

**Fig. 5.** Attribution of western US forest fire area to ACC. Cumulative forest fire area estimated from the (red) observed all-metric mean record of fuel aridity and (black) the fuel aridity record after exclusion of ACC (No ACC). The (orange) difference is the forest fire area forced by anthropogenic increases in fuel aridity. Bold lines in A and horizontal lines in B indicate mean estimated values (regression values in Fig. 1). Boxes in B bound 50% confidence intervals. Shaded areas in A and whiskers in B bound 95% confidence intervals. Dark red horizontal lines in B indicate observed forest fire area during each period.

effects during 1948–1978 and compounded anthropogenic effects during 1979–2015. During 1979–2015, for example, observed Mar–Sep vapor pressure decreased significantly across many US forest areas, in marked contrast to modeled anthropogenic increases (Fig. S6) (34). Significant declines in spring (Mar–May) precipitation in the southwestern United States and summer (Jun–Sep) precipitation throughout parts of the northwestern United States during 1979–2015 (Fig. S7 A and B) hastened increases in fire-season fuel aridity, consistent with observed increases in the number of consecutive dry days across the region (10). Natural climate variability, including a shift toward the cold phase of the interdecadal Pacific Oscillation (35), was likely the dominant driver of observed regional precipitation trends (36) (Fig. S7 B and D).

Our quantification of the ACC contribution to observed increases in forest fire activity in the western United States adds to the limited number of climate change attribution studies on wildfire to date (37). Previous attribution efforts have been restricted to a single GCM and biophysical variable (14, 16). We complement these studies by demonstrating the influence of ACC derived from an ensemble of GCMs on several biophysical metrics that exhibit strong links to forest fire area. However, our attribution effort only considers ACC to manifest as trends in

mean climate conditions, which may be conservative because climate models also project anthropogenic increases in the temporal variability of climate and drought in the western United States (34, 38, 39). In focusing exclusively on the direct impacts of ACC on fuel aridity, we do not address several other pathways by which ACC may have affected wildfire activity. For example, the fuel aridity metrics that we used may not adequately capture the role of mountain snow hydrology on soil moisture. Nor do we account for the influence of climate change on lightning activity, which may increase with warming (40). We also do not account for how fire risk may be affected by changes in biomass/fuel due to increases in atmospheric $CO_2$ (41), drought-induced vegetation mortality (42), or insect outbreaks (43).

Additionally, we treat the impact of ACC on fire as independent from the effects of fire management (e.g., suppression and wildland fire use policies), ignitions, land cover (e.g., exurban development), and vegetation changes beyond the degree to which they modulate the relationship between fuel aridity and forest fire area. These factors have likely added to the area burned across the western US forests and potentially amplified the sensitivity of wildfire activity to climate variability and change in recent decades (2, 22, 24, 44). Such confounding influences, along with nonlinear relationships between burned area and its drivers (e.g., Fig. 1), contribute uncertainty to our empirical attribution of regional burned area to ACC. Our approach depends on the strong observed regional relationship between burned area and fuel aridity at the large regional scale of the western United States, so the quantitative results of this attribution effort are not necessarily applicable at finer spatial scales, for individual fires, or to changes in nonforested areas. Dynamical vegetation models with embedded fire models show emerging promise as tools to diagnose the impacts of a richer set of processes than those considered here (41, 45) and could be used in tandem with empirical approaches (46, 47) to better understand contributions of observed and projected ACC to changes in regional fire activity. However, dynamic models of vegetation, human activities, and fire are not without their own lengthy list of caveats (2). Given the strong empirical relationship between fuel aridity and wildfire activity identified here and in other studies (1, 2, 4, 8), and substantial increases in western US fuel aridity and fire-weather season length in recent decades, it appears clear from empirical data alone that increased fuel aridity, which is a robustly modeled result of ACC, is the proximal driver of the observed increases in western US forest fire area over the past few decades.

## Conclusions

Since the 1970s, human-caused increases in temperature and vapor pressure deficit have enhanced fuel aridity across western continental US forests, accounting for approximately one half of the observed increases in fuel aridity during this period. These anthropogenic increases in fuel aridity approximately doubled the western US forest fire area beyond that expected from natural climate variability alone during 1984–2015. The growing ACC influence on fuel aridity is projected to increasingly promote wildfire potential across western US forests in the coming decades and pose threats to ecosystems, the carbon budget, human health, and fire suppression budgets (13, 48) that will collectively encourage the development of fire-resilient landscapes (49). Although fuel limitations are likely to eventually arise due to increased fire activity (17), this process has not yet substantially disrupted the relationship between western US forest fire area and aridity. We expect anthropogenic climate change and associated increases in fuel aridity to impose an increasingly dominant and detectable effect on western US forest fire area in the coming decades while fuels remain abundant.

PNAS

## Methods

We focus on climate variables that directly affect fuel moisture over forested areas of the western continental United States, where fire activity tends to be flammability-limited rather than fuel- or ignition-limited (1) (study region shown in Fig. 1, *Inset*). There are a variety of climate-based metrics that have been used as proxies for fuel aridity, yet there is no universally preferred metric across different vegetation types (24). We consider eight frequently used fuel aridity metrics that correlate with fire activity variables, including annual burned area (Fig. 1 and Table S1), in western US forests.

Fuel aridity metrics are calculated from daily surface meteorological data (50) on a 1/24° grid for 1979–2015 for the western United States (west of 103°W). Although we calculated metrics across the entire western United States, we focus on forested lands defined by the climax succession vegetation stages of "forest" or "woodland" in the Environmental Site Potential product of LANDFIRE (landfire.gov). Forested 1/24° grid cells are defined by at least 50% forest coverage aggregated from LANDFIRE. We extended the aridity metrics calculated at the monthly timescale (ETo, VPD, CWD, and PDSI) back to 1948 using monthly anomalies relative to a common 1981–2010 period from the dataset developed by the Parameterized Regression on Independent Slopes Model group (51) for temperature, precipitation, and vapor pressure, and by bilinearly interpolating NCEP–NCAR reanalysis for wind speed and surface solar radiation. We aggregated data to annualized time series of mean May–Sep daily FWI, KBDI, ERC, and FFDI; Mar–Sep VPD and ETo; Jan–Aug PDSI; and Jan–Dec CWD. We also calculated the aridity metrics strictly from ERA-INTERIM and NCEP–NCAR reanalysis products for 1979–2015 covering the satellite era (*Supporting Information*).

Days per year of high fire potential are quantified by daily fire danger indices (ERC, FWI, FFDI, and KBDI) that exceed the 95th percentile threshold defined during 1981–2010 from observations after removing the ACC signal. Observational studies have shown that fire growth preferentially occurs during high fire danger periods (52, 53). We also calculate the fire weather season length for the four daily fire danger indices following previous studies (10).

The ACC signal is obtained from ensemble members taken from 27 CMIP5 global climate models (GCMs) regridded to a common 1° resolution for 1850–2005 using historical forcing experiments and for 2006–2099 using the Representative Concentration Pathway (RCP) 8.5 emissions scenario (Table S3 and *Supporting Information*). These GCMs were selected based on availability of monthly outputs for maximum and minimum daily temperature ($T_{max}$ and $T_{min}$, respectively), specific humidity ($huss$), and surface pressure. Saturation vapor pressure ($e_s$), vapor pressure ($e$), and VPD were calculated using standard methods (*Supporting Information*). A variety of approaches exist to estimate the ACC signal (26). We define the anthropogenic signals in $T_{max}$, $T_{min}$, $e$, $e_s$, VPD, and relative humidity by a 50-y low-pass-filter time series (using a 10-point Butterworth filter) averaged across the 27 GCMs using the following methodology: For each GCM, variable, month, and grid cell, we converted each annual time series to anomalies relative to a 1901–2000 baseline. We averaged annual anomalies across all realizations (model runs) for each GCM and calculated a single 50-y low-pass-filter annual time series for each of the 12 mo for 1850–2099. We averaged each month's low-pass-filtered time series across the 27 GCMs and additively adjusted so that all smoothed records pass through zero in 1901. The resultant ACC signal represents the CMIP5 modeled anthropogenic impact since 1901 for each variable, grid cell, and month (*Supporting Information*).

We bilinearly interpolated the 1° CMIP5 multimodel mean 50-y low-pass time series to the 1/24° spatial resolution of the observations and subtracted the ACC signal from the observed daily and monthly time series. We consider the remaining records after subtraction of the ACC signal to indicate climate records that are free of anthropogenic trends (26).

Annual variations in fuel aridity metrics are presented as standardized anomalies (σ) to accommodate differences across geography and metrics. All fuel aridity metrics are standardized using the mean and SD from 1981 to 2010 for observations that excluded the ACC signal. Although the selection of a reference period can bias results (54), our findings were similar when using the full 1979–2015 time period or the observed data (without removal of ACC) for the reference period. The influence of anthropogenic forcing on fuel aridity metrics is quantified as the difference between metrics calculated with observations and those calculated with observations that excluded the ACC signal. Area-weighted standardized anomalies and the spatial extent of western US forested land that experienced high (>1 σ) aridity are computed for each aridity metric. Annualized burned area as well as aggregated fuel aridity metrics calculated with data from ref. 50 and the two reanalysis products are provided in Datasets S1–S3.

We use the regression relationship between the annual western US forest fire area and the all-metric mean fuel aridity index in Fig. 1 to estimate the forcing of anthropogenic increases in fuel aridity on forest fire area during 1984–2015. Uncertainties in the regression relationship due to imperfect correlation and temporal autocorrelation are propagated as estimated confidence bounds on the anthropogenic forcing of forest fire area. This approach was repeated using a more conservative definition of the regression relationship, where we removed the linear least squares trend for 1984–2015 from both the area burned and fuel aridity time series before regression to reduce the possibility of spurious correlation due to common but unrelated trends (Fig. S5). Statistical significance of all linear trends and correlations reported in this study are assessed using both Spearman's rank and Kendall's tau statistics. Trends are considered significant if both tests yield $P < 0.05$.

**ACKNOWLEDGMENTS.** We thank J. Mankin, B. Osborn, and two reviewers for helpful comments on the manuscript and coauthors of ref. 26 for help developing the empirical attribution framework. A.P.W. was funded by Columbia University's Center for Climate and Life and by the Lamont-Doherty Earth Observatory (Lamont contribution 8048). J.T.A. was supported by funding from National Aeronautics and Space Administration Terrestrial Ecology Program under Award NNX14AJ14G, and the National Science Foundation Hazards Science, Engineering and Education for Sustainability (SEES) Program under Award 1520873.

EARTH, ATMOSPHERIC, AND PLANETARY SCIENCES

1. Littell JS, McKenzie D, Peterson DL, Westerling AL (2009) Climate and wildfire area burned in western U.S. ecoprovinces, 1916-2003. *Ecol Appl* 19(4):1003–1021.
2. Williams AP, Abatzoglou JT (2016) Recent advances and remaining uncertainties in resolving past and future climate effects on global fire activity. *Curr Clim Chang Reports* 2:1–14.
3. Dennison P, Brewer S, Arnold J, Moritz M (2014) Large wildfire trends in the western United States, 1984–2011. *Geophys Res Lett* 41:2928–2933.
4. Westerling AL, Hidalgo HG, Cayan DR, Swetnam TW (2006) Warming and earlier spring increase western U.S. forest wildfire activity. *Science* 313(5789):940–943.
5. Westerling AL (2016) Increasing western US forest wildfire activity: Sensitivity to changes in the timing of spring. *Philos Trans R Soc B Biol Sci* 371(1696):20150178.
6. Kasischke ES, Turetsky MR (2006) Recent changes in the fire regime across the North American boreal region - Spatial and temporal patterns of burning across Canada and Alaska. *Geophys Res Lett* 33(9):L09703.
7. Kelly R, et al. (2013) Recent burning of boreal forests exceeds fire regime limits of the past 10,000 years. *Proc Natl Acad Sci USA* 110(32):13055–13060.
8. Abatzoglou JT, Kolden CA (2013) Relationships between climate and macroscale area burned in the western United States. *Int J Wildland Fire* 22(7):1003–1020.
9. Seager R, et al. (2015) Climatology, variability, and trends in the U.S. vapor pressure deficit, an important fire-related meteorological quantity. *J Appl Meteorol Climatol* 54(6):1121–1141.
10. Jolly WM, et al. (2015) Climate-induced variations in global wildfire danger from 1979 to 2013. *Nat Commun* 6:7537.
11. Dobrowski SZ, et al. (2013) The climate velocity of the contiguous United States during the 20th century. *Glob Change Biol* 19(1):241–251.
12. Flannigan MD, Krawchuk MA, de Groot WJ, Wotton BM, Gowman LM (2009) Implications of changing climate for global wildland fire. *Int J Wildland Fire* 18(5):483–507.
13. Flannigan M, et al. (2013) Global wildland fire season severity in the 21st century. *For Ecol Manage* 294:54–61.
14. Yoon J, Kravitz B, Rasch P (2015) Extreme fire season in California: A glimpse into the future? *Bull Am Meteorol Soc* 96:S5–S9.
15. Barbero R, Abatzoglou JT, Larkin NK, Kolden CA, Stocks B (2015) Climate change presents increased potential for very large fires in the contiguous United States. *Int J Wildland Fire* 24(7):892–899.
16. Gillett NP, Weaver AJ, Zwiers FW, Flannigan MD (2004) Detecting the effect of climate change on Canadian forest fires. *Geophys Res Lett* 31(18):L18211.
17. Westerling AL, Turner MG, Smithwick EAH, Romme WH, Ryan MG (2011) Continued warming could transform Greater Yellowstone fire regimes by mid-21st century. *Proc Natl Acad Sci USA* 108(32):13165–13170.
18. Krawchuk MA, Moritz MA, Parisien MA, Van Dorn J, Hayhoe K (2009) Global pyrogeography: The current and future distribution of wildfire. *PLoS One* 4(4):e5102.
19. Moritz MA, et al. (2012) Climate change and disruptions to global fire activity. *Ecosphere* 3(6):1–22.
20. Marlon JR, et al. (2012) Long-term perspective on wildfires in the western USA. *Proc Natl Acad Sci USA* 109(9):E535–E543.
21. Parks SA, et al. (2015) Wildland fire deficit and surplus in the western United States, 1984–2012. *Ecosphere* 6(12):1–13.
22. Higuera PE, Abatzoglou JT, Littell JS, Morgan P (2015) The changing strength and nature of fire–climate relationships in the northern Rocky Mountains, U.S.A., 1902-2008. *PLoS One* 10(6):e0127563.
23. Pausas JG, Ribeiro E (2013) The global fire–productivity relationship. *Glob Ecol Biogeogr* 22(6):728–736.
24. Littell JS, Peterson DL, Riley KL, Liu Y, Luce CH (2016) A review of the relationships between drought and forest fire in the United States. *Glob Change Biol* 22(7):2353–2369.

25. Williams AP, et al. (2015) Correlations between components of the water balance and burned area reveal new insights for predicting forest fire area in the southwest United States. *Int J Wildland Fire* 24(1):14–26.

26. Williams AP, et al. (2015) Contribution of anthropogenic warming to California drought during 2012–2014. *Geophys Res Lett* 42(16):6819–6828.

27. Sheffield J, et al. (2013) North American Climate in CMIP5 experiments. Part I: Evaluation of historical simulations of continental and regional climatology. *J Clim* 26(23):9209–9245.

28. Hobbins MT (2016) The variability of ASCE standardized reference evapotranspiration: A rigorous, CONUS-wide decomposition and attribution. *Trans Am Soc Agric Biol Eng* 59(2):561–576.

29. Mann ML, et al. (2016) Incorporating anthropogenic influences into fire probability models: Effects of human activity and climate change on fire activity in California. *PLoS One* 11(4):e0153589.

30. Yue X, Mickley LJ, Logan JA, Kaplan JO (2013) Ensemble projections of wildfire activity and carbonaceous aerosol concentrations over the western United States in the mid-21st century. *Atmos Environ (1994)* 77:767–780.

31. Pechony O, Shindell DT (2010) Driving forces of global wildfires over the past millennium and the forthcoming century. *Proc Natl Acad Sci USA* 107(45):19167–19170.

32. Littell JS, et al. (2010) Forest ecosystems, disturbance, and climatic change in Washington State, USA. *Clim Change* 102(1-2):129–158.

33. Rogers BM, et al. (2011) Impacts of climate change on fire regimes and carbon stocks of the U.S. Pacific Northwest. *J Geophys Res Biogeosci* 116(G3):G03037.

34. Williams AP, et al. (2014) Causes and implications of extreme atmospheric moisture demand during the record-breaking 2011 wildfire season in the southwestern United States. *J Appl Meteorol Climatol* 53(12):2671–2684.

35. Dong B, Dai A (2015) The influence of the Interdecadal Pacific Oscillation on temperature and precipitation over the globe. *Clim Dyn* 45(9-10):2667–2681.

36. Deser C, Knutti R, Solomon S, Phillips AS (2012) Communication of the role of natural variability in future North American climate. *Nat Clim Chang* 2(11):775–779.

37. National Academies of Sciences, Engineering, and Medicine (2016) *Attribution of Extreme Weather Events in the Context of Climate Change* (The National Academies Press, Washington, DC).

38. Swain DL, Horton DE, Singh D, Diffenbaugh NS (2016) Trends in atmospheric patterns conducive to seasonal precipitation and temperature extremes in California. *Sci Adv* 2(4):e1501344.

39. Polade SD, Pierce DW, Cayan DR, Gershunov A, Dettinger MD (2014) The key role of dry days in changing regional climate and precipitation regimes. *Sci Rep* 4:4364.

40. Romps DM, Seeley JT, Vollaro D, Molinari J (2014) Climate change. Projected increase in lightning strikes in the United States due to global warming. *Science* 346(6211):851–854.

41. Knorr W, Jiang L, Arneth A (2016) Climate, $CO_2$ and human population impacts on global wildfire emissions. *Biogeosciences* 13(1):267–282.

42. Williams AP, et al. (2013) Temperature as a potent driver of regional forest drought stress and tree mortality. *Nat Clim Chang* 3(3):292–297.

43. Hart SJ, Schoennagel T, Veblen TT, Chapman TB (2015) Area burned in the western United States is unaffected by recent mountain pine beetle outbreaks. *Proc Natl Acad Sci USA* 112(14):4375–4380.

44. Van Wagtendonk JW (2007) The history and evolution of wildland fire use. *Fire Ecol* 3(2):3–17.

45. Bowman DMJS, Murphy BP, Williamson GJ, Cochrane MA (2014) Pyrogeographic models, feedbacks and the future of global fire regimes. *Glob Ecol Biogeogr* 23(7):821–824.

46. Parisien M-A, et al. (2014) An analysis of controls on fire activity in boreal Canada: Comparing models built with different temporal resolutions. *Ecol Appl* 24(6):1341–1356.

47. Krawchuk MA, Moritz MA (2014) Burning issues: Statistical analyses of global fire data to inform assessments of environmental change. *Environmetrics* 25(6):472–481.

48. Millar CI, Stephenson NL (2015) Temperate forest health in an era of emerging megadisturbance. *Science* 349(6250):823–826.

49. Smith AMS, et al. (2016) The science of firescapes: Achieving fire-resilient communities. *Bioscience* 66(2):130–146.

50. Abatzoglou JT (2013) Development of gridded surface meteorological data for ecological applications and modelling. *Int J Climatol* 33(1):121–131.

51. Daly C, et al. (2008) Physiographically sensitive mapping of climatological temperature and precipitation across the conterminous United States. *Int J Climatol* 28(15):2031–2064.

52. Stavros EN, Abatzoglou J, Larkin NK, McKenzie D, Steel EA (2014) Climate and very large wildland fires in the contiguous Western USA. *Int J Wildland Fire* 23(7):899–914.

53. Riley KL, Abatzoglou JT, Grenfell IC, Klene AE, Heinsch FA (2013) The relationship of large fire occurrence with drought and fire danger indices in the western USA, 1984–2008: The role of temporal scale. *Int J Wildland Fire* 22(7):894–909.

54. Sippel S, et al. (2015) Quantifying changes in climate variability and extremes: Pitfalls and their overcoming. *Geophys Res Lett* 42(22):9990–9998.

55. Littell JS, Gwozdz RB (2011) Climatic water balance and regional fire years in the Pacific Northwest, USA: linking regional climate and fire at landscape scales. *The Landscape Ecology of Fire* (Springer, Dordrecht, The Netherlands), pp 117–139.

56. Morton DC, et al. (2013) Satellite-based assessment of climate controls on US burned area. *Biogeosciences* 10(1):247–260.

57. Stocks BJ, et al. (1989) Canadian forest fire danger rating system: An overview. *For Chron* 65(4):258–265.

58. Westerling AL, Gershunov A, Brown TJ, Cayan DR, Dettinger MD (2003) Climate and wildfire in the western United States. *Bull Am Meteorol Soc* 84(5):595–604.

59. Flannigan MD, et al. (2016) Fuel moisture sensitivity to temperature and precipitation: Climate change implications. *Clim Change* 134(1-2):59–71.

60. Flannigan MD, Van Wagner CE (1991) Climate change and wildfire in Canada. *Can J Res* 21(1):66–72.

61. Dowdy AJ, Mills GA, Finkele K, de Groot W (2010) Index sensitivity analysis applied to the Canadian Forest Fire Weather Index and the McArthur Forest Fire Danger Index. *Meteorol Appl* 17(3):298–312.

62. Mitchell KE, et al. (2004) The multi-institution North American Land Data Assimilation System (NLDAS): Utilizing multiple GCIP products and partners in a continental distributed hydrological modeling system. *J Geophys Res Atmos* 109(D7):D07S90.

63. Allen RG, Pereira LS, Raes D, Smith M (1998) Crop evapotranspiration-Guidelines for computing crop water requirements-FAO Irrigation and drainage paper 56. *FAO, Rome* 300(9):D05109.

64. Willmott CJ, Rowe CM, Mintz Y (1985) Climatology of the terrestrial seasonal water cycle. *J Climatol* 5(6):589–606.

65. Andrews PL, Loftsgaarden DO, Bradshaw LS (2003) Evaluation of fire danger rating indexes using logistic regression and percentile analysis. *Int J Wildland Fire* 12(2):213–226.

66. Cohen JE, Deeming JD (1985) The National Fire-Danger Rating System: basic equations. *Gen Tech Rep*:16.

67. McArthur AG (1967) Fire behaviour in eucalypt forests (Forestry and Timber Bureau Leaflet 107).

68. Griffiths D (1999) Improved formula for the drought factor in McArthur's Forest Fire Danger Meter. *Aust For* 62(3):202–206.

69. Wallace JM, Hobbs PV (2006) *Atmospheric Science: An Introductory Survey* (Academic, Amsterdam), 2nd Ed.

70. Eidenshink JC, et al. (2007) A project for monitoring trends in burn severity. *Fire Ecol* 3(1):3–21.

71. Roy DP, Boschetti L, Justice CO, Ju J (2008) The collection 5 MODIS burned area product—Global evaluation by comparison with the MODIS active fire product. *Remote Sens Environ* 112(9):3690–3707.

72. van Vuuren DP, et al. (2011) The representative concentration pathways: An overview. *Clim Change* 109(1):5–31.

SCIENCE ADVANCES | RESEARCH ARTICLE

CLIMATOLOGY

# Relative impacts of mitigation, temperature, and precipitation on 21st-century megadrought risk in the American Southwest

Toby R. Ault,[1]* Justin S. Mankin,[2,3] Benjamin I. Cook,[2,3] Jason E. Smerdon[2]

2016 © The Authors, some rights reserved; exclusive licensee American Association for the Advancement of Science. Distributed under a Creative Commons Attribution NonCommercial License 4.0 (CC BY-NC).

Megadroughts are comparable in severity to the worst droughts of the 20th century but are of much longer duration. A megadrought in the American Southwest would impose unprecedented stress on the limited water resources of the area, making it critical to evaluate future risks not only under different climate change mitigation scenarios but also for different aspects of regional hydroclimate. We find that changes in the mean hydroclimate state, rather than its variability, determine megadrought risk in the American Southwest. Estimates of megadrought probabilities based on precipitation alone tend to underestimate risk. Furthermore, business-as-usual emissions of greenhouse gases will drive regional warming and drying, regardless of large precipitation uncertainties. We find that regional temperature increases alone push megadrought risk above 70, 90, or 99% by the end of the century, even if precipitation increases moderately, does not change, or decreases, respectively. Although each possibility is supported by some climate model simulations, the latter is the most common outcome for the American Southwest in Coupled Model Intercomparison 5 generation models. An aggressive reduction in global greenhouse gas emissions cuts megadrought risks nearly in half.

Downloaded from http://advances.sciencemag.org/ on October 16, 2016

## INTRODUCTION

Megadroughts are periods of aridity as severe as the worst multiyear droughts of the 20th century and persist for decades. These droughts are known to have occurred in the American Southwest (1, 2) and other parts of the world (3, 4) during the past millennium, and they have been linked to the demise of several preindustrial civilizations (3, 5, 6). A megadrought occurring again in the Southwest in the coming decades would impose unprecedented stresses on water resources of the region, and recent studies have shown that they are far more likely to occur this century because of climate change compared to past centuries (7, 8).

Estimating the probability of a megadrought under different climate change scenarios is critical for effectively evaluating risk and managing water resources, but recent studies have disagreed on the relative odds of these events. For example, on the basis of precipitation projections and paleoclimate data, Ault *et al.* (8) argued that the risk of multidecadal megadrought in the American Southwest would increase at least twofold from 5 to 15% over the last millennium to between 20 and 50% this century; Cook *et al.* (7) estimated those risks to be much higher in an analysis of a wider range of soil moisture indicators of varying levels of complexity. Further complicating this picture is that certain regions (for example, much of the American West) are expected to become drier, on average, even with a predicted increase in precipitation because of the increased demand for moisture by the atmosphere and consequent increases in evapotranspiration (9, 10). It is therefore critical to clarify the relative contributions of precipitation and temperature to future megadrought risk.

Here, we focus on characterizing megadrought risk as a function of variables that govern the balance of moisture at the land surface during climate change. At decadal and longer time scales, these variables are primarily precipitation, which supplies moisture, and temperature and vegetation, which modulate evapotranspiration (9, 11). Although cli-

mate change projections of higher temperatures are robust and broadly consistent across different model simulations, projections of precipitation change are subject to considerably more uncertainty. Moreover, megadroughts are extreme events that unfold over decades, implying that even state-of-the-art multimodel ensembles used for the Intergovernmental Panel on Climate Change (IPCC) will have only a handful of realizations of these intervals at best. This small sample size inherently makes estimating the probability of a megadrought challenging because any empirical probability density function (PDF) of its occurrence will be finite and incomplete. For example, imagine two simulations run with a model that predicts overall drying: In the first realization, there is a megadrought, and in the second, there is none. The model-predicted probability would appear to be 50% regardless of the true megadrought PDF. As an alternative, we characterize the megadrought PDF by asking the following: (i) What are the changes in regional hydroclimate that elevate (or lower) megadrought risk? (ii) How do state-of-the-art general circulation models (GCMs) simulate the variables that govern megadrought risk?

We adopt a probabilistic framework for quantifying the risk of future events under a broad range of possible climate outcomes and then compare GCMs against these possibilities. Although there are a number of objective methods for identifying periods of megadrought in a hydroclimate time series (12–16), here we define a megadrought as a multidecadal (35-year) period of aridity as bad as, if not worse than, the worst droughts of the 20th century (−0.5 of an SD on average; Materials and Methods). By megadrought "risk," we refer to the probability of an event occurring this century, acknowledging that the statistics of regional hydroclimate in the future will likely be different from past statistics. This notion of risk accommodates the possibility that an event might not unfold even if megadroughts are generally more likely to occur (for example, a few fortuitous wet years in a drier climate with higher megadrought risk could prevent an event from fully unfolding).

Quantifying megadrought risk over a wide range of plausible climate change outcomes allows us to assess how deterministic GCMs, forced with rising greenhouse gas (GHG) concentrations, simulate changes in temperature and precipitation associated with different levels of risk

[1]Department of Earth and Atmospheric Sciences, Cornell University, Ithaca, NY 14853, USA. [2]Division of Ocean and Climate Physics, Lamont-Doherty Earth Observatory of Columbia University, Palisades, NY 10964, USA. [3]NASA Goddard Institute for Space Studies, New York, NY 10025, USA.
*Corresponding author. Email: toby.ault@cornell.edu

(see Materials and Methods). We apply this framework to characterize the chances of a megadrought defined by precipitation and multiple soil moisture metrics in output from the Coupled Model Intercomparison Project Phase 5 (CMIP5) multimodel ensemble (*17*), as well as a single-model [Community Earth System Model (CESM)] "large" ensemble (*18*). Although structural uncertainty and internal variability are conflated in the CMIP5 ensemble, diagnosis of a single-model ensemble allows us to delineate the role of internal variability alone in shaping future megadrought risk.

## RESULTS

We express megadrought risk as a two-dimensional (2D) PDF of both changes in mean hydroclimate state (denoted $\Delta\mu$, Materials and Methods) and changes in hydroclimate variability ($\delta\sigma$) relative to the historical period (1951–2000). This framework reveals that risks are dominated by changes in the mean state of a given hydroclimate variable ($\Delta\mu$), although there are some exceptions, as seen in the shading of Fig. 1 and fig. S1. For example, decreases in the mean ($\Delta\mu < 0$) can be compensated by decreases in variance ($\delta\sigma > 1$), maintaining low megadrought risk in the light-colored triangle-shaped region of negative $\Delta\mu$ (between the dark shading and the dashed line on all panels of Fig. 1). Likewise, increases in hydroclimate mean values ($\Delta\mu > 0$) do not necessarily correspond to lower megadrought risk if those changes are accompanied by increases in variance (dark gray shading to the right of the dashed line on all panels in Fig. 1). Herein, we will adopt the language of the IPCC to characterize probabilities (*19*): The black region of the 2D PDF in Fig. 1 identifies areas where megadroughts are "virtually certain" (>99% probability of occurrence), whereas the white region shows combinations of mean state and variability changes that would make these events "exceptionally unlikely" (<1% probability). Note that the regions shaded in black depict probabilities in excess of 99.9% and hence would correspond to a climate that is drier, on average, than the worst droughts of the past 1000 years (*7*). For reference, megadroughts in the preindustrial era only occurred once or twice per millennium on average (*2*, *8*, *20*); thus, without climate change, these events would be "very unlikely" (0 to 10% probability) (*8*).

Although some studies have relied on precipitation alone to identify prolonged drought or megadrought conditions (*13*, *21*, *22*), our results show that this approach tends to underestimate risk in a changing climate (Fig. 1). On each panel, changes in normalized drought indicators [annually averaged precipitation, June-July-August (JJA) soil moisture at 2 m and 30 cm, and JJA Palmer Drought Severity Index (PDSI)] are overlaid on the 2D PDF of megadrought risk, expressed again as a function of $\delta\sigma$ and $\Delta\mu$. We focus on JJA for soil moisture and PDSI because it is the driest, hottest part of the year in much of the Southwest and also for compatibility with paleoclimate reconstructions of JJA aridity (*7*, *12*). By midcentury (2051–2080), under a business-as-usual emissions scenario, the "large" ensemble (LENS) from one model (CESM) simulates increases in annual precipitation, which decreases megadrought risk according to estimates solely based on this variable (Fig. 1A, blue circles). The CMIP5 multimodel ensemble shows a similar pattern, although (on average) regional annual precipitation decreases, slightly increasing megadrought risk (Fig. 1B). Nonetheless, models within the CMIP5 archive also support decreases in average normalized annual precipitation of nearly one full SD and increases of more than 1 SD (Fig. 1B and fig. S1). These projected changes encompass megadrought probabilities that range from virtually certain (>99.9%) to exceptionally unlikely (<0.1%) if precipitation alone is used to assess its risk.



**Fig. 1. Megadrought risk estimates for the American Southwest shown with model-projected changes in mean hydroclimate. (A to C)** Megadrought risk estimates for the American Southwest (shading) shown with model-projected changes in mean hydroclimate under the RCP 8.5 (high emissions) scenario for (A) annual precipitation and JJA soil moisture (PDSI, 30-cm soil moisture, and 2-m soil moisture) in the CESM LENS, (B) annual precipitation from all CMIP5 models, and (C) JJA soil moisture indicators derived from a 17-model subset of CMIP5 for which all variables needed to compute these quantities were available (*7*). In all panels, the interquartile range of the ensemble is shown (the full range is shown in the Supplementary Materials). Model-based variables are normalized to unit variance over a historical reference period (1951–2000) and compared with midcentury changes (2051–2080). The shading shows the 2D PDF of megadrought risk for combinations of changes in the mean ($\Delta\mu$) and variability ($\delta\sigma$) of a normalized drought indicator time series [$z'(t)$].

Downloaded from http://advances.sciencemag.org/ on October 16, 2016

In contrast to precipitation, indicators of JJA soil moisture depict a more consistent picture of drying ($\Delta\mu < 0$) and correspondingly higher megadrought risks (orange symbols in Fig. 1, A and C). Most simulations in both the CESM and CMIP5 ensembles plot into a region of the megadrought risk PDF where events are virtually certain (>99.9% probability) by midcentury (Fig. 1C and figs. S1 and S2). Note that Cook *et al.* (7) estimated regional risks to be closer to 80% because that study derived risks from the CMIP5 ensemble itself (which includes models that simulate both low and high risks), whereas here we are plotting where each ensemble member falls in the 2D megadrought PDF. The contrasting estimates of risk between precipitation and soil moisture hint at the role that temperature might play in elevating megadrought probabilities by altering the mean regional moisture balance during climate change. They further imply that this tendency is generally independent of the particular soil moisture metric targeted for analysis, as also shown in earlier studies (7, 23).

Not all variables from all models plot into the portion of the 2D PDF shown here (fig. S2). For example, one model (CanESM2) simulates average 2-m soil moisture conditions ($\Delta\mu$) that are approximately 3σ wetter by midcentury than over the historical period (1951–2000). We therefore cannot completely rule out the possibility that moisture will increase in deeper soil layers despite warming temperatures (22), but this possibility is inconsistent with near-surface conditions in most of the models, some of which support mean conditions far worse than the worst years of drought during the historical period. Moreover,

variables from four models (MIROC-ESM-CHEM 2-m soil moisture, MIROC-ESM 2-m soil moisture, NorESM1-M 30-cm soil moisture, and GFDL-CM3 2-m soil moisture) fall to levels below −3σ (much drier), three of which are associated with the deep soil layer. Nonetheless, these uncertainties motivate a closer look at the relative contributions of mean temperature and precipitation change to regional megadrought risk.

Because changes in the mean state largely determine megadrought risk (Fig. 1), the second 2D PDF that we consider (Fig. 2) is generated using the JJA PDSI calculated from resampled and rescaled observational and reanalysis data over a wide range of plausible changes in mean precipitation and temperature (Materials and Methods). These values are "plausible" in the sense that they are supported by the range of estimates derived from the CMIP5 ensemble (Materials and Methods). This PDF shows a strong risk dependence on both variables, with decreasing precipitation and/or increasing temperature linked to a higher probability of megadrought (Fig. 2). At a constant temperature relative to the 1951–2000 baseline ($\Delta T = 0$), reductions in precipitation are associated with increases in risk. Likewise, increases in temperature elevate risk if precipitation is held constant (for example, $\Delta P = 0\%$). This effect is stronger for higher regional temperature change, such that even without any reduction in precipitation, the probability of megadrought is close to 100% if Southwest temperatures rise by 5°C or more, a possibility encompassed by the CMIP5 multimodel distribution under business-as-usual forcing (Fig. 2C). Moreover, the general characteristics of this 2D PDF, including its strong dependence on temperature, are



**Fig. 2. Megadrought risk expressed as a function of both mean precipitation and temperature for the American Southwest compared with projected changes in temperature and precipitation.** (**A**) Megadrought risk expressed as a function of both mean precipitation and temperature for the American Southwest (shading) compared with projected changes in temperature and precipitation (symbols) for two scenarios: RCP 2.6 (low emissions, blue triangles) and RCP 8.5 (high emissions, red circles). CMIP5 estimates of change are expressed as the difference between the historical reference period (1951–2000) and the midcentury average (2051–2080). The megadrought risk surface (shading) is the average of all 2D PDFs calculated at each grid point in the Southwest for each combination of temperature and precipitation change. JJA PDSI is used as the reference normalized drought indicator time series [*z(t)*]. The vertical dashed line marks no change in precipitation. (**B**) Marginal distribution of precipitation change in CMIP5 models, binned at 5% intervals from −30 to +30% of historical climatology. (**C**) Marginal distribution of temperature changes, binned at 0.5°C intervals from zero to six.

Ault *et al., Sci. Adv.* 2016;**2**:e1600873    5 October 2016

Downloaded from http://advances.sciencemag.org/ on October 16, 2016

robust even if temperature and precipitation only change during certain seasonal windows (fig. S3).

Model-based estimates of mean Southwest temperature and precipitation change are plotted as symbols in Fig. 2A (model IDs are provided in fig. S1). Because megadrought risk largely depends on these mean changes, we evaluate the effect of climate mitigation on megadrought risk. We consider the two experiments that bracket a large number of possible mitigation outcomes from the "low-emission" Representative Concentration Pathway 2.6 (RCP 2.6) (blue triangles) to the "high-emission" RCP 8.5 (orange circles) scenarios. Marginal distributions of mean precipitation and temperature change from the CMIP5 archive are also shown in Fig. 2 (B and C, respectively). There is clearly more ambiguity about the direction and magnitude of precipitation change in the Southwest as compared to temperature: The distribution of RCP 2.6 precipitation is nearly unchanged from the historical period (median precipitation change of +0.7%), whereas the RCP 8.5 scenario is only moderately drier (median of −3%), albeit with greater spread (Fig. 2, A and B).

In contrast to precipitation, the temperature distributions are universally of the same sign (positive), but the RCP 2.6 and RCP 8.5 scenarios are distinct from one another (Fig. 2C). It is clear that the combined projections of $\Delta T$ and $\Delta P$ from the two scenarios do not overlap appreciably because RCP 8.5 projects a higher regional temperature change than RCP 2.6. These warmer temperatures shift the entire RCP 8.5 distribution into a region of the 2D PDF where megadrought risks are much higher. Even in the case where one model (CanESM2; fig. S2) predicts a 30% increase in precipitation, this amount is insufficient to overcome the effects of higher temperature—the projection still plots into a region of elevated megadrought risk (30 to 40%) despite the precipitation increase. On the other hand, some RCP 2.6 simulations project a net increase of precipitation (blue triangles to the lower right of the gray shading in Fig. 2A), and these simulations map onto a region of megadrought risk that is either similar to (5 to 10%) or lower than (<1%) the preindustrial period (8). This reduction in risk occurs largely

because increases in precipitation are accompanied by only modest temperature shifts that stay below 2°C.

In Figs. 3 and 4, we further highlight the role that temperature plays in "loading the dice" to make megadroughts more probable through its effect on the moisture balance of the region. In Fig. 3, megadrought risks estimated for fixed values of mean precipitation change are shown with the median temperature increases simulated by RCP 2.6 (1.9°C) and RCP 8.5 (4.5°C) over the period 2051–2100 compared to 1951–2000. Here, we focus on the second half of the 21st century to emphasize the outcomes of mitigation on mean regional temperature. Two features of Fig. 3 are important to note. First, unless mean precipitation increases, megadroughts are likely (>66% probability) to occur for a regional temperature change above 2°C (dashed line). Second, median regional warming simulated for RCP 8.5 (4.5°C; dotted line) would make megadroughts very likely (>90% probability) by the end of the century if average precipitation does not increase. This risk remains above 50% unless precipitation increases by 10 to 20%, which is not typical of models in the CMIP5 archive. These estimates of risk would be even higher, and the required increases in precipitation would be even greater, if regional warming exceeds 4.5°C, which itself is a possibility supported by many of the individual model simulations (Fig. 2C).

Whereas the estimates above are based on the average 2D PDFs of megadrought risk for the entire American Southwest, our approach allows us to make similar estimates for each grid point in the domain (Fig. 4, A to C). These estimates are not based on CMIP5 output but instead are derived from probabilistic modeling of megadrought risk as a function of rescaled historical temperature and precipitation climatologies. Our results clarify the effects of these two variables on PDSI throughout the region. For temperature change below 1° and no change in precipitation, most of the domain is exposed to levels of risk below 20% (yellow regions in Fig. 4, A to C). As temperatures reach 2°C and above, increasing fractions of the domain see megadrought risks above 90%, with nearly the entire domain doing so at 6°C of warming.



**Fig. 3. Megadrought risk estimates for fixed mean precipitation changes, shown as a function of mean annual temperature and compared with CMIP5 projections of mean warming from 2051 to 2100 compared to 1951 to 2000.** Contours show risks for constant levels of mean precipitation change ($\Delta P$), derived from the 2D PDF in Fig. 2. The dashed lines denote the median warming (again comparing 2051–2100 to 1951–2000) from RCP 2.6 (1.9°C) and RCP 8.5 (4.5°C) and their corresponding risks assuming no change in precipitation ($\Delta P = 0\%$).

Downloaded from http://advances.sciencemag.org/ on October 16, 2016

SCIENCE ADVANCES | RESEARCH ARTICLE



**Fig. 4. Maps of megadrought risk for the American Southwest under different levels of warming, and the required increase in precipitation to compensate for that warming.** (**A** to **C**) Maps of megadrought risk for the entire American Southwest domain at constant (historical) precipitation climatology ($\Delta P = 0\%$) and various levels of warming. These estimates are based on the Monte Carlo procedure of observational and reanalysis data, not on CMIP5 (see Materials and Methods). (**D** to **F**) Increases in precipitation (blue shading) needed to maintain megadrought risks below 50% for different levels of regional warming. Contours map the projected changes in precipitation derived from the multimodel CMIP5 mean and are shown for reference at each level of temperature change.

For each warming threshold in Fig. 4 (A to C), we have also calculated the amount by which precipitation would need to increase to keep megadrought risks below 50% (Fig. 4, D to F, blue shading). For levels of warming below 2°C, most of the region would only need modest (<10%) increases in precipitation to keep megadrought risk levels under this threshold. As warming reaches 4°C, increases of 10 to 30% are needed throughout Nevada and the four-corner region, and at 6°C, these required increases reach 40 to 50%. For reference, the changes in precipitation projected by the RCP 8.5 CMIP5 multimodel ensemble mean at each level of warming (for example, 2°, 4°, and 6°C) are shown in contours on Fig. 4 (D to F). These projected precipitation changes are negative (dashed contours) for much of the domain, with the CMIP5 ensemble mean predicting a 5 to 15% reduction in precipitation in the southernmost areas considered here for levels of warming between 2° and 6°C. Furthermore, projected precipitation change is close to zero, on average, in regions where a 40 to 50% increase is needed to keep risks below 50% by the end of the century when warming levels approach 6°C.

### DISCUSSION
Our findings have important implications for both mitigation and adaptation. With regard to mitigation, the dependence of megadrought

risk on mean temperature highlights a relative advantage of keeping GHG emissions low. In a business-as-usual world (RCP 8.5), rising temperatures alone are sufficient to drive megadrought risks to unprecedented levels. On the other hand, if regional warming remains below 2°C, megadrought risks will correspondingly remain below 66% for a wide range of precipitation changes [for example, below the IPCC-defined threshold for likely (*19*)]. Further emission reductions, and hence smaller temperature risks, thus highlighting the fact that global efforts aimed at mitigating climate change through GHG emission reductions will also help minimize prolonged drought probabilities (*24*).

Our results also provide insight into how much additional moisture supply is needed in the Southwest on average to keep megadrought levels below certain thresholds. In our case, we again focus on the 50% threshold, though, in principle, this could be lowered. We find that even for this fairly high tolerance of risk, most of the region would need to see at least a 40 to 50% increase in precipitation (Fig. 4, D to F, shading), which, according to the CMIP5 projections, is unlikely for the area (Fig. 4, D to F, contours) (*8*, *25*). A constellation of adaptation policies, such as demand reduction and increased efficiency strategies, interbasin water transfers, shifts to groundwater reliance, increased surface irrigation, and other management measures, could serve to offset some of this increased moisture requirement. However, the feasibility, sustainability,

Downloaded from http://advances.sciencemag.org/ on October 16, 2016

and implementation of these measures and the extent to which they could reduce megadrought risk remain critical open questions.

Both structural differences between GCMs and natural variability introduce uncertainty into projected changes in precipitation (Fig. 1). These uncertainties in precipitation play out in terms of both the mean state and the variability of the Southwest, although most models simulate drying in general (Fig. 1B) (8, 25, 26). Our analysis of a LENS of one model (CESM) suggests that the role of natural variability in generating precipitation uncertainty is relatively small compared to structural differences between models, which simulate regional responses to warming between −1 and more than 1 full SD. Notwithstanding these uncertainties, higher temperatures shift the moisture balance toward conditions that are drier on average, as evidenced by multiple soil moisture metrics (Fig. 1C) (7). This shift consequently makes megadrought conditions much more likely than they are today, even if precipitation increases. Consideration of soil moisture therefore reduces the uncertainty in megadrought risk estimates stemming from natural variability and model differences because it integrates the effects of moisture supply, storage, and atmospheric demand under higher temperatures.

Several features of our approach make it easily extensible to other drought indicators, other parts of the world, and other global climate model data sets. For example, land surface model (LSM) components of GCMs could be forced with similar ranges of temperature and precipitation change to generate LSM-based 2D PDFs of risk, as we have done for PDSI. This would facilitate sensitivity tests of LSM components under a wide range of future possible climates, akin to "stress tests" in engineering (27), and could even be extended to include the relative impacts of $CO_2$ "fertilization" on megadrought risk (11). Additionally, the 2D PDFs developed here are particularly useful in the context of IPCC climate model assessments, because a new generation of simulations is released for analysis every few years. Although the details of regional hydroclimate in these simulations might change, the PDFs we generate as a function of mean state and variability (Fig. 1), or temperature and precipitation (Fig. 2), will not change, because they are generated from the observed climatology. Further work could also extend risk estimates to other aspects of hydroclimate beyond soil moisture (for example, reservoir levels, snowpack, and streamflow) and other parts of the world.

Finally, the dependence of megadrought risk on temperature makes the probability of these events in the future very distinct from such intervals in the past. Historically, megadroughts were extremely rare phenomena occurring only once or twice per millennium, possibly from internal variability (28) or weak external forcing (29). According to our analysis of modeled responses to increased GHGs, these events could become commonplace if climate change goes unabated. This appears to arise not because of any particular change in the dynamic circulation of the atmosphere but because the projected increase in atmospheric demand for moisture from the land surface will shift the baseline of soil moisture balance, making megadroughts far more likely than they have been for at least the last millennium (7).

## MATERIALS AND METHODS
Drought indicators, including precipitation, surface (30-cm) soil moisture, full column–integrated soil moisture (2 m), and the PDSI, were obtained or calculated from the following sources:

(1) Output from a recent LENS experiment (18) conducted using a single model (CESM) to address the relative importance of internal climate variability as opposed to its combination with structural differ-

ences between models. Annual precipitation, JJA 30-cm soil moisture, JJA 2-m soil moisture, and JJA PDSI were either obtained or computed from the "historical" (1920–2005) and RCP 8.5 (2005–2080) experiments in the LENS data set.

(2) GCM data from two RCPs included in the CMIP5 archive: RCP 2.6, which assumes aggressive cuts in emissions for the coming decades, generally preventing global mean temperatures from exceeding 2°C of total warming (17, 30); and RCP 8.5, which assumes that anthropogenic emissions of GHGs will continue to increase and contribute 8.5 $W/m^2$ of average net radiative forcing by the year 2100. As in the study by Cook et al. (7), we computed PDSI from a 17-model subset of the CMIP5 archive for which all fields were available to calculate the Penman-Monteith estimates of evapotranspiration, and for which soil moisture fields were also available. Annual precipitation averages were used as the normalized drought indicators in Fig. 1, whereas JJA averages of soil moisture (30 cm and 2 m) and PDSI were used from the 17-model subset for consistency with earlier studies (7, 12) and to focus on the hottest, driest part of the year in the Southwest. In contrast to the earlier study (7), we also included the remaining GCMs in our analysis of risk arising from changes in precipitation and temperature (Fig. 2), although PDSI and soil moisture were not always available from these products. In this case, annual temperature and precipitation were used.

(3) Observational temperature and precipitation fields, used in the Monte Carlo procedure described below, originated from the University of East Anglia's Climate Research Unit's "TS2.1" data product (31). These fields are produced at 0.5° native resolution but were linearly interpolated to 1° for the megadrought risk estimates computed here. Net radiation, relative humidity, and surface pressure fields used for calculating PDSI with the Penman-Monteith method for estimating evapotranspiration are from the National Centers for Environmental Prediction reanalysis data (32). Climatological values of these fields were all averaged for the Southwest domain (125°W to 105°W; 32°N to 41°N) and used to compute both historical and future estimates of JJA PDSI with bootstrap resampling procedures described below. The use of climatological values for all fields other than temperature and precipitation was motivated by the goal of isolating the effects of temperature and precipitation alone on future JJA PDSI values; changes in megadrought risk were therefore constrained to arise solely from changes in either of these two variables.

Precipitation and soil moisture are physical quantities, whereas the PDSI is a normalized index of aridity (though its local SD is not necessarily unity). Negative and positive PDSI values correspond to drought or wet conditions, respectively (33, 34). PDSI can be computed "offline" from model output and presents an internally consistent measure of drought across space, through time, and among models with different land surface schemes.

There are a number of plausible objective methods for identifying periods of megadrought in hydroclimate time series (12–16), but we adopted a simple and relatively transparent definition recently used by Cook et al. (7) and Ault et al. (8). Namely, for a given time series ($y_t$), we are interested in finding intervals when the running mean (of length $w$) falls below a certain threshold ($q$). This definition has recently been shown to reliably identify decadal droughts in the historical record (with $w = 11$ and $q = −0.5$) and multidecadal megadroughts in the paleoclimate record (with $w = 35$ and $q = −0.5$) (8). These definitions were also applied to characterize 21st-century prolonged drought risk arising primarily from climate change (7, 8). We adopt the latter definition to assess multidecadal (35-year) megadrought risk in the projections.

Downloaded from http://advances.sciencemag.org/ on October 16, 2016

SCIENCE ADVANCES | RESEARCH ARTICLE

Identifying megadroughts across a wide range of hydroclimatic time series that might include precipitation, soil moisture, drought indices, and paleoclimate records required us to normalize data in ways that would allow objective comparisons across results. We therefore considered a "modified $z$ score" ($z_t'$) defined as

$$z_t' = \frac{y_t - \mu_{ref}}{\sigma_{ref}}$$

where $y_t$ is the original variable and $\mu_{ref}$ and $\sigma_{ref}$ are the mean and SD, respectively, of that variable over a reference time period (in our case, 1951–2000). The modified $z$ score is then smoothed using a moving average of length $w$ to produce a new time series $[X_w(t)]$

$$X_w(t) = \frac{1}{w}(z_t' + z_{t-1}' + z_{t-2}' + \dots + z_{t-w}')$$

Fundamentally, we were interested in the probability that any element of $X_w(t)$ falls below the threshold $q$ for different combinations of shifts in the mean values of $z_t'$ ($\Delta\mu$) and changes in the SD ($\delta\sigma = \sigma_{new}/\sigma_{ref}$). The parameters $\Delta\mu$ and $\delta\sigma$ were interpreted as being estimates of the influence of climate change on the mean and SD of some particular drought indicator ($y_t$). The quantity of interest was the 2D PDF of megadrought: $\Pr\{X_w \leq q \mid \delta\sigma, \Delta\mu\}$, which depends on both changes in the mean ($\Delta\mu$) and the SD ($\delta\sigma$) of the modified $z$ score ($z_t'$).

The 2D PDF of megadrought risk ($\Pr\{X_w \leq q \mid \delta\sigma, \Delta\mu\}$) was estimated using a Monte Carlo procedure as in Ault et al. (8) and Cook et al. (7) and checked analytically (see figs. S4 and S5). Because we were interested in relative changes in megadrought risk as a function of shifts in the mean and different variance ratios, we would assume that the reference time series ($z_t'$) has zero mean and unit variance over the reference period. This assumption is analogous to the approach used by Ault et al. (8) and Cook et al. (7), which looked at modified $z$ scores computed from precipitation and soil moisture indicators, respectively. The difference herein is that we prescribed changes in $\Delta\mu$ and $\delta\sigma$ directly, rather than computing these parameters from GCM output. We generated random (Monte Carlo) realizations ($\hat{z}_t'$) from a Gaussian (temporally white) distribution of changes in $\Delta\mu$ mean and $\delta\sigma$ SD to represent changes in megadrought risk as a function of these two parameters (Fig. 1). Note that using Monte Carlo realizations with built-in sources of temporal persistence elevated risks in the "gray area" (values between 0.1 and 0.8) in Fig. 1 (see fig. S6). Accordingly, the PDF shown in Fig. 1 is "conservative" in the sense that true risks for certain types of drought indicators with interannual autocorrelation might be even higher than those depicted. CMIP5-based estimates of $\Delta\mu$ and $\delta\sigma$ were computed from annual precipitation, JJA soil moisture (at 30 cm and 2 m), and JJA PDSI by normalizing each of these indices over the historical period (1951–2000) and computing their normalized means and SDs at midcentury (2051–2080). These model-based estimates were then overlaid on the 2D PDF in Fig. 1.

We estimated the 2D PDF of megadrought risk as a function of changes in both temperature and precipitation (Fig. 2) using PDSI as a proxy for the surface moisture balance. To do so, the following four steps were repeated 100 times for each grid point in the American Southwest. First, the joint distribution of precipitation and temperature was generated for each month from observations. Second, temperature and precipitation values were drawn from this distribution (with replacement) to generate 100 "bootstrap" years (1200 months). Third, changes in temperature ($\Delta T$) were then added to each month of these realizations,

and precipitation was likewise scaled between −30 and +30% of climatology [that is, the range encompassed by the GCMs; see the studies by Cook et al. (7), Ault et al. (8), and Diffenbaugh and Giorgi (25)]. Fourth, these bootstrap realizations were used to compute PDSI for each unique combination of change in precipitation and change in temperature. Climatological values were used for all other variables (surface pressure, net radiation, and humidity) required by the Penman-Monteith model of evapotranspiration. As in the study by Cook et al. (7), the 1931–1990 period was used for calibrating the PDSI, and JJA average values were used to identify megadroughts.

The process above generated bootstrap realizations of PDSI with different combinations of change in temperature ($\Delta T$) and precipitation imposed on the historical period. We estimated a 2D PDF of megadrought risk for JJA PDSI at each grid point by normalizing each realization by the mean and SD of the 1951–2000 period, applying a 35-year averaging window, and identifying periods where this running mean dropped below −0.5$\sigma$. This step yielded one 2D PDF per grid point. PDFs from all grid points were averaged together for the American Southwest to produce a "master" PDF of megadrought risk, against which changes in temperature and precipitation from the entire CMIP5 multimodel ensemble were compared [for example, even from members that did not have sufficient data for computing the soil moisture quantities or PDSI in the study by Cook et al. (7)]. This 2D PDF is shown in Fig. 2.

Last, in Fig. 2, CMIP5-based estimates of changes in temperature and precipitation were computed as the difference ($\Delta T$), or ratio (%), between midcentury (2051–2080) and historical (1951–2000) periods. These differences were calculated independently from each run; thus, the symbols in Fig. 2 represent internally consistent (with respect to each simulation) estimates (as opposed to comparisons of model simulations to historical values).

## SUPPLEMENTARY MATERIALS

Supplementary material for this article is available at http://advances.sciencemag.org/cgi/content/full/2/10/e1600873/DC1

Analytical PDF of megadrought

fig. S1. Joint (2D) PDF of Southwest megadrought risk for a normalized drought indicator time series [$z'(t)$] with various changes in the mean ($\Delta\mu$) and changes in the variance ($\delta\sigma$).

fig. S2. Full range of changes in mean ($\Delta\mu$) and variability ($\delta\sigma$) simulated by a CMIP5 model subset.

fig. S3. Megadrought PDF for various combinations of seasonal changes.

fig. S4. Reduction of variance in smoothed time series ($X_w$) as a function of smoothing window length ($w$).

fig. S5. Two-dimensional PDF of prolonged drought risk computed from the analytical expression for megadrought probability.

fig. S6. Megadrought 2D PDF for changes in mean and variance but for different autocorrelation characteristics of the underlying data.

## REFERENCES AND NOTES

1. R. Acuna-Soto, D. W. Stahle, M. K. Cleaveland, M. D. Therrell, Megadrought and megadeath in 16th century Mexico. *Emerg. Infect. Dis.* **8**, 360–362 (2002).

2. C. A. Woodhouse, J. T. Overpeck, 2000 years of drought variability in the central United States. *Bull. Am. Meteorol. Soc.* **79**, 2693–2714 (1998).

3. B. M. Buckley, K. J. Anchukaitis, D. Penny, R. Fletcher, E. R. Cook, M. Sano, C. N. Le, A. Wichienkeeo, T. T. Minh, T. M. Hong, Climate as a contributing factor in the demise of Angkor, Cambodia. *Proc. Natl. Acad. Sci. U.S.A.* **107**, 6748–6752 (2010).

4. T. M. Shanahan, J. T. Overpeck, K. J. Anchukaitis, J. W. Beck, J. E. Cole, D. L. Dettman, J. A. Peck, C. A. Scholz, J. W. King, Atlantic forcing of persistent drought in West Africa. *Science* **324**, 377–380 (2009).

5. L. Benson, K. Petersen, J. Stein, Anasazi (pre-Columbian Native-American) migrations during the middle-12th and late-13th centuries—Were they drought induced? *Clim. Change* **83**, 187–213 (2007).

6. D. A. Hodell, J. H. Curtis, M. Brenner, Possible role of climate in the collapse of Classic Maya civilization. *Nature* **375**, 391–394 (1995).

Downloaded from http://advances.sciencemag.org/ on October 16, 2016

7. B. I. Cook, T. R. Ault, J. E. Smerdon, Unprecedented 21st century drought risk in the American Southwest and Central Plains. *Sci. Adv.* **1**, e1400082 (2015).

8. T. R. Ault, J. E. Cole, J. T. Overpeck, S. T. Pederson, D. M. Meko, Assessing the risk of persistent drought using climate model simulations and paleoclimate data. *J. Clim.* **27**, 7529–7549 (2014).

9. B. I. Cook, J. E. Smerdon, R. Seager, S. Coats, Global warming and 21st century drying. *Clim. Dyn.* **43**, 2607–2627 (2014).

10. J. E. Smerdon, S. Coats, T. R. Ault, Model-dependent spatial skill in pseudoproxy experiments testing climate field reconstruction methods for the Common Era. *Clim. Dyn.* **46**, 1921–1942 (2016).

11. P. C. D. Milly, K. A. Dunne, Potential evapotranspiration and continental drying. *Nat. Clim. Change* 10.1038/nclimate3046 (2016).

12. E. R. Cook, C. A. Woodhouse, C. M. Eakin, D. M. Meko, D. W. Stahle, Long-term aridity changes in the western United States. *Science* **306**, 1015–1018 (2004).

13. G. A. Meehl, A. X. Hu, Megadroughts in the Indian monsoon region and southwest North America and a mechanism for associated multidecadal Pacific sea surface temperature anomalies. *J. Clim.* **19**, 1605–1623 (2006).

14. D. M. Meko, C. A. Woodhouse, C. A. Baisan, T. Knight, J. J. Lukas, M. K. Hughes, M. W. Salze, Medieval drought in the upper Colorado River Basin. *Geophys. Res. Lett.* **34**, L10705 (2007).

15. B. G. Hunt, Global characteristics of pluvial and dry multi-year episodes, with emphasis on megadroughts. *Int. J. Climatol.* **31**, 1425–1439 (2011).

16. S. Coats, J. E. Smerdon, R. Seager, B. I. Cook, J. F. González-Rouco, Megadroughts in Southwestern North America in ECHO-G millennial simulations and their comparison to proxy drought reconstructions. *J. Climate* **26**, 7635–7649 (2013).

17. R. Knutti, J. Sedlacek, Robustness and uncertainties in the new CMIP5 climate model projections. *Nat. Clim. Change* **3**, 369–373 (2013).

18. J. E. Kay, C. Deser, A. Phillips, A. Mai, C. Hannay, G. Strand, J. M. Arblaster, S. C. Bates, G. Danabasoglu, J. Edwards, M. Holland, P. Kushner, J.-F. Lamarque, D. Lawrence, K. Lindsay, A. Middleton, E. Munoz, R. Neale, K. Oleson, L. Polvani, M. Vertenstein, The Community Earth System Model (CESM) Large Ensemble Project: A community resource for studying climate change in the presence of internal climate variability. *Bull. Am. Meteorol. Soc.* **96**, 1333–1349 (2015).

19. IPPC, Summary for policymakers, in *Climate Change 2013: The Physical Science Basis. Contribution of Working Group I to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change* (Cambridge Univ. Press, Cambridge, 2013), p. 33; www.ipcc.ch/pdf/assessment-report/ar5/wg1/WG1AR5_SPM_FINAL.pdf [accessed 12 September 2016].

20. B. I. Cook, E. R. Cook, J. E. Smerdon, R. Seager, A. P. Williams, S. Coats, D. W. Stahle, J. Villanueva Díaz, North American megadroughts in the Common Era: Reconstructions and simulations. *Wiley Interdiscip. Rev. Clim. Change* **7**, 411–432 (2016).

21. T. R. Ault, R. Zurita-Milla, M. D. Schwartz, A Matlab© toolbox for calculating spring indices from daily meteorological data. *Comput. Geosci.* **83**, 46–53 (2015).

22. L. Cheng, M. Hoerling, A. AghaKouchak, B. Livneh, X.-W. Quan, J. Eischeid, How has human-induced climate change affected California drought risk? *J. Climate* 10.1175/JCLI-D-15-0260.1 (2016).

23. J. E. Smerdon, B. I. Cook, E. R. Cook, R. Seager, Bridging past and future climate across paleoclimatic reconstructions, observations, and models: A hydroclimate case study. *J. Climate* **28**, 3212–3231 (2015).

24. H. Kunreuther, G. Heal, M. Allen, O. Edenhofer, C. B. Field, G. Yohe, Risk management and climate change. *Nat. Clim. Change* **3**, 447–450 (2013).

25. N. Diffenbaugh, F. Giorgi, Climate change hotspots in the CMIP5 global climate model ensemble. *Clim. Change* **114**, 813–822 (2012).

26. R. Seager, M. Ting, I. Held, Y. Kushnir, J. Lu, G. Vecchi, H.-P. Huang, N. Harnik, A. Leetmaa, N.-C. Lau, C. Li, J. Velez, N. Naik, Model projections of an imminent transition to a more arid climate in southwestern North America. *Science* **316**, 1181–1184 (2007).

27. W. Nelson, *Accelerated Testing: Statistical Models, Test Plans, and Data Analysis* (John Wiley & Sons Inc., 2004).

28. B. G. Hunt, Global characteristics of pluvial and dry multi-year episodes, with emphasis on megadroughts. *Int. J. Climatol.* **31**, 1425–1439 (2010).

29. D. A. Hodell, M. Brenner, J. H. Curtis, T. Guilderson, Solar forcing of drought frequency in the Maya lowlands. *Science* **292**, 1367–1370 (2001).

30. G. P. Peters, R. M. Andrew, T. Boden, J. G. Canadell, P. Ciais, C. Le Quéré, G. Marland, M. R. Raupach, C. Wilson, The challenge to keep global warming below 2°C. *Nat. Clim. Change* **3**, 4–6 (2012).

31. T. D. Mitchell, P. D. Jones, An improved method of constructing a database of monthly climate observations and associated high-resolution grids. *Int. J. Climatol.* **25**, 693–712 (2005).

32. E. Kalnay, M. Kanamitsu, R. Kistler, W. Collins, D. Deaven, L. Gandin, M. Iredell, S. Saha, G. White, J. Woollen, Y. Zhu, A. Leetmaa, R. Reynolds, M. Chelliah, W. Ebisuzaki, W. Higgins, J. Janowiak, K. C. Mo, C. Ropelewski, J. Wang, R. Jenne, D. Joseph, The NCEP/NCAR 40-year reanalysis project. *Bull. Am. Meteorol. Soc.* **77**, 437–471 (1996).

33. W. M. Alley, The Palmer Drought Severity Index—Limitations and assumptions. *J. Clim. Appl. Meteorol.* **23**, 1100–1109 (1984).

34. A. L. S. Swann, F. M. Hoffman, C. D. Koven, J. T. Randerson, Plant responses to increasing $CO_2$ reduce estimates of climate impacts on drought severity. *Proc. Natl. Acad. Sci. U.S.A.* **113**, 10019–10024 (2016).

**Acknowledgments:** We thank the World Climate Research Program's Working Group on Coupled Modeling, which oversees CMIP, and the individual model groups (listed in the caption of fig. S1) for making their data available. **Funding:** This material is based on work partially supported by NSF EaSM2 (Earth System Model 2) grants (AGS1243125 and AGS1243204) and NSF grants AGS1602564 and AGS1401400. **Author contributions:** T.R.A., J.E.S., J.S.M., and B.I.C. conceived the study. T.R.A. wrote the paper and produced all figures. B.I.C. calculated PDSI values from CMIP5 data, J.S.M. calculated PDSI values from LENS, and T.R.A. conducted the rest of the calculations. J.E.S., J.S.M., and B.I.C. contributed feedback and helped refine the writing. **Competing interests:** The authors declare that they have no competing interests. **Data and materials availability:** All methods needed to evaluate the conclusions in the paper are present in the paper and/or the Supplementary Materials. Additional data related to this paper may be requested from the authors. All data for computing changes in mean and variance as well as PDSI from CMIP5 models and LENS are available through the Earth System Grid Federation. Lamont-Doherty Earth Observatory contribution no. 8056.

Submitted 22 April 2016
Accepted 31 August 2016
Published 5 October 2016
10.1126/sciadv.1600873

**Citation:** T. R. Ault, J. S. Mankin, B. I. Cook, J. E. Smerdon, Relative impacts of mitigation, temperature, and precipitation on 21st-century megadrought risk in the American Southwest. *Sci. Adv.* **2**, e1600873 (2016).

Downloaded from http://advances.sciencemag.org/ on October 16, 2016

# Science Advances

Relative impacts of mitigation, temperature, and precipitation on 21st-century megadrought risk in the American Southwest
Toby R. Ault, Justin S. Mankin, Benjamin I. Cook and Jason E. Smerdon (October 5, 2016)
Sci Adv 2016, 2:.
doi: 10.1126/sciadv.1600873

This article is publisher under a Creative Commons license. The specific license under which this article is published is noted on the first page.

For articles published under CC BY licenses, you may freely distribute, adapt, or reuse the article, including for commercial purposes, provided you give proper attribution.

For articles published under CC BY-NC licenses, you may distribute, adapt, or reuse the article for non-commerical purposes. Commercial use requires prior permission from the American Association for the Advancement of Science (AAAS). You may request permission by clicking here.

The following resources related to this article are available online at http://advances.sciencemag.org. (This information is current as of October 16, 2016):

Updated information and services, including high-resolution figures, can be found in the online version of this article at:
http://advances.sciencemag.org/content/2/10/e1600873.full

Supporting Online Material can be found at:
http://advances.sciencemag.org/content/suppl/2016/10/03/2.10.e1600873.DC1

This article cites 30 articles, 7 of which you can access for free at:
http://advances.sciencemag.org/content/2/10/e1600873#BIBL

Downloaded from http://advances.sciencemag.org/ on October 16, 2016

Science Advances (ISSN 2375-2548) publishes new articles weekly. The journal is published by the American Association for the Advancement of Science (AAAS), 1200 New York Avenue NW, Washington, DC 20005. Copyright is held by the Authors unless stated otherwise. AAAS is the exclusive licensee. The title Science Advances is a registered trademark of AAAS



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 8**
1595 Wynkoop Street
DENVER, CO   80202-1129
Phone 800-227-8917
http://www.epa.gov/region08

Ref: 8EPR-N                          *Original signed 01/07/2011*

Juan Palma, State Director
Bureau of Land Management
Utah State Office
P.O. Box 45155
Salt Lake City, Utah 84145-0155

                                  Re:    Comments on the Gasco Uinta Basin
                                         Natural Gas Development Project Draft EIS
                                         CEQ # 20100386

Dear Mr. Palma:

    The U.S. Environmental Protection Agency (EPA) Region 8 has reviewed the Gasco Energy, Inc. Uinta Basin Natural Gas Development Project (Gasco) Draft Environmental Impact Statement (EIS) prepared by the Bureau of Land Management (BLM).  Gasco Energy, Inc. proposes to develop oil and natural gas in the Monument Butte-Red Wash and West Tavaputs Exploration and Development Areas in Uintah and Duchesne Counties, Utah.  Our comments are provided for your consideration pursuant to our responsibilities and authorities under Section 102(2)(C) of the National Environmental Policy Act (NEPA), 42 U.S.C. Section 4332(2)(C), and Section 309 of the Clean Air Act (CAA), 42 U.S.C. Section 7609.

    At the outset, I want to acknowledge the recent efforts of BLM Utah in working to achieve improved environmental protection for air quality and water quality while managing fossil fuel resource development on federal lands.  EPA supports BLM's initiative in development of a statewide air management strategy.  BLM's Air Resource Management (ARM) Strategy would provide a regional photochemical model that could be used to streamline air quality analyses during the NEPA process for all BLM oil and gas projects in Utah and set a framework for defining appropriate mitigation levels across the state.  BLM Utah also recently published IM No. UT 2010-055 - Protection of Ground Water Associated with Oil and Gas Leasing, Exploration and Development, an impressive step in enhancing BLM's existing process for the continued protection of all usable groundwater zones.

    Based upon our discussions with BLM, it is clear to us that we share common concerns regarding protection of air quality and water quality in the Uinta Basin.  Under our CAA Section 309 review responsibilities, however, our review and rating of the proposed action must be based upon information contained in the Draft EIS.  We would like to work with you in addressing the concerns expressed in this letter, as you proceed with the NEPA process for the proposed project.

**PROJECT BACKGROUND**

Five alternatives for development in the 206,826 acre Gasco project area are analyzed in the Draft EIS.  Under Alternative A, the BLM Preferred Alternative, Gasco would drill 1,491 new natural gas production wells to depths of 5,000 to 20,000 feet.  Wells would be drilled from individual well pads, with a maximum surface density of one well pad per 40 acres and at a rate of 100 wells per year.  The Preferred Alternative includes construction of associated facilities such as access roads and pipelines, as well as construction of a water evaporation facility (WEF), consisting of 30 basins on 214 acres, to dispose of produced water.  Other alternatives analyzed in the Draft EIS include:  Alternative B, Reduced Development, with 1,114 new gas production wells developed in a phased manner and special exclusions for sensitive areas; Alternative C, Full Development, with 1,887 new gas production wells; Alternative D, No Action, under which 368 separately approved wells would be developed; and Alternative E, Directional Drilling, which has all the components of the Reduced Development Alternative, but wells would be directionally drilled from only 328 well pads.  All alternatives include a WEF and other associated facilities in proportion to the number of wells and well pads.

**EPA ISSUES OF CONCERN**

Based on EPA's review of the Draft EIS, we have identified four primary concerns with the project:  air quality impacts; the characterization of and potential for impacts to groundwater resources; impacts to impaired surface waters; and the development and analysis of alternatives.  More importantly, EPA has also identified inadequacies in the Draft EIS that hinder a complete assessment of potential environmental impacts.

<u>Air Quality</u>

*Evaporation Pond VOC and HAP Emissions*

EPA is concerned that the emissions inventories used for all project-related modeling (near-field, far-field, and ozone) do not include volatile organic compound (VOC) emissions from the WEF.  The produced water found in many gas operations can contain substantial levels of various VOCs, including those that when emitted are classified as hazardous air pollutants (HAPs).  Given the large size of the proposed produced water disposal facility, there is potential for substantial emissions of VOCs from the evaporation ponds.  The EIS should provide an estimate of the VOC content of the evaporation basins and an emissions inventory that indicates the level of VOCs emitted from the WEF, as well as disclose the potential impact on HAP and ozone concentrations in the project area.

*Near-field Modeling*

Modeling for the new one-hour near-field nitrogen dioxide ($NO_2$) National Ambient Air Quality Standard (NAAQS) (finalized on April 12, 2010) was not included in the Draft EIS.  The explanation presented in the Draft EIS that gas development would not impact one-hour $NO_2$ because of its temporary nature is not valid because this is a one-hour standard.  The lack of one-

2

hour NO$_2$ modeling constitutes an inadequacy in the Draft EIS, particularly because modeling results are necessary to plan adequate mitigation to reduce any predicted adverse impacts. Moreover, as discussed above, near-field modeling conducted for the Draft EIS also does not include HAP emissions. An accurate prediction of potential HAP impacts from the proposed project is necessary to protect those living, working, or recreating in or near the project area. In particular, we note that the Pariette Wetlands (a popular recreational destination) and the community of Ouray are approximately five miles and ten miles, respectively, from the proposed WEF.

*Ozone*

Measured ambient concentrations of ozone in the Uinta Basin during the period of January through March 2010 reached levels that are considerably above the NAAQS of 75 ppb for an eight-hour average, which was promulgated by EPA in 2008. EPA has proposed to lower the primary 8-hour ozone NAAQS to a level between 60 – 70 ppb and to establish a distinct cumulative, seasonal "secondary" standard; regardless of the outcome of this decision, it is clear that the measured values are a concern for public health. EPA appreciates that BLM acknowledged the measured wintertime ozone concentrations in Section 3.2.3 – Existing Air Quality. However, further information should be provided in the EIS to fully consider the potential impacts to wintertime ozone from the proposed action. Although current modeling capabilities do not allow for prediction of wintertime ozone concentrations, the wintertime ozone issues should be addressed qualitatively in light of the significant predicted project impacts with the knowledge gained from the modeling, monitoring and potential mitigation scenarios.

The project incremental increase with the Applicant Committed Environmental Protection Measures (ACEPMs) has been modeled at 1.3 ppb, which is considered a significant project-specific contribution given the recent ozone monitored exceedances in the Uinta Basin. We believe there are additional control strategies that could be utilized to effectively reduce NO$_x$ and VOC emissions, which may include selection of a produced water disposal alternative that avoids or reduces use of surface evaporation pits.

Water Resources

*Groundwater*

Groundwater resources in the project area have not been adequately characterized in the Draft EIS to enable an assessment of the potential for impact to groundwater quality. All groundwater that has not been exempted through the aquifer exemption process and meets the definition of underground source of drinking water (USDW) at 40 C.F.R. § 144.3 is protected under the Safe Drinking Water Act. The brief description of the three principle aquifers in the project area indicates that there may be USDWs in the area of Gasco's proposed development; in particular, the Draft EIS notes that the Uinta-Animas aquifer contains freshwater in some areas. However, very little information is provided in the document regarding the location or depth of USDWs. In order to accurately assess the potential impacts of the proposed project, the EIS must provide substantially more detail characterizing groundwater resources, including

3

delineating the depth of all USDWs in the project area, and providing the quality of these aquifers in terms of total dissolved solids for each specific zone. EPA considers surface impoundment of produced water from oil and gas development as a potentially significant risk to groundwater and surface water. Therefore, adequate groundwater characterization is of special concern for the area underlying the proposed site of the evaporation pond complex.

Although there are no Sole Source Aquifers or Utah Drinking Water Source Protection Zones underlying the project area that would be at risk from the activities proposed, EPA is concerned that there still may be potential to impact public or private water supplies. The EIS should provide available location and other information regarding Public Water Supply wells or springs or private (domestic or stock) water wells or springs in the project area. This includes Tribal wells and springs and should include the alluvium along the Green River.

EPA disagrees with the determination in the Draft EIS that impacts to groundwater need not be discussed because they are "effectively eliminated, reduced, or mitigated" (pg. 4-264). The potential for significant impacts to water resources exists during all project stages, including drilling, well pad construction, production, hydraulic fracturing, produced water disposal, and freshwater withdrawal. EPA does not believe that deferring a detailed groundwater evaluation to the site-specific well reviews provides a complete analysis of potential cumulative environmental impacts to the aquifers. Further, we believe that the potential for groundwater impacts from leaks or spills from the WEF should be addressed in the EIS.

EPA is pleased to see the discussion of "suggested" or "encouraged" mitigation measures which the approving officer could require at the time of Application for Permit to Drill (APD) approval (pg. 4-264) and the discussion of protective drilling practices (Sections 2.2.2.3 and 2.2.2.4). These measures, if fully implemented, would provide effective mitigation of, for example, potential migration of production fluids away from the production zone during well drilling, completion, and production. However, it is unclear to what extent such mitigation will occur. Mitigation measures to protect groundwater should be clearly described in the EIS and required in the Record of Decision (ROD). Monitoring is also critical to document impacts during oil and gas development. A complete monitoring plan and program to track surface water or groundwater impacts as drilling and production operations occur should be included in the EIS.

*Surface Water Quality*

EPA considers impacts to surface water from runoff a substantial concern for the proposed project. Runoff of sediments, salts and selenium is the most substantial water quality concern in the Gasco project area as noted in the Draft EIS. Pariette Draw and Nine Mile Creek were listed on Utah's most recent 303(d) list of impaired waters, finalized in 2006, and both would receive increased loading of sediments, salts and selenium from this proposed project. A Total Maximum Daily Load (TMDL) was approved by EPA for Pariette Draw on September 28, 2010 that specifically calculates the reductions in total dissolved solids, selenium, and boron in the watershed that are necessary in order for surface water standards to be met. Increased loading of sediments to Pariette Draw would occur under all alternatives, although the use of

4

directional drilling would reduce runoff through a reduced number a well-pads. In addition to well-pads, loading would result from the construction of the evaporative ponds, which appear to be located within the Pariette Draw watershed, and from new roads and pipelines. Since the proposed project was not captured in the TMDL, any increase in sediment loading to Pariette Draw would represent a load that exceeds the TMDL and would be an unacceptable impact to surface water quality. Our recommendations for monitoring and mitigation to detect and prevent unacceptable impacts are described in the enclosed detailed comments.

<u>Development and Analysis of Alternatives</u>

*Water Evaporation Facility*

Significant environmental impacts are likely to be associated with disposal of produced water in the proposed WEF. EPA's concerns include the impact of potential WEF leaks on water quality, potential impacts to migratory birds and other wildlife from contact with the evaporation basins, and air quality impacts from VOC emissions. These potential impacts were not addressed in detail in the Draft EIS.

Over the past several years, EPA and the BLM Vernal Office have actively worked together to increase the number of underground injection permits and reduce the number of evaporation ponds in the Uinta Basin. Nonetheless, all five alternatives analyzed in the Draft EIS include surface evaporation as the means of disposal of produced water. The Draft EIS considered, but did not fully analyze, subsurface water disposal. No other alternative water management method or combinations of methods were considered or analyzed in the Draft EIS. Based on our preliminary review of available data, there appear to be reasonably available alternate disposal methods, including subsurface injection or treatment and reuse/recycling, which should be fully analyzed in order to reduce the potentially significant environmental impacts of the WEF. The decision to avoid surface evaporation disposal may resolve many of EPA's concerns regarding potential impacts to air quality, water quality, and wildlife from on-site produced water surface impoundments.

Additional data are available to better assess the feasibility of underground injection, including logs and driller's reports for over 100 production wells previously drilled in the project area. EPA's preliminary review of data logs suggests to us that underground injection could be a viable option in several zones of the Green River formation as well as the deeper Sego and Castlegate formations. Cross sections of the subsurface geology in the project area should be provided in the EIS to support conclusions of the feasibility of underground injection. The EIS should also consider water treatment options that would allow for reuse or recycling of produced water, an environmentally beneficial disposal method. Treated water could be reused in drilling or production operations in the Gasco field or recycled for a variety of uses, including waterflood for enhanced oil recovery, in other nearby fields. Treatment could also potentially allow for surface discharge.

*Directional Drilling*

BLM's Preferred Alternative proposes development of natural gas resources with each well drilled from an individual well pad; however, according to the analysis in the Draft EIS, implementation of directional drilling could reduce surface disturbance by approximately 60 percent if implemented as described in Alternative E and result in greatly reduced impacts to nearly all resources of concern. Minimizing surface disturbance is critical in the arid Uinta Basin, where reclamation is frequently difficult. Impacts of disturbed soils can include: erosion and sediment runoff impacts to surface water resources; impacts to local air quality from fugitive dust; dust impacts to vegetation and cultural resources (including the rock art of Nine-Mile Canyon); both direct and indirect impacts to the Uinta Basin Hookless Cactus, a federally listed threatened species; and long distance transport of fugitive dust out of the basin, which may contribute to dust on snow events in the mountains. The Draft EIS clearly indicates that resource impacts associated with surface disturbance are proportionate to the number of well pads. EPA therefore believes that directional drilling should be utilized to the maximum extent possible in the Uinta Basin project area. We recommend that BLM reconsider selection of Alternative E as the Preferred Alternative, or develop a new alternative that maximizes the valuable resource protection provided by directional drilling while maintaining reasonable cost and desirable development level.

Cumulative Impacts

The Reasonably Foreseeable Development (RFD) scenario used in the cumulative impact assessment for Gasco appears to undercount planned and projected development in the Uinta Basin. The RFD scenario appears to be based on the Vernal Resource Management Plan (RMP), which was finalized in 2008. However, based on information provided for NEPA projects currently undergoing scoping or review for oil and gas projects on federal lands managed by the BLM, U.S. Forest Service, and Bureau of Indian Affairs (BIA), it appears that more than three times as many oil and gas wells are now anticipated in the basin than were considered during RMP development. The Greater Natural Buttes Draft EIS (released for comment by BLM July 16, 2010) included 21,293 wells in its RFD, significantly higher than the 6,400 quantified in the Gasco Draft EIS. The under-accounting of RFD may have caused significant underestimation of cumulative air quality impacts, as well as cumulative impacts to all other resources of concern.

**EPA'S RATING**

The Draft EIS does not adequately analyze the project's potential impacts to air quality, particularly associated with VOC and HAP emissions from the produced water evaporation ponds. Moreover, inadequate characterization of groundwater resources results in an inability to determine whether adverse impacts to groundwater may occur as a result of the proposed action. EPA's review of the Draft EIS has also revealed significant environmental impacts from well-pad construction in the Pariette Draw watershed, which should be avoided, underscoring a need to fully consider the feasibility of directional drilling technology. In accordance with our policies and procedures for reviews under NEPA and CAA Section 309, EPA has rated this Draft EIS as "Inadequate" (3). As with all projects with potential unsatisfactory impacts or inadequate

assessment of such impacts, this proposal is a potential candidate for referral to the Council on Environmental Quality (CEQ).  The "3" rating indicates EPA's belief that the Draft EIS does not meet the purposes of NEPA, and thus should be formally revised and made available for public comment in a supplemental or revised Draft EIS.  A copy of EPA's rating criteria is enclosed.  In addition, the enclosed detailed comments provide further discussion of our concerns regarding air quality and water resources, as well as our comments on climate change, potential impacts to environmental justice communities, tribal coordination, spill prevention, and impacts to wildlife and special status species.

Thank you for the opportunity to comment on this Draft EIS.  We reaffirm our commitment to work cooperatively with BLM to address our significant concerns.  If you have any questions on our rating or the comments provided in this letter, please contact Larry Svoboda, Region 8 NEPA Compliance and Review Program Director, at 303-312-6004, or Carol Campbell, Assistant Regional Administrator of Ecosystems Protection and Remediation, at 303-312-6340.

Sincerely,

*//Original signed by James B. Martin//*

James B. Martin
Regional Administrator

Enclosures:    Detailed Comments
               EPA's Rating System Criteria

cc:    Daniel Picard, U&O Agency Superintendent, BIA
       The Honorable Richard Jenks Jr., Chairman, Ute Indian Tribe
       Bill Stringer, Green River District Manager, BLM


*Printed on Recycled Paper*

**EPA'S DETAILED COMMENTS FOR THE**
**GASCO DRAFT EIS**

Consideration of Directional Drilling

EPA recommends that additional consideration be given to use of directional drilling in the EIS. We believe that directional drilling is a technologically and economically feasible alternative, which is being used extensively in nearby fields and throughout the world. It is recognized that directional drilling is more costly to implement than vertical drilling, however, it does not appear that the estimates of economic feasibility of the alternatives in the EIS have fully considered the many cost savings associated with construction of directionally drilled wells. Decreased construction of roads and well-pads and less time associated with moving the drill rig are among the factors that can offset many of the costs of directional drilling itself.

The need for utilization of directional drilling for Gasco is underscored by the challenges of reclamation in the project area, and the environmental impacts associated with surface disturbance. A total of 97,706 acres in the project area (47 percent) have soil characteristics that restrict reclamation. The Draft EIS acknowledges that it generally takes at least 10 years to reclaim a site following disturbance; other recent Uinta Basin EISs have indicated significantly longer time periods, up to 100 years, for revegetation of some plant species (Ashley National Forest South Unit Draft EIS, Greater Natural Buttes Draft EIS). According to the Draft EIS regeneration of biological soil crusts, which serve several critical ecosystem functions including stabilizing soils, could take up to 250 years. Long-term surface disturbance can contribute to regional dust concerns. For example, a recent study found that dust on snow in the Upper Colorado River Basin robs the Colorado River of about five percent of its water each year, enough to supply Los Angeles for 18 months.[1] EPA believes the substantial impacts to air quality, water quality, and threatened plant species from surface disturbance in the Gasco project area necessitates utilization of directional drilling to the maximum extent possible.

According to the Draft EIS (pg. 2-1), Alternative A was selected as the Preferred Alternative "because it best addresses issues raised in scoping about impacts to cultural resources in Nine Mile Canyon while meeting the purpose and need for the project." EPA is confused regarding this selection, and recommends that the EIS include an explanation of Preferred Alternative selection that is more transparent to readers of the EIS. We understand from Table 4-168 that, although Alternative A disturbs 844 acres in the Nine Mile Canyon Special Recreation Management Area (SRMA), none of this disturbance would be below the rim. Other alternatives include a small percentage of disturbance below the rim of Nine Mile Canyon. Utilization of directional drilling would likely allow for access to mineral resources within the Nine Mile Canyon SRMA without disturbance of cultural or other critical resources.

---

[1] Painter et. al, "Response of Colorado River runoff to dust radiative forcing in snow," *PNAS* 2010 107 (40) 17125-17130.

<u>Air Quality</u>

*Ozone*

EPA disagrees with the Draft EISs characterization of ozone as able to "only be evaluated on a regional basis" on page 4-16.  Although ozone is a regional pollutant, direct project impacts can be isolated from regional models.  For this reason, we recommend that the project's incremental contributions to ozone be discussed in Section 4.2 – Air Quality rather than in 4.18 – Cumulative Impacts, to avoid confusion.

Table 1-1 of Appendix J presents emission from the Proposed Action and emissions from the Proposed Action with ACEPMs.  EPA appreciates the addition of control emissions to mitigate impacts to the surrounding area by a modeled increment of 0.6 ppb.  Please indicate by source category the emissions reductions taken and the number of units used in the modeled emissions inventory.  Based on the modeled incremental impact of the Preferred Alternative with ACEPMs of 1.3 ppb, additional mitigation measures may be warranted.  For example, additional $NO_x$ reductions could be realized through use of Tier IV engines, which should be available later in 2011, and alternate produced water disposal methods could reduce VOC emissions from the WEF.  Onsite air monitoring programs (e.g., $O_3$, $NO_x$, VOC, aldehyde), source emission monitoring (i.e., FLIR camera), and emission control recordkeeping should also be considered.

EPA is concerned the Draft EIS does not fully disclose the potential impacts to ozone from the proposed action.  The Draft EIS indicates that ozone concentrations in areas impacted by the project will not exceed the 75 ppb ozone standard, but does not disclose the modeled absolute maximum value.  It is unclear from the information presented in the Draft EIS and Appendix J whether values of 75 ppb may have been modeled, or how many values approaching or reaching the standard were modeled.  The figures provided in Appendix J indicate numerous grid squares in the 73 – 76 ppb range, which is cause for concern.  Additionally, given the sparse monitoring data in the project area, the Draft EIS should disclose the absolute modeling results in addition to the non-monitored area analysis.

A 12 km modeling domain was used in the CMAQ modeling.  A smaller 4 km nested domain should be used in the project area.  The 4 km higher resolution emissions/emissions/topographic information data would likely improve model performance.  EPA has consistently expressed this concern with grid resolution over the past several iterations of modeling performed in the Uinta Basin (beginning with the Uinta Basin Air Quality Study, letter to Bill Stringer October 16, 2009, and most recently regarding the GASCO ozone modeling protocol, letter to Jeff Rawson, May 10, 2010).  Regarding model performance evaluation, we note that the EPA guidance for determining attainment of the ozone standard is generally intended for use in urban State Implementation Plan applications where a large network of monitors is available to evaluate the model performance and there is reasonable assurance that the baseline monitoring data captures the locations of highest ambient ozone concentrations.  The monitoring data are sparse in the Gasco area and so in some instances the guidance may not be applicable.  Caution should be used in citing this guidance for NEPA projects in rural areas.

*Near-field Modeling Protocol*

An explanation is presented in the Draft EIS on page 4-9 as to why modeling for one-hour $NO_2$ was not performed. EPA does not agree with the determination in the document that the information needed to analyze potential impacts to the NAAQS is lacking. For example, a "detailed plan of the facility" is not required as implied on page 4-9; rather, modeling must only assess a reasonable scenario like that used for near-field dispersion modeling for $PM_{10}$, $PM_{2.5}$, $SO_2$ and HAPs. In fact, modeling for one-hour $NO_2$ has already been performed for oil and gas NEPA projects. The conclusion of one-hour impacts being temporary and not expected to exceed the NAAQS is not substantiated. In many cases, emissions from drill rigs or other nonroad sources are not required to obtain a construction or operating permits and therefore would not have to demonstrate compliance with modeling under permitting rules. We note that the same discussion regarding the one-hour $NO_2$ standard is repeated in Draft EIS Sections 4.2.1.1.1.1, 4.2.1.2.1.1, and 5.0 (additional note: there appear to be some numbering inconsistencies in the Draft EIS) for development, operations, and cumulative impacts, respectively. We recommend that BLM revise this discussion to be more relevant to each section of the EIS, as the current format is confusing.

The one-hour $SO_2$ should also be modeled and compared with the new NAAQS for that pollutant, which was finalized in June 2010.

EPA is concerned that meteorological data from Canyonlands National Park was used for dispersion modeling for Gasco. To provide more representative near-field results, meteorological data should be used from stations within the Uinta Basin, such as the Vernal Airport or the Redwash or Ouray monitoring sites. Additionally, please ensure that the background concentrations used for all NAAQS and PSD comparisons utilize the most recent and applicable values available (i.e., ozone and $PM_{2.5}$ data from the Ouray and Redwash sites).

*Particulate Matter ($PM_{2.5}$ and $PM_{10}$)*

EPA is concerned that near-field modeling for impacts from Gasco operations showed a 24-hour average $PM_{10}$ value of 149.5 μg/m$^3$, just below the NAAQS of 150 μg/m$^3$, and a predicted PSD Class II increment of 287 percent of the threshold. Although an exceedance of the standard was not modeled, the level of impact predicted indicates a substantial potential for health concerns in the project area. We recommend that additional PM mitigation strategies be employed to reduce these impacts.

The Draft EIS identifies vehicle traffic, and particularly truck traffic associated with the WEF, as the primary source of the $PM_{10}$ emissions, which underscores the need to consider alternate water disposal methods. Due to the large amount of surface disturbance associated with the proposed project and the sensitivity of the soil resource, further efforts to reduce surface disturbance and promote successful reclamation are warranted for Gasco. We recommend that BLM consider installation of a liquids gathering system to reduce truck traffic in the project area. Travel management in the project area should be designed for maximum reduction in soil and vegetation impacts. Access roads and well pads should be sited to avoid highly constrained areas

3

and biological soil crusts whenever possible.  Impacts associated with access roads should be reduced to the maximum extent practicable, by utilizing transportation planning to establish proper road location and design and through treatment of unpaved roads.  We further recommend that a project-specific Reclamation Plan be developed and included in the EIS.

EPA appreciates the discussion of air quality measurements in the Uinta Basin that have recently shown elevated concentrations of fine particulate matter ($PM_{2.5}$).  On page 3-12 of the Draft EIS, the discussion of $PM_{2.5}$ formation in rural areas maybe accurate for most rural areas of the United States, however, since complete chemical speciation of monitored $PM_{2.5}$ has not been completed, the conclusion made that the elevated $PM_{2.5}$ concentrations in  Vernal are from similar sources is not supportable.  Full speciation of particulate matter from $PM_{2.5}$ monitoring should be conducted in the Basin in order to identify these sources.

We also note that $PM_{2.5}$ data are now available for part of 2009 and 2010 from the Redwash monitoring site, and this data should also be included in the EIS.  Based on knowledge gained through Uinta Basin air monitoring to-date, EPA is concerned with the characterization of $PM_{2.5}$ as "not appear[ing] to be an issue in rural areas of the Uinta Basin" (Draft EIS pg. 3-17). Again, the source of the high wintertime $PM_{2.5}$ concentrations measured during the 2007 and 2008 in Vernal are not currently well understood, and additional speciation data are needed to determine the characteristics of $PM_{2.5}$ in the Basin.  Although potentially harmful levels of $PM_{2.5}$ were not modeled for Gasco, this may be because the near field modeling may not consider the particular conditions that lead to high wintertime concentrations.  The near field modeling utilized meteorological data from the Canyonlands National Park monitoring site, which may not be indicative of the conditions found in the Uinta Basin.  EPA is therefore concerned that the proposed project has potential to contribute to significant impacts to $PM_{2.5}$.  Consequently, we recommend that all reasonable measures be taken to reduce $PM_{2.5}$ emissions from the project. The Draft EIS identifies road traffic emissions as primary contributors to $PM_{2.5}$ for Gasco. Measures to reduce truck traffic between well pads and to the WEF, such as multiple-well pads or a liquids gathering system, and provide unpaved road treatments should be considered.

The near-field modeling for the various scenarios of the Draft EIS was conducted to up to a 5 km domain.  The near-field model AERMOD is applicable up to 50 km.  We recommend that dispersion modeling for near-field criteria pollutant concentrations should include receptors located at least 20 km from the project sources, particularly to capture potential impacts at population centers.

*Hazardous Air Pollutants*

EPA is pleased that BLM included near-field modeling for HAPs.  However, the modeling predicted concentrations of acrolein in excess of the Reference Concentration for continuous inhalation exposure (RfC) for Gasco.  We recommend that BLM consider mitigation measures that would reduce acrolein emissions from the Gasco project.  This mitigation should include consideration of alternative water disposal methods, which would reduce acrolein emissions from the WEF generator.

We note that new assessments are available for HAPs, and the acute RELs for acrolein, formaldehyde, and acetaldehyde in Table 4-12 of the Draft EIS and Table 6-27 of Appendix H should be updated[2].

*Far-field Modeling*

EPA has concerns regarding predicted impacts to air quality related values (AQRVs) for the proposed project. The Draft EIS identifies one day of impairment (visibility impacts greater than one deciview) predicted at a federal Class I area, Canyonlands National Park. Impacts to sensitive Class II areas included a maximum of 57 days of impairment at Dinosaur National Monument and 186 days at Ouray National Wildlife Refuge. We recommend mitigation measures to reduce these visibility impacts be discussed in the EIS. Further, we note that the cumulative screening visibility assessment conducted for the Gasco project differs significantly from the results presented in the Greater Natural Buttes Draft EIS. For example, the Greater Natural Buttes cumulative visibility impairment for Arches National Park was 311 days of impairment, while for the Gasco project the cumulative for Arches was 22 days of impairment. Given that the direct project impacts to visibility impairment were minor for both projects, please explain why there are such large discrepancies between these cumulative assessments. We additionally note that it is not clear to us which approved FLAG method was used to determine the "screening" level visibility impacts. EPA prefers Methods 2, 6 or 8 in determining visibility impairment.

*Adaptive Management*

The Adaptive Management Strategy described in the Draft EIS is a useful concept which may help to prevent significant adverse impacts to air quality from the proposed project. However, several critical components are lacking in the proposed strategy. First, the Draft EIS does not make clear what would constitute a "significant increase" in the emissions inventory, triggering a need for a new modeling analysis. Second, the strategy should include monitoring that conforms to 40 CFR Parts 50 and 58, with emphasis on obtaining measurements that contribute to the formation of secondarily formed pollutants such as $PM_{2.5}$ and ozone. The EIS should identify how monitoring results may trigger a need for additional modeling. Finally, the adaptive management strategy should address how BLM and Gasco will address the proposed lowering of the ozone standard. EPA would like to work with BLM to develop a comprehensive list of potential enhanced mitigation measures that may be employed under the Adaptive Management Strategy.

*Climate Change*

We appreciate the discussion of the 2010 CEQ Draft NEPA Guidance on Consideration of the Effects of Climate Change and Greenhouse Gas Emissions that was included in section 3.2.3.1.4 of the Draft EIS, and the disclosure of annual methane ($CH_4$) and carbon dioxide ($CO_2$) emissions for development and operations of the proposed project in Tables 4-2 and 4-5.

---

[2] http://www.epa.gov/ttn/atw/toxsource/summary.html

However, further qualitative and quantitative assessment should be provided in the EIS to support a discussion of mitigation measures to reduce GHG emissions. This need is substantiated by the emissions figures in Tables 4-2 and 4-5, which are significantly higher than CEQs reference value of 25,000 metric tons of $CO_2$ equivalent per year.

We suggest the following four-step approach be used to ensure complete consideration and disclosure of potential GHG emissions and relevant mitigation:

1. Quantify and disclose projected annual and total project lifetime cumulative GHG emissions in $CO_2$-equavalent terms and translate the emissions into equivalencies that are easily understood from the public standpoint (e.g., annual GHG emissions from x number of motor vehicles, see, https://www.epa.gov/RDEE/energy-resources/calculator.html). In addition, because information on the "downstream" indirect GHG emissions from activities such as refining and end use may be of interest to the public in obtaining a complete picture of the GHG emissions associated with the proposed project, it may be helpful to estimate and disclose them. Please describe any potential inconsistencies between the proposed action and any relevant Regional, Tribal or State climate change plans or goals, as well as the extent to which BLM would reconcile, through mitigation or otherwise, its proposed action with such plans. For example, please consider the Governor's Blue Ribbon Advisory Council on Climate Change 2007 Final Report (http://www.deq.utah.gov/BRAC_Climate/final_report.htm), Utah's GHG reduction goals (to reduce GHG emissions to 2005 levels by 2020) (http://deq.utah.gov/Climate_Change/GHG.goal.htm) and the Western Climate Initiative (http://www.westernclimateinitiative.org).

2. Qualitatively discuss the link between GHGs and climate change, and the potential impacts of climate change. As discussed in the 2010 CEQ Draft Guidance, the estimated level of GHG emissions from the project and its alternatives can also serve as a reasonable proxy for assessing potential climate change impacts, and provide decision makers and the public with useful information for a reasoned choice among alternatives.

3. Include a summary discussion of ongoing and projected regional climate change impacts relevant to the action area based on U.S. Global Change Research Program assessments. EPA also recommends that the EIS identify any potential need to adapt the proposed action to these effects, as well as any potential impacts from the proposed action that may be exacerbated by climate change.

4. Analyze reasonable alternatives and/or potential means to mitigate project-related GHG emissions. For example, BLM could analyze a "GHG-reducing alternative" that would include measures that could be taken to reduce GHG emissions. BLM could also assess potential energy efficient technologies as well as technologies to reduce GHG emissions from oil and gas development. For instance, the analysis could include carbon capture and sequestration; measures from BLM's Supplemental Information Report for the eight EAs in Montana, North Dakota and South Dakota (http://www.blm.gov/mt/st/en/prog/energy/oil_and_gas/ leasing/leasingEAs.html); EPA's GasSTAR program

6

(http://www.epa.gov/gasstar/) which is a voluntary mitigation effort targeted at the oil and gas industry; and promoting the implementation of cost-effective technologies and practices to reduce GHG emissions.

Water Resources – Groundwater Protection

*Groundwater Characterization*

The Draft EIS does not identify existing or potential public or private drinking water supplies in the Gasco project area, nor aquifer zones that are USDWs under the Safe Drinking Water Act. The document indicates that this information will be collected during site-specific reviews at the APD stage. Deferring the evaluation of impacts to potential or existing drinking water supplies to the review of each well in the APD does not provide the opportunity for public comment nor does it provide analysis of cumulative environmental impacts to the aquifers.

The EIS must assess the risk to groundwater within the project area. Four basic categories of information should be contained in the Draft EIS:

1. Groundwater resource characterization,
2. Groundwater use characterization,
3. Potential impacts from the proposed project, and
4. Proposed alternatives and mitigation measures.

EPA would like to work with BLM to create an outline of the groundwater information that should be included in all project-level oil and gas EISs. In the meantime, we provide the following expansion upon the four basic categories listed above as an indication of the information EPA would ideally like to have for review of a project-level EIS. The West Tavaputs EIS included some of this information and could be used as a model.

1. The EIS should include a discussion of the viability of water bearing formations as underground sources of drinking water (USDW). USDWs include not only those formations that are presently being used for drinking water, but also those that can reasonably be used in the future. In general, this includes aquifers with TDS less than 10,000 mg/L and with a quantity of water sufficient to supply a public water system. Aquifers are presumed to be USDWs unless they have been specifically exempted or if they have been shown to fall outside the definition of USDW (e.g., over 10,000 mg/L TDS). Are there any fresh water zones/USDWs under the project area? What is known about the depth to and water quality of the fresh water zones/USDWs? We recommend using existing information to describe the resource (Utah Geologic Survey, USGS reports, geologic logs, etc.). Relevant information to disclose in the EIS includes: maps of the aquifers in the project area, formation names and depths, a table or graphic of hydrostratigraphic units, local outcrops of the aquifer, chemistry of the formation water (including TDS), well yield data for water bearing formations, recharge areas for the aquifers, mineral zones to be developed in relation to aquifers/aquitards, etc.

2.  The EIS should characterize current and anticipated uses of the project area groundwater resources.  Who is using the groundwater resource now, and what is the expected future use?  Provide a list and map of water rights and users in the area and within one mile of the project boundary, including:  wells and springs related to public water supplies, domestic and stock uses; Tribal wells and springs; and wells and springs in the alluvium along the Green River.  This description should include the depth of the wells, the formations they are producing from, and the quality of the water being used currently in the area.  If there are users, how will the quality be monitored to detect impacts from the project?

3.  The EIS should assess the potential impacts of the proposed project.  What is the potential for changes in the volume, storage, flow and quality of groundwater in light of the data obtained from the characterization of groundwater resources and groundwater use?

4.  The EIS should describe alternatives and mitigation measures necessary to prevent or reduce the identified impacts.  What actions have been considered to:
    a.  Avoid impacts to groundwater,
    b.  Limit the degree or magnitude of impacts to groundwater,
    c.  Reduce impacts by long term maintenance,
    d.  Repair or restore groundwater resource, and
    e.  Compensate for groundwater impacts by replacement or substitution?

BLM Utah has developed an excellent policy for the protection of groundwater associated with oil and gas leasing, exploration and development (BLM Instruction Memorandum No. UT 2010-055).  The purpose of the Instruction Memorandum (IM) is to enhance the existing process for the continued protection of all usable groundwater zones ($<$ 10,000 mg/L as defined in Onshore Oil and Gas Order No. 2) associated with oil and gas exploration and development.  We appreciate that, although the Draft EIS was largely completed prior to finalization of the IM, much of the substance of this policy was included.  However, we recommend that the EIS incorporate the entire UT 2010-055 IM.  This is especially important due to the fact that most wells in the project area will undergo hydraulic fracturing of the producing zone, thereby potentially posing a risk of contamination to any nearby USDW.  Because the IM does not address groundwater protection related to evaporation ponds in detail, particular attention should be paid to identifying and mitigating potential impacts from the WEF in the EIS.

*Water Quality Monitoring*

A monitoring plan and program should be in place to track any groundwater impacts as drilling and production operations occur.  Monitoring should be conducted during all project phases, including: background conditions before construction begins; during project implementation, including construction, production, and produced water disposal; and after project termination.  This is especially pertinent to the existing wells and springs and near the proposed WEF.  We recommend that the "Long-Term Plan for Monitoring of Water Resources"

developed for the West Tavaputs Plateau Natural Gas Full Field Development Plan (West Tavaputs) Final EIS be used as a guide in developing a monitoring plan for Gasco. Particularly critical components of the plan include baseline monitoring, inclusion of organic parameters in the monitoring suite, public disclosure of monitoring data, and discussion of mitigation measures to be employed if monitoring results in identification of impacts.

*Mitigation*

EPA is encouraged that BLM believes groundwater impacts from the proposed project can be prevented through implementation of mitigation measures. We commend BLM's effort to protect freshwater through the best management practices (BMPs) described in Section 2.2.2.3 - Well Drilling, including specifications for steel casing and cementing. However, we recommend that these well drilling practices be clearly identified in the list of mitigation measures. Additional mitigation measures beyond those described in the Draft EIS may also be appropriate for the proposed project; the EIS should clearly identify all relevant and reasonable mitigation measures to protect groundwater sources. We recommend that BLM may want to consider incorporating some additional mitigation measures that were included in the West Tavaputs Final EIS, including Toxic Characteristic Leaching Procedure testing. The ROD should clearly describe all mitigation measures that will be required.

There are additional issues related to groundwater protection that should be considered in the EIS, as well as additional practices and mitigation measures that may be necessary for adequate protection. For example, EPA recommends the following be added to the Gasco EIS:

- Cement bond logs should be evaluated to ensure adequate cement bonding to prevent fluid and gas migration.
- EPA encourages closed loop or pitless drilling of the production hole to avoid the need for mud reserve pits. Completion and stimulation fluids returned to the surface should also be contained in tanks to avoid the need for pits.
- However, if pits are necessary, after evaporation of fluids, pit sludges should be tested for toxicity and disposed accordingly. Pit liners should also be removed and disposed of according to solid waste rules. Compacted liners should be tested for toxicity and disposed. Soils below the pit liners should be tested for contamination. If compacted liner material is not contaminated it should be ripped and mixed with soil in order to allow infiltration.
- Appropriate closure should also be discussed for the WEF ponds.
- Aquifers with high quality fresh water must be drilled using fresh water based drilling muds. In addition any mud additives must be low toxicity and compatible with the aquifer so as not to cause contaminant introduction into the fresh water zones.
- If underground injection is used as a mechanism for disposing of produced water, then new production wells should be constructed appropriately and have adequate cement through the identified confining zone(s). Any current or future producing oil well could potentially be converted to an injection well; therefore, these wells should meet Class II construction criteria in order to avoid future remediation.

There are currently serious questions about whether the process of hydraulic fracturing could potentially result in groundwater impacts. Additionally, some hydraulic fracturing compounds contain materials that could be harmful if released to freshwater sources. The EIS should acknowledge and discuss this potential for impact. An analysis of the management of the fracturing fluids should be provided in the EIS, including the toxicity and fate of these fluids, with a focus on avoiding surface spills or leaks of these fluids from the reserve pits. Hydraulic fracturing of any production zones near freshwater zones should not be considered. This includes fracturing production zones that are not adequately isolated from freshwater aquifers with zones of low permeability that would prevent fluid and gas migration.

*Produced Water Disposal*

The Draft EIS suggests that disposal of produced water through underground injection is not feasible because there are no suitable injection zones in the project area, although it would be the preferred disposal method of the operator. Without providing cross sections of the subsurface geology in the project area, it is difficult to assess this assertion. There are over 100 production wells drilled in the project area, and much of the needed information could be gathered from the analysis of the logs and driller's reports for these wells. The Birds Nest Aquifer is a zone of the Green River formation that many operators utilize for water disposal in nearby fields. Although in the proposed Gasco project area the Birds Nest Aquifer is considered to be less permeable, this zone should be explored further to accurately determine permeability along with its potential to be a USDW. EPA believes that there may be other potential sands in the Green River Formation that could be used for disposal. In logs reviewed approximately two miles to the north of the proposed project area, sand lenses in the Green River Formation just below the Garden Gulch (GG2) were identified. These sands could be used as potential targeted injection zones. Currently, Newfield has a salt water disposal well (Pariette Bench 4-8-17 API #43-047-15681) located in the proposed project area. This salt water disposal well is injecting into sands found in the Green River formation. Analysis of logs and driller's reports for production wells would allow BLM to better determine where these sands are present throughout the Gasco project area. There are also other deeper zones that lie beneath the proposed production zones, specifically the Sego and Castlegate formations, which could be targeted for disposal. The EIS should include several subsurface cross sections that present the subsurface geology as presently known through the information derived from existing wells, as well as a more complete consideration of the extent to which subsurface injection may be possible.

An additional disposal method, which was not considered in detail in the Draft EIS, is treatment and reuse or recycling. The Draft EIS suggests the high total dissolved solids (TDS) of produced waters make it incompatible with waters from the Green River formation near the project area where produced waters are being injected for disposal and waterflood purposes. Reuse and recycling of produced water provides many environmental benefits, including reduced consumption of freshwater, and may be more viable than subsurface injection. Operators in the Uinta Basin are currently using water with TDS of 25,000-30,000 ppm for hydraulic fracturing, which is similar to the naturally occurring TDS levels in the formations of the Gasco project area. Treatment of produced water for enhanced oil recovery would most likely at a minimum need to go through a walnut shell filter to remove hydrocarbons and then a precipitation and

filtration process to remove metals.  Additional treatment may be necessary, depending on water chemistry.  Our understanding is that the cost per barrel of treatment for use in production would be comparable, or less expensive, than evaporation pond disposal.  Based on local geology, it appears likely that bedrock will need to be blasted and removed in pond construction; the experience of another Uinta Basin operator indicates that this could double the estimated cost of pond construction.  Water could also potentially be treated to allow for permitting for surface discharge through an NPDES permit process.

The EIS should include a water compatibility study that analyzes the extent to which water reuse or recycling could be utilized by Gasco or by operators in neighboring fields.  In order to fully disclose the potential for positive environmental impacts from water conservation through reuse or recycling of produced water, the EIS should also include:  the volume of water that may be recycled, whether this water will be used within the Gasco project area or elsewhere in the Basin, how water will be transported, and spill and leak prevention plans.

*Freshwater Consumption*

According to the Draft EIS, 90 percent of the water for drilling, completion, and production will come from Green River sources and tributaries.  The associated environmental impacts of the use of this fresh water should be evaluated in the EIS.  Four endangered fish species of the Colorado River system may be affected by water withdrawals from the Green River.  The proposed action would result in an estimated maximum consumption of 450 acre-feet per year from the Colorado River Basin (6,745 acre-feet total).  The cumulative consumption of fresh water for the Gasco project and other projects in the area may have the potential to impact aquatic special status species by reduction in water flow.  Although the project proponent would pay a depletion fee to the U.S. Fish and Wildlife Service Recovery Program, EPA recommends additional emphasis on reuse of produced water to reduce water consumption impacts on Colorado River endangered fish species.

EPA has two concerns regarding the disclosure in the Draft EIS of the impacts of freshwater use.  First, the amount of fresh water to be used appears to be based on one hydraulic fracturing job per well, however, it is our understanding that wells are often fractured as many as five times.  This additional water use should be disclosed in the EIS.  Second, we note that the discussion of groundwater depletion does not clearly indicate the anticipated impacts to freshwater aquifers.

Water Resources – Surface Water Quality

*Potential for Impact to Impaired Waterbodies*

EPA approved a TMDL[3] for Pariette Draw on September 28, 2010 that specifically calculates the reductions in total dissolved solids, selenium, and boron in the watershed that are necessary in order for surface water standards to be met.  Since there are no point sources in the

---

[3] http://www.waterquality.utah.gov/TMDL/Pariette%20Draw%20TMDL%20Final.pdf

watershed, all loading and reductions in loading are from nonpoint sources. The Draft EIS (pg 4-268) has calculated that each well would result in an increased load of 259 tons per wellpad. Using this estimate, Alternative A would result in an increase of 16,058 tons of sediment load to Upper and Lower Pariette Draw. The Pariette Draw TMDL states that loading of TDS needs to be reduced by 48.72 tons per day to meet the water quality target of 1,200 mg/l. Even under Alternative E, through which directional drilling would greatly reduce the number of wellpads compared to Alternative A, increased loading of sediments to Pariette Draw would occur. Besides the sediment loading from wellpads that were calculated in the Draft EIS, there would also be additional loading from the construction of the WEF that appears to be located within the Pariette Draw watershed, as well as from the new roads and pipelines that would be constructed and disturb additional acres of soils in the watershed. Any increase in sediment loading to Pariette Draw is an unacceptable impact to surface water quality, as documented in the TMDL.

For Nine Mile Creek, a TMDL has not yet been drafted that would address the impairment that has caused it to be included on the Utah 2006 303(d) list for temperature. Nevertheless, the increased sediment loading that would result from this project would be likely to further degrade the water quality and would most likely contribute to increasing the already unacceptable temperatures that have caused Nine Mile Creek to be impaired for the cold water aquatic life use designation (3A).

The primary cause of the loading across the entire project area would be from the 568 road crossings of ephemeral streams that would occur under Alternative A – the proposed action. The number of these crossings could be reduced to 190 if Alternative E (Directional Drilling) is selected according to estimates presented in Table 4-113 (page 4-267). Increasing the sediment load to the Green River will occur in all scenarios considered in this Draft EIS, so it would seem prudent to select the alternative that would go furthest in complying with the Colorado Basin Salinity Control Act of 1974. Allowing an estimated 77,085 tons of sediment to reach the Green River through the implementation of Alternative A does not seem to be the best choice when Alternative E would result in a 70 percent reduction in sediment load, with an estimated load of 22,829 tons. The document makes the conclusion that the impact of the increased sediment load to the Green River from its activities under Alternative A would be relatively low; but this can be said of almost any single project in a watershed as vast as the Green River. This type of analysis minimizes the impact of nonpoint source loading by only looking at a small portion of the watershed and not considering the cumulative impacts of similar projects being implemented throughout the entire watershed. The EIS should clearly disclose connections between sediment loads and local water quality impairments, as well as any potential for adverse impact to water quality.

Based upon the information contained in the Draft EIS, it is our understanding that the WEF will be constructed within the Pariette Draw watershed, and that the large amount of disturbance associated with the construction of the facility may impact water quality in Pariette Draw. However, it is difficult to be certain of the location of the WEF within the watershed, or the proximity to ephemeral streams, based on the maps and discussion provided. We recommend that the EIS include a more detailed map showing watersheds in the project area, as well as a discussion of the proximity of surface water resources to the WEF.

12

*Monitoring*

Given the variability in salinity and selenium across the landscape and the recognized concern with potential surface water contamination, the EIS should include monitoring and adaptive management requirements. Monitoring plans should be developed for areas potentially affected by highly erosive soils, as well as the perennial waterbodies including the Green River and the two streams on Utah's 303(d) list of impaired waters. EPA recommends the BLM implement a comprehensive water monitoring plan to ensure the BMPs are successfully mitigating the impacts from increased sedimentation and to direct reclamation resources and efforts. At a minimum, we recommend that BLM establish a monitoring program in Pariette Draw and Nine Mile Creek. The "Long-Term Monitoring Plan for Water Resources" developed by BLM for the West Tavaputs Final EIS is a good example of a comprehensive monitoring program.

*Mitigation*

We recommend that additional steps be taken to minimize erosion and sedimentation for watershed protection. BLM may want to consider project area-wide mitigation measures that may include: a cap on acres of surface disturbance, which can significantly limit TDS loading by increasing interim reclamation efforts and decreasing the amount of disturbed soils; phased drilling, which will also effectively reduce the amount of surface disturbance present at any time; reducing construction of roads or well pads in drainages; and use of directional drilling to reduce project total surface disturbance. To reduce TDS loading, directional drilling should be used to access mineral resources within drainages wherever possible, and roads and well pads should be sited outside of these sensitive zones.

It is best to involve a system of BMPs that targets each stage of the erosion process to ensure success from construction activities. The most efficient approach involves minimizing the potential sources of sediment from the outset. This means limiting the extent and duration of land disturbance to the minimum needed, and protecting surfaces once they are exposed. BMPs should also involve controlling the amount of runoff and its ability to carry sediment by diverting incoming flows and impeding internally generated flows. In addition, BMPs should include retaining sediment that is picked up on the project site through the use of sediment-capturing devices. On most sites successful erosion and sedimentation control requires a combination of structural and vegetative practices. Finally, BMPs are best performed using advance planning, good scheduling and maintenance.

<u>Spill Prevention</u>

We appreciate the discussion on "Spills Potentially Contaminating Surface Waters" in section 4.15.1.1.2.2 of the Draft EIS; however, we believe that some important information was left out of this discussion. Although the Draft EIS states that stipulations such as double-lining and leak detection for the WEF would result in an "extremely low risk," the potential consequences of a WEF spill or leak should have been addressed. Further, the discussion in the Draft EIS does not consider the potential for impacts to groundwater. A discussion should be

added disclosing the possible impacts to both surface and groundwater resources from a WEF leak. This discussion should include further information on the detection limits of the leak detection system, response times, and what will be done in the case of a leak. Water quality monitoring, discussed in greater detail above, will be particularly critical to reduce potential impacts from the WEF ponds. We additionally recommend further information be provided regarding the ACEPMS, such as use of shutoff valves, that will reduce the risks associated with pipeline spills.

The Draft EIS cites *BLM Onshore Order #7* as the source for construction and operation stipulations for all evaporative facilities, and asserts that because of these stipulations, potential impacts to surface waters would have an extremely low risk of occurring (pg. 4-273). Because the BLM Order includes very general provisions for several disposal methods (including lined and unlined pits), the EIS should include further details of the intended stipulations. These details should clearly outline project stipulations for the double lined pits, including prevention of surface water ingress and discharges, further details of lining requirements, leak detection requirements, etc. Further details of the construction and operation of evaporation ponds is necessary to substantiate the conclusion of extremely low risk of potential impacts.

The implementation of a Spill Prevention, Control, and Countermeasures Plan (SPCCP) will reduce the potential for direct and indirect impacts to sensitive resources from spills or accidental releases of hazardous substances. It is critical that all SPCCPs are appropriately designed given local geology and the level of risk associated with local conditions. We recommend that BLM describe in the EIS how site-specific SPCCPs will address low probability catastrophic spills.

Wetlands and Floodplains

Although Executive Order (EO) 11990 – Protection of Wetlands is referenced in Table 4-1 – Supplemental Authorities to be Considered, the EIS does not describe how actions authorized through the Gasco NEPA process will comply with the EO. The Draft EIS discusses only those wetlands and riparian areas associated with perennial rivers. It is unclear from the document whether additional wetlands such as isolated wetlands, springs, or riparian areas associated with ephemeral streams may exist in the Gasco project area. The EIS should address protective measures in the case of encountering an isolated or ephemeral wetland during project construction. EPA additionally recommends that Section 1.6 – Authorizing Actions should include regulation and permitting processes on Tribal lands according to Clean Water Act (CWA) Section 401 in addition to CWA Section 404, which applies to activity on a portion of the Gasco project area.

EPA is concerned that approximately 11 acres of surface disturbance would occur in wetland and riparian areas under the Preferred Alternative, resulting in the long term loss of riparian vegetation in these areas. The Draft EIS does not disclose whether this disturbance is associated with well pads, roads, pipelines, or other associated facilities, nor does it clearly specify where the riparian impacts will occur. Such information is necessary to determine

whether reasonable alternatives may exist, and to ensure adequate mitigation for unavoidable impacts. This information should be included in the EIS along with a description of proposed mitigation.

The Preferred Alternative also proposes 223 acres of disturbance in 100-year floodplains, including 48 well pads and 8.4 miles of road. This disturbance includes well pad construction in the floodplain of the Green River as well as other floodplains that have been identified as critical flood potential areas. Well pad construction in floodplains is a serious risk that should be avoided, particularly due to the potential for flood damage to well-heads and associated production equipment that could result in leaks or spills of toxic materials to waterbodies. Given the capabilities of directional drilling technologies, well pad construction in floodplains or riparian areas should be considered an unacceptable risk.

It is EPA's opinion that consideration of avoidance or mitigation for development in wetlands and floodplains should occur during the project-wide evaluation in the EIS, rather than for individual wells during site-specific review. We appreciate the proposed mitigation measures included in Section 4.15.2, and strongly suggest these mitigation measures be committed to by the applicant, and required in the ROD. In particularly, it is critical that closed-loop drilling be used in or near sensitive water resource areas. We also recommend that the measure which requires relocation of wells proposed within the 100-year floodplain of the Green River be extended to include all floodplains, wetlands, and riparian areas. Finally, we recommend that the last measure on the list, which restricts surface disturbing activities within active floodplains, wetlands, public water reserves, or within 100 m or riparian areas be significantly strengthened. EPA recommends complete avoidance of well pad construction within any of these areas. Where construction of associated linear facilities cannot be avoided, the NEPA analysis should identify specific mitigation requirements that will ensure full mitigation of unavoidable impacts.

Environmental Justice

As the CEQ guidance on considering Environmental Justice (EJ) under NEPA notes, Executive Order 12898 requires federal agencies to consider "whether there may be disproportionately high and adverse human health or environmental effects on minority populations, low-income populations, or Indian tribes" from a proposed action. Although when viewed at the county level, as described in the Draft EIS, the region of the proposed project has minority and low-income characteristics that are not significantly different from the national average, communities near the Gasco project area have high percentages of low-income and minority residents. For example, two nearby communities that were enumerated by the 2000 U.S. Census, Fort Duchesne and Randlett, have greater than 50% of residents in poverty and greater than 90% minority residents. In the town of Myton, 38% of the residents are below the poverty line according to the 2000 Census. In accordance with CEQ guidance on identifying minority and low-income communities, EPA believes that these communities should be treated as EJ communities for the purposes of the NEPA analysis. Given the local nature of many human health and social impacts of oil and gas projects, EPA recommends that the appropriate scale at which to consider EJ impacts from the proposed Gasco project should be community, rather than county.

15

The Draft EIS concludes that, "Based on the distance of the project area from local communities, no minority or economically disadvantaged communities or populations would be affected" (pg. 4-112). EPA does not agree with this conclusion, and we note that BLM Instruction Memorandum Environmental Justice No. 2002-164 does not include any reference to distance or proximity in determining the potential for environmental justice impacts. EPA's opinion is that the area affected by the proposed project will contain EJ communities, therefore the human health, economic, and social effects of the proposed action on potential EJ communities should be thoroughly evaluated in the EIS for Gasco. The towns of Randlett and Myton are approximately 12 miles from the Gasco project area, while Fort Duchesne is approximately 16 miles away. There are also other small communities near the project area that were not enumerated in the 2000 U.S. Census, but which likely possesses similar population characteristics to Fort Duchesne and Randlett. For example the community of Ouray is located less than 5 miles from the Gasco project area. Additionally, the EJ analysis should define the affected area based on the location of environmental impacts, not merely on proximity, and the analysis should take into account whether EJ communities use subsistence or cultural resources that may be affected by the proposed project. The nature of the project's rural setting should also be considered. For example, the simple act of shopping for groceries may involve a twenty or thirty mile drive. EPA is willing to assist BLM in identifying minority, low-income, or tribal communities that may be impacted by the proposed project.

Environmental justice issues encompass a broad range of potential impacts, including impacts on the natural or physical environment and interrelated social, cultural and economic effects. The Draft EIS acknowledges that the "boom-and-bust" cycle of oil and gas development in the Uinta Basin is likely to adversely impact communities due to impacts on employment, housing, population, poverty rates, public finances, and infrastructure. According to the Draft EIS, public services and infrastructure are already over-taxed in the region. The document also identifies the potential for disproportionate, adverse impacts to low-income populations from increased housing costs. Mitigation should be considered for these potential adverse social and economic impacts. Examples of mitigation may include outreach to low income and tribal persons to provide counseling on finding affordable housing, consultation with those who use the land for recreational and spiritual purposes, and providing job training for local residents to take advantage of the project's employment opportunities.

The document does not discuss the potential for disproportionately high adverse human health and environmental impacts from the proposed project. However, air quality and water quality impacts are a significant potential concern for this project. BLM's EJ analysis should therefore evaluate whether the proposed project may result in environmental or human health impacts to minority, low-income, or tribal communities in the area. Impacts of implementation causing an increase in HAPs (especially acrolein) or criteria pollutants (including ozone and particulate matter) should be shared with the surrounding communities. According to CEQ guidance, the identification of an adverse impact to EJ populations should heighten attention to alternatives, mitigation strategies, monitoring needs, and preferences expressed by the affected community. If such impacts are identified, BLM should explore whether additional mitigation strategies will be sufficient to reduce those impacts. Mitigation measures relating to potential EJ Communities may include outreach and health services in the communities.

<u>Tribal Coordination</u>

As noted in the Draft EIS, the project is located partly within the southeastern portion of the Uintah and Ouray Indian (U&O) Reservation, which is known as the Uncompahgre Reservation.  The Tenth Circuit Court of Appeals has determined that all lands within the Uncompahgre Reservation are Indian country as defined at 18 U.S.C. Section 1151.  *Ute Indian Tribe v. Utah*, 773 F.2d 1087 (10th Cir. 1985) (en banc), *cert. denied*, 479 U.S. 994 (1986); *Ute Indian Tribe v. Utah*, 114 F.3d 1513 (10th Cir. 1997), *cert. denied*, 522 U.S. 1107 (1998).  We therefore recommend that relevant Tribal environmental laws be referenced in the EIS as appropriate.  You may wish to consult with BIA on the status of the project location.

EPA recommends that BLM perform the following coordination with the Ute Indian Tribe, and reference relevant authorities where appropriate in the EIS:

- Cultural Resource consultation should include the Tribal Historic Preservation Officer.
- The Ute Indian Tribe Energy and Minerals Department regulates oil and gas development within the U&O Reservation, and should be contacted regarding resource protection measures on Tribal lands.
- The Tribal Wetland program is implementing wetland mitigation projects.
- The Tribal Environmental Program of the Ute Indian Tribe should also be contacted regarding environmental regulations on Reservation lands.

<u>Wildlife and Special Status Species</u>

EPA has several concerns with the proposed project with respect to impacts to wildlife and special status species.  Our concerns for water withdrawal and sediment impacts to the Colorado River endangered fish species are addressed above in our comments on surface water resources.  Reduced surface disturbance and recycling of produced water will reduce these potential impacts.  The need to consider alternatives that reduce surface disturbance is also heightened by the presence of the Uinta Basin Hookless Cactus, which is federally listed as threatened under the Endangered Species Act.  The U.S. Fish and Wildlife Service has determined that the proposed action "may affect, and is likely to adversely affect" the species. The potential impacts to migratory birds or other wildlife from the WEF are not analyzed in the Draft EIS.  Although audible and visible deterrents are planned as BMPs to deter birds from utilizing the ponds, wildlife impacts should be discussed in the Environmental Consequences chapter of the EIS.  This discussion should include the likelihood of wildlife utilizing the WEF basins, the potential impacts to wildlife from utilization, and the predicted effectiveness of deterrent BMPs.

17



**Oil and Gas Accountability Project**
P.O. Box 1102  Durango, CO  81302
Ph:  970-259-3353 • Fax:  970-259-7514 • Web site: www.ogap.org
OGAP is a program of EARTHWORKS (www.earthworksaction.org)

# Closed-loop drilling systems
## - a cost-effective alternative to pits-

### CASE 1:  Comparing closed loop drilling to a conventional system: A tale of two wells (M-I Swaco Company)[1]

Closed-loop systems employ a suite of solids control equipment to minimize drilling fluid dilution and provide the economic handling of the drilling wastes. For one company, a typical closed-loop system includes a series of linear-motion shakers, mud cleaners and centrifuges followed by a dewatering system. The combination of equipment typically results in a "dry" location where a reserve pit is not required, used fluids are recycled, and solid wastes can be landfarmed, hauled off or injected downhole.

Two wells drilled only 200 ft apart in Matagorda Cty, TX, provided a unique opportunity to compare the costs between conventional solids-control equipment and the company's closed-loop system. Both wells drilled through the same formations, used the same rig crew, mud company and bit program.

The closed-loop system resulted in significant savings:
- 43% savings in drilling fluid costs
- 23% fewer rotating hours
- 33$ fewer days to drill to a comparable depth
- 37% reduction in the number of bits used
- up to 39% improvement in the rate of penetration

### CASE 2:  Reducing waste volume and costs using closed-loop systems (New Mexico Oil Conservation Division) [2]

**Challenge—** Challenges associated with conventional reserve pits include volume of drilling wastes; drill site installation and restoration costs; pollution of land and/or surface water due to failure of pits and/or containment system and associated cleanup costs; and potential for subsurface pollution due to downward migration from pits and/or surface soil permeability.

**Solution—** Use closed-drilling pit system to reduce volume of drilling waste.  The drilling contractor maintained "safe pit levels" and recycled drilling fluid to

---

[1] M-I Swaco.  "Swaco closed-loop systems: A tale of two wells." *This is Swaco.* http://www.miswaco.com/More_Info/About_Us/98131.pdf
[2] New Mexico Oil Conservation Division. *Pollution Prevention Best Management Practices for the New Mexico Oil and Gas Industry.* http://www.emnrd.state.nm.us/ocd/

minimize pit volumes and disposal requirements. Waste management costs due to procedures other than those specified were also the responsibility of the drilling contractor. Cost savings provided the incentive to implement and maintain proper procedures to minimize waste generation in the closed-loop system.

| | Conventional reserve pit | Closed-loop drilling fluid system |
|---|---|---|
| **Surface disturbance** | • reserve pit (235' x 77' x 5')<br>• cuttings pit (20' x 10' x 5')<br>• water pit (40' x 10' x 5') | • no reserve pit necessary. |
| **Total drilling mud and wastes in pits** | • 16,625 barrels | • 1,100 barrels |
| | Total reduction in drilling mud and wastes using closed-loop system | 15,625 barrels |

**Benefits—** The following benefits were realized:

- Total estimated cost savings (considering reduced costs for drill site installation, fluid hauling and disposal, dirt work, and surface damage payment): $11,000.00
- Reduced surface disturbance by 18,000 square feet (0.4 acres).
- Reduced drilling mud and wastes in pits by 15,625 barrels.
- Reduced potential for environmental impact to surface and groundwater.

## CASE 3:  Closed-loop system helps reduce drilling waste (Oklahoma Department of Environmental Quality)[3]

A large oil and gas production company used a number of pollution prevention techniques, including closed loop drilling, to drill an exploratory well adjacent to the Tishomingo Wildlife Refuge in Johnston County, OK.  The well was drilled on land owned by the U.S. Army Corps of Engineers.  Some of the measures taken in drilling the well included:

- a closed-loop mud system that allowed for reuse of drilling fluids and smaller quantities of water for dilution of the mud to control viscosity and density
- compressed air as the drilling fluid where possible, which allowed for the use of smaller quantities of water and drilling fluid
- smaller casing, which allowed for the use of a 25% smaller hole.  This generated a smaller volume of drill cuttings and required less drilling fluid

Savings and Benefits— The hole-size reduction, use of air drilling and closed-loop system reduced wastes by close to 1.5 million pounds.  A material and disposal cost savings of $12,700 was achieved.

---

[3] Oklahoma Department of Environmental Quality. *Pollution Prevention Case Studies.* http://www.deq.state.ok.us/CSDnew/P2/Casestudy/oxyusa%7E1.htm



**Depth to Groundwater at
Oil and Gas Groundwater Contamination Sites**

**Data Source:** New Mexico Oil Conservation Division.
Ground water impact data available at:
http://www.emnrd.state.nm.us/ocd/Statistics.htm



Oil and Gas
Accountability
Project



**Oil and Gas Industry Groundwater Contamination Events
- by oil and gas facility type -**

Total number of groundwater
contamination incidents: **743**

**Data Source:** New Mexico Oil Conservation Division.
Ground water impact data available at:
http://www.emnrd.state.nm.us/ocd/Statistics.htm

Oil and Gas
Accountability
Project

## Location of Pits Causing Groundwater Contamination



**Facility Type/Location of Pit** (vertical axis)

| Location | Number of contamination events |
|---|---|
| Gas Gathering Pipeline | 1 |
| Gas Storage | 1 |
| Unknown | 2 |
| Waste Management | 2 |
| Crude Transmission Pipeline | 2 |
| Crude Pump | 2 |
| Cl | 2 |
| Refinery | 4 |
| Crude Gathering Pipeline | 4 |
| Lease Water Pipeline | 5 |
| Service Company | 7 |
| Compressor Station | 7 |
| Tank Battery | 25 |
| Unspecified (mainly at well sites) | 325 |

**Number of contamination events**

**Data Source:** New Mexico Oil Conservation Division.
Ground water impact data available at:
http://www.emnrd.state.nm.us/ocd/Statistics.htm

**NOTE:** "Unspecified" includes flare, line drip, blow and other types of pits, and those undergoing redmediation or with abatement plans underway.



Oil and Gas
Accountability
Project



Groundwater Contamination from Oil and Gas Industry Pits
- by county -

**Data Source:** New Mexico Oil Conservation Division.
Ground water impact data available at:
http://www.emnrd.state.nm.us/ocd/Statistics.htm



Oil and Gas
Accountability
Project



**Groundwater Contamination From Oil and Gas Industry Pits**
**- by operator -**

**Data Source:** New Mexico Oil Conservation Division.
Ground water impact data available at:
http://www.emnrd.state.nm.us/ocd/Statistics.htm



Oil and Gas
Accountability
Project

BEFORE THE OIL AND GAS CONSERVATION COMMISSION

OF THE STATE OF COLORADO

| | | |
|---|---|---|
| IN THE MATTER OF ALLEGED VIOLATIONS OF | ) | CAUSE NO. 1V |
| THE RULES AND REGULATIONS OF | ) | |
| THE COLORADO OIL AND GAS CONSERVATION | ) | ORDER NO. 1V-276 |
| COMMISSION BY **ENCANA OIL & GAS (USA) INC.**, | ) | |
| GARFIELD COUNTY, COLORADO | ) | |

REPORT OF THE COMMISSION

This cause came on for hearing before the Colorado Oil and Gas Conservation Commission ("COGCC") on August 16 and 17, 2004 at 10:00 a.m. and 7:30 a.m. in the Birch Room at the Ramada Inn, 124 W. 6th Street, Glenwood Springs, Colorado, after giving Notice of Hearing as required by law, as to why the COGCC should find EnCana Oil & Gas (USA) Inc. in violation of certain of the COGCC's rules and regulations (2 CCR-404-1, "Rules") and why it should impose penalties for those violations pursuant to § 34-60-121, C.R.S., as amended.

# FINDINGS

1.  On July 29, 2003, the COGCC Director approved an Application for Permit-to-Drill ("APD"), Form 2, for the Schwartz 2-15B Well (the "Schwartz 2-15B Well") located in the SW¼ SE¼ of Section 2, Township 7 South, Range 92 West, 6th P.M. submitted by EnCana Oil & Gas (USA) Inc. ("EnCana").

2.  COGCC's "Notice to All Operators Drilling Williams Fork Formation Wells in Garfield County - Surface Casing Depth and Modification of Leakoff Test Requirements" dated May 3, 2001 ("2001 Notice") which amended a notice to operators dated September 22,

1998, specified drilling permit conditions applicable to all wells drilled in Garfield County to the Williams Fork Formation.  The 2001 Notice was not attached to or referenced by EnCana's copy of the APD for the Schwartz 2-15B Well, although it was on the COGCC's copy.  Among the permit conditions in the 2001 Notice was the requirement to report to the COGCC Northwest Colorado Area Engineer as soon as feasible within twenty-four (24) hours, all lost circulation zones and gas kicks, together with depths, mud volumes lost, mud weights before and after kicks, and procedures used to control kicks.

3.   While drilling the well on January 20, 2004 EnCana lost circulation at the depth of 1543'.  EnCana continued drilling without circulation to a depth of 1589', and the well began to flow requiring the well to be shut-in for one (1) hour to control the kick.  The lost circulation and kick were not reported to COGCC staff.  It is uncommon to encounter kicks this shallow in the Wasatch Formation.

4.   While drilling the well on January 27, 2004 EnCana lost circulation at a depth of 4328'.  The well began to kick shortly thereafter and was shut-in for eight (8) hours to control the kick and reestablish circulation with kill mud.  The lost circulation and kick were not reported to COGCC staff.

5.   On February 6, 2004, the Schwartz 2-15B Well had been drilled to total depth and was logged.  EnCana had difficulty breaking circulation after logging.  EnCana also lost circulation while running casing and had to shut down for seven (7) hours to build pit volume and re-establish circulation.

6.   Casing was run to total depth and the well was cemented on February 9, 2004.  Cement was circulated to surface with twenty-five (25) barrels excess and was witnessed by EnCana supervisors and by Schlumberger personnel.

7.   On February 16, 2004 EnCana ran a cement bond log ("CBL") on the Schwartz 2-15B Well which showed the apparent top of competent cement had fallen to approximately 4050', far below the level required on the permit conditions and far below what was observed at the end of the cementing job.  At the time, EnCana engineers interpreted the CBL as showing the top of cement at approximately 3500'; EnCana acknowledges that the CBL can be interpreted to show incomplete cement coverage above 4050'.

8.  On February 16, 2004 EnCana ran a temperature survey in conjunction with the CBL. The temperature survey showed cooling beginning at the approximate depth of 4328' and upward.  The survey demonstrated upward gas migration was occurring under shut-in conditions. The flow originated below the apparent top of cement and suggested the cement was not competent above that depth.

9.  On February 18, 2004 EnCana ran a series of Cased Hole Dynamics Tests to measure formation pressures.  The tests showed formation pressure gradients averaged 0.591 psi/ft below a depth of 4711' and averaged 0.232 psi/ft above that depth.   The tests suggest the formations below 4711' are over pressured and that a geologic feature could exist that allowed the intervals at and above 4711' to be extremely under pressured.

10.  EnCana performed completion operations between February 16, 2004 and April 1, 2004 that included cased hole logging, perforating, fracturing and flowing back four (4) different intervals without notifying the COGCC staff that the cement top had fallen to approximately 4050' and without disclosing the well conditions.

11.   On March 23, 2004 at 5:07 pm EnCana e-mailed a Sundry Notice, Form 4 to COGCC staff requesting approval to remedially cement the Schwartz 2-15B Well.

12.  Staff reviewed the Sundry Notice on March 30, 2004 and called an EnCana engineer to inquire why the sundry proposed perforating at 3800' and circulating cement to surface on the well since there had been no previous discussion of a problem.  COGCC staff asked the EnCana engineer what the bradenhead pressure was, and he responded that it was five hundred (500) pounds per square inch (psi).  COGCC staff approved the Sundry Notice that same day.

13.  On April 1, 2004 COGCC staff received a complaint of the recent appearance of gas bubbles in West Divide Creek where none had been observed previously.  COGCC staff inspected and confirmed the existence of the gas bubbles in West Divide Creek, notified EnCana of the complaint and its validity, and scheduled sampling to begin to determine the cause.

14. On April 2, 2004, as part of the investigation to determine the cause of the seep, COGCC staff obtained samples of the bradenhead gas from two (2) wells adjacent to the West Divide Creek seep (Schwartz 2-15B Well and Brown 11-2C Well), one (1) sample of Williams Fork Formation produced gas (Twin Creek 1-15B Well), and one (1) sample of gas seeping into West Divide Creek. EnCana personnel and Cordilleran Compliance Services ("Cordilleran") were present during this investigation.

15. On April 2, 2004 the COGCC staff and Cordilleran took water samples from West Divide Creek to determine whether benzene, toluene, ethylbenzene, xylenes ("BTEX"), or inorganic compounds were discharging from the seep. Cordilleran also sampled a pond on Pepi Langegger's ("Langegger") property.

16. On April 7, 2004 COGCC staff and Cordilleran obtained a sample of the bradenhead gas from one (1) additional well (Morgan 12-14B Well) adjacent to the West Divide Creek seep.

17. On April 8, 2004 the COGCC staff collected water and gas samples from two (2) stock ponds (Langegger upper and lower ponds) located in the valley of West Divide Creek.

18. Isotopic and compositional analysis indicated the bradenhead gas from two (2) of the wells (Schwartz 2-15B Well and Brown 11-2C Well) and the produced gas (Twin Creek 1-15B Well) were very similar and were from the Williams Fork Formation. The bradenhead gas from one (1) of the wells (Morgan 12-14B Well) was not similar to the Williams Fork Formation. The isotopic values and composition of the gas seeping into West Divide Creek and into the Langegger lower pond also were very similar to the produced gas from the Twin Creek 1-15B Well and the bradenhead gas from the Schwartz 2-15B Well and the Brown 11-2C Well indicating that gas seeping into the West Divide Creek and into the Langegger lower pond was Williams Fork Formation gas.

19. Analysis of a water sample taken from West Divide Creek on April 2, 2004 showed impact to the surface waters of the state by the presence of benzene at the concentration of 99.0 micrograms per liter (µg/l). The Water Quality Control Commission (WQCC) has classified West Divide Creek as "aquatic life cold water 1, recreation 1a, water supply, agriculture" and has established 1.2 µg/l as the numeric standard for benzene for surface waters so classified. From April 13, 2004 through April 19, 2004, EnCana collected water samples from six (6) locations along West Divide Creek on a daily basis for analysis of benzene, toluene,

ethylbenzene, and xylenes (BTEX). On April 19, 2004 benzene, at a concentration of 1.4 µg/l, was detected in only one (1) of the six (6) samples collected at these locations. None of the BTEX compounds were detected in any samples collected from EnCana's six (6) surface water monitoring locations in West Divide Creek after April 19, 2004. In addition, BTEX compounds were never detected in any of the thirty-three (33) water wells, eleven (11) ponds, or four (4) springs sampled by EnCana or the COGCC staff in the vicinity of the West Divide Creek gas seep.

20. On May 19, 2004 the COGCC staff took a water sample from a spring on the eastern cut bank approximately four (4) feet above the surface of the water level of West Divide Creek in the gas seep area. Analysis of the May 19, 2004 spring sample showed impact to the ground water by the presence of benzene at the concentration of 200 µg/l. The WQCC has established a ground water standard for benzene of 5 µg/l.

21. At the direction of the COGCC staff, EnCana initiated a ground water investigation. As part of the investigation, EnCana installed nine (9) ground water monitoring wells between June 28 and July 9, 2004, and began a program of sampling and analysis of ground water from the wells.

22. On July 26, 2004, the COGCC received the results from the first samples taken from the ground water monitoring wells. Six (6) of the samples contain benzene at concentrations ranging from 65 µg/l to 240 µg/l. These levels exceed the WQCC standard of 5 µg/l for benzene in ground water. The extent of the ground water impact has not been defined.

23. After the gas from the seep in West Divide Creek was identified as Williams Fork Formation gas, EnCana promptly responded to the COGCC staff with a plan of action to address the environmental and safety concerns of nearby residents and the community. Among other things, the plan called for placing charcoal booms in West Divide Creek, implementing an air sparging system to enhance natural volatilization of benzene in the creek water, and supplying drinking water to nearby residents. In addition to implementing this plan, EnCana also voluntarily agreed to cease drilling and completion operations within a two (2) mile radius of the seep until new drilling and completion procedures can be developed to prevent any similar occurrence in the future.

24. On April 5, 2004 the Schwartz 2-15B Well was remedially cemented. Within eight (8) days of the repair, the gas seep in West Divide Creek had visibly decreased. Within twelve (12) days the benzene concentration in West Divide Creek had decreased.

25. The decrease in gas seepage corresponding to the remedial cementing of the Schwartz 2-15B Well indicates that the failure of the primary cementing of the Schwartz 2-15B Well was the most likely reason that seepage of Williams Fork Formation gas and the associated release of benzene into West Divide Creek and into the ground water of the shallow alluvium in the seep area occurred.

26. Impact to the surface and ground water by the presence of benzene and methane indicate that Williams Fork Formation gas and benzene are still present in the gas seep area and continue to be a threat to the waters of the state; however, the amount of Williams Fork Formation gas and the associated release of benzene appear to have decreased since April 5, 2004 when EnCana remedially cemented the Schwartz 2-15B Well. After April 19, 2004 benzene was not detected in surface waters of West Divide Creek at EnCana's six (6) surface water monitoring locations. It is likely that the remedial cementing sealed the annulus of the Schwartz 2-15B Well and halted any further migration of gas from the wellbore into fractures or surrounding rock. It is also likely that levels of Williams Fork Formation gas and benzene in the ground water will continue to decrease as a result of the elimination of the gas source.

27. The COGCC staff reviewed the completion reports, bond logs and bradenhead pressures of all other wells within a two (2) mile radius of the seep area. No other well exhibited a top of cement low enough to allow pressure to build above the strength of the formation below the surface casing shoe. No other well exhibited bradenhead pressure high enough to exceed the strength of the formation below the surface casing shoe. No other well had been completed in a manner that would allow it to be the source of the seep. Neighboring operators' wells were cemented into the surface casing or to surface and exhibited low or no bradenhead pressures.

28. EnCana is the owner and operator of all Williams Fork Formation gas wells underneath and adjacent to the West Divide Creek seep. As operator of the Schwartz 2-15B Well EnCana has accepted and continues to accept responsibility for monitoring and addressing the environmental and public health and safety effects of the release. The COGCC staff has required and continues to require testing, analyses, delineation, monitoring and reporting by EnCana to address the environmental and public health and safety effects of the release.

29.   The COGCC staff hand-delivered a Notice of Alleged Violation ("NOAV") to EnCana on April 23, 2004.  The NOAV had an abatement deadline of May 8, 2004.  The NOAV cited Rule 209., failure to prevent the contamination of fresh water by gas, Rule 301., failure to notify the Director when public health or safety is in jeopardy, Rule 317.i., failure to pump cement 200' above the top of the shallowest producing horizon, Rule 324A., impacts to water quality and Rule 906.b.(3), failure to report a release to the Director.

30.   The NOAV required EnCana to submit a Site Investigation and Remedial Workplan, Form 27 for COGCC staff approval, outlining monitoring and mitigation measures to be taken to ensure protection of public safety and to mitigate impacts to water resources, submit a letter detailing how the Schwartz 2-15B Well was drilled and completed, along with an explanation of what occurred that caused Williams Fork Formation gas, benzene, and other hydrocarbon compounds to seep into West Divide Creek and Williams Fork Formation gas to seep into a nearby pond on the Langegger property.

31.   EnCana responded to the NOAV by letter dated May 7, 2004 with a Form 27 Workplan.   The workplan was approved by the COGCC staff on May 13, 2004.   EnCana submitted an amended response to the NOAV on May 18, 2004.

32.   Rule 209. states that "Special precautions shall be taken in drilling and abandoning wells to guard against … the contamination of fresh water by objectionable water, oil, or gas.  Before any oil or gas well is completed as a producer, all oil, gas and water strata above and below the producing horizon shall be sealed or separated in order to prevent the intermingling

of their contents."  EnCana's failure to seal all gas and water strata above the producing horizon resulted in impacts to West Divide Creek and adjacent ground water by benzene.  EnCana acknowledges that it should be found in violation of Rule 209.

33.   The APD approved for the Schwartz 2-15B Well required the production casing to be cemented to surface.   During the production casing cementing procedure on February 9, 2004, twenty-five (25) barrels of cement were circulated to the surface.  On February 16, 2004 EnCana ran a CBL and temperature survey log prior to beginning completion operations on the well.   The CBL indicated that the top of cement had fallen to approximately 4050', well below the level observed at the end of the cementing job and the level required by the permit conditions.  EnCana acknowledges that it violated the permit conditions for failure to cement to surface.

34.  Rule 317.i. states that "…cement shall be pumped behind the production casing two hundred (200) feet above the top of the shallowest known producing horizon." EnCana indicated the top of gas in the Schwartz 2-15B Well to be at approximately 4132'. EnCana's completion report dated February 16, 2004 indicates that an onsite EnCana employee or contractor read the CBL to show top of cement at 4050', with which the COGCC staff concurs, and which is less than 200 feet above the top of the shallowest known producing horizon.  EnCana engineers interpreted the CBL to show good cement coverage up to 3500', but nonetheless, EnCana acknowledges that it should be found in violation of Rule 317.i. for failure to pump cement 200 feet above the top of the shallowest known producing horizon.

35.  On February 16, 2004 a temperature survey log was run on the Schwartz 2-15B Well in conjunction with the CBL.  The logs were run seven (7) days after the well was cemented and were run under shut-in conditions.  The temperature survey indicates gas entry into the annular space between the production casing and the wellbore at approximately 4300' and gas migration behind the pipe exiting into shallower formations (i.e., crossflow).  Rule 327. states "The operator shall take all reasonable precautions, in addition to fully complying with Rule 317., to prevent any oil, gas or water well from blowing uncontrolled and shall take immediate steps and exercise due diligence to bring under control any such well…."  EnCana acknowledges that it did not take all reasonable precautions to avoid an underground blowout, in violation of Rule 327., and that as a result there was an unanticipated and unintended release of gas from the well.  EnCana acknowledges that it should be found in violation of Rule 327.

36.  The release of gas from the Schwartz 2-15B Well  occurred from the date of the attempted cementing of production casing (February 9, 2004) until the remedial cementing operation (April 5, 2004), a period of fifty-five (55) days.  This release of gas for fifty-five (55) days resulted in waste of natural gas resources as defined by §34-60-103(11) ("Waste" as applied to gas includes the escape, blowing or releasing, directly or indirectly into the open air…) and §34-60-10313(a), C.R.S. ("Waste" in addition…means [p]hysical waste, as that term is generally understood in the oil and gas industry) and is prohibited under §34-60-107, C.R.S.  EnCana acknowledges that it should be found in violation of §34-60-107, C.R.S. because the release of natural gas for fifty-five (55) days is a waste of resources, which is prohibited by statute.

37.  Rule 301. states that "Immediate notice shall be given to the Director when public health or safety is in jeopardy.  Notice shall also be given to the Director of any other significant downhole problem or mechanical failure within ten (10) days."  EnCana ran a CBL and a temperature survey on February 16, 2004 which indicated significant downhole problems. EnCana's notification on March 30, 2004 during the phone call with the COGCC staff was neither immediate notification of the high bradenhead pressure nor within ten (10) days of the

downhole problem or mechanical failure as required by Rule 301. COGCC staff was notified on March 23, 2004 of the lack of cement coverage and on March 30, 2004 of the bradenhead pressure. EnCana should be found in violation of Rule 301. for each omission (failure to report cement top falling 2/16/04-3/23/04, thirty-six (36) days; failure to report bradenhead pressure 2/16/04-3/30/04, forty-three (43) days).

38.    Rule 324A. states that "The operator shall take precautions to prevent significant adverse environmental impacts to air, water, soil, or biological resources to the extent necessary to protect public health, safety and welfare, by using cost-effective and technically feasible measures to protect environmental quality and to prevent the unauthorized discharge of oil, gas, E&P waste, chemical substances, trash, discarded equipment or other oil field waste." The rule also states that "No operator, in the conduct of any oil or gas operation shall perform any act or practice which shall constitute a violation of the water quality standards or classifications established by the [WQCC]… for waters of the state…." Based on the benzene levels measured in West Divide Creek on April 2, 2004 which exceed the WQCC surface water standards established for benzene, EnCana acknowledges that it should be found in violation of Rule 324A.

39.    Rule 910.a. and Table 910-1 specify the allowable concentrations for soil and ground water based on standards and classifications established by the WQCC. Based on the benzene levels measured in six (6) of the nine (9) ground water monitoring wells on July 9, 2004 which exceed the WQCC ground water standards established for benzene, EnCana acknowledges that it should be found in violation of Rule 910.a.

40.    On June 14, 2004, COGCC staff requested the COGCC Director make an application to the Commission for an OFV against EnCana. The matter was docketed for the August 16-17, 2004 hearing.

41.    On July 14, 2004, a Notice of Conflicts Counsel was filed with the Commission which stated that Assistant Attorney General Carol J. Harmon would be the legal advisor to the COGCC staff in the OFV matter, and that Assistant Attorney General Tim Monahan would be the legal advisor for the Commission.

42.    On July 14, 2004, an Entry of Appearance was filed by Erika Z. Enger, Attorney for EnCana, indicating EnCana's intent to present testimony, arguments and exhibits in the enforcement proceeding.

43.  On July 14, 2004, Don DeFord, County Attorney for the Board of County Commissioners of Garfield County ("BOCC"), filed with the Commission a Motion for Intervention under Rule 509.a.

44.  On July 14, 2004, Sean McAllister, Attorney for Western Colorado Congress ("WCC") and Grand Valley Citizens' Alliance ("GVCA") filed with the Commission a Motion for Intervention under Rule 509.a.

45.  On July 14, 2004, an email was sent to the Commission from Robert Eicher describing the manner in which he would like to participate in the OFV hearing.

46.  On July 16, 2004, a document titled "Testimony ref. West Divide Creek was filed with the Commission by Steven R. Thompson.

47.  On July 21, a prehearing conference was held with the parties to discuss procedural issues, submittal of documents and scheduling.

48.  On August 6, 2004, the parties exchanged exhibits and expert reports.

49.  On August 9, 2004, COGCC staff and EnCana reported to the Hearing Officer that progress was being made on reaching a stipulated recommended order and they requested that the prehearing conference scheduled for August 10, 2004 be rescheduled to allow additional time for negotiations.  The Hearing Officer rescheduled the prehearing conference for Thursday, August 12, 2004.

50.  On August 12, 2004, the third prehearing conference was held at which time COGCC staff and EnCana presented a stipulated recommended order for review by the parties. In addition, case management was discussed for proceeding with the August 16-17, 2004 hearing.

51.    At the time of the hearing, Commissioner Klish recused himself from the proceedings as a voting Commissioner.

52.    After comments provided by Mr. DeFord and an objection by Ms. Enger to participation in the violation phase, the Commission voted unanimously to accept the BOCC's Motion for Intervention to allow the County to intervene in both the violation phase and the penalty phase of the hearing.

53.    After comments provided by Mr. McAllister, an objection by Ms. Enger stating a lack of showing that the intervention is in the public interest, and a concern raised by Ms. Harmon, regarding the scope of participation, the Commission voted unanimously to accept the WCC/GVCA Motion for Intervention to allow WCC/GVCA to intervene in both the violation phase and the penalty phase of the hearing.

54.    After discussion on EnCana's Motion in Limine to exclude evidence regarding WCC/GVCA's requested relief which it believes goes beyond the scope of the hearing, the Commission determined that rather than make a ruling at the beginning of the hearing, they would address these issues as they arise during the course of the hearing.

55.    After opening statements were presented by the parties, COGCC staff witnesses Jaime Adkins, COGCC Northwest Engineer and Debbie Baldwin, COGCC Environmental Supervisor presented the stipulated recommended order, including supporting exhibits, to the Commission.

56.    COGCC staff witness Scott Klarich, Colorado Department of Public Health and Environment Water Quality Control Division ("WQCD") Enforcement Team Leader testified as to the Memoranda of Agreements between the WQCD, WQCC and the COGCC.  He indicated his agency's agreement with the actions taken in response to the gas seep by COGCC staff.

57.    COGCC staff witness Greg Nagle, WQCD Ground Water Quality Coordinator testified as to the standards established by the WQCC and his agency's agreement with the COGCC staff's recommended order.

58.   COGCC staff witness Mark Beeunas, a gas isotope expert, testified regarding interpretation of stable isotopes and compositional analysis collected from water wells and gas wells which corroborated COGCC staff's interpretation of the source of the gas seeping into West Divide Creek.

59.   COGCC staff witness Richard Moore, consulting geologist, testified that he had no changes to the data and conclusions presented in his expert report after his review of the other expert reports provided.  He concluded that there was a strong likelihood that the West Divide Creek gas seep was caused by improper completion procedures at the Schwartz Well.

60.   Ms. Enger indicated EnCana's concurrence with the COGCC's staff presentation. Mr. DeFord indicated the BOCC had no objections to the Commission accepting Finding Nos. 1 through 39 of the stipulated recommended order, although the BOCC objected to the number of days EnCana was found in violation of Rules 324A. and 207.  Mr. McAllister presented a written objection to the stipulated recommended order.

61.   After discussion, Ms. Harmon proposed that Finding No. 38 be amended to include both Rule 324A.a. and Rule 324A.b.  This amendment was agreed to by the parties and the Commission.

62.   Commissioner Ashby asked Mr. Adkins if he had reviewed the CBL run after the remedial cementing was performed.  Mr. Adkins testified that the CBL showed a good cement job and that the bradenhead test showed no pressure.   All exhibits presented, including the second CBL, were admitted.

63.   After comments from BOCC and WCC/GVCA on the number of days of violation of Rules 324A. and 910.a., the Commission deliberated and voted unanimously to accept Finding Nos. 1 through 39 and previous Finding No. 41 (now Finding No. 64), including the revision to Finding No. 38.

64.   EnCana should be found in violation of Rule 209. from February 9, 2004 until April 5, 2004 for fifty-five (55) days of violation.  EnCana should be found in violation of

Rule 301. from February 16, 2004 until March 30, 2004 for forty-three (43) days of violation (failure to report bradenhead pressure) and from February 16, 2004 until March 23, 2004 for thirty-six (36) days of violation (failure to report fall of cement top). EnCana should be found in violation of Rule 317.i. from February 9, 2004 until April 5, 2004 for fifty-five (55) days of violation. EnCana should be found in violation of Rule 324A. from February 9, 2004 until April 5, 2004 for fifty-five (55) days of violation. EnCana should be found in violation of Rule 327. from February 9, 2004 until April 5, 2004 for fifty-five (55) days of violation. EnCana should be found in violation of Rule 910.a. from February 9, 2004 until April 5, 2004 for fifty-five (55) days of violation. EnCana should be found in violation of the permit conditions from February 9, 2004 until April 5, 2004 for fifty-five (55) days of violation. EnCana should be found in violation of §34-60-107, C.R.S. from February 9, 2004 until April 5, 2004 for fifty-five (55) days of violation.

65.   Having determined that violations existed, the Commission moved into the penalty phase of the hearing by having testimony presented first by WCC/GVCA witness Herman Lucero to accommodate his schedule. Mr. Lucero testified about the sampling process he utilized in the West Divide Creek area, the results from his water sampling and his observations in the area.

66.   Mr. Adkins described the penalty and remedial action proposed in the stipulated recommended order, previous Finding Nos. 40, and 42 through 45 (now Finding Nos. 67 through 71 below).

67.   Rule 523. specifies a base fine of One Thousand dollars ($1000) per day for violations of Rules 209., 301., 317.i., 324A., 327., and 910. No base fine is listed in Rule 523.a.(4) for violation of the Permit Conditions or §34-60-107, C.R.S. Fines for these two (2) violations (i.e., Permit Conditions and §34-60-107, C.R.S.) are limited to One Thousand dollars ($1,000) per day in accordance with Rule 523.a.(1).

68. Rule 523.a.(1) specifies that "…no fine for any single violation shall exceed One Thousand dollars ($1,000) per day." EnCana does not admit liability for causing significant waste or significant adverse impact on public health, safety or welfare. However, it agrees to pay the following fines as adjusted pursuant to Finding No. 69 in order to resolve this matter without the necessity of an extended contested hearing:

| Item Violated Fine/Rule | Number of Violation/Days | Total |
|---|---|---|
| Rule 209. | 55 | $55,000.00 |
| Rule 301. Bradenhead | 43 | $43,000.00 |
| Rule 301. Cement | 36 | $36,000.00 |
| Rule 317.i. | 55 | $55,000.00 |
| Rule 324A. | 55 | $55,000.00 |
| Rule 327. | 55 | $55,000.00 |
| Rule 910.a. | 55 | $55,000.00 |
| Permit Conditions | 55 | $55,000.00 |
| §34-60-107, C.R.S. | 55 | $55,000.00 |
| Total Maximum Allowable Fine Amount | | $464,000.00 |

69.  The following mitigating factors were considered in reducing the maximum allowable fine amount by ten percent (10%) per mitigating factor, for a total of twenty percent (20%) fine reduction:  Rule 523.d.(2), the violator demonstrated prompt, effective and prudent response to the violation, including assistance to any impacted parties, and Rule 523.d.(3). the violator cooperated with the Commission with respect to the violation.  These mitigating factors were applied to actions taken by EnCana once the gas seep was discovered.

70.  A monetary penalty of Three Hundred Seventy-one Thousand, Two Hundred dollars ($371,200.00) should be assessed against EnCana, in accordance with Rule 523.a. and Rule 523.d., for the above-described violations of the Rules, Permit Conditions and the Oil and Gas Conservation Act.  The fine should be suspended until the Commission's next regularly scheduled hearing on September 20, 2004 to give the parties an opportunity to propose a public project in lieu

of the fine.  The Commission will hear and consider the proposal of the public project and may approve, modify, or condition the proposal or reinstate the fine.

71.  EnCana should proceed under the Site Investigation and Remediation Workplan, Form 27 approved by COGCC staff on May 13, 2004.  EnCana should submit to the COGCC staff for approval a Site Investigation and Remediation Workplan, Form 27, for the investigation, remediation, and monitoring of ground water to meet the required allowable concentrations.  The COGCC staff should evaluate EnCana's compliance with both Form 27 Workplans submitted.  In addition, the COGCC should direct the staff to maintain the moratorium on drilling and completion operations within a two (2) mile radius of the seep at West Divide Creek until the COGCC staff evaluates the effectiveness of the Notice to All Operators Drilling Wells to the Mesaverde Group or Deeper in the Mamm Creek Field, Garfield County drafted and implemented July 23, 2004 ("2004 Notice") and determines when the moratorium can be lifted. The 2004 Notice contains the following requirements that require operators in the Mamm Creek Field to obtain COGCC staff approval prior to completion of a well and will prevent the unusual set of circumstances that caused the West Divide Creek seep from happening again:

a.  A drilling prognosis showing projected top of gas and formation tops shall be required with the Application for Permit-to-Drill, Form 2.  This information shall be provided in the form of a wellbore diagram showing the top of gas, formation tops, and top of cement for each stage.

b.  Upon completion of the primary cementing operation, the annular fluid level around the production casing shall be monitored for a minimum of four (4) hours prior to the installation of the casing slips.

c.  The bradenhead pressure shall be measured at intervals of six (6), twelve (12), twenty-four (24) and seventy-two (72) hours after the production casing is cemented.  If bradenhead pressures greater than one hundred fifty (150) psig are observed, such pressures shall be immediately reported to the COGCC and a remediation procedure shall be prepared for COGCC approval.

d.  Following the cementing operation, a combination temperature/cement bond log shall be run within twelve (12) to forty-eight (48) hours to locate the actual cement top.  If the cement top does not conform to this notice (500 feet above the top of gas), the COGCC

shall be immediately notified and a remediation procedure shall be prepared for COGCC approval.

e.   The bradenhead pressure record, cement bond log, temperature survey log, and revised formation tops shall be provided to the COGCC Northwest Area Engineer within seven (7) days of cementing the production casing.

f.   The COGCC shall review the casing and cementing operations and approval shall be obtained by the operator from the COGCC prior to commencement of completion operations.

g.   The bradenhead pressure shall be monitored and recorded when performing fracturing operations.

72.   EnCana witness Kimberley Kaal, Senior Geologist for Cordilleran Compliance Services, testified as to the environmental sampling and monitoring conducted at the West Divide Creek gas seep area to date and the plan for future studies.

73.   EnCana witness Karmen King, Program Administrator, Natural Resource Management Institute, Colorado Mountain College, testified on the study she conducted on aquatic life in the West Divide Creek after the discovery of the gas seep.  She testified about the scope, purpose, and four (4) sampling events (between May 10 and July 21, 2004) of the study.  Ms. King testified about BTEX and methane measurements of surface water samples and seep samples.  She also testified that one (1) of the four (4) data sets of benthic macroinvertebrates had been analyzed and showed no impact attributable to the seep.  Ms. King further testified that a fifth sampling event was scheduled for August, 2004 and that three (3) data sets of benthic macroinvertebrates were still to be analyzed.

74.   BOCC witness Doug Dennison, Garfield County Oil & Gas Auditor testified about the photographs he had taken at the West Divide Creek gas seep and its impact on public health, safety and the environment of Garfield County citizens, and on the number of Notices of Alleged Violation issued by the COGCC staff to EnCana  in the past year.

75.  BOCC witness Jeffery Thyne, Research Professor in the Department of Geology and Geological Engineering at the Colorado School of Mines testified about his independent review of the data available at the COGCC office and his belief that the gas seep was caused by incomplete cementation during completion of the Schwartz well, that the longer term impacts of contamination have not been evaluated, nor the extent of the contamination been determined, and that Garfield County should be involved in the review of additional data gathered.

76.  WCC/GVCA witness Pepe Langegger testified about his personal experience with the gas seep on his property and potential impacts affecting his elk herd population, and his belief that there is not enough oversight of drilling.

77.  WCC/GVCA witness Nancy Jacobsen testified about living in proximity to four (4) gas wells, the need to hold EnCana accountable for the gas seep, and her belief that EnCana should be required to comply with the relief requested in the WCC/GVCA intervention.

78.  WCC/GVCA witness Bill Griffin, spokesperson for the neighborhood association, testified that he wants the moratorium on drilling and completion to be extended until a complete study can be performed.  He testified that it may be necessary to curtail drilling completely throughout the area, and that COGCC staff should inspect all EnCana wells prior to completion.

79.  WCC/GVCA witness Matt Sura, Director of Western Colorado Congress testified about his experience working with oil and gas issues over the past two (2) years, his belief that additional monitoring and mitigation of the gas seep at West Divide Creek are needed prior to lifting the moratorium on drilling, and his preference for a joint effort with EnCana to determine potential public projects in lieu of a fine.

80.  A sworn statement was made pursuant to Rule 510. by Hermann Stauffer who testified to express his concern about preserving the land and water.

81.  A sworn statement was made pursuant to Rule 510. by Ken Wonstolen, General Counsel for the Colorado Oil and Gas Association who testified that he believes Rule 209. and Rule 324A. address the same issue.  He testified that he had concern over the penalty calculations but would not bring it up because of the stipulated recommended order.

82.   A sworn statement was made pursuant to Rule 510. by Sher Long, Community Relations Consultant for EnCana who testified that she lives on the Deitrich property and feels comfortable using the water from the well and living in the area near the gas seep.

83.   A sworn statement was made pursuant to Rule 510. by Matt Sura, Director of Western Colorado Congress to describe why there were so few Rule 510. statements made at the hearing, indicating that citizens for the most part could only attend one day of the hearing and the time for making Rule 510. statements was not determined well in advance of the hearing.

84.   Lisa Bracken and her father Robert Eicher had wished to make a sworn statement pursuant to Rule 510. but had to leave early.  They asked Ms. Harmon to relay to the Commission their approval with the process occurring over the two (2) days of hearing, and their concurrence with the direction the hearing seemed to be headed.

85.   EnCana response witness Anthony Gorody, Consulting Geologist, testified on his analysis of gas samples gathered from the West Divide Creek seep, from surface water, from the Schwartz Wells and from other wells in the vicinity of the seep.  He testified about methods for identifying the source of gas seeping into West Divide Creek, the localized impact of the seep on aquifers, the influence of fractures in the a1rea on the extent and direction of the seep, and EnCana's plan to conduct a nine (9) square mile study to detect methane at the surface, including the corridor between the Schwartz 2-15B Well and West Divide Creek.

86.   EnCana response witness Eric Marsh, Vice President-Southern Rockies, testified about his company's corporate philosophy, new procedures put in place regarding cementing practices and bradenhead testing, and the plan to provide more oversight from field personnel, the amount of money EnCana has spent to date on investigating, mitigating, and monitoring the seep, and EnCana's commitment to continue following the program required by the COGCC staff until it is complete.

## ORDER

NOW, THEREFORE, IT IS ORDERED, that EnCana Oil & Gas (USA) Inc. shall be found in violation of the Permit Conditions requiring the cementing of production casing to the surface on the Schwartz 2-15B Well located in the SW¼ SE¼ of Section 2, Township 7 South, Range 92 West, 6th P.M.

IT IS FURTHER ORDERED, that EnCana Oil & Gas (USA) Inc. shall be found in violation of Rule 209. failure to prevent the contamination of fresh water by gas, Rule 301., failure to notify the Director when public health or safety is in jeopardy and failure to notify the Director of significant downhole problems or mechanical failure, Rule 317.i., failure to pump cement 200' above the top of the shallowest producing horizon, Rule 324A., impacts to water quality, Rule 327., loss of well control and allowing an underground blowout of gas, and Rule 910.a., failure to meet ground water standards in Table 910-1.

IT IS FURTHER ORDERED, that EnCana Oil & Gas (USA) Inc. shall be found in violation of §34-60-107, C.R.S., waste due to the loss of gas resources.

IT IS FURTHER ORDERED, that EnCana Oil & Gas (USA) Inc. shall be found to be responsible for the release of Williams Fork Formation gas, benzene, and other hydrocarbon compounds from the Schwartz 2-15B Well resulting in the subsequent impacts to the surface and ground waters of the state and for monitoring and addressing the environmental and public health and safety effects of the release.

IT IS FURTHER ORDERED, that EnCana Oil & Gas (USA) Inc. shall be assessed a fine of Three Hundred Seventy One Thousand Two Hundred dollars ($371,200.00) which fine shall be suspended until the Commission's next regularly scheduled hearing on September 20, 2004 to give the parties an opportunity to propose a public project in lieu of the fine. The Commission will hear and consider the proposal of the public project and may approve, modify, or condition the proposal or reinstate the fine.

IT IS FURTHER ORDERED, that EnCana Oil & Gas (USA) Inc. shall proceed under the Site Investigation and Remediation Workplan, Form 27 approved by COGCC staff on May 13, 2004. In addition, Encana shall proceed under the Notice to All Operators Drilling Wells to the Mesaverde Group or Deeper in the Mamm Creek Field, Garfield County implemented and effective July 23, 2004.

IT IS FURTHER ORDERED, that EnCana Oil & Gas (USA) Inc. shall submit to the COGCC staff for approval a Site Investigation and Remediation Workplan, Form 27, to delineate the extent of contamination to ground water and to continue the investigation, remediation, and monitoring of ground water to meet the required allowable concentrations.

IT IS FURTHER ORDERED, that the COGCC staff shall maintain the moratorium on drilling and completion operations within a two (2) mile radius of the seep at West Divide Creek until the COGCC staff evaluates (1) the effectiveness of the Notice to All Operators Drilling Wells to the Mesaverde Group or Deeper in the Mamm Creek Field, Garfield County, effective July 23, 2004 ("notice"), and (2) EnCana's compliance with any applicable Site Investigation and Remediation Workplan, Form 27, as approved or amended by the COGCC staff ("investigation and remediation requirements"), related to the gas seep in the area of West Divide Creek. After the COGCC staff evaluates the effectiveness of the notice and EnCana's compliance with investigation and remediation requirements, it shall make any modifications it deems necessary and lift the moratorium when, in the COGCC staff's determination, the appropriate safety precautions are set forth in the notice and EnCana has complied with all investigation and remediation requirements related to the gas seep in the area of West Divide Creek.

IT IS FURTHER ORDERED, that the provisions contained in the above order shall become effective forthwith.

IT IS FURTHER ORDERED, that the Commission expressly reserves its right after notice and hearing, to alter, amend, or repeal any and/or all of the above orders.

IT IS FURTHER ORDERED, that under the State Administrative Procedure Act the Commission considers this order to be final agency action for purposes of judicial review within thirty (30) days after the date this order is mailed by the Commission.

IT IS FURTHER ORDERED, that an application for reconsideration by the Commission of this order is not required prior to the filing for judicial review.

Entered this _____ day of September, 2004, as of August 16, 2004.

OIL AND GAS CONSERVATION COMMISSION


By_____

Patricia C. Beaver, Secretary


Dated at Suite 801

1120 Lincoln Street

Denver, Colorado  80203

September 16, 2004



**science for a changing world**

**National and Global Petroleum Assessment**

# Assessment of Continuous (Unconventional) Oil and Gas Resources in the Late Cretaceous Mancos Shale of the Piceance Basin, Uinta-Piceance Province, Colorado and Utah, 2016

*Using a geology-based assessment methodology, the U.S. Geological Survey assessed technically recoverable mean resources of 74 million barrels of shale oil, 66.3 trillion cubic feet of gas, and 45 million barrels of natural gas liquids in the Mancos Shale of the Piceance Basin in Colorado and Utah.*

## Introduction

The U.S. Geological Survey (USGS) completed a geology-based assessment of the continuous (unconventional) oil and gas resources in the Late Cretaceous Mancos Shale within the Piceance Basin of the Uinta-Piceance Province (fig. 1). The previous USGS assessment of the Mancos Shale in the Piceance Basin was completed in 2003 as part of a comprehensive assessment of the greater Uinta-Piceance Province (U.S. Geological Survey Uinta-Piceance Assessment Team, 2003). Since the last assessment, more than 2,000 wells have been drilled and completed in one or more intervals within the Mancos Shale of the Piceance Basin (IHS Energy Group, 2015). In addition, the USGS Energy Resources Program drilled a research core in the southern Piceance Basin that provided significant new geologic and geochemical data that were used to refine the 2003 assessment of undiscovered, technically recoverable oil and gas in the Mancos Shale.

## Geologic Summary of the Mancos Shale in the Piceance Basin

The Late Cretaceous Mancos Shale was deposited within a foreland basin setting during the initial development and ultimate extension of the Cretaceous Western Interior Seaway. At its maximum extent, the Western Interior Seaway spanned from the present-day Arctic Ocean in the north, to the Gulf of Mexico in the south, to central Utah in the west, and as far east as western Minnesota.



**EXPLANATION**

— Uinta-Piceance Province (part)
— Distal Frontier Conventional AU
— Lower Mancos Tight Gas AU
— Lower NiobraraTight Gas AU
— Upper Niobrara Shale Gas AU
— Upper Niobrara Shale Oil AU
— Upper Mancos Tight Gas AU

**Figure 1.**   Map of the Uinta-Piceance Province and extent of six Mancos Shale assessment units. (AU, assessment unit)

The central part of the foreland basin was later segmented into multiple Rocky Mountain basins, including the Piceance Basin, during the Laramide orogeny. The Mancos Shale in the Piceance Basin represents more than 29 million years of deposition (Cobban and others, 1994). The unit is more than 4,000 feet thick throughout most of the basin and is dominated by mudrocks with varying amounts of terrigenous siliciclastic and biogenic calcite deposited in an offshore marine

U.S. Department of the Interior
U.S. Geological Survey

Printed on recycled paper

setting. The percentage of biogenic calcite in the Mancos Shale is highest in the lower half of the formation (Johnson and Rice, 1990). Organic matter is also highest in the lower half, consisting of Type II and mixed Type II/III kerogen with as much as 4.9 weight percent total organic matter (Johnson and Rice, 1990; Hawkins and others, 2012). In the upper half of the Mancos Shale, discontinuous siltstone and sandstone bodies represent distal to proximal shoreface deposits (Kirschbaum, 2003).

## Geologic Model for Assessment

The primary hydrocarbon source rock for the Mancos/Mowry Total Petroleum System (TPS) is the Mancos Shale. Hydrocarbons generated in the Mancos Shale have migrated into tight (that is, continuous) reservoirs within the formation and into conventional reservoirs both above and below the formation. Tight reservoirs within the Mancos Shale include (1) offshore marine siltstones and sandstones in the basal members of the Mancos Shale; (2) sandstones and siltstones of the distal shoreface to tidally influenced Prairie Canyon Member (Cole and others, 1997), including the Mancos "B" zone of Kopper (1962); and (3) shoreface sandstones in the upper Mancos Shale and Late Cretaceous Iles Formation. Mancos Shale gas also migrated into conventional reservoirs in the Piceance Basin along the Douglas Creek arch (Lillis and others, 2003). Hydrocarbons were also generated and retained within the calcareous, organic-rich Niobrara Member in the lower part of the Mancos Shale.

Tight gas in the younger, shallower Mancos Shale intervals is produced primarily from vertical and directional wells in which the reservoirs have been hydraulically fractured. The tight-gas production is reported as commingled production with the overlying Williams Fork Formation. Tight gas and continuous oil and gas in the older and deeper intervals of the Mancos Shale are produced mostly from horizontal wells that have been hydraulically fractured.

## Assessment Units

The Late Cretaceous Mancos Shale was assessed previously as a single interval. The assessment combined all of the continuous accumulation resources within the Mancos and Mowry Shales into one set of three assessment units (AUs) that addressed the hydrocarbon resources in the entirety of the Uinta-Piceance Province (Kirschbaum, 2003). This current assessment of the Mancos Shale differs from the previous assessment in two ways: (1) it only assesses the Mancos Shale within the Piceance Basin and (2) the Mancos Shale strata are subdivided vertically into separate AUs. Each AU differs in geological characteristics that control hydrocarbon accumulation type and extent, the type of drilling and completion techniques applied, and the distribution of estimated ultimate recovery volumes of producing wells. These key factors influenced the input data used to assess the technically recoverable hydrocarbons in the Mancos Shale (table 1).

Five continuous AUs were defined in the Piceance Basin Mancos Shale for this assessment of the Mancos/Mowry TPS: (1) Lower Mancos Tight Gas AU, (2) Lower Niobrara Tight Gas AU, (3) Upper Niobrara Shale Gas AU, (4) Upper Niobrara Shale Oil AU, and (5) Upper Mancos Tight Gas AU (fig. 1). One conventional AU, the Distal Frontier Conventional AU, was also identified but was not

**Table 1.** Key assessment input data for five continuous assessment units in the Mancos Shale, Piceance Basin.

[AU, assessment unit; %, percent; EUR, estimated ultimate recovery per well; BCFG, billion cubic feet of gas; MMBO, million barrels of oil. The average EUR input is the minimum, median, maximum, and calculated mean. Shading indicates not applicable]

| Assessment input data—Continuous AUs | | | |
|---|---|---|---|
| **Lower Mancos Tight Gas AU** | **Minimum** | **Mode** | **Maximum** | **Calculated mean** |
| Potential production area of AU (acres) | 50,000 | 1,550,000 | 4,651,000 | 2,083,667 |
| Average drainage area of wells (acres) | 100 | 160 | 220 | 160 |
| Success ratio (%) | 30 | 60 | 90 | 60 |
| Average EUR (BCFG) | 0.08 | 0.6 | 1.2 | 0.622 |
| AU probability | 1.0 | | | |
| **Lower Niobrara Tight Gas AU** | **Minimum** | **Mode** | **Maximum** | **Calculated mean** |
| Potential production area of AU (acres) | 50,000 | 2,000,000 | 4,651,000 | 2,233,667 |
| Average drainage area of wells (acres) | 100 | 160 | 220 | 160 |
| Success ratio (%) | 60 | 85 | 95 | 80 |
| Average EUR (BCFG) | 0.4 | 0.7 | 1.7 | 0.753 |
| AU probability | 1.0 | | | |
| **Upper Niobrara Shale Gas AU** | **Minimum** | **Mode** | **Maximum** | **Calculated mean** |
| Potential production area of AU (acres) | 50,000 | 1,000,000 | 3,800,000 | 1,616,667 |
| Average drainage area of wells (acres) | 100 | 160 | 220 | 160 |
| Success ratio (%) | 60 | 85 | 95 | 80 |
| Average EUR (BCFG) | 0.5 | 0.8 | 2.6 | 0.901 |
| AU probability | 1.0 | | | |
| **Upper Niobrara Shale Oil AU** | **Minimum** | **Mode** | **Maximum** | **Calculated mean** |
| Potential production area of AU (acres) | 5,000 | 1,000,000 | 2,000,000 | 1,001,667 |
| Average drainage area of wells (acres) | 100 | 160 | 220 | 160 |
| Success ratio (%) | 10 | 30 | 75 | 38.33 |
| Average EUR (MMBO) | 0.01 | 0.03 | 0.08 | 0.032 |
| AU probability | 0.95 | | | |
| **Upper Mancos Tight Gas AU** | **Minimum** | **Mode** | **Maximum** | **Calculated mean** |
| Potential production area of AU (acres) | 2,220,000 | 2,800,000 | 3,742,000 | 2,914,000 |
| Average drainage area of wells (acres) | 10 | 20 | 40 | 23.33 |
| Success ratio (%) | 80 | 92 | 94 | 88.67 |
| Average EUR (BCFG) | 0.15 | 0.4 | 0.65 | 0.408 |
| AU probability | 1.0 | | | |

**Table 2.**   Assessment results for continuous and conventional oil and gas resources in the Mancos Shale, Piceance Basin.

[TPS, total petroleum system; AU, assessment unit; MMBO, million barrels of oil; BCFG, billion cubic feet of gas; NGL, natural gas liquids; MMBNGL, million barrels of natural gas liquids. Results shown are fully risked estimates. For gas accumulations, all liquids are included under the NGL category. F95 represents a 95 percent chance of at least the amount tabulated. Other fractiles are defined similarly. Fractiles are additive under the assumption of perfect positive correlation. Shading indicates not applicable]

| Total petroleum system (TPS) and assessment units (AUs) | AU prob- ability | Accu- mula- tion type | Total undiscovered resources | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Oil (MMBO) | | | | Gas (BCFG) | | | | NGL (MMBNGL) | | | |
| | | | F95 | F50 | F5 | Mean | F95 | F50 | F5 | Mean | F95 | F50 | F5 | Mean |
| Mancos/Mowry TPS | | | | | | | | | | | | | | |
| Lower Mancos Tight Gas AU | 1.0 | Gas | | | | | 1,266 | 4,343 | 10,297 | 4,875 | 1 | 3 | 10 | 4 |
| Lower Niobrara Tight Gas AU | 1.0 | Gas | | | | | 2,482 | 7,837 | 16,366 | 8,441 | 1 | 6 | 16 | 7 |
| Upper Niobrara Shale Gas AU | 1.0 | Gas | | | | | 1,875 | 6,360 | 15,659 | 7,268 | 1 | 5 | 15 | 6 |
| Upper Niobrara Shale Oil AU | 0.95 | Oil | 0 | 64 | 175 | 74 | 0 | 71 | 218 | 86 | 0 | 4 | 14 | 5 |
| Upper Mancos Tight Gas AU | 1.0 | Gas | | | | | 28,498 | 43,773 | 69,129 | 45,661 | 6 | 21 | 44 | 23 |
| **Total undiscovered continuous resources** | | | **0** | **64** | **175** | **74** | **34,121** | **62,384** | **111,669** | **66,331** | **9** | **39** | **99** | **45** |
| Distal Frontier Conventional AU | | | Not quantitatively assessed | | | | | | | | | | | |
| **Total undiscovered continuous and conventional resources** | | | **0** | **64** | **175** | **74** | **34,121** | **62,384** | **111,669** | **66,331** | **9** | **39** | **99** | **45** |

quantitatively assessed. The Distal Frontier Conventional AU is hypothetical and defined by the presence of the Frontier Sandstone where it interfingers with the Mancos Shale as determined by examination of well logs.

The Lower Mancos Tight Gas AU includes tight-gas reservoirs in the Mowry Shale (where present) and in the Mancos Shale above the Dakota Sandstone and below the Niobrara Member of the Mancos Shale. The AU boundary is defined by the outcrop of the Mancos Shale to the north, east, and south, and along the axis of the Douglas Creek arch to the west (fig. 1).

The Lower Niobrara Tight Gas AU includes the bioturbated silici-clastic interval in the basal 250–400 feet of the Niobrara Member. The geographic extents of the Lower Niobrara Tight Gas AU and the Lower Mancos Tight Gas AU are the same.

The Upper Niobrara Shale Gas AU and Upper Niobrara Shale Oil AU include the portion of the Niobrara Member that is rich in organic matter and biogenic calcite (Hawkins and others, 2012). The AU boundaries were drawn using mapped vitrinite reflectance values from the base of the Mancos Shale. Vitrinite reflectance values between 0.6 percent and 1.35 percent (Peters and Cassa, 1994) were used to define the Upper Niobrara Shale Oil AU.

Vitrinite reflectance values greater than 1.35 percent (Peters and Cassa, 1994) were used to define the Upper Niobrara Shale Gas AU.

The Upper Mancos Tight Gas AU consists of proximal to distal shoreface deposits and offshore marine sandy siltstones in the upper Mancos Shale and the Iles Formation above the Niobrara Member and below the Williams Fork Formation. Gas production from the Upper Mancos Tight Gas AU is commonly reported as commingled with production from the overlying Williams Fork Formation. The Upper Mancos Tight Gas AU boundary was drawn on the outcrop of the Iles Formation.

## Resource Summary

The U.S. Geological Survey (USGS) assessed undiscovered, technically recoverable continuous (unconventional) oil and gas resources in the Mancos Shale of the Piceance Basin (table 2). The USGS estimated mean volumes of 66.3 trillion cubic feet of gas, 74 million barrels of oil, and 45 million barrels of natural gas liquids in the Mancos/ Mowry Total Petroleum System. All of the undiscovered hydrocarbon resources quantitatively assessed are continuous (unconventional) reservoirs. The Distal Frontier Conventional Assessment Unit was not quantitatively assessed.



Outcrop of the Niobrara Member of the Mancos Shale known as The Castle, near Delta, Colorado. Photograph by Joshua Hicks, U.S. Geological Survey.

## Acknowledgments

The authors thank David Noe (Colorado Geological Survey), Gus Gustason (Enerplus Resources), Mark Kirschbaum (USGS, retired), and Steve Sonnenberg and Kathy Emme (Colorado School of Mines) for all their assistance and guidance throughout this work.

## References

Cobban, W.A., Merewether, E.A., Fouch, T.D., and Obradovich, J.D., 1994, Some Cretaceous shorelines in the western interior of the United States, *in* Caputo, M.V., Peterson, J.A., and Franczyk, K.J., eds., Mesozoic systems of the Rocky Mountain region, USA: Denver, Colo., Society of Economic Paleontologists and Mineralogists (Society for Sedimentary Geology), Rocky Mountain Section, p. 393–414.

Cole, R.D., Young, R.G., and Willis, G.C., 1997, The Prairie Canyon Member, a new unit of the Upper Cretaceous Mancos Shale, west-central Colorado and east-central Utah: Utah Geological Survey Miscellaneous Publication, no. 97–4, 23 p.

Hawkins, Sarah; Kirschbaum, Mark; and Schenk, Christopher, 2012, U.S. Geological Survey research core of the Niobrara Member of the Mancos Shale, Delta, Colorado [abs.], in American Association of Petroleum Geologists Rocky Mountain Section Meeting Program Abstracts, Grand Junction, Colo., September 9–12, 2012, p. 27.

IHS Energy Group, 2015, Petroleum information database: Available from IHS Energy, 15 Inverness Way East, Englewood, Colo., 80112.

Johnson, R.C., and Rice, D.D., 1990, Occurrence and geochemistry of natural gases, Piceance Basin, northwest Colorado: American Association of Petroleum Geologists Bulletin, v. 74, no. 6, p. 805–829.

Kirschbaum, M.A., 2003, Geologic assessment of undiscovered oil and gas resources of the Mancos/Mowry Total Petroleum System, Uinta-Piceance Basin Province, Utah and Colorado, chap. 6 *of* U.S. Geological Survey Uinta-Piceance Assessment Team, comps., Petroleum systems and geologic assessment of oil and gas in the Uinta-Piceance Province, Utah and Colorado (ver. 1.0) [CD-ROM]: U.S. Geological Survey Digital Data Series DDS–69–B, 51 p.

Kopper, P.K., 1962, Douglas Creek anticline and adjoining area, *in* Amuedo, C.L., and Mott, M.R., eds., Exploration for oil and gas in northwestern Colorado: Rocky Mountain Association of Geologists, p. 108–110.

Lillis, P.G., Warden, Augusta, and King, J.D., 2003, Petroleum systems of the Uinta and Piceance Basins—Geochemical characteristics of oil types, chap. 3 *of* U.S. Geological Survey Uinta-Piceance Assessment Team, comps., Petroleum systems and geologic assessment of oil and gas in the Uinta-Piceance Province, Utah and Colorado (ver. 1.0) [CD-ROM]: U.S. Geological Survey Digital Data Series DDS–69–B, 51 p.

Peters, K.E., and Cassa, M.R., 1994, Applied source rock geochemistry, *in* Magoon, L.B., and Dow, W.G., eds., The petroleum system—From source to trap: American Association of Petroleum Geologists Memoir 60, p. 93–117.

U.S. Geological Survey Uinta-Piceance Assessment Team, comps., 2003, Petroleum systems and geologic assessment of oil and gas in the Uinta-Piceance Province, Utah and Colorado (ver. 1.0) [CD-ROM]: U.S. Geological Survey Digital Data Series DDS–69–B, 51 p.

## Mancos Shale Assessment Team

Sarah J. Hawkins (Task Leader, shawkins@usgs.gov), Ronald R. Charpentier, Christopher J. Schenk, Heidi M. Leathers-Miller, Timothy R. Klett, Michael E. Brownfield, Tom M. Finn, Stephanie B. Gaswirth, Kristen R. Marra, Phuong A. Le, Tracey J. Mercier, Janet K. Pitman, and Marilyn E. Tennyson

## For Additional Information

Assessment information can be accessed at the USGS Energy Resources Program Web site at http://energy.usgs.gov.

Crews stop flow of drilling fluid from Pennsylvania well                                    5/5/14, 10:52 AM



# Crews stop flow of drilling fluid from Pennsylvania well

**Associated Press business staff** By **Associated Press business staff**
on April 22, 2011 at 2:30 PM, updated April 22, 2011 at 3:56 PM

CANTON, Pa.  -- Workers stopped the flow of liquid and natural gas from a well that spilled chemical-laced water for two days and were hoping to start on a permanent solution to control the well, company officials said Friday.

Chesapeake Energy Corp., which was drilling the Marcellus Shale well near Canton in Bradford County, said the liquid leak was stopped Thursday.

Following an equipment failure Tuesday night, a small amount of gas and thousands of gallons of liquid spilled from the well, crossing farm fields and entering a stream. The exact cause of the blowout remained unclear, although Chesapeake spokesman Brian Grove said Thursday it took place in a wellhead connection.



**View full size**

Associated Press file

Workers move a section of well casing into place at a Chesapeake Energy natural gas well site near Burlington, Pa.

Houston-based well-control specialists pumped ground-up tires, plastic bits and other rubber material into the well to temporarily seal the leak. The company said Friday afternoon that it hopes to begin removing the malfunctioning well equipment and finalizing "structural integrity of the wellhead equipment."

State environmental regulators and nearby residents were still waiting on results from tests to determine the extent of contamination of nearby waterways and private water wells. Results of tests on water samples taken by the state Department of Environmental Protection were expected next week, but an agency spokesman said field checks found no cause for concern.

Brad Hugo, a welder who lives down the road from the well site, told the Pittsburgh Post-Gazette that his family had found no sign of contamination in their well water, but they decided to drink bottled water anyway.

Oklahoma City-based Chesapeake Energy officials say the environmental impact is minimal.

The company nonetheless froze all post-drilling work on its wells in Pennsylvania, West Virginia and Ohio while it

Crews stop flow of drilling fluid from Pennsylvania well                                                                5/5/14, 10:52 AM

investigates the reason for the blowout.

Officials from the U.S. Environmental Protection Agency, the Occupational Safety and Health Administration and the Pennsylvania Fish and Boat Commission were on the scene.

Drilling a Marcellus Shale well involves pumping millions of gallons of water and sand laced with chemicals down the well bore at high pressure to break up the dense shale rock more than a mile beneath the surface and release the gas trapped inside. The process is known as hydraulic fracturing.

Some of that chemical-laced water returns to the surface as a briny stew carrying sulfates, chlorides, metals and naturally occurring radioactivity that the wastewater picks up deep underground.

DEP spokesman Dan Spadoni said the agency has taken water samples from Towanda Creek and a tributary to screen for chlorides, sulfates, arsenic, barium, iron, magnesium and strontium. The DEP also took samples from seven nearby private wells and from the Susquehanna River where Towanda Creek empties into it, about 16 miles from the well pad, he said.

© 2014 cleveland.com. All rights reserved.

# Water fouled with fracking chemicals spews near Windsor

By Bruce Finley The Denver Post The Denver Post
Posted:

DenverPost.com

State regulators say at least 84,000 gallons of water contaminated with oil and chemicals used in hydraulic fracturing spilled from a broken well-head in a field about 4 miles north of Windsor.

A mechanical failure at about 9:30 a.m. Monday sent a smelly stream of steaming, greenish fluid onto soil and required fire trucks testing air every 30 minutes to ensure leaking natural gas was not about to explode and the use of a vacuum truck to try to suck up the liquid, state natural resources spokesman Todd Hartman said.

The flow from the well bore was stopped more than 30 hours later.

PDC crews dug trenches around the spill and hired Wild Well Control to plug the well, but not before natural gas leaked, Windsor-Severance Fire Rescue operations chief Mike Blackwill said. "We weren't going to go right up next to it. There was very limited information."

The closest homes are about 1,500 feet away.

A Colorado Oil and Gas Conservation Commission inspector and engineer responded to the scene. They don't yet know whether the spill contaminated groundwater or streams, or whether enforcement action will be taken, Hartman said Wednesday.

"We are still reviewing what happened," Hartman said.

He said PDC Energy has removed soil from the well pad and is testing other areas for contamination. "Cold weather assisted the cleanup by freezing and immobilizing the material."

PDC has reported two other spills near Greeley in the past few weeks. Both contaminated groundwater, according to a state database of spills.

A Jan. 22 spill by PDC released 2,880 gallons of oil and covered 3,900 square feet, leaving groundwater contaminated with benzene at a concentration 128 times higher than the state limit along with toluene and xylene chemicals.

About 17 percent of 2,078 oil and gas spills that companies reported since January 2008 have contaminated groundwater. Fracking wastewater is one of the most common substances spilled.

*Bruce Finley: 303-954-1700, twitter.com/finleybruce or bfinley@denverpost.com*

*The Greeley Tribune contributed to this report.*

## REVIEWS REVIEWS REVIEWS

503

# Rapid expansion of natural gas development poses a threat to surface waters

Sally Entrekin[1]*, Michelle Evans-White[2], Brent Johnson[3], and Elisabeth Hagenbuch[4]

Extraction of natural gas from hard-to-reach reservoirs has expanded around the world and poses multiple environmental threats to surface waters. Improved drilling and extraction technology used to access low permeability natural gas requires millions of liters of water and a suite of chemicals that may be toxic to aquatic biota. There is growing concern among the scientific community and the general public that rapid and extensive natural gas development in the US could lead to degradation of natural resources. Gas wells are often close to surface waters that could be impacted by elevated sediment runoff from pipelines and roads, alteration of streamflow as a result of water extraction, and contamination from introduced chemicals or the resulting wastewater. However, the data required to fully understand these potential threats are currently lacking. Scientists therefore need to study the changes in ecosystem structure and function caused by natural gas extraction and to use such data to inform sound environmental policy.

*Front Ecol Environ* 2011; 9(9): 503–511, doi:10.1890/110053  (published online 6 Oct 2011)

Natural gas drilling has dramatically expanded with advances in extraction technology and the need for cleaner burning fuels that will help meet global energy demands. Natural gas is considered a "bridge fuel" to renewable energy resources because its combustion releases fewer contaminants (eg carbon dioxide [$CO_2$], nitrogen oxide [$NO_x$], sulfur oxide [$SO_x$]) than compared with that of coal or petroleum. Horizontal drilling and hydraulic fracturing ("hydrofracking" or "fracking") now allow the extraction of vast shale gas reserves previously considered inaccessible or unprofitable. Shale gas production in the US is expected to increase threefold and will account for nearly half of all natural gas produced by 2035 (EIA 2011). This widespread proliferation of new gas wells and the use of modern drilling and extraction methods have now been identified as a global conservation issue (Sutherland *et al.* 2010). Here, we

describe the threats to surface waters associated with increased natural gas development in shale basins and highlight opportunities for research to address these threats.

### ■ Horizontal drilling and hydraulic fracturing

Gas-well drilling has historically used a single vertical well to access gas trapped in permeable rock formations (eg sandstone) where gas flows freely through pore spaces to the wellbore. Unlike these conventional sources, unconventional gas reservoirs are low permeability formations, such as coal beds, dense sands, and shale, that require fracturing and propping (addition of sand or other granular material suspended in the fracturing fluid to keep fractures open) before gas can travel freely to the wellbore. Hydrofracking uses high-pressure fracturing fluids, consisting of large volumes of water and numerous chemical additives, to create fractures, while added propping agents, such as sand, allow the gas to flow. Although hydrofracking was first used in the 1940s, the practice was not widely applied until the 1990s, when natural gas prices increased and advances in horizontal drilling made the technique more productive. Horizontal drilling increases the volume of rock a single well can access, thereby reducing the total number of wells required at the surface. The horizontal leg of a gas well is fractured in discrete lengths of 91–152 m, allowing up to 15 separate hydrofrack "events" along one horizontal well (Kargbo *et al.* 2010). Fracturing depth depends on target rock formations but varies from 150 m to more than 4000 m for the major shale formations in the US (US DOE 2009).

### In a nutshell:

- The construction of pipelines and roads coupled with the extraction of natural gas from shale basins may pose environmental threats
- Streams and rivers near newly drilled natural gas wells are vulnerable to sediment runoff, reduced streamflow, and possible contamination from introduced chemicals and the resulting wastewater
- Federal and state environmental regulations may not prevent or mitigate damaging effects to surface waters
- Scientific studies are needed to understand the possible environmental effects caused by activities associated with natural gas extraction

### ■ Extent of resources

The US currently has 72 trillion cubic meters (tcm) of potentially accessible natural gas – enough to last 110 years, based on 2009 rates of consumption (EIA 2011).

[1]*Biology Department, University of Central Arkansas, Conway, AR* *(sentrekin@uca.edu)*; [2]*Department of Biological Sciences, University of Arkansas, Fayetteville, AR*; [3]*National Exposure Research Laboratory, US Environmental Protection Agency (EPA), Cincinnati, OH*; [4]*Dynamac Corporation, contracted by the US EPA, Cincinnati, OH*

© The Ecological Society of America

Natural gas development and surface waters

S Entrekin *et al.*

**504**



**Figure 1.** (a) National map of all recognized potential areas for unconventional natural gas exploration in the contiguous US; (b) density of wells in the Fayetteville unconventional natural gas basins; (c) number of gas wells installed in the Fayetteville and Marcellus basins from 2005 to 2010; and (d) density of wells in the Marcellus shale basins. We calculated densities using the kernel density tool in ArcMap 9.3.1.

water (eg brines). However, the use of hydraulic fracturing poses additional environmental threats due to water withdrawals and contamination from fracking-fluid chemicals. Extraction of gas from shale formations may also produce considerably more methane ($CH_4$) than conventional wells and could have a larger greenhouse-gas footprint than other fossil-fuel development (Howarth *et al.* 2011). Furthermore, gas wells are often located adjacent to rivers and streams and may occur at high densities in productive shale basins, resulting in cumulative impacts within watersheds. Environmental and human health concerns associated with hydrofracking have stirred much debate, and the practice has received extensive attention from the media (Urbina 2011) and from researchers (US EPA 2004; Kargbo *et al.* 2010; Osborn *et al.* 2011; US EPA 2011; Colborn *et al.* in press). Research that addresses concerns regarding increased drilling and hydrofracking in shale basins has primarily focused on contaminants that threaten drinking water and groundwater, whereas data collection to address concerns associated with surface water and terrestrial ecosystems has largely been overlooked.

Our goal here is to provide background information on shale development in the US that may inform future ecological studies that assess the potential for environmental impacts. We use data from the Fayetteville and Marcellus shale formations to demonstrate the recent accelerated drilling activity, well proximity to streams, and well density relationships with stream turbidity. We also review other potential threats to aquatic freshwater ecosystems as a result of increased natural gas development.

Approximately 23 tcm of that gas is found in unconventional (ie low permeability) gas reservoirs; development of such reservoirs has increased by 65% since 1998 (US DOE 2009). There are 29 known shale basins spanning 20 states, which are expected to contribute 45% of the total US gas produced by 2035 (EIA 2011; Figure 1a). Furthermore, the US gas supply represents only a fraction of the total global estimate of potentially accessible natural gas (~459 tcm) and, outside of North America, only 11% has so far been recovered (MIT 2010). Development of potentially accessible natural gas is expected to increase with rising global demand and the transfer of drilling technologies overseas.

■ **Threats to surface waters**

The rapid expansion in natural gas development threatens surface-water quality at multiple points, creating a need to assess and understand the overall costs and benefits of extracting this resource from shale reservoirs. Gaswell development of any type creates surface disturbances as a result of land clearing, infrastructure development, and release of contaminants produced from deep ground-

■ **Focus areas**

The Fayetteville and Marcellus shale basins are among the most productive in the US. The Fayetteville shale basin underlies more than 23 000 km² of Arkansas and eastern Oklahoma, at a depth of 300–2000 m (Figure 1a). The number of gas wells sited in this area has increased nearly 50-fold, from 60 to 2834 wells since 2005, in a concentrated area of north-central Arkansas (Figure 1, b and c). The Marcellus shale basin spans 240 000 km² at a depth of 1200–2500 m and underlies six states in the upper Mid-Atlantic, including much of the Appalachian region (Figure 1d). Estimates indicate natural gas reserves in the Marcellus to be 14 tcm, or 59% of the total esti-

© The Ecological Society of America

S Entrekin *et al.*                                                                 Natural gas development and surface waters

mated unconventional reserves in the US (US DOE 2009). As of summer 2010, the Marcellus had 3758 natural gas wells, with projections of up to 60 000 wells being constructed in the region over the next 30 years (Johnson 2011). The Marcellus formation also underlies sensitive watersheds, such as the threatened upper Delaware River, a designated wild and scenic river that supplies drinking water to >15 million people (DRBC 2008). The rapid development of gas wells in relatively concentrated areas may increase the likelihood of ecological impacts on surrounding forests and streams.

### ■ Proximity of gas-well development to water resources

We initially assessed the proximity of active gas wells to water resources using state well-location data and the National Hydrography Dataset (NHD) flowlines (ie streams and rivers mapped from 1:24 000 Digital Line Graph hydrography data). Spatial analysis indicated that, for both the Fayetteville and Marcellus shale formations, gas wells were sited, on average, 300 m from streams, yet several hundred wells were located within 100 m of stream channels (Table 1). Gas wells were located, on average, 15 km from public surface-water drinking supplies, and 37 km and 123 km from public well water supplies in the Marcellus and Fayetteville shale reservoirs,

respectively (Table 1). Although wells are generally constructed far from public drinking-water sources, there is potential for wastewater to travel long distances, given that many of the components of produced waters (ie a mixture of fracking fluids and natural geologic formation water flowing back out of the well), such as brines, will not settle out or be assimilated into biomass. Furthermore, the NHD underestimates the density of headwater stream channels (Heine *et al.* 2004), so our proximity measures probably underestimate the threat to streams. We therefore used geographic information system (GIS) tools to generate detailed drainage-area networks in portions of the Fayetteville and Marcellus shale reservoirs where gas wells occur at high densities. The terrain processing tools in ArcHydro Tools 9 version 1.3 (an ArcGIS extension) were used to generate drainage area lines from 10-m digital elevation models (http://seamless.usgs.gov/ned13.php) in a subset of drainage areas in each shale basin. A stream threshold of 500 (50 000 m²) was used to define stream channels in the model. Gas-well proximity was analyzed again with a subset of modeled stream drainage areas and the same subset of NHD flowlines for comparison (Figure 2; Table 2). Active gas wells were an average of 130 m and 153 m from modeled drainage areas, as compared with 230 m and 252 m from NHD flowlines, in the Fayetteville and Marcellus shale reservoirs, respectively. Over 80% of the

**Table 1. Number of unconventional gas wells drilled each year since 2005 for Arkansas, New York, Ohio, Pennsylvania, and West Virginia**

| | State | Total wells | Total operators | Distance to NHD flowlines (mean ± SD, range, m) | Total # (percent) of wells within | | | Distance to | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | 100 m of NHD flowlines | 200 m of NHD flowlines | 300 m of NHD flowlines | public water wells (mean ± SD, range, km) | public drinking-water intakes (mean ± SD, range, km) |
| Marcellus | PA | 2091[*] | 59 | 319 ± 171 (8–1172) | 74 (4) | 577 (28) | 1141 (55) | 25.83 ± 17.93 (0.32–79.60) | 14.83 ± 10.06 (0.60–50.23) |
| | WV | 1599[‡] | 86 | 214 ± 143 (1–850) | 409 (26) | 798 (50) | 1198 (75) | 52.32 ± 32.81 (0.55–125.42) | 11.16 ± 5.36 (0.53–33.32) |
| | OH | 42[‡] | 12 | 230 ± 153 (46–691) | 8 (19) | 23 (55) | 33 (79) | 71.85 ± 28.29 (26.46–138.17) | 14.15 ± 8.38 (1.54–29.87) |
| | NY | 26[§] | 9 | 247 ± 182 (27–631) | 9 (35) | 12 (46) | 14 (54) | 10.47 ± 7.11 (2.58–34.19) | 16.59 ± 9.06 (4.58–35.63) |
| | All four states combined | 3758 | | 273 ± 168 (1–1172) | 500 (13) | 1410 (38) | 2386 (64) | 37.51 ± 28.88 (0.32–138.17) | 13.27 ± 8.55 (0.53–50.23) |
| Fayetteville | AR | 2834[¶] | 21 | 353 ± 241 (7–1642) | 269 (10) | 900 (32) | 1434 (51) | 123.67 ± 11.12 (78.94–156.12) | 15.15 ± 7.49 (0.66–133.43) |

Notes: [*]PA: Pennsylvania Department of Environmental Protection Bureau of Oil and Gas (records available through 30 Sep 2010), www.dep.state.pa.us/dep/deputate/minres/oilgas/reports.htm; [†]WV: West Virginia Geological and Economic Survey (records available through early Sep 2010), www.wvgles.wvnet.edu/www/datastat/devshales.htm; [‡]OH: Ohio Department of Natural Resources Division of Mineral Resources Management (records available through 30 Sep 2010), www.dnr.state.oh.us/mineral/database/tabid/17730/Default.aspx; [§]NY: New York State of Environmental Conservation (records available through 30 Sep 2010), www.dec.ny.gov/energy/1603.html; [¶]AR: Arkansas Oil and Gas Commission (records available through 30 Sep 2010), www.aogc.state.ar.us/ (data downloaded from: ftp://www.aogc.state.ar.us/).

Natural gas development and surface waters                                                     S Entrekin *et al.*

**506**



*Figure 2. Proximity of gas wells to stream channels in a subset of the Fayetteville and Marcellus unconventional natural gas reservoirs. Blue squares represent the areas modeled by GIS in the Fayetteville shale ([a] drainage area modeled and represented by the blue square was 5809 km²) and the Marcellus shale ([b] drainage area modeled and represented by the blue square was 4041 km²). Topographic maps are example areas that demonstrate differences between the National Hydrography Dataset and modeled drainage area networks.*

active gas wells were located within 300 m of modeled drainage areas (Table 2). Because the modeled drainage areas estimate some intermittent and ephemeral channels, the proximity of wells to stream channels (and the potential for downstream impacts) is greater than that reflected by NHD flowline data. This process may provide a more accurate assessment of potential stream impacts, particularly if shale gas development continues at its current rate. As gas-well densities continue to increase, the proximity of wells to stream channels may also increase, resulting in a greater risk of streamflow reductions from pumping, contamination from leaks and spills from produced waters or

fracking fluids, and sedimentation from infrastructure development (eg pipelines and roads).

■ **Environmental regulation**

Environmental regulation of oil and gas drilling is complex and varies greatly between states. The Safe Drinking Water Act (SDWA) provides federal laws for protecting surface and groundwaters and human health, but with the exception of diesel-fuel injection, hydraulic fracturing operations are exempt as a result of the 2005 Energy Policy Act. State agencies are therefore primarily responsible for regulation and enforcement of environmental issues associated with natural gas development. The rapid growth and expansion of US gas drilling has made regulation difficult, and violations are common; in Pennsylvania alone, there were more than 1400 drilling violations between January 2008 and October 2010 (PADEP 2010). Of these, nearly half dealt with surface-water contamination and included direct discharge of pollutants, improper erosion control, or failure to properly contain wastes. In contrast, the Arkansas Department of Environmental Quality cited only 15 surface-water violations in the Fayetteville shale in 2010; however, over half of these dealt with permitting and discharge violations associated with natural gas development (ADEQ 2010). The discrepancy in the numbers of violations between states demonstrates the variable degree of regulation at the state level and is probably based on differences in regulations as well as available regulatory resources. The number and proportion of violations associated with natural gas development indicates that sediments

**Table 2. Proximity of natural gas wells to stream channels modeled by terrain processing tools in ArcHydro Tools 9 (version 1.3) to generate drainage area lines from a 10-m digital elevation model (http://seamless.usgs.gov/ned13.php) as compared with well proximity to National Hydrography Dataset flowlines**

| | | Subset | | Previous distances (in Marcellus, PA only) | | Subset | | | Previous distances (in Marcellus, PA only) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | range (m) | mean ± SD (m) | range (m) | mean ± SD (m) | within 100 m | within 200 m | within 300 m | within 100 m | within 200 m | within 300 m |
| Marcellus* | Drainage area lines | 4–316 | 153 ± 56 | – | – | 17% | 80% | 100% | – | – | – |
| | NHD flowlines | 48–681 | 252 ± 114 | 8–1172 | 319 ± 171 | 5% | 39% | 70% | 4% | 28% | 55% |
| Fayetteville** | Drainage area lines | 0–420 | 130 ± 70 | – | – | 32% | 71% | 82% | – | – | – |
| | NHD flowlines | 1–933 | 230 ± 136 | 7–1642 | 353 ± 241 | 12% | 43% | 61% | 10% | 32% | 51% |

**Notes:** *Processed for 615 of 3758 wells (16%), processed 42 of 559 HUC-12 Units containing well point locations (8%). **Processed for 2372 of 2834 wells (84%), processed 55 of 84 HUC-12 Units containing well point locations (65%).

                                          © The Ecological Society of America

507



**Figure 3.** *Simplified diagram of potential threats due to natural gas development through coupled horizontal drilling with hydraulic fluid fracturing in unconventional natural gas reservoirs. Exposure pathways that may result in structural and functional alterations to aquatic ecosystems will vary, depending on geographic location and rigor of best management practices applied. UIC = underground injection control; TDS = total dissolved solids; TENORM = technologically enhanced naturally occurring radioactive materials. Dotted lines indicate secondary effects from gas development. "Flowback" is underlined to indicate that it may be recycled and reused.*

and contaminants associated with drilling are making their way into surface waters, and yet there are few studies examining their ecological effects. Primary threats to surface waters and potential exposure pathways (Figure 3) include sediments, water withdrawal, and release of wastewater.

### Sediments

Excessive sediment levels are one of the primary threats to US surface waters (US EPA 2006) and have multiple negative effects in lotic (river, stream, or spring) food webs (Wood and Armitage 1999). Gas-well installation activities can negatively affect lotic ecosystems by increasing sediment inputs from well pads and supporting infrastructure (eg roads, pipelines, stream crossings), as well as loss of riparian area. Typically, at least 1.5–3.0 ha of land must be cleared for each well pad, depending on the number of wells per pad; where these occur in high densities, well pads can cumulatively alter the landscape. Land clearing and stream disturbance during well and infrastructure development can increase sediments in surface-water runoff (Williams *et al.* 2008), resulting in increased suspended and benthic sediments in surface waters. Nutrients, such as phosphorus, bound to these sediments may also have negative impacts on surface waters by contributing to eutrophication.

We identified seven streams in the Fayetteville shale with a variety of different well densities within their drainage areas, to test the prediction that stream turbidity would be positively related to the density of gas wells. The seven stream drainages were delineated through the use of the ArcHydro extension in ArcMap (version 9.3.1 ESRI). Using gas-well location data obtained from the Arkansas Oil and Gas Commission (ftp://www.aogc.state.ar.us/GIS_Files/), we quantified well density within each drainage area as the total number of wells divided by the drainage area. Turbidity was measured with a Hach Lamotte 2020 meter in April 2009, during high spring flow. Pearson product moment correlations identified a positive relationship between stream-water turbidity and well density (Figure 4). Turbidity was not positively correlated to other land-cover variables, but there was a strong negative correlation between turbidity and drainage area and percent pasture cover in the watershed (Table 3). These preliminary data suggest that the cumulative effects from gas well and associated infrastructure development may be detectable at the landscape scale.

### Water withdrawal may alter flow regime

Surface waters may serve as sources for necessary drilling and fracking fluids – each well uses between 2–7 million

**508**



**Figure 4.** *Well density and stream turbidity measured in April 2009 during high flows in seven stream drainages. NTU = nephelometric turbidity unit.*

gallons (~7.5–26 million liters) of source water. Several wells may be fractured per well pad over the life span of well development, which may last several decades. This concentration of fracturing effort within a small area should compound water use. Many gas wells are installed in regions where water is already being withdrawn for agriculture, and thus may further stress the resource. Streamflow may be negatively affected if streams are dammed to create holding ponds or if water is directly extracted for the fracturing process. The rapid and concentrated extraction of water could create regional shortages during periods of drought, resulting in an altered flow regime and the further degradation of critical habitat for aquatic biota, particularly if low-order streams are primary sources. A reduction in streamflow may also result in secondary effects, such as increased contaminant concentrations and reduced downstream water quality, because less water is available for dilution.

### Release of wastewaters

Surface-water contamination from hydrofracking fluids and produced water is most likely to occur during

**Table 3. Pearson product moment correlations[*] and associated *P* values between turbidity (NTU) and other landscape-level variables, including land cover (Gorham and Tullis 2007) and drainage area**

| Correlates | r | P value |
|---|---|---|
| Well density | 0.91 | 0.003 |
| Drainage area | −0.86 | 0.01 |
| Low-impact urban | 0.35 | 0.44 |
| Wood/herbaceous | −0.63 | 0.12 |
| Forest | −0.36 | 0.42 |
| Pasture | −0.88 | 0.008 |

[*]Quantifies the strength of the directional relationship. Analyses were run in SigmaPlot 11.

hydrofracking or treatment and disposal processes, when the potential for accidental spills and leaking is greatest. Contamination from hydrofracking wastes can also occur through inadequate waste treatment practices, improper waste storage, inadequately constructed impoundments or well casings, and improper disposal of solid wastes (eg in poorly lined impoundments that are buried onsite) that may leach into nearby surface waters. Wastewater impoundment ponds can therefore also pose a threat to wildlife and livestock.

Fracturing fluids typically include a combination of additives that serve as friction reducers, cross-linkers, breakers, surfactants, biocides, pH adjusters, scale inhibitors, and gelling agents (NYSDEC 2010). The aim of additives is to achieve an ideal viscosity that encourages fracturing of the shale and improves gas flow, but discourages microbial growth and corrosion that can inhibit recovery efficiency (US DOE 2009). Composition of the fracturing fluids can vary greatly among wells and shale formations. Specific content is often proprietary, although some states require disclosure of constituents and companies may voluntarily register the chemicals they use with regulatory agencies. A recent Congressional investigation revealed that, over a 4-year period, 14 leading gas companies used over 2500 hydrofracking products that contained 750 different chemicals, 29 of which were highly toxic or known carcinogens. Fracturing fluids used over the period totaled 780 million gallons or ~2.9 billion liters (not including dilution water), and included lead, ethylene glycol, diesel, and formaldehyde, as well as benzene, toluene, ethylbenzene, and xylene compounds (US House of Representatives Committee on Energy and Commerce 2011). The volume of fracking fluids recovered is also highly variable, but unrecovered amounts can be substantial. Only 10–30% of fracture fluids are typically recovered from wells in portions of the Marcellus shale (NYSDEC 2010); there is currently no information on the fate and transport of the unrecovered chemicals.

Produced waters pose a threat to surface waters because they typically contain not only fracking additives but also elevated levels of metals, dissolved solids (eg brine), organics, and radionuclides that occur naturally in deep groundwaters. Onsite waste impoundments or evaporation ponds could overflow, spill, or leach into groundwater and contaminate nearby streams. Even after treatment, total dissolved solids (TDS) in produced waters are very high and remaining salts are often disposed of through land application or used as road salts, which are known to enter surface waters and contribute to increased stream salinization (Kaushal *et al.* 2005). Recovered wastewaters are most often transported offsite for deepwell injection or to a domestic wastewater treatment plant (WWTP) and/or conventional waste treatment facility. After fracturing, initially recovered flowback water is sometimes reused as fracking fluid for other wells. Reuse of recovered fluids is becoming more common, but

still requires a substantial amount of fresh water because of low recovery volumes and the need to dilute flowback water containing high concentrations of chlorides, sulfates, barium, and other potentially harmful substances. Domestic WWTPs are not capable of treating the high TDS (5000 to >100 000 mg $L^{-1}$) typical of recovered wastewater. Many WWTPs have therefore been forced to limit their intake of recovered hydrofracking waste to remain in compliance with effluent limitations (Veil 2010). Industrial WWTPs are better equipped to treat recovered wastes using reverse osmosis, filtration, or chemical precipitation, but such facilities are costly and not widely available. Therefore, although billions of liters of produced water are being generated annually on a national scale by hydrofracking (Clark and Veil 2009), water treatment options are limited, and the potential ecological impacts of wastes on terrestrial and aquatic ecosystems are not well studied.

### ■ Challenges and potential for new research

Quantifying the effects of natural gas development on surface waters in shale basins is difficult because multiple companies often work in the same geographical area and use different fracturing techniques (eg varied and often proprietary composition of fracturing fluids), resulting in uncoordinated timing of infrastructure development and well fracturing. In addition, the degree to which these companies adhere to best management practices, such as buffer strips and erosion control devices, varies among companies as a result of the differing regulations among states and agencies. Furthermore, wells occur across human-impacted watersheds with characteristics that may confound our ability to attribute effects from gas-well development.

Most studies that examine the effects of sediments on biological communities focus on shifts in abundance, biomass, diversity, or community composition (Wood and Armitage 1999); few studies have analyzed how sediments alter species' roles and their interactions (but see Hazelton and Grossman 2009). In addition, contaminant effects are often assessed through single-species laboratory acute and chronic toxicity tests with standardized test organisms (eg *Daphnia*, fathead minnows [*Pimephales promelas*]; Cairns 1983) and with single contaminants. Studies are therefore needed to assess the toxicity of contaminant mixtures (eg produced water and fracking fluids) and their effects on more complex communities and ecosystems, to predict effects in the real world (Clements and Newman 2002). Sediment and contaminants associated with recovered wastewater will likely affect organism behavior and alter ecological interactions at sublethal levels (Evans-White and Lamberti 2009). Reductions in feeding efficiencies (Sandheinrich and Atchison 1989) can lead to negative effects on reproduction (Burkhead and Jelks 2001) and growth (Peckarsky 1984), and may alter the magnitude or sign (+ or −) of

species' effects, causing changes in community structure. Ecologists studying the environmental effects of natural gas extraction can therefore contribute to scientific understanding by examining the effects of sediment and contaminants from natural gas development on species and community interactions.

In addition to the need for traditional bioassessments, the inevitable alteration in land use that will occur as a result of rapid and expanded drilling offers a template for conducting novel experiments in an ecosystem context. Ecosystem functions, such as decomposition rates, are affected by multiple abiotic and biotic factors, making them well-suited for detecting large-scale alterations (Bunn *et al.* 1999). For example, reduced streamflows, contaminants from produced wastewater and fracking fluids, and elevated sediment inputs would alter ecosystem functions, such as whole-stream metabolism, decomposition of organic matter, and accrual of macroinvertebrate biomass over time. However, it is not known how natural gas development could influence biological processing rates. The potential effects may stimulate or inhibit specific ecosystem functions. For example, excessive sedimentation or chemical contamination associated with natural-gas-well development could stimulate macroinvertebrate production by expanding habitat for tolerant, multivoltine (species that produce several broods per season) taxa (Stone and Wallace 1998) or lead to a decline in production by eliminating sensitive taxa representing a majority of community growth and/or biomass (Woodcock and Huryn 2007). A move to incorporate ecosystem functions into mainstream biological assessment and restoration protocols is currently underway (Fritz *et al.* 2010), yet few studies have been conducted to inform their implementation and interpretation in the context of concurrent structural changes (Young and Collier 2009). The rapid expansion of gas development across the US could provide a framework for the implementation of concurrent structural and ecosystem experiments to inform process-based ecological assessment. Furthermore, ecological studies relating to natural gas extraction could be combined with similar studies for surface mining (Fritz *et al.* 2010; Bernhardt and Palmer 2011), to gain a more holistic view of the environmental costs associated with fossil-fuel extraction.

The distinct elemental composition and isotopic signatures of produced water provide unique opportunities for tracer studies that could indicate aquatic system exposure. Stable isotopes of strontium and carbon have been used to trace water from coalbed natural gas production wells to surface waters and hyporheic zones (Brinck and Frost 2007). Osborn *et al.* (2011) used isotopes of water, carbon, boron, and radium to test for hydraulic fracturing contamination of shallow aquifers overlying the Marcellus and Utica shale formations in Pennsylvania and New York, respectively, and found significant changes in $CH_4$ concentrations in drinking-water wells near locations where gas wells have been drilled. Limited

S Entrekin *et al.*

**510**

research has also suggested that $CH_4$-derived carbon is assimilated into stream food webs (Kohzu *et al.* 2004; Trimmer *et al.* 2010). Many gas-bearing geological formations also contain elevated levels of naturally occurring radioactive materials, such as radon ($^{222}$Rn) and radium ($^{226}$Ra, $^{228}$Ra), that can be used as hydrological tracers (Genereux and Hemond 1990). The extent to which metals, organics, or other contaminants from the drilling and hydrofracking process may ultimately enter aquatic and terrestrial food webs remains unknown.

### ■ Conclusions

Natural gas exploration will continue to expand globally. In addition to the potential threats to groundwater and drinking-water sources, increasing environmental stress to surface-water ecosystems is of serious concern. Scientific data are needed that will inform ecologically sound development and decision making and ensure protection of water resources. Elevated sediment runoff into streams, reductions in streamflow, contamination of streams from accidental spills, and inadequate treatment practices for recovered wastewaters are realistic threats. Gas wells are often sited close to streams, increasing the probability of harm to surface waters, and preliminary data suggest the potential for detectable effects from sedimentation. Regulations that consider proximity of natural gas development to surface waters may therefore be needed. Further ecological research on impacts from developing natural-gas-well infrastructure are sorely needed, and will inform future regulatory strategies and improve our understanding of the factors affecting community structure and ecosystem function.

### ■ Acknowledgements

We thank A Bergdale, R Adams, G Adams, and L Lewis for early conversations that helped develop our interest in this topic. E D'Amico provided valuable assistance on spatial analysis of well placement and suggestions that helped to shape the manuscript. A Bergdale, W Dodds, M Drew, K Fritz, and K Larson provided comments on early drafts of the manuscript. The US Environmental Protection Agency (EPA) through its Office of Research and Development partially funded and collaborated in the research described here under contracts EP-D-06-096 and EP-D-11-073 to Dynamac Corporation. The views expressed in this article are those of the author(s) and do not necessarily reflect the views or policies of the US EPA.

### ■ References

ADEQ (Arkansas Department of Environmental Quality). 2010. Water violations database. www.adeq.state.ar.us/legal/cao_info.asp. Viewed 25 Aug 2010.

Bernhardt ES and Palmer MA. 2011. The environmental costs of mountaintop mining valley fill operations for aquatic ecosystems of the central Appalachians. *Ann NY Acad Sci* **1223**: 39–57.

Brinck EL and Frost CD. 2007. Detecting infiltration and impacts of introduced water using strontium isotopes. *Ground Water* **45**: 554–68.

Bunn SE, Davies PM, and Mosisch TD. 1999. Ecosystem measures of river health and their response to riparian and catchment degradation. *Freshwater Biol* **41**: 333–45.

Burkhead NM and Jelks HL. 2001. Effects of suspended sediment on the reproductive success of the tricolor shiner, a crevice-spawning minnow. *T Am Fish Soc* **130**: 959–68.

Cairns JJ. 1983. Are single-species toxicity tests alone adequate for estimating environmental hazard? *Hydrobiologia* **100**: 47–57.

Clark CE and Veil JA. 2009. Produced water volumes and management practices in the United States. Argonne, IL: Argonne National Laboratory, Environmental Science Division; doi:10.2172/1007397.

Clements W and Newman M. 2002. Community ecotoxicology. West Sussex, UK: John Wiley & Sons Ltd.

Colborn TC, Kwiatkowski C, Shultz K, and Backstrom M. Natural gas operations from a public health perspective. *Int J Hum Ecol Risk Assess.* In press.

DRBC (Delaware River Basin Commission). 2008. 2008 Annual Report. Trenton, NJ: DRBC.

EIA (Energy Information Administration). 2011. Annual 382 energy outlook. Washington, DC: EIA, US Department of Energy. DOE/EIA-0383ER(2011).

Evans-White MA and Lamberti GA. 2009. Direct and indirect effects of a potential aquatic contaminant on grazer–algae interactions. *Environ Toxicol Chem* **28**: 418–26.

Fritz KM, Fulton S, Johnson BR, *et al.* 2010. Structural and functional characteristics of natural and constructed channels draining a reclaimed mountaintop removal and valley fill coal mine. *J N Am Benthol Soc* **29**: 673–89.

Genereux D and Hemond H. 1990. Naturally occurring radon 222 as a tracer for streamflow generation: steady state methodology and field sample. *Water Resour Res* **26**: 3065–75.

Gorham BE and Tullis JA. 2007. Final report: 2006 Arkansas land use and land cover (LULC). Fayetteville, AR: Center for Advanced Spatial Technologies (CAST), University of Arkansas.

Hazelton PD and Grossman GD. 2009. Turbidity, velocity and interspecific interactions affect foraging behaviour of rosyside dace (*Clinostomus funduloides*) and yellowfin shiners (*Notropis lutipinnis*). *Ecol Freshw Fish* **18**: 427–36.

Heine R, Lant C, and Sengupta R. 2004. Development and comparison of approaches for automated mapping of stream channel networks. *Ann Assoc of Am Geogr* **94**: 477–90.

Howarth RW, Santoro R, and Ingraffea A. 2011. Methane and the greenhouse-gas footprint of natural gas from shale formations. *Climatic Change* **106**: 679–90.

Johnson N. 2011. Pennsylvania energy impacts assessment: report 1: Marcellus shale natural gas and wind. Philadelphia, PA: The Nature Conservancy.

Kargbo DM, Wilhelm RG, and Campbell DJ. 2010. Natural gas plays in the Marcellus shale: challenges and potential opportunities. *Envir Sci Tech Lib* **44**: 5679–84.

Kaushal SS, Groffman PM, Likens GE, *et al.* 2005. Increased salinization of fresh water in the northeastern United States. *P Natl Acad Sci USA* **102**: 13517–20.

Kohzu A, Kato C, Iwata T, *et al.* 2004. Stream food web fueled by methane-derived carbon. *Aquat Microb Ecol* **36**: 189–94.

MIT (Massachusetts Institute of Technology). 2010. The future of natural gas: an interdisciplinary MIT study. Cambridge, MA: MIT. 978-0-9828008-0-5.

NYSDEC (New York State Department of Environmental Conservation). 2010. Well permit issuance for horizontal drilling and high-volume hydraulic fracturing to develop the Marcellus shale and other low-permeability gas reservoirs. www.dec.ny.gov/energy/58440.html. Viewed 5 Nov 2010.

© The Ecological Society of America

Osborn SG, Vengosh A, Warner NR, and Jackson RB. 2011. Methane contamination of drinking water accompanying gas-well drilling and hydraulic fracturing. *P Natl Acad Sci USA* **108**: 8172–76.

PADEP (Pennsylvania Department of Environmental Protection). 2010. Violations database. www.dep.state.pa.us/dep/deputate/minres/OILGAS/OGInspectionsViolations/OGInspviol.htm. Viewed 8 Dec 2010.

Peckarsky B. 1984. Do predaceous stoneflies and siltation affect structure of stream insect communities colonizing enclosures? *Can J Zoolog* **63**: 1519–30.

Sandheinrich M and Atchison G. 1989. Sublethal copper effects on bluegill, *Lepomis macrochirus*, foraging behavior. *Can J Fish Aquat Sci* **46**: 1977–85.

Stone MK and Wallace JB. 1998. Long-term recovery of a mountain stream from clearcut logging: the effects of forest succession on benthic invertebrate community structure. *Freshwater Biol* **39**: 151–69.

Sutherland WJ, Bardsley S, Bennun L, *et al.* 2010. Horizon scan of global conservation issues for 2011. *Trends Ecol Evol* **26**: 10–16.

Trimmer M, Maanoja S, Hildrew AG, *et al.* 2010. Potential carbon fixation via methane oxidation in well-oxygenated riverbed gravels. *Limnol Oceanogr* **55**: 560–68.

US DOE (US Department of Energy). 2009. Modern shale gas development in the United States: a primer. Washington, DC: US DOE. DoE-FG26-04NT15455.

US EPA (US Environmental Protection Agency). 2004. Evaluation of impacts to underground sources of drinking water by hydraulic fracturing of coalbed methane reservoirs study. Washington, DC: EPA. EPA 816-F-04-017.

US EPA (US Environmental Protection Agency). 2006. Wadeable stream assessment: a collaborative survey of the nation's streams. Washington, DC: EPA. EPA 841-B-06-002.

US EPA (US Environmental Protection Agency). 2011. Draft plan to study potential impacts of hydraulic fracturing on drinking water resources. Washington, DC: EPA. EPA/600/D-11/001.

US House of Representatives Committee on Energy and Commerce. 2011. Chemicals used in hydraulic fracturing. http://democrats.energycommerce.house.gov/sites/default/files/documents/Hydraulic%20Fracturing%20Report%204.18.11.pdf. Viewed 31 Aug 2011.

Urbina I. 2011. Drilling down (series). *New York Times*. http://topics.nytimes.com/top/news/us/series/drilling_down/index.html. Viewed 27 Apr 2011.

Veil JA. 2010. Final report: water management technologies used by Marcellus shale gas producers. Washington, DC: US DOE. National Energy Technology Laboratory Award No FWP 49462.

Williams HFL, Havens DL, Banks KE, and Wachal DJ. 2008. Field-based monitoring of sediment runoff from natural gas well sites in Denton County, Texas, USA. *Environ Geol* **55**: 1463–71.

Wood PJ and Armitage PD. 1999. Sediment deposition in a small lowland stream – management implications. *Regul River* **15**: 199–210.

Woodcock TS and Huryn AD. 2007. The response of macroinvertebrate production to a pollution gradient in a headwater stream. *Freshwater Biol* **52**: 177–96.

Young RG and Collier KJ. 2009. Contrasting responses to catchment modification among a range of functional and structural indicators of river ecosystem health. *Freshwater Biol* **54**: 2155–70.

**511**

# ESA's *Issues in Ecology* series

### Each publication in this series:
- Reports a consensus of a panel of scientific experts
- Uses clear, commonly understood language
- Focuses on issues related to the environment
- Is intended for scientists, educators, students, and decision-makers
- Is reviewed by external experts for technical content



**Issue #13:** "A Synthesis of the Science on Forests and Carbon for U.S. Forests"

Now available in English and Spanish. Supplemental teaching tool for undergraduate courses coming soon.

Issues #1–13 are available in print (order online) and as a PDF (free download)

For more information, visit:

## www.esa.org/issues



**HARVARD LAW SCHOOL**
Environmental Law Program
POLICY INITIATIVE

# Legal Fractures in Chemical Disclosure Laws

Why the Voluntary Chemical Disclosure Registry FracFocus
Fails as a Regulatory Compliance Tool

KATE KONSCHNIK, WITH MARGARET HOLDEN AND ALEXA SHASTEEN

April 23, 2013

# Legal Fractures in Chemical Disclosure Laws

## Why the Voluntary Chemical Disclosure Registry FracFocus Fails as a Regulatory Compliance Tool

## Introduction

In April 2011, a voluntary chemical disclosure registry was launched for companies developing unconventional oil and gas wells.  Two years later, eleven states direct or allow well operators and service companies to report their chemical use to this online registry: FracFocus (www.fracfocus.org).   The Bureau of Land Management (BLM) has also proposed adopting FracFocus as the reporting method for companies fracturing wells on federal and tribal lands.

When first announced, FracFocus held promise as a positive response to public concern about chemical use, storage, and disposal at well sites.  The concept of a centralized, on-line registry appeals to under-resourced agencies, since it offers them the ability to delegate data gathering to a third party, and promises transparency by posting some chemical information online.   However, our evaluation of FracFocus suggests that reliance on the registry as a regulatory compliance tool is misplaced or premature.

## Summary

In its current form, FracFocus is not an acceptable regulatory compliance method for chemical disclosures.  The registry's shortcomings – and opportunities for improvement – fall into three categories:

(1)  Timing of Disclosures.  State laws attach penalties to a company's late submittal of, or failure to submit, chemical disclosures.  However, FracFocus does not notify a state when it receives a disclosure from a company operating in that state.  Nor can most states readily determine when a disclosure is made.  As a result, states cannot enforce timely disclosure requirements.

(2)  Substance of Disclosures.  FracFocus creates obstacles to compliance for reporting companies.   For example, by not providing state-specific forms, FracFocus leaves companies to figure out how to account for state disclosure requirements not covered by the FracFocus form.  FracFocus staff does not review submissions, and states usually do not receive the form; factors that may encourage some companies to under-value careful reporting.  Meanwhile, no state sets minimum reporting standards for FracFocus.  In fact, were FracFocus to disappear entirely, most states using the registry would have no backup disclosure methods readily identified and available to them.

(3)  Nondisclosures.  Trade secret protection is critical in order to reward development of unique products in the marketplace.  However, three characteristics of a robust trade secret regime prevent overly broad demands for this protection: substantiation by the company, verification by a government agency, and opportunity for public challenge.  FracFocus has none of these characteristics; operators have sole discretion to determine when to assert trade secrets.  As a result, inconsistent trade secret assertions are made throughout the registry.

Although FracFocus provides training, and has made some modifications to its form in response to criticism, shortcomings remain.  Our research uncovered numerous examples where information about the same product differs across forms.[i]  The research was very time-consuming, because the registry does not allow searching across forms – readers are limited to opening one PDF at a time.  This format prevents site managers, states, and the public from catching many mistakes or failures to report.  More broadly, the limited search function sharply limits the utility of having a centralized data cache.

Disclosure serves many purposes in a healthy civil society. It helps people make informed decisions about risk – for instance, a landowner determining whether to agree to have a well on her property, a worker considering employment, an investor researching oil and gas companies, or an insurance company determining whether to extend a policy. Chemical disclosure facilitates effective emergency response, and enables doctors to treat patients more effectively.  Disclosure can improve policy-making, too, by helping agencies prioritize regulatory action, and by encouraging public participation.  In fact, disclosure may be viewed as a societal prerequisite for hydraulic fracturing – what some have called a "social license" to drill.[ii]

Incomplete and inaccurate disclosures, however, serve no public purpose.  If a property owner searches for a well form on FracFocus, she may find that the form omits information required by the state, contains non-existent Chemical Abstract Service (CAS) numbers, or hides the identity of chemicals.  Unable to search across forms, the property owner will not know that other forms disclose chemicals withheld in this form, or list different ingredients for the same product.  If she asks for more information from FracFocus she will be denied, on the grounds that the site's organizers are not subject to state or federal public records laws.[iii]  Unless disclosures were also made to the state, the property owner may not petition the state for more complete answers or challenge the company's trade secret claims.

States and the BLM are expending valuable resources issuing hydraulic fracturing disclosure requirements.  Companies are spending valuable time submitting disclosures.  We should make sure these systems work.



Unconventional shale gas platform located just outside Fort Worth, Texas.

# Background

The United States is in the midst of an energy boom.  Geologists have known since the 1970s that vast quantities of natural gas lie trapped in the country's shale formations[iv]  Only recently, however, have advances in technology made recovery economically viable.[v]  Shale gas represents nearly one quarter of U.S. gas production, and that share is growing.[vi]  Technological advances and high oil prices are sparking similar interest in shale oil;[vii]  North Dakota's Bakken Shale produced nearly 600,000 barrels of oil a day in 2012.[viii]

As its name suggests, hydraulic fracturing involves injecting a large volume of fluid (usually water-based) into a well at high pressure, to fracture the rock, prop open the cracks with sand, and release trapped oil or gas.  Chemicals represent a small fraction of the fracturing fluid; however, given that millions of gallons of fracturing fluid may be injected into a well[ix], the fluid may contain thousands of gallons of chemicals.

The public has raised concerns about the potential health and environmental risks associated with shale oil and gas production.[x]  These concerns often focus on the chemicals used in the hydraulic fracturing process.  By 2010, elected officials and environmental organizations were calling for increased chemical disclosure, to educate the public and provide policymakers with the information needed to assess and manage risk.[xi]  In response, industry worked with the Interstate Oil and Gas Compact Commission (IOGCC) and the Groundwater Protection Council (GWPC) to create a voluntary chemical registry called FracFocus.  The online registry provides disclosure forms in PDF, enabling the public to view information one well at a time.

> In response to public concerns about the chemicals used in the hydraulic fracturing process, industry worked to create a voluntary chemical registry called FracFocus.  Two years later, eleven states direct or allow well operators and service companies to report chemical use to FracFocus.

When FracFocus launched in April 2011, six states – Alabama,[xii] Arkansas,[xiii] Colorado,[xiv] Pennsylvania,[xv] West Virginia,[xvi] and Wyoming[xvii] – had drilling rules that required some form of chemical disclosure, ranging from minimal reporting and maintenance of on-site chemical inventories, to comprehensive reporting before and after fracturing a well.  Federal law did not – and still does not – require any disclosure of chemicals used to fracture wells.

Two years since the launch of FracFocus, eighteen states require fracturing chemicals disclosure.[xviii]  Of those, eleven states direct or allow well operators and service companies to report chemical use to FracFocus: Colorado; Louisiana; Mississippi; Montana; North Dakota; Ohio; Oklahoma; Pennsylvania; South Dakota; Texas; and Utah.[xix]  Meanwhile, Alaska,[xx] California,[xxi] and New York[xxii] are considering FracFocus for chemical reporting from their states, and the BLM has proposed adopting FracFocus as the disclosure method for unconventional wells on federal and tribal lands.[xxiii]

At the outset, FracFocus held promise as a positive response to public concern about chemical use, storage, and disposal at well sites.  And over time, the IOGCC and the GWPC have worked to improve FracFocus; for instance, by releasing a "FracFocus 2.0" form in late 2012 (all companies will use this form beginning in June 2013).[xxiv]  However, FracFocus still fails as an acceptable regulatory compliance tool.  This paper will address three categories of shortcomings, and conclude with recommendations.

Legal Fractures in Chemical Disclosure Laws | 4/23/2013

3

## Issue #1: Timing of Disclosures

States require that companies make post-fracturing chemical disclosures by a certain date. The deadline is calculated typically from the date that fracturing begins, or from the date of well completion (when the well begins generating product[xxv]). Timing varies, but all states seek disclosures within a few months of fracturing or completing a well:

- Mississippi requires reporting within 30 days of fracturing of a well;[xxvi]
- Utah requires reporting within 60 days of fracturing a well;[xxvii]
- Oklahoma requires reporting within 60 days of the start of fracturing;[xxviii]
- Louisiana requires reporting within 20 days of completion of the well;[xxix]
- Montana,[xxx] Pennsylvania,[xxxi] and South Dakota[xxxii] require reporting within 30 days of well completion;
- Texas requires reporting within 30 days of well completion or within 90 days after drilling is completed, whichever is earlier;[xxxiii]
- North Dakota[xxxiv] and Ohio[xxxv] require reporting within 60 days of well completion; and
- Colorado requires reporting within 60 days of completion, and not more than 120 days from the start of fracturing.[xxxvi]

State laws attach penalties to a company's late submittal or failure to submit chemical disclosures. A person failing to timely submit a report in Colorado, for instance, may be subject to a civil fine of up to $1,000 per violation per day, for a total of up to $10,000.[xxxvii] Each violation of an oil and gas rule (including requirements to report) in North Dakota is subject to a penalty of up to $12,500 per day.[xxxviii] In Ohio, violation of the oil and gas statute may result in civil penalties of up to $4000 per day;[xxxix] in addition, if the state has made reasonable attempts to notify the operator, and a report is more than 30 days late, the state may issue a finding that the operator has committed a "material and substantial violation." Such a finding authorizes the state to suspend well activities.[xl]



However, when state laws direct companies to make disclosures on FracFocus, states cede oversight of these provisions to a non-regulatory third party. FracFocus does not notify a state when the site receives a disclosure form about a well in that state. Nor can most states readily determine when a disclosure is made. Of the states that use FracFocus as a disclosure compliance tool, only Texas requires companies to submit copies of the FracFocus form to the state. Otherwise, to determine if a disclosure has been filed, a state agency must search FracFocus by well number every day until a form appears. When the form does appear, it does not reflect the date it was submitted. As a result, states using FracFocus are not able to enforce timely disclosure requirements.

FracFocus 2.0 may be able to provide notification to states *when desired*.[xli] However, no state rule requires that FracFocus notify the state when a submission is made. The fact that the registry will not offer this service by default may mean that there are technical (database interface), regulatory, or political barriers to doing so. How those barriers will be overcome has not been made clear. Meanwhile, even if a state were to begin receiving notifications going forward, there may not be a way to reach back to determine when submissions were made over the past two years.

## Issue #2:  Substance of Disclosures

Regulatory frameworks are more effective when they operate within systems that encourage compliance by "making the undesirable behavior less profitable or more troublesome."[xlii]  For instance, speeding laws by themselves may deter some motorists from driving too fast, but compliance rates improve with construction of speed bumps and traffic circles.  Unfortunately, states that use FracFocus as a compliance method for chemical disclosures are relying on a registry that creates barriers to compliance.  For instance, FracFocus does not provide state-specific forms, leaving companies to figure out how to account for state requirements not requested by FracFocus.  Too often, companies do not provide the additional information.

For instance, some states limit disclosure to chemicals regulated under the Occupational Safety and Health Act (OSHA).  However, Colorado,[xliii] Mississippi,[xliv] Montana,[xlv] Ohio,[xlvi] Oklahoma,[xlvii] and Texas[xlviii] require disclosure of all chemicals intentionally added to the fracturing fluid.  This is an important distinction.  OSHA requires chemical manufacturers to list information about "hazardous chemicals" on Material Safety Data Sheets (MSDS) for placement in work spaces.[xlix]  While the law defines "hazardous chemical" broadly,[l] manufacturers rely on existing literature to determine whether a chemical is hazardous; they are not required to test their product.[li]  Moreover, OSHA's requirements only apply to chemicals "known to be present in the workplace in such a manner that employees may be exposed under normal conditions of use or in a foreseeable emergency."  This further limits "hazardous chemicals" to those that have been studied for workplace exposure.  At a 2012 American Chemical Society conference, Matthew Watson of Environmental Defense Fund said, "Halliburton [a fracturing chemical service company] and others tell me that probably half of the chemicals used in fracturing aren't those OSHA-regulated MSDS chemicals."[lii]

A recent review of FracFocus found that 29% of CAS numbers reported at Texas wells in July 2012 did not exist.

However, until recently the FracFocus website appeared to limit reporting to OSHA-regulated chemicals.  For instance, in response to the question, "What chemicals are being disclosed on this site?," the site states:

All chemicals that would appear on a Material Safety Data Sheet (MSDS) that are used to hydraulically fracture a well except for those that can be kept proprietary based on the "Trade Secret" provisions related to MSDS found on the Trade Secret link at 1910.1200(i)(1) [reference to OSHA regulations].[liii]

Moreover, the bottom of the original FracFocus form reads, "All component information listed was obtained from the supplier's Material Safety Data Sheets (MSDS). . . ."  This language might lead a rational operator to disclose only those chemicals regulated by OSHA, even if that operator were reporting on a well located in Colorado (or another state seeking broader disclosures).  And in fact, operators have reported non-OSHA chemicals inconsistently on this form.  For instance, while TX well operators sometimes report that Clay-Max contains choline chloride,[liv] at other wells they merely report that Clay-Max contains "no hazardous ingredients per MSDS."[lv]  When companies do report non-OSHA chemicals, they assert trade secret protection for them at a higher rate than for OSHA chemicals.[lvi]

FracFocus appears to have amended the disclosure form to address this issue – many FracFocus 2.0 forms contain a heading part-way through the chemicals table that reads, "Additional Ingredients Not Listed on MSDS."  Unfortunately, the bottom of the new form then often reads, "Additional ingredients not listed on MSDS component information were obtained directly from the supplier.  As such, the Operator is not responsible for inaccurate and/or

incomplete information." This statement does not reflect the law in at least six states that rely on FracFocus, where a company is under equal obligation to report *all* chemicals intentionally added to a well.

In several other instances, the FracFocus form likewise does not cover state required information. Louisiana requires that well operators (or their service companies) report the type of base fluid used in hydraulic fracturing.[lvii] So do Colorado,[lviii] Mississippi,[lix] Oklahoma,[lx] and Texas.[lxi] While water is typically used, petroleum-based fracturing fluids are used as well and should be reported as such on the form. However, the FracFocus form only provides a place for companies to report the total water volume of a fracturing job. As a result, there is no clear place to identify other base fluids.

Pennsylvania requires a company to report whether recycled water was used in a fracturing job.[lxii] Ohio requires companies to report the amount and source of any recycled water used.[lxiii] Re-used fracturing water may contain chemicals; knowing the water source assists landowners, well owners, and regulators in identifying the chemicals present, to assist waste management and emergency response. However, the FracFocus form does not provide a place for companies to describe whether water is fresh or recycled, or to identify the source of water. As a result, compliance has been spotty. For instance, the report for Ohio well #34-067-21075, fractured on January 4, 2013, notes only that "water" was used as the base fluid. Operators reported the amount of fresh and recycled water used at least four other Ohio wells; however, none of these reports identified the source of the recycled water.[lxiv]

> "The Deletion Default" FracFocus enables well operators to pull down forms when they "discover an error in a disclosure but [are] unable to correct the error immediately." In this circumstance, the document is stored for 90 days in a "temporary holding container." During this time, an operator may replace or refresh the form. However, if no action is taken, the entire disclosure is deleted from the site.

Montana requires companies to report the actual concentrations of chemicals used in the fracturing fluid.[lxv] However, the FracFocus form only requests maximum concentrations. While Montana operators could list the actual concentrations in the "Comments" field, the form makes it difficult for a company to comply with Montana state law. In some Montana forms, operators appear to have tried to provide actual concentrations on the far right-hand side of the chart, but the numbers have been jumbled in the uploading process.[lxvi] Other Montana forms do not provide actual concentrations.[lxvii]

Texas requires well operators to provide the contact information for any business claiming entitlement to trade secret protection.[lxviii] This information is critical in the event a medical professional or first responder needs to identify the protected chemical in an emergency situation. However, FracFocus provides no specific place for this contact information. While some disclosure forms include contact information for trade secret chemicals,[lxix] most do not.

In addition, FracFocus has a "deletion default" for forms that need to be corrected. FracFocus enables well operators to pull down forms off the site when they "discover an error in a disclosure but [are] unable to correct the error immediately."[lxx] When the operator selects this function, the document is stored for 90 days in a temporary holding container. During this time, the operator can replace the form with a corrected version, or restore the original form. However, if no action is taken, the form is deleted.[lxxi] It is easy to imagine a busy company pulling down a form to correct later, and forgetting about the form. Therefore, FracFocus appears structurally skewed to discourage corrections and facilitate deletions.

FracFocus has limited quality assurance procedures to ensure accuracy. The registry indicates automatically when certain pieces of information on a newly completed form are incorrect; for instance, an invalid date or API well number, or latitude or longitude values that place a well outside of North America.[lxxii] However, the registry does not appear to reject incorrect CAS numbers, which help to identify chemicals. A recent review of FracFocus found that 29% of CAS numbers reported at Texas wells in July 2012 did not exist.[lxxiii]

FracFocus staff does not review submissions. And of all the states relying on FracFocus, only Texas[lxxiv] receives copies of the form. (Pennsylvania requires submission of similar information through a state form, but not the FracFocus form itself.)[lxxv] While states can never review every submission they receive, there is a greater chance of state review if the state receives the documentation. Given the near certainty that no one will review the form (either at FracFocus or at the agency that could assess penalties for a failure to disclose), the rational company may conclude that careful reporting is not highly valued by regulators and act accordingly.

Finally, no state sets minimum reporting standards for FracFocus, or requires an alternative method of compliance should FracFocus scale back its site. In fact, were FracFocus to disappear, most states using the registry have not identified a backup disclosure method (Texas[lxxvi] is an exception, indicating by law that the Texas Railroad Commission would post disclosures on its own site until a new site was identified by rule).

## Issue #3:  Nondisclosure of Chemicals

Trade secret protection is critical, to reward development of unique products in the marketplace. Trade secret law is state-based, but 47 states and Washington, DC[lxxvii] have adopted the Uniform Trade Secrets Act (UTSA) definition of trade secrets:[lxxviii]

> [I]nformation, including a formula, pattern, compilation, program device, method, technique, or process that derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.[lxxix]

States protect "trade secrets" and other "confidential business information"[lxxx] from disclosure under public information laws. Federal laws also contain proprietary exemptions to public disclosure requirements, including those set forth in the Occupational Safety and Health Act (OSHA),[lxxxi] the Toxic Substances Control Act (TSCA),[lxxxii] the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA),[lxxxiii] and the Emergency Planning and Community Right to Know Act (EPCRA).[lxxxiv] A comparative review of these regimes suggests that three procedures may contribute to higher rates of disclosure, while protecting true trade secrets: substantiation by the company seeing protection; agency verification; and public challenge.

For instance, EPCRA requires substantiation of proprietary claims at the submittal stage.[lxxxv] Furthermore, any person may challenge a trade secret claim and EPA must review and resolve within nine months.[lxxxvi] Less than 1% of facilities have filed trade secret claims under EPCRA.[lxxxvii]

TSCA does not require substantiation of proprietary claims, or provide for public challenges to these claims. A 1992 report commissioned by EPA found that companies made trade secret claims in more than 25% of all "substantial risk" notices submitted under TSCA Section 8(e); more than 20% of all health and safety studies; and about half of all records of significant hazardous reactions.[lxxxviii] In response, EPA has used its administrative authority to enhance

TSCA procedures. For instance, EPA now requires companies to substantiate trade secret claims in "substantial risk" notices.[lxxxix] In addition, in 2010 EPA announced it would increase review of TSCA trade secret claims.[xc] TSCA authorizes EPA to challenge assertions,[xci] but without a public challenge process to spur it into action, EPA had not exercised its authority vigorously. As of 2005, EPA was only challenging an annual average of fourteen claims over TSCA health and safety studies, out of thousands of claims. (Almost all challenged claims were withdrawn.)[xcii] In 2012, EPA began reviewing 16,000 chemical identities protected as trade secrets in TSCA submissions.[xciii]

Many states have one or more of these procedures – substantiation, verification, and opportunity for challenge – embedded in their general public information laws. For instance, if a company makes a trade secret assertion in Louisiana, it must still file the information with the state (with a cover sheet that warns the submission contains proprietary information). Then, the state verifies whether the information is proprietary within 30 days, or sooner if there is a pending public records request.[xciv] Any person may request documents, and file a legal action if access is denied.[xcv] If a company has provided proprietary records to the state of Mississippi, the state must notify the company if anyone requests to see the documents, "but such records shall be released within a reasonable period of time unless the [companies] shall have obtained a court order protecting such records as confidential."[xcvi] In North Dakota, "[a]ny interested person" may request an attorney general's opinion to review a written denial of a request for records, and the attorney general may obtain information claimed to be confidential for the purpose of determining whether it is.[xcvii] Alternatively, the person may file a civil action.[xcviii]

FracFocus offers none of these procedures; operators posting on the site have sole discretion to determine whether a chemical is a trade secret.[xcix] No substantiation is required, and there is no verification process to determine if trade secret claims meet the OSHA standard (which FracFocus directs companies to follow).[c] Finally, there is no process for the public to challenge a proprietary claim.[ci] In fact, the IOGCC and the GWPC hold themselves out as exempt from federal and state public information laws.[cii]



What's more, when states permit or direct chemical disclosure to FracFocus, state public information laws may no longer apply. For example, Ohio's general public information law enables any person to challenge trade secret claims in court.[ciii] The state's fracturing chemical disclosure law narrows the universe of persons with standing, but still allows challenges from a property owner, an adjacent property owner, or any interested person or state agency that may be negatively impacted by fracturing chemicals.[civ] However, Ohio allows operators to disclose to FracFocus instead of the state. If operators submit to FracFocus, appeal to the state agency would be impossible because the agency will not be in possession of the records.[cv]

Colorado has attempted to address this public challenge disconnect. The state's hydraulic fracturing rule requires companies making trade secret assertions on FracFocus to file a "claim of entitlement" with the state.[cvi] The law then empowers people "directly and adversely affected or aggrieved as a result of any violation of any Rule" to challenge trade secret claims.[cvii] While "directly and adversely affected or aggrieved" is not defined and may set a standard that precludes many challenges,[cviii] Colorado makes an important attempt to enable challenges to trade secret assertions made on FracFocus.

Otherwise, by directing or allowing companies to report to FracFocus, states have endorsed implicitly a "check-the-box" approach to proprietary assertions, with no meaningful oversight. This approach may encourage companies to make over-broad trade secret claims, a tendency that appears borne out by the many instances of inconsistent disclosures on the registry. About 20% of all hydraulic fracturing chemicals are not disclosed on FracFocus forms.[cix] However, those chemical constituents withheld from disclosure in one form are often published in other forms. For instance:

- CLA-Web, a clay stabilizer supplied by Halliburton. At well # 35-049-24878, the ingredient column simply says "proprietary." At well #05-045-16150, the ingredient is identified as an "ammonium salt" with no CAS number provided. However, at well #42-483-33339 and at least 5 other wells,[cx] CLA-Web is identified as containing Polyepichlorohydrin, trimethyl amine quarternized (CAS # 51838-31-4).

- CX-14, a crosslinker supplied by Universal. At well # 42-127-33846 and many other wells, this product is reported as a "trade secret."[cxi] However, at well #42-013-34489, this product is identified as containing Hydro-Treated Light Petroleum Distillate (CAS   # 64742-47-8).[cxii]

- S-3, a surfactant supplied by EES. At well # 05-095-06238 and at least nine other wells,[cxiii] this product is marked as a "trade secret." However, at well #05-077-09440, six ingredients and their CAS numbers are listed for this product:  Sodium Carbonate (497-19-18); Proteolytic Enzyme (9014-01-1); Linear alkyl benzene sulfonate (68081-81-2); Primary C14-15 alcohol sulfate (Mix of 68081-98-1, 68187-50-0); Alcohol Ether Sulfate (68585-34-2); and d-Limonene (94266-47-4).

- S-262, a scale inhibitor supplied by Reef. At well #42-462-38034, the product is marked "proprietary." At well # 30-015-39086, two ingredients and their CAS numbers are listed for this product: Amino Triethyl Phosphate Ether (68131-71-5) and Methanol (67-56-1). In addition, "inert ingredients" are mentioned.

- SUPERMAX, a surfactant and foamer supplied by Nabors/Superior Well Services.[cxiv] At well # 37-005-29978 and at least 8 other wells,[cxv] there is one "proprietary" ingredient noted, and three other ingredients and their CAS numbers listed:  Isopropyl Alcohol (67-63-0); Glycol Ether (111-76-2) and Ethyl Hexanol (104-76-7). Similarly, at well # 37-051-24334, the same three ingredients are listed, plus an "other unspecified". However, at well #37-063-36002 and at least three other wells,[cxvi] 22 ingredients and their CAS numbers are listed, including Isopropyl Alcohol, Glycol Ether, and 2-Ethylhexanol. There are no proprietary assertions made for the product on these forms.

- TFR-21L, a friction reduction supplied by TES. At well # 35-121-24512, the product is listed as "proprietary." However, at well # 35-121-24534 and at least 21 other wells[cxvii] five ingredients are listed, and a CAS number is provided for four:  Ethoxylated C10-16 Alcohols (68002-97-1); Hydrotreated Light Distillate (64742-47-8); Sodium Chloride (7647-14-5); Water (7732-18-5); and an Acrylamide modified polymer (CAS withheld as proprietary).

- TSC-6755, a scale inhibitor supplied by X-Chem. At well #42-103-01856 and at least six other wells,[cxviii] the product is marked "proprietary." However, at well # 42-115-33475 and dozens of other wells,[cxix] two ingredients and their CAS numbers are identified: Phosphonic acid,nitrilotris(methylene)tris-,pentasodium salt (2235-43-0) and Sodium Chloride (7647-14-5).

A company taking reasonable efforts to maintain the secrecy of one or more ingredients of a fracturing fluid additive would consistently shield those ingredients from disclosure on a public website. Indeed, "trade secret" is defined as information that is the subject of reasonable efforts under the circumstances to maintain secrecy.[cxx]  Many courts will find that these "reasonable efforts" would include making sure information is not published on a website accessible to the general public and to one's competitors.[cxxi]

Well owners, operators, and service companies are disclosing information to FracFocus from different states and at different times.  Given this, there are three circumstances that might give rise to inconsistent disclosures.  First, some trade secrets may lose their proprietary value over time, leading a company to deliberately disclose ingredients it once protected. That action should moot the trade secret designation for all other entries listing the same product.

Second, a state agency may have determined that one or more chemical ingredients were not "trade secrets" under applicable state rules.[cxxii]  Were this to occur, the company could no longer assert protections over those constituents, under the plain definition of "trade secret." The information is now easily accessible to others, there are no confidential circumstances surrounding the posting, and there no longer remains any confidential character to the information.

Third, a company may have inadvertently disclosed information about a chemical.  Once that occurs, the company may no longer attest that it has taken reasonable efforts to maintain the secrecy of the chemical – the company has abandoned the trade secret by posting it on a public forum accessible to known competitors.[cxxiii]  Failure to prevent publication "effectively [destroys] any confidential character it might otherwise have enjoyed as a trade secret."[cxxiv]

## Recommendations

In short, our review suggests that FracFocus prevents states from enforcing timely disclosure requirements, creates obstacles for compliance for reporting companies, and allows inconsistent trade secret assertions.  Furthermore, the reliance on FracFocus by numerous states as a de facto regulatory mechanism sends a strong signal to industry that careful reporting and compliance is not a top priority.  Thus, it is worth reconsidering reliance on FracFocus as a regulatory compliance tool.

At the very least, agencies should condition reliance on FracFocus on a set of minimum standards.   Only two states have required anything of FracFocus – Colorado[cxxv] and Pennsylvania[cxxvi]  directed FracFocus to become a searchable database by January 1, 2013 – and the registry failed to comply.  Under Colorado law, this failure triggered a requirement that companies begin sending disclosures to FracFocus *and* the state on February 1, 2013; however, a spokesperson for the state Oil and Gas Commission seemed unaware of this requirement.[cxxvii]  Pennsylvania's law states that if FracFocus was not searchable by January 1, 2013, the Department of Environmental Protection "shall investigate the feasibility of making the information . . . available on the department's Internet website in a manner that will allow the department and the public to search and sort the information."[cxxviii]  As of April 2013, Pennsylvania had not posted disclosures on its site.

This example suggests that any state's ability to make demands on FracFocus is limited.  Therefore, the federal government should step into this void and require minimum standards for the disclosure registry.  Specifically, in its upcoming rule, BLM should set forth basic requirements for a third party disclosure registry that must exist for publication on that site to be deemed in compliance with the federal disclosure law.  BLM should not mention FracFocus by name, but instead should describe the floor requirements for any eligible disclosure registry.  If FracFocus cannot meet the new standards, perhaps a competitor site can.

BLM should require FracFocus to:

- o   Be searchable across forms and allow for meaningful cross-tabulation of search results;
- o   Report on the face of each disclosure form the date that form was submitted to FracFocus;

○ Provide state/federal agency-specific forms, and/or at least reflect the differences across those forms (for instance, the "maximum concentration" columns could be re-labeled "maximum or actual concentrations").

○ Reject submissions that list non-existent (or non-matching) CAS numbers.

In addition, the following recommendations could enhance reporting:

➢ States (and BLM, if it chooses to use FracFocus) should require, as Texas does, that companies send copies of their FracFocus disclosure forms to the relevant agency.  If a state discovers that a FracFocus form it receives was not published on FracFocus, penalties should apply.

➢ States and BLM must have an alternative disclosure mechanism in place in the event of the third-party website weakening its standards or folding, as Texas now does.

➢ States and BLM should adopt the trade secret procedures set forth in the Emergency Planning and Community Right to Know Act, for its hydraulic fracturing chemical disclosure rules.  Arkansas already incorporates EPCRA by reference in its hydraulic fracturing disclosure rule.[ccxix]

➢ States and BLM should require companies to submit a statement to the relevant agency describing and substantiating any trade secret claims made on FracFocus.  The statement should include information necessary to trigger the state's public information laws so that challenges may be made to the assertions. Colorado law provides a useful starting point, although a clearer and broader standard for eligible challengers may be required.

➢ States and BLM should consider assessing penalties for asserting trade secret over a product that has been fully disclosed elsewhere on FracFocus.

➢ Congress should debate the implications of submitting reporting requirements to a non-regulatory third party. A number of legal and political issues may not have been considered fully when states began directing companies to disclose to FracFocus, such as the lack of oversight on trade secret claims and the fact that these third-parties are generally not subject to public information laws. A hearing could review these implications and suggest ways to improve public access to information.

➢ State and federal agencies should attach conditions to government funding of any third-party informational repository. Since 2009, DOE contributed $3.84 million in grants to GWPC, $1.5 million of which was used for FracFocus.[ccxx]  DOE could condition future funding on FracFocus being made searchable across forms.

## Acknowledgements

We wish to acknowledge SkyTruth for creating a searchable database of the information uploaded into FracFocus.org. Their database was a useful first step in a number of the searches we undertook for this report. Visit them at skytruth.org.  We also wish to acknowledge Jason Munster for his help navigating the SkyTruth database.

Credit for the "confidential" stamp on page 8 goes to Stuart Miles/123rf.com.

[i] Pages 10-11 of this report lists examples of inconsistent trade secret claims. In addition, ingredient lists for the same product differ from form to form. *Compare* the ingredients for CL-350HT, a product supplied by Frac Tech Services, in the form for well # 17-013-20820 (listing 10 ingredients, with 9 CAS numbers), *with* the ingredients reported at well # 17-031-25143 (listing 3 ingredients and their CAS numbers), *with* the ingredients reported at well # 42-127-33868 (listing 5 ingredients, 3 with CAS numbers and two described as "trade secrets"), *with* the ingredients reported at well # 42-401-35176 (listing 16 ingredients, 10 with CAS numbers and 6 described as "proprietary").

[ii] *See, e.g.*, John Kemp, *Fracking Safely and Responsibly*, REUTERS, Mar. 13, 2012.

[iii] *See, e.g.*, Mike Soraghan, *Hydraulic Fracturing: Public Disclosure Database Kept Private*, ENERGYWIRE, Aug. 13, 2012. The authors may explore the position taken by the FracFocus organizers in a future paper.

[iv] *See, e.g.*, Daniel Soeder, *Shale Gas Development in the United States*, *in* ADVANCES IN NATURAL GAS TECHNOLOGY 3, 9-13 (Hamid Al-Megren ed., 2012) (describing the U.S. Department of Energy's Eastern Gas Shales Project, launched in 1975).

[v] For instance, the share of shale gas proved reserves relative to total U.S. natural gas proved reserves increased from less than 10% in 2007 to over 30% in 2010. *U.S. Crude Oil, Natural Gas, and NG Liquids Proved Reserves*, U.S. ENERGY INFORMATION ADMINISTRATION (Aug. 1, 2012), http://www.eia.gov/naturalgas/crudeoilreserves/.

[vi] In 2010, shale gas accounted for 23 percent of U.S. natural gas production. Shale gas will comprise 49 percent of total U.S. natural gas production by 2035. ANNUAL ENERGY OUTLOOK 2012 93 (2012).

[vii] *See, e.g.*, Norimitsu Onishi, *Vast Oil Reserve May Now be within Reach, and Battle Heats Up*, NEW YORK TIMES, Feb. 2, 2013.

[viii] *North Dakota Monthly Bakken Oil Production Statistics*, NORTH DAKOTA DEPARTMENT OF MINERAL RESOURCES, www.dmr.nd.gov/oilgas/stats/historicalbakkenoilstats.pdf (last visited Apr. 9, 2013).

[ix] Well operators use from 3.8 million gallons to 5.5 million gallons of water to fracture a single well in the Marcellus shale. CORRIE CLARK ET AL., ARGONNE NATIONAL LABORATORY, LIFE CYCLE ANALYSIS OF SHALE GAS AND NATURAL GAS 10 (2011).

[x] *See, e.g.*, Scott Streater, *Colorado City Passes Fracking Ban Despite Aggressive Oil and Gas Industry Campaign*, ENERGYWIRE, Nov. 7, 2012; Danny Hakim, *Shift by Cuomo on Gas Drilling Prompts both Anger and Praise*, NEW YORK TIMES, Oct. 1, 2012, http://www.nytimes.com/2012/10/01/nyregion/with-new-delays-a-growing-sense-that-gov-andrew-cuomo-will-not-approve-gas-drilling.html?pagewanted=all; Carrie Tait & Shawn McCarthy, *Fear of Fracking: How Public Concerns Put an Energy Renaissance at Risk*, GLOBE AND MAIL, Mar. 10, 2012, http://www.theglobeandmail.com/report-on-business/industry-news/energy-and-resources/fear-of-fracking-how-public-concerns-put-an-energy-renaissance-at-risk/article535092/?page=all.

[xi] Mike Soraghan, *In Fracking Debate, 'Disclosure' Is in the Eye of the Beholder*, NEW YORK TIMES, June 21, 2010, http://www.nytimes.com/gwire/2010/06/21/21greenwire-in-fracking-debate-disclosure-is-in-the-eye-of-19087.html?pagewanted=all.

[xii] ALA. ADMIN. CODE r. 400-3-8-03 (2007).

[xiii] ARK. ADMIN. CODE 178.00.1-B-19 (2011) (requiring well operators to notice their intent to perform hydraulic fracturing on applications to drill, and to report within 30 days of well completion the types, volumes of base fluid and additives used).

[xiv] 2 COLO. CODE REGS. § 404-1:205 (2008) (requiring well operators to maintain Material Safety Data Sheets for chemicals used downhole, and a Chemical Inventory for chemicals exceeding 500 pounds during any quarterly reporting period).

[xv] PA. CODE § 78.122(b)(6) (2011) (requiring well operators to report within 30 days of well completion the volume of water as base fluid, a list of hydraulic fracturing additives by type and percent by volume, and a list of OSHA-regulated chemicals in those additives, and to provide a list of non-OSHA regulated chemicals to the state upon request).

[xvi] W. VA. CODE R. § 22-6A (2011).

[xvii] WYO. ADMIN. CODE OIL GEN Ch. 3 § 45 (2010) (requiring well operators to provide the following on applications to drill: the source of the base stimulation fluid, each additive by type, chemical compounds and CAS numbers, and proposed rate or concentration; further requiring well operators to report after well completion the total volume of fluid, proppant rate or concentration, chemical additive name, type, concentration or rate, and amounts actually used to fracture the well).

[xviii] Those eighteen states are: Alabama; Arkansas; Colorado; Idaho; Indiana; Louisiana; Michigan; Mississippi; New Mexico; North Dakota; Ohio; Oklahoma; Pennsylvania; South Dakota; Texas; Utah; West Virginia; and Wyoming.

[xix] Colorado updated its rules in 2012 and began directing companies engaged in hydraulic fracturing to report chemical use on FracFocus. *See* 2 COLO. CODE REGS. § 404-1:205A(b)(2)(A) (2008). Pennsylvania updated its chemical reporting requirements by statute in 2012; Pennsylvania now requires reporting to FracFocus, *see* 58 PA. CONS. STAT. § 3222.1(b)(2), and the Commonwealth's Department of Environmental Protection, *see* 58 PA. CONS. STAT. § 3222(b)(3), (b.1)(1) (2012).

[xx] Alaska Oil and Gas Conservation Commission, Second Revised Notice of Proposed Changes in the Regulations of the Alaska Oil and Gas Conservation Commission (Jan. 17, 2013), *available at* http://doa.alaska.gov/ogc/hear/HydraulicFrac3.pdf.

[xxi] California Department of Conservation, Pre-Rulemaking Discussion Draft: Chapter 4. Development, Regulation, and Conservation of Oil and Gas Resources, *available at* http://www.conservation.ca.gov/dog/general_information/Documents/121712DiscussionDraftofHFRegs.pdf.

xxii *High Volume Hydraulic Fracturing Proposed Regulations: 6 NYCRR Parts 52, 190, 550-556, 560, and 750*, NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION, http://www.dec.ny.gov/regulations/77353.html (last visited Mar. 24, 2013).

xxiii Proposed Rule: Oil and Gas; Well Stimulation, Including Hydraulic Fracturing, on Federal and Indian Lands, 77 Fed. Reg. 27691 (May 11, 2012); Supplemental Notice of Proposed Rulemaking and Request for Comment, 43 CFR Part 3160, *available at* http://www.eenews.net/assets/2013/02/08/document_ew_01.pdf (last visited Mar. 23, 2013) (leaked updated proposal).

xxiv *Important Announcement*, FRAC FOCUS (Jan. 30, 2012), http://fracfocus.org/node/336.

xxv 30 C.F.R. § 250.501 (2012).

xxvi "Report of Shooting or Treating," Rule 26(6), MISS. OIL AND GAS BD. RULES OF ORDER AND PROCEDURE (2013).

xxvii UTAH ADMIN. CODE r. 649-3-39(1.1) (2013).

xxviii OKLA. ADMIN. CODE § 165:10-3-10(b) (2013).

xxix LA. ADMIN. CODE tit. 43, § XIX.105 (2011).

xxx MONT. ADMIN. R. 36.22.1011(1), (2) (2012).

xxxi 58 PA. CONS. STAT. § 3222(b)(3) (2012).

xxxii S.D. ADMIN. R. 74:12:02:17 (2013).

xxxiii 16 TEX. ADMIN. CODE § 3.16(b) (2013).

xxxiv N.D. ADMIN. CODE 43-02-03-27.1(1)(g), (2)(i) (2013).

xxxv OHIO ADMIN. CODE § 1509.10(A) (2012).

xxxvi 2 COLO. CODE REGS. § 404-1:205A(b)(2)(A) (2008).

xxxvii 2 COLO. CODE REGS. §404-1:523a(1), (3) (2008).

xxxviii N.D. CENT. CODE § 38-08-16 (2011).

xxxix OHIO REV. CODE ANN. § 1509.33(A) (2012).

xl OHIO REV. CODE ANN.  § 1509.04(C) (2012).

xli *See, e.g.*, Stan Belieu, NOGCC, FracFocus Chemical Disclosure Registry, Presentation at the 19th IPEC Conference (Oct. 29 – Nov 1, 2012).

xlii Edward K. Cheng, *Structural Laws and the Puzzle of Regulating Behavior*, 100 NW. U. L. REV. 657 (2006); *see also* Leandra Lederman, *Statutory Speed Bumps: The Roles Third Parties Play in Tax Compliance*, 60 STAN. L. REV. 695 (2007).

xliii *See, e.g.*, 2 COLO. CODE REGS. § 404-1:205A(b)(2)(A) (2008). *See also* 2 COLO. CODE REGS. § 404-1:100 (2008) (defining "chemical" as broader than OSHA-regulated).

xliv While Rule 26(6)(G) would appear to limit reporting to OSHA chemicals, Rule 26(6)(F) requires disclosure of "any Additives to be used during the Hydraulic Fracturing process not otherwise disclosed by the person performing such treatment." "Report of Shooting or Treating," Rule 26(6), MISS. OIL AND GAS BD. RULES OF ORDER AND PROCEDURE (2013).

xlv MONT. ADMIN. R. 36.22.1015(2) (2012).

xlvi OHIO REV. CODE ANN. § 1509.10(A)(9)(a) (2012).

xlvii OKLA. ADMIN. CODE § 165:10-3-10(b), (c) (2012).

xlviii TEX. NAT. RES. CODE § 91.851(a)(1)(E); 16 TEX. ADMIN. CODE § 3.29(c)(2)(A) (2013).

xlix 29 C.F.R § 1910.1200(b)(1) (2013).

l 29 C.F.R § 1910.1200(c) (2013).

li Edwin G. Foulke, Jr., Assistant Secretary of Labor for Occupational Safety & Health, *Guidance for Hazard Determination – for Compliance with the OSHA Hazard Communication Standard*, U.S. DEPARTMENT OF LABOR, OCCUPATIONAL SAFETY & HEALTH ADMINISTRATION (2004), *available at* http://www.osha.gov/dsg/hazcom/ghd053107.html. This guidance acknowledges that "there may be limited information available on all aspects of a chemical's effects, particularly in the area of chronic health effects."

lii Rodney White, *Disclosing More Detail About Fracking Chemicals Might be Wise*, THE BARREL: PLATTS, Mar. 2, 2012, *available at* http://blogs.platts.com/2012/03/02/disclosing_more/.

liii *Frequently Asked Questions*, FRAC FOCUS, http://fracfocus.org/faq (last visited Mar. 26, 2013).

liv Well 42-399-35302 (fractured on Mar. 30, 2012); 42-415-31840 (fractured on July 25, 2012).

lv Well #42-429-36726 (fractured on Mar. 1, 2012); #42-461-36948 (fractured on Dec. 6, 2012).

lvi Scott Anderson, *A Red Flag on Disclosure of Hydraulic Fracturing Chemicals*, EDF: ENERGY EXCHANGE (Dec. 12, 2012), http://blogs.edf.org/energyexchange/2012/12/12/a-red-flag-on-disclosure-of-hydraulic-fracturing-chemicals/.

lvii LA. ADMIN. CODE tit. 43 § XIX.118C.1 (2011).

lviii 2 COLO. CODE REGS. § 404-1:205A(b)(2)(A)(viii) (2008).

lix "Report of Shooting or Treating," Rule 26(6)(B), MISS. OIL AND GAS BD. RULES OF ORDER AND PROCEDURE (2013).

lx OKLA. ADMIN. CODE § 165:10-3-10(b)(1) (2013).

lxi 16 TEX. ADMIN. CODE § 3.29(c)(2)(A)(viii) (2013).

lxii 58 PA. CONS. STAT. § 3222(b.1)(1)(viii) (2012).

[lxiii] OHIO REV. CODE ANN. § 1509.10(A)(9)(b).

[lxiv] These wells were: 34-067-21073 (fractured on Nov. 9, 2012); 34-029-21737 (fractured on Nov. 14, 2012); 34-019-22156 (fractured on Jan. 31, 2013); and 34-155-24057 (fractured on Mar. 11, 2013).

[lxv] MONT. ADMIN. R. 36.22.1015(2) (2012).

[lxvi] See, e.g., well # 25-033-21162.

[lxvii] See, e.g., well #25-087-21732; 25-03522159.

[lxviii] 16 TEX. ADMIN. CODE § 3.29 (c)(2)(C) (2013).

[lxix] See, e.g., well # 42-317-37273, #42-203-34936.

[lxx] Operator Training Webinar, FracFocus and the Texas Engineering Extension Service (Apr. 4, 2012), available at http://fracfocus.org/node/331 (last visited Mar. 23, 2013), at 28.

[lxxi] Id. at 30.

[lxxii] Operator Training Webinar, supra note lxxii, at 27.

[lxxiii] See Anderson, supra note lvi.

[lxxiv] TEX. NAT.RES. CODE § 91.851(a)(1)(D), (E).

[lxxv] 58 PA. CONS. STAT. § 3222(b)(3), (b.1) (2012) (disclosure requirements to the state); 58 PA. CONS. STAT. § 3222.1(b)(2) (2012) (simultaneous disclosure requirements for unconventional well operators to FracFocus); Telephone Interview with Joseph Lee, Chief of Compliance and Data Management, Office of Oil and Gas Management, Pennsylvania Department of Environmental Protection (April 5, 2013).

[lxxvi] 16 TEX. ADMIN. CODE § 3.29(c)(2)(B) (2013) (as directed by TEX. NAT.RES. CODE § 91.851(a)(1)(C)).

[lxxvii] Those states that have not adopted the UTSA typically rely on common law based on the Restatement of Torts and the Restatement (Third) of Unfair Competition. Id. at 798.

[lxxviii] Ryan M. Wiesner, A State-By-State Analysis of Inevitable Disclosure: A Need for Uniformity and a Workable Standard 16 INTELL. PROP. L. REV. 211, 215 (2012).

[lxxix] See, e.g., LA. REV. STAT. ANN. § 51:1431(4) (2012).

[lxxx] In most cases, a trade secret is considered a subset of Confidential Business Information (CBI). While a trade secret is, strictly speaking, held to a higher standards, states appear to use these terms interchangeably. The wide variation in the transparency that results under each law seems to have little to do with differing definitions of the terms "trade secret" or "CBI."

[lxxxi] 29 U.S.C. § 651 et seq.

[lxxxii] 15 U.S.C. § 2601 et seq.

[lxxxiii] 7 U.S.C. § 136 et seq.

[lxxxiv] 46 U.S.C. § 116 et seq.

[lxxxv] 40 C.F.R. 350.5.

[lxxxvi] 40 C.F.R. 350.15.

[lxxxvii] Environmental Protection Agency, The Emergency Planning and Community Right-to-Know Act, http://www.iowahomelandsecurity.org/documents/ierc/IERC_EPCRA_FactSheet.pdf.

[lxxxviii] Richard Denison, Worse Than We Thought: Decades of Out-of-Control CBI Claims under TSCA (Feb. 12, 2010), http://blogs.edf.org/nanotechnology/2010/02/12/worse-than-we-thought-decades-of-out-of-control-cbi-claims-under-tsca/ (citing a report commissioned by EPA, SHEILA FERGUSON, ET. AL., INFLUENCE OF CBI REQUIREMENTS ON TSCA IMPLEMENTATION (1992)).

[lxxxix] See 68 Fed. Reg. 33129, 33140 (republishing, with new standards and procedural requirements, the TSCA Section 8(e) Policy and Guidelines); Toxic Substances Control Act (TSCA) Section 8(e) Notices, ENVIRONMENTAL PROTECTION AGENCY, http://www.epa.gov/opptintr/tsca8e/pubs/confidentialbusinessinformation.html (last updated Sept. 17, 2012).

[xc] 75 Fed. Reg. 29,754 (May 27, 2010), EPA, Claims of Confidentiality: Certain Chemical Identities Contained in Health and Safety studies and Data from Health and Safety Studies Submitted under TSCA, Notice.

[xci] 15 U.S.C. § 2613(c)(2).

[xcii] U.S. GOVERNMENT ACCOUNTABILITY OFFICE, CHEMICAL REGULATION: OPTIONS EXIST TO IMPROVE EPA'S ABILITY TO ASSESS HEALTH RISKS AND MANAGE ITS CHEMICAL REVIEW PROGRAM 33 (2005).

[xciii] See, Toxic Substances Control Act (TSCA) Section 8(e) Notices, ENVIRONMENTAL PROTECTION AGENCY, http://www.epa.gov/opptintr/tsca8e/pubs/confidentialbusinessinformation.html (last updated Sept. 17, 2012).

[xciv] LA. REV. STAT. ANN. § 44:32 (2012).

[xcv] LA REV. STAT. ANN. § 44: 35A (2012).

[xcvi] MISS. CODE ANN. § 25-61-9(1) (West 2012).

[xcvii] N. D. CENT. CODE § 44-04-21.1(1) (2011).

[xcviii] Id.

[xcix] Ben Elgin, Benjamin Haas, & Phil Kuntz, *Fracking Secrets by Thousands Keep U.S. Clueless on Wells*, BLOOMBERG NEWS, Nov. 30, 2012, http://www.bloomberg.com/news/2012-11-30/frack-secrets-by-thousands-keep-u-s-clueless-on-wells.html.

[c] *Id.*

[ci] *Id.*

[cii] Soraghan, *supra* note iiii.

[ciii] OHIO REV. CODE ANN. § 149.43(C)(1) (2012).

[civ] OHIO REV. CODE ANN. § 1509.10(I)(2) (2012).

[cv] OHIO REV. CODE ANN. § 149.43(A)(1) (2012).

[cvi] 2 COLO. CODE REGS. § 404-1:205A(b)(2)(B) (2008).

[cvii] Order No. 1R-114, Amendments to 200 Series Rules: Rule 205A, Hydraulic Fracturing Chemical Disclosure, at 12-13 (citing Section 114 of the Oil and Gas Conservation Act and Rule 522(a)(1)).

[cviii] No matter how courts interpret this phrase, it acts to limit standing in fracturing chemical trade secret challenges. Under Colorado's general public information law, *any person* can ask to review records; seek a written explanation if documents were withheld; and file an action in state court to review any decision not to disclose. COLO. REV. STAT. § 24-72-204(4), (5) (2013).

[cix] *Id.*

[cx] Wells #17-031-25829; 17-031-25877; 17-031-25878; 42-317-37042; and 42-317-37309.

[cxi] *See, e.g.,* Wells # 42-127-33853; 42-127-33892; 42-127-34113; 42-479-41131.

[cxii] Note: This well identifies the supplier as UPPI.  This is Universal Pressure Pumping, Inc., the part of Universal that operates in Texas.  *See,* "About Universal," www.patenergy.com/pressurepumping/about-us/.

[cxiii] Wells # 05-095-06362; 05-095-06364; 05-095-06368; 05-095-06447; 05-095-06448; 05-095-06449; 05-095-06450.

[cxiv] Krishna Das, *Nabors to Buy Superior Wells Services for $736 Million*, REUTERS, Aug. 9, 2010, http://www.reuters.com/article/2010/08/09/us-superior-nabors-idUSTRE6781MH20100809; SEC Form SCTO-T/A, Sept. 9, 2010, *Tender Offer Statement, Superior Well Servs., Inc., Diamond Acquisition Corp., a wholly-owned subsidiary of Nabors Industries, Ltd.*.

[cxv] Wells #37-005-30851; 37-005-30855, 37-005-30919; 37-005-30998; 37-005-31027; 37-005-31062; 37-019-21858; 43-047-50736.

[cxvi] Wells #37-005-30920; 21-079-60357; 21-079-60183.

[cxvii] Wells #35-029-21206; 35-121-24436; 35-121-24437; 35-121-24462; 35-121-24463; 35-121-24533; 35-121-24552; 35-121-24554; 35-121-24555; 35-121-24568; 35-121-24589; 35-121-24615; 42-203-34936; 42-203-35095; 42-203-35101; 42-211-34858; 42-393-32394; 42-405-30434; 42-405-30459; 42-459-31455; 42-483-31886; 42-483-31918.

[cxviii] 42-103-10578; 42-103-31803; 42-103-32596; 42-173-34737; 42-173-34759; 42-173-34769.

[cxix] *See, e.g.,* Wells # 42-115-33491; 42-115-33493; 42-115-33504; 42-115-33505; 42-135-41129; 42-135-41131; 42-135-41132; 42-135-41133; 42-135-41152; 42-135-41154; 42-135-41156.

[cxx] The three states that do not follow the UTSA definition of "trade secret" nonetheless apply a similar "secrecy" standard.  *See, e.g., Trilogy Software, Inc. v. Callidus Software, Inc.,* 143 S.W.3d 452, 467-68 (Tex. App.-Austin 2004, pet. denied) (noting that Texas courts require a "substantial element of secrecy" before they will confer trade secret protection over information).

[cxxi] *See DVD Copy Control Ass'n Inc. v. Bunner,* 116 Cal. App. 4th 241, 251 (6th Dist. Cal. 2004).

[cxxii] This situation would occur if the state agency required substantiation and determined that the company's claim was invalid.

[cxxiii] *Eli Lilly and Co. v. E.P.A.,* 615 F.Supp. 811, 820 (S.D. Ind. 1985) ("Property rights in a trade secret are extinguished when a company discloses its trade secret to persons not obligated to protect the confidentiality of such information."); *Dep't of Public Utilities of City of Norwich v. Freedom of Information Com'n,* 739 A.2d 328, 533 (Conn. App. Ct. 1999); *Cubic Transp. Systems, Inc. v. Miami-Dade County,* 899 So.2d 453, 454 (Fla. Dist. Ct. App. 3d Dist. 2005); *Awards.com, LLC v. Kinko's, Inc.,* 834 N.Y.S.2d 147, 156 (1st Dep't 2007).

[cxxiv] *Sepro Corp. v. Florida Dept. of Envtl. Protection,* 839 So.2d 781, 783 (Fla. Dist. Ct. App. 1st Dist. 2003).

[cxxv] 2 COLO. CODE REGS. § 404-1:205A(b)(3)(A) (2008).

[cxxvi] 58 PA. CONS. STAT. § 3222.1(b)(6) (2012).

[cxxvii] 2 COLO. CODE REGS. § 404-1:205A(b)(3)(B) (2008); Telephone interview by Alexa Shasteen, J.D. Candidate, Harvard Law School, and Robert J. Frick, Hearing Manager, Colorado Oil & Gas Conservation Commission (Feb. 12, 2013).

[cxxviii] 58 PA. CONS. STAT. § 3222.1(b)(6) (2012).

[cxxix] ARK. ADMIN. CODE 178.00.1-B-19 (I)(8) (2011).

[cxxx] Benjamin Haas, et. al., *Fracking Hazards Obscured in Failure to Disclose Wells*, BLOOMBERG NEWS, Aug. 14, 2012, http://www.bloomberg.com/news/2012-08-14/fracking-hazards-obscured-in-failure-to-disclose-wells.html.

*The views and opinions expressed in this report do not necessarily reflect the views of Harvard Law School or Harvard University.*

# Hydraulic Fracturing Considerations for Natural Gas Wells of the Marcellus Shale

Authors: J. Daniel Arthur, P.E., ALL Consulting; Brian Bohm, P.G., ALL Consulting; Mark Layne, Ph.D., P.E., ALL Consulting

## Lead Author Biographical Sketch

Dan Arthur is a founding member and the Managing Partner of ALL Consulting (www.all-llc.com). Mr. Arthur earned his bachelors degree in Petroleum Engineering from the University of Missouri-Rolla. He is a recognized authority on environmental issues pertaining to unconventional resource development and production. Mr. Arthur has served or is currently serving as the lead researcher on several significant projects involving unconventional resources; environmental considerations pertaining to shale gas development; produced water management and recycling; access to federal lands; and low impact natural gas and oil development. Has previously managed U.S. Department of Energy (DOE) funded research projects involving the development of best management practices utilizing GIS technologies for efficient environmental protection during unconventional resource Development and Production; research to develop a national primer on coal bed methane; research to develop a Handbook on the preparation and review of environmental documents for CBM development; and research with the Ground Water Protection Research Foundation (GWPRF) and funded by DOE and BLM involving analysis of produced water management alternatives and beneficial uses of coal bed methane produced water. Mr. Arthur has published many articles and reports and has made numerous presentations on environmental, energy, and technology issues.

## Abstract

The issue of hydraulic fracturing has raised many concerns from the public as well as government officials. This paper will review the history and evolution of hydraulic fracturing, including environmental and regulatory considerations. Additionally, technical and environmental considerations will be presented applicable to hydraulic fracturing in the unconventional arena of gas shales with an emphasis on the Marcellus Shale of the Appalachians. Topics addressed in the paper will include discussion on why hydraulic fracturing is performed; the hydraulic fracturing process; applicable design and engineering aspects of well completions; geological considerations such as confinement of the fracturing process; potential risks to groundwater and underground sources of drinking water; and the use of hydraulic fracturing fluids and associated technical considerations.

## Presented at

### The Ground Water Protection Council
### 2008 Annual Forum
### Cincinnati, Ohio
### September 21-24, 2008

Hydraulic Fracturing of the Marcellus Shale

# Introduction

Shale gas reservoir developments are a growing source of natural gas reserves across the United States. The successful model used for gas shale development in the Barnett Shale of the Fort Worth Basin is being expanded to other shale plays. The basis of the Barnett Shale completion model is the use of horizontal wells and hydraulic fracturing stimulations. One shale gas play that is currently in the early stages of development is the Marcellus Shale of the Appalachian Basin. The Marcellus Shale has the potential to be one of the largest natural gas plays in the United States and is the focus for the discussion in this paper. While the development of the Marcellus Shale is in the early stages, the use of horizontal well drilling and hydraulic fracturing appear to be key aspects of successfully developing this important natural gas resource. This paper is a review of the hydraulic fracture process, including a brief history of hydraulic fracturing as applied to shales and the activities associated with a hydraulic fracture treatment.

Unconventional development of energy resource plays, including coal beds, tight sands and shales has been a growing source of natural gas development in the United States. Since 1998 unconventional natural gas production has increased nearly 65%. This increase has resulted in unconventional production becoming an increasingly larger portion of total natural gas production, increasing from 28% in 1998 to 46% of total natural gas production in 2007[1]. One type of unconventional development that has gained attention and contributed to this increase is natural gas from shale formations. Gas production from gas shales is gaining attention throughout the United States and extends beyond the well known Barnett Shale in the Fort Worth Basin and Fayetteville Shale in the Arkoma Basin. Shale gas resources extend across the continental United States, offering abundant and available access to clean burning natural gas. Development of shale gas resources includes the shales in a variety of basins, including the Devonian shales in the Appalachian Basin; the Mowry shale in the Powder River Basin; the Mancos shale in the Uinta Basin; the Woodford shale in the Ardmore Basin; the Floyd/Neal shale play in the Black Warrior Basin; the Barnett shale in the Permian Basin; the New Albany shale in the Illinois Basin; the Pearsall shale in the Maverick Basin; the Chattanooga shale in Arkansas and Tennessee; the Hovenweep shale in the Paradox Basin; the Bend shale in the Palo Duro Basin; and the Barnett/Woodford shale plays in the Delaware and Marfa Basins[2].

One key shale gas play identified as having promise for future development is the Devonian Aged, Marcellus Shale of the Appalachians[2]. The development of the Marcellus has been made possible based on recent technological advances in two key technologies – horizontal drilling and hydraulic fracturing[3]. The technology of horizontal well completions was first adapted for shale gas development to provide increased wellbore exposure to the reservoir area while allowing for a reduced number of surface locations in the urban areas of the Ft. Worth Basin[4]. Barnett horizontal wells have laterals ranging from 1,500 to more than 5,000 feet and for these wells to be economically productive, they require hydraulic fracturing. Because of well configurations and other considerations, hydraulic fracturing procedures were adapted to the unique Barnett formation's needs[4]. Similar well completions and treatments are expected to be necessary for Marcellus Shale wells to be economically productive and to effectively and prudently manage the resource.

Shale gas plays are unconventional reservoirs because these formations contain oil- or gas-bearing rocks which have poor or limited natural permeability relative to the transmission of fluids to a wellbore[5]. As such, these resources require a means to increase their permeability through stimulation[5]. Hydraulic fracturing of unconventional plays has been tried in the judicial system due to expressed concerns that the technology had the potential for groundwater sources to be affected. In the coal bed play of the Black Warrior Basin of Alabama and the San Juan Basin of New Mexico and Colorado, this issue reached the 11th Circuit Court of Appeals and merited

[1] Navigant Consulting, Inc. 2008, *North American Natural Gas Supply Assessment*, Prepared for: American Clean Skies Foundation.
[2] David Brown. 2007. *From Sea to Shining Sea: If It's Shale, It's Probably in Play.* AAPG Explorer April 04 2007.
[3] H. Lee Matthews and Mark Malone. 2007. *Stimulation of Gas Shales: They're All the Same- Right?*. SPE 106070.
[4] R. Leonard, R. Woodroof, K. Bullard, M. Middlebrook, and R. Wilson. 2007. *Barnett Shale Completions: A Method for Assessing New Completion Strategies.* SPE 110809.
[5] David D. Cramer. *Stimulating Unconventional Reservoirs: Lessons Learned, Successful Practices, Areas for Improvement.* SPE 114172.

Copyright ©, ALL Consulting, 2008

Hydraulic Fracturing of the Marcellus Shale

a court-imposed investigation by the U.S. Environmental Protection Agency (EPA) along with an additional investigation led by the Ground Water Protection Council[6].  One of the concerns identified dealt with the concerns that groundwater was impacted by hydraulic fracturing stimulations in the shallow coal bed methane formations because these shallow coal beds can also contain high quality water which is able to be treated to meet drinking water standards[6].  Unconventional gas shales resources are typically deeper than coal bed methane formations, have not traditionally been identified as sources for supplying drinking water, are not noted as containing treatable drinking water, and are often geologically isolated from drinking water aquifers by several thousand feet of other strata including other shale formations that act as aquitards.  While hydraulic fracturing is a necessary aspect of gas shale development, the natural barriers present between productive shale formations and groundwater zones, in combination with the oil and gas regulations present in the regulating states provide levels of protection that ensure potential groundwater sources are protected.

## America's Gas Shales

Gas shales are organic-rich shale formations that were previously believed to function as source rocks and seals for gas accumulating in the stratigraphically proximal sandstone and carbonate reservoirs of traditional onshore gas development[7].  Shale is a sedimentary rock that is predominantly comprised of consolidated clay and silt sized particles.  Shales accumulate as muds in low-energy depositional environments such as tidal ponds and deep water basins where the fine-grained clay and silt particles fall out of suspension in these quiet waters.  During the deposition of these sediments, there can also be deposition of organic matter in the form of algae, plant stems and leaves[8].  The compaction of the sheet-like clay particles results in thin laminae in part because the clay grains rotate to lie flat as a result of pressure from compaction.  The thin layers that make up shale result in a rock that



has limited permeability horizontally and extremely minimal permeability vertically; typical unfractured shales have permeabilities on the order of 0.01 to 0.00001 millidarcies[9].  The layering and fracturing of shales can be seen in outcrop and is reflective of the manner in which shales develop fractures both naturally and as a result of hydraulic fracturing (see photo).  The photograph shows an outcrop of the Marcellus shale which reveals the natural bedding planes or layers of the shale and near vertical fractures that can cut across the natural bedding planes.

The low natural permeability of shale has been a limiting factor to the production of gas shale resources[10].  Research from the 1980's documented the presence of natural gas in Devonian shales of the Appalachians identifying that the development of

Photograph of Marcellus Shale Outcrop
Source: T. Engelder home page

these resources had limited economic potential without supplemental reservoir stimulation to facilitate the flow of the gas to the wellbore[10,11].  Low reservoir permeability represents a key difference between shale and other gas reservoirs.  For gas shales to be economically produced, the restrictions of low permeability must be overcome[12].  The combination of reduced economics and low permeability of gas shale formations historically caused

[6] Drilling Contractor, 2000. *Alabama Lawsuit Poses Threat to Hydraulic Fracturing Across US.* January/February 2000. pgs 42-43.

[7] Schlumberger 2005.  *Shale Gas White Paper.* 05-OF299.  October 2005, Schlumberger Marketing Communications.

[8] Richard Davis, Jr. 1992. *Depositional Systems: An Introduction to Sedimentology and Stratigraphy.* 2nd Edition. Prentice Hall.  604 pgs.

[9] R.A. Freeze and J.A. Cherry. 1979. *Groundwater.* Prentice Hall. 604pgs.

[10] S. Ameri, K. Aminian, J.A. Miller, D. Doricich, and A.B. Yost II. *A Systematic Approach for Economic Development of the Devonian Shale Gas Resources.* SPE 14504.

[11] D.E. Lancaster. *An Update on GRI's Comprehensive Study Well Program in the Devonian Shales of the Appalachian Basin.* SPE 19310.

[12] Halliburton Energy Services. 2008. *U.S. Shale Gas: An Unconventional Resource. Unconventional Challenges.* Halliburton White Paper

operators to by-pass these formations and focus on resources that required less investment and that had earlier financial return[13].

Shales are located across the United States, with those bearing natural gas at depths exceeding 12,000 feet (ft)[7]. Estimates of total natural gas resource potential for gas shales has been estimated to be from 500 to 1,000 Trillion cubic feet (Tcf)[12], with estimates increasing as additional wells are brought online and additional information is gathered. The distribution of gas shale formations in the continental United States with estimated reserves for those basins in which development is ongoing or evolving is shown in Figure 1. The natural gas present in the shale formations typically resides in one of three locations including: within the pore space of the shale, within natural fractures of the shale, and adsorbed on minerals or organic matter within the shale[14]. This gas has been identified as thermogenically sourced, as indicated by the lack of other liquid hydrocarbons[15]. The degree to which shale has been exposed to heat and pressure can be measured by the relative volumes of oil and natural gas; the most mature shales are comprised primarily of dry natural gas[15]. To date the gas shales which have been developed have occurred in three depth ranges, northern shallow gas shales are found between 250 to 2,000 ft in the Antrim Shale and New Albany Shale, eastern shales average between depths of 3,000 and 5,000 ft and southern shales are located between 2,000 and 6,000 feet[7], however new exploration activities are reaching depths of 12,000 ft[2].

### Figure 1: Gas Shale Basins of the United States



The Barnett Shale has set the standard for gas shale development with production ramping up since the mid 1990's, when horizontal drilling and hydraulic fracturing technologies enabled the play to become economically viable[12]. The Barnett Shale play has experienced more than a 3000% growth rate between 1998 and 2007, and it has been estimated that the Fayetteville, Haynesville, Woodford, and Marcellus are expected to show similar growth as these plays move forward[1]. While the Barnett Shale technologies have continued to mature, petroleum industry innovators exported the lessons learned in the Fort Worth Basin to many other basins and many other shales[16], which has led to more recent development efforts in other shales.

Table 1 presents a comparison of the characteristics of select shale gas plays in the US. Table 1 is a summary of the characteristics for U.S. gas shale plays and provides several characteristics for comparison including; estimated reserves, play size, production volumes, depth to production zone, characteristics of the shales and estimated or known well spacing.

---

[13] M. Airhart. 2008. *The Barnett Shale Gas Boom: Igniting a Hunt for Unconventional Natural Gas Resources.* Geology.com article.

[14] Geology.com. 2008. *Marcellus Shale- Appalachian Basin Natural Gas Play: New research results surprise everyone on the potential of this well-known Devonian black shale.*

[15] John A. Harper. 2008. *The Marcellus Shale – An Old "New" Gas Reservoir in Pennsylvania.* In Pennsylvania Geology, Volume 28 Number 1. Published by the Bureau of Topographic and Geologic Survey, Pennsylvania Department of Conservation and Natural Resources.

[16] D.W. Walser and D.A. Pursell. 2007. *Making Mature Shale Gas Plays Commercial: Process vs. Natural Parameters.* SPE 110127

Copyright ©, ALL Consulting, 2008                      3

## Hydraulic Fracturing of the Marcellus Shale

The data in Table 1 also shows the variations in depth of target formation with development potential. Review of the table shows that both the Haynesville and the Marcellus Shales have estimated maximum recoverable gas volumes six to eight times greater than the Barnett Shale. The Woodford and Haynesville Shales are predicted to have deeper average target depths than other shale plays. The shale plays show production intervals at depths considerably deeper than many other unconventional plays. A comparison of the estimated depth of the target zone and the base of treatable water data demonstrates that gas shale development is estimated to occur several thousand feet below treatable water zones in most of the gas shale basins. In analyzing the Fayetteville data, the shallowest shale gas play presented, it is important to understand that the Arkansas Oil and Gas Commission (AOGC) regulates the depth of protective casings (as do other state oil & gas regulatory agencies) based on field rules in order to protect groundwater resources[17]. These rules and regulations are not exclusive to Arkansas, rules regarding depth of casings in order to protect groundwater resources are part of every state oil and gas regulatory agencies rules. Based on the size of the Marcellus Play, the average target depth, estimated reserves, and the proximity to a large market for produced gas, the Marcellus is an appealing target which has a large potential upside for development[1]. while also having significant natural isolation and confinement from treatable groundwater resources.

| Table 1. Comparison of Data for the Active Gas Shales in the United States | | | | | | |
|---|---|---|---|---|---|---|
| Gas Shale Basin | Barnett | Marcellus | Fayetteville | Haynesville | Woodford | Lewis |
| Estimated Basin Area, square miles | 5,000 | 95,000 | 9,000 | 9,000 | 11,000 | 10,000 |
| Depth, ft | 6500-8500[18] | 4,000-8,500[12] | 1,000-7,000[12] | 10,500-13,500[12] | 6,000-11,000[5] | 3,000-6000[18] |
| Net Thickness, ft | 100-600[18] | 50-200[6] | 20-200[18] | 200[7] | 120-220[5] | 200-300[18] |
| Depth to Base of Treatable Water, ft[#] | ~1200 | ~850 | ~500[17] | ~400 | ~400 | ~2000 |
| Total Organic Carbon, % | 4.5[18] | 3-12[11] | 4.0-9.8[18] | | 1-14[10] | 0.45-2.5[18] |
| Total Porosity, % | 4-5[18] | | 2-8[18] | | | 3.0-5.5[18] |
| Gas Content, scf/ton | 300-350[18] | | 60-220[18] | | | 15-45[18] |
| Water Production, Barrels water/day | 0[18] | | | | | 0[18] |
| Well spacing, Acres | 60-160[18] | 40-160[6] | | 40-560[6] | 640[6] | 80-320[18] |
| Gas-In-Place, Tcf | 327[1] | 1,500[1] | 52[1] | 717[1] | 52[1] | 61.4[1] |
| Reserves, Tcf | 44[1] | 262[1], 500[20] | 41.6[1] | 251[1] | 11.4[1] | 20[1] |
| Est. Gas Production, mcf/day/well | 338[19] | 3,100[20] | 530[19] | 625-1800[13] | 415[19] | 100-200[12] |
| mcf = thousands of cubic feet of gas.<br>NOTE: Data derived from various sources and research analysis. Information from some basins was unable to be identified and confirmed at the time of this paper and has been left blank.<br># - for the Depth to base of treatable water data, the data was based on depth of casing information if the state's oil and gas agency did not specifically report BTW values in their data base. | | | | | | |

[17] Arkansas Oil and Gas Commission. 2008. Field Rules and Rule B-15.

[18] Hayden, J., and Pursell, D. 2005. *The Barnett Shale. Visitor's Guide to the Hottest Gas Play in the US.* October 2005.

[19] Williams, P. American Clean Skies. *A Vast Ocean of Natural Gas.* Summer 2008. P 44-50.

Hydraulic Fracturing of the Marcellus Shale

## The Marcellus Shale

Devonian Shale was the producing formation of the first natural gas well drilled in the United States in 1821[15]. Devonian shales in the Appalachian Basin have a long history of low productivity and long well life which has limited the extent to which these sources of natural gas have been developed to date.[15]  The Marcellus Shale extends from its northern reaches in west central New York on a northeast to southwest trend down into Pennsylvania, Ohio, and West Virginia; with minor portions of the eastern side of the basin extending into Maryland and Virginia (Figure 2).



Figure 2: Marcellus Shale Distribution in the Appalachian Basin
*Source: ALL Consulting, 2008*

The Marcellus Shale is a highly organic black shale that was deposited when a shallow continental seaway existed in the area that now makes up the eastern United States west of the Appalachian Mountains[20].  The interior seaway was a result of the African Plate (at the time part of the continent of Gondwana) and the North American plate (at the time part of the continent of Laurentia) colliding approximately 380 million years ago.   The Marcellus Shale was deposited in a deep trough basin (below the pycnocline, a layer in water bodies below which a density difference prevents water from overturning and bringing oxygen to the lower portions of the water) located between the rise of the Cincinnati Arch and the collision boundary of the two plates[20].  This collision created a deep basin in which minimal clastic sediment deposition (from rivers and streams) occurred[20].  This depositional environment is analogous to the Black Sea of Europe, where a lack of fresh water flow from rivers prevents the deposition of significant quantities of clastic sediments.  The deposition of large quantities of organic matter below the pycnocline and the subsequent thrust faulting that resulted from the continued collision of the two continental plates resulted in a rapid burial process for the organic matter that proved to be the source materials for the natural gas present in this black shale[20].  The rapid burial of the Marcellus, a result of continued sedimentation and thrust faulting, eventually resulted in the sediments surpassing the temperature and pressure of the oil window leading to the formation of large quantities natural gas entrained in the shales porosity[20].  The subsequent uplift and erosion of the Marcellus Formation has resulted in the natural formation of vertically orientated joints (or fractures)[20].

The Stratigraphic Column presented in Figure 3 is representative of the southwestern portion of New York State but provides a general reference to the composition of the overlying formations that were deposited after the Marcellus Shale.  The strata overlying the Marcellus Shale in other portions of the Appalachians where Marcellus Shale is present are likely to be of similar composition.  Directly overlying the Marcellus Shale are other Hamilton Group units of the middle Devonian, and the upper Devonian sequence, which is a section of geologic materials that are predominantly comprised of siltstones and shales.  In the parts of the basin where the Marcellus is sufficiently deep to be a target for shale gas development, the upper Devonian strata would represent a thick section of geologic materials which would act as a barrier to upward migration of fluids.

---

[20] T. Engelder and G.G. Lash. *Marcellus Shale Play's Vast Resource Potential Creating Stir in Appalachia.* in The American Oil & Gas Reporter. May 2008.

**Figure 3: General Stratigraphic Column of Southwestern New York State.**

| Period | | Group | Unit | | | Lithology |
|---|---|---|---|---|---|---|
| Penn | | Pottsville | Olean | | | Quartz Pebble |
| Miss | | Pocono | Knapp | | | Conglomerate and Sandstone Quartz Pebble, Conglomerate, Sandstone, and Minor Shale |
| Devonian | Upper | Conewango | | | | Shale and Sandstone Scattered Conglomerates |
| | | Conneaut | Chadakoin | | | Shale and Sandstone Scattered Conglomerates |
| | | Candadaway | Undifferentiated | • | ○ | Shale and Siltstone |
| | | | Perrysburg | | | Minor Sandstone |
| | | West Falls | Java | • | ○ | Shale and Siltstone |
| | | | Nunda | • | ○ | |
| | | | Rhinestreet | | | Minor Sandstone |
| | | Sonyea | Middlesex | ○ | | Shale and Siltstone |
| | | Genesee | | | | Shale with Minor Shale and Limestone |
| | Middle | | Tully | ○ | | Limestone with minor Siltstone and Sandstone |
| | | Hamilton | Moscow | ○ | | Shale with minor Sandstone and Conglomerate |
| | | | Ludlowville | | | |
| | | | Skaneateles | | | |
| | | | Marcellus | | | |
| | | | Onondaga | • | ○ | Limestone |
| | Lower | Tristates | Oriskany | ○ | | Sandstone |
| | | Helderberg | Manlius | | | Limestone and Dolostone |
| | | | Rondout | | | |
| Silurian | Upper | | Akron | • | ○ | Dolostone |
| | | Salina | Camillus | | | Shale, Siltstone, Anhydrite, and Halite |
| | | | Syracuse | | | |
| | | | Vernon | | | |
| | | Lockport | Lockport | ○ | | Limestone and Dolostone |
| | | Clinton | Rochester | | | Shale and Sandstone |
| | | | Irondequoit | | | |
| | Lower | | Sodus | | | Limestone and Dolostone |
| | | | Retnules | | | |
| | | | Thorold | | | |
| | | Medina | Grimsby | ○ | | Sandstone and Shale |
| | | | Whirlpool | ○ | | Quartz Sandstone |
| Ordovician | Upper | | Queenston | ○ | | |
| | | | Oswego | | | |
| | | | Lorraine | ○ | | Shale and Siltstone |
| | | | Utica | | | With Minor Sandstone |
| | Middle | Trenton-Black River | Trenton | ○ | | Limestone and Minor Dolostone |
| | | | Black River | | | |
| | Lower | Beekmantown | Tribes Hill | | | Limestone |
| | | | Chuctanunda | | | |
| Cambrian | Upper | | Little Falls | | | Quartz Sandstone and Dolostone; Sandstone and Sandy Dolostone; Conglomerate Base |
| | | | Galway (Theresa) | ○ | | |
| | | | Potsdam | ○ | | |
| Pre-Cambrian | | | Gneiss, Marble, Quartzite, etc ... | | | Metamorphic and Igneous Rocks |

Source: New York GEIS, 1992        ○ - gas productive        • - oil productive

The extraction of natural gas from shallow gas shale has been occurring in parts of the northeastern United States since the early 1800's[21]. By the turn of the 20th Century, development of shallow natural gas wells along the shoreline of Lake Erie was common place, with a well located on nearly every property or business in the area. In some cases, these wells were used for years to supply lighting or heat to properties[15]. However, many of these early wells were never able to produce a marketable quantity of natural gas; consequently researchers from agencies such as the Gas Research Institute (GRI) and the U.S. Department of Energy (DOE) have been searching

---

[21] NY DEC Division of Mineral Resources. 1992. *Final Generic Environmental Impact Statement on the Oil, Gas and Solution Mining Regulatory Program.*

Copyright ©, ALL Consulting, 2008

for means to effectively produce economic volumes of natural gas from the Appalachian Devonian shale for years[11].

The states of New York, Pennsylvania and Ohio each contain potential Marcellus Shale production; these are also states that rank in the top 10 in energy consumption in the United States based on data from the Energy Information Administration (EIA)[22]. These states contain some of the most densely populated areas in the United States, some of which have had historical power distribution issues with rolling blackouts and other energy crisis. New York City Mayor Michael R Bloomberg has recently proposed the addition of windmill farms to bridges and skyscrapers across the city to help generate additional power[23]. Local production of natural gas which could also be used to generate electricity could help meet New York City's energy needs.

In the two decades of Barnett Shale development, the science of shale gas production has grown to embrace sophisticated horizontal drilling and multi-stage hydraulic fracturing practices which help to make shale gas development successful[16]. The financial success and completion techniques of the Barnett Shale have developed to the point where analogous shale gas plays are similarly being explored and tested by various operators[16].

A renewed interest in the Marcellus Shale was initiated in 2003 when Range Resources-Appalachia, LLC drilled the first "new" Marcellus well in recent years and began experimenting with the techniques used in the Barnett. This effort resulted in reported production in Pennsylvania from the Marcellus in 2005[15]. Since 2005, the expansion of Marcellus shale development has continued in Pennsylvania and the Appalachian Basin. Development is increasing rapidly to the extent that Pennsylvania has experienced a nearly 25% increase in Applications for Permits to Drill, most of which are attributed to interest in developing Marcellus shale wells[15]. In Pennsylvania the number of Marcellus wells had reached an estimated 450 wells in February of 2008[15]. Development in other Appalachian states has been slower. For instance, the New York Department of Environmental Conservation (DEC) has less than 38 completed wells with the Marcellus formation as the target production zone in their current database[24]. One aspect which may facilitate a more rapid rate of development of the Marcellus shale is the proximity of the play to major markets in the northeastern United States. Development of the Marcellus Shale has



Figure 4: Horizontal and Vertical Well Completions
*Source: John Perez, Copyright ©, 2008*

---

[22] Energy Information Administration. Consumption, Price and Expenditure Estimates US State Rankings, 2005.

[23] NY Times Article. August 20, 2008. Bloomberg Offers Windmill Power Plan.

[24] NY DEC, Searchable On-Line Database. http://www.dec.ny.gov/cfmx/extapps/GasOil/. September 02, 2008.

Copyright ©, ALL Consulting, 2008

potential to occur near some of the largest population centers of the eastern United States including New York City, Pittsburgh, and Philadelphia. This production of natural gas could help to facilitate meeting the energy needs of these major metropolitan areas. One operator with current production in Pennsylvania noted that the company receives a premium price to NYMEX from production in the Appalachians, while the company faces discounted rates from its production in the Rockies[2].

Current development practices in the Marcellus shale involve the drilling of both horizontal and vertical wells[15]. Regardless of the preferred well orientation, Marcellus shale well completions require formation stimulation, typically in the form of hydraulic fracturing to produce economic volumes of natural gas[25]. Further, based on development in other gas shales, it is likely that horizontal well drilling will become the preferred method of drilling for gas development from the Marcellus Shale.

From a historic perspective, horizontally drilled wells were first drilled in Texas in the 1930's[15]. The technology has been continuously improved and developed; and by the 1980's, horizontal drilling has become a standard industry practice[15]. In the Appalachians, through mid-2008, wells completed in the Marcellus formation have predominantly been vertically completed, but current permitting activity is showing an increasing trend in the numbers of horizontal well permit applications[15]. Based on discussions with industry in the area, it appears that there will continue to be a combination of both vertical and horizontal wells developed in the Marcellus, although horizontal wells are expected to become the predominant well drilling and completion for this play.

There are a wide range of factors that influence the choice between a vertical or horizontal well. While vertical wells may require less capital investment on a per well basis, production is less economical and overall development could require 4 or more vertical wells compared to one horizontal well or 16 separate well pads for vertical wells compared to only one multi-well pad using horizontal well technology. When assessing capital investments between vertical and horizontal wells, a vertical well may cost as much as $800,000 (excluding pad and infrastructure) compared to a horizontal well that can cost in the range of $2.5 million or more per well (excluding pad and infrastructure)[26].

Figure 4 illustrates the differences between horizontal and vertical shale well completions. The figure shows how a horizontal well completion provides greater wellbore exposure to the foundation in comparison to a vertical well. For the Marcellus Shale, a vertical well may only be exposed to as little as 50 ft of formation while a horizontal well may be developed with a lateral wellbore extending a length of 2,000 to 6,000 ft within the 50 to 300 ft thick formation as depicted in Figure 4[15]. The increase in reservoir exposure represents one advantage horizontal wells have over vertical wells. Other advantages of horizontal wells include reduced surface disturbances resulting from well pads, roads, and pipeline. Additionally, several horizontal wells can be placed on multi-well pads for a less intrusive impact to the surrounding area, the decrease in area can also change the impacts from noise, traffic, and result in visual changes to the landscape. Horizontal wells have also been used in many areas of the country to access natural gas resources in instances not possible using a vertical well due to existing infrastructure, buildings, environmentally sensitive areas, or other surface conflicts.

## Hydraulic Fracturing

In addition to horizontal drilling, the other technology key to facilitating economical recovery of natural gas from shale is hydraulic fracturing. Hydraulic fracturing is a formation stimulation practice used in the industry to create additional permeability in a producing formation to allow gas to flow more easily toward the wellbore for purposes of production[27]. Hydraulic fracturing can be used to overcome natural barriers to the flow of fluids to the wellbore. Barriers may include naturally low permeability common in shale formations or reduced permeability resulting from near wellbore damage during drilling activities[27]. The process of hydraulic fracturing

---

[25] A.R. Jennings Jr. and W.G. Darden. 1979. *Gas Well Stimulation in the Eastern United States*. SPE 7914.

[26] Marshall Miller & Associates.Inc. *Marcellus Shale*. Presented to: Fireside Pumpers in Bradford, PA.

[27] Veatch, Ralph W. Jr.; Zissis A. Moschovidis; and C. Robert Fast, *An Overview of Hydraulic Fracturing*. in Recent Advances in Hydraulic Fracturing, edited by John L Gidley, Stephen A. Holditch, Dale E. Nierode, and Ralph W, Veatch Jr. Society of Petroleum Engineers, Henry L Doherty Series Monograph Volume 12.

Copyright ©, ALL Consulting, 2008

Hydraulic Fracturing of the Marcellus Shale

has been used in the Appalachia area since the early 1960s[15]. While aspects of hydraulic fracturing have been changing (mostly changes in the additives and propping agents) and maturing, this technology is utilized by the industry to increase the necessary production to support an ever increasing demand for energy. Modern formation stimulation practices have become more complex and the process has developed into a sophisticated, engineered process in which production companies work to design a hydraulic fracturing treatment to emplace fracture networks in specific areas[28]. Hydraulic fracture treatments are not a haphazard process but are designed to specific conditions of the target formation (thickness of shale, rock fracturing characteristics, etc.) to optimize the development of a network of fractures. Understanding the in-situ conditions present in the reservoir and their dynamics is critical to successful stimulations. Hydraulic fracturing designs are constantly being refined to optimize fracture networking and to maximize gas production, while ensuring that fracture development is confined to the target formation for both horizontal and vertical shale gas wells[28].

Initial hydraulic fracture treatments for new plays are designed based on past experience and data collected on the specific character of the formation to be fractured. Engineers and Geologists evaluate data from geophysical logs and core samples and correlate data from other wells and other formations which may have similar characteristics. Data are often incorporated into one of the many computer models the natural gas industry has specifically developed for analysis and design of hydraulic fracturing.



*Fracture Design*

Fracture design can incorporate many state-of-the-art and sophisticated procedures to accomplish an effective, economic and highly successful fracture job. Some of these techniques include pre- and post-simulation, geologic studies using microseismic fracture mapping, and additional data collection that is used to refine future stimulations.

Figure 5: Example Output of a Hydraulic Fracture Stimulation Model.
*Source: Chesapeake Energy Corporation.*

A computer simulation of the geologic model can be used to evaluate hydraulic fracturing designs via a simulator[29]. Using a simulator can help to economically plan and design a simulation treatment helping to manage costs and effectiveness of the stimulation. A simulator is used to predicted three-dimensional fracture geometry (Figure 5), integrated acid fracturing solutions, or to reverse engineer design stages for specific characteristics[28]. Hydraulic fracturing modeling programs allow geologists and engineers to modify the design of a hydraulic fracture treatment and evaluate the height, length and orientation of potential fracture development prior to initiation of the actual fracture treatment (Figure 5)[30]. These simulators also allow the engineers to use the data gathered during a fracture stimulation to evaluate the effectiveness and success of the fracture job performed. From these data and analyses the hydraulic fracturing design engineers can better predict and perform more effective fracture jobs in the future.



Figure 6: Mapping of Microseismic Events
*Source: Oilfield Service Company*

---

[28] C. Boyer, J. Kieshchnick, and R Lewis. 2006. Producing Gas from Its Source. In Oilfield Review Autumn 2006. pgs 36-49.
[29] Meyer & Associates, Inc. *User's Guide for the Meyer Fracturing Simulators. Sixth Edition.*
[30] Schlumberger Fracturing Services PowerSTIM webpage. .www.slb.com. September 2, 2008.

Copyright ©, ALL Consulting, 2008           9

Hydraulic Fracturing of the Marcellus Shale

Modeling programs also allow designers to modify plans as additional data are collected relative to the specific target formation[29]. The use of models allows designers to make advances in the design of hydraulic fracturing operations to develop more efficient ways to create additional flow-paths to the wellbores.

Additional advances in hydraulic fracturing design target analysis of hydraulic fracture treatments through technologies such as microseismic fracture mapping (Figure 6) and tilt measurements[22]. These technologies can be used to define the success and orientation of the fractures created, thus providing the engineers the ability to manage the resource through intelligent placement of additional wells to take advantage of the natural conditions of the reservoir and expected fracture results in new wells.

The refinement of the hydraulic fracture process that occurs as operators collect more resource specific data, helps to create a more optimized fracture pattern within the target formation to increase gas production and ensure that the fractures do not grow out of the formation which may reduce production[32]. Not only is fracture growth outside of the target formation discouraged relative to the potential of reduced production by production of fluids from non-productive zones, creating fracture size outside of the productive interval is more expensive and less cost beneficial to the well's economics.

*Fracturing Fluids and Additives*

The current practice for hydraulic fracture treatments of gas shale reservoirs are commonly sequenced events which can require thousands of barrels of water-based fracturing fluids mixed with proppant materials to be pumped in a controlled and monitored manner into the target shale formation above fracture pressure[21].



Figure 7: Volumetric Composition of a Fracture Fluid
*Source: Compiled Data from Multiple Sources*

The fracturing fluids used for fracturing gas shale include a variety of additive components, each with an engineered purpose to facilitate the production of gas[31]. The fluids currently being used for fracture treatments in the Marcellus Shale are water based or mixed slickwater fracturing fluids. Slickwater fracturing fluids are water-based fluids mixed with friction reducing additives, primarily potassium chloride[15]. Water is the principal component of slickwater based fracturing fluids; however, other additives are included to perform specific actions, such as the addition of friction reducers which allows a fracturing fluid and proppant to be pumped to the target zone at a higher rate and reduced pressure than by using water alone. In addition to friction reducers, other additives include biocides to prevent micro-organism growth and reduce bio-fouling of fractures. Oxygen scavengers and other stabilizers which



Closed system hydraulic fracturing of a vertical well (PA)
*Source: ALL Consulting, September 2008*

---

[31] Schlumberger Fracturing Services Page of Schlumberger website, .www.slb.com. September 2, 2008.

Copyright ©, ALL Consulting, 2008

prevent corrosion of metal pipes, and acids which are used to remove drilling mud damage within the area near wellbore are also common either in fracturing fluids or as part of the fracture treatment[30].

Figure 7 is a pie chart showing a relational breakdown of the volumes used for additives in a hypothetical 2,500,000 gallon fracture treatment which would be a similar size to a Marcellus Shale horizontal well treatment. The chart shows water as the primary component in comparison to the other additives that comprise the total of all fracturing fluids used for an individual fracturing event (Figure 7). Table 2 provides a summary of the additives, their main compounds and some of the other common uses for the main compounds of the additives in day-to-day life. Table 2 reveals that while there are a variety of different additives used in fracturing fluids, these additives are items that people encounter in their daily lives. Because the make-up of each fracturing fluid varies to meet specific needs for a well, it is not possible to provide a single amount or volume present in each additive. However, based on the volume of water that is used in making a fracturing fluid as seen in Figure 7, the concentration of these additives is diluted considerably when considered on an overall volumetric basis. Service companies are also working to develop even more environmentally friendly fluids, including the use of hydrochloric acids which more easily break down into simple salts[32].

| Table 2: Fracturing Fluid Additives, Main Compounds and Common Uses. | | |
|---|---|---|
| **Additive Type** | **Main Compound** | **Common Use of Main Compound** |
| Acid | Hydrochloric acid or muriatic acid | Swimming pool chemical and cleaner |
| Biocide | Glutaraldehyde | Cold sterilant in health care industry |
| Breaker | Sodium Chloride | Food preservative |
| Corrosion inhibitor | N,n-dimethyl formamide | Used as a crystallization medium in Pharmaceutical Industry |
| Friction Reducer | Petroleum distillate | Cosmetics including hair, make-up, nail and skin products |
| Gel | Guar gum or hydroxyethyl cellulose | Thickener used in cosmetics, sauces and salad dressings. |
| Iron Control | 2-hydroxy-1,2,3-propanetricaboxylic acid | Citric Acid it is used to remove lime deposits Lemon Juice ~7% Citric Acid |
| Oxygen scavenger | Ammonium bisulfite | Used in cosmetics |
| Proppant | Silica, quartz sand | Play Sand |
| Scale inhibitor | Ethylene glycol | Automotive antifreeze and de-icing agent |

Table 3 presents an example of a single stage hydraulic fracture treatment. The data in Table 3 presents a generalized treatment design for what might be considered as a typical well completed in the Marcellus Shale – although practices are quickly advancing and can be substantially different than what is presented. The fracture treatment design shown in Table 3 is a single stage treatment that is typical of what may performed on a vertical Marcellus Shale well or a single stage on a horizontal well. This treatment differs from a horizontal well treatment primarily because it is only a single stage treatment. Horizontal wells in the Marcellus Shale may be treated using 4 or more stages to fracture the perforated interval of the well.

Figure 4 (above) presents a schematic representation of the differences between a four stage horizontal fracture treatment and a single stage vertical hydraulic fracturing treatment. While the sequence of events that occur within each stage of a fracture treatment are similar for both horizontal and vertical wells in the Marcellus Shale, horizontal well completions require multiple stages because it is not typically possible to maintain pressures sufficient to induce fractures over the complete length of a lateral leg that can be several thousand feet in length[33]. Further, staging fracture treatments allows the fracturing process to be performed in a much more controlled manner.

---

[32] Joel Parshall. *Barnett Shale Showcases Tight-gas Development*. Journal of Petroleum Technology.
[33] A.A. Ketter, J.L. Daniels, J.R. Heinze, and G. Waters. *A Field Study Optimizing Completion Strategies for Fracture Initiation in Barnett Shale Horizontal Wells*. SPE 103232.

Copyright ©, ALL Consulting, 2008                    11

Hydraulic Fracturing of the Marcellus Shale

| Stage | Volume (gallons) | Rate (gal/min) | Fluid Type | Proppant Size |
|-------|------------------|----------------|------------|---------------|
| Acid | 5,000 | 500 | 15% HCl acid | none |
| Pad | 100,000 | 3,000 | slickwater | none |
| Prop 0.1 | 50,000 | 3,000 | slickwater | 100 Mesh |
| Prop 0.3 | 50,000 | 3,000 | slickwater | 100 Mesh |
| Prop 0.5 | 40,000 | 3,000 | slickwater | 100 Mesh |
| Prop 0.75 | 40,000 | 3,000 | slickwater | 100 Mesh |
| Prop 1 | 40,000 | 3,000 | slickwater | 100 Mesh |
| Prop 2 | 30,000 | 3,000 | slickwater | 100 Mesh |
| Prop 3 | 30,000 | 3,000 | slickwater | 100 Mesh |
| Prop 0.25 | 20,000 | 3,000 | slickwater | 40/70 |
| Prop 0.5 | 20,000 | 3,000 | slickwater | 40/70 |
| Prop 0.75 | 20,000 | 3,000 | slickwater | 40/70 |
| Prop 1 | 20,000 | 3,000 | slickwater | 40/70 |
| Prop 2 | 20,000 | 3,000 | slickwater | 40/70 |
| Prop 3 | 20,000 | 3,000 | slickwater | 40/70 |
| Prop 4 | 10,000 | 3,000 | slickwater | 40/70 |
| Prop 5 | 10,000 | 3,000 | slickwater | 40/70 |
| Flush | 13,000 | 3,000 | slickwater | none |

**Table 3: Example of a Single Stage of a Sequenced Hydraulic Fracture Treatment**

Volumes are presented in gallons (42 gals = one barrel, 5,000 gals = ~120 bbls).
Rates are expressed in gals/minute, 42 gals/minute = 1 bbl/min, 500 gal/min = ~12 bbls/min.
Flush volumes are based on the total volume of open borehole, therefore as each stage is completed the volume of flush decreases as the volume of borehole is decreased.

Before operators or services companies perform a hydraulic fracture treatment of a well (vertical or horizontal), a series of tests are performed to ensure that the well, well equipment and hydraulic fracturing equipment is in proper working order and will hold up to the operational pressures of the fracture treatment. The testing of well equipment starts with the testing of casings and cements during the drilling and well construction process and the testing continues with pressure testing of hydraulic fracturing equipment throughout the fracture treatment process[15]. It should be noted that minimum construction requirements are typically required and are regulated by state oil and gas regulatory agencies to assure that a well is protective of resources and safe for operation.

After the testing of treatment equipment and well equipment has been completed, the hydraulic fracture treatment of a well can begin. The first sequence in the hydraulic fracture treatment stage is initiated with the pumping of an acid treatment. This acid treatment helps to clean the near wellbore area permeability which is lost as a result of the drilling process and drilling muds. The acid treatment can also initiate the fracturing process. The next sequence after the acid treatment is a slickwater pad. The slickwater pad is a volume of fracturing fluid large enough in volume to effectively fill the wellbore and open the formation area with slickwater for friction reduction purposes. The slickwater pad helps to facilitate the flow and placement of the proppant sequences further into the fracture network. After the slickwater pad is the first proppant sequence which combines a large volume of water with fine mesh sand at a low concentration of 0.1 pounds per gallon (lbm/gal). As shown in Table 3, each subsequent sequence in the stage increases the concentration of proppant. In the example single stage treatment, there are seven sequences of fine proppant in which the volume of fluids pumped are decreased incrementally from 50,000 gallons (gals) to 30,000 gals. This fine grained proppant is used because the finer particle size is capable of being carried deeper into the developed fractures[5]. The fine proppant stages are followed by eight stages of a more course proppant with volumes from 20,000 gals to 10,000 gals. After the completion of the final sequence of the coarse proppant, the well and equipment is flushed with a volume of freshwater sufficient to flush the excess proppants from the equipment and the wellbore.

Copyright ©, ALL Consulting, 2008

Hydraulic Fracturing of the Marcellus Shale

Hydraulic fracturing stimulations are monitored continuously by operators and the service companies to evaluate and document the events of the hydraulic fracturing treatments (see photo to right). The monitoring of the fracture treatment includes tracking every aspect of the process from the wellhead and downhole pressures, to pumping rates, density of the fracturing fluid slurry, tracking the volumes for each additive (from the acid, to the slickwater lubricant and friction reducer), tracking volumes of water, and ensuring that equipment is functioning properly. For the 12,000 bbl fracture treatment of a vertical Marcellus Shale well in Pennsylvania shown in the photo on page 11, there were between 30-35 people on site monitoring the entire stimulation.



Monitoring Fracturing Activities (Fayetteville Shale)
*Source: ALL Consulting, 2008*

## Marcellus Shale Development and the Environment

### *Horizontal and Vertical Well Completions*

Operators developing the Marcellus Shale are currently using both horizontal and vertical wells to extract the natural gas present in the shale. The low natural permeability of shale requires vertical wells to be developed at closer spacing intervals than conventional gas reservoirs to effectively manage the resource; this can result in initial development of vertical wells at spacing intervals of 40 acres or less to efficiently drain the gas resources from the tight shale reservoirs[32]. If the formation characteristics of Marcellus Shale allow for similar development patterns as seen in the Barnett Shale of the Ft. Worth Basin, shale gas operators who are able to successfully incorporate horizontal wells into the development of the Marcellus can reduce the number of wells needed to developing this resource. In addition, one can significantly reduce the overall number of well pads, access roads, pipeline routes, and production facilities required, thus minimizing forest fragmentation, impacts to public and overall environmental footprint. Devon Energy Corporation reports that incorporating the development of horizontal wells into the development of the Barnett Shale allowed the company to replace 3 or 4 vertical wells with a single horizontal[31]. While it is too early in the development of the Marcellus to determine the final spacing that operators will use to efficiently drain the gas resource over the lifetime of the play, assumptions can be made based on information from other gas shale basins that there will be less surface disturbance using horizontal well technology over vertical well technology.

Table 1 includes data on the well spacing for several shale gas basins including the Marcellus; and based on these data, assumptions can be made regarding the level of disturbance or number of wells that would be drilled using horizontal techniques in comparison to vertical well completions. The spacing for vertical well completions in the Marcellus are predicted to start on 40 acre spacing, while horizontal wells are predicted to be spaced at intervals closer to 160 acres. Applying these predicted well spacing units to a standard 640 acre (1 square mile) section of land a total of 16 vertical wells per square mile would be needed. Whereas the same square mile of resource could drilled and produced by as few as 4 or 6 horizontal wells from a single multi-well drilling pad. Development of horizontal wells and multi-well pads not only reduces surface area disturbances by reducing the total number of drilling and well pad sites, but also results in fewer roadways being needed and combined utility corridors.

### *Water Availability, Fluid Handling, and Disposal*

Copyright ©, ALL Consulting, 2008

Hydraulic Fracturing of the Marcellus Shale

The Appalachian area receives approximately 10 inches more precipitation per year than the average for the continental United States[34]. The average annual precipitation that falls in the Marcellus shale area is approximately 43 inches (Figure 8) and is evenly distributed over the course of the year. This precipitation over the Marcellus Shale Boundary production area (estimated to be between 54,000 square miles and 95,000 sq. mi) results in between 710,000,000,000 and 1,250,000,000,000 gallons of water input into the Marcellus Shale area annually from precipitation. In comparison to other shale plays, there is substantially more available water in this region than many others, making the area ideal for shale gas development.

### Groundwater

Geological materials can act as natural barriers that provide protection to groundwater zones. The stratigraphic column in Figure 3 for part of the Marcellus Shale play area shows that there are multiple siltstone and shale formations (the Hamilton Group and upper Devonian formations) overlying the Marcellus[6]. Shale is a natural barrier to the vertical migration of fluids and is documented as confining layers to vertical migration of oil and



Figure 8: Average Annual Rainfall in the Area of the Marcellus Shale Play
*Source: NOAA*

gas. The multiple shale zones present between the Marcellus Shale and shallow groundwater zones in much of the development area provides protection of groundwater resources from the hydraulic fracture treatments used to develop the Marcellus Shale. In some parts of the Marcellus Shale production area there is as much as 7,000 ft of sedimentary rock strata, including thousands of vertical feet of shale, between the Marcellus and the shallow groundwater system in parts of the Appalachian Basin. Additionally, each shale has a varied physical character such that the propagation of fractures across multiple shale zones is unlikely. In the designing of fracture treatments, it is beneficial to have a zone with differing physical properties outside the target zone as the interface of the target and bounding formation can act as a transition zone where the direction of fracture propagation can be altered[13]. This can be used to help manage fracture growth during the fracturing job.

In additional to the natural protection of groundwater provided by the distance between producing shale gas formations and potentially usable groundwater sources, there are protection factors built into state required well completion procedures. The casing and cementing programs that state oil and gas agencies require provide protection of groundwater resources. The casing and cement programs required by oil and gas agencies are designed to ensure that drilling and construction of a gas well protects potential sources of drinking water. Therefore, it is typical for state oil and gas agencies to require operators to include casing and cementing details for proposed well completions when the operator files an Application for Permit to Drill (APD). An APD typically details the size, weight, and pressure rating of each type of steel casing that shall will be installed during the completion of a well. APD's also include details pertaining to how steel casings are cemented into place to further prevent unintended flow of injected or produced fluids from occurring outside of the casing string.

Analysis of the protection provided by casings and cements was presented in a series of reports and papers prepared for the American Petroleum Institute[35] in the 1980s[36]. These investigations evaluated the level of

---

[34] National Oceanic and Atmospheric Administration. 2005 Annual Summary.
[35] Michie & Associates. 1988. *Oil and Gas Water Injection Well Corrosion.* prepared for the American Petroleum Institute. 32 pgs.

Copyright ©, ALL Consulting, 2008

Hydraulic Fracturing of the Marcellus Shale

corrosion that occurred in Class II injection wells. Class II injection wells are used for the routine injection of water associated with oil and gas production. The research resulted in the development of a method of calculating the likely probability (or risk) that fluids injected into Class II injection wells could result in a discharge of fluids that could reach an Underground Source of Drinking Water (USDW). This research started by evaluating data for oil and gas producing basins to determine if there were formations present that were reported to cause corrosion of well casings. The United States was divided into 50 basins, and each basin was ranked by its potential to have a casing leak resulting from such corrosion. The Appalachian Basin was ranked as having a minor potential for corrosion because there were only a minor number of instances of casing corrosion reported by oil and gas agencies.

The analysis performed was then limited to those basins in which there was a possibility of casing corrosion[36]. The Appalachian Basin was not analyzed in detail because the risk of casing failure was considered so low. For those basins where analyses were carried forward, risk probability analysis provided an upper bound for the probability of the fracturing fluids reaching an underground source of drinking water. Based on the values calculated, a modern horizontal well completion in which 100% of the USDWs are protected by properly installed surface casings (and for geologic basins with a reasonable likelihood of corrosion), the probability that fluids injected at depth could reach a USDW would be between $2 \times 10^{-5}$ (one well in 200,000) and $2 \times 10^{-8}$ (one well in 200,000,000) if these wells were operated as injection wells. This analysis does not account for the fact that gas shale wells are not operated as injection wells, a gas producing well is operated at a reduced pressure, would be exposed to lesser volumes of water flowing through the production tubing, and would only be exposed to the pumping of fluids into the well during fracture stimulations. Based on the analysis performed for API, the Appalachian Basin was not identified as having a reasonable likelihood of corrosion so the risk probability is likely lower than the value presented above.

The API study also included an analysis of wells which have been in operation for numerous years, accounting for what is likely many variations in applied technologies and regulations. As such, a calculation of the probability of fracture fluids reaching groundwater would have an even lower probability for newly constructed wells than the calculations conducted by API; perhaps by as much as two to three orders of magnitude. The API report also makes one other important conclusion relative to the probability of the contamination of a USDW when it stated that "…for injected water to reach a USDW in the 19 identified basins of concern [the 19 basins from the API study did not include the Appalachian Basin], a number of independent events must occur at the same time and go UNDETECTED (emphasis added) [by the Operator and regulators]. These events include simultaneous leaks in the [production] tubing, production casing, [intermediate casing], and the surface casing coupled with the unlikely occurrence of water moving long distances up the borehole past salt water aquifers to reach a USDW." As indicated by the analysis conducted by API, the potential for groundwater to be impacted by injection is low. It is expected that the probability for groundwater to be impacted by the pumping of fluids during hydraulic fracture treatments of newly installed wells when a high level of monitoring is being performed would be even less than the $2 \times 10^{-8}$ calculated in the API research.

## Surface Water

The potential for hydraulic fracturing and Marcellus Shale development activities to impact surface water has been reduced by operator and service company practices over recent years. The migration toward the use of water-based slickwater fracturing fluids has reduced the number of additives used in fracturing fluids in comparison to a cross-linked gel. Service companies who perform hydraulic fracturing stimulation work for operators are also working to design systems which allow fracturing fluids to be contained within closed systems which have been designed to keep all additives, fracturing fluids, mixing equipment and flow-back water within a storage tank, service truck or flowline[21].

---

[36] Michie & Associates. 1989. *Evaluation of Injection Well Risk Management Potential in the Williston Basin*. Prepared for Underground Injection Practices Council Research Foundation. 79 pgs.

Service companies and operators try to ensure that spills do not occur during a fracturing job; however, if a spill did occur operators act to contain the spill because fluids lost to a spill must be replaced and this increases the cost of the fracture treatment. Operators also have reporting responsibilities which are typically addressed in state oil and gas regulations which require operators to report all spills of additives or produced water to the state oil and gas agency, which can potentially cause delays while the agency assesses the size of the spill and completes the appropriate paperwork and other agency requirements related to documenting the spill. The operator also has the responsibility to remediate the spill including the removal and remediation of contaminated soils, which adds another cost to the project.

### *Disposal*

Operators developing the Marcellus Shale are evaluating safe and economic practices for the disposal of produced waters from the drilling and fracture treating of wells. Flow-back and produced water from hydraulic fracturing events are being contained in enclosed fluid capture systems to reduce their exposure to the environment and the potential for spills to occur. Operators are using a variety of containment tanks and storage trucks to reduce the potential for exposure of fluids to the environment during the transport of chemicals to disposal locations away from the well pad. Many Marcellus operators in states like New York are actively researching options where Class II disposal wells and municipal and industrial treatment facilities can be used to manage flow-back water.

The disposal of flow-back and produced water is evolving in the Appalachians. The volumes of water that are being produced as flow-back water is likely going to require a number of options for disposal that may include municipal or industrial water treatment facilities, Class II injection wells, and the recycling of flow-back water.

## Conclusions

The Marcellus Shale of the Appalachian Basin is a potential source for 50 Tcf or more of technically recoverable natural gas[20]. In a time when national energy dialogue has focused on finding alternatives to our reliance on foreign oil, the natural gas resources of the Marcellus Shale presents an opportunity to move toward a domestic source for some of our future energy needs. The history of shale gas development including the success of Barnett Shale has demonstrated the economic potential of shale gas through the use of horizontal well completions and hydraulic fracturing techniques.

Hydraulic fracturing and horizontal well completions appear to be effective for development of natural gas from the Marcellus Shale, although development is still early and there have only been a few wells drilled to-date. However, it is reasonable to conclude that horizontal well completions combined with hydraulic fracturing will provide the best opportunity for producing economic volumes of natural gas from the Marcellus Shale. Advances are being made in the design of hydraulic fracturing programs to develop more efficient ways to create additional flow-paths to the wellbores; and these advances are targeting extensive design and analysis of hydraulic fracture treatments including simulators, microseismic fracture mapping and tilt measurements[22]. The refinement of the hydraulic fracture process that will occur as operators collect more resource-specific data will help to create a more optimized fracture pattern within the target formation, resulting in increased gas production and ensuring that the fractures do not grow out of the formation. Production economics directly hinge on improving gas production by optimizing fracture development and ensuring the propagation of fractures is contained or limited to the target formation and ensuring fractures do not extend into surrounding wet formations.

The potential for impacts to surface water and groundwater from development of the Marcellus shale are expected to be minimal because of the regulatory requirements from state oil and gas agencies involved and the practices operators are implementing to ensure fluids are contained. In evaluating the risk of fluids migrating up to reach groundwater; the depositional environment of the Marcellus Shale that produced a thick blanket of Devonian-aged shales above the Marcellus should also be considered as this thick sequence of overlying shales act as series of confining layers to prevent the vertical migration of fracturing fluids toward groundwater systems.

Copyright ©, ALL Consulting, 2008



U.S. Energy Information
Administration

# Review of Emerging Resources: U.S. Shale Gas and Shale Oil Plays

July 2011



*Independent Statistics & Analysis*

www.eia.gov



U.S. Department of Energy

Washington, DC 20585

THIS PAGE INTENTIONALLY LEFT BLANK

The information presented in this overview is based on the report Review of Emerging Resources: U.S. Shale Gas and Shale Oil Plays, which was prepared by INTEK, Inc. for the U.S. Energy Information Administration (EIA), the statistical and analytical agency within the U.S. Department of Energy. The full report is attached. By law, EIA's data, analyses, and forecasts are independent of approval by any other officer or employee of the United States Government. The views in this report therefore should not be construed as representing those of the Department of Energy or other Federal agencies.

# Review of Emerging Resources: U.S. Shale Gas and Shale Oil Plays

## Background

The use of horizontal drilling in conjunction with hydraulic fracturing has greatly expanded the ability of producers to profitably recover natural gas and oil from low-permeability geologic plays—particularly, shale plays. Application of fracturing techniques to stimulate oil and gas production began to grow rapidly in the 1950s, although experimentation dates back to the 19th century. Starting in the mid-1970s, a partnership of private operators, the U.S. Department of Energy (DOE) and predecessor agencies, and the Gas Research Institute (GRI) endeavored to develop technologies for the commercial production of natural gas from the relatively shallow Devonian (Huron) shale in the eastern United States. This partnership helped foster technologies that eventually became crucial to the production of natural gas from shale rock, including horizontal wells, multi-stage fracturing, and slick-water fracturing.[1] Practical application of horizontal drilling to oil production began in the early 1980s, by which time the advent of improved downhole drilling motors and the invention of other necessary supporting equipment, materials, and technologies (particularly, downhole telemetry equipment) had brought some applications within the realm of commercial viability. [2]

The advent of large-scale shale gas production did not occur until Mitchell Energy and Development Corporation experimented during the 1980s and 1990s to make deep shale gas production a commercial reality in the Barnett Shale in North-Central Texas. As the success of Mitchell Energy and Development became apparent, other companies aggressively entered the play, so that by 2005, the Barnett Shale alone was producing nearly 0.5 trillion cubic feet of natural gas per year. As producers gained confidence in the ability to produce natural gas profitably in the Barnett Shale, with confirmation provided by results from the Fayetteville Shale in Arkansas, they began exploring other shale plays, including Haynesville, Marcellus, Woodford, Eagle Ford, and others.

Although the U.S. Energy Information Administration's (EIA) National Energy Modeling System (NEMS) and energy projections began representing shale gas resource development and production in the mid-1990s, only in the past 5 years has shale gas been recognized as a "game changer" for the U.S. natural gas market. The proliferation of activity into new shale plays has increased dry shale gas production in the United States from 1.0 trillion cubic feet in 2006 to 4.8 trillion cubic feet, or 23 percent of total U.S. dry natural gas production, in 2010. Wet shale gas reserves increased to about 60.64 trillion cubic feet by year-end 2009, when they comprised about 21 percent of overall U.S. natural gas reserves, now at the highest level since 1971.[3] Oil production from shale plays, notably the Bakken Shale in North Dakota and Montana, has also grown rapidly in recent years.

To gain a better understanding of the potential U.S. domestic shale gas and shale oil resources, EIA commissioned INTEK, Inc. to develop an assessment of onshore Lower 48 States technically recoverable shale gas and shale oil resources. This paper briefly describes the scope, methodology, and key results of the report and discusses the key assumptions that underlie the results. The full report prepared by INTEK is provided in Attachment A. The shale gas and shale oil resource assessment contained in the INTEK report and summarized here was incorporated into the Onshore Lower 48 Oil and Gas Supply Submodule (OLOGSS) within the Oil and Gas Supply Module (OGSM) of NEMS to project oil and natural gas production for the *Annual Energy Outlook 2011* (*AEO2011*). EIA also anticipates using the assessment to inform other analyses and to provide a starting point for future work.

## Scope and results

The INTEK shale resources report estimates shale gas and shale oil resources for the undeveloped portions of 20 shale plays that have been discovered (Table 1). Eight of those shale plays are subdivided into 2 or 3 areas, resulting in a total of 29 separate resource assessments. The total of 750 trillion cubic feet shown in Table 1 excludes three additional components of resources: proven reserves, inferred reserves in actively developed areas and un-discovered resources as estimated by the U.S. Geological Survey (USGS). The map in Figure 1 shows the location of the shale plays in the Lower 48 States.

Eighty-six percent of the total 750 trillion cubic feet of technically recoverable shale gas resources identified in Table 1 are located in the Northeast, Gulf Coast, and Southwest regions, which account for 63 percent, 13 percent, and 10 percent of the total, respectively. In the three regions, the largest shale gas plays are the Marcellus (410.3 trillion cubic feet, 55 percent of the total), Haynesville (74.7 trillion cubic feet, 10 percent of the total), and Barnett (43.4 trillion cubic feet, 6 percent of the total).

Table 1 also summarizes the INTEK shale report's assessment of technically recoverable shale oil resources, which amount to 23.9 billion barrels in the onshore Lower 48 States. The largest shale oil formation is the Monterey/Santos play in southern California, which is estimated to hold 15.4 billion barrels or 64 percent of the total shale oil resources shown in Table 1. The Monterey shale play is the primary source rock for the conventional oil reservoirs found in the Santa Maria and San Joaquin Basins in southern California. The next largest shale oil plays are the Bakken and Eagle Ford, which are assessed to hold approximately 3.6 billion barrels and 3.4 billion barrels of oil, respectively.

The 750 trillion cubic feet of shale gas resources in the INTEK shale report is a subset of the *AEO2011* onshore Lower 48 States natural gas shale technically recoverable resource estimate of 862 trillion cubic feet.  The *AEO2011* includes 35 trillion cubic feet of proved reserves reported to the Securities and Exchange Commission (SEC) and the EIA, 20 trillion cubic feet of inferred reserves not included in the INTEK shale report, and 56 trillion cubic feet of undiscovered resources estimated by the USGS.

**Table 1. INTEK estimates of undeveloped technically recoverable shale gas and shale oil resources remaining in discovered shale plays as of January 1, 2009**

| Onshore Lower-48 Oil and Gas Supply Submodule region | Shale play | Shale gas resources (trillion cubic feet) | Shale oil resources (billion barrels) |
|---|---|---|---|
| Northeast | Marcellus | 410 | -- |
| | Antrim | 20 | -- |
| | Devonian Low Thermal Maturity | 14 | |
| | New Albany | 11 | -- |
| | Greater Siltstone | 8 | |
| | Big Sandy | 7 | -- |
| | Cincinnati Arch* | 1 | -- |
| Subtotal | | 472 | -- |
| Percent of total | | 63% | -- |
| Gulf Coast | Haynesville | 75 | -- |
| | Eagle Ford | 21 | 3 |
| | Floyd-Neal & Conasauga | 4 | |
| Subtotal | | 100 | 3 |
| Percent of total | | 13% | 14% |
| Mid-Continent | Fayetteville | 32 | -- |
| | Woodford | 22 | -- |
| | Cana Woodford | 6 | -- |
| Subtotal | | 60 | -- |
| Percent of total | | 8% | -- |
| Southwest | Barnett | 43 | -- |
| | Barnett-Woodford | 32 | -- |
| | Avalon & Bone Springs | -- | 2 |
| Subtotal | | 76 | 2 |
| Percent of total | | 10% | 7% |
| Rocky Mountain | Mancos | 21 | -- |
| | Lewis | 12 | -- |
| | Williston-Shallow Niobraran* | 7 | -- |
| | Hilliard-Baxter-Mancos | 4 | -- |
| | Bakken | -- | 4 |
| Subtotal | | 43 | 4 |
| Percent of total | | 6% | 15% |
| West Coast | Monterey/Santos | -- | 15 |
| Subtotal | | -- | 15 |
| Percent of total | | -- | 64% |
| **Total onshore Lower-48 States** | | 750 | 24 |

*Note: From previous EIA estimates and thus not assessed in the INTEK shale report.
Subtotals and total may not equal sum of components due to independent rounding.

*Review of Emerging Resources: U.S. Shale Gas and Shale Oil Plays*

**Figure 1. Map of U.S. shale gas and shale oil plays (as of May 9, 2011)**



Source U.S. Energy Information Administration based on data from various published studies.
Update: May 9, 2011

## Methodology

The resource estimates shown in Table 1 were developed by INTEK from publicly available company data and commercial databases for wells and acreage currently in production. The estimates of technically recoverable resources shown in Table 1 are based on the area, well spacing, and average expected ultimate recovery (EUR) for each shale play or subportion of the play. An effective recovery factor has been applied which reflects: (a) a probability factor that takes into account the results from current shale gas activity as an indicator of how much is known or unknown about the shale play; (b) a recovery factor that takes into account prior experience in how production occurs, on average, given a range of factors (including mineralogy and geologic complexity) that affect the response of the geologic play to the application of best-practice shale gas recovery technology; and (c) resources in the play that have already been produced or added into proved reserves.

Estimates of technically recoverable shale gas resources are certain to change over time as new wells go into production and new technologies are developed. For example, the gas resource estimates in the INTEK shale report are predicated on the assumption that natural gas production rates for current wells covering only a limited portion of a play are representative of an entire play or play sub-area; however, across a single play or play sub-area there can be significant variations in depth, thickness, porosity, carbon content, pore pressure, clay content, thermal maturity, and water content. As a result, individual well production rates and recovery rates can vary by as much as a factor of 10.

There is considerable uncertainty regarding the ultimate size of technically recoverable shale gas and shale oil resources, including but are not limited to the following:

- Because most shale gas and shale oil wells are only a few years old, their long-term productivity is untested. Consequently, the long-term production profiles of shale wells and their estimated ultimate recovery of oil and natural gas are uncertain.

- In emerging shale plays, production has been confined largely to those areas known as "sweet spots" that have the highest known production rates for the play. If the production rates for the sweet spots are used to infer the productive potential of entire plays, their productive potential probably will be overstated. The INTEK shale report mitigates this problem by differentiating the productivity of a play's sweet spot from the productivity for rest of that play.[8]

- Many shale plays are so large (e.g., the Marcellus shale) that only portions have been extensively production tested.
- Technical advancements could lead to more productive and less costly well drilling and completion.
- Currently untested shale plays, such as thin-seam plays or untested portions of existing plays, could prove to be highly productive.

Estimating the technically recoverable oil and natural gas resource base in the United States is an evolving process. For shale gas and oil, the evolution of resource estimates is likely to continue for some time. The size of the technically recoverable oil and natural gas resource base in the United States becomes evident only as producers drill into geologic deposits with oil and natural gas potential and attempt to produce from them on a commercial basis. As producers find plays to be more or less bountiful than expected, resource estimates are adjusted to reflect that information. As time passes and our knowledge of the resource base and future technologies and management practices improves, estimates of the technically recoverable resource base will be refined. Consequently, the resource estimates in the current report will be modified over time as more wells are drilled and completed, technologies evolve, and the long-term performance of shale wells becomes better established.

The estimates of shale oil and shale gas resources provided here represent a reasonable estimate of the resource potential for those shale plays for which public information is currently available. The potential impacts of the current uncertainty regarding shale gas resources on projected natural gas supply, consumption, and prices are described in the *AEO2011* Issues in Focus article, "Prospects for shale gas."[9]

## Footnotes

[1] G.E. King, Apache Corporation, "Thirty Years of Gas Shale Fracturing: What Have We Learned?", presentation SPE 133456, SPE Annual Technical Conference and Exhibition (Florence, Italy, September 2010), www.spe.org/atce/2010/pages/schedule/tech_program/documents/spe1334561.pdf; and U.S. Department of Energy, "DOE's Early Investment in Shale Gas Technology Producing Results Today" (February 2, 2011), www.netl.doe.gov/publications/press/2011/11008-DOE_Shale_Gas_Research_Producing_R.html.

[2] U.S. Energy Information Administration, Drilling Sideways—A Review of Horizontal Well Technology and Its Domestic Application, DOE/EIA-TR-0565 (Washington, DC, April 1993), ftp://tonto.eia.doe.gov/pub/oil_gas/natural_gas/analysis_publications/drilling_sideways_well_technology/pdf/tr0565.pdf.

[3] U.S. Energy Information Administration, U.S. Crude Oil, Natural Gas, and Natural Gas Liquids Reserves (Washington, DC, November 30, 2010), www.eia.doe.gov/oil_gas/natural_gas/data_publications/crude_oil_natural_gas_reserves/cr.html.

[4] American Association of Petroleum Geologists, "Monterey Shale Gets New Look," Explorer, Vol. 31, No. 11 (No-vember 2010), http://www.aapg.org/explorer/2010/11nov/monterey1110.cfm.

[5] Additional information and comparisons of the SEC and EIA reserves can be found in the EIA report "U.S. Crude Oil, Natural Gas, and Natural Gas Liquids Proved Reserves, 2009" and a supplemental report "Top 100 Operators: Proved Reserves and Production, Operated vs Owned, 2009". http://www.eia.gov/oil_gas/natural_gas/data_publications/crude_oil_natural_gas_reserves/cr.html.

[6] HPDI, LLC production database, and Nehring Associates (NRG), Significant Oil and Gas Fields of the United States Database.

[7] The EURs presented in this report do not include natural gas plant liquids.

[8] In the INTEK report, the "sweet spot" portion of the formation is referred to as the "active area." The remaining portion of the formation that has seen little or no drilling activity is referred to as the "undeveloped area."

[9] U.S. Energy Information Administration, *Annual Energy Outlook 2011*, DOE/EIA-0383(2011) (Washington, DC, April 2011), "Prospects for shale gas," www.eia.gov/forecasts/aeo/IF_all.cfm#prospectshale.

THIS PAGE INTENTIONALLY LEFT BLANK

*Review of Emerging Resources: U.S. Shale Gas and Shale Oil Plays*

**Attachment A**



# INTEK, Inc.

## Review of Emerging Resources
### U.S. Shale Gas and Shale Oil Plays



**December 2010**

**Prepared for:**
**Office of Energy Analysis**
**Energy Information Administration**
**U.S. Department of Energy**



**Washington, D.C**

## Disclaimer

Neither the United States Government nor any agency thereof, nor any of their employees or contractors, makes any warranty, express or implied, or assumes any legal liability or responsibility for the accuracy, completeness, or usefulness of any information, apparatus, product, or process disclosed, or represents that its use would not infringe privately owned rights. *Reference herein to any specific commercial product, process or service by trade name, trademark, manufacture, or otherwise, does not constitute or imply its endorsement, recommendation, or favoring by the United States Government or any agency thereof.* The views and opinions expressed herein are not those of the United States Government or any agency thereof. The information in the technology profiles was provided by the host institutions; there has been no independent verification of any of this information. This work was completed under contract number DE-EI0000564 and task order number DE-DT0001772. Neither INTEK, Inc., nor the Department of Energy makes any representation as to the accuracy of the information.

# Table of Contents

Executive Summary ...................................................................................................... vii
I.    Introduction ....................................................................................................... 1
II.   Northeast Regional Summary ............................................................................ 3
      A.   Marcellus Shale Gas Play ...................................................................... 5
      B.   Devonian Big Sandy Shale Gas Play ...................................................... 9
      C.   Devonian Low Thermal Maturity & Greater Siltstone Shale Gas Plays ....... 13
      D.   New Albany Shale Gas Play .................................................................. 15
      E.   Antrim Shale Gas Play .......................................................................... 19
III.  Gulf Coast Regional Summary ......................................................................... 23
      A.   Haynesville Shale Gas Play ................................................................... 25
      B.   Eagle Ford Shale Gas & Oil Play .......................................................... 29
      C.   Floyd-Neal/Conasauga Shale Gas Play .................................................. 33
IV.   Mid-Continent Regional Summary ................................................................... 35
      A.   Fayetteville Shale Gas Play ................................................................... 37
      B.   Woodford Shale Gas Play ...................................................................... 41
      C.   Cana Woodford Shale Gas Play ............................................................. 45
V.    Southwest Regional Summary .......................................................................... 49
      A.   Barnett Shale Gas Play .......................................................................... 51
      B.   Barnett-Woodford Shale Gas Play .......................................................... 55
      C.   Avalon & Bone Springs Shale Oil Play .................................................. 57
VI.   Rocky Mountain Regional Summary ................................................................ 61
      A.   Hilliard-Baxter-Mancos Shale Gas Play ................................................ 63
      B.   Lewis Shale Gas Play ............................................................................ 65
      C.   Mancos Shale Gas Play .......................................................................... 67
      D.   Bakken Shale Oil Play ........................................................................... 69
VII.  West Coast Regional Summary ......................................................................... 73
      A.   Monterey/Santos Shale Oil Play ............................................................ 75
VIII. Appendix A – OLOGSS Shale Gas Data File .................................................... 79

# List of Figures

Figure i  U.S. Shale Gas and Shale Oil Plays……………….….……………….….……………vii

Figure ii Shale Gas Technically Recoverable Resources and Cumulative Production……….ix

Figure 1 Northeast Shale Gas and Shale Oil Resources ................................................................. 3

Figure 2 Marcellus Shale Play ....................................................................................................... 5

Figure 3 Marcellus Type Curve ...................................................................................................... 8

Figure 4 Devonian-Big Sandy Shale Play ...................................................................................... 9

Figure 5 Devonian Low Thermal Maturity and Greater Siltstone Shale Plays ............................ 13

Figure 6 New Albany Shale Play .................................................................................................. 15

Figure 7 Antrim Shale Play .......................................................................................................... 19

Figure 8 Gulf Coast Shale Gas and Shale Oil Resources ............................................................. 23

Figure 9 The Haynesville Shale Play ........................................................................................... 25

Figure 10 Haynesville Type Curve ............................................................................................... 27

Figure 11 Eagle Ford Shale Play .................................................................................................. 29

Figure 12 Eagle Ford Type Curve ................................................................................................ 32

Figure 13 Floyd-Neal/Conasauga Shale Play .............................................................................. 33

Figure 14 Mid-Continent Shale Gas and Shale Oil Resources ..................................................... 35

Figure 15 Fayetteville Shale Play ................................................................................................. 37

Figure 16 Fayetteville Type Curve ............................................................................................... 39

Figure 17 Woodford Shale Play .................................................................................................... 41

Figure 18 Cana Woodford Shale Play ........................................................................................... 45

Figure 19 Cana Woodford Type Curve ......................................................................................... 46

Figure 20 Southwest Shale Gas and Shale Oil Resources ............................................................ 49

Figure 21 The Barnett Shale Play ................................................................................................. 51

Figure 22 Barnett Type Curve ...................................................................................................... 53

Figure 23 Barnett-Woodford Shale Play ...................................................................................... 55

Figure 24 Avalon and Bone Springs Shale Play ........................................................................... 57

Figure 25 Rocky Mountains Shale Gas and Shale Oil Resources ................................................ 61

Figure 26 Hilliard-Baxter-Mancos Shale Play ............................................................................. 63

Figure 27 Lewis Shale Play .......................................................................................................... 65

Figure 28 The Mancos Shale Play ................................................................................................ 67

Figure 29 Bakken Shale Play ........................................................................................................ 69

Figure 30 Bakken Shale Type Curve ............................................................................................ 71

Figure 31 West Coast Shale Gas and Shale Oil Resources .......................................................... 73

Figure 32 Monterey/Santos Shale Play ........................................................................................ 75

Figure 33 Monterey/Santos Type Curve ....................................................................................... 77

# List of Tables

Table i U.S Shale Gas Unproved Discovered Technically Recoverable Resources Summary…………………………………………………………..…………viii

Table ii U.S Technically Recoverable Shale Oil Resources Summary…………………………………………………………………………x

Table 1 State Distribution of the Marcellus Shale Play ............................................5

Table 2 Marcellus Average EUR and Area ..............................................................6

Table 3 Average General Properties for the Marcellus Shale Play ...........................6

Table 4 Marcellus Lease Holders ............................................................................7

Table 5 Devonian Big Sandy Average EUR and Area............................................10

Table 6 Average General Properties for the Devonian Big Sandy Shale Play.........10

Table 7 Devonian-Big Sandy Lease Holders .........................................................10

Table 8 Devonian Low Thermal Maturity and Greater Siltstone Average EUR and Area......14

Table 9 Average General Properties for the Devonian-Low Thermal Maturity and Greater Siltstone Shale Plays..............................................................14

Table 10 New Albany Average EUR and Area .......................................................16

Table 11 Average General Properties for the New Albany Shale Play.....................16

Table 12 New Albany Lease Holders......................................................................16

Table 13 Average Antrim EUR and Area ...............................................................20

Table 14 Average General Properties for the Antrim Shale Play ............................20

Table 15 Antrim Lease Holders .............................................................................20

Table 16 Haynesville Average EUR and Area .......................................................26

Table 17 Average General Properties for the Haynesville Shale Play .....................26

Table 18 Haynesville Lease Holders ......................................................................26

Table 19 Eagle Ford Average EUR and Areas .......................................................30

Table 20 Average General Properties for the Eagle Ford Shale Play ......................30

Table 21 Eagle Ford Dry Gas Zone Lease Holders................................................30

Table 22 Eagle Ford Condensate Zone Lease Holders ...........................................31

Table 23 Eagle Ford Oil Zone Lease Holders ........................................................31

Table 24 Floyd-Neal/Conasauga Average EUR and Area ......................................33

Table 25 Average General Properties for the Floyd-Neal/Conasauga Shale Play .................34

Table 26 Floyd-Neal/Conasauga Lease Holders ....................................................34

Table 27 Fayetteville Average EUR and Area ........................................................37

Table 28 Average General Properties for the Fayetteville Shale Play .....................38

Table 29 Fayetteville Lease Holders ......................................................................38

Table 30 Woodford Average EUR and Area ..........................................................41

Table 31 Average General Properties for the Woodford Shale Play ........................42

Table 32 Woodford Lease Holders in the Arkoma and Ardmore Basins.................42

Table 33 Cana Woodford Average EUR and Area .................................................45

Table 34  Average General Properties for the Cana Woodford Shale Play .............45

Table 35 Cana Woodford Lease Holders ................................................................46

Table 36 Average Barnett EUR and Area ..............................................................52

Table 37 Average General Properties for the Barnett Shale Play ...........................52

Table 38 Barnett Core/Tier 1 Lease Holders..........................................................52

Table 39 Barnett South/Western Counties Lease Holders ................................................. 52
Table 40 Barnett-Woodford Average EUR and Area ....................................................... 55
Table 41 Average General Properties for the Woodford Shale Play ................................ 56
Table 42 Barnett-Woodford Lease Holders ..................................................................... 56
Table 43 Avalon and Bone Springs EUR and Area ......................................................... 58
Table 44 General Properties for the Avalon/Bone Springs Shale Play ........................... 58
Table 45 Avalon and Bone Springs Lease Holders .......................................................... 58
Table 46 Hilliard-Baxter-Mancos Average EUR and Area ............................................. 63
Table 47 Average General Properties for the Hilliard-Baxter-Mancos Shale Play ......... 64
Table 48 Hilliard-Baxter-Mancos Lease Holders ............................................................ 64
Table 49 Lewis Average EUR and Area ........................................................................... 65
Table 50 Average General Properties for the Lewis Shale Play ...................................... 66
Table 51 Mancos Average EUR and Area ........................................................................ 67
Table 52 Average General Properties for the Mancos Shale Play ................................... 68
Table 53 Mancos Lease Holders ....................................................................................... 68
Table 54 Bakken Average EUR and Area ........................................................................ 69
Table 55 Average General Properties for the Bakken Shale Play .................................... 70
Table 56 Bakken Lease Holders ....................................................................................... 70
Table 57 Monterey/Santos Average EUR and Area ......................................................... 75
Table 58 Average General Properties for the Monterey/Santos Shale Play ..................... 76
Table 59 Monterey/Santos Lease Holders ........................................................................ 76

Review of Emerging U.S. Shale Gas and Shale Oil Plays

## List of Abbreviations & Acronyms

| Abbreviation/ Acronym | Full Text |
| --- | --- |
| Bbbl | Billion Barrels |
| bbl | Barrel |
| BBO | Billion Barrels of Oil |
| BBOE | Billion Barrels of Oil Equivalent |
| Bcf | Billion Cubic Feet |
| Bcfe | Billion Cubic Feet of Equivalent |
| BOE | Barrels of Oil Equivalent |
| DOE | Department of Energy |
| EIA | Energy Information Administration |
| EUR | Estimated Ultimate Recovery |
| MBOE | Thousand Barrels of Oil Equivalent |
| MMBOE | Million Barrels of Oil Equivalent |
| Tcf | Trillion Cubic Feet |
| Tcfe | Trillion Cubic Feet Equivalent |
| TRR | Technically Recoverable Resources |
| USGS | United States Geological Survey |

## Executive Summary

The Energy Information Administration's (EIA) 2010 Annual Energy Outlook (AEO2010) discussed the growing importance of shale gas as a component of natural gas production. "…[T]he biggest questions are the size of the shale gas resource base (which by most estimates is vast), the price level required to sustain its development, and whether there are technical or environmental factors that might dampen its development". EIA's AEO2010 reference case estimate for the shale gas resource base was 347 trillion cubic feet (Tcf).

In recognition of the increasing contribution of shale gas production to the United States, in late 2010, a study was undertaken to review and update the resource base estimates for the U.S. shale gas resources as well as emerging shale oil plays. These plays are illustrated in Figure i.

**Figure i U.S. Shale Gas and Shale Oil Plays**



### Shale Gas

Significant activities are underway in the United States to explore, develop, and produce America's shale gas and oil plays. The shale gas plays contain "fine grained, organic rich, sedimentary rocks. The shales are both the source of and the reservoir for natural gas" and oil. They are also defined by the "extremely small pore sizes [which] make them relatively impermeable to gas flow, unless natural or artificial fractures occur". A summary of the

**Executive Summary**

unproved discovered technically recoverable resources (TRR) is provided in the following Table.

Table i U.S. Shale Gas Unproved Discovered Technically Recoverable Resources Summary

| Play | Technically Recoverable Resource | | Area (sq. miles) | | Average EUR | |
|---|---|---|---|---|---|---|
| | Gas (Tcf) | Oil (BBO) | Leased | Unleased | Gas (Bcf/well) | Oil (MBO/well) |
| Marcellus | 410.34 | ... | 10,622 | 84,271 | 1.18 | ... |
| Big Sandy | 7.40 | ... | 8,675 | 1,994 | 0.33 | ... |
| Low Thermal Maturity | 13.53 | ... | 45,844 | | 0.30 | ... |
| Greater Siltstone | 8.46 | ... | 22,914 | | 0.19 | ... |
| New Albany | 10.95 | ... | 1,600 | 41,900 | 1.10 | ... |
| Antrim | 19.93 | ... | 12,000 | | 0.28 | ... |
| Cincinnati Arch* | 1.44 | ... | NA | | 0.12 | ... |
| **Total Northeast** | **472.05** | **...** | **101,655** | **128,272** | **0.74** | **...** |
| Haynesville | 74.71 | ... | 3,574 | 5,426 | 3.57 | ... |
| Eagle Ford | 20.81 | ... | 1,090 | | 5.00 | ... |
| Floyd-Neal & Conasauga | 4.37 | ... | 2,429 | | 0.90 | ... |
| **Total Gulf Coast** | **99.99** | **...** | **7,093** | **5,426** | **2.99** | **...** |
| Fayetteville | 31.96 | ... | 9,000 | | 2.07 | ... |
| Woodford | 22.21 | ... | 4,700 | | 2.98 | ... |
| Cana Woodford | 5.72 | ... | 688 | | 5.20 | ... |
| **Total Mid-Continent** | **59.88** | **...** | **14,388** | | **2.45** | **...** |
| Barnett | 43.38 | ... | 4,075 | 2,383 | 1.42 | ... |
| Barnett Woodford | 32.15 | ... | 2,691 | | 3.07 | ... |
| **Total Southwest** | **75.52** | **...** | **6,766** | **2,383** | **1.85** | **...** |
| Hilliard-Baxter-Mancos | 3.77 | ... | 16,416 | | 0.18 | ... |
| Lewis | 11.63 | ... | 7,506 | | 1.30 | ... |
| Williston-Shallow Niobraran* | 6.61 | ... | NA | | 0.45 | ... |
| Mancos | 21.02 | ... | 6,589 | | 1.00 | ... |
| **Total Rocky Mountain** | **43.03** | **...** | **30,511** | | **0.69** | **...** |
| **Total Lower 48 U.S.** | **750.38** | **...** | **160,413** | **136,081** | **1.02** | **...** |

*Cincinnati Arch and Williston-Shallow Niobraran were not assessed in this report.

The 750 trillion cubic feet of shale gas resources in the INTEK shale report is a subset of the *AEO2011* onshore lower 48 natural gas shale resource estimate of 862 trillion cubic feet. The AEO2011 includes 35 trillion cubic feet of "proved reserves" reported to the Securities and Exchange Commission (SEC) and the EIA[1], 20 trillion cubic feet of inferred reserves not

---

[1] Additional information and comparisons of the SEC and EIA reserves can be found in the EIA report "U.S. Crude Oil, Natural Gas, and Natural Gas Liquids Proved Reserves, 2009"

Review of Emerging U.S. Shale Gas and Shale Oil Plays

included in the INTEK shale report, and 56 trillion cubic feet of undiscovered resources estimated by the USGS. Of that amount, 41.4 trillion cubic feet is located in Southern California and 14.6 trillion cubic feet in the Rocky Mountain region. The play average expected ultimate recoveries (EUR) are between 0.12 billion cubic feet (Bcf) and 3.6 Bcf per well. The largest concentrations of shale gas are contained in the Northeast region which contains the Marcellus Shale and the Gulf Coast region containing the Haynesville Shale.

Figure ii shows the technically recoverable shale gas resource and the fraction which has already been produced. The figure shows that, excluding the Appalachian plays and some of the newly developing plays, between one and three percent has been produced. The size of the remaining resource underscores the importance that shale gas can play in U.S. natural gas production as well as the necessity of this resource review.

**Figure ii Shale Gas Technically Recoverable Resources and Cumulative Production[2]**



In order to realize this production, substantial drilling is required. As the effective lifespan of the shale gas wells is relatively short, new wells are required to maintain current production levels as well as increase them.

---

and a supplemental report "Top 100 Operators: Proved Reserves and Production, Operated vs Owned, 2009".
http://www.eia.gov/oil_gas/natural_gas/data_publications/crude_oil_natural_gas_reserves/cr.html
[2] Due to data availability, the Appalachian plays not included in Figure ii are the Marcellus, Devonian Big Sandy, Devonian Low Thermal Maturity, Devonian Greater Siltstone and Cincinnati Arch.

Review of Emerging U.S. Shale Gas and Shale Oil Plays

**Executive Summary**

## Shale Oil

In addition to the gas produced in the shale plays, condensate and plant liquids may also be produced. Four shale oil plays were also identified and reviewed during this analysis. As seen in the following Table, the majority of these resources are located in the Monterey/Santos shales currently under development by OXY. The technically recoverable resource for these four plays is approximately 24 Billion barrels of oil (BBO) across nearly 13,000 square miles. The average EUR for the plays is approximately 460 thousand barrels of oil (MBO).

**Table ii U.S. Technically Recoverable Shale Oil Resources Summary**

| Play | Technically Recoverable Resource | | Area (sq. miles) | | Average EUR | |
|------|------------|------------|--------|----------|---------------|--------------|
| | Gas (Tcf) | Oil (BBO) | Leased | Unleased | Gas (Bcf/ well) | Oil (MBO/ well) |
| Eagle Ford | … | 3.35 | 3,323 | | … | 300 |
| **Total Gulf Coast** | **…** | **3.35** | **3,323** | | **…** | **300** |
| Avalon & Bone Springs | … | 1.58 | 1,313 | | … | 300 |
| **Total Southwest** | **…** | **1.58** | **1,313** | | **…** | **300** |
| Bakken | … | 3.59 | 6,522 | | … | 550 |
| **Total Rocky Mountain** | **…** | **3.59** | **6,522** | | **…** | **550** |
| Monterey/Santos | … | 15.42 | 1,752 | | … | 550 |
| **Total West Coast** | **…** | **15.42** | **1,752** | | **…** | **550** |
| **Total Lower 48 U.S.** | **…** | **23.94** | **12,910** | | **…** | **460** |

## References

1. Department of Energy, Energy Information Administration. *Annual Energy Outlook 2010.* April 2010.
2. Department of Energy, Energy Information Administration. Modified by INTEK Inc.
3. Congressional Research Services. *Unconventional Gas Shales: Development, Technology, and Policy Issues.* October 2009.
4. NRG & Associates and HPDI Data.

**Introduction**

# I. Introduction

This document provides a brief description of shale gas and shale oil plays in the United States organized by chapters based on the oil and gas supply module regions. The regions included in this document are the Northeast, Gulf Coast, Mid-Continent, Southwest, Rocky Mountain, and West Coast Region. Each play description includes an estimate of the resource at the well level and across the play, description of key properties, a list of the companies active in the play as well as their activities, a comparison against United States Geological Survey (USGS) estimates, and other information. This information has been collected from publicly available data sources including USGS, the Department of Energy (DOE), individual exploration and development companies, journal articles, and other data sources.

The resource estimates in the following play descriptions were developed using a wide variety of data sources. These sources include institutes such as the USGS, professional associations such as the American Association of Petroleum Geologists (AAPG), commercial databases from the HPDI and Nehring Associates (NRG), integrated oil and gas companies, and service companies. In addition to these public sources of data, proprietary data and insights gleamed from conversations with experts were used to augment the estimates of resource and other parameters. The acreage which is reported includes sections which are currently being produced. The Technically Recoverable Resources (TRR) provided in Table i and in the following play descriptions are a function of the area, the well spacing, and the play average EUR. An effective recovery factor has been applied which reflects (a) a probability factor which takes into account the results from current shale gas activity as an indicator of how much is known or unknown about the shale formation, (b) a recovery factor which takes into account prior experience in how production occurs, on average, given a range of factors including mineralogy and geologic complexity that affect the response of the geologic formation to the application of best practice shale gas recovery technology, and (c) the removal of the resources in the play that have already been produced or added into proved reserves. The EURs presented in this report do not include natural gas plant liquids.

The Northeast Region includes the Marcellus, Devonian Big Sandy, Devonian Low Thermal Maturity, Devonian Greater Siltstone, New Albany and the Antrim shale gas plays.

- The Gulf Coast Region includes the Haynesville, Eagle Ford and the Floyd-Neal/Conasauga shale gas and shale oil plays.

- The Mid-Continent Region includes the Fayetteville, Woodford and the Cana Woodford shale gas plays.

- The Southwest Region includes the Barnett, Barnett-Woodford, and the Avalon and Bone Springs shale gas and shale oil plays.

- The Rocky Mountain Region includes the Hilliard-Baxter-Mancos, Lewis, Mancos and the Bakken shale gas and shale oil plays.

- The West Coast Region includes the Monterey/Santos shale oil play.

Review of Emerging U.S. Shale Gas and Shale Oil Plays

**Introduction**

**Northeast Region**

## II.  Northeast Regional Summary

The Northeast region includes shale gas plays located in the Appalachian, Illinois and Michigan Basins.  The Appalachian Basin includes the Marcellus, Devonian Big Sandy, Devonian Low Thermal Maturity, and the Devonian Greater Siltstone shale plays (Figure 1).  New Albany is located in the Illinois Basin and the Antrim shale play is located within the Michigan Basin.  The shale plays in the Northeast region cover a total estimated area of 229,927 square miles with an average EUR between 0.3 and 2.3 Bcf per well and approximately 472 Tcf of technically recoverable gas.

**Figure 1 Northeast Shale Gas and Shale Oil Resources**



**Northeast Region**

## A.  Marcellus Shale Gas Play

**Play Description**

The Marcellus shale gas play is located in the Appalachian Basin across the Eastern Part of the United States.  The states which contain the shale, according to the USGS, are provided in Table 1.

**Table 1 State Distribution of the Marcellus Shale Play**

| State | Areal % of Marcellus |
|-------|---------------------|
| Maryland | 1.09 |
| New York | 20.06 |
| Ohio | 18.19 |
| Pennsylvania | 35.35 |
| Virginia | 3.85 |
| West Virginia | 21.33 |

For purposes of EIA's modeling, the Marcellus was divided into two main units: the Active Area and the Undeveloped Area.  The active area, defined using the acreage reportedly under lease by the companies, is primarily located within West Virginia and Pennsylvania.  This area is 10,622 square miles.  The remainder of the area, 84,271 square miles corresponds to the area which has not been leased by the companies.  The areal extent of the Marcellus shale is provided in Figure 2.

**Figure 2 Marcellus Shale Play**

**Marcellus**

## Resource Estimate

As estimated by the USGS, the Marcellus shale has a total area of 95,000 square miles. The depth of the shale ranges between 4,000 and 8,500 with a thickness between 50 to 200 feet. The average EUR for both the active and undeveloped areas is 2.325 Bcfe per well. The active area, as detailed in Table 2, is 10,622 square miles and has a total TRR of 177.9 Tcf, which is equivalent to 3.5 Bcf per well. At the well level, the overwhelming majority of reported EURs range between 3 and 4 Bcf. Due to a development moratorium in New York, access to resource, lack of current production, and other issues in the undeveloped section of the Marcellus, the number of drilling locations and the total TRR is uncertain. However, the well level EUR has been estimated at 1.15 Bcf.

**Table 2 Marcellus Average EUR and Area**

|  | Active | Undeveloped |
|---|---|---|
| Area (sq. miles) | 10,622 | 84,271 |
| EUR (Bcfe/ well) | 3.5 | 1.15 |
| Well Spacing (wells/ sq. mile) | 8 | 8 |
| TRR (Tcf) | 177.90 | 232.44 |

Other average properties were estimated for the Marcellus shale play. These include the depth, thickness, porosity, and total organic content for the shale. The values are provided in Table 3.

**Table 3 Average General Properties for the Marcellus Shale Play**

| | |
|---|---|
| Depth (ft) | 6,750 |
| Thickness (ft) | 125 |
| Porosity (%) | 8 |
| Total Organic Content (% wt) | 12 |

## Active Companies

In 2008, there were 19 companies holding leases in the Marcellus shale. These companies, along with their net acreage, are provided in Table 4.

**Marcellus**

**Table 4 Marcellus Lease Holders**

| Company | Net Acreage |
|---|---|
| Anadarko Petroleum | 275,000 |
| Atlas Energy Resources LLC | 483,000 |
| Cabot Oil & Gas | 332,919 |
| Carrizo Oil & Gas | 57,000 |
| Chesapeake | 1,200,000 |
| CNX Gas | 161,000 |
| Dominion | 800,000 |
| Equitable Resources | 400,000 |
| EXCO Resources | 393,000 |
| Penn-Virginia | 15,000 |
| Petroleum Development | 35,000 |
| Range Resources | 1,400,000 |
| Rex Energy | 57,000 |
| Quest energy Partners L.P. | 119,000 |
| Southwestern Energy | 100,000 |
| Talisman | 640,000 |
| Ultra Petroleum | 140,100 |
| Unit Corp. | 38,000 |
| XTO Energy | 152,000 |

Based upon these lease holdings, the total active area is calculated at 6,798,019 net acres (10,622 square miles).

**Well Costs**

In 2008, Deutsche Bank reported the average well cost as between $3 and $4 million dollars. This is approximately the level of costs reported in 2010 by the majority of the companies. The highest reported cost is Rex Energy – between $4.5 and $4.7 million dollars.

**USGS Comparison**

In 2002, the USGS conducted an assessment of the Marcellus shale.  They estimated that the total undiscovered resource is between 822 and 3,668 Bcf, with a mean of 1,925 Bcf.

**Representative Type Curve**

Figure 3 provides a representative type curve for a horizontal well in the Marcellus shale. According to Chesapeake Energy, the decline rate is initially 75% and bottoms out at 6% in the later years.

**Marcellus**

**Figure 3 Marcellus Type Curve**



### References

1. USGS. *Assessment of Undiscovered Oil and Gas Resources of the Appalachian Basin Province.* 2002.
2. Deutsche Bank. *From Shale to Shining Shale.* July 2008.
3. Wrightstone Gregory, Texas Keystone, Inc. *Marcellus Shale – Geologic Controls on Production. Presented at the Winter Meeting of the IOGAWV.* February 2009.
4. U.S. Department of Energy. *Modern Shale Gas Development in the United States: A Primer.* April 2009.
5. Carrizo Oil & Gas. *Presented at the Howard Weil 38th Annual Energy Conference.* March 24, 2010.
6. XTO Energy. *Barnett vs. Marcellus – A Comparison of Two Shale Gas Giants.* June 2009.
7. Whitelight Development Inc. *The Marcellus Shale Great Expedition.*
8. Chesapeake Energy. *Marcellus Shale Overview.* 2008.
9. Chesapeake Energy. *August 2010 Investor Presentation.* August 2010.
10. EQT. *Analyst Presentation.* March 2009.
11. ALL Consulting. *Evaluating the Environmental Implications of Hydraulic Fracturing in Shale Gas Reservoirs.* Presented at the International Petroleum & BioFuels Environmental Conference, Albuquerque, New Mexico. November 2008.
12. Range Resources. *March Company Presentation.* March 2009.
13. Range Resources. *The Marcellus Shale.* 2007.
14. TransEnergy Incorporated. 2008.
15. Phasis Consulting. *US Shale Gas Brief.* September 2008.
16. Baylor, Brandon. *Marcellus Shale Decline Analysis.* 2010.
17. McKinsey & Company. *The Surge of North American Unconventional Gas and Its Impact.* Presented at the Conference on Energy in the USA, Paris. June 2010.

## B.  Devonian Big Sandy Shale Gas Play

**Play Description**

The Devonian Big Sandy shale gas play includes the Huron, Cleveland and Rhinestreet formations located within the Appalachian Basin in Kentucky, Virginia and West Virginia. For modeling purposes, the Big Sandy was divided into two main units: the Developed Area and Undeveloped Area.  The location of the Big Sandy shale play is provided in Figure 4.

**Figure 4 Devonian-Big Sandy Shale Play**



**Resource Estimate**

The USGS estimated a total area for the Big Sandy shale play as 10,669 square miles (6,828,000 acres).  The shale play has an average EUR of 0.325 Bcf per well and approximately 7.4 Tcf of technically recoverable gas. Big Sandy has a total active area of approximately 8,675 square miles and an undeveloped area of 1,994 square miles with a well spacing of 80 acres per well.  According to Deutsche Bank, Big Sandy ranges from 1,600 to 6,000 feet deep and has a thickness of 50 to 300 feet.  These values are provided in Tables 5 and 6.

Review of Emerging U.S. Shale Gas and Shale Oil Plays

**Devonian Big Sandy**

**Table 5 Devonian Big Sandy Average EUR and Area**

|  | Active | Undeveloped |
|---|---|---|
| Area (sq. miles) | 8,675 | 1,994 |
| EUR (Bcf/ well) | 0.325 | 0.325 |
| Well Spacing (wells/ sq. mile) | 8 | 8 |
| TRR (Tcf) | 6.47 | 0.92 |

Other average properties were estimated for the Big Sandy shale play.  These include the depth, thickness, porosity, and total organic content for the shale.  The values are provided in Table 6.

**Table 6 Average General Properties for the Devonian Big Sandy Shale Play**

| Depth (ft) | 3,800 |
|---|---|
| Thickness (ft) | 175 |
| Porosity (%) | 10 |
| Total Organic Content (% wt) | 3.75 |

**Active Companies**

In 2008, there were 10 companies holding leases in Big Sandy.  These companies, along with their net acreage, as reported by Deutsche Bank, are listed in Table 7.

**Table 7 Devonian-Big Sandy Lease Holders**

| Company | Net Acreage |
|---|---|
| Cabot Oil & Gas | 962,471 |
| Chesapeake Energy | 500,000 |
| CNX Gas | 193,000 |
| Dominion | 300,000 |
| Equitable Resources | 2,900,000 |
| EXCO Resources | 117,000 |
| GeoMet | 52,000 |
| NGAS Resources | 275,000 |
| Penn-Virginia | 87,500 |
| Range Resources | 165,000 |

Based upon these lease holdings, the total active area is calculated at 5,551,971 net acres (8,675 square miles).

**Well Costs**

In 2008, Deutsche Bank reported a well cost ranging from $0.5 to $3.0 million dollars and as of 2009, Equitable Resources reports an average well cost of approximately $1.2 million dollars.

Review of Emerging U.S. Shale Gas and Shale Oil Plays

**Devonian Big Sandy**

**USGS Comparison**

In 2002, the USGS conducted an assessment of Devonian Big Sandy in the Appalachian Basin. They estimated that the total undiscovered resource is between 3,877 and 9,562 Bcf, with a mean of 6,323 Bcf.

**References**

1. Deutsche Bank. *From Shale to Shining Shale.* July 2008.
2. USGS. *Assessment of the Undiscovered Oil and Gas Resources of the Appalachian Basin Province.* 2002.
3. USGS. *U.S. Geological Survey Open-File Report 2005-1268.* 2005.
4. Range Resources. *March Company Presentation.* March 2009.
5. Wrightstone Gregory, Texas Keystone, Inc. *Marcellus Shale – Geologic Controls on Production. Presented* at the Winter Meeting of the IOGAWV. February 2009.
6. Equitable Resources. *Analyst Presentation.* March 2009.

Review of Emerging U.S. Shale Gas and Shale Oil Plays

**Devonian Big Sandy**

## C.  Devonian Low Thermal Maturity & Greater Siltstone Shale Gas Plays

**Play Description**

The Devonian Low Thermal Maturity shale gas play, also know as the Northwestern Ohio shale, is located within the Appalachian Basin in Kentucky, New York, Ohio, Pennsylvania, Tennessee and West Virginia.  The location of the Greater Siltstone is also within the Appalachian Basin in New York, Ohio, Pennsylvania, Virginia and West Virginia.  The location of the Low Thermal Maturity and Greater Siltstone shale plays are provided in Figure 5.

**Figure 5 Devonian Low Thermal Maturity and Greater Siltstone Shale Plays**



**Resource Estimate**

The USGS estimated a total area for the Low Thermal Maturity as 45,844 square miles (29,340,000 acres) and a total area of 22,914 square miles (14,665,000 acres) for the Greater Siltstone shale play.  The Devonian Low Thermal Maturity has an average EUR of 0.3 Bcf per well and approximately 13.5 Tcf of technically recoverable gas.  The Devonian Greater Siltstone has an average EUR of 0.19 Bcf per well and approximately 8.5 Tcf of technically

---

Devonian Low Thermal Maturity & Greater Siltstone

**Devonian Low Thermal Maturity & Greater Siltstone**

recoverable gas. These values are provided in Table 8 along with the average EURs and well spacing.

**Table 8 Devonian Low Thermal Maturity and Greater Siltstone Average EUR and Area**

|  | **Low Thermal Maturity** | **Greater Siltstone** |
|---|---|---|
| Area (sq. miles) | 45,844 | 22,914 |
| EUR (Bcf/ well) | 0.2942 | 0.193 |
| Well Spacing (wells/ sq. mile) | 7 | 10.7 |
| TRR (Tcf) | 13.53 | 8.46 |

Other average properties were estimated for the Low Thermal Maturity and Greater Siltstone shale plays. These include the depth, thickness and porosity for the shale. Total organic content data was not publicly available. The values are provided in Table 9.

**Table 9 Average General Properties for the Devonian-Low Thermal Maturity and Greater Siltstone Shale Plays**

|  | **Low Thermal Maturity** | **Greater Siltstone** |
|---|---|---|
| Depth (ft) | 3,000 | 2,911 |
| Thickness (ft) | 371 | 623 |
| Porosity (%) | 7 | 5.8 |
| Total Organic Content (% wt) | ---- | ---- |

**USGS Comparison**

In 2002, the USGS conducted an assessment of the Low Thermal Maturity and Greater Siltstone in the Appalachian Basin. They estimated that the total undiscovered resource for the Low Thermal Maturity is between 1,454 and 4,339 Bcf, with a mean of 2,654 Bcf. The total undiscovered resource for the Greater Siltstone was estimated between 892 Bcf and 1,894 Bcf, with a mean of 1,294 Bcf.

**References**

1. USGS. *U.S. Geological Survey Open-File Report 2005-1268*. 2005.
2. USGS. *Assessment of the Undiscovered Oil and Gas Resources of the Appalachian Basin Province*. 2002.
3. West Virginia Geological Economic Survey. *Summary Data and Statistics: The Atlas of Major Appalachian Gas Plays*. 1996.

## D.  New Albany Shale Gas Play

**Play Description**

The New Albany shale gas play is located in the Illinois Basin in Illinois, Indiana and Kentucky.  The location and extent of the New Albany shale is provided in Figure 6.

**Figure 6 New Albany Shale Play**



**Resource Estimate**

The total area for the New Albany shale play is approximately 43,500 square miles. The total area includes an active and undeveloped area of the play. Deutsche Bank estimated a total active area of 1,600 square miles.  Thus, the remaining area is 41,900 square miles and is characterized as undeveloped area.  New Albany has an average EUR of 1.1 Bcf per well and approximately 10.95 Tcf of technically recoverable gas.  The depth of the New Albany shale ranges from 1,000 to 4,500 and is 100 to 300 feet thick.  Due to the lack of current production and other issues in the undeveloped section of New Albany, the average EUR, well spacing, and total organic content is undetermined.  These values are provided in Tables 10 and 11.

---

Review of Emerging U.S. Shale Gas and Shale Oil Plays

**New Albany**

**Table 10 New Albany Average EUR and Area**

|  | Active | Undeveloped |
|---|---|---|
| Area (sq. miles) | 1,600 | 41,900 |
| EUR (Bcf/ well) | 1.1 | ---- |
| Well Spacing (wells/ sq. mile) | 8 | ---- |
| TRR (Tcf) | 10.95 |  |

Other properties were estimated for the New Albany shale. These include the depth, thickness, porosity, and total organic content for the shale. The values are provided in Table 11.

**Table 11 Average General Properties for the New Albany Shale Play**

|  | Active | Undeveloped |
|---|---|---|
| Depth (ft) | 2,750 | 2,750 |
| Thickness (ft) | 200 | 200 |
| Porosity (%) | 12 | 12 |
| Total Organic Content (% wt) | 13 | ---- |

## Active Companies

In 2008, there were 9 companies holding leases in the New Albany shale play. These companies, along with their net acreage, as reported by Deutsche Bank, are listed in Table 12.

**Table 12 New Albany Lease Holders**

| Company | Net Acreage |
|---|---|
| BreitBurn Energy Partners | 168,430 |
| Carrizo Oil & Gas | 22,000 |
| CNX Gas | 356,000 |
| Continental Resources | 44,000 |
| El Paso | 122,000 |
| Forest Oil | 31,900 |
| NGAS Resources | 8,750 |
| Noble Energy | 179,000 |
| Rex Energy | 92,000 |

Based upon these lease holdings, the total active area is calculated at 1,024,080 net acres (1,600 square miles).

## Well Costs

According to Deutsche Bank, New Albany has a well cost ranging from $0.8 to $1.0 million dollars for the developed area. Due to a lack of drilling activity and harsh terrain in the undeveloped area, well costs in this region of the shale are undetermined.

## USGS Comparison

In 2007, the USGS completed an assessment of the Illinois Basin. As part of the assessment, they estimated the undiscovered resource for the Devonian to Mississippian New Albany continuous gas. They estimated resources between 1.3 and 8.1 Tcf with a mean undiscovered resource of 3.8 Tcf.

---

Review of Emerging U.S. Shale Gas and Shale Oil Plays

**New Albany**

## References

1. U.S. Department of Energy. *Modern Shale Gas Development in the United States: A Primer.* April 2009.
2. Deutsche Bank. *From Shale to Shining Shale.* July 2008.
3. USGS. *Assessment of the Undiscovered Natural Gas Resources of the Illinois Basin.* August 2010.
4. Discovery Group Inc. *2007 New Albany Shale Update.* June 2007.
5. Sundance Energy. *Annual General Meeting.* November 2006.
6. Gas Technology Institute. *New Albany Shale Project – Project Update. Presented at Mid-Continent Gas Shale Forum and RPSEA Member Meeting.* June 2009.
7. Phasis Consulting. *US Shale Gas Brief.* September 2008.
8. Forest Oil Corporation. *In the Zone- 2008 Analyst Conference.* April 2008.
9. Forest Oil Corporation. *Analyst Conference.* March 2006.
10. Marsh Operating Company. *Unconventional Gas Plays SPEE.* December 2007.
11. Carrizo Oil and Gas. *Pritchard Capital- Energize 2010 Conference.* January 2010.
12. GTI, RPSEA, and Restech. *Spring Topical Conference 2009- Philadelphia Shale Evaluation. New Albany Example- RPSEA/ GTI Project.* 2009.
13. GTI and RPSEA. *New Albany Shale Gas Research Project. Presented at 24th World Gas Conference.* October 2009.

**New Albany**

**Antrim**

# E.  Antrim Shale Gas Play

**Play Description**

The Antrim shale gas play is located in the Michigan Basin in the northern part of Michigan State.  According to Red Fork Energy, the Antrim shale is the 13th largest natural gas producer in the United States. The location of the Antrim shale is provided in Figure 7.

**Figure 7 Antrim Shale Play**



**Resource Estimate**

The total area of the Antrim shale play is approximately 12,000 square miles as shown in Table 13. The total area includes the developed and undeveloped area of the play.  Based upon the active area reported by Deutsche Bank, the developed area is approximately 527 square miles. Thus, the remaining area is 11,743 square miles as undeveloped area.  Due to the large difference in areas of the developed and undeveloped sections, Antrim shale is being modeled as a single unit.   The shale gas play has an average EUR of 0.28 Bcf per well and approximately 19.9 Tcf of technically recoverable gas.  Antrim ranges from 600 to 2,200 feet deep and is 70 to 120 feet think.

---

Review of Emerging U.S. Shale Gas and Shale Oil Plays

**Antrim**

**Table 13 Average Antrim EUR and Area**

|  | **Active** |
|---|---|
| Area (sq. miles) | 12,000 |
| EUR (Bcf/ well) | 0.28 |
| Well Spacing (wells/ sq. mile) | 7 |
| TRR (Tcf) | 19.93 |

Other average properties were estimated for the Antrim shale play. These include the depth, thickness, porosity, and total organic content for the shale. The values are provided in Table 14.

**Table 14 Average General Properties for the Antrim Shale Play**

| Depth (ft) | 1,400 |
|---|---|
| Thickness (ft) | 95 |
| Porosity (%) | 9 |
| Total Organic Content (% wt) | 11 |

## Active Companies

In 2008, there were 4 companies holding leases in the Antrim shale play. These companies, along with their net acreage, as reported by Deutsche Bank, are listed in Table 15.

**Table 15 Antrim Lease Holders**

| Company | Net Acreage |
|---|---|
| Atlas Energy Resources LLC | 53,000 |
| BreitBurn Energy Partners | 256,438 |
| HighMount E&P LLC | 1,778 |
| Whiting Petroleum | 25,869 |

Based upon these lease holdings, the total active area is calculated at 337,085 net acres (527 square miles).

## Well Costs

In 2008, Deutsche Bank estimated an average well cost for the Antrim shale play ranging from $0.3 to $0.5 million dollars.

## Current Activities

Antrim shale activity began in 1980 with 9,000 completed wells as of 2008.

## USGS Comparison

In 2004, USGS conducted an assessment of undiscovered oil and gas resources of the U.S. Portion of the Michigan Basin. As part of the assessment, they evaluated the Devonian Antrim continuous gas. Their estimate ranged from 5,864 Bcf to 9,669 Bcf with a mean of 7,475 Bcf.

## Reference

1. Red Fork Energy. *Red Fork Energy's Large Shale Gas Discovery in Oklahoma-Investor Presentation.* May 2010.
2. U.S. Department of Energy. *Modern Shale Gas Development in the United States: A Primer.* April 2009.

Review of Emerging U.S. Shale Gas and Shale Oil Plays

**Antrim**

3. Deutsche Bank. *From Shale to Shining Shale.* July 2008.
4. Wayne R. Goodman and Timothy R. Maness. *Michigan's Antrim Gas Shale Play — A Two-Decade Template for Successful Devonian Gas Shale Development.* April 2008.
5. USGS. *Assessment of Undiscovered Oil and Gas Resources of the U.S. Portion of the Michigan Basin.* 2004.
6. Gas Technology Institute. *New Albany Shale Project – Project Update. Presented at Mid-Continent Gas Shale Forum and RPSEA Member Meeting.* June 2009.
7. Jenkins, Creties, DeGolyer, MacNaughton, and Boyer, Charles II. *Coalbed- and Shale- Gas Reservoirs.* Journal of Petroleum Technology. February 2008.
8. MuleShoe Engineering. *CBM and Shale Gas Upstream Facilities.* 2010.
9. Milind Deo from University of Utah. *Shale Gas- Promise and Current Status.* 2008.
10. Phasis Consulting. *US Shale Gas Brief.* September 2008.
11. Novas Consulting Oil & Gas Consultancy. *US Shale Gas What's Going On.* April 2010.

Review of Emerging U.S. Shale Gas and Shale Oil Plays

**Antrim**

## III.  Gulf Coast Regional Summary

The Gulf Coast region includes the Haynesville, Eagle Ford and the Floyd-Neal/Conasauga shale gas and shale oil plays.  The Haynesville shale play is located in Texas and Louisiana, Eagle Ford is located in the Texas Maverick Basin and Floyd-Neal/Conasauga lies in the Black Warrior Basin.  The reviewed plays have a combined area of 14,752 square miles with an average EUR between 0.9 and 5.0 Bcf per well and 300 MBO per well.  The reviewed plays contain approximately 99.99 Tcf of technically recoverable gas and 3.35 BBO of technically recoverable oil.

**Figure 8 Gulf Coast Shale Gas and Shale Oil Resources**



**Gulf Coat Region**

## A.  Haynesville Shale Gas Play

**Play Description**

The Haynesville shale gas play, also known as the Haynesville/Bossier shale play, is located in East Texas and Western Louisiana.  In 2007, high shale gas well production rates suggested that the Haynesville might have significant gas reserves.  The location of the play is provided in Figure 9.

**Figure 9 The Haynesville Shale Play**



**Resource Estimate**

The Haynesville shale has a total area of approximately 9,000 square miles and an estimated technically recoverable resource of 74.7 Tcf.  The average EUR per well is estimated to be 3.6 Bcf.  The depth of the shale ranges between 10,500 and 13,500 feet with a thickness of 200 to 300 feet.  The Haynesville was divided into two zones: active and undeveloped.  The active area corresponds with the acreage that is currently held by the companies and might be under

---

**Haynesville**

development. The undeveloped area represents the acreage that is not currently held by companies.

The active area, as detailed in Table 16, is 3,574 square miles and has a TRR of 53.3 Tcf, which is equivalent to 6.5 Bcf per well. At the well level, the reported EURs range between 4 and 10 Bcf. The TRR for the undeveloped area is 19.41 Tcf or 1.5 Bcf per well.

**Table 16 Haynesville Average EUR and Area**

|  | Active | Undeveloped |
|---|---|---|
| Area (sq. miles) | 3,574 | 5,426 |
| EUR (Bcf/ well) | 6.5 | 1.5 |
| Well Spacing (wells/ sq. mile) | 8 | 8 |
| TRR (Tcf) | 53.30 | 19.41 |

Other average properties were estimated for the Haynesville Shale. These include the depth, thickness, porosity, and total organic content for the shale. The values are provided in Table 17.

**Table 17 Average General Properties for the Haynesville Shale Play**

| Depth (ft) | 12,000 |
|---|---|
| Thickness (ft) | 250 |
| Porosity (%) | 8.5 |
| Total Organic Content (% wt) | 2.25 |

**Active Companies**

In 2008, there were 24 companies holding leases in the Haynesville Shale. These companies, along with their net acreage, are listed in Table 18.

**Table 18 Haynesville Lease Holders**

| Company | Net Acreage |
|---|---|
| Anadarko Petroleum | 60,000 |
| Berry Petroleum | 4,508 |
| Cabot Oil & Gas | 50,000 |
| Chesapeake | 440,000 |
| Comstock | 53,000 |
| Cubic Energy | 6,326 |
| Devon Energy | 200,000 |
| El Paso | 27,000 |
| Encana Corp. | 325,000 |
| Encore Acquisition | 6,000 |
| EOG Resources | 150,000 |
| EXCO Resources | 107,000 |
| Forest Oil | 90,000 |
| GMX Resources | 27,500 |
| Goodrich Petroleum | 60,500 |
| Noble Energy | 18,000 |
| Penn-Virginia | 54,000 |

Review of Emerging U.S. Shale Gas and Shale Oil Plays

**Haynesville**

| Company | Net Acreage |
|---|---|
| Petrohawk | 275,000 |
| Plains Exploration & Production | 110,000 |
| Questar | 29,500 |
| SandRidge | 32,739 |
| St. Mary Land & Exploration | 50,000 |
| Unit Corp. | 11,506 |
| XTO Energy | 100,000 |

Based upon these lease holdings, the total active area is calculated at 2,287,579 net acres (3,574 square miles).

**Well Costs**

In 2008, Deutsche Bank reported the average well cost as between $6 and $7 million dollars. In 2010, the cost has increased to at least $7 million dollars. The highest cost reported by a company is between $9.5 and $10 million dollars including at least $2 million for stimulation. Both Petrohawk and Encana report costs averaging $9 million per well.

**Current Activities**

There is significant current drilling activity in the Haynesville. In August of this year, Plains Exploration and Production reported that there were 48 rigs currently active in the play. They further stated that 31 of these were operated by Chesapeake. This report is consistent with statements reported by both Chesapeake and Petrohawk.

**Representative Type Curve**

Figure 10 provides a representative type curve for a Haynesville well. According to Petrohawk, the well produces 80% of the EUR within the first ten years.

**Figure 10 Haynesville Type Curve**

Review of Emerging U.S. Shale Gas and Shale Oil Plays

**Haynesville**



## USGS Comparison
This play has not been evaluated by USGS.

## References
1. U.S. Department of Energy. *Modern Shale Gas Development in the United States: A Primer.* April 2009.
2. Petrohawk. *Operations: Haynesville Shale and Bossier Shale.* Presented at Petrohawk Energy Corporation 2010 Analyst Meeting. May 24, 2010.
3. Deutsche Bank. *From Shale to Shining Shale.* July 2008.
4. Chesapeake Energy. *Haynesville Shale.* Presented at the American Association of Drilling Engineers Conference. January 2010.
5. EXCO Resources, Inc. *Second Quarter 2010 Review.* August 4, 2010.
6. Encana. *The New Encana.* Presented at the 2010 CAPP Oil & Gas Investment Symposium. June 14, 2010.
7. Plains Exploration & Production Company. *2Q 2010 Presentation.* August 2010.
8. Denbury Resources Inc. Haynesville Area. May 2010.
9. ALL Consulting. *Evaluating the Environmental Implications of Hydraulic Fracturing in Shale Gas Reservoirs.* Presented at the International Petroleum & BioFuels Environmental Conference, Albuquerque, New Mexico. November 2008.
10. Chesapeake Energy. *August 2010 Investor Presentation.* August 2010.
11. Comstock Resources. August 2010.

## B.  Eagle Ford Shale Gas & Oil Play

**Play Description**

The Eagle Ford shale gas and oil play is located within the Texas Maverick Basin.  The play contains a high liquid component.  This has led to the definition of three zones: an oil zone, a condensate zone, and a dry gas zone.  The play and the delimitation of the three zones are provided in the following figure.

**Figure 11 Eagle Ford Shale Play**



The Eagle Ford shale was first discovered by Petrohawk in 2008.  The initial well was located in the Hawkville field in LaSalle County, Texas.  According to the Railroad Commission of Texas, as of September 2010, there are 162 completed wells in the Eagle Ford as well as 690 well permits.

**Resource Estimate**

The area for Eagle Ford was calculated using maps and other data reported by the companies who are currently leasing acres with the Eagle Ford shale play.  The area of the dry gas zone is estimated at 200 square miles.  The same process was done for the oil and condensate zone using the sum of the area for each company.  The area of the condensate zone was estimated at 890 square miles and the area for the oil zone is estimated at 2,233 square miles.  Eagle Ford has an average EUR of 5.0 Bcf per well and 300 MBO per well.  The shale gas and shale oil play has approximately 20.81 Tcf of technically recoverable gas and 3.35 Bbbl of technically recoverable oil.

---

Review of Emerging U.S. Shale Gas and Shale Oil Plays

**Eagle Ford**

According to Talisman Energy and Rosetta Resources, 4 Bcf per well was reported as a minimum value for the average EUR, and Petrohawk Energy and Murphy Oil Corporation reported a maximum value of 6 Bcf. An average EUR range of 150 to 750 MBO per well was estimated by Petrohawk Energy as well. The average EUR obtained for the oil zone is 300 MBO, the condensate zone has an average EUR of 4.5 Bcf and the dry gas zone has approximately 5.5 Bcf EUR. The average well spacing ranges from 4 to 8 wells per square mile, with dry gas zone as the lowest, condensate zone the highest and the oil zone with a well spacing of 5 wells per square mile. The TRR for the oil zone is 3.35 BBO while the dry gas and condensate zones have EURs of 4.4 and 16.4 Tcf respectively. The total TRR for the play is 20.8 Tcf of gas and 3.35 BBO of liquids. These values are provided in Table 19.

**Table 19 Eagle Ford Average EUR and Areas**

|  | Dry Gas Zone | Condensate Zone | Oil Zone |
|---|---|---|---|
| Area (sq. miles) | 200 | 890 | 2,233 |
| EUR (Bcf/ well) | 5.5 | 4.5 |  |
| EUR (MBO/ well) |  |  | 300 |
| Well Spacing (wells/ sq. mile) | 4 | 8 | 5 |
| TRR (BBO) |  |  | 3.35 |
| TRR (Tcf) | 4.38 | 16.43 |  |

Other average properties were estimated for the Eagle Ford shale play. These include the depth, thickness, porosity, and total organic content for the shale. The values are provided in Table 20.

**Table 20 Average General Properties for the Eagle Ford Shale Play**

| Depth (ft) | 7,000 |
|---|---|
| Thickness (ft) | 200 |
| Porosity (%) | 9 |
| Total Organic Content (% wt) | 4.25 |

**Active Companies**

There are more than 11 companies currently holding leases in the Eagle Ford shale play. These companies, along with their net acreage, are listed in Tables 21 through 23 for each of the 3 Eagle Ford shale zones.

**Table 21 Eagle Ford Dry Gas Zone Lease Holders**

| Company | Net Acreage |
|---|---|
| EOG Resources | 49,000 |
| Swift Energy | 78,000 |

Review of Emerging U.S. Shale Gas and Shale Oil Plays

**Eagle Ford**

**Table 22 Eagle Ford Condensate Zone Lease Holders**

| Company | Net Acreage |
|---|---|
| Comstock | 18,000 |
| EOG Resources | 26,000 |
| Murphy Oil Corporation | 100,000 |
| Petrohawk Energy Corporation | 270,000 |
| Pioneer Natural Resources | 89,000 |
| Rosetta Resources | 29,500 |
| Talisman | 37,000 |

**Table 23 Eagle Ford Oil Zone Lease Holders**

| Company | Net Acreage |
|---|---|
| Anadarko | 260,000 |
| EOG Resources | 505,000 |
| Goodrich Petroleum Corporation | 35,000 |
| Murphy Oil Corporation | 100,000 |
| Petrohawk Energy Corporation | 87,000 |
| TXCO Resources | 442,000 |

In 2010, these companies have leased a total of 2,125,500 net acres (3,321 square miles).

**Future Development**

Since Eagle Ford is a developing play, there is minimal information available on the future drilling activity for the companies currently holding leases within the shale.  One of the companies to discuss their future development is Pioneer Natural Resources, who plans to increase drilling activity to 6 – 7 rigs in year 2010, 10 rigs by 2011 and by 2012 they plan to be operating 14 rigs in Eagle Ford.

**Drilling Cost**

According to Petrohawk Energy the average well cost ranges from 4.0 to 6.5 million dollars per horizontal well.

**USGS Comparison**

This play has not been evaluated by USGS.

**Representative Type Curve**

Figure 12 provides a representative type curve for an Eagle Ford well.  This curve was developed by Petrohawk for the Hawkville Field within the condensate zone of the play.  According to Petrohawk, the well will produce 30 percent of the EUR in the first year, and 75% within the first ten years.

**Eagle Ford**

**Figure 12 Eagle Ford Type Curve**



### References

1. Talisman Energy. *And Common's Eagle Ford Assets Go to... Talisman!* June 2010.
2. Railroad Commission of Texas. Eagle Ford Shale Play Highlights.
3. Swift Energy. *IPAA Oil & Gas Investment Symposium.* June 2010.
4. EOG Resources. *EOG Resources South Texas Eagle Ford.* 2010.
5. TXCO Resources. *Howard Weil 37th Annual Energy Conference.* March 2009.
6. Anadarko Petroleum. *Anadarko Investor Conference.* March 2010.
7. Goodrich Petroleum Corporation. *EnerCom- The Oil & Gas Conference.* August 2010.
8. Murphy Oil Corporation. *Howard Weil 2010 Energy Conference.* March 2010.
9. Rosetta Resources. *IPAA Oil & Gas Investment Symposium.* April 2010.
10. Pioneer Natural Resources. *Investor Presentation June 2010.* August 2010.
11. Talisman Energy. *Investor Open House, May 2010 North American Operations.* May 2010.
12. Murphy Oil Corporation. *Howard Weil 2010 Energy Conference.* March 2010
13. Petrohawk Energy. *2010 Eagle Ford Shale Overview Presented at Annual Association of Drilling Engineers.* January 2010.
14. Comstock. *Comstock.* September 2010.
15. Deutsche Bank. *From Shale to Shining Shale.* July 2008.

## C. Floyd-Neal/Conasauga Shale Gas Play

### Play Description

The Floyd-Neal/Conasauga shale gas play is located within Alabama and Mississippi in the Black Warrior Basin.  Due to the lack of data published on the individual shales, the Floyd-Neal and Conasauga were combined into a single play for evaluation purposes.  The location and area is proved in Figure 13.

**Figure 13 Floyd-Neal/Conasauga Shale Play**



### Resource Estimate

According to Deutsche Bank, the Floyd-Neal/Conasauga shale contains approximately 2,429 square miles of combined active net acres with an average EUR of about 0.9 Bcf per well and 4.37 Tcf of technically recoverable gas. The shale ranges from 6,000 to 10,000 feet deep and 80 to 180 feet thick with a well spacing of 2 well per square mile (320 acres per well). These values are provided in Tables 24 and 25.

**Table 24 Floyd-Neal/Conasauga Average EUR and Area**

|  | Active |
|---|---|
| Area (sq. miles) | 2,429 |
| EUR (Bcf/ well) | 0.9 |
| Well Spacing (wells/ sq. mile) | 2 |
| TRR (Tcf) | 4.37 |

Other average properties estimated for the Floyd-Neal/Conasauga are provided in Table 23. These include the depth, thickness, porosity, and total organic content for the shale.

Review of Emerging U.S. Shale Gas and Shale Oil Plays

**Floyd–Neal/Conasauga**

**Table 25 Average General Properties for the Floyd-Neal/Conasauga Shale Play**

| | |
|---|---|
| Depth (ft) | 8,000 |
| Thickness (ft) | 130 |
| Porosity (%) | 1.6 |
| Total Organic Content (% wt) | 1.8 |

## Active Companies

The active companies, along with their net acreage, are provided in Table 26.

**Table 26 Floyd-Neal/Conasauga Lease Holders**

| Company | Net Acreage |
|---|---|
| Anadarko Petroleum | 250,000 |
| Carrizo Oil & Gas | 138,000 |
| Chesapeake Energy | 287,500 |
| Edge Petroleum | 13,563 |
| Energen | 287,500 |
| HighMount E&P LLC | 328,038 |
| Murphy Oil | 200,000 |
| Range Resources | 50,000 |

These companies have leased a total of 1,554,601 net acres (2,429 square miles).

## Current Activities

Since the Floyd-Neal/Conasauga shale play is a new developing play, there is minimal information published for the future drilling activity for the companies who are currently holding leases within the shale.

## Well Costs

The average well cost for the Floyd-Neal/Conasauga shale is $3.0 million dollars as reported by Deutsche Bank.

## USGS Comparison

This play has not been evaluated by USGS.

## References

1. IHS Energy. *Exploration and Development Trends Southeastern States*. 2007.
2. Deutsche Bank. *From Shale to Shining Shale*. July 2008.
3. Cane River Resources. *Broomtown Prospect Conasauga Shale Bed Methane*.
4. Kent A Bowker with Bowker Petroleum. *Recent Activity in the Floyd, Neal, and Chattanooga Shale Plays, Black Warrior Basin, Alabama and Mississippi*. 2008.
5. Mississippi Geological Society. *eBulletin*. 2007.
6. Carrizo Oil and Gas. *Pritchard Capital- Energize 2010 Conference*. January 2010.
7. Range Resources. *Company Presentation*. August 2007.
8. Oil and Gas Investor. *An Investor's Guide to Shale Gas*. January 2007.

## IV.  Mid-Continent Regional Summary

The mid-continent region includes shale gas plays located in the Arkoma, Ardmore and Anadarko Basins.  Located within theses basins are the Fayetteville, Woodford and Cana Woodford shale plays (Figure 14).  The total area of the reviewed plays is estimated at 14,388 square miles with an average EUR between 1.7 and 2.5 Bcf and approximately 59.9 Tcf of technically recoverable gas.

**Figure 14 Mid-Continent Shale Gas and Shale Oil Resources**



**Mid-Continent Region**

**Fayetteville**

## A.  Fayetteville Shale Gas Play

**Play Description**

The Fayetteville shale gas play is located within the Arkoma Basin in Arkansas.  Fayetteville is divided into two main units, Central and Western based on the location of the shale. Fayetteville Central extends from the Arkansas-Oklahoma border to the East of Johnson, Logan and Yell counties.  Figure 15 shows the location and area of Fayetteville Central.

**Figure 15 Fayetteville Shale Play**



**Resource Estimate**

Based on the U.S. Department of Energy, the total area for the Fayetteville shale play, including Central and Western Fayetteville, is 9,000 square miles.  Fayetteville Central is 4,000 square miles and the remaining shale, Fayetteville Western, is approximately 5,000 square miles.  The shale gas play has an average EUR of 1.7 Bcf per well and approximately 31.96 Tcf of technically recoverable gas.  The shale ranges from 1,000 to 7,000 feet deep and 20 to 200 feet thick.  These values are summarized in Tables 27 and 28.

**Table 27 Fayetteville Average EUR and Area**

|                              | Western | Central |
|------------------------------|---------|---------|
| Area (sq. miles)             | 5,000   | 4,000   |
| EUR (Bcf/ well)              | 1.15    | 2.25    |
| Well Spacing (wells/ sq. mile) | 8     | 8       |
| TRR (Tcf)                    | 4.64    | 27.32   |

Other average properties estimated for the Fayetteville shale play are provided in Table 28. These include the depth, thickness, porosity, and total organic content for the shale.

**Fayetteville**

Table 28 Average General Properties for the Fayetteville Shale Play

|  | Central/ Western |
|---|---|
| Depth (ft) | 4,000 |
| Thickness (ft) | 110 |
| Porosity (%) | 5 |
| Total Organic Content (% wt) | 6.9 |

### Active Companies

In 2008, there were 9 companies holding leases within the Fayetteville shale play. These companies, along with their net acreage, as reported by Deutsche Bank, are listed in Table 29.

Table 29 Fayetteville Lease Holders

| Company | Net Acreage |
|---|---|
| Carrizo Oil and Gas | 23,900 |
| Chesapeake | 585,000 |
| Edge Petroleum | 4,692 |
| Penn-Virginia | 14,500 |
| PetroHawk | 155,000 |
| PetroQuest | 18,000 |
| Southwestern Energy | 851,069 |
| Storm Cat Energy | 18,265 |
| XTO Energy | 300,000 |

These companies have leased a total of 1,970,426 net acres (3,079 square miles).

In 2010, XTO Energy reported that they increased their Fayetteville acreage to 380,000 net acres. Carrizo Oil and Gas reported 26,000 net acres and Southwestern Energy has a total of 888,695 net acres in 2010.

### Well Costs

According to Southwestern Energy, the average well cost completed for 2009 was $2.9 million dollars. This is within the range of $1.75 to $3.05 million dollars as reported by Deutsche Bank.

### Current Activities

Southwestern Energy drilled and completed 249 wells within the first six months of 2010. They plan on participating in 650 to 680 wells by the end of the year and operate on 475 to 500 wells. Currently, Chesapeake Energy is operating about 8 rigs and plans to have about 10 rigs in 2010 to drill about 85 net well.

### USGS Comparison

In 2010, the USGS conducted an assessment for the Fayetteville Shale Gas-Western Arkansas Basin Margin. They estimated that the total undiscovered resource is between 2,260 and 6,865 Bcf, with a mean of 4,170 Bcf.

### Representative Type Curve

Figure 16 provides a representative type curve for a Fayetteville well. According to Petrohawk, this 2.2 Bcfe Fayetteville type curve show the cumulative production and production rate for the play.

---

Review of Emerging U.S. Shale Gas and Shale Oil Plays



Figure 16 Fayetteville Type Curve

## References

1. Advanced Resources International. *Fayetteville Shale.*
2. U.S. Department of Energy. *Modern Shale Gas Development in the United States: A Primer.* April 2009.
3. Deutsche Bank. *From Shale to Shining Shale.* July 2008.
4. XTO Energy. *Barnett vs. Marcellus – A Comparison of Two Shale Gas Giants.* June 2009.
5. Carrizo Oil and Gas. *Pritchard Capital- Energize 2010 Conference.* January 2010.
6. Southwestern Energy. *August 2010 Update.* August 2010.
7. Chesapeake Energy. *August 2010 Investor Presentation.* August 2010.
8. USGS. *Assessment of the Undiscovered Natural Gas Resources of the Arkoma Basin Province and Geologically Related Areas.* 2010.
9. Petrohawk Energy. *Eagle Ford Shale & Other Q&A.*
10. Range Resources. *March Company Presentation.* March 2009.
11. Howard Weil. *Unconventional Gas and its Impact on Domestic Supply.* April 2008.
12. Phasis Consulting. *US Shale Gas Brief.* September 2008.
13. Marsh Operating Company. *Unconventional Gas Plays SPEE.* December 2007.
14. Brian Teller with XTO Energy. *Fayetteville Shale.* January 2009.

---

**Fayetteville**

**Woodford**

## B.  Woodford Shale Gas Play

**Play Description**

The Woodford shale gas play is divided into two sections based on the location of the shale in Oklahoma.  The Woodford Central is located in the Ardmore Basin and Woodford Western is located in the Arkoma Basin.  The locations of the Woodford shales are provided in Figure 17.

**Figure 17 Woodford Shale Play**



**Resource Estimate**

Advanced Resources International estimated a total area for the Woodford Shales as 2,900 square miles in the Arkoma Basin and 1,800 square miles in the Ardmore Basin, both containing a well spacing of 160 acres per square mile.  The shale gas play has an average EUR of 2.5 Bcf per well and approximately 22.2 Tcf of technically recoverable gas for both the Western and Central Woodford.  Within the Arkoma Basin, the Woodford Western ranges from 6,000 to 13,000 feet deep with a thickness of 150 feet and a EUR of 4.0 Bcf per well. The Woodford Central has a depth of 5,000 feet with a EUR of 1.0 Bcf per well.  These average values are provided in Tables 30 and 31.

**Table 30 Woodford Average EUR and Area**

|  | Western | Central |
|---|---|---|
| Area (sq. miles) | 2,900 | 1,800 |
| EUR (Bcf/ well) | 4.0 | 1.0 |
| Well Spacing (wells/ sq. mile) | 4 | 4 |
| TRR (Tcf) | 19.26 | 2.95 |

**Woodford**

Other average properties were estimated for the Woodford shale play.  These include the depth, thickness, porosity, and total organic content for the shale.  The values are provided in Table 31.

**Table 31 Average General Properties for the Woodford Shale Play**

|  | Western | Central |
|---|---|---|
| Depth (ft) | 9,500 | 5,000 |
| Thickness (ft) | 150 | 250 |
| Porosity (%) | 7 | 6 |
| Total Organic Content (% wt) | 6.5 | 4 |

### Active Companies

In 2008, there were 13 companies holding leases within Woodford.  These companies, along with their net acreage, as reported by Deutsche Bank, are listed in Table 32.

**Table 32 Woodford Lease Holders in the Arkoma and Ardmore Basins**

| Company | Net Acreage |
|---|---|
| Chesapeake Energy | 85,000 |
| Cimarex | 25,000 |
| Continental Resources | 45,000 |
| Devon Energy | 54,000 |
| Linn Energy | 46,000 |
| Newfield Exploration | 165,000 |
| Penn-Virginia | 40,000 |
| Petroquest | 39,500 |
| Range Resources | 13,000 |
| St. Mary Land & Exploration | 40,000 |
| Williams Cos. | 90,000 |
| Unit Corporation | 18,100 |
| XTO Energy | 160,000 |

These companies have leased a total of 820,600 net acres (1,282 square miles)

### Well Costs

In 2007, Marsh Operating Company estimated that well costs for the Woodford shale in the Arkoma Basin range from $6 to $7 million dollars and in 2008 Deutsche Bank reported a larger range of $4.6 to $8 million dollars for the Woodford shale in the Arkoma and Ardmore Basins.

### Current Activities

Due to the lack of drilling activity in the Ardmore Basin, there is no data available.  The Woodford shale in the Arkoma Basin had 166 vertical wells and 37 horizontal wells completed in 2007.  According to PetroQuest, 4 wells are completed as of August 2010 and the company is expecting a 3-rig Woodford program by the end of the year.  Devon Energy drilled 61 wells in 2009 and plans to have about 85 wells drilled in 2010.

---

Review of Emerging U.S. Shale Gas and Shale Oil Plays

**Woodford**

### USGS Comparison

In 2010, USGS conducted an assessment of the Woodford shale in the Arkoma Basin. They estimated that the total undiscovered resource is between 6,065 and 14,036 Bcf, with a mean of 10,068 Bcf. The shale gas resource in the Ardmore Basin has not been evaluated by USGS.

### References

1. Advanced Resources International. *Woodford Shale.*
2. Range Resources. *March Company Presentation.* March 2009.
3. Deutsche Bank. *From Shale to Shining Shale.* July 2008.
4. Marsh Operating Company. *Unconventional Gas Plays SPEE.* December 2007.
5. PetroQuest Energy. *PetroQuest Energy.* August 2010.
6. Devon Energy. *IPAA Oil and Gas Investor Symposium.* April 2010.
7. USGS. *Assessment of the Undiscovered Natural Gas Resources of the Arkoma Basin Province and Geologically Related Areas.* 2010.
8. Howard Weil. *An Update on Shale Activity in the US.*
9. Howard Weil. *Unconventional Gas and its Impact on Domestic Supply.* April 2008.
10. ALL Consulting. *Evaluating the Environmental Implications of Hydraulic Fracturing in Shale Gas Reservoirs.* Presented at the International Petroleum & BioFuels Environmental Conference, Albuquerque, New Mexico. November 2008.
11. XTO Energy. *Barnett vs. Marcellus – A Comparison of Two Shale Gas Giants.* June 2009.
12. Cimarex Energy. *EnerCom Oil & Gas Conference.* August 2010.
13. United States Geological Survey. *Shale Gas Resources in North America and Europe.* June 2010.
14. Spyglass Energy Group. *Woodford Shale Gas in Oklahoma.* 2008.
15. Phasis Consulting. *US Shale Gas Brief.* September 2008.
16. TransEnergy Incorporated. 2008.
17. Wrightstone Gregory, Texas Keystone, Inc. *Marcellus Shale – Geologic Controls on Production.* Presented at the Winter Meeting of the IOGAWV. February 2009.
18. Unit Corporation. *Unit Corporation Presentation.* August 2010.
19. Evolution Petroleum Corporation. *Corporate Presentation.* June 2010.
20. Exxon Mobil. *Global Unconventional Resource Opportunity.* December 2009.
21. Newfield Exploration. *How the Pieces Fit Together UBS Global Oil & Gas Conference.* May 2010.
22. Newfield Exploration. Deutsch Bank- Energy & Utilities Conference. May 2008.

**Woodford**

**Cana Woodford**

## C.  Cana Woodford Shale Gas Play

### Play Description
Cana Woodford is an emerging gas play located within the Oklahoma Anadarko Basin, about 40 miles west of Oklahoma City (Figure 18).  Companies have estimated that Cana Woodford contains a high liquid content of about 65% gas, 30% NGL and 5% oil.

**Figure 18 Cana Woodford Shale Play**



### Resource Estimate
Based on companies' leased acreage for the shale, as provided in Table 33, the active area for Cana Woodford is approximately 688 square miles.  Cana Woodford is said to be the world's deepest commercial horizontal shale play with depths that range from about 11,500 to 14,500 feet.  The shale's EUR ranges from 4 to 12 Bcf with an average EUR of 5.2 Bcf per well.  The TRR is estimated to be 5.7 Tcf with a well spacing of 4 wells per square miles (160 acres per well) as provided bellow in Table 33.

**Table 33 Cana Woodford Average EUR and Area**

|  | Active |
|---|---|
| Area (sq. miles) | 688 |
| EUR (Bcf/ well) | 5.2 |
| Well Spacing (wells/ sq. mile) | 4 |
| TRR (Tcf) | 5.72 |

Other average properties estimated for Cana Woodford are provided in Table 34.   These include the depth, thickness, porosity, and total organic content for the shale.

**Table 34  Average General Properties for the Cana Woodford Shale Play**

| | |
|---|---|
| Depth (ft) | 13,500 |
| Thickness (ft) | 200 |
| Porosity (%) | 7 |
| Total Organic Content (% wt) | 6 |

**Cana Woodford**

### Active Companies

The active companies, along with their net acreage, are listed in Table 35.

**Table 35 Cana Woodford Lease Holders**

| Company | Net Acreage |
|---|---|
| Devon Energy | 230,000 |
| Continental Resources | 47,500 |
| Cimarex Energy | 97,000 |
| Questar Resources | 66,000 |

These companies have leased a total of 440,500 net acres (688 square miles).

### Future Development

Since Cana Woodford is a new developing play, there is little information published for the future drilling activity for the companies who are currently holding leases within the shale.

### Drilling Cost

According to companies that report activities within Cana Woodford, the average well cost ranges from $4 to $12 million dollars per horizontal well.

### USGS Comparison

This play has not been evaluated by USGS.

### Representative Type Curve

Figure 19 provides a Type Curve for Cana Woodford as reported by Cimarex Energy.

**Figure 19 Cana Woodford Type Curve**



Review of Emerging U.S. Shale Gas and Shale Oil Plays

**Cana Woodford**

### References

1. Devon Energy. *Cana Woodford Shale Presented at Annual Association of Drilling Engineers.* January 2010.
2. Questar Resources. *Investor Presentation.* August 2010.
3. Cimarex Energy. *EnerCom Oil & Gas Conference.* August 2010.
4. Continental Resources. *Pritchard Capital Bakken Mini- Conference.* May 2010.
5. Devon Energy. *Investor Meeting.* August 2010.
6. Devon Energy. *Devon Cana- Woodford Update: 11 Bcfe Type Curve.* June 2010.
7. Cimarex Energy. *Cimarex in the Cana- Woodford.* May 2010.
8. Petrohawk Energy Corporation. *Petrohawk Offers Anadarko and Arkoma Basin Assets.* June 2010.
9. Panhandle. *2009 Annual Report.* 2009.

**Cana Woodford**

## V.  Southwest Regional Summary

The Southwest region includes shale gas and shale oil plays located in the Fort Worth and Permian Basins (Figure 20).  Located within these basins is the Barnett, Barnett-Woodford and the Avalon and Bone Springs shale play with a total area of 10,462 square miles.  The reviewed plays have an average per well EUR between 1.2 and 3.0 Bcf and 300 MBO.  There is approximately 75.5 Tcf of technically recoverable gas and 1.58 Bbbl of technically recoverable oil.

**Figure 20 Southwest Shale Gas and Shale Oil Resources**



**Southwest Region**

**Barnett**

## A.  Barnett Shale Gas Play

### Play Description

The Barnett shale gas play is located within the Fort Worth and Permian Basins in Texas. The Barnett shale is divided into two sections: the "Core/Tier I" and the Undeveloped.  The Core/Tier I section corresponds to the areas of the Barnett Shale that are currently under development.  It is primarily located in the Parker, Wise, Johnson, and other neighboring counties.  The undeveloped section corresponds with those areas of the Barnett that have not been developed by the companies.  Because the Barnett extends across two petroleum basins that are in different regions of Texas, the active and undeveloped sections of the Barnett were further subdivided for modeling purposes.  The location of the shale, as defined by Wood Mackenzie, is provided in Figure 21.

**Figure 21 The Barnett Shale Play**



Map source: Wood Mackenzie

### Resource Estimate

The total area for the Barnett, as estimated by USGS is 6,458 square miles.  This area is subdivided into two sections: the Greater Newark East Frac-Barrier Continuous Barnett Shale Gas (1,555 square miles) and the Extended Continuous Barnett Shale Gas (4,903 square miles).  As the development of the Barnett extended beyond the Newark East field, the active section of the Barnett was also extended.  The remaining area is considered to be undeveloped section of the Barnett.  The TRR in these sections is shown in Table 36.  The Barnett shale gas play, including the active and undeveloped areas, has an average EUR of 1.4 Bcf per well and approximately 43.37 Tcf of technically recoverable gas.  An average EUR and well spacing for the active area are based on company data.  These values were used to calculate the average well and TRR for the undeveloped section of the Barnett.  These averages are summarized in Table 36.

---

Review of Emerging U.S. Shale Gas and Shale Oil Plays

**Table 36 Average Barnett EUR and Area**

|  | Active | Undeveloped |
|---|---|---|
| Area (sq. miles) | 4,075 | 2,383 |
| EUR (Bcf/ well) | 1.6 | 1.2 |
| Well Spacing (wells/ sq. mile) | 5.5 | 8 |
| TRR (Tcf) | 23.81 | 19.56 |

Other average properties were estimated for the Barnett shale play. These include the depth, thickness, and porosity for the shale. The values, which are the same for the active and undeveloped sections, are provided in Table 37.

**Table 37 Average General Properties for the Barnett Shale Play**

| Depth (ft) | 7,500 |
|---|---|
| Thickness (ft) | 300 |
| Porosity (%) | 5 |

**Active Companies**

In 2008, there were 10 companies holding leases in the Barnett Shale Core and 10 companies in the South/Western section of the shale. These companies, along with their net acreage, are listed in Tables 38 and 39 respectively.

**Table 38 Barnett Core/Tier 1 Lease Holders**

| Company | Net Acreage |
|---|---|
| Carrizo Oil & Gas | 85,429 |
| Chesapeake | 260,000 |
| Devon Energy | 527,000 |
| EnCana Corp | 71,500 |
| EOG Resources | 96,000 |
| Quicksilver | 16,525 |
| Parallel Petroleum | 17,600 |
| Range Resources | 20,000 |
| Williams Cos. | 32,000 |
| XTO Energy | 125,000 |

**Table 39 Barnett South/Western Counties Lease Holders**

Review of Emerging U.S. Shale Gas and Shale Oil Plays

**Barnett**

| Company | Net Acreage |
|---|---|
| Chesapeake | 19,400 |
| Denbury | 40,400 |
| Devon Energy | 199,900 |
| EOG Resources | 554,000 |
| EnCana Corp. | 71,500 |
| Forest Oil | 34,000 |
| Petroleum Development | 8,868 |
| Quicksilver | 247,000 |
| Range Resources | 57,000 |
| XTO Energy | 125,000 |

These Companies have leased a total of 2,608,122 net acres (4,075 square miles).

## Well Costs

The well costs reported in 2008 and 2009 have been between $2 and $3 million dollars for a well in the Barnett Core. The costs in the Southern and Western counties have a larger range – between $1.6 and $3.7 million per well. The differences in costs are consistent with EOG Resources reported costs.

## Current Activities

There is significant current drilling activity in the Barnett. There are at least 58 rigs currently active in the shale. Of these, 14 are operated by EOG Resources and 22 by Chesapeake.

## Representative Type Curve

Figure 22 provides a representative type curve for a Barnett well.

**Figure 22 Barnett Type Curve**



**Barnett**

## USGS Comparison

In 2003, USGS completed an assessment of the undiscovered oil and gas resources within the Fort Worth Basin. As part of the study, they evaluated two assessment units within the Barnett-Paleozoic total petroleum system. The total undiscovered gas resource is between 21,716 Bcf and 31,521 Bcf, with a mean estimate of 26,229 Bcf.

## References

1. Deutsche Bank. *From Shale to Shining Shale.* July 2008.
2. U.S. Department of Energy. *Modern Shale Gas Development in the United States: A Primer.* April 2009.
3. XTO Energy. *Barnett vs. Marcellus – A Comparison of Two Shale Gas Giants.* June 2009.
4. Benedetto, Larry. *Unconventional Gas and its Impact on Domestic Supply.* April 2008.
5. Chesapeake Energy. Reported at http://shale.typepad.com/barnettshale/2009/08/chesapeake-energy-.html.
6. USGS. *Assessment of Undiscovered Oil and Gas Resources of the Bend Arch – Fort Worth Basin Province of North – Central Texas and Southwestern Oklahoma.* 2003.
7. Baylor, Brandon. *Marcellus Shale Decline Analysis.* 2010.
8. Phasis Consulting. *US Shale Gas Brief.* September 2008.
9. Range Resources. *March Company Presentation.* March 2009.
10. Wrightstone Gregory, Texas Keystone, Inc. *Marcellus Shale – Geologic Controls on Production.* Presented at the Winter Meeting of the IOGAWV. February 2009.
11. TransEnergy Incorporated
12. Berman, Arthur. Shale Plays, A Time for Critical Thinking. Presented at the Association for the Study of Peak Oil and Gas. October 2009.
13. Darbonne, Nissa. *The Barnett Shale and Other Shale Dreams.* IHS Energy User Forum. May 2006.
14. Range Resources Corporation. *Company Presentation.* July 2010.
15. Deo, Milind. University of Utah. *Shale Gas Promise and Current State.* Presented at the RPSEA Unconventional Gas Development in the Western Energy Corridor Forum. May 12, 2009.
16. Devon. *Shale Gas: Understanding the Rock is Key.* Presented at the Peters & Co. Limited Energy Conference. January 28, 2009.
17. Drake, Steve. Marsh Operating Company. *Unconventional Gas Plays.* SPEE. December 6, 2007.
18. Jenkins, Creties, DeGolyer, MacNaughton, and Boyer, Charles II. *Coalbed- and Shale- Gas Reservoirs.* Journal of Petroleum Technology. February 2008.
19. Bob Cluff. The Discovery Group Inc. *2007 New Albany Shale Update.* Presented at the Explorers Club Luncheon, Denver Colorado. June 21, 2007.
20. Salehi, Iraj. Gas Technology Institute. *New Albany Shale Project: Project Update.* Presented at the Mid-Continent Gas Shale Forum and RPSEA Member Meeting. June 4, 2009.
21. Forest Oil Corporation. *2008 Analyst Conference.* April 1, 2008.

---

**Barnett-Woodford**

## B.  Barnett-Woodford Shale Gas Play

**Play Description**

The Barnett-Woodford shale gas play is located in the Permian Basin in West Texas.  The location and area of the Barnett-Woodford shale is provided in Figure 23.

**Figure 23 Barnett-Woodford Shale Play**



**Resource Estimate**

The Barnett-Woodford shale play has an area of approximately 2,691 square miles combined from the net acreage in Table 38 and a well spacing of 160 acres per well (4 wells per square mile).  The shale gas play has an average EUR of 3.0 Bcf per well and approximately 32.2 Tcf of technically recoverable gas.  The shale ranges from 5,100 to 15,300 feet deep and 4 to 800 feet thick.  These values are provided in Tables 40 and 41.

**Table 40 Barnett-Woodford Average EUR and Area**

|                            | Active |
| -------------------------- | ------ |
| Area (sq. miles)           | 2,691  |
| EUR (Bcf/ well)            | 3.0    |
| Well Spacing (wells/ sq. mile) | 4  |
| TRR (Tcf)                  | 32.15  |

**Barnett-Woodford**

Other average properties were estimated for Barnett-Woodford. These include the depth, thickness and total organic content for the shale. Porosity data was not publicly available. The values are provided in Table 41.

**Table 41 Average General Properties for the Barnett-Woodford Shale Play**

|  | Active |
|---|---|
| Depth (ft) | 10,200 |
| Thickness (ft) | 400 |
| Porosity (%) | ---- |
| Total Organic Content (% wt) | 5.5 |

### Active Companies

In 2008, there were 8 companies holding leases in the Barnett-Woodford Shale. These companies, along with their net acreage, as reported by Deutsche Bank, are listed in Table 42.

**Table 42 Barnett-Woodford Lease Holders**

| Company | Net Acreage |
|---|---|
| Abraxas | 15,000 |
| Carrizo Oil & Gas | 70,000 |
| Chesapeake | 815,000 |
| Continental Resources | 67,000 |
| EnCana Corporation | 287,000 |
| Quicksilver | 375,000 |
| Range Resources | 20,000 |
| TXCO Resources | 73,500 |

Based upon these lease holdings, the total active area is calculated at 1,722,500 net acres (2,691 square miles).

### Well Costs

According to Deutsche Bank in 2008, Barnett-Woodford has an average well cost of $6.5 million dollars.

### USGS Comparison

This play has not been evaluated by USGS.

### References

1. Deutsche Bank. *From Shale to Shining Shale*. July 2008.
2. The Discovery Group Inc. *Barnett Shale-Woodford Shale pay of the Delaware Basin- is it Another Giant Shale Gas Field in Texas?*
3. Marsh Operating Company. *Unconventional Gas Plays SPEE*. December 2007.

## C. Avalon & Bone Springs Shale Oil Play

**Play Description**

The Avalon and Bone Springs shale oil play is located in the Permian Basin in Southeast New Mexico and West Texas. The Avalon play also includes the New Mexico Leonard Shale. Due to the lack of data published, Bone Spring and the Avalon shale are combined into a single unit. In Figure 24, SandRidge Energy shows the location and area of the shale play.

**Figure 24 Avalon and Bone Springs Shale Play**



**Resource Estimate**

The area for Avalon and Bone Springs was calculated using maps and other data reported by the companies who are currently leasing acres within Avalon and Bone Springs. The total active area is approximately 1,313 square miles. The shale oil play has an average EUR of 300 MBO per well and approximately 1.58 Bbbl of technically recoverable oil. The play has a reported depth from 6,000 to 13,000 feet and a thickness ranging from 900 to 1,700 feet. These values are provided in Table 43.

Review of Emerging U.S. Shale Gas and Shale Oil Plays

Avalon & Bone Springs

**Avalon & Bone Springs**

Table 43 Avalon and Bone Springs EUR and Area

|  | Active |
|---|---|
| Area (sq. miles) | 1,313 |
| EUR (MBO/ well) | 300 |
| Well Spacing (wells/ sq. mile) | 4 |
| TRR (BBO) | 1.58 |

Other average properties were estimated for Avalon and Bone Springs. These include the depth and thickness. The values are provided in Table 44. Due to the lack of publicly reported data, the porosity and total organic content are undetermined.

Table 44 General Properties for the Avalon/Bone Springs Shale Play

|  | Active |
|---|---|
| Depth (ft) | 8,750 |
| Thickness (ft) | 1,300 |
| Porosity (%) | ---- |
| Total Organic Content (% wt) | ---- |

### Active Companies
In 2008, there were 6 companies holding leases in the Avalon and Bone Springs play. These companies, along with their net acreage, are listed in Table 45.

Table 45 Avalon and Bone Springs Lease Holders

| Company | Net Acreage |
|---|---|
| Chesapeake | 190,000 |
| EOG Resources | 120,000 |
| Devon Energy | 235,000 |
| SandRidge Energy | 25,000 |
| Anadarko Petroleum | 170,000 |
| Concho | 100,000 |

As of 2010, these companies have leased a combined total of 840,000 net acres (1,313 square miles).

### Well Costs
According to Concho, the average well cost within the Bone Springs play range from $3 to $5 million dollars.

### Current Activities
SandRidge Energy currently has 31 horizontal rigs drilling within the Bone Springs and Avalon shale play and according to Concho, as of August 2010, the industry has drilled 250 horizontal wells within Bone Springs play.

### USGS Comparison
In 2007, USGS assessed the undiscovered oil and gas resources in the Permian Basin. This was the first time they broke out the continuous gas resources. However, the Avalon shale was not assessed at that time.

**References**

1. SandRidge Energy. *SandRidge- Investor Presentation*. August 2010.
2. Carrizo Oil & Gas. Presented at the Howard Weil 38th Annual Energy Conference. March 24, 2010.
3. USGS. *Assessment of Undiscovered Oil and Gas Resources of the Permian Basin Province of West Texas and Southeast New Mexico*. 2007.
4. USGS. *Bone Spring Formation*. September 2010.
5. Concho. *Investor Presentation*. August 2010.
6. http://www.oilshalegas.com/avalonshale.html
7. http://www.aapgbull.geoscienceworld.org/cgi/content/abstract/81/9/1423
8. Chesapeake Energy. *August 2010 Investor Presentation*. August 2010.
9. Cimarex Energy. *EnerCom Oil & Gas Conference*. August 2010.
10. Anadarko Petroleum Corporation. *Investor Conference*. March 2010.
11. PLS Inc. *Prospect Centre*. *Market Alert*. April 14, 2010.
12. PLS Inc. A&D Transactions. Market Alert. July 2010.

Avalon & Bone Springs

**Avalon & Bone Springs**

## VI.  Rocky Mountain Regional Summary

The Rocky Mountain region includes shale gas and shale oil plays in the Greater Green River, San Juan, Uinta, and Williston Basins.  Located within these basins are the Hilliard-Baxter-Mancos, Lewis, Mancos and the Bakken shale plays with a combined area of 37,033 square miles (Figure 25).  The reviewed plays have an average EUR between 0.18 and 1.3 Bcf and 55 MBO.  There is approximately 43.0 Tcf of technically recoverable gas and 3.59 Bbbl of technically recoverable oil.

**Figure 25 Rocky Mountains Shale Gas and Shale Oil Resources**



**Rocky Mountain Region**

## A. Hilliard-Baxter-Mancos Shale Gas Play

**Play Description**

The Hilliard-Baxter-Mancos shale gas play is located in the Greater Green River Basin in Wyoming and Colorado. According to Deutsche Bank, this is an environmentally sensitive region with high bottomhole pressures that complicates drilling completions. The location of the shale play is provided in Figure 26.

**Figure 26 Hilliard-Baxter-Mancos Shale Play**



**Resource Estimate**

According to USGS, the total active area for Hilliard-Baxter-Mancos is 16,416 square miles. The shale gas play has an average EUR of 0.18 Bcf per well and approximately 3.77 Tcf of technically recoverable gas. The depth for the shale ranges from 10,000 to 19,500 square miles and is 2,850 to 3,300 feet thick. These values are provided in Table 46.

**Table 46 Hilliard-Baxter-Mancos Average EUR and Area**

|  | Active |
|---|---|
| Area (sq. miles) | 16,416 |
| EUR (Bcf/ well) | 0.18 |
| Well Spacing (wells/ sq. mile) | 8 |
| TRR (Tcf) | 3.77 |

---

**Hilliard-Baxter-Mancos**

Other average properties were estimated for the Hilliard-Baxter-Mancos shale play. These include the depth, thickness, porosity, and total organic content for the shale. These values are provided in Table 47.

**Table 47 Average General Properties for the Hilliard-Baxter-Mancos Shale Play**

|  | Active |
|---|---|
| Depth (ft) | 14,750 |
| Thickness (ft) | 3,075 |
| Porosity (%) | 4.25 |
| Total Organic Content (% wt) | 1.75 |

## Active Companies

In 2008, there were 5 companies holding leases in the Hilliard-Baxter-Mancos shale play. These companies, along with their net acreage, as reported by Deutsche Bank, are listed in Table 48.

**Table 48 Hilliard-Baxter-Mancos Lease Holders**

| Company | Net Acreage |
|---|---|
| Anadarko Petroleum | unspecified |
| Devon Energy | 157,000 |
| Kodiak Oil & Gas | 19,879 |
| Questar | 146,000 |
| Ultra Petroleum | 62,756 |

Based upon these lease holdings, the total active area is calculated at 385,634 net acres (603 square miles).

## Well Costs

In 2008, Deutsche Bank reported an average well cost of $20 million dollars for the Hilliard-Baxter-Mancos shale play.

## Current Activities

There is minimal information published for the current and future drilling activities of the companies who are currently holding leases within the shale.

## USGS Comparison

In 2002, the USGS conducted an assessment of the Hilliard-Baxter-Mancos shale play. Their estimated area was 16,416 square miles. The USGS estimated that the total undiscovered resource for Hilliard-Baxter-Mancos continuous gas between 4.9 and 22.7 Tcf with a mean undiscovered resource of 11.8 Tcf.

## References

4. Deutsche Bank. *From Shale to Shining Shale.* July 2008.
5. United States Geological Survey. *Assessment of the Undiscovered Natural Gas Resources of the Arkoma Basin Province and Geologically Related Areas.* 2010.
6. Rice University. *The Impacts of Cap-and-Trade, RPS, and Electric Vehicles on the North American Natural Gas Market.* June 2010.

## B.  Lewis Shale Gas Play

**Play Description**

The Lewis shale gas play is located in the San Juan Basin in Colorado and New Mexico.  The location of the Lewis shale is provided in Figure 27.

**Figure 27 Lewis Shale Play**



**Resource Estimate**

According to USGS, the area for the Lewis shale play is approximately 7,506 square miles. The depth of the Lewis shale ranges from 1,640 to 8,202 feet deep and is 200 to 300 feet thick.  The shale gas play has an average EUR of 1.3 Bcf per well and approximately 11.6 Tcf of technically recoverable gas.  The well spacing for Lewis is estimated at 200 acres per well (3 wells per square mile).  Theses average values are provided in Table 49.

**Table 49 Lewis Average EUR and Area**

|  | Active |
|---|---|
| Area (sq. miles) | 7,506 |
| EUR (Bcf/ well) | 1.3 |
| Well Spacing (wells/ sq. mile) | 3 |
| TRR (Tcf) | 11.63 |

Review of Emerging U.S. Shale Gas and Shale Oil Plays

**Lewis**

Other average properties were estimated for the Lewis shale play. These properties include depth, thickness and porosity as provided in Table 50. Due to a lack of current production and other issues within the play, the total organic content is undetermined.

**Table 50 Average General Properties for the Lewis Shale Play**

|  | Active |
|---|---|
| Depth (ft) | 4,500 |
| Thickness (ft) | 250 |
| Porosity (%) | 3.5 |
| Total Organic Content (% wt) | ---- |

### Active Companies

Information on the active companies and their leased acreage is not currently available.

### Well Costs

Information on the well drilling and completion costs is not currently available.

### USGS Comparison

In 2002, USGS conducted an assessment of the Lewis shale play. They estimated that the total undiscovered resource for the Lewis continuous gas is between 8,315 and 12,282 Bcf with a mean undiscovered resource of 10,177 Bcf.

### References

1. http://www.bjservices.com/website/index.nsf/webpages/Shale-Lewis-Page?OpenDocument
2. USGS. *Assessment of Undiscovered Oil and Gas of the San Juan Basin Province of New Mexico and Colorado.* 2002.
3. USGS. *San Juan Basin, Province 5022 (Province 22). 2003 Continuous Assessment Input Data.* 2003.
4. Jenkins, Creties, DeGolyer, MacNaughton, and Boyer, Charles II. *Coalbed- and Shale- Gas Reservoirs.* Journal of Petroleum Technology. February 2008.
5. John B Curtis. *Shale Gas: From Onerous Stepchild to Premier Resource.* 2008.

## C.  Mancos Shale Gas Play

**Play Description**

The Mancos shale gas play is located within the Uinta Basin in Colorado and Wyoming (Figure 28).

**Figure 28 The Mancos Shale Play**



Map source: Newfield Exploration

**Resource Estimate**

In 2002, The Mancos shale was assessed by USGS as the Uinta Continuous Gas within the Mancos/Mowry total petroleum system.  At that time, the median assessment area was estimated to be 4,217,000 acres (6,589 square miles).  The EUR for the Mancos, apart from the Mesaverde, Wasatch, and other formations in the Uinta Basin, was reported as approximately 1.0 Bcf per well.  The shale gas play is estimated to have 21.02 Tcf of technically recoverable gas.  Typical well spacing for the Mancos shale was 40 to 80 acres. No company data was available in order to determine a minimum or maximum value for the EUR.

The Average calculated EUR for the Mancos shale is provided in Table 51.

**Table 51 Mancos Average EUR and Area**

|  | Active |
|---|---|
| Area (sq. miles) | 6,589 |
| EUR (Bcf/ well) | 1.0 |
| Well Spacing (wells/ sq. mile) | 8 |
| TRR (Tcf) | 21.02 |

The shale is estimated to be between 13,000 and 17,500 feet deep and have an average thickness of 3,000 feet.  The average values calculated for the Mancos shale are provided in Table 52.

**Mancos**

**Table 52 Average General Properties for the Mancos Shale Play**

| Depth (ft) | 15,250 |
|---|---|
| Thickness (ft) | 3,000 |
| Porosity (%) | 3.5 |
| Total Organic Content (% wt) | 14 |

### Active Companies

In 2008, there were 9 companies holding leases in the Mancos shale play.  These companies, along with their net acreage, are listed in Table 53.

**Table 53 Mancos Lease Holders**

| Company | Net Acreage |
|---|---|
| Anadarko Petroleum | 60,000 |
| Berry Petroleum | 4,508 |
| Cabot Oil & Gas | 50,000 |
| Chesapeake | 440,000 |
| Comstock | 53,000 |
| Cubic Energy | 6,326 |
| Devon Energy | 200,000 |
| El Paso | 27,000 |
| EnCana Corp. | 325,000 |

These companies have leased a combined total of 1,165,834 net acres (1,822 square miles).  These companies were just beginning to test and develop their acreage.  No additional data could be found regarding their activities specifically in the Mancos shale.

### USGS Comparison

In 2002, USGS completed an assessment of the Uinta Piceance Basin within Colorado and Utah.   As part of the assessment, they examined the continuous gas within the Mancos/Mowry Total Petroleum System.  USGS estimated that the area of the shale was 6,589 square miles and contained between 1.8 Tcf and 4.9 Tcf.  The mean estimated resource is 3.1 Tcf of natural gas.

### References

1. Deutsche Bank. *From Shale to Shining Shale.  A Primer on North American Natural Gas Shale Plays.* July 2008.
2. USGS.  *Assessment of Undiscovered Oil and Gas Resources of the Uinta-Piceance Province of Colorado and Utah.* 2002.

## D.  Bakken Shale Oil Play

### Play Description

The Bakken shale oil play is located within the Williston Basin in Montana and North Dakota (Figure 29).  While the shale extends into the Canadian provinces of Manitoba and Saskatchewan, only the United States portion is considered in this evaluation.  This oil field could contain 3.65 billion barrels which would be the largest finding in U.S history.

**Figure 29 Bakken Shale Play**



### Resource Estimate

Based on the leaseholders combined net acreage for Bakken, the area is approximately 6,522 square miles in the United States.  The shale oil play has an average EUR of 550 MBO per well and approximately 3.59 Bbbl of technically recoverable oil.  The Bakken shale ranges from 4,500 to 7,500 feet deep with a mean of 6,000 feet and an average thickness of 22 feet. According to Kodiak Oil and Gas Corporation and other companies, the well spacing ranges from 320 to 1,280 acres per well with a mean of 640 acres per well (1 well per square mile). These values are provided in Table 54.

**Table 54 Bakken Average EUR and Area**

|                                  | Active |
| -------------------------------- | ------ |
| Area (sq. miles)                 | 6,522  |
| EUR (MBO/ well)                  | 550    |
| Well Spacing (wells/ sq. mile)   | 1      |
| TRR (BBO)                        | 3.59   |

Other average properties estimated for Bakken are provided in Table 55.  These include the depth, thickness, porosity, and initial oil saturation for the shale.

**Bakken**

**Table 55 Average General Properties for the Bakken Shale Play**

| Depth (ft) | 6,000 |
|---|---|
| Thickness (ft) | 22 |
| Porosity (%) | 8 |
| Initial Oil Saturation (%) | 68 |

## Active Companies

The active companies, along with their net acreage, are listed in Table 56.

**Table 56 Bakken Lease Holders**

| Company | Net Acreage |
|---|---|
| Brigham Exploration | 358,200 |
| Concho Resources | 11,193 |
| Continental Resources | 589,937 |
| Encore Acquisition Company | 70,000 |
| GeoResources | 49,000 |
| Hess Corporation | 500,000 |
| Kodiak Oil and Gas Corporation | 9,565 |
| Marathon Oil Corporation | 350,000 |
| MDU Resources | 56,000 |
| Newfield Exploration | 400,000 |
| Oasis Petroleum | 159,500 |
| Parshall Field | 18,188 |
| Petroleum Development | 16,200 |
| Questar | 89,000 |
| Rosetta Resources | 291,000 |
| SM Energy | 78,000 |
| Southern Alberta Basin | 224,000 |
| Unit Corporation | 12,750 |
| Whiting Petroleum Corporation | 442,092 |
| XTO Energy | 450,000 |

These companies have leased a total of 4,174,625 acres (6,522 sq. miles).

## Current Activities

There are extensive activities within the Bakken shale play. Nearly all of the reported lease holders have given information about their 2010 development plans. Companies are running at least 45 rigs in 2010 and have indicated that number will increase to more than 54. Of these, 14 are operated by Continental Resources, 12 by EOG Resources, and 5 by Marathon Oil Corporation. In addition, many of the companies have significant capital programs devoted to the Bakken shale. Kodiak Oil and Gas Corporation has stated they plan to spend $60 millions dollars, Oasis will spend $144 million dollars in the West Williston Basin, and Whiting Petroleum Corporation will spend $284 million dollars for operations in the Sanish and Parshall sections of the Bakken shale play.

---

Review of Emerging U.S. Shale Gas and Shale Oil Plays

**Bakken**

### Well Costs

Well cost range form $5.5 to $8.5 million dollars.  The vast majority of the companies which provide data have costs less than $7.2 million dollars.  The lowest price, $5.5 million dollars, is also reported by Whiting Petroleum Corporation and Marathon Oil Corporation.   In addition, Marathon Oil Corporation reports operating costs are less than $5 per barrel in the Bakken play.

### USGS Comparison

In 2008, USGS conducted an assessment of the Bakken shale.   The total undiscovered resource is estimated between 3,063 and 4,319 MMOE, with a mean at 3,645 MMBO of total continuous resources.

### Representative Type Curve

Figure 30 provides a representative type curve for Middle Bakken/ Three Forks area from Oasis Petroleum for Bakken in West Williston and East Nesson.

**Figure 30 Bakken Shale Type Curve**



**Bakken**

**References**

1. http://www.oilshalegas.com/bakkenshale.html.
2. http://www.transformsw.com/resources/studies.html.
3. Rosetta Resources. *Rosetta Resources.* August 2010.
4. Kodiak Oil and Gas Corporation. *Corporate Presentation.* August 2010.
5. Denbury Resources. *Spring Analyst Meetings.* May 2010.
6. Continental Resources. *Bakken Shale: The Game-Changer from Hart's Developing Unconventional Oil Conference 2010.* May 2010.
7. Whiting Petroleum Corporation. *Current Corporate Information.* August 2010.
8. USGS. *Assessment of Undiscovered Oil and Gas Resources of the Williston Basin Province of North Dakota, Montana, and South Dakota.* 2008.
9. Oasis Petroleum. *Oasis Petroleum Company Presentation.* August 2010.
10. Concho. *Raymond James Boston Spring Investors Conference.* June 2010.
11. GeoResources. *GeoResources, Inc Corporate Profile.* August 2010.
12. SM Energy. *Macquarie Capital USA Small- & Mid- Cap Conference.* June 2010.
13. Deutsche Bank. *From Shale to Shining Shale.* July 2008.
14. QEP Resources. *Investor Presentation.* August 2010.
15. Newfield Exploration. *How the Pieces Fit Together UBS Global Oil & Gas Conference.* May 2010.
16. EOG Resources. *EOG Resources South Texas Eagle Ford.* 2010.
17. Marathon Oil Corporation. *UBS Global Oil & Gas Conference.* May 2010.
18. Hess Corporation. *Bernstein Strategic Decisions Conference.* June 2010.
19. Brigham Exploration Company. *EnerCom- The 2010 Oil & Gas Conference.* August 2010.
20. MDU Resources. *A Strong Infrastructure Utility Resources is the Heart of Energy our Economy Construction Materials.* March 2010.

# VII.  West Coast Regional Summary

The West Coast region includes shale oil plays in the San Joaquin and Los Angeles Basins (Figure 31). Located within these basins is the Monterey/Santos shale oil play with a total area estimated at 1,752 square miles.  The reviewed play has an average EUR of 550 MBO per well and approximately 15.42 Bbbl of technically recoverable oil.

**Figure 31 West Coast Shale Gas and Shale Oil Resources**



West Coast Region

**West Coast Region**

## A.  Monterey/Santos Shale Oil Play

**Play Description**

The Monterey/Santos shale oil play includes the Lower Monterey and Santos shales and is located in the San Joaquin and Los Angeles Basins in California.  The general location of the Monterey/Santos shale play is provided in Figure 32.

**Figure 32 Monterey/Santos Shale Play**



**Resource Estimate**

The active area for the Monterey/Santos shale play is approximately 1,752 square miles in the San Joaquin and Los Angeles Basin.  The depth of the shale ranges from 8,000 to 14,000 feet deep and is between 1,000 and 3,000 feet thick.   The shale oil play has an average EUR of 550 MBO per well and approximately 15.42 Bbbl of technically recoverable oil.   These average values are provided in Table 57.

**Table 57 Monterey/Santos Average EUR and Area**

|  | **Active** |
|---|---|
| Area (sq. miles) | 1,752 |
| EUR (MBO/ well) | 550 |
| Well Spacing (wells/ sq. mile) | 16 |
| TRR (BBO) | 15.42 |

Review of Emerging U.S. Shale Gas and Shale Oil Plays

**Monterey/Santos**

Other average properties were estimated for the Monterey/Santos shale. These include the depth, thickness, porosity, and total organic content for the shale. The values are provided in Table 58.

**Table 58 Average General Properties for the Monterey/Santos Shale Play**

|  | Active |
|---|---|
| Depth (ft) | 11,250 |
| Thickness (ft) | 1,875 |
| Porosity (%) | 11 |
| Total Organic Content (% wt) | 6.5 |

### Active Companies

The companies, along with their net acreage who are currently holding leases within the Monterey/Santos shale play as of 2010, are listed in Table 59.

**Table 59 Monterey/Santos Lease Holders**

| Company | Net Acreage |
|---|---|
| Berry Petroleum | 6,500 |
| National Fuel Gas Company (NFG) | 14,000 |
| Occidental Petroleum Company (Oxy) | 873,000 |
| Plains Exploration and Production | 70,000 |
| Venoco | 158,000 |

Based upon these lease holdings, the total active area is calculated at 1,121,500 net acres (1,752 square miles).

### Well Costs

Plains Exploration and Production Company reports an average gross well cost in 2010 of $1.2 million dollars per well. Oxy reports cost for vertical well ranging from $2 to $2.5 million and horizontal well costs ranging from $5 to 7 million. They also report finding and development costs between $8 and 18 dollars/BOE, depending upon the field.

### Current Activities

Oxy Corporation has undertaken a 4-year development program and remains the largest leaseholder within the Monterey/Santos play. Seneca Resources/ NFG first went into production in February 2010 and have completed a 14 well development program. In 2010, Venoco completed their 1st horizontal well in the Monterey Basin and plan to increase their net acreage.

### USGS Comparison

This play has not been evaluated by USGS.

### Representative Type Curve

Figure 33 provides a representative type curve reported by Oxy Corporation for a vertical well, horizontal well, and for the Elk Hills Area "shale" vertical well within the Monterey/Santos shale play.

---

Review of Emerging U.S. Shale Gas and Shale Oil Plays

Monterey/Santos



Figure 33 Monterey/Santos Type Curve

## USGS Comparison

In 2003, the USGS conducted an assessment of the San Joaquin Basin. At that time, they did not assess the unconventional resources.

## References

1. Todd Stevens with Oxy Corporation. *Monterey/Santos Unconventional.* May 2010.
2. Venoco Corporation. *September Update.* September 2010.
3. Plains Exploration and Production Company. *2Q 2010 Presentation.* August 2010.
4. Seneca Resources and National Fuel Gas Corporation. *EnerCom Oil and Gas Conference.* August 2010.
5. USGS. *Assessment of the Undiscovered Oil and Gas Resources of the San Joaquin Basin Province of Monterey/Santos.* 2003.
6. http://www.ogj.com/ogj/en-us/index/article-tools-template.articles.oil-gas-journal.exploration-development-2.2010.05.oxy-sees_major_growth.html
7. http://western-energy.com/pages/focus_areas.htm

**Monterey/Santos**

**Appendix**

## VIII.  Appendix A– OLOGSS Shale Gas Data File

The following table provides the key information contained in the shale gas data file used in the Onshore Lower 48 Oil and Gas Supply Submodule (OLOGSS). Within the OLOGSS model database, each shale play/subplay has 3 well productivity categories to capture the large variation in well EUR that exists within a play: 1) Best Area, which covers 30 percent of the total play/subplay wells, 2) Average Area, which covers 30 percent of the play/subplay wells, and 3) Below Average Area, which covers 40 percent of the play/subplay wells.  The EURs presented in this report do not include natural gas plant liquids.

| Play Name | Basin Area (sq. miles) | Well Spacing (wells/sq. mile) | Avg. Depth (ft) | EUR (Bcf/well) | | | | Success Rate (fr) |
|---|---|---|---|---|---|---|---|---|
| | | | | Top 10% | Next 20% | Next 30% | Next 40% | |
| Appalachia - Big Sandy Central Act | 8675 | 8 | 3800 | 0.65 | 0.49 | 0.33 | 0.16 | 0.86 |
| Best Area | 2603 | 8 | 3800 | 0.86 | 0.65 | 0.43 | 0.22 | 0.86 |
| Average Area | 2603 | 8 | 3800 | 0.65 | 0.49 | 0.33 | 0.16 | 0.86 |
| Below Average Area | 3470 | 8 | 3800 | 0.49 | 0.37 | 0.24 | 0.12 | 0.86 |
| Appalachia - Big Sandy Extension | 1994 | 8 | 3800 | 0.65 | 0.49 | 0.33 | 0.16 | 0.86 |
| Best Area | 598 | 8 | 3800 | 0.86 | 0.65 | 0.43 | 0.22 | 0.86 |
| Average Area | 598 | 8 | 3800 | 0.65 | 0.49 | 0.33 | 0.16 | 0.86 |
| Below Average Area | 798 | 8 | 3800 | 0.49 | 0.37 | 0.24 | 0.12 | 0.86 |
| Appalachia - Greater Siltstone Area | 22914 | 11 | 2911 | 0.58 | 0.29 | 0.19 | 0.06 | 0.74 |
| Best Area | 6874 | 11 | 2911 | 0.77 | 0.39 | 0.26 | 0.08 | 0.74 |
| Average Area | 6874 | 11 | 2911 | 0.58 | 0.29 | 0.19 | 0.06 | 0.74 |
| Below Average Area | 9166 | 11 | 2911 | 0.44 | 0.22 | 0.14 | 0.04 | 0.74 |
| Appalachia - Low Thermal Maturity | 45844 | 7 | 3000 | 0.90 | 0.45 | 0.30 | 0.08 | 0.74 |
| Best Area | 13753 | 7 | 3000 | 1.20 | 0.60 | 0.40 | 0.10 | 0.74 |
| Average Area | 13753 | 7 | 3000 | 0.90 | 0.45 | 0.30 | 0.08 | 0.74 |
| Below Average Area | 18338 | 7 | 3000 | 0.68 | 0.34 | 0.23 | 0.06 | 0.74 |
| Michigan Antrim | 12000 | 7 | 1400 | 0.58 | 0.43 | 0.24 | 0.14 | 0.95 |
| Best Area | 3600 | 7 | 1400 | 0.77 | 0.57 | 0.32 | 0.19 | 0.95 |
| Average Area | 3600 | 7 | 1400 | 0.58 | 0.43 | 0.24 | 0.14 | 0.95 |
| Below Average Area | 4800 | 7 | 1400 | 0.44 | 0.32 | 0.18 | 0.11 | 0.95 |
| Illinois New Albany Developing Area | 1600 | 8 | 2750 | 3.30 | 1.67 | 1.10 | 0.26 | 0.5 |
| Best Area | 480 | 8 | 2750 | 4.39 | 2.22 | 1.46 | 0.35 | 0.5 |
| Average Area | 480 | 8 | 2750 | 3.30 | 1.67 | 1.10 | 0.26 | 0.5 |
| Below Average Area | 640 | 8 | 2750 | 2.48 | 1.25 | 0.83 | 0.20 | 0.5 |
| Cincinnati Arch - Devonian Shales | 6000 | 4 | 1800 | 0.36 | 0.18 | 0.12 | 0.03 | 0.5 |
| Best Area | 1800 | 4 | 1800 | 0.48 | 0.24 | 0.16 | 0.04 | 0.5 |
| Average Area | 1800 | 4 | 1800 | 0.36 | 0.18 | 0.12 | 0.03 | 0.5 |
| Below Average Area | 2400 | 4 | 1800 | 0.27 | 0.14 | 0.09 | 0.02 | 0.5 |
| Williston - Shallow Niobraran | 10000 | 2 | 1000 | 1.35 | 0.68 | 0.45 | 0.14 | 0.58 |
| Best Area | 3000 | 2 | 1000 | 1.80 | 0.90 | 0.60 | 0.18 | 0.58 |

Review of Emerging U.S. Gas Shale and Shale Oil Plays

**Appendix**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Average Area | 3000 | 2 | 1000 | 1.35 | 0.68 | 0.45 | 0.14 | 0.58 |
| Below Average Area | 4000 | 2 | 1000 | 1.01 | 0.51 | 0.34 | 0.10 | 0.58 |
| Fort Worth Barnett - Core Area P | 1426 | 5 | 7500 | 3.20 | 2.40 | 1.60 | 0.80 | 0.95 |
| Best Area | 428 | 5 | 7500 | 4.26 | 3.19 | 2.13 | 1.06 | 0.95 |
| Average Area | 428 | 5 | 7500 | 3.20 | 2.40 | 1.60 | 0.80 | 0.95 |
| Below Average Area | 570 | 5 | 7500 | 2.40 | 1.80 | 1.20 | 0.60 | 0.95 |
| Fort Worth Barnett - Extension P | 1906 | 8 | 7500 | 2.40 | 1.80 | 1.20 | 0.60 | 0.75 |
| Best Area | 572 | 8 | 7500 | 3.19 | 2.39 | 1.60 | 0.80 | 0.75 |
| Average Area | 572 | 8 | 7500 | 2.40 | 1.80 | 1.20 | 0.60 | 0.75 |
| Below Average Area | 762 | 8 | 7500 | 1.80 | 1.35 | 0.90 | 0.45 | 0.75 |
| Fort Worth Barnett - Core Area F | 2649 | 5 | 7500 | 3.20 | 2.40 | 1.60 | 0.80 | 0.95 |
| Best Area | 795 | 5 | 7500 | 4.26 | 3.19 | 2.13 | 1.06 | 0.95 |
| Average Area | 795 | 5 | 7500 | 3.20 | 2.40 | 1.60 | 0.80 | 0.95 |
| Below Average Area | 1060 | 5 | 7500 | 2.40 | 1.80 | 1.20 | 0.60 | 0.95 |
| Fort Worth Barnett - Extension F | 477 | 8 | 7500 | 2.40 | 1.80 | 1.20 | 0.60 | 0.75 |
| Best Area | 143 | 8 | 7500 | 3.19 | 2.39 | 1.60 | 0.80 | 0.75 |
| Average Area | 143 | 8 | 7500 | 2.40 | 1.80 | 1.20 | 0.60 | 0.75 |
| Below Average Area | 191 | 8 | 7500 | 1.80 | 1.35 | 0.90 | 0.45 | 0.75 |
| Woodford-Barnett - Active | 2691 | 4 | 10200 | 6.00 | 4.50 | 3.00 | 1.50 | 0.75 |
| Best Area | 807 | 4 | 10200 | 7.98 | 5.99 | 3.99 | 2.00 | 0.75 |
| Average Area | 807 | 4 | 10200 | 6.00 | 4.50 | 3.00 | 1.50 | 0.75 |
| Below Average Area | 1076 | 4 | 10200 | 4.50 | 3.38 | 2.25 | 1.13 | 0.75 |
| Lewis Shale | 7506 | 3 | 4500 | 3.25 | 2.44 | 1.30 | 0.82 | 0.95 |
| Best Area | 2252 | 3 | 4500 | 4.32 | 3.25 | 1.73 | 1.09 | 0.95 |
| Average Area | 2252 | 3 | 4500 | 3.25 | 2.44 | 1.30 | 0.82 | 0.95 |
| Below Average Area | 3002 | 3 | 4500 | 2.44 | 1.83 | 0.98 | 0.62 | 0.95 |
| Fayetteville - Central | 4000 | 8 | 4000 | 6.74 | 3.38 | 2.25 | 0.68 | 0.94 |
| Best Area | 1200 | 8 | 4000 | 8.96 | 4.50 | 2.99 | 0.90 | 0.94 |
| Average Area | 1200 | 8 | 4000 | 6.74 | 3.38 | 2.25 | 0.68 | 0.94 |
| Below Average Area | 1600 | 8 | 4000 | 5.06 | 2.54 | 1.69 | 0.51 | 0.94 |
| Fayetteville - West | 5000 | 8 | 4000 | 3.45 | 1.75 | 1.15 | 0.35 | 0.88 |
| Best Area | 1500 | 8 | 4000 | 4.59 | 2.33 | 1.53 | 0.46 | 0.88 |
| Average Area | 1500 | 8 | 4000 | 3.45 | 1.75 | 1.15 | 0.35 | 0.88 |
| Below Average Area | 2000 | 8 | 4000 | 2.59 | 1.31 | 0.86 | 0.26 | 0.88 |
| Woodford - Western Arkoma | 2900 | 4 | 9500 | 11.97 | 6.00 | 4.00 | 1.20 | 0.9 |
| Best Area | 870 | 4 | 9500 | 15.92 | 7.98 | 5.32 | 1.60 | 0.9 |
| Average Area | 870 | 4 | 9500 | 11.97 | 6.00 | 4.00 | 1.20 | 0.9 |
| Below Average Area | 1160 | 4 | 9500 | 8.98 | 4.50 | 3.00 | 0.90 | 0.9 |
| Woodford - Central OK Fold Belt | 1800 | 4 | 5000 | 2.99 | 1.50 | 1.00 | 0.30 | 0.86 |
| Best Area | 540 | 4 | 5000 | 3.98 | 2.00 | 1.33 | 0.40 | 0.86 |
| Average Area | 540 | 4 | 5000 | 2.99 | 1.50 | 1.00 | 0.30 | 0.86 |
| Below Average Area | 720 | 4 | 5000 | 2.24 | 1.13 | 0.75 | 0.23 | 0.86 |
| Woodford - Cana | 688 | 4 | 13500 | 15.56 | 7.80 | 5.20 | 1.50 | 0.86 |
| Best Area | 206 | 4 | 13500 | 20.69 | 10.37 | 6.92 | 2.00 | 0.86 |

Review of Emerging U.S. Gas Shale and Shale Oil Plays

**Appendix**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Average Area | 206 | 4 | 13500 | 15.56 | 7.80 | 5.20 | 1.50 | 0.86 |
| Below Average Area | 726 | 4 | 13500 | 11.67 | 5.85 | 3.90 | 1.13 | 0.86 |
| Haynesville Shale- Developed | 3574 | 8 | 12000 | 13.00 | 9.75 | 6.50 | 3.25 | 0.75 |
| Best Area | 1072 | 8 | 12000 | 17.29 | 12.97 | 8.65 | 4.32 | 0.75 |
| Average Area | 1072 | 8 | 12000 | 13.00 | 9.75 | 6.50 | 3.25 | 0.75 |
| Below Average Area | 1430 | 8 | 12000 | 9.75 | 7.31 | 4.88 | 2.44 | 0.75 |
| Haynesville Shale- Undeveloped | 5426 | 8 | 12000 | 3.00 | 2.25 | 1.50 | 0.75 | 0.75 |
| Best Area | 1628 | 8 | 12000 | 3.99 | 2.99 | 2.00 | 1.00 | 0.75 |
| Average Area | 1628 | 8 | 12000 | 3.00 | 2.25 | 1.50 | 0.75 | 0.75 |
| Below Average Area | 2170 | 8 | 12000 | 2.25 | 1.69 | 1.13 | 0.56 | 0.75 |
| Appalachia - Marcellus Dev | 10622 | 8 | 6750 | 7.00 | 5.25 | 3.50 | 1.75 | 0.7 |
| Best Area | 3187 | 8 | 6750 | 9.31 | 6.98 | 4.66 | 2.33 | 0.7 |
| Average Area | 3187 | 8 | 6750 | 7.00 | 5.25 | 3.50 | 1.75 | 0.7 |
| Below Average Area | 4249 | 8 | 6750 | 5.25 | 3.94 | 2.63 | 1.31 | 0.7 |
| Appalachia - Marcellus Und- MD | 920 | 8 | 6750 | 2.30 | 1.73 | 1.15 | 0.58 | 0.7 |
| Best Area | 276 | 8 | 6750 | 3.06 | 2.30 | 1.53 | 0.77 | 0.7 |
| Average Area | 276 | 8 | 6750 | 2.30 | 1.73 | 1.15 | 0.58 | 0.7 |
| Below Average Area | 368 | 8 | 6750 | 1.73 | 1.30 | 0.86 | 0.44 | 0.7 |
| Appalachia - Marcellus Und- NY | 16926 | 8 | 6750 | 2.30 | 1.73 | 1.15 | 0.58 | 0.7 |
| Best Area | 5078 | 8 | 6750 | 3.06 | 2.30 | 1.53 | 0.77 | 0.7 |
| Average Area | 5078 | 8 | 6750 | 2.30 | 1.73 | 1.15 | 0.58 | 0.7 |
| Below Average Area | 6770 | 8 | 6750 | 1.73 | 1.30 | 0.86 | 0.44 | 0.7 |
| Appalachia - Marcellus Und- OH | 15348 | 8 | 6750 | 2.30 | 1.73 | 1.15 | 0.58 | 0.7 |
| Best Area | 4604 | 8 | 6750 | 3.06 | 2.30 | 1.53 | 0.77 | 0.7 |
| Average Area | 4604 | 8 | 6750 | 2.30 | 1.73 | 1.15 | 0.58 | 0.7 |
| Below Average Area | 6139 | 8 | 6750 | 1.73 | 1.30 | 0.86 | 0.44 | 0.7 |
| Appalachia - Marcellus Und- PA | 29828 | 8 | 6750 | 2.30 | 1.73 | 1.15 | 0.58 | 0.7 |
| Best Area | 8948 | 8 | 6750 | 3.06 | 2.30 | 1.53 | 0.77 | 0.7 |
| Average Area | 8948 | 8 | 6750 | 2.30 | 1.73 | 1.15 | 0.58 | 0.7 |
| Below Average Area | 11931 | 8 | 6750 | 1.73 | 1.30 | 0.86 | 0.44 | 0.7 |
| Appalachia - Marcellus Und- VA | 3249 | 8 | 6750 | 2.30 | 1.73 | 1.15 | 0.58 | 0.7 |
| Best Area | 975 | 8 | 6750 | 3.06 | 2.30 | 1.53 | 0.77 | 0.7 |
| Average Area | 975 | 8 | 6750 | 2.30 | 1.73 | 1.15 | 0.58 | 0.7 |
| Below Average Area | 1300 | 8 | 6750 | 1.73 | 1.30 | 0.86 | 0.44 | 0.7 |
| Appalachia - Marcellus Und- WV | 18000 | 8 | 6750 | 2.30 | 1.73 | 1.15 | 0.58 | 0.7 |
| Best Area | 5400 | 8 | 6750 | 3.06 | 2.30 | 1.53 | 0.77 | 0.7 |
| Average Area | 5400 | 8 | 6750 | 2.30 | 1.73 | 1.15 | 0.58 | 0.7 |
| Below Average Area | 7200 | 8 | 6750 | 1.73 | 1.30 | 0.86 | 0.44 | 0.7 |
| Eagleford Shale - DRY GAS | 200 | 4 | 7000 | 11.00 | 8.25 | 5.50 | 2.75 | 0.892 |
| Best Area | 60 | 4 | 7000 | 14.63 | 10.97 | 7.32 | 3.66 | 0.892 |
| Average Area | 60 | 4 | 7000 | 11.00 | 8.25 | 5.50 | 2.75 | 0.892 |
| Below Average Area | 80 | 4 | 7000 | 8.25 | 6.19 | 4.13 | 2.06 | 0.892 |

Review of Emerging U.S. Gas Shale and Shale Oil Plays

**Appendix**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Eagleford Shale - WET GAS | 890 | 8 | 7000 | 9.00 | 6.75 | 4.50 | 2.25 | 0.892 |
| Best Area | 267 | 8 | 7000 | 11.97 | 8.98 | 5.99 | 2.99 | 0.892 |
| Average Area | 267 | 8 | 7000 | 9.00 | 6.75 | 4.50 | 2.25 | 0.892 |
| Below Average Area | 356 | 8 | 7000 | 6.75 | 5.06 | 3.38 | 1.69 | 0.892 |
| Floyd/Neal-Conasauga | 2429 | 2 | 8000 | 1.80 | 1.35 | 0.90 | 0.45 | 0.906 |
| Best Area | 729 | 2 | 8000 | 2.39 | 1.80 | 1.20 | 0.60 | 0.906 |
| Average Area | 792 | 2 | 8000 | 1.80 | 1.35 | 0.90 | 0.45 | 0.906 |
| Below Average Area | 972 | 2 | 8000 | 1.35 | 1.01 | 0.68 | 0.34 | 0.906 |
| Uinta Mancos | 6589 | 8 | 15250 | 2.00 | 1.50 | 1.00 | 0.50 | 0.95 |
| Best Area | 1977 | 8 | 15250 | 2.66 | 2.00 | 1.33 | 0.67 | 0.95 |
| Average Area | 1977 | 8 | 15250 | 2.00 | 1.50 | 1.00 | 0.50 | 0.95 |
| Below Average Area | 2636 | 8 | 15250 | 1.50 | 1.13 | 0.75 | 0.38 | 0.95 |
| GGB Hilliard Baxter Mancos | 16416 | 8 | 14750 | 0.36 | 0.27 | 0.18 | 0.09 | 0.8 |
| Best Area | 4925 | 8 | 14750 | 0.48 | 0.36 | 0.24 | 0.12 | 0.8 |
| Average Area | 4925 | 8 | 14750 | 0.36 | 0.27 | 0.18 | 0.09 | 0.8 |
| Below Average Area | 6566 | 8 | 14750 | 0.27 | 0.20 | 0.14 | 0.07 | 0.8 |

Review of Emerging U.S. Gas Shale and Shale Oil Plays

# Examination of Possibly Induced Seismicity from Hydraulic Fracturing in the Eola Field, Garvin County, Oklahoma

Austin Holland



Oklahoma Geological Survey
Open-File Report
OF1-2011

# OKLAHOMA GEOLOGICAL SURVEY
## Open-file Report Disclaimer

This Open-file Report is intended to make the results of research available at the earliest possible date and not intended to represent the final or formal publication. The report is an unedited copy prepared by the author.

# Examination of Possibly Induced Seismicity from Hydraulic Fracturing in the Eola Field, Garvin County, Oklahoma

Austin A. Holland

Oklahoma Geological Survey

Sarkeys Energy Center

100 East Boyd St., Rm. N-131

Norman, Oklahoma 73019-0628

August 2011

Oklahoma Geological Survey

Open-File Report

OF1-2011

## Summary

On January 18, 2011, The Oklahoma Geological Survey (OGS) received a phone call from a resident living south of Elmore City, in Garvin County, Oklahoma, that reported feeling several earthquakes throughout the night.  The reporting local resident had also offered that there was an active hydraulic fracturing project occurring nearby.  Upon examination there were nearly 50 earthquakes, which occurred during that time.  After analyzing the data there were 43 earthquakes large enough to be located, which from the character of the seismic recordings indicate that they are both shallow and unique.  The earthquakes range in magnitude from 1.0 to 2.8 Md and the majority of earthquakes occurred within about 24 hours of the first earthquake.  Careful attention and significant effort was put into obtaining the most accurate locations possible and gaining a reasonable estimate in the error in locations.  The nearest seismic station is 35 km away from where the earthquakes occurred.  Formal errors in location are on the order 100-500 m horizontally and about twice that for depth.  Examination of different velocity models would suggest that the uncertainties in earthquake locations should be about twice the formal uncertainties. The majority of earthquakes appear to have occurred within about 3.5 km of the well located in the Eola Field of southern Garvin County.  The Eola Field has many structures, which may provide conduits for fluid flow at depth.  The well is Picket Unit B well 4-18, and about seven hours after the first and deepest hydraulic fracturing stage started the earthquakes began occurring.  It was possible to model 95% of the earthquakes in this sequence using a simple pore pressure diffusion model with a permeability of about 250 mD (milliDarcies).  While this permeability may be high it is less than those reported for highly fractured rock.  The strong correlation in time and space as well as a reasonable fit to a physical model suggest that there is a possibility these earthquakes were induced by hydraulic-fracturing.  However, the uncertainties in the data make it impossible to say with a high degree of certainty whether or not these earthquakes were triggered by natural means or by the nearby hydraulic-fracturing operation.

## Introduction

On January 18th, 2011, a resident living in south-central Oklahoma (Garvin County), living south of Elmore City contacted the Oklahoma Geological Survey (OGS) to report feeling several earthquakes throughout the night with the first occurring at approximately 6:10 PM CST Jan. 17th and another large one at about 2:50 AM CST Jan. 18th. Upon examination there were in fact earthquakes in the area.  The resident also reported that there was an active hydraulic fracturing project being conducted in a nearby well.  Examination of the available seismic data, including EarthScope USArray stations in the region, quickly confirmed that earthquakes were occurring in the area.  At this point the OGS contacted the Regional Manager for the Oklahoma Corporation Commission, who indicated that there was indeed fracturing occurring at the Picket Unit B Well 4-18.   Our analysis showed that shortly after hydraulic fracturing began small earthquakes started occurring, and more than 50 were identified, of which 43 were large enough to be located.  Most of these earthquakes

occurred within a 24-hour period after hydraulic fracturing operations had ceased. There have been previous cases where seismologists have suggested a link between hydraulic fracturing and earthquakes, but data was limited, so drawing a definitive conclusions was not possible for these cases.  The first case occurred in June 1978 in Carter and Love Counties, just south of Garvin County, with 70 earthquakes in 6.2 hours.  The second case occurred in Love County with 90 earthquakes following the first and second hydraulic fracturing stages (Nicholson and Wesson, 1990).



**Figure 1 - Earthquakes from 1897-2010 from the OGS catalog (red crosses).  Yellow triangles are seismic stations from the Earthscope Transportable Array; tan triangles are OGS seismic stations.  Faults are shown by thin black lines, solid are faults mapped from a surface expression, dotted lines indicate subsurface faults (Northcutt and Campbell, 1995).  The main movement on all of these faults was in the Pennsylvanian (Granath, 1989).  Hachured region shows the location of the Eola Oil Field (Boyd, 2002).**

South-central Oklahoma has a significant amount of historical seismicity, and has been one of the most active areas within Oklahoma since 1977, when an adequate seismic network was established.  The nearest stations to the earthquakes were several Earthscope Transportable Array (TA) stations.  Without the TA stations only

a few of the earthquakes could possibly have been located and the uncertainties in the hypocentral locations would be quite large.

**Geologic Setting**

The Eola Field lies at the northern edge of the Ardmore Basin and the buried northwestern extent of the Arbuckle Mountains and contains a highly folded and faulted thrust system (Swesnick and Green, 1950; Harlton, 1964, Granath, 1989). In the Cambrian this area experienced significant rifting associated with the Southern Oklahoma aulacogen (Keller et al., 1983).   After the initial rifting the area experienced thermal subsidence and sedimentation (Granath, 1989).  The area continued to see periods of subsidence and sedimentation with a few periods of erosion represented by unconformities (Swesnik and Green, 1950).  In the mid-Pennsylvanian the area began to experience significant transpression associated with the Ouachita Orogen (Granath, 1989).  Because of the areas complex tectonic history it is quite likely that the nature of faults has changed through time and that normal faults associated with the aulacogen and later basin accommodation were reactivated in the mid to late-Pennsylvanian with a new sense of motion.  The Washita Valley fault is the largest fault in the area, with a surface trace of approximately 56 km (Tanner, 1967).  It is a major fault that is known to extend nearly 180 km from the Ouachita thrust system in the southeast to the Anadarko basin to the northwest (Tanner, 1967).  Estimates for the amount of left-lateral strike-slip accommodated on this fault vary dramatically, but reasonably range from 65 km (Tanner, 1967) to 26 km (McCaskill, 1998).  The Roberson fault, to south of the Washita Valley fault, is a thrust fault with an associated overturned syncline with significant shortening (Swesnick and Green, 1950).  The Reagan, Eola and Mill Creek faults as mapped by Harlton (1964) all show significant components of left lateral strike slip (Granath, 1989).   The Eola field contains several fault blocks in between these major faults, with all the faults in the subsurface having near vertical dips (Harlton, 1964).  To the southeast of the Eola Field is the highly faulted West Timbered Hills of the northwestern Arbuckle Mountains (Harlton, 1964).

The Eola Field was discovered in 1947 with a discovery well completed to a total depth of 10,234 feet (3,119 m) in the basal Bromide Sandstone.  The initial bottom hole pressure was about 3800 PSI and by 1950 had declined to 2,900 PSI with seven producing wells in the field (Swesnick and Green, 1950).



**Figure 2 - Fault map for the Eola Field, Oklahoma. Thick green lines are faults modified from Harlton (1964). Faults shown as thin grey lines are from Stoeser et al. (2007). Eola field is colored a salmon color (Boyd, 2002).**

### Hydraulic Fracturing Operations at Picket Unit B Well 4-18

Hydraulic fracturing operations began on Monday January 17, 2011 at approximately 6 AM (CST), 12:00 UTC. The hydraulic fracturing of the well consisted of a four-stage hydraulic fracturing operation with frac intervals of 9,830'-10,282', 8,890'-8326', 7,662'-8,128', and 7,000'-7,562', with the last frac stage completed on January 23, 2011. The well was then flushed until February 6, 2011. Because the earthquakes began after the first frac stage we will primarily consider this stage. The first frac stage had an average rate of injection of 88.5 bpm and an average injection pressure of 4850 psi. This stage also included an acid stimulation. There was a total of 2,475,545 gallons of frac fluid injected and 575,974 lbs of propent. The Picket Unit B well 4-18 is a nearly vertical well located at 34.55272 - 97.44580, elevation 277.4 m, with an API number of 049-24797. The first frac occurred in the interval between 9,830' (2,996.2 m), and 10,282' (3,134.0 m)

### Earthquake Data Analysis and Methods

The Garvin County, earthquakes were analyzed using routine processing steps by the OGS for earthquake monitoring. The phase arrivals were picked using the interactive picking capabilities of the seismic software package SEISAN (Havskov and Ottemoller, 1999). The earthquake hypocenters and origin times were determined using the location program HYPOCENTER (Lienert et al., 1986 and Lienert and Havskov, 1995). The OGS typical duration magnitude calculations were

used to determine the magnitude of the earthquakes (Lawson and Luza, 2006). The velocity model used is the same model that is currently being used by the OGS for most regions of Oklahoma, the "Manitou Model" shown in Table 1. Using the HYPOELLIPSE method hypocenter locations are poorly resolved because the nearest station is approximately 35 km away, phase arrivals were difficult to identify for these events, and the events appear to have been shallow. The formal uncertainties are significant in the range of several kilometers for these earthquakes and indicate that locations for these earthquakes should be considered suspect. The formal error estimates from the initial HYPOCENTER locations can be seen in Table 2. Aside from the formal uncertainties it is very likely that the regional velocity model used is not quite appropriate for this area of Oklahoma. In fact, a single velocity model is definitely not appropriate across the structurally complex region spanning the deep (>10km) Ardmore basin to the immediately adjacent Arbuckle uplift.

In an attempt to improve the hypocenter determinations the Double-Differencing, HypoDD, technique of Waldhauser and Ellsworth (2000) was employed to relocate the earthquakes. This approach takes advantage of the fact that there is very little difference in phase traveltimes between earthquakes that occur near each other. It can then use all the earthquakes to find the centroid of the earthquakes, while more easily identifying and excluding bad phase arrival times at stations. Once the centroid of the earthquakes is determined the relative location of each earthquake to the centroid can accurately be determined. HypoDD provides very good resolution of relative earthquake locations, but the absolute earthquake location error can be larger than the formal error estimates. The singular value decomposition (SVD) method was used in HypoDD because this is a small dataset, and the SVD method provides a better estimate of the formal uncertainties (Waldhauser, 2001).

HypoDD also has the capability to use waveform cross correlation between events. Waveform cross-correlations can often dramatically improve earthquake hypocentral location errors, by removing any human error in phase arrival picks. This method uses the similarities in waveforms between events to more accurately measure arrival times, and has been shown to dramatically improve locations and their associated uncertainties. Cross correlation is simply finding the part of the recorded waveform, which is most like the template waveform window. A template waveform window is an example waveform around either a P or S-Wave arrival from an event within the earthquake sequence. Cross correlations for these earthquakes were attempted. In order to attempt the cross correlation a few of the larger events were selected as templates and windows around the P and S phase arrivals were selected. These windows where then run against the corresponding template event to determine how well the data could be cross-correlated with the entire waveform for the respective earthquake. In this test, the S-waves could readily be identified using cross correlation, but the P-wave could not. The P-waves were generally correlating better with S or surface waves in the coda than with the P phase arrival, except for two stations X34A and Y34A. The inability to cross-

**Table 1 - Velocity models used in this study; all have a Vp/Vs ratio of 1.73. Manitou and Chelsea models are derived from Mitchell and Landisman (1970). Tryggvason and Qualls (1967) model was developed from the same seismic refraction line as Mitchell and Landisman (1970). The Central Oklahoma model was developed from traveltime inversion for earthquakes in central Oklahoma.**

| Chelsea | | | Central Oklahoma | | |
|---|---|---|---|---|---|
| Thickness (km) | Vp (km/s) | Vs (km/s) | Thickness (km) | Vp (km/s) | Vs (km/s) |
| 0.6 | 4.00 | 2.31 | 0.5 | 4.46 | 2.58 |
| 0.4 | 6.05 | 3.50 | 0.5 | 4.60 | 2.66 |
| 2.1 | 5.50 | 3.18 | 2.0 | 4.75 | 2.75 |
| 10.3 | 6.08 | 3.51 | 0.5 | 6.13 | 3.54 |
| 3.0 | 6.49 | 3.75 | 1.5 | 6.16 | 3.56 |
| 1.5 | 6.20 | 3.58 | 3.0 | 6.19 | 3.58 |
| 8.2 | 6.72 | 3.88 | 2.0 | 6.19 | 3.58 |
| 9.1 | 7.05 | 4.08 | 5.0 | 6.20 | 3.58 |
| 11.1 | 7.36 | 4.25 | 11.0 | 6.73 | 3.89 |
| half-space | 8.18 | 4.73 | 9.0 | 7.10 | 4.11 |
| | | | 11.0 | 7.36 | 4.25 |
| | | | half-space | 8.18 | 4.73 |

| Manitou | | | Tryggvason-Qualls | | |
|---|---|---|---|---|---|
| Thickness (km) | Vp (km/s) | Vs (km/s) | Thickness (km) | Vp (km/s) | Vs (km/s) |
| 1.0 | 5.50 | 3.18 | 0.54 | 4.00 | 2.31 |
| 9.5 | 6.08 | 3.51 | 13.16 | 5.96 | 3.45 |
| 5.1 | 6.49 | 3.75 | 15.90 | 6.66 | 3.85 |
| 2.5 | 6.20 | 3.58 | 21.84 | 7.20 | 4.16 |
| 8.2 | 6.72 | 3.88 | half-space | 8.32 | 4.81 |
| 9.1 | 7.05 | 4.08 | | | |
| 11.1 | 7.36 | 4.25 | | | |
| half-space | 8.18 | 4.73 | | | |

**Table 2 – Initial hypocenter locations from SEISAN and HYPOCENTER.  Large uncertainties in hypocentral locations are typical of earthquakes without nearby seismic stations.  The mean error at a 90% confidence interval in locations is 3.8, 5.2, 14.4 km for longitude, latitude, depth respectively.**

| Origin Time | Longitude | Latitude | Depth (km) | Magnitude | Type | RMS | Error Longitude (km) | Error Latitude (km) | Error Depth (km) |
|---|---|---|---|---|---|---|---|---|---|
| 1/17/11 19:19 | -97.4238 | 34.5285 | 8.2 | 1.3 | Md | 0.61 | 4.1 | 11.5 | 16.7 |
| 1/17/11 19:35 | -97.4488 | 34.5583 | 3 | 1.9 | Md | 1.04 | 3.8 | 3.8 | 0 |
| 1/17/11 20:04 | -97.4418 | 34.5525 | 0 | 1.5 | Md | 0.99 | 4.9 | 8 | 24.2 |
| 1/17/11 20:16 | -97.4274 | 34.5585 | 1 | 2.1 | Md | 0.79 | 2.7 | 2.6 | 0 |
| 1/17/11 20:50 | -97.4199 | 34.5487 | 5 | 1.6 | Md | 0.64 | 4.4 | 6.3 | 17.3 |
| 1/17/11 20:56 | -97.4318 | 34.5637 | 0 | 2.1 | Md | 0.99 | 3.3 | 3.3 | 10.4 |
| 1/17/11 21:12 | -97.4391 | 34.5738 | 0.1 | 1.8 | Md | 0.95 | 4.2 | 4.8 | 19.7 |
| 1/17/11 21:23 | -97.4051 | 34.5587 | 0 | 1.7 | Md | 1.31 | 5 | 7.1 | 18.6 |
| 1/17/11 21:44 | -97.41 | 34.5439 | 0 | 1.6 | Md | 0.49 | 3.5 | 6.9 | 18.5 |
| 1/17/11 21:46 | -97.4239 | 34.561 | 0 | 2 | Md | 0.8 | 3.3 | 4.8 | 13 |
| 1/17/11 22:27 | -97.4076 | 34.5592 | 0 | 2.2 | Md | 0.67 | 2.6 | 4.4 | 9.9 |
| 1/17/11 22:35 | -97.4311 | 34.5521 | 0 | 2.3 | Md | 0.89 | 3 | 3.1 | 9.7 |
| 1/17/11 23:24 | -97.4041 | 34.569 | 0 | 1.7 | Md | 0.8 | 4.9 | 5.7 | 26.4 |
| 1/17/11 23:37 | -97.4304 | 34.5784 | 0 | 1.6 | Md | 0.96 | 4.9 | 5.9 | 24.3 |
| 1/17/11 23:48 | -97.4113 | 34.5474 | 0 | 1.9 | Md | 0.82 | 2.8 | 3.4 | 9.2 |
| 1/17/11 23:52 | -97.4247 | 34.5263 | 0 | 1.4 | Md | 0.26 | 2.7 | 4.7 | 16.1 |
| 1/18/11 0:14 | -97.433 | 34.5597 | 0 | 2.6 | Md | 0.77 | 2.4 | 2.8 | 8.1 |
| 1/18/11 0:33 | -97.4048 | 34.5463 | 0 | 1.7 | Md | 0.51 | 3 | 3.4 | 14.4 |
| 1/18/11 0:34 | -97.413 | 34.5352 | 0 | 1.3 | Md | 0.65 | 4.2 | 5.6 | 16.4 |
| 1/18/11 0:46 | -97.4173 | 34.5142 | 0 | 1 | Md | 0.41 | 3 | 5 | 16.4 |
| 1/18/11 1:05 | -97.4363 | 34.5644 | 0 | 1.6 | Md | 0.77 | 3.1 | 3.6 | 12.7 |
| 1/18/11 1:06 | -97.4164 | 34.5146 | 0 | 1.2 | Md | 0.56 | 3.4 | 6.2 | 14.4 |
| 1/18/11 1:31 | -97.438 | 34.5619 | 0 | 1.7 | Md | 1.06 | 4.9 | 5 | 20.4 |
| 1/18/11 1:37 | -97.4277 | 34.5368 | 5 | 1.7 | Md | 0.81 | 4.7 | 10.2 | 18.5 |
| 1/18/11 1:40 | -97.4424 | 34.5679 | 0.1 | 2.2 | Md | 0.93 | 3.4 | 4.2 | 12.1 |
| 1/18/11 2:13 | -97.4347 | 34.5653 | 0 | 2 | Md | 0.95 | 3.6 | 4.2 | 15.9 |
| 1/18/11 2:27 | -97.4077 | 34.5587 | 4.7 | 1.5 | Md | 0.43 | 3.1 | 7.9 | 12.3 |
| 1/18/11 2:43 | -97.4496 | 34.5659 | 0 | 2 | Md | 1.01 | 3.9 | 4.8 | 16 |
| 1/18/11 3:17 | -97.4502 | 34.5838 | 0 | 1.8 | Md | 1.01 | 4.7 | 5.2 | 16.7 |
| 1/18/11 3:40 | -97.43 | 34.5663 | 0 | 2.8 | Md | 1.17 | 3.2 | 3.7 | 8.7 |
| 1/18/11 4:01 | -97.419 | 34.5466 | 0 | 2.4 | Md | 0.96 | 2.7 | 3.6 | 8.6 |
| 1/18/11 4:52 | -97.3959 | 34.5516 | 0 | 1.5 | Md | 0.83 | 4.5 | 6.5 | 17.2 |
| 1/18/11 5:57 | -97.4264 | 34.5481 | 0 | 2.1 | Md | 0.62 | 2.3 | 3.4 | 10.6 |
| 1/18/11 7:05 | -97.4383 | 34.5633 | 0 | 1.2 | Md | 0.94 | 4.3 | 6.5 | 23.2 |
| 1/18/11 7:58 | -97.4009 | 34.5375 | 0 | 2 | Md | 1.34 | 6.8 | 9.4 | 23.2 |
| 1/18/11 7:59 | -97.4195 | 34.5341 | 8.2 | 1.3 | Md | 0.45 | 3.2 | 6.3 | 8 |
| 1/18/11 8:23 | -97.4227 | 34.562 | 0 | 1.7 | Md | 1.15 | **4** | 6 | 13.3 |
| 1/18/11 9:22 | -97.4302 | 34.5572 | 0.1 | 2.3 | Md | 0.68 | 2.6 | 3.9 | 9.6 |
| 1/18/11 9:52 | -97.4188 | 34.5326 | 0 | 1.5 | Md | 0.63 | 3.2 | 5 | 13.9 |
| 1/18/11 12:32 | -97.4296 | 34.5685 | 0 | 2 | Md | 1.06 | 3.7 | 4.7 | 13.2 |
| 1/18/11 12:43 | -97.4106 | 34.5279 | 0 | 1.5 | Md | 1.03 | 7.9 | 10.5 | 22.5 |
| 1/18/11 19:40 | -97.4247 | 34.5382 | 0 | 1.4 | Md | 0.5 | 2.6 | 4.1 | 18.3 |
| 1/19/11 4:29 | -97.4259 | 34.5555 | 0.1 | 2 | Md | 0.82 | 4.4 | 3.9 | 13 |

correlate an earthquake's P-Wave arrival with the template, excluded the possibility of using cross-correlation data for earthquake relocations using HypoDD.

Because the events are shallow, the hypocentral depths were fixed to 2.5 km to prevent events that were initially located at the surface from being excluded immediately in the relocation process. In order to address the sensitivity to velocity models, relocations were conducted for all velocity models listed in Table 1. Only the velocity model varied between HypoDD relocations for the different velocity models. These models all correspond reasonably well and earthquakes hypocenters moved well away from the initial 2.5 km depth imposed on the input data. A comparison of cluster locations is shown in Table 3 and Figure 3. The model selected to represent the results of the relocations is the Chelsea model. This model is consistent with all the others. Its cluster centroid while a little shallower than the other models is centrally located and retained the most earthquakes in the relocation process. The mean $2\sigma$ error is 164.7, 274.8, 362.4 meters for x (longitude), y (latitude), and z (depth) respectively. The final hypocenter relocations can be seen in Table 4 and Figure 4. As mentioned earlier the uncertainties provided by HypoDD provide good relative estimates. In order to address what the absolute uncertainties might be, we examined the maximum distance between all of the cluster centroids and the Chelsea model cluster centroid from Table 3. The greatest distances in cluster centroid from that of the Chelsea centroid are 160 m in longitude, 115 m in latitude, and 264 m in depth. Our absolute error could be considered the addition of the previous values to the relative locations uncertainties in Table 4. The total earthquake location uncertainties are shown in Figure 11b. A value for the Vp/Vs ratio of 1.73 was used in all of the relocations. Because the locations of these earthquakes rely on the high quality S-Wave phase arrivals this value can have a significant impact on the relocations of these events. An evaluation of the appropriate Vp/Vs ratio is well beyond the scope of this work and may be evaluated in the future. The uncertainties should be considered a minimum for the earthquake relocations given our assumption of the Vp/Vs ratio and the lack of nearby stations.

**Table 3 – HypoDD relocation cluster centroids for the different velocity models used. The number of earthquakes that remained in the solution is shown in the last column. HypoDD eliminates earthquakes that occur above the surface or lose link to nearby earthquakes in the cluster.**

| Model | Latitude | Longitude | Depth (km) | Weighted RMS | Number of Earthquakes |
|-------|----------|-----------|-----------|--------------|-----------------------|
| Manitou | 34.549496 | -97.424278 | 2.764315 | 0.2263 | 37 |
| Chelsea | 34.550533 | -97.424286 | 2.499614 | 0.21 | 43 |
| Tryggvasson-Qualls | 34.549976 | -97.426025 | 2.695957 | 0.223 | 35 |
| Central Oklahoma | 34.551384 | -97.423981 | 2.535471 | 0.2094 | 42 |



**Figure 3 – HypoDD cluster centroid locations, black crosses, in relationship to Picket Unit B Well 4-18, shown as black hexagon, Eola Field (Boyd, 2002) is shown in salmon. Thick green lines are faults modified from Harlton (1964).**



**Figure 4 – HypoDD earthquake relocations (colored by depth in kilometers) determined using Chelsea model. Picket Unit B Well 4-18, shown as black hexagon, Eola Field (Boyd, 2002) shown cross-hachured area. Thick green lines are faults modified from Harlton (1964).**

**Table 4 – HypoDD relocations using the Chelsea velocity model.  The mean 2σ error is 164.7, 274.8, 362.4 meters for longitude, latitude, depth respectively.**

| Latitude | Longitude | Depth (km) | Error Lon (m) | Error Lat (m) | Error Depth (m) | YR | MO | DY | HR | MN | SEC | Md |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 34.553837 | -97.422 | 2.45 | 205.2 | 264.3 | 358.2 | 2011 | 1 | 17 | 19 | 35 | 37.44 | 1.9 |
| 34.559546 | -97.428 | 2.39 | 235.3 | 391.8 | 532.4 | 2011 | 1 | 17 | 20 | 4 | 51.12 | 1.5 |
| 34.557353 | -97.422 | 3.77 | 144.1 | 221.6 | 464.8 | 2011 | 1 | 17 | 20 | 16 | 7.02 | 2.1 |
| 34.556832 | -97.42 | 1.84 | 148.8 | 240.8 | 772 | 2011 | 1 | 17 | 20 | 50 | 9 | 1.6 |
| 34.555636 | -97.427 | 2.81 | 115.2 | 165.3 | 186.7 | 2011 | 1 | 17 | 20 | 56 | 49.06 | 2.1 |
| 34.557035 | -97.425 | 2.25 | 200 | 269.5 | 383.9 | 2011 | 1 | 17 | 21 | 12 | 20.88 | 1.8 |
| 34.553377 | -97.428 | 2.22 | 232.9 | 362.9 | 380.7 | 2011 | 1 | 17 | 21 | 23 | 32.24 | 1.7 |
| 34.533862 | -97.421 | 2.6 | 170.8 | 410.1 | 339.1 | 2011 | 1 | 17 | 21 | 44 | 51.28 | 1.6 |
| 34.550916 | -97.423 | 2.12 | 176 | 297.9 | 334.3 | 2011 | 1 | 17 | 21 | 46 | 37.08 | 2 |
| 34.543506 | -97.421 | 2.68 | 220.3 | 570.2 | 423.3 | 2011 | 1 | 17 | 22 | 27 | 48.48 | 2.2 |
| 34.549756 | -97.423 | 4.29 | 216.5 | 352.7 | 691 | 2011 | 1 | 17 | 22 | 35 | 5.12 | 2.3 |
| 34.573397 | -97.44 | 3.64 | 388.1 | 506.7 | 1103 | 2011 | 1 | 17 | 23 | 37 | 1.44 | 1.6 |
| 34.544462 | -97.42 | 1.69 | 131 | 206.4 | 233.1 | 2011 | 1 | 17 | 23 | 48 | 39.68 | 1.9 |
| 34.527926 | -97.426 | 0.77 | 210.6 | 405.2 | 417.6 | 2011 | 1 | 17 | 23 | 52 | 24.38 | 1.4 |
| 34.553235 | -97.427 | 3.98 | 159.3 | 286.9 | 590.6 | 2011 | 1 | 18 | 0 | 14 | 22.13 | 2.6 |
| 34.53527 | -97.418 | 2.55 | 148.9 | 260.6 | 288.4 | 2011 | 1 | 18 | 0 | 33 | 39.44 | 1.7 |
| 34.539315 | -97.412 | 2.36 | 220.7 | 352.5 | 450.5 | 2011 | 1 | 18 | 0 | 34 | 59.51 | 1.3 |
| 34.546712 | -97.42 | 2.51 | 233.5 | 500.8 | 660.4 | 2011 | 1 | 18 | 0 | 46 | 46.76 | 1 |
| 34.557678 | -97.424 | 1.45 | 152 | 236.7 | 300.8 | 2011 | 1 | 18 | 1 | 5 | 15.18 | 1.6 |
| 34.500814 | -97.417 | 1.21 | 181 | 296.8 | 317 | 2011 | 1 | 18 | 1 | 6 | 31.9 | 1.2 |
| 34.55614 | -97.429 | 1.29 | 135.3 | 183 | 215.4 | 2011 | 1 | 18 | 1 | 31 | 43.79 | 1.7 |
| 34.555119 | -97.432 | 2.83 | 145.8 | 270.8 | 275 | 2011 | 1 | 18 | 1 | 37 | 0.57 | 1.7 |
| 34.554578 | -97.435 | 4.63 | 164.9 | 231.3 | 445.2 | 2011 | 1 | 18 | 1 | 40 | 42.24 | 2.2 |
| 34.560836 | -97.428 | 3.11 | 112.8 | 160.9 | 232.3 | 2011 | 1 | 18 | 2 | 13 | 20.17 | 2 |
| 34.559957 | -97.415 | 1.61 | 141.1 | 243.4 | 306.8 | 2011 | 1 | 18 | 2 | 27 | 32.86 | 1.5 |
| 34.557605 | -97.424 | 3.21 | 162.9 | 253.9 | 409.5 | 2011 | 1 | 18 | 2 | 43 | 34.24 | 2 |
| 34.55968 | -97.424 | 2.21 | 183.7 | 235.2 | 287.1 | 2011 | 1 | 18 | 3 | 17 | 27.51 | 1.8 |
| 34.554517 | -97.428 | 3.08 | 115.2 | 182.8 | 284.4 | 2011 | 1 | 18 | 3 | 40 | 6.62 | 2.8 |
| 34.54281 | -97.422 | 1.4 | 102.6 | 185.6 | 177.7 | 2011 | 1 | 18 | 4 | 1 | 53.34 | 2.4 |
| 34.563953 | -97.412 | 2.37 | 169 | 275.2 | 321.8 | 2011 | 1 | 18 | 4 | 53 | 0.09 | 1.5 |
| 34.552193 | -97.423 | 1.24 | 131.9 | 238.8 | 273.3 | 2011 | 1 | 18 | 5 | 57 | 58.97 | 2.1 |
| 34.552287 | -97.44 | 2.31 | 98.6 | 166.7 | 190.5 | 2011 | 1 | 18 | 7 | 5 | 49.79 | 1.2 |
| 34.552144 | -97.422 | 1.12 | 157.5 | 218 | 300.5 | 2011 | 1 | 18 | 7 | 58 | 42.51 | 1.2 |
| 34.55752 | -97.426 | 2.97 | 133.8 | 301.8 | 259.9 | 2011 | 1 | 18 | 7 | 59 | 50.63 | 1.3 |
| 34.553984 | -97.424 | 2.47 | 125.8 | 247.6 | 215.7 | 2011 | 1 | 18 | 8 | 23 | 5.25 | 1.7 |
| 34.553451 | -97.432 | 3.81 | 126.5 | 265.4 | 296.6 | 2011 | 1 | 18 | 9 | 22 | 43.89 | 2.3 |
| 34.547607 | -97.424 | 1.93 | 133.6 | 240.6 | 241.5 | 2011 | 1 | 18 | 9 | 52 | 43.55 | 1.5 |
| 34.558683 | -97.425 | 2.58 | 107.2 | 164 | 160.9 | 2011 | 1 | 18 | 12 | 32 | 53.83 | 2 |
| 34.526497 | -97.421 | 1.9 | 182 | 271.3 | 305.6 | 2011 | 1 | 18 | 12 | 43 | 57.78 | 1.5 |
| 34.550395 | -97.425 | 3.02 | 148.8 | 251.6 | 248.9 | 2011 | 1 | 18 | 19 | 40 | 5.34 | 1.4 |
| 34.55144 | -97.424 | 5.62 | 200.3 | 245.5 | 401.5 | 2011 | 1 | 19 | 4 | 29 | 55.61 | 2 |
| 34.551355 | -97.421 | 2.09 | 107.2 | 188.9 | 214.1 | 2011 | 1 | 22 | 13 | 8 | 10.84 | 2.1 |
| 34.549731 | -97.42 | 1.12 | 106.6 | 195.2 | 292.5 | 2011 | 1 | 22 | 15 | 6 | 49.46 | 2 |

**Summary of Earthquake Activity**

The earthquake activity in southern Garvin County began at 1/17/11 19:19 UTC and there were 43 earthquakes large enough to be located by 1/19/11 4:29 UTC.  Of these events, 39 earthquakes occurred by 1/18/11 9:52 UTC, with largest having a duration magnitude of 2.8 (Md) and the smallest a Md 1.0. The timing of these events can be seen in Figures 5 and 6.  The first earthquake began about 1 hour and 20 minutes after hydraulic-fracturing operations had ceased.

The earthquakes exhibited waveforms with an unusual character.  A comparison of waveform recordings between one of the larger earthquakes in the southern Garvin County earthquake sequence, that occurrued on January 18th,  and an earthquake that occurred a little bit further north in Garvin county, on January 25th, of the same magnitude are shown in Figures 7, 8 and 9.  The unique character of these events which make them appear different than other regionally recorded earthquakes are:
- The events are clearly shallow and generate significant surface wave energy
- P-waves are:
  - Subdued in amplitude
  - Not impulsive even on the closest stations
  - Significant energy in the P-coda (ringing)
  - Nearly as prominent on horizontal as vertical components
  - Very hard to identify on all but the nearest seismic stations
  - Could not be identified using cross correlation, generally correlating better to an arrival sometime after the S-wave
- S-waves are:
  - Somewhat difficult to distinguish from P-coda and because of the significant surface wave energy
  - Easiest phase to identify on most seismic stations
  - Identifiable using cross correlation as well

These characteristics definitely suggest that the shallow hypocenter locations are most likely not an artifact of the location algorithm (program) or velocity model.  Any other conclusions about the unique character of these events would be speculative.

The earthquakes occur within the portion of the Eola field, which has many small fault bounded blocks.  The seismicity appears consistent with activation on portions of these fault bounding blocks or smaller faults within the blocks.  Due to the character of the P-wave arrivals it was not possible to produce first motion focal mechanisms for these earthquakes.  The majority of the earthquakes occur within 4 km horizontal distance from the Picket Unit B well.



**Figure 5 – Time magnitude plot of Eola Field earthquakes following hydraulic fracturing at Picket Unit B Well 4-18.  Hydraulic fracturing began at about 1/17/11 12:00.**



**Figure 6 – HypoDD relocations using the Chelsea velocity model; symbols are colored by the number of hours after the first earthquake observed in the Eola Field. Picket Unit B Well 4-18, shown as black hexagon, Eola Field (Boyd, 2002) shown cross-hachured area. Thick green lines are faults modified from Harlton (1964).**



**Figure 7 – Comparison of two similar sized earthequakes recorded at station X34A in Garvin County. The earthquake on Jan. 18 occurred in the Enola Field and the earthquake on Jan 25 occurred further to the north at about the same epicentral distance. The waveforms are aligned on each events corresponding origin time.**



**Figure 8 – Comparison of two similar sized earthequakes recorded at station X34A in Garvin County.  The earthquake on Jan. 18 occurred in the Enola Field and the earthquake on Jan 25 occurred further to the north.  The waveforms are aligned on each events corresponding origin time.**



**Figure 9 – Comparison of P-Wave arrivals for the two events compared in Figures 7 and 8.  P-waves for the Jan. 18th Eola Field earthquake have lower frequency arrivals than those from the earthquake on Jan. 25th.**

## Discussion

Anthropogenic triggered seismicity has regained scientific and media attention recently. Recent earthquakes in the Dallas-Fort Worth area (Frohlich et al., 2011) and earthquakes near Guy, Arkansas, have dramatically raised this issue to some significance.  Cases of clear anthropogenically-triggered seismicity from fluid injection are well documented with  correlations between the number of earthquakes in an area and injection, specifically injection pressures, with earthquakes occurring very close to the well.  Examples of clearly induced seismicity include the Rocky Mountain Arsenal (Hsieh and Bredehoeft, 1981), Rangely, Colorado (Raleigh et al., 1972; Raleigh et al., 1976), Paradox Valley, Colorado (Ake et al., 2005), and the KTB Deep Well in Germany (Jost et al., 1995; Baisch et al., 2002).  There are also many examples from enhanced geothermal systems where there is a clear correlation between injection and earthquakes.  Examples of these include, but are not limited to Frenton Hill, New Mexico (Fehler et al., 1998), Basel, Switzerland (Deichmann and Giardini, 2009), Cooper Basin, Australia (Baisch et al., 2006), and Soultz, France (Horalek et al., 2010).  Figure 10 demonstrates the earthquake distribution as a function of distance from the well for a few of these cases.  In the cases from Rangely, Colorado and the Rocky Mountain Arsenal the majority of seismicity lies within a distance of 4 km from the injection well, which is quite comparable to what is seen for the Picket Unit B well in this study.

There are also less clear examples in which earthquakes may or may not have been triggered by fluid injection at a well.  In these cases, there is no clear correlation between fluid injection and earthquakes and the earthquakes may occur at somewhat larger distances from the suspected wells.  Some examples of these cases are Sleepy Hollow Oil Field, Nebraska (Rothe and Lui, 1983; Evans and Steeples, 1987); a gas field, Lacq France (Grasso and Wittlinger, 1990); a deep waste disposal well in northeastern Ohio (Nicholson et al., 1988; Seeber et al., 2004); Fashing, Texas (Davis et al., 1995); the Wabash Valley, Illinois (Eager et al., 2006), and the DFW airport (Frohlich et al., 2011)  These are not exhaustive lists of proposed induced seismicity and there is a large spectrum of scientific opinions regarding many of these cases.



**Figure 10 – Number of earthquakes verses distance for selected examples where seismicity is clearly induced from fluid injection at depth. The information was hand digitized from Raleigh et al. (1972), Hsieh and Bredehoeft (1981), and Baisch et al. (2002). The bin size used is 0.25 km.**



**Figure 11 – a)** Number of earthquakes plotted versus distance from the Picket Unit B Well 4-18.  Total and vertical distances were determined relative to the central depth of hydraulic fracturing stage 1. **b)** Spatial distribution of earthquakes in relationship to Well 4-18 with estimated absolute location error shown as green crosses.  The depth interval for the first frac stage is shown as the crimson portion of the well.

Davis and Frolich (1993) outlined seven questions to help aid in examining whether or not earthquakes may have been induced by fluid injection at depth. We will examine these seven questions in relation to the hydraulic fracturing of the Picket Unit B and the earthquakes observed in the Eola Field in Garvin County. Affirmative answers to all seven questions according to Frolich and Davis (1993) would indicate that earthquakes are clearly induced.

*Question 1: Are these events the first known earthquakes of this character in the region?* (UNKOWN)
Given the analog recording history for most of the Oklahoma Geological Survey's recording history it is difficult to determine whether the character is uniquely different from that of earthquakes previously observed in the area. There have been significant numbers of earthquakes occurring in this area in the past, Figure 1. This negative response by itself would suggest that hydro-fracturing at Picket Unit B did not induce these earthquakes. However, we will examine all of the criteria outlined by Davis and Frolich (1993).

*Question 2: Is there a clear correlation between injection and seismicity?* (YES)
There is a clear correlation between the time of hydraulic-fracturing and the observed seismicity in the Eola Field. However, subsequent hydraulic-fracturing stages at Picket Unit B Well 4-18 did not appear to have any earthquakes associated with them. Subsequent frac stages were all shallower than the first, and otherwise there were no major differences in the fracking operations.

*Question 3: Are epicenters near wells (within 5 km)?* (YES)
Nearly all earthquakes are located within this distance and the majority of earthquakes are closer than the 5 km specified by Davis and Frolich (1993). The 5 km was selected somewhat arbitrarily by Davis and Frolich (1993) and may not be completely appropriate. The earthquakes hypocenters have formal uncertainties from HypoDD, including our uncertainty in velocity model, of about 320 m in longitude and 490 m in latitude. These uncertainties represent the absolute minimum of what we should consider the location error to be. Unknown effects of different Vp/Vs ratios and other factors add to the actual error in location being larger. Figure 11 demonstrates the distance of earthquakes from the well.

*Question 4: Do some earthquakes occur at or near injection depths?* (YES)
Most of the earthquakes do occur near injection depths. The minimum uncertainty in focal mechanism depths should be considered approximately 630 m. The focal depth is the least well-constrained portion of the hypocenter location and reported depths should be considered somewhat suspect since there are no stations within a few kilometers of the earthquake sequence. The waveform characteristics are consistent with the shallow focal depths from the double-differencing relocation. hypocentral depths and formal uncertainties can be seen in Figure 11b.

21

*Question 5:  If not, are there known geologic structures, that may channel flow to sites of earthquakes?*  (YES)

There are significant structures within the Eola Field.  The near vertical block bounding faults provide a pathway for fluid flow in the subsurface.  In addition faults are rarely single entities but rather a complex network of faults and fractures increasing the number of structures that could potentially channel flow (Scholz, 1990).  The average error in depth should be considered to be at a minimum 630 m and should be expected to be larger since there are no nearby stations to help constrain the focal depth.

*Question 6:  Are changes in fluid pressure at well bottoms sufficient to encourage seismicity?*  (YES)

Clearly since the case considered here involves hydraulic-fracturing where pressure is being used to fracture rock, by design the pressures are sufficient to encourage seismicity.

*Question 7: Are changes in fluid pressure at hypocentral locations sufficient to encourage seismicity?*  (UNKNOWN)

A further examination of this question is provided below. It is possible to apply a reasonable physical model that suggests the hydraulic fracturing could have increased pressures at hypocentral locations.  With all the production that has occurred within the Eola Field and our uncertainty in subsurface structure it would be difficult if not impossible to accurately model the effects of a pressure pulse at hypocentral locations.  This is especially true given the uncertainties in earthquake locations in this study.

After having evaluated the above criteria we have five affirmative responses and two uncertain responses.  Is this enough to determine that these earthquakes were triggered or not?  At this point I would like to directly quote Davis and Frolich (1993).

> *"At present it is impossible to predict the effects of injection with absolute certainty.  This uncertainty arises both because the underlying physical mechanisms of earthquakes are poorly understood, and because in nearly every specific situation there is inadequate or incomplete information about regional stresses, fluid migration, historical seismicity, etc.  Clearly, a series of seven or ten yes or no questions oversimplifies many of these issues."*

This statement reflects the incredible complexity and uncertainty for most cases in associating anthropogenic causes and earthquakes.

The physical mechanism, which could trigger these earthquakes from the hydraulic fracturing operations at the Picket Unit B well, is the diffusion of pore-pressure interacting with a pre-existing structure to initiate earthquakes on a fault or fracture that has an orientation favorable to failure within the regional stress field.  Many researchers have described the migration of induced seismicity by describing the migration of a pressure front through the diffusion of pore pressure, hydraulic

diffusivity (Talwani and Acree, 1985; Nicholson and Wesson, 1990; Shapiro et al., 1999; Rothert and Shapiro, 2003; Rozhko, 2010).  Cornet (2000) argued that the shape of microseismicity is controlled by the fracture process and hydromechanical coupling rather than a homogeneous hydraulic diffusivity through a rock mass.  Rutledge et al. (2004) describe this behavior in detail for a closely monitored hydraulic fracturing within the Carthage Cotton Valley Gas Field, Texas.  They clearly demonstrate the control of the regional stress field, pressure diffusion, inter-action with existing structures and suggest that there is a significant amount of aseismic slip occurring within the fractured volume.

In order to examine whether or not the data for this earthquake sequence would fit a pore pressure diffusion model we used the simplified pore pressure diffusion model of Talwani and Acree (1985).  This method describes the pore pressure diffusion through time through via a diffusion constant called seismic hydraulic diffusivity.  This hydraulic diffusivity can be related to the physical properties of the rocks and fluids involved such as fluid viscosity, rock porosity and permeability, and the compressibility of the fluid and rocks.  There is a simple method to determine the seismic hydraulic diffusivity ($\alpha$),

$$\alpha = \frac{L^2}{t}$$

where L is the distance of the earthquake away from the well in centimeters (cm) and t is the time, in seconds, since injection began.  Talwani and Acree (1985) found that seismic hydraulic diffusivity for the cases they examined ranged from $5\times10^3$ to $6\times10^5$ cm$^2$/s.  For our case we determined the seismic hydraulic diffusivity which fit 95% of the earthquakes was $2.8\times10^6$ to $2.6\times10^6$ cm$^2$/s depending on whether this was determined for the total hypocentral distance from the center point of the injection interval or simply the radial distance from the well.  The hydraulic diffusivity can be related to permeability from the following relationship.

$$\alpha = \frac{k}{\mu \phi \beta_F}$$

where,

    k – is the permeability
    $\mu$ – is the viscosity of water ($10^{-8}$ bar/s)
    $\phi$ – is the porosity of fractured rock ($3\times10^{-3}$ for this example, and
    $\beta_F$ = is the effective compressibility of the fluid ($3\times10^{-5}$ bar$^{-1}$).

This provides a maximum permeability needed to describe this earthquake sequence of 255 milliDarcies (mD). In this example the uncertainties in earthquake locations are not considered (Figure 12).  While this permeability may seem high for a shale it is within the values reported for in situ rocks, especially fractured rock (Brace, 1984).



**Figure 12 – a)** Pore pressure diffusion model results shown for total distance from Picket Unit B Well 4-18.  Red crosses show earthquake locations relative to the midpoint of the first hydraulic fracturing stage, and the solid black line represents location at a specific time of the pore pressure front from the model.  Earthquakes plotted above this line are inconsistent with this pore pressure diffusion model, and all earthquakes plotted below this line are consistent with this pore pressure diffusion model.  This line represents a seismic hydraulic diffusivity of $2.8 \times 10^6$ cm²/s, which is roughly equivalent to a permeability of 255 milliDarcies (mD), and represents the distance from the well of a pressure front.  **b)** Same as for (a) except only the radial distance is considered.  The resultant seismic hydraulic diffusivity is $2.6 \times 10^6$ cm²/s.

## Conclusions

Determining whether or not earthquakes have been induced in most portions of the stable continent is problematic, because of our poor knowledge of historical earthquakes, earthquake processes and the long recurrence intervals for earthquakes in the stable continent.  In addition understanding fluid flow and pressure diffusion in the unique geology and structures of an area poses real and significant challenges.   The strong spatial and temporal correlations to the hydraulic-fracturing in Picket Unit B Well 4-18 certainly suggest that the earthquakes observed in the Eola Field could have possibly been triggered by this activity.  Simply because the earthquakes fit a simple pore pressure diffusion model does not indicate that this is the physical process that caused these earthquakes.  The number of historical earthquakes in the area and uncertainties in hypocenter locations make it impossible to determine with a high degree of certainty whether or not hydraulic-fracturing induced these earthquakes.

Whether or not the earthquakes in the Eola Field were triggered by hydraulic-fracturing these were small earthquakes with only one local resident having reported feeling them.  While the societal impact of understanding whether or not small earthquakes may have been caused by hydraulic-fracturing may be small, it could potentially help us learn more about subsurface properties such as stresses at depth, strength of faults, fluid flow, pressure diffusion, and long term fault and earthquake behaviors of the stable continent.  It may also be possible to identify what criteria may affect the likelihood of anthropogenically induced earthquakes and provide oil and gas operators the ability to minimize any adverse affects as suggested by Shapiro et al. (2007).

## Acknowledgements

The NSF Earthscope Project and the Transportable Array stations and data availability provided by IRIS made this work possible.  I would also like to thank Amie Gibson, Dr. Kenneth V. Luza, and Dr. G. Randal Keller for their helpful comments and suggestions for this paper.  Russell Standbridge, OGS Cartography, provided a great deal of technical advice and information.  I would also like to thank the Oklahoma Corporation Commission for the help in obtaining information and input to this effort.  I would also like to thank Cimarex Energy Co. for providing usefull technical information about the hydraulic fracturing of Picket Unit B Well 4-18.

# References

Ake, J., K. Mahrer, D. O'Connell, and L. Block, 2005, Deep-Injection and Closely Monitored Induced Seismicity at Paradox Valley, Colorado, *Bull. Seismol. Soc. Amer.*, **95(2)**, p. 664-683.

Baisch, S., M. Bohnhoff, L. Ceranna, Y. Tu, and H.P. Harjes, 2002, Probing the Crust to 9-km Depth: Fluid-Injection Experiments and Induced Seismicity at the KTB Superdeep Deep Drilling Hole, Germany, *Bull. Seismol. Soc. Amer.*, **92(6)**, p. 2369-2380.

Baisch, S., R. Weidler, R. Voros, D. Wyborn, and L. de Graaf, 2006, Induced Seismicity during the Stimulation of a Geothermal HFR Resevior in the Cooper Basin, Australia, *Bull. Seismol. Soc. Amer.*, **96(6)**, p. 2242-2256.

Boyd, D.T., 2002, Map of Oklahoma Oil and Gas Fields, Oakhama Geologicial Survey **GM36**.

Brace, W.F., 1984, Permeability of Crystalline Rocks: New In Situ Measurements, *J. Geophys. Res.*, **89(B6)**, p. 4327-4330.

Davis, S.D. and C. Frohlich, 1993, Did (or Will) Fluid Injection Cause Earthquakes? – Criteria for a Rational Assessment, *Seismol. Res. Lett.*, **64(3-4)**, p. 207-224.

Davis, S.D., P.A. Nyffenegger, and C. Frohlich, 1995, The 9 April 1993 Earthquake in South-Central Texas: Was It Induced by Fluid Withdrawal?, *Bull. Seismol. Soc. Amer.*, **85(6)**, p. 1888-1895.

Eager, K.C., G.L. Pavlis, and M.W. Hamburger, 2006, Evidence of Possible Induced Seismicity in the Wabash Valley Seismic Zone from Improved Microearthquake Locations, *Bull. Seismol. Soc. Amer.*, **96(5)**, p. 1718-1728.

Evans, D.G. and D.W. Steeples, 1987, Microearthquakes near the Sleepy Hollow Oil Field, Southwestern Nebraska, *Bull. Seismol. Soc. Amer.*, **77(1)**, p. 132-140.

Fehler, M., L. House, W.S. Phillips, and R. Potter, 1998, A method to allow temporal variation of velocity in travel-time tomography using microearthquakes induced during hydraulic fracturing, *Tectonophysics*, **289**, p. 189-201.

Frohlich, C., C. Hayward, B. Stump, and E. Potter, 2011, The Dallas-Fort Worth Earthquake Sequence: October 2008 through May 2009, *Bull. Seismol. Soc. Amer.*, **101(1)**, p. 327-340.

Deichmann, N. and D. Giardini, 2009, Earthquakes Induced by the Stimulation of an Enhanced Geothermal System below Basel, Switzerland, *Seismol. Res. Lett.*, **80(5)**, p. 784-798.

Granath, J.W., 1989, Structural Evolution of the Ardmore Basin, Oklahoma: Progressive Deformation in the Foreland of the Ouichita Collision, *Tectonics*, **8(5)**, p. 1015-1036.

Grasso, J. R. and G. Wittlinger (1990). Ten Years of Seismic Monitoring Over a Gas Field, Bull. Seismol. Soc. Amer. **80**(2): 450-473.

Harlton, B.H., 1964, Tectonic Framework of Eola and Southeast Hoover Oil Fields and West Timbered Hills Area, Garvin and Murray Counties, Oklahoma, *Bull. Amer. Assoc. Petrol. Geol.*, **48(9)**, p 1555-1567.

Havskov, J. and L. Ottemoller, 1999, SeisAn Earthquake Analysis Software, *Seis. Res. Lett.*, **70**.

Horalek, J., Z. Jechumtalova, L. Dorbath, and J. Sileny, 2010, Source mechanisms of micro-earthquakes induced in a fluid injection experiment at the HDR site Soultz-sous-Forets (Alsace) in 2003 and their temporal and spatial variations, *Geophys. J. Int.*, **181**, p. 1547-1565.

Hsieh, P.A. and J.D. Bredehoeft, 1981, A Resevoir Analysis of the Denver Earthquakes: A Case of Induced Seismicity, *J. Geophys. Res.*, **86(B2),** p. 903-920.

Jost, M.L., T. BuBelberg, O. Jost, H.P. Harjes,1995, Source Parameters of Injection-Induced Microearthquakes at 9 km Depth at the KTB Deep Drilling Site, Germany, *Bull. Seismol. Soc. Amer.*, **88(3)**, p. 815-822.

Keller, G.R., E.G. Lidiak, W.J. Hinze, and L.W. Braile, 1983, The Role of Rifting in the Tectonic Development of the Midcontinent, U.S.A., *Tectonophysics*, **94**, p. 391-412.

Lawson, J.E. Jr. and K.V. Luza, 2006, Oklahoma Earthquakes 2005, *Oklahoma Geology Notes*, **V. 66, No. 3**, Fall 2006.

Lienert, B. R. E., E. Berg, and L.N. Frazer, 1986, Hypocenter: An earthquake location method using centered, scaled, and adaptively least squares, *Bull. Seismol. Soc. Am.*, **76**, p. 771–783.

Lienert, B. R. E. and J. Havskov, 1995, A computer program for locating earthquakes both locally and globally, *Seismol. Res. Lett.*, **66**, p. 26–36.

McCaskill, J.G. Jr., 1998, Multiple Stratigraphic Indicators of Major Strike-Slip Movement Along the Eola Fault, Subsurface, Arbuckle Mountains, Oklahoma, Shale Shaker, p. 119-133.

Mitchell, B.J. and M. Landisman, 1970, Interpretation of a Crustal Section across Oklahoma, *Geol. Soc. Amer. Bul.*, **81(9)**, p. 2647-2656.

Nicholson, C., E. Roeloffs, and R.L. Wesson, 1988, The Northeastern Ohio Earthquake of 31 January 1986: Was It Induced?, *Bull. Seismol. Soc. Amer.*, **78(1)**, p. 188-217.

Nicholson, C. and R.L. Wesson, 1990, Earthquake Hazard Associated With Deep Well Injection – A Report to the U.S. Environmental Protection Agency, U.S. Geol. Surv. Bull, **1951**, pp. 74.

Northcutt, R.A. and J.A., Campbell, 1995, Geologic provinces of Oklahoma, *Oklahoma Geological Survey* **OF5-95**.

Raleigh, C.B., J.H. Healy, and J.D. Bredehoeft, 1972, Faulting and Crustal Stress at Rangely, Colorado, *Am. Geophys. Union Geophys. Monograph*, **16**, p. 275-284.

Raleigh, C.B., J.H. Healy, and J.D. Bredehoeft, 1976, An Experiment in Earthquake Control at Rangely, Colorado, *Science*, **191**, p. 1230-1237.

Rothe, G.H. and C.Y. Lui, 1983, Possibility of Induced Seismicity in the Vicinity of the Sleepy Hollow Oil Field, Southwestern Nebraska, *Bull. Seismol. Soc. Amer.*, **73(5)**, p. 1357-1367.

Rothert, E. and S.A. Shapiro, 2003, Microseismic monitoring of borehole fluid injections: Data modeling and inversion for hydraulic properties of rocks, *Geophysics*, **68(2)**, p. 685-689.

Rozhko, A.Y., 2010, Role of seepage forces on seismicity triggering, *J. Geophys. Res.*, **115**, doi:10.1029/2009JB007182.

Rutledge, J.T., W.S. Phillips, and M.J. Mayerhofer, 2004, Faulting Induced bye Forced Fluid Injection and Fluid Flow Forced by Faulting: An Interpretation of Hydraulic-Fracture Microseismicity, Carthage Cotton Valley Gas Field, Texas, *Bull Seismol. Soc. Amer.*, **94(5)**, p. 1817-1830.

Scholz, C.H., 1990, The Mechanics of Earthquakes and Faulting, *Cambridge University Press*, pp. 439.

Seeber, L., J.G. Armbruster, and W.Y. Kim, 2004, A Fluid-Injection Earthquake Sequence in Ashtabula, Ohio: Implications for Seismogenesis in Stable Continental Regions, *Bull. Seismol. Soc. Amer.*, **94(1)**, p. 76-87.

Shapiro, S.A., P. Audigane, and J.J. Royer, 1999, Large-scale in situ permeability tensor of rocks from induced microseismicity, *Geophys. J. Int.*, **137**, p. 207-213.

Shapiro, S.A., C. Dinske, and J. Kummerow, 2007, Probability of a given-magnitude earthquake induced by a fluid injection, *Geophys. Res. Lett.*, **34**.

Stoeser, D.B., G.N. Green, L.C. Morath, W.D. Heran, A.B. Wilson, D/W. Moore, and B.S. Van Gosen, 2007, Preliminary integrated geologic map databases for the United States: Central States: Montana, Wyoming, Colorado, New Mexico, North Dakota, South Dakota, Nebraska, Kansas, Oklahoma, Texas, Iowa, Missouri, Arkansas, and Louisiana, *U.S. Geol. Survey Open File Report*, **OF 2005-1351**.

Swesnik, R.M. and T.H. Green, 1950, Geology of Eola Area, Garvin County, Oklahoma, *Bull. Amer. Assoc. Petrol. Geol.*, **34(11)**, p 2176-2199.

Talwani, P. and S. Acree, Pore Pressure Diffusion and the Mechanism of Resevior-Induced Seismicity, *Pageoph*, **122**, p. 947-965.

Tanner, J.H. III,  1967, Wrench fault movements along Washita Valley fault, Arbuckle Mountain area, Oklahoma, *Bull. Amer. Assoc. Petrol. Geol.*, **51(1)**, p. 126-134.

Tryggvason, E., and B.R. Qualls, 1967, Seismic refraction measurements of crustal structure in Oklahoma, *J. Geoph. Res.*, **72(14)**, 3738-3740.

Waldhauser, F. and W.L. Ellsworth, 2000, A double-difference earthquake location algorithm: Method and application to the northern Hayward fault, *Bull. Seismol. Soc. Am.*, **90**, 1353-1368.

Waldhauser, F., 2001, hypoDD: A Program to Compute Double-Difference Hypocenter Locations, *U.S. Geol. Survey Open File Report*, **OF 01-113**.





Investigation of an Earthquake Swarm near Trinidad, Colorado, August-October 2001

*By* Mark E. Meremonte, John C. Lahr, Arthur D. Frankel, James W. Dewey, Anthony J. Crone, Dee E. Overturf, David L. Carver, and W. Thomas Bice

**Open-File Report 02-0073**

2002

This report is preliminary and has not been reviewed for conformity with U.S. Geological Survey editorial standards nor with the North American Stratigraphic Code. Any use of trade names in this publication is for descriptive purposes only and does not imply endorsement by the U.S. Government.

U.S. Department of the Interior
U.S. Geological Survey

*Spanish Peaks, eastern flank of the Sangre de Cristo range, near Trinidad, Colorado*

> *Cover design by Margo Johnson, U.S.G.S.*
> *Photo credit: Mark Meremonte and David Carver (U.S. Geological Survey)*

ABSTRACT ......................................................................................................................... 3
I.    INTRODUCTION ...................................................................................................... 4
II.   EARTHQUAKE RESPONSE GOALS ................................................................... 5
A.    Determine source parameters: ................................................................................. 5
B.    A question of induced seismicity: ............................................................................ 6
III.  UNDERSTANDING THE CURRENT EARTHQUAKE ACTIVITY ...................... 6
A.    Historical earthquakes: ........................................................................................... 6
C.    Coal-bed methane production and mining activities: ............................................... 8
D.    Fluid disposal wells: ............................................................................................... 9
IV.   GEOLOGY .............................................................................................................. 10
V.    OBSERVATIONS .................................................................................................... 11
A.    INITIAL OBSERVATIONS: .................................................................................. 11
B.    Alignment of earthquake epicenters: ..................................................................... 11
C.    Earthquake frequency and spatial patterns: ........................................................... 12
D.    Earthquake depth errors: ....................................................................................... 15
E.    Significant Observations: ....................................................................................... 15
F.    Relocation of earthquakes reported by the NEIC: .................................................. 16
G.    Induced seismicity or natural seismicity: ............................................................... 16
VI.   DISCUSSION ........................................................................................................... 19
VII.  ACKNOWLEDGEMENTS ...................................................................................... 21
VIII. REFERENCES ........................................................................................................ 21
APPENDIX ........................................................................................................................ 22
1.    SEISMOGRAPH INSTRUMENTATION .............................................................. 22
a)    Data logger and Seismometer: ............................................................................... 22
b)    Instrument Timing and Accuracy: .......................................................................... 23
c)    Instrument response: .............................................................................................. 23
2.    NETWORK DESIGN ............................................................................................... 23
3.    NETWORK MANAGEMENT .................................................................................. 24
4.    DATA ANALYSIS ................................................................................................... 24
5.    DATA DISSEMINATION ....................................................................................... 25

# Abstract

A swarm of 12 widely felt earthquakes occurred between August 28 and September 21, 2001, in the area west of the town of Trinidad, Colorado. The earthquakes ranged in magnitude between 2.8 and 4.6, and the largest event occurred on September 5, eight days after the initial M 3.4 event. The nearest permanent seismograph station to the swarm is about 290 km away, resulting in large uncertainties in the location and depth of these events. To better locate and characterize the earthquakes in this swarm, we deployed a total of 12 portable seismographs in the area of the swarm starting on September 6. Here we report on data from this portable network that was recorded between September 7 and October 15. During this time period, we have high-quality data from 39 earthquakes. The hypocenters of these earthquakes cluster to define a 6 km long northeast-trending fault plane that dips steeply (70-80°) to the southeast. The upper bound of well-constrained hypocenters is near 3 km depth and lower bound is near 6 km depth. Preliminary fault mechanisms suggest normal faulting with movement down to the southeast.

Significant historical earthquakes have occurred in the Trinidad region in 1966 and 1973. Reexamination of felt reports from these earthquakes suggest that the 1973 events may have occurred in the same area, and possibly on the same fault, as the 2001 swarm.

In recent years, a large volume of excess water that is produced in conjunction with coal-bed methane gas production has been returned to the subsurface in fluid disposal wells in the area of the earthquake swarm. Because of the proximity of these disposal wells to the earthquakes, local residents and officials are concerned that the fluid disposal might have triggered the earthquakes. We have evaluated the characteristics of the seismicity using criteria proposed by Davis and Frohlich (1993) as diagnostic of seismicity induced by fluid injection. We conclude that the characteristics of the seismicity and the fluid disposal process do not constitute strong evidence that the seismicity is induced by the fluid disposal, though they do not rule out this possibility.

3

# I.   Introduction

On August 28, 2001, the first of a swarm of earthquakes occurred near Trinidad, Colorado, a small town (population approximately 10,000) near the Colorado-New Mexico border that is situated along the Santa Fe Trail and Interstate 25 (Figure 1 ).



*Click Image for detail*

Trinidad Colorado is located near the New Mexico border.

The USGS National Earthquake Information Center located 12 earthquakes in the vicinity of Trinidad during August and September, 2001.

**Figure 1.** *Map of the state of Colorado and surrounding region showing the location of Trinidad, Colorado, where the swarm of felt earthquakes occurred.*

Between August 28 and September 21, 2001, the U.S. Geological Survey (USGS) National Earthquake Information Center (NEIC) recorded and located 12 earthquakes of magnitude 2.8-4.6 in the region west of Trinidad. The largest earthquake (M 4.6) was the fifth event in the swarm and occurred eight days after the initial M 3.4 event (Figures 2 and 3). All of the earthquakes were widely felt in the Trinidad area, especially in the small towns of Cokedale, Valdez, and Segundo, which are located 10-19 km (6-12 mi) west of Trinidad (Figure 4). The felt area for the M 4.6 event extended ~32 km (20 mi) south to Raton, New Mexico, ~32 km (20 mi) north to Aquilar, Colorado, and ~32-48 km (20-30 mi) west to Weston and Stonewall, Colorado.

Figure 4 shows the locations of the 12 earthquakes recorded by the NEIC. These epicenters are widely scattered in the general area 5-19 km (3-12 mi) WSW of Trinidad and show little evidence of an alignment that could indicate a causative fault. Because the nearest permanent station (Albuquerque, NM) of the United States National Seismograph Network (USNSN ) is more than 290 km (180 mi) away, the uncertainties in the location and depth of the earthquakes reported by the NEIC are large. These location uncertainties are of the order ± 10 km (6 mi), and the exact depths within the crust cannot be determined. However, NEIC officials (W. Person, pers. commun., 2001) reported that the "character of seismograms of the earthquakes implies that they occurred in the uppermost 16 km (10 mi) of the earth's crust."

*Click Image for detail*

**Trinidad Earthquakes Reported by the USGS National Earthquake Information Center (NEIC) , Golden, Colorado**

| DATE | TIME (GMT) | MAGNITUDE |
|---|---|---|
| 08/28/01 | 14:16:09 | 3.4 |
| 08/28/01 | 14:22:00 | 3.5 |
| 09/04/01 | 12:22:45 | 3.4 |
| 09/04/01 | 12:45:53 | 4.0 |
| 09/05/01 | 10:52:07 | 4.6 |
| 09/05/01 | 14:48:58 | 3.7 |
| 09/06/01 | 09:41:43 | 3.6 |
| 09/06/01 | 11:28:26 | 3.5 |
| 09/10/01 | 18:56:00 | 3.4 |
| 09/13/01 | 11:22:16 | 2.8 |
| 09/13/01 | 16:39:05 | 3.0 |
| 09/21/01 | 19:10:58 | 3.4 |

**Figure 2.** *Catalog of the 12 felt earthquakes in the vicinity of Trinidad, Colorado reported by the USGS National Earthquakes Information Center between August 28 and September 21, 2001.*

4

Considering the absence of close-in seismographs to provide good location and depth control and the occurrence of five felt events over an eight-day period, the USGS decided to install a local network of portable digital seismographs. Figure 5 shows the location of the local seismograph network of 12 portable digital seismographs; and Figures 6 and 7 are photographs of a typical seismograph station in this network (see Appendix: Seismograph instrumentation, Network design, and Network management).



*Figure 3. A plot of the earthquake magnitude of earthquakes in the Trinidad, Colorado, swarm vs. the date and approximate time of their occurrences.*

Other circumstances also contributed to USGS's decision to respond to the Trinidad earthquake swarm. Currently coal-bed methane gas is under production west of Trinidad. The process of coal-bed methane gas extraction involves the removal of large amounts of water from the shallow coal beds and, due to environmental regulations, the excess water is returned to deeper underground layers. Thus, data from a local seismograph network might be able to shed some light on whether a relationship between the earthquake activity and the fluid disposal operation existed.

# II.   Earthquake response goals

## A.   Determine source parameters:

The primary focus of the Trinidad earthquake study is to record and accurately locate the earthquakes occurring in the area of the swarm. It is important to pinpoint the locations and depths of the earthquakes, that is, the earthquake hypocenters, to better understand their spatial distribution. These locations, together with other information derived from the seismograms, permit geophysicists to determine the type of faulting, fault orientation, fault mechanics, and fault dimensions. This information, in turn, can guide geologists to look for surface features above the hypocenters and signs of recent tectonic deformation or faulting.

## B.   A question of induced seismicity:

In recent years, the area west of Trinidad has become the focus of extensive drilling for the production of coal-bed methane. Water from the coal-bed methane production is returned to the subsurface in disposal wells, and local citizens and officials in the Trinidad area expressed concern that the earthquakes might be somehow related to this fluid disposal. Previous cases of subsurface fluid disposal causing earthquakes have been reported elsewhere in Colorado. Earthquakes were induced by fluid injection at Rangely oil field (1960-1973), at the Rocky Mountain Arsenal (1962-1972 , Healy and others, 1966, 1968, and Herrmann and others, 1981), and at Paradox Valley (1991-present ).

[Information on investigations of induced earthquakes can be found at these links:
- Injection Induced Earthquake References,
- U.S.G.S. OFR-96-0011: Reservoir-Induced Seismicity,
- U.S.G.S.: The Physics of Earthquakes.]



*Click Image for detail*

***Figure 4.*** *Locations of the 12 earthquakes in the Trinidad area reported by the National Earthquake Information Center that were widely scattered in the area 5-19 km (3-12 mi) WSW of Trinidad. The earthquakes were strongly felt in the small towns of Cokedale, Valdez, and Segundo, Colorado.*

# III.   Understanding the current earthquake activity

## A.   Historical earthquakes:

In Colorado's earthquake history at least two episodes of past seismicity have occurred in the Trinidad area (Figure 8).

[Note: sensitive modern seismographs have only been in use since the early 1960's, and widespread seismograph coverage was minimal across the U.S before 1974. Furthermore, the number and density of seismograph stations was much less in the past than it is today, especially in southern Colorado and northern New Mexico. Thus, it is important to understand that any earthquakes located in this area before 1974 have large uncertainties in their locations.]

6



**Figure 5.** *Locations of the 12 portable digital seismographs installed west-southwest of Trinidad, Colorado to monitor earthquake activity. Details of the instrument characteristics are described in the appendix.*

A widely felt magnitude 4.6 earthquake occurred on October 2, 1966, and was felt over a 38,400 km$^2$ (15,000 mi$^2$) area that extended south to Roy, New Mexico, east to Two Buttes, Colorado, north to Pueblo, Colorado, and west to the Weston and Stonewall, Colorado. The published location for this event, which is just northeast of Trinidad, has an uncertainty of ±10 km (±6 mi). However, detailed analysis of this event precludes its epicentral location and, consequently, its source area to be anywhere else except in the region northeast of Trinidad (J. Dewey, pers. commun., 2001). Therefore, this event is not associated with the current seismicity.

In September 1973, a swarm of six earthquakes occurred in a period of five days and was felt in and around Segundo. The two largest events had magnitudes of 3.1 and 4.2. The published locations of these two earthquakes are directly northwest of Trinidad Lake (Figure 8) but their exact locations are uncertain by at least ±10 km (±6 mi). Considering the location uncertainty and the felt report information, this historical earthquake swarm could have originated from the same source area as the current earthquake swarm.

## B.   Trinidad Lake:

Man-made reservoirs can potentially induce earthquakes due to reservoir loading after impoundment. Reservoir-induced seismicity has been long recognized and studied extensively.

[Visit these web sites for more information:
- Reservoir Induced Earthquake References,
- U.S.G.S. OFR-96-0011: Reservoir-Induced Seismicity,
- Alaska Science Forum, 1985: Reservoir Loading and Earthquakes,
- California Geology, 1982: Reservoir-Induced Earthquakes.]



**Figure 6.** *USGS technician configuring a RefTek portable digital seismograph at station BH0 using a notebook PC.*

7



*Click Image for detail*

**Figure 7.** *Photograph of a Guralp CMG-40T seismometer at station BH0 being buried in a 1-foot-deep hole. Burying the seismometer improves the sensitivity of the equipment and its ability to record small-magnitude earthquakes.*

Trinidad Lake, which is located near the earthquake swarm, was designed and constructed by the U.S. Army Corps of Engineers in the 1970s and completed in 1979. Considering that the 1966 and 1973 earthquake activity occurred before Trinidad Lake impoundment, that the reservoir is significantly shallower than the depth of reservoirs that have induced seismicity elsewhere, and that the current seismic activity occurred 22 years after impoundment, the likelihood that the current swarm of earthquakes is directly related to reservoir-induced seismicity is very small. However, the design of any dam does include the assessment of the potential seismic ground motions expected, and the Trinidad Lake dam is no exception.

[See U.S. Army Corps of Engineers: for more information on earthquake design of civil works projects.]

## C.   Coal-bed methane production and mining activities:

Between 1862 and the 1960s, coal mining was the dominant industry in the Trinidad area, but since the 1980's, coal mining has been replaced by coal-bed methane gas production. Information on investigations of coal mining and petroleum and gas production induced earthquakes are listed below:

1. Mining & Quarrying Induced Seismicity References
2. Oil and Gas Production Induced Earthquake References

And NEIC routinely identifies and catalogs mining-induced earthquakes:

1. Evidence used in Identifying Routine Mining Seismicity:
2. Routine United States Mining Seismicity,
3. Mining-Induced Events in the Earthquake Catalogs of the USGS/NEIC.



*Click Image for detail*

**Figure 8.** *Locations of two historical earthquakes that occurred in 1973 as part of a swarm of six events recorded southwest of Trinidad, Colorado, near Trinidad Lake. The felt area for this swarm was similar to the felt area for the 2001 swarm.*

8

However, no such events related to either coal mining or coal-bed methane-gas production in the Trinidad area have been cataloged by the NEIC to date.

[More information on gas activities in the Trinidad area can be found at Evergreen Resources, Inc.. Click on "Projects", then on "Raton Basin."]

## D.   Fluid disposal wells:



*Click Image for detail*

**Figure 9.** *Locations of the 10 fluid disposal wells managed by Evergreen Resources, Inc., in area of the 2001 earthquake swarm. These wells dispose of excess water produced during the production of coal-bed methane gas.*

(COGCC, writ. commun., 2001).

The process of coal-bed methane gas extraction results in the production of large amounts of excess water. The Colorado Oil and Gas Conservation Commission's (COGCC) rules and regulations require that some of the excess water be returned to the subsurface in disposal wells, and 10 fluid disposal wells are presently operating in the earthquake-monitored area (Figure 9). The first fluid disposal well began operating in mid-1988 and the latest well began September 4, 2001. All wells are disposing of the water at various flow rates at depths of 1.5 – 2.1 km (4,000 – 7,000 ft). At all sites but two the water is freely accepted by the target geologic formation. No other external pressure is applied except for the hydrostatic pressure of the water column itself in the borehole, so no pumping is necessary. Both sites where external pressure is applied are located in the west-southwestern part of the earthquake-monitored area near station BH0. Well head Pressures at the two sites range from  160-900 psi

[More information is available from the COGCC website: click on "Information Systems" to access the Colorado oil and gas well database. Next click on "Go to GIS online", allow the GIS viewer plug-in to install automatically, and proceed to browse the GIS online oil and gas well database system. Use the "magnifier" to enlarge the map area west of Trinidad and, at some point, be sure to click on "well status" to show well differentiation details.]

## IV.    Geology

The region west of Trinidad lies within the Raton basin, which contains a thick section of Cretaceous and Tertiary sedimentary rocks composed of sandstone, siltstone, and shale.  Contained within these sedimentary rocks are numerous coal beds that have high concentrations of methane gas.  To the Northwest are the peaks of Spanish Peaks, which were formed by Tertiary volcanic and intrusive rocks.  These mountains, along with large intrusive dikes that cross the Raton basin, are evidence of the geologic dynamics that have occurred in this area in the past (see_ Rocky Mountain Geology of south-central Colorado).

Figure 10 shows a detailed geologic column from the fluid disposal well located near seismograph station MAD.  The target formation for fluid disposal at this well is the Dakota Formation, which is composed of buff conglomeratic sandstone (Johnson, 1969).  The Dakota Formation has a large regional lateral extent and, in the Trinidad area,



*Click Image for detail*

**Figure 10.** *Stratigraphic column showing formation names and depths based on data from the fluid disposal well in the vicinity of station MAD.  Computed depths of earthquake hypocenters are more than four thousand feet below the bottom of the disposal well.*

outcrops east of Trinidad along the Purgatoire River and west of Stonewall.  Along the Colorado Front Range, the Dakota Formation outcrops in many places and is known as the Dakota Hogback.

Most of the other fluid disposal wells were also drilled into the Dakota except for the two wells injecting under pressure described above.  The target formations of these two wells for fluid disposal are the Entrada, Dockum, and Glorietta (COGCC, writ. commun., 2001), which lie below the Dakota.  Note that the formations described in Figure 10 occur at various burial depths throughout the Raton basin and therefore, occur at different depths in different wells.

The surface geology of the earthquake-monitored area comprises sedimentary rocks of sandstone, siltstone, and shale of the Raton Formation.  All seismograph stations are sited on rocks of this type except for stations VAL, TKD, and DK0.  These three stations are sited in the wide valleys of Picketwire Valley (VAL and CKD) and Long Canyon (DK0).  The thickness of the unconsolidated material on which they are sited is unknown.

10

# V.   Observations

## A.   Initial observations:



*Click Image for detail*

***Figure 11.*** *Map showing epicenters of the 39 earthquakes recorded by the local seismograph network and the fluid disposal wells. The well-defined northeasterly alignment of the epicenters is strong evidence that these earthquakes are occurring on a previously unknown subsurface fault.*

Thus far we have collected data for 39 days between September 7 and October 15, 2001. We have data for 334 earthquakes that were recorded by at least two stations within a 10 second window, which averages about eight earthquakes per day. Yet, of these 334 earthquakes, those recorded by less than 5 stations cannot be located reliably. If we confine our dataset to events that were recorded by 5 or more stations within a 10 second window (see Appendix: Data analysis), then we have 39 earthquakes whose epicenters can be confidentially located (Figure 11). A plot of these epicenters reveals a northeasterly striking linear alignment positioned between the towns of Segundo and Valdez and close to the fluid disposal well near station MAD.

## B.   Alignment of earthquake epicenters:

Figure 12 is an enlargement of the highlighted area in Figure 11 and shows two cross-sections, 12-A and 12-B. The heavy-lined box on the map outlines a 10 km x 10 km (6.25 mi x 6.25 mi) area encompassing the earthquake epicenters and the closest seismograph stations. The black arrows in the box show the view/strike direction of the cross-sections. Cross-section 12-A is a view looking N. 42° E. along the strike of the epicenters, and cross-section 12-B is an orthogonal view looking N. 48° W. Horizontal and vertical scales on both cross-sections are the same, so the boxes can be viewed as a 10 km cube. The sections include the seismograph stations to show their spatial relationship to the earthquake hypocenters.

The distribution of hypocenters in Figure 12-A suggests that they are occurring on a plane that dips steeply (~70-80°) to the southeast and strikes about N. 42° E. We have bounded the hypocenters within a parallelogram to emphasize this planar distribution. Projecting the plane of the hypocenter distribution to the surface indicates that if the hypothesized fault plane extends to the surface, then this area would be the most likely area to search for evidence of young deformation, including evidence of a surface fault.



*Click Image for detail*

Figure 12-B is a view of the earthquakes along the hypothesized fault plane. Similar to 12-A, we have emphasized the distribution of earthquakes within a shaded ellipse. (The two shallowest hypocenters are not included in this plot because they have large uncertainties in their depth estimates, which we discuss below.) The distribution of events in this elliptical region is not uniform; more events are located toward the edge of the region than the center. Further, there seems to be two distinct groupings in the distribution. Most of the hypocenters in the upper-right of the elliptical region occur at depths shallower than

***Figure 12.*** *Map showing detailed locations of earthquake epicenters in a 10 km x 10 km box, which is an enlargement of part of figure 11. Cross-section A (upper right panel) is a plot of the hypocenters in a view from the southwest looking to the northeast, which is along the strike of the fault. These hypocenters have a strike of about N. 42° E. Cross-section B (lower right panel) is a plot of the hypocenters in a view from the southeast looking to the northwest, which is looking at the surface of the fault plane. This view is along a bearing of N. 48° W.*

4.0 km (13,200 ft), whereas in the lower-left, most hypocenters occur deeper than 4.5 km (14,800 ft). In map view, the northeastern earthquakes correlate with the upper-right distribution of hypocenters and the southwestern earthquakes correlate with the lower-left distribution.

## C.   Earthquake frequency and spatial patterns:

The 39 earthquakes shown in Figure 13 are divided into five time periods between September 7 and October 15. The catalog also shows the dates when seismograph stations began operation. Figures 14, 15, 16, 17, and 18 display the seismicity of each time period and are subsets of the data shown in Figure 12. All figures are in the same formats as Figure 12. Each time interval is one-week long, except for period 1, which is 11 days long. The earthquakes in each time period are color-coded to help relate the events to the information plotted in Figures 14-18. In addition to color-coding the earthquakes for each time period, Figures 14-18 show the spatial relationship of earthquakes in each period to the entire earthquake series, which are gray, enclosed circles.

12



**Figure 13.** *Catalog of the 39 earthquakes located by the local seismograph network divided into five, color-coded time periods. The table also shows the dates when seismograph stations began operation.*

A comparison of the number of earthquakes recorded within each time period provides insight into changes in the rate of seismicity with time. Our record of events during the first period may be incomplete because, at that time, there were no stations closer than about 6.5 km (4 mi) to the center of seismicity; and stations BUR and RG0 were not installed until after September 13, that is, a week after the initial installation of the local network (see Appendix: Network design). During the second time period, an average of about two earthquakes occurred each day (Figure 13), whereas this rate declines to less than one event per day in period four and about one event every two days in period five. Yet, the rate in period three was similar to the rate in period five. Overall, the frequency of earthquakes decreased with time but additional data from later time periods after October 15 will better substantiate this observation.



**Figure 14.** *Plot of seismicity (red dots) during the first 11 days of operation of the portable network. Earthquakes of the entire series are shown by gray dots.*

Comparing the earthquake locations in Figures 14-18 one can identify spatial patterns in the seismicity. Of the five periods, only the second



**Figure 15.** *Plot of seismicity (orange dots) during the next 7 days of operation of the portable network. Earthquakes of the entire series are shown by gray dots.*

and fourth periods show a pattern best. During the second period (Figure 15), most earthquakes were located at depths greater than 4 km (13,200 ft), whereas during the fourth period, all the seismicity is shallower that 4 km (Figure 17). In map view, earthquakes in the second time

13

period were concentrated in the southwestern part of the epicentral area and then, in the fourth period, solely concentrated in the northeastern part. This pattern suggests that the seismicity occurs in clusters above and below some arbitrary boundary that expresses itself in both map and cross-section views. Most events during the first period (Figure 14) have large uncertainties in their earthquake depths (see section D. "Earthquake depth errors" below) and, therefore, we are unable to interpret the hypocenter distribution. Spatial patterns during the third and fifth periods (Figures 16 and 18) are difficult to recognize since few earthquakes occurred in these intervals.



*Figure 16.* Plot of seismicity (dark blue dots) during the next 7 days of operation of the portable network. Earthquakes of the entire series are shown by gray dots.

*Figure 17.* Plot of seismicity (light blue dots) during the next 7 days of operation of the portable network. Earthquakes of the entire series are shown by gray dots.



*Figure 18.* Plot of seismicity (yellow dots) during the next 7 days of operation of the portable network. Earthquakes of the entire series are shown by gray dots.

14

## D.   Earthquake depth errors:

To better characterize the quality of our earthquake depths, we organized our data into three vertical error ($E_z$) categories:

1)              $E_z < \pm1.5$ km ($E_z < \pm5,000$ ft); green symbols

2)      $\pm1.5 \leq E_z < \pm2.5$ km ($\pm5,000 \leq E_z < \pm8,250$ ft); yellow symbols

3)              $E_z \geq \pm2.5$ km ($E_z \geq \pm8,250$ ft); red symbols



***Figure 19.** Estimated vertical errors of the earthquake hypocenters divided into three categories; red, yellow, and green; see figure for details.*

Figure 19 shows the estimated vertical errors of the earthquake hypocenters. Most hypocenters have vertical errors of less than ±1.5 km (±5,000 ft) and we are confident that these are accurate (see Appendix: Data analysis). A couple of hypocenters have vertical errors in the red category and several have errors in the yellow category. The earthquakes that have vertical errors in the red and yellow categories occurred at the beginning of the recording period when there was a limited number of stations in the network and none directly above the earthquakes to constrain the depths. Better constraints on earthquake depths were not achieved until stations BUR and RGO were installed to the north and south of the epicentral area on September 13 and 17, respectively (Figures 11 and 13); and stations VZO, MAD, and VAL were not installed in the epicentral area until after September 24. Only hypocenters satisfying the vertical depth green category were used in the following data analysis.

## E.   Significant Observations:

Two significant observations are clearly defined by the hypocenters in Figure 20, which is a summation of Figures 13-19 and includes the closest fluid disposal wells. The first is a steep fault plane that dips approximately 70-80° to the southeast and whose probable upper bound is near 3 km (10,000 ft) depth and lower bound is near 6 km (19,800 ft) depth. Second, two areas of concentrated activity, emphasized by ellipses in Figure 20-B, are evident within the fault

plane. These areas suggest that the earthquakes occurred in clusters rather than randomly throughout the fault plane. In map view, these clusters correlate with the northeastern and southwestern regions of the fault. These two clusters may bound that part of the fault plane ruptured during one or more of the initial 12 earthquakes reported by the NEIC and its extent. Laterally, the earthquakes are bounded by Burro Canyon to the north and by the southern edge of Picketwire Valley to the south, a length of about 6 km (4 mi).

## F.  Relocation of earthquakes reported by the NEIC:

The initial earthquakes in the Trinidad swarm were located by the NEIC and, the epicenters were widely scattered (Figure 4). Following installation of the local portable digital network, a magnitude 3.4 earthquake occurred (Figure 21, 9/21/2001 19:10:59.76 ) that was recorded by both the local and national networks. Using this earthquake as a master event enabled us to calculate timing correction factors for each of the national network stations, and, then we applied these correction factors to relocate the other reported earthquakes. We still had limited control on the depths of these events, so we fixed their depths at 5 km (16,500 ft). Figure 21 (left) shows the original NEIC locations in blue, and Figure 21 (right) shows the relocations in blue as well. In both maps, the earthquake shown with a yellow symbol is the master event, and the red symbols show later earthquakes that were located by the local network. The relocated events cluster in the area of the seismicity recorded by the portable network,



*Click Image for detail*

**Figure 20.** *Summary of information described in Figures 13-19 showing significant observations of this investigation. Map (left panel) shows location for well-located earthquakes (red dots), seismograph stations, and fluid disposal wells. Cross-sections (right panels) show plots of these data in views toward the northeast (upper right panel) and toward the northwest (lower right panel).*

which suggests that those events initially recorded by the NEIC likely occurred on the same fault that we define using data from the portable instruments.

## G.   Induced seismicity or natural seismicity:

One aspect of this study is to explore the possibility that the earthquakes might be induced by water injection associated with coal-bed methane production. Conceivably, very accurate hypocenter locations alone might have provided a basis for accepting or rejecting this hypothesis, but this is not the case with the hypocenters obtained in the present study. For instance, if the hypocenters were concentrated at mid-crustal depths of 10-15 km (6-9 mi) or at substantial lateral distance from any well, this would constitute strong evidence against induced seismicity. Conversely, clusters of hypocenters at shallow depths directly beneath more than one of the wells would by themselves be strong evidence in favor of induced seismicity (Healy and others,

16

1968).  However, although our hypocenter locations are accurate (see Appendix: Data analysis), their locations by themselves do not argue strongly for or against the induced seismicity hypothesis.



**Figure 21.** *Maps showing relocation of the original 12 earthquakes reported by the National Earthquake Information Center (NEIC) and the master event used in the calculations. Map on the left shows the initial widely scattered NEIC earthquake locations. Map on the right shows the relocated NEIC events and the 39 earthquakes located by the local seismograph network.*

To assess the seismicity at Trinidad with respect to characteristics of seismicity induced by fluid injection worldwide, we consider the Trinidad observations in terms of seven questions posed by Davis and Frohlich (1993).  For a given set of earthquakes, Davis and Frohlich (1993) consider that four or more "yes" answers to their questions as suggestive but "incomplete or conflicting evidence" for induced seismicity, and they consider five or more "yes" answers to be "strong" evidence. We find (below) that only three of the questions can be answered "yes" or "tentative yes".

The questions of Davis and Frohlich (1993) are based on the perspective that a given set of earthquakes is assumed to be not induced until a convincing case can be made that it is induced.  This perspective is driven by the fact that the vast majority of earthquakes are natural, and it is a perspective that helps counteract the human tendency to see cultural causes behind unusual coincidences.  It is important to emphasize, however, that the fact that the data do not make a strong case for the earthquakes being induced does not imply that the data do make a strong case against the earthquakes being induced.  Davis and Frohlich (1993) note, moreover, that any set of answers to their questions "is open to revision if new information or evidence becomes available."  The questions nonetheless provide a useful framework to examine the diverse set of clues that may point to a suite of earthquakes having been induced by fluid injection, and the "profile" of answers to these questions provides a measure of the similarity of a given earthquake sequence to well-documented cases of injection-induced seismicity worldwide.

Question 1 (Background Seismicity):  Are these events the first known earthquakes of this character in the region?  For Trinidad, the answer to this question is "no".  A sequence of earthquakes in 1973 was located close to the 2001 source, perhaps coincident with it.

Question 2 (Temporal Correlation):  Is there a clear correlation between the time of injection and the times of seismic activity?  The answer to this question for the Trinidad earthquakes is a tentative "no?".  To answer this question, we consider the possibility that the earthquakes were induced by water injected into the well that is nearest station MAD (Figure 20).  Water has been injected into this well since April 2000 (Shirley, 2001), but most of the earthquake activity was

concentrated in a period of several weeks (August 28 – September 21, 2001) more than a year after injection began. Earthquake activity has subsequently (to the date of this writing) subsided, although fluid injection continues unchanged (COGCC; writ. commun., 2001). The examples cited by Davis and Frohlich (1993) indicate that they do not consider the onset of seismicity after a year of injection to be a "clear" temporal correlation between injection and seismicity. We consider the answer to this question to be tentative, however, because the three months that (as of this writing) have elapsed since the August/September period of seismicity are not sufficiently long to conclude that the earthquake source region has entered another period of multi-decade quiescence.

Question 3a (Spatial Correlation): Are epicenters near the wells? For Trinidad, the answer to this question is "yes".

Question 3b (Spatial Correlation): Do some earthquakes occur at depths comparable to the depth of injection? For Trinidad, the answer to this question is a tentative "yes?" The most reliably located of the Trinidad earthquakes occur at least 1.6 km (5,280 ft) deeper than the depth of injection, but Davis and Frohlich (1993) considered, for another sequence of earthquakes, that "3 km (10,000 ft) deeper" corresponded to a tentative "yes?". This answer is reasonable when we consider that the focal-depth uncertainties are of the order ±1.5 km (±5,000 ft).

Question 3c (Local Geology): If some earthquakes occur away from wells, are there known geologic structures that may channel fluid flow to the sites of the earthquakes? We consider the answer to this question to be a tentative "yes." There is some evidence in geophysical and topographic data (e.g., V. Matthews, pers. commun. to Shirley, 2001) for a northeast-trending geologic structure that passes close to the injection well near MAD and might be considered a candidate for a structure that would channel fluid flow, but neither the geologic nor hydrologic characteristics of the structure have been determined.

Question 4a (Injection Practices): Are changes in fluid pressure sufficient to encourage seismic or aseismic failure at the bottom of the well?. In most well-documented cases of injection-induced seismicity, water is introduced into geologic formations under pressure (e.g., Davis and Frohlich, 1993. In the case of Trinidad earthquakes, water is introduced *via* the well near MAD into geologic formations under only the force of gravity (Shirley, 2001). Our understanding is that the water is easily accepted into the formation into which it is injected (e.g., Shirley, 2001), which would imply that fluid pressure at the bottom of the well is little changed by the injection of water into the well. On this basis, we judge that the answer to this question is a tentative "no?".

Question 4b (Injection Practices): Are changes in fluid pressure sufficient to encourage seismic or aseismic failure at the hypocentral locations? As noted by Davis and Frohlich (1993), answering this question requires a model of the hydrologic system. The authors of the present report do not have the expertise in ground-water hydrology to develop such a model for the region of the Trinidad earthquakes. Moreover, we are not able to assess if there is a mechanism, well-documented scientifically and consistent with the known geology of the earthquake area, by which injection of water under the force of gravity would cause changes in fluid pressure at

18

depths of the Trinidad sequence hypocenters sufficient to induce fault failure. We are therefore unable to answer this question.

As stated above, we have three "yes" or "yes?" answers to the questions of Davis and Frohlich (1993). The characteristics of the Trinidad sequence summarized by the answers to the above questions do not rule out the possibility of the Trinidad earthquakes being induced, but neither do they make a strong case for the Trinidad shocks being induced.

From a seismic hazard perspective, the most important implication of the earthquakes being induced would be that the earthquake activity would probably continue at the Trinidad site for a period of years as long as injection continues at its current level at the well near station MAD. If the earthquakes are naturally occurring, we would expect the level of seismicity to generally subside, although it would not be unusual to have this general subsidence of activity punctuated by occasional delayed aftershocks or bursts of aftershocks. These inferences are qualitative judgments, based on typical (but not invariable) behavior of apparently similar bursts of natural and induced earthquake activity elsewhere in the world.


# VI.   Discussion

The upper-crustal focal depths of the Trinidad swarm (in the upper 6 km, 19,800 ft, of the earth's crust) may have seismic hazards implications in the long-term if the earthquakes are natural. Such shallow-depth earthquakes tend to produce more intense shaking at communities close to the epicenter (within several kilometers) than do earthquakes of similar magnitude at mid-crustal depths of 10-15 km (6-9 mi). Natural earthquakes with similar shallow depths have been observed at some other locations of the Southern Rocky Mountains. An example is the M 4.6 Dulce, New Mexico, earthquake of January 23, 1966, (Herrmann and others, 1980), which is inferred to have had a source depth of about 3 km (10,000 ft). The locations of the Trinidad earthquakes support the idea that such shallow-depth earthquakes may be a characteristic mode of seismicity in the Southern Rocky Mountains.

Other seismic hazards implications of the earthquake swarm do not depend in an obvious way on whether the earthquake was induced or natural. We know from the historical record that the Trinidad area occasionally experiences natural earthquakes; so demonstrating that the 2001 earthquakes were induced would not negate the possibility of damaging natural earthquakes in the area.

Three water disposal wells in the general epicentral area bottom in the Dakota Formation, which has a wide regional lateral extent in the Raton basin and throughout the west-central U.S. If the water being supplied to this formation spreads laterally and if the fault plane extends upward to the depth of the Dakota Formation at 1.4-1.2 km (4500-4000 ft), then this recharge water may be capable of changing the hydrologic conditions along the fault and become a contributing factor in inducing the swarm. Yet, as noted previously, the injected water is easily accepted into the formation suggesting that the fluid pressure at the bottom of the well is little changed. Therefore, although there is a general spatial relation between the location of the events and some of the

19

disposal wells, we do not have any firm evidence of a direct relationship between the fluid disposal and the earthquake swarm.

Based on our analysis, we hypothesize that the M 4.6 event of September 5, 2001, ruptured much of the shaded elliptical region outlined in Figure 20-B and subsequent aftershocks have been occurring in and around the perimeter of this rupture area. The two areas of enhanced activity, enclosed by the smaller ellipses in both map and cross-section views (Figure 20), may represent the northeastern end of the rupture extending upwards to about 4-3 km (13,200-10,000 ft) depth and the southwestern end of the fault extending downwards to 6 km (19,800 ft) depth. These areas may be where stress on the fault increased around the boundary of the M 4.6 rupture, and ensuing smaller magnitude earthquakes are continuing to take place responding to equilibrium forces within the fault.

Hypocenters from the local Trinidad network show that the recent sequence of earthquakes occurred on a previously unknown fault located at 3 km to 6 km (10,000 - 19,800 ft) below the surface. The northeast strike of the causative fault is important information because it indicates that similarly oriented faults at other locations of the Trinidad region may also be favorably oriented to slip in the current tectonic stress field, but this is true whether or not the earthquakes are natural. The seismologically-identified fault system on which the recent earthquakes have occurred deserves more study to assess its geologic characteristics, its history of past displacement, and to determine if the fault extends to depths shallower than 3 km, which is the upper limit of the well-constrained hypocenters.

Preliminary single-event focal mechanisms calculated for the 39 local earthquakes are poorly constrained due to sparse coverage of the focal sphere. However, both the composite mechanism (Figure 22) of the 39 earthquakes and the Harvard CMT (Centroid-Moment Tensor) for the M 4.6 event of September 5, 2001, concur that primary movement is normal dip-slip. Thus, the fault movement is believed to be normal, down to the southeast with possibly a small component of left lateral strike-slip.

# VII.   Acknowledgements

This earthquake study is being conducted in collaboration with the Colorado State Geological Survey. We thank the Colorado Gas and Oil Conservation Commission for sharing information on the water disposal wells and contributing Figure 13. We also thank Evergreen Resources, Inc., for allowing access to their owned or leased lands to accommodate our portable digital seismograph and for cooperating with this earthquake study. If it was not for the untiring efforts of Mr. Ken Torres (Las Animas County Commissioner) and Mr. Vince Vigil (building inspector for Las Animas County Planning Commission), we would still be looking for sites in some unpopulated canyon or traveling down another dead end road. We thank the many property owners who kindly offered their assistance and services, and allowed us to site our portable digital seismographs on their property. Their trust in our work and integrity is greatly appreciated. Charles Pillmore (USGS emeritus) provided us with initial topographic, geologic, and logistical information to help us identify potential seismograph station locations. The base maps used in the Figures are attributed to the excellent work of John Michael and John Kosovich, both of the USGS. And, finally, we thank Steve Harmsen for his thorough and informative review.



*Click Image for detail*

**Figure 22.** *Plots of focal mechanism solutions determined for the M 4.6 earthquake of September 5, 2001. The left solution was determined by the Harvard Seismology: Centroid-Moment Tensor Project. The right solution is a composite focal mechanism determined from P-wave first motions of 39 earthquakes recorded by the local seismograph network using the program FPFIT (Reasonberg and Oppenheimer, 1985). Both solutions characterize slip as dominantly normal but the composite also shows a small component of left lateral strike-slip.*

# VIII.   References

Colorado Oil and Gas Conservation Commission, written communication, 2001, 1120 Lincoln Street, Suite 801 Denver, Colorado 80203

Davis, S.D., and Frohlich, C., 1993, Did (or will) fluid injection cause earthquakes? - Criteria for a rational assessment, *Seismological Research Letters*, v. 64, p. 207-224.

Evergreen Resources, Inc., written communication, 2001, 1401 17th Street, Suite 1200, Denver, CO 80202.

Healy, J.H., Jackson, W.H., and Van Schaack, J.R., 1966, Microseismicity studies at the site of the Denver earthquakes (part 5) *in* Geophysical and geological investigations relating to earthquakes in the Denver area, Colorado, *U.S. Geological Survey Open-File Report*, March 22, 1966, 19 p.

Healy, J.H., Rubey, W.W., Griggs, D.T., and Raleigh, C.B., 1968, The Denver earthquakes, science, v.161, no. 3848, p. 1301-1310.

Herrmann, R.B., Dewey, J.W., and Park, S.-K., 1980, The Dulce, New Mexico, earthquake of 23 January 1966, *Bulletin of the Seismological Society of America*, v. 70, no. 6, p. 2171-2183.

Herrmann, R.B., Park, S.-K., and Wang, C.-Y., 1981, The Denver Earthquakes of 1967-1968, *Bulletin of the Seismological Society of America*, v. 71, no. 3, p. 731-745.

Johnson, Ross B., 1969, Geologic map of the Trinidad quadrangle south-central Colorado: U.S. Geological Survey, *Geological Investigations Map* I-588, scale 1:250,000.

Lahr, J.C., 1999, HYPOELLIPSE: A computer program for determining local earthquake hypocentral parameters, magnitude, and first-motion pattern (Y2K compliant version), version 1.0: *U.S. Geological Survey Open-File Report* 99-23, paper and on-line editions, 116 p.

Reasonberg, P. and Oppenheimer, D., 1985, FPFIT, FPPLOT, and FPPAGE: Fortran computer programs for calculating and displaying earthquake fault-plane solutions: *U.S. Geological Survey Open-File Report* 85-739, 47 p.

Shirley, K., 2001, Colorado quakes cause concern, *American Association of Petroleum Geologists Explorer*, v. 22, n. 12, p. 6,10,11, and 17.

# Appendix

# 1.    Seismograph instrumentation

## a)    Data logger and Seismometer:

Two types of common portable digital data loggers are being used for this study. One type, manufactured by Refraction Technology, Inc (RefTek), is a 3- or 6-channel, 24-bit digital recorder with a hard disk and GPS receiver/clock – model 72A- 08. The other type, manufactured by Kinemetrics Inc (K2), is a 3- or 6-channel, 19-bit digital recorder with PCMCIA storage cards and GPS receiver/clock – model K2. Figure 5, shows the locations of each type of data logger. The up-pointing triangle symbol denotes the RefTek while the down-pointing triangle denotes the K2.

Four types of seismometers are being used in the network. Most RefTek stations have CMG-40T broadband seismometers that record frequencies between 0.05 – 50 Hz. One RefTek station, BH0, has a Mark Products L22 seismometer, which is a short-period sensor capable of

recording frequencies from 0.5 Hz and higher depending on the data-logger recording configuration. The other two types of seismometers are accelerometers that record strong motion, that is, ground motion strong enough to cause damage. These instruments, both manufactured by Kinemetrics, are the FBA-23 and the Episensor ES-T accelerometers. RefTek station, RG0, is using the FBA-23 while all of the K2 stations are using the Episensor ES-T.

## b)   Instrument Timing and Accuracy:

Accurate timing between the portable seismographs is critical because precise earthquake locations depend on knowing the time that the P- and S-wave from earthquakes arrive at each station. These arrival times are mathematically inverted to determine when the earthquake occurred and to compute the earthquake's latitude, longitude, and depth (Lahr, 1999). Both loggers utilize GPS (Global Positioning System) receiver/clocks to time stamp the digital data. The GPS clocks continuously receive a time signal from one or more orbiting geo-stationary satellites as a reference and compared to the time signal of a data logger's internal clock. If a time difference exists, then the internal clock is adjusted, and the correction is written into a log file. Nominally, the timing error of an internal clock is less than 1 ms (0.001 sec), however, since the digital recording instrument logs time comparison differences, the log can be used to apply clock corrections to the data.

## c)   Instrument response:

The instrument response files for the digital data loggers and the seismometers are available at the Geologic Hazards Website.

# 2.   Network design

Our primary objective of this study was to obtain accurate information on the location, depth, and characteristics of the earthquakes. To accomplish this, we initially installed seven portable digital seismographs in an array that roughly surrounded the epicentral area as defined by the locations reported by NEIC (Figure 2). Since the NEIC locations had uncertainties on the order of ±10 km (6 mi) and because the strongest felt reports were from the towns of Segundo and Valdez, which are 19 km (12 mi) west of Trinidad, Colorado, we centered our network on these towns. The average distance between stations was based on the overall scatter of the NEIC locations, but specific locations were influenced by the density of homes in the surrounding region. To expedite and simplify our installation, we attempted to locate stations at sites where we had access to AC power, but since many canyons in the area are not populated, we needed batteries and solar panels in some places. Figure 5 shows the distribution of the 12 portable seismographs in our network.

The first stations in the network were installed by September 8, 2001 and included stations TK0, PD0, TKD, PT0, and BH0 on the perimeter and CKD and DK0 in the interior. As we began to more accurately define the earthquake epicentral area, we installed additional stations to provide better azimuth and depth control of the earthquakes (Figure 11). Our initial locations indicated that the earthquakes were located about 8 km (5 mi) directly west of Cokedale and north of

23

Valdez, so we installed stations BUR on September 13 and RG0 on September 17 to control the locations in the north-south direction. On September 25 and 26 we installed stations VZ0 and MAD to better constrain the depths of the earthquakes. Having these stations directly above the earthquakes greatly improved our ability to estimate the depth of the events. Lastly, on October 11, we installed station VAL for better depth control on the events near the southwestern edge of the source area.

# 3.   Network management

Once the network was fully operational, we systematically serviced the stations to verify their operations and to retrieve data. A few days after each station was installed, we revisited it in order to: 1) verify that the data logger was operating; 2) verify that the data logger configuration was suitable for the expected magnitude range, and 3) verify that the data logger configuration could accommodate the existing ambient background noise from manmade or natural sources. When we were satisfied with the station's operations, we then retrieved the recorded data. When we were confident that stations were operating satisfactorily, we only visited them as frequently as needed to retrieve data.

# 4.   Data analysis

Data from all stations was first sorted into chronological order, and an algorithm organized them into individual events. These events were then reviewed by an analyst to determine which events are earthquakes where the resulting dataset was used for all subsequent analysis. For this study, we determined that a minimum of five stations was necessary to compute a well-constrained location for individual earthquakes.

This determination was based on: 1) the final distribution of stations relative to the earthquake epicenters and 2) the distance from the epicenters to the nearest station relative to the calculated earthquake focal depths. The most accurate earthquake locations are derived from stations that are evenly distributed around the epicenters, which provides even azimuth control. However, topography, demographics, and instrumentation availability limit this distribution. For good depth control, it is important to have at least one station within one to two focal depths of the event. For this earthquake study, the depths ranged between about 3 and 6 km (10,000 to 20,000 ft), we attempted to establish our array to have stations within 3 km of individual earthquakes

The P- and S-arrival times were measured at each station for events recorded by five or more stations, and we located each earthquake using the program HYPOELLIPSE (Lahr, 1999) using a velocity model containing four layers over a half-space. Velocities in the model are:

| Depth to top of layer (km) | P-phase Velocity of layer (km/sec) |
|---|---|
| 0.0 | 4.0 |
| 1.8 | 4.9 |
| 3.0 | 5.8 |
| 20.0 | 6.9 |
| 40.0 | 8.0 |

Precise determination of earthquake hypocenters (especially depths) depends on an accurate model of seismic velocities as a function of depth. For the upper crust, we used a three-layer velocity model consisting of a top layer of Tertiary and Cretaceous sedimentary rocks about 2 km thick, a layer of older Permian and Pennsylvanian sedimentary rock about 1 km thick, and a layer of Precambrian basement (crystalline rock) starting at a depth of 3 km (10,000 ft). The depth to basement model was based on the estimate in an unpublished map by Ogden Tweto (P. Sims, writ. commun., 2001). A P-wave velocity of 4.0 km/sec (2.5 mi/sec) was assigned to the top layer, largely constrained by the stacking velocities from reflection surveys in the region done by Evergreen Resources, Inc. (writ. commun., 2001). This velocity is typical for shallow well-consolidated sedimentary rock. A P-wave velocity of 4.9 km/sec (3.1 mi/sec) was used for the second layer, based on the velocity of similar rock at the Rocky Mountain Arsenal measured from a borehole (Healy and others., 1966). The Precambrian basement rock was assigned a P-wave velocity of 5.8 km/sec (3.6 mi/sec), again using values for this rock type measured at the Arsenal. S-wave arrival times were also used for all hypocentral determinations.

An average Vp/Vs ratio of 1.68 was determined from these data by the program HYPOELLIPSE and was used to compute S-phase travel times. No station travel-time corrections were used. The average RMS residual for all 39 events located by the local network is 0.038.

Different types of analyses on these data can determine geophysical properties of the earthquakes and other earthquake effects such as fault characteristics, magnitude, and site response. However, at this time, we are focusing our effort on determining the spatial distribution of the hypocenters.

# 5.   Data dissemination

The earthquake data and the P-wave and S-wave arrival time picks are available at the Geologic Hazards Website.

BUREAU OF LAND MANAGEMENT
WYOMING STATE OFFICE

# Appendix E

## Hydraulic Fracturing White Paper

**7/5/2013**

## I. BACKGROUND

Hydraulic fracturing (HF) is a well stimulation process used to maximize the extraction of underground resources – oil, natural gas and geothermal energy. The HF process includes the acquisition of water/mixing of chemicals, production zone fracturing, and HF flowback disposal.

In the United States, HF has been used since the 1940's. Early on, the HF process utilized pressures that are of a much smaller magnitude than those used today.

The HF process involves the injection of a fracturing fluid and propping agent into the hydrocarbon bearing formation under sufficient pressure to further open existing fractures and/or create new fractures. This allows the hydrocarbons to more readily flow into the wellbore. HF has gained interest recently as hydrocarbons previously trapped in low permeability tight sand and shale formations are now technically and economically recoverable. As a result, oil and gas production has increased significantly in the United States. The state of Wyoming classifies all gas production zones as Class 5 groundwater zones; this means these zones can be highly impacted by oil and gas activities and are exempt from regulation under the Clean Water Act. However, operations within these zones cannot cause other zones to lose their use classification.

Prior to the development of hydrocarbon bearing tight gas and shale formations, domestic production of conventional resources had been declining. In response to this decline, the federal government in the 1970's through 1992, passed tax credits to encourage the development of unconventional resources. It was during this time that the HF process was further advanced to include the high-pressure multi-stage frac jobs used today.

Generally, HF can be described as follows:

1. Water, proppant, and chemical additives are pumped at extremely high pressures down the wellbore.
2. The fracturing fluid is pumped through perforated sections of the wellbore and into the surrounding formation, creating fractures in the rock. The proppant holds the fractures open during well production.
3. Company personnel continuously monitor and gauge pressures, fluids and proppants, studying how the sand reacts when it hits the bottom of the wellbore, slowly increasing the density of sand to water as the frac progresses.
4. This process may be repeated multiple times, in "stages" to reach maximum areas of the formation(s). The wellbore is temporarily plugged between each stage to maintain the highest fluid pressure possible and get maximum fracturing results in the rock.
5. The plugs are drilled or removed from the wellbore and the well is tested for results.
6. The pressure is reduced and the fracturing fluids are returned up the wellbore for disposal or treatment and re-use, leaving the sand in place to prop open the fractures and allow the oil/gas to flow.

## II. OPERATIONAL ISSUES

Wells that undergo HF may be drilled vertically, horizontally, or directionally and the resultant fractures induced by HF can be vertical, horizontal, or both. Wells in Wyoming (WY) may extend to depths greater than 20,000 feet or less than 1,000 feet, and horizontal sections of a well may extend several thousand feet from the production pad on the surface[1].

The total volume of fracturing fluids is generally 95-99% water. The amount of water needed to fracture a well in WY depends on the geologic basin, the formation, and depth and type of well (vertical, horizontal, directional), and the proposed completion process.

In general, approximately 50,000 to 300,000 gallons[2] may be used to fracture shallow coalbed methane wells in the Powder River Basin, while approximately 800,000 to 2 million gallons may be used to fracture deep tight sand gas wells in southwestern WY.  In the Niobrara oil play, approximately 250,000 gallons may be used to fracture a vertical well, while up to 5 million gallons may be used to fracture a horizontal well.

Proppant, consisting of synthetic or natural silica sand, may be used in quantities of a few hundred tons for a vertical well to a few thousand tons for a horizontal well.

Drilling muds, drilling fluids, water, proppant and hydraulic fracturing fluids are stored in onsite tanks or lined pits during the drilling and/or completion process. Equipment transport and setup can take several days, and the actual HF and flowback process can occur in a few days up to a few weeks.  For oil wells, the flowback fluid from the HF operations is treated in an oil-water separator before it is stored in a lined pit or tank located on the surface. Where gas wells are flowed back using a "green completion process" fluids are run through a multi-phase separator, which are then piped directly to enclosed tanks or to a production unit.

**Gas emissions** associated with the HF process are captured when the operator utilizes a green completion process. Where a green completion process is not utilized, gas associated with the well may be vented and/or flared until "saleable quality" product is obtained in accordance with federal and state rules and regulations. The total volume of emissions from the equipment used (trucks, engines) will vary based on the pressures needed to fracture the well, and the number of zones to be fractured. Emissions associated with a project, and HF if proposed, will be analyzed through a site specific NEPA document to ensure that the operation will not cause a violation of the Clean Air Act.

Under either completion process, wastewaters from HF may be disposed in several ways. For example, the flowback fluids may be stored in tanks pending reuse; the resultant

---

[1] See Grass Creek Resource Management Plan (RMP) 1998 (BLM 1998a); Washakie RMP 1988 (BLM 1988b); Cody RMP 1990 (BLM 1990); Lander RMP 1987 (BLM 1987) RFD and/or Mineral Occurrence Report for specific information on current and projected oil and gas development.

[2] How much is one million gallons of water? One million gallons is the amount of water consumed by: A 1,000 megawatt coal-fired power plant in 2.5 hours, a golf course in 5 days or, 1.5 acres of corn in a season.

waste may be re-injected using a permitted injection well, or the waste may be hauled to a licensed facility for treatment, disposal and/or reuse.

Disposal of the waste stream following establishment of "sale-quality" product, would be handled in accordance with Onshore Order #7 regulations and other state/federal rules and regulations.

### Fracturing Fluids

As indicated above, the fluid used in the HF process is approximately 95to 99 percent water and a small percentage of special-purpose chemical additives[3, 4] and proppant. There is a broad array of chemicals that can be used as additives in a fracture treatment including, but not limited to, hydrochloric acid, anti-bacterial agents, corrosion inhibitors, gelling agents (polymers), surfactants, and scale inhibitors. The 1 to 5 percent of chemical additives translates to a minimum of 5,000 gallons of chemicals for every 1.5 million gallons of water used to fracture a well (Paschke, Dr. Suzanne. USGS, Denver, Colorado. September 2011). Water used in the HF process is generally acquired from surface water or groundwater in the local area.

### Re-Fracturing

Re-fracturing of wells (RHF) may be performed after a period of time to restore declining production rates.   RHF success can be attributed to enlarging and reorienting existing fractures while restoring conductivity due to proppant degradation and fines plugging. Prior to RHF, the wellbore may be cleaned out.  Cleaning out the wellbore may recover over 50% of the initial frac sand.  Once cleaned, the process of RHF is the same as the initial HF. The need for RHF cannot be predicted.

### Water Availability and Consumption Estimates

The Wyoming Framework Water Plan, A Summary, (Wyoming Water Development Commission, October 2007), indicates that approximately 15 million acre-feet per year of water becomes either surface water or groundwater and is available for use. This estimate includes water that flows into the state and the precipitation that runs off as stream flow or infiltrates as groundwater; it does not include volumes lost to evapotranspiration.

Water flowing out of WY is estimated to be 13,678,200 acre-feet per year. Wyoming's share of this supply under existing water compacts is estimated to be 3,313,500 acre-feet per year; approximately10, 364,700 acre-feet flows downstream out of the state.

The industrial water use sector includes electric power generation, coal mining, conventional oil and gas production, uranium mining, trona mining and soda ash production, bentonite mining, gypsum mining, coalbed methane (CBM) production, manufacturing of aggregate, cement, and concrete, and road and bridge construction.

---

[3] FracFocus Chemical Registry.  Hydraulic Fracturing Water Usage
[4] Chesapeake Energy. 2012.  Hydraulic Fracturing Fact Sheet.  http://www.chk.com/Media/Educational-Library/Fact-Sheets/Corporate/Hydraulic_Fracturing_Fact_Sheet.pdf (Last accessed March 1, 2012)

Total current industrial surface water use for Wyoming is estimated to be 125,000 acre-feet per year.

Total current industrial groundwater water use is estimated to be 246,000 acre-feet per year.

According to the state water plan, it appears likely that any new water-intensive industrial developments in the state over the next 30 years will fall into the electric power generation and/or chemical products categories. The other two intensive water use industries, primary metals and paper producers, tend to locate near the source of their largest process inputs – metals and wood respectively. The total projected industrial use under the Mid Scenario is 331,000 acre-feet per year.  The Mid-Scenario is a middle of the road estimate versus the projected low or high scenarios.

Water needs for future fracturing jobs were estimated for this discussion paper using the current Reasonable Foreseeable Development (RFD) scenario numbers taken from each of the nine WY RMPs and multiplied by the maximum volume of water necessary based on information located at fracfocus.org.  The table is included as Attachment 1.  Based on a statewide RFD of 25,478 non-CBM wells and 18,299 CBM wells, the maximum projected water needs for HF is 401,319 acre-feet of water. This number is an estimate based upon maximum projected water needs per HF job, and assumes that 100% of the water is freshwater.

According to the WOGCC, as of October 26, 2012, there are approximately 4,185 Class II injection wells in the state disposing of oil and gas waste water. Data obtained from the Wyoming Oil and Gas Conservation Commission, for a period ending December 31, 2011, indicates that 1,106,376,299 barrels of water (105,255.53 acre-feet) have been injected into underground formations. These injection wells may also utilize HF depending upon the specific geology of the disposal zone; however, subsequent disposal operations utilize injection pressures below the fracture stress of the receiving formation to ensure containment in the targeted zone.  Each formation for which injection is approved must receive an aquifer exemption from the Environmental Protection Agency documenting that the injectate will be properly contained and that the formation receiving the water is not of useable quality (DEQ Class 4 Use).

**Potential Sources of Water for Hydraulic Fracturing**
Freshwater-quality water is required to drill the surface-casing section of the wellbore per federal regulations; other sections of the wellbore (intermediate and/or production strings) would be drilled with appropriate quality makeup water as necessary. This is done to protect usable water zones from contamination, to prevent mixing of zones containing different water quality/use classifications, and to minimize total freshwater volumes. With detailed geologic well logging during drilling operations, geologists/mud loggers on location identify the bottoms of these usable water zones, which aids in the proper setting of casing depths.

Several sources of water are available for drilling and/or HF in WY. Because WY's water

rights system is based in the prior appropriation doctrine, water cannot be diverted from a stream/reservoir or pumped out of the ground for drilling and/or HF without reconciling that diversion with the prior appropriation doctrine. Like any other water user, companies that drill or hydraulically fracture oil and gas wells must adhere to WY water laws when obtaining and using specific sources of water.

Below is a discussion of the sources of water that could potentially be used for HF. The decision to use any specific source is dependent on BLM authorization at the APD stage and the ability to satisfy the water appropriation doctrine. BLM must also consult in accordance with the Endangered Species Act (ESA) as amended (16 U.S .C. 1531 et seq.) with the U.S Fish and Wildlife Service (FWS on projects resulting in consumptive water use over de minimus levels, in the Platte and Colorado River Basins of WY. Where this is an issue, USFWS was consulted during the preparation of the appropriate RMP and would again be consulted on a case by case basis. From an operators' standpoint, the decision regarding which water source will be used is primarily driven by the economics associated with procuring a specific water source.

<u>Water transported from outside the state.</u>  The operator may transport water from outside the state. As long as the transport and use of the water carries no legal obligation to Wyoming, this is an allowable source of water from a water rights perspective.

<u>Irrigation water leased or purchased from a landowner.</u> The landowner may have rights to surface water, delivered by a ditch or canal that is used to irrigate land. The operator may choose to enter into an agreement with the landowner to purchase or lease a portion of that water. This is allowable, however, in nearly every case, the use of an irrigation water right is likely limited to irrigation uses and cannot be used for well drilling and HF operations. To allow its use for drilling and HF, the owner of the water right and the operator must apply to change the water right through a formal process.

<u>Treated water or raw water leased or purchased from a water provider.</u> The operator may choose to enter into an agreement with a water provider to purchase or lease water from the water provider's system. Municipalities and other water providers may have a surplus of water in their system before it is treated (raw water) or after treatment that can be used for drilling and HF operations. Such an arrangement would be allowed only if the operator's use were compliant with the water provider's water rights.

<u>Water treated at a waste water treatment plant leased or purchased from a water provider.</u> The operator may choose to enter into an agreement with a water provider to purchase or lease water that has been used by the public, and then treated as wastewater. Municipalities and other water providers discharge their treated waste water into the streams where it becomes part of the public resource, ready to be appropriated once again in the priority system. But for many municipalities a portion of the water that is discharged has the character of being "reusable." As a result, it is possible that after having been discharged to the stream, it could be diverted by the operator to be used for drilling and HF operations. Such an arrangement would only be appropriate with the approval of the WY State Engineer's Office (WSEO) and would be allowed only if the

water provider's water rights include uses for drilling and HF operations.

New diversion of surface water flowing in streams and rivers. New diversion of surface waters in most parts of the state are rare because the surface streams are already "over appropriated," that is, the flows do not reliably occur in such a magnitude that all of the vested water rights on those streams can be satisfied. Therefore, the only time that an operator may be able to divert water directly from a river is during periods of high flow and less demand. These periods do occur but not reliably or predictably.

Produced Water. The operator may choose to use water produced in conjunction with oil or gas production at an existing oil or gas well. The water that is produced from an oil or gas well is under the administrative purview of the WSEO and is either non-tributary, in which case, it is administered independent of the prior appropriation doctrine; or is tributary, in which case, the depletions from its withdrawal must be fully augmented if the depletions occur in an over-appropriated basin. The result in either case is that the produced water is available for consumption for other purposes, not just oil and gas operations. The water must not be encumbered by other needs and a the operator must obtain a proper well permit from the WSEO before the water can be used for drilling and HF operations.

Reused or Recycled Drilling Water. Water that is used for drilling of one well may be recovered and reused in the construction of subsequent wells. The BLM encourages reuse and recycling of both the water used in well drilling and the water produced in conjunction with oil or gas production. However, as described above, the operator must obtain the right to use the water for this purpose.

On-Location Water Supply Wells. Operators may apply for, and receive, permission from the WSEO to drill and use a new water supply well. These wells are usually drilled on location to provide an on-demand supply. These industrial-type water supply wells are typically drilled deeper than nearby domestic and/or stock wells to minimize drawdown interference, and have large capacity pumps. The proper construction, operation and maintenance, backflow prevention and security of these water supply wells are critical considerations at the time they are proposed to minimize impacts to the well and/or the waters in the well and are under the jurisdiction of the WSEO. Plugging these wells are also under the jurisdiction of the WSEO.

### III. Potential Impacts to Usable Water Zones

Impacts to freshwater supplies can originate from point sources, such as chemical spills, chemical storage tanks (aboveground and underground), industrial sites, landfills, household septic tanks, and mining activities. Impacts to usable waters may also occur through a variety of oil and gas operational sources which may include, but are not limited to, pipeline and well casing failure, and well (gas, oil and/or water) drilling and construction of related facilities. Similarly, improper construction and management of

open fluids pits and production facilities could degrade ground water quality through leakage and leaching. [5]

Should hydrocarbons or associated chemicals for oil and gas development, including HF, exceeding EPA/WDEQ standards for minimum concentration levels migrate into culinary water supply wells, springs, or usable water systems, it could result in these water sources becoming non-potable. Water wells developed for oil and gas drilling could also result in a draw down in the quantity of water in nearby residential areas depending upon the geology; however it is not currently possible to predict whether or not such water wells would be developed.

Usable groundwater aquifers are most susceptible to pollution where the aquifer is shallow (within 100 feet of the surface depending on surface geology) or perched, are very permeable, or connected directly to a surface water system, such as through floodplains and/or alluvial valleys or where operations occur in geologies which are highly fractured and/or lack a sealing formation between the production zone and the usable water zones. If an impact to usable waters were to occur, a greater number of people could be affected in densely populated areas versus sparsely populated areas characteristic of WY.

Potential impacts on usable groundwater resources from fluid mineral extraction activities can result from the five following scenarios:

● Contamination of aquifers through the introduction of drilling and/or completion fluids through spills or drilling problems such as lost circulation zones.

● Communication of the induced hydraulic fractures with existing fractures potentially allowing frac fluid migration into usable water zones/supplies. The potential for this impact is likely dependent on the local hydraulic gradients where those fluids are dissolved in the water column. To date, this is an unproven theory.

● Cross-contamination of aquifers/formations that may result when fluids from a deeper aquifer/formation migrate into a shallower aquifer/formation due to improperly cemented well casings.

● Localized depletion of unconfined groundwater availability.

● Progressive contamination of deep confined, shallow confined, and unconfined aquifers if the deep confined aquifers are not completely cased off, and geologically isolated, from deeper units. An example of this would be salt water intrusion resulting from sustained drawdown associated with the pumping of groundwater.

The impacts above could occur as a result of the following processes:

---

[5] See Subject RMPs, Grass Creek Resource Management Plan (RMP) 1998 (BLM 1998a); Washakie RMP 1988 (BLM 1988b); Cody RMP 1990 (BLM 1990); Lander RMP 1987 (BLM 1987)

Improper casing and cementing.
A well casing design that is not set at the proper depths or a cementing program that does not properly isolate necessary formations could allow oil, gas or HF fluids to contaminate other aquifers/formations.

Natural fractures, faults, and abandoned wells.
If HF of oil and gas wells result in new fractures connecting with established natural fractures, faults, or improperly plugged dry or abandoned wells, a pathway for gas or contaminants to migrate underground may be created posing a risk to water quality. The potential for this impact is currently unknown but it is generally accepted that the potential decreases with increasing distance between the production zone and usable water zones. This potential again is dependent upon the site specific conditions at the well location.

Fracture growth.
A number of studies and publications report that the risk of induced fractures extending out of the target formation into an aquifer—allowing hydrocarbons or other fluids to contaminate the aquifer —may depend, in part, on the formation thickness separating the targeted fractured formation and the aquifer.  For example, according to a 2012 Bipartisan Policy Center report, the fracturing process itself is unlikely to directly affect freshwater aquifers because fracturing typically takes place at a depth of 6,000 to 10,000 feet, while drinking water aquifers are typically less than 1,000 feet deep.  Fractures created during HF have not been shown to span the distance between the targeted l formation and freshwater bearing zones.  If a parcel is sold and development is proposed in usable water zones, those operations would have to comply with federal and/or state water quality standards or receive a Class 5 designation from the WDEQ.

Fracture growth and the potential for upward fluid migration, through coal and other geologic formations depend on site-specific factors such as the following:

1.  Physical properties, types, thicknesses, and depths of the targeted formation as well as those of the surrounding geologic formations.
2.  Presence of existing natural fracture systems and their orientation in the target formation and surrounding formations.
3.  Amount and distribution of stress (i.e., in-situ stress), and the stress contrasts between the targeted formation and the surrounding formations.

Hydraulic fracture stimulation designs include the volume of fracturing fluid injected into the formation as well as the fluid injection rate and fluid viscosity; this information would be evaluated against the above site specific considerations.

Fluid leak and recovery (flowback) of HF fluids.
It is theorized that not all fracturing fluids injected into the formation during the HF process may be recovered. It is theorized that fluid movement into smaller fractures or

other geologic substructures can be to a point where flowback efforts will not recover all the fluid or that the pressure reduction caused by pumping during subsequent production operations may not be sufficient to recover all the fluid that has leaked into the formation. It is noted that the fluid loss due to leakage into small fractures and pores is minimized by the use of cross-linked gels.

Willberg et al. (1998) analyzed HF flowback and described the effect of pumping rates on cleanup efficiency in initially dry, very low permeability (0.001 md) shale. Some wells in this study were pumped at low flowback rates (less than 3 barrels per minute (bbl/min). Other wells were pumped more aggressively at greater than 3 bbl/min. Thirty-one percent of the injected HF fluids were recovered when low flowback rates were applied over a 5-day period. Forty-six percent of the fluids were recovered when aggressive flowback rates were applied in other wells over a 2-day period. In both cases, additional fluid recovery (10 percent to 13 percent) was achieved during the subsequent gas production phase, resulting in a total recovery rate of 41 percent to 59 percent of the initial volume of injected HF fluid. Ultimate recovery rate however, is dependent on the permeability of the rocks, fracture configuration, and the surface area of the fracture(s).

The ability of HF chemicals to migrate in an undissolved or dissolved phase into a usable water zone is likely dependent upon the location of the sealing formation (if any), the geology of the sealing formation, hydraulic gradients and production pressures. The following discussion, adapted from: Evaluation of Impacts to Underground Sources of Drinking Water by Hydraulic Fracturing of Coalbed Methane Reservoirs; Chapter 3 Characteristics of CBM Production and Associated HF Practices (3-5EPA 816-R-04-003, June, 2004), takes place where there is not a sealing formation between the fractured formation and usable waters; the two zones are separated by approximately 1000' of earth in the Powder River Basin of WY.

HF Fluids can remain in the subsurface unrecovered, due to "leak off" into connected fractures and the pores of rocks. Fracturing fluids injected into the primary hydraulically induced fracture can intersect and flow (leak off) into preexisting smaller natural fractures. Some of the fluids lost in this way may occur very close to the well bore after traveling minimal distances in the hydraulically induced fracture before being diverted into other fractures and pores. Once "mixed" with the native water, local and regional vertical and horizontal gradients may influence where and if these fluids will come in contact with usable water zones, assuming that there is inadequate recovery either through the initial flowback or over the productive life of the well. Faults, folds, joints, etc., could also alter localized flow patterns as discussed below.

The following processes can influence effective recovery of the fracture fluids:

*Check-Valve Effect*
A check-valve effect occurs when natural and/ or newly created fractures open and HF fluid is forced into the fractures when fracturing pressures are high, but the fluids are subsequently prevented from flowing back toward the wellbore as the fractures close when the fracturing pressure is decreased (Warpinski et al., 1988; Palmer et al., 1991a).

A long fracture can be pinched-off at some distance from the wellbore. This reduces the effective fracture length. HF fluids trapped beyond the "pinch point" are unlikely to be recovered during flowback and oil/gas is unlikely to be recovered during production.

In most cases, when the fracturing pressure is reduced, the fracture closes in response to natural subsurface compressive stresses. Because the primary purpose of hydraulic fracturing is to increase the effective permeability of the target formation and connect new or widened fractures to the wellbore, a closed fracture is of little use. Therefore, a component of HF is to "prop" the fracture open, so that the enhanced permeability from the pressure-induced fracturing persists even after fracturing pressure is terminated. To this end, operators use a system of fluids and "proppants" to create and preserve a high-permeability fracture-channel from the wellbore deep into the formation.

The check-valve effect takes place in locations beyond the zone where proppants have been placed (or in smaller secondary fractures that have not received any proppant). It is possible that some volume of stimulation fluid cannot be recovered due to its movement into zones that were not completely "propped" open.

*Adsorption and Chemical Reactions*
Adsorption and chemical reactions can also prevent HF fluids from being recovered. Adsorption is the process by which fluid constituents adhere to a solid surface and are thereby unavailable to flow with groundwater. Adsorption to coal is likely; however, adsorption to other geologic material (e.g., shale, sandstone) is likely to be minimal. Another possible reaction affecting the recovery of fracturing fluid constituents is the neutralization of acids (in the fracturing fluids) by carbonates in the subsurface.

*Movement of Fluids Outside the Capture Zone*
Fracturing fluids injected into the target zone flow into fractures under very high pressure. The hydraulic gradients driving fluid flow away from the wellbore during injection are much greater than the hydraulic gradients pulling fluid flow back toward the wellbore during flowback and production (pumping) of the well. Some portion of the fracturing fluids could be forced along the hydraulically induced fracture to a point beyond the capture zone of the production well. The size of the capture zone will be affected by the regional groundwater gradients, and by the drawdown caused by producing the well. Site-specific geologic, hydrogeologic, injection pressure and production pumping details should provide the information needed to estimate the dimension of the production well capture zone and the extent to which the fracturing fluids might disperse and dilute.

*Incomplete Mixing of Fracturing Fluids with Water*
Steidl (1993) documented the occurrence of a gelling agent that did not dissolve completely and actually formed clumps at 15 times the injected concentration in an induced fracture. Steidl also directly observed, in his mined-through studies, gel hanging in stringy clumps in many other induced fractures. As Willberg et al. (1997) noted, laboratory studies indicate that fingered flow of water past residual gel may impede fluid recovery. Therefore, some fracturing fluid gels appear not to flow with groundwater

during production pumping and remain in the subsurface unrecovered. Such gels are unlikely to flow with groundwater during production, but may present a source of gel constituents to flowing groundwater during and after production.

Authorization of any future proposed projects , would require full compliance with local, state, and federal regulations and laws that relate to surface and groundwater protection and would be subject to routine inspections by the BLM and the Wyoming Oil and Gas Commission as described in Memorandum of Understanding WY920-94-09-79, dated September 21, 1994, prior to approval.

## IV. Geologic Hazards (including seismic/landslides)

Potential geologic hazards caused by HF include induced seismic activity.  Induced seismic activity could indirectly cause surficial landslide activity where soils/slopes are susceptible to failure.

Landslides involve the mass movement of earth materials down slopes and can include debris flows, soil creep, and slumping of large blocks of material. There are no identified landslides in the project area [Grass Creek Resource Management Plan (RMP) 1998 (BLM 1998a); Washakie RMP 1988 (BLM 1988b); Cody RMP 1990 (BLM 1990); Lander RMP 1987 (BLM 1987) and Final Environmental Impact Statement and Record of Decision for each RMP; Wyoming State Geological Survey 2011].

Earthquakes occur when energy is released due to blocks of the earth's crust moving along areas of weakness or faults.  Earthquakes attributable to human activities are called "induced seismic events" or "induced earthquakes." In the past several years induced seismic events related to energy development projects have drawn heightened public attention. Although only a very small fraction of injection and extraction activities at hundreds of thousands of energy development sites in the United States have induced seismicity at levels that are noticeable to the public, seismic events caused by or likely related to energy development have been measured and felt in Alabama, Arkansas, California, Colorado, Illinois, Louisiana, Mississippi, Nebraska, Nevada, New Mexico, Ohio, Oklahoma, and Texas.

A study conducted by the National Academy of Sciences[6] studied the issue of induced seismic activity from energy development. As a result of the study, they found that: (1) the process of hydraulic fracturing a well as presently implemented for shale gas recovery does not pose a high risk for inducing felt seismic events; and (2) injection for disposal of waste water derived from energy technologies into the subsurface does pose some risk for induced seismicity, but very few events have been documented over the past several decades relative to the large number of disposal wells in operation.

The potential for induced seismicity cannot be made at the leasing stage; as such, it will be evaluated at the APD stage should the parcel be sold/issued, and a development proposal submitted.

---

[6] Induced Seismicity Potential in Energy Technologies, National Academy of Sciences, 2012

## V. Spill Response and Reporting

Spill Prevention, Control, and Countermeasure (SPCC) - EPAs rules include requirements for oil spill prevention, preparedness, and response to prevent oil discharges to navigable waters and adjoining shorelines. The rule requires that operators of specific facilities prepare, amend, and implement SPCC Plans. The SPCC rule is part of the Oil Pollution Prevention regulation, which also includes the Facility Response Plan (FRP) rule. Originally published in 1973 under the authority of §311 of the Clean Water Act, the Oil Pollution Prevention regulation sets forth requirements for prevention of, preparedness for, and response to oil discharges at specific non-transportation-related facilities. To prevent oil from reaching navigable waters and adjoining shorelines, and to contain discharges of oil, the regulation requires the operator of these facilities to develop and implement SPCC Plans and establishes procedures, methods, and equipment requirements (Subparts A, B, and C). In 1990, the Oil Pollution Act amended the Clean Water Act to require some oil storage facilities to prepare Facility Response Plans. On July 1, 1994, EPA finalized the revisions that direct facility owners or operators to prepare and submit plans for responding to a worst-case discharge of oil.

In addition to EPA's requirements, operators must provide a plan for managing waste materials, and for the safe containment of hazardous materials, per Onshore Order #1 with their APD proposal. All spills and/or undesirable events are managed in accordance with Notice to Lessee (NTL) 3-A and WY Information Memorandums 2008-028: *NTL-3A Reporting Requirements* and 2009-021 *Guidance & Standards for Response to Oil & Gas-Related Spills & Clean-Up Criteria*. Regulations found at 43 CFR 3162.5(c) provide BLM with the necessary regulatory framework for responding to all spills and/or undesirable events related to hydraulic fracturing operations.

## VI. Public Health and Safety

The intensity, and likelihood, of potential impacts to public health and safety, and to the quality of usable water aquifers is directly related to proximity of the proposed action to domestic and/or community water supplies (wells, reservoirs, lakes, rivers, etc.) and/or agricultural developments. The potential impacts are also dependent on the extent of the production well's capture zone and well integrity. Standard Lease Notice No.1 specifies that development is generally restricted within a quarter mile of occupied dwellings and within 500 feet of riparian habitats and wetlands, perennial water sources (rivers, springs, water wells, etc.) and/or floodplains. Intensity of impact is likely dependent on the density of development. Further information related to the rate of development is provided in the Leasing Environmental Analysis under cumulative impacts.

**HF White Paper**
**Attachment 1**

| Field Office (Year of RFD) | Projected Number of CBM wells | Projected Number of Non-CBM/ Conventional Wells | Max Frac Volume CBM (gallons) | Total Est. H2O for CBM | Max Frac Volume Non_CBM (gallons) | Total Est. H2O for Non-CBM | Total Projected H2O for HF (gallons) | Total Projected H2O for HF (barrels) | Total Projected H2O for HF (acre-feet) |
|---|---|---|---|---|---|---|---|---|---|
| BFO (2012) | 10,343 | 3,865 | 300,000 | 3,102,900,000 | 5,000,000 | 19,325,000,000 | 22,427,900,000 | 711,996,824 | 67,736.09 |
| BHB (2010) (WFO/CYFO) | 150 | 1,890 | 300,000 | 45,000,000 | 5,000,000 | 9,450,000,000 | 9,495,000,000 | 301,428,571 | 28,676.52 |
| CFO (2005) | 700 | 2,100 | 300,000 | 210,000,000 | 5,000,000 | 10,500,000,000 | 10,710,000,000 | 340,000,000 | 32,346.03 |
| NFO (2004) | 0 | 30 | 300,000 | 0 | 5,000,000 | 150,000,000 | 150,000,000 | 4,761,905 | 453.03 |
| LFO (2009) | 861 | 2,566 | 300,000 | 258,300,000 | 5,000,000 | 12,830,000,000 | 13,088,300,000 | 415,501,587 | 39,528.90 |
| RFO (2004) | 4,655 | 4,655 | 300,000 | 1,396,500,000 | 5,000,000 | 23,275,000,000 | 24,671,500,000 | 783,222,221 | 74,512.14 |
| RSFO (GRRMP/1991) | 300 | 1,258 | 300,000 | 90,000,000 | 5,000,000 | 6,290,000,000 | 6,380,000,000 | 202,539,682 | 19,268.69 |
| RSFO (JMH/2002) | 50 | 314 | 300,000 | 15,000,000 | 5,000,000 | 1,570,000,000 | 1,585,000,000 | 50,317,460 | 4,786.97 |
| KFO (2006) | 640 | 220 | 300,000 | 192,000,000 | 5,000,000 | 1,100,000,000 | 1,292,000,000 | 41,015,873 | 3,902.06 |
| PFO (2006) | 600 | 8,580 | 300,000 | 180,000,000 | 5,000,000 | 42,900,000,000 | 43,080,000,000 | 1,367,619,046 | 130,108.96 |
| Total | 18,299 | 25,478 | | 5,489,700,000 | | 127,390,000,000 | 132,879,700,000 | 4,218,403,168 | 401,319 |

Calculation assumes 100% of HF H2O is freshwater.
Conversion factor: gallons to barrels: *0.0317460317
Conversion factor: barrels to acre feet: /10511.3365126

Directive **083**



# Directive 083: Hydraulic Fracturing – Subsurface Integrity

## May 21, 2013

Effective June 17, 2013, the Energy Resources Conservation Board (ERCB) has been succeeded by the Alberta Energy Regulator (AER).

As part of this succession, the title pages of all existing ERCB directives now carry the new AER logo. However, no other changes have been made to the directives, and they continue to have references to the ERCB. As new editions of the directives are issued, these references will be changed.

Some phone numbers in the directives may no longer be valid. Contact AER Inquiries at 1-855-297-8311 or inquiries@aer.ca.



**ERCB** *Energy Resources Conservation Board*

Calgary Office  Suite 1000, 250 – 5 Street SW, Calgary, Alberta, Canada  T2P 0R4    Toll-free 1-855-297-8311    Fax 403-297-7336    www.ercb.ca

# Directive 083

**Release date: May 21, 2013**
**Effective date: August 21, 2013**

## Hydraulic Fracturing – Subsurface Integrity

The Energy Resources Conservation Board (ERCB/Board) has approved this directive on May 21, 2013.

*<original signed by>*

Brad McManus
Acting Chair

## Contents

1   Introduction .................................................................................................................2
    1.1   Purpose of This Directive ....................................................................................2
    1.2   Implementation Date for Directive 083 Requirements ........................................3
    1.3   Compliance Assurance .........................................................................................3
    1.4   Directive 083 Help ..............................................................................................3

2   Well Integrity – Subject Well ......................................................................................4
    2.1   Issue ....................................................................................................................4
    2.2   Regulatory Objective ..........................................................................................4
    2.3   Requirements .......................................................................................................4

3   Interwellbore Communication .....................................................................................6
    3.1   Issue ....................................................................................................................6
    3.2   Regulatory Objective ..........................................................................................6
    3.3   Requirements .......................................................................................................6

4   Nonsaline Aquifer Protection ......................................................................................8
    4.1   Issue ....................................................................................................................8
    4.2   Regulatory Objective ..........................................................................................8
    4.3   Requirements .......................................................................................................8

5   Hydraulic Fracturing Near Water Wells......................................................................9
    5.1   Issue ....................................................................................................................9
    5.2   Regulatory Objective ..........................................................................................9
    5.3   Requirements .......................................................................................................9

6   Hydraulic Fracturing Near Top of Bedrock ..............................................................10
    6.1   Issue ..................................................................................................................10
    6.2   Regulatory Objective ........................................................................................10
    6.3   Requirements .....................................................................................................10

7   Special Provisions for Coalbed Methane Fracturing ..................................................10
    7.1   Coalbed Methane Fracturing Near Water Wells................................................10

7.2    Coalbed Methane Fracturing Near Top of Bedrock ............................................... 10

7.3    Nitrogen Pumping Volume Limitations in Coals ................................................... 11

8    Notification Requirements ..................................................................................... 11

9    Continual Improvement ........................................................................................ 11

## Appendices

1    Definitions of Terms as used in This Directive .................................................... 12

2    Additional ERCB Directives ................................................................................ 14

## 1    Introduction

### 1.1    Purpose of This Directive

This directive sets out the Energy Resources Conservation Board's (ERCB) requirements for managing subsurface integrity associated with hydraulic fracturing subsurface operations. This directive does not apply to thermal wells.

These requirements are intended to

- prevent the loss of well integrity at a subject well (a well at which a licensee proposes to conduct hydraulic fracturing operations),
- reduce the likelihood of unintentional interwellbore communication between a subject well and an offset well,[1]
- manage well control at an offset well in the event of interwellbore communication with a subject well,
- prevent adverse effects to nonsaline aquifers,
- prevent impacts to water wells, and
- prevent surface impacts.

For other requirements not dealt with in this directive, refer to appendix 2.

This directive rescinds *Directive 027: Shallow Fracturing Operations – Restricted Operations* and supersedes *Bulletin 2012-02: Hydraulic Fracturing; Interwellbore Communication between Energy Wells.*

This directive includes

- requirements to prevent the loss of well integrity at a subject well (section 2),
- requirements for licensees to assess, plan for, and mitigate the risks of interwellbore communication with offset wells (section 3),
- requirements to notify licensees of at-risk offset wells related to hydraulic fracturing operations (section 3),
- requirements to protect nonsaline aquifers from hydraulic fracturing operations conducted at depths less than 100 metres (m) below the base of groundwater protection (BGWP) (section 4),
- increased vertical depth restriction for hydraulic fracturing operations near water wells (section 5),

---

[1] An offset well includes any well that has been designated by the Board as an orphan well pursuant to section 70(2)(a) of the *Oil and Gas Conservation Act.*

- increased vertical depth restriction for hydraulic fracturing operations near the top of the bedrock surface (section 6),
- pumping-volume restrictions and provisions to setback distances for nitrogen fracturing operations for coalbed methane (section 7), and
- requirements to notify the ERCB about hydraulic fracturing operations (section 8).

## 1.2    Implementation Date for Directive 083 Requirements

1)    The requirements of this directive are effective August 21, 2013 (three months from the date of publication). Licensees are to continue to follow the applicable requirements in both *Directive 027* and *Bulletin 2012-02* until August 21, 2013.

## 1.3    Compliance Assurance

The term "must" indicates ERCB requirements for which compliance is required and is subject to ERCB enforcement. The terms "recommends" or "expects" indicate recommended practices and are not subject to enforcement action.

Noncompliance with any requirement may result in licensees receiving a response in accordance with *Directive 019: Compliance Assurance*. A list of noncompliance events is available from the ERCB website, www.ercb.ca.

Licensees are responsible for compliance with ERCB requirements. If licensees identify a noncompliance, it should inform the ERCB of the noncompliance for consideration under the ERCB Voluntary Self-Disclosure policy set out in *Directive 019*.

For the purposes of this directive, the term "licensees" is used to designate the responsible duty holder (e.g., licensee, operator, company, applicant, approval holder, permit holder) as specified in legislation, and refers to subject well licensees unless otherwise stated.

In its assessment of licensees' compliance with the requirements of this directive, the ERCB may at any time request licensees to produce those documents, records, or plans required to be completed by this directive, and licensees must provide them to the ERCB. If the ERCB determines that the documentation is incomplete, insufficient, or that additional documentation is needed to support licensees' compliance with the regulatory objectives in this directive, licensees may be required to provide additional documentation prior to conducting its hydraulic fracturing operation. The ERCB recommends that all documentation be kept on file for the life of the well.

## 1.4    Directive 083 Help

If you have a specific question not covered in this directive, contact the ERCB's Well Operations Section:

Phone:  403-297-5290
Fax:     403-297-2691
E-Mail: WellOperations@ercb.ca

## 2   Well Integrity – Subject Well

### 2.1   Issue

During hydraulic fracturing operations, subject wells can incur significant stresses, which may lead to a loss of well integrity. A loss of well integrity may result in subsurface impacts or result in a release of fluids to the surface, placing the public and the environment at risk.

### 2.2   Regulatory Objective

To prevent the loss of well integrity at a subject well.

### 2.3   Requirements

#### 2.3.1   General

2)   Licensees must design, construct, and operate its well to provide well integrity during hydraulic fracturing operations.

3)   Licensees must obtain ERCB approval if using a barrier system other than a single- or dual-barrier system as described below.

Licensees are expected to manage well integrity throughout the life of the well, from construction to post abandonment.

#### 2.3.2   Dual-barrier System

4)   If a dual-barrier system (see figure 1) is used, it must consist of

   a)   a primary barrier system capable of containing and isolating the fracture fluids,

   b)   a secondary barrier system capable of providing well control in the event of a failure of the primary barrier, and

   c)   a monitoring system to detect and allow for a response to a primary barrier failure.

5)   To be classified as a dual-barrier system, the cement of the primary barrier system must not extend above the base of the overlying porous interval.

#### 2.3.3   Single-barrier System

The ERCB expects licensees to apply increased diligence in designing a single-barrier system (see figure 2).

When using a single-barrier system, surface casing must be set in accordance with the current requirements of *Directive 008: Surface Casing Depth Requirements*.

6)   If surface casing is not set to the BGWP, licensees must

   a)   not use hydraulic fracturing fluids that may cause an adverse effect on nonsaline aquifers and

   b)   cement the next casing string to surface.

7) If a single-barrier system is used, licensees must

a) document the load capacity and safety factors used in the design of its casing relative to the loads and the well environment that the casing will be exposed to,

b) document the adjusted maximum pressure,

c) use an operating practice, such as the *Primary and Remedial Cementing Guidelines* (Drilling and Completions Committee) or a technically equivalent standard, when planning and executing its cementing program,

d) be able to demonstrate integrity of both casing and cement prior to initial fracture operations,

e) be able to demonstrate integrity of casing during fracture operations,

f) be able to demonstrate integrity of casing with final completion operations or within 90 days of the fracture operation, and

g) conduct a surface casing vent flow / gas migration test (as per *Interim Directive 2003-01: Isolation Packer Testing, Reporting, and Repair Requirements; Surface Casing Vent Flow/Gas Migration Testing, Reporting, and Repair Requirements; Casing Failure Reporting and Repair Requirements*) or a surface casing annulus flow test (as per the attachment to *Bulletin 2011-35: Surface Casing Vent Requirements for Wells*)

   • prior to initial fracturing operations and

   • between 60 and 90 days after completing fracturing operations.



**Figure 1. Example of a simplified dual-barrier system.**



**Figure 2. Example of a single-barrier system.**

## 3   Interwellbore Communication

### 3.1   Issue

Interwellbore communication occurs when a communication pathway has been established between a subject well and an offset well. A communication pathway may cause a well-control event at an offset well, which may result in subsurface impacts or a release of fluids to the surface, placing the public and the environment at risk.

### 3.2   Regulatory Objective

To reduce the likelihood of unintentional interwellbore communication between a subject well and an offset well.

To manage well control at an offset well in the event of interwellbore communication with a subject well.

### 3.3   Requirements

#### 3.3.1   General

8)   Licensees must manage the risks of interwellbore communication between a subject well and an offset well.

#### 3.3.2   Hydraulic Fracturing Risk Planning

9)   Licensees must have a documented hydraulic fracturing program.

10) The hydraulic fracturing program must include the following elements:

   a) determination of a fracture planning zone (FPZ),

   b) identification of all offset wells within the FPZ,

   c) an assessment of well integrity for each offset well,

   d) a risk assessment for each offset well, using a methodology such as that described in *Interim Industry Recommended Practice 24: Fracture Stimulation: Interwellbore Communication* (*IRP 24*) (Drilling and Completions Committee),

   e) determination of at-risk offset wells within the FPZ,

   f) identification and assessment of special-consideration wells for possible inclusion in the well control plan, and

   g) identification of energizing gas(es) used in fracture fluids.

11) Licensees must maintain a copy of its hydraulic fracturing program at the subject well site for the duration of the operation.

The use of high vapour pressure hydrocarbons requires prior approval by the ERCB pursuant to section 8.110 (3) of the *Oil and Gas Conservation Regulations*.

Licensees should be aware of any subsurface features such as those described in *IRP 24* Hazard Register.

### 3.3.3    At-risk Offset Well Control Plans

12) Licensees must have a documented well control plan for each at-risk offset well that includes

   a) the method(s) of detection of interwellbore communication,

   b) how information will be relayed from an at-risk offset well back to the hydraulic fracturing operations should an interwellbore communication event occur,

   c) the adjusted maximum pressure for each at-risk offset well, and

   d) how the licensee will ensure well control at each at-risk offset well.

13) Licensees must maintain a copy of its at-risk offset well control plan at the subject well site for the duration of the hydraulic fracturing operation.

### 3.3.4    Subject Well / At-risk Offset Well Licensee Engagement[2]

14) Licensees must notify licensees of at-risk offset wells of its planned hydraulic fracturing program.

   Upon notification of a planned hydraulic fracturing program, licensees of at-risk offset

---

[2] Within this section, if an at-risk offset well is an orphan well, "licensee" includes the Orphan Well Association.

wells are expected to engage and work cooperatively with licensees of subject wells in the development of well control plans.

15) Licensees must engage licensees of at-risk offset wells and make all reasonable efforts to develop mutually acceptable well control plans.

Licensees of both offset and subject wells are responsible for maintaining control of its licensed wells at all times.

16) If the at-risk offset well does not have an active licensee, and it is not an orphan well, licensees must contact the appropriate ERCB field centre.

17) Upon becoming aware of any communication event with an offset well, licensees must immediately notify the licensee of the offset well.

Additional ERCB notification requirements are found in section 8.1.

## 4   Nonsaline Aquifer Protection

### 4.1   Issue

Communication between the subject well and a nonsaline aquifer as a result of hydraulic fracturing operations may cause adverse effects.

### 4.2   Regulatory Objective

To prevent adverse effects to nonsaline aquifers.

### 4.3   Requirements

#### 4.3.1   General

18) Licensees' hydraulic fracturing operations must not have an adverse effect on a nonsaline aquifer.

#### 4.3.2   Nonsaline Aquifer Risk Assessment

19) A risk assessment must be prepared if conducting hydraulic fracturing operations above, or within 100 m below, the BGWP.

20) Licensees' risk assessment must include the following:

   a) an evaluation of the potential for direct fracture communication from the subject well to a nonsaline aquifer,

   b) the true vertical depth (TVD) of the top and base of any nonsaline aquifers above the BGWP,

   c) the TVD of the fracture interval(s) within the wellbore,

   d) the modelled vertical fracture distance (i.e., vertical half length),

   e) the minimum distance between vertical fracture propagation and the adjacent nonsaline aquifers along the entire fracture interval,

f) documentation of the procedure used to determine whether or not fracture fluid components may cause an adverse effect on nonsaline aquifers,

g) any geological feature or other pathways that may allow or facilitate communication to a nonsaline aquifer, and

h) mitigation measures to minimize the risk of adverse effects on nonsaline aquifers.

21) If the modelled vertical fracture distance multiplied by a factor of two is within, or would extend above, the BGWP, licensees must not use hydraulic fracturing fluids that may cause adverse effect on nonsaline aquifers.

## 5   Hydraulic Fracturing Near Water Wells

### 5.1   Issue

Communication between the subject well and water wells as a result of hydraulic fracturing operations may cause adverse effects.

### 5.2   Regulatory Objective

To prevent impacts to water wells.

### 5.3   Requirements

22) Licensees' hydraulic fracturing operations must not have an adverse effect on the water well's water quality or quantity.

23) Licensees must not initiate hydraulic fracturing operations within a zone that extends 200 m horizontally from the surface location of a water well and 100 m vertically from the total depth of the water well (see figure 3), except when using nitrogen as the fracturing fluid for coalbed methane completions (see section 7).



**Figure 3. Hydraulic fracturing near water wells.**

## 6   Hydraulic Fracturing Near Top of Bedrock

### 6.1   Issue

Fracture propagation during hydraulic fracturing operations may result in a release of fluids to the surface, placing the public and the environment at risk.

### 6.2   Regulatory Objective

To prevent surface impacts.

### 6.3   Requirements

24)   Licensees' hydraulic fracturing operations must not cause surface impacts.

25)   Licensees must not hydraulically fracture within 100 vertical m of the top of the bedrock surface (see figure 4), except when using nitrogen as the fracturing fluid for coalbed methane completions (see section 7).



**Figure 4. Hydraulic fracturing near top of bedrock.**

## 7   Special Provisions for Coalbed Methane Fracturing

The requirements below are derived from an independent study with respect to using *nitrogen* as the fracturing fluid for coalbed methane completions.[3]

### 7.1   Coalbed Methane Fracturing Near Water Wells

26)   Licensees must not initiate nitrogen fracturing operations within a zone that extends 200 m horizontally from the surface location of a water well to 50 m vertically from the total depth of the water well.

### 7.2   Coalbed Methane Fracturing Near Top of Bedrock

27)   Licensees must not initiate nitrogen fracturing operations within 50 vertical m of the top of the bedrock surface.

---

[3] The report, *Shallow Nitrogen Fracturing Dimensions and Groundwater Protection*, outlining the findings of the study can be found on the landing page for *Directive 027: Shallow Fracturing Operations-Restricted Operations* on the ERCB website, www.ercb.ca.

### 7.3        Nitrogen Pumping Volume Limitations in Coals

28)   Licensees must not use more than 15 000 standard cubic metres of nitrogen per vertical metre of coal.

## 8    ERCB Notification Requirements

29)   Licensees must notify the ERCB a minimum of five days prior to the pressure test of surface equipment for hydraulic fracturing operations as per the Hydraulic Fracturing Notification Submission procedure found on the ERCB website at www.ercb.ca.

Notification is for one well licence or for a pad (multi-well) with continuous hydraulic fracturing operations.

30)   If an operation is demobilized and remobilized at a later date, licensees must re-notify the ERCB via the Hydraulic Fracturing Notification Submission procedure a minimum of five days prior to the pressure test of surface equipment for hydraulic fracturing operations.

Notification is for one well licence or for a pad (multi-well) with continuous hydraulic fracturing operations.

31)   Licensees must immediately notify the appropriate ERCB field centre if well integrity fails.

32)   Licensees of the subject well must immediately notify the appropriate ERCB field centre upon becoming aware of any communication event with an offset well, a nonsaline aquifer, or a water well.

## 9    Continual Improvement

It is recommended that all licensees continually improve the planning and execution of its hydraulic fracturing operations by evaluating the effectiveness of its operations in meeting the regulatory objectives of this directive and by revising the planning and execution of its subsequent hydraulic fracturing operations accordingly.

Licensees are encouraged to document its continual improvement process using a procedure such as that described in *IRP 24*.

## Appendix 1      Definitions of Terms as used in This Directive

| | |
|---|---|
| **Adjusted maximum pressure** | Operating pressure limits at the subject well and the offset wells, including a safety margin that will not be exceeded. |
| **Adverse effect** | As defined in the *Environmental Protection and Enhancement Act*. |
| **At-risk offset well** | An offset well that may be adversely affected by a hydraulic fracturing operation. |
| **Barrier** | Individual components that collectively make up a barrier system. |
| **Base of groundwater protection (BGWP)** | A modelled depth at which saline groundwater is likely to occur. It is calculated as the base of the deepest protected (nonsaline groundwater-bearing) formation plus a 15 m buffer. |
| **Bedrock** | Consolidated rock underlying unconsolidated glacial or drift material. |
| **Dual-barrier system** | A well system designed for hydraulic fracturing operations made up of both primary and secondary barrier systems. |
| **Energizing gas** | A gas used to improve the effectiveness of the hydraulic fracture. |
| **Fracture planning zone (FPZ)** | An area that may be impacted by hydraulic fracturing operations. |
| **High vapour pressure hydrocarbon** | As per section 8.110(1) of the *Oil and Gas Conservation Regulations*. |
| **Nonsaline aquifer** | An aquifer above the BGWP that contains water with a total dissolved solids content of less than or equal to 4000 milligrams per litre. |
| **Offset well** | Any well that is within the FPZ of a subject well, excluding water wells. |
| **Orphan well** | A well that has been designated by the Board as an orphan well pursuant to section 70(2)(a) of the *Oil and Gas Conservation Act*. |
| **Primary barrier system** | A well system designed to contain and isolate fracture fluids within the well. |
| **Risk assessment** | Systematic analysis of the risks from activities and a rational evaluation of their significance by comparison against predetermined standards, target risk levels, or other risk criteria. |
| **Secondary barrier system** | The backup well system that provides well control in the event of a failure of the primary barrier system. |
| **Single-barrier system** | A well system designed for hydraulic fracturing operations comprised of a primary barrier system only. |
| **Special-consideration well** | A well beyond the FPZ that may have characteristics of unique concern which justifies further scrutiny. |
| **Subject well** | A well at which a licensee proposes to conduct hydraulic fracturing operations. |

**Thermal well**

A well that is completed in a reservoir that is, was, or has the potential to be artificially heated.

**Water well**

A well with the primary purpose of nonsaline groundwater production.

**Well control event**

A flow of wellbore fluids in the subsurface from one formation to another formation, a flow of wellbore fluids at surface that can be controlled by existing wellhead or blowout prevention equipment, or a blowout.

**Well integrity**

Prevention of the escape of fluids (i.e., liquids or gases) to subsurface formations or surface.

**Appendix 2**     **Additional ERCB Directives**

Other aspects that have not been dealt with under this directive, such as the design and operation of surface facilities, subsurface well design, waste management, well licensing, and emergency preparedness, are covered under other ERCB directives, including the following:

- *Directive 008: Surface Casing Depth Requirements*
- *Directive 009: Casing Cementing Minimum Requirements*
- *Directive 010: Minimum Casing Design Requirements*
- *Directive 019: Compliance Assurance*
- *Directive 051: Injection and Disposal Wells – Well Classifications, Completions, Logging, and Testing Requirements*
- *Directive 055: Storage Requirements for the Upstream Petroleum Industry*
- *Directive 056: Energy Development Applications and Schedules*
- *Directive 058: Oilfield Waste Management Requirements for the Upstream Petroleum Industry*
- *Directive 059: Well Drilling and Completion Data Filing Requirements*
- *Directive 060: Upstream Petroleum Industry Flaring, Incinerating, and Venting*
- *Directive 071: Emergency Preparedness and Response Requirements for the Petroleum Industry*



# United States Department of the Interior

FISH AND WILDLIFE SERVICE
UTAH FIELD OFFICE
2369 WEST ORTON CIRCLE, SUITE 50
WEST VALLEY CITY, UTAH 84119

October 27, 2008

In Reply Refer To
FWS/R6
ES/UT
07-F-0005
6-UT-08-F-026

Memorandum

To:         Field Office Manager, Bureau of Land Management, Price Field Office, 125
            South 600 West, Price, UT 84501

From:       Utah Field Supervisor, U.S. Fish and Wildlife Service, Ecological Services, West
            Valley City, Utah

Subject:    Biological Opinion for BLM Resource Management Plan (RMP), Price Field
            Office (PFO)

This document transmits the Fish and Wildlife Service's (USFWS) Biological Opinion based on
our review of potential activities described under the Resource Management Plan of the Utah
Bureau of Land Management (BLM) Price Field Office's (PFO) and their potential effects on the
federally threatened Mexican spotted owl (*Strix occidentalis lucida*), Last Chance townsendia
(*Townsendia aprica*), Winkler pincushion cactus (*Pediocactus winkleri*), Maguire daisy
(*Erigeron maguirei*), Jones cycladenia (*Cycladenia humilis* var. *jonesii*), Uinta Basin hookless
cactus (*Sclerocactus glaucus*) and the federally endangered southwestern willow flycatcher
(*Empidonax traillii extimus*), bonytail (*Gila elegans*), Colorado pikeminnow (*Ptychocheilus
lucius*), humpback chub (*Gila cypha*), razorback sucker (*Xyrauchen texanus*), Barneby reed-
mustard (*Schoenocrabe barnebyi*), Wright fishhook cactus (*Sclerocactus wrightiae*), and San
Rafael cactus (*Pediocactus despainii*) in accordance with section 7 of the Endangered Species
Act (Act) of 1973, as amended (16 U.S.C. 1531 et seq.). In addition, this document includes the
Conference Opinion for the candidate species yellow-billed cuckoo (*Coccyzus americanus
occidentalis*). Critical habitat was designated for the Mexican spotted owl on February 01, 2001
and was re-designated August 31, 2004 (66 FR 8530, 69 FR 53181). Critical habitat was
designated for the southwestern willow flycatcher on October 12, 2004 (69 FR 60705). Your
July 21, 2008 request for formal consultation for all aforementioned species was received on
July 23, 2008.

Price FO BLM Resource Management Plan proposed activities are categorized into the following 15 programs:

Air Quality
Cultural Resources
Paleontological Resources
Fire and Fuels Management
Forestry and Woodland Management
Hazardous Materials Management
Lands and Realty Management
Recreation Management
Riparian, Soils and Water Management
Special Status Species Management
Special Management Areas
Vegetation Resources
Visual Resources
Wild Horse and Burro Management
Transportation and Access Management

This Biological Opinion and Conference Opinion is based on information provided in the July 21, 2008 Biological Assessment, personal communications between the USFWS's biologists and the BLM's biologists, telephone conversations, email correspondence, conference calls, planning meetings, and other sources of information. A complete administrative record of this consultation is on file at this office.

**Consultation History**

This section summarizes significant steps in the consultation process. Additional correspondence, and email transmissions, that occurred between February 12, 2008, and September 25, 2008 are documented in the administrative record for this consultation.

- January 29, 2008: BLM electronically sent a draft Biological Assessment for the Price BLM Field Office Resource Management Plan to the USFWS for review;

- February 2008 through April 11, 2008: The USFWS reviewed and provided comments on the draft Biological Assessments;

- July 23, 2008: We received the final version of the PFO Biological Assessment and began formal consultation.

# PROGRAMMATIC BIOLOGICAL OPINION

# TABLE OF CONTENTS

**DESCRIPTION OF THE PROPOSED ACTION** ......................................................................... 5

DESCRIPTION OF ACTIVITIES AND MANAGEMENT PRESCRIPTIONS UNDER THE PRICE RMP ........ 9
   *Air Quality* .................................................................................................................... 9
   *Cultural Resources* ......................................................................................................... 9
   *Paleontological Resources* .......................................................................................... 10
   *Fire and Fuels Management* ........................................................................................ 11
   *Forestry and Woodland Management* ......................................................................... 11
   *Geology and Minerals Management* ........................................................................... 12
   *Hazardous Materials Management* .............................................................................. 14
   *Lands and Realty Management* .................................................................................... 14
   *Livestock Grazing Management* ................................................................................... 15
   *Recreation Management* ............................................................................................... 15
   *Riparian, Soils and Water Resources* ......................................................................... 16
   *Special Status Species Management* ............................................................................ 16
   *Special Management Areas Programs* ......................................................................... 17
   *Vegetation Management* ............................................................................................... 18
   *Visual Resource Management* ...................................................................................... 18
   *Wild Horse and Burro Management* ............................................................................ 18
   *Fish and Wildlife Resource Management* .................................................................... 19
   *Transportation and Access Management* ..................................................................... 19
CONSERVATION MEASURES ................................................................................................ 20

**SPECIES ACCOUNTS, EFFECTS, AND CONCLUSIONS** ................................................. 20

MEXICAN SPOTTED OWL (*STRIX OCCIDENTALIS LUCIDA*) ............................................. 20
SOUTHWESTERN WILLOW FLYCATCHER (*EMPIDONAX TRAILLII EXTIMUS*) .................................... 33
LAST CHANCE TOWNSENDIA (*TOWNSENDIA APRICA*) .................................................... 45
WRIGHT FISHHOOK CACTUS (*SCLEROCACTUS WRIGHTIAE*) .......................................... 53
SAN RAFAEL CACTUS (*PEDIOCACTUS DESPAINII*) ......................................................... 63
WINKLER CACTUS (*PEDIOCACTUS WINKLERI*) ............................................................... 71
UINTA BASIN HOOKLESS CACTUS (*SCLEROCACTUS GLAUCUS*) ..................................... 80
BARNEBY REED-MUSTARD (*SCHOENOCRAMBE BARNEBYI*) ............................................. 90
JONES CYCLADENIA (*CYCLADENIA HUMILIS*) ................................................................ 98
MAGUIRE DAISY (*ERIGERON MAGUIREI*) ..................................................................... 106
COLORADO RIVER FISH ................................................................................................... 115
BONYTAIL (*GILA ELEGANS*) ......................................................................................... 115
COLORADO PIKEMINNOW (*PTYCHOCHEILUS LUCIUS*) ................................................. 118
HUMPBACK CHUB (*GILA CYPHA*) ................................................................................. 123
RAZORBACK SUCKER (*XYRAUCHEN TEXANUS*) ............................................................ 127
WESTERN YELLOW-BILLED CUCKOO (*COCCYZUS AMERICANUS*) ................................. 139

**INCIDENTAL TAKE STATEMENT** ..................................................................................... 149

**REASONABLE AND PRUDENT MEASURES / TERMS AND CONDITIONS** .............. 150

**RECOMMENDED CONSERVATION MEASURES** ........................................................ 150

**RE-INITIATION STATEMENT** ............................................................................... 156

**LITERATURE CITED** ............................................................................................ 157

**APPENDIX A – BLM COMMITTED CONSERVATION MEASURES AND LEASE NOTICES** ................................................................................................................ 190

# LIST OF TABLES

Table 1.  Federally Protected Utah Species on BLM Lands Analyzed in this Biological Opinion (BO) for the Proposed Resource Management Plan by Price BLM Field Office. .......................... 7

Table 2.  Survey results for Last Chance townsendia populations on BLM lands 1991-2007. .... 46

# DESCRIPTION OF THE PROPOSED ACTION

The proposed action examined in this consultation is the continuation of land management activities described by the Resource Management Plan (RMP). The Price RMP/EIS replaces two Land Use Plans that provided management direction for the planning area: the 1983 Price River Management Framework Plan and the 1991 San Rafael Resource Management Plan. The Price RMP and the accompanying Environmental Impact Statement (EIS) will provide planning guidance for public lands managed by the Price Field Office (PFO) in Carbon and Emery counties in central-eastern Utah for the next 15 to 20 years. RMPs are used by the BLM to guide and control future actions and set standards upon which future decisions on site-specific activities will be based. RMPs only establish general management policy on a broad scale. They are not used to make decisions that commit resources on a small scale such as on specific parcels of land. RMPs identify desired outcomes, also known as "desired future conditions". These desired future conditions are expressed in RMPs as goals, standards, objectives, and allowable uses and actions needed to achieve desired outcomes. These are often referred to as RMP decisions or resource allocations. It is upon these RMP decisions or resource allocations that the effects determinations in this Biological Opinion are based for:

- Mexican spotted owl (*Strix occidentalis lucida*)
- Southwestern willow flycatcher (*Empidonax traillii extimus*)
- Uinta Basin hookless cactus (*Sclerocactus glaucus*)
- Maguire daisy (*Erigeron maguirei*)
- Barneby reed-mustard (*Schoenocrabe barnebyi*)
- Jones cycladenia (*Cycladenia humilis var. jonesii*)
- San Rafael cactus (*Pediocactus despainii*)
- Winkler cactus (*Pediocactus winkleri*)
- Wright fishhook cactus (*Sclerocactus wrightiae*)
- Last Chance townsendia (*Townsendia aprica*)
- Bonytail (*Gila elegans*)
- Colorado pikeminnow (*Ptychocheilus lucius*)
- Humpback chub (*Gila cypha*)
- Razorback sucker (*Xyrauchen texanus*)

In addition, our Conference Opinion considers the effects for the candidate species:

- Yellow-billed Cuckoo *(Coccyzus americanus occidentalis)*

The action area is defined at 50 CFR 402 to mean "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." Federal lands administered by other agencies and State, Tribal, and private lands that adjoin BLM-administered land are also considered part of the action area. In general, these are lands immediately adjacent to, downslope from, downstream of, or downwind from BLM-administered land where effects to the watershed, post-fire floods, ash flows, and elevated sedimentation may occur. The planning area is located in south-central Utah and includes all of Carbon and Emery counties. This area totals approximately 3.7 million acres. Of this, the BLM

manages 2.4 million acres surface and subsurface mineral estate, additional Federal mineral resources underlying the national forests and split-estate lands where the mineral estate is held by the Federal government but the surface right belongs to the state or private parties. State lands, privately owned lands, Manti-La Sal National Forest, the Uintah and Ouray Indian Reservations are all located in or adjacent to the Price Field Office, therefore, federally listed species and habitat located on these lands could be indirectly effected by resource management decisions made in the Proposed Action area.

The Price RMP describes activities in a number of resource management programs. Several of the aforementioned programs have "no effect" or "not likely to adversely affect" determinations on the following species, however overall, the entire Price RMP is a "likely to adversely affect" determination for the listed species: Mexican spotted owl, southwestern willow flycatcher, Uinta Basin hookless cactus, Maguire daisy, Barneby reed-mustard, Last Chance townsendia, Winkler pincushion cactus, Jones cycladenia, Wright fishhook cactus, San Rafael cactus, bonytail, Colorado pikeminnow, humpback chub and razorback sucker. The Price RMP is not likely to contribute to listing of the candidate species Western Yellow-billed cuckoo.

**Table 1.  Federally Protected Utah Species on BLM Lands Analyzed in this Biological Opinion (BO) for the Proposed Resource Management Plan by Price BLM Field Office.** "Likely to adversely affect" determinations (LAA) are used if a program may have any direct or indirect adverse effect to a threatened or endangered species. "May affect, not likely to adversely affect" (NLAA) determinations conclude that activities occurring under the program are either insignificant or beneficial. "No effect" (NE) determinations conclude that the species and critical habitat will be unaffected by the proposed activities under the program. "Not likely to contribute to Federal listing" (NCFL) are listed for candidate species if the program was determined not to contribute to its listing as a threatened or endangered species. "No Jeopardy" (NJ) are listed if the program was determined not to jeopardize an experimental, non-essential population.

| Price BLM Field Office | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Programs<br><br>Common Name<br>(Scientific Name) | Air Quality | Cultural Resources | Paleontological Resources | Fire and Fuels | Forestry and Woodlands | Geology and Minerals | Hazardous Materials | Lands and Realty | Livestock Grazing | Recreation | Riparian, soils and water | Special Status Species | Special Management Areas | Vegetation | Visual | Wild Horse and Burro | Fish and Wildlife | Transportation and Access |
| Wright fishhook Cactus (*Sclerocactus wrightiae*) | NE | LAA | LAA | LAA | LAA | LAA | LAA | LAA | LAA | LAA | LAA | NLAA | NLAA | LAA | NLAA | LAA | LAA | LAA |
| Barneby reed-mustard (*Schoenocrabe Barnebyi*) | NE | LAA | LAA | LAA | LAA | LAA | LAA | LAA | LAA | LAA | LAA | NLAA | NLAA | LAA | NLAA | LAA | LAA | LAA |
| Last Chance townsendia (*Townsendia aprica*) | NE | LAA | LAA | LAA | LAA | LAA | LAA | LAA | LAA | LAA | LAA | NLAA | NLAA | LAA | NLAA | LAA | LAA | LAA |
| San Rafael cactus (*Pediocactus despainii*) | NE | LAA | LAA | LAA | LAA | LAA | LAA | LAA | LAA | LAA | LAA | NLAA | NLAA | LAA | NLAA | LAA | LAA | LAA |
| Winkler pincushion cactus (*Pediocactus winkleri*) | NE | LAA | LAA | LAA | LAA | LAA | LAA | LAA | LAA | LAA | LAA | NLAA | NLAA | LAA | NLAA | LAA | LAA | LAA |
| Jones cycladenia (*Cycladenia humilis* var. *jonesii*) | NE | LAA | LAA | LAA | LAA | LAA | LAA | LAA | LAA | LAA | LAA | NLAA | NLAA | LAA | NLAA | LAA | LAA | LAA |
| Uinta Basin hookless cactus (*Sclerocactus glaucus*) | NE | LAA | LAA | LAA | LAA | LAA | LAA | LAA | LAA | LAA | LAA | NLAA | NLAA | LAA | NLAA | NLAA | LAA | LAA |

*Biological Opinion for the Price BLM Resource Management Plan*

| Programs | Common Name (Scientific Name) | Maguire daisy (*Erigeron maguirei*) | Mexican spotted owl (*Strix occidentalis lucida*) | Southwestern willow Flycatcher (*Empidonax traillii extimus*) | Colorado River Fishes | Yellow-billed Cuckoo (*Coccyzus americanus occidentalis*) |
|---|---|---|---|---|---|---|
| Air Quality | | NE | NE | NE | NE | NCFL |
| Cultural Resources | | LAA | LAA | LAA | LAA | NCFL |
| Paleontological Resources | | LAA | LAA | LAA | LAA | NCFL |
| Fire and Fuels | | LAA | LAA | LAA | LAA | NCFL |
| Forestry and Woodlands | | LAA | LAA | LAA | NLAA | NCFL |
| Geology and Minerals | | LAA | LAA | LAA | LAA | NCFL |
| Hazardous Materials | | LAA | LAA | LAA | LAA | NCFL |
| Lands and Realty | | LAA | LAA | LAA | LAA | NLAA |
| Livestock Grazing | | LAA | LAA | LAA | LAA | NCFL |
| Recreation | | LAA | LAA | LAA | LAA | NCFL |
| Riparian, soils and water | | LAA | LAA | LAA | LAA | NCFL |
| Special Status Species | | NLAA | NLAA | NLAA | NLAA | NCFL |
| Special Management Areas | | NLAA | NLAA | NLAA | NLAA | NCFL |
| Vegetation | | LAA | LAA | LAA | LAA | NCFL |
| Visual | | NLAA | NLAA | NLAA | NLAA | NCFL |
| Wild Horse and Burrow | | LAA | LAA | NLAA | NLAA | NCFL |
| Fish and Wildlife | | LAA | LAA | LAA | LAA | NCFL |
| Transportation and Access | | LAA | LAA | LAA | LAA | NCFL |

# Description of Activities and Management Prescriptions under the Price RMP

Air Quality

The primary objective of air quality management within the Price planning area is to maintain air quality in accordance with standards precribed by federal and state laws and regulations. The air quality program does not consider potential impacts to fish and wildlife resources beyond the standards set forth by EPA and the Utah Department of Environmental Quality. Air quality management practices include recommendations for dust control measures, smoke management, weather monitoring, air quality data gathering, regulatory conformity analyses, and BLM review of New Source Reviews and Prevention of Significant Deterioration (PSD) Permits. Air quality management may include recommendations for the best available control practices or restrict surface development in order to meet state and national ambient air quality standards. BLM-initiated actions or authorizations are planned in accordance with state and national air quality standards through coordination with the Division of Air Quality (UDAQ), Utah Department of Environmental Quality (UDEQ), and the U.S. Environmental Protection Agency (EPA). Laws controlling air pollutants in the United States include the Clean Air Act of 1970 and its amendments, and the 1999 Regional Haze Regulations. The concentrations of air contaminants in the BLM's planning areas need to be within limits of all state ambient air quality standards, and national ambient air quality standards (NAAQS).

The air quality in the Price Field Office is good. Based on measured data, the regions remoteness, and a lack of major urban communities, the region around Price is designated as an attainment area for all criteria pollutants. Data from the most recent Utah Division of Air Quality Report (UDAQ 2004) indicate that Power Plants are the major source of air pollution in Carbon and Emery Counties. The primary sources of pollutants in these counties occur outside or adjacent to BLM managed lands.

Cultural Resources

The objective of the cultural resource management program is to protect, preserve, interpret, and manage significant cultural resources for their informational, educational, recreational, and scientific values. Site-specific inventories for cultural resources are required before the start of surface disturbance or if Price Field Office-administered lands were proposed for transfer out of federal ownership.

Inventories have traditionally been conducted to support site-specific surface-disturbing projects, such as mineral and energy development, to comply with the requirements of Section 106 of the National Historic Preservation Act and other cultural resource preservation laws. During these activities, cultural resources are inventoried, categorized, and preserved; in addition staff will conduct field activities, perform excavations; map and collect surface materials, research records, and photograph sites and cultural resources. Inventory data collection is used for documentation and development of mitigation plans before other resource program surface disturbance. Inventory activities commonly entail the use of hand tools, power tools, or heavy machinery. Survey intensity varies among inventories and may last from one day to several weeks. In addition, academic institutions have performed research excavations, although such scientific investigations were limited. Less than 5 percent of the PFO has been inventoried for cultural

resources. Through this inventory, more than 2,000 sites have been identified. Given the current number of acres inventoried and the current number of sites, archeologists estimate that thousands more sites may exist throughout the PFO. The PFO is considered to be the center of the Fremont culture, and its abundant cultural resources show human presence in the area during the past 12,000 years.

Cultural resource land management may further include: reduction of imminent threats and potential conflicts from natural and human-caused deterioration, including other resource uses; creation of opportunities for scientific and educational uses of cultural resource sites; interpretation and education focused on previous human occupation and land uses, provision of traditional Native American uses though permits, including collection of herbs, medicines, traditional use items, and items necessary for traditional, religious, or ceremonial purposes. These actions may involve proactive research, protection and inventories involving universities, service groups, site stewards, tribes and community outreach.

Surface disturbance is generally avoided near significant cultural resource sites and within ¼ mile or the visual horizon of significant segments of historic trails and canals. Sites listed on, or eligible for, the National Register for Historic Places are protected and would be managed for their local and national significance in compliance with the National Historic Preservation Act, the Archaeological Resources Protection Act, the American Indians Religious Freedom Act, and the Native American Graves Protection and Repatriation Act, as appropriate. Seven sites within the PFO are listed on the NRHP. Current laws protect sites that are listed on the NRHP and those that are eligible. Those sites currently listed on the NRHP are as follows: Flat Canyon Archeological District, Desolation Canyon National Historic Landmark, Black Dragon Canyon Pictographs, Buckhorn Wash Rock Art Sites, San Rafael Bridge, Denver and Rio Grande Lime Kiln (also known as Buckhorn Flat Lime Kiln), Rochester-Muddy Creek Petroglyph Site.

Paleontological Resources

The objective of the paleontological resource management program is to protect, preserve, interpret, inventory and manage significant paleontological resources for their informational, educational, recreational, and scientific values. On the ground paleontological inventories are required prior to surface disturbing areas in Class I areas.

During these activities, paleontological resources are inventoried, categorized, and preserved; in addition staff will conduct field activities, perform excavations; map and collect surface materials, research records, and photograph sites and resources. Inventory data collection is used for documentation and development of mitigation plans before other resource program surface disturbance. Inventory activities commonly entail the use of hand tools, power tools, or heavy machinery. Survey intensity varies among inventories and may last from one day to several weeks. In addition, academic institutions have performed research excavations.

Paleontological resource land management may further include surface collection of common invertebrate and botanical paleontological resources for non-commercial use, interpretation of paleontological resources, protection of fossil resource sites not feasible or desirable to excavate.

## Fire and Fuels Management

Objectives of fire management are to protect life, property, and resource values from wildfire and to restore the natural role of fire in the ecosystem. The major activities involved with the fire management program include: wildfire suppression, managing natural ignitions as wildland fire use for resource benefit, prescribed burning, non-fire fuels treatment for hazardous fuels reduction, and emergency stabilization and rehabilitation following wildfires.

Fires within the planning area are both naturally occuring and used as a management tool. Naturally occuring fires are widely distributed in terms of frequency and severity.

Wildfires are suppressed when they threaten values and resources, such as: wildland urban interface areas, developed recreation sites, areas that are unlikely to recover following fire (i.e., areas of noxious weeds or invasive species), sensitive soils, critical threatened and endangered species habitat, or fires with potential to spread to private, state, or other federal lands. Fire suppression methods vary with the intensity of the wildfire and are conducted on an emergency basis. Firelines may be constructed by hand or by heavy equipment to contain the wildfire. Water may be withdrawn from nearby sources to suppress fires. Chemical fire suppression agents and retardants may be used, if necessary. The use of aerial fire retardant is restricted near water resources. After a fire is extinguished, emergency stabilization and rehabilitation techniques, such as seeding and soil stabilization actions, may be used restore a burned or suppressed area to its previous vegetation cover. These suppression and post-suppression activities often employ the use of off-road vehicles, hand tools, and heavy equipment such as bulldozers.

Wildland fire use fires are implemented in areas that would benefit from the reintroduction of fire. Some suppression techniques, as described above, may be used to keep the fire within pre-determined boundaries, but no emergency stabilization and rehabilitation actions are taken following wildland fire use.

Prescribed fire and non-fire fuels treatment objectives are to restore natural fire regimes, reduce hazardous fuel loading, and enhance resources, such as wildlife habitat. Prescribed fires follow a pre-determined prescription and include activities such as broadcast burning or pile burning following manual or mechanical fuel treatments. Non-fire fuel treatment actions include: tree thinning or clear-cutting (i.e., juniper) by hand or using mechanized equipment, chemical application of herbicides to reduce shrub cover, disking to remove vegetation and prepare the soil for seeding, and seeding of native and/or non-native species to prevent increase of invasive species.

## Forestry and Woodland Management

Forest management objectives are to maintain and enhance the health, productivity, sustainability, and biological diversity of forest and woodland ecosystems and to provide a balance of natural resource benefits and uses, including opportunities for commercial and non-commercial harvest of forest and woodland products on a sustainable basis. Forests are managed for multiple uses, such as recreation, livestock grazing, and wildlife habitat. The forestry and woodlands program also implements silviculture practices including site preparation, regeneration, stand protection, stand maintenance, pre-commercial and commercial thinning for

density management, fertilization, pruning, forest and woodland condition restoration treatments, and salvage harvest.

Roughly 70,000 acres of forest and 650,000 acres of woodland (mostly pinyon-juniper) exist in the PFO. Current forest and woodland management is limited to permit sales for noncommercial harvest and occasional hazardous fuels reduction projects conducted by BLM fire management. Interest in commercial timber production is low. The highest demand for forest products is fuelwood and Christmas trees. There is also limited demand for juniper fence posts. An additional use of forest resources within the PFO is vegetative harvest for grass and seeds. Pinyon nuts and grass seeds are the vegetative products in highest demand and with the widest distribution in the PFO. Forest management actions may include conducting surveys, obtaining easements, pursuing legal access, allowing road development, and installing drain culverts and water bars. Private and state land may be accessed for forest management purposes through easement acquisitions. Non-timber forest products are harvested and sold by permit. Non-timber forest products include firewood, posts, poles, Christmas trees, nuts, seeds and wildings.

<u>Geology and Minerals Management</u>

Objectives of the Geology and Minerals program are to provide opportunities for mineral exploration, development and reclamation under leasing laws subject to legal requirements to protection other resources. Mineral development is subject to leasing, location, or sale based on the Federal mineral law covering that particular commodity. The planning area will be open to consideration for exploration, leasing, and development of leasable minerals including oil, gas, coal, oil shale, and geothermal. BLM minerals program is divided into the three categories of salable, leasable, or locatable minerals.

*Salable Minerals*

Salable minerals include sand, gravel, building stone, and humate. Before issuing contracts or free use permits for salable minerals, appropriate environmental analyses are conducted, including special studies or inventories of cultural resource values, threatened or endangered plant and wildlife species, and other resources. Stipulations or conditions may be included in the terms of the contract to ensure protection of the natural resources and reclamation of the land following project completion. Site reclamation is required following any surface-disturbing activity by mining for salable minerals. Reclamation includes removing surface debris, recontouring, reducing steep slopes, and planting vegetation. All reclamation proposals must conform to federal and state agency requirements.

*Leasable Minerals*

Leasable minerals include fluid (oil, gas, geothermal, coal bed natural gas) and solid minerals such as coal and sodium. In Utah, coal is generally extracted using underground mining methods although surface coal mine operations and methods are likely to be proposed for some future operations. Surface facilities include truck/train loadouts, offices, maintenance facilities, change house, electrical substations, and roads. Total surface disturbance is usually less than 20 acres.

Surface coal mining involves the use of draglines, shovels, and haul trucks and results in large areas of surface disturbance from road construction; topsoil and overburden removal; and stock

piling of these materials. Reclamation includes recontouring as closely to the original landscape as possible, reconstruction of drainages, reseeding, and monitoring.

Fluid leasable minerals include oil, gas, and geothermal steam. In areas where development of oil and gas resources would conflict with the protection or management of other resources or public land uses, mitigation measures are identified and may appear on the leases as either stipulations to uses, or as restrictions on surface occupancy. Once the parcel is sold, it matures into a lease and is authorized for a 10 year period. Currently oil and gas leasing in the Price FO contains 489,125 acres are open for oil and gas leasing and 673,389 acres for coal leasing.

Initial geophysical exploration involves use of vehicles to lay the geophones and drill the shot holes for charges, or "thumpers" to create the sound waves. Exploration for oil and coal bed natural gas may also include drilling more than one well. Surface disturbance during the exploration phase of drilling includes the construction of roads, well pads, reserve pits, and other facilities.

Development of oil and gas fields includes construction pads, storage tanks, storage tank batteries, oil and gas processing facilities and necessary pipeline, compressor engines and power lines right-of-ways. Generally, each drill site includes a 3 acre pad, 1 mile of road, and 1 mile of pipeline. Directional drilling requires a larger pad size and is dependent on the number of wells drilled from each pad.

Methods to dispose of residual water from oil and gas production include: subsurface re-injection, direct surface discharge, and discharge into a containment pond or pit. Chemically polluted water may be treated before surface discharge or may be reinjected. Geothermal resources are available for exploration, development, and production and are subject to the same surface disturbance restrictions and other stipulations applied to oil and gas exploration, development, and production.

Potential impacts of leasable mineral developments include increased soil erosion resulting in increased sedimentation, some potential for release or exposure to toxic chemicals and wastes, individual mortality, localized population mortality, habitat loss/fragmentation, and reduction of reproductive success.

*Locatable Minerals*

Locatable minerals in the project area include uranium, gypsum and clay. Minerals that are normally locatable may be leasable on acquired lands. There are 32,000 acres open for mining these materials in the planning area.

Surface disturbance for uranium extraction includes processing plants, evaporation ponds, equipment maintenance buildings and offices, or other various extraction support facilities disturbing approximately 5-15 acres. Potential impacts of locatable mineral developments include increased soil erosion resulting in increased sedimentation, some potential for release or exposure to toxic chemicals and wastes, individual mortality, localized population mortality, habitat loss/fragmentation, and reduction of reproductive success.

Potential impacts of locatable mineral developments include increased soil erosion resulting in increased sedimentation, some potential for release or exposure to toxic chemicals and wastes, individual mortality, localized population mortality, habitat loss/fragmentation, and reduction of reproductive success.

Hazardous Materials Management

The primary objective of hazardous materials management is to ensure that human hazardous materials concerns, such as hazardous materials, wastes, abandoned mine & well sites are mitigated or eliminated. The potential for intentional or accidental releases of hazardous materials onto public lands will also be minimized to protect public and environmental hazardous materials on lands administered by BLM.

State Office and field office contingency plans specify how personnel are supposed to respond to a hazardous substance incident, such as hazard recognition, retreating procedures, record keeping, and reporting. Contingency plans recommend using signs, fencing, and/or barricades for site security, unless such actions would create an attractive nuisance. Emergency spill response may necessitate containment measures such as building dikes, or overland vehicle and equipment travel.

Management of hazardous materials, substances, and waste (including storage, transportation and access, and spills) will be conducted in compliance with 29 CFR 1910, 49 CFR 100-185, 40 CFR 100-400, Comprehensive Environmental Response Compensation and Liability Act, Resource Conservation and Recovery Act, Superfund Amendment Reauthorization Act, Toxic Substances Control Act, Clean Water Act, and other federal and state regulations and policies regarding hazardous materials management. Databases of previous mining operations exist for the decision area, but no formal inventories for abandoned mine lands have occurred. Because of previous mining operations throughout the decision area, there is a potential for physical safety hazards and/or environmental issues.

Lands and Realty Management

The objectives of the lands and realty management program are to support multiple-use management goals of other BLM resource programs; respond to public requests for land use authorizations, sales, and exchanges; and acquire and designate rights-of-way access to serve administrative and public needs.

Public land tracts that are not critical to current management objectives will be disposed of through the realty management program (reviewed on a case-by-case basis). Non-federal lands may be acquired through exchange in areas with potential for recreation development or in areas containing important wildlife, cultural, scenic, natural, open space, or other resource values. Protective withdrawals may be established to protect and preserve important resource values, but require extensive mineral investigations.

Realty management authorizes occupancy of public lands for roads, power lines, pipelines, communication sites, and irrigation ditches authorized by granting rights-of-way. Rights-of-way management actions respond to public requests for access, land authorizations, sales, and exchanges. These rights-of-way may be temporary or extend up to 30 years, or in perpetuity.

The program pursues cooperative agreements, develops recreation site facilities, considers offsite mitigation, minimizes access in wildlife habitat, fences revegetation sites, blocks linear rights-of-way to vehicle use, considers temporary-use permits, considers new withdrawals, and identifies parcels for landfills under the Recreation & Public Purposes Act. Areas with important resource values will be avoided where possible when planning routes and installation of new facilities. Effects will be mitigated if it becomes necessary to place facilities within avoidance areas.

Livestock Grazing Management

The objective of livestock grazing management is to maintain or improve forage production and range condition as a sustainable resource base, while improving wildlife habitat and watershed condition and meeting Utah's Rangeland Health Standards.

Not all BLM lands are open to livestock grazing due to conflicts with other resource uses. Range management activities may include vegetation treatments such as prescribed fire or mechanical and chemical control of noxious weeds, sagebrush, and other target species. Salt or mineral supplements may be approved to help manage livestock distribution. The determinations and effects analyses associated with the potential impacts of these treatments can be located under the other appropriate program headings (i.e., fire treatments – see Fire and Fuels Management, or vegetative treatments – see Vegetation Management).

Within the planning area all grazing areas are open for livestock grazing, with the exception of Gray Canyon Wildland Area, Gordon Creek Wildlife Area, and Wildlife Allotment, which is closed to grazing because of its aesthetic and recreation values. Livestock grazing on public land is administered through Livestock Grazing Allotments. Grazing permits are usually issued for a 10-year period. Livestock grazing management includes using an interdisciplinary allotment evaluation to provide specific guidance and actions, allocation of long-term increases or decreases in forage on a case-by-case basis, analyzed through the NEPA process, use of livestock grazing to enhance ecosystem health and help accomplish resource objectives. Other range improvements authorized by the livestock grazing management program may include fence construction, water developments, exclosures, and livestock handling facilities. These projects are designed and constructed to implement grazing systems that are designed to meet Rangeland Health Standards and improve watersheds conditions, wildlife habitat, riparian proper functioning conditions, and forage production.

Recreation Management

The objective of recreation resources management is to identify recreation values and resources on public lands and make decisions which will ensure that these values are maintained on a long-term sustained yield basis to meet the recreational needs of the using public. Recreation management includes allowing recreational access by the public, developing and maintaining recreation areas and facilities, issuing special recreation permits for organized groups, competitive events and commercial outfitters and guides, acquiring recreational access, providing information to the public about recreation resources and assessing effects of recreational use to the environment. The BLM monitors recreational use, develops management plans, and evaluates recreational potential.

Through the Resource Management Planning process BLM identifies and designates special recreation management areas. These include areas which require greater recreation investment, where more intensive recreation management is needed and recreation is a principal management objective. Recreational activities in the project area may include OHV use, camping, hiking, rappelling, photography, wildlife & scenery viewing, horseback riding, hunting, and mountain biking.

Riparian, Soils and Water Resources

The objectives for the riparian, soil and water resources management program are to maintain and improve soil integrity, riparian and wetland areas, and protect water quality. Many Best Management Practices (BMPs), designed under this program reduce sedimentation and protect water quality also benefit soil productivity by minimizing erosion. Examples of other protection measures implemented under this program include maintenance and restoration of appropriate biological soil crusts, management of watershed health, and manage salinity load. Generally, this management program provides information in support of other resource objectives and goals.

Under this program, management actions include implementation of BMPs for reduction of soil loss by performing appropriate land treatments such as seeding and fuels reduction, reclamation of surface disturbance and temporary roads associated with other projects, apply seasonal closures, monitoring public drinking water, and completing groundwater studies. Other soil resource projects may include abandoned mine reclamation, waste rock removal, tailings cleanup, soil sampling, and erosion studies. Water management practices chiefly strive to maintain or improve surface and ground water quality. Other riparian management activities include delineation of buffer zones, restriction to surface disturbance and restoration of hydrologic function.

Special Status Species Management

Objectives of the special status species program include maintenance of biological diversity of plant and animal (terrestrial and aquatic) species by supporting the State Division of Wildlife Resources' strategic plans for wildlife population objectives to the extent practical and consistent with BLM multiple-use management requirements. Other objectives include the development of protective measures for federally listed species and other special status species; cooperation with other agencies in managing listed species; facilitation of scientific research of special status species and their habitats; and to the extent possible, avoidance of habitat fragmentation.

In addition, BLM's special status species management program often includes the enforcement of timing restrictions, completion of surveys, and development of conservation measures and best management practices for the mitigation of effects of development deemed to be discretionary actions of the BLM. Activities implemented under this program may include identification and enforcement of timing stipulations; completion of species surveys; implementation of Recovery Plans; implementation of Conservation Agreement and Strategy decisions to increase populations and improve habitat of special status species; and closure of areas containing sensitive species populations or habitat.

Special Management Areas Programs

The following describes special management areas, including Areas of Critical Environmental
Concern (ACEC); Wild and Scenic Rivers (WSR); and Wilderness Resources which include
Wilderness Study Areas (WSAs), and non-WSA areas with wilderness characteristics.

Areas of Critical Environmental Concern (ACECs) - An ACEC is the principal BLM designation
for public lands where special management attention is required to protect and prevent
irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources or
other natural systems or processes, or to protect life and safety from natural hazards.
Management actions include limitation of OHV use to designated routes, lease for oil and gas
under NSO stipulations, no allocation of livestock grazing, and regular monitoring. There are 13
ACECs in the planning area for a total of 268,320 acres.

Wild and Scenic Rivers - Congress designates rivers into the National Wild and Scenic Rivers
system. These can include scenic, wildlife, fish, cultural and recreational values. Eligible and
suitable rivers are given a tentative classification of wild, scenic, or recreational based upon the
amount of disturbance within the river corridor. Both congressionally designated rivers and
eligible or suitable segments are managed to protect the free-flowing nature of the river, the
tentative classification, and the outstandingly remarkable values. Currently no wild and scenic
rivers have been designated within the decision area. As part of the wild and scenic river review
process, fifteen river segments have been determined eligible for inclusion into the National
Wild and Scenic Rivers System. With the implementation of the Proposed RMP, twelve eligible
segments totaling 135 river miles will be managed as suitable for inclusion into the National
Wild and Scenic Rivers System. Management actions include preventing modifications such as
impoundments, diversions, channelization, and other actions that could alter the values of these
areas.

Wilderness Resources - There are two types of special designations in this category: wilderness
study areas, and non-WSA lands with wilderness characteristics. In general this means that there
can be no new permanent structures or new disturbance that would require reclamation in order
for the area to appear natural. The lands are closed to mineral leasing. With very few
exceptions, there can be no new permanent structures or new disturbance, and no motorized or
mechanized transport. The lands are closed to mineral leasing and mineral location under the
mining laws. In the planning area, there are designated 11 designated wilderness study areas
(WSAs) within what is now the PFO. These WSAs total 526,960 acres. A discussion of the
current resource values and uses in each WSA, established in 1980 under the authority of Section
603(c) of FLPMA, can be found in the Utah BLM statewide Wilderness Final Environmental
Impact Statement (BLM 1990). Management actions in WSA's include designating open routes
for motorized uses if it will not impair the area's wilderness suitability, or in this case, the BLM
would take appropriate steps including use of restrictions or closures, installation of additional
signs and barricades, and restoration of affected areas. In addition, non-WSA areas that retain
wilderness characteristics are often managed similarly to official WSA's.

Other Special Designations – This category includes byways and backway, National Historic
Trails, and National Landmark. Portions of the Old Spanish National Historic Trail exist in the

PFO, running through the Green River. In addition the planning area contains the Cleveland Lloyd Dinosaur Quarry, and the Desolation Canyon National Historic Landmark

Vegetation Management

Objectives of the vegetation resource management program are to maintain or improve the diversity of plant communities to support timber production, livestock needs, wildlife habitat, watershed protection, and acceptable visual resources. Primary goals of the vegetation management program are to monitor and improve riparian habitats, perform mitigation, support other programs and rehabilitate functioning at-risk and non-functioning areas.

Vegetation treatments, (e.g., timber harvest and sagebrush spraying, burning, chaining) will be designed to meet overall resource management objectives, which include the protection of listed plant and animal species. Control methods include chemical, biological, and mechanical, and cultural practices. Biological control can involve the use of weevils, beetles, or goats.

Mechanical methods include dozing, cutting, chopping, and pulling. Cultural controls include education and public awareness campaigns, use of weed free forage, and changes in grazing practices to increase health and vigor of plant communities so that they are more resistant to invasion. Depending on the site and circumstances, these methods can be used individually or in combination. Fire is used to improve range forage production, wildlife habitat, timber stands, sale debris disposal, and to reduce hazardous fuel buildup.

Visual Resource Management

The objective of visual resource management (VRM) is to manage public lands in a manner that will protect the quality of the scenic (visual) values of the landscape. To accomplish this objective, BLM establishes visual resource management priorities while giving consideration to other resource values and uses. Visual resources are managed in accordance with objective classes that have been assigned to all public lands in each Field Office.

To meet VRM objectives, the BLM designs facilities, such as power lines, oil and gas wells, wildlife guzzlers, and storage tanks to fit with their surroundings. Design considerations include location (e.g., screening or distance), color (painting), building materials, size and scale, and reclamation.

Wild Horse and Burro Management

The objective of wild horse and burro management is the protection, management, and control of wild free-roaming horses and burros (WH&B) on public lands. Management includes maintaining viable herds that will preserve the free-roaming nature of WH&Bs in a manner that is designed to achieve and maintain thriving ecological balance on the public lands.

There are four Herd Areas or Herd Management Areas located in the planning area: Range Creek, Sinbad, Muddy Creek, and Robbers' Roost. These areas total approximately 169,906 acres, 150,755 of which are on BLM land.

Management actions under this program include managing burros for age and sex ratios, genetic viability, allow burro research, and introduce burros from other populations. Management can sometimes involve herd gathering. Helicopters are used when gathering horses and burros by hazing the animals into ground traps, set-up using portable metal panels.

Fish and Wildlife Resource Management

The BLM works closely with the UDWR to manage habitat for fish and wildlife (including big game, upland game, waterfowl, neo-tropical migratory birds, small mammals, amphibians, and reptiles) to achieve and maintain suitable habitat for desired population levels and distribution within the decision area. The UDWR is responsible for managing wildlife population levels; the BLM is responsible for managing wildlife and fisheries habitat in a condition that will support desired levels of species. The BLM works cooperatively with the UDWR to maintain and reestablish populations of native species that have used the historic range located within the planning area through habitat management and restoration.

Objectives of the fish and wildlife resource management program include maintenance of habitat quantity, quality, and connectivity to sustain diverse wildlife populations; maintenance and improvement of aquatic habitats to sustain diverse fisheries and aquatic populations; and conservation of migratory bird habitat as directed by Executive Order 13186 (Responsibilities of Federal Agencies to Protect Migratory Birds) and the Migratory Bird Treaty Act and emphasize management of migratory birds listed on the USFWS current list of Birds of Conservation Concern and the Partners-in-Flight priority species. Wildlife Management actions may include surveying; habitat monitoring; habitat and species inventories, habitat improvement, habitat restoration, water developments, riparian habitat improvements, etc., as well as development of habitat management plans.

The BLM develops stipulations and conservation measures to both protect and enhance wildlife and fisheries habitats. These stipulations and conservation measures may include such things as: recommending withdrawal of some areas from mineral entry; limiting access to specific areas by OHVs and pedestrians; and minimizing the impacts of surface development. The BLM may acquire crucial wildlife habitats or easements and conduct inventories of potential habitats for occurrences of threatened, endangered, and sensitive species or their habitat.

Transportation and Access Management

The objectives of the travel management program include maintenance of access for public and administrative needs; establishment of a route system that contributes to protection of sensitive resources; accommodates a variety of uses and minimizes user conflicts; and coordination of OHV management.

Activities included under this program include maintenance of roads, support of counties and states for land access and road networks, reclamation of redundant and unused roads, management of scenic byway and backway corridors, and instillation of appropriate signage.

## Conservation Measures

As part of the proposed action, in order to minimize the effects of the above management programs, the Price BLM Field Office has committed to a variety of species-specific conservation measures and, in conjunction with USFWS, developed species-specific lease notices for leases permitted under the Geology and Minerals Program. For a complete listing of the BLM committed conservation measures, lease notices, and Best Management Practices (BMPs), please refer to Appendix A.

# SPECIES ACCOUNTS, EFFECTS, AND CONCLUSIONS

The following section includes species-specific information pertaining to the status and distribution of each species, the environmental baseline, and programmatic-level effects of the proposed action.

Regulations implementing the Act (50 CFR 402.02) define the environmental baseline as the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed State or Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation process.

"Effects of the action" refers to the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, which will be added to the environmental baseline. Direct effects encompass the immediate, often obvious effect of the proposed action on a species or its habitat. Indirect effects are caused by, or result from the proposed action, are later in time, and are reasonably certain to occur. In contrast to direct effects, indirect effects may be more subtle, and may affect species' populations and habitat quality over an extended period of time, long after RMP activities have been completed.

Interrelated actions are those that are part of a larger action and depend upon the larger action for their justification. Interdependent actions are those that have no independent utility apart from the action under consultation. Interdependent actions are those that have no independent utility apart from the action under consideration. Indirect effects are those that are caused by the proposed action and are later in time, but are still reasonably certain to occur.

## Mexican spotted owl (*Strix occidentalis lucida*)

### Status of the Species

*Species / Critical Habitat Description*

The Mexican spotted owl (*Strix occidentalis lucida*) is one of three subspecies of spotted owl recognized by the American Ornithologists' Union (AOU 1957:285). The other two subspecies are the northern (*S. o. caurina*) and the California spotted owl (*S. o. occidentalis*). The Mexican subspecies is geographically isolated from both the California and northern subspecies.

The spotted owl is mottled in appearance with irregular white and brown spots on its abdomen, back and head. Several thin white bands mark an otherwise brown tail. The spots of the Mexican spotted owl are larger and more numerous than in the other two subspecies, giving it a lighter appearance. *Strix occidentalis* translates as "owl of the west"; *lucida* means "light" or "bright." Unlike most owls, spotted owls have dark eyes.

Adult male and female spotted owls have similar plumage. However, the sexes can be identified by voice and size differentiation. Juveniles, subadults, and adults can be distinguished by plumage characteristics (Forsman 1981; Moen et al. 1991). Juvenile spotted owls (hatchling to approximately five months) have a downy appearance. Subadults (5 to 26 months) have pointed rectrices with white tips (Forsman 1981, Moen et al. 1991). Rectrices of adult (>27 months) feathers have rounded, mottled tips.

Although the spotted owl is often referred to as a medium-sized owl, it ranks among the largest owls in North America. Of the 19 species of owls that occur in North America, only 4 are larger than the spotted owl (Johnsgard 1988). As a species, the spotted owl averages 41-48 cm (16-19 inches) long (Earhart and Johnson 1970), 107-114 cm (42-45 inches) across the spread wings (Walker 1974), and weighs 547-647 grams (19.5-23 ounces). These measures are expressed as ranges because, similar to other owl species, spotted owls exhibit reversed sexual dimorphism (i.e., females are larger than males).

*Life History and Population Dynamics*

Spotted owls have one of the lowest clutch sizes among North American owls (Johnsgard 1988); females lay one to three eggs, two being the most common. Mexican spotted owls breed sporadically and do not nest every year (Ganey 1988). In good years, most of the population will nest, whereas in other years only a small proportion of pairs will nest successfully (Fletcher and Hollis 1994).

Courtship begins in March and eggs are laid in late March or, more typically, early April. Incubation begins shortly after the first egg is laid, and is performed entirely by the female. Female spotted owls generally incubate for approximately 30 days. During incubation, the female leaves the nest only to defecate, regurgitate pellets, or receive prey delivered by the male, who does most or all of the foraging. The eggs usually hatch in early May (Ganey 1988). Females brood their young almost constantly, leaving their nests for only brief periods during the night. Nestling owls fledge from four to five weeks after hatching, from early to mid-June in most cases (Ganey 1988). Owlets often leave the nest before they can fly, simply jumping from the nest onto surrounding tree branches or the ground. Within a week after leaving the nest, most owlets can make short, clumsy flights. Three weeks after leaving the nest owlets can hold and tear up prey on their own, and by late July most have become proficient at pouncing on crawling insects (Forsman et al. 1984). The young depend on their parents for food during the summer and will eventually disperse out of the natal area in the fall. Reproductive output varies both spatially and temporally (White et al. 1995), but may be higher than the California and the Northern spotted owl (Verner et al. 1992, Thomas et al. 1993).

Forsman et al. (1976) described spotted owls as "perch and pounce" predators. They typically locate prey from an elevated perch by sight or sound, then pounce on the prey and capture it with

their talons. Spotted owls have also been observed capturing flying prey such as birds and insects (Verner et al. 1992). Specific prey groups include: woodrats, mice, voles, rabbits, gophers, bats, birds, reptiles, and arthropods. Spotted owls dwelling in canyons of the Colorado Plateau take more woodrats, and fewer birds, than do spotted owls from other areas.

Mortality factors include predation, starvation, and accidents. Little is known about how disease and parasites contribute to mortality of spotted owls. Avian predators include great horned owls, northern goshawks, red-tailed hawks, and golden eagles. The extent of predation is unknown; however both juveniles and adults are preyed upon (Willey 1993). Starvation may result from low abundance or availability of prey. Most instances of starvation occurred from late fall through winter when prey resources were reduced in abundance and availability (Willey 1993, Block and Ganey, unpub. data). Starvation may also predispose individuals to increased predation. Little data is available on frequency of accidents, and subsequent mortality. Instances of spotted owls being hit by cars have been documented. Owls may also collide with power lines or other obstacles (USFWS 1995).

Based on limited study information, annual survival rates of adult Mexican spotted owls is 0.8-0.9 and juvenile survival is 0.06-0.29 (USFWS 1995). Survival estimates may be biased low, but conclude higher survival of adults than juveniles. Available data is either insufficient or has not been analyzed to estimate population trends.

*Status and Distribution*

The Mexican spotted owl (*Strix occidentalis lucida*) was listed as a threatened species on March 16, 1993 (58 FR 14248). The primary threats to the species were cited as even-aged timber harvest and catastrophic wildfire, although grazing, recreation, and other land uses were also mentioned as possible factors influencing the Mexican spotted owl population. The Fish and Wildlife Service appointed the Mexican Spotted Owl Recovery Team in 1993, which produced the Recovery Plan for the Mexican Spotted Owl (Recovery Plan) in 1995 (USFWS 1995).

On August 31, 2004, the USFWS designated approximately 8.6 million acres of critical habitat for the Mexican spotted owl in Arizona, Colorado, New Mexico, and Utah, on Federal lands (69 FR 53181). There are approximately 47,700 acres of designated critical habitat in the decision area on the western boundary adjacent to Zion National Park and southeast of the town of Tropic. However, not all of these acres contain the primary constituent characteristics essential to the conservation of the species. Some of the primary constituent elements for the Mexican spotted owl include: (1) cooler and often more humid conditions than the surrounding area, (2) clumps or stringers of trees and/or canyon walls with crevices, ledges or caves, (3) high percent of ground litter and woody debris, and (4) riparian or woody vegetation. The primary constituent elements related to forest structure include (1) a range of tree species, (2) a shade canopy created by the tree branches covering 40 percent or more of the ground, and (3) large dead trees with a trunk diameter of at least 12 inches (69 Federal Register 53181-5398).

The primary constituent elements of the critical habitat designation include those physical and biological features that support nesting, roosting, and foraging. Vegetation communities and structural attributes used by the owl vary across the range of the subspecies, but consist primarily of mixed conifer forests or canyons. The mixed-conifer, pine-oak communities and canyon

habitat appear to be the most frequently used communities throughout most portions of the subspecies' range (Skaggs and Raitt 1988; Ganey and Balda 1989, 1994; Gutierrez and Rinkevich 1991; USFWS 1995). In Utah, owls utilize canyon habitats (Willey 1998).

Primary constituent elements related to critical habitat in Utah include one or more of the following: (1) presence of water (often providing cooler temperatures and higher humidity than the surrounding areas); (2) clumps or stringers of mixed conifer, pine-oak, pinyon-juniper, and/or riparian vegetation; (3) canyon walls containing crevices, ledges, or caves; and (4) high percent of ground litter and woody debris. The primary constituent elements provide a qualitative description of those physical and biological features necessary to ensure the conservation of the owl in Utah (69 FR 53181).

Although the Mexican spotted owl's entire range covers a broad area of the southwestern United States and Mexico, the Mexican spotted owl does not occur uniformly throughout its range. Instead, it occurs in disjunct localities that correspond to isolated forested mountain systems, canyons, and in some cases steep, rocky canyon lands. Surveys have revealed that the species has an affinity for older uneven-aged forests but also is known to inhabit a physically diverse landscape in the southwestern United States and Mexico. Owls can be found in forested mountains and canyons from southern Utah and Colorado to the mountains of Arizona, New Mexico, western Texas, and into the mountains of northern and central Mexico.

Steep-walled rocky canyonlands provide typical owl habitat within the Utah portion of the Colorado Plateau Recovery Unit. Canyon habitat is used by owls for nesting, roosting, and foraging and includes landscapes dominated by vertical walled rocky cliffs within complex watersheds, including many tributary side canyons. Rock walls must include caves, ledges, and fracture zones that provide protection for nesting and roosting sites. Breeding sites are located below canyon rims; however, it is known that owls use areas outside of the canyons (i.e., rims and mesa tops). Owls nest and roost primarily on cliff faces using protected caves and ledges, and forage in canyon bottoms, on cliff faces and benches, and along canyon rims and adjacent lands. Although it is difficult to rely upon vegetation alone to identify canyon habitat, these areas frequently contain small clumps or stringers of mixed-conifer, ponderosa pine, pine-oak, pinyon-juniper, and/or riparian vegetation (69 FR 53181). Little is known about patterns of habitat use by foraging owls. Willey (1998) documented owl use in Utah to include canyon bottoms and adjacent rims.

Colorado Plateau canyon habitats in Utah are naturally discontinuous and may explain the patchy locations of owls in the region. A study conducted in Zion National Park found owls nesting and roosting in humid, narrow canyons with dense understories (Rinkevich 1991). These canyons provide large cliffs with escape cover to avoid predation, shaded roost sites to avoid high summer temperatures, patches of forest vegetation, and availability of suitable prey.

Historic population size estimates and range of the Mexican spotted owl are unknown; however present population size and distribution are thought to be similar (USFWS 1995). Ninety-one percent of known owls in 1990-1993 occurred on U.S. Forest Service lands, primarily in Arizona and New Mexico. It is unknown why there are fewer owls in Utah and Colorado, but that may be a function of habitat type. Total range wide population estimates are 1,176 to 2,352 owls (69FR 53181, August 31, 2004). Seamans et al. 1999 reported 10 percent or greater population

declines and low survival rates in central Arizona and west-central New Mexico. Gutierrez et al. (2003) documented that the decline in New Mexico was continuing, whereas the decline in Arizona appeared to have stabilized. Wide population fluctuations may be common for Mexican spotted owls (Gutierrez et al. 2003).

**Environmental Baseline**

*Status of the Species within the Action Area*

Dr. David Willey and Dan Spotskey modeled Mexican spotted owl habitat based on vegetation type, slope, elevation, aspect, and other factors in 1997 and 2000 (Willey and Spotskey 1997, 2000). Both the 1997 model and the 2000 model are used within Utah to identify potential habitat. Any projects that occur within the modeled potential habitat should be field-verified for actual habitat suitability and, if appropriate, surveys according to protocol should be conducted to determine if Mexican spotted owls occupy the area. The Mexican spotted owl occurs in the eastern and southern thirds of Utah, including Garfield and Kane counties (UDWR 2003).

The Mexican Spotted Owl Recovery Plan was finalized in 1995. Six Recovery Units in the United States were identified based on similarities, or obvious dividing lines, between the following: physiographic provinces, biotic regimes, perceived threats to habitat or individual birds, administrative boundaries, and owl distribution. Suitable habitat and designated critical habitat on public lands managed by the BLM in Utah are within the Colorado Plateau Recovery Unit (USFWS 1995). Five critical habitat units have been delineated in Utah:

> *Unit CP–11.* This unit is located in Iron, Washington, and Kane Counties in southwest Utah, approximately 22 mi (35 km) northeast of St. George. About half of the unit is on BLM owned lands; Zion National Park is the other land owner.

> *Unit CP–12.* This Unit is in the vicinity of the Kaiparowits Plateau and the Cockscomb, in Kane and Garfield Counties. This unit is primarily on the Grand Staircase-Escalante National Monument, which is owned and managed by the BLM. The other land owner is the Forest Service (Dixie National Forest).

> *Unit CP–13.* This unit occurs in Wayne, Garfield, Kane, and San Juan Counties, Utah. It is primarily in the Waterpocket Fold landform extending to Lake Powell. The primary land owner in this Unit is the National Park Service (Capitol Reef National Park and Glen Canyon National Recreation Area). The BLM owns and manages lands within this unit primarily on the Grand Staircase-Escalante National Monument and along the eastern edge of the Unit. The Forest Service (Fishlake National Forest) also owns land, but to a much lesser extent.

> *Unit CP–14.* This Unit lies in Wayne, Garfield, San Juan, and Grand Counties, Utah. It includes the Dark Canyon Primitive and Wilderness areas of the BLM and FS, respectively. This Unit has lands owned and managed by the National Park Service (Canyonlands National Park and Glen Canyon National Recreation Area), the BLM, and the Forest Service (Manti La-Sal National Forest).

*Unit CP–15.* This unit is located approximately 30 mi (48 km) east of Price, in Carbon and Emery Counties. Situated in the West Tavaputs Plateau, it is located largely along the Desolation Canyon area of the Green River. The BLM is the primary owner and manager of land within this unit.

It is important to note that critical habitat is not the only suitable or occupied habitat available for owls. Critical habitat is only a regulatory delineation of habitat meeting primary constituent elements, and was defined based largely on known localities of nest sites (Protected Activity Centers; PACs) at the time of designation. There is substantial suitable habitat that occurs outside of the designated critical habitat boundaries and these should be assessed using the models and field evaluations as previously described.

Designated critical habitat and suitable habitat occur within the Price BLM Field Office. Approximately, 10,770 acres of designated critical habitat in Unit CP-15 exist within the Price planning area. In addition, there are 4 known nesting sites but no officially designated PACs.

*Factors Affecting Species Environment within the Action Area*

Threats to this species and its habitat include recreation, grazing, oil and gas exploration and development, and road improvement and development within canyons; loss, fragmentation, or modification of habitat from catastrophic fire and timber harvest within upland forests potentially used for foraging, dispersal, and wintering; and increased predation associated with habitat fragmentation (USFWS 1995).

**Effects of the Action**

Cultural Resources Management

This program includes surveys, inventories, excavation activities, surface material collection, and interpretive site development. Surveys may involve multiple people and vehicles and can last up to several weeks. Inventories for cultural resources commonly entail the use of hand tools, power tools, or heavy machinery.

Activities occurring under this program may increase human presence; equipment and vehicle use; and surface disturbance in Mexican spotted owl habitat. Associated visual and noise disturbances may adversely affect the behavior of spotted owls during breeding, nesting, roosting, or foraging efforts. Vegetation disturbances or removal associated with cultural resources excavations may reduce availability of prey habitat and prey abundance, at least in the short term. As a result, there may be site-specific decreases in nest initiation or nesting success, and displacement. These effects are likely to be short-term and relatively small scale due to the type of activity.

Paleontological Resources Management

This program includes surveys, inventories, excavation activities, surface material collection, and interpretive site development. Surveys may involve multiple people and vehicles and can last up to several weeks. Inventories for paleontological resources commonly entail the use of hand tools, power tools, or heavy machinery.

Activities occurring under this program may increase human presence; equipment and vehicle use; and surface disturbance in Mexican spotted owl habitat. Associated visual and noise disturbances may adversely affect the behavior of spotted owls during breeding, nesting, roosting, or foraging efforts. Vegetation disturbances or removal associated with cultural resources excavations may reduce availability of prey habitat and prey abundance, at least in the short term. As a result, there may be site-specific decreases in nest initiation or nesting success, and displacement. These effects are likely to be short-term and relatively small scale due to the type of activity.

Fire and Fuels Management

Objectives of fire management are to protect life, property, and resources values from wildfire and restore the natural role of fire in the ecosystem. Major activities associated with the BLM's fire management program include: wildfire suppression, wildland fire use, prescribed burning, non-fire fuels treatments (mechanical and chemical), and emergency stabilization and rehabilitation following wildfires. Fire suppression methods may involve: fireline construction, use of fire suppression agents and retardants, and water withdrawals.

Activities occurring under this program may increase human presence; equipment and vehicle use; vegetation treatment or disturbance; and surface disturbance; and decrease local air quality in Mexican spotted owl habitats. Associated visual and noise disturbances may adversely affect the behavior of Mexican spotted owls during breeding, nesting, roosting, or foraging activities. Vegetation disturbances or vegetation removal may decrease prey habitat and prey abundance. Soil disturbances and increased erosion may indirectly decrease abundance of prey. Localized effects from smoke may adversely affect owlets or displace owls. As a result of these impacts, there may be site-specific decreases in nest initiation or nesting success, increased potential for displacement, and increased owlet and adult mortality.

Potential impacts from wildland fire use and prescribed fire would be similar to those from wildfire suppression. Non-fire fuels treatments and emergency stabilization and rehabilitation following wildfires may be used to retain or improve range conditions and maintain lower fuel loads in grassland and sagebrush habitats. Negative short term impacts include harassment or displacement; or immediate post-project alteration of key prey habitat components from surface disturbance. Fire management activities could benefit prey populations of Mexican spotted owls in the long-term due to improved forage quality and quantity.

Forestry and Woodland Management

Forest management objectives are to maintain and enhance the health, productivity, sustainability, and biological diversity of forest and woodland ecosystems and to provide a balance of natural resource benefits and uses, including opportunities for commercial and non-commercial harvest of forest and woodland products on a sustainable basis. Forests are managed for multiple uses, such as recreation, livestock grazing, and wildlife habitat. The Forestry and Woodlands Management program also implements silviculture practices including site preparation, regeneration, stand protection, stand maintenance, pre-commercial and commercial thinning for density management, fertilization, pruning, forest and woodland condition restoration treatments, and salvage harvest.

Forest resources support activities such as road construction that may occur in or near existing or suitable Mexican spotted owl habitat. However, the impacts of these activities are analyzed and authorized by the lands and realty program.

Activities occurring under this program may increase human presence; equipment and vehicle use; vegetation treatment or disturbance; and surface disturbance near or in Mexican spotted owl habitat. Associated visual and noise disturbances may adversely affect the behavior of Mexican spotted owls during breeding, nesting, or foraging activities. Vegetation disturbances, vegetation removal, or chemical treatment of vegetation may adversely affect prey habitat and prey availability, and therefore, adversely affect Mexican spotted owls and their young. Soil disturbances may increase erosion, adversely affect soil stability, and adversely affect prey habitat and prey abundance. Increased occurrence of invasive plants species may change the vegetation community and change the habitat for Mexican spotted owl prey species. As a result, there may be decreases in nest initiation or nesting success, and decreased adult and owlet fitness.

## Geology and Minerals Management

The planning area will be open to consideration for exploration, leasing, and development of leasable minerals (oil, gas, coal bed natural gas), salable minerals (sand, gravel, stone and humate) and locatable materials (uranium, clay and gypsum). Although stipulations or conditions may be included in the terms of these mineral contracts, there are potential impacts associated with these various activities. Mineral exploration and extraction often results in surface disturbance from road and facility construction, removal of topsoil and overburden, stock piling of these materials, and post-mining reclamation and recontouring.

These occurrences may increase human presence; equipment and vehicle use; vegetation disturbance or removal; soil disturbances; invasive plant species; and pollutants in Mexican spotted owl habitat. Associated noise and visual disturbances may adversely affect the behavior of Mexican spotted owls during breeding, nesting, or foraging activities. Vegetation disturbances or vegetation removal may adversely affect availability of quality and quantity of prey habitat. Soil disturbances may increase erosion, adversely affect soil stability, and decrease prey habitat. Some ancillary equipment associated with energy development (e.g., transmission lines, oil pits) may result in direct mortality of owls if they become impinged on the lines or caught in the pits. Increased occurrence of invasive plants species may change the vegetation community and change the habitat for Mexican spotted owl prey species. Pollutants in the area may affect Mexican spotted owls through adverse effects to prey populations. As a result of these impacts, there may be decreases in nest initiation or nesting success, and decreased adult or owlet fitness.

## Hazardous Materials Management

Activities conducted under the hazardous materials program include providing warnings, securing and disposing of hazardous waste discharged on public lands, establishing precautions, and responding to emergencies. Activities may involve increased human presence, use of heavy equipment, and removal of contaminated soils. These activities have the potential to occur in locations where mineral development or transport occurs.

Mineral developments, pipelines, and roads occur within all of the planning areas analyzed in this document, and have some potential to occur in Mexican spotted owl habitat. Activities occurring under this program may increase human presence; equipment and vehicle use; vegetation treatment or disturbance; and surface disturbance in Mexican spotted owl habitat. Associated noise and visual disturbances may adversely affect the behavior of Mexican spotted owls during breeding, nesting, or foraging activities. Vegetation disturbances or vegetation removal may decrease the availability and quality of nesting habitat; decrease cover from predators and increase predation; and decrease the availability of prey habitat. Soil disturbances may increase erosion, adversely affect soil stability, and adversely impact prey habitat. As a result, there may be decreases in nest initiation or nesting success, and decreased adult and owlet fitness.

## Lands and Realty Management

Objectives of the lands and realty management program are to support multiple-use management goals of the BLM resource programs; respond to public requests for land use authorizations, sales, and exchanges; and acquire and designate rights of way access to serve administrative and public needs. Realty management authorizes occupancy of public lands for roads, power lines, pipelines, communication sites, and irrigation ditches authorized by granting rights of way. Rights of way management actions respond to public requests for access, land authorizations, sales, and exchanges. These rights of way may be temporary or extend up to 30 years, or even in perpetuity.

Activities occurring under this program may increase human presence; equipment and vehicle use; vegetation disturbance; and surface disturbance in Mexican spotted owl habitat. Associated noise and visual disturbances may adversely affect the behavior of Mexican spotted owls during breeding, nesting, or foraging activities. Construction of power lines or other infrastructure may result in electrocutions, entanglements, or collisions with flying birds, resulting in possible mortality. Vegetation disturbances or vegetation removal may adversely affect availability of prey habitat. Soil disturbances may increase erosion, adversely affect soil stability, and adversely affect prey habitat. Increased occurrence of invasive plants species may change the vegetation community and change the habitat for Mexican spotted owl prey species. Exchange or sales of lands may lead to habitat fragmentation and loss. As a result, there may be decreases in nest initiation or nesting success, and decreased adult and owlet fitness.

## Livestock Grazing Management

The objective of livestock grazing management is to maintain or improve forage production and range condition as a sustainable resource base for livestock grazing on BLM land. Livestock management includes designating the kind and class of livestock, seasons of use, locations of use and the numbers of livestock that are permitted to use BLM lands.

Range management activities may include vegetation treatments such as prescribed fire, mechanical and chemical control of noxious weeds, sagebrush and other target species. The determinations and effects analyses associated with the potential impacts of these treatments can be located under the other appropriate program headings (i.e., fire treatments – see Fire and Fuels Management, or vegetative treatments – see Vegetation Management). Other range

improvements authorized by the livestock grazing management program may include fence construction, water developments, exclosures, and livestock handling facilities.

There are four primary ways livestock manipulate habitats to favor/hinder wildlife species: 1) alteration of vegetation composition, 2) cause increased/decreased productivity of selected plant species, 3) increase/decrease the nutritive quality of available forage, and/or 4) increase/decrease the diversity of habitats by altering structure (Severson and Urness 1994).

Activities occurring under this program may increase human presence; equipment and vehicle use; vegetation disturbance; and minor surface disturbance in Mexican spotted owl habitat. Associated visual and noise disturbances may adversely affect the behavior of Mexican spotted owls during breeding, nesting, or foraging activities. Vegetation disturbances, vegetation removal, or vegetation alteration may result in less dense vegetation, more invasive plant species, fragmented prey habitat and adverse affects to availability of prey habitat and prey abundance. Soil disturbances may increase erosion, adversely affect soil stability, and adversely affect prey habitat. As a result, there may be decreases in nest initiation or nesting success, and increased adult and owlet mortality.

## Recreation Management

The recreation program includes providing for and managing recreational access, developing and maintaining recreation areas, issuing special recreation permits, providing information to the public about recreational resources, and assessing effects of recreational use on the natural resources. Under this program, OHV use, camping, rafting, hiking, fishing, boating, swimming, and other activities are allowed in designated areas.

Authorized activities under this program have the potential to increase human presence; equipment and vehicle use; vegetation disturbance; and surface disturbance in Mexican spotted owl habitat. Associated visual and noise disturbances may adversely affect the behavior of Mexican spotted owls during breeding, nesting, or foraging activities. Vegetation disturbances or vegetation removal may adversely affect the availability and quality of prey habitat and prey abundance. Soil disturbances may increase erosion, adversely affect soil stability, and adversely affect prey habitat. Increased occurrence of invasive plants species may change the vegetation community and change the habitat for Mexican spotted owl prey species. As a result, there may be decreases in nest initiation or nesting success, and decreased adult and owlet fitness.

## Riparian, Soils and Water Resources

The objectives for the riparian, soil and water resources management program are to maintain and improve soil integrity, riparian and wetland areas, and protect water quality. Many Best Management Practices (BMPs), designed under this program reduce sedimentation and protect water quality also benefit soil productivity by minimizing erosion. Examples of other protection measures implemented under this program include maintenance and restoration of appropriate biological soil crusts, management of watershed health, and manage salinity load. Generally, this management program provides information in support of other resource objectives and goals.

Potential adverse impacts to Mexican spotted owl suitable and designated critical habitat may
result from land treatments occurring within watersheds. Many of these activities are meant to
benefit soil resources and watersheds by reducing soil loss and reclaiming surface disturbances
or unnecessary roads. However, activities occurring under this program may also increase
human presence; equipment and vehicle use; vegetation manipulation; and surface disturbance in
Mexican spotted owl habitat. Short-term adverse impacts may include, but not be limited to:
disruption of normal breeding, nesting, foraging, and roosting behaviors (associated with noise
and visual disturbances); decreased nesting habitat; and decreased prey habitat. Long-term
benefits may include increased nesting success, increased prey abundance, and increased
survival.

## Vegetation Management

Program objectives are to maintain or improve the diversity of plant communities to support
timber production, livestock needs, wildlife habitat, watershed protection, and acceptable visual
resources. Therefore, this program includes mechanical, chemical, biological, cultural
vegetation management methodologies. These management methodologies may result in ground
disturbing activities, chemical impacts, human disturbances, and impacts to vegetation from
biological management techniques.

Activities occurring under this program may increase human presence; equipment and vehicle
use; vegetation treatment or disturbance (mechanical, chemical, biological); and surface
disturbance in Mexican spotted owl habitat. Associated visual and noise disturbances may
adversely affect the behavior of Mexican spotted owls during breeding, nesting, or foraging
activities. Vegetation alteration, removal, or inadvertent chemical treatment may adversely
affect availability and quality of prey habitat. Soil disturbances may increase erosion, adversely
affect soil stability, and adversely affect prey species habitat. As a result, there may be site-
specific decreases in nest initiation or nesting success, and decreased owl fitness. Long-term
benefits may include increased nesting success, increased prey abundance, and increased
survival.

## Wild Horse and Burro Management

The objective of wild horse and burro management is the protection, management, and control of
wild free-roaming horses and burros (WH&B) on public lands. Management includes
maintaining viable herds that will preserve the free-roaming nature of WH&Bs in a manner that
is designed to achieve and maintain thriving ecological balance on the public lands.

Activities occurring under this program may increase human presence; equipment, helicopter,
and vehicle use; vegetation treatment or disturbance; and surface disturbance in Mexican spotted
owl habitat. Associated visual and noise disturbances may adversely affect the behavior of
Mexican spotted owls during breeding, nesting, or foraging activities. Vegetation disturbances
or vegetation removal may adversely affect availability of prey habitat. Soil disturbances may
increase erosion, adversely affect soil stability, increase sediment deposits, and habitat for prey
species. Short-term adverse impacts may include, but not be limited to: fragmented prey habitat;
decreases in nest initiation or nesting success; and decreased adult and owlet fitness.

Fish and Wildlife Management

This program aims to maintain biological diversity, improve habitat for wildlife and fisheries, and provide habitats for threatened and endangered species.

Activities occurring under this program may increase human presence; equipment and vehicle use; vegetation treatment or disturbance; and surface disturbance in Mexican spotted owl habitat. Associated visual and noise disturbances may adversely affect the behavior of Mexican spotted owls during breeding, nesting, or foraging activities. Vegetation disturbances or vegetation removal may adversely affect availability of prey habitat. Soil disturbances may increase erosion, adversely affect soil stability, increase sediment deposits, and habitat for prey species. Short-term adverse impacts may include, but not be limited to: fragmentation of prey habitat; decreased nest initiation or nesting success; decreased adult and owlet fitness; and alterations of water distribution within occupied habitat of the Mexican spotted owl. In general, long-term efforts to improve the health of riparian habitats may benefit Mexican spotted owls by increasing prey abundance.

Transportation Access Management

The objectives of the transportation and access management program are to provide a safe and effective transportation and access system across public lands. Activities included under this program include maintenance of roads, support of counties and states for land access and road networks, reclamation of redundant and unused roads, management of scenic byway and backway corridors, and instillation of appropriate signage.

Authorized activities under this program have the potential to increase human presence; equipment and vehicle use; vegetation disturbance; and surface disturbance in Mexican spotted owl habitat. Associated noise and visual disturbances may adversely affect the behavior of Mexican spotted owls during breeding, nesting, or foraging activities. Vegetation disturbances or vegetation removal may adversely affect the availability and quality of prey habitat and prey abundance. Soil disturbances may increase erosion, adversely affect soil stability, and adversely affect prey habitat. Increased occurrence of invasive plants species may change the vegetation community and change the habitat for Mexican spotted owl prey species. As a result, there may be decreases in nest initiation or nesting success, and decreased adult and owlet fitness. There is some potential for owls to be killed in vehicle collisions on roadways.

**Cumulative Effects**

Cumulative effects include the effects of future State, Tribal, local or private actions that are reasonably certain to occur in the action area considered in this biological opinion. Future Federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to section 7 of the Act.

Cumulative effects to the Mexican spotted owl and designated critical habitat under the Proposed Actions would include, but are not limited to, the following broad types of impacts:

- Changes in land use patterns or practices that adversely affect a species' critical, suitable, or potential habitat.
- Encroachment of human development into a species' critical, suitable, or potential habitat.
- Fire management actions by some, or all, of the following groups, on lands adjoining or upstream of BLM-administered lands:
  o State of Utah
  o County Governments in Utah
  o Local Governments in Utah
  o Private landholders in Utah

Mexican spotted owls occur throughout the action area, generally as year-around residents (Ganey and Block 2005). In these areas, Mexican spotted owls locations are surrounded by a checkerboard pattern of land ownership including Federal, State, and private landowners. Mexican spotted owls are susceptible to activities on State and private lands. Many of these activities, such as livestock grazing, oil and gas exploration and development, human population expansion and associated infrastructure (increased trails and roads) development, research, and recreation activities (including OHV use and any activities that increase human presence), are expected to continue on State and private lands within the Mexican spotted owl's range. Contributing as cumulative effects to the proposed action, these activities will continue to affect Mexican spotted owls' productivity with disturbances to breeding, nesting, and foraging behaviors and further fragmenting habitat of prey populations.

**Conclusion**

The conclusions of this biological opinion are based on full implementation of the project as described in the "Description of the Proposed Action" section of this document, including the resource protection measures that were incorporated into the project design.

After reviewing the current status of the Mexican spotted owl and its critical habitat, the environmental baseline for the action area, the effects of the proposed project, and the cumulative effects, it is the USFWS's biological opinion that the Price BLM Field Office Resource Management Plan, as proposed, is not likely to jeopardize the continued existence of the Mexican spotted owl, and is not likely to destroy or adversely modify designated critical habitat. We base our conclusion on the following:

1. The applicant committed resource protection measures will be incorporated into site-specific projects designed under the BLM Resource Management Plan. If project design cannot adhere to all applicant committed resource protection measures, consultation under Section 7 of the Endangered Species Act will be initiated.

2. All site-specific projects designed under the proposed BLM Resource Management Plan would be subject to consultation requirements under Section 7 of the Endangered Species Act.

# Southwestern willow flycatcher (*Empidonax traillii extimus*)

## Status of Species

### Species/Critical Habitat Description

The southwestern willow flycatcher (*Empidonax traillii extimus*) is a small passerine bird associated with riparian habitats and a subspecies of *Empidonax traillii*. This species was listed as endangered under the Endangered Species Act of 1973, as amended (ESA), on February 27, 1995 (USFWS 1995). On October 19, 2005, 120,824 acres of critical habitat were designated for southwestern willow flycatchers across Arizona, New Mexico, California, Nevada, and Utah (USFWS 2005). Within Utah, critical habitat was only designated along the Virgin River in Washington County, an area not part of this consultation. Therefore, there will not be any further mention of critical habitat for southwestern willow flycatchers in this consultation.

The southwestern willow flycatcher is a small bird, approximately 15 centimeters (cm) (5.75 inches) long. It has a grayish-green back and wings, whitish throat, light grey-olive breast, and pale yellowish belly. Two wing bars are visible; the eye ring is faint or absent. The upper mandible is dark, the lower is light. The southwestern willow flycatcher is one of four currently recognized subspecies of the willow flycatcher (*E. traillii*) (Hubbard 1987; Unitt 1987; Sogge 2000; USFWS 2001 and 2002). The *E. t. extimus* subspecies was first described by Phillips (1948) and later re-evaluated and accepted as a subspecies by Unitt (1987) and Browning (1993).

The *E. t. extimus* is paler than the other willow flycatcher subspecies and also differs in morphological characteristics: e.g., wing: tail ratio, wing formula; and bill length (Unitt 1987 and 1997; Browning 1993; USFWS 2001 and 2002). These differences are difficult to distinguish and are not reliable characteristics for field identification. The characteristic song of willow flycatcher species is often referred to as a *"fitz-bew"*. Travis (1996) and Sedgwick (1998 and 2001) suggest that clinal variations in willow flycatcher songs also serve to distinguish between subspecies, but this too is unreliable as a definitive field identification tool. In southern Utah, southwestern Colorado, and perhaps New Mexico, clinal gradations of the *E. t. extimus* and Great Basin/Rocky Mountain willow flycatcher (*E. t. adastus*) are thought to occur (USFWS 2002). Phillips et al. (1964) suggested that the *E. t. extimus* may be typical of lower elevations, and in northern parts of its range (including Utah), clinal gradation with the Great Basin subspecies may exist with increasing elevation and latitude. Recent research (Paxton 2000) concluded that the *E. t. extimus* is genetically distinct from the other willow flycatcher species. However, clinal gradation increases the difficulty of subspecies identification without genetic testing.

### Life History and Population Dynamics

Male southwestern willow flycatchers generally arrive at breeding grounds first, with females typically arriving a week or two later. Males are usually monogamous, but polygamy has been recorded (Sogge et al. 1997). Nests are usually built within a week of pair formation. Egg-laying begins as early as May but typically occurs in mid-June. The female provides initial care of the nestlings, the role of the male increases with the age and size of the young. Young typically fledge at 12 to 15 days of age, usually between June and mid-August. Second clutches are common if the first attempt is unsuccessful. Territory size varies among the southwestern

willow flycatcher, probably due to differences in population density, habitat quality, and nesting stage.

Open, cup-shaped nests are typically constructed in the fork of a branch. Historically, most southwestern willow flycatcher nests (75-80%) were constructed in willows. Currently, the species nests in a variety of plant species, including exotic species such as tamarisk.

Information on breeding site fidelity and persistence is limited. Studies of banded birds (Whitfield and Strong 1995; Whitfield and Enos 1996) report varying rates of nestlings returning to study sites to breed. Sogge and Tibbits (1994) reported the return of breeding populations to sites that had been unoccupied for several years, indicating that a habitat cannot be assumed unsuitable or unoccupied in the long term based on absence of southwestern willow flycatchers during a single year.

The southwestern willow flycatcher breeds in different types of dense riparian habitats across a large elevational and geographic area. Although the other willow flycatcher subspecies may breed in shrubby habitats away from water, the southwestern willow flycatcher breeds in patchy to dense riparian habitats along streams or other wetlands, near or adjacent to surface water or underlain by saturated soil. Occupied southwestern willow flycatcher sites consist of dense vegetation in the patch interior that is generally 3 to 4 m (10 to 13 ft) above ground, or in aggregates of dense patches interspersed with openings. Saturated soil is present at or near the breeding site during wet or non-drought years (Sogge et al. 1997, Sogge and Marshall 2000, USFWS 2001 and 2002). Rangewide, common tree and shrub species comprising nesting habitat include willows (*Salix* spp.), seepwillow or mulefat (*Baccaharis* spp.), box elder (*Acer negundo*), stinging nettle (*Urtica* spp.), blackberry (*Rubus* spp.) cottonwood (*Populus* spp.) arrowweed (*Tessaria sericea*), tamarisk or saltcedar (*Tamarix ramosissima*), and Russian olive (*Elaeagnus angustifolia*). Dominant plant species, size and shape of habitat patch, canopy structure, vegetation height, etc., vary widely across the *E. t. extimus*'s range. In Utah, the southwestern willow flycatcher is typically found in mixed native and exotic riparian species habitats, generally dominated by coyote willow, tamarisk and Russian olive (Johnson et al. 1999a and 1999b).

Little specific information is known about migration and wintering ecology of the southwestern willow flycatcher (Yong and Finch 1997, Finch et al. 2000). Willow flycatchers (all subspecies) breed in North America, but winter in Mexico, Central America, and possibly northern South America (Phillips 1948, Stiles and Skutch 1989, Ridgely and Tudor 1994, Howell and Webb 1995, Sogge et al. 1997).

*Status and Distribution*

The historical breeding range of the southwestern willow flycatcher included southern California, southern Nevada, southern Utah, Arizona, New Mexico, western Texas, southwestern Colorado, and extreme northwestern Mexico (Hubbard 1987; Unitt 1987; Browning 1993; USFWS 2002). The flycatcher's current range is similar to the historical range, but the quantity of suitable habitat within that range is much reduced from historical levels. The flycatcher occurs from near sea level to over 2600 m (8500 ft), but is primarily found in lower elevation riparian habitats (USFWS 2002). Throughout its range, the flycatcher's distribution follows that

of its riparian habitat; relatively small, isolated, widely dispersed locales in a vast arid region
(USFWS 2002 Surveys for the southwestern willow flycatcher have been conducted by the
UDWR.

The Recovery Plan (USFWS 2002) divides the southwestern willow flycatcher's breeding range
into six Recovery Units, which are subdivided into Management Units. Recovery Units are
defined based on large watershed and hydrologic units; standardized boundaries of river basin
units within the U.S. Within each of the six Recovery Units, multiple Management Units are
delineated based on a geographic area representing all or part of a surface drainage basin, a
combination of drainage basins, or a distinct hydrologic feature. The outer limits of both the
Recovery Unit and Management Unit boundaries are defined by the southwestern willow
flycatchers' range (USFWS 2001 and 2002).

The State of Utah falls within the Lower Colorado and Upper Colorado Recovery Units. The
Upper Colorado Recovery Unit covers much of the four-corners area of southern Utah,
southwestern Colorado, northeastern Arizona, and northwestern New Mexico. The northern
boundary of the Upper Colorado Recovery Unit is delineated by the northern range boundary of
the southwestern willow flycatcher. Ecologically, this region may be an area of clinal gradation
between the southwestern willow flycatcher and the Great Basin willow flycatcher. The Lower
Colorado Recovery Unit is a geographically large and ecologically diverse Recovery Unit,
encompassing the Colorado River and its major tributaries, from Glen Canyon Dam downstream
to the Mexico border (USFWS 2001 and 2002).

As previously discussed, recent genetic work (Paxton 2000) verified *E. t. extimus* genetic stock
in the San Luis Valley of south-central Colorado and the Virgin River in Utah. Paxton's (2000;
as cited in USFWS 2002) research showed that the northern boundary for southwestern willow
flycatchers was generally consistent with that proposed by Unitt (1987) and Browning (1993),
and subsequently used in the Final Recovery Plan (USFWS 2002). Paxton's (2000) research
further illustrated that the willow flycatcher in central Utah does not have the genetic markers of
*E. t. extimus* and is more closely related to *E. t. adastus*. However, because of the absence of
flycatchers in the lower- to mid-elevations of the Colorado Plateau in southern Utah and
southwestern Colorado, Paxton (2000; as cited in USFWS 2002) did not address potential sub-
specific differences resulting from elevation or habitat differences and watershed boundaries.
Analysis of willow flycatcher vocalizations in central Utah also suggests association with *E. t.
adastus*. The Final Recovery Plan (USFWS 2002) adopts a range boundary that reflects
Paxton's (2000) and Sedgwick's (2001) results; the northern extent of southwestern willow
flycatchers is confined to the southern portions of Utah. In the Recovery Plan, the USFWS
acknowledges that new data may result in refinements to the northern range boundary currently
recognized (USFWS 2002). This is based on the limited genetic information in portions of
central and eastern Utah, particularly along major drainages including the Colorado and Green
Rivers. Therefore, the USFWS Utah Field Office considers potential distribution for
southwestern willow flycatchers to possibly extend further north than the Recovery Plan
boundary.

The reasons for the decline of the southwestern willow flycatcher and current threats to its
conservation are numerous, complex and inter-related (USFWS 2001, 2002). The major factors
threatening the species include habitat loss and modification; invasion of breeding habitats by

exotic plant species; brood parasitism by brown-headed cowbirds; the vulnerability of small southwestern willow flycatcher population numbers; and stresses that occur to the species during migration and in wintering habitats. These factors vary in severity over the southwestern willow flycatcher's range, and several are likely to have cumulative and synergistic effects (USFWS 1997).

For more information regarding the life history and population dynamics, see the Final Recovery Plan for the Southwestern Willow Flycatcher (USFWS 2002).

## Environmental Baseline

### *Status of the Species within the Action Area*

*E. t. extimus* may have always been rare in southern Utah (Behle pers. comm. cited in Unitt 1987). However where habitat existed along the Colorado River and its tributaries in southeastern Utah, it was thought to be a locally common breeding and migratory resident (Behle and Higgins 1959). Few data are available on population trends in southern Utah. There is a lack of genetic information to draw a definitive range boundary, particularly as it pertains to the central and eastern portions of the State (USFWS 2002), including the planning area. However, there is the potential for the flycatcher to occur within the planning boundary, and thus it is analyzed in this biological opinion.

### *Factors Affecting Species Environment within the Action Area*

The main threats to the species have been attributed to loss, modification, and fragmentation of riparian breeding habitat, loss of wintering habitat, and brood parasitism by the brown-headed cowbird (Whitfield 1990; Sferra et al. 1995; Sogge et al. 1997; McCarthey et al. 1998; USFWS 2002). The southwestern willow flycatcher and its habitat are threatened by urban, recreational, and agricultural development, water diversion and groundwater pumping, channelization, dams, and livestock grazing (USFWS 2002). Fire is an increasing threat to southwestern willow flycatcher habitat (Paxton et al. 1996), especially in monotypic salt cedar vegetation (DeLoach 1991) and where water diversions and/or groundwater pumping desiccates riparian vegetation (Sogge et al. 1997).

Floodplains and associated riparian vegetation were once dominated by a wide band of trees, principally cottonwood and willows (Horton 1977). Arrowweed and mesquite were dominant in many upland areas (Horton 1977). Graf (1982) reports that tamarisk was introduced into the United States in the early 1800s and into the American Southwest by 1856. From 1925 through 1960, tamarisk rapidly spread throughout Utah with the greatest degree of invasion occurring from 1935 to 1955 (Christensen 1962). Tamarisk changes channel morphology from braided, shallow systems to ones that are constrained, centralized, and deeper. Dense tamarisk vegetation reduces the channel capacities of normal flow events and has been cited as the cause of disastrous flooding (Graf 1982). Southwestern willow flycatcher habitat may be very vulnerable to the changes tamarisk invasion brings about in stream morphology and ecology. The effects of tamarisk to breeding southwestern willow flycatchers may not be as apparent as the effects to their habitat. Owen and Sogge (2002) studied 12 parameters of physiological condition of 130 southwestern willow flycatchers in native vegetation and tamarisk and found no evidence that flycatchers breeding in tamarisk exhibit poorer nutritional condition or are suffering negative

physiological affects. However, breeding success and the number of species supported within a tamarisk stand is reduced (Anderson et al. 1977).

**Effects of the Action**

Cultural Resources

This program includes surveys, inventories, excavation activities, surface material collection, and interpretive site development. Surveys may involve multiple people and vehicles and can last up to several weeks. Inventories for cultural resources commonly entail the use of hand tools, power tools, or heavy machinery.

Activities occurring under this program may increase human presence; equipment and vehicle use; and surface disturbance in southwestern willow flycatcher habitat. Associated noise and visual disturbances may adversely affect the behavior of southwestern willow flycatchers during breeding, nesting, or foraging efforts. Vegetation disturbances or removal may decrease the availability of nesting habitat; decrease cover from predators and increase predation; and decrease the availability of prey habitat. As a result, there may be decreases in nest initiation or nesting success. There is some potential for vegetation removal to result in nestling mortality.

Paleontological Resources

This program includes surveys, inventories, excavation activities, surface material collection, and interpretive site development. Surveys may involve multiple people and vehicles and can last up to several weeks. Inventories for paleontological resources commonly entail the use of hand tools, power tools, or heavy machinery.

Activities occurring under this program may increase human presence; equipment and vehicle use; and surface disturbance in southwestern willow flycatcher habitat. Associated noise and visual disturbances may adversely affect the behavior of southwestern willow flycatchers during breeding, nesting, or foraging efforts. Vegetation disturbances or removal may decrease the availability of nesting habitat; decrease cover from predators and increase predation; and decrease the availability of prey habitat. As a result, there may be decreases in nest initiation or nesting success. There is some potential for vegetation removal to result in nestling mortality; however implementation of the applicant committed conservation measures should greatly minimize this potential.

Fire and Fuels Management

Objectives of fire management are to protect life, property, and resources values from wildfire and restore the natural role of fire in the ecosystem. Major activities associated with the fire management program include: wildfire suppression, wildland fire use, prescribed burning, non-fire fuels treatments (mechanical and chemical), and emergency stabilization and rehabilitation following wildfires. Fire suppression methods may involve fireline construction, use of fire suppression agents and retardants, and water withdrawals.

Activities occurring under this program may increase human presence; equipment and vehicle use; vegetation treatment or disturbance; and surface disturbance in southwestern willow

flycatcher habitat. Associated noise and visual disturbances may adversely affect the behavior of southwestern willow flycatchers during breeding, nesting, or foraging activities. Vegetation disturbances or vegetation removal decrease availability of nesting habitat; decrease cover from predators and increase predation; and decrease prey habitat. As a result, there may be decreases in nest initiation or nesting success, and decreased adult or nestling/fledgling fitness. There is some potential for fire management activities to result in adult or nestling mortality; however implementation of the applicant committed conservation measures should greatly minimize this potential.

Potential impacts from wildland fire use and prescribed fire would be similar to those from wildfire suppression. Non-fire fuels treatments and emergency stabilization and rehabilitation following wildfires may be used to retain or improve range conditions and maintain lower fuel loads in grassland and sagebrush habitats. Negative impacts include harassment or displacement; or immediate post-project alteration of adjacent habitat from surface disturbance.

Long-term benefits of this program, as vegetation is reestablished, may include increased nesting success, increased insect prey abundance, and decreased predation.

Forestry and Woodland Management

Forest management objectives are to maintain and enhance the health, productivity, sustainability, and biological diversity of forest and woodland ecosystems and to provide a balance of natural resource benefits and uses, including opportunities for commercial and non-commercial harvest of forest and woodland products on a sustainable basis. Forests are managed for multiple uses, such as recreation, livestock grazing, and wildlife habitat. The forestry and woodlands management program also implements silviculture practices including site preparation, regeneration, stand protection, stand maintenance, pre-commercial and commercial thinning for density management, fertilization, pruning, forest and woodland condition restoration treatments, and salvage harvest.

Forest resources support activities such as road construction may occur in or near existing or suitable southwestern willow flycatcher habitat. Impacts associated with these activities are described under the Lands and Realty Program effects analysis.

Activities occurring under this program may increase human presence; equipment and vehicle use; vegetation treatment or disturbance; and surface disturbance in southwestern willow flycatcher habitat. Associated noise and visual disturbances may adversely affect the behavior of southwestern willow flycatchers during breeding, nesting, or foraging activities. Vegetation disturbances, vegetation removal, or chemical treatment of vegetation decrease availability of nesting habitat; decrease cover from predators and increase predation; and decrease prey populations and prey habitat. Soil disturbances may increase erosion, adversely affect soil stability, and increase sediment deposits. Increased occurrence of invasive plants species may change the vegetation community and change the habitat for southwestern willow flycatchers and their prey species. As a result, there may be decreases in nest initiation or nesting success, and decreased adult fitness. There is some potential for vegetation removal to result in nestling mortality; however implementation of the applicant committed conservation measures should greatly minimize this potential.

Geology and Minerals Management

The planning area will be open to consideration for exploration, leasing, and development of leasable minerals (oil, gas, coal bed natural gas), salable minerals (sand, gravel, stone and humate) and locatable materials (uranium, clay and gypsum). Although stipulations or conditions may be included in the terms of these mineral contracts, there are potential impacts associated with these various activities. Mineral exploration and extraction often results in surface disturbance from road and facility construction, removal of topsoil and overburden, stock piling of these materials, and post-mining reclamation and recontouring.

Activities occurring under this program may increase human presence; equipment and vehicle use; surface disturbance; and increased occurrence of chemical leaks in southwestern willow flycatcher habitat. Associated noise and visual disturbances may adversely affect the behavior of southwestern willow flycatchers during breeding, nesting, or foraging activities. Vegetation disturbances or vegetation removal may decrease the availability and quality of nesting habitat; decrease cover from predators and increase predation; and decrease the availability of prey habitat. Soil disturbances may increase erosion, adversely affect soil stability, and increase sediment deposits. Increased occurrence of invasive plants species may change the vegetation community and change the habitat for southwestern willow flycatcher and their prey species. Pollutants in the area may affect southwestern willow flycatchers, prey populations, and vegetation. As a result of these impacts, there may be decreases in nest initiation or nesting success and decreased adult and nestling/fledgling fitness. There is some potential for vegetation removal to result in nestling mortality; however implementation of the applicant committed conservation measures should greatly minimize this potential. Ancillary facilities such as oil pits may result in direct mortality of birds if they forage over or become trapped in the pits.

Hazardous Materials Management

Activities conducted under the hazardous materials program include providing warnings, securing and disposing of hazardous waste discharged on public lands, establishing precautions, and responding to emergencies. Activities may involve increased human presence, use of heavy equipment, and removal of contaminated soils. These activities have the potential to occur in locations where mineral development or transport occurs.

Mineral developments, pipelines, roads, and railroad transportation and access systems occur within all of the planning areas analyzed in this document, and have the potential to occur in southwestern willow flycatcher habitat. Activities occurring under this program may increase human presence; equipment and vehicle use; vegetation treatment or disturbance; and surface disturbance in southwestern willow flycatcher habitat. Associated noise and visual disturbances may adversely affect the behavior of southwestern willow flycatchers during breeding, nesting, or foraging activities. Vegetation disturbances or vegetation removal may decrease the availability and quality of nesting habitat; decrease cover from predators and increase predation; and decrease the availability of prey habitat. Soil disturbances may increase erosion, adversely affect soil stability, and increase sediment deposits. As a result of these impacts, there may be decreases in nest initiation or nesting success, and decreased adult and nestling/fledgling fitness. There is some potential for vegetation removal to result in nestling mortality; however

implementation of the applicant committed conservation measures should greatly minimize this potential.

Lands and Realty Management

Objectives of the lands and realty management program are to support multiple-use management goals of the BLM resource programs; respond to public requests for land use authorizations, sales, and exchanges; and acquire and designate rights of way access to serve administrative and public needs. Realty management authorizes occupancy of public lands for roads, power lines, pipelines, communication sites, and irrigation ditches authorized by granting rights of way. Rights of way management actions respond to public requests for access, land authorizations, sales, and exchanges. These rights of way may be temporary or extend up to 30 years, or even in perpetuity.

Activities occurring under this program may increase human presence, equipment and vehicle use (including associated noise disturbances), vegetation disturbance, and surface disturbance in southwestern willow flycatcher habitat. Associated noise disturbances may adversely affect the behavior of southwestern willow flycatchers during breeding, nesting, or foraging activities. Vegetation disturbances or vegetation removal may decrease the availability and quality of nesting habitat; decrease cover from predators and increase predation; and decrease the availability of prey habitat. Soil disturbances may increase erosion, adversely affect soil stability, and increase sediment deposits. Increased occurrence of invasive plants species may change the vegetation community and change the habitat for southwestern willow flycatchers and their prey species. Exchange or sales of lands may lead to fragmentation and loss of the species suitable habitat. As a result, there may be decreases in nest initiation or nesting success, and decreased adult and nestling fitness. There is some potential for activities authorized under this program to result in bird mortality; however implementation of the applicant committed conservation measures should greatly minimize this potential.

Livestock Grazing Management

The objective of livestock grazing management is to maintain or improve forage production and range condition as a sustainable resource base for livestock grazing on BLM land. Livestock management includes designating the kind and class of livestock, seasons of use, locations of use and the numbers of livestock that are permitted to use BLM lands.

Range management activities may include vegetation treatments such as prescribed fire, mechanical and chemical control of noxious weeds, sagebrush and other target species. The determinations and effects analyses associated with the potential impacts of these treatments can be located under the other appropriate program headings (i.e., fire treatments – see Fire and Fuels Management, or vegetative treatments – see Vegetation Management). Other range improvements authorized by the livestock grazing management program may include fence construction, water developments, exclosures, and livestock handling facilities.

There are four primary ways livestock manipulate habitats to favor/hinder some wildlife species: 1) alteration of vegetation composition, 2) cause increased/decreased productivity of selected plant species, 3) increase/decrease the nutritive quality of available forage, and/or 4) increase/decrease the diversity of habitats by altering structure (Severson and Urness 1994).

Activities occurring under this program may increase human presence; vegetation disturbance; and minor surface disturbance in southwestern willow flycatcher habitat. Associated noise and visual disturbances may adversely affect the behavior of southwestern willow flycatchers during breeding, nesting, or foraging activities. Vegetation disturbances, vegetation removal, or vegetation alteration may result in less dense vegetation; an increase in invasive plant species; increased fragmented habitat; reduced availability of nesting habitat; decreased cover from predators and increased predation; and decreased availability of prey habitat. Soil disturbances may increase erosion, adversely affect soil stability, and increase sediment deposits. As a result, there may be decreases in nest initiation or nesting success, and decreased adult or nestling/fledgling fitness. There is some potential for vegetation removal, particularly prescribed fire, to result in nestling or adult mortality; however implementation of the applicant committed conservation measures should minimize this potential.

Recreation Management

The recreation program includes providing for and managing recreational access, developing and maintaining recreation areas, issuing special recreation permits, providing information to the public about BLM's recreational resources, and assessing effects of recreational use on the natural resources. Under this program, OHV use, camping, rafting, hiking, fishing, boating, swimming, and other activities are allowed in designated areas.

Authorized activities under this program have the potential to increase human presence; equipment and vehicle use; vegetation disturbance; and surface disturbance in southwestern willow flycatcher habitat. Associated noise and visual disturbances may adversely affect the behavior of southwestern willow flycatchers during breeding, nesting, or foraging activities. Vegetation disturbances or vegetation removal may decrease the availability and quality of nesting habitat; decrease cover from predators and increase predation; and decrease the availability of prey habitat. Soil disturbances may increase erosion, adversely affect soil stability, and increase sediment deposits. Increased occurrence of invasive plants species may change the vegetation community and change the habitat for southwestern willow flycatchers and their prey species. As a result, there may be decreases in nest initiation or nesting success, and decreased adult or nestling/fledgling fitness. There is some potential for vegetation removal to result in nestling mortality; however implementation of the applicant committed conservation measures should greatly minimize this potential.

Riparian, Soils and Water Resources

The objectives for the riparian, soil and water resources management program are to maintain and improve soil integrity, riparian and wetland areas, and protect water quality. Many Best Management Practices (BMPs), designed under this program reduce sedimentation and protect water quality also benefit soil productivity by minimizing erosion. Examples of other protection measures implemented under this program include maintenance and restoration of appropriate biological soil crusts, management of watershed health, and manage salinity load. Generally, this management program provides information in support of other resource objectives and goals.

Activities occurring under this program may increase human presence; equipment and vehicle use; vegetation manipulation; stream alteration; and minor surface disturbance in southwestern

willow flycatcher habitat. Short-term adverse impacts may include, but not be limited to: disruption of normal breeding, nesting, and foraging behaviors (associated with noise and visual disturbances); decreased nesting habitat; decreased cover from predators and increased predation; insect prey habitat; and alterations of water distribution within occupied habitat for southwestern willow flycatchers. There is some potential that work in riparian areas could result in mortality of nestlings; however implementation of the applicant committed conservation measures should greatly minimize this potential. Long-term benefits may include: increased nesting success, increased insect prey abundance, and decreased predation.

Vegetation Resources

Program objectives are to maintain or improve the diversity of plant communities to support livestock needs, wildlife habitat, watershed protection, and acceptable visual resources. Therefore, this program includes mechanical, chemical, biological, cultural vegetation management methodologies. These management methodologies may result in ground disturbing activities, chemical impacts, human disturbances, and impacts to vegetation from biological management techniques.

Activities occurring under this program may increase human presence; equipment and vehicle use; vegetation treatment or disturbance (mechanical, chemical, biological); and surface disturbance in southwestern willow flycatcher habitat. Associated noise and visual disturbances may adversely affect the behavior of southwestern willow flycatchers during breeding, nesting, or foraging activities. Vegetation alteration, removal, or inadvertent chemical treatment may adversely affect availability and quality of nesting habitat; decrease cover from predators and increase predation; and decrease insect prey populations. Release of biological control agents may have site-specific and wide ranging effects that may need to be further considered (refer to the Reinitiation Section of this BO) dependent in part on the release organism, e.g., salt cedar leaf beetle. Soil disturbances may increase erosion, adversely affect soil stability, increase sediment deposits, and alter channel morphology. As a result, there may be decreases in nest initiation or nesting success, and decreased adult and nestling/fledgling fitness. There is some potential for vegetation removal to result in nestling mortality; however implementation of the applicant committed conservation measures should greatly minimize this potential. Long-term benefits may include: increased nesting success, increased insect prey abundance, and decreased predation.

Wild Horse and Burro Management

The objective of wild horse and burro management is the protection, management, and control of wild free-roaming horses and burros (WH&B) on public lands. Management includes maintaining viable herds that will preserve the free-roaming nature of WH&Bs in a manner that is designed to achieve and maintain thriving ecological balance on the public lands.

Activities occurring under this program may increase human presence; equipment, helicopter and vehicle use; vegetation treatment or disturbance; and surface disturbance in southwestern willow flycatcher habitat. Associated noise and visual disturbances may adversely affect the behavior of southwestern willow flycatchers during breeding, nesting, or foraging activities. Vegetation disturbances or vegetation removal may adversely affect availability of nesting habitat, cover from predators, and insect prey habitat. Soil disturbances may increase erosion, adversely affect

soil stability, and increase sediment deposits. Short-term adverse impacts may include, but not be limited to: disruption of normal breeding, nesting, foraging, and roosting behaviors; decreased nesting habitat; decreased cover from predators and increased predation; decreased insect prey habitat; and alterations of water distribution within occupied habitat for southwestern willow flycatchers.

Fish and Wildlife Management

This program aims to maintain biological diversity, improve habitat on for wildlife and fisheries, and provide habitats for threatened and endangered species.

Activities occurring under this program may increase human presence; equipment and vehicle use; vegetation treatment or disturbance; and surface disturbance in southwestern willow flycatcher habitat. Associated noise and visual disturbances may adversely affect the behavior of southwestern willow flycatchers during breeding, nesting, or foraging activities. Vegetation disturbances or vegetation removal may adversely affect availability of nesting habitat, cover from predators, and insect prey habitat. Soil disturbances may increase erosion, adversely affect soil stability, and increase sediment deposits. Short-term adverse impacts may include, but not be limited to: disruption of normal breeding, nesting, foraging, and roosting behaviors; decreased nesting habitat; decreased cover from predators and increased predation; decreased insect prey habitat; and alterations of water distribution within occupied habitat for southwestern willow flycatchers. There is some potential for vegetation removal to result in nestling mortality; however implementation of the applicant committed conservation measures should greatly minimize this potential. In some cases, management activities beneficial for one species may be detrimental to another species. In general, long-term efforts to improve the health of riparian habitats may benefit southwestern willow flycatchers by increasing nesting success, increasing insect prey abundance, and decreasing predation.

Transportation and Access Management

The objectives of the transportation and access management program include maintenance of access for public and administrative needs; establishment of a route system that contributes to protection of sensitive resources; accommodates a variety of uses and minimizes user conflicts; and coordination of OHV management.

Activities occurring under this program may increase human presence; equipment and vehicle use; surface disturbance; and increased occurrence of chemical leaks in southwestern willow flycatcher habitat. Associated noise and visual disturbances may adversely affect the behavior of southwestern willow flycatchers during breeding, nesting, or foraging activities. Vegetation disturbances or vegetation removal may decrease the availability and quality of nesting habitat; decrease cover from predators and increase predation; and decrease the availability of prey habitat. Soil disturbances may increase erosion, adversely affect soil stability, and increase sediment deposits. Increased occurrence of invasive plants species may change the vegetation community and change the habitat for southwestern willow flycatcher and their prey species. As a result of these impacts, there may be decreases in nest initiation or nesting success, and decreased adult and nestling/fledgling fitness. There is some potential for vegetation removal to result in nestling mortality; however implementation of the applicant committed conservation measures should greatly minimize this potential.

## Cumulative Effects

Cumulative effects include the effects of future State, Tribal, local or private actions that are reasonably certain to occur in the action area considered in this biological opinion. Future Federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to section 7 of the Act.

Cumulative effects to federally protected southwestern willow flycatchers under the Proposed Actions would include, but are not limited to, the following broad types of impacts:

- Changes in land use patterns or practices that adversely affect a species' suitable or potential habitat.
- Encroachment of human development into a species' suitable or potential habitat.
- Fire management actions by some, or all, of the following groups, on lands adjoining or upstream of BLM-administered lands:
  o State of Utah
  o County Governments in Utah
  o Local Governments in Utah
  o Private landholders in Utah

Few southwestern willow flycatcher breeding sites and territories have been found in Utah. In these areas, southwestern willow flycatcher habitat is surrounded by a checkerboard pattern of land ownership including Federal, State, and private landowners. Southwestern willow flycatchers are susceptible to activities on State and private lands. Many of these activities, such as urban growth and development; construction and operation of dams along major waterways; water retention, diversion, or dewatering of springs, wetlands, or streams; recreation; road construction; fuels-reduction treatments; research; grazing activities (including alteration or clearing of native habitats for domestic animals); oil and gas exploration and development; introduction of non-native plant or wildlife species (which can alter native habitats and alter prey populations); and other associated actions. Increases or changes in cowbird foraging areas (construction of corrals, grazing of domestic stock, placement of bird feeders) and habitat fragmentation may increase the parasitism rate and decrease southwestern willow flycatcher reproduction. Continued and future conversion of floodplain and near shore lands will likely eliminate opportunities to restore floodplains to develop willow flycatcher habitat. Increased recreation, camping, off-road vehicle use, and river trips may harass and disturb breeding birds or impact nesting habitats. Contributing as cumulative effects to the proposed action, these activities will continue to affect southwestern willow flycatcher productivity with disturbances to breeding, nesting, and foraging behaviors and habitat (including areas of designated critical habitat), and further fragmenting habitat.

## Conclusion

The conclusions of this biological opinion are based on full implementation of the programs as described in the "Description of the Proposed Action" section of this document, including the conservation measures that were incorporated into the project design.

After reviewing the status of the southwestern willow flycatcher, the environmental baseline for the action area, the effects of the proposed project, and the cumulative effects, it is the USFWS's biological opinion that the Price BLM Field Office Resource Management Plan, as proposed, is not likely to jeopardize the continued existence of the southwestern willow flycatcher, and is not likely to destroy or adversely modify designated critical habitat. We base our conclusion on the following:

1. The applicant committed resource protection measures will be incorporated into site-specific projects designed under the BLM Resource Management Plan. If project design cannot adhere to all applicant committed resource protection measures, consultation under Section 7 of the Endangered Species Act will be initiated.

2. All site-specific projects designed under the proposed BLM Resource Management Plan would be subject to consultation requirements under Section 7 of the Endangered Species Act.

## Last Chance townsendia (*Townsendia aprica*)

### Status of Species

*Species Description*

Last Chance townsendia (*Townsendia aprica*) is a member of the sunflower family; this species is a stemless perennial herb with yellow flower heads submersed in its ground-level leaves (UDWR 2005). Endemic to the Colorado Plateau in Utah, Last Chance townsendia was discovered in Sevier County in 1966 by Stanley L. Welsh and James L. Reveal.

Last Chance townsendia is described as pulvinate-caespitose acaulescent perennial herb from a caudex, 1.5-2.5 cm tall; leaves 7-13 (16) mm long, 1-3.5 mm wide spatulate to oblanceolate, stringose; heads sessile, submersed in leaves; involucres 4-8 mm high, 7-13mm wide; bracts in 3-4 series, lanceolate, fimbriate, red scarious, hyaline-ciliate, the outermost sparsely stringose; rays 13-21, the corollas yellow to golden ventrally, purplish dorsally and grandualar, 4-7mm long; disk corollas yellow, 3.7-.5mm long; achene's 2-2.5mm long, 2 ribbed, the hairs glochidiate; ray pappus 0.7-1 mm long; pappus of disk flowers 4-5 mm long.

*Life History and Population Dynamics*

Last Chance townsendia reproduction is sexual. Flowering occurs from April to May and fruiting occurs May to June (USFWS 1993). The factors which govern the distribution of Last Chance townsendia are not well known, nor are the long-term population dynamics (USFWS 1993).

Self-pollination is virtually non-existent in Last Chance townsendia (USFWS 1993). Pollination is accomplished by several species of solitary bees: eight species of metallic blue and green megachilid bees in the genus Osmia, and the anthophorid bee *Tetralonia fulvitarsis* (USFWS 1993). A few species of flies (not yet identified) also visit the flowers (USFWS 1993). Seed set seems frequently to be pollinator-limited (USFWS 1993). Lack of pollination may be due to various reasons including low pollinator numbers, inclement weather affecting pollinator flight

activity, and possibly other unidentified factors (Tepedino and Griswold, USDA-ARS Bee Biology and Systematics Laboratory, Logan, Utah, pers. comm., 1991; USFWS 1993).

*Status and Distribution*

The Last Chance townsendia was listed throughout its range on August 21, 1985 as threatened under the Endangered Species Act of 1973, as amended (ESA). Last Chance townsendia is found at elevations of 6,000 to 8,000 feet (1680 to 2560 meters) within clay, clay-silt, or gravelly clay soils derived from the Blue Gate Shale, and Ferron sandstone members of the Mancos formation, Salt Wash and Brushy Basin members of the Morrison formation and the Carmel formation. The species co-occurs in salt brush and pinyon-juniper communities, commonly on clay or clay silt exposures of the Mancos Shale (Blue Gate Member) at 1860- 2440 meters elevation in western Emery and adjacent eastern Sevier (Welsh et al. 1993). Soils are often densely covered with biological soil crusts (UDWR 2005). The average soil pH of occupied habitats is 7.42 (Armstrong et al. 1991).

Last Chance townsendia is currently known from a series of small populations most of which are in a band less than 5 miles (8 km) wide and 30 miles (48 km) long in Emery, Sevier, and Wayne counties, Utah (USFWS 1993). Most population sites have been found on the Southwest edges of the San Rafael Swell. Populations appear to be isolated. Approximately 29 populations, comprising 70% of the entire species range, have been known to exist on BLM lands; most species sites within these populations are less than an acre in size (USFWS 1993). The remainder of the populations occur on National Forest and National Park Service lands.

Field surveys have been conducted for all Utah BLM *Townsendia aprica* population sites for the years 1991 and 2002-2007 (Robinson 2007) (Table 2).

**Table 2. Survey results for Last Chance townsendia populations on BLM lands 1991-2007.**

| Survey Year | Estimated Population Numbers on BLM Lands |
|---|---|
| 1991 | 447-1,930 |
| 2002 | 794 |
| 2003 | 536 |
| 2004 | 834 |
| 2005 | 1,098 |
| 2006 | 1,233 |
| 2007 | 1,613 |

*(Robinson 2007)

**Environmental Baseline**

*Status of the Species within the Action Area*

Approximately 29 populations of Last Chance townsendia have been identified on lands administered by the Bureau of Land Management Richfield and Price field offices, with 20% of these populations found in the action area. Overall, the number of known locations of Last

Chance townsendia appears to be decreasing, however, the number of individual plants on locations in the action area are maintaining or slightly increasing. Reasons for decline of known locations are unclear.

*Factors Affecting Species Environment within the Action Area*

Because Last Chance townsendia is so restricted in its distribution, any event that could result in loss of individuals or habitat within one or more populations is a potential threat to the species survival. Threats to Last Chance townsendia come primarily from mineral and energy development, road building, and livestock trampling and grazing (USFWS 1993). In addition, off-road vehicles within suitable habitat have been cited as a potential localized threat (USFWS 1993, CPC 2005). For more information regarding threats to this species, see the U.S. Fish and Wildlife Service's 1993 Last Chance townsendia Recovery Plan (USFWS 1993).

**Effects of the Action**

Cultural Resources Management

This program includes surveys, inventories, excavation activities, surface material collection, and interpretive site development. Surveys may involve multiple people and vehicles and can last up to several weeks. Inventories for cultural resources commonly entail the use of hand tools, power tools, or heavy machinery.

Activities under this program may increase minor surface disturbance from cultural resource excavations. Activities occurring under this program may increase localized foot traffic, motorized traffic, and use of tools in suitable Last Chance townsendia habitats. Associated impacts may include: trampling or crushing of individuals; increased soil disturbance, compaction, and erosion; removal, degradation, or alteration of key habitat; reduced seed banks; and increased occurrence of invasive plant species. As a result, there may be decreased recruitment and increased plant damage or individual mortality.

Paleontological Resources Management

This program includes surveys, inventories, excavation activities, surface material collection, and interpretive site development. Surveys may involve multiple people and vehicles and can last up to several weeks. Inventories for paleontological resources commonly entail the use of hand tools, power tools, or heavy machinery.

Activities under this program may increase minor surface disturbance from fossil resource excavations. Activities occurring under this program may increase localized foot traffic, motorized traffic, and use of tools in suitable Last Chance townsendia habitats. Associated impacts may include: trampling or crushing of individuals; increased soil disturbance, compaction, or erosion; removal, degradation, or alteration of key habitat; reduced seed banks; and increased occurrence of invasive plant species. As a result, there may be decreased recruitment and increased plant damage or individual mortality.

## Fire and Fuels Management

Major activities associated with the fire management program include: wildfire suppression, wildland fire use, prescribed burning, non-fire fuels treatments (mechanical and chemical), and emergency stabilization and rehabilitation following wildfires. Fire suppression methods may involve: fireline construction, use of fire suppression agents and retardants, and water withdrawals.

Although the BLM does not propose to carry out prescribed fire or non-fire treatments (mechanical and chemical) within suitable habitat for the Last Chance townsendia, wildland fire suppression activities could adversely affect the Last Chance townsendia. Activities under this program may increase foot or motorized traffic and application of chemicals (fire retardants, pesticides, insecticides) in suitable Last Chance townsendia habitats. Associated impacts include: trampling or crushing of individuals; increased soil disturbance; compaction or erosion; removal or degradation of suitable habitat; reduction of the seed bank; reduced pollinator populations; and increase the occurrence of invasive plant species. As a result, there may be decreased seed production, decreased recruitment, and increased occurrence of plant damage or individual mortality.

## Forestry and Woodlands Management

The forestry and woodlands management program implements silvicultural practices including site preparation, regeneration, stand protection, stand maintenance, pre-commercial and commercial thinning for density management, fertilization, pruning, forest and woodland condition restoration treatments, and salvage harvest. The program allows the treatment of forest insect and disease infestations by spraying, cutting, and removal; and herbicidal spraying of grasses and shrubs. Forest management actions may also include conducting surveys, obtaining easements, pursuing legal access, allowing road development, and installing drain culverts and water bars. Wood collection is also authorized under this program.

Forest resources support activities such as road construction that may occur in or near existing or suitable Last Chance townsendia habitat. However, the impacts of these activities are analyzed and authorized by the lands and realty program.

Although activities authorized under this program are not likely to occur in Last Chance townsendia habitat, there is some potential for individuals to trample Last Chance townsendia plants while harvesting wood products. Known populations of Last Chance townsendia, and potential habitats, have not been specifically protected from fuel wood, Christmas tree, and post and pole harvesting. As a result, there may be decreased seed production, decreased recruitment, and increased occurrence of plant damage or individual mortality.

## Geology and Minerals Resources

The planning area will be open to consideration for exploration, leasing, and development of leasable minerals (oil, gas, coal bed natural gas), salable minerals (sand, gravel, stone and humate) and locatable materials (uranium, clay and gypsum). Although stipulations or conditions may be included in the terms of these mineral contracts, there are potential impacts associated with these various activities. Mineral exploration and extraction often results in

surface disturbance from road and facility construction, removal of topsoil and overburden, stock piling of these materials, and post-mining reclamation and recontouring.

Activities occurring under this program may increase foot traffic, motorized traffic, significant soil disturbance, and surface development in Last Chance townsendia habitat. Associated impacts include: trampling or crushing of individuals, illegal collection of individuals due to increased human access; removal of suitable habitat, loss, modification or degradation of suitable habitat, reduced seed banks, reduced pollinator populations, increased occurrences of invasive plant species, increased competition from seeded species, and increased erosion. As a result, there may be increased loss of individuals or populations, decreased seed production, decreased recruitment, and increased occurrence of plant damage or individual mortality.

## Hazardous Materials Management

Activities conducted under the hazardous materials program include providing warnings, securing and disposing of hazardous waste discharged on public lands, establishing precautions, and responding to emergencies. Activities may involve increased human presence, use of heavy equipment, and removal of contaminated soils. These activities have the potential to occur in locations where mineral development or transport occurs.

Activities occurring under this program may increase foot traffic, motorized traffic, and significant soil disturbance in Last Chance townsendia suitable habitat. Associated impacts include: trampling or crushing of individuals; removal of suitable habitat; contamination, loss, modification or degradation of suitable habitat; reduced seed banks, reduction of pollinator populations; and increased occurrences of invasive plant species. As a result, there may be decreased seed production, decreased recruitment, and increased occurrence of plant damage or individual mortality.

## Lands and Realty

Objectives of the lands and realty management program are to support multiple-use management goals of the BLM resource programs; respond to public requests for land use authorizations, sales, and exchanges; and acquire and designate rights of way access to serve administrative and public needs. Realty management authorizes occupancy of public lands for roads, power lines, pipelines, communication sites, and irrigation ditches authorized by granting rights of way. Rights of way management actions respond to public requests for access, land authorizations, sales, and exchanges. These rights of way may be temporary or extend up to 30 years, or even in perpetuity.

Activities authorized under this program may adversely impact Last Chance townsendia with human- and equipment-related soil disturbances. Associated impacts include: trampling or crushing of individuals; illegal collection of individuals due to increased human access; increased soil disturbance, compaction, or erosion; loss, modification or degradation of suitable habitat; and removal of suitable habitat. Land exchanges may contribute to loss, fragmentation, and degradation of suitable Last Chance townsendia habitat. As a result, there may be increased loss of individuals or populations, decreased recruitment, and increased occurrence of plant damage or individual mortality.

Livestock Grazing

The objective of livestock grazing management is to maintain or improve forage production and range condition as a sustainable resource base for livestock grazing on BLM land. Livestock management includes designating the kind and class of livestock, seasons of use, locations of use and the numbers of livestock that are permitted to use BLM lands.

Range management activities may include vegetation treatments such as prescribed fire, mechanical and chemical control of noxious weeds, sagebrush and other target species. The determinations and effects analyses associated with the potential impacts of these treatments can be located under the other appropriate program headings (i.e., fire treatments – see Fire and Fuels Management, or vegetative treatments – see Vegetation Management). Other range improvements authorized by the livestock grazing management program may include fence construction, water developments, exclosures, and livestock handling facilities.

There are four primary ways livestock manipulate habitats to favor/hinder other species within the habitat: 1) alteration of vegetation composition, 2) cause increased/decreased productivity of selected plant species, 3) increase/decrease the nutritive quality of available forage, and/or 4) increase/decrease the diversity of habitats by altering structure (Severson and Urness 1994).

Activities occurring under this program may increase and concentrate domestic ungulates, increase motorized traffic, and increase surface disturbance from fence and livestock pond construction in Last Chance townsendia suitable habitat. Associated impacts include: trampling or crushing of individuals; increased soil disturbance, compaction or erosion; loss, modification or degradation of suitable habitat; and removal of suitable habitat. As a result, there may be decreased recruitment and increased occurrence of plant damage or individual mortality.

Recreation Management

The recreation program includes providing for and managing recreational access, developing and maintaining recreation areas, issuing special recreation permits, providing information to the public about BLM's recreational resources, and assessing effects of recreational use on the natural resources. Under this program, OHV use, camping, rafting, hiking, fishing, boating, swimming, and other activities are allowed in designated areas.

Activities occurring under this program may increase human, horse, and motorized traffic in Last Chance townsendia suitable habitat. Associated impacts include: trampling or crushing of individuals; illegal collection of individuals; increased soil disturbance, compaction, or erosion; loss, modification or degradation of suitable habitat; reduced seed banks; and increased occurrences of invasive plant species. As a result, there may be decreased recruitment, and increased occurrence of plant damage or individual mortality.

Riparian, Soils and Water Resources

The objectives for the riparian, soil and water resources management program are to maintain and improve soil integrity, riparian and wetland areas, and protect water quality. Many Best Management Practices (BMPs), designed under this program reduce sedimentation and protect water quality also benefit soil productivity by minimizing erosion. Examples of other protection

measures implemented under this program include maintenance and restoration of appropriate biological soil crusts, management of watershed health, and manage salinity load. Generally, this management program provides information in support of other resource objectives and goals.

Activities occurring under this program may increase localized foot traffic, motorized traffic, and use of tools and heavy machinery in suitable Last Chance townsendia habitats. Land treatments may lead to short-term increased soil erosion, and storm water runoff with heavy concentrations of sediment. Associated impacts may include: trampling or crushing of individuals; increased soil disturbance, erosion, and compaction; removal, degradation, or alteration of key habitat; reduced seed banks; and increased occurrence of invasive plant species. As a result, there may be decreased recruitment and increased plant damage or individual mortality.

Vegetation Management

Program objectives are to maintain or improve the diversity of plant communities to support timber production, livestock needs, wildlife habitat, watershed protection, and acceptable visual resources. Therefore, this program includes mechanical, chemical, biological, cultural vegetation management methodologies. These management methodologies may result in ground disturbing activities, chemical impacts, human disturbances, and impacts to vegetation from biological management techniques.

Management activities occurring under this program may increase foot traffic, motorized vehicle use, and vegetation treatments in Last Chance townsendia suitable habitat. Associated impacts include: trampling or crushing of individuals; impact to individuals or populations from herbicides; loss, modification or degradation of suitable habitat; seed bank impacts and reductions; reduced pollinator populations; and increased occurrences of invasive plant species. As a result, there may be decreased seed production, decreased recruitment, and increased occurrence of plant damage or individual mortality.

Wild Horse and Burro Management

The objective of wild horse and burro management is the protection, management, and control of wild free-roaming horses and burros (WH&B) on public lands. Management includes maintaining viable herds that will preserve the free-roaming nature of WH&Bs in a manner that is designed to achieve and maintain thriving ecological balance on the public lands.

Management activities occurring under this program may increase foot traffic, motorized vehicle use, and vegetation treatments in Last Chance townsendia suitable habitat. Associated impacts include: trampling or crushing of individuals; impact to individuals or populations from herbicides; loss, modification or degradation of suitable habitat; seed bank impacts and reductions; reduced pollinator populations; and increased occurrences of invasive plant species. As a result, there may be decreased seed production, decreased recruitment, and increased occurrence of plant damage or individual mortality.

Fish and Wildlife Resource Management

This program aims to maintain biological diversity, support UDWR Herd Management Plans, improve habitat on for wildlife and fisheries, and provide habitats for threatened and endangered species.

Activities occurring under this program may increase foot traffic, motorized traffic, and/or significant soil disturbance in Last Chance townsendia suitable habitat. Associated impacts include: trampling or crushing of individuals; increased soil disturbance; compaction or erosion; removal of suitable habitat; loss, modification or degradation of suitable habitat; reduced seed banks; reduced pollinator populations; and increased occurrences of invasive plant species. As a result, there may be decreased seed production, decreased recruitment, and increased occurrence of plant damage or individual mortality.

Transportation and access Management

The objectives of the transportation and access management program are to provide a safe and effective transportation and access system across public lands. Activities included under this program include maintenance of roads, support of counties and states for land access and road networks, reclamation of redundant and unused roads, management of scenic byway and backway corridors, and instillation of appropriate signage.

Activities occurring under this program may increase localized foot traffic, motorized traffic, and use of tools and heavy machinery in suitable Last Chance townsendia habitats. Land treatments may lead to short-term increased soil erosion, and storm water runoff with heavy concentrations of sediment. Associated impacts may include: trampling or crushing of individuals; illegal collection of individuals due to increased human access; increased soil disturbance, erosion, and compaction; removal, degradation, or alteration of key habitat; reduced seed banks; and increased occurrence of invasive plant species. As a result, there may be decreased recruitment and increased plant damage or individual mortality.

**Cumulative Effects**

Cumulative effects include the effects of future State, Tribal, local or private actions that are reasonably certain to occur in the action area considered in this biological opinion. Future Federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to section 7 of the Act.

Cumulative effects to the Last Chance townsendia under the Proposed Actions would include, but are not limited to, the following broad types of impacts:

- Changes in land use patterns or practices that adversely affect a species' critical, suitable, or potential habitat.
- Program management actions by some, or all, of the following groups, on lands adjoining or upstream of BLM-administered lands:
    - State of Utah
    - County Governments in Utah
    - Local Governments in Utah

      o   Private landholders in Utah

Last Chance townsendia occur primarily within BLM management boundaries. In these areas, Last Chance townsendia locations are surrounded by a checkerboard pattern of land ownership including Federal, State, and private landowners. Last Chance townsendia are susceptible to activities on State and private lands. Many of these activities, such as livestock grazing, oil and gas exploration and development, increased road densities, research, and recreation activities (e.g. off-road vehicles), are expected to continue on State and private lands within the Last Chance townsendia range. Contributing as cumulative effects to the proposed action, all these activities will continue to affect Last Chance townsendia populations by increasing mortalities, injuring plants, and further adversely impacting limited occupied and suitable habitat.

## Conclusions

The conclusions of this biological opinion are based on full implementation of the project as described in the "Description of the Proposed Action" section of this document, including the resource protection measures that were incorporated into the project design.

After reviewing the current status of the Last Chance townsendia, the environmental baseline for the action area, the effects of the proposed action, and the cumulative effects, it is the USFWS's biological opinion that the Price Field Office Resource Management Plan, as proposed, is not likely to jeopardize the continued existence of the Last Chance townsendia. Critical habitat has not been designated for this species. We base our conclusion on the following:

1. The applicant committed resource protection measures will be incorporated into site-specific projects designed under the BLM Resource Management Plan. If project design cannot adhere to all applicant committed resource protection measures, consultation under Section 7 of the Endangered Species Act will be initiated.

2. All site-specific projects designed under the proposed BLM Resource Management Plan would be subject to consultation requirements under Section 7 of the Endangered Species Act.

## Wright fishhook cactus (*Sclerocactus wrightiae*)

### Status of the Species

*Species Description*

The Wright fishhook cactus is one of ten recognized species within the *Sclerocactus* genus in the southwest. Mrs. Dorde Wright Woodruff discovered *S. wrightiae* Benson in 1961 "near San Rafael Ridge" in Emery County (Benson 1982). The species occurs in Utah's Emery, Sevier, and Wayne Counties.

Wright fishhook is a small, perennial cactus, generally growing as a single plant with a branched taproot. If damaged, the cactus will form clumps of stems. Stems are mostly pale green and are depressed globose in shape. The stems are 1 to 8 cm long and 4 to 8 cm in diameter. Tubercles are well developed with 1 to 4 central spines, the lower one being hooked. Eight to 11 radial spines spread out from the aerole. The flower is 3 to 4 cm in diameter, 3 to 4 cm long, and

fragrant. Outer petals have reddish white to brown midstripes and white to cream or pinkish margins. The inner petals are white to pink. The stamens have magenta filaments with anthers that are yellow. The magenta filaments are the best character to distinguish Wright fishhook cactus from other species of *Sclerocactus*. Flowering occurs from early April through May and fruits are set in June. The fruits are barrel shaped and 9 to 12 mm long and thick. Seeds are black, 2 mm long and 3.5 mm broad (modified from Clark 2001, Heil and Porter 1994).

*Life History and Population Dynamics*

Observations of the species indicate that plants less than 2 cm in diameter are seedlings and do not flower, while plants greater than 2 cm but less than 4 cm in diameter flower occasionally but seldom set fruit. Plants with diameters between 4 and 9 cm are mature and reproductive, but at slightly lower rates than plants greater than 9 cm in diameter (Intermountain Ecosystems 1999). The Wright fishhook cactus is known to be a difficult cactus to grow and natural recruitment is apparently rare and episodic (Kass [no date]). A monitoring study conducted by Dr. Kass between 1993 and 2000 at the Giles, Hanksville, and Mesa Butte study sites, concluded that the combination of these and other sources of mortality to the Wright fishhook cactus has resulted in a mortality to recruitment ratio of approximately 2.5 to 1 (i.e., on average, 2.5 plants are lost from the population for every new plant added or "recruited") (Kass 2001).

The plant is almost completely self-incompatible. Pollination is accomplished mostly by native sweat bees (*Halictidae*) (Tepedino 2000). Grafted specimens are not easily cultivated (Mathew 1994). Asexual reproduction is rare, although damaged plants form clumps of stems.

Insects and small mammals are known to forage on Wright fishhook cactus. In the Giles and Mesa Butte populations, the Opuntia borer beetle *(Moneilema semipunctatum)*, a large, black, nocturnal, flightless beetle have been observed foraging on the cactus. There was a 23% mortality rate at the study areas due to beetle foraging, with a disproportionate loss of larger individuals with greater reproductive rates; long-term effects to cactus population levels, if any, are unknown. At the Kass' Hanksville study site, no new plants were recorded by the study after 1995. Other significant sources of natural mortality are the Ord's kangaroo rat (*Dipodomys ordii*) and the white-tailed antelope ground squirrel (*Ammospermophilus leucurus)* (Kass 2001).

*Status and Distribution*

Wright fishhook cactus was listed as endangered under the Endangered Species Act of 1973, as amended (ESA), on October 11, 1979 (44 FR 58868). No critical habitat has been designated for the species as discussed under Section 4(a)(3) of the ESA. On August 3, 2005, a 90-Day Finding to delist *Sclerocactus wrightiae* was initiated along with the initiation of a 5-Year Review (50 FR 44544).

The Wright fishhook cactus is found on semi-barren sites in salt desert shrub, pinyon/juniper woodland-low shrub, pinyon/juniper woodland-grassland, pinyon/juniper woodland-big sage phase, mixed grassland, and mixed desert shrub communities. The cactus is most commonly found between the elevations of 4200 and 7600 feet (1280-2315 meters).

The Wright fishhook cactus is found on a variety of geologic formations. Neese Investigations (1987) found Wright fishhook cactus most commonly on Curtis Sandstone and least commonly

on Mancos Shale. The study conducted by Kass (1990) in the San Rafael Swell found the cacti to occur most frequently on the Tununk member of the Mancos Shale Formation. Out of 33 sites studied by Clark (2002), the cacti were most abundant on the Summerville formation (eight sites) and the Curtis Formation (six sites). Other geologic formations where the Wright fishhook cactus is found include Morrison, Carmel, Entrada, Dakota, Ferron, and Moenkopi. It appears the Wright fishhook cactus does not solely occur on any particular formation but is most commonly found on the Curtis, Mancos Shale and Summerville Formations.

Soils where the species are found have an overlying layer of fine and medium sized gravels or a cryptobiotic soil surface crust (USFWS 1985, Kass 1990). Soils include a broad range of textures, including clays, sandy silts, fine sands, loam and loamy sand. The pH of occupied soils ranged from 7.85 to 8.6 when tested at three monitoring sites for the cactus (Intermountain Ecosystems 1999). According to Kass (1990) and Neese Investigations (1987), the following physiographic factors are important for the establishment and growth of the Wright fishhook cactus: 1) soils derived from contact of mudstone or siltstone with sandstone; 2) pebbles and/or gravels that litter the soil surface; 3) saline or sodic content of soil; and 4) slopes not exceeding 10 degrees. All of the criteria do not need to be present for the species to occur. Kass (1990) reported at least three of the above factors were present for the populations found in 1988.

The Wright fishhook cactus is known from Emery, Sevier, Wayne, and Garfield counties in south-central Utah. The species occurs in the Canyonlands section of the Intermountain region (Cronquist et al. 1972). Populations of Wright fishhook cactus occur primarily on lands managed by the BLM out of the Price and Price Field Offices and by the National Park Service (NPS) at Capitol Reef National Park. The species is found from the San Rafael Swell in Emery County to the north and extends south to the Waterpocket Fold in Garfield County (Neese Investigations 1987, Kass 1990, Clark 2002). As of April 2005, the cactus has been documented at 264 sites, and recent population estimates for the species range from 4,500 to 21,000 individuals (USFWS 2005).

The majority of the documented populations of the Wright fishhook cactus occur within Richfield Field Office lands. Over 100 known populations of the Wright fishhook cactus, as well as additional potential habitat, have been documented within the Richfield Field Office lands, many of them located within the boundaries of Capitol Reef National Park, which lies directly to the west of the Henry Mountains. ("Known populations" consist of documented findings of one or more members of the plant species.) Several populations have been documented in the area between the San Rafael Swell to the north and the Henry Mountains to the south, and within the northern reaches of Capitol Reef National Park and the Waterpocket Fold. A few populations have also been documented in the southern reaches of the Waterpocket Fold.

Potential habitat is widely available in the vicinity of known populations of the species in the planning areas, and because the species is a relative generalist, abundance of habitat is not currently a limiting factor in the conservation or survival of the species. Much of this additional potential habitat has yet to be searched for populations of the Wright fishhook cactus.

Extensive surveys were conducted by Clark (2002) from 1999 to 2004. Sites surveyed by Neese Investigations in 1987 were revisited. Ninety-seven of the Neese Investigation sites on BLM

land reported by were relocated and plants were documented. At sixteen of these sites where cacti were reported by Neese Investigations (1987), plants of the Wright fishhook cactus were not rediscovered (Clark 2002, Clark and Groebner 2003, Groebner et. al. 2004). As a result of those surveys, twenty new sites supporting Wright fishhook cactus have been documented. Eleven sites were found on Capitol Reef National Park and nine on BLM land. About 480 cacti were found at the new sites.

## Environmental Baseline

### Status of the Species within the Action Area

Within the PFO, the Wright fishhook cactus is found in the southeast portion in lower-elevation areas. The Price FO manages the Muddy Creek ACEC and the I-70 Scenic Corridor ACEC. The Muddy Creek ACEC contains Wright fishhook cactus habitat, but no populations have been documented within the ACEC boundaries. The nearest documented occurrence is a quarter mile outside the ACEC boundary. The I-70 Scenic Corridor ACEC includes 10 documents cacti locations of the Mesa Butte study population. This population also extends outside the ACEC. This population represents a very small portion of the overall numbers of this plant.

### Factors Affecting Species Environment within the Action Area

Potential human threats to the Wright fishhook cactus populations and suitable habitat include: recreation, including off-highway vehicle (OHV) use; energy and mineral exploration and development, including associated ancillary facilities and disturbances; infrastructure development; and illegal collection (USFWS 1985). BLM has also documented impacts to the species from trampling, due to livestock grazing. Illegal collection and removal of individuals and populations also constitutes a significant threat to the species (USFWS 1979, Christiansen 1991, BLM 1979).

## Effects of the Action

### Cultural Resources Management

This program includes surveys, inventories, excavation activities, surface material collection, and interpretive site development. Surveys may involve multiple people and vehicles and can last up to several weeks. Inventories for cultural resources commonly entail the use of hand tools, power tools, or heavy machinery.

Activities under this program may increase minor surface disturbance for cultural resource excavations. Activities occurring under this program may increase localized foot traffic, motorized traffic, and use of tools in suitable Wright fishhook cactus habitats. These activities may result in: trampling or crushing of individuals; increased soil disturbance; soil erosion and compaction; removal, degradation, or alteration of key habitat; reduced seed banks; reduced pollinator populations; and increased occurrence of invasive plant species. As a result, there may be decreased recruitment, and increased plant damage or individual mortality.

Paleontological Resources Management

This program includes surveys, inventories, excavation activities, surface material collection, and interpretive site development. Surveys may involve multiple people and vehicles and can last up to several weeks. Inventories for paleontological resources commonly entail the use of hand tools, power tools, or heavy machinery.

Activities under this program may increase minor surface disturbance for fossil resource excavations. Activities occurring under this program may increase localized foot traffic, motorized traffic, and use of tools in suitable Wright fishhook cactus habitats. These activities may result in: trampling or crushing of individuals; increased soil disturbance; soil erosion and compaction; removal, degradation, or alteration of key habitat; reduced seed banks; reduced pollinator populations; and increased occurrence of invasive plant species. As a result, there may be decreased recruitment, and increased plant damage or individual mortality.

Fire and Fuels Management

Major activities associated with the fire management program include: wildfire suppression, wildland fire use, prescribed burning, non-fire fuels treatments (mechanical and chemical), and emergency stabilization and rehabilitation following wildfires. Fire suppression methods may involve: fireline construction, use of fire suppression agents and retardants, and water withdrawals.

Although the BLM does not propose to carry out prescribed fire or non-fire treatments (mechanical and chemical) within suitable habitat for the Wright fishhook cactus, wildland fire suppression activities could adversely affect the Wright fishhook cactus. Activities under this program may increase foot or motorized traffic and application of chemicals (fire retardants, pesticides, insecticides) in suitable Wright fishhook cactus habitats. Associated impacts include: trampling or crushing of individuals; increased soil disturbance; compaction or erosion; removal or degradation of suitable habitat; reduction of the seed bank; reduced pollinator populations; and increase the occurrence of invasive plant species. As a result, there may be decreased seed production, decreased recruitment, and increased occurrence of plant damage or individual mortality.

Forestry and Woodland Management

Forest management objectives are to maintain and enhance the health, productivity, sustainability, and biological diversity of forest and woodland ecosystems and to provide a balance of natural resource benefits and uses, including opportunities for commercial and non-commercial harvest of forest and woodland products on a sustainable basis. Forests are managed for multiple uses, such as recreation, livestock grazing, and wildlife habitat. The forest management program also implements silviculture practices including site preparation, regeneration, stand protection, stand maintenance, pre-commercial and commercial thinning for density management, fertilization, pruning, forest and woodland condition restoration treatments, and salvage harvest.

Forest resources support activities such as road construction that may occur in or near existing or suitable Wright fishhook cactus habitat. However, the impacts of these activities are analyzed and authorized by the lands and realty program.

Although activities authorized under this program are not likely to occur in Wright fishhook cactus habitat, there is some potential for private individuals to trample Wright fishhook cactus individuals while harvesting wood products. Known populations of Wright fishhook cactus, and potential habitats have not been specifically protected from fuel wood, Christmas tree, and post and pole harvesting. As a result, there may be decreased seed production; decreased recruitment; increased illegal collection of individuals due to increased human access; and increased occurrence of plant damage or individual mortality.

Geology and Minerals Resources

The planning area will be open to consideration for exploration, leasing, and development of leasable minerals (oil, gas, coal bed natural gas), salable minerals (sand, gravel, stone and humate) and locatable materials (uranium, clay and gypsum). Although stipulations or conditions may be included in the terms of these mineral contracts, there are potential impacts associated with these various activities. Mineral exploration and extraction often results in surface disturbance from road and facility construction, removal of topsoil and overburden, stock piling of these materials, and post-mining reclamation and recontouring.

Activities occurring under this program may increase foot traffic, motorized traffic, and significant soil disturbance. These activities may cause trampling or crushing of individuals; increased soil disturbance; soil erosion and compaction; loss, modification, or degradation of suitable habitat; reduced seed banks; loss of pollinator populations; increased occurrences of invasive plant species; and increased occurrence of illegal collection due to increased human access due to increased human access. As a result, there may be loss or degradation of cactus populations; decreased Wright fishhook cactus seed production; decreased recruitment; and increased occurrence of plant damage or individual mortality.

Hazardous Materials Management

Activities conducted under the hazardous materials program include providing warnings, securing and disposing of hazardous waste discharged on public lands, establishing precautions, and responding to emergencies. Activities may involve increased human presence, use of heavy equipment, and removal of contaminated soils. These activities have the potential to occur in locations where mineral development or transport occurs.

Activities occurring under this program in Wright fishhook cactus suitable habitat may increase foot traffic, motorized traffic, and significant soil disturbance. These activities may cause trampling or crushing of individuals, increased soil disturbance; soil erosion and compaction, removal of suitable habitat, contamination, loss, modification or degradation of suitable habitat, reduced seed banks, loss of pollinators, and increased occurrences of invasive plant species. As a result, there may be loss or degradation of cactus populations; decreases in Wright fishhook cactus seed production; decreased recruitment; and increased occurrence of plant damage or individual mortality.

## Lands and Realty

Objectives of the lands and realty management program are to support multiple-use management goals of the BLM resource programs; respond to public requests for land use authorizations, sales, and exchanges; and acquire and designate rights of way access to serve administrative and public needs. Realty management authorizes occupancy of public lands for roads, power lines, pipelines, communication sites, and irrigation ditches authorized by granting rights of way. Rights of way management actions respond to public requests for access, land authorizations, sales, and exchanges. These rights of way may be temporary or extend up to 30 years, or even in perpetuity.

Activities authorized under this program may adversely impact Wright fishhook cactus with human- and equipment-related soil disturbances. Soil disturbance, erosion, and compaction may impact individual plants, modify or degrade suitable habitat, reduce pollinator populations, and reduce the seed bank. Land exchanges may result in fragmentation or degradation of potential Wright fishhook cactus habitat. As a result, there may be loss or degradation of cactus populations; decreased recruitment; and increased occurrence of plant damage and individual mortality.

## Livestock Grazing

The objective of livestock grazing management is to maintain or improve forage production and range condition as a sustainable resource base for livestock grazing on BLM land. Livestock management includes designating the kind and class of livestock, seasons of use, locations of use and the numbers of livestock that are permitted to use BLM lands.

Range management activities may include vegetation treatments such as prescribed fire, mechanical and chemical control of noxious weeds, sagebrush and other target species. The determinations and effects analyses associated with the potential impacts of these treatments can be located under the other appropriate program headings (i.e., fire treatments – see Fire and Fuels Management, or vegetative treatments – see Vegetation Management). Other range improvements authorized by the livestock grazing management program may include fence construction, water developments, exclosures, and livestock handling facilities.

There are four primary ways livestock manipulate habitats to favor/hinder other species within the habitat: 1) alteration of vegetation composition, 2) cause increased/decreased productivity of selected plant species, 3) increase/decrease the nutritive quality of available forage, and/or 4) increase/decrease the diversity of habitats by altering structure (Severson and Urness 1994).

Activities occurring under this program may increase and concentrate domestic ungulate presence, increase motorized traffic, and cause surface disturbance from fence and livestock pond construction in Wright fishhook cactus suitable habitat. These activities may increase the occurrence of trampling, uprooting or crushing of individuals; increase soil disturbance; increase soil erosion and compaction; increase occurrence of exotic plant species; reduce pollinator populations; and modify or degrade suitable habitat. As a result, there may be increased occurrence of plant damage or individual mortality and loss of habitat.

Recreation Management

The recreation program includes providing for and managing recreational access, developing and maintaining recreation areas, issuing special recreation permits, providing information to the public about BLM's recreational resources, and assessing effects of recreational use on the natural resources. Under this program, OHV use, camping, rafting, hiking, fishing, boating, swimming, and other activities are allowed in designated areas.

Activities occurring under this program may increase human, horse, and motorized traffic in Wright fishhook cactus suitable habitat. These activities may cause trampling or crushing of individuals; collection of individuals due to increased human access; increased soil disturbance, erosion, and compaction; loss, modification or degradation of suitable habitat; reduced seed banks; and increased occurrences of invasive plant species. As a result, there may be decreased recruitment, and increased occurrence of plant damage or individual mortality.

Riparian, Soils and Water Resources

The objectives for the riparian, soil and water resources management program are to maintain and improve soil integrity, riparian and wetland areas, and protect water quality. Many Best Management Practices (BMPs), designed under this program reduce sedimentation and protect water quality also benefit soil productivity by minimizing erosion. Examples of other protection measures implemented under this program include maintenance and restoration of appropriate biological soil crusts, management of watershed health, and manage salinity load. Generally, this management program provides information in support of other resource objectives and goals.

Activities occurring under this program may increase localized foot traffic, motorized traffic, and use of tools and heavy machinery in suitable Wright fishhook cactus habitats. Land treatments may lead to short-term increased soil erosion, and storm water runoff with heavy concentrations of sediment. Associated impacts may include: trampling or crushing of individuals; increased soil disturbance; soil erosion and compaction; removal, degradation, or alteration of key habitat; reduced seed banks; reduced pollinator populations; and increased occurrence of invasive plant species. As a result, there may be decreased recruitment and increased plant damage or individual mortality.

Vegetation Management

Program objectives are to maintain or improve the diversity of plant communities to support timber production, livestock needs, wildlife habitat, watershed protection, and acceptable visual resources. Therefore, this program includes mechanical, chemical, biological, cultural vegetation management methodologies. These management methodologies may result in ground disturbing activities, chemical impacts, human disturbances, and impacts to vegetation from biological management techniques.

Management activities occurring under this program may increase foot traffic, motorized presence, and vegetation treatments in Wright fishhook cactus suitable habitat. These activities may cause trampling or crushing of individuals, increased soil disturbance; soil erosion and compaction; impacts from herbicides; loss, modification or degradation of suitable habitat;

reduced seed banks; reduced pollinator populations; and increased occurrences of invasive plant species. As a result, there may be decreased seed production, decreased recruitment, and increased occurrence of plant damage or individual mortality.

Wild Horse and Burro Management

The objective of wild horse and burro management is the protection, management, and control of wild free-roaming horses and burros (WH&B) on public lands. Management includes maintaining viable herds that will preserve the free-roaming nature of WH&Bs in a manner that is designed to achieve and maintain thriving ecological balance on the public lands.

Management activities occurring under this program may increase foot traffic, motorized presence, and vegetation treatments in Wright fishhook cactus suitable habitat. These activities may cause trampling or crushing of individuals, increased soil disturbance; soil erosion and compaction; impacts from herbicides; loss, modification or degradation of suitable habitat; reduced seed banks; reduced pollinator populations; and increased occurrences of invasive plant species. As a result, there may be decreased seed production, decreased recruitment, and increased occurrence of plant damage or individual mortality.

Fish and Wildlife Resource Management

This program aims to maintain biological diversity, support UDWR Herd Management Plans, improve habitat on for wildlife and fisheries, and provide habitats for threatened and endangered species.

Activities occurring under this program may increase foot traffic, motorized traffic, and/or significant soil disturbance in Wright fishhook cactus suitable habitat. These activities may cause trampling or crushing of individuals, increased soil disturbance, erosion, and compaction; removal of suitable habitat; loss, modification or degradation of suitable habitat; reduced seed banks; reduced pollinator populations; and increased occurrences of invasive plant species. As a result, there may be decreased seed production, decreased recruitment, and increased occurrence of plant damage or individual mortality.

Transportation and Access Management

The objectives of the transportation and access management program are to provide a safe and effective transportation and access system across public lands. Activities included under this program include maintenance of roads, support of counties and states for land access and road networks, reclamation of redundant and unused roads, management of scenic byway and backway corridors, and instillation of appropriate signage.

Activities occurring under this program occurring may increase localized foot traffic, motorized traffic, and use of tools and heavy machinery in suitable Wright fishhook cactus habitats. Land treatments may lead to short-term increased soil erosion, and storm water runoff with heavy concentrations of sediment. Associated impacts may include: trampling or crushing of individuals; increased soil disturbance, erosion, and compaction; removal, degradation, or alteration of key habitat; reduced seed banks; reduced pollinator populations; and increased occurrence of invasive plant species. As a result, there may be loss or degradation of cactus

populations; decreases in Wright fishhook cactus seed production; decreased recruitment; and increased occurrence of plant damage or individual mortality.

## Cumulative Effects

Cumulative effects include the effects of future State, Tribal, local or private actions that are reasonably certain to occur in the action area considered in this biological opinion. Future Federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to section 7 of the Act.

Cumulative effects to the Wright fishhook cactus under the Proposed Actions would include, but are not limited to, the following broad types of impacts:

- Changes in land use patterns or practices that adversely affect a species' critical, suitable, or potential habitat;
- Encroachment of human development into a species' critical, suitable, or potential habitat; and
- Management actions by some, or all, of the following groups, on lands adjoining or upstream of BLM-administered lands:
  - o State of Utah;
  - o County Governments in Utah;
  - o Local Governments in Utah; and
  - o Private landholders in Utah.

Wright fishhook cacti occur primarily within BLM management boundaries. In these areas, Wright fishhook cactus locations are surrounded by a checkerboard pattern of land ownership including Federal, State, and private landowners. Wright fishhook cacti are susceptible to activities on State and private lands. Many of these activities, such as livestock grazing, oil and gas exploration and development, human population expansion and associated infrastructure (increased trails and roads), research, and recreation activities (e.g. off-road vehicles), are expected to continue on State and private lands within the Wright fishhook cactus' range. In addition, illegal collection is reasonably certain to occur. Contributing as cumulative effects to the proposed action, all these activities will continue to affect Wright fishhook cactus populations by decreasing abundance, injuring plants, adversely affecting pollinators, and further adversely impacting occupied and suitable habitat.

## Conclusions

The conclusions of this biological opinion are based on full implementation of the project as described in the "Description of the Proposed Action" section of this document, including the resource protection measures that were incorporated into the project design.

After reviewing the current status of the Wright fishhook cactus, the environmental baseline for the action area, the effects of the proposed action, and the cumulative effects, it is the USFWS's biological opinion that the Price Field Office Resource Management Plan, as proposed, is not likely to jeopardize the continued existence of the Wright fishhook cactus. Critical habitat has not been designated for this species. We base our conclusion on the following:

1. The applicant committed resource protection measures will be incorporated into site-specific projects designed under the BLM Resource Management Plan. If project design cannot adhere to all applicant committed resource protection measures, consultation under Section 7 of the Endangered Species Act will be initiated.

2. All site-specific projects designed under the proposed BLM Resource Management Plan would be subject to consultation requirements under Section 7 of the Endangered Species Act.

## San Rafael cactus (*Pediocactus despainii*)

**Status of the Species**

*Species Description*

The San Rafael cactus (*Pediocactus despainii*) was first discovered by Kim Despain in 1978 on an anticline in the San Rafael Swell. The San Rafael cactus is usually solitary stemmed, 3.8 to 6.0 centimeters (cm) tall, with a diameter of 3.0 to 9.5 cm. The stem apex is even with the ground level to 5 cm above. Stems are ribbed with tubercles 0.6 to 1.0 cm in length. Spine-bearing areoles are borne at the apex of the tubercle. The areoles are elliptic with moderate spines partially obscuring the stem. Central spines are lacking; 9 to 13 white radial spines are commonly 2 to 6 millimeters (mm) long. Flowers are borne on the end of the tubercle near the apex of the stem, are 1.5 to 2.5 cm in length, and are yellow bronze, peach bronze, or pink with a purple midstripe. Stamens are yellow and stigmas are green. Fruit is 0.9 to 1.1 cm long with a smooth surface, initially green turning reddish-brown with age and dehiscing with a vertical slit along the ovary wall. Seeds are shiny black and kidney shaped with papillate mounds that coalesce into large irregular ridges (Welsh and Goodrich 1980, Welsh et al. 1993).

*Life History and Population Dynamics*

San Rafael cacti are seasonal. When temperatures increase in mid-February or early March and rainfall is adequate, cacti emerge from just below the surface to flower. Flowering occurs from mid-April through mid-May and fruits are set in mid-May to June. After flowering, the plants shrink into the ground during the hot season and remain underground until the following spring when they resurface with sufficient rains.

Reproduction is sexual (USFWS 1995b) and the specific pollination mechanism and vectors are believed to be wild bees of the Halictidae family (USFWS 1995b). Seedling ecology is unknown (Heil 1984).

*Status and Distribution*

Due to the rarity of this species and collection pressures, the *P. despainii* was listed as endangered under the Endangered Species Act of 1973, as amended (ESA), on September 16, 1987 (USFWS 1987). No critical habitat has been designated for this species. Identified threats to *P. despainii* have been deemed to be primarily human-related. The primary threat to this species is collection. Other threats include impacts from off-road vehicles, mineral exploration and development, mining activities, and occasional trampling from livestock activities. Some instances of insect larvae infestations have also been observed (USFWS 1987 and 1998).

The San Rafael cactus is found on benches, hill tops, and gentle slopes in desert shrub and juniper woodland communities between the elevations of 4,550 and 6,400 feet (1450 to 2080 meters). It is found on a variety of geologic formations, including Morrison-Brushy Basin, Morrison-Salt Wash, Dakota Sandstone, Moenkopi, Summerville, Morrison-Brushy Basin/Entrada, Summerville/Morrison-Brushy Basin, Carmel Formation, Mancos Shale Formation, Cedar Mountain Shale, and Dakota Sandstone Formations. The San Rafael cactus is known to occur primarily on the Carmel Formation, the Sinbad member of the Moenkopi formation, and the Brushy Basin member of the Morrison Formations. It grows on hills, benches, and flats of the Colorado plateau's semiarid grasslands. This habitat is savannah-like and contains scattered junipers, pinyon pines, low shrubs, and annual and perennial herbs (USFWS 1987).

The San Rafael cactus is known from Wayne and Emery Counties in south central Utah primarily on lands administered by BLM. This species occurs in the Canyon Lands section of the Colorado Plateau Floristic Region (Cronquist et al. 1972). Populations of the species occur primarily on lands managed by the Utah BLM through the Price and Richfield Field Offices, and by the National Park Service (NPS) at Capitol Reef National Park.

**Environmental Baseline**

*Status of the Species within the Action Area*

The entire range of the species occurs within Utah, mostly on lands managed by the Bureau of Land Management (USFWS 1995), with one section owned by the State of Utah (52 FR 34914). With its diminutive size and peculiar habit of shrinking underground for several months a year during dry or cold seasons, it is not surprising that *Pediocactus despainii* was only recently discovered. Within the PFO, the San Rafael cactus is found from the central to the southeast portion in lower-elevation areas. There are currently 5 populations of the cactus in the planning area, representing approximately 93% of the species.

*Factors Affecting Species Environment within the Action Area*

The San Rafael cactus is considered a vulnerable plant species due to low numbers of individuals, the scattered and isolated nature of their occurrence, and their restriction to a limited geographic area due to the specificity of their soil and geologic habitat requirements (USDA et al. 1998). Known threats to the species include collection by cactus collectors; one population was heavily impacted by recreational use of off-road vehicles; and approximately half of each population occurred in areas covered by oil and gas leases and mining claims for gypsum or other minerals (USFWS 1987, TNC 1998). Cattle grazing can be a threat to San Rafael cactus (Walter and Gillett 1998). The San Rafael cactus forms buds in the fall that overwinter to become the next spring's flowers (Heil et al. 1981). These flowering buds at ground level may be vulnerable to surface disturbance, increasing the portion of the year that the species' reproductive capacity is vulnerable (USFWS 1987). USFWS botanists have observed that the species is susceptible to infestation of insect larvae (USFWS 1987). The habitat in which San Rafael cactus occurs is fragile and vulnerable to invasion by aggressive native shrub and tree species or exotic weedy species when the soils are mechanically disrupted or when native grass species are removed (USFWS 1987).

**Effects of the Action**

Cultural Resources Management

This program includes surveys, inventories, excavation activities, surface material collection, and interpretive site development. Surveys may involve multiple people and vehicles and can last up to several weeks. Inventories for cultural resources commonly entail the use of hand tools, power tools, or heavy machinery.

Activities occurring under this program may increase minor surface disturbance for cultural resource excavations. Activities occurring under this program may increase localized foot traffic, motorized traffic, and use of tools in suitable San Rafael cactus habitats. These activities may cause: trampling or crushing of individuals; increased soil disturbance; soil erosion and compaction; removal, degradation, or alteration of key habitat; reduced seed banks; and increased occurrence of invasive plant species. As a result, there may be loss or degradation of cactus populations; decreases in San Rafael cactus seed production; decreased recruitment; and increased occurrence of plant damage or individual mortality.

Paleontological Resources Management

This program includes surveys, inventories, excavation activities, surface material collection, and interpretive site development. Surveys may involve multiple people and vehicles and can last up to several weeks. Inventories for paleontological resources commonly entail the use of hand tools, power tools, or heavy machinery.

Activities occurring under this program may increase minor surface disturbance for fossil resource excavations. Activities occurring under this program may increase localized foot traffic, motorized traffic, and use of tools in suitable San Rafael cactus habitats. These activities may cause: trampling or crushing of individuals; increased soil disturbance; soil erosion and compaction; removal, degradation, or alteration of key habitat; reduced seed banks; and increased occurrence of invasive plant species. As a result, there may be loss or degradation of cactus populations; decreases in San Rafael cactus seed production; decreased recruitment; and increased occurrence of plant damage or individual mortality.

Fire and Fuels Management

Major activities associated with the fire management program include: wildfire suppression, wildland fire use, prescribed burning, non-fire fuels treatments (mechanical and chemical), and emergency stabilization and rehabilitation following wildfires. Fire suppression methods may involve: fireline construction, use of fire suppression agents and retardants, and water withdrawals.

Although the BLM does not propose to carry out prescribed fire or non-fire treatments (mechanical and chemical) within suitable habitat for the San Rafael cactus, wildland fire suppression activities could adversely affect the San Rafael cactus. Activities under this program may increase foot or motorized traffic and application of chemicals (fire retardants, pesticides, insecticides) in suitable San Rafael cactus habitats. Associated impacts include: trampling or crushing of individuals; increased soil disturbance; compaction or erosion; removal or

degradation of suitable habitat; reduction of the seed bank; reduced pollinator populations; and increase the occurrence of invasive plant species. As a result, there may be decreased seed production, decreased recruitment, and increased occurrence of plant damage or individual mortality.

Forestry and Woodland Management

Forest management objectives are to maintain and enhance the health, productivity, sustainability, and biological diversity of forest and woodland ecosystems and to provide a balance of natural resource benefits and uses, including opportunities for commercial and non-commercial harvest of forest and woodland products on a sustainable basis. Forests are managed for multiple uses, such as recreation, livestock grazing, and wildlife habitat. The forest management program also implements silviculture practices including site preparation, regeneration, stand protection, stand maintenance, pre-commercial and commercial thinning for density management, fertilization, pruning, forest and woodland condition restoration treatments, and salvage harvest.

Forest resources support activities such as road construction that may occur in or near existing or suitable San Rafael cactus habitat. However, the impacts of these activities are analyzed and authorized by the lands and realty program.

Although activities authorized under this program are not likely to occur in San Rafael cactus habitat, there is some potential for private individuals to trample San Rafael cactus individuals while harvesting wood products. Known populations of San Rafael cactus, and potential habitats, have not been specifically protected from fuel wood, Christmas tree, and post and pole harvesting. As a result, there may be decreased seed production; decreased recruitment; increased illegal collection of individuals due to increased human access; and increased occurrence of plant damage or individual mortality.

Geology and Minerals Resources

The planning area will be open to consideration for exploration, leasing, and development of leasable minerals (oil, gas, coal bed natural gas), salable minerals (sand, gravel, stone and humate) and locatable materials (uranium, clay and gypsum). Although stipulations or conditions may be included in the terms of these mineral contracts, there are potential impacts associated with these various activities. Mineral exploration and extraction often results in surface disturbance from road and facility construction, removal of topsoil and overburden, stock piling of these materials, and post-mining reclamation and recontouring.

Activities occurring under this program may increase foot traffic, motorized traffic, significant soil disturbance; soil erosion and compaction, and surface development in San Rafael cactus habitat. These activities may cause trampling or crushing of individuals, removal of suitable habitat, loss, modification or degradation of suitable habitat, reduced seed banks, reduced pollinator populations, increases the occurrence of invasive plant species, and increased loss of individuals to illegal collection. As a result, there may be loss or degradation of cactus populations; decreases in San Rafael cactus seed production; decreased recruitment; and increased occurrence of plant damage or individual mortality.

Hazardous Materials Management

Activities conducted under the BLM's hazardous materials program include providing warnings, securing and disposing of hazardous waste discharged on public lands, establishing precautions, and responding to emergencies. Activities may involve increased human presence, use of heavy equipment, and removal of contaminated soils. These activities have the potential to occur in locations where mineral development or transport occurs.

Activities occurring under this program may increase foot traffic, motorized traffic, and significant soil disturbance in San Rafael cactus suitable habitat. These activities may cause trampling or crushing of individuals, removal of suitable habitat, increased soil disturbance; soil erosion and compaction, loss, modification or degradation of suitable habitat, reduced seed banks, reduced pollinator populations, and increased invasive plant species. As a result, there may be loss or degradation of cactus populations; decreases in San Rafael cactus seed production; decreased recruitment; and increased occurrence of plant damage or individual mortality.

Lands and Realty

Objectives of the lands and realty management program are to support multiple-use management goals of the BLM resource programs; respond to public requests for land use authorizations, sales, and exchanges; and acquire and designate rights of way access to serve administrative and public needs. Realty management authorizes occupancy of public lands for roads, power lines, pipelines, communication sites, and irrigation ditches authorized by granting rights of way. Rights of way management actions respond to public requests for access, land authorizations, sales, and exchanges. These rights of way may be temporary or extend up to 30 years, or even in perpetuity.

Activities authorized under this program may adversely impact San Rafael cactus with human- and equipment-related soil disturbances. Soil disturbance will impact individual plants, increased soil disturbance; soil erosion and compaction, modify or degrade suitable habitat, and reduce the seed bank. Land exchanges or sales may increase fragmentation or degradation of suitable San Rafael cactus habitat. As a result, there may be loss or degradation of cactus populations; decreases in San Rafael cactus seed production; decreased recruitment; and increased occurrence of plant damage or individual mortality.

Livestock Grazing

The objective of livestock grazing management is to maintain or improve forage production and range condition as a sustainable resource base for livestock grazing on BLM land. Livestock management includes designating the kind and class of livestock, seasons of use, locations of use and the numbers of livestock that are permitted to use BLM lands.

Range management activities may include vegetation treatments such as prescribed fire, mechanical and chemical control of noxious weeds, sagebrush and other target species. The determinations and effects analyses associated with the potential impacts of these treatments can be located under the other appropriate program headings (i.e., fire treatments – see Fire and Fuels Management, or vegetative treatments – see Vegetation Management). Other range

improvements authorized by the livestock grazing management program may include fence construction, water developments, exclosures, and livestock handling facilities.

There are four primary ways livestock manipulate habitats to favor/hinder other species within the habitat: 1) alteration of vegetation composition, 2) cause increased/decreased productivity of selected plant species, 3) increase/decrease the nutritive quality of available forage, and/or 4) increase/decrease the diversity of habitats by altering structure (Severson and Urness 1994).

Activities occurring under this program may increase and concentrate domestic ungulate presence, increase motorized traffic, and cause surface disturbance from fence and livestock pond construction in San Rafael cactus suitable habitat. These activities may increase the occurrence of trampling, uprooting or crushing of individuals; increase soil disturbance; increase soil erosion and compaction; increase occurrence of exotic plant species; reduce pollinator populations; and modify or degrade suitable habitat. As a result, there may be increased occurrence of plant damage or individual mortality and loss of habitat.

Recreation Management

The recreation program includes providing for and managing recreational access, developing and maintaining recreation areas, issuing special recreation permits, providing information to the public about BLM's recreational resources, and assessing effects of recreational use on the natural resources. Under this program, OHV use, camping, rafting, hiking, fishing, boating, swimming, and other activities are allowed in designated areas.

Activities occurring under this program may increase human, horse, and motorized traffic in San Rafael cactus suitable habitat. These may cause trampling or crushing of individuals, collection of individuals, increased soil disturbance; soil erosion and compaction; loss, modifications or degradation of suitable habitat, reduced seed banks, and increased occurrences of invasive plant species. As a result, there may be loss or degradation of cactus populations; decreases in San Rafael cactus seed production; decreased recruitment; and increased occurrence of plant damage or individual mortality.

Riparian, Soils and Water Resources

The objectives for the riparian, soil and water resources management program are to maintain and improve soil integrity, riparian and wetland areas, and protect water quality. Many Best Management Practices (BMPs), designed under this program reduce sedimentation and protect water quality also benefit soil productivity by minimizing erosion. Examples of other protection measures implemented under this program include maintenance and restoration of appropriate biological soil crusts, management of watershed health, and manage salinity load. Generally, this management program provides information in support of other resource objectives and goals.

Activities occurring under this program occurring may increase localized foot traffic, motorized traffic, and use of tools and heavy machinery in suitable San Rafael cactus habitats. Land treatments may lead to short-term increased soil erosion, and storm water runoff with heavy concentrations of sediment. Associated impacts may include: trampling or crushing of individuals; increased soil disturbance; soil erosion and compaction; removal, degradation, or

alteration of key habitat; reduced seed banks; and increased occurrence of invasive plant species. As a result, there may be loss or degradation of cactus populations; decreases in San Rafael cactus seed production; decreased recruitment; and increased occurrence of plant damage or individual mortality.

## Vegetation Management

Program objectives are to maintain or improve the diversity of plant communities to support timber production, livestock needs, wildlife habitat, watershed protection, and acceptable visual resources. Therefore, this program includes mechanical, chemical, biological, cultural vegetation management methodologies. These management methodologies may result in ground disturbing activities, chemical impacts, human disturbances, and impacts to vegetation from biological management techniques.

Management activities occurring under this program may increase foot traffic, motorized presence, and vegetation treatments in San Rafael cactus suitable habitat. These activities may cause trampling or crushing of individuals, increased soil disturbance; soil erosion and compaction; effects from herbicides, loss, modification or degradation of suitable habitat, seed bank impacts and reductions, reduced pollinator populations, and increased invasive plant species. As a result, there may be loss or degradation of cactus populations; decreases in San Rafael cactus seed production; decreased recruitment; and increased occurrence of plant damage or individual mortality.

## Wild Horse and Burro Management

The objective of wild horse and burro management is the protection, management, and control of wild free-roaming horses and burros (WH&B) on public lands. Management includes maintaining viable herds that will preserve the free-roaming nature of WH&Bs in a manner that is designed to achieve and maintain thriving ecological balance on the public lands.

Management activities occurring under this program may increase foot traffic, motorized presence, and vegetation treatments in San Rafael cactus suitable habitat. These activities may cause trampling or crushing of individuals, increased soil disturbance; soil erosion and compaction; effects from herbicides, loss, modification or degradation of suitable habitat, seed bank impacts and reductions, reduced pollinator populations, and increased invasive plant species. As a result, there may be loss or degradation of cactus populations; decreases in San Rafael cactus seed production; decreased recruitment; and increased occurrence of plant damage or individual mortality.

## Fish and Wildlife Resource Management

This program aims to maintain biological diversity, support UDWR Herd Management Plans, improve habitat on for wildlife and fisheries, and provide habitats for threatened and endangered species.

Activities occurring under this program may increase foot traffic, motorized traffic, and/or significant soil disturbance in San Rafael cactus suitable habitat. These activities may cause trampling or crushing of individuals, removal of suitable habitat, loss, modification or

degradation of suitable habitat, reduced seed banks, reduced pollinator populations, and increased occurrences of invasive plant species. As a result, there may be loss or degradation of cactus populations; decreases in San Rafael cactus seed production; decreased recruitment; and increased occurrence of plant damage or individual mortality.

<u>Transportation and Access Management</u>

The objectives of the transportation and access management program are to provide a safe and effective transportation and access system across public lands. Activities included under this program include maintenance of roads, support of counties and states for land access and road networks, reclamation of redundant and unused roads, management of scenic byway and backway corridors, and instillation of appropriate signage.

Activities occurring under this program occurring may increase localized foot traffic, motorized traffic, and use of tools and heavy machinery in suitable San Rafael cactus habitats. Land treatments may lead to short-term increased soil erosion, and storm water runoff with heavy concentrations of sediment. Associated impacts may include: trampling or crushing of individuals; increased soil disturbance; soil erosion and compaction; removal, degradation, or alteration of key habitat; reduced seed banks; and increased occurrence of invasive plant species. As a result, there may be loss or degradation of cactus populations; decreases in San Rafael cactus seed production; decreased recruitment; and increased occurrence of plant damage or individual mortality.

**Cumulative Effects**

Cumulative effects include the effects of future State, Tribal, local or private actions that are reasonably certain to occur in the action area considered in this biological opinion. Future Federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to section 7 of the Act.

Cumulative effects to the San Rafael cactus under the Proposed Actions would include, but are not limited to, the following broad types of impacts:

- Changes in land use patterns or practices that adversely affect a species' critical, suitable, or potential habitat;
- Encroachment of human development into a species' critical, suitable, or potential habitat; and
- Management actions by some, or all, of the following groups, on lands adjoining or upstream of BLM-administered lands:
  - State of Utah;
  - County Governments in Utah;
  - Local Governments in Utah; and
  - Private landholders in Utah.

San Rafael cacti occur primarily within BLM management boundaries. In these areas, San Rafael cactus locations are surrounded by a checkerboard pattern of land ownership including Federal, State, and private landowners. San Rafael cacti are susceptible to activities on State and

private lands. Many of these activities, such as livestock grazing, oil and gas exploration and development, research, human population expansion and associated infrastructure (increased trails and roads), and recreation activities (e.g. off-road vehicles), are expected to continue on State and private lands within the San Rafael cactus' range. In addition, illegal collection is reasonably certain to occur. Contributing as cumulative effects to the proposed action, all these activities will continue to affect San Rafael cactus populations by decreasing abundance, injuring plants, adversely affecting pollinators, and further adversely impacting occupied and suitable habitat.

## Conclusions

The conclusions of this biological opinion are based on full implementation of the project as described in the "Description of the Proposed Action" section of this document, including the conservation measures that were incorporated into the project design.

After reviewing the current status of the San Rafael cactus, the environmental baseline for the action area, the effects of the proposed action, and the cumulative effects, it is the USFWS's biological opinion that the Price Field Office Resource Management Plan, as proposed, is not likely to jeopardize the continued existence of the San Rafael cactus. Critical habitat has not been designated for this species. We base our conclusion on the following:

1. The applicant committed resource protection measures will be incorporated into site-specific projects designed under the BLM Resource Management Plan. If project design cannot adhere to all applicant committed resource protection measures, consultation under Section 7 of the Endangered Species Act will be initiated.

2. All site-specific projects designed under the proposed BLM Resource Management Plan would be subject to consultation requirements under Section 7 of the Endangered Species Act.

# Winkler cactus (*Pediocactus winkleri*)

## Status of the Species

### Species Description

Winkler cactus (*Pediocactus winkleri*) was first discovered by Agnes Winkler in the late 1960's. The Winkler cactus is a small, subglobose, leafless cactus. The species' stems are solitary or clumped, 3.9 to 6.8 cm tall, with a diameter of 2.7 to 5.0 cm. The stem apex is even with ground level to 5 cm above. Stems are ribbed with tubercles 0.4-0.7 cm long. Spine-bearing areoles are borne at the apex of the tubercles. The areoles are elliptic and densely wooly pubescent with spines obscuring or partially obscuring the stem. Central spines are lacking; radial spines commonly number 9 to 11. The spines, 1.5-4mm long, spread downward with tips tapering from bulbous bases. Flowers are 1.7 to 2.2 cm in length with peach to pink color. Stamens are yellow and stigmas are green. The fruit is 0.7 to 1.0 cm long with a smooth surface, initially green turning reddish-brown with age and dehiscing with a vertical slit along the ovary wall. Seeds are shiny black with papillate mounds that coalesce into large irregular ridges (Heil 1979, Welsh et al. 1993).

*Life History and Population Dynamics*

Winkler cacti are seasonal. When temperatures increase in mid-February or early March and rainfall is adequate, cacti emerge from just below the surface to flower. Flowering occurs from mid-April through mid-May and fruits are set in mid-May to June. After flowering, the plants shrink into the ground during the hot season and remain underground until the following spring when they resurface with sufficient rains. No studies have been completed on pollination of the Winkler cactus. Reproduction is presumed to be sexual.

*Status and Distribution*

Due to the rarity of this species and collection pressures, Winkler cactus was designated as a threatened species on August 20, 1998 (63 FR 44587). No critical habitat is designated for this species.

The Winkler cactus is endemic to specific, fine textured derived from the Dakota Formation and the Brushy Basin Member of the Morrison Formation in the lower Fremont River and Muddy Creek drainages. It occurs on rocky, alkaline hill tops and benches, and gentle slopes in on barren, open sites in salt desert shrub communities. Soils are characterized as silty or clay-like primarily derived from Dakota geologic formation (Neese 1987). *P. winkleri* is found at elevations ranging between 1490 to 2010 meters (4890 to 6595 feet).

The Winkler cacti are known in Wayne and Emery Counties in south central Utah. Populations of the species occur primarily on lands managed by the Utah BLM through the Price and Richfield Field Offices, and by the National Park Service (NPS) at Capitol Reef National Park. The range of *P. winkleri* occurs across the landscape in a narrow arc extending from Notom in central Wayne County to Hartnet Draw in southwestern Emery County, Utah. This area extends about 48 km (30 miles) but plants are estimated to occupy about 80 hectares (200 acres). The majority of the known populations occur on lands managed by BLM.

Prior to 1999, approximately 5,000 individuals of the Winkler cactus were documented (USFWS 1995a). Due to a general lack of knowledge on this species, approximating the current population status relative to when it was listed is not possible. Monitoring sites have been established in known Winkler cactus populations at Notom and Askland.

**Environmental Baseline**

*Status of the Species within the Action Area*

Within the PFO, the Winkler pincushion cactus is associated with low-elevation lands where Dakota and Brushy Basin geologic formations occur. Only one population of this cactus is present in the planning area, located in the west-central and southwest corner of the PFO. The majority of this species is found in the Richfield FO.

*Factors Affecting Species Environment within the Action Area*

The Winkler cactus is considered a vulnerable plant species due to low numbers of individuals, the scattered and isolated nature of their occurrence, and their restriction to a limited geographic area due to the specificity of their soil and geologic habitat requirements (USDA et al. 1998).

These characteristics make the species vulnerable to human-caused disturbances and exacerbate the effects of natural disturbances on the species. The species may also be vulnerable to a loss of genetic viability due to the small size and isolation of most populations (USFWS 1995a).

Potential human threats to the Winkler cactus populations and suitable habitat include: livestock grazing; recreation, including off-highway vehicle (OHV) use; energy and mineral development, including associated auxiliary disturbances; infrastructure development; paleontological operations; and illegal collection. Illegal collection poses the largest threat to species survival and recovery. Winkler cactus populations near Notom are particularly at risk for collection and vandalism, due to ease of accessibility and the high concentration of the recreating public in that location. As a result, collection has impacted that population and remains a continuing threat (USFWS 1998, England 1997, USDA et al. 1998). The Hartnet population has also been impacted by unauthorized collection, including cacti removed from a grazing exclosure constructed for a monitoring project (USDA et al. 1998).

The habitats of this species are also susceptible to invasion by aggressive native shrubs and non-native weeds when the surface area is disturbed by grazing, OHVs, road building, and other surface-disturbing activities. The potential for human related threats to the species from BLM-authorized activities is recognized by the BLM, and will be considered during future project specific consultations, and appropriate measures will be taken to avoid adverse effects to the species where possible.

Populations of the cacti are also vulnerable to predation by insect larvae (USFWS 1987 and 1998). Natural threats, including insect predation, illegal collection and other illegal or malicious activities, cannot be evaluated in the same manner as BLM-authorized activities in this Biological Opinion because these are not BLM-authorized actions.

**Effects of the Action**

Cultural Resources Management

This program includes surveys, inventories, excavation activities, surface material collection, and interpretive site development. Surveys may involve multiple people and vehicles and can last up to several weeks. Inventories for cultural resources commonly entail the use of hand tools, power tools, or heavy machinery.

Activities under this program may increase minor surface disturbance for cultural resource excavations. Activities occurring under this program may increase localized foot traffic, motorized traffic, and use of tools in suitable Winkler cactus habitats. These activities may cause: trampling or crushing of individuals; increased soil disturbance; soil erosion and compaction; removal, degradation, or alteration of key habitat; reduced seed banks; and increased occurrence of invasive plant species. As a result, there may be loss or degradation of cactus populations; decreased recruitment; and increased occurrence of plant damage or individual mortality.

Paleontological Resources Management

This program includes surveys, inventories, excavation activities, surface material collection, and interpretive site development. Surveys may involve multiple people and vehicles and can last up to several weeks. Inventories for paleontological resources commonly entail the use of hand tools, power tools, or heavy machinery.

Activities occurring under this program may increase minor surface disturbance for fossil resource excavations. Activities occurring under this program may increase localized foot traffic, motorized traffic, and use of tools in suitable Winkler cactus habitats. These activities may cause: trampling or crushing of individuals; increased soil disturbance; soil erosion and compaction; removal, degradation, or alteration of key habitat; reduced seed banks; and increased occurrence of invasive plant species. As a result, there may be loss or degradation of cactus populations; decreased recruitment; and increased occurrence of plant damage or individual mortality.

Fire and Fuels Management

Major activities associated with the fire management program include: wildfire suppression, wildland fire use, prescribed burning, non-fire fuels treatments (mechanical and chemical), and emergency stabilization and rehabilitation following wildfires. Fire suppression methods may involve: fireline construction, use of fire suppression agents and retardants, and water withdrawals.

Although the BLM does not propose to carry out prescribed fire or non-fire treatments (mechanical and chemical) within suitable habitat for the Winkler cactus, wildland fire suppression activities could adversely affect the Winkler cactus. Activities under this program may increase foot or motorized traffic and application of chemicals (fire retardants, pesticides, insecticides) in suitable Winkler cactus habitats. Associated impacts include: trampling or crushing of individuals; increased soil disturbance; compaction or erosion; removal or degradation of suitable habitat; reduction of the seed bank; reduced pollinator populations; and increase the occurrence of invasive plant species. As a result, there may be decreased seed production, decreased recruitment, and increased occurrence of plant damage or individual mortality.

Forestry and Woodland Management

Forest management objectives are to maintain and enhance the health, productivity, sustainability, and biological diversity of forest and woodland ecosystems and to provide a balance of natural resource benefits and uses, including opportunities for commercial and non-commercial harvest of forest and woodland products on a sustainable basis. Forests are managed for multiple uses, such as recreation, livestock grazing, and wildlife habitat. The forest management program also implements silviculture practices including site preparation, regeneration, stand protection, stand maintenance, pre-commercial and commercial thinning for density management, fertilization, pruning, forest and woodland condition restoration treatments, and salvage harvest.

Forest resources support activities such as road construction that may occur in or near existing or suitable Winkler cactus habitat. However, the impacts of these activities are analyzed and authorized by the lands and realty program.

Although activities authorized under this program are not likely to occur in Winkler cactus habitat, there is some potential for private individuals to trample Winkler cactus individuals while harvesting wood products. Known populations of Winkler cactus, and potential habitats, have not been specifically protected from fuel wood, Christmas tree, and post and pole harvesting. As a result, there may be decreased seed production; decreased recruitment; increased illegal collection of individuals due to increased human access; and increased occurrence of plant damage or individual mortality.

## Geology and Minerals Resources

The planning area will be open to consideration for exploration, leasing, and development of leasable minerals (oil, gas, coal bed natural gas), salable minerals (sand, gravel, stone and humate) and locatable materials (uranium, clay and gypsum). Although stipulations or conditions may be included in the terms of these mineral contracts, there are potential impacts associated with these various activities. Mineral exploration and extraction often results in surface disturbance from road and facility construction, removal of topsoil and overburden, stock piling of these materials, and post-mining reclamation and recontouring.

Activities occurring under this program may increase foot traffic, motorized traffic, significant soil disturbance; soil erosion and compaction, and surface development in Winkler cactus habitat. These activities may cause trampling or crushing of individuals, removal of suitable habitat, loss, modification or degradation of suitable habitat, reduced seed banks, reduced pollinator populations, increases the occurrence of invasive plant species, and increased loss of individuals to illegal collection. As a result, there may be loss or degradation of cactus populations; decreases in Winkler cactus seed production; decreased recruitment; and increased occurrence of plant damage or individual mortality.

## Hazardous Materials Management

Activities conducted under the hazardous materials program include providing warnings, securing and disposing of hazardous waste discharged on public lands, establishing precautions, and responding to emergencies. Activities may involve increased human presence, use of heavy equipment, and removal of contaminated soils. These activities have the potential to occur in locations where mineral development or transport occurs.

Activities occurring under this program may increase foot traffic, motorized traffic, and significant soil disturbance in Winkler cactus suitable habitat. These activities may cause trampling or crushing of individuals, removal of suitable habitat, increased soil disturbance; soil erosion and compaction, loss, modification or degradation of suitable habitat, reduced seed banks, reduced pollinator populations, and increased invasive plant species. As a result, there may be loss or degradation of cactus populations; decreases in Winkler cactus seed production; decreased recruitment; and increased occurrence of plant damage or individual mortality.

Lands and Realty

Objectives of the lands and realty management program are to support multiple-use management goals of the BLM resource programs; respond to public requests for land use authorizations, sales, and exchanges; and acquire and designate rights of way access to serve administrative and public needs. Realty management authorizes occupancy of public lands for roads, power lines, pipelines, communication sites, and irrigation ditches authorized by granting rights of way. Rights of way management actions respond to public requests for access, land authorizations, sales, and exchanges. These rights of way may be temporary or extend up to 30 years, or even in perpetuity.

Activities authorized under this program may adversely impact Winkler cactus with human- and equipment-related soil disturbances. Soil disturbance will impact individual plants, increased soil disturbance; soil erosion and compaction, modify or degrade suitable habitat, and reduce the seed bank. Land exchanges or sales may increase fragmentation or degradation of suitable Winkler cactus habitat. As a result, there may be loss or degradation of cactus populations; decreased recruitment; and increased occurrence of plant damage or individual mortality.

Livestock Grazing

The objective of livestock grazing management is to maintain or improve forage production and range condition as a sustainable resource base for livestock grazing on BLM land. Livestock management includes designating the kind and class of livestock, seasons of use, locations of use and the numbers of livestock that are permitted to use BLM lands.

Range management activities may include vegetation treatments such as prescribed fire, mechanical and chemical control of noxious weeds, sagebrush and other target species. The determinations and effects analyses associated with the potential impacts of these treatments can be located under the other appropriate program headings (i.e., fire treatments – see Fire and Fuels Management, or vegetative treatments – see Vegetation Management). Other range improvements authorized by the livestock grazing management program may include fence construction, water developments, exclosures, and livestock handling facilities.

There are four primary ways livestock manipulate habitats to favor/hinder other species within the habitat: 1) alteration of vegetation composition, 2) cause increased/decreased productivity of selected plant species, 3) increase/decrease the nutritive quality of available forage, and/or 4) increase/decrease the diversity of habitats by altering structure (Severson and Urness 1994).

Activities occurring under this program may increase and concentrate domestic ungulate presence, increase motorized traffic, and cause surface disturbance from fence and livestock pond construction in Winkler cactus suitable habitat. These activities may increase the occurrence of trampling, uprooting or crushing of individuals; increase soil disturbance; increase soil erosion and compaction; increase occurrence of exotic plant species; reduce pollinator populations; and modify or degrade suitable habitat. As a result, there may be increased occurrence of plant damage or individual mortality and loss of habitat.

Recreation Management

The recreation program includes providing for and managing recreational access, developing and maintaining recreation areas, issuing special recreation permits, providing information to the public about BLM's recreational resources, and assessing effects of recreational use on the natural resources. Under this program, OHV use, camping, rafting, hiking, fishing, boating, swimming, and other activities are allowed in designated areas.

Activities occurring under this program may increase human, horse, and motorized traffic in Winkler cactus suitable habitat. These may cause trampling or crushing of individuals, collection of individuals, increased soil disturbance; soil erosion and compaction; loss, modification or degradation of suitable habitat, reduced seed banks, and increased occurrences of invasive plant species. As a result, there may be loss or degradation of cactus populations; decreases in Winkler cactus seed production; decreased recruitment; and increased occurrence of plant damage or individual mortality.

Riparian, Soils and Water Resources

The objectives for the riparian, soil and water resources management program are to maintain and improve soil integrity, riparian and wetland areas, and protect water quality. Many Best Management Practices (BMPs), designed under this program reduce sedimentation and protect water quality also benefit soil productivity by minimizing erosion. Examples of other protection measures implemented under this program include maintenance and restoration of appropriate biological soil crusts, management of watershed health, and manage salinity load. Generally, this management program provides information in support of other resource objectives and goals.

Activities occurring under this program occurring may increase localized foot traffic, motorized traffic, and use of tools and heavy machinery in suitable Winkler cactus habitats. Land treatments may lead to short-term increased soil erosion, and storm water runoff with heavy concentrations of sediment. Associated impacts may include: trampling or crushing of individuals; increased soil disturbance; soil erosion and compaction; removal, degradation, or alteration of key habitat; reduced seed banks; and increased occurrence of invasive plant species. As a result, there may be loss or degradation of cactus populations; decreases in Winkler cactus seed production; decreased recruitment; and increased occurrence of plant damage or individual mortality.

Vegetation Management

Program objectives are to maintain or improve the diversity of plant communities to support timber production, livestock needs, wildlife habitat, watershed protection, and acceptable visual resources. Therefore, this program includes mechanical, chemical, biological, cultural vegetation management methodologies. These management methodologies may result in ground disturbing activities, chemical impacts, human disturbances, and impacts to vegetation from biological management techniques.

Management activities occurring under this program may increase foot traffic, motorized presence, and vegetation treatments in Winkler cactus suitable habitat. These activities may

cause trampling or crushing of individuals, increased soil disturbance; soil erosion and compaction; effects from herbicides, loss, modification or degradation of suitable habitat, seed bank impacts and reductions, reduced pollinator populations, and increased invasive plant species. As a result, there may be loss or degradation of cactus populations; decreases in Winkler cactus seed production; decreased recruitment; and increased occurrence of plant damage or individual mortality.

## Wild Horse and Burro Management

The objective of wild horse and burro management is the protection, management, and control of wild free-roaming horses and burros (WH&B) on public lands. Management includes maintaining viable herds that will preserve the free-roaming nature of WH&Bs in a manner that is designed to achieve and maintain thriving ecological balance on the public lands.

Management activities occurring under this program may increase foot traffic, motorized presence, and vegetation treatments in Winkler cactus suitable habitat. These activities may cause trampling or crushing of individuals, increased soil disturbance; soil erosion and compaction; effects from herbicides, loss, modification or degradation of suitable habitat, seed bank impacts and reductions, reduced pollinator populations, and increased invasive plant species. As a result, there may be loss or degradation of cactus populations; decreases in Winkler cactus seed production; decreased recruitment; and increased occurrence of plant damage or individual mortality.

## Fish and Wildlife Resource Management

This program aims to maintain biological diversity, support UDWR Herd Management Plans, improve habitat on for wildlife and fisheries, and provide habitats for threatened and endangered species.

Activities occurring under this program may increase foot traffic, motorized traffic, and/or significant soil disturbance in Winkler cactus suitable habitat. These activities may cause trampling or crushing of individuals, removal of suitable habitat, loss, modification or degradation of suitable habitat, reduced seed banks, reduced pollinator populations, and increased occurrences of invasive plant species. As a result, there may be decreased seed production, decreased recruitment, and increased occurrence of plant damage or individual mortality.

## Transportation and Access Management

The objectives of the transportation and access management program are to provide a safe and effective transportation and access system across public lands. Activities included under this program include maintenance of roads, support of counties and states for land access and road networks, reclamation of redundant and unused roads, management of scenic byway and backway corridors, and instillation of appropriate signage.

Activities occurring under this program occurring may increase localized foot traffic, motorized traffic, and use of tools and heavy machinery in suitable Winkler cactus habitats. Land treatments may lead to short-term increased soil erosion, and storm water runoff with heavy

concentrations of sediment. Associated impacts may include: trampling or crushing of individuals; increased soil disturbance; soil erosion and compaction; removal, degradation, or alteration of key habitat; reduced seed banks; and increased occurrence of invasive plant species. As a result, there may be loss or degradation of cactus populations; decreases in Winkler cactus seed production; decreased recruitment; and increased occurrence of plant damage or individual mortality.

**Cumulative Effects**

Cumulative effects include the effects of future State, Tribal, local or private actions that are reasonably certain to occur in the action area considered in this biological opinion. Future Federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to section 7 of the Act.

Cumulative effects to the Winkler cactus under the Proposed Actions would include, but are not limited to, the following broad types of impacts:

- Changes in land use patterns or practices that adversely affect a species' critical, suitable, or potential habitat;
- Encroachment of human development into a species' critical, suitable, or potential habitat; and
- Management actions by some, or all, of the following groups, on lands adjoining or upstream of BLM-administered lands:
  - State of Utah;
  - County Governments in Utah;
  - Local Governments in Utah; and
  - Private landholders in Utah.

Winkler cacti occur primarily within BLM management boundaries. In these areas, Winkler cactus locations are surrounded by a checkerboard pattern of land ownership including Federal, State, and private landowners. Winkler cacti are susceptible to activities on State and private lands. Many of these activities, such as livestock grazing, oil and gas exploration and development, human population expansion and associated infrastructure (increased trails and roads), research, and recreation activities (e.g. off-road vehicles), are expected to continue on State and private lands within the Winkler cactus' range. In addition, illegal collection is reasonably certain to occur. Contributing as cumulative effects to the proposed action, all these activities will continue to affect Winkler cactus populations by decreasing abundance, injuring plants, adversely affecting pollinators, and further adversely impacting occupied and suitable habitat.

**Conclusions**

The conclusions of this biological opinion are based on full implementation of the project as described in the "Description of the Proposed Action" section of this document, including the resource protection measures that were incorporated into the project design.

After reviewing the current status of the Winkler cactus, the environmental baseline for the action area, the effects of the proposed action, and the cumulative effects, it is the USFWS's biological opinion that the Price Field Office Resource Management Plan, as proposed, is not likely to jeopardize the continued existence of the Winkler cactus. Critical habitat has not been designated for this species. We base our conclusion on the following:

1. The applicant committed resource protection measures will be incorporated into site-specific projects designed under the BLM Resource Management Plan. If project design cannot adhere to all applicant committed resource protection measures, consultation under Section 7 of the Endangered Species Act will be initiated.

2. All site-specific projects designed under the proposed BLM Resource Management Plan would be subject to consultation requirements under Section 7 of the Endangered Species Act.

## Uinta Basin hookless cactus *(Sclerocactus glaucus)*

### Status of the Species

*Species Description*

Uinta Basin hookless cactus (*S. glaucus*) is a member of the small cactus genus *Sclerocactus*. Specimens of this species from the Grand Valley of Colorado were initially described as *Echinocactus glaucus* in 1898 by Karl Schumann. Several other specimens of this species, all from Colorado's Grand Valley were subsequently described in the scientific literature: *Echinocactus subglaucus* (Rydberg in 1917), *Sclerocactus whipplei* var. *glaucus* (Purpus 1925) and *Sclerocactus franklinii* (Evans 1939). The Uinta basin hookless cactus was listed as threatened under the Endangered Species Act of 1973, as amended (ESA), on October 11, 1979 (USFWS 1979).

In the 1930's Edward Graham collected *"Sclerocactus whipplei"* and *"Utahia sileri"* specimens in Utah's Uinta Basin. These along with the Colorado plants were included by Lyman Benson in his 1966 monograph on the genus *Sclerocactus,* as *Sclerocactus glaucus.* The USFWS followed this taxonomic treatment when the Uinta Basin hookless cactus (*S. glaucus*) was listed as a threatened species in 1979 (USFWS 1979).

Taxonomic changes continued after *Sclerocactus glaucus*' listing in 1979. Of importance is Fritz Hochstätter's description and publication of *Sclerocactus wetlandicus* in1989. He describes this species as occurring in northeast Utah in habitat around the Pariette Wetlands. In 1993, he recognized a variety, which he named *ilseae.* He describes this variety as maintaining a relatively small form with extremely short spination. Also recognizing a distinctive entity in the Pariette Draw, Kenneth D. Heil and J. Mark Porter published *Sclerocactus brevispinus* in 1994. *S. brevispinus* is distinctive, due largely to its globose stems, short spines, and small flowers.

*S. wetlandicus* and *S. brevispinus* comprise distinct morphological forms of *S. glaucus.* Genetics research is ongoing (Hochstätter 1989, 1993 cited in Heil and Porter 2004; Porter et al. 2006). The USFWS recognizes these two species as threatened under *S. glaucus*'s original

listing as threatened, and have proposed a revision to recognize *S. wetlandicus* and *S. brevispinus* as threatened under their now recognized scientific names (72 FR 53211 September 18, 2007).

*Sclerocactus wetlandicus* (The Utah form of typical *S. glaucus*) is a photosynthesizing green plant with succulent unbranched stems usually 3 to 9 cm diameter and 4 to 12 cm tall varying from spheric to elongated cylindrical in shape. The succulent stem has 12 to 14 ribs spirally aligned on the plant body with tubercles bearing spines. Spines are borne in clusters on areoles at the apex of the rib tubercles. The spines are of three types: 6 to 10 strait radial spines 6 to 20 mm long are borne at the margin of areole, 3 to 4 central strait spines similar to radial spines but borne in central portion of the areole around the, usually large single (sometimes 2 or lacking) abaxial spine 15 to 29 mm long and thicker than the other spines the abaxial spine is strait or gently curved (very rarely hooked). (Hooked abaxial spines are the norm in all Sclerocactus species except *S. glaucus* and *S. wetlandicus*). Flowers are funnelform 2 to 4 centimeters wide and 2.5 to 5 centimeters high. The sepals and petals are collectively called tepals in cacti. The outer tepals are oblanceolate about 15 mm wide and 20 to 50 mm long with broad brownish lavender midstripe and pink to violet margins. The inner tepals are oblanceolate to lanceolate 17 to 25 mm wide and 30 to 60 mm long pink or violet. The stigma has 6 lobes and it and the style is pinkish yellow. Filaments are green to white and anthers are yellow. The Fruit is ovoid to barrel shaped reddish or reddish grey when ripe 7 to 12 millimeters wide and 9 to 25 mm long. Seeds are black 1.5 millimeters wide 2.5 millimeters long (Hochstätter 1993, cited in Heil and Porter 1994).

*Sclerocactus brevispinus* (The short spined form Utah form of *S. glaucus*) is a photosynthesizing green plant with succulent unbranched stems usually 1.8 to 7 cm diameter and 2.5 to 8 centimeters tall varying from depressed spheric to shortened cylindrical in shape. The succulent stem has about 13 ribs spirally aligned on the plant body with tubercles bearing spines. Spines are borne in clusters on areoles at the apex of the rib tubercles. The spines are of three types: 6 to 7 strait radial spines 5 to 15 mm long are borne at the margin of areole, 0 to 2 lateral strait central spines similar to radial spines but borne in central portion of the areole around the usually small single (sometimes lacking) abaxial spine 1 to 5 mm long and thicker than the other spines the abaxial spine is hooked (in specimens with 1 to 2 mm central long spines the spine hook reflexes back to the surface of the areole) are shorter. Flowers are campanulate about 1.1 to 3 centimeters wide and 2 to 3 centimeters high. The outer tepals are oblanceolate about 6 millimeters wide and 15 millimeters long with broad brownish midstripe and pink to purple margins. The inner tepals are oblanceolate to lanceolate 10 to 22 millimeters wide and 30 to 60 millimeters long purple. The stigma has 6 lobes and it and the style is pinkish yellow. Filaments are white to green to pinkish purple and anthers are yellow. The Fruit is shortened barrel shaped reddish or reddish grey when ripe 7 to 12 mm wide and 9 to 25 mm long. Seeds are black 1.8 to 2.7 millimeters wide 2.5 to 3.8 millimeters long. (Species descriptions adapted from Hochstätter 1993).

*Life History and Population Dynamics*

The Uinta Basin hookless cactus is a slow-growing species (Rechel et al. 1999). Reproduction is sexual. Flowering occurs from April to May and fruiting occurs from May to June. Bees, flies, beetles, and ants have been observed visiting Uinta basin hookless cactus flowers, however, the effective pollination vectors are not clearly understood (USFWS 1990). Seed dispersal is

possibly a limiting factor in the distribution of the species. Seed dispersal is accomplished primarily by ants (Rechel et. al. 1999), but may also occur via rain and water flow, other insects, birds, and rodents (USFWS 1990). Seed dispersal is possibly a limiting factor in the distribution of the species. Factors which govern the distribution of Uinta Basin hookless cactus and long-term population dynamics are poorly understand (USFWS 1990).

*Status and Distribution*

Populations and suitable habitat for the Uinta Basin hookless cactus occur within the administrative boundaries of BLM's Vernal Field Office and Price Field Office. The cactus is found in the Uinta Basin of northeastern Utah and the upper Colorado and Gunnison River valleys of western Colorado. In Colorado, there are two population centers of Uinta Basin hookless cactus which occur in the Upper Colorado and Gunnison River valleys of western Colorado. These population centers occur on alluvial river terraces of the Gunnison River from near Delta, Colorado, to southern Mesa County, Colorado; and on alluvial river terraces of the Colorado River and in the Plateau and Roan Creek drainages in the vicinity of DeBeque, Colorado (USFWS 1990).

In Utah, the Uinta Basin hookless cactus is found within one major population center composed of three important population groups. Each of these three population groups occur within the BLM Diamond Mountain planning area, with one of the three populations extending into the Book Cliffs planning area and one extending into the Price River planning area. Specifically, the three Utah populations are found within the following areas and habitats:

- on alluvial river terraces near the confluence of the Green, White, and Duchesne rivers including Ouray National Wildlife Refuge and the town of Ouray, Utah, south along the Green River, to the vicinity of Sand Wash including concentrations near the mouth of Pariette Draw;

- along the base of the Badlands Cliffs in extreme southeastern Duchesne County; and

- a small population of a morphologically distinct form (*S. brevispinus*) growing on the Clay badlands in the Pariette Draw drainage south of Myton, Utah, which gradates into the more typical Uinta Basin hookless cactus near the mouth of Pariette Draw south of Ouray, Utah (USFWS 1990).

There are additional populations east along the White River drainage and a disjunct population near Bonanza, Utah.

*S. wetlandicus* generally occurs on cobblely, gravelly, or rocky surfaces on river terrace deposits and lower mesa slopes. The morphologically distinct form, *S. brevispinus*, occurs on badlands in the Pariette Draw drainage, derived from the Wagonhound member of the Uinta geologic formation.

*S. glaucus* occurs on varying exposures, but is more abundant on south facing exposures, and on slopes to about 30 percent grade; it is most abundant at the point where terrace deposits break from level tops to steeper side slopes. The species is found at an elevational range of 4,500 to 5,900 feet.

Vegetation type of the species' habitat is comprised of desert scrub dominated by shadscale (*Atriplex confertifolia*), galleta (*Hilaria jamesii*), black-sage (*Artemisia nova*), and Indian rice grass (*Stipa hymenoides*). Other important species include two similar spherical or cylindrical cactus species, strawberry hedgehog cactus (*Echinocereus triglochidiatus* var. *melanacanthus*) and Simpson's pincushion cactus (*Pediocactus simpsonii*). Other important species in the plant community include the prickly pear cactus (*Opuntia polycantha*), winterfat (*Krascneninnikovia lanata*), yucca (*Yucca harrimaniae*), snakeweed (*Gutierrezia sarothrae*), low rabbitbrush (*Crysothamnus viscidiflorus*), sand dropseed (*Sporobolus cryptandrus*), and Salina wildrye (*Elymus salinus*) (USFWS 1990).

**Environmental Baseline**

*Status of the Species within the Action Area*

According to the Biological Assessment, approximately 759,724 acres of potentially suitable habitat exists within the Vernal and Price Field Offices. However, the majority of this habitat is in the Vernal Field Office. Within the PFO, the Uinta Basin hookless cactus is associated with low-elevation lands where outcroppings of the Green River and Mancos geologic formations occur. Typical habitat is located on the coarse soils above the flood plain of the Green River. This occurrence generally is associated with the northeast corner of the PFO. No range-wide study of this species has been completed, so it is unknown how much of the cactus is in this planning area.

*Factors Affecting Species Environment within the Action Area*

Range-wide activities with the greatest potential to adversely affect Uinta basin hookless cactus populations and habitats include: livestock grazing (trampling); off-highway vehicle use; energy and mineral exploration and development; stone collecting; the use of insecticides and herbicides; and illegal collection (USFWS 1990). In addition to these human-induced threats, several natural threats to the continued conservation of the species include: disease, parasitism, predation, drought, erosion, trampling by wildlife, and vegetative competition (USFWS 1990).

**Effects of the Action**

Cultural Resources

This program includes surveys, inventories, excavation activities, surface material collection, and interpretive site development. Surveys may involve multiple people and vehicles and can last up to several weeks. Inventories for cultural resources commonly entail the use of hand tools, power tools, or heavy machinery.

Activities under this program include minor surface disturbance for cultural resource excavations. Activities under this program may increase localized foot traffic, motorized traffic, and use of tools in Uinta basin hookless cactus habitat. These activities may cause trampling or crushing of individuals; increased soil disturbance; removal, degradation, or alteration of key habitat; reduced seed banks; reduced pollinator populations and increased occurrence of invasive plant species. As a result, there may be decreased recruitment, increased plant damage or individual mortality, and a potential for long-term population declines.

Paleontological Resources

This program includes surveys, inventories, excavation activities, surface material collection, and interpretive site development. Surveys may involve multiple people and vehicles and can last up to several weeks. Inventories for paleontological resources commonly entail the use of hand tools, power tools, or heavy machinery.

Activities under this program include minor surface disturbance for fossil resource excavations. Activities under this program may increase localized foot traffic, motorized traffic, and use of tools in Uinta basin hookless cactus habitat. These activities may cause trampling or crushing of individuals; increased soil disturbance; removal, degradation, or alteration of key habitat; reduced seed banks; reduced pollinator populations; and increased occurrence of invasive plant species. As a result, there may be decreased recruitment, increased plant damage or individual mortality, and a potential for long-term population declines.

Fire and Fuels Management

Major activities associated with the BLM's fire management program include: wildfire suppression, wildland fire use, prescribed burning, non-fire fuels treatments (mechanical and chemical), and emergency stabilization and rehabilitation following wildfires. Fire suppression methods may involve: fireline construction, use of fire suppression agents and retardants, and water withdrawals.

Although the BLM does not propose to carry out prescribed fire or non-fire treatments (mechanical and chemical) within suitable habitat for the Uinta basin hookless cactus, wildland fire suppression activities could adversely affect the Uinta Basin hookless cactus. Activities under this program may result in increased foot or motorized traffic and application of chemicals (fire retardants, pesticides, insecticides) in suitable Uinta basin hookless cactus habitats. These activities may cause trampling or crushing of individuals; increased soil disturbance; removal, degradation, or alteration of key habitat; reduced seed banks; reduced pollinator populations; and increased occurrence of invasive plant species. As a result, there may be decreased recruitment, increased plant damage or individual mortality, and a potential for long-term population declines.

Forestry and Woodlands Resources

The forest management program implements silvicultural practices including site preparation, regeneration, stand protection, stand maintenance, pre-commercial and commercial thinning for density management, fertilization, pruning, forest and woodland condition restoration treatments, and salvage harvest. The program allows the treatment of forest insect and disease infestations by spraying, cutting, and removal; and herbicidal spraying of grasses and shrubs. Forest management actions may also include conducting surveys, obtaining easements, pursuing legal access, allowing road development, and installing drain culverts and water bars. Wood and seed collection as well as non-commercial harvest of posts and Christmas trees are also authorized under this program.

Although activities authorized under this program are not likely to occur in Uinta Basin hookless cactus habitat, there is some potential for private individuals to trample Uinta Basin hookless cactus individuals while harvesting wood products. Known populations of Uinta Basin hookless

cactus, and potential habitats have not been specifically protected from fuel wood, Christmas tree, and post and pole harvesting. As a result, there may be decreased seed production; decreased recruitment; increased illegal collection of individuals due to increased human access; and increased occurrence of plant damage or individual mortality.

Geology and Minerals Management

The planning area will be open to consideration for exploration, leasing, and development of leasable minerals (oil, gas, coal bed natural gas), salable minerals (sand, gravel, stone and humate) and locatable materials (uranium, clay and gypsum). Although stipulations or conditions may be included in the terms of these mineral contracts, there are potential impacts associated with these various activities. Mineral exploration and extraction often results in surface disturbance from road and facility construction, removal of topsoil and overburden, stock piling of these materials, and post-mining reclamation and recontouring.

Activities occurring under this program may result in increased foot traffic and motorized traffic, significant soil disturbance; increased energy development of facilities, and increased mineral excavation in Uinta basin hookless cactus habitat. These activities may cause trampling or crushing of individuals; increased soil disturbance; soil erosion and compaction; loss, modification, or degradation of suitable habitat; reduced seed banks; loss of pollinator populations; increased occurrences of invasive plant species; and increased occurrence of illegal collection due to increased human access due to increased human access. As a result, there may be loss or degradation of cactus populations; decreased Uinta Basin hookless cactus seed production; decreased recruitment; and increased occurrence of plant damage or individual mortality.

Hazardous Materials Management

Activities conducted under the BLM's hazardous materials program include providing warnings, securing and disposing of hazardous waste discharged on public lands, establishing precautions, and responding to emergencies. Activities may involve increased human presence, use of heavy equipment, and removal of contaminated soils. These activities have the potential to occur in locations where mineral development or transport occurs.

Activities occurring under this program may increase foot traffic, motorized traffic, and significant soil disturbance in Uinta Basin hookless cactus suitable habitat. These activities may cause trampling or crushing of individuals, removal of suitable habitat, increased soil disturbance; soil erosion and compaction, loss, modification or degradation of suitable habitat, reduced seed banks, reduced pollinator populations, and increased invasive plant species. As a result, there may be loss or degradation of cactus populations; decreases in Uinta Basin hookless cactus seed production; decreased recruitment; and increased occurrence of plant damage or individual mortality.

Lands and Realty

Objectives of the lands and realty management program are to support multiple-use management goals of the BLM resource programs; respond to public requests for land use authorizations, sales, and exchanges; and acquire and designate rights of way access to serve administrative and

public needs. Realty management authorizes occupancy of public lands for roads, power lines, pipelines, communication sites, and irrigation ditches authorized by granting rights of way. Rights of way management actions respond to public requests for access, land authorizations, sales, and exchanges. These rights of way may be temporary or extend up to 30 years, or even in perpetuity.

Activities authorized under this program may adversely impact Uinta Basin hookless cactus with human- and equipment-related soil disturbances. Soil disturbance, erosion, and compaction may impact individual plants, modify or degrade suitable habitat, reduce pollinator populations, and reduce the seed bank. Land exchanges may result in fragmentation or degradation of potential Uinta Basin hookless cactus habitat. As a result, there may be loss or degradation of cactus populations; decreased recruitment; and increased occurrence of plant damage and individual mortality.

## Livestock Grazing

The objective of livestock grazing management is to maintain or improve forage production and range condition as a sustainable resource base for livestock grazing on BLM land. Livestock management includes designating the kind and class of livestock, seasons of use, locations of use and the numbers of livestock that are permitted to use BLM lands.

Range management activities may include vegetation treatments such as prescribed fire, mechanical and chemical control of noxious weeds, sagebrush and other target species. The determinations and effects analyses associated with the potential impacts of these treatments can be located under the other appropriate program headings (i.e., fire treatments – see Fire Management, or vegetative treatments – see Vegetation Management). Other range improvements authorized by the livestock grazing management program may include fence construction, water developments, exclosures, and livestock handling facilities.

There are four primary ways livestock manipulate habitats to favor/hinder other species within the habitat: 1) alteration of vegetation composition, 2) cause increased/decreased productivity of selected plant species, 3) increase/decrease the nutritive quality of available forage, and/or 4) increase/decrease the diversity of habitats by altering structure (Severson and Urness 1994).

Activities occurring under this program may increase and concentrate domestic ungulate presence; increase motorized traffic; and surface disturbance from fence and livestock pond construction in Uinta basin hookless cactus suitable habitat. These activities may increase the occurrence of trampling or crushing of individuals, increase soil disturbance, soil compaction and erosion; increase occurrence of exotic plant species; reduce pollinator populations and remove, modify or degrade suitable habitat. As a result, there may be increased occurrence of plant damage or individual mortality and loss of habitat.

## Recreation Management

The recreation program includes providing for and managing recreational access, developing and maintaining recreation areas, issuing special recreation permits, providing information to the public about BLM's recreational resources, and assessing effects of recreational use on the

natural resources.  Under this program, OHV use, camping, rafting, hiking, fishing, boating, swimming, and other activities are allowed in designated areas.

Activities occurring under this program may increase human, horse, and motorized traffic in Uinta basin hookless cactus suitable habitat.  Associated impacts from these activities include trampling or crushing of individuals, illegal collection of individuals due to increased human access, loss, modification or degradation to suitable habitat, reduced seed banks, and increased occurrences of invasive plant species.  As a result, there may be decreased recruitment, and increased occurrence of plant damage or individual mortality.

Riparian, Soils and Water Resources

The objectives for the riparian, soil and water resources management program are to maintain and improve soil integrity, riparian and wetland areas, and protect water quality.  Many Best Management Practices (BMPs), designed under this program reduce sedimentation and protect water quality also benefit soil productivity by minimizing erosion.  Examples of other protection measures implemented under this program include maintenance and restoration of appropriate biological soil crusts, management of watershed health, and manage salinity load.  Generally, this management program provides information in support of other resource objectives and goals.

Activities occurring under this program may increase localized foot traffic, motorized traffic, and use of tools and heavy machinery in suitable Uinta Basin hookless cactus habitats.  Land treatments may lead to short-term increased soil erosion, and storm water runoff with heavy concentrations of sediment.  Associated impacts may include:  trampling or crushing of individuals; increased soil disturbance; soil erosion and compaction; removal, degradation, or alteration of key habitat; reduced seed banks; reduced pollinator populations; and increased occurrence of invasive plant species.  As a result, there may be decreased recruitment and increased plant damage or individual mortality.

Vegetation Management

Program objectives are to maintain or improve the diversity of plant communities to support timber production, livestock needs, wildlife habitat, watershed protection, and acceptable visual resources.  Therefore, this program includes mechanical, chemical, biological, cultural vegetation management methodologies.  These management methodologies may result in ground disturbing activities, chemical impacts, human disturbances, and impacts to vegetation from biological management techniques.

Management activities occurring under this program may increase foot traffic, motorized presence, and vegetation treatments in Uinta basin hookless cactus suitable habitat.  Associated impacts include trampling or crushing of individuals, loss, modification or degradation of suitable habitat, reductions in seed banks, reduced pollinator populations, and increased occurrences of invasive plant species.  As a result, there may be decreased seed production, decreased recruitment, and increased occurrence of plant damage or individual mortality.