lands are closed to human entry. Recreation activities would be unevenly dispersed and distributed by location, intensity, activity type, infrastructure, season, and time on BLM lands. In the CRVFO, recreation use peaks during the summer in locations like the Colorado and Eagle Rivers, on weekends and evenings on BLM lands adjacent to communities or within easy access of communities, and during the fall big game hunting seasons when many resident and out-of-town hunters add to the mix of recreation. Alternative A lacks the limitations on recreation use (camping closures, firearm use restriction) proposed under the Proposed RMP and Alternatives C and D. The risks to visitor experience from inappropriate or increasing recreation use are higher under Alternatives A and D.

**Impacts from Lands and Realty.** Land exchanges, acquisitions, and disposals would add or remove land from BLM jurisdiction. Land disposals could result in the loss of the indirect protection of scenic viewsheds provided by other resource management actions. In contrast, acquisitions would indirectly, but beneficially, contribute to the protection of national trail and scenic byway viewshed corridors. Under Alternative A, land tenure adjustments are performed to increase the overall efficiency and effectiveness of BLM land management.

ROW authorizations associated with roads, utilities, communication facilities, and energy facilities could impact scenic viewsheds by necessitating surface occupancy and surface-disturbing activities. This could indirectly impact a visitor's travel experience on national trails or scenic byways. BLM lands identified as avoidance areas may not be totally unavailable, but should be avoided if possible due to some resource value that may become damaged or detracted from if development were allowed. Under all alternatives, ROW avoidance and exclusion areas would apply to ROWs, other land use authorizations, and renewable energy. Under all alternatives, ROWS would be subject to NSO and CSU stipulations that would constrain surface occupancy and surface-disturbing activities. Potential adverse impacts to scenic viewsheds within national trails and scenic byways under Alternative A would be more than under the Proposed RMP and Alternatives C and D.

**Impacts from Coal Management.** Exploration and development of coal creates surface disturbance that could adversely affect scenic viewsheds within national trails and scenic byway corridors. While coal mining would result in surface-disturbing activities, there currently are no active coal mines in the planning area, and the potential is relatively low. Known coal resources within the CRVFO are located along the Grand Hogback between Rio Blanco Hill and Glenwood Springs and are not within any national trails or scenic byway viewsheds.

**Impacts form Fluid Minerals Management.** Oil and gas development activity is concentrated on the western 22 percent of the CRVFO (the area west of the Grand Hogback), where high potential for the occurrence of gas resources is found. It is estimated that 99 percent of future drilling would occur in the areas identified as high potential for the occurrence of oil and gas resources. Of the 147,500 acres of BLM mineral estate in this high potential area that is not within the Roan Plateau planning area, 88 percent has been leased and is being developed. The eastern 78 percent of the CRVFO (east of the Grand Hogback) has a lower potential for the occurrence of oil and gas resources. Approximately 1 percent of future drilling activity is likely to occur in areas of medium and low potential, and no drilling is predicted in the areas identified as no known potential. Alternative A identifies the most acres as open to leasing and gas development. Despite the variance in acres open to leasing and gas development, the scope of the impacts is not expected to vary among the alternatives, but the intensity of impacts could increase in areas with a high potential for natural gas located west of the Grand Hogback. Under Alternative A, all WSAs and the Thompson Creek ACEC

(formerly NEA) would remain closed to fluid minerals leasing and geophysical development. Over the life of the current RMP, the designation CL for these areas would continue to indirectly support the protection of national trails and scenic byway viewshed corridors.

**Impacts from Locatable Minerals, Mineral Materials, and Non-Energy Leasable Minerals Management.** The effects of mineral resource development and production on scenic viewsheds within national trails and scenic byways could vary, depending on the location and degree of disturbance. Acres of locatable minerals, mineral materials sales, and non-energy leasable minerals open to development would vary by alternative, with Alternatives A and D having the most open acres. However, the amount of land that is open to mineral use is not necessarily indicative of the number of acres that would be directly disturbed since the amount of expected mineral is low. Under all alternatives, minerals would be subject to the concurrent stipulations for each alternative. If mineral development would occur through the life of the plan, Alternative A would pose more risk of not supporting the protection of national trails and scenic byway viewshed corridors.

**Impacts from Areas of Critical Environmental Concern Management.** Under Alternative A, six ACECs would be designated where special management is needed to protect important geologic, botanic, historic, scenic values, and wildlife. ACEC designations and their management prescriptions offer long-term benefits by limiting or preventing surface disturbance. Thus, indirectly, but beneficially, these designations contribute to maintaining the condition and the quality of national trail and scenic byway viewshed corridors

## Alternative B (Proposed RMP)

Impacts to national trails and scenic byways from management of resources would be the same as or similar to those under Alternative A except as described below.

**Impacts from Comprehensive Trails and Travel Management.** Impacts would be the same as those under Alternative A, except that the Proposed RMP would designate no acres as open to OHV use, 464,000 acres as limited to designated routes, and 41,200 acres as closed to OHVs. Compared with Alternative A, the Proposed RMP has no open designation, and would have long-term indirect beneficial impacts on the viewsheds within national trails and scenic byways.

**Impacts from Air Quality Management.** Impacts would be similar to those under Alternative A, except that under the Proposed RMP and Alternatives C and D, the objective would be to control or reduce emissions of air pollutants associated with oil and gas activities to help protect human health and reduce visibility-impairing pollutants. Air quality management objectives and actions under the Proposed RMP would include more stringent emission controls on oil and gas equipment and activities than Alternative A. Implementing the proposed air quality management actions and allowable use decisions would indirectly, but beneficially, contribute to maintaining the condition and the quality of national trail and scenic byway viewshed corridors.

**Impacts from Water Resource Management.** Impacts would be similar to those under Alternative A except that under the Proposed RMP and Alternative C, an NSO stipulation would prohibit surface occupancy and surface-disturbing activities within a buffer distance of a hydrologic feature (i.e., perennial streams, water bodies, riparian areas, and wetlands). Under the Proposed RMP, the buffer distance would be 325 horizontal feet from the outer edge of riparian/wetland zones. Alternative C would provide a similar streamside management protection zone, but with a smaller buffer distance of 50 feet from the ordinary high

water mark of any hydrologic feature (i.e., ephemeral, intermittent, perennial channels, wetland, lake, fen, spring). Under the Proposed RMP, in addition to an NSO for municipal watersheds and public water supplies, a CSU stipulation would constrain surface-disturbing activities within watersheds providing domestic water. A CSU for intermittent and ephemeral streams would also be applied, constraining surface-disturbing activities within 100 feet of the edge of intermittent or ephemeral stream drainages. Under the Proposed RMP and Alternative C, constraints on surface-disturbing activities would be increased, compared with Alternatives A and D. The stipulations would indirectly, but beneficially, contribute to maintaining the condition and the quality of national trail and scenic byway viewshed corridors.

**Impacts from Vegetation Management.** Impacts would be similar to those under Alternative A except that the Proposed RMP and Alternatives C and D would provide more benefits to vegetation than Alternative A. This would in turn, contribute to maintaining the condition and quality of national trail and scenic byway viewshed corridors.

**Impacts from Fisheries and Aquatic Wildlife Management.** Impacts would be similar to those under Alternative A, except that the Proposed RMP would apply an NSO stipulation for fish-bearing streams and an NSO stipulation for fish hatcheries. These stipulations would protect fish-bearing streams and hatcheries by constraining surface-disturbing activities. Alternatives C and the Proposed RMP, respectively, would propose more constraints on use and surface-disturbing activities and a larger area of constraints, so qualitatively it is estimated that they would indirectly, but beneficially, contribute to maintaining the condition and the quality of national trail and scenic byway viewshed corridors.

**Impacts from Terrestrial Wildlife Management.** Impacts under the Proposed RMP would be similar to those under Alternative A, with the addition of stipulations for migratory bird nesting season and priority wildlife areas, which would further prohibit surface occupancy and surface-disturbing activities. This would continue to indirectly support the protection national trails and scenic byway viewshed corridors.

**Impacts from Special Status Species Management.** Impacts under the Proposed RMP would be similar to those under Alternative A, with the inclusion of NSOs for additional special status species, which would further prohibit surface occupancy and surface-disturbing activities. This would continue to indirectly support the protection of national trails and scenic byway viewshed corridors.

**Impacts from Managing to Protect Wilderness Characteristics.** Under the Proposed RMP and Alternative C, Castle Peak Addition, Deep Creek, Flat Tops Addition, and Pisgah Mountain, Thompson Creek would be managed for wilderness characteristics. These lands would be closed to fluid minerals leasing and geophysical exploration to protect their wilderness character. In addition, the Proposed RMP and Alternative C would apply an NSO stipulation that would prohibit surface occupancy and surface-disturbing activities. Compared with Alternative C, the Proposed RMP would provide fewer benefits to scenic viewsheds within national trail and scenic byway corridors, but more than Alternatives A and D.

**Impacts from Livestock Grazing Management.** Impacts under the Proposed RMP would be similar to those under Alternative A, except that livestock grazing would continue to be authorized on 441,600 acres. The Proposed RMP would allow fewer acres for grazing compared with Alternative A, which would indirectly, but beneficially, contribute to maintaining the condition and the quality of national trail and scenic byway viewshed corridors.

**Impacts from Recreation and Visitor Services Management.** Under the Proposed RMP and Alternatives C and D, BLM lands would be designated as SRMAs or ERMAs, or they would be left undesignated. Five areas would be managed as SRMAs. Within SRMAs, R&VS management is recognized as the predominant land use focus, where specific recreation opportunities and RSCs are managed and protected on a long-term basis. An NSO stipulation for SRMAs would be applied under the Proposed RMP that would prohibit surface occupancy and surface-disturbing activities within these areas. Six areas would be managed as ERMAs. ERMAs are managed to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA. Since management within ERMAs is commensurate with the management of other resources and resource uses, all R&VS decisions would be compatible with other resource objectives. Compared with Alternatives A and C, R&VS management under the Proposed RMP would provide more indirect benefits to scenic viewsheds within national trail and scenic byway corridors.

**Impacts from Lands and Realty Management.** Impacts would be similar to those under Alternative A, except that the Proposed RMP would have 191,200 acres of ROW avoidance areas and 39,400 acres of ROW exclusion areas. Compared with Alternative A, the Proposed RMP would provide more benefits to maintaining the condition and the quality of national trail and scenic byway viewshed corridors.

**Impacts from Areas of Critical Environmental Concern Management.** Impacts would be similar to those under Alternative A, except that the Proposed RMP would designate 11 ACECs. Compared with Alternative A, the Proposed RMP would provide more benefits to maintaining the condition and quality of national trail and scenic byway viewshed corridors.

_Alternative C_

Impacts to national trails and scenic byways from management of resources would be the same as or similar to those under Alternative A except as described below.

**Impacts from Comprehensive Trails and Travel Management.** Under Alternative C, additional travel limitations and a reduced number of designated routes are proposed. Compared with Alternative A, Alternative C would have the most long-term indirect beneficial impacts to viewsheds within national trail and scenic byways.

**Impacts from Air Quality Management.** Impacts would be similar to those under the Proposed RMP, except that under Alternative C, the cumulative impacts would differ because of the cumulative emissions within the WRFO. Implementing the proposed air quality management actions and allowable use decisions would indirectly, but beneficially, contribute to maintaining the condition and the quality of the viewsheds within national trail and scenic byway corridors.

**Impacts from Water Resource Management.** Indirect impacts would be similar to those under the Proposed RMP, except that Alternative C would propose a 100-foot (50 feet beyond the NSO) CSU stipulation for hydrologic features. The stipulation would apply to ephemeral, intermittent, and perennial channels, wetlands, lakes, fens, and springs. The areas and acres with constraints on surface-disturbing activities would increase, compared with other alternatives.

**Impacts from Fisheries and Aquatic Wildlife Management.** The indirect impacts would be similar to those under the Proposed RMP and Alternatives A, except Alternative C would be slightly more beneficial

because it proposes application of an NSO stipulation to all perennial waters instead of only to fish-bearing streams. It would also apply an NSO stipulation for fish hatcheries.

**Impacts from Special Status Plants and Terrestrial Wildlife Management.** The Proposed RMP and Alternative C would propose more constraints on use and surface-disturbing activities, and a larger area of constraints. Therefore, it is qualitatively estimated that Alternative C and the Proposed RMP, respectively, would indirectly be the most beneficial to reducing adverse impacts from surface-disturbing activities that would affect the viewsheds of national trails and scenic byways.

**Impacts from Managing to Protect Wilderness Characteristics.** Under Alternative C, all lands managed for wilderness characteristics would be managed consistent with the Management and Setting Prescriptions for Lands Managed to Protect Wilderness Characteristics (Appendix F). This would ensure that these lands are managed to preserve their wilderness characteristics. The prescriptions collectively retain the area's natural integrity, which would provide indirect benefits to scenic viewsheds within national trail and scenic byway corridors.

**Impacts from Livestock Grazing Management.** Impacts would be the similar to those described under Alternative A. Of the 58 vacant allotments, all would be closed and three currently active allotments would be closed to grazing. Alternative C offers the greatest potential increase in herbaceous vegetation. This would provide indirect benefits to viewsheds within national trail and scenic byway corridors.

**Impacts from Recreation and Visitor Services Management.** Under the Alternative C theme, current recreation uses would be recognized but not necessarily accommodated when considering land uses. Impacts from R&VS would be the same as or similar to those under the Proposed RMP, except that Alternative C would designate only the Red Hill and Upper Colorado SRMAs. Three additional ERMAs (Hack Lake, King Mountain, and the Crown) would be identified to sustain the principal recreation activities and the associated qualities and conditions. Alternatives C and D and the Proposed RMP would include more limitations (e.g., camping closures, firearm use restriction, and SRPs) on inappropriate recreation use.

**Impacts from Lands and Realty Management.** Impacts would be similar to those under Alternative A, except that Alternative C would have 196,800 acres of ROW avoidance areas and 39,900 acres of ROW exclusion areas. Compared with Alternative A, Alternative C would provide the most indirect benefits to viewsheds within national trail and scenic byway corridors of all the action alternatives.

**Impacts from Areas of Critical Environmental Concern Management.** Impacts would be similar to those under Alternative A, except that Alternative C would designate more acres as ACECs. Compared with Alternative A, Alternative C would provide the most benefits to viewsheds within national trail and scenic byway corridors of all the action alternatives.

## _Alternative D_

Impacts to national trails and scenic byways from management of resources would be the same as or similar to those under Alternative A except as described below.

**Impacts from Comprehensive Trails and Travel Management.** Impacts under Alternative D would be greater than under the Proposed RMP and Alternative C, but less than Alternative A, because OHVs would

be limited to designated routes. Alternative D would designate no land as open to OHV use, 464,800 acres as limited to designated routes, and 40,400 acres as closed to OHVs.

**Impacts from Water Resource Management.** Impacts under Alternative D would be similar to those under Alternative A. However, Alternative D would provide more protection to water resources than Alternative A, but less protection than the Proposed RMP and Alternative C.

**Impacts from Fisheries and Aquatic Wildlife Management.** Impacts under Alternative D would be similar to those under Alternative A, with an additional stipulation for trout-bearing streams. Compared with Alternative A, Alternative D would offer more indirect benefits to scenic viewsheds within national trail and scenic byway corridors, but less than the Proposed RMP and Alternative C.

**Impacts from Special Status Species Management.** Impacts under Alternative D would be similar to those under Alternative A, but would provide less protection by stipulations for special status plants and terrestrial wildlife that would prohibit surface occupancy and surface-disturbing activities. Alternative D would provide the least protection to national trails and scenic byway viewshed corridors.

**Impacts from Livestock Grazing Management.** Impacts under Alternative D would be similar to those under Alternative A, except that livestock grazing would continue to be authorized on 442,200 acres. Alternative D would allow fewer acres for grazing compared with Alternative A. Alternative D would be more protective than Alternative A, but less protective than Alternative C.

**Impacts from Recreation and Visitor Services Management.** Impacts under Alternative D would be similar to those under the Proposed RMP and Alternative C. Seven areas would be managed as SRMAs and five areas would be managed as ERMAs. Compared with the Proposed RMP and Alternatives A and C, R&VS management under Alternative D would provide the most indirect benefits to viewsheds within national trail and scenic byway corridors of all the action alternatives.

**Impacts from Lands and Realty Management.** Impacts would be similar to those under Alternative A, except that Alternative D has 105,100 acres of ROW avoidance areas and 39,100 acres of ROW exclusion areas. Compared with Alternative A, Alternative D would provide more indirect benefits to viewsheds within national trail and scenic byway corridors of all the action alternatives, but less than the Project Plan and Alternative C.

**Impacts from Areas of Critical Environmental Concern Management.** Impacts would be similar to those under Alternative A, except that Alternative D would designate fewer ACECs. Compared with Alternative A, Alternative D would provide the least indirect protection of viewsheds within national trail and scenic byway corridors by designating the least amount of acres to ACECs that limit surface-disturbing activities.

### Cumulative Impacts

The geographic extent of the cumulative impact analysis as it pertains to national trails and scenic byways would be within the eastern and southeastern extent of the planning area where existing national trails and scenic byway corridors reside or are within the vicinity. Cumulative effects include other federal, state, local, or private actions that are reasonably certain to occur in the planning area and near an existing national trail or scenic byway corridor. Potential cumulative impacts on national trails and scenic byways in the planning area

would result primarily from surface disturbance activities on adjacent lands, including OHV use, mineral exploration and development, livestock grazing, vegetation treatments (including prescribed burning), wildfires, and ROW authorizations. These activities would remove vegetation cover, exposing bare soil and creating visual scars in the landscape. These scars may not be in the corridors themselves, but would be within the corridor viewshed. These impacts would alter the natural appearance of a viewshed corridor and could diminish the scenic value, potentially affecting a visitor's overall travel experience.

BLM lands in the CRVFO contain a large amount of interspersed private lands, and some small parcels of state lands, making for an enormous amount of WUI issues with a diversity of commercial, industrial, residential, and agricultural land use. Communities bordering BLM land are certain to grow in both geographic extent and population over the life of the plan. In addition, destination resorts such as Aspen and Vail will continue to attract visitors year-round. Access to these destinations via scenic routes will become increasingly important as other more commonly traveled corridors (e.g., Interstate 70) are becoming more developed. Demands to use BLM lands and to expand development opportunities are expected to continue, and with this pressure there is more potential to impact national trail and scenic byway viewshed corridors.

Proposed management action and allowable use decisions under Alternatives A and D would maintain the scenic viewsheds within national trails and scenic byway corridors. However, this maintenance would decrease over time, since Alternatives A and D recognize and accommodate more land uses. Alternative A has the greatest risk of negative cumulative impacts on BLM lands, with those activities currently occurring and reasonably certain to occur on private lands. Alternative C would place major constraints on surface-disturbing activities and designate the most acres of ACECs, lands managed for wilderness characteristics, and ROW exclusion areas. Cumulative impacts would be the least under Alternative C. Alternative D would provide the least benefit to viewsheds within national trail and scenic byway corridors among all the action alternatives. Stipulations designed to protect other resources within the planning area would indirectly, but beneficially, support the protection of national trail and scenic byway viewshed corridors.

## 4.5    IMPACTS ON SUPPORT

### 4.5.1   Transportation Facilities

**Methods and Assumptions**

Access to BLM lands is crucial for the effective use and stewardship of those lands. This section describes potential impacts on transportation facilities (maintained roads) from management actions for the resources and resource uses discussed in Chapter 2. Existing conditions concerning transportation facilities are described in Section 3.5.1.

Maintained roads provide appropriate ingress, egress, and access in the planning area. The following discussion of the impacts on transportation and access focuses on management actions that restrict or facilitate transportation and access opportunities on federal-, state-, and county-maintained highways and roadways and BLM-maintained system roads described in Section 3.5.1. Potential impacts resulting from management of transportation and access are characterized by changes in vehicle movement on designated roadways within and next to the planning area because of other resource management programs. The impact analysis is based on BLM's knowledge of the planning area, best professional judgment, review of existing literature, information from BLM experts, and information from other agencies' experts.

The proposed transportation network is designated to achieve RMP goals and objectives and to provide for appropriate public and administrative access. Because transportation facilities are considered a support function, significance is based on the capability to create and manage the comprehensive travel network that best meets the full range of public, resource management, and administrative access needs for each alternative.

The transportation facility and access impact analysis was based on the following assumptions:

- BLM "Maintenance Intensities" provide guidance for appropriate "standards of care" to recognized routes within the BLM planning area. Recognized routes by definition include roads, primitive roads, and trails carried as assets within the FAMS.

- Maintenance intensities provide consistent objectives and standards for the care and maintenance of BLM routes based on identified management objectives. Maintenance intensities are consistent with land use planning management objectives (e.g., natural and cultural conditions, recreation setting characteristics, and VRM). Maintenance intensities do not describe route geometry, route types, types of use, or other physical or managerial characteristics of the route.

- In light of the wide range of needs and uses, BLM's routes represent a broad spectrum of linear features, from engineered roadways through challenging trails accessible only to nonmotorized traffic.

- BLM would coordinate with Eagle, Routt, Garfield, Mesa, and Pitkin Counties and the State of Colorado in development, maintenance, and management of BLM system, state, and county roads on lands in the planning area.

- Transportation needs would increase through the life of the RMP. The greatest needs for additional transportation facilities are associated with energy development and community expansion.

- Routes created through ROW authorizations would be maintained by the authorized users.

- If necessary, the BLM would evaluate Revised Statute 2477 road assertions under a separate process and criteria outside this planning process. Travel management planning is not intended to address the validity of any Revised Statute 2477 assertions. A travel management plan is not intended to provide evidence bearing on or addressing the validity of any Revised Statute 2477 assertions. Revised Statute 2477 rights are determined through a process that is entirely independent of the BLM's planning process. Consequently, travel management planning should not take into consideration Revised Statute 2477 assertions or evidence. Travel management planning should be founded on an independently determined purpose and need that is based on resource uses and associated access to public lands and waters. At such time as a decision is made on Revised Statute 2477 assertions, the BLM will adjust its travel routes accordingly.

- Under Alternative A in the CRVFO, resources and resource uses that would have negligible impacts on public travel and access are paleontology, wildland fire management, cave and karst resources, forestry, wild and scenic rivers, watchable wildlife, livestock grazing management, coal management, lands and realty management, and interpretation and environmental education. These resources have proposed actions or stipulations that would have benefits or negligible adverse impacts to public travel and access and are not discussed further in this section.

- There are no landing strips on BLM lands within the CRVFO planning boundary.

In addition, impacts from forest and woodlands management, rangeland management, riparian and weeds management, special status fish and other aquatic wildlife management, special status plants and terrestrial wildlife management, fisheries and aquatic wildlife and terrestrial wildlife management, lands managed for wilderness characteristics, cultural resources management, VRM, ACECs management, WSAs management, and health and safety management all have NSO, CSU, or other proposed actions that could impact transportation management by limiting ground-disturbing activities. These stipulations and proposed actions were addressed in Section 4.3.4 Comprehensive Trails and Travel Management,) and would all have similar impacts on the manageability, maintainability, and ability to meet the needs, as defined by the goals and objectives, for resources and resource uses of transportation facilities. Therefore, they are not discussed further in this section.

Table 4.5.1-1 shows road maintenance levels in the CRVFO by alternative. Maintenance levels by route are listed in Appendix N.

**Table 4.5.1-1**
**Road Maintenance in the CRVFO by Alternative**

| Trails and Travel Management | Alternative A | Alternative B (Proposed RMP) | Alternative C | Alternative D |
|---|---|---|---|---|
| Maintenance Level 2 | 21 | N/A | N/A | N/A |
| Maintenance Level 3 | 166 | N/A | N/A | N/A |
| Maintenance Level 4 | 93 | N/A | N/A | N/A |
| Intensity Level 0 | N/A | 21 | 23 | 29 |
| Intensity Level 1 | N/A | 166 | 161 | 167 |
| Intensity Level 3 | N/A | 93 | 96 | 84 |
| Total CRVFO miles | 280 | 280 | 280 | 280 |

Acronyms and Abbreviations:
CRVFO   Colorado River Valley Field Office
N/A       not applicable

### Environmental Consequences

Impacts on transportation facilities would result from some of the actions proposed under other resources and uses. Programs not addressed below were deemed to have no, or only negligible, impacts on transportation facilities under any of the four alternatives.

#### Alternative A

**Impacts from Transportation Facilities Management.** Under this alternative, BLM would maintain approximately 280 miles of road. Maintenance and upkeep of BLM roads are critical for travel management. As costs have risen, fewer miles of BLM roads have been maintained each year. The actual miles of roads maintained each year would be based on annual budgets. Under all alternatives, the CRVFO would emphasize maintaining the majority of BLM system roads at maintenance intensities that may not provide year-round access but are intended to keep the route in use for most of the year. This level of maintenance is sufficient to meet the CRVFO's objectives across all alternatives. BLM does not remove snow, but portions on some access routes are plowed by county road maintenance, utility companies, oil and gas operators, mining companies, or private landowners if the roads provide access to their property, facilities, or operations.

**Impacts from Air Quality Management.** Under all alternatives, the impacts on transportation would come from dust abatement projects. These impacts would be minor and short term along unpaved travel routes (Class D roads, single-track routes, and mechanized trails). In addition, impact analysis for air management is deferred pending completion of air quality modeling.

**Impacts from Recreation and Visitor Services Management.** Recreation-related demands on public lands could increase the need for maintenance, depending on access requirements and recreation setting objectives. Recreation-related routes would be maintained as needed for maintaining the desired setting, and as allowed by annual budgets.

**Impacts from Comprehensive Trails and Travel Management.** Trails and travel management-related demands on public lands could increase the need for maintenance and access. Alternative A opens approximately 792 miles of routes to full-sized vehicles. Approximately 280 miles of these roads would be maintained, while the remaining 512 miles of routes would not be maintained by BLM. These unmaintained routes would remain open through repeated use from the public and administrative users. ATV, motorcycle, mechanized, and pedestrian and equestrian routes would be maintained as needed and as allowed by annual budgets.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Leasing the oil and gas mineral estate under the fluid minerals program would have the greatest potential effect on the transportation program by requiring construction of new roads, increasing traffic on existing roads, and upgrading existing routes for access to well pads. A short-term increase in the volume of both heavy and light traffic would occur during the construction, well drilling, and completion phases of developing gas resources. Temporary conflicts, including a potential for delays, dust, road degradation, and increased public safety concerns, would occur during the well construction and drilling phase and recompletion and workover activities. Traffic levels and their impacts would be reduced after gas wells are in operation.

The CRVFO estimates that 99 percent of new gas development and associated energy-related traffic growth would occur in high-potential areas in the western part of the CRVFO from Glenwood Springs to DeBeque,

with the remaining 1 percent in moderate- to low-potential areas throughout the remainder of the CRVFO. Because the high-potential area is already leased, the RMP would allow BLM to require COAs to control traffic volume or require the lease developer to improve roads to help ease road capacity problems.

The greatest impacts on the CRVFO transportation network would continue to occur in the western part of the CRVFO, the area with the greatest potential for natural gas occurrence. Native-surfaced roads would continue to be improved to accommodate the increased traffic and heavy equipment.

The amount of traffic attributable to oil and gas development would depend on the rate of development, but any period of intense development would impact the major points of access. Most traffic would be generated by large (larger than pickup size) vehicles. The actual distribution of traffic is hard to predict because the exact rate of drilling, the distribution of the development, the use of multi-well pads , and the use of pipelines for fluids are unknown and likely to vary from year to year.

**Impacts from Locatable Minerals, Salable Minerals, and Non-Energy Leasable Minerals Management.** Locatable mineral exploration and development on BLM land would be regulated under 43 CFR 3800 in all alternatives. Access roads would be constructed under all of the alternatives. New roads constructed for mining would normally be gated and would not offer new public access. In addition, these roads would be maintained by the mining claimant.

### Alternative B (Proposed RMP)

Impacts to transportation facilities from, air quality management, R&VS management, and locatable minerals, salable minerals, and non-energy leasable minerals management would be the same as or similar to those under Alternative A. Impacts from management of other resources and uses would be as described below.

**Impacts from Transportation Facilities Management.** Impacts would be the same as or similar to those under Alternative A, except that BLM would provide maintenance on 259 miles of road.

**Impacts from Comprehensive Trails and Travel Management.** Trails and travel management-related demands on public lands could increase the need for maintenance and access. The Proposed RMP includes 495 miles of routes designated for full-sized vehicles. Approximately 259 miles of these roads would be maintained by BLM. The 236 miles of unmaintained routes would remain open through repeated use from the public and administrative users. ATV, motorcycle, mechanized, and pedestrian and equestrian routes would be maintained as needed and as allowed by annual budgets.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Impacts would be the same as those described under Alternative A.

### Alternative C

Impacts to transportation facilities from air quality management, R&VS management, locatable minerals, salable minerals, and non-energy leasable minerals management, would be the same as or similar to those under Alternative A. Impacts to transportation facilities from fluid minerals management would be the same as or similar to those under the Proposed RMP. Impacts from management of other resources and uses would be as follows.

**Impacts from Transportation Facilities Management.** Impacts would be the same as or similar to those under Alternative A, except that BLM would provide maintenance on 257 miles of road.

**Impacts from Comprehensive Trails and Travel Management.** Trails and travel management-related demands on public lands could increase the need for maintenance and access. Alternative C includes 420 miles of routes designated for full-sized vehicles. Approximately 257 miles of these roads would be maintained by BLM. The 163 miles of unmaintained routes would remain open through repeated use from the public and administrative users. ATV, motorcycle, mechanized, and pedestrian and equestrian routes would be maintained as needed and as allowed by annual budgets.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Impacts would be the same as those described under Alternative A.

### Alternative D

Impacts to transportation facilities from air quality management, R&VS management, locatable minerals, salable minerals, and non-energy leasable minerals management would be the same as or similar to those under Alternative A. Impacts from management of other resources and uses would be as described below.

**Impacts from Transportation Facilities Management.** Impacts would be the same as or similar to those under Alternative A, except that BLM would provide maintenance on 251 miles of road.

**Impacts from Comprehensive Trails and Travel Management.** Trails and travel management-related demands on public lands could increase the need for maintenance and access. Alternative D includes 546 miles of routes designated for full-sized vehicles. Approximately 251 miles of these roads would be maintained by BLM. The 295 miles of unmaintained routes would remain open through repeated use from the public and administrative users. ATV, motorcycle, mechanized, and pedestrian and equestrian routes would be maintained as needed and as allowed by annual budgets.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Impacts would be the same as those described under Alternative A.

### Cumulative Impacts

The cumulative impact analysis boundary includes the CRVFO boundary. Cumulative impacts on transportation and access would primarily occur from actions that facilitate, restrict, or preclude motorized access. Management actions that restrict OHV use would limit the degree of travel opportunities and the ability to access certain portions of the planning area. The continued maintenance of federal and state highways would provide arterial connections to BLM system roads. County-maintained routes that connect federal and state highways to BLM system routes would maintain and improve access to CRVFO's resources. Past, present, and reasonably foreseeable future nonfederal actions have affected, and will continue to affect, transportation management within the planning area. These actions—which include urban development patterns, the continuing growth of vehicle-based recreation, planned road and highway projects, and population growth—are expected to increase demand and construction of transportation routes near the CRVFO. Actions that would limit or restrict transportation project design (e.g., VRM designations, land use closures, and NSO stipulations) would result in impacts on transportation and access.

The actions and activities considered in this analysis, including land use restrictions for the preservation of sensitive resources, would not result in the inability of BLM to maintain transportation facilities. The degree of impact would be lowest under Alternative A because of fewer land use restrictions for the protection of sensitive resources. Conversely, implementation of increased restrictions to protect sensitive resources under Alternative C would result in the greatest level of impact on transportation and access. The Proposed RMP has slightly less restriction than under Alternative C. Alternative D would have slightly more restriction than under Alternative A.

## 4.6    IMPACTS ON THE SOCIAL AND ECONOMIC ENVIRONMENT

### 4.6.1   Public Health and Safety

***Methods and Assumptions***

This section describes potential impacts on public health and safety from management actions for the resources and resource uses discussed in Chapter 2. Existing conditions concerning public health and safety are described in Section 3.6.1. Abandoned mines are not discussed because most mines are closed or have exclosures to keep people out. Hot springs are not addressed because the BLM does not maintain hot springs for recreation.

The public health and safety impact analysis was based on the following assumptions:

- Public health and safety issues would receive priority consideration in the management of the BLM lands.

- Recreation participation would increase and would probably result in a corresponding increased need to maintain safe public use conditions.

- Increased public land use would result in increased exposure to energy and mineral development, mines, hazardous materials, and illegal dumpsites.

- All new hazardous materials sites would be identified and remediated.

- Resource development activities would not generate new hazardous material waste that would pose a health and safety threat to visitors.

- All hazardous material releases on BLM lands posing a substantial threat to the public or the environment are addressed as emergency cleanup actions.

- Interest in energy and mineral development on BLM lands within the planning area would continue, as identified in the RFD. The pace and timing of development would depend on a variety of factors outside the management decisions of BLM. These factors include national and international energy demand and prices, production factors (geology and technology) within the planning area, and business strategies of operators. A relatively constant rate of development is assumed for this analysis because the pace of development in the planning area is unknown. Therefore, actual impacts could vary if the rate of development or production changes over the life of the RMP.

***Environmental Consequences***

Impacts on public health and safety would result from some of the actions proposed under other resources and uses including air quality, water resource, R&VS, fluid minerals, ACEC designation, and public health and safety management. Other programs not addressed below were deemed to have little or no impact on public health and safety under any of the four alternatives.

<u>Alternative A</u>

**Impacts from Public Health and Safety Management.** Incidental dumping of hazardous materials occasionally occurs mostly in proximity to towns and highways within the CRVFO. Under Alternative A, an increase in the amount of illegal dumping would be expected as the population continues to grow in proximity to the BLM lands in the CRVFO.

Under all alternatives, mineral extraction operators would be required to prepare and maintain a current emergency communications plan and to adjust operating procedures to accommodate local residential concerns. Operators would be subject to oversight measures within 3 miles of Project Rulison for the benefit of public health and safety. The emergency communications plan would reduce the immediate danger to human health and safety by requiring the operator to remove the threat and to inform appropriate authorities and potentially affected citizens. The operator working in residential areas would be expected to mitigate impacts (e.g., noise, dust, and traffic) in response to public concerns. While there is no known potential for radionuclides to migrate from Project Rulison, the sampling program and oversight measures are a reasonable response to the public concern about the project.

**Impacts from Air Quality Management.** Allowing venting consistent with federal regulations in some instances under Alternative A may result in greater human exposure to air toxics such as VOCs in proximity to drilling activities and production facilities.

**Impacts from Water Resource Management.** A high degree of protection for the quality of water derived from public land in municipal watersheds would be provided under all alternatives. No surface disturbance that would adversely affect water quality would be permitted. Alternative A specifically prohibits surface occupancy and surface-disturbing activities to protect the domestic watersheds of Rifle and New Castle, of which the former is located in the high-potential area for oil and gas, with some existing development already having been approved there in collaboration with the Town of Rifle. Since not all designated municipal watersheds would be specifically protected, the potential exists under Alternative A for greater risks to municipal watersheds than under the other alternatives.

**Impacts from Recreation and Visitor Services Management.** BLM would continue to allow the discharge of firearms for target shooting on BLM lands, outside of areas with firearm use restrictions (e.g., developed recreation sites and within 300 feet of the centerline of North Hardscrabble Access Road -Spring Creek). Ongoing concerns about public safety and use would continue as well as concerns about illegal dumping and littering that frequently accompany target shooting (Responsive Management 2009). This litter includes clay pigeons; spent shells; and paper, metal, plastic, and glass objects brought to BLM lands for targets. The prohibitions would also protect visitor safety by minimizing the potential for accidental shootings.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** On the basis of statistical probability, fluid minerals development would increase the potential for releases of hazardous materials at well pads and during transport in trucks or pipelines in proportion to the amount of development and distance of transport. Therefore, Alternative A, with the greatest number of acres open for development, would have a greater statistical risk of hazardous materials impacts than the other alternatives, unless the larger number of wells used for the purpose of analysis in the Proposed RMP and Alternative D proves more accurate.

In recent years, public concern has become heightened regarding emissions of chemicals to the atmosphere in conjunction with oil and gas production and potential contamination of freshwater aquifers, domestic or municipal water wells, and surface waters, particularly in relation to hydraulic fracturing. To date, no studies have documented significant cancer-based or noncancer-based public health risks from oil and gas operations using emission rates and operational practices typical of current development in the CRVFO. (See Section 3.6.1 for a detailed discussion.) However, as with spills and other accidental releases on pads or during fluids transport, potential risks from airborne or groundwater-borne chemicals would be statistically related to the

amount of oil and gas activity. Alternative A, in addition to opening the most acres to development, also includes the least stringent air quality mitigation measures, and would therefore be anticipated to have the greatest potential for air quality impacts and associated risks to public health.

**Impacts from Areas of Critical Environmental Concern Management.** Continued designation of the Glenwood Springs Debris Flow Hazard Zone ACEC under all alternatives would result in management actions (e.g., NSO stipulations) to reduce the debris flow hazard and the potential for harm and damage from debris flow incidents.

## Alternative B (Proposed RMP)

Impacts to public health and safety from ACEC (administrative designations) management would be the same as or similar to those under Alternative A. Impacts from management of other resources and uses would be as described below.

**Impacts from Public Health and Safety Management.** Impacts would be similar to Alternative A, except that the Proposed RMP and Alternatives C and D would close motorized vehicle access routes that lead to illegal dumpsites. Closing motorized vehicle access would result in a net decrease in the number of illegal dumpsites, and thus reduce the quantity of hazardous waste materials illegally dumped on BLM lands within the CRVFO.

**Impacts from Air Quality Management.** Using green completions and applicable BMPs, including locating drilling and production facility operations at suitable distances from public buildings and residences, would reduce the already low risk to humans from exposure to air toxics such as VOCs. The application under this alternative of these BMPs, more stringent air quality mitigation measures than under Alternative A, and the use of adaptive management through an Air Quality Management Plan (AQMP) would result in impacts to air quality below those of Alternatives A and D and comparable to those of Alternative C.

**Impacts from Water Resource Management.** The impacts from water resource management would be similar to Alternative A. However, the Proposed RMP and Alternatives C and D would expand the protection afforded under NSO stipulations to include all designated municipal watershed areas, thus affording more protection to municipal drinking water supplies within CRVFO.

**Impacts from Recreation and Visitor Services Management.** The types of impacts would be similar to those described under Alternative A and Alternative D. However, under the Proposed RMP and Alternative C, additional high use and urban interface areas would have firearm use restrictions on target shooting. The Proposed RMP and Alternative C would restrict firearm use for target shooting on approximately 1,100 acres and 3,500 acres respectively. The Proposed RMP only proposes restricting firearm use for target shooting on 900 acres in the urban interface zone (south portion) of Silt Mesa, whereas Alternative C proposes to restrict firearm use for target shooting on all BLM lands on Silt Mesa (3,300 acres). The 900-acre restriction would cause very minor, localized impacts to target shooting activities in the CRVFO. The 900-acre restriction would address the existing public safety concerns by minimizing a direct threat to public safety from accidental shooting and use in an urban interface zone. Other local BLM lands and state lands would probably absorb the displaced target shooting use. For example, people who want to target shoot could go to the nearby West Rifle Creek State Wildlife Area, which has a recently improved and expanded shooting range. The improved shooting range provides Garfield County (including the towns of Rifle, Silt and New Castle)

hunters and firearm enthusiasts with a safe, high-end public shooting area. Improvements include improved access, expanded parking, and the construction of additional rifle and pistol lanes (CPW 2013).

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Because the Proposed RMP assumes more wells than Alternative A, notwithstanding fewer acres designated as open to oil and gas development, potential risks to public health from accidental exposure to hazardous materials be higher under this alternative.

## *Alternative C*

Impacts to public health and safety from ACECs management would be the same as or similar to under Alternative A. Impacts to public health and safety from air quality management, water resources management, visitor services management, and public health and safety management would be the same as or similar to the Proposed RMP. Impacts from management of other resources and uses would be as described below.

**Impacts from Recreation and Visitor Services Management.** The types of impacts would be similar to those described under the Proposed RMP and Alternative A. However, under Alternative C, additional high use and urban interface areas would have firearm use restrictions on target shooting (3,500 acres) and camping restrictions (20,900 acres). Alternative C proposes the most acres of use restrictions. Within the additional areas covered by these restrictions, it is anticipated that there would be a decrease in littering and unsanitary conditions as well as a reduced potential for accidental shootings from target shooting at these locations.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** The types of impacts from fluid minerals management would be similar to Alternative A. However, the amount of hazardous materials impacts on public health and safety under Alternative C would be slightly less than under Alternatives A and D, because Alternative C would open fewer acres to fluid mineral extraction. Alternative C would also have fewer wells than assumed under the Proposed RMP for impact analysis. However, Alternative C would not include the AQMP to be employed by the BLM as an adaptive management tool under the Proposed RMP to ensure compliance with federal and state air quality standards.

## *Alternative D*

Impacts to public health and safety from ACECs management would be the same as or similar to Alternative A. Impacts to public health and safety from water resources management and public health and safety management would be the same as or similar to those under the Proposed RMP. Impacts from management of other resources and uses would be as described below.

**Impacts from Air Quality Management.** Impacts on public health and safety from air quality management would be similar to the Proposed RMP, except that flaring would be required of natural gas well completions that do not use green completion technology.

**Impacts from Recreation and Visitor Services Management.** The impacts would be the same as the Proposed RMP, except that target shooting would be allowed on part of the Silt Mesa.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** The types of impacts from fluid minerals development under Alternative D would be similar to those under Alternative A despite a larger number of wells, owing to more stringent mitigation measures incorporated into

the impact analysis. The number of assumed wells would be the same as under the Proposed RMP, but without adaptive management under the AQMP incorporated into that alternative. Alternative D is assumed to have more wells than Alternative C, but with more stringent air quality controls that that alternative.

### Cumulative Impacts

Cumulative impacts would be similar under all of the alternatives. The potential impacts would be caused by management actions and planning within those lands surrounding the CRVFO, including the White River, Little Snake, Kremmling, Royal Gorge, Gunnison, Uncompahgre, and Grand Junction BLM Field Offices, the State of Colorado, and the WRNF. Minerals development within surrounding areas would increase the use, generation, and transportation of hazardous materials. City and county use plans for surrounding communities could have cumulative effects, whereby mineral resources are developed adjacent to BLM lands. State lands that are surrounded by BLM land could have impacts from inholding development. Hazardous materials are regulated by the EPA and administered by state agencies regardless of land status. The incremental contribution of the alternatives on the cumulative impacts on health and safety is anticipated to be minimal if all applicable laws, regulations, safeguards, and procedures are followed.

## 4.6.2   Social and Economic Conditions

The economic analysis focuses on changes in labor income and employment associated with BLM planning actions and estimated outputs for the alternatives. The social analysis focuses on changes in well-being of identified communities relative to the alternatives.

### 4.6.2.1 Economic Conditions

#### Methods and Assumptions

This section presents an analysis of economic impacts of the management alternatives proposed in the Draft RMP/Draft EIS. This section discusses employment, labor income, and effects on sectors in the impact area economies that encompass the CRVFO. Impacts to revenues received by states and counties also are presented. Finally, the alternatives are discussed in light of forecasts for the area over the 20-year period of analysis. Projected resource outputs from BLM management actions for each of the alternatives are presented in Table 4.6.2-1. The projected outputs and activities are discussed by resource in the following sections.

**Table 4.6.2-1**
**BLM Outputs by Alternative**

| Output | Current | Alternative A No Action | Alternative B Proposed RMP | Alternative C | Alternative D |
|---|---|---|---|---|---|
| General recreation (visits) | 268,440 | 338,000 | 362,140 | 325,930 | 374,210 |
| Fish and wildlife recreation (visits) | 24,300 | 33,600 | 36,000 | 32,400 | 37,200 |
| Grazing (AUMs) | 22,800 | 39,200 | 35,500 | 35,500 | 36,500 |
| Forest products (MMBF) | <0.1 | 1.8 | 0.9 | 0.9 | 1.4 |
| Natural gas (bcf) | 117.0 | 193.6 | 188.9 | 182.3 | 193.6 |
| Natural gas condensate (barrels) | 489,200 | 807,200 | 787,600 | 758,300 | 807,200 |
| Sand and gravel (short tons) | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| Crushed stone (short tons) | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 |
| Gypsum (short tons) | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 |
| Pumice (short tons) | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 |

Sources: FEAST 2010 and IMPLAN 2010.

Acronyms and Abbreviations:
AUM       animal-unit month
bcf         1,000,000,000 cubic feet
MMBF   million board feet

This section presents estimates of changes in labor income for each alternative. Higher employment, subject to some qualifications, can be seen as a benefit to the local community. Other benefits are also present, although some are not easily measured or tied to economic activity. Examples of where effects are difficult to quantify are equity effects, impacts to social values, and non-market values. Regardless, these effects are discussed despite the inability to measure them quantitatively.

The following analytical methods and assumptions were used to complete the analysis for the economic impacts from the proposed management decisions:

- The planning area population will continue to increase and age as described in Chapter 3.

- Regional economic impacts are estimated based on the assumption of full implementation of each alternative. The actual changes in the economy would depend on individuals taking advantage of the resource-related opportunities that would be supported by each alternative. If market conditions or trends in resource use were not conducive to developing some opportunities, the impact on the economy would be different than is estimated here.

- Resource specialists projected annual resource outputs that are based on the best available information and professional judgment. The purpose of the economic analysis is to compare the relative impacts of the alternatives; it should not be viewed as absolute economic values.

- The share of timber and other forest products harvested within the impact area by logging contractors and local residents was obtained from personal communication with field office staff.

- The ratios of harvests to jobs and income used to assess the impacts of the alternatives are based on statewide ratios developed for Colorado by the University of Montana (Keegan and Dillon 2003).

- Over the long term, timber prices are residual values determined by national and international markets based on what the final product market will pay for timber, rather than supply competition at the local level (Lippke et al. 2006). In addition, the share of timber contributed to total harvest in the area is relatively too small to have price impacts in the short term.

- Projected recreation visits are distributed among different types of visitors based on the results of National Visitor Use Monitoring (NVUM) surveys and interviews with field office staff.

- The ratios of recreation visits to jobs and income used to assess the impacts of the alternatives are based on national ratios developed through the U.S. Forest Service's NVUM program (Stynes and White 2005).

- Baseline recreation demand is assumed to increase at rates based on the observed annual rate of recreation use in both the CRVFO and adjacent Kremmling Field Office (RMIS 2010).

- Non salary-related expenditures made by the CRVFO are assumed to be allocated to different economic sectors based on data compiled for the White River and Routt National Forests.

- Range revenues received by BLM and benefits of BLM forage were calculated using the conservative AUM price for 2009 of $1.35 per AUM and the 2009 statewide average AUM price for private land of $14.70 (US Department of Agriculture 2009).

- The impact area for the social and economic analysis consists of the six counties that include lands managed by the CRVFO: Eagle, Garfield, Mesa, Pitkin, Rio Blanco, and Routt Counties.

- Potential economic impacts are assessed using the Forest Economic Analysis Spreadsheet Tool (FEAST) developed by the US Forest Service Inventory and Monitoring Institute in Fort Collins, Colorado. This tool uses a Microsoft Excel workbook as an interface between user inputs and data generated using the IMPLAN input-output modeling system (FEAST 2010).

- The FEAST analysis assesses the economic impacts of the resource outputs projected under each alternative. Resource outputs in this context are the amount of a resource (e.g., forest products, AUMs, or recreation visits) that would be available for use under each alternative. Average annual resource outputs were projected by resource specialists for each alternative for a 20-year planning period based on the best available information and professional judgment.

- Employment and labor income estimates developed for this analysis include direct, indirect, and induced economic effects. Direct employment would, for example, be generated in the grazing sector. Additional employment would be generated as the affected livestock operators purchase services and materials as inputs ("indirect" effects) and ranchers spend their earnings within the local economy ("induced" effects). Direct, indirect, and induced effects are combined in the discussion of effects below.

- Theoretically, expenditures associated with changes in final demand would be available and specific enough to allocate to each of the 440 sectors contained in the IMPLAN model. In the absence of primary data, national level production functions are used. Expenditures should be delineated between local and non-local providers, as purchases out of the economic study region will have no local economic impact. The IMPLAN data contain information, called regional purchase coefficients, which describe the proportion of a given commodity that will be provided by local producers. Previous modeling experience has shown that the data contained in the IMPLAN modeling system for the various sectors are an accurate representation of impacts.

- Biomass opportunities may exist but are not analyzed given the impracticalities of projecting future scenarios for implementation.

- Oil and gas development and production are assumed to occur at constant rates over the 20-year period of analysis; consequently, effects are not distinguished for development and production periods since development would not occur over predictable timeframes. For the analysis, development and resulting production are assumed to occur at rates averaged over the 20-year period of analysis. The alternatives analyze the projected maximum potential for fluid mineral development; though the results are not guaranteed, they are useful for comparative purposes.

- Changes in population and housing availability are assessed using IMPLAN data specific to field office impact areas. For the CRVFO, data indicate there are 1.4 persons per job and 2.5 persons per household (IMPLAN 2008).

- Traffic effects from oil and gas development are assessed using available information on vehicle trips per well for all vehicle class types (1,160 trips per well for pickup and larger trucks) over a 30-day period (DOI 2006).

- Non-market values, including natural amenities, non-use values, ecosystem services, and aspects of well-being and quality of life, are assessed in qualitative terms, as appropriate.

None of the alternatives would be expected to reduce economic diversity (the number of economic sectors) or increase economic dependency, which occurs when the local economy is dominated by a limited number of industries. Shifts in emphasis could occur, but these shifts would not result from planning actions in this RMP/EIS. While the alternatives have the potential to affect local businesses and individuals, the relative contribution of BLM activities to the local economy (see Alternative A) and the relative differences between the alternatives would not be large enough to have any measurable effect on economic diversity or dependency. For example, the dependency of the local economy on the livestock industry, forest products, mining, and recreation activities would not be affected by BLM resource management under this RMP/EIS. Under all the alternatives, all BLM-related contributions—jobs and labor income—would continue to support less than 1 percent of totals within the impact area economy, but could be more important for smaller communities within the planning area.

Estimates of the levels of employment and labor income that would be supported by the alternatives are based on projected resource outputs from BLM management actions (see Table 4.6.2-1), estimated payments to counties (see below), BLM expenditures, and other externally funded activities on BLM lands. The projected outputs and activities are discussed by resource in the following sections. Estimated average annual employment and labor income from outputs and activities are summarized in Table 4.6.2-2 and Table 4.6.2-3 below.

**Table 4.6.2-2**
**Average Annual Employment by Program by Alternative (Full- and Part-time Jobs)**

| Resource | Current | Alternative A (No Action) | Alternative B (Proposed RMP) | Alternative C | Alternative D |
|---|---|---|---|---|---|
| Recreation | 103 | 143 | 153 | 138 | 158 |
| Grazing | 20 | 34 | 31 | 31 | 32 |
| Forest Products | 0.2 | 20 | 11 | 11 | 16 |
| Minerals | 676 | 1,115 | 1,088 | 1,048 | 1,115 |
| Externally Funded | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 |
| County Payments | 131 | 241 | 232 | 221 | 241 |
| BLM Expenditures | 78 | 78 | 78 | 78 | 78 |
| **Total BLM Management** | **1,009** | **1,631** | **1,593** | **1,527** | **1,640** |
| **Change from Current** | | **62%** | **58%** | **51%** | **63%** |

Sources: FEAST 2010 and IMPLAN 2010.
   Acronyms and Abbreviations:
      BLM      Bureau of Land Management

**Table 4.6.2-3**
**Average Annual Labor Income by Program by Alternative (Thousands of 2010 dollars)\***

| Resource | Current | Alternative A (No Action) | Alternative B (Proposed RMP) | Alternative C | Alternative D |
|---|---|---|---|---|---|
| Recreation\*\* | $3,953 | $5,471 | $5,862 | $5,276 | $6,057 |
| Grazing | $153 | $260 | $230 | $230 | $237 |
| Forest Products | $6 | $809 | $442 | $442 | $655 |
| Minerals | $54,358 | $89,691 | $87,516 | $84,255 | $89,691 |
| Externally Funded | $8 | $8 | $8 | $8 | $8 |
| County Payments | $6,812 | $12,151 | $11,620 | $10,986 | $12,149 |
| BLM Expenditures | $4,154 | $4,154 | $4,154 | $4,154 | $4,154 |
| Total BLM Management | $69,443 | $112,544 | $109,832 | $105,351 | $112,951 |
| Percent Change from Current | | 62% | 58% | 52% | 63% |

Sources: FEAST 2010 and IMPLAN 2010.
\*Average annual values are based on projected impacts over the 20-year analysis period. Source: Potential employment and labor income impacts are based on the estimated resource outputs summarized by alternative in Table 4.6.2-1. Potential impacts were estimated using the IMPLAN model and FEAST.
\*\*As discussed in Chapter 3, these recreation estimates do not include visits from all local use since their expenditures do not represent new money into the economy. Within the CRVFO, it was determined that 85 percent of non-wildlife recreation use would not occur in the impact area if the opportunity on BLM land were not provided. As a result, only 15 percent of the local use is not included in the CRVFO model.
   Acronyms and Abbreviations:
      BLM      Bureau of Land Management

In the absence of quantitative data, impacts were described using ranges of potential effects, or a qualitative analysis was performed based on the best available data, as appropriate. Expert opinions were solicited from each CRVFO and the BLM State Office regarding current conditions for specific resources and anticipated outcomes and incorporated into the evaluation.

*Forest Products.* Both the no action and the action alternatives would continue to make wood product materials available. As shown by the estimates of forest products output in Table 4.6.2-1, potential commercial harvest varies by alternative. However, these are estimates based on ideal market conditions, which may not provide an accurate portrayal of actual impacts. Factors such as financial limitations on operators, market conditions, and implementation of timber sale practices that limit actual sale volume are important to consider. Consequently, timber removal (Table 4.6.2-1) is compared with the potential under the alternatives. Under Alternative A, timber under the current Allowable Sale Quantity (ASQ) would potentially be available, while under the action alternatives the PSQ would potentially be available.

*Grazing.* Dependency on BLM forage would not change under the alternatives. The permitted use limit is used to evaluate potential impacts under each of the alternatives. Table 4.6.2-1 above shows varying degrees of total forage needed to feed 2007 levels of livestock in the CRVFO area (ranging from 17 to 27 percent in the CRVFO impact area (USDA 2007). However, grazing would not fall below current levels in the CRVFO impact area (11 percent). In addition, jobs and labor income associated with BLM grazing would continue to account for less than 1 percent of area totals. Additionally, jobs and labor income in the agricultural sector associated with BLM management would account for less than 1 percent of area totals in the agricultural sector across all the alternatives.

While dependency on BLM forage would remain low, BLM forage would continue to provide a low-cost and important complement to some livestock producers' grazing, forage, and hay production. Dependency on BLM forage might also be greater for smaller communities within the impact area. In addition to potential changes in projected employment and income as a result of changes in BLM forage offered, the value of BLM forage to area operators should also be considered. This value can be estimated as the difference between the competitive market price of an AUM and the BLM lease fee. This value is experienced above the price ranchers pay for AUM leases and can be considered a benefit. The benefit to operators from the potential permitted BLM grazing varies among the alternatives, however, would not fall below current levels of actual use. Payments to counties under the Taylor Grazing Act would continue under all the alternatives; these payments are included in Table 4.6.2-4 and are discussed below.

**Table 4.6.2-4**
**Payments to Counties Under the Alternatives (2008 dollars)**

| Output | Current | Alternative A (No Action) | Alternative B (Proposed RMP) | Alternative C | Alternative D |
|---|---|---|---|---|---|
| PILT | $739,913 | $739,913 | $739,913 | $739,913 | $739,913 |
| Range revenue | $4,869 | $8,155 | $7,526 | $7,526 | $7,738 |
| Mineral royalty distributions | $9,855,246 | $16,261,156 | $15,866,946 | $15,275,631 | $16,261,156 |
| Total | $10,600,028 | $17,009,224 | $16,614,385 | $16,023,070 | $17,008,806 |

Sources: FEAST 2010 and IMPLAN 2010.
Acronyms and Abbreviations:
    PILT    payment in lieu of taxes

*Recreation.* While changes in recreation may occur as a result of planning actions in the alternatives, the role of recreation in the local economy will continue to increase as OHV use, hunting, fishing, boating, biking, and other forms of recreation continue to increase. Travel to the area from outside the area to enjoy these opportunities is not an unreasonable assumption, and average annual rates of change are based on the observed recreation use data (RMIS 2010).

While different levels of recreation are supported under the alternatives, recreation management would continue to sustain opportunities important to the area economy and well-being under all the alternatives. As noted in Chapter 3, opportunities provided to local residents are important; however, their recreation expenditures do not represent new money introduced into the economy. If BLM-related opportunities were not present, it is likely that residents would participate in other locally based recreation activities and this money would still be retained in the local economy. Therefore, only a portion of local recreation visits attributable to unique area opportunities are included in the effects from the alternatives. Even without a portion of BLM local recreation use, recreation on BLM-administered lands would sustain more jobs and labor income annually than contributions from grazing and forest products programs under all the alternatives. (See Table 4.6.2-2 and Table 4.6.2-3.)

Jobs and income associated with recreation management should not overshadow the economic value of experience held by recreation users within the planning area. For example, boating or motorized use in the planning area could change as management actions are implemented. The value of these recreation experiences could thus change as visitor use changes. Changes in the quantity and quality of these recreation experiences offered are discussed in the recreation section of this EIS.

*Mineral Resources.* Leasable, locatable, and salable minerals would continue to be provided by the BLM in the planning area (Table 4.6.2-1 above). Management under this RMP will determine the extent of mineral resource activity in the future. For example, withdrawal from mineral entry will occur for portions of ACECs with mineral potential. Regardless of these changes, area dependency on BLM-related employment provided to the mining sector would not change among the alternatives.

Under all alternatives, the change in population that would result from changes in mineral sector employment would be less than 1 percent of current population levels in the CRVFO impact area. In addition, the housing vacancy rate within the impact area (21 percent) would accommodate any changes in housing demand from population changes since required households would not exceed 1 percent of current vacancies under all the alternatives. However, with concentrated oil and gas activity occurring alongside high vacancy rates in individual counties, localized change could be greater within the CRVFO impact area. These potential effects are discussed below under the social effects section. It should be noted that these effects are based on current conditions in both the housing and oil and gas markets. Actual oil and gas activity and housing markets cannot be projected; thus, these estimates may not be an accurate portrayal of actual impacts. However, they provide a frame of reference for discussion of housing. In addition projected population increases, discussed in Chapter 3 and the cumulative effects section below, also temper potential effects on housing availability and affordability at the local level.

Crushed stone, sand, and gravel removal by county and state governments is authorized under free use permits, such that no revenues or lease fees are received by the BLM and consequently no payments to counties are made. No fees are collected from removal of saleable and locatable minerals; however, royalties

from oil and gas production are distributed back to local governments under the 1902 Reclamation Act and the 1920 Mineral Leasing Act. These payments are discussed below.

**Impacts to Counties.** Costs to local governments would remain largely unchanged as a result of planning actions, consequent changes in population, or oil and gas development; demand for services and infrastructure would not significantly change as a result of BLM planning actions. Payments to counties would remain an important portion of local government revenue (ranging from 4 to 6 percent of total revenue in the CRVFO impact area). Any changes under the alternatives in grazing revenues would not be large enough to substantially affect the overall amount of payments made to counties since these payments make up a small portion of county payments by alternative (less than a tenth of 1 percent under all the alternatives [Table 4.6.2-4]). Minerals royalty payments in CRVFO counties provide at least 95 percent of BLM-associated payments under all the alternatives. However, impracticalities exist in predicting actual levels of production, market prices, and the resulting royalties paid.

Under all alternatives, BLM land identified for retention or disposal varies; however, the identification of this land for potential land tenure changes does not guarantee disposal would occur. Further site-specific NEPA processes not covered under this plan would evaluate the availability of this land for disposal if proposed. If this land is disposed of, it would no longer count toward the entitlement acres used in PILT calculations, which could slightly decrease the contribution to county payments from BLM land in the area. However, predicting county payments based on entitlement acres alone is impractical as a result of other factors used to determine PILT payments, such as changes in the population ceiling, Congressionally approved annual appropriation acts, and other factors discussed in Chapter 3. Nevertheless, if BLM land is disposed of, it would be subject to property taxes, whereas before disposal it was not. Payments under PILT are designed to help offset losses in property taxes that result from the nontaxable status of federal lands within state or county boundaries. Therefore, county property taxes could offset losses from the qualifying entitlement acres for PILT.

**BLM Expenditures and Employment.** Levels of expenditures and employment at the CRVFO are not expected to vary as result of the alternatives. While different alternatives may cost more or less to implement, speculating whether the budget will be available is impractical. However, implementation is not impractical as a result, since management priorities are likely to determine how funds are allocated to actions outlined in the plan. Thus, a constant budget over the life of the plan is a reasonable and practical assumption, based on the average annual salary and non-salary expenditures of the CRVFO. Under all the alternatives, it is estimated that average annual BLM expenditures would continue to support around 78 total jobs and $4.2 million in total labor income (Table 4.6.2-2 and Table 4.6.2-3) in the CRVFO impact area economy. In addition to direct job and income impacts, these estimates include impacts to industries that provide factors of production to BLM and other industries impacted by wage-related spending.

**Externally Funded Ecosystem Restoration.** A portion of the management actions performed on BLM lands is carried out with funds not provided by the BLM. Thus, these expenditures are not accounted for under the category of BLM expenditures discussed above. Recent examples of such projects include trail work and travel management implementation funded by Colorado State Parks, habitat improvement projects funded by CPW, and implementation of range improvement projects funded with a portion of royalties from grazing payments. These treatments are labor intensive and use agricultural industries and associated businesses contained within the impact area economy. As a result of these treatments, less than one job and

$10,000 in labor income would be supported annually in the CRVFO impact area economy. (See Table 4.6.2-2 and Table 4.6.2-3.)

*Role of Amenities, Migration, and Non-Market Values.* The economic analysis assesses the economic effects of the direct use of resources in terms of jobs and income. This type of analysis does not include other types of economic value, often referred to as non-market values. Non-market values are important to the well-being of visitors, area residents, and others outside the planning area. These values include natural amenities, quality of life factors, recreational opportunities, ecosystem services, and non-use values such as existence, option, and bequest values. Non-market values are difficult to quantify and insufficient data exist to assess the effects of management actions. However, the fact that no monetary value is assigned to these values does not lessen their importance in the decision-making process.

In addition, helpful inferences can be made. While there is a general consensus that non-use values exist, the methodologies for measuring these values are controversial and difficult to apply. Wilderness has been the subject of numerous non-use studies, usually conducted for specific natural areas. However, no attempt has been made to directly elicit potential non-use values associated with the alternatives under this RMP. The alternatives establish units to be managed for wilderness characteristics and changes to ACECs and other special designations. These designations would further maintain and perhaps enhance non-market values associated with natural amenities protected on these lands.

Additionally these ACECs, land to be managed for wilderness character, and VRM designations that protect the integrity of the natural environment may attract new residents and tourists to the area, which would then contribute to area economic activity. While in some cases land protection directly reduces employment growth, it has been shown that natural amenities can offset job losses through increases in net migration (Eichman et al. 2010). Natural amenities and quality of life have been increasingly recognized as important factors in the economic prospects of many rural communities in the West (Rudzitis and Johnson 2000). In addition, non-labor income is intimately tied to natural amenities, as discussed in Chapter 3. Rural county population change, the development of rural recreation, and retirement-destination areas are all related to natural amenities (McGranahan 1999). Thus, designations that maintain and protect natural amenities may similarly contribute to area economic well-being.

### Environmental Consequences

Impacts on economic conditions would result from some of the actions proposed under other resources and uses. Programs not addressed below were deemed to have no or only negligible impacts on economic conditions under any of the four alternatives.

<u>Alternative A</u>

As a result of Alternative A, about 1,631 jobs and $113 million in labor income would be generated in the impact area economy on an average annual basis. This amount is 62 percent more employment and labor income than contributed currently, because of larger natural gas contributions, timber products, permitted grazing, and recreation visits evaluated under this alternative than levels evaluated under the current scenario. Oil and gas estimates are based on current prices and potential production. Because future production and market price cannot be projected, these estimates may not be an accurate portrayal of actual impacts under future market conditions. In addition, estimates of timber products and grazing are based on the sawtimber ASQ and AUM permitted use limit and thus reflect an annual average of the maximum available contribution that would be available rather than actual use. This estimate includes direct, indirect, and induced effects as a

result of BLM outputs (Table 4.6.2-1) and county payments (Table 4.6.2-4). The largest employment and labor income effects would occur in the Government, Mining, and Construction sectors. (See Table 4.6.2-5 and Table 4.6.2-6.)

**Table 4.6.2-5**
**Average Annual Employment Contribution by Sector and Alternative**

| Sector | Area Total | Current | Alternative A | Alternative B (Proposed RMP | Alternative C | Alternative D |
|---|---|---|---|---|---|---|
| Agriculture | 6,842 | 20 | 36 | 34 | 34 | 35 |
| Mining | 13,505 | 451 | 743 | 725 | 699 | 743 |
| Utilities | 1,358 | 8 | 12 | 12 | 11 | 12 |
| Construction | 59,134 | 196 | 389 | 377 | 359 | 390 |
| Manufacturing | 9,302 | 6 | 16 | 14 | 13 | 16 |
| Wholesale Trade | 8,619 | 32 | 45 | 43 | 42 | 45 |
| Transportation & Warehousing | 47,947 | 15 | 23 | 22 | 22 | 23 |
| Retail Trade | 11,294 | 106 | 155 | 152 | 148 | 155 |
| Information | 4,652 | 5 | 7 | 6 | 5 | 8 |
| Finance & Insurance | 10,883 | 19 | 26 | 24 | 23 | 26 |
| Real Estate & Rental & Leasing | 23,801 | 30 | 44 | 42 | 41 | 45 |
| Professional, Scientific, & Tech Services | 20,907 | 40 | 62 | 58 | 54 | 62 |
| Management of Companies | 914 | 3 | 5 | 4 | 4 | 5 |
| Administration, Waste Management & Remediation Services | 18,826 | 29 | 46 | 44 | 42 | 46 |
| Educational Services | 4,395 | 5 | 7 | 6 | 6 | 7 |
| Health Care & Social Assistance | 32,022 | 57 | 79 | 75 | 73 | 80 |
| Arts, Entertainment, and Recreation | 22,823 | 17 | 22 | 23 | 21 | 24 |
| Accommodation & Food Services | 46,850 | 99 | 159 | 150 | 142 | 160 |
| Other Services | 23,035 | 31 | 44 | 39 | 37 | 45 |
| Government | 43,632 | 240 | 366 | 358 | 349 | 367 |
| Total | **410,741** | 1,409 | 2,286 | 2,208 | 2,125 | 2,294 |

Sources: FEAST 2010 and IMPLAN 2010.

While employment and labor income contributions under Alternative A would be higher than under the Proposed RMP and Alternative C, less BLM land would be managed to protect natural amenities and scenic landscapes than under the other alternatives (Table 4.6.2-7). Therefore, Alternative A would provide less protection of non-market values and natural amenities than the other alternatives.

As discussed above under Methods and Assumptions, BLM expenditures and employment are assumed to be the same under all the alternatives. Direct, indirect, and induced effects from these contributions are displayed in Table 4.6.2-2 and Table 4.6.2-3. Externally funded restoration projects described above under Methods and Assumptions would continue under this alternative so that effects also are the same as those described above.

**Table 4.6.2-6**
**Average Annual Labor Income Contribution by Sector and Alternative**
**(Thousands of 2010 dollars)**

| Sector | Area Total | Current | Alternative A | Alternative B (Proposed RMP) | Alternative C | Alternative D |
|---|---|---|---|---|---|---|
| Agriculture | $95,803 | $86 | $251 | $239 | $213 | $267 |
| Mining | $1,352,661 | $62,588 | $108,942 | $105,158 | $100,992 | $109,024 |
| Utilities | $152,966 | $858 | $1441 | $1415 | $1377 | $1443 |
| Construction | $3,384,519 | $11,241 | $20,522 | $19,741 | $18,843 | $20,612 |
| Manufacturing | $521,305 | $218 | $602 | $527 | $489 | $604 |
| Wholesale Trade | $558,499 | $1,958 | $2,740 | $2,628 | $2,605 | $2,733 |
| Transportation & Warehousing | $1,587,764 | $903 | $1,429 | $1,401 | $1,393 | $1,427 |
| Retail Trade | $656,499 | $2,904 | $4,412 | $4,330 | $4,265 | $4,419 |
| Information | $280,744 | $319 | $411 | $369 | $308 | $520 |
| Finance & Insurance | $732,593 | $1,397 | $1,789 | $1,702 | $1,660 | $1,795 |
| Real Estate & Rental & Leasing | $1,188,998 | $1,475 | $2,188 | $2,054 | $2,006 | $2,201 |
| Professional, Scientific, & Tech Services | $1,286,276 | $2,412 | $3,871 | $3,784 | $3,744 | $3,876 |
| Management of Companies | $80,185 | $278 | $488 | $331 | $327 | $454 |
| Administration, Waste Management & Remediation Services | $802,005 | $1,057 | $1,740 | $1,689 | $1,642 | $1,741 |
| Educational Services | $104,443 | $113 | $188 | $160 | $155 | $189 |
| Health Care & Social Assistance | $1,622,257 | $2,711 | $3,940 | $3,809 | $3,724 | $3,971 |
| Arts, Entertainment, and Recreation | $699,919 | $498 | $672 | $689 | $627 | $701 |
| Accommodation & Food Services | $1,339,436 | $2,744 | $4,190 | $3,952 | $3,808 | $4,217 |
| Other Services | $688,327 | $923 | $1,404 | $1,312 | $1,260 | $1,437 |
| Government | $2,446,953 | $13,077 | $19,943 | $19,522 | $19,017 | $19,989 |
| Total | $19,582,152 | $107,760 | $181,163 | $174,812 | $168,455 | $181,620 |

Sources: FEAST 2010 and IMPLAN 2010.

**Table 4.6.2-7**
**Protected Area Designations\* in Acres**

| Designated Areas* | Alternative A (No Action) | Alternative B (Proposed RMP) | Alternative C | Alternative D |
|---|---|---|---|---|
| | 274,230 | 317,320 | 404,500 | 282,500 |

\*These areas include ACECs, VRM Class I, VRM Class II, and lands managed for wilderness characteristics. Based on the proposed management decisions in this RMP/EIS, these areas would typically have fewer surface-disturbing activities within their boundaries compared to other locations in the planning area. Total acres do not include VRM Class III or Class IV, since these classes include objectives other than the retention and preservation of existing character of the landscape (DOI 2010c).

Acronyms and Abbreviations:

ACEC    area of critical environmental concern
VRM     visual resource management

Under Alternative A, annual payments to counties in the planning area would be approximately $17 million, which includes a portion of PILT payments that can be attributed to BLM entitlement acres, a portion of payments received from grazing revenues, and a portion of royalties received from the sale of mineral material (Table 4.6.2-4). These payments would support about 241 jobs and $12.2 million in labor income (Table 4.6.2-2 and Table 4.6.2-3). Payments to counties and their impacts under this alternative are slightly higher than under the Proposed RMP and Alternative C, since the level of gas production based on anticipated well drilling is higher. As discussed above, this estimate is based on current prices and potential

production. Actual production and market price cannot be projected. Therefore, these estimates may not be an accurate portrayal of actual impacts. Regardless, contributions from these payments are likely to remain an important portion of county revenue, increasing from 2 to 4 percent of 2007 levels of local government revenue within the impact area.

**Impacts from Visual Resource Management.** VRM designations to protect the scenic qualities of the landscape may attract new residents and tourists to the area, which would then contribute to area economic activity, as would ACECs and lands to be managed for wilderness character. In addition, these designations would further maintain and perhaps enhance non-market values associated with natural amenities protected on these lands. Under Alternative A, less land would be managed under Class I and II VRM designations, as well as special designations and identifications, than under the other alternatives. Therefore, this alternative would provide the least protection of non-market values and natural amenities among the alternatives (Table 4.6.2-7). Consequently, well-being associated with non-market values and potential contributions from new residents and tourists attracted by intact natural landscapes could be less than the other alternatives.

**Impacts from Lands with Wilderness Characteristics Management.** The economic effects generated by managing for wilderness characteristics are described above under impacts from VRM.

**Impacts from Forestry Management.** Alternative A would allow an average annual harvest of approximately 1,800 MBF of sawtimber (Table 4.6.2-1). As stated above, this estimate is based on the sawtimber ASQ and reflects an annual average of the volume that would be available rather than actual harvest projections. Annual average harvest has been less than 1 percent of this estimate (Table 4.6.2-1). If harvests were to occur at ASQ levels, approximately 20 jobs and $809 thousand in labor income (Table 4.6.2-2 and Table 4.6.2-3) would be supported within the local economy. In addition to direct job and income impacts in the forest products industry, these estimates include impacts to industries that provide factors of production to the forest products industry and other industries impacted by wage-related spending.

**Impacts from Livestock Grazing Management.** Alternative A could authorize average annual grazing of approximately 31,000 cattle AUMs and 8,000 sheep AUMs (Table 4.6.2-1), and would support approximately 34 jobs with $260,000 in labor income (Table 4.6.2-2 and Table 4.6.2-3). While these contributions are higher than current contributions from grazing, it must be noted these are impacts from the established permitted use limit for AUMs in the planning area. This amount is the maximum number of AUMs that could be offered under ideal forage conditions, which may not be an accurate portrayal of actual impacts. Factors such as drought, financial limitations on operators, market conditions, and implementation of grazing practices to improve range conditions are important to consider.

The benefit of BLM forage to area operators under Alternative A would be approximately $768,000, which is less than the maximum potential benefit under Alternative D; however, this benefit is greater than the current value of $310,000. Thus, despite the relatively small employment and labor income impacts, the value of forage to area operators would remain.

**Impacts from Comprehensive Trails and Travel Management and Recreation and Visitor Services Management.** In general, it can be assumed recreation use would continue to increase by 3 percent per year based on rates of visitation observed in the past (RMIS 2010). Given this increase, average annual recreation visits are estimated at 338,000 general visits and another 33,600 wildlife-related visits (Table 4.6.2-1). These visits account for OHV use, hunting, fishing, boating, biking, and other forms of recreation. Expenditures of

these visitors would support approximately 143 jobs and $5.5 million in labor income in the impact area economy on an average annual basis.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Under Alternative A, an estimated 4,198 wells are assumed to be drilled on BLM mineral estate within areas with high potential over the 20-year analysis period; this number amounts to approximately 210 wells per year. Contributions to employment and income from these uses would provide approximately 1,115 jobs and $89.7 million in labor income on an average annual basis (Table 4.6.2-2 and Table 4.6.2-3). Approximately 2 percent of employment and labor income would continue to be supported in the minerals sector under this alternative.

**Impacts from Locatable Minerals, Mineral Materials, and Non-energy Leasable Minerals Management.** Mineral resource management under this alternative would continue to support levels of saleable, locatable, and leasable mineral resource uses depicted in Table 4.6.2-1.

**Impacts from Areas of Critical Environmental Concern Management.** The economic effects generated by management of ACECs are described above under impacts from VRM.

### Alternative B (Proposed RMP)

As a result of the Proposed RMP, about 1,593 jobs and $110 million in labor income would be generated in the impact area economy on an average annual basis. This level is 58 percent more employment and labor income than contributed currently and primarily results from more anticipated gas production under this alternative than levels evaluated under the current scenario. Oil and gas estimates are based on current prices and potential production, and future production and market price cannot be projected; thus, these estimates may not be an accurate portrayal of actual impacts under future market conditions. Approximately 2 percent of employment and labor income would continue to be supported in the minerals sector under this alternative. The largest employment and labor income effects would occur in the Government, Mining, and Construction sectors. (See Table 4.6.2-5 and Table 4.6.2-6.)

While employment and labor income contributions under this alternative would be the lowest among all the alternatives, apart from Alternative C, more acres would be designated under protected area designations than the other alternatives, except for Alternative C (Table 4.6.2-7). Therefore, this alternative would provide less protection of non-market values and natural amenities than Alternative C, but more than the other alternatives.

The economic impacts from BLM expenditures and employment and externally funded restoration projects under the Proposed RMP would be the same as those described above under Methods and Assumptions and under Alternative A.

Under the Proposed RMP, annual payments to counties would be approximately $16.6 million, which includes a portion of PILT payments that can be attributed to BLM entitlement acres, a portion of payments received from grazing revenues, and a portion of royalties received from the sale of mineral material (Table 4.6.2-4). These payments would support about 232 jobs and $12 million in labor income (Table 4.6.2-2 and Table 4.6.2-3). Payments to counties and their impacts under this alternative would be lower than Alternative A and Alternative D, since the level of permitted grazing and gas production would be lower. As discussed above, this estimate is based on current prices and potential gas production. Actual production and market

price cannot be projected; thus, these estimates may not be an accurate portrayal of actual impacts. Regardless, contributions from these payments to county revenues would increase from current levels (from 2 to 4 percent) and would remain an important portion of county revenue within the impact area.

**Impacts from Visual Resource Management.** Under the Proposed RMP more acres are managed under VRM Class I and II designations (and associated stipulations), ACECs, and LWCs then under Alternatives A and D, but less than under Alternative C (Table 4.6.2-7). Therefore, this alternative would provide more protection for non-market values and natural appearing landscapes among the alternatives, apart from Alternative C. Consequently, well-being associated with non-market values and potential contributions from new residents and tourists attracted by naturally-appearing landscape amenities could be more than these alternatives but less than Alternative C.

**Impacts from Lands with Wilderness Characteristics Management.** The economic effects generated by managing for wilderness characteristics are described above under impacts from VRM.

**Impacts from Forestry Management.** The Proposed RMP would allow an average annual harvest of approximately 900 MBF of sawtimber (Table 4.6.2-1). As stated above, this estimate is based on the sawtimber PSQ and reflects an annual average of the volume that would be available rather than actual harvest projections. Annual average harvest has been less than 1 percent of this estimate (Table 4.6.2-1). If harvests were to occur at PSQ levels, approximately 11 jobs and $442,000 in labor income (Table 4.6.2-2 and Table 4.6.2-3) would be supported within the local economy. In addition to direct job and income impacts in the forest products industry, these estimates include impacts to industries that provide factors of production to the forest products industry and other industries impacted by wage-related spending. While less volume would be available than under Alternative A, it should be emphasized that less than 1 percent of the average annual available harvest has been removed historically. Consequently, the Proposed RMP could maintain or increase the jobs and labor income levels supported currently since the PSQ estimate is greater than current levels of harvest from BLM lands.

**Impacts from Livestock Grazing Management.** The Proposed RMP would have a smaller permitted use limit than Alternative A and Alternative D and could thus support fewer average annual AUM contributions (Table 4.6.2-1). On an average annual basis, this permitted use limit would support 31 jobs and $230,000 in labor income within the impact area economy (Table 4.6.2-2 and Table 4.6.2-3). While closure of several inactive allotments yields this decrease, current activity could be accommodated and potentially increase under this alternative. This decrease also may be less likely with historical decreases in actual use of AUMs (DOI 2010b). Nonetheless, if demand for AUMs existed along with favorable forage and market conditions, the contribution from BLM grazing could increase relative to current use under this alternative, despite the decrease in the permitted use limit. Regardless, BLM grazing-related jobs would continue to remain below 1 percent of overall agricultural employment and labor income for the area.

Levels of employment and income associated with the Proposed RMP should not overshadow potential increases in other values as a result of grazing actions under this alternative. The benefit to permittees of low-cost BLM forage, below the cost of competitively priced AUMs, would be $486,000. This amount is less than the maximum potential benefit under Alternative A. However, it is greater than the current value ($310,000) and could reduce conflict and increase value to other resources.

**Impacts from Comprehensive Trails and Travel Management and Recreation and Visitor Services Management.** It is anticipated that the Proposed RMP would accommodate recreation at slightly higher levels than the expected rates of increase discussed under Alternative A. Given this increase, average annual recreation visits are estimated at 362,140 general visits and another 36,000 wildlife-related visits (Table 4.6.2-1). These visits account for OHV use, hunting, fishing, boating, biking, and other forms of recreation. Consequent expenditures of these visitors would support approximately 153 jobs and $5.9 million in labor income in the impact area economy on an average annual basis (Table 4.6.2-2 and Table 4.6.2-3).

Jobs and income associated with this alternative should not overshadow the value of experience provided by recreation on BLM lands under this alternative. The absence of actions that support recreation facilities would result in a decrease in the value of the experience for some relative to enhanced facilities under Alternative D. However, with the SRMAs and route designation under this alternative, BLM management would likely be more commensurate with desired recreational experiences. For example, certain motorized user segments would benefit from opportunities specifically catered to their interests. Consequently, the value of the recreation experience on BLM lands is expected to slightly increase relative to Alternative A.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Less oil and gas activity would occur under the Proposed RMP than under Alternative A (Table 4.6.2-1). Under this alternative, a total of 3,940 wells are estimated to be drilled on BLM mineral estate within areas with high potential over the 20-year analysis period and amounts to approximately 197 wells per year. Contributions to employment and income from these uses would provide approximately 1,088 jobs and $87.5 million in labor income on an average annual basis (Table 4.6.2-2 and Table 4.6.2-3). Approximately 2 percent of employment and labor income would be supported in the minerals sector under this alternative.

Decreases in gas production would result in less royalty disbursements to local governments than under Alternative A and Alternative D.

**Impacts from Locatable Minerals, Mineral Materials, and Non-energy Leasable Minerals Management.** Mineral resource management under this alternative would continue to support current levels of saleable and locatable uses.

**Impacts from Areas of Critical Environmental Concern Management.** The economic effects generated by management of ACECs are described above under impacts from VRM.

## Alternative C

As a result of Alternative C, about 1,527 jobs and $105 million in labor income would be generated in the impact area economy on an average annual basis. This amount is 51 percent more employment and 52 percent more labor income than contributed currently as a result of more anticipated gas production under this alternative than under the levels evaluated under the current scenario. Oil and gas estimates are based on current prices and potential production, and future production and market price cannot be projected. Thus, these estimates may not be an accurate portrayal of actual impacts under future market conditions. In addition, fewer permitted AUMs and less timber volume would be made available (Table 4.6.2-1). These estimates are based on the sawtimber ASQ and AUM permitted use limit and thus reflect an annual average of the maximum available contribution that would be available rather than actual use. The largest employment and labor income effects would occur in the Government, Accommodation & Food Services, and Mining sectors. (See Table 4.6.2-5 and Table 4.6.2-6.)

While employment and labor income contributions under this alternative would be the lowest among the alternatives, more protected area designation would occur than the other alternatives (Table 4.6.2-7). Therefore, this alternative would ensure more protection of non-market values and natural amenities than the other alternatives.

Effects on local economic conditions from BLM expenditures and employment and externally funded restoration projects under Alternative C would be the same as those described above under Methods and Assumptions and under Alternative A. The impacts associated with payments to counties, R&VS actions, and mineral resource uses under Alternative C would be the same as effects discussed above under the Proposed RMP.

**Impacts from Visual Resource Management.** Under Alternative C, more acres of VRM Class I and II designations (including VRM stipulations), ACECs, and lands managed for wilderness characteristics would occur than under the other alternatives (Table 4.6.2-7). Therefore, this alternative would ensure more protection of non-market values and natural amenities than the other alternatives. Consequently, well-being associated with non-market values and potential contributions from new residents and tourists attracted by natural amenities could be more than the other alternatives.

**Impacts from Lands with Wilderness Characteristics Management.** The economic effects generated by managing for wilderness characteristics are described above under impacts from VRM.

**Impacts from Forestry Management.** Alternative C would allow an average annual harvest of approximately 900 MBF of sawtimber (Table 4.6.2-1). As stated above, this estimate is based on the sawtimber PSQ and reflects an annual average of the volume that would be available rather than actual harvest projections. Annual average harvest has been less than 1 percent of this estimate (Table 4.6.2-1). If harvests were to occur at PSQ levels, approximately 11 jobs and $442,000 in labor income (Table 4.6.2-2 and Table 4.6.2-3) would be supported within the local economy. In addition to direct job and income impacts in the forest products industry, these estimates include impacts to industries that provide factors of production to the forest products industry and other industries impacted by wage-related spending. While less volume would be available than under Alternatives A or D, it should be emphasized that less than 1 percent of the average annual available harvest has been removed historically. Consequently, Alternative C could maintain or increase the jobs and labor income levels supported currently, since the PSQ estimate is greater than current levels of harvest from BLM.

**Impacts from Livestock Grazing Management.** Alternative C would have a lower permitted use limit than the other alternatives (Table 4.6.2-1). On an average annual basis, this grazing would support approximately 31 jobs and $230,000 in labor income (Table 4.6.2-2 and Table 4.6.2-3). While closure of several inactive allotments yields this decrease, current activity could be accommodated and potentially increase under this alternative. This increase may be less likely with historical decreases in actual use of AUMs (DOI 2010b). Nonetheless, if demand for AUMs existed along with favorable forage and market conditions, the contribution from BLM grazing could increase relative to current use under this alternative despite the decrease in the permitted use limit. Regardless, BLM grazing related jobs would continue to remain below 1 percent of overall agricultural employment and labor income for the area.

Levels of employment and income associated with Alternative C should not overshadow potential increases in other values as a result of grazing actions under this alternative. The benefit to permittees of low-cost BLM

forage, below the cost of competitively priced AUMs, would be $479,000. This cost is less than the maximum potential benefit under Alternative A. However, it is greater than the current value ($310,000) and could reduce conflict and increase value to other resources.

**Impacts from Comprehensive Trails and Travel Management and Recreation and Visitor Services Management.** It is anticipated that Alternative C would accommodate recreation at slightly lower levels than the expected rates of increase under any other alternative. Given this decrease, average annual recreation visits are estimated at 325,930 general visits and another 32,400 wildlife-related visits (Table 4.6.2-1). These visits account for OHV use, hunting, fishing, boating, biking, and other forms of recreation. Consequent expenditures of these visitors would support approximately 138 jobs and $5.3 million in labor income in the impact area economy on an average annual basis (Table 4.6.2-2 and Table 4.6.2-3).

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Less oil and gas activity would occur under Alternative C than under any other alternative (Table 4.6.2-1). Under this alternative, a total of 3,578 wells are estimated to be drilled on BLM mineral estate within areas with high potential over the 20-year analysis period and amounts to approximately 179 wells per year. Contributions to employment and income from these uses would provide approximately 1,048 jobs and $84 million in labor income on an average annual basis (Table 4.6.2-2 and Table 4.6.2-3). Approximately 2 percent of employment and labor income would be supported in the minerals sector under this alternative.

Decreases in gas production would result in less royalty disbursements to local governments than under any other alternative.

**Impacts from Locatable Minerals, Mineral Materials, and Non-energy Leasable Minerals Management.** Mineral resource management under this alternative would continue to support current levels of saleable and locatable uses.

**Impacts from Areas of Critical Environmental Concern Management.** The economic effects generated by management of ACECs are described above under impacts from VRM.

_Alternative D_

As a result of Alternative D, about 1,640 jobs and $113 million in labor income would be generated in the impact area economy on an average annual basis. This amount is 63 percent more employment and labor income than contributed currently, and results from the higher anticipated gas production, timber product contributions, and permitted grazing and recreation visits evaluated under this alternative than levels evaluated under the other action alternatives. Oil and gas estimates are based on current prices and potential production and future production, and market price cannot be projected. Thus, these estimates may not be an accurate portrayal of actual impacts under future market conditions. In addition, timber and grazing estimates are based on the sawtimber ASQ and AUM permitted use limit and thus reflect an annual average of the maximum available contribution that would be available rather than actual use. The largest employment and labor income effects would occur in the Government, Mining, and Construction sectors. (See Table 4.6.2-5 and Table 4.6.2-6.)

While employment and labor income contributions under this alternative would be the highest among the alternatives, less protected area designations would occur than under the Proposed RMP and Alternative C

(Table 4.6.2-7). Therefore this alternative would ensure less protection of non-market values and natural amenities than the Proposed RMP and Alternative C and only slightly more protection than Alternative A.

The economic impacts from BLM expenditures and employment and externally funded restoration projects under Alternative D would be the same as those described above under Methods and Assumptions and under Alternative A.

Under Alternative D, annual payments to counties would be approximately $17 million, which includes a portion of PILT payments that can be attributed to BLM entitlement acres, a portion of payments received from grazing revenues, and a portion of royalties received from the sale of mineral material (Table 4.6.2-4). These payments would support about 241 jobs and $12.1 million in labor income (Table 4.6.2-2 and Table 4.6.2-3). Payments to counties and their impacts under this alternative are higher than the other alternatives with higher levels of anticipated gas production. As discussed above, this estimate is based on current prices and potential production. Actual production and market price cannot be projected; thus, these estimates may not be an accurate portrayal of actual impacts. Contributions from these payments to local government revenue could increase from current levels (from 2 to 4 percent) and thus would remain an important portion of local government revenue within the impact area.

**Impacts from Visual Resource Management.** Under this alternative, less protective area designations and managing lands for wilderness characteristics would occur than the other alternatives, apart from Alternative A (Table 4.6.2-7). Therefore, this alternative would provide less protection of non-market values and natural amenities among the alternatives, apart from Alternative A. Consequently, well-being associated with non-market values and potential contributions from new residents and tourists attracted by natural amenities could be more than Alternative A but less than the Proposed RMP and Alternative C.

**Impacts from Lands with Wilderness Characteristics Management.** The economic effects generated by managing for wilderness characteristics are described above under impacts from VRM.

**Impacts from Forestry Management.** Alternative D would allow an average annual harvest of approximately 1,400 MBF of sawtimber (Table 4.6.2-1). As stated above, this estimate is based on the sawtimber PSQ and reflects an annual average of the volume that would be available rather than actual harvest projections. Annual average harvest has been less than 1 percent of this estimate (Table 4.6.2-1). If harvests were to occur at PSQ levels, approximately 16 jobs and $655,000 in labor income (Table 4.6.2-2 and Table 4.6.2-3) would be supported within the local economy. In addition to direct job and income impacts in the forest products industry, these estimates include impacts to industries that provide factors of production to the forest products industry, and other industries impacted by wage-related spending. While less volume would be available than under Alternative A, it should be emphasized that less than 1 percent of the average annual available harvest has been removed historically. Consequently, Alternative D could maintain or increase the jobs and labor income levels supported currently since the PSQ estimate is greater than current levels of harvest from BLM.

**Impacts from Livestock Grazing Management.** Alternative D would have a lower permitted use limit than Alternative A but higher than the other alternatives (Table 4.6.2-1). On an average annual basis, this grazing would support approximately 32 jobs and $237,000 in labor income (Table 4.6.2-2 and Table 4.6.2-3). While closure of several inactive allotments yields this decrease relative to Alternative A, current activity could be accommodated and potentially increase under this alternative. This may be less likely with

historical decreases in actual use of AUMs (DOI 2010b). Nonetheless, if demand for AUMs existed along with favorable forage and market conditions, the contribution from BLM grazing could increase relative to current use under this alternative despite the decrease in the permitted use limit. Regardless, BLM grazing-related jobs would continue to remain below 1 percent of overall agricultural employment and labor income for the area.

Levels of employment and income associated with the Proposed RMP should not overshadow potential increases in other values as a result of grazing actions under this alternative (see Section 3.3.2 Livestock Grazing). The benefit to permittees of low-cost BLM forage, below the cost of competitively priced AUMs, would be $493,000. This cost is less than the maximum potential benefit under Alternative A. However, it is greater than the current value ($310,000) and could reduce conflict and increase value to other resources.

**Impacts from Comprehensive Trails and Travel Management and Recreation and Visitor Services Management.** In spite of the decrease in areas open to cross-county travel, it is anticipated that the increase in areas limited to designated routes would accommodate recreation at levels similar to the expected rates of increase discussed under Alternative A. In addition, improved recreation facilities and management focus under Alternative D would attract additional visitation not experienced under the other alternatives. Given this increase, average annual recreation visits are estimated at 374,210 general visits and another 37,200 wildlife related visits (Table 4.6.2-1). These visits account for OHV use, hunting, fishing, boating, biking, and other forms of recreation. Consequent expenditures of these visitors would support approximately 158 jobs and $6.1 million in labor income in the impact area economy on an average annual basis (Table 4.6.2-2 and Table 4.6.2-3).

Job and income associated with this alternative should not overshadow the value of experience provided by recreation on BLM lands under this alternative. As noted above, actions that support recreation facilities would result in an increase in the value of experience for some relative to the other alternatives. In addition, designation of motorized routes would result in improved landscape health and associated recreation amenity values under this alternative that would likely better match the desired recreational experiences of some visitors. Thus, the value of the recreation experience on BLM lands could increase relative to the other alternatives.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Fluid mineral resource management under Alternative D would support more natural gas-related activity than the other alternatives (Table 4.6.2-1). Under this alternative, a total of 4,198 wells are estimated to be drilled on BLM mineral estate within areas with high potential over the 20-year analysis period and amounts to approximately 210 wells per year. Contributions to employment and income from these uses would provide approximately 1,115 jobs and $89.7 million in labor income on an average annual basis (Table 4.6.2-2 and Table 4.6.2-3). Approximately 2 percent of employment and labor income would be supported in the minerals sector under this alternative.

As discussed above, increases in gas production would result in more royalty disbursements to local governments than under the Proposed RMP or Alternative C.

**Impacts from Locatable Minerals, Mineral Materials, and Non-energy Leasable Minerals Management.** Mineral resource management under this alternative would continue to support current levels of saleable and locatable uses (the same as under the Proposed RMP and Alternatives A and C).

**Impacts from Areas of Critical Environmental Concern Management.** The economic effects generated by management of ACECs are described above under impacts from VRM.

## Cumulative Impacts

The regional economy can be affected by a variety of factors including population growth, changes in interest rates, location of new industries, recession, growth of new sectors, tax policy, and state economic policy. When compared with these variables, the management actions under this plan have relatively small effects on the regional economy. There should be no cumulative economic effects regionally because the changes in economic activity presented above would be largely unnoticeable on a regional basis. However, cumulative economic effects may occur for smaller areas within counties and communities in the impact area.

*Forest Products.* The potential for biomass utilization within the planning area has been deemed favorable by many (BLM and DOE 2003); however, projecting future scenarios for utilization is impractical based on factors outside the scope of BLM management. Utilization depends on industry capacity, and decisions to invest in energy development and infrastructure depend on factors determined by regional and world markets. In addition, the cost of transportation and removal from public land (site-specific planning) could hamper development. In the future, utilization of biomass from BLM-administered lands in the planning area may become more likely with changes in energy markets and technology.

*Grazing.* Field office personnel noted the increasing status of allotments in non-use as larger areas of land are split up into smaller private estates and ranchettes (P. Torma and I. Pitman 2010). While these decreasing trends in AUM utilization are largely outside the spectrum of BLM management, current levels of grazing would be supported under all the alternatives, with cooperation of favorable market conditions and willing permittees.

**Recreation and Comprehensive Trails and Travel Management.** Recreation management and comprehensive trails and travel management decisions produce satisfying recreation experiences and beneficial outcomes for BLM visitors as well as beneficial outcomes for communities. These beneficial outcomes accrue from recreation participation, are both short and long term, and are realized onsite and offsite. Beneficial outcomes are identified in one of four categories: personal/individual benefits, social/community benefits, economic benefits or environmental benefits. The decisions included in the Proposed RMP as well as future implementation decisions (e.g., types of special recreation permits issued, recreation facilities developed, or extent of the travel system as well as the types or modes of travel) will influence the economic outcomes produced from BLM lands. Types of economic outcomes expected to be produced include: increase in desirability as a place to live or retire, greater value-added local services, and helping to maintain local tourism revenue.

*Mineral Resources.* Leasable, locatable, and salable mineral production would continue to be provided by BLM in the planning area (Table 4.6.2-1). Regardless of differences among the alternatives, area dependency on BLM-related employment provided to the mining sector would not change among the alternatives. Consequently, any cumulative economic effects on those dependent on these contributions will remain the same under the alternatives.

*Impacts to Counties.* Under all the alternatives, the share of local government revenue attributable to the BLM ranges from 7 to 9 percent in the CRVFO impact area. Thus, county programs and infrastructure supported by these payments would not differ much among the alternatives. Consequently, any cumulative

economic effects on those dependent on these contributions would remain similar under all of the alternatives. In addition, as discussed above in the social and economic sections, costs to local governments would remain largely unchanged as a result of planning actions. Consequently, significant changes in population, oil and gas development, or the demand for services and infrastructure would not result from BLM planning actions. As a result, cumulative economic effects to counties will remain the same under all of the alternatives.

***BLM Expenditures and Employment.*** Under all the alternatives, it is assumed the level of expenditures and employment would not vary by alternative; thus, the employment and income supported by these actions would not vary among the alternatives. Consequently, cumulative economic effects on those dependent on these contributions would remain the same under the alternatives.

***Externally Funded Ecosystem Restoration.*** Current levels of management performed on BLM lands in the CRVFO carried out with funds not provided by BLM would continue under all the alternatives. Consequently, associated cumulative economic effects would be the same among the alternatives.

***Role of Amenities, Migration, and Non-Market Values.*** Establishing areas to be managed for their wilderness character and changes to ACECs, WSR eligibility, and VRM (Table 4.6.2-8) would further maintain and perhaps enhance non-market values associated with natural amenities protected on these lands. The effects on non-market values from special area designations and management of these attributes on private, state, and other federal land cannot be projected. However, the effects could be the greatest under Alternative C and the least under Alternative A, with the respective most and fewest acres designated among the alternatives.

**Table 4.6.2-8**
**Social Indicators**

| Resource | Current | Alternative A (No Action) | Alternative B (Proposed RMP) | Alternative C | Alternative D |
|---|---|---|---|---|---|
| Non wildlife recreation (visits) | 268,440 | 338,041 | 362,140 | 325,930 | 374,210 |
| Wildlife recreation (visits) | 24,263 | 33,576 | 36,000 | 32,400 | 37,200 |
| Oil and Gas Development (# of wells per year) | 177 | 210 | 197 | 179 | 210 |
| Oil and Gas Development (average daily trips per year) | 562 | 667 | 626 | 568 | 667 |
| Trails and Travel Management (acres limited to designated routes) | 0 | 123,000 | 467,600 | 467,400 | 473,500 |

***Cumulative Effects to Population.*** Population increases are also anticipated over the period between 2005 and 2030 within the planning area. According to projections from the Colorado State Demography Office (2009i), the population in the CRVFO impact area would increase by 100 percent. (See the Section 3.6.2 Social and Economic Conditions, discussion of population trends.) These population increases suggest that challenges associated with increasing uses of BLM lands in the CRVFO impact area will grow along with challenges associated with BLM's urban interface.

In conclusion, projected employment changes in the area suggest economic contributions from BLM management will be small. However, the role BLM plays in the economic aspects of the CRVFO impact area may increase along with the population, since the land managed by BLM sustains area employment, income, and quality of life and will continue to do so under all alternatives. These benefits occur largely through the provision of natural amenities and recreational opportunities that attract tourists and businesses. None of the alternatives would alter the trends outlined above but would sustain employment, recreation, access, and rural character. While the provision of these resources varies by alternative, these opportunities would be available for a variety of demographic groups, area residents, tourists, and others who value the area.

### 4.6.2.2 Social Conditions

#### Methods and Assumptions

The social analysis focuses on changes to social and economic well-being as it relates to the quality of life of those individuals and communities identified in Chapter 3. While many of the potential changes in quality of life can be discussed only qualitatively, several indicators provide an approach to discuss the magnitude of effects to these communities. Table 4.6.2-8 lists these indicators and compares the alternatives for communities[1]. Comments from the RMP planning process and the North-Central Colorado Community Assessment Report provided specific information pertaining to the concerns of individuals and groups affected by this plan. All comments were examined and general categories were formed from common themes pertaining to community connections and interests in BLM management. The three communities of interest identified include individuals and groups interested in recreation and access, preservation of rural characteristics and values, and oil and gas development. These communities are described in Chapter 3, while effects to these communities are discussed below.

The following analytical methods and assumptions were used to complete the analysis for the social impacts from the proposed management decisions:

- The planning area population will continue to increase and age, as described in Chapter 3.

- The social groups are defined to facilitate the discussion of social impacts. These discussions simplify what are often quite complex and unique values and attitudes, and the groupings presented here are by no means mutually exclusive. For example, oil and gas workers also participate in recreation activities. It is also worth noting that attitudes, interests, and values often change over time. The social analysis covers the groups and individuals that are most likely to be affected by this plan.

- The social analysis assesses the potential effects of different management actions on potentially affected social groups. These groups were identified based on the results of public scoping and comments received during the planning process. This analysis addresses the potential impacts of the alternatives based on the issues and concerns raised by these groups. The analysis draws on ongoing discussions between BLM and potentially affected publics, as well as discussions with subject matter experts involved in other parts of the analysis. The analysis is primarily qualitative with potential impacts ranked by alternative. Quantitative measures, such as the number of wells, potential traffic, and recreation visitation, are used as appropriate.

---

[1] Changes in indicators do not imply the same change in quality of life for all communities since marginal changes in quality of life relative to the indicators cannot be considered equal among communities. For example, the change in quality of life associated with an increase in oil and gas development is different for communities interested in recreation from the change in quality of life for those interested in preservation of rural characteristics and values.

- Non-market values, including natural amenities, non-use values, ecosystem services, and aspects of well-being and quality of life, are assessed in qualitative terms, as appropriate.

In the absence of quantitative data, a qualitative analysis was performed based on the best available data, as appropriate. Expert opinions were solicited from each CRVFO and the BLM State Office regarding current conditions for specific resources and anticipated outcomes and were incorporated into the evaluation. Particularly, detractions from existing lifestyles, quality of life, sense of place, and community values did not lend themselves to quantitative analysis. This analysis involved researching the available literature concerning community values and quality of life, including newspaper articles, university research studies, the community assessment report for the planning area, and visitor surveys that reveal public opinions, levels of satisfaction, and desired outcomes. The permitted use information derived from these studies was then compared against the anticipated changes in the factors identified as important that would occur under each alternative.

*Recreation and Access.* Under all alternatives, wildlife and non-wildlife visits are expected to increase (Table 4.6.2-8). Employment and income related to recreational activities, many of which depend on access to public lands, will at minimum continue to support this community's quality of life. While localized changes in access could occur, recreation opportunities will be maintained and enhanced, thus accommodating existing recreation uses and expected increases in recreation uses (Table 4.6.2-8).

Effects of increased visitation on the quality of the recreation experience will depend on the type and location of the recreation activity taking place as well as on the behavior of the individual recreating. No information is currently available on the effects of increased visitation on quality of recreational experience or access to public land. Changes in the quantity and quality of the recreation experiences offered are discussed in the recreation section of this EIS.

Across all alternatives, it is important to recognize that the difference in special management area designations (such as SRMAs and areas open, closed, or limited to motorized uses) represents a change in management focus, and may not change the ability to access public land or the uses that occur on that land. In addition, drawing conclusions about changes to access based on acres or route designations may not be appropriate since substantive consideration depends on an accurate proxy for actual portrayal of effects to quality of life. Regardless, as discussed above, it is anticipated that recreation opportunities will be maintained and enhanced with these designations, thus accommodating existing recreation uses and expected increases in recreation uses (Table 4.6.2-8). Therefore, no change in recreational value is anticipated from changes in recreation access; however, the lack of site-specific information on access for other uses makes evaluation impractical.

*Preservation of Rural Characteristics and Values.* Individuals and communities interested in the preservation of rural characteristics and value noted the importance of access to public land. Effects on access are address in the paragraph directly above. Effects on rural character and value from oil and gas development are discussed under effects by alternative.

*Oil and Gas Development.* Under all alternatives, the potential change in population that would result from changes in mineral sector employment would be less than 1 percent of current population levels in the CRVFO impact area. In addition, the housing vacancy rate within the impact areas (21 percent within the CRVFO impact area) would accommodate any changes in housing demand from population changes, since required households would not exceed 1 percent of current vacancies under all the alternatives. However, localized change could be greater for individual counties within the CRVFO impact area. While possible, the

maximum potential change would still be small. If all potential changes in population and households within the impact area are examined as a percent of individual county household vacancies, the hypothetical change in vacancy rate would not exceed 4 percent of county vacancies, except in Garfield County, where the potential households' percent of current vacancies ranges from 9 to 15. While potential effects on population at a local level are small, they could occur alongside cumulative effects on population from oil and gas development, as discussed in the cumulative effects section. As a result of these cumulative effects, changes in housing affordability and availability could adversely affect local economic well-being by decreasing the local vacancy rate below sustainable amounts.

## Environmental Consequences

Impacts on social conditions would result from some of the actions proposed under other resources and uses. Programs not addressed below were deemed to have no or only negligible impacts on social conditions under any of the four alternatives.

### Alternative A

**Impacts from Visitor Services Management.** Under Alternative A, it is anticipated that recreation use would continue to increase by 2.5 percent per year based on rates of visitation observed in the past (RMIS 2010). Given this increase, average annual recreation visits are estimated at 338,041 general visits and another 33,576 wildlife-related visits (Table 4.6.2-8). Thus, Alternative A continues to support value to recreational users through continued access to public land.

**Impacts from Comprehensive Trails and Travel Management.** Under Alternative A, current access for commercial and non-commercial uses would be maintained under current travel management. Thus, Alternative A continues to support standard of living through continued access to public land.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Of particular concern to those interested in preservation of rural character and values was increased traffic from oil and gas development. Large traffic volumes can negatively impact quality of life through traffic congestion, noise, and dust. Additionally, commuting times and threats to the public's health and safety persist because of continued traffic volumes. The number of potential wells is used to estimate potential changes in traffic and is measured in trips made to a well during development. Based on an average of 1,160 trips per well (DOI 2006) and development anticipated (approximately 210 wells completed per year over 20 years), Alternative A would contribute 667 average daily trips (Table 4.6.2-8). This number of trips is more than the Proposed RMP and Alternative C.

While this traffic volume may not cause traffic congestion by itself (contributing less than 4 percent of current average daily trips along Interstate70 between Silt and Parachute), it often occurs in rural areas where additional truck traffic, noise, and dust may be easily noticed. Consequently, it could negatively impact the quality of life for those living in the vicinity of the development and those who are accustomed to and value a quiet rural setting. While the level and occurrence of this traffic volume along specific roads is not available, the maximum daily trips across the entire planning area would not exceed 13 percent of traffic along Highway 13 between Rifle and Meeker (CDOT 2009).

Employment and income generated from oil and gas development activities contribute to the standard of living for those depending on the industry and connected industries. Under this alternative, 1,115 jobs would be supported by oil, gas, and mineral uses on BLM lands within the CRVFO (Table 4.6.2-2). Consequently,

the standard of living for those who depend on oil and gas related employment would continue under this alternative.

Approximately 1,100 households depend on BLM minerals-related employment under this alternative, which is no more than 4 percent of total vacancies in individual impact area counties. This total does not include Garfield County, where total households supported by BLM minerals-related employment could account for 15 percent of current vacancies. Consequently, no effect on the availability and affordability of area housing is anticipated in individual counties, except in Garfield County. Some potential for effects on the availability and affordability of housing exists in Garfield County, given the possibility of concentrated oil and gas activity alongside low housing vacancy rates[2].

### Alternative B (Proposed RMP)

**Impacts from Recreation and Visitor Services Management.** As described below under Impacts from Comprehensive Trails and Travel Management, it is anticipated that the increase in areas limited to designated routes (Table 4.6.2-8) under the Proposed RMP would accommodate an increased recreation demand that would be expected under the Proposed RMP. This alternative would maintain increase recreation visitation from the levels experienced under Alternative A—approximately 362,000 general visits and another 36,000 wildlife-related visits (Table 4.6.2-8).

**Impacts from Comprehensive Trails and Travel Management.** In spite of the decrease in areas open to cross-county travel, it is anticipated that the increase in areas limited to designated routes (Table 4.6.2-8) would accommodate the recreation access that would be demanded under the Proposed RMP. In addition, it is anticipated that the designation of routes and site-specific travel management planning would continue to accommodate other commercial and non-commercial uses of public land. Consequently, no change in quality of life is anticipated.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Of particular concern to those interested in the preservation of rural character and values was increased traffic from oil and gas development. Using the same methodology as above to calculate the number of average daily trips, the Proposed RMP would result in 626 trips (Table 4.6.2-8). This number is below the projected trip amounts for Alternatives A and D. Less traffic could improve quality of life because of the lowered traffic congestion, noise, and dust. Additionally, less traffic congestion could lead to decreased commuting times and improved public health and safety.

Regardless, oil and gas related traffic concern would remain for area communities. While this traffic volume may not cause traffic congestion by itself--it could contribute less than 4 percent of current average daily trips along Interstate 70 between Silt and Parachute--it often occurs in rural areas where additional truck traffic, noise, and dust may be easily noticed. Consequently, it could negatively impact the quality of life for those living in the vicinity of the development and those who are accustomed to and value a quiet rural setting. While the level and occurrence of this traffic volume along specific roads is not available, the maximum daily

---

[2]  It should be noted that these effects are based on current conditions in both the housing and oil and gas markets. Actual oil and gas activity and housing markets cannot be projected. Thus, these estimates may not be an accurate portrayal of actual impacts. However, they provide a frame of reference for discussion of housing. In addition, projected population increases, discussed in Chapter 3 and the cumulative effects section below, also temper potential effects on housing availability and affordability at the local level.

trips across the entire planning area would not exceed 12 percent of traffic along Highway 13 between Rifle and Meeker (CDOT 2009).

Employment and income generated from oil and gas development activities contribute to the standard of living for those depending on the industry and connected industries. Under this alternative, 1,088 jobs would be supported by oil, gas, and mineral uses on BLM lands within the CRVFO (Table 4.6.2-2). Consequently, the standard of living for those who depend on oil- and gas-related employment would continue under this alternative.

Approximately 1,100 households would depend on the BLM minerals-related employment under this alternative (Table 4.6.2-8), which is no more than 4 percent of total vacancies in individual impact area counties, apart from Garfield County, where total households supported by BLM minerals-related employment could account for 14 percent of current vacancies. Consequently, no effect on the availability and affordability of area housing is anticipated in individual counties, except in Garfield County. Some potential for effects on the availability and affordability of housing exists in Garfield County, given the possibility of concentrated oil and gas activity alongside low housing vacancy rates.

### *Alternative C*

Under Alternative C, impacts from R&VS Management, Comprehensive Trails and Travel Management, and Fluid Minerals Management would be similar, but slightly reduced as those described above under the Proposed RMP.

### *Alternative D*

**Impacts from Visitor Services Management.** As described below under Impacts from Comprehensive Trails and Travel Management, it is anticipated that the recreation levels that would occur under Alternative A would be increased by the recreation access provided under Alternative D. This access would increase recreation visitation and other commercial and non-commercial uses of public land from levels experienced currently. In addition, facilities development for recreation purposes would provide additional visitation not experienced under the other alternatives: approximately 374,210 general visits and another 37,200 wildlife-related visits (Table 4.6.2-8). Consequently, an increase in recreational value relative to the other alternatives could occur.

**Impacts from Comprehensive Trails and Travel Management.** In spite of the decrease in areas open to cross-county travel, it is anticipated that the increase in areas limited to designated routes (Table 4.6.2-8) would accommodate greater recreation visits that would be experienced under Alternative A. This access would increase recreation visitation and other commercial and non-commercial uses of public land from the levels experienced currently. Consequently, an increase in recreational value is anticipated.

**Impacts from Fluid Minerals Management (Oil and Gas, Oil Shale, and Geothermal Resources).** Of particular concern to those interested in the preservation of rural character and values was increased traffic from oil and gas development. Using the same methodology as above to calculate the number of average daily trips, Alternative D would result in an estimated 667 trips (Table 4.6.2-8), the most of all the alternatives, along with Alternative A. More traffic than under the Proposed RMP or Alternative C would decrease quality of life through traffic congestion, noise, and dust. Additionally, increased traffic could lead to increased commuting times and threats to public health and safety.

While this traffic volume may not cause traffic congestion by itself--it could contribute 4 percent of current average daily trips along Interstate 70 between Silt and Parachute--it often occurs in rural areas where additional truck traffic, noise, and dust may be easily noticed. Consequently, it could negatively impact the quality of life for those living in the vicinity of the development and who are accustomed to and value a quiet rural setting. While the level and occurrence of this traffic volume along specific roads is not available, the maximum daily trips across the entire planning area would not exceed 13 percent of traffic along Highway 13 between Rifle and Meeker (CDOT 2009).

Employment and income generated from oil and gas development activities contribute to the standard of living for those depending on the industry and connected industries. Under this alternative, 1,115 jobs would be supported by oil, gas, and mineral uses on BLM lands within the CRVFO (Table 4.6.2-2). This number is more than the current contribution and the Proposed RMP and Alternative C; consequently, the standard of living for those who depend on oil- and gas-related employment could increase under this alternative.

Approximately 1,100 households would depend on the BLM minerals related employment under Alternative D. This number is no more than 4 percent of total vacancies in individual impact area counties, apart from Garfield County, where total households supported by BLM minerals-related employment could account for 15 percent of current vacancies. Consequently, no effect on the availability and affordability of area housing is anticipated in individual counties, except in Garfield County. Some potential for effects on the availability and affordability of housing exists in Garfield County, given the possibility of concentrated oil and gas activity alongside low housing vacancy rates.

## Cumulative Impacts

**Recreation and Comprehensive Trails and Travel Management.** Recreation management and comprehensive trails and travel management decisions produce satisfying recreation experiences and beneficial outcomes for BLM visitors as well as beneficial outcomes for communities. These beneficial outcomes accrue from recreation participation, are both short and long term, and are realized onsite and offsite. Beneficial outcomes are identified in one of four categories: personal/individual benefits, social/community benefits. economic benefits or environmental benefits. The decisions included in the Proposed RMP as well as future implementation decisions (e.g., types of special recreation permits issued, recreation facilities developed, or extent of the travel system as well as the types or modes of travel) will influence the personal and social outcomes produced from BLM lands. Types of personal/social outcomes expected to be produced include: improved physical fitness/ better health maintenance, living a more outdoor-oriented lifestyle, heightened sense of satisfaction with one's community, lifestyle improvement or maintenance and a closer relationship with the natural world.

*Mineral Resources.* As discussed above, no additional effect on population change, housing affordability, housing availability, or traffic is anticipated under the alternatives. Under all alternatives, the change in population that would result from changes in mineral sector employment related to BLM activity would be less than 1 percent of current population levels within the impact areas. However, localized change could be greater for individual counties within the CRVFO impact area. Consequently, cumulative effects on population could occur to the extent that effects on traffic in rural areas, housing affordability, and housing availability adversely affect local social well-being. As noted above, the effects depend on concentrated BLM activity in particular counties where vacancy rates are low, such as in Garfield County, where 13 percent of housing units are vacant and concentrated oil and gas activity is anticipated.

***Role of Amenities, Migration, and Non-Market Values.*** Natural amenities and quality of life have been increasingly recognized as important factors in many rural communities in the West (Rudzitis and Johnson 2000). Thus, the established ACECs, WSRs, and land to be managed for wilderness characteristics similarly contribute to area quality of life of communities interested in resource protection. The effects on quality of life from special area designations and management of these attributes on private, state, and other federal land cannot be projected. However, the effects could be the greatest under Alternative C and the least under Alternative A, with the respective most and fewest acres designated among the alternatives (Table 4.6.2-8).

***Cumulative Effects to Population.*** The role BLM plays in the social aspects of the CRVFO impact area may increase along with the population, since the land managed by the BLM sustains area quality of life and will continue to do so under all alternatives, largely through the provision of natural amenities and recreational opportunities. None of the alternatives would alter the trends outlined above, but would sustain aspects of quality of life such as employment, recreation, access, and rural character. While the provision of these resources varies by alternative, these opportunities would be available for a variety of demographic groups, area residents, tourists, and others who value the area.

### 4.6.3   Environmental Justice

***Methods and Assumptions***

Executive Order 12898, Federal Action to Address Environmental Justice in Minority Populations and Low-Income Populations, requires identifying and addressing disproportionately high and adverse human health and environmental impacts of federal programs, policies, and activities on minority or low-income populations. To evaluate potential environmental justice impacts, guidance obtained from other federal agencies was reviewed, as follows:

- EO 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, February 11, 1994, *Federal Register* at 7630.

- US Environmental Protection Agency, Interim Final Guidance for Incorporating Environmental Justice Concerns in EPA's Compliance Analysis, Office of Federal Activities, September 30, 1997.

- Council on Environmental Quality, Environmental Justice, Guidance under the National Environmental Policy Act, Executive Office of the President, December 1997.

The following four-step method was used to evaluate potential environmental justice impacts associated with land management actions proposed by the BLM:

1. Identify potential minority or low-income populations within the region of influence.

2. Identify a broad range of potential environmental and human health effects that could affect minority or low-income populations, including safety, traffic, exposure to hazardous materials, land use, and socioeconomics.

3. Assess whether these potential impacts would disproportionately affect minority and low-income populations.

4. Evaluate mitigation measures that would be used to minimize impacts on minority and low-income populations.

Relevant Bureau of the Census data for counties within the planning area, including Eagle, Routt, Garfield, Mesa, and Pitkin, as well as for the State of Colorado, were collected for this analysis, as follows:

- Total population.

- Percentage of the population with minority status (e.g., Black or African American, Hispanic or Latino, Asian American, American Indian or Alaskan Native, and Native Hawaiian and other Pacific Islander).

- Percentage of the population with low-income status, using annual statistical thresholds from the Bureau of the Census Current Population Reports.

- Percentage of the population with minority status in the entire State of Colorado.

- Percentage of the population with low-income status in the entire State of Colorado, using annual statistical thresholds from the Bureau of the Census Current Population Reports.

### Environmental Consequences

Impacts on environmental justice populations could result from some of the actions proposed under other resources and uses. Programs not addressed below were deemed to have no, or only negligible, impacts on environmental justice populations under any of the four alternatives. Impacts predominately are associated with programs related to fluid minerals management and recreation and visitor services management.

### Alternative A

No proposed management actions that would directly affect minority and low-income populations are incorporated into this alternative or any other alternative. However, the proposed management actions could indirectly affect the minority or low-income population's quality of life by potentially affecting local housing markets or increasing health and safety risks to children or other environmental justice populations. However, there is no evidence to suggest that minority or low-income populations would be disproportionately affected by these indirect effects. If these effects were to occur, they would probably affect all segments of the area population. Indirect impacts that would result from the proposed management actions could also benefit minority and low-income populations, such as secondary employment that could be generated by increased recreation expenditures in the regional economy or by increased oil and gas and energy development. In general, this type of employment occurs in services and retailing industries (Colorado Division of Local Government 2005), which typically employ lower income households.

Under all alternatives, oil and gas development would increase the potential for exposure to the hazardous chemicals involved in oil and gas extraction. Further, the increased traffic congestion, noise, and dust associated with oil and gas operations would be likely to adversely affect the quality of life of populations closest to oil and gas development, some of which would be considered low-income or minority populations. Environmental justice populations also could be affected by oil and gas development to the extent that there could be an influx of transient workers, who might increase the pressure on the market for affordable housing (Headwaters Economics 2008) in some areas such as Garfield County, where housing vacancies are low and concentrated BLM oil and gas activity is likely. A decrease in housing availability could disproportionately affect low-income families if housing costs (such as property taxes and rents) rise as a share of their income more than the share of the rest of the population. In addition, travel time to work for low-income families could increase if they are displaced as a result of increased costs of housing. Consequently, disproportionate effects on environmental justice populations are possible. These effects are contingent on oil and gas activity and its effect on housing markets, which cannot be accurately projected.

Changes to employment levels identified in Section 4.6.2 Social and Economic Conditions, could affect low-income and minority populations by providing additional employment opportunities. As depicted in that section's Table 4.6.2-5, much of the employment under the alternatives would be generated in the service and retail related sectors (Accommodation & Food Services, Retail Trade, Transportation & Warehousing), which typically provide lower paying jobs that employ members of low-income households. As a share of total employment provided by the alternatives, the construction sector would provide the most employment (Table 4.6.2-5).

Oil and gas development would contribute employment and income to the CRVFO planning area workforce, including low-income and minority populations. While direct employment in the minerals sector, could be taken up by a specialized temporary workforce that would reside in the area only for as long as their skills were required, additional indirect and induced employment would be supported in other industries by the oil and gas related activity on BLM lands.

An increase in the oil and gas workforce could also increase the demand for affordable housing in Garfield County, where housing vacancies are low and concentrated BLM oil and gas activity is likely. A decrease in housing availability could disproportionately affect low-income families if housing costs (such as property taxes and rents) rise as a share of their income more than the rest of the population. In addition, travel time to work for low-income families could increase if they are displaced as a result of increased costs of housing. Consequently, disparate effects on environmental justice populations are possible. These effects are contingent on oil and gas activity and its effect on housing markets, which cannot be accurately projected.

Although additional drilling could have health effects associated with exposure to the hazardous chemicals involved in oil and gas extraction, these effects would be distributed among all segment of the population. Consequently, there is no evidence to suggest that minority or low-income populations would be disproportionately affected by the potential health effects.

### Alternative B (Proposed RMP), Alternative C, and Alternative D

Impacts on environmental justice populations would be similar to or the same as those under Alternative A. There is no evidence to suggest that minority or low-income populations would be disproportionately affected by decisions in these alternatives.

## 4.7   IRREVERSIBLE AND IRRETRIEVABLE COMMITMENT OF RESOURCES

Section 102(2)(C) of NEPA requires a discussion of any irreversible or irretrievable commitments of resources that are involved in the proposal should it be implemented. An irretrievable commitment of a resource is one in which the resource or its use is lost for a period of time (e.g., extraction of any locatable mineral ore, or oil and gas). An irreversible commitment of a resource is one that cannot be reversed (e.g., the extinction of a species or disturbance to protected cultural resources).

The air quality resource in the planning area is not irreversible or irretrievable; however, committed actions that consume PSD increments would use up available PSD increments for other proposed sources. For this Final EIS, there are no actions by BLM that would require PSD permitting.

Soil erosion, loss of productivity, and soil structure might be considered an irreversible commitment of resources. Although new soil can develop, soil development is a slow process. Surface-disturbing activities that remove too much vegetation would accelerate erosion that would contribute to irreversible soil loss. However, if management actions and BMPs are applied to surface-disturbing activities, the magnitude of these impacts would be greatly reduced. Rehabilitation and reclamation would restore most all of the soil and vegetation lost.

Also, surface-disturbing activities could impact areas of high cultural sensitivity or areas containing vertebrate or scientifically significant fossil resources. Such destruction of paleontological and cultural resources could be irreversible and irretrievable.

Surface disturbing activities such as construction of roads, utility corridors, various mining operations, and fuels treatment projects, as well as construction of facilities, whether associated with developed recreation, livestock grazing, mineral development, or other activities, generally contribute to increased visual obtrusions on the landscape. Although the BLM gives greater emphasis to visual resources through management of the VRM classification system, these types of activities constitute a commitment for the given use for the duration that the infrastructure and facilities exist. When these various uses cease, reclamation efforts could generally restore visual resources to at least their current quality.

Fire suppression has led to the accumulation of fuels and makes these forests more susceptible to stand-replacing fires. The loss of forest products from stand-replacing fires is considered an irreversible, and in some instances, irretrievable commitment of resources if an extremely hot fire burns over a long time. Also, if aspen continues to decline in the lands managed by CRVFO, the species could become rare to non-existent in some watersheds and might not be able to be restored.

The extraction and development of nonrenewable fossil fuels (e.g., oil, gas, and coal), locatable minerals, and mineral materials would occur from development over the next 20 years. The impacts would be irretrievable and irreversible because, once extracted, the mineral resource cannot be used again, nor can it be replaced in the foreseeable future. BLM Handbook H-1624-1, "Planning for Fluid Mineral Resources," acknowledges leasing of oil and gas resources as an irreversible commitment.

## 4.8   UNAVOIDABLE ADVERSE IMPACTS

Section 102(C) of NEPA requires disclosure of any adverse environmental effects that cannot be avoided should the proposal be implemented. Unavoidable adverse impacts are those that remain following the implementation of mitigation measures, or impacts for which there are no mitigation measures. Some unavoidable adverse impacts occur as a result of implementing the RMP. Others are a result of public use of the BLM lands within the planning area.

Land management directed at meeting non-market values (e.g., social and ecological values, resource protection, recreation settings and experiences) may decreases resource development opportunities and outputs (e.g., right-of-way avoidance areas, closed to salable mineral development).

Activities planned would produce some level of air emissions even with mitigation; however, none of the activities proposed in this Final EIS would produce adverse impacts on the air quality resource.

Surface-disturbing activities would result in unavoidable adverse impacts under current BLM policy to foster multiple uses. Although these impacts would be mitigated to the extent possible, unavoidable damage would be inevitable. Permanent conversion of areas to other uses, such as transportation, mineral and energy development, or OHV use, would increase erosion and decrease the relative abundance of species within plant communities, the relative distribution of plant communities, and the relative occurrence of seral stages of those communities. Because large portions of the crucial big game habitats coincide with areas of high oil and gas potential, unavoidable wildlife habitat loss would also occur. Areas of high oil and gas potential also coincide with critical habitat of special status species fish and fish-bearing streams within the planning area. Unavoidable adverse impacts on fish and other aquatic wildlife would occur through erosion and sedimentation. These activities would also introduce intrusions, which could affect the visual landscape.

Unavoidable water quality impacts would include temporary increases in suspended loads in flowing streams as a result of culvert installation, vehicle use at low-water crossings, livestock use of streambanks and wetlands, and permitted channel fills resulting from construction of oil and gas pads, roads, and pipelines. Water quantity would be reduced by such activities as water withdrawals for livestock use, oil and gas resource development, and watering of roads for dust mitigation.

Unavoidable soil impacts would occur from activities associated with oil and gas development, including compaction from increased vehicle traffic displacement of soils from the construction pipelines and roads, and erosion.

Unavoidable damage to cultural and paleontological resources from permitted activities could occur if resources undetected during surveys were identified during ground-disturbing activities. In these instances, further impacts would be ceased on discovery and the resource would be mitigated to minimize data loss. Unavoidable loss or destruction of cultural and paleontological resources would also occur in areas open to cross-country OHV use, specifically in areas of high cultural sensitivity or areas containing vertebrate or scientifically significant fossil resources. Unavoidable loss of cultural and paleontological resources due to non-recognition, lack of information and documentation, erosion, casual collection, and inadvertent destruction or use would also occur. Broad-scale sampling and classification of areas with a high likelihood of containing cultural and paleontological resources would be expected to greatly reduce the probability of unavoidable adverse impacts on the resource.

Wildlife and livestock would contribute to soil erosion, compaction, and vegetation loss, which could be extensive during drought cycles and dormancy periods. Conversely, unavoidable losses or damage to forage from human uses in the planning area would affect livestock and wildlife. Some level of competition for forage among the species, although mitigated to the extent possible, would be unavoidable. Instances of displacement, harassment, and injury could also occur.

Recreational activities, development of energy and mineral resources, and general use of the planning area would introduce additional potential ignition sources into the planning area, which would increase the probability of human caused fires and the need for suppression activities. These activities combined with continued fire suppression would also affect the overall composition and structure of vegetation communities, which could increase the potential for high-intensity wildland fires.

Increases in recreation use of BLM lands could create unavoidable conflicts between recreation activity types sharing the same BLM lands. In areas where non-recreational land use activities occur there is a potential to displaced visitors. As recreation use increases, conflicts between recreational use and natural resources management could also occur.

Numerous land use restrictions imposed to protect sensitive resources and other important values, by their nature, affect the ability of operators, individuals, and groups who use the BLM lands to do so freely without limitations. These restrictions could also require the closing of roads and trails or the limiting of certain modes or seasons of travel. Although attempts would be made to minimize these impacts by limiting them to the level of protection necessary to accomplish management objectives and by providing alternative use areas for affected activities, unavoidable adverse impacts would occur under all alternatives.

## 4.9    RELATIONSHIP BETWEEN LOCAL SHORT-TERM USES AND LONG-TERM PRODUCTIVITY

Section 102(C) of NEPA requires discussion of the relationship between local, short-term uses of human environment and the maintenance and enhancement of long-term productivity of resources. As described in the introduction to this chapter, "short term" is defined as anticipated to occur within 1 to 5 years of implementation of the activity; "long term" is defined as following the first 5 years of implementation but within the life of the RMP.

Short-term use of the air quality resource would not affect long-term productivity, except that air quality emissions in high enough concentrations could reduce vegetation and plant vigor.

Short-term use of an area to foster energy and minerals, ROWs, and cross-country OHV use would result in long-term loss of soil productivity and vegetation diversity. Impacts would persist as long as surface disturbance and vegetation loss continued.

The short-term use of big game severe winter range, birthing areas, and/or migratory corridors for energy and minerals, ROWs, and cross-country OHV use could impair the long-term productivity of big game populations by displacing animals from primary habitats and by removing components of these habitats that might not be restored for more than 20 years. These short-term uses could also affect the long-term sustainability of some special status species. Long-term productivity, survivorship, and health could be impaired by the long-term use of big game winter range, birthing areas, and migratory corridors, and by long-term use activities located near water bodies containing special status species, for energy and minerals, ROWs, and cross-country OHV use. This could occur by displacing animals in areas permanently open to recreational uses and areas permanently altered. Actions associated with specific leases lasting longer than 5 years, but within the life of this RMP, could affect the long-term sustainability of special status species known to occur in the planning area.

Across all alternatives, the use of management prescriptions, stipulations, COAs, and BMPs are intended to minimize the effects of short-term or long-term land uses.

# Final Environmental Impact Statement for the Bull Mountain Unit Master Development Plan

## Volume I, Environmental Impact Statement

DOI-BLM-CO-S050-2013-0022-EIS



**U.S. Department of the Interior**
**Bureau of Land Management**
**Uncompahgre Field Office**
**2465 South Townsend Avenue**
**Montrose, CO 81401**
**Phone: (970) 240-5300**







# United States Department of the Interior
## BUREAU OF LAND MANAGEMENT



**Southwest District Office**
**2465 S. Townsend Ave.**
**Montrose, CO 81401**

In Reply Refer To
1792

July 2016

Dear Reader:

Attached for your review is the Final Environmental Impact Statement (EIS) for the Bull Mountain Master Development Plan (MDP). The United States (US) Department of the Interior, Bureau of Land Management (BLM), Uncompahgre Field Office (UFO), has received a proposed MDP for natural gas exploration and development from SG Interests I, Ltd. for the Bull Mountain Unit. The BLM prepared this document in consultation with cooperating agencies, and in accordance with the National Environmental Policy Act of 1969 (NEPA), as amended, the Federal Land Policy and Management Act of 1976, as amended, implementing regulations, the BLM's NEPA Handbook (H-1790-1), and other applicable law and policy.

The boundaries of the Unit encompass approximately 19,670 acres federal and private oil and gas mineral estate in Gunnison County, Colorado. The Unit consists of 440 acres of federal surface underlain by federal mineral estate and administered by the BLM UFO; 12,900 acres of split-estate lands consisting of private surface and federal minerals administered by the BLM; and 6,330 acres of fee land consisting of private surface and private minerals regulated by the Colorado Oil and Gas Conservation Commission (COGCC). The Bull Mountain MDP Final EIS and supporting information is available on the project web site at:
http://www.blm.gov/co/st/en/BLM_Information/nepa/ufo/Bull_Mountain_EIS.html.

A MDP provides information common to multiple planned wells, including drilling plans, Surface Use Plans of Operations, and plans for future production; they are typically prepared for a planned cluster of wells and associated facilities in close proximity, or for multiple in-fill wells scattered throughout an oil and gas Unit or field, and include information on associated facilities (roads, pipelines, utility corridors, compressor stations, etc.). If the MDP is approved, this EIS will provide an "umbrella" analysis to which subsequent federal actions proposed within the Unit (e.g.; APDs) would be tiered for additional NEPA compliance.

In developing the Final EIS, the BLM decision maker selected a combination of various management decisions from each of the alternatives analyzed in the Draft EIS to create the Preferred Alternative (Alternative D). The Preferred Alternative proposes a management strategy that best meets the needs of the resources and values in this area under the BLM multiple-use and sustained-yield mandate. Comments on the Bull Mountain MDP Draft EIS helped to formulate the Final EIS and Preferred Alternative.

A limited number of the Bull Mountain MDP Final EIS have been printed. Viewing the document electronically from the project website or from a CD is encouraged. The Bull Mountain MDP Final EIS is available for review at the following locations during regular business hours:

- Bureau of Land Management, Uncompahgre Field Office, 2465 South Townsend Ave., Montrose, CO 81401

- Bureau of Land Management, Colorado State Office, 2850 Youngfield Street, Lakewood, CO 80215U.S.

- Forest Service, Paonia Ranger District, North Rio Grande Ave., Paonia, CO 81428

- Paonia Public Library, 2 Third Street, Paonia, CO 81428

The Final EIS is available for a 30-day public review following publication of the Notice of Availability in the *Federal Register*. The 30-day availability period is not a formal public comment period, but any comments received may be addressed in the Record of Decision.

Thank you for your continued interest in the Bull Mountain MDP EIS. We appreciate the information and suggestions you contribute to the planning process. For additional information or clarification regarding this document, please contact Ms. Gina Jones at (970) 240-5381.

Sincerely,

Barbara Sharrow
Acting Southwest District Manager

1 Attachment:
1- Final EIS

BLM

# United States Department of the Interior
# Bureau of Land Management

---

**Environmental Impact Statement**

**BLM/CO/PL-16/012**

---

**July 2016**

## Final Environmental Impact Statement for
## the Bull Mountain Unit Master Development Plan

***Location:*** *Gunnison County, Colorado*

---

**U.S. Department of the Interior**
**Bureau of Land Management**
**Uncompahgre Field Office**
**2465 South Townsend Avenue**
**Montrose, CO 81401**
**Phone: (970) 240-5300**



# VOLUME I:
*Executive Summary; Chapters 1 through 7; Glossary*

# TABLE OF CONTENTS – VOLUME I

Chapter          Page

**ES.**    **Executive Summary** ...................................................................... **ES-1**

     ES.1    Overview ...................................................................... ES-1
           ES.1.1 Project Setting ...................................................... ES-1
     ES.2    Purpose and Need .......................................................... ES-3
     ES.3    Relationship to Laws, Regulations, and Policies .................... ES-3
     ES.4    Decisions to be Made ..................................................... ES-4
     ES.5    Scope of Analysis .......................................................... ES-4
           ES.5.1 Requirements for Future NEPA Analysis ...................... ES-5
     ES.6    Summary of the Reasonably Foreseeable Development Scenario ..... ES-5
     ES.7    Alternatives ................................................................ ES-6
           ES.7.1 Alternative A, No Action ...................................... ES-6
           ES.7.2 Alternative B, Proposed Action .............................. ES-10
           ES.7.3 Alternative C, Modified Action .............................. ES-10
           ES.7.4 Alternative D, the BLM's Preferred Alternative ............ ES-11
     ES.8    Summary of Environmental Consequences Analysis .................. ES-11
     ES.9    Public Involvement, Consultation, and Coordination ............... ES-12
           ES.9.1 Comments on the Draft EIS .................................... ES-12
           ES.9.2 Cooperating Agencies ......................................... ES-13

**1.**    **Introduction** ........................................................................... **1-1**

     1.1    Overview .................................................................... 1-1
           1.1.1   Regional Setting .......................................... 1-2
     1.2    Purpose and Need .......................................................... 1-5
     1.3    Decisions to be Made ..................................................... 1-5
     1.4    Relationship to BLM Plans and Policies ............................... 1-6
           1.4.1   BLM National and Statewide Regulations and Policies ..... 1-6
           1.4.2   Conformance with the Current Resource Management Plan ... 1-7
           1.4.3   Uncompahgre Resource Management Plan Revision ........... 1-7
     1.5    Federal, State, and Local Permitting and Approvals ................ 1-7
     1.6    Scope of Analysis .......................................................... 1-9
           1.6.1   Requirements for Future NEPA Analysis .................... 1-10
     1.7    Public Involvement ........................................................ 1-11
           1.7.1   Cooperating Agencies ...................................... 1-12
     1.8    Key Issues Addressed in this EIS ....................................... 1-13
           1.8.1   Issues Identified at Environmental Assessment Scoping ... 1-13
           1.8.2   Additional Issues Considered in this EIS ................. 1-14
     1.9    Changes between the Draft EIS and the Final EIS ..................... 1-15
           1.9.1   Updates to Geographic Information Systems Information ... 1-16
           1.9.2   Changes to the Alternatives (Chapter 2) .................. 1-16
           1.9.3   Changes to Other Chapters and Appendices ................ 1-17

**2.** **Alternatives** ........................................................................................... 2-1

2.1 Introduction .................................................................................. 2-1
2.2 Alternatives .................................................................................. 2-1
2.2.1 Alternative Development .................................................. 2-1
2.2.2 Alternatives Considered for Detailed Analysis ................ 2-2
2.2.3 Identifying the Preferred Alternative (Alternative D) ......... 2-3
2.2.4 Summary of the Alternatives ........................................... 2-3
2.2.5 Elements Common to All Alternatives .............................. 2-8
2.2.6 Alternative A, No Action ................................................ 2-13
2.2.7 Alternative B, Proposed Action ...................................... 2-40
2.2.8 Alternative C, Modified Action ....................................... 2-73
2.2.9 Alternative D, the BLM's Preferred Alternative .............. 2-86
2.3 Alternatives Considered but Eliminated from Detailed Analysis ................ 2-102
2.3.1 Alternatives Considered and Eliminated during EA Development .. 2-102
2.3.2 Alternatives Considered and Eliminated from EIS Development .... 2-103
2.4 Summary of Alternatives .......................................................... 2-105
2.5 Summary of Impacts ................................................................. 2-116

**3.** **Affected Environment** ....................................................................... 3-1

3.1 Introduction .................................................................................. 3-1
3.2 Resources .................................................................................... 3-4
3.2.1 Air Resources .................................................................. 3-4
3.2.2 Noise .............................................................................. 3-21
3.2.3 Soil Resources ............................................................... 3-23
3.2.4 Water Resources ............................................................ 3-30
3.2.5 Geology .......................................................................... 3-48
3.2.6 Vegetation ...................................................................... 3-57
3.2.7 Invasive, Nonnative Species .......................................... 3-63
3.2.8 Fish and Wildlife ............................................................. 3-65
3.2.9 Migratory Birds ............................................................... 3-73
3.2.10 Special Status Species (Threatened, Endangered, Sensitive Species) ........................................................................... 3-81
3.2.11 Wildland Fire Management .............................................. 3-97
3.2.12 Cultural Resources ......................................................... 3-98
3.2.13 Paleontological Resources ............................................ 3-101
3.2.14 Visual Resources .......................................................... 3-106
3.3 Resource Uses .......................................................................... 3-109
3.3.1 Livestock Grazing ......................................................... 3-109
3.3.2 Minerals (Leasable, Locatable, Salable) ....................... 3-113
3.3.3 Recreation ..................................................................... 3-119
3.3.4 Lands and Realty ........................................................... 3-120
3.3.5 Transportation and Access ............................................ 3-122
3.4 Social and Economic Conditions .............................................. 3-125
3.4.1 Hazardous Materials and Wastes ................................. 3-125
3.4.2 Socioeconomics ............................................................ 3-128
3.4.3 Environmental Justice ................................................... 3-135

**4.     Environmental Consequences ....................................................................... 4-1**

4.1     Introduction ............................................................................................ 4-1
        4.1.1   General Methodology for Analyzing Impacts ..................... 4-1
        4.1.2   Analytical Assumptions ...................................................... 4-3
        4.1.3   Cumulative Effects .............................................................. 4-4
        4.1.4   Incomplete or Unavailable Information.............................. 4-21
4.2     Resources ................................................................................................ 4-22
        4.2.1   Air Quality .......................................................................... 4-22
        4.2.2   Noise ................................................................................... 4-72
        4.2.3   Soil Resources ..................................................................... 4-80
        4.2.4   Water Resources ................................................................. 4-91
        4.2.5   Geology ............................................................................... 4-109
        4.2.6   Vegetation and Invasive, Nonnative Species..................... 4-118
        4.2.7   Fish and Wildlife................................................................. 4-128
        4.2.8   Migratory Birds................................................................... 4-152
        4.2.9   Special Status Species ........................................................ 4-158
        4.2.10  Wildland Fire Management ................................................. 4-172
        4.2.11  Cultural Resources ............................................................. 4-174
        4.2.12  Paleontological Resources .................................................. 4-179
        4.2.13  Visual Resources ................................................................ 4-183
4.3     Resource Uses ......................................................................................... 4-191
        4.3.1   Livestock Grazing ............................................................... 4-191
        4.3.2   Minerals (Leasable, Locatable, Salable)............................ 4-194
        4.3.3   Recreation ........................................................................... 4-199
        4.3.4   Lands and Realty ................................................................. 4-202
        4.3.5   Transportation and Access .................................................. 4-207
4.4     Social and Economic Conditions ........................................................... 4-214
        4.4.1   Hazardous Materials and Wastes ........................................ 4-214
        4.4.2   Socioeconomics .................................................................. 4-219
        4.4.3   Environmental Justice ......................................................... 4-244
4.5     Irreversible and Irretrievable Commitment of Resources and
        Relationship of Short-term Uses of the Environment to Long-term
        Productivity ............................................................................................ 4-245
        4.5.1   Irreversible and Irretrievable Commitment of Resources.. 4-245
        4.5.2   Relationship of Short-term Uses of the Environment to
                Long-term Productivity........................................................ 4-246

**5.     Consultation and Coordination ................................................................. 5-1**

5.1     Introduction ............................................................................................ 5-1
5.2     Notice of Intent and Public Comments ................................................. 5-1
5.3     Notice of Availability for the Draft EIS and Public Review ................. 5-2
        5.3.1   Public Meetings ................................................................... 5-2
5.4     Summary of Comments Received on the Draft EIS ............................... 5-3
        5.4.1   Process and Methodology .................................................. 5-3
        5.4.2   Public Comments ................................................................ 5-5

5.5     Consultation and Coordination with Agencies and Tribal Governments ......... 5-7

      5.5.1   Government-to-Government Consultation with Native
      American Tribes................................................................. 5-7

      5.5.2   Colorado State Historic Preservation Officer Consultation.................. 5-8

      5.5.3   US Fish and Wildlife Service Consultation ......................................... 5-8

      5.5.4   US Environmental Protection Agency ................................................. 5-9

5.6     Cooperating Agencies.................................................................................. 5-9

**6.     List of Prepares** ........................................................................................ **6-1**

**7.     References** ................................................................................................ **7-1**

**Glossary** ..................................................................................................... **Glossary-1**

# TABLES

Page

ES-1    Summary of Actions by Alternative ....................................................................ES-7
ES-2    Summary of Design Features and Mitigation Measures per Alternative....................ES-9
1-1     Federal, State, and Local Permits and Approvals Applicable to the Bull
        Mountain Unit ..................................................................................................... 1-7
2-1     Traffic Estimates for Construction, Drilling, Completion, and Production
        Activities per Well Pad ........................................................................................ 2-10
2-2     Project Feature Assumed Short- and Long-Term Disturbance Estimates ................. 2-12
2-3     Existing Features within the Unit ......................................................................... 2-12
2-4     McIntyre Flowback Pits........................................................................................ 2-27
2-5     Bull Mountain Unit Annual Production Rates......................................................... 2-30
2-6     Alternative A Traffic Estimates per Well Pad for Construction, Drilling,
        Completion, and Production Activities ................................................................... 2-37
2-7     Alternative B Traffic Estimates for Construction, Drilling, Completion, and
        Production Activities ........................................................................................... 2-71
2-8     Alternative C Traffic Estimates for Construction, Drilling, Completion, and
        Production Activities ........................................................................................... 2-82
2-9     Alternative D Traffic Estimates for Construction, Drilling, Completion, and
        Production Activities ........................................................................................... 2-98
2-10    Summary of Actions by Alternative .................................................................... 2-105
2-11    Stipulations, Design Features, and Mitigation Measures....................................... 2-107
2-12    Summary of Surface Disturbance Acres by Alternative........................................... 2-116
2-13    Estimated Total Traffic Round Trips for Drilling, Completion, and
        Production Activities by Alternative[1] ................................................................... 2-117
2-14    Summary of Environmental Consequences by Alternative ..................................... 2-118
3-1     Approved Standards for Public Land Health .......................................................... 3-2
3-2     Ambient Air Standards and PSD Increments ($\mu g/m^3$) ......................................... 3-6
3-3     Near-Field Analysis Background Ambient Air Quality Concentrations ..................... 3-8
3-4     Background Nitrogen and Sulfur Deposition Values (kg/ha-yr) ............................... 3-12
3-5     Background Acid Neutralizing Capacity Values for Acid-Sensitive Lakes............... 3-13
3-6     Mean Monthly Temperature Ranges and Total Precipitation Amounts .................... 3-15
3-7     Wind Direction Frequency Distribution ................................................................ 3-17
3-8     Wind Speed Distribution ...................................................................................... 3-17
3-9     Common Sound Levels.......................................................................................... 3-21
3-10    Regulatory Limits for Noise Generated by Natural Gas Facilities............................ 3-22
3-11    Noise Levels Associated with Typical Construction Equipment (dBA) ..................... 3-23
3-12    Classified Soil Types in the Bull Mountain Unit..................................................... 3-25
3-13    Acres of Farmlands in the Bull Mountain Unit ....................................................... 3-26
3-14    Acres of Slopes in the Bull Mountain Unit............................................................. 3-26
3-15    Soil Erosion Ratings for the Bull Mountain Unit ................................................... 3-28
3-16    Erosion Potential of Roads and Trails for the Bull Mountain Unit ........................... 3-28
3-17    Land Health Assessment Results in the Bull Mountain Unit .................................... 3-29
3-18    Typical Monthly Flows for USGS near the Unit (cfs[1]) ............................................ 3-33
3-19    General Water Quality of Springs within the Unit (one sample per station).............. 3-35
3-20    Stream Classifications and Water Quality Standards ............................................. 3-36

| | | |
|---|---|---|
| 3-21 | List of Impaired Water Quality Segments | 3-36 |
| 3-22 | General Water Quality of East Muddy/Muddy Creeks on/near the Unit | 3-37 |
| 3-23 | Water Quality Lab Test Results from Produced Water from Existing Producing Natural Gas Wells within the Producing Formations in the Unit | 3-41 |
| 3-24 | Summary of Results for Selected Analytes in Samples from 23 Wells Collected between July 16, 2002 and June 12, 2013 | 3-45 |
| 3-25 | Summary of Results for Selected Analytes in Samples from 51 Surface Water Locations Collected between July 16, 2002 and August 10, 2012 | 3-45 |
| 3-26 | Existing Vegetation Communities in Bull Mountain Unit | 3-58 |
| 3-27 | Land Health Assessment Results in the Bull Mountain Unit | 3-63 |
| 3-28 | Colorado Noxious Weeds in Gunnison County and Noxious Weeds Observed in Bull Mountain Unit | 3-64 |
| 3-29 | Birds of Conservation Concern of the Uncompahgre Field Office | 3-75 |
| 3-30 | Threatened and Endangered Species of the Uncompahgre Field Office | 3-82 |
| 3-31 | Existing Habitats within the Ragged Mountain Lynx Analysis Unit | 3-86 |
| 3-32 | Existing Habitats within the Crystal West Lynx Analysis Units | 3-86 |
| 3-33 | BLM Sensitive Species of the Uncompahgre Field Office[1] | 3-90 |
| 3-34 | Sedimentary Rock Units, Their Fossil-bearing Potential, and Known Fossil Resources | 3-103 |
| 3-35 | Ranches and Allotments within the Bull Mountain Unit | 3-110 |
| 3-36 | Bull Mountain Unit Existing Facilities | 3-114 |
| 3-37 | Annual Wages by Industry, 2012 | 3-130 |
| 4-1 | Summary of Cumulative Actions within the Unit by Alternative | 4-5 |
| 4-2 | Summary Cumulative Surface Disturbance Acres within the Unit by Alternative | 4-8 |
| 4-3 | Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario | 4-16 |
| 4-4 | Acute Reference Exposure Levels (1-hour exposure) | 4-31 |
| 4-5 | Sensitive Lakes Analyzed in Far-Field Analysis | 4-33 |
| 4-6 | Alternative A Year 2 Emissions (TPY) | 4-38 |
| 4-7 | Alternative A Year 2 GHG Emissions (metric tons per year) | 4-39 |
| 4-8 | Alternative A - Maximum Modeled Pollutant Concentrations at Class I and Sensitive Class II Areas ($\mu g/m^3$) | 4-40 |
| 4-9 | Alternative A - Maximum Visibility Impacts at Class I and Sensitive Class II Areas | 4-42 |
| 4-10 | Alternative A - Maximum Nitrogen and Sulfur Deposition Impacts at Class I and Sensitive Class II Areas | 4-43 |
| 4-11 | Alternative A - Maximum Impacts on Lakes within the Class I and Sensitive Class II Areas | 4-44 |
| 4-12 | Alternative B Year 5 Emissions (TPY) | 4-45 |
| 4-13 | Alternative B Year 5 GHG Emissions (metric tons per year) | 4-46 |
| 4-14 | Alternative B - Criteria Pollutant Modeling Results for Field Development Activities | 4-46 |
| 4-15 | Alternative B - Criteria Pollutant Modeling Results for Field Production Activities | 4-47 |
| 4-16 | Alternative B - HAP Modeling Results for Field Production Sources | 4-48 |
| 4-17 | Alternative B - Unit Risk Analyses | 4-49 |

4-18    Alternative B - Maximum Modeled Pollutant Concentrations at Class I and Sensitive Class II Areas ($\mu g/m^3$) ............................................................................ 4-50

4-19    Alternative B - Maximum Visibility Impacts at Class I and Sensitive Class II Areas ...................................................................................................................... 4-52

4-20    Alternative B - Maximum Nitrogen and Sulfur Deposition Impacts at Class I and Sensitive Class II Areas .................................................................................. 4-52

4-21    Alternative B - Maximum Impacts on Lakes within the Class I and Sensitive Class II Areas ............................................................................................................. 4-53

4-22    Cumulative Pollutant Concentrations (CARMMS 2021 High Development Scenario) at Class I and Sensitive Class II Areas ($\mu g/m^3$) ................................ 4-67

4-23a   Cumulative Visibility Results ($\Delta dv$) for Worst 20% Visibility Days at Class I Areas for Current Year (2008) and 2021 High Development Scenario all Emissions and Contributions from RFD Sources ........................................... 4-70

4-23b   Cumulative Visibility Results ($\Delta dv$) for Best 20% Visibility Days at Class I Areas for Current Year (2008) and 2021 High Development Scenario all Emissions and Contributions from RFD Sources ........................................... 4-70

4-24    Cumulative RFD Nitrogen and Sulfur Deposition Impacts (CARMMS 2021 High Development Scenario) at Class I and Sensitive Class II Areas ................ 4-71

4-25    Cumulative RFD Impacts on Lakes (CARMMS 2021 High Development Scenario) within the Class I and Sensitive Class II Areas ................................ 4-71

4-26    Average Noise Levels Produced during Construction and Operations ............ 4-74

4-27    Acres of Soils on Steep Slopes Potentially Impacted (Alternative A) ............ 4-83

4-28    Acres of Soils with Erosion Hazard Ratings Potentially Impacted (Alternative A) ... 4-83

4-29    Acres of Soils with Erosion Hazard Ratings for Roads (Alternative A) .................. 4-84

4-30    Acres of Soils on Steep Slopes Potentially Impacted (Alternative B) ............ 4-84

4-31    Acres of Farmlands Potentially Impacted (Alternative B) .......................... 4-85

4-32    Acres of Soils with Erosion Hazard Ratings Potentially Impacted (Alternative B) ... 4-85

4-33    Acres of Soils with Erosion Hazard Ratings for Roads (Alternative B) ................. 4-86

4-34    Acres of Farmlands Potentially Impacted (Alternative C) .......................... 4-87

4-35    Acres of Soils on Steep Slopes Potentially Impacted (Alternative C) ............ 4-87

4-36    Acres of Soils with Erosion Hazard Ratings Potentially Impacted (Alternative C) ... 4-87

4-37    Acres of Soils with Erosion Hazard Ratings for Roads Potentially Impacted (Alternative C) ...................................................................................................... 4-88

4-38    Acres of Farmlands Potentially Impacted (Alternative D) .......................... 4-88

4-39    Acres of Soils on Steep Slopes Potentially Impacted (Alternative D) ............ 4-89

4-40    Acres of Soils with Erosion Hazard Ratings Potentially Impacted (Alternative D) ... 4-89

4-41    Acres of Soils with Erosion Hazard Ratings for Roads Potentially Impacted (Alternative D) ...................................................................................................... 4-90

4-42    Estimated Risk of a Reportable Spill from a Producing Gas Well in Colorado 2009 to 2013 ........................................................................................ 4-96

4-43    Direct Impacts on Vegetation Communities in Bull Mountain Unit (Alternative A) ..................................................................................................... 4-121

4-44    Direct Impacts on Vegetation Communities in Bull Mountain Unit (Alternative B) ..................................................................................................... 4-122

4-45    Permanent Impacts on Vegetation Communities from Development of Well Pad 12-89-7-1 ............................................................................................... 4-123

4-46   Direct Impacts on Vegetation Communities in Bull Mountain Unit
       (Alternative C) ................................................................................... 4-124
4-47   Direct Impacts on Vegetation Communities in Bull Mountain Unit
       (Alternative D) ................................................................................... 4-125
4-48   Cumulative Impacts on Vegetation Communities in Bull Mountain Unit
       (Alternatives A and B combined) ...................................................... 4-126
4-49   Cumulative Impacts on Vegetation Communities in Bull Mountain Unit
       (Alternatives A and C combined) ...................................................... 4-126
4-50   Cumulative Impacts on Vegetation Communities in Bull Mountain Unit
       (Alternatives A and D combined) ...................................................... 4-127
4-51   Habitat Quality Categories as a Function of Road Density ..................... 4-132
4-52   Habitat Categories by Alternative .......................................................... 4-133
4-53   Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit under
       Alternative A ...................................................................................... 4-134
4-54   Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit under
       Alternative B ...................................................................................... 4-142
4-55   Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit under
       Alternative C ...................................................................................... 4-145
4-56   Impacts on Mule Deer and Elk Habitat in the Bull Mountain Unit under
       Alternative D ...................................................................................... 4-149
4-57   Cumulative Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit
       (Alternatives A and B combined) ...................................................... 4-150
4-58   Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit
       (Alternatives A and C combined) ...................................................... 4-151
4-59   Impacts on Mule Deer and Elk Habitat in the Bull Mountain Unit
       (Alternatives A and D Combined) ..................................................... 4-151
4-60   Visual Resources Inventory Scenic Quality Evaluation Ratings .............. 4-184
4-61   Grazing Disturbance on BLM Allotments from Roads and Well Pads ....... 4-192
4-62   Alternative A - Surface Disturbance[1] by Landownership ........................ 4-204
4-63   Alternative B - Surface Disturbance[1] by Landownership ........................ 4-205
4-64   Alternative C - Surface Disturbance[1] by Landownership ........................ 4-206
4-65   Alternative D - Surface Disturbance[1] by Landownership ........................ 4-206
4-66   Bull Mountain Unit Estimated Annual Direct Labor Requirements and
       Costs - Alternative A ......................................................................... 4-227
4-67   Bull Mountain Unit Direct and Indirect Annual Contributions - Alternative A ....... 4-228
4-68   Impacts on Local Fiscal Conditions—Alternative A ................................ 4-231
4-69   Bull Mountain Unit Direct Annual Employment and Labor Costs—
       Alternative B ...................................................................................... 4-234
4-70   Bull Mountain Unit Direct and Indirect Annual Contributions—Alternative B ...... 4-235
4-71   Impacts on Local Fiscal Conditions - Alternative B ................................ 4-237
4-72   Irreversible and Irretrievable Commitment of Resources ......................... 4-246
4-73   Relationship of Short-term Uses of the Environment to Long-term Productivity .... 4-247
5-1    Number of Unique Submissions and Comments by Affiliation ................... 5-5
5-2    Number of Comments on the Draft EIS by Category .................................. 5-6

# FIGURES

<div style="text-align: right">Page</div>

| | | |
|---|---|---|
| ES-1 | Bull Mountain Unit | ES-2 |
| 1-1 | Regional Bull Mountain Unit | 1-3 |
| 1-2 | Bull Mountain Unit | 1-4 |
| 2-1 | Alternative A, No Action | 2-14 |
| 2-2 | Alternative B, Proposed Action | 2-41 |
| 2-3 | Alternative B, C, and D 12-89-7-1 APD | 2-43 |
| 2-4 | Alternative B, Proposed Action Wildlife Habitat Plan | 2-44 |
| 2-5 | Alternative C, Modified Action | 2-75 |
| 2-6 | Alternative C, Constraints | 2-76 |
| 2-7 | Alternative D, BLM's Preferred Alternative | 2-89 |
| 2-8 | Alternative D, BLM's Preferred Alternative Wildlife Habitat Plan | 2-90 |
| 3-1 | Air Quality Study Area | 3-7 |
| 3-2 | Soils | 3-24 |
| 3-3 | Farmlands | 3-27 |
| 3-4 | Watersheds | 3-31 |
| 3-5 | Streams and Springs | 3-34 |
| 3-6 | Water Quality Monitoring | 3-44 |
| 3-7 | Geology Cross Section | 3-50 |
| 3-8 | Geology | 3-53 |
| 3-9 | Landslides | 3-55 |
| 3-10 | Vegetation | 3-59 |
| 3-11 | Riparian and Wetland Vegetation | 3-62 |
| 3-12 | Fish and Aquatic Wildlife Habitat | 3-66 |
| 3-13 | Mule Deer Habitat | 3-69 |
| 3-14 | Elk Habitat | 3-70 |
| 3-15 | Purple Martin Habitat | 3-79 |
| 3-16 | Bald Eagle Habitat | 3-80 |
| 3-17 | Canada Lynx Habitat | 3-87 |
| 3-18 | North Fork Landscape Unit Prehistoric Site Sensitivity Model | 3-100 |
| 3-19 | Potential Fossil Yield Classification | 3-105 |
| 3-20 | Grazing Allotments | 3-111 |
| 3-21 | Existing Infrastructure | 3-123 |
| 4-1 | Alternatives A and B Cumulative | 4-12 |
| 4-2 | Alternatives A and C Cumulative | 4-13 |
| 4-3 | Alternatives A and D Cumulative | 4-14 |
| 4-4 | Cumulative Effects Study Area | 4-15 |
| 4-5 | Near-Field Analysis, Well Pad and Access Road Construction Modeling Scenario | 4-25 |
| 4-6 | Near-Field Analysis, Well Production Modeling Scenario | 4-26 |
| 4-7 | Near-Field Analysis, Well Development Modeling Scenario | 4-27 |
| 4-8 | Well Production Receptor Grid | 4-28 |
| 4-9 | Near-Field Analysis, Well Development Receptor Grid | 4-29 |
| 4-10 | Far-field Analysis Modeling Scenario | 4-34 |
| 4-11 | Far-field Analysis, Source Layout | 4-35 |

4-12    2008 ozone DVC (top left), 2021 ozone DVF (top right) and 2021 – 2008 ozone DVF differences calculated using MATS for the CARMMS 2021 High Development Scenario. ............................................................... 4-63

4-13    Fourth highest daily maximum 8-hour ozone concentrations for the 2008 Base Case (top left), CARMMS 2021 High Development Scenario (top right), 2021 minus 2008 differences (bottom). ....................................................... 4-65

4-14    Contribution to Fourth Highest Daily Maximum Ozone Concentrations Due to Emissions from Federal Oil and Gas within the UFO Planning Area for the CARMMS 2021 High Development Scenario. ......................................................... 4-66

4-15    Habitat Categories by Alternative............................................................ 4-135

# APPENDICES – VOLUME II

A        Well Pad Site Suitability Models and Methodology
B        Construction, Drilling, Completion, and Reclamation
C        Design Features, Mitigation Measures, and Conditions of Approval
D        Master Surface Use Plan of Operations
E        Master Drilling Plan
F        Summary of Lease Stipulations
G        Hazardous Materials Management Summary
H        Water Quality Sampling Constituents for the Bull Mountain Unit
I        Noxious Weed Management Plan
J        Air Quality Technical Support Document for the Bull Mountain Unit MDP EIS
K        Economic Impact Analysis Methodology – Technical Report
L        Bainard Augmentation Plan
M        Poly Pipeline Operation Plan
N        Response to Comments on the Draft EIS
O        12-89-7-1 APD Package

This page intentionally left blank.

| ACRONYMS AND ABBREVIATIONS | Full Phrase |
| --- | --- |
| μeq/l | microequivalents per liter |
| APD | Application for Permit to Drill |
| AUM | Animal Unit Month |
| BLM | United States Department of the Interior, Bureau of Land Management |
| BMP | best management practice |
| CAAQS | Colorado Ambient Air Quality Standards |
| CDPHE | State of Colorado Department of Public Health and Environment |
| CDWR | Colorado Division of Water Resources |
| CEQ | Council on Environmental Quality |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| CFR | Code of Federal Regulations |
| cfs | cubic feet per second |
| COGCC | Colorado Oil and Gas Conservation Commission |
| COGIS | Colorado Oil and Gas Information System |
| CPW | Colorado Parks and Wildlife |
| CSU | controlled surface use |
| dBA | A-weighted decibel |
| dBC | C-weighted decibel |
| DOI | United States Department of the Interior |
| DOT | Department of Transportation |
| EA | environmental assessment |
| EIS | environmental impact statement |
| EPA | Environmental Protection Agency |
| ESA | Endangered Species Act |
| FLPMA | Federal Land Policy and Management Act |
| Forest Service | United States Department of Agriculture, Forest Service |
| GIS | geographic information system |
| kg/ha/yr | kilogram per hectare per year |
| lbs | pounds |
| MBTA | Migratory Bird Treaty Act |
| MDP | Master Development Plan |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| NSO | no surface occupancy |
| PFYC | potential fossil yield count |
| POD | Plans of Development |
| ppm | parts per million |
| PSD | prevention of significant deterioration |
| RAC | Resource Advisory Council |
| RDFs | Required Design Features |
| RMP | Resource Management Plan |
| ROD | Record of Decision |
| ROW | right-of-way |

| | |
|---|---|
| SGI | SG Interests I, LTD |
| SPCC | Spill Prevention Control and Countermeasures |
| TDS | total dissolved solids |
| TL | timing limitation |
| UFO | Uncompahgre Field Office |
| the Unit | Bull Mountain Unit |
| US | United States |
| USC | United States Code |
| USDA | United States Department of Agriculture |
| USFWS | United States Fish and Wildlife Service |
| USGS | United States Geological Survey |
| VOCs | volatile organic compounds |
| VRI | Visual Resource Inventory |
| VRM | Visual Resource Management |
| WHP | Wildlife Habitat Plan |

# Executive Summary

# TABLE OF CONTENTS

Chapter                                                                                                    Page

**ES. EXECUTIVE SUMMARY** ................................................................................. **ES-1**

ES.1   Overview.........................................................................................ES-1
  ES.1.1 Project Setting.........................................................................ES-1
ES.2   Purpose and Need .........................................................................ES-3
ES.3   Relationship to Laws, Regulations, and Policies ............................ES-3
ES.4   Decisions to be Made ....................................................................ES-4
ES.5   Scope of Analysis .........................................................................ES-4
  ES.5.1 Requirements for Future NEPA Analysis ...................................ES-5
ES.6   Summary of the Reasonably Foreseeable Development Scenario .................ES-5
ES.7   Alternatives ..................................................................................ES-6
  ES.7.1 Alternative A, No Action ..........................................................ES-6
  ES.7.2 Alternative B, Proposed Action ...............................................ES-10
  ES.7.3 Alternative C, Modified Action ................................................ES-10
  ES.7.4 Alternative D, the BLM's Preferred Alternative ........................ES-11
ES.8   Summary of Environmental Consequences Analysis .......................ES-11
ES.9   Public Involvement, Consultation, and Coordination.......................ES-12
  ES.9.1 Comments on the Draft EIS ....................................................ES-12
  ES.9.2 Cooperating Agencies .............................................................ES-13

# TABLES

Page

ES-1   Summary of Actions by Alternative ...................................................ES-7
ES-2   Summary of Design Features and Mitigation Measures per Alternative................ES-9

# FIGURE

Page

ES-1   Bull Mountain Unit...........................................................................ES-2

This page intentionally left blank.

# EXECUTIVE SUMMARY

## ES.1   OVERVIEW

The United States Department of the Interior, Bureau of Land Management (BLM), Uncompahgre Field Office, has received a proposed Master Development Plan (MDP) for natural gas exploration and development from SG Interests I, Ltd. (SGI) for the Bull Mountain Unit. The Bull Mountain Unit MDP describes the exploration and development of up to 146 natural gas wells, 4 water disposal wells, and associated infrastructure on federal and private mineral leases. An MDP provides information common to multiple planned wells, including drilling plans, Surface Use Plans of Operations, and plans for future production. MDPs are typically prepared for a planned cluster of wells and associated facilities near, or for multiple in-fill wells scattered throughout, an oil and gas unit or field. They have information on associated facilities, such as roads, pipelines, utility corridors, and compressor stations.

In 2003 (and updated in 2008), the BLM approved the agreement for the Bull Mountain Unit (the Unit) to provide for the orderly, planned, and structured development for extraction of the natural gas resources. "The objective of unitization is to proceed with a program that will adequately and timely explore and develop all committed lands within the unit area without regard to internal ownership boundaries.... By effectively eliminating internal property boundaries within the unit area, unitization permits the most efficient and cost effective means of developing the underlying oil and gas resources" (Draft BLM Manual, Section 3180-1 Unitization [Exploratory], p. 2-7).

Under terms of the agreement, SGI is required to diligently develop at least two producing wells per year in order to maintain the Unit designation. This requirement is currently suspended under an approved Suspension of Operations and Production while this EIS is being prepared.

### ES.1.1 Project Setting

The boundaries of the Unit encompass approximately 19,670 acres of federal and private oil and gas mineral estate in Gunnison County, Colorado. The Unit consists of 440 acres of federal surface underlain by federal mineral estate and administered by the BLM; 12,900 acres of private surface with federal mineral estate (split-estate) administered by the BLM; and 6,330 acres of private surface with private mineral estate (**Figure ES-1**, Bull Mountain Unit).



**Bull Mountain Unit**

Source: BLM GIS 2014

Bull Mountain Unit

Federal surface, federal minerals

Private surface, federal minerals

Private surface, private minerals

Perennial stream

Figure ES-1

The Unit is in the Colorado River basin, approximately 30 miles northeast of the town of Paonia and is bisected by State Highway 133. The elevation is approximately 7,400 feet, consisting of rolling topography in a mountainous region (**Figure ES-1**). The Unit is dominated by sagebrush (*Artemisia tridentata* ssp. *vaseyana*). The second most common vegetation community is oakbrush, which is composed of Gambel's oak (*Quercus gambelii*), Saskatoon and Utah serviceberry (*Amelanchier utahensis* and *A. alnifolia*), and chokecherry (*Padus virginiana*), followed by mixed mountain shrubland. Other vegetation communities are aspen (*Populus tremuloides*) woodlands and irrigated pasturelands.

Cattle graze over most of the area during the snow-free months, typically mid-May through mid-October; sheep graze in spring and fall. In the fall, cattle and sheep gather in portions of the Unit, coming off grazing allotments on the adjacent Grand Mesa, Uncompahgre, and Gunnison National Forest. A few residential sites are within the Unit, generally near the State Highway 133 corridor. Further details for the project's regional setting are described in **Chapter 3**, Affected Environment.

## ES.2   PURPOSE AND NEED

The BLM's purpose is to consider the proponent's request for approval of an MDP to develop federal fluid minerals in the Bull Mountain Unit. The BLM also must consider its multiple-use mission. In addition to managing such activities as fluid mineral development, the mission is to conserve natural, historical, cultural, and other resources on the lands it administers.

The BLM's need arises from its responsibility under the Federal Land Policy and Management Act, the Mineral Leasing Act, and other legislation to respond to the applicant's request. These acts authorize the development of federal onshore natural gas reserves for supply and economic stability. Also, the BLM is considering the proposed MDP, which takes into account field development in total. This is intended to facilitate infrastructure planning and to increase the orderly development of natural gas resources, consistent with the Energy Policy Acts of 2001 and 2005.

## ES.3   RELATIONSHIP TO LAWS, REGULATIONS, AND POLICIES

This environmental impact statement (EIS) is prepared under the authority of and complies with the following:

- National Environmental Policy Act of 1969 (NEPA), as amended

- Council on Environmental Quality regulations for implementing NEPA (40 Code of Federal Regulations [CFR], Parts 1500-1508)

- Department of the Interior NEPA regulations (43 CFR Part 46)

- Endangered Species Act of 1973, as amended

- National Historic Preservation Act of 1966

- Department of the Interior and BLM policies (BLM NEPA Handbook H-1790-1 [BLM 2008a])

The BLM regulates environmental aspects of oil and gas exploration, development, and production of deposits from federal and Native American leases (43 CFR Part 3162.5-1, and 25 CFR Part 225.4). Exploration and development of federal oil and gas resources by private industry is under the authority of the following:

- Mineral Leasing Act of 1920

- Mining and Minerals Policy Act of 1970

- National Materials and Minerals Policy, Research, and Development Act of 1980

- Federal Onshore Oil and Gas Leasing Reform Act of 1987

- Various regulations specific to implementing those laws (e.g., 43 CFR 3100)

Onshore Oil and Gas Order Number 1 describes the application requirements for the approval of all proposed oil and gas exploratory, development, or service wells on federal onshore oil and gas leases. The Order addresses procedures for processing APDs and the use of best management practices in lease development, operations in split-estate situations, and defines MDPs including information on drilling plans, surface use plans of operations, and plans for future production.

## ES.4   DECISIONS TO BE MADE
The BLM must decide to do one of the following:

- Approve the Bull Mountain Unit MDP, including the 12-89-7-1 well pad APD, as proposed

- Approve the plan and APD with modification and mitigation

- Reject the MDP, but still approve the APD with appropriate mitigations

- Reject both the MDP and the APD

Approving the APD as proposed or with mitigation in the Record of Decision (ROD) would grant SGI a permit to begin well pad, road, pipeline, and facility construction and well drilling and completion.

Any decisions made in the ROD would provide a blueprint for future anticipated actions; future ground-disturbing activity and construction would require additional authorizations from the BLM or COGCC or both. Additional applications and approvals would be required and additional NEPA analysis may be required prior to BLM making decisions on the applications (see **Section ES.5.1**, Requirements for Future NEPA Analysis).

## ES.5   SCOPE OF ANALYSIS
The scope of analysis encompasses all phases of natural gas field development: siting, construction, drilling, completion, interim reclamation, production and maintenance, final wellbore abandonment, and reclamation. The technologies described here are representative of those most likely to be deployed over the life of the project.

The analysis areas for well pad locations is shown as 40-acre conceptual circles on maps; this was done because the exact locations of future well pads is unknown. Additionally, the roads and pipelines are approximations because no engineering has been done to specifically design road and pipeline alignments or construction requirements. As these elements of the MDP are generalizations, approximations, and conceptual analysis areas, the effects analysis in **Chapter 4**, Environmental Consequences, is generalized to account for all possible scenarios. In this manner, the BLM is able to analyze future potential energy development on the entire Bull Mountain Unit.

To address the specifics of developing the 12-89-7-1 APD, the scope of analysis for affected resources is specific to the location and drilling plan (see **Appendix O** for the complete APD package). The BLM conducted an on-site inspection of the well locations and conducted numerous site-specific studies to define the current condition of resources on location and to determine the possible effects on those resources. Specialty reports included a Class III cultural resources survey, a vegetation and wildlife summary report, and baseline water quality monitoring. All of this information has been incorporated into the EIS and analyzed to ensure adequate NEPA analysis.

The life of any individual well is estimated to be 40 years; this includes the coal bed natural gas, shale gas, and water disposal wells, although the actual production years could vary by individual wells. For purposes of analysis, the BLM therefore assumed that the analysis horizon for the project would be 50 years. The analysis focuses on the direct, indirect, and cumulative impacts that could eventually result from activities associated with development of the Unit. This analysis identifies impacts that may result in some level of change to the resources, regardless of whether that change is beneficial or adverse.

### ES.5.1 Requirements for Future NEPA Analysis

The Bull Mountain Unit MDP EIS programmatic analysis relies on approximate information for the well pad locations, road alignments, pipeline routes, and other facilities. The purpose of this is to assess the cumulative resource impacts of SGI's proposed well development in the overall Unit area.

If the MDP is approved, this EIS will provide an "umbrella" analysis; future APDs proposed in the Unit would be analyzed and the resulting document would tier off from this EIS. Approval of these actions would require additional documentation of NEPA compliance, such as a tiered environmental assessment, a documentation of NEPA adequacy, or a categorical exclusion. Categorical exclusions that may apply to some future development activities include those provided in Section 390 of the Energy Policy Act of 2005, 42 USC 15942(b). Approval would be subject to the APD process (described in **Section 1.6.1**, Requirements for Future NEPA Analysis) and would be in accordance with federal and state oil and gas regulations, Washington Office Instruction Memorandum 2008-166, the 1989 Uncompahgre Basin RMP, or the future revised Uncompahgre RMP.

### ES.6   SUMMARY OF THE REASONABLY FORESEEABLE DEVELOPMENT SCENARIO

The BLM developed a reasonably foreseeable development scenario (RFDS) for oil and gas from analyzing past activity, production, and other sources in support of the Uncompahgre RMP revision (BLM 2012). An RFD scenario provides information about the type and level of oil and

gas activity and associated disturbance that could occur subsequent to leasing in the Uncompahgre Field Office planning area. The RFDS is unconstrained by management-imposed conditions as it is based primarily on geology and historical exploration and development activity. It provides information necessary to analyze long-term and/or widespread effects that could result from possible exploration and/or development activities on oil and gas leases. The RFD is not a decision, and it neither establishes nor implies a "cap" on development. The time frame used in the Uncompahgre RMP/EIS's RFDS is from 2010 through 2030. For more details regarding the cumulative development within the region, see Tables 7a, 7b, 8a, and 8b from the Reasonably Foreseeable Development Scenario for Oil and Gas for the Uncompahgre Field Office (BLM 2012).

## ES.7   ALTERNATIVES

The goal of developing feasible alternatives is to allow analysis of different combinations of resource uses and protections to address conflicts among resources and resource uses and meet the purpose of and need for the project.

The BLM identified a reasonable range of alternatives, including a No Action Alternative (as required at 40 CFR 1502.14). It also identified the proposed action and a modified action. These are based on issues, concerns, and opportunities raised in public comments during scoping; interdisciplinary interaction between resource professionals; and collaboration with cooperating agencies. Meaningful differences among the three alternatives are described in **Tables ES-1 and ES-2**.

The eight phases of the project (siting, construction, drilling, completion, interim reclamation, production and maintenance, final wellbore abandonment, and reclamation) are uniform across all alternatives; however, the actions differ as to how the phases would be completed and what additional environmental protections would be required.

As a result of public comments, best science, cooperating agency coordination, and internal review of the Draft EIS, the BLM developed the Final EIS for the Bull Mountain Unit Master Development Plan. The BLM selected none of the alternatives from the Draft EIS as its Preferred Alternative; rather, the BLM selected a combination of locations and actions from Alternative B (the Proposed Action) and Alternative C (BLM Modified Action). Additionally, the BLM included amendments to the Proposed Action from SGI (revisions to one compressor station location, inclusion of a wildlife habitat plan, and the addition of the 12-89-7-1 APD). The Preferred Alternative (Alternative D) focuses on addressing public comments, while continuing to meet the BLM's legal and regulatory mandates.

### ES.7.1 Alternative A, No Action

Alternative A, No Action, is the only alternative that does not respond to the purpose of and need for the proposed action; rather it serves as a comparison to the proposed action's and the alternatives' environmental effects (including cumulative effects). Under the No Action Alternative, the Bull Mountain Unit MDP would not be approved; private mineral estate would continue to be developed through authorizations approved by the Colorado Oil and Gas Conservation Commission (COGCC), which regulates and approves private mineral estate development.

**Table ES-1**
**Summary of Actions by Alternative[1]**

| Phase | Action | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|---|
| Construction | Well pads | 10 new pads on private mineral estate | 36 new pads on federal mineral estate, inclusive of the 12-89-7-1 APD | 35 new pads on federal mineral estate, inclusive of the 12-89-7-1 APD | 33 new pads on federal mineral estate, inclusive of the 12-89-7-1 APD |
| | Access roads | 26 miles upgrades to existing roads<br>5 miles new road construction | 53 miles upgrades to existing roads<br>16 miles new road construction | 13 miles upgrades to existing roads<br>12 miles new road construction | 14 miles upgrades to existing roads<br>16 miles new road construction |
| | | construction rate: 600-800 yards per day | | | |
| | Pipelines | 4 miles new collocated with roads<br>8 miles new cross-country | 13 miles new collocated with roads<br>9 miles new cross-country | 19 miles new collocated with roads<br>0 miles new cross-country | 14 miles new collocated with roads<br>10 miles new cross-country |
| | Electrical lines | 1 new overhead electrical line<br>(up to 5 power poles) | 4 new overhead electrical lines<br>(up to 20 power poles) | 4 new buried electrical lines (collocated with roads) | 4 new electrical lines, may be buried or overhead<br>(up to 20 power poles) |
| Drilling | Gas wells | 55 new gas wells | 146 new gas wells, inclusive of the one well to be drilled as part of the 12-89-7-1 APD | | |
| | | Timeframe<br>Coal bed methane natural gas – 60 days<br>Shale and sandstone – 85 days | | | |
| | Water disposal wells | 1 new water disposal well | 4 new water disposal wells | | |
| | | Timeframe: 60 – 120 days | | | |
| | Total wells | 56 wells | 150 wells | | |
| | Drilling rate | 3 Tier-2 or -3 rigs drilling 27 wells per year | 3 Tier-2 or -3 rigs drilling 27 wells per year | 3 Tier-2 or cleaner rigs drilling 27 wells per year | 3 Tier-2 or cleaner rigs drilling 27 wells per year |
| | Drilling duration | 3 years | 6 years | | |
| Completion | Gas wells | Well completion duration: 8 – 10 days<br>Flow testing duration: 25 – 50 days | | | |
| | Water disposal | Well completion duration: 8 – 10 days | | | |

[1] Under the BLM's Preferred Alternative, Alternative D, the operations and development of private minerals described in Alternative A would continue to be implemented; analysis for the cumulative effects of development under Alternative A and D is discussed in **Table 4-1**, Summary of Cumulative Actions within the Unit by Alternative. Alternatives B, C, and D display development and actions that would occur only on federal mineral estate (which falls within the BLM's decision-making authority).

**Table ES-1**
**Summary of Actions by Alternative[1]**

| Phase | Action | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|---|
| | wells | | | | |
| Production and Maintenance | Compressor station | 1 new screw compressor station | 3 new screw compressor stations; 1 new multi-engine compressor station | 4 new screw compressor stations | 3 new screw compressor stations; 1 new multi-engine compressor station |
| | Remote telemetry monitoring | No similar action | Included as part of the Wildlife Habitat Plan | No similar action | Included as part of the Wildlife Habitat Plan |
| | Workover estimates | Years 1-6: one workover every two years per well / Years 7-40: 67 workovers annually | | | |
| | Produced water management | Production: 500 – 3,000 barrels[2] per day | | | |
| | | Coal bed methane natural gas-produced water injected into water disposal wells, trucked to disposal location, or recycled for use in well completions | | | |
| Water Use and Sources | Drilling | Up to 21.3 acre-feet[3] | 58 acre-feet | | |
| | Completion | Up to 714.3 acre-feet[4] | Up to 2,369.3 acre-feet | | |
| | Dust abatement | Up to 13.2 acre-feet of freshwater | Up to 52.9 acre-feet of freshwater | | |
| | Source for all uses | 30% freshwater and 70% recycled or produced water | | | |
| | Total water usage for drilling and completion[5] (based on source percentages noted above) | Total water: 748.8 acre-feet / Freshwater: 220.7 acre-feet / Recycled/produced water: 514.9 acre-feet | Total water: 2,480.2 acre-feet / Freshwater: 744.1 acre-feet / Recycled/produced water: 1736.1 acre-feet | | |

[2] 1 barrel = 42 gallons, standard US oil barrel volume
[3] Combined water disposal and gas wells, based on an average of 3,000 barrels per well. Conversion factor is 7,758 barrels per acre-foot.
[4] Calculated based on assuming 50 percent coal bed natural gas wells and 50 percent shale wells as discussed in the Bull Mountain EA. Water amounts for each type of well were taken from the Master Drilling Plan in Appendix E. Calculations used number of new gas wells per alternative divided in half for each type of well (coal bed methane/shale). To estimate the amount of water use per well type, the number of wells was multiplied by the highest amount of water use for that well type. Water usage totals were added together for a total maximum amount of water usage during completion.
[5] Amounts were calculated based on adding together the drilling, completion, and dust abatement amounts together. The total was multiplied by 30 percent to determine the freshwater amount and 70 percent to determine the amount of recycled/produced water that would be used.

**Table ES-2**
**Summary of Design Features and Mitigation Measures per Alternative**

| | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| *Design Features* | • Operator committed measures | • Operator committed measures<br>• Wildlife Habitat Plan | • Operator committed measures<br>• Appendix C<br>• Air quality/AQRV measures<br>• Pneumatic requirements<br>• Annual construction planning meeting<br>• Order of development plan<br>• Annual reclamation status report<br>• Annual raptor nest surveys<br>• ¼ mile avoidance for raptor nests<br>• Control drainage to avoid wetlands<br>• Control of noxious weeds | • Operator committed measures<br>• Wildlife Habitat Plan<br>• Appendix C<br>• Air quality/AQRV measures<br>• Pneumatic requirements<br>• Annual construction planning meeting<br>• Order of development plan<br>• Annual reclamation status report<br>• Annual raptor nest surveys<br>• ¼ mile avoidance for raptor nests<br>• Control drainage to avoid wetlands<br>• Control of noxious weeds<br>• Geologic hazards measures<br>• Water quality monitoring measures |
| *Mitigation Measures* | | • App. C measures<br>• Air quality/AQRV measures<br>• Geologic hazards measures | • Geologic hazards measures | |

Rejection of the MDP under the No Action Alternative would not mean that private mineral estate would be the only source of development in the Unit. Existing lease rights granted by the BLM on federal mineral estate would remain in effect; the BLM may consider proposals for individual APDs on federal mineral estate, for access across federal lands for oil and gas development, and for production-related activities in the Unit at any time. These additional individual proposals or applications would be analyzed separately at the time they were received. While development of the federal leases is foreseeable even in the absence of an MDP, the No Action Alternative looks at only private mineral estate development in the direct and indirect analysis. However, because federal mineral estate development is a reasonably foreseeable future action, the combination of private and federal mineral estate development is analyzed in the cumulative effects section of **Chapter 4**, Environmental Consequences.

Based on this, Alternative A is comprised of the following activities:

- Continuation of previously authorized federal authorizations on the existing well pads

- Continued operation of previously authorized private wells targeting private minerals

- Development of new natural gas wells on private surface targeting private minerals that would be built on new and existing well pads approved through the COGCC

### ES.7.2 Alternative B, Proposed Action

Alternative B is largely the same as Alternative A in terms of the phases of development and actions anticipated to complete construction, drilling, completion, production, and reclamation. However, this alternative is specific to BLM-administered mineral estate, considering only the federal mineral estate development within the Unit for purposes of comparison to Alternative A. If Alternative B were approved, the operations and development of private minerals described in Alternative A would also likely be implemented. The combination of federal mineral and private mineral development is analyzed in Chapter 4, Environmental Consequences, under cumulative effects.

### ES.7.3 Alternative C, Modified Action

Alternative C, the Modified Action, is similar to Alternative B in that it considers federal mineral estate development only. It considers the same number of wells (146) but one less well pad (35). It also uses different weighting factors in the site selection model to address issues of development impacts on vegetation resources, water quality, and soil resources, which resulted in different pad locations. When the GIS analysis was rerun to eliminate areas that would be in elk critical winter range, one pad with most of its area in elk critical winter range was also eliminated. The BLM dropped this one pad from consideration to avoid conflicts with development in critical winter range.

Alternative C provides additional mitigation measures and addresses issues regarding development impacts on the same resources noted above, as well as wildlife populations and air quality. Like Alternative B, Alternative C considers only federal mineral estate development, and if it were approved, the private mineral estate development described in Alternative A likely would still be implemented. The cumulative effects of federal and private mineral estate

development is analyzed in the cumulative effects section of Chapter 4, Environmental Consequences.

### ES.7.4 Alternative D, the BLM's Preferred Alternative

Alternative D, the BLM's Preferred Alternative, is similar to Alternatives B and C in that it considers development on federal mineral estate only. It considers the same number of wells (146) but slightly fewer well pads (33). Alternative D is based on interdisciplinary team recommendations, environmental consequences analysis of the alternatives in the Draft EIS, cooperating agency input, and public input on the Draft EIS. This resulted in the following additions to Alternative D:

- The BLM selected only those roads and pipelines needed to access the pads, thereby reducing the miles of road and cross-country pipelines constructed. Minimizing cross-country pipelines was achieved by collocating most pipelines with roads; only those pipelines that could not follow roads, such as where the road and pipeline were going in opposite directions, were placed cross country. Roads and pipelines would also be placed to avoid elk habitat as much as possible.

- The standard will be for closed loop systems to be used to eliminate pits on location and the release of VOCs, unless, due to resource considerations, impacts could be demonstrated to be less when using a reserve pit system (no net benefit to using a closed loop system).

- Remote monitoring (remote telemetry) would be applied to locations and facilities to minimize well monitoring trips throughout the Unit.

- The Proposed Action from SGI would incorporate amendments, including the addition of the 12-89-7-1 APD, the revised plans for a compressor station outside the Unit, and the Wildlife Habitat Plan.

- The air quality design features, requirements for baseline water quality monitoring, and geologic hazards measures would be added.

As for Alternatives B and C, if Alternative D were approved, the operations and development of private minerals described in Alternative A would still be implemented. The cumulative effects of the combined private and federal mineral estate development is analyzed in the cumulative effects section of **Chapter 4**, Environmental Consequences.

### ES.8   SUMMARY OF ENVIRONMENTAL CONSEQUENCES ANALYSIS

The purpose of the environmental consequences analysis in this EIS is to determine and disclose the potential for significant impacts of the federal action on the human environment. Council on Environmental Quality regulations for implementing NEPA comprehensively interprets the "human environment" to include the natural and physical environment and the relationship of people with that environment (40 CFR 1508.14). The "federal action" is the BLM's decision whether to approve the Bull Mountain Unit MDP as proposed, to approve the MDP with modification and mitigation including the 12-89-7-1 APD, to reject both the MDP and 12-89-7-1 APD, or to reject the MDP but approve the 12-89-7-1 APD. The environmental consequences

provide the decision maker with the information necessary to compare and contrast the predicted effects of the proposed action and alternatives and to make a reasoned and informed decision regarding which alternative or course of action or combination of alternatives should be selected in the ROD.

**Chapter 4** evaluates the likely direct, indirect, and cumulative impacts on the human and natural environment in terms of environmental, social, and economic consequences that are projected to occur from implementing the alternatives. Some types of impacts for resources or resource uses could be confined to BLM-administered lands, such as soil disturbance resulting from construction activities; some actions may have offsite/indirect impacts on resources on other land jurisdictions, such as private or state lands, overlying federal mineral estate. An example of the latter is requirements to protect special status species and cultural resources overlying mineral resources. Some BLM management actions might affect only certain resources and alternatives.

The impact analysis identifies both enhancing and improving effects on a resource from a management action, as well as those that have the potential to diminish resource values. See **Tables 2-11**, **2-12**, and **2-13** for summaries of resource-specific direct and indirect impacts that could or would result from implementing the alternatives.

### ES.9   PUBLIC INVOLVEMENT, CONSULTATION, AND COORDINATION

During the development of this EIS, the BLM consulted and coordinated formally and informally with other federal agencies, state and local governments, Native American tribes, and the interested public, in compliance with 40 CFR 1501.7, 1502.19, and 1503 and Department of Interior regulations 43 CFR 46.435.

The BLM conducted two scoping periods for the Bull Mountain Unit MDP Environmental Assessment: from October 28 to December 12, 2008, and from September 17 to November 13, 2009. The preliminary environmental assessment was available for a 30-day public comment period, from March 23 to April 23, 2012. Comments on the proposed action received during the public scoping period and comments received on the Bull Mountain Unit MDP Preliminary Environmental Assessment are summarized in the Bull Mountain Scoping Report. It is available on the project website at http://www.blm.gov/co/st/en/BLM_Information/nepa/ufo/Bull_ Mountain_EIS.html.

A Notice of Intent to prepare an EIS was published in the *Federal Register* on April 3, 2013 (78 *Federal Register* 20133-20134), as well as provided general information regarding the project and how to participate in scoping through media outlets, postcards, emails, and its website. A project newsletter was issued on May 2, 2013, which provided information on the kickoff of the EIS and future opportunities for public involvement.

### ES.9.1 Comments on the Draft EIS

On January 16, 2015, the BLM and EPA published a Notice of Availability in the *Federal Register*, which marked the beginning of the formal 45-day public comment period. On January 27, 2015, the public comment period was extended for an additional 45 days, ending on April 16, 2015. One open house/listening session was held on February 10, 2015, in Paonia, during the 90-day comment period.

The BLM received a total of 565 unique comment letters, forms, and e-mails during the 90-day public comment period; this resulted in 360 substantive comments. In addition to the unique submissions discussed above, 83 form letters were submitted.

The 360 substantive comments were categorized into 67 issue statements. The comments received on the Draft EIS were similar to the issues raised during both the EA and EIS public scoping periods. They focused primarily on water resources (57), air resources (52), wildlife, birds, and special status species (49), socioeconomics (40), the Conservation Alternative (38), general regulatory comments (27), and general NEPA requirements (20). See **Table 5-2** for a complete list of comments by issue category.

All substantive comments, detailed summaries, and responses organized by resource, resource use, or EIS planning regulation can be found in **Appendix N**, Response to Comments on the Draft Environmental Impact Statement. A brief overview of changes to the document is provided in **Chapter 1**, Introduction, **Section 1.9**, Changes between the Draft EIS and Final EIS.

## ES.9.2 Cooperating Agencies

A cooperating agency is any federal, state, or local government agency or Native American tribe that enters into a formal agreement with the lead federal agency to help develop an environmental analysis or EIS (40 CFR Part 1508.5). Throughout this EIS preparation, the BLM engaged multiple cooperating agencies and tribes for a broader understanding of their issues and concerns regarding the Bull Mountain Unit MDP and EIS. Interactions have included periodic briefings and reviews of preliminary, internal draft EIS text. Cooperating agencies are Region 8 of the US Environmental Protection Agency; the Grand Mesa, Uncompahgre, Gunnison National Forest; the Delta Conservation District; the Colorado Department of Natural Resources (including the Division of Parks and Wildlife); the Colorado Department of Public health and Environment; Gunnison County and Delta County.

Consistent with Section 7(c) of the Endangered Species Act, the BLM consulted with the US Fish and Wildlife Service (USFWS) regarding potential effects of the project on federally listed threatened or endangered species or critical habitat. The BLM prepared and submitted to the USFWS a biological assessment to evaluate the impacts of the preferred alternative on federally listed threatened and endangered species. For each listed species, the BLM provided a determination of whether the implementation of the final EIS would affect, adversely affect, not affect, or have no adverse effect" for the species that were the subject of this consultation. After reviewing the biological assessment, the USFWS responded with a concurrence memorandum, dated October 20, 2015, with a finding of "not likely to adversely affect."

The Draft Bull Mountain Unit MDP EIS was submitted to the Environmental Protection Agency in accordance with 40 CFR 1506.9. The BLM has contacted and consulted with tribal governments of Ute Tribe of the Uintah and Ouray Reservation, the Southern Ute Indian Tribe, and the Ute Mountain Ute Indian Tribe. The BLM remains in contact via phone calls and emails and by responding to individual requests for additional information or meeting presentations.

The BLM began consultations with the Colorado State Historic Preservation Officer on September 10, 2013, in accordance with the Protocol for Managing Cultural Resources on Lands Administered by the Bureau of Land Management in Colorado. The SHPO formally responded

to the letter on September 19, 2013, expressing interest but no specific concerns. The SHPO did not submit any formal comments on the Draft EIS.

In addition, the BLM has kept the Southwest Resource Advisory Council informed of the EIS progress throughout its development, but the council has not had any specific comments or input during the NEPA process.

# Chapter 1
## Introduction

# TABLE OF CONTENTS

Chapter                                                                                                                Page

**1. INTRODUCTION** ................................................................ 1-1

  1.1 Overview .......................................................... 1-1
    1.1.1 Regional Setting ......................................... 1-2
  1.2 Purpose and Need .......................................... 1-5
  1.3 Decisions to be Made ..................................... 1-5
  1.4 Relationship to BLM Plans and Policies ......... 1-6
    1.4.1 BLM National and Statewide Regulations and Policies ........ 1-6
    1.4.2 Conformance with the Current Resource Management Plan ...... 1-7
    1.4.3 Uncompahgre Resource Management Plan Revision .......... 1-7
  1.5 Federal, State, and Local Permitting and Approvals ......... 1-7
  1.6 Scope of Analysis ........................................... 1-9
    1.6.1 Requirements for Future NEPA Analysis ................ 1-10
  1.7 Public Involvement ........................................ 1-11
    1.7.1 Cooperating Agencies .................................. 1-12
  1.8 Key Issues Addressed in this EIS .................... 1-13
    1.8.1 Issues Identified at Environmental Assessment Scoping ...... 1-13
    1.8.2 Additional Issues Considered in this EIS ............ 1-14
  1.9 Changes between the Draft EIS and the Final EIS ........ 1-15
    1.9.1 Updates to Geographic Information Systems Information ...... 1-16
    1.9.2 Changes to the Alternatives (Chapter 2) ............ 1-16
    1.9.3 Changes to Other Chapters and Appendices .......... 1-17

# TABLES

                                                                                                                Page

1-1 Federal, State, and Local Permits and Approvals Applicable to the Bull Mountain Unit ................ 1-7

# FIGURES

                                                                                                                Page

1-1 Regional Bull Mountain Unit ........................ 1-3
1-2 Bull Mountain Unit ..................................... 1-4

This page intentionally left blank.

# CHAPTER 1
# INTRODUCTION

## 1.1   OVERVIEW

The United States Department of the Interior, Bureau of Land Management (BLM), Uncompahgre Field Office, has received a proposed Master Development Plan (MDP) for natural gas exploration and development from SG Interests, Ltd. (SGI) for the Bull Mountain Unit (the Unit). It includes one application for a permit to drill (APD) for the 12-89-7-1 well pad.[1] The Bull Mountain Unit MDP arises from initial studies of the subsurface fluid mineral reserves and the results of previous natural gas drilling, both of which indicate the potential for economically viable reserves of natural gas in the area. An MDP provides information common to multiple planned wells, including drilling plans, surface use plans of operation, and plans for future production; they are typically prepared for a planned cluster of wells and associated facilities in close proximity, or for multiple in-fill wells scattered throughout an oil and gas Unit or field, and include information on associated facilities (e.g., roads, pipelines, utility corridors, and compressor stations).

The Bull Mountain Unit MDP describes the exploration for and development of up to 146 natural gas wells, 4 water disposal wells, and associated infrastructure on federal and private mineral leases within a federally Unitized area known as the Unit. Under terms of the Unit agreement, SGI is required to diligently develop at least two producing wells per year in order to maintain the administrative structure of the Unit. This requirement is currently suspended under an approved Suspension of Operations and Production while this environmental impact statement (EIS) is being prepared. Instead of structuring the development of federal leases as a series of individual actions, the BLM encourages the use of multi-well development plans to more effectively manage federal lease development (BLM IM 2005-247).

Additionally, federal unitization allows for placement of wells within the Unit in a logical fashion without regard to setbacks from committed lease lines in order to minimize road

---

[1] SGI submitted the 12-89-7-1 well pad APD and the BLM made an on-site inspection on May 16, 2011. The APD has been pending since October 25, 2012. SGI has submitted no other APDs nor has the BLM conducted any on-site inspections for wells, pads, or associated infrastructure in the Unit.

development, pipelines, and other surface impacts (BLM 2007c); however, the COGCC rule 318.d(3) setback requirements subject to agreements between COGCC and BLM. The objective of unitization is to proceed with a program that will adequately and timely explore and develop all committed lands within the Unit area without regard to internal ownership boundaries. By effectively eliminating internal property boundaries within the Unit area, unitization permits the most efficient and cost effective means of developing the underlying oil and gas resources (BLM 2013g, pages 2-60).

In 2003, the BLM approved a Unit agreement for the leases within the Bull Mountain area to provide for the orderly, planned, and structured development of extraction for natural gas resources. The boundaries of the Unit encompass approximately 19,670 acres federal and private oil and gas mineral estate in Gunnison County, Colorado. The Unit consists of 440 acres of federal surface underlain by BLM-administered mineral estate; 12,900 acres of split-estate lands consisting of private surface and BLM-administered minerals; and 6,330 acres of fee land consisting of private surface and private minerals regulated by the Colorado Oil and Gas Conservation Commission (COGCC; **Figure 1-2**, Bull Mountain Unit).

In split estate situations, the surface rights and subsurface rights (such as the rights to develop minerals) for a piece of land are owned by different parties. See the BLM's website on Split Estate for additional information and details on BLM policies regarding split estate (http://www.blm.gov/wo/st/en/prog/energy/oil_and_gas/best_management_practices/split_estate.html); see also Legal Responsibilities of BLM for Oil and Gas Leasing and Operations on Split Estate Land.

A memorandum of understanding was signed by the BLM Colorado State Office, the US Department of Agriculture, the Forest Service (Forest Service), the Rocky Mountain Region, and the COGCC dated July 10, 2009. It addresses the application of the COGCC's final amended rules for oil and gas operations to federal lands and minerals (including split-estate lands). The Memorandum of Understanding facilitates cooperation among the agencies to limit the potential for redundancy or conflicting regulations among the permitting authorities. However, it recognizes that each regulatory agency in Colorado must receive permit applications from oil and gas operators that comply with and include responses to their own specific rules and regulatory requirements.

In the memorandum of understanding, the parties agree to advise operators to identify and incorporate applicable standards and practices contained in the COGCC rules into federal APDs, MDPs, or other requested authorizations related to oil and gas operations so long as such state standards or practices are at least as stringent as comparable federal standards or practices, in order to minimize the potential for multiple reviews.

## 1.1.1   Regional Setting

The Unit is located within the Colorado River basin, approximately 30 miles northeast of the Town of Paonia, and is bisected by State Highway 133. The elevation is approximately 7,400 feet and consists of rolling topography in a mountainous region (**Figure 1-1**, Regional Bull Mountain Unit and **Figure 1-2**, Bull Mountain Unit). Snow blankets most of the area from mid-October through mid-May, increasing from an average of a few inches through early December



**Regional Bull Mountain Unit**
Source: BLM GIS 2014

Bull Mountain Unit
Federal surface, federal minerals
Private surface, federal minerals
Private surface, private minerals

Figure 1-1

I. Introduction



**Bull Mountain Unit**

Source: BLM GIS 2014

Legend:
- Bull Mountain Unit
- Federal surface, federal minerals
- Private surface, federal minerals
- Private surface, private minerals
- Perennial stream

Figure 1-2

to an average high of 5.5 to 6 feet in March (NRCS 2011). South-facing slopes have more winter melting events, and north-facing slopes retain snow longer and accumulate more snow through the course of the winter. East and West Muddy Creek, the two main drainages that collect local surface waters within the Unit, reach their confluence just south and outside of the Unit, where they form Muddy Creek.

Expansive irrigated hay meadows are generally found in the bottomlands of the East Muddy Creek basin. Irrigated meadows are also found in the Ault Creek basin at the far western side of the Unit. There are many irrigation diversions off of the larger creeks, especially on the eastern side of the Unit. Stock ponds for domestic cattle and sheep grazing occur frequently on the landscape, and in general retain surface waters throughout the year.

The Unit is dominated by sagebrush (*Artemisia tridentata* subsp. *vaseyana*). Oakbrush communities comprised of Gambel's oak (*Quercus gambelii*), Saskatoon and Utah serviceberry (*Amelanchier utahensis* and *A. alnifolia*), and chokecherry (*Padus virginiana*) are the second most common, followed by mixed mountain shrubland. Other vegetation communities include aspen (*Populus tremuloides*) woodlands and irrigated pasturelands.

Cattle grazing occurs over most of the area during the snow-free months, typically mid-May through mid-October. Some springtime and fall sheep grazing occurs as well. In the fall, portions of the Unit are used for gathering cattle and sheep coming off of grazing allotments on the adjacent Grand Mesa, Uncompahgre, and Gunnison National Forest. A few residential sites are located within the Unit, generally near Gunnison County Road 265 and the State Highway 133 corridor.

## 1.2   PURPOSE AND NEED

The BLM's purpose is to consider the proponent's request for an MDP and the 12-89-7-1 APD to develop federal fluid minerals in the Unit, while also considering the BLM's multiple-use mission which, in addition to managing activities on federal land such as fluid mineral development, includes conserving natural, historical, cultural, and other resources on the BLM-administered lands.

The BLM's need arises from its responsibilities under the Federal Land Policy and Management Act of 1976 (FLPMA), the Mineral Leasing Act, and other legislation to respond to the applicant's request. To increase the orderly development of natural gas resources consistent with the Energy Policy Acts of 2001 and 2005, which emphasize the development of domestic natural gas reserves for supply and economic stability, and to better facilitate the planning of infrastructure, the BLM is considering the proposed MDP. The MDP takes into account field development as a whole rather than as individual actions.

## 1.3   DECISIONS TO BE MADE

The decision to be made by the BLM is whether to approve the Bull Mountain Unit MDP, including approving the 12-89-7-1 well pad APD, as proposed, to approve the plan and APD with modification and mitigation, to reject the MDP, or to approve the APD. Approval of the APD as proposed or with mitigation in the ROD would grant SGI a permit to begin well pad, road, pipeline, and facility construction and well drilling and completion.

In the ROD, the BLM decision-maker (i.e., the BLM Southwest District Manager) will determine the following:

- Whether the Proposed Action and alternatives are in conformance with the applicable land use plan and programmatic plans developed under NEPA

- Whether the analysis in this EIS is adequate for the purposes of reaching informed decisions on the Bull Mountain Unit natural gas field development Proposed Action and alternatives

- Whether to approve the Proposed Action, select a different alternative, or select a combination of alternatives

The Authorized Officer will also determine what conditions of approval (COAs) will be attached to the ROD and any individual permits issued after the ROD.

Existing lease rights granted by the BLM on federal mineral estate remain in effect during this EIS process. The BLM may receive and consider proposals for individual APDs and/or associated facilities on federal surface land and mineral estate, access across federal lands for oil and gas development, and production-related activities at any time. These additional individual actions submitted to the BLM will have separate NEPA analyses at the time they are received.

Any decisions made in the ROD will provide a blueprint for future anticipated actions; future ground-disturbing activity and construction would require additional authorizations from the BLM and/or COGCC. **Section 1.6.1**, Requirements for Future NEPA Analysis, provides additional details on the process for reviewing future APDs submitted under the MDP.

## 1.4    RELATIONSHIP TO BLM PLANS AND POLICIES

### 1.4.1    BLM National and Statewide Regulations and Policies
This EIS is consistent with the National Environmental Policy Act of 1969 (NEPA), as amended; the Council on Environmental Quality (CEQ) Regulations for Implementing the Procedural Provisions of NEPA, outlined in Part 40 of the Code of Federal Regulations (40 Code of Federal Regulations [CFR] Parts 1500-1508) and Department of the Interior NEPA regulations at 43 CFR 46; Department of the Interior and BLM policies and manuals (BLM 2008); the Endangered Species Act of 1973 (ESA); and the National Historic Preservation Act of 1966 (NHPA).

Exploration and development of federal oil and gas resources by private industry is under authority of the Mineral Leasing Act of 1920, as amended; the Mining and Minerals Policy Act of 1970; the National Materials and Minerals Policy, Research and Development Act of 1980; the Federal Onshore Oil and Gas Leasing Reform Act of 1987; and various regulations specific to implementation of those laws (e.g., 43 CFR 3100).

Onshore Oil and Gas Order Number 1 (Order) contains the requirements necessary for the approval of all proposed oil and gas exploratory, development, or service wells on all federal onshore oil and gas leases, including leases where the surface is managed by the Forest Service.

In 2007, the Order was revised to reflect passage of the 1987 Onshore Oil and Gas Leasing Reform Act and the Energy Policy Act of 2005. Major changes involve procedures for processing APDs, the use of best management practices (BMPs) in lease development, and procedures for operating in split estate situations, where privately owned surface overlies federally owned minerals. The Order also defines master development plans, noting that they provide information common to multiple planned wells, including drilling plans, surface use plans of operations, and plans for future production.

In 2015, the BLM released the new rule, Oil and Gas: Hydraulic Fracturing on Federal and Indian Lands (to be codified in 43 CFR, Part 3160). If and when the rule takes effect, it will apply to hydraulic fracturing operations on federal minerals. The requirements would not apply to actions conducted exclusively on private mineral estate.

### 1.4.2   Conformance with the Current Resource Management Plan

The BLM land use planning decisions for federal lands and minerals within the Unit are contained in the Uncompahgre Basin RMP (1989). The alternatives are subject to the decisions in the current RMP. The RMP decision relevant to the Bull Mountain Unit MDP states, "Federal oil and gas estate will be open to leasing. Seasonal restrictions are required on crucial deer and elk winter range and on bald eagle hunting habitat to protect crucial deer and elk winter range and bald eagle hunting habitat from disturbance" (BLM 1989, pages 28 and 32).

All of the alternatives in this EIS are in conformance with the Uncompahgre Basin RMP.

### 1.4.3   Uncompahgre Resource Management Plan Revision

The BLM is revising its Land Use Plan for the Uncompahgre Field Office. Existing RMP decisions will remain in effect during the land use plan revision process until the revision is completed and approved (43 United States Code [USC] 1711- 1712, 43 CFR 1600).

Inventory information and baseline reports developed for the Uncompahgre RMP revision, as well as those for the Bull Mountain Unit MDP Environmental Assessment (EA, BLM 2012), were incorporated into this EIS to provide recent and best information available.

### 1.5   FEDERAL, STATE, AND LOCAL PERMITTING AND APPROVALS

The Proposed Action and alternatives would be in compliance with various federal, state, and local laws and regulations, and SGI would procure any required permits or easements (**Table 1-1**, Federal, State, and Local Permits and Approvals Applicable to the Bull Mountain Unit).

**Table 1-1**
**Federal, State, and Local Permits and Approvals Applicable to the Bull Mountain Unit**

| Agency | Permit, Approval, or Action |
|---|---|
| *Federal Agency* | |
| US Army Corps of Engineers | • Section 404 and 401 permits for compliance with Clean Water Act |
| US Bureau of Land Management | • NEPA<br>• Approval of the APDs<br>• Sundry notices for construction and other changes<br>• Permits to drill, deepen, or plug back on BLM-administered land (APD/Sundry Notice process) |

**Table 1-1**
**Federal, State, and Local Permits and Approvals Applicable to the Bull Mountain Unit**

| Agency | Permit, Approval, or Action |
|---|---|
| US Bureau of Land Management *(continued)* | • Right-of-way (ROW) grants and temporary use permits for pipelines on BLM-administered land outside the Unit<br>• ROW grants for access roads on BLM-administered land outside the Unit<br>• Authorization for flaring and venting of natural gas on BLM-administered land<br>• Plugging and abandonment of a well on BLM-administered land<br>• Modifications and/or exceptions to lease stipulations<br>• Antiquities, cultural and historic resource permits on BLM-administered land<br>• Paleontological resource use permits<br>• Approval to dispose of produced water on BLM-administered land<br>• Pesticide use permits<br>• Noxious Weed Act enforcement<br>• Initiation of Section 7 consultation with US Fish and Wildlife Service (USFWS)<br>• Mineral material sales permits |
| US Department of Justice, Bureau of Alcohol, Tobacco and Firearms | • Explosives user permits |
| US Environmental Protection Agency – Region 8 | • Air quality permits (delegated to Colorado Department of Public Health and Environment)<br>• Review and comment on major federal actions<br>• Spill Prevention, Control, and Countermeasure Plan<br>• Underground Injection Control permits (delegated to COGCC) |
| US Fish and Wildlife Service | • Migratory Bird Treaty Act and Bald Eagle Protection Act consultations<br>• Section 7 consultation for compliance with Endangered Species Act |
| *State Agency* | |
| Colorado Division of Water Resources (Office of the State Engineer) | • Water well permits<br>• Stream alteration permits<br>• Change in nature of use water applications |
| Colorado Parks and Wildlife | • Coordination regarding impacts on wildlife and state sensitive species<br>• Compliance with COGCC Rules and Regulations<br>• Consistency with essential elements of wildlife mitigation strategy |
| Colorado Oil and Gas Conservation Commission | • Coordination on APDs (including Oil and Gas Location Assessment)<br>• Permits to drill, deepen, or re-enter and operate oil and gas or disposal wells<br>• Underground Injection Control Permits (delegated by the Environmental Protection Agency)<br>• Pressure monitoring and well spacing<br>• Disposal facility permits<br>• Permits to flare natural gas<br>• Compliance with safety regulations for oil and gas activities |

**Table 1-1**
**Federal, State, and Local Permits and Approvals Applicable to the Bull Mountain Unit**

| Agency | Permit, Approval, or Action |
| --- | --- |
| Colorado Department of Public Health and Environment, Division of Water Quality | • Construction Discharge Permit for stormwater discharges during project construction (according to current stormwater management plan)<br>• Coordination with COGCC for Injection Permit Applications<br>• Water Well Permit<br>• Section 401 Clean Water Act water quality certification stream and wetland crossing.<br>• Construction dewatering permits<br>• Stream alteration permits<br>• Solid and hazardous waste control |
| Colorado Department of Public Health and Environment, Division of Air Quality | • Air Quality Permits and Air Pollutant Emissions Notices (including delegations from the Environmental Protection Agency) for stationary and portable sources<br>• Approval orders and permits for compressors and other stationary emissions sources<br>• Air quality permits to construct<br>• New Source Review permits<br>• Fugitive dust control |
| Colorado Department of Transportation | • Access permits for access to and from State Highway 133<br>• Utility, relocation, and special use permit for work in the highway ROW<br>• Oversize/overweight vehicle permits for use of state highway<br>• Approval of construction and operation of natural gas pipelines<br>• Permits for encroachment and for crossing state roads |
| Colorado Water Court Division 4 | • Water Augmentation Plan |
| *Local Government* | |
| Gunnison County | • Gunnison County Land Use Resolution<br>• Application for an Oil & Gas/land use change permit<br>• Performance/utilization bond<br>• Driveway permits for county road access<br>• Permits for use of County Road 265 for overweight/oversize equipment<br>• County zoning/land use plan consultation<br>• Special use and conditional use permits<br>• Encroachment permits<br>• Road conditional use and opening permits<br>• Solid waste disposal permits<br>• Construction permits and licenses<br>• Colorado Noxious Weed Act enforcement |

Source: BLM 2012; Gunnison County 2013.

## 1.6   SCOPE OF ANALYSIS

The BLM has addressed the requisite resource issues (as defined from internal and external scoping as well as from comments on the Draft EIS) at a programmatic level and on the site-specific level for the proposed 12-89-7-1 APD.

All phases of natural gas field development are included in the scope of the analysis. These are siting, construction, drilling, completion, interim reclamation, production and maintenance, final

wellbore abandonment, and reclamation. The technologies described here are representative of those most likely to be deployed over the life of the project.

The analysis areas for well pad locations is shown as 40-acre conceptual circles on maps to account for not knowing the exact locations of future well pads. Additionally, the roads and pipelines are approximations, because no engineering has been done to specifically design road and pipeline alignments or construction requirements. Because these elements of the MDP are generalizations, approximations, and conceptual analysis areas, the effects analysis in Chapter 4, Environmental Consequences is generalized to account for all possible scenarios. In this manner, the BLM is able to analyze future potential energy development on the entire Bull Mountain Unit.

To address the specifics of developing the 12-89-7-1 APD, the scope of analysis for affected resources is specific to the location and drilling plan (see **Appendix O** for the complete APD package). The BLM conducted an on-site inspection of the well location, and numerous site-specific studies were conducted to define the current condition of resources on location and to determine possible effects on those resources. Specialty reports included a Class III cultural resources survey, a vegetation and wildlife summary report, and baseline water quality monitoring. All of this information has been incorporated into the EIS and analyzed to ensure adequate NEPA compliance.

For the purposes of analysis, the life of any individual well is estimated to be 40 years and the analysis horizon for the project would be 50 years. This includes all oil and gas wells and water disposal wells, although the actual production years may vary for individual wells. The analysis focuses on the direct, indirect, and cumulative impacts that could eventually result from activities resulting from the actions presented in the alternatives. This analysis identifies impacts that may result in some level of change to the resources, regardless of whether that change is beneficial or adverse.

Information provided within the environmental consequences section provides the decision-maker with the information necessary to compare and contrast the predicted effects of the Proposed Action and alternatives and make a reasoned and informed decision regarding which alternative or combination of actions should be selected in the ROD.

### 1.6.1   Requirements for Future NEPA Analysis

If the BLM decides to approve SGI's proposed Bull Mountain Unit MDP or a modified alternative to it, the exact locations of wells, roads, pipelines, and other facilities would be determined when those wells or facilities are proposed for drilling or construction as part of an APD. The BLM would be required to review and act on the APD, which includes the surface use plans of operation (SUPOs) and site-specific subsurface drilling plan (see **Appendix O** for a complete APD package). Submission and approval of such applications are required before the surface is disturbed. Siting of these locations would be subject to the APD process described below and the design features and conditions of approval (COAs) adopted in the ROD for this EIS, plus any BMPs the BLM determines are necessary to reduce adverse effects.

An operator can initiate the APD process either by filing an APD or a notice of staking (NOS). The NOS consists of an overview of the operator's proposal, including a location map and a

sketched site plan. The detailed information required to be submitted for each APD is identified in Onshore Oil and Gas Order No. 1 and 43 CFR 3162.3.

The BLM is responsible for approving a project proponent's APD, including both the SUPO and subsurface drilling plan, and for applying appropriate mitigation measures, or COAs, for affected resources on BLM-administered lands or minerals.

Before approving an APD, the BLM must comply with NEPA and consider the environmental effects of the Proposed Action. The environmental review includes an on-site inspection of the proposed well, access road, and pipeline locations, as well as other areas of proposed surface use. The purpose of the on-site inspection is to identify site-specific environmental impacts and to identify avoidance techniques or other mitigation measures. The on-site inspection could, for example, include site-specific surveys for cultural and paleontological resources or threatened or endangered species if the potential for these resources exists on or near the proposed disturbance.

After the on-site inspection, the project proponent would submit the APD or would revise it to address changes requested during the inspection. Additional mitigation measures may be added as design features by proponents as part of their revisions, or BLM may add them as COAs after NEPA analysis. Examples of these additional measures are adjusting the proposed locations of well sites, roads, and pipelines to avoid a sensitive resource, identifying specific construction methods to be employed, and identifying reclamation standards.

After drilling, routine well operations would not require approval; however, the BLM would have approval authority for operational activities that may alter the specifications of an approved APD, certain subsequent well operations, disposal of water produced from federal leases, and new surface disturbances (e.g., workover pits). The BLM also retains the authority to approve well plugging and abandonment, gas venting, gas flaring, and certain measures for handling production. Other permits, approvals, authorizing actions, and consultations required by federal, state and local agencies are discussed in **Section 1.5**.

If the MDP is approved, this EIS will provide an "umbrella" analysis to which analysis of future APDs proposed within the Unit would be tiered. Approval of these actions would require additional documentation of NEPA compliance, such as a tiered environmental assessment, a Documentation of NEPA Adequacy, or a categorical exclusion. Categorical exclusions that may apply to some future development activities include those provided in Section 390 of the Energy Policy Act of 2005, 42 USC 15942(b). Approval would be subject to the APD process described above. They would be in accordance with federal and state oil and gas regulations, Washington Office Instruction Memorandum 2008-166, and the 1989 Uncompahgre Basin RMP or the future revised Uncompahgre RMP.

Because the APD for the 12-89-7-1 well pad is included in this EIS, no further NEPA analysis would be required to approve it. Should it be approved as part of the Bull Mountain Unit MDP ROD, well pad work and drilling could begin at any time.

## 1.7   PUBLIC INVOLVEMENT

Public involvement is a vital component of the EIS processes (43 CFR 1506.6). Scoping was an early and open process for determining the scope of issues to be addressed and identifying the

significant issues related to a Proposed Action. Information collected during scoping may also be used to develop the alternatives to be addressed in a NEPA document. Public involvement was conducted in the following phases for the Bull Mountain Unit MDP environmental review process:

- Public scoping prior to NEPA analysis to determine the scope of issues and alternatives to be addressed

- Public outreach, news releases, and newspaper advertisements

- Public review and input on the Bull Mountain Unit MDP EA

- Collaboration with federal, state, local, and tribal governments; the BLM Colorado Southwest Resource Advisory Council (RAC); and cooperating agencies

- A Notice of Intent (NOI) to prepare an EIS was published in the *Federal Register* on April 3, 2013 (78 *Federal Register* 20133-20134, April 3, 2013)

- A Notice of Availability (NOA) of the Draft EIS was published in the *Federal Register* on January 16, 2015 (80 *Federal Register* 2438-2439, January 16, 2015). The Draft EIS was available for public review and comment for 90 days.

The scoping summary report documents the results of the public involvement process beginning with public scoping and including the comments received on the EA, and provides information about the ongoing collaboration process; a copy of the report is available on the Bull Mountain EIS project website: http://www.blm.gov/co/st/en/BLM_Information/nepa/ufo/ Bull_Mountain_EIS.html. **Appendix N** documents the substantive comments, summary of issues, and responses to comments from public review of the Draft EIS.

Detailed information regarding the public comment process for the Draft EIS is found **Chapter 5**, Consultation and Coordination.

### 1.7.1   Cooperating Agencies

The BLM engaged multiple cooperating agencies and tribes for a broader understanding on their issues and concerns regarding the Bull Mountain Unit Master Development Plan and EIS. Cooperating agencies are state or federal agencies, or local or tribal governments that enter into a formal relationship with the BLM to help develop EISs (40 CFR 1508.5). A cooperating agency's involvement can include participating in issue identification, collecting inventory data, contributing to alternative formulation, and estimating effects of alternatives (40 CFR 1501.6). The cooperating agencies on the Bull Mountain Unit MDP EIS are the following:

- Environmental Protection Agency, Region 8

- Grand Mesa, Uncompahgre, Gunnison National Forest

- Delta Conservation District

- Colorado Department of Natural Resources, including the Division of Parks and Wildlife

- Colorado Department of Public Health and Environment

- Delta County

- Gunnison County

The BLM initiated consultation with the Colorado State Historic Preservation Officer in August 2013 in accordance with the Protocol for Managing Cultural Resources on Lands Administered by the Bureau of Land Management in Colorado. Consultations will continue through the course of the EIS process to ensure compliance with the NHPA and NEPA.

The BLM has also contacted and consulted with Native American tribal governments including the Ute Tribe of the Uintah and Ouray Reservation, Southern Ute Indian Tribe, and Ute Mountain Ute Indian Tribe. Formal letters were sent to the three tribes in January 2014. The BLM continues to remain in contact via phone calls and emails, and by responding to individual requests for additional information or meeting presentations.

Finally, the Southwest RAC has been kept informed of the EIS progress throughout the document's development. For full details on the coordination and consultation conducted for the EIS, see **Chapter 5**, Consultation and Coordination.

## 1.8    KEY ISSUES ADDRESSED IN THIS EIS

An issue is a point of disagreement or dispute with the Proposed Action based on some anticipated environmental effect (BLM 2008a, page 40). The BLM has used the issues and other information collected in the scoping and EA comment phases to help formulate a reasonable range of alternative management strategies that are analyzed in this Final EIS.

The NOI invited further comments and the project has been discussed internally and externally during the interim. The issue statements below include those from the scoping period for the EA, as well as public comments received on the EA after its publication in March 2012. The process of developing this EIS afforded opportunities for collaboration with local, state, federal, and tribal governments; land-management agencies; public interest groups; and public land users. As a result, these issues and concerns have been modified to reflect public comments and concerns. The overarching issues the EIS addresses are listed below.

### 1.8.1   Issues Identified at Environmental Assessment Scoping

Information accepted during project scoping conducted in 2008 and 2009 was compiled to develop issue statements. The following issues of key environmental, social, and economic concern were identified:

Air Quality. How will harmful emissions and dust from construction and operations be monitored and controlled?

Water Quality and Supply. How will hydraulic fracturing and reinjection of produced water affect the short-term and long-term quality and supply of water for agricultural and residential use? What are the potential hazards from surface spills and various substances used during

drilling and production? An inventory and performance monitoring program should be instituted to establish a baseline and provide regular reporting for the life of the project.

Threatened, Endangered, and Sensitive Wildlife Species. What are the potential impacts on species identified as threatened, endangered, or of concern to state and federal agencies, including Canada Lynx and Gunnison sage-grouse?

Wildlife and Wildlife Habitat. The area is used by a wide variety of species, including a large population of elk, and the potential impacts, duration, and density of development in this relatively undeveloped area is a concern. How will construction and ongoing use of access roads affect wildlife habitat utilization and connectivity within and adjacent to the Bull Mountain Unit?

Recreation and Visual Resources. The Bull Mountain Unit is adjacent to important recreation areas for camping, hunting, and sightseeing and includes a segment of the West Elk Scenic Byway. How will the project affect access to and quality of recreation and visual resources?

Socio-economics. How will development and operation of additional roads and infrastructure affect the rural character, lifestyle, and property values in the area, as well as tourism that relies on existing recreational and scenic values? What are the positive and negative economic impacts of developing the mineral resource?

Transportation. How will increased traffic and resulting impacts on road conditions, maintenance, and safety be addressed? How will new pipeline and access road corridors be minimized?

### 1.8.2   Additional Issues Considered in this EIS

Based on the comments received on the EA, many of the issues are similar to those identified from scoping; however, some additional concerns and key issues have been identified as noted below.

Climate Change. How will the BLM address climate change and greenhouse gas emissions that result from the project and other projects in the area in the EIS?

Cumulative Impacts. What area projects will the BLM include when considering cumulative impacts; will the BLM include projects such as the North Fork Valley Leasing and other leasing actions? Will the BLM address impacts from the project activities on the surrounding National Park Service Units, National Forest System lands, and the broader county socioeconomics?

Range of Alternatives. Will the BLM consider additional alternatives in the EIS, such as different water disposal systems or access points to the Bull Mountain Unit? Will the BLM consider additional required design features as part of the alternatives?

National Environmental Policy Act. How will the BLM coordinate the EIS development with the on-going Uncompahgre RMP revision? What is the appropriate level of analysis for the EIS – high-level programmatic analysis or site-specific analysis? Will there be additional NEPA analysis required for individual drilling permits? Since this is an EIS effort, will the BLM coordinate with cooperating agencies and other stakeholders?

<u>Noise</u>. What are the impacts from increased noise in the project area? Will noise diminish the quality of life and recreational experiences people currently enjoy?

<u>Geologic Resources</u>. What are the impacts on the geologic resources from water injection and hydraulic fracturing? Could there be increased risk for induced seismicity and geologic hazards (e.g., landslides and slope instability)?

<u>Visual Resources, Vegetation, Soil Resources, Recreation</u>. How will the BLM address impacts on these resources from the project's actions? What mitigation measures will the BLM include, such as design features, BMPs, or other required mitigation to address these impacts?

<u>Health and Safety</u>. What are the impacts on human health and safety that could result from the project actions? How will the BLM address project-related trash and reduce the risk for hazardous spills, traffic related safety issues, and release of toxic emissions?

## 1.9   CHANGES BETWEEN THE DRAFT EIS AND THE FINAL EIS

As a result of public comments, best science, cooperating agency coordination, and internal review of the Draft EIS, the BLM developed the Final EIS for the Bull Mountain Unit Master Development Plan. None of the alternatives from the Draft EIS were selected as the BLM's Preferred Alternative. Rather, the BLM selected a combination of locations and actions from Alternative B (the Proposed Action) and Alternative C (BLM Modified Action). Additionally, the BLM included amendments to the Proposed Action from SGI (revisions to one compressor station location, inclusion of a wildlife habitat plan, and the addition of the 12-89-7-1 APD). The Preferred Alternative (Alternative D) focused on addressing public comments while continuing to meet the BLM's legal and regulatory mandates.

Throughout the development of the Final EIS, editorial changes were made to improve clarity, and technical changes were made to correct errors. New information on resources or resource uses was added. New program policies were recognized.

The BLM has determined that the Preferred Alternative is a minor variation of the Draft EIS alternatives and that its impacts would not affect the human environment in a substantial manner or to a significant extent not already considered in the Draft EIS. The impacts disclosed in the Final EIS are similar or identical to those described in the Draft EIS, and all differences have been accounted for in the analysis. Because they are not substantial or significant changes, supplementation to the Draft EIS is not necessary.

NEPA requires agencies to prepare a supplement to a Draft EIS under the following circumstances:

- The agency makes substantial changes in the Proposed Action that are relevant to environmental concerns

- If there are significant new circumstances or information relevant to environmental concerns and bearing on the Proposed Action or its impacts

A supplement is not necessary if a newly formulated alternative is a minor variation of one of the alternatives and is qualitatively within the spectrum of alternatives analyzed in the Draft EIS.

The Preferred Alternative includes components of the alternatives analyzed in the Draft EIS. Taken together, these components present a suite of management decisions that present a minor variation of alternatives identified in the Draft EIS and are qualitatively within the spectrum of alternatives analyzed.

### 1.9.1    Updates to Geographic Information Systems Information
GIS information (e.g., acreage figures and associated quantifications) was updated as follows:

- Some datasets, including the roads layer, were corrected due to inaccurate datasets, unknown sources, or outdated information.

### 1.9.2    Changes to the Alternatives (Chapter 2)
Management actions in Chapter 2 were updated. The following are the management actions that underwent the changes between the Draft EIS and the Final EIS.

- Existing infrastructure was updated based on information provided by SGI to account for continuing development permitted through the COGCC on private mineral estate.

- Alternative A, No Action, was revised to clarify that it represents those actions that would be anticipated should the BLM reject the MDP. Rejection of the MDP would result in continued development of the gas resources, but without the benefit of an umbrella development strategy and without any assurance on how long the approval process would take. The BLM would continue to review and process each individual APD submitted on a first-come/first-served basis. As these additional BLM permitted activities would occur in the future, but without an assumed time frame for submission and approval, the BLM considers them reasonably foreseeable actions. The BLM has accounted for all 146 federal gas wells in the cumulative effects analysis for Alternative A.

- SGI added to its Proposed Action (Alternative B) the 12-89-7-1 APD and a wildlife habitat plan and replaced the size and number of compressor engines at the station outside the Unit boundary to the northwest (see **Figure 2-2**, Alternative B, Proposed Action). The new arrangement consists of three 3,550-horsepower engines housed in a larger muffled building. The State of Colorado (15GU0015) and Gunnison County (OG2014-05) have permitted this station. The affected environment and environmental consequences chapters were revised to reflect these changes in Alternative B.

- Alternative D, the BLM's Preferred Alternative

  o Well Pad Locations, Roads, and Pipelines. The BLM selected 33 well pad locations that present environmentally responsible development of the gas resource. Thirty-one pads were selected from Alternative B and two pads from Alternative C. Additionally, the BLM selected only those roads and pipelines needed to access the pads, resulting in a reduction of miles of road constructed

and cross-country pipelines. Minimization of cross-country pipelines was achieved through colocation of most pipelines into road routes; only those pipelines that could not follow roads (i.e., the road and pipeline were going in opposite directions) were placed cross-country. Roads and pipelines would also be placed to avoid elk habitat as much as possible.

o   The standard will be for closed loop systems to be used to eliminate pits on location and release of VOCs, unless due to resource considerations impacts can be demonstrated to be less when using a reserve pit system (no net benefit to using a closed loop system).

o   All EPA and COGCC requirements for use of green completion technologies will be considered when reviewing submitted APDs.

o   Remote monitoring (remote telemetry) will be applied to locations and facilities to minimize well monitoring trips throughout the Unit.

o   Incorporation of amendments to the Proposed Action from SGI: the 12-89-7-1 APD, the revised plans for a compressor station located outside the Unit, and the Wildlife Habitat Plan.

o   Air Quality design features. The air quality mitigation measures identified in Alternative B of the Draft EIS were incorporated in the Preferred Alternative (Alternative D).

o   Baseline Water Quality Monitoring. Commenters requested a baseline water quality monitoring program as part of the Master Development Plan. SGI conducts water quality sampling and monitoring as part of their State of Colorado requirements. This program will continue and the Preferred Alternative includes additional requirements to monitor for additional compounds. The BLM and SGI will also hold annual meetings to report findings from water quality monitoring.

o   Mitigation measures that were presented in **Section 4.2.5**, Geology, impact analysis are incorporated into the Preferred Alternative and they are analyzed as such in the impact analysis under Alternative D.

### 1.9.3   Changes to Other Chapters and Appendices

- **Appendix C**, Conditions of Approval, was refined to include only those actions that are pertinent to the Master Development Plan. Certain actions were eliminated from the appendix because they were redundant with other actions, represented requirements that the BLM and SGI must follow as a matter of law, or were stipulations on the existing leases.

- Additional literature provided by the public was reviewed and, when relevant, added to the baseline information in **Chapter** 3, Affected Environment.

- **Chapter 3**, Affected Environment, and **Chapter 4**, Environmental Consequences, were updated to reflect the new EPA ozone NAAQS of 70 ppb (released to the public October 1, 2015). The BLM's air quality technical specialists reviewed the analysis in Chapter 4 to ensure that the analysis was adequate when discussing ozone. The impacts discussion in the Final EIS is similar to what was described in the Draft EIS. Because the current analysis changes are not substantial or significant, supplementation to the Draft EIS resulting from the ozone standard change is not necessary.

  Note that the ozone contributions from the project have not changed and the project area and areas surrounding it are in attainment for the previous ozone NAAQS from 2008 (75 ppb). The EPA expects to issue detailed guidance on the designation process for the new NAAQS in early 2016; however, it has indicated that attainment designations for the 2015 NAAQS will be based on 2014-2016 data. State recommendations for designations of attainment and nonattainment areas are due to the EPA by October 1, 2016, and the EPA will finalize designations by October 1, 2017. Therefore, at the time of writing of this document, the attainment status of the project area and surrounding counties in western Colorado under the 2015 NAAQS is not yet known and the designations under the 2008 NAAQS remain in place. The nonattainment decisions are the purview of the EPA and the State of Colorado and therefore are beyond the scope of this document.

- The site-specific studies conducted for the 12-89-7-1 APD (Class III Cultural Resources Survey Report, Vegetation and Biological Report, and baseline water well water quality monitoring data) were incorporated into the affected environment and analyzed in the environmental consequences. See **Chapter 3**, Affected Environment, **Sections 3.2.4**, Water Resources, **3.2.6**, Vegetation, **3.2.8**, Fish and Wildlife, **3.2.10**, Special Status Species, and **3.2.12**, Cultural Resources.

- **Chapter 4**, Environmental Consequences, was updated with analysis related to the Preferred Alternative and was revised for consistency with **Chapter 3**, Affected Environment, including the new information related to the 12-89-7-1 APD.

- **Table 4-3** in Chapter 4, Cumulative Effects, was revised to provide a more comprehensive list of cumulative projects, past and future, and was used to support a more detailed analysis of cumulative impacts. Cumulative impacts were reviewed for consistency with the rest of the Final EIS.

- Additions were made to **Chapter 5**, Consultation and Coordination, to describe the public comment process on the Draft EIS and the results of the US Fish and Wildlife Survey's review of the biological assessment for the Bull Mountain MDP.

- **Appendix N**, Response to Comments on the Draft EIS, was added. It documents the substantive public comments received, summaries of the issues resulting from public input, and responses to public comments.

- In various chapters and appendices, clarifications were made on specific topics commenters found confusing or deficiently described, including implementation-level decisions.

- All comments citing editorial changes to the document were reviewed and incorporated as appropriate. The Final EIS was edited and revised to correct typographic errors, missing references, definitions, acronyms, calculations, and other inconsistencies.

This page intentionally left blank.

# Chapter 2
## Alternatives

# TABLE OF CONTENTS

Chapter                                                                                                    Page

**2. ALTERNATIVES** ................................................................................................ **2-1**

2.1 Introduction ........................................................................................... 2-1
2.2 Alternatives ........................................................................................... 2-1
    2.2.1 Alternative Development ............................................................. 2-1
    2.2.2 Alternatives Considered for Detailed Analysis ............................. 2-2
    2.2.3 Identifying the Preferred Alternative (Alternative D) .................. 2-3
    2.2.4 Summary of the Alternatives ...................................................... 2-3
    2.2.5 Elements Common to All Alternatives ........................................ 2-8
    2.2.6 Alternative A, No Action ........................................................... 2-13
    2.2.7 Alternative B, Proposed Action ................................................. 2-40
    2.2.8 Alternative C, Modified Action ................................................. 2-73
    2.2.9 Alternative D, the BLM's Preferred Alternative ......................... 2-86
2.3 Alternatives Considered but Eliminated from Detailed Analysis ................. 2-102
    2.3.1 Alternatives Considered and Eliminated during EA Development .. 2-102
    2.3.2 Alternatives Considered and Eliminated from EIS Development .... 2-103
2.4 Summary of Alternatives ......................................................................... 2-105
2.5 Summary of Impacts ............................................................................... 2-116

# TABLES                                                                                            Page

2-1 Traffic Estimates for Construction, Drilling, Completion, and Production Activities per Well Pad ................................................................................. 2-10
2-2 Project Feature Assumed Short- and Long-Term Disturbance Estimates ................. 2-12
2-3 Existing Features within the Unit ............................................................................ 2-12
2-4 McIntyre Flowback Pits ......................................................................................... 2-27
2-5 Bull Mountain Unit Annual Production Rates .......................................................... 2-30
2-6 Alternative A Traffic Estimates per Well Pad for Construction, Drilling, Completion, and Production Activities ...................................................................... 2-37
2-7 Alternative B Traffic Estimates for Construction, Drilling, Completion, and Production Activities ............................................................................................... 2-71
2-8 Alternative C Traffic Estimates for Construction, Drilling, Completion, and Production Activities ............................................................................................... 2-82
2-9 Alternative D Traffic Estimates for Construction, Drilling, Completion, and Production Activities ............................................................................................... 2-98
2-10 Summary of Actions by Alternative ....................................................................... 2-105
2-11 Stipulations, Design Features, and Mitigation Measures .......................................... 2-107
2-12 Summary of Surface Disturbance Acres by Alternative ........................................... 2-116
2-13 Estimated Total Traffic Round Trips for Drilling, Completion, and Production Activities by Alternative[1] .................................................................................... 2-117
2-14 Summary of Environmental Consequences by Alternative ....................................... 2-118

# FIGURES

Page

2-1    Alternative A, No Action ................................................................................... 2-14
2-2    Alternative B, Proposed Action ......................................................................... 2-41
2-3    Alternative B, C, and D 12-89-7-1 APD ............................................................. 2-43
2-4    Alternative B, Proposed Action Wildlife Habitat Plan .............................................. 2-44
2-5    Alternative C, Modified Action .......................................................................... 2-75
2-6    Alternative C, Constraints................................................................................ 2-76
2-7    Alternative D, BLM's Preferred Alternative .......................................................... 2-89
2-8    Alternative D, BLM's Preferred Alternative Wildlife Habitat Plan ............................. 2-90

# CHAPTER 2
# ALTERNATIVES

## 2.1   INTRODUCTION

This chapter details Alternatives A through C and the Preferred Alternative (Alternative D) for the Bull Mountain Unit MDP Final Environmental Impact Statement (Final EIS). The BLM identified a range of alternatives, including the No Action Alternative, the Proposed Action, the Modified Action, and the Preferred Alternative. The Proposed Action, Modified Action, and Preferred Alternative are based on the actions proposed by SGI, issues, concerns, and opportunities raised in public comments during scoping and comments on the Preliminary EA; interdisciplinary interaction between resource professionals; and collaboration with cooperating agencies.

The BLM NEPA Handbook (H-1790-1) also calls for expression of the BLM's preferred alternative in the Draft EIS if one exists (BLM 2008c). The BLM did not identify a preferred alternative for the Bull Mountain Unit Master Development Plan project at the Draft EIS stage, pending the review and analysis of public comments on the Draft EIS. Based on the review of public and internal BLM comments, the BLM has identified the Preferred Alternative in this Final EIS. A summary of the Preferred Alternative and how the BLM selected it is detailed below in **Section 2.2.3**, The Preferred Alternative (Alternative D).

Although the development activities anticipated in the alternatives would take place on federal and private mineral estate, the BLM's decisions are limited to federal lands and minerals. Those activities on BLM-administered mineral estate for the BLM's decision for the Bull Mountain Unit MDP must conform to the Uncompahgre Basin RMP (BLM 1989). See **Chapter 1**, Introduction, for further details regarding BLM authority.

## 2.2   ALTERNATIVES

### 2.2.1   Alternative Development

The CEQ regulations require an agency to consider significant issues when developing the range of alternatives to be considered in an EIS (43 CFR 1500.1, 1501.7, and 1502.1). As defined in the BLM's NEPA Handbook (H-1790-1, page 40), an issue is a point of disagreement, debate, or

dispute with a Proposed Action based on some anticipated environmental effect; an issue has elements that distinguish it from a position statement including:

- Has a cause and effect relationship with the Proposed Action or alternatives

- Is within the scope of analysis

- Has not been decided by law, regulation, or previous decision

- Is amenable to scientific analysis rather than conjecture

Issues point to environmental effects, and may lead to the identification of **design features** that are incorporated into the Proposed Action or an alternative, or to **mitigation measures**.

Issues relevant to the Bull Mountain Unit MDP EIS were identified during internal and external scoping for this EIS, as well as public comments submitted on the Bull Mountain Unit MDP EA, and are presented in **Section 1.8**, Key Issues Addressed in this EIS.

> **Design Features:** Specific means, measures, or practices that make up the Proposed Action and alternatives. They include construction activities, operating procedures, stipulations, and measures that reduce or avoid adverse environmental impacts.
>
> **Mitigation Measures:** Specific means, measures, or practices that would reduce or eliminate the effects of the Proposed Action or alternatives. They may be used to reduce or avoid adverse impacts, whether or not impacts are significant. A measure or practice is termed "mitigation measure" only if it has not been incorporated into the Proposed Action or alternatives. (See 40 CFR 1508.20 and BLM NEPA Handbook, H-1790-1, pages 44–45 and 61.)

### 2.2.2   Alternatives Considered for Detailed Analysis

The two action alternatives (Alternative B, the Proposed Action, and Alternative C, the Modified Action) and the Preferred Alternative (Alternative D) offer a range of possible management approaches for responding to the issues presented in **Section 1.8**, Key Issues Addressed in this EIS.

Meaningful differences among the alternatives are described in **Table 2-10**, Summary of Actions by Alternative. Figures following the description of each alternative provide a visual representation of differences between alternatives. GIS has been used to perform acreage calculations and to generate these figures. Calculations are dependent upon the quality and availability of data, and most calculations in this EIS are rounded to the nearest 10 acres or 0.1 mile. Given the general scale of the analysis and the compatibility constraints between datasets, all calculations are approximate and serve for comparison and analytic purposes only. Likewise, the figures are provided for illustrative purposes and subject to the limitations discussed above. The BLM may receive additional or updated data; therefore, acreages may be recalculated and revised during the analysis of future decisions.

Well pad and well locations, road alignments, pipeline routes, and other facility placements discussed in the Bull Mountain Unit MDP EIS alternatives are conceptually illustrated for the purposes of assessing the cumulative resource impacts of proposed development in the Unit. However, during development of the Final EIS, the BLM agreed to consider the 12-89-7-1 APD. As noted in **Section 1.3**, Decisions to be Made, this APD was submitted to the BLM, which inspected the site on May 16, 2011. The APD has been pending since October 25, 2012. By considering it in the Final EIS, it is now possible for the BLM to approve or reject the APD as

part of the ROD. (See **Section 1.3**, Decisions to be Made, and **Section 1.6.1**, Requirements for Future NEPA Analysis, for further details.)

### 2.2.3   Identifying the Preferred Alternative (Alternative D)

The BLM's NEPA handbook (H-1790-1) requires the BLM to identify a Preferred Alternative in the Final EIS. Formulated by the management and interdisciplinary team, the Preferred Alternative represents those goals, objectives, and actions determined to be most effective at resolving the issues, while allowing environmentally responsible development. While collaboration is critical in developing and evaluating alternatives, the final designation of the Preferred Alternative remains the exclusive responsibility of the BLM. The BLM has selected Alternative D as the Preferred Alternative, based on interdisciplinary team recommendations, environmental consequences analysis of the alternatives, cooperating agency input, and public input on the Draft EIS.

Comments submitted by other government agencies, public organizations, state and tribal entities, and interested individuals were given careful consideration. Public scoping and Draft EIS commenting efforts enabled the BLM to identify and shape significant issues pertaining to energy development, air resources, water quality and quantity, wildlife, and other program areas. Cooperating agencies participated, reviewed, and provided comments at critical intervals during the alternatives development process, as well as during the EIS process in general.

All of the action alternatives were developed to meet the purpose of and need for the project, while minimizing or mitigating environmental impacts. These objectives would be accomplished in Alternative D by incorporating the following key elements of Alternatives B and C:

- Including air quality and air quality related values COAs that limit emissions in order to keep levels below national standards

- Including actions and COAs that would reduce soil, vegetation, and water impacts (see **Appendix C**)

- Selecting well pad analysis areas that would impact wildlife habitat the least

- Implementing a wildlife habitat plan (see **Appendix C** for plan specifics)

These components of the Preferred Alternative are discussed more in **Section 2.2.8**, Alternative D, BLM's Preferred Alternative. The air measures and wildlife habitat plan in the Preferred Alternative have been voluntarily agreed to by SGI since the publication of the DEIS and in light of public comments received on the DEIS. Some of these measures may go beyond those required by the approved Uncompahgre RMP, regulations, statutes, or the terms of SGI's valid and existing leases; however, the company has voluntarily agreed to these components of the alternative and BLM will include them as COAs in the ROD.

### 2.2.4   Summary of the Alternatives

A brief, narrative introduction to each of the four alternatives is provided below. The phases of construction, drilling, completion, reclamation, and final abandonment are the same under all alternatives.

***Alternative A, No Action***

Under the No Action Alternative, the Bull Mountain Unit MDP would be denied, and the BLM would not approve the 12-89-7-1 APD.

If the BLM were to select Alternative A, it would mean that SGI could continue to submit APDs to COGCC for authorization to develop on private lands with private mineral estate and to submit individual APDs to the BLM in the future. Regarding COGCC submissions, the BLM does not approve or control development on these lands. For analysis purposes, the No Action Alternative addresses the development of private mineral estate only in recognition of the fact that federal mineral development would still occur with SGI submitting individual APDs to the BLM on a case-by-case basis. Up to 146 wells could be fully developed, but they would be spaced over an unknown time frame due to such factors as availability of drilling equipment, federal permit processing time, and the need for future NEPA analysis. This combination of federal mineral and private mineral development that would occur is discussed and analyzed in **Section 4.1.3**, Cumulative Effects.

The components described for Alternative A (e.g., development, construction, and drilling) are assumptions only. The BLM's analysis of the No Action Alternative assumes that previously authorized activities and activities on private mineral estate would continue and that federal mineral estate would be developed ad hoc without an MDP. Private mineral estate activities would occur as authorized by the COGCC.

**Figure 2-1**, Alternative A, No Action, presents the conceptual locations of potential well pads over areas currently thought to be most productive for natural gas development.

***Alternative B, SGI's Proposed Action***

Alternative B is specific to BLM-administered mineral estate, the BLM's authority, and the actions the BLM would approve under a master development plan. Alternative B describes the development that would occur on federal mineral estate in the Unit. As private mineral development would continue to occur outside the scope of a federally approved MDP and APD, the combination of federal mineral and private mineral development is discussed and analyzed in **Section 4.1.3**, Cumulative Effects.

After the Draft EIS was released, SGI modified its Proposed Action, as follows:

- Inclusion of the 12-89-7-1 well pad APD—This APD was submitted to the BLM, which inspected the site on May 16, 2011. The APD has been pending since October 25, 2012. The specific surface use plan of operations and drilling plan and other relevant information collected as part of the APD review process are provided in **Appendix O**. This site-specific information is a refinement of the types of development information described in **Section 2.2.5**, Elements Common to All Alternatives, and **Section 2.2.7**, Alternative B. For example, while **Section 2.2.5** describes many options and general information for how a well may be drilled (e.g., horizontal, vertical, or directional), the information in the 12-89-7-1 APD drilling plan provides specifics as to the type of drilling and downhole engineering for this well pad and natural gas well.

- New developments under the Proposed Action would be subject to the Bull Mountain Unit Wildlife Habitat Plan (WHP) submitted by SGI. The WHP would apply throughout development phase activities (construction, drilling, and completion); it would not apply to production or maintenance phase activities. The WHP with maps is found in **Appendix C**; the provisions found in it are included in the text descriptions below.

- Three of the stations would remain the same, with one 637-horsepower, screw compressor engine in an appropriately sized and muffled building. The fourth station (outside the Unit boundary to the northwest) would consist of three 3,550-horsepower engines housed in a larger muffled building. The State of Colorado (15GU0015) and Gunnison County (OG2014-05) have permitted this station.

- The pipeline that ran east-west through T12S, R89W, Sections 7, 8, and 9 would be replaced with the Volk and Medved pipelines that run north-south from T12S, R89W, Section 9 to T11S, R89W, Section 29. The length and route of the pipeline has been updated to reflect this change.

**Table 2-11**, Stipulations, Design Features, and Mitigation Measures, lists plans and strategy documents that would apply to federal APDs, including a master surface use plan of operations and a master drilling plan (see **Appendix D** and **E**, respectively). These plans would be revised to reflect the specifics of an APD, design features, and current lease stipulations.

When the analysis in **Chapter 4**, Environmental Consequences, indicated the need for mitigation to address adverse impacts, BLM analyzed the COAs listed in **Appendix C** or suggested additional measures to evaluate the effectiveness of the measures in reducing or eliminating effects. These include the following additional mitigation measures that may be included as COAs on the 12-89-7-1 APD and any future APD:

- The COAs listed in **Appendix C**

- Geologic hazard measures, the same as those noted above for Alternative A, No Action

- Air quality and AQRV control measures

**Figure 2-2**, Alternative B, Proposed Action, presents the conceptual locations of potential well pads over areas currently thought to be most productive for natural gas development.

If Alternative B is approved, the operations and development of private minerals described in Alternative A would continue to be implemented. All actions would be in compliance with all laws, regulations, and BLM policies. These include the BLM Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (DOI and USDA 2007), Manual 9113 (BLM 1985), and additional requirements from the Uncompahgre Basin RMP (BLM 1989).

### Alternative C, the BLM's Modified Action

Alternative C was developed by modifying the GIS model to minimize surface disturbance by putting greater emphasis on soil types and proximity to existing roads and collocating roads and pipelines. This in turn would reduce the miles of roads and pipelines needed to service the pad

sites (see **Appendix A** for additional details). The phases of development, development methods, and actions anticipated during construction, drilling, completion, production, and reclamation of Alternative C are similar to Alternative A. However, like Alternative B, this alternative is specific to BLM-administered mineral and surface estate, the BLM's authority, and the actions it would approve under an MDP.

Alternative C provides additional features and changes to actions in order to consider options for addressing the impacts of gas development on wildlife populations, vegetation resources, water quality, air quality, and soil resources. It includes the following as design features:

- Seasonal winter timing limitations or a progressive development approach, which would limit drilling and construction over private and federal minerals to no more than one-quarter of the Unit in any given period (December 1 to April 30)

- The COAs listed in **Appendix C**

- Geologic hazard measures the same as those noted above for Alternative A

- Air quality and AQRV control measures, including a requirement to apply dust abatement to unpaved roads to achieve at least 50 percent control during all construction and development phases and the use and operation of pneumatic devices, tanks, and dehydrators in accordance with CDPHE and EPA Oil and Gas Regulations

- A requirement for an annual meeting to plan and discuss an annual construction and operational activities plan, the order for development phasing around the Unit to avoid widespread impacts on wintering big game species, and the reclamation monitoring status report

- Annual raptor nesting surveys to identify raptor nests within 0.25 mile of surface-disturbing activities from April 15 to July 15 or until young of the year have fledged and avoidance of occupied nests from April 15 to July 15

- A requirement to prevent accumulated water on pads from draining into wetlands or riparian areas

- Control of noxious weeds

Like Alternative B, if Alternative C is approved, the operations and development of private minerals described in Alternative A would continue to be implemented. The combination of federal mineral and private mineral development is discussed and analyzed in **Section 4.1.3**, Cumulative Effects.

### *Alternative D, the BLM's Preferred Alternative*

Alternative D is based on interdisciplinary team recommendations, environmental consequences analysis of the alternatives, cooperating agency input, and public input on the Draft EIS. Comments submitted by other government agencies, public organizations, state and tribal entities, and interested individuals were given careful consideration. Public scoping and Draft

EIS commenting enabled the BLM to identify and shape significant issues pertaining to energy development, air resources, water quality and quantity, wildlife, and other program areas. Cooperating agencies participated, reviewed, and provided comments at critical intervals during the alternatives development process and the EIS process in general.

Additional design features of Alternative D resulting from public input on the Draft EIS are the following:

- The measures identified in SGI's Wildlife Habitat Plan (**Appendix C**)

- All of the air quality and AQRV control and monitoring measures, noxious weeds measures, and other measures noted in Alternative C

- Baseline water quality monitoring measures

The amendments proposed by SGI in the Proposed Actions also apply to Alternative D as noted here:

- Inclusion of the 12-89-7-1 well pad APD—This APD was submitted to the BLM, which inspected the site on May 16, 2011. The APD has been pending since October 25, 2012. The specific surface use plan of operation and drilling plan and other relevant information collected as part of the APD review process are provided in **Appendix P**. The site-specific information is a refinement of the types of development information described in **Section 2.2.5**, Elements Common to All Alternatives, and **Section 2.2.7**, Alternative B. For example, while **Section 2.2.5** describes many options and general information for how a well may be drilled (e.g., horizontal, vertical, or directional), the information in the 12-89-7-1 APD Drilling Plan provides specifics as to the type of drilling and downhole engineering for this well pad and natural gas well.

- New developments under the Preferred Alternative would be subject to the Bull Mountain Unit WHP submitted by SGI. The WHP would apply throughout development phase activities (construction, drilling, and completion); it would not apply to production or maintenance phase activities. The WHP with maps is found in **Appendix C**.

- Three of the stations would remain the same, with one 637-horsepower, screw compressor engine in an appropriately sized and muffled building. The fourth station (outside the Unit boundary to the northwest; see **Figure 2-2**) would consist of three 3,550-horsepower engines housed in a larger muffled building. The State of Colorado (15GU0015) and Gunnison County (OG2014-05) have permitted this station.

- The pipeline that ran east-west through T12S, R89W, Sections 7, 8, and 9 would be replaced with the Volk and Medved pipelines that run north-south from T12S, R89W, Section 9 to T11S, R89W, Section 29. The length of the pipeline has been updated to reflect this change.

Similar to Alternatives B and C, if Alternative D were approved, the operations and development of private minerals described in Alternative A would continue to be implemented. The

combination of federal mineral and private mineral development is discussed and analyzed in **Section 4.1.3**, Cumulative Effects.

### 2.2.5 Elements Common to All Alternatives

The following alternatives describe the range of possible actions that the BLM is considering in the EIS. There are several phases of the project and assumptions that would be the same across all alternatives. To eliminate redundancy and streamline presentation, those elements common to all alternatives are presented first, followed by the elements unique to each individual alternative. The actions are also summarized in **Table 2-10**, Summary of Actions by Alternative, and **Table 2-12**, Summary of Surface Disturbance Acres by Alternative, at the end of the chapter.

The life cycle of an individual well and its associated facilities and required infrastructure (e.g., roads, pipelines, and compressor stations) is composed of eight primary phases: siting, construction, drilling, completion, interim reclamation, production and maintenance, final wellbore abandonment, and reclamation. A siting design and constraints analysis for well pad placement was conducted as part the Bull Mountain EA and has been carried forward to determine approximate siting for the EIS. The siting design and constraints analysis was used as a baseline for all alternatives and is described below. Additionally, due to uncertainties for site-specific locational information, several assumptions have been made for all alternatives and are provided in the section titled *Assumptions Common to All Alternatives*. Specific details of the remaining seven phases are described in each alternative.

#### *Siting*

As explained in detail in **Appendix A**, Well Pad Site Suitability Models and Methodology, GIS was utilized to find sites with respect to a number of environmental resource constraints. The GIS analysis was used by SGI to propose locations of well pads, roads, pipelines, and other infrastructure and utilized in all alternatives. GIS was also used to modify locations in Alternative C (see additional details in **Section 2.2.6**, Alternative C, Modified Action).

It is important to note that the locations of proposed well pads, access roads, pipelines, compressor stations, and other surface facilities for each alternative illustrated on **Figures 2-1** to **2-3** are conceptual in nature and may be modified at a later stage (e.g., during consideration of an APD), as noted above. Field verification of proposed locations is described in **Appendix A**. Drilling proposals would conform to the COGCC regulations and policies and to the objectives of the site selection model as described in **Appendix A**. On BLM-administered surface or mineral estate, where reasonably practicable, the on-site determinations would conform with the objectives of the site selection model and as described in the BLM Instruction Memorandum No. 2004-194: Integration of Best Management Practices into Application for Permit to Drill Approvals and Associated Rights of Way, IM 2013-033: Reducing Preventable Causes of Direct Wildlife Mortality Associated with Fluid Mineral Facilities Authorized by the BLM, and the BLM/Forest Service publication Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development – The Gold Book (The Gold Book [DOI and USDA 2007]).

#### *Assumptions Common to All Alternatives*

Several assumptions have been made for all alternatives and are provided below.

- Rate of development: SGI anticipates using three drilling rigs to drill multiple wells per rig per year. It is assumed that SGI would drill up to 27 wells each year. The full-field development time frame will differ based on the number of wells proposed under each alternative, as well as additional delay time for permitting.

- Wells would be drilled to develop productive formations in the Unit including the Cameo, South Canyon, and Coal Ridge coal formations, the Cozzette and Corcoran sandstone formations, and the Mancos shale formations.

- The extent of such development and prospective nature of the resources is based on geologic information, data derived from wells drilled to date, and economic factors. The resource is expected to be productive over the entire Unit; however, it is possible for some areas to have more favorable economics than other areas due to varying reservoir qualities. It is possible that areas currently identified for development may not be economically viable; as a result, some of the proposed well pads and wells may not be constructed and drilled.

- The well-head density needed to develop the resources is expected to vary depending on the formation being developed. The geologic characteristics of the individual formations in the Unit would dictate this density. The ultimate well-head density per well pad would be defined through future drilling, and resource and formation analysis. Again, these well-head densities refer to downhole/bottomhole wellbore densities. SGI would use directional drilling and multiple well pad drilling and completion techniques to develop these resources that would minimize the number of well pads or surface locations.

  The number of wells per well pad would vary depending on the required downhole well density and how many directional wells can be drilled from the location, whether or not both shallow and deep horizons are being developed, and topographic considerations. For the purposes of analysis, the assumption is that, on average, there could be four to five wells on any individual well pad; however, depending on the factors noted above, an individual well pad could have one well or up to twelve wells per pad. Some of the new gas wells would be drilled on the existing water disposal or gas well pads. The quantity and combination of coal bed methane natural gas, sandstone gas wells, and shale gas wells on each pad is not known at this time but would be determined at the APD stage.

  Wellbores on multi-well pads would be offset in a line 15 to 20 feet from the previous wellbore. If more than approximately 6 wells are to be drilled from a well pad, parallel lines of wells spaced up to 15 to 20 feet apart may be employed.

- Across all alternatives, the life of any individual well is estimated to be 40 years based on use of current technologies and production methods, although the actual productive life of a single well may vary. This includes all oil, gas, and water disposal wells, although the actual production years may vary for individual wells. It is assumed for the purposes of analysis that the life of the project would be 50 years, but future technological advances and increased production efficiency may extend the life of the project beyond 50 years.

- The number of employees working in the Unit during the construction, drilling, and completion phases would depend on the number of drilling rigs operating at any one time. In addition to the workforce associated with well pad construction, and drilling and completion operations, personnel and contractors could be in the Unit during the construction or improvement of roads, installation of pipelines, and construction of new compressor stations or other surface facilities. These employment numbers would also vary depending on the amount of infrastructure proposed and the pace and level of development. Estimates are presented under each phase in each alternative.

  Employment for production operations and well service would depend on the number of producing wells at any one time. The number of operations and service personnel would grow over time as the number of producing wells increased, but employment for production operations and well force would amount to a small percentage of the total workforce.

  If the current employment patterns are maintained, the workforce and contractors associated with the project would be stationed in the areas of Grand Junction, Montrose, Delta, Paonia, Hotchkiss, Glenwood Springs, and Gunnison, Colorado.

- Reserve pit fences would be constructed and maintained according to the permitting agency requirements.

- All alternatives assume a standard traffic rate per well pad that will be used for calculations. **Table 2-1**, Traffic Estimates for Construction, Drilling, Completion, and Production Activities per Well Pad, presents the traffic that could occur for each individual well pad. Actual traffic volumes would vary depending on the level of drilling activity, the specific operations that might be underway at a well pad and the maturity of the project at any particular time. Actual and specific volumes will be determined in future APDs and disclosed in associated NEPA documents, as appropriate.

**Table 2-1**
**Traffic Estimates for Construction, Drilling, Completion, and Production Activities per Well Pad**

| Vehicle Type | Average Weight (Pounds) | Estimated Round Trips |
|---|---|---|
| Vehicles for pad and access road construction | | |
| Gravel trucks | 110,000 | 160 |
| Semi trucks | 37,000 | 4 |
| Pickup trucks | 6,000 | 40 |
| Motor grader on semi-trailer | 40,000 | 1 |
| Dozer (2) on semi-trailer | 19,000 | 2 |
| Track hoe on semi-trailer | 43,000 | 1 |
| Pipeline construction | | |
| Motor grader on lowboy trailer with truck | 50,800 | 2 |
| Bulldozer on lowboy trailer with truck | 120,000 | 2 |
| 80-barrel water trucks for dust control | 54,000 loaded | 20 |
| 80-barrel water trucks for hydrostatic testing | 25,000 empty | 2-4 |
| Track hoe on lowboy trailer with truck | 91,000 | 2 |

**Table 2-1**
**Traffic Estimates for Construction, Drilling, Completion, and Production Activities per Well Pad**

| Vehicle Type | Average Weight (Pounds) | Estimated Round Trips |
|---|---|---|
| Welding trucks | 9,500 | 2 |
| Crew cab pickups | 5,200 | 40 |
| Bending machine/trailer | 48,000 | 2 |
| Side booms on lowboy trailer with truck | 63,000 | 2 |
| X-ray truck | 5,200 | 4 |
| Testing truck | 6,000 | 2 |
| Pipe trucks | 120,000 loaded | 1 |
|  | 36,000 unloaded | 1 |
| Utility tractor and truck with lowboy trailer | 40,000 | 2 |
| Vehicles for drilling/completing first well on the pad | | |
| Drilling/completion rig | 120,000 | 1 |
| Rig-up trucks loaded (e.g., cement or fracturing) | 120,000 | 25 |
| Rig-up trucks empty | 36,500 | 4-6 |
| 80-barrel water trucks loaded | 54,000 | 40 |
| 80-barrel water trucks empty | 25,000 | 40 |
| Crew-cab pickups | 6,000 | 40 |
| Vehicles for drilling/completing subsequent wells on the same pad | | |
| Motor grader | 50,000 | 2 |
| Drilling/completion rig | 120,000 | 2 |
| Rig-up trucks loaded (e.g., cement or fracturing) | 120,000 | 25 |
| Rig-up trucks empty | 36,500 | 4-6 |
| 80-barrel water trucks loaded | 54,000 | 45 |
| 80-barrel water trucks empty | 25,000 | 45 |
| Pickup trucks | 6,000 | 40 |
| Vehicles for well production | | |
| Pickup trucks for workovers | 6,000 | 16 rountrips per well workover |
| Workover rig | 120,000 | 1 roundtrip per well workover |
| Haul trucks | 120,000 | 6 |

- All alternatives assume a standard area of disturbance that will be used for calculations. Due to the unknown number of wells per pad and actual alignments for roads and pipelines, the disturbance areas used are estimates only and were developed based on the assumption that the disturbance area would need to be large enough to reasonably accommodate future permitted construction or realignments. Additionally, an adequately sized well pad would accommodate the drilling equipment while providing a safe offset from other existing wellbore(s). **Table 2-2**, Project Feature Assumed Short- and Long-Term Disturbance Estimates, presents the assumed short- and long-term estimates. Actual and specific well pad size, pipeline width or road width will be determined in future APDs and analyzed in subsequent NEPA actions.

**Table 2-2**
**Project Feature Assumed Short- and Long-Term Disturbance Estimates**

| Project Feature | Short-Term Surface Disturbance | Long-Term Surface Disturbance |
|---|---|---|
| Well pads | | |
| New well pads | 5 acres | 2 acres |
| Existing well pads | 2 acres | 2 acres |
| Access roads (width) | | |
| Existing improved roads | 0 feet | 16 feet |
| Upgrades to existing 2-track roads | 25 feet | 16 feet |
| New road construction | 25 feet | 16 feet |
| Pipelines (analysis area) | | |
| Collocated with roads | 100 feet | 16 feet |
| Not collocated with roads (cross country) | 50 feet | 0 feet |
| Facilities | | |
| Compressor station | 5 acres per station | 2 acres per station |

Note: Estimated acreages according to the assumed short- and long-term disturbance are for analysis purposes. The permitted rights-of-way for construction would cover fewer acres.

### Existing Facilities

There are already existing well pads, wells, roads, pipelines, and other facilities within the Unit to which any alternative (including No Action) would add developments. Listed below in **Table 2-3**, Existing Features within the Unit, are the current number of productive/active pads, wells, facilities, and miles of roads that would remain consistent across all alternatives.

**Table 2-3**
**Existing Features within the Unit**

| Feature | Number of Features or Miles of Road |
|---|---|
| Well pads | 18 |
| Natural gas wells | 17 |
| Water disposal wells | 1 |
| Access roads currently suitable for use | 23 miles |
| Pipelines collocated with roads | 6 miles |
| Pipelines cross-country | 13 miles |
| Overhead electrical lines (to water disposal well) | 1 |
| Flowback pits | 4 |
| Existing storage yard outside the Unit | 1 |
| Existing storage yard inside the Unit | 1 |

As noted above in the table, SGI would use an existing equipment storage yard located on private land at the Forest Service boundary outside of the Unit, as well as existing well pads to temporarily house construction equipment, vehicles, pipe and pipe welding materials, hydraulic fracturing tanks, production equipment, and other standard gas field equipment. The existing storage area would be used continuously throughout the project development phase. Storage of sensitive or hazardous materials would be handled in compliance with all applicable federal and State of Colorado regulations. Temporary use of existing pads for equipment storage would occur with appropriate permitting and notice to agencies and landowners at the APD stage of development. These locations would be chosen to accommodate nearby construction, drilling, and completion activities. Upon completion of the development phase of the project, or when

storage areas are no longer needed, all remaining equipment would be removed and the storage areas would be reclaimed according to standards of the appropriate surface management agency.

A complete listing of producing, active, inactive, closed, abandoned, dry, and plugged features are listed in **Section 3.3.2**, Minerals.

## 2.2.6   Alternative A, No Action

NEPA regulations require that the EIS alternatives analysis "include the alternative of no action" (40 CFR 1502.14(d)). The No Action Alternative does not respond to the purpose and need for the Proposed Action. Rather, it serves as a baseline for comparing the Proposed Action's and alternatives' environmental effects (including cumulative effects) and it illustrates the consequences of not meeting the stated purpose and need. Under the No Action Alternative, the Bull Mountain Unit MDP would be denied, but the BLM could approve the 12-89-7-1 APD.

If the BLM were to reject an MDP, SGI could continue to submit APDs to COGCC for authorization to develop on private lands with private mineral estate and could submit individual APDs to the BLM in the future. Regarding COGCC submissions, the BLM does not approve or control development on these lands. For analysis purposes, the No Action Alternative addresses the development of private mineral estate only. In recognition of the fact that federal mineral development would likely still occur with SGI submitting individual APDs on a case-by-case basis, this combination of federal mineral and private mineral development is discussed and analyzed in **Section 4.1.3**, Cumulative Effects.

As noted in **Section 2.1.1**, Elements Common to All Alternatives, the eight phases of the project (siting, construction, drilling, completion, interim reclamation, production and maintenance, final wellbore abandonment, and reclamation) are uniform across all alternatives; however, the actions differ as to how the phases are completed and what additional environmental protections would be required. The BLM's analysis of the No Action alternative assumes that previously authorized activities and activities on private mineral estate would continue and that federal mineral estate would be developed ad hoc without an MDP. Private mineral estate development would occur as authorized by the COGCC.

**Figure 2-1**, Alternative A, No Action, presents the conceptual locations of potential well pads over areas currently thought to be most prospective for natural gas development.

### *New Developments*

Alternative A comprises up to 55 new natural gas wells on privately owned surface lands targeting private minerals. The 55 wells would be built on existing well pads and as many as 10 new well pads. There would be one new water disposal well, construction of new pipelines and some new roads, and upgrades to existing roads. Based on these numbers, a total of 56 new wells drilled, and the assumed drilling rate noted in the common assumptions, the BLM estimates that drilling activities would occur for approximately 3 years.

The average number of wells per pad would be the same as that described above in **Section 2.2.4**, Elements Common to All Alternatives. One of the new well pads would be constructed specifically to drill and maintain a new water disposal well. Some of the new gas wells would be

Alternative A, No Action

- Proposed well pad analysis area
- Proposed screw compressor
- Proposed pipeline
- Proposed new road construction
- Existing road requires upgrade for use

Existing Infrastructure

- Existing storage yard
- Existing road currently suitable for use
- Existing pipeline
- Federal surface, federal minerals
- Private surface, federal minerals
- Private surface, private minerals

## Alternative A, No Action

The No Action alternative is specific to previously authorized activities and activities on private (fee) lands/private (fee) mineral estate.

Figure 2-1

drilled on the existing water disposal well pad; however, the quantity and combination of conventional sandstone, coal bed methane natural gas, and shale gas wells on each pad is not known at this time and would be determined at the permitting stage.

### Construction

Implementation of any alternative would require the construction of roads, well pads, pipelines, and ancillary facilities.

### Access Road Construction

The primary access roads within the Unit are State Highway 133 and County Road 265. In addition to these primary access roads, gas development of the Bull Mountain Unit would require the construction and improvement of multiple access roads some of which would cross private lands overlying federal mineral estate. Site-specific plans for road construction and upgrades would be included as part of individual future State APDs and would be subject to approval from the County and/or landowners.

New road construction and improvements of existing roads would typically require the use of motor graders, crawler tractors, 10-yard end dump trucks, and water trucks. The standard methodology for building new roads involves the use of a bulldozer or track hoe to segregate and windrow the vegetation to one side of the route, remove topsoil to the opposing side of the route, and rough-in the roadway. As access roads would be constructed using standard crown-and-ditch specifications, a grader or bulldozer would establish barrow ditches and crown the road surface. Roads would be constructed with appropriate drainage and erosion-control features/structures (e.g., cut-and-fill slope and drainage-ditch stabilization, relief and drainage culverts, water bars, wing ditches, and rip-rap). On roads with grades between 3 and 15 percent, rolling dips could be used rather than culverts. Where culverts are required, a track hoe or backhoe would trench the road and install the culverts. Some hand labor would be required when installing and armoring culverts.

The new roads and improved existing road surfaces would be composed of an appropriate volume of road base compacted using a roller and freshwater as necessary. Approximately 6 to 8 inches of road base would be used in road construction and reconstruction. Road base or gravel needed would be hauled in and a grader used to smooth the running surface. Rock, road base, and gravel materials for all uses would be obtained from local permitted, commercial sources outside the Unit near Paonia and either Carbondale or Delta, Colorado. Specifics on where the source materials would be obtained from would be identified on the individual APD when submitted. Upgrade and graveling of these roads would occur as necessary to maintain the post-construction surface quality.

Freshwater would be used in initial road construction and rock/gravel surfacing to improve the workability of the soil and the rock and gravel, and for dust abatement. Freshwater needed for access road construction would be obtained from nearby sources (per agreements with landowners), or would be under the guidance of SGI's water augmentation plan (see **Appendix L**, Bainard Augmentation Plan). Freshwater application to roads for dust abatement would be applied to the road more frequently as traffic volumes increase and according to weather patterns. Approximately 5,000 to 8,000 gallons of freshwater may be used each day to control fugitive dust per mile during dry months (for example in a typical June). Approximately 2,000 to

5,000 gallons of freshwater may be used to control fugitive dust per mile of road during wet months (for example during a typical August).

On average, SGI estimates that roads would be constructed at a rate of approximately 600 to 800 yards per day. Spur roads to individual well pads would be constructed immediately prior to well pad construction. Each spur road workforce would include an average of five personnel to operate the equipment. For trunk roads (i.e., those providing access through the Unit or to multiple well pads), several crews could operate simultaneously on different roads or different portions of the same road. Total personnel working on trunk road construction or improvements could range in size from 6 to12 individuals.

*Well Pad Construction (Gas and Water Disposal Wells)*
Prior to individual well pad construction, SGI would obtain approval of an APD by the COGCC. Each application would contain site-specific details related to well pad size, construction and well operations, and mitigation measures; possible mitigation measures that could be applied as COAs for the drilling permit are noted in **Appendix B**, Construction, Drilling, Completion, and Reclamation. COGCC would apply its own measures to mitigate potential environmental impacts, but it could adopt the measures identified in **Appendix C**, Design Features, Mitigation Measures, and Conditions of Approval, based on the analysis contained in this EIS. COGCC would consult with CPW, CDPHE, the local government designee, and the landowner before applying its own measures to mitigate potential environmental impacts.

Construction of a typical well pad would entail the use of bulldozers, motor graders, Class 125 or larger track hoes, backhoes, compacters, and 10- to 20-yard dump trucks. Well pad construction equipment needs would vary depending on site-specific conditions; however, methods for construction would be the same for all types of natural gas well pads and water disposal well pads proposed.

Within the approved well pad location, a leveled area would be graded by a bulldozer after or simultaneously with upgrade/construction of an access road to the well site. Standard cut-and-fill construction techniques and machinery (bulldozer or grader) would be used; stockpile, cut, and fill locations within the well pad construction area would be specified on the APD. Vegetation would be cleared and all available topsoil to a depth of 8 to 12 inches would be stockpiled and segregated from subsoils over the entire disturbed surface to create the well pad area. The well pad would be surfaced using "pit run," or equivalent material, which generally consists of rock less than 6 inches in diameter. The area within the anchor bolt pattern and around tank batteries or facilities would also be surfaced with a top dressing of 3-inch road base. Pit run and road base would both be trucked in to the site from local gravel pits near Carbondale, Delta, Paonia, or other local areas. If the well location requires only minimal grading, 8 inches of topsoil would be salvaged from the entire disturbed surface and stockpiled in contiguous berms or stockpiles at the edges of the well pad to facilitate future reclamation. Stockpiled topsoil would be protected against wind and water erosion and seeded with approved seed mix concurrent with cessation of well pad construction and earth-moving operations. Native seed mixes would be required for reclamation.

On average, five personnel, mostly equipment operators, would work on the construction of an individual well pad. Construction of an individual well pad could take from 1 to 3 weeks

depending on the features of each particular site. Under Alternative A, SGI has a range of possible drilling methods that could be used, including a system that utilizes a reserve pit or one that does not use a pit (referred to as "closed-loop"). If SGI utilized a drilling system with a reserve pit to hold drill cuttings and fluids, a lined reserve pit system would be constructed on the well pad. The reserve pit sizes vary with well type and site conditions, but would typically be approximately 50 feet by 150 feet and lined with an impermeable minimum 24-mil plastic liner so as not to leak, break, or allow discharge. The reserve pit would be fenced on three sides during drilling and on the fourth side immediately after the removal of the drilling rig. The well pad itself may also be fenced. Bird netting would be installed over the pit within 24 hours and silt fencing would be installed around the base of the fences. Two feet of freeboard is required at all times. Any reserve pits, which are left open over the winter months, would be fenced to keep big game and wildlife off of the pits. Pits would have a 2-foot unlined berm in addition to the minimum 2 feet of freeboard around them to prevent snowmelt on the pad from flowing into pits.

Fill from the pit would be stockpiled along the edge of the pit and the adjacent edge of the well pad. Use of erosion control measures, including proper grading to minimize slopes, diversion ditches, mulching, riprap, fiber matting, temporary sediment traps, and broad-based drainage dips would be employed by SGI as necessary and appropriate to minimize erosion and surface runoff during well pad construction and operation.

*Pipeline Construction*
Pipelines would be necessary to transport gas from producing wells to the existing sales gas pipeline and to transport produced water to proposed water disposal wells or flowback pits. The following sections describe the various pipeline construction phases, which are typical for this type of development.

Clearing and Grading
At the start of pipeline construction, the route would be cleared of vegetation to remove any obstacles or debris. Grading would follow to remove the topsoil and surface rock, and stockpile it within the edge of the route for redistribution following construction. All brush and other materials that are cleared would be windrowed within the route or in temporary use areas. If the pipeline is not collocated with a road, then these materials may be dispersed over the route to impede future access along it following construction. Trees and rocks would be strategically placed on the pipeline corridor to impede future access as stipulated by individual permit conditions or surface landowner agreements.

Trenching
Construction methods used to excavate a trench would vary depending on soil, terrain, and related factors. Rotary trenching machines would be used where possible. In situations such as steep slopes, unstable soils, high water tables, or deep or wide trench requirements, conventional tracked backhoes (track hoes) would generally be used. Highway crossing methods and construction requirements would be according to the Colorado Department of Transportation (CDOT) permit stipulations and general conditions as necessary.

Measures would be taken during construction to ensure that access is provided for property owners, tenants, or ROW holders to move vehicles, equipment, and livestock across the trench where necessary. Adequate precautions would also be taken to ensure that livestock are not

prevented from reaching water sources because of the open trench. These would include contacting livestock operators, providing adequate crossing facilities, fencing, or other measures as needed.

If a pipeline should be routed to cross a road or wetland, SGI could utilize a pipeline bore for the crossing. If boring were utilized, the bore operations would be set up outside of the wetland or road right-of-way, and designed to minimize impacts on these features. Temporary use areas before and after the feature to be bored may be needed, and would vary in size depending on the terrain and the size of the feature to be bored. Specific route determinations, siting design, and boring methods would be determined at the permitting stage.

Pipe Installation

Gas gathering and subsurface water pipelines would be constructed of steel. Pipe installation would include stringing, bending for horizontal or vertical angles in the alignment, welding the pipe segments together, x-ray inspection, coating the joint areas to prevent corrosion, and then lowering-in and padding.

- Stringing. Line pipe would be trucked directly from the manufacturer or a contractor storage yard to the corridor. Each individual joint of pipe would be unloaded, and strung parallel to the trench. Sufficient pipe for road or stream crossings and steep slopes would be stockpiled at staging areas near the crossings or slope. Stringing operations would be coordinated with trenching and installation activities to properly manage the construction time at a particular tract of land. Gaps would be left at access points across the trench to allow crossing of the corridor.

- Bending. After the joints of pipe are strung along the trench but before the joints are welded together, individual joints of the pipe would be bent if necessary to accommodate horizontal and vertical changes in direction. Field bends would be made utilizing a hydraulically operated bending machine. Where the deflection of a bend exceeds the allowable limits for a field-bent pipe, factory (induction) bends would be installed.

- Welding. After the pipe joints are bent, the pipe would be lined up end-to-end and clamped into position. The pipe would then be welded in conformance with 49 CFR Part 192, Subpart E. "Welding of Steel Pipelines" and API 1104, "Standard for Welding Pipelines and Related Facilities," latest edition.

- X-Ray Inspection. Welds would be visually inspected by a qualified inspector using non-destructive radiographic methods according to CDOT requirements. A specialized contractor, certified to perform radiographic inspection, would be employed to perform this work. Any defects would be repaired or cut out as required under the specified regulations and standards.

- Coating. To prevent corrosion, the pipe would be externally coated with fusion-bonded epoxy coating prior to delivery. Power Crete-coated pipe would be installed in all bore locations unless the pipe is cased. After welding, field joints would be sandblasted, flocked, and coated with a synergy coating. Before the pipe is lowered into the trench, the

pipeline coating would be visually inspected and tested with an electronic detector, and any faults or scratches would be repaired.

- Lowering-In and Padding. Once the welding, inspection, and joint coating has been completed, a section of the pipe would be lowered into the trench. Side boom tractors would be used to lift the pipe, position it over the trench, and lower it into place. Inspection would be conducted to verify that minimum cover is provided, the trench bottom is free of rocks or other debris, external pipe coating is not damaged, and the pipe is properly fitted and installed into the trench. Specialized machines would be used to sift soil fines from the excavated subsoils to provide rock-free pipeline padding and bedding. In rocky areas, padding material or a rock shield would be used to protect the pipe.

- Backfilling. Backfilling would begin after a section of the pipe has been successfully placed in the trench and final inspection has been completed. Backfill would be conducted using a track hoe, rotary auger backfilled, padding machine, or other suitable equipment. Backfilling of the trench would generally use the subsoil previously excavated from the trench, except in rocky areas where imported select fill material may be needed. Backfill would be graded and compacted by tamping or walking-in with a wheeled or tracked vehicle. Compaction would be performed to 95 percent maximum density as determined by AASHTO T-99 at all county road crossings. Backfill of trenches would not be performed where the soil is frozen to the extent that large consolidated masses have formed that would not "break down." The contractor would then re-spread the previously segregated topsoil to return the surface to its original grade. Any excavated materials or materials unfit for backfill would be utilized or properly disposed of in conformance with applicable laws or regulations. The construction contractor would place a mound over the trench approximately 6 inches high to account for subsidence. The entire construction zone would be seeded in the first appropriate season after disturbance.

- Pressure Testing. The entire pipeline would be tested in compliance with USDOT regulations (49 CFR Part 192). Prior to filling the pipeline for a pressure test, each section of the pipeline would be cleaned by passing reinforced poly pigs through the interior of the line. Incremental segments of the pipeline would then be filled with compressed water, air, or natural gas to the desired maximum pressure (up to 720 pounds per square inch), and held for the duration of the test (8 hours minimum if USDOT regulations apply). The compressed air would be discharged into the atmosphere following the completion of the test. Notification to all nearby residents as well as the Gunnison County Dispatch Center would be made prior to the pressure test and blow down. Water discharge, if necessary, would occur into upland areas, on gentle slopes, and would be conducted in accordance to the conditions and stipulations in CDPHE's Colorado Discharge Permit System for Hydrostatic Testing of Pipelines Tanks and Similar Vessels. These conditions and stipulations require permit-specific sampling, testing, filtering or mitigation, reporting, and a plan to prevent soil erosion or impacts on surface waters.

Gathering pipelines for individual well pads would consist of 6- to 8-inch outer diameter pipeline, and be designed for 720 pounds per square inch. Each gathering line would tie into a larger trunk line with a 12- to 16-inch outer diameter, which would eventually transport the gas to the Bull Mountain Pipeline; carsonite pipeline markers would be installed on the surface and tracer wire would be installed for all buried pipelines. The dimensions of the pipe used would be dependent on the number of wells served and production estimates.

Between 10 and 25 construction and supply-related personnel would be needed to install new sections of pipeline gathering system. All gas pipelines would be constructed to applicable American Petroleum Institute/industry standards.

*Overhead Electrical Line Construction for Water Disposal Wells*

For Alternative A, the new water disposal well would require construction of one new overhead electrical line (up to 5 power poles) to supply power to the water disposal wellhead. Electrical line construction would take place following successful completion of the new water disposal well. Electrical power would be used for long-term operation of lights, water heaters, and ancillary needs at the water disposal facility. In most, but not all cases, well pumps would not use electricity, and would be run by natural gas-powered pumps.

The new line would be installed following the most practical route from existing lines to the new water disposal well site; two options would be to follow existing two-track roads or run the line cross-country. The average ROW width for power lines is 30 feet. Final routes would be subject to surface owner approval. If the line followed existing two-track roads construction vehicles would stay on existing disturbance areas. If the line ran cross-country, then appropriate access and vehicle routes would be approved as part of the project design. If the terrain allows for it, access could be overland along the route. Wooden power poles would be erected and typical equipment includes pickups, auger/drilling rigs, bucket trucks and stringing equipment. Some Gambel's oak, aspen, and other taller shrubs may need to be pruned back for construction, and each power pole hole would disturb approximately 8 square feet of vegetation during excavation of the hole and setting of the power poles. There would be no prescriptive clearing of the corridor for electrical lines. Electrical line would run to the new water disposal well location.

### Drilling

Drilling operations would be conducted in compliance with the APD issued by the State and any relevant Federal Regulations (i.e., USFWS and EPA regulations). Specific techniques for drilling wells would differ depending on whether SGI drilled a gas well or a water disposal well; the specific techniques for natural gas well and water well drilling are presented below. Trucks would be used to transport drilling components to the work site. Rig components are designed for portability and are easily loaded and unloaded and mostly self-contained on the mobile drill rig. Auxiliary equipment for the supply of electricity, compressed air, and freshwater would be trucked in for drilling operations. Drill pipe, drill bits, cement, freshwater, wire rope, and other supplies would be trucked to the well pad and stored temporarily until used. Traffic would consist of support equipment, contractor vehicles, construction personnel, and material delivery. Well pad activity would involve backhoes, front-end loaders, boom and winch trucks, delivery trucks, welding machinery, and personal conveyance vehicles.

*Gas Well Drilling*

Drilling gas wells can use a number of different wellbore directions, types of drilling technologies, target different formations, and utilize different drilling lubricants (commonly referred to as drilling fluids or drilling muds).

In its broadest definition, a wellbore is a hole that is drilled to aid in the exploration and recovery of natural resources including oil, gas or water. A wellbore is the actual hole that forms the well. A wellbore can be drilled vertically or directionally. A vertical wellbore is a wellbore drilled straight down below the drilling rig. A directional wellbore may start out vertically, but is then turned to move out at an angle, in an S-shape, or turned horizontally. Wellbores could be any of the mentioned varieties (vertical or directional), and would be encased by materials such as steel and cement. As applications to the COGCC are similar to Federal applications, illustrations of the different types of wellbores for Federal applications are provided in **Appendix E**, Master Drilling Plan.

As noted under the section describing the well pad construction techniques, drilling methods could fall within two broad categories – those drilling systems that utilize a reserve pit on the well pad or a pit-less system, generally called a "closed-loop system." Under Alternative A, SGI proposes to use either system: drilling with a reserve pit or closed-loop. Which system is utilized would depend on the type of well to be drilled, what drilling equipment may be available at the time, and/or economic factors such as a closed-loop system becoming cost-prohibitive. The type of drilling system would be determined when the drilling application is submitted to the COGCC.

In drilling with a reserve pit system, a small amount of fluid is retained in the cuttings and the cuttings are placed in the reserve pit. The reserve pit would also hold fresh and/or recycled water used in drilling and any excess drilling mud; the reserve pit is not used to store flowback water during the completion phase nor used to store produced water during the production phase. Drilling mud would be circulated by means of pump pressure from the rig mud pits down the drill pipe, through jets in the bit, and up the annulus (the space between the wellbore and the drill pipe). Drilling mud would flow through a series of equipment and tanks in order to recondition it. A small amount of mud and the cuttings from the wellbore would be placed in the reserve pit. Drill cuttings would be processed to remove excess drilling fluids. The cuttings would be stored on location in segregated lined piles or in a storage container. Cuttings would be sampled and tested according to COGCC 900 Series Rules, then transported to a permitted disposal/waste management facility.

Each reserve pit would be constructed with an impermeable liner so as to prevent releases. Reserve pit fences would be constructed and maintained according to the COGCC requirements, including fencing and netting to prevent harm to wildlife resources. Once all drilling wastes are removed from the pit, the pit liners would be removed and disposed of at a permitted waste facility; the pit would be closed in compliance with all COGCC 900 Series pit closure rules.

A closed loop system is defined simply as a mechanical and chemical system that would allow an operator to drill a well without using a reserve pit. In a closed-loop drilling system, the reserve pit is replaced with a series of storage tanks that separate liquids and solids. Equipment to separate out solids (e.g., screen shakers, hydrocyclones, or centrifuges) and collection

equipment (e.g., vacuum trucks) minimize the amount of drilling waste muds and cuttings that require disposal, and maximize the amount of drilling fluid recycled and reused in the drilling process. The recovered drilling fluid can be stored in 500-barrel tanks and re-used in active mud systems; consequently, drilling fluid is moved from well-to-well and reconditioned by the dewatering equipment and mud products. The solid wastes would be transferred off-site for disposal at oilfield waste disposal facilities.

Following well pad and access road construction, a Tier-2 or Tier-3 type drilling rig would be transported to the well pad along with other necessary equipment. A conventional drilling rig used for vertical wellbores would require construction as described above in the well pad construction section. The rig would operate 24 hours per day. If the well were proposed as a directional wellbore (e.g., horizontal or s-shaped), then directional drilling equipment would be used and would operate 24 hours per day. Additional equipment and materials needed for directional drilling operations would be trucked in to the well site.

Drilling would begin by digging a circular pit, called a cellar, and lining the pit with metal, where the wellbore would be drilled. The cellar would provide space for the casing head spools and blowout preventers that would be installed under the rig. Drilling operations normally include keeping a sharp bit on the bottom drilling as efficiently as possible, adding a new joint of pipe as the hole deepens, tripping the drill string out of the hole to put on a new bit as needed and running it back to the bottom, and installing steel casing and cementing the casing in the hole.

Drilling fluids are used to aid the drilling of boreholes regardless of the type of well being drilled. The main functions of drilling fluids include providing hydrostatic pressure to prevent formation fluids from entering into the wellbore, keeping the drill bit cool and clean during drilling, carrying out drill cuttings (i.e., pulverized rock generated from drilling), and suspending the drill cuttings while drilling is paused and when the drilling assembly is brought in and out of the hole.

Drilling fluid is a mixture of a fluid (either water or an oil-based product such as mineral oil) and "mud." For Alternative A, SGI plans to use freshwater-based drilling fluid but may also use oil-based drilling fluids in production formations where borehole stability requires it or for directionally drilled wells. Alternative A does not present a preference for one type of drilling fluid over another; specifics on which type of drilling fluid used would be included on the individual drilling application.

A water-based drilling fluid uses fresh or recycled[1] water or a combination of both mixed with the mud; SGI would use a fresh-water mud system. Up to approximately 3,000 barrels of water would be used for drilling a particular well. For Alternative A, that would result in up to 165,000 barrels of water that could be used for drilling (up to 3,000 barrels per well multiplied by up to 55 new wells drilled). In production level formations, where the borehole stability requires it, or for directionally drilled wells, an oil-based drilling fluid, using products such as mineral oil, may

---

[1] Recycled water is water that has been used in other phases of the well development process. It could be water that has been removed from drilling mud, water used during completion that flows back after the well has been pressured and fractured, or water that has been produced as a by-product of gas production (known as produced water).

be used. The mud portion of a drilling fluid is composed of clays, minerals, and additives, such as bentonite, barite, soda ash, lime, polymer, lignite, and lost circulation material.

The drilling fluid used for a particular job is selected to avoid formation damage and to limit corrosion. For example, where borehole stability requires it, a mud typically consisting of potassium chloride substitute and commercial clay stabilizer (such as Di-Ammonium phosphate) would be used to drill the production hole section. This mud formulation inhibits potentially reactive shales to prevent shale swelling and hole sloughing. Drilling fluids and mud additives would be recirculated during drilling, and could be transported to another drilling location for reuse or treated and removed from the location.

Casing and cementing plans are designed by engineers and included in an APD and associated Drilling Plan. The casing and cementing program would be conducted as approved to protect and isolate all usable water zones, potentially productive zones, lost circulation zones, abnormally pressured zones, and any prospectively valuable deposits of minerals. Placement of steel casing would entail the connection and insertion of continuous sections of steel pipe into the drill hole. The casing would extend from the bottom of the hole to the surface except when drilling or production liner is used. Casing would be set in the hole, one joint at a time, threading one piece into a collar on the next. The wells would be lined with conductor casing to a depth of at least 80 feet; with surface casing to at least 400 feet; with intermediate casing to approximately 3,000 to 5,500 feet; then with production casing to the target well depth. Casing programs are dependent on the target depth and individual well casing plan.

The casing would be cemented into place in stages by pumping a slurry of dry cement and water into the casing head, down through the casing string to the bottom of a string stage, and then up through the spacing between the casing and the wellbore (annulus) back up to the surface except when a production string is used. Surface casing cement is calculated to return to the surface (100 percent excess volume). After the cement is pumped into the casing, a 1-inch pipe is run on the outside of the casing and approximately 50 sacks of cement are used to top off the annulus. If the cement does not circulate back to the surface, a temperature log is run to find the top of cement. At this point, corrective measures are taken if necessary.

A plug would be pushed to the bottom of the wellbore to remove any residual cement from the inside walls of the casing. If adequate cement coverage and quality were not attained, remedial actions would be taken based on site-specific situations. Calculated volumes of cement would be pumped into the annulus to fill the space, where it would be allowed to harden. A cement bond log would be run on the wellbore to ensure that no voids remain in the annulus. Cementing the annulus around the casing pipe restores the original formation isolation by posing a barrier to the vertical migration of fluids or gasses between rock formations within the annulus of the borehole, protects the well by preventing formation pressures from damaging the casing, and retards corrosion by minimizing contact between the casing and naturally occurring corrosive formation fluids. Each well may have multiple strings, and each string is cemented independently.

All drilling operations and other well site activities would be conducted in compliance with COGCC rules and regulations. Pressure tests are required before drilling out from under all casing strings set and cemented in place. Blowout preventer controls must be installed prior to

drilling out the surface shoe and prior to starting workover or completion operations. Blowout preventers would be inspected and tested at regular intervals to insure good mechanical working order.

Site-specific descriptions of drilling procedures would be included in each APD submitted to the COGCC for each proposed well.

Drilling activities on individual wells would typically occur 24 hours per day, 7 days per week, and would require approximately 16 workers.

Coal bed methane natural gas wells would typically be drilled vertically, but some would be drilled directionally including horizontally, depending on the specific needs at that location, which are dictated by terrain in the surrounding areas, distance to the Unit boundary, and other site-specific factors. There could also be multiple wells on one well pad. Development of coal bed methane natural gas wells on new well pads, including construction, drilling, stimulation, and completion, would require an average of 60 days.

Shale and sandstone gas wells could be drilled vertically, directionally, or with multiple horizontal wells from a single pad, where feasible, to minimize the number of well pads required to drain the resource. Directionally drilled wells, both shallow and deep, could take approximately 46 to 60 days per well to drill. Development of shale gas wells on new well pads would require an average of 85 days.

*Water Disposal Well Drilling*

For Alternative A, SGI proposes drilling one new water disposal well. For each water disposal well, a 24-inch-diameter hole would be drilled for the first 40 feet, and then gradually reduced with decreasing diameters of casing strings until the hole reaches its target depth, estimated at 10,000 feet. Once the casing strings are set and the outside annulus is cemented in place for each string of casing, the wells would be completed (see *Water Disposal Well Completion* below).

Tubing with a diameter of 2.875 to 3.5 inches would be run down the casing to the top of the target disposal zones. The tubing would be landed in a set packer approximately 100 feet above the uppermost-completed injection zone. A packer set has rubberized rings, which when activated seal off the bottom of the casing, preventing disposal waters from migrating up the insides of the casing. Above the packer set, the annulus between the tubing and inner casing walls would be filled with packer fluid. Pressure would be monitored at the surface to detect any loss of packer fluid into surrounding formations and to detect migration of injected water upward into non-target annulus zones, as well as to insure tubing, packer, and casing integrity.

The disposal well may be completed in the Entrada or Maroon Formations; the primary injection target zone is the Entrada formation at 8,900 feet, with the Maroon in the secondary injection zone at 9,000 to 9,500 feet. The maximum daily injection rate for the Maroon formation is 4,000 barrels per day, while the maximum daily injection rate for the Entrada formation is 2,000 barrels per day. If these formations are not useable, the Dakota and Morrison Formations may also be evaluated. A water-based mud system would be used for drilling of the surface hole, and a low-solids, non-dispersed gel system would be used for the intermediate and production hole sections of the water disposal well.

Drilling water disposal wells would require 60 to 120 days. Up to approximately 3,000 barrels of water would be used for drilling a particular water disposal well. For Alternative A, that would result in up to 3,000 barrels of water that could be used for drilling (up to 3,000 barrels per well multiplied by up to one new water disposal well drilled).

***Completion***

*Gas Well Completion*
After drilling and casing of the well, a completion program would be initiated to stimulate production of natural gas and to determine gas and water production characteristics. A mobile completion rig (also called a workover rig) similar to the drill rig may be used to complete each well. The well completion process, lasting 8 to 10 days, includes perforating the well's steel casing and cement, hydraulically fracturing the producing formation(s), and installing a series of valves and fittings on the wellhead. Hydraulic fracturing does not always require the presence of a workover rig.

Wells are often treated during completion to improve resource recovery by increasing the rate and volume of hydrocarbons moving from the natural gas reservoir into the wellbore. These processes are known as well-stimulation treatments and include hydraulic fracturing, acidizing, and other mechanical and chemical treatments, often used in combination.

Hydraulic fracturing is a 60-year-old process used to maximize the extraction of underground resources by allowing natural gas to move more freely from the rock pores to production wells that bring the gas to the surface. Fluids, commonly made up of water and chemical additives (e.g. recycled or freshwater, liquid carbon dioxide, sand, and chemical additives), are pumped into a geologic formation at high pressure during hydraulic fracturing. When the pressure exceeds the rock strength, the fluids open or enlarge fractures. After the fractures are created, a propping agent is pumped into the fractures to keep them from closing when the pumping pressure is released. After fracturing is completed, approximately 60 to 80 percent of the injected fracturing fluid returns to the wellbore (EPA 2004). The specific type and components of the fracturing fluid chemical vary based on geologic formation and by company, but may include constituents such as hydrochloric acid, anti-bacterial agents, corrosion inhibitors, and surfactants (BLM 2013a). Per COGCC Order No. 1R-114, operators are required to post their disclosure of chemicals intentionally added to hydraulic fracturing fluids on FracFocus per COGCC Order No. 1R-114.

Hydraulic fracturing is now being used more commonly due to advances in technology. Groundwater is protected during the fracturing process by a combination of the casing and cement that is installed when the well is drilled and by the depth of the rock between fracture zone and any fresh-water bearing zones or aquifers (EPA 2004). As state requirements for applications are similar to federal applications, illustrations of the different wellbores requirements are presented in **Appendix E**, Master Drilling Plan. Additionally, specific casing information would be included on the drilling applications. The casing and cementing techniques described in the drilling plan would provide redundant protection of all usable aquifers above the target zones by cementing both the surface and intermediate casing strings from the base of pipe back to the surface.

Water used during completion operations would be recycled, fresh, or a combination of both, and quantities used would vary in accordance with the formations the wells are completed in. Specifics for how much water each well type would require for completion is provided in **Appendix D**, Master Surface Use Plan of Operations. As each well type requires vastly different amounts of water, calculations for estimated water usage were based on assuming 50 percent CBNG wells and 50 percent shale wells as discussed in the Bull Mountain EA. Calculations used number of new wells per alternative divided in half for each type of well (CBNG/shale). To estimate the amount of water use per well type, the number of wells was multiplied by the highest amount of water use for that well type. Water usage totals were added together for a total maximum amount of water usage. The results showed that there could be up to 5,542,000 barrels (or 538 acre-feet) of water used for well completions during the 3 year development time frame. If fewer shale wells were drilled and completed, the water use estimate could be lower. Recycled water could also be used for well completions when water conditions allow (see *Flowback Pits* discussion below).

Test gas could be flared (released to the atmosphere) or environmentally friendly green completion technology may be used. What makes the well completion "green" is that the gas is separated from the water and placed in a pipeline instead of being released to the atmosphere. Green completions take place during the flowback stage of the completion, during which natural gas is produced with the water. Green completion technologies capture the gas at the well head immediately after well completion instead of releasing it into the atmosphere or flaring it off, resulting in reducing volatile organic compound (VOC) emissions from wells. In green completions, gas and hydrocarbon liquids are physically separated from other fluids and delivered directly into equipment that holds or transports the hydrocarbons for productive use. There is no venting or flaring. See also COGCC regulation 800-4 for further details on green completion technologies.

If a well is flared, the flares are designed to be directed straight upward and are located in an area on pad to prevent damage to the environment or a safety hazard. In the event it becomes necessary to flare a well, a deflector and/or directional orifice would be designed and installed to safeguard both personnel and adjacent lands. The flowback involves removing the water that was used to stimulate the well.

Following the hydraulic fracturing of the well, a percentage of the fluid, consisting primarily of produced water, may be returned to the surface. This percentage of return varies between wells. Even though the produced water and gas can flow into the casing after it is perforated, a small-diameter pipe, called tubing, is placed in the well to serve as a way for the produced water to be brought to the surface. Typically, the start of the tubing is placed below the perforated interval to allow any fluids collecting at the bottom of the well to be pumped up through the tubing to the surface. The tubing in the well is suspended from the wellhead, so as the well production flows up, the production from the well can be controlled by opening and closing valves on the wellhead. Excess produced water would be stored on the pad in containers, piped to the McIntyre Flowback Pits (see *Flowback Pits*, below), or sent to a water disposal well for reinjection.

Typical equipment and vehicles used during completion activities include propane and carbon dioxide tanker trucks; hydraulic fracturing trucks; sand transport trucks; water trucks; oil service

trucks used to transport pumps and equipment for hydraulic fracturing; flat beds and gin trucks to move water tanks, rigs, tubing, and hydraulic fracturing chemicals; logging trucks (cased hole wireline trucks); and pickup trucks to haul personnel and miscellaneous small materials.

Completion activities on individual wells would occur 24 hours per day, 7 days per week, and would require approximately 25 workers. Completion of an individual well would generally take approximately 7 days, depending on conditions at the individual well. Flow testing follows completion and takes 25 to 50 days. Only 2 workers are employed 24 hours per day for testing.

*Flowback Pits*

In order to minimize the consumptive use of water for completion operations, SGI has constructed four pits on private surface lands to temporarily store a mixture of freshwater, produced water, and recycled water prior to and after completion operations, per the regulatory guidance and permitting of COGCC. Water estimates for hydraulic fracturing operations by well type are presented in **Appendix D**. The flowback pits would reduce the amount of water transportation trucking traffic, on-site storage of water on pads in hydraulic fracturing tanks, and subsequent removal of waters between hydraulic fracturing operations. At this time the flowback pits are permitted as follows: two pits on Rock Creek Ranch (T11N R90W Section 24) immediately north of SGI's existing federal 11-90-24-2 water disposal well, and two additional pits on Rock Creek Ranch lands in T11N R90 Section 26. Since all four flowback pits would be located on lands previously owned by the McIntyre Ranch, they are referenced as follows (**Table 2-4**, McIntyre Flowback Pits):

Table 2-4
McIntyre Flowback Pits

| Pit Name | Dimensions | Fluid Volume Capacity (barrels) |
|---|---|---|
| McIntyre Flowback Pit 1 | 130 feet by 200 feet by 12 feet deep (10 feet fluid depth) | 31,463 |
| McIntyre Flowback Pit 2 | 110 feet by 230 feet by 12 feet deep (10 feet fluid depth) | 29,720 |
| McIntyre Flowback Pit 3 | 150 feet by 600 feet by 12 feet deep (10 feet fluid depth) | 144,247 |
| McIntyre Flowback Pit 4 | 150 feet by 600 feet by 13 feet deep (11 feet fluid depth) | 144,247 |

Fresh, production, and recycled water would be delivered to the McIntyre pits through surface polyethylene (HDPE, referred to here as poly) pipe and existing buried steel water pipelines for temporary storage prior to hydraulic fracturing operations. Temporary water pumps would draw water from the McIntyre pits into the temporary surface pipes and existing water pipelines (in order to reduce truck-based fluid hauling). Water would be mixed with sands and chemicals on a target pad site prior to injection into a wellbore (see the *Drilling* and *Hazardous Material and Solid Waste* sections below for details on chemicals used).

As noted above, SGI plans to temporarily lay down poly pipelines in order to transport the fresh or recycled water used for completions from the McIntyre Pits to storage tanks and then to the wellhead (see **Appendix M**, Poly Pipeline Operation Plan). Generally, the pipe strings would follow roads. The length of time the pipe is on the surface depends on where and when a well is to be completed; it is moved from one location to another when a new well is ready for completion. Temporary poly may be left in place for several months in some cases. Pipe

diameter is dependent on the volume and pressure of water needed for the completion. SGI anticipates that 12-inch internal diameter would be the largest pipe required, but could also use a smaller interior diameter pipe if needed (e.g., 8-inch or 6-inch).

After hydraulic fracturing operations for a well are complete, used fluids would be flowed back out of a wellbore, filtered on the pad site, temporarily stored in tanks, and then pumped into transportation trucks (to be trucked to a McIntyre flowback pit) or pumped into an existing water pipeline or temporary surface poly pipe for delivery to a McIntyre flowback pit for temporary storage. These used fluids could then be re-used for additional hydraulic fracturing operations during the same season if water condition allows. The highest total dissolved solids (TDS) anticipated in the water contained within the pits would be 60,000 to 70,000 parts per million (ppm), with an average TDS of 40,000 ppm in the pits. Produced water TDS in the field is approximately 15,000 ppm.

Construction of the McIntyre pits involved the salvaging of topsoils, the excavation of the pit itself, and compaction of the pit interior. Pits have been engineered with a triple liner system that includes surface and groundwater sites and monitoring of the four groundwater monitoring wells as required by the COGCC permits issued for the pits. There is a 1-foot berm surrounding the pit over which the liners are pulled and anchored in on the opposite side. At least 2 feet of freeboard is maintained in the pits at all times. Bird deterrent netting is stretched over the pits to keep birds out. Additionally, year-round wildlife and silt fencing has been placed around the pits to prevent terrestrial wildlife entry into a full or empty pit.

*Water Disposal Well Completion*
The additional water disposal well would also require completion. Similar to traditional wells, a workover rig would be used to complete the well. This process includes perforating the well's steel casing, and may include hydraulic fracturing of the formation to improve its ability to accept injected water. This supplemental hydraulic fracturing could also recur later in the life of the well. Drilling and hydraulic fracturing would follow standard industry and regulatory procedures, and be permitted as under producing wells with the additional process of converting it to a disposal well. Multiple disposal zones would be perforated in order to allow produced water to flow into any of the available receiving formations, and allow for redundancy in receiving formations.

**Interim Reclamation**
The goal of interim reclamation is to maintain soil productivity during the production phase. All surfaces not needed for long-term operations would be recontoured and seeded as per the requirements set by the COGCC. Seed availability may vary, so not all species may be available at the time they are needed. However, major species are generally available. If availability were a concern, SGI would request the use of COGCC's approved alternate seed mixture.

If the well(s) on a pad are not productive, the pad would be abandoned and reclaimed in accordance with applicable agency requirements stipulated in the permit for the well, and according to the reclamation portion of the information submitted with the APD. Reclamation areas would include, but not be limited to, fill slopes, trenches, wing ditches, edges of disturbance, temporary-use areas no longer needed, and embankments. Reclamation would involve recontouring the well pad to blend with the natural topography, even redistribution of

segregated topsoil, seeding, and monitoring to ensure revegetation is successful. Reclamation efforts would continue until all related requirements were met. Removal or burial of any surfacing material used to complete the well pad would be according to the authorizing agency's standards.

Upon well completion, the well location and surrounding area would be cleared of all unused tubing, materials, trash, and debris. SGI would perform interim reclamation efforts on as much of the disturbed area as practicable after drilling and conducting subsequent operations. This process entails returning areas not needed for production operations or for subsequent drilling operations to near-original condition or to the land use designated by the surface landowner. SGI would minimize dust and erosion during the interim reclamation process. SGI would initiate interim reclamation within three months for projects on croplands and within 6 months for projects on non-crop lands after finishing drilling and subsequent operations, unless an exception was granted. Areas needed for production and subsequent drilling operations (those planned within 12 months) would be stabilized to minimize fugitive dust and erosion. Stockpiled topsoil, as well as remnant vegetation (e.g., uprooted sagebrush and oak brush) would be spread over interim reclamation areas, and then seeded with an approved seed mix per the landowner agreement. Any remaining stockpiled topsoil not needed for final interim reclamation would also be stabilized and reseeded. Prior to reseeding, all reclaimed areas would be scarified and left with as rough and uneven a surface as is practicable. The appropriate amount of seed would be applied across the reclaimed areas as prescribed in the permit.

If a reserve pit is utilized, it would be cleaned out, the liner removed and properly disposed of, backfilled, and reclaimed within 6 months from the date of well completion, weather permitting. Prior to any dirt work associated with reserve pit restoration, the reserve pits would be as dry as possible. Cuttings within the pit would be sampled and laboratory tested according to COGCC 900 Series Rules. Results of cuttings pit testing on federal well sites would be made available to the COGCC. Cuttings would then be trucked to an approved and permitted disposal facility (depending on the concentrations of potential soil contaminants listed in COGCC Table 910-1 and analyzed by an EPA-approved laboratory); fencing surrounding the pits would also be removed.

It is estimated that well pads would be reduced in size to an average of 2 acres after interim reclamation is complete. However, the number of wells and associated production equipment needs on each pad would primarily dictate the size of an individual production pad.

Revegetation efforts would be considered satisfactory when soil erosion resulting from the operation has been stabilized, and a vegetation cover equal to 70 percent of pre-existing or seeded-in vegetation is reestablished (both cover and diversity of species) as evidenced by pre- and post-construction photo-point monitoring and vegetation plots and transects. SGI would monitor interim and final reclamation progress at 1-, 3-, and 5-year intervals. Reseeding would be required if satisfactory interim reclamation progress is not being made at year 2 or year 3 monitoring intervals, or if final reclamation is not achieved by year 5.

Interim reclamation would also include repair of range management facilities and improvements that had been altered by project-related activities, for example, the installation of cattle guards where new access roads crossed fences.

***Production and Maintenance***

*Production*

If a well were determined to be commercially productive, production facilities would be installed on the well pad. Typically, up to eight (8) 200- to 400-barrel storage tanks would be installed per well for produced water and 1 storage tank for condensate (if needed). The produced water would be piped or trucked to the McIntyre pits, storage tanks, or water disposal wells (described below in the *Produced Water Management* section). Condensate, if produced, would be transferred to trucks as necessary and transported for sale or to an approved disposal site. Typically, a heated three-phase separator, rated at 0.125 mmBtu/day, would be necessary to separate fluids associated with each wellbore. Protective barriers would be installed around the production facilities, including tanks. Regardless of the alternative selected, the appropriate location of facilities would be determined during the APD process.

Dehydration facilities to separate water from natural gas would be centralized at compression facilities.

Where applicable, wells would be fitted with cavity pumps that would require generators to power them. Currently, there is 1 188-horsepower generator to run 2 existing cavity pumps, but smaller, more efficient turbine generators could also be used. These pump and generator systems could be used on any type of well, whether coal bed methane natural gas or shale, if needed. The prime mover for pump jacks would be small (50 horsepower or less) natural gas-fired internal combustion engines.

All site security guidelines would be followed as identified in the authorizing agency's statutes, regulations, and policy.

Existing wells in the Unit have seen increases in production since initial production year of 2010. **Table 2-5**, Bull Mountain Unit Annual Production Rates, illustrates the amounts of gas and water produced each year.

Table 2-5
**Bull Mountain Unit Annual Production Rates**

| Year | Average No. of Prod. Wells | Average No. of Prod. Days | Gas Production (MCF)[2] | Water Production (barrels) |
|------|------|------|------|------|
| 2010 | 12 | 30 | 133,455 | 10,911 |
| 2011 | 11 | 99 | 132,678 | 224,476 |
| 2012 | 9 | 110 | 95,299 | 254,944 |
| 2013 | 9 | 56 | 116,780[3] | 107,342 |
| 2014 | 9 | 100 | 923,948[3] | 268,155 |
| 2015[1] | 9 | 126 | 928,815[3] | 216,037 |

Source: COGCC 2013
Colorado Oil and Gas Conservation Commission's Colorado Oil and Gas Information System
Production Data Inquiry website: http://cogcc.state.co.us/cogis/ProductionSearch.asp..
[1] Production through July 2015
[2] Production amounts are from SGI, August 7, 2013, unless otherwise noted.
[3] Production amounts are from the COGCC website.

In addition to the daily site inspections at each well pad location, SGI would remotely monitor specific aspects of well production. This remote monitoring is proposed as a way to provide monitoring between the daily site inspections by SGI personnel. This proposed remote monitoring would be conducted at all fee and federal well pad locations, as proposed in SGI's Proposed Action and Alternative A. SGI will monitor the following aspects of well production using remote telemetry:

- Tubing pressure

- Casing pressure

- Gathering system line pressure

- Wellhead differential pressure

- Wellhead gas temperature

- Wellhead gas rate

- Production tank level alarms

SGI will implement this proposed remote monitoring under the following time limits:

- Wells existing in the Bull Mountain Unit on the effective date of this WHP must be retrofitted and become compliant with the seven monitored aspects of well production listed above within 24 months of the effective date of this WHP.

Wells not yet existing in the BMU on the effective date of this WHP must be compliant with the seven monitored aspects of the well production listed above within six months of such a well being placed in production.

*Surface Facilities*
Installed surface facilities for each gas well would include the wellhead, and may include artificial lift, separators, water transfer, pumps, tank batteries, wellhead compression, and gas-metering facilities. If artificial lift is used, the driver may be natural gas powered. Facilities would occupy less than 1 acre on the site. All long-term facility structures would be painted in accordance with the authorizing agency's standards. Separated, produced water from each well would be transported or pumped through in-ground water lines to an approved disposal well. Disposal of produced water would be in accordance with a plan approved by the COGCC.

All permanent structures would be painted a flat, non-reflective standard environmental color as specified by the authorizing agency or private landowner. Facilities would be painted within 6 months of being located on site. As required by the Occupational Safety and Health Administration, some equipment would be painted for safety considerations (i.e., some parts of equipment would retain its safety coloration such that it does not blend with the surroundings).

Surface facilities for water disposal wells would include the wellhead, water injection pump and housing, filter skid and gas filter skid, and approximately 6 to 8 400-barrel holding tanks and 1

90-barrel facility drain tank. Water storage tanks would be heated during the winter months to prevent ice formation in the tanks and lines. The injection pumps for the water disposal well would be powered by electricity supplied by overhead or buried electrical lines or by natural gas engine. Facilities would occupy less than 1 acre on the well pad, which would be 1.4 acres following interim reclamation. All long-term facility structures would be painted in accordance with the authorizing agency's standards.

SGI would use a second existing storage yard sized approximately 250 feet by 400 feet, and it would be located on their property to store materials and equipment (T11S R90W Section 14).

*Compressor Stations*
Compression in the field may be necessary as wells come online. Under Alternative A, SGI proposes one new screw compressor located on previously disturbed land (T11S R90W Section 24 and adjacent to the Federal 24-1 and Federal 24-1a well pads, see **Figure 2-1**).

SGI is proposing to use natural gas-fired internal combustion engines to power the compressor. Emissions from natural gas-fired compressor at the compressor facility would typically be less than 2 grams per horsepower/hour of carbon monoxide (CO) and nitrous oxides ($NO_x$), and less than 1 gram per horsepower/hour of VOCs. The compressor would use hospital grade mufflers (an industry standard within the oil and gas industry) and would be housed in buildings or portable structures in an effort to abate noise from the compressor engine.

Up to 20 personnel may be involved in compressor station construction, with an average of 5 personnel on site at any one time.

*Produced Water Management*
Water to be injected into the water disposal wells would first be piped or delivered by truck into the holding tanks to allow sediments to settle out. The water would then pass through a series of filters to remove solids larger than 10 microns in diameter. Accumulated solids from the settling and filtration process would be periodically removed from the holding tanks and trucked to an approved off-site disposal facility. Chemical treatment of water would reduce scaling or deposition of minerals in the receiving formation, which would otherwise shorten the life of the disposal zones. Chemicals used for treatment would likely include acids, which would keep any minerals in suspension, retard scaling, and act as a biocide. Disposal of produced water would be in accordance with a plan approved by the COGCC rules and regulations.

SGI estimates that between 500 and 3,000 barrels per day of produced water would be injected into the water disposal well. Produced water could also be trucked to an approved disposal site.

Water disposal wells would be drilled to non-producing, non-useable water bearing, formations capable of accepting water. These formations do not produce gas, contain no useable water, and are capable of accepting large quantities of injected water. Conceptual locations for water disposal wells have been illustrated on each alternative map (**Figures 2-1** to **2-3**). In some cases, non-producing gas wells may also be converted for water disposal use. All water disposal wells would be permitted through the appropriate authority. Water disposal facilities would include natural gas-fired internal combustion engines to drive injection pumps directly or via a generator powering an electric motor.

*Workovers*

Periodic workovers would be required to correct downhole problems in a producing well, pump maintenance, and to return the well to production. Workovers are undertaken on an as-needed basis to increase or maintain production from downhole producing zones or to re-complete a well in a new zone.

A well would require a workover for any of several typical reasons including:

- Refracturing the producing formation(s) using advanced techniques designed to stimulate additional production

- Cleaning out the wellbore and perforations to stimulate/facilitate production

- Re-completing in another potentially productive zone that was not originally completed at the time the well was drilled

- Repairing casing and other downhole equipment

A workover would generally require three to five workers for four days. Workover activities would typically be implemented during daylight hours only.

A single workover rig and five-person support crew with four light trucks is anticipated to workover any given individual well within the Unit.  The exact scheduling and particular wells selected for workover is unknown at this time, however individual well workovers would be conducted on a bi-annual schedule. With the proposed well development schedule of drilling 27 new Fee/Fee wells per year in Alternative A and continued operations of the existing wells in the Unit, the following estimates for workover operations may occur.

After completion of the drilling phase of this alternative, annually, up to 36 workovers are anticipated to occur upon the 55 Fee/Fee new wells amongst 10 new well pads and the existing 20 wells amongst 17 existing pads (14 Fee/Fee wells, 11 pads, one WDW-one pad, and five federal wells, five pads).  Based on the initial drilling schedule the workover rig and support crew could move between approximately 15-16 well pads each year to workover wells. Although the single workover rig would likely remain within the Unit should additional workovers are scheduled to occur consecutively, the support crew would be travelling in and out of the Unit with up to four light trucks on a daily basis. As an individual well workover is estimated to take approximately four days, the resulting round trips in and out of the Unit by light truck per individual four-day workover is estimated to be 16, which results in approximately 576 light truck round trips per year should all 36 calculated workovers be completed annually. It is also assumed that if workover scheduling permits (e.g., minimal delay between scheduled operations), the workover rig would likely be temporarily staged in the area when not in use to limit multiple round trips in and out of the Unit.

SGI could conduct workover operations at any period during the calendar year on the Fee/Fee wells of Alternative A and those which already exist.

Regardless of timing limitations when performing workovers on federal wells, such operations would be conducted in compliance with the subsequent well operations standards put forth in 43 CFR 3162.3-2. These regulations include notification requirements and outline circumstances which may require additional approval from BLM prior to conducting subsequent well operations.

*Maintenance*

During the normal life of the wells, routine production and maintenance operations would be conducted throughout the year to ensure that equipment is functioning properly. A well operations technician (referred to in the industry as a pumper) visits well pads in a pickup truck to monitor various operating conditions such as gas and water production rates, pipeline pressure, and separator pressure, to determine if abnormal conditions exist and make or schedule necessary repairs. Maintenance of the well pad would also include monitoring the establishment of desirable vegetation, repair of any erosion occurring on the location, and control of noxious or invasive weeds. Additionally, road maintenance would include dust abatement procedures such as application of magnesium chloride. In the case of the water disposal wells, routine maintenance ensures that the well can continue to accept injections of produced water efficiently.

All project roads would require routine year-round maintenance to provide year-round access. SGI would be required to prepare and implement a road maintenance plan for all roads used for project-related purposes. Maintenance would include inspections, reduction of ruts and holes, maintenance to keep water off the road, replacement of surfacing materials, and clearing of sediment blocking ditches and culverts. Should snow removal be necessary, roads would be cleared with a motor grader or snowplow, and where possible snow would be stored along the down gradient side to prohibit runoff onto the road. Road maintenance agreements and requirements would vary depending on the owner of a given road in the Unit. SGI has committed to adhere to county road maintenance and encroachment ordinance requirements. Aggregate would be used as necessary to maintain a solid running surface and minimize dust generation.

**Final Reclamation and Abandonment**

When a well is to be plugged and abandoned, SGI or subsequent operators would reclaim and revegetate the well pads. Site-specific reclamation plans would be included with the submitted drilling applications to the COGCC. Development of a site-specific reclamation plan would include consultation between the surface owner and the operator. The following minimum standards would be applied:

- All surface equipment would be removed

- Removal or burial of surfacing material would comply with the authorizing agency's standards

Wells would be plugged using COGCC standards and comply with all state regulations.

Revegetation efforts would be considered satisfactory when soil erosion resulting from the operation has been stabilized, and a vegetation cover equal to 70 percent (both cover and diversity of species) of pre-existing or seeded-in vegetation is reestablished as evidenced by pre- and post-construction photo-point monitoring and vegetation plots and transects. SGI would

monitor interim and final reclamation progress at 1-, 3-, and 5-year intervals. Reseeding would be required if satisfactory interim reclamation progress is not being made at year 2 or year 3 monitoring intervals, or if final reclamation is not achieved by year 5.

***Water Use and Water Sources***

Specific volumes of water usage needed for any given phase of development are presented within that phase description.

Over the life of the project (approximately 50 years), an estimated 30 percent of project water would be obtained from freshwater sources. The remaining 70 percent of water needs could be supplied by various sources, and may include recycled or produced water (see **Appendix D** and **Appendix E**).

Water is needed for a variety of activities associated with development of the Unit, including dust abatement on roads, moistening of soils and gravels for compaction of well pad surfaces, production of drilling muds (to help lubricate the bore hole and circulate drill-bit cuttings), cementing the casing, and hydraulic fracturing and well stimulation. Water is also sometimes used to hydraulically test pipeline integrity (see "pressure testing" section in the pipe installation section). Water for drilling and cementing would be pumped to the well site and stored for operations or would be trucked in. After use, the water used for drilling/completion must be injected into a disposal well or, hauled off-site to an approved disposal facility or stored for reuse in the flowback pits. SGI plans to re-use water where possible. Flowback fluids to be used during the same drilling season may be stored in the McIntyre Flowback Pits (see above).

Use of surface water would be contingent upon the proper authorizations and permissions by the State of Colorado and water right holders (see **Appendix L**). Specific water withdrawal points would be identified in each future drilling application. However, as specific water withdrawal points have not yet been identified by SGI, it is assumed for the purposes of analysis and Section 7 Consultation that the entire depletion associated with this project would be a new depletion from the Colorado River, and thus would be subject to recovery fees as appropriate.

Water from all of these sources would be distributed by truck, buried pipeline, or surface poly pipe to the point of use. Re-use of produced water and water from drilling and completion of other wells would be conducted to the maximum extent practical, estimated at 70 percent of total water needs.

Freshwater application to roads for dust abatement would be applied to the road more frequently as traffic volumes increase and according to weather patterns. Approximately 5,000 to 8,000 gallons of freshwater may be used each day to control fugitive dust per mile during dry months (for example in a typical June). Approximately 2,000 to 5,000 gallons of freshwater may be used to control fugitive dust per mile of road during wet months (for example during a typical August). If dust palliatives were used, the County would determine which ones would be best suited to the situation on county roads. Options for palliatives are magnesium chloride and potassium chloride.

### Hazardous Materials and Solid Waste

Natural gas development employs a variety of chemicals including solvents, lubricants, paints, and additives. A list of chemicals used during drilling, completion, and production is included in **Appendix G**, Hazardous Materials Management Summary. The listing identifies the chemical, its common application, and potentially hazardous components.

Drilling by-products produced include solid pieces of waste rock combined with fluids and/or lubricants used to maintain smooth drilling operations; the by-products are produced by the drill bit cutting through the various formations at intervals beginning 3 to 4 feet from the surface and ending at the bottom of the hole. After drilling is complete, closure of the reserve pit would be completed according to the appropriate regulatory requirements (see pit closure section below).

Emptied steel and plastic drums for materials such as caustic soda, citric acid, lubricating oil, methanol, and drilling additives would require disposal. Empty metal or plastic drums would be returned to the supplier of the product. Any waste lubricating oil would be disposed of properly by a third-party contractor.

SGI has prepared and implemented an Integrated Spill Prevention, Control, and Countermeasures Plan and Emergency Response Plan for containment and control of oil and chemicals used in the Unit, as well as fire prevention and protection and emergency reporting. Procedures outlined in the Plans are applicable to all SGI personnel and contractors. In accordance with the plans, SGI personnel are trained to conduct routine inspections of the containment areas and to promptly contain and clean up any accidental spills. SGI's plans can be provided upon request to BLM at their Montrose office.

Chemicals on the EPA's Consolidated List of Chemicals Subject to Reporting Under Title III of the Superfund Amendments and Reauthorization Act of 1986 (SARA Title III) may be used or stored in quantities over reportable quantities. In the course of drilling, SGI could potentially store and use diesel fuel, sand (silica), hydrochloric acid, and $CO_2$ gas, all described as hazardous substances in 40 CFR Part 302, Section 302.4. In addition, natural gas condensate and crude oil, described as hazardous substances in 40 CFR Part 302, Section 302.4, may be stored or used in reportable quantities. During production operations, tri-ethylene glycol, ethylene glycol mix (50 percent), and methanol, all described as hazardous substances in 40 CFR Part 302, Section 302.4, may be stored or used on site. Small quantities of retail products (paint/spray paint, solvents [e.g., WD-40], and lubrication oil) containing non-reportable volumes of hazardous substances may be stored and used on site at any time. No extremely hazardous substances, as defined in 40 CFR Part 355, would be used, produced, stored, transported, or disposed of under any of the alternatives. Hazardous substances would be reported as required by Title III and COGCC chemical inventory programs.

Any surface spills or releases of oil, condensate, produced or flowback water, drilling fluids or other potentially harmful substances would be contained and immediately removed according to SGI's spill plan. The spilled or released fluids, along with any contaminated soils would be disposed of at an approved disposal site.

Tanks containing hazardous materials, including drilling fluids and/or muds, completion fluids, fuels, lubricants, produced liquid hydrocarbons, condensates, and produced water, would be surrounded by a secondary containment berm of sufficient capacity to contain the entire capacity of the largest single container and sufficient freeboard to contain precipitation as required in the authorizing agency's standards. For instance, EPA requires containment of 150 percent of the volume of the largest container. All loading lines and valves would be placed inside the berm surrounding the tank or would utilize catchment basins to contain spills. The tanks would be emptied as necessary, and the liquids transported to market via trucks.

Portable toilets and bear-resistant trash containers would be located on active construction sites. A commercial supplier would install and maintain portable toilets and equipment and would be responsible for removing sanitary waste. Sanitary waste facilities (i.e., toilet holding tanks) would be regularly pumped and their contents disposed of at approved sewage disposal facilities in Delta, Montrose, Garfield, or Gunnison Counties, in accordance with applicable rules and regulations regarding sewage treatment and disposal. Accumulated trash and nonflammable waste materials would be hauled to an approved landfill once a week or as often as necessary. All debris and waste materials not contained in the trash containers would be cleaned up, removed from the construction ROW or well pad, and disposed of at an approved landfill. Trash would be cleaned up every day.

Sanitary waste equipment and trash bins would be removed from the Unit upon completion of access road or pipeline construction, following drilling and completion operations at an individual well pad, or as required.

### Access and Traffic

Traffic estimates would be the same as those described in **Section 2.2.5**, Elements Common to All Alternatives, above. Specific calculations for Alternative A are presented below in **Table 2-6** and are based on 10 new well pads.

**Table 2-6**
**Alternative A Traffic Estimates per Well Pad for Construction, Drilling, Completion, and Production Activities**

| Vehicle Type | Average Weight (Pounds) | Estimated Round Trips |
|---|---|---|
| Vehicles for pad and access road construction | | |
| Gravel trucks | 110,000 | 1,600 |
| Semi-trailer trucks | 37,000 | 40 |
| Pickup trucks | 6,000 | 400 |
| Motor grader on semi-trailer | 40,000 | 10 |
| Dozer (2) on semi-trailer | 19,000 | 20 |
| Track hoe on semi-trailer | 43,000 | 10 |
| Pipeline construction | | |
| Motor grader on lowboy Trailer with truck | 50,800 | 20 |
| Bulldozer on lowboy trailer with Truck | 120,000 | 20 |
| 80-barrel water trucks for dust control | 54,000 loaded | 200 |
| 80-barrel water trucks for hydrostatic testing | 25,000 empty | 20-40 |
| Track hoe on lowboy trailer with truck | 91,000 | 20 |
| Welding trucks | 9,500 | 20 |

**Table 2-6**
**Alternative A Traffic Estimates per Well Pad for Construction, Drilling,**
**Completion, and Production Activities**

| Vehicle Type | Average Weight (Pounds) | Estimated Round Trips |
|---|---|---|
| Crew cab pickups | 5,200 | 400 |
| Bending machine/trailer | 48,000 | 20 |
| Side booms on lowboy trailer with truck | 63,000 | 20 |
| X-ray truck | 5,200 | 40 |
| Testing truck | 6,000 | 20 |
| Pipe trucks | 120,000 loaded | |
| | 36,000 unloaded | 10 |
| Utility tractor and truck with lowboy trailer | 40,000 | 20 |
| Vehicles for drilling/completing first well on the pad | | |
| Drilling/completion rig | 120,000 | 10 |
| Rig-up trucks loaded (including cement and fracturing) | 120,000 | 250 |
| Rig-up trucks empty | 36,500 | 40-60 |
| 80-barrel water trucks loaded | 54,000 | 400 |
| 80-barrel water trucks empty | 25,000 | 400 |
| Crew-cab pickups | 6,000 | 400 |
| Vehicles for drilling/completing subsequent wells on the same pad | | |
| Motor grader | 50,000 | 20 |
| Drilling/completion rig | 120,000 | 20 |
| Rig-up trucks loaded (including cement and fracturing) | 120,000 | 250 |
| Rig-up trucks empty | 36,500 | 40-60 |
| 80-barrel water trucks loaded | 54,000 | 450 |
| 80-barrel water trucks empty | 25,000 | 450 |
| Crew cab pickups | 6,000 | 400 |
| Vehicles for well production | | |
| Workover traffic (vehicle roundtrips per year) | 6,000 | 576 |
| Workover rig (rig roundtrips per year) | 120,000 | 36 |
| Haul trucks | 120,000 | 60 |

Typical pumper traffic would be pickup trucks estimated to have an average vehicle weight of 6,000 to 10,000 pounds for approximately 1 round trip per well per day; typical water disposal well traffic would be approximately 2 round trips per well per day. Typical water truck traffic for dust suppression activities is estimated at 2 round trips per well per day. Workover traffic is difficult to predict because there is no schedule for when equipment will break down, nor can downhole problems be reliably predicted, however an estimate has been provided. The field's general age also is a factor in how many workovers may occur in a given year or on a given well. Younger wells tend to have fewer issues than older wells; as equipment and facilities age, the trend is for more repairs and replacement. Additionally, the Unit is still in the exploratory phase, so factors that would contribute to predicting when a well may need maintenance are unknown, such as type of downhole environment. All other traffic estimates would be the same as described in **Table 2-1**.

### Surface Disturbance

Short-term surface disturbance (expressed as acres) would occur during and immediately after the construction, drilling, completion, and testing activities. Those portions of the well pads, access road ROWs, pipeline ROWs, and other facilities not needed for production operations or additional well drilling on the same pad would be reclaimed as conditions allow within one to two growing seasons following completion of the respective well, access road, or pipeline. What remains after interim reclamation and prior to final reclamation is considered long-term disturbance.

The No Action alternative would construct up to 10 new well pads that would result in approximately 50 acres of short-term disturbance and 20 acres of long-term disturbance, and require 5 miles of new road construction and 26 miles of improvements to existing roads for access (totaling 109 acres of short-term disturbance and 58 acres of long-term disturbance).[2] SGI also proposes 12 miles of new pipelines that would total 101 acres short-term disturbance and 9 acres long-term disturbance (cross-country pipelines would be fully reclaimed resulting in zero acres long-term disturbance). Details for these actions are shown in **Table 2-10**, Summary of Actions by Alternative; acreage area of disturbance are shown in **Table 2-12**, Summary of Surface Disturbance Acres by Alternative, which includes both short-term (during immediate construction and development) and long-term (after interim reclamation) disturbance.

### Best Management Practices

Best management practices are practices or a combination of practices that are determined to provide the most effective, environmentally sound, and economically feasible means of managing an activity; they are state-of-the-art industry and agency recognized mitigation measures applied on a site-specific basis to avoid, minimize, reduce, rectify, or compensate for adverse environmental or social impacts. They are selectively applied to projects to aid in achieving desired outcomes for safe, environmentally responsible development by preventing, minimizing, or mitigating adverse impacts and reducing conflicts. BMPs can also be proposed by SGI for activities. BMPs not incorporated into the permit application by the applicant may be considered and evaluated through the environmental review process and incorporated into the use authorization as conditions of approval or ROW stipulations.

SGI has also provided a Master Surface Use Plan of Operations (see **Appendix D**) and a Master Drilling Plan (**Appendix E**) that provide measures for application under Alternative A. These generalized plans would be revised to include site-specific information for future drilling permits, and reviewed for adequacy by the COGCC prior to approval. Upon review of the individual drilling application, the COGCC may request additional mitigation measures.

---

[2] Calculations of possible disturbance areas are based on the assumptions presented in **Section 2.2.5**, Elements Common to All Alternatives, and **Table 2-2**, Project Feature Assumed Short- and Long-Term Disturbance Estimates; the estimates below should be considered upper threshold limits for the purposes of summarizing the extent of possible disturbance under Alternative A, No Action.

### 2.2.7   Alternative B, Proposed Action

Alternative B is specific to BLM-administered mineral estate, the BLM's authority, and the actions they would approve under a Master Development Plan, including consideration of the 12-89-7-1 APD. As noted in **Section 1.3**, Decisions to be Made, this APD was submitted to the BLM, which inspected it on May 16, 2011. The APD has been pending since October 25, 2012. By considering it in the Final EIS, it is now possible for the BLM to approve or reject the APD as part of the ROD.

If Alternative B is approved, the operations and development of private minerals described in Alternative A would continue to be implemented. Alternative B describes the development that would occur on federal mineral estate within the Unit for purposes of comparison with Alternative A conditions. The combination of federal mineral and private mineral development is discussed and analyzed in **Section 4.1.3**, Cumulative Effects.

**Figure 2-2**, Alternative B, Proposed Action, presents the conceptual locations of potential well pads over areas currently thought to be most prospective for natural gas development.

All actions described below, including those that occur on split-estate lands, would be in compliance with all laws, regulations, and BLM policies, including BLM Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (DOI and USDA 2007), the BLM Manual 9113 (BLM 1985), and additional requirements from the Uncompahgre Basin RMP (BLM 1989). Design features, mitigation measures, and the COAs listed in **Appendix C** would apply (see **Table 2-11**, Stipulations, Design Features, and Mitigation Measures). In addition, several strategy and planning documents would apply, including the Hazardous Materials Management Summary (**Appendix G**), the Noxious Weed Management Plan (**Appendix I**), Bainard Augmentation Plan (**Appendix L**), and Poly Pipeline Operations Plan (**Appendix M**). The Master Surface Use Plan of Operations and a Master Drilling Plan (see **Appendices D** and **E**, respectively) would also apply, and a revised version of the plans specific to a development must be submitted with an APD.

#### New Developments

Alternative B includes up to 36 new well pads, up to 146 new natural gas wells, and up to 4 new water disposal wells to develop federal mineral estate. The average number of wells per pad would be the same as described above in **Section 2.2.4**, Elements Common to All Alternatives. Some of the new gas wells would be drilled on the existing water disposal or gas well pads. The quantity and combination of coal bed methane natural gas, sandstone gas wells, and shale gas wells on each pad is not known at this time and would also be determined at the APD stage.

Additionally, it is estimated that approximately 16 miles of new road construction and 53 miles of improvements to existing roads for access, 21 miles of new pipeline construction, and up to 4 new compressor stations would be constructed.

After release of the Draft EIS, SGI amended its Proposed Action with the following modifications:



**Alternative B, Proposed Action**

Alternative B, Proposed Action

- Proposed well pad analysis area
- Proposed screw compressor
- Proposed pipeline

- Proposed new road construction
- Existing road requires upgrade for use

Existing Infrastructure
- Existing road currently suitable for use
- Existing pipeline

- Existing storage yard
- Federal surface, federal minerals
- Private surface, federal minerals
- Private surface, private minerals

Alternative B is specific to BLM-administered federal mineral estate and surface and development would occur under a Master Development Plan.

Figure 2-2

- Inclusion of the 12-89-7-1 well pad APD—The Specific surface use plan of operations and drilling plan and other relevant information collected as part of the APD review process are provided in **Appendix O**. The site-specific information described below and in detail in **Appendix O** is a refinement of the types of development information described in **Section 2.2.5**, Elements Common to All Alternatives, and **Section 2.2.7**, Alternative B. For example, while the alternatives describe many options and general information for how a well may be drilled (e.g., horizontal, vertical, or directional), the information in the 12-89-7-1 APD Drilling Plan provides specifics as to the type of drilling and downhole engineering for this well pad and natural gas well (see **Figure 2-3**, Alternative B, C, and D 12-89-7-1 APD).

- New developments under the Proposed Action would be subject to SGI's Bull Mountain Unit WHP (see **Figure 2-4**, Alternative B, Proposed Action Wildlife Habitat Plan). The WHP would apply throughout development phase activities (construction, drilling, and completion); it would not apply to production or maintenance phase activities. The WHP with maps is found in **Appendix C**. The provisions found in the WHP are included in the text descriptions below.

- Three of the stations would remain the same, with one 637-horsepower, screw compressor engine in an appropriately sized and muffled building. The fourth station (outside the Unit boundary to the northwest; see **Figure 2-2**, Alternative B, Proposed Action) would consist of three 3,550-horsepower engines housed in a larger muffled building. The State of Colorado (15GU0015) and Gunnison County (OG2014-05) have permitted this station.

- The pipeline that ran east-west through T12S, R89W, Sections 7, 8, and 9 would be replaced with the Volk and Medved pipelines that run north-south from T12S, R89W, Section 9 to T11S, R89W, Section 29. The length of the pipeline has been updated to reflect this change.

Based on these numbers, and the assumed drilling rate noted in the common assumptions, it is estimated that drilling activities would occur for approximately 6 years.

*APD for Federal 12-89-7-1*

On November 6, 2014, the COGCC approved an APD submitted by SGI to drill 12-89-7-1, which was SGI had re-filed on June 19, 2014. The well would be drilled to a total depth of 4,700 feet, and would target sandstone and coal bed methane gas in the Cameo Coal, Corcoran, and Cozzette Formations. The well would have a 16-inch-diameter conductor casing in a 26-inch-diameter borehole to a depth of 80 feet; a 10-inch surface casing in a 12-inch-diameter borehole to a depth of 970 feet (the depth was extended in the current permit from its original depth); and a 6-inch-diameter casing in a 8.5-inch-diameter borehole to the final depth of 4,700 feet.

As described in the Surface Use Plan of Operations, the well pad would cover about three acres. A total of up to five wells are planned for this well pad. The wells would target both coal bed methane and sandstone and shale gas-producing formations.

2. Alternatives



Short-term surface disturbance for proposed well pad 12-89-7-1

Proposed pipeline

Existing road currently suitable for use

Bull Mountain Unit

Federal surface, federal minerals

Private surface, federal minerals

**Alternatives B, C, and D, 12-89-7-1 APD**

During development of the Final EIS, BLM agreed to consider the 12-89-7-1 well pad APD. This APD was submitted and had an on-site inspection by the BLM on May 16, 2011. The APD has been pending since October 25, 2012. By considering it the Final EIS in alternatives B, C, and D, it is now possible for BLM to approve or reject the APD as part of the Record of Decision.

Figure 2-3



**BULL MOUNTAIN UNIT**

The WHP covers 12,500 acres of the MDP. Of the alternative B estimated 600 acres of short term disturbance*, 353 would be covered under the WHP, and of the estimated 215 acres of long-term disturbance, 123 would be covered under the WHP. *The total short- and long-term disturbance acreages are calculated without any overlapping areas; for example, collocated pipelines and roads are only counted once rather than double counted.

December 30, 2015
BullMtn_alts_B_WHP_V08.pdf
Bull Mountain EIS Uncompahgre Field Office
No warranty is made by the BLM as to the accuracy, reliability, or completeness of these data for individual use or aggregate use with other data.

Source: SG Interests GIS 2013 and BLM GIS 2014

**Alternative B, Proposed Action**

- 🔴 Proposed well pad analysis area
- ⬠ Proposed screw compressor
- ▬ Proposed pipeline
- 〰 Proposed new road construction

- —— Existing road requires upgrade for use
- ▨ WHP winter closure
- ▨ Federal surface, federal minerals
- ▨ Private surface, federal minerals
- ▨ Private surface, private minerals

**Alternative B, Proposed Action Wildlife Habitat Plan**

New developments under the Proposed Action would be subject to the Bull Mountain Unit Wildlife Habitat Plan (WHP) submitted by SGI. The WHP would apply throughout development phase activities (construction, drilling, and completion); it would not apply to production or maintenance phase activities.

Figure 2-4

Although the proposed well pad is about one-half mile west of Highway 133 and East Muddy Creek, the topography to the east of the site is steep. Site access would be from an existing road designed to accommodate heavy vehicle traffic that runs southeast from an existing well pad, the Gunnison Energy Corporation's Hotchkiss 12-90 #1-34 well, located a little more than one mile northwest of the proposed well pad. This approximately one-mile road segment would require realignment, and about 23 acres of surface area would be disturbed in the process.

Just west of the proposed pad is the Narrows Gathering Pipeline, with a buried 12- to 16-inch-diameter gas line and an 8-inch-diameter water line for transporting gas and produced water from the production wells. The right-of-way of the Narrows Gathering Pipeline is 50 feet wide. About 2.75 acres will be disturbed for tie-in lines from the proposed well to the Narrows Gathering Pipeline.

*Construction*
In accordance with the WHP, SGI would do the following:

- Conduct raptor and migratory bird nest surveys at areas proposed for new surface disturbance and heavy construction and drilling—SGI will conduct these surveys between May 15 and July 15 of each year, prior to submitting a COGCC Form 2 or BLM NOS. The intent of the surveys is to implement avoidance strategies where possible and minimize potential impacts on nesting raptors and migratory birds. These surveys may modify facility design, make minor site location adjustments, and promote operational awareness to reduce direct and indirect impacts when a habitat of concern is identified. Where active raptor nests are identified, SGI will apply CPW's raptor nest buffer guidelines (Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors 2008). When other migratory bird nests are located, SGI will avoid disturbing them and will flag and avoid nestlings during the nesting season. Stream crossing in active streams would be conducted outside the spawning season identified by CPW for applicable aquatic species.

- Meet annually with the BLM by December 31 to summarize its development and mitigation activities for the previous 12 months and to forecast with best available information the next year's development and mitigation activities as they relate to the WHP.

- Observe the restricted surface occupancy (RSO) buffer restrictions in COGCC Rules—If SGI cannot comply with the RSO buffer restrictions for a particular facility, it agrees to enter into an individual consultation with CPW on that facility, under Rule 306.c, to evaluate options for avoidance, minimization, and mitigation.

- Avoid the verified elk winter concentration areas where practicable in re-siting the well pad—The primary constraint in avoiding these areas will be the 40-acre analysis area, within which the well pad can be relocated under the MDP EIS analysis. Other resources, such as slope, soil, and wetlands, will also factor into any re-siting analysis. Where this conflict occurs and cannot be resolved, site-specific mitigations will be addressed during any future required site-specific NEPA analysis.

*Access Road Construction*

The primary access roads would be State Highway 133 and County Road 265, and new road construction and improvements would only occur on an as-needed basis to facilitate access to well pads and other facilities. Site-specific plans for road construction and up-grades would be included as part of individual future APDs and would be subject to approval from the BLM.

New road construction and improvements to existing roads would typically require the use of motor graders, crawler tractors, 10-yard-end dump trucks, and water trucks. The standard method for building new roads involves the use of a bulldozer or track hoe to segregate the vegetation to one side of the route in windrows, remove topsoil to the opposing side of the route, and rough-in the roadway. As access roads would be constructed using standard crown-and-ditch specifications, a grader or bulldozer would establish barrow ditches and crown the road surface. Roads would be constructed with appropriate drainage and erosion control features and structures (e.g., cut-and-fill slope and drainage-ditch stabilization, relief and drainage culverts, water bars, wing ditches, and riprap). On roads with grades between 3 and 15 percent, rolling dips could be used rather than culverts. Where culverts are required, a track hoe or backhoe would be used to trench the road and install the culverts. Some hand labor would be required when installing and armoring culverts.

The new roads and improved existing road surfaces would be composed of an appropriate volume of road base compacted using a roller and freshwater as necessary. Approximately 6 to 8 inches of road base would be used in road construction and reconstruction. Road base or gravel would be hauled in and a grader would be used to smooth the running surface. Rock, road base, and gravel materials for all uses would be obtained from local permitted, commercial sources outside the Unit near Paonia and either Carbondale or Delta, Colorado. Specifics on where the source materials would be obtained from would be identified on the individual APD when it is submitted. These roads would be upgraded and covered with gravel as necessary to maintain the post-construction surface quality.

Freshwater would be used in initial road construction and rock/gravel surfacing to improve the workability of the soil, rock, and gravel and for dust abatement. Freshwater needed for access road construction would be obtained from nearby sources, in accordance with agreements with landowners, or would be under the guidance of SGI's water augmentation plan (see **Appendix L**, Bainard Augmentation Plan). Freshwater for dust abatement would be applied to the road more frequently as traffic volumes increase and according to weather patterns. Approximately 5,000 to 8,000 gallons of freshwater may be used per day per mile to control fugitive dust during dry months (for example in a typical June). Approximately 2,000 to 5,000 gallons of freshwater may be used per day per mile to control fugitive dust during wet months (for example during a typical August).

On average, SGI estimates that roads would be constructed at a rate of approximately 600 to 800 yards per day. Spur roads to individual well pads would be constructed just before well pad construction. Each spur road workforce would include an average of five workers to operate the equipment. For trunk roads (those providing access through the Unit or to multiple well pads), several crews could operate simultaneously on different roads or different portions of the same

road. The total number of workers on trunk road construction and improvements could range from 6 to12.

*Well Pad Construction (Gas and Water Disposal Wells)*
Before individual well pad construction, SGI would obtain approval of an APD by the BLM. Each APD would contain site-specific details related to well pad size, construction and well operations, and mitigation measures (see **Appendix C** for a list of COAs). The BLM may consult with CPW, CDPHE, the local government designee, and the landowner before applying its own measures to mitigate potential environmental impacts, or it could adopt the measures identified in **Appendix C**.

SGI will use multiple-well pad sites to reduce surface disturbance and overall habitat fragmentation. This could reduce heavy equipment traffic due to fewer rig mobilizations and de-mobilizations.

Construction of a typical well pad would entail the use of bulldozers, motor graders, Class 125 or larger track hoes, backhoes, compacters, and 10- to 20-yard dump trucks. Well pad construction equipment needs would vary depending on site-specific conditions; however, methods for construction would be the same for all types of natural gas well pads and water disposal well pads proposed.

Within the approved well pad location, a leveled area would be graded by a bulldozer after or simultaneously with upgrade/construction of an access road. Standard cut-and-fill construction techniques and machinery (bulldozer or grader) would be used; stockpile, cut, and fill locations in the well pad construction area would be specified on the APD. Vegetation would be cleared, and all available topsoil to a depth of 8 to 12 inches would be stockpiled and segregated from subsoils over the entire disturbed surface to create the well pad area. The well pad would be surfaced using "pit run," or equivalent material, which generally consists of rock less than 6 inches in diameter. The area within the anchor bolt pattern and around tank batteries or facilities would also be surfaced with a top dressing of 3-inch road base. Pit run and road base would both be trucked to the site from gravel pits near Carbondale, Delta, Paonia, or other local areas. If the well location requires only minimal grading, 8 inches of topsoil would be salvaged from the entire disturbed surface and stockpiled in contiguous berms or stockpiles at the edges of the well pad to facilitate future reclamation. Stockpiled topsoil would be protected against wind and water erosion and would be seeded with an approved seed mix concurrent with cessation of well pad construction and earth-moving operations. Native seed mixes would be required for reclamation.

On average, five workers, mostly equipment operators, would work on the construction of an individual well pad. This could take from one to three weeks, depending on the features of each particular site.

The quantity and combination of coal bed methane natural gas, sandstone, and shale gas wells on each pad are unknown at this time, the same as described in Alternative A. Additionally, as part of individual APDs, SGI would identify the specific pipeline routes needed in order to transport the gas and water from the well head.

Under Alternative B, SGI could propose a reserve pit or pitless closed-loop drilling system, which would determine the size and construction needs of the well pad. If SGI used a drilling system with a reserve pit to hold drill cuttings and fluids, it would construct a lined reserve pit system on the well pad. The reserve pit sizes vary with well type and site conditions, but they would typically be approximately 50 feet by 150 feet and lined with an impermeable, minimum 24-mil plastic liner so as not to leak, break, or allow discharge. The reserve pit would be fenced on three sides during drilling and on the fourth side immediately after the drilling rig is removed. The well pad itself may also be fenced. Bird netting would be installed over the pit within 24 hours, and silt fencing would be installed around the base of the fences. Two feet of freeboard is required at all times. Any reserve pits left open over the winter would be fenced to keep out big game and wildlife. Pits would have a 2-foot unlined berm in addition to the minimum 2 feet of freeboard around them to prevent snowmelt on the pad from flowing into the pits.

Fill from the pit would be stockpiled along the edge of the pit and the adjacent edge of the well pad. As necessary, SGI would use erosion control measures, including proper grading to minimize slopes, diversion ditches, mulching, riprap, fiber matting, temporary sediment traps, and broad-based drainage dips. These materials and structures would be used to minimize erosion and surface runoff during well pad construction and operation.

The requirements for a closed loop drilling system are described under *Gas Well Drilling*, below.

In addition to installing standard stormwater erosion controls to protect water quality, as required by the CDPHE, SGI would comply with CPW- and COGCC-recommended buffers for aquatic habitats in the BMU. SGI would implement the following best management practices from the wildlife habitat plan in the BMU:

- Except as outlined on Figure 2 in the WHP and activities outlined in the bullets below, no surface disturbance would be allowed within 300 feet of a designated cutthroat trout stream.

- In other watersheds, well pads and facilities would not be sited, to the extent practicable, within 150 feet of any natural lake, wetland, or perennial or seasonally flowing stream or river.

- Roads crossing CPW mapped cutthroat trout streams would be bridged or appropriately sized culverts would be used to prevent stream bed damage and the transfer of disease organisms. Pipelines that cross cutthroat trout streams should be bored if practicable.

- Stream disturbances in or upstream of CPW-mapped cutthroat trout habitat would be avoided between June 1 and August 31 to prevent impacts on spawning cutthroat trout.

- All stream crossing and culverts on perennial and intermittent streams would be designed to allow aquatic species passage.

- Minimum right-of-way widths would be used where pipelines cross riparian areas and streams, and crossing would be constructed at right angles to the stream channel.

- Native riparian canopy cover and stream bank vegetation would be left intact to the extent practicable.

- Chemical dust suppression would be avoided within 300 feet of the ordinary high water mark of any reservoir, lake, wetland, or natural perennial or seasonally flowing stream or river, unless required by the surface owner or by county or state requirements.

- Water suction hoses would be screened to exclude fish and amphibians.

- SGI would disinfect heavy equipment, hand tools, boots, and any other equipment that was previously used in a river, stream, lake, pond, or wetland in a different watershed before moving the equipment to another water body. The disinfection practice applies field wide and follows the procedure outlined in COGCC's Rule 1204.a.2.

*Pipeline Construction*
SGI would collocate pipelines and other utilities next to road rights-of-way where practicable. The methods of construction are described below and are the same as described in Alternative A, No Action.

Pipelines would be necessary to transport gas from producing wells to the existing gas pipeline and to transport produced water to proposed water disposal wells or flowback pits.

The following sections describe the various pipeline construction phases, which are typical for this type of development.

Clearing and Grading
At the start of pipeline construction, the route would be cleared of vegetation to remove any obstacles or debris. Grading would follow to remove the topsoil and surface rock and stockpile it at the edge of the route for redistribution following construction. All brush and other materials that are cleared would be placed in windrows in the route or in temporary use areas. If the pipeline is not collocated with a road, then these materials may be dispersed over the route to impede access following construction. Trees and rocks would be strategically placed on the pipeline corridor to impede access, as stipulated by individual permit conditions or surface landowner agreements.

Trenching
Construction methods used to excavate a trench would vary, depending on soil, terrain, and related factors. Rotary trenching machines would be used where possible. In situations where there are steep slopes, unstable soils, high water tables, or deep or wide trench requirements, conventional tracked backhoes (track hoes) would generally be used. Highway crossing methods and construction requirements would be according to CDOT permit stipulations and general conditions as necessary.

SGI would take measures during construction to ensure that access is provided for property owners, tenants, and ROW holders to move vehicles, equipment, and livestock across the trench where necessary. Adequate precautions would also be taken to ensure that livestock are not prevented from reaching water sources because of the open trench. These would include

contacting livestock operators, providing adequate crossing facilities and fencing, or other measures as needed.

If a pipeline should be routed across a road or wetland, SGI could use a pipeline bore for the crossing. If so, the bore operations would be set up outside of the wetland or road right-of-way and would be designed to minimize impacts on these features. Temporary use areas before and after the feature to be bored may be needed and would vary in size depending on the terrain and the size of the feature to be bored. Specific route determinations, siting design, and boring methods would be determined at the permitting stage.

<u>Pipe Installation</u>
Gas gathering and subsurface water pipelines would be constructed of steel. Pipe installation would include stringing, bending for horizontal or vertical angles in the alignment, welding the pipe segments together, making x-ray inspection, coating the joint areas to prevent corrosion, and then lowering-in and padding.

- Stringing—Line pipe would be trucked directly from the manufacturer or a contractor storage yard to the corridor. Each individual joint of pipe would be unloaded and strung parallel to the trench. Sufficient pipe for road or stream crossings and steep slopes would be stockpiled near the crossings or slope. Stringing operations would be coordinated with trenching and installation to properly manage the construction time at a particular tract of land. Gaps would be left at access points across the trench to allow crossing corridor.

- Bending—After the joints of pipe are strung along the trench but before the joints are welded together, individual joints of the pipe would be bent if necessary to accommodate horizontal and vertical changes in direction. Field bends would be made using a hydraulically operated bending machine. Where the deflection of a bend exceeds the allowable limits for a field-bent pipe, factory (induction) bends would be installed.

- Welding—After the pipe joints are bent, the pipes would be lined up end-to-end and clamped into position. The pipes would then be welded in conformance with 49 CFR, Part 192, Subpart E, "Welding of Steel Pipelines," and API 1104, "Standard for Welding Pipelines and Related Facilities," latest edition.

- X-ray inspection—Welds would be inspected by a qualified inspector using nondestructive radiographic methods and according to CDOT requirements. A specialized contractor, certified to perform radiographic inspection, would be employed to perform this work. Any defects would be repaired or cut out, as required under the specified regulations and standards.

- Coating—To prevent corrosion, the exterior of the pipes would be coated with fusion-bonded epoxy coating before delivery. Power Crete-coated pipe would be installed in all bore locations unless the pipe is cased. After welding, field joints would be sandblasted, flocked, and coated with a synergy coating. Before the pipe is lowered into the trench, the pipeline coating would be inspected and tested with an electronic detector, and any faults or scratches would be repaired.

- Lowering-in and padding—Once the welding, inspection, and joint coating has been completed, a section of the pipe would be lowered into the trench. Side boom tractors would be used to lift the pipe, position it over the trench, and lower it into place. An inspection would verify that minimum cover is provided, the trench bottom is free of rocks or other debris, external pipe coating is not damaged, and the pipe is properly fitted and installed into the trench. Specialized machines would be used to sift soil fines from the excavated subsoils to provide rock-free pipeline padding and bedding. In rocky areas, padding material or a rock shield would be used to protect the pipe.

- Backfilling—This would begin after a section of the pipe has been successfully placed in the trench and final inspection has been completed. Backfilling would be conducted using a track hoe, rotary auger back filler, padding machine, or other suitable equipment. Backfilling of the trench would generally use the subsoil previously excavated from the trench, except in rocky areas where imported select fill material may be needed. Backfill would be graded and compacted by tamping or walking-in with a wheeled or tracked vehicle. Compaction would be performed to 95 percent maximum density, as determined by AASHTO T-99, at all county road crossings. Trenches would not be backfilled where the soil is frozen to the extent that large consolidated masses have formed that would not break down. The contractor would then re-spread the previously segregated topsoil to return the surface to its original grade. Any excavated materials or those unfit for backfill would be used or properly disposed of, in conformance with applicable laws or regulations. The construction contractor would place an approximately 6-inch-high mound over the trench to account for subsidence. The entire construction zone would be seeded in the first appropriate season after disturbance.

- Pressure testing—The entire pipeline would be tested in compliance with USDOT regulations (49 CFR, Part 192). Before the pipeline is filled for a pressure test, each section would be cleaned by passing reinforced poly pigs through the interior. Incremental segments of the pipeline would then be filled with compressed water, air, or natural gas to the desired maximum pressure (up to 720 pounds per square inch) and held for the duration of the test (8 hours minimum, if USDOT regulations apply). The compressed air would be discharged into the atmosphere following the completion of the test. All nearby residents and the Gunnison County Dispatch Center would be notified before the pressure test and blow down. If necessary, water would be discharged into upland areas on gentle slopes. This would be conducted in accordance with the conditions and stipulations in CDPHE's Colorado Discharge Permit System for Hydrostatic Testing of Pipelines Tanks and Similar Vessels. These conditions and stipulations require permit-specific sampling, testing, filtering or mitigation, reporting, and a plan to prevent soil erosion or impacts on surface waters.

Gathering pipelines for individual well pads would consist of 6- to 8-inch outer diameter pipeline and would be designed for 720 pounds per square inch. Each gathering line would tie into a larger trunk line with a 12- to 16-inch outer diameter, which would eventually transport the gas to the Bull Mountain pipeline; carsonite pipeline markers would be installed on the surface, and tracer wire would be installed for all buried pipelines. The dimensions of the pipe used would depend on the number of wells served and the production estimates.

Between 10 and 25 construction- and supply-related workers would be needed to install new sections of the pipeline gathering system. All gas pipelines would be constructed to applicable American Petroleum Institute and industry standards.

*Overhead Electrical Line Construction for Water Disposal Wells*

Under Alternative B, SGI proposes up to four new water disposal wells that would require construction of four new overhead electrical lines (up to 20 power poles) to supply power to the water disposal well heads. SGI would collocate pipelines and other utilities next to road rights-of-way where practicable.

The methods for constructing the electrical lines are described below and are the same as described in Alternative A, No Action.

Electrical lines would be constructed following successful completion of the new water disposal wells. Electrical power would be used for long-term operation of lights, water heaters, and ancillary needs at the water disposal facilities. In most but not all cases, well pumps would not use electricity and would be run by natural gas-powered pumps.

The average ROW width for power lines is 30 feet; final routes would be subject to surface owner approval. If a line followed existing two-track roads, then construction vehicles would stay on existing disturbance areas. If the line ran cross-country, then appropriate access and vehicle routes would be approved as part of the project design. If the terrain allows for it, access could be overland along the route.

Wooden power poles would be erected, and typical equipment includes pickups, auger/drilling rigs, bucket trucks, and stringing equipment. Some Gambel's oak, aspen, and other taller shrubs may need to be pruned back for construction, and each power pole hole would disturb approximately 8 square feet of vegetation during excavation of the hole and setting of the power poles. There would be no prescriptive clearing of the corridor for electrical lines, which would run to the new water disposal well location.

**Drilling**

Drilling operations would be conducted in compliance with all applicable and relevant state and federal regulations. In accordance with the WHP, SGI would limit the number of drilling rigs in the BMU when wintering big game could be most impacted. SGI would operate up to three drilling rigs between April 15 and December 1 of each year. Only one drilling rig would operate from December 1 through April 15 each year.

To address potential direct and indirect impacts on wintering big game, SGI would voluntarily limit winter activities in portions of the BMU that CPW has identified as the most critical to wintering big game. See **Figure 1**, Winter Closure Areas, in **Appendix C**, the Wildlife Habitat Plan.

SGI agrees that the activities listed below would not be allowed in the voluntary big game winter closure areas between December 1 and April 15 each year:

- Drilling of new wells

- Well work-over and completion activity intended to increase the production of a well

- Reclamation activities and existing road maintenance activities that can be delayed until after April 15 each year

- New surface-disturbing activities, including pipeline construction and installation, road and pad construction, and other general construction and facility installation

The BLM would not unreasonably withhold individual waivers allowing for such continuing activity under the following circumstances:

- Where activities prohibited in the winter closure areas between December 1 and April 15 of each year would begin in a timely fashion

- Where the date of completion is expected to be December 1

- Where operational or regulatory restraints require continuing operations after December 1

SGI would limit activities to the following between December 1 and April 15 each year:

- Well production and routine maintenance activities. In this context, well production and routine maintenance activities are

  o Emergency work-overs or other emergency actions necessary to remedy equipment failures or unanticipated declines in production, or as required by local, state, or federal regulatory agencies

  o Non-routine pipeline facility maintenance necessary to remedy unanticipated production problems, to address safety issues, or as required by local, state, and federal regulatory agencies

  o Normal daily production activities including pumping of wells, generally requiring up to two vehicle trips per day or less to a well pad

Normal daily production activities require snow plowing and the minimum amount of road maintenance necessary to access the well. Daily access to each well pad is necessary for safe and environmentally responsible operations. For example, formation water produced from wells in the BMU and stored temporarily in tanks on each location requires daily site visits to ensure prudent and environmentally responsible operations. The combination of large volumes of stored water and extreme low temperatures can result in mechanical failures that can be effectively monitored only by daily site visits. Roads to each location must be plowed to ensure minimal response times for necessary equipment to address any issue that could result in damage to environmental resources. Remote telemetry monitoring cannot provide the same level of assurance and environmental protection that human daily site visits can.

SGI would install gates and signs to limit access, to the extent permitted by the landowners, at all entry points to the Voluntary Big Game Closure Areas (see **Figure 1**, Winter Closure Areas, in **Appendix C**, the Wildlife Habitat Plan).

Specific techniques for drilling wells would differ depending on whether SGI drilled a gas well or a water disposal well; the specific techniques for natural gas well and water well drilling are presented below. Trucks would transport drilling components to the work site. Rig components are designed for portability and are easily loaded and unloaded and mostly are self-contained on the mobile drill rig. Auxiliary equipment for the supply of electricity, compressed air, and freshwater would be trucked in for drilling operations. Drill pipe, drill bits, cement, freshwater, wire rope, and other supplies would be trucked to the well pad and stored until used. Traffic would consist of support equipment, contractor vehicles, construction personnel, and material delivery. Well pad activity would involve backhoes, front-end loaders, boom and winch trucks, delivery trucks, welding machinery, and personal vehicles.

*Gas Well Drilling*

Gas well drilling could use any of the different wellbore directions, types of drilling technologies (reserve pit and/or closed loop systems), target formations, and drilling lubricants. Alternative B, Proposed Action, does not present a preference for one type of technology or methodology over another. Under Alternative B, the type of wellbore, drilling system, target formation, and drilling lubricant would be specified in the APD when submitted to the BLM. All drilling operations and other well site activities would be conducted in compliance with BLM policies, and regulations, and with the Master Surface Use Plan of Operations and Master Drilling Plan (see **Appendix D** and **E**, respectively). The possible range of methods for drilling are described below.

In its broadest definition, a wellbore is a hole that is drilled to aid in the exploration and recovery of natural resources, including oil, gas, or water. A wellbore is the actual hole that forms the well and can be drilled vertically or directionally. A vertical wellbore is drilled straight down below the drilling rig. A directional wellbore may start out vertically but is then turned to move out at an angle, in an S-shape, or turned horizontally. Wellbores could be any of the mentioned varieties (vertical or directional) and would be encased by such materials as steel and cement. Because applications to the COGCC are similar to federal applications, illustrations of the different types of wellbores for federal applications are provided in **Appendix E**, Master Drilling Plan.

As noted under the section describing the well pad construction techniques, drilling methods could fall within two broad categories: those drilling systems that use a reserve pit on the well pad or a pitless system, generally called a closed-loop system. Under Alternative A, SGI proposes either to drill with a reserve pit or a closed-loop. Which system it uses would depend on the type of well to be drilled, what drilling equipment may be available at the time, and economic factors, such as a closed-loop system becoming cost-prohibitive. The type of drilling system would be determined when the drilling application is submitted to the BLM.

In drilling with a reserve pit system, a small amount of fluid is retained in the cuttings, which are placed in the reserve pit. The reserve pit would also hold freshwater or recycled water used in drilling and any excess drilling mud; the reserve pit would not be used to store flowback water during the completion phase nor to store produced water during the production phase.

Drilling mud would be circulated by means of pump pressure from the rig mud pits down the drill pipe, through jets in the bit, and up the annulus (the space between the wellbore and the drill pipe). Drilling mud would flow through a series of equipment and tanks in order to recondition

it. A small amount of mud and the cuttings from the wellbore would be placed in the reserve pit. Drill cuttings would be processed to remove excess drilling fluids. The cuttings would be stored on location in segregated lined piles or in a storage container. Cuttings would be sampled and tested according to COGCC 900 Series Rules then transported to a permitted disposal/waste management facility.

Each reserve pit would be constructed with an impermeable liner so as to prevent releases. Reserve pit fences would be constructed and maintained according to the BLM requirements, including using fencing and netting to prevent harm to wildlife. Once all drilling wastes are removed from the pit, the pit liners would be removed and disposed of at a permitted waste facility; the pit would be closed in compliance with all COGCC 900 Series pit closure rules.

A closed-loop system is defined simply as a mechanical and chemical system that would allow an operator to drill a well without using a reserve pit. In a closed-loop drilling system, the reserve pit is replaced with a series of storage tanks that separate liquids and solids. Equipment such as screen shakers, hydrocyclones, or centrifuges to separate solids and collection equipment, such as vacuum trucks, minimize the amount of drilling waste muds and cuttings that require disposal and maximize the amount of drilling fluid recycled and reused in the drilling process.

The recovered drilling fluid can be stored in 500-barrel tanks and reused in active mud systems; consequently, drilling fluid is moved from well to well and is reconditioned by the dewatering equipment and mud products. The solid wastes would be transferred off-site for disposal at oilfield waste disposal facilities.

Following well pad and access road construction, a tier-2 or tier-3 type drilling rig would be transported to the well pad, along with other necessary equipment; SGI would determine which rig is finally chosen at the APD stage, depending on availability or BLM COAs. A conventional drilling rig used for vertical wellbores would require construction, as described above in the well pad construction section. The rig would operate 24 hours a day. If the well were proposed as a directional wellbore (e.g., horizontal or s-shaped), then directional drilling equipment would be used and would operate 24 hours a day. Additional equipment and materials needed for directional drilling operations would be trucked to the well site.

Drilling would begin by digging a circular pit, called a cellar, and lining the pit with metal, where the wellbore would be drilled. The cellar would provide space for the casing head spools and blowout preventers that would be installed under the rig. Drilling operations normally include the following:

- Keeping a sharp bit on the bottom drilling as efficiently as possible

- Adding a new joint of pipe as the hole deepens

- Tripping the drill string out of the hole to put on a new bit as needed and running it back to the bottom

- Installing steel casing and cementing it in the hole

Drilling fluids are used to aid the drilling of boreholes regardless of the type of well being drilled. The main functions of drilling fluids are as follows:

- To provide hydrostatic pressure to prevent formation fluids from entering the wellbore

- To keep the drill bit cool and clean during drilling

- To carry out drill cuttings (i.e., pulverized rock generated from drilling)

- To suspend the cuttings while drilling is paused and when the drilling assembly is brought in and out of the hole

Drilling fluid is a mixture of either water or an oil-based product, such as mineral oil, and mud. For Alternative B, SGI would use both water-based and oil-based drilling fluids, depending on the target formations. Specifics on which type of drilling fluid used would be included on the individual APD.

A water-based drilling fluid uses freshwater or recycled water[3] or a combination of both mixed with the mud; SGI would use a freshwater mud system. Up to approximately 3,000 barrels of water would be used for drilling a particular well. For Alternative B, that would result in up to 438,000 barrels of water for drilling (up to 3,000 barrels per well multiplied by up to 146 new wells drilled). In production level formations, where borehole stability requires it or for directionally drilled wells, an oil-based drilling fluid, made from products such as mineral oil, may be used. The mud portion of a drilling fluid is composed of clays, minerals, and additives, such as bentonite, barite, soda ash, lime, polymer, lignite, and lost circulation material.

The drilling fluid used for a particular job is selected to avoid formation damage and to limit corrosion. For example, where borehole stability requires it, a mud typically consisting of potassium chloride substitute and commercial clay stabilizer (such as di-ammonium phosphate) would be used to drill the production hole section. This mud formulation inhibits potentially reactive shales to prevent shale swelling and hole sloughing. Drilling fluids and mud additives would be recirculated during drilling and could be transported to another drilling location for reuse or treated and removed from the location.

Casing and cementing plans are designed by engineers and are included in an APD and associated drilling plan. The casing and cementing program would be conducted as approved to protect and isolate all usable water zones, potentially productive zones, lost circulation zones, abnormally pressured zones, and any prospectively valuable deposits of minerals. Placement of steel casing would entail the connection and insertion of continuous sections of steel pipe into the drill hole. The casing would extend from the bottom of the hole to the surface, except when a drilling or production liner is used. Casing would be set in the hole, one joint at a time, threading one piece into a collar on the next. The wells would be lined with conductor casing to a depth of

---

[3] Recycled water has been used in other phases of the well development process. It could be water that has been removed from drilling mud, water used during completion that flows back after the well has been pressured and fractured, or water that has been produced as a by-product of gas production (known as produced water).

at least 80 feet, with surface casing to at least 400 feet, with intermediate casing to approximately 3,000 to 5,500 feet, then with production casing to the target well depth. Casing programs are dependent on the target depth and individual well casing plan.

The casing would be cemented into place in stages by pumping a slurry of dry cement and water into the casing head, down through the casing string to the bottom of a string stage, and then up through the spacing between the casing and the wellbore (annulus), back up to the surface, except when a production string is used. Surface casing cement is calculated to return to the surface (100 percent excess volume). After the cement is pumped into the casing, a 1-inch-diameter pipe is run on the outside of the casing and approximately 50 sacks of cement are used to top off the annulus. If the cement does not circulate back to the surface, a temperature log is run to find the top of cement. At this point, corrective measures are taken, if necessary.

A plug would be pushed to the bottom of the wellbore to remove any residual cement from the inside walls of the casing. If adequate cement coverage and quality were not attained, remedial actions would be taken, based on site-specific situations. Calculated volumes of cement would be pumped into the annulus to fill the space, where it would be allowed to harden. A cement bond log would be run on the wellbore to ensure that no voids remain in the annulus. Cementing the annulus around the casing pipe accomplishes the following:

- Restores the original formation isolation by posing a barrier to the vertical migration of fluids or gasses between rock formations in the annulus of the borehole

- Protects the well by preventing formation pressures from damaging the casing

- Retards corrosion by minimizing contact between the casing and naturally occurring corrosive formation fluids

Each well may have multiple strings, and each string is cemented independently.

All drilling operations and other well site activities would be conducted in compliance with BLM rules and regulations. Pressure tests are required before drilling out from under all casing strings set and cemented in place. Blowout preventer controls must be installed before drilling out the surface shoe and before starting workover or completion operations. Blowout preventers would be inspected and tested at regular intervals to ensure good mechanical working order.

Site-specific descriptions of drilling procedures would be included in each APD submitted to the BLM for each proposed well.

Drilling activities on individual wells would typically occur 24 hours a day, 7 days a week, and would require approximately 16 workers.

Coal bed methane natural gas wells would typically be drilled vertically, but some would be drilled directionally, including horizontally, depending on the specific needs at that location. These are dictated by terrain in the surrounding areas, distance to the Unit boundary, and other site-specific factors. There could also be multiple wells on one well pad. Development of coal

bed methane natural gas wells on new well pads, including construction, drilling, stimulation, and completion, would require an average of 60 days.

Shale and sandstone gas wells could be drilled vertically or directionally or with multiple horizontal wells from a single pad, where feasible, to minimize the number of well pads required to drain the resource. Directionally drilled wells, both shallow and deep, could take approximately 46 to 60 days per well to drill. Development of shale gas wells on new well pads would require an average of 85 days.

In accordance with the WHP, SGI would manage pits necessary for production activities to minimize the likelihood of wildlife mortalities. SGI would install wildlife fencing around pits and netting over open pits to exclude birds, bats, and terrestrial wildlife. For reserve pits, the netting would be applied within 24 hours after drilling has begun. The netting would be retained and maintained for as long as there are liquids in the reserve pit, but it may be removed once the pits are dried. For dry pits, SGI would provide escape ramps or other means to allow terrestrial wildlife to escape from open pits. SGI may implement closed-loop pitless drilling systems at its discretion to avoid the need to fence and net reserve pits.

*Water Disposal Well Drilling*
For Alternative B, SGI proposes drilling up to four new water disposal wells.

For each water disposal well, a 24-inch-diameter hole would be drilled for the first 40 feet and then gradually reduced with decreasing diameters of casing strings until the hole reaches its target depth, estimated at 10,000 feet. Once the casing strings are set and the outside annulus is cemented in place for each string of casing, the wells would be completed (see *Water Disposal Well Completion* below).

Tubing with a diameter of 2.875 to 3.5 inches would be run down the casing to the top of the target disposal zones. The tubing would be landed in a set packer approximately 100 feet above the uppermost completed injection zone. A packer set has rubberized rings, which when activated seal off the bottom of the casing, preventing disposal waters from migrating up the insides of the casing. Above the packer set, the annulus between the tubing and inner casing walls would be filled with packer fluid. Pressure would be monitored at the surface to detect any loss of packer fluid into surrounding formations and to detect migration of injected water upward into nontarget annulus zones, as well as to ensure tubing, packer, and casing integrity.

The disposal wells may be completed in the Entrada or Maroon Formations; the primary injection target zone is the Entrada Formation at 8,900 feet, with the Maroon Formation in the secondary injection zone at 9,000 to 9,500 feet. The maximum daily injection rate for the Maroon Formation is 4,000 barrels a day, while the maximum daily injection rate for the Entrada Formation is 2,000 barrels a day. If these formations are not usable, the Dakota and Morrison Formations may be evaluated. A water-based mud system would be used for drilling the surface hole, and a low-solids, non-dispersed gel system would be used for the intermediate and production hole sections of the water disposal well.

Drilling water disposal wells would require 60 to 120 days to complete. Up to 3,000 barrels of water would be used for drilling a particular water disposal well. For Alternative B, that would

result in up to 12,000 barrels of water that could be used for drilling (up to 3,000 barrels per well multiplied by up to four new water disposal wells drilled).

Water disposal wells would be permitted by the BLM as APDs if the wells are on-lease; SGI would then go through the conversion process with the BLM and COGCC to ensure that no production could come from the well prior to using the well for water disposal.

### Completion

#### Gas Well Completion

After well drilling and casing, a completion program would be initiated to stimulate production of natural gas and to determine gas and water production characteristics. A mobile completion rig (also called a workover rig) similar to the drill rig may be used to complete each well. The well completion process, lasting 8 to 10 days, includes perforating the well's steel casing and cement, hydraulically fracturing the producing formations, and installing a series of valves and fittings on the wellhead. Hydraulic fracturing does not always require the presence of a workover rig.

Wells are often treated during completion to improve resource recovery by increasing the rate and volume of hydrocarbons moving from the natural gas reservoir into the wellbore. These processes are known as well-stimulation treatments and include hydraulic fracturing, acidizing, and other mechanical and chemical treatments, often used in combination.

Hydraulic fracturing is a 60-year-old process used to maximize the extraction of underground resources by allowing natural gas to move more freely from the rock pores to production wells that bring the gas to the surface. Fluids, commonly made up of water and chemical additives (e.g., recycled or freshwater, liquid carbon dioxide, sand, and chemical additives), are pumped into a geologic formation at high pressure. When the pressure exceeds the rock strength, the fluids open or enlarge fractures. After the fractures are created, a propping agent is pumped in to keep them from closing when the pumping pressure is released. After fracturing is completed, approximately 60 to 80 percent of the injected fracturing fluid returns to the wellbore (EPA 2004). The specific type and components of the fracturing fluid chemical vary based on geologic formation and by company, but they may include constituents such as hydrochloric acid, anti-bacterial agents, corrosion inhibitors, and surfactants (BLM 2013a). In accordance with COGCC Order No. 1R-114, operators are required to disclose chemicals intentionally added to hydraulic fracturing fluids on FracFocus.

Hydraulic fracturing is now being used more commonly due to advances in technology. Groundwater is protected during the fracturing process by a combination of the casing and cement that is installed when the well is drilled and by the depth of the rock between fracture zone and any freshwater-bearing zones or aquifers (EPA 2004). Illustrations of the different wellbore requirements are in **Appendix E**, Master Drilling Plan. Additionally, specific casing information would be included on the drilling applications. The casing and cementing techniques described in the drilling plan would provide redundant protection of all usable aquifers above the target zones by cementing both the surface and intermediate casing strings from the base of pipe back to the surface.

Water used during completion operations would be recycled, freshwater, or a combination of both, and quantities used would vary in accordance with the formations the wells are completed in. Specifics for how much water each well type would require for completion is provided in **Appendix E**. As each well type requires vastly different volumes of water, calculations for estimated water use were based on assuming 50 percent CBNG wells and 50 percent shale wells, as discussed in the Bull Mountain EA. Calculations used the number of new wells per alternative and divided in half for each type of well (CBNG/shale). To estimate the volume of water use per well type, the number of wells was multiplied by the highest volume of water use for that well type. Water use totals were added to get a total maximum amount of water use. The results showed that there could be up to 18,132,000 barrels (or 1,759 acre-feet) of water used for well completions during the six-year development time frame. If fewer shale wells were drilled and completed, the water use estimate would be lower.

Test gas could be flared (released to the atmosphere), or environmentally friendly green completion technology may be used, and must meet additional federal requirements such as federal regulations and Onshore Orders. Recycled water could also be used for well completions when water conditions allow (see *Flowback Pits* discussion below). What makes the well completion "green" is that the gas is separated from the water and placed in a pipeline instead of being released to the atmosphere. Green completions take place during the flowback stage of the completion, during which natural gas is produced with the water. Green completion technologies capture the gas at the well head immediately after well completion instead of releasing it into the atmosphere or flaring it off, reducing volatile organic compound (VOC) emissions from wells. In green completions, gas and hydrocarbon liquids are physically separated from other fluids and delivered directly into equipment that holds or transports the hydrocarbons for productive use. There is no venting or flaring when green completion techniques are employed. (See COGCC regulation 800-4 for further details on green completion technologies.)

If a well is flared, the flares are designed to be directed straight upward and are on a pad to prevent damage to the environment or a safety hazard. If it becomes necessary to flare a well, a deflector or directional orifice would be designed and installed to safeguard both personnel and adjacent lands. The flowback involves removing the water that was used to stimulate the well.

Following the hydraulic fracturing of the well, a percentage of the fluid, consisting primarily of produced water, may be returned to the surface. This percentage of return varies between wells. Even though the produced water and gas can flow to the casing after it is perforated, a small-diameter pipe, called tubing, is placed in the well as a way for the produced water to be brought to the surface. Typically, the start of the tubing is placed below the perforated interval to allow any fluids collecting at the bottom of the well to be pumped up through the tubing to the surface. The tubing in the well is suspended from the wellhead, so as the well production flows up, the production from the well can be controlled by opening and closing valves on the wellhead. Excess produced water would be stored on the pad in containers, piped to the McIntyre Flowback Pits (see *Flowback Pits*, below), or sent to a water disposal well for reinjection.

Typical equipment and vehicles used during completion activities are as follows:

- Propane and carbon dioxide tanker trucks

- Hydraulic fracturing trucks

- Sand transport trucks and water trucks

- Oil service trucks used to transport pumps and equipment for hydraulic fracturing

- Flatbeds and gin trucks to move water tanks, rigs, tubing, and hydraulic fracturing chemicals

- Logging trucks (cased hole wireline trucks)

- Pickup trucks to haul personnel and miscellaneous small materials

Individual wells would be completed 24 hours a day, 7 days a week, and would require approximately 25 workers. Completion of an individual well would generally take approximately seven days, depending on conditions. Flow testing follows completion and takes 25 to 50 days. Only two workers are used 24 hours per day for testing.

*Flowback Pits*

At full build out, the four McIntyre Flowback Pits would be used for the Proposed Action.

In order to minimize water consumption for completion operations, SGI has constructed four pits on private surface lands to temporarily store a mixture of freshwater, produced water, and recycled water before and after completion operations, in accordance with the regulatory guidance and permitting of COGCC. Water estimates for hydraulic fracturing operations by well type are presented in **Appendix D**. The flowback pits would reduce the number of trucks transporting water, on-site storage of water on pads in hydraulic fracturing tanks, and subsequent removal of water between hydraulic fracturing operations. At this time the flowback pits are permitted as follows: two pits on Rock Creek Ranch (T11N R90W Section 24) immediately north of SGI's existing federal 11-90-24-2 water disposal well, and two additional pits on Rock Creek Ranch lands in T11N R90 Section 26. (See **Table 2-4**, McIntyre Flowback Pits, for further details on the pits.)

Fresh, production, and recycled water would be delivered to the McIntyre pits through surface polyethylene (HDPE, referred to here as poly) pipe and existing buried steel water pipelines for temporary storage prior to hydraulic fracturing operations. Temporary water pumps would draw water from the McIntyre pits into the temporary surface pipes and existing water pipelines, in order to reduce the number of trucks hauling fluid. Water would be mixed with sands and chemicals on a target pad site before being injected into a wellbore (see the *Drilling* and *Hazardous Material and Solid Waste* sections below for details on chemicals used).

SGI plans to temporarily lay down poly pipelines in order to transport the freshwater or recycled water used for completions from the McIntyre pits to storage tanks and then to the wellhead (see **Appendix M**, Poly Pipeline Operation Plan). Generally, the pipe strings would follow roads. The length of time the pipe is on the surface depends on where and when a well is to be completed; it is moved from one location to another when a new well is ready for completion. Temporary poly may be left in place for several months in some cases. Pipe diameter depends on the volume and

pressure of water needed for the completion. SGI anticipates that 12-inch internal diameter pipe would be the largest required, but the company could use an 8-inch- or 6-inch-diameter pipe if needed.

After hydraulic fracturing operations for a well are complete, used fluids would flow back out of a wellbore and would be filtered on the pad site, temporarily stored in tanks, and then trucked to a McIntyre flowback pit or pumped into an existing water pipeline or temporary surface poly pipe for delivery to a McIntyre flowback pit for temporary storage. These used fluids could then be reused for additional hydraulic fracturing operations during the same season if water condition allows. The highest total dissolved solids (TDS) anticipated in the water contained in the pits would be 60,000 to 70,000 parts per million (ppm), with an average TDS of 40,000 ppm in the pits. Produced water TDS in the field is approximately 15,000 ppm.

Construction of the McIntyre pits involved salvaging topsoil, excavating the pit itself, and compacting the pit interior. Pits have been engineered with a triple liner system that includes surface and groundwater sites and monitoring of the four groundwater monitoring wells, as required by the COGCC permits issued for the pits. There is a 1-foot berm surrounding the pit over which the liners are pulled and anchored on the opposite side. At least 2 feet of freeboard is maintained in the pits at all times. Netting is stretched over the pits to keep birds out. Additionally, year-round wildlife and silt fencing has been placed around the pits to prevent terrestrial wildlife from entering a full or empty pit.

*Water Disposal Well Completion*

The additional water disposal wells would also require completion. Similar to traditional wells, a workover rig would be used to complete a water disposal well. This process includes perforating the well's steel casing and may include hydraulic fracturing of the formation to improve its ability to accept injected water. This supplemental hydraulic fracturing could also recur later in the life of the well. Drilling and hydraulic fracturing would follow standard industry and regulatory procedures and would be permitted as under producing wells, with the additional process of converting it to a disposal well. Multiple disposal zones would be perforated in order to allow produced water to flow into any of the available receiving formations and to allow for redundancy in receiving formations.

**Interim Reclamation**

The goal of interim reclamation is to maintain soil productivity during the production phase. If the wells on a pad are not productive, the pad would be abandoned and reclaimed, in accordance with BLM and landowner requirements stipulated in the permit for the well and according to the reclamation portion of the surface-use plan submitted with the APD. Reclamation areas would include fill slopes, trenches, wing ditches, edges of disturbance, temporary-use areas no longer needed, and embankments. Reclamation would involve recontouring the well pad to blend with the natural topography, evenly redistributing segregated topsoil, seeding, and monitoring to ensure revegetation is successful. Reclamation would continue until all related requirements were met. Removal or burial of any surfacing material used to complete the well pad would be according to the BLM's standards.

Upon well completion, the well location and surrounding area would be cleared of all unused tubing, materials, trash, and debris. SGI would perform interim reclamation on as much of the

disturbed area as practicable after drilling and conducting subsequent operations. This process entails returning areas not needed for production operations or for subsequent drilling operations to near-original condition or to the land use designated by the surface landowner. SGI would minimize dust and erosion during the interim reclamation process. It would initiate interim reclamation within three months for projects on croplands and within six months for projects on non-crop lands after finishing drilling and subsequent operations, unless an exception were granted. Areas needed for production and subsequent drilling operations (those planned within 12 months) would be stabilized to minimize fugitive dust and erosion. Stockpiled topsoil and remnant vegetation (e.g., uprooted sagebrush and oak brush) would be spread over interim reclamation areas.

Following well completion, portions of the well pad not needed for production would be reseeded and reclaimed. On private surface, the landowner has the choice to use a BLM-approved seed mix or their own, as outlined in the agreement with SGI. SGI will use a CPW-recommended, wildlife-friendly seed mix for interim and final reclamation where approved by the surface owner. The CPW-recommended seed mixes for the BMU are found in Appendix A of the Wildlife Habitat Plan (**Appendix C**; see also **Appendix D** for reclamation details). Any remaining stockpiled topsoil not needed for final interim reclamation would also be stabilized and reseeded. Prior to reseeding, all reclaimed areas would be scarified and left with as rough and uneven a surface as is practicable.

If a reserve pit is used, it would be cleaned out and the liner would be removed and properly disposed of. The pit would be backfilled and reclaimed within six months from the date of well completion, weather permitting. Before any work associated with reserve pit restoration, the reserve pits would be as dry as possible. Cuttings within the pit would be sampled and laboratory tested according to COGCC 900 Series Rules. Results of cuttings pit testing on federal well sites would be made available to the COGCC. Cuttings would then be trucked to an approved and permitted disposal facility (depending on the concentrations of potential soil contaminants listed in COGCC Table 910-1 and analyzed by an EPA-approved laboratory); fencing surrounding the pits would also be removed.

Well pads would be reduced in size to an estimated average of 2 acres after interim reclamation is complete. However, the number of wells and associated production equipment needs on each pad would primarily dictate the size of an individual production pad.

Revegetation would be considered satisfactory when soil erosion resulting from the operation has been stabilized and a vegetation cover equal to 70 percent of preexisting or seeded-in vegetation has been reestablished (both cover and diversity of species), as evidenced by pre- and post-construction photo monitoring and vegetation plots and transects. SGI would monitor interim and final reclamation progress at intervals of one, three, and five years. Reseeding would be required if satisfactory interim reclamation progress is not being made at year two or year three, or if final reclamation is not achieved by year five.

Interim reclamation would also include repairing range management facilities and improvements that had been altered by project-related activities, such as the installation of cattle guards where new access roads cross fences.

***Production and Maintenance***

*Production*

Regardless of the alternative selected, the actual location of facilities would be determined during the APD stage. All site security guidelines (Onshore Order #3) would be followed as identified in the BLM's statutes, regulations, and policy.

If a well were determined to be commercially productive, production facilities would be installed on the well pad. Typically, up to eight 200- to 400-barrel storage tanks would be installed per well for produced water and one storage tank for condensate (if needed). The produced water would be piped or trucked to the McIntyre pits, storage tanks, or water disposal wells (described below in the *Produced Water Management* section). Condensate, if produced, would be transferred to trucks as necessary and transported for sale or to an approved disposal site. Typically, a heated three-phase separator, rated at 0.125 mmBtu/day, would be necessary to separate fluids associated with each wellbore. Protective barriers would be installed around the production facilities, including the tanks. Regardless of the alternative selected, the appropriate location of facilities would be determined during the APD process.

Dehydration facilities to separate water from natural gas would be centralized at compression facilities.

Where applicable, wells would be fitted with cavity pumps that would require generators to power them. Currently, there is one 188-horsepower generator to run two cavity pumps, but smaller, more efficient turbine generators could also be used. These pump and generator systems could be used on any type of well, whether coal bed methane natural gas or shale, if needed. The prime mover for pump jacks would be 50-horsepower or smaller natural gas-fired internal combustion engines.

All site security guidelines would be followed as identified in the authorizing agency's statutes, regulations, and policy.

As noted in the WHP and in addition to the daily site inspections at each well pad location, SGI would remotely monitor specific aspects of well production. This remote monitoring is proposed as a way to provide monitoring between the daily site inspections by SGI personnel. Additionally, this proposed remote monitoring would be conducted at all fee and federal well pad locations, as proposed in SGI's Proposed Action and Alternatives A and B. SGI would monitor the following aspects of well production using remote telemetry:

- Tubing pressure

- Casing pressure

- Gathering system line pressure

- Wellhead differential pressure

- Wellhead gas temperature

- Wellhead gas rate

- Production tank level alarms

SGI would implement this proposed remote monitoring under the following time limits:

- Wells existing in the BMU on the effective date of the WHP would be retrofitted to comply with the seven monitored aspects of well production listed above within 24 months of the effective date of the WHP.

- Wells not yet existing in the BMU on the effective date of the WHP would comply with the seven monitored aspects of the well production listed above within six months of such a well being placed in production.

*Surface Facilities*

Surface facilities installation and regulatory requirements would be in accordance with BLM standards, policies, and regulations.

Installed surface facilities for each gas well would include the wellhead and may include artificial lifts, separators, water transfer, pumps, tank batteries, wellhead compression, and gas-metering facilities. If an artificial lift is used, the driver may be powered by natural gas. Facilities would occupy less than an acre on the site. Separated produced water from each well would be transported or pumped through in-ground water lines to an approved disposal well.

All long-term facility and permanent structures would be painted a flat, nonreflective standard environmental color, as specified by the BLM or private landowner. Facilities would be painted within six months of being on-site. As required by the Occupational Safety and Health Administration, some equipment would be painted for safety considerations; that is, some parts of equipment would retain their safety coloration so they do not blend with the surroundings.

Surface facilities for water disposal wells would include the wellhead, water injection pump and housing, filter skid and gas filter skid, and approximately six to eight 400-barrel holding tanks and a 90-barrel facility drain tank. Water storage tanks would be heated during the winter to prevent ice formation in the tanks and lines. The injection pumps for the water disposal well would be powered by electricity supplied by overhead or buried electrical lines or by a natural gas engine. Facilities would occupy less than an acre on the well pad, which would be 1.4 acres following interim reclamation.

SGI would use a second existing storage yard of approximately 250 feet by 400 feet on SGI's property to store materials and equipment (T11S R90W Section 14).

*Compressor Stations*

Compression in the field may be necessary as wells come online. Under Alternative B, SGI proposes four new screw compressor stations (see **Figure 2-2**, Alternative B, Proposed Action). Three of the stations consist of one 637-horsepower, screw compressor engine in an appropriately sized and muffled building. The fourth station (outside the Unit boundary to the northwest) would consist of three 3,550-horsepower engines housed in a larger muffled building.

The State of Colorado (15GU0015) and Gunnison County (OG2014-05) have permitted this station.

Emissions from natural the gas-fired compressor at the compressor facilities would typically be less than 2 grams per horsepower per hour of carbon monoxide (CO) and nitrous oxides ($NO_x$), and less than 1 gram per horsepower per hour of VOCs. The compressor would use hospital grade mufflers (an oil and gas industry standard) and would be housed in buildings or portable structures so as to abate noise from the compressor engine.

Up to 20 personnel may be involved in constructing all of the compressor stations, with an average of 5 personnel on a site at any one time.

*Produced Water Management*

Disposal of produced water would be in accordance with a plan approved by the BLM as provided for in Onshore Oil and Gas Order No. 7, Produced Ground Water.

Water to be injected into the water disposal wells would first be piped or delivered by truck into the holding tanks to allow sediments to settle. The water would then pass through a series of filters to remove solids larger than 10 microns in diameter. Accumulated solids from the settling and filtration process would be periodically removed from the holding tanks and trucked to an approved off-site disposal facility. Chemical treatment of water would reduce mineral scaling or deposition in the receiving formation, which would otherwise shorten the life of the disposal zones. Chemicals used for treatment would likely include acids, which would keep any minerals in suspension, retard scaling, and act as a biocide. Disposal of produced water would be in accordance with a plan approved by the COGCC rules and regulations.

SGI estimates that between 500 and 3,000 barrels per day of produced water would be injected into the water disposal well. Produced water could also be trucked to an approved disposal site.

Water disposal wells would be drilled to nonproducing, unusable water-bearing formations capable of accepting water. These formations do not produce gas, contain no usable water, and are capable of accepting large quantities of injected water. In some cases, nonproducing gas wells may also be converted for water disposal use; if this were proposed, it would be detailed in the specific APD when it is submitted to the BLM. Water disposal facilities would include natural gas-fired internal combustion engines to drive injection pumps directly or a generator powering an electric motor.

Where applicable, each new facility would be tied in to a field-wide produced water gathering system for water disposal. This water gathering system, when used in conjunction with temporary surface poly lines, significantly reduces truck traffic and consolidates water handling facilities.

SGI estimates that between 500 and 3,000 barrels per day of produced water would be injected into each of the water disposal wells at full build-out of the Unit. In the interim, produced water would be reinjected into the existing water disposal well within the Unit or trucked to an approved disposal site.

*Workovers*
Periodic workovers would be required to correct downhole problems in a producing well, to maintain pumps, and to return the well to production. Workovers are undertaken as needed to increase or maintain production from downhole producing zones or to re-complete a well in a new zone.

A well would require a workover for any of the following reasons:

- Refracturing the producing formations using advanced techniques designed to stimulate additional production

- Cleaning out the wellbore and perforations to stimulate and facilitate production

- Re-completing in another potentially productive zone that was not originally completed at the time the well was drilled

- Repairing casing and other downhole equipment

A workover would generally require three to five workers for four days. Workover activities would typically be implemented during daylight only.

A single workover rig and five-person support crew with four light trucks is anticipated to workover any given individual well within the Unit. The exact scheduling and particular wells selected for WO is unknown at this time, however individual well workovers would be conducted on a bi-annual schedule. With the proposed well development schedule of drilling 27 new federal wells per year in Alternative B the following estimates for workover operations may occur.

After completion of the drilling phase of Alternative B, annually, approximately 67 workovers are anticipated to occur upon the proposed 150 federal wells amongst 40 new pads. Based on the initial drilling schedule the workover rig and support crew could move between approximately 20 well pads each year to workover wells. Although the single workover rig would likely remain within the Unit should multiple workovers be scheduled to occur consecutively, the support crew would be travelling in and out of the Unit daily with up to four light trucks. Individual well workovers are anticipated to take approximately four days each resulting in up to 16 light truck round trips in and out of the Unit per individual workover. Also resulting in approximately 1,072 light truck round trips per year should all 67 workovers occur. It is also likely that if workover scheduling permits (i.e. minimal delay between scheduled operations), the workover rig would likely be temporarily staged in the area when not in use to limit multiple round trips in and out of the Unit.

During the initial period of development of Alternative B (years one through six), SGI's WHP applies a timing restriction on workovers throughout the unit from Dec. 1 - April 15. However the Winter Closure Areas as identified in the WHP only include up to 84 wells amongst 21 well pads. If no commitments were made throughout the rest of the Unit, there would otherwise be no timing constraints applicable to workovers on the other proposed 66 wells amongst 19 (15 multi-well pads and four individual WDW) well pads located outside the Winter Closure Areas.

After full development of the Federal wells in Alternative B has occurred (150 wells), the timing restrictions on workovers from the WHP would no longer be applicable to the federal wells within the Winter Closure Areas.

Regardless of timing limitations when performing workovers on federal wells, such operations would be conducted in compliance with the subsequent well operations standards put forth in 43 CFR 3162.3-2. These regulations include notification requirements and outline circumstances which may require additional approval from BLM prior to conducting subsequent well operations.

*Maintenance*

During the normal life of the wells, routine production and maintenance operations would be conducted throughout the year to ensure that equipment is functioning properly. A well operations technician (referred to in the industry as a pumper) visits well pads in a pickup truck to monitor various operating conditions, such as gas and water production rates, pipeline pressure, and separator pressure, to determine if abnormal conditions exist and to make or schedule necessary repairs. Well maintenance also would include monitoring the establishment of desirable vegetation, repairing any erosion, and controlling noxious or invasive weeds. Additionally, road maintenance would include dust abatement procedures, such as applying magnesium chloride. In the case of the water disposal wells, routine maintenance ensures that the well can continue to accept injections of produced water efficiently.

All project roads would require routine year-round maintenance to provide year-round access. SGI would be required to prepare and implement a road maintenance plan for all roads used for project-related purposes. Maintenance would include inspections, reduction of ruts and holes, maintenance to keep water off the road, replacement of surfacing materials, and clearing of sediment blocking ditches and culverts. Should snow removal be necessary, roads would be cleared with a motor grader or snowplow, and where possible snow would be stored along the downgradient side to prohibit runoff onto the road. Road maintenance agreements and requirements would vary depending on the owner of a given road in the Unit. SGI has committed to adhere to county road maintenance and encroachment ordinance requirements. Aggregate would be used as necessary to maintain a solid running surface and to minimize dust generation.

**Final Reclamation and Abandonment**

Development of a site-specific reclamation plan, based on information provided in **Appendix D** would include consultation between the BLM, the surface owner, and SGI. Site-specific reclamation plans would be submitted to the BLM.

Wells would be plugged in compliance with all BLM standards and all federal regulations. All surface equipment would be removed. Removal or burial of surfacing material would comply with the authorizing agency's standards. Wells would be plugged in compliance with all BLM standards and all federal regulations.

Revegetation would be considered satisfactory when soil erosion resulting from the operation has been stabilized and a vegetation cover equal to 70 percent (both cover and diversity of species) of pre-existing or seeded-in vegetation is reestablished, as evidenced by pre- and post-construction photo monitoring and vegetation plots and transects. SGI would monitor interim

and final reclamation progress at intervals of one, two, and three years. Reseeding would be required if satisfactory interim reclamation progress is not being made at year two or year three monitoring intervals, or if final reclamation is not achieved by year five.

### Water Use and Sources

Specific volumes of water usage needed for any given phase of development are presented within that phase description.

Over the life of the project, an estimated 30 percent of project water would be obtained from freshwater sources. The remaining 70 percent could be supplied by various sources and may include recycled or produced water (see **Appendices D** and **E**).

Water is needed for a variety of activities associated with development of the Unit, including dust abatement on roads, moistening of soils and gravels for compaction of well pad surfaces, production of drilling muds (to help lubricate the bore hole and circulate drill-bit cuttings), cementing the casing, and hydraulic fracturing and well stimulation. Water is also sometimes used to hydraulically test pipeline integrity (see *Pressure Testing* under *Pipe Installation*). Water for drilling and cementing would be pumped to the well site and stored for operations or would be trucked in. After use, the water for drilling and completion must be injected into a disposal well, hauled off-site to an approved disposal facility, or stored for reuse in the flowback pits. SGI plans to reuse water where possible. Flowback fluids to be used during the same drilling season may be stored in the McIntyre flowback pits (see above).

Use of surface water would be contingent on the proper authorizations and permissions by the State of Colorado and water rights holders (see **Appendix L**). Specific water withdrawal points would be identified in each future drilling application. However, SGI has not yet identified specific water withdrawal points; thus, for the purposes of analysis and Section 7 Consultation, the assumption is that the entire depletion associated with this project would be a new depletion from the Colorado River and thus would be subject to recovery fees.

Water from all of these sources would be distributed by truck, buried pipeline, or surface poly pipe to the point of use. Produced water and water from drilling and completion of other wells would be reused to the maximum extent practical, estimated at 70 percent of total water needs.

Freshwater for dust abatement would be applied to roads more frequently as traffic volumes increase and according to weather patterns. Approximately 5,000 to 8,000 gallons of freshwater per mile may be used each day to control fugitive dust during dry months (for example in a typical June). Approximately 2,000 to 5,000 gallons per mile of freshwater may be used to control fugitive dust during wet months (for example during a typical August). If dust palliatives were used, the County would determine which ones would be best suited to the situation on county roads. Options include magnesium chloride and potassium chloride.

### Hazardous Materials and Solid Waste

Natural gas development employs a variety of chemicals, including solvents, lubricants, paints, and additives. A list of chemicals used during drilling, completion, and production is in **Appendix G**, Hazardous Materials Management Summary. The listing identifies the chemical, its common application, and potentially hazardous components.

Drilling by-products produced include solid pieces of waste rock combined with fluids and lubricants used to maintain smooth drilling operations; the by-products are produced by the drill bit cutting through the various formations, at intervals beginning 3 to 4 feet from the surface and ending at the bottom of the hole. After drilling is complete, the reserve pit would be closed according to the appropriate regulatory requirements (see *Pit Closure* below).

Emptied steel and plastic drums for such materials as caustic soda, citric acid, lubricating oil, methanol, and drilling additives would require disposal. Empty metal or plastic drums would be returned to the supplier of the product. Any waste lubricating oil would be disposed of properly by a third-party contractor.

SGI has prepared and implemented an integrated spill prevention, control, and countermeasures plan and emergency response plan for containment and control of oil and chemicals used in the Unit, as well as fire prevention and protection and emergency reporting. Procedures outlined in the plans are applicable to all SGI personnel and contractors. In accordance with the plans, SGI personnel are trained to conduct routine inspections of the containment areas and to promptly contain and clean up any accidental spills. SGI can provide its plans on request to the BLM at its Montrose office.

Chemicals on the EPA's Consolidated List of Chemicals Subject to Reporting Under Title III of the Superfund Amendments and Reauthorization Act of 1986 (SARA Title III) may be used or stored in quantities over reportable quantities. In the course of drilling, SGI could store and use diesel fuel, sand (silica), hydrochloric acid, and $CO_2$ gas, all described as hazardous substances in 40 CFR, Part 302, Section 302.4. In addition, natural gas condensate and crude oil, described as hazardous substances in 40 CFR, Part 302, Section 302.4, may be stored or used in reportable quantities. During production operations, tri-ethylene glycol, ethylene glycol mix (50 percent), and methanol, all described as hazardous substances in 40 CFR, Part 302, Section 302.4, may be stored or used on-site. Small quantities of retail products (paint, solvents [e.g., WD-40], and lubrication oil) containing volumes of hazardous substances that do not need to be reported may be stored and used on-site at any time. No extremely hazardous substances, as defined in 40 CFR, Part 355, would be used, produced, stored, transported, or disposed of under any of the alternatives. Hazardous substances would be reported as required by Title III and COGCC chemical inventory programs.

Any surface spills or releases of oil, condensate, produced or flowback water, drilling fluids, or other potentially harmful substances would be contained and immediately removed according to SGI's spill plan. The spilled or released fluids, along with any contaminated soils, would be disposed of at an approved disposal site.

Tanks containing hazardous materials, including drilling fluids or muds, completion fluids, fuels, lubricants, produced liquid hydrocarbons, condensates, and produced water, would be surrounded by a secondary containment berm of sufficient capacity to contain the entire capacity of the largest single container and sufficient freeboard to contain precipitation, as required in the authorizing agency's standards. For instance, the EPA requires containment of 150 percent of the volume of the largest container. All loading lines and valves would be placed inside the berm surrounding the tank, or catchment basins would be used to contain spills. The tanks would be emptied as necessary, and the liquids would be trucked to market.

Portable toilets and bear-resistant trash containers would be located on active construction sites. A commercial supplier would install and maintain portable toilets and equipment and would be responsible for removing sanitary waste. Toilet holding tanks would be regularly pumped and their contents disposed of at approved sewage disposal facilities in Delta, Montrose, Garfield, or Gunnison Counties, in accordance with applicable rules and regulations. Accumulated trash and nonflammable waste would be hauled to an approved landfill once a week or as often as necessary. All debris and waste materials not contained in the trash containers would be cleaned up, removed from the construction ROW or well pad, and disposed of at an approved landfill. Trash would be cleaned up every day.

Sanitary waste equipment and trash bins would be removed from the Unit upon completion of access road or pipeline construction, following drilling and completion operations at an individual well pad, or as required.

### Access and Traffic

Traffic estimates would be the same as those described in **Section 2.2.5**, Elements Common to All Alternatives, above. Specific calculations for Alternative B are presented below in **Table 2-7**, Alternative B Traffic Estimates for Construction, Drilling, Completion, and Production Activities, based on 36 new well pads.

**Table 2-7**
**Alternative B Traffic Estimates for Construction, Drilling, Completion, and Production Activities**

| Vehicle Type | Average Weight (Pounds) | Estimated Round Trips |
|---|---|---|
| Vehicles for pad and access road construction | | |
| Gravel trucks | 110,000 | 5,760 |
| Semi-trailer trucks | 37,000 | 144 |
| Pickup trucks | 6,000 | 1440 |
| Motor grader on semi-trailer | 40,000 | 36 |
| Dozer (2) on semi-trailer | 19,000 | 72 |
| Track hoe on semi-trailer | 43,000 | 36 |
| Pipeline construction | | |
| Motor grader on lowboy trailer with truck | 50,800 | 72 |
| Bulldozer on lowboy trailer with truck | 120,000 | 72 |
| 80-barrel water trucks for dust control | 54,000 loaded | 720 |
| 80-barrel water trucks for hydrostatic testing | 25,000 empty | 72–144 |
| Track hoe on lowboy trailer with truck | 91,000 | 72 |
| Welding trucks | 9,500 | 72 |
| Crew-cab pickups | 5,200 | 1,440 |
| Bending machine/trailer | 48,000 | 72 |
| Side booms on lowboy trailer with truck | 63,000 | 72 |
| X-ray truck | 5,200 | 144 |
| Testing truck | 6,000 | 72 |
| Pipe trucks | 120,000 loaded 36,000 unloaded | 36 |
| Utility tractor and truck with lowboy trailer | 40,000 | 72 |
| Vehicles for drilling/completing first well on the pad | | |
| Drilling/completion rig | 120,000 | 36 |
| Rig-up trucks loaded (including cement and fracturing) | 120,000 | 900 |

**Table 2-7**
**Alternative B Traffic Estimates for Construction, Drilling, Completion, and Production Activities**

| Vehicle Type | Average Weight (Pounds) | Estimated Round Trips |
|---|---|---|
| Rig-up trucks empty | 36,500 | 144-216 |
| 80-barrel water trucks loaded | 54,000 | 1,440 |
| 80-barrel water trucks empty | 25,000 | 1,440 |
| Crew-cab pickups | 6,000 | 1,440 |
| Vehicles for drilling/completing subsequent wells on the same pad | | |
| Motor grader | 50,000 | 72 |
| Drilling/completion rig | 120,000 | 72 |
| Rig-up trucks loaded (including cement and fracturing) | 120,000 | 900 |
| Rig-up trucks empty | 36,500 | 144-216 |
| 80-barrel water trucks loaded | 54,000 | 1,620 |
| 80-barrel water trucks empty | 25,000 | 1,620 |
| Crew-cab pickups | 6,000 | 1,440 |
| Vehicles for well production | | |
| Workover traffic (vehicle roundtrips per year) | 6,000 | 1,072 |
| Workover rig (rig roundtrips per year) | 120,000 | 67 |
| Haul trucks | 120,000 | 216 |

Typical pumper traffic would be pickup trucks estimated to have an average vehicle weight of 6,000 to 10,000 pounds for approximately one round trip per well per day; typical water disposal well traffic would be approximately two round trips per well per day. Typical water truck traffic for dust suppression activities is estimated at two round trips per well per day.

Workover traffic is difficult to predict because there is no schedule for when equipment will breakdown, nor can downhole problems be reliably predicted. The field's general age also plays a factor in how many workovers may occur in a given year or on a given well. Younger wells tend to have fewer issues than older wells; as equipment and facilities age, the trend is for more repairs and replacement. Additionally, the Bull Mountain Unit is still in the exploratory phase, so factors that would contribute to predicting when a well may need maintenance are unknown, such as type of downhole environment. Only with time and experience will a routine schedule of workovers be determined.

### Surface Disturbance

Alternative B would construct up to 36 new well pads to develop federal mineral estate that would result in approximately 180 acres of short-term disturbance and 72 acres of long-term disturbance, and would require 16 miles of new road construction and 53 miles of improvements to existing roads for access (totaling 243 acres of short-term disturbance and 129 acres of long-term disturbance).[4] SGI also proposes 21 miles of new pipelines that would total 206 acres short-term disturbance and 25 acres long-term disturbance (cross-country pipelines would be fully

---

[4] Calculations of possible disturbance areas are based on the assumptions presented in **Section 2.2.5**, Elements Common to All Alternatives, and **Table 2-2**, Project Feature Assumed Short- and Long-Term Disturbance Estimates.

reclaimed resulting in zero acres of long-term disturbance[5]). Details for these actions are shown in **Table 2-10**, Summary of Actions by Alternative; acreages for areas of disturbance are shown in **Table 2-12**, Summary of Surface Disturbance Acres by Alternative, which includes both short-term (immediate construction) and long-term (interim reclamation) disturbance amounts.

Following well completions, portions of the federal well pad not needed for production would be reseeded and reclaimed according to BLM specifications. Long-term well pad disturbance from the 36 new well pads would be reduced to 72 acres following successful interim reclamation.

### 2.2.8   Alternative C, Modified Action

Alternative C was developed by modifying the GIS model to minimize surface disturbance by putting greater emphasis on soil types and collocating roads and pipelines, which in turn would reduce the miles of road and pipeline needed to service the pad sites (see **Appendix A** for additional details). Like Alternative B, this alternative is specific to BLM-administered mineral and surface estate, the BLM's authority, and the actions they would approve under a MDP. If Alternative C were approved, the operations and development of private minerals described in Alternative A would continue to be implemented. The combination of federal mineral and private mineral development is discussed and analyzed in **Section 4.1.3**, Cumulative Effects.

Alternative C provides additional features and changes to actions in order to consider options for addressing the impacts of gas development on wildlife populations, vegetation resources, water quality, air quality, and soil resources. In order to highlight the substantive differences in Alternative C, the modified actions are described in detail; actions that are the same as those described in Alternative B are noted as such and the reader is referred back to the previous discussion.

As noted in **Section 1.8**, Key Issues Addressed in the EIS, wildlife and habitat impacts are an issue to be addressed in the EIS. Federal minerals within the Unit are generally subject to a winter seasonal timing limitation (December 1 to April 30) to protect crucial deer and elk winter ranges from development activities (e.g., construction and drilling). Therefore, Alternative C includes the option to use seasonal winter timing limitations or a progressive development approach. SGI's desire to conduct winter construction and drilling activities over federal minerals could be accommodated while minimizing impacts on wintering big game through winter timing limitations within the Negotiated Reduced Winter Activity Areas identified in **Figure 2-6**, Alternative C, Constraints.

Impacts on big game could be mitigated by creating a progressive movement of winter construction and drilling activities. SGI would voluntarily confine drilling and construction activities over private and federal minerals to no more than one-quarter of the Unit in any given winter period (December 1 to April 30). The portion or area of the Unit where winter activity may occur would be mutually negotiated annually between SGI, the BLM, and CPW no later than August 1. Under this scenario, the BLM would consider exceptions to winter seasonal timing limitations within the agreed-upon area to allow ongoing winter drilling activity.

---

[5] While the assumption is for pipeline rights-of-way to be fully reclaimed, they may not be returned to pre-construction productivity because the proposed seed mixes do not include forbs or shrubs.

If Alternative C is approved, the operations and development of private minerals described in Alternative A would continue to be implemented. The combination of federal mineral and private mineral development is discussed and analyzed in **Section 4.1.3**, Cumulative Effects.

All actions described below, including those that occur on split-estate lands, would be in compliance with all laws, regulations, and BLM policies, including BLM Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (DOI and USDA 2007), the BLM Manual 9113 (BLM 1985), and additional requirements from the Uncompahgre Basin RMP (BLM 1989). Design features, mitigation measures, and the COAs listed in **Appendix C** would apply (see **Table 2-11**, Stipulations, Design Features, and Mitigation Measures). In addition, several strategy and planning documents would apply, including the Hazardous Materials Management Summary (**Appendix G**), Noxious Weed Management Plan (**Appendix I**), Bainard Augmentation Plan (**Appendix L**), and Poly Pipeline Operations Plan (**Appendix M**). The Master Surface Use Plan of Operations and a Master Drilling Plan (see **Appendices D and E**, respectively) would also apply, and a revised version of the plans specific to a development must be submitted with an APD.

*New Developments*
The techniques and methodologies described for construction, drilling, completion, reclamation, production, maintenance, water uses and sources, and other elements in **Section 2.2.5**, Elements Common to All Alternatives, are applicable to Alternative C. The information provided below is unique to Alternative C, Modified Action.

As noted above, Alternative C modified the weighting factors in the site selection model to minimize surface disturbance by putting greater emphasis on soil types and collocating roads and pipelines, resulting in moving many of the well pad locations as illustrated on **Figure 2-5**, Alternative C, Modified Action. Additionally, well pads and roads would avoid identified elk winter concentration areas as illustrated on **Figure 2-6**, Alternative C, Constraints, unless avoiding such habitats would equate to greater net surface disturbance or is determined to be a detriment to other resource values.

With these constraints, SGI would construct up to 35 new well pads to develop Federal mineral estate, up to 146 new natural gas wells and up to 4 new water disposal wells. The average number of wells per pad would be the same as described above in **Section 2.2.4**, Elements Common to All Alternatives. Some of the new gas wells would be drilled on the existing water disposal or gas well pads. The quantity and combination of coal bed methane natural gas, sandstone, and shale gas wells on each pad is not known at this time and would also be determined at the APD stage. Additionally, at the APD stage, the exact locations of well pads would be sited in ecological sites within the 40-acre analysis areas best suited to achieve maximum reclamation success. Under Alternative C, new water disposal wells would be sited on existing pads.

Additionally, it is estimated that approximately 12 miles of new road construction and 13 miles of improvements to existing roads for access, 19 miles of new pipeline construction collocated with roads, and up to 4 new compressor stations would be constructed.



BULL MOUNTAIN UNIT
COLORADO
Bull Mountain
Uncompahgre Field Office
Uncompahgre Field Office
Bull Mountain
Paonia
Hotchkiss
133
265
T11S R90W
T11S R89W
T12S R90W
T12S R89W
Alternative C is specific to BLM-administered federal mineral estate and surface and development would occur under a Master Development Plan. Alternative C provides additional design features including siting to avoid identified elk winter concentration areas and includes a voluntary winter timing limitation within the Negotiated Reduced Winter Activity Areas.
0 2,000 4,000
Feet
December 31, 2015
BullMtn_alts_C_V08.pdf
Bull Mountain EIS Uncompahgre Field Office
No warranty is made by the BLM as to the accuracy, reliability, or completeness of these data for individual use or aggregate use with other data
GUNNISON COUNTY
Source: SG Interests GIS 2013, BLM GIS 2014, CPW 2012, Petterson 2012
Alternative C, Modified Action
Proposed well pad analysis area
Proposed well pad analysis area- must site pad outside areas of overlapping identified elk winter concentration areas
Proposed screw compressor
Proposed pipeline (co-located with roads)
Proposed new road construction
Existing road requires upgrade for use
Area eliminated from consideration for proposed pad (identified elk winter concentration area)
Existing Infrastructure
Existing storage yard
Existing pipeline
Existing road currently suitable for use
Alternative C, Modified Action
Federal surface, federal minerals
Private surface, federal minerals
Private surface, private minerals
Figure 2-5

2. Alternatives



**Alternative C, Constraints**

 Negotiated Reduced
Winter Activity Area

Area eliminated from
consideration for
proposed pad
(identified elk winter
concentration area)

Federal surface,
federal minerals

Private surface,
federal minerals

Private surface,
private minerals

Figure 2-6

Based on these numbers, and the assumed drilling rate noted in the common assumptions, it is estimated that drilling activities would occur for approximately 6 years.

### Construction

Pre-construction nesting surveys for migratory birds, including raptors, would be conducted prior to any surface disturbing construction activities scheduled between April 15 and July 15 each year to identify active migratory bird nest sites. Active nests would be avoided during construction activities using applicable species-specific CPW construction buffers to avoid disruption of migratory bird breeding activities. Stream crossing in active streams would be conducted outside the spawning season identified by CPW for applicable aquatic species.

### Access Road Construction

As under Alternative B, the primary access roads would be State Highway 133 and County Road 265, and new road construction and improvements would only occur on an as-needed basis to facilitate access to well pads and other facilities. Site-specific plans for road construction and up-grades would be included as part of individual future APDs and would be subject to approval from the BLM (see **Appendix D**).

The new roads and improved existing road surfaces would be composed of an appropriate volume of road base compacted using a roller and freshwater as necessary. Approximately 6 to 8 inches of road base would be used in road construction and reconstruction. Road base or gravel would be hauled in and a grader would be used to smooth the running surface. Rock, road base, and gravel materials for all uses would be obtained from local permitted, commercial sources outside the Unit near Paonia and either Carbondale or Delta, Colorado. Specifics on where the source materials would be obtained from would be identified on the individual APD when it is submitted. These roads would be upgraded and covered with gravel as necessary to maintain the post-construction surface quality.

### Well Pad Construction (Gas and Water Disposal Wells)

As under Alternative B, prior to individual well pad construction, SGI would obtain approval of an APD by the BLM. Each APD would contain site-specific details related to well pad size, construction and well operations, and mitigation measures. Pit run and road base would both be trucked to the site from gravel pits near Carbondale, Delta, Paonia, or other local areas.

Under Alternative C, the BLM is including additional design features to address issues raised during scoping and public comments on the EA (see Appendix C). One such design feature requires SGI to use a closed loop drilling system, which would determine the size and construction needs of the well pad. Similar to Alternatives A and B, the quantity and combination of coal bed methane natural gas, sandstone, and shale gas wells on each pad are unknown at this time.

### Pipeline Construction

No new cross country pipeline construction would be approved; the entire pipeline network would be required to be collocated with current and proposed road network development consistent with Gold Book recommendations unless deemed a detriment to resources. Where feasible, trunk lines shall be buried in the roadbed or within the borrow ditch to further reduce surface disturbance. No more than a 30-foot-wide disturbance route in addition to the average

16-foot road surface would be approved for collocated pipelines. All other construction methods would be the same as described in Alternative B.

*Overhead Electrical Line Construction for Water Disposal Wells*
Under Alternative C, up to four new water disposal wells that would require construction of four new electrical lines to supply power to the water disposal wellheads. Under Alternative C the new electrical lines would be buried adjacent to the roads to minimize overhead disturbance to wildlife resources. All other construction methods would be the same as described in Alternative B.

**Drilling**
Drilling operations would be conducted in compliance with all applicable and relevant state and federal regulations, and would be the same as described in Alternative B above except for the differences noted below. However, under Alternative C, only closed loop drilling systems would be approved for federal wells. The BLM would review industry standards and procedures (BMPs) at the time of application and consider operator input when determining feasibility. See **Appendix E** for additional information.

*Gas Well Drilling*
Gas well drilling could use any of the different wellbore directions, target formations, and drilling lubricants noted in Alternative B. Under Alternative C, the type of wellbore, target formation, and drilling lubricant would be specified in the APD when submitted to the BLM. More environmentally friendly additives (e.g., mineral oil) would be considered for use. Required use would be based on such factors as economic feasibility and availability. All drilling operations and other well site activities would be conducted in compliance with BLM laws, policies, and regulations.

Under Alternative C, a Tier-2 drilling rig engine or cleaner would be required; this determination would be made by SGI at the APD stage and subject to BLM stipulations and COAs. All descriptions relating to drilling rig time frames, equipment, and materials are the same as described under Alternative B.

Similar to Alternative B, approximately 3,000 barrels of water would be used for drilling in any particular well on average. For Alternative C, that would result in up to 438,000 barrels of water that could be used for drilling (up to 3,000 barrels per well multiplied by up to 146 new gas wells drilled).

*Water Disposal Well Drilling*
As under Alternative B, SGI proposes drilling up to four new water disposal wells and the methods and technologies used for water disposal well drilling are the same as described there. As described under New Developments for Alternative C, new water disposal wells would be sited on existing pads.

Like Alternative B, the disposal wells may be completed in the Dakota, Morrison, Entrada, or Maroon Formations. A water-based mud system would be used for drilling of the surface hole, and a low-solids, non-dispersed gel system would be used for the intermediate and production

hole sections of the water disposal well. Water usage for each water disposal well would be the same as described in Alternative B.

Water disposal wells would be permitted by the BLM as APDs if the wells are on-lease; SGI would then go through the conversion process with the BLM and COGCC to ensure that no production could come from the well prior to using the well for water disposal.

### Completion

#### Gas Well Completion
Gas well completions would largely be the same as described under Alternative B, including the water used during completion operations.

For Alternative C, SGI would be required to employ green completion technologies following EPA NSPS OOOO Regulations. Recycled water could also be used for well completions when water conditions allow (see *Flowback Pits* discussion below).

#### Flowback Pits
The four McIntyre Flowback Pits would be used for the Proposed Action in the same manner as described in Alternative B.

#### Water Disposal Well Completion
The methods, equipment and process used for water disposal well completions would be the same as described in Alternative B.

### Interim Reclamation
Following well completions, portions of the well pad not needed for production would be reseeded and reclaimed according to specifications of the approved Federal APD. Interim reclamation would be designed to develop a suitable plant community capable of competitively excluding invasive species while also providing for wildlife and livestock objectives and would include appropriate composition of grasses, forbs, and shrubs for the ecological site. Long-term well pad disturbance from the 35 new well pads would be reduced to 70 acres following successful interim reclamation (see **Appendix D**).

### Production and Maintenance

#### Production
Specifications and methodologies for production would be the same as described in Alternative B. Regardless of the alternative selected, the actual location of facilities would be determined during the APD stage. All site security guidelines as identified in the BLM's statutes, regulations, and policy would be followed.

#### Surface Facilities
How and where surface facilities would be installed are the same as described in Alternative B, although their installation and regulatory requirements would be in accordance with BLM standards, policies, and regulations, and the modifications unique to Alternative C as described below.

All permanent structures would be painted a flat, non-reflective standard environmental color as specified in the authorized Federal APD. Facilities would be painted within 6 months of being located on site. As required by the Occupational Safety and Health Administration, some equipment would be painted for safety considerations (i.e., some parts of equipment would retain its safety coloration such that it does not blend with the surroundings).

Specifications for water disposal wells' surface facilities would be the same as described in Alternative B. Any long-term water disposal well structures would also be painted in accordance with the BLM's standards.

Centralized production facilities would be established outside of the Negotiated Reduced Winter Activity Areas shown in **Figure 2-6** to significantly reduce year round truck traffic to the individual wells located within these areas to enhance their utility as winter refugia for wildlife. Centralized production facilities would ideally be situated on existing pads down gradient and would serve to further maximize interim reclamation as the outlying pads would not necessarily need traditional production facilities. The centralized production facilities may result in larger pad sizes at centralized production facilities or the development of additional pads to accommodate such facilities. Successful implementation of the centralized production facilities concept could result in a substantial reduction in the number of annual truck miles driven within the Unit and result in corresponding reduced disturbance to wildlife.

Once a well is put into production, SGI would use remote telemetry or equivalent technology at all Unit wells and flowback pits to minimize well monitoring trips throughout the Unit, unless another proven method would create less environmental impact. Locked gates would be established at the access points for well pad roads that occur within the Negotiated Reduced Winter Activity Areas (see **Figure 2-6**) and only emergency related trips would occur within these areas from Dec. 1 - April 30 annually between the hours of 9 A.M. and 3 P.M. For Alternative C, emergency is defined as:

- Non-routine pipeline facility maintenance to remedy unanticipated production or safety problems, and

- Emergency workovers to remedy equipment failures, loss of well integrity, unanticipated rapid declines in production, or threats to life, property, or resources.

The BLM Authorized Officer would be promptly notified of any emergency work commencing. The minimal amount of seasonal road maintenance required to pump the well or conduct emergency activities would be conducted by SGI.

*Compressor Stations*
Compression in the field may be necessary as wells come online, and the four new compressor stations are the same as described under Alternative B (see **Figure 2-5**).

*Produced Water*
Methodologies for treating produced water would be the same as described in Alternative B; however, disposal of produced water would be in accordance with a plan approved by the BLM as provided for in Onshore Oil and Gas Order No. 7, Disposal of Produced Water.

SGI estimates that between 500 and 3,000 barrels per day of produced water from the coal bed methane natural gas wells would be injected into each of the water disposal wells at full build-out of the Unit. In the interim, produced water would be reinjected into the existing water disposal well within the Unit or trucked to an approved disposal site.

Water disposal wells would be drilled to non-producing, non-useable water bearing, formations capable of accepting water. These formations do not produce gas, contain no useable water, and are capable of accepting large quantities of injected water. In some cases, non-producing gas wells may also be converted for water disposal use; if this were proposed, it would be described in detail in the specific APD at the time of submission to the BLM. Water disposal facilities would include natural gas-fired internal combustion engines to drive injection pumps directly or via a generator powering an electric motor.

*Workover and Maintenance*

A single workover rig and five-person support crew with four light trucks is anticipated to workover any given individual well within the Unit. The exact scheduling and particular wells selected for workover is unknown at this time, however individual well workovers would be conducted on a bi-annual schedule. With the proposed well development schedule of drilling 27 new federal wells per year in Alternative C the following estimates for workover operations may occur.

After completion of the drilling phase of Alternative C, annually, approximately 67 workovers are anticipated to occur upon the proposed 150 federal wells amongst 36 new well pads. Based on the initial drilling schedule the workover rig and support crew could move between approximately 18 well pads each year to workover wells. Although the single workover rig would likely remain within the Unit should multiple workovers be scheduled to occur consecutively, the support crew would be travelling in and out of the Unit daily with up to four light trucks. Individual well workovers are anticipated to take approximately four days each resulting in up to 16 light truck round trips in and out of the Unit per individual workover. Also resulting in approximately 1,072 light truck round trips per year should all 67 workovers occur. It is also assumed that if WO scheduling permits (e.g., minimal delay between scheduled operations), the workover rig would likely be temporarily staged in the area when not in use to limit multiple round trips in and out of the Unit.

Workovers on wells which are proposed in areas identified within Negotiated Reduced Winter Activity Areas would be avoided (excepting emergencies) by such operations from Dec. 1 – April 30 annually for the life of the well. This results in avoidance (excepting emergency) of routine workovers on approximately 43 wells amongst 10 well pads for the productive life of the wells during these months.

Otherwise there are no timing constraints applicable to workovers on the remaining proposed 107 wells amongst 25 well pads located outside the Negotiated Reduced Winter Activity Areas.

Regardless of timing limitations when performing workovers on federal wells, such operations would be conducted in compliance with the subsequent well operations standards put forth in 43 CFR 3162.3-2. These regulations include notification requirements and outline circumstances which may require additional approval from BLM prior to conducting subsequent well

operations. Additionally, all workover related traffic would be limited to travelling to and from location after 9 a.m. and before 3 p.m. SGI shall minimize trips between the hours of 9 a.m. and 3 p.m. as much as possible.

### Final Reclamation and Abandonment
Standards and methodologies would be generally the same as described in Alternative B. Development of a site-specific reclamation plan, based on information provided in **Appendix D** would include consultation between the BLM, the surface owner, and SGI. Site-specific reclamation plans would be submitted to the BLM. Wells would be plugged in compliance with all BLM standards and all federal regulations.

- All surface equipment would be removed

- Removal or burial of surfacing material would comply with the authorizing agency's standards

Wells would be plugged in compliance with all BLM standards and all federal regulations.

### Water Use and Sources
Specific volumes of water usage needed for any given phase of development are presented within that phase description. Otherwise, the rest of the water usage information is the same as presented in Alternative B.

### Hazardous Materials and Solid Waste
The hazardous materials actions for Alternative C are generally the same as those described under Alternative B.

### Access and Traffic
Traffic estimates would be the same as those described in **Section 2.2.5**, Elements Common to All Alternatives, above. Specific calculations for Alternative C are presented below in **Table 2-8**, Alternative C Traffic Estimates for Construction, Drilling, Completion, and Production Activities, based on 35 new well pads.

**Table 2-8**
**Alternative C Traffic Estimates for Construction, Drilling, Completion, and Production Activities**

| Vehicle Type | Average Weight (Pounds) | Estimated Round Trips |
|---|---|---|
| Vehicles for pad and access road construction | | |
| Gravel trucks | 110,000 | 5,600 |
| Semi-trailer trucks | 37,000 | 140 |
| Pickup trucks | 6,000 | 1,400 |
| Motor grader on semi-trailer | 40,000 | 35 |
| Dozer (2) on semi-trailer | 19,000 | 70 |
| Track hoe on semi-trailer | 43,000 | 35 |
| Pipeline construction | | |
| Motor grader on lowboy trailer with truck | 50,800 | 70 |
| Bulldozer on lowboy trailer with truck | 120,000 | 70 |

**Table 2-8**
**Alternative C Traffic Estimates for Construction, Drilling, Completion, and Production Activities**

| Vehicle Type | Average Weight (Pounds) | Estimated Round Trips |
|---|---|---|
| 80-barrel water trucks for dust control | 54,000 loaded | 700 |
| 80-barrel water trucks for hydrostatic testing | 25,000 empty | 70-140 |
| Track hoe on lowboy trailer with truck | 91,000 | 70 |
| Welding trucks | 9,500 | 70 |
| Crew-cab pickups | 5,200 | 1,400 |
| Bending machine/trailer | 48,000 | 70 |
| Side booms on lowboy trailer with truck | 63,000 | 70 |
| X-ray truck | 5,200 | 140 |
| Testing truck | 6,000 | 70 |
| Pipe trucks | 120000 loaded | 35 |
| | 36000 unloaded | |
| Utility tractor and truck with lowboy trailer | 40,000 | 70 |
| Vehicles for drilling/completing first well on the pad | | |
| Drilling/completion rig | 120,000 | 35 |
| Rig-up trucks loaded (including cement and fracturing) | 120,000 | 875 |
| Rig-up trucks empty | 36,500 | 140-210 |
| 80-barrel water trucks loaded | 54,000 | 1,400 |
| 80-barrel water trucks empty | 25,000 | 1,400 |
| Crew-cab pickups | 6,000 | 1,400 |
| Vehicles for drilling/completing subsequent wells on the same pad | | |
| Motor grader | 50,000 | 70 |
| Drilling/completion rig | 120,000 | 70 |
| Rig-up trucks loaded (including cement and fracturing) | 120,000 | 875 |
| Rig-up trucks empty | 36,500 | 140-210 |
| 80-barrel water trucks loaded | 54,000 | 1,575 |
| 80-barrel water trucks empty | 25,000 | 1,575 |
| Crew-cab pickups | 6,000 | 1,400 |
| Vehicles for well production | | |
| Workover traffic (vehicle roundtrips per year) | 6,000 | 1,072 |
| Workover rig (rig roundtrips per year) | 120,000 | 67 |
| Haul trucks | 120,000 | 210 |

Traffic estimates are the same as those described for Alternative B.

***Surface Disturbance***

Alternative C would construct up to 35 new well pads that would result in approximately 175 acres of short-term disturbance and 70 acres of long-term disturbance, and require 12 miles of new road construction and 13 miles of improvements to existing roads for access (totaling 91 acres of short-term disturbance and 48 acres of long-term disturbance). Under this alternative, there would also be 19 miles of new pipelines collocated with roads that would total 231 acres short-term disturbance and 37 acres long-term disturbance (there are no cross-country pipelines as part of this alternative). Details for these actions are shown in **Table 2-10**, Summary of Actions by Alternative; acreage area of disturbance are shown in **Table 2-12**, Summary of

Surface Disturbance Acres by Alternative, which includes both short-term (immediate construction) and long-term (interim reclamation) disturbance amounts.

Following the cessation of disturbance operations necessary to facilitate drilling the first well on the pad, portions of the well pad and access road not needed for drilling would be reseeded and stabilized according to BLM specifications. Following well completions or the 6th year of development anticipated as the final season necessary for full build-out of this alternative, all portions of existing well pads not needed for production would be reseeded and reclaimed according to BLM specifications. Long-term well pad disturbance from the 35 new well pads would be reduced to 70 acres following successful interim reclamation.

**Figure 2-5**, Alternative C, Modified Action, presents the conceptual locations of potential well pads over areas currently thought to be most prospective for natural gas development.

***Design Features***
Alternative C includes additional design features to address air quality, wildlife, and water issues:

- Air quality measures:

    o The BLM would place a COA on each permit, requiring SGI to apply continuous watering to keep the surface moist during access road and well-pad construction, and during heavy traffic periods, including drilling and completion phases of well development. SGI would be required to limit off-site transport by maintaining no visible dust plume operations.

    o The BLM would place a COA on each permit, requiring SGI to emit 5 tons per year (TPY) or less of NOx at each well pad for production operations (post-construction and production phase), as defined by the acceptable emissions level analyzed in the $NO_2$ 1-hour modeling analysis. SGI would be required to submit a detailed well pad production emissions inventory for each APD or details for the well pad production equipment and operations (including refined emissions factors) to use to develop project-specific emissions inventories. An annual NOx emissions rate greater than 5 tons per year may be acceptable if SGI can demonstrate compliance with the $NO_2$ 1-hour NAAQS for the APD. The BLM would need to approve any additional impacts analyses before it authorizes activities.

    o The BLM would place a COA on each permit, requiring the operation of Tier 2 engines or cleaner for drilling, fracturing, and completion. SGI would be required to submit a detailed well pad development phase emissions inventory for each APD or details for the well pad development equipment and operations (including refined emissions factors and hours of operation) to use to develop project-specific emissions inventories. Operation of engines totaling greater than 2,000-

horsepower[6] at any one time during the development phase could trigger the need for additional impacts analysis. It could also warrant a COA for Tier 3-4 engines. The goal of the requirement is for drilling-, completion-, and fracturing-related engines to emit no more than 1 gram per second of NOx total at any one time (total of all engines operating concurrently), unless another NOx emissions rate could be demonstrated to achieve compliance with the $NO_2$ 1-hour NAAQS.

o The BLM would require SGI to provide a detailed Unit-wide equipment configuration plan (with specific information for the pumping units) and emissions inventory that shows a plan/projection for Unit-wide federal wells production phase NOx emissions at or below 143 TPY of NOx.[7] The BLM would place a COA on each permit (APD), requiring SGI to submit a NOx emissions accounting analysis summary. This would provide information for how the APD emissions fit into the overall Unit-wide production phase (post-construction and development) NOx emissions budget (approximately 143 TPY of NOx).

- SGI would be required to utilize and operate pneumatic devices, tanks and dehydrators in accordance with CDPHE and EPA Oil and Gas Regulations.

- SGI would have a yearly meeting with the BLM to present an annual construction and operational activities plan of operations prior to the construction season.

- With an annual agreement by SGI as part of the annual Operations Plan, SGI would present the order for development phasing around the Unit to avoid widespread impacts on wintering big game species during a winter period.

- SGI would provide an annual reclamation monitoring status report that would present reclamation status, maps of reclamation areas, and identifying appropriate native seed mixes and their proper application.

- SGI would conduct annual raptor nesting surveys in the Unit to ensure compliance with the Migratory Bird Treaty Act. The surveys would occur within 0.25 mile of surface disturbing activities from April 15 to July 15 or until young of the year have fledged Activities would be avoided around occupied nests from April 15 to July 15; exceptions would be discussed with the authorized officer on a case-by-case basis.

- SGI would ensure that water accumulation on pads is not allowed to drain into wetlands or riparian areas down-gradient from the Unit.

- SGI would control noxious weeds within the Unit, including on or within wells pads, pipeline corridors, access roads and adjacent areas, temporary use areas, and any other

---

[6] This total horsepower was analyzed for the EIS-specific $NO_2$ 1-hour impacts analysis.
[7] The annual NOx emissions level limit required to provide project-level nitrogen deposition impacts at the DAT threshold [0.005 kg/ha-yr]; it is determined from the nitrogen deposition modeling analyses for Alternatives A and B.

area associated with natural gas development. The measures identified in **Appendix I**, Noxious Weed Management Plan, would be followed.

## 2.2.9   Alternative D, the BLM's Preferred Alternative

Alternative D is based on interdisciplinary team recommendations, environmental consequences analysis of the alternatives, cooperating agency input, and public input on the Draft EIS. Comments submitted by other government agencies, public organizations, state and tribal entities, and interested individuals were given careful consideration. Public scoping and Draft EIS commenting efforts enabled the BLM to identify and shape significant issues pertaining to energy development, air resources, water quality and quantity, wildlife, and other program areas. Cooperating agencies participated, reviewed, and provided comments at critical intervals during the alternative development process, as well as the EIS process in general.

Additional features included with Alternative D resulting from SGI's amendments to the Proposed Action and public input on the Draft EIS are the following:

- Inclusion of the 12-89-7-1 well pad APD—This APD was submitted to the BLM, which inspected the site on May 16, 2011. The APD has been pending since October 25, 2012 (see **Figure 2-3**, Alternative B, C, and D 12-89-7-1 APD). The specific surface use plan of operations and drilling plan and other relevant information collected as part of the APD review process are provided in **Appendix O**. The site-specific information described below and in detail in **Appendix O** is a refinement of the types of development information described in **Section 2.2.5**, Elements Common to All Alternatives, and **Section 2.2.9**, Alternative D. For example, while **Section 2.2.5** describes many options and general information for how a well may be drilled (e.g., horizontal, vertical, or directional), the information in the 12-89-7-1 APD drilling plan provides specifics as to the type of drilling and downhole engineering for this well pad and natural gas well.

- New developments under the Preferred Alternative would be subject to the Bull WHP submitted by SGI. The WHP would apply throughout development phase activities (construction, drilling, and completion); it would not apply to production or maintenance phase activities. The WHP with maps is found in **Appendix C**; its provisions are included in the text descriptions below.

- Three of the stations would remain the same, with one 637-horsepower, screw compressor engine in an appropriately sized and muffled building. The fourth station (outside the Unit boundary to the northwest; see **Figure 2-7**, Alternative D, BLM's Preferred Alternative) would consist of three 3,550-horsepower engines housed in a larger muffled building. The State of Colorado (15GU0015) and Gunnison County (OG2014-05) have permitted this station.

- The pipeline that ran east-west through T12S, R89W, Sections 7, 8, and 9 would be replaced with the Volk and Medved pipelines that run north-south from T12S, R89W, Section 9 to T11S, R89W, Section 29. The length of the pipeline has been updated to reflect this change.

- Air quality and AQRV control and monitoring measures

  o The BLM would place a COA on each permit, requiring SGI to apply continuous watering to keep the surface moist during access road and well-pad construction activities and during heavy traffic periods, including drilling and completion phases of well development and for production and operational phase during dry conditions. SGI would be required to limit off-site transport by maintaining "no visible dust plume" operations.

  o The BLM would place a COA on each permit, requiring SGI to emit 5 TPY or less of NOx at each well-pad for production operations (post-construction and production phase), as defined by the acceptable emissions level analyzed in the $NO_2$ 1-hour modeling analysis. SGI would be required to submit a detailed well pad production emissions inventory for each APD or details for the well pad production equipment and operations (including refined emissions factors) to use to develop project-specific emissions inventories. An annual NOx emissions rate greater than 5 TPY may be acceptable if SGI can demonstrate compliance with the $NO_2$ 1-hour NAAQS for the APD. The BLM would need to approve any additional impacts analyses  before it authorizes activities.

  o The BLM would place a COA on each permit, requiring the operation of Tier 2 engines or cleaner for drilling, fracturing, and completion. SGI would be required to submit a detailed well pad development phase emissions inventory for each APD or details for the well pad development equipment and operations (including refined emissions factors and hours of operation) to use to develop project-specific emissions inventories. Operating engines totaling greater than 2,000 horsepower at any one time during the development phase could trigger the need for additional impacts analysis and could warrant a COA for Tier 3-4 engines. The goal of the requirement is for drill-, completion-, and fracturing-related engines to emit no more than 1 gram per second of NOx total at any one time (total of all engines operating concurrently), unless another NOx emissions rate can be demonstrated to achieve compliance with the $NO_2$ 1-hour NAAQS.

  o The BLM would require SGI to provide a detailed Unit-wide equipment configuration plan (with specific information for the pumping units) and emissions inventory that shows a plan/projection for Unit-wide federal wells production phase NOx emissions at or below 143 TPY of NOx. The BLM would place a COA on each permit (APD), requiring SGI to submit a NOx emissions accounting analysis summary that provides information for how the APD emissions fit into the overall Unit-wide production phase (post-construction and development) NOx emissions budget (approximately 143 TPY of NOx).

- Noxious weeds measures (COAs #45-48)

- An annual reclamation and monitoring status report (COA #51)

- Geological hazard measures (COAs #52-55)

- Baseline water quality monitoring requirement (COAs #56-59)

Those techniques and methods for construction, drilling, completion, reclamation, production, maintenance, water uses and sources, and other elements in **Section 2.2.5**, Elements Common to All Alternatives, and the actions anticipated to complete construction, drilling, completion, production, and reclamation. Alternative D is specific to BLM-administered mineral estate, the BLM's authority, and the actions it would approve under a master development plan. Regardless of whether Alternative D is approved, the operations and development of private minerals described in Alternative A would continue to be implemented. The combination of federal mineral and private mineral development is discussed and analyzed in **Section 4.1.3**, Cumulative Effects.

**Figure 2-7**, Alternative D, BLM's Preferred Alternative, presents the conceptual locations of potential well pads over areas currently thought to be most prospective for natural gas development.

All actions described below, including those that occur on split-estate lands, would comply with all laws, regulations, and BLM policies. These include the BLM Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (DOI and USDA 2007), the BLM Manual 9113 (BLM 1985), and additional requirements from the Uncompahgre Basin RMP (BLM 1989). Design features, mitigation measures, and the COAs listed in **Appendix C** would apply (see **Table 2-11**, Stipulations, Design Features, and Mitigation Measures). In addition, several strategy and planning documents would apply, including the Hazardous Materials Management Summary (**Appendix G**), Noxious Weed Management Plan (**Appendix I**), Bainard Augmentation Plan (**Appendix L**), and Poly Pipeline Operations Plan (**Appendix M**). The Master Surface Use Plan of Operations and a Master Drilling Plan (see **Appendices D** and **E**, respectively) would also apply, and a revised version of the plans specific to a development must be submitted with an APD.

*New Developments*
The information provided below is unique to Alternative D, the BLM's Preferred Alternative.

New developments under the Preferred Alternative would be subject to the Bull Mountain Unit WHP that SGI submitted. The WHP would apply throughout development phase activities (construction, drilling, and completion); it would not apply to production, maintenance, or reclamation phase activities. **Figure 2-8**, Alternative D, BLM's Preferred Alternative Wildlife Habitat Plan, illustrates where restrictions apply; the WHP text and additional maps are found in Appendix C, Design Features, Mitigation Measures, and Conditions of Approval.

SGI would construct up to 33 new well pads to develop federal mineral estate, up to 146 new natural gas wells, and up to 4 new water disposal wells. The average number of wells per pad would be the same as described above in **Section 2.2.4**, Elements Common to All Alternatives. The quantity and combination of coal bed methane natural gas, sandstone, and shale gas wells on each pad is not known at this time but would also be determined at the APD stage. Additionally,



Alternative D, Preferred

○ Proposed well pad analysis area

⬠ Proposed screw compressor

Proposed pipeline

Proposed new road construction

Existing road requires upgrades for use

Existing Infrastructure

▣ Existing storage yard

Existing road currently suitable for use

Existing pipeline

Federal surface, federal minerals

Private surface, federal minerals

Private surface, private minerals

Source: SG Interests GIS 2013 and BLM GIS 2014

**Alternative D, BLM's Preferred Alternative**

Alternative D is specific to BLM-administered mineral estate, the BLM's authority, and development would occur under a master development plan.

Figure 2-7

2. Alternatives



The WHP covers 12,500 acres of the MDP. Of the alternative D estimated 455 acres of short term disturbance*, 245 would be covered under the WHP, and of the estimated 133 acres of long-term disturbance, 67 would be covered under the WHP. *The total short- and long-term disturbance acreages are calculated without any overlapping areas; for example, collocated pipelines and roads are only counted once rather than double counted.

Source: SG Interests GIS 2013 and BLM GIS 2014

**Alternative D, Preferred**

| | |
|---|---|
| Proposed well pad analysis area | Existing road requires upgrades for use |
| Proposed screw compressor | WHP winter closure |
| Proposed pipeline | Federal surface, federal minerals |
| Proposed new road construction | Private surface, federal minerals |
| | Private surface, private minerals |

**Alternative D,**
**BLM's Preferred Alternative**
**Wildlife Habitat Plan**

New developments under the Preferred Alternative would be subject to the Bull Mountain Unit WHP that SGI submits. The WHP would apply throughout development phase activities (construction, drilling, and completion); it would not apply to production, maintenance, or reclamation phase activities.

Figure 2-8

at the APD stage, the exact locations of well pads would be in ecological sites within the 40-acre analysis areas best suited to achieve maximum reclamation success. These locations would be determined in consultation with BLM, COGCC, CPW, CDPHE, the local government designee, and the landowner. Under Alternative D, new water disposal wells would be sited on existing pads.

Additionally, SGI would construct approximately 16 miles of new road construction and 14 miles of improvements to existing roads for access, 14 miles of new pipeline construction collocated with roads, 10 miles of new cross-country pipeline construction, and up to 4 new compressor stations. Three of the stations would have one 637-horsepower screw compressor engine in an appropriately sized and muffled building. The fourth station (located outside the Unit boundary to the northwest; see **Figure 2-7**, Alternative D, BLM's Preferred Alternative) would consist of three 3,550-horsepower engines housed in a larger muffled building. The State of Colorado (15GU0015) and Gunnison County (OG2014-05) have permitted this station.

Based on these numbers and the assumed drilling rate noted in the common assumptions, drilling activities would occur for approximately 6 years.

*APD for Federal 12-89-7-1*
On November 6, 2014, the COGCC approved an APD submitted by SGI to drill Federal 12-89-7-1, which SGI had re-filed on June 19, 2014. The well would be drilled to a total depth of 4,700 feet, and would target sandstone and coal bed methane gas in the Cameo Coal, Corcoran, and Cozzette Formations. The well would have a 16-inch-diameter conductor casing in a 26-inch-diameter borehole to a depth of 80 feet; a 10-inch surface casing in a 12-inch-diameter borehole to a depth of 970 feet (the depth was extended in the current permit from its original depth); and a 6-inch-diameter casing in a 8.5-inch-diameter borehole to the final depth of 4,700 feet.

As described in the surface use plan of operations, the well pad would cover about three acres. A total of up to five wells are planned for this well pad. The wells would target both coal bed methane and sandstone and shale gas producing formations.

Although the proposed well pad is about one-half mile west of Highway 133 and East Muddy Creek, the topography to the east of the site is steep, and access would be from a road designed to accommodate heavy vehicle traffic that runs southeast from Gunnison Energy Corporation's Hotchkiss 12-90 #1-34 well, located a little more than one mile northwest of the proposed well pad. This approximately one-mile road segment would require realignment, and about 23 acres of surface area would be disturbed in the process.

Just west of the proposed pad is the Narrows Gathering Pipeline, with a buried 12- to 16-inch-diameter gas line and an 8-inch-diameter water line, for transporting gas and produced water from the production wells. The right-of-way of the Narrows Gathering Pipeline is 50 feet wide. About 2.75 acres would be disturbed for tie-in lines from the proposed well to the Narrows Gathering Pipeline.

**Construction**
SGI will conduct raptor and migratory bird nest surveys at areas proposed for new surface disturbance and heavy construction and drilling activities. SG will conduct these surveys

between May 15 and July 15 of each year, prior to submitting a COGCC Form 2 or BLM Notice of Staking. The intent of the surveys is to implement avoidance strategies where possible and minimize potential impacts to nesting raptors and migratory birds. These surveys may result in modifications to facility design, minor site location adjustments, and operational awareness that reduce direct and indirect impacts when a habitat of concern is identified. Where active raptor nests are identified, SGI will apply CPWs raptor nest buffer guidelines (Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors, 2008). When other migratory bird nests are located, SGI will avoid disturbance of nests, nestling birds are flagged when located and avoided during the nesting season.

*Access Road Construction*

Alternative D access road construction would be the same as under Alternative B. The primary access roads would be State Highway 133 and County Road 265, and roads would be constructed or improved only as needed to facilitate access to well pads and other facilities. Site-specific plans for road construction and upgrades would be included as part of individual future APDs. They would be subject to approval from the COGCC, landowners, or the BLM (see **Appendix D**).

*Well Pad Construction (Gas and Water Disposal Wells)*

Alternative D well pad construction would be the same as Alternative B. Before individual well pad construction, SGI would obtain the BLM's approval for an APD. Each APD would contain site-specific details on well pad size, construction and well operations, and mitigation measures.

Under Alternative D, the BLM's standard would be for closed loop systems to be used to eliminate pits on location and the release of VOCs, unless impacts could be demonstrated to be less when a reserve pit system is used. (There would be no net benefit to using a closed loop system.) The type of drilling system would be determined when the drilling application is submitted.

The quantity and combination of coal bed methane natural gas, sandstone, and shale gas wells on each pad are unknown at this time, the same as described in Alternative B.

*Pipeline Construction*

This would be the same as Alternative B; however, pipelines and roads would be sited to avoid identified elk winter concentration areas, unless avoiding such habitats would result in greater net surface disturbance or if it were determined to be a detriment to other resource values. Where feasible, trunk lines would be buried in the roadbed or in the borrow ditch to further reduce surface disturbance. No more than a 30-foot-wide disturbance route in addition to the average 16-foot-wide road would be approved for collocated pipelines.

*Overhead Electrical Line Construction for Water Disposal Wells*

Under Alternative D, SGI proposes up to four new water disposal wells that would require constructing new overhead electrical lines to each water disposal well to supply power to the wellhead (up to five power poles for each line). The methods for installing the overhead power lines would be the same as described in Alternative B. The new lines would be installed following the most practical route from existing lines to the new water disposal well site via two options: following existing two-track roads or running the line cross-country.

### Drilling

Drilling would be conducted in compliance with all applicable and relevant state and federal regulations; it would be the same as described in Alternative B, except for the differences noted below.

### Gas Well Drilling

Gas well drilling could use any of the different wellbore directions, types of drilling technologies (reserve pit or closed loop systems), target formations, and drilling lubricants noted in Alternative B. Under Alternative D, the type of wellbore, target formation, and drilling lubricant would be specified in the APD when submitted to the BLM. All drilling operations and other well site activities would be conducted in compliance with BLM policies and regulations and with the Master Surface Use Plan of Operations and Master Drilling Plan (see **Appendices D and E**). The standard drilling system would be a closed loop system in order to eliminate pits on location and the release of VOCs, unless analysis indicates that resource impacts would be reduced by using a reserve pit system (i.e., there would be no net benefit to using a closed loop system). The type of drilling system would be determined when the drilling application is submitted.

A closed loop system is defined as a mechanical and chemical system that would allow an operator to drill a well without using a reserve pit. During use, the following would apply:

- The reserve pit would be replaced with a series of storage tanks that separate liquids and solids.

- Equipment to separate solids (e.g., screen shakers, hydrocyclones, or centrifuges) and collection equipment (e.g., vacuum trucks) would minimize the volume of drilling waste muds and cuttings that require disposal and would maximize the volume of drilling fluid recycled and reused in the drilling process.

- The recovered drilling fluid would be stored in 500-barrel tanks and reused in active mud systems.

- Drilling fluid would be moved from well-to-well and reconditioned by the dewatering equipment and mud products.

- Solid wastes would be transferred off-site for disposal at oilfield waste disposal facilities.

If a reserve pit system were used, the following would apply:

- A conventional drilling rig would be used.

- A reserve pit would hold drilling cuttings and a small amount of fluid, freshwater, or recycled water used in drilling and any excess drilling mud.

- The reserve pit would not be used to store flowback water during the completion phase nor used to store produced water during the production phase.

- Drilling mud would be circulated by means of pump pressure from the rig mud pits down the drill pipe, through jets in the bit, and up the annulus (the space between the wellbore and the drill pipe).

- Drilling mud would flow through a series of equipment and tanks in order to recondition it. A small amount of mud and the cuttings from the wellbore would be placed in the reserve pit.

- Drill cuttings would be processed to remove excess drilling fluids. The cuttings would be stored on location in segregated lined piles or in a storage container. Cuttings would be sampled and tested according to COGCC 900 Series Rules then transported to a permitted disposal/waste management facility.

- Reserve pit fences would be constructed and maintained according to the permitting agency's requirements.

- Once all drilling wastes are removed from the pit, the pit liners would be removed and disposed of at a permitted waste facility; the pit would be closed in compliance with all COGCC 900 Series pit closure rules or federal regulations.

- The pit would be lined with an impermeable minimum 24-mil plastic liner so as not to leak, break, or allow discharge.

- Reserve pit sizes vary with well type and site conditions but would typically be approximately 50 feet by 150 feet and lined.

- Fencing:

  o Reserve pits would be fenced on three sides during drilling and on the fourth side immediately after the drilling rig is removed in order to keep big game and wildlife out of the pits.

  o Silt fencing would be installed around the base of the fences.

- Bird netting would be installed over the pit within 24 hours after drilling has begun.

- Two feet of freeboard would be required at all times.

- Pits would have a two-foot unlined berm in addition to the minimum two feet of freeboard around them to prevent snowmelt on the pad from flowing into the pits.

- Fill from the pit would be stockpiled along the edge of the pit and the adjacent edge of the well pad.

- Erosion control measures would be used, including proper grading to minimize slopes, diversion ditches, mulching, riprap, fiber matting, temporary sediment traps, and broad-based drainage dips, as necessary and appropriate to minimize erosion and surface runoff during well pad construction and operation.

A Tier 2 or cleaner drilling rig would be transported to the well pad, along with other necessary equipment. All descriptions relating to drilling rig time frames, equipment, and materials are the same as described under Alternative B.

SGI would use freshwater-based drilling fluids for most drilling activities. However, a small percentage of mineral oil additive may be used, depending on the formation that will be encountered. Mineral oil drilling fluids are preferred in production formations where borehole stability requires it or for directionally drilled wells. Specifics on which type of drilling fluid used would be identified at the APD stage and included on the individual drilling application. Similar to Alternative B, on average, approximately 3,000 barrels of water would be used for drilling in any particular well. For Alternative D, that would result in up to 438,000 barrels of water for drilling (up to 3,000 barrels per well multiplied by up to 146 new wells drilled).

*Water Disposal Well Drilling*
As under Alternative B, SGI proposes drilling up to four new water disposal wells, and the methods and technologies used for water disposal well drilling are the same as described there.

Like Alternative B, the disposal wells may be completed in the Dakota, Morrison, Entrada, or Maroon Formations. A water-based mud system would be used for drilling the surface hole, and a low-solids, non-dispersed gel system would be used for the intermediate and production hole sections of the water disposal well. Up to approximately 3,000 barrels of water would be used for drilling a particular water disposal well. For Alternative D, that would result in up to 12,000 barrels of water that could be used for drilling (up to 3,000 barrels per well multiplied by up to four new water disposal wells drilled).

The BLM would permit water disposal wells APDs if the wells are on-lease; SGI would then go through the conversion process with the BLM and COGCC to ensure that no production could come from the well before using it for water disposal.

***Completion***

*Gas Well Completion*
Gas well completions would largely be the same as described in Alternative B, except for the differences described below. As under Alternative B, **Appendix E** and **Appendix D** are incorporated by reference for drilling and surface use descriptions.

Test gas could be flared (i.e., released to the atmosphere) or captured for sale or use, which would prevent its escape to the atmosphere. The operator would follow the EPA NSPS OOOO regulations regarding use of green completions. See also COGCC regulation 2 CCR 805.b(3) for further details on green completion technologies.

*Flowback Pits*
At full build out, the four McIntyre flowback pits would be used in the same manner as described in Alternative B.

*Water Disposal Well Completion*
The methods, equipment, and process used for water disposal well completions would be the same as described in Alternative B.

**Interim Reclamation**
Following well completions, portions of the well pad not needed for production would be reseeded and reclaimed according to the specifications outlined in the Wildlife Habitat Plan (see Appendix C). Long-term well pad disturbance from the 33 new well pads would be reduced to 66 acres following successful interim reclamation.

**Production and Maintenance**

*Production*
Production specifications and methods would be the same as described in Alternative B, with the following change:

- Centralized production facilities may be used should it be determined that doing so would provide a net benefit to the impacted resources. Whether centralized production facilities are required or developed as part of a project's design features would be determined at the permitting stage.

As under other alternatives, the actual location of facilities would be determined during the APD stage. All site security guidelines (Onshore Order #3) would be followed as identified in the BLM's statutes, regulations, and policy.

*Surface Facilities*
Surface facilities would be installed the same as described in Alternative B, with the following changes:

- The BLM Authorized Officer would be promptly notified of any emergency work commencing.

- SGI would conduct the minimal amount of seasonal road maintenance required to pump the well or conduct emergency activities.

*Compressor Stations*
Compression in the field would be necessary as wells come online. As noted under *New Developments* above, Alternative D has four new screw compressor stations. Three of the stations would have one 637-horsepower, screw compressor engine in an appropriately sized and muffled building. The fourth station (outside the Unit boundary to the northwest) would consist of three 3,550-horsepower engines housed in a larger muffled building. The State of Colorado (15GU0015) and Gunnison County (OG2014-05) have permitted this station (see **Figure 2-5**).

*Produced Water Management*
Methods for treating produced water would be the same as described in Alternative B.

*Workover and Maintenance*

A single workover rig and five-person support crew with four light trucks is anticipated to workover any given individual well within the Unit. The exact scheduling and particular wells selected for workover is unknown at this time, however individual well workovers would be conducted on a bi-annual schedule. With the proposed well development schedule of drilling 27 new federal wells per year in Alternative D the following estimates for workover operations may occur.

After completion of the drilling phase of Alternative D, annually, approximately 67 workovers are anticipated to occur upon the proposed 150 federal wells amongst 33 new well pads. Based on the initial drilling schedule the workover rig and support crew could move between approximately 17 well pads each year to workover wells. Although the single workover rig would likely remain within the Unit should multiple workovers be scheduled to occur consecutively, the support crew would be travelling in and out of the Unit daily with up to four light trucks. Individual well workovers are anticipated to take approximately four days each resulting in up to 16 light truck round trips in and out of the Unit per individual workover. Also resulting in approximately 1,072 light truck round trips per year should all 67 workovers occur. It is also assumed that if workover scheduling permits (i.e. minimal delay between scheduled operations), the workover rig would likely be temporarily staged in the area when not in use to limit multiple round trips in and out of the Unit.

During the initial period of development of Alternative D (years one through six), SGI's WHP applies a timing restriction on workovers throughout the Unit from Dec. 1 - April 15. However the Winter Closure Areas as identified in the WHP only include up to 77 wells amongst 17 well pads. If no commitments were made throughout the rest of the Unit, there would otherwise be no timing constraints applicable to workovers on the other proposed 73 wells amongst 19 well pads located outside the Winter Closure Areas.

After full development of the Federal wells in Alternative D has occurred (150 wells), the timing restrictions on workovers from the WHP would no longer be applicable to the federal wells within the Winter Closure Areas.

Regardless of timing limitations when performing workovers on federal wells, such operations would be conducted in compliance with the subsequent well operations standards put forth in 43 CFR 3162.3-2. These regulations include notification requirements and outline circumstances which may require additional approval from BLM prior to conducting subsequent well operations.

**Final Reclamation and Abandonment**

Standards and methods would be generally the same as described in Alternative B.

**Water Use and Sources**

Water use and sources is the same as described in Alternative B.

**Hazardous Materials and Solid Waste**

Hazardous materials and solid waste actions are the same as those described in Alternative B.

*Access and Traffic*

Traffic estimates would be the same as those described in **Section 2.2.5**, Elements Common to All Alternatives, above. Specific calculations for Alternative D are presented below in **Table 2-9**, Alternative D Traffic Estimates for Construction, Drilling, Completion, and Production Activities, based on 33 new well pads.

**Table 2-9**
**Alternative D Traffic Estimates for Construction, Drilling, Completion, and Production Activities**

| Vehicle Type | Average Weight (Pounds) | Estimated Round Trips |
|---|---|---|
| Vehicles for pad and access road construction | | |
| Gravel trucks | 110,000 | 5,280 |
| Semi-trailer trucks | 37,000 | 132 |
| Pickup trucks | 6,000 | 1,320 |
| Motor grader on semi-trailer | 40,000 | 33 |
| Dozer (2) on semi-trailer | 19,000 | 66 |
| Track hoe on semi-trailer | 43,000 | 33 |
| Pipeline construction | | |
| Motor grader on lowboy trailer with truck | 50,800 | 66 |
| Bulldozer on lowboy trailer with truck | 120,000 | 66 |
| 80-barrel water trucks for dust control | 54,000 loaded | 660 |
| 80-barrel water trucks for hydrostatic testing | 25,000 empty | 66-132 |
| Track hoe on lowboy trailer with truck | 91,000 | 66 |
| Welding trucks | 9,500 | 66 |
| Crew-cab pickups | 5,200 | 1,320 |
| Bending machine/trailer | 48,000 | 66 |
| Side booms on lowboy trailer with truck | 63,000 | 66 |
| X-ray truck | 5,200 | 132 |
| Testing truck | 6,000 | 66 |
| Pipe trucks | 120,000 loaded 36,000 unloaded | 33 |
| Utility tractor and truck with lowboy trailer | 40,000 | 33 |
| Vehicles for drilling/completing first well on the pad | | |
| Drilling/completion rig | 120,000 | 33 |
| Rig-up trucks loaded (e.g., cement or fracturing) | 120,000 | 825 |
| Rig-up trucks empty | 36,500 | 132-198 |
| 80-barrel water trucks loaded | 54,000 | 1,320 |
| 80-barrel water trucks empty | 25,000 | 1,320 |
| Crew-cab pickups | 6,000 | 1,320 |
| Vehicles for drilling/completing subsequent wells on the same pad | | |
| Motor grader | 50,000 | 66 |
| Drilling/completion rig | 120,000 | 66 |
| Rig-up trucks loaded (e.g., cement or fracturing) | 120,000 | 825 |
| Rig-up trucks empty | 36,500 | 132-198 |
| 80-barrel water trucks loaded | 54,000 | 1,485 |
| 80-barrel water trucks empty | 25,000 | 1,485 |
| Crew-cab pickups | 6,000 | 40 |
| Vehicles for well production | | |
| Workover traffic (vehicle roundtrips per year) | 6,000 | 1,072 |
| Workover rig (rig roundtrips per year) | 120,000 | 67 |
| Haul trucks | 120,000 | 198 |

Traffic estimates for Alternative D are the same as those described in Alternative B.

### Surface Disturbance

Alternative D would construct up to 33 new well pads to develop federal mineral estate. This would result in approximately 165 acres of short-term disturbance and 66 acres of long-term disturbance. It would require 16 miles of new road construction and 14 miles of improvements to existing roads for access (totaling 106 acres of short-term disturbance and 57 acres of long-term disturbance).[8] SGI also proposes 24 miles of new pipelines that would total 231 acres of short-term disturbance and 27 acres of long-term disturbance (cross-country pipelines would be fully reclaimed, resulting in zero acres of long-term disturbance).

Details for these actions are shown in **Table 2-10**, Summary of Actions by Alternative; acreages for areas of disturbance are shown in **Table 2-12**, Summary of Surface Disturbance Acres by Alternative, which includes both short-term (immediate construction) and long-term (interim reclamation) disturbance amounts.

Following well completions, portions of the federal well pad not needed for production would be reseeded and reclaimed according to BLM specifications. Long-term well pad disturbance from the 33 new well pads would be reduced to 66 acres following successful interim reclamation.

### Design Features

Alternative D includes additional design features to address air quality, wildlife, geologic hazards, and water issues, as follows:

- The following air quality measures:

    o The BLM would place a COA on each permit, requiring SGI to apply continuous watering during access road and well-pad construction and during heavy traffic periods, including drilling and completion phases of well development. SGI would be required to limit off-site transport by maintaining no visible dust plume operations.

    o The BLM would place a COA on each permit, requiring SGI to emit 5 TPY or less of NOx at each well-pad for production operations (post-construction and production phase), as defined by the acceptable emissions level analyzed in the $NO_2$ 1-hour modeling analysis. SGI would be required to submit a detailed well pad production emissions inventory for each APD or details for the well pad production equipment and operations (including refined emissions factors) to develop project-specific emissions inventories. An annual NOx emissions rate greater than 5 TPY may be acceptable if SGI can demonstrate compliance with the $NO_2$ 1-hour NAAQS for the APD. The BLM would need to approve any additional impacts analyses before authorizing activities.

---

[8] Calculations of possible disturbance areas are based on the assumptions presented in **Section 2.2.5**, Elements Common to All Alternatives, and **Table 2-2**, Project Feature Assumed Short- and Long-Term Disturbance Estimates.

2. Alternatives

   o  The BLM would place a COA on each permit, requiring the operation of Tier 2 engines or cleaner for drilling, fracturing, and completion activities. SGI would be required to submit a detailed well pad development phase emissions inventory for each APD or details for the well pad development equipment and operations (including refined emissions factors and hours of operation) to develop project-specific emissions inventories. Operation of engines totaling greater than 2,000 horsepower at any one time during the development phase could trigger the need for additional impacts analysis and potentially warrant a COA for Tier 3-4 engines. The goal of the requirement is for drill-, completion-, and fracturing-related engines to emit no more than 1 gram per second of NOx total at any one time (total of all engines operating concurrently), unless another NOx emissions rate can be demonstrated to achieve compliance with the $NO_2$ 1-hour NAAQS.

   o  The BLM would require SGI to provide a detailed Unit-wide equipment configuration plan (with specific information for the pumping units) and emissions inventory that shows a plan/projection for Unit-wide federal wells production phase NOx emissions at or below 143 TPY of NOx. The BLM would place a COA on each permit (APD), requiring SGI to submit a NOx emissions accounting analysis summary. This would provide information for how the APD emissions fit into the overall Unit-wide production phase (post-construction and development) NOx emissions budget (approximately 143 TPY of NOx).

- SGI would be required to use and operate pneumatic devices, tanks, and dehydrators, in accordance with CDPHE and EPA oil and gas regulations.

- SGI agrees to meet annually with BLM by December 31 each year to summarize its development and mitigation activities for the previous 12-months and to forecast with best available information the next year's development and mitigation activities

- SGI meet annually with the BLM to present a construction and operational activities plan prior to the construction season.

- With an annual agreement by SGI as part of the annual operations plan, SGI would present the order for development phasing around the Unit to avoid widespread impacts on wintering big game species.

- SGI would provide an annual reclamation monitoring status report that would present maps of reclamation areas and identify appropriate native seed mixes and their proper application.

- SGI would conduct annual raptor nesting surveys in the Unit to ensure compliance with the Migratory Bird Treaty Act. The surveys would occur within 0.25 mile of surface-disturbing activities from April 15 to July 15 or until young of the year have fledged. Activities would be avoided around occupied nests from April 15 to July 15; exceptions would be discussed with the BLM Authorized Officer on a case-by-case basis.

- SGI would ensure that water accumulation on pads is not allowed to drain into wetlands or riparian areas downgradient of the Unit.

- SGI would control noxious weeds in the Unit, including on or in wells pads, pipeline corridors, access roads and adjacent areas, temporary use areas, and any other area associated with natural gas development. SGI would follow the measures identified in **Appendix I**, Noxious Weed Management Plan.

- The following Geologic Hazards measures:

  o Avoidance of areas with geologic hazards—Project-specific conditions would be evaluated during the site permitting process, and avoiding disturbance in areas with higher risks in the proposed sites would minimize hazards.

  o Engineering controls—If geologic hazards could not be avoided, drainage systems would be designed to reduce soil saturation and prevent erosion in areas with steep slopes and to stabilize the toes of slopes. The design would be based on site-specific geotechnical site evaluations.

  o Monitoring of landslides—If landslide-prone areas could not be avoided, such as east of Highway 133, mass movement of the landslide deposits could be monitored, such as by installing tensiometers or alarm systems to enable automated shutoff of gas pipelines in the event of slope failure.

  o Monitoring and maintenance of acceptable injection pressure—Monitoring of deep well injection pressures and of changes in the transmissivity[9] during injection could determine whether deep injection pressures are fracturing the reservoir rock, and injection rates and pressures could be adjusted to reduce the potential for these effects.

  o Monitoring of seismicity—Seismic activity could be monitored with sensitive seismometers as a follow-up to the injection pressure monitoring measure above to determine whether earthquakes are triggered at the depth of injection. This would provide additional evidence as to whether the reservoir rock was being fractured by injection pressures in the targeted injection zone.

- The following Water Quality monitoring measures:

  o In addition to the State of Colorado water baseline monitoring requirements, the following will be added to the existing baseline monitoring program conducted by SGI

    ▪ Increase sampling radius to 1 mile from well pad location for water wells

    ▪ Include all surface water sources and spring sources within 1 mile of well pad location. Surface water and springs would be sampled twice a year, at high flow and at low flow, to meet the baseline monitoring requirements.

---

[9] A measure of how much fluid can flow horizontally through an aquifer

Water would be analyzed for major ions, trace metals, dissolved gases (including methane), BTEX, TPH, dissolved organic carbon (DOC), and nutrients and for field properties, including temperature, pH, specific conductance, dissolved oxygen, turbidity, and alkalinity. Quality assurance sampling would include one replicate and one blank during each sampling trip. The replicate and blank would be analyzed for the same constituents as the environmental sample.

o   Surface water and groundwater baseline samples should include stable isotopes of methane (carbon and deuterium) to determine the origin of the methane (biogenic or thermogenic).

o   Sample collection for surface water and groundwater should follow the National Field Manual for collecting water quality data. SGI should submit instrument logs, well characteristics, and other QC/QA collection methods to the BLM.

o   SGI should summarize data provide it to the BLM annually. The BLM would determine if further analysis of data may be required by a third party, such as the US Geological Survey. Any additional expenses incurred for third-party reviews required by BLM would be the responsibility of SGI.

## 2.3   ALTERNATIVES CONSIDERED BUT ELIMINATED FROM DETAILED ANALYSIS
There were several elements of alternatives considered by the BLM during the development of the EA and the EIS. The elements considered during EA development came during the initial scoping period on the EA; those considered during EIS development came from public comments on the EA or were received after publication of the Notice of Intent. No individual or group submitted a complete alternative that included all elements of the project (well pads, well drilling, and pipelines). The elements and the reasons for eliminating them are described below.

### 2.3.1   Alternatives Considered and Eliminated during EA Development

#### 500-foot Development Setback
During initial EA scoping, the Gunnison County Temporary Regulations for Oil and Gas Operations were discussed, and implementation of a required 500-foot development setback from waterways and riparian areas was considered. This setback requirement has since been changed to be a 300-foot requirement.

SGI and the BLM ran a modified GIS modeling program to incorporate this 500-foot setback from waterways and riparian areas. The resulting well site locations would have required an additional 5.6 miles of access roads and an additional 8.3 acres of long-term surface disturbance. This alternative also placed development higher on ridges and side-slopes. Therefore, the alternative was considered but eliminated from further analysis due to increased surface impacts associated with increased development and development on ridges and side slopes.

#### Proximity to Road Networks
Another alternative considered but not carried forward during EA development raised the issue of the overall length of roads and the amount of surface disturbance under the Proposed Action

as an environmental concern. The BLM developed a set of weights and values for the GIS model criteria that would minimize road lengths and, therefore, surface disturbance, emphasizing proximity to existing road networks while reducing the weights on surface water and surrounding buffer zones. The well pad locations produced from the modified model were not uniformly distributed throughout the Unit and occurred in high-density groups in close proximity to existing roads, and many pad sites were within 300 feet of waterways. As a result, large portions of the Unit were excluded from development and only about half of the Unit's natural gas resource would have been drained. This alternative was considered but eliminated from further analysis because it did not meet the purpose and need for the proposal, and it was not consistent with the existing Unit agreement to efficiently develop the federal mineral resources.

### 2.3.2   Alternatives Considered and Eliminated from EIS Development

The alternatives considered but not carried forward in the earlier Draft EA and the public comments on the Draft EA were considered in the alternatives development for the EIS. Issues and comments are summarized in the Scoping Summary Report (BLM 2013b). Several commenters suggested additional mitigation measures for consideration in the alternatives. The comments were provided to the resource authors for consideration and included in the Final EIS as appropriate. Specific actions or alternatives that were not carried forward are addressed below.

#### *Alternative Water Treatment Facilities*

Comments suggested that the BLM consider an alternative form of produced water management such as the potential for on-site produced water treatment to meet NPDES discharge permit requirements and reuse water rather than deep well injection. Under the alternatives, during the development phase water would be managed and reused for operations (e.g., completion) as practicable. Large evaporation pond(s) and smaller on-site treatment (e.g., reverse osmosis units) were considered for dealing with produced water after the drilling and development and during the production and maintenance phase. Evaporation rates at higher altitudes and cooler temperatures hinder the ability to evaporate large volumes of water from ponds. Potential mitigation measures and/or processes such as smaller on-site units to address this issue at the APD stage are identified in Chapter 4, Environmental Consequences. Consequently a separate alternative was eliminated from further analysis.

#### *New Access Route Entry Points to the Unit*

Several commenters on the EA suggested that the BLM consider different access routes to well pads that would remove new roads or eliminate upgrades to roads, including highlighting specific sections of the Unit to avoid such as the Bull Mountain Ranch. Siting of access routes into the Unit was considered early on in the Proposed Action design process by the siting study (see **Appendix A**) that was specifically intended to take advantage of existing access routes and minimize the need for new roads and upgrades. In addition, other existing roads that could possibly provide access to the analysis area are shown on the maps. The MDP would not foreclose consideration of alternate access routes in the future, and other routes may be considered during site-specific analysis at the APD stage. Therefore, Alternatives A, B, and C provide an appropriate range of alternatives for analysis at this time.

***Extending Development to a Longer or Shorter Time Period***

Commenters suggested considering additional phasing time frames to extend the drilling horizon past the 6 years estimated in the Proposed Action. Other commenters suggested the BLM consider requiring all of the development to occur at once and to be completed within 1 year. Drilling all 146 gas wells and 4 water disposal wells in one construction season is unviable due to insufficient rig and labor availability and limits the ability to incorporate the results of recent drilling into future drilling plans. The 6-year period is an aggressive estimate.

***Additional Mitigation Measures***

Several commenters suggested that additional mitigation measures should be considered in the alternatives, including greenhouse gas and criteria pollutants emission mitigation measures, and well pad berming and lining measures. Several of these suggestions are already addressed under existing regulations such as New Source Performance Standards Subparts W and OOOO (40 CFR Part 60). Additionally, SGI includes emission reducing mitigations in their Greenhouse Gas Strategy and adopted as standard operating procedures for projects. Measures that were not covered under existing regulations or included as operator committed design measures were included for consideration in one or more alternative.

## 2.4    SUMMARY OF ALTERNATIVES

**Table 2-10**
**Summary of Actions by Alternative[10]**

| Phase | Action | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|---|
| Construction | Well pads | 10 new pads on private mineral estate | 36 new pads on federal mineral estate, inclusive of the 12-89-7-1 APD | 35 new pads on federal mineral estate, inclusive of the 12-89-7-1 APD | 33 new pads on federal mineral estate, inclusive of the 12-89-7-1 APD |
| | Access roads | 26 miles upgrades to existing roads 5 miles new road construction | 53 miles upgrades to existing roads 16 miles new road construction | 13 miles upgrades to existing roads 12 miles new road construction | 14 miles upgrades to existing roads 16 miles new road construction |
| | | construction rate: 600-800 yards per day | | | |
| | Pipelines | 4 miles new collocated with roads 8 miles new cross-country | 13 miles new collocated with roads 9 miles new cross-country | 19 miles new collocated with roads 0 miles new cross-country | 14 miles new collocated with roads 10 miles new cross-country |
| | Electrical lines | 1 new overhead electrical line (up to 5 power poles) | 4 new overhead electrical lines (up to 20 power poles) | 4 new buried electrical lines (collocated with roads) | 4 new electrical lines, may be buried or overhead (up to 20 power poles) |
| Drilling | Gas wells | 55 new gas wells | 146 new gas wells, inclusive of the one well to be drilled as part of the 12-89-7-1 APD | | |
| | | Time frame Coal bed methane natural gas – 60 days Shale and sandstone – 85 days | | | |
| | Water disposal wells | 1 new water disposal well | 4 new water disposal wells | | |
| | | Time frame: 60 – 120 days | | | |
| | Total wells | 56 wells | 150 wells | | |
| | Drilling rate | 3 Tier-2 or -3 rigs drilling 27 wells per year | 3 Tier-2 or -3 rigs drilling 27 wells per year | 3 Tier-2 or cleaner rigs drilling 27 wells per year | 3 Tier-2 or cleaner rigs drilling 27 wells per year |
| | Drilling duration | 3 years | 6 years | | |

---

[10] Under Alternatives B, C, and D, the operations and development of private minerals described in Alternative A would continue to be implemented; analysis for the cumulative effects of development under Alternative A plus the action alternatives is discussed in **Table 4-1**, Summary of Cumulative Actions within the Unit by Alternative. Alternatives B, C, and D display development and actions that would occur only on federal mineral estate (which falls within the BLM's decision-making authority).

**Table 2-10**
**Summary of Actions by Alternative[10]**

| Phase | Action | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|---|
| Completion | Gas wells | Well completion duration: 8 – 10 days Flow testing duration: 25 – 50 days | | | |
| | Water disposal wells | Well completion duration: 8 – 10 days | | | |
| Production and Maintenance | Compressor station | 1 new screw compressor station | 3 new screw compressor stations; 1 new multi-engine compressor station | 4 new screw compressor stations | 3 new screw compressor stations; 1 new multi-engine compressor station |
| | Remote telemetry monitoring | No similar action | Included as part of the WHP | No similar action | Included as part of the WHP |
| | Workover estimates | Years 1-6: one workover every two years per well Years 7-40: 67 workovers annually | | | |
| | Produced water management | Production: 500 – 3,000 barrels[11] per day | | | |
| | | Coal bed methane natural gas-produced water injected into water disposal wells, trucked to disposal location, or recycled for use in well completions | | | |
| Water Use and Sources | Drilling | Up to 21.3 acre-feet[12] | 58 acre-feet | | |
| | Completion | Up to 714.3 acre-feet[13] | Up to 2,369.3 acre-feet | | |
| | Dust abatement | Up to 13.2 acre-feet of freshwater | Up to 52.9 acre-feet of freshwater | | |
| | Source for all uses | 30% freshwater and 70% recycled or produced water | | | |
| | Total water usage for drilling and completion[14] (based on source percentages noted above) | Total water: 748.8 acre-feet Freshwater: 220.7 acre-feet Recycled/produced water: 514.9 acre-feet | Total water: 2,480.2 acre-feet Freshwater: 744.1 acre-feet Recycled/produced water: 1736.1 acre-feet | | |

[11] 1 barrel = 42 gallons, standard US oil barrel volume

[12] Combined water disposal and gas wells, based on an average of 3,000 barrels per well. Conversion factor is 7,758 barrels per acre-foot.

[13] Calculated based on assuming 50 percent coal bed natural gas wells and 50 percent shale wells as discussed in the Bull Mountain EA. Water amounts for each type of well were taken from the Master Drilling Plan in Appendix E. Calculations used number of new gas wells per alternative divided in half for each type of well (coal bed methane/shale). To estimate the amount of water use per well type, the number of wells was multiplied by the highest amount of water use for that well type. Water usage totals were added together for a total maximum amount of water usage during completion.

[14] Amounts were calculated based on adding together the drilling, completion, and dust abatement amounts together. The total was multiplied by 30 percent to determine the freshwater amount and 70 percent to determine the amount of recycled/produced water that would be used.

**Table 2-11**
**Stipulations, Design Features, and Mitigation Measures**

| | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| Lease stipulations | Standard stipulations as listed on individual leases apply.<br>Additional lease stipulations that apply within the Unit:<br>• Timing limitation stipulation: To protect crucial deer and elk winter ranges. No surface use is allowed from December 1 through April 30. This stipulation does not apply to operation and maintenance of production facilities.<br>• All lands of the following leases are subject to Colorado lease notice exhibit CO-34, Lease Notice: To alert lessee of potential habitat for threatened endangered, candidate, or other special status plant or animal.<br>Bull Mountain Unit Agreement stipulations:<br>• The terms, conditions, and provisions of all leases, subleases, and other contracts relating to exploration, drilling, development or operation for oil or gas on lands committed to this agreement are hereby expressly modified and amended to the extent necessary to make the same conform to the provisions hereof, but otherwise to remain in full force and effect. | | | |
| Plans and strategy documents | Master Surface Use Plan of Operations (Appendix D) | | | |
| | Master Drilling Plan (Appendix E) | | | |
| | Hazardous Materials Management Summary (Appendix G) | | | |
| | Noxious Weed Management Plan (Appendix 1) | | | |
| | Bainard Augmentation Plan (Appendix L) | | | |
| | Poly Pipeline Operations Plan (Appendix M) | | | |
| Site Suitability Modeling | No similar action | SGI's Wildlife Habitat Plan | No similar action | SGI's Wildlife Habitat Plan |
| | Site selection weighted factors:<br>• Slope – 30%<br>• Sensitivity to visual impacts from Highway 133 and County Road 265 travel routes – 30%<br>• Proximity to existing road networks – 15%<br>• Proximity to existing gathering pipeline system – 10%<br>• Proximity to delineated wetlands and wetland buffer zones, stream networks, and stream buffer zones – 10%<br>• Proximity to known streams containing Colorado River | Same as Alternative A | Site selection weighted factors:<br>• Slope – 20%<br>• Sensitivity to visual impacts from Highway 133 and County Road 265 travel routes – 10%<br>• Proximity to existing road networks – 35%<br>• Proximity to existing gathering pipeline system – 15%<br>• Proximity to delineated wetlands and wetland buffer zones, stream networks, and stream buffer zones – 5%<br>• Proximity to known streams containing Colorado River | Individual well pad locations were selected from Alternatives B and C. This resulted in selecting the following well pad locations:<br>• 31 pads from Alternative B<br>• 2 pads from Alternative C<br>• 3 pads dropped from consideration<br><br>See **Figure 2-5**, BLM's Preferred Alternative (Alternative D). |

**Table 2-11**
**Stipulations, Design Features, and Mitigation Measures**

| | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | cutthroat trout – 0%<br>• Soil erosion factors – 4%<br>• Vegetated areas and open meadows – 1% | | cutthroat trout – 0%<br>• Soil erosion factors – 15%<br>• Vegetated areas and open meadows – 0%<br><br>Additional factor considered:<br>• Verified elk winter concentration areas | |
| Design Features | Operator actions and measures as described in Section 2.2.5, Elements Common to All Alternatives and Section 2.2.6, Alternative A, No Action. | Operator actions and measures described in Section 2.2.5, Elements Common to All Alternatives, and Section 2.2.7, Alternative B, Proposed Action | Operator actions and measures described in Section 2.2.5, Elements Common to All Alternatives, and Section 2.2.8, Alternative C, Modified Action<br><br>Appendix C, Design Features, Mitigation Measures, and Conditions of Approval<br><br>Air Quality and AQRV measures<br><br>SGI would be required to utilize and operate pneumatic devices, tanks and dehydrators in accordance with CDPHE and EPA Oil and Gas Regulations.<br><br>SGI would have a yearly meeting with the BLM to present an annual construction and operational activities plan prior to the construction season.<br><br>With an annual agreement by | Operator actions and measures described in Section 2.2.5, Elements Common to All Alternatives, and Section 2.2.9, Alternative D, Preferred Alternative<br><br>All of the design features identified under Alternative C<br><br>Geologic hazards measures (noted under Alternative B Mitigation Measures)<br><br>Water Quality monitoring: In addition to the State of Colorado water baseline monitoring requirements, the following will be added to the existing baseline monitoring program conducted by the operator.<br>• Increase sampling radius to 1 mile from well pad |

**Table 2-11**
**Stipulations, Design Features, and Mitigation Measures**

| | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | | | SGI as part of the annual Operations Plan, SGI would present the order for development phasing around the Unit to avoid widespread impacts on wintering big game species during a winter period.<br><br>SGI would provide an annual reclamation monitoring status report that would present reclamation status, maps of reclamation areas, and identifying appropriate native seed mixes and their proper application.<br><br>SGI would conduct annual raptor nesting surveys in the Unit to ensure compliance with the Migratory Bird Treaty Act. The surveys would occur within 0.25 mile of surface disturbing activities from April 15 to July 15 or until young of the year have fledged Activities would be avoided around occupied nests from April 15 to July 15; exceptions would be discussed with the authorized officer on a case-by-case basis.<br><br>SGI would ensure that water accumulation on pads is not allowed to drain into wetlands | location for water wells.<br>• Include all surface water sources and spring sources within 1 mile from well pad location. Surface water and springs will be sampled two times a year, at high flow and at low flow to meet the baseline monitoring requirements. Water will be analyzed for major ions, trace metals, dissolved gases (including methane), BTEX, TPH, dissolved organic carbon (DOC), nutrients, and field properties including temperature, pH, specific conductance, dissolved oxygen, turbidity, and alkalinity. Quality assurance sampling will include one replicate and one blank during each sampling trip. The replicate and blank will be analyzed for the same constituents as the environmental sample.<br>• Surface water and groundwater baseline samples should include stable isotopes of |

**Table 2-11**
**Stipulations, Design Features, and Mitigation Measures**

| | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | | | or riparian areas down-gradient from the Unit.<br><br>SGI would control noxious weeds within the Unit, including on or within wells pads, pipeline corridors, access roads and adjacent areas, temporary use areas, and any other area associated with natural gas development. The measures identified in Appendix I, Noxious Weed Management Plan, would be followed. | methane (carbon and deuterium) to determine the origin of the methane (biogenic and/or thermogenic).<br>• Sample collection for surface water and groundwater should follow the National field manual for the collection of water-quality data. Instrument logs, well characteristics, and other QA/QA collection methods should be submitted to the BLM.<br>• Data should be summarized and provided to the BLM annually for review. BLM will determine if further analysis of data may be required by a third party such as the U.S. Geological Survey. Any additional expenses incurred for third party reviews as required by BLM, will be the responsibility of the operator |

**Table 2-11**
**Stipulations, Design Features, and Mitigation Measures**

|  | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| Mitigation measures |  | Appendix C, Design Features, Mitigation Measures, and Conditions of Approval which includes the following:<br><br>Air Quality measures:<br>• SGI would apply dust abatement to unpaved roads to achieve at least 50% control during all construction and development phases. SGI would also apply dust abatement (greater than or equal to 50%) to unpaved roads during the production phase when expected traffic rates exceed two trips to each well pad within the Unit per day.<br>• The BLM would place a COA on each permit, requiring SGI to emit 5 TPY or less of NOx at each well pad for production operations (post-construction and production phase), as defined by the acceptable emissions level analyzed in the NO$_2$ 1-hour modeling analysis. SGI would be required to submit a detailed well-pad production emissions inventory for each APD or details for the well-pad production equipment and operations (including refined emissions factors) to | Geologic Hazards mitigation measures same as Alternative B. | None |

**Table 2-11**
**Stipulations, Design Features, and Mitigation Measures**

| | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | | develop project-specific emissions inventories. An annual NOx emissions rate greater than 5 TPY may be acceptable if SGI can demonstrate compliance with the $NO_2$ 1-hour NAAQS for the APD. The BLM would need to approve any additional impacts analyses before authorizing activities.<br>• The BLM would place a COA on each permit, requiring the operation of Tier 2 engines or cleaner for drilling/ fracturing/completion activities. SGI would be required to submit a detailed well pad development phase emissions inventory for each APD or details for the well pad development equipment and operations (including refined emissions factors and hours of operation) to develop project-specific emissions inventories. Operation of engines totaling greater than 2,000 horsepower at any one time during the development phase could trigger the need for additional impacts analysis and potentially warrant a COA for Tier 3-4 engines. The goal of the requirement is for | | |

**Table 2-11**
**Stipulations, Design Features, and Mitigation Measures**

| | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | | development-(drill/completion/ fracturing) related engines to emit no more than 1 gram per second of NOx total at any one time (total of all engines operating concurrently), unless another NOx emissions rate can be demonstrated to achieve compliance with the $NO_2$ 1-hour NAAQS.<br>• The BLM would require SGI to provide a detailed Unit-wide equipment configuration plan (with specific information for the pumping units) and emissions inventory for BLM review that shows a plan/projection for Unit-wide federal wells production phase NOx emissions at or below 143 TPY of NOx. The BLM would place a COA on each permit (APD), requiring SGI to submit a NOx emissions accounting analysis summary. This would provide information for how the APD emissions fit into the overall Unit-wide production phase (post-construction and development) NOx emissions budget (approximately 143 TPY of NOx).<br><br>Geologic Hazards mitigation measures to include: | | |

**Table 2-11**
**Stipulations, Design Features, and Mitigation Measures**

| | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | | • Mitigation 1, Avoidance of Areas with Geologic Hazards. The most effective mitigation to reduce effects of slope failure is to avoid areas with higher risks. Project-specific conditions would be evaluated during the site permitting process, and disturbance would be avoided in areas with higher risks in the proposed sites to minimize hazards.<br>• Mitigation 2, Engineering Controls. If geologic hazards cannot be avoided, such mitigation measures as designing drainage systems to reduce soil saturation and prevent erosion in areas with steep slopes and to stabilize the toes of slopes could be implemented, based on recommendations following site-specific geotechnical site evaluations.<br>• Mitigation 3, Monitoring of Landslides. If landslide-prone areas could not be avoided, such as east of Highway 133, mass movement of the landslide deposits could be monitored by installing tensiometers to monitor the rate of differential horizontal movement so that corrective | | |

**Table 2-11**
**Stipulations, Design Features, and Mitigation Measures**

| | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | | action can be taken. Alarm systems can be installed to enable automated shutoff of gas pipelines at critical points in the event of slope failure.<br>• Mitigation 4, Monitoring and Maintenance of Acceptable Injection Pressure. Monitoring of deep well injection pressures and of changes in the transmissivity during injection can determine whether deep injection pressures are causing fracturing of the reservoir rock and injection rates, and pressures can be adjusted to reduce the potential for these effects.<br>• Mitigation 5, Monitoring of Seismicity. Seismic activity could be monitored with sensitive seismometers as a follow-up measure to Mitigation 1, to determine whether earthquakes are triggered at the depth of injection. This would provide additional evidence as to whether the reservoir rock was being fractured by injection pressures in the targeted injection zone. | | |

## 2.5   SUMMARY OF IMPACTS

Table 2-12
Summary of Surface Disturbance Acres by Alternative

| Project Feature | Alternative A, No Action | | Alternative B, Proposed Action | | Alternative C, Modified Action | | Alternative D, the BLM's Preferred Alternative | |
|---|---|---|---|---|---|---|---|---|
| | Short-Term Surface Disturbance | Long-Term Surface Disturbance | Short-Term Surface Disturbance | Long-Term Surface Disturbance | Short-Term Surface Disturbance | Long-Term Surface Disturbance | Short-Term Surface Disturbance | Long-Term Surface Disturbance |
| New well pads | 55 acres | 22 acres | 180 acres | 72 acres | 175 acres | 70 acres | 165 acres | 66 acres |
| Access roads | | | | | | | | |
| Upgrades to existing | 92 acres | 49 acres | 183 acres | 97 acres | 47 acres | 25 acres | 51 acres | 27 acres |
| New road construction | 17 acres | 9 acres | 60 acres | 32 acres | 44 acres | 23 acres | 56 acres | 30 acres |
| Pipelines | | | | | | | | |
| New collocated with roads | 54 acres | 9 acres | 161 acres | 25 acres | 231 acres | 37 acres | 171 acres | 27 acres |
| New cross-country | 47 acres | 0 acres | 56 acres | 0 acres | 0 acres | 0 acres | 61 acres | 0 acres |
| Facilities | | | | | | | | |
| New compressor stations | 5 acres | 2 acres | 20 acres | 8 acres | 20 acres | 8 acres | 20 acres | 8 acres |
| storage yard | 5 acres | 2 acres | 5 acres | 2 acres | 5 acres | 2 acres | 5 acres | 2 acres |
| **Total Acres[15]** | **260 acres** | **88 acres** | **600 acres** | **215 acres** | **441 acres** | **126 acres** | **455 acres** | **133 acres** |
| **Total Acres within WHP** | **NA** | **NA** | **353 acres** | **123 acres** | **NA** | **NA** | **245 acres** | **133 acres** |

---

[15] Acreage amounts presented under each type of disturbance (roads, pipelines, etc.) are not summed to give the total estimated short- and long-term disturbance acreages. The total short- and long-term disturbance acreages are calculated without any overlapping areas; for example, collocated pipelines and roads are only counted once rather than double counted. Cumulative impacts are discussed in Chapter 4.

**Table 2-13**
**Estimated Total Traffic Round Trips for Drilling, Completion, and Production Activities by Alternative[1]**

| Vehicle Type | Alternative A, No Action (10 Well Pads) | Alternative B, Proposed Action (36 Well Pads) | Alternative C, Modified Action (35 Well Pads) | Alternative D, BLM's Preferred Alternative (33 Well Pads) |
|---|---|---|---|---|
| Vehicles for pad and access road construction | | | | |
| Gravel trucks | 1,600 | 5,760 | 5,600 | 5,280 |
| Semi trucks | 40 | 144 | 140 | 132 |
| Pickup trucks | 400 | 1,440 | 1,400 | 1,320 |
| Motor grader | 10 | 36 | 35 | 33 |
| Dozer (2) | 20 | 72 | 70 | 66 |
| Track hoe | 10 | 36 | 35 | 33 |
| Pipeline construction | | | | |
| Motor grader on lowboy trailer with truck | 20 | 72 | 70 | 66 |
| Bulldozer on lowboy trailer with truck | 20 | 72 | 70 | 66 |
| 80-barrel water trucks for dust control | 200 | 720 | 700 | 660 |
| 80-barrel water trucks for hydrostatic testing | 20-40 | 72-144 | 70-140 | 66-132 |
| Track hoe on lowboy trailer with truck | 20 | 72 | 70 | 66 |
| Welding trucks | 20 | 72 | 70 | 66 |
| Crew-cab pickups | 400 | 1,440 | 1,400 | 1,320 |
| Bending machine/trailer | 20 | 72 | 70 | 66 |
| Side booms on lowboy trailer with truck | 20 | 72 | 70 | 66 |
| X-ray truck | 40 | 144 | 140 | 132 |
| Testing truck | 20 | 72 | 70 | 66 |
| Pipe trucks | 10 | 36 | 35 | 33 |
| Utility tractor and truck with lowboy trailer | 20 | 72 | 70 | 33 |
| Vehicles for drilling/completing first well on the pad | | | | |
| Drilling/completion rig | 10 | 36 | 35 | 33 |
| Rig-up trucks loaded | 250 | 900 | 875 | 825 |
| Rig-up trucks empty | 40-60 | 144-216 | 140-210 | 132-198 |
| 80-barrel water trucks loaded | 400 | 1,440 | 1,400 | 1,320 |
| 80-barrel water trucks empty | 400 | 1,440 | 1,400 | 1,320 |
| Crew-cab pickups | 400 | 1,440 | 1,400 | 1,320 |
| Vehicles for drilling/completing subsequent wells on the same pad | | | | |
| Motor grader | 20 | 72 | 70 | 66 |
| Drilling/completion rig | 20 | 72 | 70 | 66 |
| Rig-up trucks loaded | 250 | 900 | 875 | 825 |
| Rig-up trucks empty | 40-60 | 144-216 | 140-210 | 132-198 |
| 80-barrel water trucks loaded | 450 | 1,620 | 1,575 | 1,485 |

**Table 2-13**
**Estimated Total Traffic Round Trips for Drilling, Completion, and Production Activities by Alternative[1]**

| Vehicle Type | Alternative A, No Action (10 Well Pads) | Alternative B, Proposed Action (36 Well Pads) | Alternative C, Modified Action (35 Well Pads) | Alternative D, BLM's Preferred Alternative (33 Well Pads) |
|---|---|---|---|---|
| 80-barrel water trucks empty | 450 | 1,620 | 1,575 | 1,485 |
| Crew-cab pickups | 400 | 1,440 | 1,400 | 40 |
| Vehicles for well production | | | | |
| Haul trucks | 60 | 216 | 210 | 198 |
| Pickup trucks (roundtrips per well) | 4 round trips per day for WDWs | 8 round trips per day for WDWs | 8 round trips per day for WDWs | 8 round trips per day for WDWs |
| | 71 round trips per day for gas wells | 162 round trips per day for gas wells | 162 round trips per day for gas wells | 162 round trips per day for gas wells |
| Vehicles for workovers | | | | |
| Workover rig (1 roundtrip per well) | 36 | 67 | 67 | 67 |
| Pickup trucks (roundtrips per well) | 576 | 1,072 | 1,072 | 1,072 |

[1] Number of trips per well pad are found in **Table 2-1**, Traffic Estimates for Construction, Drilling, Completion, and Production Activities per Well Pad

**Table 2-14**, Summary of Environmental Consequences by Alternative, provides a brief summary comparison of resource-specific direct and indirect impacts that could or would result from implementation of the alternatives. Detailed discussions (including quantitative and cumulative) on impacts or environmental consequences are addressed within Chapter 4 of this EIS.

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| Air Resources | ▪ Near-field pollutant impacts would below the NAAQS or CAAQS. In addition impacts would not exceed the PSD Class ll increments, with the exception of annual $NO_2$ concentrations that could exceed the annual increment value.<br>▪ Direct modeled | ▪ Total ambient air concentrations are less than the applicable NAAQS and CAAQS.<br>▪ Direct modeled concentrations are below the applicable PSD Class ll increments, with the exception of the modeled annual $NO_2$ concentration which is above the annual | ▪ Near-field pollutant impacts for Alternative C would be similar to those presented for Alternative B. Impacts from Alternative C sources would below the NAAQS or CAAQS. In addition impacts would not exceed the PSD Class ll increments, with the exception of annual $NO_2$ concentrations which | ▪ Near-field pollutant impacts for Alternative D would be similar to those presented for Alternative B.<br>▪ The maximum predicted acute and chronic (long-term) HAP impacts from well site production would be similar to the impacts for the Alternative B.<br>▪ Pollutant impacts would be |

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | concentrations of $NO_2$, $SO_2$, $PM_{10}$, and $PM_{2.5}$ at Class sensitive Class II areas and I are well below the PSD Class I and Class II increments.<br>▪ Visibility analysis indicated that there are zero days predicted above the 0.5 delta-decivew threshold at any of the Class I and sensitive Class II areas.<br>▪ For all lakes the estimated changes in ANC are all predicted to be less than the significance thresholds of less than a 10 percent change in ANC for lakes with ANC values greater than 25 μeq/l, and a 1.0 μeq/l change in ANC for lakes with background ANC values equal to or less than 25 μeq/l<br>▪ The degree to which any observable changes to climate can, or would, be attributable to Alternative A cannot be reasonably predicted at this time | increment value.<br>▪ HAP impacts are below the applicable short-term RELs and the long-term non-carcinogenic RfCs, with the exception of the maximum modeled formaldehyde concentration from compression emissions which at 81.6 μg/m³ is above the short-term REL threshold of 55 μg/m³.<br>▪ Direct modeled concentrations of $NO_2$, $SO_2$, $PM_{10}$, and $PM_{2.5}$ at Class I and sensitive Class II areas are well below the PSD Class I and Class II increments.<br>▪ The visibility analysis indicated that there are zero days predicted above the 0.5-delta-decivew threshold at any of the Class I and sensitive Class II areas.<br>▪ The maximum predicted visibility impact was 0.45 delta-decivew occurring at the Maroon Bells - Snowmass Wilderness Area<br>▪ For all lakes the estimated changes in ANC are all predicted to be less than the significance thresholds of less than a 10 percent change in ANC for lakes with ANC | could exceed the annual increment value.<br>▪ HAP impacts from well site production would be similar to the impacts for the Alternative B<br>▪ Pollutant impacts would be similar to those presented in for Alternative B<br>▪ Visibility impacts estimated resulting from Alternative C emissions would be similar to those presented for Alternative B<br>▪ Nitrogen deposition impacts under Alternative C would be less than the impacts for Alternative B and greater than the impacts for Alternative A. Sulfur deposition impacts would be below the DAT.<br>▪ The degree to which any observable climate changes can, or would, be attributable to Alternative C cannot be reasonably predicted at this time<br>▪ Additional mitigation measures as described under Alternative B would also apply and would result in similar impacts. | similar to those presented in for Alternative B.<br>▪ Visibility impacts estimated resulting from Alternative D emissions would be similar to those presented for Alternative B.<br>▪ Nitrogen deposition impacts under Alternative D would be less than the impacts for Alternative B and greater than the impacts for Alternative A. Sulfur deposition impacts would be below the DAT.<br>The maximum greenhouse gas emissions resulting from Alternative D sources would be comparable to the emissions estimated for Alternative B.<br>▪ The contribution to regional ozone from Bull Mountain project sources would likely be less than the maximum ozone contribution from the UFO planning area oil and gas sources.<br>▪ The maximum future year emissions from the Bull Mountain project area emissions, including existing sources, Alternative A sources (on private lands) and Alternative D sources (on BLM-administered lands), |

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | | values greater than 25 µeq/l, and a 1.0 µeq/l change in ANC for lakes with background ANC values equal to or less than 25 µeq/l.<br>■ The degree to which any observable climate changes can, or would, be attributable to Alternative B cannot be reasonably predicted at this time<br>■ Additional mitigation measures would reduce impacts on near-field particulate matter (PM) impacts from construction and traffic, near-field $NO_2$ 1-hour impacts, and far-field nitrogen deposition at nearby Forest Service sensitive areas.<br>   o The BLM would place a COA on each permit, requiring SGI to continuously keep the surface moist by watering during access road and well-pad construction and during heavy traffic periods, including drilling and completion phases of well development. SGI would be required to limit off-site transport by maintaining "no visible | | are: 311.1 TPY $NO_x$, 124.5 TPY VOC, 206.5 TPY CO, 0.8 TPY $SO_2$, 65.6 TPY $PM_{10}$ and 46.0 TPY $PM_{2.5}$.<br>■ All AQRVs would be below required standards.<br>■ Additional mitigation measures as noted under Alternative B would be included as design features to keep emissions below acceptable levels. |

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | | dust plume" operations.<br>○ The BLM would place a COA on each permit, requiring SGI to emit 5 TPY or less of NOx at each well-pad for production operations (post-construction and production phase), as defined by the acceptable emissions level analyzed in the $NO_2$ 1-hour modeling analysis. SGI would be required to submit a detailed well pad production emissions inventory for each APD or details for the well pad production equipment and operations (including refined emissions factors) to use to develop project-specific emissions inventories. An annual NOx emissions rate greater than 5 TPY may be acceptable if SGI could demonstrate compliance with the $NO_2$ 1-hour NAAQS for the APD. The BLM would approve any additional | | |

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | | impacts analyses before authorizing activities.<br>o The BLM would place a COA on each permit, requiring the operation of Tier 2 engines or cleaner for drilling, fracturing, and completion activities. SGI would be required to submit a detailed well pad development phase emissions inventory for each APD or details for the well pad development equipment and operations (including refined emissions factors and hours of operation) to develop project-specific emissions inventories. Operation of engines totaling greater than 2,000 horsepower at any one time during the development phase could trigger the need for additional impacts analysis and potentially warrant a COA for Tier 3-4 engines. The goal of the requirement is for development-related (e.g., drill, completion, | | |

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | | and fracturing) engines to emit no more than 1 gram per second of NOx total at any one time (total of all engines operating concurrently), unless another NOx emissions rate could be demonstrated to achieve compliance with the NO$_2$ 1-hour NAAQS<br><br>o  The BLM would require SGI to provide a detailed Unit-wide equipment configuration plan (with specific information for the pumping units) and emissions inventory that shows a plan and projection for Unit-wide federal wells production phase NOx emissions at or below 143 tons per year of NOx. The BLM would place a COA on each APD, requiring SGI to submit a NOx emissions accounting analysis summary that provides information for how the APD emissions fit into the overall Unit-wide production phase (post-construction and development) NOx | | |

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | | emissions budget (approximately 143 tons per year of NOx). | | |
| Noise | ▪ Short-term, localized, and intermittent daytime noise impacts during approximately 60 days of construction. Localized impacts 24 hours per day during well drilling; potentially greater at night.<br>▪ Construction-related traffic would produce intermittent noise impacts, with greater impacts occurring on more heavily used routes such as SH 133. Construction traffic would generally not occur during nighttime hours; therefore, would not affect the more sensitive nighttime ambient noise levels.<br>▪ Potential for increased noise levels related to well drilling, pumping, and operations at:<br>  ▪ 1 residence (T11S R90W Section 13)<br>However, well pad construction, drilling, and operations are estimated to be within the maximum permissible noise levels allowed under COGCC | ▪ Impacts on noise from construction activities and construction traffic would be similar to Alternative A, but would be elevated given the increased duration (6 years) of development.<br>▪ Potential for increased noise levels related to well drilling, pumping, and operations at 12 residences.<br>▪ Potential for increased noise levels related to pipeline construction at 15 residences.<br>▪ Potential for increased noise levels related to new access road at 6 residences.<br>▪ Similar to Alternative A, noise levels are estimated to be within the maximum permissible levels allowed under COGCC rules.<br>▪ Similar to Alternative A, projected noise level from 4 new compressor stations would be below 26 dBA. Like Alternative A, there would be potential low frequency sounds.<br>  ▪ nearest residence located approximately 3,000 feet east of the proposed | ▪ Impacts on noise from construction activities would be similar to Alternative B, but the same number of wells would be concentrated in fewer areas, resulting in potential increased localized noise impacts during construction.<br>▪ Potential for increased noise levels related well drilling, pumping, and operations at 8 residences.<br>▪ Potential for increased noise levels related to pipeline construction at 8 residences.<br>▪ Potential for increased noise levels related to new access road at 7 residences.<br>▪ Like Alternative A, well pad construction, pipeline and access road construction, and well drilling and operations are estimated to be within the maximum permissible noise levels allowed under COGCC rules.<br>▪ Compressor station-related noise impacts and mitigation would be the same as described under Alternative | ▪ Impacts under Alternative D would be less than those described under Alternative B because there would be fewer sensitive receptors within 1,000 feet of proposed well pad analysis areas and new proposed access roads or road upgrades.<br>▪ Impacts from APD 12-89-7-1 would be the same as those described under Alternative B. |

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | rules.<br>▪ Projected noise level from 1 new compressor station would be below 26 dBA at locations farther than 2,500 feet. However, there would be potential low frequency sounds.<br>   ▪ Nearest residence located approximately 3,000 feet east of the proposed site<br>▪ Mitigation measures (such as siting to avoid impacts and requiring mufflers and other sound reducing-measures) would be determined during permitting and subsequent environmental review to ensure that construction and operational activities comply with COGCC maximum permissible noise levels. | compressor station in T11S R90W Section 24<br>▪ nearest residents are 0.5 to 1 mile away from the other three compressor site locations<br>▪ Implementing mitigation measures would ensure compliance with COGCC maximum permissible noise levels and minimize potential noise impacts.<br>▪ Application of mitigation measure #28 and other noise dampening measures would likely be needed to comply with regulatory limits for noise generated by natural gas facilities associated with the 12-89-7-1 APD. | B.<br>▪ Impacts from implementing mitigation measures would be the same as Alternative B.<br>▪ Impacts from APD 12-89-7-1 would be the same as those described under Alternative B. | |
| Soil Resources | ▪ Impacts include compaction from overland travel and land grading, vegetation clearing, increased erosion, runoff and sedimentation. | ▪ Impacts on soils would be similar to Alternative A, but on a larger scale.<br>▪ Mitigation measures for erosion and sediment control reduce the likelihood for long-term soil impacts.<br>▪ The 12-89-7-1 APD would result in short-term disturbance on 35.8 acres and | ▪ Impacts on soils would be similar to Alternative B but covering a slightly smaller area because of the clustered footprint in this alternative.<br>▪ Mitigation measures for erosion and sediment control reduce the likelihood for long-term soil impacts.<br>▪ Impacts from APD 12-89-7- | ▪ Impacts on soils would be similar to Alternative B but covering a slightly smaller area.<br>▪ Design features for erosion and sediment control would reduce the likelihood for long-term soil impacts.<br>▪ Impacts from APD 12-89-7-1 would be the same as those |

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | | long-term disturbance on 32.8 acres. Impacts would be minimized via COAs to mitigate erosion. | 1 would be the same as those described under Alternative B. | described under Alternative B. |
| Water Resources | <ul><li>Water quantity:<ul><li>32 acre-feet required from Muddy Creek (minor percent of total flow).</li></ul></li><li>Water quality:<ul><li>Least amount of impacts on surface water quality from spills or chemical releases.</li><li>Potential impacts on groundwater quality from spills or releases from HPDE pipes.</li></ul></li><li>Groundwater:<ul><li>Least amount of impacts from drilling.</li><li>Least amount of impacts from hydraulic fracturing.</li></ul></li><li>Wastewater:<ul><li>Lowest volume of water to be disposed in the injection wells.</li></ul></li></ul> | <ul><li>Water quantity:<ul><li>Same augmentation requirements as Alternative A but for a longer time.</li></ul></li><li>Water quality:<ul><li>More development over a larger area could result in greater impacts on surface water quality from spills and release of chemicals.</li><li>Increased risk of impacts on groundwater quality resulting from the increased number of facilities than Alternative A.</li></ul></li><li>Groundwater:<ul><li>Drilling impacts similar to Alternative A, but would occur over a longer duration.</li><li>Impacts from hydraulic fracturing would be minor and similar to Alternative A, but would occur over a longer duration. No impacts on potable groundwater expected.</li></ul></li></ul> | <ul><li>Water quantity:<ul><li>Impacts would be nearly identical to those under Alternative B, except slightly less water consumption for dust control.</li></ul></li><li>Water quality:<ul><li>Impacts on surface water and groundwater quality from spills and chemical releases would be slightly less than Alternative B due to fewer well pads and miles of roads.</li></ul></li><li>Groundwater:<ul><li>Impacts from drilling and hydraulic fracturing activities would be the same as under Alternative B.</li></ul></li><li>Wastewater:<ul><li>Impacts would be the same as Alternative B.</li></ul></li><li>COAs would reduce potential impacts.</li></ul> | <ul><li>Water quantity:<ul><li>Impacts would be similar to Alternatives B and C.</li></ul></li><li>Water quality:<ul><li>Impacts on surface water and groundwater quality from spills would be less than under Alternative B, due to construction of fewer well pads.</li><li>The well pads eliminated from Alternative D relative to Alternative B are those with more difficult access or higher vulnerability to spills, which would also result in lower level of risk in the event that a spill were to occur.</li></ul></li><li>Groundwater:<ul><li>Impacts would be the same as Alternative B.</li></ul></li><li>Design features would reduce potential impacts.</li></ul> |

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | | ▪ Wastewater:<br>  ▪ Impacts of disposal of production wastewater are expected to be minor.<br>▪ COAs would reduce potential impacts. | | |
| Geology | ▪ Slope stability:<br>  ▪ Potential impacts on well pads east of SH 133 from slope failure less likely; however, creep may occur.<br>  ▪ Potential impacts on well pads west of SH 133 would likely be avoided.<br>  ▪ Roads would not likely contribute to slope failure.<br>▪ Earthquake potential:<br>  ▪ Low potential for inducing surface earthquakes. | ▪ Slope stability:<br>  ▪ Impacts would be similar to Alternative A, except risk is increased by a larger area of pads and more miles of roads and pipelines.<br>▪ COAs would reduce potential impacts.<br>▪ Earthquake potential:<br>  ▪ Increased risk of inducing strong earthquakes due to increased volume of waste fluid disposal; however, degree of increased risk cannot be easily predicted. Overall risk considered low. | ▪ Slope stability:<br>  ▪ Impacts would be greater than under Alternative A, but would be minimized by avoidance of steep slopes to the extent possible, and by implementation of COAs.<br>▪ Earthquake potential:<br>  ▪ Impacts similar to Alternative B. | ▪ Slope stability:<br>  ▪ Impacts would be less than Alternative B, as there are four fewer well pads and infrastructure located east of SH 133.<br>  ▪ Effects associated with slope instability under Alternative D would be similar to those under Alternative B, except that risk would be reduced by the smaller number of pads and fewer miles of roads and pipelines.<br>▪ Earthquake potential:<br>  ▪ Impacts similar to Alternative B. |
| Vegetation | ▪ Impacts include increased fragmentation of vegetation communities; decreased productivity due to increased erosion, sediment deposition, and fugitive dust; increased potential for wildfires; and increased potential for the spread of | ▪ Impacts similar to Alternative A, but would occur over a larger area.<br>▪ COAs would be applied to minimize impacts on vegetation.<br>▪ Mandatory noxious and invasive weed controls would reduce likelihood of weed | ▪ Impacts would be the same as Alternative B, but would occur over a smaller area.<br>▪ Interim reclamation would go further in restoring a native plant community compared to Alternatives A.<br>▪ There would be short-term impacts on 439 acres and | ▪ Impacts would be similar to Alternative B, but would occur over a smaller area.<br>▪ Design features would be applied to minimize impacts on vegetation.<br>▪ Mandatory noxious and invasive weed controls would reduce the likelihood of weed |

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | invasive and noxious plants.<br>▪ There would be short-term impacts on 258 acres and long-term impacts on 85 acres. | spread.<br>▪ There would be short-term impacts on 586 acres and long-term impacts on 212 acres. | long-term impacts on 124 acres. | spread.<br>▪ There would be short-term impacts on 454 acres and long-term impacts on 133 acres. |
| Fish and Wildlife | ▪ Terrestrial wildlife:<br>  ▪ Impacts include increased fragmentation in disturbed areas; reduced habitat value or use by wildlife; temporary habitat loss due to changes in vegetation structure; avoidance of habitat or temporary displacement from habitat caused by increased human activity, traffic, noise, and lighting, which could increase physical distress, energy expenditure, competition for resources, and decrease nutritional condition and reproductive success; displacement from crucial winter habitats due to winter drilling; increased potential for disruption | ▪ Terrestrial wildlife:<br>  ▪ Short- and long-term impacts would be the greatest of any alternative because they would occur over the largest area.<br>  ▪ Timing limitations may reduce impacts on deer and elk crucial winter range.<br>  ▪ COAs would be applied to minimize impacts on wildlife.<br>▪ Aquatic wildlife:<br>  ▪ Potential impacts on fish from boring pipelines greater than Alternative A.<br>▪ General:<br>  ▪ The WHP would reduce impacts on big game, aquatic resources, and nesting birds, relative to current conditions or Alternative C.<br>▪ 12-89-7-1 APD<br>  ▪ Direct impacts on deer and elk could include | ▪ Terrestrial wildlife:<br>  ▪ Impacts similar to Alternative A, but would occur over a larger area.<br>  ▪ The progressive development plan would directly increase habitat protection for deer and elk winter habitat and indirectly increase habitat protection for other wildlife species which may inhabit those areas.<br>  ▪ COAs would be applied to minimize impacts on wildlife.<br>▪ Aquatic wildlife:<br>  ▪ Potential impacts on fish from boring pipelines greater than Alternative A.<br>  ▪ Aquatic wildlife and their habitat would be impacted more than Alternative A as a result of increased water depletions; however, | ▪ Terrestrial wildlife:<br>  ▪ Impacts would be similar to Alternative A but would occur over a larger area.<br>  ▪ Timing limitations may reduce impacts on deer and elk crucial winter range.<br>  ▪ Design features would be applied to minimize impacts on wildlife.<br>▪ Aquatic wildlife:<br>  ▪ Measures to protect water quality and aquatic resources in the WHP wildlife mitigation plan would reduce impacts on fish compared to Alternative C.<br>▪ General:<br>  ▪ The WHP would reduce impacts on big game, aquatic resources, and nesting birds, relative to current conditions or Alternative C.<br>▪ 12-89-7-1 APD |

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | of migration routes and prevention of access to sufficient foraging and water resources; and increased potential for collisions with vehicles.<br>▪ Timing limitations may reduce impacts on deer and elk crucial winter range.<br>▪ Aquatic wildlife:<br>  ▪ Potential impacts on fish from boring pipelines.<br>  ▪ In the short term and long term, water depletions would threaten the quantity of aquatic habitat for fish and other aquatic species known to inhabit the Unit. | mortality from traffic on access roads, but the levels of mortality would likely be low and not have population-level impact. Short- and long-term indirect impacts would likely include habitat avoidance due to disturbance, noise, and light. | water use would be less than the water withdrawals proposed under Alternative B.<br>▪ 12-89-7-1 APD<br>▪ Same as Alternative B. | ▪ Same as Alternative B. |
| Migratory Birds | ▪ Neotropical species:<br>  ▪ Reduced habitat availability in the short and long term for sagebrush obligate species.<br>  ▪ Reduced irrigated meadow habitat could possibly impact American bittern, although habitat is limited within the | ▪ Neotropical species:<br>  ▪ Sagebrush vegetation would be most impacted under this alternative in both the short term and long term; therefore, sagebrush obligate species would have decreased habitat.<br>  ▪ Oakbrush and some aspen habitat would be disturbed in the short and | ▪ Neotropical species:<br>  ▪ Impacts would be similar to Alternative B, but would occur over a smaller area.<br>▪ Raptors:<br>  ▪ Impacts would be similar to Alternative B but would occur over a smaller area.<br>▪ Like Alternative B, migratory bird impacts | ▪ Neotropical species:<br>  ▪ Impacts would be similar to Alternative B but would occur over a smaller area.<br>▪ Raptors:<br>  ▪ Impacts would be similar to Alternative B but would occur over a smaller area.<br>▪ The effects of applying the WHP and design features |

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | Unit.<br>▪ Raptors:<br> ▪ Surface disturbance within irrigated meadow and sagebrush vegetation would reduce habitat and hunting grounds for golden eagles and prairie falcons in the short and long term. | long term. This would reduce the available habitat for multiple species.<br> ▪ Impacts on American bittern would be similar to Alternative A, but would occur over a larger area.<br>▪ Raptors:<br> ▪ Impacts on golden eagles and prairie falcons from surface disturbance would be similar to Alternative A, but would occur over a larger area.<br>▪ Migratory bird impacts would be mitigated by implementing measures in the WHP and applying COAs, including nesting surveys.<br>▪ Prohibiting surface-disturbing activities from May 15 to July 15 would protect breeding migratory birds.<br>▪ 12-89-7-1 APD:<br> ▪ Negligible impacts on migratory birds. | would be mitigated by applying COAs and performing nesting surveys.<br>▪ Burying new electrical lines would minimize potential overhead disturbance for migratory bird species.<br>▪ 12-89-7-1 APD<br> ▪ Same as Alternative B. | would be similar to those under Alternative B and would provide greater benefits than under Alternative C.<br>▪ 12-89-7-1 APD<br> ▪ Same as Alternative B. |
| Special Status Species | ▪ Impacts on special status wildlife includes increased fragmentation in disturbed areas; reduced habitat value or use by wildlife; temporary habitat loss due to changes in vegetation | ▪ Impacts on special status wildlife are similar to Alternative A, but would be the greater due to occurring over a larger area. Adherence to applicable COAs, and attaching site-specific COAs | ▪ Impacts on special status wildlife are similar to Alternative A, but would occur over a larger area. Adherence to applicable COAs, and attaching site-specific COAs and APDs | ▪ Impacts on special status wildlife are similar to Alternative A but would be greater as they would occur over a larger area. Adhering to applicable COAs and attaching site-specific COAs |

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | structure; avoidance of habitat or temporary displacement from habitat caused by increased human activity, traffic, noise, and lighting, which could increase physical distress, energy expenditure, competition for resources, and decrease nutritional condition and reproductive success; displacement from crucial winter habitats due to winter drilling; increased potential for disruption of migration routes and prevention of access to sufficient foraging and water resources; and increased potential for collisions with vehicles.<br>▪ Implementing SGI's Well Pad Site Suitability Models and Methodologies would likely result in no water quality impacts on the four endangered Colorado River fish species. Impacts of additional water depletions could be mitigated by SGI.<br>▪ *No effect* on no species.<br>▪ *May affect but is not likely to adversely affect* Canada lynx.<br>▪ *May affect, and is likely to* | and APDs would minimize the potential for impacts on Threatened, Endangered, and Candidate species. COAs and BLM adopted mitigation would make activities compliant with the 1999 Programmatic BO and Recovery Agreement and ensure continued recovery of those listed fish species.<br>▪ Implementing SGI's water augmentation plan would require much less water depletions within the Unit, reducing impacts on endangered Colorado and Gunnison River Fish.<br>▪ *No effect* on greenback cutthroat trout.<br>▪ *May affect but is not likely to adversely affect* Canada lynx and bald eagle.<br>▪ *May affect, and is likely to adversely affect* no species.<br>▪ *Not likely to jeopardize the continued existence* Colorado pikeminnow, razorback sucker, humpback chub, bonytail chub.<br>▪ *May adversely impact individuals, but is not likely to result in a loss of viability on the Unit, nor cause a trend to federal listing or a loss of* | would minimize the potential for impacts on Threatened, Endangered, and Candidate species.<br>▪ Similar to Alternative B, implementing SGI's water augmentation plan would require much less water depletions within the Unit, reducing impacts on endangered Colorado and Gunnison River Fish.<br>▪ *No effect* on greenback cutthroat trout.<br>▪ *May affect but is not likely to adversely affect* Canada lynx and bald eagle.<br>▪ *May affect, and is likely to adversely affect* no species.<br>▪ *Not likely to jeopardize the continued existence* Colorado pikeminnow, razorback sucker, humpback chub, and bonytail chub.<br>▪ *May adversely impact individuals, but is not likely to result in a loss of viability on the Unit, or cause a trend to federal listing nor a loss of species viability range-wide* northern goshawk, Brewer's sparrow, and leopard frog.<br>▪ *No adverse impacts on these species, and would not* | and APDs would minimize the potential for impacts on threatened, endangered, and candidate species. COAs and BLM-adopted mitigation would make activities compliant with the 1999 Programmatic BO and Recovery Agreement and would ensure continued recovery of those listed fish species.<br>▪ *No effect* on greenback cutthroat trout.<br>▪ *May affect but is not likely to adversely affect* Canada lynx and bald eagle.<br>▪ *May affect and is likely to adversely affect* no species.<br>▪ *Not likely to jeopardize the continued existence* of Colorado pikeminnow, razorback sucker, humpback chub, bonytail chub.<br>▪ *May adversely impact individuals but is not likely to result in a loss of viability on the Unit, nor cause a trend to federal listing or a loss of species viability range-wide* on northern goshawk, Brewer's sparrow, and leopard frog.<br>▪ *No adverse impacts and would not result in a loss of* |

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | *adversely affect Colorado pikeminnow, razor back sucker, humpback chub, and bonytail chub.*<br><br>▪ *May affect, and is not likely to adversely affect greenback cutthroat trout.*<br><br>▪ *May adversely impact individuals, but is not likely to result in a loss of viability on the Unit, nor cause a trend to federal listing or a loss of species viability range-wide northern goshawk, bald eagle, Brewer's sparrow, and leopard frog.*<br><br>▪ *No impacts on these species, and would not result in a loss of viability on the project area, nor cause a trend to federal listing or a loss of species viability range-wide on the BLM listed bat species.* | *species viability range-wide northern goshawk, Brewer's sparrow, and leopard frog.*<br><br>▪ *No adverse impacts on these species, and would not result in a loss of viability on the project area, nor cause a trend to federal listing or a loss of species viability range-wide on the BLM listed bat species.*<br><br>▪ Development of APD 12-89-7-1 may result in bald eagles temporarily avoiding scavenging habitat near the access road or well pad during the winter. The APD would not result in population-level effects on the northern leopard frog. There would be no impact on other special status species. | *result in a loss of viability on the project area, nor cause a trend to federal listing or a loss of species viability range-wide* on the BLM listed bat species.<br><br>▪ Impacts from APD 12-89-7-1 would be the same as under Alternative B. | *viability on the project area, nor cause a trend to federal listing or a loss of species viability range-wide* on the BLM-listed bat species.<br><br>▪ Impacts from APD 12-89-7-1 would be the same as under Alternative B. |
| Wildland Fire Management | ▪ Natural gas well development may increase the risk of wildfires by introducing new ignition sources, increasing human activity, and increasing invasive weeds.<br><br>▪ Natural gas well development may pose a hazard to firefighters from | ▪ Impacts would be similar to Alternative A; however, the risk of human caused ignition from construction and firefighter hazards would be increased due to increased level of development. | ▪ Impacts would be similar to Alternative B; however, fewer new well pads would be constructed, therefore the likelihood of ignition and hazards would be decreased.<br><br>▪ Additional design features to protect other resources, burying four overhead lines, and an annual reclamation | ▪ Impacts under Alternative D would be similar to those described under Alternative B, except there would be slightly less vehicle traffic, thereby reducing the potential for unplanned ignition. |

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | toxins, fighting fires and evacuating personnel, and risks from overhead power lines.<br>■ New and improved access roads may improve access for wildland fire suppression activities.<br>■ Proposed development may also create fuel breaks that could prevent the spread of wildland fires. | | monitoring status report may also provide indirect reduction of wildfire risk. | |
| Cultural Resources | ■ Specific numbers of impacted cultural resources under Alternative A are unavailable, though previous work in the Unit indicates that the resources are sparsely distributed (Millward 2013). Impacts on cultural resources would be assessed on a case-by-case or APD-specific basis.<br>■ Potential effects, including direct and indirect impacts from surface-disturbing activities and soil erosion, on cultural resources eligible for listing on the NRHP would be avoided or mitigated. If previously undiscovered resources were identified during an undertaking, work would be suspended while the | ■ Under Alternative B, the total number of impacted resources is expected to be low (Greubel 2010; Millward 2013). Under Alternative B, impacts on cultural resources would be assessed on a case-by-case or APD-specific basis.<br>■ COAs for APDs would be applied to minimize impacts on cultural resources. | ■ Same as Alternative B. | ■ Same as Alternative B. |

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | resource is evaluated and mitigated to avoid any further effects. Through this process, effects would be minimized or eliminated, although residual effects and adverse effects would be possible. | | | |
| Paleontological Resources | ▪ There would be few protections provided to paleontological resources that may occur within the Unit. Paleontological resources would be indirectly protected via stipulations or actions that would protect other resources, such as those for wildlife and cultural resources.<br><br>▪ If individual APDs are submitted to BLM for consideration (not under a Master Development Plan), then paleontological resources could be directly protected via a paleontological resources lease notification, which requires an inventory be performed by an accredited paleontologist approved by the BLM Authorized Officer before surface-disturbing activities are | ▪ If APDs are submitted to BLM for consideration (not under a Master Development Plan), paleontological resources could be directly protected via the paleontological resources lease notification, which requires an inventory be performed by an accredited paleontologist approved by the BLM Authorized Officer before surface-disturbing activities are authorized in Class 4 and 5 Paleontological Areas. | ▪ Same as Alternative B. | ▪ Same as Alternative B. |

**Table 2-14
Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | authorized in Class 4 and 5 Paleontological Areas. | | | |
| Visual Resources | ▪ Increase in long-term surface disturbance and permanent structures could diminish scenic quality evaluation ratings for vegetation, color, and cultural modifications enough to lower the scenic quality ratings of the Scenic Quality Rating Units from Class A to a Class B or Class C, thereby potentially changing the VRI to Class III or IV.<br>▪ Majority of visual impacts would be away from the West Elk Loop Scenic Byway. | ▪ Greater increase in long-term surface disturbance and permanent structures could diminish scenic quality evaluation ratings and more likely change the VRI to Class III or IV.<br>▪ Greatest potential for changing the VRI and having the most impacts near the West Elk Loop Scenic Byway.<br>▪ COAs would be applied to reduce impacts on visual resources.<br>▪ Overall, changes to existing landform, vegetation, and structures from I2-89-7-I APD activities would result in a weak to moderate degree of contrast in form, line, texture, and color. | ▪ Long-term surface disturbance and permanent structures similar to Alternative B would result in similar scenic quality impacts and VRI changes to Class III or IV.<br>▪ Greater potential for visual impacts near the West Elk Loop Scenic Byway.<br>▪ COAs would be applied to reduce impacts on visual resources.<br>▪ Impacts from APD I2-89-7-I would be the same as under Alternative B. | ▪ Similar to those described under Alternative B, except that there would be three fewer well pads, resulting in slightly fewer changes to vegetation, color, and cultural modifications.<br>▪ Impacts from APD 12-89-7-I would be the same as under Alternative B. |
| Livestock Grazing | ▪ Construction-related disturbance would reduce available grazing acreage and forage for sheep and cattle in the short term. Installation of access roads, well pads and utility lines to access private mineral reserves would reduce forage and acreage in long term. | ▪ Impacts from construction-related disturbance and the installation of access roads, well pads and utility lines to access mineral reserves would be similar to Alternative A, but would occur over a larger area.<br>▪ Potential long-term loss of 23 acres of vegetation on BLM allotments would be less than | ▪ Impacts from construction-related disturbance and the installation of access roads, well pads and utility lines to access mineral reserves would be similar to Alternative A, but would occur over a larger area.<br>▪ Potential long-term loss of 16 acres of vegetation on BLM allotments. | ▪ Impacts would be similar to those described under Alternative B, except there would be the potential long-term loss of 13 acres of vegetation on BLM allotments.<br>▪ Impacts from APD 12-89-7-I would be the same as under Alternative B. |

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | ▪ Potential long-term loss of vegetation on 14 acres of BLM allotments. Additional acreage lost on private lands.<br>▪ Potential for additional sources of income to ranches through lease fees or surface use agreements. Replacement of old fence lines could help with long-term costs of maintaining infrastructure. | significant because only approximately 5% of acres on BLM land would be impacted and design features would be applied to minimize indirect impacts.<br>▪ Potential impacts from additional sources of income and replacement of old fence lines would be similar to Alternative A.<br>▪ APD 12-89-7-1 would disturb approximately 5 acres of private ranchland and has the potential to impact livestock productivity on this private ranch. Impacts would be minimized due to the limited acres disturbed and the fact that livestock are not currently grazed on the ranch in the winter and spring. | ▪ Additional COAs to reduce impacts on vegetation, and reclamation of pipeline corridors would ultimately increase forage. With this mitigation in place, impacts on livestock grazing would be less than significant.<br>▪ Potential impacts from additional sources of income and replacement of old fence lines would be similar to Alternative A.<br>▪ Impacts from APD 12-89-7-1 would be the same as under Alternative B. | |
| Minerals | ▪ Possible that SGI would not pursue much near-term development of federal gas resources in the project area; therefore, development of federal gas resources would be reduced.<br>▪ Federal leases in the project area would continue to be subject to lease stipulations including the standard stipulations, and a timing | ▪ SGI would pursue development of federal gas resources in the project area; therefore, development of federal gas resources would be increased.<br>▪ Impacts on federal leases from lease stipulations, site suitability, and various management plans would be similar to Alternative A; but the effects would be increased due to more | ▪ Similar to Alternative B, SGI would pursue development of federal gas resources in the project area; therefore, development of federal gas resources would be increased.<br>▪ Impacts on federal leases from lease stipulations, site suitability, and various management plans would be similar to Alternative B. The additional constraints to | ▪ As under Alternatives B and C, development of federal resources would be increased compared to Alternative A.<br>▪ Impacts on federal leases from lease stipulations, site suitability, and various management plans would be similar to Alternative B.<br>▪ Impacts from design features would be similar to Alternative B. |

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | limitation. Timing limitation stipulation could reduce development of federal gas resources.<br>■ Factors and constraints for site suitability could reduce the total amount of development of federal gas resources.<br>■ Implementing various management plans (i.e., noxious weeds, surface use, etc.) would restrict development of federal gas resources. | development.<br>■ Federal gas leases in the project area would be subject to the COAs; however, overall development of federal gas resources in the project area would increase despite the added restrictions. | protect wildlife would not be likely to reduce the total amount of development of federal gas resources in the project area.<br>■ Impacts from COAs would be similar to Alternative B. | |
| Recreation | ■ Fewer potential adverse impacts on hunting opportunities because less big game habitat fragmented.<br>■ Fewer potential adverse impacts on scenic viewing and other recreational activities that occur along West Elk Loop Scenic Byway and CR 265. | ■ Greatest disturbance of, and decrease in, big game would result in most potential adverse impacts on hunting opportunities, especially during construction activities. Long-term impacts would be less noticeable, but hunters could choose to go elsewhere.<br>■ Noise, congestion, and safety concerns resulting from increased traffic on the West Elk Loop Scenic Byway and CR 265 would adversely impact scenic viewing and other recreational activities. | ■ Impacts on hunting opportunities would be similar to Alternative B; however, comprehensive wildlife management actions would likely limit disturbance of and decrease in big game. Like Alternative B, hunters could choose to go elsewhere.<br>■ Scenic viewing and other recreational activity impacts on the West Elk Loop Scenic Byway and CR 265 similar to Alternative B. | ■ Impacts would be similar to those described under Alternative B because there would be similar wildlife mitigation measures, traffic levels, disturbance to the landscape, and resultant potential for conflict with recreational activities and opportunities. |
| Lands and Realty | ■ Approximately 88 acres long-term disturbance<br> ■ Federal surface – 4 acres | ■ Approximately 215 acres long-term disturbance<br> ■ Federal surface – 4 acres<br> ■ Federal minerals – 164 | ■ Approximately 126 acres long-term disturbance<br> ■ Federal surface – 6 acres | ■ Land use impacts would be similar to but fewer than those described in Alternative B. |

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | <ul><li>Federal minerals – 25 acres</li><li>Private surface – 60 acres</li></ul><ul><li>Approximately 259 acres short-term disturbance<ul><li>Federal surface – 7 acres</li><li>Federal minerals – 74 acres</li><li>Private surface – 178 acres</li></ul></li><li>Implementation would lead to adjustments in existing land uses on BLM-administered and private lands and authorization of additional ROWs.</li><li>Extent of land uses displaced would be mostly on private lands, including residential areas along State Highway 133.</li></ul> | <ul><li>Private surface – 47 acres</li></ul><ul><li>Approximately 598 acres short-term disturbance<ul><li>Federal surface – 10 acres</li><li>Federal minerals – 462 acres</li><li>Private surface – 126 acres</li></ul></li><li>Impacts from additional ROW authorizations similar to Alternative A.</li><li>Impacts on Federal surface lands would be similar to Alternative A. Increased development on private surface lands would be greater than under Alternative A, resulting in potential greater increase in impacts on land use on these lands.</li><li>APD 12-89-7-1 could result in greater increases in intrusive impacts and loss of forage, irrigated hay meadows, and hunting opportunities than under Alternative A.</li></ul> | <ul><li>Federal minreals-109 acres</li><li>Private surface – 12 acres</li></ul><ul><li>Approximately 441 acres short-term disturbance<ul><li>Federal surface – 16 acres</li><li>Federal minerals – 369 acres</li><li>Private surface – 56 acres</li></ul></li><li>Impacts from additional ROW authorizations similar to Alternative A.</li><li>Extent of Federal and private surface land uses displaced would be less than under Alternatives A and B. During winter months, private landowner and public users would not be as severely affected due to comprehensive wildlife management actions.</li><li>Impacts from APD 12-89-7-1 would be the same as under Alternative B.</li></ul> | <ul><li>Approximately 133 acres long-term disturbance<ul><li>Federal surface – 1 acre</li><li>Federal minerals – 120</li><li>Private surface – 12 acres</li></ul></li><li>Approximately 455 acres short-term disturbance<ul><li>Federal surface – 5 acres</li><li>Federal minerals – 382 acres</li><li>Private surface – 68 acres</li></ul></li><li>Impacts from applying COAs would be the same as under Alternatives B and C.</li><li>Impacts from APD 12-89-7-1 would be the same as under Alternative B.</li></ul> |
| Transportation and Access | <ul><li>Temporary decrease in access for property owners and leaseholders during construction activities; however, long-term improvements to existing</li></ul> | <ul><li>Temporary and long-term impacts on access would be similar to Alternative A, but would apply to a larger area within the Unit.</li><li>Increased average annual</li></ul> | <ul><li>Temporary and long-term impacts on access similar to Alternative A, but would apply to a larger area.</li><li>Increased average annual daily traffic on Highway 133</li></ul> | <ul><li>Temporary and long-term impacts on access would be similar to Alternative A but would apply to a larger area in the Unit.</li><li>Increased average annual</li></ul> |

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | routes would promote greater access within the Unit.<br>▪ Increased average annual daily traffic on Highway 133 (in Gunnison County) by less than 1% over a 3-year time frame. Average annual daily trips associated with trucks could increase by up to 11%.<br>▪ Increased vehicle trips would affect long-term traffic movement on routes in Unit, especially on Highway 133. Short-term spikes in traffic volumes on CR 265 and access roads during construction.<br>▪ Safety on Highway 133 and other routes in the Unit decreased because of higher traffic volumes.<br>▪ Potential for road surface deterioration over time, including Highway 133 and CR 265; however, implementing a road maintenance plan may reduce deterioration. | daily traffic on Highway 133 (in Gunnison County) by 1.35% over a 6-year time frame. Average annual daily trips associated with trucks could increase by up to 21%.<br>▪ Increased vehicle trips would affect long-term traffic movement on routes in Unit, especially on Highway 133 and CR 265. Similar to Alternative A, short-term spikes in traffic volumes on CR 265 and access roads.<br>▪ Effects on safety from increased vehicle volume similar to Alternative A.<br>▪ Potential for road surface deterioration greater than Alternative A. Similar to Alternative A, implementing a road maintenance plan may reduce deterioration. | (in Gunnison County) by 1% over a 6-year time frame. Average annual daily trips associated with trucks could increase by up to 16%.<br>▪ Increased vehicle trips would affect traffic movement on routes in Unit, especially on Highway 133. Similar to Alternative A, short-term spikes in traffic volumes on CR 265 and access roads.<br>▪ Effects on safety from increased vehicle volume similar to Alternative A.<br>▪ Potential for road surface deterioration similar to Alternative B. | daily traffic on Highway 133 (in Gunnison County) by 1.35% over a 6-year time frame. Average annual daily trips associated with trucks could increase by up to 21%.<br>▪ Effects on long-term traffic movement on Highway 133 and CR 265 would be similar to Alternative B. Short-term spikes in traffic volumes on CR 265 and access roads would be similar to Alternative B.<br>▪ Effects on safety from increased vehicle volume would be similar to Alternative A.<br>▪ Potential for road surface deterioration would be similar to Alternatives B and C. |
| Hazardous and Solid Wastes | ▪ Alternative A would result in the least risk over time, because it involves the fewest wells. | ▪ Potential impacts similar to Alternative A, but of greater magnitude based on the increase in proposed | ▪ Potential impacts on human health and safety would be similar to Alternative B; however, SGI would | ▪ The impacts from hazardous substances and waste generation under Alternative D would be less than those |

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | • Potential impacts include human or animal contact to hazardous substances, contamination of water bodies and aquifers, and effects on air quality from natural gas and drilling operations.<br>• No development on BLM-administered lands would likely result in fewer impacts from hazardous and solid wastes on lands overlaying BLM-administered mineral estate, including potential contamination of groundwater. Development continuing on private land could impact the surrounding community.<br>• If a closed-loop system were implemented, there would be fewer impacts on health and safety from drilling waste and cuttings than if a reserve pit system is used. | development.<br>• Because there would be more development on BLM-administered mineral estate, there are likely to be more impacts from hazardous and solid wastes on these lands, including potential contamination of groundwater. Impacts on surrounding community would be similar to Alternative A.<br>• Similar to Alternative A, a closed loop system that could reduce potential impacts on health and safety.<br>• COAs in Appendix C address hazardous substances and would reduce the risk of hazardous spills. | propose to use a closed loop system, which would reduce potential impacts on health and safety.<br>• COAs in Appendix C address hazardous substances and would reduce the risk of hazardous spills. | under Alternative B, since Alternative D would construct fewer pads.<br>• Risks would be reduced through avoidance of risky locations and implementation of site-specific design features.<br>• Design features from Appendix C would reduce the risk of hazardous material spills. |
| Socioeconomics | • Employment would be approximately 80 percent from within the Rocky-Mountain region; however, a smaller portion would be from the immediate project area. | • Employment would be approximately 80 percent from within the Rocky-Mountain region; however, a smaller portion would be from the immediate project area. | • Employment would be approximately 80 percent from within the Rocky-Mountain region; however, a smaller portion would be from the immediate project area. | • Employment would be approximately 80 percent from within the Rocky Mountain region; however, a smaller portion would be from the immediate project area. |

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | ▪ Direct employment estimates are 285 people during the drilling phase; 34 people during the production. <br> ▪ Development likely to result in increases to severance and ad valorem taxes <br> ▪ Development is likely to result in an increase in Non-residential property, particular oil and gas property as well as ad-valorem tax on oil and gas production. <br> ▪ Changes in residential property values may be mixed. <br> ▪ Sales tax revenues would be increased <br> ▪ Lodging tax revenues may be increased. <br> ▪ Impacts on public services are likely to be restricted to the drilling phase and would be limited in nature. <br> ▪ Increased heavy vehicle traffic would likely result in the need to increase road maintenance. <br> ▪ Even if project activities do not directly result in significant changes in air or water quality, residents and | ▪ Direct employment estimates are 285 people during the drilling phase; 94 people during the production. <br> ▪ Development likely to result in higher increases to severance and ad valorem taxes than under Alternative A. <br> ▪ Development is likely to result in larger increases in Non-residential property than under Alternative A. <br> ▪ Changes in residential property values would be the same as Alternative A; all 44 properties in the Unit would likely be affected. <br> ▪ Sales tax and lodging tax revenues would be increased more than under Alternative A. <br> ▪ Alternative B is likely to have more extensive impacts on public services than Alternative A. <br> ▪ Road maintenance costs are expected to be higher than Alternative A due to higher levels of heavy vehicle traffic. <br> ▪ Even if project activities do not directly result in significant changes in air or water quality, residents' | ▪ Direct employment estimates are the same as under Alternative B. <br> ▪ Increases to severance and ad valorem taxes would be the same as Alternative B. <br> ▪ Increase in Non-residential property revenue would be the same as Alternative B. <br> ▪ Changes in residential property values would be the same as Alternatives A and B. <br> ▪ Sales tax and lodging tax revenues would be the same as Alternative B. <br> ▪ Impacts on public services are likely to be the same as Alternative B. <br> ▪ Road maintenance costs would be the same as Alternative B. <br> ▪ Quality of life concerns would be same as Alternative B. <br> ▪ Impacts from APD 12-89-7-1 would be the same as under Alternative B. | ▪ Direct employment estimates are the same as Alternative B. <br> ▪ Development would likely result in higher increases to severance and ad valorem taxes than under Alternative A. <br> ▪ Development would likely result in larger increases in non-residential property than under Alternative A. <br> ▪ Impacts on residential property values would be slightly fewer than Alternative B. <br> ▪ Sales tax and lodging tax revenues would be increased more than under Alternative A. <br> ▪ Alternative B is likely to have more extensive impacts on public services than Alternative A. <br> ▪ Road maintenance costs would be similar to Alternative B. <br> ▪ Residents' concerns about impacts on quality of life would be similar to Alternative B. <br> ▪ Impacts from APD 12-89-7-1 would be the same as under Alternative B. |

**Table 2-14**
**Summary of Environmental Consequences by Alternative**

| Resource/Use | Alternative A, No Action | Alternative B, Proposed Action | Alternative C, Modified Action | Alternative D, BLM's Preferred Alternative |
|---|---|---|---|---|
| | visitors perception of the air and water quality may be influenced by the presence of development activities.<br>■ Changes to residential property values may occur but are likely to have impacts only on those properties immediately adjacent to the proposed development. | concerns about impacts on quality of life would be highest under Alternative B due to the higher degree of development.<br>■ APD 12-89-7-1 could increase employment needs, while reducing hunting opportunities, potentially decreasing property values and affecting quality of life. | | |
| Environmental Justice | ■ The actions are not likely to have disproportionate adverse effects on low income or minority populations. | ■ Same as Alternative A | ■ Same as Alternative A | ■ Same as Alternative A. |

# Chapter 3
## Affected Environment

# TABLE OF CONTENTS

Chapter                                                                                                    Page

**3.    AFFECTED ENVIRONMENT** ................................................................................... **3-1**

3.1    Introduction ................................................................................................. 3-1
3.2    Resources .................................................................................................... 3-4
       3.2.1    Air Resources .............................................................................. 3-4
       3.2.2    Noise ........................................................................................... 3-21
       3.2.3    Soil Resources ............................................................................ 3-23
       3.2.4    Water Resources ......................................................................... 3-30
       3.2.5    Geology ....................................................................................... 3-48
       3.2.6    Vegetation ................................................................................... 3-57
       3.2.7    Invasive, Nonnative Species ....................................................... 3-63
       3.2.8    Fish and Wildlife ......................................................................... 3-65
       3.2.9    Migratory Birds ........................................................................... 3-73
       3.2.10   Special Status Species (Threatened, Endangered, Sensitive
               Species) ....................................................................................... 3-81
       3.2.11   Wildland Fire Management .......................................................... 3-97
       3.2.12   Cultural Resources ...................................................................... 3-98
       3.2.13   Paleontological Resources ........................................................... 3-101
       3.2.14   Visual Resources ......................................................................... 3-106
3.3    Resource Uses ............................................................................................. 3-109
       3.3.1    Livestock Grazing ....................................................................... 3-109
       3.3.2    Minerals (Leasable, Locatable, Salable) ..................................... 3-113
       3.3.3    Recreation ................................................................................... 3-119
       3.3.4    Lands and Realty ......................................................................... 3-120
       3.3.5    Transportation and Access ........................................................... 3-122
3.4    Social and Economic Conditions ................................................................. 3-125
       3.4.1    Hazardous Materials and Wastes ................................................. 3-125
       3.4.2    Socioeconomics .......................................................................... 3-128
       3.4.3    Environmental Justice .................................................................. 3-135

# TABLES

Page

3-1    Approved Standards for Public Land Health ............................................. 3-2
3-2    Ambient Air Standards and PSD Increments ($\mu g/m^3$) .................................. 3-6
3-3    Near-Field Analysis Background Ambient Air Quality Concentrations ...................... 3-8
3-4    Background Nitrogen and Sulfur Deposition Values (kg/ha-yr) ............................. 3-12
3-5    Background Acid Neutralizing Capacity Values for Acid-Sensitive Lakes .............. 3-13
3-6    Mean Monthly Temperature Ranges and Total Precipitation Amounts ..................... 3-15
3-7    Wind Direction Frequency Distribution ..................................................... 3-17
3-8    Wind Speed Distribution......................................................................... 3-17
3-9    Common Sound Levels ........................................................................... 3-21
3-10   Regulatory Limits for Noise Generated by Natural Gas Facilities........................... 3-22
3-11   Noise Levels Associated with Typical Construction Equipment (dBA) .................... 3-23
3-12   Classified Soil Types in the Bull Mountain Unit............................................ 3-25
3-13   Acres of Farmlands in the Bull Mountain Unit ............................................. 3-26
3-14   Acres of Slopes in the Bull Mountain Unit................................................... 3-26
3-15   Soil Erosion Ratings for the Bull Mountain Unit ........................................... 3-28
3-16   Erosion Potential of Roads and Trails for the Bull Mountain Unit ......................... 3-28
3-17   Land Health Assessment Results in the Bull Mountain Unit ............................... 3-29
3-18   Typical Monthly Flows for USGS near the Unit (cfs[1]) ..................................... 3-33
3-19   General Water Quality of Springs within the Unit (one sample per station)............. 3-35
3-20   Stream Classifications and Water Quality Standards ...................................... 3-36
3-21   List of Impaired Water Quality Segments .................................................... 3-36
3-22   General Water Quality of East Muddy/Muddy Creeks on/near the Unit................... 3-37
3-23   Water Quality Lab Test Results from Produced Water from Existing
       Producing Natural Gas Wells within the Producing Formations in the Unit.............. 3-41
3-24   Summary of Results for Selected Analytes in Samples from 23 Wells Collected
       between July 16, 2002 and June 12, 2013 .................................................. 3-45
3-25   Summary of Results for Selected Analytes in Samples from 51 Surface Water
       Locations Collected between July 16, 2002 and August 10, 2012 ............................ 3-45
3-26   Existing Vegetation Communities in Bull Mountain Unit ................................. 3-58
3-27   Land Health Assessment Results in the Bull Mountain Unit ............................... 3-63
3-28   Colorado Noxious Weeds in Gunnison County and Noxious Weeds Observed
       in Bull Mountain Unit......................................................................... 3-64
3-29   Birds of Conservation Concern of the Uncompahgre Field Office ............................ 3-75
3-30   Threatened and Endangered Species of the Uncompahgre Field Office ................... 3-82
3-31   Existing Habitats within the Ragged Mountain Lynx Analysis Unit ...................... 3-86
3-32   Existing Habitats within the Crystal West Lynx Analysis Units............................. 3-86
3-33   BLM Sensitive Species of the Uncompahgre Field Office[1] ................................. 3-90
3-34   Sedimentary Rock Units, Their Fossil-bearing Potential, and Known Fossil
       Resources ................................................................................... 3-103
3-35   Ranches and Allotments within the Bull Mountain Unit.................................. 3-110
3-36   Bull Mountain Unit Existing Facilities..................................................... 3-114
3-37   Annual Wages by Industry, 2012............................................................ 3-130

# FIGURES

<div align="right">Page</div>

| | | |
|---|---|---|
| 3-1 | Air Quality Study Area | 3-7 |
| 3-2 | Soils | 3-24 |
| 3-3 | Farmlands | 3-27 |
| 3-4 | Watersheds | 3-31 |
| 3-5 | Streams and Springs | 3-34 |
| 3-6 | Water Quality Monitoring | 3-44 |
| 3-7 | Geology Cross Section | 3-50 |
| 3-8 | Geology | 3-53 |
| 3-9 | Landslides | 3-55 |
| 3-10 | Vegetation | 3-59 |
| 3-11 | Riparian and Wetland Vegetation | 3-62 |
| 3-12 | Fish and Aquatic Wildlife Habitat | 3-66 |
| 3-13 | Mule Deer Habitat | 3-69 |
| 3-14 | Elk Habitat | 3-70 |
| 3-15 | Purple Martin Habitat | 3-79 |
| 3-16 | Bald Eagle Habitat | 3-80 |
| 3-17 | Canada Lynx Habitat | 3-87 |
| 3-18 | North Fork Landscape Unit Prehistoric Site Sensitivity Model | 3-100 |
| 3-19 | Potential Fossil Yield Classification | 3-105 |
| 3-20 | Grazing Allotments | 3-111 |
| 3-21 | Existing Infrastructure | 3-123 |

This page intentionally left blank.

# CHAPTER 3
# AFFECTED ENVIRONMENT

## 3.1   INTRODUCTION

The purpose of this chapter is to describe the existing biological, physical, and socioeconomic characteristics of the Bull Mountain Unit MDP project area, including human uses that could be affected by implementing the alternatives described in **Chapter 2**, Alternatives. This chapter includes a discussion of resources, resource uses, and social and economic conditions. Each topic area includes an introduction, followed by a description of current conditions and trends.

Information from the ongoing Uncompahgre RMP revision, scoping comments, the Preliminary Bull Mountain EA and public comments received on the environmental assessment, and other updated sources were used to help set the context for the project area. The level of information presented in this chapter is commensurate with and sufficient to assess potential effects discussed in **Chapter 4**, Environmental Consequences, based on the alternatives presented in **Chapter 2**.

Acreage figures and other numbers used are approximate projections. Readers should not infer that they reflect exact measurements or precise calculations. Acreages were calculated using GIS technology, and there may be slight variations in total acres between resources.

The project area is the geographic area within which the BLM will make decisions and includes all lands, regardless of jurisdiction, within the project area boundaries. However, the BLM makes decisions on only those lands and federal mineral estates that it administers (the decision area). Private mineral estate development is not included in Alternatives B or C; decisions in either of those alternatives may have impacts on private surface overlying private mineral leases (i.e., to accommodate access, or construct a stretch of pipeline both inside and directly adjacent to the Unit if the only reason impacts were to occur were due to the approval of a federal APD). The analysis area includes any lands, regardless of jurisdiction, for which the BLM synthesizes, analyzes, and interprets data and information that relates to the project area. The analysis areas can be any size, can vary according to resource, and can be located anywhere within, around, partially outside, or completely outside the project or decision areas. For example, air quality and socio-economics necessitate a broader analysis area in order to better disclose the extent and magnitude of the anticipated impacts. The analysis areas for resources and resource uses are defined in **Chapter 4**, Environmental Consequences.

## Standards for Public Land Health

In January 1997, Colorado BLM approved the Standards for Public Land Health. Standards describe conditions needed to sustain public land health and relate to all uses of the public lands. The approved standards presented in **Table 3-1**, Approved Standards for Public Land Health, are applicable to resources within the Unit and the current resource conformance to these standards is proved in **Section 3.2**, Resources.

**Table 3-1**
**Approved Standards for Public Land Health**

| Standard | Definition/Statement |
|---|---|
| #1 Upland Soils | Upland soils exhibit infiltration and permeability rates that are appropriate to soil type, climate, land form, and geologic processes. Adequate soil infiltration and permeability allow for the accumulation of soil moisture necessary for optimal plant growth and vigor, and minimizes surface runoff. |
| #2 Riparian Systems | Riparian systems associated with both running and standing water, function properly and have the ability to recover from major surface disturbances such as fire, severe grazing, or 100-year floods. Riparian vegetation captures sediment, and provides forage, habitat and biodiversity. Water quality is improved or maintained. Stable soils store and release water slowly. |
| #3 Plant and Animal Communities | Healthy, productive plant and animal communities of native and other desirable species are maintained at viable population levels commensurate with the species and habitat's potential. Plants and animals at both the community and population level are productive, resilient, diverse, vigorous, and able to reproduce and sustain natural fluctuations, and ecological processes. |
| #4 Threatened and Endangered Species | Special status, threatened and endangered species (federal and state), and other plants and animals officially designated by the BLM, and their habitats are maintained or enhanced by sustaining healthy, native plant and animal communities. |
| #5 Water Quality | The water quality of all water bodies, including ground water where applicable, located on or influenced by BLM-administered lands will achieve or exceed the Water Quality Standards established by the State of Colorado. Water Quality Standards for surface and ground waters include the designated beneficial uses, numeric criteria, narrative criteria, and anti-degradation requirements set forth under State law as found in (5 Code of Colorado Regulations 1002-8), as required by Section 303(c) of the Clean Water Act. |

Source: BLM 1997

## Resources and Uses Not Addressed

Certain types of resources that may be present in the Uncompahgre Field Office (UFO) are not addressed in this EIS because issues relating to these resources were not identified during scoping by the public or the BLM determined they do not occur within the analysis area. The noted resources below are not addressed in this chapter.

Areas of Critical Environmental Concern and Wild and Scenic Rivers do not occur in or within analysis area of the Unit, and will not be affected by the actions being considered in **Chapter 2**, Alternatives; therefore, they are not discussed.

Coal resources within the Unit are within the Piceance Deep coal field, located in the Uinta coal region. The coal development potential area identified in the 1989 Uncompahgre Basin RMP is based on a maximum development depth of about 2,000 feet; however, coal resources in the Unit

have an overburden of more than 3,500 feet. Therefore, coal resources in the Unit are not considered to have economic or scientific interest and are not further discussed in this chapter.

Although locatable minerals such as uranium, vanadium, gypsum, and placer gold are known to exist throughout portions of the region, there has been no history of exploration, development, or production of any kind within or near (within 50 miles) the Unit. For this reason, locatable minerals are not further discussed in this chapter. Similarly, there are no mineral material operations and no free use permits in or near the Unit. While potential for mineral materials within the Unit may exist, lack of interest in and surrounding this area in developing mineral materials is an indication that development in this area is not likely to occur. For this reason, mineral materials are not discussed further in this chapter.

According to the Renewable Energy Potential Report (2010), the Unit has 19,670 acres (100 percent) with geothermal potential. This is shown in **Figure 2-2** of the Renewable Energy Potential Report (BLM 2010a). There are no hot springs, geothermal facilities, pending applications for geothermal facilities, leases, or lease nominations in or near the Unit. For this reason, geothermal resources are not further discussed in this chapter.

No congressionally designated Wilderness Areas, Wilderness Study Areas, or lands with wilderness characteristics have been identified within the project area (defined as the boundaries of the Unit). The nearby Raggeds Wilderness in the White River and Gunnison National Forests and the West Elk Wilderness Area in the Gunnison National Forest are managed by the US Department of Agriculture, Forest Service (Forest Service). Because they do not fall within the defined project area, these areas will not be analyzed as discrete units in the EIS. However, Raggeds Wilderness and West Elk Wilderness Area do fall within the defined analysis area for air resources. Therefore, these areas are discussed in the context of the air resources affected environment and impact analysis.

BLM-administered lands within the UFO were inventoried for wilderness characteristics between 2010 and 2011[1]. No lands possessing wilderness characteristics were found on BLM-administered lands occurring in or within the analysis area of the Unit and will not be affected by the actions being considered in **Chapter 2**, Alternatives; therefore, they are not discussed further.

Based on the current cultural resources surveys completed as part of the Bull Mountain Unit MDP EIS, there has been limited archaeological evidence of the historic presence of Native Americans within the Unit. However, only consultation with tribes that use resources in the Unit or live in the surrounding area will confirm whether there are sensitive heritage areas or religious concerns within the Unit. Consultation with the tribes is on-going and is described in **Chapter 5**, Consultation and Coordination.

---

[1] For additional details and information, please see the Uncompahgre Field Office's Lands With Wilderness Characteristics report which can be found on-line at
http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp/lwc_inventory.html

## 3.2   RESOURCES

This section contains a description of the biological and physical resources of the project area and follows the order of topics addressed in Chapter 2, as follows:

- Air resources

- Noise

- Soil resources

- Water resources

- Geology

- Vegetation

- Invasive, nonnative species

- Fish and wildlife

- Migratory birds

- Special status species (threatened, endangered, sensitive species)

- Wildland fire management

- Cultural resources

- Paleontological resources

- Visual resources

### 3.2.1   Air Resources

*Current Conditions*

The project area is in Gunnison County, in the Central Mountains Region for air quality planning (CDPHE 2014). This region includes counties that generally are on or near the Continental Divide. Air quality concerns in this region are primarily impacts related to particulate pollution from wood burning and road sanding activities. Air quality for any area is generally influenced by the amount of pollutants that are released within the vicinity and up wind of that area, and can be highly dependent upon the contaminants chemical and physical properties. Additionally, an area's topography or terrain (such as mountains and valleys) and weather (such as wind, temperature, air turbulence, air pressure, rainfall, and cloud cover) will have a direct bearing on how pollutants accumulate or disperse.

*Overview of Regulatory Environment*

Air quality impacts from pollutant emissions are limited by regulations, standards, and implementation plans established under the Clean Air Act (CAA), as administered by the

Colorado Department of Public Health and Environment (CDPHE) Air Pollution Control Division (APCD) under authorization of the EPA. The operator will comply with all applicable federal, state, and local air laws, regulations, and policies.

The APCD is the primary air quality regulatory agency responsible for determining potential impacts once detailed industrial development plans have been made, and those development plans are subject to applicable air quality laws, regulations, standards, control measures, and management practices. Unlike the conceptual "reasonable, but conservative" engineering designs used in NEPA analyses, any APCD air quality preconstruction permitting demonstrations required would be based on very site-specific, detailed engineering values, which would be assessed in the permit application review. Any proposed facility which meets the requirements set forth under division permit regulations is subject to the Colorado permitting and compliance processes.

Regulations and standards which limit permissible levels of air pollutant concentrations and air emissions and are relevant to the Project air impact analysis include:

- National Ambient Air Quality Standards (NAAQS) and Colorado Ambient Air Quality Standards (CAAQS)

- Prevention of Significant Deterioration

- New Source Performance Standards

- National Emission Standards for Hazardous Air Pollutants

- Non-Road Engine Tier Standards

- Colorado Oil and Gas Permitting Guidance

Each of these regulations is further described in the following sections.

*Ambient Air Quality Standards*

The NAAQS and CAAQS are health-based criteria for the maximum acceptable concentrations of air pollutants at all locations to which the public has access. Although specific air quality monitoring has not been conducted in the project area, the CDPHE (2014) has designated all of Gunnison County as "attainment" for all criteria pollutants. Criteria pollutants under CAAQS and NAAQS are carbon monoxide (CO), nitrogen dioxide ($NO_2$), ozone ($O_3$), particulate matter less than 10 microns in effective diameter ($PM_{10}$), particulate matter less than 2.5 microns in effective diameter ($PM_{2.5}$), sulfur dioxide ($SO_2$), and lead (Pb). Lead emissions from project sources are negligible and therefore, the lead NAAQS is not addressed in this analysis. States typically adopt the NAAQS but may also develop state-specific ambient air quality standards for certain pollutants. The NAAQS and CAAQS are summarized in **Table 3-2**, Ambient Air Standards and PSD Increments ($\mu g/m^3$). PSD Class I and Class II increments are also included in **Table 3-2**, and a discussion of PSD increments is provided later in this section.

**Table 3-2**
**Ambient Air Standards and PSD Increments ($\mu g/m^3$)**

| Pollutant | Averaging Time | Colorado and National Ambient Air Quality Standards | Incremental Increase Above Legal Baseline | |
|---|---|---|---|---|
| | | | PSD Class I[1] | PSD Class II[1] |
| Carbon Monoxide (CO) | 1-hour[2] | 40,000 | --[3] | --[3] |
| | 8-hour[2] | 10,000 | -- | -- |
| Nitrogen Dioxide (NO₂) | Annual[4] | 100 | 2.5 | 25 |
| | 1-hour[5] | 188 | N/A | N/A |
| Ozone (O₃) | 8-hour[6] | 137 (NAAQS)[7] 147 (CAAQS) | N/A | N/A |
| Particulate matter (PM₁₀) | 24-hour[2] | 150 | 8 | 30 |
| | Annual[4] | --[8] | 4 | 17 |
| Particulate matter (PM₂.₅) | 24-hour[9] | 35 | N/A | N/A |
| | Annual[4] | 12 | N/A | N/A |
| Sulfur Dioxide (SO₂) | 1-hour[10] | 196 | N/A | N/A |
| | 3-hour[2] | 1,300 (NAAQS) 700 (CAAQS) | 25 | 512 |
| | 24-hour[2,11] | 365 | 5 | 91 |
| | Annual[4,11] | 80 | 2 | 20 |

CAAQS (CDPHE 2014), NAAQS (EPA 2014), PSD Increments (EPA 2010a)

[1] The PSD demonstrations serve information purposes only and do not constitute a regulatory PSD increment consumption analysis.
[2] No more than one exceedance per year.
[3] No PSD increments have been established for this pollutant.
[4] Annual arithmetic mean.
[5] An area is in compliance with the standard if the 98th percentile of daily maximum 1-hour nitrogen dioxide concentrations in a year, averaged over 3 years, is less than or equal to the level of the standard.
[6] An area is in compliance with the standard if the fourth-highest daily maximum 8-hour ozone concentrations in a year, averaged over 3 years, is less than or equal to the level of the standard.
[7] On October 1, 2015, the EPA revised the NAAQS for 8-hour ozone concentrations from 75 ppb (147 $\mu g/m^3$) to 70 ppb (137 $\mu g/m^3$). The effective date of the revised NAAQS is 60 days after publication in the *Federal Register* (EPA 2015b). The 75 ppb NAAQS was established in 2008, and under the Clean Air Act, the EPA is required to review the NAAQS periodically.
[8] The NAAQS and CAAQS for this averaging time for this pollutant has been revoked by EPA and the CDPHE.
[9] An area is in compliance with the standard if the highest 24-hour PM₂.₅ concentrations in a year, averaged over 3 years, is less than or equal to the level of the standard.
[10] An area is in compliance with the standard if the 99th percentile of daily maximum 1-hour sulfur dioxide concentrations in a year, averaged over 3 years, is less than or equal to the level of the standard.
[11] In accordance with 40 CFR §50.4 *National Primary Ambient Air Quality Standards for Sulfur Oxides*, the SO₂ 24-hour and annual NAAQS remains in effect until 1 year after the effective date of the designation of that area, pursuant to section 107 of the Clean Air Act, for the SO₂ NAAQS set forth in §50. 17 (SO₂ 1-hour standard). Designations for the 1-hour SO₂ NAAQS in Colorado have not occurred.

*Air Pollutant Concentrations*

Monitoring of air pollutant concentrations has been conducted within the region, shown in
**Figure 3-1**, Air Quality Study Area. These monitoring sites are part of several monitoring
networks overseen by state and federal agencies, including: CDPHE (State of Colorado), Clean
Air Status and Trends Network (CASTNET), Interagency Monitoring of Protected Visual
Environments (IMPROVE), and National Acid Deposition Program National Trends Network
(NADP/NTN).

3. Affected Environment



Air quality monitoring site
Sensitive Class II
Forest Service Wilderness - Class I
National Park Service - Class I
Bull Mountain Unit
Uncompahgre Field Office

**Air Quality Study Area**
Source: Carter Lake Consulting GIS 2014

Figure 3-1

Air pollutants monitored at these sites include carbon monoxide, nitrogen dioxide, ozone, particulate matter, and sulfur dioxide. Background concentrations of these pollutants define ambient air concentrations in the region and establish existing compliance with ambient air quality standards. The most representative monitored regional background concentrations of carbon monoxide, nitrogen dioxide, particulate matter, and sulfur dioxide, as identified by the CDPHE Air Pollution Control Division (2013), are shown in **Table 3-3**, Near-Field Analysis Background Ambient Air Quality Concentrations. This table also provides a representative background ozone concentration from the CASTNET Gothic monitoring site in Gunnison National Forest (EPA 2015c).

**Table 3-3**
**Near-Field Analysis Background Ambient Air Quality Concentrations**

| Pollutant | Averaging Period | Measured Background Concentration ($\mu g/m3$) |
|---|---|---|
| Carbon monoxide (CO)[1] | 1-hour | 1150 |
| | 8-hour | 1150 |
| Nitrogen dioxide (NO$_2$)[1] | Annual | 1.9 |
| | 1-hour | 21 |
| Ozone (O$_3$)[2] | 8-hour | 126 |
| Particulate matter (PM$_{10}$)[3] | 24-hour | 36 |
| | Annual | 15 |
| Particulate matter (PM$_{2.5}$)[1] | 24-hour | 14 |
| | Annual | 3 |
| Sulfur dioxide (SO$_2$)[4] | 1-hour | 3 |
| | 3-hour | 3 |
| | 24-hour | 3 |
| | Annual | 3 |

Sources: CDPHE 2013b; EPA 2015c

[1] Data collected at Williams Willow Creek during 2012
[2] Data collected from Gothic monitoring site from 2012 to 2014
[3] Data from S. Ute, collected 1 mile NE of Ignacio from 2003 to 2005
[4] Data from Greasewood Hub, collected from 2009 to 2010

*Ozone*
Ozone is an important component of photochemical smog. Ozone is not emitted directly into the atmosphere, but is formed from photochemical reactions of precursor species in the presence of sunlight. The most important precursors are oxides of nitrogen (NO$_x$) and volatile organic compounds (VOCs). High ozone episodes occur most typically in urban areas during the summer during periods with high temperatures and abundant sunlight. However, high ozone episodes during the winter have been recently been recorded in Wyoming's Upper Green River basin and in Utah's Uinta Basin during periods with fresh snow cover, cold temperatures, and sunlight.

*Hazardous Air Pollutants*
Toxic air pollutants, also known as hazardous air pollutants, are those pollutants that are known or suspected to cause cancer or other serious health effects, such as reproductive effects or birth defects, or adverse environmental effects. No ambient air quality standards exist for hazardous air pollutants; instead emissions of these pollutants are regulated by a variety of regulations that

target the specific source class and industrial sectors for stationary, mobile, and product use/formulations. Sources of hazardous air pollutants from project operations include well-site production emissions (benzene, toluene, ethyl benzene, xylene, n-hexane, and formaldehyde), and compressor station and gas plant combustion emissions (formaldehyde).

*Prevention of Significant Deterioration*

The PSD Program is designed to limit the incremental increase of specific air pollutant concentrations above a legally defined baseline level. All areas of the country are assigned a classification which describes the degree of degradation to the existing air quality that is allowed to occur within the area under the PSD permitting rules. PSD Class I areas are areas of special national or regional natural, scenic, recreational, or historic value, and very little degradation in air quality is allowed by strictly limiting industrial growth. Class I areas are protected by Federal Land Managers (FLMs) through management of air quality related values such as visibility, aquatic ecosystems, flora, and fauna (See section *Air Quality Related Values*, below). PSD Class II areas allow for reasonable industrial/economic expansion.

The FLMs can designate specific PSD Class II areas that they manage as "sensitive" Class II areas, based on their own criteria, and request that PSD Class I level air quality analyses are included for these areas.

The project area and surrounding areas are classified as PSD Class II. The PSD Class I area located closest to the Unit is the Maroon Bells – Snowmass Wilderness Area, which is approximately 5.6 miles to the east. Other PSD Class I and sensitive Class II areas located within 124 miles (200 kilometers) of the project area are shown in **Figure 3-1**, Air Quality Study Area, and include:

- Arches National Park, Utah (Class I)

- Black Canyon of the Gunnison National Park, Colorado (Class I)

- Colorado National Monument, Colorado, (Class II)

- Dinosaur National Monument, Colorado-Utah (Federal Class II, Colorado Class I (SO$_2$ only)

- Eagles Nest Wilderness Area, Colorado (Class I)

- Flat Tops Wilderness Area, Colorado (Class I)

- La Garita Wilderness Area, Colorado (Class I)

- Maroon Bells – Snowmass Wilderness Area, Colorado (Class I)

- Mount Zirkel Wilderness Area, Colorado (Class I)

- Rocky Mountain National Park, Colorado (Class I)

- Weminuche Wilderness Area , Colorado (Class I)

- West Elk Wilderness Area, Colorado (Class I)

All NEPA analysis comparisons with PSD Class I and II increments are intended to evaluate a threshold of concern and do not represent a regulatory PSD increment consumption analysis. The determination of PSD increment consumption is an air quality regulatory agency responsibility and only applies to major sources of air pollution. Such an analysis is not likely to be required for this project because the field is not considered a major source of air pollution.

*Air Quality Related Values*
An air quality related value represents atmospheric effects on the landscape that may adversely impact sensitive resources. Landscape level resources may include visibility or a specific scenic, cultural, physical, biological, ecological, or recreational resource. The air quality related values of visibility, atmospheric deposition, and the change in water chemistry associated with atmospheric deposition at acid-sensitive lakes have been identified as a concern at several Class I and sensitive Class II areas within the study area. A discussion of the applicable background data and analysis thresholds is provided below.

*Visibility*
Visibility conditions can be measured as standard visual range, the farthest distance at which an observer can just see a black object viewed against the horizon sky; the larger the standard visual range, the cleaner the air. Visibility for the region is considered to be very good. Continuous visibility-related optical background data representative of the project area have been collected in the PSD Class II White River Wilderness (located approximately 30 miles east of the project area), as part of the Interagency Monitoring of Protected Visual Environments program. The average standard visual range at the White River Wilderness is over 125 miles (VIEWS 2013).

Another measure of visibility includes the concept of extinction (i.e., the absorption or scattering of light). Change in atmospheric light extinction relative to background conditions is used to measure regional haze. Analysis thresholds for atmospheric light extinction are set forth in The Federal Land Managers' Air Quality Related Values Work Group (FLAG) Report (FLAG 2010), with the results reported in percent change in light extinction and change in deciviews. A 5-percent change in light extinction (approximately equal to 0.5 deciview) is the threshold recommended in the 2010 FLAG Report and is considered to contribute to regional haze visibility impairment. A 10-percent change in light extinction (approximately equal to 1 deciview) is considered to represent a noticeable change in visibility when compared with background conditions.

Estimated visibility degradation at the Class I areas and sensitive Class II areas of concern are presented in terms of the number of days that exceed a threshold percent change in extinction, or deciview relative to background conditions. Although procedures and thresholds have not been established for sensitive Class II areas, the BLM is including these areas in its visibility analysis.

*Atmospheric Deposition and Lake Chemistry*
Atmospheric deposition refers to the processes by which air pollutants are removed from the atmosphere and deposited on terrestrial and aquatic ecosystems, and it is reported as the mass of material deposited on an area per year. Air pollutants are deposited by wet deposition (precipitation) and dry deposition (gravitational settling of pollutants). The chemical components

of wet deposition include sulfate ($SO_4$), nitrate ($NO_3$), and ammonium ($NH_4$); the chemical components of dry deposition include sulfate, sulfur dioxide, nitrogen oxides, nitrate, ammonium, and nitric acid ($HNO_3$).

The effects of atmospheric deposition of nitrogen and sulfur compounds on terrestrial and aquatic ecosystems are well documented and have been shown to cause leaching of nutrients from soils, acidification of surface waters, injury to high-elevation vegetation, and changes in nutrient cycling and species composition. The 2010 FLAG Report recommends that applicable sources assess impacts of nitrogen and sulfur deposition at Class I areas.

This guidance recognizes the importance of establishing critical deposition loading values ("critical loads") for each specific Class I area as these critical loads are completely dependent on local atmospheric, aquatic, and terrestrial conditions and chemistry. Critical load thresholds are essentially a level of atmospheric pollutant deposition below which negative ecosystem effects are not likely to occur. The 2010 FLAG Report does not include any critical load levels for specific Class I areas and refers to site-specific critical load information on federal land management websites for each area of concern. This guidance does, however, recommend the use of deposition analysis thresholds developed by the National Park Service and the USFWS. The deposition analysis thresholds represent screening-level values for nitrogen and sulfur deposition from project emission sources below which estimated impacts are considered negligible. The deposition analysis threshold established for both nitrogen and sulfur in western Class I areas is 0.005 kilograms per hectare per year (kg/ha/yr).

In addition to the screening level analysis, project-specific and cumulative modeled results are compared to critical load thresholds established for the Rocky Mountain region to assess total deposition impacts. The BLM has compiled currently available research data on critical load values for Class I areas in the vicinity of the project area. Critical load thresholds published by Fox et al. (1989) established pollutant loadings for total nitrogen of 3 to 5 kg/ha/yr) and for total sulfur of 5 kg/ha/yr for Bob Marshall Wilderness Area in Montana and Bridger Wilderness Area in Wyoming. However, the National Park Service has recently stated that these pollutant loadings are not protective of sensitive resources and in its Technical Guidance on Assessing Impacts on Air Quality in NEPA and Planning Documents (NPS 2011) suggests that critical load values above 3 kg/ha/yr may result in moderate impacts. Research conducted by Jill Baron (Baron 2006) using hindcasting of diatom communities suggests 1.5 kg/ha/yr as a critical loading value for wet nitrogen deposition for high-elevation lakes in Rocky Mountain National Park, Colorado. Recent research conducted by Saros et al. (2010) using fossil diatom assemblages suggest that a critical load value of 1.4 kg/ha/yr for wet nitrogen is applicable to the eastern Sierra Nevada and Greater Yellowstone ecosystems. For the Bull Mountain MDP, both project-specific and cumulative nitrogen and sulfur deposition impacts are compared to the following critical load values: 1.5 kg/ha/yr as a surrogate for total nitrogen deposition and 3 kg/ha/yr for total sulfur deposition for the Class I and sensitive Class II areas evaluated.

The National Acid Deposition Program and the National Trends Network station monitors wet atmospheric deposition and the Clean Air Status and Trends Network station monitors dry atmospheric deposition at the Gothic site, located east of the project area, shown in **Figure 3-1**.

The total annual deposition (wet and dry) reported as total nitrogen and total sulfur deposition for year 2010 is shown in **Table 3-4**, Background Nitrogen and Sulfur Deposition Values (kg/ha-yr).

**Table 3-4**
**Background Nitrogen and Sulfur Deposition Values (kg/ha-yr)**

| Site Location | Nitrogen Disposition | | | Sulfur Deposition | | | Year of Monitoring |
|---|---|---|---|---|---|---|---|
| | Wet | Dry | Total | Wet | Dry | Total | |
| Gothic | 1.77 | 0.23 | 2.00 | 0.89 | 0.09 | 0.98 | 2010 |

Source: EPA 2013

Analyses to assess the change in water chemistry associated with atmospheric deposition are performed following the procedures developed by the Forest Service Rocky Mountain Region (Forest Service 2000). The analysis assesses the change in the acid neutralizing capacity of the sensitive lakes within the study area (**Figure 3-1**). Predicted changes in acid neutralizing capacity are compared with the applicable threshold for each identified lake: 10-percent change in acid neutralizing capacity for lakes with background acid neutralizing capacity values greater than 25 microequivalents per liter, and less than a 1 microequivalents per liter change in acid neutralizing capacity for lakes with background acid neutralizing capacity values equal to or less than 25 microequivalents per liter.

**Table 3-5**, Background Acid Neutralizing Capacity Values for Acid-Sensitive Lakes, presents a list of 28 lakes in the Eagles Nest, Flat Tops, La Garita, Maroon Bells-Snowmass, Raggeds, Weminuche and West Elk Wilderness Areas that have been identified as acid sensitive. Analyses for potential changes to lake acidity from atmospheric deposition are based on the acid neutralizing capacity for the lake. The most recent lake chemistry background acid neutralizing capacity data are also shown in **Table 3-5**. The acid neutralizing capacity values shown are the 10th percentile lowest acid neutralizing capacity values which were calculated for each lake following procedures provided from the Forest Service. The years of monitoring data that were currently available, and the number of samples used in the calculation of the 10th percentile lowest acid neutralizing capacity values, are provided.

Of the 28 lakes listed in **Table 3-5**, 6 are considered by the Forest Service as extremely sensitive to atmospheric deposition since the background acid neutralizing capacity values are less than 25 microequivalents per liter ($\mu$eq/l), including four in the Weminuche Wilderness Area (White Dome Lake, Little Eldorado Lake, Ute Lake and Big Eldorado Lake), one in the Raggeds Wilderness (Deep Creek Lake), and one in the Flat Tops Wilderness Area (Upper Ned Wilson).

*New Source Performance Standards*
Under Section 111 of the Clean Air Act, the EPA has promulgated technology-based emissions standards which apply to specific categories of stationary sources. These standards are referred to as New Source Performance Standards (40 CFR Part 60). The New Source Performance Standards potentially applicable to the Project include the following subparts of 40 CFR 60.

**Table 3-5**
**Background Acid Neutralizing Capacity Values for Acid-Sensitive Lakes**

| Wilderness Area | Lake | Latitude (Degrees) | Longitude (Degrees) | 10th Percentile Lowest Value (µeq/L)[1] | Number of Samples | Monitoring Period |
|---|---|---|---|---|---|---|
| Eagles Nest | Booth Lake | 39.6983 | -106.3044 | 86.8 | 49 | 1993-2010 |
| Eagles Nest | Upper Willow Lake | 39.6470 | -106.1735 | 133.9 | 50 | 1990-2010 |
| Flat Tops | Ned Wilson Lake | 39.9614 | -107.3239 | 39.0 | 191 | 1981-2007 |
| Flat Tops | Upper Ned Wilson Lake | 39.9628 | -107.3236 | 12.9 | 143 | 1983-2007 |
| Flat Tops | Lower Packtrail Pothole | 39.9682 | -107.3241 | 29.7 | 96 | 1987-2007 |
| Flat Tops | Upper Packtrail Pothole | 39.9656 | -107.3238 | 48.7 | 96 | 1987-2007 |
| La Garita | Small Lake Above U-Shaped Lake | 37.9436 | -106.8648 | 59.9 | 24 | 1992-2009 |
| La Garita | U-Shaped Lake | 37.9429 | -106.8618 | 81.4 | 23 | 1992-2009 |
| Maroon Bells | Avalanche Lake | 39.1439 | -107.0998 | 163.3 | 52 | 1991-2009 |
| Maroon Bells | Capitol Lake | 39.1630 | -107.0820 | 167.6 | 54 | 1991-2009 |
| Maroon Bells | Moon Lake | 39.1644 | -107.0589 | 52.2 | 51 | 1991-2009 |
| Mount Zirkel | Lake Elbert | 40.6342 | -106.7069 | 53.6 | 67 | 1985-2007 |
| Mount Zirkel | Seven Lakes (LG East) | 40.8958 | -106.6819 | 36.2 | 67.0 | 1985-2007 |
| Mount Zirkel | Summit Lake | 40.5453 | -106.6819 | 48.3 | 124 | 1985-2007 |
| Raggeds | Deep Creek Lake | 39.0089 | -107.2400 | 20.6 | 24 | 1995-2009 |
| Weminuche | Big Eldorado Lake | 37.7133 | -107.5433 | 7.8 | 55 | 1985-2007 |
| Weminuche | Four Mile Pothole | 37.4684 | -107.0525 | 123.4 | 19 | 2000-2009 |
| Weminuche | Lake Due South of Ute Lake | 37.6361 | -107.4428 | 13.2 | 24 | 1992-2009 |
| Weminuche | Little Eldorado | 37.7133 | -107.5458 | -3.3 | 54 | 1985-2007 |
| Weminuche | Little Granite Lake | 37.6205 | -107.3317 | 80.7 | 20 | 2000-2009 |
| Weminuche | Lower Sunlight Lake | 37.6331 | -107.5830 | 80.9 | 52 | 1985-2007 |
| Weminuche | Middle Ute Lake | 37.6483 | -107.4752 | 42.8 | 29 | 1985-2009 |
| Weminuche | Small Pond Above Trout Lake | 37.6519 | -107.1564 | 25.5 | 27 | 1992-2009 |
| Weminuche | Upper Grizzly Lake | 37.6200 | -107.5836 | 29.9 | 45 | 1985-2007 |
| Weminuche | Upper Sunlight Lake | 37.6278 | -107.5797 | 28.0 | 51 | 1985-2007 |
| Weminuche | West Snowdon Lake | 37.7103 | -107.6935 | 39.4 | 26 | 2000-2009 |
| Weminuche | White Dome Lake | 37.7089 | -107.5525 | 1.7 | 49 | 1985-2007 |
| West Elk | South Golden Lake | 38.7776 | -107.1828 | 111.4 | 25 | 1995-2008 |

Source: VIEWS, January 2014
[1]10th Percentile Lowest Acid Neutralizing Capacity Values Reported

- Subpart A—General Provisions. Provisions of Subpart A apply to the owner or operator of any stationary source which contains an affected facility, the construction or modification of which is commenced after the date of publication in this part of any standard (or, if earlier, the date of publication of any proposed standard) applicable to that

facility. Provisions of Subpart A could apply to proposed sources that are affected by New Source Performance Standards.

- Subpart Kb—Standards of Performance for Volatile Organic Storage Vessels. Subpart Kb applies to storage vessels with a capacity greater than or equal to 75 cubic meters (m3) that are used to store volatile organic liquids for which construction, reconstruction, or modification is commenced after July 23, 1984. This subpart potentially would be applicable to storage tanks for natural gas liquids.

- Subpart JJJJ—Standards of Performance for Stationary Spark-Ignition Internal Combustion Engines. This subpart establishes emission standards and compliance schedules for the control of emissions from stationary combustion turbines that commenced construction, modification, or reconstruction after February 18, 2005. The pollutants regulated by this subpart are nitrogen oxides and sulfur dioxide. Subpart JJJJ applies to manufacturers, owners, and operators as well as new, modified, and reconstructed stationary spark-ignited internal combustion engines such as generators, pumps, and compressors. The applicable emissions standards are based on engine type, fuel type, and manufacturing date.

- Subpart OOOO—Standards of Performance for Crude Oil and Natural Gas Production. Subpart OOOO regulates volatile organic compound emissions from well completions, centrifugal compressors, reciprocating compressors, pneumatic controllers, storage vessels and leaking components in the natural gas production industry, as well as sulfur dioxide emissions from onshore natural gas processing plants.

*National Emission Standards for Hazardous Air Pollutants*
National emission standards for hazardous air pollutants from oil and natural gas production facilities (40 CFR, Part 63, Subpart HH) are applicable to the project. Subpart HH establishes emissions standards for hazardous air pollutants from glycol dehydrator process vents and flash emissions from storage vessels, and sets requirements for equipment leaks at oil and natural gas production facilities.

*Non-Road Engine Tier Standards*
The EPA sets emissions standards for non-road diesel engines for hydrocarbons, nitrogen oxides, carbon monoxide, and particulate matter. The emissions standards are implemented in tiers by year, with different standards and start years for various engine power ratings. The new standards do not apply to existing non-road equipment. Only equipment built after the start date for an engine category (1999-2006, depending on the category) is affected by the rule. Over the life of the project, the fleet of non-road equipment will turn over and higher-emitting engines will be replaced with lower-emitting engines.

*Colorado Oil and Gas Permitting Guidance*
Colorado Department of Public Health and Environment Air Quality Control Commission regulations that are applicable to the project are as follows:

- Regulation 3 emissions reporting requirements

- Regulation 6, which fully adopts the EPA's Standards of Performance for Crude Oil and Natural Gas Production, Transmission, and Distribution found in 40 CFR, Part 60, Subpart OOOO ("NSPS OOOO")

- Regulation 7, which includes extensive VOC reductions and regulates methane emissions from the oil and gas industry

*Climate*

The nearest precipitation and temperature measurements were collected at Redstone, Colorado, (1979-1994), approximately 2.5 miles northeast of the project area at an elevation of 8,070 feet above mean sea level (WRCC 2013).

The annual average total precipitation at Redstone, Colorado, is 27.7 inches, with annual totals ranging from 20.2 inches in 1987 to 40.4 inches in 1985. Precipitation is greatest in the spring and fall. Snowfall occurs from fall though spring with the greatest amount in March. The average annual snowfall is 169.4 inches.

The region has cool temperatures, with average daily temperature (in degrees Fahrenheit [°F]) ranging between 8°F and 33°F in January to between 44°F and 76°F in July. Extreme temperatures have ranged from negative 29°F in 1985 to 93°F in 1991. **Table 3-6**, Mean Monthly Temperature Ranges and Total Precipitation Amounts, shows the mean monthly temperature ranges and total precipitation amounts.

**Table 3-6**
**Mean Monthly Temperature Ranges and Total Precipitation Amounts**

| Month | Average Temperature Range (°F) | Total Precipitation (inches) | Total Snowfall (inches) |
|---|---|---|---|
| January | 8-33 | 1.8 | 26.0 |
| February | 12-36 | 2.4 | 29.9 |
| March | 17-43 | 3.1 | 32.4 |
| April | 25-51 | 2.0 | 12.1 |
| May | 32-61 | 2.3 | 5.3 |
| June | 39-72 | 1.5 | 0.5 |
| July | 44-76 | 2.2 | 0.0 |
| August | 44-75 | 1.7 | 0.0 |
| September | 37-67 | 3.0 | 0.5 |
| October | 28-55 | 3.0 | 6.9 |
| November | 18-39 | 2.6 | 26.4 |
| December | 9-32 | 2.0 | 29.5 |
| ANNUAL | 39.6 (mean) | 27.7 | 169.4 |

Source: WRCC 2013

Due to the absence of any available representative monitored meteorology data for the Bull Mountain project area, the 2008 Weather Research and Forecasting (WRF) meteorological model output produced as part of the Western Regional Air Partnership's (WRAP) West-wide

Jump Start Air Quality Modeling Study (WestJumpAQMS; ENVIRON et al. 2012) was used to characterize current meteorological conditions in the project area. Two WRF model 4-kilometer (2.4-mile) grid cells are within the project area boundary, a north site and a south site. The north site represents mountain top conditions, and the south site characterizes channeling in the project area valley. Wind roses showing a diagram of the frequency of each wind direction for the north and south sites are shown on the next page. Wind direction is the direction from which the wind is blowing. For example, if the wind is blowing from the north to the south 1.8 percent of the time, the wind direction is north.



**Table 3-7**, Wind Direction Frequency Distribution, and **Table 3-8**, Wind Speed Distribution, below display the 2008 WRF model data in tabular format for wind direction frequency and speed distributions at the north and south project area sites. The annual mean wind speed at the north site is 4.2 miles per hour (mph), and 5.0 mph at the south site.

*Greenhouse Gases and Climate Change*

Greenhouse Gases

Greenhouse gases (GHGs) in Earth's atmosphere absorb outgoing thermal radiation and radiate some of that heat back to Earth. This causes temperatures in the lower atmosphere and on the surface to be higher than they would be without atmospheric GHGs. Higher concentrations of

**Table 3-7**
**Wind Direction Frequency Distribution**

| North Site | | South Site | |
|---|---|---|---|
| Wind Direction | Frequency (%) | Wind Direction | Frequency (%) |
| North | 10.6 | South | 5.0 |
| North- Northeast | 12.0 | South Southwest | 2.2 |
| Northeast | 11.0 | Southwest | 1.1 |
| East Northeast | 6.3 | West Southwest | 0.8 |
| East | 3.2 | West | 0.8 |
| East Southeast | 1.8 | West Northwest | 1.0 |
| Southeast | 1.9 | Northwest | 2.9 |
| South Southeast | 4.5 | South Southeast | 12.7 |
| South | 5.5 | South | 21.6 |
| South Southwest | 8.8 | South Southwest | 15.3 |
| Southwest | 9.8 | Southwest | 12.4 |
| West Southwest | 4.2 | West Southwest | 5.3 |
| West | 2.9 | West | 3.2 |
| West Northwest | 2.6 | West Northwest | 3.1 |
| Northwest | 5.0 | Northwest | 4.2 |
| North Northwest | 9.9 | North Northwest | 8.7 |

Source: ENVIRON et al. 2012

**Table 3-8**
**Wind Speed Distribution**

| North Site | | South Site | |
|---|---|---|---|
| Wind Speed (mph) | Frequency (%) | Wind Speed (mph) | Frequency (%) |
| 0-4.0 | 61.7 | 0-4.0 | 52.1 |
| 4.0-7.5 | 22.8 | 4.0-7.5 | 23.9 |
| 7.5-12.1 | 12.2 | 7.5-12.1 | 18.6 |
| 12.1-19.0 | 3.1 | 12.1-19.0 | 5.0 |
| 19.0-24.7 | 0.2 | 19.0-24.7 | 0.3 |
| Greater than 24.7 | 0 | Greater than 24.7 | 0.02 |

Source: ENVIRON et al. 2012

GHGs amplify the heat-trapping effect, resulting in higher surface temperatures. Some GHGs, such as water vapor, occur naturally in the atmosphere. Others, such as carbon dioxide and methane, occur naturally in the atmosphere and are also emitted into the atmosphere by human activities. The human-caused GHGs of primary concern are carbon dioxide ($CO_2$), methane ($CH_4$), nitrous oxide ($N_2O$), and fluorinated gases. GHGs projected to be emitted by Bull Mountain project sources are $CO_2$, $CH_4$, and $N_2O$. The atmospheric lifetimes for these gases are on the order of decades. Emitted GHGs become well mixed throughout the atmosphere and contribute to the global atmospheric burden. Therefore, it is not possible to attribute a particular climate impact in any given region to GHG emissions from a particular source.

In 2007, the US Supreme Court ruled in *Massachusetts v. EPA* that the EPA has the authority to regulate greenhouse gases such as methane and carbon dioxide as air pollutants under the Clean

Air Act. The ruling did not, however, require the EPA to create any emission control standards or ambient air quality standards for greenhouse gases. At present, there are no ambient air quality standards for greenhouse gases, and there are no emissions limits on greenhouse gases that would apply to the sources developed under the Proposed Action and the action alternatives. There are, however, applicable reporting requirements under the EPA's Greenhouse Gas Reporting Program. These greenhouse gas emission reporting requirements, finalized in 2010 under 40 CFR Part 98 (EPA 2010), require facility operators to develop and report annual methane and carbon dioxide emissions from equipment leaks and venting, and emissions of carbon dioxide, methane, and nitrous oxide from flaring, onshore production stationary and portable combustion emissions, and combustion emissions from stationary equipment. At present, there are no rules related to greenhouse gas emissions or impacts that would affect development of the Proposed Action or the action alternatives besides these greenhouse gas reporting requirements.

Climate Change
Climate change is a statistically significant and long-term change in climate patterns. The terms climate change and global warming are often used interchangeably, although they are not the same thing.

Climate change is any deviation from the average climate, whether warming or cooling, and can result from both natural and human (anthropogenic) sources. Natural contributors to climate change include fluctuations in solar radiation, volcanic eruptions, and plate tectonics.

Global warming refers to the apparent warming of climate observed since the early twentieth century and is primarily attributed to human activities, such as fossil fuel combustion, industrial processes, and land use changes.

The natural greenhouse effect is critical to the discussion of climate change. It refers to the process by which natural GHGs in the atmosphere absorb heat energy radiated by Earth's surface and reflect some of that heat back toward Earth, causing temperatures in the lower atmosphere and on the surface to be higher than they would be otherwise. These GHGs trap heat that would otherwise be radiated into space, causing Earth's atmosphere to warm and making temperatures suitable for life. Without the natural greenhouse effect, the average surface temperature of Earth would be about 0°F.

Higher concentrations of GHGs amplify the heat-trapping effect, resulting in higher surface temperatures. Water vapor is the most abundant GHG, followed by carbon dioxide, methane, nitrous oxide, and several trace gases. Water vapor, which occurs naturally in the atmosphere, is often excluded from the discussion of GHGs and climate change since its atmospheric concentration depends largely on temperature rather than specific source emissions. Other GHGs, such as carbon dioxide and methane, occur naturally in the atmosphere, but they are also emitted by human activities.

Atmospheric concentrations of naturally emitted GHGs have varied for millennia, and Earth's climate has fluctuated accordingly. However, since the beginning of the Industrial Revolution around 1750, human activities have significantly increased GHG concentrations and introduced human-made compounds that act as GHGs in the atmosphere. The atmospheric concentrations of

carbon dioxide, methane, and nitrous oxide have increased to levels unprecedented in at least the last 800,000 years. From pre-industrial times until today, the global average concentrations of carbon dioxide, methane, and nitrous oxide in the atmosphere have increased by around 40 percent, 150 percent, and 20 percent, respectively (IPCC [Intergovernmental Panel on Climate Change] 2013).

Human activities emit billions of tons of carbon dioxide every year, primarily from fossil fuel combustion, but there are a variety of other industrial sources. Methane is emitted from oil and natural gas systems, landfills, mining, agricultural waste, and other industrial processes. Nitrous oxide is emitted from anthropogenic activities in the agricultural, energy-related, waste, and industrial sectors. Refrigerant and semiconductor manufacturing, electrical transmission, and metal production emit a variety of trace GHGs, including hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride. These trace gases have no natural sources and come entirely from human activities.

Our current understanding of the climate system comes from the cumulative results of observations, experimental research, theoretical studies, and model simulations. The IPCC Fifth Assessment Report (AR5; IPCC 2013) uses terms to indicate the assessed likelihood of an outcome ranging from *exceptionally unlikely* (0 to 1 percent probability) to *virtually certain* (99 to 100 percent probability), and a level of confidence ranging from *very low* to *very high*. The findings presented in AR5 indicate that climate system warming is unequivocal, and many of the observed changes are unprecedented over decades to millennia. It is *certain* that the global mean surface temperature has increased since the late nineteenth century and *virtually certain* that maximum and minimum temperatures over land have increased on a global scale since 1950. The globally averaged combined land and ocean surface temperature data show a warming of 1.5 °F.

Human influence has been detected in the warming of the atmosphere and the ocean, in changes in the global water cycle, in reductions in snow and ice, in global mean sea level rise, and in changes in some climate extremes. It is *extremely likely* (95 to 100 percent probability) that human influence has been the dominant cause of the observed warming since the mid-twentieth century (IPCC 2013). Findings from AR5 and reported by other organizations (NASA Goddard Institute for Space Studies 2013; NOAA National Climate Data Center 2013) also indicate that changes in the climate system are not uniform and that regional differences are apparent.

*National Assessment of Climate Change*

The US Global Change Research Program released the third US National Climate Assessment in May 2014. The assessment summarizes the current state of knowledge on climate change and its impacts throughout the United States. It was written by climate scientists and draws from a large body of peer-reviewed scientific research, technical reports, and other publicly available sources. The assessment documents current climate change impacts and those that are anticipated to occur throughout this century. It also provides region-specific impact assessments for key sectors, such as energy, water, and human health.

The assessment summarizes the authors' conclusions in a number of key messages (NCA 2014a), several of which are excerpted here:

Global climate is changing and this change is apparent across a wide range of observations. The global warming of the past 50 years is primarily due to human activities.

Global climate is projected to continue to change over this century and beyond. The magnitude of climate change beyond the next few decades depends primarily on the amount of heat-trapping gases emitted globally, and how sensitive the Earth's climate is to those emissions.

U.S. average temperature has increased by 1.3°F to 1.9°F since record keeping began in 1895; most of this increase has occurred since about 1970. The most recent decade was the nation's warmest on record. Temperatures in the United States are expected to continue to rise. Because human-induced warming is superimposed on a naturally varying climate, the temperature rise has not been, and will not be, uniform or smooth across the country or over time.

Average U.S. precipitation has increased since 1900, but some areas have had increases greater than the national average, and some areas have had decreases. More winter and spring precipitation is projected for the northern United States, and less for the Southwest, over this century.

Global sea level has risen by about 8 inches since reliable record keeping began in 1880. It is projected to rise another 1 to 4 feet by 2100.

The oceans are currently absorbing about a quarter of the carbon dioxide emitted to the atmosphere annually and are becoming more acidic as a result, leading to concerns about intensifying impacts on marine ecosystems.

The assessment provided an analysis of projected climate change by region, and the Bull Mountain project is part of the Southwest region. The key messages for this region (NCA 2014b) are as follows:

Snowpack and streamflow amounts are projected to decline in parts of the Southwest, decreasing surface water supply reliability for cities, agriculture, and ecosystems.

The Southwest produces more than half of the nation's high-value specialty crops, which are irrigation-dependent and particularly vulnerable to extremes of moisture, cold, and heat. Reduced yields from increasing temperatures and increasing competition for scarce water supplies will displace jobs in some rural communities.

Increased warming, drought, and insect outbreaks, all caused by or linked to climate change, have increased wildfires and impacts on people and ecosystems in the Southwest. Fire models project more wildfire and increased risks to communities across extensive areas.

Flooding and erosion in coastal areas are already occurring even at existing sea levels and damaging some California coastal areas during storms and extreme high tides. Sea level

rise is projected to increase as Earth continues to warm, resulting in major damage as wind-driven waves ride upon higher seas and reach farther inland.

Projected regional temperature increases, combined with the way cities amplify heat, will pose increased threats and costs to public health in southwestern cities, which are home to more than 90% of the region's population. Disruptions to urban electricity and water supplies will exacerbate these health problems.

## 3.2.2   Noise

### Current Conditions

Noise is defined as unwanted sound and can be intermittent or continuous, steady or impulsive. Human response to noise is extremely diverse and varies according to the type of noise source, the sensitivity and expectations of the receptor, the time of day, and the distance between the noise source and the receptor.

The decibel (dB) is the accepted unit of measurement for noise. Because human hearing is not equally sensitive to all sound frequencies, various frequency weighting schemes have been developed to approximate the way people hear sound. The A-weighted decibel scale (dBA) is normally used to approximate human hearing response to sound. Example sound noise levels are shown in **Table 3-9**, Common Sound Levels.

**Table 3-9**
**Common Sound Levels**

| Characterization | dBA | Example Noise Condition Or Event |
|---|---|---|
| Threshold of pain | 130 | Surface detonation, 30 pounds of TNT at 1,000 feet |
|  | 125 | F/A-18 aircraft takeoff with afterburner at 470 feet |
| Possible building damage | 120 | Mach 1.1 sonic boom under aircraft at 12,000 feet |
|  | 115 | F/A-18 aircraft takeoff with afterburner at 1,600 feet |
|  | 110 | Peak crowd noise at a professional football game in an open stadium |
|  | 105 | Emergency vehicle siren at 50 feet |
|  | 100 | F/A-18 aircraft departure climb-out at 2,400 feet |
| Extremely noisy | 95 | Locomotive horn at 100 feet |
| 8-hour workplace limit | 90 | Heavy truck, 35 mph at 20 feet; leaf blower at 5 feet |
| Very noisy | 85 | Power lawn mower at 5 feet; city bus at 30 feet |
|  | 80 | 2-Axle commercial truck, 35 mph at 20 feet |
| Noisy | 75 | Street sweeper at 30 feet; Idling locomotive, 50 feet |
|  | 70 | Auto, 35 mph at 20 feet; 300 feet from busy 6-lane freeway |
| Moderately noisy | 65 | Typical daytime busy downtown background conditions |
|  | 60 | Typical daytime urban mixed use area conditions |
|  | 55 | Typical urban residential area away from major streets |
|  | 50 | Typical daytime suburban background conditions |
| Quiet | 45 | Typical rural area daytime background conditions |
|  | 40 | Quiet suburban area at night |
| Very quiet | 30 | Quiet rural area, winter night, no wind |
|  | 20 | Empty recording studio |
| Barely audible | 10 | Audiometric testing booth |
| Threshold of Hearing | 0 | --- |

Source: Beranek 1988

In general, sound waves travel away from the noise source as an expanding spherical surface. The energy contained in a sound wave is spread over an increasing area as it travels away from the source. This results in a decrease in loudness at greater distances from the noise source. A doubling of distance results in an approximately 6-decibel reduction in sound pressure level for single point sources of noise and a 3-decibel reduction in sound pressure level for multiple point sources moving in a straight line such as a highway (Hedge 2011).

*Regulatory Considerations*

The Department of the Interior and the USDA have published surface operating standards and guidelines for oil and gas exploration and development, commonly referred to as The Gold Book (DOI and USDA 2007). This Gold Book contains noise control guidelines for well drilling and production operations. These guidelines state:

> Noise that has the potential to disturb wildlife, livestock, and private surface owners or neighbors should be controlled to reduce sound levels. Suitable mufflers should be installed on all internal combustion engines and certain compressor components. Other noise reduction techniques to consider include siting wells, production facilities, compressors, roads to take advantage of topography and distance, and constructing engineered sound barriers or sound-insulated buildings. The placement of tank batteries and other facilities offsite and the use of remote well monitoring systems can reduce vehicle traffic in the field and the associated noise.

The COGCC has established noise abatement regulations for oil and gas operations (COGCC 2009). These regulations follow Colorado Noise Statute 25-12-103, Maximum Permissible Noise Levels. The COGCC guidelines state that the goal of the rule is to identify noise sources related to oil and gas operations that impact surrounding landowners and to implement cost-effective and technically feasible mitigation measures to bring oil and gas facilities into compliance with maximum permissible noise levels detailed in **Table 3-10**, Regulatory Limits for Noise Generated by Natural Gas Facilities, below.

The Gunnison County Board of County Commissioners passed Resolution No. 2012-25, A Resolution Amending the Gunnison County, Colorado Temporary Regulations for Oil and Gas Operations on August 28, 2012. These regulations do not contain specific standards for noise.

**Table 3-10**
**Regulatory Limits for Noise Generated by Natural Gas Facilities**

| Zone Area[1] | 7 AM to 7 PM[2] | 7 PM to 7 AM |
|---|---|---|
| Residential/Agricultural/Rural | 55 dBA | 50 dBA |
| Commercial | 60 dBA | 55 dBA |
| Light industrial | 70 dBA | 65 dBA |
| Industrial | 80 dBA | 75 dBA |

Source: COGCC 2009, Section 802(c)
[1] In remote areas with no nearby occupied structures, the light industrial standard may be applied.
[2] In the hours between 7:00 a.m. and the next 7:00 p.m., the noise levels permitted below may be increased 10 dBA for a period not to exceed 15 minutes in any 1 hour period. The allowable noise level for periodic, impulsive or shrill noises is reduced by 5 dBA from the levels shown.
[3] Sound levels shall be measured at a distance of 350 feet from the noise source. If an oil and gas well site, production facility, or gas facility is installed closer than 350 feet from an existing occupied structure, sound levels shall be measured at a point 25 feet from the structure towards the noise source.

*Existing Noise Environment*
The Unit is within a rural agricultural area that includes a mix of farming and ranching properties, with dwellings located primarily along State Route 133 and county and private roads in the plan Unit. Noise levels from human activity are mostly mechanical, consisting mainly of existing natural gas development, new exploration activities, ranching/farming activities, and travel on local roadways. Ambient levels are estimated to range from 35 to 40 dBA, increasing up to 60 dBA with traffic from local roads. The varied terrain and vegetation within the Unit provide barriers and buffers for noise.

Noise from existing natural gas development within the Unit comes from a number of sources, including truck traffic, drilling and completion activities, and well pumps. No compressor stations are present in the Unit. **Table 3-11**, Noise Levels Associated with Typical Construction Equipment (dBA), summarizes noise levels of typical construction equipment.

**Table 3-11**
**Noise Levels Associated with Typical Construction Equipment (dBA)**

| Equipment | 50 feet | 500 feet | 1,000 feet |
|---|---|---|---|
| Tractor | 80 | 60 | 54 |
| Bulldozer | 89 | 69 | 63 |
| Motor grader | 85 | 65 | 59 |
| Mechanic truck | 88 | 68 | 62 |
| Backhoe | 85 | 65 | 59 |
| Crane | 88 | 68 | 62 |
| Air compressor | 82 | 62 | 56 |
| Dump truck | 88 | 68 | 62 |
| Average, nearest dBA | 86 | 66 | 60 |

Source: La Plata County 2002

*Sensitive Resources*
Sensitive receptors include known residences, schools, churches, hospitals, libraries, camping areas, and parks. Any known cultural or sensitive wildlife area is also considered a sensitive noise receptor. Sensitive receptors in the project area include the residences discussed above, recreational users, and wildlife.

**Trends**
Noise level trends in the project area are expected to resemble baseline levels, with localized noise level increases as more natural gas wells are developed on private and potentially public lands.

### 3.2.3   Soil Resources

*Current Conditions*

*Soil Composition*
Soils are the product of weathering of rocks. They may reflect the mineral composition of the parent rock materials, but they are also highly dependent on vegetation, climate, and slope. There are 10 classified soil types with significant acreage (greater than 15 acres) found within the Unit per the USDA Natural Resource Conservation Service, as seen in **Figure 3-2**, Soils. Some of the

3. Affected Environment



**Soils**

Source: NRCS 2013



Bull Mountain Unit

Breece loam

Bulkley clay loam

Cochetopa stony loam

Cryoborolls, very stony

Curecanti loam

Fluvents, flooded

Fughes loam

Torriorthents-Rock outcrop, sandstone, complex

Figure 3-2

soil series are differentiated based on percent of slope in the Unit as found in **Table 3-12**, Classified Soil Types in the Bull Mountain Unit. Many have similar characteristics, and the majority are within the Fughes Series, which has 10,880 acres (55 percent) of soils in the project area and Bulkley Series, which has 3,600 (18 percent) of soils in the project area. Soils in the Fughes series are derived principally from sedimentary rocks, mainly shale and interbedded sandstone, and typically form deep, well-drained soil deposits on alluvial fans, terraces, valley side-slopes, draws, and drainage ways (NRCS 2013). Their texture is heavy clay loam with 36 to 50 percent clay. The Bulkley soil series is derived from fine-textured alluvium eroded from shale and are found on alluvium fans and hills (NRCS 2013). Their texture is clay or silty clay loam with weathered shale, typically found at depths of approximately 3 to 6 feet.

**Table 3-12**
**Classified Soil Types in the Bull Mountain Unit**

| Classified Soil Type | Acres |
|---|---|
| Herm-Fughes-Kolob family complex, 25 to 40 percent slopes | 10 |
| Wetopa-Wesdy complex, 5 to 65 percent slopes | 10 |
| Breece loam, 1 to 6 percent slopes | 280 |
| Bulkley clay loam, 12 to 25 percent slopes | 980 |
| Bulkley clay loam, 25 to 65 percent slopes | 2,620 |
| Cochetopa stony loam, 10 to 40 percent slopes | 850 |
| Cryoborolls, very stony | 1,540 |
| Curecanti loam, 3 to 15 percent slopes | 290 |
| Curecanti stony loam, 3 to 30 percent slopes | 300 |
| Fluvents, flooded | 560 |
| Fughes loam, 5 to 15 percent slopes | 1,240 |
| Fughes loam, 15 to 25 percent slopes | 3,700 |
| Fughes loam, 25 to 65 percent slopes | 4,180 |
| Fughes stony loam, 3 to 30 percent slopes | 880 |
| Fughes-Curecanti stony loams, 10 to 40 percent slopes | 880 |
| Torriorthents-Rock outcrop, sandstone, complex | 1,370 |

Source: NRCS 2013

Approximately 9 percent of the soils are within the Cryoborolls sub-order, and 7 percent of the soils are within the Torriorthents series. Cryoborolls are a sub-order of Mollisols, and are currently classified as Cryolls. Cryolls have similar soil characteristics as Mollisols, and are considered to be Mollisols in cold climates. Torriorthent soils are generally shallow silty clay or silty clay loam and are typically found in moderately steep to very steep areas with bedrock outcrops of sandstone, shale, and interbedded shale and sandstone. The remaining 11 percent of soils are within the Cochetopa series (4 percent), the Curecanti series (3 percent), the Fluvents series (3 percent), and the Breece series (1 percent). These soils are well drained and formed in colluvium and alluvium on mountain sides and slopes, from basalts, rhyolitic tuffs, or granitic outcrops and glacial outwash (NRCS 2013).

*Prime and Unique Farmlands*
Four categories of farmlands are federally regulated by the USDA under the Farmland Protection Policy Act: (1) prime farmlands, (2) unique farmlands, (3) farmlands of statewide importance, and (4) farmlands of local importance. The state makes designations of land that would be considered prime farmland if irrigated. Impacts from federal actions on BLM-administered lands on farmlands identified as prime or unique are required to be analyzed and disclosed to the

public during development of an EIS. The USDA delineates important farmlands as those having soils that support the crops necessary for the preservation of the nation's domestic food and other supplies, specifically the capacity to preserve high yields of food, seed, forage, fiber, and oilseed with minimal agricultural amendment of the soil, adequate water, and a sufficient growing season. As seen in **Table 3-13**, Acres of Farmlands in the Bull Mountain Unit, and **Figure 3-3**, Farmlands, there are 1,240 acres of farmlands of statewide importance, and 280 acres of land that would be considered prime farmland if irrigated in the Unit. There are 18,150 acres in the Unit that do not have a farmland designation. Of these designations, 2,160 acres are irrigated, as shown in **Table 3-13**. There are 170 irrigated acres of prime farmland if irrigated, indicating that there are 170 acres of prime farmland within the Unit.

**Table 3-13**
**Acres of Farmlands in the Bull Mountain Unit**

| Farmland Classification | Acres |
| --- | --- |
| Farmlands of statewide importance | 1,240 |
| Irrigated farmlands of statewide importance | 770 |
| Prime farmland if irrigated | 280 |
| Irrigated prime farmland if irrigated | 170 |
| Not prime farmland | 18,150 |
| Irrigated not prime farmland | 1,220 |

Source: NRCS 2013 and CDSS 2013

*Fragile Soils*
Fragile soils in the Unit consist of soils with a high wind and water erosion hazard and soils located on steep slopes. The Unit does contain soils high in sodium, selenium, soils affected by drought, or soils with a high potential to support biological soil crusts.

The NRCS has categorized slopes into five groups of steepness with overlapping lower and upper slope grade limit percentages. Moderately steep slopes have angles between 4 and 10 degrees, steep slopes have angles between 8 and 30 degrees, and very steep slopes have angles greater than 40 degrees. Soils located on steep slopes are generally subjected to high drainage densities, high relief, and high ruggedness, which results in increased erosion rates. Within the Unit, there are 1,730 acres of moderately steep slopes, 1,370 acres of steep slopes, and 8,340 acres of very steep slopes, as shown in **Table 3-14**, Acres of Slopes in the Bull Mountain Unit.

**Table 3-14**
**Acres of Slopes in the Bull Mountain Unit**

| Slope Classification | Acres |
| --- | --- |
| Gently sloping 1-10% | 2,360 |
| Strongly sloping 11-20% | 5,860 |
| Moderately steep 21-30% | 1,730 |
| Steep 31-40% | 1,370 |
| Very steep >40% | 8,340 |

Source: NRCS 2013

COLORADO
Bull Mountain
Uncompahgre Field Office
70
Uncompahgre Field Office
Bull Mountain
Paonia
133
Hotchkiss
T11S R90W
T11S R89W
T12S R90W
T12S R89W
133
0 2,000 4,000
Feet
July 03, 2014
BullMtn_AE_farmlands_V04.pdf
Bull Mountain EIS Uncompahgre Field Office
No warranty is made by the BLM as to the accuracy, reliability, or completeness of these data for individual use or aggregate use with other data.
GUNNISON COUNTY
Farmlands
Bull Mountain Unit
Irrigated land
Farmland of statewide importance
Prime farmland if irrigated
Not prime farmland
Source: CDSS 2013, NRCS 2013

Figure 3-3

The erodibility of a soil, known as the K factor in soil surveys, represents both the susceptibility of soil to wind erosion, and water erosion through the rate of run-off. The Natural Resource Conservation Service surveys soils for their potential rate of erosion, or soil erosion hazard on a scale of slight to very severe. The conditions of eroded soil are based on a comparison of the suitability for use and the management needs of the eroded soil with those of the uneroded soil of the same type or series (NRCS 2012).

The Natural Resource Conservation Service has classified soils in the project area based on their potential for erosion after disturbance in off-road and off-trail areas. The ratings in this interpretation indicate the hazard of soil loss from off-road and off-trail areas after disturbance activities that expose the soil surface. The ratings are based on slope and soil erosion factor K. The soil loss is caused by sheet or rill erosion in off-road or off-trail areas where 50 to 75 percent of the surface has been exposed by logging, grazing, mining, or other kinds of disturbance. **Table 3-15**, Soil Erosion Ratings for the Bull Mountain Unit, shows acres of each soil hazard rating for the Unit.

**Table 3-15**
**Soil Erosion Ratings for the Bull Mountain Unit**

| Rating | Total Acres | Percent of the Unit |
|---|---|---|
| Slight | 2,360 | 12% |
| Moderate | 8,970 | 45% |
| Severe | 6,800 | 35% |
| Very Severe | 1,540 | 8% |
| Total | 19,670 | 100% |

Source: NRCS 2013

Soil erosion is also categorized into an erosion soil hazard for roads and trails, which is based on the soil erosion factor, K, slope, and content of rock fragments. This data has 3 categories (slight, moderate, and severe) and a numerical rating ranging from 0.01 to 1.00 which designates the soils as suitable or not suitable for road building, as seen in **Table 3-16**, Erosion Potential of Roads and Trails for the Bull Mountain Unit. A rating of slight indicates that little or no erosion is likely. A rating of moderate indicates that some erosion is likely and the road or trail may require additional maintenance and erosion-control measures. A rating of severe indicates that significant erosion is expected and the road or trail would require frequent maintenance and costly erosion control measures (NRCS 2012).

**Table 3-16**
**Erosion Potential of Roads and Trails for the Bull Mountain Unit**

| Rating | Total Acres | Percent of the Unit |
|---|---|---|
| Slight | 280 | 1% |
| Moderate | 2,010 | 10% |
| Severe | 17,370 | 89% |
| Total | 19,660 | 100% |

Source: BLM GIS 2014

*Trends*

Soil erodibility and low strength, combined with steep slopes and variable rates of runoff can lead to undesirable effects. Erosion is a natural process but human activities can speed up or increase the potential magnitude of these effects. Erosion rates may increase significantly when soil is disturbed. Undercutting slopes can activate or reactivate slides. Some of these effects have been observed in the site area. For example, construction of State Highway 133 may have directly undercut slopes, including landslide deposits, or constrained the natural ability of Muddy Creek to establish an optimal gradient, leaving some reaches vulnerable to erosion. Muddy Creek normally carries a high sediment load, and has resulted in significant loss of storage capacity in Paonia Reservoir since 1962 when the dam was constructed. There is some evidence that sedimentation rates have accelerated over the years. A major landslide following heavy rainfall in 1986 carried massive quantities of sediment to the channel and banks of East Muddy Creek (Appel and Butler 1991). Efforts to maintain the outlet works of the reservoir by keeping its level low to flush sediment through were initially successful; however, it may have had the unintended effect of increasing sediment deposition rates in the dead pool area of the reservoir (Collins and Kimbrel 2015).

A land health assessment was conducted on federal surface lands within the Unit in 2006-2007 as part of the North Fork Land Health Assessment. This assessment rates soil resources into 1 of 3 categories based upon BLM Colorado Public Land Health Standard: 1) meeting the standard, 2) meeting the standard with problems, or 3) not meeting the standard. Areas were classified as "unknown" if they were considered too small or minor to evaluate. Soils meeting the land health standard are healthy with respect to water absorption, erosion, organic matter, and groundcover. The BLM applies these standards to public lands on a landscape scale to help describe a landscape's potential, various uses, and the conditions needed to sustain land health. The soil rating for soil resources within the Unit is shown in **Table 3-17**, Land Health Assessment Results in the Bull Mountain Unit (BLM 2007).

**Table 3-17**
**Land Health Assessment Results in the Bull Mountain Unit**

| Land Health Assessment Rating | Federal Surface (acres) |
|---|---|
| Meeting Land Health Standard 1 | 310 (70%) |
| Not Meeting Land Health Standards 1 | 0 |
| Unknown or Data Not Available | 130 (30%) |
| Total | 440 |

Source: BLM 2007

Recently, natural gas exploration and development activities have been creating surface disturbances which can lead to an increased rate of run off and erosion of soils. Over the last decade exploratory and development activities in and surrounding the Unit have focused on exploring for shale gas resources and developing coal bed natural gas resources, and these activities are expected to continue over the next 20 years (BLM 2012). Mineral and energy exploration and development activities have BMPs in place to minimize soil surface disturbance, but the projected increases in natural gas extraction indicate that there is potential for additional soil disturbance and accelerated rates of erosion.

### 3.2.4   Water Resources

***Current Conditions***

*Surface Water*

The Unit is in the North Fork Gunnison River drainage basin, US Geological Survey (USGS) Hydrologic Unit Code 14020004, and is part of the upper Colorado River Basin. The climate in the Unit is semi-arid and the North Fork Gunnison River basin has a drainage area of approximately 969 square miles. Hydrologic Unit Code numbers identify the hierarchical relationships of sub-watersheds. Hydrologic Unit Code 14, which represents the upper Colorado River basin, is 1 of 21 hydrologic regions in the United States. The 10-digit Hydrologic Unit Codes 1402000409 and 1402000455 identify the watersheds of East Muddy Creek and West Muddy Creek, respectively. These are the two principal streams draining the Unit. As shown on **Figure 3-4**, Watersheds, the watersheds of both streams extend far beyond the Unit. The Unit is entirely contained within these two watersheds, though the two streams converge a little more than a mile south of the Unit.

On the east side of the Unit, the tributary streams to East Muddy Creek form a radial pattern from peaks that rise to more than 12,000 feet above mean sea level. The peaks are rocky outcrops, composed of the exposed remnants of igneous intrusions that once erupted lava onto the surface. Thousands of feet of overlying deposits have been eroded away, but the process still continues. Many of the lower slopes are landslide deposits which are continuously sliding into East Muddy Creek. East Muddy Creek flows along the toe of these deposits, sweeping them downstream as they are delivered by the radial stream channels and by episodic landslide activity. Lee Creek, which is a tributary to East Muddy Creek, extends north along the toe of the slope of Chair Mountain beyond the Unit, but the watershed of Lee Creek is much smaller than the watershed of East Muddy Creek, and more runoff is carried by East Muddy Creek than by Lee Creek. The channel of West Muddy Creek is similarly constrained by the north-facing slope of Buck Mesa, as it carries runoff from the upper watershed across the southwest corner of the Unit.

The lowest elevation within the Unit is approximately 6,500 feet above mean sea level at the southern boundary of the Unit just below the convergences of East Muddy Creek and Spring Creek. The elevation of East Muddy Creek where it enters the northeast corner of the Unit, near the convergence with Henderson Creek, is approximately 7,240 feet above mean sea level. This represents a fall of about 740 feet over a distance of about 10 miles, or an average stream gradient of about 75 feet per mile, or less than 1.5 percent. The gradient is relatively uniform over the entire reach and during normal flow conditions, the stream meanders through a relatively broad flood plain. The channel of West Muddy Creek is about twice as steep, with a drop of about 720 feet over a distance of about 5 miles within the Unit. Both streams have alluvial channels through the Unit. The tributaries to East Muddy Creek and West Muddy Creek are steeper and narrower.

3. Affected Environment



**Watersheds**

Source: BLM GIS 2014, NHD 2013

Legend:
- Bull Mountain Unit
- Watershed: level 5 hydrologic unit code
- Perennial stream or other stream
- Lake or reservoir
- Other water body
- Town

Figure 3-4

The highest elevation within the Unit is on the northeast boundary, where the elevation reaches about 8,400 feet above mean sea level on the western slope of the Raggeds. On the western side of the Unit, the landscape is dominated by the relatively uniform regional uplift of the Colorado Plateau. The summit of Bull Mountain, near the center of the Unit, is 8,185 feet above mean sea level, but most of the ridges and promontories on the west side of the Unit rise to elevations in the range of approximately 7,000 to 7,500 feet above mean sea level. The tributaries to East and West Muddy Creek tend to drain small, rectangular watersheds, many of which contain broad terraces suitable for agriculture.

Due to the high elevation of the area, snow covers the ground from about November through March. Peak runoff within the area is a result of spring snowmelt (April through June) that originates from the higher peaks to the north and east of the Unit (**Table 3-18**, Typical Monthly Flows for USGS near the Unit (cfs[1])). The gages on East and West Muddy Creek were only in use for limited periods of time, but provide an indication of the distribution of runoff during the year. The station descriptions are summarized below:

- **USGS Station 09131200, West Muddy Creek near Somerset, Colorado**. This site was maintained from 1961 through 1973 and was located on West Muddy Creek upstream of the confluence of West and East Muddy creeks, approximately 4 miles west of the Unit. The drainage area upstream of the gage is approximately 50 square miles. The mean monthly discharge rates for the entire data record at this location ranged from 5 cubic feet per second (cfs; January) to 167 cfs (May). The mean annual discharge rates recorded at this location ranged from 11.0 cfs (1963) to 59.1 cfs (1962). Instantaneous peak discharge rates recorded at this site ranged from 120 cfs (1972) to 1,190 cfs (1973).

- **USGS Station 09130500, East Muddy Creek near Bardine, Colorado**. This site was maintained from October 1934 through September 1953 and was located on East Muddy Creek just south of the Unit. The drainage area upstream of the gage is 133 square miles. The mean monthly discharge rates for the entire data record at this location range from 14 cfs (January) to 475 cfs (May). The mean annual discharge rates recorded at this location ranged from 53.7 cfs (1940) to 135.0 cfs (1938). Instantaneous peak discharge rates recorded at this site ranged from 480 cfs (1951) to 2,190 cfs (1941).

- **USGS Station 09131500, Muddy Creek at Bardine, Colorado**. This site was maintained from October 1949 through September 1955 and was located on Muddy Creek below Paonia Reservoir, approximately 5 miles south of the Unit. The drainage area upstream of the gage is 257 square miles. The mean monthly discharge rates for the entire data record at this location ranged from 21 cfs (December and January) to 642 cfs (May). The mean annual discharge rates recorded at this location ranged from 48.9 cfs (1954) to 242.9 cfs (1952). Instantaneous peak discharge rates recorded at this site ranged from 382 cfs (1954) to 3,400 cfs (1952).

Muddy Creek is the principal source of inflow to Paonia Reservoir, which is operated by the Bureau of Reclamation for irrigation and flood control. As the name implies, Muddy Creek carries a high sediment load, especially during the period of peak annual runoff, which occurs in June, following the spring thaw. Paonia reservoir was designed with the expectation that it would

**Table 3-18**
**Typical Monthly Flows for USGS near the Unit (cfs[1])**

| USGS Gage | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09131200 West Muddy Creek Near Somerset, Colorado | 5.0 | 5.1 | 9.9 | 64.7 | 166.8 | 74.7 | 14.5 | 6.3 | 8.7 | 8.5 | 7.4 | 5.7 |
| 09130500 East Muddy Creek Near Bardine, Colorado | 13.7 | 14.8 | 26.1 | 172.8 | 474.9 | 209.3 | 46.6 | 27.1 | 18.9 | 18.5 | 18.4 | 15.0 |
| 09131500 Muddy Creek at Bardine, Colorado | 21.0 | 22.4 | 29.9 | 302.3 | 642.1 | 268.7 | 48.7 | 36.0 | 22.4 | 24.0 | 24.0 | 21.0 |

Source: USGS 2013. National Water Information System (http://waterdata.usgs.gov/co/nwis/ )
[1] cubic feet per second

receive about 100 acre-feet of sediment per year, but it has sometimes received much more, such as in 1986 when landslides activated by runoff on the west-facing slopes of Chair Mountain and the Raggeds delivered more than 600 acre-feet of sediment to Muddy Creek, which deposited it in the reservoir (Latousek 1995). The dam was built in 1962, but about one-quarter of its storage capacity had been lost to siltation by 2010 (NFRIA 2010). The outlet works became plugged, and sediment had to be excavated to clear them following heavy spring runoff in 2014 (NFRIA 2010; Collins and Kimbrell 2015). The source of much of the sediment appears to be material being shed from the landslide terrane on the western slope of the Raggeds, east of Highway 133.

The area within the Unit receives relatively little precipitation during the summer despite the high runoff Snowmelt, overland flow after rainfall events, and perched groundwater likely contribute to the high runoff observed in the Unit. Surface water is the primary source of irrigation for the area, due to lack of a significant groundwater aquifer, and water storage has historically been a concern.

One hundred twelve (112) ponds and small reservoirs exist within the Unit, based on review of the Bull Mountain and Chair Mountain 7.5-minute topographic quadrangle maps (USGS 2001a, 2001b). Records indicate that 19 of these are permitted through the Colorado Division of Water Resources (CDWR). The permitted reservoirs are used for recreation, fishery, augmentation, fire, stock watering, wildlife, and other uses (CDWR 2010). Permitted reservoirs are discussed further in the Water Resources Technical Report (WWC 2011).

Six developed springs are listed in the National Water Information System database and 13 are recorded with surface water rights in the Colorado Division of Water Resources database, including two that were also in the USGS database (USGS 2010b). The spring water is evaluated as good quality with a moderate mineral content reflected in the specific conductance values. The approximate locations of the listed springs are shown on **Figure 3-5**, Streams and Springs. Available water quality data for the six springs listed in the database are resented in **Table 3-19**, General Water Quality of Springs within the Unit (one sample per station).

3. Affected Environment



**Streams and Springs**

Source: BLM GIS 2014, NHD 2013

Bull Mountain Unit
Perennial stream
Intermittent stream
Lake or reservoir

Spring
100 foot contour

Figure 3-5

**Table 3-19**
**General Water Quality of Springs within the Unit (one sample per station)**

| | Parameters | | |
| --- | --- | --- | --- |
| Gauging Station | Temperature (°F) | Specific Conductance (µmohs/cm)[1] | pH (standard units) |
| USGS 390210107202001 SC01208909ABB1 | 57 | 70 | 6.9 |
| USGS 390340107213801 SC01108932BAD1 | 50 | 205 | 8.2 |
| USGS 390435107253801 SC01109027AAC1 | 82 | 285 | 7.5 |
| USGS 390611107235601 SC01109013BDB1 | 68 | 320 | 7.2 |
| USGS 390625107231701 SC01109013AAA1 | 61 | 270 | 7.0 |
| USGS 390659107240801 SC01109012BCA1 | 46 | 370 | 6.7 |

Source: USGS 2013. National Water Information System – Water Quality Samples for Colorado.

http://nwis.waterdata.usgs.gov/co/nwis/
[1] µmohs/cm = micro mohs per centimeter

Colorado has adopted basic standards and antidegradation rules for surface waters. The CDPHE regulations governing the North Fork Gunnison River are contained within Water Quality Control Commission Regulation No. 35, which establishes classifications and numeric standards for the Gunnison and Lower Dolores River Basins (CDPHE 2010a). Under these rules, the beneficial uses of all tributaries to the North Fork Gunnison River (including all lakes, reservoirs, and wetlands) are classified under five separate categories. The designated beneficial uses for surface water are Aquatic Life; Recreation; Domestic Water Supply; Wetlands; and Agriculture (CDPHE 2009a).

Stream segment descriptions and water quality classifications within and downstream of the Unit, including the North Fork Gunnison River, are listed in **Table 3-20**, Stream Classifications and Water Quality Standards. A complete listing of numeric standards for physical, biological, inorganic, and metal constituents for Colorado surface water can be found in Basic Standards for Surface Water (CDPHE 2009a).

Regulation No. 93 establishes Colorado's Section 303(d) list of water quality-limited segments requiring total maximum daily loads (TMDLs; CDPHE 2012b). The list, which also established Colorado's Monitoring and Evaluation List, must be submitted to the EPA, while the Monitoring and Evaluation List is a state-only document. It identifies water bodies not on the 303(d) list in which water quality problems are suspected but where further evaluation is necessary to confirm the problem.

The 2012 303(d) list was the one most recently submitted to the EPA, which has not yet approved it. The reach of East Muddy Creek, from Little Muddy Creek to West Muddy Creek, is listed on the 303(d) list or the Monitoring and Evaluation List, as summarized in **Table 3-21**.

**Table 3-20**
**Stream Classifications and Water Quality Standards**

| Stream Segment Description | Classification |
|---|---|
| All tributaries to North Fork of the Gunnison River including all lakes, reservoirs, and wetlands within the West Elk and Raggeds Wilderness Areas. | Aquatic Life Cold 1 Recreation E Water Supply Agriculture |
| All tributaries to the North Fork of the Gunnison River including all lakes, reservoirs, and wetlands from the source of Muddy Creek to a point immediately below the confluence with Coal Creek; all tributaries to the North Fork of the Gunnison including all lakes, reservoirs, and wetlands, including the Grand Mesa Lakes which are on National Forest System lands, except for the specific listing in Segments 1 and 7. | Aquatic Life Cold 1 Recreation E Water Supply Agriculture |
| All tributaries to the North Fork of the Gunnison River including all lakes, reservoirs, and wetlands which are not on National Forest System lands, except for the specific listings in Segments 4, 5, 6b, and 7. | Aquatic Life Warm 2 Recreation P Agriculture |
| Paonia Reservoir. | Aquatic Life Cold 1 Recreation E Water Supply Agriculture |

Source: CDPHE 2010a

**Table 3-21**
**List of Impaired Water Quality Segments**

| Water Body Identification Number (WBID) | Segment Description | Portion | Monitoring and Evaluation Parameters | 303(d) Impairment |
|---|---|---|---|---|
| COGUNF04 | All tributaries to the North Fork Gunnison River | E. Muddy Creek | Lead, selenium, *E. coli* (May–October) | Iron (total recoverable) |

Lead, selenium, and *E. coli* bacteria are included on the Monitoring and Evaluation List, due to the uncertainty in the measured data that form the basis for listing; total recoverable iron is listed as an impairment requiring development of a TMDL. Total recoverable metals (also called total metals) are determined by digestion of an unfiltered sample. If the sample were to have sediment containing the targeted metal, the metal would be included in the result. In waters with high suspended sediment loads, such as Muddy Creek, a significant percentage of the iron detected in the sample may originate from sediment entrained in the sample.

One USGS surface water quality sampling station (390620107241900) is located within the Unit, and four other sampling stations (09129800, 390000107212700, 385918107205200, and 385903107210800) are located either above or below the Unit that provide relevant long-term water quality data, including temperature, specific conductance, pH, hardness, sodium absorption ratio, total dissolved solids, total suspended sediment, and sediment yield.

The USGS has collected water quality samples of various constituents at differing time intervals. Data are summarized in **Table 3-22**, General Water Quality of East Muddy/Muddy Creeks on/near the Unit. The data are not definitive since they were collected over a limited period of time and at only a few locations, but they indicate that the stream water quality is generally good.

**Table 3-22**
**General Water Quality of East Muddy/Muddy Creeks on/near the Unit**

| Parameter | No. of Samples | Range | Mean | Median |
|---|---|---|---|---|
| **USGS 385918107205200 Muddy Creek Above Paonia Res Site No 1 (1977 – 1978)** | | | | |
| Temperature (°C) | 2 | 6.5-20 | 0.2 | 0.2 |
| Specific Conductance (µmohs/cm) | 2 | 120-305 | 302.5 | 302.5 |
| pH (field - standard units) | 2 | 7.6-8.7 | 8.3 | 8.3 |
| Total Hardness (mg/L as CaCO₃) | - | - | - | - |
| Sodium Absorption Ratio (unitless) | 2 | 7.3-8.5 | 140.0 | 140.0 |
| Total Dissolved Solids at 180 °C (mg/L) | 2 | 60-140 | 0.4 | 0.4 |
| Total Suspended Solids (mg/L) | - | - | - | - |
| Sediment Yield (tons/day) | - | - | - | - |
| **USGS 385903107210800 Muddy Creek Above Paonia Reservoir, Colorado (1982 – 1983)** | | | | |
| Temperature (°C) | 15 | 6.5-20 | 13.5 | 13.0 |
| Specific Conductance (µmohs/cm) | 15 | 120-305 | 191.5 | 180.0 |
| pH (field - standard units) | 15 | 7.6-8.7 | 8.2 | 8.2 |
| Total Hardness (mg/L as CaCO₃) | 15 | 60-140 | 90.1 | 79.0 |
| Sodium Absorption Ratio (unitless) | 15 | 0.2-0.4 | 0.3 | 0.3 |
| Total Dissolved Solids at 180°C (mg/L) | 14 | 84-182 | 124.4 | 117.5 |
| Total Suspended Solids (mg/L) | 10 | 58-3,660 | 862.3 | 450.5 |
| Sediment Yield (tons/day) | 10 | 9.4-3,710 | 1395.1 | 905.0 |
| **USGS 385918107205200 Muddy Creek Above Paonia Res Site No 1 (1977 – 1978)** | | | | |
| Total Dissolved Solids at 180°C (mg/L) | 2 | 60-140 | 0.4 | 0.4 |
| Total Suspended Solids (mg/L) | - | - | - | - |
| Sediment Yield (tons/day) | - | - | - | - |
| **USGS 390000107212700 Lower West Muddy Creek Near Paonia Reservoir, Colorado (1982 – 1983)** | | | | |
| Sodium Absorption Ratio (unitless) | 12 | 0.2-0.4 | 0.3 | 0.3 |
| Total Dissolved Solids at 180°C (mg/L) | 12 | 96-210 | 152.8 | 155.5 |
| Total Suspended Solids (mg/L) | 11 | 10-271 | 96.6 | 48.0 |
| Sediment Yield (tons/day) | 11 | 0.15-653 | 110.5 | 6.4 |

Source: USGS 2010b
°C = degrees Celsius
µmohs/cm = µmohs per centimeter
mg/L = milligrams per liter

Given the geology of the region, it seems likely that most of the base flow in the perennial streams through the Unit is contributed by perched ground water, possibly within the alluvium near the stream channels, and by overland flow during periods of rainfall and runoff from snowmelt. No hydrologic studies have been performed to confirm the importance of perched groundwater, but most groundwater wells in the area are shallow wells located close to the channel of East Muddy Creek.

The North Fork Gunnison River is recognized as a major contributor of salt to the Colorado River System (NFRIA 2010). Salinity has become a major concern within the Colorado River drainage basin. The 1972 Clean Water Act required the establishment of numeric criteria for salinity for the Colorado River and in 1973, seven Colorado River Basin states created the Colorado River Basin Salinity Control Forum. The Forum developed water quality standards for salinity including numeric criteria and a basin-wide plan of implementation. The plan consists of a number of control measures to be implemented by State and Federal agencies. In 1974, Congress enacted the Colorado River Basin Salinity Control Act. The Act was amended in 1984, requiring the Secretary of the Interior to develop a comprehensive program to minimize

contributions from BLM-administered. Salinity in Muddy Creek upstream of Paonia Reservoir is low, as demonstrated by the low total dissolved solids concentrations shown in **Table 3-22**.

*Regional Groundwater Occurrence*

An understanding of the regional aquifer system provides clues to the occurrence of groundwater within the Unit. However, conditions within the Unit may differ in important ways, due to the fact that the Unit is located on the margin of the Piceance Basin and is likely affected by several unusual features of that location, including the presence of volcanic intrusive rocks, proximity to the upwarped edge of Mesaverde strata, and because of the unusual juxtaposition of a source of recharge (East Muddy Creek) over this same area. Much remains to be discovered about the subsurface conditions in the vicinity of the Unit.

According to Ackerman and Brooks (1986), alluvial aquifers in the region are thickest in valley bottoms (usually less than 100 feet thick) and are likely connected hydraulically with adjacent bedrock aquifers. This suggests that groundwater is probably able to flow from the alluvial aquifer into the underlying bedrock formation, although the direction and quantity of this flow would depend on the permeability of the underlying bedrock unit.

The primary bedrock aquifers in the North Fork Gunnison River Basin are the Dakota Sandstone and the Burro Canyon Formation of Early and Late Cretaceous age (Ackerman and Brooks 1986). The Dakota Sandstone varies from 30 to 150 feet in thickness and the Burro Canyon Formation varies from 50 to 180 feet thick (BLM 2010b). Wells completed in these formations typically yield more than 10 gallons per minute, although the depth and quality of water in these formations at the Unit is expected to make them unsuitable as a potable aquifer (Ackerman and Brooks 1986).

The Upper Cretaceous Mesaverde aquifer is regionally more extensive than the other bedrock aquifers in the area because none of the major river systems (i.e., the North Fork of the Gunnison, Colorado, or White Rivers) have eroded into it. Within the North Fork Gunnison River Basin, the Mesaverde aquifer includes the Lance Formation, the Fox Hills Sandstone (where it is present), the Lewis Shale, and the Mesaverde Group, which is composed of the Williams Fork Formation, the Trout Creek Sandstone Member, and the Iles Formation (Freethey 1991). The lithologic composition of the Mesaverde aquifer is highly variable from formation to formation and from location to location due to the complex nature in which the strata were deposited. Within the Piceance Basin, the Mesaverde aquifer is predominantly composed of sandstone with interbedded shale and coal beds. Within the North Fork of the Gunnison River Basin, the thickness of the Mesaverde aquifer varies between approximately 4,000 feet to 5,000 feet. Wells completed in the Mesaverde Formation have yields that are typically less than 10 gallons per minute, especially where the formation contains relatively little secondary permeability from joints and fractures (Ackerman and Brooks 1986).

Underlying the Mesaverde aquifer is the Mancos shale. Within the Unit, the Mancos Shale is approximately 4,500 feet thick. The Mancos Shale is primarily marine shale, mudstone, and claystone; therefore, permeability is very low. Because of the low permeability within the Mancos Shale, it is considered a major confining layer that essentially stops all groundwater flow (Ackerman and Brooks 1986).

*Local Groundwater Occurrence*

Alluvial deposits within the Unit primarily consist of sand, silt, and gravel of Quaternary age adjacent to the East Muddy Creek valley. Portions of the alluvial aquifer extends into the tributary valleys. Thin alluvial and eolian deposits are present on mesas near the site but none appear to be actually within the Unit (Ackerman and Brooks 1986). Wells completed in the alluvium have yields that can range from 1 to 150 gallons per minute but generally average about 20 gallons per minute (Ackerman and Brooks 1986).

Most domestic water wells in the Unit are completed in the Wasatch Formation or in alluvium near stream channels. In the Piceance Basin, alluvial aquifers are generally the most productive, but within the Unit, alluvial deposits are thin, except within the floodplains of the major streams, the water table is generally below the elevation of the alluvium.

Groundwater in the bedrock aquifers is expected to flow in the direction of the geologic dip, which is approximately 4 degrees from horizontal and in a northeastward direction (BLM 2007a). However, near the margins of the Piceance Basin, where outcrops of Mesaverde rocks have been folded upward and crop out at the surface or are found at shallow depth, runoff or rainwater can work its way down through fractures and may yield good quality water to wells in these margin areas (EPA 2004).

The situation is further complicated by the presence of the igneous intrusive rocks, such as the Raggeds, in the southeastern portion of the basin. Flow within joints and fractures is sometimes significant in intrusive igneous rocks; these are not deposited in horizontal layers and have strata of varying permeability, as sedimentary rocks tend to be. The path of groundwater flow through joints and fractures in igneous intrusive rocks, as well as in other crystalline rocks, can be unpredictable, and the fractures might be capable of conducting freshwater vertically or in unexpected directions. It is also possible that some freshwater recharge occurs through the alluvial channels of the principal streams, especially where the streams are near the upturned Mesaverde Formation, such as along the south-trending reach of East Muddy Creek (Lazear 2009).

*Groundwater Quality*

Federal Safe Drinking Water Act regulations (40 CFR 144.3) define an Underground Source of Drinking Water as:

> an aquifer or portion thereof: (a)(1) which supplies any public water system; or (2) which contains a sufficient quantity of ground water to supply a public water system; and (i) currently supplies drinking water for human consumption; or (ii) contains fewer than 10,000 mg/L total dissolved solids; and (b) which is not an exempted aquifer.

Under 40 CFR 146.04, a Underground Source of Drinking Water can be exempted if it does not currently serve as a source of drinking water, and cannot now and will not in the future serve as a source of drinking water for one of four reasons:

- It is mineral, hydrocarbon, or geothermal energy producing, or can be demonstrated by a permit applicant as part of a permit application for a Class II or III operation to contain

minerals or hydrocarbons that considering their quantity and location are expected to be commercially producible.

- It is situated at a depth or location that makes recovery of water for drinking water purposes economically or technologically impractical.

- It is so contaminated that it would be economically or technologically impractical to render that water fit for human consumption.

- It is located over a Class III well mining area subject to subsidence or catastrophic collapse; or the total dissolved solids content of the ground water is more than 3,000 and less than 10,000 milligrams/liter, and it is not reasonably expected to supply a public water system.

The EPA secondary drinking water standard for total dissolved solids (TDS) is 500 mg/L. Above a TDS of 500 mg/L, water has a noticeable salty taste, and at higher concentrations may have excessive hardness, or may contain harmful constituents. Secondary drinking water standards are guidelines rather than enforceable standards, though, and water with a high TDS can be blended with higher quality water to achieve acceptable TDS concentrations in the blended water.

A USGS investigation of groundwater resources in the North Fork watershed found that alluvial aquifers yield water with dissolved solids concentrations ranging from 110 to 2,300 mg/L. The higher cost of drilling deeper wells is usually not rewarded by higher yields or better quality water. The Mesaverde Group contains rocks that generally have low permeability and poor water quality. TDS concentrations of water samples from the Mesaverde Group, the Dakota Sandstone, and Burro Canyon Formation that were evaluated by the USGS ranged from 56 to 3,200 mg/L.

According to the North Fork River Watershed Plan, groundwater from bedrock aquifers in the upper watershed is generally of the sodium bicarbonate type that is neutral to alkaline (pH 7 to 9), with low metals content and a high methane content (NFRIA 2010). This suggests that methane continues to be generated in the underlying rocks, and that there may be a steady flux of methane into the overlying formations.

Below the depths normally explored for domestic water supplies, water quality tends to diminish. Most potable wells are less than 200 feet deep, though occasionally they extend deeper. But the deeper portions of the Piceance Basin, particularly in the central basin areas, contain evaporites (salts concentrated in sands of Lake Uinta, for example, which once covered portions of the Piceance Basin) that raise the TDS concentrations above levels that are normally acceptable for drinking water.

TDS concentrations of water samples from the Mancos Shale ranged from 1,800 to 8,200 mg/L in the USGS study (Ackerman and Brooks 1986); but the Mancos Shale has very low primary permeability associated with an aquitard rather than an aquifer. TDS in the overlying Rollins Sandstone reportedly ranges from 3,000 to 9,000 mg/L (NFRIA 2010). While poor in quality, the Rollins Sandstone would qualify as a Underground Source of Drinking Water.

Throughout the central parts of the Piceance Basin, coal-bearing strata are generally found at depths of more than 4,000 feet. Within the Unit, the depth to the base of the coal-bearing Cameo Group ranges from greater than 4,000 feet in the northwest to less than 2,000 feet along the east. These depths are generally too deep for economic drilling and pumping of groundwater, even if the groundwater were potable.

Knowledge about groundwater conditions at depths greater than several thousand feet comes almost entirely from wells drilled for gas production. The deepest permeable formations are commonly used for deep injection of production wastewater. SGI's existing disposal well (Federal 24-2 WDW) is a Class II disposal well located on fee lands in the NWSW Section 24, T11S, R90W and is used to dispose of produced water from current natural gas production in the area. The geological horizons for the primary disposal zones for the one existing and four proposed disposal wells are the sandstone formations below the Mancos Shale, including the Dakota Sandstone, Morrison Formation, Entrada Sandstone, and Maroon Formation at depths between 9,300 and 9,500 feet. The total dissolved solids concentration measured in the existing injection well, completed in the Unit in the Permian to Pennsylvanian age Maroon Formation, is 18,962 mg/L, which is about half the salinity of sea water. Produced-water quality sample lab test results from samples collected in 2007 from existing producing wells within the Unit are included in **Table 3-23**, Water Quality Lab Test Results from Produced Water from Existing Producing Natural Gas Wells within the Producing Formations in the Unit. Some of the waters encountered at these depths also contain dissolved petroleum hydrocarbons, including the volatile constituents benzene, toluene, ethylbenzene, and xylenes, which are found in light crude oil.

**Table 3-23**
**Water Quality Lab Test Results from Produced Water from Existing Producing Natural Gas Wells within the Producing Formations in the Unit**

| Parameter[1] | McIntyre 11-90-14-4 | Falcon Seaboard 11-90-12-1 | Henderson R1 | Federal 26-1 |
|---|---|---|---|---|
| pH (field) | 5.5 | 7.1 | 5.6 | 9.6 |
| Total Dissolved Solids | 10,557 | 8,775 | 18,445 | 4,495 |
| Potassium | 94 | 431 | 312 | 110 |
| Sodium | 2,961 | 2,531 | 5,462 | 1,493 |
| Calcium | 664 | 260 | 736 | 60 |
| Magnesium | 252 | 140 | 572 | 60 |
| Bicarbonate | 280 | 636 | 132 | 260 |
| Chloride | 6,400 | 4,800 | 11,600 | 2,400 |
| Sulfate | 0 | 4 | 4 | 19 |
| Total Iron | 0.9 | 5.4 | 1.6 | 0.1 |

[1] All units in mg/L except pH, which is in standard pH units

Water to be injected into the deep formations in which the disposal wells are completed is first piped into holding tanks to allow sediments to settle out by gravity. The water then passes through a series of filters to remove solids larger than 10 microns in diameter so that these sediments will not clog the pores of the sandstone aquifer in which they are injected.

Accumulated solids from the settling and filtration process are periodically removed from the holding tanks and trucked to an approved off-site disposal facility. Chemical treatment of water

reduces scaling or deposition of minerals in the receiving formation, which, if unabated, could reduce the porosity in the recovery formation and otherwise shorten the life of the disposal wells.

*Current Water Quality Monitoring Program*

In compliance with Gunnison County and COGCC regulations (Gunnison County Board of County Commissioners 2003, COGCC 2009), and in anticipation of potential new development, SGI initiated baseline water quality monitoring of surface water monitoring locations near existing and proposed production wells within the Unit. Sites have been established to sample surface water along streams, ponds, and other water bodies to establish baseline conditions.

The requirements have changed during recent years, but as part of its current permitting requirements, COGCC Rules 608 (which covers coal bed methane wells) and 609 (which addresses all other oil and gas wells) require baseline monitoring of groundwater, and SGI has collected samples from available sources of groundwater within a 0.25 to 1-mile radius of proposed natural gas wells as part of its compliance with these rules.

Under Rule 609, the permittee is required to sample up to four sources of groundwater, including wells or springs (with preference given to well-maintained domestic wells), within a 0.5 mile radius of a new well pad. Initial sampling must be conducted within 12 months prior to setting conductor pipe in the first well of a multi-well site, or before commencement of drilling an injection well. Subsequent monitoring is required at the same locations between 6 and 12 months, and then again between 5 and 6 years after completion of the well. The testing program must include pH, specific conductance, TDS, dissolved gases (methane, ethane propane), alkalinity (total bicarbonate and carbonate as $CaCO_3$), major anions (bromide, chloride, fluoride, sulfate, nitrate and nitrite as N, phosphorus), major cations calcium, iron, magnesium, manganese, potassium, sodium), other elements barium, boron, selenium and strontium, presence of bacteria (iron related, sulfate reducing, slime forming), total petroleum hydrocarbons TPH), and BTEX compounds benzene, toluene, ethylbenzene and xylenes). Field observations of odor, color, sediment, bubbles, and effervescence must also be documented.

Rule 608 imposes additional requirements for monitoring in the vicinity of coal bed methane wells. The operator must perform a records search for plugged and abandoned wells within 0.25 mile of the proposed coal bed methane well, and must assess the risk that the plugged and abandoned wells may act as a conduit for gas or water leakage. Within 1 year, and then every 3 years after production from the coal bed methane well, SGI must perform a soil gas survey at all plugged and abandoned wells, and submit the result of the surveys to COGCC. In addition, SGI must sample existing water wells within a certain distance from the proposed coal bed methane well as part of a baseline sampling program. The method of selecting the wells to be sampled is specified in the rule, but generally requires sampling 2 wells within 0.25 mile of the coal bed methane well if they exist, or 1 well within 0.5 mile if closer wells do not exist. The initial testing program differs from Rule 609. Testing must include major cations and anions, TDS, iron, manganese, selenium, nitrates and nitrites, dissolved methane, field pH, sodium adsorption ratio, presence of bacteria (iron related, sulfate reducing, slime, and coliform), and specific conductance. Hydrogen sulfide must be measured in the field, and field observations of odor, color, sediment, bubbles, and effervescence must also be included.

The network of sampling points that has been monitored by SGI currently includes 23 wells, 1 cistern, and 51 surface water locations within the Unit. Additional sampling has also been conducted at locations outside the Unit. **Figure 3-6**, Water Quality Monitoring, shows the locations where baseline monitoring has been performed. Some of the available data were collected prior to 2010, including 6 wells and 8 surface water locations that were sampled between 2002 and 2008 but have not been sampled since; 8 wells that were sampled prior to 2010 and have been sampled again since 2010. Excluding the locations for which there are only pre-2010 data, there are currently 16 wells, 1 cistern, and 40 surface water locations in the water quality monitoring network within the Unit.

Baseline samples provide an indication of conditions prior to the initiation of oil and gas development activities. They can also provide an indication of the geographic variability of water quality throughout the Unit. Examination of baseline data could potentially reveal underlying geographic and temporal trends in water quality associated with natural conditions or with pre-oil and gas activities. More importantly, re-sampling over time and comparison to the baseline data can be used to identify changes in water quality, to monitor the effectiveness of controls designed to protect water resources, and to determine the need for corrective action.

The baseline monitoring program has evolved somewhat over the years since it was initiated, resulting in variations in the chemical and physical parameters measured at different locations and times. At most locations, water samples have been analyzed for presence of petroleum hydrocarbons, a class of compounds called polynuclear aromatic hydrocarbons, selected metals, general water quality indicators (such as pH, dissolved and suspended solids, nutrients, common anions and cations, and others), and methane. Since water quality can be affected by many factors other than project activities, data from multiple monitoring locations in the vicinity of existing and proposed production/exploration well platforms, preferably collected over time are needed to evaluate the causes of changes in water quality. The baseline monitoring results have indicated that existing surface and groundwater quality is generally good and typically meets regulatory standards to support the existing beneficial uses of the water. **Table 3-24**, Summary of Results for Selected Analytes in Samples from 23 Wells Collected between July 16, 2002 and June 12, 2013, and **Table 3-25**, Summary of Results for Selected Analytes in Samples from 51 Surface Water Locations Collected between July 16, 2002 and August 10, 2012, show the ranges of concentrations of selected analytes from monitoring of water wells and surface water sites within the Unit between 2007 and 2013. The results are from 59 samples analyzed from a network of 23 wells, and 84 samples analyzed from 51 surface water locations. (Note that not all analytical data are represented in the tables; not all wells or surface water samples were analyzed for the same compounds each time; and some wells and surface water locations have been sampled multiple times.) The similarity between the surface water and the well sample results in **Table 3-24** and **Table 3-25** probably reflects the fact that many of the wells included in the monitoring network are completed at shallow depths, within the alluvial aquifer, and near stream channels.

3. Affected Environment



**Water Quality Monitoring**

Source: BLM GIS 2014,
SG Interests 2013

| | Bull Mountain Unit | ▲ | Surface water |
|---|---|---|---|
| | | ● | Well water |
| | | ● | Shallow ground water |
| | | ■ | Water cistern |

Figure 3-6

**Table 3-24**
**Summary of Results for Selected Analytes in Samples from 23 Wells Collected between July 16, 2002 and June 12, 2013**

| Analyte | No. of Samples | Number of Non-detects | Average Detected Concentration | Minimum Detected | Maximum Detected |
|---|---|---|---|---|---|
| pH | 23 | 0 | 8.2 | 8 | 8.6 |
| Temperature | 23 | 0 | 21.4 | 19 | 23 |
| conductivity @25°C | 23 | 0 | 355 | 138 | 725 |
| Residue, filterable (TDS) @180°C | 25 | 0 | 208 | 90 | 430 |
| Calcium (dissolved) | 12 | 0 | 48.6 | 28.6 | 93.8 |
| Sodium (dissolved) | 3 | 0 | 8.9 | 6.8 | 10.4 |
| Potassium (dissolved) | 11 | 0 | 1.16 | 0.6 | 2.2 |
| Silica (dissolved) | 9 | 0 | 13.7 | 6.2 | 19.1 |
| Total alkalinity | 25 | 0 | 164 | 60 | 304 |
| Bicarbonate as CaCO$_3$ | 25 | 0 | 163 | 59 | 304 |
| Ortho phosphorus (dissolved) | 8 | 0 | 0.019 | 0.01 | 0.04 |
| Bromide | 4 | 0 | 0.10 | 0.03 | 0.25 |
| Chloride | 24 | 0 | 9.8 | 1 | 70 |
| Fluoride | 17 | 0 | 0.32 | 0.1 | 0.8 |
| Nitrate as nitrogen (dissolved) | 6 | 1 | 0.31 | 0.1 | 0.47 |
| Sulfate | 19 | 1 | 8.8 | 3 | 31 |
| Boron (dissolved) | 9 | 4 | 0.014 | 0.01 | 0.02 |
| Selenium (total) | 10 | 0 | 0.0011 | 0.00010 | 0.0036 |
| Strontium (dissolved) | 9 | 0 | 0.53 | 0.2 | 0.9 |
| Uranium (dissolved) | 10 | 3 | 0.0019 | 0.0003 | 0.005 |
| Methane | 6 | 4 | 4.995 | 0.39 | 9.6 |
| Benzene | 2 | 2 | ND | ND | ND |
| Ethylbenzene | 2 | 1 | 0.4 | 0.2 | 0.6 |
| Toluene | 3 | 0 | 0.23 | 0.2 | 0.3 |
| m,p-xylenes | 1 | 0 | 0.4 | 0.4 | 0.4 |
| TPH C10 to C28 | 22 | 20 | 0.35 | 0.2 | 0.5 |

**Table 3-25**
**Summary of Results for Selected Analytes in Samples from 51 Surface Water Locations Collected between July 16, 2002 and August 10, 2012**

| Analyte | Units | No. of Samples | Number of Non-detects | Average Detected Concentration | Mini-mum | Maxi-mum |
|---|---|---|---|---|---|---|
| pH | std units | 42 | 0 | 8.4 | 7.8 | 9.7 |
| Temperature | deg C | 42 | 0 | 20.8 | 19 | 23 |
| Conductivity @25°C | umhos/cm$^2$ | 42 | 0 | 362 | 70 | 602 |
| Residue, filterable (TDS) @180°C | mg/L | 45 | 0 | 223 | 40 | 370 |
| Calcium (dissolved) | mg/L | 5 | 0 | 60.22 | 46.3 | 70.1 |
| Sodium (dissolved) | mg/L | 3 | 0 | 21.6 | 12.5 | 38.9 |
| Potassium (dissolved) | mg/L | 5 | 0 | 1.9 | 1.2 | 2.5 |
| Silica (dissolved) | mg/L | 2 | 0 | 8.5 | 6.7 | 10.3 |
| Total alkalinity | mg/L | 45 | 0 | 183 | 33 | 325 |
| Bicarbonate as CaCO$_3$ | mg/L | 45 | 0 | 172 | 33 | 305 |

**Table 3-25**
**Summary of Results for Selected Analytes in Samples from 51 Surface Water Locations Collected between July 16, 2002 and August 10, 2012**

| Analyte | Units | No. of Samples | Number of Non-detects | Average Detected Concentration | Mini-mum | Maxi-mum |
|---|---|---|---|---|---|---|
| Ortho phosphorus (dissolved) | mg/L | 2 | 0 | 0.03 | 0.02 | 0.04 |
| Bromide | mg/L | 2 | 0 | 0.045 | 0.03 | 0.06 |
| Chloride | mg/L | 41 | 0 | 6.5 | 1 | 23 |
| Fluoride | mg/L | 37 | 0 | 0.24 | 0.1 | 0.5 |
| Nitrate as nitrogen (dissolved) | mg/L | 0 | NA | NA | NA | NA |
| Sulfate | mg/L | 35 | 0 | 6.9 | 1 | 39 |
| Boron (dissolved) | mg/L | 2 | 0 | 0.015 | 0.01 | 0.02 |
| Selenium (total) | mg/L | 36 | 0 | 0.00031 | 0.0001 | 0.0008 |
| Strontium (dissolved) | mg/L | 2 | 0 | 0.7 | 0.55 | 0.85 |
| Uranium (dissolved) | mg/L | 2 | 0 | 0.0012 | 0.0009 | 0.0014 |
| Methane | mg/L | 2 | 1 | 0.17 | 0.17 | 0.17 |
| Benzene | µg/L | NA | NA | NA | NA | NA |
| Ethylbenzene | µg/L | 1 | 0 | 0.2 | 0.2 | 0.2 |
| Toluene | µg/L | 6 | 0 | 0.33 | 0.2 | 0.7 |
| m,p-xylenes | µg/L | 2 | 0 | 0.65 | 0.5 | 0.8 |
| TPH C10 to C28 | mg/L | 42 | 33 | 0.24 | 0.1 | 0.6 |

*Hydrology and Water Rights*

There are a number of irrigation diversions from the larger creeks, especially on the eastern side of the Unit (BLM 2010a). Stock ponds are abundant in the area and, in general, contain water throughout the year.

Expansive irrigated hay meadows are generally found in the bottomlands of the East Muddy Creek drainage. Irrigated meadows are also found in the Ault Creek drainage at the far western side of the Unit (BLM 2010a). Natural flows of streams are likely affected by diversions for irrigation and there are numerous water rights for both reservoirs and irrigation diversions on North Fork Gunnison River (NFRIA 2010). Based on USGS estimates, approximately 3,000 acres of irrigated lands occur upstream of USGS gauging station 09132500 (North Fork Gunnison River near Somerset, Colorado; USGS 2010a). Irrigation diversions affect the intensity, quantity, and timing of streamflows within the North Fork Gunnison River, and may have a similar effect in the Unit. For example, in June when runoff is highest, irrigation diversions attenuate peak flows by diverting some of the flow onto irrigated lands. Irrigation withdrawals sometimes reduce discharge in the North Fork Gunnison River to low volumes. During drought years, surface flow sometimes disappears entirely from segments of the channel (NFRIA 2010).

According to the Colorado Division of Water Resources, there are 35 ditch-type water rights within the Unit. All but three of these ditches list Muddy Creek as the source. Permitted surface water rights on the Unit are summarized in the Water Resources Technical Report (WWC 2011).

<u>Surface Water Rights.</u> Based on a review of the Colorado Division of Water Resources' surface water rights database, there are 75 permitted surface water rights within the Unit. The majority of the water rights (33) have a designated use that is (or includes) irrigation. Other uses include

stock (19), fishery (18), domestic (14), recreation (12), wildlife (5), fire (5), federal reserve (4), storage (2), other (2), industrial (1), and augmentation (1). The sum of water rights uses is greater than 75 as some of the individual rights list multiple uses. Sources for these surface water rights within the Unit are as follows: Muddy Creek is the water source for 71, North Fork Gunnison River is the source for 3, and Gunnison River is the source for 1. Existing surface water rights within the Unit are tabulated in the Water Resources Technical Report.

Groundwater Rights. A CDWR records review revealed 66 current groundwater permits within the Unit. All of these groundwater permits are filed on water wells apportioned as follows: 20 domestic use; 15 domestic/stock use; 12 other use; 11 household use only; and 8 industrial use. Of the 66 permitted wells, 50 wells are developed, no records of completion are available for 14 wells, and 2 permits were extended. Of the 66 permitted wells, 48 report positive yields. Details on the permitted wells within the Unit are tabulated in Water Resources Technical Report (WWC 2011).

### Trends

Several trends related to water resources are important in the region and may affect the Unit.

The Unit provides very favorable conditions for agriculture in terms of climate and soils. However, a reliable water supply has long been a limiting factor for agricultural development of the area. Most of the water use in the area is from surface water or from shallow groundwater that is probably in direct connection to surface water. Surface storage is limited, and groundwater storage capacity is inadequate to meet most needs. Any reduction in surface water availability is likely to impact agriculture. Similarly, water quality is critical to the viability of agriculture and, with limited supplies of potable surface water and groundwater to meet demand, any reduction in water quality could have severe impacts on landowners.

Development of the gas resources in the southeastern margin of the Piceance Basin is in its early stages. The economic viability of gas production in this portion of the basin remains to be tested. The exploration and initial development phase will likely bring significant changes to the region, including additional demands on water resources. There is strong demand for development of domestic gas resources throughout the country that could also contribute to lower prices as the demand is filled, and to reduced economic feasibility in marginally productive areas. In the event that the gas resources in the Unit do not prove as economically viable as initially hoped, it would be important to ensure that the region is not abandoned in such a way that agriculture activity could continue with minimal long-term impact.

The rate of erosion from the vicinity of the Unit, and particularly the west slope of the Raggeds, has an important effect on the rate of sedimentation of the Paonia Reservoir, and therefore its effective life. The project, along with other potential consequent development of the area could lead to increased erosion rates and faster sedimentation of the reservoir. This would have an indirect effect on irrigation and on agriculture that is dependent on water storage in the reservoir.

The 2006-2007 land health assessment of federal lands within the Unit included a water quality assessment (standard 5) on nearly 60 miles of streams. This standard was met for a majority of streams (74 percent) in the Unit and the watersheds they drain into. The remaining waters assessed within the Unit were meeting standard 5 with problem areas (23 percent) or were not

meeting the water quality standard (3 percent). Stream segments that were not meeting standard 5 in the Unit were attributed to soil erosion, exposed soil, and poor vegetation cover in the surrounding watersheds. These watersheds are more susceptible to erosion and subsequent sedimentation within adjacent streams.

### APD for Federal 12-89-7-1

The domestic water well nearest to the 12-89-7-1 pad site is well 12-89-8 #2 (the Fransen well), about 2,000 feet east of the site. It is at an elevation of about 6,700 feet amsl, or about 700 feet below the elevation of the site (the proposed pad is about 7,388 feet amsl). The Fransen well is a shallow well screened from 35 to 45 feet below the surface in the alluvial sediment along the channel of East Muddy Creek. The Fransen well is included in SGI's baseline monitoring program, in accordance with COGCC Rule 609. The well is reportedly used for watering domestic animals and for lawn and garden irrigation. The water is impacted by iron-related bacteria; it reportedly has a rotten egg odor and effervesces slightly. The resident has complained of skin irritation caused by exposure to the water. Testing has indicated the presence of methane gas at a concentration of 9.6 mg/L in the water, which is the highest concentration of methane reported to date in the baseline sampling program for the project area.[2] Isotopic analysis indicates that the methane falls within a range that is slightly more characteristic of a thermogenic origin (meaning that it may be generated from hydrocarbon deposits in the deep subsurface) than of a biogenic origin (such as from microbial degradation of organic matter near the surface).

### 3.2.5   Geology

#### Current Conditions

##### Physiography

Physiography refers to the physical appearance of the surface of the earth, which reflects its geologic and tectonic history. The Unit is located on the boundary between the Western Section of the Southern Rocky Mountains physiographic province, and the Uinta Basin Section of the Colorado Plateau physiographic province (Lobeck 1975; Fenneman 1946; CGS 2011). It lies west of the Sawatch Range, the White River Uplift, and the Continental Divide which belong to the Southern Rocky Mountains; and east of the Uncompahgre uplift, on the southeastern margin of the Piceance Basin, which are part of the eastern edge of the Colorado Plateau. State Highway 133 roughly marks the boundary between the 2 provinces. Streams west of the Continental Divide drain to the west, toward the Colorado River, but follow a circuitous route to get there: first the tributaries of Muddy Creek flow to the southeast across the Continental Divide and converge near the southeast corner of the Unit. Then Muddy Creek turns south and flows along State Highway 133 to Paonia Reservoir on the North Fork of the Gunnison River. The North Fork Gunnison flows southwest and then turns northwest to join the Colorado River at Grand Junction. Streams on the east side of State Highway 133 drain to the west, to Muddy Creek.

---

[2] Methane is an odorless gas and would not explain the rotten egg odor, which is characteristic of hydrogen sulfide; however, hydrogen sulfide was not reported in the analytical results from the well.

As indicated on the USGS 7.5 minute topographic quadrangles that depict the site area, topographic relief ranges widely in the nearby region of the Unit (USGS 2001a, 2001b, 2001c, 2011). Chair Mountain, about 3 miles east of the Unit, rises to 12,723 feet, and nearby Ragged Peak is 12,641 feet. There is about 1,500 feet of relief within the Unit. The lowest point is in the channel of East Muddy Creek near the confluence of Spring Creek, where the elevation is about 6,690 feet. At 8,185 feet, Bull Mountain is the highest point within the Unit.

The stream drainage pattern on the west side of the Unit, west of State Highway 133, is rectangular, with small straight stream segments generally oriented perpendicular to the principal drainages, West Muddy Creek, and East Muddy Creek. The trunk streams are moderately incised, with relatively wide channels and steep side slopes, which have the appearance of being antecedent to the terrain. Meanders have developed within the channels of East and West Muddy Creeks. Some of the side slopes are relatively flat, while others are very steep. The stream channel gradients of the trunk streams are relatively gradual. For example, the slope of the channel of East Muddy Creek is about 3 feet per 1,000 feet. The drainage pattern on the east side of State Highway 133 is radial, with streams issuing in every direction out from peaks such as Chair Peak.

The Unit is at the southeastern margin of the Piceance Basin, a large structural basin covering approximately 1,000 square miles, which extends northwest to the area near Rangely, Colorado. It is bounded by the Uinta uplift to the north, the White River uplift and the Grand Hogback on the northeast, and the Uncompahgre uplift on the southwest. To the southeast, it butts up against Chair Mountain and the Raggeds. It is separated from the Uinta Basin, which extends westward into Utah, by the Douglas Creek Arch, a topographic rise that roughly parallels the western border of Colorado. The Piceance Basin is cut approximately in half by the Colorado River, which enters the Piceance Basin near Rifle Creek at the south end of the White River uplift, and exits the Piceance Basin at Grand Junction. Water drains from the each end of the Basin toward the Colorado River. The Piceance Basin lies almost entirely within the Colorado Plateau physiographic province.

North of the Colorado River, the Piceance Basin contains abundant oil shale deposits (up to 2,000 feet thick, some of it very near the surface) in the Middle Tertiary Green River formation (Taylor 1987). Coal and gas are found below the depth of the oil shale, at depths of 6,000 to 10,000 feet, in the Mesaverde formation. The southern portion of the basin contains mainly coal and gas. In the southern portion of the basin, there is no structural or stratigraphic trap for the gas deposits. The gas is trapped in the primary porosity of the low permeability rocks. The low permeability of these rocks presents the primary challenge for exploiting these abundant gas deposits. The most effective way of releasing and extracting the gas is to increase the secondary porosity of the reservoir rock using a technique called hydraulic fracturing. See **Figure 3-7**, Geology Cross Section.

*Geologic History*

The Piceance Basin formed during the Laramide orogeny, a period of mountain building that began in the late Cretaceous Period (more than 65 million years ago) and continued for more than 30 million years, extending into the Oligocene Period. Before the Laramide, the area that



Geology Cross Section

was to become the Piceance Basin was part of a broad, shallow inland sea, the western shoreline of which lay along the edge of the Sevier thrust belt, a north-trending mountain range created as the oceanic plate was pushed up against the continent by plate tectonic forces. This westward compressional movement deformed the crust inland, creating large folds in the sedimentary rocks that had been deposited in the continental interior. Sediments eroded from the eastern slopes of the Sevier thrust belt were deposited in the sea that covered the Piceance Basin, gradually filling it and causing the shoreline to migrate eastward. It was these sediments, deposited during the late Cretaceous Period, which became the Mesaverde formation. The fact that the same rocks lie deep under the Piceance Basin and form the principal gas reservoir in the south part of the basin, and also crop out along its margins, forming the steep cliffs of the Grand Hogback, is proof of the intense forces that deformed the landscape during the Laramide orogeny. The exposed Mesaverde rocks also act as a conduit to conduct groundwater to great depths within the basin.

The Laramide orogeny, which was powered by subduction of oceanic crust deep under the continent formed vast quantities of molten rock (magma) that, along with the compressional forces associated with plate subduction, intruded under and pushed up the sedimentary rocks that had once filled the inland sea, creating the Rocky Mountains. But rocks that are above sea level tend to erode and are transported to lower areas by water. The period of the later Cretaceous to the middle Paleocene is missing from the geologic record of the Piceance Basin because the area was gradually elevated above sea level during this time. However, by the middle of the Paleocene, the Piceance Basin was subsiding, and filled with thousands of feet of sediments eroded from the adjacent uplifted mountains.

Heat from the subducting crust helped to "cook" the organic matter that was contained in the shallow marine sediments that had been deposited in the inland basins and subsequently buried by basin filling sediments during the Laramide. The combination of heat from the pressure of burial, and the heat from the underlying magma, transformed the organic matter over time into oil, coal, and methane gas, depending on the combination of temperature and pressure and the abundance of the organic matter prevailing in each part of the basin. In some areas, such as to the area southeast of the Unit, magma rose nearer to the surface, and even erupted onto the surface during the middle Oligocene to early Miocene Periods.

The primary gas source rocks in the southern Piceance Basin are the Mancos Shale and certain members of the Mesaverde Group. The Mesaverde Group is also considered to be a gas reservoir, largely because of its low permeability. The stratigraphic and structural context of these formations is discussed below.

### Hydrocarbon Source Rocks

The Mancos Shale formed from the deposition of fine-grained silts and clays in the shallow inland sea that prevailed at the beginning of the late Cretaceous Period a little more than 90 million years ago. The Mancos Shale, in addition to carbonaceous strata in the overlying Mesaverde Group, is considered a likely source of some of the methane gas now present in the Mesaverde Group (Johnson 1988). Methane is generated when oil or coal is sufficiently heated, and in some areas the Mancos Shale is known to contain up to 4 percent organic carbon, and it may have been a significant source of gas due to its great thickness. The top of the Mancos Shale

is reported to be about 4,500 feet below the surface at the southern end of the Unit, and may be
several thousand feet thick (Hettinger and Kirshbaum 2002). The Mancos Shale rests on the
Cretaceous Dakota Sandstone. Below these are additional Mesozoic rocks, which may lie
unconformably on pre-Cambrian crystalline rocks. Tweto (1983) indicates that in one cross-
sections that happens to pass through the Unit the pre-Cambrian basement is about 9,000 feet
below the surface at the southern boundary of the Unit.

The relatively steady conditions that accompanied the deposition of the Mancos Shale were
gradually superseded about 65 to 70 million years ago by a period of more rapid deposition and
regional uplift. Sediments eroded from the Sevier Thrust Belt to the west were deposited during a
period of changing sea depths, so that shale deposits (away from the shore) alternated with
sandstones (near the shore). The Upper Cretaceous Mesaverde Group, which is exposed on
nearly all of the margins of the Piceance Basin, including along the eastern side of the Unit, is
important as both a source and a reservoir for natural gas throughout the region (Tweto 1979).
The Mesaverde Group (labeled Kmv on **Figure 3-8**, Geology) includes several formations or
members, among which are two highly carbonaceous sequences: the Corcoran and Cozzette
Members. These are the deepest significant coal-bearing strata in the basin. Towards the end of
the Cretaceous, uplift and shallowing of the depositional environment caused by an eastward
migrating shoreline resulted in deposition of coarser sediments. Although the sediments of the
Mesaverde Formation are generally coarser, the pores between the grains have been filled with
various precipitated minerals, including clay minerals that tend to swell when moisture is
present, and these fillings reduce the porosity and permeability of the formation. Most of the
natural porosity in the gas-bearing formations results from subsequent dissolution of the
precipitated material filling the pores, though most of the pores are not well connected to each
other (Pitman et al 1988). Hence, although gas is stored within the porosity of the formation, it is
difficult to recover it. Throughout the basin, gas production has had to be enhanced by hydraulic
fracturing (Johnson 1988).

According to Johnson (1988), most of the gas produced from the southern part of the Piceance
Basin has been from the Corcoran and Cozzette Members of the Mesaverde Group, or from
stratigraphic units that contain coarser grained sediments, and most has been from depths of less
than 5,000 feet. The Unit lies at approximately the southern limit of occurrence of the Cozzette
Member, and therefore the Cozzette is relatively thin in this area (Johnson 1988). It was at the
base of the Mesaverde Group, and near the top of the Mancos Shale. The top of the Mesaverde
Group is reportedly found at a depth of about 800 feet below the surface at the southern end of
the Unit, making the Mesaverde Group more than 3,000 feet thick in this area. Thin coal beds are
reportedly present in the Bowie Shale Member, a member of the Williams Fork Formation,
which is found in the lower half of the Mesaverde Group (Hettinger and Kirshbaum 2002). The
top of the Mesaverde Group dips toward the center of the Piceance Basin, more steeply along the
margins of the basin, such as in the vicinity of the Unit (Tweto 1983). Mesaverde Group rocks
are exposed along Muddy Creek according to mapping by Ellis and Freeman (1984), and are
prominently exposed in the Grand Hogback north of the Unit. This exposure at the surface
demonstrates that, if gas were not trapped in the tight porosity of the formation, it would have
leaked to the surface.

3. Affected Environment





## Geology

Source: Tweto et al. 1978

| | |
|---|---|
| Bull Mountain Unit | Miocene (12-26 Ma) |
| Quaternary Deposits (<3 Ma) | Miocene Intrusives; Basalt dikes and plugs (3-12 Ma) |
| Landslide or colluvial deposits | Eocene (38-54 Ma) |
| Alluvial Terraces | Wasatch Frm |

Figure 3-8

Similarly, the exposed, shallow portions of the Mesaverde Group provide a potential conduit for surface and groundwater to enter the Mesaverde rocks. Indeed, seepage of groundwater from above may be one of the factors that prevents gas from escaping from the porosity of the Mesaverde rocks. Drill stem tests have reportedly indicated that gas within the porosity of the formation is under higher pressure than expected due to formation pressure alone. It has been suggested that water-filled porosity under hydrostatic pressure may be a significant factor in sealing the formation and trapping the gas under pressure. Understanding the dynamic forces involved may provide insights regarding the effects of the use of hydraulic fracturing to extract gas from the formation.

The Wasatch Formation is the principal formation exposed at the surface throughout the Piceance Basin, and on most of the western half of the Unit (Tweto 1979). The Wasatch Formation (and underlying Ohio Creek Formation) was deposited on the erosional surface of the Mesaverde Group at the end of the Cretaceous and beginning of the Paleocene Period. In some parts of the basin, the Wasatch Formation contains significant gas deposits. Wasatch Formation deposits (labeled Tw on **Figure 3-8**) is exposed across most of the western side of the Unit, and is covered by various types of Quaternary deposits on the eastern side of the Unit. These include landslide deposits (Ql), alluvium (Qa), colluvium (Qc), gravel (Qg), and glacial deposits (Qr). The Wasatch Formation consists of consolidated materials eroded from the slopes of the young Rocky Mountains and includes claystone, mudstone, shale, sandstone, and conglomerate. When exposed to weathering at the ground surface, these rocks tend to break down to their component sediments. They contain a high percentage of fine grained materials that are highly erodible. The Ohio Creek Formation (Toc) has been mapped along the valley walls and bottoms of East Muddy Creek. It forms steep canyons in areas of stream erosion and is known as a source of landslide hazards. Sandstone outcrops of the Ohio Creek Formation are visible along the valley of East Muddy Creek (Godwin 1968). Erosion of the soils that develop on the exposed Wasatch and Ohio Creek Formations is a source of sediment that is transported downstream by Muddy Creek (Stover 1986). The sediment load carried by Muddy Creek is the primary cause of rapid sedimentation and loss of storage capacity in Paonia Reservoir (Appel and Butler 1991; Latousek 1995).

*Geologic Hazards*

Potential geological hazards within the Unit include (Trautner 2011):

- Avalanches—A few limited areas within the Unit have slopes steeper than 30 degrees, generally considered the minimum angle for avalanche initiation in Colorado's snow climate. Avalanches may occur during periods of intensive snowfall (greater than 1 inch of snow per hour for 12 hours or more); however, the area has not historically had significant avalanche hazards.

- Landslides—Existing landslide areas within the Unit comprise 1,163 acres, primarily on the east side of State Highway 133 in the southeast corner of the Unit. **Figure 3-9**, Landslides, illustrates the distribution of landslide deposits, based on mapping conducted by various workers and compiled by the Colorado Geological Survey (CGS 2012). The data shown on **Figure 3-9** have various degrees of accuracy and do not include some

3. Affected Environment



**Landslides**

Bull Mountain Unit

Landslide, digitized at a scale of 1:250,000

Landslide, digitized at a scale of 1:24,000

Source: Godwin 1968 (1:24,000 scale data),
USGS 1976 (1:250,00 scale data),
both accessed via Colorado Geological Survey
GIS 2013

Figure 3-9

recent data. A landslide area near Spring Creek was active in 1986, during a period of above-average precipitation and rapid snowmelt (Appel and Butler 1991). Stover (1986) prepared a detailed map of the recent landslide deposits. Evidence of recent landslide movement was found along the proposed pipeline route leading from State Highway 133 to the proposed FED 12-89-9 #1, with scarps ranging from 2 to 5 feet high (Trautner 2011).

- Rockfall—Most rockfall hazards within the Unit occur along the west side of the State Highway 133 corridor. Colorado Department of Transportation has conducted extensive mitigation in the form of rockfall fences and scaling of existing hazards. Some small areas occur near the top of slopes with slopes greater than 30 percent. One such area, which has a small outcrop of sandstone, is located north of the proposed access road and pipeline to the proposed FED 11-90-35 #1.

- Mudflows and debris fans—Mud or debris flows occur when soils become saturated, usually during an intense rain event, and begin to flow down-slope, often carrying rocks or boulders and building up sediment channels. A debris fan is created when the mud or debris flow spreads into a fan-like shape at the bottom of a gully. The landslides that occurred on the east and west sides of East Muddy Creek were a combination of rotation landslides and debris flows.

- Seismic activity—Landslides can be triggered by earthquakes under some circumstances. The site is in an area that has very low seismic activity, where only very low magnitude earthquakes are likely (USGS 2008). State of Colorado/USGS database shows one minor earthquake recorded in the area of the Unit in 1988, which does not appear to have triggered any landslide events. There are no significant active faults in the region of the site (Morgan 2008).

### Trends

Exploration and extraction of gas and other hydrocarbons from tight formations are receiving increased interest as more easily extractable resources are depleted and technological improvements combined with increased demand for fuel make extraction from tight formations more economically feasible.

The Unit is located in an area of active erosion and many unstable slopes. These conditions present a continuing concern in the area because of the economic and safety challenges they present. Global climate changes may lead to more extreme ranges in rainfall and runoff and reducing the reliability of past records as predictors of future hazards.

### APD for Federal 12-89-7-1

On November 6, 2014, the COGCC approved an APD submitted by SGI to drill Federal 12-89-7-1, which SGI had re-filed on June 19, 2014. The bedrock exposed at the surface of the proposed site belongs to the Wasatch Formation. The well would be drilled to a total depth of 4,700 feet and would target sandstone and coal bed methane gas in the Cameo Coal, Corcoran, and Cozzette Formations. The well would have the following characteristics:

- 16-inch-diameter conductor casing in a 26-inch-diameter borehole to a depth of 80 feet

- 10-inch surface casing in a 12-inch-diameter borehole to a depth of 970 feet (the depth was extended in the current permit from its original depth)

- 6-inch-diameter casing in a 8.5 inch-diameter borehole to the final depth of 4,700 feet

By comparison, the published boring log summary of the Hotchkiss Federal Well 12-89-17-11, about 2,300 feet southeast of the proposed well and at about the same surface elevation, reportedly encountered the following:

- Cameo Coal at a depth of about 3,004 feet

- Rollins Formation at a depth of 3,093 feet

- Cozzette Formation at a depth of 3,970 feet

- Corcoran Formation at 4,104 feet

- Mancos Shale at a depth of 4,126 feet

- Dakota Formation at a depth of 7,906 feet

Surface casing was run to a depth of 800 feet.

The boring log of Hotchkiss Federal Well 12-89-17-13, located about 2,000 feet south of Well 12-89-17-11, encountered the following:

- Ohio Creek Formation at a depth of 328 feet

- Mesaverde Formation at a depth of 1,283 feet

- Cameo Coal at a depth of 2,304 feet

- Rollins Formation at a depth of 3,070 feet

- Cozzette Formation from 3,490 to 3,525 feet

Surface casing was run to a depth of 632 feet.

The proposed well pad is on relatively level terrain, with steep slopes to the east of the site. Access would be from existing roads northwest of the site.

### 3.2.6   Vegetation

Information in this section is based on the Biological Evaluation (Petterson 2012) conducted for the Bull Mountain Unit EA, interpretation of high resolution aerial photography, and site visits conducted in 2009 to ground-truth the vegetation community types.

#### *Current Conditions*

The Unit is within the Southern Rockies EPA Level III ecoregion (EPA 2011d). This ecoregion is composed of steep, rugged mountains with high elevations. Although coniferous forests cover

much of the region, as in most of the mountainous regions in the western United States, vegetation, as well as soil and land use, follows a pattern of elevational banding. The lowest elevations are generally grass or shrub-covered. Low to middle elevations are also grazed and covered by a variety of vegetation types including Douglas-fir, ponderosa pine, aspen, and juniper-oak woodlands. Middle to high elevations are largely covered by coniferous forests. The highest elevations have alpine characteristics (EPA 2010).

Vegetation communities found within the Unit are listed in **Table 3-26**, Existing Vegetation Communities in Bull Mountain Unit, and shown on **Figure 3-10**, Vegetation.

**Table 3-26**
**Existing Vegetation Communities in Bull Mountain Unit**

| Vegetation Type | Federal Surface/Federal Minerals (acres) | Private Surface/Federal Minerals (acres) | Private Surface/Private Minerals (acres) |
|---|---|---|---|
| Aspen | 0 | 829 | 292 |
| Aspen/Conifer | 0 | 3 | 9 |
| Aspen/Oak | 95 | 486 | 188 |
| Disturbed Area | 4 | 78 | 93 |
| Irrigated Meadow | 3 | 297 | 1,681 |
| Mixed Conifer | 0 | 5 | 58 |
| Mixed Mountain Shrub | 50 | 1,048 | 655 |
| Oakbrush | 162 | 3,156 | 667 |
| Pinyon/Juniper | 6 | 80 | 43 |
| Riparian Woodland | 3 | 28 | 56 |
| Rocky Outcrop | 0 | 1 | 0 |
| Sagebrush | 81 | 6,337 | 1,838 |
| Wetland/Riparian Area | 28 | 213 | 431 |
| Willow | 0 | 15 | 1 |
| Open Water | 9 | 33 | 47 |
| Total | 440 | 12,609 | 6,485 |

Source: Petterson 2012; BLM GIS 2014

The following are descriptions of the major community types:

Sagebrush. Vegetation is dominated by mountain sagebrush (*Artemisia tridentata* var. *vaseyana*), with Douglas rabbitbrush (*Chrysothamnus viscidiflorus*) and snowberry (*Symphorocarpos rotundifolius*) also present. Dominant grasses include Kentucky bluegrass (*Poa pratensis*) and Thurber's fescue (*Festuca thurberi*), with western yarrow (*Achillea lamulosa*), lupine (*Lupinus argenteus*), and sandwort (*Arenaria kingii*) as the dominant forb species. There are a few invasive and noxious plant species in the area, including musk thistle (*Carduus nutans*) and Japanese brome (*Bromus japonicus*).

Oakbrush (Gambel's Oak Shrubland). This diverse community type is found at middle elevations of the project area. The amount of Gambel's oak (*Quercus gambelii*; also called oakbrush) varies, depending primarily on elevation and aspect. In some areas, the type consists almost entirely of dense, tall oakbrush with few associated shrubs and a sparse herbaceous understory due to extreme shading by the oak canopy and competition for light, moisture, and space. In areas of elevated soil moisture, another tall shrub, chokecherry (*Prunus virginiana*), is

3. Affected Environment



| | | |
|---|---|---|
| ■ Bull Mountain Unit | ■ Aspen | ■ Pinyon/juniper |
| ■ Sagebrush | ■ Aspen/oak | ■ Open water |
| ■ Oakbrush | ■ Wetland/riparian | ■ Other |
| ■ Irrigated meadow | ■ Meadow | |
| ■ Mixed mountain shrub | ■ Disturbed | |

**Vegetation**

Source: Petterson 2012, BLM GIS 2014

Figure 3-10

sometimes present and locally co-dominant. On slightly drier exposures, the oakbrush shares dominance with Saskatoon serviceberry (*Amelanchier alnifolia*). More open stands may include snowberry in the understory, occasionally accompanied by wax currant (*Ribes cereum*).

Irrigated meadow. A major community type in the Unit is irrigated hay meadows. These pasturelands occur mostly towards the northern end of the Unit. Dominant vegetation includes timothy (*Phleum pratense*), orchardgrass (*Dactylis glomerata*), red clover (*Trifolium pratense*), Kentucky bluegrass, and smooth brome (*Bromus inermus*). The noxious weed Canada thistle (*Cirsium arvense*) is common in wetter areas and in ditches. Some native wetland graminoids, including beaked sedge (*Carex utriculata*) and meadow sedge (*C. praegracilis*), are found in the irrigation ditch laterals. Almost the entire irrigated meadow community is dominated by nonnative vegetation.

Mixed Mountain Shrubland. On drier slopes at lower elevations or on sunnier aspects, the habitat is dominated by Utah serviceberry (*Amelanchier utahensis*) and some Saskatoon serviceberry and varying amounts of chokecherry, sagebrush, snowberry, and Gambel's oak. Because of the more open canopies of these shrubs, the herbaceous layer is denser and more diverse. Associated forbs vary with elevation, site moisture, and shrub density but commonly include tailcup lupine (*Lupinus caudatus*), Rocky Mountain penstemon (*Penstemon strictus*), Watson's penstemon (*Penstemon watsonii*), aspen daisy (*Erigeron speciosus*), running fleabane (*Erigeron flagellaris*), Drummond's rockcress (*Boechera drummondii*), Nuttall's larkspur (*Delphinium nuttallianum*), small-leaf pussytoes (*Antennaria parviflora*), lambs-tongue groundsel (*Senecio integerrimus*), longleaf phlox (*Phlox longifolia*), sticky false starwort (*Pseudostellaria jamesii*), and narrowleaf mountain trumpet (*Collomia linearis*). Native perennial graminoids include elk sedge (*Carex geyeri*) and a variety of grasses such as slender wheatgrass (*Elymus trachycaulus*) and junegrass (*Koeleria macrantha*).

Grasses. Common grasses include Indian ricegrass (*Achnatherum hymenoides*), slender wheatgrass, western wheatgrass (*Pascopyrum smithii*), bottlebrush squirreltail (*Elymus elymoides*), junegrass, and muttongrass (*Poa fendleriana*). Common forbs include tapertip onion (*Allium acuminatum*), running fleabane, lobeleaf groundsel (*Packera multilobata*), tailcup lupine, death camas (*Toxicoscordion venenosum*), coppermallow (*Sphaeralcea coccinea*), balsamroot (*Balsamorhiza sagittata*), and Indian paintbrush (*Castilleja* sp.).

Aspen Forest. At the higher elevations in the Unit, and on north facing slopes at mid-elevations stands of quaking aspen (*Populus tremuloides*) occur. In the lower elevation aspen stands, understory vegetation is dominated by chokecherry and Saskatoon serviceberry. The understory in this system can also include low-growing shrubs such as common juniper (*Juniperus communis*), Woods' rose (*Rosa woodsii*), and snowberry as well as a diverse grass/forb understory. Perennial grasses in the herbaceous layer include the native mountain brome (*Bromopsis marginatus*) as well as the nonnative smooth brome. Many dead and dying aspen trees were observed, likely from sudden aspen decline or possibly old age.

Pinyon/Juniper Woodland. Stands of pinyon pine (*Pinus edulis*) and Utah juniper (*Juniperus osteosperma*)—generally consisting almost entirely of the latter—occur at lower elevations of the project area, often interspersed within sagebrush shrublands or drier types of mixed mountain shrubland. This habitat type is best developed at the southern end of the Unit on south and west

facing slopes. Associated shrubs include bitterbrush (*Purshia tridentata*), Utah serviceberry, broom snakeweed (*Gutierrezia sarothrae*), and skunkbrush (three-leaf sumac) (*Rhus trilobata*). In general, the sparse herbaceous layer consists of graminoids such as cheatgrass (*Bromus tectorum*), western wheatgrass, Indian ricegrass, bottlebrush squirreltail, muttongrass, and Sandberg bluegrass (*Poa secunda*). Forbs are a minor component.

*Wetlands and Riparian Zones*
Wetlands, some of which are hydrologically connected to Waters of the United States, are found throughout the Unit (**Figure 3-11**, Riparian and Wetland Vegetation). Major drainages include Lee Creek and East and West Muddy Creeks. Wetlands in the Unit are dominated by beaked sedge, woolly sedge (*Carex lanuginosa*), meadow sedge, swordleaf rush (*Juncus ensifolius*), Baltic rush (*Juncus balticus*) and other graminoids. Rocky Mountain willow (*Salix monticola*), Bebb's willow (*S. bebbiana*), and Drummonds willow (*S. drummondiana*) occur in these wetlands. Most wetlands retain moisture well into the summer, and the widespread irrigation at the northern end of the Unit has expanded the surface area of wetlands. Subsequently, many irrigation ditches and laterals move waters across the private ranches, utilizing waters from Lee, Henderson, Spring, Drift, Little Henderson, Grouse, Buck, East and West Muddy, and Ault creeks.

No fens (peat-forming wetlands fed by groundwater; EPA 2014c) have been identified within the Unit.

Within the broad category of riparian vegetation are many distinct, interwoven plant communities. Among the most widespread are communities dominated by narrowleaf cottonwood (*Populus angustifolia*) and distinguished by various associated shrubs and trees including thinleaf alder (*Alnus tenuifolia*), blue spruce (*Picea pungens*), Douglas-fir (*Pseudotsuga menziesii*), river hawthorn (*Crataegus rivularis*), box elder maple (*Acer negundo*), sandbar willow (*Salix exigua*), skunkbrush, and red osier dogwood (*Cornus sericea*). Some willow dominated communities may also be present, with sandbar willow occurring alone or in combination with strapleaf willow (*Salix ligulifolia*) or Pacific willow (*Salix lucida*). Tamarisk (*Tamarix chinensis*; BLM 2007a) occurs in ephemeral and lower elevation drainages.

*Trends*
Sagebrush. Most of the sagebrush communities within the Unit generally support very good understory grass and forb diversity, despite evidence of high grazing pressure and mechanical damage to plants. Thousands of acres of sagebrush on the Hotchkiss Ranch were mowed in the mid-2000s to reduce sagebrush cover and increase grass production for livestock grazing. In these areas, sagebrush is beginning to recover.

Meadow. There is persistent and heavy grazing on the majority of the meadow communities, likely favoring the persistence and cover of species more tolerant to grazing, such as Kentucky bluegrass and tarweed.

Wetlands and Riparian Zones. Widespread summertime cattle and sheep grazing has impacted the wetlands in the Unit; hoof action on soft soils is evident and extensive grazing of wetland vegetation was observed during 2008 to 2011 site visits. Hedging of willows was also evident.

3. Affected Environment



**Riparian and Wetland Vegetation**

Source: Peterson 2012, BLM GIS 2014, NHD 2013

| | |
|---|---|
| Bull Mountain Unit | Perennial stream |
| Open water | Intermittent stream |
| Wetland/riparian | Ephermal stream |
| Riparian woodland | Ditch/other |

Figure 3-11

<u>Aspen Forest</u>. Aspen trees have been impacted by sudden aspen decline. Aging stands and many dead aspen trees are observable at mid- and high elevations in the Unit.

<u>Conifers</u>. Spruce and pine trees in coniferous forests have suffered from bark beetle infestations.

Trends for the other vegetation communities within the Unit are unknown.

A land health assessment was conducted on federal surface lands within the Unit in 2006-2007 as part of the North Fork Land Health Assessment. Most lands were found to be meeting Land Health Standard 3 (healthy vegetation communities; **Table 3-27**, Land Health Assessment Results in the Bull Mountain Unit). Areas were classified as "unknown" if they were considered too small or minor to evaluate (BLM 2007a).

**Table 3-27**
**Land Health Assessment Results in the Bull Mountain Unit**

| Land Health Assessment Rating | | Federal Surface (acres and percentage) |
|---|---|---|
| Meeting Land Health Standards 3 | | 315 (72%) |
| Not Meeting Land Health Standards 3 | | 0 |
| Unknown or Data Not Available | | 125 (28%) |
| | Total | 440 |

Source: BLM 2007

### *APD for Federal 12-89-7-1*

The well pad location for Federal 12-89-7-1 is composed of 1.79 acres of mixed mountain shrub and 0.21 acre of aspen vegetation. The area along the proposed pipeline associated with Federal 12-89-7-1 is composed of 5.272 acres of sagebrush, 0.182 acre of oakbrush, 0.058 acre of mixed mountain shrub, and 0.001 acre of wetland vegetation.

### 3.2.7   Invasive, Nonnative Species

### *Regulatory Background*

#### *Federal Noxious Weed Act of 1974*

This law provides for the control and management of nonindigenous weeds that injure or have the potential to injure the interests of agriculture and commerce, wildlife resources, or the public health. The Federal Noxious Weed Act prohibits importing or moving any noxious weeds identified by the regulation and allows for inspection and quarantine to prevent the spread of noxious weeds.

#### *Executive Order 13112, Invasive Species*

Signed in 1999, this Executive Order directs federal agencies to prevent the introduction of invasive species and provide for their control and to minimize the economic, ecological, and human health impacts that invasive species cause. To do this, the Executive Order established the National Invasive Species Council; there are currently 13 departments and agencies on the Council.

*Colorado Noxious Weed Act*

Passed in 1996, the Colorado Noxious Weed Act ensures protection for all Colorado lands from noxious weeds and creates a duty to control these plants on the part of all landowners, both public and private. It characterizes noxious weeds into three lists: A, B, and C. List A species require mandatory eradication by local governing agencies; List B species are mandated for eradication in some parts of the state, and recommended for suppression or containment in other areas depending on distribution and densities around the state; and List C species are widespread and established.

*Current Conditions*

Noxious and invasive weeds compete with native vegetation for water, space, and nutrients. Invasive plants include those species that are not native to the United States, and the BLM considers plants invasive if they have been introduced into an environment where they did not evolve. As a result, they usually have no natural enemies to limit their reproduction and spread (Westbrooks 1998).

Noxious weeds are a subset of invasive plants that are state or federally listed as harmful to public health, agriculture, recreation, wildlife and any private or public property. These weeds are regulated by the Animal and Plant Health Inspection Service and/or the Colorado Department of Agriculture. The Colorado state noxious weeds that occur within Gunnison County are presented in **Table 3-28**, Colorado Noxious Weeds in Gunnison County and Noxious Weeds Observed in Bull Mountain Unit.

**Table 3-28**
**Colorado Noxious Weeds in Gunnison County and Noxious Weeds Observed in Bull Mountain Unit**

| Common Name | Scientific Name | Colorado Weed List | Observed in Bull Mountain Unit |
|---|---|---|---|
| Absinth wormwood | *Artemisia absinthium* | B | |
| Black henbane | *Hyoscyamus niger* | B | |
| Canada thistle | *Cirsium arvense* | B | X |
| Cheatgrass | *Bromus tectorum* | C | X |
| Dalmatian toadflax | *Linaria dalmatica* | B | |
| Dame's rocket | *Hesperis matronalis* | B | |
| Diffuse knapweed | *Centaurea diffusa* | B | X |
| Field bindweed | *Convolvulus arvensis* | C | |
| Hoary cress | *Cardaria draba* | A | |
| Houndstongue | *Cynoglossum officinale* | B | X |
| Leafy spurge | *Euphorbia esula* | B | |
| Musk thistle | *Carduus nutans* | B | X |
| Orange hawkweed | *Hieracium aurantiacum* | A | |
| Oxeye daisy | *Chrysanthemum luecanthemum* | B | X |
| Plumeless thistle | *Carduus acanthoides* | B | |
| Purple loosestrife | *Lythrum salicaria* | A | |
| Russian knapweed | *Acroptilon repens* | B | |
| Saltcedar | *Tamarix* spp. | B | |
| Scentless chamomile | *Matricaria perforate* | B | X |
| Scotch thistle | *Onopordum acanthium* or *O. tauricum* | B | |
| Spotted knapweed | *Centaurea maculosa* | B | X |
| Yellow toadflax | *Linaria vulgaris* | B | X |
| Whitetop | *Cardaria draba* | B | X |

Source: Colorado State University Extension 2013; Petterson 2012

Musk thistle is widely scattered across the Unit and becomes quite noticeable on private property at the southwestern side of the Unit. Scattered Japanese brome (invasive, but not noxious) and houndstongue (*Cynoglossum officinale*) are also common. Canada thistle occurs in more mesic (moist) sites. Other noxious weeds in the vicinity of the project area and potentially becoming problematic in areas of surface disturbance include the nonnative annual cheatgrass and limited patches of the nonnative biennial forbs spotted knapweed (*Centaurea stoebe* ssp. *micranthos*) and diffuse knapweed (*Centaurea diffusa*), which currently infests the Colorado Department of Transportation yard at the junction of County Road 265 and State Highway 133. Other noxious weeds minimally occurring in the general area include oxeye daisy (*Chrysanthemum leucanthemum*), scentless chamomile (*Matriciaria perforata*), whitetop (*Cardaria draba*), and yellow toadflax (*Linaria vulgaris*). Vegetative cover by noxious weeds in the general area is estimated at less than 1 percent of the total plant cover. For the past 8 years, SGI has annually treated noxious weeds on their pads, access roads, and pipeline corridors. Noxious weeds in these areas are relatively infrequent.

***Trends***

The Unit is covered by a mixed mountain shrubland community type that has seen various agricultural uses and surface disturbances over the last 100 years. Recently, natural gas exploration and development activities have also been creating surface disturbances, which remove native vegetation and increase the potential for noxious or invasive weed introduction and spread. For most of the landscape, noxious weeds are not yet a dominant part of the plant community. However, although few infestations are present in undisturbed lands, infestations tend to be distributed frequently enough across the landscape to pose a threat to undisturbed lands, especially with some of the more invasive species (BLM 2007a).

### 3.2.8   Fish and Wildlife

***Current Conditions***

*Aquatic Wildlife*

The Unit contains a number of fish-bearing streams, including Henderson, Roberts, Drift, Lee, East and West Muddy, and Ault Creeks (**Figure 3-12**, Fish and Aquatic Wildlife Habitat). However, East Muddy Creek can only support fish during the late summer and fall, the rest of the year it is too silty and is likely ineffective for any significant fish use (Petterson 2012). A multitude of smaller tributaries contribute perennial and ephemeral flows to these creeks.

In terms of aquatic life, all of these streams are limited primarily by flows, which are flashy and seasonally very low, and by heavy sediment loads in East Muddy Creek. Other limiting factors include the type of substrate and the presence, density, and width of riparian plant communities. For more information regarding riparian conditions within the Unit refer to **Section 3.2.6**, Vegetation. These streams are sourced both directly and indirectly from snowpack at higher elevations on the flanks of Huntsman Ridge, the Ragged Mountains, and Spruce Mountain to the north of the Unit, but some of these creeks are sourced by lower-elevation hills, and these creeks (mainly on the western side of the Unit) tend to be ephemeral. Much of the recharge from snowpack enters the streams as groundwater inflow from colluvium and shallow bedrock. Refer to **Section 3.2.4**, Water Resources, for flow and water quality descriptions within the Unit.

3. Affected Environment



**Fish and Aquatic Wildlife Habitat**

Source: BLM GIS 2014

Bull Mountain Unit

Cutthroat conservation complete barrier

Cutthroat conservation partial barrier

Occupied cutthroat stream

Perennial stream

Intermittent stream

Watershed

Federal surface, federal minerals

Private surface, federal minerals

Private surface, private minerals

Figure 3-12

Substrates vary longitudinally along the streams and include reaches dominated by cobbles and finer sediments.

Fish surveys by CPW have documented the presence of greenback cutthroat trout (*Onchorhynchus clarkia stomias*) lineage fish, a federally listed threatened subspecies, in upper reaches of Roberts and Henderson Creeks located north of the Unit (**Figure 3-12**). Other creeks in the Unit may have suitable greenback cutthroat trout habitat, including Lee Creek, Drift Creek, and Ault Creek; however, no greenback cutthroat trout have been identified within the Unit. Further discussion of greenback cutthroat trout is provided in **Section 3.2.10**, Special Status Species (Threatened, Endangered, and Sensitive Species).

Nonnative brook trout is a sport fish that occupies lower reaches of Lee Creek. This eastern North American trout has been widely introduced in mountainous areas of Colorado because of its ability to tolerate slightly warmer waters than the cutthroat trout and its ability to reproduce successfully in streams with very low flows. Brook trout may also occur in other creeks within the Unit. Brook trout can competitively displace cutthroat trout.

Aquatic macroinvertebrates inhabit perennial streams such as Lee Creek during a portion of their lifecycles. These species include larvae of stoneflies, mayflies, and some caddisflies in fast-flowing reaches with rocky or detrital substrates. The aquatic larvae and winged adults of stoneflies, mayflies, and caddisflies are probably the main prey for trout in Lee, Roberts, and Henderson Creeks, and other creeks with low-sediment loading. Other terrestrial invertebrates that land or fall onto the surface or are carried into the stream in runoff from adjacent uplands can also be prey for trout. In slow-flowing portions of area wetlands with fine substrates, and in East and West Muddy Creeks, aquatic macroinvertebrates probably include the larvae of midges, mosquitoes, and some caddisflies. These species are able to tolerate relatively warm, turbid, and poorly oxygenated waters, and their more abbreviated larval stages allow them to reproduce in intermittent streams and in seasonally inundated overbank areas.

*Terrestrial Wildlife*
<u>General Wildlife</u>. General wildlife species of interest that have habitat on or adjacent to the project area include mammals, birds, and herptiles. A detailed description of wildlife species observed within the Unit is provided in the Biological Evaluation for the Bull Mountain Unit (Petterson 2012). Big game species that inhabit the Unit include mule deer, elk, black bear, and moose. Refer to **Section 3.2.9**, Migratory Birds, and **Section 3.2.10**, Special Status Species (Threatened, Endangered, and Sensitive Species), for additional information on other specific species. For a complete description of the various habitat types within the Unit refer to **Section 3.2.6**, Vegetation, which provides acres of habitat that could be impacted under the alternatives.

CPW was consulted regarding the development of the Unit through the scoping process. CPW raised concerns over direct and indirect impacts on deer and elk habitats and habitat connectivity. Per their request, CPW was provided a copy of the Biological Evaluation.

Big game species were chosen for impacts analysis because of the high biological importance and public interest of these species, for economic value, and for regulatory concern. Individual wildlife species and groups not specifically mentioned in this assessment are not insignificant;

rather, they are not presently at issue because the limited extent of the proposed project would avoid or minimally impact these species and their habitats.

Mule Deer (*Odocoileus hemionus*). Throughout the State of Colorado, mule deer are abundant and browse on shrubs and trees. Mule deer breed in mid- to late fall (October to December; CPW 2012a). The Unit is located at the northern end of a larger area of mule deer Winter Range, Severe Winter Range and a Winter Concentration Area as mapped by CPW Natural Diversity Information Source data (**Figure 3-13**, Mule Deer Habitat). The northern and western portions of the Unit, as well as larger areas to the west, north, and east outside of the Unit, do not provide mule deer limiting habitats. The CPW manage mule deer in the Bull Mountain area under game management units 52 and 521, south Grand Mesa. Deer use of the Unit occurs throughout the summer, and the entire Unit is shown as Mule Deer Summer Range by CPW Natural Diversity Information Source mapping. Fawning occurs in the general area, given the suitable aspen and mixed mountain shrubland habitats (which provide good cover), and abundant water sources from frequent stock tanks and creeks (which is important for nursing does). During the winter, deer mainly use pinyon-juniper habitats towards the southern end of the Unit in lower elevations and on south facing slopes, but some winter use may still occur in the northern areas of the Unit during mild winters. The southern and western facing slopes are very important for deer during the winter months due to shallower snow depths and more frequent melting, and northern and eastern slopes are less utilized due to deep and persistent snows. Deer will mobilize throughout the winter to find more desirable foraging areas, and habitat connectivity is important throughout the winter. CPW maps approximately 4,616 acres of mule deer Winter Range, 196 acres of mule deer Severe Winter Range, and 207 acres of mule deer Winter Concentration Areas within the Unit.

During the fall and during hunting seasons, deer congregate in the Unit and likely use some of the area as a "hunting refuge" as the Unit is mostly private land. Management of deer herd sizes by CPW is difficult when deer utilize sizable hunting refuges. However, during the fall hunters are known to be legally guided and permitted to hunt on the Falcon Seaboard, Jacobs, Aspen Leaf, Rock Creek, Buck Creek, Hughes, Hotchkiss, and other ranches within the Unit. Continued hunting of the area will be important to keep deer herds from congregating and will help with managing deer herd sizes. At this time, mule deer continue to pass through the greater area but are likely modifying their movement patterns to avoid human activity and traffic around the more active wells and roads.

Elk (*Cervus elaphus*). Elk mostly graze on grasses in summer and they will also consume twigs from trees and shrubs during the winter (CPW 2012b).The Unit is located at the northern end of a larger area of elk Winter Range, Severe Winter Range, and Winter Concentration Area as mapped by CPW (**Figure 3-14**). The Unit itself contains elk Winter Range, Severe Winter Range, Winter Concentration Area, and Summer Range by CPW (**Figure 3-14**, Elk Habitat), and is located in Data Analysis Unit E-14. The data analysis unit covers 2,477 square miles. Most of the Unit is on private lands, BLM- administered lands, and the Grand Mesa Uncompahgre and Gunnison National Forest and White River National Forests.

3. Affected Environment



**Mule Deer Habitat**

Source: NDIS 2010

Legend:
- Bull Mountain Unit
- Mule deer winter concentration
- Mule deer severe winter range
- Mule deer critical winter range
- Mule deer winter range

Figure 3-13

3. Affected Environment



Bull Mountain Unit

Elk highway crossings: where elk movements traditionally cross roads, presenting potential conflicts between elk and motorists.

Elk severe winter range: where 90% of the individuals are located when the annual snowpack is at its maximum and/or temperatures are at a minimum in the two worst winters out of ten.

Elk winter concentration: verified by Petterson 2012

Elk winter concentration: where densities are 200% greater than the surrounding winter range density during the average five winters out of ten from the first heavy snowfall to spring green-up.

**Elk Habitat**

Source: NDIS 2010, Petterson 2012

Figure 3-14

Elk can be found in the Unit year-round, but most significant elk use of the Unit occurs generally during the spring, fall, and winter, with some low-density summertime use. Suitable habitat for elk in spring, summer, and fall occurs in the aspen stands at the upper elevations outside of the Unit, and along both the extreme eastern and western sides of the Unit. Hunting pressure in the area is likely light to moderate. Most, if not all, of the larger ranches within the Unit provide

access for hunting, as this helps keep elk from congregating on private property, but also provides an important supplemental source of income for these ranches and helps with herd size management.

Most observed elk use of the Unit area begins in late October and becomes more localized as winter range occupancy in small but important yards where elk tend to linger through the deepest snow months. As the snows melt in late winter and early spring elk are more widespread. During the most severe of winters (such as in 2008-2009), elk may be forced toward the more southern end of the Unit and along the Muddy Creek corridor, commonly lingering and utilizing hay spread for wintering cattle.

Elk activities through the winter vary depending on snowfall depths and subsequent melting events. Elk scat on lower-elevation, steep, south-facing slopes in the Unit are observed to be very common, and browsing levels of brush are indicative of heavy winter utilization. However, the north-facing slopes and more level terrain do not see intense wintertime utilization. Some of the elk yards on south- and west-facing slopes are very small but are likely critical habitats for wintering elk.

CPW maps the entire Unit as Winter Range; lower elevations of the Unit are also considered Severe Winter Range totaling approximately 5,000 acres, and Winter Concentration Areas totaling nearly 12,000 acres within the Unit. There are approximately 77 acres of elk highway crossings in the Unit. There are no mapped elk calving grounds, but some elk do calve in the Unit, especially during cool, wet springs. Most cows and calves move to higher elevations outside of the Unit as summer progresses.

Black Bear (*Ursus americanus*). Colorado Black bears tend to live near open areas of chokecherry and serviceberry brush in stands of Gamble's oak and aspen. Black bears within the Unit are managed by CPW as Grand Mesa Data Analysis Unit B-17 in west-central Colorado. Bear densities are considered high within the Grand Mesa Data Analysis Unit. Their natural diet consists of berries, nuts, and insects (CPW 2012c). Bears commonly supplement their diets by raiding garbage cans, breaking into homes, and becoming a hazard and a nuisance. Habitat in the Unit is suitable for bear use.

Moose (*Alces alces*). Moose were introduced by CPW onto the Grand Mesa from Utah between 2005 and 2007 and are managed by CPW Data Analysis Unit M-5. Since that time, moose have expanded their range towards areas around the Unit. Moose in general utilize coniferous habitats and wetland complexes, but can also heavily utilize oakbrush and mixed mountain shrubland habitats in the area. During the winter moose browse mainly on willows; in summer they graze on grasses and forbs. Additionally, moose wade into lakes and streams to feed on aquatic vegetation (CPW 2013a). CPW has mapped the Unit as Overall Range, which covers most of the Grand Mesa and Muddy Creek basin.

*Trends*

In the 2006-2007 North Fork Land Health Assessment, which included federal lands within the Unit, found that most of the Land Health Standards were being met for standard 1 (soils), standard 3 (plant and animal communities), and standard 4 (threatened and endangered species).

Nearly 90 percent of the stream miles included in the 2006-2007 North Fork Land Health Assessment were meeting standards 2 (riparian systems) and 5 (water quality).

Current population data are lacking for fish, amphibians, and other aquatic species; therefore current trends are largely unknown. Other non-game populations, including furbearers, small mammals, and reptiles, are expected to be stable. Those wildlife species or populations thought to be at risk or declining are monitored and tracked as special status species (**Section 3.2.10**, Special Status Species [Threatened, Endangered, Sensitive Species]).

Mule Deer. The mule deer herds which occur within the Unit are managed by CPW under Data Analysis Unit D-51, South Grand Mesa and consist of game management units 411, 52, and 521. The D-51 herd management plan from 2007 is outdated but reports that the mule deer populations exceeded population objectives from the early 1980s with a peak in 1982 of nearly 20,000 deer. Since the population peak, mule deer in D-51 have declined to at or below the population objective of 12,500 deer , possibly due to such factors as limited winter range habitat availability and human development on transition and winter ranges (CPW 2007). The post-hunt 2012 population estimate was approximately 9,200 animals, with a 3-year average sex ratio of 27:100; the D-51 population is essentially stable (B. Diamond, CPW pers. comm. June 21, 2013).

Elk. Computer modeling data as well as other information, including harvest and aerial surveys, show that the Data Analysis Unit E-14 elk herd has increased significantly since the 1950s (CPW 2009; Giezentanner 2008). The overall population of this herd increased from approximately 2,500 animals in the early 1950s to an estimated high of over 21,000 in 1990 and 1991. The 10-year average from 1998 to 2007 is approximately 16,000. In 2008, the post-hunt population was estimated at approximately 18,600 individuals, within the population objective range of 15,000 to 19,000 (CPW 2010).

Black Bear. Current black bear numbers in Data Analysis Unit B-17 are considered stable. In 2011, population models estimated the presumptive post-hunt population at 1,600 individual black bears in Data Analysis Unit B-17 (CPW 2013b). Total mortality objectives for population suppression have been set at 15 to 20 percent (240 to 320 bears) annually; this plan was approved by the CPW Commission in January 2013.

Moose. In 2008, CPW estimated that approximately 125 moose inhabit Data Analysis Unit M-5 consisting of approximately 60 bulls: 100 cows. The current herd management objectives include increasing the population size to 200-300 moose (CPW 2009).

*APD for Federal 12-89-7-1*

Existing habitats for wildlife in the APD area are described in **Section 3.2.6**, Vegetation. The APD area is within mule deer winter range and is at the edge of a winter concentration area. Some fawning likely occurs in the general area, given the habitat with suitable cover and

abundant water sources from stock ponds and ephemeral creeks (Rocky Mountain Ecological Services, Inc. 2012).

The APD area is also within elk winter range and severe winter range. Elk begin to use the area in early November, both north- and south-facing slopes. As winter progresses and snows become deeper, elk congregate on south-facing slopes.

As the pad site and pipeline corridor are next to existing roads and increased human activity, the suitability and use of these areas by terrestrial wildlife is likely low.

There are no perennial aquatic habitats in the APD area to provide habitat for aquatic species.

### 3.2.9   Migratory Birds

*Current Conditions*
The Migratory Bird Treaty Act, established in 1918, made it unlawful to pursue, hunt, kill, capture, possess, sell, purchase, or barter any migratory bird, including the feathers or other parts, nests, eggs, or migratory bird products. In addition, Executive Order 13186 set forth the responsibilities of federal agencies to implement further the provisions of the Act by integrating bird conservation principles and practices into agency activities and by ensuring that federal actions evaluate the effects of actions and agency plans on migratory birds.

As used in the Act, "migratory birds" include native resident species that remain in an area throughout the year as well as migrant species that move from northern to southern latitudes and from higher to lower elevations to avoid winter conditions and a seasonal shortage of suitable food.

For most migrant and native resident species, nesting habitat is of special importance because it is critical for supporting reproduction in terms of both nesting sites and food. Also, because birds are generally territorial during the nesting season, their ability to access and utilize sufficient food is limited by the quality of the territory occupied. During non-breeding seasons, birds are generally non-territorial and able to feed across a larger area and wider range of habitats.

Among the wide variety of species protected by the Act, special concern is usually given to the following groups:

- Species that migrate across long distances

- Birds of prey, which require large areas of suitable habitat for finding sufficient prey

- Species that have narrow habitat tolerances and hence are vulnerable to extirpation from an area as a result of a relatively minor habitat loss

- Species that nest colonially and hence are vulnerable to extirpation from an area as a result of minor habitat loss

BLM Instruction Memorandum No. 2008-050 provides guidance toward meeting the agency's responsibilities under the Migratory Bird Treaty Act. This guidance directs field offices to

promote the maintenance and improvement of habitat quantity and quality for migratory birds of conservation concern to avoid, reduce, or mitigate adverse impacts on their habitats to the extent feasible and in a manner consistent with regional or statewide bird conservation priorities. Because of the many species of migratory birds potentially present within field office boundaries, the BLM has focused its protection on species listed by the USFWS as Birds of Conservation Concern. This listing resulted from the 1988 amendment to the Fish and Wildlife Conservation Act, which mandates USFWS to "identify species, subspecies, and populations of all migratory nongame birds that, without additional conservation actions, are likely to become candidates for listing under the Endangered Species Act of 1973." **Table 3-29**, Birds of Conservation Concern of the Uncompahgre Field Office, lists those species that occur or have a potential to occur within the field office.

*Neotropical Species*

The Unit is dominated by sagebrush communities, with nearby Gambel's oak and mixed shrubs. A variety of migratory birds fulfill nesting requirements within these vegetation communities from late May to mid-July and/or during spring and fall migrations.

Approximately 42 percent of the Unit is dominated by sagebrush shrublands, and provides potential habitat for Brewer's sparrow, See **Section 3.2.10**, Special Status Species (Threatened, Endangered, Sensitive Species) for a discussion on impacts on this species. Other species associated with sagebrush shrublands that occur, but are not Birds of Conservation Concern species, include the western meadowlark (*Sturnella neglecta*), vesper sparrow (*Pooecetes gramineus*), and lark sparrow (*Chondestes grammacus*).

None of the Birds of Conservation Concern species in the UFO area are commonly associated with mixed mountain shrub and oakbrush habitats in the Unit. Migratory birds commonly associated with these habitat types but not included on the Birds of Conservation Concern list include migrants such as the Cordilleran flycatcher (*Empidonax occidentalis*), western scrub-jay (*Aphelocoma californica*), blue-gray gnatcatcher (*Polioptila caerulea*), Virginia's warbler (*Vermivora virginiae*), MacGillivray's warbler (*Oporornis tolmiei*), lesser goldfinch (*Carduelis psaltria*), black-headed grosbeak (*Pheucticus melanocephalus*), spotted towhee (*Pipilo maculatus*), and green-tailed towhee (*P. chlorurus*).

Areas of quaking aspen or other deciduous trees (including along drainages), occupy approximately 6 percent of the project area, and provide potential habitat for the house wren (*Troglodytes aedon*) and warbling vireo (*Vireo gilvus*). Also, migrants may use these habitats periodically such as the cordilleran flycatcher, western wood-pewee (*Contopus sordidulus*), tree swallow (*Tachycineta bicolor*), and violet-green swallow (*Tachycineta thalassina*). A Birds of Conservation Concern species of riparian habitats, the willow flycatcher, is an obligate in lower-elevation riparian shrublands dominated by tall willows or structurally similar species.

The small area of mixed conifer forests on north-facing slopes in some of the deeper drainages supports limited numbers of coniferous forest species, including Cassin's finch. The area is generally below the elevational range of Cassin's finch for nesting, but use during winter is possible when individuals or flocks move to lower areas in search of food. Other species potentially nesting in the scattered coniferous forest stands include migrants such as Hammond's

**Table 3-29**
**Birds of Conservation Concern of the Uncompahgre Field Office**

| Common Name | Scientific Name | Habitat Description | Range/Status | Potential and/or Occurrence in Project Area |
|---|---|---|---|---|
| American bittern | *Botaurus lentiginosus* | Marshes and wetlands; ground nester | Spring/summer resident, breeding confirmed in the region but not within the UFO | Suitable habitat is limited, not likely occurring |
| Bald eagle[1] | *Haliaeetus leucocephalus* | Nests in forested rivers and lakes; winters in upland areas, often with rivers or lakes nearby | Fall/winter resident, no confirmed breeding | See assessment under Sensitive Species |
| Bendire's thrasher | *Toxostoma bendirei* | Desert, especially areas of tall vegetation, cholla cactus, creosote bush and yucca, and in juniper woodland | UFO is outside known range | No |
| Black rosy-finch | *Leucosticte atrata* | Open country including mountain meadows, high deserts, valleys, and plains; breeds and nests in alpine areas near rock piles and cliffs | Winter resident, non-breeding | No |
| Brewer's sparrow | *Spizella breweri* | Sagebrush-grass stands; less often in pinyon-juniper woodlands | Summer resident, breeding | Summer resident, breeding, see Sensitive Species assessment |
| Brown-capped rosy-finch | *Leucosticte australis* | Alpine meadows, cliffs, and talus and high-elevation parks and valleys | Summer residents, breeding | No |
| Burrowing owl | *Athene cunicularia* | Open grasslands and low shrublands often in association with prairie dog colonies; nests in abandoned burrows created by mammals; short vegetation | Summer/fall resident, breeding | No, see assessment under Sensitive Species Section |
| Cassin's finch | *Haemorhous cassinii* | Open montane coniferous forests; breeds and nests in coniferous forests | Year-round resident, breeding | Yes |
| Chestnut-collared longspur | *Calcarius ornatus* | Open grasslands and cultivated fields | Spring migrant, non-breeding | No |
| Ferruginous hawk | *Buteo regalis* | Open, rolling, and rugged terrain in grasslands and shrubsteppe communities; also grasslands and cultivated fields; nests on cliffs and rocky outcrops | Fall/winter resident, non-breeding | Possible migrant through area. See assessment under Sensitive Species Section |

**Table 3-29**
**Birds of Conservation Concern of the Uncompahgre Field Office**

| Common Name | Scientific Name | Habitat Description | Range/Status | Potential and/or Occurrence in Project Area |
|---|---|---|---|---|
| Flammulated owl | *Otus flammeolus* | Montane forest, usually open and mature conifer forests; prefers ponderosa pine and Jeffrey pine | Summer resident, breeding | Yes |
| Golden eagle | *Aquila chrysaetos* | Open country, grasslands, woodlands, and barren areas in hilly or mountainous terrain; nests on rocky outcrops or large trees | Year-round resident, breeding | Common in Unit, unknown nest site |
| Grace's warbler | *Dendroica graciae* | Mature coniferous forests | Summer resident, breeding | No |
| Grasshopper sparrow | *Ammodramus savannarum* | Open grasslands and cultivated fields | UFO is outside known range | No |
| Gray vireo | *Vireo vicinior* | Pinyon-juniper and open juniper-grassland | Summer resident, breeding | Possibly at southern end of Unit |
| Gunnison sage grouse | *Centrocercus minimus* | Sagebrush communities (especially big sagebrush) for hiding and thermal cover, food, and nesting; open areas with sagebrush stands for leks; sagebrush-grass-forb mix for nesting; wet meadows for rearing chicks | Year-round resident, breeding. | No, see assessment under Sensitive Species Section |
| Juniper titmouse | *Baeolophus griseus* | Pinyon-juniper woodlands, especially juniper; nests in tree cavities | Year-round resident, breeding | Possibly at southern end of Unit |
| Lewis's woodpecker | *Melanerpes lewis* | Open forest and woodland, often logged or burned, including oak, coniferous forest (often ponderosa), riparian woodland, and orchards, less often in pinyon-juniper | Year-round resident, breeding | No |
| Long-billed curlew | *Numenius americanus* | Lakes and wetlands and adjacent grassland and shrub communities | Spring/fall migrant, non-breeding | Unlikely migrant through area. See assessment under Sensitive Species Section |

**Table 3-29**
**Birds of Conservation Concern of the Uncompahgre Field Office**

| Common Name | Scientific Name | Habitat Description | Range/Status | Potential and/or Occurrence in Project Area |
|---|---|---|---|---|
| Mountain plover | *Charadrius montanus* | High plain, cultivated fields, desert scrublands, and sagebrush habitats, often in association with heavy grazing, sometimes in association with prairie dog colonies; short vegetation | Spring/fall migrant, non-breeding | No |
| Peregrine falcon[1] | *Falco peregrinus* | Open country near cliff habitat, often near water such as rivers, lakes, and marshes; nests on ledges or holes on cliff faces and crags | Spring/summer resident, breeding | Possibly foraging during summer. See assessment under Sensitive Species Section |
| Pinyon jay | *Gymnorhinus cyanocephalus* | Pinyon-juniper woodland | Year-round resident, breeding | Possibly at southern end of Unit |
| Prairie falcon | *Falco mexicanus* | Open country in mountains, steppe, or prairie; winters in cultivated fields; nests in holes or on ledges on rocky cliffs or embankments | Year-round resident, breeding | Observed as migrant through area |
| Snowy plover [2] | *Charadrius alexandrines* | Sparsely vegetated sand flats associated with pickleweed, greasewood, and saltgrass | Spring migrant, non-breeding | No |
| Veery | *Catharus fuscescens* | Deciduous forests, riparian, shrubs | Possible summer resident, observed recently in Gunnison County, possible breeding | No |
| Willow flycatcher [2] | *Empidonax traillii* | Riparian and moist, shrubby areas; winters in shrubby openings with short vegetation | Summer resident, breeding | No |
| Yellow-billed cuckoo[3] | *Coccyzus americanus* | Riparian, deciduous woodlands with dense undergrowth; nests in tall cottonwood and mature willow riparian, moist thickets, orchards, abandoned pastures | Summer resident, breeding | No, see assessment under Sensitive Species Section |

Source: USFWS 2008; Cornell Lab of Ornithology 2009; San Juan Institute of Natural and Cultural Resources 2009; Petterson 2012
[1] Endangered Species Act delisted species.
[2] Non-listed subspecies/population
[3] Endangered Species Act candidate species

flycatcher (*Empidonax hammondii*), western tanager (*Piranga ludoviciana*), plumbeous vireo (*Vireo plumbeus*), yellow-rumped warbler (*Dendroica coronata*), chipping sparrow (*Spizella passerina*), darkeyed junco (*Junco hyemalis*), and pine siskin (*Carduelis pinus*).

Stands or scattered individuals of pinyon pine and Utah juniper provide some habitat for three pinyon-juniper obligates on the Birds of Conservation Concern list: the pinyon jay, juniper titmouse, and gray vireo. The gray vireo is unlikely to occur because the location of the project area is outside the known nesting range, which is located farther to the west. Other migrants occurring in the limited pinyon-juniper include migrants such as the gray flycatcher (*Empidonax wrightii*), Say's phoebe (*Sayornis saya*), mountain bluebird (*Sialia sialis*), blue-gray gnatcatcher, and black-throated gray warbler (*Dendroica nigrescens*).

During winter, three additional species—Clark's nutcracker (*Nucifraga Columbiana*), Townsend's solitaire (*Myadestes townsendi*), and the cedar waxwing (*Bombycilla cedrorum*)—may congregate in pinyon-juniper habitats in search of pine nuts (the nutcracker) or juniper berries (the solitaire and waxwing).

The purple martin (*Progne subis*), although not a Bird of Conservation Concern, is a migratory bird that winters in South America and arrives in Colorado in early June then departs the area by late August (CPIF 2013). This swallow is recognized as a Forest Service sensitive species and is a Management Indicator Species in the Rocky Mountain Region (Region 2). Additionally, this species is listed as a Priority Species by the Colorado Partners in Flight plan (Wiggins 2005). The purple martin is an obligate secondary cavity nester and in Colorado it prefers to breed in stands of old growth aspen nesting in cavities excavated by woodpeckers or flickers (CPIF 2013). Due to the presence of suitable habitat and sightings of purple martin within and adjacent to the Unit (**Figure 3-15**, Purple Martin Habitat), as well as current management considerations of this species, effects of the Proposed Action on the purple martin will be addressed.

*Raptor Species*
Suitable bald eagle winter habitat occurs in the south central region of the Unit along East Muddy Creek (**Figure 3-16**, Bald Eagle Habitat). The golden eagle (*Aquila chrysaetos*) and prairie falcon (*Falco mexicanus*) are more likely to hunt across sagebrush areas than in the other habitat types in the Unit, all of which contain taller and denser woody vegetation. The irrigated meadows occupying 10 percent of the Unit provide potential habitat for the golden eagle and potentially for prairie falcon, when this species migrates through the project area.

Also, stands of quaking aspen and other deciduous trees provide suitable habitat for the flammulated owl. Intact stands of aspen within the Unit that are not affected by sudden aspen decline may also provide suitable nesting habitat for raptors and could require further surveys to address potential impacts on nesting raptors in the Unit. The north-facing slopes of mixed conifer forests in some of the drainages have the potential to support the flammulated owl.

*Trends*
Habitat throughout the UFO supports a diversity of migratory bird species, including neotropical migrants. Recent studies and monitoring suggest that some of these populations are declining, due in part to land use and management practices and habitat loss and degradation (USFWS 2008). With the limited wildlife data available, most raptor populations appear to be stable.

3. Affected Environment



**Purple Martin Habitat**

Source: USFS 2008, GAP 2013

Bull Mountain Unit

Purple martin colony

Purple martin habitat

Figure 3-15

3. Affected Environment



**Bald Eagle Habitat**

Source: NDIS 2010

☐ Bull Mountain Unit

▨ Bald eagle winter forage: frequented by wintering bald eagles between November 15 and March 15.

▨ Bald eagle winter range: bald eagles have been observed between November 15 and April 1.

Figure 3-16

## 3.2.10  Special Status Species (Threatened, Endangered, Sensitive Species)

*Current Conditions*

Listed or candidate wildlife, fish, and plant species that were considered and evaluated for this assessment include those identified by the UFO and the USFWS as potentially occurring in Gunnison County (accessed December 2011).

The following habitats dominate the project area: sagebrush, mixed shrublands, oakbrush, riparian/emergent wetlands, aspen, irrigated hay meadows, and upland grass meadows. While all species were considered, only species which occur in the area, have suitable habitat, or for which the Unit is within the range of the species were selected for additional evaluation due to direct, indirect, and/or cumulative impacts. No critical habitat occurs in the Unit.

Information on species status, distribution, and ecology was derived from USFWS recovery plans, Colorado Natural Heritage Program database maps and reports, CPW habitat mapping (CPW 2011), personal knowledge of the consultant and reviewing BLM biologists, various scientific studies and reports, and correspondence with USFWS biologists.

Habitat surveys were conducted in the fall of 2007 through spring of 2011 (Petterson 2012).

*Federally Listed, Proposed, or Candidate Threatened or Endangered Animal Species*

**Table 3-30**, Threatened and Endangered Species of the Uncompahgre Field Office, is a complete list of federally protected listed, proposed, or candidate threatened or endangered animal species considered and evaluated.

Canada Lynx (*Lynx canadensis*), Federally Threatened Species: In Colorado, Canada lynx occupy high elevation coniferous forests characterized by cold, snowy winters and an adequate prey base (Ruggiero et al. 1999). The preferred prey of Canada lynx throughout their range is the snowshoe hare (*Lepus americanus*). In the western United States, lynx are associated with mesic forests of lodgepole pine, subalpine fir, Engelmann spruce, and quaking aspen in the upper montane and subalpine zones, generally between 8,000 and 12,000 feet in elevation. Although snowshoe hares are the preferred prey, lynx also feed on other species such as pine squirrel (*Tamiasciurus hudsonicus*), and blue (dusky) grouse (*Dendragapus obscurus*).

The Canada Lynx Conservation Assessment and Strategy (Ruediger et al. 2000, revised 2003) was developed to provide a consistent and effective approach to conserve Canada lynx on federal lands in the conterminous United States. The Lynx Conservation Assessment and Strategy indicates that project planning should evaluate the effects on lynx habitat within designated Lynx Analysis Units that are generally greater than 25,000 acres in the southern Rocky Mountain Geographic Area. Lynx Analysis Units do not represent actual lynx home ranges, but their scale should approximate the size of an area used by an individual lynx. A major transportation route to the Unit is State Highway 133, which passes through the Ragged Mountain Lynx Analysis Unit and McClure Pass Lynx Linkage Area. As such, the USFWS (Broderdorp 2011) has suggested that indirect effects from development of the Unit be investigated for potential effects on Canada lynx.

**Table 3-30**
**Threatened and Endangered Species of the Uncompahgre Field Office**

| Species | Status | Habitat Description | Critical Habitat (Y/N?) | Known?[1] | Range (Y/N)?[2] | Habitat (Y/N)?[3] | No Effect (X)?[4] | MENLAE (X)[5] | MELAE (X)[6] |
|---|---|---|---|---|---|---|---|---|---|
| **Fish** | | | | | | | | | |
| Bonytail *Gila elegans* | E | Warm-waters of the Colorado River main stem and tributaries, some reservoirs; flooded bottomlands for nurseries; pools and eddies over rocky substrates with silt-boulder mixtures for spawning | N | N | Y | N | | | X |
| Humpback chub *Gila cypha* | E | Warm-water, canyon-bound reaches of Colorado River main stem and larger tributaries; turbid waters with fluctuating hydrology; young require low-velocity, shoreline habitats such as eddies and backwaters | N | N | N | N | | | X |
| Razorback sucker *Xyrauchen texanus* | E | Warm-water reaches of the Colorado River main stem and larger tributaries; some reservoirs; low velocity, deep runs, eddies, backwaters, side canyons, pools, eddies; cobble, gravel, and sand bars for spawning; tributaries, backwaters, floodplain for nurseries | N | N | N | N | | | X |
| Colorado pikeminnow *Ptychocheilus lucius* | E | Warm-waters of the Colorado River main stem and tributaries; deep, low velocity eddies, pools, runs, and nearshore features; uninterrupted streams for spawning migration and young dispersal; also floodplains, tributary mouths, and side canyons; highly complex systems | N | N | N | N | | | X |

**Table 3-30**
**Threatened and Endangered Species of the Uncompahgre Field Office**

| Species | Status | Habitat Description | Critical Habitat (Y/N?) | Known?[1] | Range (Y/N)?[2] | Habitat (Y/N)?[3] | No Effect (X)?[4] | MENLAE (X)[5] | MELAE (X)[6] |
|---|---|---|---|---|---|---|---|---|---|
| Greenback cutthroat trout *Oncorhynchus clarki stomias* | T | Cold water streams and lakes with adequate spawning habitat (riffles), often with shading cover; young shelter in shallow backwaters | N | Y | Y | N | X | | |
| **Mammals** | | | | | | | | | |
| Black-footed ferret[7] *Mustela nigripes* | E | Prairie dog colonies for shelter and food; greater than 200 acres of habitat with at least 8 burrows per acre | N | N | N | N | X | | |
| Canada lynx *Lynx canadensis* | T | Spruce-fir, lodgepole pine, willow carrs, and adjacent aspen and mountain shrub communities that support snowshoe hare and other prey | N | N | Y | Y | | X | |
| North American Wolverine *Gulo gulo luscus* | C | Alpine and arctic tundra, boreal and mountain forests (primarily coniferous); limited to mountains in the south, especially large wilderness areas. | N | N | N | N | X | | |
| Gunnison's prairie dog *Cynomys gunnisoni* | C | Level to gently sloping grasslands, semi-desert shrublands, and montane shrublands, from 6,000 to 12,000 feet in elevation | N | N | N | N | X | | |
| **Birds** | | | | | | | | | |
| Mexican spotted owl[8] *Strix occidentalis* | T | Mixed-conifer forests and steep-walled canyons with minimal human disturbance | N | N | Y | N | X | | |

**Table 3-30**
**Threatened and Endangered Species of the Uncompahgre Field Office**

| Species | Status | Habitat Description | Critical Habitat (Y/N?) | Known?[1] | Range (Y/N)?[2] | Habitat (Y/N)?[3] | No Effect (X)?[4] | MENLAE (X)[5] | MELAE (X)[6] |
|---|---|---|---|---|---|---|---|---|---|
| Southwestern willow flycatcher[8] *Empidonax traillii extimus* | E | For breeding, riparian tree and shrub communities along rivers, wetlands, and lakes; for wintering, brushy grasslands, shrubby clearings or pastures, and woodlands near water | N | N | N | N | X | | |
| Gunnison sage grouse *Centrocercus minimus* | C | Sagebrush communities (especially big sagebrush) for hiding and thermal cover, food, and nesting; open areas with sagebrush stands for leks; sagebrush-grass-forb mix for nesting; wet meadows for rearing chicks | N | N | N | Y | X | | |
| Western yellow-billed cuckoo *Coccyzus americanus* | C | Riparian, deciduous woodlands with dense undergrowth; nests in tall cottonwood and mature willow riparian, moist thickets, orchards, abandoned pastures | N | N | Y | N | X | | |
| **Plants** | | | | | | | | | |
| Clay-loving wild buckwheat *Eriogonum pelinophilum* | E | Mancos shale badlands in salt desert shrub communities, often with shadscale, black sagebrush, and mat saltbush; 5,200 to 6,400 feet in elevation | N | N | N | N | X | | |
| Colorado hookless cactus *Sclerocactus glaucus* | T | Salt-desert shrub communities in clay soils on alluvial benches and breaks, toe slopes, and deposits often with cobbled, rocky, or graveled surfaces; 4,500 to 6,000 feet in elevation | N | N | N | N | X | | |

**Table 3-30**
**Threatened and Endangered Species of the Uncompahgre Field Office**

| Species | Status | Habitat Description | Critical Habitat (Y/N?) | Known?[1] | Range (Y/N)?[2] | Habitat (Y/N)?[3] | No Effect (X)?[4] | MENLAE (X)[5] | MELAE (X)[6] |
|---|---|---|---|---|---|---|---|---|---|
| **Invertebrates** | | | | | | | | | |
| Uncompahgre fritillary butterfly[8] *Boloria acrocnema* | E | Restricted to moist, alpine slopes above 12,000 feet in elevation with extensive snow willow patches; restricted to San Juan Mountains | N | N | N | N | X | | |

Source: USFWS 2009; Van Reyper 2006
[1] Potential and/or known occurrences in Project Area? Assessment based on UFO files and GIS data, partner data, and local knowledge.
[2] Project area is within the current known range of the species?
[3] Project area contains suitable habitat for the species?
[4] Project activities will have "No Effect" to the species or its habitat
[5] Project activities "May Effect, Not Likely to Adversely Affect" to the species or its habitat
[6] Project activities "May Effect, Likely to Adversely Affect" to the species or its habitat
[7] Black-footed ferret are believed to be extirpated from this portion of its range.
[8] Species not known to occur within UFO boundaries, but known to occur in close proximity.

The Ragged Mountain Lynx Analysis Unit comprises 20,174.5 acres or 31.5 square miles (Forest Service 2008a). Mapped lynx habitat in Lynx Analysis Unit statistics only includes lands in federal ownership (Error! Not a valid bookmark self-reference., Canada Lynx Habitat). Environmental baseline statistics of lynx habitat in the Ragged Mountain Lynx Analysis Unit are summarized in **Table 3-31**, Existing Habitats within the Ragged Mountain Lynx Analysis Unit, and **Table 3-32**, Existing Habitats within the Crystal West Lynx Analysis Units.

**Table 3-31**
**Existing Habitats within the Ragged Mountain Lynx**
**Analysis Unit**

| Habitat Type | Acres | Percent of the Unit |
|---|---|---|
| Primary Suitable | 8,638 | 43% |
| Secondary Suitable | 3,166 | 16% |
| Unclassified | 8,370 | 41% |
| Total | 20,174 | 100% |

Source: Forest Service 2008

**Table 3-32**
**Existing Habitats within the Crystal West Lynx**
**Analysis Units**

| Habitat Type | Acres | Percent of the Unit |
|---|---|---|
| Winter Foraging | 20,790 | 21% |
| Denning | 14,603 | 15% |
| Other | 10,884 | 11% |
| Non-Habitat | 40,294 | 41% |
| Private | 10,963 | 11% |
| Total | 97,534 | 100% |

Source: Forest Service 2008

The Ragged Mountain Lynx Analysis Unit overlaps a small portion of the 27,034-acre McClure Pass Lynx Linkage Area at the northern end of the Lynx Analysis Unit, linking the Huntsman Ridge area with habitats in the Crystal West, Crystal East, and Huntsman Mountain Lynx Analysis Units on the White River and Grand Mesa Uncompahgre and Gunnison National Forests. The McClure Pass Lynx Linkage Area links suitable lynx habitats in the Elk Mountains to potential habitats on Huntsman Ridge and the Grand Mesa. State Highway 133 is within the McClure Pass Lynx Linkage Area.

The Crystal West Lynx Analysis Unit is a relatively large Lynx Analysis Unit at 97,534 acres, and is located on the White River National Forest. At this time the White River National Forest still utilizes habitat definitions previously described under the Lynx Conservation Assessment and Strategy. The Lynx Conservation Assessment and Strategy provides guidelines for the management of lynx habitat within Lynx Analysis Units, and recommends that at least 10 percent of a Lynx Analysis Unit be suitable Denning habitat, and the Crystal West Lynx Analysis Unit is at 15 percent Denning habitat. The Lynx Conservation Assessment and Strategy also recommends that at least 6,500 acres of primary lynx habitat (Denning and Winter Foraging habitats) be available for lynx use; the Crystal West Lynx Analysis Unit is at 35,393 acres.

3. Affected Environment



**Canada Lynx**

Source: USFS 2003

□ Bull Mountain Unit

▨ Canada lynx linkage: travel corridors between large blocks of potential habitat used for dispersal or summer movements

■ Canada lynx habitat: denning, winter and other (seasonal) habitat

Canada lynx analysis unit: management boundaries for locations with enough potential habitat to support a female lynx, state or private lands not incorporated

Figure 3-17

Major existing land uses that may influence lynx habitat use within the Ragged Mountain Lynx Analysis Unit and McClure Pass Lynx Linkage Area is generally limited to widespread livestock grazing, dispersed camping and infrequent trail use, relatively active fall big game hunting, and some limited winter-time snowmobile activities.

Colorado River Endangered Fish, Federally Endangered Species. The USFWS lists the humpback chub (*Gila cypha*), bonytail chub (*G. elegans*), Colorado pikeminnow (*Ptychocheilus lucius*), and razorback sucker (*Xyrauchen texanus*) as occurring in downstream waters in the Colorado River. Colorado pikeminnow and razorback sucker also occur in lower reaches of the Gunnison River, near the City of Delta down to the confluence with the Colorado River.

The Unit is approximately 60 river miles upstream of the nearest designated critical habitat for the Colorado pikeminnow and razorback sucker and even further away for designated critical habitats for the humpback chub and bonytail in the main stem of the Colorado River.

Water depletions in the Colorado River Basin and the potential effects on federally listed Colorado River fish as a result of fluid mineral development were addressed in the Programmatic Biological Assessment for the BLM's Fluid Minerals Program in Western Colorado (May 2008). In response to BLM's Programmatic Biological Assessment, the USFWS issued a Programmatic Biological Opinion (ES/GJ-6-CO-08-F-0006) on December 19, 2008, which determined that BLM water depletions associated with BLM approved projects in the Colorado River Basin are not likely to jeopardize the continued existence the Colorado pikeminnow, razorback sucker, bonytail chub, and humpback chub. Likewise, the project is also not likely to destroy or adversely modify designated critical habitats for these endangered fish along the Green, Yampa, White, Colorado, and Gunnison Rivers. Water depletions analyzed under the Programmatic Biological Opinion include water used for dust abatement, hydrostatic testing, well drilling and completion, and water associated with federal actions. The Programmatic Biological Opinion requires the BLM and SGI to report the entire quantity of freshwater actually used to develop a federal well in that year to update water use estimates. Water depletion reports will be submitted to the USFWS on October 31 of each year. These reports will be used to track compliance with the threshold depletion amount.

Greenback cutthroat trout (*Onchorhynchus clarkii stomias*), Federally Threatened Species. Currently, populations of green lineage cutthroat occur in Roberts Creek and Henderson Creek in the northwest portion of the Unit. Genetic testing has shown that the Roberts Creek population is 96 percent genetically pure greenback cutthroat trout and the Dyke Creek population is 98 percent genetically pure. Any population that shows at least 80 percent genetic purity would be subject to the requirements of the Endangered Species Act (Speas 2010; USFWS 2010). Fish sampling in Ault Creek revealed that there are no cutthroat trout within that creek (Petterson 2012). Cutthroat trout populations in Henderson Creek have not undergone the amplified fragment length polymorphism genetic testing process, but mitochondrial DNA testing has shown those trout to have greenback cutthroat trout lineage. Greenback cutthroat trout occur in clear, cold, high-gradient streams and creeks. They are extremely vulnerable to competition by nonnative trout (e.g., brook trout [*Salvelinus fontinalis*]), which were accidentally released in the Clear Fork. Trout are also vulnerable to water depletions.

*Federally Listed, Proposed, or Candidate Threatened or Endangered Plant Species*
Habitat necessary for life requirements of federally listed, proposed, or candidate threatened or endangered plant species are not found within the Unit.

*BLM Sensitive Species*
**Table 3-33**, BLM Sensitive Species of the Uncompahgre Field Office[1], lists the species considered and evaluated. Of the 31 UFO-listed sensitive animal species known or likely to occur in or adjacent to the Unit, most do not occur in the area on a regular basis and are listed as unlikely based on project location and habitat types. However, eight species are considered to possibly occur, indicating a greater likelihood of occurrence, or present, in that they are known to occur. These species are addressed below.

Northern Goshawk (*Accipiter gentilis*). This raptor nests in subalpine spruce-fir, Ponderosa pine, aspen forests, and infrequently in mature pinyon-juniper woodlands, but may move to lower-elevation woodlands during winter in search of prey. The Unit provides suitable nesting and foraging habitat for this species.

Bald Eagle (*Haliaeetus leucocephalus*). Removed from the federal list of threatened or endangered species in August 2007, this large raptor is now considered a sensitive species and remains protected by the Bald and Golden Eagle Protection Act as well as the Migratory Bird Treaty Act. Bald eagles roost during the winter along Muddy Creek at the southern end of the Unit, but may scavenge on winter-killed big game species in upland areas in the Unit. Bald eagle winter forage areas and winter range are mapped on approximately 2,976 acres of the Unit. Bald eagles are not known to occur in the area during the summer.

Brewer's Sparrow (*Spizella breweri*). This migrant is essentially a sagebrush obligate, although it may occasionally nest in other semi-desert shrublands. Sagebrush is a significant component of the habitat in the Unit, and this species is known to nest in the project area (Petterson 2012). This species does not occur in the area during the winter (see **Section 3.2.9**, Migratory Birds).

Bat Species. Bats potentially found in the Unit include Townsend's big-eared bat (*Corynorhinus townsendii pallescens*), spotted bat (*Euderma maculatum*), and fringed myotis (*Myotis thysanodes*). All of these bat species may forage over shrublands typified by the sagebrush and pinyon-juniper woodlands occurring within the lower elevations and south-facing slopes in the Unit. However, these bat species require nearby rock outcrops, caves or mines (abandoned or active) for shelter; for fringed myotis and spotted bat, old buildings and larger trees with cavities will suffice. Rock outcrops occur at the southern end of the Unit, near the West Muddy Creek and East Muddy Creek canyons, but no direct or indirect impacts on these outcrops would occur.

Leopard Frog (*Lithobates pipiens*). This species occurs in the Unit in irrigated meadows, riparian areas and creeks, and prefers sunny, grassy wetlands. It requires abundant aquatic vegetation for breeding and adjacent semi-aquatic vegetation for cover when adults disperse short distances to feed. Leopard frogs feed primarily on emergent adults of aquatic insects or on terrestrial insects attracted to the water.

**Table 3-33**
**BLM Sensitive Species of the Uncompahgre Field Office[1]**

| Species | Habitat Description | Known[1] | Range?[2] | Habitat?[3] | No Effect[4] | MAI[5] | LFL[6] |
|---|---|---|---|---|---|---|---|
| **Fish** | | | | | | | |
| Roundtail chub<br>*Gila robusta* | Warm-water rocky runs, rapids, and pools of creeks and small to large rivers; also large reservoirs in the upper Colorado River system; generally prefers cobble-rubble, sand-cobble, or sand-gravel substrate | None | N | N | | X | |
| Bluehead sucker<br>*Catostomus discobolus* | Large rivers and mountain streams, rarely in lakes; variable, from cold, clear mountain streams to warm, turbid streams; moderate to fast flowing water above rubble-rock substrate; young prefer quiet shallow areas near shoreline | None | N | N | | X | |
| Flannelmouth sucker<br>*Catostomus latipinnis* | Warm moderate- to large-sized rivers, seldom in small creeks, absent from impoundments; pools and deeper runs often near tributary mouths; also riffles and backwaters; young usually in shallower water than are adults | None | N | N | | X | |
| Colorado River cutthroat trout<br>*Oncorhynchus clarki pleuriticus* | Cool, clear streams or lakes with well-vegetated streambanks for shading cover and bank stability; deep pools, boulders, and logs; thrives at high elevations | None | Y | N | X | | |
| **Mammals** | | | | | | | |
| Desert bighorn sheep<br>*Ovis canadensis nelsoni* | Steep, mountainous or hilly terrain dominated by grass, low shrubs, rock cover, and areas near open escape and cliff retreats; in the resource area, concentrated along major river corridors and canyons | None | N | N | X | | |
| White-tailed prairie dog [7]<br>*Cynomys leucurus* | Level to gently sloping grasslands and semi-desert grasslands from 5,000 to 10,000 feet in elevation | None | N | N | X | | |
| Kit fox<br>*Vulpes macrotis* | Semi-desert shrublands of saltbrush, shadscale and greasewood often in association with prairie dog towns | None | N | N | X | | |

**Table 3-33**
**BLM Sensitive Species of the Uncompahgre Field Office[1]**

| Species | Habitat Description | Known[1] | Range?[2] | Habitat?[3] | No Effect[4] | MAI[5] | LFL[6] |
|---|---|---|---|---|---|---|---|
| Allen's (Mexican) big-eared bat *Idionycteris phyllotis* | Ponderosa pine, pinyon-juniper woodland, oak brush, riparian woodland (cottonwood); typically found near rocky outcrops, cliffs, and boulders; often forages near streams and ponds. Thought to be in the West End of Montrose County. | None | Y | N | X | | |
| Big free-tailed bat *Nyctinomops macrotis* | Rocky areas and rugged terrain in desert and woodland habitats; roosts in rock crevices in cliffs and in buildings caves, and occasionally tree holes | None | Y | Y | | X | |
| Spotted bat *Euderma maculatum* | Desert shrub, ponderosa pine, pinyon-juniper woodland, canyon bottoms, open pasture, and hayfields; roost in crevices in cliffs with surface water nearby | None | Y | Y | | X | |
| Townsend's big-eared bat *Corynorhinus townsendii* | Mesic habitats including coniferous forests, deciduous forests, sagebrush steppe, juniper woodlands, and mountain; maternity roosts and hibernation in caves and mines; does not use crevices or cracks; caves, buildings, and tree cavities for night roosts | None | Y | Y | | X | |
| Fringed myotis *Myotis thysanodes* | Desert, grassland, and woodland habitats including ponderosa pine, pinyon/juniper, greasewood, saltbush, and scrub oak; roosts in caves, mines, rock crevices, and buildings | None | Y | Y | | X | |
| **Birds** | | | | | | | |
| Bald eagle[5] *Haliaeetus leucocephalus* | Nests in forested rivers and lakes; winters in upland areas, often with rivers or lakes nearby | None | Y | Y | | X | |
| American peregrine falcon[5] *Falco peregrines anatum* | Open country near cliff habitat, often near water such as rivers, lakes, and marshes; nests on ledges or holes on cliff faces and crags | None | Y | N | X | | |

**Table 3-33**
**BLM Sensitive Species of the Uncompahgre Field Office[1]**

| Species | Habitat Description | Known[1] | Range?[2] | Habitat?[3] | No Effect[4] | MAI[5] | LFL[6] |
|---------|---------------------|----------|-----------|-------------|--------------|--------|--------|
| Northern goshawk *Accipiter gentilis* | Nests in a variety of forest types including deciduous, coniferous, and mixed forests including ponderosa pine, lodgepole pine, or in mixed-forests with fir and spruce; also nest in aspen or willow forests; migrants and wintering individuals can be observed in all coniferous forest types | None | Y | Y | | X | |
| Ferruginous hawk *Buteo regalis* | Open, rolling and/or rugged terrain in grasslands and shrubsteppe communities; also grasslands and cultivated fields; nests on cliffs and rocky outcrops; winter migrant. | None | Y | N | X | | |
| Burrowing owl[8] *Athene cunicularia* | Level to gently sloping grasslands and semi-desert grasslands; Prairie dog colonies for shelter and food | None | Y | N | X | | |
| Columbian sharp-tailed grouse *Tympanuchus phasianellus columbian* | Native bunchgrass and shrub-steppe communities for nesting; mountain shrubs including serviceberry are critical for winter food and escape cover; thought to be extirpated from UFO. | None | N | Y | X | | |
| Long-billed curlew *Numenius americanus* | Lakes and wetlands and adjacent grassland and shrub communities; rare occurrence | None | Rare | N | X | | |
| White-faced ibis *Plegadis chihi* | Marshes, swamps, ponds and rivers | None | Y | N | X | | |
| American white pelican *Pelecanus erythrorhynchos* | Typically large reservoirs but also observed on smaller water bodies including ponds; nests on islands | None | Y | N | X | | |
| Brewer's sparrow *Spizella breweri* | Breeds primarily in sagebrush shrublands, but also in other shrublands such as mountain mahogany or rabbitbrush; migrants seen in wooded, brushy, and weedy riparian, agricultural, and urban areas; occasionally observed in pinyon-juniper | None | Y | Y | | Y | |
| Black swift[8] *Cypseloides niger* | Nests on precipitous cliffs near or behind high waterfalls; forages from montane to adjacent lowland habitats; rare | None | Y | N | X | | |

**Table 3-33**
**BLM Sensitive Species of the Uncompahgre Field Office[1]**

| Species | Habitat Description | Known[1] | Range?[2] | Habitat?[3] | No Effect[4] | MAI[5] | LFL[6] |
|---------|---------------------|----------|-----------|-------------|--------------|--------|--------|
| **Reptiles and Amphibians** | | | | | | | |
| Longnose leopard lizard *Gambelia wislizenii* | Desert and semidesert areas with scattered shrubs or other low plants; e.g., sagebrush; areas with abundant rodent burrows, typically below 5,000 feet in elevation | None | N | N | X | | |
| Midget faded rattlesnake[9] *Crotalus oreganus concolor* | Rocky outcrops for refuge and hibernacula, often near riparian; upper limit of 7,500 to 9,500 feet in elevation | None | Y | N | X | | |
| Milk snake *Lampropeltis triangulum taylori* | Variable types including shrubby hillsides, canyons, open ponderosa pine stands and pinyon-juniper woodlands, arid river valleys and canyons, animal burrows, and abandoned mines; hibernates in rock crevices | None | Y | N | N | | |
| Northern leopard frog[7] *Lithobates pipiens* | Springs, slow-moving streams, marshes, bogs, ponds, canals, flood plains, reservoirs, and lakes; in summer, commonly inhabits wet meadows and fields; may forage along water's edge or in nearby meadows or fields | Yes | Y | Y | | X | |
| Canyon treefrog *Hyla arenicolor* | Rocky canyon bottoms along intermittent or perennial streams in temporary or permanent pools or arroyos ; semi-arid grassland, pinyon-juniper, pine-oak woodland, scrubland, and montane zones; elevation 1,000 to 10,000 feet | None | Y | N | X | | |
| Boreal toad *Anaxyrus boreas boreas* | Mountain lakes, ponds, meadows, and wetlands in subalpine forest (e.g., spruce, fir, lodgepole pine, and aspen); feed in meadows and forest openings near water but sometimes in drier forest habitats | None | N | N | X | | |
| **Plants** | | | | | | | |
| Debeque milkvetch *Astragalus debequaeus* | Varicolored, fine-textured, seleniferous, saline soils of the Wasatch Formation-Atwell Gulch Member; elevation 5,100 to 6,400 feet | None | N | N | X | | |

**Table 3-33**
**BLM Sensitive Species of the Uncompahgre Field Office[1]**

| Species | Habitat Description | Known[1] | Range?[2] | Habitat?[3] | No Effect[4] | MAI[5] | LFL[6] |
|---|---|---|---|---|---|---|---|
| Grand Junction milkvetch *Astragalus linifolius* | Sparsely vegetated habitats in pinyon-juniper and sagebrush communities, often within Chinle and Morrison Formation and selenium-bearing soils; elevation 4,800 to 6,200 feet | None | Y | N | X | | |
| Naturita milkvetch *Astragalus naturitenis* | Cracks and ledges of sandstone cliffs and flat bedrock area typically with shallow soils, within pinyon-juniper woodland; elevation 5,400 to 6,700 feet | None | Y | N | X | | |
| San Rafael milkvetch *Astragalus rafaelensis* | Banks of sandy clay gulches and hills, at the foot of sandstone outcrops, or among boulders along dry watercourses in seleniferous soils derived from shale or sandstone formations; elevation 4,500 to 5,300 feet | None | Y | N | X | | |
| Sandstone milkvetch *Astragalus sesquiflorus* | Sandstone rock ledges (Entrada formation), domed slickrock fissures, talus under cliffs, sometimes in sandy washes; elevation 5,000 to 5,500 feet | None | N | N | X | | |
| Gypsum Valley cateye *Cryptantha gypsophila* | Confined to scattered gypsum outcrop and grayish-white, often lichen-covered, soils of the Paradox Member of the Hermosa Formation; often the dominant plant at these sites; elevation 5,200 to 6,500 feet | None | N | N | X | | |
| Fragile (slender) rockbrake *Cryptogramma stelleri* | Cool, moist, sheltered calcareous cliff crevices and rock ledges | None | Y | N | X | | |
| Kachina daisy (fleabane)[8] *Erigeron kachinensis* | Saline soils in alcoves and seeps in canyon walls; elevation 4,800 feet 5,600 feet | None | N | N | X | | |
| Montrose (Uncompahgre) bladderpod *Lesquerella vicina* | Sandy-gravel soil mostly of sandstone fragments over Mancos Shale (heavy clays) mainly in pinyon-juniper woodlands or in the ecotone between it and salt desert scrub; also in sandy soils derived from Jurassic sandstones and in sagebrush steppe communities; elevation 5,800 to 7,500 feet | None | N | N | X | | |

**Table 3-33**
**BLM Sensitive Species of the Uncompahgre Field Office[1]**

| Species | Habitat Description | Known[1] | Range?[2] | Habitat?[3] | No Effect[4] | MAI[5] | LFL[6] |
|---------|---------------------|----------|-----------|-------------|--------------|--------|--------|
| Colorado (Adobe) desert parsley *Lomatium concinnum* | Adobe hills and plains on rocky soils derived from Mancos Formation shale; shrub communities dominated by sagebrush, shadscale, greasewood, or scrub oak; elevation 5,500 to 7,000 feet | None | N | N | X | | |
| Paradox Valley (Payson's) lupine *Lupinus crassus* | Pinyon-juniper woodlands, or clay barrens derived from Chinle or Mancos Formation shales, often in draws and washes with sparse vegetation; elevation 5,000 to 5,800 feet | None | Y | N | X | | |
| Dolores skeleton plant[8] *Lygodesmia doloresenis* | Reddish purple, sandy alluvium and colluviums of the Cutler Formation between the canyon walls and the river in juniper, shadscale, and sagebrush communities; elevation 4,000 to 5,500 feet | None | N | N | X | | |
| Eastwood's monkey-flower *Mimulus eastwoodiae* | Shallow caves and seeps on steep canyon walls; elevation 4,700 to 5,800 feet | None | Y | N | X | | |
| Paradox (Aromatic Indian) breadroot *Pediomelum aromaticum* | Open pinyon-juniper woodlands in sandy soils or adobe hills; elevation 4,800 to 5,700 feet | None | Y | N | X | | |
| **Invertebrates** | | | | | | | |
| Great Basin silverspot butterfly *Speyeria nokomis nokomis* | Found in streamside meadows and open seepage areas with an abundance of violets | None | N | | X | | |

Sources: BLM 2011; Van Reyper 2006; Spackman et al. 1997
[1] Potential and/or known occurrences in Project Area? Assessment based on UFO files and GIS data, partner data, and local knowledge.
[2] Project area is within the current known range of the species?
[3] Project area contains suitable habitat for the species?
[4] Project activities will have no effect on the species or its habitat
[5] Project activities may affect individuals of the species or its habitat, but not likely to result in a trend toward federal listing
[6] Project activities are likely to result in a trend toward federal listing for the species
[7] Species was petitioned for listing and is currently under status review by USFWS, and a 12-month finding is pending; i.e., listing of the species throughout all or a significant portion of its range may be warranted.
[8] Species not on BLM Colorado State Director's Sensitive List; included at the Field Office level to account for recent sightings, proximate occurrences, and/or potential habitat
[9] Validity of subspecies designation is in question by taxonomists.

*BLM Sensitive Plant Species*
During field surveys for special status plant species, no sensitive plants species were observed, nor was suitable habitat present in the project area for any of these species.

**Trends**
By definition, the populations, and often habitats, of all special status wildlife species have historically suffered downward trends. However, due to protection and recovery efforts, some populations, such as peregrine falcon and bald eagle, are stabilizing. Management efforts by USFWS, CPW, the BLM, and others have reversed the downward trend for a number of these populations. Nevertheless, none of the populations are thought to be near their historic levels, and most remain biologically insecure, regardless of their legal status.

Current and future threats include habitat loss and fragmentation, poaching, predation, disease, invasive species, and others. Habitat degradation and loss are caused by, or exacerbated by, historic overgrazing, oil and gas development, mining, water diversions, recreation, agriculture, residential development, and other human activities. Natural processes such as fire, drought, vegetation type conversions, and climate change may also contribute to landscape changes over time. It is not known which species will be able to adapt to these changes and persist over time. Pinyon-juniper, riparian, sagebrush, and salt-desert shrub have been determined to be at-risk habitats and harbor many of our special status and rare species.

Beginning in 1997, the Colorado Division of Wildlife (now CPW) initiated a Canada lynx reintroduction program to establish a self-sustaining population in suitable habitat throughout Colorado (CPW 2010). All of the benchmarks established by CPW used in measuring the success of the reintroduction program for Canada lynx were met as of 2010. Observations of lynx reproduction in Colorado first documented litters in the spring of 2003; as of 2010, reintroduced lynx that have established territories also produced litters (CPW 2010). At present, the Canada lynx population is estimated at 200 to 300 throughout Colorado and the reintroduction program is considered a success by the USFWS (USFWS 2013).

The greenback cutthroat trout recovery plan (USFWS 1998) identified hybridization and resource competition with other trout species as key limiting factors that affect greenback cutthroat trout success. Colorado greenback cutthroat trout populations were believed to be exceeding population recovery goals set in the USFWS recovery plan (USFWS 1998, 2009). Intensive data collection efforts within the Grand Mesa Uncompahgre and Gunnison National Forest have not produced rigorous trend data for greenback cutthroat trout near the Unit due to a lack of standardized sampling methods. Despite the lack of population trend data, the USFWS concluded that populations within the Grand Mesa Uncompahgre and Gunnison National Forest including Dyke and Roberts Creeks have increased between 2002 and 2010 (Dare et al. 2011). However, recent genetic studies have concluded that the only true greenback cutthroat trout population exists in Bear Creek, a tributary of the Arkansas River west of Colorado Springs (USFWS 2012). These recent findings will require the USFWS to reevaluate the taxonomy and status of the species.

The goals of the Upper Colorado River Endangered Fish Recovery Program is to downlist the Colorado pikeminnow from endangered to threatened by 2018, and to downlist the humpback chub, razorback sucker, and bonytail from endangered to threatened by 2020 (Upper Colorado

River Endangered Fish Recovery Program 2013). Current estimates for Colorado pikeminnow indicate that the Colorado River populations are stable and the program is meeting or exceeding stocking goals for bonytail and razorback sucker (Upper Colorado River Endangered Fish Recovery Program 2013). Upper Colorado River humpback chub populations below the confluence of the Gunnison River near Black Rocks, Colorado, have remained stable since a decline 13 years ago (Upper Colorado River Endangered Fish Recovery Program 2013).

### APD for Federal 12-89-7-1

The APD area does not provide suitable habitat for Canada lynx or special status fish, birds, or bats. Bald eagles may be attracted to the area during winter for foraging or scavenging, though the species is not in the area during the spring, summer and fall.

The pipeline associated with Federal 12-89-7-1 would cross suitable and likely occupied northern leopard frog habitats. The pad location is within upland habitats, which do not provide suitable habitat for the species.

### 3.2.11  Wildland Fire Management

Wildland fire management on public lands is governed by the Federal Wildland Fire Management Policy was developed by the secretaries of the Department of the Interior and the USDA. The 2001 Federal Wildland Fire Management Policy provides guiding principles, policy statements, and implementation actions. Under the plan, every unit within a federal land management agency, such as a BLM field office, that has vegetation capable of sustaining wildland fire is required to prepare a fire management plan, a strategic plan that outlines a program for managing wildland and prescriptive vegetation treatments. Fire management plans are dynamic documents that are reviewed annually and updated whenever better information is available. The plan is supplemented by operational plans, such as preparedness plans, dispatch plans, prescribed fire plans, and prevention plans.

The UFO Fire Management Plan (FMP) was originally written and approved in 1998, and has undergone three revisions in order to incorporate national policy changes, as well as minor changes gained through experience. In the next few years, an effort will be made to integrate the UFO FMP and other local agencies' fire management plans.

### Current Conditions

The Unit is located within the Ragged Mountain Fire Protection District. It is geographically located within Management Unit 16 as defined in the RMP (BLM 1989). The RMP calls for intensive suppression of fire on federally managed lands within this Unit. Surface fuels in the Unit are dominated by generally continuous sagebrush fuels, with patches of decadent Gambel's oak and mixed-shrub fuel types. Should they occur, fires within these fuel types would be generally difficult to stop with hand-crews and Type 6 brush trucks, unless natural and man-made fuel breaks (e.g., roads and irrigated meadows) were utilized. Wildfire risk assessment mapping from 2012 quantifies potential fire intensity in the project area as moderate to high (Colorado State Forest Service 2012).

Gunnison County regulations state that natural gas operations "shall not cause a significant risk of wildfire hazard." As a result, measures are put in place to minimize risk on natural gas operations and other energy development in the project area and surrounding area.

*Trends*

Large fires have been uncommon in the area. Within 10 miles of the Bull Mountain Management Unit, only two large fires have been documented since 1960, the most recent of which occurred in 1981 (BLM 2013a).

Changes to vegetation, climate, as well as development in the wild land-urban interface zone could all impact fire risk in and around the project area. Changes to these factors are difficult to quantify, but it is likely that fire risk will remain static or slightly increase over the life of the plan.

## 3.2.12  Cultural Resources

Cultural resources are defined as fragile and nonrenewable remains of prehistoric and historic human activity, occupation, or endeavor as reflected in districts, sites, structures, buildings, objects, artifacts, ruins, works of art, architecture, and natural features that were important to human history. Cultural resources comprise the physical remains themselves, the areas where significant human events occurred even if evidence of the event no longer remains, and the environment surrounding the actual resource.

Significant cultural resources are defined as those listed in, or eligible for listing in, the National Register of Historic Places. Significant cultural resources are generally at least 50 years old and meet one or more of the criteria presented in 36 CFR Part 60, which specifies that the quality of significance in American history, architecture, archaeology, and culture is present in districts, sites, buildings, structures, and objects of national, state and local importance that possess integrity of location, design, setting, materials, workmanship, feeling, and association, and that are associated with events that have made a significant contribution to the broad patterns of our history; are associated with the lives of persons significant in our past; embody the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction; or have yielded, or may be likely to yield, information important in prehistory or history.

*Current Conditions*

The area has been inhabited by humans for approximately 10,000 to 12,000 years. Early inhabitants are characterized as Paleo-Indian hunters of big game, followed by small-game hunters and gatherers, Ute, and eventually Euro-American settlement. Detailed summaries of the Units prehistoric and historic past can be found in the UFO Class I Cultural Resource Overview (Greubel et al. 2010), the Northern Colorado River Basin regional prehistoric archaeological context (Reed and Metcalf 1999), and the Colorado historical archaeology context (Church et al. 2007). Current land uses within the Unit include cattle and sheep grazing, oil and gas exploration, and residential development.

As of May 14, 2013, 25 cultural resource investigations have been conducted within the Unit covering 600 acres (less than 1 percent) of the Unit. Of these, 20 were related to the oil and gas development in the area, 4 were related to federal management or exchange, and 1 was related to Natural Resource Conservation Service funding. These inventories resulted in the identification of five archaeological sites and five isolated artifacts. The archeological sites include a historic ranch, three historic roads, and one historic trash dump with a prehistoric lithic scatter. Of these,

only the ranch and one historic road are considered significant resources. Although very few previous surveys have been conducted in the Unit, those inventories show that cultural resources are limited.

As part of a larger UFO RMP, a cultural resource sensitivity model of the North Forth Land Unit of the UFO Management area was developed (**Figure 3-18**, North Fork Landscape Unit Prehistoric Site Sensitivity Model; Greubel et al. 2010). The model used existing environmental and cultural data across the UFO management area to extrapolate the potentiality of cultural resources in areas not yet inventoried. The Unit is within this model area, and the analysis can be used to characterize the likely cultural resources within the Unit as a whole. Based on mathematical probabilities used in the model, 88 percent of the Unit has very low to low potential for prehistoric cultural sites. None of the Unit has a medium or high likelihood of prehistoric cultural resources, but 12 percent of the Unit is characterized as Low-Medium sensitivity.

In order to gain further insight into prehistoric site distributions and densities within the Unit more specifically, a Class II cultural resource inventory was conducted by Alpine Archaeological Consultants, Inc. in the spring of 2013 (Millward 2013). Of the 840 acres inventoried, roughly half were in Low-Medium sensitivity areas, with the remainder in Low and Very Low areas. The sample-oriented inventory resulted in the recordation of one new site and three isolated finds, all found within the Low-Medium areas. This inventory validated the model expectations; few to no prehistoric sites are expected to exist in the vast majority of the Unit. It is likely that travel in the area was restricted by the geographic features and thick vegetation, thus limiting prehistoric human use to ephemeral activities and resulting in fewer artifacts and features than might typically be expected.

Historic use of the area appears to be more common and includes roads and small ranch settings. Historic research shows that the Unit was homesteaded from 1916 to 1936, with stock raising as a clear focus. There is most certainly evidence of small, historic homesteading efforts in the Unit; based on available records, there were likely approximately 50 residential areas with structures within the entire Unit in the 1920s and 1930s. A few of those homesteads grew and consolidated into larger ranches, with some complexes still occupied today. Most were isolated structures that were abandoned and lie in ruins. Although historic homestead and ranch activities are likely still evident on the landscape, the relative frequency of homesteads, transportation corridors, ditches, and trash dumps are low.

Although the Unit has been occupied for more than 10,000 years, the evidence of those occupations occurs at a very low frequency. The relatively ephemeral occupations coupled with dense vegetation and rugged terrain result in very few cultural resources in the Unit.

### *Trends*
Factors influencing cultural resource trends include the presence and condition of cultural sites, which are very difficult to evaluate. In general, downward trends in cultural resources directly relate to impacts, which alter the integrity and physical condition of the resource, while upward trends relate to the identification or creation of new sites.

3. Affected Environment



**North Fork Landscape Unit
Prehistoric Sensitivity Model**

Source: Alpine Archaeological Consultants, Inc. 2013

Legend:
- Bull Mountain Unit
- Low-medium
- Low
- Very low

Figure 3-18

In general, site conditions are considered to be declining due to natural erosional processes, increased casual use, increased development, and a general lack of protection. Exposed sites and associated artifacts, features, and structures are easily disturbed by natural elements such as wind and water erosion, deterioration, decay, animal and human intrusion, and development and maintenance activities. Vandalism of sites and cultural artifacts, such as illicit surface collecting, unauthorized digging, and pot hunting, is also a factor. Archaeological and historic sites are also known to be deteriorating from a variety of causes.

As time passes, additional cultural resources are being discovered, which appears as a positive trend. As development increases, more Section 106 studies are required. The results of those studies are the likely discovery of previously unknown sites. However, these new discoveries do not constitute newly created resources, merely newly discovered ones. The discoveries add to the knowledge base but are not truly additions to the body of resources in existence.

Cultural resources are defined as objects or locations more than 50 years old. As long as the definition remains based on the age of the items, as time passes the trend is toward increasing numbers of (relatively recent) cultural resources.

### APD for Federal 12-89-7-1
A Class III cultural resources inventory was performed for the well pad location, and the access road in November 2010. The area is known to have few archaeological resources, so there were expected to be few or no significant properties within the project boundaries. The field survey was conducted using accepted agency standards and resulted in no isolated finds or sites being located. The report preparers noted that the project area and immediate surroundings have limited potential in terms of available resources; large-scale projects in the region have had very limited results, and this inventory had similar findings. Although there are areas where soils are fairly deep, the preparers concluded that the subsurface potential is quite low (Cater and Larsen 2010).

### 3.2.13  Paleontological Resources
Paleontology is the study of prehistoric life, its evolution, and its interaction with the environment (paleoecology). The term paleontological resources, as used by the BLM, includes any fossilized remains or traces of organisms that are preserved in or on Earth's crust, are of scientific interest, and provide information about the history of life. Paleontological resources, whether invertebrate, plant, trace, or vertebrate fossils, constitute a fragile and nonrenewable record of the history of life on our planet. The BLM's policy is to manage paleontological resources for scientific, educational, and recreational values (e.g., hobby collecting of invertebrate fossils and petrified wood) and to protect these resources from adverse impacts. To accomplish this goal, paleontological resources must be professionally identified and evaluated, and paleontological data should be considered as early as possible any decision-making process.

Paleontological resources are integrally associated with the geologic rock units (formations, members, or beds) in which they are preserved, and the probability for finding paleontological resources can be broadly predicted from the geologic units present at or near the surface. Therefore, geologic mapping paired with the BLM's Potential Fossil Yield Classification (PFYC) system can be used for assessing the occurrence potential of paleontological resources.

Paleontological resources are managed according to the BLM Manual Section 8270, Paleontological Resource Management, BLM Handbook H-8270-1, General Procedural Guidance for Paleontological Resource Management, and applicable BLM instructional memoranda and bulletins. It should be noted that additional protection measures have now been enacted under the Omnibus Public Lands Act of 2009 (123 Stat. 1174 Public Law 111–11, Subtitle D), giving paleontological resources protection under law. The BLM is currently developing regulations to implement the requirements of this law.

Recent BLM guidance (Instruction Memorandum 2008-009, PFYC system for Paleontological Resources on Public Lands [BLM 2007b]) defines a new classification system for the classification of paleontological resources, the PFYC system. This system is intended to provide a uniform tool to assess potential occurrences of paleontological resources and to allow evaluation of potential impacts on these resources. It is intended to be applied in broad approach for programmatic efforts and as an intermediate step in evaluating specific projects.

### Potential Fossil Yield Classification System

The potential for paleontological resources is currently identified using two indicators: The BLM Fossil Class Condition system, and the newer PFYC system. While the older BLM Fossil Class Condition system has been used extensively in the past, recent BLM guidelines encourage use of the more precise PFYC system.

In the PFYC system, geologic units are classified from 1 (no potential for significant fossils) to 5 (very high occurrence of significant fossils) based on the relative abundance of vertebrate fossils or significant invertebrate or plant fossils and their sensitivity to adverse impacts.[3] This classification is applied to the geologic formation, member, or other distinguishable unit, preferably at the most detailed mappable level. It is not applicable to specific paleontological localities or small areas within units. While widely scattered fossils or localities may occur within a geologic unit, the relative abundance of significant localities determines the class assignment. The BLM in Colorado has classified rock units both statewide and by BLM region (Trujillo 2010).

The PFYC system is meant to provide baseline guidance for predicting, assessing, and mitigating paleontological resources. The classification should be considered at an intermediate point in the analysis, and should be used to assist in determining the need for further assessment and/or mitigation actions. Descriptions of the PFYC classes can be found in BLM Instruction Memorandum 2008-009 (BLM 2007b).

---

[3] PFYC 1 – very low potential for recognizable fossil remains; PFYC 2 – low potential for vertebrate fossils or scientifically significant non-vertebrate fossils; PFYC 3 – moderate potential where fossil content varies in significance, abundance, and predictable occurrence, or unknown fossil potential; PFYC 4 – high occurrence of significant fossils; PFYC 5 – very high occurrence that consistently and predictably produce fossils. Source: BLM WO Instruction Memorandum 2008-009
(http://www.blm.gov/wo/st/en/prog/more/CRM/paleontology/paleontological_regulations.html)

**Current Conditions**

**Table 3-34**, Sedimentary Rock Units, Their Fossil-bearing Potential, and Known Fossil Resources, lists the potentially fossil-bearing rock units in the project area in stratigraphic order (from oldest at bottom to youngest at top), their PFYC category, and the known fossil resources from each unit in general and specifically in the project area. The distribution of PFYC categories across the project area is displayed in **Figure 3-19**, Potential Fossil Yield Classification. There are no rocks at the surface or near the surface older than the Ohio Creek Formation within the boundaries of the Bull Mountain Unit; **Figure 3-19** shows the Wasatch Formation and other recent deposits. Additionally, there are few areas of exposed rock outcrops or strata and no known localities within the project area.

**Table 3-34**
**Sedimentary Rock Units, Their Fossil-bearing Potential, and Known Fossil Resources**

| Geologic Age | Group | Formation | Member | PFYC Rating | Known Fossil Resources | Known Fossil Resources in Project Area |
|---|---|---|---|---|---|---|
| Quaternary | | unconsolidated sediments | | 3 | Pleistocene mammals | Mammoth teeth, camel, horse, rodents |
| Eocene | | Uinta Formation | | 3 | mammals | none known |
| Eocene | | Green River Formation | Parachute Creek Member | 3 | fish, bats, birds, mammals | none known |
| Paleocene-Eocene | | Wasatch Formation | | 3 | mammals, reptiles, invertebrates | none known |
| Upper Cretaceous | Mesa Verde | Hunter Canyon Formation Mt. Garfield Formation Sego Sandstone | | 3 | dinosaurs, mammals, reptiles, fish | none known |
| Upper Cretaceous | | Mancos Shelf | | 3 | marine reptiles, invertebrates, shark teeth, wood | mosasaur, invertebrates, wood |
| Lower Cretaceous | | Dakota Formation | | 3 | invertebrates, plants, tracks, mammals | none known |
| Lower Cretaceous | | Burro Canyon Formation | | 3 | dinosaurs, tracks, plants | theropod dinosaur, fish scales, plants, invertebrates |
| Upper Jurassic | | Morrison Formation | Brushy Basin Member | 4-5 | dinosaurs, mammals, pterosaurs, lizards, amphibians, sphenodonts, crocodiles, turtles, fish, invertebrates | dinosaurs, mammals, pterosaurs, lizards, amphibians, crocodiles, turtles, fish, invertebrates |

**Table 3-34**
**Sedimentary Rock Units, Their Fossil-bearing Potential, and Known Fossil Resources**

| Geologic Age | Group | Formation | Member | PFYC Rating | Known Fossil Resources | Known Fossil Resources in Project Area |
|---|---|---|---|---|---|---|
| Middle Jurassic | San Rafael | Wanakah Formation | | 4-5 | fish, plants, trace fossils, invertebrates | Hadrodon (bivalve) |
| | | | Salt Wash Member | 4-5 | dinosaurs, crocodiles, turtles, invertebrates | dinosaurs, crocodiles, turtles, invertebrates |
| | | Entrada Sandstone | | 3 | dinosaur tracks | none known |
| Lower Jurassic | Glen Canyon | Navajo Sandstone | | 3 | dinosaur tracks, rare dinosaur skeleton | none known |
| | | Kayenta Formation | | 3 | dinosaurs, dinosaur tracks | none known |
| | | Wingate Sandstone | | 3 | dinosaur tracks | theropod tracks |
| Lower Triassic | | Chinle Formation | | 5 | Phytosaurs, aetosaurs, dinosaurs, lizards, lungfish, invertebrates | none known |
| Lower Triassic | | Moenkopi Formation | | 3 | tracks, invertebrates | plants |
| Pennsylvanian-Permian | | Cutler Formation | | 3-4-5 | amphibians, synapsids, reptiles, invertebrates | Fish, large amphibians, microsaurian amphibians, various reptiles, plants |
| Pennsylvanian | | Hermosa Formation | | | none known | none known |

Sources: Trujillo 2010; Batten and Stokes 1986; Breithaupt 1985; Foster 2007; Irmis 2005; Kass 1999; Kurten and Anderson 1980; Lillegraven and McKenna 1986; Lockley and Hunt 1995; Merewether et al. 2006; O'Sullivan et al. 2006; Roehler 1992; Schoch 1986; Sertich and Loewen 2010; Turner and Peterson 1999; Untermann and Untermann 1964; Vaughn 1962, 1964; Weiscampel 1990

The surface geology of the Bull Mountain Unit is unlikely to yield significant fossils for two primary reasons, as follows:

1. The Wasatch Formation is made up of fluvial sandstone that has been transported some distance, as evidenced by large-scale cross bedding and gravel lags seen in the outcrops. The interbedded shales exposed are orange and red, indicating an aerobic environment as expected to be associated with fluvial sand deposition. Fossil preservation is not likely in this type of deposition. This environment is the reason that **Table 3-34** lists "none known" under "Known Fossil Resources in Project Area" for the Wasatch Formation. The other rock types shown on the map would be recent deposits and have similar characteristics.

3. Affected Environment



**Potential Fossil Yield Classification**
Source: BLM GIS 2014

Bull Mountain Unit

PFYC 5 very high fossil occurrence that consistently and predictably produce fossils

PFYC 4 high occurrence of significant fossils (none)

PFYC 3 moderate potential where fossil content varies in significance, abundance, and predictable occurrence, or unknown fossil potential

PFYC 2 low potential for vertebrate fossils or scientifically significant nonvertebrate fossils (none)

PFYC 1 very low potential for recognizable fossil remains (none)

Figure 3-19

2. Limited outcrops are found in the Bull Mountain Unit. The best rock exposures are found on the cutbanks of West and East Muddy Creeks. The broad Wasatch Formation shown on the surface geology map (**Figure 3-19**) is the top of the layer and is covered with a shallow soil or thin gravels. Construction and associated disturbance would be very limited next to the creeks where fossils might be found.

*Trends*

Qualitative observation indicates that the condition has remained stable for paleontological resources protected or mitigated through the permitting process and other standard operating procedures, such as pre-disturbance clearance, associated with federal management actions. In these cases, the trend has been toward conservation. For resources not associated with direct management actions, the trend has been slightly downward. The primary contributors to this trend include unauthorized collection of fossils, limited law enforcement resources, and ground disturbance associated with recreational activities.

## 3.2.14 Visual Resources

Visual resources refer to the visible features (e.g., land, water, vegetation, animals, and structures) on a landscape. These features contribute to the scenic or visual quality and appeal of the landscape. Visual impact is the creation of an intrusion or perceptible contrast that affects the scenic quality of a landscape. A visual impact can be perceived by an individual or group as either positive or negative, depending on a variety of factors or conditions (e.g., personal experience, time of day, and weather or seasonal conditions; BLM 1984).

*Visual Resource Management System*

The BLM Visual Resource Management (VRM) system is a way to identify and evaluate these scenic values in order to determine appropriate levels of management. VRM is a tool to identify and map essential landscape settings to meet public preferences and recreational experiences today and into the future. The VRM system helps to ensure that actions taken on BLM-administered lands today will benefit the visual qualities associated with the landscapes, while protecting these visual resources for years to come.

*Visual Resource Inventory*

Visual resource inventory (VRI) involves identifying the visual resources of an area and assigning them to inventory classes using the BLM's resource inventory process. The process involves rating the visual appeal of a tract of land (Scenic Quality Evaluation), measuring public concern for scenic quality (Sensitivity Level Analysis), and determining whether the tract of land is visible from travel routes or observation points (Delineation of Distance Zones). Based on these three inventory components, lands are placed into one of four VRI classes. These class assignments are informational and provide the basis for considering visual values during the RMP process. They do not establish management direction and are not used as a basis for constraining or limiting surface-disturbing activities but are considered a baseline for existing conditions. This process is described in detail in BLM Handbook H-8410-1, Visual Resource Inventory (BLM 1986a).

*Visual Resource Management*

The assignment of VRM classes is ultimately based on management decisions made during the RMP process, which must take into consideration the value of visual resources. During the

process, inventory class boundaries can be adjusted as necessary to reflect these resource allocation decisions. The goal of VRM is to minimize the visual impacts of all surface-disturbing activities, regardless of the class to which an area is assigned. Objectives for each of the four Visual Resource Classes are as follows:

Class I. The objective of this class is to preserve the existing character of the landscape. This class provides for natural ecological changes; however, it does not preclude very limited management activity. The level of change to the characteristic landscape should be very low and must not attract attention.

Class II. The objective of this class is to retain the existing character of the landscape. The level of change to the characteristic landscape should be low. Any changes must repeat the basic elements of form, line, color, and texture found in the predominant natural features of the characteristic landscape.

Class III. The objective of this class is to partially retain the existing character of the landscape. The level of change to the characteristic landscape should be moderate. Management activities may attract attention but should not dominate the view of the casual observer. Changes should repeat the basic elements found in the predominant natural features of the characteristic landscape.

Class IV. The objective of this class is to provide for management activities that require major modification of the existing character of the landscape. The level of change to the characteristic landscape can be high. These management activities may dominate the view and be the major focus of viewer attention. However, every attempt should be made to minimize the impact of these activities through careful location, minimal disturbance, and repeating the basic elements.

The analysis of a visual contrast rating process is used to resolve visual impacts. The process of a visual contrast rating, which involves comparing the project features with the existing landscape features using basic elements of form, line, color, and texture, is described in detail in BLM Handbook H-8431-1, Visual Resource Contrast Rating (BLM 1986b).

### Current Conditions

The project area encompasses the rolling foothills to the northwest of the Ragged Mountain range, which holds a highly diverse landscape with a high amount of visual variety. Vertical relief is present, with high, rolling hills and fairly steep slopes. It is substantially natural in character, with few human intrusions creating a visual imprint on the land. The vegetation is vibrant and healthy, displaying as much or more diversity than seen in comparable areas in the west, resulting in brilliant seasonal color variation. Numerous shrub species thrive with open meadows weaving in between large stands of woodlands comprised of aspen, juniper, and oak, along with a few groups of coniferous trees. The viewshed is mostly open and exposed as the traveler comes down McClure Pass, moving west along State Highway 133. As the highway begins to drop, the viewshed begins to narrow and is limited by the valley walls of Muddy Creek and the North Fork of the Gunnison River.

State Highway 133 and County Road 265 serve as the two primary travel routes in the project area. The West Elk Loop Scenic Byway passes through the project area on State Highway 133

and connects the towns of Carbondale, Hotchkiss, Crawford, Gunnison, Crested Butte, among others. This route also provides access to the White River and Gunnison National Forests, the Black Canyon of the Gunnison National Park, Gunnison Gorge National Conservation Area, Curecanti National Recreation Area, and Crawford and Paonia State Parks. County Road 265 has less traffic and is primarily used for local use with some regional access. This road follows a drainage, which limits its viewshed to the immediate foreground due to the topography.

The proposed facilities in the project area occur on a mixture of private surface/private minerals, private surface/federal minerals (split-estate), and federal surface/federal minerals. While VRM objectives do not apply to non-BLM-administered lands, visual concerns may be addressed on split-estate where federal minerals occur.

A VRI of the UFO was completed in September 2009 according to guidelines in BLM Manual Handbook H-8410-1, Visual Resource Inventory (BLM 1986a) and the project area was included as part of that inventory. While not yet incorporated into the current RMP, this data is the most recent and comprehensive data available for visual resources within the project area.

Information for each of the three VRI components, as they pertain to the project area, is as follows:

Scenic Quality Evaluation: The project area is within the Bull Mountain, Paonia Reservoir, and Deep Creek Scenic Quality Rating Units of the VRI. Landform, water, vegetation, and structures were reviewed and described in the context of form, line, color, and texture as part of the VRI. In addition, landform, vegetation, water, color, adjacent scenery, scarcity, and cultural modifications were rated. The three Scenic Quality Rating Units received a Class A scenic quality rating, indicating a high and unique scenery value. The Scenic Quality Rating Units were given this rating due to the variety and seasonal color variation of vegetation, the adjacent scenery provided by the Ragged Mountain Range as well as the presence of flowing water. The rating documentation also notes that these Scenic Quality Rating Units provide a very diverse and vibrant vegetative community, considerable visual variety in terms of color, and that it is a very scenic landscape.

Sensitivity Level Analysis: The project area is within the Bull Mountain, Paonia Reservoir, and Deep Creek Sensitivity Level Rating Units. Although the Deep Creek Sensitivity Level Rating Unit received a rating of medium for sensitivity, the Bull Mountain and Paonia Reservoir Sensitivity Level Rating Units (97 percent of the project area) received a rating of high for sensitivity. During the VRI, it was noted that a high sensitivity rating involved a high public sensitivity to preserving the rural character and open space of the area, as well as the presence of the West Elk Loop Scenic Byway, and the volume of tourist traffic and visitor use. The area attracts the notice of conservation groups concerned about energy development.

Delineation of Distance Zones: The project area is all within the foreground/middle ground distance zone (0 to 5 miles), which means the landscape can readily be seen and experienced from a major travel route or point. The primary travel routes are State Highway 133 and County Road 265.

The scenic quality evaluation, sensitivity level analysis, and distance zone delineation combine to rate the project area as VRI Class II. Under the RMP, however, all BLM-administered land within the project area is rated as VRM Class III.

*State and Local Plans*

The Delta County Master Plan. This plan notes the presence of the West Elk Loop Scenic Byway and the protection and interpretation of the cultural heritage and natural resources in the area. The Delta County Master Plan states the following goal:

> The preservation of the rural lifestyle and landscape, which includes the natural environment and unique physical characteristics of Delta County. Natural resources associated with the rural landscape include open space and scenic viewsheds, and includes a desired strategy to map the significant physical features and environmental characteristics of the County, such as important scenic viewsheds.

The Town of Paonia State Highway 133 Corridor Master Plan. This plan states as a goal that, "The open scenic character of the West Elk Scenic Byway shall be protected." It states that new development should not detract from the rural qualities of the highway corridor and Paonia's small-town character.

*Trends*

The landscape in the Unit is experiencing a high degree of human modification due to energy development occurring on private lands. This type of development includes strips of land lacking vegetation for access roads, artificial structures associated with energy development and transmission infrastructure, and commotion from operating and maintaining energy development sites.

## 3.3   RESOURCE USES

This section contains a description of the human uses of resources in the project area and follows the order of topics addressed in **Chapter 2**:

- Livestock grazing

- Minerals (leasable, locatable, salable)

- Recreation

- Lands and realty

- Transportation and access

### 3.3.1   Livestock Grazing

*Regulatory Environment*

The BLM manages grazing under the authority of the Taylor Grazing Act of 1934, the FLPMA, and the Public Rangelands Improvement Act of 1978. Under this management, ranchers may

obtain permits for an allotment of public land on which a specified number of livestock may graze. The number of permitted livestock on a particular allotment is determined by how many animal unit months that land will support.

The BLM operates a program to stabilize or improve the ecological condition of the allotments in compliance with the Colorado Standards for Public Land Health and Guidelines for Livestock Grazing Management. Standards are expressions of physical and biological condition or the degree of function required for healthy land, and they define minimum resource conditions that must be achieved or maintained.

### Current Conditions

Until recently, this area sustained very high levels of both sheep and cattle grazing. Larger ranches within the Unit still host both cattle and sheep grazing, but sheep grazing is mostly limited to ranches at the northern end of the Unit (**Figure 3-20**, Grazing Allotments). **Table 3-35**, Ranches and Allotments within the Bull Mountain Unit, below lists private landholdings and BLM grazing allotments within the Unit.

**Table 3-35**
**Ranches and Allotments within the Bull Mountain Unit**

| Name | Acreage (if available) | AUMs | Class of Livestock | Season of Use |
|---|---|---|---|---|
| **BLM Allotments** | | | | |
| Stock Driveway | 340 | 32 | Cattle | Summer |
| Downing | 280 | 27 | Cattle | Summer |
| Rock Creek Ranch I, Ltd. | N/A | 200 | Sheep | Spring/Fall |
| **Private Ranches** | | | | |
| Sperry | N/A | 200 | Sheep | Spring/Fall |
| Rock Creek Ranch I, Ltd. | N/A | 315 | Cattle | Summer/Fall |
| Jacobs Ranch | 2,000 | 225 | Cattle | Summer/Fall |
| Falcon Seaboard Ranch | N/A | N/A | Cattle | Summer |
| Aspen Leaf | N/A | N/A | Sheep and Cattle | Spring/Summer/Fall |
| Hotchkiss | N/A | N/A | Sheep and Cattle | Spring/Summer/Fall |

Source: BLM GIS 2014, needs source for AUMs
AUM = animal unit month
N/A = not available

Federal landholdings are limited in the Unit and only two grazing allotments are present in the southeast corner of the Unit, Stock Driveway and Downing. These allotments are partially on BLM-administered and partially on private land (BLM 2007 - North Fork Land Health Assessment). The allotment portions on BLM-administered land are generally meeting land health standards (BLM 2007).

The Rock Creek Ranch I, Ltd. once ran 20 bands of sheep (a band is 1,000 sheep) in this area. Currently, Rock Creek Ranch runs one band, and another rancher (Sperry) runs one band northeast of this area. In addition, cattle graze seasonally in this area, and a grazing permit is leased back to Rock Creek Ranch I, Ltd. for grazing. On the Rock Creek Ranch, Rock Creek Ranch I, Ltd. runs 173 cow-calf pairs in one area and 134 pairs in another, plus 10 heifers.

3. Affected Environment



**Grazing Allotments**

Source: BLM GIS 2014

Bull Mountain Unit

Grazing allotment

Figure 3-20

The Jacobs Ranch is located at the eastern side of the Unit and is a working cattle ranch. This ranch supports a cow-calf operation, with grazing occurring from May 15th through December. A maximum of 225 cow-calf pairs graze on 2,000 acres of pasture. Cattle start the early season on south-facing slopes north of State Highway 133, and in mid-July are moved south of State Highway 133. No cattle are grazed during the winter and spring on the ranch. Irrigation starts around the end April or early May, and ends in late August to early September. Meadows are hayed for grass-hay production.

The Falcon Seaboard Ranch was consolidated from several smaller ranches in 1990 and was purchased by Falcon Seaboard in its current configuration in 1996. Prior to 1996 the ranch was used for both cattle and sheep grazing, but currently only sees cattle grazing. The ranch supports both a cow/calf and yearling calf operation. Yearlings are brought on (via stock trucks) in early May and grazed through the summer to early September. Cows and nursing calves are trucked to the ranch in early June and come off in early October. No cattle are grazed during the winter and spring on the ranch. Irrigation of meadows starts around the end of April or early May, and ends in late August to early September. Meadows are hayed for grass-hay production.

Other large ranches in the Unit include the Sperry, Aspen Leaf, and Hotchkiss ranches, all of which support cow/calf and yearling calf operations as well as sheep grazing. Sheep generally graze the ranches in the spring, and are moved onto summertime allotments on National Forest System lands on the Grand Mesa Uncompahgre and Gunnison and White River National Forests. They are trailed back down onto the ranches in the late fall, where they graze on upland meadows, and on irrigated hay fields post-haying. All sheep are generally trucked out of the Muddy Creek basin by early November for market. On the Hotchkiss Ranch, a small herd of sheep (around 30) persists through the summer on the ranch. The location of the 12-89-7-1 APD well pad is on private lands with active sheep and cattle grazing on Hotchkiss Ranch.

Along the State Highway 133 corridor, from the intersection of State Road 265 and south, there is a lack of widespread large ranches, but cattle are often wintered on the lower-elevation meadows near Muddy Creek. Subdivisions and smaller lot sizes have decreased the connectivity of larger ranches, and less cattle grazing occurs. Further, the steeper topography and drier climate reduce grazing opportunities at the southern end of the Unit.

Despite the extremely high grazing pressure in the past, the area has a very good distribution of grasses and forbs in the understory of the sagebrush and Gambel's oak habitat types. Within the general area, aspen stands and various increaser species of plants indicate high long-term grazing pressure. These increasers include skunk cabbage (*Veratrum tenuipetalum*), tall larkspur (*Delphinium barbeyi*), tarweed (*Madia glomerata*), and sneezeweed (*Helenium autumnale*). Notable evidence of habitat degradation from past and current grazing was not apparent during a site visit. The dense stands of Gambel's oak are too thick to be greatly utilized by livestock.

Substantial elk wintering activity can also occur on ranches with elk winter ranges (e.g., lower-elevation, south- and west-facing slopes), such as the Jacobs Ranch. Some mule deer wintering range is also present in the project area.

*Trends*

Past livestock grazing on the Unit was heavier than currently practiced, with use levels up to 20 times higher than current use maintained in the area. Currently, 7 private ranches and 2 BLM grazing allotments operate in the Unit at a capacity of approximately 1,000 animal unit months. Livestock grazing trends in the project area appear stable at the present time, though with increasing human population and associated development, grazing may experience some decline in the near future.

## 3.3.2   Minerals (Leasable, Locatable, Salable)

Except for gas and coal resources, no fluid or solid leasable minerals or locatable minerals are known to exist within the Unit. As discussed under Section 3.2.5, Geology, coal can be found at depths of 6,000 to 10,000 feet. In the Uncompahgre RMP (1989), coal potential is based on a maximum development depth of about 2,000 feet, and the revised RMP (ROD expected in 2015) is proposing to expand that depth to 3,000 feet. As such, coal resources are not considered a viable resource in the Unit and no impact on coal is expected from the proposed project. There is potential for minor occurrences of mineral materials; however, there are no operations and no county free use permits within the Unit. No impact on mineral materials is expected from the proposed project.

*Fluid Leasable Minerals—Gas*

In the Unit, the Mesa Verde Group in the Piceance Basin has gas potential for conventional gas in sandstone units, coal bed methane gas within its coal seams, and shale gas resources in sedimentary strata associated with the Mancos Shale. The hydrocarbon production in this area has been natural gas with very little condensate[4] and no associated oil. For this reason, only natural gas production will be discussed in the remainder of this section.

As of 2010, wells in the North Fork area had produced over 3 billion cubic feet of gas. The bulk of the gas production in this area is from upper Cretaceous sandstone reservoirs in the Mesa Verde Group within the greater Piceance Basin. Primary targets for drilling in the Mesa Verde group include the Cozzette and Corcoran Sandstone members found within the Mount Garfield (or Iles) Formation.

In addition, a high potential exists for the occurrence of coal bed natural gas in the Mesa Verde Group. The South Canyon Coal and Cameo Coal units within the Williams Fork Formation are targets within this group. Producers are also exploring potential sources of shale gas within the Mancos shale (BLM 2012).

Additional formations within the Cenozoic zone contain natural gas production potential but have not yet been productive (BLM 2012). According to Colorado State historic records, 116 gas wells have been drilled in the North Fork area on federally managed oil and gas leases, including split-estate lands. Of these wells, 15 are currently producing, 29 are shut-in but capable of production, and 72 have been drilled, abandoned, and plugged (BLM 2011).

---

[4] Of SGI's 13 producing wells, 6 made condensate. Of these 6 wells, 2 produce salable quantities and the remaining 4 produce between 0 and 6 barrels per month. The 2 wells that produce condensate have had average sales of 98 and 20 barrels of condensate per month.

*Current Conditions*

Oil and gas leasing in the Unit is guided by the Uncompahgre RMP (1989), which is currently being revised (ROD expected in 2015). According to the RFD prepared in support of the ongoing RMP revision, the Unit is located in an area identified as having High occurrence potential (BLM 2012). Mineral production within the Unit is limited to natural gas wells developed by SGI and one natural gas well developed by Gunnison Energy Corporation. SGI owns and operates 11 private/private and 5 federal mineral/private surface natural gas wells on 13 well pads, and one additional well pad housing a water-disposal well. Gunnison Energy Corporation owns and operates one private/private natural gas well within the Unit project area. **Table 2-5**, Bull Mountain Unit Annual Production Rates, provides annual gas and water production data. Additionally, **Table 3-36**, Bull Mountain Unit Existing Facilities, presents the existing facilities in the Unit.

**Table 3-36**
**Bull Mountain Unit Existing Facilities**

| Facility Type | Facility Name/Number | Operator Name/Number | Field Name/Number | Location |
|---|---|---|---|---|
| Well | McIntyre 11-90-11 #3 | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 11, NWSW |
| Location | McIntyre-11S90W 11NWSW | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 11, NWSW |
| Well | McIntyre 11-90-11 1 | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 11, SENW |
| Location | McIntyre 11-90-11-SENW | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 11, SENW |
| Location | Falcon Seaboard 11-90-11SESE | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 11, SESE |
| Well | Falcon Seaboard 11-90-11 2 | SGI 77330 | Bull Mountain 7815 | Gunnison Co. T.11S, R. 90W, 11, SESE |
| Well | Falcon Seaboard 11-90-12 2 | SGI 77330 | Ragged Mountain 71430 | Gunnison Co. T.11S, R. 90W, 12, NWNE |
| Location | Falcon Seaboard 11-90-12NWNE | SGI 77330 | Ragged Mountain 71430 | Gunnison Co. T.11S, R. 90W, 12, NWNE |
| Location | Falcon Seaboard 11-90-12SWNW | SGI 77330 | Ragged Mountain 71430 | Gunnison Co. T.11S, R. 90W, 12, SWNW |
| Location | Falcon Seaboard -11S90W 12SWNW | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 12, SWNW |
| Well | Falcon Seaboard 11-90-12 #1A | SGI 77330 | Bull Mountain 7815 | Gunnison Co. T.11S, R. 90W, 12, SWNW |
| Well | Falcon Seaboard 11-90-12 1 | SGI 77330 | Ragged Mountain 71430 | Gunnison Co. T.11S, R. 90W, 12, SWNW |

**Table 3-36**
**Bull Mountain Unit Existing Facilities**

| Facility Type | Facility Name/Number | Operator Name/Number | Field Name/Number | Location |
|---|---|---|---|---|
| Well | Falcon Seaboard 11-90-12 4 | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 12, SWNW |
| Lease | Falcon Seaboard 11-90-12 1 | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 12, SWNW |
| Well | McIntyre 11-90-14 1 | SGI 77330 | Ragged Mountain 71430 | Gunnison Co. T.11S, R. 90W, 14, NWSW |
| Location | McIntyre 11-90-14-NWSW | SGI 77330 | Ragged Mountain 71430 | Gunnison Co. T.11S, R. 90W, 14, NWSW |
| Pit | McIntyre Flowback Pits 2 | SGI 77330 | Ragged Mountain 71430 | Gunnison Co. T.11S, R. 90W, 23, NESE |
| Location | McIntyre Flowback Pits 1 & 2 | SGI 77330 | | Gunnison Co. T.11S, R. 90W, 23, NESW |
| Well | RC Fed 11-90-23 2 | SGI 77330 | Bull Mountain 7815 | Gunnison Co. T.11S, R. 90W, 23, SESW |
| Location | Rock Creek 11-90-23 1 | SGI 77330 | | Gunnison Co. T.11S, R. 90W, 23, SESW |
| Well | Rock Creek 11-90-23 1 | SGI 77330 | Bull Mountain 7815 | Gunnison Co. T.11S, R. 90W, 23, SESW |
| Location | Federal 11-90-24 #3 | SGI 77330 | | Gunnison Co. T.11S, R. 90W, 24, Lot 4 |
| Well | Federal 11-90-24 3 | SGI 77330 | Bull Mountain 7815 | Gunnison Co. T.11S, R. 90W, 24, Lot 4 |
| Location | Federal 11-90-24-11S90W 24NWSE | SGI 77330 | Ragged Mountain 71430 | Gunnison Co. T.11S, R. 90W, 24, NWSE |
| Well | Federal 11-90-24 1 | SGI 77330 | Bull Mountain 7815 | Gunnison Co. T.11S, R. 90W, 24, NWSE |
| UIC Disposal | Federal 24-2 WDW | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 24, NWSW |
| Well | Federal 24-2 WDW | SGI 77330 | Bull Mountain 7815 | Gunnison Co. T.11S, R. 90W, 24, NWSW |
| Location | Federal -611S90W 24NWSW | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 24, NWSW |

**Table 3-36**
**Bull Mountain Unit Existing Facilities**

| Facility Type | Facility Name/Number | Operator Name/Number | Field Name/Number | Location |
|---|---|---|---|---|
| Location | Federal 24SWNE | SGI 77330 | Bull Mountain 7815 | Gunnison Co. T.11S, R. 90W, 24, SWNE |
| Well | Federal 11-90-24 #1A | SGI 77330 | Bull Mountain 7815 | Gunnison Co. T.11S, R. 90W, 24, SWNE |
| Pit | McIntyre Flowback 1 | SGI 77330 | Ragged Mountain 71430 | Gunnison Co. T.11S, R. 90W, 24, SWNW |
| Centralized EP Waste Management Facility | McIntyre Flowback Pits #1 and #2 421065 | SGI 77330 | Ragged Mountain 71430 | Gunnison Co. T.11S, R. 90W, 24, SWNW |
| Well | Hughes 11-90-26 2 | SGI 77330 | Bull Mountain 7815 | Gunnison Co. T.11S, R. 90W, 26, Lot 6 |
| Location | Hughes 11-90-26 2 | SGI 77330 | | Gunnison Co. T.11S, R. 90W, 26, Lot 6 |
| Well | Federal 11-90-26 #1 | SGI 77330 | Bull Mountain 7815 | Gunnison Co. T.11S, R. 90W, 26, NENE |
| Location | Federal 26NENE | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 26, NENE |
| Location | McIntyre Flowback Pits 3 & 4 | SGI 77330 | Ragged Mountain 71430 | Gunnison Co. T.11S, R. 90W, 26, NWNE |
| Centralized EP Waste Management Facility | McIntyre Flowback Pits #3 and #4 421066 | SGI 77330 | Ragged Mountain 71430 | Gunnison Co. T.11S, R. 90W, 26, NWNE |
| Pit | McIntyre Flowback 4 | SGI 77330 | Ragged Mountain 71430 | Gunnison Co. T.11S, R. 90W, 26, NWNE |
| Pit | McIntyre Flowback 3 | SGI 77330 | Ragged Mountain 71430 | Gunnison Co. T.11S, R. 90W, 26, NWNE |
| Well | Pasco Spadafora 3 | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 27, NENE |
| Well | Pasco Spadafora 2 | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 27, NENE |
| Location | Pasco Spadafora #2 413893 | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 27, NENE |
| Location | Pasco (Spadafora)-611S90W 27NENE | Delhi Taylor Oil Corp 23430 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 27, NENE |

**Table 3-36**
**Bull Mountain Unit Existing Facilities**

| Facility Type | Facility Name/Number | Operator Name/Number | Field Name/Number | Location |
|---|---|---|---|---|
| Well | Pasco (Spadafora) 1 | Delhi Taylor Oil Corp 23430 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 27, NENE |
| Well | Federal 11-90-35#1 | SGI 77330 | Bull Mountain 7815 | Gunnison Co. T.11S, R. 90W35, SWNE |
| Location | Federal -611S90W 35SWNE | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 90W, 35, SWNE |
| Location | Falcon Seaboard 11-89-7- 611S89W 7SESE | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 89W, 7, SESE |
| Well | Falcon Seaboard 11-89-7 1 | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 89W, 7, SESE |
| Well | Federal 11-89-17 1 | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 89W, 17, SWNE |
| Well | Muddy Creek Federal 10-17-11-89 | Tamarack Energy Inc. 85545 | Wildcat 99999 | Gunnison Co. T.11S, R. 89W, 17, SWNE |
| Location | Federal 11-89-17-11S89W 17SWNE | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 89W, 17, SWNE |
| Location | Muddy Creek Federal- 611S89W17SWNE | Tamarack Energy Inc. 85545 | Wildcat 99999 | Gunnison Co. T.11S, R. 89W, 17, SWNE |
| Well | Cow Skull 11-89-18 1 | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 89W, 18, NESW |
| Location | Cow Skull 11-89-18 #1 414132 | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 89W, 18, NESW |
| Well | Cow Skull 11-89-18 2 | SGI 77330 | Bull Mountain 7815 | Gunnison Co. T.11S, R. 89W, 18, NESW |
| Location | HL 11-89-19 #1 | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 89W,19, SENW |
| Well | HL 11-89-19 1 | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 89W,19, SENW |
| Pit | Jacobs 29-1 | Loch Exploration Inc. 51058 | Wildcat 99999 | Gunnison Co. T.11S, R. 89W, 29 |
| Well | Jacobs 29-1 | SGI 77330 | Bull Mountain 7815 | Gunnison Co. T.11S, R. 89W, 29, NWNW |

**Table 3-36**
**Bull Mountain Unit Existing Facilities**

| Facility Type | Facility Name/Number | Operator Name/Number | Field Name/Number | Location |
|---|---|---|---|---|
| Location | Jacobs-611S89W 29NWNW | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 89W, 29, NWNW |
| Location | Borich 11-89-32 #1 | SGI 77330 | | Gunnison Co. T.11S, R. 89W, 32, NWSE |
| Well | Borich 11-89-32 1 | SGI 77330 | Wildcat 99999 | Gunnison Co. T.11S, R. 89W, 32, NWSE |
| Location | Buck Creek 12-89-5 1 | SGI 77330 | | Gunnison Co. T.12S, R. 89W, 5, SWNE |
| Well | Medved 12-89-5 1 | SGI 77330 | Wildcat 99999 | Gunnison Co. T.12S, R. 89W, 5, SWNE |
| Location | Federal 12-89-7 #1 | SGI 77330 | | Gunnison Co. T.12S, R. 89W, 7, NESE |
| Well | Federal 12-89-7 #1 | SGI 77330 | West Muddy Creek 91970 | Gunnison Co. T.12S, R. 89W, 7, NESE |
| Location | Eck 12-90-1 428197 | SGI 77330 | | Gunnison Co. T.12S, R. 90W, 1, Lot 1 |
| Well | Eck WDW 2 | SGI 77330 | West Muddy Creek 91970 | Gunnison Co. T.12S, R. 90W, 1, Lot 1 |
| Well | Eck 12-90-1 #3 | SGI 77330 | West Muddy Creek 91970 | Gunnison Co. T.12S, R. 90W, 1, Lot 1 |
| Well | Eck 12-90-1 1 | SGI 77330 | West Muddy Creek 91970 | Gunnison Co. T.12S, R. 90W, 1, Lot 1 |
| Well | Hotchkiss 12-90 1-34 | Gunnison Energy Corp. 100122 | West Muddy Creek 91970 | Gunnison Co. T.12S, R. 90W, 1, SWSE |
| Pit | Hotchkiss 1290 1-34 | Gunnison Energy Corp. 100122 | Wildcat 99999 | Gunnison Co. T.12S, R. 90W, 1, SWSE |
| Location | Hotchkiss 12-90-612S90W 1SWSE | Gunnison Energy Corp. 100122 | West Muddy Creek 91970 | Gunnison Co. T.12S, R. 90W, 1, SWSE |
| Well | Hotchkiss Ranch 3-11 | Petro-Lewis Corp. 68900 | Wildcat 99999 | Gunnison Co. T.12S, R. 90W, 11, NENW |
| Location | Hotchkiss Ranch -12S90W 11NENW | Petro-Lewis Corp. 68900 | Wildcat 99999 | Gunnison Co. T.12S, R. 90W, 11, NENW |

*Trends*

The US oil and gas industry is drilling fewer dry holes and recovering more oil and gas reserves per well due to innovative drilling and completion techniques. The Energy Information Administration estimates that over the next 20 years successfully drilled US energy wells will increase 0.2 percent per year through 2030. According to the Annual Energy Outlook 2011, shale gas production is expected to steadily increase, growing almost fourfold from 2009 to 2034; natural gas in power generation will grow due to low natural gas prices and the relatively low capital costs for new natural gas plants that make it more attractive than coal; and reliance on petroleum imports as a share of total liquids consumption is expected to decrease (EIA 2011; BLM 2012).

Over the last decade, exploratory and development activities in and surrounding the Unit have focused on exploring for and developing coal bed natural gas resources and other Cretaceous aged sediments. Although the risk of failure is higher for these types of exploratory activities (in comparison to drilling for tight sands gas and shale gas types of reservoirs), the BLM expects that exploratory and development activities in this area will continue over the next 20 years (BLM 2012).

Increases in future natural gas production to accommodate projected increased demand is anticipated to come partly from the Rocky Mountain area, in particular shale gas resources. It is difficult to predict how much new gas production is expected to come from reservoirs in and surrounding the Unit.

### 3.3.3   Recreation

*Current Conditions*

The Unit is accessed from State Highway 133, along the West Elk Loop Scenic Byway, and County Road 265. The West Elk Loop Scenic Byway passes through the proposed project area on State Highway 133 and connects the town of Carbondale, Hotchkiss, Crawford, Gunnison, Crested Butte, and other towns. In addition to attracting tourists, State Highway 133 provides access to hiking, mountain biking, dispersed camping, viewing of seasonal colors, cross-country skiing, and snowmobiling. The byway is known for its history, showcasing towns of varied lifestyles, and natural beauty. This route also provides access to the White River and Gunnison National Forests, the Black Canyon of the Gunnison National Park, Gunnison Gorge National Conservation Area, Curecanti National Recreation Area, and Crawford and Paonia State Parks.

County Road 265 provides access to the Grand Mesa, Uncompahgre, and Gunnison National Forest, which is extensively utilized for fall big game hunting, summer camping, viewing of seasonal colors, and snowmobiling.

Paonia State Park is located in close proximity to State Highway 133 and provides developed campsites, picnic sites, and a boat ramp surrounding Paonia Reservoir. McClure Pass is also in the vicinity and provides access to hiking, horseback riding, fishing, viewing of seasonal colors and scenic viewing, skiing, and snowshoeing and is a popular area with locals seeking nearby recreation opportunities.

The project area consists primarily of private surface that has historically been used for agriculture and grazing, with seasonal hunting. Hunting on private lands is permitted through local outfitter-guide services located in Crested Butte, Paonia, and Hotchkiss as well as with landowner permission requested by individual hunters. Most of the larger private ranches in the Unit allow hunting with a ranch-approved guide or through the payment of a fee to the landowner. Surface use agreements between SGI and individual surface owners dictate any timing restrictions applicable to specific locations. This is in addition to the federal timing limitations associated with federal leases or COAs. SGI has negotiated amendments to such agreements where drilling or completion operations have taken place during restricted times, as stated in the agreement.

### Trends
Recreation near the project area is expected to continue to increase as the local population increases. Recreation in the project area itself is likely to stay at current levels if private landowners continue to limit the number of hunters allowed on their property.

## 3.3.4   Lands and Realty

### Current Conditions
The analysis area includes all land ownerships in the project area. The boundaries of the Unit encompass federal and private oil and gas mineral estate which covers approximately 19,670 acres located in Gunnison County, Colorado. As shown in **Figure 1-1**, Bull Mountain Unit, the majority of the surface lands in the project area are privately owned. Over 90 percent of the subsurface minerals, both federal and private within the geographic area of the Unit, are committed to the Unit at this time. The total project area consists of 440 surface acres of federal surface underlain by federal mineral estate administered by the BLM; 6,330 acres of private lands consisting of private surface and private minerals regulated by the COGCC; and 12,900 acres of split-estate land, consisting of private surface and federal minerals administered by the BLM.

The primary land uses within and adjacent to the project area include oil and gas development, livestock grazing, and seasonal hunting. See **Sections 3.3.1**, Livestock Grazing; **3.3.2**, Minerals; and **3.3.3**, Recreation, for details on these specific land uses. Expansive irrigated hay meadows are generally found in the bottomlands of the East Muddy Creek basin. Irrigated meadows are also found in the Ault Creek basin at the far western side of the Unit. A few residential subdivisions are located within the Unit, generally near the State Highway 133 corridor.

SGI began leasing minerals in the Unit in 2000 and has periodically purchased additional mineral interests within the Unit. The company currently owns and operates 11 private/private and 5 federal natural gas wells on 18 well pads and 1 water-disposal well occupying approximately 36 acres in the Unit. The wells were developed at an average of 2 per year for the past 6 years. To date, SGI and Gunnison Energy Corporation (the other existing operator within the Unit boundary) have developed 19.0 miles of gathering pipelines (6.3 miles collocated with roads, and 12.7 miles cross-country). Approximately 22.9 miles of roads within the Unit are currently suitable for use, many of which SGI has improved for access roads (not including Gunnison County Road 265, which has also been improved by Gunnison County Road and Bridge and by

SGI according to various road use agreements). Natural gas is currently delivered to the Bull Mountain Pipeline and the Ragged Mountain Pipeline north of the Unit for delivery to local and national markets.

*Relevant Regulations and Guidelines*

Land use regulations applicable to this project include federal, state, and local. The primary entities responsible for land use planning within the study area are the BLM and Gunnison County. The proposed project is located mainly in rural areas. The nearest communities are Paonia and Marble. Paonia is approximately 30 miles southwest of the Unit and Marble is approximately 20 miles east of the Unit. Land use plans for these communities will not inform the land use and realty analysis. These locations are provided for reference only.

Overarching policy and procedural guidance is found in the FLPMA, Mineral Leasing Act, and the BLM NEPA Handbook (H-1790-1). These documents direct BLM activities related to ROW authorizations and preparation of environmental impact documentation. The BLM does not require the Unit Operator to obtain an authorization in circumstances where actions are tied to leases that are part of a unit. For example, SGI is not required to obtain a BLM ROW authorization, provided the facility (e.g., road or pipeline) is contained within the Unit and its use is specific to the Unit. If the facility also serves off-Unit use, then a ROW authorization would be required. For example a pipeline carrying off-Unit gas from development outside of the Unit.

The proposed project is located partially on surface lands and entirely on federal mineral estate administered by the UFO. The UFO RMP guides the management of lands and resources on BLM-administered land in the project area. County-level land use planning criteria applicable to this project are found within the Gunnison County Regulations for Oil & Gas Operations. The Gunnison County, Colorado Regulations for Oil and Gas Operations were adopted by the Gunnison County Board of County Commissioners on August 28, 2012, via Resolution #2012-25. The purpose of these Regulations is to establish "processes" that provide reasonable limitations and safeguards for the exploration and production of oil and gas resources in the County. Where valid and applicable, all oil and gas operations in the unincorporated areas on private land within the County shall comply with these regulations.

*Land Use Authorizations*

BLM-administered lands throughout the project area are generally made available for land use authorizations, which are analyzed and issued on a case-by-case basis. A ROW is an authorization to use a specific parcel of BLM-administered land for a specific project, such as roads, pipelines, and power lines. A ROW authorizes nonexclusive rights and privileges for a specific use of the land for a designated time. A ROW is granted for a term appropriate to the life of a project. A ROW authorizes the holder to construct, operate, maintain, and terminate a facility over, under, upon, or through BLM-administered lands. Such authorizations are issued for commercial and non-commercial purposes such as roads and utilities, and may be for energy or non-energy-related uses. Land use authorizations are also issued to other federal, state, and local agencies and governments.

Existing land use authorizations within the Unit include ROWs for State Highway 133, Delta-Montrose Electric Association power lines, a Delta County Tele-Com telephone line, the Volk Ditch, and private access ROWs.

*Trends*

Demand for land use authorizations in the project area is anticipated to increase in correlation with future residential and commercial development, increasing population, and energy demand. Based on review of LR 2000 database, there has only been one new ROW authorized (access road to a private property) since the Draft Environmental Assessment was released in 2012.

### 3.3.5   Transportation and Access

*Current Conditions*

Travel and access are central to many activities on BLM-administered lands. Comprehensive Travel and Transportation Management, which is the BLM's program for managing transportation, takes into consideration motorized (e.g. cars, trucks, and motorcycles) and non-motorized (e.g. bicycles, foot, and horseback) access for resource management, recreation, and other resource uses such as energy and mineral development. The primary goal of Comprehensive Travel and Transportation Management is to provide a network of routes for which access is available to designated uses. Executive Order 11644 and CFR (43 CFR Part 8340) both require the BLM to designate all BLM-administered lands as open, closed, or limited to off-highway vehicle use. Further, Colorado Instruction Memorandum 2007-20 restricts off-highway vehicle use within limited areas to designated routes. Accordingly, motorized vehicle access on the 440 acres of BLM-administered surface estate in the Unit is limited to existing routes until further route planning can be conducted for the area.

*Access*

Within the project area, State Highway 133 is the only paved roadway; it bisects the eastern portion of the Unit from north to south for approximately 6.4 miles. There are 23 miles of roads currently suitable for use, some of which SGI upgraded as access roads to well pads. Gunnison County Road 265, which is an upgraded unpaved public road, crosses the project area for approximately 4.8 miles. There are additional numerous miles of unimproved two-track routes throughout the project area. Primary access to the Unit is from State Highway 133 and Gunnison County Road 265 (**Figure 3-21**, Existing Infrastructure).

State Highway 133 is an undivided 2-lane road with a typical lane width of 12 feet and overall paved width, including shoulders, of between 30 and 40 feet, depending on location in the Unit. State Highway 133 provides an arterial connection for regional car and truck travel between Hotchkiss and Paonia in Delta County through Gunnison County to the town of Carbondale in Garfield County. In Gunnison County, County Roads 265 and 77 intersect State Highway 133 as well as several private roads. Where these roads intersect State Highway 133, the intersecting roadway is typically paved for the first 100 to 200 feet before becoming gravel or dirt. The posted speed limit for the segment of State Highway 133 within the project area ranges from 45 to 50 mph. Paved and unpaved emergency and slow vehicle turnouts are located intermittently along the route.

County Road 265 intersects with State Highway 133 approximately 2 miles south of the point where State Highway 133 enters the Unit from the northeast. The road is graveled except for a paved 120-foot segment where the road intersects with State Highway 133. The road runs

3. Affected Environment





**Existing Infrastructure**

Source: BLM GIS 2014,
Gunnison County 2012,
SG Interests GIS 2013,
US Census 2012

Figure 3-21

| | | | |
|---|---|---|---|
| ▮ Bull Mountain Unit | ⬭133⬭ | Existing paved road | |
| ▮ Existing well pad | ⬭205⬭ | Existing upgraded public road | |
| •—•— Existing pipeline | ▬▬ | Existing road currently suitable for use | |
| Gunnison Energy LLC existing pipeline | ▬▬ | Existing road requires upgrades for use | |

northwest through the Unit providing access to private homes and ranches, as well as National Forest System lands. Private roads used for oil and gas development and other private residential, agricultural, and industrial uses also intersect County Road 265 periodically throughout the roadway length in the project area. The roadway width varies depending on location, but is typically between 15 and 30 feet with periodic turnouts. Within the Unit, County Road 265 crosses two small streams. The bridge width for each stream crossing is approximately 28 feet. Gunnison County provides limited plow service on this road during the winter (Gunnison County 2013).Two additional gravel-surfaced county roads, County Road 849 and County Road 77, provide access in the northwestern and southeastern portions of the Unit, respectively. County Road 849 intersects with County Road 265 and provides access to private agricultural and industrial uses. Each road has similar design characteristics as County Road 265. Other routes within the Unit are single lane gravel-surfaced roads and two-track routes used for private access to ranches, agricultural lands, and existing well sites. Several of the private access roads are gated with access limited to administrative uses only.

*Transportation*

Existing regional traffic on State Highway 133 consists primarily of local residents, regional travelers, and commercial vehicles, including light and heavy trucks from nearby mineral extraction activities. Based on 2012 data from the Colorado Department of Transportation, the annual average daily traffic, which is a measurement of total traffic volume for a full year for a given location, as counted by a traffic counter, divided by 365 days, is 1,400 for a 22.3 mile segment of State Highway 133 between the intersection with County Road 12 approximately 6.75 miles south of the project area boundary and the intersection with County Road 3 north of the Gunnison County line in Pitkin County approximately 6 miles north of the project area boundary. The peak truck traffic for this segment is 6.3 percent of the total recorded volume. On an average day, there are 30 single trucks and 60 combined trucks traveling on this segment of State Highway 133 (CDOT 2012a).

Between 2008 and 2010 (the years for which data is available), there were three traffic-related fatalities on State Highway 133 in Gunnison County. Two of the fatalities involved motorcycle riders, while the other involved the driver of a passenger vehicle (CDOT 2012b).

Traffic on the 4.8 mile segment of County Road 265 within the Unit consists primarily of local residents, farmers and ranchers, and commercial vehicles, including light and heavy trucks from the mineral extraction industries. The county road is also used to access recreation and hunting opportunities on adjacent National Forest System Lands. For the period July 31 through October 15, 2007 (the latest period for which data are available), the average daily traffic count for the entire roadway was 205 vehicles (102 northbound and 103 southbound).

SGI executed Gunnison County Road Improvement Agreement on September 13, 2005, and the First Amendment to Road Improvement Agreement on July 11, 2006, for improvements to County Road 265. Gunnison County holds Performance/Utilization Bond No. RLB0004678 in the amount of $10,000 to warrant against road damage to County Road 265. On November 5, 2010, SGI and Gunnison Energy entered an agreement with Gunnison County (Gunnison County 2010) under which SGI and Gunnison Energy agreed to purchase magnesium chloride so that the Gunnison County Public Works Department can apply it to County Road 265 for dust

suppression twice each year through 2015. In accordance with the agreement, both of the annual applications would be for the entire length of County Road 265, while an additional and discretionary application would be applied only at residential driveway entrances next to County Road 265. Gunnison County would grade County Road 265 each year in preparation for the magnesium chloride application and would have full responsibility for the product's application.

*Trends*

On the 22.3 mile segment of State Highway 133 between the intersection with County Road 12 and the intersection with County Road 3, Colorado Department of Transportation projects an increase in annual average daily traffic from a current level of 1,400 to 2,500 by 2033. Over the next 20 years, the number of single trucks traveling on this segment on an average day is expected to increase from 30 to 54, while the daily number of combined trucks is expected to increase from 60 to 107 (CDOT 2012c).

While no quantitative forecast is available for County Road 265, annual average daily traffic on this road would increase only if the local population increases or non-residential uses in the Unit, such as access to adjacent National Forest System Lands for recreation and hunting, create additional vehicle trips.

## 3.4   SOCIAL AND ECONOMIC CONDITIONS

This section is a description of the support conditions in the project area and follows the order of topics addressed in **Chapter 2**:

- Hazardous and solid waste

- Socioeconomics

- Environmental Justice

### 3.4.1   Hazardous Materials and Wastes

The affected environment for hazardous materials is air, water, soil, and biological resources that could be affected by an accidental release of hazardous materials during storage, use in construction, drilling, and operations, and transportation to and from the Unit. Additionally, hazardous wastes from abandoned mines or other past activities in the project area could affect air, water, soil, and biological resources. Sensitive areas for hazardous materials releases are those next to water bodies, those above potable groundwater aquifers, and those in areas where humans or sensitive environmental receptors would be directly impacted.

The most pertinent of the federal laws dealing with hazardous materials contamination are as follows:

- The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA, Public Law 96-510 of 1980) provides for liability, compensation, cleanup, and emergency response for hazardous substances released into the environment. It also provides national, regional, and local contingency plans. Applicable emergency operations plans in place include the National Contingency Plan (40 CFR 300, required by Section 105 of CERCLA), the Region VIII Regional Contingency Plan, and the

Gunnison County Emergency Operations Plan (developed by the Gunnison County Office of Emergency Management).

- The Resource Conservation and Recovery Act (Public Law 94-580, October 21, 1976) regulates the use of hazardous substances and strictly regulates the management and disposal of hazardous as well as ordinary solid wastes. Oil and gas lessees are exempt from certain parts of the Act, including Subtitle C (hazardous waste regulations); however, they are not exempt from Subtitle D (solid waste regulations).

In general, a spill prevention, control, and countermeasures (SPCC) plan must be developed in compliance with 40 CFR, Part 112, for facilities with an aggregate aboveground oil storage capacity of 1,320 gallons or more. The SPCC plan is intended to prevent the release of oils, such as diesel fuel, gasoline, crude oil, or condensate, into the Waters of the United States. The plan must provide response actions to be taken and notifications to be made in the event of a release.

According to 29 CFR 1910.1200(g), SGI is required to maintain a file containing Material Safety Data Sheets for all chemicals, compounds, and/or substances utilized during the course of construction, drilling, completion, and production operations of the project. This file is to be available at all times when employees are present at the site. The BLM Instruction Memoranda numbers WO-93-344 and CO-97-023 require that all NEPA documents list and describe any hazardous and extremely hazardous materials that would be produced, used, stored, transported, or disposed of as a result of a proposed project.

On December 13, 2011, the State of Colorado enacted Code of Colorado Regulations 404-1:205A, a new rule requiring vendors and providers of hydraulic fracturing services to provide the operator of a natural gas well with the identity of each additive and each chemical intentionally added to the hydraulic fracturing fluid, within 30 days following the conclusion of the hydraulic fracturing treatment (Nettles et al. 2012 CCR 404-01:205A). The operator must then complete a chemical disclosure registry form and post the form to a national public website, fracfocus.org, within 60 to 120 days. The operator must disclose the concentration of the chemical or additive but is not required to disclose the brand name of the product or additive to which the disclosed chemical or chemical concentration is a component. A vendor, service provider, or operator may claim that the specific identity and concentration of a chemical is entitled to trade secret protection and may withhold disclosure of this information on that basis. However, the identity and amount of any chemicals claimed to be a trade secret must be identified to any health professional who requests such information in writing (and who agrees to keep the information confidential) for the purpose of diagnosing or treating an individual who may have been exposed to such chemicals. Likewise, this information must be provided to the COGCC upon receipt of a letter stating that such information is necessary to respond to a spill or release, or a complaint from a person who may have been directly and "adversely affected or aggrieved" by a spill or release.

The EPA conducted a study in 2004 and concluded hydraulic fracturing presents little or no threat to underground sources of drinking water (EPA 2004). However, this study was highly criticized as politically motivated and scientifically unsound by former EPA scientists and others (Wilson 2004). In 2010, Congress mandated the EPA conduct a new study on the impacts of hydraulic fracturing on drinking water. This study is scheduled to be released by the EPA in

2014, though it is rumored that its release may be delayed until 2016 (EPA 2013g). In the meantime, many citizen groups, environmentalists, and scientists believe hydraulic fracturing poses a great threat to air and water quality. Concerns are typically about the use of toxic chemicals and diesel fuel in fracturing fluid and the detrimental impacts on the environment and on human health that would result if these chemicals were to contaminate underground drinking water sources (EPA 2004).

Typical hazardous materials present or likely to be present in the project area during development and production are listed in **Appendix G**, Hazardous Materials Management Summary, and are as follows:

- Drilling mud and cementing products, including caustic materials

- Flammable or combustible materials, including petroleum products

- Well stimulation additives, such as acids and gels (corrosives)

- Hydraulic oil

- Ethylene glycol (antifreeze), which is also used in dehydration units

- sanitary wastes

Use of any substances classified as Extremely Hazardous by the Superfund Amendments and Reauthorization Act of 1986 would be limited to treating chemicals, should they be necessary. Materials generated during drilling include drill cuttings, combined with drilling fluids and additives used to maintain circulation and reduce borehole caving and accomplish cementing of the borehole annulus. These fluids are normally confined to the borehole, reserve pit, and/or storage tanks.

### General Project Area

A search of EPA records indicates no presence of present or past hazardous waste generation or management facilities in the area, nor any accidents, spills, leaks, or improper disposal of hazardous materials resulting in brownfields (EPA 2013a). As of 2011 there were no Superfund sites in the area, nor any indication in the EPA Hazardous Waste Report of any past or present hazardous waste treatment, storage, or disposal facilities (EPA 2013b).

The interactive EPA database *EnviroMapper for Envirofacts* identified two points of interest for hazards to human health within the project area. The Gunnison Energy Corp 1-34 Well Site was identified in the Air Facility System as a stationary source of volatile organic compound emissions, and the Aspen Leaf Lateral Pipeline was identified in the EPA Integrated Compliance System for having been issued a permit to discharge waste water into rivers (EPA 2013c, 2013d) Both facilities are operating in compliance with procedure (EPA 2013c, 2013e).

Other nearby points of interest include the Gunnison Energy Corporation and three Gunnison Energy Corp well sites, all of which lie just south of the project area and are operating in compliance with procedure (EPA 2013a, 2013f).

*Trends*

Over the last decade exploratory and development activities in and surrounding the Unit have focused on exploring for and developing coal bed natural gas resources, and these activities are expected to continue over the next 20 years (BLM 2012b). As these activities continue and potentially increase in the future, the risk of an accidental release of hazardous materials increases. Increased gas operations would likely result in increased transportation, storage, and use of hazardous material in construction, drilling, and operations, which would increase the risk of air, water, soil, and biological resources being affected by hazardous materials.

### 3.4.2   Socioeconomics

*Current Conditions and Trends*

Local and regional demographic characteristics, economic factors, and social structure have the potential to be affected by management decisions in the Bull Mountain Unit MDP EIS planning area. Economic and demographic statistics are primarily reported by county. While the project is located within Gunnison County, it is likely that the local workforce may be drawn from Delta, and project construction and operation has the potential to impact Delta County, in particular North Fork Valley. For these reasons, demographic, economic, and social data are presented for Gunnison and Delta Counties. A state context is provided for comparison where appropriate. It should be noted that much of the population of Gunnison County is located in the Gunnison and Crested Butte area, which is not likely to be impacted by the proposed project and has little influence on the current conditions of the planning area. A summary of current social and economic conditions for the area is included below, additional information, including complete data tables, is available in the Bull Mountain MDP EIS Socioeconomic Baseline Report (BLM 2013b).

*Demographics and Economic Conditions*

Population: As of 2010, total population in Delta and Gunnison Counties was 30,952 and 15,324 respectively. Total population in the two-county region has increased since 1980, but at a slower rate than that of the State. From 1980 to 1990, population declined in both Delta and Gunnison Counties. In the 1990s, growth for both Counties was slightly higher than the state average (30.6 percent) at 32.7 percent for Delta County and 35.9 percent for Gunnison County. Since 2000, population growth has slowed and was lower than the state average of 16.9 percent (11.2 percent for Delta County and 9.8 percent for Gunnison County) (US Census Bureau 2010, Headwaters Economic 2013). It should be noted that, despite growth, total population density remains low in the study area.

Population growth in the area is expected to continue over the next few decades with approximately 14 percent increase by 2020 and 62 percent increase by 2040 for the two-county study area (Colorado Division of Local Government, State Demography Office 2012). In-migration of people from other Colorado regions and throughout the West is the likely source of much of the anticipated population growth. For Delta, and in particular, Gunnison County, a growing percentage of the population is originally from other states, with 44.9 percent and 56.5 percent respectively born in other states based on 2010 data (US Census Bureau 2010).

<u>Income and Employment:</u> Median household incomes for Delta County ($41,856) and Gunnison County ($50,073) remained below the state average of $52,762 in 2010. Per capita income in Delta County ($23,495) was lower than the state average of $27,915, while the per capita income in Gunnison County ($28,862) was slightly higher than the state average (US Census Bureau 2010).

Income is derived from two major sources: (1) labor earnings or income from the workplace; and (2) non-labor income including dividends, interest, and rent and transfer payments (payments from governments to individuals; age-related, including Medicare, disability insurance payments, and retirements). Labor income is the main source of income in Delta and Gunnison County, however non labor income contributes an important source of income; from 1970 to 2011, non-labor income in Delta County grew from $50 million to $187 million, an increase of 275 percent (Headwater Economics 2013). Percent of personal income contributed by non-labor income in Delta County (44.6 percent) and Gunnison County (40.8 percent) are well above the state average of 29.8 percent (Headwater Economics 2013). Based on input from the community assessment and economic workshops, the large level of non-labor income is likely related to high numbers of retirees in the area (BLM 2009, 2010).

As of 2011 data, key industries in Delta County include retail trade (11 percent of total employment), health care and social assistance (9 percent), farm employment (9.3 percent), construction (7 percent), and government (16 percent). In Gunnison County, retail trade (9.1 percent), construction (8.7 percent), arts entertainment and recreation (8.2 percent) and accommodation and food services (11.7 percent), and government (16.9 percent) employed the most people (US Department of Commerce, Bureau of Economic Analysis 2012). Mining data is non-disclosed for Gunnison County and for certain mining sectors in Delta County, however, estimates from the Headwaters Economics' Economic Profile System indicate that mining represents an important industry in the area, with approximately 7.9 percent of employment in Delta County and 10.4 percent in Gunnison County related to mining (Headwaters Economics 2013). It should be noted that data from the US Department of Commerce, Bureau of Economic Analysis are not directly comparable with the data from Headwaters Economics due to different sources of data and different industry coverage.

A significant portion of the tourism base economy in Gunnison County is located in the towns of Gunnison and Crested Butte. The Bull Mountain area's economic conditions are, therefore, not comparable with the rest of Gunnison County. Specifically, agriculture and natural resource development are more dominant in the project area than tourism. Fall big game hunting is also a popular activity in this area. Delta County's economy is similar to the project area, but also features a significant healthcare and nursing home industry in and around the town of Delta.

It should be noted that for some industries average annual wages are higher than others. Highest average annual wages are typically seen in the government sector and natural resources extraction, particularly in mining. Average wage per job numbers are typically lower in the hospitality sector and in agriculture. The average annual wage for the natural resources and mining sector was significantly higher than average annual wage for both Gunnison and Delta Counties (116 percent and 63 percent higher than average wage) (Headwater Economics 2013). see **Table 3-37**, Annual Wages by Industry, 2012.

**Table 3-37**
**Annual Wages by Industry, 2012**

| | Avg. Annual Wages | | % Above or Below Avg. | |
|---|---|---|---|---|
| | Delta | Gunnison | Delta | Gunnison |
| **Total** | $33,870 | $36,202 | | |
| **Private** | $32,231 | $35,342 | -4.8% | -2.4% |
| **Non-Services Related** | $47,354 | $58,853 | 39.8% | 62.6% |
| Natural Resources and Mining | $55,410 | $78,183 | 63.6% | 116.0% |
| Agriculture, forestry, fishing & hunting | $28,202 | N/A | -16.7% | N/A |
| Mining (incl. fossil fuels) | $69,873 | N/A | 106.3% | N/A |
| Construction | $37,210 | $36,393 | 9.9% | 0.5% |
| Manufacturing (Incl. forest products) | $35,312 | $21,806 | 4.3% | -39.8% |
| **Services Related** | $25,619 | $27,781 | -24.4% | -23.3% |
| Trade, Transportation, and Utilities | 28,270 | $27,329 | -16.5% | -24.5% |
| Information | $28,515 | $35,688 | -15.8% | -1.4% |
| Financial Activities | $33,642 | $37,726 | -0.7% | 4.2% |
| Professional and Business Services | $34,538 | $60,954 | 2.0% | 68.4% |
| Education and Health Services | $24,378 | $34,314 | -28.0% | -5.2% |
| Leisure and Hospitality | $12,961 | $17,041 | -61.7% | -52.9% |
| Other Services | $29,350 | $22,942 | -13.3% | -36.6% |
| Unclassified | $6,246 | $56,047 | -81.6% | 54.8% |
| **Government** | $38,217 | $38,970 | 12.8% | 7.6% |
| Federal Government | $61,600 | $52,914 | 81.9% | 46.2% |
| State Government | $50,796 | $44,794 | 50.0% | 23.7% |
| Local Government | $35,087 | $34,801 | 3.6% | -3.9% |

Source: Headwaters Economics 2013. Based on BLS 2012 data.

Unemployment levels in the two-county area are decreasing from peaks in 2010 and remain lower in Gunnison County than Delta County. Estimated annual unemployment rates were 5.9 percent and 7.5 percent in Delta and Gunnison County respectively in 2013, compared to the Colorado annual unemployment rate of 6.8 percent (US Department of Commerce, Bureau of Labor Statistics 2014).

Housing Resources: As of 2010, approximately 14,572 and 11,412 housing units were available in Delta and Gunnison counties respectively (US Census Bureau 2010). The number of housing units in the two-county area increased since 2000, with the rate of increase higher than the state average in Gunnison County (20.0 percent) and lower than the average in Delta County (15 percent). Housing vacancy rates in the study area are notably high in Gunnison County (42.9 percent), with the majority of the vacant housing units second homes used for seasonal, recreational, or occasional use.

Temporary housing availability in the area includes 2 RV parks and 16 hotels with in a 25 mile radius of Delta, the largest town in the vicinity of the project area (tripadvisor.com 2014). Glenwood Springs is approximately 50 miles and contains approximately 24 hotels. The regional hub of Grand Junction is approximately 100 miles away contains over 25 hotels.

Median home value has increased since 2000, with a 32 percent increase in Delta County (a median value of $198,000) and a 37 percent increase in Gunnison County (a median value of $338,100), based on 2007-2011 data (US Census Bureau 2000, 2011). Both Counties had higher rates of change than the Colorado average of 9 percent. Based on 2007-2011 data, median

monthly rental rates were $721 and $858 in 2011 for Delta and Gunnison Counties, respectively (US Census Bureau 2000, 2011). Median rental rates increased at a lower rate than housing prices, at 10 percent for Delta County and 11 percent for Gunnison County, but at a higher rate than the Colorado average of 1 percent.

*Fiscal Conditions*

Property Taxes: Property taxes are determined by multiplying the assessed (taxable) value of the property by the tax rate. The tax rates are set by local government entities and vary by location. Assessed values are derived by multiplying the actual value of the property by 7.96 percent for residential property and by 29 percent for other property, including improvements for oil and gas production. Ad-valorum property taxes are also applied to oil and gas production in Colorado based on prior year production. The assessed value is either 87.5 percent or 75 percent depending on whether the production is classified as primary or secondary.

Approximately half of property tax revenues go towards County school districts with the remainder distributed to other Gunnison County entities. Gunnison County's total taxable assessed value for 2012 was $689,286,200, with oil and gas property representing $4,264,210 (0.62 percent) of total County-assessed value. Gunnison County reported $35,413,810 in property tax revenue for 2012 (Gunnison County 2012). Property taxes in Delta County would not be directly affected by project activities but could be impacted by any related change in property values.

Severance Taxes: Tax revenue related to natural gas production comes from two main sources: the Colorado state severance tax and the state's share of federal mineral lease royalties. Colorado Severance Tax is a tax imposed upon nonrenewable natural resources that are removed from the earth. The severance tax is graduated, ranging from 2 percent for income under $25,000 to 5 percent for income of $300,000 and over. Very small operations are exempt. Producers may also deduct ad- valorum property taxes paid from severance taxes. Severance tax revenues are distributed with 50 percent to the Colorado Department of Natural Resources to fund water conservation, wildlife, and environmental programs and the remaining 50 percent to Local Impact Fund Department of Local Affairs. Of the amount that goes to the Local Impact Fund Department of Local Affairs, 70 percent goes to local government projects and 30 percent is directly distributed to local communities. The direct payments from Department of Local Affairs to Colorado communities are often used to offset the impacts of drilling on roads, schools and public services. Gunnison County received $833,006 in severance taxes in 2012.

Federal Mineral Royalties: Additional revenue is collected for bonus, rent and royalties on federal mineral leases. Federal royalty rates are generally 12.5 percent of production value. Approximately 50 percent of revenues go to the US Treasury and 49 percent of these revenues are transferred to the Colorado State Treasurer. This portion, in turn, is distributed to counties, cities, and school districts based on senate bill 08-218. In 2012 approximately $2.5 million was distributed to Delta County, Gunnison county, and area communities (Colorado Division of Local Government 2012).

Other Taxes: Additional taxes on oil and gas activities include contributions to the Oil & Gas Conservation Fund Levy (approximately 12 percent of net revenue) and the Oil & Gas Environmental Response Fund (approximately 2 percent of net revenue).

Contributions also occur from corporate income tax (4.63 percent), sales tax would be paid on supplies purchased in state ( average rate for Colorado is 4.3 percent).

Lodging taxes in Delta county provide additional revenue for local communities, approximately $80,000 in Delta County in 2011 (Delta County 2012). County lodging tax is 1.9 percent, but may vary by municipality (Colorado Department of Revenue 2014). Gunnison County has no county imposed lodging tax.

*Social Services*

Law Enforcement and Emergency Response: Law enforcement services in the Bull Mountain area are provided by the Gunnison County Sheriff's Office. Sheriff's deputies provide routine patrol services, First Responder medical care, and 24-hour on-call coverage for the area. The Sheriff's Office provides dispatch services for all emergency service agencies in the county. Emergency management is also provided under the jurisdiction of the Sheriff's Office through the County's emergency manager.. Delta County Hospital in Delta offers ambulance service with advanced life support and is a certified Level IV trauma center. Montrose Memorial Hospital is a Level III trauma center. Fire-suppression services are provided by the Ragged Mountain Fire District.

Schools: The project area is located within Delta County Joint District. The average teacher/student ratio is 1:17.8. The district has four high schools, three middle schools, five elementary schools, one K-8 school, and three K-12 schools (Delta County 2013).

Domestic Water and Wastewater Treatment: The incorporated areas of Delta County and Gunnison counties, including much of the two-county region, are not served by domestic water suppliers or municipal waste water treatment plants and generally utilize wells for potable water and private septic systems. Scarcity of domestic water as well as water quality has historically been important issues in the region. The town of Paonia is in the process of upgrading the existing water treatment facility to 2 million gallons in order to provide additional finished water storage and the ability to divert the Old Original Town Spring and the Upper Reynolds Creek Spring to the Lamborn Plant, therefore added flexibility in operations and redundancy in the water system. Federal and state funding is being sought to support this effort. Recent water rate increases also occurred in in anticipation of the State of Colorado requiring upgrades and the need for additional water capacity (Delta County Independent 2012).

*Local Economic Activity Affected By Project Area Land Uses*

Local economies are directly and indirectly impacted by expenditures and revenues generated by a variety of activities in planning area. Activities that tend to have the greatest economic influence in the area include recreation, mining and energy resource development, and livestock grazing, as discussed in detail below.

Hunting and Recreational Use: Recreational activity has important economic value both in terms of the satisfaction it provides local residents and the economic activity it generates for the regional economy. In terms of economic activity, recreation generates additional spending in the local economy that supports jobs and income. Recreation use contributes to the local economy through expenditures of visitors and employment of local residents in the service sectors. A 2008 study by Colorado Parks and Wildlife found that hunters and anglers spent an estimated $1

billion on trip expenses and sporting equipment in Colorado in 2007 (CPW 2008). Expenditures per visitor for multiple activities can also be estimated by applying the average visitor spending levels developed by the US Forest Service for its National Visitor Use Monitoring Reports, which were $57.15 for the average overnight visitor and $19.02 for the average day-use visitor (USDA Forest Service 2008). In the planning area recreational activity includes hunting on private lands through local outfitter-guide services as well as hiking, biking and other recreational activities along the State Highway 133 corridor as described in **Section 3.3.3**, Recreation.

Agriculture and Livestock Grazing: Agriculture is a traditional use of lands in the project region and continues to be important today. There were 1,494 farms totaling 441,004 acres in the two-county region in 2012 (USDA NASS 2014). The North Fork Valley has become known for its rural character and organic farms; approximately 40 farms in Delta County were certified organic or transitioning to organic in 2012; Delta County has the largest concentration of organic farms and orchards of any Colorado county (USDA NASS 2014). The area has become a premier agri-tourism destination in the Rocky Mountains for visitors to organic farms and vineyards; based on the 2012 agricultural census, approximately 21 farms had established agri-tourism opportunities in Delta County, generating $293,000, and 17 farms in Gunnison County generated $243,000 through agri-tourism (USDA NASS 2014). Livestock grazing of cattle and sheep is also a traditional use on public and private lands in the area as discussed in **Section 3.3.1**, Livestock Grazing.

Tourism: Tourism in the North Fork Valley Area includes those seeking recreational experiences and agri-tourism, as discussed above. Employment in tourism is not considered a separate industry category; therefore, data on jobs generated are estimates only. In 2011, travel and tourism-related jobs accounted for approximately 11.8 percent of the jobs in Delta County and 48.5 percent of jobs in Gunnison County compared the state average of 17.5 percent of jobs (Headwater Economics 2013). As previously noted, the majority of the tourism in Gunnison County is located outside of the project area in the towns of Gunnison and Crested Butte. Travel spending has been classified by county in Colorado in a recent report. In 2011, it is estimated that travel spending in Delta County resulted in an estimated 33.8 million dollars, brought in 9.5 million in earnings, resulted in 530 jobs, and generated nearly 1 million in local taxes (Colorado Tourism Office 2011).

Mineral and Energy Resources: Leasable minerals play an important economic role in both Delta and Gunnison Counties. As discussed in **Section 3.3.2**, Minerals, while the potential for development may exist, locatable minerals, mineral materials, and renewable energy have not been developed in notable amounts in the project area and are unlikely to be developed over the life of the MDP and therefore do not significantly contribute to the local area economy or social structure.

Coal mining is a historical industry in the area and is primarily related to three mines in the North Fork Valley near Paonia in an area known as the Somerset coal field. Production varies based on market conditions, but in 2012, approximately 13.4 million tons were produced overall for the three mines combined and employment totaled 948 miners (Colorado Division of Reclamation Mining and Safety 2013). However, Elk Creek Mine was closed in late 2013 after

an underground fire closed off much of the coal-mining operation, resulting in a 257-person reduction in workforce in 2013 (Denver Post 2013). Coal resources within the Unit are not considered economically feasible for extraction. Therefore, while coal mining is a traditional land use in the area, coal resources in the Unit are not considered to have economic interest and do not likely contribute a significant economic contribution or influence on social values.

In the past 10 years, oil, and in particular and natural gas development, has increased steadily in Gunnison County, as described in detail in **Section 3.3.2**, Minerals. As of 2010, wells on private and federal minerals in the North Fork area had produced over 3 billion cubic feet of gas. Similarly, within the Unit, existing wells have seen steady increases in production since initial production year of 2010, with approximately 359,165 mcf sold in 2012, including all producing wells (see **Table 2-5**, Bull Mountain Unit Annual Production Rates).

County employment figures for oil, gas, and coal extraction are included within the mining and mining and mining related industries category of BLS and contributes approximately 7.9 percent of county employment in Delta County in 2011, and an estimated 10.4 percent in Gunnison County (Headwater Economics 2013). Additional jobs for this industry are also reflected in construction numbers and other fields that are connected to the exploration and development of resources. It should be noted, however, that these figures include portions of the Counties located outside of the planning area and include estimates for non-disclosed data.

Estimates can be made for economic contributions from natural gas based on the production levels reported. At an average well-head price of $2.66 per mcf and 1,944,599 mcf sold, total gas sales from all wells in the two-county area would have been approximately $5.17 million in 2012 (EIA 2013; Colorado Oil and Gas Conservation Commission 2013). As previously noted, this figure includes all production in Delta and Gunnison Counties, including lands outside of the planning area. Using the same average well-head price and the estimated 359,165 mcf sold from all existing Unit wells (private and BLM minerals) in 2012, it can be estimated that sales from the Unit totaled $955 thousand in 2012.

*Quality of Life and Non-Market Values*
The planning area an surrounding North Fork Valley region consist of a largely rural setting with small towns. Meetings were held with local community leaders in advance of the UFO RMP revision which collected information about local residents' values and desired conditions for community in the planning area. In meetings held for a Community Assessment in November-December of 2008 and in economic workshops in March of 2010, local residents sited small community feeling, slower pace of life, and outdoor lifestyle as important factors in local communities, particularly in Hotchkiss and Paonia. Local community leaders also stressed the importance of health lands and environment as well as municipal watershed protection as important factors. Some representatives, particularly from Delta County, also recognized the importance of mining jobs for the local economy. All communities desired moderate controlled growth (BLM 2009 and BLM 2010) .

Many of the quality of life components brought forward in community meetings can be discussed in terms of non-market values. Non-market values are the benefits derived by society from the uses or experiences that are not dispensed through markets and do not require payment. Non-market values can be broken down into two categories, use and non-use values. The use-

value of a non-market good is the value to society from the direct use of the asset; through recreational activities such as hiking, bird watching and OHV use. The use of non-market goods often requires consumption of associated market goods, such as lodging and gas. Non-use, or passive use, values of a non-market good reflect the value of an asset beyond its current use, due to willingness to preserve a resource for potential future use and for the benefit of preserving an asset for future generations to enjoy. This can include values such as scenic views and preservation of plant and animal habitat that are not currently providing economic benefits . Non-use values are typically measures in surveys of individual's willingness to pay for preservation of a resource.

Open space in the region has an important non-market function in the use category through area recreational activities, including fishing and hunting. These uses provide opportunities for recreation local residents and may also attract area visitors. Undeveloped open space in the area may also play a role in the non-use category by preserving the visual landscape as well as the historic pastoral setting for future generations' enjoyment. Ranchlands and farmlands themselves may be important for heritage value, both culturally and naturally (Rosenberger and Walsh 1997).

Some of the value of undeveloped areas can also be determined by examining ecosystem services, including clean air and water. BLM Instruction Memorandum (IM 2013-131) explains that "Ecosystem goods and services include a range of human benefits resulting from appropriate ecosystem structure and function, such as flood control from intact wetlands and carbon sequestration from healthy forests. Some involve commodities sold in markets, for example, natural gas. Others, such as wetlands protection and carbon sequestration, do not commonly involve markets, and thus reflect nonmarket values" (BLM 2013c).

Both use and non-use non-market values of open space can play a role in attracting new residents who in turn bring new sources of income to the area. Communities adjacent to public lands offer a high level of natural amenities that often attract retirees and others with non-labor sources of income, as well as sole proprietors and telecommuters who bring income from other regions into the local economy (Haefele et al. 2007). Undeveloped open space may also influence property value of local homes (Fausold and Lilieholm 1996, Western Governors' Association 1998, Crompton 2000).

### 3.4.3   Environmental Justice

*Current Conditions*

A summary of low income populations and racial and ethnic minorities in the socioeconomic planning areas is provided below. Additional information, including complete data tables, is available in the Bull Mountain MDP EIS Socioeconomic Baseline Report (BLM 2013b).

Executive Order 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-income Populations, requires that federal agencies identify and address any disproportionately high and adverse human health or environmental effects of their programs, policies, and activities on minority and low-income populations. Environmental justice refers to the fair treatment and meaningful involvement of people of all races, cultures, and incomes with respect to the development, implementation, and enforcement of environmental laws, regulations, programs, and policies. It focuses on environmental hazards and human health to

avoid disproportionately high and adverse human health or environmental effects on minority and low-income populations. Low-income populations are defined as persons living below the poverty level based on total income of $11,484 for an individual and $22,811 for a family household of four for 2011 data (US Census Bureau 2010b). Black/African American, Hispanic, Asian and Pacific Islander, American Indian, Eskimo, Aleut, and other non-White persons are defined as minority populations. For environmental justice compliance, the relevant minority population is defined as the total of all persons of a minority racial identity plus persons of Hispanic-origin ethnic identity (Council on Environmental Quality 1997).

Populations are identified for further analysis of environmental justice impacts when one of two factors is present: (1) the minority and/or low income population of the affected area exceeds 50 percent or (2) the minority and/or population percentage of the affected area is "meaningfully greater" than the minority population percentage in the general population or other appropriate unit of geographic analysis, identified here as 20 percentage points or greater difference from the state level.

*Low-income Populations*
Based on 2007-2011 data, Delta County had a low-income population of 14.1 percent, near the state poverty rate of 14.3, while Gunnison County was estimated to be slightly lower than the state rate at 13.8 percent of persons below poverty. The census tracts encompassing the proposed project area (Gunnison Valley tract 9639) and those in the North Fork Valley south of the project area along State Highway 133 (Delta County tracts 9646 and 9650) were also examined. Poverty rate for these geographic areas ranged from 7.0 in Gunnison County in the regions surrounding the project area, and 16.9 and 9.5 percent for the 2 relevant census tracts in Delta County. All areas had an increase in poverty compared to 2000 data due to the 2008 economic downturn (US Census Bureau 2011).

*Minority Populations*
Based on 2007-2011 data, approximately 71 percent of Colorado's population was identified as White and not of Hispanic or Latino origin. The remaining 29 percent identified as an ethnic and/or racial minorities. People of Hispanic or Latino descent (of any race) were the largest minority group and accounted for 20.7 percent of the total state population (US Census Bureau 2011).

The project area and the two-county region examined are less diverse than that of the state. In Delta County, approximately 83 percent of the total population was identified as White of non-Hispanic/Latino origin in 2010 and the remaining 17 percent as ethnic and/or racial minority, while in Gunnison County approximately 89 percent were identified as White of non-Hispanic/Latino origin and the remaining 11 percent identifying as an ethnic and/or racial minority. The largest minority groups in both counties included those of Hispanic/Latino descent. The racial and ethnic background of the census tract containing the project area (Gunnison County tract 9639) as well as those along State Highway 133 in the North Fork Valley south of the project area (Delta County tracts 9646 and 9650) were also examined. For these census tracts, the percentage of the population who identified themselves as being of Hispanic/Latino origin or from a minority racial group were 1.8, 6.1 and 7.8 percent receptivity, while the remainder of the population classified themselves as White of non-Hispanic/Latino origin (US Census Bureau 2011).

# Chapter 4
## Environmental Consequences

# TABLE OF CONTENTS

Chapter                                                    Page

**4. ENVIRONMENTAL CONSEQUENCES** ................................................................... 4-1

    4.1    Introduction ................................................................................. 4-1
        4.1.1   General Methodology for Analyzing Impacts ................... 4-1
        4.1.2   Analytical Assumptions ..................................................... 4-3
        4.1.3   Cumulative Effects ............................................................ 4-4
        4.1.4   Incomplete or Unavailable Information .......................... 4-21
    4.2    Resources .................................................................................. 4-22
        4.2.1   Air Quality ...................................................................... 4-22
        4.2.2   Noise ............................................................................... 4-72
        4.2.3   Soil Resources ................................................................. 4-80
        4.2.4   Water Resources .............................................................. 4-91
        4.2.5   Geology ......................................................................... 4-109
        4.2.6   Vegetation and Invasive, Nonnative Species ............... 4-118
        4.2.7   Fish and Wildlife .......................................................... 4-128
        4.2.8   Migratory Birds ............................................................. 4-152
        4.2.9   Special Status Species ................................................... 4-158
        4.2.10 Wildland Fire Management ........................................... 4-172
        4.2.11 Cultural Resources ........................................................ 4-174
        4.2.12 Paleontological Resources ............................................. 4-179
        4.2.13 Visual Resources ........................................................... 4-183
    4.3    Resource Uses .......................................................................... 4-191
        4.3.1   Livestock Grazing ......................................................... 4-191
        4.3.2   Minerals (Leasable, Locatable, Salable) ....................... 4-194
        4.3.3   Recreation ...................................................................... 4-199
        4.3.4   Lands and Realty ........................................................... 4-202
        4.3.5   Transportation and Access ............................................ 4-207
    4.4    Social and Economic Conditions ............................................. 4-214
        4.4.1   Hazardous Materials and Wastes .................................. 4-214
        4.4.2   Socioeconomics ............................................................. 4-219
        4.4.3   Environmental Justice ................................................... 4-244
    4.5    Irreversible and Irretrievable Commitment of Resources and
        Relationship of Short-term Uses of the Environment to Long-term
        Productivity ............................................................................. 4-245
        4.5.1   Irreversible and Irretrievable Commitment of Resources ................. 4-245
        4.5.2   Relationship of Short-term Uses of the Environment to
                Long-term Productivity ................................................. 4-246

# TABLES

Page

4-1 Summary of Cumulative Actions within the Unit by Alternative ................................ 4-5
4-2 Summary Cumulative Surface Disturbance Acres within the Unit by Alternative ...... 4-8
4-3 Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario ................................ 4-16
4-4 Acute Reference Exposure Levels (1-hour exposure) ................................ 4-31
4-5 Sensitive Lakes Analyzed in Far-Field Analysis ................................ 4-33
4-6 Alternative A Year 2 Emissions (TPY) ................................ 4-38
4-7 Alternative A Year 2 GHG Emissions (metric tons per year) ................................ 4-39
4-8 Alternative A - Maximum Modeled Pollutant Concentrations at Class I and Sensitive Class II Areas ($\mu g/m^3$) ................................ 4-40
4-9 Alternative A - Maximum Visibility Impacts at Class I and Sensitive Class II Areas ................................ 4-42
4-10 Alternative A - Maximum Nitrogen and Sulfur Deposition Impacts at Class I and Sensitive Class II Areas ................................ 4-43
4-11 Alternative A - Maximum Impacts on Lakes within the Class I and Sensitive Class II Areas ................................ 4-44
4-12 Alternative B Year 5 Emissions (TPY) ................................ 4-45
4-13 Alternative B Year 5 GHG Emissions (metric tons per year) ................................ 4-46
4-14 Alternative B - Criteria Pollutant Modeling Results for Field Development Activities ................................ 4-46
4-15 Alternative B - Criteria Pollutant Modeling Results for Field Production Activities ................................ 4-47
4-16 Alternative B - HAP Modeling Results for Field Production Sources ................................ 4-48
4-17 Alternative B - Unit Risk Analyses ................................ 4-49
4-18 Alternative B - Maximum Modeled Pollutant Concentrations at Class I and Sensitive Class II Areas ($\mu g/m^3$) ................................ 4-50
4-19 Alternative B - Maximum Visibility Impacts at Class I and Sensitive Class II Areas ................................ 4-52
4-20 Alternative B - Maximum Nitrogen and Sulfur Deposition Impacts at Class I and Sensitive Class II Areas ................................ 4-52
4-21 Alternative B - Maximum Impacts on Lakes within the Class I and Sensitive Class II Areas ................................ 4-53
4-22 Cumulative Pollutant Concentrations (CARMMS 2021 High Development Scenario) at Class I and Sensitive Class II Areas ($\mu g/m^3$) ................................ 4-67
4-23a Cumulative Visibility Results ($\Delta dv$) for Worst 20% Visibility Days at Class I Areas for Current Year (2008) and 2021 High Development Scenario all Emissions and Contributions from RFD Sources ................................ 4-70
4-23b Cumulative Visibility Results ($\Delta dv$) for Best 20% Visibility Days at Class I Areas for Current Year (2008) and 2021 High Development Scenario all Emissions and Contributions from RFD Sources ................................ 4-70
4-24 Cumulative RFD Nitrogen and Sulfur Deposition Impacts (CARMMS 2021 High Development Scenario) at Class I and Sensitive Class II Areas ................................ 4-71
4-25 Cumulative RFD Impacts on Lakes (CARMMS 2021 High Development Scenario) within the Class I and Sensitive Class II Areas ................................ 4-71

4-26   Average Noise Levels Produced during Construction and Operations ...................... 4-74
4-27   Acres of Soils on Steep Slopes Potentially Impacted (Alternative A)....................... 4-83
4-28   Acres of Soils with Erosion Hazard Ratings Potentially Impacted (Alternative A)... 4-83
4-29   Acres of Soils with Erosion Hazard Ratings for Roads (Alternative A) ................... 4-84
4-30   Acres of Soils on Steep Slopes Potentially Impacted (Alternative B)........................ 4-84
4-31   Acres of Farmlands Potentially Impacted (Alternative B) ....................................... 4-85
4-32   Acres of Soils with Erosion Hazard Ratings Potentially Impacted (Alternative B)... 4-85
4-33   Acres of Soils with Erosion Hazard Ratings for Roads (Alternative B).................... 4-86
4-34   Acres of Farmlands Potentially Impacted (Alternative C) ........................................ 4-87
4-35   Acres of Soils on Steep Slopes Potentially Impacted (Alternative C)....................... 4-87
4-36   Acres of Soils with Erosion Hazard Ratings Potentially Impacted (Alternative C)... 4-87
4-37   Acres of Soils with Erosion Hazard Ratings for Roads Potentially Impacted
         (Alternative C) ........................................................................................................... 4-88
4-38   Acres of Farmlands Potentially Impacted (Alternative D) ........................................ 4-88
4-39   Acres of Soils on Steep Slopes Potentially Impacted (Alternative D)....................... 4-89
4-40   Acres of Soils with Erosion Hazard Ratings Potentially Impacted (Alternative D)... 4-89
4-41   Acres of Soils with Erosion Hazard Ratings for Roads Potentially Impacted
         (Alternative D) ........................................................................................................... 4-90
4-42   Estimated Risk of a Reportable Spill from a Producing Gas Well in
         Colorado 2009 to 2013 ............................................................................................... 4-96
4-43   Direct Impacts on Vegetation Communities in Bull Mountain Unit
         (Alternative A) ......................................................................................................... 4-121
4-44   Direct Impacts on Vegetation Communities in Bull Mountain Unit
         (Alternative B) ......................................................................................................... 4-122
4-45   Permanent Impacts on Vegetation Communities from Development of
         Well Pad 12-89-7-1 ................................................................................................... 4-123
4-46   Direct Impacts on Vegetation Communities in Bull Mountain Unit
         (Alternative C) ......................................................................................................... 4-124
4-47   Direct Impacts on Vegetation Communities in Bull Mountain Unit
         (Alternative D) ......................................................................................................... 4-125
4-48   Cumulative Impacts on Vegetation Communities in Bull Mountain Unit
         (Alternatives A and B combined) ............................................................................. 4-126
4-49   Cumulative Impacts on Vegetation Communities in Bull Mountain Unit
         (Alternatives A and C combined) ............................................................................. 4-126
4-50   Cumulative Impacts on Vegetation Communities in Bull Mountain Unit
         (Alternatives A and D combined) ............................................................................. 4-127
4-51   Habitat Quality Categories as a Function of Road Density ..................................... 4-132
4-52   Habitat Categories by Alternative............................................................................ 4-133
4-53   Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit under
         Alternative A............................................................................................................. 4-134
4-54   Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit under
         Alternative B ............................................................................................................. 4-142
4-55   Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit under
         Alternative C............................................................................................................. 4-145
4-56   Impacts on Mule Deer and Elk Habitat in the Bull Mountain Unit under
         Alternative D............................................................................................................. 4-149

4-57    Cumulative Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit
        (Alternatives A and B combined) .......................................................................... 4-150
4-58    Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit
        (Alternatives A and C combined) .......................................................................... 4-151
4-59    Impacts on Mule Deer and Elk Habitat in the Bull Mountain Unit
        (Alternatives A and D Combined) ......................................................................... 4-151
4-60    Visual Resources Inventory Scenic Quality Evaluation Ratings ............................... 4-184
4-61    Grazing Disturbance on BLM Allotments from Roads and Well Pads ..................... 4-192
4-62    Alternative A - Surface Disturbance[1] by Landownership ........................................ 4-204
4-63    Alternative B - Surface Disturbance[1] by Landownership ........................................ 4-205
4-64    Alternative C - Surface Disturbance[1] by Landownership ........................................ 4-206
4-65    Alternative D - Surface Disturbance[1] by Landownership ........................................ 4-206
4-66    Bull Mountain Unit Estimated Annual Direct Labor Requirements and
        Costs - Alternative A ........................................................................................... 4-227
4-67    Bull Mountain Unit Direct and Indirect Annual Contributions - Alternative A ....... 4-228
4-68    Impacts on Local Fiscal Conditions—Alternative A ............................................... 4-231
4-69    Bull Mountain Unit Direct Annual Employment and Labor Costs—Alternative B ... 4-234
4-70    Bull Mountain Unit Direct and Indirect Annual Contributions—Alternative B ...... 4-235
4-71    Impacts on Local Fiscal Conditions - Alternative B ................................................ 4-237
4-72    Irreversible and Irretrievable Commitment of Resources ......................................... 4-246
4-73    Relationship of Short-term Uses of the Environment to Long-term Productivity .... 4-247

# FIGURES

Page

4-1     Alternatives A and B Cumulative ........................................................................... 4-12
4-2     Alternatives A and C Cumulative ........................................................................... 4-13
4-3     Alternatives A and D Cumulative ........................................................................... 4-14
4-4     Cumulative Effects Study Area .............................................................................. 4-15
4-5     Near-Field Analysis, Well Pad and Access Road Construction Modeling
        Scenario .............................................................................................................. 4-25
4-6     Near-Field Analysis, Well Production Modeling Scenario ....................................... 4-26
4-7     Near-Field Analysis, Well Development Modeling Scenario .................................... 4-27
4-8     Well Production Receptor Grid .............................................................................. 4-28
4-9     Near-Field Analysis, Well Development Receptor Grid ........................................... 4-29
4-10    Far-field Analysis Modeling Scenario ..................................................................... 4-34
4-11    Far-field Analysis, Source Layout ........................................................................... 4-35
4-12    2008 ozone DVC (top left), 2021 ozone DVF (top right) and 2021 – 2008
        ozone DVF differences calculated using MATS for the CARMMS 2021 High
        Development Scenario ........................................................................................... 4-63
4-13    Fourth highest daily maximum 8-hour ozone concentrations for the 2008 Base
        Case (top left), CARMMS 2021 High Development Scenario (top right),
        2021 minus 2008 differences (bottom) ................................................................... 4-65
4-14    Contribution to Fourth Highest Daily Maximum Ozone Concentrations Due
        to Emissions from Federal Oil and Gas within the UFO Planning Area for
        the CARMMS 2021 High Development Scenario .................................................... 4-66
4-15    Habitat Categories by Alternative ........................................................................... 4-135

# CHAPTER 4
# ENVIRONMENTAL CONSEQUENCES

## 4.1   INTRODUCTION

This chapter presents the likely direct, indirect, and cumulative environmental impacts that could result from implementing the alternatives presented in **Chapter 2**, Alternatives. This chapter is organized by topic, similar to **Chapter 3**, Affected Environment. Each topic area includes a method of analysis section that identifies indicators of impacts, methods, and assumptions; a summary of effects common to all alternatives; and an analysis of impacts for each of the alternatives.

This impact analysis identifies impacts that may result in some level of change to the resource, regardless of whether that change is beneficial or adverse. The impact analysis does not include a subjective qualifier (beneficial or adverse) to the impact; instead, it states the nature, magnitude, and context for the change (see **Section 4.1.1**, General Methodology for Analyzing Impacts, for more detail). The evaluations presented in this section are confined to the actions that have more prominent, immediate, or direct effects. Some of the proposed management actions and potential future development may affect only certain resources and alternatives. If an activity or action is not addressed in a given section, no impacts are expected, or the impact is expected to be negligible.

Impact analysis is a cause-and-effect inquiry. The detailed impact analyses and conclusions are based on the interdisciplinary team's knowledge of resources and the project area, reviews of existing literature, and information provided by experts in the BLM and other agencies. The baseline used for the impact analysis is the current condition or situation, as described in **Chapter 3**, Affected Environment. Impacts on resources and resource uses are analyzed and discussed in detail commensurate with resources issues and concerns identified throughout the process. At times, impacts are described using ranges of potential impacts or in qualitative terms.

## 4.1.1   General Methodology for Analyzing Impacts

Potential impacts or effects are described in terms of type, context, duration, and intensity, which are generally defined as follows:

- Type of Impact – Because types of impacts can be interpreted differently by different people, this chapter does not differentiate between beneficial and adverse impacts (except

in cases where such characterization is required by law, regulation, or policy). The presentation of impacts for key programmatic issues is intended to provide the BLM decision-maker and reader with an understanding of the multiple-use tradeoffs associated with each alternative.

- Context – Context describes the area or location (site-specific, local, Unit-wide, or regional) in which the impact would occur. Site-specific impacts would occur at the location of the action, local impacts would occur within the general vicinity of the action area, Unit-wide impacts would affect a greater portion of the state, and regional impacts would extend beyond the Unit (state) boundaries.

- Duration – Duration describes the length of time an effect would occur, either short term or long term. Short term is defined as anticipated to begin and end within the first 5 years after the action is implemented. Long term is defined as lasting beyond 5 years to the end of or beyond a 50-year project horizon.

- Intensity – This analysis discusses impacts using quantitative data wherever possible. If quantitative analysis is not possible, qualitative statements are used.

- Direct and Indirect Impacts – Direct impacts are caused by an action or implementation of an alternative and occur at the same time and place. Indirect impacts result from implementing an action or alternative but usually occur later in time or are removed in distance and are reasonably certain to occur.

- Cumulative Impacts – Cumulative impacts are described at the end of each resource section. Cumulative impacts are the direct and indirect effects of a proposed project alternative's incremental impacts when they are added to other past, present, and reasonably foreseeable actions, regardless of who carries out the action (40 CFR Part 1508.7). The list of actions used for cumulative impact analysis is provided in **Section 4.1.3**, Cumulative Effects, Past, Present, and Reasonably Foreseeable Future Actions.

Analysis shown under an alternative may be referenced in the other alternatives with such statements as "impacts would be the same as, or similar to, Alternative A" or "impacts would be the same as Alternative B, except for…" as applicable.

Irreversible and irretrievable commitment of resources, unavoidable adverse impacts, and the relationship of short-term uses of the environment to long-term productivity are discussed in **Section 4.5**, Irreversible and Irretrievable Commitment of Resources and Relationship of Short-term Uses of the Environment to Long-term Productivity. Each of these impacts discussions is required by the regulations at 40 CFR 1502.16 and summarizes information for resources and resources uses that may be affected.

The scope of the analysis focuses on impacts on resources and uses on BLM-administered lands or mineral estate, as the decisions being made by the BLM apply only to BLM-administered resources and uses. However, the type of impacts anticipated from energy development may be useful to other agencies and/or private landowners in understanding project development.

## 4.1.2   Analytical Assumptions

Several assumptions were made to facilitate the analysis of the projected impacts. These assumptions set guidelines and provide reasonably foreseeable projected levels of development that would occur within the project area and time frame. These assumptions should not be interpreted as constraining or redefining the management objectives and actions proposed for each alternative, as described in **Chapter 2**, Alternatives. The following general assumptions apply to all resource categories. Any specific resource assumptions are provided in the methods of analysis section for that resource.

- Sufficient funding and personnel would be available for implementing the final decision.

- Implementing actions from any of the alternatives would be in compliance with all valid existing rights, federal regulations, BLM policies, and other requirements such as state, county, and local government regulations.

- Additional site-specific NEPA documentation would be completed on PODs or individual APDs as appropriate.

- Appropriate maintenance would be carried out to maintain the functional capability of all developments.

- The discussion of impacts is based on the best available data. Knowledge of the Unit and professional judgment, based on observation and analysis of conditions and responses in similar areas, are used to infer environmental impacts where data are limited.

- Temporal and spatial boundaries used in the direct and indirect effects analysis are developed on the basis of resources of concern and actions that might contribute to an impact. The baseline date for the cumulative impacts analysis is 2013. The short-term scope of analysis is 0-5 years and the long-term scope of analysis is 6+ years unless otherwise noted under the specific resource heading. The spatial boundary for the scope of analysis is the Unit boundary, unless otherwise noted under the specific resource heading.

- Acreage figures and other numbers used in the analyses are approximate projections for comparison and analytic purposes only. Readers should not infer that they reflect exact measurements or precise calculations. Acreage calculations are rounded to the nearest 10 acres. All alternatives assume a standard area of disturbance that would be used for calculations. Due to the uncertainty of the number of wells per pad and alignments for roads and pipelines, the disturbance areas used are estimates only and were developed based on the assumption that the disturbance area would need to be large enough to reasonably accommodate future permitted construction or realignments. Actual and specific well pad size, pipeline width or road width would be determined in future APDs and/or PODs and analyzed in subsequent NEPA actions.

- Cumulative actions in in the Unit are all those of Alternative A plus all those of Alternatives B, C, and D. For example, the cumulative actions under Alternative A includes all of the private wells and well pads as described in Alternative A, plus all of

the federal wells and well pads as described in Alternative B. These numbers are the same for cumulative Actions under Alternative B. For Alternatives C and D, the cumulative effects include all of Alternative A actions plus all actions accounted for in Alternative C or Alternative D, respectively. **Table 4-1**, Summary of Cumulative Actions within the Unit by Alternative, and **Table 4-2**, Summary Cumulative Surface Disturbance Acres within the Unit by Alternative, below present action quantities in terms of well and well pad numbers as well as miles of roads and acreage of disturbance.

### 4.1.3   Cumulative Effects

Cumulative impacts are effects on the environment that result from the impact of implementing any one of the alternatives in combination with other actions outside the scope of this plan, either within the Unit or adjacent to it. Cumulative impact analysis is required by CEQ regulations because environmental conditions result from many different factors that act together. The total effect of any single action cannot be determined by considering it in isolation. Total effect must be determined by considering the likely result of that action in conjunction with many others. Evaluation of potential impacts considers incremental impacts that could occur from the proposed project, as well as impacts from past, present, and reasonably foreseeable future actions. Management actions could be influenced by activities and conditions on adjacent public and non-public lands beyond the Unit boundary; therefore, assessment data and information could span multiple scales, landownerships, and jurisdictions. These assessments involve determinations that often are complex and, to some degree, subjective.

*Cumulative Analysis Methodology*

The cumulative impacts discussion that follows considers the alternatives in the context of the broader human environment – specifically, actions that occur outside the scope and geographic area covered by the Unit. Resources not discussed in detail include Areas of Critical Environmental Concern and Wild and Scenic Rivers, coal resources, locatable minerals, mineral materials, geothermal resources, Wilderness Study Areas, or lands with wilderness characteristics (see Chapter 3, Resources and Uses Not Addressed for more information). Wilderness areas are only discussed in the context of potential air quality and visibility impacts on wilderness in **Section 4.2.1**, Air Quality.

Because of the programmatic nature of the Bull Mountain Unit MDP EIS and cumulative assessment, the analysis tends to be broad and generalized to address potential effects that could occur from a reasonably foreseeable management scenario combined with other reasonably foreseeable activities or projects. Consequently, this assessment is primarily qualitative for most resources because of lack of detailed information that would result from site-specific decisions and other activities or projects. Quantitative information is used whenever available and as appropriate to portray the magnitude of an impact. The analysis assesses the magnitude of cumulative impacts by comparing the environment in its baseline condition with the expected impacts of the alternatives and other actions in the same geographic area. The magnitude of an impact is determined through a comparison of anticipated conditions against the naturally occurring baseline as depicted in the affected environment (see **Chapter 3**, Affected Environment) or the long-term sustainability of a resource or social system.

**Table 4-1**
**Summary of Cumulative Actions within the Unit by Alternative**

| Phase | Action | Alternative A, No Action | Alternative B Proposed Action | Alternative C Modified Action | Alternative D BLM's Preferred Alternative |
|---|---|---|---|---|---|
| Construction | Well pads | 18 existing pads on private mineral estate<br>10 new pads on private mineral estate<br>36 new pads on federal mineral estate | 18 existing pads on private mineral estate<br>10 new pads on private mineral estate<br>36 new pads on federal mineral estate | 18 existing pads on private mineral estate<br>10 new pads on private mineral estate<br>35 new pads on federal mineral estate | 18 existing pads on private mineral estate<br>10 new pads on private mineral estate<br>33 new pads on federal mineral estate |
| | Access roads | 23 miles existing suitable roads<br>79 miles upgrades to existing roads<br>21 miles new road construction | 23 miles existing suitable roads<br>79 miles upgrades to existing roads<br>21 miles new road construction | 23 miles existing suitable roads<br>39 miles upgrades to existing roads<br>16 miles new road construction | 23 miles existing suitable roads<br>40 miles upgrades to existing roads<br>20 miles new road construction |
| | | Construction Rate: 600-800 yards per day | | | |
| | Pipelines | 6 miles existing collocated with roads<br>12 miles existing cross-country<br>18 miles new collocated with roads<br>17 miles new cross-country | 6 miles existing collocated with roads<br>12 miles existing cross-country<br>18 miles new collocated with roads<br>17 miles new cross-country | 6 miles existing collocated with roads<br>12 miles existing cross-country<br>24 miles new collocated with roads<br>8 miles new cross-country | 6 miles existing collocated with roads<br>12 miles existing cross-country<br>19 miles new collocated with roads<br>18 miles new cross-country |
| | Electrical lines | 5 new overhead electrical lines (20 power poles) + 1 existing overhead electrical line | | 5 new buried electrical lines + 1 existing overhead electrical line | 1 new overhead electrical line (5 power poles) + 1 existing overhead electrical line |

**Table 4-1**
**Summary of Cumulative Actions within the Unit by Alternative**

| Phase | Action | Alternative A, No Action | Alternative B Proposed Action | Alternative C Modified Action | Alternative D BLM's Preferred Alternative |
|---|---|---|---|---|---|
| Drilling | Gas wells | 18 existing gas wells 201 new gas wells (146 federal wells, 55 private wells) | | | |
| | | Time frame Coal bed methane natural gas—60 days Shale and sandstone—85 days | | | |
| | Water disposal wells | 1 existing water disposal well 5 new water disposal wells | | | |
| | | Time frame: 60 to 120 days | | | |
| | Drilling rate | 3 Tier-2 or cleaner rigs drilling 27 wells per year | | | |
| | Drilling duration | 10 years | 6 years | | |
| Completion | Gas wells | Well completion duration: 8 to 10 days Flow testing duration: 25 to 50 days | | | |
| | Water disposal wells | Well completion duration: 8 to 10 days | | | |
| Production and maintenance | Compressor station | 4 compressor stations | | | |
| | Produced water management | Production: 500 to 3,000 barrels per day | | | |
| | | Coal bed Methane Natural Gas-produced water is used in completions, recycled, and then injected into water disposal wells or trucked to disposal location | | | |

**Table 4-1**
**Summary of Cumulative Actions within the Unit by Alternative**

| Phase | Action | Alternative A, No Action | Alternative B Proposed Action | Alternative C Modified Action | Alternative D BLM's Preferred Alternative |
|---|---|---|---|---|---|
| Water use and sources | Drilling | | 618,000 barrels for all wells | | |
| | Completion | | Up to 27,446,200 barrels[1] or 2,662 acre-feet for all new wells (109 coal bed methane)(1,800 barrels) = 196,200 (109 shale)(250,000 barrels) = 27,250,000 | | |
| | Dust abatement | | 100 to 400 barrels per day | | |
| | Source for all uses | | 30% freshwater and 70% recycled or produced water | | |
| | Total water usage for drilling and completion[2] (based on source percentages noted above) | | 8,419,260 barrels, or 817 acre-feet freshwater 19,644,940 barrels, or 1,905 acre-feet recycled/produced water | | |

[1]Calculated based on assuming 50 percent CBNG wells and 50 percent shale wells as discussed in the Bull Mountain EA. Water amounts for each type of well were taken from the general SUPO in Appendix D. Calculations used number of new wells per alternative divided in half for each type of well (coal bed methane/shale). To estimate the amount of water use per well type, the number of wells was multiplied by the highest amount of water use for that well type. Water usage totals were added together for a total maximum amount of water usage.

[2]Amounts were calculated based on adding together the Drilling barrels and Completion barrels. The total was multiplied by 30 percent to determine the freshwater amount and 70 percent to determine the amount of recycled/produced water that would be used.

**Table 4-2**
**Summary Cumulative Surface Disturbance Acres within the Unit by Alternative[3]**

| Project Feature | Alternative A | | Alternative B | | Alternative C | | Alternative D | |
|---|---|---|---|---|---|---|---|---|
| | Short-Term Surface Disturbance | Long-Term Surface Disturbance | Short-Term Surface Disturbance | Long-Term Surface Disturbance | Short-Term Surface Disturbance | Long-Term Surface Disturbance | Short-Term Surface Disturbance | Long-Term Surface Disturbance |
| **Well Pads** | | | | | | | | |
| Existing Well Pads | N/A | 36 acres | N/A | 36 acres | N/A | 36 acres | N/A | 36 acres |
| New Well Pads | 230 acres | 92 acres | 230 acres | 92 acres | 225 acres | 90 acres | 215 acres | 86 acres |
| **Roads** | | | | | | | | |
| Existing suitable roads | N/A | 41 acres | N/A | 41 acres | N/A | 41 acres | N/A | 41 acres |
| Upgrades to existing | 275 acres | 146 acres | 275 acres | 146 acres | 139 acres | 74 acres | 143 acres | 76 acres |
| New road construction | 77 acres | 41 acres | 77 acres | 41 acres | 60 acres | 32 acres | 72 acres | 38 acres |
| **Pipelines** | | | | | | | | |
| Existing, collocated with roads | N/A | 11 acres | N/A | 11 acres | N/A | 11 acres | N/A | 11 acres |
| Existing cross-country | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| New, collocated with roads | 215 acres | 34 acres | 215 acres | 34 acres | 285 acres | 45 acres | 225 acres | 35 acres |
| New cross-country | 103 acres | 0 acres | 103 acres | 0 acres | 47 acres | 0 acres | 108 acres | 0 acres |

---

[3]Calculated by adding Alternative A short- and long-term disturbances with Alternative B short- and long-term disturbances (A+B = Alternative A cumulative, A+B= Alternative B cumulative) and Alternative C (A+C=Alternative C cumulative) and Alternative D (A+D=Alternative D cumulative). Total acres are calculated without any overlapping areas; for example, collocated pipelines and roads are only counted once rather than double counted.

**Table 4-2**
**Summary Cumulative Surface Disturbance Acres within the Unit by Alternative[3]**

| Project Feature | Alternative A | | Alternative B | | Alternative C | | Alternative D | |
|---|---|---|---|---|---|---|---|---|
| | Short-Term Surface Disturbance | Long-Term Surface Disturbance | Short-Term Surface Disturbance | Long-Term Surface Disturbance | Short-Term Surface Disturbance | Long-Term Surface Disturbance | Short-Term Surface Disturbance | Long-Term Surface Disturbance |
| Facilities | | | | | | | | |
| Existing Flowback Pits | N/A | 5 acres | N/A | 5 acres | N/A | 5 acres | N/A | 5 acres |
| New Compressor Stations | 20 acres | 8 acres | 20 acres | 8 acres | 20 acres | 8 acres | 20 acres | 8 acres |
| New Storage Yard | 5 acres | 2 acres | 5 acres | 2 acres | 5 acres | 2 acres | 5 acres | 2 acres |
| Total acres | 860 acres | 303 acres | 860 acres | 303 acres | 701 acres | 214 acres | 715 acres | 221 acres |

The following factors were considered in this cumulative impact assessment:

- Federal, state, and private actions

- Potential for synergistic effects or synergistic interaction among or between effects

- Potential for effects across political and administrative boundaries

- Other spatial and temporal characteristics of each affected resource

- Comparative scale of cumulative impacts across alternatives

Temporal and spatial boundaries used in the cumulative analysis are developed on the basis of resources of concern and actions that might contribute to an impact. The baseline date for the cumulative impacts analysis is 2013. The temporal scope of this analysis is a 50-year planning horizon.

General cumulative analysis spatial boundaries were developed to facilitate the analysis; the cumulative effects analysis area is the Bull Mountain Unit boundary plus a 10-mile radius. Spatial and temporal boundaries can vary and can be contained within the Unit boundaries. If a resource requires a different analysis area than these, the specifics are included under the appropriate resource section heading.

### Past, Present, and Reasonably Foreseeable Future Actions

Past, present, and reasonably foreseeable future actions are considered in the analysis to identify whether and to what extent the environment has been degraded or enhanced, whether ongoing activities are causing impacts, and trends for activities in and impacts on the area. Projects and activities are evaluated on the basis of proximity, connection to the same environmental systems, potential for subsequent impacts or activity, similar impacts, the likelihood a project would occur, and whether the project is reasonably foreseeable.

The general cumulative impacts analysis area was defined as the Bull Mountain Unit plus a 10-mile buffer around the Unit; however, each resource topic defines the area based on the specific issues and resources being addressed. For example, the air resources cumulative impacts analysis provides for an airshed cumulative analysis area which extends well beyond the general cumulative analysis area. For those projects that fall within the general cumulative analysis area, projects and activities considered in the cumulative analysis were identified by cooperators and BLM employees with local knowledge of the area. Each was asked to provide information on the most influential past, present, or reasonably foreseeable future actions. Additional information was obtained through discussions with agency officials and review of publicly available materials and websites.

Effects of past actions and activities are manifested in the current condition of the resources, as described in the affected environment (see **Chapter 3**, Affected Environment). Reasonably foreseeable future actions are actions that have been committed to or known proposals that would take place within a 50-year planning period. **Table 4-1**; **Table 4-2**; **Figure 4-1**, Alternatives A and B Cumulative, **Figure 4-2**, Alternatives A and C Cumulative, **Figure 4-3**, Alternatives A and D Cumulative, and **Figure 4-4**, Cumulative Effects Study Area, present summaries of the existing and current actions within the Bull Mountain Unit as a starting point for cumulative effects analysis.

Reasonably foreseeable future action scenarios are projections made to predict future impacts – they are not actual planning decisions or resource commitments. Projections, which have been developed for analytical purposes only, are based on current conditions and trends and represent a best professional estimate. Unforeseen changes in factors such as economics, demand, and federal, state, and local laws and policies could result in different outcomes than those projected in this analysis.

The BLM has considered other potential future actions that have been eliminated from further analysis because of the small likelihood these actions would be pursued and implemented within the life of the plan or because so little is known about the potential action that formulating an analysis of impacts is premature. In addition, potential future actions protective of the environment (such as new potential threatened or endangered species listings or regulations related to fugitive dust emissions) have less likelihood of creating major environmental consequences alone, or in combination with this programmatic effort. Federal actions such as species listing may cause the BLM to reconsider decisions created from this action because the consultations and relative impacts might no longer be appropriate. These potential future actions may have greater capacity to affect resource uses within the Unit; however, until more information is developed, no reasonable estimation of impacts could be developed.

Data on the precise locations and overall extent of resources within the Unit are considerable, although the information varies according to resource type and locale. Furthermore, understanding of the impacts on and the interplay among these resources is evolving. As knowledge improves, management measures (adaptive or otherwise) would be considered to reduce potential cumulative impacts in accordance with law, regulations, and BLM RMPs.

Projects and activities identified as having the greatest likelihood to generate potential cumulative impacts when added to the Bull Mountain Unit MDP alternatives are displayed in **Table 4-3**, Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario.

4. Environmental Consequences



**Alternatives A and B Cumulative**

Figure 4-1

Alternative A proposed well pad analysis area
Alternative B proposed well pad analysis area
Alternative A proposed pipeline
Alternative B proposed pipeline
Alternative A proposed new road construction
Alternative B proposed new road construction
Alternatives A and B existing road requires upgrade for use
Alternatives A and B proposed screw compressor
Existing storage yard

Existing Infrastructure
Existing road currently suitable for use
Existing pipeline
Existing flowback pit
Existing well pad

Federal surface, federal minerals
Private surface, federal minerals
Private surface, private minerals

Source: SG Interests GIS 2013 and BLM GIS 2014

December 31, 2015
BullMtn_fA_cuml_A_B_V08.pdf
Bull Mountain EIS Uncompahgre Field Office
No warranty is made by the BLM as to the accuracy, reliability, or completeness of these data for individual use or aggregate use with other data.

BULL MOUNTAIN UNIT
COLORADO
Bull Mountain
Uncompahgre Field Office
Uncompahgre Field Office
Bull Mountain
Paonia
Hotchkiss
T11S R90W
T11S R89W
T12S R90W
T12S R89W
GUNNISON COUNTY
Federal surface, federal minerals
Private surface, federal minerals
Private surface, private minerals
0 2,000 4,000
Feet
December 31, 2015
BullMtn_IA_cuml_A_C_V06.pdf
Bull Mountain EIS Uncompahgre Field Office
No warranty is made by the BLM as to the accuracy, reliability, or completeness of these data for individual use or aggregate use with other data.
Source: SG Interests GIS 2013 and BLM GIS 2014
Alternatives A and C Cumulative
Alternative A proposed well pad analysis area
Alternative C proposed well pad analysis area
Alternative C proposed well pad analysis area- must site pad outside of areas overlapping identified elk winter concentration areas
Alternative A proposed pipeline
Alternative C proposed pipeline
Alternative A proposed new road construction
Alternative C proposed new road construction
Alternatives A and C existing road requires upgrade for use
Alternatives A and C proposed screw compressor
Existing Infrastructure
Existing road currently suitable for use
Existing pipeline
Existing flowback pit
Existing well pad
Existing storage yard

Figure 4-2

4. Environmental Consequences





**Alternatives A and D Cumulative**

| Alternative A proposed well pad analysis area | Alternative A proposed new road construction | Existing Infrastructure |
| Alternative D proposed well pad analysis area | Alternative D proposed new road construction | Existing road currently suitable for use |
| Alternative A proposed pipeline | Alternatives A and D existing road requires upgrade for use | Existing pipeline |
| Alternative D proposed pipeline | Alternatives A and D proposed screw compressor | Existing flowback pit |
| | | Existing well pad |
| | | Existing storage yard |

Figure 4-3

4. Environmental Consequences



**Cumulative Effects Study Area**

Source: BLM GIS 2014

- Bull Mountain Unit
- Cumulative Effects Study Area
- Forest Service Wilderness
- Watershed: level 5 hydrologic unit code
- Federal surface, federal minerals
- Private surface, federal minerals
- Private surface, private minerals

Figure 4-4

**Table 4-3**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario**

| Energy and minerals development | Summary. Most oil and gas development on BLM-administered lands within the cumulative analysis area has been in the North Fork of the Gunnison River area. Numerous mining claims exist. Most coal mining occurs in the North Fork of the Gunnison area. Oil and gas development has been focused on the North Fork area and to the south of the valley. |
|---|---|
| | Coal. There are two active underground coal mines on federal mineral estate in the cumulative impacts analysis area. The following table contains recent production data for the three coal mines in the North Fork Valley. |

| Raw Coal Production in the North Fork Valley Year Averages (Tons) | | | | |
|---|---|---|---|---|
| Average Based on[1] | Bowie No. 2 Mine | Elk Creek Mine | West Elk Mine | Total |
| 5 year | 2,935,892 | 2,051,704 | 6,090,157 | 11,077,753 |
| 1 year | 3,000,000 | -- | 6,000,000 | 9,000,000 |

Source: BLM UFO Coal program

[1]5-year period ended December 31, 2014; 1-year period ends Dec. 31, 2015

Notes: Each of these mining operations control coal reserves with a mix of federal and fee coal; however, 90 percent or more of local production is federal. As mining progresses, only federal coal would be available in the reserve base.

Bowie No. 2 Mine was opened in 1997 as a room-and-pillar mine but was converted to a longwall system in late 1999. It is northeast of Paonia, Colorado, and is operated by Bowie Resources, LLC, with a loadout northeast of Paonia. There are 14,540 acres permitted in the combined Bowie No. 1 and No. 2 Mines, accessed by the Bowie No. 2 Mine.

The Elk Creek Mine is a longwall operation north of Somerset, Colorado, operated by Oxbow Mining, LLC, with a loadout immediately north of Somerset. There are 13,430 acres permitted.

The West Elk Mine is a longwall operation south and east of Somerset and is operated by Mountain Coal Company with a loadout about 1 mile east of Somerset. There are 17,160 acres permitted. The mine is approximately the seventh largest underground longwall coal mine in the United States.

| | Oxbow has completed exploration drilling to confirm the quality, quantity, and extent of the coal in this area. The Oak Mesa Project encompassed about 13,873 acres north of Hotchkiss in Delta County. The coal exploration license expired under its own terms in September 2014. There has been no interest expressed in leasing the coal reserves. |
|---|---|
| | Oil and Gas Leasing. The BLM routinely offers land parcels for competitive oil and gas leasing to allow exploration and development of oil and gas resources for public sale. Continued leasing is necessary for oil and gas companies to seek new areas for oil and gas production, or to develop previously inaccessible/uneconomical reserves. |
| | Twenty-five percent (224,950 acres) of the federal fluid mineral estate in the UFO (916,030) is already leased. This includes 160,510 acres (24 percent) of BLM surface and 64,440 acres (27 percent) of split-estate lands (private, state, and local surface with federal fluid mineral subsurface). Total fluid minerals acres leased annually by the BLM over the past 12 years are as follows: |

**Table 4-3**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario**

| Year | Average Lease Acreages | Total Leased Acres* | Total Number of Leases |
|------|-----------------------|---------------------|------------------------|
| 2000 | 745 | 16,130 | 21 |
| 2001 | 545 | 40,070 | 71 |
| 2002 | 490 | 2,240 | 5 |
| 2003 | 460 | 14,070 | 32 |
| 2004 | 635 | 4,250 | 7 |
| 2005 | 900 | 54,710 | 52 |
| 2006 | 510 | 15,850 | 29 |
| 2007 | 500 | 31,560 | 48 |
| 2008 | 490 | 23,540 | 37 |
| 2009 | 80 | 390 | 5 |
| 2010 | N/A | 0 | 0 |
| 2011 | 40 | 40 | 1 |
| 2012** | 800 | 800 | 1 |

Source: BLM 2012a
*Includes all leased BLM surface acres, plus all federal fluid mineral subsurface under private, local, and State surface. Values are limited to active leases and do not include pending leases.
**As of August 2012.

The BLM developed a reasonably foreseeable development scenario (RFDS) for oil and gas by analyzing past activity, production, and other sources in support of the Uncompahgre RMP revision (BLM 2012b). An RFD scenario provides information about the type and level of oil and gas activity and associated disturbance that could occur after leasing in the Uncompahgre Field Office planning area. The RFDS is unconstrained by management-imposed conditions because it is based primarily on geology and historical exploration and development. It provides information necessary to analyze long-term or widespread effects that could result from possible exploration or development on oil and gas leases. The RFD is not a decision, and it neither establishes nor implies a cap on development. NFS lands, other federal agency lands, and state and private lands are included in the baseline projection for those lands assessed in the RFD. The time frame used in the Uncompahgre RMP/EIS's RFDS is from 2010 through 2030. For more details on cumulative development in the region, see Tables 7a, 7b, 8a, and 8b from the Reasonable Foreseeable Development Scenario for Oil and Gas for the Uncompahgre Field Office.

According to the RFD the project area is identified as having high occurrence potential (BLM 2012b). Mineral production in the area is limited to existing natural gas wells operated by Gunnison Energy and SGII.

Gunnison Energy is the sole oil and gas operator in Delta County. Since 2005 the company has drilled approximately 10 wells and installed a gathering line for the Spaulding Peak Unit, which is north and east of Cedaredge, Colorado.

Gunnison Energy permitted 16 wells on 9 pads (Hotchkiss Federal BLM-DOI-UFO-2008-035 EA) in Gunnison County; to date, five pads have been constructed and nine wells have been drilled.

There is a combined federal and private mineral development of 28 abandoned natural gas wells, 54 producible wells, and 10 approved wells that have not been constructed.

Vessels Coal Mine Methane Capture Project Methane Drainage System, situated above Oxbow Mining LLC's Elk Creek Mine near Somerset, Colorado: Capture of low-level coal mine methane emissions produced at the mine as a result of coal extraction and combusted on-site for either electrical generation, with excess flared rather than venting directly to atmosphere.

**Table 4-3**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario**

| | |
|---|---|
| | Petrox 2-APDs in Somerset Unit: Two APDs from Petrox Resources are proposed for development in the Federal Somerset Unit, a 6,400-acre project area that largely overlies the Pilot Knob Roadless Area north of Somerset. Petrox has submitted an MDP to the Forest Service; however, the proposal does not contain complete or current data and relies on the development of the two submitted APDs for revision. While operations may be considered reasonably foreseeable, specific details of the MDP are unavailable for analysis. |
| | Spadafora Waste Disposal Pits: The Gunnison County Planning Commission approved the Spadafora Water Storage Facility on March 6, 2015. Three water storage pits, each with a pump station and a volume of about 9,240,000 gallons, would sit on roughly 19 acres and would store and recycle produced water for drilling and gas well operations. This facility is in the project area and next to the Spadafora well pad for APDs GE 11-90-20-21 H1 and H2. |
| | Huntsman Unit Proposal: SGI has proposed drilling in the Huntsman Unit (COC 74403X), which includes three SGI leases (COC 63886, 63888, and 63889). SGI has proposed one APD there for well 10-89-31 #1 inside lease COC 63886. |
| | Deadman Gulch APD: SGI has proposed an APD (12-89-30#1) inside the Gunnison Energy Deadman Gulch Unit and next to the Petrox Somerset Federal Unit in the Pilot Knob CRA on lease COC 64169. |
| | The Gunnison Energy/SGI duel proposal for 25 federal natural gas wells and associated infrastructure on 5 multi-well pads, approximately 5 miles west of the Bull Mountain Unit. The development would be on an existing well pad (Aspen Leaf), four new multi-well pads would be constructed (11-90-9, Allen, Henderson, and Spadafora), along with associated gas gathering lines, subsurface water lines, temporary surface poly pipelines, and up to 25 total gas wells, which may be drilled within the next 5 years. |
| | On private lands within Delta and Gunnison Counties, COGIS records as of November 2011 show a total of 43 natural gas wells; 19 wells are producing, 16 are shut-in and capable of producing; 2 are waiting on completion; and the remaining 6 were drilled, abandoned, and plugged. |
| Vegetation Management | Forestry. Past, current, and foreseeable forestry uses in the cumulative analysis area include personal and commercial harvest of pinyon and juniper fuel wood, poles and posts for fence building, wildings (live trees and shrubs), and Christmas trees. |
| | Vegetation treatments. Prescribed fire and mechanical treatments of vegetation (e.g., chaining, rollerchops, Dixie-harrow, drill seeding, hydro-axing, and brush mowing) were very common in the past on public and private rangelands in the cumulative analysis area. These treatments and maintenance of these vegetation treatments are still fairly common and would likely continue (except chaining). In addition, manual and mechanical treatments of large woody invasive species such as tamarisk have occurred in the riparian areas of rivers and streams; this type of restoration work would likely continue in the foreseeable future. |
| | Hazardous fuels reduction. Fuels treatments, including prescribed fires, chemical and mechanical treatment, and seeding, would likely continue and potentially increase in the future. |
| | Sage-grouse habitat. Implementation of conservation plans for sage-grouse within the cumulative impacts analysis area includes active management techniques to improve habitat quality for sage-grouse, maintain or increase suitable habitat within population areas, and maintain or increase sage-grouse numbers. Plans include the San Miguel Basin Gunnison Sage-grouse Conservation Plan (San Miguel Basin Gunnison Sage-grouse Working Group 2009), Gunnison Sage-grouse Rangewide Conservation Plan (Gunnison Sage-grouse Rangewide Steering Committee 2005), Conservation Assessment of Greater Sage-grouse and Sagebrush Habitats (Connelly et al. 2004), and Colorado Sagebrush: A Conservation Assessment and Strategy (Boyle and Reeder 2005). |

**Table 4-3**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario**

| | |
|---|---|
| Livestock grazing | The UFO manages 240 grazing allotments with 165 grazing permittees. Historically, several areas throughout the Unit sustained high levels of both sheep and cattle grazing. Seasonal cattle grazing still occurs, to a lesser degree, from approximately June through September. The Forest Service conducted an Environmental Assessment in 2005 for the Muddy Creek basin (also known as Muddy country). On National Forest System lands surrounding the Unit, there are 11 allotments with multiple permittees managing approximately 12,480 ewe/lamb pairs, 1,048 cow/calf pairs, and 30 horses. These allotments are managed intensely with multi-pasture rotations of relatively short duration.

This resource is primarily affected by surface disturbance of forage habitat for the livestock. With the coal mines and increasing oil and gas development, there continues to be a loss of grass/forb vegetation communities, which have become a limiting factor for grazing. On the Forest, some shut-in wells had not been reclaimed, which continues to affect the amount of forage available to livestock. |
| Recreation and visitor use | Colorado's population has grown significantly in the past 10 years, and an increasing number of people are living near or seeking local BLM-administered lands for a diversity of recreational opportunities characterized by the mountain resort or outdoor lifestyle. The primary recreational activities in the UFO are motorized vehicle touring, all-terrain vehicle use, motorcycling, mountain biking, big and small game hunting, fishing, hiking, backpacking, horseback riding, sight-seeing, target shooting, dog-walking, and river boating. Recreation-based visitor use in the UFO has increased in most areas in recent years and is expected to continue to increase on BLM and non-BLM lands.

Unauthorized travel. Travel off designated or existing routes as well as the creation of social trails has occurred and would likely continue to occur within the cumulative analysis area. |
| Lands and realty | Designation of Energy Corridors on Federal Lands in the 11 Western States Programmatic EIS (DOE and BLM 2009). This multi-federal agency Programmatic EIS analyzes the environmental impacts of designating federal energy corridors on federal lands in 11 western states and incorporating those designations into relevant land use and resource management plans.

Natural gas pipelines. Bull Mountain Gathering line, Ragged Mountain Gathering, Sheep Gas Gathering System, Henderson Lateral pipeline, Aspen Leaf trunk pipeline, Hotchkiss Ranches Gas Gathering System, Vessels Oxbow facility connection line from Bore hole 1, local utility service pipelines.

Sheep-Bull connector natural gas pipeline. A pipeline in which GE will convey produced gas from the Sheep Gas Gathering System to the SGI Bull Mountain Gathering line. It will connect on private land at the existing Sheep Gas pipeline yard in T11S, R90W, Section 8, NENE, traverse NFS lands to the NE cross country but parallel to NFSR 851 and tie into Bull Mountain pipeline on NFS lands in T11S, R90W, Section 3, SW/SW.

Colorado Department of Transportation: 2011 activities on State Highway 133 include snow maintenance and emergency response actions. CDOT is working on highway improvement projects on Highway 92 from Hotchkiss to Delta and Highway 50 in the Blue Mesa Lake area; both of these projects are likely to continue for the next several years

Delta County Master Plan (Delta County 1996). Countywide land use and growth plan for Delta County.

Several gravel pits have also been approved in the past 5 years; however, most are within just a few miles of the city of Delta itself.

Residential developments in the area around the communities of Paonia, Hotchkiss, Crawford, and Delta have been growing in population, with many new houses being built. Most of this development has been down-valley from the coal mines in broader portions of the North Fork Valley. This development has increased the traffic load and demand for maintenance on State Highway 133. |

**Table 4-3**

**Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario**

| | |
|---|---|
| | Gunnison County: Lands in the Bull Mountain Unit area are designated almost exclusively agricultural and that the current land use is primarily ranching with interspersed residences. The area is nearly surrounded by National Forest System lands. There is a small mixed use area south and southeast of County Road 849; however, there are no commercial or industrial uses occurring in this area. The East Bull Mountain subdivision is in the general area; it consists of 6 35-acre lots of which only one has been developed. |
| Roadway development | Road construction has occurred in association with timber harvesting, historic vegetation treatments, energy development, and mining on BLM-administered lands, private lands, State of Colorado lands, and National Forest System lands. The bulk of new road building is occurring for community expansion and energy development. Road construction is expected to continue at the current rate on BLM and National Forest System lands; the future rate is unknown on private and State of Colorado lands. |
| Water diversions | The UFO has been and will continue to be affected by irrigation and drinking water diversions. Reservoir operations have affected water supply, aquatic conditions, and timing. Irrigation rights are expected to continue being bought and sold in the future, with some new property owners informally changing how the right was historically used. Due to population growth and land sales, more agricultural water rights may be converted to municipal and industrial uses. Future oil shale development in the region could also result in water diversions. |
| Water | The Natural Resources Conservation Service and US Bureau of Reclamation have been replacing irrigation ditches with buried pipe to conserve water and reduce salinity and selenium within the Colorado River system. |
| | The Town of Paonia plans to replace its current 2-million-gallon water treatment plant, add an additional 2 million gallons of treated water storage, and incorporate hydropower components on the water lines in an effort to reduce plant costs with sustainable energy. Estimated completion 2015. |
| Spread of noxious/invasive weeds | Noxious weeds, including tamarisk, have invaded and will continue to invade many locations in the cumulative analysis area. Noxious weeds are carried by wind, humans, machinery, and animals. The BLM UFO currently manages weed infestations through integrated weed management, including biological, chemical, mechanical, manual, and educational methods. The 1991 and 2007 Records of Decision for Vegetation Treatment on BLM Lands in Thirteen Western States (BLM 2007a), and the 2007 Programmatic Environmental Report (BLM 2007g), guide the management of noxious weeds in western states. The BLM UFO finalized a noxious weed management strategy in 2013 (BLM 2013) that guides the treatment of weeds in the field office. Noxious and invasive weeds are expected to continue to spread on all lands. Due to their ability to tolerate certain conditions, some species are expected to remain a serious long-term challenge in the cumulative analysis area. |
| | Delta County Noxious Weed Management Plan (Delta County 2010). |
| Wildland fires | Fires within the cumulative analysis area are both naturally occurring and used as a management tool. Naturally occurring fires have been widely distributed in terms of frequency and severity. Increasing recurrence and severity of drought conditions have been predicted for this area as a result of climate change. This could, in turn, increase the occurrence and severity of wildfires on BLM-administered land. |
| Spread of forest insects and diseases | Several years of drought in western states have resulted in severe stress on pine trees. This stress has made the trees less able to fend off attacks by insects such as mountain pine beetles. Mountain pine beetle infestation has been occurring in Colorado since 1996, and some pinyon pine stands in the cumulative analysis area have experienced ips beetle kill. Sudden Aspen Decline is also impacting parts of the cumulative analysis area. |

**Table 4-3**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario**

| | |
|---|---|
| Drought | For much of the last decade, most of the western US has experienced drought. Inflows to Lake Powell (indicative of the Upper Colorado Basin) have been below average since 2000, and Colorado regularly goes through periods of drought that may be statewide, region-wide, or within a more localized area. Agriculture, drinking water supplies, and wildland fires are all impacted by drought. |
| Climate change | Increased concern over greenhouse gas emissions and global warming issues may lead to future federal and state regulations limiting the emission of associated pollutants. |
| Air Quality | The area near Telluride is in the Telluride PM$_{10}$ maintenance area. The area is currently in compliance with all applicable National Ambient Air Quality Standards. For as long as the area remains in maintenance, the BLM will analyze any authorized activities in accordance with the provisions of the General Conformity Rule and document any findings in the applicable authorizing NEPA document. |
| Other | Forest Service Special Areas; Roadless Area Conservation; Applicability to the National Forests in Colorado; Final Rule (77 *Federal Register* 39576-39612, 3 July 2012). The Colorado Roadless Rule provides management direction for conserving and managing approximately 4.2 million acres of Colorado Roadless Areas on National Forest System lands. |

## 4.1.4  Incomplete or Unavailable Information

The CEQ established implementing regulations for NEPA requiring that a federal agency identify relevant information that may be incomplete or unavailable for an evaluation of reasonably foreseeable significant adverse effects in an EIS (40 CFR 1502.22). If the information is essential to a reasoned choice among alternatives, it must be included or addressed in an EIS. Knowledge and information is, and will always be, incomplete, particularly with complex ecosystems considered at various scales.

The best available information pertinent to the decisions to be made has been used in developing this EIS. Considerable effort has been taken to acquire and convert resource data from both the BLM and outside sources into digital format for use in the EIS.

Certain information was unavailable for use in developing this plan because inventories have either not been conducted or are not complete. Some of the major types of data that are incomplete or unavailable include the following:

- Class III cultural resources inventory for the entire Unit

- Field surveys for paleontological resources

- General fish and wildlife surveys focused on migratory bird and raptor surveys for the entire Unit

For these resources, estimates were made concerning the number, type, and significance of these resources based on previous surveys and existing knowledge. In addition, some impacts cannot be quantified given the proposed management actions. Where this gap occurs, impacts are projected in qualitative terms or, in some instances, are described as unknown. Subsequent project-level analysis will provide the opportunity to collect and examine site-specific inventory data required to determine appropriate application of the land use plan-level guidance. In

addition, ongoing inventory efforts by the BLM and other agencies in the Unit are updating and refining information for the project area.

## 4.2   RESOURCES

### 4.2.1   Air Quality

*Methods of Analysis*

Air quality modeling analyses were performed to assess the potential impacts on ambient air quality and air quality related values (AQRVs) from potential air emissions resulting from Bull Mountain Unit MDP alternatives. Emissions inventories were developed for Alternative A and Alternative B, and both near-field and far-field air quality analyses were performed to assess the potential impacts from these alternatives. Potential ambient air quality impacts were quantified and compared to applicable state and federal ambient air quality standards (AAQS), Prevention of Significant Deterioration (PSD) increments, and hazardous air pollutant (HAP) thresholds. Potential AQRV impacts (impacts on visibility, atmospheric deposition, and potential increases in acidification to acid-sensitive lakes) were determined and compared with applicable thresholds. The information for this section is pulled directly from the air quality analysis provided in the Bull Mountain Project Air Quality Technical Support Document (AQTSD; Carter Lake 2014).The project-specific air quality impact analyses as described in the AQTSD shows that there are several key air quality related impacts of concern due to predicted air quality impact levels being close to acceptable impact thresholds (AAQS, DAT, etc.). A primary objective of this section is to summarize the overall air quality analysis as described in the AQTSD and provide discussions for the following impacts of concern: near-field particulate matter (p.m.) impacts from construction and traffic activities, near-field NO2 1-hour and HAPs impacts, far-field nitrogen deposition at nearby Forest Service sensitive areas and regional ozone.

*Emission Inventory Development*

Air pollutant emissions would occur as part of field construction and well production activities. Sources of emissions during construction include vehicle traffic, well pad and road construction, pipeline construction, and well drilling and completion. The primary pollutants emitted during construction would be $PM_{10}$, $PM_{2.5}$, $NO_x$, $CO$, $SO_2$, volatile organic compounds (VOCs), and HAPs including benzene, toluene, ethyl benzene, xylene, n-hexane, and formaldehyde. These activities would temporarily elevate pollutant levels, but impacts would be localized and would occur only for the short-term duration of the activities. Fugitive dust emissions ($PM_{10}$ and $PM_{2.5}$) would result from work crews commuting to and from the work site and from the transportation and operation of equipment during construction. Wind-blown fugitive dust emissions would also occur from open and disturbed land during construction.

Emissions were quantified using accepted methodologies, including manufacturer's emission factors, EPA emission factors and standards (emissions standards described in Chapter 3), and engineering estimates. Drill rig and completion engines emissions estimated assuming Non-Road Engine Tier-2 Standards emissions compliant.

During field production air pollutant emissions would occur from compressor station operation, well site pumping unit engines, water transfer pump engines, well site heaters, valve/flanges

(fugitives), vehicle traffic on roads during routine field operations and maintenance, and work-over activities. The primary pollutants emitted would be $PM_{10}$, $PM_{2.5}$, $NO_x$, CO, $SO_2$, VOCs, and HAPs (benzene, toluene, ethyl benzene, xylene, n-hexane and formaldehyde). These emissions would impact air quality in the project area over the life of the project. Production equipment is subject to current and future CDPHE Best Available Control Technology (BACT) and Reasonably Achievable Control Technology (RACT) guidance and applicable portions of 40 CFR Part 63 Subpart OOOO, Standards of Performance for Crude Oil and Natural Gas Production.

Greenhouse Gases

As part of the development of the project emission inventories, inventories of $CO_2$, $CH_4$, and $N_2O$ emissions from field development and production activities were prepared. Modeling GHG impacts is not within the scope of either the near-field or far-field impact analyses, but the GHG inventories are presented herein for informational purposes and compared to other GHG emission inventories in order to provide context for the project GHG emissions.

In the emission inventory, emissions of the greenhouse gases $CO_2$, $CH_4$, and $N_2O$ from new and existing sources are quantified in terms of $CO_2$ equivalents ($CO_2e$). Measuring emissions in terms of $CO_2e$ allows for the comparison of emissions from different greenhouse gases based on their Global Warming Potential (GWP). GWP is defined as the cumulative radiative forcing of a gas over a specified time horizon relative to a reference gas resulting from the emission of a unit mass of gas. The reference gas is taken to be $CO_2$. The $CO_2e$ emissions for a greenhouse gas are derived by multiplying the emissions of the gas by the associated GWP. The GWPs for the inventoried greenhouse gases are $CO_2$:1, $CH_4$:21, $N_2O$:310 (EPA 2011).

Near-Field Modeling

A near-field ambient air quality impact assessment was performed to evaluate potential maximum pollutant impacts within and near the project area resulting from project alternative construction and operation activities. EPA's Guideline (EPA 2005) model, AERMOD (version 13350), was used to assess these near-field impacts. The near-field modeling analyses performed provide an estimate of the potential impacts resulting from Alternative A and Alternative B source emissions.

Due to the absence of any available representative monitored meteorology data for the Unit, the 2008 Weather Research and Forecasting (WRF) meteorological model output produced as part of the Western Regional Air Partnership's (WRAP) West-wide Jump Start Air Quality Modeling Study (WestJumpAQMS; ENVIRON et al. 2012) was used to develop meteorological datasets for the AERMOD modeling. To generate appropriate meteorology for input into AERMOD, the Mesoscale Model Interface Program (MMIF) Version 3.0 (ENVIRON 2013) was used in conjunction with 2008 WRF model output. There are 2 WRF model (4-kilometer/2.5-mile) grid cells within the project area, a north site and a south site. MMIF was used to extract the WRF meteorology data for these two sites and both these meteorological data sets were used to assess impacts from emissions for each alternative. Impacts reported herein represent the maximum modeled impacts from either of the two meteorological data sets.

The near-field criteria pollutant impact assessment was performed to estimate maximum potential impacts of CO, $NO_2$, $SO_2$, and $PM_{10}$ and $PM_{2.5}$ from field development and field production emissions sources. Near-field HAP emissions were evaluated for purposes of

assessing impacts in the immediate vicinity of the project area for both short-term exposure assessment and for calculation of long-term human health risk. Potential impacts on regional ozone formation from this project are discussed below in the cumulative impacts summary section.

For well pad and access road construction during field development, near-field modeling assessed $PM_{10}$ and $PM_{2.5}$ impacts. The entire Unit layout for the proposed development shows that the minimum distance separating new wells pads is approximately 600 meters and therefore, fugitive dust and vehicle tailpipe particulate emissions from one representative well pad and road segment under construction were analyzed. Wind erosion emissions were included in the modeling. Road and pad vehicle activities were idealized as volume sources and wind erosion emissions were idealized as area sources. Model receptors were placed at 25-meter increments along a boundary 100 meters from the well pad and accessed road, and then defined on 100-meter intervals extending outward approximately 1.5 kilometers. Flat terrain receptors were used. The source and receptor layout for this modeling scenario is shown in **Figure 4-5**, Near-Field Analysis, Well Pad and Access Road Construction Modeling Scenario.

For well production and drilling, modeling scenarios were developed for a concentrated area of development proposed in the Unit, shown in **Figure 4-6**, Near-Field Analysis, Well Production Modeling Scenario, and **Figure 4-7**, Near-Field Analysis, Well Development Modeling Scenario. The modeling scenario for well production included 10 new well pads, 4 existing well pads, and 3 proposed compressor stations. New well pads included three pumping units, and associated activities (well site heaters, traffic, and fugitive emissions) for 4 wells in production. Existing well pads included two pumping units and related activities for two wells in production. A 100-meter pad size (approximately 2 acres) was used for well production and compressor station pads. The modeling scenario developed for analyzing drilling included seven new well pads and four existing well pads under production, three compressor stations, and three Tier-2 drilling rigs operating (one year-round and two operating from April through November). Drill rig emissions were based on a maximum hourly load conditions. New well pads included three pumping units, and associated activities for four wells in production. Existing well pads included two pumping units and related activities for two wells in production. A 100-meter pad size was used for well and compressor station pads. For the 3 well pads with drilling, a 150-meter (approximately 5 acres) pad size was used.

Both analyses utilized receptor grids that extended outward approximately 1.5 kilometer from the edge of any well pad. Discrete modeling receptors were defined on a 25-meter interval along boundaries, and then defined on 100-meter intervals throughout the modeling domain. **Figure 4-8**, Well Production Receptor Grid, and **Figure 4-9**, Near-Field Analysis, Well Development Receptor Grid, illustrate the receptor grids used for analyzing well production and well construction, respectively. Where applicable, terrain elevations for each receptor were developed using the AERMAP (Version 11103) processor along with available digital elevation model data.

Point sources were used for modeling emissions from compressors, heaters, pumping units, and drilling rigs. Volume sources were used for modeling well-site fugitive emissions and road travel. Volume source parameters were also used for modeling one pumping unit at each well given that these units could have a horizontal stack release.

4. Environmental Consequences



**Figure 4-5. Near-Field Analysis, Well Pad and Access Road Construction Modeling Scenario**



**Figure 4-6. Near-Field Analysis, Well Production Modeling Scenario**



**Figure 4-7. Near-Field Analysis, Well Development Modeling Scenario**



**Figure 4-8. Well Production Receptor Grid**



**Figure 4-9. Near-Field Analysis, Well Development Receptor Grid**

The AERMOD near-field modeling utilized default regulatory model switch settings, with the exception of the non-default Ozone Limiting Method (OLM) option, which was used for modeling $NO_2$ concentration estimates. Modeling analyses for $NO_2$ concentration estimates utilized seasonal diurnal ozone concentration profiles developed using the years 2011-2013 data collected at the Clean Air Status and Trends Network (CASTNET) Gothic ozone site located in Gunnison County, Colorado. A value of 20 percent was used for all source in-stack $NO_2$ concentration estimates. This value is a conservative estimate supported by data from EPA's $NO_2/NO_x$ In-Stack Ratio (ISR) Database (EPA 2013) and from data provided from oil and gas operators.

For 1-hour $NO_2$ NAAQS compliance demonstrations, where the 1-hour NAAQS is defined as the 3-year average of the 98th percentile of the yearly distribution of 1-hour daily maximum concentrations, all modeled impacts presented represent the 3-year average of the eighth-highest daily maximum 1-hour concentrations. For scenarios where drilling operations were modeled, drilling operations were assumed to occur for a maximum of 1 year during the 3-year averaging period. Since drill rigs move to different locations during field development, it is unlikely that drilling would occur for 3 consecutive years in the same location.

Hazardous Air Pollutants
Short-term and long-term near-field modeling analyses were conducted for HAPs. Short-term, 1-hour (acute) HAP concentrations were compared with acute reference exposure level (REL) thresholds. Long-term (annual) HAP concentrations were compared with non-carcinogenic reference concentrations for chronic inhalation thresholds (RfCs).

Modeling analyses estimated the potential cancer risk from emissions of suspected carcinogens benzene, ethyl benzene and formaldehyde. Impacts were evaluated based on estimates of the increased latent cancer risk over a 70-year lifetime. This analysis presents the potential incremental risk from formaldehyde and does not represent a total risk analysis. The cancer risks were calculated using the maximum predicted annual concentrations and EPA's chronic inhalation unit risk factors (URF) for carcinogenic constituents (EPA 2012b). Two estimates of cancer risk are presented: 1) a most likely exposure (MLE) scenario; and 2) a maximum exposed individual (MEI) scenario. The estimated cancer risks are adjusted to account for duration of exposure and time spent at home.

The adjustment for the MLE scenario is assumed to be 9 years, which corresponds to the mean duration that a family remains at a residence (EPA 1993). This duration corresponds to an adjustment factor of 9/70 = 0.13. The duration of exposure for the MEI scenario is assumed to be 50 years (i.e., the life of the project), corresponding to an adjustment factor of 50/70 = 0.71. A second adjustment is made for time spent at home versus time spent elsewhere. For the MLE scenario, the at-home time fraction is 0.64 (EPA 1993), and it is assumed that the individual would remain in an area where annual air toxics concentrations would be one-quarter as large as the maximum annual average concentration during the rest of the day. Therefore, the final MLE adjustment factor is (0.13) x [(0.64 x 1.0) + (0.36 x 0.25)] = 0.094. The MEI scenario assumes that the individual is at home 100 percent of the time, for a final MEI adjustment factor of (0.71 x 1.0) = 0.71.