For the air analysis short-term (1-hour) hazardous air pollutant concentrations are compared to acute reference exposure levels (EPA 2011) shown in **Table 4-4**, Acute Reference Exposure Levels (1-hour exposure). Reference exposure levels are defined as concentrations at or below which no adverse health effects are expected. No reference exposure levels are available for ethyl benzene and n-hexane; instead, the available Immediately Dangerous to Life or Health values divided by 10 are used. These values were determined by the National Institute for Occupational Safety and Health and were obtained from EPA's Air Toxics Database (EPA 2011). These values are approximately comparable to mild effects levels for 1-hour exposures.

**Table 4-4**
**Acute Reference Exposure Levels (1-hour exposure)**

| Hazardous Air Pollutant | REL ($\mu g/m^3$) |
|---|---|
| Benzene | 1,300 |
| Toluene | 37,000 |
| Ethyl Benzene | 350,000[1] |
| Xylene | 22,000 |
| n-Hexane | 390,000[1] |
| Formaldehyde | 55 |

Source: EPA 2011
[1] No reference exposure levels available for these hazardous air pollutants.

Long-term exposure to hazardous air pollutants are compared to reference concentrations for chronic inhalation. A reference concentration for chronic inhalation is defined by EPA as the daily inhalation concentration at which no long-term adverse health effects are expected. Reference concentrations for chronic inhalation exist for both non-carcinogenic and carcinogenic effects on human health (EPA 2012). Annual modeled hazardous air pollutant concentrations for all hazardous air pollutants emitted were compared directly to the non-carcinogenic reference concentrations for chronic inhalation shown in **Table 3-7**, Non-Carcinogenic Hazardous Air Pollutant Reference Concentrations for Chronic Inhalation (Annual Average). Long-term exposures to emissions of suspected carcinogens (benzene, ethyl benzene, and formaldehyde) are also evaluated based on estimates of the increased latent cancer risk over a 70-year lifetime.

Far-Field Modeling
The CALPUFF model was used to assess potential far-field impacts on ambient air pollutant concentrations and AQRVs (visibility and atmospheric deposition) from air pollutant emissions of $NO_x$, $SO_2$, $PM_{10}$, and $PM_{2.5}$ from project alternative sources. Concentration and AQRV impacts were assessed at the following Class I and sensitive Class II areas within 200 kilometers of the project area (exceptions noted):

- Arches National Park, Utah (Class I)

- Black Canyon of the Gunnison National Park, Colorado (Class I)

- Colorado National Monument, Colorado, (Class II)

- Dinosaur National Monument, Colorado-Utah (Federal Class II, Colorado Class I ($SO_2$ only)

- Eagles Nest Wilderness Area, Colorado (Class I)

- Flat Tops Wilderness Area, Colorado (Class I)

- La Garita Wilderness Area, Colorado (Class I)

- Maroon Bells – Snowmass Wilderness Area, Colorado (Class I)

- Mount Zirkel Wilderness Area, Colorado (Class I)

- Ragged Wilderness Area, Colorado (Class II) (deposition analysis only)

- Rocky Mountain National Park, Colorado (Class I)

- Weminuche Wilderness Area , Colorado (Class I)

- West Elk Wilderness Area, Colorado (Class I)

Twenty-eight lakes within the Class I and sensitive Class II areas identified as being sensitive to atmospheric deposition were assessed for potential increases in lake acidification from atmospheric deposition impacts. These lakes are listed below in **Table 4-5**, Sensitive Lakes Analyzed in Far-Field Analysis.

The far-field analyses used the EPA-approved version of the CALPUFF modeling system (Version 5.8.4) along with a windfield developed for year 2008 using the MMIF (Version 3.0) program and the 2008 WRF meteorological model output that was produced as part of the WRAP WestJumpAQMS. The modeling domain and the Class I and sensitive Class II areas are shown in **Figure 4-10**, Far-field Analysis Modeling Scenario.

The far-field assessment assumed maximum field-wide emissions scenarios with well development and production activities occurring simultaneously throughout the project area. Three drilling rigs operating continuously (one year-round and two operating from April through November), and one completion rig operating year-round were included in the modeling analysis for each project alternative. Compression and well site production emissions (including heaters, pumping units, and traffic emissions) were included in the modeling analysis. Drilling rigs, completion rigs, and four compressor stations were idealized as point sources, and well site activities were idealized as volume sources. The source layout analyzed for the far-field analysis is shown in **Figure 4-11**, Far-field Analysis, Source Layout.

**Table 4-5**
**Sensitive Lakes Analyzed in Far-Field Analysis**

| Wilderness Area | Lake |
|---|---|
| Eagles Nest Wilderness Area | Booth Lake |
| Eagles Nest Wilderness Area | Upper Willow Lake |
| Flat Tops Wilderness Area | Ned Wilson Lake |
| Flat Tops Wilderness Area | Upper Ned Wilson Lake |
| Flat Tops Wilderness Area | Lower Packtrail Pothole |
| Flat Tops Wilderness Area | Upper Packtrail Pothole |
| La Garita Wilderness Area | Small Lake Above U-Shaped Lake |
| La Garita Wilderness Area | U-Shaped Lake |
| Maroon Bells Wilderness Area | Avalanche Lake |
| Maroon Bells Wilderness Area | Capitol Lake |
| Maroon Bells Wilderness Area | Moon Lake |
| Mount Zirkel Wilderness Area | Lake Elbert |
| Mount Zirkel Wilderness Area | Seven Lakes (LG East) |
| Mount Zirkel Wilderness Area | Summit Lake |
| Raggeds Wilderness Area | Deep Creek Lake |
| Weminuche Wilderness Area | Big Eldorado Lake |
| Weminuche Wilderness Area | Four Mile Pothole |
| Weminuche Wilderness Area | Lake Due South of Ute Lake |
| Weminuche Wilderness Area | Little Eldorado Lake |
| Weminuche Wilderness Area | Little Granite Lake |
| Weminuche Wilderness Area | Lower Sunlight Lake |
| Weminuche Wilderness Area | Middle Ute Lake |
| Weminuche Wilderness Area | Small Pond Above Trout Lake |
| Weminuche Wilderness Area | Upper Grizzly Lake |
| Weminuche Wilderness Area | Upper Sunlight Lake |
| Weminuche Wilderness Area | West Snowdon Lake |
| Weminuche Wilderness Area | White Dome Lake |
| West Elk Wilderness Area | South Golden Lake |



**Figure 4-10. Far-field Analysis Modeling Scenario**



**Figure 4-11. Far-field Analysis, Source Layout**

### *Nature and Type of Effects*

*Air Quality and Air Quality Related Values*

Air quality impacts from pollutant emissions are limited by regulations, standards and implementation plans established under the Federal Clean Air Act, as administered by the CDPHE-APCD under authorization of the EPA. The operator will conform to all applicable local, state, tribal or federal air quality laws, statutes, regulations, standards or implementation plans. As such, significant impacts on air quality from project-related activities would result if it is demonstrated that:

- NAAQS or CAAQS likely would be exceeded
- AQRVs likely would be impacted beyond acceptable levels

Short-term, 1-hour (acute) HAP concentrations are compared with the acute RELs. RELs are defined as concentrations at or below which no adverse health effects are expected. Long-term (annual) HAP concentrations are compared with non-carcinogenic RfCs. An RfC is defined by EPA as the daily inhalation concentration at which no long-term adverse health effects are expected. Analyses for cancer risk are based on a 1-in-1 million cancer risk factor. An acceptable exposure level (AEL) is generally a concentration level that represents lifetime cancer risk to an individual of between 1 in 10,000 and 1 in 1,000,000 (EPA 2014b).

Greenhouse Gas Emissions and Climate Change

The US Supreme Court ruled in 2007 that the EPA has the authority to regulate greenhouse gases (GHGs), such as $CH_4$ and $CO_2$, as air pollutants under the Clean Air Act; however, there are currently no ambient air quality standards for GHGs, nor are there any emissions limits on GHGs that would apply to sources developed under the Proposed Action and alternatives. There are, however, applicable reporting requirements under the EPA's Greenhouse Gas Reporting Program. These GHG emission reporting requirements, finalized in 2010 under 40 CFR, Part 98, require industrial sources that emit 25,000 metric tons or more of $CO_2e$ per year to report GHG emissions annually. At present, there are no rules related to GHG emissions or impacts that could affect development of project alternatives, besides these GHG reporting requirements.

The Council on Environmental Quality (CEQ) in 2014 released draft guidance for federal agencies on consideration of GHGs and the effects of climate change in NEPA documents. While the guidance provides federal agencies with significant discretion on how to consider the effects of GHG emissions and climate change in their evaluation of proposals for federal actions, it also provides an expectation of what should be considered and disclosed. Agencies are directed to consider two separate issues when addressing climate change: the effects of a Proposed Action on climate change as indicated by its GHG emissions and the implications of climate change for the environmental effect of a Proposed Action. Agencies should consider the climate change effects of a proposal by comparing the GHG emissions of the Proposed Action and the reasonable alternatives. The effects of climate change on the Proposed Action and alternatives should be considered during the analysis of the affected environment. Land managers should consult the CEQ guidance for information on direct, indirect, and cumulative impact analyses, among other topics.

Renewable and nonrenewable resource management actions have the potential to impact climate change due to GHG emissions and other human-caused effects. However, the assessment of GHG emissions and climate change is extremely complex because of the inherent interrelationships among its sources, causation, mechanisms of action, and impacts.

Emitted GHGs become well-mixed throughout the atmosphere and contribute to the global atmospheric burden of GHGs. Given the global and complex nature of climate change, it is not possible to attribute a particular climate impact in any given region to GHG emissions from a particular source. The uncertainty in applying results from global climate models to the regional or local scale (a process known as downscaling) limits the ability to quantify potential future impacts from GHGs emissions at this scale. When further information on the impacts of local emissions to climate change is known, such information would be incorporated into the BLM's planning and NEPA documents.

The environmental impacts of GHG emissions from oil and gas refining and from consumption, such as from vehicle operations, are not effects of BLM actions related to oil and gas development, as defined by the CEQ. This is because they do not occur at the same time and place as the action. Thus, GHG emissions from refining and consumption oil and gas do not constitute a direct effect that is analyzed under NEPA. Nor are refining and consumption an indirect effect of oil and gas production because production is not an indirect cause of GHG emissions resulting from refining and consumption. However, emissions from refining and consumption and other activities may be accounted for in the cumulative effects analysis (BLM 2014a).

***Effects Common to All Alternatives***

*Near-field Impacts*

Near-field pollutant impacts resulting from well development and well production would be below the NAAQS and CAAQS. In addition, pollutant impacts would not exceed the PSD Class II increments, with the exception of annual $NO_2$ impacts, which could exceed the annual increment value. The maximum predicted acute and chronic (long-term) HAP impacts from well site production would be below all applicable REL and RfC exposure thresholds, with the exception of the modeled formaldehyde concentrations from compression emissions which could exceed the short-term REL threshold.

*Far-Field Impacts*

Pollutant Impacts

Far-field pollutant impacts from project sources would be below PSD increments at all Class I and sensitive Class II areas.

Visibility Impacts

Impacts on visibility from project sources would be below the 0.5 delta-deciview (Δdv) threshold at all Class I and sensitive Class II areas.

Deposition Impacts
Sulfur deposition impacts from project sources would be below the DAT at all Class I and sensitive Class II areas.

Potential nitrogen and sulfur deposition impacts from project sources would not contribute to ANC changes that exceed threshold values at any of the analyzed sensitive lakes.

***Alternative A***

Alternative A includes the construction and operation of 55 natural gas wells, 12 well pads, 1 water disposal well, and associated roads and production facilities, including 1 compression station. The 55 new natural gas wells would be built on privately owned surface lands targeting private minerals.

*Alternative A Emissions*

Maximum annual field-wide criteria pollutant ($PM_{10}$, $PM_{2.5}$, $NO_x$, CO, $SO_2$, and VOC), HAP and GHG emissions were calculated for the first 10 years of the life of the project (LOP). The maximum field-wide emissions are expected to occur during project year 2, the last year with drilling occurring at a rate of 27 wells per year. The criteria pollutant and HAP emissions for well development and production activities in project year 2 are shown in **Table 4-6**, Alternative A Year 2 Emissions (TPY). Total HAP emissions for project year 2 are also provided in this table, including benzene, toluene, ethyl benzene, xylene, n-hexane, and formaldehyde emissions of 1.38, 2.06, 0.11, 0.92, 0.75, and 1.84 tons per year (TPY), respectively. Maximum total GHG emissions from construction and production activities are also expected to occur in project year 2 and are shown in **Table 4-7**, Alternative A Year 2 GHG Emissions (metric tons per year).

**Table 4-6**
**Alternative A Year 2 Emissions (TPY)**

| Activity | $PM_{10}$ | $PM_{2.5}$ | $NO_x$ | CO | $SO_2$ | VOC | HAPs |
|---|---|---|---|---|---|---|---|
| Construction Emissions | | | | | | | |
| Well Pad and Road Construction | 1.67 | 0.17 | -- | -- | -- | -- | -- |
| Well Pad and Road Construction Traffic | 2.78 | 0.30 | 0.47 | 0.45 | 0.002 | 0.05 | -- |
| Well Pad and Road Construction Heavy Equipment | 0.13 | 0.13 | 2.37 | 2.20 | 0.11 | 0.17 | -- |
| Pipeline Construction | 0.94 | 0.09 | -- | -- | -- | -- | -- |
| Pipeline Construction Traffic | 0.85 | 0.09 | 0.09 | 0.15 | 0.0004 | 0.01 | -- |
| Pipeline Construction Heavy Equipment | 0.06 | 0.06 | 1.79 | 1.03 | 0.05 | 0.16 | -- |
| Drill Rig Engines | 1.16 | 1.16 | 34.71 | 20.06 | 0.11 | 2.31 | 0.03 |
| Drilling Traffic | 15.25 | 15.25 | 2.44 | 2.49 | 0.01 | 0.28 | -- |
| Drilling Heavy Equipment | 0.006 | 0.006 | 0.18 | 0.10 | 0.005 | 0.25 | -- |
| Fracturing Engines | 0.31 | 0.31 | 9.43 | 5.45 | 0.11 | 0.63 | 0.009 |
| Completion Rig Engines | 0.09 | 0.09 | 2.68 | 1.55 | 0.003 | 0.18 | 0.003 |
| Completion Traffic | 0.62 | 0.07 | 0.13 | 0.10 | 0.001 | 0.01 | 0.00 |
| Completion Flaring | 0.10 | 0.10 | 0.91 | 4.97 | 0.00 | 0.37 | 0.09 |

**Table 4-6**
**Alternative A Year 2 Emissions (TPY)**

| Activity | $PM_{10}$ | $PM_{2.5}$ | $NO_x$ | CO | $SO_2$ | VOC | HAPs |
|---|---|---|---|---|---|---|---|
| Production Emissions | | | | | | | |
| Workover Rig Engines | 0.06 | 0.06 | 1.72 | 0.99 | 0.002 | 0.11 | 0.002 |
| Production Traffic | 1.36 | 0.14 | 0.09 | 0.17 | 0.0004 | 0.02 | 0.00 |
| Separator Heaters | 0.11 | 0.11 | 1.45 | 0.72 | -- | 0.46 | 0.06 |
| Tank Heaters | 0.15 | 0.15 | 1.93 | 0.97 | -- | 0.61 | 0.09 |
| Production Fugitives | -- | -- | -- | -- | -- | 20.58 | 4.87 |
| Screw Compressors | 0.26 | 0.26 | 6.15 | 13.16 | -- | 2.52 | 1.44 |
| C.S. Separators | 0.004 | 0.004 | 0.05 | 0.03 | -- | 0.02 | 0.002 |
| Water Transfer Pumps | 0.51 | 0.51 | 18.00 | 3.71 | -- | 1.26 | 0.13 |
| Pumping Units | 1.16 | 1.16 | 41.24 | 8.50 | -- | 2.89 | 0.31 |
| Total Construction Emissions | 23.96 | 17.82 | 55.19 | 38.55 | 0.40 | 4.43 | 0.14 |
| Total Production Emissions | 3.61 | 2.39 | 70.64 | 28.26 | 0.002 | 28.47 | 6.91 |
| Total Emissions | 27.57 | 20.21 | 125.83 | 66.80 | 0.40 | 32.90 | 7.05 |

**Table 4-7**
**Alternative A Year 2 GHG Emissions (metric tons per year)**

| Pollutant | Construction | Production | Total |
|---|---|---|---|
| $CO_2e$ | 7,107 | 13,071 | 20,178 |

*Near-Field Impacts*

Near-field pollutant impacts for Alternative A would be similar to those presented below for Alternative B. Impacts from Alternative A sources would be below the NAAQS and CAAQS. In addition, impacts would not exceed the PSD Class II increments, with the exception of annual $NO_2$ concentrations, which could exceed the annual increment value.

The maximum predicted acute and chronic (long-term) HAP impacts from well site production would be similar to the impacts for the Alternative B. HAP impacts under Alternative A would be below all applicable REL and RfC exposure thresholds, with the exception of the modeled formaldehyde concentrations from compression emissions which could exceed the short-term REL threshold.

For the suspected carcinogens (benzene, ethyl benzene, and formaldehyde), the cancer risk level for production activities for either the MLE or the MEI analysis would be similar to Alternative B levels.

*Far-Field Impacts*

The far-field assessment assumed a field-wide maximum emissions scenario with well drilling/completion and production activities occurring simultaneously throughout the project area. The field-wide scenario included 41 wells in production, 3 drilling rigs operating continuously (one year-round and two operating from April through November), and one completion rig operating year-round.

Pollutant Impacts

The direct modeled concentrations of $NO_2$, $SO_2$, $PM_{10}$, and $PM_{2.5}$ at Class I and sensitive Class II areas are provided in **Table 4-8**, Alternative A - Maximum Modeled Pollutant Concentrations at Class I and Sensitive Class II Areas (μg/m$^3$), for comparison to applicable PSD Class I and Class II increments. As shown in **Table 4-8**, these values are well below the PSD Class I and Class II increments.

**Table 4-8**

**Alternative A - Maximum Modeled Pollutant Concentrations at Class I and Sensitive Class II Areas (μg/m$^3$)**

| Location | Pollutant | Averaging Time | Direct Modeled | PSD Increment |
|---|---|---|---|---|
| Arches National Park | $NO_2$ | Annual | 5.91E-06 | 2.5 |
| | $SO_2$ | 3-hour | 4.54E-04 | 25 |
| | | 24-hour | 1.35E-04 | 5 |
| | | Annual | 1.54E-06 | 2 |
| | $PM_{10}$ | 24-hour | 7.08E-04 | 8 |
| | | Annual | 1.03E-05 | 4 |
| | $PM_{2.5}$ | 24-hour | 7.04E-04 | 2 |
| | | Annual | 8.27E-06 | 1 |
| Black Canyon of the Gunnison National Park | $NO_2$ | Annual | 3.58E-04 | 2.5 |
| | $SO_2$ | 3-hour | 3.24E-03 | 25 |
| | | 24-hour | 1.03E-03 | 5 |
| | | Annual | 3.17E-05 | 2 |
| | $PM_{10}$ | 24-hour | 8.35E-03 | 8 |
| | | Annual | 2.25E-04 | 4 |
| | $PM_{2.5}$ | 24-hour | 7.21E-03 | 2 |
| | | Annual | 1.91E-04 | 1 |
| Colorado National Monument | $NO_2$ | Annual | 4.60E-05 | 2.5 |
| | $SO_2$ | 3-hour | 5.67E-04 | 25 |
| | | 24-hour | 1.36E-04 | 5 |
| | | Annual | 6.73E-06 | 2 |
| | $PM_{10}$ | 24-hour | 1.35E-03 | 8 |
| | | Annual | 4.00E-05 | 4 |
| | $PM_{2.5}$ | 24-hour | 1.11E-03 | 2 |
| | | Annual | 3.26E-05 | 1 |
| Dinosaur National Monument | $NO_2$ | Annual | 6.42E-06 | 25 |
| | $SO_2$ | 3-hour | 2.72E-04 | 512 |
| | | 24-hour | 4.77E-05 | 91 |
| | | Annual | 1.33E-06 | 20 |
| | $PM_{10}$ | 24-hour | 5.12E-04 | 30 |
| | | Annual | 1.17E-05 | 17 |
| | $PM_{2.5}$ | 24-hour | 4.99E-04 | 9 |
| | | Annual | 9.42E-06 | 4 |

**Table 4-8**
**Alternative A - Maximum Modeled Pollutant Concentrations at Class I and Sensitive Class II Areas ($\mu g/m^3$)**

| Location | Pollutant | Averaging Time | Direct Modeled | PSD Increment |
|---|---|---|---|---|
| Eagles Nest Wilderness Area | $NO_2$ | Annual | 3.62E-04 | 2.5 |
| | $SO_2$ | 3-hour | 1.79E-03 | 25 |
| | | 24-hour | 3.42E-04 | 5 |
| | | Annual | 4.16E-05 | 2 |
| | $PM_{10}$ | 24-hour | 7.69E-03 | 8 |
| | | Annual | 3.70E-04 | 4 |
| | $PM_{2.5}$ | 24-hour | 7.20E-03 | 2 |
| | | Annual | 2.88E-04 | 1 |
| Flat Tops Wilderness Area | $NO_2$ | Annual | 2.04E-04 | 2.5 |
| | $SO_2$ | 3-hour | 1.67E-03 | 25 |
| | | 24-hour | 4.03E-04 | 5 |
| | | Annual | 2.15E-05 | 2 |
| | $PM_{10}$ | 24-hour | 8.16E-03 | 8 |
| | | Annual | 2.17E-04 | 4 |
| | $PM_{2.5}$ | 24-hour | 7.97E-03 | 2 |
| | | Annual | 1.80E-04 | 1 |
| La Garita Wilderness Area | $NO_2$ | Annual | 1.05E-04 | 2.5 |
| | $SO_2$ | 3-hour | 2.95E-03 | 25 |
| | | 24-hour | 5.29E-04 | 5 |
| | | Annual | 1.53E-05 | 2 |
| | $PM_{10}$ | 24-hour | 1.05E-02 | 8 |
| | | Annual | 1.47E-04 | 4 |
| | $PM_{2.5}$ | 24-hour | 1.11E-02 | 2 |
| | | Annual | 1.21E-04 | 1 |
| Maroon Bells/Snowmass Wilderness Area | $NO_2$ | Annual | 7.78E-03 | 2.5 |
| | $SO_2$ | 3-hour | 2.83E-02 | 25 |
| | | 24-hour | 6.91E-03 | 5 |
| | | Annual | 6.70E-04 | 2 |
| | $PM_{10}$ | 24-hour | 5.49E-02 | 8 |
| | | Annual | 2.96E-03 | 4 |
| | $PM_{2.5}$ | 24-hour | 3.86E-02 | 2 |
| | | Annual | 1.94E-03 | 1 |
| Mount Zirkel Wilderness Area | $NO_2$ | Annual | 4.87E-05 | 2.5 |
| | $SO_2$ | 3-hour | 5.41E-04 | 25 |
| | | 24-hour | 2.14E-04 | 5 |
| | | Annual | 7.42E-06 | 2 |
| | $PM_{10}$ | 24-hour | 2.96E-03 | 8 |
| | | Annual | 7.01E-05 | 4 |
| | $PM_{2.5}$ | 24-hour | 2.49E-03 | 2 |
| | | Annual | 5.79E-05 | 1 |

**Table 4-8**
**Alternative A - Maximum Modeled Pollutant Concentrations at Class I and Sensitive Class II Areas ($\mu g/m^3$)**

| Location | Pollutant | Averaging Time | Direct Modeled | PSD Increment |
|---|---|---|---|---|
| Rocky Mountain National Park | $NO_2$ | Annual | 1.37E-04 | 25 |
| | $SO_2$ | 3-hour | 1.09E-03 | 25 |
| | | 24-hour | 3.48E-04 | 5 |
| | | Annual | 1.97E-05 | 2 |
| | $PM_{10}$ | 24-hour | 2.96E-03 | 8 |
| | | Annual | 1.98E-04 | 4 |
| | $PM_{2.5}$ | 24-hour | 2.31E-03 | 2 |
| | | Annual | 1.60E-04 | 1 |
| Weminuche Wilderness Area | $NO_2$ | Annual | 6.02E-05 | 2.5 |
| | $SO_2$ | 3-hour | 1.20E-03 | 25 |
| | | 24-hour | 2.61E-04 | 5 |
| | | Annual | 9.78E-06 | 2 |
| | $PM_{10}$ | 24-hour | 6.84E-03 | 8 |
| | | Annual | 9.29E-05 | 4 |
| | $PM_{2.5}$ | 24-hour | 6.85E-03 | 2 |
| | | Annual | 7.94E-05 | 1 |
| West Elk Wilderness Area | $NO_2$ | Annual | 2.73E-03 | 2.5 |
| | $SO_2$ | 3-hour | 7.43E-03 | 25 |
| | | 24-hour | 2.82E-03 | 5 |
| | | Annual | 2.05E-04 | 2 |
| | $PM_{10}$ | 24-hour | 2.34E-02 | 8 |
| | | Annual | 1.21E-03 | 4 |
| | $PM_{2.5}$ | 24-hour | 2.08E-02 | 2 |
| | | Annual | 8.79E-04 | 1 |

Visibility Impacts

Visibility impacts were calculated following FLAG 2010 (FLAG, 2010), at Class I and sensitive Class II areas and the results are shown in **Table 4-9**, Alternative A - Maximum Visibility Impacts at Class I and Sensitive Class II Areas. The visibility analysis indicated that there are zero days predicted above the 0.5 delta-deciview ($\Delta dv$) threshold at any of the Class I and sensitive Class II areas.

**Table 4-9**
**Alternative A - Maximum Visibility Impacts at Class I and Sensitive Class II Areas**

| Location | Maximum Impact ($\Delta dv$) |
|---|---|
| Arches National Park | 0.003 |
| Black Canyon of the Gunnison National Park | 0.028 |
| Colorado National Monument | 0.004 |
| Dinosaur National Monument | 0.002 |
| Eagles Nest Wilderness Area | 0.033 |
| Flat Tops Wilderness Area | 0.037 |
| La Garita Wilderness Area | 0.045 |
| Maroon Bells/Snowmass Wilderness Area | 0.170 |

**Table 4-9**
**Alternative A - Maximum Visibility Impacts at Class I and Sensitive Class II Areas**

| Location | Maximum Impact (Δdv) |
|---|---|
| Mount Zirkel Wilderness Area | 0.011 |
| Rocky Mountain National Park | 0.009 |
| Weminuche Wilderness Area | 0.031 |
| West Elk Wilderness Area | 0.086 |

Deposition Impacts

Potential direct atmospheric deposition impacts within Class I and sensitive Class II areas were calculated for Alternative A sources and are shown in **Table 4-10**, Alternative A - Maximum Nitrogen and Sulfur Deposition Impacts at Class I and Sensitive Class II Areas. The maximum direct total (wet and dry) N and S deposition are predicted to be below the DAT of 0.005 kg/ha-yr at all Class I and sensitive Class II areas.

In addition, potential changes in ANC, resulting from potential N and S deposition from Alternative A source emissions, were calculated for 28 sensitive lakes within the Class I and sensitive Class II Wilderness areas. The baseline ANC values for calculating changes were based on approximately 15-20 years of lake chemistry data ending year 2010 for most lakes included in the analysis. The estimated change in ANC for each lake is shown in **Table 4-11**, Alternative A - Maximum Impacts on Lakes within the Class I and Sensitive Class II Areas. For all lakes the estimated changes in ANC are all predicted to be less than the significance thresholds of less than a 10 percent change in ANC for lakes with ANC values greater than 25 μeq/l, and a 1.0 μeq/l change in ANC for lakes with background ANC values equal to or less than 25 μeq/l.

**Table 4-10**
**Alternative A - Maximum Nitrogen and Sulfur Deposition Impacts at Class I and Sensitive Class II Areas**

| Location | Maximum N Deposition (kg/ha/yr) | Maximum S Deposition (kg/ha/yr) |
|---|---|---|
| Arches National Park | 0.00001 | 0.000001 |
| Black Canyon of the Gunnison National Park | 0.00030 | 0.00004 |
| Colorado National Monument | 0.00003 | 0.00001 |
| Dinosaur National Monument | 0.00001 | 0.00000 |
| Eagles Nest Wilderness Area | 0.00047 | 0.00006 |
| Flat Tops Wilderness Area | 0.00030 | 0.00004 |
| La Garita Wilderness Area | 0.00025 | 0.00004 |
| Maroon Bells/Snowmass Wilderness Area | 0.00427 | 0.00071 |
| Mount Zirkel Wilderness Area | 0.00011 | 0.00001 |
| Ragged Wilderness Area (Deep Creek Lake) | 0.00273 | 0.00042 |
| Rocky Mountain National Park | 0.00026 | 0.00003 |
| Weminuche Wilderness Area | 0.00015 | 0.00002 |
| West Elk Wilderness Area | 0.00134 | 0.00018 |

**Table 4-11**
**Alternative A - Maximum Impacts on Lakes within the Class I and Sensitive Class II Areas**

| Wilderness Area | Sensitive Lake | 10th Percentile Lowest ANC Value (µeq/L) | N Deposition (kg/ha/yr) | S Deposition (kg/ha/yr) | ANC Relative Change (%) | ANC Absolute Change (µeq/L) |
|---|---|---|---|---|---|---|
| Eagles Nest | Booth Lake | 86.8 | 0.00040 | 0.00005 | 0.005 | n/a |
| Eagles Nest | Upper Willow Lake | 134.1 | 0.00042 | 0.00005 | 0.004 | n/a |
| Flat Tops | Ned Wilson Lake | 39.0 | 0.00019 | 0.00002 | 0.005 | n/a |
| Flat Tops | Upper Ned Wilson Lake | 12.9 | 0.00019 | 0.00002 | 0.015 | 0.002 |
| Flat Tops | Lower Packtrail Pothole | 29.7 | 0.00019 | 0.00002 | 0.007 | n/a |
| Flat Tops | Upper Packtrail Pothole | 48.7 | 0.00019 | 0.00002 | 0.004 | n/a |
| La Garita | Small Lake Above U-Shaped Lake | 59.9 | 0.00021 | 0.00003 | 0.005 | n/a |
| La Garita | U-Shaped Lake | 81.4 | 0.00021 | 0.00003 | 0.004 | n/a |
| Maroon Bells | Avalanche Lake | 158.8 | 0.00209 | 0.00031 | 0.010 | n/a |
| Maroon Bells | Capitol Lake | 154.4 | 0.00208 | 0.00031 | 0.011 | n/a |
| Maroon Bells | Moon Lake | 53.0 | 0.00207 | 0.00031 | 0.039 | n/a |
| Mount Zirkel | Lake Elbert | 56.6 | 0.00010 | 0.00001 | 0.001 | n/a |
| Mount Zirkel | Seven Lakes (LG East) | 36.2 | 0.00008 | 0.00001 | 0.002 | n/a |
| Mount Zirkel | Summit Lake | 48.0 | 0.00011 | 0.00001 | 0.002 | n/a |
| Raggeds | Deep Creek Lake | 20.6 | 0.00273 | 0.00042 | 0.156 | 0.032 |
| Weminuche | Big Eldorado Lake | 19.6 | 0.00008 | 0.00001 | 0.004 | 0.001 |
| Weminuche | Four Mile Pothole | 123.4 | 0.00009 | 0.00001 | 0.001 | n/a |
| Weminuche | Lake Due South of Ute Lake | 13.2 | 0.00008 | 0.00001 | 0.006 | 0.001 |
| Weminuche | Little Eldorado | -3.3 | 0.00008 | 0.00001 | 0.027 | 0.001 |
| Weminuche | Little Granite Lake | 80.7 | 0.00008 | 0.00001 | 0.002 | n/a |
| Weminuche | Lower Sunlight Lake | 80.9 | 0.00007 | 0.00001 | 0.001 | n/a |
| Weminuche | Middle Ute Lake | 42.8 | 0.00008 | 0.00001 | 0.002 | n/a |
| Weminuche | Small Pond Above Trout Lake | 25.5 | 0.00009 | 0.00001 | 0.005 | n/a |
| Weminuche | Upper Grizzly Lake | 29.9 | 0.00007 | 0.00001 | 0.002 | n/a |
| Weminuche | Upper Sunlight Lake | 28.0 | 0.00007 | 0.00001 | 0.003 | n/a |
| Weminuche | West Snowdon Lake | 39.4 | 0.00008 | 0.00001 | 0.002 | n/a |
| Weminuche | White Dome Lake | 2.1 | 0.00008 | 0.00001 | 0.042 | 0.09 |
| West Elk | South Golden Lake | 111.4 | 0.00091 | 0.00012 | 0.009 | n/a |

*Regional Climate Change and Greenhouse Gas Emissions*

The maximum GHG emissions resulting from Alternative A are estimated at 20,178 metric tons per year (0.02 terragrams [tg]/yr] of $CO_2e$). To place the project GHG emissions in context, those from the top five emitting coal-fired power plants in Colorado range from 2.6 to 9.0 tg/year (EPA 2014b). At this time, it is not possible to predict the degree of impact any single emitter of GHGs may have on global climate change, or on the changes to biotic and abiotic systems that accompany climate change. As such, the controversy is to what extent GHG emissions resulting from continued oil and gas development may contribute to global climate change, as well as the accompanying changes to natural systems cannot be quantified or predicted. The degree to which any observable changes can, or would, be attributable to Alternative A cannot be reasonably predicted at this time.

***Alternative B***

Alternative B includes the construction and operation of up to 146 natural gas wells, 36 well pads, 4 water disposal wells, and associated roads and production facilities, including 4 compression stations. These activities are specific to BLM-administered estate.

*Alternative B Emissions*

Maximum annual field-wide criteria pollutant ($PM_{10}$, $PM_{2.5}$, $NO_x$, CO, $SO_2$, and VOC), HAP and GHG emissions were calculated for the first 10 years of the life of the project (LOP). The maximum field-wide emissions are expected to occur during project year 5, the last year with drilling occurring at a rate of 27 wells per year. The criteria pollutant and HAP emissions for well development and production activities in project year 5 are shown in **Table 4-12**, Alternative B Year 5 Emissions (TPY). Total VOC and HAP emissions for project year 5 are also provided in this table. Project year 6 is expected to have slightly higher VOC emissions (82.95 TPY) and HAP emissions (20.65 TPY); including benzene (3.65 TPY), toluene (5.50 TPY), ethyl benzene (0.30 TPY), xylene (2.44 TPY), n-hexane (1.98 TPY), and formaldehyde emissions (6.78 TPY). Maximum total GHG emissions from construction and production activities are also expected to occur in project year 5 and are shown in **Table 4-13**, Alternative B Year 5 GHG Emissions (metric tons per year).

**Table 4-12**
**Alternative B Year 5 Emissions (TPY)**

| Activity | $PM_{10}$ | $PM_{2.5}$ | $NO_x$ | CO | $SO_2$ | VOC | HAPs |
|---|---|---|---|---|---|---|---|
| Construction Emissions | | | | | | | |
| Well Pad and Road Construction | 1.67 | 0.17 | -- | -- | -- | -- | -- |
| Well Pad and Road Construction Traffic | 2.78 | 0.30 | 0.47 | 0.45 | 0.002 | 0.05 | -- |
| Well Pad and Road Construction Heavy Equipment | 0.13 | 0.13 | 2.37 | 2.20 | 0.11 | 0.17 | -- |
| Pipeline Construction | 0.94 | 0.09 | -- | -- | -- | -- | -- |
| Pipeline Construction Traffic | 0.85 | 0.09 | 0.09 | 0.15 | 0.0004 | 0.01 | -- |
| Pipeline Construction Heavy Equipment | 0.06 | 0.06 | 1.79 | 1.03 | 0.05 | 0.16 | -- |
| Drill Rig Engines | 1.16 | 1.16 | 34.71 | 20.06 | 0.11 | 2.31 | 0.03 |
| Drilling Traffic | 15.25 | 15.25 | 2.44 | 2.49 | 0.01 | 0.28 | -- |
| Drilling Heavy Equipment | 0.006 | 0.006 | 0.18 | 0.10 | 0.01 | 0.25 | -- |
| Fracturing Engines | 0.31 | 0.31 | 9.43 | 5.45 | 0.11 | 0.63 | 0.01 |
| Completion Rig Engines | 0.09 | 0.09 | 2.68 | 1.55 | 0.003 | 0.18 | 0.003 |
| Completion Traffic | 0.62 | 0.07 | 0.13 | 0.10 | 0.001 | 0.01 | 0.00 |
| Completion Flaring | 0.10 | 0.10 | 0.91 | 4.97 | 0.00 | 0.37 | 0.09 |
| Production Emissions | | | | | | | |
| Workover Rig Engines | 0.14 | 0.14 | 4.33 | 2.50 | 0.005 | 0.29 | 0.004 |
| Production Traffic | 3.65 | 0.37 | 0.23 | 0.46 | 0.001 | 0.04 | 0.00 |
| Separator Heaters | 0.28 | 0.28 | 3.64 | 1.82 | -- | 1.15 | 0.16 |
| Tank Heaters | 0.37 | 0.37 | 4.86 | 2.43 | -- | 1.54 | 0.22 |
| Production Fugitives | -- | -- | -- | -- | -- | 51.73 | 12.25 |
| Screw Compressors | 0.98 | 0.98 | 24.60 | 52.65 | -- | 10.09 | 5.77 |
| C.S. Separators | 0.02 | 0.02 | 0.21 | 0.11 | -- | 0.07 | 0.01 |
| Water Transfer Pumps | 1.42 | 1.42 | 50.22 | 10.35 | -- | 3.52 | 0.38 |
| Pumping Units | 2.87 | 2.87 | 101.84 | 20.99 | -- | 7.14 | 0.76 |

**Table 4-12**
**Alternative B Year 5 Emissions (TPY)**

| Activity | $PM_{10}$ | $PM_{2.5}$ | $NO_x$ | CO | $SO_2$ | VOC | HAPs |
|---|---|---|---|---|---|---|---|
| Total Construction Emissions | 23.96 | 17.82 | 55.19 | 38.55 | 0.40 | 4.43 | 0.14 |
| Total Production Emissions | 9.72 | 6.44 | 189.94 | 91.32 | 0.01 | 75.57 | 19.65 |
| Total Emissions | 33.68 | 24.26 | 245.13 | 129.87 | 0.40 | 79.99 | 19.69 |

**Table 4-13**
**Alternative B Year 5 GHG Emissions (metric tons per year)**

| Pollutant | Construction | Production | Total |
|---|---|---|---|
| $CO_2e$ | 7,107 | 37,282 | 44,389 |

*Near-Field Impacts*

Air pollutant dispersion modeling was performed to quantify maximum potential $PM_{10}$, $PM_{2.5}$, $NO_x$, CO, $SO_2$, and HAP impacts from construction and production. AERMOD was used to model the maximum potential emissions of $PM_{10}$, $PM_{2.5}$, $NO_x$, CO and $SO_2$ that could occur from Alternative B well pad/road construction, drilling/completion and production sources. **Table 4-14**, Alternative B - Criteria Pollutant Modeling Results for Field Development Activities, presents the maximum modeled air pollutant concentrations that could occur from well development activities. **Table 4-15**, Alternative B - Criteria Pollutant Modeling Results for Field Production Activities, presents maximum concentrations that could occur from well production activities. When maximum modeled concentrations from the modeled scenarios are added to representative background concentrations, total ambient air concentrations are less than the applicable NAAQS and CAAQS. In addition, direct modeled concentrations are below the applicable PSD Class II increments, with the exception of the modeled annual $NO_2$ concentration which is above the annual increment value.

Note that the emissions from field development activities would be temporary and would not consume PSD increment and, as a result, are excluded from increment comparisons.

**Table 4-14**
**Alternative B - Criteria Pollutant Modeling Results for Field Development Activities**

| | Averaging Time | Maximum Concentration ($\mu g/m^3$) | Background Concentration ($\mu g/m^3$) | Total Concentration ($\mu g/m^3$) | NAAQS/CAAQS ($\mu g/m^3$) |
|---|---|---|---|---|---|
| CO | 1-Hour | 775.1 | 1150 | 1,925.1 | 40,000 |
| | 8-Hour | 480.9 | 1150 | 1,630.9 | 10,000 |
| $NO_2$ | 1-Hour | 159.4 | 21 | 180.4 | 188 |
| | Annual | 37.3 | 1.9 | 39.2 | 100 |
| $SO_2$ | 1-Hour | 4.0 | 3 | 7.0 | 196 |
| | 3-Hour | 3.0 | 3 | 6.0 | 1,300/700 |
| | 24-Hour | 0.8 | 3 | 3.8 | 365/-- |
| | Annual | 0.09 | 3 | 3.1 | 80/-- |
| $PM_{10}$ | 24-Hour | 84.7 | 36 | 120.7 | 150 |
| | Annual | 8.1 | 15 | 23.1 | 50 |

**Table 4-14**
**Alternative B - Criteria Pollutant Modeling Results for Field Development Activities**

| | Averaging Time | Maximum Concentration (µg/m³) | Background Concentration (µg/m³) | Total Concentration (µg/m³) | NAAQS/CAAQS (µg/m³) |
|---|---|---|---|---|---|
| $PM_{2.5}$ | 24-Hour | 12.6 | 14 | 26.6 | 35 |
| | Annual | 1.2 | 3 | 4.2 | 12 |

Notes:
Maximum modeled CO, $NO_2$ and $SO_2$ impacts occur during drilling operations, and maximum $PM_{10}$ and $PM_{2.5}$ impacts occur during well pad and access road construction.
Modeled highest second-high values shown for all short term averaging times
$NO_2$ 1-hour value calculated as the 3-year average of the 8th highest daily maximum 1-hour concentrations
$SO_2$ 1-hour value is the maximum 1-hour concentration
$PM_{2.5}$ 24-hour value is the eighth-highest value
24-hour and annual $SO_2$ NAAQS remain in effect until 1 year after the area is designated for the 2010 (1-hour) standard. Designations for the 1-hr $SO_2$ NAAQS in CO have not occurred.

**Table 4-15**
**Alternative B - Criteria Pollutant Modeling Results for Field Production Activities**

| | Averaging Time | Maximum Concentration (µg/m³) | Background Concentration (µg/m³) | Total Concentration (µg/m³) | NAAQS/CAAQS (µg/m³) | PSD Class II Increment (µg/m³) |
|---|---|---|---|---|---|---|
| CO | 1-Hour | 775.4 | 1150 | 1,925.4 | 40,000 | -- |
| | 8-Hour | 481.1 | 1150 | 1,631.1 | 10,000 | -- |
| $NO_2$ | 1-Hour | 159.1 | 21 | 180.1 | 188 | -- |
| | Annual | 38.6 | 1.9 | 40.5 | 100 | 25 |
| $SO_2$ | 1-Hour | 0.002 | 3 | 3.0 | 196 | -- |
| | 3-Hour | 0.001 | 3 | 3.0 | 1,300/700 | 512 |
| | 24-Hour | 0.001 | 3 | 3.0 | 365/-- | 91 |
| | Annual | 0.0003 | 3 | 3.0 | 80/-- | 20 |
| $PM_{10}$ | 24-Hour | 0.007 | 36 | 36.0 | 150 | 30 |
| | Annual | 0.002 | 15 | 15.0 | 50 | 17 |
| $PM_{2.5}$ | 24-Hour | 0.007 | 14 | 14.0 | 35 | 9 |
| | Annual | 0.002 | 3 | 3.0 | 12 | 4 |

Notes:
Modeled highest second-high values shown for all short term averaging times
$NO_2$ 1-hour value calculated as the 3-year average of the 8th highest daily maximum 1-hour concentrations
$SO_2$ 1-hour value is the maximum 1-hour concentration
24-hour and annual $SO_2$ NAAQS remain in effect until 1 year after the area is designated for the 2010 (1-hour) standard. Designations for the 1-hr $SO_2$ NAAQS in CO have not occurred.

As described in the footnote for **Table 4-14**, the maximum $PM_{10}$ and $PM_{2.5}$ impacts (primarily dust) occur during access road and well pad construction activities. For construction phase near-field modeling, impacts are below applicable AAQS at receptors starting 100 meters from the emissions sources (see Figure 4-3 for construction scenario near-field modeling layout). Emissions calculations for the construction phase p.m. near-field modeling analysis assume dust control applied routinely to disturbed unpaved surfaces. To ensure that dust impacts are acceptable at receptors near well pad and access road construction/development phase activities (< 100 meters of source), additional dust mitigation would be required (see Mitigation Section for more details).

As previously described in this section as well as the in-depth discussion in the AQTSD, $NO_2$ 1-hour 98th percentile daily maximum 3-year average impacts for the Field Development (**Table 4-14**) activities modeling scenario are calculated assuming 1 year of drilling and 2 years of production related activities at each well pad. Three years of production related activities at each well pad are assumed for calculating $NO_2$ 1-hour 98th percentile daily maximum 3-year average impacts for the production modeling scenario (**Table 4-15**). The near-field modeling scenarios were based on the best available information from the Project proponent at the time of conducting the analysis. $NO_x$ emissions rates totals for new well pad development are primarily made up of large engine (drilling/fracturing/completion) emissions. $NO_x$ emissions rates totals for the new well pad production level equipment configuration are primarily driven by the pumping units and were developed for modeling to support compliance with the applicable AAQS. The number of pumping units designated for new well pads for the modeling analysis to support compliance is reasonable for the average number of wells per pad. Well pad level $NO_x$ emissions rate limits (one for development and production phases) would be required for each new well pad to ensure that near-field $NO_2$ impacts are acceptable. (See Mitigation Section for more information).

Modeling was performed to estimate the maximum impacts that could occur from HAP emissions from field production sources as well as an analysis for long-term (annual) HAP concentrations was performed for benzene, toluene, ethyl benzene, n-hexane, and formaldehyde emission resulting from field production activities. Potential maximum acute (short-term; 1-hour) HAP concentrations compared with the acute RELs and potential annual HAP concentrations compared with non-carcinogenic RfCs are shown in **Table 4-16**, Alternative B - HAP Modeling Results for Field Production Sources. RELs are defined as concentrations at or below which no adverse health effects are expected. As shown in **Table 4-16**, all HAP impacts are below the applicable short-term RELs and the long-term non-carcinogenic RfCs, with the exception of the maximum modeled formaldehyde concentration from compression emissions which at 81.6 $\mu g/m^3$ is above the short-term REL threshold of 55 $\mu g/m^3$.

**Table 4-16**
**Alternative B - HAP Modeling Results for Field Production Sources**

| | Maximum 1-hour Concentration ($\mu g/m^3$) | REL ($\mu g/m^3$) | Annual Concentration ($\mu g/m^3$) | RFC($\mu g/m^3$) |
|---|---|---|---|---|
| Formaldehyde | 81.6 | 55 | 3.89 | 9.8 |
| n-Hexane | 8.0 | 390000[1] | 1.33 | 700 |
| Benzene | 14.8 | 1,300 | 2.47 | 30 |
| Toluene | 23.6 | 37,000 | 3.92 | 5,000 |
| Ethyl Benzene | 1.3 | 350000[1] | 0.21 | 1,000 |
| Xylene | 10.4 | 22,000 | 1.74 | 100 |

[1] No REL available for these air toxics. Values shown are from Immediately Dangerous to Life or Health (IDLH/10), EPA Air Toxics Database, Table 2 (EPA 2011).

Modeling estimated the potential cancer risk resulting from suspected carcinogens (benzene ethyl benzene and formaldehyde) emissions. Impacts were evaluated based on estimates of the increased latent cancer risk over a 70-year lifetime. This analysis presents the potential incremental risk from formaldehyde and does not represent a total risk analysis. The cancer risks were calculated using the maximum predicted annual concentrations and EPA's chronic inhalation unit risk factors (URF) for carcinogenic constituents. Two estimates of cancer risk are

presented: 1) a most likely exposure (MLE) scenario; and 2) a maximum exposed individual (MEI) scenario. The estimated cancer risks are adjusted to account for duration of exposure and time spent at home.

The modeled long-term risk from project emissions is shown in **Table 4-17**, Alternative B - Unit Risk Analyses. Under both the MLE and MEI scenarios, the estimated cancer risk associated with long-term exposure to benzene and formaldehyde is greater than a 1 in 1 million, but within AEL concentration levels (EPA 2014b). While reviewing these results, it is important to recognize that these maximum impacts occur along the edge of the well pad (50 meters) for benzene and within 150 meters of a compressor station for formaldehyde. Maximum emissions are assumed to occur continuously for a 50-year life of project, and that the MEI risk level assumes a person would have to live within close proximity to a well pad and/or a compressor station for 50 years.

**Table 4-17**
**Alternative B - Unit Risk Analyses**

| | Analysis | HAP | Modeled Concentration (µg/m3) | Unit Risk Factor 1/(µg/m3) | Exposure Adjustment Factor | Cancer Risk |
|---|---|---|---|---|---|---|
| Field Production | MLE | Benzene | 2.47 | 7.8E-06 | 0.0949 | 1.8E-06 |
| | | Ethylbenzene | 0.21 | 2.5E-06 | 0.0949 | 5.0E-08 |
| | | Formaldehyde | 3.89 | 1.3E-05 | 0.0949 | 4.8E-06 |
| Total Combined | | | | | | 6.7E-06 |
| Field Production | MEI | Benzene | 2.47 | 7.8E-06 | 0.71 | 1.4E-05 |
| | | Ethylbenzene | 0.21 | 2.5E-06 | 0.71 | 3.7E-07 |
| | | Formaldehyde | 3.89 | 1.3E-05 | 0.71 | 3.6E-05 |
| Total Combined | | | | | | 5.0E-05 |

Refined air quality analyses for compressor stations would be required for CDPHE permitting at a later stage when detailed information for the compressor station layout and equipment (i.e. emissions sources) configuration will be known. It is anticipated that the CDPHE would analyze and address potential formaldehyde impacts at the compressor station permitting stage.

*Far-Field Impacts*

The far-field assessment assumed a field-wide maximum emissions scenario with well drilling/completion and production activities occurring simultaneously throughout the project area. The field-wide scenario included 135 wells in production, 3 drilling rigs operating continuously (one year-round and two operating from April-November), and one completion rig operating year-round.

Pollutant Impacts

The direct modeled concentrations of $NO_2$, $SO_2$, $PM_{10}$, and $PM_{2.5}$ at Class I and sensitive Class II areas are provided in **Table 4-18**, Alternative B - Maximum Modeled Pollutant Concentrations at Class I and Sensitive Class II Areas (µg/m$^3$), for comparison to applicable PSD Class I and Class II increments. These values are well below the PSD Class I and Class II increments.

**Table 4-18**
**Alternative B - Maximum Modeled Pollutant Concentrations at Class I and Sensitive Class II Areas ($\mu g/m^3$)**

| Location | Pollutant | Averaging Time | Direct Modeled | PSD Increment |
|---|---|---|---|---|
| Arches National Park | $NO_2$ | Annual | 1.3E-05 | 2.5 |
| | $SO_2$ | 3-hour | 5.2E-04 | 25 |
| | | 24-hour | 1.6E-04 | 5 |
| | | Annual | 1.9E-06 | 2 |
| | $PM_{10}$ | 24-hour | 1.8E-03 | 8 |
| | | Annual | 2.7E-05 | 4 |
| | $PM_{2.5}$ | 24-hour | 1.8E-03 | 2 |
| | | Annual | 2.0E-05 | 1 |
| Black Canyon of the Gunnison National Park | $NO_2$ | Annual | 8.7E-04 | 2.5 |
| | $SO_2$ | 3-hour | 4.3E-03 | 25 |
| | | 24-hour | 1.2E-03 | 5 |
| | | Annual | 4.0E-05 | 2 |
| | $PM_{10}$ | 24-hour | 2.4E-02 | 8 |
| | | Annual | 5.9E-04 | 4 |
| | $PM_{2.5}$ | 24-hour | 2.0E-02 | 2 |
| | | Annual | 4.8E-04 | 1 |
| Colorado National Monument | $NO_2$ | Annual | 1.0E-04 | 2.5 |
| | $SO_2$ | 3-hour | 6.7E-04 | 25 |
| | | 24-hour | 1.5E-04 | 5 |
| | | Annual | 7.9E-06 | 2 |
| | $PM_{10}$ | 24-hour | 3.3E-03 | 8 |
| | | Annual | 1.0E-04 | 4 |
| | $PM_{2.5}$ | 24-hour | 2.5E-03 | 2 |
| | | Annual | 7.6E-05 | 1 |
| Dinosaur National Monument | $NO_2$ | Annual | 1.4E-05 | 25 |
| | $SO_2$ | 3-hour | 3.1E-04 | 512 |
| | | 24-hour | 5.5E-05 | 91 |
| | | Annual | 1.6E-06 | 20 |
| | $PM_{10}$ | 24-hour | 1.4E-03 | 30 |
| | | Annual | 3.0E-05 | 17 |
| | $PM_{2.5}$ | 24-hour | 1.4E-03 | 9 |
| | | Annual | 2.3E-05 | 4 |
| Eagles Nest Wilderness Area | $NO_2$ | Annual | 8.7E-04 | 2.5 |
| | $SO_2$ | 3-hour | 3.0E-03 | 25 |
| | | 24-hour | 5.2E-04 | 5 |
| | | Annual | 5.3E-05 | 2 |
| | $PM_{10}$ | 24-hour | 2.4E-02 | 8 |
| | | Annual | 9.7E-04 | 4 |
| | $PM_{2.5}$ | 24-hour | 2.2E-02 | 2 |
| | | Annual | 7.0E-04 | 1 |
| Flat Tops Wilderness Area | $NO_2$ | Annual | 4.9E-04 | 2.5 |
| | $SO_2$ | 3-hour | 3.0E-03 | 25 |
| | | 24-hour | 5.9E-04 | 5 |
| | | Annual | 2.8E-05 | 2 |
| | $PM_{10}$ | 24-hour | 2.5E-02 | 8 |
| | | Annual | 5.7E-04 | 4 |
| | $PM_{2.5}$ | 24-hour | 2.5E-02 | 2 |
| | | Annual | 4.5E-04 | 1 |

**Table 4-18**
**Alternative B - Maximum Modeled Pollutant Concentrations at Class I and Sensitive Class II Areas ($\mu g/m^3$)**

| Location | Pollutant | Averaging Time | Direct Modeled | PSD Increment |
|---|---|---|---|---|
| La Garita Wilderness Area | $NO_2$ | Annual | 2.8E-04 | 2.5 |
| | $SO_2$ | 3-hour | 7.0E-03 | 25 |
| | | 24-hour | 1.2E-03 | 5 |
| | | Annual | 2.0E-05 | 2 |
| | $PM_{10}$ | 24-hour | 3.3E-02 | 8 |
| | | Annual | 3.9E-04 | 4 |
| | $PM_{2.5}$ | 24-hour | 3.5E-02 | 2 |
| | | Annual | 3.0E-04 | 1 |
| Maroon Bells/Snowmass Wilderness Area | $NO_2$ | Annual | 1.8E-02 | 2.5 |
| | $SO_2$ | 3-hour | 3.3E-02 | 25 |
| | | 24-hour | 8.3E-03 | 5 |
| | | Annual | 8.4E-04 | 2 |
| | $PM_{10}$ | 24-hour | 1.6E-01 | 8 |
| | | Annual | 8.1E-03 | 4 |
| | $PM_{2.5}$ | 24-hour | 1.0E-01 | 2 |
| | | Annual | 4.7E-03 | 1 |
| Mount Zirkel Wilderness Area | $NO_2$ | Annual | 1.1E-04 | 2.5 |
| | $SO_2$ | 3-hour | 7.7E-04 | 25 |
| | | 24-hour | 2.6E-04 | 5 |
| | | Annual | 9.2E-06 | 2 |
| | $PM_{10}$ | 24-hour | 7.1E-03 | 8 |
| | | Annual | 1.8E-04 | 4 |
| | $PM_{2.5}$ | 24-hour | 5.5E-03 | 2 |
| | | Annual | 1.4E-04 | 1 |
| Rocky Mountain National Park | $NO_2$ | Annual | 3.3E-04 | 25 |
| | $SO_2$ | 3-hour | 1.9E-03 | 25 |
| | | 24-hour | 4.4E-04 | 5 |
| | | Annual | 2.5E-05 | 2 |
| | $PM_{10}$ | 24-hour | 8.5E-03 | 8 |
| | | Annual | 5.1E-04 | 4 |
| | $PM_{2.5}$ | 24-hour | 6.4E-03 | 2 |
| | | Annual | 3.8E-04 | 1 |
| Weminuche Wilderness Area | $NO_2$ | Annual | 1.5E-04 | 2.5 |
| | $SO_2$ | 3-hour | 3.6E-03 | 25 |
| | | 24-hour | 6.8E-04 | 5 |
| | | Annual | 1.3E-05 | 2 |
| | $PM_{10}$ | 24-hour | 2.2E-02 | 8 |
| | | Annual | 2.4E-04 | 4 |
| | $PM_{2.5}$ | 24-hour | 2.2E-02 | 2 |
| | | Annual | 1.9E-04 | 1 |
| West Elk Wilderness Area | $NO_2$ | Annual | 6.7E-03 | 2.5 |
| | $SO_2$ | 3-hour | 1.2E-02 | 25 |
| | | 24-hour | 3.3E-03 | 5 |
| | | Annual | 2.6E-04 | 2 |
| | $PM_{10}$ | 24-hour | 6.7E-02 | 8 |
| | | Annual | 3.3E-03 | 4 |
| | $PM_{2.5}$ | 24-hour | 6.3E-02 | 2 |
| | | Annual | 2.2E-03 | 1 |

Visibility Impacts

Visibility impacts were calculated following FLAG 2010 (FLAG, 2010), at Class I and sensitive Class II areas. The results are shown in **Table 4-19**, Alternative B - Maximum Visibility Impacts at Class I and Sensitive Class II Areas. The visibility analysis indicated that there are zero days predicted above the 0.5-Δdv threshold at any of the Class I and sensitive Class II areas. The maximum predicted visibility impact was 0.45 Δdv, occurring at the Maroon Bells - Snowmass Wilderness Area.

**Table 4-19**
**Alternative B - Maximum Visibility Impacts at Class I and Sensitive Class II Areas**

| Location | Maximum Impact (Δdv) |
|---|---|
| Arches National Park | 0.01 |
| Black Canyon of the Gunnison National Park | 0.08 |
| Colorado National Monument | 0.01 |
| Dinosaur National Monument | 0.01 |
| Eagles Nest Wilderness Area | 0.10 |
| Flat Tops Wilderness Area | 0.12 |
| La Garita Wilderness Area | 0.14 |
| Maroon Bells/Snowmass Wilderness Area | 0.45 |
| Mount Zirkel Wilderness Area | 0.02 |
| Rocky Mountain National Park | 0.03 |
| Weminuche Wilderness Area | 0.10 |
| West Elk Wilderness Area | 0.26 |

Deposition Impacts

As shown in **Table 4-20**, modeled nitrogen and sulfur deposition impacts for Alternative B are below the DAT at all Class I and sensitive Class II areas. The exception is the Maroon Bell/Snowmass and Raggeds wilderness areas, where nitrogen deposition impacts are above the DAT. Modeling for Alternatives A and B used the same source locations and parameters, although Alternative B was modeled with more emissions from these source locations.

**Table 4-20**
**Alternative B - Maximum Nitrogen and Sulfur Deposition Impacts at Class I and Sensitive Class II Areas**

| Location | Maximum N Deposition (kg/ha/yr) | Maximum S Deposition (kg/ha/yr) |
|---|---|---|
| Arches National Park | 0.00002 | 0.000001 |
| Black Canyon of the Gunnison National Park | 0.00070 | 0.000054 |
| Colorado National Monument | 0.00008 | 0.000006 |
| Dinosaur National Monument | 0.00002 | 0.000002 |
| Eagles Nest Wilderness Area | 0.00110 | 0.000075 |
| Flat Tops Wilderness Area | 0.00069 | 0.000045 |
| La Garita Wilderness Area | 0.00057 | 0.000043 |
| Maroon Bells/Snowmass Wilderness Area | 0.00953 | 0.000874 |
| Mount Zirkel Wilderness Area | 0.00025 | 0.000017 |
| Ragged Wilderness Area (Deep Creek Lake) | 0.00623 | 0.000521 |
| Rocky Mountain National Park | 0.00061 | 0.000039 |
| Weminuche Wilderness Area | 0.00034 | 0.000026 |
| West Elk Wilderness Area | 0.00319 | 0.000221 |

Given that Alternative A deposition impacts are below the DAT at all Class I and sensitive Class II areas, the emissions levels close to those under Alternative A would be required to reduce Alternative B nitrogen deposition impacts to near the DAT. In order to achieve this, additional mitigation measures are included, as described below in *Additional Mitigation Measures*.

In addition, potential changes in ANC, resulting from potential N and S deposition from Alternative B source emissions, were calculated for 28 sensitive lakes within the Class I and sensitive Class II Wilderness areas. The estimated change in ANC for each lake is shown in **Table 4-21**, Alternative B - Maximum Impacts on Lakes within the Class I and Sensitive Class II Areas. For all lakes the estimated changes in ANC are all predicted to be less than the significance thresholds of less than a 10 percent change in ANC for lakes with ANC values greater than 25 μeq/l, and a 1.0 μeq/l change in ANC for lakes with background ANC values equal to or less than 25 μeq/l.

**Table 4-21**
**Alternative B - Maximum Impacts on Lakes within the Class I and Sensitive Class II Areas**

| Wilderness Area | Sensitive Lake | 10th Percentile Lowest ANC Value (μeq/L) | N Deposition (kg/ha/yr) | S Deposition (kg/ha/yr) | ANC Relative Change (%) | ANC Absolute Change (μeq/L) |
|---|---|---|---|---|---|---|
| Eagles Nest | Booth Lake | 86.8 | 0.00093 | 0.00006 | 0.011 | n/a |
| Eagles Nest | Upper Willow Lake | 134.1 | 0.00098 | 0.00007 | 0.009 | n/a |
| Flat Tops | Ned Wilson Lake | 39.0 | 0.00042 | 0.00003 | 0.011 | n/a |
| Flat Tops | Upper Ned Wilson Lake | 12.9 | 0.00042 | 0.00003 | 0.032 | 0.004 |
| Flat Tops | Lower Packtrail Pothole | 29.7 | 0.00042 | 0.00003 | 0.014 | n/a |
| Flat Tops | Upper Packtrail Pothole | 48.7 | 0.00042 | 0.00003 | 0.009 | n/a |
| La Garita | Small Lake Above U-Shaped Lake | 59.9 | 0.00049 | 0.00004 | 0.012 | n/a |
| La Garita | U-Shaped Lake | 81.4 | 0.00049 | 0.00004 | 0.009 | n/a |
| Maroon Bells | Avalanche Lake | 158.8 | 0.00471 | 0.00038 | 0.021 | n/a |
| Maroon Bells | Capitol Lake | 154.4 | 0.00467 | 0.00038 | 0.024 | n/a |
| Maroon Bells | Moon Lake | 53.0 | 0.00465 | 0.00039 | 0.083 | n/a |
| Mount Zirkel | Lake Elbert | 56.6 | 0.00022 | 0.00002 | 0.003 | n/a |
| Mount Zirkel | Seven Lakes (LG East) | 36.2 | 0.00018 | 0.00001 | 0.004 | n/a |
| Mount Zirkel | Summit Lake | 48.0 | 0.00025 | 0.00002 | 0.004 | n/a |
| Raggeds | Deep Creek Lake | 20.6 | 0.00623 | 0.00052 | 0.335 | 0.069 |
| Weminuche | Big Eldorado Lake | 19.6 | 0.00018 | 0.00002 | 0.010 | 0.002 |
| Weminuche | Four Mile Pothole | 123.4 | 0.00021 | 0.00002 | 0.001 | n/a |
| Weminuche | Lake Due South of Ute Lake | 13.2 | 0.00018 | 0.00001 | 0.014 | 0.002 |
| Weminuche | Little Eldorado | -3.3 | 0.00018 | 0.00002 | 0.057 | 0.002 |
| Weminuche | Little Granite Lake | 80.7 | 0.00019 | 0.00002 | 0.004 | n/a |
| Weminuche | Lower Sunlight Lake | 80.9 | 0.00017 | 0.00001 | 0.002 | n/a |
| Weminuche | Middle Ute Lake | 42.8 | 0.00018 | 0.00001 | 0.005 | n/a |
| Weminuche | Small Pond Above Trout Lake | 25.5 | 0.00022 | 0.00002 | 0.011 | n/a |
| Weminuche | Upper Grizzly Lake | 29.9 | 0.00016 | 0.00001 | 0.005 | n/a |
| Weminuche | Upper Sunlight Lake | 28.0 | 0.00017 | 0.00001 | 0.006 | n/a |
| Weminuche | West Snowdon Lake | 39.4 | 0.00017 | 0.00002 | 0.004 | n/a |
| Weminuche | White Dome Lake | 2.1 | 0.00018 | 0.00002 | 0.089 | 0.19 |
| West Elk | South Golden Lake | 111.4 | 0.00215 | 0.00015 | 0.019 | n/a |

*Regional Climate Change and Greenhouse Gas Emissions*

The maximum GHG emissions resulting from Alternative B are estimated at 39,689 metric tons per year (0.04 tg/yr) of $CO_2e$. To place the project GHG emissions in context, the GHG emissions from the top 5 emitting coal-fired power plants in Colorado range from 2.6 to 9.0 tg/year (EPA 2014c).

Predicting the degree of impact any single emitter of GHGs may have on global climate change, or on the changes to biotic and abiotic systems that accompany climate change, is not possible at this time primarily because climate change is a cumulative phenomenon that requires global scale emissions inventory/budget and many resources (computational power, etc.) to determine the sensitivity of climate with respect to changing global conditions. As such, the controversy is to what extent GHG emissions resulting from continued oil and gas development may contribute to global climate change, as well as the accompanying changes to natural systems cannot be quantified or predicted. The degree to which any observable changes can or would be attributable to Alternative B cannot be reasonably predicted at this time.

***Amended Proposed Action Air Quality Impacts Analysis***

Between publication of the Draft EIS and development of the Final EIS, SGI submitted a change to the type, size, and number of compressor engines at the Bull Mountain Compressor Station (BMCS) site. This change resulted in an amended Proposed Action and required a review and update of the analysis. The new compressor station includes the installation of a set of three 3,550-horsepower natural gas-fired compressor engines.

The BMCS is outside the Bull Mountain Unit project area, approximately 0.5 mile (approximately 800 meters) to the west of the northwest corner of the project area. The DEIS air quality analysis analyzed one 637-horsepower natural gas-fired compressor engine at this location and three 637-horsepower compressor engines in the project area; these latter engines remain included in the revised Proposed Action.

The BLM obtained a construction permit recently from the CDPHE that provides detailed permitted air pollutant emissions rates and operations information for the new BMCS. The BLM Colorado State Office used the details of this permit to conduct a refined air quality impacts analysis for the amended Proposed Action. The near-field air quality impacts analysis for the DEIS and the CDPHE-issued permit showed that $NO_x$ and formaldehyde emissions and impacts are the primary concerns for compressor engine operation. The remainder of this amended Proposed Action analysis is focused on air quality impacts from these pollutants.

The air quality impacts analysis for the DEIS presented above had three primary components: a cumulative CARMMS analysis, a project-specific far-field CALPUFF analysis, and a project-specific near-field AERMOD impacts analysis.

The following provides information for each air quality impacts analysis component, with respect to new information for the amended Proposed Action:

- CARMMS cumulative impacts analysis—The CARMMS cumulative year 2021 emissions inventory for UFO and the Bull Mountain project area accounted for substantial new future federal and non-federal oil and gas development. The CARMMS

high oil and gas development, year 2021, $NO_x$ annual emissions estimates for 37 4-kilometer grid points were centered approximately on the amended Proposed Action BMCS. They were compared to an April 2015 CDPHE permitted $NO_x$ emissions inventory for the same size domain. This was done to determine the projected increase and growth in $NO_x$ emissions in the project area. The current CDPHE emissions inventory shows approximately 139 TPY of $NO_x$ for all permitted emissions sources in the project area. The CARMMS high scenario accounted for approximately 1,441 TPY of $NO_x$ in the same project area. (Approximately 75 percent of the CARMMS year 2021 $NO_x$ emissions estimate is associated with oil and gas.) This substantial growth in oil and gas-related $NO_x$ emissions in the project area for the CARMMS high oil and gas development scenario accounts for the Bull Mountain Unit Proposed Action and multiple nearby potential future oil and gas projects. The CARMMS high scenario inventory allowed for plenty of oil and gas growth in the project area for the amended Proposed Action. For this reason, it is adequate to assume that the CARMMS projected year 2021 high oil and gas development scenario cumulative modeling results sufficiently account for the amended Proposed Action.

- Project-specific far-field CALPUFF analysis—As described in the CALPUFF modeling subsection and the previous mitigation subsection of this EIS, a Unit-wide $NO_x$ emissions limit (approximately 143 TPY of $NO_x$ for the post-development phase/full production and operational phase) was determined using project-specific CALPUFF modeling results for Alternatives A and B. It is reasonable to assume that project-specific CALPUFF modeling results would be different for the amended Proposed Action; however, that would not change the acceptable annual $NO_x$ limit that was established based on the CALPUFF modeling for the two alternatives. Additional project-specific CALPUFF modeling was not performed for the amended Proposed Action; this is because the $NO_x$ emissions limit had already been determined, based on previous project alternative CALPUFF modeling, and it would still apply regardless of the size and extent of the amended Proposed Action.

- Project-specific near-field AERMOD impacts analysis—As previously described, the amended Proposed Action includes installation of a new compressor station that would be substantially larger than any that were originally analyzed in the project-specific near-field analysis for the DEIS (10,650 horsepower versus 637 horsepower). For this reason, the BLM Colorado completed a refined AERMOD near-field $NO_2$ (1-hour) and formaldehyde (1-hour and annual) impacts analysis for the amended Proposed Action, the details of which are as follows:

    - Using ArcGIS and aerial images, the closest ambient air receptors are two nearby residences approximately .5 mile (approximately 800 meters) to the northeast and northwest of the BMCS.

    - The two annual year 2008 meteorological datasets that were used for the original project-specific near-field analysis were used for this refined AERMOD near-field impacts analysis. Also, the annual ozone dataset used for the previous near-field $NO_2$ modeling analyses was used for the AERMOD ozone limiting method

(OLM) $NO_x$ to $NO_2$ conversion for this refined amended Proposed Action analysis (see the AQTSD for more information on near-field modeling meteorology and ozone dataset).

- For the amended Proposed Action BMCS, maximum short-term $NO_x$ and formaldehyde emissions at CDPHE permitted emissions levels were modeled for estimating maximum 1-hour average $NO_2$ and formaldehyde concentrations. Annual permitted formaldehyde emissions levels were modeled for estimating formaldehyde concentrations that were used in the annual/long-term formaldehyde exposure analysis. The modeling analysis for the amended Proposed Action also included the emissions from proposed oil and gas sources related to a nearby project in western Gunnison County, the Dual Operator Proposal: Development of 25 Federal Natural Gas Wells and Associated Infrastructure on 5 Multi-Well Pads (BLM and US Forest Service 2015). $NO_x$ and formaldehyde emissions associated with full development (drilling and completion) of a well pad near the BMCS (approximately 2,100 meters west of BMCS) were included in the AERMOD runs for the $NO_2$ and formaldehyde short-term/1-hour impacts analysis. The post-construction/development phase formaldehyde emissions were modeled for the long-term/annual formaldehyde exposure analysis.

- For future background concentrations for the project area to account for impacts not modeled explicitly using AERMOD, the CARMMS year 2021 projected $NO_2$ concentrations for the 37 grid cells (see discussion above for CARMMS cumulative analysis for the amended Proposed Action) were processed. The results would determine a future $NO_2$ 1-hour background concentration that would account for the projected oil and gas growth in the project area. The background $NO_2$ 1-hour concentration that was used for the refined analysis (approximately 31 $\mu g/m^3$) is the overall maximum (of all grid cells) 1st high, daily 1-hour value for all CARMMS grid cells processed. The formaldehyde background concentrations that were used to account for all sources not explicitly modeled in AERMOD are from a Garfield County monitor located in an area of substantial oil and gas operations. CARMMS year 2021 $NO_2$ and Garfield County-monitored formaldehyde concentrations were added to AERMOD modeled concentrations for developing total concentration estimates for comparison to ambient air impact thresholds.

The refined near-field impacts analysis maximum modeled results for the amended Proposed Action are well below the impacts thresholds for all pollutants and averaging times. The maximum modeled 1st-highest daily maximum 1-hour $NO_2$ value, when added to the maximum modeled CARMMS daily maximum 1-hour $NO_2$ concentration for the project area, is well below the $NO_2$ 1-hour NAAQS. The amended Proposed Action BMCS maximum modeled 1st-highest daily maximum $NO_2$ value alone (impact from just the BMCS) is approximately a sixth of the $NO_2$ 1-hour NAAQS. Maximum modeled short-term and long-term formaldehyde concentrations (including background concentrations) are well below acceptable formaldehyde exposure thresholds (REL and RfC) and within the acceptable long-term exposure risk range.

The information provided above indicates that the air quality impacts for the amended Proposed Action would be in compliance with ambient air quality standards and below applicable threshold values.

To summarize, the CARMMS high scenario cumulative analysis accounted for substantial oil and gas growth in the project area and therefore includes emissions and impacts associated with the amended Proposed Action; the DEIS project-specific CALPUFF analysis for Alternatives A and B were used to establish the Bull Mountain Unit field-wide operational phase (post-construction) annual NOx emissions limit. This limit still applies for the amended Proposed Action, so no additional project-specific CALPUFF modeling is needed. The maximum modeled results for the refined near-field impacts analysis for the amended Proposed Action BMCS are predicted to be below acceptable impact thresholds or within acceptable impact ranges at nearby ambient receptors.

***Additional Mitigation Measures***

As described in the *Methods of Analysis* description at the beginning of the this section, there are several key air quality-related impacts of concern identified in the AQTSD due to predicted air quality impact levels being close to acceptable impact thresholds. Specifically, additional mitigation is needed for the following impacts of concern: near-field particulate matter (p.m.) impacts from construction and traffic activities, near-field $NO_2$ 1-hour impacts, and far-field nitrogen deposition at nearby Forest Service sensitive areas.

As described previously in this section and in the AQTSD, maximum modeled p.m. impacts are associated with the resource road and well pad construction activities modeling scenario. That scenario includes routine water/dust control application achieving approximately 50 percent dust control. Near-field impacts are acceptable for the construction scenario at receptors 100 meters of more from the emissions sources, assuming this level of emissions control. It is not technically practicable to exclude p.m. impacts at all locations within 100 meters of the emissions source , such as well pad and road construction activities; for that reason, additional emissions control would be needed to reduce dust emissions.

The $NO_2$ 1-hour modeling production scenario was based on a configuration of well pad production equipment (i.e. pumping units, heaters, etc.) that resulted in acceptable $NO_2$ 1-hour modeled impacts. The well pad production equipment configuration (i.e., the emissions levels) is reasonable for the average number of wells per pad based on operator input. To ensure that $NO_2$ 1-hour concentrations are acceptable near well pads for any number of new wells (approximately 4 to 12) per pad, there would be a $NO_x$ well pad emissions limit requirement so that well pad production $NO_x$ emissions are at or below the levels modeled for the near-field analysis described in the AQTSD. In addition, the $NO_2$ 1-hour modeling development scenario assumed Tier 2 development engines at 2,000 horsepower total operating at any one time for a single year at each well pad. It further assumed that there would be an engine operation or NOx emissions limit requirement for well development-related engines.

Modeled nitrogen deposition for the No Action Alternative (Alternative A) are below the DAT for all Class I and sensitive Class II areas; however, nitrogen deposition for the Proposed Action (Alternative B) are above the DAT for a nearby Class I and sensitive Class II area. Modeling for Alternatives A and B used the same number of sources, locations, and source parameters; the

main difference for the two scenarios is that Alternative B was modeled with more emissions from the project-related emissions sources. Using information determined from the modeling analyses, a Unit-wide emissions control plan would be required so that production level emissions for all action alternatives would be at or below the levels modeled for Alternative A (nitrogen deposition impacts at acceptable levels).

The following provides details for the additional emissions control requirements, as identified by the modeling analyses performed for this EIS:

- The BLM would place a COA on each permit, requiring SGI to continuously keep the surface moist with water during access road and well pad construction and during heavy traffic periods, including drilling and completion phases of well development. SGI would be required to limit off-site transport by maintaining no visible dust plume operations.

- The BLM would place a COA on each permit, requiring SGI to emit 5 TPY or less of $NO_x$ at each well pad for production operations (post- construction and production phase), as defined by the acceptable emissions level analyzed in the $NO_2$ 1-hour modeling analysis. SGI would be required to submit a detailed well pad production emissions inventory for each APD or details for the well pad production equipment and operations (including refined emissions factors) to develop project-specific emissions inventories. An annual $NO_x$ emissions rate greater than 5 TYP may be acceptable if SGI can demonstrate compliance with the $NO_2$ 1-hour NAAQS for the APD. The BLM would need to approve any additional impacts analyses before authorizing activities.

- The BLM would place a COA on each permit, requiring the operation of Tier 2 engines or cleaner for drilling, fracturing, and completion. SGI would be required to submit a detailed well pad development phase emissions inventory for each APD or details for the well pad development equipment and operations (including refined emissions factors and hours of operation) to develop project-specific emissions inventories. Operation of engines totaling greater than 2,000 horsepower at any one time during the development phase[4] could trigger the need for additional impacts analysis and potentially warrant a COA for Tier 3 or 4 engines. The goal of the requirement is for drill-, completion-, and fracturing-related engines to emit no more than 1 gram per second of $NO_x$ total at any one time (total of all engines operating concurrently), unless another $NO_x$ emissions rate can be demonstrated to comply with the $NO_2$ 1-hour NAAQS.

- The BLM would require SGI to provide a detailed Unit-wide equipment configuration plan (with specific information for the pumping units) and emissions inventory . It would show a plan/projection for Unit-wide federal wells production phase NOx emissions at or below 143 TPY of NOx[5]. The BLM would place a COA on each permit (APD), requiring

---

[4]  This total horsepower was analyzed for the EIS-specific $NO_2$ 1-hour impacts analysis.
[5]  The annual $NO_x$ emissions level limit required to provide project-level nitrogen deposition impacts at the DAT threshold (0.005 kg/ha-yr); it is determined from the nitrogen deposition modeling analyses for Alternatives A and B.

SGI to submit a $NO_x$ emissions accounting analysis summary. This would provide information for how the APD emissions fit into the overall Unit-wide production phase (post-construction and development) $NO_x$ emissions budget (approximately 143 TPY of $NO_x$).

***Alternative C***

Alternative C includes activities specific to BLM-administered estate for the construction and operation of up to 146 natural gas wells, 35 well pads, 1 water disposal well, and associated roads and production facilities, including 4 compression stations. This alternative would include as design features the use of drilling rig engines with Tier 3 or Tier 4 level emissions, as well as the air resources additional mitigation measures noted under Alternative B. Therefore, the following analysis describes the effects with the measures applied.

*Near-field Impacts*

Near-field pollutant impacts for Alternative C would be similar to those presented above for Alternative B. However, with the implementation of additional mitigation measures (described above under *Additional Mitigation Measures*), the impacts would be below the NAAQS or CAAQS. In addition impacts would not exceed the PSD Class II increments, with the exception of annual $NO_2$ concentrations which could exceed the annual increment value.

The maximum predicted acute and chronic (long-term) HAP impacts from well site production would be similar to the impacts for the Alternative B. HAP impacts under Alternative C would be below all applicable REL and RfC exposure thresholds, with the exception of the modeled formaldehyde concentrations from compression emissions which could exceed the short-term REL threshold. For the suspected carcinogens (benzene, ethyl benzene, and formaldehyde) the cancer risk level for production activities for either the MLE or the MEI analysis would be similar to Alternative B.

*Far-Field Impacts*

Pollutant Impacts

Pollutant impacts would be similar to those presented in for Alternative B. Pollutant impacts would be below PSD increments at all Class I and sensitive Class II areas.

Visibility Impacts

Visibility impacts estimated resulting from Alternative C emissions would be similar to those presented for Alternative B, which indicated that there would be zero days predicted above the 0.5 $\Delta$dv threshold at any of the Class I and sensitive Class II areas.

Deposition Impacts

Nitrogen deposition impacts under Alternative C would be less than the impacts for Alternative B and greater than the impacts for Alternative A. Sulfur deposition impacts would be below the DAT.

Potential sensitive lake acidification resulted from nitrogen and sulfur deposition impacts under Alternative C would be similar to the impacts for Alternative B, where modeling results

indicated that there would be no ANC changes at any of the analyzed lakes that exceeded threshold values.

*Regional Climate Change and Greenhouse Gas Emissions*
The maximum greenhouse gas emissions resulting from Alternative C sources would be comparable to the emissions estimated for Alternative B. See discussion for Alternative B.

The additional mitigation measures described under Alternative B would be applied in Alternative C resulting in a reduction of the noted impacts to be the same as described in Alternative B.

***Alternative D***
Alternative D includes activities specific to BLM-administered estate for the construction and operation of up to 146 natural gas wells, 4 water disposal wells, and associated roads and production facilities, including 4 compression stations. In developing the Preferred Alternative (Alternative D), the BLM included as design features the air resources mitigation measures noted under Alternative B. Therefore, the following analysis describes the effects with the measures applied.

*Near-Field Impacts*
Near-field pollutant impacts for Alternative D would be similar to those presented above for Alternative B. Impacts from Alternative D sources would be below the NAAQS and CAAQS. In addition impacts would not exceed the PSD Class II increments, with the exception of annual $NO_2$ concentrations, which could exceed the annual increment value.

The maximum predicted acute and long-term HAP impacts from well site production would be similar to the impacts under Alternative B. HAP impacts under Alternative D would be below all applicable REL and RfC exposure thresholds, with the exception of the modeled formaldehyde concentrations from compression emissions, which could exceed the short-term REL threshold. For the suspected carcinogens benzene, ethyl benzene, and formaldehyde, the cancer risk level for production activities for either the MLE or the MEI analysis would be similar to that under Alternative B.

*Far-Field Impacts*

Pollutant Impacts
Pollutant impacts would be similar to those for Alternative B and would be below PSD increments at all Class I and sensitive Class II areas.

Visibility Impacts
Estimated visibility impacts from Alternative D emissions would be similar to those presented for Alternative B; they indicated that there would be zero days predicted above the 0.5 $\Delta$dv threshold at any of the Class I and sensitive Class II areas.

Deposition Impacts
Nitrogen deposition impacts under Alternative D would be less than the impacts for Alternative B and greater than those for Alternative A. Sulfur deposition impacts would be below the DAT.

Under Alternative D, potential sensitive lake acidification that results from nitrogen and sulfur deposition impacts would be similar to that described for Alternative B. Under that alternative, modeling results indicated that there would be no ANC changes at any of the analyzed lakes that exceeded threshold values.

*Regional Climate Change and Greenhouse Gas Emissions*
The maximum GHG emissions from Alternative D sources would be comparable to the emissions estimated for Alternative B. See discussion for Alternative B.

*Regional Ozone and Cumulative Air Quality and AQRV analyses*
As part of the adaptive management strategy for managing air resources within the BLM GJFO and UFO planning areas, the BLM conducted a regional air modeling study to evaluate potential impacts on air quality from future mineral development in western Colorado. The Colorado Air Resources Management Modeling Study (CARMMS) (BLM 2014b) assesses predicted impacts on air quality and air quality related values (AQRVs) from projected increases in oil and gas development. The CARMMS includes potential impacts using projections of oil and gas development up to a maximum of 10 years in the future to reflect realistic estimations of development projections and technology improvements.

The CARMMS includes cumulative air quality and AQRV impact assessments from future year (year 2021) oil and gas development on federal and non-federal lands within 13 separate Colorado BLM planning areas as well as mining within the 13 Colorado BLM planning areas. CARMMS also includes emissions from other regional sources including oil and gas emissions throughout the modeling domain which encompasses all of Colorado, western Arizona, western Utah and north-central New Mexico and extends into southern Wyoming, western Nebraska, western Kansas and northwest Texas.

The CARMMS includes use of the Comprehensive Air-quality Model with extensions (CAMx) photochemical grid model (PGM) model to estimate air quality and AQRV impacts for both a base case year (2008) and future year 2021. Emissions from all sources types (anthropogenic and natural) are included in the CAMx modeling.

As part of CARMMS future year 2021 emissions estimates were developed for 3 development scenarios for the 13 Colorado planning areas. These include year 2021 high, medium and low oil and gas development scenarios. Modeling results for the CARMMS 2021 high oil and gas development scenario are applicable for use in estimating potential ozone formation from regional emissions and Bull Mountain project emissions, and for determining the maximum contribution of Bull Mountain sources to regional ozone formation (BLM 2014b). The CARMMS results are also applicable for Bull Mountain project cumulative air quality and AQRV analyses.

The CARMMS 2021 high oil and gas development scenario modeling analysis included BLM UFO planning area oil and gas emissions on BLM-administered lands of 612 TPY $NO_x$, 620 TPY VOC, 788 TPY CO, 1 TPY $SO_2$, 144 TPY $PM_{10}$ and 37 TPY $PM_{2.5}$. The maximum future year emissions from Bull Mountain project area emissions, including existing sources, Alternative A sources (on private lands), and Alternative D sources (on BLM-administered

lands), are 311.1 TPY $NO_x$, 124.5 TPY VOC, 206.5 TPY CO, 0.8 TPY $SO_2$, 65.6 TPY $PM_{10}$ and 46.0 TPY $PM_{2.5}$.

*Regional Ozone Impacts*

The CARMMS included estimates of future year regional ozone impacts using two analysis methods. One method uses the change in the PGM modeled concentrations between base case or current year (DVC) (year 2008) and future year (DVF) (year 2021) simulations to scale observed ozone concentrations from monitoring sites to obtain projected future year ozone concentrations. This method utilized EPA's Modeled Attainment Test Software (MATS; Abt 2012) projection tool with the CAMx 2008 Base Case and 2021 High Development Scenario ozone concentrations to estimate ozone impacts. The second method uses the absolute modeling results from the CAMx model to estimate ozone impacts.

The ozone analyses included in the CARMMS study (BLM 2014b) presented CAMx modeled ozone concentrations compared to the 8-hour ozone NAAQS of 75 ppb that has been in effect since 2008.  On October 1, 2015, the EPA revised the level of the 8-hour ozone NAAQS to 70 ppb (EPA 2015b). The CAMx modeled ozone concentration data prepared for the CARMMS 2014 study will be reprocessed. A revised CARMMS report that presents predicted future year ozone concentrations relative to the new ozone NAAQS will be completed during 2016. However the information presented herein, from the 2014 CARMMS study, is applicable for estimating Bull Mountain project-level ozone impacts. This information also will be used for comparing future year regional ozone impacts in the vicinity of the Bull Mountain project area to the level of the revised ozone NAAQS.

**Figure 4-12** presents the CAMx predicted ozone concentrations using MATS. The current year DVCs indicate areas of ozone exceedances of the NAAQS (70 ppb) in Colorado, eastern Utah, southern Wyoming, northeast Arizona, and northern New Mexico with the maximum concentrations near Denver and Salt Lake City. The maximum DVC of 81.5 ppb is estimated just northwest of Denver (**Figure 4-12**, top left). The current year DVCs also indicate that there are areas near the Bull Mountain project area in Gunnison County that are above the 70 ppb NAAQS, in the range of 71 to 73 ppb. For the 2021 High Development Scenario, the area of 2021 ozone DVF exceedances is slightly reduced from the base year, with a peak DVF of 79.3 ppb still northwest of Denver (**Figure 4-12**, top right). The High Development Scenario indicates that the range of future year concentrations nearby the Bull Mountain project area are approximately the same as the base year. The 2021 DVF-2008 DVC difference plot (**Figure 4-12**, bottom) shows mainly ozone reductions, the largest of which is in the Denver and Salt Lake City areas; however, it shows ozone increases in the Piceance Basin (Garfield County, Colorado). In the vicinity of the project area, there are small areas with ozone reductions up to 1.0 ppb and ozone increases up to 1.0 ppb.



Case No. 1:20-cv-02484-MSK Document 90-2 filed 05/06/21 USDC Colorado pg 33 of 576

**Figure 4-12.** 2008 ozone DVC (top left), 2021 ozone DVF (top right) and 2021 – 2008 ozone DVF differences calculated using MATS for the CARMMS 2021 High Development Scenario.

The CAMx absolute modeling results are presented in **Figure 4-13**. The ozone NAAQS is defined as the three-year average of the 4th highest daily maximum 8-hour ozone concentrations. Since CARMMS only has one year of modeling results, the 2021 fourth highest daily maximum 8-hour ozone concentrations are used for the NAAQS comparison metric.

**Figure 4-13** displays the fourth highest ozone concentrations for the 2008 Base Case and the 2021 High Development Scenario and their differences. For the 2008 Base Case, there are ozone exceedance areas in Colorado, eastern Utah, southern Wyoming, northeast Arizona, and northern New Mexico. The maximum ozone concentrations are estimated near Denver, Salt Lake City and northern New Mexico, and on the border of Utah and Arizona (**Figure 4-13**, top left).

The 2008 Base Case also indicates that there are areas near the Bull Mountain project area in Gunnison County that are above the 70 ppb NAAQS, in the range of 70-76 ppb. In the 2021 High Development Scenario, the area of ozone exceedances is slightly reduced, although there are increases in ozone concentrations estimated in the Uinta Basin (**Figure 4-13**, top right). The 2021 High Development Scenario also indicates a slight increase in the areas near the project area that are above the 70 ppb NAAQS in the range of 70-76 ppb.

The 2021-2008 ozone differences (**Figure 4-13**, bottom) show more decreases than increases. The areas of ozone increases tend to occur in oil and gas development areas, for example, the D-J, Piceance, and Uinta Basins. In the vicinity of the Bull Mountain project area, there are small areas with ozone reductions up to 3.0 ppb and ozone increases up to 3.0 ppb.

**Figure 4-14** presents the maximum ozone contributions due to federal oil and gas emissions in the UFO planning area from the CAMx absolute model results. The maximum ozone contribution from the UFO planning area oil and gas sources is 0.8 ppb. Given that the UFO planning area oil and gas emissions include 612 TPY $NO_x$ and 620 TPY VOC and that the maximum future year emissions from Bull Mountain project sources show 311.1 TPY $NO_x$ and 124.5 TPY VOC, the contribution to regional ozone from Bull Mountain project sources would likely be less.

Cumulative Air Quality and AQRV Impacts

The CARMMS 2021 high oil and gas development modeling analysis presented a scenario which included future year 2021 projected federal and non- federal oil and gas emissions throughout the 4-kilometer grid CARMMS domain plus mining on BLM-administered in Colorado. This scenario which includes future year oil and gas emissions from the 13 Colorado BLM planning area plus the Mancos Shale area in Northern New Mexico, and emissions from the Piceance Basin (CO) and Uinta Basin (UT), is presented herein to describe cumulative impacts for the Bull Mountain project. For the Bull Mountain project cumulative analysis these cumulative oil and gas emissions and mining emissions are considered reasonably foreseeable development (RFD) emissions.

The CARMMS included impact assessments at 55 PSD Class I and sensitive Class II areas, and at 58 lakes throughout the CARMMS modeling domain, which included each of the Class I and Class II areas and lakes that have been included in the Bull Mountain project CALPUFF impacts analyses. For the Bull Mountain project cumulative assessment, the CARMMS impacts are presented for the PSD Class I and sensitive Class II areas and lakes that were included in the CALPUFF analyses.



Case No. 1:20-cv-02484-MSK Document 90-2 filed 05/06/21 USDC Colorado pg 35 of 576

**Figure 4-13.** Fourth highest daily maximum 8-hour ozone concentrations for the 2008 Base Case (top left), CARMMS 2021 High Development Scenario (top right), 2021 minus 2008 differences (bottom).



**Figure 4-14.** Contribution to Fourth Highest Daily Maximum Ozone Concentrations Due to Emissions from Federal Oil and Gas within the UFO Planning Area for the CARMMS 2021 High Development Scenario.

Air Quality Impacts

The modeled concentrations of $NO_2$, $SO_2$, $PM_{10}$, and $PM_{2.5}$ at Class I and sensitive Class II areas resulting from cumulative RFD source emissions are provided in **Table 4-22**, Cumulative Pollutant Concentrations (CARMMS 2021 High Development Scenario) at Class I and Sensitive Class II Areas (μg/m$^3$), for comparison to applicable PSD Class I and Class II increments. All values are well below the PSD Class I and Class II increments.

**Table 4-22**
**Cumulative Pollutant Concentrations (CARMMS 2021 High Development Scenario) at Class I and Sensitive Class II Areas (μg/m³)**

| Location | Pollutant | Averaging Time | Modeled Concentration | PSD Increment |
|---|---|---|---|---|
| Arches National Park | $NO_2$ | Annual | 0.357 | 2.5 |
| | $SO_2$ | 3-hour | 0.107 | 25 |
| | | 24-hour | 0.046 | 5 |
| | | Annual | 0.006 | 2 |
| | $PM_{10}$ | 24-hour | 0.577 | 8 |
| | | Annual | 0.096 | 4 |
| | $PM_{2.5}$ | 24-hour | 0.430 | 2 |
| | | Annual | 0.080 | 1 |
| Black Canyon of the Gunnison National Park | $NO_2$ | Annual | 0.481 | 2.5 |
| | $SO_2$ | 3-hour | 0.086 | 25 |
| | | 24-hour | 0.052 | 5 |
| | | Annual | 0.006 | 2 |
| | $PM_{10}$ | 24-hour | 0.763 | 8 |
| | | Annual | 0.199 | 4 |
| | $PM_{2.5}$ | 24-hour | 0.617 | 2 |
| | | Annual | 0.104 | 1 |
| Colorado National Monument | $NO_2$ | Annual | 0.600 | 2.5 |
| | $SO_2$ | 3-hour | 0.190 | 25 |
| | | 24-hour | 0.080 | 5 |
| | | Annual | 0.012 | 2 |
| | $PM_{10}$ | 24-hour | 1.233 | 8 |
| | | Annual | 0.194 | 4 |
| | $PM_{2.5}$ | 24-hour | 0.890 | 2 |
| | | Annual | 0.155 | 1 |
| Dinosaur National Monument | $NO_2$ | Annual | 1.444 | 25 |
| | $SO_2$ | 3-hour | 1.495 | 512 |
| | | 24-hour | 0.487 | 91 |
| | | Annual | 0.108 | 20 |
| | $PM_{10}$ | 24-hour | 3.539 | 30 |
| | | Annual | 0.551 | 17 |
| | $PM_{2.5}$ | 24-hour | 3.535 | 9 |
| | | Annual | 0.546 | 4 |
| Eagles Nest Wilderness Area | $NO_2$ | Annual | 0.246 | 2.5 |
| | $SO_2$ | 3-hour | 0.093 | 25 |
| | | 24-hour | 0.029 | 5 |
| | | Annual | 0.005 | 2 |
| | $PM_{10}$ | 24-hour | 0.566 | 8 |
| | | Annual | 0.131 | 4 |
| | $PM_{2.5}$ | 24-hour | 0.485 | 2 |
| | | Annual | 0.099 | 1 |
| Flat Tops Wilderness Area | $NO_2$ | Annual | 0.515 | 2.5 |
| | $SO_2$ | 3-hour | 0.422 | 25 |
| | | 24-hour | 0.157 | 5 |
| | | Annual | 0.017 | 2 |
| | $PM_{10}$ | 24-hour | 1.093 | 8 |
| | | Annual | 0.241 | 4 |
| | $PM_{2.5}$ | 24-hour | 0.882 | 2 |
| | | Annual | 0.189 | 1 |

**Table 4-22**
**Cumulative Pollutant Concentrations (CARMMS 2021 High Development Scenario) at Class I and Sensitive Class II Areas (μg/m³)**

| Location | Pollutant | Averaging Time | Modeled Concentration | PSD Increment |
|---|---|---|---|---|
| La Garita Wilderness Area | $NO_2$ | Annual | 0.135 | 2.5 |
| | $SO_2$ | 3-hour | 0.074 | 25 |
| | | 24-hour | 0.024 | 5 |
| | | Annual | 0.004 | 2 |
| | $PM_{10}$ | 24-hour | 0.341 | 8 |
| | | Annual | 0.059 | 4 |
| | $PM_{2.5}$ | 24-hour | 0.293 | 2 |
| | | Annual | 0.045 | 1 |
| Maroon Bells/Snowmass Wilderness Area | $NO_2$ | Annual | 0.447 | 2.5 |
| | $SO_2$ | 3-hour | 0.114 | 25 |
| | | 24-hour | 0.036 | 5 |
| | | Annual | 0.007 | 2 |
| | $PM_{10}$ | 24-hour | 0.824 | 8 |
| | | Annual | 0.241 | 4 |
| | $PM_{2.5}$ | 24-hour | 0.587 | 2 |
| | | Annual | 0.167 | 1 |
| Mount Zirkel Wilderness Area | $NO_2$ | Annual | 0.228 | 2.5 |
| | $SO_2$ | 3-hour | 0.179 | 25 |
| | | 24-hour | 0.065 | 5 |
| | | Annual | 0.010 | 2 |
| | $PM_{10}$ | 24-hour | 0.893 | 8 |
| | | Annual | 0.240 | 4 |
| | $PM_{2.5}$ | 24-hour | 0.822 | 2 |
| | | Annual | 0.219 | 1 |
| Raggeds Wilderness Area | $NO_2$ | Annual | 0.579 | 25 |
| | $SO_2$ | 3-hour | 0.114 | 25 |
| | | 24-hour | 0.035 | 5 |
| | | Annual | 0.007 | 2 |
| | $PM_{10}$ | 24-hour | 1.407 | 8 |
| | | Annual | 0.332 | 4 |
| | $PM_{2.5}$ | 24-hour | 1.209 | 2 |
| | | Annual | 0.247 | 1 |
| Rocky Mountain National Park | $NO_2$ | Annual | 0.240 | 25 |
| | $SO_2$ | 3-hour | 0.087 | 25 |
| | | 24-hour | 0.021 | 5 |
| | | Annual | 0.005 | 2 |
| | $PM_{10}$ | 24-hour | 1.882 | 8 |
| | | Annual | 0.207 | 4 |
| | $PM_{2.5}$ | 24-hour | 1.164 | 2 |
| | | Annual | 0.116 | 1 |
| Weminuche Wilderness Area | $NO_2$ | Annual | 0.446 | 2.5 |
| | $SO_2$ | 3-hour | 0.171 | 25 |
| | | 24-hour | 0.046 | 5 |
| | | Annual | 0.006 | 2 |
| | $PM_{10}$ | 24-hour | 0.494 | 8 |
| | | Annual | 0.097 | 4 |
| | $PM_{2.5}$ | 24-hour | 0.459 | 2 |
| | | Annual | 0.062 | 1 |

**Table 4-22**
**Cumulative Pollutant Concentrations (CARMMS 2021 High Development Scenario) at Class I and Sensitive Class II Areas (μg/m³)**

| Location | Pollutant | Averaging Time | Modeled Concentration | PSD Increment |
|---|---|---|---|---|
| West Elk Wilderness Area | $NO_2$ | Annual | 0.289 | 2.5 |
| | $SO_2$ | 3-hour | 0.095 | 25 |
| | | 24-hour | 0.037 | 5 |
| | | Annual | 0.005 | 2 |
| | $PM_{10}$ | 24-hour | 0.790 | 8 |
| | | Annual | 0.238 | 4 |
| | $PM_{2.5}$ | 24-hour | 0.706 | 2 |
| | | Annual | 0.193 | 1 |

*Visibility Impacts*

The visibility impacts due to RFD oil and gas emissions and mining emissions were examined following the procedures provided by the USFWS and NPS (USFWS and NPS, 2012). These procedures use EPA's Modeled Attainment Test Software (MATS) to project current year observed visibility impairment for the best 20 percent (B20%) and worst 20 percent (W20%) days to the future year using the 2008 Base Case and 2021 High Development Scenario modeling results [which include contributions from all sources categories (anthropogenic and natural)] with and without emissions from RFD sources.

**Table 4-23a** and **Table 4-23b** display the cumulative visibility results for the 2021 High Development Scenario and RFD sources for W20% and B20% days, respectively. Note that since MATS was used and MATS only includes observed data for Class I areas, cumulative visibility results are presented for just the Class I areas.

As is indicated in **Table 4-23a**, from the 2008 current year to the 2021 High Development Scenario future year, the W20% visibility metric is estimated to improve at each of the Class I areas. The biggest improvement is a reduction of 0.89 dv that occurs at Rocky Mountain National Park and goes from 12.04 dv in 2008 to 11.15 dv in 2021. RFD emissions are estimated to contribute a maximum of 0.26 dv to the 2021 W20% days visibility at Black Canyon in Gunnison National Park.

Cumulative visibility results at Class I areas for the B20% days are provided in **Table 4-23b**. From the 2008 to 2021, the B20% days visibility is estimated to degrade in two and improve in eight Class I areas. The largest B20% visibility degradation is a 0.18 dv increase from 2.25 to 2.43 dv at the Weminuche Wilderness Area. The largest B20% visibility improvement is a 0.16 dv decrease at the Maroon Bells-Snowmass Wilderness Area, from 0.69 to 0.53 dv. The maximum contribution from RFD sources to 2021 B20% visibility metrics is 0.17 dv at the Flat Tops Wilderness Area.

**Table 4-23a**

**Cumulative Visibility Results (Δdv) for Worst 20% Visibility Days at Class I Areas for Current Year (2008) and 2021 High Development Scenario all Emissions and Contributions from RFD Sources**

| Class I Area | State | IMPROVE Site | 2008 Base | 2021 High | 2021 High Improvement from 2008 | Contribution from RFD |
|---|---|---|---|---|---|---|
| Arches NP | UT | CANY1 | 11.02 | 10.37 | 0.65 | 0.18 |
| Black Canyon of the Gunnison NP | CO | WEMI1 | 9.95 | 9.31 | 0.64 | 0.26 |
| Eagles Nest Wilderness | CO | WHRI1 | 8.68 | 7.87 | 0.81 | 0.17 |
| Flat Tops Wilderness | CO | WHRI1 | 8.68 | 8.07 | 0.61 | 0.22 |
| La Garita Wilderness | CO | WEMI1 | 9.95 | 9.36 | 0.59 | 0.05 |
| Maroon Bells-Snowmass Wilderness | CO | WHRI1 | 8.68 | 7.91 | 0.77 | 0.11 |
| Mount Zirkel Wilderness | CO | MOZI1 | 9.36 | 8.54 | 0.82 | 0.12 |
| Rocky Mountain NP | CO | ROMO1 | 12.04 | 11.15 | 0.89 | 0.12 |
| Weminuche Wilderness | CO | WEMI1 | 9.95 | 9.49 | 0.46 | 0.07 |
| West Elk Wilderness | CO | WHRI1 | 8.68 | 8.08 | 0.60 | 0.11 |

**Table 4-23b**

**Cumulative Visibility Results (Δdv) for Best 20% Visibility Days at Class I Areas for Current Year (2008) and 2021 High Development Scenario all Emissions and Contributions from RFD Sources**

| Class I Area | State | IMPROVE Site | 2008 Base | 2021 High | 2021 High Improvement from 2008 | Contribution from RFD |
|---|---|---|---|---|---|---|
| Arches NP | UT | CANY1 | 2.86 | 2.86 | 0.00 | 0.08 |
| Black Canyon of the Gunnison NP | CO | WEMI1 | 2.25 | 2.18 | 0.07 | 0.14 |
| Eagles Nest Wilderness | CO | WHRI1 | 0.69 | 0.55 | 0.14 | 0.07 |
| Flat Tops Wilderness | CO | WHRI1 | 0.69 | 0.55 | 0.14 | 0.17 |
| La Garita Wilderness | CO | WEMI1 | 2.25 | 2.29 | -0.04 | 0.07 |
| Maroon Bells-Snowmass Wilderness | CO | WHRI1 | 0.69 | 0.53 | 0.16 | 0.06 |
| Mount Zirkel Wilderness | CO | MOZI1 | 0.95 | 0.84 | 0.11 | 0.16 |
| Rocky Mountain NP | CO | ROMO1 | 1.91 | 1.87 | 0.04 | 0.07 |
| Weminuche Wilderness | CO | WEMI1 | 2.25 | 2.43 | -0.18 | 0.08 |
| West Elk Wilderness | CO | WHRI1 | 0.69 | 0.57 | 0.12 | 0.05 |

*Deposition Impacts*

Potential atmospheric deposition impacts within Class I and sensitive Class II areas were calculated for cumulative RFD sources and are shown in **Table 4-24**, Cumulative RFD Nitrogen and Sulfur Deposition Impacts (CARMMS 2021 High Development Scenario) at Class I and Sensitive Class II Areas. The maximum direct total (wet and dry) N and S deposition are predicted to be well below the cumulative analysis thresholds of 1.5 ky/ha/yr for nitrogen and 3 kg/ha/yr for sulfur at all Class I and sensitive Class II areas. The maximum total nitrogen and sulfur deposition rates are approximately 50 percent and 1 percent of the cumulative analysis thresholds, occurring at Dinosaur National Monument and the Mount Zirkel Wilderness Area, respectively.

Potential changes in ANC from baseline conditions resulting from potential N and S deposition from cumulative RFD source emissions were calculated for 28 sensitive lakes within the Class I and sensitive Class II Wilderness areas. The estimated change in ANC for each lake is shown in **Table 4-25**, Cumulative RFD Impacts on Lakes (CARMMS 2021 High Development Scenario) within the Class I and Sensitive Class II Areas. The estimated changes in ANC are all predicted

**Table 4-24**
**Cumulative RFD Nitrogen and Sulfur Deposition Impacts (CARMMS 2021 High Development Scenario) at Class I and Sensitive Class II Areas**

| Location | Maximum N Deposition (kg/ha/yr) | Maximum S Deposition (kg/ha/yr) |
|---|---|---|
| Arches National Park | 0.257 | 0.003 |
| Black Canyon of the Gunnison National Park | 0.303 | 0.006 |
| Colorado National Monument | 0.400 | 0.006 |
| Dinosaur National Monument | 0.745 | 0.030 |
| Eagles Nest Wilderness Area | 0.414 | 0.015 |
| Flat Tops Wilderness Area | 0.557 | 0.033 |
| La Garita Wilderness Area | 0.257 | 0.007 |
| Maroon Bells/Snowmass Wilderness Area | 0.439 | 0.019 |
| Mount Zirkel Wilderness Area | 0.472 | 0.041 |
| Ragged Wilderness Area | 0.410 | 0.018 |
| Rocky Mountain National Park | 0.456 | 0.019 |
| Weminuche Wilderness Area | 0.505 | 0.013 |
| West Elk Wilderness Area | 0.324 | 0.011 |

**Table 4-25**
**Cumulative RFD Impacts on Lakes (CARMMS 2021 High Development Scenario) within the Class I and Sensitive Class II Areas**

| Wilderness Area | Sensitive Lake | 10th Percentile Lowest ANC Value (µeq/L) | N Deposition (kg/ha/yr) | S Deposition (kg/ha/yr) | ANC Relative Change (%) | ANC Absolute Change (µeq/L) |
|---|---|---|---|---|---|---|
| Eagles Nest | Booth Lake | 86.8 | 0.012 | 0.342 | 5.1 | n/a |
| Eagles Nest | Upper Willow Lake | 134.1 | 0.009 | 0.251 | 2.8 | n/a |
| Flat Tops | Ned Wilson Lake | 39.0 | 0.027 | 0.434 | 10.9 | n/a |
| Flat Tops | Upper Ned Wilson Lake | 12.9 | 0.027 | 0.434 | n/a | 4.3 |
| Flat Tops | Lower Packtrail Pothole | 29.7 | 0.027 | 0.434 | 14.4 | n/a |
| Flat Tops | Upper Packtrail Pothole | 48.7 | 0.027 | 0.434 | 8.8 | n/a |
| La Garita | Small Lake Above U-Shaped Lake | 59.9 | 0.006 | 0.228 | 4.5 | n/a |
| La Garita | U-Shaped Lake | 81.4 | 0.006 | 0.228 | 3.3 | n/a |
| Maroon Bells | Avalanche Lake | 158.8 | 0.019 | 0.412 | 2.2 | n/a |
| Maroon Bells | Capitol Lake | 154.4 | 0.019 | 0.405 | 2.6 | n/a |
| Maroon Bells | Moon Lake | 53.0 | 0.019 | 0.405 | 7.6 | n/a |
| Mount Zirkel | Lake Elbert | 56.6 | 0.038 | 0.472 | 5.5 | n/a |
| Mount Zirkel | Seven Lakes (LG East) | 36.2 | 0.028 | 0.388 | 7.8 | n/a |
| Mount Zirkel | Summit Lake | 48.0 | 0.041 | 0.466 | 7.7 | n/a |
| Raggeds | Deep Creek Lake | 20.6 | 0.014 | 0.336 | n/a | 4.2 |
| Weminuche | Big Eldorado Lake | 19.6 | 0.007 | 0.246 | n/a | 2.4 |
| Weminuche | Four Mile Pothole | 123.4 | 0.011 | 0.471 | 3.5 | n/a |
| Weminuche | Lake Due South of Ute Lake | 13.2 | 0.008 | 0.277 | n/a | 2.8 |
| Weminuche | Little Eldorado | -3.3 | 0.007 | 0.246 | n/a | 2.4 |
| Weminuche | Little Granite Lake | 80.7 | 0.008 | 0.333 | 5.4 | n/a |
| Weminuche | Lower Sunlight Lake | 80.9 | 0.009 | 0.307 | 3.5 | n/a |
| Weminuche | Middle Ute Lake | 42.8 | 0.007 | 0.253 | 6.1 | n/a |
| Weminuche | Small Pond Above Trout Lake | 25.5 | 0.008 | 0.337 | 13.2 | n/a |
| Weminuche | Upper Grizzly Lake | 29.9 | 0.011 | 0.328 | 10.2 | n/a |
| Weminuche | Upper Sunlight Lake | 28.0 | 0.011 | 0.328 | 10.9 | n/a |
| Weminuche | West Snowdon Lake | 39.4 | 0.006 | 0.228 | 6.5 | n/a |
| Weminuche | White Dome Lake | 2.1 | 0.007 | 0.246 | n/a | 2.4 |
| West Elk | South Golden Lake | 111.4 | 0.008 | 0.285 | 2.8 | n/a |

to be above the applicable significance thresholds (less than a 10 percent change in ANC for lakes with ANC values greater than 25 µeq/l, and a 1.0 µeq/l change in ANC for lakes with background ANC values equal to or less than 25 µeq/l); at Ned Wilson and Upper Ned Wilson Lakes and Lower Packtrail Pothole in the Flat Tops Wilderness Area; at Deep Creek Lake in the Raggeds Wilderness Area; and at Big and Little Eldorado lakes, the Lake Due South of Ute Lake, the Small Pond Above Trout Lake, and Upper Grizzly, Upper Sunlight, and White Dome lakes in the Weminuche Wilderness Area. The greatest percent change for lakes with ANC values greater than 25 µeq/l is 14.4 percent at Lower Packtrail Pothole. The greatest ANC change for lakes with background ANC values equal to or less than 25 µeq/l is 4.3 µeq/l at Upper Ned Wilson Lake.

***Amended Proposed Action Air Quality Impacts Analysis***

Alternative D changes to the Bull Mountain Compressor Station engine size, type, and number are the same as those described under Alternative B; therefore, the resulting effects are the same as those described above under Alternative B.

### 4.2.2 Noise

***Methods of Analysis***

Noise from the development and operation of gas wells and construction of associated infrastructure has the potential to impact sensitive land uses and users in the Unit. For this analysis, potential sensitive receptor locations within the Unit were identified, and the distances to potential well pads, compressor stations, pipelines, electrical lines, and access roads were assessed. The nature and types of noise sources associated with construction and operation and approximate noise levels by distance were then described. Actual noise levels at sensitive receptor locations would depend upon the exact locations of wells and related infrastructure, the amount of development activity occurring, and the local topography and would be assessed in tiered analysis as described in **Section 1.6.1**, Requirements for Future NEPA Analysis. This analysis assumes that measures for noise abatement would be applied to meet DOI and USDA Gold Book guidelines (DOI and USDA 2007) and COGCC and CDPHE maximum permissible noise levels described in **Section 3.2.2**, Noise, and in **Appendix C,** Conditions of Approval, Requirement 28.

***Nature and Type of Effects***

Sources of noise include construction activities (earth-moving equipment for road, well pad, compressor station, electrical line, and pipeline construction); vehicle traffic; well drilling, completion, and production; and compressor station operations. Noise levels that typically result from these activities are described under Effects Common to All Alternatives, below.

Noise resulting from each alternative has the potential to affect sensitive receptors in the project area, primarily residents, recreational users, and wildlife. Potential noise impacts on wildlife are addressed separately in **Section 4.2.7**, Fish and Wildlife. The magnitude of the effect would depend upon the distance between the receptor and the noise source, the duration and frequency of the noise, and the time at which the noise occurred (noise is viewed as more disruptive when it occurs at night). In addition, individuals react differently to changes in ambient noise levels and to various types of sound; therefore, the perceived level of impact may vary by receptor. Noise

levels that meet maximum permissible noise levels may still be perceived as a noise impact for some sensitive receptors.

***Effects Common to All Alternatives***

Noise under all alternatives would occur from construction activities and from operational activities. Construction would produce short-term, localized, and intermittent increases in ambient noise levels, while operations may produce long-term increases in ambient noise levels over the life of the project.

Construction-related Actions. Construction activities would include well pad development, access road improvement and development, pipeline and electrical line development, and compressor station development. These activities would require the use of earth-moving equipment (e.g., bulldozers, graders, and backhoes), heavy trucks (e.g., dump trucks and water trucks), generators, and air compressors at the construction site. In addition, heavy truck traffic and personal vehicle traffic would increase along area roadways to bring personnel and supplies to the staging and construction site locations. Noise from these activities would be short term and intermittent. For access roads, electrical lines, and pipelines, the construction equipment would not remain in one location for a long period of time given the linear nature of this type of development. Construction of these features would occur during working hours and would not affect nighttime ambient noise levels. In general, well pads would each take 1 to 3 weeks to construct, and access roads would be constructed at a rate of 600 to 800 yards per day.

Well drilling and completion would also be a short-term source of noise but would occur 24 hours per day, 7 days per week for an average of 60 days per natural gas well and 60 to 120 days per water disposal well. Drilling would take an average of 60 days for coal bed methane wells and 85 days for shale and sandstone. Completions would take an additional 8 to 10 days for all types of wells. The primary noise sources associated with drilling include large diesel engines that power the rotary rig and pumps and the large diesel-driven air compressors. In addition, heavy truck traffic and personal vehicle traffic would increase along area roadways to bring personnel and supplies to the well site.

Operation-Related Actions. The primary sources of noise during operation include natural gas well pumps at each well, natural gas-fired internal combustion engines to power the compressors at each compressor station, and intermittent traffic related to operations and maintenance. In addition, periodic workovers would be needed to correct problems with producing wells, and road maintenance would occur to replace surface materials and apply dust abatement.

Noise from oil and gas development has been studied at federal, state, and local levels. Within Colorado, the COGCC conducted surveys of noise generated by various types of equipment used for drilling and production of natural gas (COGCC 2006), while La Plata County published a county impact report that included noise analysis from oil and gas operations (La Plata County 2002). **Table 4-26**, Average Noise Levels Produced during Construction and Operations, shows noise levels contained within those reports. The noise level reported was extrapolated to other distances; noise levels generally decrease by 6 dBA with a doubling of distance.

**Table 4-26**
**Average Noise Levels Produced during Construction and Operations**

| Activity | Duration of Noise | Noise Level at 50 Feet (dBA) | Noise Level at 500 Feet (dBA) | Noise Level at 1,000 Feet (dBA) | Noise Level at 2,500 Feet (dBA) |
|---|---|---|---|---|---|
| Well Pad, Access Road, Pipeline Construction Equipment[1] | Short-term, daytime | 86 | 66 | 60 | 52 |
| Well Drilling[1] | Short-term, 24 hours/day | 86 | 66 | 60 | 52 |
| Three-Axle On-Road Vehicle, 35 mph[1] | Short-term, daytime | 88 | 68 | 62 | 54 |
| Two-Axle On-Road Vehicle, 35 mph[1] | Short-term, daytime | 72 | 52 | 46 | 28 |
| Well Pump Units (Natural Gas) [1] | Long-term, 24 hours/day | 67 | 47 | 41 | 33 |
| Compressor Station (muffled and shielded) [1] | Long-term, 24 hours/day | 60 | 48 | 42 | 26 |

Source: [1]La Plata County 2002, [2]COGCC 2006

Actual noise levels at a given location depend upon the topography of the area, atmospheric conditions (e.g., temperature, wind speed and direction, and humidity), vegetative conditions (which can absorb sound), and the presence of structures between a noise source and a noise receptor.

### *Alternative A*

Alternative A would include new developments on private lands and private minerals. Activities on these lands would be subject to COGCC and CDPHE maximum permissible noise levels described in **Section 3.2.2**, Noise.

Construction-Related Impacts. Construction related to well pad, road, and pipeline construction would have short-term, localized, and intermittent noise impacts as facilities are constructed. These actions would not occur during nighttime hours. Well drilling would have localized impacts within the vicinity of the well drilling activities that would last approximately 60 days per well. These activities would occur 24 hours per day and would thus have greater impacts, especially during nighttime hours, if drilling occurred in the vicinity of sensitive receptors such as residences. Construction-related traffic would produce intermittent noise impacts during the construction period, with greater impacts occurring on more heavily used routes such as State Route 133.

Under Alternative A, no proposed well pad analysis areas or new pipelines would be within 1,000 feet of existing residences except for the well pad that would be located within T11S R90W Section 13 (see **Figure 2-1**, Alternative A), as measured from the edge of the well pad analysis area (actual well pad and well placement likely would be greater than 1,000 feet from residences within this area). Well pad construction and drilling are estimated to be within the maximum permissible noise levels allowed under COGCC and CDPHE rules for gas facility installation based on average noise levels presented in **Table 4-26**. Under COGCC rules, well pad development, pipeline development, well drilling, workover, and completion are subject to the noise standards for light industrial or industrial land uses. For construction-related actions,

the standards are 70 dBA (light industrial) or 80 dbA (industrial) from 7 a.m. to 7 p.m. and 65 dbA or 70 dBA from 7 p.m. to 7 a.m.. At 1,000 feet, the construction activities are within these levels for all phases of construction. Activities may exceed this level for short periods of time if blasting or flaring is required, as allowed for by COGCC rules.

Under Alternative A, there are residences along roads that require upgrade for use and roads that do not require upgrade but that would be utilized over the 3-year construction period for construction-related traffic. These residences would experience intermittent and short-term noise level increases from road improvement as well as noise level increases from construction-related traffic. Construction traffic is not subject to COGCC maximum permissible noise levels, and noise levels at sensitive receptor locations would depend upon setback of the residence from the road as well as volume, speed, and type of traffic. Construction traffic would generally not occur during nighttime hours and would not affect the nighttime ambient noise levels.

Construction would have the potential to affect recreational users of the areas. Because noise related to construction could affect game movements within the Unit, hunters would be particularly impacted.

Operation-Related Noise Impacts. The primary operation-related noise sources would be natural gas-fired production well pumps and the compressor station. As described above, there are generally no well pad analysis areas within 1,000 feet of residences. Well pump operations are projected to be 41 dBA at 1,000 feet, which is below the COGCC standards of 55 dBA from 7 a.m. to 7 p.m. and 50 dBA from 7 p.m. to 7 a.m. for residential/agricultural/rural uses. Well pads containing multiple wells may result in higher cumulative noise levels than those described for discrete wells but would be subject to the same maximum permissible noise levels.

Under Alternative A, the nearest residence is approximately 3,000 feet east of the proposed compressor station site. While the projected noise level would be below 26 dBA at locations farther than 2,500 feet based on **Table 4-26**, compressor stations also have the potential to produce low frequency sounds (measured as dBC) that are less likely to attenuate with distance or at downwind locations. COGCC rules address low frequency noise by requiring noise readings at the request of a landowner and mitigation for noise levels over 65 dBC within 25 feet of a residence or occupied structure (COGCC Rule 802d).

Siting to avoid impacts, requiring mufflers, and other sound reducing-measures would be determined during permitting and subsequent environmental review to ensure that construction and operational activities comply with COGCC maximum permissible noise levels.

***Alternative B***

Construction-Related Impacts. Construction related to well pad, road, and pipeline construction would have short-term, localized, and intermittent noise impacts as facilities are constructed. These actions would not occur during nighttime hours. Well drilling would have localized impacts within the vicinity of the well drilling activities that would last approximately 60 days per well. These activities would occur 24 hours per day and would thus have greater impacts, especially during nighttime hours, if drilling occurred in the vicinity of sensitive receptors such as residences. Construction-related traffic would produce intermittent noise impacts during the

Case No. 1:20-cv-02484-MSK Document 90-2 filed 05/06/21 USDC Colorado pg 46 of 576

construction period, with greater impacts occurring on more heavily used routes. Construction would occur over 6 years, resulting in a longer duration of elevated construction noise levels when compared with Alternative A.

Under Alternative B, one proposed well pad analysis area would be within 1,000 feet of an existing residence (T11S R90W Section 36) and many would be more than 1 mile from existing residences, with the exceptions of 1 house within T11S R90W Section 11, 1 house within T11S R89W Section 29, a cluster of 3 houses within T11S R90W Section 27, a cluster of 6 houses within T12S R89W Sections 4 and 9, and a single house within Section 9 (see **Figure 2-2**, Alternative B), as measured from the edge of the well pad analysis area. Actual well pad and well placement could be greater than 1,000 feet from residences within these areas. In addition, the same residences within T12S R89W Sections 4 and 9, as well as residences within T11S R89W Section 31, could be within 1,000 feet of proposed pipeline construction. Residences within T12S R89W Sections 4 and 9 could also be within 1,000 feet of a new proposed access road or road upgrades.

If the BLM were to apply mitigation measure #28, operators would be required to comply with CDPHE and COGCC regulations related to noise control. However, this would not further reduce noise impacts because compliance with CDPHE and COGCC regulations is mandatory. Well pad construction, pipeline and access road construction, and well drilling are estimated to be within the maximum permissible noise levels allowed under COGCC and CDPHE rules for gas facility installation. Activities may exceed this level for short periods of time if blasting or flaring is required, as allowed for by COGCC rules.

Under Alternative B, there are residences along roads that require upgrade for use throughout the Unit, as well as roads that do not require upgrade but that would be utilized over the 6-year construction period for construction-related traffic. These residences would experience intermittent and short-term noise level increases from road improvement as well as noise level increases from construction-related traffic. Noise levels at sensitive receptor locations would depend upon setback of the residence from the road as well as volume, speed, and type of traffic. Construction traffic would generally not occur during nighttime hours and would not affect the nighttime ambient noise levels.

Construction would have the potential to affect recreational users of the areas. Because noise related to construction could affect game movements within the Unit, hunters would be particularly impacted.

There are two residences within one-half mile of the APD 12-89-7-1 well site; the nearer of the two is approximately 1,700 feet from the well site. A third residence is slightly more than one-half mile away. The maximum average sound level at the nearest residence during construction and operation would be approximately 57 dBA. This would be from three-axle vehicles traveling to and from the well site and would be a short-term daytime impact. Average noise levels from well drilling would be approximately 55 dBA; this impact would occur over the short term but for 24-hours a day. Regulatory limits for noise generated by natural gas facilities are 55 dBA from 7 a.m. to 7 p.m. and 50 dBA from 7 p.m. to 7 a.m. (see **Section 3.2.2**, Noise). To meet these regulatory requirements and to comply with mitigation measure #28 in **Appendix C**, noise

dampening measures would likely be needed.[6] If the BLM were to apply mitigation measure #28 in **Appendix C**, then impacts would be less than significant.

Operation-Related Noise Impacts. The primary operation-related noise sources would be natural gas-fired production well pumps, the three new screw compressor stations, and the one new multi-engine compressor station. Well pump operations are projected to be 41 dBA at 1,000 feet, which is below the COGCC standards. Well pads containing multiple wells would result in higher noise levels than those described for discrete wells depending upon the location and number of wells.

Under Alternative B, the nearest residences are approximately 3,000 feet east of the 2 proposed compressor stations in T11S R90W Section 24 and northeast of the proposed compressor station in T11S R90W Section 10, while the nearest residents are approximately 1 mile away from the proposed compressor station in T12S R90W Section 1. While the projected noise level would be below 26 dBA at locations farther than 2,500 feet based on **Table 4-26**, compressor stations have the potential to produce low frequency sounds (measured as dBC) that are less likely to attenuate with distance or at downwind locations. COGCC rules address low frequency noise by requiring noise readings at the request of a landowner and mitigation for noise levels over 65 dBC within 25 feet of a residence or occupied structure (COGCC Rule 802d).

Operation impacts related to APD 12-89-7-1 are the same as those described for construction, above (**Appendix O**).

***Alternative C***

Alternative C has additional facility location constraints designed to move development closer to existing roads and pipelines and away from sensitive erosive soils. This has modified the number and placement of potential well pads, roads, and pipelines. While Alternative C would have fewer well pads, the same number of wells would be concentrated in fewer areas, resulting in the potential for increased localized noise impacts during construction and operation.

Construction-Related Impacts. Construction-related noise impacts associated with well pad, road, and pipeline construction would have short-term, localized, and intermittent noise impacts as facilities are constructed. These actions would not occur during nighttime hours. Well drilling would have localized impacts within the vicinity of the well drilling activities that would last approximately 60 days per well. These activities would occur 24 hours per day and would thus have greater impacts, especially during nighttime hours, if drilling occurred in the vicinity of sensitive receptors such as residences. Construction-related traffic would produce intermittent noise impacts during the construction period, with greater impacts occurring on more heavily used routes. Construction would occur over 6 years, resulting in a longer duration of elevated construction noise levels when compared with Alternative A.

---

[6] Actual noise levels at a given location depend upon the topography of the area, atmospheric conditions, vegetative conditions, and the presence of structures between a noise source and a noise receptor.

Like Alternative B, no proposed well pad analysis areas would be within 1,000 feet of existing residences and many would be more than 1 mile from existing residences, with the exceptions of one residence within T11S R90W Section 11, a cluster of 6 residences within T12S R89W Sections 4 and 9, and a single residence within Section 9 (see **Figure 2-3**, Alternative C), as measured from the edge of the well pad analysis area. Actual well pad and well placement could be greater than 1,000 feet from residences within these areas. In addition, the same residences within T12S R89W Sections 4 and 9, as well as 1 residence within T11S R89W Section 31, could be within 1,000 feet of proposed pipeline construction. Residences within T12S R89W Sections 4 and 9 could also be within 1,000 feet of a new proposed access road or road upgrades.

As shown in **Appendix C**, a required design feature mandates compliance with CDPHE and COGCC regulations related to noise control. Impacts would be the same as those described under Alternative B. Well pad construction, pipeline and access road construction, and well drilling are estimated to be within the maximum permissible noise levels allowed under COGCC rules for gas facility installation. Activities may exceed this level for short periods of time if blasting or flaring is required, as allowed for by COGCC rules.

Under Alternative C, there are residences along roads that require upgrade for use throughout the Unit, as well as roads that do not require upgrade but that would be utilized over the 6-year construction period for construction-related traffic. These residences would experience intermittent and short-term noise level increases from road improvement as well as noise level increases from construction-related traffic. Noise levels at sensitive receptor locations would depend upon setback of the residence from the road as well as volume, speed, and type of traffic. Construction traffic would generally not occur during nighttime hours and would not affect the nighttime ambient noise levels.

Construction would have the potential to affect recreational users of the areas, primarily hunters, because noise related to construction could affect game movements within the Unit.

Impacts from APD 12-89-7-1 would be the same as those described under Alternative B.

Operation-Related Noise Impacts. The primary operation-related noise sources would be natural gas-fired production well pumps and the four compressor stations. Well pump operations are projected to be 41 dBA at 1,000 feet, which is below the COGCC standards. Well pads containing multiple wells would result in higher noise levels than those described for discrete wells depending upon the location and number of wells. Noise levels at well pads near residences likely would be higher under Alternative C compared with Alternative B if a greater number of wells were developed on these pads.

Compressor station-related noise impacts would be the same as described under Alternative B.

Specific best management practices would be determined during permitting and subsequent environmental review to ensure that construction and operational activities comply with CDPHE and COGCC maximum permissible noise levels and minimize potential noise impacts on sensitive receptors within the project area.

Impacts from APD 12-89-7-1 would be the same as those described under Alternative B.

***Alternative D, the Preferred Alternative***
The types of impacts under Alternative D would be similar to those described under Alternative B, except that there would be fewer sensitive receptors within one mile of the proposed well pad analysis areas.

Construction-Related Impacts
Construction related to well pad, road, and pipeline construction would have short-term, localized, and intermittent noise impacts similar to those described under Alternative B. As under Alternative B, there would be one proposed well pad analysis area within 1,000 feet of an existing residence (T11S R90W Section 36). Compared to Alternative B, there would be three fewer homes within one mile of a well pad analysis area. The following homes would be within one mile of a well pad analysis area: 1 house within T11S R90W Section 11, 1 house within T11S R89W Section 29, a cluster of 6 houses within T12S R89W Sections 4 and 9, and a single house within Section 9 (see **Figure 2-4**, Alternative D), as measured from the edge of the well pad analysis area. Actual well pad and well placement could be greater than 1,000 feet from residences within these areas.

As under other alternatives, noise impacts would be reduced because well pad, pipeline, and access road construction and well drilling would be required to be within the maximum permissible noise levels allowed under COGCC and CDPHE rules for gas facility installation. Activities may exceed this level for short periods if blasting or flaring is required, as allowed for by COGCC rules.

Impacts from road upgrades and construction traffic on residences would be similar to, but slightly less than, those under Alternative B. This is because there would be fewer miles of upgraded roads and similar numbers and types of vehicles.

Impacts on recreation, including hunting, would be similar to those described under Alternative B. This is because the overall level of development and associated disturbance on recreation is similar.

Impacts from APD 12-89-7-1 would be the same as those described under Alternative B.

Operation-Related Noise Impacts
Impacts would be similar to those under Alternative B because similar types and numbers of equipment would be used.

Impacts from APD 12-89-7-1 would be the same as those described under Alternative B.

***Cumulative***
The cumulative impacts assessment area for noise is the Unit boundary. Development of combined natural gas production facilities from Alternative A and any of the action alternatives (see **Table 4-1** and **Table 4-2**) would result in the addition of noise sources to those that already exist within the Unit. Existing noise sources include existing traffic and equipment noise from natural gas development and well maintenance, agricultural activities, and recreational and tourist traffic on State Highway 133 and County Route 265.

Natural gas development actions under all alternatives, in combination with the 18 existing wells and the 55 wells and 1 compressor station that would be developed under Alternative A, would contribute to increases in ambient noise levels in the short term during construction and over the long term as wells go into production and operate for the life of the field (estimated to be 40 years). The types of noise impacts from implementing Alternatives B, C, or D would be similar to those described under Effects Common to All Alternatives but would occur for a longer duration and over a wider area. Cumulative noise impacts would be similar across alternatives because there would be similar noise sources, types, and durations under each alternative. Cumulative projects under Alternative B would create new long-term sources of noise throughout the Unit, while cumulative projects under Alternative C would concentrate the same amount of development within fewer areas. Cumulative projects under Alternative D would be similar to those under Alternative B. However, there would be three fewer well pads within the Unit and therefore three fewer stationary sources of noise (and associated traffic to and from those three well pads).

In some areas, the density of development could be considered by some individuals to be noisy. The continuous noise from production wells and compressor stations may be disruptive or objectionable to some residents as well as recreationists, hunters, and livestock operators and may result in displacement of such activities. The combined effect would be greater than the sum of their parts.

Ambient noise levels at buildout would be expected to increase in some areas within the Unit as a result of implementing any of the alternatives in combination with past, present, and reasonably foreseeable future actions.

### 4.2.3   Soil Resources
This section discusses impacts on soil resources from proposed management actions under each alternative. Existing conditions concerning soil resources are described in **Section 3.2.3**, Soil Resources. Soils, especially in fragile soil areas, are susceptible to impacts from surface disturbance, which can lead to compaction, accelerated erosion, soil loss, and reduced productivity

#### *Methods of Analysis*
Each 5-acre well pad may be placed within a 40-acre area as identified in **Figures 2-1**, **2-2**, and **2-3**. Due to the uncertainty of final well pad placement, a total sediment production based on well pad placement is not available. Every soil type within the Unit (see **Table 3-14**) may be impacted by wellhead placement and other features of the proposed projects. Soils within the Unit have soil erosion hazard ratings from slight to very severe, an erosion potential of roads and trails ranging from slight to severe and slope classification ranging from gently sloping to very steep. Erosion hazard ratings for roads and trails are broken out into three categories. A rating of *slight* indicates that little or no erosion is likely; *moderate* indicates that some erosion is likely, that the roads or trails may require occasional maintenance, and that simple erosion-control measures are needed; and *severe* indicates that significant erosion is expected, that the roads or trails require frequent maintenance, and that costly erosion-control measures are needed. Slope classification has a scale connotation that refers to the ground surface configuration for scales

that exceed about 10 meters of range upward to the landscape as a whole, and includes gradient, complexity, length, and aspect (NRCS 1993).

Overall, soils with moderate erosion ratings and gently sloping slopes are less likely to produce sediment, whereas soils with severe or very severe erosion ratings and steep slopes are more likely to produce sediment. Soil erosion and slope steepness are correlated. That is, the steeper the slope that the soil is found on, the more erosion that is likely to happen. Due to the varying nature of slope, soil type, and soil erosion ratings, the absolute amount of erosion based on erosion ratings is not specified (NRCS 1993).

Impacts were determined by assessing number of acres planned for modification under each alternative. This assessment was completed for soils within the Unit and sensitive soils. For the purpose of this analysis, sensitive soils are defined as soils suitable for farmland as classified by the USDA under the Farmland Protection Act, soils on steep slopes, soils susceptible to natural erosion, and soils susceptible to erosion in reference to road and trail maintenance.

*Indicators*
Indicators of impacts on soil resources are based on proposed changes in the level of surface-disturbing activities from construction and development of roads, pipelines, well pads, and other facility placements. Management actions involving ground-disturbing activities, reduced vegetation cover, trampling, and vehicle and heavy machinery use contribute to soil impacts through compaction and increased erosion rates.

The following indicators were used to evaluate effects on soils resources from the Proposed Action:

- Acres proposed for disturbance

- Acres of farmlands and sensitive soils proposed for disturbance

- Acres proposed for long term and short term disturbance (as shown in **Table 2-2**)

*Assumptions*
The analysis of soil resources has the following assumptions:

- Soil resources would be managed to meet Standard 1 of the Colorado Standards for Public Land Health.

- Fragile soils would be managed to minimize erosion and maintain soil productivity.

- Applicable COAs and other mitigation measures as outlined under approved ROWs, APDs, and lease stipulations would apply under all alternatives.

***Nature and Type of Effects***
Direct effects are as follows:

- Compaction from overland travel and land grading, resulting in decreased vegetation cover and more exposure of the soil surface to erosion (Burton et al. 2008).

- Clearing areas for construction of well pads, roads, pipelines, and ancillary facilities leads to increased erosion, runoff and sedimentation, and fragmentation of soil features due to the loss of surface vegetation.
- Removing soil surface from facility sites and stockpiling it for later reclamation could result in soil horizon mixing and changes to initial soil properties of individual sites during reclamation.

Direct impacts on acres with farmland designation would be surface disturbance resulting in the long-term or short-term loss of farmland characteristics. If development were to convert important farmland to non-farm use, then a land evaluation and site assessment system form (Form AD-1006 or Form CPA-106) to establish a farmland conversion impact rating score on impacted lands would need to be submitted to the appropriate US Department of Agriculture's Natural Resources Conservation Service (NRCS) office. This score is used as an indicator to consider alternative sites if the potential adverse impacts on the farmland were to exceed the recommended allowable level.

Indirect effects of the actions on soil resources may include introducing invasive weeds to the project area through additional overland travel. This results in decreased soil stability and increased soil erosion. If chemical spills were to occur, remediation could require removing soil layers for proper disposal at appropriate designated facilities, resulting in a local permanent loss of soil horizons. Indirect effects on soils with farmland characteristics would be the same as those on other vegetation types, assuming crops are growing on the farmlands.

***Effects Common to All Alternatives***
Under all alternatives, interim reclamation of areas with the processes and seed mixtures described in **Section 2.2.3** would reduce the effects from extended exposure of bare ground. This is because these measures are expected to replace the vegetation and hold the soil in place. However, weed infestation of the reclaimed areas is still a possibility and would need to be addressed with monitoring or additional mitigation measures.

An integrated spill prevention, control and countermeasures plan and emergency response plan, required by both COGCC and BLM, outlines the actions and procedures needed to reduce the possibilities for spills and measures to control and respond to emergency spills. The measures provide effective, environmentally sound, and economically feasible means of managing spills. They would be applied on an as-needed, site-specific basis to avoid, minimize, reduce, and rectify impacts from spills. As such, a plan is anticipated to reduce the likelihood of hazardous material spills and subsequent permanent removal and disposal of soil.

***Alternative A***
**Table 2-10** provides acreage amounts for the direct short-term and long-term impacts on soil resources under Alternative A.

Case No. 1:20-cv-02484-MSK Document 90-2 filed 05/06/21 USDC Colorado pg 53 of 576

**Table 4-27**, **Table 4-28**, and **Table 4-29** provide the acreage amounts of disturbance on farmlands and sensitive soil resources. As noted above, when construction exposes bare ground, interim reclamation measures are applied to reduce wind and water erosion and the resultant loss of soils. Under Alternative A, the interim reclamation procedures agreed to via landowner agreements and the COGCC would help to reduce the possibility and severity of soil loss. Reclamation plans would be submitted for each new well. Reseeding and interim reclamation areas with approved seed mixes would reduce the likelihood for noxious weed invasion, erosion, and dust by restoring plant cover. Monitoring would help to ensure that revegetation is deemed successful.

**Table 4-27**
**Acres of Soils on Steep Slopes Potentially Impacted (Alternative A)**

| Slope Percent | Pipes: Collocated | Pipes: Cross-country | New Road Construction | Roads: Requires Substantial Upgrades for Use | Well Pads |
|---|---|---|---|---|---|
| Long Term | | | | | |
| 1-10 | 2 | 0 | 4 | 11 | 12 |
| 11-20 | 3 | 0 | 2 | 16 | 8 |
| 21-30 | 0 | 0 | 0 | 4 | 1 |
| 31-40 | 0 | 0 | 0 | 2 | 0 |
| 41+ | 2 | 0 | 3 | 18 | 1 |
| Total | 8 | 0 | 9 | 49 | 22 |
| Short Term | | | | | |
| 1-10 | 15 | 13 | 7 | 21 | 28 |
| 11-20 | 21 | 22 | 4 | 29 | 21 |
| 21-30 | 2 | 0 | 1 | 8 | 1 |
| 31-40 | 2 | 0 | 0 | 11 | 0 |
| 41+ | 14 | 11 | 5 | 33 | 5 |
| Total | 54 | 46 | 17 | 92 | 55 |

Source: SGI 2013, BLM GIS 2014, NRCS 2013

**Table 4-28**
**Acres of Soils with Erosion Hazard Ratings Potentially Impacted (Alternative A)**

| Erosion Hazard | Pipes: Collocated | Pipes: Cross-country | New Road Construction | Roads: Requires Substantial Upgrades for Use | Well Pads |
|---|---|---|---|---|---|
| Long Term | | | | | |
| Slight | 2 | 0 | 4 | 11 | 12 |
| Moderate | 4 | 0 | 2 | 21 | 9 |
| Severe | 2 | 0 | 1 | 10 | 0 |
| Very Severe | 0 | 0 | 1 | 7 | 1 |
| Total | 8 | 0 | 9 | 49 | 22 |
| Short term | | | | | |
| Slight | 15 | 13 | 7 | 21 | 28 |
| Moderate | 24 | 23 | 4 | 38 | 22 |
| Severe | 13 | 4 | 3 | 19 | 1 |
| Very Severe | 2 | 7 | 2 | 14 | 4 |
| Total | 54 | 46 | 17 | 92 | 55 |

Source: SGI 2013, BLM GIS 2014, NRCS 2013

Case No. 1:20-cv-02484-MSK Document 90-2 filed 05/06/21 USDC Colorado pg 54 of 576

**Table 4-29**
**Acres of Soils with Erosion Hazard Ratings for Roads (Alternative A)**

| Erosion Hazard | Pipes: Collocated | Pipes: Cross-country | New Road Construction | Roads: Requires Substantial Upgrades for Use | Well Pads |
|---|---|---|---|---|---|
| Long term | | | | | |
| Slight | 1 | 0 | 0 | 1 | 0 |
| Moderate | 0 | 0 | 2 | 2 | 3 |
| Severe | 7 | 0 | 7 | 47 | 18 |
| Total | 9 | 0 | 9 | 49 | 22 |
| Short term | | | | | |
| Slight | 5 | 2 | 0 | 1 | 0 |
| Moderate | 2 | 4 | 3 | 3 | 8 |
| Severe | 46 | 44 | 14 | 87 | 47 |
| Total | 54 | 46 | 17 | 92 | 55 |

Source: SGI 2013, BLM GIS 2014, NRCS 2013

### *Alternative B*

Impacts from the phases of development would be similar to those described under *Nature and Type of Effects*, *Effects Common to All Alternatives*, and Alternative A. BLM land health in developed areas would likely be reduced under this alternative.

The acreage of impacts would increase under Alternative B compared to Alternative A, as shown in **Table 2-10**, due to the additional facilities and areas considered under this alternative. **Table 4-30**, **Table 4-31**, **Table 4-32**, and **Table 4-33** provide acreage amounts that would be disturbed on farmlands and sensitive soil resources as a result of construction.

Under Alternative B, the BLM has the suite of conditions of approval actions that would be applied to approved APDs (**Appendix C**) and that would help mitigate impacts on sensitive soil resources. If the BLM were to apply mitigation measures in **Appendix C**, then the impacts on soil and sensitive soil resources would temporarily increase erosion rates and soil instability. Once mitigation measures were applied, soils would be restabilized. COA #7 (measure for stockpiling soils and addressing disturbed areas) and COA #10 (measure for recontouring and replacing vegetation materials) would reduce the level of soil loss from wind and water erosion. They also would reduce the risk of soil horizons mixing and soil property changes.

**Table 4-30**
**Acres of Soils on Steep Slopes Potentially Impacted (Alternative B)**

| Slope Percent | Pipes: Collocated | Pipes: Cross-country | New Road Construction | Roads: Requires Substantial Upgrades for Use | Well Pads |
|---|---|---|---|---|---|
| Long term | | | | | |
| 1-10 | 1 | 0 | 2 | 17 | 4 |
| 11-20 | 15 | 0 | 18 | 36 | 40 |
| 21-30 | 1 | 0 | 1 | 7 | 2 |
| 31-40 | 0 | 0 | 1 | 2 | 2 |
| 41+ | 8 | 0 | 11 | 35 | 22 |
| Total | 25 | 0 | 32 | 97 | 71 |

**Table 4-30**
**Acres of Soils on Steep Slopes Potentially Impacted (Alternative B)**

| Slope Percent | Pipes: Collocated | Pipes: Cross-country | New Road Construction | Roads: Requires Substantial Upgrades for Use | Well Pads |
|---|---|---|---|---|---|
| Short term | | | | | |
| 1-10 | 3 | 3 | 4 | 32 | 10 |
| 11-20 | 96 | 24 | 33 | 67 | 102 |
| 21-30 | 6 | 8 | 1 | 13 | 5 |
| 31-40 | 1 | 4 | 1 | 5 | 6 |
| 41+ | 54 | 7 | 21 | 66 | 60 |
| Total | 161 | 47 | 60 | 182 | 182 |

Source: SGI 2013, BLM GIS 2014, NRCS 2013

**Table 4-31**
**Acres of Farmlands Potentially Impacted (Alternative B)**

| Farmland Type | Pipes: Collocated | Pipes: Cross-country | Roads: New Road Construction | Roads: Requires Substantial Upgrades for Use | Well Pads |
|---|---|---|---|---|---|
| Long term disturbance | | | | | |
| Farmland of statewide importance | 0 | 0 | 1 | 11 | 2 |
| Prime farmland if irrigated | 0 | 0 | 0 | 2 | 0 |
| Short term disturbance | | | | | |
| Farmland of statewide importance | 2 | 2 | 2 | 21 | 5 |
| Prime farmland if irrigated | 0 | 0 | 1 | 3 | 0 |

Source: SGI 2013, BLM GIS 2014, NRCS 2013

**Table 4-32**
**Acres of Soils with Erosion Hazard Ratings Potentially Impacted (Alternative B)**

| Erosion Hazard | Pipes: Collocated | Pipes: Cross-country | New Road Construction | Roads: Requires Substantial Upgrades for Use | Well Pads |
|---|---|---|---|---|---|
| Long term | | | | | |
| Slight | 1 | 0 | 2 | 17 | 4 |
| Moderate | 16 | 0 | 19 | 46 | 45 |
| Severe | 8 | 0 | 9 | 26 | 21 |
| Very Severe | 0 | 0 | 2 | 9 | 1 |
| Total | 25 | 0 | 32 | 97 | 71 |
| Short term | | | | | |
| Slight | 3 | 3 | 4 | 32 | 10 |
| Moderate | 104 | 36 | 36 | 85 | 112 |
| Severe | 51 | 7 | 16 | 49 | 57 |
| Very Severe | 1 | 0 | 4 | 17 | 3 |
| Total | 161 | 47 | 60 | 182 | 182 |

Source: SGI 2013, BLM GIS 2014, NRCS 2013

**Table 4-33**
**Acres of Soils with Erosion Hazard Ratings for Roads (Alternative B)**

| Erosion Hazard | Pipes: Collocated | Pipes: Cross-country | New Road Construction | Roads: Requires Substantial Upgrades for Use | Well Pads |
|---|---|---|---|---|---|
| Long term | | | | | |
| Slight | 0 | 0 | 0 | 2 | 0 |
| Moderate | 1 | 0 | 1 | 9 | 5 |
| Severe | 23 | 0 | 30 | 87 | 66 |
| Total | 25 | 0 | 31 | 97 | 71 |
| Short term | | | | | |
| Slight | 0 | 0 | 1 | 3 | 0 |
| Moderate | 10 | 6 | 2 | 17 | 12 |
| Severe | 151 | 41 | 57 | 162 | 169 |
| Total | 161 | 47 | 60 | 182 | 182 |

Source: SGI 2013, BLM GIS 2014, NRCS 2013

Other measures are COA #5 (maximizing interim reclamation), COA #6 (stockpiling top soil), and COAs #50 through #52 (reclamation). These would all provide guidelines for vegetation reestablishment, in addition to the measures noted above; COA #8 (weed-free seed mixes) and COAs #45 through #48 would help limit the spread of weeds; COA #12 (dust abatement), and COA #17 (avoiding steep slopes) would limit water and wind erosion and would help reduce erosion from wind.

Under Alternative B, the 12-89-7-1 APD would be approved. The APD would include the authorization to disturb 3 acres for the construction of the well pad, an additional 25.3 acres for associated pipeline construction, and 7.5 acres to upgrade the access road to the well pad site. This disturbance would occur on soils identified as Bulkley clay loam with 12 to 25 percent slopes. Slopes between 11 and 25 percent are considered strongly sloping and may be more susceptible to erosion when disturbed. After construction, interim reclamation would reduce the disturbance associated with the authorization of the APD by about 3 acres. These acres would be reseeded with approved weed-free mix, which would further reduce the long-term potential for erosion.

***Alternative C***

**Table 2-10** shows the direct and short-term and long-term impacts on soil resources under all alternatives. **Table 4-34**, **Table 4-35**, **Table 4-36**, and **Table 4-37** show the direct short-term and long-term impacts on farmlands and sensitive soil resources. Application of the COAs provided in Alternative C would help mitigate impacts in the same manner as described in Alternative B. The 12-89-7-1 APD would be approved and would result in the same level of disturbance as discussed under Alternative B.

Under Alternative C additional measures would provide a monitoring protocol to ensure that reclamation is meeting requirements and standards. These additional measures require an annual reclamation monitoring status report to help identify areas for improvement and identify appropriate native seed mixes and their proper application. Interim reclamation would ultimately increase soil health and stability through replanting an appropriate composition of grasses, forbs, and shrubs for the ecological site. This would reduce the overall potential for soil loss through erosion.

**Table 4-34**
**Acres of Farmlands Potentially Impacted (Alternative C)**

| Farmland Type | Pipes: Collocated | Pipes: Cross-country | Roads: New Construction | Roads: Requires Substantial Upgrades for Use | Potential Yard Storage | Proposed Screw Compressor | Well Pads |
|---|---|---|---|---|---|---|---|
| Long term disturbance | | | | | | | |
| Farmland of statewide importance | 1 | 0 | 1 | 0 | 0 | 0 | 3 |
| Prime farmland if irrigated | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Short term disturbance | | | | | | | |
| Farmland of statewide importance | 8 | 0 | 2 | 0 | 0 | 0 | 8 |
| Prime farmland if irrigated | 0 | 0 | 1 | 0 | 0 | 0 | 0 |

Source: SGI 2013, BLM GIS 2014, NRCS 2013

**Table 4-35**
**Acres of Soils on Steep Slopes Potentially Impacted (Alternative C)**

| Slope Percent | Pipes: Collocated | Pipes: Cross-country | New Road Construction | Roads: Requires Substantial Upgrades for Use | Potential Yard Storage | Proposed Screw Compressor | Well Pads |
|---|---|---|---|---|---|---|---|
| Long term | | | | | | | |
| 1-10 | 3 | 0 | 3 | 1 | 1 | 0 | 4 |
| 11-20 | 18 | 0 | 12 | 12 | 1 | 6 | 35 |
| 21-30 | 4 | 0 | 2 | 4 | 0 | 0 | 5 |
| 31-40 | 0 | 0 | 0 | 1 | 0 | 0 | 2 |
| 41+ | 12 | 0 | 0 | 7 | 0 | 0 | 23 |
| Total | 37 | 0 | 23 | 25 | 2 | 6 | 69 |
| Short term | | | | | | | |
| 1-10 | 21 | 0 | 6 | 15 | 3 | 0 | 10 |
| 11-20 | 110 | 0 | 23 | 30 | 2 | 13 | 89 |
| 21-30 | 25 | 0 | 4 | 5 | 0 | 0 | 15 |
| 31-40 | 0 | 0 | 0 | 2 | 0 | 0 | 3 |
| 41+ | 74 | 0 | 11 | 27 | 0 | 2 | 61 |
| Total | 230 | 0 | 44 | 78 | 5 | 15 | 177 |

Source: SGI 2013, BLM GIS 2014, NRCS 2013

**Table 4-36**
**Acres of Soils with Erosion Hazard Ratings Potentially Impacted (Alternative C)**

| Erosion Hazard | Pipes: Collocated | Pipes: Cross-country | New Road Construction | Roads: Requires Substantial Upgrades for Use | Potential Yard Storage | Proposed Screw Compressor | Well Pads |
|---|---|---|---|---|---|---|---|
| Long term | | | | | | | |
| Slight | 3 | 0 | 3 | 1 | 1 | 0 | 4 |
| Moderate | 22 | 0 | 14 | 17 | 1 | 6 | 42 |
| Severe | 9 | 0 | 4 | 6 | 0 | 0 | 22 |
| Very Severe | 3 | 0 | 2 | 1 | 0 | 0 | 0 |
| Total | 37 | 0 | 23 | 25 | 2 | 6 | 69 |

**Table 4-36**
**Acres of Soils with Erosion Hazard Ratings Potentially Impacted (Alternative C)**

| Erosion Hazard | Pipes: Collocated | Pipes: Cross-country | New Road Construction | Roads: Requires Substantial Upgrades for Use | Potential Yard Storage | Proposed Screw Compressor | Well Pads |
|---|---|---|---|---|---|---|---|
| Short term | | | | | | | |
| Slight | 21 | 0 | 6 | 2 | 3 | 0 | 10 |
| Moderate | 135 | 0 | 27 | 32 | 2 | 13 | 106 |
| Severe | 57 | 0 | 7 | 11 | 0 | 2 | 59 |
| Very Severe | 18 | 0 | 4 | 2 | 0 | 0 | 2 |
| Total | 231 | 0 | 44 | 47 | 5 | 15 | 177 |

Source: SGI 2013, BLM GIS 2014, NRCS 2013

**Table 4-37**
**Acres of Soils with Erosion Hazard Ratings for Roads Potentially Impacted (Alternative C)**

| Erosion Hazard | Pipes: Collocated | Pipes: Cross-country | New Road Construction | Roads: Requires Substantial Upgrades for Use | Well Pads |
|---|---|---|---|---|---|
| Long term | | | | | |
| Slight | 0 | 0 | 0 | 0 | 0 |
| Moderate | 6 | 0 | 5 | 2 | 8 |
| Severe | 31 | 0 | 18 | 23 | 61 |
| Total | 37 | 0 | 23 | 25 | 69 |
| Short term | | | | | |
| Slight | 0 | 0 | 1 | 0 | 0 |
| Moderate | 36 | 0 | 9 | 3 | 20 |
| Severe | 194 | 0 | 34 | 44 | 157 |
| Very Severe | 0 | 0 | 0 | | |
| Total | 231 | 0 | 44 | 47 | 177 |

Source: SGI 2013, BLM GIS 2014, NRCS 2013

### *Alternative D, the Preferred Alternative*

**Table 2-10** shows the direct short-term and long-term impacts on soil resources under all alternatives. **Table 4-38**, **Table 4-39**, **Table 4-40**, and **Table 4-41** show the direct short-term and long-term impacts on farmlands and sensitive soil resources. The 12-89-7-1 APD would be approved and would result in the same level of disturbance as discussed under Alternative B.

**Table 4-38**
**Acres of Farmlands Potentially Impacted (Alternative D)**

| Farmland Type | Pipes: Collocated | Pipes: Cross-Country | Roads: New Construction | Roads: Requires Substantial Upgrades for Use | Proposed Screw Compressor | Well Pads |
|---|---|---|---|---|---|---|
| Long-term disturbance | | | | | | |
| Farmland of statewide importance | 0 | 0 | 1 | 0 | 0 | 2 |
| Prime farmland if irrigated | 0 | 0 | 0 | 0 | 0 | 0 |

Case No. 1:20-cv-02484-MSK Document 90-2 filed 05/06/21 USDC Colorado pg 59 of 576

**Table 4-38**
**Acres of Farmlands Potentially Impacted (Alternative D)**

| Farmland Type | Pipes: Collocated | Pipes: Cross-Country | Roads: New Construction | Roads: Requires Substantial Upgrades for Use | Proposed Screw Compressor | Well Pads |
|---|---|---|---|---|---|---|
| Short-term disturbance | | | | | | |
| Farmland of statewide importance | 2 | 3 | 2 | 0 | 0 | 5 |
| Prime farmland if irrigated | 0 | 0 | 1 | 0 | 0 | 0 |

Sources: SGI 2013; BLM GIS 2014; NRCS 2013

**Table 4-39**
**Acres of Soils on Steep Slopes Potentially Impacted (Alternative D)**

| Slope Percent | Pipes: Collocated | Pipes: Cross-Country | New Road Construction | Roads: Requires Substantial Upgrades for Use | Proposed Screw Compressor | Well Pads |
|---|---|---|---|---|---|---|
| Long-term | | | | | | |
| 1-10 | 0 | 0 | 2 | 1 | 0 | 4 |
| 11-20 | 15 | 0 | 17 | 15 | 6 | 39 |
| 21-30 | 1 | 0 | 1 | 2 | 0 | 2 |
| 31-40 | 0 | 0 | 0 | 0 | 0 | 1 |
| 41+ | 10 | 0 | 9 | 9 | 0 | 18 |
| Total | 27 | 0 | 30 | 27 | 6 | 65 |
| Short-term | | | | | | |
| 1-10 | 3 | 7 | 4 | 1 | 0 | 10 |
| 11-20 | 96 | 35 | 31 | 27 | 13 | 99 |
| 21-30 | 9 | 5 | 2 | 4 | 0 | 5 |
| 31-40 | 1 | 0 | 11 | 1 | 0 | 3 |
| 41+ | 62 | 13 | 18 | 18 | 2 | 50 |
| Total | 171 | 60 | 56 | 51 | 15 | 166 |

Sources: SGI 2013; BLM GIS 2014; NRCS 2013

**Table 4-40**
**Acres of Soils with Erosion Hazard Ratings Potentially Impacted (Alternative D)**

| Erosion Hazard | Pipes: Collocated | Pipes: Cross-Country | New Road Construction | Roads: Requires Substantial Upgrades for Use | Proposed Screw Compressor | Well Pads |
|---|---|---|---|---|---|---|
| Long-term | | | | | | |
| Slight | 0 | 0 | 2 | 1 | 0 | 4 |
| Moderate | 17 | 0 | 18 | 17 | 6 | 43 |
| Severe | 9 | 0 | 7 | 9 | 0 | 17 |
| Very Severe | 0 | 0 | 2 | 0 | 0 | 1 |
| Total | 27 | 0 | 30 | 27 | 6 | 65 |
| Short-term | | | | | | |
| Slight | 3 | 7 | 4 | 1 | 0 | 10 |
| Moderate | 106 | 40 | 34 | 32 | 13 | 107 |
| Severe | 60 | 8 | 14 | 17 | 2 | 47 |
| Very Severe | 2 | 5 | 4 | 0 | 0 | 3 |
| Total | 171 | 60 | 56 | 51 | 15 | 166 |

Sources: SGI 2013; BLM GIS 2014; NRCS 2013

**Table 4-41**
**Acres of Soils with Erosion Hazard Ratings for Roads Potentially Impacted (Alternative D)**

| Erosion Hazard | Pipes: Collocated | Pipes: Cross-Country | New Road Construction | Roads: Requires Substantial Upgrades for Use | Well Pads |
|---|---|---|---|---|---|
| Long-term | | | | | |
| Slight | 0 | 0 | 0 | 0 | 0 |
| Moderate | 1 | 0 | 1 | 2 | 6 |
| Severe | 26 | 0 | 28 | 25 | 60 |
| Total | 27 | 0 | 30 | 27 | 65 |
| Short-term | | | | | |
| Slight | 0 | 0 | 1 | 0 | 0 |
| Moderate | 7 | 0 | 3 | 4 | 12 |
| Severe | 164 | 0 | 52 | 47 | 154 |
| Very Severe | 0 | 0 | 0 | | |
| Total | 171 | 60 | 56 | 51 | 166 |

Sources: SGI 2013; BLM GIS 2014; NRCS 2013

Alternative D has a suite of COAs from Appendix C that would be applied to approved APDs and would help mitigate impacts on sensitive soil resources. Application of COAs #7 (for stockpiling soils and addressing disturbed areas) and #10 (for recontouring and replacing vegetation materials) would reduce the level of soil loss from wind and water erosion. They also would reduce the risk of soil horizons mixing and soil property changes.

Other measures are COA #5 (maximizing interim reclamation), COA #6 (stockpiling top soil), and COAs #50 through #52 (reclamation), which would provide guidelines for vegetation reestablishment. COA #8 (weed-free seed mixes) and COAs #45 through #48 would help limit the spread of weeds. COA #12 (dust abatement) and COA #17 (avoiding steep slopes) would limit water and wind erosion and would help reduce erosion from wind.

As noted in the Preferred Alternative, SGI would monitor interim and final reclamation progress at one-, three-, and five-year intervals. The company would reseed if satisfactory interim reclamation progress is not being made at year two or year three monitoring intervals, or if final reclamation is not achieved by year five. These measures would help ensure that reclamation is successful and would prevent the continuation of the impacts noted above.

### *Cumulative*

The cumulative analysis takes into account the combined effects of the No Action Alternative and any one of the action alternatives with other past, present, and reasonably foreseeable future actions. Of the actions noted in **Table 4-3**, grazing, mining, oil and gas, travel management, forestry and vegetation management, when combined with the actions from Alternative A and any of the action alternatives, would disturb soils in the region due to trampling, construction of project facilities, transmission lines, access roads, and overland travel. Currently there are 620 acres of livestock grazing, 23 acres of mineral materials, and 23 miles of existing access roads suitable for use, and there are 20.5 miles of pipeline. Depending on the alternative chosen, an additional 260 to 600 acres of temporary disturbance and 88 to 260 acres of soils would be permanently disturbed due to oil and gas development.

If Alternatives B through D were constructed simultaneously with other projects, cumulative construction and operation impacts on soil resources would increase. Actions taken under a Bull Mountain Unit MDP on federal mineral estate would be subject to the lease stipulations, project design features and COAs (see **Appendix C**) which would help ensure that soil resources were not unnecessarily degraded during activities, and require reclamation procedures. Application of these measures would reduce the additive effects of Alternatives B through D on the overall level of disturbance within the 10-mile radius of the analysis area.

### 4.2.4 Water Resources

***Methods of Analysis***

Existing surface and groundwater quality data, including results of baseline sampling, were compiled and evaluated to identify existing and baseline conditions. The water rights database maintained by the Colorado Division of Water Resources (CDWR) was queried to identify existing water rights holders within the Unit, and to evaluate the distribution and general magnitude of existing allocations, and the sources of water within the Unit. The Colorado Oil and Gas Information System (COGIS) was searched for records of oil and gas wells located in the Unit and surrounding area.

Sources of, and mechanisms for, potential impacts of proposed activities on water resources were gleaned from scientific literature, environmental documentation of similar projects, scoping comments, experience from other gas and oil development sites, and from a range of sources, including regulatory agency, industry, research, and advocacy group sources. For example, much public controversy surrounds the use of hydraulic fracturing as a means of extracting oil and gas from tight formations that would not have been considered economically recoverable a few years ago. Although the technique is not new, the amount of data available about applications of the technology in a wide range of environments has grown rapidly in recent years along with the number of oil and gas wells where it has been used. Success in reducing the cost of extraction and expansion of the use of hydraulic fracturing has resulted in many innovations in the technology, and greater regulatory involvement, and it is likely that these changes would continue in coming years.

Estimates of the level of significance of program-specific and location-specific effects in this impact analysis have been made based on evaluation of the hydrologic and geologic context of the project, relying on documented descriptions of effects in similar environments, opinions of experts consulted during preparation, and on engineering judgment of the analyst.

Some potential impacts are expected to be reduced as a result of compliance with existing regulatory requirements and agency policies, COAs and design features (see **Appendix C**). In general, compliance with regulatory requirements is assumed as an inherent component of the project, and theoretical impacts would be avoided by this compliance. Specific siting details, and specific project details, such as the particular well drilling methods, waste containment or disposal methods, well completion methods, and number of wells, would be evaluated in project-specific plans, and specific mitigation measures that would be developed as part of the planning process for the specific project sites.

***Nature and Type of Effects***

Effects on water resources can be divided between water quantity effects and water quality effects. Water quantity effects relate to the quantity of water that would be required to accomplish the project objectives of drilling and maximizing the recovery of gas while minimizing the costs of production and the environmental effects associated with production.

Water quality effects include effects on both surface water and groundwater resources. Groundwater resources include both potable and non-potable resources. Most of the beneficial uses of water in the project area are derived from surface water resources. However, surface water and groundwater are connected, in that groundwater is recharged by surface water, and groundwater in turn discharges to streams and springs.

Effects can be either direct and indirect, or cumulative. Direct effects are those in which there is a direct cause and effect relationship between the project action and the effect. Indirect effects tend to be less obvious than direct effects and are less predictable, since they may be contingent on a sequence of triggering actions. Direct *water quantity* effects would include effects such as reduction in streamflow or decline in groundwater levels as a result of water withdrawals from streams or wells, respectively. Indirect *water quantity* effects might include effects such as a depletion of regional groundwater supplies as a result of consumptive use of surface water. Direct *water quality* effects include the effects that would result from a waste spill that discharged to a surface water body, or from migration of saline wastewater into a freshwater aquifer because of a failure of containment. Indirect *water quality* effects might include effects such as impairment of water quality in a freshwater aquifer because of a decline in water levels in the aquifer that induces lower quality water to flow into the aquifer.

Effects can also be divided among short-term and long-term effects. Short-term effects are mainly associated with construction. They tend to occur early in the project and typically have a short duration relative to long-term impacts. Construction activities of the project include earth moving activities such as pad construction and road and pipeline construction, and also well construction. Some of these activities, especially well construction, would be initiated at different individual sites within the project area over a relatively long period, though at any particular location they would be short in duration. Short-term effects could occur at many locations simultaneously with long-term effects. Long-term effects are usually associated with operation and maintenance activities. Not only are they more likely to occur over periods of years rather than months, but their timing is also generally less predictable.

The nature and magnitude of some types of potential effects would depend on options that have not yet been specified at the programmatic level of analysis. As discussed in Chapter 2, more specific and detailed analysis of effects would be evaluated in future project-specific plans required during permitting or to meet other environmental requirements. In this analysis, where more than one option is available (such as use of recovery pits versus closed loop systems during drilling), the range of effects is discussed in an attempt to bracket the potential effects.

***Effects Common to All Alternatives***

Most of the effects of the project would occur under any of the alternatives, and only the magnitude of the effects would vary. Even under Alternative A, most of the same impacts would occur as under the action alternatives. Since these effects are common to all of the alternatives,

they are discussed in detail below, and the differences in magnitude of these common effects are discussed for each of the alternatives.

*Short-Term Effects*

Short-term effects are associated with construction activities, such as construction of roads, pipelines, well pads and associated infrastructure, and wells.

**Water Quantity.** As discussed in Chapter 2, SGI anticipates drilling new wells at a rate of up to 27 wells per year under all of the alternatives. Each alternative includes installation of wells over multiple years, but the maximum water requirements in a given year would be the same for each alternative until the maximum number of wells for the alternative is reached. Water is required for drilling and development of each new well, and for dust suppression during construction of roads, pipelines, and well pads.

Freshwater needed for drilling, pad construction, completion, and dust suppression would be obtained from nearby sources (per agreements with landowners) and in accordance with SGI's water augmentation plan (see **Appendix L**). Under the augmentation plan, SGI would store water in Bainard Reservoir No. 1 to augment stream diversion amounts of up to 50.64 acre-feet per year, based on the following estimated consumptive uses:

- Construction of up to 8 wells per year (at 1.69 acre-feet per year per well);

- Construction of an estimated 8 well pads per year (0.77 acre-feet per site);

- Dust suppression to maintain approximately 15 miles of roads (500,000 gallons, or about 1.5 acre-feet per mile);

- Transit losses of 7.96 acre-feet per year from the reservoir outlet to the point of replacement at the confluence of Muddy Creek and West Muddy Creek.

In addition, the Augmentation Plan estimates evaporative losses of 33.1 acre-feet per year from Bainard Reservoir No. 1 where the augmentation water would be stored.

These quantities represent a maximum amount estimate, since augmentation is only necessary when senior water rights holders downstream place a call on the water.

Closed loop drilling systems (that do not rely on a reserve pit for managing drilling fluids) would be used unless SGI can demonstrate the benefit or need for using a pit. Closed loop systems reduce the potential for emissions of volatile compounds and tend to reduce the volume of waste generated. Pitless systems may help minimize the volume of water consumed in drilling, though comparably low water consumption can be obtained with retention pit systems if they are operated to conserve water.

In addition to the water needed for drilling and dust suppression, additional water is needed for well completions, involving hydraulic fracturing of the gas-containing formations. The quantity of water required for hydraulic fracturing would vary with the geology encountered in the reservoir rock, the type of well (vertical or horizontal/direction and the length(s) of the

perforated interval(s), and would also depend on the amount of waste fluid that can be recycled for subsequent fracturing stages.

The water requirements for hydraulic fracturing would not be known until the wells are drilled and logged, but coal bed methane deposits are expected to require the least water per length of well (because of the water that can be produced from these deposits, and the low fracture resistance), sandstone somewhat more, and shale would require the most, because of its low porosity and high fracture resistance.

Nor is it certain that water would be used exclusively as the base fluid for hydraulic fracturing. While the use of waterless fracturing techniques could greatly reduce the quantity of water required for construction off wells, it is a technology that has not always been successful. For purposes of this analysis, the conservative maximum estimate of the average water requirements per well used for evaluation purposes in this report is 124,000 barrels of water, about 16 acre-feet per well, although this would significantly overestimate the consumptive use if the water is recycled.

Other water sources, besides freshwater, could be used, including the water produced from a well during drilling, which notably would include the water produced from coal bed methane wells. It is expected that about 80 percent of the volume injected for hydraulic fracturing would be returned during completion, and this water can potentially be recycled. Assuming that the water can be recycled and that about 30 percent is lost to the formation or to evaporation or other losses, a more realistic estimate is that 70 percent of water entered into the system could be recovered and used as recycled water for the next well. The remaining 30 percent of water would need to be replenished with freshwater sources.

Rules establishing the procedures for a determination of whether produced waters are non-tributary are codified in 2 CCR 402-17 (Produced Nontributary Groundwater Rules). The rules establish certain areas and formations as nontributary waters without requiring further evaluation. According to these rules, groundwater in the Mesaverde Formation, Cameo and South Canyon Coal Groups within the boundaries of the Bull Mountain Unit are delineated as nontributary waters. Since this includes the target formations for gas development in the Unit, augmentation is not expected to be required for water produced from these formations in the Unit. However, an augmentation plan would be needed to off-set water usage for drilling the freshwater portion of the wells, as discussed at the top of this section.

**Impacts on Surface Water Quality.** The quality of surface waters in the Unit, including streams and reservoirs, is generally high, and is suitable for most beneficial uses. Water quality could be degraded by accidental spills or releases of substances stored or used at the project sites, such as hydraulic oil and fuel used in heavy equipment, chemical additives used in well stimulation, or waste fluids stored in tanks or pits, transported by truck, or conveyed in pipelines.

Engineering controls (such as spill containment structures) and use of COAs can provide a high level of protection against spill reaching surface water bodies. In the event than unanticipated uncontrolled spills occur, setbacks from surface water bodies of chemical storage facilities, impoundments, pipelines, and other improvements, or of ground disturbing activities, can

provide additional protection by allowing more time and opportunity to detect and remediate spills before they reach surface water resources.

As described in Chapter 2, fresh, production, and recycled water may be transferred overland via portable polyethylene (HDPE) pipe, and via existing buried steel pipelines, to the four McIntyre flowback pits located on private lands on the west-central portion of the Unit. Two of the pits have capacities of about 30,000 barrels. Two larger pits each have about five times the capacities of the smaller pits. The pits must conform to requirements in COGCC 900 Series Rules. Pipelines are also addressed in the 900 Series Rules. However, use of portable pipelines is not specifically addressed. The use of pipelines to convey stimulation fluids to a central water storage facility has a number of advantages over hauling the water in trucks, or even transporting it in permanent steel pipelines, such as reducing land disturbance, dust and wear on roads, and encouraging recycling of the fluids. However, portable pipelines may be vulnerable to breakage or sabotage, and it may be difficult to monitor the integrity of the pipelines during use, or to shut off the pipelines in the event a failure is detected. Under a worst case scenario, a large volume of brine could be discharged near a stream crossing when the stream is flowing, causing a sudden change in salinity capable of impacting riparian habitat and biota downstream of the release. The effects would depend on the concentrations in the fluid and the quantity and rate of the release.

Surface water could also be degraded by sediment eroded from areas of soil disturbance such as pipeline trenches, roads, or well pads. Mitigation measures would be applied during construction and as part of the site design. These could include drainage controls at the disturbed site, grading to help maintain internal drainage and low slopes, runoff containment, directing runoff to retention/infiltration areas and away from surface water features, revegetation to establish ground cover, and installing silt fences around the perimeter of erodible areas. All of these measures are addressed in the Storm Water Construction Permit required by the CDPHE.

The Storm Water Construction Permit is required for new construction involving disturbance of more than 1 acre of land, including access roads and feeder pipelines. The state requirement applies to oil and gas facilities until the site is finally stabilized, which for oil and gas sites is defined by the COGCC as the stage of interim reclamation. Multiple oil and gas sites within a field can be covered under a single Field permit certification.

The purpose of the Storm Water Construction Permit is to prevent non-storm water discharges from entering Waters of the State. The permit must identify and implement best management practices. The Permit requires a minimum inspection schedule and specifies that the stormwater management system of each individual site under active construction must be inspected at least once every 14 calendar days, and within 24 hours after the end of any precipitation or snowfall event that causes surface erosion (except during periods of winter snow cover), to ensure that the best management practices are effective in preventing non-storm water discharges.

If spill prevention control and countermeasures (SPCC) plans are required for the site (combined aboveground oil storage capacity of more than 1,320 gallons), the SPCC plans can be incorporated into the storm water construction plan to comply with the best management practices requirements applicable to bulk storage at the site. The storm water construction plan also describes site stabilization methods at each portion of the sites, in accordance with COGCC standards.

Compliance with the requirements for the Storm Water Construction Permit is expected to ensure that the potential for impacts on surface water quality from spills or releases during construction are reduced to less than significant levels, but some idea of the risk of a spill occurring can be obtained from past spill records maintained by the COGCC (2014).

According to the US Energy Information Agency (US EIA 2013), the number of producing gas and gas condensate wells in Colorado grew from about 5,125 in 1989, to about 32,000 in 2012. **Table 4-42**, Estimated Risk of a Reportable Spill from a Producing Gas Well in Colorado 2009 to 2013, shows the number of combined oil and gas spills reported to COGCC from 2009 to 2013, and as a percentage of the number of producing gas wells. The table overestimates the risk of a spill related to gas wells only, since the spill data includes spills from oil wells. There were approximately 50,000 active oil and gas wells in Colorado in 2013, so the risk of a spill as a percentage of active oil and gas wells combined was closer to 1 percent (1 in 100) in 2013.

COGCC records indicate that, from 2006 to present, 9 spill incidents were reported at oil and gas wells in Gunnison County (no spills are recorded in Gunnison County prior to 2006), which is a rate of about 1 incident per year in an area with about 44 active wells. The higher rate of incidents per well in this area compared to the state average probably reflects a higher risk of spills during well construction. None of the spills impacted surface water, and most spills are contained within a berm or are cleaned up before they threaten surface water.

**Table 4-42**
**Estimated Risk of a Reportable Spill from a Producing Gas Well in Colorado 2009 to 2013**

| Year | Number of Producing Gas and Gas Condensate Wells[1] | Number of Reported Oil and Gas Spills[2,3] | Percent Spills per Well |
|---|---|---|---|
| 2009 | 27,021 | 384 | 1.4% |
| 2010 | 28,813 | 497 | 1.7% |
| 2011 | 30,101 | 526 | 1.7% |
| 2012 | 32,000 | 402 | 1.3% |
| 2013 | 34,000 (estimated) | 534 | 1.7% |

1 - US EIA 2013; 2 -EnergyWire, May 4, 2013;
Source: COGCC 2014

One such spill occurred in 2012 at well Jacobs 29-1 on the Jacobs Ranch property just east of Highway 133 and about 300 feet east of Muddy Creek. The spill involved a release of 158 barrels (6,636 gallons) of produced water caused by pump failure during transfer of the water to containment vessels, and was contained within the berm surrounding the containment vessels. An estimated 95 barrels (3,990 gallons) of the spilled fluid was recovered.

In its most recent annual report (2014), COGCC reported only three releases of exploration and production waste fluids in Northwestern Colorado (which includes the Piceance Basin) that impacted either surface water or dry drainages leading to surface water (COGCC 2014).

**Impacts on Groundwater Quality from Surface Spills.** Groundwater quality can be impacted by surface spills of the same sort that might impact surface water quality. Instead of running off or being transported by storm water, the spill infiltrates the vadose zone (the unsaturated area between the ground surface and water table) to the water table. The rate of migration is

dependent on the nature of the materials; infiltration is slower through clays than through sands. Spills and releases at the ground surface would be prevented or mitigated through compliance with existing regulatory requirements and policies, including regulations under state and federal laws and adherence to BLM lease stipulations (see Section 3.2.4).

The BLM's protection of groundwater resources begins during the resource management planning process with the development of stipulations or lease notices to be applied to oil and gas leases.

BLM standard practice includes performing a site-specific analysis of groundwater occurrence and vulnerability during BLM's review of an APD. A BLM geologist and/or hydrologist would perform an independent review of each APD utilizing Colorado Geological Survey (CGS) and US Geological Survey (USGS) geologic and hydrologic data and maps to identify usable groundwater resources that require protection.

**Groundwater Impacts from Drilling.** For federal lands and mineral estate, a BLM petroleum engineer would review the drilling plan to ensure that the casing and cementing program is protective of freshwater aquifer zones identified in the geologic report. A natural resource specialist would review the surface use plan and determine the adequacy of reserve pit design. COAs would be attached to the APD as necessary.

Freshwater tends to occur at relatively shallow depths below the ground surface, on the order of hundreds of feet deep, rather than thousands of feet. Freshwater is low in dissolved salts. The federal secondary drinking water standard for dissolved salts (called total dissolved solids, or TDS) is 1,000 milligram per liter (mg/L), which is approximately equivalent to 1,000 parts per million (ppm) by weight. By contrast, seawater has a TDS concentration of about 30,000 to 40,000 ppm. Water with higher concentrations is called brine. Groundwater at the depths at which the gas-containing formations are found (thousands of feet), is brackish, with TDS concentrations in the range of about 7,000 ppm up to about 15,000 ppm.

Before an oil or gas well is drilled, a plan must be submitted to the COGCC (and to the BLM where the wells target the federal mineral estate) for approval, specifying the groundwater zones and geologic units the well would encounter, and how the well would be constructed to protect groundwater resources. To protect freshwater aquifers, COGCC requires that a *surface casing* be installed to a depth of at least 50 feet below the depth of the deepest water well or below the depth of the bottom of the aquifer, whichever is greater. The surface casing must be terminated in an impermeable formation below the aquifer. If multiple freshwater aquifers are present, each may need to be isolated from the others. (In some instances, the COGCC may require a larger diameter *conductor casing* that extends a short distance below the surface and provides greater protection against migration of contaminants at the surface to the aquifer during drilling, but in most locations, the surface casing alone is sufficient.) BLM requirements are similar.

After the surface casing is installed, the borehole is continued through the surface casing and a smaller diameter casing is installed. In many wells, an *intermediate casing* is installed below the surface casing, to a depth above the formation containing the targeted hydrocarbon deposits. The intermediate casing is sealed and cemented, and then the production casing string is installed to

the depth of the target formation. In some wells the production casing is installed with no intermediate casing.

**Groundwater Impacts from Hydraulic Fracturing (Well Stimulation).** Some geologic materials (clays, cemented sandstones, shale) act as barriers to the vertical flow of water and fluids, due to their low porosity and low permeability, while other geologic units (loose sands, gravels) are highly conductive and allow fluids to migrate easily. The presence of accumulations of fluid hydrocarbons in the subsurface is evidence that the hydrocarbons have been isolated and trapped, since otherwise the hydrocarbons would escape to the earth's surface. In the case of shale gas, the gas is trapped in the fine porosity of the shale and within the matrix of the shale formation.

Hydraulic fracturing creates or widens fractures in the fine, impermeable deposits and creates interconnected pathways that allow the hydrocarbon fluids to escape or be pumped from the formation. The process of hydraulic fracturing involves directing hydraulic fracturing fluids into a small region within a tight formation that has been penetrated by a well. The well may be either a vertical well or a horizontal well created by directional drilling. The pressure is applied through a perforated segment of production casing enclosed above and below by packers inside casing and by cement applied in the annular space between the casing and the borehole. The packers limit the distance within which the pressure is applied to the adjacent formation, and the cement outside the casing prevents the pressure from being directed into the annular space of the well bore. The segments of the well in which the hydraulic fracturing pressure is directed are selected based on the presence of the targeted deposits, and an assessment of the geologic structure, based on information from logs made during drilling.

If not properly cemented and sealed, the annular space around a well casing (the space between the borehole and the steel casing of the well) could act as a conduit for the brackish or saline fluids to move from one depth to another in response to hydraulic fracturing pressures.

As water is recycled in the hydraulic fracturing process, salt concentrations in the fluids increase because more salts are removed from the formation each time water is circulated and recovered. Brines with concentrations of up to 70,000 ppm TDS may be generated in the process of drilling and hydraulic fracturing the wells, and would be stored at the surface for reuse or disposal.

In addition to the natural salts that are present in the formations at depth, the fluids used in hydraulic fracturing can contain a variety of additives designed to accomplish various objectives, including improving the permeability of porous materials, increasing secondary porosity (fracture diameter), maintaining pumps and equipment, preventing biofouling, and adjusting viscosity. Proppants, an industry term for sand or human-made ceramics that lodge in the fractures, holding them open, are added to the hydraulic fracturing fluid to hold open the newly created or widened fractures. COGCC regulations (Rule 205) require operators to identify and report the additives used in the hydraulic fracturing fluids and their quantities within 30 days of completion of a well. Since April 2012, this information, with the exception of certain trade secret information, must be made available to the public on a publicly available website, FracFocus (http://www.fracfocusdata.org). Prior to promulgation of Rule 205, some information about the nature and quantities of chemicals used in a well were reported in the Colorado Oil and Gas Information System (COGIS) online database, with varying degrees of completeness.

The constituents of the hydraulic fracturing fluid vary. Hydraulic fracturing involves the use of water as the base injection fluid. According to COGCC, water and proppants (primarily sand, which may be supplemented by synthetic materials), account for more than 99 percent of the mass of hydraulic fluid. A variety of additives comprise the remaining less than 1 percent of the hydraulic fracturing fluid, including gels to increase fluid viscosity to suspend the proppants, biocides to eliminate bacteria, scale inhibitors to maintain piping, surfactants, iron controlling agents, and crosslinking agents that maintain viscosity with temperature increase, friction reducers to promote entry and distribution of the proppants into fractures. Most of the additives used in the industry are non-toxic and highly dilute in the fluid, so that they would present very little threat to water quality even if the cement seals in the wells were to fail, or the fractures themselves were to become conduits (COGCC 2011).

A technique called waterless fracturing has been explored as a way of reducing water use but has met with limited success and is not yet considered a proven technology. Waterless fracturing substitutes a non-aqueous fluid for some or all of the water that would ordinarily be used. Waterless fracturing was recently used in one well in the Unit (Federal 11-89-17 #1, located just west of Highway 133 and southwest of Chair Creek, and completed to a depth of 8,510 feet). The well had been drilled in 2009, but did not produce until it was hydraulically fractured in 2012. The base fluid utilized in fracturing this well was a mixture of 50 percent butane and 50 percent propane, which together comprised about 82 percent of the hydraulic fracturing fluid by weight. Proppants constituted about 13 percent, and other additives, including gelling agents, comprised the remaining approximately 3 percent (FracFocus 2012).

Most of the hydraulic fracturing fluid (often up to about 80 percent or more) is recovered in flowback from the well during completion and prior to production, and most of the rest of the residual hydraulic fracturing fluid is recovered during production, along with some water already present in the formation. Maximum recovery of gas requires that the formation be as free of water as possible. This means that the pressure gradients that force fluids into the formation away from the well during hydraulic fracturing are temporary, and reverse toward the well when production begins. COGCC requirements governing the hydraulic fracturing process include Rule 341, which requires monitoring of the pressures applied during well stimulation, and Rules 903 and 904 which include the requirements for containing hydraulic fracturing fluids. In addition, special requirements apply to Coal Bed Methane (coal bed methane) wells (Rule 608).

The water and chemical additives used in hydraulic fracturing must be stored and mixed at the wellhead during well construction, and chemicals must be stored at certain central storage points in the project area. Chemical storage and handling during construction are governed by the spill prevention requirements under the Clean Water Act, and more specifically by Construction Storm Management Plans, and SPCC Plans, where applicable, as described above. If a spill were to occur, COGCC Rule 906 requires notification of the COGCC, the Colorado Department of Public Health and Environment (CDPHE), and the landowner of any spill incident that could impact Waters of the State.

**Impacts Associated with Disposal of Production Wastewater.** It is likely that much of the water injected for hydraulic fracturing would be recycled and used in subsequent hydraulic fracturing operations of other wells, until the fluid becomes too saline for reuse. The quantity of

waste water that would need to be disposed is therefore dependent not only on the amount recovered, but on the amount that can be recycled. Additional water (not only some of the water injected during hydraulic fracturing, but also the saline water naturally present in the formation) is produced during production of gas, and must be recycled or disposed.

Currently, SGI operates one deep injection well (Federal 24-2 WDW, which is centrally located in the Unit in Section 24 of Township 11S/Range 90W). No other injection wells are currently active within more than 1 mile of the Unit. Federal 24-2 WDW was drilled to a depth of nearly 10,000 feet, and is designed to inject production water into the Maroon Formation, which lies deep below the Mancos Shale. (See also the discussion of deep injection, seismic effects, and mitigation measures in **Section 2.4.5**, Geologic Resources.)

The deep groundwater is not potable. The water that would initially be produced from the formation is brackish, with TDS concentrations generally less than 15,000 ppm. As the water is recycled, the salt concentration increases, because more salts are removed from the formation. Brines with concentrations of up to 70,000 ppm TDS may be generated in the process of hydraulic fracturing.

Other methods of handling produced water besides deep injection may be considered in individual APDs. A number of innovative options are available, but they tend to be more costly than standard disposal methods, and their feasibility depends on the composition of the produced water, the re-use objectives of the treated water, disposal options and costs of the residual waste, and the scale of treatment required. Although large-scale plants may be more efficient, they must be centrally located and produced water must be transported to the treatment site. Small-scale treatment systems are desirable because they can be placed close to the well site and can avoid the need for transport of waste fluids. The two best developed technologies applicable to treatment of produced water are membrane filtration (specifically reverse osmosis, but it also includes microfiltration, ultrafiltration, and nanofiltration) and electrocoagulation. Other technologies that may be considered alone or as part of a treatment chain include: thermal treatment (which uses heat for distillation); hydrocyclones (for particulate separation, possibly as a pretreatment in combination with other technologies); gas floatation (to remove particulates and organic matter, as a pre-treatment technology); filtration; ion exchange; chemical oxidation; electrodialysis/electrodialysis reversal; freeze thaw evaporation; Dewvaporation; and macro-porous polymer extraction (Igunnu and Chen 2013). Each of these technologies has disadvantages, ranging from high cost to limited effectiveness, to lack of data to demonstrate reliability. Each would require further evaluation of cost and feasibility.

*Long-Term Effects*
**Water Quantity.** The long-term effects on water quantity would be similar to the short-term effects, but would be lower in magnitude as construction tapers off and the focus turns to long-term operation and maintenance, which would demand less water.

**Water Quality.** The long-term effects on water quality would be similar to the short-term effects, but would probably be lower in magnitude as construction tapers off and the focus turns to long-term operation and maintenance.

***Alternative A***

**Water Quantity.** Alternative A involves development primarily on private lands and, therefore, does not require management by the BLM. For comparison purposes, Alternative A assumes that up to 27 new wells per year may be constructed. If augmentation water in Bainard Reservoir No. 1 is estimated to be sufficient for all dust suppression and pad construction as well as the drilling of 8 wells per year, and assuming that construction of each well consumes approximately 1.7 acre-feet, the remaining 19 new wells would require approximately 32 acre-feet of water per year to be purchased from willing sellers. This is approximately the amount of annual evaporative loss from Bainard Reservoir. Hydraulic fracturing would require about 536 acre-feet per year and a total of about 552 acre-feet for all purposes combined. Assuming that the water is obtained between April and July, when average historical daily flows in Muddy Creek have ranged from about 200 cubic feet per second (cfs) to over 500 cfs, this 468 acre-feet could be obtained from diverting approximately 2.6 cfs during this 4-month period, which would represent less than 1 percent of the streamflow during this period.

Water requirements could be reduced by using closed loop drilling and by recycling produced water and hydraulic fracturing fluids. Assuming that 30 percent of the required water comes from freshwater sources and 70 percent comes from other sources, such as produced and recycled water, the wells would require 140 acre-feet total of freshwater, which would be equivalent to diversion of about 0.8 cfs during a 4-month period. The diversion rate would be less if it was spread over a longer period. For example, if spread over the year, the diversion rate would only be about 0.25 cfs. If this water requirement were obtained by purchase from existing holders of water rights, then no impacts on water resources would be expected.

Overall water quantity under Alternative A was estimated based on known water quantities, anticipated drilling rates, and number of wells. For drilling, it is estimated that up to 3,000 barrels of water would be needed per well and this amount is assumed for both water disposal and gas wells. Based on this and the 56 wells proposed under Alternative A, up to 168,000 barrels of water would be needed to drill all wells. Using a standard conversion factor of 7,758 barrels per acre-foot of water, drilling would require up to 21.3 acre-feet.

For completion, the calculations assumed a 50/50 split of coal bed methane to shale wells. The water amounts for each type of well are provided in **Appendix D**. Assuming the highest water amount for each type of well would be used, this amount was multiplied by the total number of gas wells (23 coal bed methane wells and 22 shale wells), it is estimated that up to 5,541,200 barrels or 714.3 acre-feet of water would be needed for completion of all wells.

Dust abatement water usage estimates required understanding the time frame as well as the stages when water would be applied to suppress dust. Calculations estimated that there would be up to 190 barrels of freshwater used per day for dust suppression. Assuming that water usage would be higher in the drier months than in the wetter months, calculations assumed that this maximum rate of application would occur for six months out of the year, with each month estimated at 30 days. As Alternative A estimates 3 years for drilling and construction, up to 102,600 barrels or 13.2 acre-feet of water would be needed for dust abatement.

When all of these estimates are totaled, up to 748.8 acre-feet of water (220.7 acre-feet freshwater and 514.9 acre-feet of recycled/produced water) would be needed to meet anticipated water demands.

**Impacts on Surface Water Quality.** Impacts on surface water quality are generally expected to be lowest under Alternative A because it involves the least new construction and the least change from existing conditions. Under Alternative A, new construction would primarily be located in the northern and eastern areas of the Unit. The proposed well pads in the northern portion of the Unit are generally closer to perennial streams (Muddy Creek, and others). Most of the slopes at the proposed sites are relatively flat, and there are more and better established roads in the northern area, than in the southern portion of the site, which helps to minimize the potential for erosion.

The area east of Highway 133 is probably more likely to have large landslides and debris flows that could cause severe damage to the surface completions of wells, or could damage storage tanks or pipelines, which could increase the risk of spills and releases compared to existing conditions.

**Impacts on Groundwater Quality from Surface Spills.** The northern and eastern portions of the site, where most of the private lands are located comprise the majority of the cultivated and irrigated lands. These are probably located over or near more abundant fresh groundwater supplies than in the south, which is steeper and contains thinner soils and generally narrower valleys. The new well pad sites on private lands under Alternative A are relatively far from the McIntyre Flowback Pits. It may not be feasible to run portable aboveground piping to the flowback pits from east of Highway 133, or across East Muddy Creek. This would reduce the cost and logistical advantages of using the flowback pits to recycle hydraulic fracturing fluids and would thereby reduce the potential for spills or releases due to breaches of the HPDE overland water pipes.

**Groundwater Impacts from Drilling**. The potential impacts from drilling would be greater than under current conditions, but would be least for Alternative A from among the alternatives, since Alternative A involves construction of the fewest new wells.

**Groundwater Impacts from Hydraulic Fracturing (Well Stimulation)**. As with the impacts from drilling, the impacts on groundwater from hydraulic fracturing would also be lowest under Alternative A.

To the extent that the well sites in Alternative A are generally far from the McIntyre Flowback Pits, more hydraulic fracturing water might need to be stored on the proposed well pads before and after hydraulic fracturing, increasing the risk of a spill at each well pad somewhat.

**Impacts Associated with Disposal of Production Wastewater.** A new injection well is expected under Alternative A. The effects would be as described above, but since Alternative A involves the fewest new wells, it would likely generate the lowest volume of water to be disposed in the injection wells.

***Alternative B***

**Water Quantity.** Alternative B involves development on federal mineral estate lands and therefore would involve active management and oversight by BLM. Alternative B assumes that up to 146 new wells would be constructed over a period of 6 years. Since the rate of construction is the same for Alternatives A, B and C, augmentation requirements would be the same for all three alternatives, except that the augmentation would continue for a longer time under Alternative B than under Alternative A.

Overall water quantity would be higher under Alternative B due to more wells and a longer time frame for development. For drilling, the BLM estimates that up to 3,000 barrels of water would be needed per well and this amount is assumed for both water disposal and gas wells. Based on this and the 150 wells proposed under Alternative B, up to 450,000 barrels of water would be needed to drill all wells. Using a standard conversion factor of 7,758 barrels per acre-foot of water, drilling would require up to 58 acre-feet.

For completion, the calculations assumed a 50/50 split of coal bed methane to shale wells. The water amounts for each type of well are provided in **Appendix D**. Assuming the highest water amount for each type of well would be used, this amount was multiplied by the total number of gas wells (73 coal bed methane wells and 73 shale wells), the BLM estimates estimated that up to 18,381,400 barrels or 2,369.3 acre-feet of water would be needed for completion of all wells.

Dust abatement water usage estimates required understanding the time frame as well as the stages when water would be applied to suppress dust. Calculations estimated that there would be up to 380 barrels of freshwater used per day for dust suppression. Assuming that water usage would be higher in the drier months than in the wetter months, calculations assumed that this maximum rate of application would occur for 6 months out of the year, with each month estimated at 30 days. As Alternative B estimates 6 years for drilling and construction, up to 410,400 barrels or 52.9 acre-feet of water would be needed for dust abatement.

When all of these estimates are totaled, up to 2,480 acre-feet of water (744 acre-feet freshwater and 1,736 acre-feet of recycled/produced water) would be needed to meet anticipated water demands.

**Impacts on Surface Water Quality.** As discussed above under Effects Common to All Alternatives, effects on surface water quality would result mainly from either spills or releases of chemicals, or from soil erosion caused by ground disturbed by construction activities such as well pad construction, pit construction, and road and pipeline construction. Alternative B would involve construction of more than 3 times as many well pads (36 instead of 11), and about 4 times as many miles of new roads (16 miles instead of 5 miles) compared to Alternative A. However, the rate of development would be about the same as under Alternative A, meaning that construction activities would extend over a longer period than under Alternative A. Not only would there be increased construction activity under Alternative B, but the construction activity would be spread throughout a larger area, and would be located on different sites (belonging to the federal mineral estate) than under Alternative A. Compliance with existing regulatory requirements, including implementation of best management practices for storm water management, and SPCC plans, would greatly reduce the potential for spills and releases.

As discussed earlier in this chapter, the use of portable HDPE piping to convey wastewater from well stimulation activities, and production water to the centrally-located flowback pits for recycling could increase the risk of releases and are less secure than underground pipes, depending on how many of these systems are operating at one time. The risks of a spill associated with a pipe failure could be reduced by development of a contingency plan as part of the existing SPCC plan.

The broader distribution of well pad sites under Alternative B includes areas with different soils, different vegetation cover, and in some cases steeper slopes than Alternative A. Most of the land with privately-held mineral rights is located in areas suitable for agriculture, near surface water sources, and with deeper alluvial deposits, while most of the increase in well pad sites under Alternative B are in the area west of Highway 133 and between East Muddy Creek and West Muddy Creek, on the flanks of Bull Mountain. There are fewer level sites in this area, and road and pipeline routes are more likely to cross difficult terrain.

Alternative B also would allow a higher density of well pads in the area east of Highway 133, and along the east-facing slopes west of Lee Creek, than under Alternative A (13 new pads under Alternative B versus only 3 pads under Alternative A). This area contains extensive landslide deposits derived from rocks on the slopes of Chair Mountain, and these deposits are not only potentially vulnerable to reactivation by infiltration of surface water, but also have relatively low cohesiveness and are susceptible to rapid erosion.

Although ground-disturbing activities are likely to result in increased erosion, the streams draining the project area normally carry a high sediment load. Additional sediment loading rates could be greatly reduced by implementation of best management practices, as required for compliance with Construction Stormwater Planning and permitting requirements.

Impacts on surface water quality would be reduced by adhering to site-specific COAs, as follows:

- COA #1 would reduce the potential impacts on surface water quality from erosion, the risk of spills, or from other threats identified during review of the NOS/APD. It would accomplish this by enabling the BLM to require re-siting a well pad within a 745-foot radius of the proposed location.

- COA #3 would reduce the potential for erosion or spills and releases associated with slope failure by requiring site-specific slope-stability studies to be conducted in areas of potential geologic hazards.

- COA #4 would indirectly reduce impacts on surface water quality by scaling loose rock that presents a safety hazard and could also damage containment structures.

- COAs #5 and #6 would indirectly reduce impacts on surface water quality by improving the effectiveness of interim and long-term reclamation of the well pad, which would reduce the potential for erosion.

- COAs #14 and #15 would reduce impacts on surface water quality by reducing the potential for erosion associated with road construction.
- COA #20 would reduce impacts on surface water by requiring that fluids be stored in tanks or pits with approved liners, with a preference for storage in tanks, since closed loop systems would be adopted as the standard method of managing drilling fluids.
- COA #22 would reduce the potential for spills by maintaining freeboard in pits (if present) during winter.
- COA #24 would reduce the potential for spills by requiring hydrostatic testing of pipelines and storage vessels.
- COA #49 through #51 would reduce the potential for soil erosion by requiring recontouring and revegetation of disturbed slopes as so as practicable, and the submittal of reclamation status reports to ensure that the effectiveness of reclamation is tracked.

**Impacts on Groundwater Quality from Surface Spills.** The same types of spills and releases that affect surface water could also affect groundwater. Therefore, there would be an increased risk of spills and releases resulting from the increased number of facilities under Alternative B than Alternative A, but no new types of impacts are expected.

As described for surface water quality, COAs that reduce the potential for spills and releases would also protect groundwater quality. These are COAs #1, #3, #4, #20, and #22.

**Groundwater Impacts from Drilling**. Alternative B includes 146 new wells, compared to the 55 new wells expected under Alternative A. The wells would be drilled and completed at the same assumed rate under both alternatives. The main difference between the alternatives, besides location of the wells, would be the duration of the well construction activities (6 years instead of just 3 years under Alternative A). During drilling, either closed loop or pit methods may be used. The BLM encourages the use of the closed loop drilling method, but does not require it. Due to the higher cost of closed loop drilling, it is likely that pits would be used more frequently. Pits would be lined to prevent releases. The constituents of the drilling fluid additives would be non-toxic, with the exception of fluids returned from the formation, which may contain petroleum hydrocarbons and heavy metals. Drilling wastes would be properly disposed. Compliance with COGCC and BLM requirements for management of drilling wastes would reduce the potential for impacts on groundwater to negligible levels.

**Groundwater Impacts from Hydraulic Fracturing (Well Stimulation)**. The impacts on groundwater from drilling and completion are expected to be the same or similar regardless of location, since potable groundwater occurs at relatively shallow depths relative to the thousands of feet depth of the target gas formations. Therefore, the impacts from Alternative B are expected to be similar in nature to those under Alternative A, and are expected to be minor. The fractures created by hydraulic fracturing would extend to limited distances and are expected to be confined to the target formations. Surface and intermediate casings would be cemented throughout their length, and would be subject to inspection and documentation by performing cement bond logs, if necessary. The effects of hydraulic fracturing under Alternative B would be the same as under

Alternative A, but would occur over a longer period (6 years instead of 3 years). In some areas coal bed methane deposits may be encountered, involving production of more water than would be expected from shale. However, both types of deposits are well isolated from potable groundwater by depth, and so hydraulic fracturing is not expected to impact potable groundwater resources.

**Impacts Associated with Disposal of Production Wastewater.** The construction and operation of deep disposal wells are governed by state and federal regulations. Direct impacts of disposal of production wastewater are expected to be minor, since injection of the production water would be at depths on the order of 10,000 feet, and because casings would be properly cemented to avoid contamination migration through the well annulus. Compliance with regulatory requirements is expected to reduce the potential direct impacts to non-significant levels.

Potential for indirect impacts from disposal of production wastewater, such as increased potential for spills or releases of production wastewater from the conveyance systems between the wells and the injection well, potential for a release from one of the flowback pits used to store production wastewater, or potential for impacts associated with the construction of four new deep injection wells, represent a subset of the impacts of spills and releases of chemicals and fluids discussed above. Compliance with regulatory requirements would reduce these impacts to less than significant levels.

***APD for Federal 12-89-7-1***

The wells proposed for Well Pad 12-89-7-1 would be typical in that they are expected to be a mixture of coal bed methane and shale or sandstone wells. SGI has previously estimated in its surface plan of operations (SUPO) for Well Pad 12-89-7-1 that about 5,000 barrels of freshwater would be needed to complete shale and sandstone wells, while about 10,000 barrels would be needed to complete coal bed methane wells. The estimate depends on the number of completion stages and whether the wells are vertical or horizontal, with a smaller estimate for vertical wells. The water quantity estimated for Well 12-89-7-1 is lower than the average for Bull Mountain wells, so the impacts would fall within the range discussed above for the overall project. Similarly, no new roads and relatively little surface disturbance would be required to prepare the pad and gas/water transmission facilities at this pad, so water for dust suppression would be lower than average.

Surface drainage from the proposed pad location is toward the southeast into an unnamed small stream that is a tributary of East Muddy Creek just north of Spring Creek. Potential impacts on surface water and groundwater quality would be similar to those discussed for the project in general and would be mitigated in the same ways. Since the proposed pads are in the upper watershed, relatively little surface runoff accumulates near the site, and this affords more time to respond to a spill and prevent it from reaching surface water.

***Alternative C***

**Water Quantity.** The potential impacts of Alternative C on water quantity would be nearly identical to those under Alternative B, except that Alternative C would consume slightly less water for dust control on fewer miles of new and upgraded roads, and fewer miles of pipelines collocated with the new roads. These impacts are expected to be less than significant.

**Impacts on Surface Water and Groundwater Quality.** The impacts on surface water and groundwater quality from spills would be less than under Alternative B, due to construction of fewer well pads (35 new pads under Alternative C versus 36 new pads under Alternative B), and slightly few miles of new roads. Under Alternative C, six of the well pads proposed under Alternative B along the Highway 133 corridor, and eight well pads proposed under Alternative B in the somewhat steeper terrain on the slopes of Bull Mountain between East Muddy Creek and West Muddy Creek, would not be constructed. Since these locations are likely to have somewhat higher risks of spills associated with landslides and the conveyance of materials, wastes, and equipment over difficult terrain, the potential for water quality impacts is expected to be lower than under Alternative B. Because the well pads eliminated under Alternative C along the Highway 133 corridor, and at the south end of the Unit would have been relatively close to these perennial streams, and their elimination reduces the overall risk that a surface spill would reach one of these streams, or the shallow groundwater associated with the valley bottoms. It is assumed that these streams are gaining streams most of the year and that groundwater contributes to their flow.

Implementing COAs identified above to mitigate impacts of Alternative B also apply to Alternative C.

***APD for Federal 12-89-7-1***
The impacts on water resources from development of the pad and facilities at well pad 12-89-7-1 under Alternative C would be the same as under Alternative B.

**Groundwater Impacts from Drilling, Hydraulic Fracturing, and Disposal of Production Wastewater.** The impacts of Alternative C on groundwater quality from drilling and hydraulic fracturing activities would be the same as under Alternative B, because the same number of wells would be installed under both alternatives.

***Alternative D, the Preferred Alternative***
**Water Quantity.** The potential impacts of Alternative D on water quantity would be similar to those under Alternatives B and C. This is because the same number of wells would be constructed overall, and at the same rate per year. The impacts on water quantity are expected to be less than significant.

**Impacts on Surface Water and Groundwater Quality.** The impacts on surface water and groundwater quality from spills would be less than under Alternative B. This would be because fewer well pads would be constructed (33 new pads under Alternative D versus 36 new pads under Alternative B), and there would be slightly fewer miles of new roads. Fewer well pads with the same number of wells overall would increase the number of wells per pad, with an average of approximately one additional well per two well pads. Increasing the number of wells per pad would slightly increase the potential for spills at any particular pad; however, this would also help to improve some operational efficiencies, which might translate to a lower overall risk of spills. Furthermore, the four pads eliminated from Alternative D relative to Alternative B are more difficult to access or have a higher vulnerability to spills, which would also result in lower level of risk in the event of a spill.

Implementing COAs identified above to mitigate the impacts of Alternative B also apply to Alternative D.

**Groundwater Impacts from Drilling, Hydraulic Fracturing, and Disposal of Production Wastewater.** The impacts of Alternative D on groundwater quality from drilling and hydraulic fracturing would be the same as under Alternative B. This is because the same number of wells would be installed under both alternatives.

***APD for Federal 12-89-7-1***

The impacts on water resources from development of the pad and facilities at well pad 12-89-7-1 under Alternative D would be the same as under Alternative C.

***Cumulative***

Alternative A has been defined with specific numbers of additional well pads and associated roads, pipelines and other ancillary facilities to support a particular level of gas exploration and extraction activity, as a way of fixing the baseline for comparison the alternative in time. It has further been assumed, for purposes of comparison that Alternative A would not proceed under either of the project alternatives. In practice, however, the future actions described under Alternative A are independent of the project alternatives and could be implemented concurrently or at any time, in addition to the project alternatives. For this reason, the combined Alternative A and Alternative B must be evaluated with regard to the cumulative impacts of both actions.

Other gas extraction projects on both public and privately held lands, and inside and outside of the Unit boundaries, would also continue to be carried forward by various entities, subject to assessment of the economic and mineral resource potential. Based on COGIS records of oil and gas well permits, a total of 46 wells have been completed since 1960 within the approximately 140 square mile area containing the UNIT and bounded by Townships 11S and 12S, and Ranges 89W and 90W. Of these, approximately half (27 wells) were completed in the 9 years since 2005, or an average of 3 wells per year. All of these recent wells were constructed by either SGI, or by Gunnison Energy Corporation. If the project results in completion of 27 wells per year, it would represent an increase in the rate of well construction in the area well above the current and past trends.

Beyond the Unit during this period, SGI completed four wells and GEC completed one well inside the Unit. A total of 16 wells were completed within the Unit during this time, and 11 were completed outside the Unit, mainly south of West Muddy Creek and near the southern boundary of the Unit (about 1 well per year outside the boundary, and 2 wells per year inside). The reasonably foreseeable development scenario for oil and gas developed by the UFO (BLM 2012b) projects development of up to 1,271 new oil and gas wells in the UFO between 2010 and 2030. Some of these wells would be drilled horizontally, some directionally, and some vertically. The proposed new wells analyzed in this EIS are included in the UFO's projection. Because the total number of wells drilled under each alternative in this EIS does not change, the alternatives are not expected to alter the projected number of new wells in the UFO RFD.

However, assuming that drilling outside the Unit boundary continues at the same pace noted above, very little additional drilling activity is expected except for the proposed project and Alternative A. If both of those were completed, it would result in a total of 64 well pads and 218

gas wells inside the Unit in 6 years, and 5 deep injection wells. If the rate of well drilling outside the Unit continues at the same pace, there would be about 17 completed wells outside the Unit in 6 years, including 1 deep injection well. This would represent a significant increase in the amount of surface disturbance, deep injection activity, and gas production, compared to previous years.

**Water Quantity.** Since the rate of well construction is assumed to be steady, and capped at about 27 new wells per year, the demand for water will remain relatively steady for about 10 years. As explained above, the annual demand of drilling for water will not be significant at these levels, so the cumulative impact on water quantity is not expected to be significant but the expanded demand would continue for a longer time than under either of the alternatives alone. Based on calculations, the total cumulative water demands over the course of the development is estimated at 8,419,260 barrels or 817 acre-feet freshwater and 19,644,940 barrels or 1,905 acre-feet recycled/produced water.

**Impacts on Surface and Groundwater Quality.** The cumulative impacts on surface and groundwater quality from spills and releases during construction would be similar to those under Alternative B except that the period of higher risk associated with construction activities would extend further into the future than under the Proposed Alternative. If the rate of well construction increases so that the expected number of wells is completed in 6 years instead of 8 years, the cumulative rate of water consumption per year would be approximately 25 percent higher than assumed under each of the alternatives alone. However, assuming that the source of this additional water use is in exchange for existing water uses, no significant impacts are expected.

**Groundwater Impacts from Drilling, Hydraulic Fracturing, and Disposal of Production Wastewater**. As with the risk of spills, the rate of development of the gas resources would not increase, but the impacts would be extended further into the future. Since the impacts of drilling and hydraulic fracturing are expected to be minimal for any given well, due to the regulatory protections currently in place, and ability to monitor conditions in the well, the cumulative impacts are not expected to be significant. Direct and indirect impacts of disposal of production wastewater would also be much the same as under Alternative B, since the rate of disposal would not change; therefore, the cumulative effects are expected to be less than significant.

### 4.2.5 Geology

#### *Methods of Analysis*

Areas of proposed activities, such as construction of well pads, roads, and pipelines, were identified on maps and compared with areas with potential geologic hazards, such as steep slopes, landslides, or active (Quaternary) faults. Engineering judgment was used to identify the types of effects and general magnitude of the effects that could occur. Some potential impacts are expected to be reduced as a result of compliance with existing regulatory requirements and agency policies as well as through the implementation of COAs and design features.

#### *Nature and Type of Effects*

Implementation of the alternatives would affect geologic resources or be affected by geologic hazards if it exposes people, structures, or the environment to potential substantial adverse

effects, including the risk of loss, injury or death from proximity to geologic hazards, such as earthquakes, subsidence, or landslides, or if it results in damage to unique geologic features.

***Effects Common to All Alternatives***

**Construction-related effects.** Each of the alternatives includes construction of new well pads and wells, pipelines, roads, electrical transmission lines, and ancillary structures and facilities. During well drilling and completion, tanks or pits would be constructed on well pads and drilling fluids and various hazardous and non-hazardous materials would be stored on the pads or in associated storage areas. During the production and maintenance phase of operations, highly flammable gas would be produced and conveyed in pipelines and stored under pressure in tanks. Throughout the period of development of gas resources in the Unit both construction-related, and production and maintenance-related activities would be occurring simultaneously, sometimes at the same locations, and sometimes at different locations.

**Slope Failure.** The area east of Highway 133 (western slopes of Ragged Mountain to Muddy Creek) contains unstable slopes with high potential for landslide activity. The underlying geology and mechanisms for downslope movement are different on the eastern side of the Unit from the west side. In general, on the eastern side, there are larger areas containing landslide deposits, the deposits are thicker, and large areas are prone to steady and continuous downslope movement (creep). North of Jacobs Ranch and East Muddy Creek, the area between Lee Creek and Drift Creek on the west side of Highway 133 also contains thick alluvial, colluvial, and landslide deposits (Ellis and Freeman 1984), but this area is probably not as prone to new landslides because the watershed above the area is smaller, and therefore it is less likely for groundwater to accumulate within the deposits. The rate of movement can be enhanced by heavy precipitation as it infiltrates the unconsolidated deposits of previous landslides. In 1986, following major storm events, a swath of saturated soil and debris moved more than 200 feet downslope and engulfed the channel of Muddy Creek in the East Muddy Creek Slide in the southeastern portion of the Unit. Wells that penetrate landslide-prone deposits could be deformed by creep, or ruptured by rapid movement of slide deposits relative to the underlying rock. Surface equipment including tanks and pipelines could be damaged in a landslide, potentially resulting in releases or safety hazards. West of Highway 133 there are many areas with greater than 15 percent slopes and some areas, particularly bordering West Muddy Creek, and along the larger streams, where slopes exceed 30 percent. Steep slopes are susceptible to rock slides and debris flows, and slope stability can be reduced by construction activity if material at the toe of a slope is removed or destabilized, such as for road cuts or leveling of well pads.

Slope failure would be a significant impact.

The mitigation measures listed below could reduce the severity or probability for these impacts.

> **Mitigation 1—Avoidance of Areas with Geologic Hazards**. The most effective mitigation to reduce effects of slope failure is to avoid areas with higher risks. Project-specific conditions would be evaluated during the site permitting process, and avoiding disturbance in areas with higher risks within the proposed sites would minimize hazards.

> **Mitigation 2—Engineering Controls**. If geologic hazards cannot be avoided, mitigation measures such as designing drainage systems to reduce soil saturation and prevent

erosion in areas with steep slopes, and to stabilize the toes of slopes, could be implemented, based on recommendations following site-specific geotechnical site evaluations.

**Mitigation 3—Monitoring of Landslides**. If landslide-prone areas cannot be avoided, such as east of Highway 133, mass movement of the landslide deposits can be monitored, such as by installation of tensiometers to monitor the rate of differential horizontal movement so that corrective action can be taken. Alarm systems can be installed to enable automated shutoff of gas pipelines at critical points in the event of slope failure.

The BLM could apply these measures as COAs or could require them as design features on a submitted APD. Their application would avoid areas with geologic hazards, would prevent erosion and destabilization of slopes resulting from soil saturation, and would provide a monitoring protocol to track slope stability in areas prone to landslides.

**Existing Seismic Hazards.** Strong earthquakes have the potential to damage containment structures or trigger landslides or slope failure, resulting in damage to containment structures or pipelines, with potential for releases of liquids or gas to the environment. Rupture of gas lines or pressurized storage tanks could have the potential to lead to fire or explosion hazards. There are no known active faults within the Unit and the region of the site has a low potential for strong seismic shaking.

**Potential for Triggering Earthquakes during Deep Well Injection.** Disposal of waste fluids is an indirect result of drilling and well stimulation. The volume of fluids that require disposal is highly dependent on the selection of fluid management techniques; whether pits or closed loop drilling systems are used. Significantly more waste fluids would be generated where pit systems are used, but either method is allowable under each of the alternatives, and the choice of methods would be determined based on a variety of location-specific factors.

It has long been known that injection of fluids at depth can trigger earthquakes. Fluid injection has even been suggested as a way, under controlled circumstances, to gradually release the stored energy within locked segments of an earthquake fault zone to reduce the potential for a large earthquake, but the method has not been proven. However, fluid injection has been implicated as the unintended cause of earthquakes along active faults in several instances in the past (Nicholson and Wesson 1990). Deep injection for disposal of waste fluids was responsible, for example, for earthquakes up to magnitude (M) 3.6 near Ashtabula, Ohio in 1987, and for 3 M5 to M5.5 earthquakes at the Rocky Mountain Arsenal in 1967 (the largest fluid injection-related earthquakes to date). A detailed inventory of earthquakes attributed to fluid injection prior to 1990 is presented in the US Geological Survey report authored by Nicholson and Wesson (1990).

Since 2001, the number of earthquakes in the midcontinent area of the United States with magnitude greater than M3.0 has increased sharply, from a relatively steady annual rate of about 21 events per year, to a high of 188 in 2011 (Ellsworth 2013). During 2010 and 2011, more than 90 small earthquakes (up to M4.7) occurred along the Guy-Greenbrier Fault Zone in Arkansas shortly after the start of injection of waste fluids in 2 wells (Ausbrooks and Horton 2011).

Deep injection of wastewater induced a sequence of earthquakes up to M3.6 in the Hom River Basin in British Columbia in 2009. In 2010, an M4.1 earthquake occurred in a previously quiet region where injection wells had been operating for 18 years. This was followed by an M5.0 and an M5.7 earthquake in the following year. The epicenter was about 1 mile from the injection wells (Ellsworth 2013).

In Paradox Valley, in southwestern Colorado, deep injection was used as a method of disposing of shallow saline groundwater to protect water supplies, and the experience provided an opportunity to study the effects of adjusting injection pressures over time. Hundreds of small earthquakes were induced when the injection tests were conducted between 1991 and 1995. The injection pressures needed to accommodate the volume of waste water was greater than the pressure needed to fracture the rock, so the small earthquakes were expected. Over the following years of operation, several earthquakes greater than M3.0 were induced, and the zone of seismic activity expanded to beyond 7.5 miles.

These and many other events suggest that deep injection of waste fluids is capable of producing large earthquakes in areas with requisite tectonic stress conditions, that the affected zone can continue to expand with continued injection, and that it is difficult to control or reverse the process, once seismicity is initiated (Ellsworth 2013).

The primary mechanism by which fluid injection is thought to trigger earthquakes is by overcoming the shear strength and the coefficient of friction along a fault by increasing the pore pressure in the rock. The potential for movement along a fault, and the magnitude of that movement, however, depend on the tectonic stress conditions in the fault zone preceding fluid injection. Thus fluid injection facilitates fault rupture in areas where stress has built up along a fault, but does not cause faulting or create strong earthquakes in the absence of existing stress.

Injection wells for waste disposal typically target permeable formations, where the formation has capacity to accommodate the fluids with least injection pressure. Unlike hydraulic fracturing, deep well injection pressures need not exceed the strength of the rock. The most reliable method for estimating the existing stress conditions in the earth's crust is from measurements taken during hydraulic fracturing, and a large body of data from hydraulic fracturing records across the United States has made it possible to predict the general orientation and magnitudes of the principal stresses at many sites. In the Rocky Mountains province where the site is located, the principal stresses are extensional along an east-west axis, and normal faulting predominates (Nicholson and Wesson 1990). The magnitude of an earthquake is largely a function of the dimensions of the fault. Not only is the region of the Unit seismically quiet, but the few faults in the surrounding region are relatively small.

The lack of seismicity and of active faults in the region of the Unit leads to a probable low level of risk that deep injection of waste fluids would trigger an earthquake capable of causing damage at the ground surface in the Unit. However, knowledge of the stress field and of the existence or dimensions of faults at depth is imperfect. Monitoring of seismicity during operation of the deep injection wells is recommended to mitigate the potential for inducing earthquakes by injection of fluids over time.

Some mitigation measures that could reduce the severity or probability for these impacts are listed below.

**Mitigation 4—Monitoring and Maintenance of Acceptable Injection Pressure**. Monitoring of deep well injection pressures and of changes in the transmissivity (a measure of how much fluid can flow horizontally through an aquifer) during injection, can provide a means of determining whether deep injection pressures are causing fracturing of the reservoir rock and injection rates and pressures can adjusted to reduce the potential for these effects.

**Mitigation 5—Monitoring of Seismicity**. Monitoring of seismic activity with sensitive seismometers could be implemented as a follow-up measure to Mitigation 1, to determine whether earthquakes are triggered at the depth of injection, since this would provide additional evidence as to whether the reservoir rock was being fractured by injection pressures within the targeted injection zone.

Because the state regulates injection wells, both of these mitigation measures would fall under the State of Colorado's jurisdiction. If adopted by SGI or the BLM, SGI would follow all state mandates, regulations, and policies. The BLM could adopt these measures as COAs or could require them as design features on a submitted APD. Their application would provide additional monitoring mechanisms for the possibility of injection well-induced seismicity.

**Potential for Inducing Earthquakes by Well Stimulation (Hydraulic Fracturing).** Unlike deep injection of waste fluids, the purpose of hydraulic fracturing is to overcome the strength of the rock and to open fractures by increasing the pore pressure in the rock. During well stimulation activities associated with some or all well completions, fluids would be injected at high pressure into the targeted geologic formations. Hydraulic fracturing normally produces many micro-earthquakes, but it is unlikely to trigger earthquakes that can be felt at the surface.

Hydraulic fracturing differs from waste injection because injected fluids are removed after hydraulic fracturing, so that the pore pressure increase from hydraulic fracturing is temporary and the affected zone is relatively localized around the well. According to Ellsworth (2013) more than 100,000 wells have been hydraulically fractured in recent years, and no earthquakes larger than M3.6 have been attributed to hydraulic fracturing.

Extensive data collected from hydraulic fracturing events in shale formations suggest that the magnitudes of the micro-earthquakes associated with hydraulic fracturing are mainly in the range of M4 to M1, which cannot be felt (Warpinski 2013). The possibility exists that fractures created by hydraulic fracturing might intercept an existing active fault and trigger it to move, but the probability is low.

Revqust et al. (2013) performed modeling studies to evaluate the effects of hydraulic fracturing and concluded that "the possibility of hydraulically induced fractures at great depth (thousands of meters) causing activation of faults and creation of a new flow path that can reach shallow groundwater resources (or even the surface) is remote." Based on these observations, the direct effects of hydraulic fracturing as a trigger for damaging earthquakes are expected to be less than significant.

**Potential for Breaching Geologic Confining Formations during Hydraulic Fracturing.** Warpinski (2013) compiled data from hydraulic fracturing projects throughout the US, supporting the limited vertical extent of fractures above and below the point of injection. Monitoring of the micro-earthquakes that occur during hydraulic fracturing provides a way of assessing the effectiveness of hydraulic fracturing and determining the length of the fractures. Fractures propagated from hydraulic fracturing tend to be longer in the horizontal direction than the vertical, because of bedding orientation. According to Warpinski, most fractures propagated by hydraulic fracturing of shale are limited to a zone about 1,000 feet above and below the injection point, with almost no fractures extending more than 2,000 feet. Gas-containing formations targeted for hydraulic fracturing are usually much too deep below the depths of freshwater to be intercepted by fractures generated during hydraulic fracturing.

**Potential for Breaching Geologic Confining Formations during Deep Well Injection.** One of the objectives of deep injection of fluids is to isolate the fluids within the targeted geologic formation and prevent vertical migration. Due to the depth of the injection wells, fluids can be injected at pressures that could allow the fluids to rise vertically above the targeted formation. The higher the injection pressure the higher the rate of injection that can be achieved, but too high an injection pressure could enable fluids to migrate vertically if the confining pressure of the overlying formation is overcome. If the injection pressure is high enough, the rock confining the target fluid disposal reservoir may be fractured, allowing pathways for fluids to migrate vertically into overlying geologic units. The depth of the target reservoir formation relative to the fresh groundwater aquifer near the land surface makes it unlikely that injected fluids would be able to rise high enough to impact the relatively shallow freshwater aquifer (Geologic Society of America 2015). The operator is required to monitor injection pressure and to maintain hydrostatic pressures well below the elevation of the freshwater aquifer. Compliance with existing requirements is expected to adequately mitigate against significant intrusion of waste fluids into adjacent formations and would prevent cross-contamination of shallow fresh-water aquifers.

***Alternative A***

**Slope Stability.** As described in Chapter 2, three new well pads (Jacobs 11-98-32 #1; Borich 11-89-32 #1; and Medved 12-89-5 #1) are proposed east of Highway 133, on the west slope of Chair Mountain and the Raggeds, which have a recent history of landslides in the southern portion of the Unit. Detailed mapping of landslide deposits has not been performed north of Spring Creek, although available mapping suggests that landslide deposits are not as extensive north of Spring Creek as they are south of Spring Creek. The proposed well pads are on the lower slopes where sudden slope failure is less likely although creep may occur. These areas could be in the path of landslides originating upslope.

The most southeastern of the proposed well pad sites (Volk 12-88-9 #2) is south of Spring Creek, and upslope (east) of Ragged Mountain Ranch Road, in an area that is underlain by older (Pleistocene age) landslide deposits (Stover 1986). Because of their age these deposits are probably more stable than the more recently active deposits further to the west, but the thickness of the deposits is not known. It should also be noted that recent landslides have occurred as a result of failure of the older landslide deposits.

On the west side of Highway 133, the pads proposed under Alternative A would be located in relatively level areas. Most are north of East Muddy Creek, where most of the farmed lands are located. Typically, the proposed pads would be located near the margins of farmed lands, which in some cases allows for the possibility of placing them near the edges of ravines, but there is ample room within the proposed siting areas to avoid steep slopes. One proposed pad (McIntyre 11-90-23 #1) is in an area of gently sloping land near the existing McIntyre Flowback Pits #3 and #4.

The proposed roads under Alternative A tend to follow existing tracks and generally would not require significant cutting or filling of slopes, and therefore it is not likely that the roads would contribute to slope failure. A limited geotechnical study of selected slopes conducted by Trautner Geotech (2010), mostly in the area south of East Muddy Creek, concluded that the threshold for slope instability in the areas evaluated was 35 percent (20 degrees), based on the standard safety factor used for roadway stability. The report recommended avoidance of routes where slopes are greater than 35 percent, and noted that if the soil becomes saturated the safety factor decreases, so proper drainage design is important where slopes approach the recommended threshold.

**Potential for Triggering Earthqnakes dnring Deep Well Injection.** Alternative A includes one existing deep waste injection well and one new waste injection to handle the fluids generated from new gas wells on the 10 proposed pads. The potential for inducing large earthquakes is expected to be low, but no data are available to evaluate the existing stress field, and the existing network of seismographs is not designed to accurately detect micro-earthquakes.

***Alternative B***

**Slope Stability.** Under Alternative B, six of the proposed pads would be constructed east of Highway 133, where some of the underlying deposits are former landslide deposits. While not all of the area has been mapped to identify landslide deposits in detail, but the landscape east of Highway 133 is characterized by hummocky ground, lobate fan features, deflected stream channels, sparse vegetation, and other features common to landslide terrain. The hazards of constructing the pads on these lands includes the potential for creep as well as rapid mass failure of the underlying surficial materials, particularly reactivation of existing landslide deposits, and potential for landslides originating from an upslope source to move across the site.

The effects associated with slope instability under Alternative B would be similar to those under Alternative A, except that risk is increased by more acreage of pads and more miles of roads and pipelines.

If the BLM were to apply mitigation measures under Appendix C, then impacts from geologic hazards would be reduced. Specific measures applicable to geologic hazard mitigation are the following:

- COA #1 would authorize the BLM to require SGI to re-site proposed well pads within a 745-foot radius of the proposed location, based on a review of SGI's NOS/APD and results of the site-specific slope-stability analysis.

- COA #3 would require site-specific slope-stability studies to be conducted in areas of potential geologic hazard, as identified in the MDP analysis prior to design and

construction. It also would require that appropriate site-specific mitigation measures be identified to address the threats.

- COA #4 would require scaling loose rock in the vicinity of a well pad to reduce safety hazards.

Implementing these COAs would reduce but not eliminate potential hazards. Additionally, if the BLM were to incorporate the additional mitigation measures described under *Effects Common to All Alternatives*, it would further reduce the probability of impacts and monitor for changes that could result in damage or failure.

**Potential for Triggering Earthquakes during Deep Well Injection.** The effects of Alternative B would be similar to those described under Alternative A, except that Alternative B includes development of four new deep waste injection wells in the Unit, in addition to the existing deep injection well. The locations of the new wells would be determined later. The need for four additional injection wells under Alternative B reflects the increase in waste fluid that would be generated by the higher number of gas wells to be developed under Alternative B, as well as the need to have disposal wells located closer to the points of generation. The increased volume of waste fluid disposal would likely increase the risk of inducing strong earthquakes relative to Alternative A, but the degree of increased risk cannot be easily predicted since it depends on many factors, including the transmissivity of the reservoir formations, the rate of injection, the tectonic stress conditions that exist within the region, and the presence or absence of any incipient active faults at depth that could be within the radius of influence of the injection wells. In general, based on the lack of earthquake activity and lack of any known active faults in the region, the increased risk of inducing earthquakes under Alternative B is considered low.

*APD for Federal 12-89-7-1*

Geologic hazards at the proposed site are expected to be low. The relatively flat terrain at the proposed site would require relatively little alteration. Since existing roads would be used, there would be relatively little new disturbance for roadwork. The terrain to the east of the proposed site is steep, but the proposed improvements would be located on the portions of the site that are naturally level, so the adjacent steep slopes could be avoided. Mitigation measures discussed for the general project would apply to activities at well pad 12-89-7-1. No additional impacts are expected, and no other mitigation measures would be required.

***Alternative C***

**Slope Stability.** Alternative C would include construction of 35 new well pads on split estate lands, instead of the 10 new pads on private lands as described under Alternative A. Alternative C includes four well pads east of Highway 133; two located north of Jacobs Ranch, and two located in the southeast area just north of Spring Creek, which contains landslide terrain of the western slope of the Raggeds (Ellis and Freeman 1984). Overall, the potential impacts associated with slope stability would be about the same as Alternative B and higher under Alternative C than under Alternative A. Avoiding disturbance on steep slopes to the extent possible, and implementing COAs #1, #3, #4, #17, and #53 would minimize impacts, as well as designing site drainage to direct runoff away from the site and to reduce infiltration and water saturation of the underlying deposits. Additionally, as noted under Alternative B, if the BLM were to incorporate the additional mitigation measures described under *Effects Common to All Alternatives*, it would

further reduce the probability of impacts and monitor for changes that could result in damage or failure.

**Potential for Triggering Earthquakes during Deep Well Injection.** Alternative C includes development of four deep waste injection wells in the Unit, as described for Alternative B, and proposes the same number of gas wells as under Alternative B, except that the gas wells would be concentrated at one fewer well pads than under Alternative B. The effects of Alternative C would be the same as those described under Alternative B.

*APD for Federal 12-89-7-1*

Under Alternative C, the geological resource impacts from developing the pad and facilities at well pad 12-89-7-1 would be the same as under Alternative B.

***Alternative D, the Preferred Alternative***

**Slope Stability.** Alternative D is similar to Alternative B; however, it would be lessened as there are four fewer well pads and infrastructure located east of Highway 133. As described for Alternative B, the hazards of constructing the pads on landslide-prone lands east of Highway 133 are the potential for creep and rapid mass failure of the underlying surficial materials, particularly reactivation of existing landslide deposits. There is also the potential for landslides originating from an upslope source to move across the site.

The effects of slope instability under Alternative D would be similar to those under Alternative B, except that the risk would be reduced by the smaller number of pads and fewer miles of roads and pipelines. Additionally, Alternative D includes the noted measures for slope stability under *Effects Common to All Alternatives* as design features (see **Appendix C**). Because of this there would be a reduced risk from the impacts described under that heading. This, combined with the application of the COAs noted in Alternative B, would provide a suite of measures to effectively mitigate slope instability.

**Potential for Triggering Earthquakes during Deep Well Injection.** The effects of Alternative D would be similar to those described under Alternative B. Micro-earthquakes may be induced by deep injection; however, as described for Alternative B, due to the lack of earthquake activity and lack of any known active faults in the region, the risk of inducing significant earthquakes under Alternative D is considered low. Additionally, Alternative D includes the noted design features for monitoring seismicity, noted under *Effects Common to All Alternatives* as design features to be included on future APDs (see **Appendix C**). For this reason, there would be a reduced risk from the impacts described under that heading.

*APD for Federal 12-89-7-1*

Under Alternative D, the geological resource impacts from developing the pad and facilities at well pad 12-89-7-1 would be the same as under Alternative C.

***Cumulative***

The combined actions of the No Action Alternative with any of the action alternatives (B, C, or D) are shown in **Table 4-1** and **Table 4-2**. The combination of these actions with those listed in **Table 4-3** create the effects described below.

**Slope Failure.** The cumulative effects of the actions identified under Alternative A and any one of the action alternatives would increase in proportion to the amount of drilling and construction activity. Most of the increased activity that would occur on private lands would probably be related to increased drilling from the existing and proposed well pads, using the existing and proposed infrastructure (e.g. roads, pipelines, and transmission lines) and is therefore not expected to significantly increase the potential for slope failure.

**Potential for Triggering Earthquakes during Deep Well Injection.** If drilling and gas production continues to increase on private lands, the amount of waste requiring disposal would also increase, requiring more fluid injection and potentially requiring more injection wells. Logically, the potential for inducing earthquakes would increase proportionally with the increase in disposal, but the significance of any increase would depend on a number of factors that are not well known, including the tectonic stress field in the region of the site, and the presence or absence of hidden faults. Overall, increased fluid injection of wastes generated on private lands is expected to result in an incremental cumulative increase in the potential impacts relative to the action alternatives.

### 4.2.6 Vegetation and Invasive, Nonnative Species

***Methods of Analysis***

Impacts were determined by assessing which actions, if any, would change the upland vegetation, riparian and wetland vegetation, and weed indicators described below. Some impacts are direct, while others are indirect and affect vegetation through a change in another resource. Direct impacts on vegetation include disrupting, damaging, or removing vegetation, thereby reducing area, amount, or condition of native vegetation. Included among these are actions that reduce total numbers of plant species and actions that reduce or cause the loss of diversity, vigor, or structure of vegetation, or that degrade its function for wildlife habitat.

Indirect impacts are those that cannot be absolutely linked to one action, such as decreased plant vigor or health from dust or reduced water quality. Other indirect impacts include loss of habitat suitable for vegetation colonization due to surface disturbance; introduction of weeds that compete with desirable, native vegetation; conditions that enhance the spread of weeds; and general loss of habitat due to surface occupancy or soil compaction.

*Indicators*

Indicators for upland vegetation communities are based on the BLM Colorado Public Land Health Standards 2 and 3 (BLM 1997) and include:

- Condition of native vegetation communities and individual native plant species
- Connectivity
- Age class distribution

Indicators for riparian and wetland vegetation include:

- Condition of riparian vegetation community and individual riparian plant species

- Hydrologic functionality

Indicators for invasive and noxious weeds include:

- Level of spread of noxious weeds and other undesirable species in the overall plant community

***Nature and Type of Effects***
Direct effects include vegetation loss, conversion, and fragmentation (both short-term and long-term), which would result from land grading and clearing, and the construction of well pads, roads, pipelines, and ancillary facilities. Human presence and activity on-site could trample vegetation, causing damage or death. Vegetation removal or trampling would reduce the condition of native vegetation communities and individual native plant species, alter age class distribution, reduce connectivity, and encourage the spread of invasive species. Fragmentation could cause the loss of genetic interchange among vegetation communities and thus reduce fitness of some plant populations.

Reclamation could also affect individual plant species through introduction of new genetic materials into local populations by way of seedings or plantings. As a result, the local genetic make-up of populations could be degraded, resulting in reduced fitness.

Indirect effects include spread of weeds. Invasive weeds alter plant community structure and composition, productivity, nutrient cycling, and hydrology and may cause declines in native plant populations through competitive exclusion, niche displacement and other mechanisms. Invasive plants reduce and may eliminate vegetation that provides cover for wildlife and forage for livestock, and may also increase fire risk. Impacts on wetland or riparian systems could involve damage to vegetation, loss of hydrologic function, increased erosion, reduced water retention, and loss of wildlife habitat. Riparian impacts would be avoided under all alternatives.

In addition, activities that would disturb soils could cause erosion, topsoil and biological soil crust loss, and soil compaction. This could affect vegetation's ability to regenerate and could facilitate weed introduction and spread. Soil compaction results in decreased vegetation cover and more exposure of the soil surface to erosion (Burton et al. 2008). Soil compaction may also affect the size and abundance of plants by reducing moisture availability and precluding adequate taproot penetration to deeper horizons (Ouren et al. 2007). Furthermore, construction and maintenance activities could increase dust, which could cover existing vegetation and impair plant photosynthesis and respiration. Resulting impacts could include lowered plant vigor and growth rate, altered or disrupted pollination, and increased susceptibility to disease, drought, or insect attack. As a result, surface-disturbing activities could affect the density, composition, and frequency of species in an area, thus affecting native vegetation condition.

Overall, direct and indirect effects from gas development would likely reduce land health in the Bull Mountain Unit.

### *Effects Common to All Alternatives*

Under all alternatives, interim reclamation of areas not needed for long-term operations would reduce short-term direct effects from vegetation removal. Reclamation areas would be reseeded 3 to 6 months after construction. Wetlands and riparian vegetation would be avoided when possible by site selection and when they cannot be avoided through approval from the BLM. Distance from streams and wetlands was included as a siting and weighting factor in well pad site selection, see **Appendix A**. Surface-disturbing activities shall avoid riparian/wetland habitat unless otherwise approved by the BLM, see **Appendix C**, Conditions of Approval.

In addition, an Integrated Spill Prevention, Control and Countermeasures Plan and Emergency Response Plan would reduce the likelihood for hazardous material spills and subsequent toxicity to vegetation.

### *Alternative A*

Under Alternative A, impacts from gas development would continue on non-federal mineral estate, and existing lease rights on federal mineral estate would remain in effect. However, the BLM may receive and consider proposals for individual APDs, access, and/or other production-related activities at any time on federal surface and/or federal mineral estate.

There would be no change to BLM land health with respect to vegetation under Alternative A.

**Table 4-43**, Direct Impacts on Vegetation Communities in Bull Mountain Unit (Alternative A), shows the direct, short-term and long-term impacts on vegetation communities under Alternative A. This table is based on the conceptual siting of project components and estimated project footprint, and exact acreages could change during site-specific design and permitting. Sagebrush and irrigated meadow communities would have the greatest acreage affected, largely on private surface/private mineral and private surface/federal mineral estates. Given the conceptual nature of project siting, indirect impacts are not quantified. However, indirect effects include the effects from spread of weeds, dust, increased accessibility for grazing, and trampling from nearby humans.

To the extent practicable, interim reclamation areas would be reseeded with mixes that would comply with CPW and Gunnison County goals and objectives; this would reduce the likelihood for noxious weed invasion, erosion, and dust through restoration of plant cover. However, seed mixes would not have any forb or shrub species and would be a mix of grasses. This would limit diversity and restoration of initial conditions. Monitoring would help to ensure that vegetation is deemed successful and reclamation plans would be submitted for each new well.

Mandatory noxious and invasive weed measures would be applied, as discussed in **Appendix I** (**Sections I.2.2**, **I.2.3**, **I.3.1**, **I.3.2**, and **I.3.3**), thereby reducing the likelihood for the introduction and spread of noxious and invasive weeds. Further, these species would be controlled to prevent their spread.

**Table 4-43**
**Direct Impacts on Vegetation Communities in Bull Mountain Unit (Alternative A)**

| Vegetation Type[1] | Federal Surface/Federal Minerals (acres)[2] | Private Surface/Federal Minerals (acres) | Private Surface/Private Minerals (acres) | Total (acres)[3] |
|---|---|---|---|---|
| ***Short-Term Impacts*** | | | | |
| Aspen | 0 | 1 | 3 | **4** |
| Aspen/Oak | 1 | 2 | 3 | **6** |
| Disturbed Area | 0 | 6 | 17 | **23** |
| Irrigated Meadow | 0 | 2 | 56 | **58** |
| Meadow | 0 | 2 | 18 | **20** |
| Mixed Mountain Shrub | 1 | 3 | 10 | **14** |
| Oakbrush | 3 | 3 | 4 | **10** |
| Sagebrush | 2 | 52 | 60 | **114** |
| Wetland/Riparian Area | 0 | 3 | 6 | **9** |
| **TOTAL** | **7** | **74** | **177** | **258** |
| ***Long-Term Impacts*** | | | | |
| Aspen | 0 | 0 | 1 | **1** |
| Aspen/Oak | 0 | 0 | 1 | **1** |
| Disturbed Area | 0 | 3 | 11 | **14** |
| Irrigated Meadow | 0 | 0 | 16 | **16** |
| Meadow | 0 | 1 | 8 | **9** |
| Mixed Mountain Shrub | 0 | 0 | 2 | **2** |
| Oakbrush | 1 | 1 | 1 | **3** |
| Sagebrush | 1 | 17 | 18 | **36** |
| Wetland/Riparian Area[4] | 0 | 1 | 2 | **3** |
| **TOTAL** | **2** | **23** | **60** | **85** |

Source: SGI GIS 2013, BLM GIS 2014, Petterson 2012

[1] No short or long term impacts anticipated on aspen/conifer, mixed conifer, pinyon/juniper, riparian woodland, rocky outcrop, willow, or open water communities

[2] Disturbance acreage for federal lands is due to construction needed to upgrade roads to access private pads.

[3] In some cases, discrepancies in totals occur due to rounding of acres

[4] Well pads would avoid riparian areas whenever possible. However, since the well pads have not been fully sited yet, the impact analysis was based upon 5 acre and 2 acre conceptual well pads. Some of the conceptual locations may intersect with the wetlands/riparian habitat in the vegetation dataset.

### *Alternative B*

Impacts from the phases of development would be similar to those described for Alternative A, but under Alternative B, impacts would occur on federal lands/federal mineral estate. BLM land health with respect to vegetation would likely be reduced in developed areas under this alternative. However, since most lands were found to be meeting Land Health Standard 3 in the most recent North Fork Land Health Assessment, it is unknown whether they would still meet this standard or would be found to be not meeting as a result of this alternative.

**Table 4-44**, Direct Impacts on Vegetation Communities in Bull Mountain Unit (Alternative B), shows the direct, short and long term impacts on vegetation communities under Alternative B. Although the acres of impacts are estimates, the overall acreage of impacts would increase under Alternative B compared to Alternative A, as additional facilities would be constructed. Sagebrush and oakbrush communities would have the greatest acreage affected, with increased impacts on private surface/federal mineral estates compared with Alternative A.

**Table 4-44**
**Direct Impacts on Vegetation Communities in Bull Mountain Unit (Alternative B)**

| Vegetation Type[1] | Federal Surface/Federal Minerals (acres) | Private Surface/Federal Minerals (acres) | Private Surface/Private Minerals (acres) | Total (acres)[2] |
|---|---|---|---|---|
| ***Short-Term Impacts*** | | | | |
| Aspen | 0 | 19 | 3 | **22** |
| Aspen/Oak | 4 | 4 | 4 | **12** |
| Disturbed Area | 1 | 10 | 18 | **29** |
| Irrigated Meadow | 1 | 24 | 13 | **38** |
| Meadow | 0 | 13 | 8 | **21** |
| Mixed Mountain Shrub | 1 | 11 | 9 | **21** |
| Oakbrush | 6 | 56 | 9 | **71** |
| Sagebrush | 4 | 316 | 42 | **362** |
| Wetland/Riparian Area | 1 | 6 | 3 | **10** |
| **TOTAL** | **18** | **459** | **109** | **586** |
| ***Long-Term Impacts*** | | | | |
| Aspen | 0 | 5 | 1 | **6** |
| Aspen/Oak | 1 | 2 | 1 | **4** |
| Disturbed Area | 0 | 7 | 13 | **20** |
| Irrigated Meadow | 0 | 8 | 5 | **13** |
| Meadow | 0 | 6 | 4 | **10** |
| Mixed Mountain Shrub | 0 | 3 | 3 | **6** |
| Oakbrush | 1 | 17 | 3 | **21** |
| Sagebrush | 1 | 113 | 15 | **129** |
| Wetland/Riparian Area | 0 | 2 | 1 | **3** |
| **TOTAL** | **3** | **163** | **46** | **212** |

Source: SGI GIS 2013, BLM GIS 2014, Petterson 2012
[1] No short or long term impacts anticipated on aspen/conifer, mixed conifer, pinyon/juniper, riparian woodland, rocky outcrop, willow, or open water communities
[2] In some cases, discrepancies in totals occur due to rounding of acres

Development of well pad 12-89-7-1 and the associated pipelines would cause permanent impacts on vegetation, as shown in **Table 4-45**. Temporary impacts may extend into the areas around the well pad and pipelines but would be reclaimed following construction. Short- and long-term impacts would occur, as described under *Nature and Type of Effects*. The mixed mountain shrub community would have the greatest acreage affected.

Mandatory noxious and invasive weed measures (**Appendix I**) would be applied, having impacts as described for Alternative A.

If the BLM were to apply the mitigation measures in **Appendix C** as COAs, residual impacts would be reduced. Mitigation (COAs #6 through #9, #11 through #13, #15 through #18, and #48 through #50) includes measures for erosion control and dust abatement, to minimize vegetation removal, and to provide guidelines for vegetation reestablishment. These would be applied where appropriate to reduce the likelihood for fragmentation, vegetation condition and hydrologic functionality degradation, and age class distribution changes. COAs #45 through #48 would further reduce the likelihood for weed introduction and spread and would include additional control and monitoring measures. Together, these mitigation measures would reduce impacts on upland, riparian, and wetland vegetation and would reduce the likelihood of weed spread.

**Table 4-45**
**Permanent Impacts on Vegetation Communities from Development of Well Pad 12-89-7-1**

| Vegetation Community | Disturbance Area (Acres) |
|---|---|
| ***Proposed ROW*** | |
| Mixed mountain shrub | 0.058 |
| Oakbrush | 0.182 |
| Sagebrush | 5.272 |
| Wetland/riparian | 0.001 |
| **Total for ROW** | **5.513** |
| ***Pad Site*** | |
| Aspen | 0.21 |
| Mixed mountain shrub | 1.79 |
| **Total for Pad Site** | **2.01** |
| ***Proposed ROW and Pad Site*** | |
| Aspen | 0.21 |
| Mixed mountain shrub | 1.848 |
| Oakbrush | 0.182 |
| Sagebrush | 5.272 |
| Wetland/Riparian | 0.001 |
| **Total for ROW and Pad Site** | **7.523** |

Source: Rocky Mountain Ecological Services 2012

However, the short-term and long-term impacts on vegetation communities displayed in **Table 4-44** would remain as residual impacts.

***Alternative C***

**Table 4-46**, Direct Impacts on Vegetation Communities in Bull Mountain Unit (Alternative C), shows the direct, short-term, and long-term impacts on vegetation communities under Alternative C. Although the acres of impacts are estimates, the overall acreage of impacts would be less than those for Alternative B, but more than Alternative A, as additional facilities would be constructed. Impacts on land health would likely be similar to Alternative B, given the application of design features and COAs (see **Appendix C**) under both alternatives. As under Alternative B, sagebrush and oakbrush would be the most impacted vegetation communities under Alternative C.

Under Alternative C, mitigation measures described for Alternative B (**Appendix C**) would be applied as design features, where appropriate, with a similar reduction in the likelihood for impacts on vegetation. Alternative C also includes design features (shown in **Appendix C**) to reduce impacts on vegetation, such as increased dust abatement measures and requiring an annual reclamation monitoring status report, which would help identify areas for improvement. Interim reclamation would include the appropriate composition of grasses, forbs, and shrubs for the ecological site, which would go further in restoring a native plant community compared to Alternatives A and B. Mandatory noxious and invasive weed design features would be applied, having impacts as described for Alternative A. Together, these design features would reduce impacts on upland, riparian, and wetland vegetation and reduce the likelihood of weed spread

**Table 4-46**
**Direct Impacts on Vegetation Communities in Bull Mountain Unit (Alternative C)**

| Vegetation Type[1] | Federal Surface/Federal Minerals (acres) | Private Surface/Federal Minerals (acres) | Private Surface/Private Minerals (acres) | Total (acres)[2] |
|---|---|---|---|---|
| ***Short-Term Impacts*** | | | | |
| Aspen | 0 | 15 | 0 | **15** |
| Aspen/Oak | 8 | 10 | 2 | **20** |
| Disturbed Area | 0 | 9 | 5 | **14** |
| Irrigated Meadow | 1 | 26 | 5 | **32** |
| Meadow | 0 | 7 | 3 | **10** |
| Mixed Mountain Shrub | 1 | 7 | 3 | **11** |
| Oakbrush | 3 | 34 | 5 | **41** |
| Sagebrush | 4 | 253 | 31 | **288** |
| Wetland/Riparian Area | 0 | 5 | 2 | **7** |
| **TOTAL** | **17** | **366** | **56** | **439** |
| ***Long-Term Impacts*** | | | | |
| Aspen | 0 | 4 | 0 | **4** |
| Aspen/Oak | 2 | 2 | 0 | **4** |
| Disturbed Area | 0 | 3 | 4 | **7** |
| Irrigated Meadow | 0 | 8 | 1 | **9** |
| Meadow | 0 | 3 | 1 | **4** |
| Mixed Mountain Shrub | 0 | 1 | 0 | **1** |
| Oakbrush | 1 | 9 | 0 | **10** |
| Sagebrush | 1 | 78 | 5 | **84** |
| Wetland/Riparian Area | 0 | 1 | 0 | **1** |
| **TOTAL** | **4** | **109** | **11** | **124** |

Sources: SGI GIS 2013; BLM GIS 2014; Petterson 2012
[1]No short-term or long-term impacts anticipated on aspen/conifer, mixed conifer, pinyon/juniper, riparian woodland, rocky outcrop, willow, or open water communities
[2]In some cases, discrepancies in totals occur due to rounding of acres

more than Alternatives A and B. However, the short-term and long-term impacts on vegetation communities displayed in **Table 4-46** would remain as residual impacts. Residual impacts would be more than under Alternative A but less than under Alternative B. Further, impacts could still occur from erosion, dust, trampling, or ineffective re-establishment, despite the implementation of design features.

### *Alternative D, the Preferred Alternative*

**Table 4-47**, Direct Impacts on Vegetation Communities in Bull Mountain Unit (Alternative D), shows the direct, and short-term, and long-term impacts on vegetation communities under Alternative D. Although the acres of impacts are estimates, the overall acreage of impacts would be less than those for Alternative B but more than Alternative A. This is because additional facilities would be constructed. Impacts on land health would likely be similar to Alternative B, though they would likely be less under Alternative C. As under Alternative B, sagebrush and oakbrush would be the most impacted vegetation communities under Alternative D.

As under Alternative C, the same design features from **Appendix C** would be applied where appropriate, with a similar reduction in the likelihood for impacts on vegetation. Mandatory noxious and invasive weed design features would be applied, having impacts as described for

**Table 4-47**
**Direct Impacts on Vegetation Communities in Bull Mountain Unit (Alternative D)**

| Vegetation Type[1] | Federal Surface/Federal Minerals (Acres) | Private Surface/Federal Minerals (Acres) | Private Surface/Private Minerals (Acres) | Total (Acres)[2] |
|---|---|---|---|---|
| ***Short-Term Impacts*** | | | | |
| Aspen | 0 | 14 | 2 | **16** |
| Aspen/Oak | 2 | 3 | 3 | **8** |
| Disturbed Area | 0 | 6 | 4 | **10** |
| Irrigated Meadow | 1 | 22 | 7 | **29** |
| Meadow | 0 | 10 | 2 | **13** |
| Mixed Mountain Shrub | 0 | 11 | 5 | **16** |
| Riparian Woodland | 0 | 1 | 0 | **1** |
| Oakbrush | 0 | 38 | 5 | **44** |
| Sagebrush | 1 | 271 | 38 | **311** |
| Wetland/Riparian Area | 0 | 5 | 2 | **7** |
| **TOTAL** | **5** | **382** | **68** | **454** |
| ***Long-Term Impacts*** | | | | |
| Aspen | 1 | 4 | 0 | **4** |
| Aspen/Oak | 0 | 1 | 0 | **1** |
| Disturbed Area | 0 | 3 | 3 | **7** |
| Irrigated Meadow | 0 | 6 | 0 | **7** |
| Meadow | 0 | 5 | 1 | **5** |
| Mixed Mountain Shrub | 0 | 3 | 1 | **3** |
| Riparian Woodland | 0 | 0 | 0 | **0** |
| Oakbrush | 0 | 10 | 0 | **11** |
| Sagebrush | 0 | 87 | 6 | **93** |
| Wetland/Riparian Area | 0 | 1 | 0 | **2** |
| **TOTAL** | **1** | **120** | **12** | **133** |

Sources: SGI GIS 2013; BLM GIS 2014; Petterson 2012
[1]No short-term or long-term impacts are anticipated on aspen/conifer, mixed conifer, pinyon/juniper, rocky outcrop, willow, or open water communities
[2]In some cases, discrepancies in totals occur due to rounding of acres

Alternative A. Together, these design features would reduce impacts on upland, riparian, and wetland vegetation and would reduce the likelihood of weed spread more than Alternative A. However, the short-term and long-term impacts on vegetation communities displayed in **Table 4-47** would remain as residual impacts. Further, impacts could still occur from erosion, dust, trampling, or ineffective reestablishment, despite the implementation of design features.

### *Cumulative*

Cumulative impacts would represent the combination of Alternatives A and B, Alternatives A and C, or Alternatives A and D. Combined with other past, present, and reasonably foreseeable future actions, either combination of Alternatives A, B, C, and D would contribute to vegetation disturbance and removal and a reduction of land health in the region both temporarily and permanently (see **Table 4-48**, **Table 4-49**, and **Table 4-50**). Past, present, and future activities would continue to disturb and remove vegetation in the region due to trampling and constructing project facilities, transmission lines, and access roads. These activities are sheep and cattle grazing on BLM and National Forest System lands; coal mining in the North Fork Valley; oil and gas development; fuel and fence pole wood harvesting; and forage consumption.

**Table 4-48**
**Cumulative Impacts on Vegetation Communities in Bull Mountain Unit (Alternatives A and B combined)**

| Vegetation Type[1] | Federal Surface/Federal Minerals (Acres) | Private Surface/Federal Minerals (Acres) | Private Surface/Private Minerals (Acres) | Total (Acres)[2] |
|---|---|---|---|---|
| ***Short-Term Impacts*** | | | | |
| Aspen | 0 | 20 | 6 | **26** |
| Aspen/Oak | 5 | 6 | 7 | **18** |
| Disturbed Area | 1 | 16 | 35 | **52** |
| Irrigated Meadow | 1 | 26 | 69 | **96** |
| Meadow | 0 | 15 | 26 | **41** |
| Mixed Mountain Shrub | 2 | 14 | 19 | **35** |
| Oakbrush | 9 | 59 | 13 | **81** |
| Sagebrush | 6 | 368 | 102 | **476** |
| Wetland/Riparian Area | 1 | 9 | 9 | **19** |
| **TOTAL** | **25** | **533** | **286** | **844** |
| ***Long-Term Impacts*** | | | | |
| Aspen | 0 | 5 | 2 | **7** |
| Aspen/Oak | 1 | 2 | 2 | **5** |
| Disturbed Area | 0 | 10 | 24 | **34** |
| Irrigated Meadow | 0 | 8 | 21 | **29** |
| Meadow | 0 | 7 | 12 | **19** |
| Mixed Mountain Shrub | 0 | 3 | 5 | **8** |
| Oakbrush | 2 | 18 | 4 | **24** |
| Sagebrush | 2 | 130 | 33 | **165** |
| Wetland/Riparian Area[3] | 0 | 3 | 3 | **6** |
| **TOTAL** | **5** | **186** | **106** | **297** |

Sources: SGI GIS 2013; BLM GIS 2014; Petterson 2012
[1]No short-term or long-term impacts anticipated on aspen/conifer, mixed conifer, pinyon/juniper, riparian woodland, rocky outcrop, willow, or open water communities
[2]In some cases, discrepancies in totals occur due to rounding of acres
[3]Well pads would avoid riparian areas whenever possible. However, since the well pads have not been fully sited yet, the impact analysis was based upon 5 acre and 2 acre conceptual well pads. Some of the conceptual locations may intersect with the wetlands/riparian habitat in the vegetation dataset.

**Table 4-49**
**Cumulative Impacts on Vegetation Communities in Bull Mountain Unit (Alternatives A and C combined)**

| Vegetation Type[1] | Federal Surface/Federal Minerals (Acres) | Private Surface/Federal Minerals (Acres) | Private Surface/Private Minerals (Acres) | Total (Acres)[2] |
|---|---|---|---|---|
| ***Short-Term Impacts*** | | | | |
| Aspen | 0 | 16 | 3 | **19** |
| Aspen/Oak | 9 | 12 | 5 | **26** |
| Disturbed Area | 0 | 15 | 22 | **37** |
| Irrigated Meadow | 1 | 28 | 61 | **90** |
| Meadow | 0 | 9 | 21 | **30** |
| Mixed Mountain Shrub | 2 | 10 | 13 | **25** |
| Oakbrush | 6 | 37 | 9 | **52** |
| Sagebrush | 6 | 305 | 91 | **402** |
| Wetland/Riparian Area | 0 | 8 | 8 | **16** |
| **TOTAL** | **24** | **440** | **233** | **697** |

**Table 4-49**
**Cumulative Impacts on Vegetation Communities in Bull Mountain Unit (Alternatives A and C combined)**

| Vegetation Type[1] | Federal Surface/Federal Minerals (Acres) | Private Surface/Federal Minerals (Acres) | Private Surface/Private Minerals (Acres) | Total (Acres)[2] |
|---|---|---|---|---|
| ***Long-Term Impacts*** | | | | |
| Aspen | 0 | 4 | 1 | **5** |
| Aspen/Oak | 2 | 2 | 1 | **5** |
| Disturbed Area | 0 | 6 | 15 | **21** |
| Irrigated Meadow | 0 | 8 | 17 | **25** |
| Meadow | 0 | 4 | 9 | **13** |
| Mixed Mountain Shrub | 0 | 1 | 2 | **3** |
| Oakbrush | 2 | 10 | 1 | **13** |
| Sagebrush | 2 | 95 | 23 | **120** |
| Wetland/Riparian Area[3] | 0 | 2 | 2 | **4** |
| **TOTAL** | **6** | **132** | **71** | **209** |

Sources: SGI GIS 2013; BLM GIS 2014; Petterson 2012
[1]No short-term or long-term impacts anticipated on aspen/conifer, mixed conifer, pinyon/juniper, riparian woodland, rocky outcrop, willow, or open water communities
[2]In some cases, discrepancies in totals occur due to rounding of acres
[3]Well pads would avoid riparian areas whenever possible. However, since the well pads have not been fully sited yet, the impact analysis was based upon 5 acre and 2 acre conceptual well pads. Some of the conceptual locations may intersect with the wetlands/riparian habitat in the vegetation dataset.

**Table 4-50**
**Cumulative Impacts on Vegetation Communities in Bull Mountain Unit (Alternatives A and D combined)**

| Vegetation Type[1] | Federal Surface/Federal Minerals (Acres) | Private Surface/Federal Minerals (Acres) | Private Surface/Private Minerals (Acres) | Total (Acres)[2] |
|---|---|---|---|---|
| ***Short-Term Impacts*** | | | | |
| Aspen | - | 15 | 5 | 20 |
| Aspen/Oak | 3 | 5 | 6 | 14 |
| Disturbed Area | 1 | 12 | 21 | 34 |
| Irrigated Meadow | 1 | 24 | 63 | 87 |
| Meadow | 0 | 12 | 21 | 33 |
| Mixed Mountain Shrub | 1 | 13 | 15 | 29 |
| Oakbrush | 3 | 42 | 9 | 54 |
| Riparian Woodland | - | 1 | 0 | 1 |
| Sagebrush | 3 | 323 | 97 | 424 |
| Wetland/Riparian Area | 0 | 8 | 8 | 16 |
| **TOTAL** | - | 15 | 5 | 20 |
| ***Long-Term Impacts*** | **11** | **455** | **246** | **713** |
| Aspen | - | 4 | 1 | 5 |
| Aspen/Oak | 1 | 1 | 1 | 3 |
| Disturbed Area | 1 | 6 | 14 | 21 |
| Irrigated Meadow | 0 | 6 | 17 | 23 |
| Meadow | 0 | 5 | 8 | 13 |
| Mixed Mountain Shrub | 0 | 3 | 3 | 7 |
| Oakbrush | 1 | 11 | 2 | 14 |
| Riparian Woodland | - | 0 | 0 | 0 |

**Table 4-50**
**Cumulative Impacts on Vegetation Communities in Bull Mountain Unit (Alternatives A and D combined)**

| Vegetation Type[1] | Federal Surface/Federal Minerals (Acres) | Private Surface/Federal Minerals (Acres) | Private Surface/Private Minerals (Acres) | Total (Acres)[2] |
|---|---|---|---|---|
| Sagebrush | 1 | 105 | 24 | 130 |
| Wetland/Riparian Area[3] | - | 2 | 2 | 4 |
| **TOTAL** | **1** | **145** | **72** | **221** |

Sources: SGI GIS 2013; BLM GIS 2014; Petterson 2012
[1]No short-term or long-term impacts are anticipated on aspen/conifer, mixed conifer, pinyon/juniper, rocky outcrop, willow, or open water communities.
[2]In some cases, discrepancies in totals occur due to rounding of acres.
[3]Well pads would avoid riparian areas whenever possible. However, since the well pads have not been fully sited yet, the impact analysis was based on 5-acre and 2-acre conceptual well pads. Some of the conceptual locations may intersect with the wetlands/riparian habitat in the vegetation dataset.

Increasing recreation pressure, including OHVs on the 440 acres of the Bull Mountain Unit on federal surface estate, would continue to disturb native vegetation and spread weeds. Forest insects and diseases would continue to spread, and wildfires would continue to occur, both damaging and sometimes destroying native vegetation. If Alternatives A and B, Alternatives A and C, or Alternatives A and D were constructed simultaneously with other projects, cumulative construction and operation impacts on native vegetation could increase. If projects in the region were not successfully revegetated, native vegetation communities could be lost, or permanently converted to communities dominated by invasive, nonnative species, leading to an incremental reduction in land health.

Revegetation efforts with non-local genotypes could marginally reduce the fitness of native populations of the reclamation species within vegetation communities. Alternately, current efforts to protect vegetation in the region, including land use planning efforts could help prioritize areas for protection, particularly native plant communities, and would improve adaptive management for forest diseases. Implementation of COAs in **Appendix C** (COAs #6 through #9, #11 through #13, #15 through #18, and #44 through #46) would minimize cumulative impacts caused by Alternatives A, B, C, or D, and no additional mitigation measures are recommended.

### 4.2.7 Fish and Wildlife

This section discusses impacts on fish and wildlife habitat from proposed management actions of other resources and resource uses. Habitat types are described in **Section 3.2.6**, Vegetation. Existing conditions concerning fish and wildlife and descriptions of habitat requirements for various species are described in **Section 3.2.8**, Fish and Wildlife.

#### *Methods of Analysis*

*Terrestrial Wildlife*

Impacts on wildlife and their habitats include the following:

- Disturbance and/or loss of plant communities, food supplies, cover, breeding sites, and other habitat components necessary for population maintenance used by any species to a degree that would lead to substantial population declines

- Disturbance and/or loss of seasonally important habitat (e.g., critical for overwintering or successful breeding) to a degree that would lead to substantial population declines

- Interference with a species' movement pattern that decreases the ability of a species to breed or overwinter successfully to a degree that would lead to substantial population declines

- Loss of habitat functionality

*Aquatic Wildlife*

Impacts on aquatic species and their habitats include the following:

- Sediment and Turbidity – Increased sediment loading in waters containing sediment-intolerant fish species, loss of recruitment, stress, habitat alteration, and habitat loss

- Habitat Alteration – Changes that render habitat nonfunctional for select species or more conducive to competitive species

- Loss or Reduction of Streamside Vegetation/Cover – Increased temperatures, stress, reduced productivity, and impacts on food webs

- Water Quality Alteration – Actions that alter important water quality parameters, including pH, dissolved oxygen, temperature, hardness, alkalinity/salinity, and turbidity

- Water Depletions – Loss of physical habitat, changes in water quality, sediment accumulation, habitat alteration, loss of habitat complexity, or food source reduction

- Potential direct mortalities to aquatic wildlife from motorized travel

*Indicators*

Indicators of impacts on fish and wildlife are as follows:

- Amount and condition of available habitat

- Likelihood of mortality, injury, or direct disturbance

- Likelihood of habitat disturbance

*Assumptions*

The analysis includes the following assumptions:

- Activities associated with the construction, operation, and development of oil and gas resources in the Unit are expected to have the greatest impacts on big game species.

Small mammals and reptiles may be less influenced by oil and gas development as habitat use may occur over a smaller spatial extent.

- The actual locations of oil and gas well pads and associated infrastructure including pipelines and access roads is subject to change as a result of the APDs.
- Short-term effects are defined as those that would occur over a time frame of 5 years or less, and long-term effects would occur over longer than 5 years.

***Nature and Type of Effects***

Mineral exploration and development, and associated ROW use would result in both short-term and long-term impacts on fish and status wildlife species on BLM-administered lands and federal mineral estate in the Unit under all alternatives. Effects are directly linked to vegetation conditions and water quality and quantity (**Section 4.2.6**, Vegetation, and **Section 4.2.4**, Water Resources). Displacement of species could increase competition for resources in adjacent habitats. Over the long term, these activities would remove and fragment habitats due to road development and use, facility construction and placement, creation of well pads, natural gas wells, water disposal wells, and pipelines, and construction within ROWs. Species are likely to avoid developed areas over the long term. Seasonal closures of ROWs, if implemented in critical limiting habitats, could reduce impacts on targeted wildlife species and limit the effects of habitat fragmentation.

Indirect impacts may include the following:

- An increase in predators or predation pressure
- Decreased survival or reproduction of the species
- Decreased habitat effectiveness
- Interference with habitat function, movement patterns, behavior, or displacement
- Introduction of invasive vegetation that competes with desirable native vegetation and could result in changed habitat or altered fire cycles

***Effects Common to All Alternatives***

Under all alternatives, oil and gas development actions would continue to use existing infrastructure including well pads, access roads, pipelines, one overhead electrical line (4 power poles), and others. See **Table 2-10**, Summary of Actions by Alternative, for a summary of existing actions in the Unit. Some existing roads would be upgraded and new roads would be built. Therefore, impacts on fish and wildlife populations from oil and gas development activities would continue, irrespective of the proposed alternatives. These activities along with those associated with casual use, permitted activities, and habitat changes, as described in the Nature and Types of Effects section above, would continue to impact fish and wildlife throughout the Unit. Threats specific to aquatic wildlife as a result of oil and gas development within the Unit would be attributed to water depletions as well as road and pipeline crossings of streams, wetlands, and other water bodies.

Areas affected by short-term construction disturbance may have a longer duration of impacts on wildlife than expected. This is because these areas would not be reclaimed to pre-disturbance conditions for many years, given the slow rate of shrub re-establishment and time required to return to functional habitat conditions for many shrub-dependent species, such as mule deer and elk.

Under all alternatives, pipeline crossings of wetlands as well as roads, would be bored (not trenched) outside of road ROWs and wetland boundaries. Impacts from boring activities during construction phases could include a "frac-out," which is caused when excessive pressure builds up forcing drilling mud to the surface (DFO 2007) A frac-out would result in short-term displacement of terrestrial and aquatic wildlife or habitat avoidance as a result of excessive mud (terrestrial) or increased sediment and turbidity as well as reduced water quality (aquatic). Activities associated with stream borings could also result in bank destabilization in the short term. In the long term, fish and wildlife species and their habitat would be at risk of hazardous materials contamination in the event of a pipeline rupture under all alternatives. Aquatic wildlife, particularly habitat for Colorado River fish species would continue to be reduced as a result of continued water depletions for ongoing drilling, completion, and dust abatement activities.

*Habitat Quality*
There is a large body of evidence documenting the effects of roads and travel routes on habitat quality for a wide variety of big game species (Foreman et al. 2003; Hebarrelewhite 2008; Nietvelt 2002; Sawyer et al. 2006, 2009). While many studies quantify the effects of roads and road densities on wildlife and habitat quality, few distinguish between road classifications, traffic volumes, or specific road types and their corresponding effects on wildlife. Road density appears to be the most studied parameter related to roads and their effects on wildlife (Foreman et al. 2003; Hebarrelewhite 2008; Nietvelt 2002). For this reason, the BLM has chosen to use route density as a means to characterize habitat quality and describe and assess impacts within the Unit, which is mapped as crucial winter range for big game. Doherty et al. (2008), Hebarrelewhite (2008), Sawyer et al. (2009), Wilbert et al. (2008), and others have used spatial models to characterize the effects of route density on overall habitat quality within a given geographic area.

The response to routes for individual big game species varies. In many cases responses have been documented as displacement distances or avoidance buffers for individual species. When the average documented displacement distance or avoidance buffer for a given species exceeds the distance to the nearest road across available habitats, the habitat quality for that species has decreased substantially and may result in population-level adverse effects (Hebarrelewhite 2008; Doherty et al. 2008; Ingelfinger and Anderson 2004; Sawyer et al. 2006, 2009).

According to a recent literature review of ungulate response to route development, substantial impacts on ungulate populations begin to manifest themselves when route densities reach 0.5 to 1 mile of road per square mile. Similar route density threshold has been implicated for maintaining sustainable populations of sage-grouse, large carnivores, and bears (Doherty et al. 2008; Van Dyke et al. 1986; Clevenger et al. 1997).

Big game habitat quality within the geographic boundary of the Bull Mountain Unit (Unit) can be characterized as described in **Table 4-51**, Habitat Quality Categories as a Function of Road Density, based on route densities analyzed across the alternatives. Route densities were calculated based on the Kernel Density tool provided in ArcGIS with a search radius of 1000 meters based on the average route avoidance distance for ungulates described in Rost and Bailey 1979 and Freddy et al. 1986.

**Table 4-51**
**Habitat Quality Categories as a Function of Road Density**

| Habitat Quality | Existing Route Density and Fragmentation |
|---|---|
| Category 1 | 0.0 - 0.5 road miles/sq. mile |
| Category 2 | 0.6 - 2.0 road miles/sq. mile |
| Category 3 | 2.1 - 4.0 road miles/sq. mile |
| Category 4 | > 4.0 road miles/sq. mile |

Source: CPW 2011

### *Alternative A*

Effects on fish and wildlife from access road use and pipeline development would be as described under the Nature and Types of Effects for casual use and permitted use. Surface disturbance from current oil and gas development would continue. New access roads would not be purposefully sited to reduce impacts on key big game habitat such as winter habitats. Within the Unit, crucial winter range is of greatest importance for deer and elk. Seasonal restrictions to human activities may reduce impacts on crucial winter range. Under Alternative A, impacts from road development and use would have the least direct effect on wildlife and their habitat as Alternative A would result in the fewest number of well pads, miles of roads, and pipelines.

Because the WHP is an agreement with the BLM for operations on federally permitted actions, the assumption is that its provisions would not be applied under Alternative A for this analysis. If SGI were to voluntarily work under the provisions or the COGCC were to adopt them for state permits, the seasonal closures, monitoring, and design features would avoid or minimize impacts on big game winter habitat, would protect water quality and aquatic resources, would collocate wells, and would provide for pre-construction nest surveys. Additionally, installing netting over open pits would reduce the likelihood of death or injury to wildlife from entrapment or exposure to oil. Measures to protect water quality and aquatic resources would limit surface-disturbing activities near lakes, wetlands, and perennial or seasonal flowing waterways providing fish habitat. Implementing the WHP would likely reduce but not eliminate impacts on wildlife, such as habitat loss and fragmentation, injury, or death.

Additionally, reducing the number of pipeline and road crossings of streams and other water bodies as well as decreasing the amount of surface water used within the Unit would reduce impacts on aquatic species and their habitat. Actions proposed under Alternative A would result in the least amount of water depletions since Alternative A proposes to develop the fewest number of well pads which would require the least amount of project water for oil and gas development (see **Table 2-10**, Summary of Actions by Alternative, for water quantities). Therefore, aquatic habitat would be least affected by surface water use under Alternative A.

*Terrestrial Wildlife*

Under Alternative A, proposed well pads, roads, pipelines and other supporting infrastructure would result in the short-term disturbance of over 260 acres in the Unit; in the long term over 88 acres would be disturbed. Estimates of impacts on wildlife resources were determined quantitatively in GIS to analyze potential indirect impacts and potential habitat loss during construction, resource development, and completion phases. See **Table 4-43** for a description of direct impacts on habitat vegetation types under Alternative A.

The road density analysis indicates that Alternative A would result in 4,440 acres of Category 1 habitat and 15,230 acres (sum of habitat Categories 2, 3, and 4) with road densities greater than 0.5 road miles per square mile (**Table 4-52**, Habitat Categories by Alternative; **Figure 4-15**, Habitat Categories by Alternative). Scattered throughout the Unit are islands of Category 1 habitat, some of which overlap severe winter range for elk and deer. Road densities are greatest (Category 4) along Highway 133 in the eastern portion of the Unit where human disturbance is greatest. Travel activities associated with other road uses in the Unit would also contribute to human disturbances that could cause wildlife displacement or avoidance. Under Alternative A, federal minerals within the Unit would continue to be subject to a winter seasonal timing limitation from December 1 through April 30 to protect deer and elk winter ranges from development activities.

Mule Deer – Mule deer have shown considerable ability to acclimate to human activities within the area, and rarely flee very far from vehicular use of roads. However, it is well-documented that deer stress levels, and thus overall fitness, are compromised when mule deer use habitats near and within areas of major natural gas development. Wilbert et al. (2008) provided observations of wildlife responses to indicators including distance to nearest roads and well pads. Mule deer in shrub habitat avoid roads within 328 feet and the minimum distance from active oil and gas development that mule deer are likely to occur in range between 1.6 and 2.3 miles from well pads. Restricting surface-disturbing activities from mineral development through management actions would, therefore, reduce impacts on wildlife species and their habitat, generally for species within the Unit.

**Table 4-52**
**Habitat Categories by Alternative**

| | Alt. A (No Action) | | Alt. B (Proposed Action) | | Alt. B Proposed Action) Wildlife Habitat Plan | | Alt. C (Modified Action) | | Alt. C (Reduced Winter Activity) | | Alt. D (Preferred Alternative) | | Alt. D (Preferred Alternative) Wildlife Habitat Plan | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Habitat Category** | **Acres** | **% Δ** | **Acres** | **% Δ** | **Acres** | **%Δ** | **Acres** | **% Δ** | **Acres** | **% Δ** | **Acres** | **% Δ** | **Acres** | **% Δ** |
| 1 | 4,440 | -- | 1,180 | -73 | 5,950 | 25 | 4,310 | -3 | 5,750 | 30 | 3,260 | -27 | 6,480 | 31 |
| 2 | 6,160 | -- | 4,100 | -33 | 5,300 | -14 | 7,300 | 19 | 7,100 | 15 | 7,280 | -15 | 6,780 | 9 |
| 3 | 7,430 | -- | 9,230 | 24 | 6,520 | -12 | 7,010 | -6 | 5,960 | -20 | 7,450 | 0 | 5,570 | -25 |
| 4 | 1,640 | -- | 5,170 | 69 | 1,900 | 14 | 1,060 | -35 | 870 | -47 | 1,690 | -3 | 850 | -48 |

Source: BLM GIS 2014, CPW 2011

The BLM will be modifying the lease stipulations for winter timing restrictions in areas outside of the SGI committed winter big game closure areas. These lease modifications will allow a landscape-level approach to effective winter range management and maintenance of effective winter range conditions, which would otherwise not be realized. At this time, the level of natural gas development in the Unit is not considered to be major, and while there is likely some change in mule deer behavior in the area around producing wells and some of the more heavily used roads, detectable impacts on deer population levels in the area are unlikely.

Direct impacts (i.e., mortality) to mule deer are unlikely in the project area given that all roads within the Unit are dirt roads (with the exception of Highway 133), and road speeds are generally below 30 mph. Within the Unit, the slow road speeds and mobility of deer would limit traffic-related deer mortality. The level of traffic on Highway 133 from development of Alternative A would increase by less than 1 percent over the next 6 years (**Section 4.3.5**, Transportation and Access), which would likely have additive but nominal direct mortality impacts on mule deer wintering in lower elevations along Highway 133. This would likely impact individual deer, but no population level impacts would be expected.

Netting around pits would avoid the chance that deer could become stuck in a pit, or ingest waters on pit surfaces.

See the Vegetation section for a detailed description of the acres of impact on specific vegetation communities. **Table 4-53**, Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit under Alternative A, shows the quantitative impacts on mule deer and elk habitats that would result from Alternative A. These direct impacts on habitats would be relatively small in scale.

**Table 4-53**
**Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit under Alternative A**

| Impacts | Total (acres) |
|---|---|
| ***Short-Term Impacts*** | |
| Mule deer winter range | 41 |
| Mule deer winter concentration area | 0 |
| Elk highway crossing | 1 |
| Elk severe winter range | 72 |
| Elk winter concentration area | 196 |
| ***Long-Term Impacts*** | |
| Mule deer winter range | 12 |
| Mule deer winter concentration area | 0 |
| Elk highway crossing | 1 |
| Elk severe winter range | 21 |
| Elk winter concentration area | 65 |

Source: SGI 2013, BLM GIS 2014, Petterson 2012

## Habitat Categories by Alternative







Figure 4-15

Case No. 1:20-cv-02484-MSK Document 90-2 filed 05/06/21 USDC Colorado pg 106 of 576

This page intentionally left blank.

In summary, long-term impacts on habitat would decrease after major activities associated with development are complete, and thus traffic levels and heavy construction activities would also decrease. However, compared to current conditions, the area would see a long-term increase in human activity, which would diminish the utility of the area for mule deer. Avoidance of winter habitat under the WHP would reduce these impacts. Mule deer densities within the Unit may decrease over time with full development of the Unit due to increased human activities, but the relatively small footprint of the project would allow for adequate forage for mule deer throughout the area.

The long-term indirect impacts on deer would be largely dependent on the amount of traffic and human activities in the Unit. With automation of facilities and reduced traffic, disturbance would be reduced, but the facilities would still be maintained year-round. It is conceivable that deer may continue to utilize much of the Unit. However, if wells are checked daily or roads see regular traffic, deer densities and use of the Unit would likely remain lower than current levels. Overall deer populations would not be expected to decrease, but deer densities in the Unit would be lower.

Avoidance of winter big game habitat during the drilling and construction phases would protect the deer population in the winter. During the summer and fall, deer seem to be more sensitive to human disturbances (which would coincide with the construction season and fall hunting seasons), while wintering mule deer seem more accepting of human activities (which coincides with reduced human activity in the Unit). Given the low levels of human activity anticipated in the winter, deer may maintain traditional use patterns. However, year-round maintenance during the production phase would involve traffic and human disturbance and may result in deer avoiding habitat. Indirect impacts on deer would be realized through lower fawn weights and possibly higher fawn deaths. Deaths could increase due to does and fawns needing to travel more to avoid habitats near roads, pads, pits, and other areas of human activity, which could therefore limit their use of preferred habitats and refugia and increase their metabolic outputs.

Elk – Direct impacts (e.g., mortality) to elk are unlikely in the project area given that all roads within the Unit are dirt (with the exception of Highway 133), and road speeds are generally below 30 mph. It is possible that some elk may be struck while attempting to cross a road, but this is relatively unlikely given the road speeds (which are even slower during the winter) and agility of elk. Mortality to elk along Highway 133 is currently occurring due to existing traffic patterns, and development of the Unit would contribute to additional traffic on Highway 133. The level of traffic on Highway 133 from Alternative A would increase by less than 1 percent, depending on the time of year and level of development (see **Section 4.3.5**, Transportation and Access, for more information regarding traffic impacts). Traffic increases would likely have additive but nominal direct mortality impacts on elk wintering in lower elevations along Highway 133. This would likely impact individual elk, but no population-level impacts would be expected, especially when considering that elk would be wintering near Highway 133 when development-related traffic volumes are lower.

Wildlife fencing around cutting pits would avoid the chance that elk could become stuck in a pit or ingest waters on pit surfaces. The odor of cuttings pits, tarps covering pits, and the presence of livestock fencing around pads would further deter elk from these areas.

**Table 4-53** shows the quantitative impacts on mule deer and elk habitats that would result from Alternative A. See the Vegetation section for a detailed description of the acres of impacts on specific vegetation communities. These direct impacts on habitats are very small in scale. Areas affected by short-term construction disturbance may have a longer duration of impacts on elk than expected. This is because these areas would not be reclaimed to pre-disturbance conditions for many years given the slow rate of shrub re-establishment and time required to return to functional habitat conditions for elk.

There may be a 2- to 3-year period when pipeline corridors provide lower elk grazing opportunities throughout the Unit. It is assumed that over 3 years or so, most of the cleared pipeline corridors and other temporary use areas would be revegetated and would once again provide elk with more suitable foraging. However, in some circumstances where landowners or other agencies require the planting of more aggressive nonnative grasses and forbs, the recovery of native forbs and shrubs into these short-term disturbance acres may take much longer due to the competitive exclusion of desirable native plants.

Elk would avoid otherwise suitable habitats near access roads, construction areas, and active drilling sites during the construction process due to human activities, traffic, loud noises, and other perceived threats by elk as described under the Nature and Types of Effects. For instance, Wilbert et al. (2008) found that elk habitat effectiveness is eliminated in non-forested habitats when road densities exceed 1 mile/square mile. It is reasonable to assume that decreased utilization would occur near areas of higher human activity, noise, and traffic. Indirect impacts which may occur during the summer construction, drilling, and completion seasons are tempered by the fact that during the summer most elk have migrated to higher terrain outside of the Unit. Construction, road use, and drilling activities occurring during the calving period (late May through late June) which occur near aspen stands and oakbrush stands may displace some individual calving elk, or disturb some calving activities. As most cows would have left the Unit by this time of year, widespread impacts are not anticipated. Avoidance of winter habitat under the WHP would reduce potential impacts on wintering elk; however, year-round maintenance activities would occur and could result in elk avoiding habitat.

The Muddy Creek elk winter concentration area is geographically isolated, covering approximately 25,000 acres (39 square miles), approximately 1.5 percent of the entire unit. Typical winter snow depths prevent elk from using the northern slopes and confine their distribution to southern aspects. Thus, only a subset of the 25,000 acres in the Muddy Creek winter concentration area provides high functioning winter foraging habitat for elk. Despite being geographically isolated and small, aerial count data gathered since the 1980s from the Muddy Creek Area indicate that up to 10 percent of the elk in the area winter there. This geographic isolation limits the ability of big game to shift their distribution to respond to disturbances from oil and gas development and production in the winter. The disturbance to elk in this isolated winter concentration area, with its significantly higher densities of wintering animals than general winter range, could result in population decline. This could happen even after COAs, best management practices, and the voluntary timing limitation. This is because elk have no contiguous habitat to relocate to.

In summary, the development of the Unit under Alternative A would create a direct loss of less than 1 percent of the potentially available habitats under any of the proposed activities. This loss of habitat would have an insignificant impact on elk. However, traffic and human activities in the Unit would have a larger indirect impact footprint, especially during the construction and drilling phases, possibly resulting in a larger range of areas with reduced habitat effectiveness for elk. Since drilling would occur year-round on private lands/private mineral estate which are relatively evenly distributed across the Unit, impacts on elk would likely occur, causing widespread impacts. It is expected, however, that most construction, drilling, and development would likely occur during the summer, reducing the likelihood for impacts on elk when they are most common in the Unit (winter). Year-round maintenance activities would impact wintering elk, particularly in isolated winter concentration areas, such as Muddy Creek.

Elk would continue to use, migrate through, and may even be seen very close to the facilities and roads within the Unit, but scientific literature indicates that elk utilization of habitats near roads decreases with increasing traffic levels (Wilbert et al. 2008), and new roads reduce habitat effectiveness for elk (see Petterson 2012). Given the size of the project, its location, and surrounding habitats, this project could have moderate impacts on elk densities and distribution within the Unit. However, it is unlikely that elk populations within the greater Muddy Creek basin would decrease, but elk densities across the Unit would likely be lower, or at least elk would be redistributed in some areas, with elk seeking habitats away from facilities and high-use roads. This may place elk in suboptimal habitats. Some areas would likely support similar elk densities as currently occurring due to low levels of development, but some areas proposed for development are located very close to or within critical winter habitats and impacts on elk in these areas would have disproportionately large impacts.

Black bear – Alternative A would have negligible impacts on bear populations or bear habitat. Bear-proof trash containers should be used on-site at all times to minimize visitation by bears but would not be required.

Moose – The development of the Unit would likely preclude moose lingering or utilizing habitats within the modeled indirect impact areas (see previous discussions). After construction, the low human activity levels around individual well pads would likely cause moose to leave if humans entered the area. Depending on the distance from the pad site, however, some moose may linger, or would not flee from human activities on pads and roads. This is not to say that moose stress levels would not rise or changes in behavior would not be noticed.

Increased traffic on local roads would also reduce moose use of habitats near roads. Increased mortality from vehicle strikes is not likely within the project area, as road speeds are fairly low, but moose vehicle strikes have been documented on Highway 133 on the east side of McClure pass near Placita. In summary, while this project may have minor localized impacts on the ability for moose to continue to fully utilize habitats in the Unit, the Unit is not optimal moose habitat, and moose use of this area would already likely be relatively infrequent. Therefore, Alternative A would have negligible impacts on moose or moose habitat.

*Aquatic Wildlife*
Under Alternative A, 4 miles of new pipeline collocated with roads and 8 miles of new cross country would be used to transport gas from producing wells and to transport water to proposed

water disposal wells. Impacts on aquatic wildlife would occur where pipeline construction phases require a pipeline bore at fish-bearing stream crossings. See **Section 3.2.8**, Fish and Wildlife, for a description of fish-bearing streams in the Unit. Surface water withdrawals would be required for nearly all phases of oil and gas development especially during construction, drilling, and dust abatement activities; 30 percent of project water would be gathered from freshwater sources and the remaining 70 percent would come from a variety of recycled and/or produced sources. Specific water withdrawal points have not yet been identified by SGI; however, it is assumed for the purposes of this analysis that the entire freshwater depletion associated with this project would be a new depletion from the Colorado River. In the short and long term, water depletions would threaten the quantity of aquatic habitat for fish and other aquatic species known to inhabit the Unit. See **Section 3.2.8**, Fish and Wildlife and **Section 3.2.10**, Special Status Species, for a list of aquatic wildlife in the Unit. Water volumes required for the activities under Alternative A would be minimal compared with the expected discharge in Muddy Creek (see **Section 4.2.4**, Water Resources) and would not substantially reduce water for aquatic wildlife. Measures to protect water quality and aquatic resources in the WHP would further reduce impacts on fish.

***Alternative B***

Impacts on fish and wildlife from access road use, pipeline development, and water use would be as described under the Nature and Types of Effects for casual use and permitted use. Surface disturbance from current and proposed oil and gas development would be greatest under Alternative B. The WHP would be implemented as a design feature to reduce impacts on big game winter habitat, protect water quality and aquatic resources, collocate wells, and provide for pre-construction nest surveys. Under Alternative B, impacts from road development and use would have a greater direct effect on wildlife and their habitat than Alternative A as Alternative B would result in the greatest number of well pads, miles of roads, and pipelines. However, implementing the WHP would reduce impacts on big game, aquatic resources, and nesting birds, relative to current conditions or Alternative C. This is as a result of surface disturbance activities and the lack of effective timing limitations on a landscape scale to reduce impacts on big game within crucial winter activity areas.

Actions proposed under Alternative B would result in greater water depletions as a result of developing the greatest number of well pads which would require the greatest amount of water during construction, drilling, and dust abatement phases of the proposed project (see **Table 2-10**, Summary of Actions by Alternative, for water quantities). Therefore, aquatic habitat would be more affected by surface water depletions under Alternative B than Alternative A, but measures in the WHP, such as setbacks from streams, would protect water quality.

*Terrestrial Wildlife*

Management actions proposed under Alternative B would result in greater of surface disturbance relative to Alternative A. Upgrades to existing roads would total 53 miles, with 16 miles of new construction. The road density analysis within the Unit identified 1,180 acres of Category 1 habitat, an approximate decrease of 72 percent compared to Alternative A. Direct impacts on terrestrial wildlife species where road densities are greater than 0.5 road miles per square mile would be most pronounced on 18,500 acres (sum of Categories 2, 3, and 4), a 21 percent increase compared to Alternative A (**Table 4-52**). Besides the direct loss of habitat and resulting habitat

fragmentation, this increase in roads could result in habitat avoidance and an increased likelihood for injury or mortality due to collisions of wildlife with vehicles (See *Habitat Quality*, above). However, seasonal closures under the WHP would reduce the direct road impact area to 13,720 acres, a reduction of 10 percent compared to Alternative A (see **Table 4-52**).

Under Alternative B, federal minerals within the Unit would continue to be subject to a winter seasonal timing limitation from December 1 through April 30 to protect deer and elk winter ranges from development activities. In addition, deer and elk would be protected under the WHP's seasonal closures to limit activity in important wintering habitat and design features to locate wells in areas that would minimize habitat fragmentation.

Quantitative estimates of impacts on wildlife resources were determined for potential indirect impacts and potential habitat loss during construction, resource development, and completion phases. See **Table 4-44** for a description of direct impacts on habitat vegetation types under Alternative B.

In addition, under Alternative B, SGI proposes to construct up to 4 new water disposal wells powered by overhead electrical lines requiring 20 new power poles. The addition of power lines and poles pose a threat of disturbance as described under permitted activities in the Nature and Types of Effects section. Power lines and poles may also serve as perches for birds of prey, which may indirectly increase predation on small mammals and other prey items (APLIC/USFWS 2005). Further discussion regarding impacts on birds is provided in **Sections 4.2.8**, Migratory Birds and **4.2.9**, Special Status Species.

Mule Deer and Elk – Under Alternative B, surface disturbance activities from oil and gas development would result in greater impacts on mule deer habitat throughout the Unit compared to Alternative A (**Table 4-53**). The type of impacts would be as described in the Nature and Types of Effects section above.

The reduction in habitats, as shown in **Table 4-54**, Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit under Alternative B, and habitat quality, described in the road density analysis above, would likely result in increased impacts on mule deer and elk fitness in individuals and would lower mule deer and elk densities in the Unit during the winter compared to Alternative A.

Development of well pad 12-89-7-1 and the associated pipelines would cause impacts on wildlife species around the well pad and pipelines. Approximately 2 acres of sagebrush shrubland habitat would be lost to pad construction; approximately 5.5 acres of previously undisturbed vegetation and 8.6 acres of previously disturbed vegetation would be impacted temporarily by pipeline construction.

The project is in mule deer winter range, near a winter concentration area. The site is also in elk winter range, and activities there would add additional traffic and human activity and would be expected to result in elk avoiding the habitat.

**Table 4-54**
**Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit under Alternative B**

| Impacts | Total (acres) |
|---|---|
| ***Short-Term Impacts*** | |
| Mule deer winter range | 153 |
| Mule deer winter concentration area | 3 |
| Elk highway crossing | 1 |
| Elk severe winter range | 135 |
| Elk winter concentration area | 404 |
| ***Long-Term Impacts*** | |
| Mule deer winter range | 51 |
| Mule deer winter concentration area | 1 |
| Elk highway crossing | 1 |
| Elk severe winter range | 49 |
| Elk winter concentration area | 146 |

Source: SGI 2013, BLM GIS 2014, Petterson 2012

Direct impacts on deer and elk could include mortality from traffic on access roads, but the levels of mortality would likely be low and not have population-level impact. Short- and long-term indirect impacts would likely include habitat avoidance due to disturbance, noise, and light. It is not possible to quantify the impacts on the deer and elk populations at this time. Because of the small size of the project, prime winter range would not be impacted by pad development, but it could be impacted by habitat avoidance in areas adjacent to access roads. Following construction, automation of well pad activities would minimize disturbance to wintering and migrating elk, but year-round maintenance would still occur (Rocky Mountain Ecological Services 2012).

Black bear – Under Alternative B, the increase in surface disturbance activities within the Unit from proposed oil and gas development would result in slightly reduced black bear habitat and more frequent encounters with humans as a result of increased activities. However, bear-resistant dumpsters and trash receptacles would be installed at all facilities as required under the COA design feature in **Appendix C** (COA #41). Thus, impacts on black bears and their habitat under Alternative B would be negligible.

Impacts on black bear from development of well pad 12-89-7-1 and the associated pipelines would be minor. This is because bears in the area are habituated to human disturbance (Rocky Mountain Ecological Services 2012).

Moose – Moose habitat would be slightly reduced and human encounters would increase as a result of actions proposed under Alternative B. Impacts on moose and their habitat would be negligible under Alternative B.

Adhering to COAs from **Appendix C** (COAs #39 through #45 for protection of wildlife) and design features in **Appendix C** would minimize the potential for impacts on wildlife. Because of the amount of surface disturbance associated with Alternative B, residual disturbance and harm to wildlife habitat would still occur after implementation of design features and COAs. In

addition, the BLM may include additional site-specific COAs to the APDs for increased protection of wildlife and their habitat.

*Aquatic Wildlife*
Given the increased miles of pipeline infrastructure, Alternative B would require more pipeline bores at stream crossings and would, therefore, result in greater impacts on aquatic wildlife compared to Alternative A. The annual rate of oil and gas construction in the Unit would be the same under Alternative B compared to Alternative A, but it would continue for a longer time period. Therefore, under Alternative B, construction and drilling phases would require more water use from local sources over the life of the project but annual withdrawals would be minimal as described in Alternative A. Based on the water estimates in **Section 4.2.4**, Water Resources, approximately 124 acre-feet of freshwater would be required to meet water demands, which is less than the annual depletion amount of 379 acre-feet per year for all oil and gas activities on the western slope per the BLM/USFWS programmatic agreement.

Development of well pad 12-89-7-1 and the associated pipelines is sufficiently distanced from the Gunnison and Colorado Rivers and occupied habitats. Because of this, incidental sediment delivery to local streams would be adequately diluted with background waters so that sediment would have no measurable impacts on the fish in these rivers (Rocky Mountain Ecological Services 2012).

***Alternative C***
Impacts on fish and wildlife under Alternative C would be as described under the *Nature and Types of Effects* for casual use and permitted use. Surface disturbance from current oil and gas development would continue; however, new access roads would be located in a manner that reduces impacts on big game species and their habitat. Additionally, wildlife design features would implement timing limitations to restrict oil and gas activities in critical elk and deer winter habitat; however, the WHP would not be implemented under Alternative C. Aquatic wildlife and their habitat would be impacted more under Alternative C than Alternative A as a result of increased water depletions; however, water use under Alternative C would be less than the water withdrawals proposed under Alternative B.

*Terrestrial Wildlife*
In general, actions proposed under Alternative C contain elements that are similar to Alternatives A and B in terms of the phases of development and associated actions from construction through reclamation. Alternative C however, would adhere to the COAs and additional design features to address the impacts of oil and gas development on wildlife and their habitat. For example, centralized production facilities would be established outside of the Reduced Winter Activity Areas shown in **Figure 2-3** to reduce year round truck traffic to the individual wells located within these areas to enhance their utility as winter refugia for wildlife. Remote telemetry would be used to reduce well monitoring trips once a well is put into production. This could result in a substantial reduction in the number of annual truck miles driven within the Unit and a corresponding reduction in disturbance to wildlife.

Under Alternative C, proposed well pads, roads, pipelines and other supporting infrastructure would result in the short-term disturbance of over 441 acres in the Unit; in the long term, 126 acres would be disturbed. The collocation of all pipelines with roads would maintain habitat

patch size and late seral communities as well as reduce the likelihood for weed introduction and spread. However, the short-term impacts from collocation would be greater due to the larger work area required. The road density analysis within the Unit indicates that road development under Alternative C would result in 4,310 acres of Category 1 habitat and big game impacts would be most pronounced on 15,370 acres where road densities are greater than 0.5 road mile per square mile (**Table 4-52**). In Alternative A, Category 1 habitat would be about the same as Alternative A. As a result, the potential habitat avoidance and conflict with vehicles would be greater than Alternative A, but less than Alternative B.

Quantitative estimates of impacts on wildlife resources were determined for potential indirect impacts and potential habitat loss during construction, resource development, and completion phases. See **Table 4-46** for a description of direct impacts on habitat vegetation types under Alternative C.

Under Alternative C, federal minerals within the Unit would continue to be subject to a winter seasonal timing limitation from December 1 through April 30 (COA #39) to protect deer and elk winter ranges from development activities. Exceptions or modifications would not be considered within these areas except for emergency work. In addition to the general TLs already imposed on federal mineral development, Alternative C proposes to use voluntary seasonal winter timing limitations or a progressive development approach to further reduce the potential for impacting critical winter habitat for deer and elk within the Unit (see Additional Mitigation Measures, below).

The voluntary winter timing limitations or a progressive development approach could mitigate for impacts on big game during construction or resource development activities in sensitive winter habitats on federal and private lands. Under this alternative, the BLM would waive winter TLs within agreed-upon areas to allow winter development activities. See **Section 2.2.6**, Alternative C, Modified Action, for information regarding the voluntary seasonal winter timing limitations within the Unit. The voluntary seasonal winter timing limitations would result in an additional 5,750 acres of Category 1 habitat quality during the season of highest occupation by big game populations in the Unit, a 30 percent increase from Alternative A, and would reduce Category 2, 3, and 4 habitats by 1,300 acres compared to Alternative A. The TL would also focus activities in a smaller area, providing a refuge for animals elsewhere in the Unit. This TL as well as the centralized gathering facilities and remote telemetry would result in a landscape reduction of human presence and disturbance during the winter and likely maintenance of big game herd size at or near Alternative A levels given the increase in habitat quality and reduced activity areas. Other wildlife species that may inhabit the seasonal winter TL areas would also receive added protection.

Additional wildlife mitigation elements under Alternative C would include pre-construction nesting surveys for migratory birds and raptors would be conducted in advance of proposed surface-disturbing activities between April 1 and June 30. Also, the proposed construction of four new water disposal wells would bury electrical lines adjacent to roadways. Though burying electrical lines causes short-term habitat disturbance, in the long term it reduces potential harm to birds and other wildlife from providing perches to predators. For more discussion regarding impacts on birds see **Sections 4.2.8**, Migratory Birds and **4.2.9**, Special Status Species.

Mule Deer and Elk—Under Alternative C, surface disturbance activities from oil and gas development would result in overall lesser impacts on mule deer and elk habitat throughout the Unit compared to Alternatives A and B (**Table 4-52**), though roads would cross through elk winter range. The type of impacts would be as described in the Nature and Types of Effects section above. Additional voluntary winter TLs, described above, would further protect critical winter range for mule deer in the Unit. The reduction in habitats, as shown in **Table 4-55**, Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit under Alternative C, and habitat quality, as described in the road density analysis above, would likely result in increased impacts on mule deer and elk fitness in individuals and would lower mule deer and elk densities in the Unit during the winter compared to Alternative A.

**Table 4-55**
**Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit under Alternative C**

| Impacts | Total (acres) |
|---|---|
| ***Short-Term Impacts*** | |
| Mule deer winter range | 114 |
| Mule deer winter concentration area | 0 |
| Elk highway crossing | 0 |
| Elk severe winter range | 105 |
| Elk winter concentration area | 277 |
| ***Long-Term Impacts*** | |
| Mule deer winter range | 33 |
| Mule deer winter concentration area | 0 |
| Elk highway crossing | 0 |
| Elk severe winter range | 29 |
| Elk winter concentration area | 74 |

Source: SGI 2013, BLM GIS 2014, Petterson 2012

The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

Black bear—Under Alternative C, the increase in surface disturbance activities within the Unit from proposed oil and gas development would result in slightly reduced black bear habitat and more frequent encounters with humans as a result of increased activities. However, impacts on black bears and their habitat under Alternative C would be less than impacts expected as a result of Alternatives A and B. Bear-resistant dumpsters and trash receptacles would be installed at all facilities as required under the COAs described in **Appendix C** (COA #40) Impacts on bear habitat under Alternative C would be negligible.

The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

Moose—Moose habitat would be slightly reduced and human encounters would increase as a result of actions proposed under Alternative C. However, impacts on moose and their habitat under Alternative C would be less than impacts expected as a result of Alternatives A and B. Impacts on moose and their habitat would be negligible under Alternative C.

Adhering to COAs described in **Appendix C** (COAs #39 through #45 for protection of wildlife; additional measures to protect habitat are included in the vegetation section) and design features in **Appendix C** would minimize the potential for impacts on wildlife. Because of the surface disturbance associated with development, residual disturbance and harm to wildlife habitat would still occur after implementation of design features and COAs, but less than under Alternative B, which incorporates fewer protective measures. In addition, the BLM may include site-specific COAs to the APDs for increased protection of wildlife and their habitat. Further, the acceptance and participation in the voluntary winter TLs would directly increase habitat protection for deer and elk winter habitat and indirectly increase habitat protection for other wildlife species that may inhabit those areas. Changes in route density would increase indirect impacts on elk and deer winter range. They are likely to lead to changes in habitat utilization, decreased habitat quality, habitat avoidance by big game, and reduced effectiveness of habitat. This would be despite the additions of site-specific COAs and the voluntary timing limitation.

*Aquatic Wildlife*
Given the increased miles of pipeline infrastructure, it is anticipated that Alternative C would require more pipeline bores at stream crossings and would, therefore, result in greater impacts on aquatic wildlife than Alternative A, but less than Alternative B. The annual rate of oil and gas construction in the Unit would be the same under Alternative C compared Alternative B but would require less water use for dust abatement. Based on the water estimates in **Section 4.2.4**, Water Resources, approximately 124 acre-feet of freshwater would be required to meet water demands which is less than the annual depletion amount of 379 acre-feet per year for all oil and gas activities on the western slope per the BLM/USFWS programmatic agreement. Therefore, under Alternative C, annual water withdrawals from local sources in the Unit would be minimal as described in Alternative A above. Under Alternative C, aquatic wildlife within the Unit would have slightly less available water compared to Alternative A and slightly more than Alternative B.

The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

Additional Mitigation Measures
Under Alternative C, centralized production facilities would be established outside of the Reduced Winter Activity Areas (**Figure 2-3**) to reduce year-round truck traffic to the individual wells located within these areas to enhance their utility as winter refugia for wildlife.

Remote telemetry would be used to reduce well monitoring trips once a well is put into production, resulting in a substantial reduction in the number of annual truck miles driven within the Unit and a corresponding reduction in disturbance to wildlife.

Under Alternative C, collocation of all pipelines with roads would maintain habitat patch size and late seral communities as well as reduce the likelihood for weed introduction and spread over the long term.

Alternative C proposes to use voluntary seasonal winter timing limitations or a progressive development approach to further reduce the potential for impacting critical winter habitat for deer and elk within the Unit.

Voluntary winter timing limitations under Alternative C could mitigate for impacts on big game during construction or resource development activities in sensitive winter habitats. Under this alternative, the BLM would waive winter TLs within agreed-upon areas to allow winter development activities. The voluntary seasonal winter timing limitations would increase Category 1 wildlife habitat while decreasing lower quality habitat. The TL would also focus activities in a smaller area, resulting in reduced human presence on winter range.

Under Alternative C, pre-construction nesting surveys for migratory birds and raptors would occur between April 1 and June 30 (an increase from May 15 through July 15, as described in **Appendix C**. Also, four new water disposal wells would bury electrical lines adjacent to roadways to reduce potential impacts on birds and other wildlife.

***Alternative D, the Preferred Alternative***

Impacts on fish and wildlife under Alternative D would be as described under *Nature and Types of Effects* for casual use and permitted use. Surface disturbance from current oil and gas development would continue; however, new access roads would be located in a manner that reduces impacts on big game species and their habitat. Additionally, the wildlife design features described in the WHP would include timing limitations to restrict oil and gas activities in critical elk and deer winter habitat. Aquatic wildlife and their habitat would be impacted more under Alternative D than Alternative A as a result of increased water depletions; however, water use under Alternative D would be the same as water withdrawals proposed under Alternatives B and C.

*Terrestrial Wildlife*

Quantitative estimates of impacts on wildlife resources were determined for potential indirect impacts and potential habitat loss during construction, resource development, and completion phases. See **Table 4-47** for a description of direct impacts on habitat vegetation types under Alternative D. Expanding the project footprint relative to Alternative A would increase habitat loss and fragmentation for big game species.

All roads in the Unit are dirt (with the exception of Highway 133) and road speeds are generally below 30 mph. Because of this, traffic-related deaths of deer and elk would be limited, and no population level impacts would be expected. Netting around pits is a component of the WHP and would avoid the chance that deer or elk could become stuck in a pit or ingest waters on pit surfaces. The road density analysis in the Unit indicates that road development under Alternative D would result in 3,260 acres of Category 1 habitat; big game impacts would be most pronounced on 16,420 acres where road densities are greater than half a road mile per square mile (**Table 4-52**). However, seasonal closures under the WHP would reduce the direct road impact area to 13,200 acres, a reduction of 13 percent compared to Alternative A (see **Table 4-52**).

In addition, under Alternative D, SGI proposes to construct up to four new water disposal wells, powered by overhead electrical lines requiring 20 new power poles. The addition of power lines and poles pose a threat of disturbance, as described in the *Nature and Types of Effects* section. Power lines and poles may also serve as perches for birds of prey, which may indirectly increase predation on small mammals and other prey (APLIC/USFWS 2005). Burying power lines would reduce these impacts. Further discussion regarding impacts on birds is provided in **Section 4.2.8**,

Migratory Birds, and **Section 4.2.9**, Special Status Species. The effects of applying the COAs in **Appendix C** would be similar to those effects described under Alternatives C and B.

Long-term direct impacts on wildlife habitat would decrease after major activities associated with development are complete; traffic levels and heavy construction activities would also decrease. However, compared to current conditions, the area would see long-term increased indirect impacts from an increase in human activity, which would diminish the utility of the area for big game. Compared to Alternative A there would be an 8% decrease in high quality wildlife habitat (habitat category 1&2 having less <2 miles/sq. mile of industry roads, **Table 4-52**) where impacts to habitat quality will be most pronounced. Compared to Alternative A there would be a relatively small increase in poor wildlife habitat (category 3&4) with an expected 3% increase. With the application of the WHP in the winter period 12/1-4/15 SG proposes to limit their activities in winter concentration areas ("Winter Closure Areas") on both fee/fee and split estate lands resulting in a landscape approach to maintaining more effective winter habitat suitability for big game. During the winter these reduced activity areas would result in a 40% increase in higher quality wildlife habitat over Alternative A which may result in better habitat suitability for wintering big game (**Figure 4-15**). However, even with the application of the WHP SG proposes to do daily well checks requiring up to two vehicle trips per day per well pad, conduct emergency work-overs of wells, additionally these actions would require SG to also plow snow as needed. These activities will result in in some level of residual impact that will diminish wintering big game habitat quality compared to current conditions. As a result it is likely that the Bull MOuntian Unit may winter less big game than it currently does. Those impacts are expected to be greatly diminished compared to a scenario where the WHP would not be implemented as there would be no required reduction in winter activity including drilling and completions on fee/fee lands. Additionally, most work-overs and routine maintenance are not subject to standard BLM winter timing limitations on split estate lands.

SG has committed to applying the WHP through the development phase of the project meaning that once the last wells are drilled and the Bull Mountain Unit is put in to the production phase the WHP would no longer be implemented. Impacts to wintering big game are expected to be considerably greater for this portion of the project. As equipment and wells age it is conceivable that more maintenance activity and well work-overs may be necessary. Without commitments to implement the WHP after the development stage it is realistic that more activity will occur during the winter period in the "Winter Closure Areas" during the 30+ year production phase. With increased winter activity in these areas it is reasonable to assume that impacts to wintering big game may be greatest during the production phase as higher quality winter habitat would be reduced by 40 percent. Over the long term the production phase may result in fewer wintering big game within the Bull Mountain Unit that what may persist during the development phase of the project.

As noted in **Table 4-56**, Impacts on Mule Deer and Elk Habitat in the Bull Mountain Unit under Alternative D, the effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

**Table 4-56**
**Impacts on Mule Deer and Elk Habitat in the Bull Mountain Unit under Alternative D**

| Impacts | Total (Acres) |
|---|---|
| ***Short-Term Impacts*** | |
| Mule deer winter range | 115 |
| Mule deer winter concentration area | 2 |
| Elk highway crossing | 0 |
| Elk severe winter range | 98 |
| Elk winter concentration area | 306 |
| ***Long-Term Impacts*** | |
| Mule deer winter range | 30 |
| Mule deer winter concentration area | 0 |
| Elk highway crossing | 0 |
| Elk severe winter range | 28 |
| Elk winter concentration area | 89 |

Sources: SGI GIS 2013; BLM GIS 2014; Petterson 2012

*Aquatic Wildlife*

Impacts on aquatic wildlife would occur where pipeline construction phases require a pipeline bore at fish-bearing stream crossings. (See **Section 3.2.8**, Fish and Wildlife, for a description of fish-bearing streams in the Unit.) Measures to protect water quality and aquatic resources in the WHP would further reduce impacts on fish.

Surface water withdrawals would be required for nearly all phases of oil and gas development especially during construction, drilling, and dust abatement activities; 30 percent of project water would be gathered from freshwater sources, and the remaining 70 percent would come from a variety of recycled or produced sources under all alternatives. In the short term and long term, water depletions would threaten the quantity of aquatic habitat for fish and other aquatic species known to inhabit the Unit. (See **Section 3.2.8**, Fish and Wildlife and **Section 3.2.10**, Special Status Species, for a list of aquatic wildlife species in the Unit.) Water volumes required for drilling would be minimal compared with the expected discharge in Muddy Creek (see **Section 4.2.4**, Water Resources) and would not substantially reduce water for aquatic wildlife. Measures to protect water quality and aquatic resources in the WHP would reduce impacts on fish compared to Alternative C.

The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

***Cumulative***

Many past and present actions and current conditions within the cumulative impact analysis area have affected and would likely continue to affect fish and wildlife species. The proposed activities may also result in direct impacts on individuals from development or vehicular collisions or indirect impacts from noise. Vegetation restoration projects and travel management-related route closures throughout the Forest Service lands would have some cumulative impacts that might counteract some of the development-related impacts by increasing habitat availability. In addition, reasonably foreseeable future actions that may affect fish and wildlife in the future

are described in **Table 4-3**. Recent and planned habitat restoration projects within the region include vegetation treatments to improve habitat and reduce fire threats. These improvement efforts would expand the extent and increase the quality of habitat for many fish and wildlife species that inhabit the surrounding region. However, impacts resulting from energy development, especially from oil and gas resources in the North Fork of the Gunnison River areas, would continue, as less than 25 percent of the Uncompahgre Field Office mineral estate has been leased. As such, access roads would continue to be developed on federal, state, and private lands in the region in support of energy development. These actions would reduce the availability of habitat and forage as well as increase habitat fragmentation. Additionally, continued and future actions resulting in water depletions or impacts on water quality within the region would reduce the quantity and quality of habitat for fish and other aquatic species.

Under all of the alternatives, impacts on fish and wildlife as a result of increased oil and gas development within the Unit would contribute to the impacts from past, present, and reasonably foreseeable actions described in **Table 4-3** (**Table 4-57**, Cumulative Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit [Alternatives A and B combined], and **Table 4-58**, Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit [Alternatives A and C combined] and **Table 4-59)**. Alternative A would result in the fewest number of well pads and would therefore result in the least amount of impacts on terrestrial and aquatic wildlife. The WHP under Alternatives B and D would protect big game winter habitat with seasonal closures and would provide for nesting surveys prior to construction and apply provisions to protect water quality for aquatic wildlife. The winter closures in the WHP would more than double the area in the Bull Mountain Unit containing lease stipulations protecting big game. Actions proposed under Alternative B would result in the greatest direct impacts on fish and wildlife habitat while applying additional COAs described in **Appendix C** (COAs #39 through #45 for protection of wildlife). The WHP would also apply under Alternative B. Under Alternative C, oil and gas development activities would result in more disturbance of fish and wildlife habitat compared to Alternative A but less than Alternative B. Although the WHP would not apply, Alternative C would implement COAs and voluntary seasonal timing limitations and other measures described under *Additional Mitigation Measures* above. This would be to reduce impacts on sensitive winter big game habitat by avoiding drilling activity while these species are using the habitat. Alternative D, the Preferred Alternative, would have comparable disturbance levels as Alternatives B and C but would apply the WHP measures, collocating roads and drilling sites, and minimizing cumulative impacts compared to the other action alternatives.

**Table 4-57**
**Cumulative Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit (Alternatives A and B combined)**

| Impacts | Total (acres) |
|---|---|
| ***Short-Term Impacts*** | |
| Mule deer winter range | 192 |
| Mule deer winter concentration area | 3 |
| Elk highway crossing | 2 |
| Elk severe winter range | 218 |
| Elk winter concentration area | 585 |

**Table 4-57**
**Cumulative Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit (Alternatives A and B combined)**

| Impacts | Total (acres) |
|---|---|
| ***Long-Term Impacts*** | |
| Mule deer winter range | 63 |
| Mule deer winter concentration area | 1 |
| Elk highway crossing | 2 |
| Elk severe winter range | 70 |
| Elk winter concentration area | 210 |

Source: SGI 2013, BLM GIS 2014, Petterson 2012

**Table 4-58**
**Impacts on Mule Deer and Elk Habitat in Bull Mountain Unit (Alternatives A and C combined)**

| Impacts | Total (acres) |
|---|---|
| ***Short-Term Impacts*** | |
| Mule deer winter range | 165 |
| Mule deer winter concentration area | 0 |
| Elk highway crossing | 1 |
| Elk severe winter range | 177 |
| Elk winter concentration area | 473 |
| ***Long-Term Impacts*** | |
| Mule deer winter range | 45 |
| Mule deer winter concentration area | 0 |
| Elk highway crossing | 1 |
| Elk severe winter range | 50 |
| Elk winter concentration area | 139 |

Source: SGI 2013, BLM GIS 2014, Petterson 2012

**Table 4-59**
**Impacts on Mule Deer and Elk Habitat in the Bull Mountain Unit (Alternatives A and D Combined)**

| Impacts | Total (Acres) |
|---|---|
| ***Short-Term Impacts*** | |
| Mule deer winter range | 165 |
| Mule deer winter concentration area | 0 |
| Elk highway crossing | 1 |
| Elk severe winter range | 177 |
| Elk winter concentration area | 473 |
| ***Long-Term Impacts*** | |
| Mule deer winter range | 45 |
| Mule deer winter concentration area | 0 |
| Elk highway crossing | 1 |
| Elk severe winter range | 50 |
| Elk winter concentration area | 139 |

Sources: SGI 2013; BLM GIS 2014; Petterson 2012

### 4.2.8 Migratory Birds

Impacts on bird species protected under the Migratory Bird Treaty Act (MBTA) of 1918 as a result of proposed management actions within the Bull Mountain Unit are discussed in this section. Detailed descriptions of habitat types within the Unit are provided in **Section 3.2.6**, Vegetation. See **Section 3.2.9**, Migratory Birds for a list of bird species that are known or have the potential to inhabit the Unit.

***Methods of Analysis***

Impacts on migratory birds and their habitat are similar to those described for terrestrial wildlife in **Section 4.2.7**, Fish and Wildlife.

*Indicators*

Indicators of impacts on migratory birds are as follows:

- Amount and condition of available habitat
- Likelihood of mortality, injury, or direct disturbance
- Likelihood of habitat disturbance

*Assumptions*

The analysis includes the following assumptions:

- Impacts on migratory birds analyzed in this section focus on those species identified in Chapter 3, Migratory Birds, which are known to inhabit the Unit.
- The actual locations of oil and gas well pads and associated infrastructure including pipelines and access roads is subject to change as a result of the APDs.
- Short-term effects are defined as those that would occur over a time frame of 5 years or less, and long-term effects would occur over longer than 5 years.

***Nature and Type of Effects***

Migratory bird habitats on BLM-administered lands in the Unit would be affected under all alternatives. Changes to bird habitats would be caused by the following three types of disturbances: 1) disturbance and disruption from casual use; 2) disturbance and disruption from permitted activities; and 3) changes to habitat conditions. These potential causes of disturbance are directly linked to vegetation conditions and water quality and quantity (**Section 4.2.6**, Vegetation, and **Section 4.2.4**, Water Resources). See **Section 4.2.7**, Fish and Wildlife, for a complete description of the three types of disturbances that could affect migratory birds.

***Effects Common to All Alternatives***

Within the Unit, oil and gas development activities would continue under all alternatives. Direct and indirect impacts on migratory birds would be as described under Nature and Type of Effects for permitted activities. In addition, activities associate with casual use and habitat changes described in the Nature and Type of Effects section would continue to impact migratory birds and their habitat.

***Alternative A***

For a complete description of activities and disturbances associated with Alternative A, see **Section 4.2.7**, Fish and Wildlife. Increased human activity as a result of ongoing oil and gas development activities and recreation in the Unit could result in impacts on raptor species (as described in the Nature and Type of Effects section) from disturbance from casual use and permitted activities. Direct impacts on migratory bird species would primarily be a result of injury or mortality from vehicle collisions or from striking oil and gas infrastructure. Indirect impacts on migratory birds would be from the loss of habitat or habitat fragmentation as a result of resource development activities. See **Section 4.2.6**, Vegetation, for a list of impacts on vegetation types under Alternative A.

Neotropical Species

Under Alternative A, sagebrush and irrigated meadows vegetation are expected to be most impacted as a result of continued oil and gas development (e.g., well pads, pipelines, and roads). These activities would therefore result in reduced habitat availability in the short term and long term for sagebrush obligate species including Brewer's sparrow, western meadowlark, vesper sparrow, and lark sparrow. Reduced irrigated meadow habitat could possibly impact American bittern, although marsh and meadow habitat for the bittern is limited within the Unit. Purple martin habitat, which includes old growth aspen stands, is not expected to be impacted by activities associated with Alternative A.

Raptors

Several raptor species occur or have the potential to occur in the Unit including bald and golden eagles, ferruginous hawks, falcons (peregrine and prairie), as well as flammulated owls. Under Alternative A, surface disturbance within irrigated meadow and sagebrush vegetation would reduce foraging habitat for golden eagles and prairie falcons in the short term and long term.

***Alternative B***

Impacts on vegetation within the Unit from well pads, pipelines, and roads would reduce habitat availability for migratory birds compared to Alternative A. For a complete description of activities and disturbances associated with Alternative B, see **Section 4.2.7**, Fish and Wildlife. Increased human activity as a result of ongoing and proposed oil and gas development activities in the Unit could result in impacts on raptor species as described in the Nature and Type of Effects under disturbance from casual use and permitted activities. See **Section 4.2.6**, Vegetation, for a list of impacts on vegetation types under Alternative B. Migratory bird impacts would be mitigated by applying additional COAs described in **Appendix C** (COAs #21, #25, #39, #41, and #42) as mitigation measures. Installing netting over oil pits (COA #21) would reduce the likelihood of bird deaths or injury from entrapment or exposure to oil. Applying COA #25 would reduce but not eliminate the risk of raptor death or injury due to electrocution. Additional pre-construction measures include nesting surveys described in the WHP and **Table 2-11**, Stipulations, Design Features, and Mitigation Measures. These would identify occupied nests and avoid disturbance impacts (e.g., physical disturbance and noise disturbance), thereby reducing the likelihood of nest abandonment. Restrictions on surface-disturbing activities during the breeding season (COA #39 for early-nesting species, such as raptors) would protect breeding migratory birds. Such restrictions could have long-term implications, such as ensuring successful

nesting and reproduction for some individuals would maintain the size and diversity of local populations, though they may be reduced in size from pre-development levels.

A V would be implemented under Alternative B as a design feature, which would include measures intended to avoid and minimize impacts on wildlife, including migratory birds. Pre-construction raptor and migratory bird nest surveys would be conducted to identify occupied nests and avoid disturbance impacts (e.g., physical disturbance and noise disturbance), thereby reducing the likelihood of nest abandonment. Additionally, installing netting over open pits would reduce the likelihood of bird deaths or injury from entrapment or exposure to oil. Measures to protect water quality and aquatic resources would likely also benefit migratory birds by limiting surface-disturbing activities near lakes, wetlands, or perennial or seasonal flowing waterways, which serve as important breeding and foraging habitats. Implementing the V would likely reduce but not eliminate impacts on migratory birds, such as habitat disturbance and injury or death. Alternative B may adversely impact individuals, but is not likely to result in a loss of viability on the Unit, nor cause a trend to federal listing or a loss of species viability range-wide.

The effects of developing well pad 12-89-7-1 and the associated pipelines would have negligible impacts on migratory birds; however, they would cumulatively add to other human activities in the vicinity and could change how migratory birds use the area (Rocky Mountain Ecological Services 2012).

Neotropical Species

Under Alternative B, sagebrush vegetation is expected to be most impacted by the actions proposed under this alternative in both the short term and long term. Sagebrush obligate species described above under Alternative A would have decreased habitat as a result of Alternative B. Additionally, oakbrush and some aspen habitat would be disturbed in the short term and long term. This would reduce the available habitat for purple martin, woodpeckers, flickers, house wren, warbling vireo, cordilleran flycatcher, western wood-pewee, tree swallow, and violet-green swallow. Irrigated meadow habitat is expected to be disturbed in the short term, resulting in less available habitat for American bittern (see **Section 4.2.6**, Vegetation for quantitative impacts on habitat).

Raptors

Surface disturbance within irrigated meadow (short-term) and sagebrush (short- and long-term) vegetation would reduce foraging habitat for golden eagles and prairie falcons. Flammulated owl oakbrush and aspen habitat would be decreased in the short term and long term under Alternative B (see **Section 4.2.6**, Vegetation for quantitative impacts on habitat).

***Alternative C***

Under Alternative C, impacts on vegetation within the Unit from well pads, pipelines, and roads would reduce habitat availability for migratory birds. Refer to **Section 4.2.7**, Fish and Wildlife, for activities and disturbances associated with Alternative C. Impacts as described in Section 4.2.7, such as burial of electrical lines, road development, and habitat loss, would also apply to migratory birds. Increased human activity as a result of ongoing and proposed oil and gas development activities in the Unit could result in impacts on raptor species as described in the Nature and Type of Effects under disturbance from casual use and permitted activities. See **Section 4.2.6**, Vegetation, for a list of impacts on vegetation types under Alternative C.

Migratory bird impacts would be mitigated by applying COAs provided in **Appendix C** (COAs #21, #25, #39, #41, and #42) as design features. In addition, under Alternative C, pre-construction nesting surveys for migratory birds and raptors (as described in **Section 2.2.6**) would be implemented to identify occupied nests and avoid disturbance impacts (e.g., physical disturbance and noise disturbance), thereby reducing the likelihood of nest abandonment. Additionally, new electrical lines to power the four proposed water disposal wells would be buried along roads to minimize potential overhead disturbance to birds and other wildlife (APLIC/USFWS 2005).

In general, impacts on migratory birds from actions proposed by Alternative C would be similar to those described under Alternative B; however, less habitat within the Unit would be impacted in the short term and long term, and more nests would be protected from disturbance. Alternative C may adversely impact individuals, but is not likely to result in a loss of viability on the Unit, nor cause a trend to federal listing or a loss of species viability range-wide.

The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

Neotropical Species

In both the short term and long term, sagebrush vegetation is expected to be most impacted of all habitat types by the actions proposed under Alternative C. Sagebrush-obligate species described above under Alternative A would have decreased habitat as a result of Alternative C; however, sagebrush habitat would not be reduced as much as under Alternative B. Oakbrush and some aspen habitat would be disturbed in the short term and long term. This would reduce the available habitat for purple martin, woodpeckers, flickers, house wren, warbling vireo, cordilleran flycatcher, western wood-pewee, tree swallow, and violet-green swallow. Irrigated meadow habitat is expected to be disturbed in the short term. resulting in less available habitat for American bittern (see **Section 4.2.6**, Vegetation for quantitative impacts on habitat).

Raptors

Surface disturbance within irrigated meadow (short-term) and sagebrush (short- and long-term) vegetation would reduce foraging habitat for golden eagles and prairie falcons. Flammulated owl oakbrush and aspen habitat would be decreased in the short term and long term under Alternative C (see **Section 4.2.6**, Vegetation for quantitative impacts on habitat).

Additional Mitigation Measures

Under Alternative C, collocation of all pipelines with roads would maintain habitat patch size and late seral communities as well as reduce the likelihood for weed introduction and spread over the long term.

***Alternative D, the Preferred Alternative***

Under Alternative D, impacts on vegetation in the Unit from well pads, pipelines, and roads would reduce habitat availability for migratory birds. Increased human activity as a result of ongoing and proposed oil and gas development in the Unit could impact raptor species, as described in the *Nature and Type of Effects* under disturbance from casual use and permitted activities. (See **Section 4.2.6**, Vegetation and Invasive, and Nonnative Species, for a list of impacts on vegetation types under Alternative D.)

Migratory bird impacts would be mitigated by applying COAs provided in **Appendix C** (COAs #21, #25, #39, #41, and #42) as design features. The effects of applying these COAs would be similar to those effects described under Alternatives C and B. Installing netting over oil pits (COA #21) would reduce the likelihood of bird deaths or injury from entrapment or exposure to oil. Application of COA #25 would reduce but not eliminate the risk of raptor death or injury due to electrocution.

Pre-construction nesting surveys for migratory birds and raptors (as described in **Section 2.2.6** and the WHP) would be implemented to identify occupied nests and avoid disturbance impacts (e.g., physical disturbance and noise disturbance), thereby reducing the likelihood of nest abandonment. The effects of applying the Wildlife Habitat Plan  would be similar to those effects described under Alternative B. Implementing the COAs and WHP as design features under Alternative D would likely reduce but not eliminate impacts on migratory birds.

The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

Neotropical Species

In both the short term and long term, sagebrush vegetation is expected to be most impacted by the actions proposed under Alternative D. Sagebrush obligate species described under Alternative A above would have decreased habitat as a result of Alternative D; sagebrush habitat would not be reduced as much as described under Alternative B. Oakbrush and some aspen habitat would be disturbed in the short term and long term. This would reduce the available habitat for purple martin, woodpeckers, flickers, house wren, warbling vireo, cordilleran flycatcher, western wood-pewee, tree swallow, and violet-green swallow.

Irrigated meadow habitat is expected to be disturbed in the short term, resulting in less available habitat for the American bittern (see **Section 4.2.6**, Vegetation, for quantitative impacts on habitat).

Raptors

Surface disturbance within irrigated meadow (short-term) and sagebrush (short-term and long-term) vegetation would reduce foraging habitat for golden eagles and prairie falcons. Flammulated owl oakbrush and aspen habitat would be decreased in the short term and long term under Alternative D (see **Section 4.2.6**, Vegetation, for quantitative impacts on habitat).

***Cumulative***

Migratory bird habitat would continue to be affected through several past and present actions as well as current conditions within the cumulative impact analysis area. In addition, reasonably foreseeable future actions that may affect migratory birds in the future are described in **Table 4-3**. Recent and planned vegetation improvement efforts would expand the extent and increase the quality of habitat for many migratory bird species that inhabit the surrounding region. Specifically, sagebrush restoration efforts aimed at improving habitat for sage-grouse would result in an increase in habitat for other sagebrush obligate bird species including Brewer's sparrow and meadowlark. Also, projects within the region to treat aspen affected by Sudden Aspen Decline as well as aspen stands impacted by insects and disease would reduce habitat for cavity nesters like the purple martin in the short term but improve aspen health in the long term.

Impacts resulting from energy development, especially of oil and gas resources in the North Fork of the Gunnison River areas, would continue as less than 25 percent of the Uncompahgre Field Office mineral estate has been leased. As such, access roads would continue to be developed on federal, state, and private lands in the region in support of energy development. These actions would reduce the availability of migratory bird habitat as well as increase the risk of direct mortality, habitat fragmentation, and habitat avoidance.

The proposed activities may also result in direct impacts on nests or individuals from development from vehicular collisions or indirect impacts from noise. Vegetation restoration projects and travel management-related route closures throughout the Forest Service lands would have some cumulative impacts; these might counteract some of the development-related impacts by increasing habitat availability for migratory birds and raptors. Oil and gas development within the Unit proposed under all alternatives would contribute to the impacts from past, present, and reasonably foreseeable actions described in **Table 4-3**. Permitted or casual activities resulting in vegetation removal or disturbance, in combination with climate change, fires, drought, and spread of weeds and forest diseases, could affect migratory bird breeding and foraging habitat in the region, regardless of landownership. Alternative A would result in the fewest number of well pads and would therefore result in the least amount of cumulative impacts on migratory bird habitat. There are no COAs outlined in **Appendix C** that would contribute to the cumulative loss of migratory bird habitat in the region.

Actions proposed under Alternative B would result in the greatest cumulative impacts on available migratory bird habitat. Implementing COAs specific to migratory birds (COAs #21, #25, #39, #41, and #42 and the WHP) would reduce but not eliminate the likelihood of injury, death, and nest abandonment; however, Alternative B would contribute to the cumulative loss of migratory bird breeding habitat in the region, when combined with other past, present, and reasonably foreseeable projects that are expected to result in vegetation removal.

Under Alternative C, oil and gas development activities would result in more surface disturbance of migratory bird habitat compared to Alternative A, but slightly less than Alternative B. In addition, Alternative C would implement COAs as design features, as well as voluntary seasonal timing limitations to reduce impacts on sensitive winter big game habitat (see Alternative C in Fish and Wildlife section above). The additional measures proposed under Alternative C (see *Additional Mitigation Measures*, above) would reduce the risk of bird injury, death, and nest abandonment; however, Alternative C would contribute to the cumulative loss of migratory bird breeding habitat in the region, when combined with other past, present, and reasonably foreseeable projects that are expected to result in vegetation removal.

Under Alternative D, oil and gas development would result in less surface disturbance compared to Alternatives B and C. Implementing COAs specific to migratory birds (COAs #21, #25, #39, #41, and #42) and the WHP, applied as design features would reduce but not eliminate the likelihood of injury, death, and nest abandonment. However, Alternative D would contribute to the cumulative loss of migratory bird breeding habitat in the region, when combined with other past, present, and reasonably foreseeable projects that are expected to result in vegetation removal.

Impacts on migratory birds and their habitat from the Proposed Action would be limited to up to 32 acres of habitat removal, and noise and other human-related disturbance associated with development and long-term production. This comprises a <0.01 percent addition to the total past, present, and reasonably foreseeable future surface disturbance identified. These impacts would be further localized and minimized by implementing environmental protection measures and mitigation measures proposed by SGI or required by the BLM (e.g., migratory bird nest surveys and protective COAs). In addition, the Proposed Action would be at least partially temporally removed from some or all of the reasonably foreseeable future actions; thus, the overall cumulative impact on migratory birds and raptors would be reduced in terms of total cumulative acres of disturbance at one time.

### 4.2.9 Special Status Species

This section discussed impacts on special status species, including federally listed species and BLM sensitive species from proposed management actions of other resources and resource uses. Exiting conditions are described in **Section 3.2.10**, Special Status Species.

#### *Methods of Analysis*

Impacts on special status species would primarily result from unmitigated surface disturbance such as wildfires, wildfire-suppression activities, erosion, and trampling. Direct and indirect impacts on special status species result from any surface-disturbing activity or alteration to occupied habitats. All federal actions would comply with ESA consultation requirements, and all implementation actions would be subject to further special status species review before site-specific projects are authorized or implemented. Federal regulations and BLM policy protecting threatened, endangered, and sensitive species were considered methods for reducing the potential impacts from permitted activities as described in **Section 3.2.8**, Special Status Species. If adverse impacts are identified, mitigation measures, including avoidance, would be implemented to minimize or eliminate the impacts.

*Indicators*

Indicators of impacts on special status species are as follows:

- Amount and condition of available habitat
- Likelihood of mortality, injury, or direct disturbance
- Likelihood of habitat disturbance

*Assumptions*

The analysis includes the following assumptions:

- In general, special status species would be more sensitive to habitat fragmentation, development, or changes in habitat conditions, as populations are often already highly fragmented, require specific microhabitats, and are especially sensitive to disturbance and human presence.
- The actual locations of oil and gas well pads and associated infrastructure including pipelines and access roads is subject to change as a result of the APDs.

- Impacts on special status species would be more significant than impacts on common species because population viability is already uncertain for special status species and certain species, such as special status plants, tend to be poor competitors.
- Short-term effects are defined as those that would occur over a time frame of 5 years or less, and long-term effects would occur over longer than 5 years.
- USFWS would be consulted on any action that could potentially affect any listed plant or animal species or their habitat.
- No special status plant species inhabit the Unit.

***Nature and Type of Effects***

Special status fish and wildlife habitats on BLM-administered lands in the Unit would be affected under all alternatives. Changes to habitats would be caused by the following three types of disturbances: 1) disturbance and disruption from casual use; 2) disturbance and disruption from permitted activities; and 3) changes to habitat conditions. These potential causes of disturbance are directly linked to vegetation conditions and water quality and quantity (**Section 4.2.6**, Vegetation, and **Section 4.2.4**, Water Resources). See **Section 4.2.7**, Fish and Wildlife for a complete description of the three types of disturbances that could affect special status species.

***Effects Common to All Alternatives***

Under all alternatives, oil and gas development actions would continue to use existing infrastructure including well pads, access roads, pipelines, one overhead electrical line (4 power poles), and others. See **Table 2-10**, Summary of Actions by Alternative, for a summary of existing actions in the Unit. Some existing roads would be upgraded and new roads would be built. Therefore, impacts on special status fish and wildlife populations from oil and gas development activities would continue irrespective of the proposed alternatives. These activities along with those associated with casual use, permitted activities, and habitat changes, as described in the Nature and Types of Effects section above, would continue to impact special status species throughout the Unit. Threats specific to special status aquatic wildlife as a result of oil and gas development within the Unit would be attributed to water depletions as well as road and pipeline crossings of streams, wetlands, and other water bodies.

Under all alternatives, pipeline crossings of wetlands as well as roads, would be bored (not trenched) outside of road rights-of-way and wetland boundaries. Impacts from boring activities during construction phases could include a frac-out, which is caused when excessive pressure builds up forcing drilling mud to the surface (DFO 2007). A frac-out would result in short-term displacement of special status wildlife or habitat avoidance as a result of excessive mud (terrestrial) or increased sediment and turbidity (aquatic). Activities associated with stream borings could also result in bank destabilization in the short term. In the long term, special status species and their habitat would be at risk of hazardous materials contamination in the event of a pipeline rupture under all alternatives. Aquatic wildlife, particularly habitat for Colorado River fish species would continue to be reduced as a result of continued water depletions for ongoing drilling, completion, and dust abatement activities.

### *Alternative A*

*Federally Listed, Proposed, or Candidate Species*

Canada Lynx
Under Alternative A, direct impacts on suitable Canada lynx habitat are not expected. Lynx primary prey source, snowshoe hare, has very limited habitat in the Unit and it is unlikely that impacts from Alternative A would affect lynx. Some habitat for secondary prey sources does occur in the Unit but impacts from Alternative A would not affect the availability of these prey items for lynx (Petterson 2012). Highway 133 passes through the Ragged Mountain Lynx Analysis Unit and McClure Pass Lynx Linkage Area. Traffic would increase along State Highway 133 as it is the primary access road to the Unit.

Under Alternative A, well pads and access road construction phases would result in an estimated 6,032 round trips on Highway 133 and an estimated 2,407 round trips during the pipeline development phase although not all traffic associated with accessing the Unit would go over McClure Pass. Alternative A would result in an estimated increase in the overall average annual daily traffic on Highway 133 near the Unit by less than 1 percent over a 3-year time frame; average annual daily trips by trucks could increase by up to 11 percent compared to existing truck-related traffic levels. (See **Section 4.3.5**, Transportation and Access, for additional traffic impacts in the Unit.)

While an increase in vehicle traffic traveling State Highway 133 does increase the potential for vehicle collision with lynx potentially crossing the highway, the project is not anticipated to cause an increase above the 2,000-vehicle-per-day threshold at which it is believed that lynx are impeded from moving across the highway. Lynx should therefore still be able to cross State Highway 133 unimpeded (Petterson 2012). Further, indirect impacts from habitat fragmentation are not likely to be substantial since the lynx habitat in the area is considered to be poor. The activities under Alternative A may affect but is not likely to adversely affect lynx populations.

Endangered Colorado and Gunnison River Fish
Construction and maintenance activities under Alternative A are unlikely to result in water quality impacts on the four endangered Colorado River fish species by continuing to implement Colorado Department of Public Health and Environment and Clean Water Act requirements as well as SGI's Well Pad Site Suitability Models and Methodologies (**Appendix A**). Water quality impacts from sediment releases or hazardous chemical spills in the Unit would likely be reduced because the Paonia Reservoir would capture these potential contaminants before reaching the North Fork of the Gunnison River.

Surface water use under Alternative A, as described in **Section 4.2.7**, Fish and Wildlife, would result in water depletions that have the potential to impact fish populations. As the Unit would be developed over three years, the total freshwater acre-feet depletions would be roughly spread out during this time period, resulting in freshwater annual consumptive depletions of approximately 74 acre-feet for Alternative A. If development of the Unit were to take longer than three years, then the annual water depletion amount would decrease accordingly. Based on data from the US Geological Survey gauging station (#09130500), the mean annual discharge rate of East Muddy Creek near Bardine (1935-1953) varied from a low of 53.7 cfs (39,066 acre-feet per year) in

1940 to a high of 135.0 cfs (97,504 acre-feet per year) in 1938 (see the hydrology assessment for the MDP [Berry 2011]). Therefore, under Alternative A, if this water were removed directly from East Muddy Creek, the maximum water depletion for East Muddy Creek would be about 0.2 percent of the average annual discharge during a dry year to 0.07 percent of the discharge during a wet year. SGI has secured previously appropriated water for this project; as such, no new water would be depleted from the Muddy Creek system as a result of the construction and drilling phase of this project. For more information regarding water use in the Unit proposed under the alternatives refer to **Section 4.2.4**, Water Resources.

Net water depletions are expected to be lower given SGI's water augmentation plan (see **Appendix L**). However, the USFWS considers any net water depletion that could decrease instream flows to have direct and/or indirect impact on the four Colorado River endangered fish species. Therefore Alternative A may affect, and is likely to adversely affect the Colorado pikeminnow, razorback sucker, humpback chub, and bonytail chub. In May 2008, the BLM prepared a Programmatic Biological Assessment (PBA) that addresses water-depleting activities associated with the BLM's fluid minerals program in the Colorado River Basin in Colorado. In response to the BLM's PBA, the USFWS issued a Programmatic Biological Opinion (PBO) (ES/GJ-6-CO-08-F-0006) on December 19, 2008, which determined that BLM water depletions from the Colorado River Basin are not likely to jeopardize the continued existence of the Colorado pikeminnow, humpback chub, bonytail, or razorback sucker, and that BLM water depletions are not likely to destroy or adversely modify designated critical habitat for any of these fish.

A Recovery Implementation Program for Endangered Fish Species in the Upper Colorado River Basin was initiated in January 1988. The Recovery Program serves as the reasonable and prudent alternative to avoid jeopardy and provide recovery to the endangered fishes by depletions from the Colorado River Basin. The PBO addresses water depletions associated with fluid minerals development on BLM-administered lands, including water used for well drilling, hydrostatic testing of pipelines, and dust abatement on roads. The PBO includes reasonable and prudent alternatives developed by the USFWS that allow BLM to authorize oil and gas wells that result in water depletion while avoiding the likelihood of jeopardy to the endangered fishes and avoiding destruction or adverse modification of their critical habitat. As a reasonable and prudent alternative in the PBO, USFWS authorized the BLM to solicit a one-time contribution to the Recovery Implementation Program for Endangered Fish Species in the Upper Colorado River Basin (Recovery Program) in the amount equal to the average annual acre-feet depleted by fluid minerals activities on BLM-administered lands.

Upon final approval of individual APDs, this project would be entered into the Uncompahgre Field Office fluid minerals water depletion log, which would be submitted, to the Colorado State Office at the end of each fiscal year. SGI is already a signatory to the Endangered Fish Recovery Agreement (USFWS 1999), which is considered to be appropriate compensatory mitigation for likely foreseeable impacts, and because of this as well as possible USFWS-coordinated timed releases from augmenting water sources for the maintenance of instream flows (e.g., additional waters released from the Aspinall Unit), the impacts of additional water depletions could be mitigated by SGI and the BLM, which would therefore make their activities compliant with the PBO and Recovery Agreement and ensure continued recovery of these listed fish species.

Greenback Cutthroat Trout
Greenback cutthroat trout lineage fish occur nearby in Roberts, Henderson, and other tributaries to East Muddy Creek. The construction and operation activities under Alternative A may affect, and are not likely to adversely affect greenback cutthroat trout lineage fish due to a pipeline crossing of the GB lineage occupied Roberts Creek. These impacts would be very short in duration, and would require implementation of construction-related proactive impact minimization measures. Under Alternative A, SGI would continue to implement its Well Pad Site Suitability Models and Methodologies (**Appendix A**) which accounts for proximity to stream networks and stream buffer zones into the site suitability assessment, thereby minimizing the likelihood for impacts on greenback cutthroat trout habitat.

*BLM Sensitive Species*

Northern Goshawk
Proposed development activities would have periods that involve loud noises with high levels of activity, but generally lasting for a few months in any given area. Alternative A would have short-term development impacts directly impacting 12 acres, and permanently impact 4 acres of aspen and aspen/oak habitats, but would not impact mixed conifer habitats. Short-term indirect impacts through noise, human activities, and pipeline construction in suitable goshawk habitats would extend beyond the direct habitat impacts described above. Long-term lower-intensity indirect impacts would decrease over time but would likely keep goshawk from nesting within this area, and may also diminish habitat effectiveness for foraging, but would not entirely preclude use in these areas. While some components of Alternative A would occur near isolated and smaller aspen stands, these stands are not large enough to support goshawk nesting activities and would not likely support foraging either, given the dominance of shrublands and agricultural fields within the Unit (Petterson 2012).

The habitats directly and indirectly impacted are relatively poor quality for goshawk nesting, and moderate quality for foraging. With suitable prey-bases and widespread forested habitat types beyond the Unit area, goshawk could still likely forage within the Unit. Outside of the summer reproduction and nesting season, northern goshawk could still encounter low levels of human activity during the winter, which would have negligible impacts on goshawk given the small footprint of activities proposed and widespread foraging habitats available during the winter.

Alternative A may impact individuals, but is not likely to result in a loss of viability on the Unit, or cause a trend towards federal listing or a loss of species viability range-wide, but nesting raptor surveys should occur to identify potential nesting activities.

Bald Eagle
Under Alternative A, the short-term construction phase would cause approximately 12 acres of surface impacts (0.1 percent of available habitat) on CPW-mapped bald eagle winter range and winter forage areas within the Unit. Long-term, there would be approximately 4 acres of surface impacts (less than 0.1 percent of available habitat). One pipeline would cross East Muddy Creek within winter ranges. Since drilling would occur year-round on private lands/private mineral estate which are relatively evenly distributed across the Unit, impacts on wintering bald eagles would likely occur, causing widespread impacts. Aside from one pipeline crossing, these

activities would occur well away from large cottonwoods and suitable roost trees near East Muddy Creek. The pipeline crossing would be bored in any season. If a pipeline bore occurs during the low-flow period of early winter it is possible that roosting bald eagles in the area would be disturbed and vacate the area during construction (short-term). Boring operations during higher flow periods in the summer would occur outside of winter nesting months. The main impact of development on bald eagles under Alternative A could result from a re-distribution of wintering elk and deer in the area and therefore potential scavenging opportunities for eagles. While this may indeed occur near pads and roads, deer and elk would still likely be in the general area, perhaps even closer to East Muddy Creek. The high mobility of bald eagles would still allow them to easily find and feed on any carrion in the general area, and no reduction in winter foraging habitat would be expected.

Because of the potential disturbance to roosting bald eagles during the pipeline bore of East Muddy Creek (for about 5 days if the creek is crossed during the winter), and the potential for disturbance to wintering bald eagles, Alternative A may adversely impact individuals, but is not likely to result in a loss of viability on the Unit, nor cause a trend towards federal listing or a loss of species viability range-wide.

Brewer's Sparrow
Alternative A would create short-term construction related impacts on 114 acres and direct long-term production impact on 36 acres of sagebrush habitats. It is assumed that in the long term, most of the cleared pipeline corridors and other temporary-use areas in sagebrush-dominated habitats would begin to support smaller sagebrush plants. However, in some circumstances where landowners choose to plant nonnative grasses and forbs, the recovery of sagebrush plants in these short-term disturbance acres may take much longer due to competitive exclusion of sagebrush. Most areas cleared of sagebrush would recover with the use of native graminoid and forb seed mixes, though selection of seed mixes is at the discretion of the landowner (Petterson 2012).

Some construction activities would occur when sparrows are in various stages of reproduction. Adult sparrows would easily be able to avoid any clearing of sagebrush plants, and therefore there would be no anticipated direct impacts on adult birds (i.e., mortality). However, sagebrush clearing activities occurring during the nesting period (late May through early July) may result in the take of nests (i.e., eggs or nestlings). Indirect impacts on Brewer's sparrow would result from avoidance of nesting in sagebrush habitats near the access roads, construction areas, and active drilling sites during the construction process; however, they may still forage near roads and other active areas. While habitat fragmentation is cited as a cause for population declines, this is mostly tied to widespread community change types; since Alternative A is relatively small in scale and complexity, no detectable impacts on Brewer's sparrow population numbers are expected (Petterson 2012). As a result, Alternative A may adversely impact individuals, but is not likely to result in a loss of viability on the Unit, nor cause a trend towards federal listing or a loss of species viability range-wide. As Brewer's sparrows are not in the area during the winter, wintertime operations would have no impact on this species.

Bat Species

The Unit provides suitable foraging habitat for listed sensitive bat species, and while there would be some loss of foraging habitat, the project's impact on potential foraging areas would be very minor given the range of these species and their preference for lower elevation habitats. The project would have negligible impacts on shrubby habitats on the landscape scale, thus those habitats would continue to support the bats' primary prey species (flying and crawling insects). Therefore, there should be no impact on the bats' abilities to procure prey within the Unit (Petterson 2012). As bats require free water on a daily basis, bats would likely use any un-netted cuttings pits, flowback pits, or other available fluid storage areas for drinking. If these pits contain substances toxic to bats and are not netted during the summer (when bats are active), it is highly likely that bats would drink from these fluid storage areas, resulting in likely adverse effects. With the application of COA #21 that require netting of pits within 24 hours after drilling activities have begun, the likelihood of such impacts is low. As a result, Alternative A would likely result in no impacts on these species, and would not result in a loss of viability on the Unit, nor cause a trend towards federal listing or a loss of species viability range-wide.

Leopard Frog

Alternative A would have multiple well pad sites and associated facilities located within irrigated pastures, and would also result in direct construction related short term impacts on 67 acres of wetlands and irrigated meadow habitats. Loss of wetlands would require mitigation per USACE permitting. Long-term production impacts would occur on 19 acres of potential frog habitats. The potential take of individual frogs could result from trampling or direct mortality during summer construction and development periods, as well as from substances hazardous to aquatic resources and frogs washing off pad sites or roads and into suitable aquatic habitats. Some temporary diminished habitat effectiveness would occur in wetlands crossed by pipeline corridors. Stormwater sedimentation from roads would result in indirect impacts on wetlands and frog habitat. Water depletions from area ponds and reservoirs would also occur during construction and well development/completion periods, possibly impacting eggs, larvae, and foraging habitats for adults. As northern leopard frogs are hibernating during the winter, wintertime activities on roads and pads would have no impact. Alternative A may impact individuals, but is not likely to result in a loss of viability on the Unit, nor cause a trend towards federal listing or a loss of species viability range-wide.

***Alternative B***

*All Species*

Under Alternative B, SGI would apply the WHP (**Appendix C**) as a design feature. This plan, developed in coordination with BLM and CPW, would mitigate potential impacts on wildlife. Although the focus of the plan is to reduce impacts on big game species, its avoidance and mitigation actions would likely benefit all special status species as well, due to habitat overlap with these species. For example, the plan includes pre-construction raptor and migratory bird nest surveys and avoidance, pit management to exclude birds, bats, and other wildlife, and management of activities in riparian zones to protect water quality and aquatic resources. Additional measures are field-wide operating practices to reduce impacts on terrestrial species, seasonal closures, and remote monitoring.

*Federally Listed, Proposed, or Candidate Species*

Canada Lynx
Under Alternative B, traffic volume into the Unit would increase during all well development phases, which would last for approximately 3 years. New traffic would result in a 1.35 percent average increase during the six-year development time frame. The average annual daily trips associated with trucks could increase by up to 21 percent compared to existing truck-related traffic levels, and 10 percent more than Alternative A (see **Section 4.3.5**, Transportation and Access for more details). Subsequently, it is reasonable to assume an increase in traffic on Highway 133 through the Ragged Mountain Lynx Analysis Unit and McClure Pass Lynx Linkage Unit compared to Alternative A, thereby increasing the likelihood for a vehicle collision with lynx. However, as discussed under Alternative A above, increased traffic over McClure Pass is not expected to impact lynx populations or their habitat due to a general lack of suitable habitat. Therefore, actions proposed under Alternative B may affect but is not likely to adversely affect lynx populations. Development of well pad 12-89-7-1 and the associated pipelines would have no effect on Canada lynx, because there is no potential habitat in this area (Rocky Mountain Ecological Services 2012).

Endangered Colorado and Gunnison River Fish
Capturing potential contaminants at Paonia Reservoir would minimize impacts on Colorado River fish as a result of hazardous spills or sediment releases as described under Alternative A above. Actions proposed under Alternative B would result in larger annual water depletions of approximately 124 acre-feet compared to Alternative A (see **Section 4.2.4**, Water Resources). However, impacts are anticipated to be similar to Alternative A, since SGI has secured previously appropriated water for this project. As such, no new water would be depleted from the Muddy Creek system as a result of the construction and drilling phase of this project. Therefore, actions under Alternative B are not likely to jeopardize the continued existence of Colorado pikeminnow, razorback sucker, humpback chub, or bonytail chub and are not likely to destroy or adversely modify designated critical habitat for any of these fish. Development of well pad 12-89-7-1 and the associated pipelines is sufficiently distanced from the Gunnison and Colorado Rivers and occupied habitats. Because of this, incidental sediment delivery to local streams would be adequately diluted with background waters so that no sediment would have any measurable impacts on the fish in these rivers (Rocky Mountain Ecological Services 2012).

Greenback Cutthroat Trout
Under Alternative B, there would be no activities within the Henderson or Roberts Creek drainages. Water depletions from the Ault Creek drainage and from Bainard Reservoir would have no impact on known GB lineage fish or known occupied habitats (Petterson 2012). As a result, oil and gas development in the Unit (including development of well pad 12-89-7-1 and the associated pipelines) would have no effect on greenback cutthroat trout lineage fish.

*BLM Sensitive Species*

Northern Goshawk
Under Alternative B, 34 acres of aspen and aspen/oak habitat would be impacted in the short term, and 10 acres would be impacted in the long term. Effects from oil and gas development in

the Unit under this alternative would result in impacts on northern goshawk habitat as described under Alternative A but with a two-fold increase in short- and long-term impacts compared to Alternative A. Given the low quality habitat for northern goshawk and moderate foraging quality in the Unit, impacts on this raptor under Alternative B may adversely impact individuals, but is not likely to result in a loss of viability on the Unit, nor cause a trend towards federal listing or a loss of species viability range-wide, but nesting raptor surveys should occur to identify potential nesting activities.

Bald Eagle

Actions proposed under Alternative B would result in 134 acres of short term surface impacts (4 percent of available habitat) on mapped bald eagle winter range and winter forage areas from oil and gas activities in the Unit. In the long term, Alternative B would impact 47 acres of these habitats (2 percent of available habitat) in the Unit. Impacts on bald eagle winter range in the long term would be three times greater than Alternative A and nearly two times greater in the short term. Under Alternative B, a proposed pipeline would be bored under Spring Creek in the southeastern corner of the Unit near mapped bald eagle winter range. Together, these activities may affect, but are not likely to adversely affect bald eagles.

Alternative B could cause re-distribution of wintering elk and deer in the area near pads and roads. Deer and elk would likely remain in the general area, however. Given the high mobility of bald eagles, they are expected to easily continue to find and feed on any winter-kill in the general area and no reduction in available carrion would be expected (Petterson 2012). As described in **Appendix C**, COA #39 would be applied as a mitigation measure under Alternative B. If the BLM were to apply this mitigation measure, there would be a reduced likelihood of impacts on nesting bald eagles.

Development of well pad 12-89-7-1 and the associated pipelines may result in temporary avoidance of scavenging habitat near the access road or well pad during the winter; however, daily well checks and incidental activity would have no impact on eagles' ability to scavenge winter-killed big game or livestock or road kill (Rocky Mountain Ecological Services 2012).

Brewer's Sparrow

Under Alternative B, 362 acres of sagebrush would be impacted in the short term, and 129 acres in the long term. Impacts on Brewer's sparrow would be similar to those described under Alternative A but with increased impacts on sagebrush in the short term and long term. Therefore, Alternative B may adversely impact individuals, but is not likely to result in a loss of viability on the Unit, nor cause a trend towards federal listing or a loss of species viability range-wide.

Bat Species

Impacts on sensitive bat habitat under Alternative B would be similar to those described under Alternative A. Alternative B would likely result in no adverse impacts on these species, and would not result in a loss of viability on the Unit, nor cause a trend towards federal listing or a loss of species viability range-wide.

Development of well pad 12-89-7-1 and the associated pipelines would not occur near any caves or mines, and potential impacts would likely be minor, given the limitations presented by the

high elevation of the site and a lack of widespread roosts (Rocky Mountain Ecological Services 2012).

Northern Leopard Frog

Actions proposed under Alternative B would impact 48 acres of wetlands and irrigated meadows combined in the short term and 16 acres in the long term. These impacts would affect northern leopard frogs as described under Alternative A and may impact individuals, but is not likely to result in a loss of viability on the Unit, nor cause a trend towards federal listing or a loss of species viability range-wide.

Development of the pipeline associated with well pad 12-89-7-1 would cross suitable and likely occupied leopard frog habitats. However, the impacts would affect less than 0.06 acre of wetlands, and wetlands would be reclaimed, replanted, and reseeded with local native species similar in composition to existing conditions. Crossing occupied wetlands would likely destroy individual frogs; however, this would not occur at a large enough scale to affect frog populations or the long-term suitability of the area for frogs at the project level.

If the BLM were to apply the mitigation measures in **Appendix C**, the likelihood for injury, death, or direct disturbance would be reduced. Mitigation Measures (COAs #21, #25, #38 through #44, and #49 through #51 ) would minimize the potential for impacts on Threatened, Endangered, and Candidate species by preserving the amount and condition of wildlife habitat to the extent possible. This would reduce the likelihood of direct disturbance to species and their habitats. In addition, BLM may attach site-specific COAs to the APDs.

***Alternative C***

*Federally Listed, Proposed, or Candidate Species*

Canada Lynx

Under Alternative C, traffic volume into the Unit would increase during all well development phases, which would last for approximately 3 years. New traffic would result in a 1 percent average increase during the six-year development time frame. The average annual daily trips associated with trucks could increase by up to 16 percent compared to existing truck-related traffic levels, and 7 percent more than Alternative A (see **Section 4.3.5**, Transportation and Access for more details). As discussed under Alternative A, not all of the increased traffic on Highway 133 would go over McClure Pass so the potential impacts estimated under Alternative C would likely be much less than calculated in this analysis. Considering the poor quality of suitable lynx habitat in the Unit actions proposed under Alternative C may affect but is not likely to adversely affect lynx populations. The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

Endangered Colorado and Gunnison River Fish

Capturing potential contaminants at Paonia Reservoir would minimize impacts on Colorado River fish as a result of hazardous spills or sediment releases, as described under Alternative A above. Actions proposed under Alternative C would result in water depletions similar to those expected for Alternative B (see **Section 4.2.4**, Water Resources). Therefore, actions under Alternative C not likely to jeopardize the continued existence of endangered Colorado and

Gunnison River fishes and are not likely to destroy or adversely modify designated critical habitat for any of these fish. The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

Greenback Cutthroat Trout
Under Alternative C, a proposed collocated cross country pipeline would be bored under Grouse Creek in the eastern side of the Unit which is not a recognized GB lineage occupied stream as described under Alternative A. Therefore, actions proposed under Alternative C would likely result in no effect on greenback cutthroat trout lineage fish.

*BLM Sensitive Species*

Northern Goshawk
Under Alternative C, 35 acres of aspen and aspen/oak habitat would be impacted in the short term and 8 acres would be impacted in the long term. Effects from oil and gas development in the Unit under this alternative would result in short- and long-term impacts on northern goshawk habitat as described under Alternative A and would impact nearly the same amount of aspen and aspen/oak habitat as Alternative B. Given the low quality habitat for northern goshawk and moderate foraging quality in the Unit, impacts on this raptor under Alternative C may impact individuals, but is not likely to result in a loss of viability on the Unit, nor cause a trend towards federal listing or a loss of species viability range-wide, but nesting raptor surveys should occur to identify potential nesting activities.

Bald Eagle
Actions proposed under Alternative C would result in 98 acres of short-term surface impacts (3 percent of available habitat) on mapped bald eagle winter range and winter forage areas from oil and gas activities in the Unit. In the long term, Alternative C would impact 28 acres of these habitats (1 percent of available habitat) in the Unit. Impacts on bald eagle winter range in the long term would be two times greater than Alternative A and eight acres more in the short term. Under Alternative C, a proposed pipeline would be collocated at Grouse Creek outside of mapped bald eagle winter range. As described under **Appendix C**, COA #39 would be applied as a design feature under Alternative C. As such, there would be a reduced likelihood of impacts on nesting bald eagles. Impacts on bald eagles as a result of surface-disturbing activities proposed under Alternative C may affect, but is not likely to adversely affect bald eagles. The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

Brewer's Sparrow
Under Alternative C, 287 acres of sagebrush would be impacted in the short term and 84 acres in the long term. Impacts on Brewer's sparrow would be similar to those described under Alternative A but with less acres of impacted sagebrush in the short term and long term compared to Alternative B. Therefore, the management actions proposed under Alternative C may impact individuals, but is not likely to result in a loss of viability on the Unit, nor cause a trend towards federal listing or a loss of species viability range-wide.

Bat Species
Impacts on sensitive bat habitat under Alternative C would be similar to those described under Alternative A. Alternative C would likely result in no impacts on these species, and would not result in a loss of viability on the Unit, nor cause a trend towards federal listing or a loss of species viability range-wide. The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

Northern Leopard Frog
Actions proposed under Alternative C would impact 39 acres of wetlands and irrigated meadows combined in the short term and 10 acres in the long term. These impacts would affect northern leopard frogs as described under Alternative A and may impact individuals, but is not likely to result in a loss of viability on the Unit, nor cause a trend towards federal listing or a loss of species viability range-wide. Reduction to irrigated meadow/wetlands habitat would be similar in acres as Alternative B and would likely result in the same impacts on northern leopard frogs.

Adhering to applicable COAs as described for Alternative B would minimize the potential for impacts on threatened, endangered, and candidate species, as described above. In addition, the BLM may attach site-specific COAs to the APDs. The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

***Alternative D, the Preferred Alternative***

*All Species*
Under Alternative D, SGI would apply the WHP (**Appendix C**) as a design feature, which would have impacts as described for Alternative B.

*Federally Listed, Proposed, or Candidate Species*

Canada Lynx
Under Alternative D, traffic volume into the Unit would increase during all well development phases, which would last for approximately three years. Alternative D would add an estimated total of 8,439 round trips to the Unit over the six-year development period, equivalent to an average annual daily traffic amount of 10 trips. Truck-related traffic could increase by up to 11 percent compared to current conditions (see **Section 4.3.5**, Transportation and Access, for more details).

SH 133 would experience the greatest increase in average annual daily traffic. However, not all of the increased traffic on SH 133 would travel over McClure Pass to access the Unit. SGI estimates that approximately 20 percent of traffic generated by the Proposed Action would travel to the Unit from the north, traversing McClure Pass and the MPLLA. This would equate to an additional 1,688 trips over McClure Pass over current conditions. Most of this increase in traffic would occur during the summer, coinciding with construction, drilling, and well completion in the Unit. Most vehicle trips would occur during daylight hours.

While an increase in vehicle traffic traveling through the MPLLA does increase the potential for vehicle collision with lynx crossing the highway, the Proposed Action is not anticipated to cause an increase above the 2,000 vehicle-per-day threshold that would impede lynx dispersal. Given

the lack of lynx population centers and large blocks of primary lynx habitat in or near the MPLLA, the likelihood that lynx would frequently disperse through the MPLLA is small (Petterson 2012). Considering this, along with the poor quality of suitable lynx habitat in the Unit, actions proposed under Alternative D may affect but are not likely to adversely affect lynx populations.

The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

Endangered Colorado and Gunnison River Fish
Capturing potential contaminants at Paonia Reservoir would minimize impacts on Colorado River fish as a result of hazardous spills or sediment releases, as described under Alternative A above. Actions proposed under Alternative D would result in water depletions similar to those expected for Alternative B (see **Section 4.2.4**, Water Resources). Therefore, actions under Alternative D are not likely to jeopardize the continued existence of endangered Colorado and Gunnison River fishes and are not likely to destroy or adversely modify designated critical habitat for any of these fish. The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

Greenback Cutthroat Trout
Under Alternative D, there would be no activities in the Henderson or Roberts Creek drainages. Water depletions from the Ault Creek drainage and from Bainard Reservoir would have no impact on known greenback lineage fish or known occupied habitats (Petterson 2012). As a result, oil and gas development in the Unit would have no effect on greenback cutthroat trout lineage fish. Any impacts would be very short in duration and would require implementing construction-related proactive impact minimization measures. The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

*BLM Sensitive Species*

Northern Goshawk
Under Alternative D, 24 acres of aspen and aspen/oak habitat would be impacted in the short term and 5 acres would be impacted in the long term. Effects from oil and gas development in the Unit under this alternative would result in short- and long-term impacts on northern goshawk habitat as described under Alternative A and would impact fewer acres of aspen and aspen/oak habitat as Alternatives B or C. Given the low quality habitat for northern goshawk and moderate foraging quality in the Unit, impacts on this raptor under Alternative D may impact individuals, but is not likely to result in a loss of viability on the Unit, nor cause a trend toward federal listing or a loss of species viability range-wide. Nevertheless, nesting raptor surveys should occur to identify potential nesting activities.

Bald Eagle
Actions proposed under Alternative D would result in 94 acres of short-term surface impacts (3 percent of available habitat) on mapped bald eagle winter range and winter forage areas from oil and gas activities in the Unit. In the long term, Alternative D would impact 27 acres of these habitats (1 percent of available habitat) in the Unit. Impacts on bald eagle winter range in the long term would be two times greater than Alternative A and eight acres more in the short term.

As described under **Appendix C**, COA #39 would be applied as a design feature under Alternative D. As such, there would be a reduced likelihood of impacts on nesting bald eagles. Impacts on bald eagles as a result of surface-disturbing activities proposed under Alternative D may affect but are not likely to adversely affect bald eagles. The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

Brewer's Sparrow

Under Alternative D, 310 acres of sagebrush would be impacted in the short term and 93 acres in the long term. Impacts on Brewer's sparrow would be similar to those described under Alternative A but with fewer acres of impacted sagebrush in the short term and long term compared to Alternative B. Therefore, the management actions proposed under Alternative D may impact individuals but are not likely to result in a loss of viability on the Unit nor cause a trend toward federal listing or a loss of species viability range-wide. The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

Bat Species

Impacts on sensitive bat habitat under Alternative D would be similar to those described under Alternative A. Alternative D would likely result in no impacts on these species and would not result in a loss of viability on the Unit nor cause a trend toward federal listing or a loss of species viability range-wide. The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

Northern Leopard Frog

Actions proposed under Alternative D would impact 36 acres of wetlands and irrigated meadows combined in the short term and 8 acres in the long term. These impacts would affect northern leopard frogs, as described under Alternative A, and may impact individuals but are not likely to result in a loss of viability on the Unit nor cause a trend toward federal listing or a loss of species viability range-wide. Impacts on irrigated meadows and wetlands would be similar in acres as Alternative C and would likely result in the same impacts on northern leopard frogs.

The COAs described under Alternative B would be applied as design features under Alternative D, which would minimize the potential for impacts on the threatened, endangered, and candidate species described above. In addition, the BLM may attach site-specific COAs to the APDs. The effects of developing well pad 12-89-7-1 and the associated pipelines would be the same as described under Alternative B.

***Cumulative***

Past and present actions as well as current conditions within the cumulative impact analysis area have affected and would likely continue to affect special status species. In addition, reasonably foreseeable future actions that may affect special status species in the future are described in **Table 4-3**. Habitat restoration projects within the region include vegetation treatments to improve habitat and reduce fire threats. These improvement efforts would expand the extent and increase the quality of habitat for many special status fish and wildlife species that inhabit the surrounding region. However, oil and gas development in the North Fork of the Gunnison River area, would continue to affect special status species within the region as less than 25 percent of the Uncompahgre Field Office mineral estate has been leased. Access roads would continue to be

developed on federal, state, and private lands in the region in support of energy development. These actions would reduce the availability of habitat and forage as well as increase habitat fragmentation for special status species. Additionally, continued and future actions resulting in water depletions or impacts on water quality within the region would reduce the quantity and quality of habitat for special status fish and other aquatic species. Any proposed project with the potential to impact ESA-listed species would require consultation with the USFWS to determine the potential impacts on federally protected species and to develop mitigation actions.

Under all of the alternatives, impacts on special status species as a result of increased oil and gas development within the Unit would contribute to the impacts from past, present, and reasonably foreseeable actions described in **Table 4-3**. Alternative A would result in the fewest number of well pads and would therefore result in the least amount of impacts on special status fish and wildlife species. However, mitigation measures including COAs, RDFs, and voluntary seasonal winter timing limitations would not be imposed under Alternative A. Actions proposed under Alternative B would result in the greatest direct impacts on special status species habitat while imposing COAs described in **Appendix C**; no voluntary seasonal timing limitations have been proposed under Alternative B. Under Alternatives C and D, oil and gas development activities would result in more surface disturbance of special status species habitat compared to Alternative A but less than Alternative B. In addition, all action alternatives would implement COAs #21, #25, #38 through #44, and #49 through #51 to reduce impacts. The WHP under Alternatives B and D would reduce impacts on special status species and their habitats. Current and future water depletions would continue to threaten Colorado River endangered fish species. The implementation of a water augmentation program as proposed by SGI (**Appendix L**) would minimize water depletions; other such water augmentation plans are recommended in the region to reduce the amount of water used for oil and gas development. Increased road and pipeline crossings within the area would contribute to potential habitat impacts for GB lineage occupied streams.

### 4.2.10 Wildland Fire Management

***Methods of Analysis***

Impacts on fire and fuels management generally result from activities that affect firefighter and public safety or fire intensity, frequency, and suppression efforts. Indicators of impacts on wildland fire management resources are the following:

- A change in the likelihood of human caused wildfire in the Unit
- A change in the size, extent, or occurrence of wildfire in the Unit
- A change in the ability to conduct wildfire suppression efforts

***Nature and Type of Effects***

The development of natural gas wells may increase the risk of wildfires by introducing new ignition sources and increasing human activity in the Units. Potential sources of ignition during the construction period include but are not limited to construction equipment, vehicles on access roads, and construction personnel. Operation and maintenance of wells would represent a reduced level of risk of ignition s compared to the construction phase due to decreased vehicle

traffic and equipment use. Risks of ignition still exist during production, including those from well workover operations. While the potential for ignition of wildfire from natural gas emitted from wells during drilling and production does exist, best management practices and standard operating procedures generally lower these risks to a minimal level. Operators also reduce risk by shutting down during wildfire events near active wells.

Indirect sources of wildfire risk from natural gas development include the potential for an increase in invasive weeds in disturbed areas. Spread of cheatgrass (*Bromus tectorum*) is widely recognized as modifying fire behavior, resulting in reduced fire intervals and increased intensity of burning (Menakis et al. 2003). Proper reclamation techniques and use of native seed mixes can reduce incidence of cheat grass and associated fire risk.

Energy development may also pose a hazard to firefighters, including unknown toxins, facility protection, industry personnel evacuation, and overhead power line danger. Fire programs could incur additional costs to train firefighting personnel for emergency situations associated with energy development.

New and improved access roads may improve access for wildland fire suppression activities. Proposed development may also create fuel breaks (e.g., areas where there is no vegetation) that could be effective in preventing the spread of wildland fires.

***Effects Common to All Alternatives***

Under all Alternatives fires would be managed with intensive suppression as a priority based on the management prescriptions for the Fire Management Unit laid out in the UFO RMP.

Human-caused wildfires resulting from unsafe well control practices would be averted by complying with regulatory requirements and standard measures, which are discussed in **Appendix C**. In general, well pads would be kept free of vegetation and trash in order to minimize the potential of wildfires.

Storage of sensitive or hazardous materials would be handled in compliance with all applicable federal and state regulations, minimizing risk of firefighter exposures to chemicals during suppression efforts.

***Alternative A***

Under Alternative A, the risk of wild fire ignition, as described under *Nature and Type of Impacts*, would continue from operating existing federal and state authorizations and developing the new wells, pads, and associated infrastructure. Under Alternative A, COGCC requirements (rule 606A) would be applied, which could reduce wildland fire risk.

***Alternative B***

Impacts would be similar to those described in Alternative A and in Nature and Type of Impacts. Due to the increased amount of development under Alternative B, however, the risk of human caused ignition from construction related vehicles and equipment would be increased.

***Alternative C***

Impacts under Alternative C would be similar to those described under Alternative B. However, under this Alternative, fewer new well pads would be constructed on federal mineral estate; therefore reducing the likelihood of ignition.

In addition, design features imposed to protect wildlife, water, air and other resources, may also provide indirect reduction of wildfire risk. Four new electrical lines would be buried in this alternative, reducing risk of ignition from as compared to overhead lines. Preparation of an annual reclamation monitoring status report may decrease incidence and spread of invasive species and associated risk of wildfire.

***Alternative D, the Preferred Alternative***

Impacts under Alternative D would be similar to those described under Alternative B. However, under this alternative, fewer new well pads would be constructed, and there would be slightly less vehicle traffic, thereby reducing the potential for unplanned ignition.

***Cumulative***

Past and present management actions and natural events in the cumulative impact analysis area have altered the condition of vegetation and natural fire regimes across the landscape. Examples include fire suppression, energy development, grazing, noxious and invasive weed spread, and drought. Continued development in the wildland-urban interface zone may increase fire risk and result in the need for additional resources including federal, state, and local agency resources for fire suppression. Proposed ROW developments, road and trail construction, as well as oil and gas leasing and development on federal and private lands are activities would represent additional wildfire risks in the region. As discussed in **Section 3.2.11**, Wildland Fire Management, large fires in the Unit have been uncommon, and the focus on intense suppression efforts is likely to continue this trend. The Proposed Action and alternatives would, however, add to the cumulative wildfire risk in the area, potentially resulting in increased suppression costs for the UFO as well as a strain on resources in the fire protection district. The degree of added ignition risk would vary based on the alternative selected, with cumulative fire risk related to the level of development as discussed under impacts by Alternative, above.

### 4.2.11 Cultural Resources

***Methods of Analysis***

Cultural resources are past and present expressions of human culture and history in the physical environment. The term cultural resource can refer to archaeological, historical, and architectural sites, structures, or places with important public and scientific uses and can include locations (sites, natural features, resource gathering areas, or places) of traditional cultural or religious importance to specific social or cultural groups.

This section discusses impacts on cultural resources from the proposed goals, objectives, management actions, and allocation actions noted in **Chapter 2**, Alternatives. Existing conditions concerning cultural resources are described in **Section 3.2.12**, Cultural Resources.

Cultural resource baseline information in **Section 3.2.12**, Cultural Resources, was reviewed for current understanding of known resources and to determine the condition of the resources. All

laws pertinent to determining effects on cultural resources (i.e., NHPA) were considered and included in criteria for determining impacts. This known information was overlain with the actions found under each alternative in **Chapter 2**, Alternatives, and conclusions were drawn based on an understanding of how these types of actions could affect known and potentially discoverable resources.

*Indicators*

Cultural resources are impacted when a property is damaged, its physical integrity is lost, or the setting of a resource is damaged. Under NEPA, impacts on cultural resources are assessed by applying the criteria of adverse effect, as defined in the implementing regulations for Section 106 of the NHPA (36 CFR Part 800). For this analysis, indicators for determining effects on cultural resources include asking if the action would result in any of the following:

- Destroy, damage, or alter all or part of the physical nature of a cultural resource
- Change the character of the property's use or physical features within its setting that contribute to its historic significance (e.g., isolating the property from its setting)
- Introduce visual, atmospheric, or audible elements that diminish the integrity of the property's significant historic features
- Disturb any human remains, including those interred outside of formal cemeteries
- Contribute to an adverse effect (under the NHPA) to a cultural resource if it is listed in or eligible for listing in the National Register or if it is an area of importance to a Native American or other traditional community. If a site is determined to be eligible for listing in or is listed in the National Register, any physical disturbance would also constitute a significant impact under NEPA. If a site is determined to be ineligible for listing, then any disturbance could be considered substantial, but it would not be significant under NEPA or adverse under NHPA.

*Assumptions*

This analysis assumes the following:

- Impacts on cultural resources are assessed by applying the criteria of adverse effect, as defined in 36 CFR Part 800.5a: An adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association.… Adverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance, or be cumulative.
- Human occupation of North America over the last 10,000 years has left its mark on all landforms, and sites could be manifest on the surface or deeply buried. There could be areas of importance to contemporary Native Americans that are not readily identifiable outside of those communities.

- The information on cultural resources in the Unit is based on the results of industry and BLM inventory projects for cultural resource sites in the Unit (Greubel et al. 2010, Millward 2013). However, because these data are biased toward past, project-oriented undertakings, they cannot accurately predict where or how many resources may exist in unsurveyed areas.

- This analysis does not attempt to quantify affected resources. Rather, the relative number of sites that could be affected by actions correlates with the degree, nature, depth, and quantity of surface-disturbing activities in the Unit where the more surface that is disturbed, the more cultural resources may be affected.

- Each of the 40-acre analysis areas used herein represent an area of possible placement for a single 5-acre well pad.

- This analysis does not include resource-specific, protection measures. Cultural resource protection and mitigation measures would be applied at the project design and implementation phases after appropriate Section 106 consultation requirements are met. Mitigation can include project cancellation, redesign, avoidance, or data recovery.

***Nature and Type of Effects***

There would be no immediate impacts from the actions noted in the alternatives of the Bull Mountain Unit MDP, though there could be indirect impacts (impacts that occur later in time or farther removed in distance, as well as cumulative impacts) associated with future development.

Any activities that would involve surface-disturbing activities could have direct and indirect impacts on cultural resources, including damaging, destroying, or displacing artifacts and features and constructing modern features out of character with a historic setting. Damaging, displacing, or destroying cultural resources could include removing artifacts from their situational context, breaking artifacts, or shifting, obliterating, or excavating features without appropriate scientific recording.

Indirect impacts on cultural resources include changing the character of a property's use or physical features within a property's setting that contribute to its historic significance (e.g., isolating the property from its setting) and introducing visual, atmospheric, or audible elements that diminish the integrity of the property's historic features. Construction activities could result in placing modern features onto a landscape that did not have them previously. Additionally, any action that would result in increased human and worker presence (e.g., more people visiting a recreation area or workers brought in for construction operations) would risk illicit collecting of surface artifacts, resulting in a loss of scientific information.

The potential for undiscovered buried cultural resources and human remains exists despite previous archaeological surveys and investigations, suggesting a very low likelihood for such discoveries. Surface-disturbing activities could directly impact undiscovered cultural resources and human remains by exposing buried material, resulting in inadvertent artifact destruction or loss of scientific context. Indirect impacts could result from the increased human presence, leading to possible illicit collecting of newly exposed materials.

Any actions that would result in reclaiming landscapes to predisturbance conditions would eliminate the indirect viewshed or setting impacts for cultural resources. Reclamation would likely restore the natural landscape setting but may not result in restoring the historic setting. However, direct impacts on cultural resources or any unanticipated discoveries made would remain as they were, permanently destroyed or damaged by surface-disturbing actions. Reclamation impacts on undiscovered buried cultural materials or human remains would be similar to those noted above, namely that activities could expose buried materials, resulting in inadvertent artifact destruction or loss of scientific context.

***Effects Common to All Alternatives***

Cultural resource compliance actions would continue under all alternatives. Laws, regulations, and policies for both BLM-administered mineral estate and COGCC-administered mineral estate that supersede Bull Mountain Unit MDP decisions would apply. All actions would continue maintaining the integrity or characteristics of historic properties under legal guidelines for protection, preservation, investigation, and public use (i.e., development and interpretation) on a case-by-case basis.

Any action that disturbs or diminishes the integrity of a historic property's location, design, setting, materials, workmanship, feeling, or association, as defined in 36 CFR Part 800, is an adverse effect. Potential effects from subsequent undertakings for all resources, resource uses, and special designations would be addressed at the project design and implementation phase. Required separate compliance with Section 106 would result in the continued identification, evaluation, mitigation, and nominations to the National Register. Effects on cultural resources eligible for listing on the National Register would be avoided or mitigated. If previously undiscovered resources were identified during an undertaking, work would be suspended while the resource is evaluated and mitigated to avoid any further effects. Through this process, effects would be minimized or eliminated, although residual effects and adverse effects, as defined by 36 CFR Part 800, would be possible.

All alternatives include surface-disturbing actions that would directly and indirectly impact cultural resources. Surface-disturbing activities include the construction of well pads, access roads, pipelines, electrical lines, and storage areas or the recontouring and reseeding that occurs during reclamation. Drilling or other activities that do not alter the extent of surface disturbances are not likely to directly impact cultural resources. Direct effects on cultural resources would be evaluated for individual undertakings, and protections and mitigations would be applied at project design and implementation phases.

Erosion of soils that are a result of surface disturbance is an indirect impact from construction activities. Many cultural resources are susceptible to erosion damage, including modifying spatial relationships of artifacts and destroying features and stratified deposits; all of which are important to understanding past culture. Nondestructive measures to protect soils could be included as conditions on permits to reduce impacts.

All alternatives include indirect impacts on cultural resources. Any action that increases access can lead to inadvertent damage, unauthorized collection, or vandalism of cultural resources. Additionally, infrastructure construction modifies the visual or audible character of the setting of

a cultural resource. Indirect effects on cultural resources would be evaluated on a case-by-case or APD-specific basis.

***Alternative A***

All of the actions in Alternative A have the potential to directly and indirectly impact cultural resources. While the general nature of those potential impacts is described above, the exact nature of the direct and indirect impacts is not known because the location of all cultural resources within the Bull Mountain Unit is not known. Specific numbers of impacted cultural resources for the different nature and types of effects under Alternative A are unavailable, though previous work in the Bull Mountain Unit indicates that the resources are sparsely distributed (Millward 2013). Under Alternative A, impacts on cultural resources would be assessed on a case-by-case basis, and mitigation measures for possible disturbance would follow applicable COGCC requirements.

***Alternative B***

All of the actions in Alternative B have the potential to directly and indirectly impact cultural resources. While the general nature of those potential impacts is described above, because the location of all cultural resources within the Bull Mountain Unit is not known, the exact nature of the direct and indirect impacts is not known. Although the specific numbers of impacted resources under Alternative B are unavailable, the total number of impacted resources is expected to be low (Greubel 2010; Millward 2013). Under Alternative B, impacts on cultural resources would be assessed on a case-by-case or APD-specific basis. Impacts can typically be mitigated by implementing the measures identified in **Appendix C**, such as archaeological and cultural resources protection (see COA #34), and soil preservation (COA #7); they would be included on a case-by-case basis at project design and implementation phases.

***Alternative C***

All of the actions in Alternative C have the potential to directly and indirectly impact cultural resources. While the general nature of those potential impacts is described above, because the location of all cultural resources within the Unit is not known, the exact nature of the direct and indirect impacts is not known. Although the specific numbers of impacted resources under Alternative C are unavailable, the total number of impacted resources is expected to be low (Greubel 2010; Millward 2013). As with the previous alternatives, under Alternative C, impacts on cultural resources would be assessed on a case-by-case or APD-specific basis. Impacts can typically be mitigated by implementing the measures identified in **Appendix C**, such as archaeological and cultural resources protection (see COA #34), and soil preservation (COA #7); they would be included on a case-by-case basis at project design and implementation phases.

***Alternative D, the Preferred Alternative***

Similar to previous alternatives, all of the actions in Alternative D have the potential to directly and indirectly impact cultural resources. While the general nature of those potential impacts is described above, because the location of all cultural resources in the Unit is not known, the exact nature of the direct and indirect impacts also is not known. Although the specific numbers of impacted resources under Alternative D are unavailable, the total number of impacted resources is expected to be low (Greubel 2010; Millward 2013). Impacts on cultural resources would be assessed on a case-by-case or APD-specific basis. Impacts can typically be mitigated by

implementing the measures identified in **Appendix C**, such as archaeological and cultural resources protection (see COA #34) and soil preservation (COA #7); they would be included on a case-by-case basis at project design and implementation phases.

***Cumulative***

Decisions within the Unit could have impacts that, when combined with past, present, and reasonably foreseeable future actions, would produce cumulative effects on cultural resources. Cumulative effects would result from the destruction and loss of known and unrecorded resources and unanticipated discoveries from many projects, creating an additive effect of scientific information loss. Such activities include changes to federal land use plans; increases in mining, fluid mineral leasing, and renewable energy development; vegetation and habitat management; livestock grazing; increases in recreation and visitor use; road construction; urban encroachment, shifts in water management; invasive plant and animal species; and wildland fire (**Table 4-3**). These impacts would continue to affect cultural resources, through loss or disturbance to the integrity and setting of cultural resources.

Actions related to recreation, grazing, vegetation treatment, wildland fire, mineral development, and energy development have had past effects and are expected to continue to affect cultural resources. Increased frequency of wildland fire due to shifting environmental parameters, such as drought, climate change, and forest health, could lead to additional direct loss of cultural resources.

Cultural resources next to areas of growth and development would be most susceptible to future effects. The construction of buildings, roads, and associated structures increases ground disturbance, causing effects on cultural resources and their settings. Development near public lands also increases pressure from recreation. Designating travel corridors can protect cultural resources located off the routes, but restrictions are difficult to enforce, especially as population and recreational use grows and other areas are closed. Increased use of the Internet and GPS devices to disseminate the location of cultural resources and encourage visitation to sites can facilitate vandalism and unauthorized collecting.

All undertakings that could affect cultural resources on federal land or actions that are funded, licensed, or permitted by the federal government are subject to the Section 106 process of the NHPA and other applicable laws and regulations. Consideration of the future cumulative effects of undertakings on protected cultural resources would be required, and adverse effects would be resolved on a site-by-site or project-by-project basis. Adherence to appropriate predevelopment, development, and post-development protective measures would reduce most cumulative effects to an insignificant level. Implementation of the proposed MDP is not anticipated to contribute to cumulative effects.

### 4.2.12 Paleontological Resources

***Methods of Analysis***

Based on a reasonable prediction of possible future types of development, but not their timing or location, the following impact analysis provides a general description of common impacts on paleontological resources.

*Indicators*
The primary overall indicator for paleontological resources is whether the characteristics that make a fossil locality or feature important for scientific use have been lost or diminished. Natural weathering, decay, erosion, improper collection, and vandalism can remove or damage those characteristics that make a paleontological resource scientifically important. Specific indicators used to assess the condition of in situ paleontological resources are the extent of erosion, rock fall and other natural processes, and human-caused disturbances. Resource condition is assessed through field observations, paleontological reports associated with paleontological use permits and construction activities, commercial site reports, and project reviews.

*Assumptions*
In addition to the assumptions in **Section 4.1.2**, the analysis assumes the following:

- Occurrences of paleontological resources are closely tied to the geologic units (e.g., formations, members, or beds) that contain them. The probability for finding paleontological resources can be broadly predicted from the geologic units at or near the surface.
- Geologic mapping can be used for assessing the potential for paleontological resources using the BLM's Potential Fossil Yield Classification (PFYC) system.
- For assessing impacts, only those objectives and actions potentially affecting vertebrate and scientifically important paleontological resources are considered.
- Scientifically important fossils may continue to be discovered throughout the Unit. Discoveries are most likely in geologic units classified as high-potential PFYC Class 4 or 5.
- Inventories conducted before surface disturbance or construction monitoring in high-probability areas could result in the identification and evaluation of previously undiscovered resources, which the BLM would mitigate for accordingly.
- Potential for impacts on both surface and subsurface paleontological resources is directly proportional to the amount of surface disturbance associated with a Proposed Action.
- At the programmatic level of analysis, it is not possible to identify and evaluate areas of higher paleontological sensitivity with respect to locations of proposed surface disturbance. Therefore, potential impacts on paleontological resources under each alternative can only be generally estimated, and they correlate directly to the amount of anticipated surface disturbance proposed under each alternative.

***Nature and Type of Effects***
Exposed fossils can be damaged by natural weathering and erosion from wind and water, and this damage can be exacerbated by concentration of human use and activity. Other sources of human-caused damage are ground-disturbing activity, vandalism, unauthorized collection, and over-collection of localities. Surface disturbance and excavations could impact fossils that could occur on or underneath the surface in areas containing paleontologically sensitive geologic units.

If formations with high potential for yielding fossil vertebrates, such as the Upper Jurassic Morrison Formation noted in **Section 3.2.14,** crop out in the Unit, there is a high probability for impacting fossils during surface-disturbing activities in these areas.

Types of impacts include permanent loss of the paleontological resource and the scientific data it could provide through damage or destruction caused by surface-disturbing activities. Without removing some rock surrounding fossils, they would remain largely undetected; therefore, management actions that result in erosion do not necessarily result in damage to paleontological resources. Excessive erosion, especially from other surface disturbance on exposed localities, could damage fossils at the surface.

Impacts can typically be mitigated to below a level of significance by implementing paleontological mitigation measures. Pedestrian surveys would typically be necessary before any surface-disturbing activities were authorized in areas with a high potential for yielding fossil vertebrates (e.g., the Morrison formation), and if the risk were high enough, on-site monitoring could be required during construction. If data recovery were the prescribed mitigation, this could also result in fossils being salvaged that may never have been unearthed as the result of natural processes. These newly exposed fossils would become available for scientific research, education, display, and preservation into perpetuity at a public museum. Unmitigated surface-disturbing activities could dislodge or damage paleontological resources and features that were not visible before surface disturbance.

An increase in visitors to, workers in, or access to paleontological localities or sensitive areas could result in an increased potential for loss of paleontological resources by vandalism and poaching (Eagles et al. 2002). For fossils to have significant scientific value, they must be found in place; transporting fossils degrades the scientific value due to unknown source material and general erosion of the surface, resulting in the fossil being unrecognizable in some cases. The best fossil preservation occurs when the fossil is buried in place. These impacts are difficult to mitigate to below the level of significance, but they can be greatly reduced by increasing public awareness about the scientific importance of paleontological resources through education, community partnerships, and interpretive displays, and by informing the public about penalties for unlawfully destroying or poaching these resources from BLM-administered lands.

***Effects Common to All Alternatives***

Any action that disturbs or diminishes the scientific integrity of a scientifically important locality would be considered an adverse effect. Potential effects from subsequent exploration and development actions would be addressed at the APD and/or POD stage. Effects on scientifically important paleontological resources would be avoided or mitigated. If previously undiscovered resources were identified during project development, work would be suspended while the resource is evaluated and mitigated to avoid any further effects. Through this process, effects would be minimized or eliminated, although residual effects and adverse effects would be possible.

All alternatives include surface-disturbing actions that, if fossils were present, could directly and indirectly impact paleontological resources and could result in the nature and types of effects described above.

Erosion of soils that are a result of surface disturbance is an indirect impact from construction activities. Paleontological resources are susceptible to erosion damage, including destroying individual fossils and stratified deposits; all of which are important to understanding past environments. Laws, regulations, and policies for both BLM-administered mineral estate and COGCC-administered mineral estate that supersede Bull Mountain Unit MDP decisions would apply.

All alternatives could result in indirect impacts on paleontological resources. Any action that increases access can lead to inadvertent damage, unauthorized collection, or vandalism of fossil resources. Indirect effects on fossil resources would be evaluated on a case-by-case or APD-specific basis.

***Alternative A***

As Alternative A would be continuation of state managed actions, there would be few protections against the loss or diminishment of paleontological resources that may occur within the Unit, and effects could be of the nature and type described above. Paleontological resources are also indirectly protected via stipulations or actions that would protect other resources, such as those for wildlife or cultural resources.

As noted above in *Nature and Type of Effects*, there are instances when human actions can inadvertently lead to damage or destruction of these resources.

***Alternative B***

As Alternative B includes actions under a Master Development Plan, paleontological resources could be directly protected via the paleontological resources lease notification or by COAs on individual APDs or PODs submitted under the Master Development Plan.

Due to the BLM's mandate to protect scientifically important paleontological resources, there are few instances when a locality or fossil would be deliberately destroyed. However, as noted above in Nature and Type of Effects, there are instances when human actions can inadvertently lead to damage or destruction of these resources.

***Alternative C***

Alternative C would have the same nature and types of effects as described above in Nature and Type of Effects, Effects Common to All Alternatives, and Alternative B sections.

***Alternative D, the Preferred Alternative***

Alternative D would have the same nature and types of effects as described above in *Nature and Type of Effects*, *Effects Common to All Alternatives*, and Alternative B sections.

***Cumulative***

The cumulative impact analysis area used to analyze cumulative impacts on paleontological resources is a 50-mile radius around the Bull Mountain Unit. Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and would likely continue to affect paleontological resources are mineral exploration and development, unauthorized travel, forestry, livestock grazing, recreation, road construction, ROWs, water diversions, weed invasion and spread, weed control, prescribed and wildland fires,

land planning efforts, vegetation treatments, habitat improvement projects, insects and disease, and drought. Types of impacts from past, present, and reasonably foreseeable future actions that affect paleontological resources are the same as those discussed under Nature and Type of Effects. They include destruction or damage of resources without the benefit of scientific study or interpretation due to construction, recreation, theft, vandalism, and the effects of natural processes without the benefit of recovery, scientific study, or interpretation.

Current and future trends are energy and minerals development, including fluid mineral leasing and development and mineral materials sales; population growth; urbanization; increase in recreational demand; and ROW projects, including pipeline and transmission line construction, road construction, and erosion. For actions on BLM-administered land and mineral estate, impacts would be minimized through existing laws, regulations, and stipulations addressing surface-disturbing activities in PFYC Class 4 and 5 areas and other sensitive areas. Other ground-disturbing activities, such as road construction and utility infrastructure, could be reviewed by other federal, state, or local agencies for the presence and scientific value of paleontological resources, and steps could be taken to recover or avoid significant finds. Actions on private land could result in the inadvertent destruction of paleontological resources or the removal of fossils without any scientific study. Increasing recreation demand could result from unauthorized removal, vandalism, incremental damage of surface resources, and subsequent erosion.

Beyond authorized ground disturbance, cumulative impacts could occur from intensive travel, dispersed recreation, wildfire suppression, erosion, unauthorized collection, and vandalism. These could result in the unmitigated loss of scientific information and could reduce the educational and interpretative potential of the resource. Protections provided by other resource measures (such as those for cultural resources) would reduce the intensity of these effects. Adherence to appropriate protective measures before, during, and after development would reduce most impacts to a minimal level.

### 4.2.13 Visual Resources

This section discusses impacts on visual resources from the alternatives. The area of analysis for visual resources is the proposed project area.

#### *Methods of Analysis*

The visual resource inventory (VRI) classes form the basis for analysis in this section. Although VRI classes use the same numerical scale (i.e., Class I through IV) as VRM classes, they are defined differently. Visual resource inventory classes are the categories the BLM uses to classify the current visual character of the landscape and are a way to communicate the degree of visual quality in the area. Generally, VRI Class I indicates high visual quality, and VRI Class IV indicates lower visual quality. The project area is VRI Class II. The VRI is on file at the UFO.

This section identifies impacts on visual resources on BLM-administered and non-BLM-administered lands. Impacts on visual resources are assessed by comparing the Proposed Actions for each alternative to the VRI class of the project area. Because the sensitivity level is expected to remain high and medium for most of the Unit, the analysis does not consider changes to sensitivity levels. Furthermore, the landscape is entirely within the foreground/middle ground distance zone (zero to 5 miles). This is not expected to change from actions under any of the

alternatives, so the analysis does not further consider changes to distance zones. As such, the following impact analysis by alternative focuses on the potential for change in VRI classification due to a change in scenic quality. Under no alternative would the scenic quality be anticipated to improve.

When assessing scenic quality, seven factors are considered: landform, vegetation, water, color, adjacent scenery, scarcity, and cultural modifications. Of these factors, actions under the alternatives have the highest potential to change vegetation, color, or cultural modifications. Where cultural modifications would be allowed, there could be a change in the variety of vegetation forms, patterns, or texture from such activities as construction, vegetation removal, and soil composition changes. Furthermore, where cultural modifications would be allowed to the extent that the basic components of the landscape (e.g., vegetation, soil, and rock) changed drastically, the variety, contrast, and harmony of color could change as well. The VRI scenic quality evaluation ratings for vegetation, color, and cultural modifications are provided in **Table 4-60**, Visual Resources Inventory Scenic Quality Evaluation Ratings.

**Table 4-60**
**Visual Resources Inventory Scenic Quality Evaluation Ratings**

| | Scenic Quality Evaluation Rating Criteria | | | | |
|---|---|---|---|---|---|
| **Scenic Quality Rating Unit** | **Vegetation (1 to 5 points)** | **Color (1 to 5 points)** | **Cultural Modification (-4 to 2 points)** | **Total Score* (points)** | **Scenic Quality Rating (A to C)** |
| Bull Mountain | 3.5 | 4 | 0 | 19.5 | A |
| Paonia Reservoir | 5 | 4 | -0.5 | 19 | A |
| Deep Creek | 5 | 4 | 0 | 20.5 | A |

Source: Otak 2009
Notes: Total scenic quality rating score: A = 19 point or more; B = 12-18 points; C = 11 points or less.
*Table does not include ratings for the rating criteria landform, water, adjacent scenery, and scarcity.

*Indicators*
The indicator of impacts on visual resources is the following: Proposed actions would allow changes to the landscape that could alter its character enough that future visual resource inventories would result in a VRI class reclassification due to changes in vegetation, color, and cultural modifications (such as structures and artificial elements not found in nature). For example, the area is currently assigned to VRM Class III and VRI Class II. The level of change allowed by VRM Class III could alter the landscape to the point that future visual resource inventories could result in reclassifying the area to VRI Class III or IV.

Impacts on visual resources are assessed by comparing the actions for each alternative to the VRI class of the project area. Generally, VRI Class II areas are more susceptible to impacts from changes to the landscape because of the high-value visual resources in these areas.

*Assumptions*
The analysis of visual resources has the following assumptions:

- The scenic vistas within the project area would become more sensitive to visual change; in other words, they would increase in value over time.

- Scenic resources would become increasingly important to residents of and visitors to the area.
- Visitors to BLM-administered lands or residents living near BLM-administered lands are sensitive to changes in visual quality.
- Activities that cause the most contrast and are the most noticeable to the viewer and the public are considered to have the greatest effect on scenic quality.
- The severity of a visual effect depends on a variety of factors, including the size of a project (i.e., area disturbed and physical size of structures), the location and design of access roads, and the overall visibility of disturbed areas.
- VRM class objectives would be adhered to through project design, avoidance, or mitigation.
- Visual resource and reclamation COAs (in **Appendix C**, COAs #36 and #50 through #52) and design features (in **Appendix C**) for Alternatives B and C would be implemented to reduce harmful impacts.
- Visual contrast ratings would be required for all future site-specific activities. The visual contrast rating system would be used as a guide to analyze site-specific impacts from activities as well as design and placement. Activities would be designed to minimize their visual impacts in order to conform to the area's VRM class objective. This would allow the BLM to reduce impacts on a site-specific basis to ensure compliance with the assigned VRM class.
- Private lands are assigned to the same VRI classes as BLM-administered lands in order to provide a consistent approach for analyzing impacts on visual resources across all lands.
- State Highway 133 and County Road 265 serve as the two primary travel routes in the project area. The West Elk Loop Scenic Byway passes through the project area on State Highway 133. These travel routes would become more sensitive to visual change; in other words, they would increase in value over time.

Views of the project area would be afforded to individuals conducting livestock grazing, operating and maintaining access roads and energy developments (primarily oil and gas), driving vehicles along local travel routes (primarily State Highway 133 and County Road 265), and recreating (such as hunting, hiking, mountain biking, dispersed camping, viewing of seasonal colors, cross-country skiing, and snowmobiling).

***Nature and Type of Effects***

In order to accurately and comprehensively analyze and quantify impacts, future site-specific plans need to be provided detailing the location of project features and the amount of cut-and-fill. This information will be used to conduct a future analysis of impacts on visual resources according to the BLM VRM system analysis stage. The process of conducting a visual resource contrast rating, which involves comparing the project features with the existing landscape

features using basic elements of form, line, color, and texture, is described in detail in BLM Handbook H-8431-1, Visual Resource Contrast Rating (BLM 1986b). The goal of VRM is to minimize the visual impacts of all surface-disturbing activities, regardless of the class to which an area is assigned. The project area is VRM Class III. The objective of this class is to partially retain the existing character of the landscape. The level of change to the characteristic landscape should be moderate. Management activities may attract attention but should not dominate the view of the casual observer. Changes should repeat the basic elements found in the predominant natural features of the characteristic landscape. Completing the BLM VRM system analysis stage will identify if a proposed site-specific development would meet the VRM class objective for an area.

*Temporary Effects*

Temporary direct effects on visual resources would occur from construction and ground-disturbing activities at well pads, access roads, pipelines, electrical lines, and facilities, such as storage areas, flowback pits, and compressor stations. To the extent practicable and feasible, activities would be located within the right-of-way. During the construction period, crews may be working concurrently at various locations. Therefore, the temporary effects on visual resources described below may occur at the same time in multiple locations. The effects would occur for a short period of time (weeks or months). After construction is completed, all equipment would be removed, and staging, storage, and construction areas would be reclaimed to a pre-disturbance condition. Impacts from construction would not change the VRI classification.

Ground Disturbance and Dust

Construction activities would disturb the ground surface and require removing vegetation, which would affect visual resources by creating land barren of vegetation when compared to adjacent land. Also, ground disturbances would affect visual resources by creating exposed soil with a different texture and color than undisturbed soil. Depending on growing conditions, trees and shrubs may not regenerate quickly, which would affect the timeline for reclaiming disturbed areas.

Ground-disturbing activities would also generate dust from vehicle movement, excavation, and wind blowing across exposed soil. Fugitive dust would affect visual resources by diminishing atmospheric clarity. This effect would persist until the dust settles or is blown elsewhere.

Implementation of COA #36 would reduce effects on visual resources by limiting light pollution that could cause changes to cultural modifications. Implementing COAs #50 through #52 would reduce effects on visual resources by instituting reclamation practices that limit the duration and scope of changes to the physical landscape.

Construction Lighting

Lights would be used during construction only when necessary for safety, and lighting would be kept to a minimum. This would reduce nighttime darkness by adding light to areas lacking sources of artificial light. Nighttime effects on surrounding areas would be limited because nighttime construction work is not proposed.

Glare
Reflective surfaces on construction equipment and vehicles create glare. The intensity and amount of glare would vary depending on the intensity of sunlight and the time of day. This would affect visual resources by adding artificial points of illumination not found naturally in the landscape where construction equipment and vehicles are present.

Cluttered Views
During construction, views of the project area would be cluttered with construction equipment, construction materials, and temporary support infrastructure, such as pipes, pits, fences, flagging, and stream crossings. The color and geometric, boxy forms of construction materials and equipment would contrast with the rolling form of the terrain and the vegetation. The rigid vertical elements would create various focal points on a mostly open landscape and would not mimic other landscape elements, which are mostly vegetation. The color of construction equipment and vehicles would not resemble the muted tans and greens of the terrain and vegetation.

*Permanent Effects*
Permanent direct effects on visual resources would occur from operating and maintaining sites and facilities. The effects on visual resources would be permanent, unless a site was abandoned and reclaimed. The life of the project is estimated at 50 years.

Roads
New roads would add artificial elements to undeveloped areas. Improving roads typically enhances the contrast of the road with the adjacent landscape. Roads lack vegetation and create an abrupt vegetation edge along the roadside. Smooth roads would stand out against the moderately coarse texture of the terrain. This would affect visual resources by dividing the landscape with areas that lack vegetation, altering the natural topography, and altering the texture and color of the land surface. The visibility of the new and improved roads would vary, depending on viewer distance and location, topography, and screening vegetation.

Pipelines and Electrical Lines
New pipelines and electrical lines would add artificial elements to undeveloped areas. The form, line, and texture of these structures would not resemble nearby structures, unless they are collocated with similar existing structures. In particular, pipelines would divide the landscape with strips of land lacking vegetation and electrical lines would introduce prominent vertical elements. The visibility of the new pipelines and electrical lines would vary, depending on viewer distance and location, topography, color and composition of pipelines and electrical line poles, and screening vegetation.

Well Pads and Facilities
Well pads and facilities, such as flowback pits and compressor stations, would add artificial elements to undeveloped areas. These areas would be cleared of vegetation, thereby leaving a clearing that contrasts with the surrounding landscape. The form, line, color, and texture of these facilities would not resemble nearby structures, unless they are collocated with similar existing industrial facilities. Also, the well pads and facilities would be sources of activity and commotion that are not typically found in undeveloped areas. The visibility of the facilities

would vary, depending on viewer distance and location, topography, color and composition of facilities, and screening vegetation.

Lights would be installed for safety and to illuminate work areas, such as drilling rigs, at night. This would reduce nighttime darkness by adding light to areas lacking sources of artificial light. As a result, this would diminish opportunities for viewing visual resources between dusk and dawn. In particular, this would affect stargazing opportunities.

***Effects Common to All Alternatives***

The Nature and Types of Effects described above would occur under all alternatives. The intensity of the effects would vary by alternative and is described below for each alternative. The temporary direct effects on visual resources would only last during construction and all equipment would be removed, and staging, storage, and construction areas would be reclaimed to a pre-disturbance condition. Therefore, the impact on visual resources described below focuses on the permanent direct effects. **Table 2-10**, Summary of Actions by Alternative and **Table 2-12**, Summary Surface Disturbance Acres by Alternative identify the total number of permanent structures and total acres of long-term surface disturbance.

***Alternative A***

Activities under Alternative A would result in long-term surface disturbance and associated permanent structures that would change vegetation, color, and cultural modifications on the landscape. These changes could result in the 0.5 to 2.0 point drop in scenic quality evaluation ratings for the Bull Mountain, Paonia Reservoir, and Deep Creek Units; this would trigger reclassification as a Scenic Quality B rating. As a result, the VRI Class could be changed to Class III or IV. There would be no impact on VRM management because development would be on private lands. The viewshed along the West Elk Loop Scenic Byway would be less affected than under other alternatives because there would be less development. The actual extent of change to the scenic quality rating depends on a number of factors, including viewer distance and location, topography, color and composition of project structures, and screening vegetation.

Because the BLM would not approve the 12-89-7-1 APD under Alternative A, this well would not be drilled. This would result in the continuation of the current land and resource uses at this well site. As a result, there would be no impacts on visual resources from drilling this particular well.

***Alternative B***

Alternative B would result in more acres of long-term surface disturbance and associated structures than Alternative A. If the BLM were to apply mitigation measures #30 and #44 through #46 in **Appendix C**, they would reduce effects on visual resources by instituting reclamation practices that limit the duration and scope of changes to the physical landscape and by limiting light pollution that could cause changes to cultural modifications. As under Alternative A, Alternative B would likely result in reclassification of the area to VRI Class III or IV due to changes in vegetation, color, and cultural modifications. The proposed development on BLM-administered land would be consistent with VRM Class III management, which allows a moderate level of change to the landscape. Overall, Alternative B would have the greatest potential for changing the VRI Class and the greatest impacts near the West Elk Loop Scenic Byway due to the scope and location of proposed development. The actual extent of change to

the scenic quality rating depends on a number of factors, including viewer distance and location, topography, color and composition of project structures, and screening vegetation.

Approving the 12-89-7-1 APD would result in changes to landform, vegetation, and structures at the well site and along the proposed pipeline route. These changes would occur on private land in an area with several existing natural gas facilities, including producing gas wells, a water injection well, and a centralized water storage facility. The proposed drill rig derricks and nighttime lighting on the derricks would be visible during well drilling because of the low height of surrounding vegetation. The completed well pads and their associated storage tanks would be visible from various local points along private roads and from surrounding private lands. Taller equipment would also be at least partly visible from State Highway 133. In addition to the measures in **Chapter 2** (e.g., flat nonreflective standard environmental paint colors), if the BLM were to apply mitigation measures #26, #36, #51, and #52, it would make the well pad facilities blend into the surrounding colors and forms fairly well. As such, the facilities would not tend to dominate the view for the casual observer.

Overall, changes to existing landform, vegetation, and structures from 12-89-7-1 APD activities would result in a weak to moderate degree of contrast in form, line, texture, and color.

***Alternative C***

As under the other alternatives, Alternative C would likely cause the VRI class to change to Class III or IV by introducing a moderate level of change to the landscape. Impacts would be reduced by implementing required design features for reclamation and light pollution. As under Alternative B, the proposed development on BLM-administered land would be consistent with VRM Class III management. Due to the number and proximity of proposed well pad locations, Alternative C would have a greater impact on visual resources along the West Elk Loop Scenic Byway than Alternative A. The actual extent of change to the scenic quality rating depends on a number of factors, including viewer distance and location, topography, color and composition of project structures, and screening vegetation.

Impacts from approving the 12-89-7-1 APD would be the same as those described under Alternative B.

***Alternative D, the Preferred Alternative***

Impacts under Alternative D would be similar to those described under Alternative B, except that there would be three fewer well pads, resulting in slightly fewer changes to vegetation, color, and cultural modifications. Similar to Alternative B, locating well pads away from the SH 133 viewshed would minimize degradation of views from the scenic highway. However, because the Bull Mountain, Paonia, and Deep Creek Scenic Quality Rating Units require only a 0.5 to 2.0 point deduction before being reclassified as B-rated units, the scope and nature of development would likely result in a reduction in their evaluation ratings. The actual extent of change to the scenic quality rating depends on viewer distance and location, topography, color and composition of project structures, and screening vegetation.

Impacts from approving the 12-89-7-1 APD would be the same as those described under Alternative B.

### *Cumulative*

The cumulative analysis area for visual resources is the proposed project area and adjacent areas. The analysis involves the same process as described above under Methods of Analysis. However, in addition to focusing on vegetation, color, or cultural modifications, adjacent scenery is also addressed in order to capture impacts on scenic quality from nearby cumulative projects.

Several past, present, and reasonably foreseeable future projects have altered or will alter the visual character and quality of the landscape. For example, oil and gas extraction in the cumulative analysis area has impacted and will continue to impact visual resources on public and private lands. Other primary sources of cumulative impacts on visual resources are vegetation treatments, prescribed fires, and expanded residential development. These actions would occur under all alternatives. Coal development is also common in the cumulative analysis area, though the use of underground mining techniques limits the number and size of surface facilities and alteration of the visual landscape. Together, these projects have altered the area's visual character and quality by introducing cultural modifications and altering the vegetation and color of the landscape. These past, present, and reasonably foreseeable future actions would occur under any alternative.

The incremental effect of adding Alternatives A, B, C, or D to the past, present, and reasonably foreseeable future actions would be to further degrade the cumulative analysis area's visual character and quality. Development of non-federal mineral estate under Alternative A would add to the cumulative effects by introducing additional surface disturbance. It is assumed to occur regardless of whether a different alternative is approved.

Similar to the construction activities and process described under the alternatives, construction for many of the cumulative projects listed in **Table 4-3** would likely be limited to a short period of time, involve reclaiming construction areas to a pre-disturbance condition, and employ visual resource design techniques and COAs. Not all projects and their associated construction activities would occur simultaneously. Given their short-term nature and assuming implementation of design features and COAs, construction associated with reasonably foreseeable future projects would not change the VRI classification of the cumulative analysis area.

Operation and maintenance of the cumulative projects would result in cumulative impacts on scenic quality similar to the permanent effects described for each alternative above. Additionally, events, such as spread of forest insects and diseases and wildland fires, would also have long-term effects on scenic quality.

The actual extent of change to the scenic quality rating depends on a number of factors, including viewer distance and location, topography, color and composition of project structures, and screening vegetation. However, the natural landscape has a finite number of changes that it can accommodate before cumulative impacts on scenic quality become readily apparent. Therefore, as the quantity and density of development and change increases, so does the potential for scenic quality degradation. Alternative A would result in the least development in the cumulative analysis area and, as a result, the lowest degree of change affecting visual resources.

By contrast, Alternative B would result in the greatest development and degree of change affecting visual resources. Alternatives C and D would result in a greater degree of change in the cumulative analysis area when compared to Alternative A; however, cumulative impacts would be less than under Alternative B because there would be less development on the landscape.

Under Alternatives B, C, and D, implementing COAs would reduce harmful impacts (see **Appendix C**, Design Features, Mitigation Measures, and Conditions of Approval, COAs #36 and #50 through #52). Given the increase in total acres of long-term surface disturbance and associated permanent structures by previously authorized activities in the cumulative analysis area, residual impacts could change the VRI class to Class III or IV. However, implementing COAs would reduce the likelihood of a change in VRI Class. The actual amount of change to the scenic quality rating depends on a number of factors, including viewer distance and location, topography, color and composition of project structures, and screening vegetation. These would be determined and analyzed in future site-specific analyses.

## 4.3 RESOURCE USES

### 4.3.1 Livestock Grazing

***Methods of Analysis***

Impacts were determined by assessing which actions, if any, would change the livestock grazing indicators described below. Some impacts are direct, including loss of grazing acreage or reduction in AUMs. Indirect impacts affect grazing through a change in another resource, such as decreased forage from dust or reduced water quality for vegetation. Other indirect impacts include increased costs for ranchers due to fencing and difficulties in moving livestock, or loss of forage quality from introduction of unpalatable weeds.

The indicator used for impacts on livestock grazing is the number of acres of grazing habitat that would be lost.

***Nature and Type of Effects***

Direct effects include loss and fragmentation of grazing land resulting from land grading and clearing and construction of well pads, roads, pipelines, and facilities. Human presence and vehicle traffic on-site could disturb livestock and trample vegetation providing forage. Vegetation removal or trampling would reduce the amount and quality of available forage.

Indirect effects on livestock and rangeland include the possibility of injury to livestock from vehicle and equipment traffic on-site. Traffic facilitates spread of weeds, resulting in reduced forage palatability. Vehicles and equipment could also cause erosion and soil compaction, affecting the growth of forage and potentially facilitating weed spread. Furthermore, construction and maintenance activities could increase dust, which could cover vegetation, reduce palatability of forage, and increase tooth wear.

In addition, increased fencing would be required to isolate drilling facilities from livestock grazing areas. Pad sites would be fenced to keep livestock away from reclaimed areas to allow for soil and vegetation recovery, adding to lost grazing potential. Cattle guards and gates would be placed in roadways, which may impede the movement of livestock across the range and

require additional time and effort for livestock management, increasing costs for ranchers. Livestock may also be lost if gates are not properly closed on access roads. However, given that approximately 5 percent of acres on BLM-administered land would be impacted, the impacts on ranchers from decreased forage production would be less than significant.

### *Effects Common to All Alternatives*

Livestock grazing would continue during development and operation of the Unit. Construction-related disturbance would reduce available grazing acreage and forage for sheep and cattle, and the installation of access roads, well pads and utility lines to access private mineral reserves would reduce forage and acreage in the long term.

On BLM allotments, 14 acres or more would be lost to grazing under all alternatives (**Table 4-61**, Grazing Disturbance on BLM Allotments from Roads and Well Pads), with additional acreage lost from private ranchlands. The acreage would be converted to roads, pipelines and other long-term surface uses. This calculation assumes that all vegetation in these areas provides potential livestock grazing, though vegetation types such as sagebrush are not palatable for cattle, so the actual amount may be less. Also, the acreage is concentrated in the far southeastern corner of the Unit, which is where the BLM-managed grazing allotments are found.

Potential impacts include additional sources of income to ranches through lease fees or surface use agreements. Replacement of old fence lines could help with long-term costs of maintaining infrastructure.

**Table 4-61**
**Grazing Disturbance on BLM Allotments from Roads and Well Pads**

| | Alt A | Alt B | Alt C | Alt D |
|---|---|---|---|---|
| **Federal surface, federal minerals** | **4** | **11** | **8** | **5** |
| Downing (280 acres) | 4 | 8 | 6 | 5 |
| Stock Driveway (340 acres) | 0 | 3 | 2 | 0 |
| **Private surface, private minerals** | **10** | **8** | **8** | **8** |
| Downing | 10 | 8 | 8 | 8 |
| **TOTAL** | **14** | **19** | **16** | **13** |

Source: BLM GIS 2014
Grazing allotments are in the southeastern part of Unit. As pipelines are collocated with a north-south running road in Alternative C, they do not go through the BLM land in that allotment.

### *Alternative A*

Under Alternative A, existing lease rights granted by the BLM on federal lands and/or federal mineral estate would remain in effect. New wells would continue to be developed on private lands in the Unit.

Under Alternative A, based on assumptions discussed in Chapter 2, no new development on federal lands or of federal mineral estate would occur, which would limit impacts on grazing lands. However, existing lease rights on federal mineral estate would remain in effect and direct and indirect impacts from energy development would continue on non-federal mineral estate, requiring construction of access roads and pipelines on federal lands.

BLM grazing allotments under Alternative A are shown in **Table 4-61**. The table is based on the conceptual siting of project components and estimated project footprint; the exact acreages could change during design and site permitting. The table includes only BLM allotments on BLM-administered surface, because the locations of ranches on private lands are not available. Additional impacts on ranchlands on private lands overlaying federal mineral estate would occur under each alternative.

***Alternative B***

Under Alternative B, impacts described under Alternative A would occur, and impacts would also occur from mineral development on federal lands. The acreage of impacts would increase under Alternative B compared to Alternative A, as shown in **Table 4-61**, as additional facilities would be constructed. In addition to the acreage shown in the table, impacts would occur to private grazing allotments overlaying federal mineral estate. These acres of impacts were not calculated for the MDP because the locations of private ranches were not available.

Grazing acreage would be lost and forage quality would be reduced under this alternative in areas being developed. Specific mitigation measures in **Appendix C** could minimize these impacts if applied as COAs. For example, dust abatement measures (COA #12) would reduce the likelihood that forage palatability on adjacent lands would be impacted. COAs #7, #9, and #10 for erosion control and limiting removal of vegetation and requiring replanting vegetation (COAs #18 and #49 through #51) would reduce the likelihood for impacts on forage quality in the long term. Only approximately 13 acres (3 percent of acres of grazing allotments) of BLM-administered land would be impacted, Assuming COAs in **Appendix C** would be applied to minimize indirect impacts as described, the alternative's effects would be less than significant.

Approval of the 12-89-7-1 APD under Alternative B and all action alternatives has the potential for site-specific impacts on livestock grazing. Land surrounding the site is a privately owned working sheep and cattle ranch. The disturbance of approximately 5 acres of this ranchland, as well as indirect disturbance of livestock as discussed under *Nature and Type of Effects*, could impact livestock productivity on this private ranch. Impacts would be minimized due to the limited number of acres disturbed and the fact that livestock are not currently grazed on the ranch in the winter and spring.

***Alternative C***

Alternative C is a modified action alternative, with fewer overall well pads, access roads and other facilities planned. The acreage of impacts on BLM surface grazing allotments would be slightly reduced compared to Alternative B (**Table 4-61**); therefore, direct impacts would be similar to Alternative B but slightly reduced. Indirect impacts on grazing lands, forage, and livestock would be similar to Alternative B, though slightly reduced, due to the smaller scale of the projected development. Alternative C would also incorporate all measures in **Appendix C** as design features and include additional measures to reduce impacts on vegetation, such as dust abatement measures. Reclamation of pipeline corridors would ultimately increase forage through replanting of grasses and forbs. With these measures in place, impacts on livestock grazing would be less than significant.

***Alternative D, the Preferred Alternative***
As the locations and types of development under Alternative D are similar to those described for Alternative B, the impacts on livestock grazing under Alternative D would be the same as those described above.

***Cumulative***
Cumulative impacts would include the combined implementation of the No Action Alternative plus the federal development described under any of the action alternatives and combined with other reasonably foreseeable future actions in the vicinity. A total of 13 acres, or 3 percent of BLM grazing allotments on BLM-administered lands, would be lost to development under the combination of No Action and Alternative D. Additional acreage would be lost from private ranches overlaying federal mineral estate that would be developed under Alternative D; the acreage of private grazing land lost is not included in **Table 4-61** because the locations of private ranches are not available.

The Unit and larger UFO historically sustained high levels of grazing. Sheep and cattle grazing still occurs, primarily in the spring and summer. BLM-administered lands in the Unit, 60 AUMs are active, while private lands sustain over 1,000 AUMs. On National Forest System lands surrounding the Unit, approximately 2,500 sheep AUMs, 1,000 cattle AUMs, and 30 horses.

With increasing oil and gas development, as well as coal mining, grass/forb vegetation communities continue to be lost, reducing grazing potential. Combined with other past, present, and reasonably foreseeable future actions, Alternative D would contribute to the gradual decline of grazing in the vicinity of the proposed project. Implementing the COAs in **Appendix C**, as discussed under direct and indirect impacts, would minimize the cumulative impacts caused by Alternative D, and no additional mitigation measures are recommended.

### 4.3.2 Minerals (Leasable, Locatable, Salable)

***Methods of Analysis***
Impacts on leasable minerals, locatable minerals, and salable minerals could result from requirements to protect other resources in the project area. Because natural gas development is the only mineral activity occurring in the project area, only gas development is discussed in terms of impacts from this federal action.

Indicators for impacts on federal natural gas resources in the project area from this federal action are as follows:

- Approval or denial of the Bull Mountain Unit master development plan (MDP)
- Application of factors and constraints for pad, road and facility siting to protect other resources
- Application of conditions of approval to be applied to protect other resources

***Nature and Type of Effects***

Approval of the Bull Mountain Unit MDP would result in more orderly development of federal resources in the project area. SGI would develop its existing federal gas leases in the project area with vertical, directional, and horizontal wells. Federal gas resources would be extracted through conventional methods as well.

Denial of the Bull Mountain Unit MDP would result in a shift of near-term development focus from federal minerals in the project area to private minerals in the project area. Therefore, the amount of near-term development of federal minerals in the project area would be reduced.

Application of timing limitation stipulations may be required if impacts of fluid mineral development on other resources cannot be mitigated within the standard 60-day suspension of operation period afforded by regulation. Portions of the project area where timing limitation stipulations are applied would be temporarily closed to drilling operations and all subsequent well operations except routine non-surface-disturbing activities. Excepted activities that would be allowed at all times include routine fracturing or acidizing jobs, recompletion in the same interval, well cleanout work, routine well maintenance, and bottom hole pressure surveys (43 CFR Part 3162.3-2). Most activities that would be subject to timing limitation stipulations (drilling operations) can be initiated and completed outside of the restricted dates specified in the stipulation. Application of timing limitation stipulations may also limit the types of wells that can be used to extract federal mineral resources in the project area. Because horizontal wells take up to 30 days longer to drill than vertical wells, drilling horizontal wells in areas subject to timing limitations may not be practicable. However, variances may be granted on a case-by-case basis subject to the terms of the timing limitation.

Application of factors and constraints to determine site suitability for fluid mineral activities limits the location of fluid mineral development. Examples of factors and constraints considered in siting include steep slopes and proximity to known streams containing Colorado River Cutthroat Trout. If either of these factors were present in a given area, roads or other facilities may not be sited in that area, and gas development in that area would be less likely. As a result, application of these factors and constraints could reduce the total amount of development of federal gas resources in the project area.

Application of conditions of approval listed in **Appendix C** would impact federal fluid mineral development by restricting the extraction of gas resources in the project area. These restrictions may limit the siting of extraction facilities, increase the cost of extraction, or add steps that must be taken in the extraction and reclamation process. Examples of COAs that may be applied include standards such as slope stability study requirements (COA #3), minimizing construction of new staging areas (COA #14), avoiding NRHP-eligible sites (COA #34), and interim reclamation requirements (COAs #50 through #52). COAs would be applied to gas development activities on a site-specific basis as appropriate.

Application of SGI's proposed WHP would impact federal fluid mineral development and would restrict gas extraction in the project area in a manner similar to that described for the COAs listed in **Appendix C**. For example, the WHP would restrict gas extraction by prohibiting drilling, surface-disturbing activities, and workovers and completions designed to increase production in

big game winter closure areas. Surface facilities would also be sited to avoid verified elk winter concentration areas.

***Effects Common to All Alternatives***

Under all alternatives, gas development activities on SGI federal leases in the project area would continue to be subject to lease stipulations including the standard stipulations applicable to all oil and gas leases in Colorado and a timing limitation stipulation to protect crucial deer and elk winter ranges. Application of the timing limitation stipulation could reduce development of federal gas resources in the project area and limit the type of wells used as described under *Nature and Type of Effects*.

Factors and constraints for site suitability, including slope, sensitivity to visual impacts, proximity to roads and pipelines, and proximity to sensitive natural resources, would be applied to fluid mineral siting under all alternatives. Application of these factors and constraints could reduce the total amount of development of federal gas resources in the project area as described under *Nature and Type of Effects*.

Under all alternatives, various management plans would be applied to gas development activities in the project area. Example plans include a noxious weed management plan and surface use plan of operations. Application of these plans would restrict development of federal gas resources in the project area as described under *Nature and Type of Effects*.

***Alternative A***

Under Alternative A, the MDP and APD would not be approved; it is possible that SGI would shift development focus to private minerals but would also submit APDs on a case-by-case basis. If SGI did not pursue much near-term development of federal gas resources in the project area under this alternative, development of federal gas resources would be reduced in the near term but would eventually be developed as described under *Nature and Type of Effects*; see also the description of cumulative effects below for the combination of private and federal mineral estate development.

One proposed well pad would be developed and 10 significant road upgrades would occur in verified elk concentration areas under this alternative. Total new road construction would cover 5 miles. Intensive activities associated with these facilities would be impacted by timing limitation stipulations as described under *Nature and Type of Effects*.

Near-term development under Alternative A would occur on private minerals, and no COAs are applicable to development on private minerals. Some near-term development, such as upgrades to existing roads needed to access well pads on private minerals under Alternative A, would occur on lands overlying federal minerals. COAs would not impact fluid minerals on private minerals under this alternative.

***Alternative B***

Under Alternative B, the MDP and APD would be approved, and SGI's development of federal gas leases in the project area would be guided by this MDP going forward.

Under Alternative B, in verified elk concentration areas, SGI would construct 19 new well pads and 3 new roads as well as completing 10 significant road upgrades. Total new road construction would cover 16 miles. Intensive activities associated with these facilities would be impacted by timing limitation stipulations as described under *Nature and Type of Effects*. Because more well pads and roads would be constructed under Alternative B, the impacts of timing limitation stipulations on federal mineral development would increase.

Under Alternative B, development of SGI's federal gas leases in the project area would be subject to a requirement for avoidance of identified occupied raptor nests. Development of SGI's federal gas leases in the project area would also be subject to the SGI proposed wildlife mitigation plan. Impacts of the plan on federal fluid mineral development are described under *Nature and Type of Effects*. If the BLM also applied the COAs described in **Appendix C**, impacts on federal fluid minerals would be similar to those described under *Nature and Type of Effects*. The portion of the Unit where all operations would be allowed throughout the year (including winter) would be reduced compared with Alternative A. Because little near-term development of federal gas resources in the project area would have occurred under Alternative A, overall near-term development of federal gas resources in the project area would increase under Alternative B despite the added restrictions of the wildlife mitigation plan and COAs. Additionally, the total amount of federal gas resources extracted may increase compared with Alternative A due to efficiencies in extraction made possible by the more comprehensive development planning in the MDP.

***Alternative C***

Like Alternative B, under Alternative C, the MDP and APD would be approved, and SGI's development of federal gas leases in the project area would be guided by this MDP going forward. However, additional restrictions to protect big game would limit development in the project area under Alternative C compared with Alternative B. Under Alternative C, SGI would develop 35 new well pads over federal mineral estate and drill 146 new gas wells in the project area. Because no new wells would be constructed over federal mineral estate in the near-term under Alternative A, Alternative C would result in a large increase in near-term development of federal gas resources in the project area (see *Nature and Type of Effects*). Construction of new wells under Alternative C would be the same as that under Alternative B.

Under Alternative C, additional siting and operational constraints would be applied beyond those described under *Effects Common to All Alternatives*. The impacts of timing limitations on gas extraction activities (described under *Nature and Type of Effects*) would increase. This is because voluntary timing limitations and the progressive development plan would limit operations such as workovers and recompletions (emergency situations excepted) during the winter, in addition to drilling and construction. The portion of the Unit where all operations would be allowed throughout the year (including winter) would be the smallest under this alternative.

Conversely, much less activity would occur in the remainder of the Unit during the winter, providing elk a place to go with relatively less disturbance. However, total miles of new road construction would actually increase by 7 miles compared to Alternative A to 12 miles total, as would development of new well pads and wells on federal mineral estate in the near-term. Construction of these roads and well pads would facilitate development of federal gas resources

in the project area. Additional operational constraints would include requirements such as closed loop drilling, continuous watering for dust suppression, green completions, and the use of remote telemetry to minimize well monitoring trips (see **Section 2.2.6**, Alternative C, Modified Action). As illustrated by the projected drilling of 146 new federal gas wells under both Alternatives B and C, the siting and operational constraints applied under Alternative C are not likely to reduce the total amount of development of federal gas resources in the project area compared to Alternative B, even though they would reduce total surface disturbance from gas development facilities.

***Alternative D, the Preferred Alternative***

Impacts on fluid mineral development under Alternative D would be the same as those under Alternative B if the COAs under Alternative B were applied, even though the siting of surface facilities would differ. While a maximum of only 33 well pads would be developed under Alternative D, 146 new wells would be drilled. Therefore, the siting and operational constraints applied under Alternative D are not likely to reduce the total amount of development of federal gas resources in the project area compared to Alternative B. This is despite the fact that they would reduce total surface disturbance from gas development facilities. Because little near-term development of federal gas resources in the project area would have occurred under Alternative A, overall near-term development of federal gas resources in the project area would increase under Alternative D, despite the added restrictions of conditions of approval and the wildlife mitigation plan. Additionally, the total amount of federal gas resources extracted may increase compared with Alternative A due to efficiencies in extraction made possible by the more comprehensive development planning in the MDP.

***Cumulative***

The cumulative impact analysis area for the proposed MDP and APD is the federal and private mineral estate in the project area in addition to the UFO. The UFO has already leased 25 percent of the federal fluid mineral estate in the project area for fluid mineral development, including all of the parcels that would be developed by SGI under this MDP and APD.

Under Alternative A, the MDP and APD would not be approved, and development of federal gas resources in the project area would continue to occur on an APD-by-APD basis. As such, near-term development of federal gas resources in the project area would be difficult to determine as it would be dependent on SGI's drilling schedule; however, as noted in **Table 4-1** and **Table 4-2**, all 201 gas wells and five water disposal wells would be built, eventually resulting in full development of federal gas resources in the project area. Therefore, in the long term, the amount of development of federal gas resources in the project area is expected to be similar under all alternatives. Conversely, extraction of gas resources from private mineral estate would occur sooner under Alternative A than under Alternatives B and C due to the shift in near-term focus to private minerals under Alternative A. The primary difference under Alternative A, aside from the timing of the development of private vs. federal resources, is that the federal gas development in the project area would occur on a piecemeal basis under Alternative A instead of according to a plan under Alternatives B and C. As a result, cumulative development of federal gas resources in the project area could be less efficient under Alternative A.

Because gas development in the project area would occur according to the MDP and APD under Alternatives B and C, federal gas resources in the project area would be extracted more quickly and potentially more efficiently than under Alternative A. Development of private gas resources in the project area would likely be delayed under these alternatives because SGI would be focusing on federal mineral estate in the near term.

The reasonably foreseeable development scenario for oil and gas developed by the UFO (BLM 2012b) anticipates the development of up to 1,271 new oil and gas wells in the UFO between 2010 and 2030. Some of these wells would be drilled horizontally, some directionally, and some vertically. The proposed new wells analyzed in this EIS are included in the UFO's projection. Because the total number of wells drilled under each alternative in this EIS does not change, the alternatives are not expected to alter the projected number of new wells in the UFO RFD.

### 4.3.3 Recreation

This section discusses impacts on recreation from proposed management actions in each alternative. Existing conditions concerning recreation are described in **Section 3.3.3**, Recreation. Existing conditions concerning travel and access are discussed in **Section 3.3.5**, Comprehensive Transportation and Access; however, because the two resource uses are closely related and often interdependent, some references to transportation and access have been made in this section.

#### *Methods of Analysis*

Indicators of impacts on recreation include changes to recreational opportunities within the project area and along primary transportation routes used during construction and operation.

The analysis includes the following assumptions:

- The primary recreational activity occurring in the project area is big game hunting (e.g., mule deer and elk).
- Big game hunting participation in the project area is dependent upon the number of hunters allowed by private landowners.
- Recreational use in the surrounding region will continue to increase as the population increases.
- There are no developed recreation facilities in the project area.
- Development would occur under every alternative, including development on private and state lands with non-federal minerals under Alternative A.

#### *Nature and Type of Effects*

Recreation is vulnerable to any action that would alter the activities and opportunities in a particular area. These actions could result in changes to recreational access or the amount and quality of a recreational activity.

As described in **Section 3.3.3**, Recreation, primary recreational activities in the project area and major access routes include big game hunting and scenic viewing. In addition, nearby routes provide access for year-round recreational activities.

The quality of hunting opportunities is primarily influenced by access and habitat conditions. Alternatives where access and habitat are enhanced would provide improved hunting opportunities. Likewise, a reduction in access and habitat conditions would diminish hunting opportunities. The timing of project activities would also impact hunting opportunities. Mule deer and elk hunting seasons are in the fall, overlapping portions of September, October, November, and December. A decrease in project activities during this time would lessen adverse impacts on hunting activities.

Scenic viewing is primarily influenced by road conditions (including traffic) and the condition of the viewshed. Impacts on visual quality, described in **Section 4.2.11**, Visual Resources, would also result in impacts on recreation. Alternatives that introduce additional traffic or degrade visual resources would have an adverse impact on scenic viewing. A reduction in traffic or an improvement in visual resources would be beneficial to recreation.

Other recreational opportunities near the project area are dependent upon access provided by the West Elk Loop Scenic Byway and County Road (CR) 265. Impacts on travel and access are discussed in **Section 4.3.5**, Comprehensive Transportation and Access. Alternatives that reduce access would have an adverse impact on the ability to engage in recreational activities along these routes. Likewise, improvements in access would have a beneficial impact on recreation.

***Effects Common to All Alternatives***

Assuming some development occurs under Alternative A, the resulting traffic, habitat fragmentation, and visual degradation would result in adverse impacts on hunting and other recreational opportunities under all alternatives.

***Alternative A***

Development occurring on state lands with non-federal minerals would result in the same types of impacts described under Alternatives B and C, but they would occur over a smaller area. Thus, adverse impacts on hunting opportunities may be less pronounced because there would be less big game habitat fragmentation. Likewise, fewer construction and operation vehicles using the West Elk Loop Scenic Byway and County Road 265 would result in less disruption to driving for pleasure and other recreation along those routes.

***Alternative B***

Actions under Alternative B would have the most pronounced disturbances on big game over the short term and long term (see **Section 4.2.7**, Fish and Wildlife, for analysis of impacts on big game). A decrease in the presence of big game in the project area would mean that hunters could expect less success. This may cause hunters to choose to hunt elsewhere, resulting in a loss of this recreational opportunity. (The economic impacts of a loss in hunting opportunities are described in **Section 4.4.2**, Socioeconomics.) Impacts would be most pronounced over the short term, when construction activities are anticipated to result in the greatest disturbance of big game. Long-term impacts would be less noticeable, but given the many high-quality choices for

hunting in the region, the impact of project operations on habitat conditions could cause hunters to go elsewhere.

The creation of project-related road construction access points directly adjacent to West Elk Loop Scenic Byway and County Road 265 is not expected to provide recreational value because of potential conflicts with project-related truck traffic and the developed setting of the project area.

Noise, congestion, and safety concerns resulting from increased traffic on the West Elk Loop Scenic Byway and County Road 265 would adversely impact scenic viewing. Recreational opportunities near these roads may also be diminished if the activities are sensitive to the intrusion of increased truck noise. An approximately 21 percent increase in truck traffic (compared to existing conditions) would adversely affect recreational access to nearby designations as a result of lengthened travel times and safety concerns; impacts on access are described in **Section 4.3.5**, Transportation and Access.

***Alternative C***

Actions under Alternative C would disturb big game habitat over the short term and long term (see **Section 4.2.7**, Fish and Wildlife), but a more comprehensive approach to wildlife management would likely limit these disturbances. However, given the many high-quality choices for hunting in the region, the impact of project operations on habitat conditions could cause hunters to go elsewhere.

Impacts from additional access points next to the West Elk Loop Scenic Byway and County Road 265 would be similar to those under Alternative B, but there would be less project-related traffic and potential for degradation of recreation and access.

Impacts from project-related truck traffic on the West Elk Loop Scenic Byway and County Road 265 would be slightly less than under Alternative B because there would be a 5 percent smaller increase in truck traffic .

***Alternative D, the Preferred Alternative***

Impacts would be similar to those described under Alternative B because there would be similar wildlife mitigation measures, traffic levels, disturbance to the landscape, and resultant potential for conflict with recreational activities and opportunities.

***Cumulative***

The spatial boundary for cumulative impacts on recreation includes the project area boundary and the West Elk Loop Scenic Byway and County Road 265 corridors.

The cumulative impact analysis area for recreation is relatively undeveloped and is a popular area for big-game hunting. Although there are few existing or proposed oil and gas developments, residential development and the resulting loss of habitat and access pose a threat to hunting. However, the scale of residential development (and the amount of public lands where such development is prohibited) is such that hunting opportunities would remain plentiful throughout the life of the project. As a result, cumulative impacts on hunting would be minor; it

is expected that hunters could find success on nearby land away from the disturbances caused by Alternative B.

Past, present, and reasonably foreseeable future actions are expected to have minor cumulative impacts on scenic viewing because the relative lack of existing and proposed development in the cumulative impact analysis area means that scenic viewing opportunities would remain intact in many places. Adverse impacts would be localized and most noticeable along the West Elk Loop Scenic Byway and County Road 265 for the life of the project.

Impacts on recreational access in the cumulative impact analysis area would be similar to those for scenic driving. An increase in traffic would lengthen travel times and may present safety concerns. Traffic is expected to increase in conjunction with the region's population and popularity as a tourism destination. In the context of these two larger trends, the alternatives would have a relatively minor impact on recreational access. However, other proposed projects in the area would result in similar adverse additive impacts. These impacts would be especially noticeable along the West Elk Loop Scenic Byway and County Road 265 and may contribute to less recreational use of these roads and nearby lands.

### 4.3.4 Lands and Realty

***Methods of Analysis***

Land status baseline information in **Section 3.3.4**, Lands and Realty, was reviewed for an understanding of current lands and realty program goals, management practices, and ownership breakdown in the Unit. This known information was overlain with the actions found under each alternative in Chapter 2, and conclusions were drawn based on an understanding of how these types of actions may affect the lands and realty program, and adjacent landowners.

Indicators of impacts on lands and realty are conflicts with the following:

- Existing or adjacent land uses
- Existing federal and local land uses, plans, and policies
- Existing BLM land use authorizations

This analysis assumes the following:

- Existing ROWs would be managed to protect valid existing rights

***Nature and Type of Effects***

*Public Lands*

An increase in natural gas development would lead to adjustments in the existing land uses in the Unit. Existing land uses would be displaced by surface-disturbing activity during both the construction and operation phases of the project. Land users would be affected by intrusive impacts. Examples of intrusive impacts include increases in traffic, noise, dust, and human activity, as well as changes in the visual landscape. These impacts could be a source of potential

conflict with recreational users, such as seasonal hunters, and ranchers that would be impacted by temporary forage losses on BLM-administered grazing allotments. Impacts on individual land uses are analyzed in other resource sections of this chapter. Impacts would occur for the life of the project, as well as after the project, since it is possible that some areas would not be fully reclaimed to original condition.

*Private Lands*

Impacts on private lands would occur from the sights and sounds of resource development on all land jurisdictions in the Unit. These impacts could include increased traffic, fugitive dust, noise, the loss of privacy that results from increased human activity (e.g., crews and equipment), and visual or aesthetic impacts that could devalue private property. In general, implementation of the project and the construction of gas facilities would change the character of the landscape from a rural to a more industrialized setting. Impacts would occur for the life of the project as well as after the project, since some areas would not be fully reclaimed to original condition.

As discussed in **Section 3.3.4**, most private lands within and adjacent to the Unit include oil and gas development, livestock grazing, and seasonal hunting. Development on private land in the Unit would lead to adjustments in existing land uses including loss of private rangeland and irrigated hay meadows. The severity of the impacts would vary depending on surface and mineral ownership at specific locations. Landowners who own mineral rights for the property are able to decide whether to allow development on their land. Land use conflicts are most likely to occur where wells are located on split-estate properties that have private surface ownership without mineral-estate ownership. The specific locations of facilities would be negotiated with landowners on split-estate lands. As discussed in **Section 3.3.4**, approximately 6,300 acres of leased lands in the Unit are private surface/private mineral estate and 12,900 acres are held in split estate. Section 1835 of the 2005 Energy Policy Act requires the BLM to review current policies and practices with respect to management of split-estate lands.

*Land Use Authorizations*

As discussed in **Section 3.3.4**, there are several authorized ROWs within the Unit, including State Highway 133, power and telephone lines, and private accesses. During the development phase, the integrity of existing ROWs could be impacted by construction activities. In order to avoid conflicts with existing ROWs, they would be avoided to the extent possible. If they cannot be avoided, caution would be taken to ensure no impacts on facilities or disruption of use occurs.

SGI would not be required to obtain a BLM ROW, provided that the facility (e.g., road, pipeline) is contained within the Unit and its use is specific to the Unit. If the facility also serves off-unit use, then a ROW would be required. For example, a pipeline ROW would be required to transport off-unit gas from development south of unit, across the Unit on the BLM surface in Sections 8 & 9, T12S, R89W. (See proposed pipeline in **Figures 2-2** & **2-3** that enters the Unit southern boundary in Section 9.) Potential impacts on current land uses resulting from the authorization of additional ROWs across BLM-administered land include losses of livestock forage due to surface disturbance; losses of wildlife habitat and displacement of wildlife due to surface disturbance and habitat fragmentation; and visual impacts on recreational users.

***Effects Common to All Alternatives***

There are no effects common to all alternatives.

***Alternative A***

Impacts under Alternative A would be similar to those described under *Nature and Type of Effects*. However, the extent of land uses displaced by oil and gas facilities would be mostly on private lands. In particular, there could be intrusive impacts on the residential areas along SH 133. However, compliance with the COGCC and Gunnison County regulations for oil and gas operations would mitigate potential impacts on landowners and users by providing reasonable limitations and safeguards for gas development on private lands/private mineral estate.

Because the BLM would not approve the 12-89-7-1 APD under Alternative A, the density of oil and gas wells on the 2,000-acre property associated with the APD would not immediately increase. The requested 5 acres of disturbance would not be approved. APDs on the parcel could be submitted and approved in the future on a case-by-case basis, with impacts similar to those described under *Nature and Type of Effects*.

Approximately four percent of the long-term and three percent of the short-term surface disturbance under Alternative A would occur on BLM-administered lands, including from the construction of new roads and improvements to existing roads for access, new pipeline construction, and up to one new compressor station. The remaining surface disturbance, approximately 96 and 97 percent, would occur on private surface. The disturbance on private surface would be caused by new and upgraded roads, well pads, and pipelines. **Table 4-62**, Alternative A - Surface Disturbance[1] by Landownership, summarizes surface disturbance by landownership. The factors and constraints for site suitability constraints modeling (see **Appendix A**) would limit the total amount of surface disturbance.

**Table 4-62**
**Alternative A - Surface Disturbance[1] by Landownership**

| Surface Ownership | Short-Term Disturbance | Long-Term Disturbance |
|---|---|---|
| Federal | 7 | 4 |
| Private | | |
| Federal minerals | 74 | 25 |
| Private minerals | 178 | 60 |
| Total | 259 | 88 |

Source: BLM GIS 2014
[1]Disturbance includes well pads, roads, and pipelines.

Reclaiming portions of the well pads and access road and pipeline ROWs that are not needed for production would reduce long-term or residual disturbance under Alternative A to approximately 88 acres. This is approximately 66 percent less than the short-term disturbance.

Potential impacts on current land uses resulting from the authorization of additional ROWs across public land include losses of livestock forage due to surface disturbance; losses of wildlife habitat and displacement of wildlife due to surface disturbance and habitat fragmentation; and visual impacts on recreation users.

***Alternative B***

Impacts would be similar to those described under *Nature and Type of Effects* but would extend onto BLM-administered lands. In addition, increased development on private surface lands,

including 12-89-7-1 APD, could result in greater increases in intrusive impacts and loss of forage, irrigated hay meadows, and hunting opportunities than under Alternative A. Similar to Alternative A, compliance with the COGCC and Gunnison County regulations for oil and gas operations would mitigate potential impacts on landowners and users by providing reasonable limitations and safeguards for gas development on private lands/private mineral estate.

Applying the WHP would likely limit surface disturbance and reduce impacts of gas development on wildlife populations. The mitigation efforts in the WHP could also reduce the intensity of traffic, fugitive dust, noise, and human activity in the Unit project area. Consequently, private landowners and public land users would not be as severely affected by these intrusive impacts during that period.

Approximately 2 percent of the long-term and 3 percent of the short-term surface disturbance under Alternative B would occur on BLM-administered lands. There would be more short-term disturbance and associated impacts on federal lands than under Alternative A. **Table 4-63** summarizes surface disturbance by landownership. The factors and constraints taken into account during the site suitability modeling (see **Appendix A**) would limit the total amount of surface disturbance and associated impacts.

Reclamation requirements in COAs #50 through #52 would reduce the long-term or residual disturbance to approximately 215 acres. This is approximately 56 percent more than the short-term disturbance.

**Table 4-63**
**Alternative B - Surface Disturbance[1] by Landownership**

| Surface Ownership | Short-Term Disturbance | Long-Term Disturbance |
|---|---|---|
| Federal | 10 | 4 |
| Private | | |
| Federal minerals | 462 | 164 |
| Private minerals | 126 | 47 |
| Total | 598 | 215 |

Source: BLM GIS 2014
[1]Disturbance includes well pads, roads, and pipelines.

### *Alternative C*

Land use impacts would be similar to those described in Alternative B, with the following exceptions. An additional design feature (e.g., verified elk winter concentration areas factor and constraint for site suitability) and changes to actions would limit the total amount of surface disturbance and associated impacts. Long-term surface disturbance and associated impacts would be less than under Alternative A but more than under Alternative B. As such, the extent of land uses displaced would be less than under Alternative A. Voluntary construction restrictions could also reduce the intensity of traffic, fugitive dust, noise, and human activity in the Unit project area during the winter. Consequently, private landowners and public land users would not be as severely affected by these intrusive impacts during that period.

The WHP would not be implemented and there would be no possible reduction in surface disturbance and associated impacts resulting from its application.

Approximately five percent of the long-term and four percent of the short-term surface disturbance under Alternative C would occur on BLM-administered lands; impacts would be similar to those under Alternative B. **Table 4-64** summarizes surface disturbance by landownership. The factors and constraints for site suitability constraints modeling (see **Appendix A**) would limit the total amount of surface disturbance.

**Table 4-64**
**Alternative C - Surface Disturbance[1] by Landownership**

| Surface Ownership | Short-Term Disturbance | Long-Term Disturbance |
|---|---|---|
| Federal | 16 | 6 |
| Private | | |
| Federal minerals | 369 | 109 |
| Private minerals | 56 | 12 |
| Total | 441 | 126 |

Source: BLM GIS 2014
[1]Disturbance includes well pads, roads, and pipelines.

Impacts from applying COAs would be the same as under Alternative B. Their application would result in approximately 126 acres of long-term or residual disturbance, or approximately 71 percent less than the short-term disturbance.

***Alternative D, the Preferred Alternative***

Land use impacts would be similar to those described in Alternative B, with the following exceptions. Long-term surface disturbance would likely be less than Alternative B. As such, the extent of land uses displaced would be less than under Alternative B.

Less than one percent of the long-term and one percent of the short-term surface disturbance under Alternative D would occur on BLM-administered lands. Disturbance on federal surface would be caused by upgrades to existing roads and constructing pipelines. The remaining surface disturbance, approximately 99 percent long term and 99 percent short term, would occur on private lands, including the 12-89-7-1 APD. New and upgraded roads, well pads, and pipelines would result in disturbance on private surface.

**Table 4-65** summarizes surface disturbance by landownership. The factors and constraints for site suitability constraints modeling (see **Appendix A**) would limit the total amount of surface disturbance.

**Table 4-65**
**Alternative D - Surface Disturbance[1] by Landownership**

| Surface Ownership | Short-Term Disturbance | Long-Term Disturbance |
|---|---|---|
| Federal | 5 | 1 |
| Private | | |
| Federal minerals | 382 | 120 |
| Private minerals | 68 | 12 |
| Total | 455 | 133 |

Source: BLM GIS 2014
[1]Disturbance includes well pads, roads, and pipelines.

Impacts from applying COAs would be the same as under Alternatives B and C. Their application would result in approximately 133 acres of long-term or residual disturbance, or approximately 71 percent less than the short-term disturbance.

***Cumulative***

The cumulative impact analysis area for lands and realty includes the Unit project area. Lands in the Unit are designated almost exclusively agricultural by Gunnison County and the current land use is primarily ranching with interspersed residences. The Unit is nearly surrounded by National Forest System lands. With the exception of existing oil and gas development, there are no commercial or industrial uses occurring in the area.

Oil and gas leasing in the Unit is guided by the Uncompahgre RMP (1989), which is currently being revised (ROD expected in 2017). According to the RFD prepared in support of the ongoing RMP revision, the Unit is located in an area identified as having High occurrence potential (BLM 2012b). Mineral production within the Unit is limited to natural gas wells developed by SGI and one natural gas well developed by Gunnison Energy Corporation. Additional surface disturbance on BLM-administered and private lands caused by future oil and gas development would lead to adjustments in the existing land uses in the Unit. Land users would be impacted by the development activities throughout the Unit. Examples of intrusive effects include increases in traffic, noise, dust, and human activity, as well as changes in the visual landscape. As lands in the Unit become more industrialized, individuals that currently own private lands that are next to BLM-administered or National Forest System lands could be adversely impacted by the shifting character of the landscape.

The cumulative impact of identified actions on the BLM’s lands and realty program would result from activities that affect the BLM’s ability to authorize land use authorizations (including ROWs) in the Unit. Alternative B proposed the greatest possible increase, compared to Alternatives A, C, and D, in land use authorizations from oil and gas development.

The collective effects on lands and realty for Alternatives A, B, C, and D are interrelated with various energy-related economic growth activities. The need for minor ROWs (such as distribution lines and roads) and new or expanded facilities to accommodate energy growth, such as coal mining and natural gas production, are also affected by the increased demand for energy and minerals, as well as potential increased population growth and development on private lands. Most development of utility and transportation corridors has occurred in the eastern portion of the Unit, along State Highway 133. In the future, energy and minerals-related economic development activities and population growth in Gunnison County would likely drive the location and types of ROWs authorized by the BLM.

### 4.3.5 Transportation and Access

***Methods of Analysis***

Impacts on transportation and access would occur as a result of an increase in traffic volume or change in the availability or quality of transportation routes. The following indicators are used to evaluate effects on transportation and access from the Proposed Action:

- Change in the number, acreage, and total miles of access roads;

- Change in the average annual daily traffic volume for Highway 133;
- Change in the quality of existing arterial roadways and access roads that would affect the roadway's ability to safely and efficiently accommodate vehicle movement.

***Nature and Type of Effects***

For the purposes of this analysis, transportation describes the movement of vehicles on routes within the project area. Any new oil and gas development activity within the Unit would generate additional traffic entering and exiting the Unit via Highway 133, County Road (CR) 265 and the network of access roads. The nature and type of vehicle trips would vary depending on the phase of well development. During the well pad and pipeline construction phases, vehicles entering and leaving the Unit would include gravel trucks, semi-trucks, water trucks, pick-up trucks, and a series of flatbed trucks hauling construction equipment. Subsequent well drilling and well production phases would also result in an increase in vehicles entering and leaving the Unit. Vehicle traffic associated with the drilling and production phases would include drilling/completion rigs, water trucks, pick-up trucks, workover rigs, and haul trucks. Trip origins for vehicles during all phases would be from areas outside the Unit. Accordingly, traffic volumes would increase on Highway 133, County Road 265 and well site access roads. Effects of increased vehicle traffic volumes on Highway 133 would include congestion and associated longer travel times for other transportation route users and increased probability of traffic-related incidents, including fatalities.

Heavy vehicles (i.e. those 55,000 pounds or heavier) accelerate the rate of road wear. The longevity of road surface conditions depends on several factors, such as surface type, weather conditions, sub-base characteristics, and the nature and type of vehicle traffic. Interaction of pavement condition and vehicles takes into account vehicle weight, frequency, axle spacing, vehicle speed, number of tires per axle, suspension, and tire pressure. In general, a twofold increase in vehicle weight can increase road surface deterioration by 800 to 1,600 percent (FHWA 2000). More frequent maintenance would be required to offset the effects of heavy vehicle use.

Indirect effects of higher traffic volumes would include more frequent road construction, the need for additional patrolling by public safety personnel, and deterioration of the highway's scenic attributes. On County Road 265, increased heavy vehicle traffic would deteriorate the gravel road surface requiring more frequent road maintenance. However, improvements to County Road 265 as part of any agreement between the county and a developer would improve the quality and safety of the road surface in the near-term. On-going maintenance would be necessary for long-term transportation quality.

Whereas transportation describes the movement of vehicle traffic, access considers the physical availability of transportation routes. In general, the construction of new roads would improve access within the transportation network. Similarly, improvements to routes that increase the ability of route users to safely reach certain locations would promote greater access. Within the Unit, well pad development requiring new access roads would result in an overall increase in access. However, new access roads typically provide specific localized ingress and egress to and from a single or cluster of well pads and would therefore provide limited accessibility benefits throughout the broader Unit. Access to locations within the Unit would temporarily decrease

during construction activities that require the partial or full closure of existing route segments. In the long term, improvements to existing routes such as more stable surface materials, increased road widths or added lanes, additional slow vehicle turnouts, and longer sight distances would promote greater access to destinations within the Unit.

Route designation as part of a future travel management planning process would also impact transportation and access. Any seasonal or permanent closure of routes within the Unit (e.g., to motorized travel) would decrease or eliminate vehicle trips on those routes and concurrently reduce the level of accessibility to certain locations.

***Effects Common to All Alternatives***

Under all the alternatives, existing drilling operations would continue with associated effects on transportation and access. There would continue to be approximately 96 miles of paved and unpaved routes in the Unit, including a 6.4 mile segment of Highway 133, a 4.8 mile segment of County Road 265, 20 miles of gravel access roads, and 49 miles of 2-track routes. Highway 133 would continue to provide the primary access to the Unit from surrounding areas, while County Road 265 would provide localized access in the northern half of the Unit. Truck traffic and associated transportation impacts as described in the Nature and Type of Effects would be greatest during well pad and pipeline construction activities. During drilling and production phases, transportation impacts would be comparatively less.

For all alternatives, road improvements carried out prior to or in conjunction with well pad construction that strengthen road surfaces, would extend the longevity of roadways. However, the need for more frequent road maintenance activity would result in periodic delays, particularly during the summer, on the routes where maintenance activities are occurring.

***Alternative A***

Alternative A proposes an estimated 10 new well pads, which would require the construction of 5 miles of new 16-foot wide access roads and the improvement of 26 miles of existing roadways. During road construction, measures would be taken to ensure continued access to existing property owners and leaseholders within the Unit. Impacts on access would mostly occur during well pad construction or during construction of individual pipelines or transmission lines directly adjacent to roadways.

Alternative A would increase the average annual daily traffic volume on the existing transportation network within the Unit, including the number of heavy trucks. Most vehicles would enter and exit the Unit via Highway 133 from points south of the Unit. Delta, Hotchkiss, Paonia, Crested Butte, and Gunnison are the region’s primary population centers, the local distribution centers for construction materials such as gravel, and the regional disposal locations for drilling fluids and other waste from the well development process. A lesser number of vehicles would enter and exit via Highway 133 to the north; adverse impacts on traffic and access would be less in that area.

Traffic volume would increase most during the well pad, access road, and pipeline construction phases. During construction phases, Alternative A would add an estimated total of 8,439 round trips to the Unit, 55 percent of which would be from gravel trucks. Another 28 percent of the trips would be associated with crew cab pick-up trucks. Over a 6-year period, the number of

average annual daily trips for all phases of development would be 22,751, equivalent to an average annual daily traffic amount of 10 trips. Alternative A would increase the overall average annual daily traffic on the segment of Highway 133 in Gunnison County by less than 1 percent over a 6-year time frame. The average annual daily trips associated with trucks could increase by up to 11 percent compared to existing truck-related traffic levels. The increase in truck trips is expected to be noticeable to most motorists and may result in periodic delays.

Annual traffic increases would be greatest during the well pad construction and drilling due to more frequent trips by gravel trucks (4,640 total trips), water trucks (2,320 total trips), and rig-up trucks (2,610 total). The number of new trips for large trucks would be the least during well production (218 total); however, there would be an ongoing average of 71 round trips per well per year of employee pick-up trucks. Construction of individual well pads would take from 1 to 3 weeks. Other routes would experience substantially fewer average annual daily trips compared to Highway 133, but would experience localized, short-term spikes in traffic volumes during construction of nearby wells.

Increased vehicle trips, especially associated with slower moving vehicles such as loaded gravel and water trucks, drill rigs, and lowboy trucks with construction equipment would affect the movement of traffic on Highway 133, and to a lesser extent on County Road 265 and local access roads. Because well pad construction and drilling activities would occur 24 hours per day, 7 days per week, daily vehicle trips would be spaced across a longer time period. However, an overall increase in truck traffic would increase travel times for motorists on Highway 133, especially during already congested periods such as weekends. An increase in vehicle volume would also increase the potential for collisions, disabled vehicles, and other incidents thereby reducing vehicle mobility and driver safety on Highway 133 and other routes in the Unit.

Alternative A would also result in road surface deterioration over time. Gravel trucks, water trucks, and other heavy vehicles used during the well construction and drilling processes would steadily degrade road surfaces requiring more frequent road repairs. At an average loaded weight of 110,000 pounds, gravel trucks would result in the most road surface impacts during the well pad and access road construction phase. The total number of loaded gravel trucks entering the Unit under Alternative A would be 2,320. The same number would leave the Unit, but with a substantially lighter (less than 50,000 pounds) payload.

During pipeline construction and drilling/completing, drilling completion rigs, pipe trucks, and lowboy flatbed trucks carrying bulldozers, tractors, motor graders and other machinery would enter and leave the Unit approximately 5,742 times. On half of these trips (2,871) the trucks would be loaded with an average weight of 120,000 pounds. For the other half, most trucks would be empty with an average weight of 36,000 pounds or less. Because Highway 133 is a key access route into the Unit and to proposed development under Alternative A, there would be the potential for surface conditions on that roadway to degrade overtime. Impacts would include pavement cracking, rutting, and the formation of potholes. Impacts on unpaved routes, such as County Road 265, would primarily be rutting and erosion of the road surface.

For Highway 133, increased traffic volume, reduced mobility, and poorer road surfaces could incrementally decrease motorists' enjoyment of the route as a scenic byway, particularly during the well pad construction phase. Exhaust from additional truck traffic could detract from the

roadway's scenic qualities. See **Section 4.2.13**, Visual Resources and **Section 4.3.3**, Recreation, for further analysis related to the Highway 133/West Elk Scenic and Historic Byway.

***Alternative B***

Alternative B proposes an additional 36 well pads than Alternative A. To provide access to the additional well pads, developers would construct an estimated 16 new miles of access roads, 4 times more than Alternative A. The effects of the new access roads would be similar to those described in the Nature and Types of Effects and under Alternative A, above, but would apply to a larger and more widespread area within the Unit.

Under Alternative B, traffic volume would increase during all well development phases, which would last for approximately 6 years. For all development phases, Alternative B would add an estimated total of 41,658 round trips to the Unit, equivalent to an average annual daily traffic amount of 19 trips. As the primary ingress point to the Unit, Highway 133 would experience the greatest increase in average annual daily traffic, particularly with traffic entering the Unit from the south. Based on an existing average annual daily number of trips of 1,400 on Highway 133 through Gunnison County, new traffic proposed under Alternative B would result in a 1.35 percent average increase during the 6-year development time frame. The average annual daily trips associated with trucks could increase by up to 21 percent compared to existing truck-related traffic levels, and 10 percent more than Alternative A. The types of impacts would be similar to those under Alternative A but more widespread due to increased traffic levels.

Like Alternative A, daily traffic would increase the most during well construction and drilling, access road construction, and pipeline placement. These activities would require frequent trips by gravel trucks (8,480 total trips), water trucks (4,240 total trips), and rig-up trucks (4,770 total). The number of new trips associated with large trucks would be the least during well production (477 total); however, there would be an ongoing average of 162 round trips per well per year of employee pick-up trucks. Construction of individual well pads would take from 1 to 3 weeks. Since trip destinations would be disbursed throughout the Unit, other routes would experience substantially fewer average annual daily trips compared to Highway 133, with localized, short-term spikes in traffic volumes during construction of nearby wells.

Under Alternative B, 20 percent of all new trips would be from gravel trucks. Increased vehicle trips associated with these slower moving vehicles would affect the movement of traffic on Highway 133 and County Road 265. Because well pad construction and drilling activities would occur 24 hours per day, 7 days per week, daily vehicle trips would be spaced across a longer time period. However, an overall increase in truck traffic would increase travel times for motorists on Highway 133, especially during already congested periods such as weekends. An increase in vehicle volume would also increase the potential for collisions, disabled vehicles, and other incidents thereby reducing vehicle mobility and driver safety on Highway 133 and other routes in the Unit.

Similar to Alternative A, Alternative B would also result in road surface deterioration over time. Gravel trucks would result in the most road surface impacts during the well pad and access road construction phase. Other vehicles with average weights of 120,000 pounds, such as drilling completion rigs, rig up trucks, low boys with bulldozers and other construction equipment, work over rigs, and haul trucks, would impact road surfaces throughout well development due to their

heavy weights. Because Highway 133 is a key access route into the Unit and to proposed development sites under Alternative B, surface conditions on that roadway would degrade overtime. Compared to Alternative A, Alternative B would result in a greater likelihood for pavement cracking, rutting, and the formation of potholes. Impacts on unpaved routes, such as County Road 265, would include rutting and erosion of the road surface. Because County Road 265 would provide access to more well locations under Alternative B compared to Alternative A, the potential for surface deterioration on County Road 265 would be greater than Alternative A.

Applying COAs #15 and #17 through #19 (see Appendix C) would mitigate impacts on road conditions by requiring year-round maintenance and cleanup and restricting travel on natural surface roads when wet or susceptible to rutting or other damage. By maintaining better road conditions, the COAs would also improve access. However, restricting the location of new roads, parking areas, and pullouts (COAs #14, #16, and #17) could confine traffic flow and impede access if reasonable alternatives do not exist. Road construction and maintenance COAs would also minimize impacts on soil resources, as described in **Section 4.2.3**.

For Highway 133, increased traffic volume, reduced mobility, and poorer road surfaces could incrementally decrease motorists' enjoyment of the route as a scenic byway, particularly when heavy vehicle traffic entering and leaving well sites would be greatest. Vehicle exhaust could also detract from the roadway's scenic qualities. See **Section 4.2.13**, Visual Resources, and **Section 4.3.3**, Recreation, for further analysis related to the Highway 133/West Elk Scenic and Historic Byway.

***Alternative C***

Under Alternative C, the BLM would approve 35 well pads in addition to those proposed under Alternative A. Added measures to protect wildlife and reduce surface disturbance (e.g., new access roads would be constructed only as-needed) would confine traffic to fewer miles of roads. Therefore, impacts would be more localized than under the other alternatives.

Placing new piping in existing roadways would disrupt the movement of traffic on those roadways during construction activities resulting in road closures, detours, and localized travel delays.

Traffic volume would increase during all well development phases under Alternative C. For all development phases, which would last approximately 6 years, Alternative C would add an estimated total of 30,654 round trips to the Unit, equivalent to an average annual daily traffic amount of 14 trips. Highway 133 would experience the greatest increase in average annual daily traffic, particularly with traffic entering the Unit from the south. The increase for all vehicle types would be equivalent to 1 percent of the existing average annual daily traffic for the segment of Highway 133 through Gunnison County. Truck-related traffic under Alternative C could increase by up to 16 percent compared to existing conditions, which is 7 percent more than Alternative A.

Like Alternatives A and B, daily traffic increases would be greatest during the well pad construction phase due to more frequent trips by gravel trucks (6,240 total) and the least during well production (351 total). During production, the use of remote telemetry technology would reduce the need for site visits, thereby minimizing new vehicle trips during production. There

would however, be an ongoing average of 162 total round trips per year of employee pick-up trucks during well production. Other routes would experience substantially fewer average annual daily trips compared to Highway 133 due to the distributed nature of well sites in the Unit. Similar to Alternatives A and B, there would be localized, short-term spikes in traffic volumes on County Road 265 and access roads during construction of nearby wells.

The proportion of vehicle trips associated with heavy construction equipment such as gravel trucks would be the same as Alternative B. Impacts on County Road 265 and other access roads in the Unit would vary depending on individual well location.

Similar to Alternatives A and B, Alternative C would result in road surface deterioration over time. Because of vehicle weight and frequency of trips, gravel trucks would result in the most road surface impacts during the well pad and access road construction phase. Drilling completion rigs, rig up trucks, low boys with bulldozers and other construction equipment, work over rigs, and haul trucks would impact road surfaces during other well development phases due to their heavy weights (120,000 pounds). Alternative C would result in a greater likelihood for pavement cracking, rutting, and the formation of potholes compared to Alternative A, but less than Alternative B. Impacts on unpaved routes, such as County Road 265, would include more rutting and erosion of the road surface compared to Alternative A, but less than Alternative B. Because Alternative C proposes new well sites to be accessed via County Road 265, the potential for surface deterioration on County Road 265 would be greater than Alternative A and similar to Alternative B.

Impacts from applying road construction and maintenance COAs would be the same as under Alternative B.

Increased traffic volume, reduced mobility, and poorer road surfaces would affect motorists' enjoyment of Highway 133 as a scenic byway more than Alternative A, but less than Alternative B. See **Section 4.2.13**, Visual Resources and **Section 4.3.3**, Recreation, for further analysis related to the Highway 133/West Elk Scenic and Historic Byway.

***Alternative D, the Preferred Alternative***

Alternative D, the Preferred Alternative, proposes an additional 33 well pads than Alternative A, requiring the construction of an estimated 16 new miles of access roads. The effects of the new roads would be similar to those described in the *Nature and Types of Effects* and under Alternatives B and C, above.

Effects from burying new pipelines beneath roadbeds would be the same as those described under Alternative C above.

Traffic estimates for Alternative D would be approximately five percent less than for Alternative C over the course of the six-year development period, with similar but slightly fewer and less intense impacts. As discussed under the other alternatives, Highway 133, particularly south of the Unit, would experience the greatest increase in average annual daily traffic.

Similar to the other alternatives, impacts from increased annual gravel truck traffic would be greatest during the well pad construction phase, with an estimated 5,280 round trips, 3,680 (230

percent) more trips than Alternative A. During well production under Alternative D, there would be an ongoing average of approximately 1,337 round trips per year of workover light trucks, workover rigs, and haul trucks, which would be four times more trips than under Alternative A. Trip increases and subsequent traffic would be most apparent on Highway 133, while County Road 265 and smaller access roads throughout the Unit would experience localized, short-term increases in traffic volume.

As would be the case under all alternatives, Alternative D would result in a gradual deterioration of road surfaces over time, with gravel trucks used during construction resulting in the most road surface impacts. Alternative D would result in a similar degree of impacts on local and regional road surfaces and associated drivability as is described under Alternatives B and C.

Impacts from applying the road construction and maintenance COAs would be the same as under Alternatives B and C.

***Cumulative***

West-central Colorado will continue to be a popular destination for outdoor recreation activities, including motorcycling and pleasure driving on the region's many scenic mountain roadways. Accordingly, the use of Highway 133/West Elk Scenic and Historic Byway for pleasure driving and motorcycling is expected to steadily increase over time. Highway 133 serves as the primary arterial route between population centers in Delta and major destinations along the western front of the Rocky Mountains (e.g. Snowmass and Aspen). As urban populations in nearby municipalities such as Delta, Paonia, Hotchkiss, and Crawford grow, traffic volume on Highway 133 is expected to increase.

Each of the proposed alternatives would increase the average annual daily traffic volume on Highway 133 through the Unit. Alternative A would add an average of 10 trips per day to the Unit, while Alternatives B and C would add an average of 19 and 14, respectively. Alternative D, the preferred alternative, would add 15 trips per day. Because many of these trips would be by large trucks carrying heavy loads, drivers on Highway 133 could experience longer travel times for the segment within the Unit, and when travelling between eastern Delta County and the Unit.

An increase in truck volume coupled with more frequent passenger car trips would steadily degrade the Highway 133 road surface. Lane closures to repair cracked pavement and potholes would occur at more frequent intervals resulting in delays to motorists, well operators, and others travelling on Highway 133 within or adjacent to the Unit.

## 4.4 SOCIAL AND ECONOMIC CONDITIONS

### 4.4.1 Hazardous Materials and Wastes

This section describes potential impacts on humans or the environment from use or generation of hazardous substances during construction and operation and maintenance. The nature and quantities of hazardous and solid wastes are described in **Section 3.4.1**, Hazardous Materials and Wastes.

***Methods of Analysis***

Indicators of the potential for, and the severity of, impacts on human health and the environment of storing and handling hazardous substances and solid waste are the following:

- Quantity of hazardous material produced as influenced by the number of wells and methods of drilling employed
- Distance of wells from sensitive features including but not limited to steep slopes and streams
- Likelihood of accidents associated with transport over roads and via pipelines as influenced by well density and distance from disposal wells and from centralized storage facilities
- Frequency of occurrence of spills and releases of hazardous substances
- Severity of spills and releases, including effectiveness and timeliness of spill response measures

The analysis includes the following assumptions:

- Occupational Safety and Health Administration health and safety guidelines would be followed by all workers during all construction, operation, and decommissioning phases of the projects.
- Access to construction areas and areas where hazardous materials are stored, or where there is a potential for exposure to hazardous substances, would be controlled, such as by fences and gates or by other security measures, to exclude unauthorized entry.
- The COAs and design features identified in **Appendix C** would be implemented during all stages of the project as appropriate.

***Nature and Type of Effects***

Some chemicals used in hydraulic fracturing are considered hazardous under 40 CFR, Part 302, Section 302.4, as discussed under **Section 2.2.4**, Alternative A, No Action, sub-section Hazardous Materials and Solid Waste. There could be impacts on humans or the environment as a result of spills and releases or improper handling of hazardous substances (for example, from not wearing or using appropriate protective equipment or not having appropriate training to perform required duties).

Health and safety could be impacted if an exposure pathway is completed between a hazardous substance and a human or environmental receptor. A receptor is a road term that includes workers, the public, and non-human species, such as fish and wildlife, and even plant species. Exposure pathways primarily include direct contact, inhalation, and ingestion.

One of the strategies for avoiding exposure is to focus on preventing the completion of these exposure pathways, for example by containing hazardous substances or by using clothing and

equipment designed to provide a barrier to exposure. Use of such specialized clothing and equipment requires special training.

Spills and releases increase the potential for exposure pathways to be completed. Therefore, avoiding spills and releases through appropriate planning and preparation is one of the most effective strategies for preventing exposures. However, if spills or releases do occur, then contingency planning and training to respond to the spill or release can minimize or eliminate adverse effects.

Based on the actions described in the alternatives, the following are examples of possible impacts that could affect human health and safety:

- Vehicular accidents resulting in spills or leaks of petroleum products or hazardous substances, including drilling fluids, produced water, wastewater generated in drilling operations, and other substances

- Spills during fueling operations

- Spills while handling drilling or well stimulation fluids during drilling and hydraulic fracturing operations

- Introduction of methane, drilling fluids, or other contaminants into potable aquifers or otherwise causing degradation and loss of beneficial use of subsurface resources through failure of seals or other systems designed to protect those resources

- Fires or explosions of flammable or explosive materials stored or used at the site or mixing of incompatible materials

Gas field development activities involve the use of chemicals and the generation of materials that can have adverse effects on human health and the environment. Accidents from equipment failure or human error are inevitable and some are likely to result in releases. Environment and Energy Publishing analyzed state records and found that the 15 states with the highest number of onshore oil and gas activity reported 7,662 spills, blowouts, and leaks in 2013 (E&E 2014). Though many of these incidents were small spills, the combined volume of the spills was more than 26 million gallons of oil, fracturing fluid, produced water, and other substances (E&E 2014). In Colorado, reported spills increased by 33 percent, with 402 spills reported in 2012 and 534 reported in 2013 (E&E 2014).

This increase does not necessarily imply negligence, but it may be attributable to a number of factors, including improved spill reporting or an increase in development activities. However, these data show that spills occur with some frequency, and it is therefore necessary to minimize the risk of occurrence and to design measures to effectively respond to spills and minimize any subsequent effects.

Mitigation measures as required by state and federal regualtions and implementedd by SG fall into two broad categories: regulatory engineering controls and administrative controls.

Engineering controls are physical design features that address potential hazards and causes of failure. Examples of engineering controls are as follows:

- Pit liners to prevent the release of fluids from the containment structure
- Secondary containment to control migration of fluids if the primary container, such as a storage tank, fails
- Cement seals to prevent migration of fluids through the annulus of a borehole

Administrative controls are plans and policies that restrict some activities and require others. They include the following:

- Training requirements so that workers recognize the hazards associated with the tasks they are required to perform
- Monitoring requirements to evaluate the effectiveness of mitigation measures and the need to take corrective action in case the mitigation measures are not effective
- Seasonal use restrictions to avoid conditions where accidents may be more likely to occur, response would be slower, or the effects could be more severe

State and federal regulatory requirements and site-specific COAs aim to reduce the risk of impacts on human health and the environment. The COAs are based on the BLM's review of SGI's NOS/APD submittal and its evaluation of the site-specific features at the development site.

***Effects Common to All Alternatives***

Under all alternatives, existing drilling operations would continue, with potential effects on human health and the environment that would be similar to those described under *Nature and Types of Effects*, above. Impacts from additional future development would be the same as those described under *Nature and Types of Effects* and would result under all alternatives.

The types of impacts from hazardous storage and use of hazardous substances would be the same under all alternatives. The impacts may vary in degree, based on the number of wells drilled, the amount of wastewater produced, location, and site-specific conditions.

Under all alternatives oil and gas development could continue on private lands with non-federal minerals. This would result in the same kinds of human health and environmental impacts as those discussed under *Nature and Types of Effects*.

***Alternative A***

Under Alternative A, the Bull Mountain Unit MDP would not be approved. Fifty-five new natural gas wells and one new water disposal well would be developed on private lands within the non-federal mineral estate.

Under this alternative either a closed loop or reserve pit system would be used. Preference would be given to closed loop systems unless pit systems are necessary or would involve demonstrable benefits relative to closed loop systems. A closed loop system would reduce the risk of impacts

on human health and the environment compared to a reserve pit system for several reasons. A closed loop system would probably generate less drilling waste and drilling cuttings, requiring less management and necessity for less material to be transported, stored, and disposed of. SGI would specify the type of drilling system to be used when submitting the APD to the COGCC.

In general, since the impacts associated with management of hazardous substances would be similar in character under each alternative, the primary difference among the alternatives is the quantity of hazardous materials that must be managed. Alternative A would result in the least risk, because it involves the fewest wells over time. However, in a given year, the alternatives are expected to be similar, since the number of wells drilled in a year would be the same. That said, the alternatives also differ in the locations of the wells and site-specific issues, such as the following:

- Accessibility
- Distance from disposal wells and from centralized storage facilities
- Slope stability
- Proximity to streams
- Length of haul routes

Other location-specific factors would also influence the potential magnitude of the impacts.

The types of impacts that would occur under Alternative A are those described under *Nature and Types of Effects*.

***Alternative B***

Under Alternative B, as many as 146 new natural gas wells and 4 new water disposal wells would be developed on federal mineral estate only. This is a larger number of new natural gas and water disposal wells than would be developed in the decision area under Alternative A. Since the same number of wells would be constructed per year under each alternative, Alternative B differs from Alternative A, primarily in the duration of the effects and the increasing density of wells that would be operated and maintained over time. Most of the potential impacts from spills and releases or from accidents involving stored materials are expected to result from construction of the wells. Operation and maintenance involves fewer materials. Nevertheless, as well density increases, the likelihood of accidents associated with transport over roads and via pipelines would increase. Therefore, the magnitude of the impacts from Alternative B are expected to be greater than under Alternative A.

***Alternative C***

The impacts from hazardous substances and waste generation under Alternative C would be similar to those under Alternative B, except that there would be more pads and wells located in steeper, less stable terrane and more remote locations. This could increase the potential for spills or releases. The risks would be reduced by avoiding these steep, unstable areas locations and implementing site-specific COAs in **Appendix C** (see COAs #37 and #52 through #55).

***Alternative D, the Preferred Alternative***

The impacts from hazardous substances and waste generation under Alternative D would be less than those under Alternative B because Alternative D involves constructing fewer pads. The risks would be reduced by avoiding risky locations and implementing site-specific COAs (in **Appendix C**) to reduce the risk of hazardous material spills.

***Cumulative***

As discussed under the alternatives above, impacts from storage and use of hazardous substances would increase with the density of wells and well pads. The same generally applies on the wider regional scale. The Bull Mountain Unit is relatively undeveloped compared to some of the adjacent areas in the Piceance Basin; but over time, if the development of gas resources turns out to be economically feasible, the density of wells and pads would increase, approaching the density in other more developed areas of the basin. This may result in increased probability of significant spills and greater potential for impacts on human health and the environment over time.

The assumption is that the annual rate of well construction would remain constant. Nevertheless, the cumulative effects of the combined implementation of Alternative A and the preferred alternative would increase the density of wells and the intensity of road use over time in the Bull Mountain Unit. This would increase the potential for spills and releases and greater potential for impacts on human health and the environment. The longer duration of construction would also increase the probability of spills and releases. There would be a higher probability that a significant release or exposure incident would eventually occur over the lifetime of the project.

### 4.4.2 Socioeconomics

***Methods of Analysis***

Social and economic analysis is focused on the two-county study area (Gunnison and Delta Counties) as defined in **Chapter 3**. Although impacts may occur in surrounding counties and throughout the state, it was determined that the majority of impacts would occur within Delta and Gunnison Counties due to the location of the Unit and current population base.

Direct impacts on employment during drilling and production phases, as well as estimated costs of drilling and production are provided based on estimates from SGI. Estimates of production and related tax and royalty revenue based on full build-out were also supplied from SGI.

Revenues from minerals royalties, severance taxes, and property use taxes were calculated based on estimated production and estimated well head price, as described in **Section 3.4.2**, Socioeconomics. The analysis of potential changes in tax revenues is based on the federal mineral royalty of 12.5 percent of sales value and 5 percent of taxable value for state severance taxes (Colorado severance tax rates depend on production value but are 5 percent for production valued over $300,000).

Impacts on other land uses are discussed quantitatively and qualitatively where applicable. Economic impacts from recreation are discussed in terms of expenditures of residents from outside the local area only. This is was based on the assumption that expenditures of residents of the primary study area would occur in the region regardless of the BLM's actions that impact

recreational opportunities; however, changes in nonresident recreation patterns would alter the amount of money entering the primary study area. Information on the origin of visitors to recreational areas is typically not available.

Secondary project spending was analyzed using the IMPLAN input-output modeling economic impact analysis software and data (2010). All model estimates are presented in 2014 dollars, and data from SGI for labor and employment costs are based on 2014 dollars. The model represents the area where local direct economic effects would occur and where all the local secondary effects would develop (i.e., Gunnison and Delta Counties). All IMPLAN data displayed are in terms of the estimated impacts within the two-county study area. Effects of the project are also likely to occur in other counties in Colorado and the region. It should be noted that actual economic impacts and jobs created would vary based on the production schedule, technology employed, market conditions, and other factors. Modeling is intended to provide a comparison of impacts by alternatives rather than represent a precise forecast of actual economic impacts.

In addition to the assumptions included in **Chapter 2**, the following assumptions are applied for socioeconomic impact analysis

- For all alternatives, a maximum of 27 wells per year development has been estimated. This rate of drilling does not represent an average drilling year for the life of the project, but rather represents an average year at the peak drilling period, after ramp up of development, including compressor stations and supporting infrastructure construction. This level of development may not occur in any given year due to market conditions for oil and gas or other factors.

- Wells completed during the planning period would produce throughout the planning period.

- Average well head price for natural gas in 2012 was is $2.66/MCF (thousand cubic feet; EIA 2013b). Estimates from SGI predict natural gas prices of $4.50/MCF until 2017 and $5.50/MCF thereafter. Natural gas prices are volatile and actual average price is likely to change. Data are provided for comparative purposes only.

- Production estimates for drilled holes are based on SGI model numbers for composite coal bed methane and sandstone wells and Mancos wells models from 2015 to 2036.

- All data are displayed in 2014 dollar values. Data was converted to 2010 model year dollars for input into IMPLAN model using Bureau of Labor Statistics CPI deflator values

- Percent of spending in the local economy dictated by IMPLAN- model regional percentage of local spending by sector.

- Assumes current rate of severance taxes and royalty charges and distribution.

- Unless otherwise stated it is assumed that the distribution of well type for a typically well pad with five wells is one sandstone, one coal, and three Mancos shale.

Indicators of impacts on socioeconomics are the following:

- Local area employment levels

- County and local area population

- Local government fiscal conditions

- Local area property values

- Changes to other area land uses including but not limited to hunting, agriculture, and livestock grazing

- Quality of life factors including but not limited to air, water quality, traffic, crime, and social environment

***Nature and Type of Effects***

*Employment, Population and Income*
Components of the Proposed Action that are likely to affect the local economy include those that result in changes to level of employment in the area and related population levels, and those that impact spending on local materials and supplies.

The aspects that are most likely to affect project-related employment, labor, and related project spending are the number of wells drilled, technology employed in drilling, the number of producing wells, and production levels. The primary differences between the alternatives are the length, pace, and intensity and timing of the development phase, and the intensity of the production phase, which is mainly determined by the total number of wells and restrictions applied to the timing of production.

The effect of project spending on the socioeconomic study area would depend on whether project employment and spending occurs locally or over a wider geographical area. For the Unit, SGI estimates that employment would be stationed in Grand Junction, Montrose, Delta, Paonia, Hotchkiss, Glenwood Springs, and Gunnison, Colorado. The specific employment needs and project spending would change over time depending on the development phase and would affect the overall distribution of project spending; highest spending and highest levels of economic contributions are generally within the drilling phase.

Population levels would be impacted directly by project activities when temporary or permanent population increases occur in the project area as a result of labor for project work. Further indirect increases can occur when project spending and employment results in additional employment needs in service and support industries. In Pennsylvania, a 1 percent increase in total employment directly linked to the oil and gas energy sector is associated with a 0.5 percent increase in county population (Farren et al. 2013). There is potential for housing and rental prices to be indirectly impacted by gas drilling should a housing shortage result in increased demand for a limited number of homes and increased prices. In Williston, North Dakota, where the national shale boom is most pronounced, the flood of workers into the small and remote region

has placed a strain on housing availability and cost. One report states that the rental price for a two bedroom apartment rose from $350 to $2,000 (Oldham 2012). However, a recent review of housing impacts in Pennsylvania from 2007 to 2011 indicates that shale development is generally not associated with significant adverse effects on housing affordability and availability (Farren et al. 2013). There is some indication that temporary workers favor long-term hotels and may drive the construction of these facilities in areas with sustained drilling activity. Counties can also rely on the housing stock of neighboring counties to make up for any lack in housing availability when commuting is feasible

*Specific Economic Sectors*
Potential impacts on other land uses in the area include impacts on ranching/livestock grazing, recreation and hunting, and agriculture.

Level of grazing on BLM-administered lands and on private lands in the project area may decrease should proposed areas of disturbance include areas within current BLM-administered grazing allotments and private ranches. Any reduction of permitted or billed levels of AUMs would result in economic impacts on individual permittees, ranchers, and local businesses supporting ranching and livestock operations; however, as very little of the development would occur on the BLM-administered allotments, this would likely be a negligle amount. Based on IM 2003-131, SGI would be required to work with any other surface owners to mitigate or compensate for damages from the proposed operations. Operations on private lands are dependent on the annual decisions made by individual ranchers and are unknown and unpredictable for this document; therefore, reliable conclusions regarding the socioeconomic impacts from the gas developments are not possible. Impacts on particular allotments are discussed in **Section 4.3.1**, Livestock Grazing.

Estimates in 2007 dollars indicate that big game hunting in Colorado resulted in expenditures of $106 per day for in-state hunters and $216 per day for out-of-state hunters (CDOW 2008). Expenditures primarily included food, lodging and transportation. In addition, the area's hunting and fishing opportunities supported approximately 912 jobs in Delta and Gunnison counties. In general, visitation to the socioeconomic project area is anticipated to increase over the next 20 years, following trends in population growth, therefore increases in contributions from hunting and other recreational activities on project area lands would be likely (approximately 2.5 and 4.5 percent per year for the UFO as a whole utilizing Colorado State Demography Office population projects). However, should project activities exclude hunting from the area, reduce the availability of game, reduce the quality of habitat in the project area for large-game, or degrade the hunting experience for those hunting in the area, then hunting trips in the area could be reduced causing the economic contribution of this activity to the area to also be reduced.

In general, impacts of BLM management activities are likely to occur should changes in visitation by hunters or other recreational visitors from outside the area occur. The reasoning is that if local recreational visitors reduce visits to the project area, they are likely to visit other local recreational areas within the socioeconomic study area, and no overall loss in income to the local economy would occur. In contrast, loss of visitors from outside the region would reduce overall contributions to the local economy.

Impacts are also possible from changes in visitation to the West Elk Loop Scenic. Economic impacts from scenic byway travel are difficult to determine, but one 2001 Colorado study estimated an approximant $50 - $188 Visitor group spending per day and $32,500 annual visitor spending per mile (Petraglia and Weisbrod 2001). Should project activities such as increased truck traffic, dust or changes to the visual setting impact the level of visitor use of the West Elk Scenic Byway (State Highway 133) contributions to local communities would be decreased. Approximately 6.4 miles of the Byway cross the Bull Mountain Unit.

Potential impacts on agriculture and agricultural tourism consist of two main components, 1) impacts due to changes to water quality or quantity, soil quality or other factors that resulting in a decrease in quantity or quality of the product produced and, 2) impacts due to a perceived degradation of the area's quality of product that resulted in decreased sales and/or visitation.

Rumbach (2010) analyzed the potential impact of shale gas drilling on the New York tourism industry. He questioned whether drilling would permanently damage the brand of a region as a pristine and picturesque destination as well as the brand image for agricultural products from a shale drilling area. While quantitative analysis is lacking in Rumbach's paper and other literature, there is some indication that increased truck traffic and visual impacts of drilling rigs may impact visitor experience. Local organic farmers and wineries express similar concerns as noted in recent new articles (for example, Taylor 2013; Jaffee 2012). In a letter submit to the BLM related to leasing of North Fork parcels for oil and gas development, the Paonia Chamber of commerce stated, "Many of our farmers are very concerned that the mere perception of polluted air, soil, and water will drive away agricultural customers in search of other quality vendors… Our hospitality industry and community at large is concerned about the potential impacts on our growing agro-tourism economy and the West Elk Scenic and Historic Byway Tourism Loop, of which we have just received recognition and funds to promote as a healthy community travel destination."

While this letter was written specifically addressing leasing for the North Fork project 30 miles from the Bull Mountain planning area, it reflects concerns of some residents in Paonia related to oil and gas development in the area.

*Public Revenues*

Fiscal effects on local governments are extrapolated from the economic impacts, from projections of the value of the gas that is produced and from value of oil and gas property.

Federal mineral royalties are collected at a rate of 12.5 percent of total sales value of the production from federal-owned mineral estate, as described in Section 3.4.2, Socioeconomics. Approximately 50 percent of royalties' revenue is transferred to the Colorado State Treasurer. This portion, in turn, is distributed to counties, cities, and school districts based on senate bill 08-218. Increased production would therefore result in increased contributions to local communities and counties.

Taxes collected on production include severance tax, as well as less significant contributions to the Oil & Gas Conservation Fund Levy and the Oil & Gas Environmental Response Fund (taxed at a maximum of $0.0017 of market value at wellhead). Colorado state severance taxes on natural gas extraction are graduated, ranging from 2 percent for gross income under $25,000 to 5

percent for income of $300,000 and over. Some deductions apply for, example for ad valorem taxes paid. Severance tax revenues are distributed with 50 percent to the Colorado Department of Natural Resources to fund water conservation, wildlife, and environmental programs and the remaining 50 percent to Local Impact Fund Department of Local Affairs. Of the amount that goes to the Local Impact Fund Department of Local Affairs, 70 percent goes to local government projects and 30 percent is directly distributed to local communities.

Property taxes are also assessed on both residential and business property as well as machinery and equipment. Assessed values are derived by multiplying the actual value of the property by 7.96 percent for residential property and by 29 percent for other property times the local tax rate. Property taxes also include ad-valorem taxes, paid by the producer on the value of oil and gas production. Gunnison County ad-valorem taxes for primary production are determined based on appraisal value of 87.5 percent of prior year sales. Property taxes collected would benefit Gunnison County, local communities and school districts in Gunnison County, but would not directly impact Delta County. Changes in both residential and non-residential property value as a result of project activities would impact local community funds available, by increasing or decreasing assessed value and taxes paid. Sales tax would be generated based on current tax rate in local Counties and municipalities as discussed in Chapter 3. Increased supplies purchase in the local area directly or indirectly in support of drilling and production would also increase local tax revenue.

Short-term rental properties, such as hotels, are a source of income to local communities should employees for the proposed project require short-term lodging. The Delta County lodging tax is 1.9 percent as of 2011, but it may vary by municipality (Colorado Department of Revenue 2014).

*Public Services*
Potential impacts on public services include increased demand for community social services, such as police and fire departments, first responders, and local hospitals and associated costs. Such cost increases resulting from gas drilling have been documented in the Rocky Mountains and the east coast (Haefele and Morton 2009; Kelsey and Ward 2010). Impacts are generally dependent on the number of temporary workers required to relocate to the local area during drilling operations, with the higher the level of workers relocating, the greater the strain on services.

Impacts on roads may also occur due to increased traffic that occurs as a result of drilling, particularly that involving large trucks. In a 2014 study, the estimated road-reconstruction costs associated with a single horizontal well range from $13,000 to $23,000, or $5,000-$10,000 per well if state roads with the lowest traffic volumes are excluded (Abramzon et al. 2014). In Rio Blanco County Colorado, a $17,700 per well fee was suggested to off-set the costs of road infrastructure maintenance (RPI 2008). Increased taxes (severance and property) could mitigate these cost pressures for public roads.

*Community Social Conditions*
As discussed in Chapter 3, survey of residents in the project area as well as comments received during scoping and on the draft EA demonstrate that area residents have varying viewpoints on the most important values for local communities and the desired conditions for these communities (BLM 2009 and 2010). Some participants and commenters note importance of jobs

that the energy industry brings to the area, stating that decent paying jobs in Delta and Montrose are important. In other communities, particularly in the North Fork Valley, residents noted that local area is economically and socially dependent on healthy lands and noted clean air, water, as well as small town atmosphere, as key values (BLM 2009 and 2010). These residents are concerned that development would result in changes to these characteristics, reduce the quality of life for current residents, and result in reduction of retirees and other with non-labor income choosing to live in the area. In all areas surveyed, sustained growth was noted as an important in maintaining communities' social setting, therefore any should project activities result in unchecked growth could change local community character. Recent surveys of area residents conducted by the North Fork Heart and Soul Project (North Fork Heart and Soul 2014), a group of local citizens, generally support these findings. Values that were seen as most important for the community based on a survey of 1,600 residents are summarized as follows:

- Rural and natural environment that has an abundance of resources and opportunities for healthy living, quality food, work, recreation, and connection to the land

- Small town feel and sense of community

- Steady economy with work opportunities and the ability to grow traditional and emerging economic sectors

- Freedom to live the way we choose, our independence and our personal responsibility to our communities

- Honoring traditions and heritage while looking to the future

It is important to note that the BLM did not commission or review the North Fork Heart and Soul Project surveys, and they may not represent the full spectrum of public opinion.

*Property Value*
The impact on property values from oil drilling is uncertain. On the one hand, increased property valuations of large tracts may be expected due to potential income from gas drilling, and an influx of transient workers would probably increase the demand for and value of rental properties (Bennet 2013). In contrast, real or perceived concerns about local water quality, air quality and/or visual setting may decrease residential property values or impact ability to sell properties.

Two common methods used to estimate economic values for ecosystem or environmental services that directly affect real estate prices are hedonic pricing studies and contingent valuation studies. Hedonic pricing is a revealed preference technique that uses transaction data. It estimates the price of a home both by internal characteristics of the house and the external factors affecting it (i.e. surrounding location, local air and water quality, and nearby amenities). Contingent valuation, a survey-based stated preference technique, examines how much money people would be willing to pay or willing to accept to maintain the existence of or be compensated for the loss of an environmental feature.

Hedonic pricing studies and contingent valuation studies have examined the impact of wells in close proximity to residential properties. For example, contingent valuation surveys in Texas and

Florida found a 5 to 15 percent reduction in stated bid value for homes within 1 mile of theoretical hydraulic fracturing scenarios, with the exact reduction dependent on the petroleum-friendliness of the venue and proximity to the drilling site (Throupe et al. 2013). Similarly, a 2010 study found a 3 to 14 percent decrease in values, with impacts dissipating at around 2,000 meters from the well-head (Integra Realty Resources 2010). Muehlenbachs, Spiller, and Timmins (2012) hedonic price study demonstrated that the risk of groundwater contamination from natural gas extraction leads to a significant reduction in house prices—a 26 percent reduction for housing on well water compared with an increase in property value for those properties on public water supply. They further found that “these reductions offset any gains to the owners of groundwater-dependent properties from lease payments or improved local economic conditions, and may even lead to a net drop in prices.”

Overall, these studies indicate that there may be some impact on values for residential properties next to drilling sites. The exact level is variable and dissipates with distance from the drilling site. Based on literature reviewed, the greatest level of impacts may occur within .5 mile of active wells, but some impacts have been seen within 1 mile of active wells. Property values details are provided in **Appendix K**, Economic Impact Analysis Methodology – Technical Report.

*Non-Market Effects*

In addition to the impacts discussed above, project activities may impact factors such as open spaces and clean air and water that have value in terms of the preservation for future generations, or in their value as providing ecosystem services as discussed in Chapter 3. Conducting willingness to pay surveys for non-use values or determining values for ecosystem services was not within the scope of this project; therefore, discussion of non-market impacts is qualitative in nature.

***Effects Common to All Alternatives***

Development would occur to some extent under all alternatives. Additional labor requirements and associated impacts on population and income, as well as indirect impacts on property values and social setting could occur under all alternatives, the intensity of impacts for the drilling phase would be dictated by the pace and scale of development and for the production phase, by the rate of production.

***Alternative A***

Alternative A includes the construction and operation of 55 natural gas wells, 10 well pads, 1 water disposal well, and associated roads and production facilities, including 1 compression station. Under Alternative A the 2-89-7-1 well pad APD would not be approved. This scenario assumes that new development would only occur on private surface with private minerals, as detailed in **Section 2.2.5,** Alternative A, No Action.

*Employment, Income and Population*

Average number of direct employment for different project phases, based on estimates provided by SGI, are included in **Table 4-66**, Bull Mountain Unit Estimated Annual Direct Labor Requirements and Costs - Alternative A. It should be noted that numbers for the development phase represent estimated annual maximums; employment in any one year may vary based on

**Table 4-66**
**Bull Mountain Unit Estimated Annual Direct Labor Requirements and Costs - Alternative A**

| Project Phase | SGI Employees | Direct Labor Costs | Contract Employees | Direct Labor Costs | Vendors* |
|---|---|---|---|---|---|
| Drilling | 15 | $1,996,800 | 6 | $399,360 | 264 |
| Production | 6 | $798,720 | 3 | $199,680 | 25 |

Sources: SGI 2014; IMPLAN 2014
Assumes a maximum of 27 wells drilled per year per common assumptions in Chapter 2. Production estimates based on a total of 55 wells. All employment number in average annual monthly jobs, rounded to whole numbers.
*Note that vendors are not directly employed by SGI and represent estimates based on SGI vendor costs.

exact rate of drilling. The drilling period for direct and indirect impacts is expected to last up to three years. In addition to employees directly employed by SGI and as SGI contractors, additional companies would be hired to supply workers (vendors) to construct locations, roads, and pipelines as well as for drilling and completing the wells. Vendors would also perform surveys (civil and resource); stormwater BMP installation, maintenance, and inspections; and well site maintenance. No immediate development and related employment impacts would occur under Alternative A because all drilling would require additional APD approval. Peak period of employment in the Bull Mountain Unit under Alternative A would likely occur about 1 year after initiation, after some wells are online and drilling continues on others. While total number of well pads constructed and well pads drilled varies by alternative, the maximum pace of development is estimated to be the same for all alternatives (up to 27 wells drilled per year). As a result, the number of employees for a given year of drilling would be similar across alternatives.

SGI predicts that employment would be approximately 80 percent from within the Rocky-Mountain region, including areas with recent oil and gas development such as Grand Junction and Denver, Colorado, as well as Farmington, New Mexico. The amount of employees drawn from within the socioeconomic study area would be smaller and determined by the skill set of available workers. The outflow of labor earnings due to jobs held by non-residents would be especially high during the development phase. It should also be noted that job numbers represent new hires; however, an increase in new hires does not directly equate to an increase in the total employment count in an area. The new hires count is simply an indication of hiring activity in an industry.

Total production employment would be reduced as compared to employment for the drilling phase. With the exception of workers needed for construction of compression stations and periodic work-overs, employment for the production phase would be more stable and consistent. Production phase employees are more likely to represent local employees, given the long-term nature of the employment. As a result, the outflow of labor earning would be reduced during the production phase.

In addition to direct employment, project activities would result in additional secondary employment. Secondary employment is the multiplier effect resulting from additional employment created by purchases of goods and services, additional employment of suppliers (indirect employment), and household spending due to project-related income (induced employment).

Total employment estimates are summarized in **Table 4-67**, Bull Mountain Unit Direct and Indirect Annual Contributions - Alternative A. In addition, some development is likely to start while drilling is ongoing, however, the numbers in the table below do not account for this small amount of additional labor. In a given year of drilling, up to approximately 280 direct workers and 471 total jobs in the two-county study area would be supported by the proposed drilling operations, including SGI direct employees, contract employees and vendor employees. Additional jobs outside of the socioeconomic project area would also be supported. It should be noted that all employment values are estimates only and are provided for the purposes of comparison with the Proposed Action and amended Proposed Action. As discussed in the *Nature and Type of Effects* section above, actual level of employment for the project overall and at any given time would depend on the rate of production, type of technology employed in drilling wells, the number of wells drilled per pad, and other factors.

**Table 4-67**
**Bull Mountain Unit Direct and Indirect Annual Contributions - Alternative A**

| Project Phase | Direct Employment including Vendors | Total Employment | Direct Contributions | Total Contributions |
|---|---|---|---|---|
| Drilling | 285 | 471 | $89,775,488 | $101,797,900 |
| Production | 34 | 49 | $3,687,102 | $5,082,004 |

Sources: SGI 2014; IMPLAN 2014
Assumes maximum build-out and a maximum of 27 wells drilled per year. Includes estimate SGI, contract and vendor employment. Based on 2014 vendor costs. Total employment and contributions include direct, indirect and induced value added. All employment numbers reported in average annual monthly jobs

Due to the presence of natural gas drilling and skilled workers in the region, it is likely that much of the labor required can be drawn from the available workers in the region and would not require permanent relocation to the two-county study area. Based on the number of workers required during drilling under Alternative A, it is unlikely that the labor required for this alternative would result in significant population increases; local employment change represents a less than 1 percent population change.

The level of anticipated labor required would likely be filled by those currently unemployed, local residents in the oil and gas industry and experts in the field from within and outside the region. A percentage of those employed would not permanently reside in the two-county study area due to variety of reasons, such as the following:

- The industry's requirement for rotational and transient crews

- Housing availability (scarcity of appropriate type or price)

- Lifestyle preferences (invested elsewhere)

- Economic expectations (job permanence or job mobility)

Out-of-town workers would reduce the amount of household goods and services consumed and housing investment spent locally.

Impacts would likely be limited to the drilling phase as short-term employment would lead to temporary residency by job-holders instead of permanent immigration. Workers that cannot locate accommodation may be able to find temporary housing in towns in surrounding counties. For example, Montrose is located a little more than an hour driving distance from the Unit. As discussed in Chapter 3, within a 25-mile radius surrounding Delta, there are two RV parks and 16 hotels and over 50 additional hotels and other short-term lodging in population centers within a 100-mile radius of the Unit (tripadvisor.com 2014).

Rental vacancy rate for apartments or homes as of 2012 was approximately 4.5 percent in Delta County and 16 percent in Gunnison County (US Census Bureau 2012). As previously stated, SGI estimates that employment would be stationed not only locally in Delta, Paonia, Hotchkiss, but also in Montrose, Grand Junction, Glenwood Springs, and Gunnison. Based on vacancy rates and availability of hotel rooms as compared with the number of anticipated workers, area rental vacancies and hotels should be able to accommodate needs.

Average income for the natural resources and mining sector in 2012 was $77,012 and $54,586 for Gunnison and Delta Counties respectively. This average income was significantly higher than average annual wage for both Gunnison and Delta Counties (116 percent and 63 percent higher than average wage, respectively; Headwater Economics 2013).

Based on estimates provided by SGI, the direct labor costs from SGI and contract employees in the two-county study area under Alternative A would average approximately $133,120 annually per job including overhead costs for SGI employees and $66,560 for contractors during drilling and approximately $116,688 per job, including overhead costs for SGI employees and $62,233 for contractors during the production phase. Note that the high estimates per job would not be typical of earnings for all jobs. Higher income for workers in the gas industry raise the average income per job; however, the overall distribution of income would likely be concentrated on the lower end of the income spectrum due to work at lower-paid industry jobs and jobs at local trade and service establishments resulting from secondary employment. Also note that vendor labor income is not included here.

*Specific Economic Sectors*
Impacts on private land utilized for livestock grazing cannot be quantified but may result in increased time or costs for ranchers if lands are made unavailable for grazing, additional fencing is required, increased herding is required, fences are left open resulting in unwanted disbursement. See section in **Section 4.3.1**, Livestock Grazing for additional details.

Within the two-county study area, recreation, including hunting, may be impacted by ongoing development due to disturbance of big game habitat. Because the exact number of recreation visitor days in baseline conditions or under Alternative A is not available for the project area, impacts on recreation cannot be quantified. Under Alterative A, as discussed **Section 5.3.3**, Recreation, visitor experience of those hunting and recreating may be impacted by ongoing drilling operations on private lands, both in terms of visual impacts and experience. However, due to development being limited to private minerals, fragmentation of habitat for large game would be minimized under Alternative A, and economic impacts on hunting would be the lowest under this alternative.

As discussed in **Section 4.3.5**, Transportation and Access, Alternative A would result in a less than 1 percent increase in traffic; however, truck traffic may increase by up to 11 percent, which may result in decreased motorists' enjoyment of State Highway 133 as a scenic byway, particularly during the well pad construction phase. Reduction of visitor use would decrease this contribution to the local economy as discussed under *Nature and Type of Effects* with impacts most likely to occur during the drilling phase on the 6.4 miles of the West Elk Loop Scenic Byway within Bull Mountain Unit. For example, if a 5 percent reduction in visitor use or spending occurred, this could relate to loss of $10,400 annually based on a per mile base rate of $32,000 spending per mile and 6.4 miles in the project area as discussed in *Nature and Type of Effects*. Impacts would likely be lowest under this alternative due to lower level of proposed development.

Agriculture and agricultural tourism may be impacted by changes to water quality (refer to **Section 4.2.4**, Water Resources for details of impacts on water quality). Due to minimal change to water quantity and quality anticipated, direct impacts on agricultural operations are likely to be limited. As noted in the *Nature and Type of Effects* section, increased drilling may relate to a change to visitors experience of the area as well as the perceived quality of agricultural products from the area, but literature and data are lacking to verify this impact or quantitatively analyze potential impacts. Comments were submitted during public scoping and on the draft EA that provide some indication of the potential impacts on local companies. Owners of the Desert Weyr Farm near Paonia stated that they have seen a 10 percent decrease in revenues, which they attribute to concerns about the quality of the visitor experience to the farm or the quality of products due to ongoing oil and gas development and potential for expanded development. Due to the lack of development of federal lands or federal minerals under this Alternative, impacts would be limited to development of private minerals and private lands, where the BLM has no role in the decisions relate to scale and nature of development.

*Public Revenues*

As described under the *Nature and Type of Effects* section, public revenues would be influenced by anticipated production increases under Alternative A.

Existing wells in the Unit have seen steady increases in production since the initial production year of 2010. **Table 2-3**, Bull Mountain Unit Annual Production Rates, illustrates the past amounts of gas produced each year in the Unit. Average rate of gas production is estimated based on SGI models by well type. As a point of reference, total production for Gunnison County in 2012 was 2,072,000 MCF (Colorado Oil and Gas Conservation Commission 2013). Average rate of gas production is estimated for future years based on SGI models by well type. Tax estimates based on multipliers of net estimated revenue as described in **Appendix K**. Note that production and well head prices are model estimates only and actual production and price would vary depending on the resource and market conditions under all alternatives. Well head price in this analysis is estimated at $4.50/MCF for the first 3 project years and $5.50/MCF thereafter. Annual averages for well head prices have historically been volatile, ranging from a high of $7.97/MCF to a low of $0.19/MCF over the past 40 years (EIA 2013b). Production data and tax revenues should be viewed as estimates and used for the purpose of comparing alternatives only.

Estimated impacts from Alternative A on local fiscal conditions are included in **Table 4-68**, Impacts on Local Fiscal Conditions—Alternative A.

**Table 4-68**
**Impacts on Local Fiscal Conditions—Alternative A**

| Year | Severance Tax (Million $) | Ad Valorem Tax (Million $) |
|---|---|---|
| 2015 | $1.9 | $1.1 |
| 2016 | $3.7 | $2.2 |
| 2017 | $6,.2 | $3.8 |
| 2018-2036 | $113.6 | $69.6 |
| Total | $125.4 | $76.7 |

Source: SGI 2014
Severance tax includes the Oil & Gas Conservation Fund Levy and the Oil & Gas Environmental Response Fund.

Assumes maximum build-out and an average of 27 wells drilled per year. Tax estimates based on multipliers of net estimated revenue. Note that amounts represent taxes collected not taxes distributed.

Severance tax—As detailed in *Nature and Type of Effects*, Colorado state severance tax is graduated, ranging from 2 percent for income under $25,000 to 5 percent for income of $300,000 and over. Severance tax revenues are distributed with 50 percent to the Colorado Department of Natural Resources and the remaining 50 percent to Local Impact Fund Department of Local Affairs. Of the amount that goes to the Local Impact Fund Department of Local Affairs, 70 percent goes to local government projects, and 30 percent is directly distributed to local communities. Based on projected production and well head price, severance tax collected under Alternative A is displayed in **Table 4-68**.

Federal mineral royalties—As discussed in **Section 3.4.2**, Socioeconomics, and *Nature and Type of Effects*, production from federal mineral estate would result in collection of royalty revenues, a portion of which would be distributed back to local area counties and communities. Under Alternative A, royalty revenue would be limited to ongoing drilling on federal leases, with the majority of drilling likely occurring on private lands, at least in the near term, due to lack of the MDP.

Property tax—Under all Alternatives, development is likely to result in an increase in Non-residential property, particular oil and gas property as well as ad-valorem tax on oil and gas production. Changes in residential property values may be mixed, and are discussed in further detail below. Property taxes in Delta County would not be directly affected by project activities but could be impacted by any related change in property values. Based on projected production and ad-valorem tax collected under Alternative A is displayed in **Table 4-68.**

Other taxes—Sales tax revenues under Alternative A would be increased, with level of impacts dependent on the quantity and cost of local materials purchased for project construction and operations. It is likely that much of the specialized equipment would not be locally available and would not contribute to local taxes.

Lodging tax revenues may be increased as a result of temporary workers residing in the area; the exact amount would depend on the county and city in which workers stayed. Length of stay and exact number of employees requiring temporary housing cannot be determined at the planning level.

*Public Services*

As noted in *Nature and Type of Effects*, population increase can strain public services. Impacts could occur on the following:

- Law enforcement

- Emergency Response

- Public schools

- Domestic Water and Wastewater Treatment

However, due to the population change of less than 1 percent in the project area, impacts are likely to be restricted to the drilling phase and would be limited in nature under Alternative A. Impacts are most likely to occur in short term increases in emergency services due to construction work.

As discussed in **Section 4.3.5**, increased heavy vehicle traffic would likely result in the need to increase road maintenance. Alternative A would increase the overall average annual daily traffic on the segment of Highway 133 by less than 1 percent over a 6-year time frame. The average annual daily trips associated with trucks could, however, increase by up to 11 percent compared to existing truck-related traffic levels. SGI would implement a road maintenance plan for all public roads used for project-related purposes. Maintenance would include inspections, reduction of ruts and holes, and replacement of surfacing materials as needed.

Estimated costs for road maintenance associated with the development of 55 wells range from $275,000 to over $1.27 million based on previous studies as discussed under *Nature and Type of Effects*. SGI's road maintenance plan and taxes collected from oil and gas operations are intended offset the costs of maintenance.

*Community Social Conditions*

Delta and Gunnison County combined are anticipated to increase in population by over 30,000 by 2040, an increase of 62 percent (Colorado Division of Local Government, State Demography Office 2012). The proposed project would have negligible contributions to population increases, therefore changes to social setting due to population increases would not be realized. The nature and type of impacts on social conditions would be as discussed under *Nature and Type of Effects* above. Due to the lack of approval of an MDP under this alternative, the scale and pace of development are difficult to determine and would be largely impacted by the market for natural gas. Development under Alternative A is limited to development of private land with private minerals, and the BLM has no role in the decisions relate to scale and nature of development.

Studies of impacts of project activities were conducted to model both near-field and far-field impacts on air quality. As discussed in **Section 4.2.1**, Air Quality, near-field pollutant impacts would be below the NAAQS or CAAQS, and would not exceed the PSD Class II increments with the exception of annual $NO_2$ impacts, which could exceed the annual increment value.

As a result, local residents' health and quality of life related to air quality are not likely to be significantly impacted by project activities for any alternative.

As discussed in **Section 4.2.4**, Water Resources, the amount of water required for project construction activities is small compared with the discharge in Muddy Creek. Water requirements could be greatly reduced by implementing closed-loop drilling methods, recycling fracturing water, and by using waterless fracturing methods. The potential impacts from drilling on water quality would be least among the alternatives, since Alternative A involves construction of the fewest new wells. In terms of water quality, the quality of water could be degraded by accidental spills or releases of hazardous substances stored or used at the project sites, such as hydraulic oil and fuel used in heavy equipment, chemical additives used in well stimulation, or waste fluids stored in tanks or pits, transported by truck, or conveyed in pipelines. Following Colorado Department of Public Health and Environment (CDPHE) guidelines, and applying standard lease stipulations, described under **Table 2-11**, would reduce risk of contamination of water resources under all alternatives. Approval of drilling plans would provide protection measure to minimize impacts on water quality, which is of concern for area residents using well water who would be particularly affected by impacts on ground and drinking water. All wells would have a surface casing to prevent contaminates migration to the aquifer.

It should be recognized that even if project activities do not directly result in significant changes in air or water quality, residents and visitors perception of the air and water quality may be influenced by the presence of development activities. A national study in 2010 found that among Americans who are very or somewhat aware of hydraulic fracturing, more than 69 percent are very or somewhat concerned about related water quality issues (Civil Society Institute 2010). In comments received during on the draft EA, commenters expressed ongoing concerns about risks to irrigation water due to accidental contamination, particularly for irrigation water in the Muddy River; such concerns are likely to be present with any level of development. Additionally, public comments received from local business owners involved in natural homes and alternative energy noted they have already experienced a decrease in business related to uncertainly about development and related impacts on the social setting. The exact level of impacts on area business due to perceptions about development cannot be quantified due to lack of certainty. Note that comments received may not be indicative of all area businesses experience.

*Property Values*
Changes to residential property values may occur but are likely to have impacts only on those properties immediately adjacent to the proposed development as discussed under *Nature and Type of Effects*. In the project area, 37 of 44 residents are within 1 mile of existing and proposed well pads where the 40 acre analysis area is utilized, the majority of these are within 0.5 miles of proposed well sites. The greatest potential for impacts would likely occur on these 37 residential properties, although impacts may occur on a wider scale in the region. As described in the *Nature and Type of Effects* section, the literature on property values demonstrates both increases

and decreases in value, depending on water supply source, exact proximity to wells, siting and other factors, therefore the exact impacts on values cannot be determined and would vary based on site-specific location and water source.

*Non-Market Effects*
Due to the assumption under Alternative A that development is limited to private lands and private minerals, while some changes may occur to open space and associate non-market values, impacts are likely to be lowest under this Alternative.

***Alternative B***
In addition to the existing developments, Alternative B would construct up to 36 new well pads on federal mineral estate, up to 146 new natural gas wells and up to 4 new water disposal wells. The quantity and combination of CBNG and shale gas wells on each pad is not known at this time and would also be determined at the APD stage. It is estimated that drilling activities for federal wells would occur for approximately 6 years. Additionally, it is estimated that approximately 16 miles of new road construction, 53 miles of improvements to existing roads for access, 21 miles of new pipeline construction, and up to 4 new compressor stations would be constructed. Under Alternative B and all action alternatives, the BLM would also approve the 2-89-7-1 well pad APD.

*Employment, Population, and Income*
Based on estimates provided by SGI, employment directly by SGI and by contract employees for the drilling phase is estimated to be 15 SGI employees and 6 contractors and to last up to 6 years. Approval of the 2-89-7-1 well pad APD could result in an increase in immediate needs for employment, as compared to Alternative A, although the maximum level of development is still estimated at 27 wells drilled per year, as discussed under Alternative A. Employment for the production phase is estimated to be 23 SGI employees and 10 contractors. As under Alternative A, it should be noted that a substantial portion of the project workforce (approximately 264 for drilling phase and 61 for the production phase) would be from vendor's employees. SGI and vendor employment estimates are included in **Table 4-69**, Bull Mountain Unit Direct Annual Employment and Labor Costs—Alternative B.

**Table 4-69**
**Bull Mountain Unit Direct Annual Employment and Labor Costs—Alternative B**

| Project Phase | Direct Employment (SGI) | Direct Labor Costs | Direct Employment (Contract) | Direct Labor Costs | Direct Employment (Vendor)* |
|---|---|---|---|---|---|
| Drilling | 15 | $1,996,800 | 6 | $399,360 | 264 |
| Production | 23 | $2,496,000 | 10 | $665,600 | 61 |

Sources: SGI 2014; IMPLAN 2014
Assumes maximum build-out and a maximum of 27 wells drilled per year. All employment numbers reported in average annual monthly employees.
*Note that vendors are not directly employed by SGI and represent estimates based on SGI vendor costs.

These numbers do not include additional material costs for construction of compressor stations as well as roads, estimated at $2,025,250 direct costs. A portion of materials would be sourced from local retailers or supplies while a portion would be purchased in other locations and

brought to the site location. Road materials for example, are likely to be obtained from local quarry sites and therefore the costs of these materials contributing to the local economy (See **Table 4-70**, Bull Mountain Unit Direct and Indirect Annual Contributions—Alternative B).

In total, minimal population increases from employment from drilling would be as discussed under Alternative A, but would occur for a longer period of time. As under Alternative A, it is estimated that the project would result in a less than 1 percent temporary increase in population in the area.

**Table 4-70**
**Bull Mountain Unit Direct and Indirect Annual Contributions—Alternative B**

| Project Phase | Direct Employment including Vendors | Total Employment | Direct Contributions | Total Contributions |
|---|---|---|---|---|
| Drilling | 285 | 471 | $89,775,488 | $101,797,900 |
| Production | 94 | 136 | $10,024,831 | $13,804,839 |

Sources: SGI 2014; IMPLAN 2014
Assumes maximum build-out and a maximum of 27 wells drilled per year. All employment number in reported in average annual monthly employees. Includes estimated SGI and contract and vendor costs. Based on 2014 vendor costs.

*Specific Economic Sectors*
Type of impacts on range, hunting, agriculture and tourism would be similar to those described under *Nature and Type of Effects* and under Alternative A. Under Alternative B, the increase in proposed development would result in an increased level of impacts on these land uses.

For recreation including hunting, the reduction in visitation to the area has not been quantified; therefore the specific economic impacts cannot be determined. With increased development compared to Alternative A, Hunters could expect less success, which could result decreased visits and a resultant loss of income for local area outfitters, retailers, and service providers. As discussed under the *Nature and Type of Effects*, hunters' spending includes lodging, food, and fuel.

Impacts would be most pronounced over the short term, when construction activities are anticipated to result in the greatest disturbance of big game. Long-term impacts on the local economy could occur should hunters decide to hunt on other area lands in long-term. The level of impact would depend on if hunters and other visitors chose to hunt elsewhere in the two-county area or chose to travel to another county for recreation. Specifically, for the 2-89-7-1 well pad APD site, there could be short-term impacts on hunting opportunities. The project site is located in winter range for elk, and, as discussed in the site wildlife and vegetation assessment, elk may move to other undisturbed sites as a result of project activities. Economic impacts are likely to be limited overall, because the site is on private lands and hunting is restricted to outfitters authorized by the landowners.

Applying a WHP as a design feature to address the impacts of development on wildlife populations could reduce the level of impacts on local big game herds. Elements of the plan would at least partially mitigate the impact on quality and wildlife habitat and the related

economic impacts from loss of hunting opportunities. Examples of these elements are avoiding elk winter concentration areas and limiting the number of drilling rigs operating during those times when wintering big game could be most impacted.

Similarly, impacts on the visitation level and visitor experience for West Elk Loop Scenic Byway is highest under Alternative B due to higher level of proposed development. For example, if a 10 percent reduction in visitor use or spending occurred, this could relate to loss of $20,500 annually based on a per mile rate of $32,000 spending per mile and 6.4 miles in the planning area as discussed in *Nature and Type of Effects*.

As discussed in **Section 4.3.1**, Livestock Grazing, approximately 3 percent (13 acres) of federal lands available for grazing on BLM allotments would be reduced. Due to the limited acres impacted and the scattered nature of federal surface lands in the area, the impacted acres and related economic impacts are negligible. Additional acres of privately owned grazing land may become unavailable, but the acres impacted and the related economic impacts cannot be quantified for the MDP level. For the 2-89-7-1 well pad APD, as discussed in **Section 4.3.1**, Livestock Grazing, approximately 5 acres of private grazing land could be disturbed. Due to the limited number of acres impacted and the lack of grazing on the land during the winter and spring, economic impacts are likely to be minimal.

Impacts on agriculture would occur if the project resulted to changes in water quality or quantity. However, as discussed in **Section 4.2.4**, Water Resources, the amount of water required for project construction activities is small compared to the discharge in Muddy Creek and water quantify should not be impacted. While the risk of spills or erosion is increased under this alternative, the mitigation measures in **Appendix C** would likely limit the likelihood of water contamination if applied. Specifically, these features are measures to limit impacts from surface disturbance and control erosion (COAs #7, #8, #48, and #52), to identify potentially hazardous substances (COA #38), to control use of tanks, pits (COAs #20 through #23) and pipelines (COA #24), and to define reclamation requirements (COAs #50 through #52).

Overall impacts on the organic farming industry and related agri-tourism cannot be quantified. However, if the increased development in the Unit results in a real or perceived impact on the environmental quality or crops grown in the area, the sales and tourism from local farms would be impacted.

In addition, the visual impacts of a greater number of gas wells alongside Highway 133 and other areas road, increased truck traffic are likely to impact the quality of the visitor experience for those seeking a quiet, pastoral, small town setting.

*Public Revenues*

Alternative B would result in increased contributions to local, state and public revenues, as described in detail below. Impacts would be similar in nature to that described under Alternative A, but increased due to the drilling of additional wells, and anticipated higher levels of production in the long term. Revenue for any given year may be lower than the projected maximum levels described below. The addition of WHP design features limiting winter drilling may have some well pad-specific impacts on production levels and related revenue.

Severance tax: Assuming a maximum build out and based on a natural gas price of $4.50/1,000 MCF until 2017 and $5.50/1,000 MCF thereafter, the Proposed Action would generate an estimated $313 million in severance taxes from 2015-2036 (SGI 2014). Estimated severance taxes collected are displayed in **Table 4-71**, Impacts on Local Fiscal Conditions - Alternative B.

**Table 4-71**
**Impacts on Local Fiscal Conditions - Alternative B**

| Year | Severance Tax (Million $) | Ad-Valorem Tax (Million $) | Federal Mineral Royalties (Million $) |
|---|---|---|---|
| 2015 | $1.9 | $1.1 | $5.9 |
| 2016 | $3.6 | $2.2 | $11.5 |
| 2017 | $8.2 | $4.9 | $25.7 |
| 2018 | $13.1 | $7.8 | $40.8 |
| 2019 | $16.8 | $10.0 | $52.5 |
| 2020-2036 | $275.6 | $157.2 | 837.7 |
| TOTAL | $313.3 | $188.0 | $973.3 |

Source: SGI 2014
Assumes maximum build-out and a maximum of 27 wells drilled per year.
Severance tax includes the Oil & Gas Conservation Fund Levy and the Oil & Gas Environmental Response Fund.
Tax estimates are based on multipliers of net estimated revenue. Note that amounts represent taxes collected not taxes distributed.

Federal Mineral Royalties: Under Alterative B, drilling and production of federal minerals would occur as detailed in Chapter 3. The proposed Action would generate an estimated $973 million in royalties from 2015-2036 (SGI 2014). See **Table 4-71**.

Property Tax: As discussed under Alternative A, development is likely to result in an increase in Non-residential property, particular oil and gas property as well as ad-valorem tax on oil and gas production. Changes in residential property values may be mixed, and are discussed in further detail below. Property taxes in Delta County would not be directly affected by project activities but could be impacted by any related change in property values. Based on modeled production rates and natural gas prices as stated under severance taxes, ad-valorem taxes are estimated at $188 million from 2015 to 2036. See **Table 4-71**.

*Other Taxes*
As discussed under Alternative A, sales tax and lodging tax revenue are likely to increase under Alternative B, exact level of increase would be determined by quantity and cost of local materials purchased for project construction and operations and exact number of employees requiring temporary housing, location of this housing and the length of stay. Revenue increases are likely to be largest under Alternative B due to the increased number of wells drilled and the longer length of the drilling period.

*Public Services*
A strain on local services may occur as discussed under *Nature and Type of Effects* and Alternative A. Due to the longer length that temporary workers would be required for drilling required under this Alternative, the level of strain on resources is likely to be increased under Alternative B. However, total population increase in the project area would remain under 1

percent, therefore all impacts would be minimized. In addition, impacts are likely to be limited to the 6-year drilling phase, as workers would not permanently relocate to the project area. Impacts are most likely to occur in short term increases in emergency services due to construction work and increased traffic.

As discussed in section 4.3.5, Transportation and Access, average annual daily trips associated with trucks could increase by up to 21 percent compared to existing truck-related traffic levels, and 10 percent more than Alternative A. Taxes collected from oil and gas operations are intended offset the costs of maintenance, but may not fully compensate for costs. Estimated costs for road maintenance from development of 146 new well could range from $130,000-$3.36 million based on previous studies as discussed under *Nature and Type of Effects*.

Across all jurisdictions, Alternative B may stimulate demand for services and impose costs to deliver before generating the offsetting revenues As ad-valorem taxes are collected on prior year sales, monies for road repair or increased emergency responders for example, may not be immediately available, Even if revenues would eventually exceed the costs of service, some local governments and service providers may experience short-term adverse fiscal impacts due to the project.

*Community Social Conditions*

As discussed under *Nature and Type of Effects* and Alternative A, influx of temporary workers can change the character of rural towns, particularly if a large number of these workers are from outside of the area. The same maximum rate of development is proposed for all alternatives; therefore, the level of workers required and anticipated temporary population increase would be the same as discussed under Alternative A. Under Alternative B, however, the drilling phase would continue for a longer period of time (6 as opposed to 3 years) therefore the temporary workers would remain in the areas longer, and more may relocate.

The exact level of impact would be affected by the rate of development and the percentage of workers from outside the region, both of which are difficult to determine at the MDP analysis level. Anticipated population increases for all phases are less than 1 percent, substantially below that observed by Smith et al. (2001) to result in boomtown impacts that dramatically altered the character of an area, therefore changes to local community setting due to population increases are likely to be minimal.

As described in **Section 4.2.1**, Air Quality, there is potential for impacts from $PM_{10}$ and $PM_{2.5}$ at receptors less than 328 feet from the source of development activities. However, additional dust control measures would be adopted to minimize these impacts; therefore, air quality should not be impacted, and local residents' health and quality of life related to air quality are not likely to be significantly impacted by project activities.

In terms of water quality and quantity changes that may impact local communities, impacts are not anticipated, but may occur under any alternative. The rate of construction is the same for Alternatives A, B, and C, water augmentation requirements would be the same for all three alternatives, except that the augmentation would continue for a longer time under Alternative B than under Alternative A. Construction would occur at the same rates as under Alternative A and over a larger area, increasing the chance of spills and release of chemicals as well as erosion.

Compliance with existing regulatory requirements (including implementing COA #38 in **Appendix C** as a mitigation measure for hazardous substances and SPCC plans) would greatly reduce the potential for spills and releases. Overall, hydraulic fracturing is not anticipated to impact potable groundwater resources under any alternative.

As discussed under Alternative A, even if air and water quality are not significantly impacted by project activities, local residents or visitors may still have concerns over perceived impacts from development. Impacts would be as described under Alternative A and *Nature of Type of Impacts*, but due to the increased level of development under B, likelihood of increased concern for area visitors and residents, and related impacts on quality of life would be highest under this Alternative.

*Property Values*

As under Alternative A, changes to residential property values may occur and are increased with increased drilling activity due to more residences being in proximity to drilling activity. Impacts are may occur to residences within 1 mile of existing and proposed wells as discussed under *Nature and Type of Effects*. This alternative includes all 44 residential properties in the Unit. Approval of the 2-89-7-1 well pad APD could impact three residential properties; the closest structure is approximately 1,700 feet from the well site. As discussed under Alternative A, there is uncertainty in the literature about the degree to which drilling impacts property values; therefore, the exact level of impacts is uncertain.

*Non-Market Effects*

The greatest potential for impacts on non-market values occurs under Alternative B due to the highest proposed level of development. Impacts on quality of life are discussed under *Community Social Conditions*, above. Under this alternative, up 925 acres would be disturbed in the short term and over 315 acres in the long term in the Unit. Approval of the 2-89-7-1 well pad APD could specifically impact five acres, as identified in Alternative B. Lands would eventually be restored, minimizing long-term impacts. However, the perception of these areas as no longer pristine would impact the benefit of undeveloped lands for future use or enjoyment.

Based on analysis in **Section 4.2.4**, Water Resources, and **4.2.1**, Air Quality, air or water quality impacts would be minimized, assuming that the COAs described in **Appendix C** are applied as mitigation measures, particularly measures limiting surface-disturbing activities and associated dust and erosion (COAs #7, #8, #48, and #52) as well as measures for road construction and maintenance (COAs #14 through #19), and for hazardous substances (COA #38).

While impacts on air and water would be limited, and significant impacts are not anticipated, the potential for contamination of air or water from a leak or spill is present under any alternative where development occurs. It should be noted that if degradation to air, water or land quality did occur, additional loss of ecosystem service benefits would occur, the cost to replace these services provided or mitigate for the loss should be recognized.

***Alternative C***

Impacts on socioeconomics under Alternative C would be similar to those described under Alternative B. However, Alternative C would implement measures in **Appendices C** and **O** as design features. They include additional measures to reduce impacts of gas development on

vegetation, water quality, air quality, and soil. For example, as described in **Table 2-11**, Alternative C requires that only closed loop drilling operations be used, includes requirements for an annual Operations Plan, including development phasing to avoid impacts on wintering big game species. In addition, Alternative C concentrates roads and development activities to a greater extent to minimize surface disturbance. Impacts of additional measures on drilling and gas production cannot be quantified here, but it can be assumed that such measures could increase the time required for drilling operations and decrease average production levels as compared with Alternative B.

*Employment, Population, and Income*
Due to the identical number of maximum wells as under Alternative B, the same number of SGI and contract laborers would likely be required for drilling and well completion. Labor required for production would be similarly reduced. The exact level of labor needs would depend on the rate and intensity of development which cannot be determined here.

*Specific Economic Sectors*
Type of impacts on range, hunting, agriculture and tourism would be similar to those described under the *Nature and Type of Effects* and under Alternatives A and B. Under Alternative C, measures in **Appendices C** and **O** would be included as design features, as discussed in **Table 2-11**. This would result in increased certainty and consistency in application of measures and resulting decrease in impacts on other land uses. The application of additional mitigation measures for air quality could minimize the impacts on air quality that could affect visitors' experiences in the area. Although the WHP would not be applied under Alternative C, potential timing restrictions for big game wintering habitat and other measures to protect wildlife would be applied, reducing the extent of impacts to some degree.

The reduction in recreation visitation, including hunting, as a result of development activity, has not been quantified; therefore, the specific economic impacts cannot be determined. As under Alternative B, the timing restriction for wildlife would reduce the level of impacts on local big game herds, thereby at least partially mitigating the impact on quality and wildlife habitat and the related economic impacts from loss of hunting opportunities.

Impacts on livestock grazing, agriculture, and tourism including the scenic byway use would be as described under Alternative B; however, the intensity of impacts would be reduced due to the reduction in anticipated infrastructure, more clustered development, and additional mitigation measures.

*Public Expenditures and Revenues*
Under Alternative C, Gunnison County government and the School Districts would experience an increase in tax and royalty revenues as discussed under Alternative B; however, the amount realized would be proportionately less due to additional mitigation measures, discussed in **Table 2-11**, that are likely to reduce overall production.

*Public Services*
A strain on local services may occur, as discussed under *Nature and Type of Effects* and Alternative B. Impacts are likely to be limited to the 6-year drilling phase.

*Community Social Conditions*
Impacts on social conditions would be similar to those described under Alternative B. All design features and additional mitigation measures for air quality, as described in **Appendices C** and **O**, have the potential to reduce impacts on air quality thereby reducing the overall effect that the project may have on the quality of life for local area residents. Minimizing surface disturbance under this alternative could also reduce overall impacts on quality of life, due to reduced impacts on soil disturbance, visual impacts, and other resources.

*Property Values*
Approximately 41 of 44 homes are located within 1 mile of a well pad; therefore, impacts could occur as discussed under Alternative B, but at a slightly reduced scale.

*Non-Market Effects*
Impacts would be as discussed under Alternative B. Level of potential impacts would be somewhat reduced due to the concentration of development.

***Alternative D, the Preferred Alternative***
Impacts on socioeconomics under Alternative D would be similar to those described under Alternative B. Alternative D includes all measures from **Appendix C**, as well as additional measures for air quality, geologic hazards, and baseline water quality monitoring and the WHP as design features. These measures are likely to mitigate impacts of gas development on air and water quality and soil resources, which may mitigate any impacts on the local environment and community.

*Employment, Population, and Income*
Because the maximum number of wells under Alternative D is identical to those under Alternative B, the same number of SGI and contract laborers would likely be required for drilling and well completion. The exact level of labor needs would depend on the rate and intensity of development, which cannot be determined here.

*Specific Economic Sectors*
The impacts on range, hunting, agriculture, and tourism would be similar to those described under the *Nature and Type of Effects* and under Alternative A. Under Alternative D, as described for Alternatives B and C, the increase in proposed development would also increase the levels of impacts on these land uses.

Impacts on recreation, livestock grazing, agriculture, and tourism, including the scenic byway use, would be as described under Alternative B. Including additional design features to mitigate impacts on air quality and geologic hazards and to require baseline water quality monitoring, as described in **Appendices C** and **O**, could minimize the impacts of project activities on air and water quality and any related impacts on visitor experience or visitation levels.

*Public Expenditures and Revenues*
Under Alternative D, Gunnison County government and the school districts would experience an increase in tax and royalty revenues from that seen in Alternative A due to increased development, as discussed under Alternatives B.

*Public Services*
Local services may be strained, as discussed under *Nature and Type of Effects* and Alternative B. Impacts are likely to be limited to the six-year drilling phase.

*Community Social Conditions*
Impacts on social conditions would be similar to those described under Alternative B. Including additional design features, as described in **Appendices C** and **O**, could reduce overall impacts on quality of life for area residents. Design features in place for water quality monitoring could reduce the potential for impacts on water quality from project activities. Design features could also reduce concerns voiced by area residents that water quality impacts may occur but not be detected. As discussed under Alternative C, measures to protect air quality could minimize air quality-related impacts.

*Property Values*
Approximately 42 of 44 homes are within 1 mile of a well pad; therefore, impacts could occur, as discussed under Alternative B, but at a slightly reduced scale.

*Non-Market Effects*
Impacts would be similar to those discussed under *Nature and Type of Effects* and Alternative B.

Under this alternative, up to 455 acres in the Unit would be disturbed in the short term and over 133 acres in the long term. The level of surface disturbance from well pads and related impacts would be slightly reduced due to the concentration of development on fewer well pads.

As under Alternatives B and C, applying the relevant COAs would minimize air and water quality impacts and increase related ecosystem benefits. Additional measures for water monitoring would further reduce the likelihood that water quality would be impacted in the long term.

***Cumulative***
The cumulative impact analysis area used to analyze cumulative impacts on socioeconomics and environmental justice is the two-county study area. Trends discussed in **Chapter 3** are likely to continue with similar impacts; energy development in the two-county study area currently including oil and gas development and coal mining, primarily on the North Fork of the Gunnison river area. Out of approximately 124,100 currently leased acres in the North Fork Valley, 45 active wells exist. Of these, approximately half (27 wells) were completed in the 10 years since 2005, or an average of 3 wells per year within the Unit. A lease sale EA was completed in 2012 for an additional 22 parcels consisting of 29,891 acres of federal land and approximately 860 acres of split-estate land; it is unclear how many of these leases will be developed. There are currently 17 APDs pending in the area. The North Fork Valley also has coal leases of nearly 40,000 acres, of which 1,600 acres are disturbed. On private lands within Delta and Gunnison Counties, COGIS records as of November 2011 show a total of 43 natural gas wells; 19 wells are producing, 16 are shut-in and capable of producing, 2 are waiting on completion, and the remaining 6 were drilled, abandoned, and plugged. Of particular note for proposed developments is the Gunnison Energy/SGI duel proposal for 25 federal natural gas wells and associated infrastructure, located approximately 5 miles west of the Bull Mountain Unit.

The BLM UFO Reasonable Foreseeable Development Scenario for Oil and Gas (BLM 2012b) indicates that Oil and Gas development in the UFO is likely to increase over the next 20 years. It is important to note that 25 percent of the federal fluid mineral estate in the UFO is already leased for fluid mineral development, including all of the parcels that would be developed by SGI under this MDP. The level of drilling outside of the Unit boundary cannot be determined and would be influenced by the market price of oil and gas and other factors. For the purpose of this analysis, the assumption is that drilling outside the Unit boundary would continue at a similar pace to current development. Cumulative analysis focuses on the contributions from the proposed development with a qualitative discussion of potential impacts from other future development in the region.

As discussed under Alternative A, Direct and Indirect Impacts, Alternative A has been defined with specific numbers of well pads and associated roads, pipelines, and other ancillary facilities to support a particular level of gas exploration and extraction activity on private lands as a way of fixing a comparison to the action alternatives. In practice, however, the future actions described under Alternative A are independent of the project alternatives and would likely be implemented concurrently or at any time, in addition to the action alternatives. For this reason, the combined Alternative A and Action Alternatives B, C, and D must be evaluated with regard to the cumulative impacts. As described in **Table 4-1**, up to 201 new gas wells (including federal and private mineral estate) may be developed under all alternatives. Drilling rate under all alternatives is assumed to remain at a maximum of 27 wells per year, as discussed under direct and indirect impacts. SGI has provided this maximum based on infrastructure and capital limitations. The level of drilling is not likely to peak until all drilling-related infrastructure has been developed. Similarly, at the end of the estimated production time frame, drilling-related construction is likely to be reduced as production ramps up. The total development time frame may impact the exact number of wells per year and the number of temporary workers require at any given point in time, as described below; however, the number of workers required at any given time should not exceed the maximum estimate. Total production impacts and overall impacts on other land uses and social structure would be greater than that defined for Alternatives A or B, C, or D alone, as discussed in detail below.

Under Alternatives B, C, or D, the total time frame for development of all federal and fee wells may be up to 10 years (**Table 4-1**). Total employees supported for a given year of drilling would be the same as stated under Alternative B: a maximum of 285 direct employees and a total of 471 (direct, indirect, and induced) employees.

Related population increases would likely remain less than 1 percent for the area. However, extending the need for temporary employees in the area for drilling operations beyond that discussed for direct and indirect impacts could result in impacts on area temporary housing, services, and social values. Conversely, the presence of drilling operations in the area for an extended time frame could represent employment opportunities for residents in the region; 80 percent are anticipated to be drawn from within the Rocky Mountain region (SGI 2014).

The cumulative impact of employment for the proposed project and other projects under development would depend on the exact timing of development as well as the location of residences for these employees. Increased pressure on temporary housing, services, or social

values would be most likely to occur if the construction period for proposed projects overlaps the construction period for the Bull Mountain MDP. Overlap may occur with the 36 drilling and 35 completion workers that Gunnison Energy estimates would need temporary housing for the 25 natural gas well development five miles from the Bull Mountain Unit, as construction is anticipated to begin within the next five years.

Contributions of the Bull Mountain project to cumulative impacts during the production phase would consist of up to 128 direct and indirect employees (including vendors) and 185 total employees (including direct, indirect and induced jobs) annually under all alternatives. However, the production time frame for individual wells would vary and total production numbers in a given year would likewise be variable. Total population changes would remain low, and long-term impacts on housing and services are not anticipated. Due to the low level of employees required for the production phase, no substantial cumulative changes to area population or impacts on public services are anticipated.

As discussed under direct and indirect impacts, potential impacts on other land uses including livestock grazing, hunting, recreation, and agriculture may occur. When both private and federal mineral estate are taken into account and the potential for additional impacts in the area from other development is examined, the impacts on these other land uses is increased. Adopting mitigation measures, including COAs and design features as specified by alternative under the direct and indirect impacts, could reduce the impacts of development on other land uses from the proposed project, particularly for federal lands. The exact cumulative impacts on area land uses would be determined by where other Proposed Actions are sited, relative to current land uses as well as mitigation measures employed.

Overall, while the alternative selected may impact the pace and timing of development as well as the priority of developing federal or private mineral estate, development would continue under all alternatives. In the long term, the amount of development of federal gas resources in the Unit is expected to be similar under all alternatives. Level of development proposed under all alternatives would represent a significant increase in the drilling activity and potentially gas production, compared to previous years, with the exact rate of development dependent on market prices. While the exact level of labor required at any given time cannot be forecasted, increased energy development can increase the impacts of changes in social structure, population, and housing availability in local communities, particularly if simultaneous drilling periods occur requiring high levels of temporary labor in area communities. Development of the Proposed Action and other proposed activities in the two-county region could also add to the changes in the scenic values, air, and water quality and other non-market commodities. The intensity of development in the oil and gas sector is determined by pace and timing, which, to a large degree, is determined by public policy and also market forces, including national and international energy demand.

### 4.4.3   Environmental Justice

***Methods of Analysis***
As described in **Section 3.4.3**, Environmental Justice, low income and minority populations for the purpose of environmental justice analysis are defined as 1) the aggregate minority population

or low income population of the affected area exceeding 50 percent or 2) the aggregate minority or low income population percentage of the affected area being meaningfully greater than the minority population percentage in than comparable identified here as 20 percentage points or greater difference from the state level.

Indicators of impacts on environmental justice are as follows:

- Reduced income or employment in low-income and minority populations
- Impediments to economic development in low-income or minority communities
- Disproportionate potential for human health and safety impacts on low-income or minority communities

***Effects Common to All Alternatives***

As detailed in Section 3.4.2, no county or census tract level populations in the project area meet CEQ definitions for low income or minority populations. As such, the Proposed Action and alternatives are not likely to have disproportionate adverse effects on low income or minority populations. Public outreach for this EIS has included efforts to involve members of the community from all socioeconomic classes, and all relevant ethnic and racial backgrounds.

*Cumulative*

The cumulative impact analysis area is discussed in the Cumulative section of socioeconomic impacts, above. No significant cumulative impacts on environmental justice would occur under any alternative because there are no minority or low income populations in the project area per CEQ guidelines.

## 4.5 IRREVERSIBLE AND IRRETRIEVABLE COMMITMENT OF RESOURCES AND RELATIONSHIP OF SHORT-TERM USES OF THE ENVIRONMENT TO LONG-TERM PRODUCTIVITY

This section includes a summary table of the irreversible and irretrievable commitments of resources and the relationship between short-term uses of the environment and long-term productivity as required in 40 CFR 1502.16.

### 4.5.1 Irreversible and Irretrievable Commitment of Resources

A resource commitment is considered irreversible when direct and indirect impacts from its use limit future use options. Irreversible commitments apply primarily to nonrenewable resources, such as cultural resources, and to those resources that are renewable only over long periods of time, such as soil productivity. A resource commitment is considered irretrievable when the use or consumption of the resource is neither renewable nor recoverable for future use. Irretrievable commitment applies to the loss of production, harvest, or natural resources. **Table 4-72**, Irreversible and Irretrievable Commitment of Resources, summarizes the findings. The management actions, COAs, and additional mitigation measures described above would be implemented to ensure that all natural resources are conserved to the maximum extent practicable.

**Table 4-72**
**Irreversible and Irretrievable Commitment of Resources**

| Resource | Irreversible and Irretrievable Commitment of Resources |
|---|---|
| Cultural Resources | Cultural resources are nonrenewable and, once damaged or destroyed, are not recoverable. Therefore, if a cultural resource is damaged or destroyed during energy development, that particular cultural location, resource, or object would be irretrievable. |
| Energy and Minerals | Gas development would result in the consumption of natural gas, condensate, and water, as well as salable minerals such as sand and gravel used in road construction. |
| Paleontological Resources | Paleontological resources are nonrenewable and, once damaged or destroyed, cannot be recovered. Therefore, if a paleontological resource (specimen, assemblage, or site) is damaged or destroyed during development, this scientific resource would become irretrievable. |
| Soils | Grading, construction, maintenance, and other surface-disturbing activities on sensitive, protective soil surface layers such as biotic crusts and desert pavement, which take very long periods to form, are effectively irretrievable. Increases in erosion due to disturbance of these surfaces would persist for lengthy, unknown periods. Implementation of COAs and best management practices would reduce erosion in these and other areas, assuming that channel head-cutting or other severe erosion does not become established. |
| Vegetation | Most energy development projects would cause the irreversible loss of vegetation that would otherwise have been available for wildlife to use. While every effort would be made to recover native vegetation and habitat, full restoration of preexisting conditions is not assured. |
| Visual Resources | The introduction of any new manmade line, form, color, or texture into an existing landscape would cause a change, however slight or great, in the existing visual resource inventory conditions (even if the VRM objectives are met), and for the most part, is generally irreversible because few manmade footprints upon the landscape that result from the spread of a growing civilization are ultimately removed completely. |

### 4.5.2 Relationship of Short-term Uses of the Environment to Long-term Productivity

This section compares the potential temporary effects of the actions analyzed in this EIS on the environment with the potential effects on its long-term productivity. The BLM must consider the degree to which the Proposed Action or alternatives would sacrifice a resource value that might benefit the environment in the long term, for some temporary value to a project proponent or the public. **Table 4-73**, Relationship of Short-term Uses of the Environment to Long-term Productivity, summarizes the findings.

Environmental protection measures described in the management actions, COAs, and additional mitigation measures would be employed to reduce disturbances and reclaim or improve vegetation cover, soil, and wildlife habitat on these lands. While the degree of reclamation is unknown, to the extent that disturbances can be reclaimed, other productive use of these lands would not be precluded in the long term.

**Table 4-73**
**Relationship of Short-term Uses of the Environment to Long-term Productivity**

| Resource | Relationship of Short-term Uses of the Environment to Long-term Productivity |
|---|---|
| Air Quality and Greenhouse Gases | Short-term construction activities would impact air quality; long term production and continued development activities would contribute to the regional impacts on air quality. |
| Fish and Wildlife | There may be some loss of existing vegetation, soil, and habitat available for wildlife, but mitigation measures are intended to avoid most high quality wildlife habitat. Full recovery of these lands and restoration of any lost habitat or associated wildlife is not assured. |
| Livestock Grazing | Where undeveloped land is used for facilities, some grazing uses could continue within a project site. A project's use of the environment has very little adverse impact on the maintenance and enhancement of long-term productivity as construction areas would be reclaimed. |
| Soils | The alternatives would cause removal of vegetation and disturbance of soil resources. While every effort would be made to restore soil conditions, full restoration of preexisting conditions is not assured and would take many years. In particular, grading, construction, maintenance, and other surface-disturbing activities on sensitive, protective soil surface layers such as biotic crusts, which take very long periods to form, are effectively irretrievable. Increases in erosion due to disturbance of these surfaces would persist for lengthy, unknown periods. Implementing mitigation measures and COAs would reduce erosion in these and other areas, assuming that channel head-cutting or other severe erosion does not become established. |
| Special Status Species | There would be some loss of habitat under the alternatives, but at least Alternatives B and C have been designed to avoid habitat important to special status species; therefore, the project should not significantly contribute to the population decline in special status species, lead to federal listing of species, or lead to species extinction. |
| Vegetation | There would be some loss of existing vegetation, but most of the Unit has vegetation cover that is common to the region, so a project would not result in the loss of rare resources. |

Case No. 1:20-cv-02484-MSK Document 90-2 filed 05/06/21 USDC Colorado pg 218 of 576

This page intentionally left blank.

# Chapter 5
## Consultation and Coordination

# TABLE OF CONTENTS

Chapter Page

**5. CONSULTATION AND COORDINATION ........ 5-1**

5.1 Introduction ........ 5-1
5.2 Notice of Intent and Public Comments ........ 5-1
5.3 Notice of Availability for the Draft EIS and Public Review ........ 5-2
5.3.1 Public Meetings ........ 5-2
5.4 Summary of Comments Received on the Draft EIS ........ 5-3
5.4.1 Process and Methodology ........ 5-3
5.4.2 Public Comments ........ 5-5
5.5 Consultation and Coordination with Agencies and Tribal Governments ........ 5-7
5.5.1 Government-to-Government Consultation with Native American Tribes ........ 5-7
5.5.2 Colorado State Historic Preservation Officer Consultation ........ 5-8
5.5.3 US Fish and Wildlife Service Consultation ........ 5-8
5.5.4 US Environmental Protection Agency ........ 5-9
5.6 Cooperating Agencies ........ 5-9

# TABLES

Page

5-1 Number of Unique Submissions and Comments by Affiliation ........ 5-5
5-2 Number of Comments on the Draft EIS by Category ........ 5-6

This page intentionally left blank.

# CHAPTER 5
# CONSULTATION AND COORDINATION

## 5.1 INTRODUCTION

During the NEPA process for this EIS, the BLM formally and informally consulted and coordinated with other federal agencies, state and local governments, Indian tribes, and the interested public.

The following sections of this chapter describe the public involvement, consultation, and coordination process, including key consultation and coordination activities undertaken to ensure the BLM's compliance with, in both the spirit and intent, 40 CFR, Parts 1501.7, 1502.19, and 1503.

## 5.2 NOTICE OF INTENT AND PUBLIC COMMENTS

Throughout the public involvement process for this EIS, the BLM has sought information from individuals and organizations with knowledge of or concern for resources in the Bull Mountain Unit MDP. The process included a thorough and ongoing public participation process.

Two scoping periods were conducted for the Bull Mountain Unit MDP EA. The first was conducted from October 28, 2008, to December 12, 2008; and the second was conducted from September 17, 2009, to November 13, 2009. The preliminary EA was available for a 30-day public comment period from March 23 to April 23, 2012.

A Notice of Intent (NOI) to prepare an EIS was published in the *Federal Register* on April 3, 2013 (78 *Federal Register* 20133-20134, April 3, 2013). It notified the public of the BLM's intent to prepare an EIS, provided information on the EA previously completed for the project, and included an overview of the proposed action and a list of BLM-identified preliminary issues.

The preliminary issues were as follows: air quality; water quality and supply; threatened, endangered, and sensitive wildlife species; wildlife and wildlife habitat; recreation and visual resources; socioeconomics; and transportation.

In addition, the BLM notified the public of the public involvement through media outlets, postcards, emails, and the BLM's website. A project newsletter issued on May 2, 2013, provided information on the kickoff of the EIS and future opportunities for public involvement.

Comments received during the initial EIS comment period largely fell into several key categories: environmental, socioeconomic, stakeholder involvement, cumulative impact analyses, impact mitigation, alternatives to be analyzed, and coordination with ongoing regional and state planning (see list in Section 1.8, Key Issues Addressed in this EIS). The scoping summary report and copies of all written comments submitted by mail, email, or in person are available from the BLM Uncompahgre Field Office.

Public participation will be ongoing throughout the remainder of the Bull Mountain Unit MDP EIS process. One substantial part is the opportunity for members of the public to comment on this Draft EIS during the comment period. In the Final EIS, the BLM will respond to all substantive comments received during the 45-day comment period. It will issue a ROD after the release of the Final EIS.

## 5.3 Notice of Availability for the Draft EIS and Public Review

On January 16, 2015, the BLM and EPA published a Notice of Availability in the *Federal Register* which marked the beginning of the formal 45-day public comment period. On January 27, 2015 the public comment period was extended for an additional 45 days. The formal public comment period ended on April 16, 2015.

The BLM provided copies of the Draft RMP/EIS directly to cooperating agencies, and other federal, state, and local agencies. Paper copies were also available at community libraries in Paonia, Hotchkiss, Delta, and Gunnison, and the Paonia US Forest Service office.

### 5.3.1 Public Meetings

One open house/listening session was held on February 10, 2015 in Paonia, CO during the 90-day comment period for the Draft EIS. The location, date, and time of the open house was announced via email and in the RMP newsletter that was emailed and mailed to the mailing list as well as posted to the project's website.

The open house/listening session provided information to the public on the content of the Draft EIS, guidance on how, where, and when to comment on the document, and provided a question and answer session for the public to voice their thoughts and concerns. Prior to a project presentation by the BLM, the attendees were encouraged to visit with BLM representatives and managers regarding questions or concerns about the Draft EIS. Following the open house period, the BLM gave a presentation on an overview of the project, the range of alternatives considered, and the issues addressed in the analysis. Following the presentation, the public was provided an opportunity to voice questions and concerns regarding the project or aspects of the analysis. Throughout the meeting, the public had an opportunity to submit written comments to the BLM.

## 5.4 Summary of Comments Received on the Draft EIS

### 5.4.1 Process and Methodology

According to NEPA, the BLM is required to identify and formally respond to all substantive public comments. The BLM developed a systematic process to ensure all substantive comments were tracked and considered. On receipt, each comment letter was assigned an identification number and logged into CommentWorks, an Internet database that allowed the BLM to organize, categorize, and respond to comments. Substantive comments from each letter were coded to appropriate categories, based on the content of the comment, and the link to the commenter was retained. The categories generally follow the sections presented in the Draft EIS, though some relate to the NEPA process or editorial concerns.

Comments similar to each other were grouped under a topic heading, and the BLM drafted a statement summarizing the ideas and themes contained in the comments. The responses were crafted to respond to the comments and indicates whether the commenters' points resulted in a change in the document. As a result of public comments, changes were made to the Draft EIS and reflect the consideration given to public comments. A summary of major changes between the Draft EIS and the Final EIS can be found in **Section 1.9**.

Although each comment letter was diligently considered, the comment analysis process involved determining whether a comment was substantive or nonsubstantive. In performing this analysis, the BLM and Forest Service relied on the CEQ's regulations to determine what constituted a substantive comment. A substantive comment does one or more of the following:

- Questions, with a reasonable basis, the accuracy of the information or analysis in the EIS
- Questions, with a reasonable basis, the adequacy of the information or analysis in the EIS
- Presents reasonable alternatives other than those presented in the Draft EIS that meet the purpose and need of the Proposed Action and addresses significant issues
- Questions, with a reasonable basis, the merits of an alternative or alternatives
- Causes changes in or revisions to the Proposed Action
- Questions, with a reasonable basis, the adequacy of the planning process itself

Additionally, the BLM's NEPA Handbook identifies the following types of substantive comments:

- Comments on the adequacy of the analysis—Comments that express a professional disagreement with the conclusions of the analysis or assert that the analysis is inadequate are substantive but may or may not lead to changes in the Final EIS. Interpretations of analyses should be based on professional expertise. Where there is disagreement within a professional discipline, a careful review of the various interpretations is warranted. In some cases, public comments may necessitate a reevaluation of analytical conclusions. If, after reevaluation, the manager responsible for preparing the EIS (the BLM Authorized

Officer) does not think that a change is warranted, his or her response should provide the rationale for that conclusion.

- Comments that identify new impacts, alternatives, or mitigation measures—Public comments on a Draft EIS that identify impacts, alternatives, or mitigation measures that were not addressed in the draft are substantive. This type of comment requires the Authorized Officer to determine whether it warrants further consideration; if so, the BLM Authorized Officer must determine whether the new impacts, new alternatives, or new mitigation measures should be analyzed in the Final EIS, a supplement to the Draft EIS, or a completely revised and recirculated Draft EIS.

- Disagreements with Significance Determinations—Comments that directly or indirectly question, with a reasonable basis, determinations regarding the significance or severity of impacts are substantive. A reevaluation of these determinations may be warranted and may lead to changes in the Final EIS. If, after reevaluation, the BLM Authorized Officer does not think that a change is warranted, his or her response should provide the rationale for that conclusion.

Some submissions received contained substantive comments but were out of the scope of this project. These were comments on subjects not related to this project, other oil and gas development or leasing projects, or BLM laws, rules, regulations, or policy. These comments were reviewed and sent along to the appropriate party as needed, but they were not included in the comment report.

Comments that failed to meet the above descriptions were considered nonsubstantive. Many comments received throughout the process were from those who expressed personal opinions or preferences, those whose comments had little relevance to the adequacy or accuracy of the Draft EIS, or those who represented commentary on resource management without any real connection to the document being reviewed. These commenters did not provide specific information to assist the interdisciplinary team in making a change to the preferred alternative, did not suggest other alternatives, and did not take issue with methods used in the Draft EIS. Those comments are not addressed further in this document.

Examples of some of these comments are the following:

- The best of the alternatives is Alternative A (or B or C).

- The BLM has yet to show land stewardship above its current level.

- The MDP does not reflect balanced land management.

- You cannot let the project proceed.

- You should not allow leasing in this area.

Opinions, feelings, and preferences for one element or one alternative over another and comments of a personal or philosophical nature were all read, analyzed, and considered;

however, because such comments were not substantive, the BLM did not respond to them. It is also important to note that while all comments were reviewed and considered, comments were not counted as "votes." The NEPA public comment period is neither considered an election nor does it result in a representative sampling of the population. Therefore, public comments are not appropriate to be used as a democratic decision-making tool or as a scientific sampling mechanism.

Comments citing editorial changes to the document were reviewed and incorporated. The Final EIS has been extensively technically edited and revised to fix typos, missing references, definitions, and acronyms, and other clarifications as needed.

### 5.4.2 Public Comments

A total of 565 unique comment letters, forms, and e-mails were received during the 90-day public comment period. These documents resulted in 360 substantive comments. The breakdown of unique submissions and comments by affiliation are provided in **Table 5-1** below. None of the anonymous submissions contained substantive comments.

**Table 5-1**
**Number of Unique Submissions and Comments by Affiliation**

| Group | Number of Submissions | Number of Comments |
|---|---|---|
| Private individuals | 515 | 66 |
| Organizations (including businesses and environmental and wildlife protection groups) | 22 | 273 |
| Federal agencies (EPA, USFWS, Forest Service, NPS) | 4 | 11 |
| State agencies (CDPHE, Colorado State Legislature) | 2 | 2 |
| Local government (county commissions and departments) | 6 | 8 |
| Educational institutions (Western State Colorado University) | 9 | 0 |
| **Total** | **565** | **360** |

In addition to the unique submissions discussed above, 83 form letters were submitted during the public comment period. Form letters are exact or very close copies of a letter that are submitted multiple times by different individuals; individuals may add additional language to the letter, but this usually does not substantially change its content. Often, form letters are created by an organization and sent to their members, who in turn submit them during the public comment period.

For the Bull Mountain Unit MDP EIS, there was only one type of form letter master submitted. While all content in the letter was identical or nearly so with additional text, there was no indication as to which group generated the master content. One copy of the letter was included in the comment analysis process as a master form letter, and it was reviewed for substantive content. All substantive comments were included in the comment analysis process. For the form letters that contained additional unique content, the comments were reviewed for substance, and when found, the comments were parsed and analyzed.

The 360 substantive comments were categorized into 67 issue statements. The comments received on the Draft EIS were similar to the issues raised during both the EA and EIS public scoping periods; they focused primarily on the following issues:

- Water resources (57 comments)

- Air resources (52 comments)

- Wildlife, birds, and special status species (49 comments)

- Socioeconomics (40 comments)

- The Conservation Alternative (38 comments)

- General regulatory comments (27 comments)

- General NEPA requirements (20 comments)

See **Table 5-2** for a complete list of comments by issue category.

**Table 5-2**
**Number of Comments on the Draft EIS by Category**

| Topic | Number of Comments* |
|---|---|
| Water resources | 57 |
| Air resources | 52 |
| Wildlife, birds, special status species | 49 |
| Socioeconomic, environmental justice | 40 |
| Conservation alternative | 38 |
| Plans, policies, laws, regulations | 27 |
| NEPA (range of alternatives, general impacts analysis, general cumulative impacts analysis, general assumptions) | 20 |
| Project components (construction, drilling, interim reclamation, production/maintenance, final reclamation) | 16 |
| Bonding | 14 |
| Mitigation measures (general) | 13 |
| Traffic, access | 11 |
| Geology | 10 |
| Soil | 8 |
| Noise | 9 |
| Hydraulic fracturing | 8 |
| Hazardous materials | 7 |
| Vegetation | 7 |
| Alternatives assumptions | 7 |
| Visual resources | 6 |
| Siting model | 5 |
| GIS data and analysis | 4 |
| Impacts on grazing | 4 |
| Cultural resources | 3 |
| Paleontology | 1 |

*Some comments were coded to multiple categories. For example, a comment on landslide risk and the need for an alternative to address this would be coded to Geology and NEPA.

In many cases, commenters expressed a desire for a specific outcome, namely for drilling and development within the Unit to be shut down and not allowed to proceed. As described in

**Chapters 1** and **2**, the intent of the project was to consider acceptance, rejection, or modification of the applicant's proposed Master Development Plan. As the area is already under lease, stopping drilling and development is beyond the scope of this EIS.

All substantive comments, detailed summaries, and responses organized by resource, resource use, or EIS planning regulation can be found in **Appendix N**; an overview of changes to the document is provided in **Chapter 1**, Introduction, **Section 1.10**, Changes between the Draft EIS and Final EIS.

## 5.5 Consultation and Coordination with Agencies and Tribal Governments

Various federal laws require the BLM to consult with American Indian tribes, the State Historic Preservation Office (SHPO), the USFWS, and the EPA during the NEPA decision making process. This section documents the specific consultation and coordination undertaken through development of the Final EIS.

### 5.5.1 Government-to-Government Consultation with Native American Tribes

The federal government works on a government-to-government basis with Native American tribes. This relationship was formally recognized on November 6, 2000, with Executive Order 13175 (*Federal Register*, Volume 65, page 67249). As a matter of practice, the BLM coordinates with all tribal governments, associated native communities, native organizations, and tribal individuals whose interests might be directly and substantially affected by activities on public lands. In addition, Section 106 of the NHPA requires federal agencies to consult with Indian tribes for undertakings on tribal lands and for historic properties of significance to the tribes that may be affected by an undertaking (36 CFR, Part 800.2[c][2]). BLM Manual 8120 (BLM 2004a) and BLM Handbook H-8120-1 (BLM 2004b) provide guidance for Native American consultations.

The BLM has given substantial consideration to the proper government-to-government consultations for this project in order to provide for multiple opportunities for tribal consultation. It has provided tribes with multiple ongoing opportunities to comment and receive information on and participate in the Bull Mountain Unit MDP EIS.

Executive Order 13175 stipulates that, during the NEPA process, federal agencies consult tribes identified as "directly and substantially affected." The BLM contacted the following tribal governments early in the EIS process:

- Southern Ute Indian Tribe
- Ute Mountain Ute Tribe
- Ute Tribe of the Uintah and Ouray Reservation

The Tribal governments were informally consulted during the earlier EA process and have been kept abreast of the project status during regular coordination meetings. In February 2014, the BLM sent formal letters to the tribes inviting them to serve as cooperating agencies for the EIS and initiating formal consultation, in accordance with the NHPA and other legal authorities. Although no tribes requested formal status as cooperating agencies, some tribal governments

responded with a request to be kept informed of the EIS's progress. The tribes are on the EIS's mailing list to receive updates and notification of the availability of the Draft and Final EIS.

Government-to-government consultation for the Bull Mountain Unit MDP EIS has continued via phone and email to keep all tribal entities informed about the NEPA process for the EIS. In addition, the BLM will continue to implement government-to-government consultation on a case-by-case basis for site-specific energy development projects on BLM-administered lands and mineral estate within the project area.

### 5.5.2   Colorado State Historic Preservation Officer Consultation

In accordance with the requirements of Section 106 of the NHPA, the BLM coordinated with and solicited input from the Colorado SHPO. The BLM and the SHPO followed the coordination protocols in the Colorado Protocol relating to EISs; the protocol provides for a phased consultation process related to historic, traditional, and cultural resources for an EIS and subsequent activities that could tier from a ROD. In accordance with these procedures, the BLM wrote to the SHPO on September 10, 2013. The letter introduced the Bull Mountain Unit MDP EIS and specified the need to consult on information about potential development actions. The SHPO formally responded to the letter on September 19, 2013, expressing interest but no specific concerns.

The SHPO did not submit any formal comments on the Draft EIS.

### 5.5.3   US Fish and Wildlife Service Consultation

Consultation with the USFWS is required under Section 7(c) of the ESA before the BLM begins any project that may affect federally listed or endangered species or its habitat. This proposed action is considered to be a major project; the Draft EIS described potential impacts on threatened and endangered species as a result of management actions proposed in the alternatives. The BLM has been in consultation with the USFWS regarding water depletion concerns and potential lynx habitat near the project area.

As part of the Final EIS, the BLM determined their preferred alternative and prepared a Biological Assessment evaluating the impacts of the activities on federally listed threatened and endangered species. The BLM submitted the Biological Assessment to the USFWS for review on September 22, 2015. For each listed species, the BLM determined if the implementation of the Preferred Alternative may affect the species that was the subject of the consultation. The USFWS responded on October 20, 2015 with a memorandum concurring with the BLM's analysis that project "may affect, is not likely to adversely affect" the threatened Greenback cutthroat trout and threatened Canada lynx and "may affect, is likely to adversely affect" the four endangered Colorado River fishes. The finding on the Colorado River fishes falls under BLM Colorado's Programmatic Biological Assessment (PBA) for water depleting activities associated with BLM's fluid minerals program in the Colorado River Basin in Colorado. U.S. Fish and Wildlife Service (FWS) issued a Programmatic Biological Opinion (PBO) (ES/GJ-6-C0-08-F-0006) on December 19, 2008, which concurred with BLM's determination that water depletions are "Likely to Adversely Affect" the Colorado pikeminnow, Humpback chub, Bonytail, and Razorback sucker.

### 5.5.4 US Environmental Protection Agency

NEPA regulations require that EISs be filed with the EPA (40 CFR, Part 1506.9). The Final Bull Mountain Unit MDP EIS was submitted to the EPA, as required by CEQ regulations.

## 5.6 Cooperating Agencies

A cooperating agency is any federal, state, or local government agency or Native American tribe that enters into a formal agreement with the lead federal agency to help develop an environmental analysis. Cooperating agencies and tribes "work with the BLM, sharing knowledge and resources, to achieve desired outcomes for public lands and communities within statutory and regulatory frameworks."

The benefits of enhanced collaboration among agencies in preparing NEPA analyses are as follows:

- Disclosing relevant information early in the analytical process
- Applying available technical expertise and staff support
- Avoiding duplication with other federal, state, tribal, and local procedures
- Establishing a mechanism for addressing intergovernmental issues

Seven agencies are working with the BLM as cooperating agencies and are listed below:

- US EPA, Region 8
- GMUG National Forest
- Gunnison County
- Delta County
- Delta Conservation District
- Colorado Department of Natural Resources (including the Division of Parks and Wildlife)
- Colorado Department of Public Health and Environment

Interactions with the cooperating agencies have included periodic briefings and reviews of preliminary, internal draft sections of text. The BLM will continue to engage these cooperating agencies throughout the preparation of the EIS.

Case No. 1:20-cv-02484-MSK Document 90-2 filed 05/06/21 USDC Colorado pg 232 of 576

This page intentionally left blank.

# Chapter 6
## List of Preparers

# CHAPTER 6
# LIST OF PREPARERS

This EIS was prepared by an interdisciplinary team of staff from the BLM, Environmental Management and Planning Solutions, Inc. (EMPSi), with their supporting subcontractors Carter Lake Consulting and Alpine Archaeology. The following is a list of people that prepared or contributed to the development of the EIS.

| BUREAU OF LAND MANAGEMENT | |
|---|---|
| **Name** | **Role/Responsibility** |
| **Colorado State Office Interdisciplinary Team Members** | |
| Forrest Cook | Air Quality |
| Jessica Montag, Wyoming State Office | Socioeconomics, Environmental Justice |
| Martin Hensley, Colorado State Office | Socioeconomics, Environmental Justice |
| Joshua Sidon, National Operations Center | Socioeconomics, Environmental Justice |
| **Uncompahgre Field Office Interdisciplinary Team Members** | |
| Jerry Jones | Project Coordinator |
| Bruce Krickbaum | NEPA, ACEC |
| Barbara Sharrow | Field Manager |
| Thane Stranathan | Fluid Minerals |
| Edd Franz | Wilderness, Wild & Scenic Rivers |
| Glade Hadden | Cultural, Native American Concerns, Paleontology |
| Jedd Sondergard | Soils, Farmlands, Water Quality/Rights |
| Amanda Clements | Vegetation, Wetlands/Riparian |
| Lynae Rogers | Invasive/Nonnative Species, Range |
| Ken Holsinger | T&E Species, Wildlife, Migratory Birds |
| Julie Jackson | Transportation, Recreation, Visual |
| Linda Reed | Access, Realty |
| Kelly Homstad | Fire, Forestry |

| **Bureau of Land Management** | |
|---|---|
| **Name** | **Role/Responsibility** |
| Pamela Leschak | Fluids Geologist |
| Rob Ernst | Geology, Minerals |
| John Pecor | Petroleum Engineer |
| Teresa Pfifer | Supervisor Land and Minerals Staff |
| Alan Kraus | Hazardous Materials, Wastes |
| Dave Sinton | GIS |

| **Consultants** | | |
|---|---|---|
| **Name** | **Role/Responsibility** | **Education** |
| **Environmental Management and Planning Solutions, Inc.** *www.empsi.com* | | |
| **Jordon Adams** | GIS; Soil Resources; Geology | BS, Environmental Sciences |
| **David Batts** | Principal, Quality Assurance/Quality Control | MS, Natural Resource Planning<br>BS, International Development |
| **Amy Cordle** | Air Quality; Climate Change; Noise | BS, Civil Engineering |
| **Annie Daly** | Air Quality; Visual Resources | BA, Environmental Studies |
| **Carol-Anne Garrison** | Project Manager; Cultural Resources, Paleontology, Tribal Interests and Consultation | Master's Certificate, Project Management<br>MA, Anthropology<br>BA, Anthropology |
| **Andrew Gentile** | Health and Safety | MS, Environmental Management<br>BS, Biochemistry |
| **Zoe Ghali** | Soils; Socioeconomics and Environmental Justice<br>Livestock Grazing | MS, Environmental Physiology<br>Interdisciplinary Masters Certificate, Environmental Policy<br>BS, Biology |
| **Brandon Jensen** | Fish and Wildlife; Migratory Birds; Special Status Species | MS, Environmental Science<br>BS, Biology |
| **Jenna Jonker** | GIS | BA, Geography |
| **Matthew Kluvo** | Climate Change | MS, Environmental Science<br>BS, Ecology and Evolutionary Biology |
| **Laura Long** | Technical Editing; Formatting | MA, Media and Communications<br>BA, English Literature |
| **Katie Patterson** | Leasable Minerals | JD, Environmental Law<br>BA, Public Policy |
| **Marcia Rickey** | Deputy Project Manager, GIS Manager | MS, Conservation Biology<br>BS, Biology |
| **Chad Ricklefs, AICP** | Land Use and Realty | MURP, Environmental Planning<br>BA, Political Science and Environmental Conservation |

| CONSULTANTS | | |
|---|---|---|
| **Name** | **Role/Responsibility** | **Education** |
| **Drew Vankat** | Recreation; Travel Management | MS, Environmental Policy and Planning<br>BPhil, Environmental and Urban Planning |
| **Jennifer Whitaker** | Special Designations; Minerals | MS, Project Management<br>BS, Public Affairs |
| **Tom Whitehead** | Water Resources and Geology | MS, Hydrology<br>BS, Geology<br>BA, Anthropology |
| **Liza Wozniak** | Fish and Wildlife; Migratory Birds; Special Status Species, Livestock Grazing | MS, Ecology<br>MPH, Environmental Toxicology<br>BS, Biology |
| **Meredith Zaccherio** | Vegetation; Fish and Wildlife | MA, Biology<br>BS, Biology and Environmental Science |
| **Lauren Zielinski** | Water Resources, Document Support | BS, Earth and Environmental Engineering |
| **Carter Lake Consulting** | | |
| **Jim Zapert** | Air Quality | MS, Atmospheric Sciences<br>BS, Meteorology |
| **Alpine Archaeology** | | |
| **Matthew J. Landt** | Cultural/Historic Resources and Native American Interests | MA, Anthropology<br>BS, Anthropology |
| **Kimberly L. Redman** | Cultural/Historic Resources and Native American Interests | MA, Anthropology<br>BS, Anthropology |

Case No. 1:20-cv-02484-MSK Document 90-2 filed 05/06/21 USDC Colorado pg 238 of 576

This page intentionally left blank.

# Chapter 7
## References

# CHAPTER 7
# REFERENCES

Abramzon, S., C. Samaras, A. Curtright, A. Litovitz, and N. Burger. 2014. Estimating the Consumptive Use Costs of Shale Natural Gas Extraction on Pennsylvania Roadways. Journal of Infrastructure Systems, 10.1061/(ASCE)IS.1943-555X.0000203. 06014001.

Abt Associates. 2012. Modeled Attainment Software, User's Manual. Abt Associates Inc., Bethesda, MD. October. (http://www.epa.gov/ttn/scram/guidance/guide/MATS-2-5-1_manual.pdf).

Ackerman, D. J. and Brooks. 1986. Reconnaissance of Ground Water Resources in the North Fork Gunnison River Basin, Southwest Colorado. USGS Water Resources Investigation Report 85-4230.

American Speech and Hearing Association (ASHA). 2008. Noise Levels. Available at Internet Web site: http://www.asha.org/public/hearing/disorders/noise.htm.

Appel, Cynthia L. and David L. Butler. 1991. Effects of a Landslide Complex on Sediment Discharges and Loads in the Muddy Creek Drainage Basin and Deposition into Paonia Reservoir, West-Central Colorado, 1986-87. U.S. Geological Survey Water-Resources Investigations Report 90-4173.

Ausbrooks, S. M. and S. Horton. 2012. Disposal of Hydrofracking-Waste Fluid by Injection into Subsurface Aquifers Triggers Earthquake Swarm in Central Arkansas with Potential for Damaging Earthquakes. PowerPoint Slide Presentation. Arkansas Geological Survey and the University of Memphis Center for Earthquake Research and Information.

Avian Power Line Interaction Committee (APLIC) and United States Fish and Wildlife Service (USFWS). 2005. Avian Protection Plan Guidelines. http://www.aplic.org/uploads/files/2634/APPguidelines_final-draft_Aprl2005.pdf

Bamberger, M. and R. E. Oswald. 2012. *Impacts of Gas Drilling on Human and Animal Health.* New Solutions, Vol. 22(1) 51-77.

Barber, J. R., K. M. Fristrup, C. L. Brown, A. R. Hardy, L. M. Angeloni, and K. R. Crooks. 2009a. The costs of chronic noise exposure for terrestrial organisms. Trends in Ecology and Evolution 25 (3): 180-189.

_____. 2009b. Conserving the wild life therein – Protecting park fauna from anthropogenic noise. Park Science 26 (3), Winter 2009-2010.

Baron, J. S. 2006. Hindcasting Nitrogen Deposition to Determine and Ecological Critical Load. Ecological Applications, 16(2), 2006, pp 433-439.

Bennet, A. 2013. The Impact of Hydraulic Fracturing On Housing Values In Weld County, Colorado: A Hedonic Analysis. Thesis in Fulfilment of Degree of Master of Science Colorado State University Fort Collins, Colorado. Summer 2013

Beranek, L. L., editor. 1988. Noise and vibration control (revised edition). Institute of Noise Control Engineering, Washington, DC.

Berry, J. 2011. Hydrology and Surface Water Report for Bull Mountain Unit Master Development Plan. WWC Engineering. Sheridan WY.

Broderdorp, K. 2006-2011. Personal communication. Wildlife Biologist. US Fish and Wildlife Service, Western Colorado Field Office. Grand Junction, Colorado (reference from the EA).

Bureau of Land Management (BLM). 1984. Manual 8400—Visual Resource Management. Rel. 8-24, April 5, 1984. BLM, Washington, DC.

_____. 1985. BLM Manual 9113

_____. 1986a. Handbook H-8410-1- Visual Resource Inventory. Rel. 8-28, January 17, 1986. BLM, Washington, DC.

_____. 1986b. Handbook H-8431-1, Visual Resource Contrast Rating. Rel. 8-30, January 17, 1986. BLM, Washington, DC.

_____. 1989. Uncompahgre Basin Resource Management Plan and Record of Decision. BLM, Montrose District, Uncompahgre Basin Resource Area, CO. July 1989. Available at http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html. Last accessed, February 12, 2014.

_____. 1997. BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado. BLM, Colorado State Office, Lakewood, CO. February 3, 1997.

_____. 2005. Washington Office Instruction Memorandum 2005-247, "National Environmental Policy Act (NEPA) Compliance for Oil, Gas, and Geothermal Development". Available at http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction.html. Last accessed, February 12, 2014.

______. 2007a. North Fork Land Health Assessment 2006-2007. Uncompahgre Field Office, BLM.BLM. 2013. Soil Survey Staff, Natural Resources Conservation Service, United States Department of Agriculture. Soil Survey Geographic (SSURGO) Database for Paonia County, CO. Available online at http://soildatamart.nrcs.usda.gov. Accessed June 2013.

______. 2007b. Environmental Assessment Piceance Development Project CO-110-2005-219-EA. Online at: http://www.blm.gov/pgdata/etc/medialib/blm/co/information/nepa/white_river_field/completed_2007_documents.Par.71869.File.dat/co11005219ea.pdf. Accessed September 2010.

______. 2007c. BLM Onshore Oil and Gas Order #1: Onshore Oil and Gas Operations; Federal and Indian Oil and Gas Leases; Approval of Operations. Available at http://www.blm.gov/wo/st/en/prog/energy/oil_and_gas/Onshore_Order_no1.html. Last accessed, February 12, 2014.

______. 2008a. BLM NEPA Handbook, H-1790-1. Available at http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/blm_handbooks.html. Last accessed February 12, 2014.

______. 2008b. Instruction Memorandum 2008-166—Technical Correction to the Bureau of Land Management's (BLM) National Environmental Policy Act (NEPA) Handbook, August 1, 2008. BLM, Washington, DC.

______. 2009. Community Assessment of the Uncompahgre Planning Area. BLM, Uncompahgre Field Office, Montrose, CO. 224 pp

______. 2010a. Renewable Energy Potential Report. BLM, Uncompahgre Field Office, Montrose, CO. May 2010

______. 2010b. Analysis of the Management Situation for the BLM Uncompahgre Planning Area. Online at: http://www.blm.gov/pgdata/etc/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_docs.Par.60566.File.dat/AMS%20Final%20Web%20071210.pdf. Accessed September 2010.

______. 2010c. Socioeconomic Baseline report prepared for the Uncompahgre Resource Management Plan. BLM, Uncompahgre Field Office, Montrose. CO. October 2010.

______. 2011a. Meteorological observations collected at Pine Ridge Colorado Site, Remote Automated Weather Station, US Bureau of Land Management, Online at http://www.raws.dri.edu.

______. 2011b. PowerPoint Presentation, "Coal and Fluid Minerals Potential Presentation." Presented for the Cooperating Agencies on June 23, 2011 by Rob Ernst.

______. 2011c. BLM Recreation Management Information System for fiscal years 2007-2011 Uncompahgre Field Office.

______. 2012a. Bull Mountain Unit Master Development Plan, Preliminary Environmental Assessment. DOI-CO-150-2009-0005 EA. Available at http://www.blm.gov/co/st/en/BLM_Information/nepa/ufo/Bull_Mountain_EIS.html. Last accessed February 12, 2014.

______. 2012b. Reasonable Foreseeable Development Scenario for Oil and Gas for the Uncompahgre Field Office, Colorado. Prepared by BLM Wyoming State Office, Reservoir Management Group for BLM, Uncompahgre Field Office, Montrose, CO. February 2012.

______. 2013a. 2013. Hydraulic Fracturing White Paper. BLM Wyoming State Office. July 5, 2013.

______. 2013b. Bull Mountain Unit MDP Scoping Summary Report. Available at http://www.blm.gov/co/st/en/BLM_Information/nepa/ufo/Bull_Mountain_EIS.html. Last accessed February 12, 2014.

______. 2013c. Programmatic Environmental Analysis for Integrated Weed Management Treatments. Environmental Assessment. DOI-BLM-S050-2012-0029 EA. Available at http://www.blm.gov/pgdata/etc/medialib/blm/co/information/nepa/uncompahgre_field/fy2013_nepa_docs.Par.78980.File.dat/12-29%20EA%20Programmatic%20Intregrated%20Weed%20Treatments%20Final.pdf. Last accessed May 8, 2014.

______. 2013d. BLM GIS of historical fire data. Accessed by Kelly Homstad, May 2013.

______. 2013e. Socioeconomic Baseline report prepared for the Bull Mountain Unit Master Development Plan EIS. BLM, Uncompahgre Field Office, Montrose, CO. August 2013.

______. 2013f. Instruction Memorandum No. 2013-131. Guidance on Estimating Nonmarket Environmental Values. September 12, 2013.

______. 2013g. Draft BLM Manual 3180-1, Unitization [Exploratory]. Available from BLM Uncompahgre Field Office, Montrose, CO.

______. 2014a. Air Resources Technical Report for Oil and Gas Development, New Mexico, Oklahoma, Texas, and Kansas. Bureau of Land Management, New Mexico State Office. February 2014.

______. 2014b. Colorado Air Resource Management Modeling Study (CARMMS), 2021 Modeling Results for the High, Low and Medium Oil and Gas Development Scenarios (Draft Final), Bureau of Land Management, Colorado State Office, Lakewood, Colorado. December.

Bureau of Land Management Geographic Information System (BLM GIS). 2014. GIS data used in conjunction with SG Interests data to form the alternatives, and GIS data on file with BLM's eGIS server, including Bull Mountain Unit, VRM and VRI, existing roads, OHV designations, Colorado HUC 5 watersheds and others. Department of the Interior, BLM, Colorado Uncompahgre Field Office. Data was edited from June 2013 – June 2014 for DEIS and updated May –September 2015 for FEIS.

Bureau of Land Management and U.S. Forest Service. 2015. Dual Operator Proposal: Development of 25 Federal Natural Gas Wells and Associated Infrastructure on 5 Multi-well Pads, Environmental Assessment DOI-BLM-CO-S050-2015-0029-EA, BLM Uncompahgre Field Office, Montrose, CO and U.S. Forest Service Paonia Ranger District, Paonia, CO, June 2015.

Burton, T. A., E. R. Cowley, and S. J. Smith. 2008. Monitoring Stream Channels and Riparian Vegetation – Multiple Indicators. Version 5.0. US Department of the Interior. Bureau of Land Management. Idaho State Office. Boise, Idaho.

Cater, John and Andrew Larsen. 2010. A Cultural Resource Inventory of the SG Interests Federal 12-89-7 Unit 1 Well Pad in Gunnison County, Colorado. Prepared for the Bureau of Land Management, Uncompahgre Field Office by Aztec Archaeological Consultants, LLC.

Church, Minette C., Steven G. Baker, Bonnie J. Clark, Richard F. Carrillo, Jonathon C. Horn, Carl Späth, David R. Guilfoyle, and E. Steve Cassells. 2007. Colorado History:  A Context for Historical Archaeology. Colorado Council of Professional Archaeologists, Denver.

Civil Society Institute. 2010. Fracking and Clean waters: A Survey of Americans. Conducted for the Civil Society Institute by infogroup ORC. December 21, 2010.

Clevenger, A.P., Purroy, F.J., and M.A. Campos. 1997. Habitat assessment of a relict brown bear *Ursus arctos* population in northern Spain. Biological Conservation 80:17-22.

Colorado Department of Public Health and Environment (CDPHE). 2009a. Regulation 31- The Basic Standards and Methodologies for Surface Water (amended 10/13/09, effective 11/30/09). Online at http://www.cdphe.state.co.us/regulations/wqccregs/. Accessed September 2010.

_____. 2009b. Regulation 41 - The Basic Standards for Ground Water (amended 10/13/09, effective 11/30/09). Online at http://www.cdphe.state.co.us/regulations/wqccregs/. Accessed September 2010.

_____. 2010a Regulation 35 - Classifications and Numeric Standards for Gunnison and Lower Dolores River Basins (amended 2/8/10, effective 6/30/10). Online at http://www.cdphe.state.co.us/regulations/wqccregs/. Accessed March 2014.

______. 2010b. Regulation 93 - Colorado's Section 303(d) List of Impaired Waters and Monitoring and Evaluation List (amended 3/9/10, effective 4/30/10). Online at: http://www.cdphe.state.co.us/regulations/wqccregs/ . Accessed September 2010.

______. 2013a. Colorado Department of Public Health and Environment, Air Quality Control Commission, Air Quality Standards, Designations and Emission Budgets, 5 CCR 1001-14 (Effective 02/15/13). Online at: https://www.colorado.gov/pacific/sites/default/files/5-CCR-1001-14.pdf

______. 2013b. Colorado Department of Public Health and Environment, Air Pollution Control Division, Letter from Nancy Chick to Susan Connell, Carter Lake Consulting, Summary of background concentration estimates for the Bull Mountain Unit area, June 12 2013.

______. 2014. Colorado 2013 Air Quality Data Report. Air Pollution Control Division, Colorado Department of Public Health and Environment, November 2014.

Colorado Department of Revenue. 2014. Colorado Sales and Use Tax by County. DR 1002. March 12, 2014.

Colorado Department of Transportation. 2012a. Online Transportation Information System. Traffic Data Explorer. Internet Website: http://dtdapps.coloradodot.info/Otis/HighwayData#/ui/2/0/criteria/133A/15.359/42.956. Accessed on June 17, 2013.

______. 2012b. Statistics. http://www.coloradodot.info/library/statistics/2011%20Fatals.pdf/view & http://www.coloradodot.info/library/statistics/08-09-fatality-data.xls/view. Accessed on June 17, 2013.

______. 2012c. Online Transportation Information System. Traffic Data Explorer. Internet Website: http://dtdapps.coloradodot.info/Otis/TrafficData#ui/1/2/0/criteria/133A/0/68.821/true/true/. Accessed on June 17, 2013.

Colorado Division of Local Government 2012. Federal Mineral Lease and State Severance Tax Direct Distribution. Internet Web site: http://dola.colorado.gov/dlg/fa/dd/history.html#data. Accessed June 20, 2013.

Colorado Division of Local Government, State Demography Office. 2012. State Demography Office Home Page. Internet Web site: http://www.dola.state.co.us/demog/index.html. Accessed June 21, 2013.

Colorado Division of Reclamation Mining and Safety. 2013. County Operator Mining Data. 2012. Monthly Coal Summary Reports. Internet Web site: http://mining.state.co.us/Coal%20Reports.htm. Accessed June 25, 2013.

Colorado Division of Water Resources (CDWR). 2010. Revised Memorandum: Submittals to the Division of Water Resources for approval of substitute water supply plans and well permits for oil and gas wells that produce ground water while producing oil or gas. From Kevin G. Rein, Assistant State Engineer. March 24.

Case No. 1:20-cv-02484-MSK Document 90-2 filed 05/06/21 USDC Colorado pg 247 of 576

______. 2010. Colorado Decision Support System. Online at: http://cdss.state.co.us/DNN/default.aspx. Accessed September 2010.

Colorado Division of Wildlife (CDOW), now Colorado Parks and Wildlife. 2008. The Economic Impacts of Hunting, Fishing and Wildlife Watching in Colorado. Prepared for CDOW by BBC Research Consulting, Denver, CO. September 26, 2008.

Colorado Geological Survey (CGS). 2011. Map of Physiologic Provinces of Colorado, Modified from Fennemand and Johnson. 1:3,000,000. Online at: http://geosurvey.state.co.us/geology/topography/Pages/Physiographic.aspx.

Colorado Oil and Gas Conservation Commission (COGCC). 2006. Results of Noise Survey. Revised 09/19/2006.

______. 2009. Section 800 Series: Aesthetic and Noise Control Regulations. Available at Internet Web site: http://cogcc.state.co.us/. April 1, 2009.

______. 2013a. Colorado Oil and Gas Conservation Commission's Colorado Oil and Gas Information System Production Data Inquiry web site: http://cogcc.state.co.us/cogis/ProductionSearch.asp Last accessed June 19, 2013

______. 2013b. Colorado Oil and Gas information System. Internet Web site: http://cogcc.state.co.us/cogis/. Accessed June, 2013.

Colorado Partners in Flight (CPIF). 2013. Physiographic Region 62: Southern Rocky Mountains Purple Martin (*Progne subis*). Available online. http://www.rmbo.org/pif/bcp/phy62/aspen/puma.htm

Colorado Parks and Wildlife (CPW). 2007. Data Analysis Unit D-51 South Grand Mesa Mule Deer Management Plan: Game Management Units 411, 52, and 521. December 2007.

______. 2009. Moose Management Plan: Data Analysis Unit M-5. Colorado Parks and Wildlife. April 2009. Available online: http://wildlife.state.co.us/SiteCollectionDocuments/DOW/Hunting/BigGame/DAU/Moose/FinalM-5DAUPlan4-15-09.pdf.

______. 2010. Success of the Colorado Division of Wildlife's Lynx Reintroduction Program. Available online: http://wildlife.state.co.us/SiteCollectionDocuments/DOW/Research/Mammals/ColoradoLynxReintroductionAssessment_090710.pdf

______. 2011. Compensatory Mitigation and Mitigation Banking Implementation Strategy for Oil and Gas White Paper. Durango, CO. August 2011.

______. 2012a. Deer: Genus *Odocoileus*. Internet web site: http://wildlife.state.co.us/WildlifeSpecies/Profiles/Mammals/Pages/Deer.aspx. Accessed on June 17, 2013.

_____. 2012b. Elk: *Cervus elaphus*. Internet web site: http://wildlife.state.co.us/WildlifeSpecies/Profiles/Mammals/Pages/Elk.aspx. Accessed on June 17, 2013.

_____. 2012c. Black Bear: *Ursus americanus*. Internet web site: http://wildlife.state.co.us/WildlifeSpecies/Profiles/Mammals/Pages/BlackBear.aspx. Accessed on June 17, 2013.

_____. 2013a. Moose: *Alces alces*. Internet web site: http://wildlife.state.co.us/WildlifeSpecies/Profiles/Mammals/Pages/Moose.aspx. Accessed on June 17, 2013.

_____. 2013b. Black Bear Data Analysis Unit Management Plan Grand Mesa DAU B-17. Colorado Parks and Wildlife. January 2013. Available online: http://wildlife.state.co.us/SiteCollectionDocuments/DOW/Hunting/BigGame/DAU/Bear/B17DAUplan-GrandMesa.pdf.

Colorado State Forest Service. 2012. Colorado Wildfire Risk Assessment Portal. Internet web site: http://www.coloradowildfirerisk.com/home/risk. Accessed June 7, 2013.

Colorado State University Extension (CSUE). 2013. Gunnison County Noxious Weeds. Internet Web site: http://www.gunnison.colostate.edu/agri/weeds/absinthwormwood.shtml. Accessed June 17, 2013.

Colorado Tourism Office. 2011. The Economic Impact of Travel on Colorado. 1996-2011, Prepared for Colorado Tourism Office, Office of Economic Development and International Trade Denver, Colorado. Prepared by Dean Runyan Associates. November 2012.

Cornell Lab of Ornithology. 2009. All about birds: bird guide. Internet web site: http://www.allaboutbirds.org/guide/. Accessed May 15, 2009.

Council on Environmental Quality. 1997. Environmental Justice - Guidance Under the National Environmental Policy Act. December 10, 1997.

_____. 2014. Draft Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in NEPA Reviews. 40 CFR Parts 1500, 1501, 1502, 1505, 1506, 1507, and 1508. January 2014.

Crompton, J.L. 2000. The Impact of Parks and Open Space on Property Values and the Property Tax Base. National Recreation and Park Association, Ashburn, VA.

Dare, M., M. Carrillo, and C. Speas. 2011. Cutthroat trout (*Oncorhynchus clarkii*) Species and Conservation Assessment for the Grand Mesa, Uncompahgre, and Gunnison National Forests. Grand Mesa, Uncompahgre, and Gunnison National Forests, Delta, Colorado.

Delta County. 2012. Lodging Tax Revenue. 2012.

_____. 2013. Delta County Joint Education District 50 data. Accessed June 26, 2013.

Delta County Independent. 2012. June 12, 2012 article

Denver Post. 2013. Elk Creek Mine in Somerset will go idle. Aldo Svaldi. December 2, 2013.

Department of Fisheries and Oceans (DFO). 2007. Directional Drilling. Online at http://www.dfo-mpo.gc.ca/oceans-habitat/habitat/modernizing-moderniser/epmp-pmpe/qc/pdf/drill_e.pdf. Accessed December 2013.

Department of Interior and United States Department of Agriculture (DOI and USDA). 2007. Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development. BLM/WO/ST-06/021+3071/REV 07. Bureau of Land Management. Denver, Colorado. 84 pp. Available at http://www.blm.gov/wo/st/en/prog/energy/oil_and_gas/best_management_practices/gold_book.html. Last accessed, February 12, 2014.

Digiuio, D. C., R. T. Wilkin, C. Miller, and G. Oberley. 2011. Investigation of Ground Water Contamination near Pavillion, Wyoming. Draft. US EPA Office of Research and Development. EPA 600/R-00/000. December.

Doherty K. E., D. E. Naugle, B. L. Walker, and J. M. Graham. 2008. Greater Sage-Grouse Winter Habitat Selection and Energy Development. Journal of Wildlife Management 72(1): 187-195.

Ellis, M. S. and V. L Freeman. 1984. Geologic Map and Cross Sections of the Carbondale 30’ x 60’ Quadrangle West-Central Colorado. US Geological Survey Coal Investigations Map C-97-A. 1:100,000.

Ellsworth, W. L. 2013. Injection-Induced Earthquakes. Science 341, 1225942. DOI: 10.1126/science.1225942

Energy Information Administration (EIA). 2011. Annual Energy Outlook 2011. Available at http://www.eia.gov/forecasts/archive/aeo11/index.cfm. Last accessed August 5, 2014.

ENVIRON, Alpine Geophysics and University of North Carolina. 2012. Western Regional Air Partnership (WRAP) West-wide Jump Start Air Quality Modeling Study (WestJumpAQMS) WRF Application/Evaluation. Prepared for Tom Moore WRAP. January 20, 2012.

ENVIRON. 2013. The Mesoscale Model Interface Program (MMIF) Version 3.0, Draft Users Manual. Prepared for Environmental Protection Agency Office of Air Quality Planning and Standards, Air Quality Assessment Division, Air Quality Modeling Group, Research Triangle Park, North Carolina. September 30, 2013.

Environment and Energy (journalist Mike Soraghan). 2014. Oil and Gas: Spills up 17 percent in U.S. in 2013. Available online: http://www.eenews.net/energywire/stories/1059999364. Accessed May 23, 2014.

Environmental Protection Agency (EPA). 1993. Superfund's Standard Default Exposure Factors for the Central Tendency and Reasonable Maximum Exposure. Preliminary Review Draft.

______. 2004. Evaluation of Impacts to Underground Sources of Drinking Water by Hydraulic Fracturing of Coalbed Methane Reservoirs. US EPA, Office of Ground Water and Drinking Water, Drinking Water Protection Division, Prevention Branch, Washington, DC.

______. 2005. Guideline on Air Quality Models. Updated 2005. Environmental Protection Agency Office of Air Quality Planning and Standards, Research Triangle Park, North Carolina. Published in Federal Register, Vol. 70, No. 216, November 9, 2005.

______. 2010 Primary Distinguishing Characteristics of Level III Ecoregions of the Continental United States, revised July 2010. Internet Web site: http://www.epa.gov/wed/pages/ecoregions/level_iii_iv.htm. Accessed on June 17, 2013.

______. 2011a. 40 CFR Part 98, Mandatory Reporting of Greenhouse Gases, Final Rule. Published in Federal Register Vol. 75, No. 242, Friday, December 17, 2010. (air resources)

______. 2011b. Draft Investigation of Ground Water Contamination near Pavillion, Wyoming. EPA 600/R-00/000. December. Available online at http://www2.epa.gov/region8/ pavillion (water)

______. 2011c. Air Toxics Database, Table 2, Acute Dose-Response Values for Screening Risk Assessments (12/19/2011). Office of Air Quality Planning and Standards (OAQPS). Technology Transfer Network Air Toxics Website. (http://www.epa.gov/ttn/atw/ toxsource/Table2.pdf). (air resources)

______. 2011d. EPA Ecoregions. Last updated on June 20, 2011. Internet Web site: http://www.epa.gov/wed/pages/ecoregions.htm. Accessed on June 17, 2013. (vegetation)

______. 2012a. Air Toxics Database, Table 1, Prioritized Chronic Dose-Response Values (5/7/2012). Office of Air Quality Planning and Standards (OAQPS). Technology Transfer Network Air Toxics Website. (http://www.epa.gov/ttn/atw/toxsource/ Table1.pdf). (air resources)

______. 2012b. Air Toxics Database, Table 1, Prioritized Chronic Dose-Response Values (5/7/2012). Office of Air Quality Planning and Standards (OAQPS). Technology Transfer Network Air Toxics Website. (http://www.epa.gov/ttn/atw/toxsource/ Table1.pdf).

______. 2012c. Oil and Natural Gas Sector: New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants Reviews; Final Rule, Fed Reg, Vol. 77, No. 159, Thursday, August 16, 2012, pp. 49490- 49600

Case No. 1:20-cv-02484-MSK Document 90-2 filed 05/06/21 USDC Colorado pg 251 of 576

______. 2013a. Envirofacts -Multisystem Search. Internet web site: http://www.epa.gov/enviro/facts/multisystem.html. Accessed June 21, 2013.

______. 2013b. Envirofacts- List of Facilities Reporting to BR in Envirofacts. Internet web site: http://iaspub.epa.gov/enviro/brs_query_v2.brs_main?fac_search=0&fac_value=&fac_search_type=1&postal_code=&location_address=&add_search_type=1&city_name=&county_name=gunnison&state_code=co&naic_code_desc=&naic_code=&yvalue=2011&mopt=0&mmopt=&wst_search=0&keyword1=&keyword2=&keyword3=&RValue1=&RValue2=&RValue3=&CValue1=&CValue2=&CValue3=&page=1&total_rows_found=&last_fac_name=

______. 2013c. Plant Information, Gunnison Energy Corp – 1-34 Well Site. Internet web site: http://oaspub.epa.gov/enviro/afs_reports.detail_plt_view?p_state_county_compliance_src=0805100068&p_plant_id=. Accessed June 21, 2013.

______. 2013d. Topic Searches. Internet web site: http://www.epa.gov/enviro/facts/topicsearch.html#water. Accessed on June 21, 2013.

______. 2013e. Facility Detail Report; Aspen Leaf Lateral Pipeline. Internet web site: http://iaspub.epa.gov/enviro/fii_query_dtl.disp_program_facility?p_registry_id=110040434009. Accessed June 21, 2013.

______. 2013f. Envirofacts, Search Results. Interactive internet web site: http://www.epa.gov/emefdata/em4ef.html?ve=8,38.66682052612305,-107.03172302246094&pText=Gunnison. Accessed June 21, 2013.

______. 2013g. EPA's Study of Hydraulic Fracturing and Its Potential Impact on Drinking Water Resources. Internet web site: http://www2.epa.gov/hfstudy. Accessed on August 6, 2013.

______. 2013h. Clean Air Status and Trends Network (CASTNET). Accessed online: http://java.epa.gov/castnet/viewsiteinfo.do. Accessed June.

______. 2013i. NO2/NOx In-Stack Ratio (ISR) Database (8/26/2013). Office of Air Quality Planning and Standards (OAQPS). Technology Transfer Network, Support Center for Regulatory Atmospheric Modeling Website. (http://www.epa.gov/ttn/scram).

______. 2014a. Fens. Internet Web site: http://water.epa.gov/type/wetlands/fen.cfm. Accessed on July 16, 2014.

______. 2014b. Superfund Network. Accessed online: http://www.epa.gov/superfund/community/pdfs/toolkit/risk_communication-attachment6.pdf. Accessed March 2014.

______. 2014c. Greenhouse Gas Reporting Program. Accessed online: http://www.epa.gov/climatechange/ghgemissions/usinventoryreport.html. March.

_____. 2015a. National Ambient Air Quality Standards, Office of Air Quality Planning and Standards (OAQPS). Technology Transfer Network Website. (http://www.epa.gov/ttn/naaqs).

_____. 2015b. 40 CFR Parts 50, 51, 52, 53, and 58, National Ambient Air Quality Standards for Ozone: Final Rule by the Environmental Protection Agency on 10/01/2015. Online at http://www3.epa.gov/airquality/ozonepollution/pdfs/20151001fr.pdf

_____. 2015c. Clean Air Status and Trends Network (CASTNET). Accessed online from EPA's Air Quality System (AQS) Data Mart at: http://www3.epa.gov/airdata/ad_rep_mon.html. Accessed October.

Farren, M., A. Weinstein, M. Partridge, and M. Betz. 2013. Too Many Heads and Not Enough Beds:Will Shale Development Cause a Housing Shortage? Ohio State University. Swank Program in Rural-Urban Policy Summary and Report. June 2013

Fausold, C. J. and R. J. Lilieholm. 1996. The economic value of open space. Land Lines 8(5):1–4. September 1996.

Federal Highways Administration (FHWA). 2000. Comprehensive Truck Size and Weight Study to Congress

_____. 2011. Noise Effect on Wildlife. Internet Web site: http://www.fhwa.dot.gov/environment/noise/noise_effect_on_wildlife/effects/wild01.cfm #content. Accessed May 29, 2013.

Federal Land Managers Air Quality Related Values Workgroup (FLAG) 2010. Federal Land Managers' Air Quality Related Values Workgroup (FLAG) Phase I Report – Revised (2010). U.S. Forest Service-Air Quality Program, National Park Service-Air Resources Division, U.S. Fish and Wildlife Service-Air Quality Branch. October 2010.

Fenneman, N. M., and D.W. Johnson. 1946. Physiographic Divisions of the Conterminous U.S. U.S. Geological Survey (USGS), Washington, D.C., GIS version after Fenneman's is available http://water.usgs.gov/GIS/dsdl/physio.gz.

Foreman T. T., D. Sperling, J. A. Bissonette, A. P. Clevenger, C. D. Cutshall, V. H. Dale, L. Fahrig, R. France, C.R. Goldman, K. Heanue, J. A. Jones, F. J. Swanson, T. Turrentine, and T. C. Winter. 2003. Road Ecology. Island Press, Washington, D.C. 481 pp.

Forest Service 2000. Screening Methodology for Calculating ANC Change to High Elevation Lakes, User's Guide. U.S. Department of Agriculture (USDA) Forest Service, Rocky Mountain Region. January 2000.

_____. 2003. GIS purple martin colony data. Data received from BLM Kenneth Holsinger June 20th 2013.

_____. 2008a. GIS database for lynx habitat in Colorado. Regional Office, Lakewood, CO.

______. 2008b. National Visitor Use Monitoring Results, National Summary Report. Last updated October 2008.

______. 2010. Lake water chemistry provided by the USDA Forest Service, April 2010. Available online: www.fs.fed.us/armdata.

Fox, D., A. M. Bartuska, J. G. Byrne, E. Cowling, R. Fisher, G. E. Likens, S. E. Lindberg, R. A. Linthurst, J. Messer, and D. S. Nichols. 1989. A Screening Procedure to Evaluate Air Pollution Effects on Class I Wilderness Areas. General Technical Report RM-168. U.S.D.A. Forest Service, Rocky Mountain Forest and Range Experiment Station, Fort Collins, Colorado. 36 pp.

FracFocus. 2012. Hydraulic Fracturing Fluid Product Component Information Disclosure, Federal 11-89-17 1, Gunnison County, Colorado. Job Date: June 9, 2012. Available online at: http://www.fracfocusdata.org/DisclosureSearch/StandardSearch.aspx. Accessed on January 10, 2014.

Freddy, D. J., W. M. Bronaugh, and M. C. Fowler. 1986. Responses of mule deer to disturbance by persons afoot and snowmobiles. Wildlife Society Bulletin 14:63–68.

Freethey, G. W., and G. E. Cordy, 1991, Geohydrology of Mesozoic Rocks in the Upper Colorado River Basin in Arizona, Colorado, New Mexico, Utah, and Wyoming, Excluding the San Juan Basin.

Geologic Society of America. 2015. "Water Quality." GSA Critical Issue: Hydraulic Fracturing. http://www.geosociety.org/criticalissues/hydraulicFracturing/waterQuality.asp. Last accessed November 23, 2015.

Giezentanner, K. I. 2008. Final Environmental Assessment, Management Indicator Species (MIS) Forest Plan Amendment, to the 2002 Land and Resource Management Plan- 2002 Amendment for the White River National Forest. White River National Forest, Glenwood Springs, CO.

Godwin, L. H. 1968. Geologic map of the Chair Mountain quadrangle, Gunnison and Pitkin Counties, Colorado, and GIS data for landslides 24K scale. USGS Geologic Quadrangle: GQ-704. Digitized by Colorado Geological Survey, http://geosurvey.state.co.us/hazards/Landslides/Pages/CGSlandslide_inventory.aspx Downloaded June 24, 2013.

Greubel, Rand A., Jaclyn Mullen, Matthew J. Landt, Jonathon C. Horn, and Alan D. Reed. 2010. Class I Cultural Resource Overview of the Bureau of Land Management's Uncompahgre Field Office, Western Colorado. Prepared by Alpine Archaeological Consultants, Inc., Montrose, Colorado. Submitted to Bureau of Land Management, Uncompahgre Field Office, Montrose, Colorado.

Gunnison County. 2012 Financial Report. December 31, 2012.

Case No. 1:20-cv-02484-MSK Document 90-2 filed 05/06/21 USDC Colorado pg 254 of 576

_____. 2013. Gunnison County Land Use Resolution. Available at www.gunnisoncounty.org/documentcenter/view/1829. Last accessed, February 12, 2014.

Gunnison County Board of County Commissioners. 2003. Temporary Regulations for Oil and Gas Operations (Amended May 2004). Online at http://www.gunnisoncounty.org/planning_pdf/TEMP%20OIL%20AND%20GAS%20REGS%20Amended%20May%2018,%202004.pdf?download=TEMP%20OIL%20AND%20GAS%20REGS%20Amended%20May%2018,%202004.pdf. Accessed September 2010.

Gunnison County Public Works Department. 2013. Numerical List of County Maintained/Plowed Roads. http://www.gunnisoncounty.org/public_pdf/Numer-CntyMantainedRoads.pdf?download=Numer-CntyMantainedRoads.pdf. Accessed on June 17, 2013.

Haefele, M., P. Morton, and N. Culver. 2007. Natural Dividends: Wildland Protection and the Changing Economy of the Rocky Mountain West. Washington, D.C. The Wilderness Society.

Headwaters Economics. 2013. Economic Profile System Human Dimensions Toolkit - Socioeconomic Profiles produced for Delta and Gunnison Counties. Internet Web site: http://www.headwaterseconomics.org/eps/. Data for Economic Profile System accessed June, 20 2013 and March 12, 2014..

Hebblewhite, M. 2008. A literature review of the effects of energy development on ungulates: Implications for central and eastern Montana. Report prepared for Montana Fish, Wildlife and Parks, Miles City, MT. 125 pp.

Hedge, Allen. 2011. Acoustic Environment. DEA3500. Cornell University. January 2011.

Hettinger, R. D., and M. A. Kirshbaum. 2002. Stratigraphy of the Upper Cretaceous Mancos Shale (Upper Part) and Mesaverde Group in the Southern Part of the Uinta and Piceance Basins.

Holzman, D. C. 2011. *Methane Found in Well Water Near Fracking Sites*. Environmental Health Perspectives, Vol. 119, No. 7, p. A289.

IMPLAN. 2014. MIG, Inc., IMPLAN System (data and software 2010), 502 2nd Street, Suite 301, Hudson, WI 54016.

Ingelfinger, F. and F. Anderson. 2004. Passerine Response to Roads Associated with Natural Gas extraction in a Sagebrush Steppe Habitat. Western North American Naturalist. 64:385-395.

Intergovernmental Panel on Climate Change (IPCC). 2013. Climate Change 2013: The Physical Science Basis, Contribution of Working Group I to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change. [Stocker, T. F., D. Qin, G. K. Plattner, M. Tignor, S. K. Allen, J. Boschung, A. Nauels, Y. Xia, V. Bex, and P. M. Midgley (eds.)] Cambridge University Press, Cambridge, United Kingdom and New York, NY, USA. 1,535 pp.

Jaffee, Mark. 2012. Denver Post. Colorado North Fork Valley residents, businesses fighting prospect of fuel leases. Posted March 18, 2012.

Johnson, R.C. 1989. Geologic History and Hydrocarbon Potential of the Late Cretaceous-Age, Low Permeability Reservoirs, Piceance Basin, Western Colorado., in Evolution of Sedimentary Basins - Uinta and Piceance Basins. U.S. Geological Survey Bulletin 1787: E

Kassotis C. D., D. E. Tillitt, J. W. Davis, A. M. Hormann, and S. C. Nagel. 2013. *Estrogen and Androgen Receptor Activities of Hydraulic Fracturing Chemicals and Surface and Ground Water in a Drilling-Dense Region.* The Endocrine Society.

Kelsey T. W. and M. W. Ward. 2010. Natural Gas Drilling Effects on Municipal Governments throughout Pennsylvania's Marcellus Shale Region, 2010, Penn State Cooperative Extension, 2011.

Kowalski, D. 2010. CPW, Aquatic Research Scientist. Personal communication regarding greenback cutthroat trout.

La Plata County. 2002. Final La Plata County Impact Report. La Plata County, Colorado. October 2002.

Latousek, T. 1995. Paonia Reservoir. Online at: http://www.usbr.gov/projects//ImageServer?imgName=Doc_1305126167556.pdf. Accessed on June 17, 2013.

Lazear, G.D. 2009. Fractures, convection and under pressure: hydrogeology on the southern margin of the Piceance basin, west-central Colorado, USA. Hydrogeology Journal 17:641-664.

Lobeck, A. K. 1975. Physiographic Diagram of North America. The Geographical Press, N.J.

McKenzie, L. M., R. Z. Witter, L. S. Newman, and J. L. Adgate. 2012. *Human health risk assessment of air emissions from development of unconventional natural gas resources*. Science of the Total Environment. May 1, 2012. Volume 424: 79-87.

Menakis, J. P., D. Osborne, and M. Miller. 2003. Mapping the cheatgrass-caused departure from historical natural fire regimes in the Great Basin, USA. USDA Forest Service Proceedings RMRS-P-29. p. 281-288.

Millward, Sara. 2013. Class II Cultural Resources Inventory of the Bull Mountain Unit Study Area, Gunnison County, Colorado. Prepared by Alpine Archaeological Consultants, Inc., Montrose, Colorado. Prepared for EMPSi, Boulder, Colorado. Submitted to the Bureau of Land Management, Uncompahgre Field Office, Montrose, Colorado.

Morgan, M. L. 2008. Colorado's Earthquake and Fault Map, Showing Locations of Historical Earthquakes and Known or Suspected Geologically Young Faults. Colorado Geological Survey. 1:1,150,000. Online at: http://geosurvey.state.co.us/hazards/Earthquakes/Documents/Earthquake_Map_2008.pdf.

Muehlenbachs, L., E. Spiller, and C. Timmins. 2012. Shale Gas Development and Property Values: Differences Across Drinking Water Sources. National Bureau of Economic Research. Working Paper 18390. http://www.nber.org/papers/w18390.

National Climate Assessment (NCA). 2014a. Melillo, Jerry M., Terese (T. C.) Richmond, and Gary W. Yohe, eds. *2014: Climate Change Impacts in the United States: The Third National Climate Assessment.* U.S. Global Change Research Program, 841 pp. doi: 10.7930/J0Z31WJ2.

_____. 2014b. Garfin, G., G. Franco, H. Blanco, A. Comrie, P. Gonzalez, T. Piechota, R. Smyth, and R. Waskom, 2014: Ch. 20: Southwest. *Climate Change Impacts in the United States: The Third National Climate Assessment*, J. M. Melillo, Terese (T.C.) Richmond, and G. W. Yohe, Eds., U.S. Global Change Research Program, 462–486. doi:10.7930/J08G8HMN. Online at <http://nca2014.globalchange.gov/report/regions/southwest>.

National Cooperative Soil Survey. 2013. Last updated on April 15, 2013. Internet Web site: http://soils.usda.gov/partnerships/ncss/Accessed on June 17, 2013.

National GAP Analysis Program (GAP). 2013. GIS species data portal range data for purple martin. Internet Web Site: gapanalysis.usgs.gov/species/data/download Accessed on June 20th, 2013.

National Hydrography Dataset (NHD). 2013. GIS data for streams. Received via email from BLM UFO Ken Holsinger May 10th, 2013.

Natural Diversity Information Source (NDIS). 2010. GIS data for bald eagle, mule deer, elk. Colorado Parks and Wildlife, biologists, district managers and researchers. A division of the Colorado Department of Natural Resources. Accessed via the BLM's eGIS server June 2013.

Natural Resources Conservation Service (NRCS). 1993. Soil Survey Division Staff. 1993. Soil survey manual. Soil Conservation Service. U.S. Department of Agriculture Handbook 18.Accessed on December2013. http://www.nrcs.usda.gov/wps/portal/nrcs/detail/soils/survey/?cid=nrcs142p2_054262

_____. 2011. SNOTEL data, Booth station, Gunnison County, 2010-2011 Water Years.

______. 2012. National soil survey handbook, title 430-VI. Available online at http://soils.usda.gov/technical/handbook/. Accessed on June 17, 2013.

______. 2013a. United States Department of Agriculture. Soil Survey Geographic (SSURGO) Database for Paonia County, CO. Available online at http://soildatamart.nrcs.usda.gov. Accessed June 2013.

______. 2013b. GIS data for soil survey co679, with farmland, erosion, and representative slope attributes added using the NRCS Soil Data Viewer. US Department of Agriculture. Data available at www.soildatamart.nrcs.usda.gov. Last accessed June 11, 2013.

Nicholson, C., and R. L. Wesson. 1990. Earthquake Hazard Associated with Deep Well Injection – A Report to the U.S. Environmental Protection Agency. U.S Geological Survey Bulletin 1951.

Nietvelt, C. G. 2002. The effects of roads on wildlife: bibliography. Report prepared for U.S. Forest Service Bridger-Teton National Forest, Jackson, Wyoming. 73 pp.

North Fork Heart and Soul Project 2014. What Matters Most to the Future of the North Fork Valley- A White Paper. February 2014.

North Fork River Improvement Association (NFRIA). 2010. North Fork of the Gunnison River Watershed Plan Update. Online at: http://npscolorado.com/NFRIAWatershed_Action_Plan.pdf. Accessed on June 17, 2013.

Office of Governor Matt Mead. 2013. Wyoming to Lead Further Investigation of Water Quality Concerns Outside of Pavillion with Support of EPA. Press Release June 20, 2013. Available online at: http://governor.wy.gov/media/pressReleases/Pages/WyomingtoLeadFurtherInvestigationofWaterQualityConcernsOutsideofPavillionwithSupportofEPA.aspx

Oldham, J. 2012. North Dakota oil boom brings blight with growth as costs soar. Bloomberg News. Internet website: http://www.bloomberg.com/news/2012-01-25/north-dakota-oil-boom-brings-blight-with-growth-as-costs-soar.html.Accessed January 6, 2014.

Otak, Inc. 2009. Visual Resource Inventory. Prepared for the U.S. Department of the Interior. Bureau of Land Management. Uncompahgre Field Office. Montrose, Colorado. September 2009.

Ouren, D. S., C. Haas, C. P. Melcher, S. C. Stewart, P. D. Ponds, N. R. Sexton, L. Burris, T. Fancher, and Z. H. Bowen. 2007. Environmental Effects of Off-Highway Vehicles on Bureau of Land Management Lands: A Literature Synthesis, Annotated Bibliographies, Extensive Bibliographies, and Internet Resources. US Department of the Interior, US Geological Survey, Open-File Report 2007-1353. 225 p.

Petraglia and Weisbrod 2001. A Review of Impact Studies Related to Scenic Byway Designation. Prepared by Economic Development Research Group, Inc for the National Scenic Byways Resource Center. March 2001.

Petterson, E. S. 2012. Biological Opinion. Wildlife and Aquatic Resources Report for the Bull Mountain Unit Master Development Plan. *Prepared for*: Bureau of Land Management, Uncompahgre Field Office *and* SG Interests, I LTD. Rocky Mountain Ecological Services, Inc. Glenwood Springs, CO. 195pp.

Pitman, J. K., C. W. Spencer, and R. M. Pollastro. 1988. Petrograhy Mineralogy, and Reservoir Characteristics of the Upper Cretaceous Mesaverde Group in the East-Central Piceance Basin, Colorado. in Evolution of Sedimentary Basins - Uinta and Piceance Basins. U.S. Geological Survey Bulletin 1787: G.

Radle, A. L. 2007. The effect of noise on wildlife: a literature review. Accessed online at the World Forum for Acoustic Ecology Online Reader. Internet web site: http://interact.uoregon.edu/MediaLit/wfae/library/articles/radle_effect_noise_wildlife.pdf.

Reed, Alan D., and Michael D. Metcalf. 1999. Colorado Prehistory: A Context for the Northern Colorado River Basin. Colorado Council of Professional Archaeologists, Denver.

Rocky Mountain Ecological Services. 2012. Wildlife and Vegetation Assessment Report, Federal 12-89-7 Natural Gas Project. February 2012.

Rosenberger, R. S., and R. G. Walsh. 1997. “Nonmarket Value of Western Valley Ranch Land Using Contingent Valuation.” Journal of Agricultural and Resource Economics 22(2): 296–309

Rost, G. and J. Bailey. 1979. Distribution of mule deer and elk in relation to roads. The Journal of Wildlife Management 43(3): 634-641.

RPI Consulting. 2008 Road & Bridge Department Impact Fee Support Study. Prepared for Rio Blanco County, Colorado. April 2008.

Ruediger, B., J. Claar, S. Gnidek, B. Holt, L. Lewis, S. Mighton, B. Naney, G. Patton, T. Rinalki, J. Trick, A. Vandehey, F. Wahl, N. Warren, D. Wenger, and A. Williamson. 2000 (updated 2003). Canada Lynx Conservation Assessment and Strategy. USDA Forest Service, USDI Fish and Wildlife Service, USDI Bureau of Land Management, and USDI National Park Service. Forest Service Publication #R1-00-53, Missoula, MT. 142p.

Ruggiero, L. F., K. B. Aubry, S. W. Buskirk, G. M. Koehler, C. J. Krebs, K. S. McKelvey and J. R. Squires, eds. 1999. Ecology and conservation of lynx in the United States. Univ. Colorado Press and USDA Rocky Mtn. Res. Stn., USDA Gen. Tech. Rep. RMS-GTR-30WWW. 480 pp.

Rumbach, A. 2010. “Natural Gas Drilling in the Marcellus Shale: Potential Impacts on the Tourism Economy of the Southern Tier.” Prepared for the Southern Tier Central Planning Board (Corning, New York)

Rutqvist, J., A. P. Rinaldi, F. Cappa, and G. J. Moridis. 2013.  Modeling of Fault Reactivation and Induced Seismicity During Hydraulic Fracturing of Shale-Gas Reservoirs.  Journal of Petroleum Science and Engineering.  April 28.  Online at: http://www2.epa.gov/sites/production/files/2013-12/documents/fault-reactivation.pdf

San Juan Institute of Natural and Cultural Resources. 2009. Colorado Breeding Bird Atlas. Fort Lewis College, Durango, Colorado. Internet web site: http://www.cobreedingbirdatlasii.org/. Accessed: May 15, 2009.

Saros, J. E., D. W. Clow, T. Blett, and A. P. Wolfe. 2010. "Critical nitrogen deposition loads in high- elevation lakes of the western U.S. inferred from paleolimnological records". Water, Air & Soil Pollution, DOI 10.1007/s11270-010-0526-6.

Sawyer, H., Kauffman M. J., and R. M. Nielson. 2009. Influence of well pad activity on winter habitat selection patterns of mule deer. Journal of Wildlife Management 73:1052-1061.

Sawyer, H., Nielson, R., Lindzey, F., and L. Mcdonald. 2006. Winter habitat selection of mule deer before and during development of a natural gas field. Journal of Wildlife Management 70(2), 396-403. 2006

Schmidt, C. W. 2011. *Blind Rush?: Shale Gas Boom Proceeds amid Human Health Questions.* Environmental Health Perspectives, Vol. 119, No. 8, pp. A348-A353.

SG Interests. 2013. GIS data describing the alternatives. SG Interests, Houston, TX. Data layers developed received April 2013 – December 2013, updated for existing infrastructure May – June 2015.

_____. 2014. Project labor, cost, production and tax revenue estimates provided on January 24, 2014. Updated information provided May 23, 2014.

Smith, M. D., R. S. Krannich, and L. M. Hunter. Growth, Decline, Stability, and Disruption: A Longitudinal Analysis of Social Well-Being in Four Western Rural Communities. Rural Sociology, 66: 425–450. doi: 10.1111/j.1549-0831.2001.tb00075.x

Spackman, S. B., J. C. Jennings, C. Dawson, M. Minton, A. Kratz, and C. Spurrier. 1997. Colorado rare plant field guide. Prepared for the BLM, USFS, and USFWS by the Colorado Natural Heritage Program.

Speas, C. 2010. US Forest Service, Wildlife, Fisheries, and Rare Plants Program Manager. Personal communication regarding greenback cutthroat trout. January 26, 2010.

Stover, B. K., 1986, Surficial-Geologic Map of the Muddy Creek Landslide Complex, Gunnison County, Colorado, April 15, 1986. Colorado Geological Survey, Open-File Report 86-5.

Taylor, O. J. 1987. Hydrologic System of Piceance Basin. Oil Shale, Water Resources, and Valuable Minerals of the Piceance Basin, Colorado: The Challenge and Choices of Development. U.S. Department of Interior U.S. Geological Survey Professional Paper 1310. U.S. Government Printing Office. Washington D.C. 1987.

Taylor, Phil. 2013. Rising wineries, organic farms clash with BLM over leasing in energy-rich western Colorado. EE News. January 28, 2013.

Throupe, R., R.A. Simons, and X. Mao. 2013. A review of hydro ''fracking'' and its potential effects on real estate. Journal of Real Estate Literature. Volume 21, Number 2, 2013

Trautner Geotech LLC. 2011. Geologic Hazard Assessment of the Bull Mountain Geographical Area Plan Environmental Assessment Project Site. Prepared for SG Interests, Ltd.

Tripadvisor.com. 2014. Hotel rooms in Delta, Glenwood Springs and Grand Junction. Internet website: http://www.tripadvisor.com/Hotels. Accessed May 19, 2014.

Tweto, O. 1979. Geologic Map of Colorado. Colorado Geological Survey Miscellaneous Investigations MI-16. 1:500,000.

______. 1983. Geologic Sections Across Colorado (Section C-C'). Colorado Geological Survey Miscellaneous Investigations MI-1416. 1:500,000.

United States Bureau of Labor Statistics. 2014. Local Areas annual unemployment rates. Internet web site: http://data.bls.gov/cgi-bin/dbdown. Accessed May 12, 2014.

United States Census Bureau. 2000. 2000 Census Summary Data (SF1, SF2). Internet Web site: http://www.census.gov/prod/cen2000. Accessed on June 20, 2013

______.2010a. 2010 Census Summary Data (SF1, SF2). Internet Web site: http://www.census.gov/prod/cen2010. Accessed on June 20, 2013.

______. 2010b. Poverty Thresholds for 2011. Internet Web Site: http://www.census.gov/hhes/www/poverty/threshld/thresh08.html. Accessed June 25, 2013.

______. 2011. American Community Survey Data for 2007-2011, Internet Web Site: http://www.census.gov/acs/www/. Accessed June 20, 2013.

______. 2012. Gunnison and Delta Counties. American Community Survey Housing data 2008-2012. Internet Web site:http://factfinder2.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk. Accessed May 19, 2014.

United States Department of Agriculture, National Agricultural Statistical Service (USDA NASS). 2007. 2007 Agricultural Census County Summary Highlights – Colorado. Last updated December 2009. Internet Web site: http://www.agcensus.usda.gov/Publications/2007/Full_Report/Volume_1,_Chapter_2_County_Level/Colorado/st08_2_001_001.pdf. Accessed on June 19, 2013.

_____. 2014. 2012 Agricultural Census- Colorado State and County Data. Released May 2014.

United States Department of Commerce, Bureau of Economic Analysis (BEA) 2012. Regional Economic Information System Data from tables Ca25N, Ca30, Ca1-3, and Ca05N. Updated 2012. Internet Web site: http://www.bea.gov/regional/index.htm#state. Accessed June 20, 2013.

United States Energy Information Administration (EIA). 2013a . Colorado Energy Profile. Internet Web Site: http://tonto.eia.doe.gov/state/state_energy_profiles.cfm?sid=CO. Accessed June 25, 2013.

______. 2013b. U.S. Natural Gas Wellhead Price (Dollars per Thousand Cubic Feet). Internet Web Site: http://www.eia.gov/dnav/ng/hist/n9190us3A.htm. Accessed December 30, 2013.

United States Fish and Wildlife Service (USFWS). 1998. Greenback Cutthroat Trout Recovery Plan. Region 6 US Fish and Wildlife Service Denver, CO. March 1998. Available online: http://warnercnr.colostate.edu/~kurtf/400web/Field%20trip%20assignment/Native%20cutthroat/GBNRecoveryPlan.pdf.

______. 1999. Final programmatic biological opinion for Bureau of Reclamation's operations and depletions, other depletions, and funding and recovery program actions in the upper Colorado River above the confluence with the Gunnison River. USFWS, Grand Jct. CO. July 1999.

______. 2008. Birds of Conservation Concern. US Fish and Wildlife Service Division of Migratory Bird Management. Arlington, Virginia. December 2008.

______. 2009. Greenback Cutthroat Trout (*Oncorhnychus clarki stomias*) 5-Year Review: Summary and Evaluation. USFWS Colorado Field Office. Lakewood, CO. May 2009. Available online: http://ecos.fws.gov/docs/five_year_review/doc2414.pdf.

______. 2010. Endangered and Threatened Wildlife and Plants; 12-Month Finding on a Petition To List Astragalus microcymbus and Astralagus schmolliae as Endangered or Threatened. Federal Register / Vol. 75, No. 240 / Wednesday, December 15, 2010 / Proposed Rules.

______. 2012. Greenback Cutthroat Trout Recovery Team: Study Reveals Secrets of Colorado's Cutthroats. Available online: http://www.fws.gov/mountain-prairie/pressrel/2012/09242012_GBCT.pdf.

______. 2013. Rocky Mountain Success Story: Canada Lynx Returns. Available online: http://www.fws.gov/news/blog/index.cfm/2013/2/1/Rocky-Mountain-Success-Story-Canada-Lynx-Returns.

United States Geological Survey (USGS). N.d. Professional Paper 1411-C.

______. 1976. GIS data for landslides, 250 K scale, Colorado Landslide Inventory, complied by Colorado Geological Survey and USGS from multiple sources. http://geosurvey.state.co.us/hazards/Landslides/Pages/CGSlandslide_inventory.aspx Downloaded June 24, 2013.

______. 2001a. Bull Mountain, Colorado, 7.5-minute topographic quadrangle map (water).

______. 2001b. Chair Mountain, Colorado, 7.5-minute topographic quadrangle map (water).

______. 2001c. Somerset, Colorado, 7.5-minute topographic quadrangle map (water).

______. 2008. Seismic Hazard Map of Western U.S., showing Peak Ground Acceleration (PGA) with 2% probability of exceedence in 50 years. Online at: http://earthquake.usgs.gov/hazards/products/conterminous/2008/update_201001/maps/2008.WUS.0p00.1150.2475.pdf.

______. 2010. National Water Information System – Water Quality Samples for Colorado. Online at http://nwis.waterdata.usgs.gov/co/nwis/qwdata?search_criteria=search_site_no& submitted_for m=introduction. Accessed September 2010. (water)

______. 2011. Paonia Reservoir, Colorado, 7.5-minute topographic quadrangle map.

______. 2013. need reference, from ch 3 water; National Water Information System (http://waterdata.usgs.gov/co/nwis/).

______. 2014. Record Number of Oklahoma Tremors Raises Possibility of Damaging Earthquakes. 2014. Available online: http://earthquake.usgs.gov/regional/ceus/products/ newsrelease_05022014.php. Accessed May 23, 2014.

Upper Colorado River Endangered Fish Recovery Program 2013 2012-2013 Highlights. Available online: http://www.coloradoriverrecovery.org/general-information/general-publications/briefingbook/2012-2013Highlights.pdf.

Van Dyke, F. B., R. H. Brocke, H. G. Shaw, B. B. Ackerman, T. P. Hemker, and F. G. Lindzey. 1986. Reactions of mountain lions to logging and human activity. The Journal of Wildlife Management 50:95-102.

Van Reyper, G. 2006. Bureau of Land Management TES [threatened, endangered, sensitive] species descriptions. Uncompahgre Field Office, Montrose, CO, updated 2009/ 2010. Unpublished document.

Visibility Information Exchange Web System (VIEWS). 2013. Regional Haze Summary Data. Means for Best, Middle, and Worst 20% Visibility Days. Accessed online: http://views.cira.colostate.edu/web/Trends/. Accessed June.

Warpinski, M. 2013. Understanding Hydraulic Fracture Growth, Effectiveness, and Safety Through Microseismic Monitoring. http://dx.doi.org/10.5772/55974 . Accessed on January 13, 2014.

Weinhold, B. 2012. Energy Development Linked with Earthquakes. Environmental Health Perspectives Vol. 120, No. 10. October 2012.

Westbrooks, R. 1998. Invasive plants, changing the landscape of America: Fact book. Federal Interagency Committee for the Management of Noxious and Exotic Weeds (FICMNEW). Washington, DC.

Western Governors' Association, 1998. WGA Open Land Initiative. Economic Benefits of Open Space: April 1998. http://www.westgov.org/wga/intiatives/tpl/ecogen.htm

Western Regional Climate Center (WRCC). 2013. Historical climate data for Redstone 4 W, Colorado. Online at http://www.wrcc.dri.edu. Accessed June 2013.

Wiggins, D. 2005. Purple Martin (*Progne subis*): a technical conservation assessment. USDA Forest Service, Rocky Mountain Region. Available online: http://www.fs.fed.us/r2/projects/scp/assessments/purplemartin.pdf.

Wilbert, M., J. Thomas, and N. W. Culver. 2008. Analysis of Habitat Fragmentation from Oil and Gas Development and its Impacts on Wildlife: A Framework for Public Land Management Planning. The Wilderness Society, Ecology and Economics Research Department. May 20, 2008.

Wilson, Weston. 2004. Letter to Senators Allard and Campbell and Representative DeGette, Colorado Representatives, regarding errors in EPA hydraulic fracturing study. October 8, 2004.

Wright Water Engineers, Inc. 2003. Characterization and Assessment of Water Resources on the Southeastern Flank of the Grand Mesa, Delta, Gunnison and Mesa Counties, Colorado. January.

WWC Engineering (WWC) 2011. Water Resources Technical Report. Sheridan, Wyoming. June 2011. (water)

This page intentionally left blank.

# Glossary

# GLOSSARY

**100-year floodplain.** The area inundated by a flood event with a one percent chance of occurring in any given year.

**Abandoned nest.** A nest that was occupied by breeding birds earlier in the breeding season but was abandoned at some point during breeding (e.g., failed eggs, death of young).

**Active nest site.** A raptor nest site that is currently occupied by a pair of breeding raptors.

**Actual use.** The amount of animal unit months consumed by livestock based on the numbers of livestock and grazing dates submitted by the livestock operator and confirmed by periodic field checks by the BLM.

**Adaptive management.** A type of natural resource management in which decisions are made as part of an ongoing science-based process. Adaptive management involves testing, monitoring, and evaluating applied strategies, and incorporating new knowledge into management approaches that are based on scientific findings and the needs of society. Results are used to modify management policy, strategies, and practices.

**Administrative access.** Administrative access pertains to travel on routes that are limited to authorized users (typically motorized access). These are existing routes that lead to developments that have an administrative purpose, where the BLM or a permitted user must have access for regular maintenance or operation.

**Air basin.** A land area with generally similar meteorological and geographic conditions throughout. To the extent possible, air basin boundaries are defined along political boundary lines and include both the source and receptor areas.

**Air pollution.** Degradation of air quality resulting from unwanted chemicals or other materials occurring in the air.

**Air quality classes.** Classifications established under the Prevention of Significant Deterioration portion of the Clean Air Act, which limits the amount of air pollution considered significant within an area. Class I applies to areas where almost any change in air quality would be significant; Class II applies to areas where the deterioration normally accompanying moderate well-controlled growth would be insignificant; and Class III applies to areas where industrial deterioration would generally be insignificant.

**Airshed.** A subset of air basin, the term denotes a geographical area that shares the same air because of topography, meteorology and climate.

**Allotment.** An area of land in which one or more livestock operators graze their livestock. Allotments generally consist of BLM lands but may include other federally managed, state-owned, and private lands. An allotment may include or more separate pastures. Livestock numbers and periods of use are specified for each allotment.

**Allotment management plan.** A concisely written program of livestock grazing management, including supportive measures if required, designed to attain specific, multiple-use management goals in a grazing allotment. An AMP is prepared in consultation with the permittee(s), lessee(s), and other affected interests. Livestock grazing is considered in relation to other uses of the range and to renewable resources, such as watershed, vegetation, and wildlife. An AMP establishes seasons of use, the number of livestock to be permitted, the range improvements needed, and the grazing system.

**All-terrain vehicle.** A motorized vehicle that is less than 50 inches in width and is capable of operating on roads, trails, or designed areas that are not maintained. A wheeled vehicle, other than a snowmobile, that has a wheelbase and chassis of 50 inches in width or less, generally has a dry weight of 800 to 1200 pounds or less, and travels on three or more low-pressure tires.

**Alluvial soil.** A soil developing from recently deposited alluvium and exhibiting essentially no horizon development or modification of the recently deposited materials.

**Alluvium.** Clay, silt, sand, gravel, or other rock materials transported by moving water. Deposited in comparatively recent geologic time as sorted or semi-sorted sediment in rivers, floodplains, lakes, and shores, and in fans at the base of mountain slopes.

**Alternate nest (inactive nest) site.** A raptor nest site that has been used in the past by and within the territory of a breeding pair of raptors. The nest site still maintains the characteristics of a nest structure and habitat features of a nest site but is not currently in use.

**Ambient air quality.** The state of the atmosphere at ground level as defined by the range of measured and/or predicted ambient concentrations of all significant pollutants for all averaging periods of interest.

**Ambient noise.** The all-encompassing noise level associated with a given environment, being a composite of sounds from all sources.

**Animal unit month (AUM).** The amount of forage necessary for the sustenance of one cow or its equivalent for a period of one month.

**Aquatic**. Living or growing in or on the water.

**Assets.** Term utilized to describe roads, primitive roads, and trails that comprise the transportation system. Also the general term utilized to describe all BLM constructed “Assets” contained within the Facility Asset Management System.

**Atmospheric deposition.** Air pollution produced when acid chemicals are incorporated into rain, snow, fog, or mist and fall to the earth. Sometimes referred to as “acid rain” and comes from sulfur oxides and nitrogen oxides, products of burning coal and other fuels and from certain industrial processes. If the acid chemicals in the air are blown into the area where the weather is wet, the acids can fall to earth in the rain, snow, fog, or mist. In areas where the weather is dry, the acid chemicals may become incorporated into dust or smoke.

**Attainment area.** A geographic area in which levels of a criteria air pollutant meet the health-based National Ambient Air Quality Standard for that specific pollutant.

**Attenuation.** The reduction of sound intensity and energy as a function of distance traveled.

**Avoidance area.** *See “right-of-way avoidance area” definition.*

**Backcountry.** Lands that is remote from development and typically difficult to access.

**Bank-full stage.** The water surface elevation that just fills the active channel to the top of its banks and at a point where the water begins to overflow onto a floodplain.

**Best management practice (BMP)**. A method, process, or activity, or usually a combination of these, that are determined by a State or a designated planning agency to be the most effective and practicable means (including technological, economic, and institutional considerations) of managing or controlling particular conditions or circumstances. BMPs are a suite of voluntary, accepted measures that may or may not be applied to or enforced for any given project.

**Big game.** Indigenous, ungulate (hoofed) wildlife species that are hunted, such as elk, deer, bison, bighorn sheep, and pronghorn antelope.

**Biodiversity (biological diversity).** The variety of life and its processes, and the interrelationships within and among various levels of ecological organization. Conservation, protection, and restoration of biological species and genetic diversity are needed to sustain the health of existing biological systems. Federal resource management agencies must examine the implications of management actions and development decisions on regional and local biodiversity.

**Biological Opinion.** A document prepared by USFWS stating their opinion as to whether or not a federal action will likely jeopardize the continued existence or adversely modify the habitat of a listed threatened or endangered species.

**Biological soil crust.** A complex association between soil particles and cyanobacteria, algae, microfungi, lichens, and bryophytes that live within or atop the uppermost millimeters of soil.

**BLM Sensitive Species.** Those species that are not federally listed as endangered, threatened, or proposed under the ESA, but that are designated by the BLM State Director under 16 USC 1536(a)(2) for special management consideration. By national policy, federally listed candidate species are automatically included as sensitive species. Sensitive species are managed so they will not need to be listed as proposed, threatened, or endangered under the ESA.

**Candidate species.** Taxa for which the USFWS has sufficient information on their status and threats to propose the species for listing as endangered or threatened under the ESA, but for which issuance of a proposed rule is currently precluded by higher priority listing actions. Separate lists for plants, vertebrate animals, and invertebrate animals are published periodically in the Federal Register (BLM Manual 6840, Special Status Species Manual).

**Categorical Exclusion.** A category of actions (identified in agency guidance) that do not individually or cumulatively have a significant effect on the human environment, and for which neither an environmental assessment nor an environmental impact statement is required (40 CFR 1508.4), but a limited form of NEPA analysis is performed.

**Centralized production facilities.** Consolidation of basic processes, facilities, equipment, and personnel related to oil and/or gas development in one area or on one pad rather than spread out across multiple well pads or in several different locations. Examples of consolidation include drilling multiple wells (from a few to a few dozen) from a single pad, placing roads, pipes, and transmission lines sited in common corridors, and remotely storing materials and/or staging development activities, including hydraulic fracturing and other well completions materials.

**Chemical vegetation treatment**. Application of herbicides to control invasive species/noxious weeds and/or unwanted vegetation. To meet resource objectives the preponderance of chemical treatments would be used in areas where cheatgrass or noxious weeds have invaded sagebrush steppe.

**Classified surface water supply segment.** A “public water system,” as defined by the State of Colorado, beginning at the surface water point of intake and extending 5 miles upstream.

**Clean Air Act of 1963 (as amended).** Federal legislation governing air pollution control.

**Climate change.** Any significant change in measures of climate (such as temperature, precipitation, or wind) lasting for an extended period (decades or longer). Climate change may result from:

- Natural factors, such as changes in the sun's intensity or slow changes in the Earth's orbit around the sun
- Natural processes within the climate system (e.g., changes in ocean circulation)

- Human activities that change the atmosphere's composition (e.g., driving automobiles) and the land surface (e.g., deforestation, reforestation, urbanization, and desertification).

**Closed loop system:** a mechanical and chemical system which allows an operator to drill a well without using a reserve pit. In a closed-loop drilling system, the reserve pit is replaced with a series of storage tanks that separate liquids and solids, some of which are re-used and some of which are disposed of. The recovered drilling fluid is stored in 500-barrel tanks and re-used in active mud systems; consequently, drilling fluid is moved from well-to-well and reconditioned by the dewatering equipment and mud products. The solid wastes are transferred off-site for disposal at oilfield waste disposal facilities.

**Collaboration.** A cooperative process in which interested parties, often with widely varied interests, work together to seek solutions with broad support for managing public and other lands. Collaboration may take place with any interested parties, whether or not they are a cooperating agency.

**Collaborative partnerships.** Refers to people working together, sharing knowledge and resources, to achieve desired outcomes for public lands and communities within statutory and regulatory frameworks.

**Common use area.** Areas designated to sell various mineral materials (e.g., gravel or moss rock) to the public through purchase of a permit from the BLM Field Office.

**Condition of approval.** Condition or provision (requirement) under which an application for a permit to drill or sundry notice is approved.

**Conformance.** A proposed action shall be specifically provided for in the land use plan or, if not specifically mentioned, shall be clearly consistent with the goals, objectives, or standards of the approved land use plan.

**Conservation agreement.** A formal signed agreement between the USFWS or National Oceanographic and Atmospheric Administration-Fisheries and other parties that implement specific actions, activities, or programs designed to eliminate or reduce threats to, or otherwise improve the status of, a species. Conservation agreements can be developed at a state, regional, or national level and generally include multiple agencies at both the state and federal level, as well as tribes. Depending on the types of commitments the BLM makes in a conservation agreement and the level of signatory authority, plan revisions or amendments may be required before the conservation agreement is signed or subsequently in order to implement the conservation agreement.

**Conservation strategy.** A strategy outlining current activities or threats that are contributing to the decline of a species, along with the actions or strategies needed to reverse or eliminate such a decline or threats. Conservation strategies are generally developed for species of plants and animals that are designated as BLM sensitive species or that have been determined by the USFWS or National Oceanographic and Atmospheric Administration-Fisheries to be federal candidates under the ESA.

**Controlled surface use (CSU).** CSU is a category of moderate constraint stipulations that allows some use and occupancy of public land while protecting identified resources or values and is applicable to fluid mineral leasing and all activities associated with fluid mineral leasing (e.g., truck-mounted drilling and geophysical exploration equipment off designated routes, construction of wells and/or pads). CSU areas are open to fluid mineral leasing but the stipulation allows the BLM to require special operational constraints, or the activity can be shifted more than 200 meters (656 feet) to protect the specified resource or value.

**Cooperating Agency.** Assists the lead federal agency in developing an environmental assessment or environmental impact statement. These can be any agency with jurisdiction by law or special expertise for proposals covered by NEPA (40 CFR 1501.6). Any tribe or Federal, State, or local government jurisdiction with such qualifications may become a cooperating agency by agreement with the lead agency.

**Corridor.** A strip of land that aids in the movement of species between disconnected core areas of their natural habitat.

**Criteria pollutant.** The US EPA uses six "criteria pollutants" as indicators of air quality, and has established for each of them a maximum concentration above which adverse effects on human health may occur. These threshold concentrations are called National Ambient Air Quality Standards. The criteria pollutants are ozone, carbon monoxide, nitrogen dioxide, sulfur dioxide, particulate matter and lead.

**Critical habitat.** An area: A) designated by the USFWS that is occupied by a threatened or endangered species "on which are found those physical and biological features (1) essential to the conservation of the species, and (2) which may require special management considerations or protection;" or B) on which are found those physical and biological features essential to the conservation of a species that may require special management consideration or protection.

**Crucial habitat types.** The environment essential to plant or animal biodiversity and conservation at the landscape level. Crucial habitats include, but are not limited to, ecological emphasis areas, severe winter range, winter concentration areas, reproduction areas, and movement corridors.

**Crucial winter range.** That part of the overall range where 90 percent of the individuals are located during the average five winters out of 10 from the first heavy snowfall to spring green-up, or during a site-specific period of winter as defined for each Colorado Parks and Wildlife Data Analysis Unit.

**Cultural resources**. Locations of human activity, occupation, or use. Cultural resources include archaeological, historic, or architectural sites, structures, or places with important public and scientific uses, and locations of traditional cultural or religious importance to specified social and/or cultural groups.

**Cultural resources inventory.** An inventory to assess the potential presence of cultural resources. There are three classes of surveys:

**Class III.** An intensive field inventory designed to locate, from surface and exposed profile indications, all cultural resource sites in an area. Upon its completion, no further cultural resources inventory work is normally needed.

**Cumulative effects.** The direct and indirect effects of a proposed project alternative's incremental impacts when they are added to other past, present, and reasonably foreseeable actions, regardless of who carries out the action.

**Cyanobacteria.** A blue-green algae or bacteria that obtain its energy through photosynthesis.

**Decision Area.** Lands and federal mineral estate within the planning area that are administered by the BLM.

**Degraded vegetation.** Areas where the plant community is not complete or is under threat. Examples include missing components such as perennial forbs or cool season grasses, weed infestations, or lack of regeneration of key species such as sagebrush or cottonwoods trees.

**Design feature(s).** Specific means, measures or practices that make up the proposed action and alternatives. They include construction activities, operating procedures, and stipulations, as well as measures that reduce or avoid adverse environmental impacts. See BLM NEPA Handbook, H-1790-1, pages 44-45 and 61.

**Designated roads and trails.** Specific roads and trails identified by the BLM (or other agency) where some type of motorized/nonmotorized use is appropriate and allowed, either seasonally or year-long (H-1601-1, BLM Land Use Planning Handbook).

**Direct impacts.** Direct impacts are caused by an action or implementation of an alternative and occur at the same time and place.

**Directional drilling.** A drilling technique whereby a well is deliberately deviated from the vertical in order to reach a particular part of the oil- or gas-bearing reservoir. Directional drilling technology enables the driller to steer the drill stem and bit to a desired bottom hole location. Directional wells initially are drilled straight down to a predetermined depth and then gradually curved at one or more different points to penetrate one or more given target reservoirs. This specialized drilling usually is accomplished with the use of a fluid-driven downhole motor, which turns the drill bit. Directional drilling also allows multiple production and injection wells to be drilled from a single surface location such as a gravel pad, thus minimizing cost and the surface impact of oil and gas drilling, production, and transportation facilities. It can be used to reach a target located beneath an environmentally sensitive area (Alaska Department of Natural Resources, Division of Oil and Gas 2009).

**Disruptive activities.** Human-caused disturbances that induce stress on a population, community, or ecosystem and cause potential loss of species fitness (survival, reproduction, and recruitment) within crucial habitats or other sensitive areas during specified time periods; may or may not entail surface disturbance. This does not include regular background levels of activity, such as hiking, cross country skiing or livestock grazing, that individuals would be accustomed to. Examples of disruptive activities include:

- Commercial recreation activities, especially large groups

- Abnormally loud or sustained noise

- Road maintenance

**Diversity.** The relative abundance of wildlife species, plant species, communities, habitats, or habitat features per unit of area.

**Domestic well.** A well serving up to three single-family dwellings, irrigating one acre or less of lawn and garden, and providing water for the individual's domestic animals and livestock.

**Easement.** A right afforded a person or agency to make limited use of another's real property for access or other purposes.

**Ecologic functionality.** These levels include successional processes that are in place, energy and nutrients that are being cycled effectively, and soil that is being appropriately stabilized. An area can be functioning at a basic level of ecologic functionality without meeting land health standards.

**Ecosystem diversity.** The variety of habitats, living communities, and ecological processes in the living world. Ecosystem diversity refers to the diversity of a place at the level of ecosystem. Inherent in ecosystem diversity are both biotic (living) and abiotic (non-living) components. The term differs from biodiversity, which refers to variation in species rather than ecosystems.

**Emergency stabilization.** Planned actions to stabilize and prevent unacceptable degradation to natural and cultural resources, to minimize threats to life or property resulting from the effects of a fire, or to repair/replace/construct physical improvements necessary to prevent degradation of land or resources. Emergency stabilization actions must be taken within one year following containment of a wildfire.

**Endangered species.** Any species that is in danger of extinction throughout all or a significant portion of its range (BLM Manual 6840, Special Status Species Manual). Under the ESA in the US, "endangered" is the more-protected of the two categories. Designation as endangered (or threatened) is determined by USFWS as directed by the ESA.

**Endangered Species Act of 1973 (ESA) (as amended).** Designed to protect critically imperiled species from extinction as a consequence of economic growth and development untempered by adequate concern and conservation. The Act is administered by two federal agencies, USFWS and the National Oceanic and Atmospheric Administration. The purpose of the Act is to protect species and also the ecosystems upon which they depend (16 USC 1531-1544).

**Enhance.** Increase or improve in value, quality or desirability.

**Environmental assessment.** A concise public document prepared to provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact. It includes a brief discussion of the need for the proposal, alternatives

considered, environmental impact of the proposed action and alternatives, and a list of agencies and individuals consulted.

**Environmental impact statement (EIS).** A detailed statement prepared by the responsible official in which a major federal action that significantly affects the quality of the human environment is described, alternatives to the proposed action are provided, and effects are analyzed (BLM National Management Strategy for OHV Use on Public Lands).

**Exclusion area.** *See "right-of-way exclusion area" definition.*

**Exemplary (vegetation).** An area of vegetation that does not show signs of degradation and which may serve as a comparison to illustrate what the vegetation potential is for a given type of environment. Exemplary vegetation meets A-ranked viability criteria as described by the Colorado Natural Heritage Program.

**Existing routes.** The roads, trails, or ways that are used by motorized vehicles (e.g., jeeps, all-terrain vehicles, and motorized dirt bikes), mechanized uses (mountain bikes, wheelbarrows, game carts), pedestrians (hikers), and/or equestrians (horseback riders) and are, to the best of BLM's knowledge, in existence at the time of RMP/EIS publication.

**Extremely rare vegetation communities.** Unique combinations of plant species as identified by terminology and a classification system from the Colorado Natural Heritage Program. These are identified as Potential Conservation Areas with moderate or better Biodiversity Significance and fair or better Viability.

**Federal Land Policy and Management Act of 1976 (FLPMA).** Public Law 94-579, October 21, 1976, often referred to as the BLM's "Organic Act," which provides most of the BLM's legislated authority, direction policy, and basic management guidance.

**Federal mineral estate.** Subsurface mineral estate owned by the US and administered by the BLM.

**Fire frequency.** A general term referring to the recurrence of fire in a given area over time.

**Fire Regime Condition Classification System.** Measures the extent to which vegetation departs from reference conditions, or how the current vegetation differs from a particular reference condition.

**Fire severity.** Degree to which a site has been altered or disrupted by fire; loosely, a product of fire intensity and residence time.

**Fire suppression.** All work and activities connected with control and fire-extinguishing operations, beginning with discovery and continuing until the fire is completely extinguished.

**Flowback pit.** Surface pits to hold the recycled water for use during completion.

**Fluid minerals.** Oil, gas, coal bed natural gas, and geothermal resources.

**Fluvial.** Of or pertaining to rivers or produced by the action of rivers or streams.

**Forage.** All browse and herbaceous foods that are available to grazing animals.

**Forage base.** The amount of vegetation available for wildlife and livestock use.

**Four-wheel drive vehicle.** A passenger vehicle or truck having power available to all wheels. Any motorized vehicle that has generally higher clearance than a passenger car and has traction on all four wheels.

**Fragile soils.** Soils having a shallow depth to bedrock, minimal surface layer of organic material, textures that are more easily detached and eroded, or are on slopes over 35 percent.

**Fugitive dust.** Significant atmospheric dust arises from the mechanical disturbance of granular material exposed to the air. Dust generated from these open sources is termed "fugitive" because it is not discharged to the atmosphere in a confined flow stream. Common sources of fugitive dust include unpaved roads, agricultural tilling operations, aggregate storage piles, and heavy construction operations.

**Functional/structural group.** A group of species that perform similar roles or functions in the ecosystem and are grouped together on an ecological site basis because of factors such as similar shoot or root structure, rooting depth, woody or non-woody stems, plant height, photosynthetic pathways, nitrogen fixing ability, and life cycle.

**Functioning at risk.** Riparian-wetland areas that are in functional condition, but that have an existing soil, water, or vegetation attribute that makes them susceptible to degradation.

**Geographic Information System (GIS).** A system of computer hardware, software, data, people, and applications that capture, store, edit, analyze, and display a potentially wide array of geospatial information.

**Geomorphic balance.** Stream channel size, sinuosity, slope, and substrate are appropriate for its landscape setting and geology.

**Geophysical exploration.** Efforts to locate deposits of oil and gas resources and to better define the subsurface.

**Green completion.** Methods that minimize the amount of natural gas and oil vapors that are released to the environment when a well is being flowed during the completion phase of a well.

**Groundwater.** Water held underground in soil or permeable rock, often feeding springs and wells.

**Guzzler.** General term covering guzzler, wildlife drinker, or tenaja. A natural or artificially constructed structure or device to capture and hold rain water, and make it accessible to small and/or large animals. Most guzzlers involve above or below ground piping, storage tanks, and valves. Tenajas are natural depressions in rock, which trap and hold water. To some guzzlers, steps or ladders are sometimes added to improve access and reduce mortality from drowning.

**Habitat.** An environment that meets a specific set of physical, biological, temporal, or spatial characteristics that satisfy the requirements of a plant or animal species or group of species for part or all of their life cycle.

**Habitat management plan.** A written and approved activity plan for a geographical area which identifies habitat management activities to be implemented in achieving specific objectives of planning decisions.

**Hazardous material.** A substance, pollutant, or contaminant that, due to its quantity, concentration, or physical or chemical characteristics, poses a potential hazard to human health and safety or to the environment if released into the workplace or the environment.

**Healthy aquatic community.** Varies by species and numbers of target species present, and channel type, and is characterized by: proper amounts of sediment/silt; a diversity of instream habitat complexity; the development/maintenance of undercut bank habitats'; adequate canopy cover; appropriate holding habitat (pools/minimum pools depth) commensurate with the identified Rosgen channel type; reduced diurnal water temperature fluctuations; appropriate width to depth ratios; and represented by a healthy biological community (fish and macroinvertebrate diversity and abundance reflect water quality attaining a biological minimum).

**High-power communication site.** Sites that include broadcast types of uses (e.g., television, AM/FM radio, cable television, broadcast translator).

**High wind event.** The period of time and location covered by National Weather Service high wind warning; or when there are sustained surface winds greater than 40 miles per hour lasting more than an hour or winds over 58 miles per hour that are occurring for an unspecified period of time.

**Historic resources**. Any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places.

**Horizontal drilling.** A more-specialized type of directional drilling that allows a single well bore at the surface to penetrate oil- or gas-bearing reservoir strata at angles that parallel or nearly parallel the dip of the strata. The well bore is then open and in communication with the reservoir over much longer distances. In development wells, this can greatly increase production rates of oil and gas or volumes of injected fluids. Horizontal drilling may involve underbalanced drilling, coiled tubing, bit steering, continuous logging, multilateral horizontals, and horizontal completions. Lateral step-outs are directional wells that branch off a main borehole to access more of the subsurface. Conditions for successful horizontal wells include adequate pre-spud planning, reservoir descriptions, drillable strata that will not collapse, and careful cost control (Alaska Department of Natural Resources, Division of Oil and Gas 2009).

**Impact.** The effect, influence, alteration, or imprint caused by an action.

**Impairment.** The degree to which a distance of clear visibility is degraded by man-made pollutants.

**Inactive nest site.** *See "alternate nest (inactive nest) site" definition.*

**Indicators.** Factors that describe resource condition and change and can help the BLM determine trends over time.

**Indirect impacts.** Indirect impacts result from implementing an action or alternative but usually occur later in time or are removed in distance and are reasonably certain to occur.

**Intermittent stream.** An intermittent stream is a stream that flows only at certain times of the year when it receives water from springs or from some surface sources such as melting snow in mountainous areas. During the dry season and throughout minor drought periods, these streams will not exhibit flow. Geomorphological characteristics are not well defined and are often inconspicuous. In the absence of external limiting factors, such as pollution and thermal modifications, species are scarce and adapted to the wet and dry conditions of the fluctuating water level.

**Invertebrate.** An animal lacking a backbone or spinal column, such as insects, snails, and worms. The group includes 97 percent of all animal species.

**K factor.** A soil erodibility factor used in the universal soil loss equation that is a measure of the susceptibility of soil particles to detachment and transport by rainfall and runoff. Estimation of the factor takes several soil parameters into account, including soil texture, percent of sand greater than 0.10 millimeter, soil organic matter content, soil structure, soil permeability, clay mineralogy, and coarse fragments. K factor values range from .02 to .64, the greater values indicating the highest susceptibilities to erosion.

**Key wildlife habitat.** Specific areas within the geographic area occupied by a species in which are found those physical and biological features 1) essential to the conservation of the species, and 2) which may require special management considerations or protection.

**Lacustrine.** Pertaining to, produced by, or inhabiting a lake environment.

**Land health condition.** A classification for land health which includes these categories: "Meeting Land Health Standard(s)" and "Not Meeting Land Health Standard(s)".

- **Meeting Land Health Standard(s):** Lands for which health indicators are currently in acceptable condition such that basic levels of ecological processes and functions are in place. This rating includes the following subcategories:

- **Fully Meeting Standard(s):** Lands for which there are no substantive concerns with health indicators

- **Exceeding Standard(s):** Lands for which health indicators are in substantially better conditions than acceptable levels.

- **Meeting Standard(s) with Problems:** Lands which have one or more concerns with health indicators to the degree that they are categorized as meeting the Land Health Standards, but have some issues which make them at risk of becoming "not meeting."

- **Not Meeting Land Health Standard(s):** Lands for which one or more health indicators are in unacceptable conditions such that basic levels of ecological processes and functions are no longer in place.

- **Land health trend** is used to describe these classes further. It includes these categories: upward, static, and downward.

- **Upward Trend:** lands which have shown improving indicator conditions over time.

- **Static Trend:** lands which have shown no clear improvement or decline in indicator conditions over time.

- **Downward Trend:** lands which have shown declining indicator conditions over time.

**Land health improvement projects.** Activities that are directed at increasing the levels and/or vigor of desirable species within the plant community so that it reaches a higher level of functioning. Activities include restoration or revegetation of areas of degraded vegetation; removal of weeds, and repair or retirement and rehabilitation of developments which are contributing to vegetation degradation.

**Landscape scale.** An approach that examines or considers issues at an extensive scale rather than the individual site scale. The term landscape refers to the scale of the approach (landscape as an area), rather than as a topic of interest.

**Land treatment.** All methods of artificial range improvement arid soil stabilization such as reseeding, brush control (chemical and mechanical), pitting, furrowing, and water spreading.

**Land use plan.** A set of decisions that establish management direction for land within an administrative area, as prescribed under the planning provisions of FLPMA; an assimilation of land use plan level decisions developed through the planning process outlined in 43 CFR 1600, regardless of the scale at which the decisions were developed. The term includes both RMPs and management framework plans (H-1601-1, BLM Land Use Planning Handbook).

**Land use plan decision.** Establishes desired outcomes and actions needed to achieve them. Decisions are reached using the planning process in 43 CFR 1600. When they are presented to the public as proposed decisions, they can be protested to the BLM Director. They are not appealable to Interior Board of Land Appeals.

**Late season.** Late summer or fall grazing.

**Leasable minerals.** Those minerals or materials designated as leasable under the Mineral Leasing Act of 1920. These include energy-related mineral resources such as oil, natural gas, coal, and geothermal, and some non-energy minerals, such as phosphate, sodium, potassium, and sulfur. Geothermal resources are also leasable under the Geothermal Steam Act of 1970.

**Lease.** Section 302 of the Federal Land Policy and Management Act of 1976 provides the BLM's authority to issue leases for the use, occupancy, and development of public lands. Leases are issued for purposes such as a commercial filming, advertising displays, commercial or

noncommercial croplands, apiaries, livestock holding or feeding areas not related to grazing permits and leases, native or introduced species harvesting, temporary or permanent facilities for commercial purposes (does not include mining claims), residential occupancy, ski resorts, construction equipment storage sites, assembly yards, oil rig stacking sites, mining claim occupancy if the residential structures are not incidental to the mining operation, and water pipelines and well pumps related to irrigation and nonirrigation facilities. The regulations establishing procedures for processing these leases and permits are found in 43 CFR 2920.

**Lease notice.** Provides more-detailed information concerning limitations that already exist in law, lease terms, regulations, or operational orders. A lease notice also addresses special items that lessees should consider when planning operations but does not impose additional restrictions. Lease notices are not an RMP-level decision, and new lease notices may be added to fluid mineral leases at the time of sale. Lease notices apply only to leasable minerals (e.g., oil, gas, geothermal) and not to other types of leases, such as livestock grazing.

**Lease stipulation.** A modification of the terms and conditions on a standard lease form at the time of the lease sale.

**Lentic.** Pertaining to standing water such as lakes and ponds.

**Limited area.** An area restricted at certain times, in certain areas, and/or to certain vehicular use. These restrictions may be of any type, but can generally be accommodated within the following type of categories: Numbers of vehicles; types of vehicles; time or season of vehicle use; permitted or licensed use only; use on existing roads and trails; use on designated roads and trails; and other restrictions (43 CFR 8340.0-5).

**Locatable minerals.** Minerals subject to exploration, development, and disposal by staking mining claims as authorized by the Mining Law of 1872, as amended. This includes deposits of gold, silver, and other uncommon minerals not subject to lease or sale.

**Long-term effect.** The effect could occur for an extended period after implementation of the alternative. The effect could last several years or more.

**Low-power communication site.** Sites that include to non-broadcast uses (e.g., commercial or private mobile radio service, cellular telephone, microwave, local exchange network, passive reflector).

**Management decision.** A decision made by the BLM to manage public lands. Management decisions include both land use plan decisions and implementation decisions.

**Master development plan.** Information common to multiple planned wells, including drilling plans, Surface Use Plans of Operations, and plans for future production.

**Mechanical transport.** Any vehicle, device, or contrivance for moving people or material in or over land, water, snow, or air that has moving parts.

**Mechanical vegetation treatment.** Includes mowing, chaining, chopping, drill seeding, and cutting vegetation to meet resource objective. Mechanical treatments generally occur in areas where fuel loads or invasive species need to be reduced prior to prescribed fire application; when fire risk to resources is too great to use naturally started wildland fires or prescribed fires; or where opportunities exist for biomass utilization or timber harvest. Mechanical treatments may also be utilized to improve wildlife habitat conditions.

**Mechanized uses.** Equipment that is mechanized, including but not limited to mountain bikes, wheelbarrows, and game carts.

**Mexican spotted owl suitable breeding habitat.** Vegetation characteristics described in the current Mexican spotted owl recovery plan in areas where Mexican spotted owl breeding has been confirmed.

**Mineral.** Any naturally formed inorganic material, solid or fluid inorganic substance that can be extracted from the earth, any of various naturally occurring homogeneous substances (as stone, coal, salt, sulfur, sand, petroleum, water, or natural gas) obtained usually from the ground. Under federal laws, considered as locatable (subject to the general mining laws), leasable (subject to the Mineral Leasing Act of 1920), and salable (subject to the Materials Act of 1947).

**Mineral entry.** The filing of a claim on public land to obtain the right to any locatable minerals it may contain.

**Mineral estate.** The ownership of minerals, including rights necessary for access, exploration, development, mining, ore dressing, and transportation operations.

**Mineralize.** The process where a substance is converted from an organic substance to an inorganic substance.

**Mineral materials (salable minerals, salable mineral materials).** Common varieties of mineral materials such as soil, sand and gravel, stone, pumice, pumicite, and clay that are not obtainable under the mining or leasing laws but that can be acquired under the Materials Act of 1947, as amended.

**Mineral patent.** A claim on which title has passed from the federal government to the mining claimant under the Mining Law of 1872.

**Minimum impact suppression tactics**. The use of fire management tactics commensurate with the fire's potential or existing behavior while producing the least impact on the resource being protected.

**Mining claim.** A parcel of land that a miner takes and holds for mining purposes, having acquired the right of possession by complying with the Mining Law and local laws and rules. A mining claim may contain as many adjoining locations as the locator may make or buy. There are four categories of mining claims: lode, placer, millsite, and tunnel site.

**Mining Law of 1872.** Provides for claiming and gaining title to locatable minerals on public lands. Also referred to as the "General Mining Laws" or "Mining Laws."

**Mitigation.** Alleviation or lessening of possible adverse effects on a resource by applying appropriate protective measures or adequate scientific study. Mitigation may be achieved by avoidance, minimization, rectification, reduction, and compensation.

**Mitigation measure(s).** Mitigation includes specific means, measures or practices that would reduce or eliminate effects of the proposed action or alternatives. Mitigation may be used to reduce or avoid adverse impacts, whether or not they are significant in nature. Measures or practices are only termed mitigation measures if they have not been incorporated into the proposed action or alternatives. If mitigation measures are incorporated into the proposed action or alternatives, they are called design features. See **Design feature(s)** definition above. BLM NEPA Handbook, H-1790-1, and 40 CFR 1508.20.

**Modification.** A change to the provisions of a lease stipulation, either temporarily or for the term of the lease. Depending on the specific modification, the stipulation may or may not apply to all sites within the leasehold to which the restrictive criteria are applied.

**Motorized vehicles or uses.** Vehicles that are motorized, including but not limited to jeeps, all-terrain vehicles (all-terrain vehicles, such as four-wheelers and three-wheelers), trail motorcycles or dirt bikes, and aircrafts.

**Multiple-use.** The management of the public lands and their various resource values so that they are used in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output (FLPMA) (BLM Manual 6840, Special Status Species Manual).

**Municipal watershed.** A watershed area that provides water for use by a municipality as defined by the community and accepted by the State.

**National Environmental Policy Act of 1969 (NEPA).** Public Law 91-190. Establishes environmental policy for the nation. Among other items, NEPA requires federal agencies to consider environmental values in decision-making processes.

**National Register of Historic Places.** A listing of architectural, historical, archaeological, and cultural sites of local, state, or national significance, established by the Historic Preservation Act of, 1966 and maintained by the National Park Service.

**Native cutthroat trout.** Native populations include what current science and genetics tell us are Colorado River cutthroat or greenback cutthroat trout.

**Native vegetation.** Plant species that were found here prior to European settlement, and consequently are in balance with these ecosystems because they have well developed parasites, predators, and pollinators.

**Naturalness.** Consistent with what would occur without human intervention. For vegetation structure, naturalness implies a pattern similar to what fire and climate would produce across the landscape.

**Natural processes.** Fire, drought, insect and disease outbreaks, flooding, and other events that existed prior to European settlement, and shaped vegetation composition and structure.

**Non-energy leasable minerals.** Those minerals or materials designated as leasable under the Mineral Leasing Act of 1920. Non-energy minerals include resources such as phosphate, sodium, potassium, and sulfur.

**Nonfunctional condition.** Riparian-wetland areas that clearly are not providing adequate vegetation, landform, or woody debris to dissipate energies associated with flow events, and thus are not reducing erosion, improving water quality.

**No surface occupancy (NSO).** A major constraint where use or occupancy of the land surface for fluid mineral exploration or development and all activities associated with fluid mineral leasing (e.g., truck-mounted drilling and geophysical exploration equipment off designated routes, construction of wells and/or pads) are prohibited to protect identified resource values. Areas identified as NSO are open to fluid mineral leasing, but surface occupancy or surface-disturbing activities associated with fluid mineral leasing cannot be conducted on the surface of the land. Access to fluid mineral deposits would require horizontal drilling from outside the boundaries of the NSO area.

**Noxious weeds.** A plant species designated by federal or state law as generally possessing one or more of the following characteristics: aggressive and difficult to manage; parasitic; a carrier or host of serious insects or disease; or nonnative, new, or not common to the US.

**Off-highway vehicle (OHV) (off-road vehicle).** Any motorized vehicle capable of, or designated for travel on or immediately over land, water or other natural terrain, excluding: (1) any non-amphibious registered motorboat; (2) any military, fire, emergency, or law enforcement vehicle while being used for emergency purposes; (3) any vehicle whose use is expressly authorized by the authorized officer, or otherwise officially approved; (4) vehicles in official use; and (5) any combat or combat support vehicle when used for national defense emergencies (43 CFR 8340.0-5).

**Off-highway vehicle area designations.** BLM-administered lands in the CFO are designated as Open, Limited, or Closed for OHV use.

- **Limited.** An area restricted at certain times, in certain areas, and/or to certain vehicular use. These restrictions may be of any type, but can generally be accommodated within the following type of categories: Numbers of vehicles; types of vehicles; time or season of vehicle use; permitted or licensed use only; use on existing roads and trails; use on designated roads and trails; and other restrictions (43 CFR 8340.0-5).

- **Closed.** An area where off-road vehicle use is prohibited. Use of off-road vehicles in closed areas may be allowed for certain reasons; however, such use shall be made only with the approval of the authorized officer (43 CFR 8340.0-5).

- **Open.** Generally denotes that an area is available for a particular use or uses. Refer to specific program definitions found in law, regulations, or policy guidance for application to individual programs. For example, 43 CFR 8340.0-5 defines the specific meaning of "open" as it relates to OHV use.

**Open area.** *See "Off-highway vehicle area designations – Open" definition.*

**Ordinary high water mark.** That line on the shore established by the fluctuations of water and indicated by physical characteristics such as clear, natural line impressed on the bank, shelving, changes in the character of soil, destruction of terrestrial vegetation, the presence of litter and debris, or other appropriate means that consider the characteristics of the surrounding areas.

**Outstandingly remarkable value (ORV).** Values among those listed in Section 1(b) of the Wild and Scenic Rivers Act of 1968: "scenic, recreational, geological, fish and wildlife, historical, cultural, or other similar values..." Other similar values that may be considered include ecological, biological, or botanical.

**Overstory.** That portion of a plant community consisting of the taller plants on the site; the forest or woodland canopy.

**Ozone.** A faint blue gas produced in the atmosphere from chemical reactions of burning coal, gasoline, and other fuels and chemicals found in products such as solvents, paints, and hairsprays.

**Paleontological resources.** The physical remains or other physical evidence of plants and animals preserved in soils and sedimentary rock formations. Paleontological resources are important for correlating and dating rock strata and for understanding past environments, environmental change, and the evolution of life.

**Particulate matter (PM).** One of the six "criteria" pollutants for which the US EPA established National Ambient Air Quality Standards. Particulate matter is defined as two categories, fine particulates, with an aerodynamic diameter of 10 micrometers ($PM_{10}$) or less, and fine particulates with an aerodynamic diameter of 2.5 micrometers or less ($PM_{2.5}$).

**Passenger vehicle.** Two-wheel-drive, low-clearance vehicles.

**Perennial stream.** A stream that flows continuously. Perennial streams are generally associated with a water table in the localities through which they flow.

**Permitted access.** *See "administrative access" definition.*

**Permitted use.** The forage allocated by, or under the guidance of, an applicable land use plan for livestock grazing in an allotment under a permit or lease and expressed in AUMs (43 CFR 4100.0-5) (from H-4180-1, BLM Rangeland Health Standards Manual).

**Permittee.** A person or company permitted to graze livestock on public land.

**Project Area.** The geographical area for which EISs are developed. The Bull Mountain MDP EIS area boundary defines the area assessed in this EIS, and encompasses approximately 19,700 acres in Delta County in southwestern Colorado.

**Issues**. Concerns, conflicts, and problems with the existing management of public lands. Frequently, issues are based on how land uses affect resources. Some issues are concerned with how land uses can affect other land uses, or how the protection of resources affects land uses.

**Potential Fossil Yield Classification (PFYC) system.** A system used by the BLM to classify geologic units based on the relative abundance of vertebrate fossils or scientifically significant invertebrate or plant fossils and their sensitivity to adverse impacts, with a higher class number indicating a higher potential.

**Potential vegetation group.** Potential vegetation types grouped on the basis of a similar general moisture or temperature environment.

**Prehistoric resources.** Any material remains, structures, and items used or modified by people before Euro-Americans established a presence in the region.

**Prescribed fire.** A wildland fire originating from a planned ignition to meet specific objectives identified in a written, approved, prescribed fire plan for which NEPA requirements (where applicable) have been met prior to ignition.

**Prevention of significant deterioration.** An air pollution permitting program intended to ensure that air quality does not diminish in attainment areas.

**Proper functioning condition.** A term describing stream health that is based on the presence of adequate vegetation, landform and debris to dissipate energy, reduce erosion and improve water quality.

**Proper functioning condition for lentic areas.** A riparian-wetland areas are functioning properly when adequate vegetation, landform, or debris is present to: dissipate energies associated with wind action, wave action, and overland flow from adjacent sites, thereby reducing erosion and improving water quality; filter sediment and aid floodplain development; improve flood-water retention and ground-water recharge; develop root masses that stabilize islands and shoreline features against cutting action; restrict water percolation; develop diverse ponding characteristics to provide the habitat and the water depth, duration, and temperature

necessary for fish production, waterbird breeding, and other uses; and support greater biodiversity.

**Proper functioning condition for lotic areas.** A riparian-wetland area is considered to be in proper functioning condition when adequate vegetation, landform, or large woody debris is present to:

- Dissipate stream energy associated with high waterflow, thereby reducing erosion and improving water quality

- Filter sediment, capture bedload, and aid floodplain development

- Improve flood-water retention and ground-water recharge

- Develop root masses that stabilize streambanks against cutting action

- Develop diverse ponding and channel characteristics to provide the habitat and the water depth, duration, and temperature necessary for fish production, waterfowl breeding, and other uses

- Support greater biodiversity

**Proposed critical habitat.** Those areas officially proposed for designations as critical habitat by the Secretary of Interior or Commerce.

**Proposed species.** A species for which a proposed rule to add the species to the federal list of threatened and endangered species has been published in the Federal Register.

**Public land.** Land or interest in land owned by the US and administered by the Secretary of the Interior through the BLM without regard to how the US acquired ownership, except lands located on the Outer Continental Shelf and land held for the benefit of Indians, Aleuts, and Eskimos (H-1601-1, BLM Land Use Planning Handbook).

**Public water supply.** As defined by the state of Colorado, a "public water system" is a system for the provision to the public of water for human consumption through pipes or other constructed conveyances, if such system has a least fifteen service connections or regularly serves an average of at least 25 individuals daily at least 60 days out of the year.

**Range improvement project.** An authorized physical modification or treatment which is designed to improve production of forage; change vegetation composition; control patterns of use; provide water; stabilize soil and water conditions; restore, protect and improve the condition of rangeland ecosystems to benefit livestock, wild horses and burros, and fish and wildlife. This definition includes, but is not limited to: structures, treatment projects and use of mechanical devices, or modifications achieved through mechanical means.

**Raptor.** Bird of prey with sharp talons and strongly curved beaks, such as hawks, owls, falcons, and eagles.

**Rare vegetation.** Unique combinations of plant species as identified by terminology and a classification system from the Colorado Natural Heritage Program (CNHP). These are defined using CNHP's Global Rarity Ranks denoting scarcity on a global level and include the rankings of G1 and G2.

**Reasonable foreseeable development scenario.** The prediction of the type and amount of oil and gas activity that would occur in a given area. The prediction is based on geologic factors, past history of drilling, projected demand for oil and gas, and industry interest.

**Recharge areas.** Headwaters of perennial streams, contributing watersheds to springs and/or seeps, floodplains, all stream channels, municipal watersheds, and source water protection areas.

**Reclamation.** Returning disturbed lands to a form and productivity that will be ecologically balanced and in conformity with a predetermined land management plan.

**Recreation experiences.** Psychological outcomes realized either by recreation-tourism participants as a direct result of their on-site leisure engagements and recreation-tourism activity participation or by nonparticipating community residents as a result of their interaction with visitors and guests within their community or interaction with the BLM and other public and private recreation-tourism providers and their actions.

**Recreation management zones.** Subunits within an SRMA managed for distinctly different recreation products. Recreation products are composed of recreation opportunities, the natural resource and community settings within which they occur, and the administrative and service environment created by all affecting recreation-tourism providers, within which recreation participation occurs.

**Recreation opportunities.** Favorable circumstances enabling visitors' engagement in a leisure activity to realize immediate psychological experiences and attain more lasting, value-added beneficial outcomes.

**Recreation setting character conditions.** The distinguishing recreational qualities of any landscape, objectively defined along a continuum, ranging from primitive to urban landscapes, expressed in terms of the nature of the component parts of its physical, social, and administrative attributes. These recreational qualities can be both classified and mapped. This classification and mapping process should be based on variation that either exists (for example, setting descriptions) or is desired (for example, setting prescriptions) among component parts of the various physical, social, and administrative attributes of any landscape. The recreation opportunity spectrum is one of the tools for doing this.

**Recreation settings.** The collective distinguishing attributes of landscapes that influence and sometimes actually determine what kinds of recreation opportunities are produced.

**Rehabilitate.** Returning disturbed lands as near to its predisturbed condition as is reasonably practical or as specified in approved permits.

**Required Design Features.** Specific means, measures or practices that make up the proposed action and alternatives and would be required as part of future project designs. Design features could be identified as the impact analysis is being conducted, especially those that would reduce or eliminate adverse effects after the initial formulation of alternatives. In this situation, design features may be added to the proposed action or alternatives. Standard operating procedures, stipulations, and best management practices are usually considered design features. If any means, measures, or practices are not incorporated into the proposed action or alternatives, they are considered mitigation measures.

**Reserve pit:** A pit dug on a well pad used for temporary storage for waste fluids during oil and gas drilling and completion. Reserve pits are backfilled when the well is put into production and reclaimed.

**Resource Advisory Council.** A council established by the Secretary of the Interior to provide advice or recommendations to BLM management. The Southwest Colorado RAC covers issues within the UFO.

**Resource management plan (RMP).** A land use plan as prescribed by the Federal Land Policy and Management Act that establishes, for a given area of land, land-use allocations, coordination guidelines for multiple-use, objectives, and actions to be achieved.

**Restore/restoration.** The process of returning disturbed areas to a natural array of native plant and animal associations.

**Retard.** Measurably slow attainment of any identified objective level that is worse than the objective standard. Degradation of the physical/biological process or conditions that determine objective standards would be considered to retard attainment of specific objective standard.

**Revegetate/revegetation.** The process of putting vegetation back in an area where vegetation previously existed, which may or may not simulate natural conditions.

**Right-of-way (ROW).** BLM-administered lands authorized to be used or occupied for specific purposes pursuant to a right-of-way grant, which are in the public interest and which require ROWs over, on, under, or through such lands.

**Right-of-way avoidance area.** An area identified through resource management planning to be avoided but may be available for ROW location with special stipulations. A ROW avoidance area is comparable to the SSR restriction applied to other resources.

**Right-of-way exclusion area.** An area identified through resource management planning that is not available for ROW location under any conditions. A ROW exclusion area is comparable to the NGD stipulation applied to other resources.

**Riparian/aquatic system.** Interacting system between aquatic and terrestrial situations. Identified by a stream channel and distinctive vegetation that requires or tolerates free or unbound water.

**Riparian area.** A form of wetland transition between permanently saturated wetlands and upland areas. Riparian areas exhibit vegetation or physical characteristics that reflect the influence of permanent surface or subsurface water. Typical riparian areas include lands along, adjacent to, or contiguous with perennially and intermittently flowing rivers and streams, glacial potholes, and the shores of lakes and reservoirs with stable water levels. Excluded are ephemeral streams or washes that lack vegetation and depend on free water in the soil.

**Riparian zone.** An area one-quarter mile wide encompassing riparian and adjacent vegetation.

**Road.** A linear route declared a road by the owner, managed for use by low-clearance vehicles having four or more wheels, and maintained for regular and continuous use.

**Roadless.** The absence of roads that have been constructed and maintained by mechanical means to ensure regular and continuous use.

**Routes.** Multiple roads, trails and primitive roads; a group or set of roads, trails, and primitive roads that represents less than 100 percent of the BLM transportation system. Generically, components of the transportation system are described as "routes."

**Salinity.** Refers to the solids such as sodium chloride (table salt) and alkali metals that are dissolved in water.

**Saturated soils.** Occur when the infiltration capacity of the soil is exceeded from above due to rainfall or snowmelt runoff. Soils can also become saturated from groundwater inputs.

**Scoping process.** An early and open public participation process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action.

**Season of use.** The time during which livestock grazing is permitted on a given range area, as specified in the grazing lease.

**Seeding.** Seeding is a vegetation treatment that includes the application of grass, forb, or shrub seed, either aerially or from the ground. In areas of gentle terrain, ground applications of seed are often accomplished with a rangeland drill. Seeding allows the establishment of native species or placeholder species and restoration of disturbed areas to a perennial-dominated cover type, thereby decreasing the risk of subsequent invasion by exotic plant species. Seeding would be used primarily as a follow-up treatment in areas where disturbance or the previously described treatments have removed exotic plant species and their residue.

**Setting character.** The condition of any recreation system, objectively defined along a continuum, ranging from primitive to urban in terms of variation of its component physical, social, and administrative attributes.

**Severe winter range.** That part of the overall range where 90 percent of the individuals are located when the annual snowpack is at its maximum and/or temperatures are at a minimum in the two worst winters out of ten. Severe winter range is defined for each Colorado Division of Wildlife Data Analysis Unit.

**Short-term effect.** The effect occurs only during or immediately after implementation of the alternative.

**Sole-source aquifer.** Defined by the US EPA as an aquifer supplying at least 50 percent of the drinking water consumed in the area overlying the aquifer, where the surrounding area has no alternative drinking water source(s) that could physically, legally, and economically supply all those who depend upon the aquifer for drinking water.

**Source water protection area.** The area delineated by a state for a public water supply or including numerous suppliers, whether the source is ground water or surface water or both.

**Special status species.** BLM special status species are: (1) species listed, candidate, or proposed for listing under the ESA; and (2) species requiring special management consideration to promote their conservation and reduce the likelihood and need for future listing under the ESA that are designated as BLM sensitive by the BLM State Director(s). All federally listed candidate species, proposed species, and delisted species in the five years following delisting are conserved as BLM sensitive species.

**Split estate.** Lands on which the mineral estate is owned by someone other than the surface estate owner. For example, the surface is in private ownership and the mineral resources are publicly held and managed by the federal government.

**Stabilize.** The process of stopping further damage from occurring.

**Standard.** A description of the physical and biological conditions or degree of function required for healthy, sustainable lands (e.g., land health standards). To be expressed as a desired outcome (goal).

**Standard lease terms and conditions.** Areas may be open to leasing with no specific management decisions defined in a Resource Management Plan; however, these areas are subject to lease terms and conditions as defined on the lease form (Form 3100-11, Offer to Lease and Lease for Oil and Gas; and Form 3200-24, Offer to Lease and Lease for Geothermal Resources).

**State-listed noxious weed species.** Noxious weed species listed by the State of Colorado:

- **List A** species are designated by the Commissioner for eradication.

- **List B** weed species are species for which the Commissioner, in consultation with the state noxious weed advisory committee, local governments, and other interested parties, develops and implements state noxious weed management plans designed to stop the continued spread of these species.

- **List C** weed species are species for which the Commissioner, in consultation with the state noxious weed advisory committee, local governments, and other interested parties, will develop and implement state noxious weed management plans designed to support the efforts of local governing bodies to facilitate more effective integrated weed management on private and public lands. The goal of such plans will not be to stop the

continued spread of these species but to provide additional education, research, and biological control resources to jurisdictions that choose to require management of List C species.

**State implementation plan.** A detailed description of the programs a state will use to carry out its responsibilities under the Clean Air Act. State implementation plans are collections of the regulations used by a state to reduce air pollution.

**Stationary source.** Refers to a stationary source of emissions. Prevention of Significant Deterioration permits are required for major new stationary sources of emissions that emit 100 tons or more per year of carbon monoxide, sulphur dioxide, nitrogen dioxide, ozone, or particulate matter.

**Stipulation (general).** A term or condition in an agreement or contract.

**Stipulation (oil and gas).** A provision that modifies standard oil and gas lease terms and conditions in order to protect other resource values or land uses and is attached to and made a part of the lease. Typical lease stipulations include No Surface Occupancy (NSO), Timing Limitations (TL), and Controlled Surface Use (CSU). Lease stipulations are developed through the land use planning (RMP) process.

**Streamside management zone.** Land adjacent to a waterbody where activities on land are likely to affect water quality.

**Surface-disturbing activities.** Surface-disturbing activities are those that normally result in more than negligible (immeasurable, not readily noticeable) disturbance to vegetation and soils on public lands and accelerate the natural erosive process. Surface disturbances could require reclamation and normally involve use and/or occupancy of the surface, causing disturbance to soils and vegetation. They include, but are not limited to: the use of mechanized earth-moving equipment; truck-mounted drilling, stationary drill rigs in unison, and geophysical exploration equipment off designated routes; off-road vehicle travel in areas designated as limited or closed to off-road vehicle use; construction of facilities such as range facilities and/or improvements, power lines, pipelines, oil and gas wells and/or pads; recreation sites; new road and trail construction; and use of pyrotechnics and explosives. Surface disturbance is not normally caused by casual-use activities. Activities that are not considered surface-disturbing include, but are not limited to, livestock grazing, cross-country hiking or equestrian use, dispersed camping, installing signs, minimum impact filming, vehicular travel on designated routes, and general use of the land by wildlife.

**Sustained yield.** The achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple uses.

**Terrestrial.** Living or growing in or on the land.

**Threatened species.** Any species that is likely to become endangered within the foreseeable future throughout all or a significant portion of its range (BLM Manual 6840, Special Status

Species Management). Under the ESA in the US, "threatened" is the lesser-protected of the two categories. Designation as threatened (or endangered) is determined by USFWS as directed by the ESA.

**Tier 1-4 Emission Standards.** The first federal standards (Tier 1) for new nonroad (or off-road) diesel engines were adopted in 1994 for engines over 37 kW (50 hp), to be phased-in from 1996 to 2000. On August 27, 1998, the EPA signed the final rule that introduced Tier 1 standards for equipment under 37 kW (50 hp) and increasingly more stringent Tier 2 and Tier 3 standards for all equipment with phase-in schedules from 2000 to 2008. The Tier 1-3 standards are met through advanced engine design, with no or only limited use of exhaust gas aftertreatment (oxidation catalysts). On May 11, 2004, EPA signed the final rule introducing Tier 4 emission standards, which are phased-in over the period of 2008-2015. The Tier 4 standards require that emissions of particulate matter and NOx be further reduced by about 90%. Such emission reductions can be achieved through the use of control technologies—including advanced exhaust gas aftertreatment—similar to those required by the 2007-2010 standards for highway engines. For complete tables of Tier 1 – 4 emission standards, see the EPA website: http://www.epa.gov/otaq/nonroad-diesel.htm (last accessed 10/13/2014).

**Timing Limitation (TL).** The TL stipulation, a moderate constraint, is applicable to fluid mineral leasing, all activities associated with fluid mineral leasing (e.g., truck-mounted drilling and geophysical exploration equipment off designated routes, construction of wells and/or pads), and other surface-disturbing activities (i.e., those not related to fluid mineral leasing). Areas identified for TL are closed to fluid mineral exploration and development, surface-disturbing activities, and intensive human activity during identified time frames. This stipulation does not apply to operation and basic maintenance activities, including associated vehicle travel, unless otherwise specified. Construction, drilling, completions, and other operations considered to be intensive in nature are not allowed. Intensive maintenance, such as workovers on wells, is not permitted. TLs can overlap spatially with NSO, NGD, CSU, SSR, as well as with areas that have no other restrictions. Administrative activities are allowed at the discretion of the Authorized Officer.

**Total dissolved solids.** Salt, or an aggregate of carbonates, bicarbonates, chlorides, sulfates, phosphates, and nitrates of calcium, magnesium, manganese, sodium, potassium, and other cations that form salts.

**Total maximum daily load.** An estimate of the total quantity of pollutants (from all sources: point, nonpoint, and natural) that may be allowed into waters without exceeding applicable water quality criteria.

**Traditional cultural properties.** A property that derives significance from traditional values associated with it by a social or cultural group, such as an Indian tribe or local community. A traditional cultural property may qualify for the National Register of Historic Places if it meets the criteria and criteria exceptions at 36 CFR 60.4 (see National Register Bulletin 38).

**Traditional use.** Longstanding, socially conveyed, customary patterns of thought, cultural expression, and behavior, such as religious beliefs and practices, social customs, and land or resource uses. Traditions are shared generally within a social and/or cultural group and span

generations. Usually traditional uses are reserved rights resulting from treaty and/or agreements with Native American groups.

**Trail.** A linear route managed for human-power (e.g., hiking or bicycling), stock (e.g., equestrian), or off-highway vehicle forms of transportation or for historical or heritage values. Trails are not generally managed for use by four-wheel drive or high-clearance vehicles.

**Transmission.** The movement or transfer of electric energy over an interconnected group of lines and associated equipment between points of supply and points at which it is transformed for delivery to consumers, or is delivered to other electric systems. Transmission is considered to end when the energy is transformed for distribution to the consumer.

**Transportation system.** The sum of the BLM's recognized inventory of linear features (roads, primitive roads, and trails) formally recognized, designated, and approved as part of the BLM's transportation system.

**Trespass.** Any unauthorized use of public land.

**Tribal interests.** Native American or Native Alaskan economic rights such as Indian trust assets, resource uses and access guaranteed by treaty rights, and subsistence uses.

**Understory.** That portion of a plant community growing underneath the taller plants on the site.

**Upland game birds.** Non-waterfowl game birds usually hunted with pointing breed, flushing spaniels, and retrievers. Upland game birds include grouse, chukar, quail, snipe, doves, pigeons, ptarmigan, and wild turkey.

**Utility corridor.** Tract of land varying in width forming passageway through which various commodities such as oil, gas, and electricity are transported.

**Valid existing rights.** Documented, legal rights or interests in the land that allow a person or entity to use said land for a specific purpose and that are still in effect. Such rights include but are not limited to fee title ownership, mineral rights, rights-of-way, easements, permits, and licenses. Such rights may have been reserved, acquired, leased, granted, permitted, or otherwise authorized over time.

**Vegetation manipulation.** Planned alteration of vegetation communities through use of mechanical, chemical, seeding, and/or prescribed fire or managed fire to achieve desired resource objectives.

**Vegetation structure.** The stage of plant community development, encompassing age of stand, height of vegetation, and spatial distribution of plants.

**Vegetation treatments.** Management practices which change the vegetation structure to a different stage of development. Vegetation treatment methods include managed fire, prescribed fire, chemical, mechanical, and seeding.

**Vegetation type.** A plant community with immediately distinguishable characteristics based upon and named after the apparent dominant plant species.

**Vertebrate.** An animal having a backbone or spinal column. Includes jawless fishes, bony fishes, sharks and rays, amphibians, reptiles, mammals, and birds.

**Viewshed.** The panorama from a given viewpoint that encompasses the visual landscape, including everything visible within a 360-degree radius.

**Visibility (air quality).** A measure of the ability to see and identify objects at different distances.

**Visual resource management (VRM).** The inventory and planning actions taken to identify visual resource values and to establish objectives for managing those values, and the management actions taken to achieve the visual resource management objectives.

**Visual resource management classes.** Define the degree of acceptable visual change within a characteristic landscape. A class is based on the physical and sociological characteristics of any given homogeneous area and serves as a management objective. Categories assigned to public lands are based on scenic quality, sensitivity level, and distance zones. Each class has an objective that prescribes the amount of change allowed in the characteristic landscape (from H-1601-1, BLM Land Use Planning Handbook).

The four classes are described below:

- **Class I** provides for natural ecological changes only. This class includes primitive areas, some natural areas, some wild and scenic rivers, and other similar areas where landscape modification activities should be restricted.

- **Class II** areas are those areas where changes in any of the basic elements (form, line, color, or texture) caused by management activity should not be evident in the characteristic landscape.

- **Class III** includes areas where changes in the basic elements (form, line, color, or texture) caused by a management activity may be evident in the characteristic landscape. However, the changes should remain subordinate to the visual strength of the existing character.

- **Class IV** applies to areas where changes may subordinate the original composition and character; however, they should reflect what could be a natural occurrence within the characteristic landscape.

**Visual resources.** The visible physical features on a landscape, (topography, water, vegetation, animals, structures, and other features) that comprise die scenery of the area.

**Visual sensitivity.** Visual sensitivity levels are a measure of public concern for scenic quality and existing or proposed visual change.

**Volatile organic compounds.** Chemicals that produce vapors readily at room temperature and at normal atmospheric pressure. Volatile organic compounds include gasoline, industrial chemicals such as benzene, solvents such as toluene and xylene, and tetrachloroethylene (perchloroethylene, the principal dry cleaning solvent).

**Waiver.** A permanent exemption from a lease stipulation. The stipulation no longer applies anywhere within the leasehold.

**Watershed.** Topographical region or area delineated by water draining to a particular watercourse or body of water.

**Watershed condition indicators.** An integrated suite of aquatic, riparian, and hydrologic condition measures that is intended to be used at the watershed scale.

**Wilderness.** A congressionally designated area of undeveloped federal land retaining its primeval character and influence, without permanent improvements or human habitation, that is protected and managed to preserve its natural conditions and that (1) generally appears to have been affected mainly by the forces of nature, with human imprints substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least 5,000 acres or is large enough to make practical its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historic value. The definition is contained in Section 2(c) of the Wilderness Act of 1964 (78 Stat. 891).

**Wilderness characteristics.** Wilderness characteristics attributes include the area's size, its apparent naturalness, and outstanding opportunities for solitude or a primitive and unconfined type of recreation. They may also include supplemental values. Lands with wilderness characteristics are those lands that have been inventoried and determined by the BLM to contain wilderness characteristics as defined in section 2(c) of the Wilderness Act.

**Wilderness Study Area (WSA).** A designation made through the land use planning process of a roadless area found to have wilderness characteristics, as described in Section 2(c) of the Wilderness Act of 1964.

**Wildland fire.** Wildland fire is a general term describing any non-structure fire that occurs in the wildland. Wildland fires are categorized into two distinct types:

- **Wildfires:** Unplanned ignitions or prescribed fires that are declared wildfires

- **Prescribed fires:** Planned ignitions

**Wildland-urban interface (WUI):** The line, area or zone where structures and other human development meet or intermingle with undeveloped wildland or vegetative fuels.

**Winter concentration area:** That part of winter range where densities are at least 200 percent greater than the surrounding winter range density during the same period used to define winter

Case No. 1:20-cv-02484-MSK Document 90-2 filed 05/06/21 USDC Colorado pg 296 of 576

range in the average five winters out of ten. Winter concentration areas are defined for each Colorado Division of Wildlife Data Analysis Unit.

**Xeroriparian area.** An area or vegetative community that exists in arid environments and is characterized by dry washes exposed to only intermittent flows of water (ephemeral streams) associated with discrete precipitation events.

BLM

United States Department of the Interior
Bureau of Land Management

# BIOLOGICAL ASSESSMENT

## Uncompahgre Field Office

## Bull Mountain Unit Master Development Plan and EIS

Uncompahgre Field Office
Bureau of Land Management
2465 South Townsend Avenue
Montrose, Colorado 81401
August 2015



# TABLE OF CONTENTS

Chapter Page

**1. INTRODUCTION ..... 1-1**

1.1 Background ..... 1-1
1.2 Species Addressed ..... 1-2
1.3 Consultation History ..... 1-3
1.3.1 Big River Fishes ..... 1-3
1.4 Purpose of and Need for the EIS ..... 1-3
1.5 Description of the Planning Area and Decision Area ..... 1-4

**2. PROPOSED ACTION ..... 2-1**

2.1 Proposed Action ..... 2-1
2.1.1 Existing Facilities ..... 2-5
2.1.2 Siting ..... 2-6
2.1.3 New Developments ..... 2-7
2.1.4 Construction ..... 2-7
2.1.5 Drilling ..... 2-12
2.1.6 Completion ..... 2-19
2.1.7 Interim Reclamation ..... 2-23
2.1.8 Production and Maintenance ..... 2-24

**3. EVALUATED SPECIES ..... 3-1**

3.1 Introduction ..... 3-1
3.2 Listed Species ..... 3-2
3.2.1 Colorado Pikeminnow ..... 3-2
3.2.2 Razorback Sucker ..... 3-7
3.2.3 Bonytail ..... 3-9
3.2.4 Humpback Chub ..... 3-11
3.2.5 Greenback Cutthroat Trout ..... 3-13
3.2.6 Canada Lynx ..... 3-18

**4. EFFECTS OF PROPOSED ACTION ..... 4-1**

4.1 Introduction ..... 4-1
4.1.1 Definitions ..... 4-1
4.1.2 Methods of Analysis ..... 4-2
4.2 Listed Species ..... 4-4
4.2.1 Fishes ..... 4-4
4.2.2 Canada Lynx ..... 4-10

**5. EFFECTS DETERMINATION ..... 5-1**

5.1 Colorado Pikeminnow, Razorback Sucker, Bonytail, Humpback Chub ..... 5-1
5.1.1 Rationale ..... 5-1
5.2 Greenback Cutthroat Trout ..... 5-1
5.2.1 Rationale ..... 5-2
5.3 Canada Lynx ..... 5-2
5.3.1 Rationale ..... 5-2

**6. REFERENCES ..... 6-1**

**7. List of Preparers ... 7-1**

7.1 US Bureau of Land Management, Uncompahgre Field Office ... 7-1
7.2 Contractor, Environmental Management and Planning Solutions, Inc. ... 7-1

## Tables

Page

1-1 List of Threatened and Endangered Species Addressed in the Bull Mountain Unit MDP Biological Assessment ... 1-3
1-2 Land Status within the Bull Mountain Unit ... 1-4
2-1 Traffic Estimates for Construction, Drilling, Completion, and Production Activities per Well Pad ... 2-4
2-2 Project Feature Assumed Short- and Long-Term Disturbance Estimates ... 2-5
2-3 Existing Features in the Unit ... 2-6
2-4 McIntyre Flow back Pits ... 2-22
2-5 Bull Mountain Unit Annual Production Rates ... 2-25
3-1 Primary Constituent Elements of Critical Habitat for Colorado Pikeminnow, Razorback Sucker, Bonytail, and Humpback Chub ... 3-6
3-2 Primary Constituent Element of Canada Lynx Critical Habitat ... 3-23

## Figure

1-1 Bull Mountain Unit ... 1-5
2-1 Alternative D, Preferred ... 2-2
3-1 Fish and Aquatic Wildlife Habitat ... 3-17
3-2 Canada Lynx ... 3-21

## Appendices

A Best Management Practices and Conditions of Approval
B Lease Stipulations
C Wildlife Mitigation Plan

# ACRONYMS AND ABBREVIATIONS

| | Full Phrase |
|---|---|
| APD | application for permit to drill |
| BA | biological assessment |
| BLM | United States Department of the Interior, Bureau of Land Management |
| BMP | best management practice |
| BO | biological opinion |
| CBNG | coal bed natural gas |
| CDOT | Colorado Department of Transportation |
| CFR | Code of Federal Regulations |
| cfs | cubic feet per second |
| COA | condition of approval |
| COGCC | Colorado Oil and Gas Conservation Commission |
| CPW | Colorado Parks and Wildlife |
| DNA | deoxyribonucleic acid |
| EIS | environmental impact statement |
| EPA | United States Environmental Protection Agency |
| ESA | Endangered Species Act of 1973 |
| FLPMA | Federal Land Policy and Management Act of 1976 |
| *FR* | *Federal Register* |
| LAU | lynx analysis unit |
| MDP | master development plan |
| MPLLA | McClure Pass Lynx Linkage Area |
| NEPA | National Environmental Policy Act of 1969 |
| POD | plan of development |
| ROW | right-of-way |
| SH 133 | Colorado State Highway 133 |
| SGI | SG Interests I, Ltd. |
| T&E | threatened and endangered |
| UFO | Uncompahgre Field Office |
| Unit | Bull Mountain Unit |
| USC | United States Code |
| USFS | United States Department of Agriculture, Forest Service |
| USFWS | United States Department of the Interior, Fish and Wildlife Service |

This page intentionally left blank.

# SECTION 1

# INTRODUCTION

## 1.1   BACKGROUND

The United States Department of the Interior, Bureau of Land Management (BLM) Uncompahgre Field Office (UFO) is preparing a final environmental impact statement (Final EIS) analyzing a proposed master development plan (MDP) from SG Interests I, Ltd. (SGI) to drill up to 150 wells in the Bull Mountain Unit (the Unit) and to construct associated access roads, pipelines, and infrastructure. The Final EIS will include an analysis of the environmental effects that could result from implementing the alternatives addressed in that document. The Final EIS is a refinement of the Draft EIS, released on January 16, 2015. Public comments will be taken into account in the Final EIS, with corrections and clarifications being made where necessary.

The purpose of this biological assessment (BA) is to review the Final EIS to determine the extent that its implementation may affect threatened and endangered (T&E) species.

Under provisions of the US Endangered Species Act (ESA) of 1973, as amended (16 USC, Section 1531, et seq.), federal agencies are directed to conserve T&E species and their habitats. Section 7(a)(1) states that all federal agencies shall "utilize their authorities in furtherance of the purposes of this Act by carrying out programs for the conservation of endangered species and threatened species…." Thus, the conservation and recovery of T&E species is not simply the responsibility of the US Fish and Wildlife Service (USFWS) but of all federal agencies. To meet this requirement, the UFO would require SGI to implement protective stipulations, conditions of approval (COAs), and a wildlife mitigation plan.

Section 7(c) of the ESA requires the BLM to complete a BA to determine the effects of implementing the Final EIS on listed species. This section is based on compliance with Section 102 of the National Environmental Policy Act (NEPA).

Federal agencies are required to consider, avoid, or prevent adverse impacts on fish and wildlife. The agencies are also required to ensure that actions they authorize, fund, or carry out are not likely to jeopardize the continued existence of T&E species or their critical habitat.

The ESA requires action agencies, such as the BLM, to consult or confer with the USFWS when there is discretionary federal involvement or control over the action. The ESA also requires agencies to ensure that resources are afforded adequate consideration and protection. Informal consultation occurs when the federal agency, after discussion with the USFWS, determines that the proposed action is not likely to affect any listed species in the action area, and the USFWS concurs. Formal consultation occurs after the agency determines that the proposed action is likely to adversely affect listed species or critical habitat, or when the aforementioned federal agencies do not concur with the action agency's finding (USFWS 1998a).

This BA provides documentation and analysis for the proposed action to meet the federal requirements and agreements set forth by the federal agencies. It addresses federally listed T&E species and has been prepared under the 1973 ESA Section 7 regulations, in accordance with the 1998 procedures set forth by the USFWS. Site-specific evaluations would be conducted for subsequent federal actions, such as approval of applications for permit to drill (APDs) within the Unit; the BLM would consult or confer with the USFWS for those activities that may affect T&E or proposed species. In addition, the BLM would evaluate site-specific activities that may affect BLM Colorado sensitive species, in compliance with BLM Manual 6840 (BLM 2008c).

The BLM requests informal consultation and concurrence for the effects of the Final EIS on the six T&E species and their critical habitat, as applicable in **Table 1-1**, List of Threatened and Endangered Species Addressed in the Bull Mountain Unit MDP Biological Assessment.

## 1.2   SPECIES ADDRESSED

The species addressed in the Final EIS and in this BA are all listed T&E species that are known to occur within the Unit (**Table 1-1**); the Unit does not contain designated or proposed critical habitat for any listed T&E species.

Some public comments on the Draft EIS involved concern that the EIS did not analyze the threatened western yellow-billed cuckoo (*Coccyzus americanus*). However, current studies indicate the cuckoo does not nest as high in elevation as the Unit, and there is no indication that it is present in the Unit. Additionally, there is no abundant appropriate habitat for the cuckoo in the Unit; existing habitat is limited to along Colorado State Highway 133 (SH 133). As such, this species was not analyzed in this BA.

**Table 1-1**
**List of Threatened and Endangered Species Addressed in the Bull Mountain Unit MDP Biological Assessment**

| Common Name | Species Name | Federal Status[1] |
|---|---|---|
| **Listed Species for Potential Consultation** | | |
| Fish | | |
| Bonytail | *Gila elegans* | E |
| Humpback chub | *G. cypha* | E |
| Colorado pikeminnow | *Ptychocheilus lucius* | E |
| Razorback sucker | *Xyrauchen texanus* | E |
| Greenback cutthroat trout | *Oncorhynchus clarki stomias* | T |
| Mammals | | |
| Canada lynx | *Lynx canadensis* | T |

Source: BLM 2015
[1]Status: E = Endangered; T = Threatened

## 1.3 Consultation History

### 1.3.1 Big River Fishes

In November 2008, The BLM prepared two programmatic BAs for the four big river fishes, Colorado pikeminnow, bonytail, humpback chub, and razorback sucker. One BA addressed water depletions associated with the fluid mineral program in western Colorado, as administered by the BLM Colorado (BLM 2008b), and the other addressed all other water-depleting BLM programs (BLM 2008a). After the BLM began consultation with the USFWS, the USFWS issued two programmatic biological opinions (BOs; USFWS 2008, 2009a). In both BOs, the agency found that water-depleting activities were likely to adversely affect the four listed fish species and their critical habitats. This consultation is valid until the following factors trigger the need for a reassessment:

- Any critical habitat is proposed
- New and relevant information is found regarding any of the four listed fishes or their habitats
- Impacts not previously considered are identified
- Major changes are made to the Fluid Mineral Program (e.g., new or revised reasonably foreseeable developments, if higher than anticipated) or the program's implementation
- No reassessment factors have occurred since the USFWS issued the BOs, so this consultation remains valid.

## 1.4 Purpose of and Need for the EIS

The BLM's purpose is to consider the proponent's request for an MDP to develop federal fluid minerals in the Unit, while considering the BLM's multiple-use mission. In addition to managing activities on federal land, such as fluid

mineral development, the BLM's mission includes conserving natural, historical, and cultural and other resources on the lands that it administers.

The BLM's need arises from its responsibilities under the Federal Land Policy and Management Act of 1976 (FLPMA), the Mineral Leasing Act, and other legislation to respond to the applicant's request. The BLM is considering the proposed MDP to better facilitate the planning of infrastructure and to increase the orderly development of natural gas resources, consistent with the Energy Policy Acts of 2001 and 2005. These acts emphasize the development of domestic natural gas reserves for supply and economic stability. The MDP takes into account field development as a whole rather than its individual actions.

## 1.5   DESCRIPTION OF THE PLANNING AREA AND DECISION AREA

The boundaries of the Unit encompass approximately 19,670 acres of federal and private oil and gas mineral estate in Gunnison County, Colorado. It consists of the following (**Table 1-2**, Land Status within the Bull Mountain Unit):

- 440 acres of federal surface underlain by federal mineral estate, all administered by the BLM

- 12,900 acres of private surface with federal mineral estate (split-estate) administered by the BLM

- 6,330 acres of private surface with private mineral estate

A map of the planning area is included as **Figure 1-1**, Bull Mountain Unit.

**Table 1-2**
**Land Status within the Bull Mountain Unit**

| Land Status | Acres | Percentage of Planning Area |
|---|---|---|
| BLM surface; federal mineral estate | 440 | 2 |
| Private surface; federal mineral estate | 12,900 | 66 |
| Private surface; private mineral estate | 6,330 | 32 |
| **Total** | **19,670** | **100** |

Source: BLM GIS 2014

**Figure 1-1**

**Bull Mountain Unit**

Source: BLM GIS 2014

- Bull Mountain Unit
- Federal surface, federal minerals
- Private surface, federal minerals
- Private surface, private minerals

This page intentionally left blank.

# SECTION 2
# PROPOSED ACTION

## 2.1    PROPOSED ACTION

The proposed action is analyzed as Alternative D in the Final EIS and is summarized in this section (**Figure 2-1**). The full list of stipulations, best management practices (BMPs), COAs, and the wildlife mitigation plan as part of the proposed action are included as appendices to this BA. They may provide additional protection to threatened and endangered species.

The life cycle of an individual well and its associated facilities and required infrastructure (e.g., roads, pipelines, and compressor stations) is composed of eight primary phases: siting, construction, drilling, completion, interim reclamation, production and maintenance, final wellbore abandonment, and reclamation. A siting design and constraints analysis for well pad placement was conducted as part the Bull Mountain Environmental Assessment and has been carried forward to determine approximate siting for the EIS. Additionally, due to uncertainties inherent in the programmatic analysis approach of the MDP (e.g., site-specific locational information), the following assumptions have been made for the proposed action:

- Rate of development—SGI anticipates using three drilling rigs to drill multiple wells per rig per year. The full-field development timeframe would be approximately 6 years based on the assumption that SGI would drill up to 27 wells each year under the proposed action. Additionally there may be delays in permitting that will likely push development beyond the estimated full-field development timeframe.

- Wells would be drilled to develop productive geological formations in the Unit, which are the Cameo, South Canyon, and Coal Ridge coal formations, the Cozzette and Corcoran sandstone formations, and the Mancos shale formations.

**Figure 2-1**

BULL MOUNTAIN UNIT
COLORADO
Bull Mountain
Uncompahgre Field Office
Uncompahgre Field Office
Bull Mountain
Paonia
Hotchkiss
T11S R90W
T11S R89W
T12S R90W
T12S R89W
0 2,000 4,000
Feet
July 14, 2015
BullMtn_alts_D_V06.pdf
Bull Mountain EIS Uncompahgre Field Office
No warranty is made by the BLM as to the accuracy, reliability, or completeness of these data for individual use or aggregate use with other data.
GUNNISON COUNTY
Source: SG Interests GIS 2013 and BLM GIS 2014
Alternative D, Preferred
Alternative D, Preferred
Proposed well pad analysis area
Proposed screw compressor
Existing storage yard
Proposed pipeline
Proposed new road construction
Existing road requires upgrade for use
Existing Infrastructure
Existing road currently suitable for use
Existing pipeline
Federal surface, federal minerals
Private surface, federal minerals
Private surface, private minerals

DRAFT- Review and/or display copy only

- The extent of such development and the prospective nature of the resources is based on geologic information, data derived from wells drilled to date, and economic factors. The resource is expected to be productive over the entire unit; however, it is possible for some areas to have more favorable economics than other areas due to varying reservoir qualities. It is also possible that areas currently identified for development may not be economically viable; as a result, some of the proposed well pads and wells may not be constructed and drilled.

- The well-head density needed to develop the resources is expected to vary, depending on the formation being developed, and the geologic characteristics of the individual formations in the Unit would dictate this density. The ultimate well-head density per well pad would be defined through future drilling and resource and formation analysis. Again, these well-head densities refer to downhole/bottomhole wellbore densities. The operator would use directional drilling and multiple well pad drilling and completion techniques to develop these resources; this would minimize the number of well pads or surface locations.

- The number of wells per well pad would vary and would depend on several factors: the required downhole well density and how many directional wells can be drilled from the location, whether or not both shallow and deep horizons are being developed, and the topography of the site. Therefore, some well pad locations may host as few as one well, whereas others may have up to 12 wells drilled from a single well pad. Each wellbore on multi-well pads would be separated by 15 to 20 feet. If more than six wells are to be drilled from a well pad, parallel lines of wells spaced up to 15 to 20 feet apart may be drilled.

- The life of any individual well is estimated to be 40 years, based on use of current technologies and production methods, although the actual productive life of a single well may vary. This includes all oil, gas, and water disposal wells, although the actual production years may vary for individual wells. For the purposes of analysis, the life of the project was assumed to be 50 years, but future technological advances and increased production efficiency may extend the life of the project.

- Reserve pit fences would be constructed and maintained according to the permitting agency requirements.

- A standard traffic rate per well pad would be used for calculations. **Table 2-1**, Traffic Estimates for Drilling, Completion, and Production Activities per Well Pad, presents the traffic that could occur for each individual well pad. Actual traffic volumes would

**Table 2-1**
**Traffic Estimates for Construction, Drilling, Completion, and Production Activities per Well Pad**

| Vehicle Type | Average Weight (Pounds) | Estimated Round Trips |
|---|---|---|
| **Vehicles for pad and access road construction** | | |
| Gravel trucks | 110,000 | 160 |
| Semi-trailer trucks | 37,000 | 4 |
| Pickup trucks | 6,000 | 40 |
| Motor grader on semi-trailer | 40,000 | 1 |
| Dozer (2) on semi-trailer | 19,000 | 2 |
| Track hoe on semi-trailer | 43,000 | 1 |
| **Pipeline construction** | | |
| Motor grader on lowboy trailer with truck | 50,800 | 2 |
| Bulldozer on lowboy trailer with truck | 120,000 | 2 |
| 80-barrel water trucks for dust control | 54,000 loaded | 20 |
| 80-barrel water trucks for hydrostatic testing | 25,000 empty | 2-4 |
| Track hoe on lowboy trailer with truck | 91,000 | 2 |
| Welding trucks | 9,500 | 2 |
| Crew cab pickups | 5,200 | 40 |
| Bending machine and trailer | 48,000 | 2 |
| Side booms on lowboy trailer with truck | 63,000 | 2 |
| X-ray truck | 5,200 | 4 |
| Testing truck | 6,000 | 2 |
| Pipe trucks | 120000 loaded | 1 |
| | 36000 unloaded | 1 |
| Utility tractor and truck with lowboy trailer | 40,000 | 2 |
| **Vehicles for drilling and completing first well on the pad** | | |
| Drilling and completion rig | 120,000 | 1 |
| Rig-up trucks loaded (e.g., cement or fracturing) | 120,000 | 25 |
| Rig-up trucks empty | 36,500 | 4-6 |
| 80-barrel water trucks loaded | 54,000 | 40 |
| 80-barrel water trucks empty | 25,000 | 40 |
| Crew-cab pickups | 6,000 | 40 |
| **Vehicles for drilling and completing subsequent wells on the same pad** | | |
| Motor grader | 50,000 | 2 |
| Drilling and completion rig | 120,000 | 2 |
| Rig-up trucks loaded (e.g., cement or fracturing) | 120,000 | 25 |
| Rig-up trucks empty | 36,500 | 4-6 |
| 80-barrel water trucks loaded | 54,000 | 45 |
| 80-barrel water trucks empty | 25,000 | 45 |
| Crew cab pickups | 6,000 | 40 |
| **Vehicles for well production** | | |
| work over rig | 120,000 | 1 round trip every 2 years |
| Haul trucks | 120,000 | 6 |

vary, depending on the level of drilling activity, the specific operations that might be underway at a well pad, and the maturity of the project at any particular time. Actual and specific volumes would be determined in future APDs and plans of development (PODs) and would be disclosed in associated NEPA documents, as appropriate.

- The assumption that a standard area of disturbance would be used for calculations. Due to the unknown number of wells per pad and alignments for roads and pipelines, the disturbance areas used are estimates only; they were developed on the assumption that the disturbance area would need to be large enough to reasonably accommodate future permitted construction or realignments. Additionally, an adequately sized well pad would accommodate the drilling equipment, while providing a safe offset from other existing wellbores. **Table 2-2** presents the assumed short- and long-term estimates. Actual and specific well pad size, pipeline width or road width would be determined in future APDs and analyzed in subsequent NEPA actions.

**Table 2-2**
**Project Feature Assumed Short- and Long-Term Disturbance Estimates**

| Project Feature | Short-Term Surface Disturbance | Long-Term Surface Disturbance |
|---|---|---|
| **Well pads** | | |
| New well pads | 5 acres | 2 acres |
| Existing well pads | 2 acres | 2 acres |
| **Access roads (width)** | | |
| Existing improved roads | 0 feet | 16 feet |
| Upgrades to existing 2-track roads | 25 feet | 16 feet |
| New road construction | 25 feet | 16 feet |
| **Pipelines (analysis area)** | | |
| Collocated with roads | 100 feet | 16 feet |
| Not collocated with roads (cross-country) | 50 feet | 0 feet |
| **Facilities** | | |
| Compressor station | 5 acres per station | 2 acres per station |

Note: Acreages according to the assumed short- and long-term disturbance are estimated for analysis only. The permitted rights-of-way for construction would cover fewer acres.

### 2.1.1  Existing Facilities

There are already well pads, wells, roads, pipelines, and other facilities in the Unit; the proposed action would add to these developments. Listed below in **Table 2-3** are the current number of productive/active pads, wells, facilities, and miles of roads that are currently in the Unit.

**Table 2-3**
**Existing Features in the Unit**

| Feature | Number of Features or Miles of Road |
|---|---|
| Well pads | 18 |
| Natural gas wells | 17 |
| Water disposal wells | 1 |
| Access roads currently suitable for use | 21 miles |
| Pipelines collocated with roads | 5 miles |
| Pipelines cross-country | 12 miles |
| Overhead electrical lines (to water disposal well) | 1 |
| Flow back pits | 4 |

Additionally, there is an existing storage yard on private land at the US Forest Service (USFS) boundary outside the Unit. SGI would use this yard and existing well pads to temporarily store construction equipment, vehicles, pipe and pipe welding materials, hydraulic fracturing tanks, production equipment, and other standard gas field equipment. The storage area would be used continuously throughout the project development phase. Sensitive or hazardous materials would be stored in compliance with all applicable federal and State of Colorado regulations. The existing pads for temporary equipment storage would be used with appropriate permitting and notice to agencies and landowners. These locations would be chosen to accommodate nearby construction, drilling, and completion. On completion of the development phase of the project, or when the storage areas are no longer needed, all remaining equipment would be removed. The storage areas then would be reclaimed according to standards of the appropriate surface management agency.

### 2.1.2  Siting

It is important to note that the locations of proposed well pads, access roads, pipelines, compressor stations, and other surface facilities for the proposed action illustrated on **Figure 2-1** are conceptual only and may be modified at a later stage, such as during consideration of an APD. Drilling proposals would conform to the Colorado Oil and Gas Conservation Commission (COGCC) regulations and policies and to the objectives of the site selection model. On BLM-administered surface or mineral estate and where reasonably practicable, the on-site determinations would conform with the objectives of the site selection model and as described in the following:

- BLM Instruction Memorandum No. 2004-194: Integration of Best Management Practices into Application for Permit to Drill Approvals

- Associated Rights of Way, IM 2013-033: Reducing Preventable Causes of Direct Wildlife Mortality Associated with Fluid Mineral Facilities Authorized by the BLM

- BLM/Forest Service publication Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development—The Gold Book (DOI and USDA 2007)

### 2.1.3   New Developments

SGI would construct up to 33 new well pads to develop federal mineral estate, up to 146 new natural gas wells, and up to 4 new water disposal wells. On average, there would be four to five wells on any individual well pad; however, depending on the location, formation, and other factors to be determined at the APD stage of development, an individual well pad could have one well or up to 12 wells per pad.

Some of the new gas wells would be drilled on the existing water disposal or gas well pads. The quantity and combination of coal bed methane natural gas, sandstone, and shale gas wells on each pad is not known at this time and would also be determined at the APD/POD stage. Additionally, at this stage, the exact locations of well pads would be on ecological sites in the 40-acre analysis areas best suited to achieve maximum reclamation success. Under the proposed action, new water disposal wells would be sited on existing pads.

Additionally, SGI would construct approximately 12 miles of new roads and would improve 13 miles of existing roads for access. It would also construct 19 miles of pipeline collocated with roads and up to four new compressor stations.

Based on these numbers, and the assumed drilling rate noted in the common assumptions, drilling would take approximately six years.

### 2.1.4   Construction

Between April 1 and June 30 each year, preconstruction nesting surveys for migratory birds, including raptors, would be conducted before any scheduled surface-disturbing construction begins. Active nests would be avoided during construction using applicable species-specific Colorado Parks and Wildlife (CPW) construction buffers to avoid disrupting migratory bird breeding activities. Active streams would be crossed outside the spawning season for applicable aquatic species identified by the CPW.

#### *Access Road Construction*

The primary access roads to the site are SH 133 and County Road 265. New roads would be constructed and existing roads would be improved only as needed to access well pads and other facilities. Site-specific plans for road construction and upgrades would be included as part of individual future APDs or PODs. The plans would be subject to approval of the COGCC, landowners, and the BLM.

#### *Well Pad Construction (Gas and Water Disposal Wells)*

Before individual well pads are constructed, SGI would obtain the COGCC's approval of an APD. Each APD would contain site-specific details related to well

pad size, construction and well operations, and mitigation measures. Possible mitigation measures that could be COAs for the drilling permit are noted in **Appendix A**, Best Management Practices and Conditions of Approval.

Construction of a typical well pad would entail the use of bulldozers, motor graders, Class 125 or larger track hoes, backhoes, compacters, and 10- to 20-yard dump trucks. Well pad construction equipment needs would vary, depending on site-specific conditions; however, construction methods would be the same for all proposed types of natural gas and water disposal well pads.

In the approved well pad location, a leveled area would be graded by a bulldozer after or simultaneously with upgrade or construction of an access road to the well site. Standard cut-and-fill construction techniques and machinery (bulldozer or grader) would be used; stockpile, cut, and fill locations in the well pad construction area would be specified in the APD. Vegetation would be cleared and all available topsoil to a depth of 8 to 12 inches would be stockpiled and segregated from subsoils over the entire disturbed surface to create the well pad area.

The well pad would be surfaced using "pit run," or equivalent material, which generally consists of rock less than six inches in diameter. The area within the anchor bolt pattern and around tank batteries or facilities would also be surfaced with a top dressing of three-inch road base. Pit run and road base would both be trucked to the site from local gravel pits near Carbondale, Delta, and Paonia or other local areas.

If the well location were to require only minimal grading, eight inches of topsoil would be salvaged from the entire disturbed surface. This topsoil would be stored in contiguous berms or stockpiles at the edges of the well pad to facilitate future reclamation. Stockpiled topsoil would be protected against wind and water erosion and would be seeded with an approved seed mix after well pad construction and earth-moving operations. Native seed mixes would be required for reclamation.

Construction of an individual well pad could take from one to three weeks, depending on the features of each particular site.

Before individual well pad construction, SGI would obtain the BLM's approval of an APD or POD. Each APD or POD would contain site-specific details related to well pad size, construction and well operations, and mitigation measures.

Under the proposed action, SGI could propose a reserve pit or pitless closed-loop drilling system, which would determine the size and construction needs of the well pad. (The quantity and combination of coal bed methane natural gas, sandstone, and shale gas wells on each pad are unknown at this time.) Additionally, as part of individual APDs or PODs, SGI would identify the specific pipeline routes needed to transport the gas and water from the well head.

***Pipeline Construction***

Pipelines would be necessary to transport gas from producing wells to the existing sales gas pipeline and to transport produced water to proposed water disposal wells or flow back pits. The following sections describe the various pipeline construction phases, which are typical for this type of development.

*Clearing and Grading*

At the start of pipeline construction, the route would be cleared of vegetation and any obstacles or debris. Grading would follow to remove the topsoil and surface rock and stockpile them within the edge of the route for redistribution following construction. All brush and other materials that are cleared would be windrowed along the route or in temporary use areas. If the pipeline were not collocated with a road, then these materials may be dispersed over the route to impede future access following construction. Moreover, trees and rocks would be strategically placed in the pipeline corridor to impede future access, as stipulated by permit COAs or surface landowner agreements.

*Trenching*

Construction methods used to excavate a trench would vary, depending on soil, terrain, and related factors. Rotary trenching machines would be used where possible. In situations where there are steep slopes, unstable soils, high water tables, or deep or wide trench requirements, conventional tracked backhoes (track hoes) would generally be used. Highway crossing methods and construction requirements would be in accordance with the Colorado Department of Transportation (CDOT) permit stipulations and general conditions as necessary.

If a pipeline were routed to cross a road or wetland, SGI could use a pipeline bore for the crossing; in such a case, the bore operations would be set up outside of the wetland or road right-of-way and would be designed to minimize impacts on these features. Temporary use areas may need to be established before and after the feature to be bored; these areas would vary in size, depending on the terrain and the size of the feature to be bored. Specific route determinations, siting design, and boring methods would be determined at the permitting stage.

*Pipe Installation*

Gas gathering and subsurface water pipelines would be constructed of steel. Pipe installation would require stringing, bending the pipe for horizontal or vertical angles in the alignment, welding the pipe segments together, using x-ray inspection, coating the joint areas to prevent corrosion, and then lowering and padding the pipe. These procedures are explained as follows:

- Stringing—Line pipe would be trucked directly from the manufacturer or a contractor storage yard to the corridor. Each individual joint of pipe would be unloaded and strung parallel to the trench. Sufficient pipe for road or stream crossings and steep slopes

would be stockpiled at nearby staging areas. Stringing would be coordinated with trenching and installation activities to properly manage the construction time at a particular tract of land. Gaps would be left at access points across the trench to allow the corridor to be crossed.

- Bending—After the joints of pipe are strung along the trench but before the joints are welded together, individual pipe joints would be bent if necessary to accommodate horizontal and vertical changes in direction. Field bends would be made using a hydraulically operated bending machine. Where the deflection of a bend exceeds the allowable limits for a field-bent pipe, factory (induction) bends would be installed.

- Welding—After the pipe joints are bent, the pipe would be lined up end-to-end and clamped into position. The pipe would then be welded in conformance with 49 Code of Federal Regulations (CFR), Part 192, Subpart E (Welding of Steel Pipelines) and API 1104 (Standard for Welding Pipelines and Related Facilities, latest edition).

- X-ray inspection—A specialized contractor would inspect the welds using nondestructive radiographic methods and in accordance with CDOT requirements. The contractor would be certified to perform radiographic inspection. Any defects would be repaired or cut out as required under the specified regulations and standards.

- Coating—To prevent corrosion, the pipe would be externally coated with fusion-bonded epoxy before delivery to the site. The coated pipe would be installed in all bore locations unless the pipe is cased. After welding, field joints would be sandblasted, flocked, and coated with a synergy coating. Before the pipe is lowered into the trench, the coating would be inspected and tested with an electronic detector, and any faults or scratches would be repaired.

- Lowering-in and padding—Once the welding, inspecting, and joint coating have been completed, a section of the pipe would be lowered into the trench. Side-boom tractors would be used to lift the pipe, position it over the trench, and lower it into place. The pipe would be inspected to verify that minimum cover is provided, that the trench bottom is free of rocks or other debris, that the external pipe coating is not damaged, and that the pipe is properly fitted and installed in the trench. Specialized machines would be used to sift soil fines from the excavated subsoils to provide rock-free pipeline padding and bedding. In rocky areas, padding material or a rock shield would be used to protect the pipe.

- Backfilling—The trench would be backfilled after a section of the pipe has been successfully placed and final inspection has been

completed. Backfilling would be conducted using a track hoe, a rotary auger backfiller, a padding machine, or other suitable equipment. Backfilling  would generally use the subsoil previously excavated from the trench, except in rocky areas, where imported select fill material may be needed. Backfill would be graded and compacted by tamping or walking-in with a wheeled or tracked vehicle.

Trenches would not be backfilled where the soil is frozen to the extent that large consolidated masses have formed that would not break down. The contractor would then respread the previously segregated topsoil to return the surface to its original grade. Any excavated materials or materials unfit for backfill would be used or properly disposed of, in conformance with applicable laws and regulations. The construction contractor would place an approximately six-inch-high mound over the trench to account for subsidence. The entire construction zone would be seeded in the first appropriate season after disturbance.

- Pressure testing—The entire pipeline would be tested, in compliance with US Department of Transportation regulations (49 CFR, Part 192). Before the pipeline is filled for a pressure test, each section would be cleaned by passing reinforced poly pigs through the interior of the line. Incremental segments of the pipeline would then be filled with compressed water, air, or natural gas to the desired maximum pressure (up to 720 pounds per square inch) and held for the duration of the test (eight hours minimum if US Department of Transportation regulations apply). The compressed air would be discharged into the atmosphere following the completion of the test. All nearby residents and the Gunnison County Dispatch Center would be notified before the pressure test and blow-down.

If necessary, water would be discharged into upland areas, on gentle slopes, in accordance with the conditions and stipulations in the Colorado Department of Public Health and Environment Colorado Discharge Permit System for Hydrostatic Testing of Pipelines Tanks and Similar Vessels. These conditions and stipulations require permit-specific sampling, testing, filtering or mitigation, and reporting and a plan to prevent soil erosion or impacts on surface waters.

Gathering pipelines for individual well pads would consist of six- to eight-inch outer diameter pipeline. They would be designed for 720 pounds pressure per square inch. Each gathering line would tie into a larger trunk line with a 12- to 16-inch outer diameter, which would eventually transport the gas to the Bull Mountain pipeline; carsonite pipeline markers would be installed on the surface and tracer wire would be installed for all buried pipelines. The dimensions of the

pipe used would depend on the number of wells served and production estimates.

Between 10 and 25 construction- and supply-related personnel would be needed to install new sections of the pipeline gathering system. All gas pipelines would be constructed to applicable American Petroleum Institute and industry standards.

***Overhead Electrical Line Construction for Water Disposal Wells***

Under the proposed action, SGI proposes up to four new water disposal wells, which would require constructing one new overhead electrical line, with up to five power poles, to supply power to the water disposal well head. The new line would be installed following the most practical route from existing lines to the new water disposal well site; two options would be to follow existing two-track roads or run the line cross-country.

The average width for power line right-of-way (ROW) is 30 feet. Final routes would be subject to surface landowner approval. If the line were to follow existing two-track roads, construction vehicles would stay on existing disturbance areas. If the line ran cross-country, then appropriate access and vehicle routes would be approved as part of the project design. If the terrain allows for it, access could be overland along the route.

Wooden power poles would be erected by Delta-Montrose Electric Association's personnel using service trucks. Typical equipment is pickups, auger/drilling rigs, bucket trucks, and stringing equipment. Some trees and other taller shrubs may need to be pruned back for construction, and each power pole hole would disturb approximately eight square feet of vegetation during excavation of the hole and setting of the power poles. There would be no prescriptive clearing of the corridor for the electrical line, which would run to the new water disposal well location.

### 2.1.5 Drilling

Drilling would be conducted in compliance with the APD issued by the State of Colorado and any relevant federal regulations, such as those of the USFWS and US Environmental Protection Agency (EPA). Specific techniques for drilling wells would differ, depending on whether SGI drilled a gas well or a water disposal well; the specific techniques for natural gas well and water well drilling are presented below.

Trucks would be used to transport drilling components to the work site. Rig components are designed for portability and are easily loaded and unloaded and are mostly self-contained on the mobile drill rig. Auxiliary equipment for electricity and compressed air would be trucked in for drilling operations. Drill pipe, drill bits, cement, freshwater, wire rope, and other supplies would be trucked to the well pad and stored temporarily until used. Traffic would consist

of support equipment, contractor vehicles, construction personnel, and material delivery.

Well pad activity would involve backhoes, front-end loaders, boom and winch trucks, delivery trucks, welding machinery, and personal vehicles.

***Gas Well Drilling***

Drilling gas wells can use a number of different wellbore directions and types of drilling technologies, can target different formations, and can use different lubricants (commonly referred to as drilling fluids or drilling muds).

In its broadest definition, a wellbore is a hole that is drilled to aid in the exploration and recovery of natural resources, including oil, gas, and water. A wellbore is the actual hole that forms the well. It can be drilled vertically or directionally. A vertical wellbore is drilled straight down below the drilling rig; a directional wellbore may start out vertically but is then turned to move out at an angle or in an S-shape, or it may be turned horizontally. Wellbores could be any of the mentioned varieties (vertical or directional), and would be encased by such materials as steel or cement.

As noted under the section describing the well pad construction techniques, drilling methods could fall within two broad categories: those drilling systems that use a reserve pit on the well pad or a pitless system, generally called a closed-loop system. The standard drilling system would be a closed loop in order to eliminate pits on location and the release of volatile organic compounds. This would be the case unless resource impacts could be demonstrated to be less when using a reserve pit system (i.e., when there would be no net benefit to using a closed-loop system). The type of drilling system would be determined when SGI submits the drilling application to the COGCC.

A closed-loop system is defined simply as a mechanical and chemical system that would allow an operator to drill a well without using a reserve pit. In a closed-loop drilling system, the reserve pit is replaced with a series of storage tanks that separate liquids and solids. Equipment to separate solids (e.g., screen shakers, hydro-cyclones, or centrifuges) and collection equipment (e.g., vacuum trucks) minimize the amount of drilling waste muds and cuttings that require disposal. This equipment also maximizes the amount of fluid recycled and reused in the drilling process. The recovered drilling fluid can be stored in 500-barrel tanks and reused in active mud systems; consequently, drilling fluid is moved from well-to-well and is reconditioned by the dewatering equipment and mud products. The solid wastes would be transferred off-site for disposal at oilfield waste disposal facilities.

If a reserve pit system were used, the following would apply:

- A different type of drilling rig would be used.

- A reserve pit would hold drilling cuttings and a small amount of fluid, freshwater or recycled water used in drilling, and any excess drilling mud.

- The reserve pit would not be used to store flow-back water during the completion phase nor to store produced water during the production phase.

- Drilling mud would be circulated by means of pump pressure from the rig mud pits down the drill pipe, through jets in the bit, and up the annulus (the space between the wellbore and the drill pipe).

- Drilling mud would flow through a series of equipment and tanks in order to recondition it. A small amount of mud and the cuttings from the wellbore would be placed in the reserve pit.

- Drill cuttings would be processed to remove excess drilling fluids. The cuttings would be stored on location in segregated lined piles or in a storage container. Cuttings would be sampled and tested according to COGCC 900 Series Rules then would be transported to a permitted disposal/waste management facility.

- Each reserve pit would be constructed with an impermeable liner so as to prevent releases.

- Reserve pit fences would be constructed and maintained according to the permitting agency's requirements.

- Once all drilling wastes are removed from the pit, the pit liners would be removed and disposed of at a permitted waste facility; the pit would be closed in compliance with all COGCC 900 Series pit closure rules or federal regulations.

- The reserve pit would be lined with an impermeable minimum 24-mil plastic liner so as not to leak, break, or allow discharge.

- Reserve pit sizes vary with well type and site conditions, but they would typically be approximately 50 feet by 150 feet and would be lined.

- Fencing—
    - Reserve pits would be fenced on three sides during drilling and on the fourth side immediately after the removal of the drilling rig to keep big game and wildlife out of the pits;
    - If reserve pits are left open during the winter, they would also be fenced to keep out game and wildlife;
    - Silt fencing would be installed around the base of the fences.

- Bird netting would be installed over the pit.

- Two feet of freeboard would be required at all times.

- Pits would have a two-foot-wide unlined berm in addition to the minimum two feet of freeboard around them to prevent snowmelt on the pad from flowing into pits.

- Fill from the pit would be stockpiled along the edge of the pit and the adjacent edge of the well pad.

- Use of erosion control measures—proper grading to minimize slopes, diversion ditches, mulching, riprap, fiber matting, temporary sediment traps, and broad-based drainage dips—would be used as necessary and appropriate to minimize erosion and surface runoff during well pad construction and operation.

Following well pad and access road construction, a tier-2 or cleaner drilling rig would be transported to the well pad, along with other necessary equipment. A conventional drilling rig used for vertical wellbores would require construction as described above in the well pad construction section. The rig would operate 24 hours per day. If the well were proposed as a directional wellbore (e.g., horizontal or s-shaped), then directional drilling equipment would be used and would also operate 24 hours per day. Additional equipment and materials needed for directional drilling would be trucked in to the well site.

Drilling would begin by digging a circular pit, called a cellar, and lining it with metal where the wellbore would be drilled. The cellar would provide space for the casing head spools and blowout preventers that would be installed under the rig. Drilling operations normally include the following:

- Keeping a sharp bit on the bottom drilling as efficiently as possible

- Adding a new joint of pipe as the hole deepens

- Tripping the drill string out of the hole to put on a new bit as needed and running it back to the bottom

- Installing steel casing and cementing the casing in the hole

Drilling fluids are used to aid the drilling of boreholes regardless of the type of well drilled. The main functions of drilling fluids are as follows:

- To provide hydrostatic pressure to prevent formation fluids from entering into the wellbore

- To keep the drill bit cool and clean during drilling

- To carry out drill cuttings (i.e., pulverized rock generated from drilling)

- To suspend the drill cuttings while drilling is paused and when the drilling assembly is brought in and out of the hole

Drilling fluid is a mixture of a fluid (either water or an oil-based product such as mineral oil) and mud. For the proposed action, SGI would use freshwater-based drilling fluids for most drilling activities. However, a small percentage of mineral oil additive may be used, depending on the formation that would be encountered. Mineral oil drilling fluids are preferred in production formations where borehole stability requires it or for directionally drilled wells. SGI would specify which type of drilling fluid would be used on the APD.

A water-based drilling fluid uses freshwater or recycled[1] water or a combination of both mixed with the mud; SGI would use a combination of freshwater and recycled water mud system. Up to approximately 3,000 barrels of water would be used for drilling a particular well. For the proposed action, that would result in up to approximately 438,000 barrels or 58 acre-feet of water (up to 3,000 barrels per well multiplied by up to 146 new wells drilled). Approximately 30 percent (131,400 barrels or 17 acre-feet) of that water usage will be from fresh water sources and the remainder will be from recycled or produced water sources.

In production level formations, where the borehole stability requires it, or for directionally drilled wells, an oil-based drilling fluid, using such products as mineral oil, may be used. The mud portion of a drilling fluid is composed of clays, minerals, and additives, such as bentonite, barite, soda ash, lime, polymer, lignite, and lost circulation material.

The drilling fluid used for a particular job would be selected to avoid formation damage and to limit corrosion. For example, where borehole stability requires it, a mud, typically consisting of potassium chloride substitute and commercial clay stabilizer (such as di-ammonium phosphate), would be used to drill the production hole section. This mud formulation inhibits potentially reactive shales to prevent shale swelling and hole sloughing. Drilling fluids and mud additives would be recirculated during drilling and could be transported to another drilling location for reuse or could be treated and removed from the location.

Casing and cementing plans, designed by engineers, would be included in an APD and associated drilling plan. The casing and cementing program would be conducted as approved to protect and isolate all usable water zones, potentially productive zones, lost circulation zones, abnormally pressured zones, and any prospectively valuable deposits of minerals. Placement of steel casing would entail connecting and inserting continuous sections of steel pipe into the drill hole. The casing would extend from the bottom of the hole to the surface,

[1]Recycled water is that that has been used in other phases of the well development. It could be water that has been removed from drilling mud, water used during completion that flows back after the well has been pressured and fractured, or water that has been produced as a by-product of gas production (known as produced water).

except when drilling or production liner is used. Casing would be set in the hole, one joint at a time, threading one piece into a collar on the next casing.

The wells would be lined with the following:

- Conductor casing to a depth of at least 80 feet
- Surface casing to at least 400 feet
- Intermediate casing to approximately 3,000 to 5,500 feet
- Production casing to the target well depth

Casing programs depend on the target depth and individual well casing plan.

The casing would be cemented into place in stages by pumping a slurry of dry cement and water into the casing head, down through the casing string to the bottom of a string stage, then up through the spacing between the casing and the wellbore (annulus), then back up to the surface. (The exception would be when a production string is used.) Surface casing cement would be calculated to return to the surface (100 percent excess volume).

After the cement is pumped into the casing, a one-inch-diameter pipe would be run on the outside of the casing and approximately 50 sacks of cement would be used to top off the annulus. If the cement does not circulate back to the surface, a temperature log would be run to find the top of cement. At this point, corrective measures would be taken if necessary.

A plug would be pushed to the bottom of the wellbore to remove any residual cement from the inside walls of the casing. If adequate cement coverage and quality were not attained, remedial actions would be taken, based on site-specific situations. Calculated volumes of cement would be pumped into the annulus to fill the space, where it would be allowed to harden. A cement bond log would be run on the wellbore to ensure that no voids remain in the annulus.

Cementing the annulus around the casing pipe would restore the original formation isolation by the following:

- Posing a barrier to the vertical migration of fluids or gases between rock formations within the annulus of the borehole
- Protecting the well by preventing formation pressures from damaging the casing
- Retarding corrosion by minimizing contact between the casing and naturally occurring corrosive formation fluids

Each well may have multiple strings, and each string would be cemented independently.

All drilling operations and other well site activities would be conducted in compliance with COGCC rules and regulations. Pressure tests would be required before drilling out from under all casing strings set and cemented in place. Blowout preventer controls would be installed before drilling out the surface shoe and before starting work over or completion operations. Blowout preventers would be inspected and tested at regular intervals to ensure good mechanical working order.

Site-specific descriptions of drilling procedures would be included in each APD submitted to the COGCC for each proposed well.

Drilling activities on individual wells would typically occur 24 hours per day, 7 days per week, and would require approximately 16 workers.

Coal bed methane natural gas wells would typically be drilled vertically; however, some would be drilled directionally, including horizontally, depending on the specific needs at that location. This would be dictated by terrain in the surrounding areas, distance to the unit boundary, and other site-specific factors. There could also be multiple wells on one well pad. Development of coal bed methane natural gas wells on new well pads, including construction, drilling, stimulation, and completion, would require an average of 60 days.

Shale and sandstone gas wells could be drilled vertically, directionally, or with multiple horizontal wells from a single pad, where feasible, to minimize the number of well pads required to drain the resource. Directionally drilled wells, both shallow and deep, could take approximately 46 to 60 days per well to drill. Development of shale gas wells on new well pads would require an average of 85 days.

Under the proposed action, SGI would specify the type of wellbore, target formation, and drilling lubricant in the APD and POD when submitting them to the BLM. All drilling operations and other well site activities would be conducted in compliance with BLM policies and regulations and with the master surface use plan of operations and master drilling plan.

#### *Water Disposal Well Drilling*

For the proposed action, SGI proposes drilling up to four new water disposal wells. For each disposal well, a 24-inch-diameter hole would be drilled for the first 40 feet, and then the diameter would be gradually reduced with decreasing diameters of casing strings until the hole reaches its target depth, estimated at 10,000 feet. Once the casing strings are set and the outside annulus is cemented in place for each string of casing, the wells would be completed (see *Water Disposal Well Completion* below).

Tubing with a diameter of 2.875 to 3.5 inches would be run down the casing to the top of the target disposal zones. The tubing would be landed in a set packer approximately 100 feet above the uppermost completed injection zone. A

packer set has rubberized rings, which when activated seal off the bottom of the casing, preventing disposal waters from migrating up the insides of the casing. Above the packer set, the annulus between the tubing and inner casing walls would be filled with packer fluid. Pressure would be monitored at the surface to detect any loss of packer fluid into surrounding formations and to detect migration of injected water upward into nontarget annulus zones, as well as to ensure tubing, packer, and casing integrity.

The disposal wells may be completed in the Dakota, Morrison, Entrada, or Maroon Formations; the primary injection target zone is the Entrada Formation at 8,900 feet, with the Maroon Formation in the secondary injection zone, at 9,000 to 9,500 feet. The maximum injection rate for the Maroon Formation is 4,000 barrels per day, while the maximum injection rate for the Entrada Formation is 2,000 barrels per day. If these formations are not usable, the Dakota and Morrison Formations may also be evaluated. A water-based mud system would be used for drilling the surface hole, and a low-solids, nondispersed gel system would be used for the intermediate and production hole sections of the water disposal well.

Drilling water disposal wells would require 60 to 120 days. Up to approximately 3,000 barrels of water would be used for drilling a particular water disposal well. For the proposed action, that would result in up to 12,000 barrels or 1.5 acre-feet of water (up to 3,000 barrels per well multiplied by up to four new water disposal wells drilled). Approximately 30 percent (3,600 barrels or 0.5 acre-feet) of that water usage will be from fresh water sources and the remainder will be from recycled or produced water sources.

The BLM would permit water disposal wells as APDs if the wells were on-lease; SGI would then go through the conversion process with the BLM and COGCC to ensure that no production could come from the wells before they are used for water disposal.

### 2.1.6 Completion

#### *Gas Well Completion*

After drilling and casing the well, SGI would begin a completion program to stimulate production of natural gas and to determine gas and water production characteristics. A mobile completion rig (also called a work-over rig and similar to the drill rig) may be used to complete each well. The well completion process, lasting 8 to 10 days, would include perforating the well's steel casing and cement, hydraulically fracturing the producing formations, and installing a series of valves and fittings on the wellhead. Hydraulic fracturing does not always require the presence of a work-over rig.

Wells are often treated during completion to improve resource recovery by increasing the rate and volume of hydrocarbons moving from the natural gas reservoir into the wellbore. These processes are known as well-stimulation

treatments and include hydraulic fracturing, acidizing, and other mechanical and chemical treatments, often used in combination.

Hydraulic fracturing is a 60-year-old process used to maximize the extraction of underground resources by allowing natural gas to move more freely from the rock pores to production wells that bring the gas to the surface. Fluids, commonly made up of water and chemical additives (e.g. recycled or freshwater, liquid carbon dioxide, sand, and chemical additives), are pumped into a geologic formation at high pressure. When the pressure exceeds the rock strength, the fractures are opened or enlarged.

After the fractures are created, a propping agent is pumped in to keep them from closing when the pumping pressure is released. After fracturing is completed, approximately 60 to 80 percent of the injected fracturing fluid returns to the wellbore (EPA 2004). The specific type and components of the fracturing fluid chemical vary, based on geologic formation and by company, but it may include such constituents as hydrochloric acid, antibacterial agents, corrosion inhibitors, and surfactants (BLM 2013). In accordance with COGCC Order No. 1R-114, operators are required to post their disclosure of chemicals intentionally added to hydraulic fracturing fluids on FracFocus.

Hydraulic fracturing is now being used more commonly due to advances in technology. Groundwater is protected during the fracturing process by a combination of the casing and cement that is installed when the well is drilled and by the depth of the rock between fracture zone and any freshwater-bearing zones or aquifers (EPA 2004). The casing and cementing techniques described in the master drilling plan (see **Appendix E** of the Final EIS for details) would provide redundant protection of all usable aquifers above the target zones. This would be accomplished by cementing both the surface and intermediate casing strings from the base of pipe back to the surface.

During completion operations, SGI would use recycled water, freshwater, or a combination of both, and the quantities used would vary in accordance with the formations where the wells are completed. As each well type requires vastly different volumes of water, calculations for estimated water usage were based on assuming 50 percent coal bed natural gas (CBNG) wells and 50 percent shale wells, as discussed in the Bull Mountain Environmental Assessment. Calculations used the number of new wells per alternative divided in half for each type of well (CBNG or shale). To estimate the volume of water use per well type, the number of wells was multiplied by the highest volume of water used for that well type. Water usage totals were added together for a total maximum amount of water usage. The results showed that there could be up to 18,381,000 barrels (or 2,369.3 acre-feet) of water used for well completions during the six-year development timeframe. Approximately 30 percent (5,514,400 barrels or 710.8 acre-feet) of that water usage will be from fresh water sources and the

remainder will be from recycled or produced water sources. If fewer shale wells were drilled and completed, the water use estimate would be lower.

Test gas could be flared (released to the atmosphere) or captured for sale, which would prevent its escape to the atmosphere. The BLM will follow the EPA New Source Performance Standard, Subpart OOOO regulations, regarding use of green completions. (See also COGCC Regulation 2, Colorado Code of Regulations 805.b[3] for further details on green completion technologies.)

If a well is flared, the flares are designed to be directed straight upward and are located in an area on the pad to prevent damage to the environment or a safety hazard. In the event it becomes necessary to flare a well, a deflector or directional orifice would be designed and installed to safeguard both personnel and adjacent lands.

The flow-back involves removing the water that was used to stimulate the well.

Following the hydraulic fracturing of the well, a percentage of the fluid, consisting primarily of produced water, may be returned to the surface. This percentage of return varies between wells. Even though the produced water and gas can flow into the casing after it is perforated, a small-diameter pipe, called tubing, is placed in the well to serve as a way for the produced water to be brought to the surface. Typically, the start of the tubing is placed below the perforated interval to allow any fluids collecting at the bottom of the well to be pumped up to the surface. The tubing in the well is suspended from the wellhead, so as the well production flows up, it can be controlled by opening and closing valves on the wellhead. Excess produced water would be stored on the pad in containers, piped to the McIntyre Flow-back Pits (see *Flow back Pits*, below), or sent to a water disposal well for reinjection.

Typical equipment and vehicles used during completion activities are as follows:

- Propane and carbon dioxide tanker trucks
- Hydraulic fracturing trucks
- Sand transport trucks
- Water trucks
- Oil service trucks used to transport pumps and equipment for hydraulic fracturing
- Flatbed and gin trucks to move water tanks, rigs, tubing, and hydraulic fracturing chemicals
- Logging trucks (cased hole wire-line trucks)
- Pickup trucks to haul personnel and miscellaneous small materials

Completion activities on individual wells would occur 24 hours per day, 7 days per week, and would require approximately 25 workers. Completion of an individual well would generally take approximately 7 days, depending on conditions at the individual well. Flow testing follows completion and takes 25 to 50 days. Only two workers are employed 24 hours per day for testing.

***Flow-back Pits***

In order to minimize the consumptive use of water for completion operations, SGI has constructed four pits on private surface lands to temporarily store a mixture of freshwater, produced water, and recycled water before and after completion operations, in accordance with the regulatory guidance and permitting of COGCC. The flow-back pits would reduce the volume of water-transport truck traffic, on-site storage of water on pads in hydraulic fracturing tanks, and subsequent removal of waters between hydraulic fracturing operations. At this time the flow-back pits are permitted as follows: two pits on Rock Creek Ranch (T11N, R90W, Section 24), immediately north of SGI's existing Federal 11-90-24-2 WDW, and two additional pits on Rock Creek Ranch lands in T11N, R90, Section 26. Since all four flow-back pits would be on lands previously owned by the McIntyre Ranch, they are referenced as shown in **Table 2-4**.

**Table 2-4**
**McIntyre Flow back Pits**

| Pit Name | Dimensions | Fluid Volume Capacity (Barrels) |
|---|---|---|
| McIntyre Flow-back Pit 1 | 130 feet by 200 feet by 12 feet deep (10 feet fluid depth) | 31,463 |
| McIntyre Flow-back Pit 2 | 110 feet by 230 feet by 12 feet deep (10 feet fluid depth) | 29,720 |
| McIntyre Flow-back Pit 3 | 150 feet by 600 feet by 12 feet deep (10 feet fluid depth) | 144,247 |
| McIntyre Flow-back Pit 4 | 150 feet by 600 feet by 13 feet deep (11 feet fluid depth) | 144,247 |

Freshwater, production water, and recycled water would be delivered to the McIntyre pits through surface high-density polyethylene pipe (referred to here as poly pipelines) and existing buried steel water pipelines for temporary storage before hydraulic fracturing begins. Temporary water pumps would draw water from the McIntyre pits into the temporary surface pipes and existing water pipelines (in order to reduce the number of trucks hauling fluid). Water would be mixed with sands and chemicals on a target pad site before being injected into a wellbore (see the *Drilling* and *Hazardous Material and Solid Waste* sections below for details on chemicals used).

As noted above, SGI plans to temporarily lay down poly pipelines in order to transport the fresh or recycled water used for completions from the McIntyre pits to storage tanks and then to the wellhead. Generally, the pipe strings would follow roads. The length of time the pipe is on the surface depends on where and when a well is to be completed; it is moved from one location to another when a new well is ready for completion. Temporary poly pipelines may be left

in place for several months in some cases. Pipe diameter depends on the volume and pressure of water needed for the completion. SGI anticipates that a 12-inch internal diameter would be the largest pipe required, but a smaller interior diameter pipe—for example, eight-inch or six-inch—could be used if needed.

After hydraulic fracturing operations for a well are complete, used fluids would be flowed back out of a wellbore, filtered on the pad site, temporarily stored in tanks. Then the fluids would be pumped into trucks and transported to a McIntyre flow-back pit. Alternatively, they could be pumped into an existing water pipeline or temporary surface poly pipeline for delivery to a McIntyre flow-back pit for temporary storage. These used fluids could then be reused for additional hydraulic fracturing operations during the same season if water condition allows.

The highest total dissolved solids anticipated in the water contained in the pits would be 60,000 to 70,000 parts per million, with an average total dissolved solids of 40,000 parts per million. Produced water total dissolved solids in the field is approximately 15,000 parts per million.

Construction of the McIntyre pits involved salvaging topsoil, excavating the pit itself, and compacting the pit interior. Pits have been engineered with a triple liner system that includes surface and groundwater sites and four groundwater monitoring wells, as required by the COGCC permits. There is a one-foot berm surrounding the pit over which the liners are pulled and anchored on the opposite side. At least two feet of freeboard is maintained in the pits at all times. Bird deterrent netting is stretched over the pits; additionally, year-round wildlife and silt fencing has been placed around the pits to keep terrestrial wildlife out of a full or empty pit.

***Water Disposal Well Completion***

The additional water disposal well would also require completion. Similar to traditional wells, a work-over rig would be used to complete the well. This process includes perforating the well's steel casing and may include hydraulic fracturing of the formation to improve its ability to accept injected water. This supplemental hydraulic fracturing could also recur later in the life of the well. Drilling and hydraulic fracturing would follow standard industry and regulatory procedures. It would be permitted as under producing wells, with the additional process of converting it to a disposal well. Multiple disposal zones would be perforated in order to allow produced water to flow into any of the available receiving formations and to allow for redundancy in receiving formations.

### 2.1.7 Interim Reclamation

Following well completions, portions of the well pad not needed for production would be reseeded and reclaimed according to BLM specifications. Long-term well pad disturbance from the 36 new well pads would be reduced to 72 acres following successful interim reclamation; see **Appendix D** of the Final EIS for reclamation details.

### 2.1.8 Production and Maintenance

***Production***

If a well were determined to be commercially productive, production facilities would be installed on the well pad. Typically, up to eight 200- to 400-barrel storage tanks would be installed per well for produced water and one storage tank for condensate (if needed). The produced water would be piped or trucked to the McIntyre pits, storage tanks, or water disposal wells (described below in the *Produced Water Management* section). Condensate, if produced, would be transferred to trucks as necessary and transported for sale or to an approved disposal site. Typically, a heated three-phase separator, rated at 0.125 million British thermal units per day, would be necessary to separate fluids associated with each wellbore. Protective barriers would be installed around the production facilities, including tanks. The appropriate location of facilities would be determined during the APD process.

Dehydration facilities to separate water from natural gas would be centralized at compression facilities.

Where applicable, wells would be fitted with cavity pumps that would require generators to power them. Currently, there is a 188-horsepower generator to run two cavity pumps, but smaller, more efficient turbine generators could also be used. These pump and generator systems could be used on any type of well, whether coal bed methane natural gas or shale, if needed. The prime mover for pump jacks would be 50-horsepower or less, natural gas-fired, internal combustion engines.

Remote monitoring would be applied based on information and locations provided in the wildlife mitigation plan. Centralized production facilities may be used should it be determined that doing so would provide a net benefit to the impacted resources. It would be determined at the permitting stage whether centralized production facilities are required or developed as part of a project's design features.

All site security guidelines (Onshore Order #3) would be followed as identified in the BLM's statutes, regulations, and policy.

Existing wells in the Unit have seen steady increases in production since initial production year of 2010. **Table 2-5** illustrates the volumes of gas and water produced each year.

***Surface Facilities***

Installed surface facilities for each gas well would include the wellhead and may include artificial lift, separators, water transfer, pumps, tank batteries, wellhead compression, and gas-metering facilities. Installation and regulatory requirements would be in accordance with BLM standards, policies, and regulations. If artificial lift is used, the driver may be powered by natural gas.

**Table 2-5**
**Bull Mountain Unit Annual Production Rates**

| Year | Average No. of Prod. Wells | Average No. of Prod. Days | Gas Production (MCF)[2] | Water Production (Barrels) |
|---|---|---|---|---|
| 2010 | 12 | 30 | 133,455 | 10,911 |
| 2011 | 11 | 99 | 132,678 | 224,476 |
| 2012 | 9 | 110 | 95,299 | 254,944 |
| 2013[1] | 9 | 33 | 3,350 | 23,578 |

Source: COGCC 2013
[1]Production through March 2013
[2]1,000 cubic feet; production amounts from SGI, August 7, 2013

Facilities would occupy less than one acre on the site. All long-term facility structures would be painted in accordance with the authorizing agency's standards. Separated produced water from each well would be transported or pumped through in-ground water lines to an approved disposal well. Disposal of produced water would be in accordance with a plan approved by the COGCC.

All permanent structures would be painted a flat, no reflective, standard environmental color, as specified in the BLM's APD authorization. Facilities would be painted within six months of being located on the site. As required by the Occupational Safety and Health Administration, some equipment would be painted for safety considerations; that is, some parts of equipment would retain their safety coloration so they would stay visible and would not blend with the surroundings.

Surface facilities for water disposal wells would be the wellhead, water injection pump and housing, filter skid and gas filter skid, and approximately six to eight 400-barrel holding tanks and one 90-barrel facility drain tank. Water storage tanks would be heated during the winter to prevent ice formation in the tanks and lines. The injection pumps for the water disposal well would be powered by electricity supplied by overhead or buried electrical lines or by natural gas engine. Facilities would occupy less than an acre on the well pad, which would be 1.4 acres following interim reclamation. All long-term facility structures would be painted in accordance with the authorizing agency's standards. Remote monitoring or similar technology would be installed on all Unit wells and flow-back pits to minimize well monitoring trips throughout the Unit.

The BLM Authorized Officer would be promptly notified of any emergency work commencing.

SGI would conduct the minimal level of seasonal road maintenance required to pump the well or respond to emergencies.

Where strict adherence to mitigations is required related to the proposed project (e.g., in cases of winter construction or drilling, operations in groundwater recharge areas, or facilities in riparian or wetland areas), the BLM

may require a third-party compliance contractor. This contractor would be responsible for monitoring and compliance reporting and would be under the direct supervision and control of the BLM, with input from and participation by SGI at the discretion of the BLM. Multiple third-party contractors may be required to ensure that monitoring is conducted by professionals with the appropriate expertise.

SGI would use a second storage yard sized approximately 250 feet by 400 feet, and it would be located on SGI's property to store materials and equipment (T. 11 S, R. 90 W, Section 14).

Relevant appendices from the Final EIS attached to this BA are **Appendix A**, Best Management Practices and Conditions of Approval, **Appendix B**, Lease Stipulations, and **Appendix C**, Wildlife Mitigation Plan. Relevant Best Management Practices, Conditions of Approval, and Stipulations are discussed further in the effects analysis of **Chapter 4** of this BA.

# SECTION 3
# EVALUATED SPECIES

## 3.1    INTRODUCTION

Six T&E species, including their critical habitat, are addressed in this BA (see **Table 1-1**). This chapter describes the following for each species:

- Species description
- Life history
- Status and distribution
- Environmental baseline
- Critical habitat
- Threats

The environmental baseline is defined by the regulations implementing the ESA (50 CFR, Part 402.02) as the following:

- Past and present impacts of all federal, state, and private actions and other human activities in the action area
- The anticipated impacts of all proposed state or federal projects in the action area that have already undergone formal or early Section 7 consultation
- The impact of state or private actions that are contemporaneous with the consultation process

The action area is defined at 50 CFR, Part 402, to mean "all areas to be affected directly or indirectly by the federal action and not merely the immediate area involved in the action." For the purposes of this consultation, the action area includes lands and federal mineral estate administered by the BLM in the Unit and those areas nearby that could be affected by the proposed action. In the

case of water depletions and the four endangered big river fish, the action area extends downstream for the entire range of each species in the Colorado River.

## 3.2 Listed Species

### 3.2.1 Colorado Pikeminnow

***Species Description***

The Colorado pikeminnow (formerly the Colorado squawfish) is the largest cyprinid fish endemic to the Colorado River Basin. This species historically reached a maximum length of approximately 6 feet (1.8 meters) and a maximum weight of 80 pounds (36 kilograms; USFWS 2002b). Young are silvery and usually have a dark wedge-shaped spot at the base of the caudal fin. Adults are strongly counter-shaded, with a dark olive back and a white belly. Today's fish rarely exceed 3 feet (0.9 meter) in length or weigh more than 18 pounds (8 kilograms).

***Life History***

The Colorado pikeminnow is a long-distance migrator and top ecosystem predator. It lives in warm water reaches of the Colorado River main stem and larger tributaries. It requires uninterrupted stream passage for spawning migrations and young dispersal (USFWS 2002b). The species is adapted to a hydrologic cycle characterized by large spring peaks of snowmelt runoff and low, relatively stable base flows. High spring flows create and maintain in-channel habitats and reconnect floodplain and riverine habitats; this phenomenon is described as the spring flood-pulse.

Throughout most of the year, juvenile, subadult, and adult Colorado pikeminnow use relatively deep, low-velocity eddies, pools, and runs that occur in nearshore areas of main river channels. In the spring, Colorado pikeminnow adults use floodplain habitats, flooded tributary mouths, flooded side canyons, and eddies that are available only during high flows. Such environments may be particularly beneficial for the species because other riverine fishes gather in floodplain habitats to exploit food and temperatures and may serve as prey. Such low-velocity environments also may serve as resting areas for Colorado pikeminnow. River reaches of high habitat complexity appear to be preferred. Young pikeminnow feed on insects and plankton, and adults feed on other fishes (USWFS 2002b).

***Status and Distribution***

The Colorado pikeminnow is listed as endangered under the ESA (16 USC, Section 1531 et seq.). It was included on the first list of endangered species issued by the Office of Endangered Species on March 11, 1967 (32 *Federal Register* [*FR*] 4001) and was considered endangered under provisions of the Endangered Species Conservation Act of 1969 (16 USC, Section 668aa). The Colorado pikeminnow was included on the United States List of Endangered

Native Fish and Wildlife issued on June 4, 1973 (38 *FR* 14678). It received protection as endangered under Section 4(c)(3) of the original ESA of 1973.

The current revised Colorado pikeminnow recovery plan was approved on August 1, 2002 (USFWS 2002b). The final rule for determining critical habitat was published on March 21, 1994 (USFWS 1994), and the final designation became effective on April 20, 1994.

The Colorado pikeminnow is one of four endangered fish species addressed in a Recovery Implementation Program for the Upper Colorado River Basin (USFWS 1987). The program was initiated in January 1988 and is described later in this section.

Colorado pikeminnow occurrence is currently restricted to the upper Colorado River Basin. It inhabits warm-water reaches of the Colorado, Green, San Juan, Yampa, and White Rivers and their associated tributaries. Most of Lake Powell is not suitable habitat for Colorado pikeminnow, so it is not designated critical habitat. Its 1,148 designated miles (1,847 kilometers) represent 29 percent of the historical habitat for the species.

***Environmental Baseline***

*Occurrence in the Action Area*

Colorado pikeminnow do not occur in the Unit, but they do occur in the larger action area in the Gunnison and Colorado Rivers.

*Past and Present Impacts*

The following factors contributed historically to the decline of the Colorado pikeminnow:

- Changes in flow regime (especially the timing and amplitude of high flows) associated with construction of dams and irrigation diversions
- Reduced flow volumes that prevent effective or efficient movement of sediment, resulting in river channel constriction, reduced spawning habitat, habitat complexity and diversity loss, and reproduction and recruitment impacts
- Elevated selenium concentrations due to watershed level inputs from the Mancos Shale-based soils in the upper Colorado River Basin
- Interference with migration to and from spawning grounds from dams and other in-stream features
- Competition or predation on eggs, larvae, and juvenile fish by introduced predatory game and non-game fishes

The impoundment of water and water depletion from the Colorado River and its tributaries have also been large factors in the decline of this species. Important micro-habitats, such as backwaters, can be dewatered or reduced in volume or lost due to reduced flows. The frequency of periodic flooding of river bottomlands located next to the river can be reduced. Flooded bottomlands are important for riparian regeneration and maintenance and as seasonal foraging habitat. Streamflow regulation includes main stem dams that have the following adverse effects on Colorado pikeminnow and its habitat:

- Migration blockages

- Flow pattern changes (reduced peak flows, changed timing of snowmelt runoff)

- Cold water release, making temperature regimes less than optimal

- River habitat change into lake habitat

- Flow volume reduction, which can prevent effective and efficient sediment movement

In the upper basin, 435 miles (700 kilometers) of Colorado pikeminnow habitat has been lost by reservoir inundation from Flaming Gorge Reservoir on the Green River, Lake Powell on the Colorado River, and Navajo Reservoir on the San Juan River. Coldwater releases from these dams have eliminated suitable habitat for native fishes, including Colorado pikeminnow, from river reaches downstream for approximately 50 miles (80 kilometers) below Flaming Gorge Dam and Navajo Dam.

In addition to main stem dams, many dams and water diversion structures occur in and upstream of critical habitat. This reduces flows and alters flow patterns, which adversely affect critical habitat. Diversion structures in critical habitat divert fish into canals and pipes where the fish are permanently lost to the river system. The number of endangered fish lost in irrigation systems is unknown, but in some years, in some river reaches, most of the river flow is diverted into unscreened canals. High spring flows that maintain habitat diversity have been reduced by dams regulating flow and by water diversions. Frequency and magnitude of peak flows have been reduced by dams, resulting in the loss of flushing sediments from spawning substrates, lowered invertebrate food production, lessened formation of gravel and cobble deposits important for spawning, and loss of backwater nursery habitats (McAda 2002; Muth et al. 2000).

Predation and competition from nonnative fishes have been clearly implicated in the population reductions or elimination of native fishes in the Colorado River Basin (Dill 1944; Osmundson and Kaeding 1989; Behnke 1980; Joseph et al. 1977; Lanigan and Berry 1979; Minckley and Deacon 1968; Meffe 1985; Propst and Bestgen 1991; Rinne 1992). Data collected by Osmundson et al. (1995)

indicate that during low-water years, the number of nonnative fish, capable of preying on or competing with larval endangered fishes, greatly increased.

More than 50 nonnative fish species were intentionally introduced in the Colorado River Basin before 1980. The nonnatives were intended for sport fishing, forage fish, biological control, and ornamental purposes (Minckley 1982; Tyus et al. 1982; Carlson and Muth 1989). Nonnative fishes compete with native fishes in several ways, resulting in smaller populations and species sizes. Because the capacity of a particular area to support aquatic life is limited by physical habitat conditions, increasing the number of species in an area usually results in a smaller population of most species. The size of each species population is controlled by the ability of each life stage to compete for space and food resources and to avoid predation. Some nonnative fishes during certain life stages appear to have a greater ability to compete for space and food and to avoid predation in the altered habitat than do some native fishes in certain life stages.

The Colorado pikeminnow is one of four endangered native fishes in the upper Colorado River Basin; the others are the endangered humpback chub, bonytail, and razorback sucker. These fishes are found only in the Colorado River system. In 1988, the Upper Colorado River Endangered Fish Recovery Program (http://www.coloradoriverrecovery.org/) was established to help bring these four endangered species back from the brink of extinction. The program is a unique partnership of local, state, and federal agencies, water and power interests, and environmental groups. They are working toward the recovery of endangered fish in the upper Colorado River Basin, while water development proceeds in accordance with federal and state laws and interstate compacts.

This major undertaking involves restoring and managing streamflows and habitat, boosting wild populations with hatchery-raised endangered fish, and reducing negative interactions with certain nonnative fish species. The goal of recovery is to achieve natural self-sustaining populations of the endangered fish so they no longer require protection under the ESA.

The recovery program was initiated in 1988 with the signing of a cooperative agreement by the governors of Colorado, Utah, and Wyoming, the Secretary of the Interior, and the administrator of the Western Area Power Administration. In 2013, these parties agreed to extend the cooperative agreement through September 30, 2023. The program provides ESA compliance for continued operation of federal water and power projects, in accordance with project purposes.

With its demonstrated successes, the Upper Colorado River Endangered Fish Recovery Program has become a national model for its collaborative conservation efforts to protect endangered species.

***Critical Habitat***

Critical habitat was designated in 1994 in the 100-year floodplain of the Colorado pikeminnow's historical range, and the six designated critical habitat units encompass portions of the Yampa, Green, White, Gunnison, Colorado, and San Juan Rivers (USFWS 1994).

The Unit is within a tributary watershed to designated critical habitat. Within the analysis area for this project, designated critical habitat occurs from the confluence of the Gunnison and Uncompahgre Rivers in the city of Delta, downstream to the confluence with the Colorado River (Petterson 2012). The upstream distribution of pikeminnow is likely limited by the Hartland Diversion Dam on the main stem of the Gunnison River, upstream of Delta, and possibly cold water releases from the Aspinall Storage Unit (which includes the Blue Mesa, Morrow Point, and Crystal Reservoirs; Petterson 2012).

Critical habitat primary constituent elements for the four endangered big river fishes are described in **Table 3-1**. The location of critical habitat for each species in relation to the Unit is discussed under the subheading for each species, below.

**Table 3-1**
**Primary Constituent Elements of Critical Habitat for Colorado Pikeminnow, Razorback Sucker, Bonytail, and Humpback Chub**

| Features | Description |
|---|---|
| Water | A quantity of water of sufficient temperature, dissolved oxygen, nutrients, turbidity, and lack of contaminants delivered to a specific location, in accordance with a hydrologic regime that is required for the particular life stage of each species. |
| Physical habitat | Areas of the Colorado River system that are inhabited by or could be inhabited by fish for spawning, rearing, and feeding; it also refers to corridors between these areas. In addition to river channels, these areas include bottomlands, side channels, secondary channels, oxbows, backwaters, and other areas in the 100-year floodplain. When inundated, these areas provide habitats for feeding, spawning, and rearing or provide access to these habitats. |
| Biological environment | Food supply, predation, and competition are important elements of the biological environment and are considered components of it. Food supply is a function of nutrient supply, productivity, and availability to each life stage of the species. Predation and competition, although considered normal components, are out of balance due to introduced nonnative fish species in many areas. |

Source: USFWS 1994

***Threats***

The primary threats to Colorado pikeminnow are as follows:

- Habitat modification and streamflow reduction and regulation

- Competition with and predation by nonnative fishes

- Pesticides and other pollutants (BLM 2008a; USFWS 2002b)

### 3.2.2 Razorback Sucker

***Species Description***

The razorback sucker is a large catostomid (sucker) fish endemic to the Colorado River Basin. It is the only sucker with a sharp-edged dorsal keel behind its head. In the lower Colorado River Basin, these fish have reached lengths of over 3 feet (0.9 meter) and a weight of as much as 10 pounds (4.5 kilograms). Fish in the upper Colorado River Basin tend to be smaller than those in the lower Colorado River Basin. They may live for over 40 years (USFWS 2002c).

***Life History***

Adult razorback suckers occupy different habitats seasonally. Spring habitats required by adults in rivers are deep runs, eddies, backwaters, and flooded off-channel environments; summer habitats are runs and pools, often in shallow water associated with submerged sandbars; and winter habitats are low-velocity runs, pools, and eddies. The species spawns in rivers during spring runoff, over bars of cobble, gravel, and sand substrates. Water flow ranges widely, and water temperatures are typically greater than 57 degrees Fahrenheit (13.9 degrees C; USFWS 2002c). Razorback suckers breed in the spring, when flows in riverine environments are high typically. Their diet consists primarily of algae, plant debris, and aquatic insect larvae.

***Status and Distribution***

The razorback sucker is currently listed as endangered under the ESA, under a final rule published on October 23, 1991 (56 *FR* 54957). A recovery plan was approved on August 1, 2002 (USFWS 2002c); a previous recovery plan was dated December 23, 1998 (USFWS 1998c). The final rule for determination of critical habitat was published on March 21, 1994 (USFWS 1994), and the final designation became effective on April 20, 1994. The species is also state listed as endangered.

The razorback sucker is one of four endangered fish species addressed in the Recovery Implementation Program for the Upper Colorado River Basin (USFWS 1987). The program was initiated in January 1988 and is described in **Section 3.2.1** of this BA.

Historically, razorback suckers were found in the main stem Colorado River and in its major tributaries in Arizona, California, Colorado, Nevada, New Mexico, Utah, Wyoming, and Mexico. This species was reportedly once so numerous that it was commonly used as food by early settlers; commercially marketable quantities were caught in Arizona as recently as 1949. In the upper basin, razorback suckers were reported in the Green River to be very abundant near Green River, Utah, in the late 1800s (USFWS 1991).

In the upper Colorado River Basin, above Glen Canyon Dam, razorback suckers are currently found in limited numbers in both lentic (lake-like) and riverine

environments. The largest populations of razorback suckers in the upper basin are found in the upper Green and lower Yampa Rivers (Tyus 1987). In the Colorado River, most razorback suckers occur in the Grand Valley area, near Grand Junction, Colorado, but they are increasingly rare.

***Environmental Baseline***

*Occurrence in the Action Area*

Razorback suckers do not occur in the Unit but do occur in the larger action area in the Colorado River. Wild populations of razorback suckers—that is, those not recently stocked—are considered to be extirpated from the Gunnison River (USFWS 2008)

*Past and Current Impacts*

The abundance and distribution of the razorback sucker have been dramatically reduced because of water developments, such as dams and water diversions. Dams have altered the timing, magnitude, and duration of flows that characterize the variation in annual runoff in unaltered large rivers. Altered flows resulting from dam operation can also affect the abundance and distribution of spawning and rearing habitats preferred by the razorback sucker.

Historical water depletions and any new water depletions are likely to negatively affect population and habitat conditions downstream, although assessing the effects on species' viability may be difficult.

In addition, incidental catch by recreational anglers may pose a threat from stress-caused direct and delayed mortality (USFWS 2002c). The impoundment of water and water depletion from the Colorado River and its tributaries has been a large factor in the decline of this fish.

***Critical Habitat***

Critical habitat was designated in 1994 in the 100-year floodplain of the razorback sucker's historical range, including in the Colorado, Gunnison, and Green Rivers (USFWS 1994). The Unit is in a tributary watershed to designated critical habitat in the Gunnison and Colorado Rivers, including the Gunnison River's100-year floodplain from the Redlands Diversion Dam downstream of Delta to the confluence with the Colorado River.

***Threats***

The primary threats to razorback sucker are as follows:

- Water developments, such as dams and water diversions and water depletions
- Habitat alterations and reductions or loss of important micro-habitats

- Introduction of nonnative fishes, which compete for resources and can hybridize with this species
- Pollutants and pesticides

### 3.2.3 Bonytail

***Species Description***

The bonytail is a large fish in the minnow family. It is endemic to the Colorado River Basin and can live for 50 years. Adult bonytail are gray or olive on the back, with silvery sides and a white belly. The adult bonytail has an elongated body with a long, thin caudal peduncle (a stalk-like part). The head is small and compressed, compared to the rest of the body. The mouth is slightly overhung by the snout, and there is a smooth low hump behind the head that is not as pronounced as that on humpback chub. Adults attain a maximum length of about 22 inches (55 centimeters) and maximum weight of about 2.4 pounds (1.1 kilograms; USFWS 2002a).

***Life History***

Little is known about the specific habitat requirements of bonytail because the species was extirpated from most of its historic range before extensive fishery surveys. The bonytail is adapted to main stem rivers, where it has been observed in pools and eddies. Similar to other closely related *Gila* species, bonytail in rivers probably spawn in spring over rocky substrates. Spawning in reservoirs has been observed over rocky shoals and shorelines. Based on available distribution data, flooded bottomland habitats are likely important growth and conditioning areas for bonytail, particularly as nursery habitats for young. Flow recommendations specifically consider flow-habitat relationships in historic habitat of bonytail in the upper basin. These recommendations were designed to enhance habitat complexity and to restore and maintain ecological processes (USFWS 2002a).

The bonytail's large fins and streamlined body are an adaptation to torrential flows. Of five specimens captured in the upper basin, four were captured in deep, swift, rocky canyon regions (Yampa Canyon, Black Rocks, Cataract Canyon, and Coal Creek Rapid); the fifth was taken in Lake Powell. All fish taken from the lower basin since 1974 were caught in reservoirs. Individuals found in reservoirs are believed to inhabit their former habitats now inundated by these impoundments.

Vanicek (1967), who handled numerous bonytail, detected no difference in their habitat selection from roundtail chub. These bonytail were generally found in pools and eddies in the absence of, although occasionally next to, strong currents and at varying depths, generally over silt and silt-boulder substrates. No quantitative habitat data are available for this species. Adult bonytail captured in Cataract Canyon and Desolation/Gray Canyons were sympatric (related species occurring in the same area) with humpback chub. Both were

found in shoreline eddies, among emergent boulders and cobble and next to swift currents (USFWS 2002a).

Similarly, little is known of the food habits of the bonytail. They are reportedly largely omnivorous, with a diet of terrestrial insects, plant matter, and fish. Several bonytails were observed feeding on floating debris washed by heavy rainfall. Vanicek (1967) reported that "Colorado chubs" fed mainly on terrestrial insects (mostly adult beetles and grasshoppers), plant debris, leaves, stems, and woody fragments (USFWS 2002a).

***Status and Distribution***

The bonytail is listed as endangered under the ESA under a final rule published on April 23, 1980 (45 *FR* 27710). A recovery plan was approved on September 4, 1990 (USFWS 1990a). Recovery goals were subsequently published in an amendment and supplement to the recovery plan dated August 1, 2002 (USFWS 2002a). The final rule for determination of critical habitat was published on March 21, 1994 (59 *FR* 13374), and the final designation became effective on April 20, 1994.

A recovery implementation program for the four upper Colorado River Basin endangered fish species, including bonytail, was initiated in January 1988. The program, comprised of federal, state, and private cooperators, provides specific goals for the recovery of endangered Colorado River fish, while promoting sustainable water development and use (USFWS 1987). In addition, critical habitat for all four species was designated on March 21, 1994 (59 *FR* 13374).

Until the 1950s, bonytail was historically common or abundant in warm-water reaches of large rivers, from Mexico to Wyoming. It was found far downstream in the main stem Colorado River near the Colorado-Utah border in the Black Rocks area (USFWS 2002a). The last known riverine area where bonytail were common was the Green River in Dinosaur National Monument. Vanicek (1967) and Holden and Stalnaker (1970) collected 91 specimens at this location from 1962 to 1966. From 1977 to 1983, no bonytail were collected from the Colorado or Gunnison Rivers in Colorado or Utah. However, in 1984, a single bonytail was collected from Black Rocks on the Colorado River. Several suspected bonytail were captured in Cataract Canyon between 1985 and 1987.

Current stocking plans for bonytail identify the middle Green River and the Yampa River in Dinosaur National Monument as the highest priority areas in Colorado (USFWS 2002a).

Bonytail are so rare that it is not possible to conduct population estimates. A stocking program is being implemented to reestablish populations in the upper Colorado River Basin. From 1996 through 2004, 44,472 subadult bonytail were stocked in the Green and upper Colorado River sub-basins. The recovery goals (USFWS 2002a) call for reestablishing populations in the Green River and upper

Colorado River sub-basins, each with over 4,400 adults that are self sustaining with recruitment.

***Environmental Baseline***

*Occurrence in the Action Area*

Bonytail do not occur in the Unit but do occur in the larger action area in the Colorado River, where they are restricted to portions of Lake Mohave and Lake Mead on the Arizona/Nevada border. Additionally, small non-reproducing populations in the upper Colorado River basin occur in the Desolation Canyon portion of the Green River in Utah and in Cataract Canyon on the Colorado River (USFWS 1990a).

*Past and Current Impacts*

The past and current impacts on bonytail are similar to those described in **Section 3.2.1** for Colorado pikeminnow.

***Critical Habitat***

Critical habitat was designated in 1994 in the 100-year floodplain of the bonytail's historical range, consisting of portions of the Yampa, Green, and Colorado Rivers (USFWS 1994). The Unit is in a tributary watershed of designated critical habitat in the Colorado River. No critical habitat occurs in the Gunnison River for this species.

***Threats***

The primary threats to bonytail are as follows:

- Streamflow reduction and regulation and habitat modification
- Competition with and predation by nonnative fishes
- Pollutants and pesticides

### 3.2.4 Humpback Chub

***Species Description***

The humpback chub is a medium to large cyprinid fish endemic to the Colorado River Basin (Miller 1946). Adults have a pronounced dorsal hump, a narrow, flattened head, a fleshy snout, and small eyes. They are silvery, with a brown or olive back. Adults attain a maximum size of about 1.5 feet (48 centimeters) and a weight of about 2.5 pounds (1.2 kilograms; Valdez and Ryel 1997). They can live for 30 years.

***Life History***

The humpback chub is omnivorous, feeding on aquatic arthropods, smaller fishes, and algae. Adults require eddies and sheltered shoreline habitats maintained by high spring flows. Young require low-velocity shoreline habitats, including eddies and backwaters. Humpback chub live and complete their entire

Case No. 1:20-cv-02484-MSK Document 90-2 filed 05/06/21 USDC Colorado pg 346 of 576

life cycle in canyon-bound reaches of the Colorado River main stem and larger tributaries. These reaches are characterized by deep water, swift currents, and rocky substrates. Subadults use shallow, sheltered shoreline habitats, whereas adults use primarily offshore habitats of greater depths (USFWS 2002d).

***Status and Distribution***

The humpback chub is currently listed as endangered under the ESA. It was included on the first list of endangered species issued by the Office of Endangered Species on March 11, 1967 (32 *FR* 4001) and it was considered endangered under provisions of the Endangered Species Conservation Act of 1969 (16 USC, Section 668aa). The humpback chub was included in the United States List of Endangered Native Fish and Wildlife issued on June 4, 1973 (38 *FR* 14678). It received protection as endangered under Section 4(c)(3) of the original ESA of 1973.

The humpback chub recovery plan was approved on September 19, 1990 (USFWS 1990b). Recovery goals were subsequently published in an amendment and supplement to the recovery plan dated August 1, 2002 (USFWS 2002d). The final rule for determination of critical habitat was published on March 21, 1994 (59 *FR* 13374); the final designation became effective on April 20, 1994. The species is also state listed as endangered.

The humpback chub is one of four endangered fish species addressed in the Recovery Implementation Program for the upper Colorado River Basin (USFWS 1987). The program was initiated in January 1988 and is described in **Section 3.2.1**.

The historical distribution of the humpback chub is not well known because it was not described as a species until 1946; however, its original distribution was presumably limited to swift deep-water areas in the main stem Colorado River Basin, downstream to below the Hoover Dam site. In the upper basin in Colorado, the humpback chub has been found in the Yampa, Gunnison, Green, and Colorado Rivers. However, the greatest number of humpback chub in Colorado are found at the Black Rocks area of the Colorado River and in Utah (along the Westwater Canyon of the Colorado River; BLM 2012).

Currently, the largest populations of this species occur in the Little Colorado and Colorado Rivers in the Grand Canyon and in the Black Rocks and Westwater Canyon in the upper Colorado River. Hybridization with roundtail chub (*Gila robusta*) and bonytail (*G. elegans*) is recognized as a threat to humpback chub. A larger proportion of roundtail chub has been found in Black Rocks and Westwater Canyon during low-flow years (Kaeding et al. 1990; Chart and Lentsch 2000). This increases the chances for hybridization.

***Environmental Baseline***

*Occurrence in the Unit*

The humpback chub does not occur in the Unit but does occurs in the larger action area in the Colorado River, upper Green River, lower Yampa River, and White River. The largest populations occur in the Little Colorado and Colorado Rivers in the Grand Canyon and in the Black Rocks and Westwater Canyons in the upper Colorado River. One fish has been collected from the Gunnison River (Petterson 2012; USFWS 1999).

*Past and Current Impacts*

The impoundment of water and water depletion from the Colorado River and its tributaries has been a large factor in the decline of humpback chub. The existing habitat has been modified to the extent that it impairs essential behavior patterns, such as breeding, feeding, and sheltering. Survival rates in humpback chub of less than two years are thought to be less than 1 in 1,000 (USFWS 2008).

***Critical Habitat***

Critical habitat was designated in 1994 in the 100-year floodplain of the humpback chub's historical range (USFWS 1994). The Unit is in a tributary watershed of designated critical habitat in the Colorado River. No critical habitat occurs in the Gunnison River for this species.

***Threats***

The primary threats to humpback chub are as follows:

- Streamflow reduction and regulation and habitat modification
- Competition with and predation by nonnative fishes
- Pollutants and pesticides

### 3.2.5 Greenback Cutthroat Trout

***Species Description***

The true greenback cutthroat trout (*Oncorhynchus clarki stomias*) is a salmonid that is native to the headwaters of the South Platte River drainage. Adult greenbacks are greenish brown to olive on the back, with silvery to yellow sides and a white belly (red during spawning). They have a crimson slash under each side of the lower jaw and low numbers of large spots concentrated toward the tail fin. Greenbacks, like all cutthroat subspecies, inhabit cold-water streams and lakes with adequate spawning habitat present in the spring of the year.

The status of cutthroat trout in Colorado has been in a state of flux for some time. However, new research on its genetics (Metcalf et al. 2007, 2012), and new research on cutthroat trout meristics (Bestgen et al. 2013) across the state of Colorado has emerged. With the advent of new genetic testing procedures

and new analysis, the picture has become clearer. Ever since the greenback cutthroat trout was listed as endangered under the Endangered Species Act in 1974, there has been strong interest in developing methods to distinguish it from closely related subspecies with confidence. Before recent molecular testing, phenotypic traits associated with greenback cutthroat trout were larger spots, and higher scale counts above the lateral line and in the lateral series when compared to Colorado River cutthroat trout (*O. c. pleuriticus*; Behnke 1992). However, these two subspecies cannot be separated consistently on the basis of those characteristics (Behnke 1992). As a result, geographic range had become the default approach for establishing subspecies designation and occupation.

Based on geographic range, it was for years believed that Colorado contained four subspecies of cutthroat trout: the greenback cutthroat (*Oncorhynchus clarki stomias*) in the South Platte and Arkansas Basins, the Rio Grande cutthroat (*O. c. virginalis*) in the Rio Grande Basin, the extinct yellowfin cutthroat (*O. c. macdonaldi*) in the upper Arkansas River Basin (Twin Lakes), and the Colorado River cutthroat trout (*O. c. pleuriticus*) in all five major river basins west of the Continental Divide.

Early molecular work did not distinguish between the subspecies, but in 2007 Metcalf et al. used mitochondrial and nuclear molecular markers to suggest that indeed there was a genetic basis for separating greenback cutthroat trout from Colorado River cutthroat trout. The primary concern raised by that paper was five of the nine east slope greenback cutthroat trout populations examined actually displayed genetic fingerprints more similar to Colorado River cutthroat trout of Trappers Lake (White River Basin) origin than they did with many of the other greenback populations. This was particularly troubling since mechanisms were in place to deliver Colorado River cutthroat trout to the East Slope.

From 1903 through 1938, at least 80 million pure Colorado River cutthroat trout were produced at Trappers Lake (Rogers 2012a). Millions more were produced on the south slope of Pikes Peak (Rogers and Kennedy 2008). Although the fate of many of those fish remains a mystery, it is clear that they were stocked in virtually every county east of the Continental Divide that would support trout (Metcalf et al. 2012).

A finding of Metcalf et al. (2007) that attracted less attention was the discovery of a "greenback" cutthroat trout population west of the Continental Divide near Gunnison in West Antelope Creek. Intensive survey and genetics testing work since that time indicated that in fact the West Antelope Creek population is not unique, and that populations with similar genetic fingerprints are pervasive across Colorado's western slope (Rogers 2010). That finding led the Greenback Cutthroat Trout Recovery Team to question whether the West Antelope Creek fish were really greenback cutthroat trout, as suggested by Metcalf et al.

(2007), or whether they simply represented diversity within Colorado River cutthroat trout (Rogers 2010). In an effort to avoid confusion, trout with this genetic fingerprint are hereafter referred to as green lineage cutthroat trout, while cutthroat trout displaying the genetic signature commonly associated with those from Trappers Lake (White and Yampa River Basins) are referred to as blue lineage cutthroat trout.

***Life History***

Greenbacks, like all cutthroat subspecies, inhabit cold-water streams and lakes with adequate spawning habitat present in the spring of the year. Spawning generally occurs when water temperatures reach 41 to 46 degrees Fahrenheit (5 to 8 degrees Celsius). Greenback feed on a wide variety of organisms, but their primary source of food is aquatic and terrestrial insects. Size and growth of greenbacks varies, based on elevation and population size, typically 1 to 2 pounds (.45 to .9 kilogram) maximum (USFWS 1998b).

***Status and Distribution***

Greenback distribution and numbers of fish declined rapidly beginning in the 1800s. By 1973, when the ESA became law, greenbacks were believed to exist in only two small headwater streams (Como Creek and the South Fork of Cache La Poudre River). The subspecies was listed under the ESA as endangered in 1973 and was downlisted to threatened in 1978 (USWFS 1978). Cooperative efforts among the CPW, USFS, BLM, USFWS, and the National Park Service, have led to a large recovery effort for the greenback cutthroat trout. Today, it appears that only one true greenback population exists in Bear Creek near Colorado Springs, Colorado (Metcalf et al. 2012).

In 2012, the native distribution of different lineages of cutthroat trout in Colorado was clarified greatly with work published by a University of Colorado-led research team that examined DNA from 150-year-old museum specimens collected before large-scale stocking activities (Metcalf et al. 2012). This work confirmed that indeed, green lineage cutthroat trout are at least native to the Colorado and Gunnison River Basins. Additional work suggests they probably were found in the Dolores River Basin as well (Rogers 2010), with every other remaining major basin represented by its own distinct lineage. Since the subspecies were described using phenotypic characters, and recent court cases have affirmed that visual characteristics should be central to the description of taxa (Kaeding 2003), the Recovery Team launched an additional research project with the Larval Fish Lab at Colorado State University to explore if distinct phenotypes can be predicted from these underlying genetic fingerprints. The results of this meristics study (Bestgen et al. 2013) largely support the genetic information that suggests six distinct lineages of cutthroat trout historically existed in Colorado.

***Environmental Baseline***

*Occurrence in the Action Area*

Based on recent genetic research (Metcalf et al. 2012), only one remaining population of true greenback cutthroat trout exists in Colorado. However, until such time as the genetic and physical characteristic research is interpreted and decisions are made, previously suspected greenback cutthroat trout (green lineage) populations in western Colorado will continue to be considered as greenbacks with regard to ESA compliance, in accordance with USFWS direction (USFWS 2012).

Currently, populations of green lineage cutthroat occur in Roberts Creek and Henderson Creek in the northwest portion of the Unit (**Figure 3-1**, Fish and Aquatic Wildlife Habitat). Genetic testing has shown that populations in Roberts Creek are 96 percent genetically pure. Cutthroat trout in Henderson Creek have not undergone genetic testing, but the assumption is that they are of green lineage. It is unknown if other tributaries to East Muddy Creek, including Drift Creek, Dyke Creek, and Clear Fork, contain green lineage cutthroat trout, though nonnative brook trout (*Salvelinus fontinalis*) occur in these drainages. Fish sampling revealed that there are no cutthroat trout in in Ault Creek (Petterson 2011). Green lineage cutthroat trout (and other salmonid species) are assumed to occur at times in East Muddy Creek; however, the high turbidity of this creek makes conditions hostile to salmonids most of the year, and any green lineage cutthroat trout within this reach are effectively lost from the populations in the Unit (Petterson 2012). According to CPW, Lee Creek, in the northeast portion of the Unit, contains Colorado River cutthroat and not green lineage cutthroat (Rogers 2012b).

*Past and Current Impacts*

The introduction of nonnative fish was a major factor in the decline of greenback cutthroat trout, primarily by salmonid species. Hybridization and competition has been documented across the species' range; rainbow trout (*Oncorhynchus mykiss*) hybridize with native cutthroat trout, and brook and brown trout (*Salmo trutta*) tend to outcompete them in streams and rivers (USFWS 1998b). Greenback cutthroat trout are also vulnerable to water depletions, diversions, and reduced flows.

Extirpation due to loss and degradation of habitat from mining, logging, grazing, and irrigation has also been documented (USFWS 1978).

In the Unit, oil and gas development on private surface/private mineral estate in the Henderson and Roberts Creek watersheds currently exists, and will continue to occur irrespective of a nexus requiring a discretionary BLM action. Surface and mineral estate within the Unit is depicted on **Figure 3-1**; private surface and mineral estate encompasses the Roberts and Henderson Creek

**Figure 3-1**

COLORADO
Bull Mountain
Uncompahgre Field Office
70
Uncompahgre Field Office
Bull Mountain
Paonia
133
Hotchkiss
East Muddy Creek watershed
Henderson Creek
Roberts Creek
PITKIN COUNTY
133
West Muddy Creek watershed
DELTA COUNTY
GUNNISON COUNTY
N
0 1 2
Miles
August 12, 2015
BullMtn_BA_fish_V07.pdf
Bull Mountain EIS Uncompahgre Field Office
No warranty is made by the BLM as to the accuracy, reliability, or completeness of these data for individual use or aggregate use with other data.
Fish and Aquatic Wildlife Habitat
Source: BLM GIS 2014
Bull Mountain Unit
Cutthroat conservation complete barrier
Cutthroat conservation partial barrier
Occupied cutthroat stream
Perennial stream
Intermittent stream
Watershed
Federal surface, federal minerals
Private surface, federal minerals
Private surface, private minerals

Case No. 1:20-cv-02484-MSK Document 90-2 filed 05/06/21 USDC Colorado pg 352 of 576

watersheds. Additional development in these watersheds would occur under the No Action Alternative analyzed in the EIS (BLM 2015). Development generally includes infrastructure necessary for oil and gas development, including well pads, pipelines, and access roads. Approximately one acre of short-term disturbances (lasting less than two years), and less than one acre of long-term disturbances currently exist within one-quarter mile of these creeks.

#### *Critical Habitat*

Critical habitat has not been designated for the greenback cutthroat trout.

#### *Threats*

The primary threats to the greenback cutthroat trout are as follows (USFWS 1998b):

- Water diversions and reduced flows
- Livestock grazing
- Disease
- Toxicity
- Hybridization
- Competition with nonnative salmonids
- Overharvest
- Climate change
- Large wildfires

### 3.2.6 Canada Lynx

#### *Species Description*

The Canada lynx is a medium-size bob-tailed cat with long legs, large, well-furred paws, very long ear tufts, and a short black-tipped tail. The winter pelage (coat) of the lynx is dense and has a grizzled appearance, with grayish-brown mixed with buff or pale brown fur on the back, and grayish-white or buff-white fur on the belly, legs and feet. Summer pelage of the lynx is more reddish to gray-brown. It has large hind feet well adapted for moving across heavy snow. Adult males average 22 pounds (10 kilograms) and are almost 3 feet (0.9 meter) in length, with females being smaller, on average 19 pounds (8.6 kilograms) and slightly shorter in length. The lynx's long legs and large feet make it highly adapted for hunting in deep snow (USFWS 2014).

#### *Life History*

The primary prey of the lynx is the snowshoe hare (*Lepus americanus*); its physical characteristics are highly specialized for this prey. In Colorado, its prey base also includes small mammals, such as other types of rabbits, squirrels, porcupine, beaver, and other rodents. Lynx also eat carrion (usually ungulates)

and fish and can capture ground-dwelling birds, such as grouse (USFWS 2014). This diversity in the diet of Colorado populations may make them more stable than those in Canada (National Wildlife Federation 2014). The typical hunting strategy is stalking prey or patiently crouching in wait beside a trail, followed by capture in a single bound.

Lynx are highly mobile and generally move long distances (greater than 60 miles [100 kilometers]). Lynx disperse primarily when snowshoe hare populations decline. Subadult lynx disperse even when prey is abundant, presumably to establish new home ranges (USFWS 2000). Individual lynx maintain large home ranges, generally between 12 and 83 square miles (31 to 215 square kilometers). The size of lynx home ranges varies, depending on abundance of prey, the animal's gender and age, the season, and the density of lynx populations. When densities of snowshoe hares decline, for example, lynx enlarge their home ranges to obtain sufficient amounts of food to survive and reproduce. Lynx also make long-distance exploratory movements outside their home ranges (USFWS 2014).

Lynx breed in late winter, and after a gestation period of about nine weeks, females produce a litter of about four kittens in April or May. The male lynx does not assist with rearing young (USFWS 2014). Yearling females may give birth during periods when hares are abundant. When hares are abundant in the northern boreal forest (taiga), the litter size of adult females averages four to five kittens. Litter sizes are typically smaller in lynx populations in the contiguous United States (USFWS 2014).

***Status and Distribution***

The Canada lynx was listed as threatened throughout its range in the contiguous United States under the ESA's final rule published on March 24, 2000, and effective April 24, 2000 (65 *FR* 16053). A recovery plan outline was published on September 14, 2005 (USFWS 2005).

The distribution of lynx in North America is closely associated with the distribution of North American boreal forest and with snow conditions (USFWS 2005) since lynx are so highly adapted, both morphologically and physiologically, for hunting snowshoe hares and for surviving in areas with long, cold winters with deep, soft snow. In Canada and Alaska, lynx inhabit the classic taiga ecosystem. The range of lynx populations extends south from the classic boreal forest zone into the subalpine forest of the western United States and the boreal/hardwood forest ecotone in the eastern United States.

Forests with boreal features extend south into the contiguous United States, along the North Cascade and Rocky Mountain Ranges in the west, the western Great Lakes Region, and northern Maine in the east. Within these general forest types, lynx are most likely to be found in dense subalpine forests and willow-choked corridors along mountain streams and avalanche chutes, as well as areas that receive deep snow, which is the likely location of its preferred prey species

the snowshoe hare. Because of the patchiness and temporal nature of high quality snowshoe hare habitat, lynx populations require large boreal forest landscapes to ensure that sufficient high quality snowshoe hare habitat is available at any point in time and to ensure that lynx may move freely among patches of suitable habitat and among subpopulations of lynx (USFWS 2005).

Because the boreal forest landscape is patchy and transitional in the contiguous United States, snowshoe hare populations achieve lower densities compared to those of the expansive northern boreal forest in Canada. As a result, lynx generally occur at relatively low densities in the contiguous United States, compared to the high lynx densities that occur in the northern boreal forest of Canada (USFWS 2005).

Lynx populations in the contiguous United States seem to be influenced by lynx population dynamics in Canada (USFWS 2014). Many of these populations are directly interconnected to populations in the United States and are likely a source of emigration into contiguous United States lynx populations. Therefore connectivity with the larger lynx populations in Canada is important to ensuring long-term persistence of US lynx populations (USFWS 2014).

***Environmental Baseline***

*Occurrence in the Action Area*
In Colorado, lynx were virtually extirpated in the early part of the twentieth century due to a variety of factors, including unregulated hunting and use of poisons and destruction of habitat. Evidence of individual animals continued to be noted in later years as scattered sightings in mountain areas. The last lynx sighting before recovery work in the 1990s was near Vail in 1973, although tracks unsubstantiated by biologists were reported there in 1991. A state-run reintroduction program, begun in 1999, has restored Canada lynx to some of its range as part of a design for the species' recovery in Colorado (CPW 2014).

Lynx analysis units (LAUs) have been mapped throughout the range of the species and are intended to facilitate analysis and monitoring related to management actions on lynx habitat. These units do not depict actual lynx home ranges but should approximate the size of a female's home range containing year-round habitat components (Interagency Lynx Biology Team 2013). The Unit does not support effective lynx habitat (Petterson 2012); however, the 20,175-acre (8,165-hectare) Ragged Mountain LAU abuts the eastern boundary of the Bull Mountain Unit. A major transportation route to the Bull Mountain Unit is SH 133, which passes through approximately 4.5 miles of the Ragged Mountain LAU. SH 133 also passes through the 27,034-acre (10,940-hectare) McClure Pass Lynx Linkage Area (MPLLA), a portion of which overlaps the Ragged Mountain LAU to the northeast of the Unit. The MPLLA links suitable lynx habitats in the Unit vicinity; widespread suitable lynx habitat in the MPLLA is generally lacking (Petterson 2012; see **Figure 3-2**, Canada Lynx).

**Figure 3-2**

Huntsman Mountain
Crystal West
10S 91W
10S 90W
10S 89W
COLORADO
Bull Mountain
Uncompahgre Field Office
Uncompahgre Field Office
Bull Mountain
Paonia
Hotchkiss
133
Mule Park
Crystal East
11S 91W
11S 90W
11S 89W
Ragged Mountain
11S 88W
DELTA COUNTY
12S 91W
12S 90W
12S 89W
12S 88W
Anthracite
N
0 1 2
Miles
GUNNISON COUNTY
13S 89W
13S 88W
July 16, 2015
BullMtn_AE_lynx_V06.pdf
Bull Mountain EIS Uncompahgre Field Office
No warranty is made by the BLM as to the accuracy, reliability, or completeness of these data for individual use or aggregate use with other data.
Bull Mountain Unit
Canada lynx linkage: travel corridors between large blocks of potential habitat used for dispersal or summer movements
Canada lynx habitat: denning, winter and other (seasonal) habitat
Canada lynx analysis unit: management boundaries for locations with enough potential habitat to support a female lynx, state or private lands not incorporated
Canada Lynx
Source: USFS 2003

A lynx was observed crossing SH 133 just east of McClure Pass in 2006; this accounts for one of the few documented lynx to use this area (Petterson 2012). In general, large and expansive suitable lynx habitat is not present within a few miles of McClure Pass, which limits the likelihood that lynx would establish a home range in this area. This would be especially true in winter, when snowshoe hare densities in aspen and shrublands typical of this area would be very low, and secondary prey species would be less available. However, during the summer, when lynx make most long-range dispersal movements, this area would likely have an abundance of secondary and incidental prey species (Petterson 2012).

Major land uses that may influence lynx habitat use in the Ragged Mountain LAU and MPLLA is generally limited to widespread livestock grazing, dispersed camping and infrequent trail use, relatively active fall big game hunting, and some limited winter snowmobile and cross-country skiing.

*Past and Current Impacts*

The lynx population in the United States is threatened by human alteration of forests, low numbers from past overexploitation, expansion of the range of competitors, and elevated levels of human access into lynx habitat (USFWS 2009b).

Throughout its range, timber harvest, recreation, and their related activities, such as road construction, are the predominant land uses affecting lynx habitat. The primary listing factor in plans for federally managed lands was the lack of guidance for the conservation of lynx and snowshoe hare habitat. Landscape connectivity between lynx populations and habitats in Canada and the contiguous United States is important to lynx recovery. Lynx movements may be negatively affected by high traffic volume on roads that bisect suitable lynx habitat, and in some areas, road kill is high (USFWS 2014). Although the ESA bans killing lynx and requires road planners to consider lynx safety needs when planning new highways, immediate key threats to lynx recovery include road kill.

Potential risk factors to lynx in the Southern Rockies are conversion or alteration of native plant communities, fire suppression and hazardous fuels reductions, grazing, pre-commercial thinning, recreation, roads and trails, timber management, highways, predation, predator control, illegal shooting, and private land development (USFWS 2000).

***Critical Habitat***

The final rule designating critical habitat was published in the *Federal Register* on November 9, 2006 (71 *FR* 66008) and did not include lands in Colorado. In February 2008 the USFWS proposed to revise the amount of critical habitat designated under the ESA (73 *FR* 10860). The USFWS designated critical habitat for the Canada lynx on February 25, 2009 (74 *FR* 8616). On September 25, 2013, the USFWS announced a proposal to revise the critical habitat designation once again (78 *FR* 59429), which was the result of two court orders from

litigation over the 2009 critical habitat designation. A final rule for revised critical habitat was published on September 12, 2014 (79 *FR* 54781). No critical habitat occurs within the Unit or within Colorado.

Primary constituent elements of Canada lynx critical habitat are described in **Table 3-2**.

**Table 3-2**
**Primary Constituent Element of Canada Lynx Critical Habitat**

| Features | Description |
|---|---|
| Boreal forest landscapes supporting a mosaic of differing successional forest stages | • Presence of snowshoe hares and their preferred habitat conditions, which include dense understories of young trees, shrubs, or overhanging boughs that protrude above the snow, and mature multistoried stands with conifer boughs touching the snow surface<br>• Winter snow conditions that are generally deep and fluffy for extended periods<br>• Sites for denning that have abundant coarse woody debris, such as downed trees and root wads<br>• Matrix habitat (e.g., hardwood forest, dry forest, non-forest, or other habitat types that do not support snowshoe hares) that occurs between patches of boreal forest in close juxtaposition (at the scale of a lynx home range) such that lynx are likely to travel through such habitat while accessing patches of boreal forest within a home range |

Source: USFWS 2009b

The nearest designated critical habitat to the Unit is the southern portion of Unit 5 (Greater Yellowstone Area) in the Wyoming Range of western Wyoming, approximately 280 miles northwest of the Unit.

***Threats***

Threats to Canada lynx, which are described in more detail under *Environmental Baseline*, are as follows:

- Human alteration of forests
- Low numbers as a result of past overexploitation
- Expansion of the range of competitors
- Elevated levels of human access into lynx habitat
- Road kill
- Illegal shooting
- Global warming

This page intentionally left blank.

# SECTION 4
# EFFECTS OF PROPOSED ACTION

## 4.1   INTRODUCTION

This BA analyzes the impacts of a proposed discretionary federal action. A federal action is defined as anything authorized, funded, or carried out by a federal agency. The analysis of all impacts includes the effects of interrelated and interdependent actions. The proposed action, which is analyzed as Alternative D in the Final EIS, is described in **Section 2**. The proposed action is programmatic; as such, any activities proposed in an APD that could affect threatened, endangered, proposed, and candidate species would be subject to Section 7 ESA consultation with the USFWS. The BLM could tier to this BA to streamline the consultation.

### 4.1.1   Definitions

The effects of implementing the proposed action can be categorized into direct, indirect, and cumulative effects. These categories are defined differently under the ESA and NEPA, so effects presented here will differ from those described in the Final EIS.

- **Direct effects** are those that are caused by the proposed action and occur at the time of the action.

- **Indirect effects** are those that are caused by the proposed action and occur later in time but are reasonably certain to occur.

- **Cumulative effects** include those of future state, tribal, local, or private actions that are reasonably certain to occur in the action area considered in this BA. Future federal actions that are unrelated to the proposed action are not considered in a cumulative analysis. This is because they will be subject to separate consultation, in accordance with Section 7 of the ESA.

The following definitions are used for effect determinations:

- **No effect—**This is the appropriate conclusion when the BLM determines its proposed action would not affect listed species. The principal factor in this determination is that the species and its suitable habitat do not exist in the analysis area or that the proposed action would involve no surface disturbances or other species disruption. In this situation, no further contact with the USFWS is required.
- **May affect, is not likely to adversely affect—**This is the appropriate conclusion when effects on listed species are expected to be discountable, insignificant, or completely beneficial. This type of effect requires informal Section 7 consultation with the USFWS and concurrence with the determination.
- **May affect, is likely to adversely affect—**This is the appropriate conclusion if any adverse effect on listed species may occur as a direct or indirect result of the proposed action or its interrelated or interdependent actions, and the effect is not discountable, insignificant, or beneficial. If the overall effect of the proposed action is beneficial to the listed species, but also is likely to cause some adverse effects, the proper effect determination for the proposed action is "likely to adversely affect" the listed species. Such determination requires formal Section 7 consultation with the USFWS.

### 4.1.2 Methods of Analysis

Although data on known locations and habitats in the Unit are available, the data are neither complete nor comprehensive. Known and potential species and habitat locations were considered in the analysis; however, the potential for species to occur outside these areas was also considered. Impacts were quantified when possible. In the absence of quantitative data, best professional judgment was used, based on scientific reasoning.

No decision would be authorized on BLM-administered lands that would jeopardize the continued existence of species that are listed, proposed for listing, or candidates for listing as threatened or endangered. Implementing the BLM's special status species program is directed at preventing the need for listing proposed or candidate species under the ESA, protecting special status species, and improving their habitats to a point where their special status recognition is no longer warranted (BLM 2008c).

The analysis is based on the following assumptions:

- Impacts on threatened, endangered, proposed, and candidate species can occur from actions that result in direct mortality, loss of habitat, or modifications to habitat suitability and actions that displace individuals or disrupt behavior. Because threatened, endangered, proposed, and candidate species have specific habitat

requirements, and their habitats are often diminishing, disturbance of the species or their habitat could result in population declines, which could adversely affect viability of local populations.

- Since threatened, endangered, proposed, and candidate species populations are, by their nature, generally small and localized, the total area affected by other activities or restrictions is less important than where the activities or restrictions occur in relation to special status species and their habitat.

- The health of threatened, endangered, proposed, and candidate species populations is directly related to the overall health and functional capabilities of upland, aquatic, riparian, and wetland resources, which in turn are a reflection of overall watershed health.

- Ground-disturbing activities could lead to positive or negative modification of habitat and loss or gain of individuals. This depends on the nature of the activity, the intensity of the surface disturbance, the amount of area disturbed, the location of the disturbance, and the species affected.

- Road density in a given watershed and the distance of roads from threatened, endangered, proposed, and candidate species habitat provides an indication of the potential for impacts on these species. For fish and aquatic wildlife, roads are a measure of lands available for accelerated water transport and potential erosion and off-site sediment transport. However, the actual impacts and degree of impacts depend on additional variables, such as the class of road (dirt, gravel, paved), road condition (rutted, bar ditched, properly drained), the type of vegetation between the road and occupied or suitable habitat, the topography, the ecological condition of the suitable or occupied habitat, and soil characteristics.

- Species' health, population levels, and habitat conditions fluctuate in response to natural factors. Periods of drought or excessive moisture and outbreaks of diseases that directly affect species or impact habitat (e.g., beetle or other pest outbreaks) would likely impact threatened, endangered, proposed, and candidate species population levels.

- When the BLM receives an APD for review, it assesses site-specific actions on an appropriate spatial and temporal scale. Additional field inventories could be needed to determine whether any such species could be present in the Unit.

- Any activities proposed in an APD that could affect threatened, endangered, proposed, and candidate species would be required to undergo ESA Section 7 consultation with the USFWS. The BLM could tier to this BA to streamline the consultation. The activities

would need to be mitigated to ensure that threatened or endangered species would not be jeopardized on a project-specific basis or at a cumulative level.

## 4.2 Listed Species

### 4.2.1 Fishes

The following analysis is combined to include all five listed fish species: Colorado pikeminnow, bonytail, humpback chub, razorback sucker, and green lineage cutthroat trout. Effects that may differ for individual species are clarified in the text.

***Assumptions and Methods of Analysis***

The following assumptions apply throughout the assessment of effects of the proposed action on the five listed fishes:

- Some actions may benefit one species while having a negative or beneficial impact on another.
- Maintaining high quality habitat conditions would have some influence on reducing the severity of outbreaks and subsequent losses from diseases. But the prevalence in the environment of various diseases could not be fully controlled, particularly at chronic levels of occurrence.
- Impacts on fish are based on the following cause and effect premise:
  - Exposure—The likelihood that a given stressor will affect a given species
  - Stressor—The portions of an action that may cause some sort of a reaction by the species
  - Response—The negative, positive, or neutral response of the species to the stressor
- Unless otherwise noted, short-term impacts are defined as impacts expected to last two years or less, long-term impacts are defined as those expected to last longer than two years.
- Although recent studies distinguish true greenback cutthroat trout populations from green lineage cutthroat trout populations, both are treated the same in terms of management and protection. As such, if an action may affect a green lineage cutthroat trout population, then initiation of Section 7 consultation is appropriate.

The following primary impacts for the listed fish species and their habitats are the focus of the effects analysis:

- Water quality alteration—Actions, activities, or accidents (spills and leaks) that could alter important water quality parameters, such as pH, dissolved oxygen, temperature, alkalinity, and turbidity
- Reduced productivity—Sublethal effects of stress, reduced recruitment, and reduced quality and quantity of food
- Water depletions—Loss of physical habitat, reduced water quality, increased sedimentation, loss of habitat structure and complexity, reduced recruitment, reduced food quality and quantity, disease, and stress
- Introduction and spread of aquatic nuisance species or disease vectors—Competition for resources, displacement, predation, reduced recruitment
- Direct mortality—Potential direct mortality of eggs, larvae, and adults of fish in low-water crossing areas

***Conservation Planning (as Relates to Section 7[a][1] of the ESA)***

The proposed action is summarized in **Section 2** of this BA and incorporates the conservation measures described below. Since the MDP under the proposed action is a programmatic-level action, conservation measures described below may not be comprehensive. New conservation measures may be developed as necessary following BLM APD review.

*Wildlife Mitigation Plan*

SGI has submitted a wildlife mitigation plan (**Appendix C**) as part of the proposed action. It would apply throughout the development phase, including construction, drilling, and completion stages. The plan would not apply to the production and maintenance or reclamation phases of the proposed action. The wildlife mitigation plan is included as a design feature of the proposed action. Listed fish-specific measures in the plan are protection of water quality, aquatic resources, and riparian zones; stormwater erosion controls; aquatic buffers, including no surface disturbance within 300 feet of a designated cutthroat trout stream and 150 feet of any other aquatic resource, impact minimization measures for culverts, bridges, and other stream crossings, timing limitations for spawning cutthroat trout, dust suppression, and disinfection of equipment used in water.

*BMPs and COAs*

**Appendix A** includes a number of BMPs and COAs that would directly and indirectly benefit listed fish species by protecting soils, water resources, riparian habitat and wetlands, fish and wildlife management, and special status species.

*Weed Management Plan*

**Appendix I** of the Final EIS includes a plan for noxious weed management. Management would directly and indirectly benefit listed fish species by preventing the spread and establishment of nonnative plant species and noxious

Case No. 1:20-cv-02484-MSK Document 90-2 filed 05/06/21 USDC Colorado pg 364 of 576

weeds that can replace and reduce the extent of native riparian habitat and negatively impact soil erosion and water quality. The plan includes specific treatment recommendations for weeds, follow-up seeding or planting, and monitoring.

*Water Depletion Programmatic BAs*

The BLM has determined, and the USFWS has concurred, that any water depletions in the Colorado River Basin are likely to adversely affect the four endangered Colorado River fishes and their critical habitats (BLM 2008a, 2008b; USFWS 2008, 2009a).

Two programmatic BAs assessed the effects of activities administered by the BLM across eight administrative units and field offices in western Colorado that could deplete water from the upper Colorado River Basin.

One BA assessed the BLM's fluid mineral program. It consists of ongoing and projected fluid mineral development administered by the BLM in western Colorado, including all federal natural gas wells, oil wells, and coal bed methane natural gas wells, including split estate (BLM 2008b). That BA addressed water depletion activities, such as water used to abate access road dust, water used for new pipeline hydrostatic testing, water used to drill and complete wells, water associated with connected federal actions, and water use associated with seismic activity.

The second BA (BLM 2008a) addressed all other water-depleting projects, including impoundments, diversions, water wells, pipelines, and spring developments.

These programmatic BAs cover water-depleting BLM activities in the action area, so the impact analysis contained in them is incorporated here by reference.

The following impact analysis addresses impacts not included in the two programmatic BAs, including impacts from non-water-depleting activities on the Colorado River fishes, as well as the effects of water depletions and non-water-depleting activities on the green lineage cutthroat trout.

***Direct and Indirect Effects***

*Endangered Colorado River fish species*

Construction and maintenance under the proposed action is unlikely to result in water quality impacts on the four endangered Colorado River fish species (Colorado pikeminnow, razorback sucker, bonytail, and humpback chub). This is because under the proposed action, SGI will continue to comply with Colorado water quality standards and CWA water quality requirements. It also will continue to implement the well pad site suitability models and methodologies (**Appendix A** of the Final EIS). Continuing to implement these models and

methodologies ensures that well pads are sited considering proximity to wetlands and streams. It also considers soil erosion factors, which minimizes potential for water quality impacts from pad construction.

Additionally, water quality impacts from sediment releases or hazardous chemical spills in the Unit would likely be reduced. This is because potential contaminants would be captured and impounded in the Paonia Reservoir downstream of the Unit before entering potential endangered big river fish habitat in the North Fork Gunnison River. Indirect effects of small, site-specific increases in sediment on the four endangered Colorado fish species would be negligible and well within the background levels carried by the Colorado and Gunnison Rivers.

Surface water use under the proposed action would result in water depletions that have the potential to impact fish populations. As the Unit would be developed over six years, the total freshwater acre-feet depletions would be roughly spread out during this time, resulting in freshwater annual consumptive depletions of 124 acre-feet. If development of the Unit were to take longer than six years, then the annual water depletion amount would decrease accordingly.

Based on data from the US Geological Survey gauging station (#09130500), the mean annual discharge rate of East Muddy Creek near Bardine (1935-1953) varied from a low of 53.7 cubic feet per second (cfs) (39,066 acre-feet per year) in 1940 to a high of 135.0 cfs (97,504 acre-feet per year) in 1938 (Berry 2011). Therefore, if water depletions under the proposed action were removed directly from East Muddy Creek, the maximum water depletion for East Muddy Creek would be about 0.3 percent of the average annual discharge during a dry year to 0.1 percent of the discharge during a wet year. SGI has secured previously appropriated water for this project; as such, no new water would be depleted from the Muddy Creek system as a result of the construction and drilling phase of this project.

The USFWS considers any net water depletion that could decrease instream flows to have direct or indirect impacts on the four endangered big river fish species, as outlined in the programmatic biological opinions (USFWS 2008, 2009a). As a reasonable and prudent alternative, the USFWS authorized the BLM to solicit a one-time water contribution to the 1988 Upper Colorado River Endangered Fish Recovery Program in an amount equal to the average annual acre-feet depleted by fluid mineral development on BLM-administered lands.

On final approval of individual APDs, this project would be entered into the Uncompahgre Field Office fluid minerals water depletion log, which would be submitted to the Colorado State Office at the end of each fiscal year. SGI is already a signatory to the Endangered Fish Recovery Agreement (USFWS 1999), which is considered to be appropriate compensatory mitigation for impacts related to water depletions. SGI and the BLM could mitigate the impacts of

water depletions, thereby complying with the USFWS programmatic biological opinion and recovery agreement. This also would ensure continued recovery of these listed fish species.

*Endangered big river fish critical habitat*

Direct and indirect effects and mitigation for impacts on designated critical habitat for the four endangered big river fish would be similar to those described above for the fish species.

*Green lineage cutthroat trout*

Green lineage cutthroat trout occur in Henderson and Roberts Creeks in the northwest portion of the Unit (Figure 3-1). Under the proposed action, there would be no construction within the Henderson or Roberts Creek drainages; thus no direct or indirect impacts on green lineage cutthroat trout would occur from the proposed development authorized by BLM. No interrelated or interdependent effects from the proposed action are anticipated as much of the infrastructure needed to develop gas resources in these occupied watersheds has occurred irrespective of a BLM decision. Furthermore, no aspects of the development contemplated from the proposed action are dependent upon the development that has or may occur in Henderson or Roberts Creeks which occur entirely on private surface and private mineral estate.

***Cumulative Effects***

Cumulative effects under the ESA are the effects of future state, tribal, local, or private actions that are reasonably certain to occur in the action area. Future federal actions that are unrelated to the proposed action are not considered in the cumulative analysis because they would be subject to separate consultation, in accordance with Section 7 of the ESA. Cumulative effects address the impact of implementing the proposed action in combination with other future nonfederal actions outside the scope of this Final EIS, either in the Unit or next to it.

The cumulative effects analysis area for the five listed fish species extends outside the Unit and follows fourth-order watershed boundaries that completely or partially overlap the planning area. The analysis area includes federal, state, and private lands and accounts for cumulative effects associated with water depletions outside the Unit.

Declines in the abundance or range of listed fish species in the analysis area have been attributed to various human activities on federal, state, and private lands that can alter native habitats. Activities are as follows:

- Infrastructure development
- Dam construction and operation along major waterways
- Water retention or diversion or springs, wetlands, or stream dewatering

- Recreation, including off-road vehicle activity
- Agriculture and grazing expansion
- Nonnative plant, wildlife, or aquatic species introductions

Many of these activities are expected to continue on lands in the range of these fish species and could contribute to cumulative effects on these species in the analysis area.

Water diversions have been ongoing in the cumulative impacts analysis area since water has been managed for human uses, including irrigation for crops, livestock, and domestic uses. As population centers in the region have grown and expanded, water demand has increased.

The region has been and will continue to be affected by irrigation and drinking water diversions. Reservoir operations have affected the timing and volume of flows. Irrigation rights are expected to continue being bought and sold in the future. Due to population growth and land sales, more agricultural water rights may be converted to municipal and industrial uses. Future oil shale development could also result in water diversions. Impacts associated with water depletions are habitat alteration, sediment aggradation, reduced spawning habitat and habitat complexity and diversity, and loss of important microhabitats, including backwaters, flooded bottomlands, and side channels.

Introductions of nonnative fishes were common in the late 1800s and throughout the 1900s. Several species were stocked as sport fish and for food production, including rainbow trout, brown trout, brook trout, and additional species of cutthroat trout not native to the analysis area. Additional nonnative fish species have made their way to region, including minnows, suckers, catfish, and bass. Nonnative species often outcompete native species where they occur together. These species can also prey on native fishes; in other cases, nonnative fishes of the same genus or subspecies can hybridize with native species, reducing their genetic integrity and fitness.

Land management actions and activities have been ongoing since the settling of the West. Such land uses as fire suppression, logging, livestock grazing, mining, energy development, and agricultural conversion have resulted in cumulative impacts on watersheds that contain listed fish species. Impacts are habitat alteration, water quantity and quality impacts, and site-specific increases in sediment and turbidity.

Climate change could impact listed fish species and their habitats by reducing suitable habitat, changing distributions, and altering food webs and water quality, including temperatures. Additional effects of climate change may include severity and frequency of droughts, floods, and wildfires, as well as changes in the timing of snowmelt and peak flows (Isaak et al. 2012; Haak et al. 2010; Rieman and

Isaak 2010; Wenger et al. 2011), all of which may impact listed fish species in the analysis area.

Past and present actions as well as current conditions in the cumulative impact analysis area have affected and would likely continue to affect listed fish species. Oil and gas development in the North Fork of the Gunnison River area would continue to affect special status species; less than 25 percent of the UFO mineral estate has been leased. Access roads would continue to be developed on federal, state, and private lands in the region in support of oil and gas development. These actions could lead to impacts on water quality, primarily through sedimentation and other pollutant inputs to streams. Rarely, accidents or spills could occur and pollutants from such events could enter streams supporting listed fish species. Though unlikely, diesel fuel, oils, lubricants, drilling or hydraulic fracturing fluids, or other compounds could be spilled during existing drilling operations. Stormwater runoff from roads could input additional sediment to aquatic habitats supporting listed fish, adding to any existing sediments carried in the stream from precipitation runoff.

Under the proposed action, impacts on the five listed fish species as a result of increased oil and gas development in the Unit would contribute to the impacts from past, present, and reasonably foreseeable actions in the cumulative impact analysis area. The proposed action would also impose measures in the wildlife mitigation plan, BMPs, and COAs to minimize, avoid, or mitigate for impacts on listed fish species and downstream critical habitat.

Continued and future actions resulting in water depletions in the region would reduce the quantity and quality of habitat for listed fish species. Depletions could impact listed fish habitat by lowering water levels, increasing water temperatures, decreasing habitat connectivity, and reducing habitat availability. Any proposed project with the potential to impact listed species would require consultation with the USFWS to determine the potential impacts and to develop mitigation actions.

Under the proposed action, water depletion impacts on the four listed Colorado River fish species as a result of increased oil and gas development in the Unit would contribute to the impacts from past, present, and reasonably foreseeable actions in the cumulative impact analysis area. Implementing the water augmentation program proposed by SGI (**Appendix L** of the effects of water depletions in the Unit would not exceed those consulted on in the programmatic BOs (USFWS 2008, 2009a).

### 4.2.2 Canada Lynx

***Assumptions and Methods of Analysis***

As discussed in **Section 3.2.6**, the Ragged Mountain LAU and the MPLLA abut the Unit to the east (**Figure 3-2**). Both the LAU and MPLLA are traversed by SH 133, a highway used by Bull Mountain Unit traffic. One Canada lynx has been

observed in the vicinity of McClure Pass, in the Ragged Mountain LAU. The Unit itself does not support effective lynx habitat (Petterson 2012); therefore, impact analysis is based on how the proposed action would indirectly impact Canada lynx through increased traffic on SH 133.

The effects of the proposed action on lynx are assessed with respect to relevant lynx standards, guidelines, terms, and conditions in the Lynx Conservation Assessment Strategy, 3rd Edition (Interagency Lynx Biology Team 2013).

***Conservation Planning (Section 7 [a][1] of the ESA)***

The proposed action, summarized in **Section 2** of this BA, would incorporate conservation measures, which are described below. Since the MDP under the proposed action is a programmatic-level action, conservation measures described below may not be comprehensive. New conservation measures may be developed as necessary following BLM APD review.

*Wildlife Mitigation Plan*

SGI has submitted a wildlife mitigation plan (**Appendix C**) as part of the proposed action. It would apply throughout the development phase, including during the construction, drilling, and completion stages; however, it would not apply to the production, maintenance, or reclamation phases of the proposed action. The plan is included as a design feature of the proposed action. While it does not include specific measures for Canada lynx, measures for terrestrial wildlife species would indirectly benefit Canada lynx by protecting habitat for its secondary prey species in the Unit.

*BMPs and COAs*

**Appendix A** includes a number of BMPs and COAs that would directly and indirectly benefit Canada lynx secondary prey habitat in the Unit. It would do this by protecting soils, water resources, upland vegetation, and riparian habitat and wetlands.

***Direct and Indirect Effects***

*Direct and indirect effects on Canada lynx*

Under the proposed action, no direct or indirect impacts on suitable Canada lynx primary prey habitat are expected. The unit does not support spruce, fir, or coniferous habitats suitable for long-term snowshoe hare use, and snowshoe hare likely occur in densities too low to support lynx. Some habitat for secondary prey sources exists in the Unit, including the aspen and mountain shrubland habitats.

Secondary prey species would be available during snow-free periods but would be reduced during winter, due to a lack of cover and forage availability in the Unit. Measures for terrestrial wildlife species in the wildlife mitigation plan would reduce direct and indirect impacts on secondary prey species habitat in the Unit during the construction phase of the proposed action. BMPs and COAs

during construction and operation would also reduce direct and indirect impacts on secondary prey species habitat in the Unit.

Oil and gas development under the proposed action would have limited direct and indirect impacts on secondary prey habitat and secondary prey availability in the Unit; nevertheless, development would have no direct or indirect impacts on secondary prey habitat or availability in the Ragged Mountain LAU or MPLLA. Therefore, the availability of secondary prey species would not be diminished for dispersing lynx during snow-free periods (Petterson 2012). As in the Unit, secondary prey availability in the Ragged Mountain LAU and MPLLA would be reduced during winter.

High-speed, high-volume highways can result in lynx road kills, fragment and restrict lynx habitat use, impair home range effectiveness, and inhibit local movements and dispersion (Alexander et al. 2004, 2005; Clevenger et al. 2002). Of the 218 lynx released to date in Colorado, 14 have been killed as they were attempting to cross highways (Petterson 2012). Literature has shown that traffic volumes within or above the 2,000 to 5,000 vehicles per day range can impair lynx movements (Stevens et al. 1996; Clevenger et al. 2002; Alexander et al. 2004, 2005).

Under the proposed action, traffic volumes into the unit would increase during the well development phase. Existing average daily traffic is approximately 1,400 vehicles, including approximately 90 trucks traversing SH 133 in the vicinity of the Unit. The proposed action would add an estimated total of 8,439 round trips to the Unit over the six-year development period, equivalent to an average annual daily traffic amount of 10 trips. Truck-related traffic under the proposed action could increase by up to 11 percent compared to existing conditions.

SH 133 would experience the greatest increase in average annual daily traffic. However, not all of the increased traffic on SH 133 would travel over McClure Pass to access the Unit. SGI estimates that approximately 20 percent of traffic generated by the proposed action would travel to the Unit from the north, traversing McClure Pass and the MPLLA.[2] This would equate to an additional 1,688 trips over McClure Pass over current conditions. Most of this increase in traffic would occur during the summer season, coinciding with construction, drilling, and well completion in the Unit. Most vehicle trips would occur during daylight hours.

While an increase in vehicle traffic traveling through the MPLLA does increase the potential for vehicle collision with lynx crossing the highway, the proposed action is not anticipated to cause an increase above the 2,000-vehicle-per-day threshold that would impede lynx dispersal. Given the lack of lynx population

[2] Dickert, C., SGI. E-mail to C. Garrison, EMPSi, on July 15, 2015, regarding final questions for revisions to the Administrative FEIS and BA.

centers and large blocks of primary lynx habitat in or near the MPLLA, the likelihood that lynx would frequently disperse through the MPLLA is small (Petterson 2012).

*Direct and indirect effects on designated Canada lynx critical habitat*

There would be no direct or indirect effects on Canada lynx critical habitat under the proposed action. This is because no designated critical habitat for Canada lynx is in Colorado. The nearest designated critical habitat is in Wyoming, approximately 280 miles northwest of the Unit.

***Cumulative Effects***

Cumulative effects are those of future state, tribal, local, or private actions that are reasonably certain to occur in the action area. Future federal actions that are unrelated to the proposed action are not considered in cumulative analysis because they would be subject to separate consultation, in accordance with Section 7 of the ESA. Cumulative effects address the impact of implementing the proposed action in combination with other future nonfederal actions outside the scope of the Final EIS, either in the Unit or next to it.

Historically, the cumulative effects of highway and road construction, timber extraction, ski-area development, and urban development have reduced the abundance of old-growth spruce-fir forest, which has affected lynx and its prey. Areas of prime snowshoe hare habitat have been impacted by these types of activities, which has in turn affected lynx populations (Ellsworth and Reynolds 2006). Such activities are likely to continue; however, those activities that occur in the Unit are not likely to have a great impact on the species because of the limited primary habitat there.

The proposed action would not result in construction of any new roads that would impede dispersing lynx or increase traffic levels over a threshold that would impede dispersing lynx. However, the proposed action would incrementally increase traffic on SH 133 to a small degree and would contribute to cumulative impacts in this regard. As population and development in the cumulative impacts analysis area increases, transportation corridors, such as SH 133, would likely see increasing use. Eventually, this road may see use that exceeds the 2,000 to 5,000 vehicles per day threshold that could impede dispersing lynx.

This page intentionally left blank.

# CHAPTER 5

# EFFECTS DETERMINATION

## 5.1 COLORADO PIKEMINNOW, RAZORBACK SUCKER, BONYTAIL, HUMPBACK CHUB

Implementing the proposed action would have **no effect** on the four endangered Colorado River fishes nor their designated critical habitat.

### 5.1.1 Rationale

The BLM has determined (BLM 2008a, 2008b) and the USFWS has concurred (USFWS 2008, 2009a) that any water depletions in the Colorado River Basin are likely to adversely affect the four endangered Colorado River fishes and their critical habitats. Water depletion effects under the proposed action would be similar to those effects described under the programmatic BOs and would not exceed those levels consulted on in the programmatic BOs. To offset effects from water depletions, the USFWS authorized the BLM to solicit a one-time water contribution to the 1988 Upper Colorado River Endangered Fish Recovery Program. This would comply with the USFWS programmatic BOs and recovery agreement (USFWS 1999).

The indirect effects of small site-specific increases in sediment on the four endangered Colorado fish species would be negligible and well within the background levels carried by the Colorado and Gunnison Rivers. Any increased sediment loading into the river from BLM management would be largely undetectable.

Oil and gas development has the potential for accidental spills and leaks of hazardous substances associated with their application on BLM lands. The proposed action contains conservation measures to reduce the risk of these occurrences near habitat for these fish. In the rare and unlikely event of a spill, the BLM would initiate emergency consultation with the USFWS.

## 5.2 GREENBACK CUTTHROAT TROUT

Implementing the proposed action will have **no effect** on the greenback cutthroat trout.

### 5.2.1 Rationale

Under the proposed action, there would be no construction within the Henderson or Roberts Creek drainages, thus no direct or indirect impacts on green lineage cutthroat trout would occur from the proposed development authorized by BLM.

Because development in Henderson and Roberts Creek watersheds has occurred irrespective of a BLM decision, no interrelated or interdependent effects from the proposed action are anticipated. No aspects of the proposed action are dependent upon the development that has or may occur in Henderson or Roberts Creeks which would occur entirely on private surface and private mineral estate.

## 5.3 CANADA LYNX

Based on the effects analysis described above, implementing the proposed action **may affect but is not likely to adversely affect** the threatened Canada lynx. Additionally, implementing the proposed action would have **no effect** on proposed critical habitat for the Canada lynx.

### 5.3.1 Rationale

Limited suitable habitat for Canada lynx and primary prey species occur in the Unit and region. Incremental increases in construction-related traffic over McClure Pass and through the MPLLA would result in the increased potential for lynx-vehicle collisions. However, expected traffic increases are small and would not exceed traffic thresholds that are generally recognized to impede lynx road crossing success. Further, lack of population centers and large blocks of suitable habitat for lynx and its primary prey species make use of the area by lynx unlikely.

There is no designated critical habitat for lynx in Colorado.

# SECTION 6
# REFERENCES

Alexander, S. M., P. C. Paquet, and N. M. Waters. 2004. "Carnivores, roads and habitat permeability in the Canadian Rocky Mountains: A community level study." Paper presented at the Defenders of Wildlife Carnivores 2004 Conference: Expanding Partnerships in Carnivore Conservation. November 14 to 17, Santa Fe, New Mexico.

_____. 2005. "Traffic volume and highway permeability for a mammalian community in the Canadian Rocky Mountains." *The Canadian Geographer* 49(4):321-331.

Behnke, R. J. 1980. "Impacts of habitat alterations on the endangered and threatened fishes of the upper Colorado River Basin." *In:* Energy Development and the Water, Fish, and Wildlife in the Southwest: Problems of the Upper Colorado River Basin (W. O. J. Spofford, A. L. Parker, and A. V. Kneese, editors). Resources for the Future, Washington, DC. Pp. 204-216.

_____. 1992. "Native trout of western North America." *American Fisheries Society Monograph 6*, Bethesda, Maryland.

Berry, J. 2011. Hydrology and Surface Water Report for Bull Mountain Unit Master Development Plan. WWC Engineering. Sheridan, Wyoming.

Bestgen, K. R., K. B. Rogers, and R. Granger. 2013. Phenotype Predicts Genotype for Lineages of Native Cutthroat Trout in the Southern Rocky Mountains. Final Report to the U. Fish and Wildlife Service, Colorado Field Office, Denver Federal Center (MS 65412). Larval Fish Laboratory Contribution 177.

BLM (Bureau of Land Management). 2008a. Programmatic Biological Assessment for BLM Actions in Western Colorado re: Water Depletions and Effects on the Four Endangered Big River Fishes: Colorado Pikeminnow (*Ptychocheilus lucius*), Humpback Chub (*Gila cypha*), Bonytail Chub (*Gila elegans*), and Razorback Sucker (*Xyrauchen texanus*). September 16, 2008.

______. 2008b. Programmatic Biological Assessment for BLM's Fluid Minerals Program in Western Colorado re: Water Depletions and Effects on the Four Endangered Big River Fishes: Colorado Pikeminnow (*Ptychocheilus lucius*), Humpback Chub (*Gila cypha*), Bonytail Chub (*Gila elegans*), and Razorback Sucker (*Xyrauchen texanus*). May 20, 2008.

______. 2008c. BLM Manual 6840, Special Status Species Management. December 12, 2008. Washington, DC.

______. 2012. Biological Assessment for the Pine Ridge Wildland Fire and Rehabilitation Plan and the Effects on Four Endangered Fish Species: bonytail (*Gila elegans*), humpback chub (*Gila cypha*), Colorado pikeminnow (*Ptychocheilus lucius*), and razorback sucker (*Xyrauchen texanus*), and their Designated Critical Habitat, and one Threatened Plant Species: Colorado hookless cactus (*Sclerocactus glaucus*).

______. 2013. Hydraulic Fracturing White Paper. BLM Wyoming State Office. July 5, 2013.

______. 2015. Draft Environmental Impact Statement for the Bull Mountain Unit Master Development Plan. DOI-BLM-CO-S050-2013-0022-EIS. January 2015.

BLM GIS (Bureau of Land Management Geographic Information System). 2014. GIS data used in conjunction with SG Interests data to form the alternatives, and GIS data on file with BLM's eGIS server, including Bull Mountain Unit, VRM and VRI, existing roads, OHV designations, Colorado HUC 5 watersheds and others. Department of the Interior, BLM, Colorado Uncompahgre Field Office. Data was edited from June 2013 to June 2014.

Carlson, C. A., and R. T. Muth. 1989. "Lifeline of the American Southwest." *In:* Proceedings of the International Large Rivers Symposium (D. P. Dodge, editor). *Canadian Special Publication of Fisheries and Aquatic Sciences* 106:220-239

Chart, T. E., and L. Lentsch. 2000. Reproduction and recruitment of *Gila* spp. and Colorado pikeminnow (*Ptychocheilus lucius*) in the Middle Green River 1992–1996. Utah Division of Wildlife Resources, Salt Lake City. Publication Number 00-18.

Clevenger, A. P., B. Chruszcz, K. Gunson, and J. Wierzchowski. 2002. Roads and wildlife in the Canadian Rocky Mountain parks—movements, mortality and mitigation. Final report to Parks Canada. Banff, Alberta.

COGCC (Colorado Oil and Gas Conservation Commission). 2013. Colorado Oil and Gas Information System Production Data Inquiry website: http://cogcc.state.co.us/cogis/ProductionSearch.asp.

CPW (Colorado Parks and Wildlife). 2014. Colorado Parks & Wildlife Lynx Reintroduction. Internet website: http://cpw.state.co.us/Documents/Research/Mammals/LynxFactSheet.pdf.

Dill, W. A. 1944. "Fishery of the lower Colorado River." *California Fish and Game* 30(3):109-211.

DOI and USDA (Department of Interior and United States Department of Agriculture). 2007. Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development. BLM/WO/ST-06/021+3071/REV 07. Bureau of Land Management. Denver, Colorado. Internet website http://www.blm.gov/wo/st/en/prog/energy/ oil_and_gas/best_management_practices/ gold_book.html.

Ellsworth, E., and T. D. Reynolds. 2006. Snowshoe Hare (*Lepus americanus*): A technical conservation assessment. USDA Forest Service, Rocky Mountain Region.

EPA (US Environmental Protection Agency). 2004. Evaluation of Impacts to Underground Sources of Drinking Water by Hydraulic Fracturing of Coal bed Methane Reservoirs. Office of Ground Water and Drinking Water, Drinking Water Protection Division, Prevention Branch, Washington, DC.

Haak, A. L., J. E. Williams, H. M. Neville, et al. 2010. "Conserving peripheral trout populations: the values and risks of life on the edge." *Fisheries* 35:530-549.

Hirsch, C. L., M. R. Dare, and S. E. Albeke. 2013. Range-wide status of Colorado River cutthroat trout (Oncorhynchus clarkii pleuriticus): Colorado River Cutthroat Trout Conservation Team Report. Colorado Parks and Wildlife, Fort Collins.

Holden, P. B., and C. B. Stalnaker. 1970. "Systematic studies of the cyprinid genus *Gila* in the Upper Colorado River Basin." *Copeia* 1970(3):409-420.

Interagency Lynx Biology Team. 2013. Canada Lynx Conservation Assessment and Strategy. 3rd edition. USDA Forest Service, USDI Fish and Wildlife Service, USDI Bureau of Land Management, and USDI National Park Service. Forest Service Publication R1-13-19, Missoula, Montana.

Isaak, D. J., C. C. Muhlfeld, A. S. Todd, R. Al-Chokhachy, J. Roberts, J. L. Kershner, K. D. Fausch, and S. W. Hostetler. 2012. "The past as prelude to the future for understanding 21st century climate effects on Rocky Mountain trout." *Fisheries Management* 37:542-556.

Joseph, T. W., J. A. Sinning, R. J. Behnke, and P. B. Holden. 1977. An Evaluation of the Status, Life History and Habitat Requirements of Endangered and Threatened Fishes of the Upper Colorado River system. Report 24, Part 2. US Fish and Wildlife Service, Office of Biological Services, Fort Collins, Colorado.

Kaeding, L. R. 2003. Endangered and threatened wildlife and plants: reconsidered finding for an amended petition to list the westslope cutthroat trout as threatened throughout its range. *Federal Register* 68 (132):46989-47009. Internet website: http://ecos.fws.gov/docs/federal_register/fr4159.pdf. Kaeding, L. R., B. D. Burdick, P. A. Schrader, and C. W. McAda. 1990. "Temporal and spatial relations between the spawning of humpback chub and roundtail chub in the upper Colorado River." *Transactions of the American Fisheries Society* 119:135-144.Lanigan, S. H., and C. R. Berry, Jr. 1979. Distribution and Abundance of Endemic Fishes in the White River in Utah. Utah Cooperative Fish and Wildlife Research Unit, Logan.

McAda, C. W. 2002. Subadult and Adult Pikeminnow Monitoring; Summary of Results, 1986-2000. Recovery Program Project Number 22, final report. US Fish and Wildlife Service, Grand Junction, Colorado.

Meffe, G. K. 1985. "Predation and species replacement in American southwestern fishes: a case study." *Southwestern Naturalist* 30(2):173-187.

Metcalf, J. L., V. Pritchard, S. Silvestri, J. Jenkins, J. Wood, D. Cowley, R. Evans, et al. 2007. "Across the great divide: Genetic forensics reveals misidentification of endangered cutthroat trout populations." *Molecular Ecology*.

Metcalf, J. L., S. L. Stowell, C. M. Kennedy, K. B. Rogers, D. McDonald, J. Epp, K. Keepers, et al. 2012. "Historical stocking data and 19th century DNA Reveal Human-Induced Changes To Native Diversity And Distribution Of Cutthroat Trout. *Molecular Ecology* 21:5194-5207.

Miller, R. R. 1946. "*Gila cypha*, a remarkable new species of cyprinid fish from the Colorado River in Grand Canyon, Arizona." *Journal of the Washington Academy of Sciences* 36:409-415.

Minckley, W. L., and J. E. Deacon. 1968. "Southwest fishes and the enigma of endangered species." *Science* 159:1424-1432.

Minckley, W. L. 1982. "Trophic interrelations among introduced fishes in the lower Colorado River, Southwestern United States." *California Fish and Game* 68(2):78-89.

Muth, R. T., L. W. Crist, K. E. LaGory, J. W. Hayse, K. R. Bestgen, T. P. Ryan, J. K. Lyons, and R. A. Valdez. 2000. Flow and Temperature Recommendations for Endangered Fishes in the Green River Downstream of Flaming Gorge Dam. US Fish and Wildlife Service, Final Report FG-53 to the Upper Colorado River Endangered Fish Recovery Program, Denver.

National Wildlife Federation. 2014. Showcase: West, Canada lynx in Colorado. Internet website: http://www.nwf.org/~/media/PDFs/Wildlife/CanadaLynx.ashx.

Osmundson, D. B., and L. R. Kaeding. 1989. Colorado Squawfish and Razorback Sucker Grow-Out Pond Studies as part of Conservation Measures for the Green Mountain and Ruedi Reservoir Water Sales. Final report. US Fish and Wildlife Service, Colorado River Fishery Project, Grand Junction.

Osmundson, D. B., P. Nelson, K. Fenton, and D. W. Ryden. 1995. Relationship Between Flow and Rare Fish Habitat in the 15-Mile Reach of the Upper Colorado River. Final Report. US Fish and Wildlife Service, Grand Junction, Colorado.

Petterson, E. S. 2011. Ault Creek Fish Sampling for Bull Mountain Unit EA Compliance. Memorandum prepared for SG Interests and BLM. Rocky Mountain Ecological Services, Inc. Glenwood Springs, Colorado.

______. 2012. Wildlife & Aquatic Resources Report for the Bull Mountain Unit Master Development Plan, Gunnison County, Colorado. February 2012.

Case No. 1:20-cv-02484-MSK Document 90-2 filed 05/06/21 USDC Colorado pg 379 of 576

Propst, D. L., and K. R. Bestgen. 1991. "Habitat and biology of the loach minnow, *Tiaroga cobitis*, in New Mexico." *Copeia* 1991:29-39.

Rieman, B. E., and D. J. Isaak. 2010. Climate Change, Aquatic Ecosystems and Fishes in the Rocky Mountain West: Implications and Alternatives for Management." Gen. Tech. Rep. GTR-RMRS-250. US Department of Agriculture, Forest Service, Rocky Mountain Research Station, Fort Collins, Colorado.

Rinne, J. N. 1992. "Physical habitat utilization of fish in a Sonoran Desert stream, Arizona, southwestern United States." i 1:1-8.

Rogers, K. B., and C. M. Kennedy. 2008. Seven Lakes and the Pike's Peak Native (PPN): History and Current Disposition of a Critical Cutthroat Trout Brood Stock. Colorado Division of Wildlife, Fort Collins.

Rogers, K. B. 2010. "Cutthroat trout taxonomy: Exploring the heritage of Colorado's state fish." *In* Wild Trout X: Sustaining wild trout in a changing world (R. F. Carline and C. LoSapio, editors). Wild Trout Symposium, Bozeman, Montana. Pp. 152-157. Internet website: http://www.wild troutsymposium.com/proceedings.php.

_____. 2012a. "Piecing together the past: Using DNA to resolve the heritage of our state fish." *Colorado Outdoors* 61(5):28-32

_____. 2012b. Characterizing Genetic Diversity in Colorado River Cutthroat Trout: Identifying Lineage GB Populations. Colorado Division of Wildlife, Fort Collins.

Stevens, S., C. Callaghan, and R. Owchar. 1996. Wildlife Corridors Around Developed Areas of Banff National Park. Report prepared for Parks Canada, Banff, Alberta (as cited in Gibeau and Heuer 1996).

Tyus, H. M. 1987. "Distribution, reproduction, and habitat use of the razorback sucker in the Green River, Utah, 1979-1986." *Transactions of the American Fisheries Society* 116:111-116.

Tyus, H. M., B. D. Burdick, R. A. Valdez, C. M. Haynes, T. A. Lytle, and C. R. Berry. 1982. "Fishes of the upper Colorado River Basin: distribution, abundance, and status." *In:* "Fishes of the Upper Colorado River System: Present and Future" ( W. H. Miller, H. M. Tyus, and C. A. Carlson, editors). Western Division, American Fisheries Society, Bethesda, Maryland.

USFWS (US Fish and Wildlife Service). 1978. Endangered and Threatened Wildlife and Plants; Listing of the Greenback Cutthroat Trout as a Threatened Species. 43 *FR* No 16343.

_____. 1987. Recovery Implementation Program for Endangered Fish Species in the Upper Colorado River Basin. Mountain Prairie Region 6, Denver, Colorado.

_____. 1990a. Bonytail Chub Revised Recovery Plan. Mountain Prairie Region 6, Denver, Colorado. September 4, 1990.

______. 1990b. Humpback Chub Second Revised Recovery Plan. Mountain Prairie Region 6, Denver, Colorado. September 19, 1990.

______. 1991. Endangered and Threatened Wildlife and Plants; Final Rule to List the Razorback Sucker (*Xyrauchen texanus*) as a Threatened Species. *Federal Register* Vol. 59, No. 54. Pp. 14248-14271.

______. 1994. Endangered and Threatened Wildlife and Plants; Determination of Critical Habitat for the Colorado River Endangered Fishes: Razorback Sucker, Colorado Squawfish, Humpback Chub, and Bonytail Chub. Final Rule. *Federal Register* Vol. 59, No. 54. Pp. 13374-13400.

______. 1998a. ESA Section 7 Consultation Handbook. Final. USFWS and National Marine Fisheries Service.

______. 1998b. Greenback Cutthroat Trout Recovery Plan. Region 6, Denver, Colorado. March 1998.

______. 1998c. Razorback Sucker (*Xyrauchen texanus*) Recovery Plan. Mountain Prairie Region 6, Denver, Colorado. December 23, 1998.

______. 1999. Final Programmatic Biological Opinion for Bureau of Reclamation's Operations and Depletions, Other Depletions, and Funding and Recovery Program Actions in the Upper Colorado River Above the Confluence with the Gunnison River. USFWS, Grand Junction. Colorado.

______. 2000. Endangered and Threatened Wildlife and Plants; Determination of Threatened Status for Contiguous US Distinct Population Segment of the Canada Lynx and Related Rule; Final Rule. *Federal Register* Vol. 65, No. 58. pp. 16052-16086.

______. 2002a. Bonytail (*Gila elegans*) Recovery Goals: Amendment and Supplement to the Bonytail Chub Recovery Plan. Mountain Prairie Region 6, Denver, Colorado. August 1, 2002.

______. 2002b. Colorado Pikeminnow (*Ptychocheilus lucius*) Recovery Goals: Amendment and Supplement to the Colorado Squawfish Recovery Plan. Mountain Prairie Region 6, Denver, Colorado. August 1, 2002.

______. 2002c. Razorback Sucker (*Xyrauchen texanus*) Recovery Goals: Amendment and Supplement to the Razorback Sucker Recovery Plan. Mountain Prairie Region 6, Denver, Colorado. August 1, 2002.

______. 2002d. Humpback Chub (*Gila cypha*) Recovery Goals: Amendment and Supplement to the Humpback Chub Recovery Plan. Mountain Prairie Region 6, Denver, Colorado. August 1, 2002.

______. 2005. Recovery Outline: Contiguous United States Distinct Population Segment of the Canada Lynx. Mountain Prairie Region 6, Denver, Colorado. September 14, 2005.

______. 2008. Programmatic Biological Opinion for Water Depletions Associated with BLM's Fluid Minerals Program within the Upper Colorado River Basin in Colorado. Ecological Services, Grand Junction, Colorado. December 19, 2008.

______. 2009a. Programmatic Biological Opinion for Water Depletions associated with BLM Projects (excluding Fluid Mineral Development) Authorized by BLM within the Upper Colorado River Basin in Colorado. Ecological Services, Grand Junction, Colorado. February 25, 2009.

______. 2009b. Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for the Contiguous United States Distinct Population Segment of the Canada Lynx; Final Rule. *Federal Register* Vol. 74, No. 36. Pp. 8615-8702.

______. 2012. Updated FWS Position Paper on ESA Consultations on Greenback Cutthroat Trout, Including the Cutthroat referred to as Lineage GB. Updated October 4, 2012.

______. 2014. Species Profile for Canada lynx (*Lynx canadensis*). Internet website: http://ecos.fws.gov/speciesProfile/profile/speciesProfile.action?spcode=A073. Last Updated July 29, 2014.

Valdez, R. A., and R. J. Ryel. 1997. “Life history and ecology of the humpback chub population in the Colorado River in Grand Canyon, Arizona.” Proceedings of the Third Biennial Conference on Research in Colorado Plateau National Parks, US Department of Interior, National Park Service. Pp. 3-31.

Vanicek, C. D. 1967. “Ecological studies of native Green River fishes below Flaming Gorge Dam, 1964-1966.” Unpublished doctoral dissertation, Utah State University, Logan.

Wenger, S. J., D. J. Isaak, C. H. Luce, et al. 2011. “Flow regime, temperature, and biotic interactions drive differential declines of trout species under climate change.” Proceedings of the National Academy of Sciences. 108:14175-14180, doi:10.1073/pnas.1103097108.

This page intentionally left blank.

# SECTION 7

# LIST OF PREPARERS

## 7.1  US BUREAU OF LAND MANAGEMENT, UNCOMPAHGRE FIELD OFFICE
**Kenneth Holsinger**


## 7.2  CONTRACTOR, ENVIRONMENTAL MANAGEMENT AND PLANNING SOLUTIONS, INC.
**Carol-Anne Garrison**
MA, Anthropology
BA, Anthropology
Years of Experience: 15
(Project Manager)

**Meredith Zaccherio**
MA, Biology
BS, Biology
Years of Experience: 9
(BA Author)

**Morgan Trieger**
BS, Conservation and Resource Studies
Years of Experience: 8
(BA Author)

This page intentionally left blank.

# APPENDIX A
# BEST MANAGEMENT PRACTICES AND CONDITIONS OF APPROVAL

All federal actions undertaken as a result of the No Action, Proposed Action, Modified Action, and Preferred Alternatives are subject to approval by the BLM prior to implementation.

In the process of acquiring permission to drill to a federal oil and gas lease, leaseholders submit an Application for Permit to Drill (APD) to the BLM Field Office that manages the lands where their lease is located. Included with the APD are:

- Subsurface – a drilling plan that contains a description of the leaseholder's drilling program, geologic data, expected hazards, and proposed mitigation measures to address such hazards
- Surface – a plan of operations that describes the locations of the drill pad, access road, pipeline(s), facilities, details of pad construction, methods for containment and disposal of waste material, and plans for reclamation of the surface.

When the BLM has completed the necessary environmental and technical review of the proposal contained in the APD, the BLM may approve the APD as submitted or, more typically, approve the APD subject to Conditions of Approval (COAs).

## CONDITIONS OF APPROVAL

COAs are attached to an approved APD to ensure environmental protection, safety, and/or conservation of the mineral resource. They arise from a variety of controlling authorities such as the Federal Land Policy and Management Act (FLPMA), the National Environmental Policy Act (NEPA), the Endangered Species Act (ESA), and the National Historic Preservation Act (NHPA). The COAs attached to an APD can be general in nature or site-specific, and will vary from one BLM Field Office to another. Typically, a Field Office develops COAs over a number of years of active management of oil and gas development. Often the Field Office RMP provides either a listing of potential COAs or the best management practices (BMPs) that might guide development of site-specific COAs in that area. They can address topics as wide-ranging as

protection of wildlife habitat or archeological and paleontological sites, noise reduction, wildfire suppression, or management of invasive species. However, the 1989 RMP does not contain specific COAs.

## BEST MANAGEMENT PRACTICES

The BLM describes best management practices (BMPs) as "state-of-the-art mitigation measures applied to oil and natural gas drilling and production to help ensure that energy development is conducted in an environmentally responsible manner." The aim of BMPs is to protect wildlife, air quality, landscapes, and other natural resources as energy resources are developed. BMPs tend to be general principles for resource protection and are not in themselves regulatory in nature.

BLM policy is that all "Field Offices consider BMPs in National Environmental Policy Act (NEPA) documents to mitigate anticipated impacts to surface and subsurface resources, and also to encourage operators to actively consider BMPs during the application process." (Instruction Memorandum No. 2004-194; June 22, 2004).

Another important source of information on BMPs is the publication Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (commonly referred to as The Gold Book), which was developed to assist operators on the requirements for obtaining permit approval and conducting environmentally responsible oil and gas operations on federal lands.

BMPs are often expressed in natural gas leaseholders' plans of development, proposed actions, surface use plans, in reclamation plans, or, attached to approved Applications for Permit to Drill, as Conditions of Approval, which are described below.

## CONDITIONS OF APPROVAL LIST

The following list of measures is a modified version of those presented in the Draft Environmental Impact Statement (EIS). Based on public comments and internal review of the measures, the BLM found that several were redundant and restated legal, regulatory, or policy requirements, and did not need to be repeated here. The list below are the measures that will be used by the Uncompahgre Field Office (UFO) when considering APDs under the MDP and are presented in the standard format for attachments to an approved APD.

### Surface Disturbing Activities

1. Prior to approval of any Federal APDs which initiate construction of a well pad analyzed in this EIS, alternate siting within a 40-acre area of the Federal well pad may be required by the Authorized officer as a result of reviewing the proposed surface location identified in the operator's corresponding NOS/APD. The 40-acre area is identified by drawing a circle with a radius of 745-feet around the proposed location. Alternate siting may be required by the authorized officer to minimize adverse impacts to other resource values, land uses or users not addressed in the lease stipulations, other specific nondiscretionary statutes, and EIS conditions of approval at the time operations are proposed. Alternate siting of a Federal well pad beyond the 40-acre limitation may result in additional environmental analysis being required to obtain approval.

2. The operator shall notify the BLM Authorized Officer (AO) at least 48 hours prior to initiation of construction.

3. Site-specific slope-stability studies will be conducted in areas of potential geologic hazard as identified in the MDP analysis prior to design and construction of new access roads, pipelines, and well pads, and appropriate mitigation will be included for potential movement of soils and rock.

4. Any loose rock occurring in the vicinity will be scaled prior to construction if it presents a safety hazard.

5. Where feasible and consistent with future plans and operations and considering safety concerns, all tanks and production facilities will be situated on the access road side of the well pad in order to maximize the coverage by interim reclamation upon the area necessary to create the well pad.

6. The topsoil (consisting of O and A horizons) will be removed from pad locations during construction, stockpiled in berms, and saved for interim and long-term reclamation and revegetation. Stockpiled topsoil and spoil piles will be separated to prevent mixing during reclamation efforts.

7. Stockpiled soil and disturbed earthen surfaces necessary to build up well pad sites, such as cut/fill slopes, will be seeded with BLM-approved interim seed mix upon cessation of pad construction activities to control erosion, and reduce generation of dust. In addition all stockpiled soil and soil disturbed areas will be maintained noxious weed free.

8. The operator shall use only certified weed-free seed and erosion-control materials.

9. Use of erosion-control blankets with plastic netting shall not be permitted.

10. Following seeding, any woody debris cleared during initial construction will be pulled back over the recontoured/partially reshaped areas to act as flow deflectors and sediment traps.

11. The well pad surface and surfacing material will be maintained until implementation of final reclamation activities where it would be removed or buried in the cut portion of the location.

12. Dust-abatement measures will be applied to roads and pad locations. The operator can select and inform the BLM of chosen dust abatement. At a minimum, the application of fresh water will be acceptable. Other examples include: magnesium chloride, emulsified asphalt, gravel, or other dust palliatives to decrease the application frequency normally required when using fresh water only.

**Road Construction and Maintenance**

13. Vehicle traffic is limited to the bladed/traveled road surface and existing parking areas, pullouts, etc. No new pullouts, off-road parking, or staging areas will be allowed unless specifically authorized by the BLM.

14. The operator shall provide timely year-round road maintenance and cleanup on the access roads.

15. Roads will be located so as to minimize their influence on riparian areas and, when stream crossing is necessary, design the approach and crossing perpendicular to the channel. Locate the crossing where the channel is well-defined, unobstructed, and straight unless otherwise approved by BLM.

16. Unless otherwise approved by BLM, avoid headwalls, midslope locations on steep, unstable slopes, seeps, old landslides, slopes in excess of 40%, and areas where the geologic bedding planes or weathering surfaces are inclined with the slope.

17. Promptly remove slide material when it is obstructing road surface and ditchline drainage. Save all soil or material useable for reclamation and stockpile for future reclamation needs. Use remaining slide material for needed road improvement or place it in a stable waste area. Avoid sidecasting of slide material where it can damage, overload, saturate embankments, or flow into downslope drainage courses. Reestablish vegetation in areas where more than 50% of vegetation has been destroyed due to side casting.

18. During wet weather conditions, no mud blading will be allowed. When road conditions are such that vehicles create ruts deeper than 4 inches, travel activities will be temporarily suspended.

**Tanks and Pits**

19. All produced liquids shall be contained in a pit or tank, including the dehydrator vent/condensate line effluent. All drill cuttings will be kept in an approved lined pit on the pad of the well being drilled, or hauled to an approved disposal site

20. The operator shall install netting over the pits to exclude birds and bats. The netting will be applied within 24 hours after drilling activities have begun. The netting shall be retained and maintained for as long as there are liquids in the pit. The integrity of the netting must also be periodically checked by the operator for sagging due to snow accumulation if a pit must stay open through the winter.

21. Prior to the onset of winter, the operator shall remove fluids from any pits allowed to remain open over the winter months in order to reduce or eliminate the potential of spring snowmelt to exceed the 2-foot freeboard (below the top of the liner) minimum at any time.

22. The operator shall skim and eliminate oil from unfenced produced water ponds and reserve pits daily until fences are installed. Once fences are installed, the pit shall be

kept reasonably free from surface accumulation of liquid hydrocarbons that will retard evaporation.

### Pipeline and Power Line Construction

23. Hydrostatic Pipeline testing. Prior to water discharge, the operator will submit to BLM a copy of the approved conditions and stipulations from CDPHE's Colorado Discharge Permit System for Hydrostatic Testing of Pipelines, Tanks and Similar Vessels and identify on a map the location of the water discharge point.

24. Power line and ancillary structure design shall adhere to guidance provided in "Suggested Practices for Avian Protection on Power lines: State of the Art."

25. Poles and transmission line locations will be selected to achieve the minimum practicable adverse impact on visual quality.

26. Pipeline corridors will be recontoured to pre-construction contours as soon as construction activities cease unless otherwise approved by BLM.

### Natural Gas Drilling and Exploration

27. For dry holes in visually sensitive areas, the abandonment marker must be at least 4-inch diameter pipe, embedded in cement, buried to final reclaimed ground level, and capped with a 2-foot by 2-foot steel plate, at least l/4 inch thick. The plate must be permanently inscribed with the identity requirements of 43 CFR 3162.6d).

### Noise

28. This project will be compliant with COGCC and CDPHE standards for noise abatement.

### Cultural Resources

29. Any National Register of Historic Places-eligible sites located in proposed disturbance areas shall be avoided by all project-related disturbance including well pad and water-disposal units, pipelines, and access roads. Should avoidance not be possible then the Operator, in consultation with the BLM and the State Historic Preservation Office and with input from other interested parties per 36 CFR Part 800.6 and the Statewide Protocol Section VII, shall develop a mitigation plan designed to eliminate the adverse effects.

### Visual Resources

30. Downlighting will be used for all operating and production facilities.

### Rangeland Management

31. A cattle guard and/or gate will be placed at the time of fence construction where a well access road bisects the fenceline that surrounds a well pad's disturbance imprint. Once reclaimed plant species are fully established on disturbed sites as determined by the BLM (e.g. desired plant community, Public Land Health Standards), the fence and cattle guard will be completely removed by the operator. This will allow for reclaimed plant species to establish without grazing pressure from livestock.

**Hazardous Substances**

32. Signs will be posted on-site that identify potential hazards associated with site operation, including chemical hazards.

**Wildlife and Wildlife Habitat**

33. No surface-disturbing activities shall occur from December 1 through April 30 in those portions of the Unit mapped as winter concentration and sever winter range, in order to protect wintering big game on those federal leases with a big game protection timing restriction and according to conditions contained in these documents. This restriction would not apply to production and routine maintenance activities. The following activities are not considered "routine:"

   a. Heavy construction requiring the use of cranes, backhoes, bulldozers or other heavy equipment

   b. Drilling and completion operations

   c. Workover rigs

   d. Multiple water-hauling trips to one site in a day

   Exceptions or variances to this restriction will be considered and evaluated according to UFO policies. Exceptions and variances to standard restrictions and protection measures must be requested in writing to the BLM Authorized Officer or BLM biologist. Such requests are evaluated on a case-by-case basis and may be granted by a BLM biologist depending on animal or herd status, topographic characteristics, site context, weather severity, and other factors, provided species and habitats are adequately protected. Any modifications to prescribed restrictions, and the rationale behind those decisions, will be documented in the project case file(s). In some cases, site characteristics and/or conditions may warrant expanding buffer distances to ensure adequate protection of species."

34. Bear-resistant dumpsters and trash receptacles shall be installed at all facilities.

35. The operator shall install screens on all heater-treaters and other exhaust systems to prevent nesting bird activity and bird mortality.

36. All lethal and non-lethal injury events that involve migratory birds will be reported to a BLM official immediately.

37. From May 15- July 15, no surface-disturbing activities shall occur in order to protect breeding migratory birds. This restriction is relaxed if surveys determine no nests or nestlings will be directly disturbed by construction activities. In the event that the proposed construction is delayed, resurveys shall be conducted if surface disturbance occurs on or after May 15 of the following year. Operator shall provide documentation of nesting bird surveys conducted by a qualified biologist prior to construction.

38. Screened water-suction hoses shall be utilized to exclude fish when drawing water from streams, ponds, and lakes.

39. Wildlife crossovers (trench plugs) with ramps shall be installed on each side of trenches at maximum ¼ mile intervals and at well-defined game trails to facilitate passage of big game across the open trench and to allow trapped wildlife to escape the trench.

40. All measures identified in the Wildlife Mitigation Plan attached to the end of this appendix.

## Invasive, Non-native Species

41. The operator will monitor for and control noxious or invasive weeds throughout the construction and production phases. Noxious weed control is mandatory on the well pads, pipelines, and access roads used by the lessee/operator for the life of the project. Monitoring and compliance should be performed in coordination with routine maintenance activities and in accordance with state law and BLM regulations.

42. The operator and the operator's contractors will disinfect heavy equipment, hand tools, boots and any other equipment used previously in a river, lake, pond, or wetland, by routinely cleaning equipment using 140° water and high-pressure sprayers to remove dirt, mud and foreign debris before equipment is brought on-site.

43. All disturbances, pads, roads (private and public) pipelines, and pullouts will be maintained noxious weed free to deter any further weed spread. If gravel is to be used only gravel that is free of Colorado State A and B listed noxious weed species will be used.

44. Monitoring and control of noxious or invasive weeds attempting to establish within the project boundaries throughout the construction and production phases should be performed in coordination with routine maintenance activities and in accordance with state law and BLM regulations.

## Reclamation

45. To mitigate additional soil erosion at the well pad and potential increased sediment and salt loading to nearby surface waters, all disturbed areas affected by drilling or subsequent operations, except areas reasonably needed for multi-well drilling and/or production operations, shall be reshaped and reclaimed as early and as nearly as practicable to their original condition.

46. Exposed slopes shall be revegetated as soon as possible, with a native seed mix or approved seed mix, at a density and a pattern that replicate what was removed during construction. Non-native seed mix can create visual impacts through strong color and texture contrast with the surrounding native vegetation.

47. A Reclamation Status Report will be submitted to the UFO annually for all actions that require disturbance of surface soils on BLM mineral estate as a result of the Proposed Action. Actions may include, but are not limited to, well pad and road construction,

construction of ancillary facilities, or power line and pipeline construction. The Reclamation Status Report will be submitted by December of each calendar year, and will include the well number, legal description, project description (e.g., well pad or pipeline), reclamation status (e.g., interim or final), whether the well pad or pipeline has been revegetated and/or recontoured, date seeded, photos of the reclaimed site, estimate of acres seeded, and seeding method (e.g., disk-plowed, drilled, or both). Internal and external review of this plan and the process used to acquire the necessary information will be conducted annually, and new information or changes in the reporting process will be incorporated into the plan.

## Geologic Hazards

48. Avoidance of Areas with Geologic Hazards. The most effective mitigation to reduce effects of slope failure is to avoid areas with higher risks. Project-specific conditions would be evaluated during the site permitting process, and avoiding disturbance in areas with higher risks within the proposed sites would minimize hazards.

49. Engineering Controls. If geologic hazards cannot be avoided, mitigation measures such as designing drainage systems to reduce soil saturation and prevent erosion in areas with steep slopes, and to stabilize the toes of slopes, could be implemented, based on recommendations following site-specific geotechnical site evaluations.

50. Monitoring of Landslides. If landslide-prone areas cannot be avoided, such as east of Highway 133, mass movement of the landslide deposits can be monitored, such as by installation of tensiometers to monitor the rate of differential horizontal movement so that corrective action can be taken. Alarm systems can be installed to enable automated shutoff of gas pipelines at critical points in the event of slope failure.

51. The following measures fall under the state regulations for injection wells and are within their jurisdiction. They are included with the preferred alternative for measures to apply to BLM authorized wells:

    a. Monitoring and Maintenance of Acceptable Injection Pressure. Monitoring of deep well injection pressures and of changes in the transmissivity (a measure of how much fluid can flow horizontally through an aquifer) during injection, can provide a means of determining whether deep injection pressures are causing fracturing of the reservoir rock and injection rates and pressures can adjusted to reduce the potential for these effects.

    b. Monitoring of Seismicity. Monitoring of seismic activity with sensitive seismometers could be implemented as a follow-up measure to Mitigation 1, to determine whether earthquakes are triggered at the depth of injection, since this would provide additional evidence as to whether the reservoir rock was being fractured by injection pressures within the targeted injection zone.

## Water Quality Baseline Monitoring

52. In addition to the State of Colorado baseline monitoring requirements, the following will be added to the existing baseline monitoring program conducted by the operator.

a. Increase sampling radius to 1 mile from well pad location for water wells.

b. Include all surface water sources and spring sources within 1 mile from well pad location. Surface water and springs will be sampled two times a year, at high flow and at low flow to meet the baseline monitoring requirements. Water will be analyzed for major ions, trace metals, dissolved gases (including methane), BTEX, TPH, dissolved organic carbon (DOC), nutrients, and field properties including temperature, pH, specific conductance, dissolved oxygen, turbidity, and alkalinity. Quality assurance sampling will include one replicate and one blank during each sampling trip. The replicate and blank will be analyzed for the same constituents as the environmental sample.

c. Surface water and groundwater baseline samples should include stable isotopes of methane (carbon and deuterium) to determine the origin of the methane (biogenic and/or thermogenic)

d. Data should be summarized and provided to the BLM annually for review. BLM will determine if further analysis of data may be required by a third party such as the U.S. Geological Survey. Any additional expenses incurred for third party reviews as required by BLM, will be the responsibility of the operator.

This page intentionally left blank.

# APPENDIX B
# SUMMARY OF LEASE STIPULATIONS

The following federal leases are included in the area delineated by the boundary of the Bull Mountain Unit and are, at a minimum, subject to the terms and conditions provided for in the original lease authorization. All federal leases were also reviewed for consistency with the decisions outlined in the Uncompahgre Basin RMP (UBRMP) Record of Decision (ROD), specifically for resource values recognized in Management Unit 16. The UBRMP ROD states that federal oil and gas mineral estate is open to leasing. **Table B-1** provides a summary of lease stipulations that would apply to the Proposed Action and Alternative 1 and to existing federal authorizations on federal mineral leases.

Although these lease stipulations do not apply to every acre of the federal leases to be developed by the Proposed Action or Alternative 1, these and any other protective measures deemed appropriate by the Authorized Officer could be applied as Conditions of Approval (COAs) on individual applications for permit to drill (APDs).

**Table B-1**
**Summary of Lease Stipulations within BMMDP Area**

| Lease | Description of Lands | Federal Pad[1] | Lease Stipulations |
|---|---|---|---|
| COC-42314<br>Year: 1971 | T11S, R90W, 6th P.M., Gunnison County, Colorado<br>Section 14: Lot 3, SWNE, NWNW, SE | -- | The portion of parcel COC-42314 inside the Bull Mountain unitized area is subject only to the standard terms of the original lease authorization.<br>This lease parcel was authorized in 1971 as parcel COC-13484 and originally included US Forest Service lands. In 1984, parcel COC-42314 was created out of a segregation of parcel COC-13484. |
| COC-63486<br>Year: 2000 | T11S, R90W, 6th P.M., Gunnison County, Colorado<br>Section 11: Lots 3, 4, 8-10 | -- | Standard stipulations of the original lease authorization shall apply. No additional stipulations from the 1989 UBRMP ROD are applicable to this lease parcel.<br>Lease parcel #110 authorized by NEPA action CO-150-00-15DNA. 2/10/2000 competitive oil and gas sale. |

**Table B-1**
**Summary of Lease Stipulations within BMMDP Area**

| Lease | Description of Lands | Federal Pad[1] | Lease Stipulations |
|---|---|---|---|
| | Section 13: Lots 5, 12-14, S2SW | | |
| COC-64164<br>Year: 2000 | T11S, R89W, 6th P.M., Gunnison County, Colorado<br>Section 7: Lots 1, 2, E2NW<br>Section 8: N2, E2SW, SE<br>Section 17: NE, E2NW, N2SW, SESW, SE<br>Section 18: NESE | 11-89-17 #2 | Standard stipulations of the original lease authorization shall apply. No additional stipulations from the 1989 UBRMP ROD are applicable to this lease parcel.<br>Lease parcel #587 authorized by NEPA action CO-150-00-66DNA. 11/9/2000 competitive oil and gas sale. |
| COC-64165<br>Year: 2000 | T11S, R89W, 6th P.M., Gunnison County, Colorado<br>Section 19: Lots 3-11, SESW, SWSE<br>Section 20: ALL | -- | Standard stipulations of the original lease authorization shall apply. No additional stipulations from the 1989 UBRMP ROD are applicable to this lease parcel.<br>Lease parcel #588 authorized by NEPA action CO-150-00-66DNA. 11/9/2000 competitive oil and gas sale. |
| COC-64166<br>Year: 2000 | T11S, R89W, 6th P.M., Gunnison County, Colorado<br>Section 30: Lots 1-4, 7, W2NE, E2W2, SE<br>Section 31: Lots 1-4, E2, E2W2 | -- | In addition to application of standard stipulations of the original lease authorization, it was determined that all lands of the lease are also subject to UBRMP stipulation UB-04.<br>**TIMING LIMITATION STIPULATION**:<br>To protect crucial deer and elk winter ranges. No surface use is allowed during the following time period November 30 – May 1.<br>This stipulation does not apply to operation and maintenance of production facilities.<br>Lease parcel #589 authorized by NEPA action CO-150-00-66DNA. 11/9/2000 competitive oil and gas sale. |
| COC-64167<br>Year: 2000 | T11S, R89W, 6th P.M., Gunnison County, Colorado<br>Section 29: Lots 1-5, E2 | -- | Standard stipulations of the original lease authorization shall apply. No additional stipulations from the 1989 UBRMP ROD are applicable to this lease parcel.<br>Lease parcel #594 authorized by NEPA action CO-150-00-66DNA. 11/9/2000 competitive oil and gas sale. |
| COC-64170<br>Year: 2000 | T11S, R90W, 6th P.M., Gunnison County, Colorado<br>Section 22: Lots 1-3, | 11-90-24 #1 | Standard stipulations of the original lease authorization shall apply.<br>Lease parcel authorized by NEPA action CO-150-00-66DNA. 11/9/2000 competitive oil and gas sale: The |

**Table B-1**
**Summary of Lease Stipulations within BMMDP Area**

| Lease | Description of Lands | Federal Pad[1] | Lease Stipulations |
|---|---|---|---|
| | NWSE<br>Section 23: Lots 1-7, N2N2, S2NE, SENW, N2SE, SESE<br>Section 24: Lots 1-4, W2E2, W2 | | entirety of parcel 590. |
| COC-64170<br>Year: 2000 | T11S, R90W, 6th P.M., Gunnison County, Colorado<br>Section 23: Lots 1-7, N2NW, NWNE, S2NE, SENW, N2SE, SESE<br>Section 24: SW | 11-90-24 #2 WDW | In addition to application of standard stipulations of the original lease authorization, it was determined that portions of the lease area are also subject to UBRMP stipulation UB-04.<br>**TIMING LIMITATION STIPULATION**:<br>To protect crucial deer and elk winter ranges. No surface use is allowed during the following time period November 30 – May 1. This stipulation does not apply to operation and maintenance of production facilities.<br>Lease parcel authorized by NEPA action CO-150-00-66DNA. 11/9/2000 competitive oil and gas sale: The entirety of parcel 590. |
| COC-64171<br>Year: 2000 | T11S, R90W, 6th P.M., Gunnison County, Colorado<br>Section 27: Lots 1-2, W2NE<br>Section 34: E2<br>Section 35: ALL<br>Section 36: Lots 1-4, W2E2, W2 | 11-90-35 #1 | In addition to application of standard stipulations of the original lease authorization, it was determined that all lands of the lease are also subject to UBRMP stipulation UB-04.<br>**TIMING LIMITATION STIPULATION**:<br>To protect crucial deer and elk winter ranges. No surface use is allowed during the following time period November 30 – May 1. This stipulation does not apply to operation and maintenance of production facilities.<br>Lease parcel #591 authorized by NEPA action CO-150-00-66DNA. 11/9/2000 competitive oil and gas sale. |
| COC-64172<br>Year: 2000 | T11S, R90W, 6th P.M., Gunnison County, Colorado<br>Section 25: Lots 1-4, W2E2, W2<br>Section 26: Lots 1-5 | -- | In addition to application of standard stipulations of the original lease authorization, it was determined that all lands of the lease are also subject to UBRMP stipulation UB-04.<br>**TIMING LIMITATION STIPULATION**:<br>To protect crucial deer and elk winter ranges. No surface use is allowed during the following time period November 30 – May 1. This stipulation does not apply to operation and maintenance of production facilities.<br>Lease parcel #592 authorized by NEPA action CO-150-00-66DNA. 11/9/2000 competitive oil and gas sale. |

**Table B-1**
**Summary of Lease Stipulations within BMMDP Area**

| Lease | Description of Lands | Federal Pad[1] | Lease Stipulations |
|---|---|---|---|
| COC-66704<br>Year: 2003 | T12S, R89W, 6th P.M., Gunnison County, Colorado<br>Section 4: Lots 1-4, S2N2, S2<br>Section 5: Lot 4, SWNW, W2SW, SESW, S2SE<br>Section 6: Lots 1-7, S2NE, SENW, E2SW, SE<br>Section 7: Lots 1-4, E2, E2W2 | -- | In addition to application of standard stipulations of the original lease authorization, it was determined that all lands of the lease are also subject to CO lease notice exhibit CO-34.<br>**LEASE NOTICE:**<br>To alert lessee of potential habitat for threatened, endangered, candidate, or other special status plant or animal.<br>Lease parcel #1975 authorized by NEPA action CO-150-2003-0021DNA. 05/08/2003 competitive oil and gas sale. |
| COC-66704<br>Year: 2003 | T12S, R89W, 6th P.M., Gunnison County, Colorado<br>Section 6: Lots 1-7, S2NE, SENW, E2SW, SE<br>Section 7: Lots 1-4, E2, E2W2 | -- | In addition to application of standard stipulations of the original lease authorization, it was determined that portions of the lease are also subject to UBRMP stipulation UB-04.<br>**TIMING LIMITATION STIPULATION**:<br>To protect crucial deer and elk winter ranges. No surface use is allowed during the following time period December 1 - April 30. This stipulation does not apply to operation and maintenance of production facilities.<br>Lease parcel #1975 authorized by NEPA action CO-150-2003-0021DNA. 05/08/2003 competitive oil and gas sale. |
| COC-66705<br>Year: 2003 | T12S, R89W, 6th P.M., Gunnison County, Colorado<br>Section 8: N2, SW, N2SE, SWSE<br>Section 9: N2, NWSW, E2SE | -- | In addition to application of standard stipulations of the original lease authorization, it was determined that all lands of the lease are also subject to CO lease notice exhibit CO-34.<br>**LEASE NOTICE:**<br>To alert lessee of potential habitat for threatened, endangered, candidate, or other special status plant or animal.<br>Lease parcel #1976 authorized by NEPA action CO-150-2003-0021DNA. 05/08/2003 competitive oil and gas sale. |
| COC-66705<br>Year: 2003 | T12S, R89W, 6th P.M., Gunnison County, Colorado<br>Section 8: W2W2SW, W2SWNW | -- | In addition to application of standard stipulations of the original lease authorization, it was determined that portions of the lease are also subject to UBRMP stipulation UB-04.<br>**TIMING LIMITATION STIPULATION**:<br>To protect crucial deer and elk winter ranges. No |

**Table B-1**
**Summary of Lease Stipulations within BMMDP Area**

| Lease | Description of Lands | Federal Pad[1] | Lease Stipulations |
|---|---|---|---|
| | | | surface use is allowed during the following time period December 1 - April 30. This stipulation does not apply to operation and maintenance of production facilities.<br><br>Lease parcel #1976 authorized by NEPA action CO-150-2003-0021DNA. 05/08/2003 competitive oil and gas sale. |
| COC-66714<br><br>Year: 2003 | T11S, R90W, 6th P.M., Gunnison County, Colorado<br><br>Section 11: SWSW | -- | In addition to application of standard stipulations of the original lease authorization, it was determined that all lands of the lease are also subject to CO lease notice exhibit CO-34.<br><br>**LEASE NOTICE:**<br><br>To alert lessee of potential habitat for threatened, endangered, candidate, or other special status plant or animal.<br><br>Lease parcel #1917 authorized by NEPA action CO-150-2003-0021DNA. 05/08/2003 competitive oil and gas sale. |
| COC-66715<br><br>Year: 2003 | T12S, R90W, 6th P.M., Gunnison County, Colorado<br><br>Section 1: Lots 3-4, S2NW, SW<br><br>Section 2: Lots 1-9, SWNE, SENW, NESW, W2SE<br><br>Section 11: Lot 2, SENE, SWNW, SE<br><br>Section 12: ALL | -- | In addition to application of standard stipulations of the original lease authorization, it was determined that all lands of the lease are also subject to CO lease notice exhibit CO-34.<br><br>**LEASE NOTICE:**<br><br>To alert lessee of potential habitat for threatened, endangered, candidate, or other special status plant or animal.<br><br>Lease parcel #1984 authorized by NEPA action CO-150-2003-0021DNA. 05/08/2003 competitive oil and gas sale. |
| COC-66715<br><br>Year: 2003 | T12S, R90W, 6th P.M., Gunnison County, Colorado<br><br>Section 1: Lots 3-4, S2NW, SW<br><br>Section 2: Lots 1-5, Section 12: N2SE | -- | In addition to application of standard stipulations of the original lease authorization, it was determined that portions of the lease are also subject to UBRMP stipulation UB-04.<br><br>**TIMING LIMITATION STIPULATION**:<br><br>To protect crucial deer and elk winter ranges. No surface use is allowed during the following time period December 1 - April 30. This stipulation does not apply to operation and maintenance of production facilities.<br><br>Lease parcel #1984 authorized by NEPA action CO-150-2003-0021DNA. 05/08/2003 competitive oil and gas sale. |

**Table B-1**
**Summary of Lease Stipulations within BMMDP Area**

| Lease | Description of Lands | Federal Pad[1] | Lease Stipulations |
|---|---|---|---|
| COC-67145<br><br>Year: 2004 | T11S, R89W, 6th P.M., Gunnison County, Colorado<br><br>Section 19: Lot 12<br><br>Section 30: Lots 5-6 | -- | In addition to application of standard stipulations of the original lease authorization, it was determined that all lands of the lease are also subject to CO lease notice exhibit CO-34.<br><br>**LEASE NOTICE:**<br><br>To alert lessee of potential habitat for threatened, endangered, candidate, or other special status plant or animal.<br><br>Lease parcel #2098 authorized by NEPA action CO-150-2003-0045DNA. 11/13/2003 competitive oil and gas sale. |
| COC-67120X<br><br>Bull Mountain Unit Agreement<br><br>Year: 2003 | All Federal mineral estate mentioned above. | 11-89-17 #2<br><br>11-90-24 #1<br><br>11-90-24 #2 WDW<br><br>11-90-35 #1 | **Item 18. Leases and Contracts Conformed and Extended**<br><br>The terms, conditions, and provisions of all leases, subleases, and other contracts relating to exploration, drilling, development or operation for oil or gas on lands committed to this agreement are hereby expressly modified and amended to the extent necessary to make the same conform to the provisions hereof, but otherwise to remain in full force and effect… |

[1] Authorized development to date

# APPENDIX C
# WILDLIFE MITIGATION PLAN

The Wildlife Mitigation Plan is presented in the pages that follow.

**SG Interests I, Ltd.**   100 Waugh Drive, Suite 400   Houston, Texas 77007

June 16, 2015

Transmitted via email to vaarmstrong@blm.gov
and Federal Express

Lori Armstrong
Southwest District Manager
Bureau of Land Management
2465 S. Townsend Ave
Montrose, CO  81401

Re:   Bull Mountain Unit EIS
        BLM Preferred Alternative

Dear Ms. Armstrong:

Thank you for meeting with us this past Friday, June 12, 2015, regarding the BLM Preferred Alternative under SG Interests I, Ltd.'s Master Development Plan Environmental Impact Statement.

You informed us during the meeting that the BLM has developed a Preferred Alternative that can be summarized as follows:

- 26 well pad locations from Alternative B will be carried forward in the BLM Preferred Alternative.

- 5 well pad locations from Alternative B will not be included in the Preferred Alternative but will remain as part of Alternative B

- 2 well pad locations will be included in the BLM Preferred Alternative from Alternative C.

- 5 well pad locations from Alternative B were identified by the BLM to have resource impacts that require additional mitigation measures from SG in order for BLM to carry them forward in the BLM Preferred Alternative.

It is also our understanding that the well pad locations that are carried forward in the BLM Preferred Alternative will be approved following issuance of a Record of Decision in the EIS through a Categorical Exclusion.  Well pad locations that are not brought forward in the Preferred Alternative will require additional site specific NEPA such as an EA to resolve any outstanding issues or resource conflicts.

SG understands the BLM rational for moving forward with the EIS in this manner. In order to address the resource impacts on the 5 well pad locations that require additional mitigations, SG is enclosing and offers a revised Wildlife Mitigation Plan to address impacts that all locations may have on big game. In addition, the attached Table 1 lists SG's specific mitigation measures offered for the 5 locations requiring additional mitigations so that they can be included in the BLM Preferred Alternative.

Thank you for your consideration of this submittal. Should you have any questions, please do not hesitate to contact me, Catherine Dickert or Eric Sanford.

Sincerely,

SG Interests I, Ltd.

Robert H. Guinn, II
Vice President – Land

Rg
Attachments

# Table 1

This Table 1 addresses the five (5) well pads identified by the BLM in a meeting on 6/12/15 as requiring additional mitigations measures from SG in order for the BLM to bring these well pads forward in the BMU EIS Preferred Alternative. This Table 1 outlines specific mitigation measures offered by SG in order to include these locations in the BLM Preferred Alternative.

| Well | Mitigation Measures |
|---|---|
| **Federal 12-90-2 #1** | SG agrees to construct the access road to this well pad location according to plans developed and approved by a Professional Engineer in order to avoid potential geo-hazards and/or other resource impacts such as erosion. |
| **Federal 11-89-30 #1** | SG agrees to route the pipeline to this well pad location adjacent to existing roads where practicable. SG also agrees to implement visual mitigation strategies to reduce visibility from Colorado State Highway 133. These site specific measures could include adjustment of well pad layout, adjustment of well pad elevation, construction of visual mitigation berms, and low profile tanks. |
| **Federal 12-89-4 #1** | SG agrees to work with the surface owner of this well pad location to reduce impacts and conflicts which may arise from the unique operations and activities conducted by this surface owner. |
| **Federal 11-89-29 #2** | SG's revised voluntary Wildlife Mitigation Plan is offered for the Preferred Alternative locations as direct mitigation for impacts to elk from the operation of the well pad, road, and pipeline associated with this well pad location. |
| **Federal 11-89-8 #1** | SG's revised voluntary Wildlife Mitigation Plan is offered for the Preferred Alternative locations as direct mitigation for impacts to elk from the operation of the road and pipeline associated with this well pad location. |

**SG Interests I, Ltd.** 100 Waugh Drive, Suite 400 Houston, TX 77007

June 16, 2015

Bureau of Land Management
Uncompaghre Field Office
Attn: Barb Sharrow
2465 South Townsend Avenue
Montrose, Colorado 81401

Re: **SG INTERESTS I, LTD.**
**BULL MOUNTAIN FEDERAL UNIT AREA**
**VOLUNTARY WILDLIFE MITIGATION PLAN**
**GUNNISON COUNTY, COLORADO**

Dear Ms. Sharrow;

Please consider the design criteria in this Wildlife Mitigation Plan as amendments to SGI's original Proposed Action for development of the Bull Mountain Unit. This letter dated June 16, 2015 supersedes and replaces the Voluntary Wildlife Mitigation Plan dated May 29, 2015, previously sent to the BLM.

**Introduction and Background**

This voluntary, operator proposed Wildlife Mitigation Plan (WMP) addresses potential impacts to wildlife from SG Interests I, Ltd.'s (SGI) proposed natural gas development of mineral leasehold interests in the Bull Mountain Federal Unit Area (BMU) in Gunnison County, Colorado encompassing approximately 19,645 acres (**Figure 1**). The BMU area surface ownership is approximately 98% private and 2% public (**Figure 2**). The BMU area land use is comprised primarily of historic homestead settlements and agricultural operations. The BMU provides a variety of private recreational hunting and fishing opportunities, as well as other private outdoor recreational activities. Public access for recreational purposes is limited to approximately 400 acres of BLM surface inside the BMU (**Figure 2**).

This voluntary WMP is the culmination of a multi-year collaborative effort between SGI and Colorado Parks and Wildlife (CPW) to develop a plan to mitigate anticipated potential wildlife impacts from development of SGI's Master Development Plan within the guidelines provided by the Colorado Oil and Gas Conservation Commission (COGCC) Rules of Practice and Procedure (Rules) governing oil and gas development activities in Colorado. While SGI and CPW have been able to reach agreement on most aspects of a negotiated WMP, we have been unable to reach agreement on one outstanding issue; compensation for CPW's calculated potential residual impacts to elk.

Therefore, SGI is voluntarily proposing this WMP as mitigation for potential impacts to wildlife under development of SGI's BMU Proposed Action. Based on recent discussions with the BLM, SG has voluntarily agreed to amend this WMP based on specific resource concerns raised by the BLM. Further, SG has also changed several road and pipeline alignments based on these same specific resource concerns. These changes are reflected in Figures 1 and 3 attached to this WMP. This WMP is relevant and effective only if the BLM selects the well pad locations identified in the attached Figure 1 and Figure 3, as all of the analysis including acreage calculations has been done in consideration of the development shown in these Figures. COGCC Rules identify Sensitive Wildlife Habitats (SWH's) and Restricted Surface Occupancy (RSO) areas for wildlife, and provide for consultation with CPW for facilities

proposed within these areas. The COGCC Rules also allow companies like SGI to prepare a WMP to address the potential impacts associated with one or more planned facilities. Once approved by CPW, a WMP satisfies any consultation requirement with CPW that may otherwise be required for each facility within SWH's [Rule 1202.d.(2)], resulting in a streamlined permitting process for individual facilities addressed in the WMP. It remains SG's hope that CPW will approve this voluntary plan as executed by SGI.

SGI and CPW began discussing options for a WMP for SGI's planned development activities in the BMU as early as May of 2011. In March of 2012, the Bureau of Land Management (BLM) released a Preliminary Environmental Assessment covering SGI's Master Development Plan (MDP) for the Bull Mountain Unit. BLM contacted CPW at that time regarding wildlife concerns associated with the Bull Mountain Unit MDP. Prior to release of the Final EA, BLM decided to complete an Environmental Impact Statement (EIS) for the Bull Mountain Unit MDP.

Since March of 2012, CPW and BLM staff have met numerous times to discuss impact analysis methodologies and mitigation opportunities for the Bull Mountain Unit MDP. This WMP is based on well site locations, proposed access roads, and proposed pipeline routes covered in the BLM's Preferred Alternative as discussed with SGI during a meeting on June 12, 2015. The well site locations, proposed access roads, and proposed pipeline routes in the BLM's Preferred Alternative are from SGI's Proposed Action (DEIS Alternative B)and from the BLM's Alternative C. Since the BMU EIS is intended to be a programmatic analysis and disclosure of impacts, the precise locations of the components of the MDP are not specifically known until each component is examined on a site-specific basis and each is approved by COGCC and BLM during the APD process. The well pad locations, proposed oil and gas roads, and pipelines shown in **Figure 1** include elements proposed by SGI in the BMU EIS Alternative A and Alternative B, and as proposed by the BLM in Alternative C.

It is the intent of this WMP to include or exclude each well pad location from the Winter Closure Areas as shown in **Figure 1**, even if individual well pad locations are later adjusted based on future site-specific analysis, as contemplated under the BLM's DEIS programmatic analysis. This approach is valid under a programmatic analysis because exact locations can change within a 40 acre area as analyzed by BLM. More significant changes to the locations would require additional analysis by the BLM, which would include all relevant resources including wildlife. The mitigation strategies contained in this voluntary WMP have been discussed with BLM during the development of the EA and EIS proposed actions with the hope of providing BLM an impact mitigation strategy that may be incorporated into the Bull Mountain Unit MDP DEIS where appropriate.

## Scope of Wildlife Mitigation Plan

### 1) Geographic Scope and Jurisdiction

This WMP applies only to SGI's proposed oil and gas activities and facilities regulated by COGCC and BLM, proposed on private and federal lands and mineral estates located within the Bull Mountain Unit, as it exists on May 12, 2015. Unless explicitly stated in the WMP, the commitments made in this WMP by SGI in no way alter previous commitments made to county, state, or federal regulatory agencies. This WMP was prepared specifically to satisfy COGCC Rule 1202.d. (2) in making mitigation recommendations for this development to federal, state, and local agencies.

**2) Number of Facilities, Activities Addressed, and Duration of WMP**

This WMP addresses the potential impacts to wildlife resources from developing and operating the wells, pipelines, roads and other facilities and infrastructure for development of the BMU under SGI's Proposed Action, as amended herein. **(Figure 1)**. SGI will have up to six years to develop these facilities under this WMP and the future BLM EIS Record of Decision (ROD). This WMP will become effective on the date the BLM signs the BMU EIS ROD selecting SGI's Proposed Action. If full development of the facilities contemplated under this WMP is not completed within six years, SG may agree to extend the WMP for an additional six year period to allow the contemplated development to be completed.

**3) Species addressed in the WMP**

As part of the negotiations for development of a WMP between SGI and CPW, CPW evaluated potential target species and habitats for this WMP based on CPW data and biologist recommendations, as well as biological information compiled by SGI's contract wildlife biologist and BLM. CPW reviewed the baseline biological information provided in BLM's preliminary draft Environment Assessment for the BMU (for a complete list of species present see DOI-CO-150-2009-0005 EA, Bull Mountain Unit Master Development Plan Preliminary Environmental Assessment, March 2012 – [BLM BMU MDPEA]). CPW also solicited input from BLM on the species and habitats most likely to be impacted.

Due to CPW's identification of the importance of specific areas within the BMU to wintering big game in the region, impacts to critical big game winter range and wintering big game populations were identified as a primary concern for CPW and the focus of many of the mitigation efforts in this WMP. Although impacts to a number of the species and habitats of concern identified by BLM in the BMU MDP are not specifically regulated by COGCC (cavity nesting birds as an example), SGI is voluntarily addressing these species and habitats in this WMP. The Best Management Practices (BMPs) outlined below are designed to avoid and minimize impacts to many of these species. In addition, CPW has asserted that the avoidance and mitigation actions selected primarily for big game are likely to benefit these other species and their habitats due to habitat overlap with the targeted species.

**<u>Measures to Avoid and Minimize Impacts</u>**

**1) Best Management Practices**

CPW conducted an evaluation of habitats that would be potentially impacted by SGI's proposed development activities utilizing a GIS methodology. Based on the lack of comprehensive reliable site-specific data regarding known locations of northern goshawk and other raptor nest sites, nesting areas for cavity nesting birds, and occupied habitat for northern leopard frogs, impacts to these species of concern were addressed primarily through impact avoidance and minimization measures, including pre-construction survey requirements, incorporated into SGI's development practices. SGI agrees to implement voluntary Best Management Practices (BMPs) as standard operating practices that minimize direct and indirect impacts to these species. These BMPs reduce, but do not eliminate the direct and indirect impacts associated with each new facility and associated activity. The site-specific operational BMPs implemented by SGI at each new facility include:

a)  Pre-construction raptor and migratory bird nest surveys and avoidance.  SGI agrees to conduct raptor and migratory bird nest surveys at areas proposed for new surface disturbance and heavy construction and drilling activities.  SG agrees to conduct these surveys between May 15 and July 15 of each year, prior to submitting a COGCC Form 2 or BLM Notice of Staking.  The intent of the surveys is to implement avoidance strategies where possible and minimize potential impact to nesting raptors and migratory birds.  These surveys may result in modifications to facility design, minor site location adjustments, and operational awareness that reduce direct and indirect impacts when a habitat of concern is identified.  SGI previously conducted these surveys, pre-HB 1298 and outside of the context of a WMP to support compliance with the Bald and Golden Eagle Protection Act, the MBTA and ESA concerns.  Where active raptor nests are identified, SGI will apply CPW's raptor nest buffer guidelines (Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors, 2008).  When other migratory bird nests are located, SGI will avoid disturbance of nests, nestling, and fledglings during the breeding season.  Note that nest trees being used by cavity nesting birds are flagged when located and avoided during the nesting season.

b)  Pit management to exclude birds, bats, and other wildlife.  SGI agrees to manage pits necessary for production activities to minimize the likelihood of wildlife mortalities.  SGI agrees to install wildlife fencing around pits and netting over open pits to exclude birds, bats, and terrestrial wildlife.  For reserve pits, the netting will be applied within 24 hours after drilling activities have begun.  The netting shall be retained and maintained for as long as there are liquids in the reserve pit, but may be removed once the pits are dried.  For dry pits, SGI agrees to provide escape ramps or other means to allow terrestrial wildlife opportunity to escape from open pits.  Note that SGI may implement closed loop pitless drilling systems at its own discretion to avoid the need to fence and net reserve pits.

c)  Management of activities in riparian zones to protect water quality and aquatic resources.  In addition to installing standard stormwater erosion controls to protect water quality as required by the Colorado Department of Health and Environment (CDPHE), SGI will make efforts to comply with CPW and COGCC recommended buffers for aquatic habitats in the BMU (see LIDAR discussion below).  SGI agrees to implement the following BMPs within the BMU:

- Except as outlined on **Figure 2** and excepting activities outlined below, no surface disturbance within 300 feet of a designated cutthroat trout stream.

- In other watersheds, well pads and facilities will not be sited, to the extent practicable, within 150 feet of any natural lake, wetland, or perennial or seasonally flowing stream or river.

- Roads crossing CPW mapped cutthroat trout streams will be bridged or use appropriately sized culverts to prevent stream bed damage and the transfer of disease organisms.  Pipelines that cross cutthroat trout streams should be bored if practicable.

- Stream disturbances in or upstream of CPW-mapped cutthroat trout habitat will be avoided between June 1 and August 31 to avoid impacts to spawning cutthroat trout.

- All stream crossing and culverts on perennial and intermittent streams shall be designed to allow aquatic species passage.

- Minimum right-of-way widths will be used where pipelines cross riparian areas and streams and crossing will be constructed at right angles to the stream channel.

- Native riparian canopy cover and stream bank vegetation will be left intact to the extent practicable.

- Chemical dust suppression activities will be avoided within 300 feet of the ordinary high water mark of any reservoir, lake, wetland, or natural perennial or seasonally flowing stream or river, unless required by surface owner, county or state requirements.

- Screen water suction hoses to exclude fish and amphibians.

- Disinfect heavy equipment, hand tools, boots and any other equipment that was previously used in a river, stream, lake, pond, or wetland in a different watershed prior to moving the equipment to another water body. The disinfection practice applies field-wide and follows the procedure outlined in COGCC Rule 1204.a.2.

**2) Field-wide operating practices that reduce impacts on terrestrial species.**

SGI agrees to implement specific field-wide standard operating practices to reduce impacts on terrestrial wildlife species. These practices typically reduce traffic and/or the extent of human activities occurring on a daily basis across the BMU. These practices include:

- Installation of a produced water gathering system – where applicable, each new facility is tied into a field-wide produced water gathering system for water disposal. This water gathering system, when used in conjunction with temporary surface poly lines, results in a significant reduction in truck traffic and consolidation of water handling facilities;

- Use of multiple-well pad sites - the use of multiple-well pad sites reduces surface disturbance and overall habitat fragmentation and may result in a reduction of heavy equipment on road traffic due to fewer rig mobilizations and de-mobilizations;

- Use of wildlife friendly seed mixes – SGI will use a CPW-recommended wildlife friendly seed mix for interim and final reclamation where approved by the surface owner. The CPW-recommended wildlife friendly seed mixes for the BMU are found in **Appendix A**;

- Co-locating of pipelines and other utilities adjacent to road rights-of-way where practicable

**3) Design Features to Avoid and/or Minimize Impacts to Wintering Big Game**

In addition to the site-specific operational BMPs identified above, SGI has undertaken several additional measures to address the cumulative indirect impacts from their current and future operations in the Bull Mountain Unit. These measures include:

Light Detection and Ranging (LIDAR) Landscape Modeling. SGI used LIDAR, a remote sensing technology that employs lasers to determine distances, elevations and other properties of the target area to gather data for the Unit. SGI utilized the LIDAR data collected as well as data collected in field visits or obtained from publicly available sources to develop a site suitability and constraints model that ranked the appropriateness of areas in the unit for well pad placement. The in-put data consisted of:

- Slope of the existing site
- Sensitivity to visual impacts from Highway 133 and County Road 265 travel corridors
- Proximity to existing road networks
- Proximity to existing gathering pipeline system
- Proximity to delineated wetlands and wetland buffer zones
- Proximity to stream networks and stream buffer zones
- Proximity to known streams containing Cutthroat Trout
- Soil erosion factors
- Vegetated areas and open meadows

An analysis was performed on multiple models employing different weighted factors to study the project area under distinct scenarios that prioritized different criteria. Following review of the model results, one model was selected to utilize as the primary baseline for siting the proposed well pads within the unit. The site selection process involved review of the model results within each legal section of the unit because of well-spacing requirements and identifying those areas with an appropriate rank and an area large enough to construct a drilling pad. A number of successive reviews were performed to continually refine the resulting pad locations, pipeline routes, and road corridors. Wetlands and hydrology data sets were cross-referenced to refine the location of pads near sensitive buffer zones. Existing road networks and slope data were utilized to understand accessibility of the proposed site and feasibility of road construction. Ultimately, the process of modeling, data refinement, and discussions between BLM and SGI yielded a final count of 36 well pads. This process provided BLM a means to analyze the approximate sites for pads, roads, pipelines, and other facilities such as compressor stations. The outcome of this process was SGI's Proposed Action (Alternative B and Alternative A combined) as presented in the BLM's BMU DEIS.

**4) Seasonal Closures to Avoid and/or Minimize Impacts to Wintering Big Game**

During the two year negotiation process, CPW evaluated the impacts from SGI's proposed development activities, including a review of CPW-mapped habitats as well as a review of wildlife inventories conducted by CPW and others within the BMU. Based on the information provided for full build out under SGI's BMU MDP, CPW estimated potential direct and indirect impacts to big game. CPW assessed both the "direct impacts" (those related to physical land disturbance and vegetation removal resulting in habitat loss) and the "indirect impacts" (impacts that extend beyond physical disturbance and vegetation removal). Indirect impacts are those that may reduce habitat functionality. Indirect impacts may also limit wildlife access to otherwise productive habitats because of their proximity to development and associated human activities.

Based on the scale of the BMU development, CPW expressed concerns about the direct and indirect impacts from the BMU development on existing big game populations. Specifically, CPW expressed concerns that year-round development in critical winter range habitats, which may be a limiting factor for big game populations in the area, could negatively affect big game populations and reduce hunting opportunities in the BMU and surrounding areas.

To address potential direct and indirect impacts to wintering big game, SGI agrees to voluntarily limit winter activities in portions of the BMU that have been identified by CPW as the most critical to wintering big game. See **Figure 1**, Winter Closure Areas.

During discussions and negotiations with SGI, CPW reviewed existing federal lease stipulations related to winter activities. CPW agreed that where the voluntary Winter Closure Areas do not overlap with the existing federal lease timing stipulations related to big game, BLM should waive the existing federal lease timing stipulations. In areas with federal lease stipulations regarding winter activities, BLM should apply the voluntary Winter Closure Area stipulations.

Within the voluntary big game "Winter Closure Areas" identified on **Figure 1**, SGI agrees to limit activities to the following between December 1 and April 15 each year:

Well production and routine maintenance activities. In this context, well production and routine maintenance activities include:

Emergency work-overs or other emergency actions necessary to remedy equipment failures or unanticipated declines in production, or as required by local, state, or federal regulatory agencies.

Non-routine pipeline facility maintenance necessary to remedy unanticipated production problems, to address safety issues, or as required by local, state, and federal regulatory agencies.

Normal daily production activities including "pumping" of wells, generally requiring up to two (2) vehicle trips per day or less to a well pad. Normal daily production activities require snow plowing and the minimum amount of road maintenance necessary to access the well. Daily access to each well pad is necessary for safe and environmentally responsible operations. For example, formation water produced from wells in the BMU and stored temporarily in tanks on each location, require daily site visits to ensure prudent and environmentally responsible operations. The combination of large volumes of stored water and extreme low temperatures can potentially result in mechanical failures that can only be effectively monitored by daily site visits. Roads to each location must be plowed to ensure minimal response times for necessary equipment to address any issue which could result in damage to environmental resources. Remote telemetry monitoring cannot provide the same level of assurance and environmental protection that human daily site visits ensure.

SGI agrees that the activities listed below will not be allowed within the voluntary big game "Winter Closure Areas" between December 1 and April 15 each year:

Drilling of new wells.

Well work-over and completion activity intended to increase the production of a well.

Reclamation activities and existing road maintenance activities that can be delayed until after April 15 each year.

New surface-disturbing activities, including pipeline construction and installation, road and pad construction, and other general construction and facility installation.

Where activities prohibited within the Winter Closure Areas between December 1 and April 15 of each year are initiated in a timely fashion and where it is anticipated that the date of completion will be prior to December 1, but where operational or regulatory restraints require continuing operations after December 1, BLM shall not unreasonably withhold individual waivers allowing for such continuing activity.

In order to implement the voluntary big game winter closures, SGI has agreed to install gates and signage to limit access to the extent permitted by the landowners at all entry points to the Voluntary Big Game Closure Areas shown on **Figure 1**.

**5) Remote Monitoring**

In addition to the daily site inspections at each well pad location outlined in No. 4 above (Seasonal Closures to Avoid and/or Minimize Impacts to Wintering Big Game), SGI agrees to remotely monitor specific aspects of well production. This remote monitoring is proposed as a way to provide monitoring between the daily site inspections by SGI personnel. Additionally, this proposed remote monitoring will be conducted at all fee and federal well pad locations as proposed in SGI's Proposed Action under Alternative A and Alternative B.

SGI will monitor the following aspects of well production using remote telemetry:

1. Tubing pressure,
2. Casing pressure,
3. Gathering system line pressure,
4. Wellhead differential pressure,
5. Wellhead gas temperature
6. Wellhead gas rate, and
7. Production tank level alarms

SGI agrees to implement this proposed remote monitoring under the following time limits:

1. Wells existing in the BMU on the effective date of this WMP shall be retrofitted and become compliant with the seven (7) monitored aspects of well production listed above within twenty-four (24) months of the effective date of this WMP.

2. Wells not yet existing in the BMU on the effective date of this WMP shall be compliant with the seven (7) monitored aspects of the well production listed above within six (6) months of such a well being placed on production.

**6) Verified Elk Winter Concentration Area Avoidance (Figure 3)**

The BMU DEIS identifies verified Elk Winter Concentration areas identified by E. Petterson in 2012. These areas were identified by field observations of elk concentrations in 2012 at a specific point in time. See Figure 3-13 in BMU DEIS.

The majority of these verified Elk Winter Concentration Areas are not impacted by well pads as identified in SGI's proposed action. This avoidance was achieved as a result of design features implemented during the site selection process in SGI's proposed action as outlined in No. 3 above.

There are well pads in SGI's proposed action that overlap with these verified Elk Winter Concentration areas (See **Figure 3**). In some cases, well pads and other infrastructure in SGI's proposed action are inside identified Elk Concentration areas. Where such overlap occurs, SGI agrees to avoid the verified Elk Winter Concentration areas where practicable in re-siting the well pad. The primary constraint in avoiding these areas will be the 40-acre analysis area within which the well pad can be relocated under the MDP EIS analysis. Other resources such as slope, soil, and wetlands will also factor into any re-siting analysis. Where this conflict occurs and cannot be resolved, site-specific mitigations will be addressed during any future required site specific NEPA analysis.

**7) Drill Rig Count Limitation to Avoid and/or Minimize Impacts to Wintering Big Game**

In addition to the voluntary Winter Closure Areas, SGI has proposed through the BMU MDP to limit the number of drilling rigs operating in the BMU during those times when wintering big game could be most impacted. Under SGI's Proposed Action, SGI will operate up to three (3) drilling rigs between April 15 and December 1 of each year. Only one drilling rig would operate from December 1 through April 15 each year. This operator-proposed mitigation ensures that only a small percentage of the acreage identified as potentially indirectly impacted by drilling operations would actually be affected during any given winter season.

The operator proposed Winter Closure Areas restrict activity in the BMU as outlined in No. 4 above on approximately 64% of the surface of the BMU. Application of the Winter Closure Areas as shown in this WMP **(Figure 1)** dictates that SGI would already be limited to drilling activities on only 40 of the locations on approximately 7,140 acres in the BMU during the winter season. This restriction alone would allow drilling (and other) activity on only approximately 36% of the surface of the BMU during the winter months. Because SGI would be using only one (1) drilling rig during the winter months, only a small portion of the acreage (36% of BMU) and well locations available to SGI (those not restricted by the voluntary Winter Closure Areas), could be indirectly impacted. A single drill rig might move from location to location during the winter months, but would not create indirect impacts to big game at more than a single location at a given point in time. This SGI-proposed mitigation limiting the number of drill rigs in the BMU during the winter months dramatically reduces any potential direct or indirect impacts to big game across those portions on the BMU not restricted by the Winter Closure Areas.

**8)  Summary of Protections and Cumulative Benefits to Wildlife**

Approximately 6,391 acres of federal mineral leases within the BMU currently contain lease stipulations providing seasonal timing limitations for big game (**Figure 2**).  The voluntary big game Winter Closure Areas agreed to by SGI in this WMP and as shown on **Figure 1** cover approximately 12,505 acres as compared to the 6,391 acres of current federally stipulated winter closures.  The Winter Closure Areas in this WMP do overlap in areas with the current federal lease timing stipulations.

The BLM could waive the current federal lease timing stipulations existing outside the Winter Closure Areas proposed for seasonal closure in this WMP.  Any such waiver by the BLM would remain in effect only while the WMP is in effect.  At the termination of this WMP, the original federal lease seasonal timing stipulations would replace the limitations under the WMP.  Such action by the BLM would increase the amount of acreage in the BMU subject to winter closure for big game wintering by over 6,000 acres while this WMP is in effect.  This is not only a significant increase in the acres closed for the benefit of wintering big game in the BMU, but the voluntary Winter Closures Areas in this WMP would occur in areas within the BMU that have been identified by CPW biologists as the most critical for wintering big game.  Thus, the benefits of waiving current federal lease timing stipulations in favor of the Winter Closure Areas in **Figure 1** is twofold: first the amount of acreage closed for protection of wintering big game increases by over 6,000 acres and secondly, the Winter Closure Areas protect higher value habitat for wintering big game.  It must also be acknowledged that the areas of higher habitat value are located primarily on private surface and development activity would not otherwise be restricted without adoption of this voluntary WMP.

**SGI's Responsibilities**

For the facilities described and shown in **Figure 1**, SGI agrees to implement its impact avoidance and minimization measures outlined in this WMP.  SGI agrees to meet annually with BLM by December 31 each year to summarize its development and mitigation activities for the previous 12-months and to forecast with best available information the next year's development and mitigation activities as they relate to this WMP.

Due to the sensitivity and irreplaceable nature of RSO resources, the mitigation offsets contemplated in this document do not adequately address these resources.  For the facilities described in **Figure 1**, SGI agrees to observe the RSO buffer restrictions contained in COGCC Rules.  If SGI cannot comply with the RSO buffer restrictions for a particular facility, SGI agrees to enter into an individual consultation with CPW on that facility under Rule 306.c. to evaluate options for avoidance, minimization, and mitigation.

**General Terms**

This WMP shall expire (1) when the facilities described in **Figure 1** and described in SGI's Proposed Action are constructed, (2) when any development phase under any future supplement to the BMU EIS is fully completed, or (3) six years from the signature date of the Record of Decision for the BMU EIS, whichever occurs later.  Obligations and commitments made under this WMP related to

measures to avoid and minimize impacts may extend beyond the expiration term of this document, until such projects are deemed complete by both SGI and BLM.

SGI hopes that this WMP will enable the BLM to waive the current timing stipulations in the federal leases in the BMU. Waiver of these current timing stipulations and implementation of the voluntary Winter Closure Areas as shown in **Figure 1** will ensure that those areas most critical to wildlife and big game will be protected. If BLM does not accept and adopt this plan, including waiver of existing federal lease timing stipulations as outlined above, SGI will by necessity withdraw from this WMP and move forward under the current federal lease timing stipulations.

The terms of this WMP may be extended by SGI to additional SGI-proposed facilities and for additional duration with the mutual express written consent of both parties. SGI agrees that the terms of this WMP shall inure to the benefit and be binding upon the parties hereto and the parties' respective successors and assigns of SGI.

SG Interests I, Ltd.

6/16/2015

Date



COUNTY ROAD 265

HIGHWAY 133

258 ac.

3146 ac.

4194 ac.

2658 ac.

2249 ac.

Existing/Proposed Pad by Subsurface Ownership
Federal (40 SG pads)
Fee (21 SG pads)
Pipeline by Status
Existing
Proposed
Road by Status*
Existing
Proposed
*Roads most likely to be upgraded & used for oil & gas
Winter Closure Area (12,505 ac.; 21 SG pads inside, 40 SG pads outside)
Elk Winter Concentration Area
Mule Deer Winter Concentration Area
SG Interests I - 77330
BMU Proposed Action
Figure 1:
Winter Closure Areas
0
4,000
8,000
Feet
1 in = 5,000 feet
N

*Disclaimer: This product is for informational purposes and may not have been prepared for, or be suitable for legal, engineering, or surveying purposes. Users of this information should review or consult the primary data and information sources to ascertain the usability of the information.*

*Prepared for SG Interests, Inc.*
*by TerraCognito GIS, Inc.*
*June 2015*



133
Existing Facilities
Well Pads
Existing SG Gas Field Roads
Proposed Facilities
Well Pads
Roads
Winter Closure Stipulations
NSO - Timing: 11/30 - 5/1
NSO - Timing: 12/1 - 4/30
Land Ownership
Bureau of Land Management
U.S. Forest Service
Private
0 0.25 0.5 1 1.5 2 Miles
N
COLORADO PARKS & WILDLIFE
GIS Unit

Figure 2 - Federal Lease Containing Winter Closures Within the Bull Mountain Unit



COUNTY ROAD 205

258 ac.

3146 ac.

HIGHWAY 133

4194 ac.

2658 ac.

2249 ac.

Existing/Proposed Pad by Subsurface Ownership
Federal (40 SG pads)
Fee (21 SG pads)
Pipeline by Status
Existing
Proposed
Road by Status*
Existing
Proposed
*Roads most likely to be upgraded & used for oil & gas
Verified Elk Winter Concentration Area
Winter Closure Area (12505 ac.; 21 SG pads inside, 40 SG pads outside)
Elk Winter Concentration Area
Mule Deer Winter Concentration Area
SG Interests I - 77330
BMU Proposed Action
Figure 3: Winter Closure Areas and Elk Habitat
0
4,000
8,000
Feet
1 in = 5,000 feet
N

Disclaimer: This product is for informational purposes and may not have been prepared for, or be suitable for legal, engineering, or surveying purposes. Users of this information should review or consult the primary data and information sources to ascertain the usability of the information.

Prepared for SG Interests, Inc.
by TerraCognito GIS, Inc.
June 2015





Union of Concerned Scientists

January 15, 2016

**To:** Forest Service; Council on Environmental Quality; Office of Information and Regulatory Affairs

**Subject:** Comments on Proposed Exception to the Colorado Roadless Rule (RIN 0596-AD26) and Supplemental Draft Environmental Impact Statement (November 2015)

**Comments submitted by:** Environmental Defense Fund, Institute for Policy Integrity at New York University School of Law, Natural Resources Defense Council, and Union of Concerned Scientists

Our organizations respectfully submit these comments regarding the Forest Service's analysis of the climate effects of its proposed exception to the Colorado Roadless Rule. Our organizations may separately and independently submit other comments regarding the proposed exception.

Though the Forest Service's choices to monetize greenhouse gas emissions and to use the Interagency Working Group's estimates of the Social Cost of Carbon in this supplemental environmental impact statement are appropriate and necessary, the agency's application of the metric is flawed in several key respects.

- Most importantly, the Forest Service's use of a 10th percentile estimate misunderstands the treatment of uncertainty and risk built into the Interagency Working Group's range of four estimates. Using a 10th percentile estimate is inconsistent with federal guidance and uniform agency practices, and it should not be used in this or any future environmental impact statements or regulatory analysis.
- While the Forest Service appropriately analyzes costs and benefits from a global perspective, it also gives equal attention to national and forest-only perspectives, which are inappropriate in the context of climate change and inconsistent with uniform agency practices.
- The Forest Service should adopt EPA's Social Cost of Methane methodology, or at least use methane's 20-year global warming potential and monetize carbon dioxide-equivalents in the main economic analysis. As the agency's own sensitivity analysis reveals, the costs associated with methane are significant enough to flip some net present value calculations from positive to negative.
- The Forest Service should abandon the assumption that all increased electricity from coal is perfectly offset by decreased electricity from other sources. This faulty assumption likely undercounts the net greenhouse gas emissions generated by this proposed action.
- Finally, the Forest Service must reconsider, under the principles of Executive Order 12,866, whether the benefits of this deregulatory action justify the significant social costs. Similarly, given that the action's social costs outweigh its benefits, and that the Forest Service has

declined to study potential mitigation measures such as methane capture and carbon offsets, the Forest Service should reconsider whether it has fulfilled its mandate under the National Environmental Protection Act (NEPA).

## I. The Social Cost of Carbon and Social Cost of Methane Are Appropriate—and Often Necessary—Metrics to Use in This and Future Environmental Impact Statements

To achieve NEPA's goals of informing decisionmakers and the public, monetizing the costs and benefits of changes in greenhouse gas emissions is necessary for any environmental impact statement on major land and resource management decisions with substantial greenhouse gas effects. The Social Cost of Carbon and the Social Cost of Methane are peer-reviewed methodologies that harmonize the federal government's approach to climate change, and are the proper metrics for monetization. The Council on Environmental Quality (CEQ)'s draft guidance for greenhouse gas emissions, other agencies' practices, legal requirements, and economic principles all support using the Social Cost of Carbon and Social Cost of Methane in NEPA reviews of major land and resource management decisions.

### *CEQ Draft Guidance Supports Monetizing Major Greenhouse Gas Effects in NEPA Reviews*

In December 2014, CEQ released revised draft guidance on how NEPA reviews should consider climate change. The revised guidance builds on an earlier 2010 draft and responds to the substantial public and inter-agency comments received on the 2010 draft.[1] The guidance strongly supports use of the Social Cost of Carbon and Social Cost of Methane in this environmental impact statement and in future NEPA reviews of similar projects.

Applicability: The CEQ draft guidance applies explicitly to "federal land and resource management decisions" as well as "site-specific actions" and "Federal rulemaking actions." The guidance specifically eliminates any exemption for resource management decisions.[2] Consequently, the Forest Service's proposed deregulatory exception to the Colorado Roadless Rule—as well as future natural resource extraction leases (and the Forest Service's consent thereto) or natural resource management actions with important climate effects—would be subject to CEQ's instructions on the consideration of climate change.

Scope and Scale: The CEQ draft guidance reminds agencies that NEPA reviews must include consideration of direct, indirect, and cumulative effects, including connected actions. In the context of climate change, therefore, NEPA requires appropriate consideration of upstream and downstream greenhouse gas emissions. CEQ specifically refers to the reasonably foreseeable effects of "using the [extracted] resource"[3]—that is, combustion or industrial use of any coal, gas, or oil extracted under a federal lease.

From the frame of direct, indirect, and cumulative climate effects, even individual and seemingly smaller resource management decisions can generate significant greenhouse gas emissions, warranting careful analysis. CEQ reminds that:

> Government action occurs incrementally, program-by-program and step-by-step, and climate impacts are not attributable to any single action, but are exacerbated by a series of

---

[1] CEQ, Announcement of *Revised Draft Guidance for Greenhouse Gas Emissions and Climate Change Impacts*, *available at* https://www.whitehouse.gov/administration/eop/ceq/initiatives/nepa/ghg-guidance.

[2] CEQ, *Revised Draft Guidance for Greenhouse Gas Emissions and Climate Change Impacts*, 1, n.2 (2014). The 2010 draft guidance had carved out an exception for natural resource management decisions, but as the 2014 draft guidance clarifies, that exception is not justified.

[3] *Id.* at 12.

> smaller decisions, including decisions made by the government. Therefore, the statement that emissions from a government action or approval represent only a small fraction of global emissions is more a statement about the nature of the climate change challenge, and is not an appropriate basis for deciding whether to consider climate impacts under NEPA.[4]

In fact, according to the draft guidance, projects with annual carbon dioxide-equivalent emissions above 25,000 metric tons presumptively warrant quantitative analysis.[5]

Monetization vs. Qualitative Discussion: Qualitative discussion of climate change, though important, is likely insufficient on its own to adequately inform decisionmakers and the public about the climate consequences of major resource management decisions. In particular, CEQ warns agencies "not [to] rely on boilerplate text to avoid meaningful analysis."[6] CEQ reminds agencies of the wide availability of easy-to-use tools for quantifying and monetizing greenhouse gas emissions.[7] On monetization specifically, the guidance recommends using the interagency Social Cost of Carbon tool, for a harmonized federal approach to climate change:

> Monetizing costs and benefits is appropriate in some, but not all, cases . . . . When an agency determines it appropriate to monetize costs and benefits, then, although developed specifically for regulatory impact analysis, the Federal social cost of carbon, which multiple agencies have developed and used to assess the costs and benefits of alternatives in rulemakings, offers a harmonized, interagency metric that can provide decisionmakers and the public with some context for meaningful NEPA review.[8]

Though the Environmental Protection Agency (EPA) released its estimates of the Social Cost of Methane after the CEQ guidance was published,[9] the logic of the CEQ guidance—that monetization is often appropriate, and that a harmonized, interagency metric is preferable—would apply with equal force to the use of the Social Cost of Methane in NEPA reviews.

***Other Agencies Support Monetizing Climate Effects in NEPA Reviews***

In the high-profile NEPA review of the Keystone XL Pipeline project, EPA called on the State Department to include a monetized estimate of the cost of anticipated greenhouse gas emissions, and in particular to use the Social Cost of Carbon.[10] Though the State Department failed to follow EPA's prudent advice, several other federal agencies have already begun using the Social Cost of Carbon protocol in NEPA reviews, including for land and resource management decisions. For example:

- The Office of Surface Mining Reclamation and Enforcement's Final Environmental Impact Statement for Four Corners Power Plant and Navajo Mine Energy Project (May 2015) applies the Social Cost of Carbon, though it chose not to monetize methane emissions after

[4] *Id.* at 9.

[5] *Id.* at 18.

[6] *Id.* at 5-6.

[7] *Id.* at 15.

[8] *Id.* at 16.

[9] Emission Guidelines, Compliance Times, and Standards of Performance for Municipal Solid Waste Landfills; Proposed Rule, 80 Fed. Reg. 52,100, 52,144 (Aug. 27, 2015).

[10] Letter from Cynthia Giles, Assistant Adm'r, U.S. Environmental Protection Agency, to Jose W. Fernandez & Dr. Kerri Anne Jones, U.S. Department of State (Apr. 22, 2013), at 2.

concluding that coal seam methane from the Navajo Mine would comprise less than 1 percent of the project's total carbon dioxide-equivalent emissions.[11]

- The Bureau of Land Management's Environmental Assessment for the Miles City Oil and Gas Lease Sale (May 2014) applies the Social Cost of Carbon.[12]
- The National Highway Traffic Safety Administration's Final Environmental Impact Statement for Fuel Efficiency Standards for Passenger Vehicles (July 2012) uses the Social Cost of Carbon (SCC), and uses relative global warming potentials to calculate the carbon dioxide-equivalent values for gases like methane, to monetize methane emissions in its SCC analysis.[13]

These examples prove that there are no conceptual, methodological, or practical barriers to applying the Social Cost of Carbon in NEPA reviews. Likewise, there are no barriers to, at a minimum, incorporating methane emissions into the SCC analysis by using carbon dioxide-equivalent values. Though the Social Cost of Methane is a newer metric and has not yet been incorporated into other agencies' environmental impact statements, the robustness of the approach, CEQ's guidance, and NEPA's "hard look" mandate all suggest that the Social Cost of Methane will be used in future NEPA reviews by other agencies, as it should be used by the Forest Service in this action.

***NEPA May Require Monetizing Climate Costs, Especially If Benefits Have Been Monetized***

NEPA requires "hard look" consideration of beneficial and adverse effects of each alternative option for major federal government actions. The U.S. Supreme Court has called the disclosure of impacts the "key requirement of NEPA," and held that agencies must "consider and disclose the actual environmental effects" of a proposed project in a way that "brings those effects to bear on [the agency's] decisions."[14] Though NEPA does not require a formal cost-benefit analysis,[15] agencies' approaches to assessing costs and benefits must be balanced and reasonable. In the litigation that triggered the Forest Service to revisit this exception to the Colorado Roadless Rule and the related environmental impact statement, the U.S. District Court for the District of Colorado explained that "[e]ven though NEPA does not require a cost-benefit analysis, it was nonetheless arbitrary and capricious to quantify the *benefits* of the lease modifications and then explain that a similar analysis of the *costs* was impossible when such an analysis was in fact possible."[16]

While often eschewing formal cost-benefit analysis in environmental impact statements, agencies typically include in their NEPA reviews of resource management decisions both quantitative and monetized analyses of the economic benefits and distributional effects of the decision, including estimated tons of recoverable resources per acre and the market value thereof; rental rates per acre and annual royalty rates; temporary and permanent job growth, including annual wages and indirect job effects form local expenditures; construction of infrastructure supporting the project;

---

[11] *Available at* http://www.wrcc.osmre.gov/mitiatives/fourCorners/documents/FinalEIS/Section%204.2%20-%20Climate%20Change.pdf; *see also* http://www.wrcc.osmre.gov/initiatives/fourCorners/documents/FinalEIS/Appendix%20A%20-%20Air%20Quality%20and%20Climate%20Change%20Information.pdf.

[12] Bureau of Land Management, Environmental Assessment DOI-BLM-MT-C020-2014-0091-EA, 76 (May 2014).

[13] *Available at* http://www.nhtsa.gov/staticfiles/rulemaking/pdf/cafe/FINAL_EIS.pdf at 9-77; *see also* http://ntl.bts.gov/lib/55000/55200/55224/Draft_Environmental_Impact_Statement_for_Phase_2_MDHD_Fuel_Efficiency_Standards.pdf.

[14] *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 96 (1983).

[15] 40 C.F.R. § 1502.23 ("[T]he weighing of the merits and drawbacks of the various alternatives need not be displayed in a monetary cost-benefit analysis.").

[16] *High Country Conservation Advocates v. Forest Service*, 52 F. Supp. 3d 1174, 1191 (D. Colorado, 2014).

and other related benefits.[17] As the District Court of Colorado concluded in the above case, "[i]t is arbitrary to offer detailed projections of a project's upside while omitting a feasible projection of the project's costs."[18] Thus, to the extent agencies continue to quantify and monetize many of the economic benefits and distributional effects of resource management decisions, agencies must also treat environmental costs with proportional analytical rigor.

***Economic Principles Encourage Monetizing Climate Effects to Fulfill NEPA's Goals***

NEPA's goals are to inform decisionmakers and the public by providing a "hard look" at the full range of environmental consequences of the government's proposed action and any feasible alternatives.[19] To inform decisionmakers and the public, NEPA reviews should aim to present information in the manner that most easily facilitates comparison across alternatives and that best avoids any information-processing biases that might distort rational decisionmaking. The economic literature supports monetizing climate effects to achieve these goals.

Monetization provides much-needed context for otherwise abstract consequences of climate change. If the NEPA review for an agency action merely quantifies greenhouse gas emissions by metric ton, or only qualitatively discusses the general effects of global climate change, decisionmakers and the public will tend to overly discount that individual action's potential contribution. Without context, it is difficult for many decisionmakers and the public to asses the magnitude and climate consequences of, for example, an additional million tons of carbon dioxide. Monetization, on the other hand, allows decisionmakers and the public to weigh all costs and benefits of an action—and to compare alternatives—using the common metric of money. Monetizing climate costs, therefore, better informs the public and helps "brings those effects to bear on [the agency's] decisions."[20]

The tendency to ignore non-monetized effects is the result of common but irrational mental heuristics like probability neglect and base-rate bias. Even sophisticated analysts can fall victim to these distortions, especially when combined with another bias: overconfidence in expertise. For example, the phenomenon of probability neglect causes people to reduce small probabilities entirely down to zero, resulting in these probabilities playing no role in the decisionmaking process.[21] This heuristic applies even to events with long-term certainty or with lower-probability but catastrophic consequences, so long as their effects are unlikely to manifest in the immediate future. Weighing the real risks that, decades or centuries from now, climate change will fundamentally and irreversibly disrupt the global economy, destabilize earth's ecosystems, or compromise the planet's ability to sustain human life is challenging; without a tool to contextualize such risks, it is far easier to ignore them. Monetization tools like the Social Cost of Carbon and Social Cost of Methane are designed to solve this problem: by translating long-term costs into present values, instantiating the harms of climate change and giving due weight to the potential of lower-probability but catastrophic harms.

---

[17] *See, e.g.*, Forest Service, Federal Coal Lease Modifications COC-1362 & COC-67232, at pp. 190–91 (Aug. 2012); Forest Service, Pawnee National Grassland Oil and Gas Leasing Final Environmental Impact Statement 317, at 291–98 (Dec. 2014); Bureau of Land Mgmt., Final Environmental Impact Statement for the Wright Area Coal Lease Applications, ES-60-61, 4-130-50 (July 2010).

[18] *High Country*, 52 F. Supp. 3d. at 1195.

[19] *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989).

[20] *See Baltimore Gas & Elec. Co.*, 462 U.S. at 96.

[21] Cass R. Sunstein, *Probability Neglect: Emotions, Worst Cases, and Law* (John M. Olin Law & Economics, Working Paper No. 138, 2001), *available at* http://ssrn.com/abstract=292149.

Agencies and the public might also suffer from base-rate bias, which causes the undervaluation of information that is generally applicable across a range of scenarios.[22] Agencies fall into this trap when their NEPA reviews provide generic narrative descriptions of climate change yet conclude that climate change is too global and general a problem to address in a project-specific environmental impact statement. By conceding the long-run inevitability of climate change, agencies risk foreclosing the possibility of mitigating its effects. In contrast, metrics like the Social Cost of Carbon and Social Cost of Methane monetize the effects on climate change from the emission of as little as a single ton of carbon dioxide-equivalents.

Some critics insist that for resource and land management decisions, like coal leases, the cost of carbon would be "negligible" in relation to the "impacts from coal burned on a nationwide or global basis."[23] In other words, critics argue that the costs of such projects are too small to monetize. In fact, many resource management decisions have quite significant effects on greenhouse gas emissions: for example, the Bureau of Land Management recently approved coal lease expansions for mines that produce 20% of the country's coal supply.[24] Regardless, this argument about some projects being too small to monetize misunderstands the tools available for monetizing climate effects. The Social Cost of Carbon and Social Cost of Methane protocols were developed to assess the cost of actions with "marginal" impacts on cumulative global emissions,[25] and the metrics estimate the dollar figure of damages for one extra ton of greenhouse gas emissions.[26] This marginal cost is calculated using three integrated assessment models. The models translate emissions into changes in atmospheric greenhouse concentrations, atmospheric concentrations into changes in temperature, and changes in temperature into economic damages.[27] A range of plausible socio-economic and emissions trajectories are used.[28] The marginal cost is attained by first running the models using a baseline emissions trajectory, and then running the same models again with one additional unit of emissions. The difference in damages between the two runs is the marginal cost of one additional unit. The approach assumes that the marginal damages from increased emissions will remain constant for small emissions increases relative to gross global emissions.[29] In other words, the monetization tools are in fact perfectly suited to measuring the marginal effects of resource management decisions, as well as rulemakings.

***The Social Cost of Carbon and Social Cost of Methane Are the Proper Metrics***

The Social Cost of Carbon was developed collaboratively by multiple federal agencies (including the Forest Service's parent agency, the Department of Agriculture), through a comprehensive, science-based process, which has been thoroughly vetted and subject to repeated public comments.[30] The

---

[22] *See* Fallacy Files, *The Base Rate Fallacy*, http://www.fallacyfiles.org/baserate.html (last accessed Feb. 15, 2015); *see also* David B. Graham, Capt. Thomas D. Johns, *The Corporate Emergency Response Plan: A Smart Strategy*, 27 NAT. RESOURCES & ENV'T 3 (2012) (on normalcy bias).

[23] *See, e.g.*, Bureau of Land Management, West Antelope II South Lease Modification Decision (Aug. 2014).

[24] *See* Bureau of Land Mgmt., Final Environmental Impact Statement for the Wright Area Coal Lease Applications, ES-60-61, 4-130-50 (July 2010).

[25] Interagency Working Group on Social Cost of Carbon, *Technical Support Document: Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12,866*, 1 (2010) [hereinafter 2010 TSD].

[26] EPA, The Social Cost of Carbon, http://www.epa.gov/climatechange/EPAactivities/economics/scc.html (last visited Feb. 11, 2015).

[27] 2010 TSD, *supra* note 25, at 5.

[28] *Id.* at 15.

[29] *Id.* at 1.

[30] *Id.* The Interagency Working Group was made up of technical experts from many agencies, including the Department of Agriculture (which houses the Forest Service), Council of Economic Advisers, Council on Environmental Quality, National Economic Council, Office of Energy and Climate Change, Office of Management and Budget, Office of

White House convened an Interagency Working Group on the Social Cost of Carbon in 2009, to develop uniform estimates to harmonize analysis of climate change across the federal government.[31] Following the U.S. Court of Appeals for the Ninth Circuit's reprimand in *Center for Biological Diversity v. National Highway Traffic Safety Administration* that "while . . . there is a range of values, the value of carbon emissions reduction is certainly not zero,"[32] various federal agencies used an assortment of individually developed estimates in their regulatory analyses.[33] The Interagency Working Group's mandate from the Administration was to resolve the wide variance in the agencies' independently developed estimates by establishing uniform values.[34]

The Interagency Working Group met on a regular basis to explore technical literature in relevant fields, consider public comments, and discuss key model inputs and assumptions.[35] The U.S. Government Accountability Office recently praised the Group's transparent and scientific approach, finding that it relied on existing academic literature and models; used consensus-based decision-making; and took steps to disclose limitations and incorporate new information.[36] Since the Interagency Working Group published its results in 2010, dozens of proposed regulatory actions have incorporated the estimates, all subject to public comment.[37] The Office of Management and Budget also coordinated a general call for comments on the Interagency Working Group's methodology, and the Group has now responded to all public comments received during that process.[38] The Interagency Working Group plans to regularly update its estimates.[39]

Though the Working Group's charge was to develop Social Cost of Carbon estimates for use in regulatory impact analyses, the methodology used is in no way unique to the regulatory process. There is no reason to believe that the estimates would be any different if developed specifically for the context of NEPA reviews or resource management decisions. Agencies have used other metrics designed originally for regulatory impact analysis in their environmental impact statements as well. For example, after the Nuclear Regulatory Commission developed an estimate of the monetary value of radiological exposure for use in the agency's regulatory analyses, the U.S. Court of Appeals for the Third Circuit directed NRC in 1989 "to consider severe accident mitigation design alternatives as part of the NRC's environmental review process under the National Environmental Protection Act (NEPA). . . . [T]he staff used the $1000 per person-rem value [of the consequences of radiological exposure] as a screen to compare values and impacts [in those NEPA reviews]."[40]

---

Science and Technology Policy, Department of Commerce, Department of Transportation, Environmental Protection Agency, and Department of the Treasury.

[31] *See* U.S. Gov't Accountability Office, *Regulatory Impact Analysis: Development of Social Cost of Carbon Estimates*, GAO-14-663 at 5 (July 2014).

[32] 538 F.3d 1172, 1200 (9th Cir. 2008) (invalidating an EIS prepared, pursuant to the National Environmental Protection Act, by the National Highway Transportation Safety Administration, which had measured and monetized a wide array of potential costs and benefits of a rule, but had failed to monetize the benefits which would accrue from decreased carbon emissions).

[33] *See* GAO, *supra* note 31, at 5.

[34] *See* 2010 TSD, *supra* note 25, at 1.

[35] *See id.* at 2.

[36] *See* GAO, *supra* note 31.

[37] *See id.* at 6.

[38] Interagency Working Group, *Response to Comments: Social Cost of Carbon for Regulatory Impact Analysis* (July 2015), https://www.whitehouse.gov/sites/default/files/omb/inforeg/scc-response-to-comments-final-july-2015.pdf.

[39] Interagency Working Group, *Technical Update on the Social Cost of Carbon for Regulatory Impact Analysis* 4 (May 2013) ("the interagency group recommended in 2010 that the SCC estimates be revisited on a regular basis or as model updates that reflect the growing body of scientific and economic knowledge become available").

[40] Nuclear Regulatory Commission, NUREG-1530, *Reassessment of NRC's Dollar Per Person-Rem Conversion Factor Policy* 3 (1995), *available at* http://www.iaea.org/inis/collection/NCLCollectionStore/_Public/27/048/27048008.pdf;

The Interagency Working Group has, to date, focused exclusively on carbon dioxide. The Social Cost of Carbon can be roughly adjusted to approximate the costs of other greenhouse gases by multiplying by the relative global warming potential of those gases. Scientists, however, have long argued that the full social costs of specific, non-carbon dioxide gases like methane should be assessed through separate methodologies, which would more accurately account for varying atmospheric life spans, among other differences.[41] At least a dozen published studies, dating back to 1993, have estimated the social cost of non-carbon dioxide greenhouse gases, including methane.[42]

EPA has developed Social Cost of Methane estimates based on one of the most recent peer-reviewed articles: Marten *et al.*[43] Marten *et al.* builds on the methodology used by the Interagency Working Group to develop the SCC. The study maintains the same three integrated assessment models, five socioeconomic-emissions scenarios, equilibrium climate sensitivity distribution, three constant discount rates, and aggregation approach that were agreed upon by the Interagency Working Group. Consequently, most key assumptions underlying the Social Cost of Methane estimates have already gone through a transparent, consensus-driven, publically reviewed, regularly updated process, since they were borrowed from the Interagency Working Group's thoroughly vetted methodology. Marten *et al.* was not only published in a peer-reviewed economics journal, but EPA undertook additional internal and peer review of the approach.[44] Marten *et al.*'s estimates thus are reasonable measurements of the Social Cost of Methane, appropriate for use in NEPA reviews.

## II. The Forest Service's Application of a 10th Percentile Estimate Misunderstands the SCC's Treatment of Uncertainty and Is Inconsistent with Federal Practices

The Interagency Working Group on the Social Cost of Carbon—which included representatives from the Forest Service's parent agency, the Department of Agriculture—carefully developed a range of four Social Cost of Carbon values intended for uniform use across all federal agency analyses. Three values reflected a range of discount rates: 5%, 3%, and 2.5%. The fourth value was intended to "represent the higher-than-expected impacts from temperature change further out in the tails of the SCC distribution"[45]—in other words, to account for the risk of catastrophic damages that the underlying models do not fully capture. To approximate a value reflecting such lower-probability catastrophic risks, the Interagency Working Group selected the 95th percentile value at a 3% discount rate as the fourth and final estimate. This range of four estimates reflects the best available scientific and economic literature and has been thoroughly subject to peer review and public comment.

---

*see also* NRC, NUREG-1437, *Draft Report: Generic Environmental Impact Statement for License Renewal of Nuclear Plants, Supplement 55* at F-34 (2015) (using the monetary value of public health risk); *see also* NHTSA's 2012 EIS on vehicle efficiency standards, *supra* note 13, at 4-26 (using EPA's value of statistical life).

[41] *See* Disa Thureson & Chris Hope, *Is Weitzman Right? The Social Cost of Greenhouse Gases in an IAM World* 21 (Örebro University-Swedish Business School Working Paper 3/2012).

[42] *See, e.g.*, Alex L. Marten et al., *Incremental CH4 and N2O Mitigation Benefits Consistent With the US Government's SC-CO2 Estimates,* Climate Policy 7 (2014) (describing eleven prior studies estimating the social cost or global damage potential associated with methane).

[43] *Id.*

[44] EPA, *Whitepaper on Valuing Methane Emissions Changes in Regulatory Benefit-Cost Analysis, Peer Review Charge Questions , and Responses* (2015), *available at* http://www3.epa.gov/climatechange/pdfs/social%20cost%20methane%20white%20paper%20application%20and%20peer%20review.pdf.

[45] 2010 TSD, *supra* note 25, at 3.

Now, without adequate justification, consultation with other agencies, or even full disclosure of its methodology,[46] the Forest Service on its own initiative proposes adding a fifth and distinctly lower estimate: a 10th percentile value at the 3% discount rate. The Forest Service asserts its aims are "to provide a lower bound," "to 'complete' the range of SCC values," and to counterbalance the 95th percentile estimate.[47] This choice misunderstands the nature and purpose of the Interagency Working Group's range of four values in general, and of the 95th percentile estimate in particular; it contradicts the Office of Information and Regulatory Affair's guidance on best practices for handling uncertainty, risk aversion, and probability distributions; and it undermines the uniform, government-wide approach to climate analysis.

There is no economic foundation for the Forest Service's choice to include a 10th percentile estimate in a misguided attempt to balance out the 95th percentile estimate and "complete" the range. The 95th percentile value does not intend to show the probability distribution around the 3% discount rate specifically, but rather serves as a methodological approach to approximating the "higher-than-expected impacts from temperature change further out in the tails of the SCC distribution." The shape of the distribution of climate risks and damages includes a long tail of lower-probability, high-damage, irreversible outcomes, due to "tipping points" in planetary systems, inter-sectoral interactions, and other deep uncertainties.[48] Climate damages are not normally distributed around a central estimate, but rather feature a significant right skew toward catastrophic outcomes. In fact, a recent survey of economic experts concludes that catastrophic outcomes increasingly seem likely to occur.[49] The integrated assessment models used to calculate the Social Cost of Carbon are unable to systematically account for these potential catastrophic outcomes. Instead, the Interagency Working Group included the 95th percentile value to account for such uncertainty.[50] As the Interagency Working Group has explained, there are no similarly systematic biases pointing in the other direction which might warrant including a low-percentile estimate.[51]

The 95th percentile also addresses the strong possibility of widespread risk aversion with respect to climate change. As the Working Group explained:

> A key question unanswered during this interagency process is what to assume about relative risk aversion with regard to high-impact outcomes. These calculations do not take into account the possibility that individuals may have a higher willingness to pay to reduce the likelihood of low probability, high-impact damages than they do to reduce the likelihood of higher-probability but lower impact damages with the same expected cost. (The inclusion of the 95th percentile estimate in the final set of SCC values was largely motivated by this

---

[46] The Forest Service never even transparently discloses what the 10th percentile estimate is; Table E-14 of Input Values, SDEIS for Colorado Roadless Areas, has blank columns along the row labeled "3% 10th." *Compare* Office of Management & Budget, *Circular A-4* at 39 (2003) ("Any data and models that you use to analyze uncertainty should be fully identified.").

[47] SDEIS at 85. Though the Forest Service claims it limits use of the 10th percentile estimate to the global perspective, *see* SDEIS Table 3-21 ("using all the SCC values except . . . 10th percentile SCC values in Forest or National Boundary stances"), but given that the global perspective is the only rational context for climate change (see next section), the limitation is meaningless.

[48] 2010 TSD, *supra* note 25, at 31.

[49] Policy Integrity, *Expert Consensus on the Economics of Climate Change* 2 (2015), *available at* http://policyintegrity.org/files/publications/ExpertConsensusReport.pdf ("Experts believe that there is greater than a 20% likelihood that this same climate scenario would lead to a 'catastrophic' economic impact (defined as a global GDP loss of 25% or more).").

[50] 2010 TSD, *supra* note 25, at 30.

[51] Interagency Working Group, *Response to Comments: Social Cost of Carbon for Regulatory Impact Analysis*, *supra* note 38, at 26-27 (specifically rejecting a 5th percentile estimate).

concern.) . . . Even if individuals are not risk-averse for such scenarios, it is possible that regulatory policy should include a degree of risk-aversion.[52]

In short, the 95th percentile estimate attempts to capture risk aversion and uncertainties around lower-probability, high-damage, irreversible outcomes that are currently omitted or undercounted by the models. There is no need to "balance" out this estimate with a low-end 10th percentile value, because the reverse assumptions are not reasonable:

- There is no reason to believe the public or the government will be systematically risk seeking with respect to climate change.[53]
- The consequences of overestimating the risk of climate damages (i.e., spending more than we need to on mitigation and adaptation) are likely not nearly as irreversible as the consequences of underestimating the risk of climate damage (i.e., failing to prevent catastrophic outcomes).
- Though some uncertainties might point in the direction of lower Social Cost of Carbon values, such as uncertainties around the development of breakthrough adaptation technologies, the models already account for such uncertainties around adaptation;[54] on balance, most uncertainties point toward higher, not lower, Social Cost of Carbon estimates.[55]
- There is no empirical basis for any "long tail" of potential benefits that would counteract the potential for extreme harm associated with climate change. The 95th percentile has been explicitly included by the Interagency Working Group to account for systematic omissions that bias the Social Cost of Carbon downwards, including the models' inability to account for risk aversion, option value, catastrophic outcomes, and other omitted damages. As the Interagency Working Group explained, "In contrast, [we are] not aware of systematic upward biases in the estimates comparable to the downward biases discussed above. For this reason, while [we have] been fully transparent regarding the entire range of uncertainty reflected in the probability distributions, we did not include a 5th percentile estimate in the selected range for regulatory impact analysis."[56]

Furthermore, the 10th percentile value has no support in the community of experts on climate economics, as it falls far below the Social Cost of Carbon estimates that most experts recommend. The Interagency Working Group's estimates already reflect a "full range" of values: a low estimate (the 5% discount rate), a "central" estimate (the average value at the 3% discount rate), a high estimate (the 2.5% discount rate), and an estimate that accounts for uncertainty and risk (the 95th percentile of the 3% discount rate).[57] There is no need for the Forest Service to "provide a lower bound," because it already exists: namely, the 5% discount rate estimate. Indeed, if anything the 5% discount rate is already too conservative as a lower-bound estimate. A recent survey of 365 experts on the economics of climate change found that 90% of experts believe a 3% discount rate or lower

[52] 2010 TSD, *supra* note 25, at 30.

[53] As a 2009 survey revealed, the vast majority of economic experts support the idea that "uncertainty associated with the environmental and economic effects of greenhouse gas emissions increases the value of emission controls, assuming some level of risk-aversion." *See Expert Consensus, supra* note 49, at 3 (citing 2009 survey).

[54] *E.g.*, 2010 TSD, *supra* note 25, at 8 (discussing consideration of adaptation in the FUND model); *but see id.* at 29-30 (on inability to accurately forecast adaptation, but suggesting uncertainty whether the incomplete treatment of adaptation and technology leads to understating or overstating the likely damages).

[55] *See* Richard L. Revesz et al., *Global Warming: Improve Economic Models of Climate Change*, 508 NATURE 173 (2014).

[56] Interagency Working Group, *Response to Comments: Social Cost of Carbon for Regulatory Impact Analysis*, *supra* note 38, at 26-27.

[57] 2010 TSD, *supra* note 25, at 3.

is appropriate for climate change; a 5% discount rate falls on the very high end of what experts would recommend.[58] Only 8% of the experts surveyed believe that the Social Cost of Carbon should be valued below the Interagency Working Group's central estimate of $37, and 69% of experts believed the value should be at or above the central estimate of $37.[59] Moreover, all four estimates of the Social Cost of Carbon are likely underestimated because the models currently omit many significant categories of damages—such as economic growth, pests, pathogens, erosion, air pollution, fire, energy supply, health costs, political conflict, and ocean acidification—and because of other methodological choices.[60] The Social Cost of Carbon estimate derived from the 5% discount rate is clearly on the lower end of what most economic experts would currently support; there would be little to no support among economic experts for the even lower estimate the Forest Service now invents.

Finally, the Forest Service's use of a 10th percentile estimate contradicts the guidance on best practices for economic analysis issued by the Office of Information and Regulatory Affairs (OIRA). As OIRA summarized in 2011, "The goal is not to characterize the full range of *possible* outcomes . . . but rather the range of *plausible* outcomes."[61] In *Circular A-4*, OIRA explains that:

> It is a common practice to compare the 'best estimates' of both benefits and costs with those of competing alternatives. These 'best estimates' are usually the average or the expected value of benefits and costs. Emphasis on these expected values is appropriate as long as society is 'risk neutral' with respect to the regulatory alternatives.[62]

OIRA also recommends comparing the best estimates of both costs and benefits. A 10th percentile value for climate damage biases the Forest Service's comparison of costs and benefits in a way that will mislead decisionmakers and the public: there is, for example, no 10th percentile estimate of the calculation of benefits of coal production. The Forest Service cannot cherry-pick central estimates of benefits and low estimates of costs as it suits them, nor can they compare apples and oranges.

To maintain consistency across the federal government's analyses of climate change, the Forest Service should defer to the Interagency Working Group's instructions on applying the Social Cost of Carbon, and should stick to the established range of four estimates.

## III. The Global Perspective Is Appropriate; the National and Forest-Only Perspectives Are Misleading and Irrational in the Context of Climate Change

In weighing the costs and benefits of the rule, the Forest Service explains that: "If concerns are limited to potential GHG damages to the U.S. population, the proposed action is acceptable (or neutral). If decisions account for . . . populations outside the U.S., . . . no-action might be the preferred alternative."[63] This statement suggests a misunderstanding of the application of the global Social Cost of Carbon and Social Cost of Methane estimates to U.S. government decisionmaking. The global estimates are not simply intended to internalize into U.S.

---

[58] *Expert Consensus, supra* note 49, at 21; *see also* Drupp, M.A., et al. *Discounting Disentangled: An Expert Survey on the Determinants of the Long-Term Social Discount Rate* (London School of Economics and Political Science Working Paper, May 2015) (finding consensus on social discount rates between 1-3%).

[59] *Expert Consensus, supra* note 49, at 18.

[60] *See* Revesz et al., *supra* note 55; Peter Howard, *Omitted Damages: What's Missing from the Social Cost of Carbon* (Cost of Carbon Project Report, 2014); Frances C. Moore & Delavane B. Diaz, *Temperature Impacts on Economic Growth Warrant Stringent Mitigation Policy*, 5 NATURE CLIMATE CHANGE 127 (2015) (demonstrating SCC may be biased downward by more than a factor of six by failing to include the climate's effect on economic growth).

[61] *Circular A-4 Primer*,14-15 (2011).

[62] *Circular A-4*, 42 (2003).

[63] SDEIS at 100.

decisionmaking the climate effects that U.S. actions impose on non-U.S. populations; rather, as explained in this section, the U.S. government has adopted global Social Cost of Carbon and Social Cost of Methane estimates as part of a strategy to motivate reciprocal actions by foreign countries that will directly benefit U.S. populations.

To avoid a global "tragedy of the commons" that could irreparably damage all countries, including the United States, every nation should set policy according to global Social Cost of Carbon and Social Cost of Methane values.[64] Climate and clean air are global common resources, meaning they are freely available to all countries, but any one country's use—i.e., pollution—imposes harms on the polluting country as well as the rest of the world. Because carbon pollution does not stay within geographic borders but rather mixes in the atmosphere and affects climate worldwide, each ton of carbon emitted by the United States not only creates domestic harms, but also imposes large externalities on the rest of the world. Conversely, each ton of carbon abated in another country benefits the United States along with the rest of the world.

If all countries set their carbon emission levels based on only domestic costs and benefits, ignoring the large global externalities, the aggregate result would be substantially sub-optimal climate protections and significantly increased risks of severe harms to all nations, including the United States. Thus, basic economic principles demonstrate that the United States stands to benefit greatly if all countries apply global Social Cost of Carbon and Methane values in their regulatory decisions. Indeed, the United States stands to gain hundreds of billions or even trillions of dollars in direct benefits from efficient foreign action on climate change.[65]

A rational tactical option in the effort to secure that economically efficient outcome is for the United States to continue using global Social Cost of Carbon and Methane values itself.[66] The United States is engaged in a repeated strategic game of international negotiations and regulatory coordination, in which several significant players—including the United States, England, Norway, and France—have already adopted a global framework.[67] For example, Canada and Mexico have explicitly borrowed the U.S. estimates of a global Social Cost of Carbon to set their own fuel efficiency standards.[68] For the United States to now depart from this collaborative dynamic by reverting to a domestic-only SCC estimate could undermine the country's long-term interests in climate

---

[64] *See* Garrett Hardin, *The Tragedy of the Commons*, 162 Science 1243 (1968) ("[E]ach pursuing [only its] own best interest . . . in a commons brings ruin to all.").

[65] Policy Integrity, *Foreign Action, Domestic Windfall: The U.S. Economy Stands to Gain Trillions from Foreign Climate Action* (2015), http://policyintegrity.org/files/publications/ForeignActionDomesticWindfall.pdf

[66] *See* Robert Axelrod, *The Evolution of Cooperation* 10-11 (1984) (on repeated prisoner's dilemma games).

[67] *See* ECONOMICS GROUP, DEFRA, U.K., THE SOCIAL COST OF CARBON AND THE SHADOW PRICE OF CARBON: WHAT THEY ARE, AND HOW TO USE THEM IN ECONOMIC APPRAISAL IN THE UK 1 (2007); *see also* Ministry of Finance, Norway, Cost-Benefit Analysis: Carbon Price Paths, *available at* http://www.regjeringen.no/en/dep/fin/Documents-and-publications/official-norwegian-reports-/2012/nou-2012-16-2/10.html?id=713585 ("The United Kingdom has changed its method for the valuation of greenhouse gas emissions. Prior to 2009, the estimated global social cost of carbon was used, but one [sic] has now switched over to pricing in line with the necessary marginal cost of meeting long-term domestic emission reduction targets in conformity with the EU Climate and Energy Package."); Balázs Égert, *France's Environmental Policies: Internalising Global and Local Externalities* 8-10 (OECD Economics Department Working Papers No. 859, 2011), *available at* http://dx.doi.org/10.1787/5kgdpn0n9d8v-en (discussing global impacts and France's history of calculating the SCC).

[68] *See* Heavy-Duty Vehicle and Engine Greenhouse Gas Emission Regulations, SOR/2013-24, 147 Can. Gazette pt. II, 450, 544 (Can.), *available at* http://canadagazette.gc.ca/rp-pr/p2/2013/2013-03-13/html/sor-dors24-eng.html ("The values used by Environment Canada are based on the extensive work of the U.S. Interagency Working Group on the Social Cost of Carbon."); Instituto Nacional de Ecología, Mexico, Regulatory Impact Analysis on *PROY-NOM-163- SEMARNAT-ENER-SCFI-2012, Emisiones de bióxido de carbono ($CO_2$) provenientes del escape y su equivalencia en términos de rendimiento de combustible, aplicable a vehículos automotores nuevos de peso bruto vehicular de hasta 3857 kilogramos* (July 5, 2012), *available at* http://207.248.177.30/mir/formatos/defaultView.aspx?SubmitID=273026.

negotiations and could jeopardize emissions reductions underway in other countries, which are already benefiting the United States.

Negotiation is key to the President's constitutional foreign affairs powers, and the Supreme Court has "recognized the special importance of our nation speaking with one voice."[69] The development and analysis of U.S. regulations are essential parts of the dialogue between the United States and foreign countries about climate change. Through the Interagency Working Group, the President has instructed all federal agencies to use a global Social Cost of Carbon value as one important step in negotiations to encourage other countries to take reciprocal actions that also account for global externalities. As the Interagency Working Group explained, "Emphasizing the need for a global solution to a global problem, the United States has been actively involved in seeking international agreements to reduce emissions. . . . When these considerations are taken as a whole, the interagency group concluded that a global measure of the benefits from reducing U.S. emissions is preferable."[70] If different agencies use different Social Cost of Carbon and Methane values in assessing and setting regulatory policies, it would risk sending mixed signals to the international community. The President's constitutional powers to negotiate international agreements would be seriously impaired if federal agencies stop relying on a single, harmonized, global Social Cost of Carbon value.

Finally, global Social Cost of Carbon and Methane values are in the national interest because harms experienced by other countries could significantly affect the United States. Climate damages in one country could generate large spillover effects to which the United States is especially vulnerable. As seen historically, economic disruptions in one country can cause financial crises that reverberate globally at a breakneck pace. Similarly, national security analysts increasingly emphasize that the geopolitical instability associated with climatic disruptions abroad poses serious threats to the United States.[71] A global framework properly recognizes that climate change will threaten the United States with significant and shifting international spillover effects.

Moreover, because the current models do not account for inter-regional spillover effects, the "provisional and highly speculative" range of domestic-only benefits that the Interagency Working Group tentatively approximated (i.e., 7-23% of the global value) is almost certainly an underestimate, as the Working Group readily acknowledges.[72] Basing national-only and forest-only perspectives on this speculative, underestimated range and presenting such calculations alongside and on equal footing with the global perspective is deeply misleading.

NEPA further supports a global perspective on costs and benefits of climate change. In a provision on "International and National Coordination of Efforts," NEPA states that "all agencies of the Federal Government *shall* . . . recognize the worldwide and long-range character of environmental problems."[73] Using global Social Cost of Carbon and Methane values to analyze and set policy is consistent with these instructions. Furthermore, NEPA requires agencies to, "where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment."[74]  As explained above, using the global values

---

[69] *See Made in the USA Found. v. United States*, 242 F.3d 1300, 1317-18 (11th Cir. 2001) (explaining the Supreme Court's holding in *Baker v. Carr,* 369 U.S. 186, 211 (1962)).

[70] 2010 TSD, *supra* note 25, at 11-12

[71] *See, e.g.*, Department of Defense, Climate Change Adaptation Roadmap (2014); CNA Military Board, National Security and the Accelerating Risks of Climate Change (2014).

[72] 2010 TSD, *supra* note 25, at 11.

[73] 42 U.S.C. § 4332(2)(f) (emphasis added).

[74] *Id.*; *see also* Environmental Defense Fund v. Massey, 986 F.2d 528, 535 (D.C. Cir. 1993) (confirming that Subsection F is mandatory); Natural Resources Defense Council v. NRC, 647 F.2d 1345, 1357 (D.C. Cir. 1981) ("This NEPA

supports the federal government's strategy to encourage international cooperation on climate change.

In general, the national-only and forest-only perspectives are inapt for an action with significant climate consequences; the forest-only perspective is particularly irrational. The forest boundary is an arbitrary place to draw a line: what would stop an agency from narrowing the scope of analysis even further, to just the confines of the coal mine itself? NEPA requires a "hard look" at the full range of direct, indirect, and cumulative effects of a proposed federal action and any connected actions. Including an analysis that entirely ignores the significant climate costs experienced beyond the edges of a single forest violates the goals of NEPA to inform the public and decisionmakers.

The forest-only analysis is also irrationally biased, since the presentation of benefits already reflects global market forces. Just as coal has no real value within the exclusive confines of the forest boundary, and only acquires its value upon interaction with global market forces, it is meaningless to talk about climate effects "within the forest boundary," when climate change is a global phenomenon of inter-connected planetary systems, ecosystems, and economies.[75] Commodities markets are globalized and integrated, and the price for coal (its value) is based on global supply and demand. As such, the Forest Service necessarily is using a globally-set price to determine the benefits of this proposed action. The agency should likewise use the globally-determined value for the costs of its proposal.

(Finally, there appears to be a typographical error in table 3-21. On page 99 of the SDEIS, the Forest Service says that national benefits and global benefits are identical, but in the table the upper estimates for each of those two scenarios do not match ($2,410 vs $2,614).)

## IV. The Forest Service Should Adopt EPA's Social Cost of Methane Methodology, or at least Use Methane's 20-Year Global Warming Potential to Monetize Its Effects

The Forest Service claims that it is required to consider only carbon dioxide emissions because "the SCC guidelines from the U.S. Interagency Working Group has only considered estimates for the SCC."[76] Nevertheless, in its sensitivity analysis, the Forest Service converts methane emissions to carbon dioxide-equivalent amounts using the relative 100-year global warming potential, and finds that including methane has a significant effect on its present net value calculations, changing the sign from positive to negative in some cases (though, notably, the Forest Service does not disclose the full calculations in its sensitivity analysis).[77]

There is no reason for the Forest Service to relegate this important analysis of methane to the sensitivity analysis; methane should be monetized in the main economic analysis, together with carbon dioxide. As shown above, other agencies have already begun considering carbon dioxide-

---

prescription, I find, looks toward cooperation, not unilateral action, in a manner consistent with our foreign policy."); *cf.* COUNCIL ON ENVIRONMENTAL QUALITY, GUIDANCE ON NEPA ANALYSIS FOR TRANSBOUNDARY IMPACTS (1997), *available at* http://www.gc.noaa.gov/documents/transguide.pdf; CEQ, DRAFT NEPA GUIDANCE ON CONSIDERATION OF THE EFFECTS OF CLIMATE CHANGE AND GREENHOUSE GAS EMISSIONS at 2 (2010), *available at* http://www.whitehouse.gov/sites/default/files/microsites/ceq/20100218-nepa-consideration-effects-ghg-draft-guidance.pdf (defining climate change as a "global problem"); Exec. Order No. 12,114, *Environmental Effects Abroad of Major Federal Actions*, 44 Fed. Reg. 1957 §§ 1-1, 2-1 (Jan. 4, 1979) (applying to "major Federal actions . . . having significant effects on the environment outside the geographical borders of the United States," and enabling agency officials "to be informed of pertinent environmental considerations and to take such considerations into account . . . in making decisions regarding such actions").

[75] The forest boundary perspective especially makes little sense since the Forest Service is not monetizing the methane released within the forest from mining activity.

[76] SDEIS at 85.

[77] SDEIS at E-25.

equivalent tons of methane in their NEPA reviews. More importantly, EPA has now developed a sophisticated methodology for directly estimating the Social Cost of Methane. EPA's Social Cost of Methane estimates are derived from the peer-reviewed literature, are currently undergoing public comment, and should be considered by all agencies in future regulatory analysis and environmental impact statements for actions with major effects on methane emissions. (See *supra* for more support for the Social Cost of Methane.)

If the Forest Service for some reason declines to follow EPA's approach on the Social Cost of Methane, it could still use methane's relative global warming potentials to convert methane emissions to carbon dioxide-equivalents and monetize them as a less accurate, lower-bound estimate. However, instead of only using the 100-year global warming potential value for methane of 36, the Forest Service should also consider the Intergovernmental Panel on Climate Change's estimate of methane's relative global warming potential over a 20-year period: specifically, 85 to 87 times greater than carbon dioxide (after making the recommended adjustment for fossil methane).[78] Given the short life of methane, the Forest Service should at least conduct sensitivity analysis over the entire global warming potential range, instead of merely utilizing the lower 100-year timescale range. Again, though, the Social Cost of Methane approach is the more reasonable and preferred way to value this rule's important methane reductions.

## V. The Forest Service Should Abandon the Assumption that All Increased Electricity from Coal Is Perfectly Offset by Decreased Electricity from Other Sources

The model used by the Forest Service assumes "fixed demand" such that "changes in aggregate electricity generation across energy sources are assumed to be zero."[79] This assumption defies basic economic principles, which would predict that increases in supply will decrease price and so increase consumption. To the extent that additional electricity generated from additional coal mined as a result of this rule is not, in reality, perfectly offset by decreased demand for electricity from natural gas and other sources, the net greenhouse gas emissions of the proposed action are likely higher than the Forest Service estimates.

## VI. The Forest Service Must Reconsider Whether the Benefits of this Deregulatory Action Justify the Significant Social Costs, under Executive Order 12,866 and NEPA

In the *Federal Register* notice to reinstate this exception to the Colorado Roadless Rule, the Forest Service concludes that "USDA consulted with the Office of Management and Budget and determined this proposed rule does not meet the criteria for a significant regulatory action under Executive Order 12,866."[80] That determination is questionable, but it also does not excuse the Forest Service from the responsibility of explaining why the benefits of this deregulatory action justify its significant social costs. According to the agency's own statements, the rule might not be justified.

This exception to the Roadless Rule qualifies as a significant regulatory action under Executive Order 12,866. By its own terms, the Roadless Rule exception is a "notice of proposed rulemaking,"[81]

---

[78] IPCC Working Group I, Fifth Assessment Report, Climate Change 2013: The Physical Science Basis, Chapter 8: Anthropogenic and Natural Radiative Forcing (2014) at 633, 711-712, 714 (Table 8.7), available at https://www.ipcc.ch/pdf/assessment-report/ar5/wg1/WG1AR5_Chapter08_FINAL.pdf (see the adjustment identified in note B for fossil methane).

[79] SDEIS at 96, n.3.

[80] 80 Fed. Reg. at 72,668.

[81] 80 Fed. Reg. at 72,665.

and so clearly meets the definition of a "regulatory action" under Executive Order 12,866.[82] A "significant" regulatory action includes actions "likely to result in . . . an annual effect on the economy of $100 million or more or adversely effect in a material way . . . the environment."[83] The monetary threshold considers both a rule's gross costs and benefits, whether costs result from compliance with new regulation or are social costs of deregulation.[84] With up to $13.7 billion in total discounted social costs and up to $2.4 billion in total discounted benefits, as well as considerable unquantified social costs and $639 million annually in alleged distributional effects,[85] the rule very well might surpass the monetary threshold for "significance." And with the additional generation of up to 131 million tons of carbon dioxide emissions, plus additional methane emissions with a combined global warming potential equivalent to 26 million tons of carbon dioxide,[86] the rule is responsible for generating as much greenhouse gas emissions as EPA's proposed methane standards for the oil and gas industry (a "significant" rule) will mitigate over a 20-year period (at 7.7 million tons of carbon dioxide equivalents per year).[87] This deregulatory action's adverse effects on the environment certainly should qualify it as "significant."

Ultimately, it is up to individual agencies and OIRA/OMB to determine a rule's significance and whether it is subject to the Executive Order's requirements for a formal cost-benefit analysis. But most of the Executive Order applies to all regulations, not just significant ones. In particular, for all regulations, the Executive Order mandates that "Each agency shall assess both the costs and the benefits of the intended regulation and, recognizing that some costs and benefits are difficult to quantify, propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs."[88]

When focusing on the global perspective (the only defensible perspective) and throwing out the 10th percentile Social Cost of Carbon estimate (an indefensible value), the present net monetized value of either alternative action will be negative under all scenarios—all the more true when significant, currently unmonetized costs, such as from methane emissions, are also subtracted from the sum.[89] The Forest Service acknowledges that, from the global perspective, "no-action might be the preferred alternative."[90] Furthermore, in its sensitivity analysis, the Forest Service found that when monetizing methane on the basis of carbon dioxide-equivalent values, even the present net value of the national and forest-only analyses are negative or close to $0.[91] Given the agency's own calculations, the Forest Service may be hard pressed to explain why the private benefits of this deregulatory action justify the substantial social costs, under the principles of Executive Order 12,866.

Similarly, the aim of NEPA is to inform the decision whether to proceed with an action and to help decisionmakers identify steps to mitigate adverse effects. CEQ instructs that "agencies should consider reasonable mitigation measures and alternatives," and specifically lists carbon capture

[82] Exec. Order No. 12,866 § 3(d), 58 Fed. Reg. 51735 (Sept. 30, 1993).

[83] *Id.* § 3(f).

[84] Policy Integrity, *Fixing Regulatory Review* 16 (2008), http://policyintegrity.org/files/publications/FixingRegulatoryReview.pdf.

[85] SDEIS at table 3-21, table 3-17.

[86] SDEIS at table 3-20 (total net change in methane emissions for the B-average scenario). Using the 20-year global warming potential values for methane, rather than the 100-year values, methane emissions would be 77 million.

[87] EPA, *Proposed Climate, Air Quality, and Permitting Rules for the Oil and Natural Gas Industry: Fact Sheet*, http://www3.epa.gov/airquality/oilandgas/pdfs/og_fs_081815.pdf.

[88] Exec. Order No. 12,866 § 1(b)(6).

[89] *See* SDEIS at table 3-22 (focusing on global boundary's central and lower estimates of net present value).

[90] *Id.* at 100.

[91] *Id.* at E-25.

and beneficial use of fugitive methane as potential measures.[92] Given that the deregulatory action's social costs outweigh its benefits, and given that the Forest Service has declined to study potential mitigation measures such as methane capture and carbon offsets,[93] the Forest Service should reconsider whether it has fulfilled its mandate under NEPA.

## VII. The Social Cost of Carbon and Social Cost of Methane, While Appropriate for Current Use, Should Be Refined through Ongoing Updates

The Environmental Defense Fund, the Institute for Policy Integrity at New York University School of Law, the Natural Resources Defense Council, and the Union of Concerned Scientist have previously submitted joint comments to multiple agencies on the use of the Social Cost of Carbon and Methane. Those comments affirm that the values are sufficiently robust and accurate to continue to be the basis for regulatory analysis going forward. Yet as economic and scientific research continues to develop in the future, the values should be revised, and our comments offer recommendations for that future revision. Those recommendations (from a previous set of comments submitted to EPA) have been appended to this set of comments to the Forest Service.


Sincerely,

Rachel Cleetus, Ph.D., Senior Climate Economist, Union of Concerned Scientists

Frank J. Convery, Ph.D., Chief Economist, Environmental Defense Fund

Jayni Hein, Policy Director, Institute for Policy Integrity, NYU School of Law*

Peter H. Howard, Ph.D., Economic Director, Institute for Policy Integrity, NYU School of Law*

Benjamin Longstreth, Senior Attorney, Natural Resources Defense Council

Nathaniel O. Keohane, Ph.D., Vice President, International Climate, Environmental Defense Fund

Richard L. Revesz, Director, Institute for Policy Integrity, NYU School of Law*

Jason A. Schwartz, Legal Director, Institute for Policy Integrity, NYU School of Law*

Thomas Sterner, Ph.D., Senior Contributing Economist, Environmental Defense Fund

Gernot Wagner, Ph.D., Lead Senior Economist, Environmental Defense Fund

Peter Zalzal, Senior Attorney and Director of Special Projects, Environmental Defense Fund


* No part of this document purports to present New York University School of Law's views, if any.

---

[92] CEQ, *Draft Guidance for Greenhouse Gas Emissions, supra* note 2, at 20.
[93] SDEIS at 9.

Appendix: Joint Comments on the Social Cost of Carbon and Social Cost of Methane, including Recommendations for Refinement, Submitted Previously to EPA

December 4, 2015

Environmental Protection Agency

**Attn:**  Docket ID No. EPA-HQ-OAR-2010-0505,
        Oil and Natural Gas Sector: Emission Standards for New and Modified Sources

**Comments submitted by:** Environmental Defense Fund, Institute for Policy Integrity at New York University School of Law, Natural Resources Defense Council, and Union of Concerned Scientists.

Our organizations respectfully submit these comments regarding EPA's valuation of the benefits of its performance standards the oil and gas sector—specifically, the use of the Social Cost of Methane methodology developed by Marten et al.  Our organizations may separately and independently submit other comments regarding the proposed standards themselves.

We strongly affirm that the Social Cost of Methane approach is methodologically sound and should be applied to value methane emissions. As demonstrated below, if anything, current values are significant underestimates the Social Cost of Methane.

Our comments are summarized in six sections. Because the Social Cost of Methane methodology draws on and is similar to the Interagency Working Group's development of the Social Cost of Carbon (SCC) values, we begin by affirming that the SCC estimates are sufficiently robust and accurate to continue to be the basis for regulatory analysis going forward. As economic and scientific research continues to develop in the future, the values should be revised, and we offer recommendations for that future revision. Then we move to support and recommend refinements specific to the Social Cost of Methane. Finally, we close with recommendations for the use of these values in regulatory impact analyses.

1. Introduction: The SCC is an important policy tool.

2. The Interagency Working Group's (IWG) analytic process was science-based, open, and transparent.

3. The SCC is an important and accepted tool for regulatory policy-making, based on well-established law and fundamental economics.

4. Recommendations on further refinements to the SCC.

5. Support for the Social Cost of Methane methodology, and recommendations on refinements.

6. Conclusion: Recommendations on the use of the SCC and Social Cost of Methane in regulatory impact analyses.

## 1.  Introduction: The SCC is an important policy tool.

The SCC estimates the economic cost of climate impacts—specifically the additional economic harm caused by one additional metric ton of carbon dioxide ($CO_2$) emissions. SCC calculations are important for evaluating the costs of activities that produce greenhouse gas emissions and contribute to climate change, such as burning fossil fuels to produce energy. The SCC is also important for evaluating the benefits of policies that would reduce the amount of those emissions going into the atmosphere. For example, in order to properly evaluate standards that reduce the use of carbon-intensive energy, improve energy efficiency, or lead to the capture and beneficial use of greenhouse gases—like the proposed rule—it is important to understand the benefits they will provide, including the benefit of reducing carbon pollution and the harm it causes.

As with all economic impact analyses, the exercise can only provide a partial accounting of the costs of climate change (those most easily monetized) and inevitably involves incorporating elements of uncertainty. However, accounting for the economic harms caused by climate change is a critical component of sound benefit-cost analyses of regulations that directly or indirectly limit greenhouse gases. This endeavor is important because benefit-cost analysis is a central tool of regulatory policy in the United States, first institutionalized in a 1981 executive order by President Ronald Reagan. The executive order currently in effect provides that agencies:

- "[P]ropose or adopt a regulation only upon a reasoned determination that its benefits justify its costs (recognizing that some benefits and costs are difficult to quantify); . . .

- "[S]elect, in choosing among alternative regulatory approaches, those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity); . . .

- "In applying these principles, each agency is directed to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible. Where appropriate and permitted by law, each agency may consider (and discuss qualitatively) values that are difficult or impossible to quantify, including equity, human dignity, fairness, and distributive impacts."[94]

Benefit-cost analysis has long been a staple of agency rulemakings, usually conducted as part of the regulatory impact analysis associated with proposed rules. Even though the analysis is generally not able to encompass all of the effects of a policy, and it is challenging to translate impacts on health, mortality, and welfare into dollar values, benefit-cost analysis is an important economic tool to help inform decision-makers about the societal benefits of different policy choices. Of course, benefit-cost analysis cannot be the sole criterion for making regulatory decisions, especially in cases where there are overriding public health, equity, or safety imperatives.[95] And in a few instances, legal protections prohibit the consideration of benefit-cost analysis.

Without an SCC estimate, regulators would by default be using a value of zero for the benefits of reducing carbon pollution, implying that carbon pollution has no costs. That, sadly, is not the case, as evidenced by the large body of research outlining the sobering health, environmental, and economic impacts of rising temperatures, extreme weather, intensifying smog, and other climate impacts. If anything, most evidence points to the fact that current numbers significantly underestimate the SCC. It would be arbitrary for a federal agency to weigh the societal benefits and costs of a rule with significant carbon pollution effects but to assign no value at all to the considerable benefits of reducing carbon pollution.[96]

## 2.  The IWG's analytic process was science-based, open, and transparent.

To facilitate accounting for the costs of climate impacts and the benefits of reducing carbon pollution in regulatory proceedings undertaken by different agencies, the United States government

---

[94] Exec. Order No. 13,563 §§ 1(b)-(c), 76 Fed. Reg. 3,821 (Jan. 18, 2011); *see also infra* on how this and subsequent orders, including Exec. Order No. 13,609, inform the use of a global SCC value.

[95] President Clinton issued Executive Order 12,866 in 1993, establishing new guidance for benefit-cost analysis and explicitly directing agencies to consider, in addition to costs and benefits for which quantitative estimates are possible, "qualitative measures of costs and benefits that are difficult to quantify, but nevertheless essential to consider." Exec. Order No. 12,866 § 1(a), 58 Fed. Reg. 51,735 (Sept. 30, 1993).

[96] Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin., 538 F.3d 1172, 1199 (9th Cir. 2008) (holding unlawful NHTSA's fuel economy standards for passenger vehicles when NHTSA ascribed a value of "zero" to the benefits of mitigating carbon dioxide, reasoning that "NHTSA assigned no value to *the most significant benefit* of more stringent CAFE standards: reduction in carbon emissions" (emphasis added)).

assembled an Interagency Working Group (IWG) to develop an estimate of a social cost of carbon that can be utilized in rulemakings and other pertinent settings across the federal government.[97] The IWG's estimates—first released in 2010 and updated in 2013 and 2015—have been used in numerous benefit-cost analyses related to federal rulemakings.[98] The IWG recently released an updated set of SCC estimates, centered at approximately $40 per metric ton of $CO_2$ for emissions in the year 2015, in 2015 dollars at a 3% discount rate.[99] The 2015 SCC estimates are higher than those from 2010, reflecting the growing understanding of the costs that climate impacts will impose on society.

The increase in the SCC estimate is important because it reflects the growing scientific and economic research on the risks and costs of climate change, but is still very likely an underestimate of the economic cost of carbon emissions. The increase also reflects the costs of climate change that we are already experiencing, such as those associated with sea level rise and rising temperatures. Climate change is making coastal flooding, drought, and impacts from extreme weather worse. A rapidly increasing body of evidence has linked ever more recent events directly to climate change.[100]

---

[97] The IWG involved a large number of agencies, including the Council of Economic Advisers, Council on Environmental Quality, Department of Agriculture, Department of Commerce, Department of Transportation, Environmental Protection Agency, National Economic Council, Office of Energy and Climate Change, Office of Management and Budget, Office of Science and Technology Policy, and the Department of the Treasury. *See* INTERAGENCY WORKING GROUP ON THE SOCIAL COST OF CARBON, TECHNICAL SUPPORT DOCUMENT: SOCIAL COST OF CARBON FOR REGULATORY IMPACT ANALYSIS UNDER EXECUTIVE ORDER 12,866 (2010) [hereinafter "2010 TSD"], *available at* http://www.whitehouse.gov/sites/default/files/omb/inforeg/for-agencies/Social-Cost-of-Carbon-for-RIA.pdf.

[98] The SCC has been used in numerous notice-and-comment rulemakings by various agencies since it was published in 2010, and each of these occasions has provided opportunity for public comment on the SCC. *See, e.g.*, Energy Conservation Program: Energy Conservation Standards for Residential Clothes Washers, 77 Fed. Reg. 32,381 (May 31, 2012); Energy Conservation Program: Energy Conservation Standards for Residential Dishwashers, 77 Fed. Reg. 31,964 (May 30, 2012); Energy Conservation Program: Energy Conservation for Battery Chargers and External Power Supplies, 77 Fed. Reg. 18,478 (Mar. 27, 2012); Energy Conservation Program: Energy Conservation Standards for Standby Mode and Off Mode for Microwave Ovens, 77 Fed. Reg. 8526 (Feb. 14, 2012); Energy Conservation Program: Energy Conservation Standards for Distribution Transformers, 77 Fed. Reg. 7282 (Feb. 10, 2012); Energy Conservation Program for Certain Industrial Equipment: Energy Conservation Standards and Test Procedures for Commercial Heating, Air-Conditioning, and Water-Heating Equipment, 77 Fed. Reg. 2356 (Jan. 17, 2012); 2017 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions and Corporate Average Fuel Economy Standards, 76 Fed. Reg. 74,854 (Dec. 1, 2011); Oil and Natural Gas Sector: New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants Reviews, 76 Fed. Reg. 52,738 (Aug. 23, 2011); Energy Conservation Program: Energy Conservation Standards for Residential Furnaces and Residential Central Air Conditioners and Heat Pumps, 76 Fed. Reg. 37,549 (June 27, 2011); Energy Conservation Program: Energy Conservation Standards for Residential Clothes Dryers and Room Air Conditioners, 76 Fed. Reg. 22,324 (Apr. 21, 2011); Energy Conservation Program: Energy Conservation Standards for Fluorescent Lamp Ballasts, 76 Fed. Reg. 20,090 (Apr. 11, 2011); National Emission Standards for Hazardous Air Pollutants: Mercury Emissions from Mercury Cell Chlor-Alkali Plants, 76 Fed. Reg. 13,852 (Mar. 14, 2011); Greenhouse Gas Emissions Standards and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles, 75 Fed. Reg. 74,152 (Nov. 30, 2010); Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Sewage Sludge Incineration Units, 75 Fed. Reg. 63,260 (Oct. 14, 2010); Energy Conservation Program: Energy Conservation Standards for Residential Refrigerators, Refrigerator-Freezers, and Freezers, 75 Fed. Reg. 59,470 (Sept. 27, 2010); Federal Implementation Plans to Reduce Interstate Transport of Fine Particulate Matter and Ozone, 75 Fed. Reg. 45,210 (Aug. 2, 2010). The undersigned organizations have provided comment on the SCC in a number of these proceedings.

[99] INTERAGENCY WORKING GROUP ON THE SOCIAL COST OF CARBON, TECHNICAL SUPPORT DOCUMENT: TECHNICAL UPDATE OF THE SOCIAL COST OF CARBON FOR REGULATORY IMPACT ANALYSIS UNDER EXECUTIVE ORDER 12,866 (2015); *see also* INTERAGENCY WORKING GROUP ON THE SOCIAL COST OF CARBON, TECHNICAL SUPPORT DOCUMENT: TECHNICAL UPDATE OF THE SOCIAL COST OF CARBON FOR REGULATORY IMPACT ANALYSIS UNDER EXECUTIVE ORDER 12,866 (2013) [hereinafter "2013 TSD"], *available at* http://www.whitehouse.gov/sites/default/files/omb/assets/inforeg/technical-update-social-cost-of-carbon-for-regulator-impact-analysis.pdf.

[100] *See generally* Thomas C. Peterson et al. eds., *Explaining Extreme Events of 2012 from a Climate Perspective*, 94 BULL. AMER. METEOR. SOC. s1-74 (2013), and IPCC, *Special Report: Managing the Risks of Extreme Events and Disasters to Advance Climate Change Adaptation* (2012). On the scientific research connecting weather and other climate-related events to

The analytic work of the IWG has been transparent. The 2010 Technical Support Document (TSD) set out in detail the IWG's decision-making process with respect to how it assessed and employed the models.[101] Furthermore, the Government Accountability Office (GAO) found that "the working group's processes and methods reflected the following three principles: *Used consensus-based decision making, Relied on existing academic literature and models, and Took steps to disclose limitations and incorporate new information."*[102]

Because the 2013 IWG made no changes to the input assumptions and procedures for deriving its SCC estimates, the 2013 TSD discussed only how the three Integrated Assessment Models (IAMs) used in the analysis were updated in the academic literature over the three-year interim period by the independent researchers who have developed these models. The 2013 TSD also established that the increase in the SCC estimate from 2010 to 2013 resulted solely from updates to the three underlying IAMs.[103]

The 2015 TSD update provided detailed responses[104] to public comments collected through an opportunity for public participation initiated by the Office of Management and Budget (OMB).[105] Additionally, the comment period on these proposed standards are yet another opportunity for continued dialogue about areas requiring further study. Such repeated comment processes and updates demonstrate that the IWG's SCC estimates were developed—and are being used—transparently. Given the strong grounding in the best science available, nothing should prevent the current, continued use of this well-established estimate. As economic and scientific research continues to develop, future revisions will be able to further refine existing estimates based on the latest peer-reviewed literature and the latest updates to the quality of the overall modeling exercise.

### 3. The SCC is an important and accepted tool for regulatory policy-making based on well-established law and fundamental economics.

The legal and analytic basis for using the SCC is clear and well established. ***As a matter of law and economics, uncertainty in benefits estimates does not mean they should be excluded from regulatory impact analyses***. No benefit or cost estimates are certain. Further, the courts have explicitly rejected the argument that uncertainty in assessing the costs of climate impacts provided a basis for ignoring them in assessing the benefits and costs of regulations, and executive orders dating back as far as the Reagan administration have all issued guidelines specifying explicit consideration of benefits even if the precise size of the benefit is uncertain.

In 2008, the U.S. Court of Appeals for the Ninth Circuit determined that agencies could not assign a zero dollar value to the social costs of the impacts of climate change. It determined that *failing* to count SCC benefits would be illegal. In this case, the National Highway Traffic Safety Administration (NHTSA) had decided not to count any avoided climate damages in issuing fuel economy standards. The court concluded: "NHTSA's reasoning is arbitrary and capricious for several reasons. First

---

climate change, see Peter A. Stott et al., "Attribution of Weather and Climate-Related Events." In *Climate Science for Serving Society*, edited by Ghassem R. Asrar and James W. Hurrell. Netherlands: Springer s307-37 (2013).

[101] *See generally* 2010 TSD, *supra* note 97.

[102] GAO, REGULATORY IMPACT ANALYSIS: Development of Social Cost of Carbon Estimates, GAO-14-663 (2014).

[103] The 2010 and 2013 IWGs did very little to adjust the three IAMs. The main adjustment by IWG was to DICE to ensure that the IAM had an exogenous growth path that matched FUND and PAGE for the purposes of modeling various socio-economic and emission scenarios. *Id.* at 24.

[104] OMB & Interagency Working Group, Response to Comments on Social Cost of Carbon (July 2015).

[105] OMB, Notice of Availability and Request for Comments, Technical Support Documents: Social Cost of Carbon for Regulatory Impact Analysis, 78 Fed. Reg. 70,586 (Nov. 26, 2013).

while the record shows that there is a ***range of values***, the value of carbon emission reductions is certainly ***not zero*** (emphasis added)."[106]

Like the Court of Appeals, executive orders dating back to 1981 have also required agencies to assess benefits and costs even when significant uncertainty exists. Every president since (and including) Ronald Reagan has issued directives requiring that agencies conduct cost-benefit analyses of proposed regulations where permitted by statute.[107] Specifically, agencies are directed to "take into account benefits and costs, both quantitative and qualitative . . . and use the ***best available techniques*** to quantify anticipated present and future benefits and costs as accurately as possible."[108] The IWG's use of Integrated Assessment Models (IAMs) reflects the best available, peer-reviewed science to tally the benefits and costs of specific regulations with impacts on carbon dioxide emissions. While we address ways for improvement in the next section, current IAMs include benefits and costs that have been quantified to date.

The bottom line is that the IWG has properly and lawfully used the best available techniques to quantify the benefits of carbon emission reductions, basing its analysis on the peer-reviewed literature. When agencies use the IWG's estimates of the SCC to calculate the benefits of a rulemaking, they have taken, and will continue to take, comment on the SCC and the process used to derive that value. That is what the law—and good policy—requires.

***The IWG Correctly Used a Global SCC Value.***

To design the economically efficient policies necessary to forestall severe and potentially catastrophic climate change, all countries must use a global SCC value. Given that the United States and many other significant players in the international climate negotiations have already applied a global SCC framework in evaluating their own climate policies, the continued use of the global value in U.S. regulatory decisions may be strategically important as the United States seeks to set an example for other countries, harmonize regulatory systems, and take the lead in ongoing international negotiations. Binding legal obligations, basic ethical responsibilities, and practical considerations further counsel in favor of the United States using a global SCC value.

To avoid a global "tragedy of the commons" and an economically inefficient degradation of the world's climate resources, all countries should set policy according to a global SCC value. The climate and clean air are global common resources, meaning they are free and available to all countries, but any one country's use—i.e., pollution—imposes harms on the polluting country as well as the rest of the world. Because greenhouse gases do not stay within geographic borders but rather mix in the atmosphere and affect climate worldwide, each ton of carbon pollution emitted by the United States not only creates domestic harms, but also imposes additional and large externalities on the rest of the world, including disproportionate harms to some of the least-developed nations. Conversely, each ton of carbon pollution abated in another country will benefit the United States along with the rest of the world.

If all countries set their greenhouse gas emission levels based on only their domestic costs and benefits, ignoring the large global externalities, the collective result would be substantially sub-optimal climate protections and significantly increased risks of severe harms to all nations, including to the United States. "[E]ach pursuing [only its] own best interest . . . in a commons brings

[106] Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin., 538 F.3d 1172, 1200 (9th Cir. 2008) (emphases added).

[107] Stuart Shapiro, *The Evolution of Cost-Benefit Analysis in U.S. Regulatory Decisionmaking*, *in* HANDBOOK ON THE POLITICS OF REGULATION 385-392 (David Levi-Faur ed., 2011).

[108] Exec. Order No. 13,563 §§ 1(a)-(c), 76 Fed. Reg. 3,821 (Jan. 18, 2011) (emphasis added).

ruin to all."[109] By contrast, a global SCC value would require each country to account for the full damages of its greenhouse gas pollution and so to collectively select the efficient level of worldwide emissions reductions needed to secure the planet's common climate resources.

Thus, well-established economic principles demonstrate that the United States stands to benefit greatly if all countries apply a global SCC value in their regulatory decisions. A rational tactical option in the effort to secure that economically efficient outcome is for the United States to continue using a global SCC value itself. The United States is engaged in a repeated strategic game of international negotiations and regulatory coordination, in which several significant players—including the United States—have already adopted a global SCC framework.[110] For the United States to now depart from this implicit collaborative dynamic by reverting to a domestic-only SCC estimate could undermine the country's long-term interests in future climate negotiations and could jeopardize emissions reductions underway in other countries, which are already benefiting the United States.[111] A domestic-only SCC value could be construed as a signal that the United States does not recognize or care about the effects of its policy choices on other countries, and signal that it would be acceptable for other countries to ignore the harms they cause the United States. Further, a sudden about-face could undermine the United States' credibility in negotiations. The United States has recently reasserted its desire to take a lead in both bilateral and international climate negotiations.[112] To set an example for the rest of the world, to advance its own long-term climate interests, and to secure greater cooperation toward reducing global emissions, strategic factors support the continued use a global SCC value in U.S. regulatory decisions.

Though the Constitution balances the delegation of foreign affairs power between the executive and legislative branches, "[t]he key to presidential leadership is the negotiation function. Everyone agrees that the President has the exclusive power of official communication with foreign governments."[113] The development and analysis of U.S. climate regulations are essential parts of the dialogue between the United States and foreign countries about climate change. Using a global SCC value communicates a strong signal that the United States wishes to engage in reciprocal actions to mitigate the global threat of climate change. The President is responsible for developing and executing the negotiation strategy to achieve the United States' long-term climate interests. Currently, the President has instructed federal agencies to use a global SCC value as one important step that encourages other countries to take reciprocal actions that also account for global externalities. The President's constitutional powers to negotiate international agreements would be seriously impaired if federal agencies were forced to stop relying on a global SCC value.[114]

In fact, the United States has already begun to harmonize with other countries its policies on climate change and on the valuation of regulatory benefits. The recent U.S.-China agreement is but the latest example. For instance, the United States has entered into a joint Regulatory Cooperation

---

[109] Garrett Hardin, *The Tragedy of the Commons*, 162 SCIENCE 1243 (1968).

[110] *See infra* notes 68 and 125 to 128, and accompanying text, detailing use of a global SCC value by Canada, Mexico, the United Kingdom, France, Germany, and Norway.

[111] *See* ROBERT AXELROD, THE EVOLUTION OF COOPERATION 10-11 (1984) (on repeated prisoner's dilemma games).

[112] EXEC. OFFICE OF THE PRES., THE PRESIDENT'S CLIMATE ACTION PLAN 17-21 (2013).

[113] Phillip R. Trimble, *The President's Foreign Affairs Power*, 83 AM. J. OF INTL. L. 750, 755 (1989).

[114] *See* David Remnick, *The Obama Tapes*, NEW YORKER, Jan. 23, 2014, *available at* http://www.newyorker.com/online/blogs/newsdesk/2014/01/the-obama-tapes.html (quoting interview with President Obama: "[M]y goal has been to make sure that the United States can genuinely assert leadership in this issue internationally, that we are considered part of the solution rather than part of the problem. And if we are at the table in that conversation with some credibility, then it gives us the opportunity to challenge and engage the Chinese and the Indians, as long as we take into account the fact that they've still got, between the two of them, over a billion people in dire poverty. . . . This is why I'm putting a big priority on our carbon action plan here. It's not because I'm ignorant of the fact that these emerging countries are going to be a bigger problem than us. It's because it's very hard for me to get in that conversation if we're making no effort.").

Council with Canada, which has adopted a work plan that commits the two countries to synchronizing "aggressive" greenhouse gas reductions, especially in the transportation sector.[115] A separate Regulatory Cooperation Council with Mexico calls generally for improving and harmonizing policy "by strengthening the analytic basis of regulations,"[116] and its work plan acknowledges the transboundary nature of environmental risks.[117] Mexico and Canada have both adopted greenhouse gas standards for vehicles that harmonize with the U.S. standards[118] and that calculate benefits according to a global SCC value.[119] Canada has also used the IWG's global SCC value in developing carbon dioxide standards for its coal-fired power plants, estimating $5.6 billion (Canadian dollars) worth of global climate benefits.[120] The direct U.S. share of the net benefits from that Canadian regulation will likely total in the hundreds of millions of dollars.[121]

Further efforts at regulatory harmonization are currently underway. For example, the United States is now negotiating a Transatlantic Trade and Investment Partnership with the European Union, and a key element is regulatory coordination.[122] The European Union has already adopted an Emissions Trading Scheme (ETS) to cap its greenhouse gas emissions, and its Aviation Directive is just one of the climate policies that could be shaped by these negotiations.[123] The European Commission has indicated its willingness to further reduce its ETS cap if other major emitters make proportional commitments[124]—a result that will only occur if countries consider more than their own domestic costs and benefits from reducing greenhouse gas emissions. Moreover, several individual European

---

[115] UNITED STATES-CANADA REGULATORY COOPERATION COUNCIL, JOINT ACTION PLAN, at 16 (2011), *available at* http://www.whitehouse.gov/sites/default/files/omb/oira/irc/us-canada_rcc_joint_action_plan.pdf.

[116] UNITED STATES-MEXICO HIGH-LEVEL REGULATORY COOPERATION COUNCIL, WORK PLAN at 3 (2012), *available at* http://www.whitehouse.gov/sites/default/files/omb/oira/irc/united-states-mexico-high-level-regulatory-cooperation-council-work-plan.pdf.

[117] *Id.* at 11 (noting that oil drilling activities in the Gulf of Mexico conducted by either country "present risks for both countries, and both countries would benefit from a common set of drilling standards").

[118] *See* INT'L COUNCIL ON CLEAN TRANSP., MEXICO LIGHT-DUTY VEHICLE $CO_2$ AND FUEL ECONOMY STANDARDS 4 (Policy Update, July 2013), *available at* http://www.theicct.org/sites/default/files/publications/ICCTupdate_Mexico_LDVstandards_july2013.pdf (noting that Mexico's standards were based on the U.S. and Canadian standards).

[119] *See* Heavy-Duty Vehicle and Engine Greenhouse Gas Emission Regulations, SOR/2013-24, 147 Can. Gazette pt. II, 450, 544 (Can.), *available at* http://canadagazette.gc.ca/rp-pr/p2/2013/2013-03-13/html/sor-dors24-eng.html ("The SCC is used in the modelling of the cost-benefit analysis . . . . It represents an estimate of the economic value of avoided climate change damages *at the global level*. . . . The values used by Environment Canada are based on the extensive work of the U.S. Interagency Working Group on the Social Cost of Carbon.") (emphasis added); Instituto Nacional de Ecología, Mexico, Regulatory Impact Analysis on *PROY-NOM-163- SEMARNAT-ENER-SCFI-2012, Emisiones de bióxido de carbono ($CO_2$) provenientes del escape y su equivalencia en términos de rendimiento de combustible, aplicable a vehículos automotores nuevos de peso bruto vehicular de hasta 3857 kilogramos* (July 5, 2012), *available at* http://207.248.177.30/mir/formatos/defaultView.aspx?SubmitID=273026 ("[S]e obtienen beneficios ambientales por la reducción del consumo de combustible, los cuales se reflejan en beneficios a la salud de la población en el caso de contaminantes criterio, y en *beneficios globales para las emisiones evitadas de $CO_2$*.") (emphasis added).

[120] Reduction of Carbon Dioxide Emissions from Coal-Fired Generation of Electricity Regulations, SOR/2012-167, 146 Can. Gazette pt. II, 1951, 2000, 2044 (Can.), *available at* http://www.gazette.gc.ca/rp-pr/p2/2012/2012-09-12/html/sor-dors167-eng.html.

[121] $5.6 billion in Canadian dollars is worth $5.0 billion in U.S. dollars (using February 2014 conversion rates). Seven to twenty-three percent of $5 billion is between $350 million and $1.15 billion. *See* 2010 TSD, *supra* note 97, at 11 (provisionally calculating the direct U.S. share of a global SCC value at between 7-23%, though ultimately recommending "that using the global (rather than domestic) value . . . is the appropriate approach," for reasons consistent with these comments).

[122] *See* EUR. COMM'N, TRANSATLANTIC TRADE AND INVESTMENT PARTNERSHIP: THE REGULATORY PART (2013).

[123] *See* SIERRA CLUB, THE TRANSATLANTIC FREE TRADE AGREEMENT: WHAT'S AT STAKE FOR COMMUNITIES AND THE ENVIRONMENT at 9-10 (2013).

[124] Eur. Comm'n, Working with International Partners, http://www.e.europa.eu/clima/policies/international ("The EU is offering to step up its 2020 reduction targets to 30% if other major economies commit.").

nations—including the United Kingdom,[125] France,[126] Germany,[127] and Norway[128]—have adopted a global SCC value for use in their regulatory analyses. Some other European countries, such as Sweden, have adopted carbon taxes that implicitly operate as a high SCC that accounts for global externalities.[129]

As further evidence of how the United States' use of a global SCC value is already influencing other international actors to follow suit, the International Monetary Fund (IMF) applies in its policy reviews an SCC estimate based on the IWG number.[130] Given the potential influence of the IMF on the environmental policies of developing countries,[131] the pull that the IWG's global estimate has at the IMF could be very advantageous to the United States, by motivating industrializing countries to use similar numbers in the future.

In addition to this compelling strategic argument—namely, that it is rational for the United States and other countries to continue their reciprocal use of a global SCC value to achieve the economically efficient outcome on climate change (and avoid catastrophic climate impacts)—legal obligations further prescribe using a global SCC value. A basic ethical responsibility to prevent transboundary environmental harms has been enshrined in customary international law.[132] For the United States to knowingly set pollution levels in light of only domestic harms, willfully ignoring that its pollution directly imposes environmental risks—including catastrophic risks—on other countries, would violate norms of comity among countries. The United States would be knowingly causing foreseeable harm to other countries, without compensation or just cause. Given that the nations most at risk from climate change are often the poorest countries in the world, such a policy would also violate basic and widely shared ethical beliefs about fairness and distributive justice.

---

[125] ECONOMICS GROUP, DEFRA, U.K., THE SOCIAL COST OF CARBON AND THE SHADOW PRICE OF CARBON: WHAT THEY ARE, AND HOW TO USE THEM IN ECONOMIC APPRAISAL IN THE UK 1 (2007); *see also* Ministry of Finance, Norway, Cost-Benefit Analysis: Carbon Price Paths, *available at* http://www.regjeringen.no/en/dep/fin/Documents-and-publications/official-norwegian-reports-/2012/nou-2012-16-2/10.html?id=713585 ("The United Kingdom has changed its method for the valuation of greenhouse gas emissions. Prior to 2009, the estimated global social cost of carbon was used, but one [sic] has now switched over to pricing in line with the necessary marginal cost of meeting long-term domestic emission reduction targets in conformity with the EU Climate and Energy Package.").

[126] *See* Balázs Égert, *France's Environmental Policies: Internalising Global and Local Externalities* 8-10 (OECD Economics Department Working Papers No. 859, 2011), *available at* http://dx.doi.org/10.1787/5kgdpn0n9d8v-en (discussing global impacts and France's history of calculating the SCC); Oskar Lecuyer & Philippe Quirion, funded by the European Union's Seventh Framework Programme, *Choosing Efficient Combinations of Policy Instruments for Low-Carbon Development and Innovation to Achieve Europe's 2050 Climate Targets—Country Report: France* at 8 (2013) (noting the prospects for a carbon tax in 2014-15, and explaining that "A 2009 stakeholder and expert group led by the 'Conseil d'analyse stratégique' (a public body in charge of expertise and stakeholder dialogue) set the optimal level of the carbon tax (the social cost of carbon) at € 32/tCO 2 in 2010, and rising to € 100 in 2030 and € 200 in 2050.").

[127] Testimony of Howard Shelanski, OIRA Admin., before the H. Comm. on Oversight & Gov't Reform's Subcomm. on Energy Policy, Healthcare, and Entitlements, July 18, 2013, at 3 (explaining that the global SCC value estimated by the IWG is consistent with values used by Germany and the United Kingdom).

[128] *See* Ministry of Finance, *supra* note 125 (explaining that, for projects not already covered by a binding emission limitation, the carbon price should "be based on the marginal social cost of carbon," meaning "the global cost of emitting one additional tonne of $CO_2e$"). Note that Norway has joined the E.U.'s trading scheme.

[129] Henrik Hammar, Thomas Sterner & S. Åkerfeldt, *Sweden's $CO_2$ Tax and Taxation Reform Experiences*, in REDUCING INEQUALITIES: A SUSTAINABLE DEVELOPMENT CHALLENGE (Genevey, R. et al. eds., 2013).

[130] *E.g.*, Benedict Clements et al., International Monetary Fund, *Energy Subsidy Reforms: Lessons and Implications* 9 (IMF Policy Paper, Jan. 28, 2013).

[131] *See* Natsu Taylor Saito, *Decolonization, Development, and Denial*, 6 FL. A & M U. L. REV. 1, 16 (2010) (quoting former IMF counsel as saying "today it is common to find these institutions [IMF and World Bank] requiring their borrowing member countries to accept and adhere to prescribed policies on environmental protection").

[132] *See* PHILIPPE SANDS, PRINCIPLES OF INTERNATIONAL ENVIRONMENTAL LAW 241 (2d ed. 2003) (noting that "the responsibility not to cause damage to the environment of other states or of areas beyond national jurisdiction has been accepted as an obligation by all states[;] . . . there can be no questions but that Principle 21 [of the Stockholm Declaration on the Human Environment] reflects a rule of customary international law").

Indeed, taking a global approach to measuring climate benefits is consistent with the ideals of transboundary responsibility and justice that the United States commits to in other foreign affairs.[133]

Binding international agreements also require consideration and mitigation of transboundary environmental harms. Notably, the United Nations Framework Convention on Climate Change—to which the United States is a party—declares that countries' "policies and measures to deal with climate change should be cost-effective so as to ensure *global benefits* at the lowest possible cost."[134] The Convention further commits parties to evaluating global climate effects in their policy decisions, by "employ[ing] appropriate methods, for example *impact assessments* . . . with a view to minimizing adverse effects on the economy, on public health and on the quality of the environment, of projects or measures undertaken by them to mitigate or adapt to climate change."[135] The unmistakable implication of the Convention is that parties—including the United States—must account for global economic, public health, and environmental effects in their impact assessments.

Similar obligations exist in domestic U.S. law as well. For example, the U.S. National Environmental Policy Act recognizes "the worldwide and long-range character of environmental problems"[136] and requires federal agencies to include reasonably foreseeable transboundary effects in their environmental impact statements.[137] While some individual statutes under which federal agencies will craft climate policies may be silent on the issue of considering extraterritorial benefits, arguably the most important statute for U.S. climate policy—the Clean Air Act—requires the control of air emissions that affect other countries and so encourages a global assessment of greenhouse gas effects. Specifically, Section 115 of the Clean Air Act directs EPA and the states to mitigate U.S. emissions that endanger foreign health and welfare.[138] The global perspective on climate costs and benefits required by that provision should inform all regulatory actions developed under the Clean Air Act, and may provide useful guidance under other statutes as well.[139]

---

[133] *See* Paul Baer & Ambuj Sagar, *Ethics, Rights and Responsibilities*, in CLIMATE CHANGE SCIENCE AND POLICY (Stephen Schneider et al., eds., 2009).

[134] United Nations Framework Convention on Climate Change, May 9, 1992, S. Treat Doc. No. 102-38, 1771 U.N.T.S. 107, Article 3(3) (emphasis added); *see also id.* at Article 3(1) ("The Parties should protect the climate system for the *benefit of present and future generations of humankind*, on the basis of *equity* and in accordance with their common but *differentiated responsibilities* and respective capabilities.") (emphasis added); *id.* at Article 4(2)(a) (committing developed countries to adopt policies that account for "the need for equitable and appropriate contributions by each of these Parties to the global effort").

[135] *Id.* at Article 4(1)(f) (emphasis added); *see also id.* at Article 3(2) (requiring parties to give "full consideration" to those developing countries "particularly vulnerable to the adverse effects of climate change"). *See also* North American Agreement on Environmental Cooperation (1993), 32 I.L.M. 1480, art. 10(7) (committing the United States to the development of principles for transboundary environmental impact assessments).

[136] 42 U.S.C. § 4332(2)(F).

[137] COUNCIL ON ENVIRONMENTAL QUALITY, GUIDANCE ON NEPA ANALYSIS FOR TRANSBOUNDARY IMPACTS (1997), *available at* http://www.gc.noaa.gov/documents/transguide.pdf; *see also* CEQ, DRAFT NEPA GUIDANCE ON CONSIDERATION OF THE EFFECTS OF CLIMATE CHANGE AND GREENHOUSE GAS EMISSIONS at 2 (2010), *available at* http://www.whitehouse.gov/sites/default/files/microsites/ceq/20100218-nepa-consideration-effects-ghg-draft-guidance.pdf (defining climate change as a "global problem"); *see also* Exec. Order No. 12,114, *Environmental Effects Abroad of Major Federal Actions*, 44 Fed. Reg. 1957 §§ 1-1, 2-1 (Jan. 4, 1979) (applying to "major Federal actions . . . having significant effects on the environment outside the geographical borders of the United States," and enabling agency officials "to be informed of pertinent environmental considerations and to take such considerations into account . . . in making decisions regarding such actions").

[138] 42 U.S.C. § 7415.

[139] For details on the applicability of Section 115, see Petition from the Institute for Policy Integrity, to EPA, for Rulemakings and Call for Information under Section 115, Title VI, Section 111, and Title II of the Clean Air Act to Regulate Greenhouse Gas Emissions (Feb. 19, 2013); *see also* Nathan Richardson, *EPA and Global Carbon: Unnecessary Risk*, COMMON RESOURCES, Feb. 28, 2013 (explaining how Section 115 authorizes use of a global SCC value when regulating under other Clean Air Act provisions).

Presidential orders on regulatory analysis also support use of a global SCC value. In 2012, President Obama issued Executive Order 13,609 on promoting international regulatory cooperation.[140] The Order built on his previous Executive Order 13,563, which in turn had affirmed its 1993 predecessor, Executive Order 12,866, in requiring benefit-cost analysis of significant federal regulations.[141] Though White House guidance published in 2003 on regulatory impact analysis under E.O. 12,866 assumed that most analyses would focus on domestic costs and benefits, it ultimately deferred to the discretion of regulatory agencies on whether to evaluate "effects beyond the borders of the United States."[142] More importantly, since the publication of that guidance, President Obama has issued his own supplemental orders on regulatory analysis, including E.O. 13,609, which clarified the importance of international cooperation to achieve U.S. regulatory goals. This 2012 order explicitly recognizes that significant regulations can have "significant international impacts,"[143] and it calls on federal agencies to work toward "best practices for international regulatory cooperation with respect to regulatory development."[144] By employing a global SCC value in U.S. regulatory development, and by encouraging other countries to follow that best practice and account for the significant international impacts of their own climate policies, federal agencies will advance the mission of this presidential order on regulatory harmonization.

Finally, two practical considerations counsel in favor of a global SCC value. First, unlike some other significant international environmental impacts, no methodological limitations block the quantitative estimation of a global SCC value. In recent regulatory impact analyses for major environmental rules, EPA has qualitatively considered important transnational impacts that could not be quantified. For example, in the Mercury and Air Toxics Standards, EPA concluded that a reduction of mercury emissions from U.S. power plants would generate health benefits for foreign consumers of fish, both from U.S. exports and from fish sourced in foreign countries. EPA did not quantify these foreign health benefits, however, due to complexities in the scientific modeling.[145] Similarly, in the analysis of the Cross-State Air Pollution Rule, EPA noted—though could not quantify—the "substantial health and environmental benefits that are likely to occur for Canadians" as U.S. states reduce their emissions of particulate matter and ozone—pollutants that can drift long distances across geographic borders.[146] Yet where foreign costs or benefits are important and

---

[140] 77 Fed. Reg. 26,413 (May 4, 2012).

[141] *Id.* § 1 (explaining the order intends to "promot[e] the goals of Executive Order 13563"); *see also* Exec. Order No. 13,563, *Improving Regulation and Regulatory Review*, § 1(b), 76 Fed. Reg. 3821 (Jan. 18, 2011) (reaffirming Exec. Order No. 12,866, 58 Fed. Reg. 51,741 (Sept. 30, 1993) and requiring benefit-cost analysis).

[142] OMB, CIRCULAR A-4, at 15 (2003). In sharp contrast to the Circular's ultimate deferral to agencies on the issue of considering transboundary efficiency effects, the Circular makes very clear that international transfers and distributional effects should be assessed as costs and benefits to the United States: "Benefit and cost estimates should reflect real resource use. Transfer payments are monetary payments from one group to another that do not affect total resources available to society. . . . However, transfers from the United States to other nations *should* be included as costs, and transfers from other nations to the United States as benefits, as long as the analysis is conducted from the United States perspective." *Id.* at 38 (emphasis original). In other words, even if federal agencies use a global SCC value to assess efficiency effects relating to their climate policies, that global valuation will not prevent the agencies from also counting international transfers or distributional effects that benefit the United States as benefits. *See* Comments from the Institute for Policy Integrity, to EPA, on Proposed Rulemaking to Establish Light-Duty Vehicle Greenhouse Gas Emission Standards, at 12-13 (Nov. 27, 2009) (explaining that, depending on the relevant statutory mandate, agencies may calculate a monopsony benefit to the United States even while using a global SCC value).

[143] 77 Fed. Reg. at 26,414, § 3(b).

[144] 77 Fed. Reg. at 26,413, § 2(a)(ii)(B) (defining the goals of the regulatory working group).

[145] EPA, REGULATORY IMPACT ANALYSIS FOR THE FINAL MERCURY AND AIR TOXICS STANDARDS at 65 (2011) ("Reductions in domestic fish tissue concentrations can also impact the health of foreign consumers . . . [and] reductions in U.S. power plant emissions will result in a lowering of the global burden of elemental mercury . . . .").

[146] Federal Implementation Plans to Reduce Interstate Transport of Fine Particulate Matter and Ozone, 75 Fed. Reg. 45,209, 45,351 (Aug. 2, 2010).

quantifiable, other federal agencies frequently include those calculations.[147] Given that sophisticated models already exist to quantify the global SCC, the global estimate is appropriate to use.

Second, a global SCC value is in the national interest because harms experienced by other countries could significantly impact the United States. Climate damages in one country could generate large spillover effects to which the United States is especially vulnerable. The mesh of the global economy is woven tightly, and disruptions in one place can have consequences around the world. As seen historically, economic disruptions in one country can cause financial crises that reverberate globally at a breakneck pace.[148] In a similar vein, national security analysts in government and academia increasingly emphasize that the geopolitical instability associated with climatic disruptions abroad poses a serious threat to the United States.[149] Due to its unique place among countries—both as the largest global economy with trade- and investment-dependent links throughout the world, and as a military superpower—the United States is particularly vulnerable to international spillover effects.

The 2010 TSD included a rigorous examination of global versus domestic SCC estimates.[150] Consistent with the above discussion, the 2010 IWG reached the conclusion to estimate a global SCC value, citing both the global impacts of climate change and the global action needed to mitigate climate change. The IWG restated these arguments in the 2013 TSD, and refers back explicitly to its discussion in the 2010 TSD.[151] EPA should continue using a global SCC estimate in its regulatory impact analyses.

### 4. Recommendations on further refinements to the SCC.[152]

The IWG process uses assumptions that accord with economic and scientific theory. Economic models, and the scientific analyses they draw from, are of course improving continuously. Future updates to the SCC should build on these and go further. As further refinements better account for climate change impacts not yet incorporated into the modeling, all indications are that the estimated benefits of curbing carbon pollution will rise substantially over current estimates.

***The IWG appropriately used consumption discount rates rather than returns on capital.***

With respect to the **discount rate**, the IWG conducted sensitivity analysis of the results to three constant consumption discount rates: 2.5%, 3%, and 5%; for each of the discount rates, the TSDs reported the various moments and percentiles[153] of the SCC estimates.

---

[147] *E.g.*, Unique Device Identification System, 78 Fed. Reg. 58,786 (Sept. 24, 2013) ("[I]n our final regulatory impact analysis we include an estimate of the costs to foreign labelers."); Standards for the Growing, Harvesting, Packing, and Holding of Produce for Human Consumption, 78 Fed. Reg. 3504 (Jan. 16, 2013) (including costs to foreign farms); U.S. Customs and Border Protection Regulatory Agenda, RIN 1651-AA96 Definition of Form I-94 to Include Electronic Format (2013) (preliminarily estimating net benefits to foreign travelers and carriers).

[148] Steven L. Schwarz, *Systemic Risk*, 97 GEO. L.J. 193, 249 (2008) (observing that financial collapse in one country is inevitably felt beyond that country's borders).

[149] *See, e.g.*, Department of Defense, Climate Change Adaptation Roadmap (2014); CNA Military Board, National Security and the Accelerating Risks of Climate Change (2014).

[150] 2010 TSD, *supra* note 97, at 10-11.

[151] 2013 TSD, *supra* note 99, at 14-15.

[152] The following section relies heavily on Richard L. Revesz et al., *Global Warming: Improve Economic Models of Climate Change*, 508 NATURE 173 (2014), on Gernot Wagner & Martin L. Weitzman, *Climate Shock*, Princeton University Press (2015), on Frank J. Convery & Gernot Wagner, *Reflections—Managing Uncertain Climates: Some Guidance for Policy Makers and Researchers* (forthcoming in REVIEW OF ENVIRONMENTAL ECONOMICS AND POLICY) as well as on several papers cited in footnotes throughout.

The discount rate is one of the most important inputs in models of climate damages, with plausible assumptions easily leading to differences of an order of magnitude in the SCC. The climate impacts of present emissions will unfold over hundreds of years. When used over very long periods of time, discounting penalizes future generations heavily due to compounding effects. For example, at a rate of 1%, $1 million 300 years hence equals over $50,000 today; at 5% it equals less than 50 cents.[154] The discount rate changed by a factor of five, whereas the discounted value changed by more than five orders of magnitude. Depending on the link between climate risk and economic growth risk, even a rate of 1% may be too high.[155] Uncertainty around the correct discount rate pushes the rate lower still.[156]

The IWG correctly excluded a 7% discount rate, a typical private sector rate of return on capital, for several reasons. First, typical financial decisions, such as how much to save in a bank account or invest in stocks, focus on private decisions and utilize private rates of return. Private market participants typically have short time horizons. However, here we are concerned with social discount rates because emissions mitigation is a public good, where individual emissions choices affect public well-being broadly. Rather than evaluating an optimal outcome from the narrow perspective of investors alone, economic theory would require that we make the optimal choices based on societal preferences (and social discount rates). Second, climate change is expected to affect primarily consumption, not traditional capital investments.[157] OMB guidelines note that in this circumstance, consumption discount rates are appropriate.[158] Third, 7% is considered much too high for reasons of discount rate uncertainty and intergenerational concerns (further discussed below).

---

[153] The moments of a distribution (of SCC estimates in this case) are, loosely speaking, the various values that describe the distribution's shape: what value is the distribution centered around (mean); how wide is the distribution (the variance); whether the distribution is lopsided (skewness); and whether it is tall and skinny or short and fat (kurtosis). A percentile is a statistical measure of the value (the SCC value in this case) below which a specified percentage of (SCC) observations falls. The 1st percentile indicates the SCC value above which (the other) 99% of observed SCC values fall. The 99th percentile indicates the SCC value below which 99% of all observed SCC values fall.

[154] Dallas Burtraw & Thomas Sterner, *Climate Change Abatement: Not "Stern" Enough?* (Resources for the Future Policy Commentary Series, Apr. 4, 2009), *available at* http://www.rff.org/Publications/WPC/Pages/09_04_06_Climate_Change_Abatement.aspx.

[155] "If climate risk dominates economic growth risk because there are enough potential scenarios with catastrophic damages, then the appropriate discount rate for emissions investments is lower tha[n] the risk-free rate and the current price of carbon dioxide emissions should be higher. In those scenarios, the "beta" of climate risk is a large negative value and emissions mitigation investments provide insurance benefits. If, on the other hand, growth risk is always dominant because catastrophic damages are essentially impossible and minor climate damages are more likely to occur when growth is strong, times are good, and marginal utility is low, then the "beta" of climate risk is positive, the discount rate should be higher than the risk-free rate, and the price of carbon dioxide emissions should be lower." Robert B. Litterman, *What Is the Right Price for Carbon Emissions?*, REGULATION, Summer 2013, at 38, 41, *available at* http://www.cato.org/sites/cato.org/files/serials/files/regulation/2013/6/regulation-v36n2-1-1.pdf

[156] See following subsection.

[157] "There are two rationales for discounting future benefits—one based on consumption and the other on investment. The consumption rate of discount reflects the rate at which society is willing to trade consumption in the future for consumption today. Basically, we discount the consumption of future generations because we assume future generations will be wealthier than we are and that the utility people receive from consumption declines as their level of consumption increases . . . . The investment approach says that, as long as the rate of return to investment is positive, we need to invest less than a dollar today to obtain a dollar of benefits in the future. Under the investment approach, the discount rate is the rate of return on investment. If there were no distortions or inefficiencies in markets, the consumption rate of discount would equal the rate of return on investment. There are, however, many reasons why the two may differ. As a result, using a consumption rather than investment approach will often lead to very different discount rates." Maureen Cropper, *How Should Benefits and Costs Be Discounted in an Intergenerational Context?*, 183 RESOURCES 30, 33.

[158] *See* CIRCULAR A-4, *supra* note 142, at 33.

***The IWG correctly adopted as one of its discount rates a value reflecting long-term interest rate uncertainty, and—as a primary extension to current results—should go further by directly implementing a declining discount rate.***

The IWG was correct in choosing as one of its discount rates an estimate based upon declining discount rates (2.5%). Since the IWG undertook its initial analysis, a consensus has emerged among leading climate economists that a declining discount rate should be used for climate damages to reflect long-term uncertainty in interest rates. Arrow *et al* (2013) presents several arguments that strongly support the use of declining discount rates for long-term benefit-cost analysis.[159]

Perhaps the best reason is the simple fact that there is considerable uncertainty around which interest rate to use: uncertainty in the rate points directly to the need to use a declining rate, as the impact of the uncertainty grows exponentially over time. The uncertainty about future discount rates could stem from a number of reasons particularly salient to climate damages, including uncertainties in future economic growth, consumption, and the interest rate reaped by investments.

A possible declining interest rate schedule for consideration by the IWG is the one proposed by Weitzman (2001).[160] It is derived from a broad survey of top economists and the profession at large in a climate change context and explicitly incorporates arguments around interest rate uncertainty. Arrow *et al* (2013, 2014), Cropper *et al* (2014), and Gollier and Weitzman (2010), among others, similarly argue for a declining interest rate schedule and lay out the fundamental logic.[161]

Moreover, the United States would not be alone in using a declining discount rate. It is standard practice for the United Kingdom and French governments, among others.[162] The U.K. schedule explicitly subtracts out an estimated time preference.[163] France's schedule is roughly similar to the United Kingdom's. Importantly, all of these discount rate schedules yield lower present values than the constant 2.5% Newell-Pizer rate, suggesting that even the lowest discount rate evaluated by the IWG is too high.[164] The consensus of leading economists is that a declining discount rate schedule should be used, consistent with the approach of other countries like the United Kingdom. Adopting

[159] The arguments here are primarily based on: Kenneth J. Arrow et al., *Determining Benefits and Costs for Future Generations*, 341 SCIENCE 349 (2013); Kenneth J. Arrow et al., *Should Governments Use a Declining Discount Rate in Project Analysis?*, REV ENVIRON ECON POLICY 8 (2014); Richard G. Newell & William A. Pizer, *Discounting the Distant Future: How Much Do Uncertain Rates Increase Valuations?*, 46 J. ENVTL. ECON. & MGMT. 52 (2003); Maureen L. Cropper et al., *Declining Discount Rates*, AMERICAN ECONOMIC REVIEW: PAPERS AND PROCEEDINGS (2014); S.K. Rose, D. Turner, G. Blanford, J. Bistline, F. de la Chesnaye, and T. Wilson. *Understanding the Social Cost of Carbon: A Technical Assessment.* EPRI Report #3002004657 (2014).

[160] Martin L. Weitzman, *Gamma Discounting*, 91 AM. ECON. REV. 260, 270 (2001). Weitzman's schedule is as follows:

| 1-5 years | 6-25 years | 26-75 years | 76-300 years | 300+ years |
|---|---|---|---|---|
| 4% | 3% | 2% | 1% | 0% |

[161] Arrow et al. (2013, 2014), Cropper et al. (2014), *supra* note 159. Christian Gollier & Martin L. Weitzman, *How Should the Distant Future Be Discounted When Discount Rates Are Uncertain?* 107 ECONOMICS LETTERS 3 (2010).

[162] *Id.*

[163] Joseph Lowe, H.M. Treasury, U.K., Intergenerational Wealth Transfers and Social Discounting: Supplementary Green Book Guidance 5 (2008), *available at* http://www.hm-treasury.gov.uk/d/4(5).pdf. The U.K. declining discount rate schedule that subtracts out a time preference value is as follows:

| 0-30 years | 31-75 years | 76-125 years | 126-200 years | 201-300 years | 301+ years |
|---|---|---|---|---|---|
| 3.00% | 2.57% | 2.14% | 1.71% | 1.29% | 0.86% |

[164] Using the IWG's 2010 SCC model, Johnson and Hope find that the U.K. and Weitzman schedules yield SCCs of $55 and $175 per ton of $CO_2$, respectively, compared to $35 at a 2.5% discount rate. Laurie T. Johnson & Chris Hope, *The Social Cost of Carbon in U.S. Regulatory Impact Analyses: An Introduction and Critique*, 2 J. ENVTL. STUD. & SCI. 205, 214 (2012).

such a schedule would increase the SCC substantially from the administration's central estimate, suggesting that even the high end of the range presented by the administration is likely too low.

***The IWG's choice of three IAMs was fully justified but should still be revisited in its next iteration.***

In its calculations of the SCC, the IWG relied on the three Integrated Assessment Models (IAMs) available at the time, all with a long record of peer-reviewed publications that link physical and economic effects: the Dynamic Integrated Model of Climate and the Economy (DICE),[165] the Climate Framework for Uncertainty, Negotiation, and Distribution (FUND),[166] and Policy Analysis of the Greenhouse Effect (PAGE).[167] The government's first SCC estimates, published in 2010, used the then-current versions of the models; the recent update employed revised, peer-reviewed versions of the models but maintained the underlying assumptions of the 2010 IWG analysis. As stated by the 2010 IWG, "the main objective of [the 2010 IWG modeling] process was to develop a range of SCC values using a defensible set of input assumptions grounded in the existing scientific and economic literatures."[168]

DICE, FUND, and PAGE are well-established, peer-reviewed models. They represent the state-of-the-art IAMs. Each of these models has been developed over decades of research, and has been subject to rigorous peer review, documented in the published literature. However, updates to the SCC should also consider other models that are similarly peer reviewed and based on the state of the art of climate-economic modeling. One such model is Climate and Regional Economics of Development (CRED); another is the World Bank's ENVironmental Impact and Sustainability Applied General Equilibrium (ENVISAGE) model.

CRED borrows its fundamental structure from William Nordhaus's DICE and RICE models but also offers significant changes. For one, it uses updated damage functions and Marginal Abatement Cost Curves (MACC). Moreover, it uses different global equity weights, and uses additional state-of-the-art methodologies.[169]

ENVISAGE represents a broader modeling effort by the World Bank, where perhaps the largest contribution is a more detailed sectoral breakdown, using 57 different sectors.[170] This level of analysis allows for a more detailed view of agriculture as well as food and energy sectors that are particularly important to any climate-economy modeling.

Moreover, the broader policy and research community at large ought to consider creating the right incentive structure within the economic and scientific community to engage many more researchers on working with the core IAMs. Doing so could speed up the process of capturing the latest research on climate damages.

No model fully captures the costs of climate impacts to society. In fact, virtually all uncertainties and current omissions point to a higher SCC value. That makes it essential to use the established IWG process, which provides for updating the SCC estimates every two to three years in order to capture

---

165 William D. Nordhaus, *Estimates of the social cost of carbon: concepts and results from the DICE-2013R model and alternative approaches*, 1 JOURNAL OF THE ASSOCIATION OF ENVIRONMENTAL AND RESOURCE ECONOMISTS 1 (2014).

166 David Anthoff & Richard S.J. Tol, THE CLIMATE FRAMEWORK FOR UNCERTAINTY, NEGOTIATION AND DISTRIBUTION (FUND), TECHNICAL DESCRIPTION, VERSION 3.6 (2012), *available at* http://www.fund-model.org/versions.

167 Chris Hope, *The Marginal Impact of $CO_2$ from PAGE2002: An Integrated Assessment Model Incorporating the IPCC's Five Reasons for Concern*, 6 INTEGRATED ASSESSMENT J. 19 (2006).

168 2010 TSD, *supra* note 97, at 1.

169 Frank Ackerman, Elizabeth A. Stanton & Ramón Bueno, *CRED: A New Model of Climate and Development*, 85 ECOLOGICAL ECONOMICS 166 (2013).

170 World Bank, ENVISAGE, http://go.worldbank.org/8DTXIDMRM0 (last visited Feb. 4, 2014).

the advances in physical and social sciences that have been incorporated into the models during the intervening period, in order to revisit both the choice of models and the key inputs used.[171]

***The IWG should update its socio-economic assumptions to reflect the latest Shared Socio-economic Pathways (SSPs).***

One key input is the use of socio-economic scenarios reflected in the choice of economic growth rates and emissions trajectories. Current IWG socio-economic and emissions scenarios were chosen from the Stanford Energy Modeling Forum exercise, EMF-22, and consist of projections for income/consumption, population, and emissions ($CO_2$ and non-$CO_2$). The IWG selected five sets of trajectories, four of which represent business as usual (BAU) trajectories (MiniCAM, MESSAGE, IMAGE, and MERGE models) and a fifth that represents a $CO_2$ emissions pathway with $CO_2$ concentrations stabilizing at 550 ppm. Given the possibility of increases in emissions above those expressed by Business As Usual Scenarios, a high-$CO_2$ emissions pathway should also be considered. The assumptions used in calculating the SCC should be updated regularly to reflect the latest thinking around possible scenarios, reflecting the latest Shared Socio-economic Pathways (SSPs).[172] These SSPs represent the latest, consistent pathways, feeding, for example, into the latest IPCC report.

***The current inclusion of $CO_2$ fertilization benefits likely overstates its effects.***

The models do not reflect recent research on agricultural changes, which suggest the $CO_2$ fertilization is overestimated, particularly in the FUND model, and that much, if not all, of the fertilization benefits may be cancelled out by negative impacts on agriculture (e.g., extreme heat, pests, and weeds).[173] If the agency is not able to adequately model all agricultural impacts it should, at a minimum, remove $CO_2$ fertilization benefits.

***The specific functional form assumptions in IAMs ought to be re-evaluated.***

Climate damages in IAMs are assumed to affect levels of economic output rather than economic growth rates. Similarly, standard modeling assumptions assume multiplicative damage functions—i.e. substitutability across economic sectors—rather than additive functions—i.e. limited substitutability across sectors. IAMs ought to probe the impacts of both assumptions. Recent literature supports the conclusion that climate change will effect economic growth rates.[174]

---

[171] 2010 TSD, *supra* note 97, at 1-3 ("The estimates are presented with an acknowledgement of the many uncertainties involved and with a clear understanding that they should be updated over time to reflect increasing knowledge of the science and economics of climate impacts . . . . Specifically, we have set a preliminary goal of revisiting the SCC values within two years or at such time as substantially updated models become available, and to continue to support research in this area.").

[172] Kristie L. Ebi et al., *A New Scenario Framework for Climate Change Research: Background, Process, and Future Directions*, 122 CLIMATIC CHANGE 363, 368 (2014).

[173] FRANK ACKERMAN & ELIZABETH A. STANTON, CLIMATE ECONOMICS: THE STATE OF THE ART 45-56 (2013); Wolfram Schlenker et al., *Will U.S. Agriculture Really Benefit From Global Warming? Accounting for Irrigation in the Hedonic Approach*, 95 AM. ECON. REV. 395, 395-406 (2005). See also: Fisher, Anthony C., W. Michael Hanemann, Michael J. Roberts, and Wolfram Schlenker. 2012. "The Economic Impacts of Climate Change: Evidence from Agricultural Output and Random Fluctuations in Weather: Comment." *American Economic Review*, 102(7): 3749-60. **DOI:** 10.1257/aer.102.7.3749

[174] *See* Melissa Dell et al., *Temperature shocks and economic growth: Evidence from the last half century*, 4 AMERICAN ECONOMIC JOURNAL: MACROECONOMICS 66-95 (2012); R. Bansal & M. Ochoa *Temperature, aggregate risk, and expected returns* (National Bureau of Economic Research No. w17575, 2011); E.J. Moyer et al., *Climate impacts on economic growth as drivers of uncertainty in the social cost of carbon* (University of Chicago Coase-Sandor Institute for Law & Economics Research Paper 652, 2013); S. Dietz & N. Stern, *Endogenous Growth, Convexity of Damage and Climate Risk: How Nordhaus' Framework Supports Deep Cuts in Carbon Emissions*, 125 THE ECONOMIC JOURNAL 574-620 (2015); F.C. Moore & D.B. Diaz *Temperature impacts on economic growth warrant stringent mitigation policy*, NATURE CLIMATE CHANGE (2015).

Marshall Burke et al., *Global Non-Linear Effect of Temperature on Economic Production*, NATURE (Oct. 21, 2015) looks at the effect of temperature and precipitation changes on economic growth rates, and finds that a 23% decline in global GDP by 2100 for business as usual. This is much higher than previous macro-estimates by Dell et al., *supra*, is more

Similarly, models ought to better capture the impacts of wildly heterogeneous climate damages. Each of the models used to calculate the SCC assume one representative household, going as far as to consider damages by relatively large regions. Such averaging ignores the enormously diverse effects of damages. It similarly contributes to not fully capturing the effects of extreme outcomes and tail risks. Instead, models ought to attempt to capture a much broader array of damages and climate impacts.[175]

***The IWG used solid economic tools to address uncertainty and ought to go further in capturing the full extent of its implications.***

The IWG was rigorous in addressing **uncertainty**. First, it conducted Monte Carlo simulations over the IAMs specifying different possible outcomes for climate sensitivity (represented by a Roe and Baker Distribution).[176] It also used five different emissions growth scenarios and three discount rates. Second, the IWG reported the various moments and percentiles[177] of the resulting SCC estimates. Third, the IWG put in place an updating process, e.g., the 2013 revision, which updates the models as new information becomes available.[178] As such, the IWG used the various tools that economists have developed over time to address the uncertainty inherent in estimating the economic cost of pollution: reporting various measures of uncertainty, using Monte Carlo simulations, and updating estimates as evolving research advances our knowledge of climate change.

The Monte Carlo framework took a step toward addressing what is the most concerning aspect of climate change, the potential for **catastrophic damages**, i.e., low probability/high damage events. These damages come from: uncertainty in the underlying parameters in IAMs,[179] including the climate sensitivity parameter; climate tipping points[180]—thresholds that, when crossed, cause rapid, often irreversible changes in ecosystem characteristics; and "black swan" events—which refer to unknown unknowns.[181]

The analysis used a right-skewed distribution of temperature (as captured in the Roe Baker climate sensitivity parameter) and an increasing, strictly convex damage function;[182] this correctly results in right-skewed distributions of damage and SCC estimates. By using the mean values of these estimates instead of the median, IWG estimates partially captured the effects of small probability,

---

consistent with previous micro-estimates, and challenges assumptions that climate change will not affect the growth rates of wealthy nations.

[175] See, for example, National Science Foundation-funded work by Per Krusell and Anthony A. Smith on "A Global Economy-Climate Model with High Regional Resolution" using 19,000 agents (each covering a 1 x 1° area of land).

[176] *See infra* note 188.

[177] *See supra* note 153.

[178] The federal government has committed to continuing to update SCC estimates to account for new information. The IWG stated in its 2010 TSD that "[i]t is important to emphasize that the interagency process is committed to updating these estimates as the science and economic understanding of climate change and its impacts on society improves over time. Specifically, we have set a preliminary goal of revisiting the SCC values within two years or at such time as substantially updated models become available, and to continue to support research in this area. In the meantime, we will continue to explore the issues raised in this document and consider public comments as part of the ongoing interagency process." 2010 TSD, *supra* note 97, at 3.

[179] In this case, parameters are the various characteristic that describe the underlying climate and economic systems.

[180] *See generally* Timothy M. Lenton et al., *Tipping Elements in the Earth's Climate System*, 105 PNAS 1786 (2008).

[181] Standard decision theory under uncertainty addresses "known unknowns," which are unknowns for which we can specify a probability distribution function. In the cases of "unknown unknowns," i.e., 'black swan' events, we cannot specify a probability distribution function, raising a host of additional questions. *See, e.g.*, Richard J. Zeckhauser, *Investing in the Unknown and Unknowable*, CAPITALISM & SOCIETY vol. 1, iss. 2, art. 5 (2006).

[182] An increasing, strictly convex climate damage function implies a damage function that is strictly increasing in temperature at an increasing rate.

higher damages from high-level warming events.[183] To reflect uncertainty in estimates resulting from the right-skewed distribution of SCC estimates, the IWG reported the SCC value for the 95th percentile from the central 3% discount rate distribution.[184] This is done to reflect the estimation uncertainty in terms of the possibility of higher-than-expected economic impacts from climate change.

While the IAMs take different approaches to explicitly modeling tipping points, which to a great extent is lacking in current versions of FUND and DICE, the IWG improved (but in no way fixed) the representation of uncertain catastrophic damages with the Monte Carlo analysis. Still, black swan events go completely unaddressed in the IWG modeling framework, and therefore the SCC estimates do not reflect the value of preventing the occurrence of catastrophic events.[185]

In addition to choosing an appropriate discount rate and sensitivity analyses around different SSPs, another important parameter to which the SCC estimates are sensitive is Equilibrium Climate Sensitivity (ECS)—how the climate system responds to a constant radiative forcing, which is typically expressed as the temperature response to a doubling of $CO_2$ concentration in the atmosphere.[186] In its current iteration, the IWG conducted extensive sensitivity analyses over a range of equilibrium climate sensitivity estimates.[187] The assumptions are clearly stated in the TSD. In addition to its sensitivity analysis, the IWG conducted a Monte Carlo simulation over the climate sensitivity parameter and the other random variables specified within the three IAMs.[188]

The range for the Equilibrium Climate Sensitivity (ECS) is derived from a combination of methods that constrain the values from measurements in addition to models. These include measured ranges from paleoclimate records, observed comparisons with current climate, as well as responses to recent climate forcings. The currently agreed "likely" range for the ECS (from both the IPCC TAR

[183] The point here is that we miss the big picture if we ignore the "tails" (the upper-most values in the case of the right-skewed SCC), and as a result come to the wrong conclusions. An everyday analogy is airplane safety regulation: safety is protected by guarding against the low-probability but highly dangerous events. With climate change we do not have the luxury of knowing with certainty how damaging the extremes could be or whether they will be triggered by greenhouse gases accumulating in the atmosphere; all we know is that there is a very real possibility they could occur and could be devastating.

[184] This approach partially captures catastrophic damages via tipping points through the PAGE model.

[185] *See, e.g.*, Peter Howard, *Omitted Damages: What's Missing from the Social Cost of Carbon* (Cost of Carbon Project Report, 2014), and van den Bergh, J. C. J. M., and W. J. W. Botzen, *A lower bound to the social cost of $CO_2$ emissions*, 4 NATURE CLIMATE CHANGE 4 (2014).

[186] *See* INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, CLIMATE CHANGE 2013: THE PHYSICAL SCIENCE BASIS—SUMMARY FOR POLICYMAKERS 14 (2013).

[187] Specifying the climate sensitivity parameter as a random variable has a basis in PAGE02, which species a probability distribution function for the parameter. The IWG calibrated the Roe and Baker distribution, a right-skewed distribution, to characterize the probability distribution function of this parameter. The 2010 TSD explains the IWG's choice of the Roe and Baker distribution. The right-skewed nature of the climate sensitivity parameter's probability distribution function is independent of the IWG's choice of the Roe and Baker distribution. Rather, this skewness results from the IPCC's finding that values of the climate sensitivity parameter above 4.5 degree Celsius cannot be excluded. As a result, all of the probability distribution functions fit by the IWG for the climate sensitivity parameter were skewed to the right (see Figure 2 in the 2010 TSD), including Roe and Baker. *See* 2010 TSD, *supra* note 97, at 14, fig. 2.

[188] A Monte Carlo simulation will run an integrated assessment model thousands of times, each time randomly picking the value of uncertain parameters from a probability distribution function, i.e. a function that assigns a probability to each possible parameter value. In the case of the SCC, the IWG ran 10,000 Monte Carlo simulations for each of the three IAMs and five socio-economic scenarios, randomizing the value of climate sensitivity, i.e., the change in average global temperature associated with a doubling of $CO_2$, and all other uncertain parameters in the IAMs by the original authors. For each randomly drawn set of values, the IAM estimated the associated damages, with the final SCC estimate equaling the average value across all 10,000 runs, five socio-economic scenarios, and then across all three models. Therefore, each SCC estimate is calculated using 150,000 runs.

and AR5) is 1.5-4.5 degrees Celsius. Physical constraints make it "extremely unlikely" that the ECS is less than 1 degree Celsius and "very unlikely" greater than 6 degrees Celsius.[189]

A host of analyses points to the costs of such uncertainty—both for values that go outside the "likely" range and for uncertainty within it: in short, the optimal SCC tends to increase with increased uncertainty, sometimes dramatically so.[190] While the current treatment of uncertainty around climate sensitivity by the IWG highlights a range of possible uncertainties, a reconsideration of the assumptions feeding into the SCC ought to take the latest advances highlighting the potentially higher costs of deep-seated uncertainty into account. Additionally, the IWG should consider whether it relies too heavily on its 95th percentile estimates as a catchall to cover for limitations in its treatment of uncertainty and catastrophic damages.

### 5. Support for the Social Cost of Methane methodology, and recommendations on continued improvements.

EPA anticipates that its oil and gas standards will reduce significant amounts of methane. On the other hand, the regulation will slightly accelerate the production of some carbon dioxide, as methane is flared and immediately releases carbon dioxide, versus a more gradual oxidation into carbon dioxide of methane otherwise un-flared and emitted.[191] EPA proposes directly estimating the Social Cost of Methane using an analysis conducted by Marten *et al.*, which is based on the same techniques the Interagency Working Group developed to estimate the SCC.[192] The Marten *et al.* Social Cost of Methane methodology is well supported, and in the final emissions standards, EPA should monetize the benefits of methane reductions, to reflect the true benefits of the standards and to enhance the rigor and defensibility of the final rule.[193] EPA also calls for comments on whether it should apply SCC estimates to measure the small disbenefit from the accelerate release of carbon dioxide; it should.

The Interagency Working Group on the Social Cost of Carbon has, to date, focused exclusively on carbon dioxide. The SCC can be roughly adjusted to approximate the costs of other greenhouse gases by multiplying by the relative global warming potential of those gases. Scientists, however, have long argued that the full social costs of specific, non-carbon dioxide gases like methane should be assessed through separate models and methodologies, which would more accurately account for varying atmospheric life spans, among other differences.[194] At least a dozen published studies, dating back to 1993, have estimated the social cost of non-carbon dioxide greenhouse gases, including methane.[195]

---

[189] IPCC, *supra* note 186, at 14.

[190] *E.g.,* Robert S. Pindyck, *Uncertain Outcomes and Climate Change Policy*, 63 J. ENVTL. ECON. & MGMT. 289 (2012); Martin L. Weitzman, *GHG Targets as Insurance Against Catastrophic Climate Damages*, 14 J. PUB. ECON. THEORY 221 (2012); Robert S. Pindyck, *The Climate Policy Dilemma*, 7 REV. ENVTL. ECON. & POL'Y 219 (2013); Gernot Wagner & Richard J. Zeckhauser, *Confronting Deep Uncertainty on Climate Sensitivity: When Good News is Bad News*, ('Beyond IPCC' Presentation, October 17, 2014).

[191] 80 Fed. Reg. 56,657.

[192] Marten, A.L., E.A. Kopits, C.W. Griffiths, S.C. Newbold & A. Wolverton (2014). Incremental CH4 and N2O Mitigation Benefits Consistent with the U.S. Government's SC-CO2 Estimates, Climate Policy, DOI: 10.1080/14693062.2014.912981.

[193] *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.,* 538 F.3d 1172, 1202 (9th Cir. 2008) (finding NHTSA's decision to assign zero value to carbon reductions to be arbitrary and capricious).

[194] *See* Disa Thureson & Chris Hope, *Is Weitzman Right? The Social Cost of Greenhouse Gases in an IAM World* 21 (Örebro University-Swedish Business School Working Paper 3/2012).

[195] *See, e.g.*, Marten et al., *supra* note 98, at 7 (describing eleven prior studies estimating the social cost or global damage potential associated with methane).

EPA proposes to use Social Cost of Methane estimates based on one of the most recent peer-reviewed articles: Marten *et al.*[196] Marten *et al.* takes a reasonable (although conservative) approach to estimating the Social Cost of Methane and currently constitutes "the best available science" to inform agency regulation.[197] Specifically, Marten *et al.* builds on the methodology used by the Interagency Working Group to develop the SCC. The study maintains the same three integrated assessment models, five socioeconomic-emissions scenarios, equilibrium climate sensitivity distribution, three constant discount rates, and aggregation approach that were agreed upon by the Interagency Working Group. Consequently, many of the key assumptions underlying the Social Cost of Methane estimates have already gone through a transparent, consensus-driven, publically reviewed, regularly updated process, since they were borrowed from the Interagency Working Group's thoroughly vetted methodology.

Yet while sharing that carefully built framework with the SCC estimates, Marten *et al.*'s Social Cost of Methane estimates directly account for the quicker time horizon of methane's effects compared to carbon dioxide, include the indirect effects of methane on radiative forcing,[198] and reflect the complex, nonlinear linkages along the pathway from methane emissions to monetized damages. Marten *et al.* was not only published in a peer reviewed economics journal, but EPA undertook additional internal and peer review of the approach.[199] Marten *et al.*'s estimates thus are reasonable and appropriate measurements of the Social Cost of Methane.

In fact, Marten *et al.*'s estimates are conservative and very likely underestimate the true Social Cost of Methane. To start, as the authors note, because their methodology followed the Interagency Working Group's approach, all limitations that apply to inputs and modelling assumptions for the SCC also apply to the Social Cost of Methane. As discussed above, omitted damages, socio-economic assumptions, the treatment of uncertainty and catastrophic damages, and so forth all suggest the Social Cost of Methane is underestimated, just as the SCC is.

Additionally, the integrated assessment models shared by both the Social Cost of Methane and the SCC include some features better suited to assessing carbon dioxide effects than methane effects, and so likely underestimate the costs of methane. For example, a countervailing benefit of carbon dioxide emissions—enhanced fertilization in the agricultural sector—is included in the underlying models used to develop both the SCC and Social Cost of Methane, yet does not apply to methane emissions.[200] Similarly, the damage functions used by the integrated assessment models assume

[196] Alex L. Marten et al., *Incremental CH4 and N2O Mitigation Benefits Consistent With the US Government's SC-CO2 Estimates,* Climate Policy (2014).

[197] *See* Executive Order 13,563, 76 Fed. Reg. 3821 (January 18, 2011).

[198] However, the Social Cost of Methane methodology does not yet fully reflect the effects of methane oxidizing in the atmosphere over time and becoming carbon dioxide. *See* Regulatory Impact Analysis for the Proposed Emission Standards for new and Modified Sources in the Oil and Natural Gas Sector, at 4-37 (2015).

[199] http://www3.epa.gov/climatechange/pdfs/social%20cost%20methane%20white%20paper%20application%20and%20peer%20review.pdf

[200] Interagency Working Group on the Social Cost of Carbon, *Technical Support Document: Social Cost of Carbon for Regulatory Impact Analysis*, 12 (February 2010), available at https://www.whitehouse.gov/sites/default/files/omb/inforeg/for-agencies/Social-Cost-of-Carbon-for-RIA.pdf ("Impacts other than temperature change also vary across gases in ways that are not captured by GWP. For instance . . . damages from methane emissions are not offset by the positive effect of CO2 fertilization.").

Martin et al (2015) state that "A comparison across models further highlights the importance of CO2 fertilization impacts on the global damage potential. CO2 emissions, and the resulting increase in atmospheric concentration, have the potential to increase yields in the agriculture and forestry sector. This characteristic is not shared by other GHG emissions. Accordingly, the FUND model, which explicitly captures this effect, exerts downward pressure on the SC-CO2 that is not present for the SC-CH4 and SC-N2O, allowing for the possibility of substantially higher global damage potential estimates. The results based on the FUND model presented in this article exhibit this effect; however, the CO2 fertilization effect is not explicitly modelled in DICE and PAGE and therefore they are found to produce lower estimates of the global damage potential. For example, using the 3% discount rate, the global damage potential for CH4 as estimated by FUND

some level of adaptation to climate change over time, but because methane is a much faster-acting climate pollutant than carbon dioxide, there is less opportunity for technological advancement or political progress to adapt to the climate damages imposed by methane emissions. Methane also has indirect but significant effects, via its contribution to surface ozone levels, on global health and agriculture, and such effects need to be included either in the Social Cost of Methane or elsewhere in the cost-benefit analysis, but currently are not.[201]

Overall, the Marten *et al*. methodology provides reasonable, direct estimates that reflect updated evidence and provide consistency with the Government's accepted methodology for estimating the SCC. At the same time, EPA should work toward the future refinement of these Social Cost of Methane estimates. For example, the Social Cost of Methane methodology does not yet fully reflect the effects of methane oxidizing in the atmosphere over time and becoming carbon dioxide.[202] Because the Social Cost of Methane and the SCC share many assumptions and methods, it may make sense for the Interagency Working Group to review and update both metrics. In any case, any future improvements made to the SCC methodology should also be incorporated into and adjusted for the Social Cost of Methane estimates.

In particular, *global* Social Cost of Methane values are appropriate to use in EPA's regulatory impact analyses. The many strategic, economic, and legal grounds that justify use of a global SCC apply with equal force to the Social Cost of Methane. For example, other countries already use a global social cost of methane value.[203] The United States, together with several other countries, has been trying to prioritize global action on methane reductions, because as "a powerful, short-lived greenhouse gas," methane has a greater potential to affect "warming in the near to medium term."[204] And the United States has highlighted its planned actions on methane—including these standards for landfills—in its joint statements on climate with China.[205] To demonstrate the U.S. commitment to reducing methane emissions specifically, and to encourage other countries to follow suit in prioritizing efforts on this powerful and fast-acting pollutant, it is strategically important for the United States to continue valuing the global effects of its methane regulations. Under the Clean Air Act, EPA has clear authority to do so.[206] In its final emission standards for the oil and gas sector, and in its final regulatory impact analysis, EPA should bolster the rationales for the use of a global Social Cost of Methane value, as articulated in the underlying Interagency Working Group Technical Support Documents.

If EPA for some reason declines to follow the Marten *et al*. approach, it could still use the global warming potential adjustment as a less accurate, lower-bound estimate. However, instead of the

---

ranges between 58 and 88 depending on the scenario, whereas it ranges from 19 to 28 for DICE and PAGE. As the DICE and PAGE models only consider two natural system impacts, temperature and sea level, if they do implicitly include potential CO2 fertilization benefits, they are included by using the temperature anomaly as a proxy for the increasing atmospheric CO2 concentration. Fertilization benefits would therefore be allowed to falsely accrue to perturbations of other GHG emissions besides CO2. It is not clear the degree to which these models try to incorporate CO2 fertilization effects and therefore the degree to which this issue is of concern."

[201] A study by Sarofim et al. (2015) finds that reductions in surface ozone levels from the mitigation of methane emissions would provide additional global health benefits from avoided cardiopulmonary deaths equal to 60 to 140% of climate benefits identified by Marten. Similarly, Shindell (2014) finds that the impact of methane on agriculture, via changes in surface ozone, are valued at $22 and $27 per ton, for 5% and 3% discounting respectively, in addition to his study's estimates for climate and climate-health related damages.

[202] As discussed above, EPA should use the SCC to estimate the small disbenefit of the accelerated release of carbon dioxide due to flaring versus oxidation.

[203] *E.g.*, Defra, U.K., *Methodological Approaches for Using SCC Estimates in Policy Assessment* at 58 (2005) (reporting the PAGE results for the social cost of methane).

[204] *E.g.*, U.S. Dep't of State, *Joint Statement on Climate Change and the Arctic*, Aug. 31, 2015 (made following the GLACIER conference, at which Canada, Denmark, Finland, Iceland, Norway, Sweden, and Russia were also represented).

[205] White House Press Secretary, *U.S.-China Joint Presidential Statement on Climate Change*, Sept. 25, 2015.

[206] *See supra* on the use of a global SCC number and the role of Clean Air Act § 115.

outdated multiplier of 25 for methane, EPA should utilize the latest global warming potential estimates for methane issued by the IPCC: 85 to 87 times greater than carbon dioxide after 20 years and 30 to 36 times greater than carbon dioxide after 100 years (after making the recommended adjustment for fossil methane).[207] Given the short life of methane, EPA should at least conduct sensitivity analysis over the entire global warming potential range, instead of merely utilizing the lower 100-year timescale range. Again, though, the Social Cost of Methane approach is the more reasonable and preferred way to value this rule's important methane reductions.

### 6. Conclusion: Recommendations on the use of the SCC and Social Cost of Methane in regulatory impact analyses.

EPA should continue to use the latest IWG estimates of the SCC, and should start using the Social Cost of Methane estimates. The current estimates are biased downwards: more can and should be done to improve the estimates and to ensure, through regular updates, that they reflect the latest science and economics. However, the necessary process of improving the ability of the SCC and Social Cost of Methane to fully reflect the costs of climate impacts to society cannot hold up agency rulemaking efforts. The values provide an important, if conservative, estimate of the costs of climate change and the benefits of reducing carbon pollution. To ignore these costs would be detrimental to human health and well-being and contrary to law and Presidential directives to agencies to evaluate the cost of pollution to society when considering standards to abate that pollution. In the context of agency rulemakings, the SCC and Social Cost of Methane provide the best available means to factor those costs into benefit-cost analyses.

In using the estimates in its regulatory impact analyses, however, EPA should also include a qualitative assessment of all significant climate effects that are not currently quantified in the monetized estimate. The IWG acknowledged its incomplete treatment of both catastrophic and non-catastrophic damages, and instructed agencies that "These caveats . . . are necessary to consider when interpreting and applying the SCC estimates."[208] Those instructions are consistent with Executive Orders on regulatory analysis, which tell agencies to "assess . . . qualitative measures of costs and benefits that are difficult to quantify, but nevertheless essential to consider."[209] Before the IWG published its first estimates in 2010, some agencies included a detailed chart of unquantified climate effects in their regulatory impact analyses.[210] However, most recent rulemakings only reference unquantified benefits from non-$CO_2$ gases and from co-pollutants, and list none of the significant, unquantified climate effects from carbon dioxide.[211] In the final emissions standards, and in the final regulatory impact analysis, EPA should detail all significant, unquantified climate effects, as consistent with administration-wide policy, the IWG's instructions, past agency practices, and best economic practices.

---

[207] IPCC Working Group I, Fifth Assessment Report, Climate Change 2013: The Physical Science Basis, Chapter 8: Anthropogenic and Natural Radiative Forcing (2014) at 633, 711-712, 714 (Table 8.7), available at https://www.ipcc.ch/pdf/assessment-report/ar5/wg1/WG1AR5_Chapter08_FINAL.pdf (see the adjustment identified in note B for fossil methane).

[208] 2010 TSD, *supra* note 97, at 29.

[209] Exec. Order No. 12,866 § 1(a); *see also* OMB, Circular A-4.

[210] *E.g.*, EPA, 420-D-09-001, DRAFT REGULATORY IMPACT ANALYSIS:CHANGES TO RENEWABLE FUEL STANDARD PROGRAM 690 tbl. 5.3-4 (2009).

[211] *Compare* EPA, Regulatory Impact Analysis for the Proposed Carbon Pollution Guidelines for Existing Power Plants and Emission Standards for Modified and Reconstructed Power Plants, EPA-452/R-14-002, at tbl. ES-5 (2014) (listing multiple unquantified effects from co-pollutants, but marking "global climate impacts from $CO_2$" as fully monetized) *with* Peter Howard, *Omitted Damages: What's Missing from the Social Cost of Carbon* (Cost of Carbon Project Report, 2014) (detailing the many significant effects not quantified in the SCC).

We also suggest that EPA encourage the IWG to regularly update the SCC and Social Cost of Methane, as new economic and scientific consensus emerges. Such updates are in line with the stated intentions of the IWG, which committed to "updating these estimates as the science and economic understanding of climate change . . . improves."

Sincerely,

Rachel Cleetus, Ph.D., Senior Climate Economist, Union of Concerned Scientists

Frank J. Convery, Ph.D., Chief Economist, Environmental Defense Fund

Jayni Hein, Policy Director, Institute for Policy Integrity, NYU School of Law*

Peter H. Howard, Ph.D., Economic Director, Institute for Policy Integrity, NYU School of Law*

Benjamin Longstreth, Senior Attorney, Natural Resources Defense Council

Nathaniel O. Keohane, Ph.D., Vice President, International Climate, Environmental Defense Fund

Richard L. Revesz, Director, Institute for Policy Integrity, NYU School of Law*

Jason A. Schwartz, Legal Director, Institute for Policy Integrity, NYU School of Law*

Thomas Sterner, Ph.D., Senior Contributing Economist, Environmental Defense Fund

Gernot Wagner, Ph.D., Lead Senior Economist, Environmental Defense Fund

Peter Zalzal, Senior Attorney and Director of Special Projects, Environmental Defense Fund

* No part of this document purports to present New York University School of Law's views, if any.

# Comments on the Rulemaking for the Colorado Roadless Areas Supplemental Draft Environmental Impact Statement

A Report Prepared for

Sierra Club and Earthjustice.

By

Thomas Michael Power
Donovan S. Power
Power Consulting, Inc.

and

Joel M. Brown
Aesir Consulting, LLC.

January 14, 2016

## ***About the Authors***:

**Thomas Michael Power** is the Principal in Power Consulting, Inc. and a Research Professor and Professor Emeritus in the Economics Department at the University of Montana where he has been a researcher, teacher, and administrator for over 40 years. He received his undergraduate degree in Physics from Lehigh University and his MA and PhD in Economics from Princeton University.

**Donovan S. Power** received his undergraduate degree in Geosciences at the University of Montana and his M.S. in Geology from the University of Washington. He has been the principal scientist at Power Consulting, Inc. for the past six years.

**Joel M. Brown** is the principle of Aesir Consulting LLC, specializing in modeling complex systems as well as collecting and analyzing data. He received his undergraduate degree in physics from the University of Montana, his M.S. in Geology from the University of Montana, and his PhD in Geophysics from Boise State University. He worked professionally in the field of glaciology at the Norwegian Polar Institute and the University of Montana three years before starting Aesir Consulting in late 2014.

## Commonly used Acronyms

$CH_4$ - Methane

$CO_2$ – Carbon dioxide

CRR – Colorado Roadless Rule

DEIS – Draft Environmental Impact Statement

GHG – Greenhouse Gas

GDP – Gross Domestic Product

GWP – Global Warming Potential

EIA – Energy Information Administration

EPA – Environmental Protection Agency

FEIS – Final Environmental Impact Statement

IPM – Integrated Planning Model

IWG – Interagency Working Group

MSHA – Mine Safety and Health Administration

NEMS – National Energy Modelling System

NEPA – National Environmental Policy Act

NFS – National Forest Service

NFV – North Fork Valley

PED – Price Elasticity of Demand

PNV – Present Net Value

SCC – Social Cost of Carbon

SCF – Standard Cubic Feet

SCM – Social Cost of Methane

SDEIS – Supplemental Draft Environmental Statement, Rulemaking for Colorado Roadless Areas (Nov. 20, 2015).

## Executive Summary

There are two major flaws in the SDEIS; (1) the exclusion of methane in the accounting of future damages associated with an increase in North Fork Valley mine production and (2) the misapplication of a national energy/economy model. Because of these flaws, which are grave problems, the SDEIS should be revised. The arguments that follow (1) and (2) elucidate the weaknesses of the evaluation of the impact of an increase in North Fork Valley mine production presented by the Forest Service. In this document, we include in the Social Cost of Methane and critique the misapplication of the Integrated Planning Model. We come to a final benefit-cost analysis that shows that the flaws in the SDEIS are substantial. This document reveals the fatal flaws in the Forest Service's analysis of the impact of the North Fork Valley mines. We show that the effects of including methane as well as increased electricity use that accompanies a reduced price of electricity greatly affects the damages that need to be accounted for in the final benefit-cost analysis of augmenting the Colorado Roadless Rule (CRR). In other words, we show that our critique has a large effect on the final calculation of the benefit-cost analysis. Our calculations are much closer to the actual damages associated with the increase in North Fork Valley coal production than the Forest Service's calculations. The points that we bring up beyond (1) and (2) should be used as a guide when the SDEIS is revised.

**1. The Forest Service fails to satisfy the court-imposed requirements in the SDEIS.**

In 2011, the Forest Service issued a draft environmental impact statement analyzing a state-specific rule for managing Colorado's National forest Roadless areas. That proposal generally barred road construction in areas deemed Roadless Forest. However, the proposal contained several exceptions, one of which opened the door to the construction for coal mining in a 20,000-acre area in the North Fork Valley.[1] In 2012, the Forest Service approved the Colorado Roadless Rule, including the coal mining exception.[2] Conservation groups filed suit in U.S. District Court in Colorado challenging the Forest Service's failure to address the coal mine exception's climate change impacts. In response, the U.S. District Court ruled in 2014 that the Forest Service's climate change analysis failed to comply with the National Environmental Policy Act and set aside the coal mine exception.[3]

In the 2014 rulings Judge Jackson ruled that the Forest Service violated the law by failing to disclose and consider the Greenhouse Gas (GHG) implications of a Colorado Roadless Rule (CRR) provision that would open up further underground coal mining in the North Fork Valley. Specifically, the Forest Service was ordered to consider the GHG associated with the production, shipping and burning of that North Fork Valley additional coal *and* the methane that is released during mining of North Fork Valley that coal. Judge Jackson's ruling also suggested that the Social Cost of Carbon should be used to value the GHG.

The Supplemental Draft Environmental Impact Statement (SDEIS) released in November of 2015 (Rulemaking for Colorado Roadless Areas) attempts to answer many of the requirements

---

[1] 76 Fed. Reg. 21272, 21290. April 15, 2011.
[2] 77 Fed. Reg. 39.576. July 3, 2012
[3] High Country Conservation Advocates v. U.S. Forest Serv., 52 F.3d 1174 (D. Colo. 2014), and High Country Conservation Advocates v. U.S. Forest Serv., 67 F.3d 1262 (D. Colo. 2014).

imposed by Judge Jackson. It is our opinion that the SDEIS is a first step in the right direction. However, its methodology:

1) incorporated an energy economy model that does not account for the price elasticity of demand, thus under-reporting anticipated GHG emissions;
2) misapplied some of the parameters of the Social Cost of Carbon; and
3) failed to carry out specific instructions from Judge Jackson on the incorporation of methane in the analysis.

**2. The Integrated Planning Model the Forest Service applies cannot accurately represent energy production when demand increases.**

The Forest Service hired ICF to use their proprietary Integrated Planning Model (IPM) to assist the agency in modeling multiple different coal mining scenarios as well as the GHG implications of those scenarios. The IPM model is a proprietary model, run by a private company, that is essentially a 'Black Box' outside of the hands of the ICF. Because of this, there is no way to independently verify the assumptions that make up the IPM.

One very important point, of which the Forest Service makes clear, is that the IPM model is fundamentally incapable of modeling these different scenarios because it cannot account for the increased energy use that will result from the added coal made available. The Forest Service readily admits this limitation:[4]

> "…a number of chain reactions may occur related to production and consumption of fuels, related to power generation. Chain reactions may include some degree of responses such as:
>
> ♦ An increase in total electricity production, reflecting the net effect of increased availability of coal fuel inputs for power generation."

Although the Forest Service admits that there will be an increase in total electricity production, the IPM model is incapable of accounting for this increase in electrical generation. Because the IPM model cannot account for the increased electrical generation that will be induced by the additional North Fork Valley coal, the IPM model in conjunction with the Forest Service spreadsheets are incapable of accurately predicting the GHG impacts (damages) as well as the drop in electrical prices across the U.S. (benefits). The failure to accurately account for these damages and benefits means that the climate costs are underestimated.

**3. The Forest Service misapplies Social Cost of Carbon parameters in their calculations of the damages and benefits of additional North Fork Valley coal mining.**

Social Cost of Carbon values are published by the Interagency Working Group (IWG), of which the Forest Service's parent agency, the U.S. Department of Agriculture, is a member. These values are a statistical representation of the likely future monetary costs of $CO_2$ emissions

---

[4] SDEIS page E-12.

produced in a given year. In an attempt to represent the uncertainty of the published Social Cost of Carbon values in the SDEIS, the Forest Service has calculated the benefits and damages associated with 450 unique sets of parameters. This includes 3 different IPM model scenarios, 3 different production levels, 2 alternatives for mining (B-A and C-A), 5 unique sets of Boundary Stances, and 5 discount rates (3x3x2x5x5=450 sets of parameters). However, they do not differentiate between the most likely and least likely sets of parameters. By using this 'shotgun' approach to reporting the results of their calculations, the Forest Service misrepresents the damages associated with increased mining in the North Fork Valley.

The Forest Service also misinterpreted and misapplied the Social Cost of Carbon, downscaling parameters, and has even made up new scenarios for which the Social Cost of Carbon was never intended. These errors result in a misapplication of the Social Cost of Carbon and have a very large effect on the value that is applied to the Social Cost of Carbon. In short, these errors lead the Forest Service to understate the social costs of coal mining and combustion that would result from reinstating the proposed exemption.

The Forest Service presents five different discount rate scenarios when considering the Social Cost of Carbon. Those discount rates are 3% 10th, 5%, 3%, 2.5%, and 3% 95th. Use of a 3% 10th value, which was created by the Forest Service for the SDEIS and represents a Social Cost of Carbon value that is far lower than any presented by the IWG, should be abandoned.[5] Under the auspice of providing more information, the Forest Service has selectively chosen data in a way that has no support in peer-reviewed science or practical agency application and inappropriately skewed the result in favor of its preferred alternative.

**4. The Forest Service Arbitrarily Chose Geographic Boundaries for their Analysis.**

The other parameter for the Social Cost of Carbon that needs to be addressed is the choice of the geographical boundary of the analysis area: the Forest Boundary, the National Boundary, and the Global Boundary. The SDEIS presents different scenarios for each of these boundary levels. In particular, we find that the Forest Boundary scenario is an artificial and self-contradictory construct that is misleading and therefore should be stricken from any future analysis.

The Forest Boundary scenarios are meant to capture the impacts (costs and benefits) at the local level. The flaw in the logic of this boundary is that the benefits are presented as the value of the coal on the national market but the costs are only the $CO_2$ emissions created during the mining of the coal (not including methane which clearly should be included). Without a coal fired generator within the Forest Boundary, the coal must be sold into the national market for it to have any value. Since it must be sold into the national market, the GHG associated with the use of that coal for electrical generation should also be considered. The Forest Boundary scenario explicitly creates an artificial setting in which the mining of a large amount of additional coal to fuel electric generation has no emissions associated with the combustion of that coal. This is a misleading approach that does not take the "hard look" that the law requires.

[5]Technical Support Document: Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866 Interagency Working Group on Social Cost of Carbon, United States Government. Revised July 2015. https://www.whitehouse.gov/sites/default/files/omb/inforeg/scc-tsd-final-july-2015.pdf

**5. The Forest Service fails to include the social cost of methane in its analysis of climate impacts.**

Although the Social Cost of Carbon cannot be directly applied to methane emissions, the Social Cost of Methane can. The Forest Service should have applied the Social Cost of Methane to the coal mine methane that will be released by the North Fork Valley mines if they are allowed to expand. The Social Cost of Methane was developed by the EPA using the same models and methodology as the Social Cost of Carbon, and is designed to be used alongside the Social Cost of Carbon.

The Forest Service is aware that the North Fork Valley mines are exceptionally gassy and did a "sensitivity analysis"[6] of the impacts of applying the Social Cost of Carbon to the coal mine methane of the North Fork Valley mines:[7]

> "*Consideration of Methane Emissions*
> Based on the carbon dioxide and methane emission results in Tables 3-19 and 3-20 in the main text, inclusion of $CO_2$eq of methane emissions, can result in an increase in a 20% increase in estimated $CO_2$eq emissions for combined production and combustion under the national boundary stance. For the Forest boundary stance, where only those emissions from production (extraction) of coal are considered, $CO_2$eq emissions can increase by a factor of x20 when including methane emissions in the calculations."

Clearly, when the methane emissions are included in the analysis of the damages, they can have very large impacts on whether or not the values are positive or negative. Coal mine methane emissions should be included in the primary benefit-cost analysis using the Social Cost of Methane and should not *only* be considered in a "sensitivity analysis" of a benefit-cost analysis known to be incomplete.


**6. The Forest Service fails to accurately account for the elasticity of demand**

The SDEIS IPM modeling results project that increasing the supply of coal from the North Fork Valley will reduce coal costs to electric generators. Because fuel costs are an important determinant of the cost of generating electricity, the cost of supplying electricity to Americans would, in response, decline. In fact, the basis of the SDEIS benefits of mining North Fork Valley coal is the reduction in the cost of coal coming from the Uinta Basin and the reduced cost of generating electricity. That modeling shows what one would expect from a market economic perspective: Adding a significant amount of lower priced coal to the national coal supply displaces to a certain extent other higher price fuels, coal, natural gas, and renewable energy, that otherwise would have been used to provide Americans with electricity.

---

[6] Sensitivity analyses are carried out to see how sensitive the model result is to different inputs that are used. They give an indication of how sensitive the result is to assumptions that were made. If, for instance, a model result is found to change by 20 fold because of an input assumption, then the model would be very sensitive to whether or not that input is included.
[7] SDEIS page E-24.

However, in the SDEIS modeling of the economic impact of this increase in the supply of North Fork Valley coal, the reduced cost of electricity to Americans does not lead to an increase in their overall use of electricity. Just as the lower coal prices were expected to lead to the increased use of coal, the lower electric prices should also increase the use of electricity. That would require the burning of additional fuel, the emission of more GHGs, and higher damage costs from climate change as the market comes back into equilibrium. Because the IPM model assumes a fixed level of demand for electricity for each year no matter what happens to fuel and other electric generating costs, the model cannot reflect this normal market adjustment to lower energy prices, an adjustment the SDEIS predicts will occur as a result of more coal becoming available. This assures that the SDEIS underestimates the costs associated with the production, transportation, and burning of additional North Fork Valley coal because the Forest Service has not accounted for the increase in energy production and use above what would occur without the proposed exemption.

**7. By ignoring methane and increased energy demand, the Forest Service grossly understated the expected economic impacts associated with climate change damage that will result from the proposed exemption.**

Since most of the benefit-cost results[8] that the Forest Service include in the SDEIS are based on parameters that are not realistically relevant and since none of the benefit-cost results in the SDEIS include damages associated with coal mine methane or an increase in electric consumption due to decreased electricity prices, we present recalculated benefit-cost results for relevant sets of parameters laid out in the SDEIS that include coal mine methane and increased electric consumption. The relevant parameters reported here are for the Global Boundary stance using a 2.5% and 3% discount rate only. As we explain in the main body of this document, these are the *only* reasonably justified results that should be included in a revised SDEIS. Far more weight should be applied to the 2.5% discount rate since it is viewed as a high rate as mentioned above. In order to present data that can be closely compared to the SDEIS benefit-cost results, in Appendix B of this document we show results for the Forest and National Boundary stances and include the 5% and 3% 95th percentile discount rates from the IWG.

We find that for the “Reserves Added” IPM scenario on a global scale, there is a range in net damages associated with the increase in North Fork Valley mining of $4.1 Billion (2014$) for the Low Production scenario, not including increased demand for electricity due to lower electricity price, to $9.6 Billion (2014$) for the Average Production scenario. This is a $2.5 billion and $4.5 billion (2014$) increase in damages associated with North Fork Valley when compared to the SDEIS benefit-cost results based solely on the Social Cost of Carbon for the same scenarios; which approximately doubles the calculated damages.

**8. Conclusions**

The SDEIS presented by the Forest Service is an improvement over the Colorado Roadless Rule FEIS, which effectively ignored the climate impacts of coal combustion. However, it is clear

[8] The Forest Service presented many benefit-cost results in an attempt to account for uncertainty in energy futures. However, in doing so they present many results that the majority of economists would reject outright.

that the SDEIS presented by the Forest Service is significantly flawed in several ways and cannot be relied on.

**1.** The SDEIS does not fulfill Judge Jackson's mandate to assess the GHG impacts of the CRR. There is no attempt within the SDEIS to account for the coal mine methane associated with increased mining in the North Fork Valley even though methods exist to account for coal mine methane. This constitutes a failure on the part of the Forest Service to include a substantial portion of the GHG emissions in their benefit-cost analysis of the mining scenarios.

**2.** The IPM is a proprietary, 'black box' model that is inappropriately applied to an analysis of a situation where the price of, and therefore consumption of, electricity changes. Since the IPM cannot account for changes in electricity production and consumption, it does not accurately model the effect of increased coal production in the North Fork Valley.

**3.** In its analysis of the impacts of GHG emissions the SDEIS excludes the full damage of GHG emissions in the Forest and National Boundary stances[9] yet inflates the benefits for both stances.

**4.** The price elasticity of demand for electricity is not included in the SDEIS. This is partially a result of the misapplication of the IPM in the SDEIS.

Overall, the numerous flaws, false assumptions, and misapplications of models and tools within the SDEIS lead us to conclude that the SDEIS grossly underestimates the GHG impacts of the North Fork Valley mines. By doing so, the Forest Service fails to take the hard look required by law and Judge Jackson's order. In order to comply with the law and the court's order, the Forest Service must reevaluate the costs and benefits of increased North Fork Valley mining by using a national energy model that accounts for both supply and demand. This would give a more accurate estimate of the change in electrical price and consumption due to increased mining in the North Fork Valley. Further, the Forest Service must account for the social cost of methane within the benefit-cost analysis of the changes to the CRR proposed in the SDEIS.

The Forest Service's failure to account for the GHG emissions impacts from the release of methane, leads the agency to overestimate the benefit-cost by $578 to $817 million (2014$) for the National Boundary stance and $2.512 to $3.565 billion (2014$) for the Global Boundary stance. When we also include the estimate of the Social Cost of Carbon associated with the increase in electricity demand, the SDEIS overestimates the benefit-cost by $739 million to $1.032 billion (2014$) for the National Boundary and $3.215 to $4.487 billion (2014$) for the Global Boundary. It is apparent that omitting the cost of methane to society as well as the increased demand for electricity that would accompany a decrease in electricity prices has a large effect on the benefit-cost analysis. In fact, there are no scenarios which survive basic scrutiny that result in a net benefit if the effects of increased electricity production and consumption and the Social Cost of Methane are included in the calculations. Without proper modeling of the energy economy it is impossible to determine what the true impact of the expansion of mining in the North Fork Valley would be.

[9] GHG emission impacts are global by definition.

# Table of Contents

**EXECUTIVE SUMMARY ..... II**

**I. ASSESSING THE GHG EMISSIONS IMPLICATIONS OF INCREASED MINING IN THE NORTH FORK VALLEY ..... 1**

1. COURT IMPOSED REQUIREMENTS OF THE SDEIS ..... 1
2. THE INTEGRATED PLANNING MODEL CANNOT ACCURATELY REPRESENT ENERGY PRODUCTION WHEN DEMAND INCREASES. ..... 2
3. THE FOREST SERVICE MISAPPLIED SOCIAL COST OF CARBON PARAMETERS IN THEIR CALCULATIONS OF THE DAMAGES ASSOCIATED WITH INCREASED MINING IN THE NORTH FORK VALLEY ..... 5
   - *a. Parameters for the Social Cost of Carbon ..... 6*
     - i. Discount rates ..... 6
4. THE FOREST BOUNDARY, THE NATIONAL BOUNDARY, AND THE GLOBAL BOUNDARY ..... 6
   - *a. Forest Boundary: comparing the mine-level Social Cost of Carbon of coal production to the national-level benefits to the mine ..... 7*
   - *b. Forest Boundary: misapplication of the downscaling parameters in the interpretation of the damages ..... 8*
5. THE FOREST SERVICE FAILS TO INCLUDE THE METHANE COSTS OF ADDITIONAL NORTH FORK VALLEY COAL MINING IN THE SDEIS. ..... 9
   - *a. Values for the Social Cost of Methane ..... 10*
   - *b. Sensitivity analysis in the SDEIS: Attempting to account for uncalculated methane emissions ..... 10*
6. THE FOREST SERVICE FAILS TO ACCURATELY ACCOUNT FOR THE ELASTICITY OF DEMAND. ..... 13

**II. DETERMINING THE APPROPRIATE PARAMETERS FOR THE ANALYSIS OF DAMAGES 14**

1. THE FOREST BOUNDARY ..... 14
2. THE 7% DOWNSCALING FACTOR ..... 15
3. WHICH DISCOUNT RATES TO USE ..... 16
   - *a. 3% 10th percentile ..... 16*
   - *b. 5% ..... 17*
   - *c. 3% ..... 17*
   - *d. 2.5% ..... 18*
   - *e. 3% 95th Percentile ..... 18*
4. THE PERMITTED SCENARIO ..... 18
5. THE SDEIS FAILS TO INCLUDE THE CARBON COSTS ASSOCIATED WITH THE INCREASED USE OF ELECTRICITY THAT RESULTS FROM THE SDEIS'S PROJECTED LOWER COST OF ELECTRICITY. ..... 18
   - *a. The SDEIS Incorrectly Assumes the Electricity Use Is Not Sensitive to Price ..... 19*
   - *b. The Forest Service Should Use a More Direct Approach to Include a Price Sensitive Demand for Electricity ..... 22*
     - i. Estimates of the Price Elasticity of Demand - a brief literature review ..... 23
6. MODELING PARAMETERS THAT SHOULD BE CONSIDERED. ..... 24

**III. RECALCULATING THE DAMAGES INCLUDING INCREASED DEMAND AS WELL AS COAL MINE METHANE....25**

**IV. CONCLUSIONS....27**

**V. BIBLIOGRAPHY ....29**

**APPENDIX A - METHOD FOR INCORPORATING THE SOCIAL COST OF METHANE....A-1**

**APPENDIX B - COMPARISON OF THE FOREST SERVICE RESULTS TO OUR RESULTS ....B-1**

1. THE FOREST SERVICE PROVIDED A RANGE OF VALUES THAT ARE MISLEADING .... B-1
2. THE SOCIAL COST OF METHANE DRASTICALLY INCREASES DAMAGES ASSOCIATED WITH MINING IN THE NORTH FORK VALLEY AND SHOULD BE INCLUDED IN THE CALCULATION OF DAMAGES. .... B-2
3. PRICE ELASTICITY OF DEMAND NEEDS TO BE INCLUDED IN THE CALCULATION OF DAMAGES .... B-5
4. DIFFERENCES IN THE REPORTED METHANE EMISSIONS HAVE A SIGNIFICANT IMPACT ON THE DAMAGES ASSOCIATED WITH THE SOCIAL COST OF METHANE .... B-6

# I. Assessing the GHG emissions implications of increased mining in the North Fork Valley

## 1. Court imposed requirements of the SDEIS

On June 26, 2014, U.S. District Court Judge Brooke Jackson ruled that the Forest Service violated the National Environmental Policy Act (NEPA) by failing to consider and disclose the GHG emissions and climate impacts of a Colorado Roadless Rule (CRR) provision that would open the area to further underground coal mining:

> "Therefore, the decision to forgo calculating the reasonably foreseeable GHG emissions associated with the CRR was arbitrary in light of the agencies' apparent ability to perform such calculations and their decision to include a detailed economic analysis of the benefits associated with the rule."[10]

In addition, Judge Jackson's 2014 order clearly pointed the Forest Service towards the use of the Social Cost of Carbon when attempting to quantify the impact of the greenhouse gas (GHG) emissions associated with the North Fork Valley mines.

> "Effects on climate change may occur from mining coal which stem from the release of methane . . . and release of $CO_2$ caused by the burning of coal that is mined". Beyond quantifying the amount of emissions relative to state and national emissions and giving general discussion to the impacts of global climate change, they did not discuss the impacts caused by these emissions. Instead, they offered a categorical explanation that such an analysis is impossible…But a tool is and was available: the social cost of carbon protocol."[11]

In the November 2015 SDEIS, the Forest Service used two tools to try to assess the GHG impact of the potential increase in North Fork Valley mining from opening the area to road construction for coal mines. The Upstream Dashboard tool was used to assess the GHG emissions related to the production of the coal, and the Integrated Planning Model was used to assess the change in the fuel required for domestic electricity generation induced by the additional North Fork Valley mining. The Forest Service used this latter product in conjunction with the Social Cost of Carbon to help quantify the potential costs of the likely increased coal mining in the North Fork Valley which would follow an exemption to the current Roadless Rule in the region. This two-fold approach to determining the GHG emissions impact of increased coal production in the North Fork Valley represents a court ordered improvement over the lack of analysis presented in the Colorado Roadless Rule 2012 final EIS. However, the Forest Service's methodology: 1) incorporated an energy economy model that does not account for the

[10] High Country Conservation Advocates v. U.S. Forest Serv., 52 F.3d 1174. 2014. and High Country Conservation Advocates v. U.S. Forest Serv., 67 F.3d 1262. 2014.
[11] Ibid.

price elasticity of demand[12] in their analysis of the induced GHG emissions, 2) misapplied some of the parameters of the Social Cost of Carbon and 3) failed to address some of the specific instructions from Judge Jackson on the incorporation of methane in the analysis.

## 2. The Integrated Planning Model cannot accurately represent energy production when demand increases.

In the SDEIS, the Forest Service abandoned the presumption that additional coal mined would not have climate change impacts because additive coal will simply displace 100% of existing coal reserves at another location. Instead, the Forest Service now acknowledges that additional coal mined at one location only displaces *part* of the coal mined at other locations. In other words, there is no longer perfect substitution of one coal type for another. In an attempt to model this partial substitution, the Forest Service employed the Integrated Planning Model (IPM) run by the for-profit company, ICF. Since the IPM is a proprietary, 'black box' model, the calculations and assumptions that lead to the results cannot be verified by anyone outside of the ICF. In other words, the model results cannot be independently verified. It is our professional opinion that unverifiable model results should not be the sole source of information upon which public policy decisions are made. The IPM is presented as a sophisticated model that finds the least cost mixture of energy production for a given constant energy demand.[13] Part of the output of the IPM modeling is the relative increase or decrease in energy generation from different fuel sources (i.e. coal, natural gas, nuclear, renewables). The results of the IPM model scenario that the Forest Service calls the "Resources Added" scenario show that for every million tons of coal mined in the North Fork Valley the total national amount of underground coal production increases by 0.528 million tons, surface mined coal production decreases by 0.134 million tons, and natural gas production decreases by 1.57 billion cubic feet.[14]

The calculation of these substitution response coefficients represents a court ordered step in the right direction for calculating the total GHG emissions impacts of the proposed change in the CRR. However, the absence of price elasticity of demand for electricity in the design of the IPM means that model is incapable of assessing the response of the demand side of the energy economy to the resultant decrease in energy prices that accompany the increase in coal production at the North Fork Valley mines.

The SDEIS recognizes this limitation of the IPM in their discussion of the benefits that are calculated:

> "When opportunities for expanded coal production from NFS lands are created under Alternatives B and C, a number of chain reactions may occur related to production and

---

[12] The price elasticity of demand is the change in demand for a product as the price of that product changes. For example, if the price of electricity decreases, more electricity will be generated and consumed.

[13] The IPM was developed in a collaboration between ICF International and the U.S. Environmental Protection Agency to assess the impact of regulatory decisions on the cost of energy at a national level. By design, the IPM excludes elasticity of demand, meaning the model does not account for changes in national energy consumption that are the result of changes in the price of energy. The reason that the IPM was designed this way was to assure consistency between the annual EPA Base Case assumption of total national energy consumption and the Annual Energy Outlook which is published by the U.S. Energy Information Administration (EIA).

[14] SDEIS Table E-14 page E19.

consumption of fuels, related to power generation. Chain reactions may include some degree of responses such as:

♦ …

♦ An increase in total electricity production, reflecting the net effect of increased availability of coal fuel inputs for power generation.” [15]

In other words, the model projects that one of the benefits of increased coal production in the North Fork Valley would be increased electricity generation and consumption of electricity nationally. But the model is incapable of estimating that benefit because the IPM cannot account for an increase in total U.S. electricity consumption brought on by the additional North Fork Valley coal.[16] The SDEIS admits IPM's limitation. The fact that the IPM cannot account for changes in total electricity production and consumption (i.e. demand) is mentioned in the SDEIS at least eight times.[17] The IPM was designed to solve for the least cost energy mixture that can satisfy a predetermined projected demand for electricity while adhering to regulatory limitations. The fixed demand in the model assures that the results are consistent with the Energy Information Administration's projections of future demand. This is key when assessing the impact of regulatory constraints on the national energy mix that will not be accompanied by a change in the total energy consumed by the U.S. The EPA, in its use of the IPM model, does not want to predict a different energy future than the Energy Information Administration (who are the experts) predicts. Thus, the Forest Service uses the IPM to model a scenario that it was specifically designed *not* to model. The quote above (footnote 14) clearly shows that the Forest Service is aware of this problem. The use of the IPM to model a scenario wherein the demand for electricity changes is a gross misapplication of the model.

Without a model that can account for increased demand for electricity that is caused by the additional North Fork Valley coal lowering the cost of electricity and the GHG emissions associated with mining that coal (in this case the specific omission was methane), the GHG cannot be accurately accounted for. As we will show in section II-5. this is a substantial and serious flaw. This is also a flaw that the Forest Service should be well aware of. In May of 2015 we submitted a report to the Forest Service[18] urging them not to use the IPM model and instead to use the Energy Information Administration's National Energy Modeling System model.[19]

---

[15] SDEIS page E-12 and E-13

[16] There is no price elasticity of demand in the IPM.

[17] SDEIS pages 77, 80, 81, 83, 96, E-12, E-13, and E-21.

[18] Power Consulting. Assessing the Ability of Contemporary Models to Calculate the GHG Implications of Federal Coal Leasing Decisions and Other Federal Energy Management Decisions. May 2015.

[19] On page E-3 of the SDEIS, the Forest Service states that “The IPM model uses the National Energy Modeling System [NEMS] in inputs and allows for smaller changes in coal supply, like the North Fork Coal Mining Area. The National Energy Modeling System [NEMS] does not accurately model smaller changes in supply.”
To the extent that the Forest Service is stating that it did not use NEMS because NEMS could not accurately model the changes in supply that would be made available by the proposed coal mine exception to the Colorado Roadless Rule, we disagree. The proposed increase in North Fork Valley coal production is a 14.6% to 43.5% increase in total coal production (depending on the production alternative) for the relevant NEMS supply region. Considering that the percent increase in volume is substantial for all of the proposed Forest Service alternatives, it is highly likely that the supply curve for the Rocky Mountain Region would be changed dramatically by the addition of the proposed increase in the North Fork Valley coal production. This change would most likely flatten the supply curve for the region, allowing more coal at a cheaper price to be put on the market (this is exactly what happens for the IPM supply

It is important to capture demand response when predicting the GHG impacts of energy production decisions. If the response to increased production from a coal mine is a change in the price of energy, then there will be short and long run demand response (elasticity). It is quite possible, and in some cases probable, that the demand response (an increase or decrease in the consumption of electricity) will be as large, or larger, than the potential demand response associated with a fuel substitution response and the corresponding GHG increase or decrease. While the IPM model likely did capture the fuel substitution response of the increase in North Fork Valley coal, it is clear that it did not capture any change in the overall consumption of electricity associated with a price change.

The basic economic principle of elasticity has been applied to energy modeling in many different ways[20] (for a more complete discussion of how elasticity of demand has been applied please see section II.5.b.i.). Recently in a *Nature Climate Change* article[21] the impact of an increased supply of Canadian Oil Sands oil onto the global market by the proposed Keystone XL Pipeline was shown to increase oil consumption by 0.6 barrels of oil for every barrel of oil produced because of the incremental decrease in the price of global oil. They found a corresponding increase in the GHG associated with the increased mining and consumption of the oil. A 2013 White paper by Power Consulting[22] came to the same conclusion about an increase in the GHG associated with Powder River Basin coal going to China via coal export ports in the Pacific Northwest. These examples are meant to highlight the potential for increased GHG emissions associated with different energy policy decisions and the important role that elasticity can play. Any model that is used to look at the GHG associated with energy policy decisions should have elasticities that allow for a different energy future than the reference scenario that the modeled run is compared against. The fact that the IPM cannot account for the price elasticity of demand precludes it from being a reasonable or appropriate model to take a 'hard look' at the change in GHG emissions from increased mining in the North Fork Valley.

We have revealed the two main problems in the SDEIS (sections I.1. and I.2.). In the following sections we present results that are more correct than the Forest Service results while operating within the confines of a flawed model. We show that our methodology "makes a difference" and show how different parameters should be evaluated and applied. The Forest Service currently applies a benefit-cost analysis to 450 unique scenarios, this includes 3 different IPM model scenarios, 3 different production levels, 2 alternatives for mining (B-A and C-A), 5 unique sets of Boundary Stances, and 5 discount rates (3x3x2x5x5=450 sets of unique parameters). However, they do not differentiate between the most likely and least likely sets of parameters. We reject

---

curves). The likely result of this would be a decrease in the national price of electricity (which both IPM and NEMS can estimate) and an increase in electrical consumption (which NEMS can represent but the IPM is incapable of representing).

[20] "A Survey of Energy Demand Elasticities in Support of the Development of the NEMS," October 1993, prepared for the U.S. Department of Energy. http://mpra.ub.uni-muenchen.de/13962/ , p. 42. and "Price Responsiveness in the NWMS Buildings Sector Models," Steven H. Wade, pp. 55-63 in DOE/EIA-0607(99), August 1999, "Issues in Midterm Analysis and Forecasting 1999," Table 3. and A New Look at Residential Electricity Demand Using Household Expenditure Data, Harrison Fell et al., Working Paper No. 2012-04, July 2012, Colorado School of Mines, Division of Economics and Business.

[21] Erickson, P. and Lazarus, M. Impact of the Keystone XL pipeline on global oil markets and greenhouse gas emissions. Nature Climate Change Letters. DOI: 10.1038/NCLIMATE2335. August 10, 2014.

[22] Power Consulting. The Impact of Powder River Basin Coal Exports on Global Greenhouse Gas Emissions. May 2013.http://www.powereconconsulting.com/WP/assets/GHG-Impact-PRB-Coal-Export-Power-Consulting-May-2013_Final.pdf

this ‘shotgun’ approach provided by the Forest Service and feel strongly, based on our professional judgment, that the 450 scenarios provided by the Forest Service should be dramatically pared down to the most defensible scenarios only.

### 3. The Forest Service misapplied Social Cost of Carbon parameters in their calculations of the damages associated with increased mining in the North Fork Valley

Social Cost of Carbon values are published by the Interagency Working Group (IWG).[23] These values are a statistical representation of the potential and likely future monetary cost of $CO_2$ emissions produced in a given year. Since the Social Cost of Carbon values are based on a wide range of both economic and sociopolitical scenarios input into three different models,[24] the evaluation of these values is necessarily a statistical representations of a wide range of possible outcomes. The IWG takes care in representing the Social Cost of Carbon values as estimates and advises that care be taken when these values are used in regulatory decisions. Thus, the published values for the Social Cost of Carbon are given for a range of the values of the parameters that are used to calculate the Social Cost of Carbon (i.e the discount rates and different model runs). Further, as GHG emissions are a global issue, the values are based on the global impact of the Social Cost of Carbon associated with $CO_2$ emissions (in 2007$ / metric ton $CO_2$). The IWG suggests using the global values when accounting for the Social Cost of Carbon on any scale, but they also provide a means of downscaling the Social Cost of Carbon values to a national level using either national GDP as a percent of the global economy (assumed 23% for the US) or, in some limited cases, using the domestic percentage of global benefits attributed to modeled emissions reductions in one of the three models used to derive the Social Cost of Carbon values (this is 7-10% for the US for a 2.5 or 3% discount rate respectively).[25]

In an attempt to represent the uncertainty of the published Social Cost of Carbon values in the SDEIS, the Forest Service has misinterpreted the Social Cost of Carbon downscaling parameters (sections I.4.b and II.2 of this document), misapplied other parameters (sections II.1, II.3.b, and II.4 of this document), and has even made up new scenarios for which the Social Cost of Carbon was never intended (section II.3.a of this document). This results in a misapplication of the Social Cost of Carbon and can have a very large effect by devaluing the Social Cost of Carbon in calculating the damages of the mining scenarios.[26]

---

[23] The IWG was established under executive order (12866). Technical experts from numerous agencies were brought together to review the literature in relevant fields and to discuss key model inputs and assumptions to develop values for the social cost of carbon that were defensible and grounded in the existing scientific and economic literature. Technical Support Document: Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866 Interagency Working Group on Social Cost of Carbon, United States Government. February 2010.

[24] The three models are FUND, PAGE, and DICE. Each of these models is an integrated assessment model (IAM) that is used regularly by the IPCC to combine climate process, economic growth, and the feedbacks between them into a single model framework.

[25] The IWG recognizes that placing a value on the domestic portion of the Social Cost of Carbon is difficult. They suggest that "[o]ne potential source of estimates comes from the FUND model. The resulting estimates suggest that the ratio of domestic to global benefits of emission reductions varies with key parameter assumptions. For example, with a 2.5 or 3 percent discount rate, the U.S. benefit is about 7-10 percent of the global benefit, on average, across the scenarios analyzed." – IWG 2010 page 11

[26] The Forest Service calculates the Present Net Value (PNV) of different alternatives to try to determine the difference in Net Benefits or Net Damages for each of the 450 unique scenarios that they consider. The Present Net

### a. Parameters for the Social Cost of Carbon

#### *i. Discount rates*

The Forest Service presents five different discount rate scenarios when considering the Social Cost of Carbon. Those discount rate scenarios are 3% 10th percentile, 5%, 3%, 2.5%, and 3% 95th percentile. The 10th and 95th percentiles represent the outliers of this group of discount rate scenarios. They are the statistical bookends of what GHG values may be worth in two very different futures. For the 10th percentile, GHG does not have much value because in that future we have mitigated climate change to such a degree that adding extra GHG to the atmosphere is not accompanied by large added costs. For the 95th percentile the opposite is true: adding even small amounts of GHG to the atmosphere has large costs associated with it because the earth has failed to mitigate climate change and added GHG is very costly. Aside from the 3% 10th, which was invented by the Forest Service for the SDEIS and represents a Social Cost of Carbon value that is far lower than any presented by the IWG, all of the other values are consistent with the IWG report on the Social Cost of Carbon.[27] The question is then, which of the discount rates should be applied?

The SDEIS rules out the use of the 3% 10th percentile and the 5% discount rate scenarios in its own analysis:

> "These examples demonstrate that observed values or prices for carbon have ranged from approximately $2 to $23 per ton.
>
> The 10th percentile SCC values, for a 3 percent discount rate, as well as SCC values based on 5 percent discount rates, under the national boundary stance are at or below the lower range of observed carbon credit values; as a result, 10th percentile SCC values and SCC values based on 5 percent discount rates are not used to estimate social costs for the national boundary stance." [28]

In our report we present the 2.5% and the 3% discount rates. A discussion of the reasoning behind that decision follows in section II.

## 4. The Forest Boundary, the National Boundary, and the Global Boundary

When considering the impacts of the Social Cost of Carbon, the Forest Service presented analyses based on three separate geographic boundaries. This was an attempt to quantify the impacts on the local area (the Forest Boundary), the nation, and the globe as a whole. It is unclear why these boundaries were chosen since the consequence of the global build-up of GHG is influenced equally whether the emissions take place in Colorado or China.

---

Value is "A way of comparing the value of something now with the value of it in the future, which is used to compare alternative projects that have different cost and revenue flows." (from Oxford Reference http://www.oxfordreference.com/view/10.1093/oi/authority.20110803100343711). We discuss this further in Appendix B.

[27] Technical Support Document: Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866 Interagency Working Group on Social Cost of Carbon, United States Government. Revised July 2015 https://www.whitehouse.gov/sites/default/files/omb/inforeg/scc-tsd-final-july-2015.pdf.

[28] SDEIS page E-18.

Specifically, the Forest Boundary stance is a biased view of the damages of carbon vs. the benefits of increased North Fork Valley mining. By looking at this stance, the Forest Service is doing two things: 1) they are excluding the combustion of the coal from the Social Cost of Carbon and 2) they are misapplying the IWG's downscaling parameter.

### a. Forest Boundary: comparing the mine-level Social Cost of Carbon of coal production to the national-level benefits to the mine

The Forest Boundary Stance benefit-cost analysis is calculated as the monetary benefit of the mine on a local level. The local benefits are measured by the net revenue associated with operating the coal mines: mine mouth coal price less the cost of operating the coal mine multiplied by the volume of coal produced each year. From this are subtracted the Social Cost of Carbon associated with the mine production to obtain the net local value. Thus, by limiting the benefit-cost analysis to the Forest Boundary, the Forest Service only accounts for emissions associated with the *production* of coal as a cost.

Allowing the benefit of the net value of the coal to be counted at the Forest Boundary level does not make sense since the coal has no value at the Forest Boundary level, just as the Social Cost of Carbon has no cost from combustion of the coal at the Forest Boundary level. Since there are no coal fired generators inside the Forest Boundary that could use all of proposed increase in coal supply, the mined coal needs to be sold into the national market to have any value. Further, if the coal is sold into the national market, the coal will be used to generate electricity which has large GHG implications, which in turn greatly increases the damages associated with mining the coal. If one was to take the national market into consideration, then one would have to look at the net benefits *and* damages of the coal. As the SDEIS clearly points out, there will be a reduction in surface mining associated with the North Fork Valley coal (-13 percent surface coal per ton of North Fork Valley coal), there will be a reduction in the natural gas that is produced (-1.57 billion cubic feet per million tons of North Fork Valley coal), there will be a reduction in renewable energy consumed (although the value is much harder to quantify since it is not stated in the same terms), and finally only 52.8 percent of the North Fork Valley coal is additional underground coal that would not otherwise have been produced.[29] The reduction in renewables that is presented in the SDEIS does not have the same calculated factor that relates the impact of North Fork Valley coal being added into the model to the decrease in renewables.

By allowing this artificial Forest Boundary to be used, the benefits of the coal are disproportionately and incorrectly accounted for while the true damages of the coal, which primarily comes from the combustion of the coal, and the GHG associated with that combustion, are ignored. The Forest Boundary scenario effectively recreates the perfect substitution assumption used in the Colorado Roadless Rule 2012 Final EIS that was rejected by the court: More coal is mined but no more coal is burned. It is exactly this analytical error that this SDEIS was ordered to rectify. Because it produces biased, illogical results, the Forest Service cannot use the Forest Boundary in any NEPA document addressing the impacts of the coal mining exception.

---

[29] SDEIS. Table E-14.

### b. Forest Boundary: misapplication of the downscaling parameters in the interpretation of the damages

The second error with the Forest Boundary is the downscaling parameter applied to the Social Cost of Carbon. The Forest Service applies a 7% value to the Social Cost of Carbon for the Forest Boundary. As discussed above, GHG and global warming are not confined to any specific Forest Boundary. Even if they were, it is clear that the 7% weight applied to the Social Cost of Carbon was *not designed* to represent a smaller geographic area. In fact, it is the result of only one of the three models used by the IWG to scale the Social Cost of Carbon to the U.S. as a whole.

> "The resulting [FUND] estimates suggest that the ratio of domestic to global benefits of emission reductions varies with key parameter assumptions. For example, with a 2.5 or 3 percent discount rate, the U.S. benefit is about 7-10 percent of the global benefit, on average, across the scenarios analyzed."[30]

As the IWG clearly states, the 7-10 percent range is a product of the FUND model only and was meant to be applied to the U.S. as a whole with the 2.5 and 3 percent discount rates respectively. This is because the FUND model, like the other models that are used to determine the Social Cost of Carbon, is run multiple times with different discount rates in order to cover a large range of possible future scenarios. Specifically, the results of the FUND model show that the US domestic damages associated with carbon are 7% of the total global damages if the discount rate is 2.5%; if the discount rate is 3%, the FUND model shows that the domestic damages are 10% of the global damages. The application of a 7% factor to the Social Cost of Carbon ignores the results of the other two models with which the Social Cost of Carbon was developed. Further, applying the 7% weight to any results calculated with a discount rate other than 2.5% is a complete misapplication of the FUND model result.

Not only did the Forest Service cherry pick the weight that they wanted to apply to the Social Cost of Carbon (7%) but they misapplied it to a far smaller regional area for which it was not intended. It is important to understand that the "expected damage in the U.S. done by climate change" (i.e. the 7 or 23%)[31] can be an important number for assessing the brunt of the Social Cost of Carbon that would be borne by the U.S., but the full cost of the Social Cost of Carbon will be borne globally. Thus, the $CO_2$ emissions impact of the increase in North Fork Valley mining must *only* consider the global boundary in a true benefit-cost analysis. The IWG offers no percentage weights for sub-national economies and, in fact, rejects even a national weight. Therefore, the SDEIS is misusing the IWG Social Cost of Carbon analysis in its Forest Boundary calculations. The Forest Service must correct this error by abandoning the use of this metric in any subsequent NEPA analysis.

---

[30] Technical Support Document: Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866. Interagency Working Group on Social Cost of Carbon, United States Government. Page 12. 2015.

[31] Ibid.

## 5. The Forest Service fails to include the methane costs of additional North Fork Valley coal mining in the SDEIS.

The Forest Service applied the Social Cost of Carbon to $CO_2$ emissions associated with the production, transportation, and burning of the additional coal.[32] While this is a court ordered step in the right direction, they omitted the impacts of the high levels of coal mine methane that would be produced with increased production at the North Fork Valley mines. This left uncorrected a specific error in the DEIS that Judge Jackson pointed out.[33] The Forest Service justified this failure to account for the coal mine methane emissions by stating in the SDEIS:

> "As noted in the 2015 technical support document for SCC values (IWG, 2015), SCC values are designed to be applied only to carbon dioxide emissions and not methane emissions."[34]

We agree with this statement. However, the Social Cost of Methane has also been established and is currently being used by the EPA.[35] Marten[36] developed a Social Cost of Methane criteria that uses the same models and the same framework as the Social Cost of Carbon developed by the IWG. Marten works for the EPA and developed the values for the Social Cost of Methane with the EPA so that the U.S. Government could use them along with the Social Cost of Carbon to estimate the monetary impact of all of the emissions related to energy consumption, both domestically as well as globally.[37] The Social Cost of Methane values can be applied to the benefit-cost analysis in the same manner as the Social Cost of Carbon with the same discount rates and the same downscaling parameters, which makes it easy to employ the Social Cost of Methane in a similar manner to the SDEIS application of the Social Cost of Carbon. As Marten states:

> "These new estimates are designed to be compatible with the USG SC-$CO_2$ estimates currently in use and may therefore be directly applied to value emissions changes for these non-$CO_2$ gases within the benefit–cost analyses used to evaluate future policies."[38]

By neglecting the Social Cost of Methane in their analysis, the Forest Service omitted coal mine methane emissions that would be released if the Roadless Rule is amended. As a result, the SDEIS significantly under-estimates the climate change impacts and the social cost of the coal mine exception.

---

[32] As calculated with a computational spreadsheet that converts the induced change and increase in fuel type from three different model scenario runs of the Integrated Planning Model to the Present Net Value of different mining rate and volume scenarios.
[33] "FSLeasing-0046776 at 0046808 ("Effects on climate change may occur from mining coal which stem from the release of methane . . . and release of $CO_2$ caused by the burning of coal that is mined"). Beyond quantifying the amount of emissions relative to state and national emissions (FSLeasing-0046874) and giving general discussion to the impacts of global climate change (FSLeasing-0046880), they did not discuss the impacts caused by these emissions." - Civil Action No. 13-cv-01723-RBJ. Page 17.
[34] SDEIS. Page E-25.
[35] EPA. The Social Cost of Carbon. 2016. http://www3.epa.gov/climatechange/EPAactivities/economics/scc.html.
[36] Marten, A., Kopits, E., Griffiths, C., Newbold, S., Wolverton, A. Incremental CH4 and N2O mitigation benefits consistent with the US Government's SC- $CO_2$ estimates. *Climate Policy*. Vol. 15, No. 2, 272-298. 5.20.2014.
[37] Marten also accounts for the social costs of NO2 which is not relevant to this discussion. We are not suggesting however that methane and CO2 are the only relevant GHGs.
[38] Ibid.

The revised analysis that we present in this report includes the Social Cost of Methane for the coal mine methane that will likely be released. In the results section of this document we provide benefit-cost values using the Social Cost of Methane in conjunction with the Social Cost of Carbon.

### a. Values for the Social Cost of Methane

Marten[39] presents the values for the Social Cost of Methane in the same way that the IWG presents the Social Cost of Carbon as shown in Table 1.

**Table 1.**

| Table B-2 SC-CH4 (2007$ per ton CH4) | | | | |
|---|---|---|---|---|
| Year | 5.00% | 3.00% | 2.50% | 3% |
| | Mean | Mean | Mean | 95th Percentile |
| 2010 | $370 | $870 | $1,200 | $2,400 |
| 2015 | $450 | $1,000 | $1,400 | $2,800 |
| 2020 | $540 | $1,200 | $1,600 | $3,200 |
| 2025 | $650 | $1,400 | $1,800 | $3,700 |
| 2030 | $760 | $1,600 | $2,000 | $4,200 |
| 2035 | $900 | $1,800 | $2,300 | $4,900 |
| 2040 | $1,000 | $2,000 | $2,600 | $5,500 |
| 2045 | $1,200 | $2,300 | $2,800 | $6,100 |
| 2050 | $1,300 | $2,500 | $3,100 | $6,700 |

The Social Cost of Methane is strikingly higher than the Social Cost of Carbon. This is because methane has a much higher Global Warming Potential (GWP) than $CO_2$, meaning the social cost of releasing methane is higher than the social cost of releasing $CO_2$. The GWP is higher for methane because of its ability to trap heat in the atmosphere more effectively than $CO_2$. Although the heat trapping ability is dramatically larger than for $CO_2$, the effects of the methane have a shorter life span because the residence life of methane is much shorter than $CO_2$ in the atmosphere.[40] A GWP value of 36 was used by the Forest Service to convert methane to $CO_2e$.[41] Marten warns that the use of the GWP of 36 (when compared to $CO_2$) "will likely offer a conservative estimate of the social cost of non-$CO_2$ GHGs."[42] Instead of using this metric, Marten advocates for the values that are presented in Table 1. However, if a GWP multiplier is used, then 36 is the correct multiplier to use to compare methane to $CO_2$.

### b. Sensitivity analysis in the SDEIS: Attempting to account for uncalculated methane emissions

The Forest Service calculated the "average annual net change in methane emissions" associated with the additional mining of 172 million tons of North Fork Valley coal by using the

[39] Ibid.
[40] IPCC Chapter 3 table 4.1. https://www.ipcc.ch/ipccreports/tar/wg1/016.htm
[41] SDEIS pages 34 and 98.
[42] Marten, A., Kopits, E., Griffiths, C., Newbold, S., Wolverton, A. Incremental CH4 and N2O mitigation benefits consistent with the US Government's SC- $CO_2$ estimates. *Climate Policy.* Vol. 15, No. 2, 272-298. 5.20.2014.

Upstream Dashboard tool.[43] This tool is a spreadsheet that calculates the estimated emissions from producing and transporting fuels, in this case coal. The Upstream Dashboard tool can quickly estimate upstream emissions associated with the production of a particular fuel. However, Upstream Dashboard does *not* calculate the cost of the emissions that it estimates. Further, the SDEIS states:

> "…reported methane emissions data from those two mines were used to reasonable [sic] estimates of possible future methane emissions from mines within the North Fork Coal Mining Area. Available methane release data for the West Elk and Elk Creek mines were downloaded from EPA's facility GHG data web site (EPA, 2015), in tons of $CO_2$eq. The site contained three years' worth of data (2011-2013)."[44]

Using this three-year series of data[45] the Forest Service calculated the average methane produced per ton of coal[46] for the region and came up with a value of 463 cubic feet of methane per ton of coal produced. We requested a longer data series of methane emissions from the EPA and they provided us with data that spans the 2002-2013 period (12 years instead of just the three-year 2011-2013 period).[47] The mine production data comes from the Mine Safety and Health Administration (MSHA) which is part of the Department of Labor. The coal production data can be viewed on their Mine Data Retrieval System.[48] Average production over this period was just over 10 million tons per year (10.0623 million tons). The combined weighed average[49] over the 12-year span was 842 cubic feet of methane per ton of coal mined,[50] or 80% greater than the Forest Service 3-year average.[51] Since more coal (172 million tons) is being analyzed than was produced over our historic production period (2002-2013), we feel, based on our professional judgement, that the longer time period is more representative than the three-year period presented by the Forest Service.

In Table 3-20 of the SDEIS the Forest Service presents the "net change in methane emissions due to changes in surface and underground mining" for various scenarios using their three-year period estimate of the methane emissions from the North Fork Valley mines. In the "Sensitivity Discussion" of Appendix E in the SDEIS the Forest Service uses their calculated methane emissions to estimate the methane impact on their benefit-cost calculations. [52]

> "*Consideration of Methane Emissions*

---

[43] SDEIS page 34.

[44] EPA. Greenhouse Gas Emissions from Large Facilities. http://ghgdata.epa.gov/ghgp/main.do

[45] The 2013 emissions from Elk Creek Mine were excluded from the calculation of the regional average methane emissions. The DEIS reports that the average emissions for Elk Creek Mine were 898 cubic feet per ton of coal whereas the West Elk mine methane emissions were 327 cubic feet per ton of coal. The SDEIS states that these values come from the EPA website at http://ghgdata.epa.gov/ghgp/service/facilityDetail/2014?id=1010310&ds=E&et=&popup=true. The emission values from this website do not agree with the numbers quoted in Table 3-4 in the SDEIS on page 43; they also do not agree with values provided by request from the EPA.

[46] Weighted averages based on annual production. Op. cit. EPA Greenhouse Gas Emissions from Large Facilities.

[47] The data comes from quarterly methane sampling completed each year from the MSHA over the twelve year period.

[48] Mine Data Retrieval System. http://www.msha.gov/drs/drshome.htm

[49] Weighted by the annual production at each mine

[50] The 12 year weighted average methane emissions from Elk Creek Mine were 778 cu. ft. per ton of coal mined. The weighted average methane emissions from West Elk Mine were 886 cu. ft. per ton of coal mined.

[51] Op. cit. EPA Greenhouse Gas Emissions from Large Facilities.

[52] SDEIS page E-25.

> Based on the carbon dioxide and methane emission results in Tables 3-19 and 3-20 in the main text, inclusion of $CO_2$eq of methane emissions, can result in an increase in a 20% increase [sic] in estimated $CO_2$eq emissions for combined production and combustion under the national boundary stance. For the Forest boundary stance, where only those emissions from production (extraction) of coal are considered, $CO_2$eq emissions can increase by a factor of x20 when including methane emissions in the calculations.
>
> As noted in the 2015 technical support document for SCC values (IWG, 2015), SCC values are designed to be applied only to carbon dioxide emissions and not methane emissions. As a consequence, it is not necessarily appropriate to apply SCC values to $CO_2$eq emissions for methane. However, for sensitivity purposes, carbon dioxide emission factors were increased for underground and surface coal production by relevant percentages, based on values in Table 3-19 and 3-20, to incorporate the $CO_2$eq emissions of methane shown in Table 3-20 in social cost calculations for Alternatives B and C."

This statement means that Forest Service did a "sensitivity analysis" that included the methane emissions from the North Fork Valley mines and included them in the benefit-cost analysis for the Forest Boundary and the National Boundary; the Forest Service uses the term Present Net Value (PNV) in their discussion of the benefit-cost analysis. Assuming that the Forest Service took a scientifically sound approach to including the methane emissions in their analysis of the emissions impact of the potential increase in North Fork Valley mining, then there should be a 20-fold increase in $CO_2$e emissions at the Forest Boundary and a 20 percent increase in $CO_2$e emissions at the National Boundary.

This increase is described, but never presented in a table, as having the following impact.[53]

> "Lower bound PNV estimates for 3% average SCC values became negative while upper bound PNV estimates for 3% average SCC values remained positive – implying that average PNV estimates are near zero or neutral for both the National boundary as well as the Forest Boundary stances."

We interpret this to mean that *if* the social costs of coal mine methane from the North Fork Valley mines are included in the estimates of damages, then the average benefit-cost estimates are near zero or neutral for both the National Boundary and the Forest Boundary. This would mean that at the National and Forest Boundary the damages would be equal to the benefits. Since Judge Jackson specifically ruled that the Forest Service violated NEPA by failing to account for methane emissions, the methane data omitted the SDEIS, which results in a near zero or neutral benefit minus damages for the Forest and National Boundary, should have been included in the cumulative effects in the main body of the SDEIS and not relegated to some obscure paragraphs at the end of the Sensitivity Discussion. Since the inclusion of methane clearly tips the calculus of the benefit-cost to zero or near zero at the Forest and National Boundary, this is a critical omission in the main body of the SDEIS.

[53] Ibid.

To address this significant omission, we have recalculated the damages with methane included[54] using the appropriate Social Cost of Methane[55] values in the SDEIS "sensitivity analysis". Our results for the Reserves Added Scenario are shown in the tables in Appendix B.[56]

## 6. The Forest Service fails to accurately account for the elasticity of demand.

The SDEIS IPM modeling projects that increasing the supply of coal from the North Fork Valley will reduce coal costs to electric generators. Because fuel costs are an important determinant of the cost of generating electricity, the cost of supplying electricity to Americans will decline. In fact, the basis of the SDEIS benefits of mining North Fork Valley coal is the reduction in the cost of coal coming from the Uinta Basin and the reduced cost of generating electricity.[57] The IPM results show exactly what one would expect from a market economic perspective: Adding a significant amount of lower priced coal to the national coal supply displaces to a certain extent other coal, natural gas, and renewable energy that otherwise would have been used to provide Americans with electricity causing the price of electricity to decrease.

However, in the SDEIS modeling of the economic impact of this increase in the supply of North Fork Valley coal, the reduced cost of electricity to Americans is not allowed to increase the overall use of electricity. Just as the lower coal prices were expected to lead to the increased use of coal, the lower electric prices should also increase the use of electricity. That would require the burning of additional fuel, greater GHGs emissions, and higher damage costs from climate change as the market comes back into equilibrium. Because the IPM model assumes a fixed level of demand for electricity no matter what happens to fuel and other electric generating costs, this normal market adjustment to lower energy prices is not allowed by the IPM model when it comes to electricity. This assures that the SDEIS underestimates the damages associated with the production, transportation, and burning of additional North Fork Valley coal. By underestimating the damages associated with the added electricity that should have accompanied lower costs, the Forest Service again fails to take the 'hard look' at the GHG emissions impact due to the increase in North Fork Valley coal as required by law.

---

[54] The method for applying the Social Cost of Methane is similar to applying the Social Cost of Carbon. We describe our application of the Social Cost of Methane in Appendix A.
[55] Marten, A., Kopits, E., Griffiths, C., Newbold, S., Wolverton, A. Incremental CH4 and N2O mitigation benefits consistent with the US Government's SC-CO2 estimates. *Climate Policy*. Vol. 15, No. 2, 272-298. 5.20.2014.
[56] Social Cost of Carbon values are directly from the Forest Service Excel workbook; Social Cost of Carbon+Social Cost of Methane values have the Social Cost of Methane included in the calculation of the PNV. All values are discounted to the year 2015
[57] SDEIS page 74.

## II. Determining the appropriate parameters for the analysis of damages

The fundamental flaws of the analysis in the SDEIS have been discussed in detail above. Here we discuss and apply the correct the parameters that should be used when considering the Social Cost of Carbon, the Social Cost of Methane, and elasticity of demand, which demonstrate that a legally-sufficient hard look would disclose far greater GHG emissions and social costs than disclosed in the flawed SDEIS analysis.

### 1. The Forest Boundary

As discussed in section I-4b above, the Forest Boundary is not an appropriate geographic area for this analysis because the GHGs emitted by induced mining and coal combustion have impacts at a global scale which cannot be assessed over an area as small as the proposed Forest Boundary. GHGs emitted anywhere else on the globe have the same additive effect on the planet as a whole and, as the IWG point out, even national boundary downscaling of the effects of GHG emissions is highly uncertain and if each nation makes this type down-scaling adjustment, there will be a serious suboptimization of the levels of GHG controls adopted. The IWG clearly states that:

> "…climate change problem is highly unusual in at least two respects. First, it involves a global externality: emissions of most greenhouse gases contribute to damages around the world even when they are emitted in the United States. Consequently, to address the global nature of the problem, the SCC must incorporate the full (global) damages caused by GHG emissions. Second, climate change presents a problem that the United States alone cannot solve. Even if the United States were to reduce its greenhouse gas emissions to zero, that step would be far from enough to avoid substantial climate change. Other countries would also need to take action to reduce emissions if significant changes in the global climate are to be avoided." [58]

Further, North Fork Valley coal has no value at the Forest Boundary, just as the consumption of the coal has no cost at the Forest Boundary if it is not sold. For the coal to have any value it must be sold into the national market. Assuming that the coal has a national value inside the Forest Boundary yet the consumption of the coal has no cost within the same boundary is inconsistent and contradictory. For the coal to have value within the Forest Boundary there would have to be coal-fired generators capable of burning all of the coal within the Forest Boundary and the associated damages of consuming the coal would have to be taken into account.

Because the national value for the coal is assumed at the Forest Boundary the benefits are dramatically overinflated. The SDEIS's analysis thus erroneously reports that the benefits of additional coal mining appear to dramatically outweigh the damages, because benefits at the National Boundary are considered but only some of the damages at the Forest Boundary are included. Only some of the damages are included because they only consider the emissions

---

[58] Technical Support Document: Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866 Interagency Working Group on Social Cost of Carbon, United States Government. February 2010. Pages 10-11.

associated with the mining of the coal. This does not include the emissions associated with the burning of the coal nor does it include the methane that comes from the mining of the coal.

Any attempt to scale down a global problem to a sub-national level should be abandoned because it is fundamentally inconsistent and misleading. The coal coming from the North Fork Valley mines is sold into a national and international markets, the coal fired generators that burn the North Fork Valley coal are geographically dispersed across the U.S. and the world, and the emissions from those coal fired generators distribute their GHG globally. Because of this the Forest Boundary scenarios should be abandoned.

### 2. The 7% downscaling factor

In an attempt to show the impact of global warming on the U.S., the IWG does present a way to scale the global SCC to a "domestic SCC."[59] Although they present this value, as we show above in footnote 58, the IWG has expressed its preference that the full global value of the SCC should be used. Recall that the 7% downscaling factor comes from the IWG's downscaling of the Social Cost of Carbon to the national level and is based on *one* of the models, that was used to create the Social Cost of Carbon (the FUND model), which estimated that the U.S. represented 7% of the global damages associated with global warming at a 2.5% discount rate.

To apply the 7% factor, which is meant as a national approximation for the U.S's share of the damages of global warming going forward, to any other discount rate other than 2.5%, and/or to apply it to any other geographic area other than the U.S. is a misapplication of the IWG estimates for downscaling. Further, use of the 7% value implies that the analyst believes one of the three models has an advantage over the combination of the three different models that the IWG used. The FUND model consistently shows that the damages will be less than the other two AIM models and the IWG has expressed concerns with the approach that the FUND model takes.[60] The result of assuming a 7% of global damages borne domestically is that the Social Cost of Carbon, is dramatically reduced.

Since global warming is a global problem, and since GHG emitted anywhere within the world has the same impact on the world as a whole, the global value of the Social Cost of Carbon and the Social Cost of Methane should be used. The IWG gives precisely this advice when considering whether to value the Social Cost of Carbon at a national or global level.

> "…climate change presents a problem that the United States alone cannot solve. Even if the United States were to reduce its greenhouse gas emissions to zero, that step would be far from enough to avoid substantial climate change. Other countries would also need to take action to reduce emissions if significant changes in the global climate are to be avoided. Emphasizing the need for a global solution to a global problem, the United States has been actively involved in seeking international agreements to reduce emissions and in encouraging other nations, including emerging major economies, to take significant steps to reduce emissions. When these considerations are taken as a

[59] Ibid.

[60] The FUND model is described by the IWG as likely underestimating the U.S. (or domestic) share of impacts associated with global warming: "Further, FUND does not account for how damages in other regions could affect the United States (e.g., global migration, economic and political destabilization)." From Technical Support Document: Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866 Interagency Working Group on Social Cost of Carbon, United States Government. Page 11.

whole, the interagency group concluded that a global measure of the benefits from reducing U.S. emissions is preferable." [61]

In our analysis of the costs associated with additional North Fork Valley coal we present both the National Boundary (23%) as well as the Global Boundary (100%) values for the Social Cost of Carbon and the Social Cost of Methane so that they can more readily be compared to the SDEIS. We provide a full set of modeling values in Appendix B to be fully transparent about our methods. However, we believe strongly, as do the U.S. Government agencies that developed the values for the Social Cost of Carbon (the IWG, which includes the U.S Department of Agriculture), that the *global* costs (not the downscaled national or regional costs) are the only costs that should be presented because the social damage from the climate change impacts of carbon and methane are felt globally.

### 3. Which discount rates to use

As discussed earlier, the SDEIS presented 5 different discount rate scenarios (3% 95th, 2.5%, 3%, 5%, and 3% 10th). The IWG has narrowed the field of relevant discount rates far more than this.

> "In light of disagreement in the literature on the appropriate market interest rate to use in this context and uncertainty about how interest rates may change over time, we use three discount rates to span a plausible range of certainty-equivalent constant discount rates: 2.5, 3, and 5 percent per year. Based on the review in the previous sections, the interagency workgroup determined that these three rates reflect reasonable judgments under both descriptive and prescriptive approaches." [62]

Despite that IWG recommendation, the SDEIS used a broader range of discount rate scenarios. Here, we briefly review each discount rate from the highest discount to the lowest and examine the merits and potential shortfalls of each.

#### a. 3% 10th percentile

The 3% 10th percentile discount rate scenario is a value that was invented by the Forest Service for this SDEIS. This "best case" (for additional coal mining) value is far outside of the values presented by the IWG. In fact, this value was deemed too low by the Forest Service for its own use.

> "Domestic 10th percentile SCC values (i.e., 7% to 23% of global 10th percentile SCC values) are lower than typical ranges of market prices for carbon credits and therefore too low to be representative of social costs."[63]

In other words, the Social Cost of Carbon current market prices are already higher than the 10th percentile value that the Forest Service created. For these reasons, the 3% 10th percentile discount rate scenario should not be used in the SDEIS. To include it is to confuse the reader into believing that the range of potential likely outcomes is far wider than

[61] Technical Support Document: Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866 Interagency Working Group on Social Cost of Carbon, United States Government. February 2010. Page 10.
[62] Technical Support Document: Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866 Interagency Working Group on Social Cost of Carbon, United States Government. Page 23.

[63] SDEIS page 85.

it actually is. This skewing of the range of benefit-cost analysis misleads the public and undermines the 'hard look' that NEPA requires.

### b. 5%

As noted above, the IWG does present a 5% discount rate. This is the largest discount rate that the IWG allows in their "plausible range." However, as the Forest Service notes in the SDEIS,

> "The 10th percentile SCC values, for a 3 percent discount rate, as well as SCC values based on 5 percent discount rates, under the national boundary stance are at or below the lower range of observed carbon credit values; as a result, 10th percentile SCC value sand SCC values based on 5 percent discount rates are not used to estimate social costs for the national boundary stance." [64]

The Forest Service does not explain, as it must, why, if the Social Cost of Carbon at the 5% discount rate is below the current market rate, it is appropriate to apply it to only the Global Boundary. For this reason, and the reasons that will be discussed associated with the 3% discount rate below, the SDEIS should not include the 5% discount rate in the analysis of the Social Cost of Carbon or the Social Cost of Methane.

### c. 3%

In a recent survey of *all* of the economists who have published an article related to climate change in a highly ranked, peer-reviewed economics or environmental economics journal since 1994, the economists were asked about discount rates.[65] Aside from the fact that only 8% of the economists thought that a constant discount rate, as is being applied in the SDEIS, should be used, if the 1st percentile and the 99th percentile values are excluded, then the discount rates that should be used, were 2.3% and 2% (median and mean respectively).[66] If the 95th and 5th percentile is excluded then the mean and median estimates become 1.87% and 2% respectively.

The Union of Concerned Scientists has also weighed in on the issue of discount rates.

> "Importantly, all of these discount rate schedules yield lower present values than the constant 2.5% Newell Pizer rate, suggesting that even the lowest discount rate evaluated by the IWG is too high."[67]

Based on the collective advice of all of the economists that have published an article related to climate change and the advice of the Union of Concerned Scientists, we suggest that the 3% discount rate should also not be used in the analysis of the Social Cost of Carbon or the Social Cost of Methane. While the IWG recommends use of the 3% discount rate, the Forest Service must at least acknowledge that the 3% discount rate likely underestimates the climate damage that is likely to result from additional carbon emissions.

---

[64] SDEIS page E-18

[65] Howard, P. and Sylvan, D. Expert Consensus on the Economics of Climate Change. Institute for Policy Integrity. December 2015. Page 20.

[66] Howard, P. and Sylvan, D. Expert Consensus on the Economics of Climate Change. Institute for Policy Integrity. December 2015. Page 21.

[67] Dockets EPA-HQ-OAR-2014-0827 &NHTSA-2014-0132. 10.1.2015. Page 14. http://policyintegrity.org/documents/Oct2015_Joint_Comments_to_EPA-NHTSA.pdf

### d. 2.5%

Although both the survey of all the economists that have published on climate related articles and the Union of Concerned Scientists believe that the constant 2.5% discount rate is too high, we include it in our analysis. In our professional opinion, this value is in the ballpark of acceptable discount rates, although it is on the upper end. The value of including this discount rate is that it allows direct comparison with the estimate presented in the SDEIS.

### e. 3% 95th Percentile

This value was given by the IWG to represent the "higher-than-expected" impacts from global warming. Just as we rejected the Forest Service's 10th percentile as a "best case" scenario, we reject the "worst case" scenario. However, modeling the higher-than-expected impacts does have value in this setting because the worst case scenario should be avoided at all cost and under the worst case scenario, any further contributions of GHG have very large impacts associated with them. Thus there is a very good reason that the IWG included a 95th percentile and did not include a 5th (or in this case 10th) percentile value for the Social Cost of Carbon.

## 4. The Permitted Scenario

The average mining rate of Elk Creek and West Elk over the period of 2002-2013, when both mines were in operation, was about 10 million tons of coal per year.[68] This is the same coal volume as the Average Scenario proposed in the SDEIS. The Permitted Scenario assumes 15.5 million tons per year.[69] Given that the Elk Creek mine is not currently in operation (and has not been since 2013) it seems unreasonable to use the Permitted Scenario when assessing the impacts of the North Fork Valley mines. During 2004 the West Elk and Elk Creek mines together produced just over 13 million tons of coal. At no point since 2002, when both mines were in operation, have the two mines produced 15.5 million tons of coal. Given the soft demand for coal going forward in time, it is reasonable to assume that the market will not support such a high rate of production from the North Fork Valley.

Because the Elk Creek and West Elk mine collectively have not produced 15.5 million tons of coal in any given year, the Permitted Scenario should not be used to assess the impacts of the proposed increase in North Fork Valley mining.

## 5. The SDEIS Fails to Include the Carbon Costs Associated with the Increased Use of Electricity That Results from the SDEIS's Projected Lower Cost of Electricity.

[68] The actual value is 10.06 million. http://www.msha.gov/drs/drshome.htm
[69] SDEIS table 3.3 page 37.

### a. The SDEIS Incorrectly Assumes the Electricity Use Is Not Sensitive to Price

The SDEIS IPM modeling projects that increasing the supply of coal from the North Fork Valley will reduce coal costs to electric generators. Because fuel costs are an important determinant of the cost of generating electricity, the cost of supplying electricity to Americans will decline. In fact, the basis of the SDEIS benefits of mining North Fork Valley coal is the reduction in the cost of coal coming from the Uinta Basin and the reduced cost of generating electricity. What that modeling shows is, from a market economic perspective, what one would expect: Adding a significant amount of lower priced coal to the national coal supply displaces, to a certain extent, other coal, natural gas, and renewable energy that otherwise would have been used to provide Americans with electricity.

However, in the SDEIS modeling of the economic impact of this increase in the supply of North Fork Valley coal, the reduced cost of electricity to Americans does not increase their overall use of electricity. Just as the lower coal prices were expected to lead to the increased use of coal by utilities, the lower electric prices should also increase the use of electricity by consumers. An increase in electricity consumption would require the burning of additional fuel, leading to the emission of more GHGs and higher damage costs from climate change. Because the IPM model assumes a fixed level of demand for electricity no matter what happens to fuel and other electric generating costs, this normal market adjustment to lower energy prices is not accounted for. This leads the SDEIS to underestimate the costs associated with the production, transportation, and burning of additional North Fork coal.

In the SDEIS's final appendix, Appendix E, this limitation of the SDEIS IPM modeling is admitted:

> "When opportunities for expanded coal production from NFS lands are created under Alternatives B and C, a number of chain reactions may occur related to production and consumption of fuels, related to power generation. Chain reactions may include some degree of responses such as:
>
> - ……
> - An increase in total electricity production, reflecting the net effect of increased availability of coal fuel inputs for power generation." [70]

Later in this SDEIS appendix this problem with the IPM modeling is also made explicit:

> "…the IPM model minimizes the cost of meeting fixed schedules of energy demand over time. The modeling assumption of fixed demand implies that demand for energy (e.g. to generate electricity) is not allowed to increase in response to increased supplies." [71]

This is not clearly stated. In the setting of this SDEIS it should read: "…the IPM model minimizes the cost of meeting fixed schedules of *electricity* demand over time. The modeling assumption of fixed demand implies that the *consumption of electricity* is not allowed to increase in response to increased supplies *of cheaper fuels and lower electricity prices.*"

---

[70] SDEIS p. E-12 and 13.
[71] SDEIS p. E-22

Thus the SDEIS admits that using the IPM is not an accurate way to model the impact of an increased supply of cheaper fuels and, therefore, cheaper electricity. The SDEIS attempts to estimate the size of the error involved in this misapplication of the IPM by assuming that some of the increase in North Fork Valley coal is used directly to generate more electricity without displacing other fuels. The IPM modeling found that one ton of additional North Fork Valley coal led to only about 0.4 tons of additional coal being burned because of the substitution of North Fork Valley coal for other coal that otherwise would have been burned. That reduced the net carbon emissions associated with the additional North Fork Valley coal. Within the SDEIS "sensitivity analysis"[72] the Forest Service assumed that some of the additional North Fork Valley coal would facilitate increased consumption of electricity without offsetting other coal. This would boost the carbon emissions of that part of the North Fork Valley coal. Although the "sensitivity analysis" shows that this has a large effect, the Forest Service does not include the damages associated with this in their decision making process.

This is a poor and inaccurate way of estimating the size of the error that is associated with the assumption that national electricity use is insensitive to price, which it is not. The SDEIS estimate of the size of the error is focused solely on coal markets while ignoring the market for electricity. The SDEIS "sensitivity analysis" of how important this might be in increasing the social costs associated with increased North Fork Valley coal mining focused on a relatively small change in net coal sales: Five percent of North Fork Valley coal was assumed to be exempt from substitution or displacement effects. This coal, that is exempt from substitution, is a complete departure from the modeling results from the IPM. For average coal mining levels of 10 million tons per year, this would be 500,000 tons of North Fork Valley coal that would be burned without any displacement effects. In 2013 that would have represented only 0.05 percent of total U.S. coal use.

This is a very modest, but inadequate, step in the SDEIS in the direction of recognizing that lower electricity costs lead to more electric generation, fossil fuel combustion, and GHG emissions. This, in turn, leads to significant reductions in the projected net benefits associated mining the North Fork Valley coal because the damages are significantly higher. For the National Boundary analysis, the size of the projected net benefits declines for all mining scenarios. In many cases the SDEIS's calculated net losses associated with mining more North Fork Valley coal become larger. For the "lower" and "3% Average (lower)" scenarios, the net benefits decline 23 and 67 percent, respectively. The Global Boundary analysis also shows large declines in the projected net values associated with the Lower and 3% Average mining scenarios: 15 to 34 percent declines. See table 2 below.

**Table 2.**

[72] SDEIS pp. E-22 and 23.

| *NPV of Net Benefits of Mining More NF Coal with and without additional NF "non-substition" coal* | | | | |
|---|---|---|---|---|
| Alternative Mining Scenario | **with** Additional Non-Substitution Coal (millions of 2014 $s) | **without** Additional Non-Substitution Coal (millions of 2014 $s) | Change in NPV of Net Benefits | |
| | | | Dollar Difference (millions of 2014$s) | Percentage Change |
| **National Boundary** | B-A | B-A | Difference | %change |
| Lower Estimate | -2,306 | -1,879 | -427 | -23% |
| 3% Avg (Lower) | 71 | 215 | -144 | -67% |
| 3% Avg (Upper) | 2,089 | 2,127 | -38 | -2% |
| Upper Estimate | 2,111 | 2,171 | -60 | -3% |
| **Global Boundary** | | | | |
| Lower Estimate | -14,325 | -12,468 | -1,857 | -15% |
| 3% Avg (Lower) | -3,990 | -3,363 | -627 | -19% |
| 3% Avg (Upper) | -2,169 | -1,624 | -545 | -34% |
| Upper Estimate | 1,854 | 1,920 | -66 | -3% |
| Source: SDEIS Table E-16, pp. E-22 and 23. | | | | |

The Forest Service is aware that making an adjustment to account for the fact that the IPM cannot accurately model increased demand is inconsistent with its overall benefit-cost analysis. The SDEIS estimated the benefit of mining additional North Fork Valley coal as the cost savings associated with serving a fixed demand for electricity at a lower cost. In that setting the benefits to the national economy is simply the product of the assumed fixed demand for electricity and the electric price reduction. The SDEIS's "sensitivity analysis" of this assumption of a fixed demand for electricity, relaxed that assumption and allowed the demand for electricity and, therefore, coal to increase in response to the lower electric price. In that setting, where there is a normal demand curve for electricity, the benefit of the increased availability of North Fork Valley coal can no longer be estimated by looking at only the change in supply. The shape of the demand curve also matters and the calculation of the benefit (the sum of producer and consumer surplus) is considerably more complicated.

The SDEIS described this problem in the following terms:

> "…the analysis in general for National and Global stances, relies on electricity generation cost savings as a surrogate for benefits for domestically consumed coal under the National and Global boundary stances, justified in part by assumptions that coal demand is inelastic. As the percentage of North Fork Valley coal production assumed to represent increased demand [for electricity] grows, the reliability of using cost savings as a surrogate for benefits weakens." [73]

That is, if electricity consumption is allowed to rise in response to the cost of electricity falling, the SDEIS measure of the benefits of the mining of additional North Fork Valley coal no longer can be considered accurate. In other words, by adding energy to the system, benefits calculated by the Forest Service are reduced. This "sensitivity analysis" is a clumsy attempt to step outside of the IPM model in an attempt to represent a change in the amount of electricity that the U.S. consumes. Yet even this small step shows that there are large changes to the U.S. energy

[73] SDEIS page E-23.

economy if the drop in the price of electricity associated with increased mining in the North Fork Valley is allowed.

### b. The Forest Service Should Use a More Direct Approach to Include a Price Sensitive Demand for Electricity

As the SDEIS recognizes, the IPM model *cannot* accurately model the full impact of additional North Fork Valley coal being sold to fuel additional electric generation in the United States. The IPM assumes preset electricity production and calculates the least cost way to meet that preset electricity demand. In that sense, the IPM model was the wrong model to use to estimate the full GHG implications of putting additional North Fork Valley coal on the market. What was needed was an energy model that allowed both supply and demand for coal and electricity to find an equilibrium solution after all the fuel substitutions and changes in ultimate demand for electricity had been determined.

As we described at length in our previous comments[74] the NEMS model has that capability.[75] The NEMS model uses relatively aggregated geographies but can allow for the interaction between supply and demand. The IPM model incorporates much finer geographic detail[76] allowing a focus on a particular coal region and the electric utilities served by that coal region. But the IPM model does not allow the interaction of supply and demand. In the IPM demand is pre-determined outside of IPM (by NEMS) and is fixed for each year. What would be optimal for modeling the impact of increased North Fork Valley coal sales on national GHG emissions, would be a NEMS-like model with finer geographic granularity.[77] Absent that, one can use what is known about the character of the demand for electricity and add an adjustment to the IPM output to reflect the impacts of increased electric production and consumption.

Following the methodology laid out in the SDEIS, one can approximate the additional GHG emissions associated with the mining and sale of additional North Fork Valley coal by adding on a separate calculation of how Americans use electricity and would respond to lower costs of electricity. That is, by looking at the characteristics of the demand for electricity within the U.S. we can step outside of the IPM framework to separately account for the demand induced by the

[74] Power Consulting. Assessing the Ability of Contemporary Models to Calculate the GHG Implications of Federal Coal Leasing Decisions and Other Federal Energy Management Decisions. May 2015.

[75] On page E-3 of the SDEIS, the Forest Service states that "The IPM model uses the National Energy Modeling System [NEMS] in inputs and allows for smaller changes in coal supply, like the North Fork Coal Mining Area. The National Energy Modeling System [NEMS] does not accurately model smaller changes in supply."
To the extent that the Forest Service is stating that it did not use NEMS because NEMS could not accurately model the changes in supply that would be made available by the proposed coal mine exception to the Colorado Roadless Rule, we disagree. The proposed increase in North Fork Valley coal production is a 14.6% to 43.5% increase in total coal production (depending on the production alternative) for the relevant NEMS supply region. Considering that the percent increase in volume is substantial for all of the proposed Forest Service alternatives, it is highly likely that the supply curve for the Rocky Mountain Region would be changed dramatically by the addition of the proposed increase in the North Fork Valley coal production. This change would most likely flatten the supply curve for the region, allowing more coal at a cheaper price to be put on the market (this is exactly what happens for the IPM supply curves). The likely result of this would be a decrease in the national price of electricity (which both IPM and NEMS can estimate) and an increase in electrical consumption (which NEMS can represent but the IPM is incapable of representing).

[76] Much of the IPM data is disaggregated from NEMS input data.

[77] Because the NEMS code is free and available, this could easily be done by disaggregating the regional data within NEMS.

additional North Fork Valley coal. The sensitivity of the use of a product to the price of that product is usually measured by the *price elasticity of demand* which is the ratio of the percentage change in the quantity consumed to the percentage change in price. Because demand curves are expected to slope down to the right, indicating that as a price *falls* the quantity consumed *rises*, the price elasticity of demand is expected to be negative.

At any given time, there is a particular set of electricity-using appliances and industrial machines and processes in place. Certain patterns and habits of use are also likely to exist. In that short-term setting, the ability to adjust electric usage as electric prices rise may be limited to simply using less electricity and "going without" and these short-run adjustments could be expected to be relatively small. However, over time, the energy efficiency of appliances, machines, and process can rise and habits and patterns of use can be modified. Substitutes for electricity may be adopted, e.g. shifting hot water heating, clothes drying, and space heating and cooling from electricity to natural gas. For these reasons, one would expect the short-run price elasticity of demand to be smaller than the long-run elasticity. The definition of the *long-run* in this case is a time period long enough for new more efficient technologies to be adopted and patterns of use adjusted to the new economic reality.[78] The steady increase in the required energy efficiency of major electric appliances such as refrigerators, light bulbs, air conditioners, etc. is an indication of these adjustments to higher energy costs.[79] The adoption of higher efficiency standards for automobiles is another. Beyond these required improvements in energy efficiency, there has also been increased competition among appliance manufacturers and construction companies in advertising a broader array of higher efficiency products.

### *i. Estimates of the Price Elasticity of Demand - a brief literature review*

In this section we briefly review some of the different applications of the price elasticity of demand. This short literature review is meant to highlight that this is something that economists, as well as federal agencies, have been aware of, understand, and have known how to account for, for some time. Of special note is the use of the price elasticity of demand in the EIA's NEMS model (which is used to give energy demand forecasts to the IPM model) as shown below.

1. In 1993 Carol A. Dahl reviewed the price elasticity of demand for energy and different types of energy for U.S. EIA[80]. That survey was in support of the price elasticities of demand that would be used in EIA's NEMS model. The first type of energy demand she reviewed was that for electricity. She found over a hundred studies of the price elasticity of demand for electricity, either in the aggregate or broken down into separate customer groupings (residential, commercial, industrial) or even sub-groups such as residential households using different types

[78] U.S. EIA distinguished short-run and long-run elasticities in the following way: "Conventionally defined, short-run responses are the immediate behavioral effects of a change in energy prices on the intensity of unitization of a fixed stock of energy-consuming capital equipment. Long-run price responses occur through changes in the stock of energy-consuming capital equipment installed in buildings." "Price Responsiveness in the NEMS Building Sector Models," in EIA "Issues in Midterm Analysis and Forecasting 1999," S.H. Wade, DOE/EIA-0607(99), 1999, p. 55.
[79] Ibid. p. 56.
[80] "A Survey of Energy Demand Elasticities in Support of the Development of the NEMS," October 1993, prepared for the U.S. Department of Energy. http://mpra.ub.uni-muenchen.de/13962/ , p. 42.

of electricity-intensive appliances. She concluded that: "Studies for aggregate electricity demand suggest that the long run price elasticity might be near -1.0."[81]

2. EIA summarized Dahl's review of the price elasticity of demand for different types of energy in a 1999 publication.[82] The long-run price elasticity of demand for residential electricity use ranged from 0 to -2.5. For the commercial sector it ranged from 0 to -4.74.

3. More recent studies of the long-run price elasticity of demand for electricity lend some support for these earlier estimated. A 2012 study found the long run price elasticity of demand for residential customers in the United States was "near -1.0."[83] A 2004 survey of residential electric demand concluded that the long-run price elasticity of demand was -0.85.[84] A 2005 analysis of commercial demand for electricity estimated the long-run price elasticity of demand was -0.97.[85]

4. One reason that there is a relatively broad range of empirical estimates for the price elasticity of demand for electricity in the U.S. is that real electric prices in the U.S. declined from 1983 to 2000. Real electric prices rose from 1969 to 1983 and from 2004 to 2009. As a result, there has not been an opportunity to study the impact of rising electric prices in recent years in the United States. As one analyst of residential demand for electricity put it, the low sensitivity of residential use of electricity to price changes revealed in many studies of the 1980-2000 period "may be more of an artifact of the lack of price increases" than an accurate indication of how electricity users would have responded to real price increases.[86]

## 6. Modeling parameters that should be considered

Recall that the Forest Service considers 450 unique scenarios in their benefit-cost analysis. As we have shown, many of the parameters that make up these scenarios either are completely misapplied, do not make sense, or are unlikely representations of the future. Thus, the range of appropriate and representative parameters that should be used to calculate the damages associated with increased mining in the North Fork Valley is much smaller than those presented by the Forest Service. The range of parameters that should be used to model the damages should include only the Global Boundary, a discount rate of 2.5%, and the average or low production scenarios. A complete accounting of the damages should also include the Social Cost of Methane and should account for an increase in the amount of electricity that the U.S. uses as a result of the lower cost of electricity. We present the scenarios that are based on these reasonable, most likely parameters in Section III of this document (below).

---

[81] A price elasticity of demand that is -1 corresponds to a decrease in the price that is equal to the increase in consumption. For instance: If the price of electricity decreases by 10% then there would be a corresponding increase in consumption of 10%.

[82] "Price Responsiveness in the NWMS Buildings Sector Models," Steven H. Wade, pp. 55-63 in DOE/EIA-0607(99), August 1999, "Issues in Midterm Analysis and Forecasting 1999," Table 3.

[83] A New Look at Residential Electricity Demand Using Household Expenditure Data, Harrison Fell et al., Working Paper No. 2012-04, July 2012, Colorado School of Mines, Division of Economics and Business.

[84] J.A. Espey and M. Espey, "Turning on the Lights: A Meta-analysis of Residential Electricity Demand Elasticities," Journal of Agricultural and Applied Economics 36(1): 65-81.

[85] "Regional Differences in the Price-Elasticity of Demand for Energy," Mark A. Bernstein and James Griffin, 2005, RAND Corporation, for the National Renewable Energy Laboratory, p. 21. It should be pointed out that this study found a relatively low long-run residential electricity price elasticity of demand, only -0.32.

[86] Ibid. p. xiii.

## III. Recalculating the damages including increased demand as well as coal mine methane

As we discussed in Section II above, most of the benefit-cost results[87] in the SDEIS are not derived from sound assumptions based on current or correctly interpreted data. Further, none of the damages estimates include coal mine methane emissions or an increase in electric demand due to decreased electricity prices. Therefore, the SDEIS's benefit-cost results significantly under-represent the climate costs, and therefore result in an analysis that fails to use the best available information or take a 'hard look' at environmental impacts.

Below we present benefit-cost results that: redress two of the most significant deficiencies; better demonstrate the magnitude of the damages; and show that the SDEIS's multiple failures result in severely under-counting the costs the proposed action will have. Our analysis includes both the social cost of the large amount of methane that would be released under the IPM "Reserves Added" B-A scenario as well as the additional $CO_2$ impact that would result from increased demand for electricity.

For reasons described above, we present here results for the Global Boundary stance using a 2.5% and 3% discount rate only. Much more weight should be applied to the 2.5% discount rate, but we have provided the 3% discount rate for comparison with the SDEIS. These are the *only* reasonably justifiable results that should be included. However, for complete transparency, Appendix B includes the results of calculations of benefit-cost that include the Forest and National Boundaries with 7% and 23% estimates of the Social Cost of Carbon borne domestically, and the 5% and 3% 95th percentile discount rates.

We acknowledge that our benefit-cost results included in this section are partially based on the results of the IPM which does not model the change in demand due to a decrease in the cost of electricity. In this respect, although the results which are presented here are a more accurate accounting of the impacts of emissions associated with increased mining at the North Fork Valley mines, the results presented here should be viewed as conservative and preliminary only. These calculations are meant to demonstrate that inclusion of the Social Cost of Methane and increased consumption of electricity drastically changes the value of the damages within the Forest Service calculations.

Recall that the Forest Service calculated the weighted average methane emissions for the Elk Creek and West Elk mines from a three-year series of emissions as reported in $CO_2$ equivalent by the EPA.[88] Because this short-term data series is not representative of the lifespan of the two mines included in the SDEIS analysis, we recalculated the annual methane emissions for each mine from data which was provided to us by the EPA Climate Change Division.[89] The data spans the 2002-2013 period (12 years instead of just 2011-2013). The mine production data comes from the Mine Safety and Health Administration (MSHA) which is part of the Department of Labor. The mine production data can be viewed on their Mine Data Retrieval System.[90]

---

[87] The Forest Service presented many PNV results in an attempt to account for uncertainty in energy futures. However, in doing so they also presented many results that the majority of economists would reject outright because of errors and omissions in the Forest Service analysis.

[88] Op. cit. EPA Greenhouse Gas Emissions from Large Facilities.

[89] Data provided by: Felicia A. Ruiz, Climate Change Division, U.S. Environmental Protection Agency, 1200 Penn Ave, NW (6207J), Washington, DC 20460, Phone: (202) 343-9129, www.epa.gov/cmop.

[90] http://www.msha.gov/drs/drshome.htm

Average production over this period is just over 10 million tons per year (10.0623 million tons). The combined weighted average methane released over the 12-year period that both mines produced coal was 842 cubic feet of methane per ton of coal produced. This represents an 80% increase in the methane volumes presented in the SDEIS.

Also recall that there exists a metric by which the Social Cost of Methane can be valued; this metric has been available since 2014.[91] This Social Cost of Methane is currently used by the EPA for recent rulemakings.[92] The results of our calculations which include the Social Cost of Methane are shown in Table 3 below.

**Table 3.**

| Benefit-cost results for the "Reserves Added" IPM scenario, B-A alternative, taking into account Social Cost of Methane (millions 2014$) | | |
|---|---|---|
| Global Boundary | Average Scenario | Low Scenario |
| 3% Avg | -$5,395 | -$4,136 |
| 2.5% Avg | -$8,696 | -$7,227 |
| Global Boundary + CO2 from price elasticity of demand | Average Scenario | Low Scenario |
| 3% Avg | -$5,999 | -$4,666 |
| 2.5% Avg | -$9,629 | -$8,058 |

These results of this benefit-cost analysis show that the total damages associated with the increase in North Fork Valley mining are $4.1 to $9.6 billion (2014$). These results stand in stark contrast to the damages presented in the SDEIS, which range from $1.6 to $5.1 billion (2014$) and underestimate the damages associated with the Social Cost of Carbon by at least $2.5 billion (2014$). In other words, by accounting for the Social Cost of Methane and increased $CO_2$ emissions due to the price elasticity of demand, the net damages associated with increased mining in the North Fork Valley increase by 87% - 155% for the most reasonable benefit-cost scenarios. Table 3-22 in the main body of the SDEIS (also shown in Appendix B of this document) presents Global Boundary PNV results, but without the accompanying excel spreadsheet to "read the tea leaves" these values are hard to understand. The 24 values quoted in the SDEIS are the highest and lowest values for the 450 different scenario combinations, this gives a range of values with no weight put on any value over any other value. The lowest value (-$12.468 billion (2014$)) that the Forest Service presents is a 3% 95th percentile value that we have rejected as an improbable worst-case scenario. However, our scenarios present values that are lower than all of their other presented scenarios in table 3-22 of the SDEIS using the Global Boundary. For a complete presentation of our calculated results and how they compare to the results calculated in the SDEIS, please see appendix B.

---

[91]  This is the date of the original publication of the Marten et al paper, the addendum published in July 2015 (ibid.) is the proper citation for this work.
[92] EPA. The Social Cost of Carbon. The last paragraph of this webpage has different examples of the EPA's use of the SCM including its use in Regulatory Impact Analysis.
http://www3.epa.gov/climatechange/EPAactivities/economics/scc.html.

## IV. Conclusions

The SDEIS presented by the Forest Service is a court ordered improvement over the complete lack of analysis of GHG emissions and impacts in the Colorado Roadless Rule 2012 final EIS. However, it is clear from our analysis here that the SDEIS presented by the Forest Service is a seriously flawed analysis of the GHG implications of substantial additional mining in the North Fork Valley:

1. The SDEIS does not address the legal flaws identified in Judge Jackson's order. The assessment of the impact of GHG emissions due to increased mining in the North Fork Valley does not provide a "hard look" at the potential costs of releasing greenhouse gases, particularly methane, which is only considered within a "sensitivity analysis" which is loosely conducted within the framework of the Social Cost of Carbon. In the penultimate paragraph of the final appendix, the SDEIS acknowledges that the "SCC values are designed to be applied only to carbon dioxide emissions and not methane emissions,"[93] yet the SDEIS does not attempt to use any other means of determining the cost of the North Fork Valley coal-related methane releases even though accepted methods are available to the agency (such as the Social Cost of Methane). This constitutes a failure on the part of the Forest Service to include a substantial portion of the GHG emissions in their benefit-cost analysis of the mining scenarios, and skews the entire analysis by omitting a significant impact from the SDEIS.

2. The IPM is inappropriately applied to an analysis of a situation where the price of, and therefore demand for, electricity changes. Since the IPM cannot account for changes in electricity demand, it does not accurately model the effect of increased coal production in the North Fork Valley.

Although the IPM is a sophisticated and useful tool for precisely determining the least cost mixture of fuels and generators for generating electricity to meet a certain pre-specified demand for electricity, it cannot be used to determine the electrical price difference for two alternatives involving different levels of electricity production since this necessarily requires a change in demand, which IPM cannot account for. As a result, any values based on the IPM outputs are incorrect and underrepresent the damages associated with GHG emissions.

3. In its analysis of the impacts of GHG emissions, the SDEIS excludes the full cost of GHG emissions in the Forest and National boundary stances[94] yet inflates the benefits for both stances using national and global market values.[95]

The Present Net Values reported in the SDEIS are a benefit-cost analysis of the North Fork Valley mining Alternatives under different IPM model scenarios. Calculations of the benefits in the Forest Boundary stance are the projected coal mine price less the mine costs and the costs are limited to the Social Cost of Carbon from coal production *at the mine* and hence include no coal combustion emissions or methane emissions. This assumes that the domestic coal market influences the Forest Boundary but the combustion of the coal does not influence the Forest

[93] SDEIS page E-25.
[94] GHG emission impacts are global by definition.
[95] In the Forest Boundary stance, the benefits are from sales of coal nationally. In the National Boundary stance, the benefits are from the difference in the IPM results from different Alternatives.

Boundary; this arbitrary and inconsistent boundary over which the benefit-cost is calculated either under-represents the damages or over-represents the benefits associated with the mines.

4. The price elasticity of demand is not included in the SDEIS.

The price elasticity of demand mandates that if the price of electricity drops, as a result of the North Fork Valley mines expanding production, then consumption of energy should increase. This would increase the GHG emissions associated with the production of the energy and represents an important part of the emissions impact of the North Fork Valley mines, but the SDEIS does not include a model that accounts for this portion of the GHG emissions.

The SDEIS does not include modeling that could result in a complete assessment of the GHG emissions impact of the proposed change to the CRR. In this document we have provided values that more accurately represent the full GHG emissions impact of the North Fork Valley mines than the values provided in the SDEIS. However, we acknowledge that many of our calculations are based on the Forest Service's fundamental misapplication of IPM results; this fundamental flaw propagates into our calculations. It is unfortunate that the Forest Service ignored our assessment of national energy models provided to them[96] which included a recommendation to use the National Energy Modeling System.[97]

Overall, the numerous flaws, false assumptions, and misapplications of models and tools within the SDEIS lead us to conclude that the assessment of the GHG impacts of the North Fork Valley mines are grossly underrepresented in the SDEIS, demonstrating that the SDEIS failed to take the 'hard look' required by law.

[96] Power Consulting. Assessing the Ability of Contemporary Models to Calculate the GHG Implications of Federal Coal Leasing Decisions and Other Federal Energy Management Decisions. May 2015.

[97] The U.S. Energy Information Administration (EIA) uses the National Energy Modeling System (NEMS) to model the national energy economy. The NEMS includes both the supply and demand side of the economy and is employed by the EIA in their Annual Energy Outlook. The total domestic demand calculated by the NEMS in the EIA base case scenario is used as the fixed demand input to the IPM.

# V. Bibliography

Bernstein, M., Griffin, J. Regional Differences in the Price-Elasticity of Demand for Energy. RAND Corporation, for the National Renewable Energy Laboratory. 2005.

Dahl, C. A Survey of Energy Demand Elasticities in Support of the Development of the NEMS. Prepared for the U.S. Department of Energy. October 1993. http://mpra.ub.uni-muenchen.de/13962/

Erickson, P. and Lazarus, M. Impact of the Keystone XL pipeline on global oil markets and greenhouse gas emissions. Nature Climate Change Letters. DOI: 10.1038/NCLIMATE2335. August 10, 2014.

Espey, J., Espey, M. Turning on the Lights: A Meta-analysis of Residential Electricity Demand Elasticities," *Journal of Agricultural and Applied Economics* 36(1): 65-81.

Fell, H. A New Look at Residential Electricity Demand Using Household Expenditure Data. Working Paper No. 2012-04. Colorado School of Mines, Division of Economics and Business. July 2012.

High Country Conservation Advocates, WildEarth Guardians, and Sierra Club, Plaintiffs, v. Unites States Forest Service, United States Department of Agriculture, United States Bureau of Land Management, United States Department of the Interior Civil Action No. 13-cv-01723-RBJ. 6.27.2014. http://earthjustice.org/sites/default/files/files/91%20-%20Order%20on%20Merits%20(2).pdf

Howard, P. and Sylvan, D. Expert Consensus on the Economics of Climate Change. Institute for Policy Integrity. December 2015

Interagency Working Group on Social Cost of Carbon, United States Government. Technical Support Document: Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866. Revised July 2015. https://www.whitehouse.gov/sites/default/files/omb/inforeg/scc-tsd-final-july-2015.pdf

Intergovernmental Panel on Climate Change. Working Group I: The Scientific Basis. Chapter 3 table 4.1. Accessed on 12.24.2015. https://www.ipcc.ch/ipccreports/tar/wg1/016.htm

Marten, A., Kopits, E., Griffiths, C., Newbold, S., Wolverton, A. Incremental CH4 and N2O mitigation benefits consistent with the US Government's SC- $CO_2$ estimates. *Climate Policy*. Vol. 15, No. 2, 272-298. 5.20.2014.

Power, T. and Power, D. The Impact of Powder River Basin Coal Exports on Global Greenhouse Gas Emissions. Prepared for the Energy Foundation. May 2013. http://www.powereconconsulting.com/WP/assets/GHG-Impact-PRB-Coal-Export-Power-Consulting-May-2013_Final.pdf

Ruiz, F. Methane Emissions for West Elk and Elk Creek provided in email correspondence on December 4, 2015. Climate Change Division, U.S. Environmental Protection Agency, 1200 Penn Ave, NW (6207J), Washington, DC 20460, Phone: (202) 343-9129, www.epa.gov/cmop

United States Department of Agriculture (USDA), Forest Service. (2015). *Economic specialist report, Social cost of carbon workbook: Supplemental roadless area conservation rule for Colorado*. Region 2, USDA Forest Service, Denver, CO.

United States Department of Agriculture. Rulemaking for Colorado Roadless Areas Supplemental Draft Environmental Impact Statement. November 2015.

United States Department of Labor. Mine Safety and Health Administration's Mine Data Retrieval System. Accessed on 12.24.2015. http://www.msha.gov/drs/drshome.htm

United States Energy Information Administration. The Electricity Market Module of the National Energy Modeling System: Model Documentation 2014. August 2014. https://www.eia.gov/forecasts/aeo/nems/documentation/electricity/pdf/m068(2014).pdf

United States Environmental Protection Agency. Greenhouse Gas Emissions from Large Facilities. Accessed on 12.24.2015. http://ghgdata.epa.gov/ghgp/main.do

United States Environmental Protection Agency. The Social Cost of Carbon. http://www3.epa.gov/climatechange/EPAactivities/economics/scc.html

Union of Concerned Scientists, Environmental Defense Fund, Institute for Policy Integrity at New York University School of Law, and Natural Resources Defense Council. Docket EPA-HQ-OAR-2014-0827 & NHTSA-2014-0132, Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium and Heavy-Duty Engines and Vehicles; Phase 2. Accessed on 12.24.2015. http://policyintegrity.org/documents/Oct2015_Joint_Comments_to_EPA-NHTSA.pdf

Wade, S. Price Responsiveness in the NWMS Buildings Sector Models. DOE/EIA-0607(99) Issues in Midterm Analysis and Forecasting 1999. August 1999.

# Appendix A - Method for incorporating the Social Cost of Methane

Calculating the values for the Social Cost of Methane for the North Fork Valley mines is very similar to calculating Social Cost of Carbon values. To calculate the Social Cost of Methane values we did the following:

1. We calculated the weighted average methane emissions for the North Fork Valley mines using the reported values from the EPA and the MSHA shown in table A-1 below.

**Table A-1.**

| | Methane emissions (mmcf/year) | | Coal production in tons | |
|---|---|---|---|---|
| Year | Elk Creek | West Elk | Elk Creek | West Elk |
| 2002 | 36.50 | 7,227.00 | 595,508 | 6,556,211 |
| 2003 | 401.50 | 9,928.00 | 4,596,324 | 6,490,688 |
| 2004 | 1,861.50 | 7,628.50 | 6,551,034 | 6,493,363 |
| 2005 | 2,007.50 | 8,322.00 | 6,545,485 | 5,576,731 |
| 2006 | 2,737.50 | 6,643.00 | 5,128,389 | 6,011,620 |
| 2007 | 4,525.37 | 5,254.23 | 4,823,662 | 6,874,101 |
| 2008 | 4,065.41 | 4,295.04 | 4,902,633 | 5,858,789 |
| 2009 | 4,223.39 | 2,451.98 | 5,702,875 | 4,475,344 |
| 2010 | 6,861.42 | 4,707.71 | 3,794,262 | 4,793,507 |
| 2011 | 5,852.48 | 2,746.68 | 3,007,833 | 5,896,402 |
| 2012 | 4,181.81 | 2,491.23 | 2,958,014 | 6,852,136 |
| 2013 | 1,390.40 | 1,825.00 | 436,381 | 5,826,798 |

The combined weighted average methane emissions for the Elk Creek and West Elk mines were 842 scf/ton between 2002 and 2013; we use this value as the methane emitted in the production of North Fork Valley coal.[98] We assume that the values for methane emissions for surface mines and other underground mines are represented by the default values in the Upstream Dashboard tool for Powder River Basin (51 scf/ton) and Illinois No. 6 coal (422 scf/ton), respectively.

2. We calculate the methane emission difference between Alternative B and Alternative A (B-A) coal production levels.[99]

This difference in emissions is calculated annually with the following equation:

[98] The 2011-2013 weighted average methane emissions were 740 scf/ton coal produced. This is 277 standard cubic feet of methane per ton coal produced greater than the estimate of 463 that the Forest Service used in the SDEIS.
[99] Defined in Chapters 2 and 3 of the SDEIS

$$NFV_{B-A} = (prod_B - prod_A) * 842\ scf/ton\ coal * 2.11376x10^{-5}\ metric\ ton\ (CH4)/scf$$

This results in the total methane emissions difference for B-A for the North Fork Valley coal mines.

3. We use SDEIS results from the “Reserves Added” IPM scenario to account for the methane *not* emitted from surface mines since there is partial substitution in the model result.

To account for the surface mine substitution modeled in the IPM “Reserves Added” scenario, we use the surface mine substitution coefficient[100] to determine the amount of methane emissions that are saved by the reduction in surface mining with the following equation:

$$Surf_{B-A} = (prod_B - prod_A) * 0.134 * 51\ scf/ton\ coal * 2.11376x10^{-5}\ metric\ ton\ (CH4)/scf$$

Where 0.134 is the substitution coefficient for surface coal mining.[101] This results in the total annual methane *not* emitted by surface coal mining due to substitution from North Fork Valley coal.

4. Similarly, we use the “Reserves Added” IPM scenario to account for the methane *not* emitted from other underground mines due to partial substitution of North Fork Valley coal.

Since the underground substitution coefficient in the SDEIS[102] is the net increase in underground coal mining and this includes the North Fork Valley mining, the substitution coefficient for underground mines *excluding* the North Fork Valley is 1-0.134-0.528=0.338. So the reduction in methane from substitution of *other* underground mining is:

$$UG_{B-A} = (prod_B - prod_A) * 0.338 * 422\ scf/ton\ coal * 2.11376x10^{-5}\ metric\ ton\ (CH4)/scf$$

This results in the total annual methane *not* emitted from other underground mines due to substitution of North Fork Valley coal.

5. We then calculate the total annual change in methane emissions.

The IPM results indicate partial substitution of North Fork Valley coal so the total annual methane emissions are:

$$CH4_{B-A} = NFV_{B-A} - Surf_{B-A} - UG_{B-A}$$

This results in the total annual methane emissions difference for B-A in metric tons of methane per ton of coal mined.

[100] SDEIS Table E-14, page E-19
[101] The SDEIS defines this coefficient as -0.134 to indicate that there is a decrease in surface mining. We drop the negative sign for convenience in the equations in this section.
[102] SDEIS Table E-14, page E-19

6. To calculate the costs associated with the released methane, we multiply the annual methane emissions by the appropriate Social Cost of Methane discounted value.

This results in the annual cost associated with the release of methane for B-A.

7. Since the Social Cost of Methane results are designed to be integrated into the Social Cost of Carbon framework, they become an additive to the PNV equation.

The PNV equation is the annual benefits less the annual costs, summed over all of the years that the two alternatives are being compared. The equation for this is:

$$PNV = \sum benefits\ of\ mining - SCC - SCM$$

The results of our incorporation of the Social Cost of Methane values into the PNV calculations are presented in section III-1 and Appendix B.

# Appendix B - Comparison of the Forest Service results to our results

In the main body of this document we recognize that the IPM model cannot accurately determine the full effect of increased production of coal from the North Fork Valley because the model cannot account for the price elasticity of demand response to lower energy prices. The Forest Service corroborates this in the SDEIS and yet they chose to use the IPM even though they were informed that using the IPM for this assessment of the impacts of the GHG emissions is an inappropriate use of the model.[103] We also recognize in the main body of this document that the 450 unique scenarios that the Forest Service considers in the SDEIS do not all have the same likelihood of occurring and that some of those scenarios should be given more weight when used in the assessment of policy. Therefore, we presented the results of the most appropriate and likely future scenarios in Section III.

In this appendix we present results of our calculations that are based on the misapplied IPM results. The purpose of showing these results is to elucidate the problem with the Forest Service's approach of reporting the range in benefits or damages across the 450 unique scenarios, and treating those scenarios as equal probability scenarios, as well as the demonstrating the effect that incorporating the Social Cost of Methane, Price Elasticity of Demand, and proper methane emissions levels has on the damages associated with the CRR. We present our results alongside the results of the Forest Service for the IPM "Reserves Added" scenario, alternative B-A, since this is the scenario and alternative preferred by the Forest Service. Although our values account for the damages in a more complete manner than the Forest Service values, we recognize that we are working within a flawed IPM framework.

## 1. The Forest Service provided a range of values that are misleading

The Forest Service's benefit-cost analysis, which they call the Present Net Value (PNV), is a calculation of the differences in the benefits and costs from two different alternatives (i.e. B-A). Results of the Forest Service calculations are presented in the SDEIS as the maximum and minimum values from a range of unique scenarios. For example, Table 3-22 in the SDEIS (shown below) include the "Lower Estimate" and "Upper Estimate" for each Boundary Scenario and proposed alternative. These lower and upper estimates are maximum and minimum values calculated over many unique scenarios. Although it can be useful to present the full range of values associated with all possible future scenarios, some of the scenarios have a higher probability of occurring than others and should be given more weight when making a decision. Further, as we describe in Section II above, many of the scenarios that the Forest Service models are not based on a realistic assessment of the individual parameters.

[103] Power Consulting. Assessing the Ability of Contemporary Models to Calculate the GHG Implications of Federal Coal Leasing Decisions and Other Federal Energy Management Decisions. May 2015.

***Table 3-22.*** *Present Net Values (million 2014$)*

| | *Alternative B – Alternative A** | *Alternative C – Alternative A** |
|---|---|---|
| | *millions of 2014 dollars* | |
| **Forest Boundary** | | |
| Lower Estimate (a) | $334 | $272 |
| 3% Discount Avg (Lower) (b) | $423 | $329 |
| 3% Discount Avg (Upper) (b) | $772 | $450 |
| Upper Estimate (a) | $791 | $456 |
| **National Boundary** | | |
| Lower Estimate (a) | -$1,879 | -$968 |
| 3% Discount Avg (Lower) (b) | $215 | $191 |
| 3% Discount Avg (Upper) (b) | $2,127 | $1,440 |
| Upper Estimate (a) | $2,171 | $1,440 |
| **Global Boundary** | | |
| Lower Estimate (a) | -$12,468 | -$6,861 |
| 3% Discount Avg (Lower) (b) | -$3,363 | -$1,819 |
| 3% Discount Avg (Upper) (b) | -$1,624 | -$811 |
| Upper Estimate (a) | $1,920 | $1,317 |

** PNV results may not be exactly equivalent to the sum of discounted benefits and costs from Table 3-21 due to rounding.*

It is also worth noting that the range of values presented in the SDEIS are so large that they are not helpful in assessing the true benefits or damages associated with the proposed mining increase in the North Fork Valley.[104] The Forest Service also provides the range of values that they calculated for the 3% Average discount rate, these values were "singled out as representative of mid points"[105] for the range of scenarios. These "3% Discount Avg (Upper)" and "3% Discount Avg (Lower)" values are the maximum and minimum, respectively, of 9 unique scenarios each.

## 2. The Social Cost of Methane drastically increases damages associated with mining in the North Fork Valley and should be included in the calculation of damages.

Below we include all of the results for the IPM "Reserves Added" scenario for the B-A Forest Service preferred action alternative (Table B-1). The columns of the table include the original Forest Service calculation of the benefit-cost (labeled "SCC") as well as our calculation of the benefit-cost which include damages from the Social Cost of Methane (labeled "SCC+SCM"). To calculate the benefit-cost values for the SDEIS, the Forest Service put together an Excel spreadsheet for each of the IPM model scenarios which include all of the data and parameters for the unique scenarios. We constructed a simplified version of the Forest Service spreadsheet

[104] There is a $4 billion range in the National Boundary B-A and a $14 billion range in the Global Boundary B-A stance, as calculated by the Forest Service.
[105] SDEIS Page 101.

with fewer scenarios represented to include the social cost of methane in our calculations. We then used the method described in Appendix A above to calculate the social costs associated with methane. These costs were incorporated into the final Present Net Value results shown below. For transparency and to help the reader assess the difference in the SDEIS Present Net Value results and the Present Net Value results calculated here, we also show the results of the Present Net Value calculations used in the SDEIS; these results are shown in the columns labeled Social Cost of Carbon. All of these calculations were applied only to the "Reserves Added" IPM scenario.

It is important to note that we reject the Forest Boundary stance, the use of the 7% scaling factor to assess the national burden of the global Social Cost of Carbon, and the use of the Permitted coal supply scenario completely as described in Section II.1, II.2 and II.4, respectively, in the main body of this report.

We also agree with the majority of economists who believe that all of the discount rates used in the SDEIS are too high; however, the 2.5% is the most appropriate discount rate to use in this analysis since the Social Cost of Carbon values are calculated using this discount rate.

With this in mind, we present below the values for the full range of calculations used in the SDEIS with the exception of the 3% 10th percentile discount rate scenario, which is not included in the IWG SCC values. We chose to do this for complete transparency of our work.

**Table B-1.**

| Present Net Value for the Reserves Added IPM scenario (alternative B-A) taking into account SCC as well as SCC+SCM (millions 2014$) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Production Scenario | | Permitted Scenario | | Average Scenario | | Low Scenario | |
| Forest Boundary | | SCC[106] | SCC+SCM | SCC[106] | SCC+SCM | SCC[106] | SCC+SCM |
| 7% of Global Impact | 5% Avg | $688 | $615 | $594 | $524 | $338 | $278 |
| | 3% Avg | $772 | $589 | $708 | $525 | $444 | $268 |
| | 2.5% Avg | $791 | $542 | $738 | $489 | $474 | $228 |
| | 3% 95th Percentile | $776 | $287 | $723 | $236 | $461 | -$10 |
| 23% of Global Impact | 5% Avg | $682 | $441 | $589 | $358 | $334 | $136 |
| | 3% Avg | $748 | $146 | $685 | $84 | $423 | -$155 |
| | 2.5% Avg | $755 | -$65 | $702 | -$115 | $441 | -$366 |
| | 3% 95th Percentile | $705 | -$902 | $654 | -$945 | $398 | -$1,150 |
| National Boundary | | SCC[106] | SCC+SCM | SCC[106] | SCC+SCM | SCC[106] | SCC+SCM |
| 7% of Global Impact | 5% Avg | $1,056 | $983 | $1,338 | $1,268 | $1,716 | $1,656 |
| | 3% Avg | $958 | $775 | $1,382 | $1,199 | $2,127 | $1,951 |
| | 2.5% Avg | $825 | $575 | $1,292 | $1,044 | $2,171 | $1,925 |
| | 3% 95th Percentile | $361 | -$128 | $840 | $354 | $1,759 | $1,289 |
| 23% of Global Impact | 5% Avg | $863 | $622 | $1,159 | $929 | $1,567 | $1,369 |
| | 3% Avg | $215 | -$386 | $665 | $65 | $1,482 | $904 |
| | 2.5% Avg | -$315 | -$1,135 | $185 | -$632 | $1,158 | $351 |
| | 3% 95th Percentile | -$1,839 | -$3,447 | -$1,300 | -$2,899 | -$194 | -$1,742 |
| Global Boundary | | SCC[106] | SCC+SCM | SCC[106] | SCC+SCM | SCC[106] | SCC+SCM |
| 100% of Global Impact | 5% Avg | -$65 | -$974 | $297 | -$704 | $850 | -$10 |
| | 3% Avg | -$3,363 | -$5,976 | -$2,784 | -$5,395 | -$1,624 | -$4,136 |
| | 2.5% Avg | -$5,800 | -$9,365 | -$5,142 | -$8,696 | -$3,717 | -$7,227 |
| | 3% 95th Percentile | -$12,428 | -$19,417 | -$11,602 | -$18,553 | -$9,596 | -$16,324 |

[106] The values in the SCC columns of this table are same as those calculated by the Forest Service. We include all of the values for the "Reserves Added" IPM scenario (alternative B-A) in our table, not just the high and low values reported in the SDEIS.

## 3. Price elasticity of demand needs to be included in the calculation of damages

Table B-2 shows the results of calculations of the Present Net Value with the cost of increased $CO_2$ emissions that would result from the increase in demand associated with the decrease in the cost of electricity modeled by the IPM "Reserves Added" scenario. We strongly believe that the result of Table B-2 (Social Cost of Carbon + Social Cost of Methane, Global Boundary, 2.5%), which are the same as Table 3, in the main body of this report, is the only benefit-cost results that should be used when assessing the merits of increased mining in the North Fork Valley. We have provided the other results for comparison and transparency.

**Table B-2.**

| Present Net Value for the Results added IPM scenario (alternative B-A) taking into account SCC as well as SCC+SCM with added CO2 from Price Elasticity of Demand (PED) - Average Production Scenario (millions 2014$) | | | | | |
|---|---|---|---|---|---|
| National Boundary | | SCC (PED) | SCC+SCM (PED) | SCC+SCM without PED (from Table B-1) | Impacts due to the Price Elasticity of Demand |
| 7% of Global Impact | 5% Avg | $1,328 | $1,258 | $1,268 | -$10 |
| | 3% Avg | $1,339 | $1,157 | $1,199 | -$42 |
| | 2.5% Avg | $1,227 | $978 | $1,044 | -$66 |
| | 3% 95th Percentile | $714 | $227 | $354 | -$127 |
| 23% of Global Impact | 5% Avg | $1,124 | $894 | $929 | -$35 |
| | 3% Avg | $526 | -$74 | $65 | -$139 |
| | 2.5% Avg | -$29 | -$847 | -$632 | -$215 |
| | 3% 95th Percentile | -$1,715 | -$3,314 | -$2,899 | -$415 |
| Global Boundary | | SCC (PED) | SCC+SCM (PED) | SCC+SCM without PED (from Table B-1) | Impacts due to the Price Elasticity of Demand |
| 100% of impact | 5% Avg | $146 | -$885 | -$704 | -$181 |
| | 3% Avg | -$3,388 | -$5,999 | -$5,395 | -$604 |
| | 2.5% Avg | -$6,075 | -$9,629 | -$8,696 | -$933 |
| | 3% 95th Percentile | -$13,405 | -$20,356 | -$18,553 | -$1,803 |

Table B-2, above, shows the calculated net benefits and damages including the Social Cost of Methane as well as the price elasticity of demand (PED). We also include the results for the average scenario from Table B-1 including the Social Cost of Methane and the amount of damages that are exclusively due to the price elasticity of demand. This table shows that damages associated with the price elasticity of demand are large and need to be considered in the assessment of damages.

## 4. Differences in the reported methane emissions have a significant impact on the damages associated with the Social Cost of Methane

There is a discrepancy in the methane values used in the SDEIS and the reported methane values used here. Both sets of data are based on quarterly sampling of methane emissions. The methane emissions data used in this report span 12 years and were conducted by the US Mine Safety and Health Administration (MSHA). The methane emissions data used in the SDEIS span 3 years and were self-reported emissions conducted by the coal mines. For transparency we calculated the Present Net Value with Social Cost of Methane and Social Cost of Carbon for the average methane emissions assumed in the SDEIS (463 scf/ton[107]). Table B-3, below, shows the results on the Present Net Value using the Forest Service data as well as the US Mine Safety and Health Administration data used in this report (842 scf/ton). It is our strong opinion that the short-term self-reported data used in the SDEIS is less representative of the long-term future methane emissions than the US Mine Safety and Health Administration data used in this report. The 12 years of data that we used to calculate the methane emissions of 842 scf/ton were based on the production of 121 million tons of coal. Remember that we are looking into the future and attempting to model the addition of 172 million tons of coal. It is our professional judgment that a much longer time span, representing a much larger volume of coal, is more representative than a three-year time span where only 27 million tons of coal was mined.

Table B-3, below, shows the difference in the net benefits and damages associated with using the 12-years of methane emissions data collected by the US Mine Safety and Health Administration and using the 3-years of self-reported methane emissions data. We use these data sets to account for the volume of methane that would be released if the additional 172 million tons of coal is mined.[108]

---

[107] This value is very close to the average value for underground mines used in the Upstream Dashboard model. It is not representative of the North Fork Valley mines which are considered ‘gassy’ mines.

[108] The Forest Service does not account for the damages associated with the methane, they just calculate the volume of the methane. The method that the Forest Service uses in the '"sensitivity analysis" of the SDEIS is discredited by the IWG as well as the Forest Service (SDEIS page E-25).

**Table B-3.**

| Present Net Value for the Reserves Added IPM scenario (alternative B-A) taking into account the Social Cost of Carbon and the Social Cost of Methane (millions 2014$) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Production Scenario | | Permitted Scenario | | Average Scenario | | Low Scenario | |
| Forest Boundary | | Self-reported data | MSHA data | Self-reported data | MSHA data | Self-reported data | MSHA data |
| 7% of Global Impact | 5% Avg | $655 | $615 | $563 | $524 | $311 | $278 |
| | 3% Avg | $689 | $589 | $625 | $525 | $364 | $268 |
| | 2.5% Avg | $678 | $542 | $625 | $489 | $363 | $228 |
| | 3% 95th Percentile | $555 | $287 | $503 | $236 | $247 | -$10 |
| 23% of Global Impact | 5% Avg | $573 | $441 | $484 | $358 | $244 | $136 |
| | 3% Avg | $475 | $146 | $413 | $84 | $161 | -$155 |
| | 2.5% Avg | $383 | -$65 | $332 | -$115 | $76 | -$366 |
| | 3% 95th Percentile | -$22 | -$902 | -$70 | -$945 | -$303 | -$1,150 |
| National Boundary | | Self-reported data | MSHA data | Self-reported data | MSHA data | Self-reported data | MSHA data |
| 7% of Global Impact | 5% Avg | $1,023 | $983 | $1,307 | $1,268 | $1,689 | $1,656 |
| | 3% Avg | $876 | $775 | $1,299 | $1,199 | $2,048 | $1,951 |
| | 2.5% Avg | $712 | $575 | $1,180 | $1,044 | $2,060 | $1,925 |
| | 3% 95th Percentile | $139 | -$128 | $620 | $354 | $1,546 | $1,289 |
| 23% of Global Impact | 5% Avg | $754 | $622 | $1,055 | $929 | $1,477 | $1,369 |
| | 3% Avg | -$57 | -$386 | $393 | $65 | $1,220 | $904 |
| | 2.5% Avg | -$686 | -$1,135 | -$185 | -$632 | $793 | $351 |
| | 3% 95th Percentile | -$2,567 | -$3,447 | -$2,024 | -$2,899 | -$895 | -$1,742 |
| Global Boundary | | Self-reported data | MSHA data | Self-reported data | MSHA data | Self-reported data | MSHA data |
| 100% of Global Impact | 5% Avg | -$539 | -$974 | -$156 | -$704 | $461 | -$10 |
| | 3% Avg | -$4,546 | -$5,976 | -$3,966 | -$5,395 | -$2,761 | -$4,136 |
| | 2.5% Avg | -$7,414 | -$9,365 | -$6,751 | -$8,696 | -$5,306 | -$7,227 |
| | 3% 95th Percentile | -$15,592 | -$19,417 | -$14,749 | -$18,553 | -$12,642 | -$16,324 |

This table shows that, even if the Forest Service had applied the damages from the Social Cost of Methane to the benefit-cost calculations, by using the 3-year self-reported methane emissions instead of the 12-year methane emissions used in this report, the Forest Service would under-represent the damages associated with the mines by more than $100 million (2014$) in most of the scenarios that they assessed.

MENU

**COLORADO RIVER FLOWS REDUCED BY WARMER SPRING TEMPERATURES**

9 March 2016

Like 55 Tweet G+1 0 3

Joint Release

WASHINGTON, DC — Warmer-than-average spring temperatures reduce upper Colorado River flows more than previously recognized, according to a new study.

Although climate models have suggested that spring temperatures affect stream flow, this study is the first to examine the instrumental historical record to see if a temperature effect could be detected, said Connie Woodhouse, a geographer and dendrochronologist at the University of Arizona in Tucson and lead author of the new study.

**(http://news.agu.org/files/2016/03/Colorado_River_at_Navajo_Bridge_nr_Lees_Ferry__AZ_06-27-2009_3-USGS.jpg)**

A late afternoon view of the Colorado River in Marble Canyon upstream of Navajo Bridge, near Lees Ferry, Arizona. New research shows that warmer-than-average spring temperatures reduce upper Colorado River flows more than previously thought.
*Credit: Stewart Tomlinson, U.S. Geological Survey.*

"Forecasts of stream flow are largely based on precipitation," Woodhouse said. "What we're seeing since the 1980s is that temperature plays a larger role in stream flow and in exacerbating drought."

The bulk of stream flow in the upper Colorado comes from snowpack. However, temperatures during the "runoff season" of March through July can have a significant impact on the amount of water that ends up in the river, the researchers found. The team studied the records of temperature, cool-season precipitation and stream flow for the years 1906 to 2012.

"In certain years, temperature became a very strong influence. It was a bit of a surprise," Woodhouse said. "If we have a warmer spring, we anticipate that the river flows will be less relative to the amount of snowpack."

Seven Western states and Mexico use water from the Colorado River for agriculture and for cities. Major U.S. cities that use Colorado River water include Denver, Albuquerque, Salt Lake City, Phoenix, Tucson, Las Vegas, Los Angeles and San Diego.

The team's **study (http://onlinelibrary.wiley.com/doi/10.1002/2015GL067613/full?campaign=wlytk-41855.5282060185)** has been accepted for publication in *Geophysical Research Letters*, a publication of the American Geophysical Union.

From her previous work with water managers in the region, Woodhouse knows they are interested in how temperature affects stream flow in the Colorado River.

She and her colleagues wanted to determine how Upper Colorado River Basin winter precipitation, March-July temperatures and November soil moisture levels influence annual streamflow at Lees Ferry, Arizona.

For each year from 1906 to 2012, the U.S. Bureau of Reclamation estimates natural upper Colorado River flow based on data recorded from stream gauges at Lees Ferry. At that location, Colorado River streamflow reflects water that has drained from the upper basin, which includes Colorado, Wyoming, Utah and New Mexico.

Using the streamflow data, the researchers identified six droughts that occurred in the Upper Colorado River Basin from 1906 to 2012. A drought was defined by consecutive years with below-average streamflow punctuated by no more than one year of normal or above-average flow.

The drought periods were 1931-1940, 1950-1956, 1959-1969, 1972-1977, 1988-1996 and 2000-2012.

For average winter precipitation and March through July temperatures for the Upper Colorado River Basin, the research team turned to a database that provides climatological data at very high spatial resolution for locations all over the U.S. The database goes back more than 100 years.

Soil moisture records don't exist very back far into the 20th century. Therefore, the team used a hydrologic model, which is based on modern observations, to generate annual averages for November soil moisture going back to 1906.

The team found November soil moisture had only a small effect on streamflow.

The researchers found that winter precipitation and average runoff-season temperatures varied from drought to drought.

"The 1950s was the driest period, but also the coolest," Woodhouse said. "In contrast, the most recent drought of 2000 to 2012 was the warmest, but only moderately dry."

If the temperatures during the runoff season were cooler than average, streamflow was higher than expected on the basis of winter precipitation alone, the team found. However, when runoff-season temperatures were above average, streamflow was less than expected on the basis of winter precipitation.

During and since the 1980s, average Upper Colorado River Basin temperatures during the runoff season have been increasing.

"If we have a warmer spring, we can anticipate that the flows will be less relative to the amount of snowpack," Woodhouse said. "What we're seeing is not just the future – it's actually now. That's not something I say lightly."

For at least the past decade, climate models have indicated that warming temperatures have an increasing effect in modulating streamflow, she said. The team's findings, which are based on real, observed data, mirror the predictions of the climate models.

###

*The **American Geophysical Union (http://www.agu.org/)** is dedicated to advancing the Earth and space sciences for the benefit of humanity through its scholarly publications, conferences, and outreach programs. AGU is a not-for-profit, professional, scientific organization representing more than 60,000 members in 139 countries. Join the conversation on **Facebook (https://www.facebook.com/AmericanGeophysicalUnion)**, **Twitter (https://twitter.com/theAGU)**, **YouTube (http://www.youtube.com/user/AGUvideos)**, and our other **social media channels (http://about.agu.org/get-social/)**.*

---

**Notes for Journalists**

Journalists and public information officers (PIOs) of educational and scientific institutions who have registered with AGU can download a PDF copy of the article by clicking on this link: **http://onlinelibrary.wiley.com/doi/10.1002/2015GL067613/full (http://onlinelibrary.wiley.com/doi/10.1002/2015GL067613/full)**

Or, you may order a copy of the final paper by emailing your request to Lauren Lipuma at llipuma@agu.org.

Please provide your name, the name of your publication, and your phone number.

Neither the paper nor this press release is under embargo.

**Title**
"Increasing influence of air temperature on Upper Colorado River streamflow"

**Authors:**

**Connie A. Woodhouse,** School of Geography and Development and Laboratory of Tree-Ring Research, University of Arizona, Tucson, Arizona, U.S.A;

**Gregory T. Pederson,** U.S. Geological Survey, Northern Rocky Mountain Science Center, Bozeman, Montana, U.S.A.;

**Kiyomi Morino,** Laboratory of Tree-Ring Research, University of Arizona, Tucson, Arizona, U.S.A.;

**Stephanie A. McAfee,** Department of Geography, University of Nevada, Reno, Reno, Nevada, U.S.A.;

**Gregory J. McCabe,** U.S. Geological Survey, National Research Program, Water Resources Division, Denver Federal Center, Denver, Colorado, U.S.A.

**Contact Information for the Authors:**
**Connie Woodhouse:** +1 520-626-0235, **conniew1@email.arizona.edu (mailto:conniew1@email.arizona.edu)**

---

**AGU Contact:**
Lauren Lipuma
+1 (202) 777-7396
**llipuma@agu.org (mailto:llipuma@agu.org)**

**University of Arizona Contact:**
Mari Jensen
+1 (520) 626-9635
**mnjensen@email.arizona.edu (mailto:mnjensen@email.arizona.edu)**

**Resources**

- **Fall Meeting Media Center (http://fallmeeting.agu.org/2016/media-center/)**
- **Ocean Sciences Media Center (http://osm.agu.org/2016/media-center/)**
- **Journalism Awards (http://honors.agu.org/journalism-award-nominations/)**
- **Sign Up for Press Releases (http://news.agu.org/press-release-signup/)**
- **Register for Journal Paper Access (http://news.agu.org/agu-press-subscriptions/)**
- **How to Speak to the Media (http://sharingscience.agu.org/sharing-science/sharing-science-helpful-hints/the-media/)**
- **Publicity Form for Journal Authors (http://news.agu.org/publicity-q-and-a/)**

**MEDIA CONTACTS**

**Nanci Bompey (mailto:NBompey@agu.org)**
Manager, Public Information
Phone: +1 202 777 7524

**Joan Buhrman (mailto:JBuhrman@agu.org)**
Assistant Director, Strategic Communications
Phone: +1 202 777 7509

**Caitlyn Camacho (mailto:CCamacho@agu.org)**
Program Manager, Strategic Communications
Phone: +1 202 777 7423

**Lauren Lipuma (mailto:LLipuma@agu.org)**
Public Information Specialist
Phone: +1 202 777 7396

Phone: +1 (800) 966 2481
(Toll free in North America)
Fax: +1 202 328 0566

### I WANT TO

Join AGU (http://membership.agu.org/join-renew/)

Renew AGU Membership (http://membership.agu.org/join-renew/)

Donate to AGU (https://giving.agu.org/)

Search Publications (http://onlinelibrary.wiley.com/agu/search/easi)

Find an AGU Meeting (http://meetings.agu.org/)

Visit the Career Center (https://careers.agu.org/)

Learn about AGU Scientific Integrity and Professional Ethics (http://ethics.agu.org/)

Volunteer (http://sites.agu.org/leadership/volunteer/)

Contact AGU (http://about.agu.org/contact/)

### POPULAR LINKS

Sections and Focus Groups (http://sites.agu.org/leadership/sections-focus-groups/)

AGU GeoCalendar (http://geocalendar.agu.org/)

Get Social with AGU (http://about.agu.org/get-social/)

AGU Press Releases (http://news.agu.org/)

Latest Science Policy News (http://sciencepolicy.agu.org/)

Education and Outreach Programs (http://education.agu.org/)

*Eos* (http://eos.org/)

*AGUniverse* Newsletter (http://membership.agu.org/aguniverse/)

Media Kit (http://sites.agu.org/media-kits/)

### ABOUT AGU

AGU galvanizes a community of Earth and space scientists that collaboratively advances and communicates science and its power to ensure a sustainable future.

**GET CONNECTED (HTTP://ABOUT.AGU.ORG/GET-SOCIAL/)**

© 2016. American Geophysical Union (http://sites.agu.org) | All rights reserved | Privacy Policy (http://about.agu.org/privacy-policy)

2000 Florida Ave. NW, Washington, DC 20009 | Phone: +1 202 462 6900 | Toll Free: 800 966 2481 (North America only) | Customer Service (mailto:service@agu.org)

RECLAMATION
*Managing Water in the West*

**SECURE Water Act Section 9503(c)—Reclamation Climate Change and Water 2016**

# Chapter 10: Other Western River Basins

U.S. Department of the Interior
Bureau of Reclamation

March 2016

# Mission Statements

The U.S. Department of the Interior protects America's natural resources and heritage, honors our cultures and tribal communities, and supplies the energy to power our future.

The mission of the Bureau of Reclamation is to manage, develop, and protect water and related resources in an environmentally and economically sound manner in the interest of the American public.

SECURE Water Act Section 9503(c) Report to Congress

# Chapter 10: Other Western River Basins

*Prepared for*

**United States Congress**

*Prepared by*

**U.S. Department of the Interior**
**Bureau of Reclamation**

**U.S. Department of the Interior**
**Bureau of Reclamation**
**Policy and Administration**
**Denver, Colorado**

**March 2016**

# Acronyms and Abbreviations

| | |
|---|---|
| °F | degrees Fahrenheit |
| AF | acre-feet |
| AFY | acre-feet per year |
| CUP | Central Utah Project |
| CVWD | Coachella Valley Water District |
| GPCD | gallons per capita per day |
| IID | Imperial Irrigation District |
| LBAO | Lahontan Basin Area Office |
| M&I | municipal and industrial |
| MAF | million acre-feet |
| MCD | Master Conservancy Districts |
| Mitigation Commission | Utah Reclamation Mitigation and Conservation Commission |
| msl | mean sea level |
| MWA | Mojave Water Agency |
| MWD | Metropolitan Water District of Southern California |
| OWRB | Oklahoma Water Resources Board |
| Reclamation | Bureau of Reclamation |
| USACE | U.S. Army Corps of Engineers |
| USGS | U.S. Geological Survey |
| WRWUA | Weber River Water Users Association |
| WaterSMART | Sustain and Manage America's Resources for Tomorrow |

# About this Chapter

This summary chapter is part of the 2016 SECURE Water Act Report to Congress prepared by the Bureau of Reclamation (Reclamation) in accordance with Section 9503 of the SECURE Water Act. The 2016 SECURE Water Act Report follows and builds on the first SECURE Water Act Report, submitted to Congress in 2011[1], which characterized the impacts of warmer temperatures, changes to precipitation and snowpack, and changes to the timing and quantity of streamflow runoff across the West.

The SECURE Water Act identifies the eight major Reclamation river basins. This chapter provides a summary of activities conducted by Reclamation and its partners in other western river basins not specifically identified in the SECURE Water Act. This chapter is organized as follows:

**Section 1**: Coastal and Inland Basin Areas of Southern California,

**Section 2**: Great Basin, and

**Section 3**: Arkansas-Red-White River Basin

This chapter includes updated information from Reclamation studies completed or initiated in the basin over the past 5 years. The key studies referenced in this chapter include the following:

- Los Angeles Basin Study (ongoing)
- Santa Ana River Watershed Basin Study (completed)
- Mojave River Watershed Climate Change Assessment (completed)
- San Diego Watershed Basin Study (ongoing)
- Southeast California Regional Basin Study (completed)
- Upper Washita Basin Study (ongoing)
- Upper Red River Basin Study (ongoing)

---

1 The first SECURE Water Act Report, submitted to Congress in 2011 is available on the Reclamation website: www.usbr.gov/climate/secure/docs/2011secure/2011SECUREreport.pdf .

# Contents

Page

About this Chapter

1 Southern California Coastal and Inland Basins ....... 10–1
 1.1 Regional Setting ....... 10–1
  1.1.1 Coastal Area ....... 10–1
  1.1.2 Inland Basins Area ....... 10–3
 1.2 Coordination Activities ....... 10–7
  1.2.1 Bureau of Reclamation Partnered Studies ....... 10–8

2 Great Basin ....... 10–10
 2.1 Great Basin Setting ....... 10–10
 2.2 Coordination Activities ....... 10–14
  2.2.1 Utah Reclamation Mitigation and Conservation Commission ....... 10–15
  2.2.2 Weber River Collaboration ....... 10–15
  2.2.3 Science and Technology Research ....... 10–16

3 Arkansas-Red-White River Basin ....... 10–18
 3.1 Basin Setting ....... 10–18
  Arkansas River ....... 10–18
  White River ....... 10–19
  Red River ....... 10–19
 3.2 Coordination Activities ....... 10–19
  Upper Washita Basin Study ....... 10–19
  Upper Red River Basin Study ....... 10–21

4 References ....... 10–23

## Figures

Page

Figure 10–1. Map of Southern California showing locations of Basin Studies. ....... 10–2
Figure 10–2. San Diego, California. ....... 10–3
Figure 10–3. Map of the Great Basin ....... 10–11
Figure 10–4. Location of on-going basin studies in the Arkansas-Red-White River Basin. ....... 10–20

# 1 Southern California Coastal and Inland Basins

Southern California consistently faces serious water supply threats from numerous factors: increasing population, reliance on imported water, flooding, and the overuse of groundwater. Recently, California ranked second among all states in the country for population increases (U.S. Census Bureau, 2011), and as of 2015, the state was struggling through its fourth consecutive year of one of the most severe droughts on record. In a region that experiences highly variable precipitation and periodic drought, climate change may exacerbate shortages in a system already operating on the edge with respect to water supply.

**Coastal and Inland Basin Areas of Southern California**

**States:** California

**California Counties:** Los Angeles, Ventura, Riverside, San Bernardino, and Orange

**Basin Rivers:** Los Angeles River, San Gabriel River, Santa Ana River, Whitewater River, Mojave River, San Diego River, New River, and Alamo River

**Major Water Uses:** Municipal Supply (more than 22 million people), Agricultural irrigation, Flood Control, Recreation, and Fish and Wildlife

## 1.1 Regional Setting

For this chapter, Southern California is separated into two distinct geographical areas: the Coastal Area, which is defined as the Los Angeles, Santa Ana, and San Diego Watershed Basins, and the Inland Basins Area, which is represented by the adjudicated boundary of the Mojave River basin and the Salton Trough region. Figure 10–1 presents the Coastal and Inland Basin Areas, as well as the location of Reclamation Basin Studies.

### 1.1.1 Coastal Area

The Coastal Area encompasses the Southern California watersheds bounded by Malibu to the north and San Ysidro to the south. Most of the water in the area is supplied by the Metropolitan Water District of Southern California (MWD), which provides water to 26 member agencies in a 5,200-square-mile service area that sustains approximately 19 million people.

The area is situated in an arid desert climate without enough local fresh water to support the growing population and major economic development, so it receives approximately 40 percent of its needed water from outside sources. In 2014, 22 percent of the total water supply was provided by the Colorado River (delivered via the 242-mile Colorado River Aqueduct); 17 percent was supplied by northern California (delivered via the 444-mile California Aqueduct); 33 percent was from local supply, which included groundwater, surface water, Los Angeles Aqueduct (from the Sierra Nevada Mountains), and groundwater recovery, and 28 percent of the supply was from conservation and water recycling (Reclamation, 2015 [Moving Forward]).

SECURE Water Act Section 9503(c) 2016 Report to Congress

Sacramento-San Joaquin Basin
Nevada
DAVIS DAM
Soda Lake
Mojave Basin
Barstow
Mojave River
Colorado Basin
Colorado River
California
Victorville
Apple Valley
Hesperia
California Aqueduct
Los Angeles Basin Study
San Gabriel Res
Morongo Basin
Yucca Valley
Parker Dam
Los Angeles
San Gabriel River
Santa Ana River
Perris Res
Santa Ana River Watershed Basin Study
Lake Mathews
PACIFIC OCEAN
Palm Springs
Colorado River Aqueduct
Cochella Valley
Blythe
Temecula
Lake Henshaw
San Diego Watershed Basin Study
Borrego Valley
Salton Sea
Arizona
Coachella Canal
Southeast California Regional Basin Study
Brawley
Imperial Dam
San Diego
El Capitan Reservoir
Imperial Valley
All American Canal
Calexico
Yuma
Tijuana
Mexico
Legend
Coastal Basin Area
Basin Studies
Los Angeles Basin Study
Santa Ana River Watershed Basin Study
San Diego Watershed Basin Study
Inland Basin Area
Basin Studies
Mojave Basin
Morongo Basin
Southeast California Regional Basin Study
Neighboring Basins

Figure 10–1. Map of Southern California showing locations of Basin Studies.

10–2



**Figure 10–2. San Diego, California.**
**Source: Reclamation, 2015 (SCAO).**

The metropolitan area population has increased by nearly 50 percent since 1980, adding more than 6 million to the municipal water-service-area population, while total annual water use increased by approximately 20 percent. On average, per capita water use rates have decreased by approximately 10 percent since 2000. Residential water use accounts for around 70 percent of the total water delivered by MWD (Reclamation, 2015 [Moving Forward]).

In February 2008, Governor Arnold Schwarzenegger introduced a seven-part comprehensive plan for improving the Sacramento-San Joaquin Delta. As part of this effort, the Governor directed state agencies to develop a plan to reduce statewide per capita urban water use by 20 percent by the year 2020. This marked the initiation of the 20x2020 Water Conservation Plan (20x2020Plan) process. Because of an unprecedented 4-year drought, Governor Jerry Brown declared a drought State of Emergency in January 2015 and directed state officials to take all necessary actions to prepare for water shortages. In April 2015, Governor Brown mandated a 25 percent water use reduction for cities and towns across California. For the June-August 2015 period, the cumulative statewide savings rate was 28.7 percent.

Although the majority of water resources within this area are used for urban and agricultural purposes, a variety of wildlife species thrive in southern California's coastal and marine environments, sage scrub and chaparral habitats, and marshes and riparian zones. Valuable area wetlands, including salt marshes and estuaries, freshwater marshes, riparian woodlands, and a number of reservoirs and lakes are essential resting stops for migrating birds on the Pacific Flyway and provide nesting areas for large numbers of wintering waterfowl (Reclamation, 2015b).

The Coastal Area has a Mediterranean climate with average summer temperatures ranging from 64 to 85 degrees Fahrenheit (°F) during August, the warmest month; average winter temperatures range from 46 to 70 °F during December, the coolest month. In the inland areas, the climate is semiarid, with colder winters and markedly hotter summers. Precipitation in the metropolitan area occurs primarily during the winter months and ranges from 10 to 17 inches per year (Reclamation, 2015b).

### 1.1.2 Inland Basins Area

The Inland Basin Area of southeastern California encompasses the Borrego, Coachella, and Imperial Valleys in the Salton Trough region and the high desert

region of the Mojave Basin near Barstow, CA. This area includes the cities of Indio, Palm Desert, El Centro, Calexico, Victorville, and Barstow. Both of these areas are water supply limited, and growing municipal and commercial sectors (e.g., retail outlets, resorts, and casinos), a massive agricultural industry, and numerous recent regulatory and legal settlements require a delicate balance to manage existing supply and demand.

Bounded to the east and west by high-elevation mountain ranges that drain to the low-depression valley containing the Salton Sea, the Salton Trough is home to a diverse range of habitats that support more than 1,000 plant species and more than 400 animal species. The Salton Trough region consists of approximately 5,200 square miles and is home to 10 desert cities and four Indian reservations, which have a combined population of 750,000 full-time residents. In addition, millions of winter and spring visitors flock to the Palms Springs and Borrego Springs areas annually. The region is also home to California's largest inland lake, the Salton Sea, which is a critical component of the Pacific flyway. The three irrigation districts that service this vast area have a combined annual agricultural economic value of more than $2.5 billion dollars, and the region's tourism economy generates more than $8.4 billion dollars annually (Reclamation, 2014 [Southeast California]).

The Salton Trough region lies within the Sonoran desert geomorphic area, which has a typical subtropical desert climate—hot summers, mild winters, and 3 to 4 inches of annual precipitation. Temperatures in the summer are often in excess of 120° F. Precipitation falls mainly during the winter months; however, monsoonal summer storms do occur (Reclamation, 2014 [Southeast California]). An estimated 124,000 shorebirds, including at least 25 different species, migrate through the Salton Sea, which is considered the third most important shorebird habitat west of the Rocky Mountains.

The population in the Salton Trough region has almost doubled since 1990, adding more than 230,000 to the municipal water service-area population. Total annual water use increased by approximately 143 percent over the same period. The most recent annual average (2008-2012 average) per capita use was estimated at 314 gallons per capita per day (GPCD). The high per-capita use rates for this metropolitan area are generally associated with large-scale turf irrigation in resort areas Reclamation, 2015 (Moving Forward).

In the Salton trough region, three distinct subareas—Borrego Valley, Coachella Valley, and Imperial Valley—have both unique and overlapping water supply-demand issues. The Borrego subarea is entirely dependent on groundwater. A draft U.S. Geological Survey (USGS) groundwater study (Faunt et al., 2015) of the area indicates the aquifer has an overdraft of 17,000 acre-feet per year (AFY) and estimates that the upper aquifer may be depleted in as little as 50 years. Coachella's challenge is a mix of both groundwater overdraft and Colorado River water supply issues. In addition, a portion of the Coachella subarea's water supply is derived from the State Water Project (SWP) imports and exchanged for

Colorado River water.  The Imperial subarea's challenge is near-100-percent dependence on Colorado River water supply (Reclamation, 2014 [Southeast California]).

The Coachella Valley Water District (CVWD) began operation in 1918.  It provides service to approximately 1,000 square miles from the San Gorgonio Pass to the Salton Sea, mostly within the Coachella Valley in Riverside County, California.  CVWD provides water-related service to more than 303,000 people living in the nine cities of CVWD's service area.  CVWD relies on three sources of water (groundwater, recycled water, and imported water) to provide service to its customers, either through the SWP (via exchange) or from the Colorado River via the Coachella Canal, a branch of the All-American Canal.  In the CVWD service area, approximately 300,000 AFY of water delivered from the Coachella Canal was initially used exclusively by agriculture.  As residential growth moved into the eastern valley, other water users, primarily golf courses and homeowner associations, began using Colorado River water for large landscape irrigation.  From 2008 to 2012, more than 40 percent of the total CVWD deliveries were distributed to municipal and industrial (M&I) water users (Reclamation, 2015 [Moving Forward]).

The Imperial Irrigation District (IID), the largest irrigation district in the nation, was formed in 1911 to import and distribute raw Colorado River water, mainly to agricultural irrigation customers.  IID delivers an average of 2.8 million acre-feet (AF) of water each year, and 97 percent is used for the irrigation of more than 400,000 acres.  In addition, IID supplies water to approximately 178,000 people across seven municipalities.  The largest cities included in the IID M&I service area are El Centro and Calexico.  The IID diverts water at the Imperial Dam on the Colorado River through the 80-mile-long All-American Canal (Reclamation, 2015 [Moving Forward]).

The Mojave Basin is in the Mojave Desert and is classified as high desert.  Elevations within the area range from 1,500 feet mean sea level (msl) in the east to 5,500 feet msl in the mountains to the south.  The Mojave Water Agency (MWA) services water users in the adjudicated boundary of the Mojave Basin.  Precipitation and runoff throughout the basin are highly variable.  Most of the surface water originates from ephemeral streams; consequently, the MWA area has limited surface water supplies.  Groundwater supplies are currently used to meet the vast majority of demand.  Since groundwater production started in the 1900s, groundwater extraction has greatly expanded, and groundwater levels have been declining since the early 1950s.  Since this time, the overdraft has reduced groundwater storage by an estimated 2 million acre-feet (MAF).  MWA imports significant amounts of surface water from the SWP (Reclamation, 2013 [Mojave]).

The Colorado River Basin Water Supply and Demand Study (Reclamation, 2012 [CO Basin Study]) assessed historical water supply in the Colorado River Basin, and observations and conclusions of historical temperature and precipitation

trends in the Lower Colorado River Basin are consistent with Southern California historical trends. Key findings related to projected changes in temperature, precipitation, snowpack, and runoff are presented below:

- **Increases in temperatures**: Studies consistently show that the temperatures in Southern California will continue to increase. Increases in both minimum and maximum temperatures may be expected, with increases in extreme warm temperatures and decreases in extreme cool temperatures. For the Los Angeles area, a mean temperature increase of 2 to 5 °F is expected by 2050.

- **Decreases in annual precipitation**: Studies suggest that the storm track in the Pacific Ocean may shift northward, resulting in less-frequent precipitation events along the coast of southern California. Changes in mean annual precipitation indicate a mean drying (i.e., less precipitation) of 2 to 5 percent since the mid-20th century, with little additional change by mid-21st century. Additional drying (mean reduction of 2 to 5 percent) could occur along the coastal areas of California.

- **Increases in extreme precipitation events**: Overall, precipitation may be less frequent but more intense, meaning that the contribution to annual precipitation by extreme precipitation events may increase. The heavy rainfall events may be interspersed with longer, relatively dry periods. The higher evaporation rates resulting from the rising temperature may decrease soil moisture, resulting in reduced storm runoff. The literature does not associate a specific return period to extreme precipitation events but rather discusses extreme precipitation events in general terms.

Water demand in the area is expected to increase due to changes in temperature and increased reservoir evaporation (Reclamation, 2013 [Santa Ana]). Key findings related to projected changes in demand are summarized below.

- Overall, there are expected to be two to three times as many extreme days (i.e., greater than 95 °F) in coastal areas and within the Los Angeles Basin. Inland areas were noted to have three to five times the number of extremely hot days (Reclamation, 2013 [Santa Ana]).

- Water demand in the Inland Basins Area is largely dominated by agriculture and, to a lesser extent, municipalities and golf courses. Increased temperatures can affect both agricultural and municipal demand by increasing evaporative demand on crops, golf courses, and lawns. From 1970 to 2003, agricultural demand in the Imperial Valley varied from 2.6 to 3.2 million AFY.

- Projections indicated more winter precipitation and less springtime precipitation. Increased winter precipitation could result in crop damages, and excessive summer heat could decrease yields. In addition, it is expected that as the climate changes, farmers will adapt by changing the types of crops planted, which might also affect demand (Reclamation 2014 [Southeast California]).

- Other drivers influencing demand include the population of the Coastal Southern California Metropolitan Area, which has increased by about 50 percent since 1980, adding more than 6 million to the municipal water service area population, while total annual water use increased by approximately 20 percent.

- Recent averages indicate that residential water use accounts for about 70 percent of the total water delivered by MWD.  However, many factors affect future water demands, such as population growth, hydrologic conditions, public education, and economic conditions, among others.

- Municipal demand accounts for only 3 percent of historical Colorado River water deliveries in the Imperial Valley; however, the population is expected to more than double from approximately 162,000 to 365,000 between 2010 and 2050.  This level of growth would result in a roughly 64,000-acre increase in urban area (Reclamation 2014 [Southeast California]).

- Since 1999, considerable growth within the Coachella Valley has resulted in the conversion of agricultural and desert lands to residential urban uses.  There is a recognized overdraft and a 2002 water management plan set a number of water conservation goals for CVWD in order to reduce demand.

- In the Mojave River Basin, the population is projected to increase nearly 25 percent from 2010 through 2020, and total demand is projected to increase, assuming moderate conservation.  For planning purposes, the Mojave Water Agency assumes that average natural water supply and agricultural depletion from storage will remain constant through 2035, while wastewater imports and return flows are projected to increase slightly.  SWP imports are projected to increase by approximately 10 percent by 2035 (Reclamation 2013 [Mojave]).

## 1.2   Coordination Activities

The Coastal and Inland Basins Areas of Southern California are situated in an arid desert climate without enough local fresh water to support the growing population and burgeoning economy.  As the area receives two-thirds of its needed water supplies from northern California (delivered via the 444-mile California Aqueduct), the Sierra Nevada Mountains (delivered by the 338-mile Los Angeles Aqueduct), and the Colorado River (delivered via the 242-mile Colorado River Aqueduct), water challenges are being addressed through Federal, state, tribal, and local partnerships.  Reclamation is an active partner in activities to develop strategies for conservation, water recycling and reuse, salinity management, ground and surface water conjunctive management, storm water augmentation programs, and other watershed management opportunities.

In the Coastal Area, Reclamation has led or participated in multiple studies and activities.  Some recent activities include Reclamation's partnership with the Los Angeles and San Gabriel Rivers Watershed Council and other agencies in a Water

Augmentation Study.  The purpose of the study is to explore potential adaptation strategies such as reducing urban runoff pollution by increasing infiltration of stormwater runoff.  This stormwater infiltration has the potential to augment local groundwater supplies by capturing and recharging stormwater runoff that otherwise would flow unused to the ocean.  The Los Angeles Basin Study provides the opportunity for multiple water management agencies to participate in a collaborative process to plan for future local water supply scenarios.

Another example of integrated planning is Reclamation's partnership with the California Energy Commission and the Metropolitan Water District of Southern California to commission an innovative study to bring together energy utilities, water districts, wastewater sanitation districts, and state and local agencies to study the potential for integrated water and energy efficiency programs.  This approach allowed water districts and energy utilities to take advantage of opportunities to leverage their limited resources and coordinate resource management efforts to meet future needs (Reclamation, 2015 [SCAO]).

In the Inland Basin Area, Reclamation is also actively involved in conservation initiatives and long-term water management planning.  Studies have been conducted in partnership with multiple water agencies and irrigation districts.  For example, the Southeast California Regional Basin Study was conducted in partnership with the Borrego Water District and other regional stakeholders. Reclamation also works with the newly created Borrego Water Coalition, which is addressing the significant risks associated with over drafting the Borrego Valley groundwater basin (Reclamation, 2015 [SCAO]).

### 1.2.1   Bureau of Reclamation Partnered Studies

Reclamation administers programs to develop and enhance water management throughout southern California.  In cooperation with state and local water agencies, Reclamation programs address desalination research, conjunctive use of ground and surface water resources, stormwater runoff augmentation, watershed modeling that addresses both water quantity and quality, and the development of new water resources.  Recent activities include long-term planning focused on options to provide water management assistance to address complex water issues on local, regional, and statewide levels, as well as water conservation-related projects through WaterSMART Grants to facilitate water conservation and efficiency improvements on Federal and non-Federal projects (Reclamation, 2015 [SCAO]).  Recent and on-going Reclamation studies with partners in the Coastal and Inland Basin Areas include the following:

- **Colorado River Basin Water Supply and Demand Study**: Completed in 2012, the study evaluated future water supply and demand in the Colorado River Basin and adjacent areas receiving Colorado River water, including the Coastal and Inland Basin Areas (Reclamation, 2012 [CO Basin Study]).

- **Santa Ana Watershed Basin Study**: Completed in 2013, the study focuses on the Santa Ana Watershed Project Authority's integrated regional water

resources planning process, refined the region's water projections, and identified potential strategies to help the region adapt to climate change (Reclamation, 2013 [Santa Ana] and Reclamation, 2013 [Santa Ana Summary]).

- **Mojave River Watershed Climate Change Assessment**: Completed in 2013, this report provides a detailed climate change assessment of the Mojave River watershed (Reclamation, 2013 [Mojave]).
- **Los Angeles Basin Study**: Reclamation is collaborating with the Los Angeles County Flood Control District for this ongoing, phased effort investigating long-term water conservation and flood-control impacts from projected climate conditions and population changes in the Los Angeles Basin. This study is expected to be completed in 2016.
- **San Diego Watershed Basin Study** – This study, expected to be completed in 2016, will assess the San Diego region's water supply and demand and determine the potential effects from climate change impacts within the San Diego Integrated Regional Water Management planning region. It will also analyze the region's existing infrastructure and develop adaptation strategies that can assist with addressing the uncertainties associated with climate change.
- **Southeast California Regional Basin Study**: Completed in 2014, the study addressed current and future supply and demand imbalances in the Coachella, Borrego, and Imperial Valleys of California, provided an assessment of existing infrastructure resources, and developed options and alternatives to solve identified issues and help plan for an uncertain water supply future (Reclamation, 2014 [Southeast California]).
- **Colorado River Basin Study *Moving Forward* Effort**: The Colorado River Basin Study was widely described as a "call to action." In May 2013, the Department of the Interior and other stakeholders launched the *Moving Forward* effort to identify and implement, in a coordinated and collaborative manner, actions to address projected supply and demand imbalances that have broad-based support and provide a wide range of benefits. In Phase 1 of the effort, completed in 2015, three workgroups focused on water-use efficiency (urban and agricultural) and environmental and recreational flows throughout the Basin, including the Coastal and Inland Basins Areas (Reclamation, 2015 [Moving Forward]).

Reclamation basin studies and other planning efforts have demonstrated that the implementation of a broad range of options can help improve the Coastal and Inland Basins Areas' resiliency to dry and variable hydrologic conditions. Actions to help ensure the sustainability of these areas are occurring at a variety of scales and locations, ranging from basin-wide initiatives to specific infrastructure improvements.

# 2 Great Basin

The Great Basin includes most of Nevada, western Utah, and small portions of bordering states, including Wyoming, Idaho, Oregon, and California. The southern boundary is less distinct. The Great Basin region has a population of roughly 3.2 million people. Major population centers include Salt Lake City, Utah, and Reno, Nevada, and the region is sparsely populated outside of the two major cities. Water uses include hydropower, irrigation, recreation, fish and wildlife, and municipal and industrial water supply.

**Great Basin Setting**

**States:** California, Idaho, Nevada, and Utah

**Major U.S. Cities:** Salt Lake City, Ogden, Reno, and Carson City

**Longest River Length:** 350 miles (Bear River)

**River Basin Area:** 140,000 square miles

**Major River Uses:** Municipal (6 million people), Agricultural, Flood Control, Navigation, and Recreation, and Ecological Uses

**Reclamation Irrigation Projects in the Great Basin:** Central Utah Project (Bonneville, Jensen, and Vernal Units), Humboldt Project, Hyrum, Newlands Project, Newton, Ogden River, Preston Bench, Provo River, Strawberry Valley, Truckee River Storage Project, Washoe Project, Weber Basin, and Weber River

## 2.1 Great Basin Setting

The Great Basin region consists of many small basins that together span an area of roughly 140,000 square miles. The region includes the Bear River, Great Salt Lake, Escalante Desert-Sevier Lake, Central Lahontan, and Central Nevada Desert Basins, and the Black Rock Desert-Humboldt subbasins. The Great Basin's longest (350 miles) and largest river is the Bear River in northern Utah; the largest single watershed is the Humboldt River drainage in north-central Nevada (17,000 square miles). Lake Tahoe, North America's largest alpine lake, is part of Great Basin's Central Lahontan subbasin.

The region is bounded by the Wasatch Mountains to the east, the Sierra Nevada Mountains to the west, and the Snake River Plain to the north (Figure 10–3). The Great Basin is a closed basin, with no drainage to the Pacific Ocean or the Gulf of Mexico. All precipitation in the region evaporates, sinks underground, or flows into lakes, most of which are saline. The Great Salt Lake, Pyramid Lake, and the Humboldt Sink are a few of the drains in the Great Basin.



Figure 10–3.  Map of the Great Basin.

Public and private development of the water resources of the Great Basin has resulted in the addition of many features for flood control, irrigation, hydroelectric power generation, recreation, improvement of fish and wildlife habitat, and municipal and industrial water supply. Most of the Federally directed water resources development in the basin has been undertaken by Reclamation. The Sacramento District of the U.S. Army USACE of Engineers (USACE) is involved in the management of some of these federal facilities. Reclamation has constructed thirteen irrigation projects in the Great Basin. Nine of these projects are administered by the Provo Area Office of the Upper Colorado Region, including:

- Central Utah Project (Bonneville, Jensen, and Vernal Units)
- Hyrum
- Newton
- Ogden River
- Preston Bench
- Provo River
- Strawberry Valley
- Weber Basin
- Weber River

The Central Utah, Provo River, and Strawberry Valley projects also utilize trans-basin diversions from the Green River system (a tributary to the Colorado River) to the Great Basin for project water supplies.

Reclamation's Lahontan Basin Area Office (LBAO) of the Mid-Pacific Region also has jurisdiction over a large area of the Great Basin, including most of the northern two-thirds of Nevada, with a small amount of overlap into California and Oregon. The main area of LBAO activities is in the Carson, Truckee, and Humboldt River basins, where there are four operating Reclamation projects:[2]

- Newlands Project
- Truckee River Storage Project
- Washoe Project
- Humboldt Project

Climate varies throughout the Great Basin by elevation, latitude, and other factors. Much of the Great Basin is characterized by a semi-arid or arid climate and by basin-and-range topography. Elevation in the region ranges from 283 feet below sea level, the lowest point in North America, to 14,505 feet less than 100 miles away at the summit of Mount Whitney, which is the highest point of the

[2] Note: Chapter 9: Truckee River Basin Summary includes specific information on the Truckee River Basin setting, implications for various water and environmental resources, adaptation strategies, and coordination activities.

contiguous United States. The western areas of the basin tend to be drier than the eastern areas because of the rain shadow of the Sierra Nevada. Higher elevations tend to be cooler and receive more precipitation, with most Great Basin precipitation falling as snow. Average annual rainfall ranges from 1.5 inches in Death Valley to 40 inches in the Wasatch Mountains. Because of snowmelt processes, natural streamflow is historically highest in the late spring and early summer and diminishes rapidly by mid-summer. While flows in late summer through autumn sometimes increase following rain events, natural streamflow in the late summer through winter is generally low compared to spring and early summer. Key generalizations related to projected changes in temperature, precipitation, snowpack, and runoff are presented below:

- **Temperature** is projected to increase approximately 2.7 to 8.1 °F by the latter half of the 21st century for the Great Basin region. The largest increases are projected for the summer months. Reasonable consensus is also seen in the literature with respect to projected increases in extreme temperature events, including more frequent, longer, and more intense summer heat waves in the long-term future compared to the recent past (USACE, 2015).
- **Precipitation** projections in the study basin are less certain than projections associated with air temperature. Results of the studies reviewed here are roughly evenly split with respect to projected increases versus decreases in future annual precipitation. There is, however, moderate consensus among the reviewed studies that future storm events in the region will become more intense and more frequent compared to the recent past (USACE, 2015).
- **Streamflow** projections are variable. In some cases, models indicate minimal change in future streamflow, but in other cases indicate a potential increase in runoff and/or streamflow in the Great Basin region (USACE, 2015).

Potential climate change impacts on agricultural, municipal and industrial, and in-stream water demands are difficult to predict, and existing information on the subject is limited. It is widely accepted that water demands will change due to increased air temperatures; increased atmospheric carbon dioxide levels; and changes in precipitation, winds, humidity, and atmospheric aerosol and ozone levels. Furthermore, these natural-system changes must be considered in combination with socioeconomic changes, including infrastructure, land use, technology, and human behavior. Key projections related to changes in demand are summarized below.

- Agricultural irrigation is the predominant water demand in the Great Basin and throughout the greater western United States (Frederick, 2001). The seasonal volume of agricultural water demand could increase if growing seasons become longer, assuming that farmers could adapt to this opportunity by planting more crop cycles per growing season.

- Additionally, agricultural water demand could decrease due to crop failures caused by changes in pests and diseases in the future.

- In addition to changes in water demands associated with natural processes, which are difficult to quantify, municipal and industrial consumption is projected to increase due to population growth.

- Domestic water use is not very sensitive to changes in temperature and precipitation (Frederick, 2001), and water conservation measures may reduce potential increases in per capita water usage, thereby offsetting potential increase in population.

- Climate change also could result in changed demands for in-stream flows or reservoir releases to satisfy other system objectives, including ecosystem support, hydropower generation, municipal and industrial water deliveries, river and reservoir navigation, and recreational uses.

- Water demands for endangered species and other fish and wildlife could increase with ecosystem impacts due to warmer air and water temperatures and resulting hydrologic impacts (e.g., runoff timing).

- Diversions and consumptive use by industrial cooling facilities are predicted to increase, since these processes will function less efficiently with warmer air and water temperatures.  The timing of these diversions and those for hydropower production also could be a factor in ecosystem demands and navigation and recreational water uses.

As climate change might affect water supplies and reservoir operations, the resultant effects on water allocations from year to year could increase pressure for water uses (e.g., crop types, cropping dates, environmental flow targets, transfers among different uses, hydropower production, and recreation).  Such climate-related changes in water use would interact with market influences on agribusiness and energy management, demographics, land use changes, and other non-climate factors.

## 2.2   Coordination Activities

Interest in ensuring the sustainability of water resources in the Great Basin is broad and includes Federal, state, and local governments, tribes, agricultural users, purveyors of M&I water, power users, and conservation and recreation groups.  Water management in the basin is complex, as are the challenges associated with balancing competing needs such as water delivery, hydropower generation, and environmental protection.  To meet such challenges, various stakeholders have implemented programs and initiatives, each with its own set of goals, objectives, approaches, and processes, in various parts of the basin.  These stakeholders recognize that cross-program coordination and information exchange are important strategies that can allow such programs to work together and focus resources to address basin-wide challenges.

### 2.2.1 Utah Reclamation Mitigation and Conservation Commission

The Utah Reclamation Mitigation and Conservation Commission (Mitigation Commission) is a Federal agency authorized under the Central Utah Project (CUP) Completion Act of 1992. The Act set terms and conditions for completing the Central Utah Project, which diverts, stores, and delivers large quantities of water from numerous Utah rivers to meet the needs of central Utah's citizens. The Mitigation Commission is responsible for designing, funding, and implementing projects to offset the impacts to fish, wildlife, and related recreation resources caused by CUP and other Federal water management projects in Utah.

Many mitigation projects require completing efforts initially administered by Reclamation and the Department of the Interior, now two of the Mitigation Commission's most important partners. Under the Mitigation Commission's umbrella authority, other Federal and Utah state agencies, local governments, universities, non-profit organizations, and the Ute Tribe cooperate through agreements with the Mitigation Commission to implement a wide variety of ecosystem restoration and wildlife conservation projects in Utah, including:

- Diversion dam modifications
- Provo River Restoration Project
- Angler access
- Wetland preservation and restoration
- Aquatic and riparian habitat restoration
- Native species recovery and sensitive species inventory
- June Sucker Recovery Implementation Program

Annual funding for Mitigation Commission projects depends on Congressional appropriations through the Secretary of the Interior as part of the Department of the Interior's Central Utah Project Completion program.

### 2.2.2 Weber River Collaboration

#### *2.2.2.1 Weber River Management Plan*

This Weber River Water Management Plan was prepared for the Weber River Water Users Association (WRWUA) with partial funding from a Reclamation Water Conservation Field Services Program grant. Cost share partners include WRWUA, Weber Basin Water Conservancy District, Davis and Weber Counties Canal Company, and the Weber River Water Rights Committee. Several other private, state, and Federal entities were also involved during the preparation of the Management Plan.

The Weber River and its tributaries are the sole source of water for three Reclamation projects (Weber River, Ogden River, and Weber Basin Projects), and a contributing source for a fourth (Provo River Project). Numerous other private

developments also depend on the Weber River for water. Population in the Weber River basin area has increased significantly in the several decades since these projects were constructed. This growth is expected to continue into the future, placing increasing demands on the limited water supply. Because of the importance of the Weber River to the multiple agricultural, municipal, industrial, power, recreational, and environmental interests in the area, effective water management and planning are critical needs.

The Management Plan was prepared to provide a database of information related to the management and operation of the Weber River system, to describe the current operations of the major projects and facilities on the Weber River, and to identify and adopt measures for improving the management of the system.

#### 2.2.2.2 *Weber River Symposium*

The Weber River is a valuable watershed to the people of Utah. It has shaped the charismatic landscape of northern Utah and it is the primary source of water for drinking, irrigation, recreation, and industrial uses. The Weber River also provides recreational opportunities, fish and wildlife habitat, and the cornerstone for current and future economic development. Over the past year, individuals representing cities, counties, water users, conservation districts, and private/state/Federal agencies have collaborated to establish the Weber River Partnership and a restoration framework through the development of a Weber River Watershed Plan. In conjunction with the plan, the Partnership established an annual forum where stakeholders can gather to discuss major conservation efforts, challenges, and realities throughout the watershed.

The Weber River Symposium is designed to bring together stakeholders with an interest in the Weber River, and to develop and strengthen partnerships. The inaugural Weber River Symposium was a 2-day event held in Ogden, Utah, in November 2014. The event was well attended by Federal, state, and local water managers, including Reclamation, as well as local officials and the public. Ogden City Mayor Mike Caldwell was the keynote speaker for the symposium.

### 2.2.3 Science and Technology Research

Since 2013, Reclamation's Research and Development Office has provided funding through its Science and Technology Program to investigate climate change and variability impacts to water resources along the Wasatch Front. In one study, researchers are studying whether tree rings from local species can provide longer records of climate impacts for better future planning (Liljegren, 2013). City planners and others in the Wasatch Front area of Utah could utilize the results to determine previous climate impacts and forecast supplies in the future. Collaborators include Utah State University, Columbia University's Lamont-Doherty Earth Observatory, Brigham Young University, and various Irrigation Districts.

In 2014 and 2015, Reclamation's Research and Development Office also provided funding through its Science and Technology Program to investigate infrequent large groundwater recharge events and their importance for long-term groundwater availability, use, and management.  This research was conducted in collaboration with the USGS Utah Water Science Center to address the information gap of climate change effects on groundwater and the resultant impacts to surface-water supply over the next several decades.  This study assisted Reclamation in developing a methodology that could be applied drainage-basin by drainage-basin across the western United States.  The assessment method consistently provides information about the relative importance of groundwater in support of basin-specific surface-water flow and illustrates how changing climate conditions (i.e., changes in groundwater recharge) might affect future stream-flow volumes in these drainage basins.

# 3 Arkansas-Red-White River Basin

The Arkansas-Red-White River Basin encompasses the entire state of Oklahoma and portions of Arkansas, Colorado, Kansas, Louisiana, Missouri, New Mexico, and Texas. The three basins (the Arkansas, Red, and White River Basins) drain about 280,000 square miles involving all or parts of eight states, 331 counties, and 28 congressional districts.

**Arkansas-Red-White River Basin Setting**

**States:** Arkansas, Colorado, Kansas, Louisiana, Missouri, New Mexico, Oklahoma, and Texas

**Major U.S. Cities:** Little Rock, Pueblo, Wichita, Springfield, Oklahoma City, Tulsa, Amarillo, and Wichita Falls

**River Length:** 1,500 miles

**River Basin Area:** 280,000 square miles

**Major River Uses:** Municipal (6 million people), Agricultural, Flood Control, Navigation, Recreation, and Ecological Uses

**Key Studies Referenced in this Report:** Upper Red River Basin Study and Upper Washita Basin Study

## 3.1 Basin Setting

Water uses in the basin include navigation, hydropower, irrigation, recreation, fish and wildlife, and municipal and industrial water supply. The region has a population of about 6 million and includes the following metropolitan areas:

- Fort Smith and Little Rock, Arkansas
- Pueblo, Colorado
- Dodge City and Wichita, Kansas
- Shreveport and Alexandria, Louisiana
- Tucumcari, New Mexico
- Springfield and Joplin, Missouri
- Oklahoma City and Tulsa, Oklahoma
- Amarillo and Wichita Falls, Texas

Public and private development of the water resources of the Arkansas, Red, and White River basins has resulted in the addition of many features for flood control, navigation, irrigation, generation of hydroelectric power, recreation, improvement of fish and wildlife habitat, and municipal and industrial water supply. Most of the Federally directed water resources development in these basins has been undertaken by the USACE. Reclamation has constructed only three irrigation projects in the Arkansas-Red-White River basins.

### Arkansas River

The headwaters of the Arkansas River are fed by snowpack from the Sawatch Range of the Rocky Mountains near Leadville, Colorado. From its headwaters, the Arkansas River flows 1,460 miles through Kansas, Oklahoma, and Arkansas

to its confluence with the Mississippi river near Arkansas City, Arkansas.  The Arkansas River drainage basin covers nearly 161,000 square miles.

### White River

The White River forms in the Boston Mountains of northwest Arkansas and flows for 722 miles to the Mississippi River in Desha County, Arkansas.  The White River drains a watershed of 17.8 million acres across 60 counties in two states, Arkansas and Missouri.

### Red River

The Red River is a major tributary of the Mississippi and Atchafalaya Rivers.  It is formed by two branches, both originating in the Texas panhandle.  The larger, southern fork, known as the Prairie Dog Town Fork, begins in Randall County, Texas.  The smaller, northern fork, known as the North Fork, begins near Pampa, Texas, and flows eastward and then southward until it joins with the Prairie Dog Town Fork along the Texas-Oklahoma border.  Combined, the two forks form the main stem of the Red River.  The Red River's total length is 1,360 miles and its watershed covers 65,590 square miles throughout Arkansas, Louisiana, Texas, and Oklahoma, making it the second largest river basin in the southern Great Plains.  The Red River Basin receives little precipitation, and flows can be intermittent in the portions above Arkansas.  The basin's flat, fertile agricultural land is supported largely through groundwater.

## 3.2  Coordination Activities

Reclamation has recently initiated two Basin Studies in the Arkansas-Red-White River basin, the Upper Washita Basin Study and the Upper Red River Basin Study, which are described below (Figure 10–4).

### Upper Washita Basin Study

Reclamation is collaborating with the Oklahoma Water Resources Board (OWRB), in partnership with the Foss and Fort Cobb Reservoir Master Conservancy Districts (MCD), to evaluate water management issues in the Upper Washita River Basin in west-central Oklahoma.  The study area comprises more than 5,000 square miles of drainage area in west-central Oklahoma, along with the Texas panhandle.  The area of study includes the Rush Springs aquifer, a critical agricultural supply source that supplies many springs and streams and provides unique environmental, recreational, and cultural values to the area.  Reclamation's Washita Basin Project, composed of both Foss and Fort Cobb Reservoirs, provides 90 percent of the surface water supplies in the study area, including municipal water to 40,000 people and two power generation facilities.

SECURE Water Act Section 9503(c) 2016 Report to Congress

Arkansas-White-Red River Basin
Upper Washita Basin Study Area
Upper Red Basin Study Area
Oklahoma
Texas
Washita River
North Fork Red River
Elm Fork Red River
Salt Fork Red River
Elk Creek
Cobb Creek
Lake Creek
Foss Reservoir
FOSS DAM
Clinton
Bessie
New Cordell
Ft. Cobb Reservoir
FORT COBB DAM
Chickasha
Anadarko
Hobart
Lugert-Altus Reservoir
Tom Steed Res
Altus
Snyder
Frederick
Legend
Study Areas
Lugert-Altus Irrigation District
Aquifers
Rush Springs
Elk City
Elk Creek Alluvium & Terrace
North Fork of the Red River
Salt Fork of the Red River

Figure 10–4. Location of on-going basin studies in the Arkansas-Red-White River Basin.

10–20

Both reservoirs are currently experiencing challenges due to aging, inefficient, and/or undersized infrastructure. Fort Cobb Reservoir MCD, for instance, has been unable to meet peak water demands for up to 4 months every year for the past 12 years due to an undersized and inefficient aqueduct system; Foss Reservoir MCD is having trouble meeting the immediate needs of its member cities due to the limited capacity of its treatment plant. Long-term supply reliability is also a challenge.

According to the recently completed 2012 Oklahoma Comprehensive Water Plan, demands are projected to increase substantially by 2060 for all uses in the study area. Under current permitting procedures, depletions in the Rush Springs aquifer are forecast throughout much of the study area by 2020. These depletions may reduce flows of Cobb Creek, which contributes to Fort Cobb reservoir's firm yield, and therefore threaten the reliability of Fort Cobb reservoir as a supply source. Also of concern are whether climate-related changes in precipitation, run-off and evaporation rates may affect aquifer recharge and reservoir yield.

The Upper Washita Basin Study, which is expected to be completed in 2016, will:

- Characterize and quantify surface and groundwater resources;
- Develop a surface water allocation model to evaluate various water management options, including protecting the future water supply capabilities of Foss and Fort Cobb reservoirs;
- Assess operational and infrastructure constraints associated with Foss and Fort Cobb reservoirs; and
- Evaluate alternatives to address water supply issues facing the study area, both now and in the future.

### Upper Red River Basin Study

Reclamation is collaborating with the Oklahoma Water Resources Board (OWRB), in partnership with Lugert-Altus Irrigation District and Mountain Park Master Conservancy District to evaluate water management issues in the Upper Red River Basin in southwest Oklahoma. The Upper Red River Basin encompasses more than 4,000 square miles and all or part of nine counties in southwest Oklahoma. The region includes tributaries to the Red River, the largest being the North Fork, the Salt Fork, and the Elm Fork of the Red River. The basin contains two Reclamation reservoirs, Lugert-Altus and Tom Steed Reservoirs. These two reservoirs provide 99 percent of the surface water supply sources in the study area to almost 45,000 people and irrigation water for 48,000 acres of land.

The water supply needs in the study area are both immediate and severe due to water quantity and quality issues, as well as aging infrastructure. An extreme drought has stricken the area since 2011, and both Lugert-Altus and Tom Steed Reservoirs are at record lows. A large portion of the study area remains in exceptional drought. Groundwater depletions in the area are forecasted to be as

high as 17,220 acre-feet per year by 2060, resulting in increased likelihood of localized impacts and potential effects on streamflow.

Additionally, the 2012 Oklahoma Comprehensive Water Plan Update analysis identified six of the twelve subbasins within the study areas that have been forecasted to face significant water supply challenges within the next 50 years. These challenges prompted stakeholders to develop a Southwest Oklahoma Water Supply Action Plan (May 2014) that outlines short-, mid-, and long-term solutions in the area. Using the Southwest Action Plan as a guide, the Upper Red River Basin Study, which is expected to be completed in 2018, will:

- Characterize and quantify surface and groundwater resources;

- Conduct hydrologic investigations on the North Fork of the Red River Alluvium and Terrace, Elk City Sandstone, and Salt Fork of the Red River Alluvium and Terrace to determine the amount of groundwater available for future appropriations;

- Develop a surface water allocation model to evaluate water management options, including protecting the future water supply capabilities of Lugert-Altus and Tom Steed Reservoirs;

- Assess current and future capabilities to meet demands, including operational risks and reliability of the system; and

- Evaluate alternatives to address water supply issues facing the study area, both now and in the future.

In addition to the Basin Study efforts, the USGS will work in collaboration with Reclamation on the Red River Basin Focus Area Study. The USGS will develop products that can support Bureau of Reclamation project that will include: (1) basin-wide water-use data by category (such as municipal, agricultural, and domestic); (2) a groundwater model upstream of the Denison Dam on Lake Texoma to quantify groundwater/surface-water interactions and effects of climate change and increased groundwater withdrawals; (3) expand an existing daily time-step Precipitation Runoff Modeling System model of natural streamflows for the entire Red River Basin, augmenting an ongoing project with the Gulf Coastal Plain and Ozarks Landscape Conservation Cooperative downstream of Lake Texoma; and, (4) an evaluation of future changes to fish assemblages due to changes in flow regime.

# 4 References

| | |
|---|---|
| Faunt et al., 2015 | Faunt, C.C., C.L. Stamos, P. Martin, L.E. Flint,M.T. Wright, M.. Burgess, and A.L. Coes, 2015. Hydrogeology, Hydrologic Effects of Development, and Simulation of Groundwater Flow in the Borrego Valley, San Diego County, California. U.S. Geological Survey. |
| Frederick, 2001 | Frederick, K., 2001. Water Resources and Climate Change. In M.A. Toman (ed.), Climate Change Economics and Policy, An RFF Anthology. Washington, DC, Resources for the Future. |
| Liljegren, 2013 | Liljegren, F., 2013. Using Tree Ring Analysis to Reconstruct Paleoclimate and Streamflows. Bureau of Reclamation. Retrieved from https://www.usbr.gov/research/docs/updates/2013-11-tree-rings.pdf. |
| Reclamation, 2012 (CO Basin Study) | Bureau of Reclamation (Reclamation), 2012. Colorado River Basin Water Supply and Demand Study. Retrieved from. http://www.usbr.gov/lc/region/programs/crbstudy/fmalreport/ |
| Reclamation, 2013 (Santa Ana) | Bureau of Reclamation (Reclamation), 2013. Climate Change Analysis for the Santa Ana River Watershed. Santa Ana Watershed Basin Study Technical Memorandum No. 1. |
| Reclamation, 2013 (Mojave) | ______. 2013. Mojave River Watershed Climate Change Assessment. Technical Memorandum No. 86-68210-2013-04. |
| Reclamation, 2013 (Santa Ana Summary ) | ______. 2013. Santa Ana Watershed Basin Study Summary Report. |
| Reclamation, 2014 (Southeast California) | Bureau of Reclamation (Reclamation), 2014. Southeast California Regional Basin Study Summary Report. Retrieved from http://www.usbr.gov/lc/socal/basinstudies/SECA.html. |

| | |
|---|---|
| Reclamation, 2015 (Moving Forward) | Bureau of Reclamation (Reclamation), 2015. Moving Forward, Phase 1 Report. Moving Forward. Colorado River Basin Stakeholders Moving Forward to Address Challenges Identified in the Colorado River Basin Water Supply and Demand Study — Phase 1 Report. A Product of the Moving Forward Effort. Retrieved from http://www.usbr.gov/lc/region/programs/crbstudy/MovingForward/Phase1Report/fullreport.pdf |
| Reclamation, 2015 (SCAO) | ______. 2015. Southern California Area Office. Retrieved from http://www.usbr.gov/lc/socal/aboutus.html |
| U.S. Census Bureau, 2011. | U.S. Census Bureau, 2011. Population Distribution and Change: 2000 to 2010. 2010 Census Briefs. |
| USACE, 2015 | U.S. Army USACE of Engineers (USACE), 2015. Recent US Climate Change and Hydrology Literature Applicable to US Army USACE of Engineers Missions: Great Basin Region 16. Civil Works Technical Report CWTS 2015-17, Washington, DC. |

# RECLAMATION

*Managing Water in the West*

**SECURE Water Act Section 9503(c)—Reclamation Climate Change and Water 2016**

# Chapter 1: West-Wide Overview

U.S. Department of the Interior
Bureau of Reclamation

March 2016

## Mission Statements

The U.S. Department of the Interior protects America's natural resources and heritage, honors our cultures and tribal communities, and supplies the energy to power our future.

The mission of the Bureau of Reclamation is to manage, develop, and protect water and related resources in an environmentally and economically sound manner in the interest of the American public.

**On Cover: Map of the 17 Western States showing locations and typical scenes representing the eight major Reclamation river basins listed in the SECURE Water Act.**

SECURE Water Act Section 9503(c), 2016 Report to Congress

# Chapter 1: West-Wide Overview

*Prepared for*

**United States Congress**

*Prepared by*

**U.S. Department of the Interior**
**Bureau of Reclamation**

**U.S. Department of the Interior**
**Bureau of Reclamation**
**Policy and Administration**
**Denver, Colorado**

**March 2016**

# Acronyms and Abbreviations

| | |
|---|---|
| °C | degrees Celsius |
| BGNDRF | Brackish Groundwater National Desalination Research Facility |
| CCAWWG | Climate Change and Water Working Group |
| CMIP | Coupled Model Intercomparison Project |
| DOE | Department of Energy |
| DOI | Department of the Interior |
| DWPR | Desalination and Water Purification Research |
| LCC | Landscape Conservation Cooperatives |
| NOAA | National Oceanic and Atmospheric Survey |
| Reclamation | Bureau of Reclamation |
| Title XVI | Title XVI Water Reclamation and Reuse Program |
| U.S. | United States |
| USACE | U.S. Army Corps of Engineers |
| USGS | U.S. Geological Survey |
| WaDE | Western Data Exchange |
| WaterSMART | Sustain and Manage America's Resources for Tomorrow |
| WCRP | World Climate Research Program |
| WestFAST | Western Federal Agency Support Team |
| WSWC | Western States Water Council |
| WWCRA | West-Wide Climate Risk Assessment |

# About this Chapter

This overview chapter is part of the 2016 SECURE Water Act Report to Congress prepared by the Bureau of Reclamation (Reclamation) in accordance with Section 9503 of the SECURE Water Act (Subtitle F of Title IX of P.L. 111-11). The 2016 SECURE Water Act Report builds upon the first SECURE Water Act Report, submitted to Congress in 2011,[2] which characterized the impacts of warmer temperatures, changes to precipitation and snowpack, and changes to the timing and quantity of streamflow runoff across the West by identifying additional impacts of climate change and adaptation strategies throughout western river basins. These strategies are developed in coordination with Reclamation stakeholders and customers through the Sustain and Manage America's Resources for Tomorrow (WaterSMART) Basin Studies and additional programs and activities.

This chapter provides a West-wide summary of the information presented in Chapters 2 through 10 of this SECURE Water Act Report to Congress, including highlights in the following areas:

- Identification of the key climate change risks and anticipated impacts to western water resources—those relevant West-wide, as well as those specific to certain western basins;
- Discussion of strategies being considered and implemented to mitigate and adapt to these climate change impacts; and

An overview of Reclamation's coordination activities with western partners to address emerging water-management challenges associated with climate change.

[2] The first SECURE Water Act Report, submitted to Congress in 2011 is available on the Reclamation website: http://www.usbr.gov/climate/SECURE/docs/SECUREWaterReport.pdf.

This chapter is organized as follows:

- **Section 1** provides relevant background information on the implementation of the SECURE Water Act by the Department of the Interior (DOI) and Reclamation.
- **Section 2** summarizes information on the projected effects of climate change on the hydrology of the Western United States.
- **Section 3** addresses the effects of, and risks resulting from, global climate change in terms of anticipated impacts on water supplies and water operations. This includes a discussion of impacts to water deliveries; hydropower; recreation; flood management; water quality; groundwater management; watershed integrity; and fish, wildlife, and ecological resources.
- **Section 4** addresses mitigation and adaptation strategies considered by Reclamation and its western partners to address the anticipated impacts of climate change on water resources.
- **Section 5** highlights accomplishments in implementing Reclamation's Climate Change Adaptation Strategy. Relevant examples are included to summarize coordination activities conducted by Reclamation with fellow Federal agencies, State water resource agencies, and other western stakeholders. In particular, this section focuses on activities undertaken since delivery of the SECURE 2011 Report to Congress.

# Contents

*Page*

About this Chapter

1 Introduction ........ 1–1
 1.1 About Reclamation ........ 1–1
 1.2 About Section 9503 of the SECURE Water Act ........ 1–1
 1.3 The 2011 SECURE Water Act Report to Congress ........ 1–2
 1.4 Subsequent Federal Action on Climate Change ........ 1–4
 1.5 Reclamation's Climate Change Adaptation Strategy ........ 1–5
 1.6 Reclamation's WaterSMART Program and Activities Addressing the SECURE Water Act ........ 1–6

2 Climate and Hydrology ........ 1–9
 2.1 West-Wide Climate Risks to Water Supplies ........ 1–10
 2.2 Uncertainties in Climate and Water Projections ........ 1–12

3 Impacts to Water Management ........ 1–13
 3.1 Water Deliveries ........ 1–13
 3.2 Hydropower ........ 1–15
 3.3 Recreation ........ 1–16
 3.4 Flood Management ........ 1–16
 3.5 Fish, Wildlife, and Ecological Resources ........ 1–18
 3.6 Water Quality ........ 1–19
 3.7 Groundwater Management ........ 1–20
 3.8 Watershed Integrity ........ 1–20

4 Adaptation Strategies to Address Vulnerabilities ........ 1–22
 4.1 Supply Augmentation ........ 1–24
  Taking Action to Augment Supply ........ 1–25
 4.2 Demand Management ........ 1–27
  Taking Action to Implement Demand Management Strategies ........ 1–28
 4.3 System Operations ........ 1–30
  Taking Action to Improve System Operations ........ 1–31
 4.4 Ecosystem Resiliency ........ 1–33
  Taking Action to Build Ecosystem Resiliency ........ 1–34
 4.5 Data and Information ........ 1–36
  Taking Action to Access Data and Information ........ 1–37

5 Collaboration ........ 1–39
 5.1 Collaboration and Coordination with Federal Agencies ........ 1–39
 5.2 Collaboration and Coordination with States and Stakeholders ........ 1–41

## Figures

*Page*

Figure 1–1. Comparison of CMIP3 and CMIP5 projections for temperature, precipitation, April 1st snowpack, and annual runoff relative to the 1990s for the 2020s, 2050s, and 2070s. ............................1–3
Figure 1–2. Projected changes to temperature and precipitation in the latter 21st century. ....................................................................1–9
Figure 1–3. Projected climate impacts to water resources in western river basins. ...........................................................................1–11
Figure 1–4. Anticipated impacts to water deliveries. ....................................1–14
Figure 1–5. Anticipated impacts to hydropower............................................1–15
Figure 1–6. Anticipated impacts to recreation. ..............................................1–16
Figure 1–7. Anticipated impacts to flood management. ................................1–17
Figure 1–8. Anticipated impacts to fish, wildlife, and ecological resources. ...1–18
Figure 1–9. Anticipated impacts to water quality. .........................................1–19
Figure 1–10. Anticipated impacts to groundwater. .........................................1–20
Figure 1–11. Anticipated impacts to watershed integrity. ...............................1–21
Figure 1–12. General categories of possible actions used in a water management portfolio to adapt to climate change......................1–22
Figure 1–13. WaterSMART basin studies and climate impact assessments. ...1–23
Figure 1–14. Potential water supply augmentation strategies. ........................1–24
Figure 1–15. Potential demand management strategies..................................1–27
Figure 1–16. Potential system operations adaptation strategies. ......................1–30
Figure 1–17. Potential ecosystem resiliency adaptation strategies. .................1–33
Figure 1–18. Potential data and information development strategies..............1–36

## Tables

*Page*

Table 1–1. Basin Studies Initiated, Study Locations and Cost Share Partners ........................................................................... 1–44

# 1 Introduction

## 1.1 About Reclamation

The Bureau of Reclamation (Reclamation), established in 1902, is best known for the dams, powerplants, and canals it constructed within the 17 Western United States (U.S.). Today, Reclamation is the largest wholesaler of water in the Nation. It provides more than 10 trillion gallons of water each year for municipal use and provides water to approximately 10 million acres of irrigated farmland that collectively produce 60 percent of the Nation's vegetables and 25 percent of its fruit and nuts. Reclamation also is the largest producer of hydroelectric power in the Western U.S. Its 53 powerplants generate more than 40 billion kilowatt-hours of electricity annually, enough to serve some 3.5 million households and produce nearly a billion dollars in power revenues.

Reclamation's mission is to manage, develop, and protect water and related resources in an environmentally and economically sound manner in the interest of the American public. As the largest manager and wholesaler of western water, Reclamation has a responsibility to consider potential risks to western water supplies, and to help implement measures that ensure water will be managed as effectively and sustainably as possible.

A growing risk to effective western water management is climate change. In recent decades, climate science has highlighted a broad suite of future challenges for managing western water, in addition to risks already posed by natural variations in climate and pressures associated with growing populations. This includes impacts to water supplies, water demands, and environmental conditions that have the potential to affect Reclamation's ability to fulfill its mission. In light of these challenges, Reclamation is working with its western partners to identify appropriate forward-looking adaptive actions that add resiliency and reliability to water-management planning and practices.

## 1.2 About Section 9503 of the SECURE Water Act

The Omnibus Public Land Management Act of 2009 (Public Law 111-11) was enacted on March 30, 2009. Subtitle F of Title IX of that legislation, known as the SECURE Water Act, recognizes that climate change poses a significant challenge to the protection of adequate and safe supplies of water, which are fundamental to the health, economy, security, and ecology of the United States. Section 9503 of the SECURE Water Act authorizes Reclamation to coordinate and partner with others to ensure the use of best available science, to assess specific risks to water supply, to analyze the extent to which water supply risks will impact various water-related benefits and services, to develop appropriate mitigation strategies, and to monitor water resources to support these analyses and

assessments.[3] The SECURE Water Act also directs Reclamation to submit reports to Congress, 2 years after enactment and every 5 years thereafter, describing progress in carrying out those activities.

## 1.3 The 2011 SECURE Water Act Report to Congress

RECLAMATION
Managing Water in the West
SECURE Water Act
Section 9503(c) – Reclamation
Climate Change and Water
2011

In 2011, Reclamation published the *SECURE Water Act Section 9503(c) – Reclamation Climate Change and Water 2011 Report to Congress*. That report assessed climate change risks and how those risks could impact water operations, hydropower, flood control, and fish and wildlife in the Western U.S. It represented the first consistent and coordinated assessment of risks to future water supplies across eight major Reclamation river basins, and identified several increased risks to Western U.S. water resources during the 21st century. Specific projections cited in the report include:

- A temperature increase of 5–7 degrees Fahrenheit (°F) during the 21st century;
- A precipitation increase over the northwestern and north-central portions of the Western U.S., and a decrease over the Southwestern and South-central areas; and
- A decrease across much of the West in April 1st snowpack.

The 2011 SECURE Water Act Report to Congress used the World Climate Research Programme (WCRP) global climate projections developed through its Coupled Model Intercomparison Project (CMIP), which are released roughly every 5 to 7 years. The 2011 SECURE Water Act assessment was developed using hydrologic projections featured in the Intergovernmental Panel on Climate Change (IPCC) Fourth Assessment and developed as part of the WCRP CMIP Phase 3, referred to here as CMIP3 Projections (i.e., the contemporary projections available in 2011). The report noted that projected changes in temperature and precipitation are expected to impact the timing and quantity of streamflows in all western basins, which would impact water available for farms and cities, hydropower generation, fish and wildlife, and other uses such as recreation.

This 2016 SECURE Water Act Report to Congress was developed using the most current hydrologic projections featured in the IPCC Fifth Assessment and developed as part of the WCRP CMIP Phase 5, referred to here as CMIP5 Projections. The difference between CMIP3 and CMIP5 projections is relatively minor when assessing the range of basin-scale potential future climatic and hydrologic conditions.

---

[3] The SECURE Water Act also authorizes the Department of Energy (Section 9505) and the Department of Interior's United States Geological Survey (Sections 9507 and 9508) to assess and report on the impacts of climate change on national hydropower production and water data enrichment, respectively.

Figure 1–1 illustrates the relative similarity of CMIP3 and CMIP5 projections when assessing the full range of future conditions for key water supply indicators assessed in this report.

**Figure 1–1. Comparison of CMIP3 and CMIP5 projections for temperature, precipitation, April 1st snowpack, and annual runoff relative to the 1990s for the 2020s, 2050s, and 2070s.**

**Bars represent the 10th (bottom of the box), 50th (middle black line), and 90th (top of the box) percentile projections for CMIP3 and CMIP5 for the Colorado River Basin at Imperial Dam.**

This report takes advantage of the best available datasets and modeling tools, follows methodologies documented in peer-reviewed literature, and provides a consistent update to the assessment presented in the 2011 SECURE Water Act Report. The report also acknowledges the uncertainties in future hydroclimate possibilities. (See Section 2.2 of this chapter and additional discussions in chapter 2 of the report.)

## 1.4 Subsequent Federal Action on Climate Change

At the time of the 2011 SECURE Water Act Report, Reclamation was already working with stakeholders across the West to build a sustainable water strategy to meet the Nation's water needs. Since 2011, additional Federal actions have been taken to address risks associated with climate change. Listed are some of the key actions implemented by the President, by the Department of the Interior (DOI), and by Reclamation:



- **The President's Climate Action Plan**. In June 2013, President Obama released his *Climate Action Plan*, which provides a blueprint for steady national and international action to slow the effects of climate change. The plan includes efforts to identify vulnerabilities of the water supply sector to climate change, prepare for future flood risks, and manage drought through activities such as a National Drought Resilience Partnership. In March 2014, as follow-up to this plan, the Obama Administration kicked-off the *Climate Data Initiative* to more effectively disseminate the Federal Government's extensive, freely available, climate-relevant data resources.

- **DOI's Climate Change Adaptation Policy** (523 DM1). This policy, issued in December 2012, articulates and formalizes the Departmental approach to climate change adaptation and provides guidance to DOI bureaus and offices for addressing climate change impacts on the Department's mission, programs, operations, and personnel. It also establishes clear Departmental leadership responsibilities for climate change adaptation implementation, and directs Reclamation and other bureaus to participate in relevant Departmental workgroups.

- **DOI's Climate Change Action Plan**. Annually, DOI publishes a plan for addressing concerns related to climate change. DOI's 2013 Plan focused on assessing the Department's climate change-related vulnerabilities. Its 2014 Plan further assessed the Department's work to address climate change through implementation of Executive Order 13653 ("Preparing the United States for the Impacts of Climate Change," signed November 1, 2013) and DOI's *Climate Change Adaptation Policy*.

- **Reclamation's Climate Change Adaptation Policy** (CMP P16). In March 2015, Reclamation adopted an overarching policy establishing how

Reclamation addresses climate change impacts to its mission, facilities, operations, and personnel, in accordance with Departmental Policy 523 DM1. Among other things, this policy specifies that Reclamation will develop appropriate climate adaptation strategies to address impacts to land, water, natural, energy, cultural, and tribal resources; to Reclamation facilities and assets; and to personnel.

## 1.5 Reclamation's Climate Change Adaptation Strategy

In November 2014, Reclamation published its Climate Change Adaptation Strategy to build on existing actions and identify new activities that extend climate change adaptation efforts across Reclamation's mission responsibilities. Reclamation has made significant progress in assessing the impacts of climate change to water resources and implementing on-the-ground actions to mitigate impacts. The strategy highlights additional actions that are necessary to use information about future climate change to make decisions now about how best to operate Reclamation reservoirs, prioritize investments in new or improved facilities, and protect species and habitat in a changing climate. The strategy identifies four primary goals to improve Reclamation's ability to consider climate change information in agency decision making:

- **Goal 1 - Increase Water Management Flexibility:** Increase flexibility in reservoir operations, water conservation, efficiency, and reuse to maximize the efficient use of available water supplies and existing water infrastructure.
- **Goal 2 - Enhance Climate Adaptation Planning:** Develop capabilities, tools, and guidance to incorporate climate change information across Reclamation's planning processes. These enhanced planning efforts will help Reclamation understand and address climate change impacts to the delivery of water and power, to infrastructure, and to ecosystems and habitat affected by Reclamation projects.

RECLAMATION
*Managing Water in the West*

Climate Change Adaptation Strategy

U.S. Department of the Interior
Bureau of Reclamation

November 2014

- **Goal 3 - Improve Infrastructure Resiliency:** Improve infrastructure resilience, reliability, and safety to prepare for increased intensity and frequency of floods and droughts. Ultimately, Reclamation will include climate change considerations within evaluations of infrastructure safety as well as in setting priorities for operations and maintenance of existing facilities.
- **Goal 4 - Expand Information Sharing:** Collaborate with stakeholders to support mutual climate adaptation efforts through sharing data and tools.

The President's Climate Action Plan and Reclamation's Climate Change Adaptation Policy both identify the continued development of sound science, water management planning and conservation, and increasing the resiliency of infrastructure as critical actions to prepare the United States for the impacts of climate change. Highlights and accomplishments in implementing Reclamation's Climate Change Adaptation Strategy are provided in Section 4 of this chapter.

## 1.6  Reclamation's WaterSMART Program and Activities Addressing the SECURE Water Act

**WaterSMART** (Sustain and Manage America's Resources for Tomorrow) was established in February 2010 by DOI as a broad framework for Federal collaboration with States, tribes, local governments, and nongovernmental organizations to work toward secure and sustainable water resources. Reclamation has implemented the climate change adaptation activities authorized under Section 9503 of the SECURE Water Act through the **Basin Study Program**, which is part of WaterSMART. The Basin Study Program includes three complementary activities that represent a comprehensive approach to incorporate the best available science into planning activities for climate change adaptation:



- **Basin Studies:** Reclamation partners with basin stakeholders to conduct comprehensive studies to define options for addressing future water demands in river basins in the West where imbalances in supply and demand exist or are projected. These studies are comprehensive technical assessments that identify current or future imbalances between water supply and demand resulting from climate change and other stressors. In response to the identified imbalances, the studies assess options and strategies for addressing future water demands.

- **West-Wide Climate Risk Assessments (WWCRA):** WWCRAs complement the Basin Studies by developing key data on climate-induced risks and impacts to Reclamation's operations (including climate projections and baseline water supply, water demand, operational, and environmental response analyses) to provide a foundation for future Basin Studies as well as for project-specific applications. WWCRAs also generate important information, tools, and guidance that support the integration of climate information into planning activities, consistent with Reclamation's Climate Change Adaptation Strategy.

- **Landscape Conservation Cooperatives (LCC):** LCCs provide tools for analyzing and addressing climate change impacts for use in Basin Studies.

The LCCs are partnerships of governmental (Federal, State, tribal, and local) and nongovernmental entities. The primary goal of the LCCs is to bring together science and resource management to inform strategies for adapting to climate change and other stressors within an ecological region or "landscape." Each LCC functions in a specific geographic area; the series of LCCs together form a national network. Reclamation and the Fish and Wildlife Service co-lead the Desert and Southern Rockies LCCs.[4]

Through WaterSMART, Reclamation also works with an array of partners to cost-effectively develop new water sources and make the most of existing supplies. In addition to the Basin Study Program, WaterSMART includes grants for water and energy improvement projects (**WaterSMART Grants**); water reclamation and reuse projects that provide flexibility during water shortages by diversifying the water supply (**Title XVI Program**); a comprehensive approach to drought planning and implementation actions that address water shortages (**Drought Response Program**); support for the water sustainability efforts of collaborative watershed groups (**Cooperative Watershed Management Program**); smaller-scale water conservation planning and improvements (the **Water Conservation Field Services Program**); and a program to identify resilient infrastructure investments that take into account potential effects of climate change while continuing to support healthy watersheds (**Resilient Infrastructure Program**).

Also under DOI's WaterSMART program, the U.S. Geological Survey (USGS) supports science activities that include developing estimates for components of the water budget; assessing groundwater resources; working with stakeholders to address water resource issues in basins that are experiencing water conflicts; enhancing the nation's streamflow and groundwater networks; and understanding drought impacts. In addition the USGS provides funding to States to participate in the National Groundwater Monitoring Network and to improve water use data through the Water Use Data and Research program.

Reclamation is also actively engaged with research partners to develop and share information for a common understanding of climate change impacts to water resources in the West. The **Science and Technology Program** is a Reclamation-wide competitive, merit-based applied research and development program focused on innovative solutions for water and power challenges in the Western U.S. Reclamation's Research and Development Office also manages the **Desalination and Water Purification Research Program**, which funds research projects to develop and pilot test new clean water treatment technologies that can make degraded water supplies available for consumptive use. Clean water

---

[4] Reclamation also participates in the other LCCs located in the 17 Western States, which include the Great Northern LCC, North Pacific LCC, Great Basin LCC, California LCC, Plains and Prairie Potholes LCC, Great Plains LCC, and Gulf Coast Prairie LCC. Currently, Reclamation is a steering committee member on the Great Northern LCC.

Case No. 1:20-cv-02484-MSK Document 90-2 filed 05/06/21 USDC Colorado pg 563 of 576

technologies developed in this program are implemented through complementary research projects under the WaterSMART Title XVI Program.

Reclamation partners with the U.S. Army Corps of Engineers (Corps), USGS, the National Oceanic and Atmospheric Survey (NOAA), and others through the Climate Change and Water Working Group (CCAWWG) to identify mutual science needs for short-term water management decisions and long-term planning. These programs are fundamental to developing new information for adapting to climate change by assessing the current state of knowledge, identifying where gaps exist, and finding opportunities to address those gaps.

Many of the activities carried out as part of WaterSMART are leveraged by partner participation to implement adaptation strategies identified in Basin Studies. Sections 4 and 5 of this chapter include further discussion of these activities, including how they fit within Reclamation's Climate Change Adaptation Strategy and accomplishments to date.

# 2 Climate and Hydrology

Climate change poses a fundamental challenge to Reclamation's mission and the national economy. The effects of climate change are already being felt across the West. As a result, Reclamation and its water management partners must be prepared to respond to shifts in the baseline of what is considered "normal" for drought, floods, water availability, and water demands over coming decades. Observed and projected changes to western climate and hydrology are summarized in Chapter 2 of this report. Key observations and projections relevant to western water management include the following:

- Temperature increases have resulted in decreased snowpack, differences in the timing and volume of spring runoff, and an increase in peak flows for some Western U.S. basins. Observed increases in mean annual temperature have been approximately 2 °F (1.1 degrees Celsius [°C]) since 1900. Continued warming of roughly 5 to 7 °F (3 to 4 °C), depending on location, is projected over the course of the 21st century. (See Figure 1–2).
- Precipitation changes are also expected to occur, interacting with warming to increase the duration and frequency of droughts and resulting in larger and more numerous floods, varying by basin. The increased intensity of droughts and floods raises concerns about infrastructure safety, the resiliency of species and ecosystems to these changes, and the ability to maintain adequate levels of hydropower production.

Change in Mean Annual Precipitation (%)
from 1970-1999 to 2070-2099
20
10
0
-10
-20
Change in Mean Annual Temperature (°C)
from 1970-1999 to 2070-2099
6
5
4
3
2
1

**Figure 1–2. Projected changes to temperature and precipitation in the latter 21st century.**

**Figure represents the median change from a large collection of WCRP's Coupled Model Intercomparison Project phase 5 climate projections spatially downscaled over the U.S. Temperatures are shown to increase throughout the West by 2–5 °C. Mean annual precipitation is largely expected to increase for much of the Western U.S. with the exception of the Southwest, where precipitation is expected to decrease by between 5 and 20 percent.**

The impacts to snowpack and runoff affect the timing and availability of water supplies. More variation in hydrology will make it more difficult for Reclamation to address competing demands for water. Key trends related to runoff include the following:

- Winter runoff is projected to increase over the West Coast basins from California to Washington and over the north-central U.S., but little change to slight decreases are projected over the area from the Southwestern U.S. to the Southern Rockies.

- Summer runoff is projected to decrease substantially over a region spanning southern Oregon, the Southwestern U.S., and the Southern Rockies. However, north of this region warm-season runoff is projected to change little or to increase slightly.

- Projected increases in annual precipitation in the northern tier of the Western U.S. could counteract decreases in warm-season runoff, whereas decreases in annual precipitation in the southern part of the Western U.S. could amplify the effect of decreases in warm-season runoff.

## 2.1  West-Wide Climate Risks to Water Supplies

It is expected that annual and seasonal natural runoff will continue to reflect the continuing changes to the climate. It is not possible to infer water management impacts from these natural runoff changes alone. Water management systems across the West have been designed to operate within envelopes of local hydrologic variability, handling annual and seasonal variations typical for their specific localities. As a result, their physical and operating characteristics vary in terms of storage capacity and conveyance flexibility. The ability to use water storage resources to control future hydrologic variability and changes in runoff seasonality is an important consideration in assessing potential water management impacts due to natural runoff changes.

The impacts of climate change on water resources give rise to difficult questions about how best to operate Reclamation facilities to address growing demands for water and hydropower now and how to upgrade and maintain infrastructure to optimize operations in the future. Figure 1–3 summarizes key risks to western water supplies identified in Reclamation's WaterSMART Basin Study Program. Additional information on impacts to water resources specific to each western river basin, including the strategies to address potential water shortages, is included in Chapters 3 through 10.



**Figure 1–3.  Projected climate impacts to water resources in western river basins.**

## 2.2 Uncertainties in Climate and Water Projections

This report summarizes analyses on potential future climate and hydrologic conditions in the Western U.S. The information presented is gathered from Reclamation studies as well as other peer-reviewed literature and reflects the use of best available datasets and data development methodologies. While this report summarizes potential future climate and hydrologic conditions based on the best available datasets and data development methodologies, its characterization of future hydroclimate possibilities implicitly reflects several uncertainties.

- Uncertainties arise characterizing future global climate forcings such as greenhouse gas emissions, simulating global climate response to these forcings, correcting global climate model outputs for biases, spatially downscaling global climate model outputs to basin-relevant scales, and characterizing the hydrologic response to projected climatic changes within specific regions or basins.

- The impacts of climate change on water resources are evident; however, it is important to acknowledge the uncertainties inherent within climate change science and how they contribute to making climate adaptation a difficult challenge. Projections of future climate change contain uncertainties that vary geographically and depend on the weather variable of interest (e.g., temperature, precipitation, and wind).

- Trying to identify an exact climate change impact at a particular place and time remains difficult, despite advances in modeling efforts over the past half-century. As an example, it is not possible to say with certainty whether climatic change makes a particular flood or drought event exactly twice as likely to occur; however, current science may provide enough evidence to judge whether such an event is more or less likely to occur overall.

The concept of risk management in the face of uncertainty is one that is becoming well recognized for climate change adaptation. Notwithstanding these uncertainties, the Third National Climate Assessment identifies viable decision support tools currently available to support the incorporation of climate information into resource management decisions, including risk assessments, targeted projections for high-consequence events such as floods and droughts, and vulnerability assessments. In spite of the uncertainties, Reclamation and its stakeholders have identified a number of possible adaptation strategies, which are presented within this report.

# 3  Impacts to Water Management

In many regions of the West, projected climate-driven changes in water supply (quantities and timing), along with increased demands for water, are expected to strain the ability of existing infrastructure and operations to meet water needs – not only for consumptive uses such as agricultural, municipal, and industrial activities, but also for hydropower, flood control, fisheries, wildlife, recreation, and other largely nonconsumptive water-related benefits.

This section provides an overview of anticipated impacts to specific categories identified by the SECURE Water Act for analysis:  water deliveries; hydropower; recreation; flood management; fish, wildlife, and ecological resources; and water quality.  In addition, this section addresses anticipated impacts to groundwater management and watershed integrity, as these also impact the effectiveness of managing water supplies to provide multiple public benefits.

## 3.1  Water Deliveries

Both the timing and quantity of runoff are expected to continue to be impacted by the changing climate.  Together with changes in the magnitude and timing of the demands for water and energy, this will impact the ability of existing water infrastructure to satisfy public interests in diverting, storing, and delivering water when and where it is needed.  Shifts in water availability will impact water uses and increase reliance on deliveries of water from reservoir storage or groundwater.  The likelihood of increased year-to-year variability in surface water supplies also presents challenges.  Figure 1–4 summarizes key considerations and anticipated impacts to water deliveries.

Additional examples are provided below, as illustrations of the impacts described:[5]

- In the **Colorado River Basin**, future projected development of water supplies and increased consumptive use in the Upper Basin, combined with potential reductions in future supply, are expected to result in reduced volumes of water stored in system reservoirs and a vulnerability to water delivery shortages.

- In the **Missouri River Basin**, irrigation shortages are generally expected to increase, and earlier calls on reservoir releases for irrigation water are expected to lead to a stronger reliance on stored water during the late summer months.

---

[5] Only select examples are provided for each category, as illustrations of the impacts described. Typically, additional examples are identified and described in one or more of the river basin chapters 3–10.

**Changes in Water Supply and Demand**
Climate assessments project that the manageable water supply, in general, will decline in much of the West. A decrease of up to 8 percent in average annual stream flow is projected in several river basins, including the Colorado, the Rio Grande, and the San Joaquin river basins.

**Changes in Timing of Runoff and Water Availability**
West-wide, runoff is expected to shift to earlier times of the year (less in summer, more in winter and spring), making it more difficult to manage water deliveries as they have been managed in the past. Reservoirs are anticipated to fill earlier in the year, with a corresponding reduction in the water supply available through the summer season.

**Change in Snowpack versus Rainfall**
Across the West, snowpack generally is projected to decrease as more precipitation falls as rain and warming temperatures cause earlier snowmelt. Water deficits are expected to worsen throughout the Columbia River Basin due to more precipitation falling as rain, shifts in runoff timing, lengthening of the growing season, and greater reliance on stored water.

**More Extreme Weather Events**
A likelihood for more frequent extreme weather events is projected in many areas of the West. In the Rio Grande Basin, an increased potential for strengthening of the summer monsoons is projected, with corresponding increases in the portion of the basin's precipitation falling downstream of current water storage infrastructure.

**Figure 1–4. Anticipated impacts to water deliveries.**

- For the **Central Valley Project** in California, projected earlier seasonal runoff will cause reservoirs to fill earlier, thereby reducing overall storage capability, as current flood control constraints limit early season storage in these reservoirs. End-of-September reservoir storage is projected to decrease by 3 percent over the course of the 21st century.
- In the **Klamath Basin**, the seasonal shift in runoff, more precipitation falling as rain, and the expected increased reservoir evaporation are projected to result in more years with water shortages.
- In the **Rio Grande Basin**, decreases in winter snowpack are projected to result in a decreased water supply (e.g., by about one-fourth to one-third in the upper basin over the course of the 21st century), limiting storage available for use during the summer irrigation season.

## 3.2  Hydropower

Hydropower production at Reclamation facilities provides a large, renewable supply of power to the West with a relatively small carbon footprint, and helps keep consumer power costs low.  Reclamation is the largest producer of hydroelectric power in the Western U.S.  Reclamation's 53 powerplants provide more than 40 billion kilowatt-hours annually, generating nearly a billion dollars in power revenues and producing enough electricity to serve 3.5 million homes.  Hydroelectric generation to satisfy power demands is sensitive to climate change impacts on basin precipitation, the amount and timing of river flows, and reservoir levels.  Figure 1–5 summarizes the anticipated impacts to western hydropower.



**Changes in Supply and Runoff Timing**
West-wide, runoff is anticipated to shift to earlier periods of the year (less in summer, more in the winter and spring).  Where peak demand for hydropower occurs during the hottest weeks of summer, shift in runoff timing is expected to impact summer hydropower revenues due to a reduction in peak-season hydropower generation.



**Changes in Hydropower Demand**
The warming projected across the West is generally expected to decrease energy demand during winter (for heating) and increase demand during summer (for cooling).  These changes might necessitate adjustments in reservoir operations to better align with demand, although the reduced summer inflow may present its own challenges.

**Figure 1–5.  Anticipated impacts to hydropower.**

Select examples are provided below, as illustrations of the impacts described:

- In some western river basins, including the **Colorado River and Upper Rio Grande basins**, reduced flows and lower reservoir levels together with increased consumptive water demands associated with climate change are anticipated to result in reduced hydropower production.

- In the Pacific Northwest, power customers currently use more electricity in the winter than in the summer, so projected increases in winter and spring flows in the **Columbia River Basin** should not negatively affect generation to meet power demands during those periods.  Nevertheless, decreased summer flows could present challenges to meet increasing summer season power demands, partly associated with increasing summer temperatures.

## 3.3  Recreation

The recreation areas developed as a result of Reclamation water projects are among the Nation's most popular for water-based outdoor recreation. Reclamation projects include approximately 6.5 million acres of land and water that is, for the most part, available for public outdoor recreation.  Reclamation and its partners manage 289 recreation sites that have 90 million visits annually. Recreational uses are diverse, and include seasonal activities such as swimming, fishing, and boating on reservoirs and rivers.  Figure 1–6 summarizes anticipated impacts on recreation including impacts to flatwater and river recreation.



**Flatwater Recreation**
Increased summer and winter temperatures may increase visitation at reservoirs for camping, boating, swimming, fishing, and other activities. Lower reservoir levels will mean a decrease in the area available for those activities.  In some cases, reduced reservoir storage could make it more difficult for water-dependent recreational opportunities.

**River Recreation**
Increased summer and winter temperatures may increase the popularity of recreational opportunities in and along Western rivers, while decreased snowpack resulting in reduced flows in key river tributaries has negative implications for flow-dependent recreation such as boating and fishing.



**Figure 1–6.  Anticipated impacts to recreation.**

Select examples are provided below, as illustrations of the impacts described:

- The **Colorado River Basin Study** indicated that without future action, the projected development of water supplies and increased consumptive use in the Upper Basin could reduce the access to shoreline recreational facilities in both the Upper and Lower Basins.

- The **Upper Rio Grande Impact Assessment** concluded that river recreation, including fishing, kayaking, and rafting, will be negatively impacted by projected decreases in flows.

## 3.4  Flood Management

Flood control is an important function of many Reclamation reservoirs.  From 1950 through 2014, for example, accumulated benefits from annual flood control in the Missouri River Basin are estimated to total over $2.9 billion.  A trend toward earlier annual peak flows associated with warming temperatures and an increased frequency of rain-on-snow events is expected, especially in "transitional" basins – those that already straddle zones of rain- vs. snow-dominated hydrology – such as the Missouri River Basin.  Figure 1–7 summarizes anticipated impacts to flood management.



**At Reservoirs with Multiple Year Storage**
Where reservoirs are designed to store several years of runoff, the additional flood risks associated with climate change are generally considered minimal, due to the considerable capacity of those facilities to deal with shorter-duration high flow events.

**At Reservoirs Managed for Annual Refill**
Where reservoirs require year-round balancing of flood control functions with other purposes, changes in the magnitude, intensity, and severity of extreme runoff events may prompt reconsideration of operating rules to better manage flood risks while maximizing storage opportunities.





**Reservoir Sedimentation**
At many reservoirs, the increased frequency of intense storms and flood events coupled with frequent, higher-intensity wildfires will lead to accelerated reservoir sedimentation due to increased sediment runoff during storm events.

**Figure 1–7.  Anticipated impacts to flood management.**

Select examples are provided below, as illustrations of the impacts described:

- In the **Missouri River Basin**, warming is expected to lead to more rainfall runoff in higher-elevation watersheds such as Lake Sherburne and Fresno Reservoir, both in Montana, which provide flood-control benefits by storing water during the peak runoff period.

- In the **Rio Grande Basin**, runoff from forested areas subject to climate stress and impacted by an increased occurrence of catastrophic wildfires is projected to result in accelerated debris and sediment accumulation in reservoirs, which would lead to less reservoir storage and flood protection. In the **Upper Rio Grande Basin**, the frequency and intensity of floods is projected to increase at the main flood control reservoirs.

- Similarly, in the **Truckee River Basin**, an increase in the magnitude of peak flows is expected.

- Lake Powell and Lake Mead have the capacity to store several years of average Colorado River runoff.  The **Colorado River Basin Study** indicated that flood control vulnerabilities were few over the next 50 years.

## 3.5 Fish, Wildlife, and Ecological Resources

The potential impacts of climate change on fish and wildlife habitats, federally listed species, and ecological systems in the West are complex and diverse. Current stresses on species habitats in many areas of the West are expected to be impacted by climate change. Changes in temperature and hydrology will shift the location and distribution of species and their preferred habitats, while improving conditions for certain species. Reclamation has many river restoration and enhancement efforts ongoing across the West that result in a broad array of benefits to fish and wildlife resources and their habitats. Climate change could adversely affect these programs, possibly impacting species populations and their resiliency to unpredictable shocks (e.g., disease, floods, fire, drought). The impacts could be positive, negative, or neutral, depending on the exact species, hydrology, and ecosystem affected. Figure 1–8 summarizes the anticipated impacts.

**Water and Air Temperature Impacts**

Fisheries sensitive to a warming aquatic habitat will be more frequently stressed, and suitable habitat for cold-water dependent species such as trout will be reduced. Shifts in the geographic range of various species are anticipated. The incidence of pathogens in warming waters also may increase.

**Aquatic Migration**

Changes in the timing of species migration will become more likely with increased water and air temperatures. In the Columbia River Basin, elevated temperatures would increase the number and severity of thermal barriers to migration for certain fish, including several federally listed species.

**Invasive Species**

Warmer water temperatures and other climate-related stresses on native species can confer competitive advantages to various non-native and invasive species. Studies indicate that quagga mussels could expand their range under projected climate scenarios, further complicating facility maintenance.

**Sea Level Rise**

Sea level rise increases the salinity of vulnerable coastal waterways. Sea level rise is a significant concern in the Sacramento-San Joaquin Delta, affecting not only its suitability as a water source for agricultural, municipal, and environmental uses, but also the ability to move freshwater through the estuary to water users.

**Riverine Habitat**

In Western river basins, it is anticipated that changes to hydrology and climate may make it more difficult to achieve environmental flows to support endangered species. In the Columbia River Basin, projected increases in winter flooding and decreases in summer flows will affect Coho and Chinook salmon as well as steelhead. .

**Figure 1–8. Anticipated impacts to fish, wildlife, and ecological resources.**

## 3.6  Water Quality

The quality of water in western river basins is vital to human and environmental health.  Whether water quality improves or deteriorates under a changing climate depends on multiple variables including water temperature; the rate, volume, and timing of runoff; and the physical characteristics of the watershed.  Figure 1–9 summarizes anticipated impacts.



**Water temperature**

As water warms, less oxygen dissolves in the water column, affecting that water body's ability to support fisheries and other aquatic life.  In addition, higher water temperatures can increase the incidence of toxic algal blooms occurring at reservoirs and other water bodies.

**Pollutants**

Where runoff decreases without a corresponding reduction in pollutants, maintenance of acceptable water quality will become more difficult, especially during periods of low flow. Increases in the frequency and intensity of high-precipitation events will also increase the runoff of pollutants into water bodies.





**Turbidity and Sediment**

Where storm intensity and severity increases, there is a corresponding increase in land surface erosion, sediment transport, and occurrences of elevated surface water turbidity. Moreover, an increase in the frequency, extent, and intensity of forest fires associated with temperature- or drought-stressed forests will increase sediment production and surface water turbidity.

**Figure 1–9.  Anticipated impacts to water quality.**

As one example of the anticipated impacts, in the **Rio Grande Basin** above the confluence of the Rio Grande with the Rio Puerco, concentrations of pollutants are expected to increase with increased surface water evaporation rates and more intense precipitation events.

## 3.7 Groundwater Management

Over the long term, groundwater supplies are sustainable only to the extent that aquifer recharge remains in approximate long-term balance with groundwater extraction.  Climate change has the potential to affect this balance by altering the rate and/or the pathways of groundwater recharge associated with shifts in precipitation patterns, increased temperature, and other drivers of vegetative evapotranspiration and changes in streamflow.  Figure 1–10 summarizes key groundwater considerations.



**Changes in Groundwater Recharge**
Studies project that warmer climate conditions could reduce groundwater recharge. In the Missouri River Basin (northern Great Plains) and in the Santa Ana watershed of southern California, groundwater recharge could be reduced as rising temperatures increase water demands and as decreased precipitation reduces recharge.

**Changes in Groundwater Demands**
With increased variability and uncertainty of precipitation and surface water supplies, many Western communities are expected to increase reliance on groundwater as a source for both agricultural and municipal purposes. In California's Central Valley, increased groundwater dependency may result in additional land subsidence and a reduction in aquifer storage capacity.





**Coastal Saltwater Intrusion**
In coastal communities, sea level rise and an increased reliance on aquifer withdrawals has the potential to increase the risk of saltwater intrusion into freshwater coastal aquifers.

**Figure 1–10.  Anticipated impacts to groundwater.**

## 3.8 Watershed Integrity

To protect and sustain both surface-water and groundwater supplies, prudent management of contributing watersheds is essential.  Forested lands, in particular, serve as crucial water supply zones in the West:  high-elevation, forested landscapes are source areas for 65 percent of western water supplies.  The health and integrity of these landscapes are fundamental to the maintenance of reliable quantities, timing, and quality of water supplies, including water to meet various Reclamation project purposes.  Figure 1–11 summarizes the ways that climate change is expected to impact the landscape-scale factors that influence watershed hydrology.



**Changes in Land Cover and Vegetation Mix and Density**

Changes in precipitation, temperature, humidity, $CO_2$, and other climate conditions are expected to affect the composition, distribution, and productivity of vegetative communities, in turn affecting watershed hydrology. For example, in southern California, warmer temperatures are expected to cause forested landscapes to migrate over time northward and to higher elevations.

**Forest Insects and Disease**

Increased tree mortality from insects already has been observed throughout the West, raising concerns about the future distribution of forest vegetation. In the forests of some parts of New Mexico, moisture stress has led to bark beetle infestations, in turn leading to a potential transition of the affected forests to a new mix of species, forest structure, and ecological processes.

**Forest Fires**

In the Missouri River Basin, an increased risk of wildfires is projected due to the expectation that more intense droughts, higher temperatures, and disease will stress forest vegetation.

**Figure 1–11. Anticipated impacts to watershed integrity.**