# 4 Adaptation Strategies to Address Vulnerabilities

Reclamation, in consultation with customers and stakeholders, has already begun to identify and develop a variety of adaptation strategies to address vulnerabilities related to drought and climate change in western river basins. WaterSMART Basin Studies provide an important mechanism for identifying adaptation options appropriate for the area being studied. As collaborative studies that are cost-shared with non-Federal partners, Basin Studies evaluate the impacts of climate change and identify a broad range of potential options to address water supply and demand imbalances, both current and future. To date, Reclamation and its partners have initiated 24 Basin Studies in 15 of the 17 Western States, and 12 of those have now been released, meaning that a broad range of climate adaptation strategies have been developed.

Basin Studies evaluate *portfolios of multiple possible adaptation actions*. Rarely will one single action be sufficient to address all of the potential impacts of concern. While Basin Studies are not intended to be decision documents, they do provide a solid foundation for further exploring actions that will support sustainable water supplies and achieve other water management goals. The general categories of possible actions to adapt to climate change and other stresses on western water supplies are listed in Figure 1–12.

Each type of adaptation strategy is discussed in the following section, with a brief description of Reclamation actions supporting implementation of these strategies.

Specifically, this section draws upon the extensive information and analysis provided by the WaterSMART Basin Study Program products (mapped in Figure 1–13). As Reclamation continues implementation of its Climate Change Adaptation Strategy, many adaptation strategies are already underway. In this section, examples of adaptation strategies are highlighted, along with the activities being undertaken by Reclamation and its partners to implement strategies and accomplishments to date.



**Figure 1–12. General categories of possible actions used in a water management portfolio to adapt to climate change.**



**Figure 1–13.  WaterSMART basin studies and climate impact assessments.**

SECURE Water Act Section 9503(c) Report to Congress

## 4.1  Supply Augmentation

The total supply of water available to meet user needs often can be augmented through one or more possible actions, including water reuse, desalination, stormwater capture, water rights acquisition, water importation, and new or expanded water storage.  Augmented supplies can serve a variety of possible purposes, including municipal and industrial use, agricultural use, power generation, groundwater recharge, environmental restoration, fish and wildlife maintenance, and recreation.  Select examples of potential adaptation strategies considered by Reclamation-sponsored Basin Studies and related efforts are identified in Figure 1–14.



**Figure 1–14.  Potential water supply augmentation strategies.**[6]

---

[6] Select examples are provided in this figure, as illustrations of the options considered.  Additional examples are described in Chapters 3–10 or in individual Basin Studies.

## Taking Action to Augment Supply

Reclamation has made significant progress in assessing the impacts of climate change to water resources and implementing on-the-ground actions to mitigate impacts of climate change.  Reclamation's Climate Change Adaptation Strategy identifies increasing water management flexibility and enhanced adaptation planning as key goals to implementation the strategy.

To augment traditional surface and groundwater supplies, the **Title XVI Water Reclamation and Reuse Program** provides cost-shared funding for research, planning, design, and construction of water reuse projects.  Water reuse and recycling can turn currently unusable water sources into a new source of supply that is less vulnerable to drought and climate change, increasing flexibility and reducing the pressure to transfer water from agricultural to urban uses.  The State of California estimates that 900,000 to 1.4 million acre-feet of "new water" could



**Purple pipe prior to installation by the Napa Sanitation District in California. The pipeline was constructed as part of Reclamation's Title XVI Program.**

be added to its supply by reusing municipal wastewater that currently flows to the ocean.

Since 1992, approximately $639 million in Federal cost-share funds have been leveraged with more than $2.4 billion in non-Federal funding to design and construct water recycling projects.  In 2015, Reclamation announced grants totaling $25 million for continued construction of seven water reclamation and reuse projects in California and seven water reclamation and reuse feasibility studies in California and Texas.

As a next step to the Santa Fe Basin Study, the City of Santa Fe and Santa Fe County, New Mexico, are collaborating to develop greater resiliency and diversity in their water portfolios by exploring alternatives for reclaimed wastewater.  In 2014, the City of Santa Fe received Title XVI funding for a feasibility study to evaluate alternatives for both potable and non-potable applications of reclaimed water to augment water supplies.  The current water supply is vulnerable to uncontrolled factors, which include drought, fire, environmental regulations, and water quality limits.

SECURE Water Act Section 9503(c) Report to Congress

Reclamation's **Desalination and Water Purification Research (DWPR) Program** funds research projects to develop and test new advanced water treatment technologies that can make degraded water supplies available for consumptive use.  In 2015, Reclamation announced grants totaling $1.4 million to nine laboratory and pilot-scale research studies in the field of water desalination and



**Reclamation's Brackish Groundwater National Desalination Research Facility in Alamogordo, NM.**

purification. The DWPR Program also supports operation and maintenance of Reclamation's Brackish Groundwater National Desalination Research Facility (BGNDRF) in Alamogordo, New Mexico, which provides a field environment to test and develop advanced water treatment technologies.  The facility brings together researchers from Federal government agencies, universities, the private sector, research organizations, and State and local agencies to work collaboratively and in partnership.  BGNDRF hosted the final round of the 2015 Desal Prize,[7] in partnership with U.S. Agency for International Development, focused on innovative brackish groundwater treatment technologies powered by renewable energy.



**Reclamation's Water Quality Improvement Center at the Yuma Area Office, AZ.**

Reclamation also has a state-of-the-art advanced water treatment research center, the Water Quality Improvement Center[8], located at the Yuma, Arizona, Area Office.  These centers represent two of six National Centers for Water Treatment Technologies.

---

[7] See http://www.securingwaterforfood.org/the-desal-prize/

[8] See http://www.usbr.gov/lc/yuma/facilities/wqic/yao_facilities_wqic.html

## 4.2  Demand Management

Activities that reduce the demand for water, particularly during periods of water scarcity, provide valuable flexibilities for helping to bring those demands into better balance with supply.  With water deliveries in the West facing increasing vulnerabilities from population growth and climate change, various strategies to ease demands are being implemented by communities across the West.  These strategies include improved water conservation and efficiencies in water and energy use.  Examples of the relevant adaptation options and actions considered by Reclamation-sponsored basin studies are identified in Figure 1–15.



**Figure 1–15.  Potential demand management strategies.**[9]

---

[9]  Select examples are provided in this figure, as illustrations of the options considered.  Additional examples are described in Chapters 3–10 or in individual Basin Studies.

SECURE Water Act Section 9503(c) Report to Congress

## Taking Action to Implement Demand Management Strategies

Reclamation continues to work with its partners to complete agricultural and municipal and industrial water conservation improvements that implement demand-management strategies identified through Basin Studies.  Consistent with Reclamation's Climate Change Adaptation Strategy, which recognized a role for Reclamation in helping to increase water management flexibility, **WaterSMART Grants** make cost-shared funding available to non-Federal partners to carry out water conservation and efficiency projects collaboratively, and they prioritize projects that implement adaptation strategies identified through Basin Studies.



**Hidalgo County Irrigation District #2 Water and Energy Efficiency Grant**

Since 2009, about $149 million in Federal funding has been leveraged with non-Federal funding to implement 257 WaterSMART Grant projects that together represent more than $560 million in water management improvements across the West.

As Basin Studies are completed, water managers look to WaterSMART Grants to help them implement adaptation strategies.  In southern Texas, for example, the Hidalgo County Irrigation District #2 is using $1 million in WaterSMART Grant funding, along with more than $4 million in non-Federal funding, to implement one of the demand management adaptation strategies identified in the Lower Rio Grande Basin Study, which the District participated in as a cost-share partner.  The District's work to line 5.3 miles of an unlined canal and install advanced check gate structures is expected to result in annual water savings of more than 2,000 acre-feet currently lost to spills and seepage.

In 2010, DOI and other Federal agencies established a series of outcome-based performance goals, including a **Priority Goal for Water Conservation**.  Activities funded through WaterSMART Grants, the Title XVI Program, and other water conservation programs through 2015 are expected to result in more than 970,000 acre-feet of water savings once completed — roughly the



**Priority Goal for Water Conservation**

amount of water needed for household use in Phoenix and the surrounding area each year – and the Department of Interior is on track to meet its goal of 1,040,000 acre-feet of water savings by the end of 2017.

Climate change is expected to increase the frequency, intensity, and duration of drought conditions in the West.  Drought contingency planning provides an important tool to proactively manage drought risks.  In 2015, Reclamation reformulated its drought program to incorporate climate information and build resiliency against future droughts.

The new **Drought Response Program**[10] helps Reclamation and its partners avoid drought-related crises in the short term while laying a foundation for climate resiliency in the long term.  In 2015, under this program, Reclamation announced grants for western communities totaling $5.1 million to implement 23 proactive projects to build long-term drought resiliency in nine western States.  The program helps to implement Reclamation's Climate Change Adaptation Strategy and also directly supports the National Drought Resilience Partnership, identified in the President's Climate Action Plan, helping communities develop long-term resilience strategies by providing key climate change and drought information.



In northern Nevada, for example, the Truckee Meadows Water Authority is using Drought Response Program funding and its own cost-share contribution to update its current Drought Contingency Plan.  The updated plan will incorporate climate projections developed through the Truckee River Basin Study and will specify mitigation actions that will help adapt to short-term changes in hydrologic conditions caused by drought.  The Truckee Meadows Water Authority will update its plan by engaging stakeholders through established and successful stakeholder groups representing Federal, State, and local governmental organizations, tribes, agricultural producers, industries, and environmental and recreational interests.

---

[10] See http://www.usbr.gov/drought.

SECURE Water Act Section 9503(c) Report to Congress

## 4.3  System Operations

With or without a change in future water supplies and demands, building additional flexibility and reliability into the systems used to manage those supplies helps to ensure that adequate water is available.  The potential for increased frequency and intensity of floods and droughts brings additional challenges to operations and infrastructure conditions.  Climate change, coupled with the fact that much of the water resources infrastructure in the Western U.S. is beyond its originally envisioned service life, highlights the importance of enhancing infrastructure resiliency to meet Reclamation's mission requirements in the future.  Examples of the adaptation options and actions to improve system operations and resiliency are identified in Figure 1–16.



**Figure 1–16.  Potential system operations adaptation strategies.**[11]

---

[11] Select examples are provided in this figure, as illustrations of the options considered. Additional examples are described in Chapters 3–10 or in individual Basin Studies.

## Taking Action to Improve System Operations

To prepare for new extremes, Reclamation's Climate Change Adaptation Strategy identifies opportunities to incorporate climate change information into decisions regarding reservoir operations, infrastructure investments, and safety upgrades. The President's Plan provides support for this goal, prioritizing the need to build safer communities and infrastructure, manage drought, and prepare for future floods.

In 2014, Reclamation launched the **Reservoir Operations Pilot Initiative**[12] to determine how reservoir operations are impacted by climate change and how reservoir operations can be made more flexible to adapt to impacts. Reclamation's reservoirs are operated using criteria to meet a number of different water management priorities, including reliable water deliveries, power generation, environmental requirements, and needs for flood control management. Historically, uncertainties in weather prediction and assumptions of an unchanging climate have resulted in general rules for reservoir management, often seasonal to annual that will shift with future climate conditions.



**Reservoir Operations Pilot Studies Initiated in 2015**

In 2015, Reclamation initiated five pilot studies to evaluate how weather, hydrology, and climate-change information could better inform reservoir operations.  Reservoir operation pilots are critical to understanding where flexibilities in reservoir operations may be increased through identifying trends in historic and current climate and hydrology, and through improved use of weather forecasting.  Reclamation will use these pilot studies to develop guidance on considering climate change within reservoir operations.

WaterSMART also includes the **Resilient Infrastructure Program**, through which Reclamation proactively maintains and improves existing infrastructure for system reliability, safety, and efficiency to prepare for extremes and to support healthy and resilient watersheds.  Prioritization of infrastructure investments is influenced by climatic conditions as well as by watershed management opportunities.  In 2016, Reclamation is developing an enhanced decision-making framework to select a project to serve as a model for refining design considerations and decision-making criteria.

---

[12]  The Reservoir Operations Pilot Initiative is funded through Reclamation's WaterSMART Basin Study Program:  www.usbr.gov/watersmart/wcra/index.html

SECURE Water Act Section 9503(c) Report to Congress

Hydropower production is vulnerable to altered water availability resulting from climate change; consequently, **optimizing hydropower production** is a key part of Reclamation's overall strategy to respond to the impacts of climate change. Reclamation is building on successful efforts already underway to continue generating clean energy, and it is providing Federal leadership in renewable energy development, both of which are priorities in the President's Climate Action Plan to slow the pace of climate change.

Reclamation has a long, successful history of working with customers to upgrade turbines and rewind generators at powerplants to achieve water and energy conservation benefits. Such investments improve hydropower generation resilience as climate change impacts occur and increase the generation of clean renewable energy. Initial assessments have also identified an opportunity to improve efficiency and flexibility at some Reclamation-owned pumping plants, reducing the amount of Reclamation hydropower energy required for water deliveries.



**Aerial View of Hoover Dam and Lake Mead**

Reclamation has identified equipment upgrades at hydropower and pumping plants to increase hydropower efficiency. For example, in cooperation with the Hoover power contractors, Reclamation has begun replacing 5 of the 17 existing generating turbines with wide-head turbines at Hoover Dam. These wide-head turbines can operate at a much wider range of reservoir levels that will allow the Hoover Powerplant to generate electricity more efficiently at lower Lake Mead levels. Since 1947, an average of about 4.4 billion kilowatt-hours of energy has been generated at the dam annually, or enough to supply about 400,000 U.S. households with all of their electricity needs for one full year.

The use of climate-change information to inform decisions about infrastructure investments is complex and on the cutting edge of climate science development. Warming is contributing to trends of heavier downpours over much of the U.S., which may lead to increases in local flood potential for some areas. However, at the local scale, substantial uncertainty remains about how global climate change will impact wet weather extremes.

Reclamation has a pilot initiative underway to incorporate climate change information into the Dam Safety risk assessment process. Reclamation's **Dam Safety Program** is developing a methodology for incorporating climate change information into hydrologic hazard analyses. An initial pilot completed at Friant Dam in California indicated that climate change is an important factor to consider in the hydrologic hazard analysis. A follow-on study is currently underway at Taylor Park Dam, Colorado. Additional work is also ongoing to integrate projections of future hydrology into existing methodologies for Reclamation dam safety comprehensive review studies, which are performed at all Reclamation dams on an 8-year cycle to identify and address risks to life and property.

## 4.4  Ecosystem Resiliency

Ecological resiliency refers the capacity of an ecological system to absorb change without major disruption to the system's structures and processes. Maintaining ecosystems and habitat affected by Reclamation projects is more challenging in changing climate and hydrology conditions. Anticipated changes in climate, the quantity and timing of river flows, and associated habitat conditions threaten ecological resiliency in many areas of the West. Examples of potential adaptation options and actions to enhance ecosystem resiliency are identified in Figure 1–17.



The **Southern Rockies LCC** funded the Nature Conservancy to improve model accuracy to represent environmental and recreational flow needs for the **Colorado River Basin**.

The **Santa Fe Basin Study (New Mexico)** noted the success of prescribed burning in the upper Santa Fe River watershed to reduce the risk of catastrophic wildfire.

Aquifer recharge efforts in the **Yakima River (Washington)** are expected to enhance instream flows and improve summer water temperatures in downstream river reaches.

The **Colorado River** *Moving Forward* Effort identifies seven major opportunities to advance environmental benefits within the basin.

**Figure 1–17. Potential ecosystem resiliency adaptation strategies.**[13]

---

[13] Select examples are provided in this figure, as illustrations of the options considered. Additional examples are described in Chapters 3–10 or in individual Basin Studies.

## Taking Action to Build Ecosystem Resiliency

Though meaningful and significant steps have been taken to protect or improve ecological and recreational resources, opportunities exist to expand environmental and recreational flow activities. Reclamation's Climate Change Adaptation Strategy identifies existing programs, including the WaterSMART Program, to address climate change impacts to ecosystems.

Under WaterSMART, the **Cooperative Watershed Management Program** provides financial assistance grants to improve water quality and ecological resilience and to reduce conflicts over water through collaborative conservation efforts in the management of local watersheds. To date, Phase 1 of the program has been initiated funding the formation or expansion of 19 watershed groups. Phase 2 of the program is under development and is expected to begin in 2017, to carry out projects in accordance with the goals of watershed groups to improve water quality and ecological resilience.

With the signing of Secretarial Order No. 3289, DOI launched the **Landscape Conservation Cooperatives (LCC)** to better integrate science and management to address climate change and other landscape-scale issues. By building a network that is holistic, collaborative, adaptive, and grounded in science, LCCs are working to ensure the sustainability of our economy, land, water, wildlife, and cultural resources. Reclamation and the U.S. Fish and Wildlife Service co-lead the Desert and Southern Rockies LCCs. Key highlights of ecological resource studies funded through the LCCs include:

1) *Building Decadal Prediction of Extreme Climate for Managing Water in the Intermountain West:* By reconstructing the history of streamflow and precipitation for watersheds in the Uinta Mountains and the Wasatch Range using tree-growth rings, a team of researchers at Utah State University improved water managers' understanding of streamflow variability and impact from climate extremes. Data from this research are being used directly by the Weber Basin Water Conservancy District to compare recent droughts and historic reconstructed records, in order to plan changes in operations management.

2) *Managing Water and Riparian Habitats on the Bill Williams River with Scientific Benefit for Other Desert River Systems:* The Corps Hydrologic Engineering Center, U.S. Fish and Wildlife Service, and USGS developed new operational rules for water managers to guide reservoir releases in the Bill Williams River that promote the establishment of native cottonwood and willow stands downstream of reservoirs while balancing other water management needs. By codifying water flow-ecology relationships for riparian species as operational rules for water managers and testing those rules under different climate scenarios, project benefits can be transferable to other managed river systems in the arid southwest.

3) *Predicting Snow Water Equivalence and Soil Moisture Response to Restoration Treatments in Headwater Ponderosa Pine Forests of the Desert LCC:*  Northern Arizona University built upon the U.S. Forest Service's Four Forest Restoration Initiative to investigate how restoration efforts affect the water volume available in the snowpack and soil moisture. Models of snow water equivalence and soil moisture response to ponderosa pine forest restoration treatments are helping identify optimal treatments for sustaining water availability for plants as well as downstream water users in Verde Valley and the Phoenix metropolitan area.

4) *A Study of Climate Change Impacts on Water Quality and Internal Nutrient Recycling in Lake Mead, Arizona-Nevada:*  Southern Nevada Water Authority modeled impacts of climate change on water quality and sediment transport in Lake Mead.  This information enables organizations with water supply responsibilities to evaluate the likely quality of raw water in the future and plan for infrastructure or treatment changes.  Additionally, organizations that discharge into Lake Mead or the Lower Colorado River can use the results to assess whether target nutrient loads for the point-source discharges may have to be reduced to offset the increased internal nutrient loading driven by climate change.

High-elevation forested zones are crucial for maintaining the quantities, timing, and quality of water supplies that serve Reclamation projects and western water users.  Through the **Western Watershed Enhancement Partnership,** the U.S Forest Service and Reclamation seek to proactively improve the health and resiliency of National Forest System watersheds to reduce the potential for severe wildfire.  Improving watershed functions and reducing the risk of uncharacteristically severe wildfire benefits Reclamation's water supply, irrigation, and hydroelectric customers.



**Horsetooth Reservoir.  The 2012 High Park Fire was the impetus for the Colorado-Big Thompson Headwaters Watershed Enhancement Partnership.**

In 2015, projects in several areas of the West were competitively awarded a total of $770,000 in cost-shared funding to advance on-the-ground activities.  This program supports site-specific treatments to mitigate risks by protecting upland ecosystem and watershed functions on Reclamation or U.S. Forest Service lands with a direct connection to facilities in order to avoid adverse impacts to water supplies.

SECURE Water Act Section 9503(c) Report to Congress

## 4.5  Data and Information

Access to quality data on past and projected future hydrology, water use, land cover, and climate is essential if meaningful adaptation strategies are to be effectively evaluated and implemented.  In many cases, quality data already exist, and considerable value can be added by merely making the data more accessible, understandable, and useful.  In other cases, the development of tools that can analyze available data and use the data to model alternative scenarios can be useful.  Where quality observational data are scarce or nonexistent, the collection of additional data to address key informational gaps may be invaluable. Examples of the relevant actions and data strategies identified within Reclamation-sponsored basin studies are provided in Figure 1–18.



The **Sacramento and San Joaquin River Basins Study (California)** identified improved methods for storing data, linking databases, and improving user access to information to increase the effectiveness of data to support decision-making.

A decision-making tool, the Greenhouse Gas (GHG) Emissions Calculator, was developed as part of the **Santa Ana Watershed Basin Study (California)**, to evaluate mitigation strategies.  It is used to estimate water supply and energy demands and GHG emissions in specific geographic regions within the study area.

The **Hood River Basin Study (Oregon)** identifies the need for a significant enhancement to surface and groundwater data collection before groundwater recharge alternatives in the basin can be more meaningfully assessed.

**Figure 1–18.  Potential data and information development strategies.**[14]

---

[14] Select examples are provided in this figure, as illustrations of the options considered. Additional examples are described in Chapters 3–10 or in individual Basin Studies.

## Taking Action to Access Data and Information

Reclamation's Climate Change Adaptation Strategy acknowledges that
Reclamation and its stakeholders will benefit from increased access to climate
change and water resources data.  In order to successfully implement any supply
augmentation strategy or demand management program, one must have a way to
gauge needs and success, which requires an assessment of conditions before,
during, and after exploration.  Fundamental to developing new information for
adapting to climate change is assessing the current state of knowledge, identifying
where gaps exist, and finding opportunities to address those gaps.

**Reclamation's Science and Technology Program** is taking a leading role to
develop the data and tools necessary to support climate change adaptation within
Reclamation and by customers and stakeholders.  During the course of these
efforts, the research team has remained engaged with Reclamation-wide programs
to enhance the relevance and utility of the climate adaptation strategies.

**Downscaled Climate and Hydrology Projections Web Service:**[15]  Since 2007,
Reclamation has led a partnership of nine Federal, academic, and nongovern-
mental organizations to provide future projections of temperature, precipitation,
hydrology, and streamflow throughout the continental U.S. to support locally
relevant decision making.  These information resources are served though a
website that provides users access to the monthly gridded precipitation,
temperature, and hydrologic
projection data, as well as
additional climate projection
information that covers the
contiguous U.S.



Through the WaterSMART
Basin Study Program, a data
visualization site has been
produced to accompany the
release of this 2016 SECURE
Water Act Report to Congress.[16]
This tool allows users to view
changes in temperature,
precipitation, and snowpack in
major river basins and to
download supporting projection
data sets as they walk through
the SECURE Water Act Report.

**SECURE Water Act Data Visualization Tool —
Projected temperature change in the 2070s
for the Colorado River Basin**

---

[15] Downscaled CMIP3 and CMIP5 Climate and Hydrology Projections Web Service site :
http://gdo-dcp.ucllnl.org/downscaled_cmip_projections/dcpInterface.html

[16] SECURE Water Act Report website: http://www.usbr.gov/climate/SECURE

**Climate Training:** Since 2012, Reclamation and USACE have been collaborating with CCAWWG and the University Center for Atmospheric Research COMET® program to develop and pilot climate change training tools for Federal and non-Federal water agency staff and to explore sustained delivery approaches.

- *Technical Series:* Initial efforts focused on developing a new COMET® Professional Development Series, "Assessing Natural Systems Impacts under Climate Change." The series is designed to provide technical training to water resources professionals on how to incorporate climate change science and uncertainties into a variety of natural resource impacts assessments, including those related to surface water hydrology, crop irrigation requirements, water temperature, river and reservoir sedimentation, water quality, and land cover.

- *General Audience Series:* While the initial effort to develop technical training series has successfully engaged technical practitioners, there is also a need to provide training for senior leaders, program managers, project managers, resource specialists, public affairs specialists, and others who play critical roles in mainstreaming climate change into mission activities. In response, training partners have recently begun to scope and develop a parallel professional development series aimed at these communities.

**Open Water Data Initiative:** Reclamation is addressing the requirements of the President's Open Data Policy and DOI's Open Water Data Initiative by making Reclamation's water and related data more comparable across locations, easier to find, more shareable with other agencies, stakeholders, and the public, leading to an overall outcome of better managed data.



**Colorado Drought Visualization Web Tool — Lake Mead in 2001 and 2015.**

One example of an open data product is the specialized web tool developed by the USGS and Reclamation: "Drought in the Colorado River Basin – Insights Using Open Data."[17] This visualization is an effort to showcase the usefulness of open data by exploring the current 16-year drought and its effects on the Colorado River Basin. The dramatic data interactions show the interconnected results of a reduced water supply as reservoir levels have declined from nearly full to about 50 percent of capacity.

---

[17] See https://www.doi.gov/water/owdi.cr.drought/en/index.html

# 5  Collaboration

Given the important partner equities in water resource management, Reclamation has a responsibility to demonstrate leadership and to leverage resources by sharing information and capabilities with partners interested in climate adaptation. Reclamation recognizes that for Federal investments in climate resiliency to be successful, strong partnerships with State, tribal, and local governments and with water users, stakeholders, the public, and other Federal agencies are crucial.  The President's Climate Action Plan emphasizes the importance of providing open government data that "can fuel entrepreneurship, innovation, scientific discovery, and public benefits."

## 5.1   Collaboration and Coordination with Federal Agencies

Reclamation is actively engaged in multiple collaborative efforts with Federal and non-Federal partners to monitor, develop, and share information for a common understanding of climate change impacts to water resources in the West.  This section highlights activities that implement Section 9503(b)(1) of the SECURE Water Act, which directs the Secretary of the Interior, through Reclamation, to "coordinate with the USGS, National Oceanic and Atmospheric Survey (NOAA), the program, and each appropriate State water resource agency, to ensure that the Secretary has access to the best available scientific information with respect to presently observed and projected future impacts of global climate change on water resources."

Reclamation coordinates with the USGS, NOAA, and the Natural Resources Conservation Service on climate monitoring activities through the **WWCRA Implementation Team**.  Climate monitoring objectives for the Implementation Team include:

- Sustain active communication between agencies on monitoring activities, climate and water resources data, and science tools for water management decisions,

- Understand data availability, accessibility, and applicability for direct use and implementation in Reclamation's climate change impact and planning studies, and

- Identify opportunities to improve climate monitoring data available for water management decisions.

Reclamation is using climate monitoring data networks in a broad set of studies to determine impacts and risks to water resources due to climate change.  Inter-agency coordination to acquire and maintain water resources data aids in strengthening the understanding of water supply trends and assists in the assessments and analyses conducted by Reclamation.  Information generated through WWCRA provides a foundation of climate change data, information, and tools that partners can build from to develop adaptation strategies.

**SECURE Water Act Section 9503(c) Report to Congress**

Reclamation is coordinating with other Federal and non-Federal agencies to implement Section 9503 of the SECURE Water Act through multiple collaborative approaches. Together, these activities will allow Reclamation to better assess the risks and impacts of climate change on the hydrological cycle and to implement collaborative adaptation strategies. In addition to the climate-monitoring activities listed under Section 9503(b)(1), Reclamation also coordinates closely with the following other Federal agencies authorized under the SECURE Water Act.

As directed by Congress in **Section 9505 of the SECURE Water Act**, the U.S. Department of Energy (DOE), in consultation with the Federal Power Marketing Administrations and other Federal agencies, examines the potential effects of climate change on water available for hydropower generation at Federal facilities and on the marketing of that power. Through the WWCRAs, Reclamation coordinates with DOE to compare climate modeling analyses that project climate conditions and impacts to hydropower into the future and compare basin-specific climate impacts to hydropower.

The **SECURE Water Act Sections 9507 and 9508** authorized the "Water Data Enhancement by the United States Geological Survey" and the "National Water Availability and Use Assessment Program," respectfully. As previously mentioned, through WaterSMART, the USGS has implemented a National Water Census. The SECURE Water Act authorized $20 million for each of fiscal years 2009 through 2023 for the USGS through the National Water Census; appropriations for this effort as of 2015 totaled $28 million. With this funding, the USGS continues to engage stakeholders in a discussion of priorities.

Reclamation coordinates closely with the USGS to leverage information produced by a number of activities, including groundwater assessments and surface water focus area studies in Reclamation's Basin Studies. In 2016, the USGS began three additional Geographic Focus Area Studies of water availability and use in the Coastal Basins of the Carolinas and two which overlap with ongoing or completed assessments in the Basin Study Program: the Red River Basin and the Upper Rio Grande Basin. In addition, five topical areas are producing information on water budget components that are national in scope. The topical studies include:

- Estimating streamflow at ungaged locations and characterization of long-term trends in streamflow;

- Assessing regional groundwater availability of principal aquifers;

- Using remote sensing to quantify evapotranspiration;

- Improving information on human water withdrawals, consumptive uses, and return flows; and

- Developing tools and web-available resources to understand the effects of streamflow alteration on aquatic ecosystems.

Additionally, in 2015, the USGS received $1.5 million for grants to States to improve water use collection, estimation, and delivery.  The USGS also received $2.4 million for grants to States to implement the National Groundwater Monitoring Network.  These two efforts greatly enhance the ability of the Water Availability and Use Science Program to produce the information and tools necessary to improve water budget component information for water management decisions and are critical to Reclamation's climate resilience and adaptation planning efforts.

**Reclamation's Research and Development Office** focuses on researching innovative, workable solutions to our challenging issues with managing water and power in the Western U.S.  CCAWWG is a partnership with the USACE, the USGS, NOAA, and others to identify mutual science needs for long-term planning and short-term operations.  The development of these groups has included strong stakeholder interaction and involvement through the Western States Water Council, the American Water Works Association, Family Farm Alliance, Western Area Power Administration, and Seattle City and Light Department.  Reclamation's Science and Technology Program has invested in a range of solutions to meet needs identified collaboratively by CCAWWG, including climate change training programs for Reclamation staff.

Reclamation is also collaborating with Federal entities on the National Fish, Wildlife and Plants Climate Adaptation Strategy.  This strategy provides a framework for actions needed now to help safeguard our valuable natural resources and the communities and economies that depend on them in a changing climate.  Implementing the strategy will also fill critical gaps in the science, monitoring, modeling and training to sustain fish, wildlife, and plants in a changing climate.  Its implementation is being overseen by a Joint Implementation Working Group made up of representatives from the same Federal, State, and Tribal agencies that led the successful completion of the strategy, including Reclamation.  The group's purpose is to help facilitate and promote implementation across multiple agencies, as well as to share information among participants.

## 5.2  Collaboration and Coordination with States and Stakeholders

Western water management and operations at Reclamation facilities are closely intertwined with the activities and interests of various western stakeholders.  This includes other Federal agencies, States, Indian tribes, local water and irrigation districts, and other nongovernmental organizations.  Although Reclamation builds, owns, and continues to operate much of its infrastructure, local partners also play a huge role in system operations and maintenance.  The SECURE Water Act has catalyzed collaboration between Reclamation and multiple stakeholders, and has promoted the exchange of valuable technical assistance that otherwise may be difficult to acquire.

**SECURE Water Act Section 9503(c) Report to Congress**

As Reclamation has taken steps to implement the SECURE Water Act, it also has engaged with State interests via participation in the **Western Federal Agency Support Team (WestFAST)** meetings and discussions.  WestFAST is a collaboration of 12 Federal agencies with water management responsibilities in the West, established to support the Western States Water Council and the Western Governors' Association in coordinating Federal water resources efforts.  WestFAST is engaged in a variety of activities related to water resources and climate change.

The **Western States Water Council (WSWC)** is a collaborative body created by western governors in 1965 and comprised of member States – from Texas to North Dakota and westward – which allows the governors to effectively address and work toward solutions that are larger than single states and across a regional scale.  Over the past decade, a barrier to regional cooperation was identified:  a lack of or difficulty accessing available water data that would assist with regional water resource management issues.  To address this, the WSWC initiated the Water Data Exchange (WaDE) Program.  Begun in 2012, the WaDE program is a cooperative effort between the WSWC, the Western Governors' Association, DOE, WestFAST, and the National Environmental Information Exchange Network.

The WaDE Program seeks to (1) better enable the States to share important water planning and administrative datasets with each other and the public, and (2) encourage Federal agencies to begin to share their datasets using "open data" formats and publication methods.  WSWC support of Federal data-sharing stems from the difficulty of assembling and preparing myriad data produced by Federal agencies for incorporation into models and tools.  It would greatly improve and ease the development of hydrologic and groundwater models, etc., for State agency water planners if they could access these datasets in a more interoperable and possibly centralized location.  WSWC has engaged with Federal agencies that have water management responsibilities in the West through WestFAST, and asked that they consider what standards and formats exist for the types of data they wish to share and whether they could publish them using "open data" formats.  WSWC has also offered to help agencies to develop standardized formats for specific data types if needed, and to provide feedback on any pilots or preliminary work done to make datasets publically accessible in interoperable and machine-readable formats.  Specific examples include:

- **Reclamation's Lower Colorado River Data Sharing Pilot:**  In 2014, Reclamation's Lower Colorado Region Office staff members asked WSWC for assistance with the development and review of a possible data-sharing portal for Colorado River data maintained by their offices.  WSWC and the regional office team discussed and refined the potential products and interfaces that might be used in the future for publishing Reclamation datasets.

- **Open Water Data Initiative Coordination:**  In late 2014, DOI began to pursue an Open Water Data Initiative — an effort to improve the availability of water datasets generated not only by Federal agencies, but by a wide range of authoritative public and private water data providers.  The goals of Open Water Data Initiative are to integrate fragmented water information into a connected national framework and leverage existing shared resources, while encouraging more partners to share their information using interoperable and machine-readable formats.

WSWC and Reclamation are collaborating on the Open Water Data Initiative framework and on finding ways that Reclamation and State-managed data can be leveraged and integrated into useful tools for decision-making.  The intent of these efforts is to demonstrate the value of "open data" when used to support key visualizations and policy tools in an automated and timely fashion.

The **Basin Study Program** is a key avenue of collaboration and coordination between Reclamation and various local, State, and tribal interests.  With 24 Basin Studies now initiated (and 18 completed as of the release of this document), Reclamation has forged collaborative relationships in 15 of the 17 Western States with a diverse assortment of non-Federal partners, including State water resource agencies, regional water authorities, local planning agencies, water districts, agricultural associations, environmental interests, cities and counties, and tribal governments (see Table 1–1).

A number of these non-Federal partners point to the usefulness of efforts through Basin Studies to incorporate the best available science into planning activities.  As part of the Los Angeles Basin Study, for example, Reclamation worked with partners to down-scale future precipitation projections to time intervals that could be used as part of existing planning efforts.  Lee Alexanderson of the Los Angeles County Department of Public Works notes that those efforts allowed the county to incorporate more robust climate science into future water demand and supply analysis so that planning efforts can be adjusted accordingly:  "In the end, that effort reaffirmed our confidence that the Los Angeles Basin is well-positioned to cope with anticipated climate changes and water demands for the remainder of this century, provided that we continue to implement appropriate planning and policies."

Similarly, Larry Dolan, Hydrologist at the Montana Department of Natural Resources, points to the usefulness of work carried out through the Upper Missouri River Impact Assessment and Missouri River Headwaters Basin Study:  "Basin modeling enabled us to understand how water supplies in the future, although they might be similar to what we have today, will not be sufficient to meet future needs in the region for irrigation and other uses.  Warming trends will mean higher shortages in the future due to a longer growing season and higher crops irrigations demands for the water that we have available to us."

SECURE Water Act Section 9503(c) Report to Congress

## Table 1–1. Basin Studies Initiated, Study Locations and Cost Share Partners

| | Basin Study | Study Location | Cost Share Partners |
|---|---|---|---|
| **Chapter 3** | Colorado River Basin Study | Arizona, California, Colorado, Nevada, New Mexico, Utah and Wyoming | Arizona Department of Water Resources, (California) Six Agency Committee, Colorado Water Conservation Board, New Mexico Interstate Stream Commission, Southern Nevada Water Authority, Utah Division of Water Resources, Wyoming State Engineer's Office |
| | Lower Santa Cruz River Basin Study | Arizona | Southern Arizona Water Users Association |
| | West Salt River Valley Basin Study | Central Arizona | West Valley Central Arizona Project Subcontractors |
| **Chapter 4** | Henrys Fork of the Snake River Basin Study | Central Idaho | Idaho Water Resource Board |
| | Hood River Basin Study | North-central Oregon | Hood River County Water Planning Group |
| | Upper Deschutes Basin Study | Oregon | Deschutes Basin Board of Control |
| | Yakima River Basin Study | South-central Washington | State of Washington Department of Ecology |
| **Chapter 5** | Klamath River Basin Study | California and Oregon | Oregon Water Resources Department, California Department of Water Resources |
| **Chapter 6** | Missouri River Headwaters Basin Study | Montana | Montana Department of Natural Resources and Conservation |
| | Niobrara River Basin Study | Northern Nebraska | Nebraska Department of Natural Resources |
| | Republican River Basin Study | Colorado, Kansas and Nebraska | Colorado Division of Water Resources, Kansas Department of Agriculture, Kansas Division of Water Resources, Kansas Water Office, Nebraska Department of Natural Resources |
| | St. Mary and Milk River Basins Study | Montana, southern Alberta and Saskatchewan Canada, Blackfeet and Ft. Belknap Indian Reservations | Montana Department of Natural Resources and Conservation |

Chapter 1:  West-Wide Overview

| | Basin Study | Study Location | Cost Share Partners |
|---|---|---|---|
| **Chapter 7** | Santa Fe Basin Study | Northern New Mexico and southern Colorado | City of Santa Fe and County of Santa Fe |
| | Lower Rio Grande Basin Study | United States/Mexico border from Fort Quitman, Texas to the Gulf of Mexico | Rio Grande Regional Water Authority |
| | Pecos River Basin Study | New Mexico | New Mexico Interstate Stream Commission |
| **Chapter 8** | Sacramento and San Joaquin Rivers Basin Study | California | California Dept. of Water Resources, Stockton East Water District, California Partnership for the San Joaquin Valley, El Dorado County Water Agency, Madera County Flood Control and Water Conservation Agency |
| | Salinas and Carmel River Basins | California | Monterey Peninsula Water Management District, Monterey County Water Resources Agency, Monterey Regional Water pollution Control Agency, San Luis Obispo County |
| **Chapter 9** | Truckee River Basin Study | California and Nevada | Truckee River Flood Management Project, Placer County Water Agency, Truckee Meadows Water Authority and the Tahoe Regional Planning Agency |
| **Chapter 10** | Santa Ana River Watershed Basin Study | California | Santa Ana Watershed Project Authority |
| | Southeast California Regional Basin Study | California | Borrego Water District |
| | San Diego Watershed Basin Study | California | City of San Diego Public Utilities Department |
| | Los Angeles Basin Study | California | Los Angeles County Flood Control District |
| | Upper Washita River Basin Study | Oklahoma | Oklahoma Water Resources Board, Fort Cobb Reservoir Master Conservancy District, Foss Reservoir Master Conservancy District |
| | Upper Red River Basin Study | Oklahoma | Oklahoma Water Resources Board |

SECURE Water Act Section 9503(c) Report to Congress

Other non-Federal partners highlight the ways that collaborative efforts through Basin Studies are continuing, even after work on a particular study has been completed.  For example, Hood River County Commissioner Les Perkins notes that the hydrological model developed as part of the Hood River Basin Study helped the community focus on strategies for long-term sustainability of water supplies, and that those efforts are continuing:  "The study launched follow-up efforts to evaluate new storage options in Hood River County, and it spurred us to enhance groundwater monitoring in order to better understand local surface and groundwater interactions."

Others note that sharing of data developed through the Basin Study Program is helping with local planning efforts.  Aaron Sussman, formerly with the Mid-Region Council of Governments in Albuquerque, New Mexico, points out that information on the projected effects of climate, developed as part of the Upper Rio Grande Climate Impact Assessment, is being used outside of water resources planning:  "Together with our water demand analyses, that information jump-started community discussions on how we want to see our area grow—in particular, looking at our transportation needs in the broader and more comprehensive context of future land use and water resource needs."

Relationships established through the Basin Studies lead to additional collaborative efforts, such as the Colorado River Basin *Moving Forward* Effort, a collaborative partnership among Reclamation, the seven Colorado River Basin States, the Ten Tribes Partnership, and conservation organizations designed to pursue several areas of the "next steps" identified in the *Colorado River Basin Water Supply and Demand Study*.  Collaboration with stakeholders is critical to the successful implementation of climate adaptation strategies through WaterSMART Grants, the Title XVI Program, Drought Response Program, Cooperative Watershed Management Program, and the Water Conservation Field Services Program.  Additional information on coordination activities specific to each western river basin, including the strategies developed to address potential water shortages, is included in Chapters 3 through 10.



ALASKA   CALIFORNIA   FLORIDA   MID-PACIFIC   NORTHEAST   NORTHERN ROCKIES
NORTHWEST   ROCKY MOUNTAIN   WASHINGTON, D.C.   INTERNATIONAL

April 12, 2016

Mr. Scott Armentrout, Supervisor
GMUG National Forest
2250 Highway 50
Delta, CO 81416
Via Email: sarmentrout@fs.fed.us
Via web: https://cara.ecosystem-management.org/Public/CommentInput?Project=32459

**Re:   Scoping Comments Federal Coal Lease Modifications COC-1362 & COC-67232
(Project #32459)**

Dear Supervisor Armentrout:

Thank you for this opportunity to submit scoping comments on the supplemental environmental impact statement (EIS) on the Forest Service's proposal to consent to Bureau of Land Management (BLM) modifying Federal Coal Leases COC-1362 and COC-67232 by adding 800 and 922 acres, respectively, to those leases. The Forest Service also intends to address in that supplemental EIS whether to concur to Arch Coal's Sunset Trail Area Coal Exploration Plan within the Lease Modifications area.[1] This letter is sent on behalf of the following 10 conservation groups and conservationists, all of whom have a longstanding interest in the protection and wise stewardship of roadless national forest lands and our climate. Given the important roadless, wilderness, wildlife, and other values at stake and the climate impacts of allowing Arch Coal to bulldoze over 6 miles of roads in publicly owned backcountry forests so that it might profit from the mining and burning of 19 million tons of coal, we urge the Forest Service to reject Arch's proposal in favor of the No Action Alternative.

High Country Conservation Advocates (HCCA) was founded in 1977 as High Country Citizens' Alliance, to keep Mount Emmons molybdenum mine-free. HCCA's work now addresses other issues that affect Gunnison County's clean air, clean water, public lands, and healthy wildlife. HCCA has over 600 members who live, recreate, and enjoy the rural and wild character of Gunnison County and its public lands.

The Sierra Club is America's largest grassroots environmental organization, with more than 2.4 million members and supporters nationwide. In addition to creating opportunities for people of all ages, levels and locations to have meaningful outdoor experiences, the Sierra Club works to safeguard the health of our communities, protect wildlife, and preserve our remaining wild places through grassroots activism, public education, lobbying, and litigation. Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's resources and ecosystems; to educating and

---

[1] *See* Forest Service, Notice of intent to prepare a supplemental environmental impact statement, Federal Coal Lease Modifications COC-1362 & COC-67232, 81 Fed. Reg. 8899-8900 (Feb. 23, 2016) ("2016 Lease Modifications Fed. Reg. Notice").

enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.

WildEarth Guardians is a Santa Fe, New Mexico-based nonprofit organization with offices throughout the western U.S., including in Colorado.  WildEarth Guardians is dedicated to protecting and restoring wild places, wildlife, wild rivers, and the health of the American West and has over 100,000 members.  As part of its Climate and Energy Program, Guardians works to combat climate change by advancing clean energy and aiding a transition away from fossil fuels, the key source of the greenhouse gases fueling global warming, particularly on our pubic lands.  In doing so, Guardians defends the public interest by safeguarding clean air, pure water, vibrant wildlife populations, and protected open spaces.

The Center for Biological Diversity is a non-profit environmental organization with 50,400 member activists, including members who live near and recreate in the areas in the Grand Mesa, Uncompahgre and Gunnison National Forests.  The Center uses science, policy and law to advocate for the conservation and recovery of species on the brink of extinction and the habitats they need to survive.  The Center has and continues to actively advocate for increased protections for species and habitats in the planning area on lands managed by the Forest Service.  The lands and waters that will be affected by the decision include habitat for many listed, rare, and imperiled species that the Center has worked to protect including the Colorado pikeminnow, humpback chub, bonytail, razorback sucker, Colorado cutthroat trout, and Canada lynx.

Founded in 1947 as Defenders of Furbearers, Defenders of Wildlife is a nonprofit organization dedicated to the protection and restoration of wildlife and plants in their natural communities, with 1.2 million members and supporters nationwide.  Defenders' distinguished record of leadership on America's conservation efforts includes helping secure final passage of the Endangered Species Act in 1973.  Defenders' current priorities include conserving wildlife including the predators that help maintain biodiversity, protecting the Endangered Species Act and other important wildlife conservation laws from political attacks, supporting policies and practices that help wildlife adapt to climate change and advocating for wildlife-friendly renewable energy development.

Friends of the Earth fights to create a more healthy and just world.  Its current campaigns focus on promoting clean energy and solutions to climate change, ensuring the food we eat and products we use are safe and sustainable, and protecting marine ecosystems and the people who live and work near them.

Founded in 1967, the mission of Wilderness Workshop's ("WW") mission is to protect and conserve the wilderness and natural resources of the Roaring Fork Watershed, the White River National Forest, and adjacent public lands.  WW is a non-profit organization that engages in research, education, legal advocacy and grassroots organizing to protect the ecological integrity of local landscapes and public lands.  WW not only defends pristine public lands from new threats, but also helps restore the functional wildness of a landscape fragmented by human activity.  WW protects and preserves existing wilderness areas, advocates for expanding wilderness, defends roadless areas from development that would destroy their wilderness character, and safeguards the ecological integrity of all federal public lands in its area of

interest.  WW has a long history of participation in forest planning on the White River National Forest.  WW has approximately 700 members who support its mission and enjoy the lands WW protects and conserves.

Rocky Mountain Wild is a conservation advocacy organization focused on protecting wildlands for wildlife throughout the Southern Rocky Mountain region (Colorado, eastern Utah, southern Wyoming, and northern New Mexico).  The organization has around 600 members who are passionate about protecting the biodiversity and ecosystem health throughout the region.  Rocky Mountain Wild advocates for its members' interests through participating in administrative processes, collaboration, education, and, when necessary, litigation.

Founded in 1986, San Juan Citizens Alliance ("SJCA") advocates for clean air, pure water, and healthy lands – the foundations of resilient communities, ecosystems and economies in the San Juan Basin. SJCA is a membership organization with 650 dues-paying members and over 2,000 supporters that has been active in BLM and National Forest fossil fuel issues in southwest Colorado and northern New Mexico since the early 1990s.

Great Old Broads for Wilderness is a national organization, with 5,200 members nation-wide, including 700 members in Colorado.  Great Old Broads for Wilderness engages and ignites the activism of elders to preserve and protect wilderness and wild lands.  Broads gives voice to the millions of older Americans who want to protect their public lands as Wilderness for this and future generations.  Broads brings experience, commitment, and humor to the movement to protect the last wild places on Earth.

Rocky Smith is a Colorado resident who uses and enjoys Colorado's national forests and roadless areas, and who has reviewed and responded to plans, projects, laws, regulations, and policies that affect national forest management for 35 years.  He drafted various sets of comments on the Colorado Roadless Rule.

For the reasons set forth below, the undersigned groups and individual, among other things, urge the Forest Service to:

- adopt the no action alternative, because the proposed action will degrade sensitive roadless lands and worsen climate change, hobble renewable energy generation, and result in millions if not billions of dollars of damage to the global environment and economy while likely benefitting only a single corporation: bankrupt Arch Coal;

- correct any and all remaining flaws in the analysis of the social costs of climate pollution contained November 2015 supplemental draft environmental impact statement on the Colorado Roadless Rule coal mine exception (2015 Colorado Roadless Rule Supplemental Draft EIS), including

  ○ failure to disclose the social cost of methane in the agency's social cost and/or present net value analysis;

     ○  using a model for estimating market impacts that fails to accurately represent increased energy consumption that will result from the sale of coal from the North Fork Valley coal mining area;

     ○  failure to use the best available data on the likely rate of methane emissions, including data from ten years of coal mining (rather than only the last three years as in the Colorado Roadless Rule 2015 SDEIS);

     ○  consider a range of reasonable alternatives, including

         -  alternatives that require the lease applicant to combust, flare, or offset the climate impacts of methane and other climate pollution

         -  alternatives that that protect forest values

- address and correct all deficiencies identified by the September 24, 2012 administrative appeal submitted by Earthjustice on behalf of High Country Citizens' Alliance;

- ensure compliance with the Endangered Species Act;

- disclose the impacts of leasing and exploration on recreation resources;

- disclose air quality impacts;

- ensure that the proposal does not tier to an outdated forest plan; and

- analyze reasonable alternatives to Arch Coal's proposed exploration plan.

## I.      THE FOREST SERVICE SHOULD ADOPT THE NO ACTION ALTERNATIVE.

In his State of the Union speech in January, President Obama emphasized the need to immediately "transition away from old, dirtier energy sources." He continued:

> Rather than subsidize the past, we should invest in the future – especially in communities that rely on fossil fuels. We do them no favor when we don't show them where the trends are going. That's why I'm going to push to change the way we manage our oil and coal resources, so that they better reflect the costs they impose on taxpayers and our planet.[2]

Consistent with the President's statements in the State of the Union, the Forest Service should reject the proposed lease modifications. The Lease Modifications present the Obama Administration with a clear policy choice: moving forward with the preferred alternative would

---

[2]  The White House, Remarks of President Barack Obama – State of the Union Address As Delivered (Jan. 13, 2016), available at https://www.whitehouse.gov/the-press-office/2016/01/12/remarks-president-barack-obama-%E2%80%93-prepared-delivery-state-union-address#annotations:8521497 (last viewed Apr. 12, 2016).

open up 19 million tons of publicly- and privately-owned coal, cause millions of dollars in climate-related economic damages; suppress production of clean, renewable energy; and degrade more than a thousand acres of wild forest directly adjacent to the West Elk Wilderness Area. It would do so all to assist a single entity, bankrupt Arch Coal, and it would do nothing to assist the transition, already ongoing in the North Fork Valley, away from an economy dependent on coal.

We urge the Forest Service to continue the Obama Administration's strong leadership on climate issues by rejecting the proposed North Fork Valley exemption. Climate change is the critical issue of our time. As we transition to clean, renewable energy economy, the Forest Service has the opportunity to play a key role in determining whether our public lands will, in the President's words, be used to "subsidize the past" or "invest in the future."

We note that the Secretary of the Interior on January 15 announced a "moratorium" on the Interior Department approving certain coal leases, and that that moratorium specifically exempted the Lease Modifications at issue here. However, the Secretary's announcement does not mandate that either BLM or the Forest Service approve the Lease Modifications or limit either agency's discretion to reject a proposal such as this which does not serve the public interest. Because the Lease Modifications will degrade roadless character, worsen climate change, and result in unnecessary and unmitigated methane pollution, with the only benefits flowing to a bankrupt coal company, both BLM and the Forest Service have ample basis to reject this lease application.

### A.    The Lease Modifications Should Be Rejected Because They Are Not In The Public Interest.

The undersigned groups urge the Forest Service to adopt the no action alternative and to reject the Coal Lease Modifications. The proposed action will harm the public by encouraging the release of vast amounts of climate pollution, by wasting millions of cubic feet a day of methane, by saddling the global economy and environment with millions (if not billions) of dollars in climate damages, and by degrading high-elevation forests and wildlife habitat. On the other hand, it is likely to benefit only a single company: now-bankrupt Arch Coal. The Forest Service should not undermine the public interest to benefit one of world's largest purveyors of dirty coal.

The Forest Service's own analysis of the Colorado Roadless Rule coal mine exception demonstrates the proposal's damaging impacts by at least four counts.

First, coal mined from the Lease Modifications will result in significant *gross* carbon emissions from coal extraction and combustion.[3] Second, even where the analysis takes into account the shifts in the mixtures of energy used to generate electricity, as well as the production of different types of energy which would result from the addition million tons of coal to the market, mining the Lease Modification coal will result in a *net* increase in total CO2 emissions.[4] Third, the Colorado Roadless Rule supplemental draft EIS's market analysis shows that the addition of coal

---

[3] *See* letter of E. Zukoski *et al.* to U.S. Forest Service (Jan. 15, 2016) at 6 ("HCCA Jan. 2016 Roadless Rule Comments"), attached as Ex. 1.

[4] *Id.* at 6-7.

from the Lease Modifications area will undercut the market for clean renewable energy.[5]  Fourth, the Colorado Roadless Rule SDEIS concludes that the *net* social damage to the global environment and property from carbon emissions (calculated by weighing the social cost of carbon against the net value of the coal) due to coal mined from the Lease Modifications and elsewhere could be in the billions of dollars.[6]

That the Forest Service appears poised to ignore the significant climate impacts of unlocking 19 million tons of coal contradicts recent statements by President Obama.  In announcing his decision rejecting a permit for the Keystone XL pipeline, the President stated:

> if we're going to prevent large parts of this Earth from becoming not only inhospitable but uninhabitable in our lifetimes, we're going to have to keep some fossil fuels in the ground rather than burn them and release more dangerous pollution into the sky.[7]

Beyond climate and energy impacts, opening the Sunset Roadless Area to road construction for coal mining is also likely to have significant, concentrated, damaging impacts across a 3-square-mile landscape of largely undisturbed roadless lands.  These areas provide habitat for lynx and goshawk, black bear and elk, frogs, snakes, and deer; mining here will degrade soils and landscapes upstream of habitat for Colorado River cutthroat trout and endangered Colorado River fish.

The purpose of the proposed action is to pave the way for the construction of at least 6 miles of road, 48 methane drainage wellpads, and 10 exploration pads within roadless forest to facilitate mining of up to 19 million tons of federal and private coal.[8]  The National Forest lands above existing leases for Arch Coal's West Elk Mine are already blanketed by a tight network of roads, and pockmarked and degraded by drill pads.[9]  Those who tout coal from the North Fork as "clean" can only do so by ignoring the degradation of roadless areas and massive amounts of methane wasted to mine it (which the Forest Service has done nothing to address), and the greenhouse gas pollution caused by burning it.

On the other hand, the alleged benefits of allowing this pollution and habitat destruction will likely accrue only to a single entity: the West Elk mine, owned by Arch Coal.  The Forest

---

[5] *Id.* at 7.

[6] *Id.* at 7-9.

[7] The White House, Statement by the President on the Keystone XL Pipeline (Nov. 6, 2015), attached as Ex. 2, and available at https://www.whitehouse.gov/the-press-office/2015/11/06/statement-president-keystone-xl-pipeline (last viewed Apr. 12, 2016).

[8] U.S. Forest Service, Final Environmental Impact Statement, Federal Coal Lease Modifications COC-1362 & COC-67232 (Aug. 2012) at 54, 190 ("2012 Lease Modifications Final EIS")

[9] *See* A Photo Report of the Sunset Roadless Area and Threats from Coal Mining at Arch Coal's West Elk Mine (Jan 14, 2016), attached as Ex. 3.

Service should not be effectively subsidizing a company so poorly run that it eliminated 99% of its shareholder's value over the last two years and ran itself into bankruptcy.

Because West Elk still has, by Forest Service estimates, approximately 10 years of coal reserves remaining,[10] the Forest Service has time to help local communities transition to a more stable, cleaner economy in the North Fork Valley while preserving the natural environment and protecting the climate. This is particularly important given the bleak future coal faces across the West Slope. As the dean of the University of Colorado school of business was recently paraphrased, "Western Slope coal lies on death's door" due to a variety of market conditions.[11]

### B.    The Forest Service Should Adopt The No Action Alternative Because Arch Has No Immediate Need For The Lease Modifications.

The Forest Service should adopt the no action alternative – or defer Arch's Lease Modifications application for the foreseeable future – because Arch has no demonstrated, immediate need for the coal.

As discussed above, Arch has access to approximately 10 years of coal at current production rates. According to Forest Service records, West Elk has an estimated 10 year supply of coal under lease, and apparently has a mine plan for the B seam that involves no surface construction until at least 2022.[12] It thus will not need to access the Lease Modifications until well after 2020. Given the ongoing and rapid deterioration in coal markets, and Arch's bankruptcy, whether the West Elk mine will actually have the ability or interest in mining the coal in coming years is highly speculative. That deterioration is particularly plain in the North Fork Valley where in the past four years, two of three coal mines then operating have been idled. In order to husband the

---

[10]  *See* Forest Service, West Elk Mine (powerpoint) (Dec. 2014) at 13, attached as Ex. 4 ("The West Elk Mine estimates that 55 million tons of coal resources are currently under lease, only a portion of which are permitted for mining. Assuming a 5 million ton year production rate, the current leased coal resources would represent approximately 11 years of production."). In 2014, West Elk mined at a rate of approximately 5.2 million tons per year since Dec. 2014. *See* Colorado Division of Reclamation, Mining and Safety, Monthly Coal Summary Report, Period 1/2015 through 12/2015 (Feb. 16, 2016), available at http://mining.state.co.us/SiteCollectionDocuments/12Summary15.pdf (last viewed Apr. 12, 2016) attached as Ex. 5. In March 2015, Forest Service staff again estimated that the West Elk mine's "current leased coal resources … represent approximately 11 years of production." Email of J. Robertson, Forest Service to J. Schaefers, Forest Service *et al.* (Mar. 20, 2015), attached as Ex. 6.

[11]  G. Ruland, Coal dead, but real estate, construction our best hope, Grand Junction Sentinel (Dec. 14, 2015), available at http://www.gjsentinel.com/news/articles/coal-dead-but-real-estate-construction-our-best-ho (last viewed Apr. 12, 2016), and attached as Ex. 7; Editorial, Grand Junction Sentinel, Resurrection Sunday, (Mar. 27, 2016) ("coal is dying"), attached as Ex. 8, and available at http://www.gjsentinel.com/articles/print/resurrection-sunday (last viewed April 12, 2016).

[12]  *See supra* at  n.10.

Forest Service's and BLM's staff and fiscal resources, the agencies should defer consideration of this application until at least 2020.[13]  While Arch may wish to have the area under lease to pad the assets on its balance sheet, that is not a valid basis for approving the Lease Modifications.

In addition, Arch's desire to explore the Sunset Roadless Area should not drive the Forest Service or BLM to consider the Lease Modifications.  Arch can apply for a license to explore the area even if the land is not under lease.[14]  Arch would apparently prefer to explore the area after it is leased because that would permit Arch to shield the exploration results from other potential coal producers.[15]  The Forest Service and BLM should not put a roadless area under lease simply to make it easier for Arch to conceal exploration data.  Such a decision does not serve the public interest.

## II.    THE LEASE MODIFICATIONS EIS MUST EVALUATE A RANGE OF REASONABLE ALTERNATIVES AND EVALUATE MITIGATION MEASURES.

### A.    NEPA Mandates That Agencies Evaluate All Reasonable Alternatives.

NEPA requires agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning

---

[13]  It remains unclear whether Arch Coal needs to construct roads in the Sunset Roadless Area in the near future, despite Arch's reapplication for the Lease Modifications.  Arch's staff, under penalty of perjury, repeatedly swore that if the company were unable to explore proposed lease modifications in a portion of the coal mine exception area by 2013 (or 2014), the West Elk mine would likely bypass any coal there Declaration of Kathy Welt, Arch Coal (Mar. 14, 2013) at 3 (swearing under penalty of perjury that if the lease modifications within the Sunset Roadless Area could not be explored "in the Summer of 2013, MCC [Mountain Coal Company] will be forced to abandon that mining course" in the lease modifications area and adjacent lands), attached as Ex. 9; Declaration of Weston Norris (May 8, 2014) at 3 (swearing under penalty of perjury that "[b]ypass of the coal [in the lease modifications area] remains a significant risk, and highly likely on the current market environment if exploration cannot be conducted in 2014"), attached as Ex. 10.  And by bypass, the Arch officials meant: leave the coal in the Lease Modifications area under the roadless lands unmined unless and until market conditions improved to justify the cost of returning to the area.

[14]  Where the exploration of federal coal will take place on lands not subject to a federal coal lease, the entity seeking to explore must receive an exploration license.  43 C.F.R. Part 3410 (Exploration Licenses).  These regulations require the publication of a notice of the company's exploration plans in the Federal Register, and a requirement that other companies have the opportunity to share in the costs and the data retrieved from such exploration.  43 C.F.R. § 3410.2-1(c).

[15]  Where exploration of federal coal will occur on lands leased to the entity seeking to explore, but not within an approved mine permit boundary, BLM reviews the exploration plan pursuant to the requirements of 43 C.F.R. Part 3480.  These regulations do not require posting notice of the exploration proposal in the Federal Register, as do the regulations for Exploration Licenses.

alternative uses of available resources." 42 U.S.C. § 4332(2)(E), (2)(C). The analysis of alternatives "is characterized as 'the heart' of the environmental impact statement." *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1174 (10th Cir. 1999) (quoting 40 C.F.R. § 1502.14). In the EIS, the agency must "[r]igorously explore and objectively evaluate *all* reasonable alternatives" in response to a "specif[ied] ... purpose and need." 40 C.F.R. §§ 1502.13, 1502.14(a) (emphasis added); *see also New Mexico ex rel. Richardson*, 565 F.3d at 703 (stating that "an EIS must 'rigorously explore and objectively evaluate' all reasonable alternatives to a proposed action, in order to compare the environmental impacts of all available courses of action" (quoting 40 C.F.R. § 1502.14)).

Without substantive, comparative environmental impact information regarding other possible courses of action, the ability of an EIS to inform agency deliberation and facilitate public involvement would be greatly degraded. *See Baltimore Gas & Elec. Co. v. Natural Res. Defense Council*, 462 U.S. 87, 97 (1983). While NEPA "does not require agencies to analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or impractical or ineffective," it does require the development of "information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned." *Colo. Envtl Coal.*, 185 F.3d at 1174 (quotations and alteration omitted). *See also New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 708 (10th Cir. 2009). Courts hold that an agency need not provide a detailed study of alternatives that do not accomplish that purpose or objective, as those alternatives are not "reasonable." *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1031(10th Cir. 2002). Courts apply this same analysis to rulemakings such as the one at issue here, as well as to site-specific project. *See, e.g., Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1243-44 (10th Cir. 2012) (applying NEPA's mandate that agencies analyze all reasonable alternative in a challenge to national Roadless Rule).

While an agency has some discretion in fashioning an action's purpose and need, agencies may not constrain the range of alternatives by "defin[ing] its objectives in unreasonably narrow terms." *City of Carmel-by-the-Sea v. United States Dept. of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). *See also Wyoming*, 661 F.3d at 1244 ("agencies are not permitted to define the objectives [of a proposed action] so narrowly as to preclude a reasonable consideration of alternatives"); *Davis v. Mineta*, 302 F.3d 1104, 1119 (10th Cir. 2002); *Citizens' Comm. to Save Our Canyons*, 297 F.3d at 1030.

### B.        NEPA Mandates That Agencies Analyze Potential Mitigation Measures.

NEPA's statutory language implicitly charges agencies with mitigating the adverse environmental impacts of their actions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351-52 (1989); *Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1522 (10th Cir. 1992). Mitigation measures are required by NEPA's implementing regulations. 40 C.F.R. §§ 1502.14(f), 1502.16(h).

The CEQ has stated: "All relevant, reasonable mitigation measures that could improve the project are to be identified, even if they are outside the jurisdiction of the lead agency or the cooperation agencies ...." Forty Most Asked Questions Concerning CEQ's National

Environmental Policy Act Regulations, 46 Fed. Reg. 18026, 18031 (March 23, 1981). According to the CEQ, "[a]ny such measures that are adopted must be explained and committed in the ROD." Forty Questions, 46 Fed. Reg. at 18036.

The Tenth Circuit has held that an agency's analysis of mitigation measures "must be 'reasonably complete' in order to 'properly evaluate the severity of the adverse effects' of a proposed project prior to making a final decision." *Colo. Envt'l Coalition*, 185 F.3d at 1173 (quoting *Robertson*, 490 U.S. at 352). Mitigation "must be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated." *City of Carmel-by-the-Sea*, 123 F.3d at 1154 (quoting *Robertson*, 490 U.S. at 353).

"[O]mission of a reasonably complete discussion of possible mitigation measures would undermine the 'action-forcing' function of NEPA. Without such a discussion, neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects." *Robertson*, 490 U.S. at 353. A "perfunctory description," of mitigation, without "supporting analytical data" analyzing their efficacy, is inadequate to satisfy NEPA's requirements that an agency take a "hard look" at possible mitigating measures. *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998). An agency's "broad generalizations and vague references to mitigation measures ... do not constitute the detail as to mitigation measures that would be undertaken, and their effectiveness, that the Forest Service is required to provide." *Id.* at 1380-81. *See also Northwest Indian Cemetery Protective Association v. Peterson*, 795 F.2d 688, 697 (9th Cir. 1986), rev'd on other grounds, 485 U.S. 439 (1988) ("A mere listing of mitigation measures is insufficient to qualify as the reasoned discussion required by NEPA."); *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1151 (9th Cir. 1988) ("Without analytical data to support the proposed mitigation measures, we are not persuaded that they amount to anything more than a 'mere listing' of good management practices."). Moreover, in its final decision documents, an agency must "[s]tate whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not." 40 C.F.R. § 1505.2(c).

The CEQ also recognizes that the consideration of mitigation measures and reasonable alternatives is closely related. For example, CEQ's guidance on mitigation and monitoring states that "agencies may commit to mitigation measures considered as alternatives in an EA or EIS so as to achieve an environmentally preferable outcome." Council on Environmental Quality, Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact (Jan. 14, 2011) at 1 (hereafter "CEQ Mitigation Guidance"); *see also id.* at 6-7 ("When a Federal agency identifies a mitigation alternative in an EA or an EIS, it may commit to implement that mitigation to achieve an environmentally-preferable outcome.").

Revised draft guidance from CEQ specifically directs agencies to consider where appropriate a variety of mitigation measures for actions that will cause climate pollution, including measures that will capture or use methane emissions:

> As Federal agencies evaluate proposed mitigation of GHG emissions or of interactions involving the affected environment, the quality of that mitigation—

including its permanence, verifiability, enforceability, and additionality—should
be carefully evaluated.  Among the alternatives that may be considered for their
ability to reduce or mitigate GHG emissions and climate effects are enhanced
energy efficiency, lower GHG-emitting technology (e.g., using renewable
energy), carbon capture, carbon sequestration (e.g., forest and coastal habitat
restoration), sustainable land management practices, and capturing or beneficially
using fugitive GHG emissions such as methane.[16]

### C.   The Supplemental EIS's Proposed Alternatives Analysis

The Forest Service proposes to analyze the following three alternatives: (1) the "no action"
alternative, under which the agency would reject both Arch's lease application and its
exploration plan; (2) "Alternative 3," under which the Forest Service would consent to both lease
modifications and would concur to the exploration plan; and (3) "Alternative 4," under which the
Forest Service would consent only to the lease modification for COC-1362, requiring some
unspecified modification of Arch's exploration plan.

### D.   The Supplemental EIS Should Modify The Action Alternatives To Postpone
Consideration Of The Exploration Plan.

The Forest Service's proposed action alternatives (Alternatives 3 and 4) cram together two
separate proposals – leasing and exploration – that do not fit together neatly, and that
unnecessarily complicate the analysis.  The Forest Service should therefore adjust the purpose
and need for the proposed action to address *only leasing*, and postpone the consideration of the
exploration plan until after the lease, or the agency should consider a broader range of
alternatives.

Arch has applied for an exploration plan pursuant to BLM regulations governing the exploration
of an area already under lease.  But the Lease Modifications area is not yet under lease, and so no
exploration plan can be approved until *after* any approval of the Lease Modifications.  Arch
premised its 2013 exploration plan on the previously approved 2013 Lease Modifications.
Because the 2013 Lease Modifications were vacated, however, there is no existing lease that
Arch can propose to explore.  The lack of an existing lease makes it awkward for the Forest
Service to analyze the pending lease modifications and exploration plans at the same time, as the
agency's description of Alternative 4 in the 2016 Lease Modifications Federal Register Notice
makes clear:

> [Alternative 4] *may* result in a reduction of three or more exploration drill holes
> and a reduction of approximately 2.75 miles of temporary road within the COC–
> 67232 lease modification.  Because an exploration plan specific to this alternative
> has not been submitted, the agencies are unsure if road density and miles might be

---

[16]  Council on Environmental Quality, Revised Draft Guidance for Federal Departments and
Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in
NEPA Reviews, 79 Fed. Reg. 77,802, 77,828 (Dec. 24, 2014).

increased on the COC–1362 lease to try to reach drill holes close to the lease modification boundary or if they will be foregone.[17]

In short, because Arch has prepared an exploration plan for the *entire* proposed lease area, the Forest Service cannot effectively disclose the impacts of the proposed exploration plan under Alternative 4 because that exploration plan, as submitted, *could not be approved* under Alternative 4.[18]

Because it is unclear whether and how Arch would explore under Alternative 4, the Forest Service should de-couple the analysis of exploration under both action alternatives, and postpone analysis or approval of any exploration plan until after the Forest Service has made a decision on leasing. This would require the agency to complete first the Lease Modifications NEPA and decisionmaking before pursuing an analysis of any proposed exploration plan. While Arch may not welcome the delay, it will make for a much more clear, sensible, and orderly analysis.[19]

**E.      The Supplemental EIS Must Analyze Alternatives That Reduce, Or Mitigate, Climate Pollution.**

The purpose of the Lease Modifications and exploration plan is to foster coal mining, which will result in significant climate impacts from both mining and the ultimate combustion of coal. The roads and methane drainage vents that the Forest Service proposes to pave the way for will result in the emission and waste of millions of cubic feet a day of methane unless the agency adopts alternatives or requires mitigation that abates or offsets that pollution.

The West Elk mine's climate impacts have long been the subject of public interest, contention, and litigation.[20] In particular, EPA, conservationists, and the State of Colorado have pressed the Forest Service and Arch Coal to address the significant levels of methane pollution from the West Elk mine. Indeed, the GMUG National Forest Supervisor in 2008 pledged that the Forest

---

[17] 2016 Lease Modifications Fed. Reg. Notice, 81 Fed. Reg. at 8903.

[18] A more rational analysis could occur if Arch submitted a separate exploration plan for the lease modification for COC-1362 in the event the Forest Service selects Alternative 4.

[19] We note further that the Forest Service in November asserted that it could not predict impacts of coal mining in part because: "BLM regulations establish that a certain amount of exploration data must be available in order for the BLM to consider leasing. Such data is not available for this SDEIS, *any future consideration of leasing* within the North Fork Coal Mining Area *would require additional exploration data.*" 2015 Colorado Roadless Rule Supplemental Draft EIS at 26 (emphasis added). If true, this statement would seem to argue for the Forest Service denying the Lease Modifications application as premature, and requiring exploration to come before leasing.

[20] *See, e.g., WildEarth Guardians v. U.S. Forest Service*, 828 F. Supp. 2d 1223 (D. Colo. 2011) (challenge to mine plan approval on grounds that Forest Service failed to address climate change and methane emissions).

would "continue to 'lead the charge' with our partners to explore options [for coal mine methane mitigation] because it is the right thing to do for the environment."[21]

Eight years on, the GMUG's alleged "charge" has led to not a single molecule of methane being captured, combusted, or offset at the West Elk mine.  That is largely because the Forest Service and BLM have steadfastly refused to analyze alternatives in detail or to adopt mitigation measures that would address the mine's methane pollution, despite the Forest Service's regulatory authority over the mine's impacts.  Here again, with the Lease Modifications, the Forest Service proposes to do nothing.

The Forest Service's failure to propose or analyze in detail any measures to address West Elk's climate pollution violates NEPA, contradicts administration policy, and ignores new information made available since 2012 regarding the need to address climate pollution.

First, there is increasing scientific evidence that for humanity to have a chance to keep climate change within tolerable levels (below two degrees Celsius), governments around the world must act quickly to reduce methane emissions in particular.[22]  Since the Forest Service's Lease Modifications ROD was signed in 2012, new information has supported the consensus that urgent action is necessary to address climate change.  As The New York Times recently put it, "virtually all climate scientists agree … that society is not moving fast enough to reduce emissions of greenhouse gases, posing grave risks."[23]

Part of that consensus is that methane pollution is more damaging than thought only a few years ago.  The Fifth Assessment Report of the Intergovernmental Panel on Climate Change (IPCC) in 2013 concluded that methane is a much more potent driver of climate change than scientists understood it to be just a few years ago – with a global warming potential as much as 36 times greater than carbon dioxide ($CO_2$) over a 100-year time frame, and 87 times greater than CO2 over a 20-year time frame.  Approximately one-third of the anthropogenic climate change we are experiencing today is attributable to methane and other short-lived climate pollutants, and about thirty percent of the warming we will experience over the next two decades as a result of this year's greenhouse gas emissions will come from methane.[24]  Climate scientists now recognize

---

[21]  *See* C. Richmond, "Capturing methane released by mines is a work in progress," Grand Junction Sentinel (Mar. 23, 2008), attached as Ex. 11.

[22]  http://www.thenation.com/article/global-warming-terrifying-new-chemistry/

[23]  J. Gillis, N.Y. Times, "Scientists Warn of Perilous Climate Shift Within Decades, Not Centuries" (Mar. 22, 2016), attached as Ex. 12 and available at http://www.nytimes.com/2016/03/23/science/global-warming-sea-level-carbon-dioxide-emissions.html?_r=1 (last viewed Apr. 12, 2016).

[24]  Climate Change 2013: The Physical Science Basis, Contribution of Working Group I to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change (Thomas Stocker et al., eds. 2013), available at http://www.climatechange2013.org/images/report/WG1AR5_ALL_FINAL.pdf (last viewed Apr. 12, 2016).

that avoiding catastrophic climate change will require both a long-term strategy to reduce carbon dioxide emissions and *near-term action to mitigate methane and similar "accelerants" of climate change*.  As a 2013 article in the journal *Science* stated: "The only way to permanently slow warming is through lowering emissions of CO2.  The only way to minimize the peak warming this century is to reduce emissions of CO2 and [short-lived climate pollutants]," including methane.[25]

Because of methane's outsize role in near-term climate-forcing, this administration has specifically targeted methane pollution to address climate change.  In 2013, the White House published a climate strategy that concluded: "Curbing emissions of methane *is critical to our overall effort to address global climate change*."[26]  In 2014, the administration published a specific strategy to reduce methane pollution which specifically identified the need for voluntary and regulatory actions to limit methane emissions from coal mines.[27]  Last month, the U.S. and Canada signed a climate agreement which calls for significant methane reductions from the oil and gas sector.[28]

The need to address methane's damaging climate impacts spurred both BLM and EPA to propose regulations to limit the fugitive methane emissions form oil and gas operations.  EPA's 2015 proposed regulations specifically address methane's damaging climate impacts.[29]  BLM has issued draft rules that also address climate impacts.[30]  Neither EPA nor BLM declined to propose regulations because such rules would not make the polluters more wealthy.  Instead, both

---

[25]  J.K. Shoemaker et al., What Role for Short-Lived Climate Pollutants in Mitigation Policy? 342 Science 1323-24 (2013), attached as Ex. 13, and available at http://www-ramanathan.ucsd.edu/files/pr200.pdf (last viewed Apr. 12, 2016).

[26]  Executive Office of the President, The President's Climate Action Plan (June 2013), attached as Ex. 14, and available at https://www.whitehouse.gov/sites/default/files/image/president27sclimateactionplan.pdf (last viewed Apr. 12, 2016).

[27]  The White House, Climate Action Plan, Strategy to Reduce Methane Emissions (Mar. 2014), attached as Ex. 15, and available at https://www.whitehouse.gov/sites/default/files/strategy_to_reduce_methane_emissions_2014-03-28_final.pdf (last viewed Apr. 12, 2016).

[28]  The White House, U.S.-Canada Joint Statement on Climate, Energy, and Arctic Leadership (Mar. 10, 2016), attached as Ex. 16, and available at https://www.whitehouse.gov/the-press-office/2016/03/10/us-canada-joint-statement-climate-energy-and-arctic-leadership (last viewed Apr. 12, 2016).

[29]  EPA, Proposed Rule, Oil and Natural Gas Sector, 80 Fed. Reg. 56,593, 56,598 (Sep. 18, 2015), attached as Ex. 17, and available at https://www.gpo.gov/fdsys/pkg/FR-2015-09-18/pdf/2015-21023.pdf (last viewed Apr. 12, 2016).

[30]  BLM, Proposed Rule, Waste Prevention, Production Subject to Royalties, and Resource Conservation, 81 Fed. Reg. 6616, 6617 (Feb. 8, 2016), attached as Ex. 18, and available at https://www.gpo.gov/fdsys/pkg/FR-2016-02-08/pdf/2016-01865.pdf (last viewed Apr. 12, 2016).

agencies concluded that reducing methane pollution would have significant social benefits, based in large part on the significant social cost of methane and/or carbon in continuing to permit unnecessary methane releases.[31]

Second, science that has emerged since 2012 demonstrates that an abrupt shift in sea-level rises and other climate-induced changes – climate "tipping points" – are likely to occur within decades unless climate emissions are reduced quickly, making more urgent the need to reduce methane emissions.  For example, a recent report concludes the collapse of the West Antarctic ice sheet is likely, and could result in catastrophic sea level rise this century unless climate emissions are significantly reduced.[32]  In the recent peer-reviewed article, esteemed climate scientist James Hansen describes climate tipping points in stark terms: "a point will be reached at which it is impossible to avoid large-scale ice sheet disintegration with sea level rise of at least several meters. The economic and social cost of losing functionality of all coastal cities is practically incalculable."[33]

The U.S. Environmental Protection Agency also recently filed sworn declarations in federal court from Dr. Christopher Field, a climate scientist with more than two decades of experience studying climate change, attesting to the critical importance of immediately reducing greenhouse gas emissions.  In defending the Clean Power Plan and the urgent need to take meaningful action on climate change, Dr. Field's declaration explains that "the window for cost effective action" to prevent the worst harms from climate change "is narrow and rapidly closing . . . *any delay in reducing emissions, even by a few years, puts the world in the crosshairs for risks that are systematically more grave, more complicated, and more diverse.*"[34]  Dr. Fields identifies increases in heat waves, heavy precipitation, severe drought, sea level rise and coastal flooding, catastrophic western wildfires, strong hurricanes, among other impacts.[35]

---

[31]  EPA, Proposed Rule, Oil and Natural Gas Sector (Ex. 17). 80 Fed. Reg. at 56,657; BLM, Proposed Rule, Waste Prevention (Ex. 18), 81 Fed Reg. at 6670-71; BLM, Regulatory Impact Analysis for Revisions to Onshore Oil and Gas Leasing (Jan. 14, 2016) at 32, 130-49, attached as Ex. 19, and available at http://www.blm.gov/style/medialib/blm/wo/Communications_Directorate/public_affairs/news_release_attachments.Par.11216.File.dat/VF%20Regulatory%20Impact%20Analysis.pdf (last viewed Apr. 12, 2016).

[32]  J. Gillis, NY Times, "Climate Model Predicts West Antarctic Ice Sheet Could Melt Rapidly," (Mar. 30, 2016), attached as Ex. 20, and available at http://www.nytimes.com/2016/03/31/science/global-warming-antarctica-ice-sheet-sea-level-rise.html (last viewed Apr. 12, 2016).

[33]  James Hansen, et al., *Ice melt, sea level rise and superstorms*, Atmos. Chem. Phys., 16, 3761, (2016), attached as Ex. 21.

[34]  Declaration of Christopher B. Field, *West Virginia v. EPA*, D.C. Cir. Case # 15-1363, Doc. 1586661, at 1-2 (Dec. 3, 2015) (emphasis added), attached as Ex. 22.

[35]  *Id.* at 2-10.

Dr. Fields further explains that "[t]he world is approaching dangerous but poorly known emissions thresholds, *beyond which massive changes could become unstoppable*."[36]  The U.S. EPA's official position, stated in federal court, is that if greenhouse gas pollution forces the climate over these tipping points, three critical and irreversible changes would likely occur and would cause devastating consequences:

- **Loss of major ice sheets:** two massive ice sheets, the Greenland Ice Sheet and the West Antarctic Ice Sheet, are at risk of crossing a tipping point leading to irreversible melting. Per Dr. Fields, "Once melting passes the tipping point, it is effectively irreversible, because melting lowers the surface elevation, move the ice surface into progressively warmer elevation zones."  The loss of either ice sheet would cause "large areas of land [to] disappear, including substantial parts of Alaska, Florida, Louisiana, Maryland, North Carolina, and Texas."[37]

- **Commitment to mass extinction:** Risks from a changing climate and an acidifying ocean often amplify pressures on species, including those from land use, invasive species, air and water pollution, and hunting and fishing.  Some studies indicate that we may already be in the early stages of a mass extinction of plants and animals that would shape the Earth's biological prospects for millions of years.[38]

- **Initiation of "vicious-cycle" warming:** There is a risk that, at some level of warming, the natural process whereby plants absorb carbon dioxide and remove it from the atmosphere will change direction and plants will start releasing carbon.  This would cause a vicious cycle, where warming triggers release of carbon dioxide or methane into the atmosphere, which then of course further exacerbates warming.[39]

Any supplemental EIS must take this information – and the immediate need to curb climate pollution – into account.

Third, the GMUG National Forest itself has concluded that climate change is a growing threat to this very forest, and to the Sunset Roadless Area's ecology, demonstrating the connection between land management and the need for prompt climate action.  In February 2016, the GMUG issued its Final EIS for the "Spruce Beetle Epidemic and Aspen Decline Management Response," or SBEADMR.[40]  The proposal is a response to drought- and insect-induced mortality across a substantial portion of the forest, mortality driven in part by a warmer climate.

---

[36] *Id.* at 10 (emphasis added).

[37] *Id.* at 10-11.

[38] *Id.* at 11.

[39] *Id.* at 12-13.

[40] U.S. Forest Service, Spruce Beetle Epidemic and Aspen Decline Management Response, Final EIS (Feb. 2016), attached as Ex. 23, and available at http://a123.g.akamai.net/7/123/11558/abc123/forestservic.download.akamai.com/11558/www/nepa/96623_FSPLT3_2720775.pdf (last viewed Apr. 12, 2016).

The SBEADMR Final FEIS explains the management challenges climate change is posing, and will likely continue to pose in the future:

> [T]hese disturbances [aspen and spruce mortality] are occurring in the context of a changing climate.  Over the past 100 years, Southwestern Colorado temperatures have increased, and modeled climate projections for the region include warmer and longer frost-free summers, snowline moving up in elevation, earlier snowmelt, and consequently, a longer fire season.
>
> Due to predicted warming, spruce beetle outbreaks could be more likely in the future.  Higher summer temperatures can foster spruce beetle outbreaks by allowing beetles to reproduce every year rather than every two years (Bentz et al. 2010).  Additionally, anticipated more frequent drought conditions place water-stressed stands at greater risk of insect and disease.
>
> Climate changes could lead to larger fires and possibly fire with more high-severity area than in previous decades (Westerling et al. 2006, Agee 2007, Funk 2012).  Modeled climate scenarios for the Gunnison Basin by 2035 indicate potential for the fire season to increase by one month; for fire frequency in high-elevation forests to increase from 4 to 12 times as often as experienced between 1971-2000; and for fire extent to increase from 6 to 11 times the extent burned between 1971-2000.  These scenarios model severity and frequency irrespective of tree mortality (Rangwala and Rondeau, *Southwest Colorado Social-Ecological Climate Resilience (SECR) Project*) [2013].[41]

The SBEADMR analysis predicts that as a result of climate change there will be "little remaining habitat for spruce on the Uncompahgre Plateau, and substantial loss in the West Elk Mountains, east of Grand Mesa, and south of the Black Canyon/Blue Mesa Reservoir" by 2060.  "[I]f no forest management action is taken, it will most likely result in the gradual conversion of spruce forests in 'lost' and threatened zones to other forest and non-forest cover types (Rehfeldt, et al., 2015)."[42]  Similarly, for aspen, "[l]ittle suitable habitat is expected to remain on the Uncompahgre Plateau, the southern and eastern fringes of the Grand Mesa, and the western West Elks" (the location of the Lease Modifications) by 2060 due to climatic warming.[43] "[C]onditions projected for 2060 could occur sooner if [global GHG] emissions are higher than projected."[44]

Given the threat climate change poses to humanity and the globe, and to the GMUG National Forest specifically, and the need for urgent action to reduce methane emissions (and coal combustion) that are exacerbating that threat, it is imperative that the Forest Service evaluate in full alternatives to reduce methane and carbon emissions from the Lease Modifications, and to

---

[41] *Id.* at 2-3.

[42] *Id.* at 10.

[43] *Id.* at 17.

[44] *Id.* at 18.

propose to adopt mitigation measures that do the same. To do otherwise is for the Forest to ignore its own contribution to a problem that is currently requiring the Forest to respond to with a significant investment of staff time and funds.

Despite the urgent need to address methane pollution, the Forest Service dismisses without detailed consideration at least two alternatives and ignores others that could limit such pollution.[45] We urge the Forest Service to consider in detail at least three alternatives aimed at reducing the climate damage of the proposed lease modifications.

> 1.     **The Forest Service Must Analyze Oxidation Of Ventilation Air Methane As A Reasonable Alternative To Reduce The Lease's Methane Pollution.**

The Forest Service predicts that Lease Modifications will prolong the West Elk mine's life for over 2.5 years.[46] Methane pollution from the mine's ventilation system, and from vents constructed within the area, will thus continue for that period. A substantial portion of methane emissions from approving the Lease Modifications will likely be from the mine's ventilation system. This methane pollution, known as ventilation air methane (VAM), is distinct from methane removed by methane drainage wells (MDWs). VAM makes up over half of all coal mining emissions in the United States and worldwide; data from the West Elk Mine from early 2010 showed that VAM constituted about half of the mine's total of 7.5 million cubic feet of daily methane emissions.[47]

VAM mitigation measures are technically and economically feasible. Such measures have been adopted at coal mines elsewhere in the United States and around the world.[48] VAM cannot be flared because the concentrations of methane in ventilation air are too dilute, so other technologies must be used to combust VAM. EPA and others report, however, that technology is

---

[45]  2016 Lease Modifications Fed. Reg. Notice, 81 Fed. Reg. at 8903-04 (declining to analyze in detail: (1) an alternative requiring mitigation of greenhouse gas emissions by utilization or combustion of ventilation air methane; and (2) an alternative requiring mitigation of greenhouse gas emissions by requiring Arch Coal to purchase carbon offsets).

[46]  2016 Lease Modifications Fed. Reg. Notice, 81 Fed. Reg. at 8901 (predicting that "approval of these lease modifications may extend the life of the existing West Elk Mine by approximately 1.4 years and provides underground access to existing privately-owned (fee) and other federal coal reserves which could extend the life of the mine by an additional 1.3 years," for a total of 2.7 years. The Forest Service must explain why it now predicts an extension of mine life by 2.7 years when in 2012 it predicted the lease modifications "would extend the life of the West Elk Mine by approximately 2.9 years." 2012 Lease Modifications Final EIS at 54 (Alternative 3).

[47]  *See* Mountain Coal Co., First Quarter 2010 Methane Release Data (May 3, 2010), attached as Ex. 24.

[48]  *See, e.g.,* J.M. Somers & H.L. Schultz, *Coal mine ventilation air emissions: project development planning and mitigation technologies* 116-21 (2010), attached as Ex. 25.

available and is being successfully employed to reduce 95% or more of VAM emissions from numerous coal mines.[49]

For example, according to a comment letter submitted by Durr Systems to BLM on that agency's Advanced Notice of Proposed Rulemaking on methane released from underground coal mines on public lands, Durr Systems highlighted its VAM abatement process at the McElroy coal mine in West Virginia.[50] The VAM abatement system at McElroy releases waste heat from methane destruction/oxidation into the environment, but it can be processed in a boiler and steam turbine to produce electric power.

As explained by Durr, the technology used to process methane depends on the concentration.[51] For low methane concentration, regenerative thermal oxidation (RTO) technology can be utilized for methane concentrations below 1.2%, which are typical of VAM streams. VAM collects in a capture hood on the outlet of the vent shaft. The infrastructure and design features of the capture hood facilitate seamless interaction with the vent fan. Centrifugal fans create a force to pull VAM from the capture hood for processing. The RTO system oxidizes collected methane at an efficiency of 96% to 97%, requires no additional fuel source during normal operation, and can generate up to 25% excess heat at 1750F for electric power generation.[52]

For medium to high methane concentrations (above 30%), Micro Gas Turbine Technology can be utilized, which has several operational benefits. Micro gas turbine technology can process heat to generate electricity, while employing destruction technology with low emissions (NOx and CO below 15 ppm). Durr notes that this technology meets high safety requirements for methane capture and destruction, has easy operation and low operation costs, is low maintenance, requires minimum space requirements and has a simple and easy installation.[53]

EPA's Coalbed Methane Outreach Project has identified at least four VAM oxidation projects that are completed, underway, or planned across the United States that utilize oxidation to eliminate VAM.[54] EPA has also compiled additional examples of technologies that use or

---

[49] *See, e.g.*, Durr Envtl. & Energy Sys., *Securing Your VAM Investment with Proper RTO Technology* 4 (2010), attached as Ex. 26; EPA, *Ventilation Air Methane (VAM) Utilization Technologies* (2009), attached as Ex. 27; Deborah A. Kosmack, *Capture and Use of Coal Mine Ventilation Air Methane* 79 (2009), excerpts attached as Ex. 28; letter of S. Bohan EPA to S. Hazelhurst, GMUG NF (July 11, 2012) at 5-6 (listing three mines utilizing VAM oxidation technologies in the U.S., and noting that 10 more overseas use such pollution controls) (hereafter "EPA July 2012 Comment Letter"), attached as Ex. 29.

[50] Letter of W. Hagendorf-Schroter, DURR to BLM (June 30, 2014) (hereafter "DURR 2014 ANPR Comment Letter"), attached as Ex. 30.

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] Pamela Franklin *et al.*, EPA, *EPA Activities to Promote Coal Mine Methane Recovery*, at unnumbered slide 5 (2010), attached as Ex. 31. The four projects include: the CONSOL

destroy VAM in coal mines in the U.S. and around the world.[55]  For example, a coal mine in
Australia uses VAM to generate power, and at least five VAM projects in China were scheduled
to begin operations before 2015, including a project that will generate electricity from VAM.[56]

The Forest Service must consider "*all possible approaches* to, and potential environmental
impacts of, a particular project." *Wilderness Soc'y v. Wisely*, 524 F. Supp. 2d 1285, 1309 (D.
Colo. 2007) (emphasis added).  Granting lease applicant Mountain Coal Co. (MCC), an Arch
subsidiary, consent for the Lease Modifications while *requiring* MCC to put in place VAM
controls on its ventilation system to reduce methane emissions clearly represents one possible,
reasonable approach to MCC's request for the lease expansions.  These technologies and controls
are "alternatives" to the proposed action – they would, when combined with the proposed action,
achieve the basic aims of the proposed action by different means, while eliminating or lessening
the adverse environmental consequences of that action.

Despite the multiple examples of successful VAM mitigation measures, the Forest Service states
that it will not study in detail such an alternative, just as it eliminated from detailed study an
alternative that would require MCC to mitigate or eliminate VAM emissions in the 2012 EIS.[57]
Data and independent research demonstrate that VAM reduction technologies may likely be
technically feasible at the West Elk Mine.  Data prepared for MCC shows that the Mine is
producing methane in sufficient concentrations to operate a VAM oxidizer at least part of the
time.  These data show methane concentrations ranging from 0.15% to 0.31%.[58]  While in
general, the higher the methane concentration the *more economical* VAM becomes, VAM
oxidizers are proven to operate reliably at concentrations as low as 0.2%.

---

Windsor Mine (closed) (MEGTEC vocsidizer); Jim Walter Resources Mine No. 4 (Biothermica
VAMOX); CONSOL McElroy mine in West Virginia (Durr Ecopure technology) – to go online
in the second quarter of 2011; and CONSOL Enlow Fork mine in Pennsylvania – scheduled to be
operational in late 2010.  Further, as explained below, MSHA data demonstrates that VAM
oxidation is likely technically feasible at the Elk Creek Mine.  *See* EPA, *U.S. Underground Coal
Mine VAM Exhaust Characterization* 1, 11, attached as Ex. 32.

[55]  EPA, *VAM Utilization Technologies* at 1-4 (Ex. 27).

[56]  *See, e.g.*, BHP Billiton, World's First Power Plant to Use Coal Mine Ventilation Air as Fuel,
attached as Ex. 33; EPA, Coalbed Methane Extra, Summer 2010, at 4, attached as Ex. 34; EPA,
Coalbed Methane Extra, Dec. 2009, at 2, attached as Ex. 35; Letter of E. Zukoski, Earthjustice,
to C. Richmond, GMUG NF (May 20, 2010) at 91 ("2010 Conservation Scoping Letter"),
attached as Ex. 36.

[57]  2016 Lease Modifications Fed. Reg. Notice, 81 Fed. Reg. at 8903-04; 2012 Lease
Modifications Final EIS at 37-38.

[58]  2012 Lease Modifications Final EIS at 69.  *See also* Verdeo Group, Inc., *Ventilation Air
Methane Oxidation Feasibility Study: Evaluation of Technical and Economic Project Viability at
the West Elk Mine*, at 3, 9 (September 2009), attached as Ex. 37; MCC, *West Elk Mine E-Seam
Gas Economic Evaluation Report*, at 17 (Sept. 24, 2009) ("R2P2"), attached as Ex. 38.

For example, an EPA report dated 2010 concluded that "one technology (the thermal flow-reversal reactor or TFRR) has been proven to operate reliably on VAM, even at concentrations as low as 0.2 percent."[59]  MEGTEC's brochure states that its VAM destruction technology can generate heat or energy with volumes as low as 0.3% methane, and at varying volumes of VAM. Modular systems allow a mine to purchase the right number of VAM oxidizers for the volume of VAM for which the VAM wishes to remediate methane pollution.[60]  Biothermica states that its "VAMOX" VAM destruction system "[a]ccepts a broad methane level range (0.2% to more than 1%)."[61]  Further, a 2010 study prepared by Ph.D. economist Thomas Power suggests that the low level of methane in West Elk's VAM may be a transitory phenomenon, and that there may be ways MCC can alter its ventilation system to produce VAM at concentrations that could be combusted.[62]  EPA agrees with both of Dr. Power's conclusions, urging the Forest Service to undertake a reevaluation that addresses the options of boosting methane levels in VAM, and that determines whether the 2009 data concerning VAM methane concentrations remain accurate.[63]

The Forest Service's justifications for declining to study in detail requiring the use of VAM reduction technology all lack support.  The 2016 notice of intent states that "no technology currently exists that has been demonstrated to have the capability of handling the volume of methane air and dilute concentrations of methane at the West Elk Mine to make capture economically feasible."[64]  This assertion is wrong for at least three reasons.  First, MEGTEC has explained that its VAM oxidation system can be expanded with additional units to handle greater volumes of VAM.[65]  EPA has agreed that this is so.[66]  Technology therefore exists that can

---

[59] EPA, *U.S. Underground Coal Mine VAM Exhaust Characterization* at 1 (Ex. 32).  *See also id.* at 13 ("If the concentration of methane entering flow-reversal reactors is high enough (i.e. $\geq 0.2$ percent), the proper amount of heat will be released into the oxidizer bed to support ongoing auto-oxidation of incoming VAM without the need for any supplemental fuel."); J.M. Somers & H.L. Schultz (Ex. 25) at 120 (showing 6 technologies that oxidize VAM where methane concentrations are 0.25% or lower).

[60] MEGTEC, Ventilation Air Methane (VAM) Processing, MEGTEC Solutions for VAM Abatement, Energy Recovery & Utilization, attached as Ex. 39, and available at http://www.megtec.com/documents/MEGTEC%20Ventilation%20Air%20Methane%20(VAM)%20Processing.pdf (last viewed Apr. 12, 2016).

[61] Biothermica, VAMOX, Create Value from VAM, attached as Ex. 40.

[62] *See* Power Consulting, An Economic Analysis of the Capture and Use of Coal Mine (Jan. 7, 2010) at 22-23 (hereafter "Power 2010 Report"), attached as Ex. 41.

[63] EPA July 2012 Comment Letter (Ex. 29) at 6.

[64] 2016 Lease Modifications Fed. Reg. Notice, 81 Fed. Reg. at 8903.  *See also* 2012 Lease Modifications Final EIS at 37 (dismissing VAM alternative and mitigation for same reason).

[65] MEGTEC (Ex. 40) ("The MEGTEC VAM solution is modular, based on VOCSIDIZER Twin Units with a capacity of handling 125,000 Nm3/h (80,000 scfm) of ventilation air.  Larger installations are multiples of VAM Cubes, where the twin units are installed on two levels" (emphasis added); id. (table showing 4 VAM Cubes can process 1,000,000 normal cubic meters per hour of ventilation air, or 640,000 standard cubic feet per minute).  Using this system, larger

handle the volume of ventilation air at West Elk.  Further, the mine need not treat all of the ventilation air.  It could simply oxidize *some* of the VAM.

Second, existing technology and strategies could address the dilute concentrations of methane, including supplementing the methane that is emitted as VAM and only oxidizing methane when the concentration exceeds 0.2%.[67]

Third, there is no reason why the Forest Service must make VAM technology economically attractive to Arch Coal.  The Forest Service can simply require the lease applicant to reduce methane pollution from VAM to protect Forest Service surface resources currently being damaged by climate change.  We note that neither BLM nor EPA in their oil and gas rulemakings conditioned their proposals on regulation being financially attractive to the regulated industry.

Much has changed in recent years with respect to both the financial and technological feasibility of VAM mitigation.  Regarding economics, the 2009 report prepared by the Mountain Coal Company (MCC) evaluating the economics of methane mitigation, and upon which the Forest Service has relied to dismiss the financial feasibility of VAM mitigation, was flawed to begin with.[68]  The economic bases for the report were challenged in 2010 by a report prepared by Dr. Tom Power.[69]  The Forest Service *never directly acknowledged or responded to that report* in

---

volumes of VAM could be handled by additional units.

[66] In July 2012, EPA told the Forest Service that: "The commercial availability and regulatory acceptance of technologies for oxidation of VAM has improved since the 2009 Report" in which the Mountain Coal Company rejected the use of VAM.  EPA July 2012 Comment Letter (Ex. 29) at 5.  *See also id.* at 5-6 (describing industry developments in VAM oxidation since 2009).  In dismissing VAM oxidation alternatives, the Forest Service also asserts that "no technology currently exists that has been demonstrated to have the capability of handling the volume of ventilation air" emitted at West Elk.  2016 Lease Modifications Fed. Reg. Notice, 81 Fed. Reg. at 8903.  *See also* 2012 Lease Modifications Final EIS at 37 (same).  EPA's 2012 letter disputed that conclusion, stating:  "VAM oxidizers are capable of handling very large air volumes.  The units are modular and multiple units can be configured to handle the appropriate ventilation flow rates."  EPA July 2012 Comment Letter (Ex. 29) at 5.  EPA clearly has expertise in the area of methane pollution abatement, given that it regulates greenhouse gases and runs the Coalbed Methane Outreach Program, the mission of which is to encourage the capture, use, or destruction of coal mine methane.

[67] *See supra* at 21.

[68] *See* Mountain Coal Company, West Elk E Seam Gas Economic Evaluation Report (Sep. 24, 2009), attached as Appendix A to 2012 Lease Modifications Final EIS.

[69] Power 2010 Report (Ex. 41)

prior NEPA reviews, which is a reversible error.  The supplemental EIS must therefore review and directly respond to Dr. Power's expert analysis and conclusions from his 2010 report.[70]

Further, a report prepared by the State of Colorado last month details recent changes in state and federal regulation of power that has improved the financing environment for coal mine methane mitigation and power projects.[71]  The report notes that a 2015 FERC ruling may make it easier for coal mines, including West Elk, to sell power produced from coal mine methane to utilities:

> On June 18, 2015, FERC issued an Order in Delta-Montrose Electric Association (DMEA), EL15-43-000, stating that DMEA was required under PURPA to purchase power from a qualifying facility (to-be-built) in its service area notwithstanding any conflicting provisions DMEA may have in its power supply contract with Tri-State Generation and Transmission Association, Inc. (Tri-State).  FERC's decision could enable CMM [coal mine methane] project developers to overcome industry barriers by securing reasonable power supply contracts with utilities in Tri-State's service area in western Colorado, where most of the "high value" CMM emission targets are located.

> A major benefit of being a qualifying facility under PURPA is that the project developer may have the right to sell energy or its capacity to the host utility for either the utilities "avoided costs" or a negotiated rate.  "Avoided costs" are the incremental costs the host utility would otherwise incur to generate or purchase the power from another source.  Typically, the state public utilities commission establishes the method for calculating avoided costs (18 CFR §§ 292.101 (b)(6) (2015)).[72]

The State of Colorado report also highlights that changes in state law have made coal mine methane mitigation projects attractive to finance by declaring them "eligible energy resources" under the state's renewable Energy Standard (RES):

> At the state level, Colorado's RES requires qualifying retail service providers, cooperative electric associations, and municipally owned utilities to achieve percentage targets for generating electricity sales from "eligible energy resources" that now include CMM.  The State's RES requirements are coupled with a range of possible incentives to make near-term eligible energy resource project development commercially feasible.  Depending on the specific circumstances for

---

[70] *See, e.g., High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1198 (D. Colo. 2014) (finding Forest Service violated NEPA for failing to respond to another report of Dr. Power's regarding the impacts of North Fork coal mining).

[71] State of Colorado, Coal Mine Methane in Colorado, Market Research Report (Mar. 2016), attached as Ex. 42, and available at https://www.colorado.gov/pacific/sites/default/files/atoms/files/Coal%20Mine%20Methane%20Report%202016%20FINAL%203_2016.pdf (last viewed Apr. 12, 2016).

[72] *Id.* at 13-14.

each CMM project developed with a qualifying retail utility, potential incentives may include, among other things: (i) accelerated cost recovery; (ii) opportunities for the qualifying retail utility to earn extra profit or its most recent authorized rate of return; or (iii) retail rates sufficient to recover all just and reasonable costs associate with an eligible energy resource contract. *The combination of federal and state requirements coupled with the right incentives provides an important synergy in promoting CMM recovery and use for power generation.*[73]

While the State of Colorado report notes that barriers exist to the use of VAM to generate electricity at Colorado mines, the report concludes that there is a potential to generate 17.4 megawatts of electricity from VAM at West Elk, and concludes that it is technically feasible to produce 20% of that amount or 3.49 megawatts of power.[74]

Neither the 2009 MCC economic report nor the 2012 Lease Modifications Final EIS addresses the changes in federal and state law that make the sale of power from coal mine methane mitigation projects more attractive and feasible. Nor has the Forest Service addressed the State of Colorado's conclusion that generating power from a portion of the VAM at West Elk is technically feasible. The Forest Service must address this significant new information in any supplemental EIS.

Further, since the Forest Service approved the vacated 2012 Lease Modification ROD, California has implemented a mine methane protocol that allows California business to purchase carbon credits from out-of-state coal mines that capture or flare methane. Five different mines have registered and sold credits into the market, reducing carbon emissions by tens of thousands of tons of CO2-e. The success of this program indicates that third-party financing may be available to mitigate methane impacts at West Elk. Any supplemental EIS must address this development.

The following chart, compiled using information from the California Air Resources Board's website, provides a description of each project, its location, the mine owner, the methane capture or flare technology used, the amount of CO2 not emitted into the atmosphere as a result of the project, and the amount of CO2-e not captured for flared.

---

[73] *Id.* at 14.

[74] *Id.* at Appendix D, page 38.

Letter to Supervisor Armentrout re: Coal Lease Modifications COC-1262 & COC-67232          Page 25
April 12, 2016

| Name | Location | Owner | Technology Used | Project Description | CO2 captured/ flared[75] |
|---|---|---|---|---|---|
| Verdeo Marshall County VAM Abatement project | Glen Easten Northern Appalachian (WV) | Verdeo McElroy, LLC/ Murray Energy | VAM and RTOs, capture VAM and destroy through RTOs | VAM will be directed through capture system, routed to 3 RTOs which can sustain temperatures able to destroy 95% of the methane in VAM. | Offset Credits: 280,667 |
| VAMOX® Demonstration Project at JWR Shaft No. 4-9 | Brookwood, AL | Biothermica Coal Carbon Inc | Capture VAM and destroy using RTOs | The project activity involves the use of a 30,000 scfm VAMOX® regenerative thermal oxidation demonstration unit to destroy a portion of the GHG emissions from JWR's shaft No. 4-9. The VAMOX® is Biothermica's proprietary technology for the oxidation of underground coal mine ventilation air methane emissions. | Total Emission Reductions: 10,379 CO2e metric tons |
| Verdeo McElroy Abatement Project | McElroy Mine, Cameron, Marshall County (WV) | Verdeo McElroy, LLC | Capture VAM and destroy using RTOs | The McElroy Mine is the largest underground coal mine in West Virginia and the third largest active underground coal mine in the U.S. In an effort to reduce greenhouse gas emissions that are currently vented to atmosphere from the ventilation system, Verdeo Group is working with CONSOL Energy to develop a project to abate ventilation air methane (VAM) from a new bleeder shaft (11A-5 North) under development at the McElroy Mine using regenerative thermal oxidation technology. | Total Emission Reductions (2012): 44,583 CO2e metric tons |

---

[75] Data for table available from
http://www.arb.ca.gov/cc/capandtrade/offsets/issuance/arb_offset_credit_issuance_table.pdf (last viewed Apr. 8, 2016).

| | | | | | |
|---|---|---|---|---|---|
| Cambria 33 Abandoned Mine Methane Capture and Use Project | Ebensburg, PA | Vessel Coal Gas, Inc | Gob wells, vacuum pumps to pull up gas from bore hole, compressor increases gas pressure to 100 psi and deliver to molecular sieve which separates gases. Removes impure gases leaving pipeline quality methane. High quality methane gas can be injected into pipeline. | The proposed Cambria 33 project consists of capturing methane gas that, prior to the project initiation, was being emitted into the atmosphere due to safety considerations at the retired "B" seam of coal in the Cambria 33 mine, which underlies 8,000 acres of property near the Township of Ebensburg, Pennsylvania.**5** | Total reductions for 2014: 24,729 CO2e metric tonnes |
| Coal Mine Methane Capture and Use Project at the North Antelope Rochelle Coal Mine Complex | North Antelope mine complex, Wyoming | Peabody Natural Gas, LLC | Well drilling, dewatering pumps, pipeline gathering system, compressors, equipment maintenance. | PNG has made substantial investments to develop An appropriate pre-drainage mining plan and build the necessary infrastructure to produce, compress, meter, and transport the methane to the nearest natural gas pipeline. A total of 47 wells were drilled within the mine lease boundary to capture methane from the coal prior to mining. This methane is compressed and transported to a natural gas pipeline where it is distributed to a national natural gas grid for use as fuel. Up to a total of 1,300 hp of compression was installed by PNG for this project. | For 2007: 218,410 CO2e metric tonnes |
| Corinth Abandoned Mine Complex | Jefferson, Franklin and Williamson Counties, IL | Keyrock Energy, LLC | Pipeline-gas transport, gas processing plant, compressors, extraction wells, delivery to commercial natural gas pipeline | Methane extracted using compressor stations, transported via pipeline to gas processing plant. During gas processing contaminants including nitrogen, carbon dioxide, oxygen and hydrogen sulfide are removed from methane gas. | For 2014: 133,651 CO2e metric tonnes |
| North Antelope Rochelle Mine CMM Capture and Use Project: Phase 1I-Porcupine Project | Campbell County, WY | Peabody Natural Gas, LNG | Wells, water pumps, transport to gas and water gathering systems | The Porcupine Project consists of 26 CMM extraction wells together with gas and water gathering systems and related infrastructure required for the production and delivery of methane to a commercial gas pipeline. | For 2009-2010: 135,102 CO2e metric tonnes |

In addition, technology has improved since the 2012 Lease Modifications ROD.  One study concludes that methane can be captured or enriched even at very low concentrations.  The study found that "[r]egardless of inlet VAM concentrations, methane was captured at almost 100%."[76]

We note that the 2012 Lease Modifications Final EIS also purported to address VAM pollution control as a mitigation measure.  The Forest Service's analysis there was equally flawed, and its rationales for giving VAM pollution control short shrift are equally baseless.  First, the EIS pleaded ignorance as to how a VAM system would be designed.[77]  This ignores the fact that it is the Forest Service's duty to explore options and obtain information, not simply to rely on its own ignorance of a particular topic to dismiss an alternative.  Obtaining such information would not be difficult, given that other mines in the U.S. (and around the world) have designed and operated such systems.  The Forest Service can easily contact any or all of the numerous vendors known to install such systems, and review the terrain and layout of MCC's mining operations.  We encourage the Forest Service to do just that to ensure that it takes the "hard look" NEPA requires.

Second, the Forest Service alleged that it "is unknown and unforeseeable ... what those [VAM pollution control] scenarios might look like at the West Elk mine or more specifically if they would be economically beneficial to the mine or the greater public."[78]  Again, alternatives incorporating pollution control measures need not economically benefit the lease holder to be reasonable or to be fully disclosed, analyzed, and adopted by the agency.  The 2012 Lease Modifications Final EIS provides no explanation for why it assumes MCC must profit from mitigating pollution it would otherwise emit.  And again, the Forest Service cannot base dismissal of an alternative on grounds of ignorance.  Further, an expert economist found that MCC's conclusions about the economic feasibility of mitigation measures were based on flawed assumptions.[79]

Third, the 2012 Lease Modifications Final EIS asserted that VAM oxidation will result in pollution, including $CO_2$, and criteria pollutants.[80]  This contention does not justify the elimination of an otherwise reasonable alternative.  The EIS provides no information on the nature or extent of criteria pollutant emissions that might result from VAM oxidation, nor does it explain why the Forest Service could not provide such information to the public.  In contrast, the Forest Service and the public know that VAM would reduce and mitigate hundreds of thousands

---

[76]  Jun-Seok Bae *et al., Enrichment of Ventilation Air Methane (VAM) with Carbon Fiber Composites*, Environmental Science & Technology 2014 48 (10), 6043-6049, abstract attached as Ex. 43, and available at http://pubs.acs.org/doi/abs/10.1021/es500025c (last viewed Apr. 12, 2016).

[77]  2012 Lease Modifications Final EIS at 69 ("The design of such [VAM oxidation] units *may* ultimately be ineffective for total VAM oxidation *if* space is an issue, or *if* vent configuration is not conducive to efficient engineering standards" (emphasis added)).

[78]  2012 Lease Modifications Final EIS at 69.

[79]  *See* Power 2010 Report (Ex. 41).

[80]  2012 Lease Modifications Final EIS at 69.

of tons of $CO_2e$ pollution annually, which would have concrete climate benefits. Without more detailed information concerning the potential levels of criteria air pollutants, it is impossible for the Forest Service or the public to weigh the climate benefits of VAM oxidation against VAM oxidation's potential air pollution impacts. In the supplemental EIS, the Forest Service must correct these errors.

Any suggestion that VAM oxidation is unreasonable because of criteria pollutant and $CO_2$ pollution is undermined by the fact that EPA – the federal agency responsible for regulating criteria air pollutants and GHG emissions – has an entire program dedicated to reducing coal mine methane emissions in part through VAM oxidation.[81]  EPA has urged agencies – including encouraging the Forest Service with respect to *this very mine* – to analyze VAM oxidation in EISs and EAs analyzing Colorado mine expansions. For these reasons, the Forest Service must analyze a VAM pollution control alternative in detail.

> ## 2.   The Forest Service Must Analyze Carbon Offsets As A Reasonable Alternative To Reduce The Lease's Methane Pollution.

Carbon offsets are a tested, feasible, and practical alternative to allowing the West Elk Mine to vent millions of cubic feet of methane into the atmosphere every day as a result of the Lease Modifications without mitigation or control, or with incomplete mitigation or control.

EPA has repeatedly urged land management agencies to assess carbon offsets in EAs and EISs as a way to reduce climate change impacts of agency actions. EPA has specifically noted that offsets are a reasonable alternative to lessen the impacts of coal mine methane emissions. In a 2007 letter concerning a proposal to permit MDWs at the West Elk Mine, EPA specifically rejected the Forest Service's assertion that a carbon offset alternative was not reasonable: "[I]t *is* reasonable to consider offset mitigation for the release of methane, as appropriate. Acquiring offsets to counter the greenhouse gas impacts of a particular project is something that *thousands of organizations, including private corporations, are doing today.*"[82]  EPA specifically recommended that the Forest Service's Lease Modifications EIS "acknowledge that revenues for carbon credits are available via several existing markets."[83]  Similarly, EPA has recommended that a Forest Service NEPA analysis of a forest health project "discuss reasonable alternatives and/or potential means to mitigate *or offset* the GHG emissions from the action."[84]  Numerous state agencies already use offsets to control GHG emissions.[85]

---

[81]  *See* EPA, Coalbed Methane Outreach Program, http://www.epa.gov/cmop/ (last viewed Apr. 12, 2016).

[82]  Letter of L. Svoboda, EPA to C. Richmond, Forest Service (Aug. 7, 2007) at 7 (emphasis added), attached as Ex. 44.

[83]  EPA July 2012 Comment Letter (Ex. 29) at 5 (identifying four U.S. carbon exchanges creating a market for carbon credits).

[84]  Letter of L. Svoboda, EPA, to T. Malecek, USFS, at 8 (Oct. 27, 2010), attached as Ex. 45.

[85]  *See, e.g.,* Settlement Agreement, ConocoPhillips and California (Sept. 10, 2007) (California agency requiring offsets as a condition of approving a project), attached as Ex. 46; Minn. Stat.

As EPA noted, many entities exist that permit agencies and polluters to purchase carbon offsets that are third-party verified. For example, the Carbon Fund and the Climate Action Reserve both allow entities to purchase carbon "credits." In 2009, the total U.S. carbon offset market was worth $74 million, with 19.4 million metric tons of $CO_2e$ in traded volume.[86]

The Forest Service rejects any analysis of the economic costs or the environmental benefits of requiring Arch to purchase carbon offsets by stating:

> [P]urchasing carbon credits is a voluntary financial investment that MCC may choose to entertain for business reasons. The federal agencies are not involved in any financial investment decisions that MCC makes as a corporation.[87]

This excuse for failing to analyze or adopt offsets lacks a rational basis. Federal agencies are deeply involved in decisions that impact lease-holder's investment decisions. Federal agencies require lease-holders to pay royalties, implement reclamation requirements, post bonds, conduct surveys, and any number of other mandates that require lease-holders to expend financial resources. BLM has required companies seeking to exploit oil and gas leases to fund numerous surveys for wildlife, cultural resources, and air quality.[88] Other agencies require those damaging wetlands to participate in wetlands mitigation banks.[89] The Forest Service has required mining companies to fund wildlife and law enforcement personnel, and measures to protect wildlife.[90]

An alternative that proposes that the Forest Service consent to MCC's proposed Lease Modifications to be conditioned upon MCC's purchase of carbon offsets would be consistent

---

§ 216H.03 subd. 4(b) (Minnesota law requiring offsets for certain new coal-fired power plants); Me. Rev. Stat. Ann. tit. 38, § 580-B(4)(c) (Maine law establishing greenhouse gas initiative that includes the use of carbon offsets).

[86] Point Carbon Research, *US Offset Markets in 2010: The Road Not Yet Taken* 1 (2010), attached as Ex. 47.

[87] 2016 Lease Modifications Fed. Reg. Notice, 81 Fed. Reg. at 8904. *See also* 2012 Lease Modifications Final EIS at 37 (same).

[88] *See, e.g.*, BLM, West Tavaputs Record of Decision, Attachment 2 (2010), attached as Ex. 48 (requiring oil and gas operators to fund, among other things: a "Class II cultural resource inventory;" "a research project" to determine the impact of dust on ancient rock art; "[r]aptor next surveys;" and "ground trothing exercises" to determine the value of Mexican spotted owl habitat); BLM, Jonah Infill Drilling Project Record of Decision, Appendix A (2006) at A-4 ("The Operators will fund and participate in a joint industry/state/federal monitoring agreement to maintain and enhance air quality monitoring."), attached as Ex. 49.

[89] See EPA, Mitigation Banking Fact Sheet, available at http://www.epa.gov/owow/wetlands/facts/fact16.html (last viewed Sep. 23, 2012), attached as Ex. 50.

[90] Kootenai National Forest, Record of Decision, Rock Creek Project (June 2003) at 29 (measures required to mitigate for mine's potential impacts grizzly bears), excerpts attached at Ex. 51.

with the proposed action's purpose and need. MCC would be able to obtain the lease modifications and expand its operations in the exact same manner as it proposed. A carbon offset alternative would simply require MCC to purchase carbon credits from a reputable vendor. Moreover, offsets do not present the Forest Service or MCC with an all-or-nothing scenario – the Forest Service could require MCC to offset less than 100% of the GHG emissions attributable to the Lease Modifications.

The Forest Service also states that while "off-set (or off-site) mitigations may be possible, they have not been brought forward for consideration related to this leasing analysis."[91] To the extent that the Forest Service implies that the purchase of carbon credits or offsets was not suggested during prior comment periods, that implication is false, since conservation groups suggested offset and off-site mitigation *six years ago*.[92] Further, as noted above, a number of programs exist from which MCC could buy carbon credits.

It is also unclear why, if an *exchange* exists, commentators must suggest a *specific* project for MCC to purchase to offset its carbon pollution. Further, the Forest Service itself previously identified a number of potential offsets for this very mine in 2008.[93]

The Forest Service's notice of intent also justifies its refusal to consider the reasonable, available alternative of requiring Arch to purchase carbon credits or offsets on the grounds that there is no Congressionally-mandated use of national offset markets or cap-and-trade program.[94] This justification lacks merit.

Although it is true that Congress has not passed a law requiring coal mining companies to participate in any of the available national offset markets, that does not excuse the Forest Service's from considering this proposed mitigation measure as a reasonable alternative. Neither this proposed alternative nor the use of offsets requires a mandatory national trading program created by Congress. There are several companies that provide the opportunity for the public to purchase retail carbon offsets sold in the voluntary market.[95] The process is straight-forward and could be utilized by coal companies that operate in Colorado. For example, here is how one company that sells voluntary carbon offsets describes its product: "Carbon offsets are purchased to . . . diminish the impact of your own GHG emissions . . . for emissions that are impossible to

---

[91] 2016 Lease Modifications Fed. Reg. Notice, 81 Fed. Reg. at 8904. *See also* 2012 Lease Modifications Final EIS at 37 (same).

[92] *See* 2010 Conservation Scoping Letter (Ex. 36) at 93-95.

[93] *See* Forest Service, Final EIS, Deer Creek Shaft and E Seam MDW Project (Aug. 2007) at 61 (addressing tree planting, replacing incandescent light bulbs with compact fluorescent bulbs, replacing SUVs with hybrids), excerpts attached as Ex. 52.

[94] 2016 Lease Modifications Fed. Reg. Notice, 81 Fed. Reg. at 8904.

[95] *See* http://www.green-e.org/getcert_ghg_products.shtml (last visited Apr. 12, 2016) (listing eight different retail carbon credit companies that receive independent credit verifications from Green-e), attached as Ex. 53.

reduce, you can use funds to help reduce emissions elsewhere."[96]  There is not valid reason for
the Forest Service to exclude this reasonable alternative simply because Congress has not
established a national carbon cap-and-trade program.

Finally, coal mine methane has been included in several other voluntary emission reduction
strategies that would make methane flaring or capture in the North Fork region more economical.
The Climate Action Reserve ("CAR") comprises one of the largest, most experienced and
illustrious offset registries in North America.  The reserve sets high quality standards for carbon
offset projects, oversees third party verification bodies, issues carbon credits and tracks
transaction of credits over time in a transparent, publicly accessible system.[97]  CAR adopted the
Coal Mine Methane Project protocol which establishes standards and quantifies emission
reductions for mine methane capture.[98]

The Verified Carbon Standard (VCS) similar to CAR is a voluntary greenhouse gas program,
which employs Clean Development Mechanism (CDM) methodology, allowing emission
reduction projects in developing countries to earn certified emissions credits.[99]  They also
encourage and promote the development of new, innovative emission reduction methodologies.
The VCS currently includes CMM emissions from surface, abandoned and underground mines.

The American Carbon Registry (ACR) oversees the registration and verification of carbon offset
projects that follow approved carbon accounting protocols, and issues offsets in a transparent
public registry in both the voluntary carbon market and California's regulated carbon market.[100]
Both CAR and ACR have been approved by the California Air Resource Board to serve as an
Offset Project Registry for the Compliance Offset program under the Cap-and-Trade program.

Additionally, the passing of Assembly Bill 32 (AB 32) and the Global Warming Solutions Act
led to the establishment of California's Cap-and-Trade regulation, which sets an enforceable
emissions cap that diminishes overall emissions over time.  Although California has no active
coal mines and does not cap CMM emissions, in 2013 the California Air Resource Board
developed and adopted a coal mine methane emissions protocol that provides compliance offset
credits to out-of-state coal mines, detailed above.[101]  CAR's coal mine methane protocol both

---

[96]  TerraPass, http://www.terrapass.com/climate-change/carbon-offsets-explained/ (last visited
Jan. 13, 2016), attached as Ex. 54.

[97]  Climate Action Reserve, Annual Report (2014), attached as Ex. 55, available at
http://www.climateactionreserve.org/wp-content/uploads/2015/05/CAR-AR-2015-Final.pdf (last
visited Apr. 12, 2016).

[98]  *Id.*

[99]  CDM, "What is the Clean Development Mechanism," attached as Ex. 56, available at
http://cdm.unfccc.int/about/index.html (last visited Apr. 12, 2016).

[100]  ACR, "American Carbon Registry: What we do," available at
http://americancarbonregistry.org/how-it-works/what-we-do (last visited Apr. 12, 2016).

[101]  California Air Resources Board, Compliance Offset Protocol, Mine Methane Capture
Projects (April 2014), attached as Ex. 57, available at

informed and prompted the California Air Resource Board to adopt Compliance Offset Protocol Mine Methane Capture Projects to provide methods of quantifying GHG emissions reductions associated with the capture and destruction of methane from active and abandoned underground mines, as well as active surface mines.

Under California's Cap- and-Trade Program, private sector entities may use compliance offset credits to satisfy up to 8% of their compliance obligation.[102]  These compliance offsets serve as tradable credits representing verified greenhouse gas emissions reductions or removal enhancements that meet regulatory criteria.  Mine methane capture  projects must be located in the U.S. and comply with project eligibility criteria and regulatory program requirements. Details regarding eligibility and regulatory criteria can be found in the ARB's mine methane capture protocol manual.[103]  Offset credit verification services must be an approved ARB-accredited offset verification body such as the ACR or CAR.[104]  The inclusion of compliance offset credits is intended to help incentivize voluntary GHG emission reductions and promote development of innovative projects and technologies both inside and outside of California.

The fact that there are at least two existing cap-and-trade programs that allow companies that emit GHGs to purchase offset credits for coal mine methane captured anywhere in the United States certainly changes the calculus of what is economically feasible for mines operating in the North Fork, and the Forest Service must take this into consideration in its supplemental EIS.

### 3.    The Forest Service Must Analyze Flaring As A Reasonable Alternative To Reduce The Lease's Methane Pollution.

The West Elk Mine removes methane not only through ventilation systems (as VAM), it also vents methane through MDWs.  The reasonably foreseeable mine plan (RFMP) in the 2012 Lease Modifications Final EIS predicts that MCC will construct 48 MDWs to remove methane in order to mine the lease modification areas.[105]  Methane vented though MDWs represented nearly 3.5 million cubic feet a day in early 2010; in 2013, that number was about 2 million cubic feet per day.[106]

---

http://www.arb.ca.gov/regact/2013/capandtrade13/ctmmcprotocol.pdf (last visited Apr. 12, 2016).

[102]  *Id.*

[103]  *Id.*

[104]  *Id.*

[105]  2012 Lease Modifications Final EIS at 54.

[106]  *See* MCC First Quarter 2010 Methane Report (Ex. 24); State of Colorado, Coal Mine Methane in Colorado (Ex. 42) at 31.

Coal mine methane from drainage wells can be combusted, or flared, before it enters the atmosphere.  Flaring results in an 87% reduction in GHG emissions compared with venting methane directly into the atmosphere.[107]  As the State of Colorado's 2016 report states:

> From a climate change standpoint, emitting carbon dioxide is much less harmful on the environment than a mine's direct emission of methane into the atmosphere. Accordingly, flaring methane, which converts the residual gas emission to carbon dioxide, has nearly the same environmental impacts as using methane to generate electricity or heat.[108]

Despite the potential benefits of methane flaring, the FEIS dismisses detailed consideration of a flaring alternative without a rational basis.  Methane flaring, however, is a reasonable, practical, effective, and feasible alternative to reduce the Lease Modifications' GHG emissions.[109]

There is a long and safe history of flaring at working underground coal mines.  Active mine flaring has been conducted at working coal mines in Australia and the United Kingdom.[110]  The Global Methane Initiative's database lists 20 operating underground mines around the world that utilize flares, including mines in Australia, China, Mexico, Poland, Russia, South Africa, the Ukraine, and Colorado.[111]  Evidence was presented at a 2007 EPA conference that methane flaring at working coal mines was "state of the art," and that flaring to dispose of vented methane at coal mines was "[s]imple, low cost and reliable to operate" with "[l]ow maintenance requirements."[112]  A 2013 Global Methane Initiative paper reinforced those conclusions.[113]

---

[107]  Daniel J. Brunner & Karl Schultz, Effective Gob Well Flaring 724 (1999), attached as Ex. 58.

[108]  State of Colorado, Coal Mine Methane in Colorado (Ex. 42) at 14.

[109]  See 2010 Conservation Scoping Letter (Ex. 36) at 88-89.

[110]  EPA, International News – Coalbed Methane Outreach Program (2009) (Australia), attached as Ex. 59; The Coal Authority, Coal Mine Methane Activity in the UK (UK), attached as Ex. 60.

[111]  See Global Methane Initiative database print out, attached as Ex. 61, available at http://www2.ergweb.com/cmm/index.aspx (last viewed Apr. 12, 2016).

[112]  See Harworth Power Ltd., CMM Flaring, at 6, 26 (2007), excerpts attached as Ex. 62.

[113]  Global Methane Initiative, Coal Subcommittee Policy White Paper ver 2.0, "Flaring of Coal Mine Methane: Assessing Appropriate Opportunities" (Nov. 2013) at page 6 ("The implementation of 40 flaring projects worldwide over time in most major coal mining countries suggests that flaring of CMM is deemed to be a generally accepted, proven and safe technology that does not pose an intrinsic risk when employing well-designed and operated equipment and sound operating practices."), attached as Ex. 63, and available at https://www.globalmethane.org/documents/GMICoalFlaringNov2013.pdf (last viewed Apr. 12 2016).  This white paper also emphasized that significant new information since late 2011 supported the paper's conclusions: "In the 2 years since the November 2011 release [of the white paper's draft], much has changed with respect to the availability of carbon finance and this in turn has affected the viability of some CMM utilization projects.  At the same time, there is

Letter to Supervisor Armentrout re: Coal Lease Modifications COC-1262 & COC-67232     Page 34
April 12, 2016

A November 2011 compilation by the Global Methane Initiative indicated at least nine vendors worldwide selling coal mine methane flare systems.[114]  EPA reported in late 2014 that it had identified "40 projects where flaring has been practiced, either in conjunction with energy recovery technologies or as a stand-alone mitigation technology," and that flaring projects had the advantage of being far less costly than coal mine methane energy generation projects.[115]

Nearly a decade ago, in a comment letter urging the Forest Service to address flaring as a reasonable alternative at the West Elk mine, EPA noted that flaring is standard practice in many industries, and concluded that "outside of the United States, methane flaring at underground coal mines is widely accepted and approved as a safe practice."[116]  As a result, EPA has repeatedly urged the Forest Service and BLM to consider flaring as an alternative in NEPA documents evaluating coal mine expansions in Colorado – including encouraging the Forest Service five years ago with respect to *this very mine*.[117]  Nearly two decades ago, EPA created a conceptual design for a system to flare coal mine methane, which the agency promoted as a way to reduce coal mine methane pollution, notwithstanding other pollutants flaring might cause.[118]

Other agencies have realized the potential benefits of flaring.  BLM's regulations specifically permit flaring of natural gas (methane) from oil and gas wells during, *inter alia*, initial production tests.[119]  MSHA has also stated that methane flaring is safe and that "there are no specific obstacles" preventing MSHA from approving flaring at working coal mines in western Colorado under certain conditions.[120]  The State of Colorado agrees.[121]

---

growing acceptance of flaring as a safe and reliable emission reduction technology option and the number of CMM flaring projects is growing."  *Id.* at 1.

[114]  Global Methane Initiative, Coal Mine Methane Mitigation and Utilization Technologies and Project Profiles (Oct. 2014), excerpts attached as Ex. 64 and available at https://www.globalmethane.org/documents/partners_cmm_tech_database.pdf (last viewed Apr. 12, 2016).

[115]  EPA, CMM Flaring: Technology and Case Studies (Sep. 2014), attached as Ex. 65, and available at https://www3.epa.gov/cmop/docs/CMM-Flaring-Flyer-Sept-2014.pdf (last viewed Apr. 12, 2016).

[116]  Letter of L. Svoboda to C. Richmond (Aug. 7, 2007) at 6 (Ex. 44).

[117]  *See, e.g., id.* (noting widespread use and benefits of flaring); letter of Larry Svoboda, EPA, to Melissa Smeins, BLM, at 3 (Apr. 22, 2010) (comment letter on BLM's EA on a coal lease for Colorado's New Elk Mine, stating: "We recommend that BLM issue additional analysis for public review that assesses alternatives and/or potential mitigation measures to reduce the projected [coal mine] methane emissions, including … flaring …."), attached as Ex. 66.

[118]  EPA, Conceptual Design for a Coal Mine Gob Well Flare (1999), excerpts attached as Ex. 67.

[119]  *See* U.S. Dep't of Interior, Notice to Lessees and Operators of Onshore Federal and Indian Oil and Gas Leases (NTL-4A), at III (1980) (authorizing flaring of gas wells), attached as Ex. 68.

[120]  *See, e.g.*, email from Hubert E. Sherer, MSHA, to Liane Mattson, USFS (Oct. 26, 2007, 3:12

And at another mine that was removing coal from GMUG National Forest lands – the Elk Creek Mine, located just a few hundred yards west of the West Elk Mine – Oxbow Mining has developed a system for capturing and utilizing coal mine methane to generate electricity.[122] Oxbow's methane capture facilities include a flare that has been safely operated for years.[123] The Colorado Division of Mining, Reclamation and Safety ("DRMS") approved this project, including the flare, in March 2012.[124]   The State of Colorado reports that the Elk Creek Mine has been safely and economically flaring coal mine methane at Elk Creek for over three years as part of a system that generates electricity and revenue:

> In 2012, Vessels Coal Gas, Inc. (Vessels) officially began generating GHG emission reductions from the project under the Climate Action Reserve.  Vessels had The Elk Creek Coal Mine Methane Destruction and Utilization Project verified, registering the first offset credits via the Climate Action Reserve in September of 2014 (CAR, 2015).  Currently, the mine sends drainage gas to a thermal oxidizer and three 1 MW electrical generating engines with the potential to install additional engines. The mine modified the borehole that drained coal mine gas in 2010 in order to combust the CMM through heaters that warmed mine intake air.  The project has destroyed about 1 BCF of CMM via heaters, *an enclosed flare*, and three 1 MW reciprocating engines since its inception in June of 2011.[125]

The Elk Creek mine project demonstrates that flaring of coal mine methane in the North Fork Valley, as well as the use of such methane to generate electricity, is safe, technical feasible and economically rewarding.

---

pm), attached as Ex. 69; letter of A. Davis, MSHA District 9 to D. Dyer, BLM (May 18, 2010), attached as Ex. 70 ("Since flaring has not been done on active mine gobs in the past in this MSHA district, a plan to flare would have to be reviewed by MSHA's Technical Support group to ensure it adequately addresses all the necessary precautions to ensure safety of all persons in the mine.  There is no specific obstacle to accomplishing this ….").

[121]   State of Colorado, Coal Mine Methane in Colorado (Ex. 42) at 14 ("A properly engineered, manufactured, and operated flare with redundant safety systems can fully address [safety] concerns.").

[122]   *See* letter of J. Kiger, Oxbow, to B. Bowles, Colo. Div. of Mining, Reclamation & Safety, at 1 (Oct. 14, 2011) (stating that "North Fork Energy LLC has determined the economic viability of constructing and operating a facility to utilize mine methane from Oxbow's underground mine methane collection system" and seeking agency approval for the same), attached as Ex. 71.

[123]   *Id.* at un-paginated attachment to letter (emphasis added).

[124]   See letter of J. Kiger, Oxbow to F. Kirby, Office of Surface Mining, (Mar. 15, 2012), attached as Ex. 72.

[125]   State of Colorado, Coal Mine Methane in Colorado (Ex. 42) at 18 (emphasis added).

Other mines in the U.S. also flare methane. For example, the Solvay trona mine in Wyoming is now using an enclosed flare to address methane pollution, something for which that mine is generating 1.2 million "climate reserve tonnes" that can be purchased as carbon offsets verified by the Climate Action Reserve.[126] Further, the Pinnacle underground coal mine in West Virginia is putting in place an enclosed flare that will also generate 1.2 million climate reserve tonnes.[127] "The flare will be located at the wellhead of the mine's highest producing gob well."[128]

EPA, in comments on the 2012 Lease Modifications draft EIS, reaffirmed its belief in the practicality and environmental benefits of flaring, reinforcing the points discussed above.

> [T]he DEIS evaluation did not provide or discuss any monetary benefit to flaring as a mitigation option such as carbon credits which could improve the economic feasibility of flaring. Furthermore, EPA believes it is worth disclosing the potential health and safety benefits attributable to using a flare to destroy VOCs and hazardous air pollutants (HAPs). More specifically, flaring of methane gas is a standard safety practice in many industries and is routinely used during processing and production of oil and gas, from landfill collection systems and the petroleum industry. Flaring appears to provide substantial benefit with less capital cost than … power generation.

> The [Forest Service's] reevaluation of flaring should also disclose the increasing commercial availability and acceptance of flaring by regulatory agencies. The MSHA safety concerns expressed in the DEIS (page 35) do not make flaring infeasible. It is EPA's understanding that MSHA has not received or reviewed any applications for flaring at a U.S. coal mine. EPA agrees with the characterization in the DEIS that describes MSHA's policy of reviewing mine applications for flaring on a case-by-case basis. MSHA does not have an official policy on flaring of gas at coal mines, therefore MSHA would review each flaring plan individually to ensure that it adequately incorporates appropriate protections such as bubble traps, fail-safe valving, flame arresters, or monitoring and control systems.

> MSHA has in fact authorized a flare for mine methane from a mine degasification system that was commissioned in August 2010 and is now operating at Solvay's underground trona mine near Green River, Wyoming.

---

[126] Sindicatum Projects, Coal Mine Methane, US: SOLVAY, Wyoming, attached as Ex. 73, available at http://www.sindicatum.com/portfolio_item/coal-mine-methane-us-solvay-wyoming/ (last viewed Apr. 12, 2016); see also Climate Action Reserve website http://www.climateactionreserve.org/how/crt-marketplace/ (explaining how Climate Action Reserve carbon offsets work) (last viewed Apr. 12, 2016), attached as Ex. 74.

[127] Sindicatum Projects, Coal Mine Methane, US: CLIFFS, West Virginia, attached as Ex. 75, available at http://www.sindicatum.com/portfolio_item/coal-mine-methane-us-cliffs-west-virginia/ (last viewed Sep. 23, 2012).

[128] Id.

> While there are currently no United States underground coal mines operating with flares, there are approximately 23 installed coal mine methane flares elsewhere in the world.  Methane flaring at underground coal mines has been approved as a safe practice by national level mine safety oversight agencies in the United Kingdom and Australia.  Flares can combust methane in air with fluctuating concentrations between 30 to 100 percent by volume.  Portable flares are also commercially available, to provide flexibility to move to different wells.  It is EPA's understanding that Solvay now intends to utilize the gas for productive use in their processing plant.  Trona mines have similar characteristics to underground coal mines in terms of their methane gas production and degasification technologies, and the experience at the Solvay trona mine should be applicable to underground coal mine operations.[129]

Copious evidence shows flaring to be safe, practical, and effective.  New information since 2012 demonstrates that flaring is technically feasible at coal mines in the North Fork Valley and at even more mines around the world, and shows that new financial incentives at the state level (including the CARB program) have incentivized completed flaring projects.  Therefore, the supplemental EIS must do what the 2012 Lease Modifications Final EIS failed to:  analyze a flaring alternative in detail.  Such an alternative would allow MCC to produce the coal within and adjacent to the Lease Modifications, thereby fulfilling the project's purpose and need, while reducing the damaging impacts of methane pollution.

In the 2012 Lease Modifications Final EIS, the Forest Service failed to provide *any basis at all* for failing to consider a flaring alternative.  It simply ignored EPA's and conservation groups' request that such an alternative be considered.  The final EIS provided no reason for its failure to do so.  While the final EIS "considered but eliminated from detailed study" two alternatives concerning methane pollution control – (1) "requiring MCC to use MDW ventilation air methane," and (2) "requiring MCC to purchase …carbon credits or do off-set mitigations" – neither of these eliminated alternatives involves flaring.[130]  The 2012 Lease Modifications Final EIS's failure to even address the alternative of methane flaring cuts "the heart" out of the NEPA process.  40 C.F.R. § 1502.14; *All Indian Pueblo Council*, 975 F.2d at 1444.  The supplemental EIS must address this clear error.

Rather than address the flaring option as an alternative, as required by NEPA, the final EIS merely considered giving MCC the *option* of flaring as a mitigation measure.[131]  There, the Forest Service downplayed the feasibility of flaring.  But this "analysis" failed to provide the necessary justification required by NEPA for failing to fully analyze a reasonable alternative of *mandating* that MCC flare methane.  Indeed, the final EIS did not address at all – or explain why it did not address – the option of requiring flaring, even as a mitigation measure.  This failure to take the required "hard look" at the impacts of a potential flaring alternative, even in the guise of a mitigation measure, violated NEPA.  This violation is one that the Forest Service must remedy

---

[129]  EPA July 2012 Comment Letter (Ex. 29) at 7 (citations omitted).

[130]  2012 Lease Modifications Final EIS at 37-39.

[131]  2012 Lease Modifications Final EIS at 68-69.

in the supplemental EIS, particularly given that the Forest Service must, in any event, address significant new information concerning the technical and financial feasibility of flaring.

First, the FEIS's discussion of flaring as a mitigation measure fails to disclose flaring's environmental benefits. For example, EPA told the Forest Service that the FEIS should "disclos[e] the potential health and safety benefits attributable to using a flare to destroy VOCs and hazardous air pollutants (HAPs)."[132] The 2012 final EIS contained no discussion of such benefits, nor did it explain its omission.

Second, as with its discussion of VAM, the Forest Service pleaded ignorance as to whether an effective flaring system could be designed.[133] Again, the Forest Service failed in its duty to explore options and track down information, not simply to rely on its own ignorance of a particular topic to dismiss an alternative. Numerous coal mines across the globe – and one just across Highway 133 from West Elk, safely and cost-effectively use flares to destroy coal mine methane. The Forest Service could have investigated these other mines so that the decisionmaker and the public could understand the potential need for supplemental fuel and cost issues. The Forest Service's failure to obtain this necessary information demonstrates that the agency failed to take the "hard look" NEPA requires. Again, the Forest Service must remedy this failure in the supplemental EIS in light of significant new information concerning flaring.

Third, the 2012 Lease Modifications Final EIS alleged that MSHA's approval of flaring at a working trona mine a few hours drive from the West Elk Mine was somehow not relevant to whether MSHA would approve flaring at a working coal mine.[134] The final EIS also downplayed the role of flares world-wide, characterizing this pollution control practice as "in limited use in other countries." [135] These characterizations are misleading. EPA published a conceptual design for a flare nearly two decades ago; flaring is in common practice in working coal mines and in other industries world-wide; and MSHA has invited all comers to propose a flare at a working mine. The record before the Forest Service – in 2012, and even more so now – conclusively demonstrates that flares are a practical, reasonable, economical, and safe way to reduce methane pollution.

In sum, because methane flaring is a reasonable, practical, proven, effective, and feasible alternative to reduce methane pollution, and because significant new information further supports this conclusion, the supplemental EIS must address the reasonable alternative of requiring MCC

---

[132]  EPA July 2012 Comment Letter (Ex. 29) at 7.

[133]  2012 Lease Modifications Final EIS at 68 ("The probability of needing to provide supplemental fuel, or allow for the bypass of the flare is not known at this time, and therefore the portable flare mitigation effectiveness is uncertain. It is unlikely that supplemental fuel would be supplied to a portable flare located at an individual MDW, given the cost and additional safety considerations that would need to be realized.").

[134]  *Id.* at 68-69.

[135]  *Id.* at 68.

to flare some or all of the methane vented from the West Elk mine or from the lease modifications area as a condition of those modifications.

### E.      The Supplemental EIS Must Analyze Alternatives That Reduce Impacts To Forest And Wildlife.

We urge the Forest Service to consider in the supplemental EIS a stipulation or stipulations to:

- prohibit surface occupancy for road and drill pad construction within mature or over-mature aspen and spruce-fir stands.

These stands provide important habitat for lynx, marten, and a variety of birds and other wildlife.

The proposed action will destroy mature aspen and spruce-fir forest.  The 2012 Lease Modifications Final EIS predicted that the RFMP would eliminate 7 acres of spruce-fir habitat in primarily "mature/overmature" condition, and 58 acres of mature/over-mature aspen; the 2013 Exploration Plan EA predicted that project would destroy 1.9 acres of spruce-fir and 26 acres of aspen.[136]  It is unclear whether that destruction caused by the two projects would be cumulative, or whether the acreage eliminated by the lease modifications would include the acreage eradicated by the exploration plan.

The Forest Service's 2016 notice of intent states that the agency will not consider in detail any alternatives that "protect … values by adopting [certain] no surface occupancy (NSO) stipulations.[137]  The Forest Service rejects consideration of an NSO stipulation within ¼ mile of old growth forest because "old growth stands have not been identified in the lease modification area," although the agency assumes for argument's sake that road and drill pad construction could destroy "mature/over-mature classes (which may provide some of the same habitat components as old growth)."[138]  The Forest Service dismisses any such impacts as immaterial because "the GMUG Forest Plan (page III–9a, III–9b) allows for removal of 70–80% of these stands assuming residual patch sizes are met," citing a standard from the antiquated 1983 Forest Plan.[139]

The Forest Service's basis for dismissal of this alternative or mitigation measure – and any measure designed to protect mature spruce-fir or aspen forest – based on the old Forest Plan's provisions is arbitrary and capricious, given significant new information developed since the Forest Plan was adopted in 1983 and amended in 1991.  Specifically, the EIS prepared for the 1983 Forest Plan failed to address or even mention the impact of climate change; the 1991 plan amendment generally dismisses the contention that logging might worsen climate change and

---

[136]  2012 Lease Modifications Final EIS at 39-40, 128 (road and MDW pad construction is likely to destroy "approximately 7 acres of oak, 58 acres of aspen, and 7 acres of spruce-fir" in primarily "mature/overmature" condition); Sunset Trail Exploration EA at 18.

[137]  2016 Lease Modifications Fed. Reg. Notice, 81 Fed. Reg. at 8904.

[138]  *Id.* at 8905.

[139]  *Id.*

concludes that any impact from climate change to forest resources is years away and would be identified by monitoring.[140]  But climate change is now modifying the forest through drought, insects and disease.  The GMUG National Forest, in the SBEADMR final EIS, now estimates that the vast majority of spruce-fir (and aspen) in the Lease Modifications area could be lost due to a warmer, drier climate in less than 45 years – or only 12 years longer than the current plan has been in effect.[141]

This significant new information is not reflected in the GMUG Forest Plan, nor in the standards and guidelines meant to protect forest resources.  The Forest Service therefore cannot rely on these standards unless and until the Forest amends the Plan to address the significant new information concerning the threats to these forest types.  It is unlikely that new standards would permit the eradication of 80% of mature forest in a particular unit in the face of the dramatic changes the climate is predicted to cause in the future.  Indeed, it may be paramount to protect mature forest stands from the unnecessary damage of road construction and drill pad clearing when the Forest may, with the threat of climate change, deem it important to protect these stands.

Until the Forest Plan is amended to address new information about the threat of climate change, the GMUG National Forest should protect existing mature forest through an NSO stipulation.  At a minimum, the Lease Modifications supplemental EIS must address the new information concerning the massive changes predicted to occur to forests there.  Addressing that new information must include consideration of stipulations – such as the one proposed here –to protect forests from hastening or worsening the damage caused by climate change.

Further, the Forest Service should consider mitigation measures to protect imperiled fish populations.  The 2015 Colorado Roadless Rule Coal Mine Exception Supplement Draft EIS states that Colorado River cutthroat trout (a Region 2 sensitive species) and greenback cutthroat trout (a threatened species) are found in and around the North Fork Coal Mining Area.[142] Information concerning the discovery of a Colorado River cutthroat trout population in Hoodoo Creek, very near the southern boundary of the Lease Modifications area, only came to the Forest Service's attention since after the 2012 Lease Modifications EIS was approved.[143]  The 2015 Roadless Rule EIS largely deferred analysis of potential impacts to the trout until later proposals were received: "proper consideration of the Colorado River cutthroat trout in further site-specific planning of the coal mining-related activities will likely be important in conservation of local individuals and populations."  The Lease Modifications are that further planning effort where

---

[140] *See, e.g.*, GMUG National Forest, Final Supplemental Environmental Impact Statement for the Amendment of the Land and Resource Management Plana (1991) at VI-77.

[141] *See supra* at 17.  Further, the outdated 1983/1991 Forest Plan is likely to remain in effect for many another 3-4 years because the Forest has only just begun the plan revision process.

[142] U.S. Forest Service, Colorado Roadless Rule Supplemental Draft EIS (Nov. 2015) at 51-60.

[143] "While Colorado River cutthroat trout were evaluated in 2012 and programmatically determined to be potentially impacted by roadless area management, new information confirms members of the species are directly associated with the North Fork Coal Mining Area." *Id.* at 53.

such planning is "important."[144]   The Forest Service therefore must address in the Lease Modifications supplemental EIS the potential impacts of coal leasing and exploration, and impacts from foreseeable mining, to Colorado River cutthroat and greenback cutthroat trout. That analysis should include mitigation measures – including avoidance of watersheds that contain such trout populations – to protect these fish.

### F.     The Supplemental EIS Must Properly Identify The Environmentally Preferably Alternative.

The Lease Modifications Notice of Intent identifies Alternative 4 ("Consent to and Modify Only COC–1362 Lease") as the "Environmentally Preferable Alternative."[145]   The Forest Service's selection of Alternative 4 as opposed to the No Action alternative as the "environmentally preferred alternative" is arbitrary and capricious.

CEQ guidance directs that:

> Section 1505.2(b) requires that, in cases where an EIS has been prepared, the Record of Decision (ROD) must identify all alternatives that were considered, "… specifying the alternative or alternatives which were considered to be environmentally preferable."  The environmentally preferable alternative is the alternative that will promote the national environmental policy as expressed in NEPA's Section 101.  Ordinarily, this means *the alternative that causes the least damage to the biological and physical environment; it also means the alternative which best protects, preserves, and enhances historic, cultural, and natural resources.*[146]

The 2012 Lease Modifications ROD declined to identify the "No Action" alternative as the environmentally preferred alternative because the alternative would, the Forest Service alleged, result in economic and social harm.[147]   But nothing in CEQ's regulations or guidance says that the environmentally preferred alternative must be an action alternative, and nothing permits the agency to claim that an action is "environmentally" preferable because, although it indisputably will destroy more environmental values, the alternative will have more financial benefits. Further, the Colorado Roadless Rule supplemental draft EIS makes clear that mining coal in the North Fork will have negative social and economic impacts when social costs of carbon are calculated properly.

---

[144]  *Id.* at 60.

[145]  2016 Lease Modifications Fed. Reg. Notice, 81 Fed. Reg. at 8903.

[146]  Council on Environmental Quality, Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, Question 6a, 46 Fed. Reg. 18026 (Mar. 23, 1981) (emphasis added).

[147]  *See* Forest Service, Record of Decision for Federal Coal Lease Modifications COC-1362 and COC-67232 at 17 (Aug. 2012) at 9 (the "no action" alternative "not identified as the environmentally preferable Alternative because it does not achieve social and economic objectives in the area.") (hereafter "2012 Lease Modification ROD").

The Forest Service must correct this error and identify the "No Action" alternative as the environmentally preferable alternative in the supplemental EIS and any ROD prepared therefor.

### G.    The Supplemental EIS Must Address Inconsistent Mitigation Measures Concerning Protection of Soils.

In its vacated 2012 Lease Modifications ROD, the Forest Service adopted stipulations concerning geologic hazards that are at odds with one another and with the GMUG Forest Plan without a rational explanation. The Forest Service must explain its rational for adopting inconsistent measures or eliminate the inconsistency in the supplemental EIS.

The Forest Service's 2012 Lease Modifications ROD prohibits surface occupancy on "slopes which exceed 60%" within the parent lease for COC-1362, as well as prohibiting surface occupancy "in areas of high geologic hazard or high erosion potential."[148] While the parent lease for COC-67232 similarly includes no surface occupancy ("NSO") stipulations for "areas of high geologic hazard or high erosion potential," that lease does *not* contain the NSO stipulation for "slopes which exceed 60%."[149]

Not only is the failure of lease modification COC-67232 to contain an NSO stipulation for slopes greater than 60% at odds with the stipulation for the adjoining lease (COC-1362), it conflicts with the 1993 Forest Plan amendment for oil and gas leasing. That decision *required* an NSO stipulation for slopes greater than 60%.[150] Why the Forest Service would prohibit road and well pad construction on such slopes for oil and gas development but not bar exactly the same type of construction for coal MDWs is nowhere explained. The Forest Service's adoption of the inconsistent stipulation for COC-67232 is arbitrary and capricious.[151]

Further, the ROD's decision to omit the stipulation on slopes greater than 60% for lease modification COC-67232 is also arbitrary and capricious because it undermines the rationale the 2012 Lease Modifications Final EIS gave for dismissing an alternative that would have required NSO stipulations on lands with slopes greater than 40%. The agency stated: "A stipulation that

---

[148]  2012 Lease Modifications ROD at 22.

[149]  *Id.*

[150]  Forest Service, Record of Decision, GMUG National Forest Oil and Gas Leasing EIS (Apr. 19, 1993), excerpts attached as Ex. 76.

[151]  The Forest Service cannot argue that the NSO stipulation for slopes greater than 60% is somehow duplicative, or the same as, a stipulation that bars surface use of "areas of high geologic hazard or high erosion potential." The parent lease for C-1362 provides that NSO stipulations are necessary for *both* slopes greater than 60% *and* "areas of high geologic hazard or high erosion potential." 2012 Lease Modifications Final EIS at 23. Further, the 1993 Final EIS for oil and gas leasing considered slopes greater than 60%, areas of high geologic hazard, and areas with high erosion potential to be three separate categories of resource concern, as demonstrated by a monitoring form identifying each of the three separately. *See* Forest Service, GMUG National Forest Oil and Gas Leasing Final EIS, Vol. II (1993), App. H, H-31, excerpts attached as Ex. 77.

requires no surface occupancy be allowed ... ["]on slopes which exceed 60%" ... already exist[s] as part of ... Alternatives 2 and 3."[152]  But the ROD failed to adopt an NSO stipulation based on slope for lease modification COC-67232.[153]

This is not a case where the Forest Service determined that no areas of 60% slopes existed within the lease modification areas.  According to a map in the project file, areas of land with greater than 60% slope do occur within both lease modifications.[154]

Finally, because the two lease modifications will have different stipulations concerning construction on slopes, they may have different types of environmental impacts.  However, the 2012 Lease Modifications Final EIS fails to disclose whether this is the case.  The supplemental EIS must address the potential for such impacts.

The 2012 Lease Modifications Final EIS provides no rational basis for why the agency will provide different levels of protection in the same decision for the two lease modification areas that are directly adjacent to one another.  That EIS states only: "The Forest Service in analyzing the effects of this proposal did not find any justification to deviate from the existing stipulations on the parent leases."[155]  In other words, the Forest Service simply decided it best to perpetuate a non-sensical and unjustified difference between the two parent leases rather than correct the inconsistency with this decision.  The final EIS's other explanation – that inconsistent stipulations "have been determined adequate on parent leases to protect surface resources"[156] – is equally bereft of rationality.  Why the Forest Service would prevent road and drill pad construction on slopes greater than 60% for all oil and gas wells, and would prevent similar construction for MDWs on similar slopes for one coal lease, but not the other, is nowhere explained.  The Forest Service must address the difference in stipulations, or eliminate the inconsistency, in its supplemental EIS.

## III.     THE SUPPLEMENTAL EIS MUST ADDRESS NEW INFORMATION CONCERNING THE NATURE AND IMPACTS OF CLIMATE CHANGE.

As discussed above, significant new information concerning the scientific understanding of climate change, the likelihood of abrupt climate change, the need to limit carbon dioxide and methane emissions, the technical and financial feasibility of climate pollution mitigation measures, and the impacts of climate change on the GMUG National Forest has become available since the Forest Service completed its final EIS on the Lease Modifications in August 2012.  The supplemental EIS must disclose and address all of this new information.

---

[152]  2012 Lease Modifications Final EIS at 40.

[153]  2012 Lease Modifications ROD at 29.

[154]  *See* Map, MCC Lease Modifications (from USFS Project File) attached as Ex. 78.

[155]  2012 Lease Modifications Final EIS at 552.

[156]  2012 Lease Modifications Final EIS at 571.

The supplemental EIS must also address other significant new information concerning the impacts of climate change on water resources in the Colorado River basin and on human health. We urge the Forest Service to review and disclose the findings of the following recent reports:

- A March 2016 Bureau of Reclamation report entitled "SECURE Water Act Section 9503(c) - Reclamation Climate Change and Water 2016." This study concludes, among other things, that climate change will be one factor leading to "reduced volumes of water stored in system reservoirs and a vulnerability to water delivery shortages" in the upper Colorado River basin; "reduced hydropower production" there; "reduced access to shoreline recreational facilities;" and shifting the date of peak runoff 12 days earlier than at present by the end of the century.[157]

- A March 2016 report from the U.S. Global Change Research Program entitled "The Impacts Of Climate Change On Human Health In The United States."[158] The study's summary explains that:

  > Climate change is a significant threat to the health of the American people. The impacts of human-induced climate change are increasing nationwide. Rising greenhouse gas concentrations result in increases in temperature, changes in precipitation, increases in the frequency and intensity of some extreme weather events, and rising sea levels. These climate change impacts endanger our health by affecting our food and water sources, the air we breathe, the weather we experience, and our interactions with the built and natural environments. As the climate continues to change, the risks to human health continue to grow.[159]

  The report estimates that extreme heat is likely to kill 27,000 Americans annually by 2100, and more than half of those deaths will be attributable to climate change.[160]

These two reports indicate that the impacts of climate change are likely to worsen, which is significant and relevant new information given the Forest Service's proposal to do nothing to address the climate pollution impacts of mining and burning the 19 million tons of coal to be made available by the Lease Modifications. The Forest Service must address and respond to these reports in its supplemental EIS.

---

[157] Bureau of Reclamation, SECURE Water Act Section 9503(c) – Reclamation Climate Change and Water 2016 (Mar. 2016) at 1-13; 1-15; 1-16; 2-7, attached as Ex. 79.

[158] U.S. Global Change Research Program, The Impacts Of Climate Change On Human Health In The United States (Mar. 2016), attached as Ex. 80.

[159] *Id.* at 2.

[160] *Id.* at 6-7.

## IV.   THE SUPPLEMENTAL EIS MUST ADDRESS THE IMPACTS OF ARCH'S PROPOSED EXPLORATION PLAN.

The Forest Service intends to address in the supplemental EIS whether to concur to Arch Coal's Sunset Trail Area Coal Exploration Plan within the Lease Modifications area.[161]   To comply with NEPA, the Forest Service must disclose the impacts of, and alternatives to, this proposed action

### A.   The Supplemental EIS Must Include Maps That Help The Reader And Decisionmaker Understand Potential Impacts Of Exploration.

Neither the 2012 Lease Modifications FEIS nor the 2013 Sunset Trail Area Exploration Plan EA contain maps that depict or identify important resources, in particular those resources likely to be impacted by road construction for exploration.  The supplemental EIS must address this deficit so that the public can obtain a basic understanding of the proposal.

For example, the Lease Modifications notice of intent contains a detailed explanation of the road network Arch will use to move people and equipment to implement the Exploration Plan.[162] That explanation identifies roads by either number (NFSRs 701, 711, 711-2A, and 711-2C), by name (Lick Creek Road) or by general description ("Highway 133 to the West Elk Mine entrance and the private" and "National Forest administrative road through Sylvester Gulch to National Forest System Road (NFSR) 711.").[163]  This type of detail *could* enable the reader to identify potential conflicts with other road users, with recreational use along the routes, with wildlife habitat in the area, etc.  But neither the 2012 Lease Modifications Final EIS nor the 2013 Sunset Trail Area Exploration Plan EA includes maps that identify any of these routes, or that would allow the reader to understand where they are located.  The Forest Service should remedy this deficiency in any subsequently prepared NEPA document by providing maps that display and identify the access routes by name and number.  While much of this information may be available through other publicly-available maps, neither the public nor agency decisionmakers should be forced to attempt to guess at the agencies' meaning, or rummage around the internet to locate relevant data.

Further, the maps in the 2013 Sunset Trail Area Exploration Plan EA reveal so little detail that they make it impossible to understand the plan's potential impacts.  The EA contains two maps: a "Location Map" covering hundreds of square miles (and with incorrect scale as part of the legend); and a map displaying the "Location of Exploration Drilling and Access and Stream Crossings."[164]  The exploration and drilling map fails to display: elevation, vegetation type, surface water bodies (other than streams), wetlands, where access routes from adjacent private land connect to any adjacent road network, roadless area boundaries, wilderness capable lands,

---

[161]  *See* 2016 Lease Modifications Fed. Reg. Notice, 81 Fed. Reg. at 8900.

[162]  *Id.* at 8902-03.

[163]  *Id.*, 81 Fed. Reg. at 8902.

[164]  2013 Sunset Trail Area Exploration Plan EA at Figure 1 (page 3) and Figure 2 (page 5).  The location map, Figure 1, indicates that the map's scale is about 200 miles to the inch, which is clearly incorrect.

or any other useful information.  This makes it virtually impossible to understand what values may be degraded by road construction and drill pad clearing.

Figure 2, for example, shows the access road to drill-pad SST-7 crossing a stream.  What it does not show is that the access road to drill-pad SST-7 will bifurcate a stand of spruce-fir; the pad itself may be located in spruce-fir forest as well.[165]  One can attempt to divine this by comparing Figure 2 with the map on page 119 of the 2012 Lease Modifications FEIS (map of Major Vegetation Cover).  The road between drill-pads SST-8 and SST-10 will apparently also cut through a spruce-fir stand, and SST-3 will be within, and require road construction through, another spruce-fir stand.[166]  These stands have value as potential lynx denning habitat (among other values).  But only by painstakingly comparing the two maps – and some guesswork – can one attempt to understand these potential impacts.  Again, neither the public nor the decisionmaker should be forced to do this because the agencies can easily prepare helpful maps, and because NEPA requires agencies to provide to the public "high quality" and "accurate" information, and to "help public officials make decisions that are based on understanding of environmental consequences."[167]

In addition, Figure 2 depicts the road connecting drill pads SST-6 and SST-9 with seven, tight hairpin turns.  Without elevation data, however, the public cannot understand the impacts of this route on visual, soil, and other resources.  Absent elevation data, the reviewer of the EA would not understand that that road construction will involve 600 feet of elevation gain over a 5,055-foot stretch of road.  A map overlaying the roads onto topography makes the potential impact obvious.[168]  These roadcuts (and, if reclaimed, clearcuts) on this steep, prominent slope will be visible for miles,[169] and they will be directly adjacent to one of the most eye-catching features on the landscape: the large slide or slump at the head of Deep Creek.[170]  Parts of the access road and drill pad itself are less than a quarter of a mile from this feature.  Further, lacking elevation data, one may not understand that construction of such a steep road – the average grade is about 12%, greater than the steepest road grade of any mountain pass in Colorado[171] – may create significant

---

[165]  *See* Earthjustice, Map, Exploration Plan – Vegetation Cover (Apr. 7, 2016), attached as Ex. 81.

[166]  *Id.*

[167]  40 C.F.R. § 1500.1(b), (c).

[168]  *See* Earthjustice, Map, Exploration Plan - Topography (Apr. 6, 2016), attached as Ex. 82.

[169]  The slope on which roads will be cut is easily visible from many locations, including from NFSR 711, and from Apache Rocks, an overlook on NFSR 711.2B.

[170]  In the Forest Service's 2005 evaluation of the Sunset Roadless area, the agency identified the "Deep Creek Slide" as "a striking geologic feature."  *See* 2012 Lease Modifications Final EIS at 480.

[171]  *See* Colorado Dep't of Transportation, Maximum Grades on Colorado Mountain Passes (showing steepest mountain pass road grades in the state at less than 10%), attached as Ex. 83, and available at https://www.codot.gov/travel/maximum-grades-on-colorado-mountain-passes.html (last viewed April 12, 2016).

erosion hazards. Cut and fill required for the roads and pads on such steep terrain is likely to increase the construction's on-the-ground footprint, and make it even more of a visual eyesore.

Therefore, any subsequently prepared NEPA document should include a map or maps displaying the proposed road network for exploration together with elevation, vegetation type, surface water bodies (other than streams), wetlands, riparian areas, the adjacent road network, roadless area boundaries, wilderness-capable lands, and any other useful information. We attach hereto several such maps that display wildlife habitats in conjunction with the proposed Exploration Plan roads, drill pads and stream crossings, and urge the Forest Service to include such maps in the supplemental EIS.[172]

### B. The Supplemental EIS Must Analyze In Detail Alternatives To The Proposed Exploration Plan.

BLM's 2013 Exploration Plan EA took an "all or nothing" approach to alternatives analysis, considering in detail only the "no action" alternative and Arch Coal's proposal, despite having authority to impose additional conditions. In the supplemental EIS, we request, and NEPA requires, that the agency consider other reasonable alternatives.

First, the Forest Service must analyze an alternative to reduce road construction within the Sunset Roadless Area while allowing all ten of Arch's desired exploration holes to be drilled. As drafted, the Exploration Plan provides redundant road access through the Roadless Area, unnecessarily increasing the damage that is likely to occur to the forest, wildlife, habitat, recreation and roadless values. Specifically, the EA's maps show that all drill pads but SST-2 and SST-7 can be accessed from two separate roads.[173] First, all the other drill pads can be accessed from MCC fee land to the east via a route which initially accesses drill pad SST-4. In addition, all the other drill pads can be accessed from Forest Service land to the north via a route which initially accesses drill pad SST-6. The Forest Service itself labels road access to this area "redundant."[174] The 2013 Exploration Plan EA did not explain its need for these redundant access routes. A reasonable alternative to MCC's redundant-route proposal would be to approve one the two alternate access routes but not the other. Such an alternative would reduce the amount of road construction (and habitat destruction) when compared to the proposed action.

---

[172] *See* Earthjustice, Map, Exploration Plan – Black Bear (Apr. 8, 2016), attached as Ex. 84; Earthjustice, Map, Exploration Plan – Brazilian Free-tailed Bat (Apr. 8, 2016), attached as Ex. 85; Earthjustice, Map, Exploration Plan – Elk (Apr. 8, 2016), attached as Ex. 86; Earthjustice, Map, Exploration Plan – Elk – Summer Range (Apr. 8, 2016), attached as Ex. 87; Earthjustice, Map, Exploration Plan – Lynx (Apr. 8, 2016), attached as Ex. 88; Earthjustice, Map, Exploration Plan – Moose (Apr. 8, 2016), attached as Ex. 89; Earthjustice, Map, Exploration Plan – Mountain Lion (Apr. 8, 2016), attached as Ex. 90; Earthjustice, Map, Exploration Plan – Mule Deer (Apr. 8, 2016), attached as Ex. 91; Earthjustice, Map, Exploration Plan – Mule Deer – Summer Range (Apr. 8, 2016), attached as Ex. 92; Earthjustice, Map, Exploration Plan – Wild Turkey (Apr. 8, 2016), attached as Ex. 93.

[173] See 2013 Exploration Plan EA at 5 (Figure 2).

[174] Lease Modifications Fed. Reg. Notice, 81 Fed. Reg. at 8899.

Letter to Supervisor Armentrout re: Coal Lease Modifications COC-1262 & COC-67232        Page 48
April 12, 2016

The U.S. District Court found that the Forest Service and BLM violated NEPA by failing to consider in detail this reasonable alternative.[175]

The Forest Service and BLM may attempt to dismiss this alternative on the grounds that the redundant road is critical to worker safety in the event of a disaster requiring multiple exit options. If the agencies take this position, however, they must explain why the agencies did not provide redundant exit options for numerous methane drainage well pads across the landscape directly adjacent to the Exploration Plan area.

We also urge the Forest Service to analyze in detail a second alternative: allowing Arch Coal to drill all of its requested exploration holes except the most damaging single hole, SST-10, because: (1) SST-10 would be bulldozed in that part of the Sunset Roadless Area that the Forest Service in 2005 determined was the most wild, and was in fact capable of being designated as wilderness;[176] (2) the access road to SST-10 cuts through mature spruce-fir forest (which will take many decades if not centuries to regenerate to its current state); and (3) the drill pad would be built nearly on top of the Sunset Trail, and so would impact recreational values.[177] This alternative would also eliminate the need for a half-mile of the proposed 5.9 miles of road, and two of seven stream crossings proposed in the plan.[178] Removing this single exploration pad and the road to access it would have large benefits to other multiple uses of the land while permitting Arch Coal to obtain 90% of its exploration data. These are exactly the kinds of trade-offs that NEPA requires agencies to explore.

BLM and the Forest Service previously rejected a different alternative – one that would have eliminated access to *six* boreholes – on the grounds that such an alternative would not provide necessary information on the coal. But the agencies nowhere explain why eliminating this *single* borehole would have such a damaging impact on Arch's data gathering, or even why Arch must have the magic number of 10 boreholes (and not 8, or 6), and what criteria it used to generate its plan. It appears instead that Arch developed an exploration plan and, rather than attempt to limit its impact, or question its scope or size, the agencies simply accepted the proposal. Such an approach violates NEPA's mandate to ensure that agencies evaluate all reasonable alternatives.

Both of these proposed alternatives meet the District of Colorado's reasonableness test. First, both proposed alternatives fall within the agency's statutory mandate, which requires that BLM "[a]pprove, disapprove, *approve upon condition(s), or require modification to* exploration

---

[175] *High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1200 (D. Colo. 2014).

[176] Earthjustice, Map, Exploration Plan – Wilderness Capable Lands (Apr. 6, 2016), attached as Ex. 94.

[177] 2013 Exploration Plan EA at 5 (Figure 2); 2012 Lease Modifications Final EIS at 169 (map showing Forest Service's 2005 roadless inventory and identifying wilderness capable lands of the Sunset Roadless Area).

[178] 2013 Exploration Plan EA at 5 (Figure 2).

plans."[179]  BLM thus has ample authority to explore more than the "all or nothing" approach it took here.  Second, the proposed alternatives would meet the exploration plan's "purpose and need," which is to approve, disapprove, or "approve the plan *with additional conditions* … if needed to minimize impacts."[180]  Both the statutory framework and the purpose and need thus anticipate alternatives that condition plan approval to reduce environmental harm.  Yet BLM failed to examine approving the exploration plan with reasonable conditions.  The supplemental EIS should address in detail this reasonable alternative.

> C.    **The Supplemental EIS Must Address The Impacts Of The Exploration Plan On Recreation In The Sunset Roadless Area.**

The Exploration Plan as proposed would approve road and drill pad construction, habitat destruction, and the scarring of hillsides within the Sunset Roadless Area.  Despite this fact, the 2013 Exploration Plan EA failed to address the proposal's impacts on the area's recreational use and users, particularly in its failure to address impacts to the Sunset Trail and Trail 8152, which the U.S. District Court for the District of Colorado concluded violated NEPA.[181]

BLM violated NEPA by explicitly declining to take *any* look, let alone the required "hard look," at the damage that the drill pads and roads proposed in the Exploration Plan will inflict on recreation values.  Instead, the 2013 Exploration Plan EA simply declared that impacts to recreation "will not be analyzed."[182]  The agency admitted that recreation values are "Present" but concluded that there will be "No Impact" to such values because there are "no recreations [sic] facilities or areas within the analysis area."[183]

The 2013 Exploration Plan EA's decision to "not … analyze[]" recreation impacts was arbitrary for three reasons.  First, the 2012 Lease Modification final FEIS specifically postponed analysis of impacts on recreation until analysis of site-specific proposal, like the Exploration Plan.  Second, the 2013 Exploration Plan EA and the 2012 Lease Modifications Final EIS

---

[179]  43 C.F.R. § 3480.0-6(d)(1) (emphasis added); *see also* 43 C.F.R. § 3482.2(a)(1) (authorized officer shall consult with surface management agency, and shall "approve or disapprove in writing an exploration plan," but in approving the plan "*may impose additional conditions*." (emphasis added)).

[180]  Exploration Plan EA at 2.

[181]  *High Country Conservation Advocates*, 52 F. Supp. 3d at 1199.

[182]  2013 Exploration Plan EA at 12-13. "Table 3 lists the elements considered in this section …. Any element present, but not affected by the proposed action or no action alternative will not be analyzed in this document; the reasons for no impact will be stated." *Id.* at 12.

[183]  *Id.* at 13 (Table 3 n.4).  Despite its statement that the EA does not address impacts to recreation, the EA contains 24 words concerning impacts to roadless character, but those few words do not address the potential for carving through the backcountry to degrade recreational enjoyment over the long term: "Temporary roads may increase foot access during the project (these roads would be closed to public motorized access).  Roads will be reclaimed following use." *Id.*

acknowledged that the area is used by recreationists.  And third, record evidence shows that
construction for, and the destruction left by, the Exploration Plan will degrade recreational
experiences.

The 2012 Lease Modifications Final EIS admitted that surface disturbing activities – like the
clear-cutting, road bulldozing, and drill pad clearing approved in the 2013 Exploration Plan –
*could* impact recreational uses of the area but postposed a hard look at such impacts.
Specifically, the 2012 final EIS stated:

> [the] presence of drill rigs and heavy equipment on the roads, and operating in the
> area could reduce a person's recreational experience.  As these activities would
> most likely occur during summer and into the fall months, they would be
> occurring in the time recreationists would most likely use the area.[184]

But while the 2012 final EIS thus admitted that construction of roads and drill pads could harm
recreational experiences, it explicitly deferred a detailed analysis of impacts to hiking, camping,
wildlife viewing, hunting, and other recreational uses until later, to the time when a site-specific
development activities on the leases were proposed:

> Site specific locations of potential surface activities are unknown[.]  Effects of
> post-leasing activities *will be evaluated on their own merits if/when activities are
> specifically proposed.*[185]

But when BLM later proposed such specific surface activities in the 2013 Exploration Plan, the
agencies ignored their pledge and duty to take the required hard look at those impacts.  Instead,
the 2013 Exploration Plan EA simply declared that impacts to recreation "will not be
analyzed."[186]  This kind of "shell game" – in which the agency postpones a hard look until the
site-specific level and then, when the time comes, in fact takes no look – is impermissible under
NEPA.

The agencies' "shell game" was all the more arbitrary because prior to the Exploration Plan, the
agencies repeatedly acknowledged that visitors recreate in the exploration area.  For example, the
2012 Lease Modifications Final EIS described "[d]ispersed recreation" in the area as including
"camping, use of all-terrain vehicles (ATVs), and horseback riding on a limited basis....  A non-
motorized non-system trail, the Sunset Trail, cuts through the lease modifications."[187]  The 2012
Lease Modifications Final EIS explained that the vicinity of the Lease Modifications area "is
*widely used for dispersed recreational activities*, such as hunting … hiking, biking[,] picnicking,
horseback riding,  … and sight-seeing."[188]  And although that EIS characterized the Sunset Trail

---

[184]  2012 Lease Modifications Final EIS at 160-61.

[185]  *Id.* (emphasis added).

[186]  2013 Exploration Plan EA at 12-13.

[187]  2012 Lease Modifications Final EIS at 49.

[188]  *Id.* at 195 (emphasis added).

as "not get[ting] heavy use,"[189] this is precisely the appeal to some of the area's users. Similarly, the 2013 Exploration Plan EA recognized that "[r]esidents and tourists visit the area for scenic and recreation values."[190]

The 2013 Exploration Plan EA also asserted that there are "no recreations [sic] facilities" in the exploration area.[191] The EA itself mapped at least two trails within the area, most prominently the Sunset Trail *after which the Exploration Plan is named*.[192] The construction of roads and drill pads on or directly adjacent to these trails clearly could harm the roadless area's visitors and their recreational enjoyment. For example, the 2013 Exploration Plan EA showed that the road to access one drill pad (SST-7) will be bulldozed across Sunset Trail; another drill pad (SST-10) will be scraped less than 100 feet from Sunset Trail.[193] An exploration drill pad (SST-1) will be built directly on top of Trail 8152, rendering any use of that portion of the trail impossible while exploration occurs; and to the west, roads will be constructed across and directly next to that same trail for about one-quarter mile.[194] In short, bulldozing for both drill pads and access roads will degrade the very recreation facilities that BLM itself mapped in the exploration area. And that harm will continue long after the exploration is complete. What was once a largely undisturbed and pristine roadless area will be criss-crossed with roads and drill pads, such that for years to come, visitors seeking solitude will be unable to walk more than a few hundred yards in any direction without encountering one of these intrusions.[195]

To remedy these omissions and legal failures, the agencies must take a hard look at the impacts of the Exploration Plan (and the RFMP) on recreation in the Lease Modifications area.

Hunting is an important use of the area, with major hunting camps being observed before and during bow hunting season along NFSR 711, at the southwest end of 711.3A (which is the northeast terminus of Sunset Trail and within a mile of the lease modifications), as well as at the eastern end of 710.5A (which terminates at Beaver Reservoir, about a mile or two from the

---

[189] *Id.* at 158. The GMUG National Forest has previously suggested that the wilderness-capable portion of the Sunset Roadless Area "is heavily used during hunting season." Sunset Roadless Evaluation (Appendix D), 2012 Lease Modifications Final EIS at 479-80.

[190] 2013 Exploration Plan EA at 31. *See also id.* at 30 (noting traffic on adjacent roads occurs "for recreational purposes"); *id.* at 9 (identifying recreation as an "[o]n-going land use").

[191] 2013 Exploration Plan EA at 13 (Table 3 n.4).

[192] *See id.* at cover (identifying project as "Sunset Trail Area Coal Exploration Plan"); *id.* at 5 (map identifying trail in area as "Sunset Trail" and displaying another route as "Trail 8152" within the Sunset Roadless Area and Exploration Area).

[193] 2013 Exploration Plan EA at 5.

[194] *Id.*

[195] Even if there were no "developed recreation facilities" in the exploration area, that does not mean supplemental EIS can ignore foreseeable impacts to recreation. Some recreationists – including members of some of the signatories – seek out roadless areas precisely *because* they contain few developed facilities.

southern end of the lease modifications area on Sunset Trail). Hikers and equestrians also use the area. Those who do use the area are very likely to be impacted by the noise of construction and use of the area. Exploration will take two summers; the construction, use, and reclamation activities on pads and roads will likely take many more years, which will impact not only wildlife but those seeking a quiet, remote experience. The damage from the network of linear clearcuts through the area, weeds, trash, and pollution resulting from construction and motorized use will persist for decades, likely leading recreationists to avoid this area. The supplemental EIS must disclose all of these impacts.

We also request that the Forest Service obtain hunting permit and success data for the area from Colorado Parks and Wildlife as one indicator of recreation use.

Further, the agencies must determine whether Sunset Trail is eligible for protection under the National Historic Preservation Act. Sunset Trail is identified and marked as such on an early USGS topo map for the area, published in 1938.[196] The Geologic Survey apparently considered the trail important enough to place three survey markers on or along the route: one where Sunset Trail diverges from the Hammond Trail at Sunset Trail's northern terminus (at elevation 9159 feet); another where it weaves between two beaver ponds just east of the Lease Modifications area (at elevation 9290 feet); and a third at its southern terminus where it connects to a trail along the east fork of Minnesota Creek (at elevation 8495 feet).[197] At its northeast terminus, Sunset Trail joins the "Hammond Trail" on the 1938 map; the Hammond Trail today roughly follows the course of NFSR 711 and connects what is now referred to as Lower and Upper Cow Camps. Sunset Trail is also displayed on USGS topo maps at a variety of scales from 1945,[198] 1964,[199] 1979,[200] and 1983.[201]

It is possible that Sunset Trail was previously used by the area's indigenous people, as were many early trails that were then developed by European settlers. Whatever its origin and history (which the agencies must investigate), the trail has been in use by recreationists and others for decades, as evidenced by its persistence on USGS maps from 1938. Impacts to the trail must be disclosed in the supplemental EIS as the court mandated.

---

[196] U.S.G.S., Mount Gunnison, topographical quadrangle map, 1:48,000 (1938), attached as Ex. 95 available at http://historicalmaps.arcgis.com/usgs/ (last viewed Apr. 12, 2016).

[197] Id.

[198] U.S.G.S., Mount Gunnison, topographical quadrangle map, 1:62,500 (1945), available at http://historicalmaps.arcgis.com/usgs/ (last viewed Apr. 12, 2016).

[199] U.S.G.S., Minnesota Pass, topographical quadrangle map, 1:24,000 (1964), available at http://historicalmaps.arcgis.com/usgs/ (last viewed Apr. 12, 2016).

[200] U.S.G.S., Minnesota Pass, topographical quadrangle map, 1:24,000 (1979), available at http://historicalmaps.arcgis.com/usgs/ (last viewed Apr. 12, 2016).

[201] U.S.G.S., Paonia, topographical quadrangle map, 1:100,000 (1983), available at http://historicalmaps.arcgis.com/usgs/ (last viewed Apr. 12, 2016).

In addition, the supplemental EIS must disclose the potential for impact to Trail 8152.  That trail is displayed on a number of maps in the 2012 Lease Modifications Final EIS, and on the only useful map in the 2013 Exploration Plan EA.[202]  It is also marked on USGS topo maps for the area since 1979.[203]  It is also a clearly discernible trail on the ground to those who have hiked in the area.  Constructing drill pads for exploration directly on the route, and roads across and near it, will impact the recreation experience for those using the trail, an impact that the supplemental EIS must address pursuant to the court's order.

## V.      THE SUPPLEMENTAL EIS MUST ADDRESS NEW INFORMATION CONCERNING COAL MARKETS AND SOCIO-ECONOMICS.

Regulations implementing NEPA require that the action agency disclose the direct, indirect, and cumulative effects of actions, including "economic, [and] social" impacts.  40 C.F.R. § 1508.8. In addition, while NEPA does not require a specific cost-benefit analysis, regulations require that when an agency prepares such an analysis that it "discuss the relationship between that analysis and any analyses of unquantified environmental impacts, values, and amenities."  40 C.F.R. § 1502.23.  Federal courts have struck down NEPA documents because economic and socio-economic benefits were not properly quantified.  *See, e.g., Sierra Club v. Sigler*, 695 F.2d 957 (5th Cir. 1983) (setting aside analysis that presented project benefits but not costs).  An analysis that overstates the economic benefits of a project fails in its purpose of allowing decisionmakers to balance environmental harms against economic benefits.  *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 446-48 (4th Cir. 1996) (setting aside EIS).  Similarly, an EIS that relies upon misleading economic information may violate NEPA if the errors subvert NEPA's purpose of providing decisionmakers and the public an accurate assessment upon which to evaluate the proposed project.  *Oregon Envtl. Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir. 1987).

The lease modification's economic costs and benefits were at the core of the Forest Service's analysis of, and choice among, alternatives.  In her August 2012 ROD on the Lease Modifications, the Forest Supervisor relied heavily on the project's alleged, estimated economic benefits, despite the fact that she had chosen to ignore or leave undisclosed the economic and social costs of carbon.  The ROD states that the Supervisor rejected the "no action" alternative because "it does not achieve social and economic objectives in the area.  Estimates suggest nearly a billion dollars in lost revenues, royalties, payroll and local payment for goods and services would be foregone by implementing this Alternative."[204]  Similarly, in justifying the agency's selection of Alternative 3, the Supervisor stated:  "I determined that the economic benefits of Alternative 3 outweigh the environmental effects of disturbing a small amount of

---

[202]  *See* 2012 Lease Modifications Final EIS at 36 (Figure 2.1c), 89 (Figure 3.4), 162 (Figure 3.29),and 171 (Figure 3.30b); 2013 Exploration Plan EA at 5 (Figure 2).

[203]  *See* U.S.G.S., Minnesota Pass, topographical quadrangle map, 1:24,000 (1979), available at http://historicalmaps.arcgis.com/usgs/ (last viewed Apr. 12, 2016); U.S.G.S., Minnesota Pass, topographical quadrangle map, 1:24,000 (2001), available at http://historicalmaps.arcgis.com/usgs/ (last viewed Apr. 12, 2016).

[204]  2012 Lease Modifications ROD at 9.

NFS lands for a short period of time as assessed in Alternative 4."[205]  Here, the Supervisor states that she based her decision in comparing Alternatives 3 and 4 on a lack of any additional costs of Alternative 3 other than land disturbance in the Lease Modifications area, failing to factor in the additional costs of $CO_2$ emissions under Alternative 3.

The supplemental EIS must address significant new information that has become available since 2012 concerning the socio-economics of coal markets and the North Fork Valley's economy. These changes include:

- Coal production nationwide and in Colorado has dropped significantly in 2016.  Colorado DRMS data indicate that coal production statewide for the first two months of 2016 is about half what it was for the same period in 2015.[206]

- Production at the West Elk mine in that same period was occurring at an annual rate of about 2.3 million tons per year, less than half of that mine's production in the first two months of 2015.[207]

- The number of those employed by the West Elk mine has fallen.  The 2012 Lease Modifications Final EIS assumed that the West Elk mine had 378 employees.[208]  The latest DRMS report indicated 281 miners working at West Elk in February 2016.[209]

- The North Fork economy is transitioning away from coal, as demonstrated by the closure and demolition of structures at Elk Creek mine, and the idling of the Bowie No. 2 mine.

- As the demand for coal has fallen, so has coal's value and price.

- The price of energy from fuels that compete with coal remains low (as with natural gas) or continues to fall (as it has with solar and wind power), making coal less competitive over the long term.

- U.S. exports of coal have also fallen as China in particular attempts to shift away from fossil fuels, reducing global demand.[210]

---

[205] *Id.* at 9.

[206] *Compare* Colorado DRMS, Monthly Coal Summary Report, 1/2016 through 2/2016 (Apr. 4, 2016), attached as Ex. 96, and available at
http://mining.state.co.us/SiteCollectionDocuments/02Summary16.pdf (last viewed Apr. 12, 2016) *with* Colorado DRMS, Monthly Coal Summary Report, 1/2015 through 2/2015 (May 26, 2015) attached as Ex. 97, and available at
http://mining.state.co.us/SiteCollectionDocuments/02Summary15.pdf (last viewed Apr. 12, 2016).

[207] *Id.*

[208] 2012 Lease Modifications Final EIS at 186.

[209] Colorado DRMS, Monthly Coal Summary Report, 1/2016 through 2/2016 (Ex. 96).

- Arch Coal and its subsidiaries (including MCC) have declared bankruptcy, raising questions about the long-term viability of the company and its operations.

- Regulatory and national political changes – the Paris Accord committing the U.S. to reduce its $CO_2$ emissions by 26%-28% in the coming years, and the potential implementation of the Clean Power Plan – may further reduce the demand for coal, including North Fork coal, in the coming years.[211]

We note that it is unclear whether the Colorado Roadless Rule supplemental EIS upon which the Forest Service may rely will address any of these factors.

The Forest Service also acknowledged in its decision on appeal that the 2012 Lease Modifications Final EIS contained errors and inconsistencies regarding the estimated price of coal.

> When disclosing the economic effects under alternative 1 and 4 (FEIS, p. 190-191) the price of coal was listed at the gross coal value of $55 per ton.  Under Alternative 3, however, the price of $40 per ton was used.  This inconsistency is recognized.
>
> ….
>
> [T]here is a mistake in the value of the coal among alternatives ….[212]

Any supplemental EIS must correct these errors and rely upon the most recent estimates for coal prices.  We note that while the 2012 Final EIS used $55 and $40 per ton for coal when comparing alternatives, the price today is below $40 per ton, and may be as low as $29 per ton.[213]

---

[210] U.S. Energy Information Agency, U.S. coal exports declined 23% in 2015, as coal imports remained steady (Mar. 7, 2016), attached as Ex. 98, and available at https://www.eia.gov/todayinenergy/detail.cfm?id=25252 (last viewed Apr. 12, 2016).

[211] Analysts believe that the U.S. is on a path to significantly reduce its reliance on dirty coal even if the Clean Power Plan is enjoined or not implemented, due to market forces and continued implementation of other state and federal initiatives.  *See* Law 360, Paris Climate Accord Implementation: United States (Mar. 11, 2016), attached as Ex. 99, and available at http://www.shearman.com/~/media/Files/NewsInsights/Publications/2016/03/Paris-Climate-Accord-Implementation-United-States.pdf (last visited Apr. 12, 2016).

[212] B. Ferebee, Forest Service, Recommendation Memorandum for Appeal of Federal Coal Lease Modifications COC-1362 and COC 67232 for the West Elk Mine (Nov. 6, 2012) at 6, attached as Ex. 100.

[213] EIA data indicates that the spot price of Uinta Basin coal as of April 8, 2016 is $37.80.  EIA, Average weekly coal commodity spot prices, April 8, 2016, attached as Ex. 101, and available at http://www.eia.gov/coal/markets/ (last viewed April 12, 2016).  A February 2016 analysis

Any subsequently prepared NEPA document must also properly characterize the royalty rate that Arch is likely to pay. The 2012 Lease Modifications Final EIS overstated the proposal's benefits by assuming a royalty rate of 8%.[214] But more than 18 months ago MCC sought to reduce from 8% to 5% the level of royalties paid to the taxpayer for these very lease expansions.[215] This would reduce the benefits from royalties by nearly 40%. The 2012 Lease Modifications Final EIS's assumption that this project will result in about $30 million in royalties is arbitrary and capricious, particularly given that we are unaware that BLM has ever denied a royalty relief request for an operating mine in the North Fork Valley. If the agencies are aware of such a decision, they should so state in the supplemental EIS.

Since publication of the 2012 Lease Modifications Final EIS, it has become clear that a portion of coal produced from the North Fork Valley, including the West Elk mine, is being exported overseas. The supplemental EIS must address this fact and fully analyze and assess the environmental and economic implications of coal export activities. We incorporate by reference the entirety of our May 22, 2015 scoping comments on the Colorado Roadless Rule, and request that the Forest Service address and respond to the issues raised therein.[216]

## VI.   THE SUPPLEMENTAL EIS MUST ADDRESS THE SOCIAL COST OF CARBON AND METHANE.

The Lease Modifications will permit Arch Coal to access 19 million tons of coal, and will prolong the life of the West Elk mine by nearly three years.[217] The production, transport, and combustion of this coal will result in carbon emissions, and mining will also result in the release of huge amounts of methane, a greenhouse gas about 86 times more potent than $CO_2$ as a heat-trapping gas over a 20-year time period. The Lease Modifications supplemental EIS must

---

assessed coal very similar to West Elk's, "Colorado's 11,700 Btu/lb coal" at $29 per short ton. Jeffrey McDonald, Platts, "Spot demand picks up for Utah thermal coal" (Feb. 22, 2016), available at http://www.platts.com/latest-news/coal/houston/spot-demand-picks-up-for-utah-thermal-coal-21975728 (last viewed Apr. 12, 2016), and attached as Ex. 102. The 2012 Lease Modifications Final EIS stated that West Elk coal was rated at approximately 11,800 btu/lb. 2012 Lease Modifications Final EIS at 80.

[214] 2012 Lease Modifications Final EIS at 188 (assuming 8% royalty rate). *See also id.* at 190 ("Royalty payments are 8% of the value of the coal removed" and assuming total value of royalties will therefore be "approximately $30 million").

[215] Letter of W. Koontz, Mountain Coal Co. to R. Welch, BLM (Sep. 4, 2014), attached as Ex. 103.

[216] Letter of E. Zukoski, Earthjustice to Colorado Roadless Rule (May 22, 2015), attached as Ex. 104. We specifically request that the Forest Service respond in any supplemental EIS on the Lease Modifications to those comments concerning socio-economics, found at pages 38-45 of the May 22, 2015 letter.

[217] 2012 Lease Modifications Final EIS at 190 (under the proposed action, Alternative 3, "19 million tons of coal representing approximately 2.9 years of continued mining activity" would be made available for mining).

address these impacts.  The Federal Register notice on scoping for the supplemental EIS hints that the Forest Service may do so, stating that the agency may address new issues including a "request for Social Cost of Methane analysis."[218]

As an initial matter, we note that it is not a "request" that the Forest Service address the social cost of methane.  The U.S. District Court vacated the 2012 Lease Modifications ROD because the Forest Service failed to apply the social cost of carbon in addressing the lease modifications' climate impacts, and specifically because it failed to address the costs of methane emissions.[219]  The court made clear that the Forest Service could not ignore the climate impacts of its actions by arguing that the social cost of climate pollution was zero, or because metrics did not exist to allow the agency to disclose those impacts.[220]  The Forest Service is therefore required to address the social cost of methane pollution in its supplemental EIS.

Although the Forest Service may attempt to rely on the analysis it prepared in the Colorado Roadless Rule supplemental draft EIS, the agency may not do so because that analysis is inaccurate.  The Colorado Roadless Rule's supplemental draft EIS, among other things:

- fails to address the social cost of methane;

- fails to properly estimate methane emissions;

- invents a "best case scenario" discount rate which skews the analysis;

- fails to use a model that addresses consumers' reaction to lower electricity prices; and

- underestimates methane emissions based on a narrow selection of West Elk's emissions data.

All of these flaws lead the Colorado Roadless Rule supplemental draft EIS to significantly underestimate the social costs of the proposed action.  These flaws are discussed in greater detail in four documents that we attach and incorporate by reference and that we specifically request that the Forest Service review and address in its supplemental EIS on the lease modifications: (1) the January 15, 2016 comments of High Country Conservation Advocates et al.;[221] (2) the January 15, 2016 comments of the Union of Concerned Scientists et al.;[222] (3) the January 14,

---

[218]  2016 Lease Modifications Federal Register Notice, 81 Fed. Reg. at 8906.

[219]  High Country Conservation Advocates, 52 F. Supp. 3d at 1192-93

[220]  Id..

[221]  HCCA Jan. 2016 Roadless Rule Comments (Ex. 1).

[222]  Letter of R. Cleetus, Union of Concerned Scientists et al. to Forest Service (Jan. 15, 2016), attached as Ex. 105.

2016 report of Dr. Thomas Power *et al.*;[223] and (4) the detailed comments of the Environmental Protection Agency.[224]

Further, the Forest Service may not rely on the social cost of carbon analysis or the social cost of methane analysis (to the extent there is any) in the Colorado Roadless Rule supplemental draft EIS, because that analysis specifically declines to address the climate pollution from mining and combusting adjacent private land and federal coal that will be made available by the lease modifications proposal, which accounts for a significant portion of the coal and extended mine life made possible by the proposed action. The 2015 Colorado Roadless Rule supplemental draft EIS explicitly refuses to address the reasonably foreseeable impacts of making this private coal available on two grounds. First, the SDEIS alleges that "[t]he U.S. Forest Service does not have jurisdiction over private lands with private mineral estate."[225] This is irrelevant to whether the Forest Service must disclose the impacts of private land coal mining. The Forest Service must address the indirect and cumulative effects of its proposed actions, regardless of whether it has jurisdiction over those actions. The very definition of cumulative effects includes those foreseeable actions "regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. This is why the Forest Service disclosed some of the impacts of mining this private coal in its 2012 Lease Modifications Final EIS. Even if the Forest Service concludes that the proposed rule has no impact on a decision to mine coal on private lands, the Forest Service must disclose the potential impacts of such mining as a cumulative impact if that action is reasonably foreseeable (as the Forest Service concluded it was in the Lease Modifications EIS).

Second, the 2015 Colorado Roadless Rule supplemental draft EIS states that "[a]ccess to private lands and private coal resources is not dependent on the Colorado Roadless Rule, and neither are private coal resources subject to the U.S. Department of the Interior's leasing process."[226] Again, it is irrelevant whether private coal is subject to DOI leasing. Further, the Forest Service has previously concluded that the private land coal near the Lease Modifications is in fact dependent on whether Arch Coal will mine the adjacent lands within the North Fork Coal Mining Area; those private lands are simply not likely to be mined absent the coal mining exception, and are likely to be mined if the exception is adopted.[227]

Further, in assessing the social cost of methane and carbon from the proposed Lease Modifications and adjacent lands, the Forest Service must estimate the likely timing of coal

---

[223]  T. Power *et al.*, Comments on the Rulemaking for the Colorado Roadless Areas Supplemental Draft Environmental Impact Statement, (Jan. 15, 2016), attached as Ex. 106.

[224]  U.S. Environmental Protection Agency, SDEIS - Colorado Roadless Rule - Detailed Comments (Jan. 2016), attached as Ex. 107.

[225]  U.S. Forest Service, Colorado Roadless Rule Supplemental Draft EIS (Nov. 2015) at 26.

[226]  2015 Colorado Roadless Rule Supplemental Draft EIS at 26.

[227]  2012 Lease Modifications Final EIS at 190 (asserting that 5.6 million tons of adjacent private land coal would not be mined under the "no action" alternative, but would be mined under the proposed action).

mining and combustion within the Lease Modifications area. This is so because both the social cost of carbon and of methane increase over time. At present, it appears unlikely that Arch Coal will mine in the Lease Modifications until after 2022. That is so because, first, it will take at least two summer seasons for Arch to explore the area at issue, based on its proposal. Second, Arch has submitted to state mining regulators documents indicating that the company intends to move its longwall miner miles away from the Lease Modifications area and mine other tracts until approximately 2023.[228] Third, given that Arch Coal's rate of production so far in 2016 is half of what it was in 2015, Arch may be mining the 50 million or so tons of coal in those other tracts for a much longer period than previously estimated.[229] The supplemental EIS therefore must identify the timing of coal mining so that it may effectively estimate the social cost of methane and carbon.

## VII.   THE SUPPLEMENTAL EIS MUST DISCLOSE THE CUMULATIVE IMPACTS OF REASONABLY FORESEEABLE FUTURE ACTIONS.

In evaluating cumulative impacts, agencies must do more than catalogue relevant "past projects in the area."[230] The EIS must also include a "useful analysis of the cumulative impacts of past, present and future projects."[231] This means a discussion and an analysis in sufficient detail to assist "the decisionmaker in deciding whether, or how, to alter the program to lessen cumulative environmental impacts."[232] Agencies also cannot merely list the number of road miles to be built or acres disturbed by past, present, and foreseeable projects.[233]

---

[228] Last year, Arch Coal sought and received approval from state regulators to begin the process of mining the B seam throughout a broad area in two of its current leases (COC-1362 and COC-67232). *See* letter of K. Welt, Mountain Coal Co. to J. Stark, Colorado Division of Reclamation, Mining and Safety (DRMS) (May 8, 2015), attached as Ex. 108. A map Arch provided to state regulators indicates the company intends to mine the B seam between 2015 and 2023 in an area far to the north of the lease modifications area. *See* Mountain Coal Co., Map 52, B Seam Projected Operations (May 8, 2015), attached as Ex. 109.

[229] For Arch Coal's current rate of production, *see infra* at 54 (mining at West Elk now occurring at a rate of 2.3 million tons per year).

[230] *City of Carmel-by-the-Sea v. United States Dep't of Transp.*, 123 F.3d 1142, 1160 (9th Cir. 1997).

[231] *Id.*

[232] *Id.* (citation omitted).

[233] *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 994-95 (9th Cir. 2004) ("A calculation of the total number of acres to be harvested in the watershed is … not a sufficient description of the actual environmental effects that can be expected from logging those acres…. Moreover, while a tally of the total road construction anticipated in the … watershed is definitely a good start to an adequate analysis, stating the total miles of roads to be constructed is similar to merely stating the sum of the acres to be harvested – it is not a description of <u>actual</u> environmental effects.").

The Lease Modifications supplemental EIS must address significant new information concerning cumulative impacts and activities likely to have cumulative affects, and cannot rely on previous EISs to do so for several reasons.

First, the 2012 Lease Modifications Final EIS failed to properly address cumulative effects. The 2012 Lease Modifications Final EIS's cumulative effects section, Section 3.37, largely consists of a list of present and reasonably foreseeable actions as well as "other activities."[234] There is almost no evaluation of what the impacts of those projects might be. For example, the 2012 Lease Modifications Final EIS's description of Bull Mountain Unit drilling discloses only that surface impacts will occur; the EIS does not address potential air quality impacts, nor does it explain how air or surface impacts will affect the environment when taken together with impacts of the Lease Modifications.[235] And while the 2012 Lease Modifications Final EIS's cumulative effects section states that "[a]ll cumulative effects are addressed specific to each resource in [other sections of the FEIS's] Chapter 3,"[236] those resource-specific cumulative impacts analyses also contain little to none of the information required by NEPA.

For example, for the expected oil and gas drilling in the Bull Mountain Unit, the 2012 Lease Modifications Final EIS identifies the number of wells to be drilled (150), and acknowledges that "[c]umulative effects would be expected as they relate to criteria air pollutants and visibility within the airshed."[237] And while the air quality effects section mentions the Bull Mountain Unit, it does so only to admit that it would add air pollutants, but then declines to even attempt to estimate or quantify such impacts, merely concluding summarily that "emissions cannot yet be quantified."[238]

Similarly, while the 2012 Lease Modifications Final EIS acknowledges the potential for cumulative effects when viewing the Lease Modifications together with the Oak Mesa coal exploration project ("cumulative effects could be expected as they relate to additional vegetation/habitat disturbance"),[239] the only other mention of Oak Mesa is the area of the project and the footprint of road and pad construction.[240] The 2012 Lease Modifications Final EIS thus fails to analyze the potential for that project to impact air quality or any other value when examined together with the impacts of the Lease Modifications. The supplemental EIS must correct these failures.

Second, the 2015 Colorado Roadless Rule Supplemental Draft EIS similarly fails to address the impacts of projects that, when taken together with the Lease Modifications, may have cumulative

---

[234]  2012 Lease Modifications Final EIS at 193-95.

[235]  *Id.* at 195.

[236]  *Id.* at 193.

[237]  *Id.* at 50.

[238]  *Id.* at 71.

[239]  *Id.* at 50.

[240]  *Id.* at 194.

impacts.  The 2015 analysis concludes that the 2012 Colorado Roadless Rule FEIS was sufficient to address the cumulative effects, and fails to identify any specific projects in the North Fork watershed, despite the fact that numerous federal actions are likely to interact cumulative with the Lease Modifications to impact the area's water, air, wildlife, roadless values, and other resources.  We specifically incorporate by reference and request the Forest Service to review and respond in its Lease Modifications supplemental EIS to our comments on the 2015 Colorado Roadless Rule Supplemental Draft EIS.[241]

Third, a number of specific projects, detailed in our 2015 Colorado Roadless Rule comments, post-date the 2012 Lease Modifications Final EIS and the 2012 Colorado Roadless Rule ROD and therefore must be addressed in this supplemental EIS.  The proposal or adoption of these proposals constitutes significant new information that the Forest Service must address.  These include:

- Petrox 2-APDs in Somerset Unit:  Two APDs from Petrox Resources proposed for development in the Federal Somerset Unit, a 6,400-acre project area that *largely overlies the Pilot Knob Roadless Area* north of Somerset.  A master development plan (MDP) has also been submitted to the Forest Service.[242]  A Forest Service document describes the level of development proposed in the Somerset Unit: "24 Multiple Well Drilling Locations (up to 50 wells); 1 Centralized Processing Facility (compressor, etc); 7.4 miles of proposed roads reconstruction, and 7.8 miles of new road construction; 16.2 miles of (mostly) co-located pipelines; *Majority of proposed activities are within the Pilot Knob CR.*)"[243]  If the MDP and the SDEIS proposed action are both approved, then no part of the Pilot Knob Roadless Area will be untouched by roads and drill pads.  The Petrox 2 APD project (as well as the MDP) would have significant on-the-ground impacts in the northern area of the Pilot Knob Roadless Area, widening and grading miles of rough, rutted, and wet jeep tracks there and scraping two well pads while the coal activity would degrade all of the roadless lands within the coal mine exception area.

---

[241]  HCCA Jan. 2016 Roadless Rule Comments (Ex. 1) at 78-89.

[242]  United States Department of the Interior Bureau of Land Management and United Stated Department of Agriculture Forest Service, *Environmental Assessment, Dual Operator Proposal: Development of 25 Federal Natural Gas Wells and Associated Infrastructure on 5 Multi-well Pads* (Sep. 2015) at 75, attached as Ex. 110.

[243]  Paonia Ranger District Natural Gas Projects, Project Description and Issues (emphasis added), attached as Ex. 111, available at https://drive.google.com/file/d/0B2JbC6r59_1KcVRwZm9iY0Z5eEk/edit (last viewed Apr. 12, 2016).  *See also* See D. Webb, Roadless dispute clouds drilling proposal, Grand Junction Sentinel (Mar. 1, 2015) (describing proposal), attached as Ex. 112, available at http://www.gjsentinel.com/news/articles/roadless-disputeclouds-drilling-proposal (last viewed Apr. 12, 2016).

- Deadman Gulch APD:  SG has proposed an APD (12-89-30#1) inside the GE Deadman Gulch Unit adjacent to the Petrox Somerset Federal Unit within the Pilot Knob Roadless Area on lease COC 64169, again scraping well pads inside that area.[244]

- Huntsman Unit Proposal:  SG has proposed drilling in the Huntsman Unit (COC 74403X), which includes three SG leases (COC 63886, 63888, and 63889).  SG has proposed one APD there for well 10-89-31 #1 inside lease COC 63886.[245]  The proposal is located in the watershed of the North Fork of the Gunnison River in the Huntsman Ridge Colorado Roadless Area.  The Huntsman Unit is located just west of McClure Pass, approximately 10 miles from the Pilot Knob Roadless Area.[246]  This unit includes the upstream reaches of the North Fork drainage.

- 150 Well Bull Mountain MDP:  The Bull Mountain Unit Master Development Plan involves the exploration and development of up to 146 natural gas wells, 4 water disposal wells, and associated roads, pipelines and infrastructure on federal and private mineral leases, in the watershed of the North Fork of the Gunnison River.[247]  The Bull Mountain Unit includes approximately 19,645 acres of federal and private subsurface mineral estate located about 30 miles northeast of the Town of Paonia and bisected by State Highway 133.  The Bull Mountain project area boundary is directly adjacent to the Pilot Knob Roadless Area, and about 8 miles from the Flatirons Roadless Area.  The MDP and the proposed rulemaking here impact the same watershed (North Fork Gunnison), and many species of wildlife.[248]

---

[244]  BLM, Environmental Assessment, Dual Operator (Ex. 110) at 75.

[245]  *Id.  See also* BLM, webpage for Uncompahgre Field Office, Bull Mountain Master Development Plan EIS, http://www.blm.gov/co/st/en/BLM_Information/nepa/ufo/Bull_Mountain_EIS.html (last viewed Apr. 12, 2016).

[246]  *See* BLM, *Categorical Exclusion DOI-BLM-CO-SO50-201-0035 CX* (August 2012), at 7-8 (maps), attached as Ex. 113, available at: http://www.blm.gov/pgdata/etc/medialib/blm/co/information/nepa/uncompahgre_field/ufo_nepa_documents0.Par.60636.File.dat/12-035CX%20SG%20USFS%20Lease%20Susp.pdf (last viewed Apr. 12, 2016).

[247]  BLM, Environmental Assessment, Dual Operator (Ex. 110) at 74.

[248]  The Bull Mountain MDP Draft EIS identified North Fork coal mining as among the projects or activities "having the greatest likelihood to generate potential cumulative impacts when added to the Bull Mountain Unit MDP alternatives."  BLM, Bull Mountain MDP Draft EIS (Jan. 2015) at 4-11 – 4-12, excerpts attached as Ex. 114, available at http://www.blm.gov/style/medialib/blm/co/information/nepa/uncompahgre_field/13-22_bull_mountain.Par.23863.File.dat/Bull_Mtn_DEIS_Jan2015_508_reduced.pdf (last viewed Apr. 12, 2016).  Beyond estimating the total acres disturbed by coal mining, however, the Bull Mountain MDP Draft EIS does not address the actual impacts of coal mining in its cumulative impacts analysis.

- Spadafora Waste Disposal Pits:  The Spadafora Water Storage Facility was approved by the Gunnison County Planning Commission on March 6, 2015.  Three water storage pits, each with a pump station and a volume of about 9,240,000 gallons, will sit on roughly 19 acres and will store and recycle produced water for drilling and gas well operations, all within the watershed of the North Fork of the Gunnison River.[249]  The Spadafora waste pits are located approximately six miles north of Pilot Knob Roadless Area.

- In February 2016, the GMUG National Forest released its final EIS and draft record of decision for the Spruce Beetle Epidemic and Aspen Decline Management Response (SBEADMR) project.[250]  That project appears to propose logging along two access routes to the Lease Modifications area:  NFSR 710 and NFSR 711.  Such logging may eliminate habitat, compact soil, result in infestations of exotic weeds, etc. in areas close to the Lease Modifications.  It may also result in increased noise and traffic.

The Lease Modifications supplemental EIS must address the potential for cumulative impacts when viewed together with the consequences of each of these individual projects.

## VIII.  THE SUPPLEMENTAL EIS MUST ADDRESS SIGNIFICANT NEW INFORMATION CONCERNING AIR QUALITY.

### A.  The Supplemental EIS Must Address Significant New Information Concerning Emissions Of Volatile Organic Compounds From MDWs.

New data made available since publication of the 2012 Lease Modifications Final EIS indicates that venting from MDWs at each of the three coal mines in the North Fork Valley may release significant amounts of volatile organic compounds (VOCs).

VOC emissions are a significant concern because atmospheric VOCs and nitrogen oxides react in the presence of sunlight to form ozone pollution (smog).[251]  Ground-level ozone poses a threat to public health.[252]  Under Clean Air Act regulations, VOCs include "any compound of carbon," including propane, pentane, butane, hexane and benzene.  40 C.F.R. § 51.100 (s)(1).  We are greatly concerned over the potential for VOC emissions to cause or contribute to future violations of ozone standards.

The 2012 Lease Modifications Final EIS contained almost nothing addressing the scale, quantity, or impacts of VOC pollution resulting from the Lease Modifications.  The 2012 Final EIS acknowledged that two data samples taken by Arch Coal in 2009 (and provided to BLM nearly three years before the EIS was published) confirm that methane drainage wells emit VOC

---

[249]  BLM, Environmental Assessment, Dual Operator (Ex. 110) at 75.

[250]  SBEADMR Final EIS (2016) (Ex. 23).

[251]  2012 Lease Modifications Final EIS at 57.

[252]  *Id.* at 58 ("Ozone in the lower atmosphere is harmful to human health").  *See also* EPA, Final Rule, National Ambient Air Quality Standards for Ozone, 73 Fed. Reg. 16,436, 16,436 (Mar. 27, 2008) (describing "an array … adverse health effects" from ozone pollution).

pollution.[253]  Despite evidence of such pollution, the 2012 Lease Modifications Final EIS explicitly stated that "no attempt is made here to quantify" such pollution.[254]  That EIS also implied that the Forest Service need not analyze and assess VOC emissions from methane venting because the Colorado Air Pollution Control Division "will be requiring all coal mines in the state, including the West Elk Mine, to gather additional data to provide a more accurate annual estimate of VOC emissions."[255]

However, since the preparation of the 2012 Lease Modifications Final EIS, new information has become available indicating that VOC emissions are a significant issue and that these emissions at Arch's West Elk mine are in violation of Colorado air quality regulations.

In June of 2009, an analysis of mine ventilation emissions was prepared for Arch Coal and revealed that the ratio of regulated VOC emissions to methane emissions was around 0.007 (low value of 0.007677 and a high value of 0.007913).[256]  Subsequent analysis of ventilation emissions at the Elk Creek mine conducted in February and August of 2014 found the ratio of regulated VOC emissions to methane emissions to average 0.005216 and 0.006048, respectively.[257]  Although the ratio of VOC/methane is low, because of the high quantity of methane releases, the total VOC emissions have the potential to be significant.

Recognizing this, the Colorado Air Pollution Control Division calculated the likely VOC emissions from several Colorado mines, including West Elk and Elk Creek.  Based on total methane emissions reported to the EPA in 2012, the Division estimated that total VOC emissions from West Elk and Elk Creek were as high as 321 and 408 tons/year, respectively, and that emissions exceeded several permitting thresholds, including state construction permitting thresholds (5 tons/year), Clean Air Act Title V Operating Permit thresholds (100 tons/year), and Prevention of Significant Deterioration (PSD) thresholds (250 tons/year).[258]  The table and chart

---

[253]  2012 Lease Modifications Final EIS at 75-76; *see also* Arista Report, Appendix 2, Analytical Solutions, Inc., Extended Gas Analysis Report, attached to 2012 Lease Modifications Final EIS.

[254]  2012 Lease Modifications Final EIS at 76.

[255]  *Id.*  The 2012 Lease Modifications Final EIS also asserted that VOC pollution from methane drainage wells must be low because, as yet, no ozone violations in the immediate mine area have been detected, and the Lease Modifications will merely extend ongoing emissions for about three years.  *Id.*  The FEIS made this leap although it admitted that, "there are few [air quality] monitors close to the mine."  *Id.*  This ignores the fact that drainage well emissions will continue as a result of the Lease Modifications, a significant impact because ozone levels in western Colorado are getting worse due to contributions from many sources.

[256]  Arista Report, Appendix 2, Analytical Solutions, Inc., Extended Gas Analysis Report, attached to 2012 Lease Modifications Final EIS (setting forth gas component analysis for two MDWs).

[257]  *See* Gas Sample Analysis, Oxbow Elk Creek Mine, attached as Ex. 115 (setting forth analysis of gas samples from generator inlets at Elk Creek mine).

[258]  E-mail of B. Cappa, Air Pollution Control Division to P. Carr, Air Pollution Control Division, "Recent Oxbow Gas Analysis and Mine VOC Summary" (Aug. 7, 2014), attached as

below show the Division's analyses of the North Fork coal mines and comparisons with regulatory thresholds.[259]

**Estimated VOC emissions using 2012 CH$_4$ data (**in US short tons/year**)**

| | 2012 Total Methane reported to EPA | VOC by #0851 ratio (0.007677) | VOC by #0840 ratio (0.007913) | VOC by 2/20/14 Oxbow Avg ratio (0.005216) | VOC by 8/11/14 Oxbow Avg ratio (0.006048) |
|---|---|---|---|---|---|
| **Oxbow –Elk Creek** | 51,574.5 | 395.9 | 408.1 | 269.0 | 311.9 |
| **MCC – West Elk** | 40,672.4 | 312.2 | 321.8 | 212.1 | 246.0 |
| **Bowie No. 2** | 14,623.5 | 112.3 | 115.7 | 76.3 | 88.4 |

---

Ex. 116 (transmitting "Coal Mine VOC Gas Analysis Calculations 8/6/2014" and "MCC and Vessels Gas Analyses Reports"); *see also* "Coal Mine VOC Gas Analysis Calculations 9/2/2014" (presenting updated calculations using August gas analysis data from Elk Creek mine), attached as Ex. 117.

[259] The Division's report was obtained by WildEarth Guardians through a Colorado Open Records Act request.

Letter to Supervisor Armentrout re: Coal Lease Modifications COC-1262 & COC-67232          Page 66
April 12, 2016



Even using 2013 methane emissions data reported to the EPA by the coal companies, total VOC emissions from the Elk Creek and West Elk mines continue to exceed regulatory thresholds. At Elk Creek, emissions still are exceeding state permitting thresholds and at West Elk, emissions are still exceeding state permitting thresholds, Title V Operating Permit thresholds, and likely PSD thresholds.

**Estimated VOC emissions using 2013 CH$_4$ data (in US short tons):**

|  | 2013 Total Methane reported to EPA | VOC by #0851 ratio (0.007677) | VOC by #0840 ratio (0.007913) | VOC by 2/20/14 Oxbow Avg ratio (0.005216) | VOC by 8/11/14 Oxbow Avg ratio (0.006048) |
|---|---|---|---|---|---|
| **Oxbow –Elk Creek** | 3,779.0 | 29.0 | 29.9 | 19.7 | 22.9 |
| **MCC – West Elk** | 33,119.1 | 254.3 | 262.1 | 172.7 | 200.3 |
| **Bowie No. 2** | 12,934.2 | 99.3 | 102.3 | 67.5 | 78.2 |

In spite of this, neither Arch nor Oxbow have applied for and obtained state construction permits, or any necessary Title V Operating Permit or PSD permit under the Clean Air Act. Recognizing

this, the Colorado Air Pollution Control Division has recommended enforcement actions be undertaken at both the West Elk and Elk Creek mines.  For instance, in an Inspection Report for the Elk Creek Mine dated November 26, 2012, the Division noted violations related to the mine ventilation shafts and blower systems, stating:

> [T]he Division is comfortable making the determination that the mine Ventilation Shaft #1 and #2 emit VOCs far above the 2 tpy APEN-reporting threshold.  These emissions have not been reported to the Division, and a request for permit modification should have been made, thus violating Condition 12.d, as well as AQCC Regulation 3, Part A, Section II.A.  Enforcement action is recommended to address this violation.[260]

Although the state has not undertaken an enforcement action to date, this does not mean that the mines are not releasing VOC emissions, posing potentially significant air quality impacts, or that the West Elk is not violating Colorado air quality rules.

In light of this, it is crucial that the supplemental EIS fully analyze and assess the extent and significance of current VOC emissions from the West Elk mine, and analyze and assess the VOC emissions that would be released as a result of any future mining in the North Fork Coal Area.  To this end, the supplemental EIS must also fully analyze and assess to what extent these coal mine VOC emissions affect air quality in the area, particularly in the context of ozone concentrations.

The need to analyze emissions is critical.  A key consideration under NEPA is "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment."  40 C.F.R. § 1508.27(b)(10).  Further, NEPA requires that agencies consider "[t]he degree to which the proposed action affects public health and safety."  40 C.F.R. § 1508.27(b)(2).  Here, if the West Elk is not in compliance with PSD, then the mine's operations are not appropriately preventing significant deterioration of air quality.  This means that the Forest Service's approval would fail to "protect public health and welfare from any actual or potential adverse effect ... notwithstanding attainment and maintenance of all national ambient air quality standards."  42 U.S.C. § 7470(1).

Further, the supplemental EIS must fully analyze and assess to what extent the West Elk mine is complying with state air quality rules.  Under the Clean Air Act, federal agencies must ensure their actions comply with "all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of air pollution."  42 U.S.C. § 7418(a).  If approval of additional mining in the North Fork Coal Area would pave the way for mining that would not comply with state air quality rules, then the Forest Service would have to disapprove such mining.

---

[260] *See* Air Pollution Control Division, "Field Inspection Report, Oxbow Mining-LLC Elk Creek Mine" (Nov. 20, 2012) at 21, attached as Ex. 118; *see also* Air Pollution Control Division, "Field Inspection Report, Mountain Coal Co-LLC West Elk Mine" (April. 4, 2013), attached as Ex. 119.

It is particularly critical that the supplemental EIS address these impacts because the 2015 Colorado Roadless Rule Supplemental Draft EIS punted the issue to later analysis. The 2015 Colorado Roadless Rule EIS asserts that "more site-specific analyses of local air impacts would occur if and when new coal actions are considered."[261] The Lease Modifications supplemental EIS constitutes just such future action requiring analysis. The Forest Service has ample information regarding the lease, and so must analyze and assess the impacts of VOC emissions that will result from mining the coal proposed to be sold by the Lease Modifications.

### B.     The Supplemental EIS Must Disclose Air Pollution Impacts.

The Forest Service must fully analyze and assess impacts to air quality, including impacts to air quality in the context of all national ambient air quality standards ("NAAQS"), prevention of significant deterioration ("PSD") increments for Class I and II areas, and visibility impacts to Class I areas. That analysis must disclose the direct, indirect, and reasonably foreseeable impacts of mining to NAAQS for ozone, particulate matter (particularly $PM_{2.5}$), nitrogen dioxide, and sulfur dioxide.

### Important NAAQS that the Supplemental EIS Must Address

| Pollutant | Date Adopted | Standard | Citation |
|---|---|---|---|
| Ozone | 2015 | 0.070 parts per million over an 8-hour period | 80 Fed. Reg. 65292 (Oct. 26, 2015) |
| $PM_{2.5}$ | 2006 | 35 micrograms/cubic meter over a 24-hour period | 40 C.F.R. § 50.13 |
| $PM_{2.5}$ | 2012 | 12 micrograms/cubic meter annually | 40 C.F.R. § 50.18 |
| $NO_2$ | 2010 | 100 parts per billion over a one-hour period | 40 C.F.R. § 50.11(b) |
| $SO_2$ | 2010 | 75 parts per billion over a one-hour period | 40 C.F.R. § 50.17 |

Mining of the Lease Modifications will result in air pollution, including from MDWs and from prolonging operations at the West Elk mine. Reasonably foreseeable impacts of the Forest Service's approval will include air quality impacts directly from mining activities, including engines, generators, locomotives, trucks and other traffic, drilling rigs, but also emissions from indirect, or reasonably foreseeable activities. This includes the air quality impacts of coal combustion, locomotive operation outside of the North Fork Coal Area (as well as particulate emissions associated with coal dust from train cars), and the air quality impacts of exporting coal overseas.

Here, there is ample information for the Forest Service to analyze and assess reasonably foreseeable air quality impacts. The 2012 Lease Modifications Final EIS did not adequately disclose these impacts, and in any event that analysis did not address the new ozone standard EPA adopted in 2015. Therefore, the supplemental EIS must fully analyze and assess air quality

---

[261]  2015 Colorado Roadless Rule Supplemental Draft EIS Appendix B at B-5.

impacts – especially VOC emissions and the potential to violate the new ozone standard – to ensure compliance with both NEPA and the Clean Air Act.

## IX.   THE FOREST SERVICE MAY NOT RELY ON THE 1983 GMUG FOREST PLAN AS AMENDED.

### A.   The Lease Modifications EIS Improperly Relied On A Stale, Outdated Forest Plan

The Forest Service is preparing its supplemental EIS for the coal lease modifications under the umbrella of a stale, antiquated, and increasingly out-dated 33-year old Forest Plan. A review of the 1983 Forest Plan, the 1991 Forest Plan amendment, and supporting EISs reveals little discussion of coal mining, and no discussion at all of coal mining impacts. The Forest Service cannot continue to consider coal lease modifications in the context of a forest planning framework that was crafted without consideration of the direct, indirect and cumulative effects of coal mining. Further, the 1983 Forest Plan, 1991 amendment, and supporting documents fail to mention or address a key impact of coal mining and a key threat to the GMUG National Forest: climate change.

NFMA mandates that Forest Plans "shall be revised … from time to time when the Secretary finds conditions in a unit have significantly changed, but at least every fifteen years."[262] Both of these conditions were long ago met on the GMUG. The responsible official has the discretion to determine at any time that conditions within a plan area have changed significantly, such that a plan must be revised.[263] In the early 2000s the Forest Service recognized that the GMUG Forest Plan was out-of-date and that it must update the Plan, and so it initiated an extensive revision process. The Forest Service put that effort on hold in 2008, but has recently stated that it will initiate its Plan assessment and revision this year. Given the antiquity of the current Plan, proceeding with the coal lease modifications in light of the Forest Service's announcement of imminent revision is unwarranted.

Due to the insufficiency of the Forest Service's existing management framework, all coal leasing and development decisions, at all stages of the administrative processes, should be suspended until the Forest Plan revision is complete and outstanding deficiencies can be addressed. In the alternative, the agency should amend the current Forest Plan to comprehensively address coal development on the GMUG, something no plan amendment has done to date. The existing Forest Plan is no longer able to serve its intended land use planning function with regard to coal development.

The 2012 Lease Modifications Final EIS states that "[t]he Forest Service Authorized Officer will determine if the activity is consistent with the GMUG Forest Plan."[264] The problem is that the GMUG Forest Plan does not reflect the on-the-ground reality of today's forest.

---

[262]   16 U.S.C. § 1604(f)(5).

[263]   *Id.*

[264]   2012 Lease Modifications Final EIS at 5.

> The Forest Plan guides all natural resource management activities and establishes
> management standards and guidelines for the GMUG.  Management directions
> described in the Forest Plan are a result of public issues, management concerns,
> and management opportunities.[265]

The above statement cuts to the heart of the matter: the Forest Service is basing its leasing
analysis and decision-making within a framework of public issues, management concerns and
management opportunities that were relevant decades ago, but have not been updated to reflect
the significant changes on the GMUG.  Climate change is a key example of a preeminent
contemporary public issue that was not a concern when the 1983 Forest Plan was developed, and
that was not addressed in the context of coal development in the 1991 amended Forest Plan.

For each potentially affected resource identified and analyzed in the 2012 Lease Modifications
Final EIS, the Forest Service reaches a conclusion that all action alternatives are consistent with
Forest Plan standards.[266]  But comparing today's resources to yesterday's Forest Plan standards
is comparing apples to oranges.  The standards of the 1980s and 1990s are not reflective of
today's standards and our understanding of today's forest and environment.

For example, the Lease Modifications EIS state that "[t]he negative effects from this project are
of short duration and magnitude and do not result in a Forest-wide decrease in trends or deter
from meeting the MIS objectives in the Forest Plan."[267]  But this project would release
significant amounts of methane into the atmosphere.  Burning the coal generated from this
project would release significant amounts of carbon dioxide into the atmosphere.  The negative
effects of climate change on the GMUG will not be short-lived and of limited magnitude.  An
updated Forest Plan would likely attempt to address climate impacts to the Forest and address the
how the agency could mitigate damage caused by the Forest's actions that worsen climate
change.  Because the Lease Modifications are viewed in terms of consistency to an outdated
plan, the purposes of NFMA are subverted, and decisions may be made that undermine proper
Forest stewardship.

**B.      The GMUG National Forest Environment Has Changed Significantly Since
1983.**

The landscape and resources of the GMUG National Forest and our understanding of the
relationship between coal and the environment have changed significantly over the past one-third
of a century.  Among those changes are:

-      Climate change.  The current Forest Plan did not anticipate or address climate change as
       it relates to coal development, and the impacts climate change is having and is likely to
       have on the Forest.  Science has long since confirmed the reality of climate change, and

---

[265] *Id.* at 7.

[266] *See, e.g., id.* at 92, 97, 158, 161, 186.

[267] *Id.* at 135.

the changing impacts are being experienced on the GMUG in the form of warmer winters, prolonged drought, beetle outbreaks and increased fire extent and severity.

- Coal mining. The current Forest Plan did not address coal mining and its impact on the Forest or on the climate (through methane venting and coal combustion).

- Population growth. Since 1983, the population of Gunnison County and Delta County has grown by about 50%, which has resulted in significant development near and more recreation pressure on forest lands.

- Oil and gas development. Since 1983, there has been unprecedented growth in natural gas development in Colorado, and a surge in development in the nearby Muddy Creek and Bull Mountain areas. Such development is impacting wildlife habitat, air quality, water quality, scenic values, and cumulative interacts with coal mining impacts.

- Wildlife. Since 1983, deer populations have fallen, the lynx has returned to the GMUG, and new science concerning the presence and status of native cutthroat trout has emerged.

Given these and many other changes, the Forest Plan and EIS's analysis increasingly fails to reflect the steadily growing body of scientific evidence concerning coal's impacts on the environment. Without the foundational land use planning guidance that is only available through a current and up-to-date Forest Plan, it is impossible for the Forest Service to make the type of fully informed decision that NEPA requires, and it is impossible for the Forest Service to ensure that other Forest values are adequately protected from the impacts of coal mining under the plan. The data utilized and conclusions drawn in the current Forest Plan are stale to the point that they do little to aid the public's understanding of the relationship between coal mining and the GMUG National Forests. In *Northern Plains Resource Council v. Tongue River Railroad*, the court addressed the duty of federal agencies to gather "baseline data" about wildlife species during the NEPA process.[268] The court ruled that the data collected was "stale," because it dated back to the 1980s and 1990s, and that insufficient efforts were made to update that data. "Reliance on data that is too stale to carry the weight assigned to it may be arbitrary and capricious."[269] Here, data collected for the GMUG's planning framework stretches back to the very early 1980s.

The 1983 Forest Plan and FEIS consideration of coal mining is largely limited to Appendix F – Unsuitability Assessment for Coal Mining. Coal Unsuitability Criteria consists of regulations developed by BLM, which use the ability of an area's surface resources to accept or absorb the impacts of coal mining activities as a means to determine suitability or unsuitability of the area for coal mining. Based on the applicability of regulatory criteria to forest conditions that existed in the early 1980s, in all alternatives approximately 755,862 acres have been identified having "high" to "moderate" suitability for coal leasing through application of the BLM Coal unsuitability criteria; 224,491 acres of the suitable acres were assessed as unsuitable for coal

---

[268] *Northern Plains Resource Council v. Tongue River Railroad*, 668 F.3d 1067 (9th Cir. 2011).

[269] *Id.* at 1086.

leasing.[270]  Although the GMUG Forest Plan was amended in 1991, it did not amend the 1983 coal suitability analysis.  Before the Forest Service can commit itself to lease modifications and other project-level planning it must reexamine the validity of the unsuitability criteria employed in the early 1980s.

Because the 1983 Forest Plan and1991 Plan amendment rely on stale data and analysis, the Forest Service cannot tier to these documents to assist the agency in adequately or fully disclosing impacts to the Forest, or to assist the public in understanding current conditions, nor can it rely on the stale plan to analyze how the environmental, social and economic foundations of the landscape would be affected by the coal lease modifications.  To satisfy the "hard look" requirement of NEPA, the Forest Service must supplement its existing analyses when new circumstances "raise significant new information relevant to environmental concerns …."[271] Since the release of the Forest Plan in 1983, and since the 1991 Plan amendment, new information has become available and circumstances have changed that must be considered.  An "agency must be alert to new information that may alter the results of its original environmental analysis, and continue to take a hard look at the environmental effects of [its] planned actions."[272]

### C.    The 2012 Lease Modifications Final EIS Does Not Correct The Forest Plan's Substantial Omissions.

A project-level supplemental EIS will be unlikely to address the significant new information and changed circumstances that have occurred since adoption of the 1983 Forest Plan and its 1991 amendment.

The Forest Service must address new information both at the project level and Forest-wide. "Forest management then occurs at two distinct levels.  At the first level, the Forest Service develops the Forest Plan, a broad, programmatic document accompanied by an environmental impact statement …."[273]  At the second level, "the Forest Service is required to implement the forest plan by approving or disapproving specific projects. Projects must be consistent with the governing forest plan and subject to the procedural requirements of NEPA. 16 U.S.C. § 1604(i)."[274]

In addition to the non-existent analysis of coal's impacts to the environment in the Forest Plan, the Plan's coal leasing stipulations are also out-dated and do not reflect or address significantly

---

[270]  GMUG Forest Plan Final EIS (1983) at IV-81.

[271]  *Portland Audubon Soc'y v. Babbitt*, 998 F.2d 705, 708 (9th Cir. 2000).

[272]  *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557 (9th Cir. 2000); *see also* 40 C.F.R. §1502.9(c)(1)(ii) (requiring preparation of supplemental EIS's where "are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts").

[273]  *Colorado Environmental Coalition*, 185 F.3d 1162, 1167–68 (10th Cir. 1999).

[274]  *Lamb v. Thompson*, 265 F.3d 1038, 1042 (10th Cir. 2001).

changed conditions on the Forest today.[275]  The Forest Plan contains a rather skeletal list of mineral leasing stipulations, conditions that may have been pertinent to protecting surface conditions and wildlife 33 years ago, but whose restrictions fail to address the significant changes to the Forest.  The EISs for the 1983 Forest Plan and the 1991 amendment contain no analysis of the stipulations or their effectiveness.  The stipulations in the GMUG Forest Plan are therefore insufficient to protect the resource values of the Sunset Roadless Area and the connected landscape of the Upper North Fork Valley.

In sum, the GMUG National Forest should not process coal leasing pending revision of the Forest Plan.  In the alternative, the Forest Service should update the analysis that supported the 1983 Forest Plan and 1991 Plan amendment through an additional plan amendment to account for significant new information that has arisen.  "While the USFS must prepare an EIS when it decides to revise a Forest Plan, it need not supplement the existing Forest Plan EIS pending the revision if it has taken a hard look at the environmental effects of the new information and made a reasoned decision not to prepare a supplemental EIS."[276]  The agency must explain why it is not pursuing an amendment to the Forest Plan in light of the significant science that has developed around coal impacts, especially climate change, over the past 30 years.

The landscapes implicated in this proposed lease modifications are ripe with diverse ecosystems, wildlife and other natural resources.  Similarly, important values in the form of organic orchards, tourist-centered wineries and clean irrigation canals exist immediately downstream from the potentially affected landscape.  Lease modification and development on the scale proposed could impact these resources.  The agency has a legal obligation to defer modifying these leases until it can address significant new information that impacts how the Forest can properly protect and successfully manage its resources.  The first step in achieving this is withholding action on coal exploration and lease modifications until the Forest Service completes the comprehensive Forest Plan revision or similar analysis that addresses significant new information at the forest level.

### D.      BLM Similarly Cannot Rely On The Outdated Uncompahgre Field Office Resource Management Plan.

The BLM Uncompahgre Field Office's Resource Management Plan (RMP), published in 1989, is also stale and outdated, creating similar legal and analysis infirmities.  The 2012 Lease Modifications EIS states:

> Leasing is also consistent with the BLM Uncompahgre Basin Resource Management Plan (RMP, 1989).  This RMP determined that the areas subject to the lease applications and exploration license applications were to be managed for both existing and potential coal development.  The area is acceptable for coal

---

[275]  For example, the Forest Plan contains a conditional surface disturbance stipulation referencing "Possible Grizzly Bear essential habitat."  1983 GMUG Forest Plan at H-16.

[276]  *Idaho Sporting Congress, Inc. v. U.S. Forest Service,* 31 F. Supp. 2d 1236 (D. Idaho 1996).

development and coal production, and such coal activities could occur without conflicting with other land uses as described in the RMP.[277]

The 27-year old RMP should not be used to consider coal leasing in today's context. We note that BLM's decided in 2012 to abandon another fossil fuel decision impacting the North Fork Valley – a proposed 30,000-acre oil and gas lease sale that included lands within a mile or two of the West Elk Mine and the GMUG National Forest – in large part because of the staleness of that Uncompahgre RMP. In that case, numerous conservation groups and members of the public argued that tiering a lease sale to a 1989 RMP, a document largely devoid of relevant analysis of modern oil and gas practices, was unacceptable. The RMP's lack of consideration of climate change, fracking, methane pollution and other issues associated with oil and gas development (many of which are also associated with the Lease Modifications) sealed the August 2012 lease sale's fate, and the agency abandoned its proposal. BLM announced the deferral of all 22 parcels and 30,000 acres of public lands surrounding the North Fork Valley from the August 2012 oil and gas lease sale, citing the need to conduct additional analysis.

The inadequacy of coal leasing provisions in the 1989 RMP is directly analogous to the inadequacy of oil and gas leasing provisions in that document. Given the outdated nature of the RMP (which is being revised but whose revision is not yet complete), and given the similar antiquated condition of the GMUG Forest Plan, with its non-consideration of climate change, methane and other identical issues, the agencies should not process Arch's lease modifications application unless and until both BLM and the Forest Service amend or revise their stale plans.

## X.    THE SUPPLEMENTAL EIS MUST ACCURATELY DISCLOSE THE IMPACTS OF DRILL PADS AND ROADS.

### A.    The Supplemental EIS Must Resolve Inconsistencies About The Location And Impact Of Roads And Drill Pads Across The Two Lease Modifications.

Inconsistencies between the 2012 Lease Modifications Final EIS and the 2013 Exploration Plan EA appear to show that the EIS's "reasonably foreseeable mine plan" grossly underestimated the impacts of road construction in Lease Modification COC-67232. The 2012 Lease Modifications Final EIS assumed that development of the lease would result in 0.5 miles of road and 4 well pads within Lease Modification COC-67232.[278] The EIS also assumed that "if any exploration drilling, staging areas, and ground water monitoring drill pads and access road construction are needed, they would utilize the same locations as those used for MDWs."[279] Thus, any exploration proposal is likely a good predictor of the future location of at least some of the MDW pads and roads.

But the 2013 Exploration Plan reveals that the Lease Modifications EIS estimate of the amount of road construction in Lease Modification COC-67232 was far too low. The roads MCC

---

[277]  2012 Lease Modifications Final EIS at 7.

[278]  2012 Lease Modifications Final EIS at 102.

[279]  *Id.* at 54, 121.

proposes in the exploration plan to connect drill pads SST-3, SST-8, and SST-10, all of which are completely within Lease Modification COC-67232, total 1.43 miles in length, or nearly three times the road mileage estimated by the Lease Modifications EIS.  Approximately half of the road connecting drill pad SST-6 and drill pad SST-9, and nearly all of the road accessing SST-7, are also within COC-67232, bringing the total road miles to be constructed within COC-67232 to nearly 2.4 miles, or about *five times* the amount of road construction (and habitat destruction) projected by the Lease Modifications Final EIS for COC-67232.[280]

This additional road construction in COC-67232 is not a mere "fly-speck."  It means that more of the eastern past of the Sunset Roadless Area will be rendered "roaded," and more of the wilderness-capable land will likely be rendered unsuitable for wilderness protection.

In addition, Lease Modification COC-67232 is generally higher in elevation than Lease Modification COC-1362 and contains more spruce-fir habitat.  Thus the 2012 Lease Modification Final EIS's under-reporting of impacts to Lease Modification COC-67232 almost certainly means the Forest Service underestimated the impacts to spruce-fir habitat, and thus impacts to lynx and other species that use such habitat.

The Lease Modifications Final EIS also projected that four MDWs would be constructed in Lease Modification COC-67232.[281]  But the Exploration Plan proposes to place four drill pads for exploration alone within COC-67232 (SST-3, SST-8, SST-9, and SST-10),[282] meaning that for the number of MDWs to remain at four, as predicted in the 2012 Lease Modifications EIS, only these four specific sites could be used for MDWs.  This seems an unlikely outcome, given the construction pattern of MDWs, and indicates that the EIS again under-predicted the impacts of roads and MDWs in COC-67232.

The Lease Modifications supplemental EIS must address these inconsistencies and more properly reflect the actual impacts of roads and drill pads across the landscape, whether from exploration or from lease development, especially within COC-67232.

### B.          The Supplemental EIS Must Disclose Impacts To Wilderness Character.

The 2012 Lease Modifications Final EIS failed to characterize impacts to roadless and wilderness character from the selected alternative as "significant" or "not significant," but asserted that impacts to roadless character would generally be "short-term," although it fails to identify where those "short-term" impacts would occur.[283]  (For example, the EIS does not clarify whether the impacts to roadless character would occur just in the roadbed of the MDW

---

[280]  *See* 2013 Exploration Plan EA at 4-5.

[281]  2012 Lease Modifications Final EIS at 102.

[282]  *See* 2013 Exploration Plan EA at 5.

[283]  2012 Lease Modifications Final EIS at 177 ("The roadless area characteristics within the Sunset CRA would be generally adversely impacted over the short-term, although aspen and spruce/fir types would take longer to regain natural appearances from temporary road construction activities and well pads.").

access routes, or whether road construction would, even temporarily, impact a larger area beyond that footprint). Construction of drill pads and access roads in the Sunset Roadless Area will dramatically alter a significant extent of the lands' character, yet the Forest Service fails to define the spatial reach of the expected impacts on roadless and wilderness characteristics and has understated their likely duration. Further, the 2012 Lease Modifications Final EIS contains contradictory statements about the extent of the harm to roadless character from the construction and bulldozing of roads and MDW pads. The Forest Service must address these issues in the supplemental EIS.

First, the agency must accurately portray the impacts of the proposed action. Road construction may directly consume 24 acres of lands,[284] but it will result in the establishment of a spider-web of roads and drill pads *throughout* the Lease Modifications area. The Forest Service anticipates the installation of 48 methane drainage wells, each requiring up to 1 acre of cleared, level ground, and 6.5 miles of access road construction in the Lease Modifications area over the life of the leases.[285] In general, mines in the North Fork Valley require the installation of one methane venting well for every 32-64 acre tract of surface acres over the mine, or 10-20 pads per square mile. The dispersal of approximately 48 methane venting wells connected by 6.5 miles of access roads in the Sunset Roadless Area will convert more than 1,700 acres of undeveloped, unroaded lands, which is contiguous with the West Elk Wilderness and much of which is capable of supporting wilderness, into a heavily developed landscape crisscrossed by roads and drill pads. The drill pads are generally sited at regular intervals in a linear manner over the coal panel beneath and connected by roads, making it impossible for anyone (or any wildlife) to walk more than a few hundred yards without hitting a road or drill pad, and leaving obvious linear scars visible from every ridge-top.[286] The entire 1,700 acres of roadless land within the Lease Modifications will likely see its roadless character degraded for decades. Yet the 2012 Lease Modifications Final EIS fails to disclose the broad extent of these impacts, or the effect on the larger Sunset Roadless Area.[287]

These are, however, exactly the types of impacts federal courts require federal agencies to disclose. As the Tenth Circuit has noted: "the *location* of development greatly influences the likelihood and extent of habitat preservation. Disturbances on the same total surface acreage may produce wildly different impacts on plants and wildlife depending on the amount of contiguous habitat between them."[288] In the 2012 Lease Modifications Final EIS, the Forest Service made no attempt to address the nature or location of the road and MDW network

---

[284] *Id.* at 54.

[285] *Id.*

[286] *See id.* at 171 (Figure 3.30b) (illustrating the location of E-Seam drainage wells near the Lease Modifications).

[287] While the Lease Modifications EIS contains a table for each alternative addressing impacts to various roadless characteristics, the document fails to address where those impacts would occur, or to compare where on the ground those by alternative. *Id.* at 173-179.

[288] *New Mexico ex rel. Richardson v. Bureau of Land Management*, 565 F.3d 683, 706 (10th Cir. 2009) (emphasis added).

(beyond estimating road mileage and the number of MDWs), although it could have done so, as BLM has done for the road and MDW network needed for other coal lease expansions in the North Fork Valley.[289]  At a minimum, the Forest Service must disclose the likely general location of roads and drill pads, based on the location of proposed coal panels underground and on past experience with E-Seam mining.  The Forest Service has had an MCC map for seven years displaying the likely location of coal panels in the Lease Modifications area.[290]  It could, for example, provide a schematic map displaying how the area might appear with 48 drill pads on the landscape.  We provide one here and urge the Forest Service to do so in its supplemental EIS.[291]

Second, the Forest Service must evaluate the impact of road construction in the proposed lease modification areas on the *entirety* of the 5,880-acre Sunset Colorado Roadless Area.[292]  The 2012 Lease Modifications Final EIS failed to undertake any meaningful analysis of the proposed lease modifications' impacts on roadless values.  Instead, it offers the superficial determination that impacts to an unspecific portion of the Sunset Roadless Area would be, in general, "short-term."[293]  Nowhere did that EIS state the extent (in terms of area) of these "temporary" impacts. The Forest Service must correct this error in the supplemental EIS.

The 2012 Lease Modifications Final EIS itself acknowledged in several cases that road and drill pad construction will result in impacts extending decades into the future, impacts that are "long term" rather than temporary.[294]  The Forest Service expressly acknowledged that "based on current mining practices, … about 72 total acres of surface disturbance would occur from mine operations over the life of the lease modifications (expected to be about 25 years ….)."[295]  The EIS also admits that reclamation elsewhere in connection with the West Elk Mine has, in fact, *permanently* altered the natural community occurring in the reclamation area from oak brush to

---

[289]  *See, e.g.*, BLM, Environmental Assessment, Elk Creek East Tract Coal Lease (June 2011) at 9, excerpts attached as Ex. 120.

[290]  *See* Ark Land Co., Application to Modify Federal Coal Leases C-1362 and COC-67232 (Jan. 19, 2009) at 4 (map displaying coal panels under the two lease modification areas, dated January 2009), attached as Ex. 121.

[291]  Earthjustice, Map, Exploration Plan – Potential Development (Apr. 8, 2016), attached as Ex. 122.

[292]  *See, e.g., Smith v. Forest Serv.*, 33 F.3d 1072, 1078 (9th Cir. 1994)

[293]  2012 Lease Modifications Final EIS at 177.

[294]  The 2012 Lease Modifications Final EIS defines "long-term effects" as "those that would occur after coal is mined." *Id.* at 47.  Coal would be mined "over a period of approximately 3 years." *Id.* at 52.  Thus the Final EIS defines any impact longer than three years to be "long term."

[295]  *Id.* at 53.

grassland.[296]  For the proposed Lease Modifications area, the effect of reclamation efforts will likely be even more pronounced and long term because the impacted area is mostly mature forest at higher elevations, where the growing season is shorter than in lower oak scrub habitat where most of MCC's previous MDWs have been bulldozed.[297]  Nearly 90% of road and MDW construction will thus likely occur on roadless lands where aspen or spruce-fir more than a century old will be chainsawed and removed.

The Forest Service's recognition of the long-term impacts to forest vegetation in the Lease Modifications area is echoed by the U.S. Fish and Wildlife Service and by other Forest Service analysis for this area.  In its concurrence letter addressing the project's impacts to lynx, the Fish and Wildlife Service assumed that "lynx habitat may recover to year-round functionality *approximately 30-40 years post disturbance.*"[298]

While the 2012 Lease Modifications Final EIS failed to explain the spatial dimension of impacts to roadless character, it does list roadless characteristics and generally discusses the impacts from roads and drill pads.[299]  But this analysis is flawed and fails to take the hard look NEPA requires.

Most importantly, the EIS failed to disclose the Lease Modifications' impacts to the *wilderness capability* of the Sunset Roadless Area.  The fact that a portion of the roadless area is capable of wilderness protection is a key attribute of the area, one recognized by the Forest Service in its 2005 inventory.[300]  While the 2012 EIS purports to examine the alternatives' potential impacts on some roadless characteristics,[301], the impacts to wilderness capability is summarily dismissed as follows:

> Part of IRA was identified as "capable" in wilderness screening process.  The area is contiguous to wilderness and includes a unique geologic feature; however, the area was not recommended for Wilderness designation.[302]

---

[296] *Id.* at 157 ("Once revegetation has occurred, the areas of previous disturbance (usually oak brush or shrub areas in the case of the West Elk Mine) *become grassland areas* that are a benefit to wildlife and livestock.").

[297] *See id.* at 39-40, 128 (road and MDW pad construction is likely to destroy "approximately 7 acres of oak, 58 acres of aspen, and 7 acres of spruce-fir" in primarily "mature/overmature" condition).

[298] Letter of A. Pfister, FWS to C. Richmond, GMUG NF (June 16, 2010) at 3 (emphasis added) (hereafter "2010 FWS Concurrence Letter"), attached as Ex. 123.

[299] 2012 Lease Modifications Final EIS at 175-77.

[300] *See id.* at 171 (Figure 3.30b) (displaying areas identified as wilderness capable in the 2005 inventory); *id.* at 479-480 (GMUG National forest inventory report).

[301] *Id.* at 172-182

[302] *Id.* at 175.  *See also id.* at 176 (similar analysis); *id.* at 585 ("The Forest is not required to hold areas that are found to be capable in that status indefinitely if they did not make it through the screening process to be recommended.").

This response misses the point.  Wilderness values are present in the Sunset Roadless Area; that wilderness capability may be irretrievably lost (or lost for a generation) through the construction of a web of roads and MDWs in the heart of the wilderness capable lands.  The fact that the GMUG National Forest does not manage the lands to protect those wilderness values does not erase those values, nor does it eliminate the Forest Service's duty to take a hard look at a project's potential impacts to those multiple use values.

The 2013 Exploration Plan EA suffers from the same deficiencies as the Lease Modifications EIS.  The Exploration EA does not address the potential for impacts to wilderness character or wilderness capable lands at all, although two drill pads (SST-8 and SST-10), all of the road between them, and about half of the road between SST-8 and SST-3 will be constructed within that portion of the Sunset Roadless Area found to be capable of protection as wilderness.[303]  This construction activity will likely degrade the wilderness capability of scores acres of the area.

In order to take the required "hard look" at the impacts of the Lease Modifications – as well as the Exploration Plan – to wilderness capable lands within the Sunset Roadless Area, the supplemental EIS must address these impacts because prior NEPA analyses did not.

## XI.   THE FOREST SERVICE MUST CONSULT WITH THE U.S. FISH AND WILDLIFE SERVICE.

The Forest Service cannot rely on the consultation prepared for the 2012 Lease Modifications proposal, which, in any event, is years old.  Nor can it rely on any consultation for the Colorado Roadless Rule, which does not address the impacts on private property.

For the reasons set forth below, the Forest Service must re-consult on the Lease Modifications because its initial consultation violated the Endangered Species Act (ESA). [304]

Under the ESA, the Forest Service has a substantive duty to ensure that its actions do not jeopardize the continued existence of threatened or endangered species or destroy or adversely modify the designated critical habitat of listed species.  16 U.S.C. § 1536(a)(2).  The ESA also prohibits the "take" of threatened and endangered species.  *Id.* § 1538(a)(1)(B) & (G).  The ESA violations detailed below are based on the Forest Service's consent to the Lease Modifications in reliance on the U.S. Fish and Wildlife Service's ("FWS's") June 16, 2010 concurrence to the Forest Service's April 16, 2010 Biological Assessment on the lease modifications.

---

[303]  *See* Earthjustice, Map, Exploration Plan – Wilderness Capable Lands (Ex. 94).

[304]  The Forest Service appears to admit that its prior analysis of impacts and ESA compliance must be addressed in the supplemental EIS.  In its Lease Modifications Federal Register notice, the agency states: "new issues will arise during this the Supplemental EIS process including … [c]hanges in fish recovery status prompting reconsideration of GMUG's Programmatic Biological Opinion for Water Depletions related to Endangered Big River Fishes."  2016 Lease Modifications Federal Register Notice, 81 Fed. Reg. at 8906.

Letter to Supervisor Armentrout re: Coal Lease Modifications COC-1262 & COC-67232                    Page 80
April 12, 2016

### A.    Legal Background

Section 7 of the Endangered Species Act ("ESA") requires that each federal agency (the "action agency") "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of the designated critical habitat of the listed species. 16 U.S.C. § 1536(a)(2).  *See also* 50 C.F.R. § 402.1(a) (implementing Section 7).  To assist action agencies in complying with this provision, ESA Section 7 and its implementing regulations set out a detailed consultation process for determining the impacts of the proposed agency action.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.  When an action agency determines that an action it proposes to take "may affect listed species or critical habitat," that agency must prepare a biological assessment ("BA") on the effects of the action.  50 C.F.R. §§ 402.12, 402.14(a); 16 U.S.C. § 1536(c).  If after preparing a BA the agency determines that the proposed action is "not likely to adversely affect" any listed species or critical habitat, then the agency need not initiate formal consultation with the FWS.  50 C.F.R. § 402.14(b)(1).[305]  The process of determining whether formal consultation may be required is referred to as "informal consultation," which is described in implementing regulations as follows:

> Informal consultation is [a] ... process that includes all discussions, correspondence, etc., between the [FWS] and the Federal agency or the designated non-Federal representative, designed to assist the Federal agency in determining whether formal consultation or a conference is required.  If during informal consultation it is determined by the Federal agency, with the written concurrence of the [FWS], that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary.

50 C.F.R. § 402.13.

In setting the scope of the action on which consultation must occur, the ESA mandates that agencies analyze the "entire" agency action.  *Conner v. Burford*, 848 F.2d 1441, 1452-53 (9th Cir. 1988) (citing 16 U.S.C. § 1536(b)(3)(A)); *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1155 (D. Ariz. 2002).  This means that a biological opinion's (or BA's) analysis of effects to listed species and critical habitat "must be coextensive with the agency action." *Conner*, 848 F.2d at 1458; *Greenpeace v. Nat'l Marine Fisheries Serv.*, 80 F. Supp. 2d 1137, 1143 (W.D. Wash. 2000) (agency "must prepare a ... biological opinion equal in scope" to action consulted upon); *Rumsfeld*, 198 F. Supp. 2d at 1156 ("breadth and scope of the analysis must be adequate to consider all the impacts").  Accordingly, courts strike down biological opinions (BOs) that fail to perform a comprehensive analysis of the entire action, including analyses that omit key areas or impacts.  *See, e.g., Conner*, 848 F.2d at 1453-54 (analysis of entire agency action for oil and gas leasing must also include impacts from development); *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 902-03 (9th Cir. 2002) (overturning Forest Service's Section 7 analysis because it omitted key geographic area affected by proposal).

---

[305]  An action agency may be required to consult with the National Marine Fisheries Service if certain aquatic species are involved.  No such species are at issue here.

Further, in designating an "action area" for analysis, the agency must consider "*all* areas to be affected directly or indirectly by the Federal Action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02 (2001); *Native Ecosystems Council*, 304 F.3d at 902 (emphasis added).

In addition, the ESA and FWS regulations require every agency to ensure that "any action [the agency] authorizes, funds, or carries out, in the United States or upon the high seas, is not likely to jeopardize the continued existence of any listed species." 50 C.F.R. § 402.01. The regulations define "action" to include any "action[] directly *or indirectly* causing modifications to the land, water, or air." 50 C.F.R. § 402.02 (emphasis added). The effects of the agency action which must be evaluated include "the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action." *Id.* "Indirect effects" include effects "that are caused by the proposed action and are later in time, but still are reasonably certain to occur." *Id.* These direct and indirect effects must be considered together with a separate category of impacts known as "cumulative effects," which are "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id.*

Courts have repeatedly found that impacts are "reasonably certain to occur" – and thus must be analyzed under the ESA as "indirect effects" in a BA or BO – where federal actions induce private or off-site development. For example, when considering the potential effects of the operation of a military base, a court required the U.S. Army to consider the indirect impacts caused by groundwater pumping required by its operation and people the base *attracted* to the area. *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139 (D. Ariz. 2002). Numerous other courts agree. *See, e.g., Fla. Key Deer v. Paulison*, 522 F.3d 1133, 1144 (11th Cir. 2008) (finding FEMA's flood insurance program may cause jeopardy to endangered Florida key deer by encouraging development); *Nat'l Wildlife Fed'n v. Fed. Emergency Mgm't Agency*, 345 F. Supp. 2d 1151, 1173-74, 1176 (W.D. Wash. 2004) (Section 7 consultation on FEMA flood insurance program must address harmful impacts of induced property development in flood zone because "development [was] reasonably certain to occur as a result of" the program, even though FEMA did not "authorize, permit, or carry out the actual development that causes the harm."); *Sierra Club v. U.S. Dep't of Energy*, 255 F. Supp. 2d 1177, 1187-89 (D. Colo. 2002) (agency consultation concerning approval of right-of-way must address indirect impacts of a mine the construction of which was made possible by the right-of-way); *Riverside Irr. Dist. v. Andrews*, 758 F.2d 508, 512 (10th Cir. 1985) ("To require [an agency] to ignore the indirect effects that result from its actions would be to require it to wear blinders that Congress has not chosen to impose" under the ESA); *Nat'l Wildlife Fed'n v. Coleman*, 529 F.2d 359, 373 (5th Cir. 1976) ("indirect effects" of highway construction include "the residential and commercial development that can be expected to result from the construction of the highway.").

**B.  The Lease Modifications Will Cause Direct And Indirect Impacts To Lynx Habitat on Adjacent Private and Public Lands.**

The agency action at issue is the Forest Service's proposal to consent to the Bureau of Land Management to lease: (1) 800 acres of Forest Service lands included in Federal Coal Lease

Modification COC-1362; and (2) 921 acres of Forest Service lands included in Federal Coal
Lease Modification COC-67232.  Of these 1,722 cumulative acres, approximately 1,700 acres
are within the Sunset Roadless Area.[306]  The purpose and effect of this decision is to provide
Arch Coal with access to approximately 10.1 million tons of federally-owned coal within the two
lease modification areas.

The Forest Service's 2012 Final EIS analyzed the impacts of a "reasonably foreseeable mine
plan" (RFMP) within the lease modifications.  That Final EIS admits that the decision will result
in impacts *outside* of the lease modifications area as well.  The Final EIS states that "the leasing
and development of the lease modifications *also* allow for the production of 5.6 million tons of
fee coal on *adjacent* [private] lands ... as well as an *additional* 3.3 million tons from existing
*adjacent* federal coal reserves."[307]  The Final EIS confirms that coal on private lands and
adjacent public lands cannot be accessed unless MCC wins the right to mine the lease
modifications area:

> *Without the lease modifications, coal on existing federal leases and private lands
> would be bypassed* because of current panel alignment on parent leases.[308]

The 2012 Lease Modifications Final EIS underscores the link between mining, road construction,
and methane drainage well construction inside the lease modifications area and outside of the
lease modifications area by considering the mining of the private land and adjacent federal coal
as a direct or indirect economic benefit of the agency's decision to consent to the lease
Modifications.[309]

Not only does the Forest Service's decision make this development possible, MCC may be
*required* to mine the private lands given the geography of the Lease Modifications, the private
land, and the orientation of the mining panels if the company is to access the coal in the Lease
Modifications, since its coal panels start in the northwest and move toward the southeast.  The
only way for MCC to access the coal in the southeast portion of the Lease Modifications area is
to mine through the private land coal.

The FEIS, in a cursory fashion, acknowledges that coal mining on adjacent private and public
land outside of the lease modifications area is likely to have two types of impacts:
(1) subsidence outside of the lease modifications area caused by underground mining there, and
(2) habitat destruction caused by the construction of roads and MDW pads outside of the lease
modifications area.

---

[306]  2016 Lease Modifications Fed. Reg. Notice, 81 Fed. Reg. at 8901.

[307]  2012 Lease Modifications Final EIS at 52 (emphasis added).

[308]  *Id.* at 531 (emphasis added).  Statements in the project record support the FEIS's statement.
*See* letter of H. Whitman, Mount Gunnison Fuel Co. (May 17, 2012) (without lease
modifications, 5.6 million tons of private coal will be bypassed).

[309]  2012 Lease Modifications Final EIS at 190.

Concerning subsidence, the FEIS estimates subsidence from mining under adjacent private and Federal lands combined:

> If the tracts are leased, subsequent underground longwall mining would cause approximately 1500 acres of subsidence (~950 acres from mining COC-1362, ~150 acres from mining COC-67232, and *~400 acres from mining adjacent reserves in existing federal leases and adjacent private lands*).[310]

Subsidence may result in landslides or slumping that could destroy lynx habitat. The FEIS, however, fails to identify on any map the location of these subsidence impacts.

The FEIS also concludes that road and MDW pad construction *within* the lease modifications area will cause 72-75 acres of surface disturbance.[311] Further, the FEIS estimates that an *additional* 63 acres of ground disturbance is likely to accompany MDW pad and road construction on *private and adjacent public lands outside* of the Lease Modifications – 42 acres for MDW pads and 21 acres for roads to access them.[312] Here, too, the FEIS fails to display even generally where these impacts on adjacent private and public lands are likely to occur.[313] Since road and drainage well construction require the elimination of all vegetation within the road-bed and drill pad, mining on private and adjacent public land outside the lease modification will eliminate all habitat values on those 63 acres.

While it is unclear whether all of the additional 63 acres of habitat to be eliminated for construction of MDW pads and roads on adjacent private and public lands *outside* of the lease modifications will be lynx habitat, additional data in a table in the FEIS indicates that at least a portion those impacts will occur in lynx habitat. While Table 3.10a is hardly clear, it indicates that in addition to the estimated 75 acres of disturbance of suitable lynx habitat *within* the Lease Modifications area from MDW pad and road construction, it is "foreseeable" that an additional 17 acres of lynx habitat will be destroyed *outside* of the lease modifications area:  10 acres of

---

[310]  *Id.* at 91 (emphasis added).  The FEIS makes similarly vague representations in numerous other locations when purporting to assess the direct and indirect impacts of the Lease Modifications.  *See id.* at 100, 101, 109, 111, 113-14, 115, 116, 160, 185-86.

[311]  *Id.* at 53.

[312]  *See id.* at 92.

[313]  The 2012 Lease Modifications Final EIS elsewhere repeats that "Postlease surface disturbances associated with mining those lands [adjacent private and federal lands outside the Lease Modifications] is estimated to be approximately 63 acres (42 acres of MDW pads, and 21 acres of MDW access)."  *See id.* at 104 (discussing cumulative impacts on soils); *see also id.* at 92 (making nearly identical statement re: topographic and physiographic environment); *id.* at 97 (making nearly identical statement re: geology); *id.* at 118 (making nearly identical statement re: watersheds); *id.* at 161 (making nearly identical statement re: recreation); *id.* at 125 (making nearly identical statement re: vegetation); *id.* at 186 (making nearly identical statement re: visual resources).

suitable lynx habitat on private lands will be damaged, and similarly "foreseeable" that 7 acres of suitable lynx habitat on "Parent Lease COC-1362" will be impacted by surface impacts.[314]

The FEIS thus discloses that the Forest Service's decision to consent to the Lease Modifications is the "but for" cause of, and the on/off switch for, subsidence and habitat destruction impacts that will result from mining the coal on private and adjacent public lands.

> **C.    Because The 2010 Forest Service BA Analyzes Only Direct And Indirect Impacts *Within* The Lease Modifications Area, And Fails To Address Indirect Impacts To Potential Lynx Habitat On Adjacent Private And Federal Land, The Forest Service Has Violated The ESA.**

In an attempt to address the Forest Service's consultation duties under ESA Section 7, the Forest Service issued a BA on the Lease Modifications in April 2010 – more than two years before the completion of the FEIS.  That BA focuses on impacts to the Canada lynx, a species designated as threatened under the ESA in the southern Rockies, including Colorado.[315]  The Lease Modification BA purported to examine the impacts of the Forest Service's consent to the lease modifications, the destruction of habitat likely to result from road and MDW pad construction caused by mining the lease, and other past and reasonably foreseeable projects.[316]

The Forest Service identified a number of stipulations to the existing leases that "would be carried over" into the Lease Modifications "slightly modified to reflect changes in Management, specifically the 2008 Southern Rockies Lynx Management Direction."[317]  The Forest Service concluded, among other things, that these stipulations "will mitigate impacts due to creation of roads and [MDW] pads within the area, winter access, and vegetative changes."[318]  The Lease Modifications BA also concluded that disturbance to lynx denning and foraging "is not anticipated to be a substantial impact as … lease stipulations for this project follow guidelines as noted" in an appendix to the BA.[319]  Based on its analysis, the Lease Modifications BA concluded that "[i]mplementation of the project 'may affect, but is unlikely to adversely affect' the Canada lynx."[320]

---

[314]  *Id.* at 127-28.  *See also id.* at 605 ("Upon further review, impacts to approximately 10,.3 [should be 10.3(?)] acres of private lands in presumably suitable lynx habitat may occur if private land actions related to the coal mining associated with the two lease modifications occur.").

[315]  GMUG NF, Biological Assessment for Federal Coal Lease Modifications (Apr. 16, 2010) at 10 ("2010 Lease Modifications BA"), attached as Ex. 124.  *See also* 2012 Lease Modifications Final EIS at 129.

[316]  Lease Modifications BA (Ex. 124) at 10-15.

[317]  *Id.* at 6-7.

[318]  *Id.* at 13.

[319]  *Id.* at 15.

[320]  *Id.*

The FWS concurred with the Forest Service's "not likely to adversely affect" determination by a letter dated June 16, 2010.[321]  The FWS stated that "[s]everal assumptions were incorporated into your analysis [that is, the Forest Service's BA] of effects as stated above.  If these assumptions prove incorrect, please contact the [Fish and Wildlife] Service to discuss any changes that may require further analysis or reinitiation of section 7 consultation."[322]

The Forest Service's BA assumptions are, in fact, incorrect, since the BA fails to account for the impacts to lynx habitat caused by coal mining under adjacent private and public lands made possible by the agency's decision.  The Forest Service's BA assumes that road and MDW pad construction *within* the lease modifications area may disturb about 75 acres of lynx habitat.[323]  The BA identifies only the land *inside* the Lease Modifications as the land where impacts to lynx habitat may occur.[324]  Thus, in assessing the impacts of "reasonably foreseeable" actions, the BA addresses only the 75 acres likely to be disturbed by mining resulting from the Lease Modifications themselves.[325]

The BA is based on incorrect assumptions and fails to account for the direct and indirect impacts of the Forest Service's consent to the lease modifications because it fails to account for or to mitigate the direct and indirect impacts of road or MDW pad construction on the *adjacent private and public land* that the FEIS admits will be induced by the Lease Modifications.  The BA fails to address the 63 acres of habitat that will be eliminated to make way for roads and MDW pads on private and adjacent public lands outside of the lease modifications, as identified in the FEIS.[326]  Nor does the BA address the 10 acres of suitable lynx habitat on private lands that will be damaged, and the 7 acres of suitable lynx habitat on "Parent Lease COC-1362" that will be impacted by surface impacts as indicated in FEIS Table 3.10a.[327]

---

[321]  2010 FWS Concurrence Letter (Ex. 123) at 4.

[322]  *Id.*

[323]  *See* 2010 Lease Modifications BA (Ex. 124) at 5 (describing project as impacting 48 acres from 48 MDW pads and 24 acres from 6.5 miles of road construction); 2010 FWS Concurrence Letter (Ex. 123) at 3 (assuming 45 acres of land cleared for MDW pads, and 24 acres cleared for temporary roads).

[324]  Lease Modifications BA (Ex. 124) at 9 (Table 3).

[325]  *Id.* at 10 (Table 4).  While the BA *mentions* private land, nowhere does the BA account for or address the impacts to lynx habitat from private and public land mining that will be induced by the Lease Modifications decision as an indirect impact.  The BA recognizes the likelihood of induced impacts.  *Id.* at 4 ("The panels in the lease modifications would include the start lines and the first few thousand feet of five panels that would extend west off the FS lands and into coal reserves under private land.").  But beyond that, the BA does not mention private land impacts except in the context of *cumulative* impacts, not induced, indirect impacts.

[326]  2012 Lease Modifications Final EIS at 92.

[327]  *Id.* at 127-128.

Further, the BA assumes that there is a chance that subsidence may alter 1360.5 acres of lynx habitat *within the Lease Modifications area*.[328]  The FEIS reiterates this acreage figure, and reinforces that it does not address lands outside the Lease Modifications area.[329]  This figure does not appear to account for the ~400 acres of subsidence that is likely to result from mining adjacent reserves in existing federal leases and adjacent private lands.[330]  Nor does it match the 1500 acres of total subsidence predicted in the FEIS.[331]

In sum, the Forest Service is violating its substantive duties to protect the lynx from jeopardy by relying on a BA and informal consultation that fails to evaluate the entirety of the agency action and all of its direct and indirect impacts.  Further, because the Forest Service has adopted a decision that "prove[s] incorrect" the FWS's assumptions about the impacts of the Forest Service's decision, the ESA required the Forest Service to contact the FWS "to discuss any changes that may require further analysis or reinitiation of section 7 consultation."[332]  The Forest Service has apparently failed to do so.

The Forest Service's failure to re-initiate consultation with the FWS on the additional habitat destruction outside of the lease modifications area that are a foreseeable indirect impact of the Forest Service's lease modifications decision, violates the ESA.  At an absolute minimum, the Forest Service must prepare a new biological assessment and reinitiate consultation with FWS to address these errors.

---

[328]  2010 Lease Modifications BA (Ex. 124) at 12 ("in a subsidence worst-case-scenario situation, this lease modification and the underground mining associated with it would alter the entire surface topography of the *modification area*") (emphasis added); *id.* at 15 ("If all of the *lease modification area* subsides to the extent that surface habitat is damaged or destroyed, an additional 1360.5 acres of habitat would be lost within the LAU" (emphasis added)).

[329]  *See* 2012 Lease Modifications Final EIS at 130 ("If all of the *lease modification area* subsides to the extent that surface habitat is damaged or destroyed, an additional 1360.5 acres of habitat would be lost within the LAU" (emphasis added)).

[330]  *Id.* at 91.

[331]  *Id.*

[332]  *See* 2010 FWS Concurrence Letter (Ex. 123) at 4; 16 U.S.C. § 1536(a)(2) (consultation mandate); 50 C.F.R. § 402.16(c) (requiring re-initiation of formal consultation if the proposed action is later modified in a manner that causes an effect that was not previously considered); 50 C.F.R. § 402.16(b) (requiring re-initiation of formal consultation if new information shows the action may impact listed species in a manner or to an extent not previously considered); *Forest Guardians v. Johans*, 450 F.3d 455, 458 (9th Cir. 2006) (applying requirements concerning reinitiation of formal consultation to informal consultation).

>   **D.      The Forest Service Has Violated Its ESA Section 7 Duty to Ensure Against Jeopardizing The Lynx.**

Section 7 of the ESA states that:

>   each federal agency shall … insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an 'action agency') is not likely to jeopardize the continued existence of any endangered species or threatened species ….[333]

The Forest Service may not rely on the 2010 biological assessment (BA), nor may it rely on the FWS's June 16, 2010 concurrence with that BA, to fulfill this substantive duty.[334]  To the extent it is the Forest Service's position that it is relying on amendments to either the BA or the concurrence, it must make those documents available as part of, or as appendices to, the supplemental EIS.

If the Forest Service consents to the coal lease modifications without correcting the deficiencies in the BA, it will be jeopardizing the lynx in violation of the ESA.  Because the 2010 BA and FWS concurrence are arbitrary and capricious and contrary to the ESA, the Forest Service's reliance on the 2010 BA and FWS concurrence to determine that the lease modifications are not likely to adversely affect the lynx is arbitrary and capricious and violates the ESA.  We therefore urge the Forest Service to explain why it believes the agency is in compliance with the ESA or correct these deficiencies.

>   **E.      The Forest Service Cannot Rely On Previously Prepared Biological Opinions To Address Water Depletions Caused By Foreseeable Exploration And Mining On Public And Private Lands.**

With respect to water depletions caused by both exploration and development of the Lease Modifications, the Forest Service may not rely on the terms of the 2007 GMUG programmatic BO for small water depletions.  Reliance on that BO is foreclosed by its own terms because listed fish populations have not met the 2015 targets the programmatic BO sets.

The Forest Service, FWS, and the courts have repeatedly confirmed that *any* water depletions within the Colorado River system jeopardize the continued existence of the endangered humpback chub, Colorado pikeminnow, razorback sucker, and bonytail (the "four endangered

---

[333]  16 U.S.C. § 1536(a)(2).

[334]  *See Res. Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1304 (9th Cir. 1993) ("Consulting with the [FWS] alone does not satisfy an agency's duty under the Endangered Species Act."); *Aluminum Co. of Am. v. BPA*, 175 F.3d 1156, 1161 (9th Cir. 1999) ("an action agency may not escape its responsibility under the Endangered Species Act by simply rubber stamping the consulting agency's analysis"); *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1143 (D. Ariz. 2002) (finding that the action agency has "independent duty under § 7 of the ESA, 16 U.S.C. § 1536(a)(2), to not cause jeopardy or adverse modification to endangered species").

fish").[335]  All four of these fish are critically endangered due chiefly to alterations in the historical flow regime of the Upper Colorado River and its tributaries

Beginning in the 1970s, the FWS determined that any water depletions would jeopardize the continued existence of the four endangered fish and adversely modify their critical habitat, and, as a result, adopted in 1988 a Recovery Implementation Program (since amended) it identified as the reasonable and prudent alternative for avoiding jeopardy.[336]

Prior ESA consultation concluded that the lease modifications may affect, and are likely to adversely affect, the four endangered fish due to water depletions from mining-related water withdrawals.[337]  The August 2012 Lease Modification ROD stated that the Lease Modifications "may affect" and is "likely to adversely affect" the lynx and the Colorado River fishes.[338]  At that time, the Forest Service contended, and the FWS concurred, that these withdrawals would be covered under the Recovery Implementation Program and the GMUG programmatic BO.[339]  The GMUG programmatic BO covers small depletions related to mineral development and other activities, such as road construction, on the GMUG national forests.[340]

The GMUG programmatic BO, by its terms, covers only total water depletions of less than 100 acre-feet per year for the three forests, and no individual project exceeding 50 acre-feet.[341]  The GMUG programmatic BO requires reinitiation of consultation under a number of conditions, including failure of the Recovery Program to meet its expected population goals of 1,100 adult Colorado pikeminnow.[342]  The GMUG programmatic BO requires a review of fish populations and the effectiveness of recovery actions following 50,000 total acre-feet of withdrawals, or in

---

[335] *See Rocky Mountain Wild v. Kornze*, No. 13-01988, Mem. Op. at 16, 20 (D. Colo. Feb. 10, 2015).

[336] *See* letter of E. Zukoski, Earthjustice to N. Walsh, U.S. Fish and Wildlife Service (Mar. 3, 2016), attached as Ex. 125.

[337] *See* 2012 Lease Modifications ROD at 17; 2010 FWS Concurrence Letter (Ex. 123) at 1-2 (explaining that actions similar to the propose lease modifications for coal mining have resulted in water depletions and providing the Forest Service with information regarding same).

[338] 2012 Lease Modifications ROD at 17.

[339] *Id.* at 17, 29; 2010 FWS Concurrence Letter (Ex. 123) at 1-2.  The Biological Assessment for the lease modifications addresses only Canada lynx impacts, contending that "[f]ish species are being analyzed separately."  2010 Lease Modifications BA (Ex. 124) at 7.

[340] Fish and Wildlife Service, Reinitiation of Consultation for GMUG NF, No. ES/GJ-6-CO-99-F-033-CP602 (April 27, 2007), at 1 (hereafter"2007 GMUG Programmatic BiOp"), attached as Ex. 126.

[341] *Id.* at 1.

[342] *Id.* at 4-7.

2015 (last year), whichever comes first.[343]  The FWS's 2015 Sufficient Progress Memorandum plainly shows that the 1,100 adult pikeminnow goal has not been met by a large margin.[344]

The FWS concluded that projects meeting water depletion limits could avoid jeopardy under the 1999 Programmatic Biological Opinion for Recovery Program Actions in the Upper Colorado if project proponents sign the Recovery Agreement, make a monetary payment towards recovery actions, and the Forest Service retains discretionary authority for reinitiation of consultation, if required.[345]  The FWS in 2010 concurred that the mine expansion lease modifications were covered by the GMUG BiOp based on Forest Service representations that water withdrawals would be limited to approximately 1 acre-foot per year for a period of 5 years associated with the drilling of approximately 45 methane drainage wells.[346]

But the most recent information available from the Recovery Program indicates that, due to a lack of sufficient progress in recovery, continued reliance on the GMUG programmatic BO as a reasonable and prudent alternative *is no longer valid*.  This is so because the Recovery Program's draft 2015 Sufficient Progress Memo finds that the Colorado pikeminnow is not meeting recovery goals nor is self-sustaining:

> The current downlisting demographic criteria for Colorado pikeminnow (USFWS 2002a) in the Upper Colorado River Subbasin is a self-sustaining population of at least 700 adults maintained over a 5-year period, with a trend in adult point estimates that does not decline significantly.  Secondarily, recruitment of age-6 (400–449 mm TL; Figure 3), naturally produced fish must equal or exceed mean adult annual mortality (estimated to be about 20%).  The average of all adult estimates (1992 – 2014; estimates from 2013 and 2014 are considered preliminary) is 613.  The average of the five most recent annual adult population estimates is 501.  Osmundson and White (2014) determined that recruitment rates were less than annual adult mortality in six years and exceeded adult mortality in the other six years when sampling occurred.  The estimated net gain for the 12 years studied was 32 fish $\geq$ 450 mm TL.  Although the Colorado River population appears to meet the trend or 'self-sustainability' criterion, it has not met the abundance criteria of 'at least 700 adults' during the most recent five year period.

---

[343] *Id.* at 6.

[344] Fish and Wildlife Service, Draft 2014-2015 Assessment of Sufficient Progress Under the Upper Colorado River Endangered Fish Recovery Program in the Upper Colorado River Basin, and of Implementation of Action Items in the December 20, 1999, 15-Mile Reach Programmatic Biological Opinion and December 4, 2009, Gunnison River Basin Programmatic Biological Opinion (Sept. 2, 2015) ("2015 Sufficient Progress Memo") at 5, attached as Ex. 127.

[345] *Id.* at 2-3.

[346] 2010 FWS Concurrence Letter (Ex. 123) at 2; *see also* 2012 Lease Modifications Final EIS at 110.

> The Service is reevaluating the demographic and threat removal criteria for
> Colorado pikeminnow through revision of the species' recovery plan.[347]

The Forest Service's reliance on the GMUG programmatic BO is fundamentally founded on that document's tiering to the assumed success of the overall recovery program.  The 2015 population data makes clear that not only are the explicit terms of the GMUG programmatic BO not satisfied, but that the overall recovery program is not achieving its anticipated goals for recovery of Colorado pikeminnow.  Therefore, neither the Forest Service nor FWS can rely on compliance with the GMUG programmatic BO, which specifies that FWS re-initiation of formal consultation under 50 C.F.R. § 402.16 is required if "[n]ew information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not considered in the Colorado River PBO."[348]  Such new information explicitly includes "the lack of a positive population response by the year 2015;" positive response being defined as  at least 1,100 adult individual pikeminnow (±250) in the Colorado River."[349]  The most recent five-year population average is 501, less than half that total.  Clearly there has not been a positive population response, and Colorado River fish are experiencing effects not considered in the 2007 GMUG programmatic BO or the Colorado River programmatic BO.  Therefore, neither the Forest Service nor the FWS may rely on the 2007 GMUG programmatic BO or the Colorado River programmatic BO for ESA compliance to address water depletions related to the Lease Modifications or the exploration plan.

### F.    Any Consultation Must Address The Impacts From The Exploration Plan.

We further note that any consultation must address water withdrawals that will result from the Exploration Plan for the Lease Modifications area.

Drilling operations will require water, which, the 2013 Exploration Plan EA states, Arch will withdraw from "nearby streams, where MCC owns the water rights, or stock watering ponds."[350]

The 2013 Exploration Plan EA apparently takes the position that water removed from creeks in the area has no impact on the four endangered Colorado River fish because: "The water source is considered to be non-tributary waters by the U.S. Fish and Wildlife Service, and does not exceeds a depletion amount consulted upon in the biological assessment."[351]  This statement is not clear.  If the waters are "non-tributary," why is a BA necessary?  Further, if the depletion "does not exceed a depletion amount consulted upon," this likely means that the agencies are relying on the programmatic BO which, as noted above, is no longer valid.  In either event, the exploration in the EA is either incorrect or legally invalid.  The Lease Modifications

---

[347]  2015 Sufficient Progress Memo (Ex. 127) at 4.

[348]  2007 GMUG Programmatic BO (Ex. 126) at 3-4.

[349]  *Id.* at 4.

[350]  2013 Exploration Plan EA at 7.

[351]  2013 Exploration Plan EA at 20.

supplemental EIS must better explain where Arch will get its water, whether that could lead to any depletion of water triggering consultation, and how the agencies will comply with the ESA.

The 2013 Exploration Plan would also result in the "complete loss" of 30 acres of lynx habitat in the short and long term.[352] The agencies do not make clear whether this loss of habitat is included within the 70 acres of habitat to be destroyed by the Lease Modifications proposal. While the Forest Service has stated that the lease applicant is "assumed" to reuse the roads and pads for methane drainage wells,[353] nothing in the lease stipulations (or documents prepared pursuant to the ESA) requires that. In the Lease Modifications supplemental EIS and biological assessment, the Forest Service must make clear whether there is any chance that the exploration plan will result in additional road and drill pad impacts, and address any additional impacts in its analyses. The EIS and biological assessment must also address the potential lag time between exploration, development, and recreation, which may leave unreclaimed roads and drill pads on the landscape for 5-10 years, further prolonging the period in which habitat is rendered useless for lynx.

## XII. THE FOREST SERVICE SHOULD ADDRESS AND RESPOND TO ADDITIONAL SUBMISSIONS.

We request that the Forest Service include in the record on the Lease Modifications supplemental EIS, and specifically review and respond to relevant analysis in the Lease Modifications supplemental draft EIS, the following documents, submitted to the Forest Service herewith or under separate cover:

- High Country Citizens' Alliance's September 24, 2012 administrative appeal of the Forest Service's 2012 Lease Modifications ROD, a document to which the GMUG National Forest did not respond (although the Forest Service's Rocky Mountain Region did), and which identified several errors in the 2012 Lease Modifications Final EIS and ROD;

- Earthjustice's December 17, 2012 notice of intent to sue the Forest Service for violations of the Endangered Species Act in adopting the Forest Service's 2012 Lease Modifications ROD, which identifies errors in the agency's consultation, and to which the GMUG National Forest never responded in a NEPA document;

- High Country Conservation Advocates' January 15, 2016 comment letter on the Colorado Roadless Rule Supplemental Draft EIS, which addresses many issues the GMUG National Forest faces in the Lease Modifications supplemental EIS; and

---

[352] 2013 Exploration Plan EA at 20-21.

[353] 2012 Lease Modifications Final EIS at 54 ("*It is common practice*, and therefore *assumed* that if any exploration drilling, staging areas, and ground water monitoring drill pads and cross-country motorized access is needed, they would utilize the same locations as those used for MDWs") (emphasis added).

- Earthjustice and Center for Biological Diversity's March 3, 2016 letter to the U.S. Fish and Wildlife Service raising questions about the adequacy of the Forest Service's consultation concerning the impacts of coal mining activities within the Sunset Roadless Area and adjacent roadless lands.

**CONCLUSION**

We urge the Forest Service to protect roadless forest, and to protect the forest and our planet from climate change by rejecting the proposed action and selecting the "no action" alternative.

Thank you for your attention to this matter. If you have any questions about the issues raised here, please call me at 303-996-9622.

Sincerely,

Edward B. Zukoski, Staff Attorney
Katie Dittelberger, Associate Attorney

Attorneys for

| | |
|---|---|
| Matt Reed<br>Public Lands Director<br>High Country Conservation Advocates<br>P.O. Box 1066<br>Crested Butte, CO 81224<br>Phone: 303-505-9917<br>matt@hccacb.org | Will Roush<br>Conservation Director<br>Wilderness Workshop<br>PO Box 1442<br>Carbondale, CO 81623<br>Phone: 970-963-3977<br>will@wildernessworkshop.org |
| Nathaniel Shoaff<br>Staff Attorney<br>Sierra Club, Environmental Law Program<br>85 Second Street, Second Floor<br>San Francisco, CA 94105<br>Phone: 415-977-5610<br>Nathaniel.shoaff@sierraclub.org | Dan Olson<br>Executive Director<br>San Juan Citizens Alliance<br>1309 East Third Avenue<br>PO Box 2461<br>Durango, CO 81302<br>Phone: 970-259-3583 Ext. 1<br>danolson@sanjuancitizens.org |
| Jeremy Nichols<br>Climate & Energy Program Director<br>WildEarth Guardians<br>1536 Wynkoop, Suite 301<br>Denver, CO 80202<br>Phone: 303-437-7663<br>jnichols@wildearthguardians.org | Matthew Sandler<br>Staff Attorney<br>Rocky Mountain Wild<br>1536 Wynkoop St., Suite 900<br>Denver, CO 80202<br>Phone: 303-579-5162<br>matt@rockymountainwild.org |

| | |
|---|---|
| Michael Saul<br>Senior Attorney<br>Center for Biological Diversity<br>1536 Wynkoop Street, Suite 421<br>Denver CO 80202<br>Phone: 303-915-8308<br>msaul@biologicaldiversity.org | Shelley Silbert<br>Executive Director<br>Great Old Broads for Wilderness<br>PO Box 2924<br>Durango, CO 81302<br>Phone: 970-385-9577<br>shelley@greatoldbroads.org |
| Marissa Knodel<br>Climate Campaigner<br>Friends of the Earth<br>1101 15th Street NW, Floor 11<br>Washington, D.C. 20005<br>Phone: 202-222-0729<br>mknodel@foe.org | Jonathan Proctor<br>Director, Rockies & Plains Program<br>Defenders of Wildlife<br>535 16th St., Suite 310<br>Denver, CO 80202<br>Phone: 720-943-0451<br>jproctor@defenders.org |
| Rocky Smith<br>Forest Management Analyst and Consultant<br>1030 Pearl St. #9<br>Denver, CO 80203<br>2rockwsmith@gmail.com | |

cc:     The Hon. Tom Vilsack, Secretary, U.S. Department of Agriculture
        Mr. Robert Bonnie, Under Secretary, U.S. Department of Agriculture
        Mr. Tom Tidwell, Chief, U.S. Forest Service
        Mr. Neil Kornze, Director, Bureau of Land Management
        Ms. Niccole Mortenson, GMUG National Forest
        Mr. Bob Randall, Exec. Director, Department of Natural Resources, State of Colorado
        Mr. Shaun McGrath, Administrator, EPA Region VIII
        Ms. Barb Sharrow, Field Manager, Uncompahgre Field Office, BLM
        Mr. Lonny R. Bagley, Deputy State Director, Colorado State Office, BLM



# SWIMMING UPSTREAM

**FRESHWATER FISH** IN A **WARMING WORLD**



# TABLE OF CONTENTS

**1** Executive Summary

**2** A New Threat for Fish

**4** Too Hot to Handle

**6** More Extreme Weather Creates
New Challenges

**10** Changing Complexion of Winter

**15** Climate Change Adds Insult to Injury for Fish

**20** Climate-Related Shifts in the Broader
Environment

**22** Giving Freshwater Fish a Fighting Chance

**27** Lead Authors & Acknowledgements

**28** Endnotes



_Frank Weissbarth_



# EXECUTIVE SUMMARY

USFWS

**W**hether fly fishing for wild trout in the legendary waters of Yellowstone National Park or ice fishing on Michigan's famed Black Lake, fishing traditions hold a special place for Americans of all ages. Generations have enjoyed our nation's clean waters in pursuit of the fish that give life to rivers, streams, and lakes across the country. Today, angling is big business, generating $26 billion annually in expenditures by some 27 million adults.

Changing climate poses new risks for our treasured freshwater fish resources. Warming waters mean lost habitat for cold-water species, the likely encroachment of species typically found in warmer areas, and exacerbation of existing stressors such as habitat loss, pollution, invasive species, and disease. More extreme weather events—especially longer and more intense droughts, heat waves, wildfires, and floods—

mean increased likelihood of fish mortality. Shorter winters with less snow and ice cover mean shifts in stream flow and water availability through the spring and summer months, as well as lost opportunities for ice fishing.

We need to act swiftly to protect our fishing heritage. We must cut the carbon pollution that currently is on track to cause significant warming by mid-century. At the same time, we must take steps to safeguard fish and their habitats from the climate changes that we can no longer avoid. This requires redoubling our efforts to restore and expand critical habitat, while carefully considering climate impacts in all our conservation activities. Finally, we must manage our water resources in a way that ensures that both people and fish have the clean, cool, and abundant water they need to survive.

# A NEW THREAT FOR FISH

**F**ishing is a great family activity enjoyed by anglers across the nation. But, scientists and anglers alike are noting changes in fish species and the rivers, streams, and lakes they call home. It is clear that climate change is creating new stresses on fish, whether brook trout in Appalachia, walleye in the Midwest, Apache trout in the arid Southwest, or salmon in the Pacific Northwest. Many of these species already face numerous environmental threats—including invasive species, habitat loss, disease, and pollution—leading to the federal listing of 147 freshwater fish species and populations as threatened or endangered.[1] Indeed, an estimated 37 percent of freshwater animals—from fish to crayfish to mussels—are considered at risk, a rate much higher than their terrestrial counterparts.[2] An estimated 55 percent of the nation's river and stream miles do not support healthy populations of aquatic life largely due to nutrient pollution, sedimentation, and habitat degradation.[3]

A wealth of scientific evidence shows that human activities are causing the climate to change. Average air temperatures in the United States have increased approximately 1.5 degrees Fahrenheit since 1895.[4] This warming is mostly due to the addition of carbon dioxide and other heat-trapping gases to the atmosphere. This carbon pollution is primarily from the burning of coal, oil, and gas, with a secondary contribution from deforestation and other changes in land use. The resulting atmospheric warming has ripple effects throughout the climate and Earth system more broadly.[5]

Climate change has direct implications for freshwater fish in the United States. Rivers, streams, and lakes are warming and subject to more severe and prolonged droughts, leaving shallower waters prone to even more warming. Snowpack on western mountains is melting 1 to 4 weeks earlier than it did 50 years ago, shifting the timing of flow regimes that are connected to fish life cycles.[6] More severe wildfires followed by heavier rainfall events are allowing massive amounts of ash and silt to be washed into rivers. Heavier rainfall events also propel pulses of excess sediment, phosphorus, and nitrogen pollution downstream, degrading fish habitat.

The loss of recreational fishing opportunities could have real economic impacts across the nation, particularly in rural areas that depend on angling-related expenditures. In 2011 more than 27 million adults sought out their favorite fishing holes. On average, each angler went fishing some 17 days and spent an average of $934. A significant boost to the economy and jobs, freshwater fishing expenditures totaled more than $25.7 billion in 2011 alone.[7]

By the end of this century, habitat that meets the climate requirements of cold-water species is projected to decline by 50 percent across the United States.[8] For example, native cutthroat trout are expected to lose an additional 58 percent of their current habitat.[9] As a result, the number of days anglers participate in cold-water fishing is projected to decline by more than 1 million days by 2030 and by more than 6 million days by the end of the century. Associated with the decline in fishing days for cold-water fish is a projected annual national economic loss of as much as $6.4 billion annually by the end of the century, if carbon pollution is not curbed.[10]

# Freshwater Fishing Recreation in 2011

| State | Freshwater Anglers | Freshwater Fishing Expenditures | State | Freshwater Anglers | Freshwater Fishing Expenditures |
|---|---|---|---|---|---|
| Alabama | 598,000 | $368,812,000 | Montana | 267,000 | $243,927,000 |
| Alaska | 302,000 | $348,229,000 | Nebraska | 207,000 | $165,266,000 |
| Arizona | 637,000 | $691,744,000 | Nevada | 147,000 | $129,515,000 |
| Arkansas | 555,000 | $481,107,000 | New Hampshire | 209,000 | $110,581,000 |
| California | 1,352,000 | $1,301,129,000 | New Jersey | 258,000 | $100,358,000 |
| Colorado | 767,000 | $612,692,000 | New Mexico | 278,000 | $401,758,000 |
| Connecticut | 243,000 | $152,178,000 | New York | 1,212,000 | $895,763,000 |
| Delaware | 55,000 | $7,591,000 | North Carolina | 1,054,000 | $574,377,000 |
| Florida | 1,214,000 | $709,725,000 | North Dakota* | 106,000 | $87,701,000 |
| Georgia | 763,000 | $740,358,000 | Ohio | 1,161,000 | $1,015,294,000 |
| Hawaii* | 22,000 | $3,658,000 | Oklahoma | 729,000 | $396,015,000 |
| Idaho | 447,000 | $361,629,000 | Oregon | 516,000 | $445,594,000 |
| Illinois | 937,000 | $729,581,000 | Pennsylvania | 874,000 | $347,592,000 |
| Indiana | 716,000 | $573,057,000 | Rhode Island | 42,000 | $16,913,000 |
| Iowa | 473,000 | $258,551,000 | South Carolina | 537,000 | $494,158,000 |
| Kansas | 400,000 | $164,788,000 | South Dakota | 268,000 | $197,485,000 |
| Kentucky | 554,000 | $722,017,000 | Tennessee | 826,000 | $1,084,278,000 |
| Louisiana | 720,000 | $504,802,000 | Texas | 1,758,000 | $608,287,000 |
| Maine | 283,000 | $252,968,000 | Utah | 414,000 | $431,329,000 |
| Maryland | 227,000 | $395,878,000 | Vermont | 207,000 | $115,543,000 |
| Massachusetts | 294,000 | $105,863,000 | Virginia | 551,000 | $455,818,000 |
| Michigan | 1,361,000 | $1,896,784,000 | Washington | 743,000 | $691,510,000 |
| Minnesota | 1,413,000 | $2,305,289,000 | West Virginia | 305,000 | $422,650,000 |
| Mississippi | 609,000 | $260,188,000 | Wisconsin | 1,107,000 | $1,078,412,000 |
| Missouri | 1,071,000 | $618,381,000 | Wyoming | 303,000 | $438,872,000 |

* Hawaii and North Dakota use the most recent applicable data from 2006.
Source: U.S. Fish and Wildlife National Survey of Fishing, Hunting, & Wildlife-Associated Recreation (FHWAR), 2011.
http://www.census.gov/prod/www/fishing.html

# TOO HOT TO HANDLE

**W**ater temperatures in rivers, streams, and lakes are increasing, with significant impacts for fish health and distributions. In a study of 40 major rivers and streams in the United States, half experienced significant warming trends over the past 50 to 100 years.[11] Another analysis found that 70 percent of the watersheds in Arizona, New Mexico, Colorado, and Utah experienced warming during the past 55 years.[12]

Fish are especially sensitive to water temperatures, as indicated by their generalized grouping into cold-water, cool-water and warm-water species. As water temperatures move away from a species' optimal temperature range, growth and survival rates decline, reproductive success declines and the fish become more susceptible to pollution, parasites, and disease.[13] Via these mechanisms affecting fish health and populations, water temperatures play a fundamental role in determining the distribution of the various fish species.

Increasing water temperatures, in combination with other climate change factors, are expected to make more northerly areas less suitable for cold-water species and more suitable for warm-water species. For example, the Great Lakes could become more suitable for warm-water fish such as smallmouth bass and bluegill, but less suitable for cool-water and cold-water species such as northern pike and whitefish.[14] Suitable thermal habitat for walleye, a cool-water species,[15] is projected to shift northward as the climate warms.[16]

Whether warm-water species actually benefit as waters warm depends on a number of factors.

Growth rates may increase in warmer waters, but so too would stress from excessively high temperatures. Northerly lakes may become more suitable for warm-water species, but fish may have no means to move into these areas unassisted. Warming may also affect prey species or the broader ecosystem.

Warmer air could also lead to earlier stratification of lakes and ponds in the spring, causing increases in summer fish kills due to oxygen-depleted waters. Seasonal temperature stratification is a normal process for temperate zone lakes wherein the steep temperature gradient between shallow warm water and cold deep water during the summer prevents mixing of the water layers.[17] This inhibits delivery of oxygen-rich water from the surface to the lower depths, leading to fish kills in deep waters.[18,19] In states like Minnesota where early stratification is becoming an issue, lakes may someday be unable to support lake trout and other species that live in the deepest, coldest zones.[20]

Rising temperatures threaten to compromise the success of restoration efforts underway in many freshwater systems. For example, the restoration of a diverse fish community to Ohio's lower Black River is at risk due to rising stream temperatures projected with climate change.[21] The maximum temperature thresholds[22] for 12 of 22 of the river's fish species assessed would be exceeded by mid-century based on projected increases in water temperature. Especially vulnerable are the river's cool-water species, such as the white sucker, as well as popular sport fish such as pumpkinseed, yellow perch, rock bass, and smallmouth bass.

## Brook Trout: Warmer Temperatures Threaten an Already Stressed Species

The cold-water brook trout, sporting a blush underbelly and lightly speckled with dots across its body, enjoys a special honor in Virginia. As the official state fish, the brook trout is an essential part of the state's thriving fishing and wildlife industries. It inhabits only the coolest, clearest, and cleanest flowing streams and rivers in most of the eastern United States and throughout the mountains of Appalachia.

About half of the brook trout's historic range has been lost due to a number of factors, including poor grazing practices, deforestation, and competition from introduced brown and rainbow trout.[23] As air temperature increases due to climate change, brook trout are expected to lose additional habitat as the cool water they depend upon warms and oxygen levels decline. More frequent droughts can further harm brook trout by reducing stream flow and killing vegetation, which provides shade that helps keep streams cool.

Brook trout have already been extirpated from more than 35 percent of their habitat in Virginia. A recent climate modeling study projects that brook trout could be extirpated from Virginia by mid-century.[24] "Warmer and drier won't be good for trout, period," says Graham Simmerman, chair of the Virginia Council of Trout Unlimited. "Brook trout have proven to be very adaptive and resilient to habitat disruptions, but warm, oxygen-depleted stream conditions are not easily avoided."

*More frequent droughts can further harm brook trout by reducing stream flow and killing vegetation, which provides shade that helps keep streams cool.*

Despite these bleak projections, Simmerman and his organization are looking for more ways to help preserve brook trout populations. "We are identifying places that might be resilient to climate change, bringing money and resources to try to secure those places for the long term, and putting in projects to enhance those habitat areas." Without such protections in place, it seems that Virginia's beloved state fish may entirely disappear.




*Brook trout distribution at present (left) and projected for the mid 21st century (right) for a business-as-usual emission scenario.[25, 26]*

# MORE EXTREME WEATHER CREATES NEW CHALLENGES

**T**he summer of 2012 was a window into the sorts of weather and climate extremes that climate change is bringing. Average temperatures for June through August were the third warmest on record, with July the hottest month ever recorded for the nation. Nearly two-thirds of the contiguous United States experienced drought conditions. Wildfires spanned more than 3.6 million acres across the western and central United States during August, a record for the month.[27] Just one year later, many states in the Ohio Valley and on the East Coast contended with much more rainfall than normal, often accompanied by major flooding.[28] These climate extremes are creating new challenges for fish across the nation.

During heat waves, water temperatures can become warm enough to cause massive fish kills, either through direct thermal stress or by creating conditions conducive to dangerously low levels of dissolved oxygen. During the summer of 2012, fish kills attributed to high water temperature were reported in many states, including Iowa, Michigan, Minnesota, Pennsylvania, Wisconsin, Ohio, Indiana, and Illinois.[29] For example, nearly 58,000 fish, including 37,000 sturgeon with a market value of nearly $10 million, died along 42 miles of the Des Moines River.[30]

Extreme heat is a concern for fish requiring cold waters, such as trout and salmon, but even warm-water species are susceptible when water temperatures exceed their temperature thresholds. For example, more than 1,700 walleye in Kansas's Cheney Reservoir were killed a year earlier when water temperatures exceeded 80 degrees Fahrenheit in late August 2011.[31]

In many cases, it is the combination of drought and high temperature that proves fatal for fish. As water levels decrease during drought, the remaining water can more easily warm, leaving fewer cool- or cold-water refuges for fish. Furthermore, receding water can shrink and fragment available habitat, leaving fish stranded. The potential for more frequent and severe droughts, especially in the Southwest, is particularly worrisome when combined with the increasing demand for water by the rapidly expanding population in the region.



*U.S. Forest Service*



*Daily mean stream temperatures exceeded 70 degrees Fahrenheit and were thermally stressful for trout in the Madison River, near McAllister, Montana. Data Source: USGS.*

Climate change is also leading to an increase in the frequency and severity of wildfire in the West.[32,33,34] While fish can typically survive the fires themselves, they are at much greater risk in the aftermath. The lack of trees and groundcover means less shading to keep rivers cool and a greater likelihood of extensive erosion. Heavy rainfall events coming on the heels of a wildfire can wash large quantities of silt and ash into local streams.

The combined effects of drought and wildfire have been particularly severe for trout in the Southwest. Native Apache, Gila, and Rio Grande cutthroat trout have been the focus of multi-decade conservation efforts. The biggest threat to these species is non-native trout that compete with, prey upon, and hybridize with the native trout. To address this threat, managers commonly isolate native trout using in-stream barriers. Unfortunately, when drought and wildfires strike, native trout cannot relocate from their isolated stream segments and many can perish. This scenario has played out several times in recent years. For example, trout populations declined 70 percent in the South Platte River following the 2002 Hayman Fire in Colorado.[35] The 2011 Wallow Fire took place in the Apache-Sitgreaves National Forest,

## Heat and Drought Mean Lost Opportunities to Fish in Prized Streams of the Greater Yellowstone Ecosystem

"The rivers and streams that flow through Yellowstone support some of the world's most renowned fisheries and the fantastic angling opportunities that go with them," says Land Tawney, Executive Director of Backcountry Hunters & Anglers. Native cutthroat trout are the crown jewel of Yellowstone's fisheries. Biologists estimate that up to 42 species—including otters, osprey, and grizzly bears—rely on these native icons, making them a critical link in the food chain.

Drought and summer heat waves are combining with other threats—such as invasive lake trout, whirling disease, and hybridization with rainbow trout[40]—to put Yellowstone cutthroat trout at increasing risk. Several tributaries are now running dry in late summer, interrupting trout migration and making them more vulnerable to predation. During recent hot summers, the National Park Service issued widespread fishery closures. For example, stretches of the Madison, Gibbons, and Firehole Rivers were closed in August 2012 due to high air temperatures, low precipitation, and runoff of warm geothermal waters.[41]

"Guides, outfitters, fly shops, and rural communities depend on these waters to feed their families and pay the bills," says Tawney. Closures of destination fishing locations can have major economic implications. Indeed, the fishing opportunities in Yellowstone National Park alone are valued at between \$67.5 and \$385 million annually.[42]

Unfortunately, streams across the Rocky Mountain region have been warming up. For example, the average number of days each year that are thermally stressful for trout has approximately tripled in Montana's Madison River since the 1980s (see Figure on page 7).[43] This warming, combined with the other factors affecting trout habitat, do not bode well for anglers like Tawney.

"For me, fishing the aqueous veins of Yellowstone goes beyond the pursuit of high alpine backcountry adventures and the lure of leviathan trout in its big rivers," says Tawney. "These waters are truly a unique place that have shaped traditions and the heritage that my family treasures. I feel obligated to protect the health and vitality of these waters cherished by those who came before us and as a legacy to my children."



Flickr / USFWS



*Flickr / USFWS*

important habitat for Apache trout in Arizona.[36] And, Gila trout in New Mexico's Gila National Forest had to be manually relocated following the 2012 Whitewater-Baldy Complex Fire, the largest wildfire ever recorded in New Mexico.[37]

In much of New England the problem is not lack of water, but too much, especially in large doses. Rainfall and storm intensities are increasing across much of the region with more than 90 percent of U.S. weather stations reporting increases in storms dropping more than one inch of precipitation.[38] Parts of New England have had "100-year" storm events in 2005, 2006, and 2007. This has resulted in major flooding and, in some places, misplaced efforts to channelize streams to speed runoff. Unfortunately, these attempts at flood control degrade fish habitat by removing trees and boulders, and eliminate the connections between rivers and floodplains. When floodplains are restored, their trees provide shade and cool

streams while the floodplains themselves store floodwaters and reduce damage.

A dramatic hypoxia event in Maine's Lake Auburn during the summer of 2012 exemplifies how the combination of multiple extreme events can cause surprising impacts for fish. Unusually warm spring weather caused lakes throughout Maine to be free of ice anywhere from 4 to 6 weeks earlier than their historical average. By early June, lake surface temperatures in central and southern Maine reached 80 degrees Fahrenheit. Then, the Lake Auburn watershed received 6 inches of rainfall in a 24-hour period, resulting in severe soil erosion from the watershed and nutrient loading to the lake. Preliminary studies indicate that the warm water and heavy nutrient loading were major factors leading to excessive algal blooms. Dissolved oxygen levels in the deeper areas of the lake were the lowest on record, leading to significant die-off of the lake trout population.[39]

# CHANGING COMPLEXION OF WINTER

**C**limate change isn't just making summers hotter; it is also changing the nature of winter. Winters are becoming warmer and shorter on average. For ice anglers across the Midwest and Northeast, this means fewer days cold enough to sustain sufficiently thick ice cover. Meanwhile, fish species that rely on the runoff from melting mountain snowpack are facing earlier peak stream flow as melting occurs earlier in the season. They then must contend with insufficient flow by late summer and fall, when the snowpack melt has been exhausted.

## Ice fishing: A tradition melting away?

Ice fishing is a beloved pastime throughout the Midwest and Northeast. The cold winters in Wisconsin, Minnesota, Michigan, New Hampshire, Maine, Ohio, and Iowa have long sustained a culture of ice anglers who can't wait for the ice to be thick enough to get out and spend hours catching yellow perch, bluegills, and other panfish.

This sport has spanned generations, but is now at risk of disappearing as warming winters are literally taking this pastime out from under anglers' feet. Ice anglers know the ice fishing season, which is entirely dependent on the ice being thick enough to walk on, is short and can end abruptly as soon as the weather warms. Unfortunately, as carbon emissions continue increasing, these fishermen and women can expect warmer winters and even shorter seasons—a change that already is starting to happen.[44]

Winter temperatures across the Midwest and Northeast are increasing at about twice the national average, with many states having warmed 3 to 4 degrees Fahrenheit since 1970.[45] As a result, the Midwest is seeing fewer days that ice is covering lakes in the region.[46] Since 1855, researchers at the University of Wisconsin-Madison have recorded the dates when the surrounding lakes have frozen ("ice in") and melted ("ice out"). The data show a clear overall



Flickr / sailorbill



*Long-term change in ice-cover duration for Lake Mendota, Wisconsin. Source: National Climate Assessment.*

trend of ice-in dates coming later and ice-out dates coming earlier, resulting in an ice season that is almost 18 days shorter than it was 150 years ago.[47]

Midwesterners and Northeasterners are also concerned about the economic impacts to local businesses that rely on winter tourism. Many communities host ice festivals, dog sled races, snowmobile races, and ice fishing tournaments to bring commerce to their area in the winter. In recent years, ice fishing competitions, derbies, and demonstrations were cancelled in the Midwest and Northeast because of the lack of safe and secure thick ice, and worse still, authorities reported numerous cases of cars

and people falling through the ice in states like Minnesota and Maine. These cancellations have greatly impacted the communities that financially rely on cold winters.[48]

Declines in ice cover can also affect some coldwater species, such as the lake whitefish. Because the survival of their eggs is highly dependent on winter ice cover that protects against wave damage, the abundance of lake whitefish populations in the Great Lakes region has been directly linked to the timing and amount of ice cover. The continued decline in ice cover projected to occur with climate change will likely have a strong impact on future reproductive success for this species.[49]

## Opportunities Lost on the Ice

"Our long-standing ice fishing heritage is something that is deeply entrenched in our culture," says Brenda Archambo, president of Sturgeon for Tomorrow in Michigan and a 4th-generation ice angler. "I have so many fond memories of spending days out on the frozen lakes here in northern Michigan, sitting in a warm, comfortable shanty with my father, grandfather, uncles, and brother—and now, with my family, grandchildren, nieces, and nephews."



Abby Batchelder

Archambo has witnessed the impacts a warming climate has had on ice fishing and understands all too well what these changes mean for this tradition. "I used to log about 100 ice-hours per season. But winters aren't normal anymore, and the past few years I only have logged about 25 hours of ice time. The conditions just have not been the same the last few winters, making it unsafe to go out onto the ice in many areas."

New Hampshire native Jason McKenzie has also witnessed the effects of a changing winter firsthand. McKenzie's family has run the Suds N' Soda convenience store and sport shop for more than half a century, but the warming winters are hurting business.

"We've had to adjust our inventory since winter and ice-fishing went away five years ago," McKenzie says. "We just can't count on a New Hampshire winter to provide us with ice fishing business like we used to."

The recent mild winters have prevented historically safe ice-fishing areas from freezing and kept anglers away. As a result, two-thirds of McKenzie's inventory was left unsold in 2010. The next year, wary ice fishermen and women were reluctant to buy any equipment, worrying the trend of unseasonable warmth would continue.

For anglers, the loss of ice fishing is not just about the economics. Says Archambo, "I'm concerned these changes will affect our ice fishing heritage and future generations of ice anglers. It's incumbent on us to instill a stewardship ethic in the next generation, and the best way to do that is to get them outdoors to experience and appreciate nature. Without memorable outdoor experiences, there's not going to be anyone here to defend our sport in the future."

## Shifting Snowpack Has Downstream Impacts

Many fish species are especially dependent on melting mountain snowpack for stream and river flow. Increased temperatures over the past several decades have already begun to alter the amount of average snowpack and the timing of springtime snowmelt, leading to changes in the timing of runoff and peak stream flows. For example, in western North America, snowpack is melting 1 to 4 weeks earlier than it did just over half a century ago.[50] Even the mildest climate projections estimate snowmelt will occur an additional 2 to 4 weeks earlier within the next century.[51] Earlier snowmelt and reduced average snowpack means that peak flow occurs earlier in the season and summer flows are lower.

Such changes in stream flow will have numerous effects on fish. They will disrupt the migratory behavior and timing of several fish species, for example, by impeding their ability to orient themselves for effective navigation.[52] Reproductive success will be affected for those species that time reproduction to coincide with pulses in stream flow. Earlier peak flow can scour streams and destroy the gravel beds that some trout, steelhead, and salmon use for nesting sites.[52,54] For example, the increasing frequency of high flows in winter, associated in part with more rain-on-snow events, is projected to especially affect fall-spawning brown trout and brook trout in the Pacific Northwest.[55] Even the stream insects that fish depend on for food are disrupted as adults emerge earlier and at smaller sizes than would normally occur.[56]



*Flickr / USDA / Scott Bauer*

With increasing demand for water resources throughout the western United States, more stress will be put on water storage systems and freshwater fish populations. Yet such systems are highly threatened by the reduced amount of snowpack and the timing of its melting, as 75 percent of the water resources in many western states are tied exclusively to snowmelt.[57] Much of the water in snowmelt-dependent waterways is allocated for various human uses, including energy production, agriculture, and municipal supply. Water shortages in many regions will present potential harm for fish species, as tradeoffs arise between maintaining fish populations and continuing intensive irrigation and hydropower.[58] New storage solutions will have to be considered to ensure that water is distributed effectively, efficiently, and fairly, and that essential populations of salmon, trout, and other fish are not harmed in the process.

## Pacific Salmon and Tribal Traditions in the Pacific Northwest

Salmon fishing is deeply important to the culture and economy of tribal communities in the Pacific Northwest. Pacific salmon spawn and rear their young in the cold, clean waters of the Columbia, Nooksack, Skagit, Klamath, and other famed rivers spanning northern California to Alaska. Salmon populations have already declined significantly from historic levels, owing to a number of obstacles including dams and pollution. Now, climate change poses yet another threat to the future of Pacific salmon.

For Indian tribes, salmon declines pose immediate risk to their way of life. Because tribal fishing rights are constrained to specific locations, the reduction of salmon populations in these areas can affect tribes acutely. The cultural, economic, and religious resources of these tribal communities are being threatened, and they may be lost if protections are not put in place for salmon.[59]



*Flickr / goingslo*

In California's lower Klamath River, the Yurok and Hoopa Valley Tribes have traditionally depended on abundant salmon resources. Increasingly warm water in the river during summer and fall has heightened the importance of restoring and protecting cold-water tributaries that provide refuge for migrating salmon and steelhead and enables them to reach their spawning grounds. Blue Creek is the primary cold-water refuge in the lower river where nearly all migrating fish stop off and cool down during warm months.[60] Protecting these high quality cold-water inflows, such as from the Blue Creek watershed, becomes more critical as climate change proceeds.

For Billy Frank, Jr., chairman of the Northwest Indian Fisheries Commission, safeguarding Pacific salmon is a high priority for current and future generations. "We're running out of time," said Frank in a recent interview.[61] "We've got to make a change."

# CLIMATE CHANGE ADDS INSULT TO INJURY FOR FISH

O ur freshwater ecosystems have borne the devastating effects of multiple assaults. Intensified land clearing and development have destroyed or degraded shorelines, floodplains, and wetlands. Pollution enters our waters from factories, farms, cities, roads and suburbs. Coal plant emissions are doubly harmful: they pump carbon into the air and toxic waste into the nation's waters. Sediment, pesticides, herbicides, and fertilizer enter our waterways from agricultural lands. Excessive water use dries out some streams. Dikes, dams, and stream channelization all change the basic ecology of aquatic ecosystems. The introduction of non-native species and diseases creates additional stress. Climate change will interact with these various stressors, in many cases creating even more challenging conditions for fish.

## Invasive Species

Invasive species are a leading factor in freshwater fish extinctions and endangerments, damage our natural ecosystems, and are costly to manage.[62] In the Great Lakes region alone, aquatic invasive species cost local people, businesses, utilities, and communities at least $200 million a year.[63] Invasive species have high growth and reproduction rates, allowing them to spread efficiently and aggressively. Invasive species threaten native fish by preying on these species, out-competing them for food or other resources, causing or spreading disease, and negatively impacting their reproduction.[64]

Higher average temperatures and changes in precipitation patterns caused by climate change are expected to enable the expansion of many invasive species into new ecosystems.[65,66] As many invasive species can tolerate a wide range of environmental conditions, a changing climate may allow these species to further impact and out-compete native species that are not adapted to the new conditions.

The likelihood of more droughts and more heavy rainfall events also will affect dispersal of invasive species. Low water flow can reduce dispersal opportunities and might slow the spread of invasive aquatic species, while the opposite is true for high water flow conditions. The interaction of climate and invasive fish are important factors driving the structure of trout communities.[67,68]



*Flickr / andres musta*



*Wikimedia commons / Wiros*

## Sea Lamprey Invasion: Impacts Increase in the Great Lakes as Climate Warms

In the Great Lakes region, the invasive predaceous sea lamprey is well-known for harming native fish species such as lake trout, whitefish, chubs, burbot, walleye, catfish, and sturgeon.[70] This aquatic vertebrate, native to Atlantic coast watersheds, is thought to have made its way to Lake Ontario in the early 1800s through shipping canals, and from there, spread to the other Great Lakes by 1939.[71,72] Sea lamprey spend part of their life cycle attached to fish and feeding parasitically on their blood, often scarring and killing the host fish. Under certain conditions, only one out of seven host fish will survive.[73]

Its aggressive feeding behavior and the lack of any predators already give sea lamprey a distinct advantage against native Great Lakes fish species. By the 1940s and 1950s, sea lamprey combined with overfishing led to the collapse of lake trout, whitefish, and chub populations,[74,75] with a substantial impact on the local economy.

Now, climate change is expected to give sea lamprey an even bigger advantage. In Lake Superior, summer surface temperatures have increased 4.5 degrees Fahrenheit since 1980.[76] Scientist Tim Cline has studied the shifting species distributions and interactions in Lake Superior associated with this warming. "One species that has clearly benefited from warmer waters and longer growing seasons is the invasive sea lamprey that, lake wide, have increased in size by 12 percent," Cline says.

Cline notes that bigger lampreys create bigger problems for native fish. "Larger lampreys consume more blood, kill more host fishes, and lay more eggs," which further benefits them and puts native fish species at greater risk. The growth of lampreys in size and population will make it that much harder to control and manage this destructive invasive species.

Climate change will pose further challenges for management and control strategies by altering the way invasive species interact and spread.[69] Preventing new invasions is the most effective and economical method for protecting the nation from the threats posed by invasive species. Management of established populations of invaders must consider how climate change will affect the success of control strategies.

## Water Withdrawals

We rely on freshwater for irrigation, drinking water, agriculture and other purposes. These withdrawals reduce water levels, making our lakes, streams and rivers more prone to warming and evaporation, leading to even further decline in water levels. The combination of low flows and warm waters can reduce oxygen levels and exceed temperature thresholds for fish, which may harm or kill them. In a warming world with more periods of intense drought, water resources will be less readily available and will have to be stretched further for irrigation and energy purposes, especially in the summer. By 2060, U.S. freshwater withdrawals are projected to increase by 12 to 41 percent due to energy demands and human population growth.[77]

Much of these future withdrawals will occur in the southwestern United States, an area already experiencing water scarcity, extreme droughts, and harsh heat waves that may be more frequent in the future.[78] Fish populations in this area tend to have smaller habitat ranges and therefore fewer options for relocation as conditions change.[79] The combination of increased water demand and climate change may cause river flow to decline as much as 48 percent, further limiting available fish habitat.[80] With water rights

already an issue of contention among states in the region, lower flows in the coming years will only cause more strife and peril for people and freshwater fish.

## Disease

Climate change may increase the vulnerability of fish to disease. Rising temperatures can stress fish, making them more susceptible to infection, as well as lengthen the period during which diseases may be transmitted, leading to increased infection and impact.[81] Warmer waters can facilitate shorter regenerative cycles for diseases, increasing disease prevalence.[82] Increasing temperature may also increase the virulence of some diseases.[83]

Several links between climate change and fish disease are already raising concerns in fisheries across the country. For example, concerns have been raised about the potential for large fish kills from Columnaris (see box on page 18). Fueled by hot weather during the summer of 1998, a Columnaris outbreak killed an estimated 70,000 to 80,000 white bass in Kansas's Cheney Reservoir.[84] Higher temperatures can also lead to higher prevalence and severity of proliferative kidney disease in salmon, with an associated increase in mortality. Although the overall geographic range of the disease may decline, outbreaks are projected in more northerly areas as temperatures rise.[85] Another disease—Ichthyophonus—develops more quickly and has greater prevalence and higher mortality in rainbow trout in warmer waters than those in cooler waters. The invasive pathogen that causes the potentially fatal whirling disease is likely to increase as the climate warms. The neurological damage and skeletal deformation caused

## Columnaris Disease: A Growing Concern in Warming Waters

Columnaris is a deadly bacterial disease in fish. Naturally present in freshwater ecosystems, it usually does not cause serious problems for otherwise healthy fish populations. However, it is well known that outbreaks of the disease can cause large fish kills when water temperatures increase. Temperatures between 68 and 86 degrees Fahrenheit are conducive for outbreaks while temperatures below 59 degrees Fahrenheit rarely cause mortality.[87]



USFWS

"In 2005, I first saw a large die-off of smallmouth bass in the Susquehanna River, which has subsequently become the new normal in hot years with low water flow," says Ed Perry, formerly with the U.S. Fish and Wildlife Service "Columnaris was identified as the primary source of mortality, and now we are seeing the same type of disease outbreaks occurring in the Delaware, Allegheny, and other rivers. Rising water temperatures that trigger the disease and cause the die-offs of smallmouth bass are a major concern. At times Susquehanna River temperatures exceed 90 degrees Fahrenheit." Investigations continue on contributing factors to the smallmouth bass die-offs caused by Columnaris.[88]

On the other side of the country, Senior Scientist Jack Williams of Trout Unlimited has similar concerns. "Right here in Oregon's Rogue River, fall and spring Chinook are susceptible to Columnaris," says Williams. "The disease is not a problem at higher water flows and in cool water but becomes really nasty at lower flows and higher stream temperatures. Exactly how much of this is caused by climate change is, of course, hard to tease out, but we are likely to see an increasing frequency of those conditions that contribute to outbreaks of the disease as our summers warm."

by this disease can severely and negatively affect salmonid ability to swim, feed, and avoid predation, and increases in virulence in warmer streams.[86]

## Water Pollution

Our nation's waterways still face major challenges from pollution. Climate change may complicate efforts to address these challenges by altering how pollution makes its way into our water bodies and the extent to which fish are sensitive to pollutants.[89]

More frequent heavy rainfall events in certain parts of the Midwest, such as Ohio, along with increased drainage,[90,91] have washed excessive quantities of phosphorus and nitrogen into streams, lakes, and ponds, leading to algal blooms and subsequent oxygen-depleted hypoxic zones. Algal blooms can be further stimulated by warmer water temperatures.[92] Some algal species such as blue-green algae (cyanobacteria) can be toxic, causing illness and death for fish and wildlife.[93,94] Escalation of harmful algal blooms and hypoxia will have serious economic and ecological implications, particularly in places like Lake Erie that support economically important fishing industries.

Climate change is also expected to worsen the effects of pollution from heavy metals, especially mercury, in many freshwater systems.[95] When coal is burned in power plants mercury is emitted to the atmosphere, deposited into soils, and then washed into streams, lakes, and rivers. As coal burning continues and heavy rainfall events become more frequent, more mercury will contaminate aquatic environments. Increasing frequency of severe wildfires is also expected to



*Flickr / eutrophication & hypoxia*

increase mercury pollution because wildfire can char the soil, releasing mercury that can wash into waterways.[96,97]

Once in the water, warmer conditions would hasten the conversion of mercury into toxic methylmercury, because the organisms that convert mercury to methylmercury thrive in warmer bodies of water.[98] Fish populations are especially sensitive to methylmercury, and can accumulate it through the food chain. Methylmercury can limit reproductive success by nearly 40 percent, increase mortality rates in fish embryos,[99] reduce liver size and function, and lower growth and development rates.[100,101]

# CLIMATE-RELATED SHIFTS IN THE BROADER ENVIRONMENT

O ur favorite fish species are also vulnerable to ways that climate change, in combination with other environmental stressors, are expected to affect the entire aquatic food web. Aquatic invertebrates are an important food source for fish. Mayflies, which fly fishers try to mimic when tying flies, may spend many months under water as nymphs but only one day out of water as an adult.[102] Mosquitoes and midges, which we love to hate, are important fish food in their aquatic nymphal life stages. Then, there are dragonflies and damselflies, voracious underwater predators as nymphs, but which we regard so reverently due to their brilliant colors as they dart through the air when adults. Even some moths,[103] beetles, wasps,[104] and flies[105] spend part of their life cycle in freshwater ecosystems.

The incredibly rich diversity of aquatic invertebrates is highly sensitive to water conditions.[106] Changes in aquatic invertebrate communities can be useful indicators of how climate change is affecting water conditions. For example, aquatic invertebrates, such as caddisfly, mayfly, stonefly, and mosquito larvae have a range of temperatures to which they are best adapted.[107] It follows that warming summer water temperatures and other climate change factors will affect the abundance and composition of aquatic invertebrate communities. A study of mosquito and midge larvae in Vermont found a strong dependence on water levels, with mosquitoes having more reproductive success when water levels were lower and midges preferring water levels that consistently stayed high.[108] The emergence of the adult life stage of many aquatic insects is keyed into peak stream flows and water temperatures. As adult females emerge earlier because of earlier snowmelt, their smaller bodies produce fewer eggs, which impacts future generations.[109]

Mussels are an important component of many healthy aquatic habitats and are even more susceptible to changes in stream flow regimes than fish.[110] The United States has the greatest diversity of freshwater mussels in the world, with more than 290 species, many of which are concentrated in the Southeast.[111] Many mussels have life cycles that are inextricably linked with freshwater fishes, relying on particular fishes to transport their larvae to new locations.[112] It follows that changes in fish communities also affect mussels. The alteration of natural flow regimes in rivers has been the major cause of mussel decline in the United States,[113] suggesting that they will be sensitive to further changes in flow regimes driven by climate change.



Flickr / Johnnagai



© Conservation Fisheries

## The Southeastern United States: An Aquatic Biodiversity Hot Spot

Although freshwaters cover only 1 percent of Earth, they are home to 10 percent of the world's animal species, including 40 percent of all fish species.[114] The southeastern United States is a global hot spot for this aquatic biodiversity. For example, more fish species are found in Tennessee's Duck River than in all of Europe.[115] Only 290 miles long, the Duck River is home to 150 fish species, 55 freshwater mussel species, and 22 aquatic snail species.[116] The southeastern United States also has the largest number of imperiled fish and mussels in the country.[117] Now this rich aquatic diversity is at further risk due to climate change.

"I can already see the effect of climate change on North Carolina's rivers," says Fred Harris, past president of the American Fisheries Society and current Resource Specialist with the North Carolina Wildlife Federation. "Floods are bigger, droughts are more severe, and the ecosystem seems less stable. It is critically important that we protect the Southeast's incredibly rich community of aquatic life for healthy rivers for our children's future."

One of the rarest fish in North America is the diamond darter, found only in a 22-mile stretch of West Virginia's Elk River. It has been severely impacted by extensive loss and degradation of its habitat. When first proposed for listing under the Endangered Species Act, the increasing likelihood of droughts and floods in the region due to climate change was identified as a concern.[118] Given its already limited range and genetic diversity, the diamond darter is especially vulnerable to these sorts of extreme events.

"Climate change only serves to exacerbate the continued threats to the diamond darter from sources like insufficient wastewater treatment and natural resource extraction and development, which have already degraded water quality," says Kathleen Tyner, conservation and advocacy program manager for the West Virginia Rivers Coalition. "At long last, the diamond darter was listed as an endangered species this year and will receive the strongest protections available."

# GIVING FRESHWATER FISH A FIGHTING CHANCE

**W**e can no longer wait to take action to address the increasing threats to America's freshwater fish. Climate change is already having significant impacts on important rivers, streams, lakes, and ponds, as well as the fishing opportunities they provide. The past century's conservation achievements are now at risk from the pervasive effects of climate change. Anglers, boaters, shoreline property owners, fisheries managers, and many others all have a vested interest and role to play in safeguarding fish and their aquatic habitats in the face of climate change.

## Get at the Root of the Problem and Tackle Carbon Pollution

The threats to the nation's fish will only increase if carbon pollution continues on the business-as-usual path. Urgent action is needed to change the course we are on: We must move away from the current reliance on fossil fuels and invest in clean energy solutions that do not pollute. Fortunately,

we have the tools and know-how to start making this transition today. While the climate crisis is ultimately a global problem, America can be a leader in driving forward policies here at home. Addressing carbon pollution requires the following priority actions:

• **Use and protect the proven, existing laws to tackle carbon pollution**. The Clean Air Act was put in place to protect people and wildlife from pollution. Under this law, the U.S. Environmental Protection Agency (EPA) has the authority and obligation to limit carbon pollution, most notably from large sources like coal-fired power plants. The President has set a clear path for the EPA to issue and finalize the first-ever limits on carbon pollution from new and existing power plants by 2016. This rulemaking is a key component of a national plan to reduce the carbon that drives climate change.

• **Prioritize clean energy and reduce fossil fuel use**. A serious effort to reduce carbon pollution must include smart energy choices that reduce dependence on fossil fuels and move us quickly towards a future powered by clean energy. Investing in clean energy options such as wind, solar, geothermal, and sustainable bioenergy will reduce our consumption of carbon-polluting fuels like coal, oil, tar sands, and natural gas, which are driving climate change. It is essential that clean energy sources be developed in an environmentally responsible way to minimize potential effects on fish and wildlife.



*Flickr / Slaunger*



*Flickr / Bien Stephenson*

## Dirty Power Plants and Water Use

The electricity generated in the United States today overwhelmingly comes from thermoelectric power plants that use water as part of the process to produce energy from coal, oil, and natural gas. Each day, these plants withdraw hundreds of billions of gallons of water.[119] Older 'once-through' systems discharge water back into the lakes, streams, or rivers where it originated, but typically at a higher temperature. Newer re-circulating systems withdraw much less water, but end up consuming more, such that less is discharged back into waterways.[120]

Billions of fish and other aquatic life are killed annually by power plants. In the state of New York alone, more than 17 billion fish, their larvae, and their eggs are mutilated or destroyed each year.[121] Many fish are sucked into the power plants with the water or are trapped on intake screens. Others are unable to tolerate the higher temperatures of discharged water, which may approach or exceed thermal thresholds or lead to algal blooms that deplete oxygen and suffocate fish.

By 2030, increased demand for electricity is expected to increase freshwater consumption by thermoelectric plants by nearly 30 percent.[122] Meanwhile, nearly a quarter of current electricity generation is projected to encounter extreme water sustainability issues, in part related to climatic shifts.[123]  These conflicting projections for the future—one showing we will need more water for electricity and the other noting less water will be available—show firsthand the problems presented by thermoelectric power generation moving forward.





NATIONAL *fish, wildlife* & *plants*
CLIMATE ADAPTATION STRATEGY



*The "National Fish, Wildlife, and Plants Climate Adaptation Strategy," released in March 2013, is available at http://www.wildlifeadaptationstrategy.gov/.*

• **Protect and restore natural carbon sinks.**
In addition to transitioning to clean energy, we must also enhance nature's ability to balance the system. Restoring the ability of farms, forests, wetlands, and other natural lands to absorb and store carbon not only provides critical habitat and increased benefits for wildlife, but also helps mitigate climate change.

## Safeguard Freshwater Fish and Their Aquatic Habitats from Climate Change

Climatic shifts are amplifying the effects of a host of existing threats to our species and ecosystems, and undermining the ability of natural systems to provide for both people and

fish. To sustain our rich legacy of conservation achievements and ensure the survival of cherished fish species, policies and practices will have to embrace climate-smart approaches to conservation. Preparing for and managing these changes—climate adaptation—increasingly will need to serve as the basis for fish conservation and water resource management. We can prepare for and cope with the new conservation challenge of climate change by taking the following actions:

• **Design, fund, and carry out climate-smart conservation strategies** that can help fish adapt to climate change. Priority steps are to adopt forward-looking conservation goals and design conservation actions that reduce climate vulnerabilities and enhance ecosystem resilience. The National Fish, Wildlife and Plants Climate Adaptation Strategy represents a shared federal, state, and tribal vision for 21st century conservation, and should be aggressively implemented. Federal and state programs critical to advancing climate science and adaptation will require adequate funding to be successful. These include several relatively new efforts intended to meet these new needs, such as the U.S. Department of the Interior's Climate Science Centers and Landscape Conservation Cooperatives, as well as existing programs that are being refocused or expanded to address climate adaptation, such as U.S. Fish and Wildlife Service's State Wildlife Grants program, state wildlife action plans,[124] and the National Fish Habitat Action Plan.[125]

• **Minimize other stressors on aquatic ecosystems**, such as habitat degradation, invasive species, pollution, sedimentation from roads, and development in floodplains and along

shores. In many cases, reducing the cumulative impacts of these other factors can directly protect fish from harm and increase the resilience of fish populations, making it possible for them to survive some climate-related stresses. For example, protecting and restoring wetlands and forested riparian buffers along tributary streams will help shelter, buffer, and cleanse streams, mitigating higher water temperatures, sedimentation, and pollution stressors and increasing resilience of stream ecosystems. Ensuring stringent limits are placed on mercury emissions and toxic discharges from coal power plants will help safeguard fish populations and fish habitat. Clean Water Act permitting standards and Farm Bill conservation incentives are important tools for minimizing habitat and water quality degradation and encouraging climate-smart restoration.

• **Prioritize and promote the use of non-structural, nature-based approaches**—such as wetlands and riparian buffer restoration, and floodplain protection—in lieu of levees and reservoirs. These approaches minimize impacts on fisheries while also providing benefits to communities such as clean drinking water, flood protection, filtering out of pollutants and excess nutrients, and maintaining water quality. Where new development or infrastructure is necessary, direct it away from sensitive aquatic habitats and climate-vulnerable areas by using water permitting and land-use planning tools such as zoning, comprehensive plans, and incentivizing development in less vulnerable areas. Urban landscapes should be made sustainable through smarter planning and design choices that use green infrastructure—including landscape features (open space, parks, wetlands) and low-impact development—to minimize storm surges and reduce polluted runoff.



*Successful climate adaptation benefits from a watershed-scale approach. The left face shows degraded habitats where the cumulative impacts from climate change will be more severe. The right face shows strategies of protecting best remaining habitats in the headwaters, restoring lower elevation valleys, and reconnecting stream networks between the two. Source: Trout Unlimited.*



Stewart Tomlinso /
U.S. Geological Survey

## Improve Water Infrastructure and Management

As population increases in the coming decades, so too will the demand for freshwater to support agriculture, municipalities, and energy production. Coupled with higher temperatures and the increasing likelihood of severe and prolonged droughts, water shortages are expected to increase. It is essential that we consider the implications for fish and other aquatic species as federal, state, and local agencies wrestle with how to address these challenges. Important steps that can be taken now include:

• **Upgrade water infrastructure**. Demand for water will continue to rise as the population grows. As more freshwater is removed from the natural system, less is left for fish and habitat. As infrastructure ages, it loses its ability to efficiently transport water, resulting in waste. Experts estimate that drinking water systems lose 6 to 25 percent of water, depending on their condition, adding up to an estimated 25.3 billion gallons of water wasted from leaky pipes each day across the nation.[126] Investing in federal Drinking Water and Clean Water State Revolving Funds can reduce waste, increase efficiency, and reduce the demand on natural freshwater sources. When upgrades are made, they should be based on projected future climatic conditions.

• **Optimize existing water infrastructure and management to enhance aquatic ecosystems.** The reproductive success and survival of freshwater and anadromous fish are dependent upon the volume, quality, and timing of freshwater flow. Federal and state permitting policies should require compliance with practices that optimize aquatic habitat, water quality, and fish spawning needs for changing climate conditions.

• **Use natural water storage**. Intact wetlands and functioning floodplains, in lieu of dikes and dams, are cost-effective ways to store water and minimize flooding, while also maintaining flows beneficial to fish and other aquatic life. Construction of dams and reservoirs should be avoided. They are costly to build and maintain and completely change the natural ecology of streams and lakes.

• **Establish broader in-stream flow requirements that account for future climate conditions**. Many riverine systems are managed without a complete assessment of competing uses. Water-use permits are issued with incomplete consideration given to in-stream needs. This is akin to purchasing real estate without first comparing monthly mortgage payments with monthly income. Accordingly, water managers should assess the in-stream and downstream requirements to maintain a healthy riverine ecosystem, as well as how climate change may affect water availability, and then manage water supply to maintain that required flow.

## Lead Authors

Amanda Staudt, Ph.D., National Wildlife Federation
Doug Inkley, Ph.D., National Wildlife Federation
Aliya Rubinstein, National Wildlife Federation
Eli Walton, National Wildlife Federation
Jack Williams, Ph.D., Trout Unlimited

## Acknowledgements

This report was produced with much assistance from many National Wildlife Federation staff including Steve Bender, Catherine Bowes, Nic Callero, Hector Galbraith, John Gale, Patty Glick, Jan Goldman-Carter, Sara Gonzalez-Rothi, Miles Grant, Amber Hewett, Bentley Johnson, Austin Kane, Julie Lalo, Grant LaRouche, Claudia Malloy, Jen Mihills, Jim Murphy, Michael Murray, Carol Oldham, Mary Price, Kelly Senser, Corey Shott, Marc Smith, Felice Stadler, Bruce Stein, Patricia Tillman, Garrit Voggesser, Ron Warnken, and Aileo Weinmann.

We are also sincerely grateful for the time and advice of many partners who provided useful input or reviewed the report, including Brenda Archambo, Sturgeon for Tomorrow; Nick Bennett, Natural Resources Council of Maine; Glenda Booth, Consultant;  Gary Botzek, Minnesota Conservation Federation; Tim Cline, University of Washington; Andy Dolloff, U.S. Forest Service Southern Research Station and Virginia Tech; Marc Gaden, Great Lakes Fishery Commission; Dick Hamilton, North Carolina Wildlife Federation; Fred Harris, North Carolina Wildlife Federation; Todd Holbrook, Georgia Wildlife Federation; Jeff Koch, Kansas Department Wildlife, Parks & Tourism; Jason McKenzie, Suds N' Soda; G. Richard Mode, North Carolina Wildlife Federation and National Wildlife Federation; Steve Moyer, Trout Unlimited; John O'Leary, Massachusetts Division of Fisheries & Wildlife; Ed Perry, U.S. Fish and Wildlife Service (retired); Graham Simmerman, Virginia Council of Trout Unlimited; Steve Sorenson, Kansas Wildlife Federation; Land Tawney, Backcountry Hunters & Anglers; Kathleen Tyner, West Virginia Rivers Coalition;  Seth Wenger, Trout Unlimited; Scott Williams, Maine Volunteer Lake Monitoring Program.

Graphic Design by MajaDesign, Inc.

This report was made possible through the generosity of our donors and supporters.

## Photo Credits

Front Cover: Pat Clayton / Fisheye Guy Photography.
Back Cover: Flickr / Charles & Clint.

Copyright © National Wildlife Federation 2013

For more information, please visit **www.nwf.org/fishandclimate**.

# ENDNOTES

1   U.S. Fish and Wildlife Service. 2013. Environmental Conservation Online System. Available at: ecos.fws.gov/tess_public/ SpeciesReport.do?groups=E&listingType=L&mapstatus=1

2   The H. John Heinz III Center for Science, Economics and the Environment. 2008. The State of the Nation's Ecosystems 2008: Highlights.

3   U.S. Environmental Protection Agency (EPA). 2013. National Rivers and Streams Assessment 2008-2009: A Collaborative Survey. Draft. EPA/841/D-13-00.

4   Kunkel, K.E, L.E. Stevens, S.E. Stevens, L. Sun, E. Janssen, D. Wuebbles, and J.G. Dobson. 2013. Regional Climate Trends and Scenarios for the U.S. National Climate Assessment. Part 9. Climate of the Contiguous United States, NOAA Technical Report NESDIS: 77, 142-9.

5   National Research Council. 2010. Advancing the Science of Climate Change. Washington, D.C., The National Academies Press: 503.

6   Stewart, I.T., D.R. Cayan, and M.D. Dettinger. 2005. Changes toward earlier streamflow timing across western North America. Journal of Climate 18: 1136-55.

7   U.S. Department of the Interior, U.S. Fish and Wildlife Service, and U.S. Department of Commerce, U.S. Census Bureau. 2012. The 2011 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation.

8   Jones, R., C. Travers, C. Rodgers, B. Lazar, E. English, J. Lipton, J. Vogel, K. Strzepek, and J. Martinich. 2013. Climate change impacts on freshwater recreational fishing in the United States. Mitigation & Adaptation Strategies for Global Change 18(6): 731-58.

9   Wenger, S.J., D.J. Isaak, C.H. Luce, H.M. Neville, K.D. Fausch, J.B. Dunham, D.C. Dauwalter, M.K. Young, M.M. Eisner, B.E. Rieman, A.F. Hamlet, and J.E. Williams. 2011a. Flow regime, temperature, and biotic interactions drive differential declines of trout species under climate change. Proceedings of the National Academy of Sciences 108(34): 14175-80.

10   Jones et al. 2013. See supra 8.

11   Kaushal, S.S., G.E.Likens, N.A. Jaworski, M.L Pace, A.M. Sides, D. Seekell, K.T. Belt, D.H. Secor, and R. L. Wingate. 2010. Rising stream and river temperatures in the United States. Frontiers in Ecology and the Environment 8: 461-6.

12   Robles, M.D., and C. Enquist. 2010. Managing changing landscapes in the Southwestern United States. The Nature Conservancy: Tucson, AZ.

13   Karvonen, A., P. Rintamäki, J. Jokel, and E.T. Valtonen. 2010. Increasing water temperature and disease risks in aquatic systems: Climate change increases the risk of some, but not all, diseases. International Journal for Parasitology 40: 1483-8.

14   Kling, G.W., K. Hayhoe, L.B. Johnson, J.J. Magnuson, S. Polasky, S.K. Robinson, B.J. Shuter, M.M. Wander, D.J. Wuebbles, and D.R. Zak. 2003. Confronting climate change in the Great Lakes Region: Impacts on our communities and ecosystems. The Union of Concerned Scientists & The Ecological Society of America.

15   Minnesota Department of Natural Resources. 2013. Walleye biology and identification. Available at: www.dnr.state.mn.us/fish/walleye/ biology.html

16   Shuter, B., C.K. Minns, and N. Lester. 2002. Climate change, freshwater fish and fisheries: Case studies from Ontario and their use in assessing potential impacts. American Fisheries Society Symposium 32: 77-87.

17   Schertzer, W.M., P.F. Hamblin, and D.C.L. Lam. 2008. Lake Erie thermal structure: Variability, trends and potential changes. In: Munawar, M., and R. Heath, eds. Checking the Pulse of Lake Erie. Ecovision World Monograph Series, Aquatic Ecosystem Health and Management Society: 3-44.

18   Quinn, F.H., and T.E. Croley. 1999. Potential climate change impacts on Lake Erie. In: Munawar, M., T. Edsall and I.F. Munawar, eds. State of Lake Erie: Past, present and future. Backhuys Publishers, Leiden, the Netherlands: 20-3.

19   Kling et al. 2003. See supra 14.





20 Wildlife Management Institute. 2008. Season's End: Global Warming's Threat to Hunting and Fishing. Bipartisan Policy Center: Washington, DC.

21 Inkley, D.B. 2012. Climate-Smart Restoration for the Black River in Lorain County, Ohio. Washington, D.C.: National Wildlife Federation.

22 Eaton, J.G., and R. M. Scheller. 1996. Effects of climate warming on fish thermal habitat in streams of the United States. Limnology and Oceanography 41(5): 1109-11.

23 Trout Unlimited. 2006. Eastern Brook Trout: Status and Trends. Available at: www.easternbrooktrout.net/docs/brookiereportfinal.pdf

24 Kane, A., C. Burkett, S. Kloper, and J. Sewall. 2013. Virginia's Climate Modeling and Species Vulnerability Assessment: How Climate Data Can Inform Management and Conservation. National Wildlife Federation: Reston, VA.

25 Klopfer, S., J. Sewall, A. Kane, and C. Burkett. 2012. Modeling Potential Climate Changes and their Related Impact on Select Species in Virginia. Conservation Management Institute, Virginia Tech. cmi.vt.edu/Articles/Files/file_ClimateChangeReport.pdf

26 Kane et al. 2013. See supra 23.

27 National Oceanic and Atmospheric Administration (NOAA). 2012. State of the Climate, 2012. Available at: www.ncdc.noaa.gov/sotc/

28 NOAA. 2013. State of the Climate, 2013. Available at: www.ncdc.noaa.gov/sotc/

29 Zelman J. 2012. Midwest Heat Wave 2012: Thousands of Fish Die in Hot Weather. The Huffington Post. Available at: www.huffingtonpost.com/2012/08/05/midwest-heat-wave-2012_n_1744504.html

30 Telegraph-Herald Online. 2012. Outdoors: Heat wave thinning Iowa's fish population. Available at: www.thonline.com/sports/local_sports/article_777aa3f1-f987-5084-b8d0-3830d8e5eee9.html

31 Jeff Koch, Fisheries Biologist, Cheney Reservoir, Kansas Department of Wildlife, Parks, and Tourism. Personal communication, July 2013.

32 Westerling, A.L., H.G. Hidalgo, D.R. Cayan, and T. W. Swetnam. 2006. Warming and earlier spring increase Western U.S. forest wildfire activity. Science 313: 940-3.

33 Littell, J.S., E. Oneil, D. McKenzie, J. Hicke, J. Lutz, R. Norheim, and M. Elsner. 2010. Forest ecosystems, disturbance, and climatic change in Washington State, USA. Climatic Change 102: 129-58.

34 McKenzie, D., D. Petereson, and J. Littell. 2009. Global warming and stress complexes in forests of western North America. Developments in Environmental Science 8: 319-38.

35 Kershner, J., L. MacDonald, L.M. Decker, D. Winters, and Z. Libohova. 2003. Ecological Effects of the Hayman Fire – Part 6: Fire-induced Changes in Aquatic Ecosystems. USDA Forest Service General Technical Report: 232-43.

36 Meyer, K. 2011. Wallow Fire 2011 Large Scale Event Recovery Fisheries Report: Apache-Sitgreaves National Forests.

37 Mozingo, J. 2012. Whitewater Baldy Fire Native Fish Rescue Fisheries and Wildlife Program FY2012 Accomplishments. Gila National Forest, Southwestern Region.

38 Pierre, S., and C. Wake. 2010. Trends in Extreme Precipitation Events for the Northeastern United States 1948-2007. Carbon Solutions New England, University of New Hampshire.

39 Fleming, D. 2013. Lake Auburn: Good fishing in troubled waters. Portland Press Herald. Available at: www.pressherald.com/life/outdoors/good-fishing-in-troubled-water_2013-05-05.html?pagenum=full

40 National Park Service (NPS). 1995. The Yellowstone Lake Crisis: Confronting a Lake Trout Invasion. Available at: www.nps.gov/yell/planyourvisit/upload/laketrout2.pdf

41 NPS. 2012. Yellowstone to implement fishing closures. Available at: www.nps.gov/yell/parknews/12055.htm

42 Kerkvliet, J., C. Nowell, and S. Lowe. 2002. The economic value of the greater Yellowstone's blue-ribbon fishery. North American Journal of Fisheries Management 22: 418-24.

USFWS

43   Isaak, D.J., C.C. Muhlfeld, A.S. Todd, R. Al-Chokhachy, J. Roberts, J.L. Kershner, K.D. Fausch, and S.W. Hostetler. 2012. The past as prelude to the future for understanding 21st-century climate effects on Rocky Mountain trout. Fisheries 37(12): 542-56.

44   Magnuson, J.J., T.K. Kratz, and B.J. Benson, eds. 2006. Long-term dynamics of lakes in the landscape: long-term ecological research on North Temperate lakes. Oxford University Press.

45   Tebaldi, C., D. Adams-Smith, and A. Kenward. 2013. Warming Winters: U.S. Temperature Trends. Climate Central.

46   NOAA. 2013. Regional Climate Trends and Scenarios for the U.S. National Climate Assessment: Part 3. Climate of the Midwest U.S. Department of Commerce, Washington D.C.

47   Magnuson, J.J., D.M. Robertson, B.J. Benson, R.H. Wynne, D.M. Livingstone, T. Arai, R.A. Assel, R.G. Barry, V. Card, E. Kuusisto, N.G. Granin, T.D. Prowse, K.M. Stewart, and V.S. Vuglinski. 2000. Historical trends in lake and river ice cover in the Northern Hemisphere. Science 289(5485): 1743-6.

48   Davey, M. 2012. The warmth of winter is casting a chill on ice fishing. The New York Times.

49   Lynch, A.J., W.W. Taylor, and K.D. Smith. 2010. The influence of changing climate on the ecology and management of selected Laurentian Great Lakes fisheries. Journal of Fish Biology 77: 1964–82.

50   Stewart, I.T., D.R. Cayan, and M.D. Dettinger. 2005. Changes toward earlier streamflow timing across western North America. Journal of Climate 18: 1136-55.

51   Hunsaker, C.T., T.W. Whitaker, and R.C. Bales. 2012. Snowmelt runoff and water yield along elevation and temperature gradients in California's southern Sierra Nevada. Journal of the American Water Resources Association 48(4).

52   Williams, J. 2006. Central Valley salmon: A perspective on Chinook and steelhead in the Central Valley of California. San Francisco Estuary and Watershed Science 4: Art. 2.

53   Lindley, S.T., R.S. Schick, E. Mora, P.B. Adams, J.J. Anderson, S. Greene, C. Hanson, B.P. May, D.R. McEwan, R.B. MacFarlane, C. Swanson, and J.G. Williams. 2007. Framework for assessing viability of threatened and endangered Chinook salmon and steelhead in the Sacramento-San Joaquin Basin. San Francisco Estuary and Watershed Science 5(1).

54   Mantua, N., I. Tohver, and A. Hamlet. 2010. Climate change impacts on streamflow extremes and summertime stream temperature and their possible consequences for freshwater salmon habitat in Washington State. Climatic Change 102: 187-223.

55   Wenger et al. 2011a. See supra 9.

56   Harper, P., and B. Peckarsky. 2006. Emergence cues of a mayfly in a high-altitude stream ecosystem: Potential response to climate change. Ecological Applications 16(2): 612-21.

57   U.S. Geological Survey. 2013. The water cycle: Snowmelt runoff. Available at: ga.water.usgs.gov/edu/watercyclesnowmelt.html

58   Barnett, T., R. Malone, W. Pennel, D. Stammer, B. Semtner, and W. Washington. 2004. The effects of climate change on water resources in the West: Introduction and overview. Climatic Change 62: 1-11.

59   Curry, R., C. Eichman, A. Staudt, G. Voggesser, and M. Wilensky. 2011. Facing the Storm: Indian Tribes, Climate-Induced Weather Extremes, and the Future for Indian Country. National Wildlife Federation: Boulder, CO.

60   Strange, J.S. 2010. Upper thermal limits to migration in adult Chinook salmon: Evidence from the Klamath River basin. Transactions of the American Fisheries Society 139: 1091-108.

61   Oregon Public Broadcasting. 2011. The Northwest's salmon people face a future without fish. Available at: earthfix.opb.org/communities/article/salmon-climate-change-video-environment/

62   Pimentel, D., R. Zuniga, and D. Morrison. 2005. Update on the environmental and economic costs associated with alien-invasive species in the United States. Ecological Economics 52(3): 273-88.

63   Lodge, D.M. 2008. Economic impact of ballast-mediated invasive species in the Great Lakes. Department of Biological Science, University of Notre Dame. Available at: www.iisgcp.org/research/reports/Lodge_shipping_final.pdf

64   U.S. Fish and Wildlife Service. 2012. The Cost of Invasive Species. Available at: www.fws.gov/home/feature/2012/pdfs/CostofInvasivesFactSheet.pdf

65   Burgiel, S.W., and A.A. Muir. 2010. Invasive species, climate change and ecosystem-based adaptation: Addressing multiple drivers of global change. Global Invasive Species Programme, Washington, D.C.

66   U.S. EPA. 2008. Effects of Climate Change on Aquatic Invasive Species and Implications for Management and Research. National Center for Environmental Assessment Office of Research and Development.

67   Wenger, S.J., D.J. Isaak, J.B. Dunham, K.D. Fausch, C.H. Luce, H.M. Neville, H. M., B.E. Rieman, M.K. Young, D.E. Nagel, D.L. Horan, and G.L. Chandler. 2011b. Role of climate and invasive species in structuring trout distributions in the interior Columbia River Basin, USA. Canadian Journal of Fisheries and Aquatic Sciences 68(6): 988-1008.

68   Wenger et al 2011a. See supra 9.

69   Hellmann, J.J., J.E. Byers, B.G. Bierwagen, and J.S. Dukes. 2008. Five potential consequences of climate change for invasive species. Conservation Biology 22(3): 534-43.

70   Great Lakes Fishery Commission. 2000. Fact Sheet: Sea Lamprey, A Great Lakes Invader. Available at: www.seagrant.umn.edu/downloads/x106.pdf

71   Great Lakes Fishery Commission. 2000. See supra 70.

72   Great Lakes Science Center. 2008. Sea Lamprey. U.S. Geological Survey. Available at: www.glsc.usgs.gov/main.php?content=research_lamprey&title=...nu=research_invasive_fish

73   Great Lakes Fishery Commission. 2000. See supra 70.

74   Great Lakes Science Center. 2008. See supra 72.

75   Great Lakes Fishery Commission. 2000. See supra 70.

76   Cline T.J., V. Bennington, and J.F. Kitchell. 2013. Climate change expands the spatial extent and duration of preferred thermal habitat for Lake Superior fishes. PLoS ONE 8(4).

77   Brown, T.C., R. Foti, and J.A. Ramirez. 2013. Projected freshwater withdrawals in the United States under a changing climate. Water Resources Research 49: 1-18.

78   McDonald, R.I., J.D. Olden, J.J. Opperman, W.M. Miller, J. Fargione, C. Revenga, J.V. Higgins, and J. Powell. 2012. Energy, water and fish: Biodiversity impacts of energy-sector water demand in the United States depend on efficiency and policy measures. PLoS ONE 7(11): e50219.

79   McDonald et al., 2012. See supra 78.

80   Caldwell, P.V., G. Sun, S.G. McNulty, E.C. Cohen, and J.A. Moore Myers. 2012. Impacts of impervious cover, water withdrawals, and climate change on river flows in the conterminous US. Hydrology and Earth Systems Sciences 16: 2839-57.

81   Karvonen, A. Päivi Rintamäki, Jukka Jokel, and E. Tellervo Valtonen. 2010. Increasing water temperature and disease risks in aquatic systems: Climate change increases the risk of some, but not all, diseases. International Journal for Parasitology 40: 1483-8.

82   Marcogliese, D.J. 2001. Implications of climate change for parasitism of animals in the aquatic environment. Canadian Journal of Zoology 79: 1331-52.

83   Crozier L.G., A.P. Hendry, P.W. Lawson, T.P. Quinn, N.J. Mantua, J. Battin, R.G. Shaw, and R.B. Huey. 2008. Potential responses to climate change in organisms with complex life histories: evolution and plasticity in Pacific salmon. Evolutionary Applications 1(2): 252-70.

84   Lawrence Journal-World. 1998. Stress, heat likely cause of fish kill. Available at: news.google.com/newspapers?nid=2199&dat=199806 12&id=TJEzAAAAIBAJ&sjid=NekFAAAAIBAJ&pg=6553,442563

85   Okamura, B., B. Hartikainen, H. Schmidt-Posthaus, and T. Wahli. 2011. Life cycle complexity, environmental change and the emerging status of salmonid proliferative kidney disease. Freshwater Biology 56(4): 735-53.

86   Rahel, F.J., and J.D. Olden. 2008. Assessing the effects of climate change on aquatic invasive species. Conservation Biology 22(3): 521-33.

87   Wakabayashi, H. 1991. Effect of environmental conditions on the infectivity of Flexibacter columnaris to fish. Journal of Fish Diseases 14(3): 279-90.

88   Smith, G. 2010. Fish Condition and Study (PA). State of the Susquehanna.

89   Noyes, P.D., M.K. McElwee, H.D. Miller, B.W. Clark, L.A. Van Tiem, K.C. Walcott, K.N. Erwin, and E.D. Levin. 2009. The toxicology of climate change: environmental contaminants in a warming world. Environment International 35(6): 971-86.

90   Fennessy, S., and C. Craft. 2011. Agricultural conservation practices increase wetland ecosystem services in the glaciated interior plains. Ecological Applications 21(3): 49-65.

91   David M.B., L.E. Drinkwater, and G.F. McIsaac. 2010. Sources of nitrate yields in the Mississippi River Basin. Journal of Environmental Quality 39: 1657-67.

92   Nicholls, K.H. 1999. Effects of temperature and other factors on summer phosphorus in the inner bay of Quinte, Lake Ontario: implications for climate warming. Journal of Great Lakes Research 25: 250-62.

93   Derived from a chart within: Butler, N., J.C. Carlisle, R. Linville, and B. Washburn. 2009. Microcystins: A Brief Overview of their toxicity and effects, with special reference to fish, wildlife, and livestock. Sacramento, CA: California EPA, Office of Environmental Health Hazard Assessment. Available at: oehha.ca.gov/ecotox/documents/Microcystin031209.pdf

94   Watson, S.B., J. Ridal, and G.L. Boyer. 2008. Taste and odour and cyanobacterial toxins: Impairment, prediction, and management in the Great Lakes. Canadian Journal of Fisheries and Aquatic Sciences 65: 1779-96.

95   Sokolova, I.M., and G. Lannig. 2008. Interactive effects of metal pollution and temperature on metabolism in aquatic ectotherms: implications of global climate change. Climate Research 37: 181–201.

96   Turetsky, M.R., J.W. Harden, H.R. Friedli, M. Flannigan, N. Payne, J. Crock, and L. Radke. 2006. Wildfires threaten mercury stocks in northern soils. Geophysical Research Letters 33.

97   Kelly, E.N., D.W. Schindler, V.L. St. Louis, D.B. Donald, and K.E. Vladicka. 2006. Forest fire increases mercury accumulation by fishes via food web restructuring and increased mercury inputs. Proceedings of the National Academy of Sciences 103(51): 19380-85.

98   Stern, G.A. R.W. Macdonald, P.M. Outridge, S. Wilson, J. Chételat , A. Cole, H. Hintelmann, L.L. Loseto, A. Steffen, F. Wang, and C. Zdanowicz. 2011. How does climate change influence arctic mercury? Science of the Total Environment 414: 22-42.

99   Scheuhammer, A.M., M.W. Meyer, M.B. Sandheinrich, and M.W. Murray. 2007. Effects of Environmental Methylmercury on the Health of Wild Birds, Mammals, and Fish. Ambio 36: 12-18.

100  Larose, C., R. Canuel, M. Lucotte, and R.T. Di Giulio. 2008. Toxicological effects of methylmercury on walleye (Sander vitreus) and perch (Perca flavescens) from lakes of the boreal forest. Comparative Biochemistry and Physiology 147: 139-49.

101  Friedmann, A.S., M.C. Watzin, T. Brinck-Johnsen, and J.C. Leiter. 1996. Low levels of dietary methylmercury inhibit growth and gonadal development in juvenile walleye (Stizostedion vitreum). Aquatic Toxicology 35(3-4): 265-78.

102  Brittain, J.E. 1989. Life history strategies in Ephemeroptera and Plecoptera. In: Mayflies and stoneflies: life histories and biology. Springer Netherlands.

103  Bouchard, R.W., Jr. 2004. Guide to Aquatic Macroinvertebrates of the Upper Midwest.  Water Resources Center, University of Minnesota, St. Paul, MN. 208 pp.

104  Rohrbeck, R. 2012. Flyfishing entymology. Available at: flyfishingentomology.com/NorthAmericanAquaticWasps.php

105  Voshell, Jr., J.R. 2009. Sustaining America's Aquatic Biodiversity Aquatic Insect Biodiversity and Conservation Department of Entomology, Virginia Tech. Available at: pubs.ext.vt.edu/420/420-531/420-531_pdf.pdf

106  U.S. EPA. 2008. Climate Change Effects on Stream and River Biological Indicators: A Preliminary Analysis (Final Report). U.S. EPA, Washington, DC, EPA/600/R-07/085F.

107  Dallas, H. 2008. Water temperature and riverine ecosystems: An overview of knowledge and approaches for assessing biotic responses, with special reference to South Africa. Water SA 34(3).

108  Hart, E.M., and N.J. Gotell. 2011. The effects of climate change on density-dependent population dynamics of aquatic invertebrates. Oikos, 120: 1227–34.

109  Harper, M.P., and B.L. Peckarsky. 2006. Emergence cues of a mayfly in a high altitude stream ecosystem: Implications for consequences of climate change. Ecological Applications 16: 612-21.

110  Spooner, D.E., M.A. Xenopoulos, C. Schneider, and D.A. Woolnough. 2011. Coextirpation of host–affiliate relationships in rivers: the role of climate change, water withdrawal, and host-specificity. Global Change Biology 17: 1720-32.

111  Stein, B.A., J.S. Adams, L.L. Master, L.E. Morse, and G.A. Hammerson. 2000. A Remarkable Array: Species Diversity in the United States. In Precious Heritage: The Status of Biodiversity in the United States. Oxford University Press.

112   Stokstad, E. 2012. Nearly buried, mussels get a helping hand. Science 16: 876-8.

113   Spooner, D.E., C.C. Vaughn, and H.S. Galbraith. 2005. Physiological determination of mussel sensitivity to water management practices in the Kiamichi River and review and summarization of literature pertaining to mussels of the Kiamichi and Little River watersheds, Oklahoma. Oklahoma Biological Survey and Department of Zoology, University of Oklahoma.

114   Poff, N.L., J.D. Olden, and D.L. Strayer. 2012. Climate Change and Freshwater Fauna Extinction Risk. 2. (Pages 309-336) in Saving a Million Species: Extinction Risk from Climate Change (L. Hannah, Ed.), Island Press.

115   Stein, B.A., L.S. Kutner, G.A. Hammerson, L.L. Master, and L.E. Morse. 2000. State of the States: Geographic Patterns of Diversity, Rarity, and Endemism. In B.A. Stein, L.S. Kutner, and J.S. Adam (Eds.). Precious Heritage: The Status of Biodiversity in the United States. Oxford University Press.

116   Wilson, E.O. 2010. Within one cubic foot. National Geographic. February issue. Available at: ngm.nationalgeographic.com/2010/02/cubic-foot/wilson-text/1

117   Stein et al. 2000. See supra 115.

118   Federal Register. 2012. Endangered and Threatened Wildlife and Plants; Endangered Status for the Diamond Darter and Designation of Critical Habitat. Available at: www.federalregister.gov/articles/2012/07/26/2012-17950/endangered-and-threatened-wildlife-and-plants-endangered-status-for-the-diamond-darter-and

119   Carter, N. 2010. Energy's Water Demand: Trends, Vulnerabilities, and Management. Congressional Research Service Report R41507.

120   National Energy Technology Laboratory (NETL). 2009. Estimating Freshwater Needs to Meet Future Thermoelectric Generation Requirements: 2009 Update. U.S. Department of Energy.

121   New York State Department of Environmental Conservation. 2011. Best Technology Available (BTA) for Cooling Water Intake Structures.

122   NETL, 2009. See supra 120.

123   Electric Power Research Institute. 2011. Water Use for Electricity Generation and Other Sectors: Recent Changes (1985-2005) and Future Projections (2005-2030).

124   Association of Fish and Wildlife Agencies. 2009. Voluntary Guidance for States to Incorporate Climate Change into State Wildlife Action Plans & Other Management Plans.

125   Association of Fish and Wildlife Agencies. 2012. National Fish Habitat Action Plan, 2nd Edition. Washington, DC. 40 pp.

126   U.S. EPA. 2006. Growing Toward More Efficient Water Use: Linking Development, Infrastructure and Drinking Water Policies. Available at: www.epa.gov/smartgrowth/pdf/growing_water_use_efficiency.pdf



John Gale



# NOW IS THE TIME TO CONFRONT THE CLIMATE CRISIS

**Learn more and take action!**
**www.nwf.org/fishandclimate**

*Inspiring Americans to protect wildlife for our children's future*

NATIONAL WILDLIFE FEDERATION

# RECLAMATION
## *Managing Water in the West*

**SECURE Water Act Section 9503(c)—Reclamation Climate Change and Water 2016**

# Chapter 3:  Colorado River Basin







U.S. Department of the Interior
Bureau of Reclamation

March 2016

## Mission Statements

The U.S. Department of the Interior protects America's natural resources and heritage, honors our cultures and tribal communities, and supplies the energy to power our future.

The mission of the Bureau of Reclamation is to manage, develop, and protect water and related resources in an environmentally and economically sound manner in the interest of the American public.

SECURE Water Act Section 9503(c) Report to Congress

# Chapter 3:  Colorado River Basin

*Prepared for*

**United States Congress**

*Prepared by*

**U.S. Department of the Interior
Bureau of Reclamation**



**U.S. Department of the Interior
Bureau of Reclamation
Policy and Administration
Denver, Colorado**

**March 2016**

# Acronyms and Abbreviations

| | |
|---|---|
| AFY | acre-feet per year |
| BWRCSC | Bill Williams River Corridor Steering Committee |
| Basin States | Colorado River Basin States |
| EIS | Environmental Impact Statement |
| LCC | Landscape Conservation Cooperative |
| M&I | municipal and industrial |
| MAF | million acre-feet |
| Mexico | United Mexican States |
| MOU | Memorandum of Understanding |
| msl | mean sea level |
| NPS | National Park Service |
| NRCS | Natural Resources Conservation Service |
| RCPP | Regional Conservation Partnership Program |
| PSCP | Pilot System Conservation Program |
| Reclamation | Bureau of Reclamation |
| TAF | thousand acre-feet |
| U.S. | United States |
| WaterSMART | Sustain and Manage America's Resources for Tomorrow |

# About this Chapter

This summary chapter is part of the 2016 SECURE Water Act Report to Congress prepared by the Bureau of Reclamation (Reclamation) in accordance with section (§) 9503 of the SECURE Water Act.  The 2016 SECURE Water Act Report follows and builds on the first SECURE Water Act Report, submitted to Congress in 2011[1], which characterized the impacts of warmer temperatures, changes to precipitation and snowpack, and changes to the timing and quantity of streamflow runoff across the West.

This chapter provides a basin-specific summary for the Colorado River Basin. This chapter is organized as follows:

- **Section 1**: Description of the river basin setting,

- **Section 2**: Overview of the implications for various water and environmental resources,

- **Section 3**: Potential adaptation strategies considered to address basin water supply and demand imbalances, and

- **Section 4**: Coordination activities within the basin to build climate resilience.

This chapter provides updated information from Reclamation studies completed or initiated in the basin over the past five years.  The key studies referenced in this chapter include the Colorado River Basin Water Supply and Demand Study (Reclamation, 2012 [CO Basin Study) and the Colorado River Basin *Moving Forward* Phase 1 Report (2015 [Moving Forward]).  Additional information relevant to the Colorado River Basin, including the latest climate and hydrology projections for the basin, is included in Chapter 2: Hydrology and Climate Assessment.

> **Colorado River Basin Setting**
>
> **States:**  Arizona, California, Colorado, Nevada, New Mexico, Utah, Wyoming
>
> **Major U.S. Cities Supplied:** Albuquerque, Denver, Las Vegas, Los Angeles, Phoenix, Salt Lake City, and San Diego
>
> **Areas Outside the Basin Receiving Colorado River Water:** Albuquerque/ Santa Fe (San Juan Chama Project); Cheyenne, Wyoming; Colorado Front Range; Southern California (Colorado River Aqueduct Service Area/Imperial and Coachella Valley); and Wasatch Front Range (Central Utah Project/Strawberry Valley Project)
>
> **International:** Mexico
>
> **River Length:**  1,450 miles
>
> **River Basin Area:** 246,000 square miles
>
> **Major River Uses:** Municipal Supply (35 to 40 million people), Agricultural Irrigation (4.5 million acres), Hydropower (4,200 megawatts), Recreation, and Fish and Wildlife
>
> **Notable Reclamation Facilities:** Hoover Dam, Glen Canyon Dam, Flaming Gorge Dam, Aspinall Unit, Navajo Dam, and Davis Dam, Parker Dam

---

[1] The first SECURE Water Act Report, submitted to Congress in 2011 is available on the Reclamation website:  www.usbr.gov/climate/secure/docs/2011secure/2011SECUREreport.pdf.

# Contents

*Page*

About this Chapter

1   Basin Setting ...............................................................................3–1
    1.1  Colorado River Basin Study Overview ............................... 3–2
    1.2  Current Drought Conditions ................................................ 3–5
    1.3  Ongoing Efforts to Enhance System Reliability................... 3–7

2   Analysis of Impacts to Water Resources ................................... 3–9

3   Potential Adaptation Strategies to Address Vulnerabilities........................3–13
    3.1  Colorado River Basin Study Potential Future Climate Adaptation
        Actions ............................................................................. 3–13
    3.2  Current and Planned Adaptation Actions ......................... 3–15

4   Coordination Activities.............................................................3–22
    4.1  *Moving Forward* Effort ..................................................... 3–22
    4.2  Additional Coordination ................................................... 3–23

5   References................................................................................3–24

## Figures

*Page*

Figure 3–1.  Colorado River Basin. ...................................................3–3
Figure 3–2.  Historical water supply and use plus projected future water
           supply and demand in the Colorado River Basin.........................3–4
Figure 3–3.  Lake Mead from Hoover Dam in March 2014..............................3–6
Figure 3–4.  The rising population in the Colorado Front Range
           metropolitan area has resulted in increased water deliveries
           over the last three decades, even though per capita use has
           declined during this period.........................................3–8
Figure 3–5.  Percent of vulnerable years for each water delivery indicator
           metric across three time periods for the baseline.........................3–11
Figure 3–6.  Low-pressure sprinkler irrigation. .................................3–18
Figure 3–7.  Delivery of a widehead turbine runner for Hoover Dam. ............3–21

## Tables

*Page*

Table 3–1.  Summary of Option Cost and Potential Yields by 2035 and
         2060........................................................................ 3–14

# 1   Basin Setting

Today, nearly 40 million people[2] in the seven Colorado River Basin states[3] rely on the Colorado River and its tributaries for some, if not all, of their municipal water needs.  These same sources irrigate nearly 4.5 million acres of land (Reclamation, 2015 [Moving Forward]) in the basin and the adjacent areas that receive Colorado River water, generating many billions of dollars a year in agricultural and economic benefits.  Within the basin, 22 federally recognized tribes consider the Colorado River and its tributaries an essential physical, economic, and cultural resource.

The Colorado River and its tributaries provide habitat for a wide range of species, including several that are federally endangered.  These rivers flow through seven National Wildlife Refuges and 11 National Park Service (NPS) units[4] that provide a range of recreational opportunities and add significant benefits to the regional economy.  Hydropower facilities in the basin can supply more than 4,200 megawatts of vitally important electrical capacity to assist in meeting the power needs of western states, reducing the use of fossil fuels.  In addition, the Colorado River is vital to the United Mexican States (Mexico).  The Colorado River Basin is depicted in Figure 3–1.

Total consumptive use and losses in the U.S. portion of the basin, including the 1944 Treaty delivery to Mexico, have averaged approximately 15.0 million acre-feet (MAF)[5] annually over the past decade (Reclamation, 2015 [Moving Forward]).  Federally recognized tribes hold approximately 2.9 MAF of annual diversion rights from the Colorado River and its tributaries (Reclamation, 2012 [CRB Study TR-C]).  In many cases, these rights are senior in priority to those held by other users.  Agriculture is the dominant use of Colorado River water, accounting for approximately 70 percent of total Colorado River water used in the U.S.  Of the total consumptive use, 40 percent is exported outside the basin's hydrologic boundaries for use in adjacent areas.

---

[2] About 40 million people are estimated to live in the area encompassed by the hydrologic boundaries of the Colorado River Basin in the United States plus the adjacent areas of the Colorado River Basin states that receive Colorado River water (Reclamation 2012, CRB Study TR-C).

[3] Arizona, California, Colorado, Nevada,  New Mexico, Utah, and Wyoming.

[4] Although there are 11 NPS Colorado River Basin Parks Program, nine are considered to be directly linked to the Colorado River and its major tributaries. (http://www.nature.nps.gov/water/Homepage/Colorado_River.cfm).

[5] Basin-wide consumptive use and losses estimated over the period 2002 to 2012, including the 1944 Treaty delivery to Mexico, reservoir evaporation, and other losses due to native vegetation and operational inefficiencies.

As shown on Figure 3–1, several major metropolitan areas that receive Colorado River water—including Albuquerque, Denver, Los Angeles, Salt Lake City, and San Diego—are located outside the basin's hydrologic boundaries.

The Colorado River system is operated in accordance with the Law of the River.[6] Apportioned water in the U.S. portion of the basin exceeds the average long-term (1906 through 2012) historical natural flow[7] of about 16.2 MAF (Reclamation, 2015 [Moving Forward]).  To date, the imbalance has been managed and demands are largely met as a result of the considerable amount of reservoir storage capacity in the system (approximately 60 MAF, or nearly 4 years of average natural flow of the river); the fact that the upper-basin states of Colorado, New Mexico, Utah, and Wyoming are still developing their apportionment; and the continuing efforts the Basin States are making to reduce their need for Colorado River water.

## 1.1  Colorado River Basin Study Overview

It was against this challenging and complex management setting that the Colorado River Basin Water Supply and Demand Study was conducted.  The Basin Study was funded through the Department of the Interior's WaterSMART (Sustain and Manage America's Resources for Tomorrow) Program and was conducted by Reclamation and agencies representing the Basin States.  The purpose of the Basin Study was to define current and future imbalances in water supply and demand in the U.S. portion of the basin and the adjacent areas that receive Colorado River water through 2060, and to develop and analyze adaptation and mitigation strategies to resolve those imbalances.

The Basin Study did not result in a decision as to how future imbalances should or will be addressed.  Rather, it provides a common technical foundation that frames the range of potential imbalances that may be faced in the future and the range of solutions that may be considered to resolve those imbalances.  The Basin Study was conducted in collaboration with stakeholders throughout the basin.  Interest in the study was broad, and participating stakeholders included tribes, agricultural users, purveyors of municipal and industrial (M&I) water, power users, and conservation and recreation groups.

There is great uncertainty in the precise trajectories of future water supply and demand, as well as how those trajectories may affect the reliability of the Colorado River system to meet the needs of basin resources.  To address this

---

[6] The treaties, compacts, decrees, statutes, regulations, contracts, and other legal documents and agreements applicable to the allocation, appropriation, development, exportation, and management of the waters of the Colorado River Basin are often collectively referred to as the Law of the River.  There is no single, universally agreed upon definition of Law of the River, but it is useful as a shorthand reference to describe this longstanding and complex body of legal agreements governing the Colorado River.

[7] Natural flow represents the flow that would have occurred at the location had depletions and reservoir regulation not been present upstream of that location.



**Figure 3–1.  Colorado River Basin.**

Note: The scope of the Colorado River Basin Study was limited to the portion of the basin and adjacent areas that receive Colorado River water within the United States.

**SECURE Water Act Section 9503(c) Report to Congress**

uncertainty, this Basin Study adopted a scenario planning process to capture a broad range of plausible water demand and supply futures, and then assessed the impacts to basin resources if such futures were to unfold.  This approach confirmed that, absent future action, the basin faces a wide range of plausible future long-term imbalances between supply and demand.  This imbalance, computed as a 10-year running average, ranges from 0 to 6.8 MAF, with a median of 3.2 MAF in 2060,[8] as shown in Figure 3–2.  The assessment of impacts to basin resources found that any long-term imbalance will impair the ability of the Colorado River system to meet the needs of basin resources resulting in negative impacts (for example, reduced reliability of water deliveries for municipal and agricultural purposes, decreased hydropower generation, reduced recreational opportunities) to those resources.



**Figure 3–2.  Historical water supply and use plus projected future water supply and demand in the Colorado River Basin.[9]**

Source: Reclamation, 2012 (CO Basin Study Executive Summary), Figure 2.
Note: A range of future water supply and demand projections are presented (dashed blue and red lines) as well as the average future supply and demand projections (solid lines).

---

[8] Comparing the 90th percentile supply to the 10th percentile demand results in no imbalance. Comparing the 10th percentile supply to the 90th percentile demand results in a 6.8-MAF imbalance. Comparing the 50th percentile of both supply and demand results in a 3.2-MAF imbalance.

[9] Water use and demand include Mexico's allotment and losses such as those due to reservoir evaporation, native vegetation, and operational inefficiencies.

No single sector can provide the solution for addressing future uncertain conditions or ensuring long-term sustainability.  To respond to the challenges of the future, diligent planning is required to find adaptable solutions that build resiliency and apply a wide variety of ideas at local, state, regional, and basin-wide levels.  With this in mind, Reclamation continues to investigate uncertainties related to water use, water-use efficiencies, reuse, and environmental and recreational flows by conducting a deeper analysis of issues and potential solutions identified in the Basin Study.  Examples of these efforts include the following:

- **The Colorado River Basin Study *Moving Forward* Effort** – This effort was designed to pursue several areas of the next steps identified in the Basin Study.  The *Moving Forward* effort (Reclamation, 2015 [Moving Forward]) builds upon and enhances the broad, inclusive stakeholder process demonstrated in the Basin Study with an ultimate goal of identifying actionable steps to address projected water supply and demand imbalances that have broad-based support and provide a wide range of benefits.

- **West Salt River Valley Basin Study** – The West Salt River Valley, located in central Arizona in the western portion of the Phoenix metropolitan area, is one of the fastest growing areas in Phoenix.  Developing renewable water supplies, such as surface water and wastewater, will be important in slowing the existing groundwater overdraft.  Funded by Reclamation in 2013, this study is examining and updating water supplies and demands projections, modelling groundwater and potential recharge, developing alternatives to deliver surface water, and identifying climate change adaptation strategies.  This study is underway expected to be completed in 2016.

- **Colorado River Basin Ten Tribes Partnership Tribal Water Study** – Begun in late 2013, this study is a collaboration with the Ten Tribes Partnership,[10] whose members hold a significant amount of quantified and unquantified Federal reserved water rights to the Colorado River and its tributaries.  The study builds on the technical foundation of the Basin Study by further assessing water supplies and demands for these tribes and identifies tribal opportunities and challenges associated with the development of tribal water.  This study is scheduled to be completed in 2016.

## 1.2  Current Drought Conditions

In addition to the long-term challenges identified in the Basin Study, current extended drought conditions in the basin have further heightened a sense of

---

[10] The tribes involved are: Chemehuevi Indian Tribe, Cocopah Indian Tribe, Colorado River Indian Tribes, Fort Mojave Indian Tribe, Jicarilla Apache Nation, Navajo Nation, Quechan Indian Tribe, Southern Ute Indian Tribe, Ute Indian Tribe of the Uintah and Ouray Reservation, and Ute Mountain Ute Indian Tribe.

**SECURE Water Act Section 9503(c) Report to Congress**

urgency for ensuring Colorado River sustainability. The period from 2000 to 2015 was the lowest 16-year period for natural flow in the last century. Paleorecords indicate that this period was also one of the lowest 16-year periods for natural flow in the past 1,200 years (Meko et al., 2007).

During the drought, storage in Colorado River system reservoirs (system storage) has declined from nearly full to about half of capacity. Lake Mead has experienced its lowest elevations since May 1937 during the reservoir's initial filling (Figure 3–3). Despite these dry conditions, Reclamation has been able to meet contracted delivery commitments and scheduled reservoir releases throughout the drought. In the Upper Basin, junior priority water users in subbasins above major Reclamation reservoirs have experienced local shortages throughout the drought. Every resource in the basin is experiencing the impact of these current drought conditions, proving that no one sector solely bears the burden of these challenging conditions.



**Figure 3–3.  Lake Mead from Hoover Dam in March 2014.**

## 1.3  Ongoing Efforts to Enhance System Reliability

The challenges and complexities of ensuring a sustainable water supply and meeting future resource[11] needs in an over-allocated and highly variable system such as the Colorado River have been recognized and documented by Reclamation, the Basin States, and many stakeholders.  Consequently, significant investments have been made in constructing infrastructure, developing other water resources, and implementing innovative conservation programs and policies to sustain current and future supplies.  Notable examples include Hoover and Glen Canyon Dams, the Central Arizona and Central Utah projects, Colorado's many headwaters trans-basin diversions, California's Colorado River Aqueduct, the All-American Canal, and a wide range of other local and regional water infrastructure projects.  In the latter part of the 20th century and in the early portion of the 21st century, focus has shifted from developing available water resources to an emphasis on improving the efficiency of the operation of Colorado River reservoirs and better planning and managing of available water supplies.  Two notable examples from this period are the Operation of Glen Canyon Dam Final Environmental Impact Statement (Reclamation, 1996) and the Colorado River Interim Guidelines for Lower Basin Shortages and Coordinated Operations of Lake Powell and Lake Mead Final Environmental Impact Statement (Interim Guidelines [Reclamation, 2007]).  Both of these resulted in the adoption of new reservoir operating policies.  These efforts have resulted in solutions to past water management challenges and will continue to provide benefits in meeting the challenges that lie ahead.

Future challenges arise from the likelihood of continued population growth and the significant uncertainty regarding an adequate future water supply.  Nevada, Arizona, and Utah rank first, second, and third, respectively, for the greatest population growth rates in the United States from 2000 to 2010.  During that same decade, California experienced the second-greatest population increase in the United States (U.S. Census Bureau, 2011).  Along the Colorado Front Range, emphasis on water conservation education programs has contributed to reductions in residential per capita use.  The historical population, total M&I water use, and gross per capita water use for the Front Range metropolitan area are shown in Figure 3–4.

All of the major metropolitan areas dependent on Colorado River water are taking action to help ensure sustainable supplies.  The communities and economies of major cities such as Albuquerque, Denver, Los Angeles, Phoenix, Salt Lake City, and San Diego are in part dependent, and Las Vegas is almost entirely dependent, on the Colorado River for water supply.  As water demand for municipal and

---

[11] Resources include water allocations and deliveries for municipal, industrial, and agricultural use; hydroelectric power generation; recreation; fish, wildlife, and their habitats (including candidate, threatened, and endangered species); water quality including salinity; flow- and water-dependent ecological systems; and flood control.

**SECURE Water Act Section 9503(c) Report to Congress**

agricultural purposes increases to serve the needs of growing populations, ensuring the availability of water for non-consumptive uses such as the environment, recreation, and hydropower becomes increasingly challenging, especially since water supply uncertainty is further compounded by the potential impacts from climate change.



**Figure 3–4.  The rising population in the Colorado Front Range metropolitan area has resulted in increased water deliveries over the last three decades, even though per capita use has declined during this period.**

**From: Reclamation, 2015 (Moving Forward), Figure 3-4.**

**Note: As shown on the top graph, the Colorado Front Range metropolitan area has added nearly 1 million people to the municipal water service population since 1980, an increase of approximately 60 percent, while over the same period, the total annual water delivered increased by only about 26 percent.**

# 2   Analysis of Impacts to Water Resources

The Basin Study evaluated the reliability of the Colorado River system to meet basin resource needs under all future supply and demand scenarios (termed baseline system reliability) and defined vulnerable conditions—those stressing to basin resources.  Two important vulnerabilities that provide an overall indication of system reliability were:

1.  **Lake Mead elevation** dropping below 1,000 feet above mean sea level (msl) in any month and

2.  **Lee Ferry deficit,**[12] when the 10-year running total flow at Lee Ferry, Arizona, is less than 75 MAF.

Vulnerability or resource risks in the basin were related to both projected impacts to basin water supply and water demand.  Key findings related to projected changes in temperature, precipitation, snowpack, and runoff through 2060 are presented below.[13]

- **Temperature** is projected to increase across the basin, with the largest changes in spring and summer and with larger changes in the Upper Basin than in the Lower Basin.

- **Precipitation** patterns continue to be spatially and temporally complex, but projected seasonal trends toward drying are significant in certain regions.  A general trend basin-wide is toward drying, although increases in precipitation are projected for some higher elevation and hydrologically productive regions.  Consistent and expansive drying conditions are projected for the spring throughout the basin.  For much of the basin, drying conditions are also projected in the summer, although slight increases in precipitation are projected for some areas of the Lower Basin, which may be attributed to the monsoonal influence in this region.  Fall and winter precipitation is projected to increase in the Upper Basin but to decrease in the Lower Basin.

---

[12] Article III(d) of the Colorado River Compact states that the Upper Division States will not cause the flow of the river at the Lee Ferry Compact Point to be depleted below an aggregate of 75 maf for any period of 10 consecutive years. For the purpose of the Basin Study, a Lee Ferry deficit is defined as the difference between 75 MAF and the 10-year total flow arriving at Lee Ferry.

[13] These findings are based on the assessment described in the Colorado River Basin Water Supply and Demand Study, Technical Report B – Water Supply Assessment (Reclamation, 2012 (CO Basin Study TR-B). Additionally, Chapter 2: West-wide Climate Assessment Summary Report of the SECURE Report to Congress provides the latest Reclamation climate projections for the Colorado River Basin.

- **Snowpack** is projected to decrease as more precipitation falls as rain rather than snow, and warmer temperatures cause an earlier melt. Even in areas where precipitation increases or does not change, decreased snowpack is projected in the fall and early winter as warming temperatures result in more rain and less snow. Substantial decreases in spring snowpack are projected to be widespread, due to earlier melt or sublimation of snowpack.

- **Runoff** (both direct and baseflow) is spatially diverse, but is generally projected to decrease, except in the northern Rockies. As with precipitation, runoff is projected to increase significantly in the higher elevation Upper Basin during winter, but is projected to decrease during spring and summer.

- **Droughts**[14] lasting 5 or more years are projected to occur 50 percent of the time over the next 50 years.

The Basin Study also considered a range of projections based on data and information provided by the Basin States, tribes, Federal agencies, and other water entitlement holders. Key findings related to projected changes in demand are summarized below.

- Under the scenarios considered by the Colorado River Basin Study, the demand for consumptive uses was projected to range between about 18.1 MAF to 20.4 MAF by 2060. The largest increase in demand is projected to be in the M&I category, owing to population growth.

- Future water demands may be affected by a changing climate, primarily due to changes in ambient temperature and the amount and distribution of precipitation. The mean projected change in evapotranspirative demand was approximately 4 percent by 2060, compared to demands without changes in climate. A total demand increase of more than 500 TAF per year by 2060 was estimated, considering potential effects of climate change (Reclamation, 2012 [CO Basin Study TR-C]).

In the Basin Study, impacts to water resources or system reliability were modeled considering all combinations of the projected supply and demand scenarios. Additionally, two operational assumptions were considered regarding Lake Powell and Lake Mead operations beyond 2026 (the end of effective period of the Interim Guidelines (Reclamation, 2007). Additionally, despite findings that the Lower Division States have demand for Colorado River water beyond their 7.5 MAF basic apportionment, the baseline system reliability assumed deliveries to the Lower Division States remain consistent with their basic apportionment. Since each supply scenario had more than 100 individual sequences, the baseline system reliability comprised more than 20,000 simulations. The Baseline system reliability revealed that many combinations of future water supply and demand result in management challenges (Figure 3–5).

---

[14] For the purpose of the Basin Study, a drought period occurs whenever the running 2-year average flow at Lees Ferry falls below 15.0 M, the observed historical long-term mean.

| | Time Period | Baseline |
|---|---|---|
| Upper Basin Shortage (exceeds 25% of requested depletion in any one year) | 2012-2026 | 4% |
| | 2027-2040 | 5% |
| | 2041-2060 | 7% |
| Lee Ferry Deficit (exceeds zero in any one year) | 2012-2026 | 0% |
| | 2027-2040 | 3% |
| | 2041-2060 | 6% |
| Lake Mead Pool Elevation < 1000 feet (below 1000 feet in any one month) | 2012-2026 | 4% |
| | 2027-2040 | 13% |
| | 2041-2060 | 19% |
| Lower Basin Shortage (exceeds 1 maf over any two year window) | 2012-2026 | 7% |
| | 2027-2040 | 37% |
| | 2041-2060 | 51% |
| Lower Basin Shortage (exceeds 1.5 maf over any five year window) | 2012-2026 | 10% |
| | 2027-2040 | 43% |
| | 2041-2060 | 59% |
| Remaining Demand Above Lower Division States' Basic Apportionment (exceeds moving threshold in any one year) | 2012-2026 | 0% |
| | 2027-2040 | 40% |
| | 2041-2060 | 85% |
| | | 0%    50%  100% Percent Years Vulnerable |

**Figure 3–5.  Percent of vulnerable years for each water delivery indicator metric across three time periods for the baseline.**

**Modified from: Reclamation, 2012 (CO Basin Study), Figure 22.**
**Note: green depicts vulnerabilities less than 25 percent; yellow depicts vulnerabilities between 25 to 50 percent; orange depicts vulnerabilities between 50 to 75 percent; red depicts vulnerabilities between 75 to 100 percent.**
**Note: The percentage of vulnerable years for water deliveries increases in intensity through the downstream storage reservoirs and over future projected time periods.**

**SECURE Water Act Section 9503(c) Report to Congress**

In the near-term (2012 through 2026), water demands are similar across scenarios, and the largest factor affecting the system reliability is water supply.  In the mid-term (2027 through 2040), the demand for water is an increasingly important element in the reliability of the system, as are assumptions regarding the operations of Lakes Powell and Mead.  In the long-term (2041 through 2060), the futures that consider the Downscaled GCM Projected water supply scenario, which incorporates projections of future climate, show a high inability to meet resource needs, regardless of the demand scenario and the operation of Lakes Powell and Mead.

In summary, the baseline analysis indicated that without action, it would become increasingly difficult for the system to meet basin resource needs over the next 50 years.  For instance:

- Future projected development of water supplies and increased consumptive use in the Upper Basin combined with potential reductions in future supply results in reduced volumes of water stored in system reservoirs.

- With lower water elevations in reservoirs, the needs for resources such as hydropower and shoreline recreation were less frequently satisfied, while water delivery shortages increased.

- Decreases in flows in key river tributaries have negative implications for flow-dependent resources such as recreation and river ecology.

- Flood-control vulnerabilities were few and actually decreased over time under the baseline condition due to the increase in availability of storage associated with growing demand.

These findings fully support the need to develop and evaluate options and strategies to help resolve the water supply and demand imbalance.

# 3   Potential Adaptation Strategies to Address Vulnerabilities

In the Colorado River Basin Study and the *Moving Forward* Effort, the Federal government, Basin States, and basin stakeholders recognize that no single option will be sufficient to resolve future projected supply and demand imbalances.  In the Colorado River Basin Study groups of options, or portfolios, were developed for analysis purposes.  The objective of the portfolio analyses in this Basin Study was to demonstrate the effectiveness of different strategies in resolving future supply and demand imbalances.

## 3.1  Colorado River Basin Study Potential Future Climate Adaptation Actions

To identify a broad range of additional potential options to resolve water supply and demand imbalances, input was sought from Basin Study participants, interested stakeholders, and the public; more than 150 suggestions were received.  Although several of the ideas may ultimately be considered too costly or technically infeasible, the Basin Study explored the wide range of options with the goal of ensuring that all viable options were considered.  Each submitted option was assigned to a category based on its primary function.  Recognizing that time and resource constraints would not allow for full evaluation of every option, about 30 representative options that spanned the range of the option categories were developed.  A summary of the representative options, yield, and timing, where applicable, is provided in Table 3–1.

Although the portfolios explored in the Basin Study addressed water supply and demand imbalances differently, there were commonalities across the options implemented for each portfolio.  All of the portfolios incorporate significant agricultural water conservation, M&I water conservation, energy water-use efficiency, and some levels of weather modification.  However, some options were implemented more frequently in response to challenging water supply conditions.  For example, ocean and brackish water desalination, wastewater reuse, and importation options were implemented for the most challenging water supply conditions in portfolios in which they were included.  Future planning requires careful consideration of the timing, location, and magnitude of anticipated future Basin resource needs.

**Table 3–1.  Summary of Options and Potential Yields by 2035 and 2060**

Modified from:  Colorado River Basin Water Supply and Demand Study, Executive Summary, Table 2

| Option Category | Representative Option | Years Before Available | Potential Yield by 2035 (AFY) | Potential Yield by 2060 (AFY) |
|---|---|---|---|---|
| Desalination | Gulf of California | 20–30 | 200,000 | 1,200,000 |
| | Pacific Ocean in California | 20–25 | 200,000 | 600,000 |
| | Pacific Ocean in Mexico | 15 | 56,000 | 56,000 |
| | Salton Sea Drainwater | 15–25 | 200,000 | 500,000 |
| | Groundwater in Southern California | 10 | 20,000 | 20,000 |
| | Groundwater in the Area near Yuma, Arizona | 10 | 100,000 | 100,000 |
| | **Subtotal** | | 776,000 | **2,476,000** |
| Reuse | Municipal Wastewater | 10–35 | 200,000 | 932,000 |
| | Grey Water | 10 | 178,000 | 178,000 |
| | Industrial Wastewater | 10 | 40,000 | 40,000 |
| | **Subtotal** | | 418,000 | **1,150,000** |
| Local Supply | Treatment of Coal Bed Methane-Produced Water | 10 | 100,000 | 100,000 |
| | Rainwater Harvesting | 5 | 75,000 | 75,000 |
| | **Subtotal** | | 175,000 | **175,000** |
| Watershed Management | Brush Control | 15 | 50,000 | 50,000 |
| | Dust Control | 15–25 | 280,000 | 400,000 |
| | Forest Management | 20–30 | 200,000 | 300,000 |
| | Tamarisk Control | 15 | 30,000 | 30,000 |
| | Weather Modification | 5–45 | 700,000 | 1,700,000 |
| | **Subtotal** | | 1,260,000 | **2,480,000** |
| Importation | Imports to the Colorado Front Range from the Missouri or Mississippi Rivers | 30 | 0 | 600,000 |
| | Imports to the Green River from the Bear, Snake[1], or Yellowstone Rivers | 15 | 158,000 | 158,000 |
| | Imports to Southern California via Icebergs, Waterbags, Tankers, or from the Columbia River[1] | 15 | 600,000 | 600,000 |
| | **Subtotal** | | 758,000 | **1,358,000** |

| Option Category | Representative Option | Years Before Available | Potential Yield by 2035 (AFY) | Potential Yield by 2060 (AFY) |
|---|---|---|---|---|
| M&I Water Conservation | M&I Water Conservation | 5–40 | 600,000 | 1,000,000 |
| | **Subtotal** | | **600,000** | **1,000,000** |
| Agricultural Water Conservation | Agricultural Water Conservation | 10–15 | 1,000,000 | 1,000,000 |
| | Agricultural Water Conservation with Transfers | 5–15 | 1,000,000 | 1,000,000 |
| | **Subtotal** | | **1,000,000**[2] | **1,000,000**[2] |
| Energy Water Use Efficiency | Power Plant Conversion to Air Cooling | 10 | 160,000 | 160,000 |
| | **Subtotal** | | **160,000** | **160,000** |
| System Operations | Evaporation Control via Canal Covers | 10 | 18,000 | 18,000 |
| | Evaporation Control via Reservoir Covers | 18 | 200,000 | 200,000 |
| | Evaporation Control via Chemical Covers on Canals and Reservoirs | 15–25 | 200,000 | 850,000 |
| | Modified Reservoir Operations | 15 | 0 – 300,000 | 0 – 300,000 |
| | Construction of New Storage | 15 | 20,000 | 20,000 |
| | **Subtotal** | | **588,000**[3] | **1,238,000**[3] |
| | **Total of All Options** | | **5,735,000**[4] | **11,037,000**[4] |

AFY = acre-feet per year

[1] Among the more than 150 options received by Reclamation and deemed responsive to the *Plan of Study*, additional importation of water supplies from various sources, including from the Snake and Columbia River systems, were submitted.  Such options were appropriately reflected in the Basin Study but did not undergo additional analysis as part of a regional or river basin plan or any plan for a specific Federal water resource project.

[2] The two agricultural water conservation representative options derive potential yield from similar measures and are thus not additive.

[3] Subtotal assumes 150,000 AFY for the Modified Reservoir Operations representative option.

Note that the potential adaptation strategies listed in the table are organized by category.  Total does not account for several options that may be mutually exclusive due to regional integration limitations or are dependent on the same supply.

## 3.2  Current and Planned Adaptation Actions

The Federal government, Basin States, and basin stakeholders have made significant investments in developing infrastructure, identifying water resources and implementing programs and policies to balance current and future supplies with existing and future demands.  Many of these efforts have resulted in solutions to past water management challenges and will continue to provide

SECURE Water Act Section 9503(c) Report to Congress

benefit to the system in meeting the challenges that lie ahead.  Actions to improve the sustainability of the Colorado River are occurring at a variety of scales and locations, ranging from basin-wide initiatives to specific infrastructure improvements.  Examples of some of the activities occurring throughout the basin in which Reclamation is involved are described below.

## Planning Activities and Pilot Programs

*Colorado River Basin Ten Tribes Partnership Tribal Water Study* – The tribes of the Ten Tribes Partnership hold a significant amount of quantified Federal reserved water rights to the Colorado River and its tributaries, and in addition, some tribes have unresolved reserved rights claims.  In recognition of the importance in bringing the tribal perspective to bear in furthering the understanding and management of Colorado River water, Reclamation and the members of the Ten Tribes Partnership began this Study in 2014.  The purpose of the Study is to, for the tribes of the Partnership,[15] assess tribal water supplies, document current tribal water use, project future water demand, document use of tribal water by others, and identify tribal opportunities and challenges associated with the development of tribal water considering the future projected water supply and demand imbalances documented in the Basin Study.

*Drought Contingency Planning*: Reclamation and the Colorado River Basin states are concerned with the potential that critically low elevations in Lake Powell and Lake Mead would be reached if the ongoing drought continues.  Work is ongoing in both basins to develop and pursue strategies to avoid reaching such elevations, should this drought continue.

Strategies currently being considered in the Upper Basin include:

- Steps to manage demand by upper basin stakeholders to allow more water to reach Lake Powell;

- Extended and coordinated operations of Colorado River Storage Project reservoirs to better maintain the power pool at Glen Canyon Dam; and

- The potential for increased weather modification, including support from Reclamation, in the Upper Basin.

In the Lower Basin, Reclamation is working with Arizona, California, and Nevada to identify proactive steps to lower the risk of reaching critical elevations at Lake Mead.  A step forward was a Memorandum of Understanding (MOU) for Pilot Drought Response Actions, signed by Reclamation and several water agencies in the lower Basin States in December 2014.  The MOU outlines a commitment by the parties to use best efforts to generate between 1.5 and 3.0 MAF of additional water in Lake Mead through 2019.

---

[15] For purposes of the Study, "tribal" refers collectively to the tribes and only those tribes of the Ten Tribes Partnership.

*System Conservation Pilot Program* – In July 2014, an $11 million funding agreement for system conservation was executed among Reclamation, the Central Arizona Water Conservation District, the Metropolitan Water District of Southern California, Denver Water, and the Southern Nevada Water Authority.  The Pilot System Conservation Program (PSCP) allows water users to participate in pilot projects that establish temporary, voluntary, compensated programs to conserve or reduce the use of Colorado River water, increasing storage levels in Lake Powell and Lake Mead for the benefit of the Colorado River system.  Requests for proposals under the PSCP have been received by potential program participants in both the upper and Lower Basins, and implementation agreements were executed in 2015.

*Reservoir Operations Pilots* – In the Upper Colorado Region, Reservoir Operations Pilot efforts have primarily focused on evaluating past flow trends (e.g., earlier runoff, lower overall inflow, etc.) and how those have or could affect reservoir operations and whether reservoir operations have already adapted to changing climate or will need to adapt in the future.

## Operational Flexibility - 2007 Interim Guidelines

In response to 7 years of unprecedented drought in the basin, the Colorado River 2007 Interim Guidelines (Reclamation, 2007) were adopted by the Secretary of the Interior in December 2007 in consultation with the seven Basin States and stakeholders.  The Interim Guidelines, in effect for an interim period through 2026, provide a prescriptive methodology for determining the annual releases from Lake Powell and Lake Mead throughout the full range of reservoir operations, including periods of low reservoir levels.

The Interim Guidelines also provide criteria for determining and implementing shortage reductions in the Lower Basin and a mechanism for Lower Basin water contractors to conserve and store water in Lake Mead as Intentionally Created Surplus (ICS).  At the end of calendar year 2014, there was approximately 837 TAF of ICS in storage, equivalent to about 10 feet in Lake Mead at current elevations.  The Interim Guidelines do not include provisions for Mexico.

## Municipal and Industrial Water Conservation

Through the WaterSMART program, Reclamation provides leadership and technical assistance focusing on water conservation and helping water and resource managers make wise decisions about water use.  In the basin, Reclamation funds metering programs, residential indoor and outdoor conservation, commercial, industrial and institutional conservation, and water reuse.

For example, in 2010, Reclamation collaborated with the Weber Basin Water Conservancy District to install 1,100 water meters on untreated irrigation systems in central Utah.  These meters are estimated to save an average of 0.25 acre-feet of water per year and overall are proving to be an effective way in helping

SECURE Water Act Section 9503(c) Report to Congress

consumers understand how much water they are using and how to appropriately adjust usage. In southern California, WaterSMART Grants have been used by municipal water agencies to provide rebates for turf replacement, installation of advanced meters for residential and commercial customers, and construction of recharge basins to develop groundwater storage, among other types of projects.

## Agricultural Water Conservation

Reclamation supports a variety of programs that offer conservation and efficiency project funding. Projects funded through WaterSMART Grants in the Colorado River Basin include conversion of unlined irrigation canals to buried pipe and installation of advanced flow meters, automated valves, and gates to increase efficiency. Through the Colorado River Basin Salinity Control Program, Reclamation has collaborated with the National Resources Conservation Service (NRCS) and the Basin States to provide cost-share assistance to landowners who install salinity control measures. These projects typically involve off-farm conveyance work and on-farm efficiency measures to reduce deep percolation, which mobilize and transport salts back to the river system (Figure 3–6).



**Figure 3–6.  Low-pressure sprinkler irrigation.**

In June 2014, the Basin was named a Critical Conservation Area under the NRCS Regional Conservation Partnership Program (RCPP), allowing project proponents to compete for an additional pool of RCPP funds. NRCS has collaborated with Reclamation and the Colorado River Water Conservation District to implement a large agricultural water efficiency project on the Gunnison River. The grant will help irrigators use water more efficiently and reduce the amount of salts and selenium carried in the Colorado River and its tributaries. These efforts include

boosting water efficiency by coordinating canals, ditches and pipes that deliver water to farms with improvements in the way water is delivered to crops, frequently by eliminating flood irrigation in favor of sprinkler and other irrigation systems.

## Environmental and Recreational Flows

Reclamation participates as a partner in many new and existing programs established for protecting or improving ecological and recreational opportunities on the Colorado River and its tributaries.  Reclamation activities include providing project funding, cost share funding with managing partners, coordinating reservoir operations, collaborating on species recovery and habitat conservation programs, and participating in stakeholder and interagency workgroups.  Some examples of these activities follow.

Signed in November 2012, Minute 319 is a historic binational agreement that promotes sharing, conserving, and storing Colorado River water.  Minute 319 provides, in part, water for environmental flows for the Colorado River Delta, and an opportunity to gain important scientific information on the effectiveness of these flows.  From March through May 2014, a one-time pulse flow event of approximately 105,000 acre-feet was released to the riparian corridor of the Colorado River Delta from Morelos Dam at the U.S.-Mexico border.  The water flowed down the river's channel, infiltrated to groundwater and helped to regenerate native cottonwood and willow habitat.  A portion of the water eventually flowed to the Gulf of California.  The experimental flow provided the scientific community the opportunity to gather valuable data from collaborative monitoring activities; these data will inform both countries in developing future management actions regarding water flows in the delta.

The construction and operation of dams on the Colorado River have fundamentally altered the Colorado River ecosystem.  Because of the importance of the Colorado River to the desert Southwest, there is considerable debate over how to share and manage this natural resource.  An important part of that debate is the need to address the impacts to the downstream ecosystem resulting from the ongoing operation of Reclamation dams in the Colorado River.  To address this challenge at Glen Canyon Dam, Reclamation is a partner in the Glen Canyon Dam Adaptive Management Program, established in 1997, to provide for long-term research and monitoring of downstream resources.  The scientific information obtained under the Adaptive Management Program is used as the basis for recommendations for dam operations and management actions.  Through the adaptive management approach, scientific experimentation is integrated into resource management actions.

For example, Reclamation and the National Park Service are preparing an environmental impact statement (EIS) for the adoption of a long-term experimental and management plan for the operation of Glen Canyon Dam.  The EIS will fully evaluate dam operations and will provide the basis for decision that identify

management action and experimental options that will provide a framework for adaptively managing Glen Canyon Dam over the next 15 to 20 years.

Other examples of environmental and recreational flow activities in the Colorado Basin include the Upper Colorado River Endangered Fish Recovery Program, San Juan River Basin Recovery Implementation Program, and the Lower Colorado River Multi-Species Conservation Program.

## Hoover Dam Infrastructure

In cooperation with the Hoover power contractors, Reclamation has begun replacing five of the 17 existing power generating turbines with wide-head turbines at Hoover Dam (Figure 3–7). As the elevation of Lake Mead has dropped in recent years, the ability for water in the reservoir to drive the existing turbines has decreased, and their effectiveness at producing hydroelectric power has been reduced. At current Lake Mead elevations, the water level is at or below the level designed for the existing turbines. The new wide-head turbines can operate at a much wider range of reservoir levels and will allow the Hoover Powerplant to generate electricity more efficiently at lower Lake Mead levels. Four of the new turbines have already been installed and the remaining turbine is scheduled to be installed in Fiscal Year 2017.

## Data and Tool Development

Reclamation continually works to enhance its suite of modeling tools, including the basin's long-term planning model and data to support such tools. Recently, The Nature Conservancy completed a project, funded by the Southern Rockies Landscape Conservation Cooperative (LCC) that explored modeling improvements to represent environmental and recreational flow needs in the planning model more accurately (Alexander et al., 2013). The University of Arizona, funded by the Desert LCC, is completing a geospatial database of environmental flow needs and responses (environmental water demands) to provide water and land managers easy access to the best techniques available for determining how much water ecosystems need. In addition, we are currently analyzing information from the CMIP 5 suite of climate model projections across the Colorado River Basin. This information will be used to conduct additional analysis to update our risk assessments and explore how the new climate projections compare to those used in the Basin Study.



**Figure 3–7.  Delivery of a widehead turbine runner for Hoover Dam.**
**The turbine was delivered on a flatbed truck wrapped in a protective tarp.**
**The turbine was flown in using the overhead crane.**
**Date Taken: June 17, 2015.**

SECURE Water Act Section 9503(c) Report to Congress

# 4   Coordination Activities

Interest in ensuring the sustainability of the Colorado River is broad and includes federal, state, and local governments, tribes, agricultural users, M&I water suppliers, power users, and conservation and recreation groups.  No one sector solely bears the burden of future challenging conditions and no one sector can provide the solution for ensuring long-term sustainability.  Water management in the basin is complex, as are the challenges associated with balancing competing needs such as water delivery, hydropower generation, and environmental protection.  To meet such challenges, various stakeholders have implemented programs and initiatives, each with their own set of goals, objectives, approaches, and processes, in various parts of the basin.  These stakeholders recognize that facilitating cross-program coordination and information exchange are important strategies that can allow such programs to work together and focus resources to address basin-wide challenges.

Reclamation and its stakeholders are actively partnering in activities and programs to help mitigate the impact of the on-going drought and to address future water management challenges.  These programs include the Pilot System Conservation Program, Drought Contingency Planning efforts, and the Water Conservation Field Services Program.  Other examples of precedent-setting partnerships occurring throughout the basin include the Colorado River Basin Ten Tribes Partnership Tribal Water Study and commitments by Reclamation, the Basin States, and Mexico to share and conserve water during both high and low reservoir conditions while also respecting the operational constraints and ecological health of the Colorado River Basin.  These activities and programs are described in more detail in section 3.2.

## 4.1  *Moving Forward* Effort

The Basin Study demonstrated that implementing a broad range of options could reduce basin resource vulnerability and improve the basin's resiliency to dry and variable hydrologic conditions.  Implementing such options requires diligent planning and collaboration that applies a wide variety of water management ideas throughout the basin.

***Colorado River Basin Study – Moving Forward Effort***:  In May 2013, Reclamation and Basin stakeholders initiated the *Moving Forward* effort to build on future considerations and next steps identified in the Colorado River Basin Study.  The *Moving Forward* effort enhances the broad, inclusive stakeholder process demonstrated in the Basin Study, with an ultimate goal of identifying actionable steps to address projected water supply and demand imbalances that have broad-based support and provide a wide range of benefits.

The *Moving Forward* effort is being conducted in a phased approach.  Phase 1 began with the formation of a coordination team and three multi-stakeholder

workgroups that focus on water conservation, reuse, and environmental and recreational flows.  The Phase 1 Report was published in May 2015 (Reclamation, 2015 [Moving Forward]).  The report documents the activities and outcomes of the workgroups during this phase and includes opportunities for potential future action.  Phase 2, which began in 2015, signals the transition from study to action.  In this phase, building from the workgroup's identified opportunities for future action; several pilot projects will be identified and pursued.

## 4.2  Additional Coordination

Climate change challenges highlight the need for increased coordination to exchange information, compare findings, and collaborate on data collection and other efforts to establish and address basin-wide priorities.  Federal-agency integration within and across Departments is strong throughout the basin.  For example, under the WaterSMART program, Reclamation and the U.S. Geological Survey coordinate on a variety of research activities in the basin, including the collection and evaluation of consumptive uses and loss data.

The Southern Rockies and Desert LCCs encompass the basin and are partnerships of governmental (Federal, state, tribal, and local) and non-governmental entities.  The primary goal of the LCCs is to bring together science and resource management to inform climate adaptation strategies to address climate change and other stressors within an ecological region, or landscape.  There are many examples in the basin of where stakeholder involvement and coordination is a critical element in the success of the program or project such as:

- The Bill Williams River Corridor Steering Committee (BWRCSC) is a stakeholder group that includes regulatory agencies, federal agencies such as Reclamation, non-governmental organizations, local jurisdictions, and scientists with management concerns and responsibilities related to the Bill Williams River (BWRCSC, 2014).  This group works cooperatively to help fund and coordinate research and adaptive management of the river's resources.

- On the Upper Colorado River, salinity issues are being addressed by the NRCS, Reclamation, and state agencies through the basin-wide Salinity Control Program, which has implemented irrigation improvements throughout the basin aimed at reducing salt load.  Examples of program activities include reducing high salinity agricultural drain water return flows and preventing highly saline waters from reaching the Colorado River.

# 5    References

| | |
|---|---|
| Alexander et al., 2013 | Alexander, C.A.D., E. Olson, and J. Carron, 2013. Integrated Water Management in the Colorado River Basin: Evaluation of Decision Support Platforms and Tools. Final Report. Prepared by ESSA Technologies, Ltd., and Hydros Consulting for the Colorado River Program of The Nature Conservancy, Boulder, Colorado. |
| BWRCSC, 2014 | BWRCSC, 2014. Bill Williams River Corridor Steering Committee. Retrieved from http://billwilliamsriver.org/Committee. |
| Meko et al., 2007 | Meko, D.M., C.A. Woodhouse, C.A. Baisan, T. Knight, J.J. Lukas, M.K. Hughs, and M.W. Salzer, 2007. Medieval Drought in the Upper Colorado River Basin. Geophysical Research Letters 2007, 34(5), L10705, doi: 10.1029/2007GL029988. |
| Reclamation, 1996 | Bureau of Reclamation (Reclamation), 1996. Operation of Glen Canyon Dam Final Environmental Impact Statement. |
| Reclamation, 2007 | Bureau of Reclamation (Reclamation), 2007. Colorado River Interim Guidelines for Lower Basin Shortage and Coordinated Operations of Lake Powell and Lake Mead Final Environmental Impact Statement. |
| Reclamation, 2012 (CO Basin Study Executive Summary) | Bureau of Reclamation (Reclamation), 2012. Colorado River Basin Water Supply and Demand Study. Executive Summary. Retrieved from http://www.usbr.gov/lc/region/programs/crbstudy/finalreport. |
| Reclamation, 2012 (CO Basin Study) | _____. 2012. Colorado River Basin Water Supply and Demand Study. Retrieved from http://www.usbr.gov/lc/region/programs/crbstudy/finalreport. |
| Reclamation, 2012 (CO Basin Study TR-B) | _____. 2012. Colorado River Basin Water Supply and Demand Study. Technical Report B—Water Supply Assessment. |
| Reclamation, 2012 (CO Basin Study TR-C) | _____. 2012. Colorado River Basin Water Supply and Demand Study. Technical Report C—Water Demand Assessment. |

Reclamation, 2015
(Moving Forward)

Bureau of Reclamation (Reclamation), 2015.  Moving Forward, Phase 1 Report. Moving Forward. Colorado River Basin Stakeholders Moving Forward to Address Challenges Identified in the Colorado River Basin Water Supply and Demand Study — Phase 1 Report.  A Product of the Moving Forward Effort.  Retrieved from http://www.usbr.gov/lc/region/programs/crbstudy/MovingForward/Phase1Report/fullreport.pdf

U.S. Census Bureau, 2011.

U.S. Census Bureau, 2011.  Population Distribution and Change: 2000 to 2010.  2010 Census Briefs.


**USGS**
science for a changing world

# Effects of Climate Change and Land Use on Water Resources in the Upper Colorado River Basin

*The Colorado River Basin*

The health of the Colorado River watershed (fig. 1) is critical to the socioeconomic and ecosystem well-being of the Southwestern United States. Water in springs, streams, and rivers supports a range of aquatic and riparian ecosystems that contain many endangered species. Terrestrial habitats support a wide array of plants and wildlife. In addition, this region is enjoyed by millions of people annually for its recreational and esthetic opportunities. The Colorado River provides water for about 25 million people and is used to irrigate 2.5 million acres of farmland. However, competition for this water is expected to increase as human populations dependent on this water are projected to increase to 38 million by 2020 (Pulwarty and others, 2005).

Climate change is expected to further exacerbate water issues in this region. Drought in the Southwest during 2000–04, caused by both reduced precipitation and a series of the hottest years on record, resulted in streamflows lower than during the 1930s Dust Bowl or the 1950s drought (Andreadis and Lettenmaier, 2006). Increased temperatures alone are a major factor in reducing surface-water flows in this region. For instance, precipitation received during the winter of 2005 was at the 100-year average. However, low soil moisture and high January–July temperatures resulted in flows that were only 75 percent of average (National Research Council, 2007). Climate models predict future warmer temperatures and reduced precipitation in the Upper Colorado River Basin (UCRB), which would reduce water available to humans and ecosystems.


**Figure 1.** The Colorado River Basin with the Upper Basin outlined in red.

The U.S. Geological Survey (USGS) and numerous partners have ongoing research activities assessing the magnitude and effects of numerous climatic and human-induced changes affecting water availability and quality in the Colorado River Basin. This fact sheet summarizes selected major research efforts (both USGS and others) to evaluate the effects of climate and landscape change on water availability and water quality in the UCRB and describes some of the science needed to support future management decisions.

*Background photograph by Jeff Foster, U.S. Geological Survey.*

## Climate Models Forecast Future Water Supply

Current climate models predict that by 2100, reductions in precipitation in the Southwestern United States, coupled with rises in temperatures as much as 5°F, and associated increases in evapotranspiration could result in changes in water runoff in the Colorado River Basin of up to 20 percent (table 1) (Milly and others, 2005; Christensen and others, 2007; Seager and others, 2007). Models predict that by 2070 the Colorado River Compact and the U.S. agreements with Mexico will be met only 60 percent of the time (McCabe and Wolock, 2007; National Research Council, 2007). By 2050, increasing temperatures alone are expected to increase evaporation such that average soil moisture conditions in the Southwest may be lower than the conditions experienced during any of the most severe droughts of this cen-



tury, including the 1930s Dust Bowl and the droughts of 1953–1956 or 1999–2004 (fig. 2). Increasing temperatures and reduced rainfall may also result in changes in vegetation cover. This, combined with other human disturbances related to land use and resource management, can affect the timing of snowmelt already altered by warming and may contribute to reduced total and late season water supplies in a substantial part of the American West. Related changes in water quantity and quality can create multiple natural-resource management and policy issues, affecting reservoir operations and water delivery for agriculture, communities, energy production, recreation, and wildlife.

**Figure 2.**   Modeled changes in annual mean precipitation (P) minus evaporation (E) for the Southwestern United States, averaged over 19 models. Median values are in red and the 25th and 75th percentiles (pink shading) of the P-E distribution among the 19 models are shown, as are the ensemble medians of P (blue line) and E (green line) for 1900–2100.

*Background photograph by Dennis Smits, U.S. Geological Survey.*

## Projected Future Flows in the Upper Colorado River Basin

Recent models have indicated that climate change could reduce Colorado River Basin flow anywhere from 5 to 45 percent by 2050 (see table below). Given this wide range, an effort by scientists from the Bureau of Reclamation, the National Oceanic and Atmospheric Administration, USGS, and several universities to reconcile these diverse projections has shown:

1.  Eighty-five percent of the runoff entering the Colorado River originates from the 15 percent of the basin at the highest elevations;

2.  Models generating the largest reductions were not accurate; and

3.  The most accurate models show the range of likely flows by 2050 are 5 to 20 percent less than current flows (Ray and others, 2009).

Table 1 and figure 2 illustrate how assumptions and analysis design affect future projections and how uncertainty of climate and runoff projections can be constrained. These results have been presented to Colorado River water managers, and future workshops are planned. For further information, contact Bradley Udall at *bradley.udall@colorado.edu*.

**Table 1.**   Projected changes in Colorado River Basin runoff or streamflow in the mid-21st century. (Adapted from Ray and others, 2009.)

| Study | Global circulation models (runs) | Spatial scale | Temperature | Precipitation | Year | Runoff (flow) | Risk estimate |
|---|---|---|---|---|---|---|---|
| Christensen and others (2004) | 1 (3) | VIC model grid (~8 mi) | +3.1°F | –6% | 2040–69 | –18% | Yes |
| Milly (2005) replotted by P.C.D. Milly | 12 (24) (~100–300 mi) | CGM grids — | — | — | 2041–60 | –10% to –20% 96% model agreement | No |
| Hoerling and Eischeid (2007) | 18 (42) | NCDC Climate Division | +5.0°F | –0% | 2035–60 | –45% | No |
| Christensen and Lettenmaier (2007) | 11 (22) | VIC model grid (~8 mi) | +4.5°F (+1.8 to +5.0) | –1% (–21% to +13%) | 2040–69 | –6% (–40% to +18%) | Yes |
| Seager and others (2007)* | 19 (49) | CGM grids (~100–300 mi) | — | — | 2050 | –16% (–8% to –25%) | No |
| McCabe and Wolock (2007) | — | USGS HUC8 units (~25–65 mi) | Assumed +3.6°F | 0% | — | –17% | Yes |
| Barnett and Pierce (2008)* | — | | | | 2057 | Assumed –10% to –30% | Yes |

*Two studies are not specifically for the Upper Colorado River Basin. Seager and others (2007) is for a larger area that only partially overlaps the Upper Basin. Barnett and Pierce (2008) assume Lees Ferry streamflow changes to drive their water balance of reservoir storage.

## The Reconstructed Paleoclimatic Record—The Past Illuminates the Future

Paleoclimatic records show that the last 100 years have been unusually wet in the Upper Colorado River Basin. Reconstructions of past climatic conditions and associated Colorado River flows based on tree-ring records indicate the early 20th century was wetter than any time period back to A.D. 800, and that period was wetter than most of the previous 10,000 years (fig. 3) (R.S. Thompson, oral commun., 2010). Droughts of greater intensity than any in the historical record occurred in the UCRB in the 11th, 14th, 15th, and 16th centuries and lasted as long as 24 years. In comparison, the longest 20th century drought lasted 14 years, and all droughts were less intense than those in previous centuries. There are other indicators that the past century has been far wetter than previous periods. Alpine lake levels in the Colorado mountains have been higher in the past millennium than any previous time in the past 5,000 to 12,000 years (Woodhouse and others, 2010). Paleobotanical evidence shows upper tree-line elevations ca. 9,000 to 5,000 years ago were at least 80 meters higher than those of today. Many climate models indicate warmer and drier



**Figure 3.** Climate reconstructions from tree rings show that the latter half of the 21st century has been wetter than any similar time periods back to A.D. 800, given the high amount and extended time of above-average precipitation (green) relative to the very few and short drought periods (orange). Tree rings show much longer and severe droughts from A.D. 800 to 1200 than any experienced since then.

future conditions in this region. Thus, if the past is a guide, then sustained periods of drought may return to the Upper Colorado River Basin. The warmer and drier future predicted by regional climate models is likely to exacerbate the drought conditions implied by the paleoclimate reconstructions creating conditions not yet experienced in recorded history. For further information, contact Bob Thompson at *rthompson@usgs.gov*.



Photograph by Kurt Chowanski, used with permission.

Remnant wood

Living trees

Photograph by Connie Woodhouse, used with permission.



## Changes In the Timing of Snowmelt and Streamflow In the Upper Colorado River Basin

More than 80 percent of the runoff from the UCRB comes from the melting of high-elevation snow. The mountain snowpack serves as a large natural reservoir, releasing water for humans and wildlife throughout the West during the spring and summer. Since the late 1970s, the onset of snowmelt in this region has shifted 2 to 3 weeks earlier coincident with increasing spring temperatures and declining snowfall (Clow, 2010). Climate projections indicate that snowmelt timing will continue to advance in response to additional warming (Rauscher and others, 2008). Windblown dust loading on the mountain snowpack may exacerbate the problem (see photographs and following section). The observed trends in snowmelt timing have resulted in a similar shift in streamflow timing; these changes may require changes in reservoir management and water usage by cities and farms and may have important implications for fish and other aquatic biota that depend on maintenance of minimum streamflows during the fall and winter low-flow period. For further information, contact Dave Clow at *dclow@usgs.gov* or Tom Painter at *thomas.painter@jpl.nasa.gov.*

## Airborne Dust—Land-Use Management and Effects on Water Supply

Wind-driven dust production is increased by drought, disturbance of the soil surface, the invasion of exotic annual grasses, and fire. A synergistic effect is created when surface disturbance occurs on invaded landscapes during drought years, and large amounts of soil can be lost from an area as a result (Belnap and others, 2009). Soil-disturbing activities—energy exploration and development, grazing, and recreation—in the UCRB reduce plant and soil-crust cover that provides soil-surface protection. Increasing temperatures and decreasing precipitation also slow the recovery of soil and vegetation from land-use disturbance, further increasing the frequency and magnitude of wind erosion.

Large dust storms have both local and regional effects on water resources. Windblown material is deposited in ephemeral washes, and this additional sediment degrades water quality when water flows. In the UCRB, these sediments are commonly heavily laden with salts and heavy metals (Bentley and others, 1978) such as selenium, degrading water quality and affecting wildlife downstream. Most importantly, much of the dust produced from low-elevation land can be deposited on the snowpack of nearby mountains (Painter and

others, 2007). During spring warming, the dark-colored dust absorbs heat, which increases the rate at which the underlying snowpack melts. Models show up to 7 percent of the annual input to the Colorado River results from early snowmelt (Painter and others, 2010). Earlier than usual runoff is problematic for water managers and commonly reduces our ability to store water. Early snowmelt also leaves soils exposed longer to solar radiation, increasing evaporation from plants and soils and the potential for dust generation. Both wind- and water-borne sediment is likely to reduce the quality and quantity of water in the Colorado River watershed. Identifying the type, size, and source of dust allows land managers to better locate the landscapes that are susceptible to generating dust and adjust the timing, intensity, and location of soil-disturbing activities in these areas during seasons when the potential for dust production is high. For further information, contact Jayne Belnap at *jayne_belnap@usgs.gov* or Tom Painter at *thomas.painter@jpl.nasa.gov.*



## Forest Die-Off and Mountain Pine Beetle



*Photograph by Michael McGrath, used with permission.*

In addition to climate change, other factors may affect local and regional water supplies. At higher elevations, trees are succumbing to beetle kill and drought, with large areas of dead trees now present in Colorado, New Mexico, Arizona, and Utah. Although the mountain pine beetle (*Dendroctonus ponderosae*) is a native insect, several factors have contributed to its current epidemic population outbreak: increasing air temperatures and recent drought (possibly related to climatic change) and the presence of contiguous stands of mature, dense forest. Trees are now dead and dying throughout over 3 million acres of Colorado forests. This mortality could significantly decrease water quality and likely will affect snowmelt rates and runoff timing. USGS scientists are collaborating with several local and Federal partners on interdisciplinary research to characterize effects of this large-scale forest mortality on ecosystem structure and function, potential fire hazard, and water resources in this region. The quantity and timing of water supply is being monitored to detect changes related to forest die-off. Changes in water quality have already been detected. Although nitrate concentrations in streams flowing into and out of key drinking-water reservoirs in the headwaters of the Colorado River have remained stable or even declined, total phosphorus concentrations have increased in some streams by 30 to 60 percent since the beetle infestation began (Dave Clow, U.S. Geological Survey, oral commun., 2010). This may contribute to algal blooms that can cause anoxia and fishkills in the reservoirs. Results from these studies will help water-resource managers and water suppliers to understand, plan for, and adapt to changes in the quality of water available for consumptive use in the Upper Colorado River Basin and adjacent watersheds. For further information, contact Dave Clow at *dclow@usgs.gov* or Jenny Briggs at *jsbriggs@usgs.gov.*

## Fish Futures and Changing Riparian Habitat in the Colorado River Basin



**Colorado River Cutthroat Trout**

Native fishes in the Colorado River and its tributaries evolved in a dynamic environment, with extreme swings in water flow and sediment loads. However, large dams have altered the timing, amount, and temperature of river flows. These changes, when combined with the introduction of non-native reservoir and river fishes, have imperiled native fishes. Future projections for the Colorado River include reduced flows, warmer water, and greater human demands for this water. Although the effects of changing water temperatures on the interactions between native and nonnative fishes is not known, it is known that declining water availability will make the restoration of endangered fish habitat extremely challenging.

Riparian areas in the Colorado River Basin are important transitions between the arid uplands and water bodies. Riparian areas provide diverse habitat for a large variety of plant and animal species, important linkage corridors for amphibians, birds, and mammals, and breeding areas for many species. Species like cottonwood depend on high spring flows for germination, and these conditions may not occur in the future, threatening these large gallery forests and the species associated with them. As river flows decrease and human demands increase, there may be an increasing need for surface-water and groundwater withdrawal. These withdrawals may dry up streams and springs, thus eliminating many riparian habitats and endangering the living things that depend on them. For further information, contact Jeffrey Kershner at *jeffrey_kershner@usgs.gov.*

## Science in Support of Management Decisions

Science is critical for making informed natural resource management decisions. The U.S. Geological Survey and Federal and non-Federal partners are exploring ways to mitigate and adapt to future climate and landscape changes. Still, there are many critical research and monitoring efforts needed to enhance this effort, including the following examples:

- Maintain and augment current monitoring networks, such as streamflow, water quality, snowmelt, groundwater, springs, vegetation, air quality, aquatic ecosystems, and climate, to document how resources are changing. Consider establishing instrumented watersheds to better understand how hydrology, climate, land use, and vegetation interact to influence water quantity and quality.

- Document climatic and land-use histories to provide context in which to understand current trends.

- Monitor and measure dust at chronic and acute dust sources. Expand mapping of vulnerable soils and suggest ways to reduce dust production.

- Develop better understanding of groundwater recharge and how to assess the effects of water withdrawals.

- Develop forecasting abilities for climate and water supplies across different temporal and spatial scales to evaluate the potential consequences of alternative management scenarios.

- Develop integrated tools for evaluating watershed-scale ecosystem health.

- Document the effects of altered hydrologic cycles on aquatic and riparian resources, as stresses on these landscape components increase in the future.

- Enhance communication between scientists and managers/policymakers.

### References

Andreadis, K.M., and Lettenmaier, D.P., 2006, Trends in 20th century drought over the continental United States: Geophysical Research Letters, v. 33, p. L10403, doi:10.1029/2006GL025711.

Barnett, T.P., and Pierce D.W., 2008, When will Lake Mead go dry?: Water Resources Research, 44, W03201, doi:10.1029/2007WR006704.

Belnap, Jayne, Reynolds, R.L., and others, 2009, Sediment losses and gains across a gradient of livestock grazing and plant invasion in a cool, semi-arid grassland, Colorado Plateau, USA: Aeolian Research v. 1, p. 27–43.

Bentley, R.G., Jr., Eggleston, K.O., Price, D., Frandsen, E.R., and Dickerman, A.R., 1978, The effects of surface disturbance (primarily livestock use) on the salinity of public lands in the Upper Colorado River Basin—1977 Status Report: Denver, Colorado, U.S. Department of the Interior, Bureau of Land Management, Denver Service Center, Division of Standards and Technology, Watershed Staff.

Christensen, J.H., Hewitson, B., Busuioc, A., Chen, A., Gao, X., Held, I., Jones, R., Kolli, R.K., Kwon, W.T., Laprise, R., Magaña Rueda, V., Mearns, L., Menéndez, C.G., Räisänen, J., Rinke, A., Sarr, A., and Whetton, P., 2007, Regional climate projections, in Solomon, S., Qin, D., Manning, M., Chen, Z., Marquis, M., Averyt, K.B., Tignor, M., and Miller, H.L., eds., Climate change 2007—The physical science basis: Contribution of Working Group I to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change, Cambridge, Cambridge University Press, p. 848–940.

Christensen N.S., and Lettenmeier, D.P., 2007, A multimodel ensemble approach to assessment of climate change impacts on the hydrology and water resources of the Colorado River Basin: Hydrology and EarthSystem Sciences, 11, p. 1417–1434.

Clow, D.W., 2010, Changes in the timing of snowmelt and streamflow in Colorado—A response to recent warming: Journal of Climate, v. 23, no. 9, p. 2293–2306.

Hoerling, M. and Eischeid, J., 2007, Past peak water in the Southwest: Southwest Hydrology, 35, p. 18–19, 35.

McCabe, G.J., and Wolock, D.M., 2007, Warming may create substantial water supply shortages in the Colorado River basin: Geophysical Research Letters, v. 34, p. L22708, doi:10.1029/2007GL031764.

Milly, P.C.D., Dunne, K.A., and Vecchia, A.V., 2005, Global pattern of trends in streamflow and water availability in a changing climate: Nature, v. 438, p. 347–350, doi:10.1038/nature04312.

National Research Council, Committee on the Scientific Bases of Colorado River Basin Water Management, 2007, Colorado River Basin Water Management—Evaluating and adjusting to hydroclimatic variability: Washington, D.C., National Academies Press, 242 p.

Painter, T.H., Barrett, A.P., Landry, C.C., Neff, J.C., Cassidy, M.P., Lawrence, C.R., McBride, K.E., and Farmer, G.L., 2007, Impact of disturbed desert soils on duration of mountain snow cover: Geophysical Research Letters, v. 34, no. L12502, doi:10.1029/2007GL030284.

Painter, T.H., Deems, J.S., Belnap, J., Hamlet, A.F., Landry, C.C., and Udall, B.H., 2010, Response of Colorado River runoff to dust radiative forcing in snow: Proceedings of the National Academy of Sciences (PNAS), accessed Oct. 19, 2010, at http://www.pnas.org/content/107/40/17125.

Pulwarty, R., Jacobs, K., and Dole, R., 2005, The hardest working river—Drought and critical water problems on the Colorado, in Wilhite, D., ed., Drought and water crises—Science, technology and management: New York, Taylor and Francis Press, p. 249–285.

Rauscher, S.A., Pal, J.S., Diffenbaugh, N.S., and Benedetti, M.M., 2008, Future changes in snowmelt-driven runoff timing over the western US: Geophysical Research Letters, v. 35, doi:10.1029/2008GL034424.

Ray, A.J., Barsugli, J.J., Averyt, K.B., Wolter, K., Hoerling, M., Doesken, N., Udall, B., and Webb, R.S., 2009, Climate change in Colorado—A synthesis to support water resources management and adaptation: Colorado Water Conservation Board, State of Colorado, at http://cwcb.state.co.us/public-information/publications/Documents/ReportsStudies/ClimateChangeReportFull.pdf.

Seager, R., Ting, M., Held, I., Kushnir, Y., Lu, J., Vecchi, G., Huang, H., Harnik, N., Leetmaa, A., Lau, N., Li, C., Velez, J., and Naik, N., 2007, Model predictions of an imminent transition to a more arid climate in Southwestern North America: Science, v. 316, p. 1181–1184.

Woodhouse, C.A., Meko, D.M., MacDonald, G.M., Stahle, D.W., and Cook, E.R., 2010, A 1,200-year perspective of 21st century drought in southwestern North America: Proceedings of hte National Academy of Sciences, v. 107, no. 50, p. 21283–21288.

For further information contact:

| Jayne Belnap | Donald H. Campbell |
| U.S. Geological Survey | U.S. Geological Survey |
| Moab, Utah | Denver, Colorado |
| jayne_belnap@usgs.gov | dhcampbe@usgs.gov |



# United States Department of the Interior

## FISH AND WILDLIFE SERVICE
### Mountain-Prairie Region



IN REPLY REFER TO:
FWS/R6
ES/CRRP

MAILING ADDRESS:
P.O. BOX 25486, DFC
Denver, Colorado 80225-0486

STREET LOCATION:
134 Union Boulevard
Lakewood, Colorado 80228-1807

OCT 7 2015

Memorandum

To:       Implementation/Management Committee, Consultants, and Interested Parties

From:    Regional Director, Region 6

Subject:  Draft 2014—2015 Assessment of Sufficient Progress Under the Upper Colorado
          River Endangered Fish Recovery Program in the Upper Colorado River Basin, and of
          Implementation of Action Items in the December 20, 1999, 15-Mile Reach
          Programmatic Biological Opinion and December 4, 2009, Gunnison River Basin
          Programmatic Biological Opinion

## I.       "SUFFICIENT PROGRESS"

In accordance with the Section 7, Sufficient Progress, and Historic Projects Agreement, the
U.S. Fish and Wildlife Service (Service) is reviewing 2014—2015 and cumulative
accomplishments and shortcomings of the Upper Colorado River Endangered Fish Recovery
Program (Recovery Program) in the upper Colorado River basin. Per that Agreement, the Service
uses the following criteria to evaluate whether the Recovery Program is making "sufficient
progress" toward recovery of the four listed fish species:
  • actions which result in a measurable population response, a measurable improvement in
    habitat for the fishes, legal protection of flows needed for recovery, or a reduction in the
    threat of immediate extinction;
  • status of the fish populations;
  • adequacy of flows; and
  • magnitude of the impact of projects.

The final March 24, 2015, assessment of accomplishments and shortcomings of the Recovery
Program under the Recovery Implementation Program Recovery Action Plan (RIPRAP) from
February 1, 2014, through January 31, 2015, is incorporated in the tables to the RIPRAP found at
on the Recovery Program's website (http://www.coloradoriverrecovery.org/documents-
publications/foundational-documents/recovery-action-plan.html). Although this memo focuses
on the RIPRAP assessment timeframe of February 1, 2014 - January 31, 2015, more recent
information has been incorporated where warranted. Previous years' accomplishments and
shortcomings are described in previous "sufficient progress" memoranda and outlined in the
RIPRAP itself.

The Service issued its most recent sufficient progress memorandum on September 10, 2014.

A.   **Status of the Species in the Upper Basin**

In 2002, the Service developed Recovery Goals (USFWS 2002 a-d) to supplement the individual endangered species recovery plans.  The Recovery Goals contain specific demographic criteria to maintain self-sustaining populations and recovery factor criteria that would indicate when threats to the species would be ameliorated.  A minimum viable population is identified for each species as a gauge for recovery.  In addition, key requirements of the population criteria include no net loss of fish over established monitoring periods, and recruitment of young fish into the adult population must occur at a rate to maintain the population.  Significant changes in the status of the four species generally are not detected on a year-to-year basis due to species' life history (i.e., recapture rates over long lifespan) as well as variable confidence intervals around population estimates and potential influence of sampling on capture probability.

Hatchery-produced, stocked fish form the foundation for the reestablishment of naturally self-sustaining populations[1] of razorback sucker and bonytail in the upper Colorado and Green river systems (Figure 1).  The Recovery Program has been implementing an integrated stocking plan (Nesler et al. 2003) with the goal of establishing self-sustaining populations of razorback sucker and bonytail in the upper Colorado River basin by 2015.  The Program has been largely successful in meeting the plan's stocking targets.  Stocked razorback sucker are reproducing and wild juvenile razorbacks are starting to be captured.  Recaptures of stocked bonytail are rarer, and the Program has yet to document spawning in the wild.  However, since 2009, increasing numbers of bonytail have been detected by stationary PIT-tag reading antennas and traditional sampling methods throughout the upper Colorado River basin.  A more rigorous assessment of bonytail recapture information should be one of the first queries of the Recovery Program's new STReaMS database.  Survival of stocked fish may be improving or the relatively new stationary antennas may be a better method of detecting stocked fish than other, ongoing active sampling methods.  The stocking plan was revised to stock fewer and larger razorback sucker and more, larger bonytail (Integrated Stocking Plan Revision Committee 2015).

---

[1] To achieve naturally self-sustaining populations, adults must reproduce and recruitment of young fish into the adult population must occur at a rate to maintain the population at a minimum that meets the demographic criteria identified in the recovery goals.



Figure 1.  Map of the Upper Colorado River drainage.

Colorado Pikeminnow

Wild populations of Colorado pikeminnow occur in the upper Colorado and Green River systems.  These populations have been studied since the 1960s, and population dynamics and responses to management actions have been evaluated since the early 1980s.  Closed-population, multiple mark-recapture estimators are being used in the upper Colorado River basin to derive population point estimates for Colorado pikeminnow to track population trends.  The accuracy and precision of each point estimate is assessed by the Service in cooperation with the Recovery Program and in consultation with investigators developing the point estimates and with qualified statisticians and population ecologists.  Recovery goals for the Colorado pikeminnow require the Service to evaluate annual point estimates for each population in order to determine if the estimates are accurate, precise, and reliable.  The Service accepts the Colorado pikeminnow estimates described below as the best available information.  However, the Service recognizes that trends for some of these populations have declined since the first estimates were made, and

that delisting would not occur until the demographic criteria are met and threats to the species are addressed to the point that the species is no longer threatened.

*Colorado River Juveniles and Adults*

Population estimates for adult Colorado pikeminnow (≥450 mm total length [TL]) began in 1992 on the Colorado River from the Price-Stubb Diversion to the confluence with the Green River (see Figure 2). Population estimates are conducted in three consecutive years followed by two years of no estimates. In their most recent summary of those data (Osmundson and White 2014) the principal investigators concluded:

> *During the 19-year study period* [1992-2010], *the population remained self-sustaining. This was evidenced by: 1) annual abundance estimates of sub-adults (400–449 mm TL) about to recruit that indicated recruitment roughly balanced estimated adult mortality in years for which data were available, and 2) results of a weighted regression analysis of river-wide adult abundance estimates that indicated the intercept-only model as having the greatest weight, suggesting population stability. However, weighted regression of just the upper-reach adult population gave greatest weight to the quadratic model, suggesting the population increased and then later declined.*

The current downlisting demographic criteria for Colorado pikeminnow (USFWS 2002a) in the Upper Colorado River Subbasin is a self-sustaining population of at least 700 adults maintained over a 5-year period, with a trend in adult point estimates that does not decline significantly. Secondarily, recruitment of age-6 (400–449 mm TL; Figure 3), naturally produced fish must equal or exceed mean adult annual mortality (estimated to be about 20%). The average of all adult estimates (1992 – 2014; estimates from 2013 and 2014 are considered preliminary) is 613. The average of the five most recent annual adult population estimates is 501. Osmundson and White (2014) determined that recruitment rates were less than annual adult mortality in six years and exceeded adult mortality in the other six years when sampling occurred. The estimated net gain for the 12 years studied was 32 fish ≥ 450 mm TL. Although the Colorado River population appears to meet the trend or 'self-sustainability' criterion, it has not met the abundance criteria of 'at least 700 adults' during the most recent five year period. The Service is reevaluating the demographic and threat removal criteria for Colorado pikeminnow through revision of the species' recovery plan.



Figure 2.  Adult Colorado pikeminnow population abundance estimates for the Colorado River (Osmundson and Burnham 1998; Osmundson and White 2009; 2014).  Error bars represent the 95% confidence intervals.  The 2013 and 2014 data are preliminary and represented by hollow data points.

6



Figure 3. Colorado pikeminnow recruitment abundance estimates (calculated using the same mark recapture methodology as for the adults) for the Colorado River (Osmundson and White 2009; 2014). Recruits are age-6 (400-449mm TL). Error bars represent the 95% confidence intervals. The 2013 and 2014 data are preliminary and represented by hollow data points.

*Green River Juveniles and Adults*

Population estimates for adult Colorado pikeminnow in the Green River Subbasin began in 2000. Sampling occurs on the mainstem Green River from the Yampa confluence to the confluence with the Colorado River and includes the Yampa and White Rivers. The initial year of sampling did not include the lower Green River (near the confluence of the White River to the confluence with the Colorado River). Beginning in 2001, the sampling regime has consisted of three years of estimates followed by two years of no estimates. The first set of estimates showed a declining trend; however, estimates collected in 2006–2008 showed an increasing trend approaching the level of the estimate made in 2000 (Figure 4). The confidence intervals indicated no statistically significant difference among the estimates. The downlisting demographic criteria for Colorado pikeminnow in the Green River Subbasin require that separate adult point estimates for the middle Green River and lower Green River do not decline significantly over a 5-year period, and each estimate for the Green River Subbasin exceeds 2,600 adults (estimated minimum viable population [MVP] number). The average of the first two sets of adult estimates was 3,020 (2000 – 2008). Despite a positive trend in the subbasin population from 2006 – 2008, Bestgen et al. (2010) expressed concern that adult Colorado pikeminnow numbers in the Yampa River remained low from 2006 – 2008. They suspected that nonnative northern pike may have been suppressing numbers of Colorado pikeminnow.

Data from the third round (2011–2013) of population estimates for the Green River Subbasin are still being analyzed (thus no confidence intervals are shown for the 2011–2013 estimates in Figure 4). Preliminary results from this analysis indicate adults and sub-adults are in decline throughout the entire Green River Subbasin. Preliminary results from 2011 - 2013 indicate that the Yampa River portion of the subbasin population remains low and may be in further decline (see Figure 6).



Figure 4. Adult Colorado pikeminnow population abundance estimates for the Green River (2000–2008 estimates from Bestgen et al. 2010; preliminary estimates from 2011-2013, Bestgen, personal communication). Error bars represent the 95% confidence intervals. In 2000, the lower Green River was not sampled. The data depicted for 2000 incorporates an extrapolated lower Green River contribution to the overall population estimate and therefore lacks a confidence interval.

Another demographic requirement in the 2002 Recovery Goals is that recruitment of age-6, naturally-produced fish must equal or exceed mean annual adult mortality. Estimates of recruitment age fish have averaged 1,455 since 2001, but have varied widely (Figure 5). Recruitment exceeded annual adult mortality only during the 2006 – 2008 period.



Figure 5.  Estimated numbers of Colorado pikeminnow recruits (400–449 mm TL) in the Green River Subbasin (Yampa, White, Middle Green, Desolation-Gray Canyons, and Lower Green) for 2001–2013.  Data from Bestgen et al. (2010; and personal communication).  Estimates of recruitment for the most recent 2011–2013 sampling period are preliminary.

As part of the process of revising the 2002 Colorado Pikeminnow Recovery Goals into recovery plans, a recovery team for Colorado pikeminnow was assembled in late 2012 consisting of species and threat experts.  During initial discussions in November 2012, the Recovery Team linked persistent low densities of adult Colorado pikeminnow in the Yampa River  to persistent high densities of nonnative predators (e.g., smallmouth bass and northern pike; northern pike abundance shown in Figure 6).  These estimates, which indicate that northern pike are outnumbering Colorado pikeminnow at least 3:1, point up the ongoing challenge of managing nonnative predators.  Based on these data, the Recovery Team recommended that the Service postpone a change in listing status for Colorado pikeminnow until this threat, which was specifically identified in the 2002 Recovery Goals, has been more adequately addressed.  The Recovery Program initiated a campaign to remove nonnative predators from the critical habitat reaches of the Yampa River in the early 2000s when it became apparent that smallmouth bass were decimating the native fish populations (Anderson 2005).  Since that time removal efforts have increased both geographically (now encompassing ~ 170 miles of Yampa River + Catamount Reservoir) and in intensity (with some reaches receiving more than 10 removal passes per year).



Figure 6. Comparison of Colorado pikeminnow population estimates (2000 – 2008 data from Bestgen et al. 2010) and northern pike (Battige 2012) in the middle Yampa River. The 2011-2013 data points for Colorado pikeminnow are preliminary. Northern pike population estimates were not conducted in 2013.

*Upper Basin Age-0*

Bestgen et al. 2010 recognized that the mechanism driving frequency and strength of recruitment events was likely the strength of age-0 Colorado pikeminnow production in backwater nursery habitats. Osmundson and White (2014) saw a similar relationship between a strong age-0 cohort in 1986 and subsequent recruitment of late juveniles five years later, but that relationship was more tenuous in later years. Researchers are particularly concerned with what appears to be very weak age-0 representation in the Middle Green reach (1999 thru 2008) and in the lower Colorado River (2001 thru 2008) (Figure 7). In some years, Reclamation has released higher summer base flows in the Green River based on the understanding that this may improve survival of young Colorado pikeminnow and disadvantage smallmouth bass.



Figure 7.  Numbers of age-0 Colorado pikeminnow collected each year from three different habitat reaches of river. A total of 2,892 age-0 fish were collected in the lower Green River in 1988; the significance of strong age-0 cohorts collected in the late 1980's was discussed in Bestgen et al. 2010.  Data from Breen et al. 2014.

The Service's status review of Colorado pikeminnow was completed in 2011. Although a good portion of the recovery factor criteria (USFWS 2002a) are being addressed, nonnative fish species continue to be problematic and researchers now speculate that mercury may pose a more significant threat to Colorado pikeminnow populations of the upper Colorado River basin than previously recognized.  Osmundson and Lusk (2012) recently reported elevated mercury concentrations in Colorado pikeminnow muscle tissue; the highest concentrations were from the largest adults collected from the Green and Colorado river subbasins.  Mercury exposure has been reported to impair reproduction in fish (Batchelar et al. 2013; J. Lusk, U.S. Fish and Wildlife Service, personal communication).  Laboratory experiments have shown diminished reproduction and endocrine impairment in fish exposed to dietary methyl mercury at environmentally relevant concentrations, with documented effects on production of sex hormones, gonadal development, egg production, spawning behavior, and spawning success. The San Juan River Recovery Implementation Program conducted a population viability analysis for Colorado pikeminnow to determine how impaired reproduction (caused by heavy metal or selenium contamination) would affect population dynamics and therefore, potentially influence adult demographic recovery criteria (Miller 2014).  Under an assumed constant burden of mercury into the future, the PVA expected a 2% reduction in female reproductive success; as females age the reduction in reproductive success would increase to about a 5% maximum. Assuming an increasing mercury burden, the PVA estimated these reductions would increase to about 3.5% and 9%, respectively.  The PVA estimated injury to adult survival would increase

from approximately 0.35% to 0.85% under a static mercury burden, and from approximately 0.65% to 1.5% if environmental mercury concentrations are assumed to increase over time. Conservation measures are being put in place to review the likelihood and pathways of effluent exposure, the concentrations of mercury and selenium necessary to protect endangered species in suitable habitats, and the results of a monitoring program to identify such concentrations in their habitats as a result of a Biological Opinion on the Four Corners Power Plant. Mercury is a global pollutant (International Conference on Mercury as a Global pollutant - http://www.mercury2013.com/); remediation is obviously beyond the scope of this Recovery Program.

Humpback chub

Five populations of humpback chub exist in the upper Colorado River basin and one occurs in the lower Colorado River basin in canyon-bound reaches of the river system. Recovery goal downlisting demographic criteria (USFWS 2002b) for humpback chub require each of five populations in the upper Colorado River basin to be self-sustaining over a 5-year period, with a trend in adult point estimates that does not decline significantly. Secondarily, recruitment of age-3 (150–199 mm TL) naturally produced fish must equal or exceed mean adult annual mortality. In addition, one of the five populations (e.g., Black Rocks/Westwater Canyon or Desolation/Gray Canyons) must be maintained as a core population such that each estimate exceeds 2,100 adults (estimated minimum viable population [MVP] number). (Note: data are not currently available to make reliable mark-recapture estimates of humpback chub recruitment; something the Service will need to address when revising the species' recovery plan). In UDWR's 2012 annual report, Brandon Gerig mentioned that *Gila* spp. (including native roundtail chub) recruitment appears strong in Westwater.

The Yampa River humpback chub population exists in the lower Yampa River Canyon and into the Green River through Split Mountain Canyon. This population is small, with an estimate of about 400 wild adults in 1998-2000. Sampling during 2003–2004 caught only 13 fish, too few to estimate population size. In 2007, the Recovery Program brought 400 young-of-year *Gila* spp. caught in Yampa Canyon into captivity as a research activity to determine the best methods for capture, transport, and holding at two different hatchery facilities. Approximately 15 percent of the *Gila* species were tentatively identified as humpback chub by physical characteristics (*Gila* identified as roundtail chub were returned to the river in Dinosaur National Monument [DNM]). Geneticists at Southwestern Native Aquatic Resources and Recovery Center (Southwestern ARRC), Dexter, NM, have since provided preliminary results indicating that the Yampa fish in captivity that were believed to be humpback chubs were hybrids between humpback chub and roundtail chub (Wade Wilson, U.S. Fish and Wildlife Service, personal communication). These fish were considered unsuitable for broodstock and were released into the Green River in DNM. Currently, it is not known if pure humpback chubs occur in Yampa Canyon. Researchers are taking fin clip samples from all suspected humpback chub for genetic analysis. Humpback chub genetics and population status will be discussed and reevaluated in the revised recovery plan.

The Desolation/Gray Canyons population of wild adults was estimated at 1,254 in 2001, 2,612 in 2002, and 937 in 2003 (Howard 2014). Sampling in 2001 and 2002 was conducted in summer, but shifted to fall beginning in 2003 to avoid capturing Colorado pikeminnow that use

Desolation Canyon for spawning. In a report on 2006–2007 estimates, researchers (Badame 2012; Figure 8) indicated that this population was trending downward. Badame (2012) linked declining catch of humpback chub in the upper portions of Desolation Canyon in the 2006–2007 estimates with increasing densities of nonnative smallmouth bass.

Table 1. A summary of population estimates and 95% confidence intervals (when available) for humpback chub in Desolation Canyon, Green River, Utah. *No estimate was calculated for 2011 due to insufficient recaptures; therefore, the number of individuals captured is presented. Excerpted from UDWR's Project 129 Annual Report for 2014 (Howard 2014).

| Year | N | 95% CI |
|------|------|-------------|
| 2014 | 1,863 | - |
| 2011* | 55 | - |
| 2010 | 1,625 | 1,023–5,465 |
| 2007 | 1,108 | 1,071–4,914 |
| 2006 | 2,578 | 1,151–9,736 |
| 2003 | 937 | 636–1,520 |
| 2002 | 2,612 | 1,477–8,509 |
| 2001 | 1,254 | 733–2,697 |

UDWR researchers recommended securing in captivity a representative sample of adults from Desolation Canyon. In 2009, 25 adults were taken to Ouray National Fish Hatchery, 12 remain. In 2011, six sites throughout Desolation Canyon were monitored for adults, 55 individual adults were encountered, but recaptures were too few to calculate a population estimate.

13






Figure 8.  Adult humpback chub population estimates with confidence intervals for four populations in the upper Colorado River Basin (note that the scale differs among the graphs for the different populations).  Clockwise from upper left: Desolation-Gray Canyons (from Badame 2011, 2012; Howard 2014); Black Rocks (from Francis and McAda 2011); Westwater Canyon (from Elverud 2011); and Cataract Canyon (from Badame 2008).

On the Colorado River of the upper Colorado River basin, three humpback chub populations are recognized.  Black Rocks and Westwater Canyon have enough exchange of individuals that they are considered a single core population.  In Black Rocks, estimates of wild adults have varied from about 800 in 1998, 900 in 1999, and 500 in 2000 and 2003 (Figure 8).  The most recent estimates, in 2007–2008 were 345 and 287, respectively.  During the fall of 2011 and 2012, 78 and 112 individual adult humpback chub were caught respectively - similar to the numbers caught in 2007 and 2008 (61 and 74, respectively).  Population estimates for Black Rocks for 2011 and 2012 were 379 and 403, respectively.  Researchers caution that 78 largemouth bass and the same number of gizzard shad were collected in Black Rocks in 2012.  This represents a ten-fold increase over the 2011 catch.  The Westwater Canyon estimates of wild adults range from about N = 4,700 in 1998 to N = 2,500 in 1999, 2000, to N = 1,525 in 2007–2008.  Although researchers link humpback chub declines in the upper portions of Desolation Canyon to increasing abundance of nonnative smallmouth bass there, a different mechanism appears to have impacted humpback chub in the Colorado River canyons.  The large declines in humpback chub densities in both Black Rocks and Westwater Canyons occurred in the late 1990's prior to more recent increases of nonnative predators in the Colorado River.

In 2008, the core population (Black Rocks/Westwater combined) dropped below the population size downlist criterion (MVP = 2,100 adults) for the first time.  In 2011, we saw some recovery

in those populations where the estimate for adults in Westwater Canyon alone was 1,467; however, UDWR reported 1,315 adults in 2012. The core population estimates in 2011 and 2012 were 1846 and 1718, respectively (Figure 9). Population estimates in both Black Rocks and Westwater canyons declined dramatically during the first population estimation rotation in the late 1990s, but have remained relatively stable since that time. Colorado State University's recent robust population estimate analysis more clearly indicated that declines in the Westwater and Black Rock humpback chub populations are due to lapses in recruitment, because adult survival rates have remained stable. Principal investigators agree that reinitiating an age-0 monitoring component is advisable. It should be noted that whatever is affecting humpback chub recruitment has not affected sympatric populations of native roundtail chub (a Conservation Agreement species). Roundtail chub populations in both canyons have remained stable or have increased since population estimation started. In addition to the potential and recent negative interactions between humpback chub and nonnative predators discussed above, both the Westwater and Black Rocks populations are at risk of potential chemical contamination due to the proximity of a railroad located on the right bank of the Colorado River which at times transports toxic substances.



Figure 9. Combined population estimates for humpback chub in Black Rocks and Westwater Canyon based on a robust open model created by Dr.'s Bestgen and White, Colorado State University. The 2002 Recovery Goal downlist criteria for these combined ("core population") estimates is 2,100 adults.

The Cataract Canyon humpback chub population is small, with estimates of about 150 wild adults in 2003 and 66 in 2005. Estimates are difficult to obtain in Cataract; therefore, catch-per-unit-effort (CPUE) has been determined to be an effective replacement (began in 2008 on a 2-years-on, 2-years-off sampling regime). In 2011, UDWR reported that the Cataract population appears to be stable with CPUE ranging between 0.010 and 0.035 fish/net-hour. In 2011 and 2012, sampling was reinitiated below the Big Drop rapids after a sampling hiatus in this reach since 2008. Biologists were interested in returning to this area because riverine habitat was being exposed with dropping Lake Powell surface elevation. No additional humpback chub were

encountered in the new riverine habitat. Due to high site fidelity often observed in humpback chub, it is likely that re-colonization of this recently created habitat would be slow (Howard 2013).

As part of a conservation measure included in the Service's 2011 Biological Opinion on Glen Canyon Dam Operations (USFWS 2011), Reclamation entered into an agreement with geneticists at Southwestern ARRC in late 2012 to genotype the humpback chub refuge population held at SNARRC. Results showed humpback chub in the lower basin are genetically diverse with insignificant inbreeding coefficients, high heterozygosity, and high allelic diversity (Wilson 2014). The average estimated genetic effective population size ($N_e$) varied between 899 and 1,437 depending on the survival rate. With the Grand Canyon adult humpback chub population estimated at 9,000–12,000, the analysis showed that about one tenth of the adult population contributes genetic information to the next generation (Wilson 2014).

The Service's status review of humpback chub completed in 2011 reported that 60% of the downlisting recovery factor criteria (USFWS 2002b) have been addressed to varying degrees; however, nonnative fish species and issues dealing with the potential chemical contamination of the river from spills and pipelines continue to be problematic.

Razorback sucker

The Recovery Program is rebuilding razorback sucker populations with hatchery stocks. As populations increase, the Program is beginning to generate mark-recapture population estimates on adult razorback sucker. Many stocked razorback sucker are being recaptured as part of other studies. Razorback sucker stocked in the Green and Colorado rivers have been recaptured in reproductive condition and often in spawning groups. Larval captures in the Green, Gunnison, and Colorado rivers document reproduction. Survival of larvae through their first year remains rare, largely due to a decrease in the availability of warm, food-rich floodplain areas and predation by a suite of nonnatives when the flood plain nursery habitats are available (Bestgen et al. 2011). However, occasional captures of juveniles (just over age-1) in the Green and Colorado rivers suggest that survival of early life stages is occurring. Collections of larvae by light trap in the middle Green River have generally been increasing since 2003; in 2013, the largest collection of light trapped larvae occurred (7,376; Figure 10). In 2011, researchers documented spawning by razorback sucker in the White River for the first time.



Figure 10.  Numbers of razorback sucker larvae collected in light traps in the middle Green River since 1993.

Since 1995, over 375,000 subadult razorback suckers have been stocked in the Green and upper Colorado River subbasins.  Two reports on survival estimates of stocked razorback sucker recommended stocking larger fish during spring, fall and winter (Zelasko et al. 2004; 2008).  From 2004–2007 approximately 96,400 fish were stocked and 1,511 recapture events from 1,470 unique individuals were encountered from 2005–2008.  In 2012, tag-reading antennas were placed on a spawning bar in the middle Green River near Dinosaur National Monument in northeast Utah.  Fifty-two unique razorback sucker stocked between 2004 and 2010 were detected, 88% of which had not been seen since stocking.  During sampling for Colorado pikeminnow estimates, 938 and 765 razorback sucker were captured in 2011 and 2012, respectively, for the Ouray to Green River, Utah reach of the main channel of the Green River. In the razorback sucker monitoring plan (Bestgen et al. 2012), estimates of large juvenile to adult razorback sucker in three reaches of the Green River ranged from 474 to over 5,000 within a reach.  Although these estimates are highly imprecise, they provide further confirmation that stocked fish are surviving in the wild.  Preliminary population estimates were generated for razorback sucker in the Colorado River as a whole (from Palisade, CO downstream to its confluence with the Green River), for adult fish >400 mm TL.  Data used to generate these razorback sucker population estimates was obtained during the Colorado pikeminnow population estimate studies done in 2005 and 2008–2010 (Figure 11).  The recently revised integrated stocking plan (Integrated Stocking Plan Revision Committee 2015) has essentially been being implemented since 2013, stocking fewer but larger razorback sucker.



Figure 11.  Preliminary population estimates of the adult razorback sucker in the Colorado River (Palisade, CO to the confluence of the Green River).  Error bars represent the 95% confidence intervals.

Three razorback sucker stocked in the San Juan River near Farmington, NM, for the San Juan Recovery Program were captured between Moab, UT and the state line with Colorado in 2008. This demonstrates that exchange of stocked razorback sucker between the San Juan River and the Upper Colorado River is certain, and may have ramifications for recovery criteria. Researchers have confirmed that hundreds of razorback sucker are using both transitional inflow areas and fully lacustrine (lake-like) habitats in Lake Powell. Razorback sucker are spawning in the lake and biologists have evidence that recruitment may be occurring.

The Service's status review of razorback sucker completed in 2012 reported that 85% of the downlisting recovery factor criteria (USFWS 2002c) have been addressed to varying degrees; however, nonnative fish species continue to be problematic.

Bonytail

Since 1996, over 450,000 tagged bonytail subadults have been stocked in the Green and upper Colorado River subbasins.  Stocking continues in an effort to reestablish populations in the upper Colorado River basin.  Until recently, very few of these stocked fish have been recaptured, most of those were captured shortly after they were stocked and in poor condition (Bestgen et al. 2008).  The bonytail reintroduction effort in the upper Colorado River basin has not been nearly as successful as the razorback sucker reintroduction efforts in the Upper Colorado and San Juan river basins.  The recently revised integrated stocking plan (Integrated Stocking Plan Revision Committee 2015), has essentially been implemented since 2013 stocking far greater (about 35,000) and larger bonytail (averaging 250 millimeters total length).

When the Recovery Program began, the bonytail had essentially disappeared and little was known about its habitat requirements.  Hatchery personnel continue to experiment with: 1)

improving fitness of hatchery fish prior to stocking; 2) stocking sites (e.g., floodplain habitats as opposed to the main channel); and 3) stocking times (e.g., recent research suggests that stocking when the river has warmed to bonytail spawning temperature could be advantageous). The changes in hatchery protocols have been captured in a revised Integrated Stocking Plan (Integrated Stocking Plan Revision Committee 2015).  In recent years, researchers have begun to see some encouraging results.  All stocked fish receive an internal microchip tag before being released in the wild.  Since 2009, an increasing number of bonytail have been detected at several locations throughout the Upper Colorado River Basin where stationary tag-reading antennas are used.  During high spring flows in 2011, more than 1,100 bonytail (16.6% of the 6,804 stocked in early April of that year) were detected by antenna arrays in the breach of the Stirrup floodplain on the Green River.  The Price-Stubb antenna array on the Colorado River detected 356 individual bonytail between November 2010 and September 2014.  The fish detected in fall 2011 had been stocked above Price-Stubb in Debeque Canyon, but in spring 2012, some of those fish were moving upstream through the fish passage.  In 2014, fewer than 10 were moving upstream, the majority were either downstream or the direction could not be determined (Francis and Ryden 2014)

The Service's status review of bonytail completed in 2012 reported that 72% of the downlisting recovery factor criteria (USFWS 2002d) have been addressed to varying degrees.

**B.**   **Program Accomplishments, Areas of Concern, and Recommended Action Items**

Recovery Program participants accomplished a number of important objectives in 2014 and early 2015. These accomplishments are described in Table 2 below. Following that is Table 3, which describes Service concerns about shortcomings in the progress of some ongoing and future recovery actions and outlines action items recommended by the Service to address those concerns/shortcomings. The second column in both of these tables identifies *how* Program accomplishments are meeting or falling short of the criteria used by the Service to evaluate whether the Recovery Program is making "sufficient progress" toward recovery.  Those criteria are:

1. actions which result in a measurable population response, a measurable improvement in habitat for the fishes, legal protection of flows needed for recovery, or a reduction in the threat of immediate extinction;
2. status of the fish populations;
3. adequacy of flows; and
4. magnitude of the impact of water projects.

More detail about Program accomplishments and shortcomings can be found in the final March 24, 2015, assessment of accomplishments and shortcomings of the Recovery Program under the Recovery Implementation Program Recovery Action Plan (RIPRAP) from February 1, 2014, through January 31, 2015 (see assessment column in the tables to the RIPRAP).

### Table 2. SIGNIFICANT ACCOMPLISHMENTS
(February 1, 2014, through January 31, 2015)

| Accomplishment | Sufficient Progress Criteria Affected |
|---|---|
| **General – Upper Basin-wide** | |
| Program participants (UDWR, CPW, CSU, FWS) continued removing nonnative fish and disrupting spawning in riverine habitats under 2014 nonnative fish management projects. Electrofishing crews exploited smallmouth bass in post-peak flows on the Yampa, and focused additional removal on northern pike in the Colorado River near Rifle Creek and on smallmouth bass in the White River. Colorado successfully removed pre-spawning northern pike in Yampa River backwaters via netting and expanded this work in 2015. Additional walleye removal passes were conducted on the lower and middle Green and Colorado rivers in 2014 and continue in 2015. | 1 – Reduce threat of extinction by removing more nonnative fishes. |
| Management Committee and Service representatives met with Wyoming, Utah and Colorado's oil and gas representatives to discuss concerns about regulations and spills in priority (spawning) areas. The Program is working with EPA to prepare an updated GIS map layer of endangered fish spawning sites and other important habitats to assist States in identifying sensitive areas. | 1 – Reduce threat of extinction by reducing risks of hazardous spills in endangered fish spawning habitat. |
| The Program's hatchery program continues to incorporate new information (e.g. stocking fish near their preferred spawning temperature presumed to be physiologically optimal) on survival of stocked fish and meet or exceed most of its targets for producing and stocking bonytail and razorback sucker. | 2 – Improving status of fish populations through stocking. |
| Antennas that detect PIT tags implanted in endangered fish have been placed in several locations throughout the upper basin, increasing tag detections significantly. Researchers are incorporating some of these data into demographic analyses (though not all antenna data are suitable for use in population abundance estimates). | 2 – Improving ability to detect status of fish populations. |

| Accomplishment | Sufficient Progress Criteria Affected |
|---|---|
| Working with the Upper Colorado and San Juan Programs, Reclamation contracted with Colorado Natural Heritage Program to develop a basin-wide online data system of fish capture and detection records. The conceptual design for the database, now named Species Tagging, Research and Monitoring System (STReaMS), was shared at the January 2015 Researchers Meeting and a beta version was released in March. | 2 – Improving ability to detect status of fish populations. |
| **Green River** | |
| 2014 was characterized as an average runoff year for inflows to Flaming Gorge Reservoir. Reclamation operated Flaming Gorge Dam under the ROD and Biological Opinion to meet or exceed a target of 18,600 cfs at Jensen, Utah. This was the third year of operating under the Larval Trigger Study Plan [LTSP] for peak releases. During larval razorback sucker presence, flows were above 18,600 cfs for 4 days and above 14,000 cfs for another 20 days, providing possible larval access to the Stewart Lake, Above Brennan, Old Charley Wash, Thunder Ranch, Bonanza Bridge, Johnson Bottom, Stirrup, and Leota 7 wetlands. The Recovery Program detected wild-produced razorback sucker larvae on May 28, 2014 (Bestgen et al. 2014). Reclamation began their ramp-up to bypass flows on May 30, 2014, achieving a peak release of 8,600 cfs, and initiated ramp down to base flows 15 days later when Yampa River flows no longer supported meaningful floodplain connection in Reach 2. The Green River at the town of Green River did not meet the average peak flow of 22,000 in 2014, but peaked at 20,600 due in part to low snowpack in the Duchesne and Price River tributaries. Baseflows met average-wet categories for reach 2 and 3. | 1 – Improve habitat and reduce threat of extinction; 3 – Improve flows; 4 – Reduce magnitude of project impact. |
| UDWR biologists used floodgate structures to control flows and picket weirs to exclude large-bodied nonnative fishes at Stewart Lake. Stewart filled to capacity during the larval drift period and then was drained in September 2014, beginning 92 days post-initial connection. A total of 749 razorback suckers were sampled returning to the river during drawdown of the wetland. Razorback larvae or young-of year were confirmed in all monitored wetlands connected via LTSP releases in 2014, indicating successful entrainment of larvae to all floodplain sites of interest. Specifically, light traps confirmed razorback larvae in above Brennan, Escalante Ranch, Stewart Lake, Leota 7 and the Stirrup. At the actively managed wetland Stewart Lake, UDWR provided adequate habitat for razorback throughout the summer. When Stewart was drained in September, although nonnative fish made up the majority of biomass (110,299 mostly small-bodied fish), UDWR collected 749 razorback suckers during sampling (only a portion of drainage flows were sampled). The fish released back to the Green River had a mean length of 97mm TL, with some fish reaching lengths of 160+mm, indicating substantial growth while in Stewart and improving these individuals' chances of overwinter survival. Later that fall, UDWR collected age-0 razorback in in-channel habitats, documenting that the species was residing in the river. More importantly, in spring 2015, UDWR collected healthy age-1 razorback – representing the first wild age-1 fish in decades! For the second consecutive year, Stewart Lake has demonstrated the enormous potential of managed wetlands for razorback sucker recovery under the Larval Trigger Study Plan. | 1 – Improve habitat and reduce threat of extinction; 2 – Improve status of fish population. |
| To further improve razorback sucker recruitment, the Service funded improvements to the Johnson Bottom floodplain on the Ouray National Wildlife Refuge so it can be operated similar to Stewart Lake. Construction was completed in spring 2015. | 1 – Improve habitat and reduce threat of extinction; 2 – Improve status of fish population. |
| UDWR continued work to reduce nonnative fish escaping from Starvation and Red Fleet reservoirs. A temporary screen was installed at Starvation in 2014 and maintained in 2015 with permanent screen construction planned for 2016. | 1 – Reduce threat of extinction by preventing escapement of nonnative fishes. |

| Accomplishment | Sufficient Progress Criteria Affected |
|---|---|
| UDWR is working with stakeholders to develop a lake management plan for Red Fleet and plans to rotenone this reservoir in 2015. | |
| **Yampa River** | |
| The 2014 water supply forecast for May - July was 129% of average for the Yampa River at Maybell and flows peaked at 13,100 cfs. With an average flow August through October of 506 cfs, the Program only called for release of 1,578 af from Elkhead Reservoir (July 20 -23) to facilitate a final nonnative fish removal trip. With the 200 cfs flow target being met at Maybell, the Recovery Program did not need additional water, thus, 4,361 af was left in Elkhead for recreation. | 1 – Improve habitat through augmented flows; reduce threat of extinction by hindering smallmouth bass recruitment and removing nonnative fishes. |
| Program participants discussed chemical reclamation of Elkhead Reservoir, but based on public concerns and the need for a permanent solution to nonnative fish escapement, have approved screening the reservoir. Chemical reclamation is an option if screening is not effective. Colorado and the Program have committed funds for screening, and Colorado hopes to install the net prior to spring runoff in 2016. Colorado also is revising the Elkhead Lake Management Plan to establish a fishery compatible with endangered fish recovery. | 1 – Reduce threat of extinction by preventing escapement of nonnative fishes. |
| The Service urged Colorado to develop and implement a comprehensive suite of nonnative fish management actions (as an alternative to must-kill regulations, which Colorado has not wanted to pursue). CPW convened a working group of stakeholders in November 2014 and additional meetings in 2015.  This group has suggested a comprehensive suite of actions that will be submitted to CPW Director Bob Broscheid. | 1 – Reduce threat of extinction by reducing nonnative fishes. |
| **Duchesne River** | |
| DOI has a lease for up to 1,500 af of water in Big Sand Wash to support base flows; lease exercised for the third year in a row in 2014 (979 af released). Flows from Daniels Diversion continue to be delivered. | 1 – Improve habitat through augmented flows; 3 -- Improve flows. |
| The Service, UDWR, and local water users completed a Candidate Conservation Agreement with Assurances (CCAA) and Safe Harbor Agreement (SHA) for the water users between Knight Diversion, Starvation Dam and the Myton Diversion. These agreements formalize the process for protecting flows released in support of base flows and protect water users from potential take of endangered fish that use the newly constructed fish passage at the Myton Diversion. | 1 – Improve habitat through augmented flows; 3 – Improve flows. |
| **Colorado River** | |
| With a 2014 snowpack of 132% of average, the peak flow target was in the wet category in the 15-Mile Reach. Coordinated Reservoir Operations was not conducted due to concern for flooding in Grand Junction. The peak target was 23,500 cfs and the actual peak was 25,300 cfs. The 2014 baseflow target was 1,630 cfs and the average flow for August – October was 1,852 cfs. A total of 94,655 af was provided for baseflow augmentation in 2014. | 3 – Improve flows; 4 – Reduce magnitude of project impact. |
| Reclamation and the municipalities of Grand Junction, Palisade, and Fruita have had municipal-recreation agreements in place that allow the State Engineer to protect deliveries of additional Orchard Mesa Check Settlement water and Grand Valley Water Management Plan water from Green Mountain Reservoir since 2001. In early 2015, Reclamation and the municipalities signed a 40-year agreement to accommodate as much as 66,000 af (the entire Green Mountain HUP pool). Under the previous agreements, Reclamation delivered as much as 61,433 af/year (55,594 delivered in 2014). | 3 – Improve flows; 4 – Reduce magnitude of project impact. |

| | |
|---|---|
| Thirty-three canal check structures were constructed on the Orchard Mesa Irrigation District (OMID) in 2014, resulting in saved water beginning in 2014. The canal automation regulating reservoir construction is scheduled to be completed in 2017. The saved water will be delivered to the 15-Mile Reach of the Colorado River. | 3 – Improve flows; 4 – Reduce magnitude of project impact. |
| Initial population estimates of razorback sucker >400mm TL from the Colorado River indicate that the population ranged between 656 and 2,035 from 2005-2010. A total of 661 unique razorbacks were captured in the Colorado River in 2013 and 835 were captured in 2014 during Colorado pikeminnow population estimates. The Program will conduct a species status assessment to be completed in 2016 to determine if the species is eligible for downlisting. | 2 – Status of fish populations improved. |

Table 3. **SERVICE CONCERNS AND RECOMMENDATIONS** (focused on February 1, 2014, through January 31, 2015)

| Service Concern | Sufficient Progress Criteria Affected | Recommended Action Items (see also Appendix table of nonnative fish management actions) |
|---|---|---|
| **General – Upper Basin-wide** | | |
| Preliminary results from the most recent rotation (2011-2014) of Colorado pikeminnow population estimates indicate adults and sub-adults are in decline throughout the entire Upper Colorado River basin, especially in the Yampa and Colorado rivers. Catch of sub-adults and adults in the Colorado River in 2013 and 2014 were near lowest observed in the history of this project. Decline of Colorado pikeminnow in the Yampa and Colorado rivers has been linked to the persistence of nonnative predators. Large-bodied predatory species of concern also appear to be expanding in other segments of critical habitat, and illegal introductions of nonnative species continues to expand. In 2012, the Colorado Pikeminnow Recovery Team was convened to review new information for Recovery Plan revisions. The team's preliminary assessment indicated that persistent low numbers of adult Colorado pikeminnow in the Yampa River may be caused by unacceptable densities of nonnative predators and that more effective management of nonnative fishes must occur before downlisting can be considered. The Service concurred. | 1– Increases threat of extinction; 2 – Declining status of fish populations. | The persistent and prolonged threat of expanding nonnative fish populations needs to be ameliorated. The Recovery Program needs to fully implement the comprehensive *Upper Colorado River Basin Nonnative and Invasive Aquatic Species Prevention and Control Strategy* and continue work with the States to implement the specific, tangible actions added to the RIPRAP in 2013 (see Appendix table), which in the aggregate have a high likelihood of stopping the expansion of invasive species and of reducing existing concentrations. Reductions in nonnative fish populations should allow expansion of the range of Colorado pikeminnow, increase survival of pikeminnow of all age classes, and reduce competition for forage for pikeminnow. |
| Downward trends in some humpback chub populations (particularly Yampa Canyon and in Desolation Canyon of the Green River) have been attributed to increased nonnative fish abundance and habitat changes associated with dry weather and low river flows. Declines in adult humpback chub catch rates for sites in the upper 45 miles of Desolation Canyon correlate strongly to the appearance and persistence of a smallmouth bass population and recent increases in number of walleye. Declines in the proportion of first year adults (200–220 mm TL) support the idea that smallmouth bass and walleye predation may be suppressing the smaller *Gila*. | 2 – Declining status of fish populations. | The Recovery Program has committed to reducing nonnative impacts to the humpback chub population in Yampa Canyon since 2001. In 2004, the Recovery Program transitioned Project 110 from a nonnative catfish control effort in Yampa Canyon to smallmouth bass removal. That effort is ongoing and is complemented by similar efforts both upstream (Projects 125, 98a, and 98b) and downstream (project 123a). In Desolation Canyon, smallmouth bass, walleye, and other nonnative species are removed during Colorado pikeminnow population estimates (Project 128) and during specific nonnative control trips conducted under Project 123b. The Program should complete recommendations for and implement humpback chub broodstock development. |

| | | |
|---|---|---|
| In 2008, the largest humpback chub population in the UCRB, the Black Rocks/Westwater core population for the first time dropped below the population size downlist criterion (MVP = 2,100 adults). In 2011, some recovery was seen with an adult population estimate of 2,157 in Westwater Canyon; however, UDWR reported a decline to 1,507 adults in 2012. The most recent Black Rocks adult population estimates in 2007–2008 were 345 and 287, respectively. During the fall of 2011, 78 individual adult humpback chub were caught in Black Rocks and 112 in 2012, similar to the numbers caught in 2007 and 2008. CSU recently conducted a robust population analysis using Program MARK to generate population and survival estimates and capture probabilities for adult humpback chub captured for Westwater Canyon and Black Rocks combined from 1998 – 2012. These core population estimates were 1,846 and 1,718 for 2011 and 2012, respectively. CSU's analysis more clearly indicated that declines in the Westwater and Black Rock humpback chub populations are due to lapses in recruitment (i.e., adult survival rates have remained stable). PIs agree that reinitiating an age-0 monitoring component is advisable. | 2 – Declining status of fish populations. | The Program needs to determine how to investigate age-0 and age-1 humpback chub mortality (especially in Black Rocks/Westwater and Desolation canyons) as recommended in the Research Framework. The difficulty in working with these size classes is they can't be identified to species. The Program should develop a scope of work to investigate age-0 and age-1 humpback chub mortality. The Service recognizes that a first step in such investigations will be to test and refine as needed age-0 sampling techniques that were effective in the 1990's when young chub were more plentiful. As conditions allow, 200 age-0 *Gila* will be brought into captivity from Black Rocks/Westwater to develop a humpback chub broodstock. |
| Despite the Recovery Program's extensive removal efforts, nonnative aquatic invasive species continue to threaten survival and recovery of the endangered fishes in the upper Colorado River basin. Basin-wide, weak year classes of smallmouth bass were produced in 2014, a result of average to above-average flows. However, crews still removed large numbers of smallmouth that were produced in the strong year classes of 2012 and 2013 (lower water years). Collections of adult smallmouth bass were very high in canyon habitats in 2014, potentially representing a range expansion of adult fish. Northern pike numbers have been largely uncontrolled, and strong year classes, such as 2011, have saturated ecosystems. Crews are now removing pre-spawn fish in the densest portions of the Yampa to control riverine reproduction. Catches of walleye have increased in the lower Green and lower Colorado over the past decade. Catch locations overlap with nursery areas for endangered fish, representing a potential impairment to recruitment. Crews documented | | The Service agrees that the impacts of non-native fish on recovery of the listed species must be controlled. Northern pike and smallmouth bass removal evaluations were completed in 2014. Both final reports indicate the focus of removal should be on preventing reproduction and immigration. Therefore, in-river removal now focuses on smallmouth bass spawning areas once rivers reach adequate temperatures and on removing a large number of pre-spawn northern pike via nets (before flows allow for boat access). To combat immigration from reservoir sources, Program Partners are implementing the comprehensive *Upper Colorado River Basin Nonnative and Invasive Aquatic Species Prevention and Control Strategy*. Adequate progress has been made to control nonnative predator escapement from Elkhead, Rifle Gap, Red Fleet, and Starvation Reservoirs. Utah and Wyoming have implemented must-kill policies |

| | | |
|---|---|---|
| walleye predation on two juvenile pikeminnow in 2014. Spring 2014 light trap samples from the lower Green River documented two larval walleye, likely representing the first documented instance of successful in-river reproduction. Escapement from reservoirs has been deemed adequate to overcompensate for in-river removal efforts. Therefore, the Program is investigating the feasibility of screening many reservoirs with populations of problematic species and working with state partners to revise lake management plans for fisheries to replace the problematic species. | | to support nonnative predator removal. However, CPW believes this is not appropriate in Colorado.  If CPW is unwilling to pursue must-kill regulations throughout the Upper Basin in Colorado, we urge the state to pursue a comprehensive suite of alternative actions, in concert with Program partners, to achieve the necessary biological outcome. In November 2014, CPW convened a NNF Management Work Group to start developing that suite of actions – meetings continued in 2015 and the group has recommended a comprehensive suite of actions for submittal to CPW Director Broscheid. |
| **Green River** | | |
| Delays in development of Reclamation's revised Green River hydrology model caused Utah to revise the Green River Flow Protection schedule last year. In 2014, Utah's Green River Utah Water Acquisition Team (GRUWAT) completed the combination of the Bureau of Reclamation's Flaming Gorge Operations Riverware model (monthly timestep) with Utah's MODSIM model (daily timestep) and moved Green River flow protection to a policy committee within the State. | Delays 1 – Legal protection of flows needed for recovery. | Maintain revised schedule to implement flow protection in FY 16-17. |
| Old Charley Wash, an important 'dry year' sampling site identified in the Larval Trigger Study Plan is currently unavailable as the Service has as of yet been unable to renew lease with Northern Ute Tribe. | Hampers ability to 1 – Improve habitat through augmented flows | Service will continue to pursue government-to-government consultation with Northern Ute Tribe and request that the lease be renewed. |
| Walleye captures have increased in middle and lower Green River. An illegal population of walleye in Red Fleet Reservoir is a problematic source of this species entering the Green River. Smallmouth bass catch rates in Desolation Canyon were the highest ever recorded in 2014. A source of white sucker was discovered at Browns Park WMA in 2014 and should eventually be eradicated. . | 1 – Increases threat of extinction. | Red Fleet Reservoir has been recommended for reclamation (rotenone) and a new Lake Management Plan is being drafted. UDWR adjusted work to add spring and fall passes for walleye and gizzard shad removal in the lower Green River in years when Colorado pikeminnow population estimates are not conducted. UDWR added passes for walleye in the middle Green River in the spring. UDWR will pursue an eradication plan for white sucker at Browns Park. UDWR will continue to remove smallmouth bass in Desolation Canyon and monitor the population. |
| **Yampa River** | | |
| CWCB still needs to provide the accounting of past depletions for the Yampa River due in 2010; a back-casted baseline of current depletions; and a recommendation and justification addressing projected future depletions and whether or not | Hampers ability to 3 – Determine adequacy of flows. | CWCB is scheduled to complete accounting of past depletions using the StateCU model (Due date from YPBO - 1st report July 1, 2010; 2nd report July 1, 2015). The depletion accounting report will include a discussion |

| | | |
|---|---|---|
| additional instream flow filings or other flow protections mechanisms should be considered. | | of the need for flow protection (which would require a peak flow recommendation). The irrigated acreage assessment was completed. Another contract was awarded to update the dataset. The models will be updated through at least 2012. Colorado has placed a high priority on the Yampa and Colorado river basins portion of this work. |
| Efforts to reduce densities of smallmouth bass in Little Yampa Canyon and other reaches of the Yampa River appear to be hampered by the immigration of smallmouth bass adults and recruits from adjacent reaches, particularly upstream sources that sustain propagule pressure and the proliferative/invasive capacity of this species. Escapement of adult smallmouth bass from Elkhead Reservoir remains problematic. A weak year class of smallmouth bass was produced in 2014, a result of average to above-average flows. However, crews still removed large numbers of smallmouth that were produced in the strong year classes of 2012 and 2013 (lower water years). Collections of adult smallmouth bass were very high in Yampa Canyon 2014, potentially representing a range expansion of adult fish. | Hampers ability to 1 – Reduce threat of extinction by decreasing numbers of nonnative fish. | CSU completed the programmatic synthesis of smallmouth bass removal efforts, providing a comprehensive evaluation of the Program's removal efforts. The expanded Yampa River "surge" effort to target smallmouth bass was continued in 2013 and 2014. The Service recommends that CPW and the Recovery Program eliminate the release of nonnative predators over the Elkhead Reservoir spillway and that CPW revise the lake management plan to transition to a compatible reservoir sportfishery. Although a brief unscreened spill occurred at Elkhead Reservoir during the above average runoff of 2014, the CRWCD has done an excellent job of managing reservoir elevations to avoid spills in recent years. |
| Efforts to reduce densities of northern pike in the Yampa River appear to be hampered by immigration from upstream sources (Catamount, Elkhead, and the upper river) and ongoing in-river reproduction. | Hampers ability to 1 – Reduce threat of extinction by decreasing numbers of nonnative fish | The Service recognizes that pike removal was expanded up to Steamboat Springs in 2014. CSU completed a programmatic synthesis of northern pike removal efforts (2004-2010) to evaluate current removal efforts in the context of northern pike life history throughout the Yampa River drainage. Spring netting of connected backwaters in 2014 proved an effective method for removing pre-spawn adults. The Service recommends that such netting efforts be continued and expanded in 2015. The Service agrees that Program partners' focus on controlling escapement of nonnative predators from Elkhead Reservoir and CPW's revision of their lake management plan to transition to compatible sportfishery are appropriate recovery actions. CPW should continue to undertake the pike removal project at Catamount and should remove any pike from Stagecoach during their standard sampling (i.e. discontinue tagging). CPW has committed to these actions. |

| Duchesne River | | |
|---|---|---|
| Extent of contribution of smallmouth bass or walleye produced in the Duchesne River below Starvation and entering Green River remains unknown.  Nonnative fish are not currently being monitored or removed from the Duchesne River due to access issues. | 1 – Increases threat of extinction. | The Service supports efforts to maintain a temporary screen below the Starvation spillway until a permanent screen can be installed (projected for 2016).  The Service will continue to pursue government-to-government consultation with Northern Ute Tribe so that in-river removal nonnative control can be resumed |
| **White River** | | |
| The schedule outlined in the approved scope of work for developing the White River Management Plan has slipped. | Hampers ability to 1 – Improve habitat through protected/augmented flows; and 3 – Inadequacy of flows. | The Service strongly encourages better progress on the development of this management plan. We recommend that the PDO work with CWCB to track progress more closely. We appreciate that CWCB has secured $250,000 from their Species Conservation Trust Fund to help with modelling, writing, and presentations of the management plan and continues to work on contracting. Previously established due dates were model completion fall 2014; plan completion winter 2015; and PBO summer 2015. Dates should be revised with contractor. |
| Smallmouth bass abundance has increased in the White River. Sampling in 2012 indicated that bass densities are highest in the uppermost section below Taylor Draw Dam and tapered off to relatively low densities approximately 20 miles downstream. Sampling in 2013 shows that fish spawned in 2012 in the White River were captured further downstream into Utah, resulting in a large increase in fish captured in that reach during 2013. A weak year class of smallmouth bass was produced in 2014, a result of average to above-average flows. However, crews still removed large numbers of smallmouth that were produced in the strong year classes of 2012 and 2013 (lower water years). Efforts to reduce the abundance of smallmouth bass through electrofishing were as high as the Program budget allowed in 2013 and 2014. | 1 – Increases threat of extinction. | Efforts to reduce the abundance of smallmouth bass were intensified in 2013 and again in 2014 with increased effort by both the Service and CPW in the Taylor Draw to Douglas Creek reach in 2014.  *See recommended action item identified for General Concern #1.* The Recovery Program continues to support and encourage the multi-agency effort to designate the White River as native fish conservation area. |

| Colorado River | | |
|---|---|---|
| The Recovery Program still struggles to meet flow recommendations in drought years. The Service emphasizes the importance of meeting the flow recommendation. | Hampers ability to 1 – Improve habitat through augmented flows; and 3 – Inadequacy of flows. | The Program is working to improve the overall strategy for flow augmentation in the 15-Mile Reach to be considered each spring and adjusted as the year progresses, addressing all possible sources of water, priorities, antecedent conditions, projected flows and supplies, including OMID, Grand Valley Project, CFOPS, etc. In 2015, Ute Water Conservancy District proposed leasing up to 12,000 af of water to CWCB for an instream flow. In addition, the OMID Canal Automation Project is expected to provide about 17,000 af of water in most years. The check structures in the OMID project are complete and partial water savings became available in the 2014 (current) irrigation season. The project will be fully implemented in 2016. |
| CWCB still needs to provide the depletion accounting report that was due July 1, 2010. | Hampers ability to 3 – Determine adequacy of flows. | *See first item under Yampa River.* The Service recommends that CWCB provide a depletion accounting progress report to be included in the 2015 review of the 15-Mile Reach PBO. Completion date for the 2015 review is Dec.31, 2015. |
| CFOPs report (evaluation of options for providing and protecting additional peak flows to the 15-Mile Reach) overdue. | Hampers ability to 1 – Improve habitat through augmented flows; and 3 – Improve flows. | CFOPS Phase III draft report distributed April 2, 2014 and comments received; revised draft most recently due December 31, 2014 (final by March 2015), but pending hiring contractor to complete in fall 2015. CFOPS report should be included in the 2015 review of the 15-Mile Reach PBO (see above row). |
| Walleye captures in the Colorado River went from being 'rare' during 2003-2009 to 'common' in 2010, and then increased dramatically in 2013 and 2014. Distribution within the lower reach in 2010 appeared to be restricted below RM 80; however, by 2013 and 2014, captures extended upstream to RM 112, indicating an upstream range expansion. Unlike smallmouth and largemouth bass, whose primary distribution is in the upper reach, walleye directly overlap in habitat with small size classes of both Colorado pikeminnow and razorback sucker. In fact, crews documented walleye predation on two juvenile pikeminnow in 2014. | 1 – Increases threat of extinction. | The Service agrees with the additional effort to target walleye expended in the lower Colorado in 2014 and with similar or greater efforts in 2015. |

| Gunnison River | | |
|---|---|---|
| The high density northern pike source population in Crawford Reservoir remains of extreme concern due to its invasive potential in the Gunnison River. | 1 – Increases threat of extinction. | The Service supports CPW initiation of mechanical removal of northern pike from Crawford in 2014, which removed an estimated 74% of the adult population. The Service recommends continued removal in 2015. Crawford Reservoir does not connect unless it spills. Every effort should be made to ensure that the Gunnison River remains a native fish stronghold. |
| Illegal introduction of smallmouth bass in Ridgway Reservoir was confirmed in 2013. Sampling demonstrated multiple size classes, but low densities of adult fish, indicating the population may be expanding from initial introduction. Densities of smallmouth bass near the spillway were high, indicating a high risk of escarpment from reservoir spilling. | 1 – Increases threat of extinction. | The Service applauds the efforts of Tri-County Water Conservancy District (which successfully avoided a spill in 2014 and so far in 2015) and recommends spills continue to be avoided in the future. The Service supports CPW regulatory actions to implement unlimited bag and possession limits for smallmouth bass at Ridgway and added information concerning the illegal introduction and its effects to the 2015 Fishing Guidebook. Long-term solutions will be addressed in the report of the CPW Nonnative Fish Workgroup due in 2015. |

Recovery Program participants need to actively pursue completion of the aforementioned action items. The Service requests that responsibilities and timeframes be identified for each action item and regular progress reports be provided to the Management Committee on these action items and their effect on meeting RIPRAP schedules.

## C.    **Conclusion on Sufficient Progress**

The Service recognizes significant accomplishments have occurred over the course of the past year, including:

1) Continued cooperation to manage spring (particularly Larval Trigger Study Plan operations at Flaming Gorge Dam) and base flows throughout the basin;

2) Reclamation's efforts to meet endangered fish flow targets under their 2012 Aspinall ROD;

3) Continued attention to addressing off-channel sources of nonnative predators (e.g., reaching agreement with communities in northwestern Colorado to screen the spillway at Elkhead Reservoir and shift the reservoir fishery to a more compatible species assemblage; continued  efforts to contain nonnative escapement at Starvation Reservoir until a permanent solution can be constructed; development of a compatible management plan for Red Fleet Reservoir including nonnative eradication and stocking of compatible species; coordination with water users at Ridgway Reservoir to contain spring spills and implementation of a fishing tournament that removed large numbers of smallmouth bass; and increased northern pike removal efforts at Stagecoach Reservoir);

4) Meeting razorback sucker and bonytail stocking targets; and

5) Continued encouraging reports of an expanding population of razorback sucker throughout the Upper Basin, including reports of 729 wild-produced young that were entrained and reared in Stewart Lake in spring 2014 and released to the Green River.

The Service also recognizes the efforts of Program partners to augment the 2014 Work Plan, including: a) Reclamation's contributions to endangered fish investigations in Lake Powell which continue to produce encouraging information about the expanding Upper Basin razorback sucker population; b) CWCB's contributions from their Species Conservation Trust Fund to supplement nonnative fish control; and c) the Service's contribution via their Cooperative Recovery Initiative to improve nursery habitat for the endangered fish at Johnson Bottom on the Ouray National Wildlife Refuge.

Despite good cooperation among Program partners and a comprehensive suite of recovery actions, the Service remains concerned with recent reports of low densities of Colorado pikeminnow in the Green and Colorado River subbasins. And we remain concerned over low numbers of humpback chub in many Upper Basin locations. We believe several specific recovery actions should receive greater attention in the coming year. We categorize those actions under: 1) nonnative fish management; 2) flow management; and 3) reducing endangered fish entrainment in irrigation canals, as follows.

*Nonnative Fish Management*

Overall, the Service is very pleased with the Program's progress on the action items developed during our review last year. We applaud Colorado Parks and Wildlife (CPW) for convening a Nonnative Fish Management Work Group to discuss and develop public outreach strategies to communicate the importance of compatible sport fisheries. The group met for the first time in November 2014 and eventually focused on submitting necessary changes in fishing regulations to the Colorado Wildlife Commission and developing a harvest incentive strategy to reduce the worst-of-the-worst nonnative predators. Both of these actions have been implemented and we now await the Wildlife Commission's decision on harvest regulations. The Work Group also recommended and CPW effectively implemented a smallmouth bass tournament at Ridgway Reservoir. We encourage CPW to follow through on the group's effort by submitting final recommendations to the CPW director in 2015. We also encourage Program partners to follow through on the extensive coordination that occurred in 2014 and which led to a decision to install a net on the Elkhead Reservoir spillway to further reduce escapement of nonnative northern pike and smallmouth bass. We understand that a net will be installed prior to spring runoff in 2016.

*Flow Management*

As was the case in our 2014 Sufficient Progress review, the Service remains concerned that the timeline for development of a White River management plan continues to slip. We appreciate CWCB's contributions from their Species Conservation Trust Fund to eventually contract a consultant to lead this effort. And we fully understand that considerable effort has been expended over the course of the past year to secure that contract, but nevertheless a contractor has not yet been retained. It is of critical importance that a contractor be hired and that the necessary hydrologic modelling be started by our next sufficient progress review. Such a plan will provide the Service and water users with clear definition of a level of future water development that can rely on the Recovery Program for ESA compliance. Further, that management plan will be the mechanism through which endangered fish flow recommendations can finally be approved for this important tributary to the Green River.

We also encourage Program partners to continue to pursue protection of endangered fish flows in the Green River now that the Green River Utah Water Acquisition Team's modeling efforts are complete. Finally, we ask that Program partners to continue to explore flexibility in operations and storage throughout the upper Colorado River drainage, particularly during dry years and with respect to priorities and antecedent conditions, to reduce the amount of time flows drop below 810cfs in the 15-Mile Reach.

*Endangered fish entrainment at irrigation canals*

The number of endangered fish detected in the Green River irrigation canal (Tusher Wash Diversion) in 2013 was astonishing. We understand that detections of endangered fish were fewer during the higher flows experienced in 2014 and that the Recovery

Program funded an important canal salvage effort following the 2014 irrigation season, which yielded only one Colorado pikeminnow. The Service applauds the Biology Committee on their important decision this past winter to endorse a weir-wall type solution for the Green River canal, which is similar to the solution implemented by the San Juan River Recovery Program at the Hogback Diversion. We agree that prior to construction at the Green River canal, the San Juan project should provide proof of concept, but we encourage the Upper Colorado Program to act as quickly as reasonably possible.

The Service shares the Recovery Program's concern about the number of native and endangered fish salvaged each year from Grand Valley canals following the irrigation season. We don't know if the screens at the GVIC, GVP, and Redlands diversions can be operated more frequently, but we implore Program partners to thoroughly investigate this issue to determine if and how the Recovery Program can assist the irrigation companies to further reduce entrainment.

The Recovery Program has made strong progress in protecting flows and restoring habitat and has demonstrated strong resolve to manage nonnative fishes in recent years. Four of the 18 accomplishments listed in the table above relate to nonnative fishes, as do 11 of the 19 concerns. As recognized for several years, the Service senses that the Recovery Program is at a critical juncture in its nonnative fish management activities and must build on recent momentum to insure significant progress on this front. Therefore, the Service strongly encourages Program participants to push hard to implement the actions needed to manage problematic nonnative fishes and prevent new problematic species and any resurgence of existing problematic nonnative fishes. The Service will assist and support the Program by identifying accomplishments and important recovery actions that remain as we revise the Colorado River endangered fish recovery plans.

The Service is confident that with continued cooperation by all Recovery Program participants, the Recovery Program will continue to make significant strides toward recovery of the four endangered fishes. Based on evaluation of the status of the fish, provision of flows during drought periods, magnitude of depletion impacts, the focus on nonnative threats, and cumulative Recovery Program accomplishments and shortcomings, the Service concludes that when implemented as Conservation Measures (i.e., part of the proposed action), the Recovery Program is making sufficient progress to continue avoiding the likelihood of jeopardy resulting from depletion impacts of new projects that have an annual depletion of up to 4,500 acre feet[2]. And,

---

[2] The 15-Mile Reach programmatic biological opinion covers an average depletion of up to 1 million acre-feet per year of existing depletions (through September 30, 1995) and up to 120,000 acre-feet of new depletions (since September 30, 1995) in the Colorado River above the confluence with the Gunnison River. The Yampa River programmatic biological opinion covers an average depletion of up to 168,000 acre-feet per year of existing depletions and up to 53,000 acre-feet per year of new depletions. The Gunnison River PBO covers all existing water depletions in the Gunnison River Basin (estimated annual average of 602,700 acre-feet/year) and future depletions up to 3,500 AF basinwide as well as future depletions up to 22,200 AF in the upper Gunnison Basin in accordance with the Upper Gunnison Basin Subordination Agreement and 12,200 AF in the Dallas Creek Project which has been contracted for but is not used at this time.

continued avoidance of jeopardy for the water projects and depletions currently provided with ESA compliance by the Program, i.e., 2,037 projects depleting 2.86 million AF/YR. Projects exceeding 4,500 acre feet or that have direct or indirect effects in addition to water depletions will be evaluated to determine if they jeopardize the species' continued existence on a case by case basis.

This concludes the Service's 2014-2015 assessment of progress. Specific questions about sufficient progress should be directed to Tom Chart, Recovery Program Director, 303-236-9885, tom_chart@fws.gov or Angela Kantola, Deputy Director, 303-236-9882, angela_kantola@fws.gov.

## II.   IMPLEMENTATION OF ITEMS IN THE 15-MILE REACH AND GUNNISON RIVER BASIN PROGRAMMATIC BIOLOGICAL OPINIONS

### A.   15-Mile Reach

On December 20, 1999, the Service issued a final programmatic biological opinion for the Bureau of Reclamation's operations and depletions, other depletions, and funding and implementation of Recovery Program actions in the upper Colorado River upstream from the Gunnison River confluence. Known as the "15-Mile Reach Programmatic Biological Opinion (PBO)", the PBO determined that implementation of recovery actions and continued water depletions in the Colorado River would not likely jeopardize the continued existence of the endangered fishes. The PBO cites action items in the RIPRAP and charges the Recovery Program with the responsibility to ensure that these action items are completed and/or implemented. Page 74 of the PBO says: "In 2003 and every 2 years thereafter, for the life of the Recovery Program, the Service and Recovery Program will review implementation of the Recovery Action Plan actions to determine timely compliance with applicable schedules."

Also as per the PBO, in 2015, the Service is scheduled to review the status of the endangered fishes and determine if the positive population response criteria have been met. As stated in the Reinitiation Notice, the Service will provide information on the status of the species and recommendations for improving population numbers to the Recovery Program as part of their evaluation of the reinitiation criteria. The Service's Western Colorado Ecological Services Office compiled the following preview of priority issues related to that pending 2015 PBO review. (Supporting information is found in attachment entitled: 2015 15-MR PBO Review.)

The Service recognizes the following significant recovery accomplishments that have occurred since 1999:

1. Fish passage at the Grand Valley Project and Price-Stubb diversions;

2. Constructing and collaborating with local water users to operate fish screens in the Grand Valley Project and Grand Valley Irrigation Company canals;

3. Implementing irrigation efficiency in the Grand Valley project canal with saved water improving flows in the 15-Mile Reach;

4. Building the Horsethief Hatchery ponds for successful propagation efforts with respect to razorback sucker reintroduction.

5. Efforts to combat nonnative fish.

6. The voluntary efforts of West and East slope water users and Reclamation to assist in meeting the recommended endangered fish flows in the 15-Mile Reach.

7. Construction of the Orchard Mesa Irrigation District Improvement Project that will contribute to flow augmentation in the 15-Mile Reach.

While recognizing these accomplishments, the Service recommends that the Recovery Program build on its history of cooperation to improve in three specific recovery areas: 1) low flow management in the 15-Mile Reach during dry years; 2) achieve greater success controlling expanding populations of nonnative predators, particularly the recent increase in abundance and distribution of nonnative walleye; and 3) identify and correct factors limiting wild populations of humpback chub and successful reintroduction of bonytail. The concerns raised here are specific to the Upper Colorado River, but are consistent with those raised in the Regional Director's overarching review of the Recovery Program's progress.

Low flow Management in the 15-Mile Reach:

In the 15-Mile Reach PBO the Service states that implementation of recovery action items, with future depletions will provide flows that meet the flow recommendations during August, September, and October. The table below presents actual average monthly flows for five 'dry' years (2002, 2003, 2004, 2012, and 2013), when the Service's recommended average monthly flow was 810 cfs.

| | Colorado River Below the Grand Valley Diversion Average Monthly Flow | | |
|---|---|---|---|
| | **August** | **September** | **October** |
| **2002** | 115.4 | 240.9 | 526.2 |
| **2003** | 611.2 | 1,088 | 1,078 |
| **2004** | 497.6 | 830.3 | 1,078 |
| **2012** | 454.1 | 371.7 | 528.6 |
| **2013** | 727.4 | 1,272 | 1,288 |

The Service understands that without the commitments from Reclamation and the voluntary cooperation of water users, the observed monthly averages would have been lower, and in some instances drastically so. However, when flows drop below 810 cfs researchers believe that habitat becomes compromised to the point that adult pikeminnow

likely vacate the 15-Mile Reach to points downstream where flows increase either due to tributary input from the Gunnison River or irrigation return flow.

The Service recognizes that the Orchard Mesa Irrigation District (OMID) Canal System Improvement Project has already started to assist in flow management. When fully complete, the project will provide approximately 17,000 acre-feet to the 15-Mile Reach, except during extremely dry conditions. We understand that this will result in approximately 30 cfs increase in flow in the 15-Mile Reach during irrigation season. We also applaud the CWCB for leasing additional Ruedi water from the Ute Water Conservancy District to augment base flows.

The 2013 spring and summer hydrology presented unprecedented flow conditions that were not fully considered in the 15-Mile Reach PBO. A very unusual set of circumstances occurred in April 2013 when air temperatures cooled, reducing mid- and high elevation runoff at the same time the irrigation season began. Flows measured at the Palisade gage then dropped below 400 cfs for 24 days and instantaneous flow dropped below 60 cfs on April 12 and April 27. The Service's recommended average monthly flow for April is 1,860 cfs. Irrigation diverters in the 15-Mile Reach are aware of this previously unexperienced situation and have identified mitigation measures to avoid it in the future. In July 2013, flows were 'flashy' due to summer storms. However, during a five day period (July 22-26), flows dropped below 400 cfs with an instantaneous low flow of 100 cfs recorded on July 24. The recommended endangered fish flow for July is 1,480 cfs. This situation will likely be avoided in the future with pro-active measures by the Program, including use of fish pool releases.

The 2014 spring and summer hydrology provided excellent habitat conditions in the 15-Mile Reach.

Nonnative Predatory Fish

As mentioned earlier, the threat to endangered fish recovery posed by nonnative predatory fishes (e.g., smallmouth bass and northern pike) is of serious concern. In fact, the threat from nonnative fish predation is currently compromising the progress the Recovery Program has made toward recovery (including progress in flow management).

As it relates specifically to the PBO, the Service is most concerned with:
1. An expanding population of northern pike (likely source – Rifle Gap Reservoir) in the Colorado River upstream of the Grand Valley Project diversion;
2. Persistent densities of smallmouth and largemouth bass in the 15-Mile Reach and downstream;
3. An emerging population of walleye in the lower Colorado River in Utah.

The Service recommends that Recovery Program partners fully engage the battle against these nonnative predators. The Service commits to joining its partners in support of Colorado Parks and Wildlife and Utah Division of Wildlife Resources as they explore new nonnative fish management options and develop policy and regulation changes

needed to control predators and clearly communicate to the public that the nonnative threat is compromising species recovery, Section 7 compliance for Colorado River water projects, and threatens other native species.

<u>Identify / Rectify Factors Limiting Wild Populations of Humpback Chub and Bonytail Reintroduction</u>

The Service remains concerned that wild populations of humpback chub in Black Rocks and Westwater Canyon of the Colorado River (near the Colorado-Utah state line) have not recovered from declines detected in the late 1990's. The reason for those population declines is uncertain. Researchers caution that 78 largemouth bass and the same number of gizzard shad were collected in Black Rocks in 2012. This represents a ten-fold increase over the 2011 catch. The Westwater Canyon estimates of wild adults range from about N = 4,700 in 1998 to N = 2,500 in 1999, 2000, to N = 1,525 in and 2003. The 2007–2008 estimates were about 1,750 and 1,300. Although researchers link humpback chub declines in the upper portions of Desolation Canyon to increasing abundance of nonnative smallmouth bass there, a different mechanism appears to have impacted humpback chub in the Colorado River canyons. The large declines in humpback chub densities in both Black Rocks and Westwater Canyons occurred in the late 1990's prior to more recent increases of nonnative predators in the Colorado River. Ongoing flow management in the 15-Mile Reach and now in the Gunnison River is, in part, intended to provide habitat needed to assist in the recovery of the humpback chub, but preferred habitat for humpback chub is not well understood. We recommend that the Recovery Program investigate the factors limiting a positive response in these humpback chub populations and then implement the necessary recovery actions.

Recent reported declines in the Colorado River adult Colorado pikeminnow population are cause for great concern. Researchers caution that the distribution of the nonnative walleye in the lower portion of the Colorado (and Green) River now present a predatory threat in an important Colorado pikeminnow nursery area and could explain the recent declines in the endangered fish. We recommend that Recovery Program partners continue to focus control efforts on this relatively new invasive species to the system.

The Service also is concerned that despite a concerted propagation effort to reintroduce bonytail in the Colorado River, results to date are not encouraging. We recommend that the Recovery Program identify the factors limiting the successful reintroduction of this endangered species.

A more detailed status review of 15-Mile Reach PBO action items is found in the attached spreadsheet.

**B.**   **Gunnison River Basin**

On December 4, 2009, the Service issued a final programmatic biological opinion for the Gunnison River Basin and the operation of the Wayne N. Aspinall Unit and the reconsultation for the Dallas Creek and Dolores projects and their respective effects on the endangered fishes. Known as the "Gunnison River Basin Programmatic Biological Opinion (PBO)", the PBO determined that the proposed action (reoperation of the Aspinall Unit, existing water depletions in the Gunnison River basin, new depletions up to 3,500 af/yr, new depletions associated with the Upper Gunnison Subordination up to 22,200 af/yr., continuation of the operation of other Reclamation Projects in the Gunnison Basin, and other Federal, private, local, and State water projects and water uses in the Gunnison Basin) is not likely to jeopardize the continued existence of endangered fish and is not likely to destroy or adversely modify designated critical habitat.  Page 83 of the PBO says: "Every 2 years, for the life of the Recovery Program, the Service and Recovery Program will review implementation of the Recovery Action Plan actions that are included in this biological opinion to determine timely compliance with applicable schedules." A detailed status review of Gunnison PBO action items is found in the attachment entitled "2015 Gunnison PBO Review."

## LITERATURE CITED

Anderson, R. 2005. Riverine Fish Flow Investigations.  Colorado Division of Wildlife Federal Aid Project F-289-R7. Job Progress Report.

Badame, P.V.  2008.  Population estimates for humpback chub *(Gila cypha)* in Cataract Canyon, Colorado River, Utah, 2003-2005. Final Report of Utah Division of Wildlife Resources to Upper Colorado River Endangered Fish Recovery Program, Denver, Colorado.

Badame, P.  2011.  Humpback chub population estimates for Desolation/Gray Canyons, Green River Utah.  Annual Report Project 129 of the Upper Colorado River Endangered Fish Recovery Program, Denver, Colorado.

Badame, P. 2012. Population estimates for humpback chub (Gila cypha) in Desolation and Gray Canyons, Green River, Utah 2006-2007. Final Report of Utah Division of Wildlife Resources to Upper Colorado River Endangered Fish Recovery Program, Denver, Colorado.

Batchelar K.L., K.A. Kidd, K.R. Munkittrick, P.E. Drevnick, and N.M. Burgess. 2013. Reproductive health of yellow perch (*Perca flavescens*) from a biological mercury hotspot in Nova Scotia, Canadian Science of the Total Environment 454–455.

Bestgen, K.R., G.B. Haines, and A.A. Hill.  2011.   Synthesis of floodplain wetland information: timing of razorback sucker reproduction in the Green River, Utah, related to streamflow, water temperature, and floodplain wetland availability.  Final Report to the Upper Colorado River Endangered Fish Recovery Program.  U. S. Fish and Wildlife Service, Denver, CO.  Larval Fish Laboratory Contribution 163.

Bestgen, K.R., K. Zelasko, R. I. Compton, and T. E. Chart.  2008.  Survival, Condition, Habitat Use, and Predation on Stocked Bonytails (Gila elegans) In the Green River, Colorado and Utah. *The Southwestern Naturalist* vol. 53 issue 4 December 2008. p. 488-494

Bestgen, K. R., G. B. Haines, R. Brunson, T. Chart, M. Trammell, R. T. Muth, G. Birchell, K. Christopherson, and J. M. Bundy. 2002. Status of wild razorback sucker in the Green River Basin, Utah and Colorado, determined from basinwide monitoring and other sampling programs. Final Report, Colorado River Recovery Implementation Program Project Number 22D, Denver, Colorado.

Battige, K. 2012.  Middle Yampa River northern pike removal and evaluation; smallmouth bass removal and evaluation. Annual Report Project 98a of the Upper Colorado River Endangered Fish Recovery Program, Lakewood, Colorado.

Bestgen, K.R., J.A. Hawkins, G.C. White, K.D. Christopherson, J.M. Hudson, M.H. Fuller, D.C. Kitcheyan, R. Brunson, P. Badame, G.B. Haines, J.A Jackson, C.D. Walford, and T.A.

Sorensen. 2007. Population status of Colorado pikeminnow in the Green River Basin, Utah and Colorado. Transactions of the American Fisheries Society. 136: 1356 – 1380.

Bestgen, K.R., K.A. Zelasko, R.I. Compton and T.E. Chart. 2008. Survival, Condition, Habitat Use, and Predation on Stocked Bonytails (*Gila elegans*) in the Green River, Colorado and Utah. The Southwestern Naturalist 53(4):488-494.

Bestgen, K.R., J.A. Hawkins, G.C. White, C.D. Walford, P. Badame, and L. Monroe. 2010. Population status of Colorado pikeminnow in the Green River Basin, Utah and Colorado, 2006–2008. Final Report of the Larval Fish Laboratory, Colorado State University to the Upper Colorado River Endangered Fish Recovery Program, Denver, Colorado.

Bestgen, K. R., G. B. Haines, and A. A. Hill. 2011. Synthesis of flood plain wetland information: Timing of razorback sucker reproduction in the Green River, Utah, related to stream flow, water temperature, and flood plain wetland availability. Final Report to the Upper Colorado River Endangered Fish Recovery Program, Denver. Larval Fish Laboratory Contribution 163.

Bestgen, K.R., K.A. Zelasko, and G.C. White, 2012 Monitoring Reproduction, Recruitment, and Population Status of Razorback Suckers in the Upper Colorado River Basin. Report to the Upper Colorado River Endangered Fish Recovery Program . Larval Fish Laboratory Contribution 170.

Breen, M.J., J.T. Herdmann and C.M. Michaud. 2014. Annual fall monitoring of young of year Colorado pikeminnow and smallbodied native fishes. Annual Report Project 138, from Utah Division of Wildlife Resources to Upper Colorado River Endangered Fish Recovery Program, Denver, Colorado.

Central Utah Water Conservation District. 2013. 2004 – 2011 Water Management Report Duchesne River Working Group.

CDOW. 2010. Yampa River Basin Aquatic Wildlife Management Plan. Colorado Division of Wildlife, Denver, Colorado.

Elverud, D. 2011. Population estimate of humpback chub in Westwater Canyon, Colorado River, Utah. Annual Report Project 132 of the Upper Colorado River Endangered Fish Recovery Program, Denver, Colorado.

Francis, T.A., and C.W. McAda. 2011. Population status of structure of humpback chub, *Gila cypha*, and roundtail chub, *G. robusta*, in Black Rocks, Colorado River, Colorado, 2007-2008. Final Draft Report of U.S. Fish and Wildlife Service to Upper Colorado River Endangered Fish Recovery Program, Denver, Colorado.

Francis, T. and D. Ryden 2014. Upper Basin database. Annual Report Project 16, from U.S. Fish and Wildlife Service to Upper Colorado River Endangered Fish Recovery Program, Denver, Colorado.

Gerig, B. 2012. Humpback Chub in Westwater Canyon. Annual Report Project 132 of the Upper Colorado River Endangered Fish Recovery Program, Lakewood, Colorado.

Harding, I., M.J. Breen, J.A. Skorupski, 2013. Young-of-the-year Colorado pikeminnow monitoring. Annual Report of Utah Division of Wildlife Resources to the Upper Colorado River Endangered Fish Recovery Program, Denver, Colorado.

Howard, J. 2013. Population monitoring of humpback and bonytail chub in Cataract Canyon. Annual Report Project 130, from Utah Division of Wildlife Resources to Upper Colorado River Endangered Fish Recovery Program, Denver, Colorado.

Howard, J. 2014. Humpback chub population estimates for Desolation/Gray Canyons, Green River Utah. Annual Report Project 129, from Utah Division of Wildlife Resources to Upper Colorado River Endangered Fish Recovery Program, Denver, Colorado.

Jackson, J.A., and J.M. Hudson. 2005. Population Estimate for Humpback Chub (*Gila cypha*) in Desolation and Gray Canyons, Green River, Utah 2001-2003. Final Report of Utah Division of Wildlife Resources to Upper Colorado River Endangered Fish Recovery Program, Denver, Colorado.

Larval Trigger Study Plan ad hoc Committee. 2012. Study Plan to Examine the Effects of Using Larval Razorback Sucker Occurrence in the Green River as a Trigger for Flaming Gorge Dam Peak Releases. Coordinated by the Upper Colorado River Endangered Fish Recovery Program.

Miller, P. 2014. A Population Viability Analysis for the Colorado Pikeminnow (Ptychochelius Lucius) in the San Juan River. Submitted to BHP Billiton New Mexico Coal by Conservation Breeding Specialist Group.

Nesler, T.P., K. Christopherson, J.M. Hudson, C.W. McAda, F. Pfeifer, and T.E. Czapla. 2003. An Integrated Stocking Plan for Razorback sucker, Bonytail, and Colorado pikeminnow for the Upper Colorado River Endangered Fish Recovery Program. Final Report of Upper Colorado River Endangered Fish Recovery Program, Denver, Colorado.

Nonnative Fish ad hoc Committee. Upper Colorado River Basin Nonnative and Invasive Aquatic Species Prevention and Control Strategy. Upper Colorado River Endangered Fish Recovery Program, Lakewood, Colorado.

Osmundson, B., and J.D. Lusk. 2012. Field assessment of mercury exposure to Colorado pikeminnow within designated critical habitat. Project ID: FFS# 6F54 and DEC#200860001.1.

Osmundson, D. B., and K. P. Burnham. 1998. Status and trends of the endangered Colorado squawfish in the upper Colorado River. Transactions of the American Fisheries Society. 127:959 − 972.

Osmundson, D.B., and G.C. White.  2009.  Population status and trends of Colorado pikeminnow
    of the upper Colorado River, 1991–2005.  Final Report of U.S. Fish and Wildlife Service
    to Upper Colorado River Endangered Fish Recovery Program, Denver, Colorado.

Osmundson, D.B., and G.C. White. 2014.  Population Structure, Abundance and Recruitment of
    Colorado Pikeminnow of the Upper Colorado River, 2008–2010. Report of U.S. Fish and
    Wildlife Service to Upper Colorado River Endangered Fish Recovery Program,
    Lakewood, Colorado

Speas, D. W., J. A. Hawkins, P. D. McKinnon, K. R. Bestgen, and C. D. Walford. 2014.
    Entrainment of native fish in Maybell Ditch, northwestern Colorado, 2011-2012. Final
    Report for the Upper Colorado River Endangered Fish Recovery Program, Lakewood,
    Colorado.

Upper Colorado River Endangered Fish Recovery Program. 2006. Evaluation of Population
    Estimates for Colorado Pikeminnow and Humpback Chub in the Upper Colorado River
    Basin. Final Report of Upper Colorado River Endangered Fish Recovery Program,
    Denver, Colorado.

U.S. Fish and Wildlife Service. 2002a. Colorado pikeminnow (*Ptychocheilus lucius*) Recovery
    Goals: amendment and supplement to the Colorado Squawfish Recovery Plan. U.S. Fish
    and Wildlife Service, Mountain-Prairie Region (6), Denver, Colorado.

U.S. Fish and Wildlife Service. 2002b. Humpback chub (*Gila cypha*) Recovery Goals:
    amendment and supplement to the Humpback Chub Recovery Plan. U.S. Fish and
    Wildlife Service, Mountain-Prairie Region (6), Denver, Colorado.

U.S. Fish and Wildlife Service. 2002c. Razorback sucker (*Xyrauchen texanus*) Recovery Goals:
    amendment and supplement to the Humpback Chub Recovery Plan. U.S. Fish and
    Wildlife Service, Mountain-Prairie Region (6), Denver, Colorado.

U.S. Fish and Wildlife Service. 2002d. Bonytail (*Gila elegans*) Recovery Goals:
    amendment and supplement to the Humpback Chub Recovery Plan. U.S. Fish and
    Wildlife Service, Mountain-Prairie Region (6), Denver, Colorado.

U.S. Fish and Wildlife Service. 2011.  Final Biological Opinion on the Operation of Glen
    Canyon Dam including High Flow Experiments and Non-Native Fish Control.  USFWS,
    Arizona Ecological Services Office, Phoenix, Arizona.

Wilson, W.  2014.  Genetic Evaluation of the Humpback Chub Refuge Population at the
    Southwestern Native Aquatic Resources and Recovery Center, Dexter, New Mexico.
    Final Report prepared for U.S. Bureau of Reclamation by Dexter National Fish Hatchery
    and Technology Center, Dexter, New Mexico.

Zelasko, K.A., K.R. Bestgen and G.C. White.  2009.  Survival rate estimation and movement of
    hatchery-reared razorback suckers *Xyrauchen texanus* in the Upper Colorado River

Basin, Utah and Colorado.  Final Report of Colorado State University Larval Fish Laboratory to Upper Colorado River Endangered Fish Recovery Program, Denver, Colorado.

Zelasko, K.A., K.R. Bestgen and G.C. White. 2011. Survival Rate Estimation Of Hatchery-Reared Razorback Suckers Xyrauchen Texanus Stocked In The Upper Colorado River Basin, Utah and Colorado, 2004-2007. Final Report of Colorado State University Larval Fish Laboratory, Department of Fish, Wildlife, and Conservation Biology to Upper Colorado River Endangered Fish Recovery Program, Denver, Colorado.

**Appendix Table**
## Upper Colorado River Endangered Fish Recovery Program
## Nonnative Fish Management Actions: an Addendum to the Recovery Action Plan
March 2015 Update on Progress

| River / Action | Responsible Entity(s) | New RIPRAP# | 2013 | 2014 | 2015 | Out years | PDO/MC update 3/2015 |
|---|---|---|---|---|---|---|---|
| **General ( in addition to ongoing projects / actions)** | | | | | | | |
| Finalize the UCR Basin Nonnative and Invasive Aquatic Species Prevention and Control Strategy (Basinwide Strategy). | Program Director's Office (PDO) | III.D. | X | | | | *Complete; Feb, 2014.* |
| Cease translocation of all nonnative predators to any fishery within the UCR. | States / Program | III.E. | | X | X | X | *Implemented 2014 field season and beyond.* |
| The States will commit to remove northern pike and / or replace them with a Compatible (compatible with recovery) species (as identified in the Basinwide Strategy) throughout the UCR Basin.  Specific waters will be targeted based on risk of escapement, opportunity and available resources. | States / Program | III.F. | | States will convey this message in their Fishing Brochure / Guidebook starting in 2014 | | | *CPW treated Paonia Resv. and held must kill fishing derby at Stagecoach. Good progress being made to address Elkhead; Program has approved recommendation to screen first. CPW began removing pike from Crawford in 2014 (~74% of the adult population removed). UDWR treated Stewart prior to inundation. Yampa pike removal expanded up to Steamboat in 2014. CSU programmatic synthesis of northern pike removal efforts (January 2015) demonstrated current removal efforts are inadequate to permanently reduce pike abundance in the Yampa River.* |
| Implement 'must kill' regulations for northern pike throughout the UCR basin (exceptions may | WY and UT | III.F.1. | | X | X | X | *Done in WY (must-kill and nongame fish designation).* |

| River / Action | Responsible Entity(s) | New RIPRAP# | 2013 | 2014 | 2015 | Out years | PDO/MC update  3/2015 |
|---|---|---|---|---|---|---|---|
| include waters where northern pike are being replaced by tiger muskie). | | | | | | | *Done in UT.* |
| Continue discussions concerning "must kill' regulations on northern pike throughout the UCR Basin to develop a proposal supported by law enforcement for regulatory consideration. | CO | III.F.2. | X | X | X | X | *If Colorado is unwilling to pursue must-kill regulations throughout the UCR basin in Colorado, then the State is urged to pursue a comprehensive suite of alternative actions, in concert with Program partners, to achieve the necessary biological outcome. CPW convened a group of Program stakeholders to develop new nonnative fish management actions; Four meetings held (first on 11/04/14; last on June 1, 2015). In-lieu of must kill, the group suggested a comprehensive suite of actions that await submittal to Director Broscheid.* |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Remove smallmouth bass and / or replace them with a Compatible species (as identified in the Basinwide Strategy) everywhere they occur throughout the UCRB (exceptions = McPhee Res., Lake Powell Res., and upstream of Flaming Gorge Dam; and 'containment' may prove to be a viable management option for smallmouth bass at Starvation Res.). Specific waters will be targeted based on risk of escapement, opportunity and available resources. | States / Program | III.G. | States will convey this message in their Fishing Brochure / Guidebook starting in 2014 | | | | *CPW treated Miramonte. Good progress being made to address Elkhead; Program has approved recommendation to screen first. Program partners working on a response to smallmouth at Ridgway. Tri-County operating reservoir to prevent spilling, CPW considering regulations, screening, and harvest incentives.* |
| Implement 'must kill' regulations for smallmouth bass throughout the UCR basin (see exceptions above). | WY and UT | III.G.1. | | X | X | X | *UT implemented in the Green River downstream of Flaming Gorge Dam. All WY bass populations currently above Flaming Gorge Dam; will add regulations if show up elsewhere.* |
| Continue discussions concerning "must kill" regulations on smallmouth bass throughout the UCR Basin to develop a proposal supported by law enforcement for regulatory consideration. | CO | III.G.2. | X | X | X | X | *See northern pike (page 2, second item)* |
| The States are dedicated to reducing burbot numbers through all means practicable (including targeted removal) throughout the UCR Basin. Current management practices (e.g., 'must kill' regulations; fishing derbies at Flaming Gorge) considered adequate. | States / USFWS | III.H. | States will convey this message in their Fishing Brochure / Guidebook starting in 2014 | | | | |
| Implement 'must kill' regulations for burbot throughout the UCR basin. Done in WY and UT. Wyoming and Utah implementing burbot bash; WY research projects. | WY and UT | III.H.1. | X | X | X | X | *Done in WY and UT. WY and UT implementing burbot bash; WY research projects.* |
| Continue discussions concerning "must kill" regulations on burbot (as a preemptive measure) | CO | III.H.2. | X | X | X | X | *See northern pike (page 2, second item)* |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| throughout the UCR Basin to develop a proposal supported by law enforcement for regulatory consideration. | | | | | | | |
| Promote increased production of sterile gamefish (e.g., hybrids, triploids), as Compatible sport fish. | Service / States / Program | III.I. | X | X | X | X | *In discussions in WY,UT&CO. Sterile walleye planned for stocking at Red Fleet Reservoir and Rifle Gap Reservoir under newly approved lake management plans.* |
| Work with State Wildlife agencies and water user groups to increase awareness amongst States' legislatures and the courts of the ecological and financial ramifications of illicit introductions. | States and PDO via the Implementation Committee | III.J. | X | X | X | X | *Ongoing in all states. (WY reg changes (leg); PDO spoke to Judicial College in Reno; raised at IC meeting Sep 2013.* |
| **Yampa River (in addition to ongoing projects)** | | | | | | | |
| Elkhead Reservoir – establish a compatible sport fishery | | III.B.1.a .(2)(a) | | | | | *Ongoing – Program has approved process that involves screening as part of the future management. Lake Management Plan and regulation changes are required under screening agreement. CO will cover $500K toward screen from SCF, Program to pay the remainder.* |
| Coordinate / schedule drawdown with Colorado River Water Conservation District (CRWCD) | CPW / Program / CRWCD | III.B.1.a .(2)(a)(i) | X | | | | *Drawdown to support screen installation planned for fall 2015.* |
| Develop / Implement Communications Plan | CPW / Program | III.B.1.a .(2)(a)(ii ) | X | | | | *Implementing. Working group met with stakeholders in Sep 2014, local government in December and held public meeting in February 2015.* |
| Complete necessary environmental compliance | CPW / CRWCD | III.B.1.a .(2)(a)(ii | X | X | | | |

| | | i) | | | | | |
|---|---|---|---|---|---|---|---|
| Identify and secure sources of replacement compatible sport fish. | CPW | III.B.1.a .(2)(a)(iv) | X | X | | | *CPW drafted revised LMP and submitted to other states and Service in summer 2015.* |
| Treat reservoir and necessary habitats in the upper Elkhead Creek drainage. | CPW / Program / CRWCD | III.B.1.a .(2)(a)(v) | | X | | | *Deferred in favor of screening first.* |
| Stock compatible sport fish | CPW | III.B.1.a .(2)(a)(vi) | | | X | | *CPW drafted revised LMP and submitted to other states and Service in summer 2015.* |
| Evaluate / treat if necessary | CPW / Program / CRWCD | III.B.1.a .(2)(a)(vii) | | | | X | *Success of screen in limiting escapement to be monitored* |
| **Walton Creek confluence area** | | | | | | | |
| Evaluate feasibility of habitat modification to eliminate / reduce northern pike spawning habitat. | CPW / Program / BOR | III.B.1.d .(1)(b)(i) | X | X | | | *$500K secured for modification from SCTF. Program contributed $30K Section 7 funds to feasibility / design. Draft feasibility report submitted by contractors.* |
| Modify habitat as indicated through feasibility investigations. | CPW / Program / BOR | III.B.1.d .(1)(b)(ii) | | X | X | ? | *Very encouraging – TNC may have been a major player in making this happen. CPW working with local stakeholders and all seem supportive.* |
| **Upper River (upstream of Hayden, CO)** | | | | | | | |
| Increase mechanical removal of northern pike in main channel and floodplain habitats as directed by Colorado Parks and Wildlife. | CPW / Program | III.B.2.d .(1) | | X | X | X | *CPW and CSU reinitiated removal in this reach in 2014. Flows made work difficult to complete. Undertaken in 2015.* |
| **Stagecoach Reservoir.** | | | | | | | |
| Convert and extend the ongoing northern pike escapement study to a removal effort (will require an addendum to existing FERC Biological Opinion). | CPW / potentially Program in outyears | III.B.1.f. | | X | X | X | *Stakeholders agreed to end the tagging portion of the escapement study (recaptures downstream will continue).* |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | *CPW will remove all pike encountered under standard sampling (including tagged fish), but doesn't have resources to implement a Catamount style pike removal project (removal from Catamount being the higher priority).*<br><br>*CPW continues to remove pike from Catamount and also has plans to eradicate the illegally established population of northern pike in Chapman Res.* |
| **White River** | | | | | | | |
| Determine and implement an adequate level of mechanical removal to reduce smallmouth bass. | CPW / Program | III.B.2. a. | | X | X | X | X | *Program implementing as much mechanical removal as possible below Kenney; new techniques in discussion. Recovery Program continues to support and encourage a multi-agency effort to designate White River as a native fish conservation area. Utah continues to discuss.* |
| Develop a measure of successful suppression of SMB | Program | General :III.B.2. a.(1) | | X | | | | *Pending. Sampling crews continue to remove as many fish as possible.* |
| **Green River (in addition to ongoing projects)** | | | | | | | |
| Direct new (or shift existing) nonnative fish removal efforts to address increasing numbers of walleye. | Program | III.A.4. d. | X | X | X | X | | *Walleye captures have increased in upper and lower Green River; gizzard shad have been found in lower GR backwaters since 2007 and increased markedly over the* |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | *past few years in lower Colo. River backwaters. Gizzard shad could significantly affect food web ecology in backwaters and mainstem.* |
| | | | | | | | *Illegal population of walleye in Red Fleet Reservoir is problematic source. UDWR finalized a Lake Mgmt. Plan in order for reclamation to occur (rotenone). UDWR plans to rotenone in October 2015 and then develop a compatible sportfishery and install a screen.* |
| | | | | | | | *UDWR adjusted work to add spring and fall passes for walleye and gizzard shad removal in lower Green River in years when pikeminnow population estimates not conducted. 4 2014 spring sampling trips in lower Green yielded 149 walleye. UDWR also added one spring pass for walleye in the middle Green. Work will continue in 2015 (deferring humpback chub population estimates by one year to better time those estimates in the future and to provide additional capacity to focus on walleye in 2015).* |
| Develop a management strategy to address escapement of walleye (and smallmouth bass) from | UDWR | III.A.4. e. | Dec. | | | | *UDWR produced a timely feasibility report; installed a* |

| | | | 2013 | | | | *temporary screen in spill channel during spring 2014 runoff; will install more robust temporary screen in 2015 and is pursuing a permanent solution (but expected to seek funding assistance from Program).* |
| Starvation Reservoir. | | | | | | | |
| Implement recommendations from the management strategy. | UDWR / Program | III.A.4.e.(1) | | X | X | X | *Pending.* |
| **Colorado River ( in addition to ongoing projects)** | | | | | | | |
| Upstream of Grand Valley Project dam: Determine and implement an adequate level of mechanical removal in the main channel.  More importantly, use all techniques available to eradicate northern pike (and other nonnative species of concern) from floodplain habitats. | CPW / Program | III.A.9. | X | X | X | X | *CPW: a) implemented significant mechanical removal; b) coordinating with USBR on future levee work at LaFarge Pond.* |
| Develop a measure(s) of successful suppressions of northern pike (and other nonnative species of concern). | Program | | | X | | | *Pending.* |
| Direct new (or shift existing) nonnative fish removal efforts to address increasing numbers of walleye in the lower river. | Program | III.A.8. | X | X | X | X | *2 additional removal passes added from Cisco to Dewey Bridge and one pass was added from Dewey Bridge to Potash in 2013. Service added 2014 fall passes to remove walleye in lower Colorado reaches (Cisco to Potash) and UDWR added removal passes for the Lower Green. FWS removed 109 walleye (346 - 600 mm TL,) during 2014 CPM pop estimate trips from RM 108 (just downstream of Cisco) to RM 3.5 (just above* |

| | | | | | | *the confluence). With regard to escapement of fish from Lake Powell, a management plan is being developed and upper basin will be involved in review (Dale Ryden representing).* |
|---|---|---|---|---|---|---|

DENVER REGIONAL OFFICE ROUTING SLIP

01-01-15

| | | LTR | INTL | DATE | | | | LTR | INTL | DATE |
|---|---|---|---|---|---|---|---|---|---|---|
| Regional Director (RD) | 60100 | | | | | Refuges (ANRS/ Deputy ANRS) | 60130 | | | |
| Deputy Regional Director (DRD) | 60100 | | | | | Partners for Fish & Wildlife | 60130 | | | |
| External Affairs (AEA) | 60160 | | | | | Program & Budget Development | 60131 | | | |
| Budget & Administration (ABA) | 60180 | | | | | Refuge Supervisor - CO/ KS | 60132 | | | |
| Special ABA Assistant (4th Flr) | 60180 | | | | | Refuge Supervisor - ND/ SD/ NE | 60132 | | | |
| Budget & Finance (BF) | 60188 | | | | | Refuge Supervisor - MT/ WY/ UT | 60132 | | | |
| Human Resources (HR) | 60182 | | | | | Regional Archeologist | 60133 | | | |
| Payroll | 60182 | | | | | Regional LE Chief | 60134 | | | |
| Diversity & Civil Rights (DCR) | 60182 | | | | | Realty | 60135 | | | |
| Contracting & General Svcs (CGS) | 60181 | | | | | Education & Visitor Services | 60136 | | | |
| Mail Room/ Property | 60181 | | | | | Regional Biologist | 60137 | | | |
| Safety & Occup Health (SOH) | 60184 | | | | | Planning | 60138 | | | |
| Info Res & Tech Mgmt (IRTM) | 60186 | | | | | Regional Fire Mgmt Coordination | 60139 | | | |
| Water Resources (WTR) | 60189 | | | | | Law Enforcement (SAC/OLE) | 99610 | | | |
| Engineering (EN) | 60190 | | | | | Ecological Services (AES) | 60120 | | | |
| Migratory Birds & State Prog (AMBSP) | 60150 | | | | | Federal Activities | 60120 | | | |
| Wildlife & Sport Fish Restor (WSFR) | 60152 | | | | | National Wetlands Inventory | 60120 | | | |
| NAWMP/ JV Coordinator | 60153 | | | | | Environmental Contaminants | 60120 | | | |
| Migratory Birds/ Permits | 60154 | | | | | Endangered Species | 60120 | | | |
| Fisheries (AFR) | 60140 | | | | | Colorado River Coord (44 Union) | 65115 | | | |
| Program Supv - MT/ ND/ SD/ KS/ NE | 60140 | | | | | Science Applications | 60170 | | | |
| Program Supv - CO/ UT/ WY | 60140 | | | | | | | | | |

A.  Comment & Return
B.  For Your Information
C.  Your Copy
D.  Draft Response
E.  Action is Needed
F.  Surname
G.  Signature
H.  Return to Originating Office

Topic: _Sufficient Progress Memo etc._
_Co Water Cons. Bd Upper Co River_
_Endangered Fish Recovery Program_

Desired due date: _____

_Tom Chart_

From:   Full Name/Program                    Phone:                    Date:

**Correspondence**
- [ ] Incoming Letter
- [ ] Yellow Surname Sheet
- [ ] Note to Reviewer
- [ ] Routed through Admin to ARD
- [ ] Route through EA if Congressional
- [ ] Edited version included (if returned from RD's office)

**Data Tracking System**
- [ ] Incoming  DTS Memo or Letter
- [ ] Yellow Surname Sheet
- [ ] Control Slip
- [ ] Note to Reviewer
- [ ] Routed through Admin to ARD
- [ ] Route through EA if Congressional
- [ ] Edited version included (if returned from RD's office)

August 28, 2015

## 2015 Gunnison PBO Review of Action Items Status

In the December 4, 2009 final Gunnison River Basin Programmatic Biological Opinion (PBO), the Service determined that the proposed reoperation of the Aspinall Unit, the proposed Selenium Management Program, and the remaining Recovery Action Plan items are sufficient to avoid the likelihood of jeopardy and/or adverse modification of critical habitat from the impacts for existing depletions (estimated average annual 602,700 af/year) and future depletions (37,900 af/year), as defined in the proposed action. Page 83 of the PBO says: "Every 2 years, for the life of the Recovery Program, the Service and Recovery Program will review implementation of the Recovery Action Plan actions that are included in this biological opinion to determine timely compliance with applicable schedules." A review of action items from the PBO follows below, with status updates in italics.

CONSERVATION MEASURES (From pages 17-18 of PBO)

Monitoring of Endangered Fish Populations 1 - The Recovery Program is responsible for monitoring endangered fish populations. The Recovery Program monitors Colorado pikeminnow populations and is developing a basin-wide razorback sucker monitoring program that will include monitoring of multiple life stages. Design of the monitoring program is expected to be completed in fiscal year 2010. Implementation will begin in 2010. It will include multi-life stage monitoring on the lower Gunnison River. Density estimates will be developed for Colorado pikeminnow and razorback sucker in the lower Gunnison River. Monitoring the endangered fish populations will help determine the status of the species before and after the SMP is implemented.

> *A long-term, multi-life-stage, monitoring program for Colorado pikeminnow and razorback sucker was started in FY11 in the Gunnison and Colorado rivers whereby population responses can be used to evaluate the effectiveness of implementation of Aspinall re-operation and the Selenium Management Program (SMP). Evaluation of effects of reoperation on critical habitat in the Colorado River from the Gunnison River confluence to Lake Powell will occur after the flow recommendations above the Gunnison River have been evaluated. Draft fish community monitoring report including adult, age-0, and larval sampling due August 30, 2015. The first contaminants report was finalized in November 2013; the next is scheduled for late 2020.*

> Conservation Measures (continued) - During fish community monitoring in the lower Gunnison River, tissue samples will be collected from razorback suckers, as well as a chosen surrogate species, to determine selenium concentrations. These samples will be collected at intervals to assess reduction in selenium contamination from implementation of the SMP. *Since FY11, researchers with the USFWS – CRFP Grand Junction (conducting the fish community monitoring on the Gunnison and Colorado rivers) have coordinated with USFWS - Ecological Services contaminant biologists to collect appropriate tissues samples.*

TERMS AND CONDITIONS (From pages 80 – 81 of PBO)

1. Reclamation will work through the Recovery Program technical committees to develop a Study Plan to evaluate the effects of the proposed operations of the Aspinall Unit and how it improves

habitat and thereby contributes to recovery. The Study Plan should be completed within one year of the finalization of this biological opinion and should focus on previously identified uncertainties related to geomorphic processes, floodplain inundation, and temperatures (see Uncertainties section). The Study Plan should also include an evaluation of the effects of reoperation on critical habitat in the Colorado River from the Gunnison River confluence to Lake Powell.

*Study plan completed in May 2011; implementation in progress with fish community monitoring begun in FY11.*

2. Reclamation will provide to the Service and Recovery Program a concise annual operations report by December 31 of each year. The primary purpose of the annual report is to provide an assessment of how well operations of the Aspinall Unit contributed to meeting target flows in the Gunnison and Colorado Rivers. The report should include information on the planned operations based on the forecast and the actual operations; flows provided at Whitewater and below the Redlands; the Colorado River at the Colorado/Utah state line and at the Cisco gage; and any operational issues (spillway inspections, etc.).

*Annual reports provided (2014 in Attachment 1).*

*Drier than average hydrology in 2012 left reservoirs at low levels leading into the 2013 water year. The May 1, 2013 April-July inflow forecast for Blue Mesa was 335,000 af. The actual 2013 April-July inflow to Blue Mesa Reservoir was 346,000 af, the fifth lowest since 1937 and categorized as a "Dry Year" exceeded 93% of the time. The April-July runoff at the Whitewater gage near Grand Junction was only 22 percent of average. Under these hydrologic conditions, the ROD requires 900 cfs peak and 900 cfs baseflow at the USGS gage at Whitewater which were met. Precipitation in the Gunnison Basin in June, 2013 was well below average, very similar to 2012; monsoonal flow developed in July and precipitation was over 130% of average. August precipitation was below average in the northwest portion of the basin and above average in the south.*

*In 2014, the Gunnison River at Grand Junction water supply forecast for May - July was 111% of average. The Blue Mesa Reservoir water supply forecast for May - July was 120% of average. The runoff target was a (borderline) moderately wet year for 10 days at bankfull (14,350 cfs) and 40 days at half bankfull (8,070 cfs). Because the main tributaries had below average snowpack and complications with potential flooding in the Grand Valley, the achieved peak was 12,700 cfs with 24 days at half bankfull.*



**Table. A summary of 2014 peak and base flow targets and actual flows (CFS)**

Red is a target not met

| 2014 (% snowpack) | Peak Target | 2014 Peak |
|---|---|---|
| Gunnison R. at Grand Junction (100%) | Mod Wet 14,350 | 12,700 |

| 2014 (% snowpack) | Base Flow Target | 2014 Aug-Oct AVG | % Avg | 2014 Min. |
|---|---|---|---|---|
| Gunnison R. at Grand Junction (100%) | Mod Wet 1,500 | 1,806 | 120 | 1,370 |

3. Eight months after the final PBO is issued Reclamation will complete a MOA or similar mechanism, with appropriate parties, to develop the Selenium Management Program. *Reclamation led this effort and* the Selenium Management Program was established in 2011 with substantial local support and participation.

4. Six months after the final PBO is issued, and every 6 months thereafter, Reclamation will provide an update to the Service on the status of the development of Selenium Management Program. *Reclamation led this effort; Selenium Management Program established in 2011.*

5. Eighteen months after the final PBO is issued, Reclamation will provide the draft Selenium Management Program document, and a final document with associated agreements with key cooperators to the Service within 24 months.

*Selenium Program Formulation Document was developed by the Selenium Management Program (SMP) Workgroup and finalized in December 2011*

6. Implementation of the initial components of the SMP not already underway will begin within 5 years of issuance of this opinion.

*SMP implementation begun in January 2012. The SMP Workgroup meets on a quarterly basis or more frequently as needed. The SMP continues to work to reduce existing selenium loads and prevent/minimize/mitigate new selenium loading. Highlights are shown below; full report available at http://www.usbr.gov/uc/wcao/progact/smp/docs/SMP-2014AnnualRep.pdf.*

*Off-farm projects completed or underway: – In late 2012, Reclamation issued a Funding Opportunity Announcement (FOA) for Salinity Control Projects above Hoover Dam. Within the Lower Gunnison Basin, at total of 7 new salinity projects were selected for funding totaling about $14.3 million (A.1.15 to A.1.22). In total, these new projects will line with pipe approximately 38.33 miles of earthen canals and laterals and is predicted to reduce salt loading by an additional 12,281 tons as measured at the Whitewater gage. As of January 2015, construction was underway on six of the seven projects. The next Reclamation FOA will occur in FY15, providing an estimated $25 – $35 million in funding, with application selection and awards are planned for August 2015.*

*Off-farm-Future Projects – Planning efforts continued in FY14 supporting the Uncompahgre Eastside Optimization Study (A.2.5.2). A final report entitled UVWUA Integrated Assessment, Comprehensive Implementation Planning, and System Optimization Analysis prepared by Irrigation Training and Research Center was submitted in July 2014. Uncompahgre Valley Water Users, Reclamation and ITRC continue to refine concepts and continue advance planning efforts. In FY14 the SMP determined that including the west side of the Uncompahgre Project would be beneficial to selenium reduction efforts. West Side – Uncompahgre Project Optimization Planning at this time includes SCADA analysis (A.2.5.3). Two in-canal headgate automation and SCADA projects were completed on the west side by the UVWUA.*

*On-farm – Underway and Future Projects – Through the Colorado River Basin Salinity Control Program, a Lower Gunnison Comprehensive Planning effort continued with Basin States funds (A.4.1). The purpose of the study is to identify and prioritize cost effective salinity control opportunities, identify impediments to these opportunities, and to describe how a variety of control measures might be best implemented in a coordinated manner to maximize local and basin-wide benefits in cooperation with other potential funding partners in the Upper Colorado River Basin. The study addresses both on-farm and off-farm. While this study focuses on reducing salinity in the Lower Gunnison Basin, there exists the potential for Selenium reduction through the salinity control efforts (USGS 2014). A draft findings and strategies report dated September 2013 prepared by URS Corporation and presented to the study team and the Salinity Control Workgroup in the fall of 2013. A final report, dated February 2014, was presented at a presentation of findings held in Grand Junction.*

*Identify and Prioritize Target Areas and Potential Projects – The SMP Workgroup continued working with sub-basin level data developed by USGS to 3 determine where to encourage/support projects that accomplish selenium reduction goals (A.2.4).*

*Encourage/Facilitate Remaining Phases of Piping/Lining East Side Uncompahgre Project Laterals – Through Phase 8, approximately 50.3% of the East Side Laterals (ESL) Project has been completed or is under contract as shown in Appendix A, A.1.2 - A.1.9 and A.1.17. An additional 14.0 miles of*

4

*piping of eastside laterals is planned for Phase 8. It is anticipated that the remainder of Phase 7 and Phase 8 will be constructed in the fall of 2015. A total of $5 million from the Colorado River Storage Project Memorandum of Agreement (CRSP MOA) funding has been committed for piping and/or lining additional East Side Canals and Laterals (see Appendix A, A.1.14). These funds have been reserved from FY2012 and FY2013 CRSP power revenues.*

7. Reclamation will provide annual water quality summary reports to the Service by December 31 of each year.

*"Selenium Management Program Gunnison River Basin, Colorado Annual Progress Report 2014" Prepared by Selenium Management Program Workgroup, Compiled by Bureau of Reclamation.*

8. Reclamation will provide a report on biological monitoring (including fish monitoring in the Gunnison and Colorado Rivers) to the Service by December 31 in years when monitoring is conducted.

*"Selenium Management Program Gunnison River Basin, Colorado Annual Progress Report 2014 also summarized biological and water quality data collected during the previous year.*

CONSERVATION RECOMMENDATIONS (From **pages** 81 – 82 of PBO)

Dolores River

1. The Service recommends that Reclamation continue support efforts of the three species conservation strategy (UDWR 2006) on a range-wide basis, including conservation efforts on the Dolores River.

*The Bureau of Reclamation has been an active participant of the Dolores River Dialogue since its inception in 2004, and is currently active in the Implementation Team efforts to manage downstream releases to the lower Dolores River (from McPhee Dam to the confluence of the San Juan Miguel River) for the Native fishes and rafting. Reclamation has: set up a pit-tag array upstream of Disappointment Creek to monitor the movement of native fishes in the Dolores River, established early water temperature suppression criteria to prevent premature spawning before a large controlled release from McPhee Dam, developed release ramping criteria that will perform sediment movement and channel maintenance while achieving boater goals for rafting.*

*Installation of two PIT antennas in the Dolores River near Disappointment Creek and upstream of confluence with the Colorado River to monitor native fishes completed in 2014. UDWR completed surveys in 2013: high abundance of 3-species, 1 adult Colorado pikeminnow (observed), and 3 smallmouth bass.*

2. The Service recommends that Reclamation continue to work with the Dolores Project Biology Committee to consider spill and flow management options to benefit the native fishery in the middle and lower Dolores River while continuing to honor commitments related to downstream rafting.

*The Biology committee was setup as an advisory committee for fishery pool management only. Reclamation and the Dolores Water Conservancy District are actively involved with the DRD and IT in performing spill management.*

*Reclamation takes an active role with the Biology Committee in identifying base needs and possibilities. Annual base release budgets are agreed upon by all members.*



In 2013, the Dolores River gage at Bedrock, CO dried up (0 cfs) for almost a month from mid-June to mid-July.  Of 29 years of record, when the river is in the lowest 5% percentile, the flows are below 1 cfs 23% of the time in June, and 16% of the time in July.  Flows in the Dolores River downstream in Utah at the Cisco gage (see below) did not go completely dry and were much better in 2014.



*Downstream on the Dolores River gage at Cisco, UT in water year 2013 the peak runoff period was below normal and for 16 days in July was well below the 5th percentile with a two days of a minimum of ~17 cfs , Both years experienced big monsoonal events in late summer.*

3. The Service recommends that Reclamation continue to take an active role in the Dolores River Dialogue, in particular activities related to native fish.

*A final "Way Forward" report presented nine potential management opportunities that may assist with the improvement of the native fish:   spill management, base flow management, sediment transport flows, habitat maintenance flows, thermal regime modification, reducing the effects of introduced coldwater species, reducing the effects of introduced warm water species, and supplementing native fishes.*

*Upon completion of the A Way Forward final report, an Implementation Team (IT) consisting of water managers, NGOs, and State and Federal Agencies was formed to find ways to implement the nine recommendations.  The IT, with financial assistance of the Colorado Water Conservation Board, completed its first iteration of "The Lower Dolores River Implementation Monitoring and Evaluation Plan for Native Fish" dated August 2012.  Public comments to the plan were received, and the second iteration was published in June 2014. An electronic version of this plan and appendices can obtained from the Dolores River Dialogue website: http://ocs.fortlewis.edu/drd/implementationTeamReports.htm*

Selenium

1. We recommend that the Recovery Program initiate investigations to determine appropriate levels of selenium to insure recovery of Colorado pikeminnow and razorback sucker.  We recognize any new studies would follow established Recovery Program protocol for priority and funding.

*The Recovery Program has not funded any new selenium investigations, but does collect tissues from endangered fish / surrogate species as part of Gunnison River fish community monitoring. Muscle plugs continue to be collected from endangered fish and surrogate species (evaluation funded outside of Program).  Results from this selenium study will be used in the Selenium Management Program (SMP) to determine baseline selenium concentrations and evaluate effectiveness of selenium remediation efforts.*

Attachment 1

**Aspinall Unit Operations for Calendar Year 2014 under the Gunnison River PBO**

In water year 2014, Western Colorado experienced a return to moderately wet conditions.  With the Record of Decision for the Final Aspinall Unit Operations EIS that was signed on May 3, 2012, peak and base flow targets were established for the Whitewater gage near Grand Junction, Colorado to aid in the recovery of four endangered fish; the Humpback Chub, Bonytail Chub, Razorback Sucker, and the Pikeminnow.  This report will assess how well the 2014 operations of the Aspinall Unit provided sufficient releases of water at critical times and quantities necessary to avoid unnecessary harm to the endangered fish species and their essential habitat while continuing to meet the authorized purposes of the Aspinall Unit.

Peak Flows      As mentioned previously, 2014 was considered a moderately wet year.  Year type is determined by the forecasted April through July inflow volume to Blue Mesa Reservoir.  Moderately wet years are defined as years where the forecasted inflow volume is greater than 831,000 acre-feet and l e s s  than 1,123,000 acre-feet. The April 1st issue of the runoff forecast predicted 850,000 acre-feet of inflow to Blue Mesa Reservoir. The actual April through July inflow volume for 2014 totaled 849,000  acre-feet.  The May 1 runoff forecast placed 2014 into a moderately wet year category with a peak flow  target of 14,350 cfs at the Whitewater gage.



Figure 1.  Peak flow and duration day targets at the Whitewater gage as determined by April-July Forecasted Inflow.

The 14,350 cfs peak target flow was not met in 2014. While spillway releases at the Aspinall Unit were in excess of 2,000 cfs and flows in the Gunnison River through the Black Canyon exceeded 9,000 cfs,

8

contributing flows from the North Fork of the Gunnison River and other smaller tributaries resulted in a peak on the Gunnison River at the Whitewater gage that only reached 12,500 cfs.

Half Bank and Peak Flow Duration     The recommended duration days at half-bankfull flows  and at the peak flow are also dependent on the forecasted inflow volume to Blue Mesa Reservoir. The  table insert in Figure 1 shows the recommended duration of days at peak flow and half bank capacity  flows for ranges of forecasted inflow volume to Blue Mesa Reservoir.  With the forecasted runoff to Blue  Mesa Reservoir setting the year type as moderately wet, the peak flow duration target was 10 days at  14,350 cfs and the half bankfull target was 40 days at 8,070 cfs.  The peak flow on the Gunnison River at  the Whitewater gage only reached 12,500 cfs and there were 3 days of flows over 12,000 cfs during the time of the peak. Half bankfull flows of 8,070 cfs were achieved for 22 days, short of the 40 day target as tributary flows from the North Fork of the Gunnison River dropped off towards summertime baseflow levels near the end of June.

Base Flows     Base flow recommendations were determined by a study conducted by the Fish and Wildlife Service (Figure 2).  Year type for base flow is also determined by the April-July forecasted inflow volume to Blue Mesa Reservoir, so 2014 followed the targets for a moderately wet year.  Since 2013 was considered a dry year, the dry year baseflow targets are carried over for the January-March time period as the hydrology of these months is more dependent on the previous year's hydrology than the current year.

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Wet** | 1050 | 1050 | 1050 | 1050 | 1050 | 1500 | 1500 | 1500 | 1050 | 1050 | 1050 | 1050 |
| **Mod Wet** | 1050 | 1050 | 1050 | 1050 | 1050 | 1500 | 1500 | 1500 | 1050 | 1050 | 1050 | 1050 |
| **Avg Wet** | 1050 | 1050 | 1050 | 1050 | 1050 | 1500 | 1500 | 1050 | 1050 | 1050 | 1050 | 1050 |
| **Avg Dry** | 1050 | 1050 | 1050 | 1050 | 1050 | 1500 | 1500 | 1050 | 1050 | 1050 | 1050 | 1050 |
| **Mod Dry\*** | 750 | 750 | 750/790 | 750/890 | 750/890 | 1050 | 1050 | 1050 | 750/890 | 750/790 | 750/790 | 750 |
| **Dry\*** | 750 | 750 | 750/790 | 750/890 | 750/890 | 1050 | 1050 | 750/890 | 750/890 | 750/790 | 750/790 | 750 |

*During March through November in Moderately Dry and Dry type years, additional releases will be made as necessary to provide flows above the 750 cfs anticipated to be diverted by the Redlands Water and Power Company, for the fish ladder and fish screen as shown.

Figure 2. Base flow recommendations to support critical flows and habitat for the endangered fish.

Baseflow targets were exceeded throughout 2014 with the exception of 12 days during the early winter months when the Whitewater gage data was unavailable due to icing impacts. Flows were later estimated to be in the 730 to 740 cfs range, just below the baseflow target of 750 cfs.



Figure 3. 2014 Base Flow Target vs. Actual Flows at Whitewater Gage.

<u>Gunnison River</u>    Flow differences between the Gunnison River at Whitewater and the Gunnison River below the Redlands Diversion Dam are primarily due to the diversion of water to the Redlands Canal. As 2014 was a moderately wet year with more than sufficient streamflow, there were no issues with providing enough water to the Redlands fish ladder and screen during the months of their operation. Figure 4 shows the fluctuations in flow between the Gunnison River at the Whitewater gage and the Gunnison River below the Redlands Diversion Dam.



Figure 4. Gunnison River flows as measured at Whitewater and below the Redlands Diversion Dam.

Colorado River    Flows at the Colorado/Utah Stateline closely matched the flows at the Cisco, UT gage. Flows tended to range from 2500 cfs up to 37,000 cfs, with both gages experiencing a peak of over 37,000 cfs in the beginning of June.  Figure 5 shows the river flows at the Colorado/Utah Stateline gage and the Cisco, UT gage.



Figure 5. Colorado River flows at the Colorado/Utah Stateline gage and the Cisco, UT gage.

Operational Issues    There were no operational issues that impeded flows from the Aspinall Unit to the  Whitewater gage during the 2014 water year.

**Summary**   In 2014, hydrologic conditions turned to moderately wet after two consecutive dry years. In an attempt to reach the peak flow and peak duration targets at the Whitewater gage, releases from the  Aspinall Unit included a combination of power plants, bypasses and spillways at all three dams. However, declining tributary flows, mainly from the North Fork of the Gunnison River, resulted in the actual peak flow and peak duration falling short of the targets. During this operation the Black Canyon water right peak flow target was met. Baseflow targets were achieved throughout the year with the exception of a short period in early winter when the Whitewater gage was not reading correctly due to  icing impacts.

| | | |
|---|---|---|
| walleye predation on two juvenile pikeminnow in 2014. Spring 2014 light trap samples from the lower Green River documented two larval walleye, likely representing the first documented instance of successful in-river reproduction. Escapement from reservoirs has been deemed adequate to overcompensate for in-river removal efforts. Therefore, the Program is investigating the feasibility of screening many reservoirs with populations of problematic species and working with state partners to revise lake management plans for fisheries to replace the problematic species. | | to support nonnative predator removal. However, CPW believes this is not appropriate in Colorado.  If CPW is unwilling to pursue must-kill regulations throughout the Upper Basin in Colorado, we urge the state to pursue a comprehensive suite of alternative actions, in concert with Program partners, to achieve the necessary biological outcome. In November 2014, CPW convened a NNF Management Work Group to start developing that suite of actions – meetings continued in 2015 and the group has recommended a comprehensive suite of actions ( e.g. liberalized bag and possession limits for nonnative predators on the west slope, incentivized harvest, and increased public outreach) for submittal to CPW Director Broscheid. |
| **Green River** | | |
| Delays in development of Reclamation's revised Green River hydrology model caused Utah to revise the Green River Flow Protection schedule last year. In 2014, Utah's Green River Utah Water Acquisition Team (GRUWAT) completed the combination of the Bureau of Reclamation's Flaming Gorge Operations Riverware model (monthly timestep) with Utah's MODSIM model (daily timestep) and moved Green River flow protection to a policy committee within the State. | Delays 1 – Legal protection of flows needed for recovery. | Maintain revised schedule to implement flow protection in FY 16-17. |
| Old Charley Wash, an important 'dry year' sampling site identified in the Larval Trigger Study Plan is currently unavailable as the Service has as of yet been unable to renew lease with Northern Ute Tribe. | Hampers ability to 1 – Improve habitat through augmented flows | Service will continue to pursue government-to-government consultation with Northern Ute Tribe and request that the lease be renewed. |
| Walleye captures have increased in middle and lower Green River. An illegal population of walleye in Red Fleet Reservoir is a problematic source of this species entering the Green River. Smallmouth bass catch rates in Desolation Canyon were the highest ever recorded in 2014. A source of white sucker was discovered at Browns Park WMA in 2014 and should eventually be eradicated. . | 1 – Increases threat of extinction. | Red Fleet Reservoir has been recommended for reclamation (rotenone) and a new Lake Management Plan is being drafted. UDWR adjusted work to add spring and fall passes for walleye and gizzard shad removal in the lower Green River in years when Colorado pikeminnow population estimates are not conducted. UDWR added passes for walleye in the middle Green River in the spring. UDWR will pursue an eradication plan for white sucker at Browns Park. UDWR will continue to remove smallmouth bass in Desolation Canyon and monitor the population. |
| **Yampa River** | | |
| CWCB still needs to provide the accounting of past depletions | Hampers ability to 3 – | CWCB is scheduled to complete accounting of past |

| Colorado River | | |
|---|---|---|
| The Recovery Program still struggles to meet flow recommendations in drought years. The Service emphasizes the importance of meeting the flow recommendation. | Hampers ability to 1 – Improve habitat through augmented flows; and 3 – Inadequacy of flows. | The Program is working to improve the overall strategy for flow augmentation in the 15-Mile Reach to be considered each spring and adjusted as the year progresses, addressing all possible sources of water, priorities, antecedent conditions, projected flows and supplies, including OMID, Grand Valley Project, CFOPS, etc. In 2015, Ute Water Conservancy District proposed leasing up to 12,000 af of water to CWCB for an instream flow. In addition, the OMID Canal Automation Project is expected to provide about 17,000 af of water in most years. The check structures in the OMID project are complete and partial water savings became available in the 2014 (current) irrigation season. The project will be fully implemented in 2017. |
| CWCB still needs to provide the depletion accounting report that was due July 1, 2010. | Hampers ability to 3 – Determine adequacy of flows. | *See first item under Yampa River.* The Service recommends that CWCB provide a depletion accounting progress report to be included in the 2015 review of the 15-Mile Reach PBO. Completion date for the 2015 review is Dec.31, 2015. |
| CFOPs report (evaluation of options for providing and protecting additional peak flows to the 15-Mile Reach) overdue. | Hampers ability to 1 – Improve habitat through augmented flows; and 3 – Improve flows. | CFOPS Phase III draft report distributed April 2, 2014 and comments received; revised draft most recently due December 31, 2014 (final by March 2015), but pending hiring contractor to complete in fall 2015. CFOPS report should be included in the 2015 review of the 15-Mile Reach PBO (see above row). |
| Walleye captures in the Colorado River went from being 'rare' during 2003-2009 to 'common' in 2010, and then increased dramatically in 2013 and 2014. Distribution within the lower reach in 2010 appeared to be restricted below RM 80; however, by 2013 and 2014, captures extended upstream to RM 112, indicating an upstream range expansion. Unlike smallmouth and largemouth bass, whose primary distribution is in the upper reach, walleye directly overlap in habitat with small size classes of both Colorado pikeminnow and razorback sucker. In fact, crews documented walleye predation on two juvenile pikeminnow in 2014. | 1 – Increases threat of extinction. | The Service agrees with the additional effort to target walleye expended in the lower Colorado in 2014 and with similar or greater efforts in 2015. |

| Recovery Actions in 15-Mile Reach PBO | RIPRAP Item # | Status | PBO Page # |
|---|---|---|---|
| **Define Existing Depletions/Calculate New Depletions** | | | |
| a). Develop consumptive use and losses report with CRDSS model to verify level of depletions. | Colorado: IA3b | CWCB completed depletion accounting report in 2008; next report overdue; however, the irrigated acreage assessment was completed and contract awarded to update the dataset. Models will be updated through at least 2012. Colorado has placed a high priority on the Yampa and Colorado river basins portion of this work. | Apx. B, #6 |
| b). Calculate new depletions as a 10-year moving average as determined by CWCB and reported to FWS & CRRIP every 5 years. | Colorado: IA3c | Reporting of depletions as a 10-year moving average was to begin in 2011.  See above. | 7 |
| **Habitat Protection Element** | | | |
| **General Protection** | | | |
| Enforcement Agreement between FWS and CWCB. | General: IC1 | Completed in 1993. | 8 |
| **Late Summer and Fall Base-Flow Period Augmentation** | | See also "Flow graphs" and "Flow tables" worksheets. | |
| a). Instream flow decree for 581 cfs in 15-Mile Reach during July, August, and September. | Colorado: IA4c1 | Completed in 1997. | 8 |
| b). 300 cfs instream flow right for water accretions in 15-Mile Reach. | Colorado: IA4c2 | Completed in 1997. | 8 |
| c). 5,000 acre-feet (af) annually + 5,000 af 4 out of 5 years from Ruedi. | Colorado: IA5a | Ongoing since 1989 (except second 5,000 af was not available in 2002 and 2012). | 8 |
| d). 21,650 af/year split evenly between Ruedi and water users. | Colorado: !A5b,c,d | Ongoing since 1997. See tables. 2014: Baseflow target 1,630 cfs; average flow August – October 1,852 cfs. 2013: In  April (not a baseflow month), flows at Palisade dropped below 100 cfs for 5 days and were below 200 cfs for 11 days creating an "April Hole." Possible contributing factors included: 1) cold weather shut off mid-elevation runoff; 2) irrigation season starts; 3) Shoshone call 'relaxation'; 4) low storage in upstream reservoirs causing conservative reservoir release management. CWCB reviewed hydrology and characterized "April Holes" of this magnitude as very rare. Dry year baseflow target 810 cfs; average flows in July and August were 734 cfs and the minimum was 161 cfs recorded in late July. Flows at Palisade dropped below CWCB's  instream flow of 581 cfs on 17 days in July and August, although a call for that flow was not placed.          To help better meet flow targets, in 2015, the CWCB Board approved pursuing renewable 1-year lease of up to 12,000 af of water in Ruedi from Ute Water; contract to be finalized for use in the 2015 baseflow season (with the potential to consider early spring augmentation in the future). OMID Canal Automation also has begun providing some additional baseflows; project completion expected in 2016 or 2017. The saved water will be delivered to the 15-Mile Reach of the Colorado River. | 8 |
| e). After 2009, the water users must have agreements with the Service to provide a permanent source of the 10,825 af (divided equally between east and west slope). | Colorado: IA5e3 | Completed in 2014. | 8-9 |
| f). 6,000 af from Wolford. | Colorado: IA5h | Ongoing since 1996 (actual amount of water available each year is based on 10% of the storable inflow to Wolford, **up to** 6,000 af). See tables. 6,000 af provided in 2000; 3,078a f in 2001; 300 af in 2002; 286 af in 2003; 0 af in 2004 and 2005 (to allow the reservoir to recover from the 2002 drought), and 5,233 af in 2006; 0 af in 2007; 3,190 af in 2008; 3,490 in 2009; 3,000 in 2010; 7,572 in 2011; 5,079 in 2012; 1,501 in 2013 and 3,000 in 2014. | 10 |

| Recovery Actions in 15-Mile Reach PBO | RIPRAP Item # | Status | PBO Page # |
|---|---|---|---|
| g). Grand Valley Water Management - Study of canal operations showed spills from the Government Highline Canal averaged 31,400 af (Aug-Oct) from 1992-1994. GVWM will reduce canal spills by 19,400 af and ~9,000 af will be returned to the Colorado River through Palisade Pipeline. | Colorado: IA5l | Complete. See tables. The Municipal/Recreation contract for Green Mountain Reservoir water was originally signed in 2002, renewed on 8/29/07 through 12/31/12, and 40-year contract completed in April 2015. | 10 |
| Spring Peak Enhancement | | See also "Flow graphs" and "Flow tables" worksheets. | |
| a). Coordinated Reservoir Operations - in all but extremely dry or wet years. | Colorado: IA5i2 | Ongoing since 1997. Spring peak flows were augmented in 1997, 1998, 1999, 2006, 2008, 2009, 2010, and 2015. Spring peak flows in 2000, 2001, 2002, 2004, 2012, and 2013 were below the 12,900 cfs threshold for implementing coordinated reservoir operations under CROS. Spring peak flows in 2003, 2005, and 2011 exceeded the 12,900 cfs threshold (forecasted flow at Cameo), but other CROS operating criteria (e.g. avoid downstream flooding) were not met and therefore flows were not augmented. CROS implementation plan completed 2/28/06 in advance of 2006 runoff season. Due to rapid snowmelt, spring 2010 saw the highest coordinated peak flow release (73,971 af) since 1997 when CROS began. The coordinate release (CROS) for the 2010 spring peak in the 15-Mile Reach increased the peak by 2,500 cfs: from 21,800 cfs to 24,300 cfs. 2014 - snowpack 132% of average, peak flow target in "wet" category. Concern for flooding in Grand Junction cancelled coordinated reservoir operations. Peak target 23,500 cfs; actual peak 25,300 cfs. | 11 |
| b). Coordinated Facilities Operations Program - provide up to 20,000 af. | Colorado: IA5m2 | Phase II report & recommendations of the Executive Committee completed in 2003, but no additional water provided under CFOPS. Implementation linked to CROS (see above). With assistance of the State Engineer's Office, CWCB, and reservoir owners, FWS identified reservoirs that could participate in CFOPS. The amount of water that could be released depends on the size of an insurance pool that would be designated by FWS ~May 5 of each year from existing base flow environmental pools in Ruedi and the water users' 10,825 pool. In years where augmentation could be expanded through use of CFOPS, Service will review antecedent conditions, determine if additional augmentation is needed, and level of augmentation based on the size of the "insurance pool." CFOPS Phase III draft report distributed April 2, 2014 and comments received; revised draft most recently due December 31, 2014 (final by March 2015), but pending hiring contractor to complete in fall 2015. CFOPS report should be included in the 2015 review of the | 11 |
| Habitat Development and Maintenance Element | | | |
| Floodplain Restoration and Selenium Remediation | | Operation, maintenance and evaluation of sites incorporated into Colorado River Subbasin Floodplain Management Plan (Valdez and Nelson 2006). | |
| a). Gardner Pond (29-5/8 Road Gravel Pit). | IIA1 | Construction complete; Beswick pond used as a growout pond in 2010 & 2011. Restoration of this "Hot Spot Complex" was on hold pending completion of new Horsethief ponds, which is now done, but Service no longer recommends reconnecting gravel pits due to nonnative fish concerns. | |
| b). Jarvis. | None | Construction complete; operation ongoing. Program removed sediment build-up at the Jarvis pond inlet/outlet structure in 2012 (same as work performed in 2010 and 2003). | 12 |

Status Review of "15-Mile Reach PBO" Action Items          Draft: June 29 2015                                                    Page 3

| Recovery Actions in 15-Mile Reach PBO | RIPRAP Item # | Status | PBO Page # |
|---|---|---|---|
| c). Adobe Creek. | IIA2 | Construction for the research study complete, but no funding available through NIWQP to complete selenium remediation. The need to pursue restoration of this site for razorback sucker recovery should be revisited. Dikes placed for research study in tertiary channel should be removed. | 13 |
| d). Walter Walker. | IIA3 | Construction complete; operation ongoing. More levee was removed in 2004. Habitat enhancements at the Audubon and Walter Walker sites were evaluated over a range of flows during 2006 spring runoff and performed well (i.e., as per design and construction). CPW actively manages WW and encouraging waterfowl hunting there. | 13 |
| e). Land acquisition and levee removal. | IIA4&IIA5 | PBO estimate of acquiring interest in up to 3,500 acres in the Grand Valley and along the Gunnison was quite high based on landowner response. Restoration more expensive than anticipated; few landowners were willing to participate. Program acquired 592 acres of floodplain/wetland habitat in the upper Colorado River subbasin (393.5 acres along the Colorado River and 198.2 acres along the Gunnison River), and is working to best manage the floodplain currently available. Restoration completed at Butch Craig property & Escalante SWA on the Gunnison, and the Audubon property on the Colorado. Until it is determined that there is enough habitat to support a self-sustaining population of razorback sucker in the upper Colorado River subbasin, Program participants will continue to consider using additional Federal, State, and other parcels for this purpose; however Service no longer recommends reconnecting gravel pits upon completion of operation due to nonnative fish concerns. Service and Program coordinated with landowner at Soaring Eagle Gravel Pit to determine best method for reconnection (at landowner's cost, per biological opinion) in light of potential nonnative fish invasion. Grand Junction Pipe site (Program property) was reclaimed (rotenone) in March 2012 prior to levee breaching (construction completed by private industry as per project Section 7 consultation). | 13 |
| **Fish Passageways** | | | |
| a). PBO states passage to be completed at Price-Stubb in 2000 (or 2002 if dam removal alternative selected). | Colorado: IIB2a3&4 | Completed in April 2008. Passive PIT-tag monitoring station installed in 2010. 2011 high-flow damage repaired in 2012. | 13 |
| b). GVIC fish passage. | Colorado: IIB1a3&4 | Completed in 1998, and operated annually. Obermeyer gate installed in 2006; and raised when flows are low (operated intermittently [due to low flows] in 2012. | 13 |
| c). Grand Valley Project (Government Highline) fish passage. | Colorado: IIB3a3 | Completed in 2004 (construction was delayed due to regulatory and landowner issues and overall budget/construction priorities). Trial operations conducted in 2005 & 2006 and continued in 2006. Full operation began in 2008 (with completion of Price-Stubb passage). 2013: 2 razorback sucker were collected in the passage. 2014: a record-setting 25 razorback, 14 bonytail, and the first Colorado pikeminnow made passage. From 2005 through the 2014 season, 29 razorback sucker, 6 humpback chub, 36 bonytail, and 85,675 other native fishes (mostly flannelmouth sucker, bluehead sucker, and roundtail chub) have used the passage. | 13 |
| **Native Fish Stocking Element** | | See also "Stocking" worksheet | |

| Recovery Actions in 15-Mile Reach PBO | RIRAP Item # | Status | PBO Page # |
|---|---|---|---|
| Raising native fish in hatcheries and grow out ponds, and stocking them in the riverine habitat. | Colorado: IVA3, IVA4, IVA5 | Ongoing (see "Stocking" tab). The integrated stocking plan for the Upper Colorado River Basin was completed in March 2003 and revised in 2015. Annual stocking targets for subadults in the upper Colorado River subbasin are being met. | 14 |
| **Nonnative Fish Control Element** | | | |
| **Regulations and Agreements** | | | |
| a). 1996 Nonnative Stocking Procedures. | General: IIIB3 | Complete; revised in 2009. | 15 |
| b). 1999 Restriction of stocking of private ponds in Colorado. | General: IIIB4 | Complete; report on evaluation of Colorado's nonnative fish stocking regulations completed in July 2004. | 15 |
| c). Bag limits removed for nonnative warm-water sportfishes in critical habitat in Colorado. | Colorado: IIIB2 | Complete. | 15 |
| d). Close river reaches to angling where and when angling mortality determined to be significant to native fish. | General: IIIA2d | CDOW agreed to do when and where necessary (to date, not deemed necessary). | 15 |
| e). CDOW Colorado River fisheries management plan. | Colorado: IIIB4 | Plan completed in 2005. | 16 |
| **Removal Efforts** | | | |
| a). Pond Reclamation. | Colorado: IIIA2 | Pond reclamation accomplished, but proved ineffective. Research initiated to document sources of nonnative fish so Program can determine if they can be controlled at the source. Final report completed February 2004. CPW and Program discussing how to control nonnative fishes in LaFarge Ponds (which may require chemical reclamation since notch was specifically engineered to maintain equilibrium between the ponds and the river during runoff). In the interim CPW installed a Merwin fish trap in 2015. The Program Director's office will work with CPW to develop a plan to inventory ponds were permitted with notches, identify how many have nonnative fish, and determine solutions. | 15 |
| b). Removal of nonnative fishes from back waters. | Colorado: IIIA3 | Pilot program to remove small cyprinids and centrarchids complete; techniques and level of effort produced some short-term depletions, but provided no solutions to long-term control. Final reports completed in 2002 and 2003. Preliminary results of research on sources of nonnative fish (which may provide another avenue of control) indicate most younger centrarchids (age-0 to age-3) were produced in main channel habitats, as opposed to having escaped from floodplain ponds. However, almost 50% of age-4+ centrarchids escaped from ponds, likely during years when higher flows connected the ponds with the river. CSU investigations have resulted in otolith markers for water chemistry for reservoirs throughout the basin (Johnson et al. 2014). | 16 |

| Recovery Actions in 15-Mile Reach PBO | RIPRAP Item # | Status | PBO Page # |
|---|---|---|---|
| c). Management of nonnative fish populations | Colorado: IIIA5&6 | Management of bass and other centrarchids in the Colorado River ongoing since 2004; Channel catfish management on hold pending development of effective techniques. Centrarchid removal efforts increased beginning in 2007. Goal is to remove as many smallmouth as possible from: 1) a 66-mile reach from between the Grand Valley Project dam in CO downstream to the Westwater boat landing in eastern UT; and 2) a 45-mile reach between Rifle and Beavertail Mountain in CO. Goal is 8 removal passes/year; in 2014, crews completed up to 11 passes in some reaches. 2014 removals: 1,120 smallmouth bass, 1,394 largemouth bass, 107 walleye. Age-0 smallmouth bass catch indicated a weak year class; catch rate for juvenile smallmouth declined precipitously (80%) from 2013. 2013 & 2014 largemouth bass catches suggest relatively low juvenile survival. Walleye captures in the Colorado River went from being 'rare' during 2003-2009 to 'common' in 2010, and then increased dramatically by 2013. Walleye distribution in the lower reach in 2010 appeared to be restricted to the lowest 80 miles of the study area (ending at the Green River confluence); however, by 2013, captures extended upstream to RM 112 at the top of the lower reach, indicating upstream range expansion. Unlike smallmouth and largemouth bass, whose primary distribution is in the upper reach, walleye directly overlap with small size classes of both Colorado pikeminnow and razorback sucker. 2014 experimental walleye removal demonstrated higher catches in the fall than the spring. All walleye captured were adults. In 2013, additional nonnative fish removal passes were added in the Silt to Beavertail reach to remove invading northern pike, focusing on backwaters and floodplain ponds; CPW continues reconnisance in floodplain and canal habitats to identify potential sources of this species. Highline Lake spillway barrier net replaced in March 2014. 2013 outlet testing at Highline resulted in uncontrolled releases; CPW purchased tube nets to be used to prevent fish escapement in future annual outlet testing. Screen constructed on Rifle Gap Reservoir in 2013 and fish escapement past the screen will be evaluated for a period five years (per biological opinion). Screen was demonstrated to exclude a broad range of fish sizes (e.g., northern pike smaller than 20mm and larger than 500mm) and no pike were detected below the screen in 2014. The Service and the Program promote the use of sterile hybrid sportfish in the future.  CPW is revising the lake management plan for Rifle Gap and propose to manage sterile walleye as their top predatory sportfish. CPW has removed all bag and possession limits for problematic nonnative fishes in the warmwater reaches of the Green, Yampa, White, Colorado, and Gunnison rivers on the western slope in Colorado. Colorado's Nonnative Fish Management Work group has evaluated options for increasing effectiveness of nonnative fish control (e.g., expanding I&E and public | 16 |
| Research, Monitoring, and Data Management Element | | | |

| Recovery Actions in 15-Mile Reach PBO | RIPRAP Item # | Status | PBO Page # |
|---|---|---|---|
| a). Population estimates will be used to determine if Recovery Actions result in a positive population response. | Colorado: VB; VB3 | The current downlisting demographic criteria for Colorado pikeminnow (USFWS 2002a) in the Upper Colorado River Subbasin is a self-sustaining population of at least 700 adults maintained over a 5-year period, with a trend in adult point estimates that does not decline significantly. Secondarily, recruitment of age-6 (400–449 mm TL; Figure 3), naturally produced fish must equal or exceed mean adult annual mortality (estimated to be about 20%). The average of all adult estimates (1992 – 2014; estimates from 2013 and 2014 are considered preliminary) is 613. The average of the five most recent annual adult population estimates is 501. Osmundson and White (2014) determined that recruitment rates were less than annual adult mortality in six years and exceeded adult mortality in the other six years when sampling occurred. The estimated net gain for the 12 years studied was 32 fish > 450 mm TL. Whereas the Colorado River population appears to meet the trend or 'self-sustainability' criterion, it has not met the abundance criteria of 'at least 700 adults' during the most recent five year period. The Service is reevaluating the demographic and threat removal criteria for Colorado pikeminnow through revision of the species' recovery plan. The Service's status review of Colorado pikeminnow was completed in 2011. Although a good portion of the recovery factor criteria (USFWS 2002a) are being addressed, nonnative fish species continue to be problematic and researchers now speculate that mercury may pose a more significant threat to Colorado pikeminnow populations of the upper Colorado River basin than previously recognized (see discussion in sufficient progress assessment). The most recent adult humpback chub population estimates in Black Rocks are as follows: 2007–2008 adult estimates were 345 and 287, respectively; 2011-2012 were 379 and 403, respectively. Researchers caution that 78 largemouth bass and the same number of gizzard shad were collected in Black Rocks in 2012. This represents a ten-fold increase over the 2011 catch. The Westwater Canyon estimates of wild adults range from about 4,700 in 1998 to 2,500 in 1999, 2000, and 2003. Researchers caution that 78 largemouth bass and the same number of gizzard shad were collected in Black Rocks in 2012. This represents a ten-fold increase over the 2011 catch. The Westwater Canyon estimates of wild adults range from about N = 4,700 in 1998 to N = 2,500 in 1999, 2000, to N = 1,525 in 2007–2008. Although researchers link humpback chub declines in the upper portions of Desolation Canyon to increasing abundance of nonnative smallmouth bass there, a different mechanism appears to have impacted humpback chub in the Colorado River canyons. The large declines in humpback chub densities in both Black Rocks and Westwater Canyons occurred in the late 1990's prior to more recent increases of nonnative predators in the Colorado River. In 2008, the core population (Black Rocks/Westwater combined) dropped | 16 |
| b). Recovery goal development. If population meets or exceeds recovery or Apx. D goals, it will be considered to exhibit a positive population response. | General: VIIA5d | Recovery goals complete. Revision underway for Colorado pikeminnow (draft version shared with the Recovery Programs in December 2014; completion paused to conduct PVA). The Service has convened a humpback chub recovery team to revise that species plan - letters of appointment were mailed to prospective team members in spring 2015. Species status assessment for razorback sucker will begin in 2015. | 16-17 |
| Long-term Funding and Annual Appropriations. | General: VIIB | Complete and ongoing. | 17 |
| Recovery Agreements | | | |
| a). With consultations. | N/A | Ongoing | 18 |
| b). By water users controlling a majority of existing depletions above the Gunnison River. | N/A | Complete | 18 |
| Depletion Charges on New Depletions | N/A | Ongoing | 19 |
| Incidental Take | | | |

| Recovery Actions in 15-Mile Reach PBO | RIPRAP Item # | Status | PBO Page # |
|---|---|---|---|
| a). Develop plan to monitor incidental take of endangered fish in diversion structures. | Colorado: VB4a | 3/32" mesh screens on Grand Valley Project, and GVIC diversion dams prevent entrainment of adult, subadult, and juvenile fish (preventing entrainment of adult and subadult fish required is by recovery goals). "Plan" complete in that fish are retrieved from canals (annually) whenever canal sreens cannot be fully operated. 9,737 native fish were salvaged and relocated from the GVIC and GVP canals following the 2013 irrigation season. The overwhelming majority of these fish were native species (predominantly flannelmouth sucker and roundtail chub).  Fourteen endangered fish were also salvaged: (3) razorback sucker and (11) bonytail. 17,865 native fish were salvaged and relocated after the 2012 irrigation season, including 3 razorback sucker and 4 bonytail. | 71 |
| b). Estimate amount of incidental take of young razorback and pikeminnow in the 15-Mile Reach. | Colorado: VB4b | Service believes screening of diversion structures has resolved entrainment issues; anytime screens are not fully operationed, the Service conducts fall sampling in the canals to retrieve endangered and other native fish. | 71 |
| Fish Screens (Reasonable & Prudent Measures) | | | |
| a). GVIC. | Colorado: IIB1b | Complete.  2014: Operations intermittent through irrigation season due to high flows and various mechanical issues; screen was operational 139 days (64%) of the irrigation season; non-operational for 79 days (36%). 2013: Operations intermittent through irrigation season due to storm events and various mechanical issues; screen was operational 127 days (59%) of the irrigation season; non-operational for 89 days (41%).  GVIC was not taking its full allotment of water during the 'April Hole' (when flows dropped below 100cfs at the Palisade gage). The fish passage canal was closed (i.e. the Obermeyer gate was in the raised position) 43% of days during the 2013 irrigation season.Some retrofits under consideration.  ** Evaluation of condition of surrogate species (white sucker) below return pipe deferred due to flow conditions since 2011. | 71 |
| b). Grand Valley Project Gov't Highline. | Colorado: IIB3b | Complete.  Screen operated through most of season in 2011.  Screen operated when conditions allowed in 2012; accumulated sediment removed. | 71 |
| Reinitiation | | | |
| a). Review RIPRAP implementation. | Colorado: IA6 | This is it (begun in 2003 and done every 2 years thereafter). | p.74, c. |

nice

NOTE TO REVIEWER

Annual Sufficient Progress Review of the Upper Colorado River Endangered Fish Recovery Program. This packet includes the memorandum for RD signature and (2) technical attachments. Tom Chart is scheduled to brief Noreen Walsh on its content on September 30, 2015. There is a considerable amount of information provided; we direct the reviewer to the 4-pg Conclusion section that starts on pg 30 of the memo document. To summarize,

"The Service calls for greater attention to several ongoing / pending recovery actions (beginning on pg 31):

    1. Nonnative Fish – *[The Service] encourage[s] Program partners to follow through on the extensive coordination that occurred in 2014 and which led to a decision to install a net on the Elkhead Reservoir spillway to further reduce escapement of nonnative northern pike and smallmouth bass. We understand that a net will be installed prior to spring runoff in 2016.*

    2. Flow management - *As was the case in our 2014 Sufficient Progress review, the Service remains concerned that the timeline for development of a White River management plan continues to slip. We appreciate CWCB's contributions from their Species Conservation Trust Fund to eventually contract a consultant to lead this effort. And we fully understand that considerable effort has been expended over the course of the past year to secure that contract, but nevertheless a contractor has not yet been retained. It is of critical importance that a contractor be hired and that the necessary hydrologic modelling be started by our next sufficient progress review. Such a plan will provide the Service and water users with clear definition of a level of future water development that can rely on the Recovery Program for ESA compliance. Further, that management plan will be the mechanism through which endangered fish flow recommendations can finally be approved for this important tributary to the Green River.*

    3. Endangered fish entrainment in irrigation canals - *Service applauds the Biology Committee on their important decision this past winter to endorse a weir-wall type solution for the Green River canal, which is similar to the solution implemented by the San Juan River Recovery Program at the Hogback Diversion. We agree that prior to construction at the Green River canal, the San Juan project should provide proof of concept, but we encourage the Upper Colorado Program to act as quickly as reasonably possible.*

Bottomline – at the bottom of pg 32 the Service concludes that : *the Recovery Program is making sufficient progress to continue avoiding the likelihood of jeopardy resulting from depletion impacts of new projects that have an annual depletion of up to 4,500 acre feet.* The Service takes the strongest position on development of a White River Management Plan in this memo (see Flow Management above). The Program Director's office is committed to work with

the Colorado Water Conservation Board over the course of the next year to get a contractor in place to start the necessary hydrologic modeling.

The Recovery Program's Management Committee was given the opportunity to review a final draft of this memo and provided no substantive comments.

DEPARTMENT OF THE INTERIOR
U.S. FISH AND WILDLIFE SERVICE
REGION # 6

# ENVIRONMENTAL CONTAMINANTS PROGRAM
## OFF-REFUGE INVESTIGATIONS SUB-ACTIVITY

## Field assessment of mercury exposure to Colorado pikeminnow within designated critical habitat.

Project ID: FFS# 6F54 and DEC# 200860001.1

by

Barb Osmundson
Environmental Contaminants Specialist
Western Colorado Field Office

and

Joel Lusk
Environmental Contaminants Specialist
Albuquerque, NM Field Office

May 5, 2011

Congressional District #'s  Colorado-3, Utah-2, New Mexico-3

# ACKNOWLEDGEMENTS

This study would not have been possible without several individuals connected with other programs and studies, who agreed to collect muscle plug samples.  Many thanks to John Hawkins, Sam Finney, Dave Beers, Dale Ryden, Doug Osmundson, Travis Francis, Trina Hedrick, Paul Badame, Derek Everud, Boyd Wright, Scott Durst, and numerous valuable seasonal employees for the field work and collection of muscle plugs.  Also we appreciate Tom Czapla, Kevin Bestgen, Chuck McAda, Dave Irving, Mark Fuller, Patrick Goddard, Laurie Martin, and Dave Campbell for their assistance with the study approval process and coordination of sampling efforts.  Thanks to John Isanhart, who coordinated sample catalogs of Colorado pikeminnow and roundtail chubs during 2009 from the White River.  Thanks to Larry Gamble and Kevin Johnson for review of the study proposal, and their assistance in making this project competitive for funding, and review of the final report.

Colorado River Recovery Program (Tom Czapla, Kevin Bestgen, John Hawkins, Chuck McAda)

Colorado River Fisheries Project-Vernal Utah (Dave Irving, Sam Finney, Mark Fuller, Dave Beers)

Colorado River Fisheries Project-Grand Junction, Colorado (Dale Ryden, Doug Osmundson, Travis Francis)

Utah Division of Wildlife Resources (Trina Hedrick, Patrick Goddard, Paul Badame, Derek Everud)

Colorado Division of Wildlife (Boyd Wright, Laurie Martin)

San Juan Implementation Program Office (Scott Durst, Dave Campbell)

Valuable seasonal employees with field crews

USFWS Environmental Contaminants Program (John Isanhart, Larry Gamble, Kevin Johnson)

# ABSTRACT

In 1994, critical habitat was designated in the Colorado, Green, Yampa, White, and San Juan rivers in western Colorado and eastern Utah for four endangered Colorado River fish.  Colorado pikeminnow is a long-lived piscivorous species, and they are voracious predators at the top of the food chain.  Mercury concentrations found in Northern pikeminnow (*Ptychocheilus oregonensis*) collected in Oregon and Sacramento pikeminnow (*Ptychocheilus grandis*) collected in northern California revealed relatively high mercury concentrations.  Of concern for the endangered Colorado pikeminnow (*Ptychocheilus lucius*) is the proximity of 12 coal-fired power plants to critical habitat.  These power plants emit several pounds of atmospheric mercury every year.  Also, mercury residing in gold ore are in Nevada has been released into the air when the ore was heated to extract the gold, and transported to downwind sites, including Utah.  Mercury concentrations have been found to be elevated in other fish species found in Colorado pikeminnow critical habitat.  Muscle plug samples were taken from 100 Colorado pikeminnow captured in the Colorado, White, Yampa, Green, and San Juan rivers for mercury analysis.  Mercury concentrations in Colorado pikeminnow collected from the Green, Yampa, White, and Colorado Rivers usually exceeded the recommended toxicity guidelines for human consumptive advisories, and also fish health.  Mercury concentrations in Colorado pikeminnow captured from the San Juan River that were > 400 mm in length also exceeded guideline concentrations.

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

LIST OF FIGURES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

LIST OF TABLES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

LIST OF ACRONYMS AND ABBREVIATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . .

ACKNOWLEDGEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

ABSTRACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
    Background and Justification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
    Objectives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
    Management Actions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

METHODS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
    Data Collection and Analytical Chemistry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
        Biopsy for Muscle Plug Collection
        Muscle Plug Collection from Archived Colorado Pikeminnow and Analytical
            Chemistry. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
        Muscle Plug Collection from Roundtail Chub in the White River . . . . . . . . . . . .
        Relative Body Condition of Colorado pikeminnow. . . . . . . . . . . . . . . . . . . . . . . .
        Statistical Analysis and Data Interpretation. . . . . . . . . . . . . . . . . . . . . . . . . . . .

RESULTS AND DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
    Colorado Pikeminnow Collections. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
    Roundtail Chub Collection and Muscle Plug Concentrations. . . . . . . . . . . . . . . . .
    Mercury Concentrations in Colorado Pikeminnow. . . . . . . . . . . . . . . . . . . . . . . . .
        Comparison of Mercury in Colorado pikeminnow with Other Studies . . . . . . . . .
        Mercury Contamination and Endocrine Disruption. . . . . . . . . . . . . . . . . . . . . . .
    Body Condition and Mercury Concentrations . . . . . . . . . . . . . . . . . . . . . . . . . . . .
    Archival Colorado Pikeminnow Collections and Analytical Results . . . . . . . . . . . .
    Selenium-Mercury Interaction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
    White River Mercury Concentrations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
    Status of Colorado pikeminnow . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
        Colorado River. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
        Green River. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
        San Juan River. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
        Colorado pikeminnow population status and mercury concentrations . . . . . . . . . .

MANAGEMENT RECOMMENDATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

REFERENCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## LIST OF FIGURES

Figure 1.  Distribution and critical habitat of the Colorado pikeminnow in the Colorado
River System (USFWS 1994)

Figure 2.  Coal-fired power plant proximity to Colorado pikeminnow critical habitat (Dots
are power plant locations and stippled outline is critical habitat . . . . . . . . . . . . . . .

Figure 3.  Mean (+/-95% Confidence Intervals) (CI) of mercury concentrations in Colorado
pikeminnow muscle plugs.  Red line is EPA human consumptive advisory of 0.3
μg/g WW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Figure 4.  Maximum, minimum, and mean mercury concentrations in Colorado pikeminnow
muscle plugs.  Red line identifies the USEPA's recommented tissue-based
mercury water quality criterion of 0.3 μg/g WW . . . . . . . . . . . . . . . . . . . . . . . . . .

Figure 5.  Mean whole-body mercury concentrations in Colorado pikeminnow estimated
from muscle plug concentrations by using model from Peterson et al. (2005).
red line is threshold effects level from Beckvar et al. (2005) of 0.2 μg/g WW
mercury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Figure 6.  Mean relative body condition and mean mercury concentrations for Colorado
pikeminnow in river reaches included in designated critical habitat (number of
samples is provided above bar)

## LIST OF TABLES

Table 1.  River segment coordinates where Colorado pikeminnow captures occurred and muscle plug samples were taken in 2008 and 2009. . . . . . . . . . . . . . . . . . . . . . . . .

Table 2.  Mercury concentrations (µg/g WW) and sampling location coordinates in roundtail chub collected from the White River in 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Table 3.  Mercury concentrations in Colorado pikeminnow (CPM) muscle plug (MP) samples collected in designated critical habitat . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Table 4.  Average (range) length, weight, moisture content, total mercury, methyl mercury, and selenium concentrations in archival Colorado pikeminnow muscle plugs and estimated whole body mercury concentrations compared by collection years and river basin or category. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Table 5.  Mass and molar concentrations of mercury and selenium and surplus selenium concentrations in Colorado pikeminnow . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Table 6.  Colorado pikeminnow mercury concentrations and population status for each River segment in critical habitat  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## LIST OF ACRONYMS AND ABBREVIATIONS

$^0$C . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Celcius (degrees)

cm. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Centimeter

$R^2$ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Coefficient of Determination

CAAS. . . . . . . . . . . . . . . . . . . . . . . . . .Combustion atomic absorption spectrometr

CDPHE. . . . . . . . . . . . . . . . . . .Colorado Department of Public Health and Environmen

CPM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Colorado pikeminnow

DDT . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Dichlorodiphenyltrichloroethane

DNA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Deoxyribonucleic acid

g. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Gram

>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . greater than

Hg. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Mercury

≤. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .less than or equal to

ug/g. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Micrograms per gram

mm. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Millimeter

MW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Molecular weight
Ng/L. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Nanograms per liter
NCBP. . . . . . . . . . . . . . . . . . . . . . . . . National Contaminants Biomonitoring Program
NIWQP. . . . . . . . . . . . . . . . . . . . . . . . . . .National Irrigation Water Quality Program
NRDC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . National Resource Defense Council
ppm. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Parts-per-million
p. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Probability
n . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Sample size
Se. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Selenium
Se:Hg . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Selenium to Mercury ratio
U.S. EPA. . . . . . . . . . . . . . . . . . . . . . . . . . . .U.S. Environmental Protection Agency
ww. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . wet weight

# INTRODUCTION

**Background and Justification**

Mercury is a toxic metallic element, and has no known essential metabolic function in
vertebrates (Wiener & Spry 1996). Fish sampling surveys in the last 20 years have demonstrated
widespread mercury contamination; especially in the freshwater systems of the northern
hemisphere (Schmitt & Brumbaugh 1990; Brumbaugh et al. 2001). In 2002, there were 2,140
freshwater fish consumption advisories for mercury across 45 states, with 28 states issuing
statewide advisories (US EPA 2004). Mercury occurs naturally in the environment and can be
released from natural sources such as volcanic and geothermal activity, marine environments,
and forest fires. Human activity, particularly coal-fired power plants and gold-mining, release

large amounts of mercury into the atmosphere (Seigneur et al. 2004, Lindberg et al. 2007). Eventually, this atmospheric mercury enters waterways, and often ends up in lake bottoms and wetlands that are at remote locations from known sources (Lorey 2001; Lindberg et al. 2007). Weidner (2007) described mercury concentrations in precipitation at a monitoring location in southwestern Colorado as among the highest in the United States. After mercury enters aquatic ecosystems, through a number of complex physical and chemical processes, mercury bioaccumulation occurs in the food web and particularly in fish (USEPA 1997; Cocca 2001; Engstrom 2007). The production of methyl mercury occurs when microbial organisms methylate inorganic mercury species into organic species. This production of methyl mercury is a key mechanism affecting bioaccumulation in fish, as nearly all mercury in fish tissue is methyl mercury (Wiener & Spry 1996).

Fish accumulate methyl mercury mostly from their diet, though some waterborne methyl mercury can be passed over the gills and accumulated directly (Wiener & Spry 1996). In temperate waters, bioaccumulation of mercury by fish seems to occur most rapidly in the summer, when microbial production of methyl mercury and feeding and metabolic rates of fish are greatest. Most of the methyl mercury in fish accumulates in the muscle tissue and is covalently bound to protein sulfhydryl groups (Wiener & Spry 1996). Fish eliminate mercury very slowly, with a half-life of about two years. Mercury concentrations in fish tissue generally increase with increasing age or body size, because of the slow rate of elimination relative to the rate of uptake. Also, mercury biomagnifies in aquatic food-chains; therefore, fish at higher trophic levels usually contain greater mercury concentrations than coexisting species at lower trophic levels. In wild fishes, a small quantity of mercury is transferred from the female to the eggs during oogenesis. Lab studies have shown that either inorganic or methyl mercury transferred from female fish to eggs during oogenesis can adversely affect developing fish embryos, reducing hatching, development, and survival (Weiner & Spry 1996). Because mercury is a neurotoxin, sublethal effects in fish may include altered behavior, such as reduced ability to avoid predators and reduced ability to secure food, resulting in emaciation and slow growth. Recent lab studies have demonstrated that mercury can also negatively affect the

endocrine system of fish at environmentally relevant concentrations.  For example, mercury exposure to fish can result in suppressed levels of reproductive hormones in male and female fish and diminished reproductive success (Hammerschmidt et al. 2002;  Drevnick & Sandheinrich 2003;  Matta et al. 2001).

In 1994, critical habitat was designated in the states including Colorado and Utah for four endangered Colorado River fish (U.S.Fish & Wildlife Service 1994).  Of these four fish, the Colorado pikeminnow (*Ptychocheilus lucius*) is of most concern when considering potential mercury exposure.  Colorado pikeminnow (CPM) are long-lived piscivorous species, and voracious predators at the top of the food chain.  Mercury concentrations found in Northern pikeminnow (*Ptychocheilus oregonensis*) collected in Oregon (Peterson et al. 2005) and Sacramento pikeminnow (*Ptychocheilus grandis*) collected in northern California (Schwarzbach et al.2001) had relatively high concentrations compared to non-piscivorous species. Though extirpated from the Lower Basin, native populations of Colorado pikeminnow are now restricted to the Upper Basin in Colorado, Utah, and New Mexico.  Critical habitat is designated in portions of the Colorado, Green, Yampa, White, and San Juan rivers (fig. 1).  Of concern is the proximity of 12 coal-fired power-plants to critical habitat.  Calculated annual mercury emissions from each of these 12 power-plants are provided in Figure 1.  These concentrations were calculated by applying the mercury emission rates developed in "Mercury Falling" (Environmental Working Group, Clean Air-Network and NRDC, 1999) to the heat input reported in the EPA CEMA data for 2000.  In a recent document, the Environment Colorado Research & Policy Center listed counties in each state that had highest power-plant mercury emissions in 2003(ECRPC 2005).  Moffat County in Colorado was listed with a total annual mercury emission value of 343 pounds.  San Juan County in New Mexico was listed with a total mercury release of 1,341 pounds.  Also contributing to mercury emissions are Nevada goldmines. Mercury residing in the gold ore is



Environmental Release Profile for Coal-fired Power Plants during 2000

| | | Colorado | www.cleartheair.org/relatives/20023.pdf |
|---|---|---|---|
| | | County | Mercury (lbs) |
| 3 | Cameo | Mesa | 12 |
| 2 | Craig | Moffat | 120 |
| 1 | Hayden | Routt | 33 |
| 4 | Nucla | Montrose | 22 |
| | | Utah | www.net.org/air/local/ut.pdf |
| 11 | Bonanza | Uintah | 36 |
| 10 | Carbon | Carbon | 46 |
| 8 | Hunter | Emery | 219 |
| 9 | Huntington | Emery | 179 |
| 12 | Intermountain | Millard | 150 |
| | | New Mexico | www.cleartheair.org/relatives/20089.pdf |
| 5 | Four Corners | San Juan | 530 |
| 6 | San Juan | San Juan | 771 |
| | | Arizona | www.net.org/air/local/az.pdf |
| 7 | Navajo | Coconino | 439 |

Figure 1.  Coal-fired power plant proximity to Colorado pikeminnow critical habitat (Dots are power plant locations and stippled outline is critical habitat).

released into the air when the ore is heated to extract the gold, and transported to downwind sites including Utah and southern Idaho (The Idaho Statesman 2005; The Salt Lake Tribune 5/11/2005, 10/24/2005) (www.greatbasinminewatch.org)(www.earthworksaction.org/mercury). It has been estimated that these ore-roasters connected with four Nevada gold mines emit more mercury annually than 25 average coal-fired power-plants.

In 2001, the U.S. Environmental Protection Agency (EPA) developed a new methyl mercury water quality criteria of 0.3 mg/kg wet weight (WW) in edible fish tissue and shellfish.  This tissue residue concentration was designed to protect human health (U.S. EPA 2001).  Yeardley et

al. (1998) suggested that mercury concentrations >0.1 ug/g WW may be harmful to piscivorous mammals. Regarding fish health, a recent publication examined approaches for linking whole-body fish tissue residues of mercury and DDT to biological effect thresholds (Beckvar et al. 2005). After the consideration of 10 papers containing mercury residue-effect information for eight fish species, and using survival, growth, reproduction, and behavior as toxicity endpoints, they concluded that 0.2 mg/kg mercury in whole body fish is a guideline protective of juvenile and adult fish. The authors believe that additional studies likely will not substantially alter this 0.2 mg/kg WW protective guideline. Schmidt and Brumbaugh (1990) listed the 1984 NCBP 85th-percentile mercury concentration in whole body fish to be 0.17 ug/g WW. A National pilot study of mercury contamination in aquatic ecosystems found a mean mercury concentration of 0.478 ug/g WW and geometric mean of 0.218 ug/g WW in fish fillets (Brumbaugh et al. 2001). This study targeted large rivers and areas of known or suspected mercury contamination.

In 2005, the State of Utah issued mercury advisories for sport fish in three locations (Salt Lake City Tribune 11/11/2005; www.deq.utah.gov/issues/Mercury/fish_advisories.htm). An analysis of channel catfish (*Ictalurus punctatus*) in the Green River in Desolation Canyon in eastern Utah found 8 out of 10 channel catfish exceeded EPA's human consumption advisory of 0.3 parts per million WW. In August, 2005, brown trout (*Salmo trutta*) caught from Mill Creek (flows into Colorado River) by Moab, UT were found to exceed the EPA's methyl mercury criteria. Both of these sites are within designated critical habitat for Colorado pikeminnow. In 1990, some fish sampled from the San Juan River within critical habitat for the National Irrigation Water Quality Program (NIWQP) contained elevated mercury concentrations (Blanchard et al. 1993) (Butler et al. 1995). Mercury advisories posted for sport fish in reservoirs of the San Juan and Dolores River Basins exemplify mercury contamination in the southwest corner of Colorado. Six out of 23 roundtail chub (*Gila robusta*) (potential Colorado pikeminnow prey species) collected in 1992 within Colorado pikeminnow critical habitat for NIWQP from the Gunnison and Colorado rivers contained mercury concentrations which exceeded 0.3 mg/kg WW (Butler et al. 1994).

A 2003 study designed to investigate environmental contaminants and their effects on fish in the Colorado River Basin demonstrated that mercury concentrations were elevated in some fish

collected from the Yampa River at Lay, Colorado (0.18-0.27 ug/g WW), and the Green River at Ouray National Wildlife Refuge in Utah (0.14-0.21 ug/g WW (Hinck et al. 2006). Both of these sites are located within designated critical habitat for Colorado pikeminnow. Seven of 10 smallmouth bass from the Yampa River site at Lay, CO were found to be intersex. Estrogen concentrations in male bass were relatively high at this site as well. And high concentrations of vitellogenin (egg production hormone) were measured in male bass from the Green River at Ouray National Wildlife Refuge. Thus, elevated mercury concentrations occur in other fish species located within Colorado pikeminnow critical habitat. Four Colorado pikeminnow captured from the White River and three Colorado pikeminnow captured from the Colorado River during the summer of 1986 were removed for propagation purposes (Krueger 1988). These fish died in confinement from 2-8 months later, and bodies were analyzed for heavy metals. Elevated mercury concentrations were found in these Colorado pikeminnow; those captured from the White River ranged from 0.31-0.96 ug/g WW, and those captured from the Colorado River ranged from 0.28-0.52 ug/g WW.

The status of the Colorado pikeminnow is still tenuous. The wild population in the San Juan River is essentially gone (Ryden 2005). The current population of Colorado pikeminnow consists of hatchery-raised fish stocked from 1996 to the present. In 2004, a total of 2,649 Colorado pikeminnow (only 2 identified as wild fish) were collected in the San Juan River as a result of stocking efforts. To determine if successful reproduction is occurring in these hatchery released Colorado pikeminnow, larval fish sampling has been conducted since 1998 (Miller 2006). No larval Colorado pikeminnow were captured in 1998-2000. Only one was captured in 2001. And out of 90,518 larval fish collected in the San Juan River in 2002, no larval Colorado pikeminnow were found.

In the upper Colorado River, Osmundson and Burnham (1998) summarized that the Colorado pikeminnow adult survival rate is probably fairly constant, although recruitment is highly variable. They concluded that recovery efforts will depend on providing environmental conditions that increase reproductive success and survival of early life stages. Bestgen et al. (2005) found an apparent decline of 48% in Colorado pikeminnow abundance throughout the

Green River Basin, Colorado and Utah, from 2000 to 2003.  Reductions were most severe in the middle Green River (59%) and the White River (63%), followed by the lower Green (36%), Yampa River (29%), and Desolation-Gray Canyon (11%).  Bestgen et al. (2005) concluded that recruitment rates for Colorado pikeminnow may not be sufficient to offset mortality rates of adults.  They discussed that reduced abundance of recruit-sized Colorado pikeminnow may be due to weak year-classes of age-0 Colorado pikeminnow produced in nursery habitat in the middle and lower Green River.

Similar to selenium, researchers have found that mercury in fish tissue can be accurately assessed by using muscle biopsies (Pearson 2000, Baker et al. 2004, Peterson et al. 2005).  Pearson (2000) found no significant difference between mercury in biopsies or whole fillets in pike and walleye samples.  Peterson et al. (2005) found a highly significant relationship between biopsy and whole-fish mercury concentrations by using 13 piscivorous and non-piscivorous fish species.  Thus, by using dermal muscle punches, mercury residues can accurately be determined without having to sacrifice fish.  This method will be used during this study to determine mercury concentrations in Colorado pikeminnow.  Because mercury is a contaminant which bioaccumulates up the food-chain, mercury in the tissue integrates route, duration, and magnitude of exposure, as well as chemical form, metabolic transformations, and modifying biotic and abiotic factors.  Fish accumulate methyl mercury mostly from their diet (Wiener and Spry 1996), but Brumbaugh et al. (2001) also found a strong positive correlation between fish fillet mercury concentration and methyl mercury in water.  They were able to associate a methylmercury water concentration of 0.12 ng/L with a fish fillet mercury concentration of 0.3 ug/g WW for an age-3 fish, when all species were considered.  Bioaccumulation was only moderately correlated with methylmercury in sediment or total mercury in water.  Because of these demonstrated relationships, it is unnecessary to sample water or sediment during this study.

**Scientific Objectives**

The scientific objectives of this study are as follows:

1) Determine mercury concentrations in Colorado pikeminnow (CPM) collected from several different river reaches within critical habitat by using biopsied muscle plugs. Develop regression equation between CPM length and mercury concentrations.

2) Compare mercury concentrations in Colorado pikeminnow between rivers, and between reaches within rivers.  Compare mercury concentrations in Colorado pikeminnow to locations of coal-fired power-plants.

3) Assess risk to Colorado pikeminnow from mercury exposure, by comparing tissue residues to guidelines and those linked with adverse effects, including endocrine disruption, by other researcher with other species.

4) Compare mercury tissue residues in Colorado pikeminnow to their population survey data to determine if there is a correlation.

**Management Actions**

This study was designed to provide information to the Colorado River Endangered Fish Recovery Program regarding mercury contamination in different geographic portions of critical habitat in the states of Colorado, New Mexico, and Utah.  Information from this study will assist the Recovery Program in the prioritization of sites for release of hatchery-raised Colorado pikeminnow, as well as other propagated endangered Colorado River fish.  Also, this information could assist the Recovery Program to prioritize least contaminated sites for bottomland restoration.  As stated in the Recovery Implementation Program Recovery Action Plan (USFWS 2006), "It is the intent of the Recovery Program to support and encourage the activities of entities outside the Recovery Program that are working to identify problem sites, evaluate contaminant impacts, and reduce or eliminate those impacts".  Information from this study may be used to scale appropriate decisions at the federal and regional level regarding appropriate regulations for mercury emissions.  Regulators need data and information for the justification of lowered permitted emissions.  Also, contaminated sites will be recommended for inclusion on the Clean Water Act 303(d) list of impaired waters for the states of Colorado, Utah, and/or New Mexico.  Future studies are warranted to determine the level of endocrine disruption occurring in Colorado pikeminnow, as compared to bass occupying the same sites.

# METHODS

## Data Collection and Analysis

### Muscle Plug Biopsy Collection

Muscle plugs were taken from wild and hatchery-stocked Colorado pikeminnow (CPM) to determine mercury accumulation within critical habitat.  Muscle plugs were taken by staff from several agencies while conducting Colorado pikeminnow population surveys;  including, USFWS Colorado River Fisheries Project in both Grand Junction, CO and Vernal UT, Colorado Division of Wildlife, Utah Division of Wildlife Resources, and Colorado State University.  Five rivers were sampled, including the San Juan, Colorado, White, Yampa, and Green rivers.  The Colorado River was divided into upper and lower reaches and the Green River was divided into upper, middle, and lower reaches.  In addition, the lower 2.3 miles of the Gunnison River downstream of Redlands Diversion Dam was also sampled, as fish utilizing this reach are generally part of the Colorado River population. Coordinates associated with each river segment are provided in Table 1.  The combined Green River segments covered almost 205 total river miles.  The combined Colorado River segments covered almost 75.9 total river miles.  The White River segment covered 102.4 river miles, and the Yampa River segment covered almost 22 river miles.  Ten CPM muscle plugs were taken at each river segment.  In addition, 11 roundtail chub muscle plug samples were also collected from the White R., and sampling locations are displayed in Table 2.  The San Juan River collections occurred between Shiprock and Aneth,

| River | Segment[1] | | River miles | Location Description | UTM's (Zone 12) | Latlongs |
|-------|-----------|------|-------------|---------------------|-----------------|----------|
| Colorado | LC | Stop | 42.3 | Below Potash | 4255628 N 615674 E | -109.6745 38.44331 |
| | | Start | 105.8 | Fish Ford launch | 4309671 N 652223.5 E | -109.244 38.92463 |
| | UC | Stop | 170.8 | Gun. R. confluence. | 4325780 N 710178.1 E | -108.571 39.0577 |

Table 1.  River segment coordinates where Colorado pikeminnow captures occurred and muscle plug samples were taken in 2008 and 2009.

| | | Start | 183.2 | Labor Camp | 4330627 N 726547 E | -108.3804 39.09537 |
|---|---|---|---|---|---|---|
| San Juan | | Stop | 106 | Aneth | 4114487 N 665398 E | -109.14 37.16 |
| | | Start | 146.3 | Shiprock | 4074289 N 703649 E | -108.72 36.79 |
| White | | Stop | 0.9 | Close to Green R. confluence | 4433366 N 636766 E | -109.39688 40.03945 |
| | | Start | 102.5 | Below Taylor Draw Dam | 4430780 N 667791 E | -109.03407 40.01056 |
| Yampa | | Stop | 81.6 | Upper Maybell | 4489051 N 748673 E | |
| | | Start | 103.4 | Morgan Gulch | Zone 13 4473396 N 256857 E | |
| Green | LGR | Stop | 53.8 | Green R. Utah | 4267030 N 586913 E | -110.00262 38.54745 |
| | | Start | 111.1 | | 4273276 N 584974 E | -110.17754 38.90998 |
| | MGR | Stop | 133.5 | Close to Price R. confluence | 4326476 N 581269 E | |
| | | Start | 238.3 | Below Ouray | 4429511 N 631382 E | |
| | UGR | Stop | 291 | Bonanza Bridge | 4463388 N 631382 E | |
| | | Start | 333.9 | Island Park | 4485121 N 656798 E | |
| [1]LC=Lower Colorado R., UC=Upper Colorado R., GR=Lower Green R., MGR=Middle Green R., UGR=Upper Green R. | | | | | | |

Table 2 .  Mercury concentrations (ppm WW) and sampling location coordinates in roundtail chub collected from the White River in 2009.

| | | | | | UTMs | | | |
|---|---|---|---|---|---|---|---|---|
| Fish ID | Hg | Length | Weight | Start | | Stop | | |
| 2909 | 0.111 | 223 | 86 | 657146 | 4425911 | 655504 | 4426673 |
| 20DF | 0.556 | 295 | 217 | 657146 | 4425911 | 655504 | 4426673 |
| 5914 | 1.37 | 382 | 401 | 661827 | 4428305 | 660256 | 4427712 |
| FA8E | 0.212 | 206 | 77 | 657146 | 4425911 | 655504 | 4426673 |
| 0F1E | 0.272 | 226 | 98 | 657146 | 4425911 | 655504 | 4426673 |

| B1BB | 0.132 | 206 | 77  | 661827 | 4428305 | 660256 | 4427712 |
| 2130 | 0.515 | 284 | 210 | 657146 | 4425911 | 655504 | 4426673 |
| 17F8 | 1.97  | 385 | 426 | 655367 | 4426006 | 654650 | 4424498 |
| 500D | 0.283 | 299 | 227 | 660254 | 4427719 | 659612 | 4426010 |
| 20B2 | 0.574 | 306 | 220 | 655367 | 4426006 | 654650 | 4424498 |
| 4FD8 | 0.539 | 297 | 194 | 655367 | 4426006 | 654650 | 4424498 |

New Mexico, and covered 40 river miles.  There were 20 Colorado pikeminnow muscle plugs taken from the San Juan River.  If possible, muscle plugs were taken during the final pass, so as not to interfere with population survey results.  Muscle plugs were taken following procedures specified by Williamson (1992) and Peterson et al. (2005).  Muscle plugs were taken by using a 5 mm biopsy punch, in which a different punch was used on each fish and discarded after use.  Muscle plugs were taken 1 to 2 cm below the dorsal fin by inserting the punch with a slight twisting motion.  Tilting the punch allows the tissue sample to break off at the end.  The sample was emptied into acid-washed cryogenic vials, placed on dry (or wet) ice in the field until they were eventually frozen at -20C.  Wounds were treated with betadine swabs to disinfect and decrease the chance of infection.  In the laboratory, skin and scales were removed with an acid-washed scalpel, before shipment to the analytical lab for mercury analysis.  These skin samples were frozen in cryotubes for potential future use for DNA isolation for development of a Colorado pikeminnow specific vitellogenin assay (Denslow 1996).  Mercury was analyzed at Trace Element Research Laboratory (TERL) at Texas A & M by using combustion atomic absorption spectrometry (CAAS)(U.S. EPA, Cizdziel et al. 2002).  This relatively new procedure allows small quantities of tissue to be used (approx. 0.25 g), compares with other analytical procedures in terms of accuracy and precision, and has no sample preparation (direct mercury analysis) (Peterson 2005 et al.).  Appropriate QA/QC connected with mercury analysis was conducted by TERL.

Statistical Analysis and Data Interpretation

A regression equation will be developed using Colorado pikeminnow body length as the independent variable and mercury concentration in the muscle plug as the dependant variable.

After ln transformations, t-tests were used to compare mercury concentrations between reaches and rivers.  Mercury concentrations in Colorado pikeminnow muscle plugs are compared to those listed by Beckvar et al. (2005), Sandheinrich and Weiner (2011), and others to assess potential adverse effects.  Mercury concentrations in Colorado pikeminnow were compared to population status data to determine if there is a correlation.

Colorado pikeminnow muscle plugs were taken from the Green River Basin reaches during the final pass of population survey work in late spring, 2008.  Colorado pikeminnow muscle plugs were collected from the San Juan and Colorado Rivers during 2009.  Samples were frozen as soon as possible.  After all muscle plugs were collected, the skin was dissected off the muscle plugs, and samples were shipped to TERL for mercury analysis.

<u>Body Condition of Colorado pikeminnow</u>

Total length (mm) and weight (g) were determined at the time each fish was sampled, and mean body condition was calculated for each river reach of critical habitat for comparison between reaches.  The relative condition ($k_n$) of Colorado pikeminnow was determined using the following equations from (Osmundson *et al.*1998):

$$k_n=100 \times M_o/M_e \hspace{4cm} \text{Equation 1}$$

where $M_o$ is the observed mass (g) and $M_e$ is the expected mass (g) as calculated from the following equation:

$$\log_{10}(M_e)=\log_{10}(\text{length})*m + b \hspace{3cm} \text{Equation 2.}$$

$M_e$ is calculated from combined fish measured and collected for muscle plug samples from each river reach, with (m) as the slope and (b) as the y-intercept.  The relative condition of Colorado pikeminnow is compared among the river reaches, and also regressed against mean mercury concentrations of Colorado pikeminnow for each river reach.

## RESULTS

**Mercury Concentrations**

During 2008, partners were able to collect muscle plugs from 41 different Colorado pikeminnow for mercury analysis (Table 3).  Of these muscle plug samples, 29 were collected from the upper, middle, and lower segments in the Green River;  8 were collected from the Yampa River;  and 4 were collected from the White River.  During 2009, partners were able to collect muscle plugs from 59 different Colorado pikeminnow for mercury analysis.  Of these, 23 were collected from the upper and lower segments of the Colorado River, 30 were collected from the San Juan River, and 6 were collected from the White River (increased the sample size from 4 to 10).

Table 3.  Mercury concentrations in Colorado pikeminnow muscle plug (MP) samples collected in designated critical habitat.

| Sample ID | Sample Date month, year | Percent Moisture | Muscle plug Hg (ppm WW) | Predicted WB Hg (ppm WW) | Length | Weight | Watershed |
|---|---|---|---|---|---|---|---|
| LG-9290 | May-08 | 78.1 | 0.38 | 0.19 | 340 | 380 | Green R. |
| LG-CPM1 | May-08 | 65.7 | 0.85 | 0.46 | 475 | 930 | Green R. |
| LG-CPM2 | May-08 | 82.1 | 0.32 | 0.15 | 395 | 581 | Green R. |
| LG-CPM3 | May-08 | 77.8 | 0.70 | 0.37 | 490 | 1020 | Green R. |
| LG-CPM4 | May-08 | 77.3 | 0.69 | 0.36 | 500 | 1230 | Green R. |
| LG-CPM5 | May-08 | 77.0 | 0.87 | 0.47 | 482 | 1050 | Green R. |
| LG-CPM6 | May-08 | 83.0 | 0.80 | 0.43 | 580 | 1600 | Green R. |
| LG-CPM7 | May-08 | 77.3 | 0.54 | 0.27 | 425 | 630 | Green R. |
| LG-CPM8 | May-08 | 75.6 | 0.68 | 0.36 | 510 | 630 | Green R. |
| LG-CPM9 | May-08 | 75.0 | 0.67 | 0.35 | 464 | 880 | Green R. |
| MGR-2B41 | May-08 | 78.0 | 0.64 | 0.33 | 482 | 897 | Green R. |
| MGR-4218 | May-08 | 76.7 | 0.64 | 0.33 | 453 | 672 | Green R. |
| MGR-53B5 | May-08 | 77.0 | 0.73 | 0.38 | 486 | 812 | Green R. |
| MGR-7B71 | May-08 | 78.7 | 0.74 | 0.39 | 525 | 936 | Green R. |
| MGR-810C | May-08 | 75.8 | 0.74 | 0.39 | 479 | 870 | Green R. |
| MGR-89d1 | May-08 | 61.7 | 1.08 | 0.59 | 458 | 698 | Green R. |
| MGR-8B2D | May-08 | 78.7 | 0.72 | 0.38 | 493 | 840 | Green R. |
| MGR-99B9 | May-08 | 82.3 | 0.76 | 0.40 | 534 | 1000 | Green R. |
| MGR-CA7A | May-08 | 78.3 | 0.92 | 0.49 | 485 | 721 | Green R. |
| UGR-3AE1 | May-08 | 76.8 | 0.64 | 0.33 | 690 | 2600 | Green R. |
| UGR-5777 | May-08 | 75.3 | 0.74 | 0.39 | 630 | 1971 | Green R. |
| UGR-57F8 | May-08 | 76.8 | 0.69 | 0.36 | 510 | 1085 | Green R. |
| UGR-5FF9 | May-08 | 77.6 | 0.54 | 0.28 | 505 | 1102 | Green R. |
| UGR-61C6 | May-08 | 78.1 | 0.84 | 0.45 | 515 | 1230 | Green R. |
| UGR-C1CF | May-08 | 75.9 | 0.55 | 0.28 | 415 | 626 | Green R. |

Table 3.  Mercury concentrations in Colorado pikeminnow muscle plug (MP) samples
collected in designated critical habitat.

| Sample ID | Sample Date month, year | Percent Moisture | Muscle plug Hg (ppm WW) | Predicted WB Hg (ppm WW) | Length | Weight | Watershed |
|---|---|---|---|---|---|---|---|
| UGR-D594 | May-08 | 77.7 | 0.52 | 0.27 | 470 | 836 | Green R. |
| UGR-E3B3 | May-08 | 78.3 | 0.74 | 0.39 | 575 | 2115 | Green R. |
| UGR-F7E5 | May-08 | 76.3 | 0.88 | 0.48 | 560 | 1727 | Green R. |
| UGR-FD31 | May-08 | 78.4 | 0.97 | 0.53 | 535 | 980 | Green R. |
| WR-3585 | May-08 | 78.2 | 1.02 | 0.56 | 536 | NA | White R. |
| WR-4F73 | Jun-08 | 74.9 | 0.84 | 0.45 | 680 | 2620 | White R. |
| WR-E0DA | May-08 | 77.0 | 0.66 | 0.34 | 486 | 812 | White R. |
| WR-F802 | Jun-08 | 76.9 | 0.70 | 0.37 | 585 | 1748 | White R. |
| WR-2FBD | Aug-09 | 82.2 | 1.02 | 0.59 | 450 | NA | White R. |
| WR-A9F1 | Aug-09 | 59.3 | 1.83 | 1.00 | 564 | 1285 | White R. |
| WR-5A10 | Aug-09 | 88.0 | 0.43 | 0.27 | 731 | 3441 | White R. |
| WR-5752 | Aug-09 | 80.7 | 1.19 | 0.68 | 561 | 1413 | White R. |
| WR-A374 | Aug-09 | 72.2 | 1.44 | 0.80 | 542 | 1020 | White R. |
| WR-7F5A | Aug-09 | 68.6 | 1.35 | 0.76 | 567 | 1286 | White R. |
| YR-09CC | May-08 | 76.3 | 0.48 | 0.24 | 565 | 2000 | Yampa R. |
| YR-1716 | May-08 | 76.3 | 0.39 | 0.19 | 559 | 1950 | Yampa R |
| YR-184E | May-08 | 74.9 | 0.49 | 0.25 | 573 | 2250 | Yampa R |
| YR-1ECD | Jun-08 | 75.6 | 0.50 | 0.26 | 634 | 2350 | Yampa R |
| YR-24EDa | May-08 | 74.4 | 0.55 | 0.28 | 549 | 1550 | Yampa R |
| YR-24EDb | May-08 | 75.2 | 0.58 | 0.30 | 549 | DUP | Yampa R |
| YR-298F | Jun-08 | 73.0 | 0.44 | 0.22 | 610 | 2050 | Yampa R |
| YR-2F17 | Jun-08 | 79.5 | 0.39 | 0.20 | 530 | 1425 | Yampa R |
| YR-FFC8 | May-08 | 71.1 | 0.57 | 0.29 | 692 | 3400 | Yampa R |
| 7358 | Jul-09 | 73.2 | 0.09 | 0.06 | 216 | 46 | San Juan R. |
| 94E6 | Jul-09 | 77.4 | 0.09 | 0.06 | 216 | 50 | San Juan R. |
| CDCC | Jul-09 | 81.4 | 0.04 | 0.03 | 242 | 95 | San Juan R. |
| 891E | Jul-09 | 80.0 | 0.12 | 0.09 | 250 | 105 | San Juan R. |
| 6879 | Jul-09 | 79.4 | 0.22 | 0.15 | 253 | 90 | San Juan R. |
| DF37 | Jul-09 | 75.0 | 0.16 | 0.11 | 260 | 120 | San Juan R. |
| A8B9 | Jul-09 | 77.8 | 0.05 | 0.04 | 260 | 120 | San Juan R. |
| 2BF3 | Jul-09 | 76.7 | 0.13 | 0.09 | 267 | 140 | San Juan R. |
| DD52 | Jul-09 | 79.1 | 0.21 | 0.14 | 270 | 135 | San Juan R. |
| 26BC | Jul-09 | 87.8 | 0.03 | 0.03 | 275 | 120 | San Juan R. |
| 9AE5 | Jul-09 | 79.5 | 0.06 | 0.05 | 280 | 135 | San Juan R. |
| 7C81 | Jul-09 | 88.4 | 0.03 | 0.03 | 281 | 140 | San Juan R. |
| 8F5E | Jul-09 | 77.1 | 0.09 | 0.06 | 290 | 170 | San Juan R. |
| B6AF | Jul-09 | 80.1 | 0.06 | 0.04 | 295 | 90 | San Juan R. |
| B151 | Jul-09 | 78.3 | 0.11 | 0.08 | 301 | 175 | San Juan R. |
| 9223 | Jul-09 | 78.7 | 0.07 | 0.05 | 303 | 155 | San Juan R. |
| 67EC | Jul-09 | 79.4 | 0.06 | 0.05 | 305 | 205 | San Juan R. |

Table 3.  Mercury concentrations in Colorado pikeminnow muscle plug (MP) samples collected in designated critical habitat.

| Sample ID | Sample Date month, year | Percent Moisture | Muscle plug Hg (ppm WW) | Predicted WB Hg (ppm WW) | Length | Weight | Watershed |
|---|---|---|---|---|---|---|---|
| E6BE | Jul-09 | 72.8 | 0.11 | 0.08 | 305 | 205 | San Juan R. |
| CC59 | Jul-09 | 72.6 | 0.05 | 0.04 | 306 | 253 | San Juan R. |
| 93F0 | Jul-09 | 77.9 | 0.05 | 0.04 | 306 | 150 | San Juan R. |
| 8F8C | Jul-09 | 76.9 | 0.10 | 0.07 | 311 | 180 | San Juan R. |
| F757 | Jul-09 | 79.2 | 0.16 | 0.11 | 312 | 190 | San Juan R. |
| 9E32 | Jul-09 | 81.1 | 0.13 | 0.09 | 312 | 210 | San Juan R. |
| 8507 | Jul-09 | 76.0 | 0.09 | 0.07 | 315 | 205 | San Juan R. |
| 7762 | Jul-09 | 78.0 | 0.21 | 0.14 | 324 | 220 | San Juan R. |
| 630B | Jul-09 | 73.0 | 0.28 | 0.18 | 346 | 290 | San Juan R. |
| D25E | Jul-09 | 78.4 | 0.31 | 0.20 | 418 | 460 | San Juan R. |
| F94E | Jul-09 | 77.9 | 0.43 | 0.27 | 435 | 535 | San Juan R. |
| CB24 | Jul-09 | 76.1 | 0.38 | 0.24 | 437 | 300 | San Juan R. |
| 7358 | Jul-09 | 73.2 | 0.09 | 0.06 | 216 | 46 | San Juan R. |
| LC-4996 | May-09 | 74.0 | 0.64 | 0.39 | 593 | 1610 | Colorado R. |
| LC-4A24 | May-09 | 76.9 | 0.81 | 0.48 | 680 | 1550 | Colorado R |
| LC-625F | May-09 | 76.6 | 0.56 | 0.34 | 430 | 730 | Colorado R |
| LC-6995 | May-09 | 73.1 | 0.59 | 0.36 | 640 | 2540 | Colorado R |
| LC-6995R | May-09 | 65.9 | 0.73 | 0.43 | 640 | 2540 | Colorado R |
| LC-6A2E | May-09 | 71.7 | 0.70 | 0.42 | 243 | 110 | Colorado R |
| LC-7825 | May-09 | 75.9 | 0.70 | 0.42 | 600 | 1800 | Colorado R |
| LC-7B9D | May-09 | 66.2 | 0.65 | 0.39 | 469 | 820 | Colorado R |
| LC-B0E5 | May-09 | 71.5 | 0.52 | 0.32 | 448 | 885 | Colorado R |
| LC-B62C | May-09 | 77.1 | 0.31 | 0.20 | 243 | 110 | Colorado R |
| LC-C241 | May-09 | 75.9 | 0.59 | 0.36 | 708 | 3485 | Colorado R |
| LC-C33F | May-09 | 75.2 | 0.69 | 0.41 | 692 | 2770 | Colorado R |
| LC-C888 | May-09 | 67.2 | 0.56 | 0.34 | 591 | 1680 | Colorado R |
| LC-C888R | May-09 | 77.8 | 0.50 | 0.31 | 640 | 1660 | Colorado R |
| UC-26EB | May-09 | 75.6 | 0.51 | 0.31 | 620 | 2315 | Colorado R |
| UC-64F1 | May-09 | 74.2 | 0.36 | 0.23 | 632 | 2780 | Colorado R |
| UC-801F | May-09 | 70.1 | 0.46 | 0.28 | 632 | 2780 | Colorado R |
| UC-A975 | May-09 | 76.0 | 0.42 | 0.26 | 604 | 2230 | Colorado R |
| UC-AF4D | May-09 | 78.2 | 0.99 | 0.57 | 820 | 5880 | Colorado R |
| UC-AF4DR | May-09 | 75.9 | 1.04 | 0.60 | 820 | 5880 | Colorado R |
| UC-BA74 | May-09 | 73.8 | 0.52 | 0.32 | 707 | 3535 | Colorado R |
| UC-CD85 | May-09 | 75.9 | 0.76 | 0.45 | 690 | 3350 | Colorado R |
| UC-E1B7 | May-09 | 73.6 | 0.33 | 0.21 | 632 | 2780 | Colorado R |
| UC-E329 | May-09 | 75.3 | 0.43 | 0.27 | 632 | 2780 | Colorado R |
| UC-F867 | May-09 | 76.6 | 0.42 | 0.26 | 640 | 2660 | Colorado R |
| GR-40CC | May-09 | 75.9 | 0.77 | 0.41 | 726 | 3940 | Gunnison R. |

Mean mercury concentrations in Colorado pikeminnow collected from all 3 Green River segments, as well as Yampa and White Rivers were elevated, particularly in the White River, and were above the EPA human consumptive advisory of 0.3 ppm WW (Figures 2 and 3).

Whole body concentrations were estimated from muscle plug concentrations by using a regression equation for Northern pikeminnow presented in Peterson et al. 2005. Results are presented in Figure 4.

Comparison of Mercury Concentrations in Colorado pikeminnow to Other Studies

Beckvar et al. 2005 suggested a tissue threshold-effect level of ≤0.2 ppm WW mercury in whole body fish as being protective for both juvenile and adult fish. Mercury concentrations in Colorado pikeminnow were elevated compared to this threshold, and this may be indicative of sublethal effects occurring within critical habitat.



Figure 2.  Mean (+/- 95% Confidence Intervals) mercury concentrations in Colorado pikeminnow muscle plugs.  Red line is EPA human consumptive advisory of 0.3 ppm mercury.



Figure 3.  Maximum, minimum, and mean mercury concentrations in Colorado pikeminnow muscle plugs.  Red line is EPA human consumptive advisory of 0.3 ppm mercury.



Figure 4.  Mean whole-body mercury concentrations in Colorado pikeminnow
estimated from muscle plug concentrations by using model from Peterson et al. (2002).
Red line is toxic effect level from Beckvar et al. (2005) of 0.2 ppm mercury.

A new review of mercury toxicity to freshwater fish by Sandheinrich and Wiener (2011)
discussed that fish-tissue concentrations associated with adverse effects are much lower than
previously thought (Wiener and Spry 1996).  Sandheinrich and Wiener (2011) list effects on
biochemical processes, damage to cells and tissues, and reduced reproduction as occurring with
methyl mercury concentrations of 0.5-1.2 ug Hg/g WW in fish axial muscle and 0.3-0.7 ug Hg/g
WW in whole body fish.  Based on this threshold, over half of Colorado pikeminnow may be
experiencing some reproductive impairment from mercury exposure.

Despite some variation between studies, there is sufficient evidence from laboratory studies to
link mercury exposure with brain and nervous system injuries and reproductive impairment in
fish species (Rabenstein 1978, Eccles and Annau 1987, ATSDR 1999, Clarkson and Magos
2006, Crump and Trudeau 2009). In a review paper of mercury-induced reproductive impairment

in fish, Crump and Trudeau (2009) suggested that the inhibitory effect of mercury on reproduction in fish may occur at multiple sites within the reproductive system, including the hypothalamus, pituitary, and gonads. They discussed studies that found accumulation of mercury in the fish brain resulted in reduced hormone secretion, nerve damage, and alterations in neurotransmission. These alterations in turn caused a reduction of gonad size, circulating hormone reproductive steroids, gamete production, and spawning success.  Crump and Trudeau discussed a mercury induced inhibition of seasonal mobilization of lipids from the liver to the ovaries, resulting in impairment of vitellogenesis and arrest of egg production. Richter et al. (2011) found individual genes in female zebrafish (*Danio rerio*) which exhibited altered expression in response to methyl mercury exposure implicate disruption of the glutathione metabolism.  Richter et al. (2011) found that after exposure to methyl mercury, genes most affected to biological functions were related to nervous system development and function, as well as lipid metabolism and molecular transport, which support the involvement of oxidative stress and effects on protein structure.

**Body Condition and Mercury Concentrations**

Sandheinrich and Wiener (2011) list studies with striped bass (*Morone saxatilis*), Northern pike (*Esox lucius*), white sturgeon (*Acipenser transmontanus*), and walleye (*Stizostedion vitreum*), which found an inverse relationship between mercury concentrations and condition factor (an index of fish weight relative to length).  They noted that this relation may, however be confounded and complicated by other co-occurring contaminants or by changes in condition factor with fish age.

Relative body condition was assessed for each Colorado pikeminnow used for muscle plug analysis.  Total length and weight measurements of Colorado pikeminnow were strongly correlated (least squares regression $R^2$=0.97, p<0.0001, n=98).  Length-weight regression coefficients with SES (in parentheses) used in the calculation of relative condition of the Colorado pikeminnow were;  slope (m)=3.4051 (0.059), and y-intercept (b)= -6.1869 (0.157).

Relative condition (Kn) was expressed as $Kn = 100 * M_o/M_e$, where $M_o$ is the observed mass (g) and $M_e$ is the expected mass (g) as calculated from $\log_{10}M_e = \log_{10}(\text{length})*m + b$, with length measured in millimeters.

Mean relative body condition and mean mercury concentrations for Colorado pikeminnow calculated for each river segment are presented in Figure 5.  The two sites with the highest mean mercury concentrations in Colorado pikeminnow, the White River and middle Green River, in turn had the lowest mean relative body condition for Colorado pikeminnow.  The Yampa River and the upper Colorado River with relatively lower mercury concentrations had higher relative body condition.  Only three Colorado pikeminnow sampled from the San Juan River that were >400 mm were included in Figure 5, because smaller fish were more recently stocked from the hatchery (Dale Ryden, per.com. 2010) and thus had not been in the river as long  as those in the other river segments.  The Colorado pikeminnow >400mm captured in the San Juan had been in the river at least four years.  Mean mercury concentrations were regressed against mean relative body condition for each river segment (excluding the San Juan River).  A significant (p=0.019)



Figure 5.  Mean relative body condition and mean mercury concentrations for Colorado pikeminnow in river segments included in designated critical habitat.

inverse relationship was found ($R^2$=0.7).  When mercury concentrations were regressed against relative body condition for all Colorado pikeminnow across sites (n=68) (again excluding the San Juan River samples), a significant (p<0.0001) inverse correlation ($R^2$=0.23) was again found.  Although significant, this relationship between mercury and relative body condition is most likely confounded by fish age and size, as well as other differences between sites, which is reflected by different correlation coefficients across ($R^2$=0.23) verses between ($R^2$=0.77) sites.  Osmundson and White (2009) found that Colorado pikeminnow body conditions varied between sampling periods and between years, depending on which length class was being considered.  However, as in other piscivorous fish species, mercury may indeed lower Colorado pikeminnow body condition, and this possibility warrants further study.

**Selenium-Mercury Interaction**

Some authors (Peterson et al. 2009) have suggested that mercury toxicity may be counteracted by selenium residues, especially when Se:Hg molar ratios exceed 1.  Peterson et al (2009) analyzed Se:Hg molar ratios in 468 fish from the western U.S., representing 40 species.  They found that 97.5% of the total fish contained more selenium than mercury (molar ratio>1).  Those fish with Se:Hg <1 were Northern pikeminnow *Ptychocheilus oregonensis*.  Although not from the same fish sampled during this study, we compared selenium concentrations in Colorado pikeminnow previously sampled during 1996 from the same river segments (listed by Hamilton et al. 2003), to mercury concentrations found during this study.  As suggested by Peterson et al. (2009), mass concentrations of selenium and mercury were converted to molar concentrations by dividing by the molecular weight (MW) (MW Se=78.96, MW Hg=200.61).  The molar concentrations were then compared to see if any "surplus" selenium was available for potential protection against mercury toxicity.  Mass and molar selenium and mercury concentrations, as well as any surplus selenium resulting from Se:Hg ratios are displayed in Table 2.  When the highest mercury and lowest selenium concentration found in Colorado pikeminnow from the White River were paired, there was more mercury than selenium, and thus no excess selenium

| Table 2. Mass and molar concentrations of mercury and selenium and surplus selenium concentrations in Colorado pikeminnow. | | | | |
|---|---|---|---|---|
| | Mean mercury concentration (minimum, maximum) | | Mean selenium concentration[1] (minimum, maximum) | | |
| | µg/g Hg WW | µmol/g Hg WW | µg/g Se WW | µmol/g Se WW | Surplus Se µmol/g Se |
| River Segment | | | | | |
| Mid Green R. | 0.77 (0.68,0.87) | 0.0038 | 0.98 (0.87, 1.08) | 0.0124 | 0.0086 |
| Yampa R. | 0.49 (0.44, 0.53) | 0.0024 | 0.62 (0.44, 0.72) | 0.0079 | 0.0055 |
| White R. | 0.95 (0.43, 1.83) | 0.0052 | 0.93 (0.64, 1.18) | 0.0118 | 0.0071 Lo Se, Hi Hg -0.001[2] |
| San Juan R. (>400mm) | 0.236 (0.199, 0.267) | 0.0007 | 0.83 (0.74, 1.0) | 0.0105 | 0.0098 |
| Colorado R. | 0.6 (0.31, 1.04) | 0.003 | 1.92 (0.93, 2.16) | 0.0243 | 0.0214 |

1 Selenium concentrations from Hamilton et al. 2003.

2 Ratio when the lowest Se residue found in Colorado pikeminnow from the White R. is paired with highest Hg residue.

available for protection against high mercury residues. If selenium does moderate the effects of mercury in endangered Colorado pikeminnow, then the White River is the only segment in critical habitat which still has potential mercury toxicity. When considering the Peterson et al. (2009) publication, it needs to be recognized that this is an unproven hypothesis regarding the counteractive mechanisms of mercury and selenium residues in freshwater fish, and is in need of further investigation. A relatively new publication (Sandheinrich and Wiener (2009) that discussed assessment of toxicity of methylmercury to freshwater fish does not even include this potential counteractive mechanism when considering mercury exposures and toxic effects to fish.

**White River Mercury Concentrations**

Because of the high mercury concentrations found in roundtail chubs (Table 2) and Colorado pikeminnow (Table 3) collected from the White River, we suggest that further investigation is warranted to assess potential adverse impacts to these species, as well as determine the source of mercury contamination.  The biggest roundtail chubs contained mercury concentrations as high as those found in Colorado pikeminnow, which is indicative of a diet switch from insects to fish for the larger roundtail chubs (D. Osmundson, per. Com., 2011).  Mercury concentrations in roundtail chubs were significantly correlated with fish length ($R^2$=0.86, p<0.0001).  The Yampa and White rivers are relatively close geographically in northwestern Colorado.  Because of this proximity, it is interesting that the Yampa River had the lowest mercury concentrations in Colorado pikeminnow while the White River had the highest mercury concentrations.  If most of the mercury was from aerial wet and dry deposition, the two drainages should be similar. This difference may indicate a localized source/s of mercury contamination into the White River drainage.   There are currently >2,600 gas and oil wells in Rio Blanco county (http://cogcc.state.co.us/General/AtAGlance.html) (BBC Research and Consulting 2008).  It is possible that there is some localized sources of mercury contamination into the White River drainage connected with oil and gas exploration and development (http://www.nrdc.org/land/use/down/fdown.pdf; http://www.faculty.ait.ac.th/visu/pdfs/Activities/Participation/TDMC.pdf; http://www.epa.gov/nrmrl/pubs/600r01066.pdf). It is also possible that contamination has come from past mining activities.  More investigation is warranted to determine potential sources.

**Status of Colorado pikeminnow**

*Colorado River*

Population estimates for adult (>450 mm) Colorado pikeminnow were started in 1991 on the Colorado River, from the Price-Stubb Diversion to the confluence with the Green River.  Trends in both adults and recruits are positive, and this population has been relatively stable since

monitoring was started (USFWS 2011). Osmundson and White (2009) found the Colorado River population increased substantially from 1991-2005, and recruitment appeared to exceed the estimated number of mortalities of fish ≥450mm total length in six of the nine years.

*Green River*

Population estimates for adult Colorado pikeminnow in the Green River subbasin began in 2000. The Green River sub-basin is sampled from the Yampa confluence to the Colorado River confluence and includes the Yampa and White rivers. The initial years demonstrated a declining trend, but the more recent estimates have shown an increasing trend, approaching the level of estimates made in 2000 (USFWS 2011). The confidence intervals indicate no significant difference among estimates. The estimate of recruitment-age fish has also shown a positive trend, exceeding the annual adult mortality of approximately 20%. Bestgen et al. suggested a 50% increase in abundance of adult Colorado pikeminnow throughout the Green River Basin and about a 70% increase over 2003 estimates. Based on the trend in annual point estimates from 2006 to 2008 (Bestgen et al.2010), abundance increases were highest in Desolation-Gray Canyon, the middle Green River, and the White River. Bestgen et al (2010) found abundance of adult Colorado pikeminnow to be stable and low in the Yampa River during 2006-2008, but populations continued to decline since 2003.

Young of year (YOY) Colorado pikeminnow monitoring has been conducted from 1986-2009 within three designated reaches: the lower Colorado River, the lower Green River, and the middle Green River (Breen et al. (2010). Over the entire study period each reach experienced similar trends in YOY catch rates. Catch rates were highly variable and generally declining between the mid-80's and mid-90's, to catches which were much less variable and typically 75% lower than observed in the previous period. All three reaches had catch rates that were positively correlated with annual peak flows between 1986 and 1994, but not the entire period. Highly successful years for YOY catches typically occur only once every 5-10 years.

*San Juan River*

In 2009, the San Juan River Colorado pikeminnow population was estimated to include about 4,666 individuals, ranging from 3,497-6,501 for fish >150 mm (USFWS 2011). A wide spectrum of size-classes of Colorado pikeminnow were collected in 2010, up to and including sub-adult and adult fish (Ryden 2011).  There was good survival of age 2 fish, and Colorado pikeminnow were found using new locations in the San Juan River basin. Larval fish have been detected in the San Juan River in very low numbers since 1993.  Larval fish caught in 2004, 2007, 2009, and 2010 indicate hatchery-produced fish are reproducing in the wild.  The San Juan River Colorado pikeminnow population is still considered a population of stocked fish and not counted toward recovery until there are wild-produced progeny which recruit to adulthood (Ryden 2011).

*Colorado pikeminnow population status and mercury concentrations*

It is difficult to make a connection between mercury concentrations in Colorado pikeminnow and population status.  The Yampa River Colorado pikeminnow population is declining, but they had relatively low mercury concentrations.  The White River population is increasing, but those fish contained the highest mercury concentrations. A more appropriate evaluation would be to compare egg production and larval fish survival with mercury concentrations to determine if reproductive impairment is occurring.  With an open river system, fish are definitely moving back and forth between the rivers and river segments, further complicating this type of assessment.  A laboratory exposure of mercury to Colorado pikeminnow would be the best way to determine reproductive impairment, using real life exposures that fish are currently experiencing in critical habitat.

## MANAGEMENT RECOMMENDATIONS

1)  Increase importance of low-Hg populations of CPM when considering recovery goals.

2)  The Colorado River Endangered Fish Recovery Program needs to consider mercury as another potential problem in recovery of CPM if reproductive output and survival are affected--may act in concert with other contaminants or stresses.

3)  Data may be used as further incentive for more restrictive emission standards from coal-fired power plants and gold mines in U.S. as well as globally.

4)  Sites with elevated mercury concentrations have been sent to Colorado Department of Public Health & Environment (CDPHE) for consideration of inclusion on future 303(d) list of impaired Colorado waters and TMDL development.

5)  Non-native fish may be higher source of mercury to CPM compared to some native species such as suckers.  More research is warranted on this subject.

6)  When CPM are recovered and eventually become game species, they will need to have human consumptive advisories issued.

7)  We need more research to determine where mercury is coming from and why mercury is relatively high in Colorado pikeminnow and roundtail chubs from the White River compared to Colorado pikeminnow from the Yampa River, which is geographically close by.

8)  We need to assess if reproductive impairment or other adverse effects are occurring in Colorado pikeminnow with elevated mercury residues using laboratory studies with current field exposures.

# REFERENCES

ATSDR (Agency for Toxic Substances and Disease Registry). 1999. Toxicological profile for mercury. ATSDR (Agency for Toxic Substances and Disease Registry), 1999. Toxicological Profile for Mercury. United States Department of Health and Human Services.

Baker, R.F., P.J. Blanchfield, M.J. Paterson, R.J.Flett, and L. Wesson. 2004. Evaluation of nonlethal methods for the analysis of mercury in fish tissue. Trans. Amer. Fish. Soc. 133: 568-576.

BBC Research and Consulting. 2008. Northwest Colorado socioeconomic analysis and forecasts: socioeconomic forecasts, fiscal projections, and model documentation. Prepared for the Associated Governments of Northwest Colorado, Rifle, CO. 4 April, 2008. 16 pp.

Beckvar, N., T.M. Dillon, and L.B. Reads. 2005. Approaches for linking whole-body fish tissue residues of mercury or DDT to biological effects thresholds. Environ. Toxicol. and Chemistry 24(8): 2094-2105.

Bestgen, K.R., J.A. Hawkins, G.C. White, K. Christopherson, M. Hudson, M.H.Fuller, D.C.Kitcheyan, R. Brunson, P. Badame, G.B. Haines, J.Jackson, C.D. Walford, T.A. Sorensen, T.B. Williams. 2005. Population status of Colorado pikeminnow in the Green River Basin, Utah and Colorado. Colorado River Recovery Implementation Program Project Numbers 22i and 22j. Larval Fish Laboratory Contribution 140.112pp.

Bestgen, K.R., J.A. Hawkins G.C. White, C.D. Walford, P. Badame, and L. Monroe. 2010. Population status of Colorado pikeminnow in the Green River Basin, Utah and Colorado, 2006-2008. Final Report of the Larval Fish Laboratory, Colorado State University to the Upper Colorado River Endangered Fish Recovery Program, Denver, Colorado.

Blanchard, P.J., R.R.Roy, and T.F. O'Brien. 1993. Reconnaissance investigation of water quality, bottom sediment, and biota associated with irrigation drainage in the San Juan River area, San Juan County, Northwestern New Mexico, 1990-91. U.S. Geological Survey Open-File Report 93-4065. U.S. Geological Survey, Albuquerque, N.M. 141pp.

Breen, M.J., M. Swasey, P. Badame, K. Creighton. 2010. Upper Colorado River basin young-of-year Colorado pikeminnow (Ptychocheilus lucius) monitoring: Summary report 1986-2009. Final Report of Utah Division of Wildlife Resources to Upper Colorado River Endangered Fish Recovery Program, Denver, Colorado.

Brumbaugh, W.G., D.P. Krabbenhoft, D.R. Helsel, J.G. Wiener, and K.R. Echols. 2001. A national pilot study of mercury contamination of aquatic ecosystems along multiple gradients: bioaccumulation in fish: U.S. Geological Survey, Biological Science Report USGS/BRD/BSR-2001-0009, 25p.

Butler, D.L., W.G. Wright, D.A. Hahn, R.P.Krueger, and B.C. Osmundson. 1994. Physical, chemical, and biological data for detailed study of irrigation drainage in the Uncompahgre Project area and in the Grand Valley, West-central Colorado, 1991-92. U.S. Geological Survey Open-File Report 94-110. 146pp.

Butler, D.L., R.P.Krueger, B.C. Osmundson, and E.G. Jensen. 1995. Reconnaissance investigation of water quality, bottom sediment, and biota associated with irrigation drainage in the Dolores Project area, Southwestern Colorado and Southeastern Utah, 1990-91. U.S. Geological Survey Open-File Report 94-4041. U.S. Geological Survey, Denver, Colorado 126pp.

Clarkson, T.W. and L. Magos. 2006. The toxicology of mercury and its chemical compounds. Critical Reviews in Toxicology 36:609-662.

Cizdziel, J.V., T.A. Hinners, and E.M. Heithmar. 2002. Determination of total mercury in fish tissues using combustion atomic absorption spectrometry with gold amalgamation. Water, Air, and Soil Pollution 135: 355-370.

Cocca, P. 2001. Mercury Maps: A Quantitative Spatial Link between Air Deposition and Fish Tissue. USEPA Peer Reviewed Final Report EPA-823-R-01-009, Office of Water, Washington, DC. 29 pp. Crump, K.L., and V.L. Trudeau. 2009. Critical Review: Mercury-Induced Reproductive Impairment in Fish. Environmental Toxicology and Chemistry 28:895-907

Crump, K.L. and V.L. Trudeau. 2009. Mercury-induced reproductive impairment in fish. 2009. Environ. Toxicol. and Chem. 28(5): 895-907.

Denslow, N.D., M.M. Chow, L.C. Folmar, S.L. Bonemelli, S.A. Heppell, and C.V. Sullivan. 1996. Development of antibodies to teleost vitellogenins: Potential biomarkers for environmental estrogens in environmental toxicology and risk assessment: Biomarkers and risk assessment-fifth Vol. ASTM STP 1306, D.A. Bengtson and D.S. Henshel, Eds., American Society for Testing and Materials, Conshohocken, PA.

Drevnick, P.E. and M.B. Sandheinrich. 2003. Effects of dietary methylmercury on reproductive endocrinology of fathead minnows. Environ. Sci. Technol. 37: 4390-4396.

Eccles, C.U. and Z. Annau. 1987. The toxicity of methyl mercury. Johns Hopkins University Press, Baltimore, MD.

Engstrom, D.R. 2007.  Fish respond when the mercury rises. Proceedings of the National
     Academy of Science of the United States of America 104:16394–16395

Goodbred, S.L., R.J. Gilliom, T.S. Gross, N.P. Denslow, W.L. Bryant, T.R. Schoeb.  1997.
     Reconnaissance of 17-*B*-estradiol, 11-ketotestosterone, vitellogenin, and gonad
     histopathology in common carp of United States streams:  potential for contaminant-
     induced endocrine disruption.  Sacramento, CA.  U.S. Geological Survey Open-File
     Report # 96-627.  47pp.

Hamilton, S.J., K.M. Holley, K.J. Buhl, F.A. Bullard, L.K. Weston, and S.F. McDonald.  2003.
     Evaluation of flushing of a backwater channel:  Concentrations of selenium and other
     inorganic elements in water, sediment, invertebrates, forage fish, and Colorado
     pikeminnow.  Draft report prepared for the Upper Colorado River Endangered Fish
     Recovery Program.  U.S. Geological Survey, Columbia Environmental Research Center,
     Field Research Station, 31247 436th Avenue, Yankton, South Dakota 57078-6364.  149
     pages.

Hammerschmidt, C.R., M.B. Sandheinrich, J.G. Wiener, and R.G. Rada.  2002.  Effects of
     dietary methylmercury on reproduction of fathead minnows.  Environ. Sci. Technol. 36:
     877-883.

Hammerschmidt, C.R. and M.B. Sandheinrich.  2005.  Maternal diet during oogenesis is the
     major source of methyl mercury in fish embryos.  Environ. Sci. Technol. 39:  3580-3584.

Hinck, J.E. V.S. Blazer, N.D. Denslow, T.S.Gross, K.R. Echols, T.W. May, C.E. Orazio, J.J.
     Coyle, and D.E. Tillitt.  2006.  Biomonitoring of environmental status and trends (BEST)
     Program:  Environmental contaminants and their effects on fish in the Colorado River
     basin:  U.S. Geological Survey Scientific Investigations Report 2006-xxxx, xx p.

Krueger, R.P. 1988.  Heavy metals analysis of seven Colorado squawfish from the Colorado and
     White rivers.  U.S. Fish & Wildlife Service.  Grand Junction, CO.

Lindberg, S., R. Bullock, R. Ebinghaus, D. Engstrom, X. B. Feng, W. Fitzgerald, N. Pirrone, E.
     Prestbo, and C. Seigneur. 2007.  The Madison Declaration on mercury pollution. Ambio
     36:62-65.

Lorey, P.M. 2001. The determination of ultra trace levels of mercury in environmental samples
     in the northeastern United States: Inferring the past, present, and future of atmospheric
     mercury deposition. Chemistry - Dissertations and Theses. Paper 85.
     http://surface.syr.edu/che_etd/85

Matta, M.B. J. Linse, C. Cairncross, L. Francendese, R.M. Kocan. 2001. Reproductive and transgenerational effects of methylmercury or Aroclor 1268 on *F. heteroclitus*. Environ. Toxicol. Chem. 20: 327-335.

Miller, W.J. 2006. San Juan River Standardized Monitoring Program Five Year Integration Report Revised Draft Final. Prepared by SJRIP Biology Committee and Researchers. Compiled and edited by William J. Miller. Miller Ecological Consultants, INC.

Osmundson, D.B. and K.P.Burnham. 1998. Status and trends of the endangered Colorado squawfish in the upper Colorado River. Trans. Amer. Fish. Soc. 127: 957-970.

Osmundson, D.B. and G.C. White. 2009. Population status and trends of Colorado pikeminnow of the upper Colorado River, 1991-2005. Final Report of U.S. Fish and Wildlife Service to Upper Colorado River Endangered Fish Recovery Program, Denver, Colorado.

Pearson, E. 2000. The analysis of mercury in fish tissue plugs for the purpose of evaluating a potentially non-lethal sampling method. North Dakota Department of Health Report. North Dakota Dept. of Health. Bismarck, ND pp9

Peterson, S.A., J. van Sickle, R.M. Hughes, J.A. Schacher, and S.F. Echols. 2005. A biopsy procedure for determining filet and predicting whole-fish mercury concentration. Arch. Environ. Contam. Toxicol. 48: 99-107.

Rabenstein, D.L. 1978. The chemistry of methylmercury toxicology. Journal of Chemical Education 55: 292-296.

Richter, C.A., N. Garcia-Reyero, C. Martyniuk, I. Knoebl, M. Pope, M.K. Wright-Osment, N.D. Denslow, and D.E. Tillit. 2011. Gene expression changes in female zebrafish (*Danio rerio*) brain in response to acute exposure to methylmercury. Environ. Toxicol. and Chem. 30(2):301-308.

Ryden, D. 2005. Long term monitoring of sub-adult and adult large-bodied fishes in the San Juan River: 2004. Interim Progress Report. U.S. Fish and Wildlife Service, Grand Junction, CO. 85 pages & appendix.

Ryden, D. 2011. Long term monitoring of sub-adult and adult large bodied fishes in the San Juan River: 2010. Interim Progress Report. U.S. Fish and Wildlife Service, Grand Junction, CO 50 pages

Sandheinrich, M.B. and J.G. Wiener. 2009. Methylmercury in freshwater fish: Recent advances in assessing toxicity of environmentally relevant exposures. Pages 161-182. IN Environmental Contaminants in Biota: Interpreting Tissue Concentrations, Second Edition. Edited by W. Nelson Beyer, James P. Meador. CRC Press. 768 pages.

Schmidt, C.J. and W.G. Brumbaugh.  1990.  National Contaminant Biomonitoring Program—Concentrations of arsenic, cadmium, copper, lead, mercury, selenium, and zinc in U.S. freshwater fish, 1976-84.  Archives of Environ. Contam. Toxicol. 19:  731-747.

Schwarzbach, S., L. Thompson, and T. Adelsbach.  2001.  Cache Creek Mercury Investigation.  U.S. Fish & Wildlife Final Report.  Off-refuge investigations reports.  FFS#11301F22 DEC ID#199710005.  Sacramento, CA  38pp. & Appendices.

Seigneur, C., K. Vijayaraghavan, K. Lohman, P. Karamchandani and C. Scott. 2004. Global source attribution for mercury deposition in the United States. Environmental Science and Technology 38:555-569.

USEPA (United States Environmental Protection Agency). 1997. Mercury Report to Congress. USEPA Report EPA-452/R-97-003, Washington, DC.

U.S. Environmental Protection Agency.  1998.  Mercury in solids and solution by thermal decomposition, amalgamation, and atomic absorption spectrophotometry, draft method 7473.  United States Environmental Protection Agency, Washington D.C.

U.S. Environmental Protection Agency.  2001.  Water quality criteria:  Notice of availability of water quality criterion for the protection of human health:  Methylmercury.  Federal Register, Vol.66, No. 5 Jan. 8, 2001.

U.S. Environmental Protection Agency.  2004.  National listing of fish advisory query tool:  USEPA (http://www.epa.gov/waterscience/fish/).

U.S. Fish & Wildlife Service.  1994.  Endangered and threatened wildlife and plant; determination of critical habitat for the Colorado River endangered fishes:  razorback sucker, Colorado squawfish, humpback chub, and bonytail chub.  Federal Register 59: 13374-13399.

U.S. Fish & Wildlife Service.  2006.  Recovery Implementation Program Recovery Action Plan.  Draft document.  42pp.

U.S. Fish & Wildlife Service.  2011. USFWS 2011 Draft assessment of "Sufficient Progress" under the Upper Colorado River Endangered Fish Recovery Program in the upper Colorado River basin. US Fish and Wildlife Service, Denver, Colorado.

Weidner, K. 2007. Investigating the effects of mercury emissions in the Four Corners Area on local deposition levels and ambient concentrations. Masters Project Report, Duke University, Durham, NC. http://dukespace.lib.duke.edu/dspace/bitstream/handle/10161/407/MP_klw20_a_200709.pdf?sequence=1

Wiener, J.G. and D.J. Spry. 1996. Toxicological significance of mercury in freshwater fish, in Beyer, W.N., Heinz, G.H., and Redmon-Norwood, A.W., eds., Environmental Contaminants in Wildlife: Interpreting Tissue Concentrations. Boca Raton, Fla., Lewis Publishers, p. 297-339.

Williamson, J.H. 1992. Colorado pikeminnow genetic survey-tissue sampling protocol. U.S. Fish and Wildlife Service. Denver, CO

Yeardley, R.B., Jr., J.M. Lazorchak, and S.G. Paulsen. 1998. Elemental fish tissue contamination in northeastern U.S. lakes: evaluation of an approach to regional assessment. Environ. Toxicol. and Chem. 17: 1875-1884.



Environmental Toxicology and Chemistry, Vol. 24, No. 8, pp. 2094–2105, 2005
© 2005 SETAC
Printed in the USA
0730-7268/05 $12.00 + .00

# Hazard/Risk Assessment

# APPROACHES FOR LINKING WHOLE-BODY FISH TISSUE RESIDUES OF MERCURY OR DDT TO BIOLOGICAL EFFECTS THRESHOLDS

NANCY BECKVAR,*† TOM M. DILLON,‡ and LORRAINE B. READ§
†Coastal Protection and Restoration Division, Office of Response and Restoration, National Oceanic and Atmospheric Administration,
7600 Sand Point Way, Northeast, Seattle, Washington 98115, USA
‡Coastal Protection and Restoration Division, Office of Response and Restoration, National Oceanic and Atmospheric Administration,
c/o U.S. Environmental Protection Agency Region 4, 61 Forsyth Street, Atlanta, Georgia 30303
§TerraStat, 10636 Sand Point Way, Northeast, Seattle, Washington 98125, USA

(Received 7 June 2004; Accepted 16 February 2005)

Abstract—A variety of methods have been used by numerous investigators attempting to link tissue concentrations with observed adverse biological effects. This paper is the first to evaluate in a systematic way different approaches for deriving protective (i.e., unlikely to have adverse effects) tissue residue-effect concentrations in fish using the same datasets. Guidelines for screening papers and a set of decision rules were formulated to provide guidance on selecting studies and obtaining data in a consistent manner. Paired no-effect (NER) and low-effect (LER) whole-body residue concentrations in fish were identified for mercury and DDT from the published literature. Four analytical approaches of increasing complexity were evaluated for deriving protective tissue residues. The four methods were: Simple ranking, empirical percentile, tissue threshold-effect level (t-TEL), and cumulative distribution function (CDF). The CDF approach did not yield reasonable tissue residue thresholds based on comparisons to synoptic control concentrations. Of the four methods evaluated, the t-TEL approach best represented the underlying data. A whole-body mercury t-TEL of 0.2 mg/kg wet weight, based largely on sublethal endpoints (growth, reproduction, development, behavior), was calculated to be protective of juvenile and adult fish. For DDT, protective whole-body concentrations of 0.6 mg/kg wet weight in juvenile and adult fish, and 0.7 mg/kg wet weight for early life-stage fish were calculated. However, these DDT concentrations are considered provisional for reasons discussed in this paper (e.g., paucity of sublethal studies).

Keywords—Mercury   DDT   Residue effects   Critical body burden   Threshold effects

## INTRODUCTION

Numerous investigators have reported experimental results linking tissue residues and biological effects for a variety of bioaccumulative environmental contaminants and aquatic biota [1–9]. McCarty and Mackay [10] argued that identifying critical body residues is a more direct measure of toxicological dose-response than linking biological effects to external media levels (e.g., water, sediment concentrations). The U.S. Environmental Protection Agency (U.S. EPA) supports this residue approach and has been moving toward using tissue concentrations for deriving ambient water-quality criteria for bioaccumulative contaminants (http://www.epa.gov/waterscience/criteria/alcg_sab_draft.pdf).

Three compilations of published literature summarize experimental results reporting biological effects and associated tissue residues in aquatic organisms ([11,12]; Environmental Residue Effects Database [http://www.wes.army.mil/el/ered]). These compilations generally focused on biologically important endpoints (e.g., survival, growth, reproduction) and corresponding whole-body or organ-specific tissue concentrations. The compilations did not make assumptions regarding toxic modes of action or identify critical body residues associated with adverse effects. Attempts to derive protective tissue concentrations for use in risk assessment have increased with the publication of these residue compilations. However, a critical evaluation of approaches for data treatment has not yet been reported.

This study reviewed existing residue-effects publications dealing with mercury and DDT and obtained information using consistent decision rules developed herein. We evaluated four approaches for analyzing data, and identified whole-body tissue concentrations of mercury and DDT that are protective of fish. In this paper, we use the term protective to mean concentrations below which adverse effects in most fish are unlikely. The U.S. EPA has set as a major goal identifying protective levels when assessing ecological risks at Superfund sites [13] and establishing water quality criteria [14]. In ecological risk assessments, protective levels are derived from the threshold for adverse effects, i.e., that area of the dose-response curve in the vicinity of the no-observed-adverse-effect level to the lowest-observed-adverse-effect level. We selected mercury and DDT to evaluate in this study because they are persistent, bioaccumulative, and toxic contaminants detected routinely in fish at hazardous waste sites as well as throughout the United States [15]. Thus, our findings may have broad application to the research community as well as to environmental managers.

In establishing water-quality criteria, the U.S. EPA uses a preponderance of the evidence (i.e., toxicological investigations meeting minimum data quality requirements and involving multiple test organisms and endpoints) and careful statistical analysis to develop numerical water concentrations that are protective of aquatic organisms [16]. Similarly, sediment quality guidelines have been developed using a preponderance of evidence to derive threshold concentrations (e.g., [17,18]). More recently, probabilistic methods, such as species-sensitivity distributions, have been extended to risk assessment

* To whom correspondence may be addressed
(nancy.beckvar@noaa.gov).

Hg or DDT whole-body fish tissue residues linked to effects

Environ. Toxicol. Chem. 24, 2005      2095

Table 1. Characteristics required for accepting mercury and DDT tissue residue-effects literature

| Characteristic | Paper accepted when: |
|---|---|
| Bounded effect and no-effect tissue concentrations | An effect and no-effect concentration for same endpoint from the same study was reported. |
| Control/reference treatments | A control treatment (laboratory experiment) or a reference area (field study) was provided, and the control treatment performed well (i.e., good survival). |
| Whole body concentrations | Whole body concentrations in egg, embryo, larvae, fry, adult, or whole body minus viscera were reported. |
| Exposure or test duration | Exposure or test durations clearly were not acute for species or life stage. |
| Ecologically important effects endpoints | Endpoints such as survival, growth, reproduction, development, and/or behavior were reported. |

Table 2. Decision rules for selecting protective tissue residue-effects information from individual publications

| Residue-effects information | Decision rule |
|---|---|
| Multiple effects endpoints for the same treatment | Effect endpoint with lowest tissue residue was selected. |
| Multiple exposure scenarios | Exposure scenario with lowest tissue residue was selected as the low-effect residue (LER). |
| Multiple life stages | Lowest tissue residue associated with each life stage was selected. |
| Multiple generations | The generation with the lowest tissue residue was selected. |
| Genders reported separately | Lowest tissue residue among genders was selected. |
| Multiple LERs or NERs reported (i.e., temporal observations or replicates, and no mean reported)[a] | When more than one tissue concentration is reported, select the LER first from the lowest low effect concentration. For observations over time, select the no-effect residue (NER) from the same sampling interval as the LER. For replicates where no mean is reported, select the NER from the highest no-effect concentration below the LER. |

[a] No-effect residue = highest chemical concentration in the organism's whole body, below which adverse effects are absent or rare; Low-effect residue = lowest chemical concentration in the organism's whole body associated with an increasing incidence of adverse effects.

[19,20]. The work reported here draws from these regulatory and probabilistic approaches to identify thresholds for adverse effects protective of fish. We evaluated four analytical approaches that encompass a range of analysis complexity. We conclude this paper by evaluating the different approaches and discussing potential areas for future investigations.

METHODS

Literature review and data selection

Published papers reporting mercury or DDT residues in fresh- or saltwater fish and associated biological responses were identified from published database compilations ([11,12]; U.S. Army Corps of Engineers Environmental Residue-Effects Database [http://www.wes.army.mil/el/ered]), electronic library literature searches (e.g., ISI Web of Knowledge, Aquatic Science & Fisheries Abstracts), and comprehensive bibliographies (e.g., U.S. Geological Survey CERC Publications database [http://www.cerc.usgs.gov/pubs/center/pdfDocs/CercPubs.pdf]). Published investigations vary widely in design, execution, and data presentation. To help bring uniformity to the treatment and analysis of this published residue-effect information, we developed discreet guidelines and decision rules for reviewing papers and obtaining residue-effects information in a consistent manner (Tables 1 and 2). Papers reporting no-effect concentrations exclusively or studies using subcutaneous injection as the exposure route were excluded a priori. The remaining published reports were evaluated further using all the guidelines in Table 1. For example, one paper was omitted based on very poor laboratory control survival (47%) [21]. Papers reporting only effects concentrations were excluded from the data analysis because the threshold for adverse effect could not be bounded. Almost all papers reviewed used single chemical exposures. For studies involving more than one chemical (e.g., hatchery spawning studies), results were included if the author(s) reported effects correlated with a single chemical or concluded that a single chemical likely was responsible for observed effects.

The following information was selected from each paper meeting the Table 1 guidelines: Fish species and life stage(s) exposed, chemical form, exposure scenario, biological response examined, control or reference concentration, and the corresponding chemical tissue residues associated with no and

low effects. The latter information especially is critical because it characterizes that area of the dose-response curve associated with the threshold for adverse effects. Selecting this information from each paper often was problematic. For example, some investigations reported variable tissue residues over time and/or among replicates even when exposure concentrations were relatively constant. Therefore, a set of decision rules (Table 2) was developed to obtain consistently acceptable threshold residue-effects information from each paper. These decision rules reflect our goal to develop protective levels for mercury and DDT in fish. The terms no-effect residue (NER) and low-effect residue (LER) are used in Table 2 and throughout this paper to bound and identify the threshold for adverse effects within each paper. The NER (analogous to the no-observed-adverse-effect level) is defined as the highest chemical concentration in the organism's whole body, below which adverse effects are not observed or rare. The LER (analogous to the lowest-observed-adverse-effect level) is the lowest chemical concentration in the organism's whole body associated with an increasing incidence of adverse effects (dose- or threshold-response). A statistically significant difference was not a requirement for using published data, but was reported for almost every study.

Except where noted, the term mercury refers to total mercury, the expression most commonly used in the studies we reviewed. The term DDT refers to the sum of DDT, dichlorodiphenyldichloroethylene (DDE), and dichlorodiphenyldichloroethane (DDD) and their isomeric forms. When individual DDT compounds or isomers were reported, we calculated and reported the sum. All tissue concentrations in this paper are expressed as mg/kg wet weight.

Data analyses

Four analytical approaches of increasing complexity were evaluated for deriving protective levels of mercury and DDT

in fish. The first method, referred to as the simple ranking approach, graphed the ranked NER and LER values for each contaminant on a $\log_{10}$ scale. This provided a visual assessment of the range and distribution of the raw data. Plotting the $\log_{10}$ values facilitated data display by reducing skewness and making all bars visible on the graph. Initially, all life stages were combined for each contaminant. Subsequently, to reduce data variability, life stages were separated into two groups: Early life stages ([ELS]: egg, embryo, fry) and juveniles and adults, collectively referred to as adults. The protective tissue threshold-effect concentration consistently was selected as the highest NER concentration below the lowest LER concentration.

The second method, referred to as the empirical percentile approach, calculated the fifth and 10th percentiles from the LER data alone. Percentile calculations are less sensitive to outlier values and have been used to develop water, sediment, and tissue-effect guidelines. For example, Klapow and Lewis [22] selected the 10th percentile of the median lethal concentration (LC50) data to estimate acutely toxic concentrations for developing water-quality guidelines in California, USA. The National Status and Trends Program used a 10th percentile of synoptic sediment chemistry and effects information to calculate sediment guidelines [17]. Meador et al. [23] calculated a 10th percentile concentration of the low-effect data to develop a protective polychlorinated biphenyl tissue concentration for salmonids. All these previous investigators focused on the effects data and did not consider the no-effects data in their methods. For our work, both a fifth and 10th percentile of the LER data were calculated using a standard spreadsheet percentile function (i.e., Excel®, Microsoft, Redmond, WA, USA), which uses linear interpolation between observed percentiles, treating the first and last ranked values as the 0th and 100th percentiles.

The third method calculated a tissue threshold-effect level (t-TEL) similar to that used by the Canadian Council of Ministers of the Environment and the state of Florida, USA for derivation of sediment guidelines [18,24]. By definition, the incidence of effects below the sediment TEL is predicted to be rare. The TEL approach is an expansion of the empirical percentile approach that incorporates the distribution of the combined no-effect and effect data into the final number to derive a concentration above which the no-effect concentrations predominate. The t-TEL, as adopted from the sediment guideline, is defined as

$$\text{t-TEL} = \sqrt{\text{LER-L} \times \text{NER-M}}$$

where t-TEL = threshold effect level as the geometric mean of LER-L and NER-M; LER-L = 15th percentile concentration in the effects data set; and NER-M = 50th percentile concentration in the no-effects data set.

The tissue residue dataset used to calculate a t-TEL was similar to the sediment dataset used by the Canadian Council of Ministers of the Environment and the state of Florida. Both datasets include published laboratory and field studies, and sublethal and lethal effects. Our approach differs in that tissue concentration data were taken from studies using only paired-effect and no-effect numbers, thereby ensuring that the threshold for adverse effect from each study was bounded.

In the fourth and most complex method, we estimated threshold effect concentrations using cumulative distribution functions (CDF). The CDF approach is used in species-sensitivity distributions and was used to derive national ambient water-quality criteria [16]. Species-sensitivity distributions are extrapolation models that fit a limited species dataset to a particular distribution with the goal of predicting effects to a larger set of species. Typical distributional forms assumed for this type of data include lognormal [25] and log-logistic [26], although nonparametric methods also have been used (e.g., [27]). For the species-sensitivity distribution approach to be valid, the dataset should consist of a randomly distributed collection of species representative of the community to which the guidelines will be applied.

For the tissue residue data, we fit a CDF for both the lognormal and log-logistic distributions. Sample parameter estimates were made using the least-squares methods employed in the literature (e.g., [19,28]). With the mean and standard deviation estimates calculated, the fifth percentile values, or hazardous concentration for 5% of the species ($HC_5$), for the two distributions were found in standard statistical tables [29]. The 95% lower confidence limit of the fifth percentile also was computed using coefficients reported in the literature (normal − 25; logistic − 26). In this analysis, distribution fits were made for both the LER endpoints as well as the geometric means of the LER and NER endpoints for both chemicals. The geometric mean was used as an approximation of the threshold-effect concentration because some studies we reviewed reported large differences among dosing intervals and, thus, wide separation in corresponding LER and NER values.

Adequacy of the two hypothesized distributions (lognormal and log-logistic) was assessed using a delta-corrected one-sample Kolmogorov-Smirnov (K-S) test [30]. The appropriate critical values for this K-S test are based on an intrinsic hypothesis, i.e., that the population parameters were estimated from the data (Table Y from Rohlf and Sokal [31]).

If neither distribution was rejected by the K-S test, a method based on likelihood functions [32] was used to select from the two hypothesized distributions. The likelihood function for a particular distributional hypothesis computes the joint probability of obtaining the observed data under that hypothesized distribution, i.e., it presents the plausibility for a model based on the cumulative evidence from all data points. The relative likelihood, $\pi(\theta)$, is computed as the individual model likelihood divided by the sum of the likelihoods for the two models. The largest relative likelihood was used to identify the most plausible of the two model choices for the data.

If a distributional hypothesis is rejected by the K-S test, then the parametric CDF approach should not be used for that distribution. Nonparametric alternatives to this CDF approach are based on bootstrapping when sample sizes are sufficient ($n \geq 20$ for $HC_5$ estimates [27]). For discussion purposes, we report the CDF results for all datasets for both distributions.

Although the decision to use a fifth percentile, or $HC_5$, is arbitrary, the number has become widely used [20]. We chose to use a $HC_5$ to be consistent with the protective approaches used in the other three methods.

The same datasets were analyzed using all four methods. Replicate species data (i.e., data from different studies using the same species) were not combined or eliminated. The reasonableness of the estimated threshold-effect concentrations for the four methods was assessed by comparing them to both the geometric means of control organisms reported in the papers (Table 3) and to ambient tissue residue concentrations from fish captured in areas unaffected by point sources of contaminants [15]. Calculated protective tissue thresholds concentrations that fall at or below these control or ambient concentrations would be considered unreasonable thresholds.

Table 3. No-effect residue (NER) and low-effect residue (LER) concentrations for mercury and DDT (mg/kg wet wt)

| Species by chemical and life stage | NER | LER | Control[a] | Effect endpoint | Form and route of exposure | Reference |
|---|---|---|---|---|---|---|
| **Mercury, adult life stages** | | | | | | |
| Walleye | 0.06 | 0.25 | 0.06 | Reproduction | MeHg, food | [66] |
| Striped mullet | 0.1 | 0.3 | <0.1 | Development | MeHg, aqueous | [67] |
| Fathead minnow | 0.1 | 0.39 | 0.1 | Reproduction | MeHg, food | [38][b] |
| Mummichog | 0.21 | 0.44 | 0.08 | Lethality | MeHg, food | [39] |
| Golden shiner | 0.23 | 0.52 | 0.04 | Behavior | MeHg, food | [65] |
| Fathead minnow | 0.62 | 1.2 | 0.22 | Growth | HgCl, aqueous | [36] |
| Fathead minnow | 0.079 | 0.86 | 0.079 | Reproduction | MeHg, food | [40] |
| Brook trout | 2.7 | 5 | 0.1 | Lethality | MeHg, aqueous | [37] |
| **Mercury, early life stages** | | | | | | |
| Rainbow trout (eggs) | 0.02 | 0.07 | 0.02 | Lethality | HgCl, aqueous | [35] |
| Rainbow trout (larvae) | 0.02 | 0.04 | 0.02 | Lethality | HgCl, aqueous + sediment | [35] |
| Grayling (fry) | 0.06 | 0.27 | 0.06 | Behavior | MeHg, aqueous | [68] |
| **DDT, adult life stages** | | | | | | |
| Goldfish | 0.06 | 1.65 | 0.06 | Behavior | p,p'-DDT, aqueous | [69] |
| Pinfish | 0.067 | 0.55 | 0.067 | Lethality | p,p'-DDT, food | [70] |
| Lake trout | 0.19 | 0.29 | 0.19 | Lethality | DDE[c], aqueous + food | [71] |
| Brook trout | 0.61 | 11.2 | 0.61 | Growth | Technical DDT, food | [72] |
| Chinook salmon | 0.62 | 3.65 | 0.62 | Lethality | Technical DDT, food | [73] |
| Cutthroat trout | 0.8 | 1.1 | 0.66 | Lethality | p,p'-DDT, aqueous | [56,57] |
| Brook trout | 2.8 | 7.6 | 0.6 | Reproduction | Technical DDT, food | [74] |
| Fathead minnow | 41.0 | 112.7 | 0.2 | Lethality | Technical DDT, aqueous | [75,76] |
| Coho salmon | 10.4 | 33.8 | ND | Lethality | Technical DDT, food | [73] |
| **DDT, early life stages** | | | | | | |
| Atlantic croaker | 0.01[d] | 0.07 | ND[e] | Behavior | p,p'-DDT, adult food | [48] |
| Rainbow trout | 0.178 | 1.15 | 0.178 | Lethality | DDT, adult food | [44] |
| Brook trout | 0.21 | 0.89 | 0.21 | Lethality | Technical DDT, food | [74] |
| Brook trout | 0.21 | 11.92 | 0.21 | Lethality | Technical DDT, food | [77] |
| Rainbow trout | 0.3 | 1.27 | 0.2 | Lethality | DDT, maternal transfer | [45] |
| Spotted seatrout | 0.5 | 1.5 | <0.5 | Lethality | DDT, maternal transfer | [47] |
| Coho salmon | 0.5 | 1.1 | 0.5 | Behavior | DDT, maternal transfer | [46] |
| Coho salmon | 0.66 | 1.09 | 0.15 | Lethality | p,p'-DDT, maternal transfer | [46] |
| Winter flounder | 1.08 | 1.11 | 0.57 | Lethality | Technical DDT, aqueous | [78] |
| Lake trout | 2.67 | 2.93 | NA[f] | Lethality | DDT, maternal transfer | [43] |
| Fathead minnow | 6.8 | 24.0 | 0.4 | Lethality | Technical DDT, aqueous | [75,76] |

[a] Control = geometric mean of control replicates.
[b] Dry weight converted to wet weight concentrations using 80% moisture.
[c] DDE = dichlorodiphenyldichloroethylene.
[d] Detection limit estimated from analytical method.
[e] Not detected, detection limit not provided.
[f] NA = not available.

However, because control and ambient residues could be lower than the no-effects tissue residues, they cannot be used to judge whether calculated protective levels are underprotective.

RESULTS

Literature review

**Mercury.** Using guidelines from Table 1, a total of 10 papers containing mercury residue-effect information for eight fish species were identified. From these 10 papers, paired NER/LER values and associated biological endpoints were obtained using decision rules in Table 2. Juvenile and adult endpoints comprised eight of the 11 tabular entries (Table 3). The majority of studies dosed fish with methylmercury, the form most frequently found in fish [33,34]. However, two studies dosed with inorganic mercuric chloride [35,36]. Five of the studies dosed with contaminated food and one used spiked sediment. Maternal transfer to eggs and the effects on reproduction or development in subsequent generations were measured in six studies [35–40]. Biological test endpoints included survival, growth, reproduction, and behavior.

**DDT.** A total of 17 papers containing DDT residue-effect information for 13 fish species were identified using guidelines from Table 1. One of the original 17 papers [41] was not included because tissue concentration units were reported inconsistently and personal communications with the authors failed to verify the correct units. Twenty paired NER/LER values and associated biological endpoints were obtained using the decision rules in Table 2. Eleven of the paired NER/LER values were for ELS and nine for adult fish (Table 3). Most laboratory exposures used technical-grade DDT or its active ingredient, p,p'-DDT. The approximate composition of technical-grade DDT is 77% p,p'-DDT, 15% o,p'-DDT, 4% p,p'-DDE, 0.4% DDD, and trace amounts of other compounds [42]. Most studies employed aqueous laboratory exposures with or without DDT-contaminated food. However, five papers evaluated effects of DDT in field-collected fish [43–47]. All but one [47] determined fry mortality from hatchery-spawned adults. Mortality was the biological endpoint measured most frequently in the DDT papers. Other endpoints included sublethal responses such as growth, behavior, and reproduction.

2098    Environ. Toxicol. Chem. 24, 2005

N. Beckvar et al.



Fig. 1. Simple ranking of no-effect residue (white bars) and low-effect residue (black bars) mercury concentrations (mg/kg wet wt) for all life stages (a), juveniles and adults (b), and early life stages (c).



Fig. 2. Simple ranking of no-effect residue (white bars) and low-effect residue (black bars) DDT concentrations (mg/kg wet wt) for all life stages (a), juveniles and adults (b), and early life stages (c).

## Data analyses

**Method 1 (simple ranking approach): Mercury.** Paired NER/LER values for all life stages in Table 3 were ranked from low to high (Fig. 1a). Most NER values are less than the LER values. Concentrations span about two orders of magnitude and all but three of the residues are less than 1 mg/kg. If one examines only adult and juvenile fish, all LER values are above a tissue residue concentration of 0.25 mg/kg (Fig. 1b). The highest adult mercury NER concentration below the lowest LER was 0.23 mg/kg. For the limited amount of ELS data (n = 3 studies), the lowest LER was 0.04 mg/kg and the highest NER below the lowest LER was 0.02 mg/kg (Fig. 1c).

**Method 1 (simple ranking approach): DDT.** Plotting the ranked paired NER/LER values for all life stages from Table 3 on a $\log_{10}$ scale also results in a gradual transition from low to high tissue concentrations (Fig. 2a). However, in contrast to the mercury residues, the NER and LER values are more randomly. Tissue residues span nearly four orders of magnitude. As with mercury, the ranked NER/LER values

were plotted separately for adults (Fig. 2b) and ELS (Fig. 2c). The threshold between adult LER and NER DDT values is less distinct than that observed for mercury. For example, six of the nine adult DDT NER values rank above the lowest LER (Fig. 2b). The lowest LER for adults was 0.29 mg/kg and the highest NER below the lowest LER was 0.19 mg/kg. The threshold between ELS NER and LER concentrations was more distinct (Fig. 2c). The lowest LER was 0.07 mg/kg. The highest NER below this LER was a nondetected result and the original paper did not report detection limits[48]. Results from the simple ranking approach are summarized in Table 4 along with results from the other three methods.

**Method 2 (empirical percentile approach).** The adult LER data yielded mercury tissue concentrations of 0.26 mg/kg and 0.28 mg/kg for the fifth and 10th percentiles, respectively (Table 4). Percentiles were not calculated for the ELS mercury results due to the paucity of data (n = 3 LERs). The limited mercury ELS dataset also precluded realistic evaluation of the

Table 4. Simple ranking, empirical percentile, tissue-threshold effects level (t-TEL), and cumulative distribution function (CDF) results for Hg and DDT in fish (mg/kg wet wt)

| | | Simple ranking | | Empirical percentile | | | |
|---|---|---|---|---|---|---|---|
| | n | Highest NER[a] | Lowest LER[b] | 5th LER | 10th LER | t-TEL | CDF range[c] |
| Hg Adult | 8 | 0.23 | 0.25 | 0.26 | 0.28 | 0.21 | 0.039–0.11 |
| Hg ELS[d] | 3 | 0.02 | 0.04 | —[e] | —[e] | —[e] | —[e] |
| DDT adult | 9 | 0.19 | 0.29 | 0.39 | 0.5 | 0.64 | 0.037–0.085 |
| DDT ELS | 11 | ND[f] | 0.07 | 0.48 | 0.89 | 0.70 | 0.057–0.11 |

[a] NER (no-effect residue) = highest no-effect tissue concentration.
[b] LER (low-effect residue) = lowest effect tissue residue concentration.
[c] Range from two best-fitting models from Table 5.
[d] ELS (early life stage) = egg, embryo, fry.
[e] Insufficient data to do empirical percentile, t-TEL, or CDF approach.
[f] ND = not detected, detection limit not provided.

t-TEL and CDF approaches. For DDT, the fifth and 10th percentiles were 0.39 mg/kg and 0.50 mg/kg, respectively, for adults and 0.48 mg/kg and 0.89 mg/kg, respectively, for ELS (Table 4).

Method 3 (tissue TEL approach). This approach, which uses both the NER and LER values, resulted in a mercury t-TEL of 0.21 mg/kg for adult fish (Table 4). As with the empirical percentile approach, a mercury t-TEL was not calculated for ELS. The DDT t-TELs for adult and ELS fish were 0.64 mg/kg and 0.70 mg/kg, respectively.

Method 4 (probabilistic CDF approach). The hypothesis that the distribution of data conformed to a lognormal distribution was rejected for the two DDT ELS datasets ($\alpha = 0.05$, Table 5), and the hypothesis of a log-logistic distribution was rejected for the DDT ELS and adult LER datasets. In order to illustrate the parametric CDF approach, the most plausible distribution was selected based on the relative likelihoods, even when both distributions were rejected by the K-S test. For the three LER datasets, the data showed a clear preference for the lognormal distribution, with $\pi(\theta)$ values ranging from 0.87 to 0.99 for the lognormal and 0.01 to 0.13 for the log-logistic (Table 5). The HC$_5$ values determined by the two distributional assumptions differed from 0.5 to 1.5

orders of magnitude for the LER datasets. The HC$_5$ values from the lognormal distribution were higher, due to the smaller skewness inherent in the lognormal distribution. The relative likelihoods for the three geometric mean datasets did not indicate a strong probability for one distribution over the other. The $\pi(\theta)$ values for the geometric mean datasets ranged from 0.40 to 0.68 for the lognormal and 0.32 to 0.60 for the log-logistic (Table 5). When the relative likelihoods were similar for the two distributions, the resulting HC$_5$ values also were similar. Both early life-stage DDT LER distributions were rejected based on the K-S test ($\alpha = 0.05$, Table 5).

Lower confidence bounds provide a measure of the uncertainty in the HC$_5$ estimates. For all mercury and DDT best-fit models, the lower confidence bounds were always 1 to 2 orders of magnitude smaller than their corresponding HC$_5$ values (Table 5). This indicates the considerable uncertainty present in these HC$_5$ estimates, due to the small sample size and variability of the acceptable data.

Comparison to control and ambient tissue residues

Mercury in control fish (0.09 mg/kg) was about two to three times lower than the adult threshold-effect concentrations calculated using three of the four methods: Simple ranking, per-

Table 5. Cumulative distribution function (CDF) results using log-normal and log-logistic models for mercury and DDT in fish (mg/kg wet wt)

| | | Log-normal | | | | Log-logistic | | | |
|---|---|---|---|---|---|---|---|---|---|
| n | Endpoint | K-S[a] | HC$_5$[b] | LCL[c] | $\pi(\theta)$[d] | K-S[a] | HC$_5$[b] | LCL[c] | $\pi(\theta)$[d] |
| Hg adult | | | | | | | | | |
| 8 | LER[e] | (0.138, 0.193) | 0.11[f] | 1.9E−02 | 0.89 | (0.189, 0.300)[g] | 0.026 | 8.5E−04 | 0.11 |
| 8 | geomean[h] | (0.189, 0.237) | 0.048 | 7.2E−03 | 0.47 | (0.130, 0.209) | 0.039[f] | 4.2E−03 | 0.53 |
| DDT adult | | | | | | | | | |
| 9 | LER | (0.051, 0.131) | 0.085[f] | 3.2E−03 | 0.87 | (0.112, 0.212) | 0.010 | 3.1E−05 | 0.13 |
| 9 | geomean[h] | (0.073, 0.170) | 0.037[f] | 1.3E−03 | 0.68 | (0.112, 0.212) | 0.013 | 1.1E−04 | 0.32 |
| DDT ELS[i] | | | | | | | | | |
| 11 | LER | (0.195, 0.261)[g] | 0.11[f] | 1.7E−02 | 0.99 | (0.274, 0.340)[g] | 0.0028 | 1.6E−05 | 0.01 |
| 11 | geomean[h] | (0.182, 0.248)[g] | 0.056 | 8.3E−03 | 0.40 | (0.156, 0.223) | 0.057[f] | 6.0E−03 | 0.60 |

[a] K-S = test statistic for the delta-corrected one-sample Kolmogorov-Smirnov goodness of fit test, for delta = 0 and 1, respectively.
[b] HC$_5$ = hazardous concentration for estimated 5% of species; the 5th quantile for the specified distribution.
[c] LCL = 95% lower confidence bound on the HC$_5$. Tolerance limit (a lower confidence bound on a percentile).
[d] $\pi(\theta)$ = relative likelihood for the particular distributional hypothesis, $\theta$.
[e] LER (low-effect residue) = lowest effect tissue residue concentration.
[f] Best-fit distribution (highest relative likelihood) for each endpoint.
[g] Critical value exceeded ($\alpha = 0.05$), significant deviation from the specified distribution.
[h] Geomean = geometric mean of the individual paired no-effect-residue/LER values from each study.
[i] ELS (early life stage) = egg, embryo, fry.







Whole-Body Tissue Concentration (mg/kg wet wt)

Fig. 3. Geometric mean of tissue concentrations in control fish (horizontal line labeled Control) compared to protective tissue concentrations derived from simple ranking (R), empirical percentile (P5 = fifth percentile; P10 = 10th percentile), tissue threshold effect level (t-TEL), and the best-fit cumulative distribution function (CDF) for mercury in adult fish (a), DDT in adult fish (b), and DDT in early life-stage (ELS) fish (c). The DDT was not detected in ELS fish for the simple ranking approach (*).

centile, and t-TEL (Fig. 3a). In contrast, the best-fitting CDF models for mercury had $HC_5$ values that ranged from an order of magnitude below or close to the control mean. The DDT in control adult fish (0.26 mg/kg) and ELS fish (0.29 mg/kg) was lower than the threshold-effect concentrations calculated using the percentile and t-TEL methods (Fig. 3b,c). Both the

simple ranking and best-fitting CDF models had threshold-effect concentrations below ELS and adult control concentrations (Fig 3b,c).

Concentrations of mercury and DDT in fish collected from areas located away from known point sources of pollution is a second independent measure for judging the reasonableness of protective levels generated by the four methods. Currently, no accepted national fish residues exist for this type of comparison. However, the U.S. EPA conducted a national survey of chemical residues in fish that included 39 background stations located throughout the United States in areas relatively free of pollution sources [15]. These data can provide an indication of ambient concentrations in fish tissue in a field setting away from known sources of pollution. Approximately three to five adult fish of similar size and from the same species were collected and composited at each location. These fish represent a variety of bottom-feeding species. The geometric mean mercury in these fish was 0.11 mg/kg (n = 34). This value is comparable to the mercury in control fish (Table 1) and about half the concentration of threshold residues generated by three of the four methods: Simple ranking, empirical percentile, and t-TEL methods (Table 4). Because of biomagnification, ambient mercury residues in predatory fish likely are higher than in bottom-feeding fish.

For DDT, the U.S. EPA study [15] only reported DDE fish residues. The geometric mean for DDE at the U.S. EPA background locations was 0.02 mg/kg (n = 29). This value is over an order of magnitude below total DDT concentrations generated by the simple ranking, empirical percentile, and t-TEL methods for adult fish and about half the concentration predicted by the CDF approach (Table 4). The background DDE concentration also was an order of magnitude lower than the geometric mean of total DDT concentrations in the adult control fish (0.26 mg/kg).

Due to the paucity of information for mercury in ELS fish (n = 3 studies), the threshold-effect concentration (0.02 mg/kg) was calculated using only the simple ranking approach. This concentration approximates the geometric mean of the control organisms (0.03 mg/kg) from all three ELS studies. The protective residue of 0.02 mg/kg produced by the simple ranking approach was the mercury concentration in the control treatment from a single experiment [35]. This egg concentration is higher than concentrations observed for fish eggs from five species inhabiting the Great Lakes (range 0.004 μg/g to 0.011 μg/g wet weight [49] and at the high end of the range measured in walleye eggs from North America, 0.005 μg/g to 0.03 μg/g wet weight [50]).

## DISCUSSION

### Literature review

Attempts to derive protective tissue residues for fish continue to be hampered by a paucity of high quality, toxicological studies specifically designed to link residues and biological effects. We increased the size of the existing compilation by Jarvinen and Ankley [11] by including ecologically important behavioral test endpoints such as foraging behavior and predator avoidance. Although sometimes difficult to quantify, these behavioral effects can impact adversely and significantly survival and reproduction [51–53].

Deriving protective tissue residues also is hampered by a lack of consensus in the scientific community regarding the treatment and analysis of published residue-effect information. Using explicit decision rules and a consistent bias toward pro-

tective tissue concentrations helped reduce the inherent variability among experimental designs and endpoints. This bias, we feel, was validated independently by the a postiori comparisons to control residues (Fig. 3) and ambient field tissue concentrations. The guidelines in Tables 1 and 2 were tailored to meet the needs of this particular collection of mercury and DDT papers. These guidelines likely have broad applicability, although additional or different decision rules may be appropriate for other contaminants.

We caution against the approach of using tissue residue information from only one study of a species that closely is related to the species of interest. This approach severely censors an already limited database and forces one to rely exclusively on the design, conditions, and endpoints of one or perhaps a few experiments. Taking paired NER and LER values from multiple studies has the advantage of including a variety of study designs and species to help ameliorate inter-experimental variability. This variability has been noted by other investigators who cited it as a major obstacle to establishing the relationship between tissue residues and biological effect [54]. Our approach of selecting paired NER/LER values has helped achieve our goal of identifying the threshold for adverse-effects area of the dose-response curve.

## Methods comparison

Simple ranking approach. The first method we evaluated, the simple ranking approach, allows one easily to see the richness/paucity of the data, the range of concentrations, and the nature of the threshold between the NER and LER values. Potential outliers are easy to recognize. The simple ranking presentation also led us to separate life stages (ELS vs. adults) to provide a sharper threshold between NER and LER concentrations. Partitioning the life-stage data revealed only two adult mercury NER values interspersed among the LER data. The sharp threshold for the adult mercury data probably was influenced by the high quality of available studies: Closely spaced dosing concentrations, sublethal endpoints, generally low concentrations in controls, trace-metal–free protocols, and use of the same form of mercury. We recommend using the simple ranking approach as a first step for initial data screening and review when evaluating residue-effect literature.

The simple ranking approach revealed a much less distinct threshold response for the DDT data. That is, the NER and LER values overlapped across a wider concentration range compared to the pattern observed for mercury. This higher variability may have resulted from several features specific to the DDT literature. First, different DDT forms were used and measured in the experiments we reviewed. According to Lotufo et al. [9], the metabolites of DDT have differing toxicities and are better assessed by using a toxic unit approach. This approach was not possible in the present study. Second, because DDT is hydrophobic, variability in fish lipid content may have obscured residue-effect relationships. For this paper, DDT concentrations could not be lipid-normalized because most papers did not report lipid concentrations. The more distinct NER–LER threshold in ELS fish may be due to their less variable lipid content relative to older fish [55]. Because lipid-normalization potentially could reduce one source of variation, we recommend that lipids be analyzed in all future DDT experiments reporting tissue residues. A third reason the DDT threshold response was less distinct than mercury's is the fact that DDT studies were conducted in the 1960s and 1970s when analytical methods were less precise and less accurate. The

older analytical techniques were less able to distinguish the various forms of DDT from other chlorinated hydrocarbons and, therefore, may have biased upward reported DDT concentrations. Finally, elevated DDT concentrations in control fish (Table 3) may have obscured the exposure-response relationship. The DDT residues in many of the control treatments from these older papers exceed ambient field concentrations by an order of magnitude. The DDT contamination of fish food was a problem reported by several investigators (e.g., [44,56,57]). The possible influence of DDT-contaminated food is unknown, but test organisms chronically exposed to this food source may have developed resistance to DDT, resulting in a higher and more variable threshold for adverse effects. These issues with the older data add uncertainty to the development of a protective threshold for DDT.

The ELS DDT dataset contained one extremely low LER concentration (0.07 mg/kg) reported by Faulk et al. [48]. We feel this data point is qualitatively different from the other LERs because fish were exposed to the $o,p'$ form of DDT (a minor component of technical-grade DDT), a sublethal behavioral endpoint was examined (the majority of other DDT studies tracked fish survival), and this was a recent study relative to the other DDT literature. Another recent study using a sensitive sublethal endpoint (immunosuppression) reported an effect to salmon fry at 0.02 mg/kg $o,p'$-DDE in wholebody [58]. Additional studies using sensitive endpoints are needed to confirm these low DDT tissue-effect concentrations.

Using the simple ranking approach and selecting the highest NER below the lowest LER value as the threshold concentration provides a protective number with no effects reported below it. A main limitation with this approach arises when extreme values are present, such as the Faulk et al. [48] paper discussed above. Consequently, for this ELS DDT dataset, the threshold effect concentration selected using the simple ranking approach gives a below detection limit concentration and appears inconsistent with the majority of the data (Table 4).

Empirical percentile approach. The second method we evaluated, the empirical percentile approach, has more flexibility than the simple ranking approach because the user may select the desired level of protection. We calculated the fifth and 10th percentiles of the LER data based on approaches used by other investigators to ensure that the effect concentration was protective. An important advantage of the empirical percentile approach is the reduced influence of extreme values in the dataset [22]. For example, the fifth percentile of the ELS DDT dataset is 0.48 mg/kg even with the inclusion of the extremely low LER concentration (0.07 mg/kg of [48]).

The empirical percentile approach is a nonparametric approach and, thus, requires no assumptions about the distributional form of the data. This approach also can be used on relatively small datasets, although estimates of extreme percentile values (≤5th or ≥95th) have large confidence bounds even for substantial datasets. Although calculating a percentile appears to be a simple and straightforward approach, users of this method should be aware that a number of different models exist for calculating percentiles. Some percentile models strictly treat the sample as the population, i.e., the lowest-observed value is treated as the 0th percentile and the highest-observed value as the 100th percentile (e.g., Excel uses this model). Other percentile models assign the percent rank as rank/(n + 1); extrapolation beyond the percent ranks of the observed data are not possible without specification of absolute upper and lower bounds. Using this latter model for the empirical

percentile approach, a hazardous concentration for the fifth percentile of affected species cannot be estimated when sample sizes are less than 19 [59]. With this latter model, our smallest data set, with eight LER concentrations for mercury, has its first ranked data point (0.25 ppm) at the 11th percentile of the dataset.

Another characteristic of the empirical percentile approach is that only the lower concentrations drive the final number when taking a low percentile of the dataset. In other words, the addition of higher effect concentrations to the dataset will not impact the calculated low percentile effect concentration. Because our goal was deriving a protective number, this attribute of the empirical percentile approach confers stability to the derived effect concentration.

**Tissue TEL approach.** The third approach, adapted from the sediment guidelines literature [24], resulted in protective levels that seemed to represent results generated by both the simple ranking approach as well as the empirical percentile approach (Table 4). The t-TELs for adult mercury and DDT were, respectively, slightly lower and higher than outputs from the simple ranking and the empirical percentile approaches, respectively (Table 4). The t-TEL for ELS DDT was intermediate to the fifth and 10th percentiles of the empirical percentile approach. As discussed above, the CDF approach generated protective levels well below the other three methods and at or below control residues. Although the simple ranking and empirical percentile approaches use only the separate NER or LER datasets, the t-TEL approach incorporates both NER and LER distributions. Because it incorporates both data distributions, the t-TEL is the only percentile-based method that represents all the available data. Using the percentile designated by the sediment guidelines (50th percentile of no-effects and 15th percentile of effects) appears reasonable with the datasets used here, but should be re-examined as additional residue-effects papers are published. For this review, we were unable to meet the minimum 20 data point requirement specified in the sediment TEL guidelines [24].

**Cumulative distribution function.** The probabilistic CDF approach, with its goal of extrapolating to the whole community or population from a limited dataset, is a very appealing method. However, to make this extrapolation accurate and reasonable, specific data requirements need to be met. Primarily, the data should be a random sample from the general population. If the sample produces biased estimates of the population mean and variance, for example due to dominance by either sensitive endpoints or insensitive species, then the thresholds resulting from this approach may be unrealistically low or high.

The data used in this study came from a wide variety of exposure scenarios, contaminant forms, and endpoints that inflated the variability of these data beyond simple interspecific differences. The term cumulative distribution function was adopted to avoid association with species-sensitivity distributions. Species-sensitivity distributions typically describe the variation among a set of species from laboratory toxicity tests where results from consistent laboratory test procedures and effect endpoints are expected to yield differences that are based on intrinsic species differences, not experimental design or endpoint differences. Existing tissue residue datasets for mercury and DDT do not meet these requirements.

The CDF results were evaluated both for goodness-of-fit of the lognormal and log-logistic models and for the reasonableness of the predicted $HC_5$ values. Neither model demon-

strated a consistently better fit based on the K-S test and relative likelihoods. The K-S test is driven by one data point (the maximum deviation from the hypothesized distribution) and so is particularly sensitive to outliers. In general, the goodness-of-fit test results should be complemented by graphical investigations (e.g., quantile-quantile plots, or empirical cumulative distribution functions, with the hypothesized curves overlain). Other parameter estimation techniques besides the least-squares methods used here also are available and may provide distribution parameters that are a better fit for the data. The likelihood approach used to compare among models can be extended to any number of distributional hypotheses including alternative parameter estimates.

The threshold-effect concentrations predicted by the CDF approach were lower than threshold-effect concentrations predicted by the three other methods, synoptic control tissue residues (Table 3), and ambient mercury (but not DDT) tissue residues from field collections. Therefore, for these datasets, the CDF approach is not viewed as particularly useful for estimating threshold-effect concentrations in whole bodies of fish. The results of the CDF approach also confirm the difficulty in identifying an underlying distribution for small datasets, and agree with conclusions voiced by other investigators regarding the limitations of this approach [28,60,61]. If other investigators take a CDF approach, the models should be evaluated for fit as well as for the reasonableness of the predicted $HC_5$.

## Recommendations

Based on results presented in Table 4 and our recommendation to consider the t-TEL approach a superior method, the following tissue residues are deemed protective of fish. For mercury, we recommend 0.2 mg/kg whole body as protective for juvenile and adult fish. This number largely is based on sublethal endpoints and additional studies likely will not substantially alter this number. As reported above, the geometric mean of mercury in adult bottom-feeding fish from background locations throughout the United States is 0.11 mg/kg, approximately one-half our recommended protective level. Due to the paucity of information, we cannot derive a protective level for mercury in ELS fish using the t-TEL approach. Only the simple ranking method could be used on the ELS mercury data providing a protective concentration of 0.02 mg/kg.

In recommending a whole-body approach for mercury tissue residue calculations, Niimi and Kissoon [62] concluded that lethal body burdens of mercury fell into the 10 to 20 mg/kg range. Based on the literature available to them in 1994, they speculated that sublethal impacts would fall into the 1-to 5-mg/kg range. With a number of recent high-quality publications, our analyses indicate that sublethal effects to mercury can occur at concentrations well below the 1 to 5 mg/kg predicted by Niimi and Kissoon [62] for adult fish. Weiner and Spry [63] concluded that sublethal effects to embryonic and larval stages could occur at 1 to 10% of the adult concentrations. Effects of mercury to early life stages of fish, including eggs, have been measured at extremely low concentrations [35]. In their study of reproductive effects of methylmercury and polychlorinated biphenyls, Matta et al. [39] observed reduced fertilization success in **Fundulus heteroclitus** at egg concentrations below the detection limit of 0.02 μg/g. Additional ELS fish studies using low detection limits are needed to validate the protective concentration of 0.02 mg/kg we derived for mercury in ELS fish.

For DDT, we recommend protective levels of 0.6 mg/kg in whole-body adult fish and 0.7 mg/kg for ELS fish. As reported above, the geometric mean of DDE in adult fish from background locations throughout the United States is 0.02 mg/kg, an order of magnitude lower than our recommended protective level. These recommended concentrations may not be fully protective because the results were derived from older studies that emphasized lethality rather than the potentially more sensitive sublethal endpoints. Use of a safety factor with these provisional DDT residues may be appropriate. Additional studies, such as those of Faulk et al. [48], should be conducted to determine whether our provisional recommendations for DDT residues truly are protective and reasonable. The influence of lipid normalization on the provisional DDT residues of 0.6 to 0.7 mg/kg also should be evaluated. In addition, studies that evaluate the toxicity of the different metabolites are needed. Therefore, these DDT tissue residue-effect numbers should be considered provisional and used carefully.

For many chemicals, insufficient data have been published to derive protective tissue residue concentrations for fish. The recent publication of tissue residue guidelines for selenium for the protection of aquatic life is in contrast to information available for many other bioaccumulative chemicals [64]. We strongly encourage investigators to conduct studies designed specifically to produce technically sound residue-effect information. Tissue residue analyses also should consider inclusion of endpoints in addition to those used by Jarvinen and Ankley [11]. Adverse effects on fish behavior, especially during sensitive life stages, could have important ecological implications. Maternal transfer (i.e., dose to developing eggs) is an important, yet often ignored exposure pathway in fish and should be evaluated. We recommend experimental designs such as ones used by Hammerschmidt et al. [38], Drevnick and Sandheinrich [40], Faulk et al. [48], and Webber and Haines [65] as providing valuable guidelines, endpoints, and results (e.g., at least 3 dosing concentrations, multiple sensitive endpoints evaluated, exposure through diet, rigorous data analyses).

Acknowledgement—We thank K. Worthington and L. Ferrero for editorial support, and J. Field for thought-provoking discussions and valuable insights. One anonymous reviewer provided valuable insight and careful feedback that greatly improved the quality of the paper.

## REFERENCES

1. Friant SL, Henry L. 1985. Relationship between toxicity of certain compounds and their concentrations in tissues of aquatic organisms: A perspective. Chemosphere 14:1897–1907.
2. McCarty LS. 1991. Toxicant body residues: Implications for aquatic bioassays with some organic chemicals. Aquat Toxicol 14:183–192.
3. Landrum PF, Lee II, H, Lydy MJ. 1992. Toxicokinetics in aquatic systems: Model comparisons and use in hazard assessment. Environ Toxicol Chem 11:1709–1725.
4. Cook PM, Erickson RJ, Spehar RL, Bradbury SP, Ankley GT. 1993. Interim report on data and methods for assessment of 2,3,7,8-tetrachloro-dibenzo-p-dioxin risks to aquatic life and associated wildlife. EPA-600/R-93/055. U.S. Environmental Protection Agency, Duluth, MN.
5. Driscoll SK, Landrum PF. 1997. A comparison of equilibrium partitioning and critical body residue approaches for predicting toxicity of sediment-associated fluoranthene to freshwater amphipods. Environ Toxicol Chem 16:2179–2186.
6. DeForest DK, Brix KV, Adams WJ. 1999. Critical review of proposed residue-based selenium toxicity thresholds for freshwater fish. Human and Ecological Risk Assessment 5:1187–1228.
7. Girard JP, Szpunar J, Pedrotti ML, Pesando D. 2000. Toxicity of tri-n-butyltin to sea urchin eggs and larvae: Relation to bioaccumulation at the nanomolar level. Environ Toxicol Chem 19:1272–1277.
8. Monosson E. 1999/2000. Reproductive and developmental effects of PCBs in fish: A synthesis of laboratory and field studies. Reviews in Toxicology 3:25–75.
9. Lotufo GR, Landrum PF, Gedeon ML. 2001. Toxicity and bioaccumulation of DDT in freshwater amphipods in exposures to spiked sediments. Environ Toxicol Chem 20:810–825.
10. McCarty LS, Mackay D. 1993. Enhancing ecotoxicological modeling and assessment. Environ Sci Technol 27:1719–1728.
11. Jarvinen AW, Ankley GT. 1999. Linkage of Effects to Tissue Residues: Development of a Comprehensive Database for Aquatic Organisms Exposed to Inorganic and Organic Chemicals. SETAC, Pensacola, FL, USA.
12. U.S. Environmental Protection Agency. 2000. Bioaccumulation testing and interpretation for the purpose of sediment quality assessment. Status and needs. EPA-823-R-00-001 and EPA-823-R-00-002 (Appendices). Office of Water/Office of Solid Wastes, Washington, DC.
13. U.S. Environmental Protection Agency. 1997. Ecological risk assessment guidance for Superfund: Process for designing and conducting ecological risk assessments. EPA 540-R-97-006. Office of Solid Wastes and Emergency Response, Washington, DC.
14. U.S. Environmental Protection Agency. 2002. National recommended water quality criteria: 2002. EPA-822-R-02-047. Office of Water, Washington, DC.
15. U.S. Environmental Protection Agency. 1992. National study of chemical residues in fish. EPA-823-R-92-008. Office of Science and Technology, Washington, DC.
16. U.S. Environmental Protection Agency. 1985. Guidelines for deriving numerical national water quality criteria for the protection of aquatic organisms and their uses. EPA PB85-227049. Office of Research and Development, Washington, DC.
17. Long ER, MacDonald DD, Smith SL, Calder FD. 1995. Incidence of adverse biological effects within ranges of chemical concentrations in marine and estuarine sediments. Environ Manag 19:81–97.
18. Canadian Council of Ministers of the Environment. 1995. Protocol for the derivation of Canadian sediment quality guidelines for the protection of aquatic life. CCME EPC-98E. Ottawa, ON.
19. U.S. Environmental Protection Agency. 2001. Risk assessment guidance for Superfund: Volume III—Part A, Process for conducting probabilistic risk assessment. EPA 540-R-02-002. Office of Emergency and Remedial Response, Washington, DC.
20. Posthuma L, Suter GW II, Traas TP, eds. 2002. Species Sensitivity Distributions in Ecotoxicology. Lewis, Boca Raton, FL, USA.
21. Heisinger JF, Green W. 1975. Mercuric chloride uptake by eggs of the ricefish and resulting teratogenic effects. Bull Environ Contam Toxicol 14:665–673.
22. Klapow LA, Lewis RH. 1979. Analysis of toxicity data for California marine water quality standards. Journal of the Water Pollution Control Federation 51:2054–2070.
23. Meador JP, Collier TK, Stein JE. 2002. Use of tissue- and sediment-based threshold concentrations of polychlorinated biphenyls (PCBs) to protect juvenile salmonids listed under the U.S. Endangered Species Act. Aquatic Conservation, Marine and Freshwater Ecosystems 12:539–551.
24. MacDonald DD, Carr RS, Calder FD, Long ER, Ingersoll CG. 1996. Development and evaluation of sediment quality guidelines for Florida coastal waters. Ecotoxicology 5:253–278.
25. Wagner C, Lokke H. 1991. Estimation of ecotoxicological protection levels from NOEC toxicity data. Water Res 25:1237–1242.
26. Aldenberg T, Slob W. 1993. Confidence limits for hazardous concentration based on logistically distributed NOEC toxicity data. Ecotoxicol Environ Saf 25:48–63.
27. Grist EPM, Leung KMY, Wheeler JR, Crane M. 2002. Better bootstrap estimation of hazardous concentration thresholds for aquatic assemblages. Environ Toxicol Chem 21:1515–1524.
28. Wheeler JR, Grist EPM, Leung KMY, Morritt D, Crane M. 2002. Species-sensitivity distribution: Data model and choice. Mar Pollut Bull 45:192–202.
29. MathSoft. 1999. S-Plus® 2000 Professional. Data Analysis Products Division, Seattle, WA, USA.
30. Sokal RR, Rohlf FJ. 1981. Biometry: The Principles and Practice of Statistics in Biological Research, 2nd ed. WH. Freeman, San Francisco, CA, USA.

31. Rohlf FJ, Sokal RR. 1995. Statistical Tables. W.H. Freeman, New York, NY, USA.

32. Casella G, Berger RL. 1990. Statistical Inference. Wadsworth and Brooks/Cole Statistics/Probability Series, Pacific Grove, CA, USA.

33. Bloom NS. 1992. On the chemical form of mercury in edible fish and marine invertebrate tissue. Can J Fish Aquat Sci 49:1010–1017.

34. Hammerschmidt CR, Wiener JG, Frazier BE, Rada RG. 1999. Methylmercury content of eggs in yellow perch related to maternal exposure in four Wisconsin lakes. Environ Sci Technol 33: 999–1003.

35. Birge WJ, Black JA, Westerman AG, Hudson JE. 1979. The effects of mercury on reproduction of fish and amphibians. In Nriagu JO, ed, The Biogeochemistry of Mercury in the Environment. Elsevier/North-Holland Biomedical, New York, NY, USA, pp 629–655.

36. Snarski VM, Olson GF. 1982. Chronic toxicity and bioaccumulation of mercuric chloride in the fathead minnow (Pimephales promelas). Aquat Toxicol 2:143–156.

37. McKim JM, Olson GF, Holcombe GW, Hunt EP. 1976. Long-term effects of methylmercuric chloride on three generations of brook trout (Salvelinus fontinalis): Toxicity, accumulation, distribution, and elimination. J Fish Res Board Can 33:2726–2739.

38. Hammerschmidt CR, Sandheinrich MB, Wiener JG, Rada RG. 2002. Effects of dietary methylmercury on reproduction of fathead minnows. Environ Sci Technol 36:877–883.

39. Matta MB, Linse J, Cairncross C, Francendese L, Kocan RM. 2001. Reproductive and transgenerational effects of methylmercury or Aroclor 1268 on F. heteroclitus. Environ Toxicol Chem 20:327–335.

40. Drevnick PE, Sandheinrich MB. 2003. Effects of dietary methylmercury on reproductive endocrinology of fathead minnows. Environ Sci Technol 37:4390–4396.

41. Benton MJ, Nimrod AC, Benson WH. 1994. Evaluation of growth and energy storage as biological markers of DDT exposure in sailfin mollies. Ecotoxicol Environ Saf 29:1–12.

42. U.S. Environmental Protection Agency. 1980. Ambient water quality criteria for DDT. EPA 440/5-80-038. Office of Water, Washington, DC.

43. Burdick GE, Harris EJ, Dean HJ, Walker TM, Skea J, Colby D. 1964. Accumulation of DDT in lake trout and the effect on reproduction. Trans Am Fish Soc 93:127–136.

44. Cuerrier JP, Keith JA, Stone E. 1967. Problems with DDT in fish culture operations. Nat Can (Que) 94:315–320.

45. Hopkins CL, Solly SRB, Ritchie AR. 1969. DDT in trout and its possible effect on reproductive potential. NZ J Mar Freshw Res 3:220–229.

46. Johnson HE, Pecor C. 1969. Coho salmon mortality and DDT in Lake Michigan. Transactions of the thirty-fourth North American Wildlife and Natural Resources Conference, Washington, DC, March 2–5, pp 159–166.

47. Butler PA, Childress R, Wilson AJ. 1972. The association of DDT residues with losses in marine productivity. In Ruivo M, ed, Marine Pollution and Sea Life. Fishing News Books, London, UK, pp 262–266.

48. Faulk CK, Fuiman LA, Thomas P. 1999. Parental exposure to ortho,para-dichlorodiphenyltrichloroethane impairs survival skills of Atlantic croaker (Micropogonias undulatus) larvae. Environ Toxicol Chem 18:254–262.

49. Niimi AJ. 1983. Biological and toxicological effects of environmental contaminants in fish and their eggs. Can J Fish Aquat Sci 40:306–312.

50. Johnston TA, Bodaly RA, Latif MA, Fudge RJP, Strange NE. 2001. Intra- and interpopulation variability in maternal transfer of mercury to eggs of walleye (Stizostedion vitreum). Aquat Toxicol 52:73–85.

51. Scherer E. 1992. Behavioral responses as indicators of environmental alterations—approaches, results, developments. J Appl Ichthyol 8:122–131.

52. Shumway CA. 1999. A neglected science: Applying behavior to aquatic conservation. Environ Biol Fishes 55:183–201.

53. Jones JC, Reynolds JD. 1997. Effects of pollution on reproductive behavior of fishes. Rev Fish Biol Fish 7:463–491.

54. Barron MG, Hansen JA, Lipton J. 2002. Association between contaminant tissue residues and effects in aquatic organisms. Rev Environ Contam Toxicol 173:1–37.

55. Miller MA, Amrhein JF. 1995. Maternal transfer of organochlorine compounds in Lake-Superior siscowet (Salvelinus namaycush siscowet) to their eggs. Bull Environ Contam Toxicol 55: 96–103.

56. Allison D, Kallman BJ, Cope OB, Van Valin C. 1963. Insecticides: Effects on cutthroat trout of repeated exposure to DDT. Science (Wash DC) 142:958–961.

57. Allison D, Kallman BJ, Cope OB, Van Valin C. 1964. Some chronic effects of DDT on cutthroat trout. Research Report 64. U.S. Department of the Interior, U.S. Fish and Wildlife Service, Bureau of Sport Fisheries and Wildlife, Washington, DC.

58. Milston RH, Fitzpatrick MS, Vella AT, Clements S, Gundersen D, Feist G, Crippen TL, Leong J, Schreck CB. 2003. Short-term exposure of chinook salmon (Oncorynhchus tshawytscha) to o,p′-DDE or DMSO during early life-history stages causes long-term humoral immunosuppression. Environ Health Perspect 111: 1601–1607.

59. Forbes VE, Calow P. 2002. Species-sensitivity distributions revisited: A critical appraisal. Human and Ecological Risk Assessment 8:473–492.

60. Newman MC, Ownby DR, Mezin LCA, Powell DC, Christensen TRL, Lerberg SB, Anderson BA. 2000. Applying species-sensitivity distributions in ecological risk assessment: Assumptions of distribution type and sufficient numbers of species. Environ Toxicol Chem 19:508–515.

61. Forbes TL, Forbes VE. 1993. A critique of the use of distribution-based extrapolation models in ecotoxicology. Funct Ecol 7:249–254.

62. Niimi AJ, Kissoon GP. 1994. Evaluation of the critical body burden concept based on inorganic and organic mercury toxicity to rainbow trout (Oncorhynchus mykiss). Arch Environ Contam Toxicol 26:169–178.

63. Wiener JG, Spry DJ. 1996. Toxicological significance of mercury in freshwater fish. In Beyer WN, Heinz GH, Redmon-Norwood AW, eds, Environmental Contaminants in Wildlife: Interpreting Tissue Concentrations. Lewis, Boca Raton, FL, USA, pp 297–339.

64. U.S. Environmental Protection Agency. 2004. Draft aquatic life water quality criteria for selenium—2004. EPA-822-D-04-001. Office of Water, Washington, DC.

65. Webber HM, Haines TA. 2003. Mercury effects on predator avoidance behavior of a forage fish, golden shiner (Notemigonus crysoleucas). Environ Toxicol Chem 22:1556–1561.

66. Friedmann AS, Watzin MC, Brinck-Johnsen T, Leiter JC. 1996. Low levels of dietary methylmercury inhibit growth and gonadal development in juvenile walleye (Stizostedion vitreum). Aquat Toxicol 35:265–278.

67. Weis P, Weis JS. 1978. Methylmercury inhibition of fin regeneration in fishes and its interaction with salinity and cadmium. Estuar Coast Mar Sci 6:327–334.

68. Fjeld E, Haugen TO, Vøllestad LA. 1998. Permanent impairment in the feeding behavior of grayling (Thymallus thymallus) exposed to methylmercury during embryogenesis. Sci Total Environ 213:247–254.

69. Davy FB, Kleerekoper H, Gensler P. 1972. Effects of exposure to sublethal DDT on the locomotor behavior of the goldfish (Carassius auratus). J Fish Res Board Can 29:1333–1336.

70. Butler PA. 1969. The significance of DDT residues in estuarine fauna. In Miller MW, Berg GG, eds, Chemical Fallout: Current Research on Persistent Pesticides. C.C. Thomas, Springfield, IL, USA, pp 205–220.

71. Berlin WH, Hasselberg RJ, Mac MJ. 1981. Growth and mortality of fry of Lake Michigan lake trout during chronic exposure to PCBs and DDE. Technical Paper 105. U.S. Fish and Wildlife Service, Ann Arbor, MI, pp 11–22.

72. Macek KJ. 1968. Growth and resistance to stress in brook trout fed sublethal levels of DDT. J Fish Res Board Can 25:2443–2451.

73. Buhler DR, Rasmusson ME, Shanks WE. 1969. Chronic oral DDT toxicity in juvenile Coho and Chinook Salmon. Toxicol Appl Pharmacol 14:535–555.

74. Macek KJ. 1968. Reproduction in brook trout fed sublethal concentrations of DDT. J Fish Res Board Can 25:1787–1796.

75. Jarvinen AW, Hoffman MJ, Thorslund TW. 1976. Toxicity of DDT food and water exposure to fathead minnows. EPA-600/3–76/114. U.S. Environmental Protection Agency, Office of Research and Development, Duluth, MN.

Environ. Toxicol. Chem. 24, 2005      2105

76. Jarvinen AW, Hoffman MJ, Thorslund TW. 1977. Long-term toxic effects of DDT food and water exposure on fathead minnows. J Fish Res Board Can 34:2089–2103.

77. Burdick GE, Dean HJ, Harris EJ, Skea J, Karcher R, Frisa C. 1972. Effect of rate and duration of feeding DDT on the repro-duction of salmonid fishes reared and held under controlled conditions. N Y Fish Game J 19:97–115.

78. Smith RM, Cole CF. 1973. Effects of egg concentrations of DDT and dieldrin on development in winter flounder. J Fish Res Board Can 30:1894–1898.

# Mercury (Hg) and Selenium (Se) in Colorado Pikeminnow and in Razorback Sucker from the San Juan River

**Joel D. Lusk, Senior Environmental Contaminants Biologist**

**US Fish &Wildlife Service, NM Ecological Services**

**2105 Osuna Road NE, Albuquerque, NM  87113**

**joel_lusk@fws.gov     505-761-4709**

**www.fws.gov/southwest/es/newmexico/**



U.S. Fish and Wildlife Service, New Mexico Ecological Services
Presentation to San Juan RIP, Biology Committee Meeting, Jan 13, 2010

# Why are Hg and Se of concern?



- Widespread concerns about Hg contamination of fish:  Fish consumption advisories in San Juan River Basin (CO, NM, UT, Navajo Nation)



- Se & Hg in endangered fish may indicate injury & suggest slowed recovery in the wild



- Public concern about coal-fired power plant emissions

U.S. Fish and Wildlife Service, New Mexico Ecological Services
Presentation to San Juan RIP, Biology Committee Meeting, Jan 13, 2010

2

# Sources of Mercury to the SJRB

- Natural Sources (31%):
  - ❖ Volcanoes
  - ❖ Forest fires volatize Hg (re-emission; Hg is a grasshopper pollutant)

- N. Amer. Sources (30%)
  - ❖ Burning activities
    - Coal-fired power plants
    - Incinerators, crematoria



    - Hg devices, home wastes
  - ❖ Gold-mining activities
- Sources in Asia (~21%)



U.S. Fish and Wildlife Service, New Mexico Ecological Services
Presentation to San Juan RIP, Biology Committee Meeting, Jan 13, 2010

3

# Hg to Increase in San Juan River Basin



San Juan River Basin Mercury Deposition Annual Total  (in 2001-05) was 712 kg (~1600 lbs) - USEPA 2005
San Juan River Basin Mercury Deposition Annual Total  in 2020 is expected 957 kg (~35% increase) – based on UNEP 2008



 U.S. Fish and Wildlife Service, New Mexico Ecological Services
Presentation to San Juan RIP, Biology Committee Meeting, Jan 13, 2010

4



# Watershed Mercury Processes

U.S. Fish and Wildlife Service, New Mexico Ecological Services
Presentation to San Juan RIP, Biology Committee Meeting, Jan 13, 2010

# Mercury in San Juan River food webs

Hg

Predator Fish: Colorado Pikeminnow

Aquatic invertebrates




Periphyton
& Vegetation





Prey Fish (example):
flannelmouth sucker



Images from:
www.glerl.noaa.gov/pubs/photogallery/gallery, and
www.fws.gov/coloradoriverrecovery/crcsq

Benthos

6

# 1990-96 San Juan River Fish Hg Data



Boxplot of mercury (ug/g ww) in whole fish from the San Juan River (reported by Simpson and Lusk 1999)

• Few fish Hg data relevant to piscivorous pikeminnow – more data needed. . .

 U.S. Fish and Wildlife Service, New Mexico Ecological Services
Presentation to San Juan RIP, Biology Committee Meeting, Jan 13, 2010

7

# 2007-10: Osmundson Pikeminnow Study

◈ Determine Hg concentrations in Colorado pikeminnow throughout critical habitat using muscle plugs

◈ Assess health risks to Colorado pikeminnow from Hg exposure

❖ Osmundson and Lusk expanded scope of study in San Juan River basin to include razorback sucker, selenium analyses and mercury analyses of museum pikeminnow.





U.S. Fish and Wildlife Service, New Mexico Ecological Services
Presentation to San Juan RIP, Biology Committee Meeting, Jan 13, 2010

8



 U.S. Fish and Wildlife Service, New Mexico Ecological Services
Presentation to San Juan RIP, Biology Committee Meeting, Jan 13, 2010

9

# San Juan River 2009 Hg & Se data for Pikeminnow & Razorback Muscle Tissues



Ln(Se) and Ln(Hg) in pikeminnow and razorback sucker muscle tissues collected from the San Juan River 2009

?We expected ratio of Hg in Pikeminnow–to-sucker to be ~ 4 (as other basins) ?



U.S. Fish and Wildlife Service, New Mexico Ecological Services
Presentation to San Juan RIP, Biology Committee Meeting, Jan 13, 2010

# Pikeminnow Length & Weight by Basin



Total length (mm) and Weight (g) of Colorado pikeminnow collected in Upper Colorado River Basins in 2008-09

[Basin: CRB=Upper Colorado River; GRN=Green River; SJR=San Juan River; WRB=White River; and, YRB=Yampa River]



U.S. Fish and Wildlife Service, New Mexico Ecological Services
Presentation to San Juan RIP, Biology Committee Meeting, Jan 13, 2010

11

# San Juan River Pikeminnow were Small



Histograph of Colorado Pikeminnow Total Length (mm)
Blue = Includes San Juan River pikeminnow
Red = Does not include San Juan River pikeminnow



U.S. Fish and Wildlife Service, New Mexico Ecological Services
Presentation to San Juan RIP, Biology Committee Meeting, Jan 13, 2010

12



BoxPlot of Mercury (ug/g ww) in Colorado Pikeminnow muscle by Watershed and the San Juan River by Size Class
[Watershed: SJR 200-San Juan River 200mm; SJR 300-San Juan River 300mm; SJR 400-San Juan River 400mm;
CRB-Upper Colorado River; GRN-Gren River; WRB-White River; YRB-Yampa River]



U.S. Fish and Wildlife Service, New Mexico Ecological Services
Presentation to San Juan RIP, Biology Committee Meeting, Jan 13, 2010

13

Scatterplot of the natural logarithm of mercury in muscle tissue (ug/g wet weight) and total length (mm)

Pikeminnow tissues collected from the Colorado (CRB), Green (GRB), San Juan (SJR), White (WRB), and Yampa (YRB) River Basins.

Linear Model:  LnHg (muscle)  = -3.2054 + 0.0046*Total Length

r = 0.7447, p = 0.0000

Polynomial model (red line with 0.9 conf. int.) LnHg = -5.8803 + 0.0171*x-1.3182E-5*x^2



U.S. Fish and Wildlife Service, New Mexico Ecological Services
Presentation to San Juan RIP, Biology Committee Meeting, Jan 13, 2010

14





U.S. Fish and Wildlife Service, New Mexico Ecological Services
Presentation to San Juan RIP, Biology Committee Meeting, Jan 13, 2010

15

# Mercury Emissions over Time



USGS Hg in Ice Cores

Nydick 2008 Sediment HG in Western CO



U.S. Fish and Wildlife Service, New Mexico Ecological Services
Presentation to San Juan RIP, Biology Committee Meeting, Jan 13, 2010

16

# What are Mercury Effects to Fish?

◈ Potent Neurotoxin
  ❖ Affects central nervous system (reacts w/ brain enzymes, then lesions)
  ❖ Affects hypothalamus and pituitary, affects gonadotropin-secreting cells
  ❖ Altered behaviors: Reduced predator avoidance, reproductive timing fail
  ❖ Reduced ability to feed (emaciation/growth effects)

◈ Endocrine disruptor
  ❖ Suppressed reproductive hormones in male and female fish
  ❖ Reduce gonad size and function, reduced gamete production,
  ❖ Altered ovarian morphology, delayed oocyte development
  ❖ Reduced reproductive success
  ❖ Transfer of dietary Hg of the maternal adult during oogenesis and into developing embryo

◈ Fish have inability to grow new brain cells or significantly reduce brain Hg

---

•Beckvar (2005)-survival, growth, reproduction, behavior at 0.2ug/g in whole fish

•Yeardley (1998)- Hg>0.1 mg/kg WW likely harmful to piscivorous mammals

•USEPA (2000)- Hg>0.3 mg/kg WW likely harmful to certain people that eat fish

---



U.S. Fish and Wildlife Service, New Mexico Ecological Services
Presentation to San Juan RIP, Biology Committee Meeting, Jan 13, 2010

17



Current and expected future(35.5 % increase by 2020) whole-body mercury concentrations in Colorado Pikeminnow along with reproductive, behavioral, and lethal effects concentrations for surrogate species described by Beckvar et al. (2005).

Legend:
- Current upper Colo. River Basin pikeminnow whole body Hg
- 2020 Future (35.5% increase) pikeminnow whole body Hg
- Proposed whole body fish threshold effect level (0.2 mg/kg)
- Possible threshold for steroidogenesis effects in male White Sturgeon (Hg in muscle)
- Gonadal atrophy in males (walleye)
- 16% reduction in spawning success (fathead minnow)
- 47.7% reduction in survival of males (mummichog)
- Severe brain lesions (vacuolation) and high lipid peroxidation (Atlantic salmon parr)
- Significant effects on dispersal behavior (golden shiner)
- 63% reduction in spawning success (fathead minnow)



U.S. Fish and Wildlife Service, New Mexico Ecological Services
Presentation to San Juan RIP, Biology Committee Meeting, Jan 13, 2010

18

# Potential effects to pikeminnow recovery



•Assume a recovered pop of pikeminnow in San Juan River of 700 adult (450 mm+) fish
• ~ 350 female pikeminnow, & each averages 77,400 eggs/F = 27 million eggs per year

### No. of Viable Eggs and Surviving Larvae Under Each Scenario



 U.S. Fish and Wildlife Service, New Mexico Ecological Services
Presentation to San Juan RIP, Biology Committee Meeting, Jan 13, 2010

19

# Sources of Selenium

## Natural Sources:

### ❖ Geology (e.g., shales)

 

### ❖ Se Accumulator plants



## Anthropogenic Se

- ❖ Irrigation of Se-rich soils
- ❖ Coal mining, leaching
- ❖ Power plant emissions &flyash





U.S. Fish and Wildlife Service, New Mexico Ecological Services
Presentation to San Juan RIP, Biology Committee Meeting, Jan 13, 2010

# Selenium (Se) Cycling

◈ Soils of marine origin naturally Se-rich (Cretaceous Period shale, coals)

◈ Se enters surface waters thru erosion, leaching, & runoff of Se-rich soils

◈ Burning of coal with Se air emissions, deposition to land, surface runoff

◈ Contributions of Se in invertebrates, algae, and fish in the San Juan River have increased with expansion of agriculture & energy development





Fig. 3. Additional mobilization processes include direct uptake of selenium by benthic invertebrates and oxidation of sediments resulting from plant roots, microorganisms, and the burrowing activity of benthos.



U.S. Fish and Wildlife Service, New Mexico Ecological Services
Presentation to San Juan RIP, Biology Committee Meeting, Jan 13, 2010



BoxPlot of selenium (ug/g dry weight) in plants and invertebrate samples (in green) and whole body fish (in red) collected from the San Juan River (upstream Reach 8 to downstream Reach 1) 1990-1996

Selenium in Plants and Invertebrats
Selenium in whole body fish

Selenium (ug/g dry weight)

San Juan River Reach (upstream Reach 8 to downstream Reach 1)



U.S. Fish and Wildlife Service, New Mexico Ecological Services
Presentation to San Juan RIP, Biology Committee Meeting, Jan 13, 2010

22



Boxplot of selenium (ug/g dry weight) in whole body fish composites collected from the San Juan River and its tributaries (1990-1996) (4 ug/g is Se level of concern in whole body fish)



U.S. Fish and Wildlife Service, New Mexico Ecological Services
Presentation to San Juan RIP, Biology Committee Meeting, Jan 13, 2010

23



Boxplot of Selenium in Colorado Pikeminnow muscle tissues over time in the San Juan River

Se ppm DW:   $F_{(2,31)} = 0.2624$, $p = 0.7709$;
$KW-H_{(2,34)} = 0.9338$, $p = 0.6269$



U.S. Fish and Wildlife Service, New Mexico Ecological Services
Presentation to San Juan RIP, Biology Committee Meeting, Jan 13, 2010

24



Boxplot of Selenium in Razorback sucker muscle tissues over time in the San Juan River



U.S. Fish and Wildlife Service, New Mexico Ecological Services
Presentation to San Juan RIP, Biology Committee Meeting, Jan 13, 2010

25



Boxplot of selenium (ug/g dry weight) in razorback sucker muscle tissues in the San Juan River by river reach (rounded) and over time



U.S. Fish and Wildlife Service, New Mexico Ecological Services
Presentation to San Juan RIP, Biology Committee Meeting, Jan 13, 2010

26



Scatterplot of selenium in razorback sucker muscle tissue by mass (weight in grams)

Weight_g:LnSe:   y = 1.08 + 0.0002*x;  r = 0.1999, p = 0.2044; $r^2 = 0.0399$



U.S. Fish and Wildlife Service, New Mexico Ecological Services
Presentation to San Juan RIP, Biology Committee Meeting, Jan 13, 2010

27

# Effects to Fish from Excess Selenium

⬖ Se is a teratogen (larvae have defects)

  ❖ Adult fish appear healthy (but pop often declines over time)

  ❖ Dietary Se is most important

  ❖ Deformities of larvae are in response to maternal exposure

  - Subsequent deposit of excess Se into their eggs
  - Yolk absorption by embryo/larvae during development leads to oxidation of enzymes and tissues and deformities occur
  - Deformed larvae have reduced survival, reduced growth

  ❖ Those larvae that remain may also have reduced survival if Se body burden plus Se in their diet exceeds safe dose

U.S. Fish and Wildlife Service, New Mexico Ecological Services
Presentation to San Juan RIP, Biology Committee Meeting, Jan 13, 2010

28

# Effects of Se in diet of larval Razorback Sucker (Hamilton & Beyer studies)

- Used dose studies to describe a relationship between larval survival and dietary selenium specifically for 5 to 35 day razorback sucker larvae.
  - 1990-96 razorback surrogate diet range <0.1-18 µg/g; $\overline{x}$=4.5 µg/g
  - If Se increases (120%) proportional to diet 0.3–40 µg/g; $\overline{x}$ =10 µg/g



U.S. Fish and Wildlife Service, New Mexico Ecological Services
Presentation to San Juan RIP, Biology Committee Meeting, Jan 13, 2010

29

# Possible effects of Se (&Hg) on razorback sucker recovery

•Recovered pop in San Juan River = ~ 2900 razorback sucker

### No. of Viable Eggs and Larvae Under Each Scenario



U.S. Fish and Wildlife Service, New Mexico Ecological Services
Presentation to San Juan RIP, Biology Committee Meeting, Jan 13, 2010



30

# Ideas on Actions to Answer Questions

- Monitor Hg and Se in fish, water, air, and sources
- Monitor biomarkers in endangered or surrogate fish eg. vitellogenin levels, sex hormones, histopathology
- Reduce Hg/Se globally, nationally, and locally
- TMDL for Hg/Se in San Juan River Basin
- Se/Hg isotope study to validate sources
- Conduct lab studies exposing endangered fish (adults and larvae) to mercury and selenium in diets

U.S. Fish and Wildlife Service, New Mexico Ecological Services
Presentation to San Juan RIP, Biology Committee Meeting, Jan 13, 2010

31