| Site or Organization | Parameter | Notes | Performance Evaluations (Accuracy) | | | | Data Complet | Collocated Precision Statistics | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Clifton | High-Vol $PM_{10}$ | | 8 | 3.9 | -5.0 | 6.7 | 98 | | | | |
| Crested Butte | High-Vol $PM_{10}$ | | 8 | 3.2 | -5.8 | 2.3 | 98 | | | | |
| Crested Butte | High-Vol $PM_{10}$ | collocated | 4 | | | | 100 | 59 | 35 | 97 | 9.1 |
| Delta | High-Vol $PM_{10}$ | | 8 | 3.5 | -5.7 | 1.7 | 94 | | | | |
| DMAS | High-Vol $PM_{10}$ | | 4 | 4.4 | -7.1 | 1.7 | 95 | | | | |
| DMAS | High-Vol $PM_{10}$ | collocated | 4 | | | | 100 | 58 | 47 | 95 | 3.4 |
| Durango | High-Vol $PM_{10}$ | | 8 | 5.7 | -9.8 | 4.5 | 91 | | | | |
| DVC | High-Vol $PM_{10}$ | | 16 | 3.0 | -5.5 | 1.5 | 97 | | | | |
| Ft. Collins CSU | High-Vol $PM_{10}$ | | 8 | 2.9 | -4.4 | 4.7 | 98 | | | | |
| Greeley | High-Vol $PM_{10}$ | | 8 | 3.6 | -6.1 | 2.2 | 97 | | | | |
| Lamar Municipal | High-Vol $PM_{10}$ | | 16 | 4.2 | -6.5 | -0.1 | 89 | | | | |
| Lamar Power Plant | High-Vol $PM_{10}$ | | 16 | 3.2 | -4.8 | -0.5 | 99 | | | | |
| Longmont | High-Vol $PM_{10}$ | | 4 | 5.0 | -5.6 | 0.7 | 89 | | | | |
| Mt. Crested Butte | High-Vol $PM_{10}$ | | 16 | 3.1 | -5.3 | 0.9 | 99 | | | | |
| Pagosa School | High-Vol $PM_{10}$ | | 16 | 3.5 | -6.9 | 2.4 | 85 | | | | |
| Parachute | High-Vol $PM_{10}$ | | 8 | 2.3 | -3.7 | 1.2 | 99 | | | | |
| Pueblo | High-Vol $PM_{10}$ | | 8 | 2.5 | -4.1 | 1.6 | 89 | | | | |
| Rifle | High-Vol $PM_{10}$ | | 8 | 5.8 | -9.2 | 2.9 | 96 | | | | |
| Steamboat | High-Vol $PM_{10}$ | | 16 | 4.7 | -8.7 | 2.4 | 96 | | | | |
| Telluride | High-Vol $PM_{10}$ | | 8 | 2.1 | -3.0 | 0.3 | 95 | | | | |
| Welby | High-Vol $PM_{10}$ | | 4 | 3.6 | -4.0 | 0. | 95 | | | | |
| CDPHE | High-Vol $PM_{10}$ | organization | 268 | 2.7 | -6.4 | 2.3 | 94 | 175 | 132 | 96 | 8.1 |
| Colorado College | Low-Vol $PM_{10}$ | | 4 | 3.1 | -4.3 | 2.0 | 85 | | | | |
| Commerce City | Low-Vol $PM_{10}$ | | 4 | 0.9 | -1.2 | 0.8 | 95 | | | | |
| DMAS | Low-Vol | start | 0 | | | | 100 | | | | |

| Site or Organization | Parameter | Notes | Performance Evaluations (Accuracy) | | | | Data Complet | Collocated Precision Statistics | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | $PM_{10}$ | 12/10 | | | | | | | | | |
| **Grand Junction** | Low-Vol $PM_{10}$ | | 4 | 1.2 | -1.5 | 0.5 | 88 | | | | |
| **Grand Junction** | Low-Vol $PM_{10}$ | collocated | 4 | | | | 97 | 52 | 52 | 85 | 4.7 |
| **CDPHE** | Low-Vol $PM_{10}$ | organization | 16 | 1.3 | -2.3 | 1.2 | 93 | 52 | 52 | 85 | 4.7 |
| **A.C.C.** | Low-Vol $PM_{2.5}$ | | 4 | 1.8 | -2.5 | 1.0 | 91 | | | | |
| **Boulder** | Low-Vol $PM_{2.5}$ | | 4 | 1.8 | -1.7 | -0.5 | 99 | | | | |
| **CAMP** | Low-Vol $PM_{2.5}$ | | 4 | 0.9 | -1.2 | 1.1 | 96 | | | | |
| **CAMP** | Low-Vol $PM_{2.5}$ | collocated | 4 | | | | 98 | 63 | 63 | 100 | 6.1 |
| **Chatfield** | Low-Vol $PM_{2.5}$ | | 4 | 0.7 | -0.5 | 0.8 | 98 | | | | |
| **Colorado College** | Low-Vol $PM_{2.5}$ | | 4 | 0.9 | -1.3 | 1.3 | 97 | | | | |
| **Commerce City** | Low-Vol $PM_{2.5}$ | | 4 | 1.3 | -1.6 | 0.7 | 94 | | | | |
| **Commerce City** | Low-Vol $PM_{2.5}$ | collocated | 4 | | | | 98 | 56 | 55 | 92 | 6.0 |
| **Cortez** | Low-Vol $PM_{2.5}$ | | 1 | 3.0 | 1.4 | 2.8 | 97 | | | | |
| **DMAS** | Low-Vol $PM_{2.5}$ | | 4 | 1.4 | -1.7 | 0.4 | 97 | | | | |
| **Elbert** | Low-Vol $PM_{2.5}$ | | 4 | 2.8 | -4.6 | 3.3 | 97 | | | | |
| **Ft. Collins CSU** | Low-Vol $PM_{2.5}$ | | 4 | 0.8 | -0.5 | 1.3 | 100 | | | | |
| **Grand Junction** | Low-Vol $PM_{2.5}$ | | 4 | 1.5 | -1.6 | 0.6 | 97 | | | | |
| **Greeley** | Low-Vol $PM_{2.5}$ | | 4 | 0.5 | -0.4 | 0.9 | 100 | | | | |
| **Longmont** | Low-Vol $PM_{2.5}$ | | 4 | 3.3 | -4.0 | -0.6 | 98 | | | | |
| **Platteville** | Low-Vol $PM_{2.5}$ | | 4 | 1.0 | -1.5 | 1.6 | 93 | | | | |
| **Pueblo** | Low-Vol $PM_{2.5}$ | | 4 | 1.6 | -1.6 | 0.1 | 89 | | | | |
| **Swansea** | Low-Vol $PM_{2.5}$ | | 4 | 2.6 | -4.0 | 3.0 | 86 | | | | |
| **CDPHE** | Low-Vol $PM_{2.5}$ | organization | 69 | 1.2 | -2.5 | 1.7 | 96 | 119 | 118 | 96 | 6.7 |
| **CDPHE** | All Low-Vol Particulate | organization | 85 | | -3.1 | 1.6 | 95 | | | | |
| **Centennial** | TSP | | 2 | 8.2 | -3.4 | 4.4 | 93 | | | | |

| Site or Organization | Parameter | Notes | Performance Evaluations (Accuracy) | | | | Data Complet | Collocated Precision Statistics | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Air.** | | | | | | | | | | | | |
| **DMAS** | TSP | | 4 | 3.7 | -6.5 | 3.6 | 100 | | | | | |
| **DMAS** | TSP | collocated | 4 | | | | 100 | 61 | 60 | 100 | 6.4 | |
| **CDPHE** | TSP | organization | 10 | 3.2 | -6.0 | 3.9 | 98 | 61 | 60 | 100 | 6.4 | |
| **Centennial Air.** | Pb | | | | | | 93 | | | | | |
| **DMAS** | Pb | | | | | | 98 | | | | | |
| **DMAS** | Pb | | | | | | 93 | | | | | |
| **CDPHE** | Pb | organization | | | | | 94 | | | | | |

Figure 51 shows the upper and lower probability limits for 2010 for the TSP, High-Vol $PM_{10}$ and Low-Vol combined (both $PM_{10}$ and $PM_{2.5}$) networks. Since collocated data is used to evaluate precision, and APCD performs audits quarterly, these statistics were calculated from the accuracy audit data.



Figure 51.    Filter Based Particulate Probability Intervals

Table 47 below summarizes statistical evaluations for all continuous particulate precision, accuracy, bias, and completeness data. The values were calculated in the same manner as the gaseous statistics using the monthly flow rate verification precision checks.

Table 47.    Summary of Precision, Accuracy, Bias, and Completeness Data for Continuous Particulate Monitoring

| Site or Organization | Particulate Parameter | Quarter or Year | Precision Count | Precision Completeness (%) | Prec. Within DQO Limit | CV (%) | Bias (%) | +/- on bias | 90% Probability Interval Probability Limits | | % of Audit Points within Probability Limits | Data Completeness (%) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Lower | Upper | | |
| **Welby** | PM$_{10}$ TEOM | 2010 | 18 | 75 | | 2.2 | 2.9 | + | -4.6 | 5.6 | | 86 |
| **CAMP** | PM$_{10}$ TEOM | 2010 | 32 | 100 | | 1.3 | 1.4 | | -3.0 | 2.8 | | 96 |
| **DMAS** | PM$_{10}$ TEOM | 2010 | 20 | 83 | | 1.7 | 2.3 | - | -4.7 | 3.3 | | 92 |
| **CDPHE** | PM$_{10}$ TEOM | 1 | 30 | | | 1.4 | 1.7 | | -3.5 | 2.6 | | |
| **CDPHE** | PM$_{10}$ TEOM | 2 | 16 | | | 1.1 | 1.6 | | -3.3 | 1.9 | | |
| **CDPHE** | PM$_{10}$ TEOM | 3 | 6 | | | 1.8 | 3.1 | | -4.4 | 5.0 | | |
| **CDPHE** | PM$_{10}$ TEOM | 4 | 18 | | | 2.2 | 2.9 | | -4.4 | 6.1 | | |
| **CDPHE** | PM$_{10}$ TEOM | 2010 | 70 | 86 | 97 | 1.8 | 1.8 | | -4.0 | 3.8 | 88 | 93 |
| **CDPHE** | PM$_{10}$ BAM | 2010 | 15 | 100 | 93 | 2.7 | 3.6 | | -5.2 | 7.7 | n/a | 77 |
| **Boulder - Marine St.** | FDMS PM$_{2.5}$ | 2010 | 28 | 100 | | 3.1 | 3.7 | | -7.1 | 7.0 | | 89 |
| **CAMP** | FDMS PM$_{2.5}$ | 2010 | 38 | 100 | | 1.5 | 2.0 | + | -4.5 | 2.3 | | 93 |
| **NJH** | FDMS PM$_{2.5}$ | 2010 | 30 | 100 | | 1.5 | 2.1 | + | -4.7 | 2.2 | | 95 |
| **DMAS** | FDMS PM$_{2.5}$ | 2010 | 14 | 58 | | 2.0 | 2.8 | - | -4.5 | 5.0 | | 97 |
| **Chatfield (1st 1/2)** | FDMS PM$_{2.5}$ | 2010 | 4 | 33 | | 0.4 | 0.9 | n/a | -1.0 | 1.5 | | 62 |
| **Colorado College** | FDMS PM$_{2.5}$ | 2010 | 12 | 50 | | 1.5 | 2.1 | - | -3.6 | 3.6 | | 80 |
| **CDPHE** | FDMS PM$_{2.5}$ | 1 | 38 | | | 2.5 | 2.7 | | -4.7 | 6.3 | | |
| **CDPHE** | FDMS PM$_{2.5}$ | 2 | 38 | | | 1.3 | 2.2 | | -4.5 | 1.4 | | |
| **CDPHE** | FDMS PM$_{2.5}$ | 3 | 22 | | | 1.7 | 2.4 | | -5.0 | 2.5 | | |
| **CDPHE** | FDMS PM$_{2.5}$ | 4 | 28 | | | 1.9 | 2.5 | | -5.2 | 3.4 | | |
| **CDPHE** | FDMS PM$_{2.5}$ | 2010 | 126 | 74 | 94 | 2.5 | 2.2 | | -5.3 | 4.1 | 100 | 86 |
| **CDPHE** | 1405 Coarse | 2010 | 12 | 100 | 67 | 4.0 | 6.0 | n/a | -8.4 | 11.3 | n/a | 89 |
| **CDPHE** | 1405 PM$_{2.5}$ | 2010 | 24 | 100 | 100 | 1.3 | 1.6 | + | -3.1 | 2.7 | n/a | 86 |
| **Commerce City** | PM$_{2.5}$ TEOM | 2010 | 42 | 100 | | 1.6 | 2.0 | | -4.5 | 2.9 | | 99 |
| **Longmont** | PM$_{2.5}$ TEOM | 2010 | 30 | 100 | | 2.0 | 3.3 | + | -6.8 | 2.1 | | 87 |
| **Chatfield 2nd** | PM$_{2.5}$ | 2010 | 8 | 67 | | 2.0 | 4.4 | n/ | -7.3 | 3.1 | | 69 |

| Site or Organization | Particulate Parameter | Quarter or Year | Precision Coun | Precision Complete ness (%) | Prec. Within DQO | CV (%) | Bias (%) | +/- on bias | 90% Probability Interval Probability Limits | | % of Audit Points within | Data Comple teness |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TEOM | | | | | | | a | | | | |
| **Grand Jct. Powell** | PM$_{2.5}$ TEOM | 2010 | 22 | 100 | | 1.4 | 1.7 | | -2.6 | 3.9 | | 73 |
| **Greeley** | PM$_{2.5}$ TEOM | 2010 | 28 | 100 | | 1.7 | 2.5 | | -5.2 | 2.6 | | 91 |
| **CDPHE** | PM$_{2.5}$ TEOM | 1 | 40 | | | 2.4 | 2.6 | | -5.7 | 4.8 | | |
| **CDPHE** | PM$_{2.5}$ TEOM | 2 | 33 | | | 1.6 | 2.4 | | -5.0 | 2.1 | | |
| **CDPHE** | PM$_{2.5}$ TEOM | 3 | 30 | | | 2.0 | 2.7 | | -6.2 | 3.0 | | |
| **CDPHE** | PM$_{2.5}$ TEOM | 4 | 27 | | | 1.3 | 1.9 | | -4.1 | 1.9 | | |
| **CDPHE** | PM$_{2.5}$ TEOM | 2010 | 130 | 93 | 92 | 2.3 | 2.1 | | -5.5 | 3.3 | 97 | 84 |

Figure 52 below shows the upper and lower probability limits for 2010 for the continuous particulate network. The probability intervals are broken down by the various types of analyzers used in collection and by reporting parameters (i.e. – both coarse and PM$_{2.5}$ probability limits have been established for the TEOM 1405 instrument). These intervals were established from the monthly flow rate verification/precision checks performed at each site.



Figure 52.   Continuous Based Particulate Probability Intervals

## 7. REFERENCES

Air Pollution Control Division. *Denver Metro Area/North Front Range 8-hour Ozone SIP - Emissions Inventory.* 2010.

AirNow. *Particulate Pollution and Your Health, What is Particulate Pollution?* 2003  1-September. http://www.airnow.gov/index.cfm?action=particle_health.page1 (accessed 2010  16-August).

American Lung Association. *The Perils of Particulates.* New York, 1994.

"Cardiovascular Toxicology." 6, no. 1 (2006).

City of Fort Collins. *Particulate Matter.* 2002  18-April. http://www.fcgov.com/airquality/particulate-matter.php (accessed 2010  17-August).

"Clean Air Act as ammended in 1977, Section 169a." In *42 USC 7491.* 1977.

Elizabeth C. Weatherhead, & Signe Bech Andersen. "The search for signs of recovery of the ozone layer." (Nature) 441 (2006).

Federal Register. *National Ambient Air Quality Standards for Ozone; Final Rule.* Vol. 73, chap. 60. 2008.

"National Primary and Secondary Ambient Air Quality Standards for Sulfer Dioxide." Chap. 50.5 in *Title 40, Code of Federal Regulations.* 2010.

Occupational Health and Safety Administration. *Guidelines for Carbon Monoxide.* 2007  8-January. http://www.osha.gov/SLTC/healthguidelines/carbonmonoxide/recognition.html (accessed 2010  17-August).

Pope, C.A., and Dockery, D.W. "Health Effects of Fine Particulate Air Pollution: Lines that Connect. 2006 Critical Review." *Air & Waste Managers Association,* 2006, 56 ed.

Pope, Thompson G. Pace and Anne. *National Emissions Inventory for Lead - Concepts and Quantities.* 2009.

United States Environmental Protection Agency. *1970-2008 Average Annual Emissions, CO.* 2009  27-May. http://www.epa.gov/ttnchie1/trends (accessed 2010  16-August).

—. *1970-2008 Average Annual Emissions, NOx.* 2009  27-May. http://www.epa.gov/ttnchie1/trends (accessed 2010  16-August).

—. *1970-2008 Average Annual Emissions, SO2.* 2009  27-May. http://www.epa.gov/ttnchie1/trends (accessed 2010  16-August).

—. *2008 Average Annual Emissions, PM10.* 2009  27-May. http://www.epa.gov/ttnchie1/trends (accessed 2010  16-August).

—. *2008 Average Annual Emissions, PM2.5.* 2009  27-May. http://www.epa.gov/ttnchie1/trends (accessed 2010  16-August).

—. *2008 Average Annual Emissions, SO2.* 2009  27-May. http://www.epa.gov/ttnchie1/trends (accessed 2010  16-August).

—. *2008 Average Annual Emissions, VOC.* 2009  27-May. http://www.epa.gov/ttnchie1/trends (accessed 2010  16-August).

—. *Air Quality Criteria for Oxides of Nitrogen.* 1982.

United States Environmental Protection Agency. "Carbon Monoxide." In *Air Trends.* 2009.

United States Environmental Protection Agency. "Carbon Monoxide." In *Air Quality Systems, Quick Look Report.* 2010.

—. *Ground Level Ozone.* 2009  27-May. http://www.epa.gov/air/airtrends/ozone.html (accessed 2010  16-August).

—. *Index.* 2010  16-August. http://www.epa.gov/air/data/index.html (accessed 2010  16-August).

United States Environmental Protection Agency. "Lead." In *Six Common Air Pollutants.* 2007.

United States Environmental Protection Agency. "Lead." In *National Air Quality Status and Trends Through 2007.* 2008.

United States Environmental Protection Agency. "Lead." In *Air Trends.* 2009.

United States Environmental Protection Agency. "Lead." In *Air Quality System, Quick Look Report.* 2010.

United States Environmental Protection Agency. "Miscellaneous Sources (Fugitive Dust and Ammonia)." In *Procedures Document for National Emissions Inventory, Criteria Air Pollutants,* 4-274. 1999.

—. *Monitor Value Reports - Criteria Air Pollutants.* 2008  2-July. http://www.epa.gov/air/data/monvals.html?us~usa~United%20States (accessed 2010  23-August).

—. *National Air Quality Status and Trends Through 2007.* 2008.

—. *National Ambient Air Quality Standards.* 2010  19-08. http://www.epa.gov/air/criteria (accessed 2010  19-08).

United States Environmental Protection Agency. "National Primary Ambient Air Quality Standards for Carbon Monoxide." Chap. 50.8 in *Title 40, Code of Federal Regulations.* 2009.

—. *Nitrogen Dioxide*. 2010  5-January. http://www.epa.gov/ttn/naaqs/standards/nox/s_nox_index.html (accessed 2010  16-August).

United States Environmental Protection Agency. "Nitrogen Dioxide." In *Air Quality Systems, Quick Look Report*. 2010.

United States Environmental Protection Agency. "Nitrogen Dioxide." In *Air Trends*. 2008.

United States Environmental Protection Agency. "Ozone." In *Air Trends*. 2009.

United States Environmental Protection Agency. "Ozone." In *Air Quality Systems, Quick Look Report*. 2010.

United States Environmental Protection Agency. "PM-10." In *Air Quality System, Quick Look Report*. 2010.

United States Environmental Protection Agency. "PM-2.5." In *Air Quality Systems, Quick Look Report*. 2010.

—. *Regulatory Actions*. December 15, 2010. http://epa.gov/air/lead/actions.html (accessed June 29, 2011).

United States Environmental Protection Agency. "Sulfer Dioxide." In *Air Trends*. 2006.

United States Environmental Protection Agency. "Sulfur Dioxide." In *Six Common Air Pollutants*. 2007.

United States Environmental Protection Agency. "Sulfur Dioxide." In *Air Quality System, Quick Look Report*. 2010.

United States Environmental Protection Agency. "Toxic Air Pollutants." In *Air Trends*. 2009.

"Visibility Protection for Federal Class 1 Areas." Chap. 51 in *Title 40 Code of Federal Regulations*, 300-309.

Wyoming Department of Environmental Quality. "A Conceptual Model of Winter Ozone Episodes in Southwest Wyoming." Final, Cheyenne, 2010.

# GAO

**United States Government Accountability Office**

## Report to Congressional Requesters

September 2012

# OIL AND GAS

# Information on Shale Resources, Development, and Environmental and Public Health Risks



**G A O**

Accountability ★ Integrity ★ Reliability



Highlights of GAO-12-732, a report to congressional requesters

**September 2012**

# OIL AND GAS

## Information on Shale Resources, Development, and Environmental and Public Health Risks

## Why GAO Did This Study

New applications of horizontal drilling techniques and hydraulic fracturing—in which water, sand, and chemical additives are injected under high pressure to create and maintain fractures in underground formations—allow oil and natural gas from shale formations (known as "shale oil" and "shale gas") to be developed. As exploration and development of shale oil and gas have increased—including in areas of the country without a history of oil and natural gas development—questions have been raised about the estimates of the size of these resources, as well as the processes used to extract them.

GAO was asked to determine what is known about the (1) size of shale oil and gas resources and the amount produced from 2007 through 2011 and (2) environmental and public health risks associated with the development of shale oil and gas. GAO reviewed estimates and data from federal and nongovernmental organizations on the size and production of shale oil and gas resources. GAO also interviewed federal and state regulatory officials, representatives from industry and environmental organizations, oil and gas operators, and researchers from academic institutions.

GAO is not making any recommendations in this report. We provided a draft of this report to the Department of Energy, the Department of the Interior, and the Environmental Protection Agency for review. The Department of the Interior and the Environmental Protection Agency provided technical comments, which we incorporated as appropriate. The Department of Energy did not provide comments.

View GAO-12-732. For more information, contact Frank Rusco at (202) 512-3841 or ruscof@gao.gov.

## What GAO Found

Estimates of the size of shale oil and gas resources in the United States by the Energy Information Administration (EIA), U.S. Geological Survey (USGS), and the Potential Gas Committee—three organizations that estimate the size of these resources—have increased over the last 5 years, which could mean an increase in the nation's energy portfolio. For example, in 2012, EIA estimated that the amount of technically recoverable shale gas in the United States was 482 trillion cubic feet—an increase of 280 percent from EIA's 2008 estimate. However, according to EIA and USGS officials, estimates of the size of shale oil and gas resources in the United States are highly dependent on the data, methodologies, model structures, and assumptions used to develop them. In addition, less is known about the amount of technically recoverable shale oil than shale gas, in part because large-scale production of shale oil has been under way for only the past few years. Estimates are based on data available at a given point in time and will change as additional information becomes available. In addition, domestic shale oil and gas production has experienced substantial growth; shale oil production increased more than fivefold from 2007 to 2011, and shale gas production increased more than fourfold from 2007 to 2011.

Oil and gas development, whether conventional or shale oil and gas, pose inherent environmental and public health risks, but the extent of these risks associated with shale oil and gas development is unknown, in part, because the studies GAO reviewed do not generally take into account the potential long-term, cumulative effects. For example, according to a number of studies and publications GAO reviewed, shale oil and gas development poses risks to air quality, generally as the result of (1) engine exhaust from increased truck traffic, (2) emissions from diesel-powered pumps used to power equipment, (3) gas that is flared (burned) or vented (released directly into the atmosphere) for operational reasons, and (4) unintentional emissions of pollutants from faulty equipment or impoundments—temporary storage areas. Similarly, a number of studies and publications GAO reviewed indicate that shale oil and gas development poses risks to water quality from contamination of surface water and groundwater as a result of erosion from ground disturbances, spills and releases of chemicals and other fluids, or underground migration of gases and chemicals. For example, tanks storing toxic chemicals or hoses and pipes used to convey wastes to the tanks could leak, or impoundments containing wastes could overflow as a result of extensive rainfall. According to the New York Department of Environmental Conservation's 2011 Supplemental Generic Environmental Impact Statement, spilled, leaked, or released chemicals or wastes could flow to a surface water body or infiltrate the ground, reaching and contaminating subsurface soils and aquifers. In addition, shale oil and gas development poses a risk to land resources and wildlife habitat as a result of constructing, operating, and maintaining the infrastructure necessary to develop oil and gas; using toxic chemicals; and injecting fluids underground. However, the extent of these risks is unknown. For example, the studies and publications GAO reviewed on air quality conditions provide information for a specific site at a specific time but do not provide the information needed to determine the overall cumulative effects that shale oil and gas activities may have on air quality. Further, the extent and severity of environmental and public health risks identified in the studies and publications GAO reviewed may vary significantly across shale basins and also within basins because of location- and process-specific factors, including the location and rate of development; geological characteristics, such as permeability, thickness, and porosity of the formations; climatic conditions; business practices; and regulatory and enforcement activities.

_____

**United States Government Accountability Office**

# Contents

| Letter | | 1 |
|---|---|---|
| | Background | 5 |
| | Domestic Shale Oil and Gas Estimates and Production | 19 |
| | Shale Oil and Gas Development Pose Environmental and Public Health Risks, but the Extent is Unknown and Depends on Many Factors | 32 |
| | Agency Comments | 55 |

| Appendix I | Scope and Methodology | 58 |
|---|---|---|

| Appendix II | List of Agencies and Organizations Contacted | 61 |
|---|---|---|

| Appendix III | Additional Information on USGS Estimates | 63 |
|---|---|---|

| Appendix IV | GAO Contact and Staff Acknowledgments | 65 |
|---|---|---|

| Tables | | |
|---|---|---|
| | Table 1: USGS and EIA Estimates of Total Remaining Technically Recoverable   U.S. Oil Resources | 20 |
| | Table 2: Estimated Technically Recoverable Shale Gas Resources, by Play | 24 |
| | Table 3: Average Freshwater Use per Well for Drilling and Hydraulic Fracturing | 37 |
| | Table 4: Shale Formation and Treatable Water Depth | 48 |
| | Table 5: USGS Estimates | 63 |

| Figures | | |
|---|---|---|
| | Figure 1: History of Horizontal Drilling and Hydraulic Fracturing | 7 |
| | Figure 2: Perforating Tool | 11 |
| | Figure 3: Examples of Common Ingredients Found in Fracturing Fluid | 12 |
| | Figure 4: Shale Plays and Basins in the Contiguous 48 States | 15 |

Figure 5: Common Terminology to Describe the Size and Scope of
Shale Oil and Gas                                                      18
Figure 6: Estimates of Technically Recoverable Shale Gas from
EIA, USGS, and the Potential Gas Committee (2006
through 2012)                                                          22
Figure 7: Estimated Production of Shale Oil from 2007 through
2011 (in millions of barrels of oil)                                  26
Figure 8: Shale Oil Production, by Shale Play (from 2007 through
2011)                                                                 28
Figure 9: Estimated Production of Shale Gas from 2007 through
2011 (in trillions of cubic feet)                                     29
Figure 10: Shale Gas Production, by Shale Play (from 2007 through
2011)                                                                 31
Figure 11: Silica Sand Proppant                                       34
Figure 12: Storage Tank for Produced Water in the Barnett Shale       43

## Abbreviations

| | |
|---|---|
| BLM | Bureau of Land Management |
| Btu | British thermal unit |
| DOE | Department of Energy |
| EIA | Energy Information Administration |
| EPA | Environmental Protection Agency |
| NORM | naturally occurring radioactive materials |
| Tcf | technically recoverable gas |
| USGS | U.S. Geological Survey |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**United States Government Acconntability Office**
**Washington, DC 20548**

September 5, 2012

Congressional Requesters

For decades, the United States has relied on imports of oil and natural gas to meet domestic needs. As recently as 2007, the expectation was that the nation would increasingly rely on imports of natural gas to meet its growing demand. However, recent improvements in technology have allowed companies that develop petroleum resources to extract oil and natural gas from shale formations,[1] known as "shale oil" and "shale gas," respectively, which were previously inaccessible because traditional techniques did not yield sufficient amounts for economically viable production. In particular, as we reported in January 2012, new applications of horizontal drilling techniques and hydraulic fracturing—a process that injects a combination of water, sand, and chemical additives under high pressure to create and maintain fractures in underground rock formations that allow oil and natural gas to flow—have prompted a boom in shale oil and gas production.[2] According to the Department of Energy (DOE), America's shale gas resource base is abundant, and development of this resource could have beneficial effects for the nation, such as job creation.[3] According to a report by the Baker Institute, domestic shale gas development could limit the need for expensive imports of these resources—helping to reduce the U.S. trade deficit.[4] In addition, replacing older coal burning power generation with new natural gas-fired generators could reduce greenhouse gas emissions and result in fewer air pollutants

---

[1]Shale oil differs from "oil shale." Shale is a sedimentary rock that is predominantly composed of consolidated clay-sized particles. Oil shale requires a different process to extract. Specifically, to extract the oil from oil shale, the rock needs to be heated to very high temperatures—ranging from about 650 to 1,000 degrees Fahrenheit—in a process known as retorting. Oil shale is not currently economically viable to produce. For additional information on oil shale, see GAO, *Energy-Water Nexus: A Better and Coordinated Understanding of Water Resources Could Help Mitigate the Impacts of Potential Oil Shale Development*, GAO-11-35 (Washington, D.C.: Oct. 29, 2010).

[2]GAO, *Energy-Water Nexus: Information on the Quantity, Quality, and Management of Water Produced during Oil and Gas Production*, GAO-12-156 (Washington, D.C.: Jan. 9, 2012).

[3]EIA is a statistical agency within DOE that provides independent data, forecasts, and analyses.

[4]The Baker Institute is a public policy think tank located on the Rice University campus.

for the same amount of electric power generated.[5] Early drilling activity in shale formations was centered primarily on natural gas, but with the falling price of natural gas companies switched their focus to oil and natural gas liquids, which are a more valuable product.[6]

As exploration and development of shale oil and gas have increased in recent years—including in areas of the country without a history of oil and natural gas activities—questions have been raised about the estimates of the size of domestic shale oil and gas resources, as well as the processes used to extract them.[7] For example, some organizations have questioned the accuracy of the estimates of the shale gas supply. In particular, some news organizations have reported concerns that such estimates may be inflated. In addition, concerns about environmental and public health effects of the increased use of horizontal drilling and hydraulic fracturing, particularly on air quality and water resources, have garnered extensive public attention. According to the International Energy Agency, some questions also exist about whether switching from coal to natural gas will lead to a reduction in greenhouse gas emissions—based, in part, on uncertainty about additional emissions from the development of shale gas. These concerns and other considerations have led some communities and certain states to impose restrictions or moratoriums on drilling operations to allow time to study and better understand the potential risks associated with these practices.

In this context, you asked us to provide information on shale oil and gas. This report describes what is known about (1) the size of shale oil and gas resources in the United States and the amount produced from 2007 through 2011—the years for which data were available—and (2) the environmental and public health risks associated with development of shale oil and gas.[8]

---

[5]EIA reported that using natural gas over coal would lower emissions in the United States, but some researchers have reported that greater reliance on natural gas would fail to significantly slow climate change.

[6]The natural gas liquids include propane, butane, and ethane, and are separated from the produced gas at the surface in lease separators, field facilities, or gas processing plants.

[7]For the purposes of this report, resources represent all oil or natural gas contained within a formation and can be divided into resources and reserves.

[8]For the purposes of this report, we refer to risk as a threat or vulnerability that has potential to cause harm.

To determine what is known about the size of shale oil and gas resources and the amount of shale oil and gas produced, we collected data from federal agencies, state agencies, private industry, and academic organizations. Specifically, to determine what is known about the size of these resources, we obtained information for technically recoverable and proved reserves estimates for shale oil and gas from the EIA, the U.S. Geological Survey (USGS), and the Potential Gas Committee—a nongovernmental organization composed of academics and industry representatives. We interviewed key officials from these agencies and the committee about the assumptions and methodologies used to estimate the resource size. Estimates of proved reserves of shale oil and gas are based on data provided to EIA by operators—companies that develop petroleum resources to extract oil and natural gas.[9] To determine what is known about the amount of shale oil and gas produced from 2007 through 2011, we obtained data from EIA—which is responsible for estimating and reporting this and other energy information. To assess the reliability of these data, we examined EIA's published methodology for collecting this information and interviewed key EIA officials regarding the agency's data collection efforts. We also met with officials from states, representatives from private industry, and researchers from academic institutions who are familiar with these data and EIA's methodology. We discussed the sources and reliability of the data with these officials and found the data sufficiently reliable for the purposes of this report. For all estimates we report, we reviewed the methodologies used to derive them and also found them sufficiently reliable for the purposes of this report.

To determine what is known about the environmental and public health risks associated with the development of shale oil and gas,[10] we reviewed studies and other publications from federal agencies and laboratories, state agencies, local governments, the petroleum industry, academic institutions, environmental and public health groups, and other nongovernmental associations. We identified these studies by conducting

---

[9]Proved reserves refer to the amount of oil and gas that have been discovered and defined.

[10]Operators may use hydraulic fracturing to develop oil and natural gas from formations other than shale, but for the purposes of this report we focused on development of shale formations. Specifically, coalbed methane and tight sandstone formations may rely on these practices and some studies and publications we reviewed identified risks that can apply to these formations. However, many of the studies and publications we identified and reviewed focused primarily on shale formations.

a literature search, and by asking for recommendations during interviews with federal, state, and tribal officials; representatives from industry, trade organizations, environmental, and other nongovernmental groups; and researchers from academic institutions. For a number of studies, we interviewed the author or authors to discuss the study's findings and limitations, if any. We believe we have identified the key studies through our literature review and interviews, and that the studies included in our review have accurately identified currently known potential risks for shale oil and gas development. However, it is possible that we may not have identified all of the studies with findings relevant to our objectives, and the risks we present may not be the only issues of concern.

The risks identified in the studies and publications we reviewed cannot, at present, be quantified, and the magnitude of potential adverse affects or likelihood of occurrence cannot be determined for several reasons. First, it is difficult to predict how many or where shale oil and gas wells may be constructed. Second, the extent to which operators use effective best management practices to mitigate risk may vary. Third, based on the studies we reviewed, there are relatively few studies that are based on comparing predevelopment conditions to postdevelopment conditions—making it difficult to detect or attribute adverse conditions to shale oil and gas development. In addition, changes to the federal, state, and local regulatory environments and the effectiveness of implementing and enforcing regulations will affect operators' future activities and, therefore, the level of risk associated with future development of oil and gas resources. Moreover, risks of adverse events, such as spills or accidents, may vary according to business practices which, in turn, may vary across oil and gas companies, making it difficult to distinguish between risks associated with the process to develop shale oil and gas from risks that are specific to particular business practices. To obtain additional perspectives on issues related to environmental and public health risks, we interviewed federal officials from DOE's National Energy Technical Laboratory, the Department of the Interior's Bureau of Land Management (BLM) and Bureau of Indian Affairs, and the Environmental Protection Agency (EPA); state regulatory officials from Arkansas, Colorado, Louisiana, North Dakota, Ohio, Oklahoma, Pennsylvania, and Texas;[11] tribal officials from the Osage Nation; shale oil and gas operators;

---

[11]We selected these states because they are involved with shale oil and gas development.

representatives from environmental and public health organizations; and other knowledgeable parties with experience related to shale oil and gas development, such as researchers from the Colorado School of Mines, the University of Texas, Oklahoma University, and Stanford University. Appendix I provides additional information on our scope and methodology.

We conducted this performance audit from November 2011 to September 2012 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## Background

This section includes (1) an overview of oil and natural gas, (2) the shale oil and gas development process, (3) the regulatory framework, (4) the location of shale oil and gas in the United States, and (5) information on estimating the size of these resources.

## Overview

Oil and natural gas are found in a variety of geologic formations. Conventional oil and natural gas are found in deep, porous rock or reservoirs and can flow under natural pressure to the surface after drilling. In contrast to the free-flowing resources found in conventional formations, the low permeability of some formations, including shale, means that oil and gas trapped in the formation cannot move easily within the rock. On one extreme—oil shale, for example—the hydrocarbon trapped in the shale will not reach a liquid form without first being heated to very high temperatures—ranging from about 650 to 1,000 degrees Fahrenheit—in a process known as retorting. In contrast, to extract shale oil and gas from the rock, fluids and proppants (usually sand or ceramic beads used to hold fractures open in the formation) are injected under high pressure to create and maintain fractures to increase permeability, thus allowing oil or gas to be extracted. Other formations, such as coalbed methane

formations and tight sandstone formations,[12] may also require stimulation to allow oil or gas to be extracted.[13]

Most of the energy used in the United States comes from fossil fuels such as oil and natural gas. Oil supplies more than 35 percent of all the energy the country consumes, and almost the entire U.S. transportation fleet—cars, trucks, trains, and airplanes—depends on fuels made from oil. Natural gas is an important energy source to heat buildings, power the industrial sector, and generate electricity. Natural gas provides more than 20 percent of the energy used in the United States,[14] supplying nearly half of all the energy used for cooking, heating, and powering other home appliances, and generating almost one-quarter of U.S. electricity supplies.

## The Shale Oil and Gas Development Process

The process to develop shale oil and gas is similar to the process for conventional onshore oil and gas, but shale formations may rely on the use of horizontal drilling and hydraulic fracturing—which may or may not be used on conventional wells. Horizontal drilling and hydraulic fracturing are not new technologies, as seen in figure 1, but advancements, refinements, and new uses of these technologies have greatly expanded oil and gas operators' abilities to use these processes to economically develop shale oil and gas resources. For example, the use of multistage hydraulic fracturing within a horizontal well has only been widely used in the last decade.[15]

---

[12]Conventional sandstone has well-connected pores, but tight sandstone has irregularly distributed and poorly connected pores. Due to this low connectivity or permeability, gas trapped within tight sandstone is not easily produced.

[13]For coalbed methane formations, the reduction in pressure needed to extract gas is achieved through dewatering. As water is pumped out of the coal seams, reservoir pressure decreases, allowing the natural gas to release (desorb) from the surface of the coal and flow through natural fracture networks into the well.

[14]Ground Water Protection Council and ALL Consulting, *Modern Shale Gas Development in the United States: A Primer*, a special report prepared at the request of the Department of Energy (Washington, D.C.: April 2009).

[15]Hydraulic fracturing is often conducted in stages. Each stage focuses on a limited linear section and may be repeated numerous times.

**Figure 1: History of Horizontal Drilling and Hydraulic Fracturing**



**1930s**
First horizontal well is drilled.

**1940s**
Hydraulic fracturing first introduced to the petroleum industry.

**1950s**
Hydraulic fracturing becomes a commercially accepted process.

**Late 1970s and early 1980s**
Shale formations, such as the Barnett in Texas and Marcellus in Pennsylvania, are known but believed to have essentially zero permeability and thus are not considered economic.

Federally sponsored research seeks to improve ways to extract gas from unconventional formations, such as shale.

**1980s to early 1990s**
Mitchell Energy combines larger fracture designs, rigorous reservoir characterization, horizontal drilling, and lower cost approaches to hydraulic fracturing to make the Barnett Shale economic.

| 1930s | 1940s | 1950s | 1970s | 1980s | 1990s | 2000s |

**1947**
The first experimental hydraulic fracturing treatment conducted in Grant County, Kansas.

**1949**
The first commercial hydraulic fracturing treatment conducted in Stephens County, Oklahoma.

**1955**
More than 100,000 individual hydraulic fracturing treatments performed.

**1979**
Exploration begins in the Barnett Shale in Texas.

**2004**
Operators begin exploring in the Marcellus Shale in Pennsylvania.

Source: GAO.

First, operators locate suitable shale oil and gas targets using seismic methods of exploration,[16] negotiate contracts or leases that allow mineral development, identify a specific location for drilling, and obtain necessary permits; then, they undertake a number of activities to develop shale oil and gas. The specific activities and steps taken to extract shale oil and gas vary based on the characteristics of the formation, but the development phase generally involves the following stages: (1) well pad

---

[16]The seismic method of exploration introduces energy into the subsurface through explosions in shallow "shot holes" by striking the ground forcefully (with a truck-mounted thumper), or by vibration methods. A portion of the energy returns to the surface after being reflected from the subsurface strata. This energy is detected by surface instruments, called geophones, and the information carried by the energy is processed by computers to interpret subsurface conditions.

preparation and construction, (2) drilling and well construction, and (3) hydraulic fracturing.[17]

**Well Pad Preparation and Construction**

The first stage in the development process is to prepare and construct the well pad site. Typically, operators must clear and level surface vegetation to make room for numerous vehicles and heavy equipment—such as the drilling rig—and to build infrastructure—such as roads—needed to access the site.[18] Then operators must transport the equipment that mixes the additives, water, and sand needed for hydraulic fracturing to the site—tanks, water pumps, and blender pumps, as well as water and sand storage tanks, monitoring equipment, and additive storage containers . Based on the geological characteristics of the formation and climatic conditions, operators may (1) excavate a pit or impoundment to store freshwater, drilling fluids, or drill cuttings—rock cuttings generated during drilling; (2) use tanks to store materials; or (3) build temporary transfer pipes to transport materials to and from an off-site location.

**Drilling and Well Construction**

The next stage in the development process is drilling and well construction. Operators drill a hole (referred to as the wellbore) into the earth through a combination of vertical and horizontal drilling techniques. At several points in the drilling process, the drill string and bit are removed from the wellbore so that casing and cement may be inserted. Casing is a metal pipe that is inserted inside the wellbore to prevent high-pressure fluids outside the formation from entering the well and to prevent drilling mud inside the well from fracturing fragile sections of the wellbore. As drilling progresses with depth, casings that are of a smaller diameter than the hole created by the drill bit are inserted into the wellbore and bonded in place with cement, sealing the wellbore from the surrounding formation.

Drilling mud (a lubricant also known as drilling fluid) is pumped through the wellbore at different densities to balance the pressure inside the wellbore and bring rock particles and other matter cut from the formation back to the rig. A blowout preventer is installed over the well as a safety measure to prevent any uncontrolled release of oil or gas and help

---

[17]The specific order of activities and steps may vary.

[18]According to the New York Department of Environmental Conservation's 2011 Supplemental Generic Environmental Impact Statement, the average size of a well pad is 3.5 acres.

maintain control over pressures in the well. Drill cuttings, which are made up of ground rock coated with a layer of drilling mud or fluid, are brought to the surface. Mud pits provide a reservoir for mixing and holding the drilling mud. At the completion of drilling, the drilling mud may be recycled for use at another drilling operation.

Instruments guide drilling operators to the "kickoff point"—the point that drilling starts to turn at a slight angle and continues turning until it nears the shale formation and extends horizontally. Production casing and cement are then inserted to extend the length of the borehole to maintain wellbore integrity and prevent any communication between the formation fluids and the wellbore. After the casing is set and cemented, the drilling operator may run a cement evaluation log by lowering an electric probe into the well to measure the quality and placement of the cement. The purpose of the cement evaluation log is to confirm that the cement has the proper strength to function as designed—preventing well fluids from migrating outside the casing and infiltrating overlying formations. After vertical drilling is complete, horizontal drilling is conducted by slowly angling the drill bit until it is drilling horizontally. Horizontal stretches of the well typically range from 2,000 to 6,000 feet long but can be as long as 12,000 feet long, in some cases.

Throughout the drilling process, operators may vent or flare some natural gas, often intermittently, in response to maintenance needs or equipment failures. This natural gas is either released directly into the atmosphere (vented) or burned (flared). In October 2010, we reported on venting and flaring of natural gas on public lands.[19] We reported that vented and flared gas on public lands represents potential lost royalties for the federal government and contributes to greenhouse gas emissions. Specifically, venting releases methane and volatile organic compounds, and flaring emits carbon dioxide, both greenhouse gases that contribute to global climate change. Methane is a particular concern since it is a more potent greenhouse gas than carbon dioxide.

Hydraulic Fracturing

The next stage in the development process is stimulation of the shale formation using hydraulic fracturing. Before operators or service companies perform a hydraulic fracture treatment of a well, a series of

---

[19]GAO, *Federal Oil and Gas Leases: Opportunities Exist to Capture Vented and Flared Natural Gas, Which Would Increase Royalty Payments and Reduce Greenhouse Gases*, GAO-11-34 (Washington, D.C.: Oct. 29, 2010).

tests may be conducted to ensure that the well, wellhead equipment, and fracturing equipment can safely withstand the high pressures associated with the fracturing process. Minimum requirements for equipment pressure testing can be determined by state regulatory agencies for operations on state or private lands. In addition, fracturing is conducted below the surface of the earth, sometimes several thousand feet below, and can only be indirectly observed. Therefore, operators may collect subsurface data—such as information on rock stresses[20] and natural fault structures—needed to develop models that predict fracture height, length, and orientation prior to drilling a well. The purpose of modeling is to design a fracturing treatment that optimizes the location and size of induced fractures and maximizes oil or gas production.

To prepare a well to be hydraulically fractured, a perforating tool may be inserted into the casing and used to create holes in the casing and cement. Through these holes, fracturing fluid—that is injected under high pressures—can flow into the shale (fig. 2 shows a used perforating tool).

---

[20]Stresses in the formation generally define a maximum and minimum stress direction that influence the direction a fracture will grow.

**Figure 2: Perforating Tool**



Source: GAO.

Fracturing fluids are tailored to site specific conditions, such as shale thickness, stress, compressibility, and rigidity. As such, the chemical additives used in a fracture treatment vary. Operators may use computer models that consider local conditions to design site-specific hydraulic fluids. The water, chemicals, and proppant used in fracturing fluid are typically stored on-site in separate tanks and blended just before they are injected into the well. Figure 3 provides greater detail about some chemicals commonly used in fracturing.

Figure 3: Examples of Common Ingredients Found in Fracturing Fluid



| Additive type | Use | Main compound |
|---|---|---|
| Acid | Removes near well damage | Hydrochloric acid |
| Biocide | Controls bacterial growth | Glutaraldehyde |
| Breaker | Delays breakdown of the geling agent | Ammonium persulfate |
| Corrosion inhibitor | Prevent corrosion of pipe | N,n-dimethyl formamide |
| Crosslinker | Maintains fluid viscosity as temperature increases | Borate salts |
| Friction reducers | Decreases pumping friction | Polyacrylamide |
| Gelling agents | Improves proppant placement | Guar gum |
| KCl | Creates a brine carrier fluid | Potassium chloride |
| Oxygen scavenger | Prevents corrosion of well tubulars | Ammonium bisulfite |
| pH adjusting agent | Adjusts the pH of fluid to maintain the effectiveness of other components | Sodium carbonate |
| Scale inhibitor | Prevents scale deposits in the pipe | Ethylene glycol |
| Surfactant | Winterizing agent | Isopropanol |

Sources: Department of Energy and Groundwater Protection Council.

The operator pumps the fracturing fluid into the wellbore at pressures high enough to force the fluid through the perforations into the surrounding formation—which can be shale, coalbeds, or tight sandstone—expanding existing fractures and creating new ones in the process. After the fractures are created, the operator reduces the pressure. The proppant stays in the formation to hold open the fractures and allow the release of oil and gas. Some of the fracturing fluid that was injected into the well will return to the surface (commonly referred to as flowback) along with water that occurs naturally in the oil- or gas-bearing formation—collectively referred to as produced water. The produced water is brought to the surface and collected by the operator, where it can be stored on-site in impoundments, injected into underground wells, transported to a wastewater treatment plant, or reused by the operator in

other ways.[21] Given the length of horizontal wells, hydraulic fracturing is often conducted in stages, where each stage focuses on a limited linear section and may be repeated numerous times.

Once a well is producing oil or natural gas, equipment and temporary infrastructure associated with drilling and hydraulic fracturing operations is no longer needed and may be removed, leaving only the parts of the infrastructure required to collect and process the oil or gas and ongoing produced water. Operators may begin to reclaim the part of the site that will not be used by restoring the area to predevelopment conditions. Throughout the producing life of an oil or gas well, the operator may find it necessary to periodically restimulate the flow of oil or gas by repeating the hydraulic fracturing process. The frequency of such activity depends on the characteristics of the geologic formation and the economics of the individual well. If the hydraulic fracturing process is repeated, the site and surrounding area will be further affected by the required infrastructure, truck transport, and other activity associated with this process.

## Regulatory Framework

Shale oil and gas development, like conventional onshore oil and gas production, is governed by a framework of federal, state, and local laws and regulations. Most shale development in the near future is expected to occur on nonfederal lands and, therefore, states will typically take the lead in regulatory activities. However, in some cases, federal agencies oversee shale oil and gas development. For example, BLM oversees shale oil and gas development on federal lands. In large part, the federal laws, regulations, and permit requirements that apply to conventional onshore oil and gas exploration and production activities also apply to shale oil and gas development.

- *Federal.* A number of federal agencies administer laws and regulations that apply to various phases of shale oil and gas development. For example, BLM manages federal lands and approximately 700 million acres of federal subsurface minerals, also known as the federal mineral estate. EPA administers and enforces key federal laws, such as the Safe Drinking Water Act, to protect

---

[21]Underground injection is the predominant practice for disposing of produced water. In addition to underground injection, a limited amount of produced water is managed by discharging it to surface water, storing it in surface impoundments, and reusing it for irrigation or hydraulic fracturing.

human health and the environment. Other federal land management agencies, such as the U.S. Department of Agriculture's Forest Service and the Department of the Interior's Fish and Wildlife Service, also manage federal lands, including shale oil and gas development on those lands.

- *State*. State agencies implement and enforce many of the federal environmental regulations and may also have their own set of state laws covering shale oil and gas development.

- *Other*. Additional requirements regarding shale oil and gas operations may be imposed by various levels of government for specific locations. Entities such as cities, counties, tribes, and regional water authorities may set additional requirements that affect the location and operation of wells.

GAO is conducting a separate and more detailed review of the federal and state laws and regulations that apply to unconventional oil and gas development, including shale oil and gas.

## Location of Shale Oil and Gas in the United States

Shale oil and gas are found in shale plays—a set of discovered or undiscovered oil and natural gas accumulations or prospects that exhibit similar geological characteristics—on private, state-owned, and federal lands across the United States. Shale plays are located within basins, which are large-scale geological depressions, often hundreds of miles across, that also may contain other oil and gas resources. Figure 4 shows the location of shale plays and basins in the contiguous 48 states.

**Figure 4: Shale Plays and Basins in the Contiguous 48 States**



Sources: Energy Information Administration (shale location data); (map) copyright © Corel Corp., all rights reserved.

A shale play can be developed for oil, natural gas, or both. In addition, a shale gas play may contain "dry" or "wet" natural gas. Dry natural gas is a mixture of hydrocarbon compounds that exists as a gas both underground in the reservoir and during production under standard temperature and pressure conditions. Wet natural gas contains natural gas liquids, or the portion of the hydrocarbon resource that exists as a gas when in natural underground reservoir conditions but that is liquid at surface conditions. The natural gas liquids are typically propane, butane, and ethane and are separated from the produced gas at the surface in lease separators, field facilities, or gas processing plants. Operators may then sell the natural gas liquids, which may give wet shale gas plays an economic advantage over dry gas plays. Another advantage of liquid petroleum and natural

gas liquids is that they can be transported more easily than natural gas. This is because, to bring natural gas to markets and consumers, companies must build an extensive network of gas pipelines. In areas where gas pipelines are not extensive, natural gas produced along with liquids is often vented or flared.

## Estimating the Size of Shale Oil and Gas Resources

Estimating the size of shale oil and gas resources serves a variety of needs for consumers, policymakers, land and resource managers, investors, regulators, industry planners, and others. For example, federal and state governments may use resource estimates to estimate future revenues and establish energy, fiscal, and national security policies. The petroleum industry and the financial community use resource estimates to establish corporate strategies and make investment decisions.

A clear understanding of some common terms used to generally describe the size and scope of oil and gas resources is needed to determine the relevance of a given estimate. For an illustration of how such terms describe the size and scope of shale oil and gas, see figure 5.

The most inclusive term is in-place resource. The in-place resource represents all oil or natural gas contained in a formation without regard to technical or economic recoverability. In-place resource estimates are sometimes very large numbers, but often only a small proportion of the total amount of oil or natural gas in a formation may ever be recovered. Oil and gas resources that are in-place, but not technically recoverable at this time may, in the future, become technically recoverable.

*Technically recoverable resources* are a subset of in-place resources that include oil or gas, including shale oil and gas that is producible given available technology. Technically recoverable resources include those that are economically producible and those that are not. Estimates of technically recoverable resources are dynamic, changing to reflect the potential of extraction technology and knowledge about the geology and composition of geologic formations. According to the National Petroleum Council,[22] technically recoverable resource estimates usually increase

---

[22]The National Petroleum Council is a federally chartered and privately funded advisory committee that advises, informs, and makes recommendations to the Secretary of Energy on oil and natural gas matters.

over time because of the availability of more and better data, or knowledge of how to develop a new play type (such as shale formations).

*Proved reserve* estimates are more precise than technically recoverable resources and represent the amount of oil and gas that have been discovered and defined, typically by drilling wells or other exploratory measures, and which can be economically recovered within a relatively short time frame. Proved reserves may be thought of as the "inventory" that operators hold and define the quantity of oil and gas that operators estimate can be recovered under current economic conditions, operating methods, and government regulations. Estimates of proved reserves increase as oil and gas companies make new discoveries and report them to the government; oil and gas companies can increase their reserves as they develop already-discovered fields and improve production technology. Reserves decline as oil and gas reserves are produced and sold. In addition, reserves can change as prices and technologies change. For example, technology improvements that enable operators to extract more oil or gas from existing fields can increase proved reserves. Likewise, higher prices for oil and gas may increase the amount of proved reserves because more resources become financially viable to extract.[23] Conversely, lower prices may diminish the amount of resources likely to be produced, reducing proved reserves.

*Historical production* refers to the total amount of oil and gas that has been produced up to the present. Because these volumes of oil and gas have been measured historically, this is the most precise information available as it represents actual production amounts.

---

[23]For example, secondary recovery operations can be costly (such as using a well to inject water into an oil reservoir and push any remaining oil to operating wells), but the costs may be justified if prices are high enough.

**Figure 5: Common Terminology to Describe the Size and Scope of Shale Oil and Gas**



Sources: GAO; based on illustration by the Congressional Research Service.

Note: This illustration is not necessarily to scale because all volumes, except historical production, are subject to significant uncertainty.

Certain federal agencies have statutory responsibility for collecting and publishing authoritative statistical information on various types of energy sources in the United States. EIA collects, analyzes, and disseminates independent and impartial energy information, including data on shale oil and gas resources. Under the Energy Policy and Conservation Act of 2000, as amended, USGS estimates onshore undiscovered technically recoverable oil and gas resources in the United States.[24] USGS has conducted a number of national estimates of undiscovered technically recoverable oil and natural gas resources over several decades. USGS geologists and other experts estimate undiscovered oil and gas—that is, oil and gas that has not been proven to be present by oil and gas companies—based on geological survey data and other information about

---

[24]Pub. L. No. 106-469 § 604 (2000), 114 Stat. 2029, 2041-42, codified, as amended, at 42 U.S.C. § 6217.

the location and size of different geological formations across the United States. In addition to EIA and USGS, experts from industry, academia, federal advisory committees, private consulting firms, and professional societies also estimate the size of the resource.

## Domestic Shale Oil and Gas Estimates and Production

Estimates of the size of shale oil and gas resources in the United States have increased over time as has the amount of such resources produced from 2007 through 2011. Specifically, over the last 5 years, estimates of (1) technically recoverable shale oil and gas and (2) proved reserves of shale oil and gas have increased, as technology has advanced and more shale has been drilled. In addition, domestic shale oil and gas production has experienced substantial growth in recent years.

### Estimates of Technically Recoverable Shale Oil and Gas Resources

EIA, USGS, and the Potential Gas Committee have increased their estimates of the amount of technically recoverable shale oil and gas over the last 5 years, which could mean an increase in the nation's energy portfolio; however, less is known about the amount of technically recoverable shale oil than shale gas, in part because large-scale production of shale oil has been under way for only the past few years. The estimates are from different organizations and vary somewhat because they were developed at different times and using different data, methods, and assumptions, but estimates from all of these organizations have increased over time, indicating that the nation's shale oil and gas resources may be substantial. For example, according to estimates and reports we reviewed, assuming current consumption levels without consideration of a specific market price for future gas supplies, the amount of domestic technically recoverable shale gas could provide enough natural gas to supply the nation for the next 14 to 100 years. The increases in estimates can largely be attributed to improved geological information about the resources, greater understanding of production levels, and technological advancements.

**Estimates of Technically Recoverable Shale Oil Resources**

In the last 2 years, EIA and USGS provided estimates of technically recoverable shale oil.[25] Each of these estimates increased in recent years as follows:

- In 2012, EIA estimated that the United States possesses 33 billion barrels of technically recoverable shale oil,[26] mostly located in four shale formations—the Bakken in Montana and North Dakota; Eagle Ford in Texas; Niobrara in Colorado, Kansas, Nebraska, and Wyoming; and the Monterey in California.

- In 2011, USGS estimated that the United States possesses just over 7 billion barrels of technically recoverable oil in shale and tight sandstone formations. The estimate represents a more than threefold increase from the agency's estimate in 2006. However, there are several shale plays that USGS has not evaluated for shale oil because interest in these plays is relatively new. According to USGS officials, these shale plays have shown potential for production in recent years and may contain additional shale oil resources. Table 1 shows USGS' 2006 and 2011 estimates and EIA's 2011 and 2012 estimates.

**Table 1: USGS and EIA Estimates of Total Remaining Technically Recoverable U.S. Oil Resources**

Barrels of oil in billions

|  | USGS | | EIA | |
| --- | --- | --- | --- | --- |
|  | 2006 | 2011 | 2011 | 2012 |
| Estimated technically recoverable shale oil and tight sandstone resources | 2 | 7 | 32 | 33 |
| Estimated technically recoverable oil resources other than shale[a] | 142 | 133 | 187 | 201 |

Source: GAO analysis of EIA and USGS data.

---

[25]As noted previously, for the purposes of this report, we use the term "shale oil" to refer to oil from shale and other tight formations, which is recoverable by hydraulic fracturing and horizontal drilling techniques and is described by others as "tight oil." Shale oil and tight oil are extracted in the same way, but differ from "oil shale." Oil shale is a sedimentary rock containing solid organic material that converts into a type of crude oil only when heated.

[26]Comparatively, the United States currently consumes about 7 billion barrels of oil per year, about half of which are imported from foreign sources.

aIncludes estimates for conventional offshore oil and gas, as well as natural gas liquids. In addition, the USGS estimates for 2006 and 2011 include a 2006 estimate of technically recoverable offshore conventional oil resources totaling 86 billion barrels of oil and natural gas liquids from the former Minerals Management Service, which has since been reorganized into the Bureau of Ocean Energy Management and the Bureau of Safety and Environmental Enforcement.

Overall, estimates of the size of technically recoverable shale oil resources in the United States are imperfect and highly dependent on the data, methodologies, model structures, and assumptions used. As these estimates are based on data available at a given point in time, they may change as additional information becomes available. Also these estimates depend on historical production data as a key component for modeling future supply. Because large-scale production of oil in shale formations is a relatively recent activity, their long-term productivity is largely unknown. For example, EIA estimated that the Monterey Shale in California may possess about 15.4 billion barrels of technically recoverable oil. However, without a longer history of production, the estimate has greater uncertainty than estimates based on more historical production data. At this time, USGS has not yet evaluated the Monterey Shale play.

**Estimates of Technically Recoverable Shale Gas Resources**

The amount of technically recoverable shale gas resources in the United States has been estimated by a number of organizations, including EIA, USGS, and the Potential Gas Committee (see fig. 6). Their estimates were as follows:

- In 2012, EIA estimated the amount of technically recoverable shale gas in the United States at 482 trillion cubic feet.[27] This represents an increase of 280 percent from EIA's 2008 estimate.

- In 2011, USGS reported that the total of its estimates for the shale formations the agency evaluated in all previous years[28] shows the

---

[27]EIA estimates are based on natural gas production data from 2 years prior to the reporting year; for example, EIA's 2012 estimate is based on 2010 data; the date cited here reflects the fact that EIA reported this latest estimate in 2012.

[28]USGS estimates are based on updated data in a few—but not all—individual geological areas, combined with data from other areas from all previous years. Each year USGS estimates new information for a few individual geological areas. For example, the 2011 USGS estimate includes updated 2011 data for the Appalachian Basin, the Anadarko Basin, and the Gulf Coast, combined with estimates for all other areas developed before 2011. See appendix III for additional information on USGS estimates. The date cited here reflects the fact that USGS reported this latest estimate in 2011.

amount of technically recoverable shale gas in the United States at about 336 trillion cubic feet. This represents an increase of about 600 percent from the agency's 2006 estimate.

- In 2011, the Potential Gas Committee estimated the amount of technically recoverable shale gas in the United States at about 687 trillion cubic feet.[29] This represents an increase of 240 percent from the committee's 2007 estimate.

**Figure 6: Estimates of Technically Recoverable Shale Gas from EIA, USGS, and the Potential Gas Committee (2006 through 2012)**



Sources: GAO analysis of EIA, Potential Gas Committee, and USGS estimates.

Notes: Natural gas is generally priced and sold in thousand cubic feet (abbreviated Mcf, using the Roman numeral for 1,000). Units of a trillion cubic feet (Tcf) are often used to measure large quantities, as in resources or reserves in the ground, or annual national energy consumption. One Tcf is enough natural gas to heat 15 million homes for 1 year or fuel 12 million natural gas-fired vehicles for 1 year. In 2012, EIA reduced its estimate of technically recoverable shale gas in the Marcellus Shale by about 67 percent. According to EIA officials, the decision to revise the estimate was based primarily on the availability of new production data, which was highlighted by the release of the USGS

[29]Potential Gas Committee estimates are based on natural gas production data from the previous year; for example, committee's 2011 estimate is based on 2010 data. The date cited here reflects the fact that the Potential Gas Committee reported this latest estimate in 2011.

estimate. In 2011, EIA used data from a contractor to estimate that the Marcellus Shale possessed about 410 trillion cubic feet of technically recoverable gas. After EIA released its estimates in 2011, USGS released its first estimate of technically recoverable gas in the Marcellus in almost 10 years. USGS estimated that there were 84 trillion cubic feet of natural gas in the Marcellus—which was 40 times more than its previous estimate reported in 2002 but significantly less than EIA's estimate. In 2012, EIA announced that it was revising its estimate of the technically recoverable gas in the Marcellus Shale from 410 to 141 trillion cubic feet. EIA reported additional details about its methodology and data in June 2012. See U.S. Department of Energy, Energy Information Administration, Annual Energy Outlook 2012, With Projections to 2035 (DOE/EIA-0383 [2012], Washington, D.C., June 25, 2012).

[a]The 2006 USGS estimate of about 54 trillion cubic feet represents those assessments that had been done up to the end of 2006. As such, the estimate is partially dependent on how the agency scheduled basin studies and assessments from 2000 through 2006, rather than purely on changes in USGS views of resource potential since 2006.

[b]The Potential Gas Committee did not report separate estimates of shale gas until 2007 and has updated this estimate every 2 years since then.

In addition to the estimates from the three organizations we reviewed, operators and energy forecasting consultants prepare their own estimates of technically recoverable shale gas to plan operations or for future investment. In September 2011, the National Petroleum Council aggregated data on shale gas resources from over 130 industry, government, and academic groups and estimated that approximately 1,000 trillion cubic feet of shale gas is available for production domestically. In addition, private firms that supply information to the oil and gas industry conduct assessments of the total amount of technically recoverable natural gas. For example, ICF International, a consulting firm that provides information to public- and private-sector clients, estimated in March 2012 that the United States possesses about 1,960 trillion cubic feet of technically recoverable shale gas.

Based on estimates from EIA, USGS, and the Potential Gas Committee, five shale plays—the Barnett, Haynesville, Fayetteville, Marcellus, and Woodford—are estimated to possess about two-thirds of the total estimated technically recoverable gas in the United States (see table 2).

**Table 2: Estimated Technically Recoverable Shale Gas Resources, by Play**

| Shale play | Location | Technically recoverable gas, in trillion cubic feet (Tcf) |
|---|---|---:|
| Barnett | North Texas | 43-53 |
| Fayetteville | Arkansas | 13-110 |
| Haynesville | Louisiana and East Texas | 66-110 |
| Marcellus | Northeast United States | 84-227[a] |
| Woodford | Oklahoma | 11-27 |

Sources: GAO analysis of EIA, USGS, and Potential Gas Committee data.

Note: The estimated technically recoverable gas shown here represents the range of estimates for these plays determined by EIA, USGS, and the Potential Gas Committee.

[a]This estimate of the Marcellus also includes estimated shale gas from other nearby lands in the Appalachian area; but, according to an official for the estimating organization, the Marcellus Shale is the predominant source of gas in the basin.

As with estimates for technically recoverable shale oil, estimates of the size of technically recoverable shale gas resources in the United States are also highly dependent on the data, methodologies, model structures, and assumptions used and may change as additional information becomes available. These estimates also depend on historical production data as a key component for modeling future supply. Because most shale gas wells generally were not in place until the last few years, their long-term productivity is untested. According to a February 2012 report released by the Sustainable Investments Institute and the Investor Responsibility Research Center Institute, production in emerging shale plays has been concentrated in areas with the highest known gas production rates, and many shale plays are so large that most of the play has not been extensively tested.[30] As a result, production rates achieved to date may not be representative of future production rates across the formation. EIA reports that experience to date shows production rates from neighboring shale gas wells can vary by as much as a factor of 3 and that production rates for different wells in the same formation can vary by as much as a factor of 10. Most gas companies estimate that production in a given well will drop sharply after the first few years and

---

[30]The Sustainable Investments Institute (Si2) is a nonprofit membership organization founded in 2010 to conduct research and publish reports on organized efforts to influence corporate behavior. The Investor Responsibility Research Center Institute is a nonprofit organization established in 2006 that provides information to investors.

then level off, continuing to produce gas for decades, according to the Sustainable Investments Institute and the Investor Responsibility Research Center Institute.

## Estimates of Proved Reserves of Shale Oil and Gas

Estimates of proved reserves of shale oil and gas increased from 2007 to 2009. Operators determine the size of proved reserves based on information collected from drilling, geological and geophysical tests, and historical production trends. These are also the resources operators believe they will develop in the short term—generally within the next 5 years—and assume technological and economic conditions will remain unchanged.

*Estimates of proved reserves of shale oil*. EIA does not report proved reserves of shale oil separately from other oil reserves; however, EIA and others have noted an increase in the proved reserves of oil in the nation, and federal officials attribute the increase, in part, to oil from shale and tight sandstone formations. For example, EIA reported in 2009 that the Bakken Shale in North Dakota and Montana drove increases in oil reserves, noting that North Dakota proved reserves increased over 80 percent from 2008 through 2009.

*Estimates of proved reserves of shale gas.* According to data EIA collects from about 1,200 operators, proved reserves of shale gas have grown from 23 trillion cubic feet in 2007 to 61 trillion cubic feet in 2009, or an increase of 160 percent.[31] More than 75 percent of the proved shale gas reserves are located in three shale plays—the Barnett, Fayetteville, and the Haynesville.

## Shale Oil and Gas Production

From 2007 through 2011, annual production of shale oil and gas has experienced significant growth. Specifically, shale oil production increased more than fivefold, from 39 to about 217 million barrels over this 5-year period, and shale gas production increased approximately fourfold, from 1.6 to about 7.2 trillion cubic feet, over the same period. To

---

[31]Reserves are key information for assessing the net worth of an operator. Oil and gas companies traded on the U.S. stock exchange are required to report their reserves to the Securities and Exchange Commission. According to an EIA official, EIA reports a more complete measure of oil and gas reserves because it receives reports of proved reserves from both private and publically held companies.

put this shale production into context, the annual domestic consumption of oil in 2011 was about 6,875 million barrels of oil, and the annual consumption of natural gas was about 24 trillion cubic feet. The increased shale oil and gas production was driven primarily by technological advances in horizontal drilling and hydraulic fracturing that made more shale oil and gas development economically viable.

**Shale Oil Production**

Annual shale oil production in the United States increased more than fivefold, from about 39 million barrels in 2007 to about 217 million barrels in 2011, according to data from EIA (see fig. 7).[32] This is because new technologies allowed more oil to be produced economically, and because of recent increases in the price for liquid petroleum that have led to increased investment in shale oil development.

**Figure 7: Estimated Production of Shale Oil from 2007 through 2011 (in millions of barrels of oil)**



Oil (in millons of barrels)

Year

Source: GAO analysis of EIA data.

---

[32]As noted previously, for the purposes of this report, we use the term "shale oil" to refer to oil from shale and other tight formations, which is recovered by hydraulic fracturing and horizontal drilling and is described by others as "tight oil." Shale oil and tight oil are extracted in the same way, but differ from "oil shale." Oil shale is a sedimentary rock containing solid organic material that converts into a type of crude oil only when heated.

In total, during this period, about 533 million barrels of shale oil was produced. More than 65 percent of the oil was produced in the Bakken Shale (368 million barrels; see fig. 8).[33] The remainder was produced in the Niobrara (62 million barrels), Eagle Ford (68 million barrels), Monterey (18 million barrels), and the Woodford (9 million barrels). To put this in context, shale oil production from these plays in 2011 constituted about 8 percent of U.S. domestic oil consumption, according to EIA data.[34]

[33]EIA provided us with estimated shale oil production data from a contractor, HPDI LLC., for 2007 through 2011. EIA uses these data for the purposes of estimating recent shale oil production. EIA has not routinely reported shale oil production data separately from oil production.

[34]In addition to production from these shale oil plays, EIA officials told us that oil was produced from "tight oil" plays such as the Austin Chalk. The technology for producing tight oil is the same as for shale oil, and EIA uses the term "tight oil" to encompass both shale oil and tight oil that are developed with the same type of technology. In addition, EIA officials added that the shale oil data presented here is approximate because the data comes from a sample of similar plays. Overtime, this production data will become more precise as more data becomes available to EIA.

**Figure 8: Shale Oil Production, by Shale Play (from 2007 through 2011)**



Sources: GAO analysis of EIA data; (map) copyright © Corel Corp., all rights reserved.

**Shale Gas Production**

Shale gas production in the United States increased more than fourfold, from about 1.6 trillion cubic feet in 2007 to about 7.2 trillion cubic feet in 2011, according to estimated data from EIA (see fig. 9).[35]

**Figure 9: Estimated Production of Shale Gas from 2007 through 2011 (in trillions of cubic feet)**



Source: GAO analysis of EIA data.

In total, during this period, about 20 trillion cubic feet of shale gas was produced—representing about 300 days of U.S. consumption, based on 2011 consumption rates. More than 75 percent of the gas was produced in four shale plays—the Barnett, Marcellus, Fayetteville, and Haynesville (see fig.10). From 2007 through 2011, shale gas' contribution to the nation's total natural gas supply grew from about 6 percent in 2007 to approximately 25 percent in 2011 and is projected, under certain assumptions, to increase to 49 percent by 2035, according to an EIA report. Overall production of shale gas increased from calendar years 2007 through 2011, but production of natural gas on federal and tribal

---

[35]EIA provided us with estimated shale gas production data from a contractor, Lippman Consulting, Inc., for 2007 through 2011. EIA uses these data for the purposes of estimating recent shale gas production. EIA has separately reported shale gas production data using reports from states for the years 2008 and 2009.

lands—including shale gas and natural gas from all other sources—decreased by about 17 percent, according to an EIA report. EIA attributes this decrease to several factors, including the location of shale formations—which, according to an EIA official, appear to be predominately on nonfederal lands.

**Figure 10: Shale Gas Production, by Shale Play (from 2007 through 2011)**



Sources: GAO analysis of EIA data; (map) copyright © Corel Corp., all rights reserved.

The growth in production of shale gas has increased the overall supply of natural gas in the U.S. energy market. Since 2007, increased shale gas

production has contributed to lower prices for consumers, according to EIA and others.[36] These lower prices create incentives for wider use of natural gas in other industries. For example, several reports by government, industry, and others have observed that if natural gas prices remain low, natural gas is more likely to be used to power cars and trucks in the future. In addition, electric utilities may build additional natural gas-fired generating plants as older coal plants are retired. At the same time, some groups have expressed concern that greater reliance on natural gas may reduce interest in developing renewable energy.

The greater availability of domestic shale gas has also decreased the need for natural gas imports. For example, EIA has noted that volumes of natural gas imported into the United States have fallen in recent years—in 2007, the nation imported 16 percent of the natural gas consumed and in 2010, the nation imported 11 percent—as domestic shale gas production has increased. This trend is also illustrated by an increase in applications for exporting liquefied natural gas to other countries. In its 2012 annual energy outlook, EIA predicted that, under certain scenarios, the United States will become a net exporter of natural gas by about 2022.[37]

**Development of Wet Gas**

EIA reported that operators have recently moved away from the development of shale plays that are primarily dry gas in favor of developing plays with higher concentrations of natural gas liquids. At current natural gas prices, natural gas liquids are a much more valuable product than dry gas. This is because the end products and byproducts of natural gas liquids contain more energy per unit of volume and have uses beyond heating and power generation and may be converted into products that can be more easily transported and traded in the global market. Shale plays with significant natural gas liquids include the Eagle Ford and Marcellus.

# Shale Oil and Gas Development Pose Environmental and Public Health Risks, but the Extent is Unknown and Depends on Many Factors

Developing oil and gas resources—whether conventional or from shale formations—poses inherent environmental and public health risks, but the extent of risks associated with shale oil and gas development is unknown, in part, because the studies we reviewed do not generally take into account potential long-term, cumulative effects. In addition, the severity of adverse effects depend on various location- and process-specific factors, including the location of future shale oil and gas development and the rate at which it occurs, geology, climate, business practices, and regulatory and enforcement activities.

---

[36]According to a 2012 report from the Bipartisan Policy Center, natural gas prices declined roughly 37 percent from February 2008 to January 2010.

[37]Department of Energy, Energy Information Administration, *Annual Energy Outlook 2012, With Projections to 2035*, DOE/EIA-0383 (Washington, D.C.: June 25, 2012).

## Shale Oil and Gas Development Pose Risks to Air, Water, Land and Wildlife

Oil and gas development, which includes development from shale formations, poses inherent risks to air quality, water quantity, water quality, and land and wildlife.

### Air Quality

According to a number of studies and publications we reviewed, shale oil and gas development pose risks to air quality. These risks are generally the result of engine exhaust from increased truck traffic, emissions from diesel-powered pumps used to power equipment, intentional flaring or venting of gas for operational reasons, and unintentional emissions of pollutants from faulty equipment or impoundments.

Construction of the well pad, access road, and other drilling facilities requires substantial truck traffic, which degrades air quality. According to a 2008 National Park Service report, an average well, with multistage fracturing, can require 320 to 1,365 truck loads to transport the water, chemicals, sand, and other equipment—including heavy machinery like bulldozers and graders—needed for drilling and fracturing. The increased traffic creates a risk to air quality as engine exhaust that contains air pollutants such as nitrogen oxides and particulate matter that affect public health and the environment are released into the atmosphere.[38] Air quality may also be degraded as fleets of trucks traveling on newly graded or unpaved roads increase the amount of dust released into the air—which can contribute to the formation of regional haze.[39] In addition to the dust, silica sand (see fig. 11)—commonly used as proppant in the hydraulic fracturing process—may pose a risk to human health, if not properly handled. According to a federal researcher from the Department of Health and Human Services, uncontained sand particles and dust pose threats to workers at hydraulic fracturing well sites. The official stated that particles from the sand, if not properly contained by dust control mechanisms, can lodge in the lungs and potentially cause silicosis.[40]

---

[38]Nitrogen oxides are regulated pollutants commonly known as NOx that, among other things, contribute to the formation of ozone and have been linked to respiratory illness, decreased lung function, and premature death. Particulate matter is a ubiquitous form of air pollution commonly referred to as soot. GAO, *Diesel Pollution: Fragmented Federal Programs That Reduce Mobile Source Emissions Could Be Improved,* GAO-12-261 (Washington, D.C.: Feb. 7, 2012).

[39]T. Colborn, C. Kwiatkowski, K. Schultz, and M. Bachran, "Natural Gas Operations From a Public Health Perspective," *International Journal of Human & Ecological Risk Assessment* 17, no. 5 (2011).

[40]Silicosis is an incurable lung disease caused by inhaling fine dusts of silica sand.

The researcher expects to publish the results of research on public health risks from proppant later in 2012.

**Figure 11: Silica Sand Proppant**



Source: GAO.

Use of diesel engines to supply power to drilling sites also degrades air quality. Shale oil and gas drilling rigs require substantial power to drill and case wellbores to the depths of shale formations. This power is typically provided by transportable diesel engines, which generate exhaust from the burning of diesel fuel. After the wellbore is drilled to the target formation, additional power is needed to operate the pumps that move large quantities of water, sand, or chemicals into the target formation at high pressure to hydraulically fracture the shale—generating additional exhaust. In addition, other equipment used during operations—including pneumatic valves and dehydrators—contribute to air emissions. For example, natural gas powers switches that turn valves on and off in the production system. Each time a valve turns on or off, it "bleeds" a small amount of gas into the air. Some of these pneumatic valves vent gas

continuously. A dehydrator circulates the chemical glycol to absorb moisture in the gas but also absorbs small volumes of gas. The absorbed gas vents to the atmosphere when the water vapor is released from the glycol.[41]

Releases of natural gas during the development process also degrade air quality. As part of the process to develop shale oil and gas resources, operators flare or vent natural gas for a number of operational reasons, including lowering the pressure to ensure safety or when operators purge water or hydrocarbon liquids that collect in wellbores to maintain proper well function. Flaring emits carbon dioxide, and venting releases methane and volatile organic compounds. Venting and flaring are often a necessary part of the development process but contribute to greenhouse gas emissions.[42] According to EPA analysis, natural gas well completions involving hydraulic fracturing vent approximately 230 times more natural gas and volatile organic compounds than natural gas well completions that do not involve hydraulic fracturing.[43] As we reported in July 2004, in addition to the operational reasons for flaring and venting, in areas where the primary purpose of drilling is to produce oil, operators flare or vent associated natural gas because no local market exists for the gas and transporting to a market may not be economically feasible.[44] For example, according to EIA, in 2011, approximately 30 percent of North Dakota's natural gas production from the Bakken Shale was flared by operators due to insufficient natural gas gathering pipelines, processing plants, and transporting pipelines. The percentage of flared gas in North Dakota is considerably higher than the national average; EIA reported that, in 2009,

---

[41]GAO-11-34.

[42]Methane and other chemical compounds found in the earth's atmosphere create a greenhouse effect. Under normal conditions, when sunlight strikes the earth's surface, some of it is reflected back toward space as infrared radiation or heat. Greenhouse gases such as carbon dioxide and methane impede this reflection by trapping heat in the atmosphere. While these gases occur naturally on earth and are emitted into the atmosphere, the expanded industrialization of the world over the last 150 years has increased the amount of emissions from human activity (known as anthropogenic emissions) beyond the level that the earth's natural processes can handle.

[43]EPA, Regulatory Impact Analysis: Final New Source Performance Standards and Amendments to the National Emissions Standards for Hazardous Air Pollutants for the Oil and Natural Gas industry (Research Triangle Park, NC: April 2012).

[44]GAO, Natural Gas Flaring and Venting: Opportunities to Improve Data and Reduce Emissions, GAO-04-809 (Washington, D.C.: July 14, 2004).

less than 1 percent of natural gas produced in the United States was vented or flared.

Storing fracturing fluid and produced water in impoundments may also pose a risk to air quality as evaporation of the fluids have the potential to release contaminants into the atmosphere. According to the New York Department of Environmental Conservation's 2011 Supplemental Generic Environmental Impact Statement, analysis of air emission rates of some of the compounds used in the fracturing fluids in the Marcellus Shale reveals the potential for emissions of hazardous air pollutants, in particular methanol, from the fluids stored in impoundments.

As with conventional oil and gas development, emissions can also occur as faulty equipment or accidents, such as leaks or blowouts, release concentrations of methane and other gases into the atmosphere. For example, corrosion in pipelines or improperly tightened valves or seals can be sources of emissions. In addition, according to EPA officials, storage vessels for crude oil, condensate, or produced water are significant sources of methane, volatile organic compounds and hazardous air pollutant emissions.

A number of studies we reviewed evaluated air quality at shale gas development sites. However, these studies are generally anecdotal, short-term, and focused on a particular site or geographic location. For example, in 2010, the Pennsylvania Department of Environmental Protection conducted short-term sampling of ambient air concentrations in north central Pennsylvania. The sampling detected concentrations of natural gas constituents including methane, ethane, propane, and butane in the air near Marcellus Shale drilling operations, but according to this state agency, the concentration levels were not considered significant enough to cause adverse health effects.[45]

The studies and publications we reviewed provide information on air quality conditions at a specific site at a specific time but do not provide the information needed to determine the overall cumulative effect that

---

[45]Methane emissions represent a waste of resources and a fractional contribution to greenhouse gas levels.

shale oil and gas activities have on air quality.[46] The cumulative effect shale oil and gas activities have on air quality will be largely determined by the amount of development and the rate at which it occurs, and the ability to measure this will depend on the availability of accurate information on emission levels. However, the number of wells that will ultimately be drilled cannot be known in advance—in part because the productivity of any particular formation at any given location and depth is not known until drilling occurs. In addition, as we reported in 2010, data on the severity or amount of pollutants released by oil and gas development, including the amount of fugitive emissions, are limited.

**Water Quantity**

According to a number of studies and publications we reviewed, shale oil and gas development poses a risk to surface water and groundwater because withdrawing water from streams, lakes, and aquifers for drilling and hydraulic fracturing could adversely affect water sources.[47] Operators use water for drilling, where a mixture of clay and water (drilling mud) is used to carry rock cuttings to the surface, as well as to cool and lubricate the drill bit. Water is also the primary component of fracturing fluid. Table 3 shows the average amount of freshwater used to drill and fracture a shale oil or gas well.

**Table 3: Average Freshwater Use per Well for Drilling and Hydraulic Fracturing**

| Shale play | Average freshwater used (in gallons) | |
| --- | --- | --- |
| | For drilling | For hydraulic fracturing |
| Barnett | 250,000 | 4,600,000 |
| Eagle Ford | 125,000 | 5,000,000 |
| Haynesville | 600,000 | 5,000,000 |
| Marcellus | 85,000 | 5,600,000 |
| Niobrara | 300,000 | 3,000,000 |

Source: GAO analysis of data reported by George King, Apache Corporation (2011).

Note: The amount of water required to hydraulically fracture a single well varies considerably as fracturing of shale oil and gas becomes dominated by more complex, multistaged fracturing activities.

---

[46]According to a 2008 National Park Service report, on a site-by-site basis, emissions may not be significant but on a regional basis may prove significant as states and parks manage regional ozone transport.

[47]An aquifer is an underground layer of rock or unconsolidated sand, gravel, or silt that will yield groundwater to a well or spring.

According to a 2012 University of Texas study,[48] water for these activities is likely to come from surface water (rivers, lakes, ponds), groundwater aquifers, municipal supplies, reused wastewater from industry or water treatment plants, and recycling water from earlier fracturing operations.[49] As we reported in October 2010, withdrawing water from nearby streams and rivers could decrease flows downstream, making the streams and rivers more susceptible to temperature changes—increases in the summer and decreases in the winter. Elevated temperatures could adversely affect aquatic life because many fish and invertebrates need specific temperatures for reproduction and proper development. Further, decreased flows could damage or destroy riparian vegetation. Similarly, withdrawing water from shallow aquifers—an alternative water source—could temporarily affect groundwater resources. Withdrawals could lower water levels within these shallow aquifers and the nearby streams and springs to which they are connected. Extensive withdrawals could reduce groundwater discharge to connected streams and springs, which in turn could damage or remove riparian vegetation and aquatic life. Withdrawing water from deeper aquifers could have longer-term effects on groundwater and connected streams and springs because replenishing deeper aquifers with precipitation generally takes longer.[50] Further, groundwater withdrawal could affect the amount of water available for other uses, including public and private water supplies.

Freshwater is a limited resource in some arid and semiarid regions of the country where an expanding population is placing additional demands on water. The potential demand for water is further complicated by years of drought in some parts of the country and projections of a warming climate. According to a 2011 Massachusetts Institute of Technology study,[51] the amount of water used for shale gas development is small in

---

[48]Charles G. Groat, Ph.D. and Thomas W. Grimshaw, Ph.D., *Fact-Based Regulation for Environmental Protection in Shale Gas Development* (Austin, Texas: The Energy Institute, The University of Texas at Austin, February, 2012).

[49]Operators are pursuing a variety of techniques and technologies to reduce freshwater demand, such as recycling their own produced water and hydraulic fracturing fluids. We recently reported that some shale gas operators have begun reusing produced water for hydraulic fracturing of additional wells (see GAO-12-156).

[50]GAO-11-35.

[51]Massachusetts Institute of Technology, *The Future of Natural Gas: An Interdisciplinary MIT Study* (2011) (web.mit.edu/mitei/research/studies/report-natural-gas.pdf).

comparison to other water uses, such as agriculture and other industrial purposes. However, the cumulative effects of using surface water or groundwater at multiple oil and gas development sites can be significant at the local level, particularly in areas experiencing drought conditions.

Similar to shale oil and gas development, development of gas from coalbed methane formations poses a risk of aquifer depletion. To develop natural gas from such formations, water from the coal bed is withdrawn to lower the reservoir pressure and allow the methane to desorb from the coal. According to a 2001 USGS report, dewatering coalbed methane formations in the Powder River Basin in Wyoming can lower the groundwater table and reduce water available for other uses, such as livestock and irrigation.[52]

The key issue for water quantity is whether the total amount of water consumed for the development of shale oil and gas will result in a significant long-term loss of water resources within a region, according to a 2012 University of Texas study. This is because water used in shale oil and gas development is largely a consumptive use and can be permanently removed from the hydrologic cycle, according to EPA and Interior officials. However, it is difficult to determine the long-term effect on water resources because the scale and location of future shale oil and gas development operations remains largely uncertain. Similarly, the total volume that operators will withdraw from surface water and aquifers for drilling and hydraulic fracturing is not known until operators submit applications to the appropriate regulatory agency. As a result, the cumulative amount of water consumed over the lifetime of the activity—key information needed to assess the effects of water withdrawals—remains largely unknown.

Water Quality

According to a number of studies and publications we reviewed, shale oil and gas development pose risks to water quality from contamination of surface water and groundwater as a result of spills and releases of produced water, chemicals, and drill cuttings; erosion from ground disturbances; or underground migration of gases and chemicals.

---

[52]USGS, *A Field Conference On Impacts of Coalbed Methane Development in the Powder River Basin, Wyoming,* Open-File Report 01-126 (Denver, CO: 2001).

### Spills and Releases

Shale oil and gas development poses a risk to water quality from spills or releases of toxic chemicals and waste that can occur as a result of tank ruptures, blowouts, equipment or impoundment failures, overfills, vandalism, accidents (including vehicle collisions), ground fires, or operational errors. For example, tanks storing toxic chemicals or hoses and pipes used to convey wastes to the tanks could leak, or impoundments containing wastes could overflow as a result of extensive rainfall. According to New York Department of Environmental Conservation's 2011 Supplemental Generic Environmental Impact Statement, spilled, leaked, or released chemicals or wastes could flow to a surface water body or infiltrate the ground, reaching and contaminating subsurface soils and aquifers. In August 2003, we reported that damage from oil and gas related spills on National Wildlife Refuges varied widely in severity, ranging from infrequent small spills with no known effect on wildlife to large spills causing wildlife death and long-term water and soil contamination.[53]

Drill cuttings, if improperly managed, also pose a risk to water quality. Drill cuttings brought to the surface during oil and gas development may contain naturally occurring radioactive materials (NORM),[54] along with other decay elements (radium-226 and radium-228), according to an industry report presented at the Society of Petroleum Engineers Annual Technical Conference and Exhibition.[55] According to the report, drill cuttings are stored and transported through steel pipes and tanks—which the radiation cannot penetrate. However, improper transport and handling of drill cuttings could result in water contamination. For example, NORM

---

[53]GAO, *National Wildlife Refuges: Opportunities to Improve the Management and Oversight of Oil and Gas Activities on Federal Lands*, GAO-03-517 (Washington, D.C.: Aug. 28, 2003).

[54]Naturally occurring radioactive materials (NORM) are present at varying degrees in virtually all environmental media, including rocks and soils. According to a DOE report, human exposure to radiation comes from a variety of sources, including naturally occurring radiation from space, medical sources, consumer products, and industrial sources. Normal disturbances of NORM-bearing rock formations by activities such as drilling do not generally pose a threat to workers, the general public or the environment, according to studies and publications we reviewed.

[55]J. Daniel Arthur, Brian Bohm, David Cornue. "Environmental Considerations of Modern Shale Gas Development" (presented at the Society of Petroleum Engineers Annual Technical Conference and Exhibition, New Orleans, Louisiana, October 2009).

concentrations can build up in pipes and tanks, if not properly disposed, and the general public or water could come into contact with them, according to an EPA fact sheet.[56]

The chemical additives in fracturing fluid, if not properly handled, also poses a risk to water quality if they come into contact with surface water or groundwater. Some additives used in fracturing fluid are known to be toxic, but data are limited for other additives. For example, according to reports we reviewed, operators may include diesel fuel—a refinery product that consists of several components, possibly including some toxic impurities such as benzene and other aromatics—as a solvent and dispersant in fracturing fluid. While some additives are known to be toxic, less is known about potential adverse effects on human health in the event that a drinking water aquifer was contaminated as a result of a spill or release of fracturing fluid, according to the 2011 New York Department of Environmental Conservation's Supplemental Generic Environmental Impact Statement. This is largely because the overall risk of human health effects occurring from hydraulic fracturing fluid would depend on whether human exposure occurs, the specific chemical additives being used, and site-specific information about exposure pathways and environmental contaminant levels.

The produced water and fracturing fluids returned during the flowback process contain a wide range of contaminants and pose a risk to water quality, if not properly managed.[57] Most of the contaminants occur naturally, but some are added through the process of drilling and hydraulic fracturing. In January 2012, we reported that the range of contaminants found in produced water can include,[58] but is not limited to

- salts, which include chlorides, bromides, and sulfides of calcium, magnesium, and sodium;

---

[56]EPA, *Radioactive Waste from Oil and Gas Drilling*, EPA 402-F-06-038 (Washington, D.C.: April 2006).

[57]A 2009 report from DOE and the Groundwater Protection Council—a nonprofit organization whose members consist of state ground water regulatory agencies—estimates that from 30 percent to 70 percent of the original fluid injected returns to the surface.

[58]GAO-12-156.

- metals, which include barium, manganese, iron, and strontium, among others;

- oil, grease, and dissolved organics, which include benzene and toluene, among others;

- NORM; and

- production chemicals, which may include friction reducers to help with water flow, biocides to prevent growth of microorganisms, and additives to prevent corrosion, among others.

At high levels, exposure to some of the contaminants in produced water could adversely affect human health and the environment. For example, in January 2012, we reported that, according to EPA, a potential human health risk from exposure to high levels of barium is increased blood pressure.[59] From an environmental standpoint, research indicates that elevated levels of salts can inhibit crop growth by hindering a plant's ability to absorb water from the soil. Additionally, exposure to elevated levels of metals and production chemicals, such as biocides, can contribute to increased mortality among livestock and wildlife.

Operators must transport or store produced water prior to disposal. According to a 2012 University of Texas report, produced water temporarily stored in tanks (see fig. 12) or impoundments prior to treatment or disposal may be a source of leaks or spills, if not properly managed. The risk of a leak or spill is particularly a concern for surface impoundments as improper liners can tear, and impoundments can overflow.[60] For example, according to state regulators in North Dakota, in 2010 and 2011, impoundments overflowed during the spring melt season because operators did not move fluids from the impoundments—which

---

[59]GAO-12-156.

[60]The composition of pit lining depends on regulatory requirements, which vary from state to state.

were to be used for temporary storage—to a proper disposal site before the spring thaw.[61]

**Figure 12: Storage Tank for Produced Water in the Barnett Shale**



Source: GAO.

Unlike shale oil and gas formations, water permeates coalbed methane formations, and its pressure traps natural gas within the coal. To produce natural gas from coalbed methane formations, water must be extracted to lower the pressure in the formation so the natural gas can flow out of the coal and to the wellbore. In 2000, USGS reported that water extracted from coalbed methane formations is commonly saline and, if not treated

---

[61]In response, the state passed a new law that will significantly reduce the number of pits. Under the new law, operators can use pits for temporary storage of fluid from the flowback process but must drain and reclaim the pits no more than 72 hours after hydraulic fracturing is complete.

and disposed of properly, could adversely affect streams and threaten fish and aquatic resources.

According to several reports, handling and transporting toxic fluids or contaminants poses a risk of environmental contamination for all industries, not just oil and gas development; however, the large volume of fluids and contaminants—fracturing fluid, drill cuttings, and produced water—that is associated with the development of shale oil and gas poses an increased risk for a release to the environment and the potential for greater effects should a release occur in areas that might not otherwise be exposed to these chemicals.

**Erosion**

Oil and gas development, whether conventional or shale oil and gas, can contribute to erosion, which could carry sediments and pollutants into surface waters. Shale oil and gas development require operators to undertake a number of earth-disturbing activities, such as clearing, grading, and excavating land to create a pad to support the drilling equipment. If necessary, operators may also construct access roads to transport equipment and other materials to the site. As we reported in February 2005, as with other construction activities, if sufficient erosion controls to contain or divert sediment away from surface water are not established then surfaces are exposed to precipitation and runoff could carry sediment and other harmful pollutants into nearby rivers, lakes, and streams.[62] For example, in 2012, the Pennsylvania Department of Environmental Protection concluded that an operator in the Marcellus Shale did not provide sufficient erosion controls when heavy rainfall in the area caused significant erosion and contamination of a nearby stream from large amounts of sediment.[63] As we reported in February 2005, sediment clouds water, decreases photosynthetic activity, and destroys organisms and their habitat.

---

[62]GAO, *Storm Water Pollution: Information Needed on the Implications of Permitting Oil and Gas Construction Activities,* GAO-05-240 (Washington, D.C.: Feb. 9, 2005).

[63]In response, the state required the operator to install silt fences, silt socks, gravel surfacing of the access road, and a storm water capture ditch.

## Underground Migration

According to a number of studies and publications we reviewed, underground migration of gases and chemicals poses a risk of contamination to water quality.[64] Underground migration can occur as a result of improper casing and cementing of the wellbore as well as the intersection of induced fractures with natural fractures, faults, or improperly plugged dry or abandoned wells. Moreover, there are concerns that induced fractures can grow over time and intersect with drinking water aquifers. Specifically:

*Improper casing and cementing.* A well that is not properly isolated through proper casing and cementing could allow gas or other fluids to contaminate aquifers as a result of inadequate depth of casing,[65] inadequate cement in the annular space around the surface casing, and ineffective cement that cracks or breaks down under the stress of high pressures. For example, according to a 2008 report by the Ohio Department of Natural Resources, a gas well in Bainbridge, Ohio, was not properly isolated because of faulty sealing, allowing natural gas to build up in the space around the production casing and migrate upward over about 30 days into the local aquifer and infiltrating drinking water wells.[66] The risk of contamination from improper casing and cementing is not unique to the development of shale formations. Casing and cementing practices also apply to conventional oil and gas development. However, wells that are hydraulically fractured have some unique aspects. For example, hydraulically fractured wells are commonly exposed to higher pressures than wells that are not hydraulically fractured. In addition, hydraulically fractured wells are exposed to high pressures over a longer period of time as fracturing is conducted in multiple stages, and wells may be refractured multiple times—primarily to extend the economic life of the well when production declines significantly or falls below the estimated reservoir potential.

---

[64]Methane can occur naturally in shallow bedrock and unconsolidated sediments and has been known to naturally seep to the surface and contaminate water supplies, including water wells. Methane is a colorless, odorless gas and is generally considered nontoxic, but there could be an explosive hazard if gas is present in significant volumes and the water well is not properly vented.

[65]The depth for casing and cementing may be determined by state regulations.

[66]Ohio Department of Natural Resources, *Report on the Investigation of the Natural Gas Invasion of Aquifers in Bainbridge Township of Geauga County, Ohio* (September 2008).

*Natural fractures, faults, and abandoned wells.* If shale oil and gas development activities result in connections being established with natural fractures, faults, or improperly plugged dry or abandoned wells, a pathway for gas or contaminants to migrate underground could be created—posing a risk to water quality. These connections could be established through either induced fractures intersecting directly with natural fractures, faults, or improperly plugged dry or abandoned wells or as a result of improper casing and cementing that allow gas or other contaminants to make such connections. In 2011, the New York State Department of Environmental Conservation reported that operators generally avoid development around known faults because natural faults could allow gas to escape, which reduces the optimal recovery of gas and the economic viability of a well. However, data on subsurface conditions in some areas are limited. Several studies we reviewed report that some states are unaware of the location or condition of many old wells. As a result, operators may not be fully aware of the location of abandoned wells and natural fractures or faults.

*Fracture growth.* A number of such studies and publications we reviewed report that the risk of induced fractures extending out of the target formation into an aquifer—allowing gas or other fluids to contaminate water—may depend, in part, on the depth separating the fractured formation and the aquifer. For example, according to a 2012 Bipartisan Policy Center report, [67] the fracturing process itself is unlikely to directly affect freshwater aquifers because fracturing typically takes place at a depth of 6,000 to 10,000 feet, while drinking water tables are typically less than 1,000 feet deep.[68] Fractures created during the hydraulic fracturing process are generally unable to span the distance between the targeted shale formation and freshwater bearing zones. According to a 2011 industry report, fracture growth is stopped by natural subsurface barriers

[67]Bipartisan Policy Center, *Shale Gas: New Opportunities, New Challenges* (Washington, D.C.: January 2012).

[68]Some coalbed methane formations are much closer to drinking water aquifers than are shale formations. In 2004, EPA reviewed incidents of drinking water well contamination believed to be associated with hydraulic fracturing in coalbed methane formations. EPA found no confirmed cases linked to the injection of fracturing fluid or subsequent underground movement of fracturing fluids. The report states that, although thousands of coalbed methane formations are fractured annually, EPA did not find confirmed evidence that drinking water wells had been contaminated by the hydraulic fracturing process.

and the loss of hydraulic fracturing fluid.[69] When a fracture grows, it conforms to a general direction set by the stresses in the rock, following what is called fracture direction or orientation. The fractures are most commonly vertical and may extend laterally several hundred feet away from the well, usually growing upward until they intersect with a rock of different structure, texture, or strength. These are referred to as seals or barriers and stop the fracture's upward or downward growth. In addition, as the fracturing fluid contacts the formation or invades natural fractures, part of the fluid is lost to the formation. The loss of fluids will eventually stop fracture growth according to this industry report.

From 2001 through 2010, an industry consulting firm monitored the upper and lower limits of hydraulically induced fractures relative to the position of drinking water aquifers in the Barnett and Eagle Ford Shale, the Marcellus Shale, and the Woodford Shale.[70] In 2011, the firm reported that the results of the monitoring show that even the highest fracture point is several thousand feet below the depth of the deepest drinking water aquifer. For example, for over 200 fractures in the Woodford Shale, the typical distance between the drinking water aquifer and the top of the fracture was 7,500 feet, with the highest fracture recorded at 4,000 feet from the aquifer. In another example, for the 3,000 fractures performed in the Barnett Shale, the typical distance from the drinking water aquifer and the top of the fracture was 4,800 feet, and the fracture with the closest distance to the aquifer was still separated by 2,800 feet of rock. Table 4 shows the relationship between shale formations and the depth of treatable water in five shale gas plays currently being developed.

---

[69]George E. King, Apache Corporation, "Explaining and Estimating Fracture Risk: Improving Fracture Performance in Unconventional Gas and Oil Wells" (presented at the Society of Petroleum Engineers Hydraulic Fracturing Conference, The Woodlands, Texas, February 2012).

[70]Kevin Fisher, Norm Warpinski, Pinnacle—A Haliburton Service, "Hydraulic Fracture-Height Growth: Real Data" (presented at the Society of Petroleum Engineers Technical Conference and Exhibition, Denver, Colorado, October 2011).

**Table 4: Shale Formation and Treatable Water Depth**

Distance in feet

| Shale play | Depth to shale | Depth to base of treatable water | Distance between shale and base of treatable water |
|---|---|---|---|
| Barnett | 6,500- 8,500 | 1,200 | 5,300- 7,300 |
| Fayetteville | 1,000- 7,000 | 500 | 500- 6,500 |
| Haynesville | 10,500- 13,500 | 400 | 10,100- 13,100 |
| Marcellus | 4,000- 8,500 | 850 | 2,125- 7,650 |
| Woodford | 6,000- 11,000 | 400 | 5,600- 10,600 |

Source: GAO analysis of data presented in a report prepared at the request of the DOE.

Note: Depths to base of treatable water are approximate. According to the report, the depth to base of treatable water was based on data from state oil and gas agencies and state geological survey data.

Several government, academic, and nonprofit organizations evaluated water quality conditions or groundwater contamination incidents in areas experiencing shale oil and gas development. Among the studies and publications we reviewed that discuss the potential contamination of drinking water from the hydraulic fracturing process in shale formations are the following:

- In 2011, the Center for Rural Pennsylvania analyzed water samples taken from 48 private water wells located within about 2,500 feet of a shale gas well in the Marcellus Shale.[71] The analysis compared predrilling samples to postdrilling samples to identify any changes to water quality. The analysis showed that there were no statistically significant increases in pollutants prominent in drilling waste fluids— such as total dissolved solids, chloride, sodium, sulfate, barium, and strontium—and no statistically significant increases in methane. The study concluded that gas well drilling had not had a significant effect on the water quality of nearby drinking water wells.

- In 2011, researchers from Duke University studied shale gas drilling and hydraulic fracturing and the potential effects on shallow groundwater systems near the Marcellus Shale in Pennsylvania and the Utica Shale in New York. Sixty drinking water samples were collected in Pennsylvania and New York from bedrock aquifers that

---

[71]The Center for Rural Pennsylvania, *The Impact of Marcellus Gas Drilling on Rural Drinking Water Supplies* (Harrisburg, Pennsylvania: October 2011).

overlie the Marcellus or Utica Shale formations—some from areas with shale gas development and some from areas with no shale gas development.[72] The study found that methane concentrations were detected generally in 51 drinking water wells across the region—regardless of whether shale gas drilling occurred in the area—but that concentrations of methane were substantially higher closer to shale gas wells. However, the researchers reported that a source of the contamination could not be determined. Further, the researchers reported that they found no evidence of fracturing fluid in any of the samples.

- In 2011, the Ground Water Protection Council evaluated state agency groundwater investigation findings in Texas and categorized the determinations regarding causes of groundwater contamination resulting from the oil and gas industry.[73] During the study period—from 1993 through 2008—multistaged hydraulic fracturing stimulations were performed in over 16,000 horizontal shale gas wells. The evaluation of the state investigations found that there were no incidents of groundwater contamination caused by hydraulic fracturing.

In addition, regulatory officials we met with from eight states—Arkansas, Colorado, Louisiana, North Dakota, Ohio, Oklahoma, Pennsylvania, and Texas—told us that, based on state investigations, the hydraulic fracturing process has not been identified as a cause of groundwater contamination within their states.

A number of studies discuss the potential contamination of water from the hydraulic fracturing process in shale formations. However, according to several studies we reviewed, there are insufficient data for predevelopment (or baseline) conditions for groundwater. Without data to compare predrilling conditions to postdrilling conditions, it is difficult to determine if adverse effects were the result of oil and gas development, natural occurrences, or other activities. In addition, while researchers

---

[72]Stephen G. Osborn, Avner Vengosh, Nathaniel R. Warner, and Robert B. Jackson, "Methane Contamination of Drinking Water Accompanying Gas-well Drilling and Hydraulic Fracturing," *Proceedings of the National Academy of Science* 108, no. 20 (2011).

[73]Ground Water Protection Council, *State Oil and Gas Agency Groundwater Investigations And Their Role in Advancing Regulatory Reforms: A Two-State Review: Ohio and Texas* (Oklahoma City, Oklahoma: August 2011).

have evaluated fracture growth, the widespread development of shale oil and gas is relatively new. As such, little data exist on (1) fracture growth in shale formations following multistage hydraulic fracturing over an extended time period, (2) the frequency with which refracturing of horizontal wells may occur, (3) the effect of refracturing on fracture growth over time,[74] and (4) the likelihood of adverse effects on drinking water aquifers from a large number of hydraulically fractured wells in close proximity to each other.

## Ongoing Studies Related to Water Quality

Ongoing studies by federal agencies, industry groups, and academic institutions are evaluating the effects of hydraulic fracturing on water resources so that, over time, better data and information about these effects should become available to policymakers and the public. For example, EPA's Office of Research and Development initiated a study in January 2010 to examine the potential effects of hydraulic fracturing on drinking water resources. According to agency officials, the agency anticipates issuing a progress report in 2012 and a final report in 2014. EPA is also conducting an investigation to determine the presence of groundwater contamination within a tight sandstone formation being developed for natural gas near Pavillion, Wyoming, and, to the extent possible, identify the source of the contamination. In December 2011, EPA released a draft report outlining findings from the investigation. The report is not finalized, but the agency indicated that it had identified certain constituents in groundwater above the production zone of the Pavillion natural gas wells that are consistent with some of the constituents used in natural gas well operations, including the process of hydraulic fracturing. DOE researchers are also testing the vertical growth of fractures during hydraulic fracturing to determine whether fluids can travel thousands of feet through geologic faults into water aquifers close to the surface.

## Land and Wildlife

Oil and gas development, whether conventional or shale oil and gas, poses a risk to land resources and wildlife habitat as a result of constructing, operating, and maintaining the infrastructure necessary to develop oil and gas; using toxic chemicals; and injecting waste products underground.

---

[74]According to research presented in the New York Department of Environmental Conservation's Supplemental Generic Environmental Impact Statement, refracturing can restore the original fracture height and length, and can often extend the fracture length beyond the original fracture dimensions.

**Habitat Degradation**

According to studies and publications we reviewed, development of oil and gas, whether conventional or shale oil and gas, poses a risk to habitat from construction activities. Specifically, clearing land of vegetation and leveling the site to allow access to the resource, as well as construction of roads, pipelines, storage tanks, and other infrastructure needed to extract and transport the resource can fragment habitats.[75] In August 2003, we reported that oil and gas infrastructure on federal wildlife refuges can reduce the quality of habitat by fragmenting it.[76] Fragmentation increases disturbances from human activities, provides pathways for predators, and helps spread nonnative plant species.

In addition, spills of oil, gas, or other toxic chemicals have harmed wildlife and habitat. Oil and gas can injure or kill wildlife by destroying the insulating capacity of feathers and fur, depleting oxygen available in water, or exposing wildlife to toxic substances. Long-term effects of oil and gas contamination on wildlife are difficult to determine, but studies suggest that effects of exposure include reduced fertility, kidney and liver damage, immune suppression, and cancer. In August 2003, we reported that even small spills may contaminate soil and sediments if they occur frequently.[77] Further, noise and the presence of new infrastructure associated with shale gas development may also affect wildlife. A study by the Houston Advanced Research Center and the Nature Conservancy investigated the effects of noise associated with gas development on the Attwater's Prairie Chicken—an endangered species. The study explored how surface disruptions, particularly construction of a rig and noise from diesel generators would affect the animal's movement and habitat.[78] The results of the study found that the chickens were not adversely affected by the diesel engine generator's noise but that the presence of the rig caused the animals to temporarily disperse and avoid the area.

---

[75]Habitat fragmentation occurs when a network of roads and other infrastructure is constructed in previously undeveloped areas.

[76]GAO-03-517.

[77]GAO-03-517.

[78]James F. Bergan, Richard Haut, Jared Judy, and Liz Price. "Living In Harmony—Gas Production and the Attwater's Prairie Chicken" (presented at the Society of Professional Engineers Annual Technical Conference, Florence, Italy, September 2010).

A number of studies we reviewed identified risks to habitat and wildlife as a result of shale oil and gas activities. However, because shale oil and gas development is relatively new in some areas, the long-term effects—after operators are to have restored portions of the land to predevelopment conditions—have not been evaluated. Without these data, the cumulative effects of shale oil and gas development on habitat and wildlife are largely unknown.

### Induced Seismicity

According to several studies and publications we reviewed, the hydraulic fracturing process releases energy deep beneath the surface to break rock but the energy released is not large enough to trigger a seismic event that could be felt on the surface. However, a process commonly used by operators to dispose of waste fluids—underground injection—has been associated with earthquakes in some locations. For example, a 2011 Oklahoma Geological Survey study reported that underground injection can induce seismicity. In March 2012, the Ohio Department of Natural Resources reported that "there is a compelling argument" that the injection of produced water into underground injection wells was the cause of the 2011 earthquakes near Youngstown, Ohio. In addition, the National Academy of Sciences released a study in June 2012 that concluded that underground injection of wastes poses some risk for induced seismicity, but that very few events have been documented over the past several decades relative to the large number of disposal wells in operation.

The available research does not identify a direct link between hydraulic fracturing and increased seismicity, but there could be an indirect effect to the extent that increased use of hydraulic fracturing produces increased amounts of water that is disposed of through underground injection. In addition, according to the National Academy of Science's 2012 report, accurately predicting magnitude or occurrence of seismic events is generally not possible, in part, because of a lack of comprehensive data on the complex natural rock systems at energy development sites.

## Extent of Risks Is Unknown and Depends on Many Factors

The extent and severity of environmental and public health risks identified in the studies and publications we reviewed may vary significantly across shale basins and also within basins because of location- and process-specific factors, including the location and rate of development; geological characteristics, such as permeability, thickness, and porosity of the

formations in the basin; climatic conditions; business practices; and regulatory and enforcement activities.

*Location and rate of development.* The location of oil and gas operations and the rate of development can affect the extent and severity of environmental and public health risks. For example, as we reported in October 2010, while much of the natural gas that is vented and flared is considered to be unavoidably lost, certain technologies and practices can be applied throughout the production process to capture some of this gas, according to the oil and gas industry and EPA. The technologies' technical and economic feasibility varies and sometimes depends on the location of operations. For example, some technologies require a substantial amount of electricity, which may be less feasible for remote production sites that are not on the electrical grid. In addition, the extent and severity of environmental risks may vary based on the location of oil and gas wells. For example, in areas with high population density that are already experiencing challenges adhering to federal air quality limits, increases in ozone levels because of emissions from oil and gas development may compound the problem.

*Geological characteristics.* Geological characteristics can affect the extent and severity of environmental and public health risks associated with shale oil and gas development. For example, geological differences between tight sandstone and shale formations are important because, unlike shale, tight sandstone has enough permeability to transmit groundwater to water wells in the region. In a sense, the tight sandstone formation acts as a reservoir for both natural gas and for groundwater. In contrast, shale formations are typically not permeable enough to transmit water and are not reservoirs for groundwater. According to EPA officials, hydraulic fracturing in a tight sandstone formation that is a reservoir for both natural gas and groundwater poses a greater risk of contamination than the same activity in a deep shale formation.

*Climatic conditions.* Climatic factors, such as annual rainfall and surface temperatures, can also affect the environmental risks for a specific region or area. For example, according to a 2007 study funded by DOE, average rainfall amounts can be directly related to soil erosion.[79] Specifically,

---

[79]ALL Consulting and the Interstate Oil and Gas Compact Commission, *Improving Access to Onshore Oil and Gas Resources on Federal Lands* (a special report prepared at the request of the U.S. Department of Energy National Energy and Technology Laboratory, March 2007).

areas with higher precipitation levels may be more susceptible to soil compaction and rutting during the well pad construction phase. In another example, risk of adverse effects from exposures to toxic air contaminants can vary substantially between drilling sites, in part, because of the specific mix of emissions and climatic conditions that affect the transport and dispersion of emissions. Specifically, wind speed and direction, temperature, as well as other climatic conditions, can influence exposure levels of toxic air contaminants. For example, according to a 2012 study from the Sustainable Investments Institute and the Investor Responsibility Research Center Institute, the combination of air emissions from gas operations, snow on the ground, bright sunshine, and temperature inversions during winter months have contributed to ozone creation in Sublette County, Wyoming.[80]

*Business practices.* A number of studies we reviewed indicate that some adverse effects from shale oil and gas development can be mitigated through the use of technologies and best practices. For example, according to standards and guidelines issued jointly by the Departments of the Interior and Agriculture, mitigation techniques, such as fencing and covers, should be used around impoundments to prevent livestock or wildlife from accessing fluids stored in the impoundments.[81] In another example, EPA's Natural Gas STAR program has identified over 80 technologies and practices that can cost effectively reduce methane emissions, a potent greenhouse gas, during oil and gas development. However, the use of these technologies and business practices are typically voluntary and rely on responsible operators to ensure that necessary actions are taken to prevent environmental contamination. Further, the extent to which operators use these mitigating practices is unknown and could be particularly challenging to identify given the significant increase in recent years in the development of shale oil and gas by a variety of operators, both large and small.

*Regulatory and enforcement activities.* Potential changes to the federal, state, and local regulatory environment will affect operators' future

---

[80]Susan Williams, "Discovering Shale Gas: An Investor Guide to Hydraulic Fracturing," Sustainable Investments Institute and Investor Responsibility Research Center Institute (New York, NY: February 2012).

[81]United States Department of the Interior and United States Department of Agriculture. *Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development.* BLM/WO/ST-06/021+3071/REV 07 (Denver, CO: 2007).

activities and can therefore affect the risks or level of risks associated with shale oil and gas development. Shale oil and gas development is regulated by multiple levels of government—including federal, state, and local. Many of the laws and regulations applicable to shale oil and gas development were put in place before the increase in operations that has occurred in the last few years, and various levels of government are evaluating and, in some cases, revising laws and regulations to respond to the increase in shale oil and gas development. For example, in April 2012, EPA promulgated New Source Performance Standards for the oil and gas industry that, when fully phased-in by 2015, will require emissions reductions at new or modified oil and gas well sites, including wells using hydraulic fracturing. Specifically, these new standards, in part, focus on reducing the venting of natural gas and volatile organic compounds during the flowback process. In addition, areas without prior experience with oil and gas development are just now developing new regulations. These governments' effectiveness in implementing and enforcing this framework will affect future activities and the level of associated risk.

## Agency Comments

We provided a draft of this report to the Department of Energy, the Department of the Interior, and the Environmental Protection Agency for review and comment. We received technical comments from Interior's Assistant Secretary, Policy, Management, and Budget, and from Environmental Protection Agency officials, which we have incorporated as appropriate. In an e-mail received August 27, 2012, the Department of Energy liaison stated the agency had no comments on the report.

As agreed with your offices, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days from the report date. At that time, we will send copies of this report to the appropriate congressional committees, the Secretary of Energy, the Secretary of the Interior, the EPA Administrator, and other interested parties. In addition, the report will be available at no charge on the GAO website at http://www.gao.gov.

If you or your staff members have any questions about this report, please contact me at (202) 512-3841 or ruscof@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made key contributions to this report are listed in appendix IV.

Frank Rusco
Director, Natural Resources and Environment

*List of Requesters*

The Honorable Barbara Boxer
Chairman
Committee on Environment and Public Works
United States Senate

The Honorable Sheldon Whitehouse
Chairman
Subcommittee on Oversight
Committee on Environment and Public Works
United States Senate

The Honorable Benjamin L. Cardin
Chairman
Subcommittee on Water and Wildlife
Committee on Environment and Public Works
United States Senate

The Honorable Henry A. Waxman
Ranking Member
Committee on Energy and Commerce
House of Representatives

The Honorable Edward J. Markey
Ranking Member
Committee on Natural Resources
House of Representatives

The Honorable Diana DeGette
Ranking Member
Subcommittee on Oversight and Investigations
Committee on Energy and Commerce
House of Representatives

The Honorable Robert P. Casey, Jr.
United States Senate

# Appendix I: Scope and Methodology

Our objectives for this review were to determine what is known about (1) the size of shale oil and gas resources in the United States and the amount produced from 2007 through 2011—the years for which data were available—and (2) the environmental and public health risks associated with development of shale oil and gas.

To determine what is known about the size of shale oil and gas resources, we collected data from federal agencies, state agencies, private industry, and academic organizations. Specifically, to determine what is known about the size of these resources, we obtained information for technically recoverable and proved reserves estimates for shale oil and gas from the Energy Information Administration (EIA), the U.S. Geological Survey (USGS), and the Potential Gas Committee—a nongovernmental organization composed of academic and industry officials. We interviewed key officials about the assumptions and methodologies used to estimate the resource size. Estimates of proved reserves of shale oil and gas are based on data provided to EIA by operators. In addition to the estimates provided by these three organizations, we also obtained and presented technically recoverable shale oil and gas estimates from two private organizations—IHS Inc., and ICF International—and one national advisory committee representing the views of the oil and gas industry and other stakeholders—the National Petroleum Council. For all estimates we report, we conducted a review of the methodologies used in these estimates for fatal flaws; we did not find any fatal flaws in these methodologies.

To determine what is known about the amount of produced shale oil and gas from 2007 through 2011, we obtained data from EIA—the federal agency responsible for estimating and reporting this and other energy information. EIA officials provided us with estimated oil and gas production data, including data estimating shale oil and gas estimates from states and two private firms—HPDI, LLC and Lippman Consulting, Inc. To assess the reliability of these data, we examined EIA's published methodology for collecting this information and interviewed key EIA officials regarding the agency's data collection and validation efforts. We also interviewed officials from three state agencies, representatives from five private companies, and researchers from three academic institutions who are familiar with these data and EIA's methodology and discussed the sources and reliability of the data. We determined that these data were sufficiently reliable for the purposes of this report.

To determine what is known about the environmental and public health risks associated with the development of shale oil and gas[1], we identified and reviewed more than 90 studies and other publications from federal agencies and laboratories, state agencies, local governments, the petroleum industry, academic institutions, environmental and public health groups, and other nongovernmental associations. The studies and publications we reviewed included scientific and industry periodicals, government-sponsored research, reports or other publications from nongovernmental organizations, and presentation materials. We identified these studies by conducting a literature search and by asking for recommendations during our interviews with stakeholders. For a number of studies, we interviewed the author or authors to discuss the study's findings and limitations, if any. We believe we have identified the key studies through our literature review and interviews, and that the studies included in our review have accurately identified potential risks for shale oil and gas development. However, given our methodology, it is possible that we may not have identified all of the studies with findings relevant to our objectives, and the risks we present may not be the only issues of concern. The widespread use of horizontal drilling and hydraulic fracturing to develop shale oil and gas is relatively new. Studying the effects of an activity and completing a formal peer-review process can take numerous months or years. Because of the relative short time frame for operations and the lengthy time frame for studying effects, we did not limit the review to peer-reviewed publications.

The risks identified in the studies and publications we reviewed cannot, at present, be quantified, and the magnitude of potential adverse affects or likelihood of occurrence cannot be determined for several reasons. First, it is difficult to predict how many or where shale oil and gas drilling operations may be constructed. Second, operators' use of effective best practices to mitigate risk may vary. Third, based on the studies we reviewed, there are relatively few that are based on evaluating predevelopment conditions to postdevelopment conditions—making it difficult to detect or attribute adverse changes to shale oil and gas development. In addition, changes to the federal, state, and local

---

[1]Operators may use hydraulic fracturing to develop oil and natural gas from formations other than shale. Specifically, coalbed and tight sand formations may rely on these practices, and some studies and publications we reviewed identified risks that can apply to these formations. However, many of the studies and publications we identified and reviewed focused primarily on the development of shale formations.

regulatory environment and the effectiveness in implementation and enforcement will affect operators' future activities. Moreover, risks of adverse events, such as spills or accidents, may vary according to business practices, which in turn, may vary across oil and gas companies making it difficult to distinguish between risks that are inherent to the development of shale oil and gas from risks that are specific to particular business practices.

To obtain additional perspectives on issues related to environmental and public health risks, we interviewed a nonprobability sample of stakeholders representing numerous agencies and organizations. (See app. II for a list of agencies and organizations contacted.) We selected these agencies and organizations to be broadly representative of differing perspectives regarding environmental and public health risks. In particular, we obtained views and information from federal officials from the Department of Energy's National Energy Technical Laboratory, the Department of the Interior's Bureau of Land Management and Bureau of Indian Affairs, and the Environmental Protection Agency; state regulatory officials from Arkansas, Colorado, Louisiana, North Dakota, Ohio, Oklahoma, Pennsylvania, and Texas; tribal officials from the Osage Nation; shale oil and gas operators; representatives from environmental and public health organizations; and other knowledgeable parties with experience related to shale oil and gas development, such as researchers from the Colorado School of Mines, the University of Texas, Oklahoma University, and Stanford University. The findings from our interviews with stakeholders and officials cannot be generalized to those we did not speak with.

We conducted this performance audit from November 2011 to September 2012 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Appendix II: List of Agencies and Organizations Contacted

| Federal Agencies | Congressional Research Service |
|---|---|
| | Department of Energy's National Energy Technology Laboratory |
| | Department of Health and Human Services |
| | Department of the Interior's Bureau of Indian Affairs |
| | Department of the Interior's Bureau of Land Management |
| | Department of the Interior's U.S. Geological Survey |
| | Environmental Protection Agency |
| **State Agencies** | Arkansas Department of Environmental Quality |
| | Arkansas Oil and Gas Commission |
| | Colorado Oil and Gas Conservation Commission |
| | Louisiana Department of Natural Resources |
| | North Dakota Industrial Commission |
| | Ohio Department of Natural Resources |
| | Ohio Environmental Protection Agency |
| | Oklahoma Geological Survey |
| | Oklahoma Corporation Commission |
| | Texas Railroad Commission |
| **Academic Institutions** | Colorado School of Mines |
| | Oklahoma University |
| | Stanford University |
| | University of Texas at Arlington |
| | University of Texas Energy Center and Bureau of Economic Geology |
| **Environmental Organizations** | Clean Water Action Pennsylvania |
| | Earthworks Oil and Gas Accountability Project |
| | Environmental Defense Fund |
| | Subra Consulting |
| | Western Resource Advocates |
| **Public Health Organizations** | The Endocrine Disruption Exchange |
| | National Association of County and City Health Officials |
| | Southwest Pennsylvania Environmental Health Project |
| **Industry** | ALL Consulting |
| | American Exploration and Production Council |
| | American Petroleum Institute |
| | Apache Corporation |

**Appendix II: List of Agencies and
Organizations Contacted**

Chesapeake Energy
Colorado Oil and Gas Association
Devon Energy
Powell Shale Digest

## Others

Ground Water Protection Council
Martin Consulting
Red River Watershed Management Institute
Osage Tribal Nation

# Appendix III: Additional Information on USGS Estimates

The USGS estimates potential oil and gas resources in about 60 geological areas (called "provinces") in the United States. Since 1995, USGS has conducted oil and gas estimates at least once in all of these provinces; about half of these estimates have been updated since the year 2000 (see table 5). USGS estimates for an area are updated once every 5 years or more, depending on factors such as the importance of an area.

**Table 5: USGS Estimates**

| Name of USGS province | Most recent assessment year |
|---|---|
| Northern Alaska | 2006 |
| Central Alaska | 2004 |
| Southern Alaska | 2011 |
| Western Oregon-Wash. | 2009 |
| Eastern Oregon-Wash. | 2006 |
| Northern Coastal | 1995 |
| Sonoma-Livermore | 1995 |
| Sacramento Basin | 2006 |
| San Joaquin Basin | 2004 |
| Central Coastal | 1995 |
| Santa Maria Basin | 1995 |
| Ventura Basin | 1995 |
| Los Angeles Basin | 1995 |
| Idaho-Snake River Downwarp | 1995 |
| Western Great Basin | 1995 |
| Eastern Great Basin | 2004 |
| Uinta-Piceance Basin | 2002 |
| Paradox Basin | 1995 |
| San Juan Basin | 2002 |
| Albuquerque-Sante Fe Rift | 1995 |
| Northern Arizona | 1995 |
| S. Ariz.-S.W. New Mexico | 1995 |
| South-Central New Mexico | 1995 |
| Montana Thrust Belt | 2002 |
| Central Montana | 2001 |
| Southwest Montana | 1995 |
| Hanna, Laramie, Shirley | 2005 |

**Appendix III: Additional Information on USGS Estimates**

| Name of USGS province | Most recent assessment year |
|---|---|
| Williston Basin (includes Bakken Shale Formation) | 2008 |
| Powder River Basin | 2006 |
| Big Horn Basin | 2008 |
| Wind River Basin | 2005 |
| Wyoming Thrust Belt | 2004 |
| Southwestern Wyoming | 2002 |
| Park Basins | 1995 |
| Denver Basin | 2003 |
| Las Animas Arch | 1995 |
| Raton Basin-Sierra Grande Uplift | 2005 |
| Palo Duro Basin | 1995 |
| Permian Basin (includes Barnett Shale) | 2007 |
| Bend Arch-Ft. Worth Basin | 2004 |
| Marathon Thrust Belt | 1995 |
| Western Gulf Coast (includes Eagle Ford Shale) | 2011 |
| East Texas Basin Province | 2011 |
| Louisiana-Mississippi Salt Basins Province | 2011 |
| Florida Peninsula | 2000 |
| Superior | 1995 |
| Cambridge Arch-Central Kansas | 1995 |
| Nemaha Uplift | 1995 |
| Forest City Basin | 1995 |
| Anadarko Basin | 2011 |
| Sedgwick Basin/Salina Basin | 1995 |
| Cherokee Platform | 1995 |
| Southern Oklahoma | 1995 |
| Arkoma Basin | 2010 |
| Michigan Basin | 2005 |
| Illinois Basin | 2007 |
| Black Warrior Basin | 2002 |
| Cincinnati Arch | 1995 |
| Appalachian Basin (includes Marcellus Shale) | 2011 |
| Blue Ridge Thrust Belt | 1995 |
| Piedmont | 1995 |

Source: USGS.

# Appendix IV: GAO Contact and Staff Acknowledgments

| GAO Contact | Frank Rusco, (202) 512-3841 or ruscof@gao.gov |
|---|---|
| **Staff Acknowledgments** | In addition to the contact named above, Christine Kehr, Assistant Director; Lee Carroll; Nirmal Chaudhary; Cindy Gilbert; Alison O'Neill; Marietta Revesz, Dan C. Royer; Jay Spaan; Kiki Theodoropoulos; and Barbara Timmerman made key contributions to this report. |

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's website (www.gao.gov). Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to www.gao.gov and select "E-mail Updates." |
| Order by Phone | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, http://www.gao.gov/ordering.htm. <br><br> Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. <br><br> Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **Connect with GAO** | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. Subscribe to our RSS Feeds or E-mail Updates. Listen to our Podcasts. Visit GAO on the web at www.gao.gov. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact: <br><br> Website: www.gao.gov/fraudnet/fraudnet.htm <br> E-mail: fraudnet@gao.gov <br> Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Katherine Siggerud, Managing Director, siggerudk@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |



Please Print on Recycled Paper.

**United States Government Accountability Office**

# GAO

## Report to Congressional Requesters

**September 2012**

# UNCONVENTIONAL OIL AND GAS DEVELOPMENT

# Key Environmental and Public Health Requirements



**GAO-12-874**



**G A O**
Accountability * Integrity * Reliability

# Highlights

Highlights of GAO-12-874, a report to congressional requesters

# UNCONVENTIONAL OIL AND GAS DEVELOPMENT

## Key Environmental and Public Health Requirements

## Why GAO Did This Study

Technological improvements have allowed the extraction of oil and natural gas from onshore unconventional reservoirs such as shale, tight sandstone, and coalbed methane formations. Specifically, advances in horizontal drilling techniques combined with hydraulic fracturing (pumping water, sand, and chemicals into wells to fracture underground rock formations and allow oil or gas to flow) have increased domestic development of oil and natural gas from these unconventional reservoirs. The increase in such development has raised concerns about potential environmental and public health effects and whether existing federal and state environmental and public health requirements are adequate.

GAO was asked to review environmental and public health requirements for unconventional oil and gas development and (1) describe federal requirements; (2) describe state requirements; (3) describe additional requirements that apply on federal lands; and (4) identify challenges, if any, that federal and state agencies reported facing in regulating oil and gas development from unconventional reservoirs. GAO identified and analyzed federal laws, state laws in six selected states (Colorado, North Dakota, Ohio, Pennsylvania, Texas, and Wyoming), and interviewed federal and state officials and representatives from industry, environmental, and public health organizations.

GAO is not making recommendations. In commenting on the report, agencies provided information on recent regulatory activities and technical comments.

View GAO-12-874. For more information, contact David C. Trimble at (202) 512-3841 or trimbled@gao.gov.

## What GAO Found

As with conventional oil and gas development, requirements from eight federal environmental and public health laws apply to unconventional oil and gas development. For example, the Clean Water Act (CWA) regulates discharges of pollutants into surface waters. Among other things, CWA requires oil and gas well site operators to obtain permits for discharges of produced water—which includes fluids used for hydraulic fracturing, as well as water that occurs naturally in oil- or gas-bearing formations—to surface waters. In addition, the Resource Conservation and Recovery Act (RCRA) governs the management and disposal of hazardous wastes, among other things. However, key exemptions or limitations in regulatory coverage affect the applicability of six of these environmental and public health laws. For example, CWA also generally regulates stormwater discharges by requiring that facilities associated with industrial and construction activities get permits, but the law and its regulations largely exempt oil and gas well sites. In addition, oil and gas exploration and production wastes are exempt from RCRA hazardous waste requirements based on a regulatory determination made by the Environmental Protection Agency (EPA) in 1988. EPA generally retains its authorities under federal environmental and public health laws to respond to environmental contamination.

All six states in GAO's review implement additional requirements governing activities associated with oil and gas development and have updated some aspects of their requirements in recent years. For example, all six states have requirements related to how wells are to be drilled and how casing—steel pipe within the well—is to be installed and cemented in place, though the specifics of their requirements vary. The states also have requirements related to well site selection and preparation, which may include baseline testing of water wells before drilling or stormwater management.

Oil and gas development on federal lands must comply with applicable federal environmental and state laws, as well as additional requirements. These requirements are the same for conventional and unconventional oil and gas development. The Bureau of Land Management (BLM) oversees oil and gas development on approximately 700 million subsurface acres. BLM regulations for leases and permits govern similar types of activities as state requirements, such as requirements for how operators drill the well and install casing. BLM recently proposed new regulations for hydraulic fracturing of wells on public lands.

Federal and state agencies reported several challenges in regulating oil and gas development from unconventional reservoirs. EPA officials reported that conducting inspection and enforcement activities and having limited legal authorities are challenges. For example, conducting inspection and enforcement activities is challenging due to limited information, such as data on groundwater quality prior to drilling. EPA officials also said that the exclusion of exploration and production waste from hazardous waste regulations under RCRA significantly limits EPA's role in regulating these wastes. In addition, BLM and state officials reported that hiring and retaining staff and educating the public are challenges. For example, officials from several states and BLM said that retaining employees is difficult because qualified staff are frequently offered more money for private sector positions within the oil and gas industry.

_____

**United States Government Accountability Office**

# Contents

| Letter | | 1 |
|---|---|---|
| | Background | 5 |
| | Federal Environmental and Public Health Laws Apply to Unconventional Oil and Gas Development but with Key Exemptions | 17 |
| | States in Our Review Implement Additional Requirements and Recently Updated Some Requirements | 47 |
| | Additional Requirements Apply on Federal Lands | 68 |
| | Federal and State Agencies Reported Several Challenges Regulating Unconventional Oil and Gas Development | 77 |
| | Agency Comments and Our Evaluation | 81 |

| Appendix I | Objectives, Scope, and Methodology | 84 |
|---|---|---|

| Appendix II | Key Requirements and Authorities under the Safe Drinking Water Act | 88 |
|---|---|---|
| | Underground Injection Control Program | 88 |
| | Imminent and Substantial Endangerment Authorities | 97 |

| Appendix III | Key Requirements and Authorities under the Clean Water Act | 99 |
|---|---|---|
| | National Pollutant Discharge Elimination System Program | 100 |
| | Oil and Hazardous Substances Spill Prevention, Reporting, and Response | 117 |

| Appendix IV | Key Requirements and Authorities under the Clean Air Act | 126 |
|---|---|---|
| | National Emission Standards for Hazardous Air Pollutants | 129 |
| | New Source Performance Standards | 137 |
| | New Source Review | 142 |
| | Title V Operating Permits | 143 |
| | Source Determinations and Aggregation Issues for Title V and NSR | 145 |
| | Greenhouse Gas Reporting Rule | 147 |
| | Accidental Releases | 149 |
| | EPA Enforcement Authorities | 155 |
| | Imminent and Substantial Endangerment Authority | 155 |

| Appendix V | Key Requirements and Authorities under the Resource Conservation and Recovery Act | 156 |
| | Subtitle C – Hazardous Waste | 156 |
| | Subtitle D – Solid Waste | 165 |
| | Enforcement | 166 |
| | Imminent and Substantial Endangerment Authority | 168 |
| Appendix VI | Key Requirements and Authorities under the Comprehensive Environmental Response, Compensation, and Liability Act | 171 |
| Appendix VII | Key Requirements and Authorities under the Emergency Planning and Community Right-to-Know Act | 179 |
| Appendix VIII | Key Requirements and Authorities under the Toxic Substances Control Act | 188 |
| Appendix IX | Selected State Requirements | 192 |
| Appendix X | Crosswalk between Selected Requirements from EPA, States, and Federal Lands | 225 |
| Appendix XI | Comments from the Department of Agriculture | 229 |
| Appendix XII | Comments from the Department of the Interior | 230 |
| Appendix XIII | GAO Contact and Staff Acknowledgments | 233 |

Tables

Table 1: Potential Waste Management and Disposal Options[a]   14

Table 2: Exemptions or Limitations in Regulatory Coverage for the Oil and Gas Exploration and Production Industry in Six Environmental Laws   44

Table 3: Key EPA Response Authorities Relevant to Oil and Gas Well Sites   46

Table 4: Key Federal Environmental and Public Health Requirements and State Requirements for Oil and Gas Production Wells   48

Table 5: Chemical Disclosure Requirements in Six Selected States   54

Table 6: Surface Agency Roles in Leasing and Permitting Federal Minerals   70

Table 7: Agencies and Organizations Contacted   85

Table 8: Summary of Effluent Limitations Guidelines for Wastewater Discharges from Selected Subcategories of Oil and Gas Wells Located on Land   103

Table 9: Summary of CAA Programs That May Apply to Emissions from Oil and Gas Well Sites   128

Table 10: NSPS for Natural Gas Wells, by Well Subcategory   139

Table 11: Primary State Agencies Responsible for Regulating Oil and Gas Development in Six States   192

Table 12: Selected State Requirements—Siting and Site Preparation   193

Table 13: Selected State Requirements—Drilling, Casing, and Cementing   196

Table 14: Selected State Requirements—Hydraulic Fracturing   202

Table 15: Selected State Requirements—Well Plugging   208

Table 16: Selected State Requirements—Site Reclamation   209

Table 17: Selected State Requirements—Waste Management in Pits   211

Table 18: Selected State Requirements—Waste Management through Underground Injection   216

Table 19: Selected State Requirements—Managing Air Emissions   222

Table 20: Crosswalk between Selected Requirements from EPA, Six States, and Federal Minerals   225

Figures

Figure 1: Conventional and Unconventional Oil and Gas Reservoirs   6

Figure 2: Locations of Unconventional Reservoirs in the United States   7

Figure 3: Well Pad and Freshwater Storage Tanks   9

Figure 4: Horizontal Drilling and Hydraulic Fracturing in an
    Unconventional Shale Formation    11
Figure 5: Hydraulic Fracturing in a Coalbed Methane Formation    12
Figure 6: Potential Sources and Types of Air Emissions from Oil
    and Gas Development    16
Figure 7: Enhanced Recovery and Disposal Wells    19

## Abbreviations

| | |
|---|---|
| APD | application for permit to drill |
| BLM | Bureau of Land Management |
| BTEX | benzene, toluene, ethylbenzene, xylenes |
| CAA | Clean Air Act |
| CAS | Chemical Abstracts Service |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| CWA | Clean Water Act |
| EPA | Environmental Protection Agency |
| EPCRA | Emergency Planning and Community Right-to-Know Act |
| FIFRA | Federal Insecticide, Fungicide, and Rodenticide Act |
| FWS | Fish and Wildlife Service |
| $H_2S$ | hydrogen sulfide |
| HAP | hazardous air pollutant |
| MACT | maximum achievable control technology |
| NAICS | North American Industry Classification System |
| NEPA | National Environmental Policy Act |
| NESHAP | National Emissions Standards for Hazardous Air Pollutants |
| NORM | naturally-occurring radioactive material |
| NPDES | National Pollutant Discharge Elimination System |
| NSPS | New Source Performance Standards |
| NSR | New Source Review |
| OEPA | Ohio Environmental Protection Agency |
| POTW | publicly-owned treatment works |
| PSD | Prevention of Significant Deterioration |
| psi | pounds per square inch |
| RCRA | Resource Conservation and Recovery Act |
| SDWA | Safe Drinking Water Act |
| SIP | state implementation plan |
| SPCC | Spill Prevention, Control, and Countermeasure |
| STRONGER | State Review of Oil and Natural Gas Environmental Regulations |
| TRI | Toxics Release Inventory |
| TSCA | Toxic Substances Control Act |
| UIC | Underground Injection Control |
| VOC | volatile organic compound |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**United States Government Acconntability Office**
**Washington, DC 20548**

September 5, 2012

Congressional Requesters

For decades, the United States has imported oil and natural gas to fuel vehicles and to heat and power homes and businesses. However, improvements in technology have allowed companies that develop petroleum resources to extract oil and natural gas from onshore unconventional reservoirs that were previously considered inaccessible because traditional techniques did not yield sufficient amounts for economically viable production. For purposes of this report, unconventional reservoirs include shale, tight sandstone,[1] and coalbed methane formations. Specifically, advances in horizontal drilling techniques combined with hydraulic fracturing have recently increased domestic production of oil and natural gas from such onshore unconventional reservoirs. These advances, which have taken place over the last several decades, now allow operators—companies that extract oil and natural gas—to accurately determine the location of a drill bit while drilling thousands of feet horizontally. Hydraulic fracturing involves pumping water, sand, and chemical additives into oil and gas wells at high enough pressure to fracture underground rock formations and allow oil or gas to flow. When combined with horizontal drilling, hydraulic fracturing allows operators to fracture the rock formation along the entire horizontal portion of a well, increasing the number of pathways through which oil or gas can flow. According to the Energy Information Administration,[2] oil production from shale formations (shale oil)[3] has increased significantly in several areas of the country, including the

---

[1] Conventional sandstone has well-connected pores, but tight sandstone has irregularly distributed and poorly connected pores. Due to this low connectivity or permeability, gas trapped within tight sandstones is not easily produced.

[2] The Energy Information Administration is the statistical and analytical agency within the Department of Energy that collects, analyzes, and disseminates independent and impartial information on energy issues.

[3] Shale oil differs from "oil shale." Oil shale requires a different process to extract. Specifically, to extract the oil from oil shale, the rock needs to be heated to very high temperatures—ranging from about 650 to 1,000 degrees Fahrenheit—in a process known as retorting. For additional information on oil shale, see GAO, *Energy-Water Nexus: A Better and Coordinated Understanding of Water Resources Could Help Mitigate the Impacts of Potential Oil Shale Development*, GAO-11-35 (Washington, D.C.: Oct. 29, 2010).

**GAO-12-874  Unconventional Oil and Gas Development**

Bakken formation in North Dakota and Montana, where production increased from just over 2,000 barrels per day in 2000 to approximately 500,000 barrels per day in 2012. The Energy Information Administration also projects that natural gas production from shale (shale gas) will account for almost half of domestic production by 2035. According to a 2011 report by the Department of Energy, the recent substantial growth in domestic natural gas production from shale has already brought lower natural gas prices, domestic jobs, and the prospect of enhanced national security.[4]

However, the increase in oil and gas development from unconventional reservoirs has raised concerns about the potential environmental and public health effects of such development.[5] For example, several environmental groups have expressed concerns that this development releases hazardous air pollutants, such as benzene, and may contaminate underground drinking water supplies and surface waters due to spills or faulty well construction. These concerns have raised questions about existing federal and state requirements governing oil and gas development from unconventional reservoirs on both private and federal lands. The Environmental Protection Agency (EPA) administers and enforces key federal laws, such as the Safe Drinking Water Act, the Clean Water Act, and others, that aim to protect human health and the environment. Under these statutes, EPA and its Regional offices work with states that implement aspects of some of these laws, as well as additional state requirements. EPA is also conducting a study, as directed by a congressional committee, to examine the potential effects of hydraulic fracturing on drinking water resources.[6] In addition, federal land management agencies, including the Department of the Interior's Bureau of Land Management (BLM), National Park Service, Fish and Wildlife Service (FWS) and the U.S. Department of Agriculture's Forest Service

---

[4]Department of Energy, Secretary of Energy Advisory Board, *Shale Gas Production Subcommittee 90-Day Report* (Washington, D.C.: 2011)

[5]GAO is conducting a separate and more detailed review of risks associated with shale oil and gas development.

[6]EPA announced in March 2010 that its Office of Research and Development would conduct a study to examine the potential effects of hydraulic fracturing on drinking water resources. According to EPA officials, the agency anticipates issuing a progress report in 2012 and a final report in 2014.

manage federal lands and have responsibilities for oil and gas development.[7]

You asked us to review environmental and public health requirements for oil and gas development from onshore unconventional reservoirs. For such development, this report (1) describes federal environmental and public health requirements; (2) describes state requirements; (3) describes additional requirements that apply on federal lands; and (4) identifies challenges, if any, that federal and state agencies reported facing in regulating oil and gas development from unconventional reservoirs.

To identify federal environmental and public health requirements governing onshore oil and gas development from unconventional reservoirs, we identified and analyzed eight key federal environmental and public health laws and corresponding regulations and guidance. The eight federal environmental and public health laws are: the Safe Drinking Water Act (SDWA); Clean Water Act (CWA); Clean Air Act (CAA); Resource Conservation and Recovery Act (RCRA); Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA); Emergency Planning and Community Right-to-Know Act (EPCRA); Toxic Substances Control Act (TSCA); and Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA). We focused our analysis on federal and state requirements that apply to activities on the well site—the area of land where drilling takes place—and wastes or emissions generated at the well site rather than on downstream infrastructure such as pipelines or refineries. We also analyzed state laws and regulations in a nonprobability sample of six selected states—Colorado, North Dakota, Ohio, Pennsylvania, Texas, and Wyoming. We selected states with current unconventional oil or gas development, as well as those states with large reservoirs of unconventional oil or gas, a variety of types of unconventional reservoirs, differing historical experiences with the oil and gas industry, and significant development on federal lands. Because we used a nonprobability sample, the information that we collected from these states cannot be generalized to all states but can provide illustrative examples. We also reviewed laws, regulations, and guidance governing oil and gas development on federal lands. In addition, we reviewed

---

[7]BLM also manages oil and gas development on American Indian lands, but American Indian lands are outside the scope of this review.

several reports issued by environmental and public health organizations, industry, academic institutions, and government agencies that provided perspectives on federal and state regulations.

To complement our analysis of laws and regulations, we interviewed officials in EPA headquarters and the four Regional offices responsible for overseeing implementation of federal programs in the six selected states; oil and gas and environmental regulators for the six selected states; officials in BLM headquarters and field offices in each of the three selected states with significant amounts of federal land; and officials in Park Service, Forest Service, and FWS headquarters to discuss how federal and state requirements apply to the oil and gas industry and any challenges faced by regulators in implementing these requirements. We also contacted representatives from industry, environmental, and public health organizations regarding federal and state regulatory requirements for unconventional oil and gas development. In addition, we met with company officials to discuss federal and state regulations and visited drilling, hydraulic fracturing, and production sites in Pennsylvania and North Dakota. Oil and gas development may also be subject to local laws and requirements related to water use and withdrawals, but we did not include an analysis of these issues in the scope of our review. We also did not include an analysis of the extent to which federal or state laws and regulations concerning oil and gas development apply on tribal lands, or the extent to which tribal laws may apply. In describing federal and state requirements for oil and gas development from unconventional reservoirs, where it is helpful to further the understanding of the requirements, we provide examples of how these requirements have been applied, but these examples do not attempt to provide a comprehensive view of the extent to which enforcement actions have been taken for any of the requirements. A more detailed description of our objectives, scope, and methodology is presented in appendix I.

We conducted this performance audit from November 2011 to September 2012 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## Background

Oil and gas reservoirs vary in their geological makeup, location, and size. Regardless of the reservoir, unconventional oil and gas development involves a number of activities, many of which are also conducted in conventional oil and gas drilling. This section describes the types and locations of oil and gas reservoirs and the key stages of oil and gas development.

## Types and Locations of Oil and Gas Reservoirs

Oil and natural gas are found in a variety of geologic formations. In conventional reservoirs, oil and gas can flow relatively easily through a series of pores in the rock to the well. Shale and tight sandstone formations generally have low permeability and therefore do not allow oil and gas to easily flow to the well. Shale and tight sandstone formations can occur at varying depths, including thousands of feet beneath the surface. For example, the Bakken shale formation in North Dakota and Montana ranges from 4,500 to 11,000 feet beneath the surface. Coalbed methane formations, often located at shallow depths of several hundred to 3,000 feet, are generally formations through which gas can flow more freely; however, capturing the gas requires operators to pump water out of the coal formation to reduce the pressure and allow the gas to flow. Shale, tight sandstone, and coalbed methane formations are located within basins, which are large-scale geological depressions, often hundreds of miles across, which also may contain other oil and gas resources. There is no clear and consistently agreed upon distinction between conventional and unconventional oil and gas, but unconventional sources generally require more complex and expensive technologies for production, such as the combination of horizontal drilling and multiple hydraulic fractures. See figure 1 for a depiction of conventional and unconventional reservoirs.

**Figure 1: Conventional and Unconventional Oil and Gas Reservoirs**



Sources: U.S. Energy Information Administration and U.S. Geological Survey.

Unconventional reservoirs are located throughout the continental United States on both private lands and federal lands that are administered by BLM, Forest Service, Park Service, and FWS (see fig. 2).[8]

---

[8]Unconventional reservoirs may also be located on tribal lands, but these were outside the scope of our review.

**Figure 2: Locations of Unconventional Reservoirs in the United States**



Source: U.S. Energy Information Administration.

Note: The map for tight sandstone basins is based off Energy Information Administration data for "tight gas," which includes both tight sandstone and tight carbonate formations.

| Activities Associated With Oil and Gas Development | Developing unconventional reservoirs involves a variety of activities, many of which are also conducted in conventional oil and gas drilling.[9] |

*Siting and site preparation.* The operator identifies a location for the well and prepares the area of land where drilling will take place—referred to as a well pad. In some cases, the operator will build new access roads to transport equipment to the well pad or install new pipelines to transport the oil or gas that is produced. In addition, the operator will clear vegetation from the area and may place storage tanks (also called vessels) or construct pits on the well pad for temporarily storing fluids (see fig. 3). In some cases, multiple wells will be located on a single well pad.

---

[9]Prior to beginning these activities, the operator must acquire the necessary leases to gain the right to drill for oil or gas on a particular area of land. Leasing is not discussed here because it is outside the scope of our review; however, aspects of BLM's process for issuing leases that are relevant to environmental requirements are discussed later in this report. In addition, the operator must obtain a permit to drill from applicable federal or state agencies, but the details of the permitting process are not generally within the scope of our review.

**Figure 3: Well Pad and Freshwater Storage Tanks**



Tanks storing freshwater for hydraulic fracturing

Well pad

Source: GAO.

*Drilling, casing, and cementing.* The operator conducts several phases of drilling to install multiple layers of steel pipe—called casing—and cement the casing in place. The layers of steel casing are intended to isolate the internal portion of the well from the outlying geological formations, which may include underground drinking water supplies. As the well is drilled deeper, progressively narrower casing is inserted further down the well and cemented in place. Throughout the drilling process, a special lubricant called drilling fluid, or drilling mud, is circulated down the well to lubricate the drilling assembly and carry drill cuttings (essentially rock fragments created during drilling) back to the surface. After vertical drilling

is complete, horizontal drilling is conducted by slowly angling the drill bit until it is drilling horizontally. Horizontal stretches of the well typically range from 2,000 feet to 6,000 feet long but can be as long as 12,000 feet in some cases.

*Hydraulic fracturing*. Operators sequentially perforate steel casing and pump a fluid mixture down the well and into the target formation at high enough pressure to cause the rock within the target formation to fracture. The sequential fracturing of a well can use between 2 million and 5.6 million gallons of water.[10] Operators add a proppant, such as sand, to the mixture to keep the fractures open despite the large pressure of the overlying rock. About 98 percent of the fluid mixture used in hydraulic fracturing is water and sand, according to a report about shale gas development by the Ground Water Protection Council.[11] The fluid mixture—or hydraulic fracturing fluid—generally contains a number of chemical additives, each of which is designed to serve a particular purpose. For example, operators may use a friction reducer to minimize friction between the fluid and the pipe, acid to help dissolve minerals and initiate cracks in the rock, and a biocide to eliminate bacteria in the water that cause corrosion. The number of chemicals used and their concentrations depend on the particular conditions of the well. After hydraulic fracturing, a mixture of fluids, gases, and dissolved solids flows to the surface (flowback),[12] after which production can begin, and the well is said to have been completed. Operators use hydraulic fracturing in many shale and tight sandstone formations (see fig. 4). Some coalbed methane wells are hydraulically fractured (see fig. 5), but operators may use different combinations of water, sand, and chemicals than with other unconventional wells. In addition, operators must "dewater" coalbed methane formations in order to get the natural gas to begin flowing—a process that can generate large amounts of water.

---

[10]In acquiring this water, operators must comply with applicable state and regional laws or rules regarding water withdrawals, but these are outside the scope of this report.

[11]The Ground Water Protection Council is a nonprofit organization whose members are state groundwater regulatory agencies. Ground Water Protection Council and ALL Consulting. "Modern Shale Gas Development in the United States: A Primer." Prepared for the Department of Energy and National Energy Technology Laboratory. April 2009.

[12]Not all the fluids injected into the well during hydraulic fracturing necessarily flow back to the surface.

**Figure 4: Horizontal Drilling and Hydraulic Fracturing in an Unconventional Shale Formation**



Source: "Groundwater Protection through Proper Well Construction," July 16, 2012, reproduced courtesy of the American Petroleum Institute.

Note: Shale formations can occur at varying depths, including thousands of feet beneath the surface, and according to the American Petroleum Institute, are separated by multiple layers of impervious rock. This figure, which is not to scale, provides a generalized depiction of subsurface geology and well construction; wells may be constructed in a variety of different ways.

**Figure 5: Hydraulic Fracturing in a Coalbed Methane Formation**



Source: Ecova, Inc.

Note: The water pressure within coalbed methane formations forces natural gas to adhere to the coal. Capturing the gas requires operators to pump water out of the coal formation to reduce the pressure, allowing the natural gas to release (desorb) from the surface of the coal, diffuse through micropores, and then flow through coal cleats (natural fracture systems) into the well. This figure depicts one possible configuration of a coalbed methane well, but other configurations, including aboveground pumps, horizontal drilling, different types of casing and cementing, and deeper or shallower coalbed methane formations are also possible.

*Well plugging*. Once a well is no longer producing economically, the operator typically plugs the well with cement to prevent fluid migration from outlying formations into the well and to prevent downward drainage from inside the well. In some cases, wells may be temporarily plugged so that the operator has the option of reopening the well in the future. In some states with a long history of oil and gas development, wells drilled decades ago may not have been properly plugged—or the plug may have deteriorated.

*Site reclamation*. Once the well is plugged, the operator takes steps to restore the site to make it acceptable for specific uses, such as farming. For example, reclamation may involve removing equipment from the well pad, closing pits, backfilling soil, and restoring vegetation.[13] Sometimes, when a well starts production, operators reclaim the portions of a site affected by the initial drilling activity.

*Waste management and disposal*. Throughout the drilling, hydraulic fracturing, and subsequent production activities, operators must manage and dispose of several types of waste. For example, operators must manage produced water, which, for purposes of this report includes flowback water—the water, proppant, and chemicals used for hydraulic fracturing—as well as water that occurs naturally in the oil- or gas-bearing geological formation. Operators temporarily store produced water in tanks or pits, and some operators may recycle it for reuse in subsequent hydraulic fracturing. Options for permanently disposing of produced water vary and may include, for example, injecting it underground into wells designated for such purposes.[14] Operators also generate solid wastes such as drill cuttings and could potentially generate small quantities of hazardous waste. See table 1 for additional methods for managing and disposing of waste.

---

[13]Backfilling is refilling a pit or other area with soil.

[14]We recently issued a report on the quantity, quality, and management of water produced during oil and gas production. See GAO, *Energy-Water Nexus: Information on the Quantity, Quality, and Management of Water Produced during Oil and Gas Production*, GAO-12-156 (Washington, D.C.: Jan. 9, 2012).

**Table 1: Potential Waste Management and Disposal Options[a]**

| | Liquid waste[b] | Solid waste | Hazardous waste |
|---|---|---|---|
| Primary types of waste | • Produced water<br>• Drilling mud | • Drill cuttings<br>• Trash | • Unused hydraulic fracturing chemicals being discarded<br>• Certain other chemical and oily wastes |
| Options for temporary storage | • Tanks or pits | • Tanks or pits | • Tanks |
| Options for reuse | • Recycle for use in future hydraulic fracturing<br>• Irrigation<br>• Roadspreading (used for dust or ice suppression)<br>• Reuse of drilling mud | • Roadspreading of drill cuttings | N/A |
| Options for permanent disposal | • Underground injection well<br>• Discharge to surface water<br>• Commercial treatment facilities<br>• Publicly-owned treatment works | • Solid waste landfill<br>• Bury drill cuttings on or near well pad | • Hazardous waste disposal facility |

Source: GAO.

[a]This table identifies a range of temporary storage and permanent disposal options but may not include all available options. Depending on the region or state, some practices may not be technically feasible or legally permissible. The table lists potential disposal options; in some cases, treatment may be required before disposal.

[b]Liquid wastes may be considered solid or hazardous wastes under applicable law. Liquid wastes are listed separately here because liquid wastes may be managed differently from wastes that are more solid in form.

*Managing air emissions.* Throughout the drilling, hydraulic fracturing, and production activities, operators also are to manage air emissions. There are four key types of air emissions that may occur at oil and gas well sites as follows:

• Criteria pollutants are a set of common air pollutants that include ground level ozone, nitrogen oxides, particulate matter, sulfur dioxide, and carbon monoxide.[15] Ground level ozone is created by chemical reactions between nitrogen oxides and volatile organic compounds and is associated with a wide range of adverse health effects that range from decreased lung function to hospital admissions for

[15]The other criteria pollutant is lead, but it is not commonly associated with oil and gas development.

respiratory causes.[16] Particulate matter is a complex mixture of small particles and liquid droplets, which are linked to a variety of health problems such as cardiovascular and respiratory problems. Nitrogen oxides have been linked to respiratory illness. Short-term exposure to sulfur dioxide is linked to a number of adverse respiratory effects, including the narrowing of airways and increased asthma symptoms. Carbon monoxide can cause harmful health effects by reducing oxygen delivery to the body's organs (like the heart and brain).

- Hazardous air pollutants, such as benzene, are pollutants known or suspected to cause cancer or other serious health effects, such as birth defects, or adverse environmental effects.

- Hydrogen sulfide is a toxic and flammable gas that poses safety and health hazards to workers at the well site.

- Methane is a greenhouse gas that, according to some estimates, is over 20 times more efficient in trapping heat in the atmosphere than carbon dioxide—another greenhouse gas—over a 100-year period.

Emissions related to oil and gas production are from both stationary sources and mobile sources (see fig. 6). Stationary sources include wells, pumps, storage vessels, pneumatic controllers, dehydrators, pits, and flaring.[17] Mobile sources include trucks bringing fuel, water, or supplies to the well site; construction vehicles; and some truck-mounted pumps or engines used for drilling or hydraulic fracturing.

---

[16]Volatile organic compounds are emitted as gases from certain solids or liquids and include a variety of chemicals, some of which may have short- and long-term adverse health effects. Volatile organic compounds are emitted by a wide array of products numbering in the thousands including paints and lacquers, paint strippers, cleaning supplies, and pesticides.

[17]Flaring involves the burning of gas either for safety reasons or because operators do not have the infrastructure to bring the gas to market. For more information on flaring, see GAO, *Federal Oil and Gas Leases: Opportunities Exist to Capture Vented and Flared Natural Gas, Which Would Increase Royalty Payments and Reduce Greenhouse Gases*, GAO-11-34 (Washington, D.C.: Oct. 29, 2010).

**Figure 6: Potential Sources and Types of Air Emissions from Oil and Gas Development**

## Stationary sources



**Well**
**Description:** An oil or gas well may be an emissions source, particularly after hydraulic fracturing as fluids and gases flow back to the surface.
**Potential emissions:** Methane, volatile organic compounds, hydrogen sulfide, and hazardous air pollutants



**Storage vessels**
**Description:** Storage vessels are used to hold a variety of liquids, including crude oil, condensate, and produced water.
**Potential emissions:** Methane, volatile organic compounds, and hazardous air pollutants



**Pneumatic controllers**
**Description:** Automated instruments are used for maintaining conditions, such as liquid level, pressure, and temperature.
**Potential emissions:** Methane, volatile organic compounds, and hazardous air pollutants



**Heater treater**
**Description:** Heater treaters are used to remove water from oil.
**Potential emissions:** Nitrogen oxides and carbon monoxide



**Dehydrator**
**Description:** Dehydration removes water that is entrained in the natural gas stream.
**Potential emissions:** Methane, volatile organic compounds, and hazardous air pollutants



**Pits**
**Description:** Pits are used to store freshwater and/or produced water.
**Potential emissions:** Volatile organic compounds, methane, and hazardous air pollutants



**Flaring**
**Description:** Flaring may be used for safety reasons or, in areas where the primary purpose of drilling is to produce oil, gas may be flared because no local market exists for the gas (pictured here).
**Potential emissions:** Nitrogen oxides, particulate matter, carbon monoxide, carbon dioxide, and sulfur dioxide

## Mobile sources



**On-road diesel engines**
**Description:** Trucks transport materials to and from the well site.
**Potential emissions:** Nitrogen oxides, particulate matter, carbon monoxide, and hazardous air pollutants



**Off-road diesel engines**
**Description:** Compressors and engines are used to drill and hydraulically fracture the well.
**Potential emissions:** Nitrogen oxides, particulate matter, carbon monoxide, and hazardous air pollutants

Sources: GAO; photos from GAO except the pneumatic controllers and dehydrator are from BLM, and the pit is courtesy of www.marcellus-shale.us.

# Federal Environmental and Public Health Laws Apply to Unconventional Oil and Gas Development but with Key Exemptions

Requirements from eight federal laws apply to the development of oil and gas from unconventional sources. In large part, the same requirements apply to conventional and unconventional oil and gas development. There are exemptions or limitations in regulatory coverage for preventive programs authorized by six of these laws, though EPA generally retains its authorities under federal environmental and public health laws to respond to environmental contamination. States may have regulatory programs related to some of these exemptions or limitations in federal regulatory coverage; state requirements are discussed later in this report.

## Eight Federal Environmental and Public Health Laws Apply to Unconventional Oil and Gas Development

Parts of the following eight federal environmental and public health laws apply to unconventional oil and gas development:

- Safe Drinking Water Act (SDWA)

- Clean Water Act (CWA)

- Clean Air Act (CAA)

- Resource Conservation and Recovery Act (RCRA)

- Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA)

- Emergency Planning and Community Right-to-Know Act (EPCRA)

- Toxic Substances Control Act (TSCA)

- Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA)

There are exemptions or limitations in regulatory coverage related to the first six laws listed above. In large part, the same requirements apply to conventional and unconventional oil and gas development. This section discusses each of these laws in brief;[18] for more details about seven of these laws, please see appendixes II through VIII.

---

[18]The National Environmental Policy Act may also apply and is discussed later in this report.

| | |
|---|---|
| **Safe Drinking Water Act** | SDWA is the main federal law that ensures the quality of drinking water.[19] Two key aspects of SDWA that are part of the regulatory framework governing unconventional oil and gas development are the Underground Injection Control (UIC) program and the imminent and substantial endangerment provision. |

### UIC Program

Under SDWA, EPA regulates the injection of fluids underground through its UIC program, including the injection of produced water from oil and gas development. The UIC program protects underground sources of drinking water by setting and enforcing standards for siting, constructing, and operating injection wells. Injection wells in the UIC program fall into six different categories based on the types of fluids being injected. The wells used to manage fluids associated with oil and gas production, including produced water, are Class II wells.[20]

EPA officials estimate there are approximately 151,000 permitted Class II UIC wells in operation in the United States. Two types of wells account for nearly all the Class II UIC wells in the United States (see fig. 7), as follows:

- Enhanced recovery wells inject produced water or other fluids or gases into oil- or gas-producing formations to increase the pressure in the formation and force additional oil or gas out of nearby producing wells. EPA documents estimate that about 80 percent of Class II wells are enhanced recovery wells.

- Disposal wells inject produced water or other fluids associated with oil and gas production into formations that are intended to hold the fluids permanently. EPA documents estimate that about 20 percent of Class II wells are disposal wells.[21]

---

[19]Pub. L. No. 93-523 (1974), codified as amended at 42 U.S.C. §§ 300f–300j-26 (2010).

[20]Other classes of UIC wells are used by other industries. For example, Class I wells are for the injection of hazardous, radioactive, and industrial wastes. Class III wells are used for the injection of fluids as part of mining operations, such as for mining salts or uranium.

[21]A third type of Class II UIC well is a hydrocarbon storage well, which injects liquid hydrocarbons into underground formations, such as salt caverns, which can store the hydrocarbons for later use. EPA estimates there are over 100 hydrocarbon storage wells in use in the United States.

**Figure 7: Enhanced Recovery and Disposal Wells**



Source: EPA.

UIC regulations include minimum federal requirements for most Class II UIC wells; these requirements are generally applicable only where EPA implements the program.[22] For example, for most new Class II UIC wells, an operator[23] must, among other things (1) obtain a permit from EPA or a state, (2) demonstrate that casing and cementing are adequate, and (3) pass an integrity test prior to beginning operation and at least once every 5 years. In addition, when proposing a new Class II UIC well, an operator must identify any existing water or abandoned production or injection wells generally within one-quarter mile of the proposed well. During the life of the Class II UIC well, the operator has to comply with monitoring requirements, including tracking the injection pressure, rate of injection, and volume of fluid injected.

SDWA authorizes EPA to approve by rule a state to be the primary enforcement responsibility—called primacy—for the UIC program, which means that a state assumes responsibility for implementing its program, including permitting and monitoring UIC wells. Generally, to be approved for primacy, state programs must be at least as stringent as the federal program for each of the well classes for which primacy is sought; however, SDWA also includes alternative provisions for primacy related to Class II wells whereby, in lieu of adopting requirements consistent with EPA's Class II regulations, a state can demonstrate to EPA that its program is effective in preventing endangerment of underground sources of drinking water. Five of the six states in our review (Colorado, North Dakota, Ohio, Texas, and Wyoming) have been granted primacy for Class II wells under the alternative provisions. Pennsylvania has not applied for primacy, so EPA directly implements the program there. Please see appendix IX for more information about UIC requirements in the six states in our review.

As discussed, the UIC program regulates the injection of fluids underground. Historically, the UIC program was not used to regulate hydraulic fracturing, even though fracturing entails the injection of fluid underground. In 1994, in light of concerns that hydraulic fracturing of coalbed methane wells threatened drinking water, citizens petitioned EPA

---

[22]See discussion below. According to EPA, some states' UIC requirements for Class II wells are very similar or identical to EPA requirements.

[23]For simplicity, throughout this report we refer to requirements on well operators. In some cases requirements may also apply to well owners.

to withdraw its approval of Alabama's Class II UIC program because the state failed to regulate hydraulic fracturing. The case ended up before the United States Court of Appeals for the Eleventh Circuit, which held that the definition of underground injection included hydraulic fracturing. The court's decision was made in the context of hydraulic fracturing of a coalbed methane formation in Alabama but raised questions about whether hydraulic fracturing would be included in UIC programs nationwide.[24]

In 2005, the Energy Policy Act amended SDWA to specifically exempt hydraulic fracturing from the UIC program, except if diesel fuel is injected as part of hydraulic fracturing. Thus, SDWA as amended continues to authorize regulation of hydraulic fracturing using diesel fuel.[25] EPA officials told us that they do not have data about how frequently companies currently use diesel in hydraulic fracturing.[26] According to EPA officials, EPA recently identified wells for which publicly available data suggest diesel was used in hydraulic fracturing.[27] Since 2005, however, EPA officials said that the agency has not received any permit applications or issued any permits authorizing diesel to be used in hydraulic fracturing. EPA officials also said that they were not aware of any state UIC programs that had issued such permits. EPA headquarters officials said that EPA requires operators conducting hydraulic fracturing operations with diesel fuel to apply for a Class II UIC permit. In May 2012, EPA published draft guidance on how its UIC permit writers should address hydraulic fracturing with diesel in the context of the Class II UIC

---

[24]The court ordered EPA to reconsider its approval of Alabama's program. Legal Environmental Assistance Foundation v. EPA, 118 F.3d 1467, 1478 (11th Cir. 1997).

[25]UIC regulations at the time and now provide that "[a]ny underground injection, except into a well authorized by rule or except as authorized by permit issued under the UIC program, is prohibited." 40 C.F.R. 144.11 (2005) (2011). The Energy Policy Act provision did not exempt injections of diesel fuel during hydraulic fracturing from the definition of underground injection. EPA's position is that underground injection of diesel fuel as part of hydraulic fracturing requires a UIC permit or authorization by rule.

[26]In 2003, EPA entered into a memorandum of agreement with three major fracturing service companies in which the companies voluntarily agreed to eliminate diesel fuel in hydraulic fracturing fluids injected into underground sources of drinking water during hydraulic fracturing of coalbed methane wells.

[27]According to EPA officials, EPA Region 3 has sent letters to the relevant operators who may have used diesel in hydraulic fracturing stating they must apply for a Class II UIC permit if they continue using diesel in hydraulic fracturing.

program. The guidance is directed at EPA permit writers in states where EPA directly implements the program; the guidance does not address state-run UIC programs (including five of the six states in our review). EPA's draft guidance is applicable to any oil and gas wells using diesel in hydraulic fracturing (not just coalbed methane wells). The draft guidance provides recommendations related to permit applications, area of review (for other nearby wells), well construction, permit duration, and well closure.

**Imminent and Substantial Endangerment Authority**

SDWA also gives EPA authority to issue orders when the agency receives information about present or likely contamination of a public water system or an underground source of drinking water that may present an imminent and substantial endangerment to human health. In December 2010, EPA used this authority to issue an emergency administrative order to an operator in Texas alleging that the company's oil and gas production facilities near Fort Worth, Texas, caused or contributed to methane contamination in two nearby private drinking water wells. EPA contended that this methane contamination posed an explosion hazard and therefore was an imminent and substantial threat to human health. EPA's order required the operator to take six actions, specifically: (1) notify EPA whether it intended to comply with the order, (2) provide replacement water supplies to landowners, (3) install meters to monitor for the risk of explosion at the affected homes, (4) conduct a survey of any additional private water wells within 3,000 feet of the oil and gas production facilities, (5) develop a plan to conduct soil and indoor air monitoring at the affected dwellings, and (6) develop a plan to investigate how methane flowed into the aquifer and private drinking water wells. The operator disputed the validity of EPA's order and noted that the order does not provide any way for the company to challenge EPA's findings. Nevertheless, the operator implemented the first three actions EPA listed in the order. In January 2011, EPA sued the operator in federal district court, seeking to enforce the remaining three provisions of the order. In March 2011, the regulatory agency that oversees oil and gas development in Texas held a hearing examining the operator's possible role in the contamination of the water wells and issued an opinion in which it concluded that the operator had not caused the contamination. In March 2012, EPA withdrew the original emergency administrative order, and the operator agreed to continue monitoring 20 private water wells near its production sites for 1 year. According to EPA officials, resolving the lawsuit allows the agency to shift its focus away from litigation and toward a joint EPA-operator effort in monitoring.

For more details about SDWA, please see appendix II.

**Clean Water Act**

To restore and maintain the nation's waters, CWA authorizes EPA to, among other things, regulate pollutant discharges and respond to spills affecting rivers and streams.[28] Several aspects of CWA are applicable to oil and gas well pad sites, but statutory exemptions limit EPA's regulatory authority. Several elements of CWA and implementing regulations are relevant to oil and gas development from onshore unconventional sources. First, the National Pollutant Discharge Elimination System (NPDES) program regulates industrial sites' wastewater and stormwater discharges to waters of the United States (surface waters).[29] Second, spill reporting and spill prevention and response planning requirements pertain to certain threats to U.S. navigable waters and adjoining shorelines.[30] In addition, under certain circumstances, EPA has response authorities; for example, it can generally bring suit or take other actions to protect the public health and welfare from actual or threatened discharges of oil or hazardous substances to U.S. navigable waters and adjoining shorelines.

**NPDES**

EPA's NPDES program limits the types and amounts of pollutants that industrial sites, industrial wastewater treatment facilities, and municipal wastewater treatment facilities (often called publicly-owned treatment works or POTWs) can discharge into the nation's surface waters by requiring these facilities to have and comply with permits listing pollutants and their discharge limits. As required by CWA, EPA develops effluent limitations for certain industrial categories based on available control technologies and other factors to prevent or treat the discharge. EPA established multiple

---

[28]The Federal Water Pollution Control Act Amendments of 1972, Pub. L. No. 92-500, § 2, 86 Stat. 816, codified as amended at 33 U.S.C. §§ 1251-1387 (2011) (commonly referred to as the Clean Water Act).

[29]For the purpose of this document, when we use the term "surface waters" in relation to federal regulation, we refer to waters of the United States, including jurisdictional rivers, streams, wetlands, and other waters. State definitions of the term "surface waters" may differ. EPA officials noted that some surface waters may not be jurisdictional for certain CWA provisions.

[30]The scope of jurisdiction for the section 311 oil spill program is broader than that for the NPDES program. The section 311 oil spill program and the NPDES program both have jurisdiction over navigable waters of the United States; Section 311 also provides jurisdiction over spills of oil or hazardous substances into or on adjoining shorelines or that may affect natural resources of the United States, among others.

subcategories for the oil and gas industry; relevant here are: (1) onshore, (2) agricultural and wildlife water use, and (3) stripper wells—that is, wells that produce relatively small amounts of oil.[31]

For the onshore and agricultural and wildlife water use subcategories, EPA established effluent limitations guidelines for direct dischargers that establish minimum requirements to be used by EPA and state NPDES permit writers. Specifically, the onshore subcategory has a zero discharge limit for discharges to surface waters, meaning that no direct discharges to surface waters are allowed. EPA documents explain that this is because there are technologies available—such as underground injection—to dispose of produced water generated at oil and gas well sites without directly discharging them to surface waters. Given that the NPDES permit limit would be "no discharge," EPA officials said that they were unaware of any instances in which operators had applied for these permits. EPA officials did mention, however, an instance in which an operator discharged produced water to a stream and was fined by EPA under provisions in CWA. For example, in 2011, EPA Region 6 assessed an administrative civil penalty against a company managing an oil production facility in Oklahoma for discharging brine and produced water to a nearby stream. The company ultimately agreed to pay a $1,500 fine and conduct an environmental project, which included extensive soil remediation near the facilities.

Effluent limitations guidelines for the agricultural and wildlife water use subcategory cover a geographical subset of wells in the west[32] in which the quality of produced water from the wells is good enough for watering crops and livestock or to support wildlife in streams. The effluent limitations guideline for this subcategory allows such discharges of produced water for these purposes as long as the water meets a minimum quality standard for oil and grease. EPA officials identified 349 facilities with discharge permits in this subcategory. Officials also stated

---

[31]EPA established additional industrial categories in the oil and gas sector for wells in certain near-shore coastal areas, but effluent limitation guidelines for this category are not discussed here, as this report is focused on onshore unconventional oil and gas production.

[32]Specifically, the agricultural and wildlife water use subcategory includes wells located west of the 98th meridian, which extends from approximately the eastern border of North Dakota south through central Texas.

that individual permits may contain limits for pollutants other than oil and grease.

EPA has not established effluent limitations guidelines for stripper wells, and EPA and state NPDES permit writers currently use their best professional judgment to determine the effluent limits for permits on a case-by-case basis. EPA explained in a 1976 *Federal Register* notice that unacceptable economic impacts would occur if the agency developed effluent limitations guidelines for stripper wells and that the agency could revisit this decision at a later date. In July 2012, EPA officials confirmed that the agency currently has no plans to develop an effluent limitations guideline for stripper wells.

EPA also has not established effluent limitations guidelines for coalbed methane wells and EPA and state NPDES permit writers currently use their best professional judgment to determine the effluent limits for permits on a case-by-case basis. EPA officials explained that the process of extracting natural gas from coalbed methane formations is fundamentally different from traditional oil and gas development, partly because of the large volume of water that must be removed from the coalbed methane formation prior to production. Given these differences, coalbed methane wells are not included in any of EPA's current subcategories. EPA announced in 2011 that, based on a multiyear study of the coalbed methane industry, the agency will develop effluent limitations guidelines for produced water discharges from coalbed methane formations. In the course of developing these guidelines, EPA officials told us that they will analyze the economic feasibility of each of the available technologies for disposing of the large volumes of produced water from coalbed methane wells and that EPA plans to issue proposed guidelines in the summer of 2013.

In addition to setting effluent limitations guidelines for direct discharges of pollutants to surface waters, CWA requires EPA to develop regulations that establish pretreatment standards. These standards apply when wastewater is sent to a POTW before being discharged to surface waters, and the standards must prevent the discharge of any pollutant that would interfere with, or pass through, the POTW. To date, EPA has not set pretreatment standards specifically for produced water, though there are some general requirements; for example, discharges to POTWs cannot cause the POTW to violate its NPDES permit or interfere with the treatment process. In October 2011, EPA announced its intention to develop pretreatment standards specific to the produced water from shale gas development. EPA officials told us that the agency intends to conduct

a survey and use other methods to collect additional data and information to support this rulemaking. Officials expect to publish the first *Federal Register* notice about the survey by the end of 2012 and to publish a proposed rule in 2014.[33]

In addition to CWA's requirement for NPDES permits for discharges from industrial sites, the 1987 Water Quality Act amended CWA to establish a specific program for regulating stormwater discharges, such as those related to rainstorms, though oil and gas well sites are largely exempt from these requirements. EPA generally requires that facilities get NPDES permits for discharges of stormwater associated with industrial and construction activities, but the Water Quality Act of 1987 specifically exempted oil and gas production sites from permit requirements for stormwater discharges, as long as the stormwater was not contaminated by, for example, raw materials or waste products.[34] As a result of this exemption and EPA's implementing regulations, oil and gas well sites are only required to get NPDES permits for stormwater discharges if the facility has had a discharge of contaminated stormwater that includes a reportable quantity of a pollutant or contributes to the violation of a water quality standard.[35] The 2005 Energy Policy Act expanded the language of the exemption to include construction activities at oil and gas well sites, meaning that uncontaminated stormwater discharges from oil and gas construction sites also do not require NPDES permits. So while other industries must generally obtain NPDES permits for construction activities that disturb an acre or more of land, operators of oil and gas well sites are generally not required to do so.

### Spill Reporting and Spill Prevention and Response Planning

CWA prohibits discharges of oil or hazardous substances into U.S. navigable waters or on adjoining shorelines. Specifically, CWA requires facilities—including oil and gas well sites—to report any unpermitted releases of oil or hazardous substances above threshold quantities to the

---

[33]POTWs will be discussed in greater detail later in this report.

[34]The 1987 Water Quality Act also exempted oil and gas processing, treatment, and transmission facilities from permit requirements for stormwater discharges.

[35]EPA has established by regulation threshold amounts of certain pollutants that, if released, trigger reporting requirements; these amounts are known as "reportable quantities." Specifically, the reportable quantities triggering a permit are listed in 40 C.F.R. §§ 117.21, 302.6, 110.6 (2011).

National Response Center, which is managed by the U.S. Coast Guard and serves as the sole federal point of contact for reporting oil and chemical spills in the United States. Oil discharges must be reported if they cause a film or sheen on the surface of the water or shorelines or if they violate water quality standards. The National Response Center shares information about spills with other agencies, including EPA Regional offices, which allows EPA to follow up on reported spills, as appropriate.

CWA also authorized spill prevention and response planning requirements as promulgated in the Spill Prevention, Control, and Countermeasure (SPCC) rule. Facilities that are subject to SPCC rules are required to prepare and implement a plan describing, among other things, how they will control, contain, clean up, and mitigate the effects of any oil discharges that occur. Onshore oil and gas well sites, among others, are subject to this rule if they have total aboveground oil storage capacity greater than 1,320 gallons and could reasonably be expected, based on location, to discharge oil into U.S. navigable waters or on adjoining shorelines.[36] The amount of oil storage capacity at oil and gas well sites tends to vary based on whether the well is being drilled, hydraulically fractured, or has entered production. For example, during drilling at well sites located near these waters, operators generally have to comply with SPCC requirements if fuel tanks for the drilling rig exceed the 1,320 gallon threshold. According to EPA officials, nearly all drill rigs have fuel tanks larger than 1,320 gallons, and so most well sites are subject to the SPCC rule during drilling if they are near these waters. Oil and gas well sites that are subject to the SPCC rule were required to comply by November 2011 or before starting operations.

In accordance with CWA, EPA directly administers the SPCC program rather than delegating authority to states. EPA regulations generally do not require facilities to report SPCC information to EPA, including whether or not they are regulated. As a result, EPA does not know the universe of

---

[36]In addition to having total aboveground oil storage capacity greater than 1,320 gallons, facilities could be required to comply with the SPCC rule if they meet other thresholds, including underground storage capacity of 42,000 gallons, among others.

SPCC-regulated facilities.[37] To ensure that regulated facilities are meeting SPCC requirements, EPA Regional personnel may inspect these facilities to evaluate their compliance. EPA officials said that some of these inspections were conducted as follow-up after spills were reported and that most inspections are conducted during the production phase, since drilling and hydraulic fracturing are of much shorter durations, making it difficult for inspectors to visit these sites during those times. According to EPA officials, Regional personnel inspected 120 oil and gas well sites nationwide in fiscal year 2011 and found noncompliance at 105 of these sites. These violations ranged from paperwork inconsistencies to more serious violations, such as a lack of secondary containment around stored oil or failure to implement an SPCC plan (though EPA officials were unable to specifically quantify the number of more serious violations). EPA officials said that EPA has addressed some of the 105 violations through enforcement actions.

### Imminent and Substantial Endangerment and Release Response Authorities

CWA also provides EPA with authorities to address the discharge of pollutants and to address actual or threatened discharges of oil or hazardous substances in certain circumstances. For example, under one provision, EPA has the authority to address actual or threatened discharges of oil or hazardous substances into U.S. navigable waters or on adjoining shorelines upon a determination that there may be an imminent and substantial threat to the public health or welfare of the United States, by bringing suit or taking other action, including issuing administrative orders that may be necessary to protect public health and welfare. Under another provision, EPA has authority to obtain records and access to facilities, among other things, in order to determine if a person is violating certain CWA requirements. For example, EPA conducted initial investigations in Bradford County, Pennsylvania, following a 2011 spill of hydraulic fracturing and other fluids that entered a stream. Citing

---

[37]See GAO, *Aboveground Oil Storage Tanks: More Complete Facility Data Could Improve Implementation of EPA's Spill Prevention Program*, GAO-08-482 (Washington, D.C.: Apr. 30, 2008). In that report, we found that EPA has information on only a portion of the facilities subject to the SPCC rule, hindering its ability to identify and effectively target facilities for inspection and enforcement. We recommended that EPA analyze the costs and benefits of the options available to EPA for obtaining key data about the universe of SPCC-regulated facilities, including, among others, a tank registration program similar to those employed by some states. EPA has begun taking action on this recommendation.

its authority under CWA and other laws,[38] EPA requested information from the operator about the incident, including information about the chemicals involved and the environmental effects of the spill. Meanwhile, the Pennsylvania Department of Environmental Protection signed a consent order and agreement with the operator in 2012 that required the operator to pay fines and implement a monitoring plan for the affected stream.

For more details about CWA, please see appendix III.

**Clean Air Act**

CAA, a federal law that regulates air pollution from mobile and stationary sources, was enacted to improve and protect the quality of the nation's air.[39] Under CAA, EPA sets national ambient air quality standards for the six criteria pollutants—ground level ozone, carbon monoxide, particulate matter, sulfur dioxide, nitrogen oxides, and lead—at levels it determines are necessary to protect public health and welfare. States then develop state implementation plans (SIP) to establish how the state will attain air quality standards, through regulation, permits, policies, and other means. States must obtain EPA approval for SIPs; if a SIP is not acceptable, EPA may assume responsibility for implementing and enforcing CAA in that state. CAA also authorizes EPA to regulate emissions of hazardous air pollutants, such as benzene. In addition, under CAA, EPA requires reporting of greenhouse gas emissions from a variety of sources, including oil and gas wells.

### Mobile Sources–Criteria Air Pollutants

In accordance with CAA, EPA has progressively implemented more stringent diesel emissions standards to lower the amount of key pollutants from mobile diesel-powered engines since 1984.[40] These standards apply to a variety of on- and off-road diesel-powered engines, including trucks used in the oil and gas industry to move materials to and from well sites and compressors used to drill and hydraulically fracture wells. Diesel

---

[38]Specifically, EPA cited authorities under CWA section 308, as well as under CERCLA and RCRA.

[39]Clean Air Act Amendments of 1970, Pub. L. No. 91-604, 84 Stat. 1676 (1970), codified as amended at 42 U.S.C. §§ 7401-7671q (2011) (commonly referred to as the Clean Air Act).

[40]See GAO, *Diesel Pollution: Fragmented Federal Programs That Reduce Mobile Source Emissions Could Be Improved*, GAO-12-261 (Washington, D.C.: Feb. 7, 2012).

exhaust contains nitrogen oxides and particulate matter. Emissions standards may set limits on the amount of pollution a vehicle or engine can emit or establish requirements about how the vehicle or engine must be maintained or operated, and generally apply to new vehicles. For example, the most recent emissions standards for construction equipment began to take effect in 2008 and required a 95 percent reduction in nitrogen oxides and a 90 percent reduction in particulate matter from previous standards. EPA estimates that millions of older mobile sources—including on-road and off-road engines and vehicles—remain in use. It is projected that over time, older sources will be taken out of use and be replaced by the lower-emission vehicles, ultimately reducing emissions from mobile sources.

### Stationary Sources–Criteria Air Pollutants

New Source Performance Standards (NSPS) apply to new stationary facilities or modifications to stationary facilities that result in increases in air emissions and focus on criteria air pollutants or their precursors.[41] For the oil and gas industry, the key pollutant is volatile organic compounds, a precursor to ground level ozone formation. Prior to 2012, EPA's NSPS were unlikely to affect oil and gas well sites because (1) EPA had not promulgated standards directly targeting well sites[42] and (2) to the extent that EPA promulgated standards for equipment that may be located at well sites, the capacity of equipment located at well sites was generally too low to trigger the requirement. For example, in 1987, EPA issued NSPS for storage vessels containing petroleum liquids; however, the standards apply only to tanks above a certain size, and EPA officials said that most storage tanks at oil and gas sites are below the threshold.

In April 2012, EPA promulgated NSPS for the oil and natural gas production industry which, when fully phased-in by 2015, will require reductions of volatile organic compound emissions at oil and gas well sites, including wells using hydraulic fracturing.[43] Specifically, these new

---

[41]For example, precursors to ground level ozone are nitrogen oxides and volatile organic compounds.

[42]EPA did promulgate standards related to other parts of the oil and gas industry. For example, in 1985, EPA promulgated NSPS that focused on natural gas processing plants, which remove impurities from natural gas to prepare it for use by consumers.

[43]EPA's April 2012 rulemaking also set NSPS for other parts of the oil and natural gas industry, such as for equipment leaks, certain types of compressors, and pneumatic controllers located at natural gas processing plants.

standards are related to pneumatic controllers, well completions, and certain storage vessels as follows:

- *Pneumatic controllers*. According to EPA, when pneumatic controllers are powered by natural gas, they may release natural gas and volatile organic compounds during normal operations. The new standards set limits for the amount of gas (as a surrogate for volatile organic compound emissions) that new and modified pneumatic controllers can release per hour. EPA's regulatory impact analysis for the NSPS estimates that about 13,600 new or modified pneumatic controllers will be required to meet the standard annually; EPA also estimates that the oil and gas production sector currently uses about 400,000 pneumatic controllers.

- *Well completions for hydraulically fractured natural gas wells*. EPA's NSPS for well completions focus on reducing the venting of volatile organic compounds during flowback after hydraulic fracturing. According to EPA's regulatory impact analysis, natural gas well completions involving hydraulic fracturing vent approximately 230 times more natural gas and volatile organic compounds than natural gas well completions that do not involve hydraulic fracturing. The regulatory impact analysis attributes these emissions to the practice of routing flowback of fracture fluids and reservoir gas to a surface impoundment (pit) where natural gas and volatile organic compounds escape to the atmosphere. To reduce the release of volatile organic compounds from hydraulically fractured natural gas wells, EPA's new rule will require operators to use "green completion" techniques to capture and treat flowback emissions so that the captured natural gas can be sold or otherwise used. EPA's regulatory impact analysis for the rule estimates that more than 9,400 wells will be required to meet the new standard annually.[44]

- *Storage vessels*. Storage vessels are used at well sites (and in other parts of the oil and gas industry) to store crude oil, condensate, and produced water. These vessels emit gas and volatile organic compounds when they are being filled or emptied and in association with changes of temperature. EPA's NSPS rule will require storage vessels that emit more than 6 tons per year of volatile organic

---

[44]This estimate includes green completions that are required to occur under the rule, including some that would likely occur voluntarily (e.g., without the rule). EPA estimated that of this total approximately 4,800 such completions would likely occur voluntarily.

compounds to reduce these emissions by at least 95 percent. EPA's regulatory impact analysis for the rule estimates that approximately 300 new storage vessels used by the oil and gas industry will be required to meet the new standards annually. EPA officials said they anticipate that most of these storage vessels will be located at well sites.

### Stationary Sources–Hazardous Air Pollutants

EPA also regulates hazardous air pollutants emitted by stationary sources. In accordance with the 1990 amendments to CAA, EPA does this by identifying categories of industrial sources of hazardous air pollutants and requiring those sources to comply with emissions standards, such as by installing controls or changing production practices. These National Emission Standards for Hazardous Air Pollutants (NESHAP) for each industrial source category include standards for major sources, which are defined as sources with the potential to emit 10 tons or more per year of a hazardous air pollutant or 25 tons or more per year of a combination of pollutants, as well as for area sources, which are sources of hazardous air pollutants that are not defined as major sources. Generally, EPA or state regulators can aggregate emissions from related or nearby equipment to determine whether the unit or facility should be regulated as a major source. However, in determining whether the oil or gas well is a major source of hazardous air pollutants, CAA expressly prohibits aggregating emissions from oil and gas wells (with their associated equipment) and emissions from pipeline compressors or pumping stations.

EPA initially promulgated a NESHAP for oil and natural gas production facilities for major sources in 1999 and promulgated amendments in April 2012. NESHAPs generally identify emissions points that may be present at facilities within each industrial source category. The source category for oil and natural gas production facilities includes oil and gas well sites and other oil and gas facilities, such as pipeline gathering stations and natural gas processing plants. The NESHAP for the oil and natural gas production facilities major source category (or sources) includes emissions points (or sources) that may or may not normally be found at well sites at sizes that would tend to meet the major source threshold. EPA officials in each of the four Regions we contacted were unaware of any specific examples of oil and natural gas wells being regulated as major sources of hazardous air pollutants before the April 2012 amendments. These amendments, however, changed a key definition used to determine whether a facility (such as a well site) is a major source. Specifically, EPA modified the definition of the term "associated equipment" such that emissions from all storage vessels and

glycol dehydrators (used to remove water from gas) at a facility will be counted toward determining whether a facility is a major source. EPA's regulatory impact analysis and other technical support documents for the April 2012 amendments did not estimate how many oil and natural gas well sites would be considered major sources under the new definition.

EPA also promulgated a NESHAP for oil and natural gas production facilities for area sources in 2007. The 2007 area source rule addresses emissions from one emissions point, triethylene glycol dehydrators, which are used to remove water from gas. Triethylene glycol dehydrators can be located at oil and gas well sites or other oil and gas facilities, such as natural gas processing plants. Area sources are required to notify EPA that they are subject to the rule, but EPA does not track whether the facilities providing notification are well sites or other oil and natural gas facilities, so it is difficult to determine to what extent oil and gas well sites are subject to the area source NESHAP.[45]

In addition to specific programs for regulating hazardous air pollutants, CAA establishes that operators of stationary sources that produce, process, store, or handle listed or extremely hazardous substances have a general duty to identify hazards that may result from accidental releases, take steps needed to prevent such releases, and minimize the consequences of such releases when they occur. Methane is one of many hazardous substances of concern due to their flammable properties. Some EPA Regional officials said that they use infrared video cameras to conduct inspections to identify leaks of methane from storage tanks or other equipment at well sites. For example, EPA Region 6 officials said they have conducted 45 inspections at well sites from July 2010 to July 2012 and issued 10 administrative orders related to violations of the CAA general duty clause.[46] EPA headquarters officials said that all well sites are required to comply with the general duty clause but that EPA prioritizes and selects sites for inspections based on risk.

---

[45]In addition to NESHAPs specific to the oil and natural gas production industrial source category, EPA promulgated other NESHAPs that could apply to oil and gas well sites depending on the types of equipment in use and their size. See appendix IV for more details.

[46]EPA Region 6 includes the states of Arkansas, Louisiana, New Mexico, Oklahoma, and Texas.

CAA also requires EPA to publish regulations and guidance for chemical accident prevention at facilities using substances that pose the greatest risk of harm from accidental releases; the regulatory program is known as the Risk Management Program. The extent to which a facility is subject to the Risk Management Program depends on the regulated substances present at the facility and their quantities, among other things. EPA's list of regulated substances and their thresholds for the Risk Management Program was initially established in 1994 and has been revised several times. The regulated chemicals that may be present at oil and gas well sites include components of natural gas (e.g., butane, propane, methane, and ethane). However, a 1998 regulatory determination from EPA provided an exemption for naturally-occurring hydrocarbon mixtures (i.e., crude oil, natural gas, condensate, and produced water) prior to entry into a natural gas processing plant or petroleum refinery; EPA explained at the time that these chemicals do not warrant regulation and that the general duty clause would apply in certain risky situations.[47] Since naturally-occurring hydrocarbons at well sites generally have not entered a processing facility, they are not included in the threshold determination of whether the well site should be subject to the Risk Management Program. EPA officials said that generally, unless other flammable or toxic regulated substances were brought to the site, well sites would not trip the threshold quantities for the risk management regulations. In September 2011, the U.S. Chemical Safety and Hazard Investigation Board (Chemical Safety Board) released a report describing 26 incidents involving fatalities or injuries related to oil and gas storage tanks located at well sites from 1983 through 2010.[48] The report found that these accidents occurred when the victims—all young adults—gathered at rural unmanned oil and gas storage sites lacking fencing and warning signs and concluded that such sites pose a public safety risk. The report also noted that exploration and production storage tanks are exempt from the Risk Management Program requirements of CAA and recommended that EPA publish a safety alert to owners and operators of exploration and

---

[47]In addition, a 1999 law provided an exemption for flammable substances being used as fuel; this exemption applies to any type of facility using fuel. Chemical Safety Information, Site Security and Fuels Regulatory Relief Act, Pub. L. No. 106–40 § 2, 113 Stat 207 (1999).

[48]The Chemical Safety Board is an independent federal agency investigating chemical accidents to protect workers, the public, and the environment. See U.S. Chemical Safety and Hazard Investigation Board, *Investigative Study Final Report: Public Safety at Oil and Gas Storage Facilities*, Report No. 2011-H-1 (September 2011).

production facilities with flammable storage tanks advising them of their CAA general duty clause responsibilities, and encouraging specific measures to reduce these risks.[49] The Chemical Safety Board requested that EPA provide a response stating how EPA will address the recommendation. EPA responded in June 2012, stating its intent to comply with the recommendation.

**Stationary Sources–Greenhouse Gas Reporting**

As of 2012, oil and natural gas production facilities are required to report their greenhouse gas emissions to EPA on an annual basis as described in EPA's greenhouse gas reporting rule. According to EPA documents, oil and gas well sites may emit greenhouse gases, including methane and carbon dioxide, from sources including: (1) combustion sources, such as engines used on site, which typically burn natural gas or diesel fuel, and (2) indirect sources, such as equipment leaks and venting.[50] The greenhouse gas reporting rule requires oil and gas production facilities (defined in regulation as all wells in a single basin that are under common ownership or control) that emit more than 25,000 metric tons of carbon dioxide equivalent at the basin level to report their annual emissions of carbon dioxide, methane, and nitrous oxide from equipment leaks and venting, gas flaring, and stationary and portable combustion. EPA documents estimate that emissions from approximately 467,000 onshore wells are covered under the rule.

For more details about CAA, please see appendix IV.

**Resource Conservation and Recovery Act**

RCRA, passed in 1976, established EPA's authority to regulate the generation, transportation, treatment, storage, and disposal of hazardous wastes.[51] Subsequently, the Solid Waste Disposal Act Amendments of 1980 created a separate process by which oil and gas exploration and

---

[49]The Chemical Safety Board also noted that exploration and production storage tanks are exempt from the security requirements of CWA's spill prevention program.

[50]Other major greenhouse gases covered by EPA's greenhouse gas reporting rule include hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride.

[51]Pub. L. No. 94-580, 90 Stat. 2795 (1976) (amending the Solid Waste Disposal Act, but generally referred to as RCRA), codified as amended at 42 U.S.C. §§ 6901-6992k (2011). RCRA also created a framework in which states are largely responsible for solid (i.e., nonhazardous) waste regulations, including treatment and land disposal of these wastes. State solid waste provisions will be discussed in greater detail later in this report.

production wastes, including those originating within a well, would not be regulated as hazardous unless EPA conducted a study of wastes associated with oil and gas development and then determined that such wastes warranted regulation as hazardous waste, followed by congressional approval of the regulations.[52] EPA conducted the study and, in 1988, issued a determination that it was not warranted to regulate oil and gas exploration and production wastes as hazardous. Based on this EPA determination, drilling fluids, produced water, and other wastes associated with the exploration, development, or production of oil or gas are not regulated as hazardous. According to EPA guidance issued in 2002, these exempt wastes include wastes that come from within the well, as well as wastes generated from field operations.[53] Conversely, wastes generated from other activities at well sites may be regulated as hazardous. For example, discarded unused hydraulic fracturing fluids and painting wastes, among others, may be present at well sites and are "non-exempt," and could be regulated as hazardous, depending on the specific characteristics of the wastes. Facilities that generate more than 100 kilograms (220 pounds) of hazardous waste per month are regulated as generators of hazardous waste and, among other things, are required to have an EPA identification number and to use the RCRA manifest system for tracking hazardous waste.[54] Facilities generating smaller quantities of hazardous waste are not subject to these requirements.[55] EPA headquarters officials said they do not have data on how many well sites may be hazardous waste generators, but that states may have more information about quantities of hazardous wastes at well sites. As such,

---

[52]Specifically, oil and gas exploration and production waste includes drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil or natural gas, among other things.

[53]Field operations include, for example, water separation, demulsifying, degassing, and storage at well sites.

[54]Small quantity generators are those generating between 100 and 1,000 kilograms of hazardous waste per month, and large quantity generators are those generating more than 1,000 kilograms per month. Both small and large quantity generators are required to obtain an EPA identification number and are subject to certain regulations. Facilities generating less than 100 kilograms of hazardous waste per month are considered conditionally exempt small quantity generators provided they meet certain conditions, and if so, do not need to obtain an identification number.

[55]These conditionally exempt small quantity generators are subject to limited generator waste management standards, namely to identify their hazardous waste, comply with storage limit requirements, and ensure waste treatment or disposal in a proper facility.

we asked state officials responsible for waste programs whether they were aware of well sites being classified as small-quantity hazardous waste generators, and officials in all six states we reviewed indicated that they were unaware of well sites having sufficient quantities of hazardous wastes to be subject to those regulations.

In September 2010, the Natural Resources Defense Council submitted a petition to EPA requesting that the agency regulate waste associated with oil and gas exploration and production as hazardous. The petition asserts that EPA should revisit the 1988 determination not to regulate these wastes as hazardous because, among other things, EPA's underlying assumptions concerning the availability of alternative disposal practices, the adequacy of state regulations, and the potential for economic harm to the oil industry are no longer valid. According to EPA officials, the agency is currently reviewing the information provided in the petition but does not have a time frame for responding.

RCRA also authorizes EPA to issue administrative orders, among other things, in cases where handling, treatment, or storage of hazardous or solid waste may present an imminent and substantial endangerment to health or the environment. EPA has used RCRA's imminent and substantial endangerment authorities related to oil and gas well sites. For example, EPA Region 8 issued RCRA imminent and substantial endangerment orders to operators in Wyoming after discovering that pits near oil production sites were covered with oil and posed a hazard to birds.

For more details about RCRA, please see appendix V.

Comprehensive Environmental Response, Compensation, and Liability Act

Congress passed CERCLA in 1980 to protect public health and the environment by addressing the cleanup of hazardous substance releases.[56] CERCLA establishes a system governing the reporting and cleanup of releases of hazardous substances and provides the federal government the authority to respond to actual and threatened releases of hazardous substances, pollutants, and contaminants that may endanger public health and the environment. CERCLA requires operators of oil and gas sites to report certain releases of hazardous substances and gives

---

[56]Pub. L. No. 96-510, 94 Stat. 2767 (1980), codified as amended at 42 U.S.C. §§ 9601-9675 (2012).

EPA authority to respond to certain releases but excludes releases of petroleum (e.g., crude oil and other petroleum products) from these provisions. As previously discussed, releases of petroleum products are covered by CWA if the release threatens U.S. navigable waters or adjoining shorelines. EPA officials identified some instances of petroleum spills in dry areas that did not reach surface waters and explained that EPA had no role related to the investigation or cleanup of these incidents. We identified regulatory provisions in five of six states requiring cleanup of oil spills even if they do not reach surface waters.

For hazardous substances, CERCLA has two key elements relevant for the unconventional oil and gas industry: release reporting and EPA's investigative and response authority. Similar to the requirements to report oil spills under CWA, CERCLA requires operators to report releases of hazardous substances above reportable quantities to the National Response Center. The National Response Center shares information about spills with other agencies, including EPA Regional offices, which allows EPA the opportunity to follow up on reported spills. EPA also has investigative and response authority under CERCLA, including provisions allowing EPA broad access to information and the authority to enter property to conduct an investigation or a removal of contaminated material. EPA has the following authorities, among others:

- *Investigative*. EPA may conduct investigations—including activities such as monitoring, surveying, and testing—in response to actual or threatened releases of hazardous substances or pollutants or contaminants. EPA can also require persons to provide information about alleged releases or threat of release. EPA officials described several instances in which the agency used CERCLA's investigative and information gathering authorities relating to alleged hazardous substance releases from oil and gas well sites. For example, EPA used CERCLA authority to investigate private water well contamination potentially related to nearby shale gas well sites in Dimock, Pennsylvania. In addition, EPA is currently using the same authority to investigate private water well contamination potentially related to tight sandstone well sites in Pavillion, Wyoming.

- *Response*. EPA has the authority to respond to releases of hazardous substances itself and to issue administrative orders requiring a company potentially responsible for a release of hazardous substances, which may pose an imminent and substantial endangerment, to take response actions, as well as to seek relief in a federal court. EPA officials could not provide a recent example where

the agency used this authority to issue an administrative order at a well site, but EPA used the response authority to conduct sampling and to provide temporary drinking water to residents with contaminated wells in Dimock, Pennsylvania.

For more details about CERCLA, please see appendix VI.

**Emergency Planning and Community Right-to-Know Act**

Among other things, EPCRA provides individuals and their communities with access to information regarding storage or release of certain chemicals in their communities.[57] Two provisions of EPCRA—release notification and chemical storage reporting—apply to oil and gas well sites. The release notification provisions require companies that produce, use, or store certain chemicals to notify state and local emergency planning authorities of certain releases that would affect the community.[58] Spills that are strictly on-site would not have to be reported under EPCRA but may still have to be reported to the National Response Center under provisions of CWA or CERCLA. In addition, companies would have to comply with EPCRA's chemical storage reporting provisions, which require facilities storing or using hazardous or extremely hazardous chemicals over certain thresholds to submit an annual inventory report including detailed chemical information to state and local emergency planning authorities and the local fire department.[59] When asked whether oil and gas well sites would commonly trigger EPCRA's release notification and chemical storage reporting requirements, EPA officials said these requirements could be triggered at every well site.

EPCRA also established the Toxics Release Inventory (TRI)—a publicly available database containing information about chemical releases from more than 20,000 industrial facilities—but EPA regulations for the TRI do

---

[57]Pub. L. No. 99-499, 100 Stat. 1728 (1986), codified at 42 U.S.C. §§ 11001–11050 (2012).

[58]Three types of releases must be reported: (1) release of extremely hazardous substances for which notification is also required under CERCLA § 103(c), (2) release of extremely hazardous substances for which notification is not required under CERCLA § 103(c), but above reporting thresholds and subject to additional conditions, and (3) release of other hazardous substances for which notification is also required under CERCLA § 103(c), subject to CERCLA reporting thresholds or 1 pound default threshold. EPCRA § 304(a), 42 U.S.C. §§ 11004(a) (2011).

[59]Specifically, the thresholds are (1) more than 500 pounds or the threshold planning quantity, whichever is lower, of extremely hazardous substances, or (2) more than 10,000 pounds of other hazardous chemicals.

not require oil and gas well sites to report to TRI. Specifically, these provisions of EPCRA generally require certain facilities that manufacture, process, or otherwise use any of more than 600 listed chemicals to report annually to EPA and their respective states on chemicals used above threshold quantities; the amounts released to the environment; and whether they were released into the air, water, or soil. EPCRA specified certain industries subject to the reporting requirement—which did not include oil and gas exploration and development—and also provided authority for EPA to add or delete industries going forward.[60] EPA issued regulations to implement the TRI in 1988 and chose not to change the list of industries subject to the provision at that time. In 1997, EPA promulgated a rule adding seven industry groups to the list of industries required to report releases to the TRI, including coal mining and electrical utilities that combust coal and/or oil.[61] In developing the 1997 rule, EPA considered including oil and gas exploration and production but did not do so because, according to EPA's notice in the *Federal Register* for the final rule, there were concerns about how "facility" would be defined for this industry. At that time, EPA's stated rationale was that the oil and gas exploration and production industry is unique in that it may have related activities over a large geographic area and, while together these activities may involved the management of chemicals regulated by the TRI program, taken at the smallest unit—an individual well—the chemical and other thresholds are unlikely to be met.[62] According to EPA officials, EPA is in the preproposal stage of developing a new rule to add additional industrial sectors into the TRI program but is not planning to include the oil and gas exploration and production industry.[63] EPA officials said that adding oil and gas well sites would likely provide an incomplete picture of

---

[60]In addition to identifying industries, EPCRA specifies that reporting requirements apply to owners or operators of covered facilities: (1) with 10 or more full-time employees and (2) that manufactured, processed, or otherwise used a listed toxic chemical in excess of the reporting threshold during the calendar year.

[61]The complete list of industries added by EPA in 1997 includes metal mining, coal mining, electrical utilities that combust coal and/or oil for the purpose of generating power for distribution in commerce, refuse processing or destruction facilities regulated under RCRA's hazardous waste provisions, chemical wholesalers, petroleum terminals, and bulk stations and solvent recovery services.

[62]Other thresholds include the number of employees at the facility.

[63]Officials said that EPA is also considering steam generation from coal and/or oil, petroleum bulk storage, iron ore mining, phosphate mining, large dry cleaning, and solid waste combustors and incinerators.

the chemical uses and releases at these sites and would, therefore, be of limited utility in providing information to communities.

For more details about EPCRA, please see appendix VII.

**Toxic Substances Control Act**

TSCA authorizes EPA to regulate the manufacture, processing, use, distribution in commerce, and disposal of chemical substances and mixtures.[64] TSCA provides EPA with several authorities by which EPA may assess and manage chemical risks, including the authority to (1) collect information about chemical substances, (2) require companies to conduct testing on chemical substances, and (3) take action to protect adequately against unreasonable risks.[65] TSCA allows chemical companies to assert confidentiality claims on information provided to EPA; if the information provided meets certain criteria, EPA must protect it from disclosure to the public.

EPA maintains a list of chemicals that are or have been manufactured or processed in the United States, called the TSCA inventory. Of the over 84,000 chemicals currently in the TSCA inventory, about 62,000 were already in commerce when EPA began reviewing chemicals in 1979. Since then, EPA has reviewed more than 45,000 new chemicals, of which approximately 20,000 were added to the inventory after chemical companies began manufacturing them. As part of EPA's *Study on the Potential Impacts of Hydraulic Fracturing on Drinking Water Resources*, EPA is currently analyzing information provided by nine hydraulic fracturing service companies, including a list of chemicals used in hydraulic fracturing operations. EPA officials said that they expect most of

[64]Pub. L. No. 94-469, 90 Stat. 2003 (1976), codified as amended at 15 U.S.C. §§ 2601-2692 (2012). TSCA addresses those chemicals manufactured or imported into the United States, but it generally excludes certain substances, such as pesticides, which are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act, and any food, food additive, drug, cosmetic, or device regulated under the Federal Food, Drug, and Cosmetics Act. Hereinafter, references to chemical substances in discussions of TSCA are intended to include mixtures.

[65]These authorities are conditional on EPA making certain findings. For example, prior to requiring testing under section 4, TSCA requires EPA to make findings (1) regarding the risk of injury to health or the environment or regarding human exposure, (2) that existing data are insufficient, and (3) that testing with respect to such effects is necessary to develop needed data. Regarding actions to protect adequately against unreasonable risks, examples of EPA actions include prohibiting or limiting the manufacture, processing, or distribution in commerce of chemical substances or by placing restrictions on chemical uses.

the chemicals disclosed by the service companies to appear on the TSCA inventory list, provided that chemicals are not classified solely as pesticides. EPA officials do not expect to be able to compare the list of chemicals provided by the nine hydraulic fracturing service companies to the TSCA inventory until the release of a draft report of the *Study on the Potential Impacts of Hydraulic Fracturing on Drinking Water Resources* for peer review, expected in late 2014.

In August 2011, EPA received a petition from the environmental group Earthjustice and 114 others asking the agency to exercise TSCA authorities and issue rules to require manufacturers and processors of chemicals used in oil and gas exploration and production to develop and provide certain information to EPA.[66] According to the petition, EPA and the public currently lack adequate information about the health and environmental effects of chemicals used in oil and gas exploration and production, and EPA should exercise its TSCA authorities to ensure that chemicals used in oil and gas exploration and production do not present an unreasonable risk of harm to health and the environment. In a letter to the petitioners, EPA granted the petition in part, stating there is value in beginning a rulemaking process under TSCA to obtain data on chemical substances used in hydraulic fracturing. EPA's letter also stated that the TSCA proposal would focus on providing an aggregate picture of the chemical substances used in hydraulic fracturing, which would complement and not duplicate well-by-well disclosure programs that exist in some states. The letter also indicates that the agency is drafting an Advance Notice of Proposed Rulemaking on this issue. As of August 31, 2012, EPA has not released a publication date for this proposed rulemaking. EPA also intends to convene a stakeholder process to gather additional information for use in developing a proposed rule.

For more details about TSCA, please see appendix VIII.

**Federal Insecticide, Fungicide, and Rodenticide Act**

FIFRA, as amended, mandates that EPA administer pesticide registration requirements and authorizes EPA to regulate the use, sale, and distribution of pesticides to protect human health and preserve the

---

[66]Earthjustice et al., Letter to Lisa P. Jackson, EPA Administrator, re: Citizen Petition under Toxic Substances Control Act Regarding the Chemical Substances and Mixtures Used in Oil and Gas Exploration or Production, Aug. 4, 2011.

environment.[67] FIFRA requires that EPA register new pesticides; pesticide registration is a very specific process that is not valid for all uses of a particular chemical. Instead, each registration describes the chemical and its intended use (i.e., the crops/sites on which it may be applied), and each use must be supported by research data. According to EPA officials, some pesticides registered under FIFRA are used in hydraulic fracturing, and EPA has approved registrations of some pesticides for this purpose. According to a report about shale gas development by the Ground Water Protection Council,[68] operators may use pesticides to kill bacteria or other organisms that may interfere with the hydraulic fracturing process. For example, glutaraldehyde may be used by operators to eliminate bacteria that produce byproducts that cause corrosion inside the well and was reregistered for this purpose by EPA in 2007.[69]

## Exemptions Are Related to Preventive Programs

As discussed above, in six of the eight federal environmental and public health laws identified, there are exemptions or limitations in regulatory coverage related to the oil and gas exploration and production industry (there are two exemptions related to CAA). All of these exemptions are related to programs designed to prevent pollution (see table 2). For example, under CWA, EPA generally requires permits for stormwater discharges at construction sites, which prevents sediment from entering nearby streams. However, the Water Quality Act of 1987 and Energy Policy Act of 2005 largely exempted the oil and gas exploration and production sector from these stormwater permitting requirements. Four of the exemptions are statutory (related to SDWA, CWA, CAA, and CERCLA), and three are related to regulatory decisions made by EPA (related to CAA, RCRA, and EPCRA). States may have regulatory programs related to some of these exemptions or limitations in federal regulatory coverage. For example, although oil and gas exploration and production wastes are not regulated under RCRA as hazardous, which reduces the federal role in management of such wastes, they are

---

[67]The Federal Environmental Pesticide Control Act, Pub. L. No. 92-516, 86 Stat. 973 (1972) (amending FIFRA), codified as amended at 7 U.S.C. §§ 136-136y (2012).

[68]Ground Water Protection Council and ALL Consulting. "Modern Shale Gas Development in the United States: A Primer." Prepared for the Department of Energy and National Energy Technology Laboratory. April 2009.

[69]Glutaraldehyde is also used as a disinfectant for medical and dental equipment, in water treatment systems, and as a preservative.

nonetheless solid wastes. State regulations may govern management of solid waste, and certain EPA regulations address minimum requirements for how solid waste disposal facilities should be designed and operated.

**Table 2: Exemptions or Limitations in Regulatory Coverage for the Oil and Gas Exploration and Production Industry in Six Environmental Laws**

| Law | Description of exemption or limitation in regulatory coverage | Source | Type of program related to exemption or limitation in regulatory coverage | |
|---|---|---|---|---|
| | | | Preventive | Response |
| SDWA | Hydraulic fracturing with fluids other than diesel fuel does not require a UIC permit. | Statutory (2005) | X | |
| CWA | Federal stormwater permits are not required for uncontaminated stormwater at oil and gas construction sites or at oil and gas well sites. | Statutory (1987, 2005) | X | |
| CAA | Emissions of hazardous air pollutants from oil and gas wells and their associated equipment may not be aggregated together or with those of pipeline compressors or pump stations to determine whether they are a major source. | Statutory (1990) | X | |
| | In the Risk Management Program, many naturally-occurring hydrocarbons in oil and gas are not included in the threshold determination of whether a facility should be regulated. | Regulatory/EPA decision (1988) | X | |
| RCRA | Oil and gas exploration and production wastes are not regulated as hazardous waste. | Regulatory/EPA decision (1988) | X | |
| CERCLA | Liability and reporting provisions do not apply to injections of fluids authorized by state law for production, enhanced recovery, or produced water. | Statutory (1980) | X | |
| EPCRA | Oil and gas well operations are not required to report releases of listed chemicals to the TRI. | Regulatory/EPA decision (1997) | X | |

Source: GAO.

Note: In some cases, states may have requirements in these areas. State requirements are discussed in the next section of this report.

The exemptions do not limit the authorities EPA has under federal environmental and public health laws to respond to environmental contamination. Table 3 lists EPA authorities that may be applicable when conditions or events at a well site present particular risk to the environment or human health. As noted throughout this report, EPA has used several of these authorities at oil and gas wells. For example, as discussed above, EPA Region 8 has used RCRA's imminent and substantial endangerment authorities to issue RCRA imminent and substantial endangerment orders to operators in Wyoming after discovering that pits near oil production sites were covered with oil and posed a hazard to birds. Similarly, as discussed above, EPA is using CERCLA's response authority to investigate private water well contamination in Pavillion, Wyoming.

Whether an authority is available depends on requisite conditions being met in a given instance. EPA officials said that, in some instances, response authorities of multiple federal environmental laws could be used to address a threat to public health or the environment. In 2001, EPA and the Department of Justice developed a memo advocating that officials consider the specifics of a situation and use the most appropriate authority.[70] See appendixes II through VI for a more detailed discussion of these authorities.

---

[70]See EPA, Memorandum, Use of CERCLA § 106 To Address Endangerments that May Also Be Addressed Under Other Environmental Statutes, App. A (2001).

**Table 3: Key EPA Response Authorities Relevant to Oil and Gas Well Sites[a]**

| Law | Key response authorities | Situation to which authority may apply |
|---|---|---|
| **Imminent and substantial endangerment and general response authorities** | | |
| SDWA | Imminent and substantial endangerment (§ 1431) | Contaminant present in or likely to enter a public water system or an underground source of drinking water |
| CWA | Imminent and substantial endangerment (§ 504) | Source(s) of pollution, including discharge of pollutant to surface waters |
| | Response authority; imminent and substantial threat (§ 311) | Actual or threatened discharge of oil or hazardous substances into U.S navigable waters or on adjoining shorelines |
| CAA[b] | Imminent and substantial endangerment (§ 112(r)(9)) | Accidental release to the air of regulated substance |
| RCRA | Imminent and substantial endangerment (§ 7003) | Past or present handling, storage, treatment, transportation, or disposal of any solid waste or hazardous waste |
| CERCLA | Response authority (§ 104(a)) | Actual or threatened release of any hazardous substance |
| | Imminent and substantial endangerment (§ 104(a)) | Actual or threatened release of any hazardous substance or pollutant or contaminant (other than petroleum) |
| | Imminent and substantial endangerment (§ 106(a)) | Actual or threatened release of a hazardous substance from a facility[c] |
| **Access, information, and inspection authorities** | | |
| SDWA | Access to records and to inspect facilities (§ 1445(b)) | Persons and facilities subject to UIC program requirements |
| CWA | Access to records and to inspect facilities; require reports (§ 308(a)) | Location of effluent source |
| | Access to records and to inspect facilities; ability to require provision of information (§ 311(m)(2)) | Persons and facilities subject to section 311, such as SPCC program requirements |
| CAA | Access to records; ability to require provision of information (§ 114(a)) | Person who owns or operates any emission source, among others |
| RCRA | Access to records and to inspect facilities (§ 3007) | Persons that have generated, stored, treated, transported, disposed of, or otherwise handled hazardous wastes[d] |
| CERCLA | Access to records and to inspect facilities; ability to require provision of information (§ 104(e)) | Location of actual or threatened release, generation, storage, treatment, or disposal of any hazardous substance or pollutant or contaminant (other than petroleum) |
| TSCA | Access to inspect facilities and onsite records (§ 11) | In relevant part, facilities where chemical substances are manufactured, processed, stored, or held before or after their distribution or sale |

Source: GAO.

[a]The table lists selected EPA authorities that may be applicable when conditions or events at a well site present particular risk to the environment or human health. Whether a particular authority is applicable depends upon the facts of the situation meeting all prerequisite conditions. EPA has other authorities not listed in the table, including the ability to require certain persons to provide information, such as information to aid in developing plans or standards, and the ability to sample emissions or effluent. EPA also has authorities by which it may enforce requirements and address violations of the programs it administers.

[b]In addition, CAA section 303 provides EPA a general imminent and substantial endangerment authority to address emission of air pollutants, where conditions are met.

[c]Generally, CERCLA section 104 authorizes EPA to take various actions to respond to a release, whereas section 106 authorizes EPA to require potentially responsible parties to do so.

[d]EPA interprets this provision of RCRA to include solid waste that EPA reasonably believes may pose a hazard when improperly managed.

## States in Our Review Implement Additional Requirements and Recently Updated Some Requirements

The six states in our review implement additional requirements governing a number of activities associated with oil and gas development. One of the states—Pennsylvania—is also part of the Delaware River Basin Commission—a regional commission that implements additional requirements. All six states have updated some aspects of their requirements in recent years.

### States in Our Review Implement Additional Requirements and Certain Federal Requirements

In addition to implementing and enforcing certain aspects of federal requirements with EPA approval and oversight, the six states in our review implement additional requirements governing a number of activities associated with oil and gas development. State requirements often do not explicitly differentiate between conventional and unconventional development but, in recent years, states have begun to promulgate some requirements that apply specifically to unconventional development. States have regulatory requirements related to a variety of activities involved in developing unconventional reservoirs, including siting and site preparation; drilling, casing, and cementing; hydraulic fracturing; well plugging; site reclamation; waste management and disposal; and managing air emissions. Table 4 compares selected state requirements and related federal environmental and public health requirements; a more comprehensive table is available in appendix X. Several studies noted that development practices and state requirements may vary based on a number of factors, including geology, climate, and the type of resource being developed.[71] We did not assess whether all requirements are appropriate for all states as part of this review.

---

[71]Charles G. Groat, Ph.D. and Thomas W. Grimshaw, Ph.D., *Fact-Based Regulation for Environmental Protection in Shale Gas Development* (Austin, Texas: The Energy Institute, The University of Texas at Austin, February 2012). Ground Water Protection Council and ALL Consulting. "Modern Shale Gas Development in the United States: A Primer." Prepared for the Department of Energy and National Energy Technology Laboratory. April 2009.

**Table 4: Key Federal Environmental and Public Health Requirements and State Requirements for Oil and Gas Production Wells**

| Area of regulation | EPA environmental and public health requirements | Requirements of six states reviewed |
|---|---|---|
| **Siting and site preparation** | | |
| Identification or testing of water wells prior to drilling of production wells | No | 1 of 6 (Wyoming) [identification alone]<br>2 of 6 (Colorado, Ohio) [identification and testing][a] |
| Required setbacks from water sources | No | 5 of 6 (Colorado, North Dakota, Pennsylvania, Ohio, Wyoming) |
| Stormwater permitting | Effectively no[b] | 4 of 6 (Colorado, North Dakota, Pennsylvania, Wyoming) |
| **Drilling, casing, and cementing** | | |
| Requirements relating to cementing/casing plans | No[c] | 6 of 6 |
| Prescribed placement of surface casing relative to groundwater zones | No[c] | 6 of 6 |
| **Hydraulic fracturing** | | |
| Requirements to disclose information on fracturing fluids | No[d] | 6 of 6 |
| **Well plugging** | | |
| Requirements for notification, plugging plan or method, witnessing, and reporting | No | 6 of 6 |
| Programs to plug wells that are not properly plugged and have been abandoned | No | 6 of 6 |
| **Site reclamation** | | |
| Requirements for backfilling, regrading, recontouring, and alleviating compaction of soil | No | 6 of 6 |
| Revegetation requirements | No | 5 of 6 (Colorado, North Dakota, Ohio, Pennsylvania, Wyoming) |
| **Waste management** | | |
| Pit lining requirements | No | 5 of 6 (Colorado, North Dakota, Pennsylvania, Texas, Wyoming) |
| Options for waste disposal: | | |
|     Underground injection | Yes (SDWA) | 5 states have their own requirements (Colorado, North Dakota, Ohio, Texas, Wyoming); EPA implements the program in Pennsylvania |
|     Direct discharge to surface water | Yes (CWA – certain discharges prohibited, others subject to conditions and permit) | Surface discharges are allowed in certain cases in 3 western states (Colorado, Texas, and Wyoming) |

| Area of regulation | EPA environmental and public health requirements | Requirements of six states reviewed |
|---|---|---|
| Requirements for discharge to POTWs or Centralized Waste Treatment (CWT) facilities | Pretreatment standards for shale gas wastewater under development (CWA) | Disposal at POTWs is an option in two states (Ohio, Pennsylvania)[e] |
| | | Disposal at CWT facilities is an option in 3 states (Colorado, Pennsylvania, Wyoming) |
| Recycling or other reuse | Yes (CWA – certain produced water discharges) | 6 of 6 states allow recycling or other reuse |
| Solid waste disposal | Effectively no[f] | Yes |
| Hazardous waste disposal | Effectively no[g] | No |
| **Managing air emissions** | | |
| Requirements for criteria pollutants | Certain CAA provisions apply | 5 of 6 states have permitting or registration programs (Colorado, North Dakota, Ohio, Texas, Wyoming) |
| Requirements for hazardous air pollutants | Certain CAA provisions apply | State permitting or registration programs may address hazardous air pollutants |
| Requirements related to hydrogen sulfide gas | No specific requirements but CAA general duty clause requires prevention of accidental releases | 6 of 6 |
| Requirements related to flaring | Under new NSPS regulation, most hydraulically fractured gas wells must do green completions | 6 of 6 |

Sources: GAO analysis of federal and state laws and regulations.

[a]Testing requirement applies only to certain wells—certain wells near proposed coalbed methane wells in Colorado and wells proposed for urbanized areas or in the vicinity of horizontal wells in Ohio. Pennsylvania does not require operators to identify or test nearby water wells, but state law incentivizes operators to do so by establishing a rebuttable presumption that operators are liable for changes in water quality of certain wells after drilling.

[b]Oil and gas well sites are only required to get permits for stormwater discharges if the facility has had a discharge of contaminated stormwater that includes a reportable quantity of a pollutant or contributes to the violation of a water quality standard, rather than prior to commencing construction or causing discharges.

[c]Generally, federal environmental laws do not have drilling, cementing, or casing requirements related to drilling production wells. However, according to EPA officials, if the well is to be hydraulically fractured with diesel fuel, it is subject to regulation as a Class II well under the SDWA UIC program and may be subject to cementing and casing, as well as plugging, requirements. In May 2012, EPA published draft guidance on how its UIC permit writers should consider hydraulic fracturing with diesel in the context of the Class II UIC program. To date, however, EPA officials are unaware of any wells that were regulated in this way.

[d]Under TSCA, to the extent a hydraulic fracturing fluid is a chemical substance or mixture, manufacturers (including importers), processors, and distributors of such fluids generally would be subject to applicable reporting requirements. Generally, well site operators would not be subject to any such applicable TSCA reporting requirements.

[e]Disposal at a POTW is currently available in Pennsylvania and Ohio, as will be discussed later in this report. We are also aware that the city of Forth Worth, Texas had a pilot program within the last several years under which it accepted flowback for disposal through its POTW, but current information suggests that the city is no longer accepting flowback water.

[f]The existing federal regulations under RCRA solid waste provisions apply to nonhazardous waste disposal facilities and practices, including those involving oil and gas wastes, and prohibit open dumping of solid waste. However, EPA has a limited role in the enforcement of RCRA solid waste provisions.

9Per EPA's 1988 regulatory determination, oil and gas exploration and production wastes—including certain field operations—are not regulated as hazardous. Small amounts of hazardous waste may be at well sites (such as discarded, unused hydraulic fracturing fluids) but we could not identify any instances where these wastes were available in high enough quantities to trigger RCRA requirements.

**Siting and Site Preparation**

All six states we reviewed have state requirements regarding site selection and preparation, though the specifics of their requirements vary. Specifically, states have requirements for baseline testing of water wells, required setbacks from water sources, and stormwater management, among others. For example, three of the six states—Colorado, Ohio, and Pennsylvania—have requirements that encourage or require operators to conduct baseline water testing in certain cases. Colorado requires testing of certain nearby wells when a proposed coalbed methane well is located within a quarter-mile of a conventional gas well or a plugged and abandoned well.[72] In Ohio, baseline water well sampling is required within 1,500 feet of any proposed horizontal well or within 300 feet of any kind of well proposed in an urban area.[73] Pennsylvania does not require baseline testing, but state law presumes operators to be liable for any pollution of water wells within 2,500 feet of an unconventional well that occurs within 12 months of drilling activities, including hydraulic fracturing.[74] Operators in Pennsylvania can defend against this presumption if they have predrilling tests conducted by an independent certified laboratory showing that the pollution predated drilling. State regulators in Pennsylvania said that nearly all companies in Pennsylvania conduct baseline testing of nearby water wells, in many cases up to 4,000 feet from the drilling site.

Five of the six states—Colorado, North Dakota, Ohio, Pennsylvania, and Wyoming—we reviewed have requirements related to setbacks for well sites or equipment from certain water sources. For example, in Ohio, oil

72An abandoned well is a well that is no longer under control of an operator, whether or not it was properly plugged. In Colorado, wells must be tested for all major cations (positively-charged ions) and anions (negatively-charged ions), total dissolved solids, iron, manganese, selenium, nitrates and nitrites, dissolved methane, field pH, sodium adsorption ratio, presence of bacteria (iron related, sulfate reducing, slime, and coliform), specific conductance, and hydrogen sulfide.

73In Ohio, sampling must be conducted in accordance with state guidelines, which require testing for barium, calcium, iron, magnesium, potassium, sodium, chloride, conductivity, pH, sulfate, alkalinity, and total dissolved solids.

74Pennsylvania has a similar provision for conventional wells, which presumes operators to be liable for any pollution of water wells within 1,000 feet of a conventional well that occurs within 6 months of drilling activities.

and gas wells and associated storage tanks generally may not be within 50 feet of a stream, river, or other body of water. In Pennsylvania, unconventional wells may not be drilled within 500 feet of water wells without written owner consent unless the operator cannot otherwise access its mineral rights and demonstrates that additional protective measures will be utilized.[75] In Pennsylvania, there are also setbacks from public water supplies and certain other bodies of water such as springs and wetlands.

Oil and gas operations are generally not subject to certain stormwater permitting requirements under the Clean Water Act, but four of the six states we contacted—Colorado, North Dakota, Pennsylvania, and Wyoming—have their own stormwater permitting requirements. For example, the Wyoming Department of Environmental Quality requires permit coverage for stormwater discharges from all construction activities disturbing 1 or more acres. These permits require the operator to develop a stormwater management program, including best management practices, that can be reviewed by the Wyoming Department of Environmental Quality. In North Dakota, operators must obtain a permit for construction activities that disturb 5 or more acres, and state officials said that nearly all oil and gas drilling projects meet this threshold. This permit also requires the operator to develop a stormwater management program and implement best management practices for managing stormwater, such as using straw bales or dikes to manage water runoff. We did not identify any stormwater permitting requirements for Ohio and Texas, but their state regulations address stormwater in other ways. For example, operators in Ohio are required to comply with the state's best management practices during construction, such as design guidelines for constructing access roads. Texas regulations prohibit operators from causing or allowing pollution of surface water and encourage operators to implement best management practices to minimize discharges, including discharges of sediment during storm events.

States have additional requirements relating to erosion control, site preparation, and surface disturbance minimization. For more details about state siting and site preparation requirements, see appendix IX.

## Drilling, Casing, and Cementing

All of the six states in our review have requirements related to how wells are to be drilled and casing should be installed and cemented in place,

---

[75]For conventional wells in Pennsylvania, the required setback is 200 feet.

though the specifics of their requirements vary. For example, states have different requirements regarding how deep operators must run surface casing to protect groundwater. In Pennsylvania, operators are required to run surface casing approximately 50 feet below the deepest fresh groundwater or at least 50 feet into consolidated rock, whichever is deeper. Generally, the surface casing may not be set more than 200 feet below the deepest fresh groundwater unless necessary to set the casing in consolidated rock.[76] Different casing and cementing requirements apply in Pennsylvania when drilling through coal formations, which state regulators said is common in the southwest part of the state. In Texas, operators are required to run surface casing to protect all usable quality water, as defined by the Texas Commission on Environmental Quality. The depth of the surface casing may be specified in a letter by the commission or in rules specific to a particular oil or gas field, which account for local considerations. In no case may surface casing be set deeper than 200 feet below the specified depth without prior approval from the Texas Railroad Commission, the oil and gas regulator in Texas. Operators in Wyoming are generally required to run surface casing to reach a depth below all known or reasonably estimated usable groundwater as defined in regulations and generally 100 to 120 feet below certain permitted water supply wells within a quarter-mile, but certain coalbed methane wells are exempt from these requirements. Until 2012, Ohio did not specify a depth to which surface casing was required to be set but according to state regulators, the depth of the casing used to protect groundwater was dictated through the permitting process, and regulators and operators were generally following the same casing and cementing requirements for unconventional wells as they would for Class II UIC wells. Ohio adopted new regulations effective August 2012 that generally require operators to run surface casing at least 50 feet below the base of the deepest underground source of drinking water or at least 50 feet into bedrock, whichever is deeper.

Among the six states we contacted, North Dakota and Ohio are the only states with specific casing and cementing provisions for horizontal wells. However, all six states have some requirements—whether through law, regulation, or the permitting process—that generally require operators to provide regulatory officials with information about the vertical and

---

[76]According to state regulators, this maximum surface casing depth requirement prevents fresh and brackish groundwater from commingling behind the same casing, among other things.

horizontal drilling paths. For example, an application for a permit to drill a horizontal well in Wyoming must include information about the vertical and horizontal paths of the well, and operators must provide notice to owners within a half-mile of any point on the entire length of the well. In addition, operators must (1) provide notification and obtain approval from the Wyoming Oil and Gas Conservation Commission before beginning horizontal drilling and (2) file a description of the exact path of the well, known as a directional survey, within 30 days of well completion. North Dakota requires a different permit to drill a horizontal well than it does for a vertical well, and the horizontal permit contains information about the horizontal path of the well.

For more details about state drilling, casing, and cementing requirements, see appendix IX.

## Hydraulic Fracturing

All six states we reviewed have requirements for disclosing the chemicals used in hydraulic fracturing, but the specific requirements vary (see table 5). Four states—Colorado, North Dakota, Pennsylvania, and Texas—require disclosure through the website FracFocus, which is a joint project of the Ground Water Protection Council and the Interstate Oil and Gas Compact Commission.[77] For example, operators that perform hydraulic fracturing in Texas are required to upload certain information to the website FracFocus within 30 days after completion of the well or 90 days after the drilling operation is completed, whichever is earlier. Information required to be uploaded to FracFocus includes, among other things, the operator's name; the date of completion of hydraulic fracturing; the well location; the total volume of water used to conduct fracturing; and chemicals used, including their trade names, suppliers, intended use, and concentration. In Ohio, companies have options as to how to disclose information, including through FracFocus. Wyoming's chemical disclosure requirements were developed prior to the development of FracFocus, and the state does not require operators to disclose information through the website. Among the six states we contacted, Wyoming is the only state

---

[77]FracFocus is the national hydraulic fracturing chemical registry managed by the Ground Water Protection Council and Interstate Oil and Gas Compact Commission. The Ground Water Protection Council is a nonprofit organization whose members consist of state groundwater regulatory agencies, which come together to mutually work toward the protection of the nation's groundwater supplies. The Interstate Oil and Gas Compact Commission is a multistate government agency that works to ensure the nation's oil and natural gas resources are conserved and maximized while protecting health, safety, and the environment.

that requires operators to disclose certain chemical information prior to conducting hydraulic fracturing. Specifically, as part of their application for permit to drill, operators are required to submit information on the chemicals proposed to be used during hydraulic fracturing.

**Table 5: Chemical Disclosure Requirements in Six Selected States**

| Requirements | Colorado | North Dakota | Ohio | Pennsylvania | Texas | Wyoming |
|---|---|---|---|---|---|---|
| Reporting mechanism | FracFocus website | FracFocus website | State website, FracFocus website, or other state approved method | FracFocus website | FracFocus website; state website if FracFocus is unavailable | State agency |
| Timing of disclosure requirement | Information must be disclosed within 60 days following completion of hydraulic fracturing and not later than 120 days after the commencement of hydraulic fracturing. | No timing requirement specified. | Information must be disclosed within 60 days after the completion of drilling or after a determination that a well is a dry or lost hole. | Information must be disclosed within 60 days following the conclusion of hydraulic fracturing. | Information must be disclosed within 30 days after completion of the well or within 90 days after drilling is completed, whichever is earlier. | Information must be disclosed before hydraulic fracturing and within 30 days of completion |
| Protections for confidential information or trade secrets | Yes | None identified[a] | Yes | Yes | Yes | Yes |
| Provisions to challenge trade secrets | None identified[a] | None identified[a] | Yes | None identified[a] | Yes | Yes |
| Provisions for disclosure to health professionals | Yes | None identified[a] | Yes | Yes | Yes | None identified[a] |
| Provisions for disclosure to emergency responders | Yes | None identified[a] | Yes | Yes | Yes | None identified[a] |

Sources: GAO analysis of state requirements.

[a]We reviewed only those requirements specifically related to hydraulic fracturing disclosures. General state requirements related to the protection of confidential business information and protection of trade secrets may apply.

Five of the six states—Colorado, Ohio, Pennsylvania, Texas, and Wyoming—have specific provisions for protecting information on hydraulic fracturing fluids that is claimed as confidential business

information or trade secrets. Four of the six states—Colorado, Ohio, Pennsylvania, and Texas—specifically require that the information must be provided to health professionals for diagnosis or treatment and to certain officials responding to a spill or a release. For example, in Texas, if an operator claims that a chemical is subject to trade secret protection, the chemical family or other similar description must generally be provided. Operators in Texas may not withhold information, including trade secrets, about chemicals used during hydraulic fracturing from health professionals or emergency responders who need the information for diagnostic, treatment, or other emergency response purposes, but health professionals and emergency responders must hold the information confidential except as required for sharing with other health professionals, emergency responders, or accredited laboratories for diagnostic or treatment purposes. Texas' regulations also allow for certain entities—including the owner of the land on which the well is located, an adjacent landowner, and relevant state agencies—to challenge a claim to trade secret protection.

Five of the six states—Colorado, North Dakota, Ohio, Pennsylvania, and Wyoming—have additional requirements specifically related to hydraulic fracturing. For example, Colorado, North Dakota, Ohio, and Wyoming require operators to continuously monitor certain pressure readings during hydraulic fracturing and to notify the state if pressure exceeds a certain threshold. Ohio also requires the suspension of operations when anticipated pressures are exceeded. North Dakota has mechanical integrity requirements specific to hydraulic fracturing, including requirements for specific types of casing, valves, and other equipment, which vary based on different fracturing scenarios. In addition, Colorado, Ohio, Pennsylvania, and Wyoming require operators to notify state regulators prior to conducting hydraulic fracturing, which provides state regulators the opportunity to conduct inspections during the hydraulic fracturing. Colorado requires notice 48 hours prior to conducting hydraulic fracturing, and Ohio and Pennsylvania require notice 24 hours prior. Wyoming does not require a specific period of notice. In Wyoming, benzene, toluene, ethylbenzene, and xylene (BTEX compounds) and petroleum distillates may only be used for hydraulic fracturing with prior authorization from state oil and gas regulators. Pennsylvania law requires

blowout preventers to be used when drilling into an unconventional formation.[78]

For more details about state hydraulic fracturing requirements, see appendix IX.

Well Plugging

All six states in our review have requirements regarding well plugging, such as notifying the state prior to plugging or using specific materials or methods to do so. For example, operators in Colorado must obtain prior approval from state regulators for the plugging method and provide notice of the estimated time and date of plugging. Colorado regulations specify that the material used for the well plugging must be placed in the well in a manner that permanently prevents migration of oil, gas, water, or other substances out of the formation in which it originated. Cement plugs must be a minimum of 50 feet in length and must extend a minimum of 50 feet above each zone to be protected. After plugging the well, operators must submit reports of plugging and abandonment to the Colorado Oil and Gas Conservation Commission and include information specifying the fluid used to fill the wellbore, information about the cement used, date of work, and depth of plugs. In Pennsylvania, operators must follow (1) specific provisions for well plugging based on whether the well is located in a coal area or noncoal area or (2) an alternate approved method. Prior to plugging a well in an area underlain by a workable coal seam, the oil and gas operator must notify the state and the coal company to permit representatives to be present at the plugging.

In addition, all six states have programs to plug wells that were improperly plugged and have been abandoned, though their level of activity varies. For example, state regulators in Texas said that the primary objective of their program, which began in 1983, is to plug abandoned oil and gas wells that are causing pollution or threatening to cause pollution for which a responsible operator does not exist; the responsible operator failed to plug the well; or the responsible operator failed to otherwise bring the wells into compliance. As of 2009, Texas state regulators had plugged 30,000 wells, and approximately 8,000 potentially abandoned wells remained throughout the state. Officials stated, however, that many of

[78]Pennsylvania law defines an unconventional formation as a shale formation existing below a certain geologic interval where natural gas generally cannot be produced economically except by hydraulic fracturing or other specialized techniques. 58 Pa. Cons. Stat. § 2301 (2012).

these abandoned wells may be re-used for development of previously overlooked reservoirs. State regulators in North Dakota said that the number of abandoned wells in the state is very low compared with other states because the state was fairly late to oil and gas development—with major development starting in the 1950s—and that the state had a good tracking system in place during the early days of development. State regulators in North Dakota used funds from its well plugging program to plug two wells in the last year.

For more details about state well plugging requirements, see appendix IX.

Site Reclamation

All six states in our review have requirements for site reclamation, though the extent of the requirements varies. Five states—Colorado, Ohio, North Dakota, Pennsylvania, and Wyoming—have requirements both for backfilling soil and for revegetating areas. For example, in Colorado, final reclamation must generally be complete within 3 months of plugging a well on crop land and within 12 months on noncrop land. Reclamation in Colorado involves returning segregated soil horizons to their original relative positions;[79] returning crop land to its original contour; as near as practicable, returning noncrop land to its original contour to achieve erosion control and long-term stability; and adequately tilling to establish a proper seedbed. In Wyoming, operators must begin reclamation within 1 year of permanent abandonment of a well or last use of a pit and in accordance with the landowner's reasonable requests, or to resemble the original vegetation and contour of adjoining lands. In addition, where practical, topsoil must be stockpiled during construction for use in reclamation. Texas has requirements for contouring soil, but we did not identify requirements for revegetating the area.

For more details about state site reclamation requirements, see appendix IX.

Waste Management and Disposal

All six states in our review have some requirements regarding waste management and disposal, though specific requirements and practices vary across and within states. For example, regulators in Colorado said that the method of waste disposal varies based on the geological formation being exploited and the location of the production well. In some

---

[79] A soil horizon is a layer roughly parallel to the soil surface whose properties and characteristics differ from the layers above and beneath.

parts of the state, they said that the produced water generated is very salty and is therefore generally disposed of in a Class II UIC well. In contrast, in the Raton Basin—a coalbed methane formation near the border with New Mexico—the produced water is of sufficiently good quality that much of it is discharged to surface waters, according to state regulators.

All six states we reviewed have requirements regarding the use of pits for storage of produced water, drill cuttings, and other substances. For example, in North Dakota, a lined pit may be temporarily used to retain solids or fluids generated during activities including well completion, but the contents of the pits must be removed within 72 hours after operations have ceased and must be disposed of at an authorized facility. Pennsylvania requires that certain pits be lined and requires the liners to meet certain permeability, strength, thickness, and design standards; the pit itself must also be constructed so that it will not tear the liner and can bear the weight of the pit contents. In addition, Colorado and Wyoming require pitless drilling systems (tanks) to be used in certain circumstances. For example, Colorado requires pitless drilling systems for produced water from new oil and gas wells within a specified distance of certain drinking water supply areas, and Wyoming requires pitless drilling systems in areas where groundwater is less than 20 feet below the surface.

Underground injection of produced water in Class II UIC wells is a common method of disposal of produced water in five of the six states we reviewed.[80] For example, state regulators in Ohio said that there are 177 Class II UIC disposal wells currently in operation, and 98 percent of the fluid waste from oil and gas wells in Ohio is disposed of in these Class II UIC wells. As noted previously, five out of the six states we reviewed have primary responsibility for regulating injection wells, whereas EPA implements the program in Pennsylvania. The five states in our review that have been granted primacy for their Class II UIC programs obtained it under the alternative provisions in which they demonstrate to EPA that

---

[80]Pennsylvania has five currently operating Class II UIC disposal wells, and produced water generated in Pennsylvania is often recycled or shipped to other states such as Ohio for disposal. Until recently, EPA did not receive many applications for new Class II UIC wells in Pennsylvania. In the last 7 months, however, EPA officials said that they have received five permit applications for Class II UIC disposal wells and expect continued interest in the future.

**Underground Injection and Earthquakes**

From March 2011 to January 2012, 12 earthquakes ranging in magnitude from 2.1 to 4.0 occurred near Youngstown, Ohio. In March 2012, the Ohio Department of Natural Resources reported that "there is a compelling argument" that injection of produced water into nearby Class Ii UIC wells was the cause of the earthquakes. The Ohio Department of Natural Resources then placed a moratorium on injection into five Youngstown area UIC wells and began examining its Class II UIC well permitting process and developing a series of rule changes to help address seismic activity concerns. In July 2012, the Governor of Ohio signed an executive order determining that an emergency exists requiring the immediate adoption of the rule changes.

The National Academy of Sciences released a study in June 2012 that concluded underground injection does pose some risk for induced seismicity, but that very few events have been documented over the past several decades relative to the large number of disposal wells in operation. The study noted that the injected fluid volume, rate, pressure, and proximity to existing faults and fractures are factors that determine the probability to create a seismic event, but effective and economic tools are not currently available to accurately predict induced seismicity prior to injection. The study made research recommendations, proposed actions to address induced seismicity, and suggested that the agency that issues UIC well permits is the most appropriate agency to oversee decisions made with respect to induced seismic events.

their program is effective in preventing endangerment of underground sources of drinking water, in lieu of adopting all Class II UIC requirements in EPA regulations. All states have requirements for Class II UIC wells relating to casing and cementing, operating pressure, mechanical integrity testing, well plugging, and the monitoring and reporting of certain information, among other requirements. For example, North Dakota requires the operators of all new Class II UIC wells to demonstrate the mechanical integrity of the well and requires existing Class II UIC wells to demonstrate continued mechanical integrity at least once every 5 years. In North Dakota, mechanical integrity is demonstrated by showing that there is no significant leak in, for example, the casing; and there is no significant fluid movement into an underground source of drinking water through vertical channels adjacent to the injection well. Texas also requires operators to demonstrate the mechanical integrity of Class II UIC wells generally by conducting specified pressure tests before commencing injection, after conducting maintenance, and every 5 years. With regard to monitoring and reporting, Ohio requires operators to monitor injection pressures and volumes for each disposal well on a daily basis and to report annually on maximum and monthly average pressure and volumes.

Aside from underground injection, there are several other options for disposal of produced water, though the specifics vary across and within states. For example, regulatory agencies issue NPDES permits in Colorado, Texas, and Wyoming for direct discharges to surface waters in certain cases;[81] in doing so, the states must apply, where applicable, EPA's effluent limitations guidelines discussed above. According to state regulators in Wyoming, the state has about 1,000 currently active permits for discharges of produced water from coalbed methane formations and 500 permits for produced water from conventional formations. In contrast, state regulators in North Dakota said that there are no direct surface discharges of produced water in their state because the produced water is too salty.

Some states, such as Colorado and Pennsylvania, also have commercial facilities, which treat produced water before discharging it to surface waters. In addition, disposal to a POTW is an option in Ohio and

---

[81]Texas has not been authorized to issue NPDES permits for activities associated with the exploration, development, or production of oil or gas or geothermal resources. EPA is the NPDES permitting authority for those facilities in Texas.

Pennsylvania, but there have been some recent efforts to restrict such disposal.[82] One concern regarding disposal to POTWs is that these facilities may not have the technology necessary to remove key pollutants, including total dissolved solids, from the waste stream. In 2010, Ohio's Environmental Protection Agency (OEPA) approved a permit modification that allowed a POTW in Warren, Ohio, to accept 100,000 gallons per day of produced water with concentrations of less than 50,000 milligrams per liter of total dissolved solids, which was then diluted and discharged to surface waters.[83] However, the Director of OEPA subsequently issued a determination in 2011 that the permit had been unlawfully issued because Ohio law does not generally permit the disposal of produced water through a POTW.[84] In response, OEPA did not reauthorize the POTW to accept produced water when its NPDES permit came up for renewal in 2012. In July 2012, however, OEPA's decision was reversed by an administrative review commission, which held that the matter was outside of OEPA's jurisdiction. Instead, the power to prohibit disposal to a POTW lies with the Ohio Department of Natural Resources. Accordingly, the commission removed the NPDES permit's prohibition on accepting produced water.[85] Prior to 2011, POTWs in Pennsylvania also accepted produced water from oil and gas well sites. The Pennsylvania Department of Environmental Protection issued administrative orders to POTWs in Pennsylvania requiring, among other things, that the POTWs restrict the volume of oil and gas wastewater they were accepting, evaluate the impacts of oil and gas wastewaters on their treatment process, and submit certain samples of oil and gas wastewater

---

[82]As discussed earlier in this report, EPA sets pretreatment standards that apply when wastewater is sent to a facility—such as an industrial treatment facility or POTW—before being discharged to surface waters. To date, EPA has not set pretreatment standards specifically for produced water, though there is a general requirement that discharges to POTWs cannot cause the POTW to violate its own NPDES permit or interfere with treatment processes.

[83]The federal secondary standard for drinking water is 500 milligrams per liter.

[84]Ohio law provides that, generally, produced water must be disposed of only by underground injection, by surface application, in association with enhanced recovery of oil or gas resources from a well, or by other methods approved by the Chief of the Division of Oil and Gas Resources Management within the Ohio Department of Natural Resources for testing or implementing a new technology or method of disposal. Ohio Rev. Code Ann. § 1509.22(C)(1) (2012). According to OEPA officials, the permit did not involve an approved test or implementation of a new technology or method of disposal.

[85]Patriot Water Treatment, LLC v. Korleski, ERAC case Nos. 156477, 156588, 786501, and 786589 (2012).

accepted for treatment. In addition, the state of Pennsylvania requested that operators of Marcellus shale gas wells stop delivering produced water to POTWs and began revising the POTWs' NPDES permits. State officials later reported that POTWs in Pennsylvania were no longer accepting produced water from the Marcellus shale, and EPA Regional officials said that they believe that POTWs are accepting less produced water.

In addition to permanent disposal of produced water, all six states in our review allow for recycling or other reuses of produced water. For example, according to a 2011 report, over 50 percent of the produced water in Colorado is recycled.[86] In addition, state regulators in Pennsylvania said that the best option for dealing with produced water in the state is recycling, and the Department of Environmental Protection can track what percentage of recycled water was used in hydraulic fracturing based on information required on well completion reports. Approximately 90 percent of produced water in Pennsylvania is recycled, according to state regulators. The Texas Railroad Commission has approved several recycling projects in the Barnett Shale to reduce the amount of fresh water used in development activities there. Four of the six states—Colorado, North Dakota, Ohio, and Wyoming—also allow operators to reuse certain types of fluid waste for road applications. For example, in Ohio, produced water, excluding flowback from hydraulic fracturing, may be used for dust and ice suppression on roads with the approval of local governments; approximately 1 percent of produced water is used in this way. In Wyoming, road and land applications may be permitted as reuses of produced water. North Dakota allows road but not land application of produced water.

Regulatory agencies in all six states implement requirements for the disposal of waste such as drill cuttings. For example, in Colorado, drill cuttings may be buried in pits at the well site, an activity which is regulated by the Colorado Oil and Gas Conservation Commission. Drill cuttings taken off site for disposal at a commercial waste facility must comply with the regulations of the state's Department of Public Health and Environment that govern those facilities. Texas allows drill cuttings to be landfarmed on the well site where they were generated with the written permission of the

---

[86]State Review of Oil and Natural Gas Environmental Regulations, Inc., *Colorado Hydraulic Fracturing State Review* (Oklahoma City, OK: 2011).

surface owner of the site if they were obtained using drilling fluids with a chloride concentration of 3,000 milligrams per liter or less.[87] Texas allows on-site burial of drill cuttings that were obtained using drilling fluids with a chloride concentration in excess of 3,000 milligrams per liter. In North Dakota, operators frequently bury drill cuttings on-site where the North Dakota Industrial Commission's Oil and Gas Division has authority but, in some cases, the drill cuttings may be disposed of at a landfill under the jurisdiction of the Department of Health due to shallow groundwater or permeable subsoil.

As discussed earlier in this report, officials in the six states we reviewed were not aware of any oil or gas well sites that would be regulated as small-quantity generators of hazardous waste under RCRA. Pursuant to RCRA, regulation of waste that is not considered hazardous is largely a state responsibility. Some states have special categories of waste and associated additional requirements that apply to industrial wastes generally, or oil and gas wastes specifically. For example, waste from crude oil and natural gas exploration and production in North Dakota is called special waste. Special waste landfills must be permitted and comply with specific design standards. Currently, there are four special waste landfills in North Dakota with another five proposed special waste landfills at the beginning stages of the permitting process. State regulators said that special waste consists mostly of drill cuttings but can also include other things such as contaminated soil. In Pennsylvania, oil and gas waste falls into a category of waste called residual waste that applies to, among other things, certain wastes from industrial, mining, or agricultural operations. Residual waste disposal must be permitted and is subject to processing and storage rules.

All six states in our review have requirements for managing and disposing of wastes, such as oilfield equipment, drilling solids, and produced water that have been exposed to or contaminated with naturally-occurring

---

[87]Landfarming is a method of treatment and disposal of low toxicity wastewater that involves spreading and mixing the wastewater into the soils to promote reduction of organic constituents and dilution and attenuation of metals. According to the Texas Railroad Commission, landfarming uses the physical, chemical, and biological capabilities of the soil-plant system to control waste migration and to provide a safe means of disposal without impairing the potential of the land for future use.

radioactive material (NORM) or technologically-enhanced NORM.[88] NORM occurs naturally in some geologic formations that also contain oil or gas and when NORM is brought to the surface during drilling and production, it remains in drill cuttings and produced water and, under certain conditions, creates scales or deposits on pipes or other oilfield equipment. Officials at the Colorado Department of Public Health and Environment said that they set tiers for how to manage materials that contain NORM based on their level of radioactivity. In addition, they said that the department is working with the Colorado Oil and Gas Conservation Commission to require operators to perform certain tests on produced water before allowing produced water to be used for road application. Texas officials said that the state requires operators to identify NORM-contaminated equipment with the letters "NORM" by securely attaching a clearly visible waterproof tag or marking with a legible waterproof paint or ink. In addition, Texas requires operators to dispose of oil and gas NORM waste by methods that are specifically authorized by rule or specifically permitted. State regulators in Wyoming said that a lot of NPDES permits for direct discharges to surface waters have limits on radioactivity that would probably lead the operator to dispose of produced water contaminated with NORM in a Class II UIC well.

For more details about states waste management and disposal requirements, see appendix IX.

## Managing Air Emissions

Five of the six states we reviewed have permitting or registration requirements for managing air emissions from oil and gas production sites. In addition, all six states have requirements related to venting and flaring of gas and limiting or managing emissions of hydrogen sulfide—a hazardous and deadly gas—at drilling sites.

Five of the six states we reviewed —Colorado, North Dakota, Ohio, Texas, and Wyoming—have developed permitting or registration requirements that apply to oil and gas development. For example, according to state regulators, the vast majority of production wells in Colorado require air permits. Operators with certain condensate tanks and tank batteries are required to obtain a permit if the tanks have uncontrolled actual emissions of volatile organic compounds greater than or equal to 2 tons per year in areas which are not attaining certain air

---

[88]Technologically-enhanced NORM is produced when activities associated with oil and gas development concentrate or expose radioactive materials that occur naturally in soils, water, or other natural materials.

quality standards (nonattainment areas) or greater than or equal to 5 tons per year in an attainment area. As part of the permit requirements, operators in nonattainment areas must reduce emissions of volatile organic compounds by 90 percent from uncontrolled actual emissions during certain times of the year, and by 70 percent during other times, and reduce emissions by 90 percent for dehydration systems. In Ohio, an operator meeting certain requirements must obtain an air permit that lists each source of emissions; all applicable rules that apply to the sources, including federal and state requirements; operational restrictions; monitoring; recordkeeping; reporting; and testing requirements. Wyoming officials noted that oil and gas facilities are subject to general state permitting requirements but did not identify any permitting requirements specific to air emissions from oil and gas development. In Wyoming, state regulators have worked with industry to achieve voluntary reductions from mobile sources in certain parts of the state that may soon not meet air quality standards for ozone. Specifically, officials at the Wyoming Department of Environmental Quality said that they have asked operators in certain areas to agree to implement voluntary reductions in volatile organic compounds and nitrogen oxides and to install controls on diesel engines on mobile drilling rigs; regulators then include these requirements in the air permit issued to the operator. North Dakota and Texas also have permitting or registration requirements, and Pennsylvania is in the process of developing an inventory for oil and gas emissions information.

All six states have some requirements for flaring excess gas encountered during drilling and production, which may otherwise pose safety hazards and contribute to emissions. For example, operators in Pennsylvania who encounter excess gas during drilling or hydraulic fracturing must capture the excess gas, flare it, or divert it away from the drilling rig in a manner that does not create a hazard to public health and safety. According to state regulators in Wyoming, the Oil and Gas Conservation Commission has jurisdiction for flaring prior to production when the primary concern with flaring is safety. For flaring that occurs after production has begun, the Department of Environmental Quality requires 98 percent combustion efficiency.

All six states have safety requirements to limit and manage emissions of hydrogen sulfide—a hazardous and deadly gas—at drilling sites. For example, in Texas, operators are subject to detailed requirements in areas where exposure to hydrogen sulfide could exceed a certain threshold if a release occurred, taking into consideration whether the area of potential exposure includes any public areas such as roads. Requirements relate to posting warning signs, using fencing, maintaining

protective breathing equipment at the well site, installing a flare line and a suitable method for lighting the flare, and conducting training. In some cases, hydrogen sulfide requirements overlap with flaring requirements. For example, flares used for treating gas containing hydrogen sulfide in North Dakota must be equipped and operated with an automatic ignitor or a continuous burning pilot, which must be maintained in good working order, including flares that are used for emergency purposes only.

For more details about state requirements for managing air emissions, see appendix IX.

## Regional Commission Implements Additional Requirements

One of the states in our review—Pennsylvania—is also part of a regional commission that implements additional requirements governing several aspects of natural gas development. Specifically, the Delaware River Basin Commission is a regional body whose members include the governors of Delaware, New Jersey, New York, Pennsylvania, as well as the U.S. Army Corps of Engineers' Division Engineer for the North Atlantic Division. The commission regulates water quantity and quality within the basin, which spans approximately 13,500 square miles.[89]

In December 2010, the Delaware River Basin Commission published draft Natural Gas Development Regulations, which are currently under consideration for adoption, and the commission will not issue any permits for shale gas wells within the basin until the final regulations have been adopted. The draft regulations propose a number of requirements related to the protection of certain landscapes and waters and how to handle wastewater generated by natural gas development. For example, the proposed regulations require that produced water stored on the well pad be kept in enclosed tanks. In addition, operators of treatment and/or discharge facilities proposing to accept natural gas wastewater would be required to provide the commission with information on the contents of the proposed discharge and submit a study showing that the proposed discharge could be adequately treated. Natural gas well operators would also be required to have natural gas development plans for projects that exceed certain thresholds for acreage or number of wells. According to commission officials, the natural gas development plans would allow the

---

[89]The Susquehanna River Basin Commission—located partially in Pennsylvania—also regulates water withdrawals but not water quality in the context of oil or gas development and therefore was not included in our review.

commission to consider the cumulative impacts of development from numerous well pads, associated roads, and pipeline infrastructure, and to minimize and mitigate disturbance on lands most critical to water resources, such as core forests and steep slopes. The plans will also help protect water resources for approximately 15 million people, including residents of New York City and Philadelphia.

## States Have Recently Updated Some Requirements

All six states in our review have updated some aspects of their requirements in recent years. Key examples include the following:

- Colorado made extensive amendments to its oil and gas regulations in 2008, which included, among other things, restrictions on locating wells near drinking water sources, measures to manage stormwater, and requirements to consult with the Colorado Division of Wildlife in certain cases to minimize adverse impacts on wildlife. According to state officials, these regulatory updates served three primary purposes: (1) address the growing impacts of increased oil and gas development; (2) implement state legislation passed in 2007 directing the Colorado Oil and Gas Conservation Commission to work with the Colorado Department of Public Health and Environment and the Colorado Division of Wildlife to update its regulations; and (3) update existing rules to enhance clarity, respond to new information, and reflect current practices and procedures.

- In 2012, North Dakota implemented 26 rule changes, including the requirement for operators to drain pits and properly dispose of their contents within 72 hours after well completion, servicing, or plugging operations have ceased. According to state officials, this change was implemented in response to a number of pit overflows that occurred during the spring melt in 2010 and 2011.

- In 2012, Ohio adopted new oil and gas well construction regulations to implement state legislation passed in 2010. The new regulations include casing and cementing requirements and requirements to disclose the chemicals used in hydraulic fracturing.

- Pennsylvania passed legislation in 2012 which, among other things, requires unconventional wells to be sited at greater setback distances from existing buildings and water wells than was previously required for all wells and requires chemical disclosure through FracFocus. In addition, the new legislation increases the distance from which an

operator of an unconventional well may be presumed liable in the event of pollution of nearby water wells from 1,000 feet to 2,500 feet.

- The Texas Commission on Environmental Quality updated its air emissions regulations for oil and gas facilities in 2011, including emissions limitations for nitrogen oxide and volatile organic compounds. Texas officials told us that changes included requirements for operators to install controls on stationary compressor engines and storage tanks. In addition, operators in the Dallas-Fort Worth area have agreed to voluntarily reduce emissions of volatile organic compounds by replacing pneumatic valves with no-bleed or low-bleed valves which helps to address nonattainment issues in the area while also reducing emissions of hazardous air pollutants. Texas also adopted a regulation in December 2011 regarding chemical disclosure requirements in order to implement state legislation passed several months earlier.

- In 2010, Wyoming updated its chemical disclosure requirements. According to state regulators, operators were always required to provide notification to the Wyoming Oil and Gas Conservation Commission before conducting hydraulic fracturing, but recent regulatory changes clarified these requirements and also added detailed requirements on what information was required to be disclosed.

In the last 3 years, Colorado, Ohio, and Pennsylvania volunteered to have parts of their regulations reviewed by the State Review of Oil and Natural Gas Environmental Regulations (STRONGER) program, which is administered by the Ground Water Protection Council and brings together state, industry, and environmental stakeholders to review state oil and gas environmental regulations and make recommendations for improvement. Ohio and Pennsylvania have made regulatory changes that reflect STRONGER's recommendations. For example, STRONGER completed a review of Pennsylvania's regulations in September 2010. The review team commended the state for encouraging baseline groundwater testing in the vicinity of wells but also recommended that the state consider whether the testing radius should be expanded to take into account the horizontal portions of fractured wells. As discussed above, in 2012, Pennsylvania passed legislation that increases the distance from which an operator of an unconventional well may be presumed liable in the event of pollution of nearby water wells from 1,000 feet to 2,500 feet.

State regulators said that the addition was in response to the state's September 2010 STRONGER review and the Governor's Marcellus Shale Advisory Commission.[90] State regulators are also considering additional regulatory changes in response to the remaining recommendations of the Governor's Marcellus Shale Advisory Board.

# Additional Requirements Apply on Federal Lands

Federal land management agencies, including the Bureau of Land Management (BLM), Forest Service, National Park Service, and Fish and Wildlife Service (FWS) manage federal lands for a variety of purposes. Specifically, both the Forest Service and BLM manage their lands for multiple uses, including oil and gas development; recreation; and provision of a sustained yield of renewable resources, such as timber, fish and wildlife, and forage for livestock. By contrast, the Park Service manages its lands to conserve the scenery, natural and historical objects, and wildlife so they remain unimpaired for the enjoyment of present and future generations. Similarly, FWS manages national wildlife refuges for the benefit of current and future generations, seeking to conserve and, where appropriate, restore fish, wildlife, plant resources, and their habitats.

Each of these agencies imposes additional requirements for oil and gas development on its lands to meet its obligations with respect to its mission. These additional federal requirements are the same for conventional and unconventional oil and gas development. In some cases, the surface rights to a piece of land and the right to extract oil and gas—called mineral rights—are owned by different parties. For example, private mineral rights might underlie lands where the surface is managed by a federal agency. Requirements for developing mineral rights vary based on whether the mineral rights are owned by the federal government or by a private entity.

---

[90]The purpose of the Pennsylvania Governor's Marcellus Shale Advisory Commission was to develop a comprehensive, strategic proposal for the responsible and environmentally sound development of the Marcellus Shale. Its membership consisted of the Lieutenant Governor, who served as the chair, and appointees chosen by the Governor and representing, among other things, the interests of environmental, conservation, industry, local and state government groups.

## Requirements for Federally Owned Mineral Rights

Requirements for operators developing federally owned mineral rights are imposed by federal agencies during planning and leasing processes carried out by federal agencies. Operators must also meet specific requirements during several of the activities involved in oil and gas development.

### Planning and Leasing Processes

BLM has primary authority for issuing leases and permits for federal oil and gas resources even in cases when surface lands are managed by other federal agencies or owned by private landowners. The majority of federal oil and gas leases underlie lands managed by BLM or the Forest Service, but there are some federal oil and gas resources available for leasing under lands managed by other federal agencies or private landowners.[91] Altogether, BLM oversees oil and gas development on approximately 700 million subsurface acres.

A first step in developing federal oil and gas resources is a planning phase, involving BLM and (for lands managed by the Forest Service) the Forest Service, to identify areas for potential leasing. Under the National Environmental Policy Act (NEPA), federal agencies are required to prepare a detailed statement on the environmental impacts of any "major federal action," if it would significantly affect the environment.[92] Regulations implementing NEPA generally require an agency to prepare

---

[91]BLM has also issued leases that underlie lands managed by the Park Service and FWS. These lands are generally not available for oil and gas development except in special circumstances. For example, FWS lands may be leased if an oil and gas operation outside of FWS lands is draining federal minerals under the FWS land. For the Park Service, small portions of three units of the National Park system are also open to federal mineral leasing based on their enabling legislation: Glen Canyon National Recreation Area, Lake Mead National Recreation Area, and Whiskeytown National Recreation Area. Currently, there are no parcels under lease in these areas. In order for oil and gas development to occur in these areas, the National Park system regional director must consent to the lease and permit, and can do so only upon determination that the activity permitted will not have significant adverse effect upon the resources or administration of the unit. (43 C.F.R. § 3109.2(b)). Three other units have a total of 16 wells under leases predating these policies.

[92]Pub. L. No. 91-190 (1970), codified as amended at 42 U.S.C. §§ 4321-4347 (2012).

either an environmental assessment or environmental impact statement.[93] After the planning process, BLM takes the lead in preparing the NEPA analysis for leases when the surface lands are managed by BLM or owned by a private landowner (see table 6). For Forest Service lands, the Forest Service takes the lead in preparing the NEPA analysis and coordinates with BLM so that BLM's subsequent leasing decision can be supported by the same analysis. At both agencies the NEPA review focuses on how the sale of leases may affect the environment and public health and, according to BLM officials, often includes mitigation measures that ultimately become stipulations on leases and permits for that tract of federal land. After the environmental impact statement is completed, BLM sells the lease to an operator through an auction or by other means.

**Table 6: Surface Agency Roles in Leasing and Permitting Federal Minerals**

| Surface land management agency | Availability for oil and gas development | Role in approving leases | Role in approving drilling permits |
|---|---|---|---|
| BLM | Generally available[a] | BLM is primary authority for approving leases | BLM is primary authority for approving drilling permits |
| Forest Service | Generally available[b] | Coordinates with BLM regarding surface issues and must authorize the lease | Forest Service must approve all surface disturbing activities before BLM approves the drilling permit. |
| Private Landowner | Generally available | No specific role; may participate in public comment process | Operator generally must reach agreement with surface landowner regarding surface disturbances. |

Source: GAO.

[a]Some lands managed by BLM are unavailable for leasing because they have been withdrawn from leasing through congressional action or by agency regulation or, according to BLM officials, because they are being managed for other uses.

[93]Agencies may prepare an environmental assessment—a concise public document—that provides sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact. An environmental impact statement is a more detailed statement than an environmental assessment, and NEPA implementing regulations specify requirements and procedures—such as providing the public with an opportunity to comment on the draft document. An environmental impact statement must, among other things, (1) describe the environment that will be affected, (2) identify alternatives to the proposed action and identify the agency's preferred alternative, (3) present the environmental impacts of the proposed action and alternatives, and (4) identify any adverse environmental impacts that cannot be avoided should the proposed action be implemented. The environmental impact statement or environmental assessment may also be used to document that the proposed leasing action is in compliance with other federal laws, including the National Historic Preservation Act (intended to preserve historic and archeological sites) and the Endangered Species Act (intended to protect threatened and endangered species).

[b]Some lands managed by the Forest Service are unavailable for leasing because they have been withdrawn through congressional action or by agency regulation. For example, the Wyoming Range (1.2 million acres) in western Wyoming and the Valle Vidal (100,000 acres) in New Mexico are both unavailable for leasing. In addition, 58.5 million acres of Inventoried Roadless Areas are indirectly unavailable in that construction or reconstruction of roads is not allowed, essentially making these areas inaccessible, according to Forest Service officials.

After acquiring a lease for the development of federal oil and gas, an operator is required to submit an application for permit to drill (APD) for individual wells to BLM. According to BLM officials, the APD is a comprehensive plan for drilling and related activities, which is approved by BLM. Prior to permit issuance for the proposed drilling activity, BLM is required to document that needed reviews under NEPA have been conducted. According to officials, at this step BLM conducts site-specific NEPA analysis, often drawing on the previous NEPA analysis conducted prior to the lease sale, but supplemented with more specifics about the proposed well site and related facilities, such as access roads or pipelines. The environmental review may also identify mitigation measures that could be used to reduce the environmental effects of drilling. The APD includes two key components: (1) the drilling plan, which describes the plan for drilling, casing, and cementing the well; and (2) the surface use plan of operations, which describes surface disturbances, such as road construction to the well pad and installation of any needed pipelines or other infrastructure. BLM is responsible for reviewing and approving the APD as a whole but gets input from the surface land management agency regarding the surface use plan of operations. For example, the Forest Service is responsible for review and approval of the surface use plan of operations component of the APD. After reviewing the operator's APD, BLM approves the APD, often by attaching conditions of approval and requiring the operator to take mitigation measures as described in the environmental review or recommended by the surface land management agency. Once the APD is approved, and any state or local approvals are obtained, the operator can begin work.

BLM has overall responsibility for ensuring compliance with approved APDs but coordinates with other surface land management agencies as appropriate. According to BLM officials, BLM is responsible for inspections and enforcement related to drilling operations, including running tests on casing and cementing. In addition, BLM officials said that they coordinate with surface land management agencies regarding surface conditions. Forest Service officials said that the Forest Service is responsible for conducting inspections relative to surface uses authorized by the surface use plan of operations. These officials said that if Forest

Service personnel note possible noncompliance related to drilling or production operations, they notify and coordinate with BLM. Similarly, officials said that, if BLM conducts an inspection and notices potential violations of the surface use plan of operations, they contact the Forest Service.

**Requirements Related to Oil and Gas Development Activities**

Operators of wells accessing federal oil and gas also face requirements related to activities involved in oil and gas development. Specifically, these requirements are related to siting and site preparation; drilling, casing, and cementing; well plugging; site reclamation; waste management and disposal; and managing air emissions. Requirements are as follows:

- *Siting and site preparation*. BLM requires an operator to identify all known oil and gas wells within a 1-mile radius of the proposed location. BLM does not require baseline testing of groundwater near the proposed well site. BLM generally prohibits an operator from conducting operations in areas highly susceptible to erosion, such as floodplains or wetlands, and recommends that operators avoid steep slopes and consider temporarily suspending operations when weather-related conditions, such as freezing or thawing ground, would cause excessive impacts.

- *Drilling, casing, and cementing*. As discussed above, operators must submit detailed drilling plans as part of their APD. The drilling plan must be sufficiently detailed for BLM to appraise the technical adequacy of the proposed project and must include, among other things: (1) geologic information about the formations that the operator expects to encounter while drilling; (2) whether these formations contain oil, gas, or useable water and, if so, how the operator plans to protect such resources; (3) a proposed casing plan, including details about the size of the casing and the depths at which each layer of casing will be set; (4) the estimated amount and type of cement to be used in the well; and (5) a description of any horizontal drilling that is planned.

- *Well plugging*. Operators are required to provide notice to and get approval from BLM prior to plugging a well and to comply with specific technical standards in plugging the well.

- *Site reclamation*. Operators describe their plans for reclamation in the surface use plan of operations submitted as part of the APD. BLM requires operators to return the disturbed land to productive use. All well pads, pits, and roads must be reclaimed and revegetated. Interim

and final reclamation generally must be completed within 6 months of the well entering production and being plugged, respectively.

- *Waste management and disposal*. In the surface use plan of operations, operators must describe the methods and locations proposed for safe disposal of wastes, such as drill cuttings, salts, or chemicals that result from drilling the proposed well. The description must also include plans for the final disposition of drilling fluids and any produced water recovered from the well.

- *Managing air emissions*. For operations in formations that could contain hydrogen sulfide, BLM requires a hydrogen sulfide operations drilling plan, which describes safety systems that will be used, such as detection and monitoring equipment, flares, and protective equipment for essential personnel.[94]

In some cases, BLM and states may regulate similar activities; in such cases, operators must comply with the more stringent regulation. For example, North Dakota state requirements allow the use of pits only for short-term storage of produced water. BLM generally allows the use of pits for longer-term storage of produced water, but operators cannot do so on federal lands in North Dakota due to state requirements. See appendix X for a comparison of federal environmental requirements, state requirements, and additional requirements that apply on federal lands.

BLM recently proposed new requirements for oil and gas development on federal lands. Specifically, in May 2012, BLM proposed regulations that update and add to its current requirements related to hydraulic fracturing. As proposed, these regulations would require operators of wells under federal leases to (1) publicly disclose the chemicals they use in hydraulic fracturing; (2) take certain steps to ensure the integrity of the well, including complying with certain cementing standards and confirming through mechanical integrity testing that wells to be hydraulically fractured meet appropriate construction standards; and (3) develop plans for managing produced water from hydraulic fracturing and store flowback water from hydraulic fracturing in a lined pit or a tank. According to BLM officials, BLM's proposed rule is intended to improve stewardship and operational efficiency by establishing a uniform set of standards for

---

[94]BLM and the Forest Service also include air quality impacts in the NEPA analysis conducted for leasing and permitting actions.

hydraulic fracturing on public lands. According to BLM officials, a final rule is expected in the fall of 2012.

## Requirements for Privately Owned Mineral Rights under Federal Surface Lands

Subject to some restriction, owners of mineral rights that underlie federal lands have the legal authority to explore for oil and gas and, if such resources are found, to develop them.[95] Federal land management agencies' authorities to control the surface impacts of drilling for privately owned minerals underlying federal lands vary based on a variety of factors, including which federal agency is responsible for managing the surface lands.[96]

According to BLM officials, private mineral owners seeking to develop oil and gas would need to obtain a right-of-way grant from BLM for any surface disturbance, including the well pad, but otherwise BLM has limited authority over the private owners' use and occupancy of the BLM-managed surface lands. Officials said that BLM would have the same rights as a private surface owner under state law to hold a mineral rights owner to "reasonable surface use." BLM officials explained that BLM would perform a NEPA analysis prior to issuing the right-of-way grant. According to officials, the agency applies its general regulations for granting rights of way, but BLM did not have specific guidance regarding oversight of private mineral operations on BLM lands.

According to Forest Service officials, Forest Service authority related to the development of privately owned minerals is limited because private mineral owners have the legal right to develop such resources. The

[95] In implementing requirements on the development of private mineral rights, agencies must consider the potential applicability of the Fifth Amendment to the U.S. Constitution. The Fifth Amendment prohibits the federal government from taking private property for public use without justly compensating the private property owner. Government regulation may place restrictions on the use of property to the extent that it deprives the owner of its use or economic value. In such cases of "regulatory taking," the owner may be entitled to just compensation under the Fifth Amendment. Thus, if agency requirements "regulated" the mineral rights to the point that they were deemed to be taken, the agency would have to compensate the owner. See, e.g., *Foster v. United States*, 607 F.2d 943 (Ct. Cl. 1979) (government's refusal to allow permit holders of mineral interest on government land any right of access for the purpose of extracting minerals was a compensable taking).

[96] In addition, an agency's authority may vary depending on whether the private rights were severed from the surface land before the land was conveyed to the United States, or were retained by the owner who conveyed the land to the United States; whether the lands in question are public domain or acquired; and on other factors.

Forest Service manages a large number of wells accessing privately owned minerals. Specifically, Forest Service officials said that, of the 19,000 operating oil and gas wells on Forest Service lands, about three-fourths are producing privately owned minerals.[97] Forest Service officials explained that the Forest Service evaluates the effects of the development and, through negotiations with the operator, tries to reach agreement on certain mitigation measures. Officials explained that these mitigation measures are generally not as stringent or specific as mitigation measures used on federal leases. In addition, Forest Service officials explained that enforcement options are limited for environmental damage from development of privately owned minerals. Generally, the Forest Service can work with state oil and gas agencies to have them enforce any relevant state requirements regarding surface impacts, or the Forest Service can seek an injunction from the court to stop damaging actions and then pursue possible damages or restitution via the court. According to Forest Service officials, development of privately owned minerals has been a particular challenge in the Alleghany National Forest in Pennsylvania where privately owned minerals underlie more than 90 percent of the forest. Forest Service officials stated that there are approximately 1,000 new wells drilled in this forest each year, most of which are shallow conventional oil development. Officials said that the pace of this development has made it difficult for the Forest Service to manage other forest uses, such as recreation and timber extraction.

Regarding lands managed by FWS, we reported in August 2003 that oversight and management of oil and gas activities varies widely among wildlife refuges.[98] We noted that some refuges issue permits that establish operating conditions for oil and gas activities, which give these refuges greater control over oil and gas activities and protect refuge resources; other refuges exercise little control or enforcement over oil and gas activities. According to FWS officials, this situation persists today,

---

[97] According to Forest Service officials, private mineral ownership is more common in the eastern United States because most eastern forest lands were acquired through the 1911 Weeks Act, which had different stipulations for mineral rights of lands conveyed to the Forest Service. See also *Minard Run v. U.S. Forest Service*, 2009 WL 4937785 at *3 (W.D.Pa.) (discussing the Weeks Act); and GAO, *Private Mineral Rights Complicate the Management of Eastern Wilderness Areas*, GAO/RCED-84-101 (Washington, D.C.: July 26, 1984).

[98] See GAO, *National Wildlife Refuges: Opportunities to Improve the Management and Oversight of Oil and Gas Activities on Federal Lands*, GAO-03-517 (Washington, D.C.: Aug. 28, 2003).

partly because FWS does not currently have regulations that directly address oil and gas development. FWS officials said that the agency is developing a proposed rule that will set requirements for operators developing privately owned minerals. Officials expect an Advance Notice of Proposed Rulemaking to be issued in calendar year 2012. FWS officials said that, despite having minimal requirements for operators drilling for privately owned minerals, they can use other federal authorities and work with federal and state agencies to minimize or remediate injury to FWS lands.[99] For example, FWS worked with EPA to respond to a spill of produced water into a stream on a National Wildlife Refuge in Louisiana in 2005, in violation of CWA. EPA, the Coast Guard, and the Department of Justice worked together on the case, and the operator ultimately paid $425,000 to FWS for the two affected wildlife refuges. According to agency officials, however, without specific regulations, FWS faces challenges conducting daily management and oversight of oil and gas activities on FWS lands.

The Park Service's 9B regulations govern potential impacts to all park system resources and values resulting from exercise of private oil and gas rights within Park Service administered lands. These regulations require an operator to submit a proposed plan of operations to the Park Service, which outlines the activities that are proposed for Park Service lands, including drilling, production, transportation, and reclamation. The regulations also outline certain requirements for operators, including that operations be located at least 500 feet from surface waters, that fences be used to protect people and wildlife, and that during reclamation the operator reestablish native vegetation. The Park Service analyzes the operator's proposed plan of operations to ensure that the proposed plan complies with the 9B regulations. Also, in determining whether it can approve an operation, the Park Service undertakes an environmental analysis under NEPA. Once the Park Service approves the proposed plan of operations, the operator can begin drilling. The Park Service continues to have access to the site for monitoring and enforcement purposes. In November 2009, the Park Service issued an Advance Notice of Proposed Rulemaking to update its 9B regulations; a proposed rule is expected in September 2013, according to agency officials.

---

[99]Officials said that these other federal authorities could include, for example, CWA, Endangered Species Act, or Migratory Bird Conservation Act.

# Federal and State Agencies Reported Several Challenges Regulating Unconventional Oil and Gas Development

Federal and state agencies reported facing several challenges in regulating oil and gas development from unconventional reservoirs. Specifically, EPA officials reported that their ability to conduct inspection and enforcement activities and limited legal authorities are challenges. In addition, BLM and state officials reported that hiring and retaining staff and educating the public are challenges.

## Conducting Inspection and Enforcement Activities

Officials at EPA reported that conducting inspection and enforcement activities for oil and gas development from unconventional reservoirs is challenging due to limited information, as well as the dispersed nature of the industry and the rapid pace of development. More specifically, according to EPA headquarters officials, enforcement efforts can be hindered by a lack of information in a number of areas. For example, in cases of alleged groundwater contamination, EPA would need to link changes in groundwater quality to oil and gas activities before taking enforcement actions. However, EPA officials said that often no baseline data exist on the quality of the groundwater prior to oil and gas development.[100] These officials also said that linking groundwater contamination to a specific activity may be difficult even in cases where baseline data are available because of the variability and complexity of geological formations.

In addition, EPA officials said that they do not always have information on the types of activities taking place or equipment being used at oil and gas well sites, making it difficult to know where to conduct inspections related to SDWA, CWA, and CAA. For example, regarding SDWA, EPA headquarters officials said that, though EPA's guidance document on this topic is not yet finalized, EPA requires operators conducting hydraulic fracturing operations with diesel fuel to apply for a Class II UIC permit.[101] However, it is difficult for EPA to assess operators' compliance because

---

[100]As discussed earlier in this report, three of the six states we reviewed—Colorado, Ohio, and Pennsylvania—have requirements that encourage or require operators to conduct baseline water testing in certain cases.

[101]As discussed earlier in this report, in 2005, the Energy Policy Act amended SDWA to specifically exempt hydraulic fracturing from the UIC program, unless diesel fuel is used in the hydraulic fracturing process.

the agency does not know which operators are using diesel. Similarly, with respect to CWA, EPA officials said it is difficult to assess operators' compliance with the SPCC program, which establishes spill prevention and response planning requirements in accordance with CWA, because EPA does not know the universe of operators with tanks subject to the SPCC rule. In addition, related to CAA, EPA headquarters officials said that it would be difficult for EPA to find oil and gas wells that are subject to but noncompliant with NESHAPs because EPA does not have information on the universe of oil and gas well sites with the equipment that are significant to air emissions. Also, according to EPA Region 8 officials, these requirements are "self-implementing," and EPA would only receive notice from a facility that identifies itself as subject to the rules.

Several EPA officials also mentioned that the dispersed nature of the industry and the rapid pace of development make conducting inspections and enforcement activities difficult. For example, officials in EPA Region 5 said that it is a challenge to locate the large number of new well sites across Ohio and to get inspectors out to these sites because EPA generally does not receive information about new wells or their location.[102] EPA headquarters officials also mentioned that many oil and gas production sites are not continuously staffed, so EPA needs to contact operators and ensure that someone will be present before visiting a site to conduct an inspection. Officials in EPA Region 6 said that the dispersed nature of the industry, the high level of oil and gas development in the Region, and the cost of travel have made it difficult to conduct enforcement activities in their Region.

EPA officials in headquarters said that SDWA is a difficult statute to enforce because of the variation across states. Specifically, SDWA authorizes EPA to approve, for states that elect to assume this responsibility, individual states' programs as alternatives to the federal UIC Class II regulatory program. As a result, EPA's enforcement actions have to be specific to each state's program, which increases the complexity for EPA. In addition, SDWA requires that EPA approve each state's UIC program by regulation rather than through an administrative process, and many of the federal regulations for state UIC programs are out of date. EPA officials said that this has hindered enforcement efforts, and some cases have been abandoned because EPA can only enforce

---

[102]EPA Region 5 includes Indiana, Illinois, Michigan, Minnesota, Ohio, and Wisconsin.

those aspects of state UIC regulations that have been approved by federal regulation.

## Limited Legal Authorities

EPA officials also reported that the scope of their legal authorities for regulating oil and gas development is a challenge. For example, EPA officials in headquarters and Regional offices told us that the exclusion of exploration and production waste from hazardous waste regulations under RCRA significantly limits EPA's role in regulating these wastes. For example, if a hazardous waste permit was required, then EPA would obtain information on the location of well sites, how much hazardous waste is generated at each site, and how the waste is disposed of; however, operators are not required to obtain hazardous waste permits for oil and gas exploration and production wastes, limiting EPA's role.[103] As discussed earlier in this report, EPA is currently considering a petition to revisit the 1988 determination not to regulate these wastes as hazardous, but according to officials, has no specific time frame for responding. In addition, as we described earlier in this report, officials in Region 8 noted that EPA cannot use either its CERCLA or CWA emergency response authority to respond to spills of oil if there is no threat to U.S. navigable waters or adjoining shorelines because those statutory authorities do not extend to such situations.[104]

## Hiring and Retaining Staff

Officials at BLM, Forest Service, and state agencies reported challenges hiring and retaining staff. For example, BLM officials in North Dakota said recruiting is a challenge because the BLM pay scale is relatively low compared with the current cost of living near the oil fields in the Bakken formation. Similarly, BLM officials in North Dakota and headquarters both said that retaining employees is difficult because qualified staff are frequently offered more money for private sector positions within the oil and gas industry. BLM officials in Wyoming told us that their challenges related to hiring and retaining staff have made it difficult for the agency to keep up with the large number of permit requests and meet certain inspection requirements. We previously reported that BLM has

---

[103]EPA officials said that, at present, they could specifically request this type of information, but do not receive it automatically.

[104]EPA Region 8 includes Colorado, Montana, North Dakota, South Dakota, Utah, and Wyoming.

encountered persistent problems in hiring, training, and retaining sufficient staff to meet its oversight and management responsibilities for oil and gas operations on federal lands. For example, in March 2010, we reported that BLM experienced high turnover rates in key oil and gas inspection and engineering positions responsible for production verification activities.[105] We made a number of recommendations to address this and other issues—and the agency agreed—but we reported in 2011 that the human capital issues we identified with BLM's management of onshore oil and gas continue.[106]

State oil and gas regulators in two of the six states we reviewed—North Dakota and Texas—also reported challenges with employees leaving their agencies for higher paying jobs in the private sector. Officials from the North Dakota Industrial Commission—which regulates oil and gas development—said they have partially mitigated this challenge by removing state geologists and engineers from the traditional state pay scale and offering signing and retention bonuses. In addition, state environmental regulators in three of the six states—North Dakota, Pennsylvania, and Wyoming—also mentioned challenges related to hiring or retaining staff. For example, air regulators in the Wyoming Department of Environmental Quality said that retaining qualified staff is challenging, as staff leave for higher-paying private sector positions. These officials said that 6 of their 22 air permit-writing positions are vacant as of June 2012. State regulators in Colorado and Ohio did not report facing this challenge.

In addition, FWS officials reported that they have inadequate staffing for oil and gas development issues and noted that additional regional and field positions could help FWS implement a more comprehensive oil and gas program.

## Public Education

BLM and state officials reported that providing information and education to the public is a challenge. Specifically, BLM headquarters officials mentioned that hydraulic fracturing has attracted the interest of the public

---

[105]GAO, *Oil and Gas Management: Interior's Oil and Gas Production Verification Efforts Do Not Provide Reasonable Assurance of Accurate Measurement of Production Volumes*, GAO-10-313 (Washington, D.C.: Mar. 15, 2010).

[106]GAO, *Oil and Gas Leasing: Past Work Identifies Numerous Challenges with Interior's Oversight*, GAO-11-487T (Washington, D.C.: Mar. 17, 2011).

and that BLM has been fielding many information requests about its use in oil and gas development. In addition, officials in five of the six states— Colorado, Ohio, Pennsylvania, Texas, and Wyoming—reported challenges related to public education. For example, regulators in Ohio said that their agency has conducted more public outreach in the last year than in the past 20 years and, in response to this public interest in shale drilling and hydraulic fracturing, they will be adding more communications staff. Similarly, oil and gas development is moving into areas of Colorado that are not accustomed to this development, and state officials in both the Department of Public Health and Environment and the Oil and Gas Conservation Commission said that they have spent a lot of time providing the public with information on topics including hydraulic fracturing. State regulators in Wyoming said that educating the public has been a challenge since coalbed methane and tight sandstone development in Wyoming is very different than, for example, shale gas development in Pennsylvania, but the media do not always make this clear. State regulators in North Dakota did not report public education as a challenge.

# Agency Comments and Our Evaluation

We provided a draft of this report to EPA and to the Departments of Agriculture and the Interior for review and comment. The Departments of Agriculture and Interior provided written comments on the draft, which are summarized below and appear in their entirety in appendixes XI and XII, respectively. In addition, both Departments and EPA provided technical comments, which we incorporated as appropriate.

In its written comments, the Department of Agriculture agreed with our findings and noted that the Forest Service also faces challenges hiring and retaining qualified staff. In response, we added this information to the report.

In its written comments, the Department of the Interior provided additional clarifying information on its efforts concerning BLM's proposed rule on hydraulic fracturing and steps BLM is taking to hire and retain skilled technical staff. In response, we included additional information in the report about BLM's proposed rule on hydraulic fracturing.

As agreed with your offices, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days from the report date. At that time, we will send copies of this report to the appropriate congressional committees, the EPA Administrator, the Secretaries of Agriculture and the Interior, the Director of the Bureau of Land Management, and other interested parties. In addition, this report will be available at no charge on the GAO website at http://www.gao.gov.

If you or your staff members have any questions about this report, please contact me at (202) 512-3841 or trimbled@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made major contributions to this report are listed in appendix XIII.

David C. Trimble
Director
Natural Resources and Environment

*List of Requesters*

The Honorable Barbara Boxer
Chairman
Committee on Environment and Public Works
United States Senate

The Honorable Sheldon Whitehouse
Chairman
Subcommittee on Oversight
Committee on Environment and Public Works
United States Senate

The Honorable Benjamin L. Cardin
Chairman
Subcommittee on Water and Wildlife
Committee on Environment and Public Works
United States Senate

The Honorable Henry A. Waxman
Ranking Member
Committee on Energy and Commerce
House of Representatives

The Honorable Edward J. Markey
Ranking Member
Committee on Natural Resources
House of Representatives

The Honorable Diana DeGette
Ranking Member
Subcommittee on Oversight and Investigations
Committee on Energy and Commerce
House of Representatives

The Honorable Robert P. Casey, Jr.
United States Senate

GAO-12-874  Unconventional Oil and Gas Development

# Appendix I: Objectives, Scope, and Methodology

To identify federal and state environmental and public health requirements governing onshore oil and gas development from unconventional reservoirs, we analyzed federal and state laws, regulations, and guidance, as well as reports on federal and state requirements. We defined unconventional reservoirs as including shale gas deposits, shale oil, coalbed methane, and tight sandstone formations. We focused our analysis on requirements that apply to activities on the well pad and wastes or emissions generated at the well pad rather than on downstream infrastructure such as pipelines or refineries. In particular, we identified and reviewed eight key federal environmental and public health laws, specifically the Safe Drinking Water Act; Clean Water Act; Clean Air Act; Resource Conservation and Recovery Act; Comprehensive Environmental Response, Compensation, and Liability Act; Emergency Planning and Community Right-to-Know Act; Toxic Substances Control Act; and Federal Insecticide, Fungicide, and Rodenticide Act. We also reviewed corresponding regulations such as the Environmental Protection Agency's (EPA) *New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants for the Oil and Gas Industry* and guidance such as EPA's *Guidance for Implementation of the General Duty Clause of the Clean Air Act*.

To identify state requirements, we identified and reviewed laws and regulations in a nonprobability sample of six selected states—Colorado, North Dakota, Ohio, Pennsylvania, Texas and Wyoming. We selected states with current unconventional oil or gas development and large reservoirs of unconventional oil or gas. In addition, we ensured that the selected states included a variety of types of unconventional reservoirs, differing historical experiences with the oil and gas industry, and that some of the selected states have significant oil and gas development on federal lands. Because we used a nonprobability sample, the information that we collected from those states cannot be generalized to all states but can provide illustrative examples.

To complement our analysis of federal and state laws and regulations, we interviewed officials in federal and state agencies to discuss how federal and state requirements apply to the oil and gas industry (see table 7). In particular, we interviewed officials in EPA headquarters and four Regional offices where officials are responsible for implementing and enforcing programs within the six states we selected, including Region 3 for Pennsylvania, Region 5 for Ohio, Region 6 for Texas, and Region 8 for Colorado, North Dakota, and Wyoming. We also interviewed state officials responsible for implementing and enforcing requirements governing the oil and gas industry and environmental or public health

requirements in each of the six states we selected. For three of these states—Colorado, North Dakota, and Wyoming—we conducted these interviews in person. We also interviewed officials from the Delaware River Basin Commission—a regional body that manages and regulates certain water resources in four states, including Pennsylvania. We also contacted officials from environmental, public health, and industry organizations to gain their perspectives and to learn about ongoing litigation or petitions that may impact the regulatory framework. We selected environmental organizations that had made public statements about federal or state requirements for oil and gas development and public health organizations representing state and local health officials and communities. The selected organizations are a nonprobability sample, and their responses are not generalizable. In addition, we visited drilling, hydraulic fracturing, and production sites in Pennsylvania and North Dakota and met with company officials to gather information about these processes and how they are regulated at the federal and state levels. We selected these companies based on their operations in the six states we selected.

**Table 7: Agencies and Organizations Contacted**

**Federal agencies**

- EPA Office of Air and Radiation
- EPA Office of Chemical Safety and Pollution Prevention
- EPA Office of Enforcement and Compliance Assurance
- EPA Office of General Counsel
- EPA Office of the Inspector General
- EPA Office of Solid Waste and Emergency Response
- EPA Office of Research and Development
- EPA Office of Water
- EPA Region 3 (includes Pennsylvania)
- EPA Region 5 (includes Ohio)
- EPA Region 6 (includes Texas)
- EPA Region 8 (includes Colorado, North Dakota, and Wyoming)

- Bureau of Land Management (BLM) headquarters
- BLM Colorado State Office
- BLM Dickinson, North Dakota Field Office
- BLM Wyoming State Office
- Fish and Wildlife Service
- Forest Service
- National Park Service

| State and regional agencies | |
|---|---|
| • Colorado Oil and Gas Conservation Commission | • Ohio Environmental Protection Agency |
| • Colorado Department of Public Health and Environment | • Division of Air Pollution Control |
| • Air Pollution Control Division | • Division of Drinking and Ground Waters |
| • Hazardous Materials and Waste Management Division | • Division of Materials and Waste Management |
| • Water Quality Control Division | • Division of Surface Water |
| • Delaware River Basin Commission | • Pennsylvania Department of Environmental Protection, Office of Oil and Gas Management |
| • Ground Water Protection Council | • Railroad Commission of Texas, Oil and Gas Division |
| • North Dakota Industrial Commission, Oil and Gas Division | • Texas Commission on Environmental Quality |
| • North Dakota Department of Health, Environmental Health Section | • Office of Air |
| • Air Quality Division | • Office of Compliance and Enforcement |
| • Waste Management Division | • Office of Legal Services |
| • Municipal Facilities Division | • Office of the Executive Director |
| • Ohio Department of Natural Resources, Division of Oil and Gas Resources Management | • Wyoming Oil and Gas Conservation Commission |
| | • Wyoming Department of Environmental Quality |
| | • Air Quality Division |
| | • Water Quality Division |
| | • Solid and Hazardous Waste Division |
| **Environmental organizations** | |
| • Dakota Resource Council | • Earthworks, Oil and Gas Accountability Project |
| • Earthjustice | • Pennsylvania Environmental Council |
| **Public Health organizations** | |
| • American Lung Association | • National Association of County and City Health Officials |
| • Association of State and Territorial Health Officials | • Southwest Pennsylvania Environmental Health Project |
| • Council of State and Territorial Epidemiologists | • Trust for America's Health |
| **Companies and industry organizations** | |
| • American Petroleum Institute | • Independent Petroleum Association of America |
| • Chesapeake Energy Corporation | • North Dakota Petroleum Council |
| • EOG Resources, Inc. | |

Source: GAO.

To identify additional requirements that apply to unconventional oil and gas development on federal lands, we reviewed laws, such as the National Environmental Policy Act (NEPA), as well as regulations and guidance promulgated by the Bureau of Land Management (BLM), Fish and Wildlife Service (FWS), Forest Service, and National Park Service. We also interviewed officials responsible for overseeing oil and gas development on federal lands, including officials in BLM headquarters and in field offices in the states we selected where there is a significant amount of oil and gas development on federal lands, including Colorado, North Dakota, and Wyoming; and in National Park Service, Forest

**Appendix I: Objectives, Scope, and Methodology**

Service, and FWS headquarters. Oil and gas development may also be subject to tribal or local laws, but we did not include an analysis of these laws in the scope of our review.

To determine challenges that federal and state agencies face in regulating oil and gas development from unconventional reservoirs, we reviewed several reports conducted by environmental and public health organizations, industry, academic institutions, and government agencies that provided perspectives on federal and state regulations and associated challenges.[1] We also collected testimonial evidence, as described above, from knowledgeable federal and state officials, as well as industry, environmental, and public health organizations.

We conducted this performance audit from November 2011 to September 2012 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

---

[1]For example, Ground Water Protection Council and ALL Consulting. "Modern Shale Gas Development in the United States: A Primer." Prepared for the Department of Energy and National Energy Technology Laboratory. April 2009. Natural Resources Defense Council. "Drilling Down: Protecting Western Communities from the Health and Environmental Effects of Oil and Gas Production." October 2007.

**GAO-12-874  Unconventional Oil and Gas Development**

# Appendix II: Key Requirements and Authorities under the Safe Drinking Water Act

The Safe Drinking Water Act (SDWA or the Act) was originally passed by Congress in 1974 to protect public health by ensuring a safe drinking water supply.[1] Under the act, EPA is authorized to set standards for certain naturally-occurring and man-made contaminants in public drinking water systems, among other things. Key aspects of SDWA for unconventional oil and gas development include provisions regarding underground injection and EPA's imminent and substantial endangerment authority.

## Underground Injection Control Program

SDWA also regulates the placement of wastewater and other fluids underground through the Underground Injection Control (UIC) program.[2] This program provides safeguards to ensure that wastewater or any other fluid injected underground does not endanger underground sources of drinking water; these sources are defined by regulation as an aquifer or its portion:

1)  (i) Which supplies any public water system; or

    (ii) Which contains a sufficient quantity of groundwater to supply a public water system; and (A) Currently supplies drinking water for human consumption; or (B) Contains fewer than 10,000 mg/l total dissolved solids; and

2)  Which is not an exempted aquifer.[3]

Thus, the program is intended to protect not only those aquifers (or portions thereof) that are currently used for drinking water, but those that possess certain physical characteristics indicating they may be viable future drinking water sources.

EPA regulations establish criteria for exempting aquifers.[4] In particular, the regulations establish that the criterion that an aquifer "cannot now and

---

[1]Pub. L. No. 93-523, 88 Stat. 1660 (1974) (codified as amended at 42 U.S.C. §§ 300f–300j-26). Hereinafter, references to SDWA sections are as amended.

[2]SDWA §§ 1421-1426, 42 U.S.C. §§ 300h to 300h-5 (2012).

[3]40 C.F.R. § 146.3 (2012).

[4]40 C.F.R. § 146.4 (2012).

will not in the future serve as a source of drinking water" may be met by demonstrating that the aquifer is mineral, hydrocarbon or geothermal energy producing, or demonstrated by a permit applicant as having commercially producible minerals or hydrocarbons.[5] States or EPA typically initially identified exempt aquifers when UIC programs were established, and according to EPA, states may have added exempt aquifers since then. While EPA has the information from the initial applications, the agency does not have complete information for the additional exemptions, although under EPA regulations certain of these subsequent exemptions are considered program revisions and must be approved by EPA.[6] EPA is currently collecting information about the location of all exempted aquifers, and an official estimated that there are 1,000-2,000 such designations (including portions of aquifers).

There are six classes or categories of wells regulated through the UIC program.[7] Class II wells are for the management of fluids associated with oil and gas production, and they include wells used to dispose of oil and gas wastewater and those used to enhance oil and gas production.[6]

The EPA Administrator may approve by rule a state to have primary enforcement responsibility for the UIC program.[9] A state with an approved program assumes responsibility for implementing the program, including

---

[5]40 C.F.R. § 146.4 (2012).

[6]40 C.F.R. § 144.7(b)(3) ("For approved State programs exemption of aquifers identified (i) under § 146.04(b) shall be treated as a program revision under § 145.32"); § 146.4(b) (allowing exemption of aquifers that are producing or are economically producible for hydrocarbons); § 145.32 (establishing procedures for EPA approval of program revisions). According to EPA officials, nonsubstantial aquifer exemptions must be approved by the Regional Administrator, while substantial or major aquifer exemptions must be approved by the EPA Administrator. See also UIC Program Guidance 34.

[7]EPA regulations established well classes. 40 C.F.R. § 144.6 (2012).

[8]The other classes of UIC program wells are as follows: Class I wells are used for the disposal of hazardous and certain nonhazardous waste; Class III wells are used to inject fluids for mineral extraction; Class IV wells are used to dispose of hazardous or radioactive wastes, into or above an underground source of drinking water; Class VI wells are used for carbon sequestration. Class IV wells are currently banned. Class V wells are for any injection not covered by Classes I, II, III, IV, or VI.

[9]SDWA § 1422(b)(2), 42 U.S.C. § 300h-1(b)(2) (2012). See also SDWA §§ 1421(b)(1), 1422(b)(1), (3), 42 U.S.C. §§ 300h(b)(1), 300h-1(b)(1), (b)(3) (2012) (establishing requirements and responsibilities for states with primacy).

permitting, monitoring, and enforcement for UIC wells within the state. Generally, to be approved as the implementing authority (primacy), state programs must be at least as stringent as the federal program and show that their regulations contain effective minimum requirements for each of the well classes for which primacy is sought. Alternately, SDWA section 1425 provides that to obtain this authority over Class II wells only, a state with an existing oil and gas program may, instead of meeting and adopting the applicable federal regulations, demonstrate that its program is effective in preventing endangerment to underground sources of drinking water.[10] With respect to the six states in this review, Texas, North Dakota, Colorado, Wyoming, and Ohio have each been granted primacy for Class II wells under the alternative provisions (SDWA section 1425). EPA directly implements the entire UIC program in Pennsylvania.

Class II wells include saltwater (brine) disposal wells, enhanced recovery wells, and hydrocarbon storage wells. These wells are common, particularly in states with historical oil and gas activity. EPA officials estimate there are approximately 151,000 Class II UIC wells in operation in the United States; about 80 percent of these wells are for enhanced recovery, about 20 percent are for disposal, and there are approximately 100 wells for hydrocarbon storage. In Pennsylvania, the one state in our review in which EPA directly implements the Class II program, EPA Region 3 officials stated that there are five active Class II disposal wells. Recently, Region 3 issued permits for two Class II disposal wells in Pennsylvania, which were appealed. On appeal, the Environmental Appeals Board remanded the permits back to EPA for further consideration, finding that the Region failed to clearly articulate its regulatory obligations or compile a record sufficient to assure the public

---

[10]SDWA § 1425, 42 U.S.C. § 300h-4 (2012). As explained by EPA, under this alternative approval "instead of meeting the Federal Regulations (40 C.F.R. Parts 124, 144, and 145) and related Technical Criteria and Standards (40 C.F.R. Part 146), a State may demonstrate that its program meets the more general statutory requirements of Section 1421(b)(1)(A) through (D) and represents an effective program to prevent endangerment of underground sources of drinking water." See, e.g., 49 Fed. Reg. 13,040 (Apr. 2, 1984) (EPA approval of Colorado application). Thus, among other things, the state program must include adequate recordkeeping and reporting. The statute also provides that "[r]egulations of the Administrator under this section for State underground injection control programs may not prescribe requirements which interfere with or impede— (A) the underground injection of brine or other fluids which are brought to the surface in connection with oil or natural gas production or natural gas storage operations, or (B) any underground injection for the secondary or tertiary recovery of oil or natural gas." SDWA § 1421(b)(2), 42 U.S.C. § 300h(b)(2) (2012).

that the Region relied on accurate and appropriate data in satisfying its obligations to account for and consider all drinking water wells within the area of review of the injection wells.[11] The Environmental Appeals Board denied all other claims against EPA.[12] Under the remand, EPA may take further action consistent with the decision, which could include such actions as additions or revisions to the record and reconsideration of the permits. With respect to applications, according to Region 3 officials, until recently EPA did not receive many applications for new Class II brine disposal wells in Pennsylvania. EPA officials said that they have received five permit applications for such wells in the last 4 months and expect continued interest in the future.

## Class II UIC Requirements

Under SDWA, UIC programs are to prohibit underground injection, other than into a well that is authorized by rule or permitted.[13] Class II UIC wells must meet requirements contained in either EPA regulations,[14] or relevant state regulations. Federal regulations for Class II wells include construction, operating, monitoring and testing, reporting, and closure requirements.[15] For example, one requirement of federal regulations is that all of the preexisting wells located in the area of review, and that were drilled into the same formation as the proposed injection well must be identified.[16] For such wells which are improperly sealed, completed, or abandoned, the operator must also submit a plan of actions necessary to prevent movement of fluid into underground sources of drinking water—known as "corrective actions," such as plugging, replugging, or operational pressure limits—which are considered in permit review.[17] Permits may be conditioned upon a compliance schedule for such corrective actions. According to EPA, in Pennsylvania many old wells

[11]See Environmental Appeals Board, Order, UIC Appeal No. 11-03 (June 28, 2012).

[12]Id.

[13]SDWA §§ 1421(b)(1)(A), 1422(c),  42 U.S.C. §§ 300h(b)(1)(A) (state programs), 300h-1(c) (EPA direct implementation programs); 40 C.F.R. § 144.11 (2012).

[14]See 40 C.F.R. pt. 144 (2012).

[15]40 C.F.R. §§ 146.21 – 146.24 (2012).

[16]40 C.F.R. §§ 146.24, 146.6 (2012).

[17]40 C.F.R. §§ 144.55(a), (b)(2)-(3); 146.7 (2012).

have had to be replugged in order to ensure they cannot present a potential pathway for migration.[18]

Regarding seismicity concerns, the federal regulations for Class II UIC wells require applicants for Class II UIC wells to identify faults if known or suspected in the area of review.[19] In addition there is a general requirement that a well must be sited to inject into a formation that is separated from any protected aquifer by a confining zone that is free of known open faults or fractures within the area of review.[20] In a permit process, EPA (in direct implementation states) or the state can require additional information (including geology) to ensure protection of underground sources of drinking water.[21] For example, Region 3 officials said the Region routinely determines whether there is the potential for fluid movement out of the injection zone via faults and fractures, as well as abandoned wells, by calculating a zone of endangering influence around the injection operation. Under the general standard, if a proposed or ongoing injection was, due to seismicity, believed to endanger underground sources of drinking water, EPA or the state could act, as the burden is on the applicant to show the injection well will not endanger such sources.[22] Officials said that if a seismic event occurs along a fault line that was not identified or known at the time of the UIC permit approval, EPA (in direct implementation states) or the state can go back to the well owner or operator and ask for additional information, which the owner or operator would be obligated to provide.

For additional information on the Class II UIC requirements applicable under EPA's program in Pennsylvania, see appendix IX.

---

[18]See Karen Johnson, Chief, Ground Water & Enforcement Branch, EPA Region 3, Marcellus Shale Educational Webinar, Feb. 18, 2010 (written Q&A).

[19]40 C.F.R. §§ 146.24, 146.24(a)(2) (2012).

[20]40 C.F.R. § 146.22(a) (2012).

[21]See 40 C.F.R. §§ 144.27(a), 144.51(h), 144.52(a)(9), 144.52(b)(1) (2012).

[22] 40 C.F.R. §§ 144.12(a), 144.1(b), (f) (2012).

## Class II UIC Programs and Hydraulic Fracturing

Historically, UIC programs did not include hydraulic fracturing injections as among those subject to their requirements.[23] In 1994, in light of concerns that hydraulic fracturing of coalbed methane wells threatened drinking water, the Legal Environmental Assistance Foundation petitioned EPA to withdraw its approval of Alabama's Class II UIC program. EPA denied the petition, but on appeal, the United States Court of Appeals for the Eleventh Circuit held that the definition of underground injection included hydraulic fracturing and ordered EPA to reconsider the issue.[24] Subsequently, Alabama revised its program to include injection of hydraulic fracturing fluids,[25] and EPA approved it pursuant to SDWA section 1425 in 2000.[26] The Legal Environmental Assistance Foundation appealed the approval and, in 2001, the Eleventh Circuit partially remanded the approval, directing EPA to regulate hydraulic fracturing as Class II UIC wells rather than a Class II-like activity.[27] Alabama amended its regulations in 2001 and 2003.[28] EPA issued a determination in 2004 addressing the question on remand and found that the hydraulic fracturing portion of Alabama's UIC program relating to coalbed methane production, which was previously approved under the alternative effectiveness provision, complied with the requirements for Class II UIC wells.[29]

EPA initiated a study in 2000 to further examine the issue of fracturing in coalbed methane in areas of underground sources of drinking water.[30] EPA officials said the study showed diesel fuel was the primary risk. Subsequently, in 2003, EPA entered into a memorandum of agreement

---

[23]See, e.g., *Legal Envtl. Assistance Found. Inc. v. EPA*, 118 F.3d 1467, 1471 (11th Cir.1997).

[24]Id.

[25]Ala. Admin. Code r. 400-4-5-.04 (filed July 9, 1999; amended Nov. 9, 1999; repealed Apr. 11, 2000).

[26]65 Fed. Reg. 2889 (Jan. 19, 2000); 40 C.F.R. § 147.52 (2012). In May 2000, Alabama repealed the hydraulic fracturing regulations at 400-4-5-.04 and established regulations at 400 -3-8-.03. EPA's regulations reference the state's repealed regulations.

[27]*Legal Envtl. Assistance Found. Inc. v. EPA*, 276 F.3d 1253 (11th Cir. 2001).

[28]See Ala. Admin. Code r. 400 -3-8-.03.

[29]69 Fed. Reg. 42,341 (July 15, 2004) (referencing Alabama rule 400 -3-8-.03).

[30]EPA, Evaluation of Impacts to Underground Sources of Drinking Water by Hydraulic Fracturing of Coalbed Methane Reservoirs, EPA 816-R-04-003 (2004).

with three major fracturing service companies in which the companies voluntarily agreed to eliminate diesel fuel in hydraulic fracturing fluids injected into coalbed methane production wells in underground sources of drinking water.[31] According to EPA officials, the agreement is still in effect insofar as the agency has not received any termination notices.

EPA officials did not know of any permits issued by Alabama, or any other state, for hydraulic fracturing injections during this time frame. EPA also did not modify its direct implementation of Class II UIC programs to expressly include hydraulic fracturing.

On December 7, 2004, EPA's Assistant Administrator for Water responded to a congressional request for information on EPA's actions on this issue.[32] The letter summarizes EPA's study findings—that the potential threat to underground sources of drinking water posed by hydraulic fracturing of coalbed methane wells is low, but there is a potential threat through the use of diesel fuel as a constituent of fracturing fluids where coalbeds are colocated with an underground source of drinking water.[33]

The Eleventh Circuit court decision on the Alabama program generated significant controversy regarding whether hydraulic fracturing would be included in UIC programs nationwide. In this context, the Energy Policy Act of 2005[34] amended SDWA to include a provision exempting certain hydraulic fracturing injections from the UIC program. Specifically, the Energy Policy Act provided that "[t]he underground injection of fluids or propping agents (other than diesel fuels) pursuant to hydraulic fracturing operations related to oil, gas, or geothermal production activities" is excluded from the definition of "underground injection." Hence, injection of

---

[31]Memorandum of Agreement Between the United States Environmental Protection Agency and BJ Services Company, Halliburton Energy Services, Inc., and Schlumberger Technology Corporation, Elimination of Diesel Fuel in Hydraulic Fracturing Fluids Injected into Underground Sources of Drinking Water During Hydraulic Fracturing of Coalbed Methane Wells 4(a) (Dec. 12, 2003).

[32]151 Cong. Rec. S7277 (daily ed. June 23, 2005) (letter of Benjamin Grumbles, Assistant Administrator, Office of Water, EPA, to Senator Jeffords).

[33]Id.

[34]Pub. L. No. 109–58 § 322, 119 Stat. 594 (2005) (modifying SDWA § 1421(d)(1), 42 U.S.C. § 300h(d)(1) (2012)).

fluids other than diesel fuel in connection with hydraulic fracturing is not subject to federal UIC regulations, including both EPA direct implementation requirements and federal minimum requirements for state programs. The provision, however, did not exempt injection of diesel fuels in hydraulic fracturing from UIC programs.

EPA has prepared a draft guidance document to assist with permitting of hydraulic fracturing using diesel fuels under SDWA UIC Class II; a public comment period for this draft guidance closed in August 2012.[35] EPA explained that the guidance does not substitute for UIC Class II regulations, rather the guidance focuses on specific topics useful for tailoring Class II requirements to the unique attributes of hydraulic fracturing when diesel fuels are used.[36] EPA's draft guidance is applicable to any oil and gas wells using diesel in hydraulic fracturing (not just coalbed methane wells). The draft guidance provides recommendations related to permit applications, area of review (for other nearby wells), well construction, permit duration, and well closure. The guidance states that it does not address state UIC programs, although states may find it useful.

EPA officials told us that they recently identified wells for which publicly available data suggest diesel was used in hydraulic fracturing. EPA officials stated the agency also has some information on diesel use in hydraulic fracturing of shale formations from a 2011 congressional investigation. EPA officials said there are no EPA-issued permits authorizing diesel to be used in hydraulic fracturing, and they believe no applications for such permits have been submitted to EPA to date. EPA officials also said that they were not aware of any state UIC programs that had issued such permits.

## Enforcement

Generally, EPA is authorized to enforce any applicable requirement of a federal or state UIC program as promulgated in 40 C.F.R. pt. 147, including Class II UIC programs approved under the alternative

---

[35]EPA, Permitting Guidance for Oil and Gas Hydraulic Fracturing Activities Using Diesel Fuels—Draft: Underground Injection Control Program Guidance #84 (May 2012 draft); see also 77 Fed. Reg. 27,451 (May 10, 2012) (announcing availability of the draft for public comment).

[36]77 Fed. Reg. at 27,452.

provision.[37] However, according to officials, EPA has not promulgated all of the states' modifications to UIC programs, and the federal regulations are out-of-date, hindering EPA's ability to directly enforce some state program provisions.[38]

EPA may issue administrative orders or, with the Department of Justice, initiate a civil action when a person violates any requirement of an applicable UIC program.[39] Where a state has primacy, EPA must first notify the state, and may act after 30 days if the state has not commenced an appropriate enforcement action.[40] SDWA also provides EPA with authority to access records, inspect facilities, and require provision of information. Specifically, EPA has authority, for the purpose of determining compliance, to enter any facility or property of any person subject to an applicable UIC program, including inspection of records, files, papers, processes, and controls.[41]

Under EPA's UIC program enforcement authorities, EPA has issued administrative compliance orders and administrative penalty orders relating to SDWA UIC Class II Wells. According to officials, most cases are administrative and handled at the Regional level. Officials said that there were more than 200 administrative orders related to the UIC program from 2004-2008 and that it is likely that a majority of these were related to Class II wells.

For example, EPA Region 3 signed a consent agreement in Venango County, Pennsylvania, where injections of produced water were made into abandoned wells not permitted under the UIC program.[42] In another

---

[37]SDWA requires that EPA approve state programs and revisions by regulation, in part 147 (rather than through an administrative process). SDWA § 1422(b)(2), (4), 42 U.S.C. § 300h-1(b)(2),(4) (2012).

[38]For federal regulations setting forth EPA-approved state programs, see 40 C.F.R. pt. 147 (2012).

[39]SDWA § 1423(a), 42 U.S.C. § 300h-2(a) (2012).

[40]SDWA § 1423(a)(1), 42 U.S.C. § 300h-2(a)(1) (2012).

[41]SDWA § 1445(b)(1), 42 U.S.C. § 300j-4(b)(1) (2012).

[42]Titusville Oil and Gas, Docket No. SDWA-03-20,11-0170 (July 19, 2011). EPA Region 3 officials noted that Pennsylvania Department of Environmental Protection also issued several orders at the site, and that the wells are being plugged.

case, Region 3 told us it has issued an administrative order against an operator for failure to conduct mechanical integrity tests. According to EPA, the order requires the operator to plug many of these wells, and to bring the wells they plan to continue to operate into compliance with their financial responsibility. Region 3 also took a penalty action against an operator for failure to report a mechanical integrity failure and continued operation after the failure.[43] According to officials, EPA was able to confirm during well rework that there was no fluid movement outside the well's casing and no endangerment to an aquifer.

## Imminent and Substantial Endangerment Authorities

While SDWA generally does not directly regulate land use activities that may pose risk to drinking water supplies,[44] SDWA gives EPA authority to issue imminent and substantial endangerment orders or take other actions deemed necessary "upon receipt of information that a contaminant which is present in or is likely to enter a public water system or an underground source of drinking water…which may present an imminent and substantial endangerment to the health of persons, [where] appropriate State and local authorities have not acted to protect the health of such persons."[45] As noted above, the term "underground source of drinking water" includes not only active water supplies but also aquifers (or portions thereof) with certain physical characteristics.

EPA has used this imminent and substantial endangerment authority in several incidents where oil or gas wells have been alleged to contaminate drinking water. For example, EPA Region 8 has conducted long-term investigation and monitoring of groundwater contamination from an oilfield in Poplar, Montana, of a water supply serving Poplar, as well as the Fort Peck Indian Reservation. EPA determined that there are several plumes of produced water (brine) in the East Poplar aquifer, which supplies private and public drinking water wells. Several pathways of contamination have been identified, including unlined pits, spills, and a leaking plugged oil well.

[43]*In the Matter of EXCO Resources (PA) LLC*, Consent Agreement, EPA Docket No. SDWA-03-2012-0061 (Mar. 30, 2012).

[44]SDWA includes nonregulatory provisions addressing protection of drinking water supplies, such as providing incentives and assistance for states and public water systems to conduct water quality protection planning. See, e.g., SDWA § 1429, 42 U.S.C. § 300h-8 (2012).

[45]SDWA § 1431, 42 U.S.C § 300i(a) (2012).

EPA issued a SDWA imminent and substantial endangerment order in 2010 to three companies operating wells in the oilfield, each of which challenged the order in federal court. Following mediation, EPA and the parties entered an administrative order on consent in which the parties agreed to monitor the public drinking water supply for specified parameters and, if certain triggers are met or exceeded, to take actions to ensure the public water system meets water quality standards and pay reimbursement costs to the public water system.[46]

In another case, on December 7, 2010, EPA issued an administrative order to a well operator in Texas alleging methane contamination affecting private wells and directly related to its oil and gas production facilities.[47] EPA subsequently filed a complaint in U.S. District Court seeking injunctive relief to enforce the order's requirements and civil penalties for the operator's noncompliance with the order.[48] A few days later, the operator filed a petition for review of the order with the Fifth Circuit Court of Appeals. The operator's position was that the order is not a final agency action and that EPA has the burden of proving its claim in the district court enforcement action, and its enforcement would violate due process.[49] On March 29, 2012, EPA withdrew its administrative order, and the parties moved for voluntary dismissal of both cases.[50] In a letter to EPA, the operator agreed to conduct sampling of 20 private water wells for 1 year.[51]

---

[46]EPA, Fort Peck East Poplar Oil Field Safe Drinking Water Act Emergency Administrative Order on Consent, Docket No. SDWA-08-20 12-0019 (Mar. 26, 2012); see also EPA, Emergency Administrative Order, Docket No. SDWA-08-2011-0006 to Murphy Exploration & Production Co.-USA, Pioneer Natural Resources USA, Inc., and SGH Enterprises, Inc. (Dec. 16, 2010).

[47]In the Matter of Range Resources Corporation, Administrative Order, EPA Docket No. SDWA-06-2011-1208 (Dec. 7, 2010).

[48]United States v. Range Production Co., No. 3:11-cv-00116-F (N.D. Tex. Jan. 18, 2011).

[49]Brief, Range Resources Corporation, et al. v. EPA, No. 11-60040 (5th Cir. Mar. 22, 2011).

[50]See Joint Stipulation of Dismissal Without Prejudice, *United States v. Range Production Co.*, No. 3:11-CV-00116-F (N.D. Texas Mar. 30, 2012); see also *Range Resources Corporation, et al. v. EPA*, No. 11-60040 (5th Cir. Mar. 30, 2012).

[51]Letter, Bracewell & Giuliani to EPA Office of Enforcement & Compliance Assurance, Mar. 30, 2012.

# Appendix III: Key Requirements and Authorities under the Clean Water Act

Under the Clean Water Act (CWA),[1] EPA regulates discharges of pollutants to waters of the United States; for the purpose of this document, we generally refer to such waters, including jurisdictional rivers, streams, wetlands, and other waters, as surface waters.[2] Discharges may include wastewater, including produced water, and stormwater. In addition, together with the U.S. Army Corps of Engineers, EPA regulates discharge of dredged or fill material into these waters.[3]

Under CWA section 311 and the Oil Pollution Act,[4] EPA regulations establish, in relevant part, requirements for the prevention of, preparedness for, and response to oil discharges at certain facilities, including among others oil drilling and production facilities.[5] These requirements may include Facility Response Plans and Spill Prevention, Control, and Countermeasure (SPCC) Plans. EPA also has certain response and enforcement authorities relevant to these requirements.

This review focuses on EPA regulatory activities under these programs relevant to unconventional oil and gas development activities.

---

[1]The Federal Water Pollution Control Act Amendments of 1972, Pub. L. No. 92-500, § 2, 86 Stat. 816 (amending the Act of June 30, 1948, ch. 758, 62 Stat. 1155) (codified as further amended at 33 U.S.C. ch. 26, §§ 1251-1387 (2012) and commonly referred to as the Clean Water Act). Hereinafter, references are to CWA sections as amended.

[2]For the purpose of this document, when we use the term "surface waters" in relation to federal regulation, we refer to waters of the United States, including jurisdictional rivers, streams, wetlands, and other waters. State definitions of the term "surface waters" may differ. EPA officials noted that some surface waters may not be jurisdictional for certain CWA provisions.

[3]The U.S. Army Corps of Engineers administers the day-to-day program, including issuance of permits and enforcement, among other things. EPA has the opportunity to review and comment on individual permit applications, can enforce CWA section 404 provisions, and has authority to veto Corps permit decisions as to the discharge of dredged or fill material at defined sites, among other things. See CWA §§ 404, 404(c), 33 U.S.C. §§ 1344, 1344(c) (2012);
http://water.epa.gov/lawsregs/guidance/cwa/dredgdis/404c_index.cfm

[4]CWA § 311, 33 U.S.C. § 1321 (2012); Oil Pollution Act of 1990, Pub. L. No. 101-380, 104 Stat. 484 (classified as amended at 40 U.S.C. ch. 40, §§ 2701 – 2761 (2012) and amending sections of CWA). See also Exec. Order 12,777, 56 Fed. Reg. 54,757 (1991).

[5]40 C.F.R. pt. 112 (2012).

# National Pollutant Discharge Elimination System Program

CWA is the primary federal law designed to restore and maintain the chemical, physical, and biological integrity of the nation's waters. Among other things, EPA and delegated states[6] administer CWA's National Pollutant Discharge Elimination System (NPDES) program, which limits the types and amounts of pollutants that facilities such as industrial and municipal wastewater treatment plants may discharge into the nation's surface waters.[7] Facilities such as municipal wastewater treatment plants and industrial sites, including oil and gas well sites, need a permit if they have a point source discharge to surface waters. Other than stormwater runoff as discussed below, discharges of pollutants from an oil or gas well site to surface water require an NPDES permit. According to EPA, wastewater associated with shale gas extraction can include total dissolved solids, fracturing fluid additives, metals, and naturally occurring radioactive materials, and may be disposed by transport to publicly-owned or other wastewater treatment plants, particularly in some locations where brine disposal wells are unavailable.[8] According to EPA, produced water from coalbed methane gas extraction can include high salinity and pollutants such as chloride, sodium, sulfate, bicarbonate, fluoride, iron, barium, magnesium, ammonia, and arsenic,[9] and some produced water is discharged to surface water in certain geographical areas.[10]

---

[6]Of the states in our review, EPA is the NPDES permitting authority for the oil and gas industry in Texas, and also administers the pretreatment program in Colorado, Pennsylvania, and Wyoming.

[7]CWA also features a system of water quality standards consisting of designated uses and water quality criteria, expressed as constituent concentrations, levels, or narrative statements, representing a quality of water that supports the use. Water quality standards play a critical role in the act's framework. For example, if technology based limitations are insufficient to meet water quality standards, then more stringent water quality based limitations are to be added to discharge permits. EPA is currently updating chloride water quality criteria with a draft criteria document expected in 2012; a more stringent chloride criteria could eventually affect permit limits for any facility discharging oil and gas wastewater. See www.epa.gov/hydraulicfracture/.

[8]76 Fed. Reg. 66,286, 66,296 (Oct. 26, 2011).

[9]See www.epa.gov/hydraulicfracture/ and 76 Fed. Reg. at 66,293-97. EPA conducts annual reviews of existing effluent guidelines and pretreatment standards and biennially publishes a plan identifying the industrial categories selected for new or revised rules.

[10]See http://water.epa.gov/scitech/wastetech/guide/cbm_index.cfm

EPA and delegated states issue discharge permits that set conditions in accordance with applicable technology-based effluent limitations guidelines that EPA has established for various industrial categories, and may also include water-quality based effluent limitations.[11] When EPA issues effluent limitations guidelines for an industrial category, it may include both limitations for direct dischargers (point sources that introduce pollutants directly into waters of the United States) and pretreatment standards applicable to indirect dischargers (facilities that discharge into publicly-owned wastewater treatment plants).[12]

## Existing Effluent Limitations Guidelines for Oil and Gas Extraction

EPA has developed effluent limitations guidelines for several subcategories of the oil and gas extraction industry.[13] The guidelines generally apply to facilities engaged in the production, field exploration, drilling, well completion, and well treatment in the oil and gas extraction industry.[14] The guidelines applicable to the wells in the scope of this review—essentially, oil and gas wells located on land and drilling unconventional reservoirs—include those for the onshore subcategory, agricultural and wildlife water use subcategory, and stripper wells.[15] The guidelines for these subcategories were finalized in 1979.[16]

---

[11]Water-quality based effluent limitations are imposed when technology-based limitations are insufficient for receiving waters to meet water quality standards.

[12]See, e.g., 76 Fed. Reg. at 66,288.

[13]40 C.F.R. pt. 435 (2012).

[14]See, e.g., 40 C.F.R. § 435.30 (2012).

[15]40 C.F.R. §§ 435.30-.32 (onshore), 435.50-.52 (agricultural and wildlife water use), 435.60-.61 (stripper wells) (2012). EPA also has developed effluent limitation guidelines for the subcategories offshore wells and coastal wells; because this report is focused on onshore wells, we do not discuss the guidelines for the offshore subcategory. See 40 C.F.R. §§ 435.10-.15 (offshore), 435.40-.47 (coastal) (2012). EPA's original 1979 rule included coastal wells in the subcategory for onshore wells. Following a court order, EPA in 1982 suspended the applicability of the guidelines for the onshore category to coastal wells. 44 Fed. Reg. 22,069 (Apr. 13, 1979), 47 Fed. Reg. 31,554 (July 21, 1982). See also *American Petroleum Institute v. EPA*, 661 F.2d. 340 (5th Cir. 1981).

[16]In 1976, EPA issued interim final regulations establishing effluent limitation guidelines for the oil and gas extraction category and, in 1979, EPA replaced these with final guidelines. 44 Fed. Reg. 22,069 (Apr. 13, 1979); see also 47 Fed. Reg. 31,554 (July 21, 1982).

For the onshore and agricultural and wildlife water use subcategories, EPA established effluent limitations guidelines for direct dischargers. EPA did not establish guidelines for stripper wells, explaining that unacceptable economic impacts would occur from use of the then-evaluated technologies, and that the agency could revisit this decision at a later date.[17] EPA officials we spoke with said that they are not aware of any reconsideration of this decision, and that this is not an issue on the current regulatory agenda. EPA also did not establish pretreatment requirements for either onshore or stripper well subcategories.[18]

Existing effluent limitations guidelines do not apply to wastewater discharges from coalbed methane extraction.[19] As EPA subsequently explained, because there was no significant coalbed methane production in 1979, the oil and gas extraction rulemakings did not consider coalbed methane extraction in any of the supporting analyses or records.[20] EPA officials also told us that the coalbed methane process is fundamentally different than traditional oil and gas exploration because of the volume of water that must be removed from the coalbed before production can begin, which they see as a significant distinction for potentially applicable technology. As will be discussed later in this appendix, in October 2011, EPA announced its intention to develop effluent limitations guidelines and standards for wastewater discharges from the coalbed methane industry.

When an oil and gas well proposing to discharge pollutants to a surface water is not covered by the existing guidelines, effluent limitations included in the permit are determined on a case-by-case basis by the

---

[17]41 Fed. Reg. 44,942, 44,946-47 (Oct. 13, 1976). EPA has also noted that the stripper subcategory may be used to exclude a well from other subcategories. In effect, the existence of the subcategory authorizes a permit writer to set case-specific permit limitations for a well that falls within the stripper subcategory, as it has no specific effluent limitations, rather than use those for the onshore subcategory. 44 Fed. Reg. at 22,073.

[18]By definition, such requirements would be inapplicable to the agricultural and wildlife use subcategory.

[19]76 Fed. Reg. 66,286, 66,293 (Oct. 26, 2011).

[20]EPA, Technical Support Document for the 2006 Effluent Guidelines Program Plan, EPA-821R-06-018, 6-1 (2006).

relevant permitting authority, using best professional judgment[21] and any applicable state rules or guidance. EPA officials were not aware of any other unconventional oil and gas extraction processes, besides coalbed methane extraction, that are not covered by the existing effluent limitations guidelines.

Table 8 summarizes the coverage and key requirements of the existing guidelines.

**Table 8: Summary of Effluent Limitations Guidelines for Wastewater Discharges from Selected Subcategories of Oil and Gas Wells Located on Land**

| Subcategory of oil or gas well | Covered by existing effluent limitations guideline | Permit requirement |
|---|---|---|
| **Wells included in an existing segment subcategory** | | |
| Onshore wells that do not fit into any of the other subcategories | Yes – direct dischargers<br>No – indirect dischargers (no pretreatment requirements established) | No discharge |
| Agricultural and Wildlife Water Use subcategory | Yes | Discharge of produced water allowed where conditions met, and subject to max daily limit for oil and grease |
| Stripper wells | Subcategory created, but no effluent limitations or pretreatment requirements established | Case-by-case |
| **Wells that are not included in any existing segment subcategory** | | |
| Coalbed methane extraction wells | No | Case-by-case |

Source: GAO analysis of federal regulations.

Note: EPA proposed pretreatment standards for oil and grease for new sources in the four subcategories in 1979, but did not issue them. Compare 41 Fed. Reg. 44,949, 44,952 (Oct. 13, 1976), 44 Fed. Reg. 22,069 (Apr. 13, 1979) and 76 Fed. Reg. 66,286, 66,295 (Oct. 26, 2011).

**Onshore Subcategory**

The effluent limitations guideline for the Oil and Gas Extraction point source category, onshore subcategory establishes the best practicable control technology currently available as

---

[21]EPA has noted that permit writers are to develop technology-based limits on a case-by-case basis using their best professional judgment, and considering the same statutory factors EPA would use in promulgating a national categorical effluent limitation guideline. See 40 C.F.R. §§ 122.44(a)(1),125.3(d) (2012). EPA, Technical Support Document for the 2006 Effluent Guidelines Program Plan, EPA-821R-06-018, 6-3 (2006).

there shall be no discharge of waste water pollutants into navigable waters from any source associated with production, field exploration, drilling, well completion, or well treatment (i.e., produced water, drilling muds, drill cuttings, and produced sand).[22]

Because an NPDES permit is only required where a facility discharges or proposes to discharge a pollutant, and as the technology-based requirement of "no discharge" must be applied in the permit, facilities subject to a "no discharge" limit are not required to apply for such permits.

According to the 1976 *Federal Register* Notice of the Proposed Rule, technologies for managing produced water to achieve no discharge to surface waters were expected to include evaporation ponds, or underground injection, either for enhanced recovery of oil or gas in the producing formation or for disposal to a deep formation.[23] Further, EPA indicated that drilling muds, drill cuttings, well treatment wastes, and produced sands would be disposed by land disposal so as not to reach navigable waterways.

**Agricultural and Wildlife Water Use Subcategory**

The effluent limitations guideline for the Oil and Gas Extraction point source category also established a subcategory for Agricultural and Wildlife Water Use to cover a geographical subset of operations in which produced water is of good enough quality to be used for wildlife or livestock watering or other agricultural uses and that the produced water is actually put to such use during periods of discharge. This subcategory guideline is only applicable to facilities located west of the 98th meridian, which extends from approximately the eastern border of North Dakota south through central Texas. EPA explained in the preamble to this rule that "[i]t is intended as a relatively restrictive subcategorization based on the unique factors of prior usage in the Region, arid conditions and the existence of low salinity, potable water."[24]

For this subcategory, the guideline establishes the best practicable control technology currently available as

---

[22] 40 C.F.R. § 435.32 (2012) (emphasis added).

[23] 41 Fed. Reg. 44,942, 44,946 (Oct. 13, 1976).

[24] 44 Fed. Reg. 22,069, 22,072 (Apr. 13, 1979).

"no discharge of waste pollutants into navigable waters from any source (other than produced water) associated with production, field exploration, drilling, well completion, or well treatment (i.e., drilling muds, drill cuttings, and produced sands)," and for produced water discharges a daily maximum limitation of 35 milligrams per liter of oil and grease.[25]

At oil and gas well sites meeting the conditions of location, produced water quality, and use of produced water for wildlife or livestock watering or agricultural use, the produced water may be discharged to waters of the United States. In terms of water quality, the produced water must be "good enough" for this use,[26] and must not exceed the daily maximum for oil and grease. States generally issue these permits, and are responsible for determining whether the water is of appropriate water quality for the beneficial use.[27] EPA is responsible for oversight and has not issued guidance on this topic.

EPA has not revised the guildeines, such as to add limitations for additional pollutants, to define "good enough" water quality, or to establish potentially more stringent guidelines. EPA officials stated that it has not done so because in certain locations the produced water from oil and gas development is high quality, and because treatment would cost more than injection, thus discouraging the beneficial use of this water.

With respect to the subcategories of oil and gas wells covered by the effluent limitations guidelines, discharges are authorized only for oil and gas wells under the Agricultural and Wildlife Water Use and Stripper well subcategories. These well sites that discharge wastewater to surface waters must, as noted above, obtain a NPDES permit from the permitting authority (state, tribe, or EPA). The permit is to incorporate the applicable effluent limitations guideline, if one exists, and include effluent monitoring and reporting requirements. Officials also stated that individual permits may contain limits for pollutants other than oil and grease.

---

[25] 40 C.F.R. §§ 435.50-52 (2012).

[26] 40 C.F.R. § 435.51(c) (2012).

[27] EPA issues permits in a small number of states that do not have responsibility for the NPDES program, and on tribal lands.

According to EPA, 349 discharge permits in the Agricultural and Wildlife Water Use subcategory have been issued. Most of these permitted discharges are located in Wyoming, Montana, and Colorado.

## Anticipated Rulemaking to Develop Effluent Limitations Guidelines for Oil and Gas Extraction from Coalbed Methane Formations

On October 26, 2011, EPA announced in its Final 2010 Effluent Limitations Program Plan that the agency will develop effluent limitations guidelines and standards for wastewater discharges from the coalbed methane extraction industry.[28]

With respect to coalbed methane extraction, as noted above, there is no existing effluent limitations guideline applicable to associated wastewaters. Coalbed methane operations discharging wastewaters to surface waters must nonetheless obtain a NPDES permit, but in the absence of a federal effluent limitations guideline, the permitting authority determines the permit limits based on best professional judgment, as well as any applicable state rules or guidelines. EPA had identified the industry for consideration in prior years, and initiated work leading to a detailed study beginning in 2007.[29] EPA's 2010 coalbed methane study found that states are primarily issuing individual permits, but they are also issuing some general permits and watershed permits covering one or more wells through a streamlined process.[30] According to EPA officials, eastern states have generally based effluent limitations in permits on the coal mining effluent limitations guideline, although that guideline does not have limitations for total dissolved solids or chlorides that are key components of produced water. In the six states reviewed, EPA identified 861 coalbed methane discharge permits.[31] According to EPA officials, most coalbed methane wastewater discharges have NPDES permits.

Following the study, EPA concluded that some of the waters discharged to surface waters have high total dissolved solids, and that there are readily available technologies to treat this produced water and decided to

---

[28]76 Fed. Reg. 66,286 (Oct. 26, 2011).

[29]76 Fed. Reg. at 66,293. See also http://water.epa.gov/scitech/wastetech/guide/cbm_index.cfm

[30]EPA, Coalbed Methane Extraction: Detailed Study Report, EPA-820-R-10-022 (2010).

[31]Id. at Appendix A. See also EPA, Technical Support Document for the 2006 Effluent Guidelines Program Plan, EPA-821R-06-018, 6-5 (2006) (listing numbers of coalbed methane discharge permits derived from state permit databases).

initiate rulemaking.[32] EPA is in the preproposal stage of rulemaking for the coalbed methane effluent guidelines and standards.[33] EPA's website indicates the projected date for publication of the proposed rule is June 2013.

## Generally Applicable Pretreatment Standards and POTW Obligations

Facilities discharging industrial wastewater to publicly-owned treatment works (POTW) treatment plants are subject to general pretreatment requirements. In addition, the POTW receiving such industrial wastewaters also has responsibilities related to its own permit and to receiving these wastewaters.

### General standards

EPA has issued general pretreatment requirements applicable to all existing and new indirect dischargers of pollutants (other than of purely domestic, or sanitary, sewage) to a POTW, including any dischargers of wastewaters associated with oil and gas wells.[34] Notably, such discharges are subject to a general requirement that the pollutants do not cause pass through or interference with the POTW.[35] For a discharge to cause pass through, it must contribute to violation of the POTW's NPDES permit; to cause interference, it must contribute to the noncompliance of its sewage sludge use or disposal.[36]

Other standard provisions for indirect discharges involve a prohibition on corrosive discharges.[37] According to EPA officials, in produced water,

---

[32]76 Fed. Reg. at 66,294.

[33]See http://yosemite.epa.gov/opei/RuleGate.nsf/byRIN/2040-AF35?opendocument#1, RIN 2040-AF35, docket no. EPA-HQ-OW-2011-0334.

[34]See generally 40 C.F.R. pt. 403 (2012).

[35]40 C.F.R. § 403.5(a)(1) (2012).

[36]Pass through means a discharge that exits the POTW into waters of the United States in quantities or concentrations which, alone or in conjunction with a discharge or discharges from other sources, is a cause of a violation of any requirement of the POTW's NPDES permit. 40 C.F.R. § 403.3(p) (2012). Interference is a discharge which, alone or in conjunction with a discharge or discharges from other sources, both (1) inhibits or disrupts the POTW, its treatment processes or operations, or its sludge processes, use or disposal; and (2) therefore is a cause of a violation of any requirement of the POTW's NPDES permit or prevents sewage sludge use or disposal in compliance with relevant laws. 40 C.F.R. § 403.3(k) (2012).

[37]40 C.F.R. § 403.5(b)(2) (2012).

concerns for corrosivity would be related to high chlorides and sulfides which could adversely affect pipes and gaskets in the POTW.[38]

EPA has stated that NPDES permits for POTWs typically do not contain effluent limits for some of the pollutants of concern from shale gas wastewater, and that some of these pollutants may be harmful to aquatic life.[39] Specifically, if a POTW did not include information in its NPDES permit application indicating that the POTW would receive oil and gas wastewater, or did not otherwise adequately characterize the incoming wastewater as including certain pollutants of concern, the permit may not include limits for these pollutants, as permits generally only contain limits for those pollutants reasonably expected to be present in the wastewater.[40]

Regarding pass through, in which an indirect industrial discharger contributes to violation of the receiving POTW's NPDES permit, Region 3 officials said that POTW operators had not indicated that NPDES violations were caused by oil and gas wastewaters received at the plant, with the following exception. In 2011, EPA issued an administrative order for compliance and request for information to a POTW in New Castle, Pennsylvania, in relation to permit effluent limit violations.[41] The POTW experienced violations of its suspended solids limits spanning over a year, and attributed the violations to salty wastewater from natural gas production it was receiving. The order required the POTW to take several actions including to cease accepting oil and gas exploration and

---

[38]See also 74 Fed. Reg. 58,784, 58,803 (Nov. 13, 2009) (in the context of SPCC regulations, stating "Information reviewed by the Agency and presented in the public docket (EPA–HQ–OPA–2007–0584–0015) showed corrosion as a common cause of oil and produced water discharges at onshore oil production facilities. The higher salt content of produced water fluids as compared to crude oil may lead to the increased corrosion rate of metallic components of the produced water storage system.").

[39]Memorandum from EPA Office of Wastewater Management to EPA Regions with answers to frequently asked questions about wastewater issues resulting from shale gas extraction (2012), available at http://cfpub.epa.gov/npdes/hydrofracturing.cfm

[40]NPDES permits held by POTWs do typically require monitoring for whole effluent toxicity, intended to measure whether the effluent is harmful to aquatic life. Some POTWs in Pennsylvania have previously accepted produced water; EPA Region 3 officials were unsure if data are available regarding whether these POTWs had problems with their whole effluent toxicity tests.

[41]In the Matter of New Castle Sanitation Authority, Findings of Violation Order for Compliance and Request for Information, EPA. Docket No. CWA-03-2011-0272 DN.

production wastewater until completing an evaluation and sampling, and to eliminate and prevent recurrence of the violations.

## POTW Obligations

Generally, local governments operating POTWs are responsible for ensuring that indirect dischargers comply with any applicable national pretreatment standards.[42] Certain POTWs are required to develop pretreatment programs, which set out a facility's approach to developing, issuing, and enforcing pretreatment requirements on any indirect dischargers to the particular plant.[43] EPA or states may be responsible for ensuring these POTWs meet their obligations and for approving the POTW's pretreatment plans.

According to EPA, regardless of pass through or interference, POTWs should not accept indirect discharges of produced water if the wastewaters have different characteristics than those for which the POTW was originally permitted, without providing adequate notice to the permitting authority.[44] If a POTW accepts oil and gas wastewater with characteristics that were not considered at the time of the permit issuance, then the permit may not adequately protect the receiving water from potential violations of water quality standards. In other words, a POTW may meet its permit limits, yet still contribute to a violation of water quality standards, if the permit does not reflect consideration of all the pollutants actually present, and their concentrations, in the incoming wastewater and in the discharge. According to Region 3 officials, EPA has conducted several investigations of whether discharges from POTWs accepting oil and gas wastewater have prevented receiving waters from meeting water quality standards. Region 3 officials stated that a major impediment to this evaluation was that the NPDES permits reviewed did not have effluent limits or monitoring requirements for the pollutants of concern. EPA also stated that it has data from a 2009 Pennsylvania Department of Environmental Protection violation report documenting a

---

[42]See EPA, Introduction to the National Pretreatment Program, EPA-833-B-11-001,3-3 (2011).

[43]C.F.R. § 403.8(a) (2012); see also http://cfpub.epa.gov/npdes/faqs.cfm?program_id=3

[44]Memorandum from EPA Office of Wastewater Management to EPA Regions with Answers To Frequently Asked Questions About Wastewater Issues Resulting From Shale Gas Extraction, Attachment at 9 (Mar. 16, 2011), available at http://cfpub.epa.gov/npdes/hydrofracturing.cfm

fishkill attributed to a spill of diluted produced water in Hopewell Township, PA.[45]

In March 2011, EPA's Office of Water issued to the Regions a set of questions and answers that provide state and federal permitting authorities in the Marcellus shale region with guidance on permitting treatment and disposal of wastewater from shale gas extraction.[46] The guidance states that POTWs must provide adequate notice to the permitting authority (EPA or the authorized state) of any new introduction of pollutants into the POTW from an indirect discharger, if the discharger would be subject to NPDES permit requirements if it were discharging directly to a surface water, among other things.[47] EPA officials indicated that if a POTW is accepting types of wastewater that were not on its original application, EPA could require a modification of the POTW's NPDES permit, or object to a NPDES renewal that did not address these wastewaters and the facility's ability to treat them. POTWs may also initiate inclusion of these wastewaters in their permits or permit renewals. For example, EPA Region 3 officials stated that four POTW operators in Pennsylvania in the NPDES renewal process have indicated the intent to continue accepting oil and gas wastewater. In addition, in cases with pass through or interference, EPA could require a POTW to develop a pretreatment program.

EPA's website indicates the agency plans to supplement the existing Office of Water questions and answers document with additional guidance directed to permitting authorities, pretreatment control authorities and POTWs, to provide assistance on how to permit POTWs and other centralized wastewater treatment facilities by clarifying existing CWA authorities and obligations.[48] Specifically, EPA plans to issue two guidance documents, one for permit writers and another for POTWs.

---

[45] 76 Fed. Reg. 66,286, 66,297 (Oct. 26, 2011).

[46] Memorandum from EPA Office of Wastewater Management to EPA Regions with Answers To Frequently Asked Questions About Wastewater Issues Resulting From Shale Gas Extraction (Mar. 16, 2011), available at http://cfpub.epa.gov/npdes/hydrofracturing.cfm

[47] Id. at 9; see also 40 C.F.R. § 122.42(b)(1) (2012).

[48] http://www.epa.gov/hydraulicfracture/#swdischarges

## Anticipated Rulemaking to Develop Pretreatment Standards for Gas Extraction from Shale Formations

With respect to shale gas extraction, the effluent limitations guideline for the onshore subcategory in effect since 1979 has prohibited direct discharges of associated wastewaters; however, EPA has not established pretreatment standards for indirect discharges of such wastewaters. EPA requested and received comments on whether to initiate a rulemaking for the industry in recent years.[49]

In 2011, EPA announced it will initiate a rulemaking to develop such pretreatment standards. EPA reviewed existing data, but did not conduct a study to develop data as it had for coalbed methane. EPA found that pollutants in wastewaters associated with shale gas extraction are not treated by the technologies typically used at POTWs or many centralized treatment facilities.[50] Further, EPA stated that resulting discharges have the potential to affect drinking water supplies and aquatic life. On this basis, EPA concluded that pretreatment standards are appropriate and decided to initiate a rulemaking.[51] EPA intends to conduct a survey, among other things, to collect information on management of produced water to support the rulemaking.[52] Finally, EPA noted that if it obtains information indicating that POTWs are already adequately treating shale gas wastewater, the agency could adjust the rulemaking plans accordingly.[53] For example, the state of Pennsylvania requested that operators of Marcellus shale gas wells stop delivering produced water to POTWs, potentially avoiding the issue. EPA officials stated that other states may nonetheless have a need to utilize POTWs to address these wastewaters and hence could benefit from pretreatment standards.

EPA is in the preproposal stage of this rulemaking, and EPA's website indicates the projected date for publication of the proposed rule is 2014.

---

[49] See, e.g., 76 Fed. Reg. at 66,292, 66,295, 74 Fed. Reg. 68,599 (Dec. 28, 2009).

[50] 76 Fed. Reg. at 66,295-96. According to EPA, POTWs typically have permits that do not contain limits for the pollutants of concern in shale gas wastewater; the secondary treatment requirements do not address such pollutants, and is it uncommon for these permits to contain water quality based limitations for such pollutants. Id. at 66,297. Thus, such wastewaters likely pass through the POTWs receiving such wastewaters and the POTWs may not monitor for these pollutants in their effluent.

[51] Id. at 66,297.

[52] Id.

[53] Id. at 66,298.

## NPDES for Stormwater Discharges

In 1987, the Water Quality Act amended CWA to establish a specific program for regulating stormwater discharges of pollutants to waters of the United States.[54] Among other things, the amendments clarified EPA authority to require an NPDES permit for discharges of stormwater from several categories, including in relevant part those associated with industrial activity and construction activity.[55] EPA subsequently issued regulations that address stormwater discharges from several source categories, including certain industrial activities and construction activities.[56]

## Stormwater from Industrial Activities

Generally, industrial sites obtain coverage for stormater through a general permit, such as the multisector general permit or construction general permit.[57] To do so, the facility operator submits a notice of intent, and agrees to meet general permit conditions. For example, conditions for the construction general permit include applicable erosion and sediment control, site stabilization, and pollution prevention requirements.[58]

In providing EPA authority to regulate stormwater discharges, the Water Quality Act also prohibited EPA from requiring a NPDES permit for discharges of stormwater from:

> oil and gas exploration, production, processing, or treatment operations or transmission facilities composed entirely of flows which are from conveyances or systems of conveyances (including but not limited to pipes, conduits, ditches, and channels) used for collecting and conveying precipitation runoff and which are not contaminated by contact with, or do not come into contact with, any overburden,[59] raw material,

---

[54] See generally Water Quality Act of 1987, Pub. L. No. 100-4 § 405, 101 Stat. 7, 69-71 (adding CWA § 402(p), codified at 33 U.S.C. § 1342(p) (2012)).

[55] Id., 55 Fed. Reg. 47,990, 47,992 (Nov. 16, 1990) (Phase 1 rule).

[56] 55 Fed. Reg. at 47,990.

[57] See Multisector General Permit at App. C.

[58] See EPA, 2012 Construction General Permit Fact Sheet at 6-7, 36.

[59] Subsequently, EPA added to its regulations a definition of overburden: "any material of any nature, consolidated or unconsolidated, that overlies a mineral deposit, excluding topsoil or similar naturally-occurring surface materials that are not disturbed by mining operations." 40 C.F.R. § 122.26(b)(10) (2012).

intermediate products, finished product, byproduct, or waste products located on the site of such operations.[60]

Interpreting the provision exempting oil and gas facilities, EPA issued regulations requiring permits for *contaminated* stormwater from oil and gas facilities.[61] To determine whether a discharge of stormwater from an oil or gas facility is contaminated, EPA regulations establish that if a facility has had a stormwater discharge that resulted in a discharge exceeding an EPA reportable quantity requiring notification under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) or section 311 of CWA, or which contributes to violation of a water quality standard, the permit requirement is triggered for that facility.[62]

Regarding stormwater at oil and gas well sites, officials said it is unlikely there is a permit requirement because it is rare that stormwater would come into contact with raw materials. Nonetheless, if a facility anticipates having a stormwater discharge that includes a reportable quantity of oil or may result in a violation of water quality standards, then the facility would be obligated to apply for a NPDES permit. In applying for the permit, however, the facility has to agree not to discharge pollutants in a reportable quantity and not to discharge pollutants so as to cause a water quality violation. Given this, it is unclear whether facilities would apply for such a permit after they have had a release of a reportable quantity or contributing to a water quality violation. Furthermore, according to officials, EPA relies upon operators self-identifying based on reportable quantities or water quality violations.

Despite these factors, EPA reviewed available data for the five states in which EPA administers the NPDES program,[63] including Texas, and

---

[60]Water Quality Act of 1987, § 401, 101 Stat. 65-66 (codified at 33 U.S.C. § 1342(l)(2) (2012)).

[61]55 Fed. Reg. at 48,029, 40 C.F.R. §§ 122.26(b)(14)(iii), (c)(1)(iii) (2012).

[62]Id. The reporting requirements triggering a permit are listed in 40 C.F.R. §§ 117.21, 302.6, 110.6 (2012). Note that the generally applicable industrial stormwater regulations also provide a conditional exclusion for discharges composed entirely of stormwater if there is no exposure of industrial materials and activities to rain, snow, snowmelt and runoff, and where additional conditions are satisfied. 40 C.F.R. § 122.26(g) (2012).

[63]The states are Idaho, Massachusetts, Texas, Oklahoma, and Alaska.

identified some stormwater general permit notifications for facilities that could be well sites.[64]

**Stormwater from Construction Activity**

EPA regulations require permits for stormwater discharges from construction activities including clearing, grading, and excavating that result in land disturbance. Beginning in 1990, EPA began regulating stormwater discharges from construction sites disturbing more than 5 acres of land under its Phase I rule. Under Phase II rules issued in 1999, EPA regulated stormwater discharges from construction sites disturbing between 1 and 5 acres of land, with initial permit applications due in 2003.

With respect to oil and gas well sites, under the statutory provisions and EPA's Phase 1 stormwater regulations, discharges of stormwater from construction activity would have required a permit only for sites disturbing more than 5 acres and where the stormwater is contaminated by contact with, or comes into contact with, any overburden, raw material, intermediate products, finished product, byproduct, or waste products located on the site of such operations.[65] According to EPA officials, the agency believed few oil and gas sites met these conditions. They further explained that when EPA conducted the Phase II rulemaking for the smaller 1 to 5 acre sites, the agency assumed incorrectly that oil and gas well sites would be smaller than 1 acre and thus did not include oil and gas well sites in their economic analysis of the rule. After the rule's issuance as it became aware that such sites would fall under the rule, and in light of industry objections over the lack of economic analysis, EPA delayed Phase II implementation at oil and gas well sites until 2006.[66]

---

[64]Specifically, EPA officials identified approximately 34 notifications from facilities with Standard Industrial Classification codes that could indicate that the facility is a well site for example, codes 1381 (drilling oil and gas) and 1389 (hydraulic fracturing services).

[65]CWA §§ 402(*l*)(2), 502(24), 33 U.S.C. §§ 1342(*l*)(2), 1362(24); 55 Fed. Reg. 47,990, 48,065 (Nov. 16, 1990) (amending 40 C.F.R. § 122.26; see § 122.26(a)(1)(ii), (b)(14)(x)).

[66]In 2005, EPA revised its regulation to extend the deadline for permits for contaminated stormwater discharges associated with small construction activity—generally including clearing, grading and excavating that results in land disturbance more than 1 acre but less than 5 acres—at oil and gas sites to June 12, 2006. 70 Fed. Reg. 11,560, 11,563 (Mar. 9, 2005) (amending 40 C.F.R. § 122.26(e)(8)). Other industry sites requiring permit coverage for small construction activity were required to comply by March 2003. http://cfpub.epa.gov/npdes/stormwater/cgp.cfm

Before implementation of Phase II regulations at oil and gas well sites began, the Energy Policy Act of 2005 was enacted. The Energy Policy Act of 2005 amended CWA to specifically define the activities included in the oil and gas stormwater exemption. Where the law already exempted from NPDES permit requirements discharges of stormwater from "oil and gas exploration, production, processing, or treatment operations or transmission facilities,"[67] the Energy Policy Act of 2005 added a definition of this term as "all field activities or operations associated with exploration, production, processing, or treatment operations, or transmission facilities, including activities necessary to prepare a site for drilling and for the movement and placement of drilling equipment, whether or not such field activities or operations may be considered to be construction activities."[68]

In response to these amendments, in 2006, EPA revised a key provision of the regulations concerning oil and gas stormwater discharges.[69] The revision provided that discharges of sediment from oil or gas facility construction activities and contributing to a water quality standard violation would not trigger a permit requirement. This revision was vacated and remanded by the Ninth Circuit in 2008.[70] EPA has not subsequently revised the regulations applicable to stormwater discharges from oil and gas facilities; the pre-2006 regulations remain in effect as to this industry.[71] EPA officials said the agency intends to revise its regulations to address the court's vacatur in an upcoming stormwater rulemaking,[72] with the proposal expected in 2013.

According to EPA officials, during construction, oil and gas well sites would have no permit requirement because of the statutory exemption.

---

[67]Water Quality Act of 1987 § 401 (adding 33 U.S.C. § 1342(l)(2)).

[68] Energy Policy Act of 2005, Pub. L. No. 109–58, § 323, 119 Stat. 594, 694 (adding 33 U.S.C. § 1362(24) (2012)).

[69]71 Fed. Reg. 33,628 (June 12, 2006) (amending 40 C.F.R. § 122.26(a)(2)(ii) (2006)). As stated in EPA's fact sheet for the 2006 revisions, permits would be required only in "very limited instances."

[70]*Natural Resources Defense Council v. EPA*, 526 F.3d 591 (9th Cir. 2008).

[71]Id. See also
http://cfpub.epa.gov/npdes/regresult.cfm?program_id=6&type=1&sort=name&view=all

[72]Compare 40 C.F.R. § 122.26 (2012) with 40 C.F.R. § 122.26 (2005).

## NPDES Enforcement

For violations of the law, or applicable regulations or permits, EPA has authority to issue administrative orders requiring compliance, impose administrative penalties, as well as to bring suit and, in conjunction with the Department of Justice, to impose civil penalties.[73] Among other things, EPA can take such actions if a well operator violates the CWA prohibition on unauthorized discharges of pollutants to surface waters.[74] EPA also has information-gathering and access authority relative to point source owners and operators, which could include certain oil and gas well site operations.[75] For example, EPA has authority to inspect facilities where an effluent source is located.[76]

As an example of enforcing the prohibition of unauthorized discharges, in 2011, EPA Region 6 assessed an administrative civil penalty against a company managing an oil production facility in Oklahoma for discharging brine and produced water to a nearby stream.[77] In another case, EPA entered a consent agreement with an oil production company in Colorado for unauthorized discharges of produced water from a multiwell site due to a failed gas eliminator valve in a produced water transportation pipeline.[78] The produced water travelled overland for 333 feet, then entered a stream tributary to an interstate river. The company agreed to pay a civil penalty and to conduct a macroinvertebrate study for the affected watershed.

## Imminent and Substantial Endangerment Authorities

CWA section 504 provides EPA an imminent and substantial endangerment authority, authorizing EPA to bring suit to restrain a person to stop the discharge of pollutants causing or contributing to pollution, or to

---

[73]CWA § 309, 33 U.S.C. § 1319 (2012).

[74]Id., CWA § 301(a), 33 U.S.C. § 1311(a) (2012). As explained above, however, discharges of pollutants via stormwater from a well site generally does not require a permit, and thus such discharges without a permit would not be considered unauthorized, except in limited circumstances.

[75]CWA § 308(a), 33 U.S.C. § 1318(a) (2012).

[76]CWA § 308(a)(B)(i), 33 U.S.C. § 1318(a)(B)(i) (2012).

[77]*American Petroleum & Environmental Consultants, Inc.*, Cease and Desist Administrative Order, EPA Docket No. CWA-06-2012-1760 (Dec. 12, 2011).

[78]*BP America Production Company*, Combined Complaint and Consent Agreement, EPA Docket No. CWA-08-2012-0014 (May 15, 2012).

take such other action as may be necessary, upon receipt of evidence that a pollution source or combination of sources is presenting an imminent and substantial endangerment to the health of persons or to the livelihood of persons.[79] Unlike the analogous provisions of several other major environmental laws, however, CWA section 504 does not expressly mention administrative orders.

# Oil and Hazardous Substances Spill Prevention, Reporting, and Response

## Spill Prevention and Response Plans

EPA's Oil Pollution Prevention regulations, promulgated and amended pursuant to CWA and the Oil Pollution Act, impose spill prevention and response planning requirements on oil and gas well sites that meet thresholds.[80] Specifically, the Spill Prevention, Control, and Countermeasure (SPCC) Rule applies to sites with underground and/or aboveground storage tanks above certain thresholds and where oil could be discharged into or upon navigable waters.[81] Onshore oil and gas production facilities, among others, generally are subject to the rule if they (1) have an aggregate oil storage capacity of greater than 1,320 gallons in aboveground oil storage containers or a total oil storage capacity greater than 42,000 gallons in completely buried storage tanks and (2) could reasonably be expected, due to their location, to discharge harmful

---

[79]CWA § 504, 33 U.S.C. § 1364 (2012).

[80]40 C.F.R. pt. 112 (2012); see also 67 Fed. Reg. 47,042 (July 17, 2002).

[81]Id.

quantities of oil into or upon U.S. navigable waters or adjoining shorelines.[82]

The SPCC rule, as amended, requires each owner or operator of a regulated facility to prepare and implement a plan that describes how the facility is designed, operated, and maintained to prevent oil discharges into or upon U.S. navigable waters and adjoining shorelines. The plan must also include measures to control, contain, clean up, and mitigate the effects of these discharges.

EPA regulations specify requirements for SPCC plans for onshore oil drilling and oil production facilities.[83] Onshore drilling facilities must meet the general requirements for such plans, as well as meet specific discharge prevention and containment procedures: (1) position or locate mobile drilling or workover equipment so as to prevent a discharge; (2) provide catchment basins or diversion structures to intercept and contain discharges of fuel, crude oil, or oily drilling fluids; and (3) install a blowout prevention (BOP) assembly and well control system before drilling below any casing string or during workover operations.[84] Oil production facilities are exempt from the SPCC security provisions.[85]

EPA has amended the SPCC regulations from time to time. In 2008, EPA amended the regulations to streamline certain requirements, to be effective in January 2010.[86] These amendments included several provisions easing requirements for oil production sites, such as excluding them from loading/unloading rack requirements, providing alternative

---

[82]40 C.F.R. § 112.2 (2012) (For purposes of the SPCC rule, "[t]he term 'navigable waters' of the United States means 'navigable waters' as defined in section 502(7) of the FWPCA, and includes: (1) all navigable waters of the United States, as defined in judicial decisions prior to the passage of the 1972 amendments of the Federal Water Pollution Control Act, (FWPCA) (Pub. L. No. 92-500) also known as CWA and tributaries of such waters as; (2) interstate waters; (3) intrastate lakes, rivers, and streams that are utilized by interstate travelers for recreational or other purposes; and (4) intrastate lakes, rivers, and streams from which fish or shellfish are taken and sold in interstate commerce.").

[83]40 C.F.R. § 112.10 (2012).

[84]Id.

[85]40 C.F.R. § 112.7(g) (2012). See also U.S. Chemical Safety and Hazard Investigation Board, Investigative Study Final Report: Public Safety at Oil and Gas Storage Facilities, Report No. 2011-H-1 at 8 (September 2011).

[86]73 Fed. Reg. 74,236 (Dec. 5, 2008).

qualified facility eligibility criteria (for streamlined compliance with self-certification of SPCC plans), and exempting certain produced water containers.[87] In November 2009, EPA revised the amendments, eliminating these three provisions before they became effective.[88] EPA explained that, in consideration of relevant facts and public comments, there was either no basis for the exclusion or the exclusion will not effectively protect the environment from discharges. For example, with respect to the alternative qualified facility criteria provision, EPA stated that the agency

> reviewed the spill data for the oil production sector contained in its study of the exploration and production sector…While these data do not characterize the extent of environmental damage caused by oil discharges from small oil production facilities, they demonstrate that the volume of oil discharged from onshore oil production facilities [is] increasing, and the number of oil discharges on a yearly basis has remained the same, despite a decline in crude oil production. In addition, oil production facilities are often unattended, and typically located in remote areas, which potentially increases the risk of environmental damage from an oil discharge of oil.[89]

Various development activities at oil and gas well sites involve storage of oil that may trigger the SPCC regulations to impose these requirements. During initial exploration and drilling, the capacity of the fuel tank of the drill rig is the primary way the SPCC rule could be triggered, and EPA officials said that almost all drill rigs exceed the threshold capacity. During well completion and workover, where hydraulic fracturing is conducted, EPA officials said the capacity of the fuel tank in the turbines and pumps being used for fracturing typically exceed the threshold. As to wells in the production phase, they said there would generally be no SPCC requirement at dry gas wells, because they would not be storing condensate on-site. For wet gas and oil production, the size of the condensate or oil tanks on the site would be the key to whether SPCC is triggered.

---

[87] 74 Fed. Reg. 58,784, 58,799-803 (Nov. 13, 2009).

[88] Id. at 58,799-803, 58,809-811.

[89] Id. at 58,802. See also Considerations for the Regulation of Onshore Oil Exploration and Production Facilities Under the Spill Prevention, Control, and Countermeasure Regulation (40 C.F.R. part 112)) (available at www.regulations.gov document EPA–HQ–OPA–2007–0584–0015).

EPA has developed guidance related to SPCC applicability and compliance for oil production, drilling, and workovers.[90] According to officials, EPA is currently developing a "frequently asked questions" document about the SPCC program and hydraulic fracturing. This document is being developed in response to an influx of questions about how the SPCC rule applies to gas well sites, particularly from companies active in the Marcellus shale. According to EPA officials, while the SPCC is focused on oil, wet gas wells involve condensates, some of which have traditionally been deemed liquid hydrocarbons and included in the program. In particular, questions have arisen over the lightest condensates (C2 and C4 hydrocarbons), which are usually in gaseous form at standard temperatures and pressures and hence are not included in the SPCC program, whereas storage of heavier condensates, such as C6+ hydrocarbons, has been included (as liquids) in the SPCC program.

EPA directly administers the SPCC program.[91] EPA's regulations do not require facilities to report to the agency that they are subject to the SPCC rule and, as of 2008, EPA did not know the universe of SPCC-regulated facilities, but the agency was considering developing some data.[92] EPA officials stated that they have significant data but not complete data because of the lack of a registration or submittal requirement. To ensure that facility owners and operators are meeting SPCC requirements, EPA personnel inspect selected regulated facilities to determine their compliance with the regulations. For some facilities, the SPCC compliance date was in November 2011.[93] EPA is working to develop a national database of sites inspected under the SPCC rule. Officials said that the SPCC program's database includes 120 inspections at oil and gas production facilities for fiscal year 2011, of which 105 had some form of noncompliance, which varies in significance from paperwork inconsistencies to more serious violations (though EPA officials were unable to specifically quantify the number of more serious violations).

---

[90]See www.epa.gov/osweroei/content/spcc/spcc_up.htm, http://www.epa.gov/Region8/opa/wkshop.html (Cross Reference Matrix For Drilling And Workover Facilities).

[91]The Clean Water Act does not provide EPA with the authority to authorize states to implement the program in its place.

[92]GAO-08-482.

[93]See 40 C.F.R. § 112.3(a)(1) (2012); see generally 40 C.F.R. § 112.3(a)(1)-(3) (2012) (establishing deadlines for SPCC plans).

According to EPA headquarters officials, EPA generally selects facilities for inspection based on spill reports EPA receives through the National Response Center.

The Oil Pollution Prevention Regulation also requires an owner or operator of nontransportation onshore facilities that could, because of location, reasonably be expected to cause substantial harm to the environment by discharging oil into or on the navigable waters or shorelines, to submit to the appropriate EPA Regional office a facility response plan.[94] The regulation specifies criteria to be used in determining whether a facility could reasonably be expected to cause substantial harm and hence triggers such requirement,[95] and it also provides that the EPA Administrator may at any time, on determination considering additional factors, require a facility to submit a facility response plan.[96] A facility owner or operator also may maintain certification that it could not, because of location, reasonably be expected to cause substantial harm by discharging oil into or onto navigable waters or shorelines.[97] Relevant to oil well sites, the initial criteria for requiring a facility response plan is that the facility has total oil storage of 1 million gallons or more. Where such facilities meet at least one of four other criteria—such as lacking secondary containment, or located at distances that could injure fish and wildlife—then a facility response plan is required.[98] The plan is to provide, in essence, an emergency response action plan for the worst-case discharge and other relevant information.[99] According to EPA officials, onshore oil well sites would typically not go over the threshold criteria triggering the requirement for a facility response plan. Officials said there may be a small number of sites where very large or centralized operations with a number of wells connected to central piping and/or storage might trigger a facility response plan.

---

[94]40 C.F.R. § 112.20 (2012).

[95]Id. at (f)(1), 40 C.F.R. Pt. 112, App. C, Att. C-1.

[96]40 C.F.R. §§ 112.20(b)(1), (c), (f) (2012).

[97]Id. at (e).

[98]Id. at (f)(1), App. C, Att. C-1 (2012). For new facilities, the facility response plan is to be submitted before startup, for facilities commencing operation after Aug. 30, 1994; time frames are different for facilities required to submit a plan due to changes in operation, among other things. See 40 C.F.R. § 112.20(a)(2)(ii) (2012).

[99]Id. at (h).

## Spill Prohibition and Reporting

CWA established the policy of the United States that there should be no discharges of oil or hazardous substances into or upon U.S. navigable waters or onto adjoining shorelines, among other resources, and generally prohibited such discharges.[100] Relevant provisions require reporting of certain discharges of oil or a hazardous substance to these waters.[101]

EPA has issued regulations designating those hazardous substances that present an imminent and substantial danger to the public health or welfare when discharged to U.S. navigable waters or onto adjoining shorelines in any quantity.[102]

EPA also has determined, in regulations, the quantities of oil and other hazardous substances of which the discharge to U.S. navigable waters or onto adjoining shorelines may be harmful to the public health or welfare or the environment.[103] CWA in conjunction with these regulations require facilities to report to the National Response Center certain unpermitted releases of oil or hazardous substances to surface waters.[104] The National Response Center subsequently sends reports to EPA Regions and headquarters. With respect to oil, discharges of oil must be reported if they "(c)ause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines," or if they violate applicable water quality standards.[105] With respect to

---

[100]CWA § 311(b)(1), (3), 33 U.S.C. § 1321(b)(1), (3) (2012). The scope of jurisdiction for the section 311 oil spill program is broader than that for the NPDES program. The section 311 oil spill program and the NPDES program both have jurisdiction over navigable waters of the United States; Section 311 also provides jurisdiction over spills of oil or hazardous substances into or on adjoining shorelines or that may affect natural resources of the United States, among others.

[101]Id. at (b)(3)-(5).

[102]40 C.F.R. § 116.4 (2012), see also CWA § 311(b)(2)(A), 33 U.S.C. § 1321(b)(2)(A) (2012).

[103]CWA § 311(b)(2)(A), (4), 33 U.S.C. § 1321(b)(2)(A), (4) (2012), 40 C.F.R. pt. 110, pt. 116-17 (2012).

[104]CWA § 311(b), 33 U.S.C. § 1321(b) (2012), 40 C.F.R. 110.6 (2012). See also 33 C.F.R. § 153.203 (2012).

[105]40 C.F.R. §§ 110.6, 110.3, 110.1 (2012), http://www.epa.gov/osweroe1/content/reporting/faq_subs.htm#pelist

hazardous substances, EPA has determined threshold quantities—those which may be harmful to the public health or welfare or the environment—known as reportable quantities.[106]

## Spill Response Authority

EPA, as well as other relevant federal agencies, has various response authorities to ensure effective and immediate removal of a discharge, and mitigation or prevention of a substantial threat of a discharge, of oil or a hazardous substance to U.S. navigable waters or onto adjoining shorelines.[107] The National Oil and Hazardous Substances Pollution Contingency Plan, issued by EPA by regulation, provides a system to respond to discharges and to contain, disperse, and remove oil and hazardous substances, among other things.[108] For example, according to EPA Region 5, in conjunction with the state of Ohio, the Region has responded to several incidents in which orphan wells were found to be leaking or discharging crude oil into waterways.

Under CWA section 311, as required to carry out its purposes including spill prevention and response, EPA also has authority to require the owner or operator of a facility subject to the Oil Pollution Prevention Regulation, among other provisions, to establish and maintain such records; make such reports; install, use, and maintain such monitoring equipment and methods; provide such other information deemed necessary; and for entry and inspection of such facilities.[109]

## Enforcement of SPCC and Spill Prohibition and Reporting Requirements

For violations of the law, or applicable regulations or permits, EPA has authority to issue administrative orders requiring compliance, impose administrative penalties, as well as to bring suit, in conjunction with the Department of Justice, to impose civil penalties.[110] Section 311 also gives EPA the authority to access records and inspect facilities, and the ability

---

[106]40 C.F.R. §§ 117.3; § 116.4 at table 116.4A; see also 40 C.F.R. § 302.4 at table 302.4 (2012).

[107]CWA § 311(c), 33 U.S.C. § 1321(c) (2012).

[108]Id., 40 C.F.R. pt. 300 (2012).

[109]CWA § 311(m)(2), 33 U.S.C. § 1321(m)(2) (2012).

[110]Id. at (b)(6)-(7), (c), (e)(1)(B) (2012).

to require provision of information, with respect to persons and facilities subject to section 311, including SPCC program requirements.[111]

For example, in Region 8, EPA participated in an effort with the U.S. Fish and Wildlife Service (FWS), states, and tribes, after FWS expressed concerns about migratory birds landing on open pits that contained oil and water, which killed or harmed the birds.[112] This effort involved aerial surveys to observe pits. Where apparent problems were identified, relevant federal or state agencies were notified and were to give oil and gas operators an opportunity to correct problems. Ground inspections were then conducted where deemed warranted and, if problematic conditions were found, further follow-up action was taken by EPA or the relevant state or other federal agency. As a result of this effort, 99 sites with violations of SPCC requirements were identified.[113] EPA's report stated that "[n]on-compliance with SPCC requirements was more pervasive than anticipated. Although the SPCC program has been the focus of outreach and compliance assistance nationally for more than 25 years, there remains a strong need to communicate its requirements, inspect regulated facilities, and conduct appropriate technical assistance or enforcement to ensure improved compliance."[114] The report states that, for most SPCC violations, EPA issued a notice of violation and that many notice of violation recipients came into compliance without escalation to formal enforcement, but that some enforcement actions were taken.[115] Region 8 reported identifying 22 sites with documented SPCC violations as a result of subsequent efforts in 2004-2005.[116] Information on the nature or resolution of these violations was not readily available.

---

[111]Id. at (m)(2) (2012).

[112]EPA Region 8, Oil and Gas Environmental Assessment Effort 1996 – 2002, v (2003).

[113]Id. at 7.

[114]Id. at 8.

[115]Id. at 8.

[116]EPA Region 8, Summary Report, Oil and Gas Environmental Assessment Activities in Wyoming during 2004-2006.

| | |
|---|---|
| Imminent and Substantial Endangerment Authority for Spills | CWA section 311 provides EPA authority to address certain releases of oil or hazardous substances to U.S. navigable waters and adjoining shorelines. Specifically, on determination that "there may be an imminent and substantial threat to the public health or welfare of the United States, including fish, shellfish, and wildlife, public and private property, shorelines, beaches, habitat, and other living and nonliving natural resources under the jurisdiction or control of the United States, because of an actual or threatened discharge of oil or a hazardous substance from a vessel or facility" in violation of the prohibition against discharges of oil or hazardous substances to U.S. navigable waters and adjoining shorelines, EPA may bring suit, or may, after notice to the affected state, take any other action under this section, including issuing administrative orders, that may be necessary to protect the public health and welfare.[117] |

---

[117] CWA § 311(e)(1), 33 U.S.C. § 1321(e)(1) (2012). EPA also may, through the Department of Justice, file a civil action to secure any relief from any person, including the facility owner or operator, as may be necessary to abate such endangerment.

# Appendix IV: Key Requirements and Authorities under the Clean Air Act

The Clean Air Act (CAA or the Act) is the primary law with the purpose to protect and enhance the nation's air quality.[1] Under CAA, EPA regulates two primary types of air pollutants: criteria pollutants and hazardous air pollutants (HAPs). EPA sets, and periodically may revise, National Ambient Air Quality Standards for six criteria pollutants—carbon monoxide, sulfur dioxide, lead, nitrogen dioxide, particulate matter, and ozone.[2] States then develop state implementation plans (SIP) and seek EPA approval; if a SIP is not acceptable, EPA may assume primary responsibility for implementing and enforcing CAA in that state.[3] In addition, EPA retains CAA implementation and enforcement oversight authority in states with approved SIPs. The SIPs generally establish how the state will attain air quality standards, through regulation, permits, policies, and other means. SIPs also must demonstrate that the state program satisfies certain minimum federal statutory and regulatory requirements. EPA also establishes various federal air emission regulations addressing criteria pollutants or HAPs, and which generally fall into two categories of emission sources: stationary sources and mobile sources. Stationary sources of air pollution are generally any building, structure, facility, or installation that may emit any air pollutant.[4] With respect to oil and gas production as a stationary source, EPA has identified various components of oil and gas production that may be relevant to emissions:

> Production components may include, but are not limited to, wells and related casing head, tubing head and "Christmas tree" piping, as well as pumps, compressors, heater treaters, separators, storage vessels, pneumatic devices and dehydrators. Production operations also include the well drilling, completion and workover processes and includes all the portable non-self-propelled apparatus associated with those operations.[5]

---

[1] Clean Air Act Amendments of 1970, Pub. L. No. 91-604, 84 Stat. 1676 (1970) (codified as amended at 42 U.S.C. §§ 7401-7671q (2011)( (commonly referred to as the Clean Air Act). Hereinafter, references to CAA are as amended.

[2] See CAA § 109, 42 U.S.C. § 7409 (2012).

[3] CAA § 110, 42 U.S.C. § 7410 (2012).

[4] CAA §§ 302(z), 111(a)(3), 112(a)(3), 42 U.S.C. §§ 7602(z), 7411(a)(3), 7412(a)(3) (2012), 40 C.F.R. §§ 52.21(b)(5), 60.2, 63.3 (2012).

[5] 76 Fed. Reg. 52,738, 52,744 (Aug. 23, 2011). EPA's description of oil and gas production also includes certain facilities separate from the well pad, such as pipelines transporting oil and gas to refineries or processing plants, which are outside the scope of GAO's review.

In addition, EPA officials have noted that tanks, ponds, and pits are sources of emissions that may be present at well sites. Others have also identified condensate storage tanks and flaring as significant emission sources often associated with gas wells.[6] The key criteria pollutant of concern for oil and gas production is VOCs, as an ozone precursor, and the primary HAP released by the oil and gas production industry are BTEX (benzene, toluene, ethylbenzene, and xylenes) and n-hexane.[7]

To address stationary sources under CAA, EPA is required to promulgate industry-specific emissions standards such as National Emission Standards for Hazardous Air Pollutants (NESHAP) and New Source Performance Standards (NSPS) for source categories that EPA has listed under the Act.[8] CAA also provides for review of new and modified major sources of emissions under the Prevention of Significant Deterioration and Nonattainment New Source Review programs, typically implemented by states.[9] CAA and EPA regulations require operating permits, known as Title V permits, for certain stationary sources, and establish minimum requirements for state operating permitting programs.[10] Each of these key programs is described below as it may apply to oil and gas well sites.

Mobile sources associated with oil and gas production may include trucks bringing fuel, water, and supplies to the well site; construction vehicles; and truck-mounted pumps and engines. That is, oil and gas wells may be served by a variety of road and nonroad vehicles and engines. EPA regulates emissions from an array of mobile sources by imposing emission limits on such vehicles and engines; these generally applicable regulations are not specific to the oil and gas industry and are not discussed here.

Finally, the Act includes provisions addressing accidental releases of dangerous pollutants to the air.[11] Oil and gas wells are unlikely to trigger the planning aspects of these provisions, according to EPA; however, the

---

[6]NRDC, Drilling Down: Protecting Western Communities from the Health and Environmental Effects of Oil and Gas Production 11 (2007).

[7]64 Fed. Reg. 32,610 (June 17, 1999).

[8]CAA §§ 111(b)(, (f), 112(c)(2), (d), 42 U.S.C. §§ 7411(b), (f), 7412(c)(2), (d) (2012).

[9]CAA §§ 165(a), 171-193, 160-169B, 42 U.S.C. §§ 7475(a), 7501-7515, 7470-7492 (2012).

[10]CAA § 502, 42 U.S.C. § 7661a (2012), 40 C.F.R. §§ 70.3, 71.3 (2012).

[11]CAA § 112(r), 42 U.S.C. § 7412(r) (2012).

well sites are subject to the general duty clause, a self-implementing provision of CAA under which operators are responsible for identifying hazards associated with accidental releases and designing and maintaining a safe facility, taking such steps as are necessary to prevent releases.

Table 9 summarizes the applicability of key Clean Air Act programs to emission points at oil and gas well sites. These provisions will be discussed in greater detail in this appendix.

**Table 9: Summary of CAA Programs That May Apply to Emissions from Oil and Gas Well Sites**

| CAA program | Specific rule for oil and gas production sector, applicable to well sites? | Likely applicability to emissions at oil and gas well sites |
|---|---|---|
| National Emission Standards for Hazardous Air Pollutants (NESHAP) | Yes, addressing glycol dehydrators and storage vessels with potential for flash emissions at major sources and only triethylene glycol dehydrators at area sources[a] | Data not available regarding the extent to which well sites comprise major or area sources subject to the NESHAP, but the NESHAPs may apply at few well sites. |
| New Source Performance Standards (NSPS) | Yes, addressing gas well completions, pneumatic controllers, and some storage vessels | Gas wells that are fractured are subject to flaring and phased-in green completion requirements, focused on VOC reductions, under April 2012 rule. |
| | | (Oil wells that are fractured are not subject to NSPS.) |
| | | Data not available on how many pneumatic controllers are at wells (in total, 13,500 subject to rule). |
| | | Data not available on how many storage vessels over threshold of 6 tons per year of VOC are at wells. In total, EPA estimates that 304 new source storage vessels will be subject to the rule annually and that most of these storage vessels are expected to be at wells. |
| New Source Review (NSR) | No (generally applicable) | Unknown; most likely is nonattainment NSR in severe areas, which have lowest threshold potential to emit. Programs are generally implemented by states and features vary. |
| Title V Operating Permits | No. The oil and gas NESHAP and NSPS specifically exempt area or nonmajor sources subject to these rules from Title V permitting requirements if they are not otherwise required by law to obtain such permits. | Unknown. |
| Accidental Releases: Risk Management Program | No (generally applicable) | Unlikely; regulated substances in oil and gas that meet the definition of "naturally occurring hydrocarbon mixture" are not counted toward threshold quantities of regulated substances; extent to which other regulated substances are present in threshold quantities at well sites not known. |
| Accidental Releases: General Duty Clause | No (generally applicable) | Applies; no threshold; EPA has used provision to conduct inspections and require control of leaks. |
| Greenhouse Gas Reporting | Yes | Applies with threshold at the basin-level, EPA estimates that certain emissions from approximately 467,000 onshore wells will be covered. |

Source: GAO.

[a]With respect to dehydrators, the major source standards apply to large glycol dehydrators—those with an actual annual average natural gas flowrate equal to or greater than 85 thousand standard cubic meters per day and actual annual average benzene emissions equal to or greater than 0.90 Mg per year. The area source standards apply to triethylene glycol dehydration units with natural gas flow rate at or above 3 million standard cubic feet per day and benzene emission at or above 1 ton per year.

# National Emission Standards for Hazardous Air Pollutants

## Hazardous Air Pollutants

The 1990 CAA amendments significantly expanded the hazardous air pollutants program; they identified 189 specific HAPs to be regulated, required EPA to list categories of sources to be regulated, and established implementation timelines.[12] The list of HAPs includes several potentially found in oil and gas well emissions.[13] In addition to these listed HAPs, EPA and others have identified hydrogen sulfide, which is found in oil and gas well emissions but is not a listed HAP, as hazardous and toxic to humans.[14] EPA has the authority to add to the HAPs list pollutants which may present, through inhalation or other routes of exposure, a threat of adverse human health effects or adverse environmental effects, but not including releases subject to EPA's regulation under section 112(r)—namely, the accidental release and risk management regulations.[15] The prevention of accidental releases regulation includes accidental releases of hydrogen sulfide.[16] In a 1993 report to Congress,

---

[12]Clean Air Act Amendments of 1990, Pub. L. No. 101-549, Title III, § 301, 104 Stat. 2399, 2531; Joint resolution to make a technical correction in Public Law 101-549, Pub. L. No. 102-187, 105 Stat. 1285 (1991). Of the 189 HAPs, two have since been delisted, so the list now includes 187 HAPs.

[13]The listed HAPs are also known as air toxics.

[14]In other regulatory contexts, hydrogen sulfide is considered hazardous; for example, it is a hazardous substance under CERCLA. 40 C.F.R. § 302.4 table 302.4, (2012). See also EPA, *Report to Congress on Hydrogen Sulfide Emissions Associated with the Extraction of Oil and Gas*, EPA-453-R-93/045 (1993) (stating that hydrogen sulfide "is toxic and care should be exercised in its presence;" EPA officials noted that the purpose of this report was not to examine whether or not hydrogen sulfide should included in the HAPs list.). Some have argued that hydrogen sulfide, of which oil and gas well emissions may be a significant source, should be a HAP. See NRDC, Drilling Down, at 13. While it was on the list initially enacted in the 1990 amendments, by a joint resolution, Congress corrected the inadvertent addition of hydrogen sulfide to the list. See page 2 of GAO, *Clean Air Act: EPA Should Improve the Management of Its Air Toxics Program*, GAO-06-669 (Washington, D.C.: Jun. 23, 2006). Cf. Earthworks and Oil & Gas Accountability Project, The Oil and Gas Industry's Exclusions and Exemptions to Major Environmental Statutes 14 (2007).

[15]CAA § 112(b)(2), 42 U.S.C. § 7412(b)(2) (2012).

[16]40 C.F.R. § 68.130 (2012).

EPA found that the limited data available did not evidence a significant threat to human health or the environment from "routine" emissions of hydrogen sulfide from oil and gas wells.[17]

CAA provides a process to petition EPA to modify the HAPs list. On March 30, 2009, the Sierra Club and 21 other environmental and public health organizations and individuals petitioned EPA to list hydrogen sulfide as a HAP under section 112(b).[18] The petitioners asserted that low-level hydrogen sulfide emissions not addressed by the accidental release provisions in section 112(r) are harmful to human health.[19] EPA officials told us they are considering the petition but have no specific timeline for acting upon it.

## NESHAPs Overview and Statutory Provisions Restricting Aggregation of Oil and Gas Production Sources

EPA is required to promulgate and periodically revise NESHAPs for source categories the agency has identified.[20] NESHAPs may include standards for major sources and for area sources, which are any sources not major.[21] Major source NESHAPs are based on the maximum achievable control technology (MACT), while EPA may use a different standard of generally available control technology for area sources.[22]

Major sources for NESHAPs are those that emit or have the potential to emit considering controls, in the aggregate, 10 tons per year or more of a single hazardous air pollutant or 25 tons per year or more of any

---

[17]The HAP provision also provided for EPA to submit a report to Congress in 1992 assessing the hazards to public health and the environment resulting from the emission of hydrogen sulfide associated with the extraction of oil and natural gas resources, and any recommendations, and directed EPA to, as appropriate, develop and implement a control strategy for such emissions using existing authorities. CAA § 112(n)(5), 42 U.S.C. § 7412(n)(5) (2012).

[18]Letter from Neil J. Carman, Sierra Club, et al, to Lisa Jackson, Administrator, EPA (Mar. 30, 2009). The petition states, among other things, that "[h]ealth studies support the need for EPA to list $H_2S$ [hydrogen sulfide] under CAA section 112(b), especially since H2S's routine exposure effects – on a daily basis – are not addressed whatsoever under the accidental release provisions in section 112(r) of CAA." Id. at 1.

[19]Id. at 11.

[20]CAA § 112(d)(1), (d)(6), 42 U.S.C. §§ 7412(d)(1), (d)(6) (2012).

[21]Id. at § 7412(a)(1)-(2).

[22]Id. at § 7412(d)(5).

combination of HAPs.[23] Normally, the determination of a facility's potential to emit HAPs is based on the total of all activities at a facility, known as aggregation.[24] Under a unique provision of CAA, however, "emissions from any oil or gas exploration or production well (with its associated equipment) and emissions from any pipeline compressor or pump station shall not be aggregated with emissions from other similar units," to determine whether such units or stations are major sources of air pollution, or for other purposes under section 112 (e.g., the HAPs section).[25] Finally, facilities that do not contain a regulated unit (e.g., glycol dehydrator or covered storage vessel) are not subject to any requirement in the rule, even if they emit HAPs.[26]

Regarding the aggregation provisions, EPA officials explained that the agency has historically interpreted the statutory language to prohibit aggregation of HAP emissions from wells and associated equipment, meaning that each well and piece of associated equipment must be evaluated separately for purposes of determining major source status.[27] EPA has defined "associated equipment" in the regulations.[28] Officials said that EPA has not evaluated the significance of the aggregation prohibition and EPA's interpretation of it, such as its effect on the numbers of facilities that are or are not regulated as major sources and hence subject to MACT controls. Officials also said that it is likely that the effect of the aggregation provisions on well sites is smaller than its impact on downstream oil and gas production facilities where equipment tends to be larger and would be more likely to trigger MACT requirements if aggregated.

---

[23]Id. at § 7412(a)(1), 76 FR 52,741 (Aug. 23, 2011).

[24]40 C.F.R. § 63.2 (2012) (defining major source); see also 64 Fed. Reg. 32,610, 32,613 (June 17, 1999).

[25]CAA § 112(n)(4)(a), 42 U.S.C. § 7412(n)(4)(a) (2012).

[26]40 C.F.R. § 63.760(d) (2012).

[27]64 Fed. Reg. at 32,619.

[28]Id.; 40 C.F.R. § 63.761 (defining "associated equipment").

| NESHAPs for Oil and Natural Gas Production Facilities | EPA originally promulgated the NESHAPs for Oil and Natural Gas Production source subcategory in two parts: the standard for major sources was issued in 1999, and the NESHAP for area sources in 2007.[29] In April 2012, EPA promulgated amendments to the NESHAPs for major sources.[30] |
|---|---|

**Major Sources**

The NESHAPs for major sources apply to emission points of HAPs located at oil and natural gas production facilities (including wells, gathering stations, and processing plants) that are major sources.[31] Under this rule, in determining whether a well site's potential to emit HAPs equals or exceeds 10 tons per year (the major source threshold), only emissions from equipment other than wells or "associated equipment," may be aggregated; associated equipment is a defined term, and excludes glycol dehydrators and storage vessels.[32] In other words, emissions from wells are not aggregated; only emissions from glycol dehydrators and storage vessels at a site may be aggregated. Further, the rule exempts facilities exclusively handling and processing "black oil" and small oil and gas production facilities, including well sites, prior to the point of custody transfer.[33] EPA documents do not indicate the extent to which these exemptions have the effect of cancelling MACT requirements that would otherwise apply to oil and gas wells from unconventional deposits.

---

[29]64 Fed. Reg. 32,610 (June 17, 1999) (the notice also announced final rules for the category of natural gas transmission and storage facilities), 72 Fed. Reg. 26 (Jan. 3, 2007); 40 C.F.R. pt. 63 Subpt. HH.

[30]77 Fed. Reg. 49,490 (Aug. 16, 2012). The notice of the final rule was signed by the Administrator and a prepublication copy released to the public in April 2012.

[31]40 C.F.R. §§ 63.760(a)(1), 63.761 (2012).

[32]77 Fed. Reg. 49,490 , 49,501, 49,569 (Aug. 16, 2012) (revising 40 C.F.R. § 63.760, 63.761 to define major source  such that "[f]or facilities that are production field facilities, only HAP emissions from glycol dehydration units and storage vessels shall be aggregated for a major source determination."). Storage vessels are defined as a tank or other vessel that is designed to contain an accumulation of crude oil, condensate, intermediate hydrocarbon liquids, or produced water and that is constructed primarily of nonearthen materials (e.g., wood, concrete, steel, plastic) that provide structural support. Id. at 49,569.

[33]64 Fed. Reg. 32,610, 32613 (June 17, 1999), 40 C.F.R. 63.760 (2012) (small sources are those, prior to the point of custody transfer, with a facility-wide annual average natural gas throughput less than 18.4 thousand standard cubic meters per day and a facility-wide actual annual average hydrocarbon liquid throughput less than 39,700 liters per day).

EPA headquarters officials did not know if any oil or gas wells were NESHAP major sources prior to the April 2012 amendments, and EPA officials in each of the four Regions we contacted were unaware of any examples of oil and natural gas wells being regulated as major sources. EPA officials noted that glycol dehydrators are more likely where there are high pressure gas wells, such as in the Jonah-Pinedale area of Wyoming. EPA officials said that a multiple pad well site in this area would very likely be major for HAPs, except that any federally enforceable standards are first applied to determine the potential emissions, and Wyoming's presumptive best available control technology standards would likely limit the emissions such that the potential to emit would be reduced to area source levels. Analyses developed for the recent amendments also do not identify if any well sites triggered the major source NESHAPs prior to the amendments, but available data suggest few well sites do so.[34]

The 1999 NESHAP for major sources has included the following emission points that may be present at oil and gas wells: process vents on large glycol dehydration units and storage vessels with potential for flash emissions.[35] The standard requires reduction in HAPs emissions from large glycol dehydration units and storage vessels with potential for flash emissions through the application of air emission control equipment or pollution prevention measures, or a combination of both.[36] The standards require that all process vents on new and existing large glycol dehydration units that are located at major HAPs sources be controlled.[37] Glycol dehydration units subject to control must reduce emissions by 95 percent or more of HAPs, or to a benzene emission level less than 0.9 megagram (1 ton) per year.[38] For existing and new storage vessels with the potential for flash emissions, the standard is to be equipped with a

---

[34]In addition to interviewing EPA officials in the Clean Air program and in four Regions, GAO conducted sample searches on the EPA Air Facility System database.

[35]Large glycol dehydrators are those with an actual annual average natural gas flowrate equal to or greater than 85 thousand standard cubic meters per day and actual annual average benzene emissions equal to or greater than 0.90 Mg/yr. 77 Fed. Reg. 49,490 , 49,568-69 (Aug. 16, 2012) (revising 40 C.F.R. §§ 63.761, 63.760(b)).

[36]64 Fed. Reg. 32,610, 32,613-14 (June 17, 1999).

[37]40 C.F.R. § 63.765 (2012).

[38]40 C.F.R. § 63.765 (2012), 64 Fed. Reg. 32,610, 32,613-14 (June 17, 1999).

cover vented through a closed vent system to a control device that recovers or destroys HAPs emissions with an efficiency of 95 percent or greater, or for combustion devices, reduces HAPs emissions to a specified outlet concentration.[39] However, these standards only apply at sites that are deemed major sources, and as outlined above, it appears likely that few well sites reach the key threshold emissions level.

The April 2012 amendments added one more emission source to the NESHAP major source rule: small glycol dehydrators.[40] These sources must meet a unit-specific limit for emissions of BTEX that is calculated using a formula in the rule based on the unit's natural gas throughput and gas composition.[41] Existing dehydrators have 3 years to comply, while new dehydrators must comply upon start-up.[42]

EPA had proposed another source to add to the NESHAPs: storage vessels without the potential for flash emissions, which are not regulated under the current rule. EPA did not include these sources in its final rule, stating that "the agency determined that it needs additional data in order to establish emission standards for this type of storage vessel."[43] In the proposed rule, EPA relied upon its original analysis of storage vessels that was used to determine the MACT standard in 1999, based on 1997 data.[44] Commenters criticized EPA's use of the 1999 analysis as outdated and not reflecting current technology in use for the vessels without potential for flash emissions and asserted that reliance on the old analysis failed to meet EPA's statutory obligations.[45] EPA stated "[i]n response to such comments, we have re-evaluated the proposed MACT standards and concluded that we need (and intend to gather) additional data on

---

[39] 40 C.F.R. § 63.766 (2012).

[40] 77 Fed. Reg. 49,490 ,49,568-71 (Aug. 16, 2012).

[41] Id. at 49,570-71.

[42] Id. at 49,568-60 (amending 40 C.F.R. 63.760(f)).

[43] Id. at 49,503; see also EPA, Summary of Requirements for Processes and Equipment at Natural Gas Well Sites.

[44] 76 Fed. Reg. 52,738, 52,769 (Aug. 23, 2011).

[45] 77 Fed. Reg. 49,490 , 49,503, 49,528-29 (Aug. 16, 2012).

these sources in order to analyze and establish MACT emission standards for this subcategory of storage vessels."[46]

In addition, the April 2012 amendments changed a key definition in the NESHAPs for determining major source status.[47] The effect of this change (i.e., revision to the definition of "associated equipment") is that emissions from *all* storage vessels and *all* glycol dehydrators now will be counted toward determining whether a facility is a major source under the NESHAP for Oil and Natural Gas Production. EPA documents do not indicate the extent to which the change in definition will result in additional oil and gas wells being subject to the MACT requirement.

Area Sources

CAA prohibits EPA from listing oil and gas production wells (with its associated equipment) as a specific "area source" category, unless the area source category is for oil and gas production wells located in any metropolitan statistical area or consolidated metropolitan statistical area with a population in excess of 1 million, and the EPA Administrator determines that emissions of HAPs from such wells present more than a negligible risk of adverse effects to public health.[48]

In 2007, EPA issued a NESHAP for oil and gas production facilities—which may include wells—that are area sources.[49] The area source rule regulations address emissions from one type of emission source at oil and gas production facilities: triethylene glycol dehydration units above specified throughput and benzene emission thresholds, which are the same thresholds as those used to define large dehydration units in the major source rule.[50] For area sources within defined control areas (areas of higher population density),[51] add-on controls or equivalent pollution prevention measures are required to achieve reduction of HAPs emissions by 95 percent, or alternately, to below the specified emission

---

[46]Id. at 49,503.

[47]Id. at 49,501, 49,569 (revising 40 C.F.R. § 63.761).

[48]CAA § 112(n)(4)(B), 42 U.S.C. § 7412(n)(4)(B) (2012).

[49]72 Fed. Reg. 26 (Jan. 3, 2007).

[50]40 C.F.R §§ 63.764(d), 63.765(a) (2012).

[51]EPA defines these control areas with reference to parameters used by the U.S. Census Bureau to identify densely settled areas. See 72 Fed. Reg. 26, 28 (2007).

limit for benzene.[52] For area sources outside of these control areas, an operational standard is required instead of an add-on control.[53]

Area sources are required to notify EPA that they are subject to the rule; additional information, including periodic reports, are required for area sources within a control area.[54] The area source notifications are sent to a specific EPA e-mail box. EPA does not track whether the facilities providing notification are well sites or other components of the oil and natural gas production sector, so it is difficult to determine to what extent oil and gas well sites are subject to the area source NESHAP.[55]

Regarding EPA's authority to establish an area source category for oil and gas wells in metropolitan statistical areas, if certain conditions are met, officials said that EPA has not considered doing so. They said that they have not analyzed well emissions in relation to location in or outside a metropolitan statistical area, and that if the agency were to consider developing an area source within metropolitan statistical areas, they would need to conduct a new data collection effort.

## Other NESHAPs

In addition, EPA has promulgated other NESHAPs, the applicability of which to oil and gas well sites depends upon the particular equipment— and factors such as capacity or emission rate—used at a well site. Although some published materials suggest several NESHAPs may apply, based on discussions with EPA, the primary NESHAP that officials believe could apply at oil and gas well sites is the Boilers and Process Heaters NESHAP for major sources.[56]

---

[52] 72 Fed. Reg. 26, 28 (Jan. 3, 2007), 40 C.F.R §§ 63.764(d), 63.765(a) (2012).

[53] 40 C.F.R § 63.764(d) (2012).

[54] 40 C.F.R. § 63.775(c) (2012); see also 72 Fed. Reg. 26, 30 (Jan. 3, 2007).

[55] For example, GAO searched EPA's Air Facility System database to identify 40 C.F.R. pt. 63 Subpt. HH MACT area sources with the Standard Industrial Classification code for oil and gas extraction. Some of the facilities identified in the search results have "well" in the facility name, but may include other facilities downstream of the well pad; the database does not have information to distinguish the well sites among the facilities.

[56] 40 C.F.R. pt. 63 Subpt. DDDDD, §§ 63.7480-7575 (2012).

The major source rule for boilers and process heaters has an unusual feature in that, to determine applicability of the rule, it references whether or not an oil and gas production facility falls within the major source definition under the NESHAPs for Oil and Gas Production Facilities (subpart HH).[57] If an oil and gas well were a major source under the Oil and Gas NESHAP, then any boilers or process heaters with heat input of 10 million British thermal units (BTU) per hour are subject to emission limitations requirements, and any smaller heaters are subject to work standards, under the Boiler NESHAP. These requirements differ from those in the NESHAP for Oil and Gas Production Facilities by, among other things, imposing limits for other pollutants, such as particulate matter, hydrogen chloride, mercury, carbon monoxide, and dioxins/furans, depending on the type of unit.[58] Officials stated that some glycol dehydrators at well sites could be over the trigger heat input and would be subject to the Boiler NESHAP requirements if the oil and gas site were a major source subject to the rule. As noted above, it is not known how many, if any, well sites are major sources.

Where a gas well has a compressor, the compressor engine may be subject to standards for stationary engines.[59] EPA did not have available information on the extent to which these engines are present at well sites and, if so, whether they fall under these rules, which are based on equipment and are not specific to the oil and gas industry.

# New Source Performance Standards

EPA promulgates NSPS, which are generally applicable to (1) new or reconstructed facilities and (2) facilities that have undergone modification—that is, any physical change in, or change in the method of operation of, a facility which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted.[60] These rules are implemented by EPA

---

[57] 40 C.F.R. § 63.7485, 76 Fed. Reg. 15,608, 15,619 (Mar. 21, 2011).

[58] 40 C.F.R. § 63.7500, pt. 63 Subpt. DDDDD Tables 1-2 (Boiler NESHAP); cf. 40 C.F.R. pt. 63 Subpt. HH App. Table 1, 64 Fed. Reg. 32,610 (June 17, 1999) (Oil and Gas NESHAP for major sources). The NESHAP for Oil and Gas Production Facilities is focused on BTEX and n-hexane.

[59] 40 C.F.R. pt. 63, Subpt. ZZZZ (Stationary Reciprocating Internal Combustion Engines).

[60] CAA § 111(a)(2), (4), 42 U.S.C. § 7411(a)(2), (4). (2012).

or by states through delegation.[61] For the oil and gas production industry, the NSPS primarily regulates VOCs (as an ozone precursor).

In 1985, EPA promulgated NSPS for the oil and gas industry focused on natural gas processing plants, but did not include any standards for emissions from preprocessing production activities.[62] EPA has recently promulgated such standards for some production emissions, notably completion and recompletion of certain hydraulically fractured gas wells.[63] In addition, some other generally applicable standards for certain equipment may apply at oil and gas well sites.

## April 2012 Amendments to NSPS

In April 2012, EPA promulgated amendments to the NSPS for the Oil and Gas sector, including new standards applicable to the production source category.[64] The new standards were issued pursuant to a 2010 consent decree that settled a challenge brought by environmental groups over EPA's failure to conduct required reviews of the existing standards.[65] Following publication of the new rules in August 2012, an industry group petitioned EPA to reconsider certain aspects of the new rules.[66]

The new standards include, for the first time, standards to reduce emissions from certain activities at natural gas wells.[67] In particular, the new standards establish operational standards applicable to selected

---

[61]Id. at § 7411(c).

[62]40 C.F.R. pt. 60, subparts KKK, LLL.

[63]77 Fed. Reg. 49,490 , 49,542-67 (Aug. 16, 2012) (adding 40 C.F.R. pt. 60 subpt. OOOO, consisting of §§ 60.5360 to 60.5430).

[64]Id.

[65]See Consent Decree, Document 25, and Third Stipulation of the Parties to Modify Consent Decree, Document 28, Wildearth Guardians et al. v. Jackson, No. 1:09-cv-00089-CKK (Dist. D.C. 2011). See also CAA §§ 111(b)(1)(B), 112(d)(6), (f)(2), 42 U.S.C. §§ 7411(b)(1)(B), 7412(d)(6), (f)(2) (2012).

[66]American Petroleum Institute, Request for Administrative Reconsideration and an Administrative Stay of Targeted Elements of EPA's Final Rule "Oil and Natural Gas Sector: New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants Reviews," Aug. 16, 2012.

[67]77 Fed. Reg. 49,490, 49,497-98, 49,543 (Aug. 16, 2012) (adding, e.g., 40 C.F.R. § 60.5365).

completions and recompletions of natural gas wells, with variable implementation dates as described in table 10. These practices are designed to capture emissions from flowback from hydraulically fractured wells, and reduce VOC emissions. EPA's regulatory impact analysis estimated that the rules will apply to about 9,700 new wells per year, and to about 1,200 existing wells being recompleted per year.[68] Of these, EPA's analysis estimates that nearly 9,400 wells will be required to use "green completion" techniques to capture and treat flowback emissions so that the captured natural gas can be sold or otherwise used, while the remainder will use completion combustion.

**Table 10: NSPS for Natural Gas Wells, by Well Subcategory**

| Natural gas well subcategory | Completion date | Green completions (routing gas to the flow line) | Combustion of flowback emissions | Duty to minimize releases to the air (flowback and recovery) | Well logs, compliance demonstration, records and reporting |
|---|---|---|---|---|---|
| Provisions[b] | | 40 C.F.R. § 60.5375(a)(1)-(2) | 40 C.F.R. § 60.5375(a)(3) | 40 C.F.R. § 60.5375(a)(4) | 40 C.F.R. § 60.5375(b)-(e) |
| New wells constructed after Aug. 23, 2011 | Completions with hydraulic fracturing before Jan. 1, 2015 | | √ | √ | √ |
| | Completions with hydraulic fracturing after Jan. 1, 2015 | √ | √ (only for emissions that cannot be directed to the flow line) | √ | √ |
| Wells existing as of Aug. 23, 2011 | Completions with hydraulic fracturing before Jan. 1, 2015 | | √ | √ | √ |
| | Completions with hydraulic fracturing after Jan. 1, 2015 | √ | √ (only for emissions that cannot be directed to the flow line) | √ | √ |
| | Alternative to avoid new source status before Jan. 1, 2015[a] | √ | √ (only for emissions that cannot be directed to the flow line) | √ | √ |

[68]See EPA, *Regulatory Impact Analysis: Final New Source Performance Standards and Amendments to the National Emissions Standards for Hazardous Air Pollutants for the Oil and Natural Gas Industry* at 3-12 (April 2012). EPA projected these numbers of affected wells for the year 2015, when the rule will be fully in effect, and the number of wells affected may actually vary from year to year. At the time of the proposed rule, EPA estimated that over 20,000 completions and recompletions annually would be subject to the proposed requirements. 76 Fed. Reg. 52,738, 52,747 (Aug. 23, 2011).

Appendix IV: Key Requirements and
Authorities under the Clean Air Act

| Natural gas well subcategory | Completion date | Green completions (routing gas to the flow line) | Combustion of flowback emissions | Duty to minimize releases to the air (flowback and recovery) | Well logs, compliance demonstration, records and reporting |
|---|---|---|---|---|---|
| Wildcat and delineation wells | | √ | | √ | √ |
| Other low pressure wells | | √ | | √ | √ |

Source: GAO analysis of EPA documents.

[a]Existing wells (constructed before Aug. 23, 2011) that are completed after fracturing can avoid being within the definition of a "modified" source by voluntarily implementing the green completion provisions. According to EPA, this would allow the owners/operators to avoid state permit requirements in some states. See EPA, Summary of Requirements for Processes and Equipment at Natural Gas Well Sites (April 2012).

[b]Provisions listed are to code sections; see 77 Fed. Reg. at 49,543-54.

Additionally, to reduce VOC emissions, the April 2012 rule establishes standards including those for, as relevant to gas well sites, gas-driven pneumatic controller devices and storage vessels, subject to thresholds.[69] According to EPA documents, over 13,600 pneumatic controllers will be affected, but it is not clear the extent to which these are located at well sites.[70] Similarly, EPA documents estimate that 304 storage vessels annually will trip the threshold of 6 tons per year of VOC and thus be subject to the rule, and EPA officials expect most of these storage vessels will be located at wells.[71]

When asked about the potential increased burden of the amended NSPS rules, officials said that it was not clear whether the rule would result in more or fewer CAA-related permits. For example, the applicability of

[69]For pneumatic controllers, an affected source is a single continuous bleed natural gas-driven pneumatic controller operating at a natural gas bleed rate greater than 6 standard cubic feet per hour located between the wellhead and the point of custody transfer to the natural gas transmission and storage segment and not located at a natural gas processing plant or oil pipeline. 77 Fed. Reg. at 49,543 (adding 40 C.F.R. § 60.5365(d)(i)).For storage vessels, the threshold for coverage is 6 tons per year of VOC. 77 Fed. Reg. at 49,543, 49,556 (adding 40 C.F.R. §§ 60.5365(e), 60.5430).

[70]EPA, Regulatory Impact Analysis: Final New Source Performance Standards and Amendments to the National Emissions Standards for Hazardous Air Pollutants for the Oil and Natural Gas Industry (April 2012) at 3-12.

[71]EPA also regulated centrifugal and reciprocating compressors at downstream sites, but those located at a well site, or an adjacent well site and servicing more than one well site, are not covered. 77 Fed. Reg. at 49,543 (adding 40 C.F.R. § 60.5365(b), (c)).

NSPS may trigger a state requirement to get a construction permit or other type of permit. These permits may be triggered by, among other things, a facility's "potential to emit" that is calculated assuming all federally enforceable controls are in place. Officials said that the NSPS, which are federally enforceable requirements, will reduce actual emissions and thus could reduce the number of facilities that trigger the requirement for these state permits. In the new rule, EPA generally exempted covered facilities from the obligation to obtain a Title V operating permit.[72]

## Other NSPS

EPA has issued equipment-focused NSPS for certain equipment that may be used at oil and gas well sites. These include NSPS for Volatile Organic Liquid Storage Vessels (Including Petroleum Liquid Storage Vessels).[73] These standards apply to such tanks with a capacity greater than or equal to 75 cubic meters that is used to store volatile organic liquids and that were built, reconstructed, or modified after July 23, 1984. Tanks attached to trucks and other mobile vehicles are excluded.[74] EPA officials said that, while there are tanks at well sites, they are often smaller than the threshold in this rule. Specifically, while the standards apply to tanks greater than 75 cubic meters (about 475 barrels, according to EPA), an individual tank typically found at oil and gas sites is often between 250 – 400 barrels, hence avoiding coverage under this rule.

Other NSPS that have been identified as potentially relevant include those for gas turbines and steam generators.[75] EPA officials said, however, that typical activity at well sites is not enough to trigger thresholds for coverage under this rule, either.

---

[72]77 Fed. Reg. at 49,543 (adding 40 C.F.R. § 60.5370(c)) (provided the facility is not otherwise required by law to obtain a Title V operating permit or new source review permit).

[73]40 C.F.R. pt. 60, subpt. Kb (2012).

[74]40 C.F.R. § 60.110b(d)(3) (2012).

[75]40 C.F.R. pt. 60, subpt. D to Dc (2012). See also EPA, Sector Notebook Project: Oil and Gas Extraction, at 100 (2000).

# New Source Review

CAA New Source Review (NSR) provisions require a source to obtain a permit and undertake other obligations to control its emissions of air pollution prior to construction of a new source or modification of an existing stationary source.[76] However, NSR only applies if the construction project results in actual emissions or the potential to emit regulated air contaminants[77] at or above certain threshold levels established in the NSR regulations. For a new source, NSR is triggered only if the emissions would cause the source to qualify as major. For an existing major source making a modification, NSR is triggered only if the modification will result in a significant increase in emissions and a significant net emissions increase of that pollutant. Relevant to NSR, the emission profile for oil and gas wells would include hydrogen sulfide and VOCs, among others. In most areas, states implement the NSR permitting programs.

The major NSR program is actually composed of the following two separate programs:

- Nonattainment NSR applies to emission of specific pollutants from sources located in areas designated as nonattainment for those pollutants because they do not meet the pollutant-specific national ambient air quality standards.

- Prevention of Significant Deterioration (PSD) applies to emissions of all other regulated pollutants from sources located in attainment areas where such standards are met or in areas unclassifiable for such standards.

For PSD, the major source threshold is generally 250 tons per year of any regulated air pollutant.[78] Determining whether a facility is a major source, together with identifying which emissions should be included in doing so is guided by the process as for Title V permits, discussed below.[79] While a

---

[76]CAA §§ 165(a), 173(a), 42 U.S.C. §§ 7475(a), 7503(a) (2012); see generally CAA §§ 160-169, 171-189, 42 U.S.C. §§ 7470-7479 (Prevention of Significant Deterioration), 7501-7513 (NSR nonattainment) (2012).

[77]Potential to emit generally means the maximum capacity of a stationary source to emit any air pollutant under its physical and operational design, taking into account any federally enforceable limitations.

[78]CAA §§ 169(1), 165(a), 42 U.S.C. §§ 7479(1), 7475(a) (2012).

[79]40 C.F.R. § 52.21(b)(5)-(6) (2012).

1993 EPA report appeared to suggest that most oil and gas extraction wells would not likely be subject to PSD regulations based on the applicability criteria,[80] the specific determination of which emission units, including wells, must be included in determining whether a source is major (source aggregation) involves a case-by-case, fact-specific analysis.[81] For nonattainment NSR, the major source threshold ranges from 100 tons per year down to 10 tons per year depending on the severity of the air quality problem where the source is located and the specific pollutant at issue.[82] To be a major source under nonattainment NSR, the source must emit or have a potential to emit above the major source level set for the specific regulated air pollutant (or its precursor) for which the area is designated nonattainment.[83] With respect to nonattainment NSR, EPA officials stated that some large wells in nonattainment zones could be major sources standing alone because of low emission thresholds in certain areas; as noted above, such thresholds could be as low as 10 tons per year in the most severe nonattainment areas, versus 250 tons per year in attainment areas.

## Title V Operating Permits

Relevant to oil and gas production, CAA generally requires Title V permits for the operation of

- any major source[84] determined based on the facility's actual emissions or "potential to emit;"

- any source, including a nonmajor source, subject to a NSPS;

- any source, including an area source, subject to a NESHAP, among others; and

- any source required to obtain a PSD or NSR permit.[85]

---

[80]EPA, Report to Congress on Hydrogen Sulfide Emissions Associated with the Extraction of Oil and Gas, EPA-453-R-93/045 at IV-37 (1993).

[81]Gina McCarthy, AA Office of Air and Radiation, Memorandum, "Withdrawal of Source Determinations for Oil and Gas Industries" (Sept. 22, 2009).

[82]40 C.F.R. § 51.165 (2012).

[83]40 C.F.R. § 51.165 (2012).

[84]Major source for Title V purposes is defined more broadly than for NESHAP purposes. Cf. CAA § 501(2) to § 112(a)(1), 42 U.S.C. § 7661(2) to § 7412(a)(1) (2012).

Thus, whether a Title V permit is required depends on whether the source (1) is subject to one of these other requirements, unless EPA has exempted the particular area sources or nonmajor sources from the Title V permit requirement,[86] or (2) meets the emissions thresholds for a major source. Title V permits for a major source must include all applicable requirements for all relevant emission units in the major source.[87] Title V permits for nonmajor sources must include all applicable requirements applicable to emissions units that caused the source to be subject to the Title V permitting requirements.[88] Title V permits may need to add monitoring, reporting, or other requirements but generally do not add new emissions control requirements (rather they consolidate requirements from throughout CAA programs and contain conditions to assure compliance with such requirements). According to EPA officials, the permits help operators and the public to understand what the requirements are for compliance with CAA and help assure compliance with such requirements.

Title V permits are generally issued by states and, in some instances, EPA Regional offices. As of August 2012, EPA officials were unaware of any Title V permits issued solely on the basis of oil and gas well site emissions alone. EPA officials stated that some oil and gas well sites have adopted federally enforceable emissions limits such that the sites do not need a Title V permit, which they would otherwise have triggered. In addition, EPA identified a March 2012 case in which a state environmental agency alleged, among other things, that an oil and gas production site had VOC emissions of over 600 tpy, which would require a Title V permit. The operator disputed the violations but agreed to submit an application for a Title V permit.

---

[85]CAA § 501(2), 42 U.S.C. § 7661(2) (2012), 40 C.F.R. §§ 70.3(a), 70.5(a)(1)(ii), 71.3(a), 71.5(a)(1)(ii)  (2012).

[86]EPA has the authority to exempt through rulemaking area sources or non-major sources from the Title V permit requirement if they are not otherwise subject to Title V. CAA § 502(a), 42 U.S.C. §7661a(a) (2012). Major sources under Title V may not be exempted.

[87]40 C.F.R. §§ 70.3(c)(1), 71.3(c)(1) (2012).

[88]40 C.F.R. §§ 70.3(c)(2) 71.3(c)(2) (2012).

# Source Determinations and Aggregation Issues for Title V and NSR

Applicable to both NSR and related determinations for Title V, EPA regulations specify three factors that must be met in source determinations—whether the emissions points are under common control, belong to the same major industrial grouping,[89] and are located on contiguous or adjacent properties.[90] Thus, in contrast to the NESHAPs, in determining whether significance thresholds for emissions are met for purposes of NSR or Title V, EPA and states must aggregate VOC emissions from oil and gas well sites that are both (1) contiguous or adjacent and (2) under common control. To determine whether a source meets the emissions thresholds for a Title V or NSR major source designation, EPA applies these regulatory criteria to evaluate whether to aggregate oil and gas production wells with other emission sources.[91] Specifically, permitting authorities (EPA or authorized states or local authorities) have in particular matters, on a case-by-case basis, aggregated emissions from facilities to determine major sources, for purposes of Title V operating permits or NSR. Determining when emissions must be aggregated is a fact-based inquiry that is made by permitting authorities on a case-by-case basis. While authorized states are typically responsible for making source determinations, EPA headquarters has stated that Regional offices should continue to review and comment on source determinations to assure consistency with regulations and historical practice.[92] In addition, EPA Regions may be responsible for source determinations in areas where they are responsible for permitting.

Aggregation of emissions from the oil and gas industry generally, including production facilities, has received recent attention.[93] For

---

[89] All oil and gas emission units are in the same major industrial grouping.

[90] 40 C.F.R. §§ 71.2, 70.2 (2012) (definition of major source for Title V permitting), §§ 51.165(a)(1)(i)-(ii), (iv) (definition of major stationary source for NSR), 51.166(b)(5)-(6), 52.21(b)(5)-(6) (definitions of stationary source for NSR) (2012).

[91] See, e.g., Letter, Cheryl L. Newton, EPA Air and Radiation Division, to Scott Huber, Summit Petroleum Corporation (Oct. 18, 2010) (aggregating gas wells, a sweetening plant, and associated flares as constituting a single source for purpose of Title V permitting).

[92] Gina McCarthy, AA Office of Air and Radiation, Memorandum, "Withdrawal of Source Determinations for Oil and Gas Industries" at 2 (Sept. 22, 2009).

[93] See, e.g., Roger Martella et al, Aggregation of Oil and Gas Wells Under the Clean Air Act: New Horizons from EPA and the Courts, Natural Resources and Environment (Fall 2011); http://www.natlawreview.com/article/oil-gas-activities-agencies-are-air-air-regulations

example, in 2007, EPA provided guidance on how to evaluate aggregation in source determinations for the oil and gas industry.[94] EPA later withdrew this industry-specific guidance and emphasized that source determinations in this industry were governed by the existing regulations, the existing interpretations of them, and need for case-specific application of the regulations in each permitting action.[95]

Aggregation of oil and gas facilities—including wells—has also been the subject of litigation. For example, a gas production company challenged EPA's determination that its gas wells, sweetening plant, and associated flares constitute a single source for purposes of Title V permitting, in the United States Court of Appeals for the Sixth Circuit.[96] In a recently issued decision, the court vacated and remanded EPA's determination, finding that EPA improperly considered the functional interrelatedness of the sweetening plant and the wells in determining that those points were adjacent under the regulations. Another example of a challenge relates to a citizen petition filed in EPA Region 8.[97] The state of Colorado issued a Title V permit renewal to Anadarko's Frederick Compressor Station for a natural gas processing station but did not aggregate the station with natural gas wells for purposes of Title V and also did not include a requirement of PSD because the emission threshold was not met without aggregation. A citizen group subsequently filed a Title V petition with EPA, seeking an objection to the permit because natural gas wells were not aggregated with the processing station. After EPA issued a Title V order finding that the petition had not demonstrated that aggregation was required, the citizen group challenged the EPA decision in the United States Court of Appeals for the Tenth Circuit.[98] In another matter, EPA Region 8 issued a Title V permit to BP America Production Company's Florida River Compression Station Facility and decided not to aggregate

---

[94]See Id.; William Wehrum, Memorandum, "Source Determinations for Oil and Gas Industries" (Jan. 12, 2007).

[95]Gina McCarthy, AA Office of Air and Radiation, Memorandum, "Withdrawal of Source Determinations for Oil and Gas Industries" (Sept. 22, 2009).

[96]See *Summit Petroleum Corp. v. EPA*, Nos. 09-4348, 10-4572, slip op. (6th Cir. August 7, 2012).

[97]See EPA, Order Responding To Petitioners' Request That The Administrator Object To Issuance Of A State Operating Permit, Petition Number: VIII-2010-4 (Feb. 2, 2011).

[98]*WildEarth Guardians et al. v. Jackson*, No.11-9527 (10th Cir).

oil and gas activities with the compressor station in determining the source. A citizen group appealed this decision to the Environmental Appeals Board.[99] Both citizen group challenges were ultimately dismissed after the parties engaged in a dispute resolution process. EPA entered settlements with the citizen group and agreed to undertake a pilot program for the purpose of studying, improving, and streamlining source determinations in the oil and gas industry in new or renewal Title V permits for which EPA Region 8 is the initial Title V permitting authority.[100]

In sum, several recent disputes over aggregation of oil and gas facilities involve whether or not well emissions should be aggregated; however, whether or not well emissions are aggregated for Title V or PSD purposes generally would not affect other federal requirements for emission controls at well sites.

# Greenhouse Gas Reporting Rule

In 2009, EPA promulgated the Greenhouse Gas Reporting Rule, providing a framework for the greenhouse gas reporting program and establishing requirements for some source categories.[101] According to EPA, the goals of the program are to obtain data that are of sufficient quality that they can be used to support a range of future climate change policies and regulations; to balance the rule coverage to maximize the amount of emissions reported while minimizing reporting from small emitters; and to create reporting requirements that are consistent with existing programs by using existing estimation and reporting methodologies to reduce reporting burden, where feasible.[102]

EPA subsequently issued and amended a rule to implement the program for the category of Petroleum and Natural Gas Systems, including oil and

---

[99]*In re BP America Production Co., Florida River Compression Facility*, Environmental Appeals Board Appeal No. CAA 10–04.

[100]*Wildearth Guardians v. EPA*, Settlement Agreement at 2-3, Docket No. 11-9527 (10th Circuit 2011). See also 76 Fed. Reg. 71,027 (Nov. 16, 2011).

[101]74 Fed. Reg. 56,260 (Oct. 30, 2009), 40 C.F.R. pt. 98.

[102]See, e.g., EPA, Economic Impact Analysis for the Mandatory Reporting of Greenhouse Gas Emissions Under Subpart W Supplemental Rule (GHG Reporting), Final Report 2-1 – 2-2 (2009).

gas wells.[103] According to EPA, oil and gas well sites may contain sources of greenhouse gas emissions including: (1) combustion sources, such as engines used on-site and which typically burn natural gas or diesel fuel, and (2) process sources, such as equipment leaks and vented emissions.[104] The process sources include pneumatic devices, dehydrators, and compressors. EPA has identified the onshore production subcategory as the largest segment for equipment leaks and vented and flared emissions in the petroleum and natural gas system source category.[105]

The rule requires petroleum and natural gas facilities—including oil and gas well sites—that emit 25,000 metric tons or more of carbon dioxide equivalent[106] per year to report certain data to EPA. Specifically, oil and gas production facilities are to report annual emissions of carbon dioxide, methane, and nitrous oxide from

- equipment leaks and venting,

- gas flaring, and

- stationary and portable combustion.[107]

Reporting is to begin in September 2012, for calendar year 2011.[108]

---

[103] 75 Fed. Reg. 74,458 (Nov. 30, 2010), 76 Fed. Reg. 59,533 (Sept. 27, 2011), 76 Fed. Reg. 73,886 (Nov. 29, 2011), 76 Fed. Reg. 80,554 (Dec. 23, 2011); 40 C.F.R. pt. 98 Subpt. W. See also http://www.epa.gov/climatechange/emissions/subpart/w.html

[104] EPA, Quantifying Greenhouse Gas Emissions from Key Industrial Sectors in the United States 12-2 (Working Draft May 2008).

[105] EPA, Economic Impact Analysis for the Mandatory Reporting of Greenhouse Gas Emissions Under Subpart W Supplemental Rule (GHG Reporting), Final Report 1-10 (2009).

[106] Carbon dioxide equivalent measures the total greenhouse gases, accounting for the relative ability of each greenhouse gas to trap heat in the atmosphere, known as the global warming potential.

[107] 40 C.F.R. § 98.232(c), (c)(12)–(13) (well flaring during testing and production), (c)(21) (leaks), (c)(22) (combustion) (2012).

[108] 76 Fed. Reg. 73,886, 73,889, 73,899 (Nov. 29, 2011) (amending 40 C.F.R. § 98.3).

For purposes of this rule, onshore petroleum and natural gas production is defined to include all equipment on a single well pad or associated with a single well pad (including but not limited to compressors, generators, dehydrators, storage vessels, and portable non-self-propelled equipment which includes well drilling and completion equipment, workover equipment, gravity separation equipment, auxiliary non-transportation-related equipment, and leased, rented or contracted equipment or storage facilities), used in the production, extraction, recovery, lifting, stabilization, separation, or treating of petroleum and/or natural gas (including condensate).[109] Moreover, the rule defines an onshore oil and gas production facility as including all oil or gas equipment on or associated with a well pad and carbon dioxide enhanced oil recovery operations that are under common ownership or control and that are located in a single hydrocarbon basin; thus, for example, where multiple wells are owned or operated by the same person or entity in a single basin, the owner or operator is to report well data collectively for each hydrocarbon basin.[110] EPA estimated that this facility definition for onshore petroleum and natural gas production will result in 85 percent GHG emissions coverage of this industry segment,[111] and EPA documents estimate that emissions from approximately 467,000 onshore wells are covered under the rule.[112]

## Accidental Releases

Section 112(r) of CAA establishes the chemical accidental release prevention program applicable to specifically listed "regulated substances," as well as other extremely hazardous substances. This provision, among other things, required EPA to publish regulations and guidance for chemical accident prevention at facilities using substances

---

[109] 75 Fed. Reg. 74,458, 74,461 (Nov. 30, 2010), 40 C.F.R. § 98.230(a)(2) (2012).

[110] 40 C.F.R. §§ 98.238, 98.236(c)(10)-(11) (2012) ( "Facility with respect to onshore petroleum and natural gas production for purposes of reporting under this subpart and for the corresponding subpart A requirements means all petroleum or natural gas equipment on a single well-pad or associated with a single well-pad and CO2EOR operations that are under common ownership or common control including leased, rented, or contracted activities by an onshore petroleum and natural gas production owner or operator and that are located in a single hydrocarbon basin as defined in §98.238. Where a person or entity owns or operates more than one well in a basin, then all onshore petroleum and natural gas production equipment associated with all wells that the person or entity owns or operates in the basin would be considered one facility.").

[111] 75 Fed. Reg. 74,458, 74,467 (Nov. 30, 2010).

[112] 75 Fed. Reg. 74,458, 74,479 (Nov. 30, 2010).

that pose the greatest risk of harm from accidental releases;[113] the resulting regulatory program is known as the Risk Management Program. In conjunction with the program, EPA was required to promulgate a list of at least 100 substances which, in the case of an accidental release, are known to cause or may reasonably be anticipated to cause death, injury, or serious adverse effects to human health or the environment, and to periodically review the list.[114] Among others, hydrogen sulfide is included on the list of regulated substances.[115] Section 112(r) also established the Chemical Safety Board;[116] and the general duty for owners and operators of facilities to take steps to prevent accidental releases of the listed and other extremely hazardous substances, among other things.[117]

## Accidental Release Prevention (Risk Management Program)

Whether and the extent to which a facility is subject to the Risk Management Program requirements depends on the regulated substances present and their quantities, the processes, and the presence of receptors. Generally, the regulation requires, for covered processes, a three-part program including (1) a hazard assessment; (2) a prevention program that includes safety procedures and maintenance, monitoring, and employee training measures; and (3) an emergency response program.[118]

EPA's list of regulated substances and their thresholds for the Risk Management Program was initially established in 1994 and has been revised several times.[119] As amended, the following chemicals that may be found at oil and gas sites are excluded from threshold determinations:

---

[113]CAA § 112(r)(7), (r)(2)(A), 42 U.S.C. § 7412(r)(7), (r)(2)(A) (2012) (defining accidental release as "an unanticipated emission of a regulated substance or other extremely hazardous substance into the ambient air from a stationary source.").

[114]Id. at § 7412(r)(3).

[115]40 C.F.R. § 68.130 (2012).

[116]CAA § 112(r)(6), 42 U.S.C. § 7412(r)(6), (6)(C) (2012).

[117]Id. at § 7412(r)(1).

[118]40 C.F.R. § 68.12 (2012).

[119]63 Fed. Reg. 640 (Jan. 6, 1998); 65 Fed. Reg. 13,243, 13,244 (Mar. 13, 2000).

- naturally occurring hydrocarbon mixtures, which include any combination of the following: condensate, crude oil, field gas, and produced water (defined as water extracted from the earth from an oil or natural gas production well, or that is separated from oil or natural gas after extraction),[120]

- regulated substances in gasoline, when in distribution or related storage for use as fuel for internal combustion engines,[121] and

- a flammable substance when the substance is used as a fuel.[122]

Regarding the exemption of naturally occurring hydrocarbon mixtures prior to entry into a processing plant or refinery, EPA explained at the time that the agency believed they do not warrant regulation, noting that the general duty clause would apply when site-specific factors make an unlisted chemical extremely hazardous.[123] In addition, EPA stated that, for naturally occurring hydrocarbons and for regulated substances in gasoline, a key consideration was EPA's original intent to exempt flammable mixtures that do not meet a preexisting standard—the National Fire Protection Association flammability hazard rating of 4. EPA has also explained that this rating reflects the potential to result in vapor cloud explosions and boiling liquid expanding vapor explosions, which it found pose the greatest potential hazard from flammable substances to the public and environment.[124]

Regarding flammable substances used as fuel, EPA had originally included chemicals on the flammable substances list based on the National Fire Protection Association flammability hazard rating, regardless of their use. After promulgating Risk Management Program regulations, EPA became aware that certain small commercial sources were subject to the requirements because they used propane or other fuels, so it initiated a rulemaking to create an exemption. In addition, a propane gas industry association had challenged the Risk Management

---

[120]40 C.F.R § 68.115(b)(2)(iii), 68.3 (2012); 63 Fed. Reg. 640, 641 (Jan. 6, 1998).

[121]40 C.F.R § 68.115(b)(2)(ii) (2012); 63 Fed. Reg. 640, 641 (Jan. 6, 1998).

[122]40 C.F.R § 68.126 (2012).

[123]63 Fed. Reg. 640, 641 (Jan. 6, 1998).

[124]65 Fed. Reg. 13,243, 13,245 (Mar. 13, 2000).

Program rule. In this context, the Chemical Safety Information, Site Security and Fuels Regulatory Relief Act prohibited EPA from listing flammable substances used as fuel, solely because of their explosive potential.[125] EPA then revised the regulation, adding the exemption to comply with the act.[126]

The regulated chemicals present at oil and gas well sites include components of natural gas (such as butane, propane, methane, and ethane), but these are exempt from the threshold determination of a facility subject to the Risk Management Program when present in "naturally occurring hydrocarbon mixtures."[127] If an oil or gas well site nonetheless uses or stores some of the regulated chemicals not encompassed by the exemptions, it could trigger the risk management requirements.

## General Duty to Prevent Accidental Releases

Section 112(r) also provides, in relevant part:

> The owners and operators of stationary sources producing, processing, handling or storing such substances have a general duty …to identify hazards which may result from such releases using appropriate hazard assessment techniques, to design and maintain a safe facility taking such steps as are necessary to prevent releases, and to minimize the consequences of accidental releases which do occur.[128]

Known as the "general duty clause," the provision is analogous to a negligence standard, according to EPA officials. In other words, if there is a known risk and a way to mitigate it, then the operator should conduct risk mitigation. As explained in an EPA report, "responsibilities include the conduct of appropriate hazard assessments and the design, operations,

---

[125]Pub. L. No. 106–40 § 2,113 Stat. 207 (1999) (Section 2 of the Act immediately removed EPA's authority to ''list a flammable substance when used as a fuel or held for sale as a fuel at a retail facility * * * solely because of the explosive or flammable properties of the substance, unless a fire or explosion caused by the substance will result in acute adverse health effects from human exposure to the substance, including the unburned fuel or its combustion byproducts, other than those caused by the heat of the fire or impact of the explosion.''

[126]65 Fed. Reg. at 13,247.

[127]40 C.F.R. § 68.115(b)(2)(iii) (2012).

[128]CAA § 112(r)(1), 42 U.S.C. § 7412(r)(1) (2012).

and maintenance of a safe facility," as well as release mitigation and community protection.[129] EPA officials noted that industry standards (such as from the American National Standards Institute or the American Petroleum Institute) and fire codes are used in determining the duty of care. EPA has published Chemical Safety Alerts to advise the regulated community of its general duty clause obligations.[130]

The general duty clause applies to sources handling or storing substances listed by EPA in the Risk Management Program regulations or any other extremely hazardous substance, without a threshold. EPA headquarters officials said that, conceivably, the general duty clause would apply to every single well but stated that it would be in EPA Regions' discretion where and when to use the general duty clause to conduct inspections. In some Regions, EPA has conducted inspections of gas well sites to enforce the general duty clause, including identifying noncompliance with certain safety standards. EPA Regional officials said that they use infrared video cameras to conduct inspections to identify leaks of methane from storage tanks or other equipment at well sites. For example, EPA Region 6 officials said they have conducted 45 inspections at well sites since July 2010 and issued 10 administrative orders related to violations of CAA general duty clause. EPA officials said that all well sites are required to comply with the general duty clause but that EPA prioritizes and selects sites for inspections based on risk.

## Imminent and Substantial Endangerment Authority Respecting Accidental Releases

Section 112(r) also provides EPA with the authority to issue orders as may be necessary to protect the public health when the EPA Administrator determines that there may be an imminent and substantial endangerment to human health or welfare or the environment because of an actual or threatened accidental release of a regulated substance.[131]

---

[129]EPA, *Report to Congress on Hydrogen Sulfide Emissions Associated with the Extraction of Oil and Gas*, EPA-453-R-93/045 at IV-35 (1993).

[130]See http://www.epa.gov/oem/publications.htm#alerts

[131]CAA § 112(r)(9)(A), 42 U.S.C. § 7412(r)(9)(A) (2012).

| Chemical Safety Board | The Chemical Safety Board, established by section 112(r), is charged with investigating and publicly reporting on accidental releases resulting in a fatality, serious injury, or substantial property damages. The board is authorized, among other things, to make recommendations to EPA. In September 2011, the Chemical Safety Board released a report investigating three incidents involving fatality and injuries at oil and gas storage tanks located at well sites and surveyed an additional 23 such incidents that occurred between 1983 and 2010.[132] The report found that these accidents occurred when the victims—all young adults—gathered at rural unmanned oil and gas storage sites lacking fencing and warning signs. This report concluded such sites pose a public safety risk. The report also reviewed federal, state, and local regulations, inherently safer designs of tanks, and industry standards. Noting that exploration and production storage tanks are exempt from the security requirements of CWA[133] and from the risk management requirements of CAA,[134] the Chemical Safety Board recommended that EPA encourage owners and operators to reduce these risks.[135] Specifically, the Chemical Safety Board recommended EPA "publish a safety alert directed to owners and operators of exploration and production facilities with flammable storage tanks, advising them of their general duty clause responsibilities for accident prevention under CAA." The letter requests that EPA provide within 180 days a response stating how EPA will address the recommendation.[136] On June 27, 2012, EPA responded to the Chemical Safety Board and stated that EPA agrees to develop and publish a safety alert and anticipates the agency will be able to publish a final safety alert |
| --- | --- |

---

[132]U.S. Chemical Safety and Hazard Investigation Board, *Investigative Study Final Report: Public Safety at Oil and Gas Storage Facilities*, Report No. 2011-H-1 (September 2011) [hereinafter Chemical Safety Board Report].

[133]Note that the Clean Water Act spill prevention control, and countermeasure (SPCC) rule requires oil and gas production facilities meeting applicability thresholds to prepare SPCC plans generally by November 2011, or before commencing operation. 40 C.F.R. pt. 112 (2012). However, oil production facilities are excluded from the SPCC regulations' security provisions. Id. at § 112.7(g).

[134]Chemical Safety Board Report at 8. See 40 C.F.R. § 112.7(g) (2012).

[135]Chemical Safety Board Report at 52.

[136]See CAA § 112(r)(6)(I), 42 U.S.C. § 7412(r)(6)(I) (2012). See also http://www.csb.gov/recommendations/details.aspx?SID=95&pg=1&F_InvestigationId=95

by June 2013.[137] The Chemical Safety Board also made related recommendations to several states and industry associations.[138]

## EPA Enforcement Authorities

Even where a state implements key CAA provisions, EPA retains oversight and enforcement authority. For example, EPA may initiate an enforcement action via an administrative order or a civil action for a violation of any requirement or prohibition of an applicable SIP, permit, or certain other requirement or prohibition after notification to the state and the party.[139] CAA also gives EPA authorities regarding access to records and the ability to require provision of information, as to any person who owns or operates any emission source, among others.[140]

## Imminent and Substantial Endangerment Authority

Where EPA receives evidence that a source or a combination of sources present an imminent and substantial endangerment to public health or welfare, or the environment, EPA may bring suit or, where prompt action is needed, issue orders to stop the emission of air pollutant or take other necessary action.[141] EPA must first consult with state and local authorities and attempt to confirm the accuracy of information before taking such actions.

---

[137]Regarding the four specific items the Board recommended for inclusion, EPA stated that it will address three, but the fourth item is under the jurisdiction of another agency.

[138]Chemical Safety Board Report at 52-54.

[139]CAA § 113(a)(1) and (3), 42 U.S.C. § 7413(a)(1) and (3) (2012); see generally CAA § 113, 42 U.S.C. § 7413 (2012).

[140]CAA § 114(a), 42 U.S.C. § 7414(a) (2012).

[141]CAA § 303, 42 U.S.C. § 7603 (2012).

# Appendix V: Key Requirements and Authorities under the Resource Conservation and Recovery Act

In 1976, Congress passed the Resource Conservation and Recovery Act (RCRA), generally establishing EPA authority to regulate the generation, transportation, treatment, storage, and disposal of hazardous waste,[1] and also including some provisions respecting solid waste.[2] As to hazardous waste, EPA may authorize states to administer their own permitting programs in lieu of the federal program, as long as these state programs are equivalent to and consistent with the federal program and provide for adequate enforcement.[3] As to solid waste, RCRA provided a more limited federal role and included incentives for states to implement programs to manage nonhazardous solid waste disposal, a prohibition on open dumping of wastes, and a requirement for EPA to promulgate technical criteria for classifying solid waste disposal facilities, among other things.[4]

## Subtitle C – Hazardous Waste

RCRA established federal requirements and EPA regulatory authority for "cradle-to-grave" management of hazardous wastes. RCRA defines hazardous waste as:

> a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may (A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or (B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.[5]

EPA regulations implementing RCRA establish several means by which solid waste may be deemed hazardous for purposes of the Subtitle C regulations, including specifically being listed by EPA as a hazardous waste or by exhibiting one of the following four characteristics: toxicity,

---

[1]Pub. L. No. 94–580, 90 Stat. 2795 (1976) (codified as amended at 42 U.S.C. §§6901-6992k (2012)). Although RCRA amended the Solid Waste Disposal Act, Pub. L. No. 89–272, Title II, 79 Stat. 997 (1965), the amended law is nonetheless sometimes referred to as RCRA, a convention we follow here. Subtitle C of RCRA, 42 U.S.C. ch. 82, subch. III (§§ 6921-6939f), governs hazardous waste management. Hereinafter, references are to RCRA sections as amended.

[2]RCRA Subtitle D, 42 U.S.C. ch. 82, subch. IV (§§ 6941-6949a) (2012).

[3]RCRA § 3006(b), 42 U.S.C. § 6926(b) (2012).

[4]RCRA §§ 4006-09, 4004(a), 4005(a), 42 U.S.C. §§ 6946-49, 6944(a), 6945(a) (2012).

[5]RCRA § 1004(5), 42 U.S.C. § 6903(5) (2012).

ignitability, corrosivity, or reactivity.[6] The generation, transport, and disposal of wastes meeting the RCRA regulatory hazardous definition are generally subject to RCRA Subtitle C requirements, such as reporting, using a manifest, and disposing of the waste in approved ways, such as through hazardous waste landfill.[7]

## Exemption of Certain Oil and Gas Production Wastes from Regulation as Hazardous Waste under RCRA Subtitle C

Notwithstanding the provisions for identifying hazardous wastes, the Solid Waste Disposal Act Amendments of 1980 created a separate process for certain oil and gas exploration and production wastes. Under the statute, these wastes would not be subject to regulation as hazardous waste under RCRA Subtitle C unless specific actions were taken.[8] The amendments required EPA to conduct and publish "a detailed and comprehensive study…on the adverse effects, if any, of drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil or natural gas or geothermal energy on human health and the environment."[9] The study report was to "include appropriate findings and recommendations for Federal and non-Federal actions concerning such effects."[10]

The law further required EPA to either propose regulations for such wastes or determine that regulation was not warranted. Any such regulations would require congressional action to become effective:

> [T]he Administrator shall, after public hearings and opportunity for comment, determine either to promulgate regulations under this subchapter for drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil or natural gas or geothermal energy or that such regulations are unwarranted. The Administrator shall transmit his decision, along with any regulations,

---

[6]40 C.F.R. §§ 261.3 (2012). Some wastes otherwise meeting the definition are excluded from regulation as a hazardous waste; see 40 C.F.R. § 261.4 (2012).

[7]See, e.g., RCRA §§ 3002, 3003, 3004, 42 U.S.C. §§ 6922, 6923, 6924 (2012).

[8]Pub. L. No. 96-482 § 7, 94 Stat. 2334, 2336 (1980), 42 U.S.C. § 6921(b)(2) (2012).

[9]Pub. L. No. 96-482 § 29(2), 94 Stat., 2350 (1980), amending RCRA § 8002(m), 42 U.S.C. § 6982(m) (2012).

[10]Id.

Appendix V: Key Requirements and
Authorities under the Resource Conservation
and Recovery Act

if necessary, to both Houses of Congress. Such regulations shall take effect only when authorized by Act of Congress.[11]

Pursuant to these provisions, EPA conducted the study and found that organic pollutants at levels of potential concern (levels that exceed 100 times EPA's health-based standards) included the hydrocarbons benzene and phenanthrene. Inorganic constituents at levels of potential concern included lead, arsenic, barium, antimony, fluoride, and uranium. EPA then issued a determination that regulation of oil and gas exploration and production wastes under RCRA Subtitle C was not warranted.[12] EPA focused on three key factors pertaining to these wastes: (1) the characteristics, management practices, and resulting impacts of these wastes on human health and the environment; (2) the adequacy of existing state and federal regulatory programs; and (3) the economic impacts of any additional regulatory controls on industry:[13]

In considering the first factor, EPA found that a wide variety of management practices are utilized for these wastes, and that many alternatives to these current practices are not feasible or applicable at individual sites…As to the second factor, EPA found that existing State and Federal regulations are generally adequate to control the management of oil and gas wastes. Certain regulatory gaps do exist, however, and enforcement of existing regulations in some States is inadequate. EPA's review of the third factor found that imposition of Subtitle C regulations for all oil and gas wastes could subject billions of barrels of waste to regulation under Subtitle C as hazardous wastes and would cause a severe economic impact on the industry and on oil and gas production in the U.S…and could cause severe short-term strains on the capacity of Subtitle C Treatment, Storage, and Disposal Facilities..and a significant increase in the Subtitle C permitting burden for State and Federal hazardous waste programs.[14]

---

[11]42 U.S.C. § 6921(b)(2)(B)-(C) (2012).

[12]53 Fed. Reg. 25,446, 25,447 (July 6, 1988). The study, titled "Management of Wastes from the Exploration, Development, and Production of Crude Oil, Natural Gas, and Geothermal Energy " was submitted to Congress in December 1987. See also Clarification of the Regulatory Determination for Wastes From the Exploration, Development and Production of Crude Oil, Natural Gas and Geothermal Energy, 58 Fed. Reg. 15,284 (Mar. 22, 1993).

[13]53 Fed. Reg. at 25,450.

[14]Id. at 25,446.

EPA stated that regulation of these wastes as hazardous waste under Subtitle C posed significant problems, including the lack of flexibility in the statute to take into account the varying geological, climatological, geographic, and other differences characteristic of oil and gas production sites, and to consider cost in applying the requirements—such that EPA would be unable to craft a program to avoid severe economic impacts and to fill only the gaps in existing programs.[15]

In lieu of regulating these wastes as hazardous waste under Subtitle C, EPA announced "a three-pronged approach toward filling the gaps in existing State and Federal regulatory programs," comprised of (1) improving existing programs under RCRA, the Safe Drinking Water Act, and the Clean Water Act; (2) working with states to improve their programs; and (3) working with Congress on any additional legislation that might be needed.[16] EPA further stated that it planned to revise its existing standards under Subtitle D of RCRA, "tailoring these standards to address the special problems posed by oil, gas, and geothermal wastes and filling the regulatory gaps,"[17] and "in developing these tailored Subtitle D standards for crude oil and natural gas wastes, EPA will focus on gaps in existing State and Federal regulations and develop appropriate standards that are protective of human health and the environment. Gaps in existing programs include adequate controls specific to associated wastes and certain management practices and facilities for large-volume wastes, including roadspreading, landspreading, and impoundments."[18]

As far as implementing the three-pronged approach, according to a 2011 EPA presentation, the agency developed Clean Water Act effluent guidelines for offshore and coastal oil and gas production, but EPA did not augment its RCRA Subtitle D regulations as planned, stating that it decided to work with the states instead.[19] EPA's work with states featured audits that ultimately led to the State Review of Oil and Natural Gas

---

[15]Id. at 25,447.

[16]Id.

[17]Id.

[18]Id. at 25,457.

[19]EPA, Exploration & Production Waste and RCRA, presented at ASTSWMO Annual Meeting (Oct. 26, 2011).

Environmental Regulations (STRONGER) program.[20] EPA also worked with industry representatives to develop best management practices for exploration and production wastes, but these efforts did not culminate in any document or guidance.

On September 8, 2010, the Natural Resources Defense Council submitted a petition requesting regulation of waste associated with the exploration, development, or production of oil, natural gas, and geothermal energy.[21] The petition asserts that EPA can and should revisit the determination not to regulate these wastes because, among other things, the underlying assumptions—concerning the availability of alternative disposal practices, the adequacy of state regulations, and economic harm to the oil and gas industry—are no longer valid. The petition requests that EPA promulgate regulations applying to wastes from the exploration, development and production of oil and natural gas under Subtitle C of RCRA.

EPA officials told us the petition is currently under consideration and that the agency has not established a time frame for its decision.[22] According to an EPA presentation, OSWER's Office of Resource Conservation and Recovery is currently (1) reviewing alleged incidents cited in the Natural Resources Defense Council petition; (2) compiling and reviewing state regulations in states with natural gas activities; and (3) reviewing best management practices for oil and gas exploration and production wastes developed by industry, federal, and state associations.[23] EPA does not anticipate releasing any studies, surveys, or other documents in the interim period. EPA officials said that when EPA is finished examining the

---

[20]The STRONGER program is conducted through the Ground Water Protection Council and brings together stakeholders to examine state oil and gas regulations and make recommendations for improvement.

[21]Letter, NRDC to EPA, Petition for Rulemaking Pursuant to Section 6974(a) of the Resource Conservation and Recovery Act Concerning the Regulation of Wastes Associated with the Exploration, Development, or Production of Crude Oil or Natural Gas or Geothermal Energy (Sept. 8, 2010); see also RCRA § 7004(a), 42 U.S.C. § 6974(a) (2012).

[22]See RCRA § 7004(a), 42 U.S.C. § 6974(a) (2012) (requiring only that EPA shall take action on a petition to promulgate regulations "within a reasonable time following receipt" of the petition.)

[23]EPA, Exploration & Production Waste and RCRA, presented at ASTSWMO Annual Meeting (Oct. 26, 2011).

**Appendix V: Key Requirements and Authorities under the Resource Conservation and Recovery Act**

issue, the agency intends to issue a proposed response to the petition. The proposed response will be printed in the *Federal Register*, and EPA will establish an electronic docket and provide an opportunity for public comment. Although EPA has not yet sought public comment on the petition, the agency has received several unsolicited comment letters, including from two industry associations, the STRONGER program, and two states.

If EPA revises the regulatory determination for some or all exploration and production wastes, the agency would conduct a full regulatory process to propose the regulations. Under the key RCRA provision, the regulations would not become effective until authorized by congressional action. Should the exemption be lifted, not all exploration and production wastes would necessarily be hazardous. Rather, whether particular exploration and production wastes would be hazardous and subject to regulation would depend on whether those particular wastes meet the regulatory definition of hazardous (i.e., are a listed waste or exhibit a characteristic of hazardous waste).

## Oil and Gas Exploration and Production Wastes That Are Not Exempt from Regulation

While well sites wastes originating within the well or generated by field operations such as water separation, demulsifying, degassing, and storage are exempt, RCRA Subtitle C regulations generally apply to other wastes that may be generated at oil and gas wells, such as discarded unused products, solvents used to clean surface machinery, and others, if they are actually hazardous. In 2002, EPA published a guide titled "Exemption of Oil and Gas Exploration and Production Wastes from Federal Hazardous Waste Regulations" that identifies, among other things, a list of nonexempt wastes. The guide identified nonexempt wastes including the following wastes that may be generated by activities at oil and gas well sites:

- unused fracturing fluids or acids;

- painting wastes;

- waste solvents;

- oil and gas service company wastes such as empty drums, drum rinsate, sandblast media, painting wastes, spent solvents, spilled chemicals, and waste acids;

- vacuum truck and drum rinsate from trucks and drums transporting or containing nonexempt waste;

- used equipment lubricating oils;

- waste compressor oil, filters, and blowdown;

- used hydraulic fluids;

- caustic or acid cleaners;

- laboratory wastes;

- sanitary wastes;

- pesticide wastes;

- radioactive tracer wastes; and

- drums, insulation, and miscellaneous solids.

According to EPA's guidance document, this list represents some types of wastes that, if hazardous, are not exempt from Subtitle C regulation; however, these wastes may or may not be hazardous in a particular situation. These wastes are hazardous if they are a listed hazardous waste or exhibit a hazardous characteristic, such as ignitability or toxicity. If hazardous, then the facility is subject to waste management requirements that vary depending upon the amount of hazardous waste generated per calendar month.

RCRA regulations establish several categories for facilities generating hazardous waste, with differing reporting obligations.[24] Among these, the lowest level category is conditionally exempt small quantity generators, composed of facilities generating no more than 100 kilograms (220 pounds) per month of hazardous waste.[25] These facilities are subject to limits on the amount of hazardous waste they accumulate,[26] as well as

---

[24]40 C.F.R. § 261.5, pt. 262 (2012).

[25]Id. at § 261.5(a).

[26]Id. at (g)(2).

general requirements to determine which wastes are hazardous[27] and to ensure that any hazardous wastes sent for off-site disposal are sent to state-approved facilities, RCRA-permitted or interim status, or for certain wastes, universal waste facilities, facilities beneficially using, recycling, or reclaiming the waste.[28] Generally, conditionally exempt small quantity generators would not be required to have an EPA ID number.[29] Small quantity generators are those facilities generating more than 100 kilograms (220 pounds) but less than 1,000 kilograms (2,220 pounds) per month of hazardous waste. These facilities are subject to limits on the amount of hazardous waste they accumulate, as well as storage requirements,[30] and general requirements to determine which wastes are hazardous[31] and to ensure that any hazardous wastes sent for off-site disposal are sent to RCRA-permitted or interim status facilities.[32] In addition, the small quantity generators are required to have an EPA ID number and use manifests, by which hazardous waste may be tracked.[33]

For facilities, like oil and gas well sites, that may generate hazardous wastes but do not store, treat, or dispose of these wastes, no specific actions by EPA (or the authorized state) are required, beyond issuance of an EPA ID number to those facilities notifying EPA that it has generated hazardous waste in amounts making it a small or large quantity generator.[34] EPA uses the notification information and EPA ID number to identify the universe of regulated waste generators and their specific regulated waste activities, for tracking, and for a variety of enforcement

---

[27]Id. at § 262.11.

[28]Id. at § 261.5(g)(3). If the facility generates a subset of hazardous waste known as acute hazardous waste, it is subject to additional requirements for that waste. Id. at § 261.5(f)(3).

[29]Id. at §§ 261.5(b), 262.12.

[30]Id. at § 261.34.

[31]Id. at § 262.11.

[32]Id. at g)(3). If the facilities generate a subset of hazardous waste known as acute hazardous waste, it is subject to additional requirements for that waste. Id. at § 261.5(f)(3).

[33]Id. at §§ 262.12, 262.20.

[34]Id. at § 262.12(a) (a generator, other than a conditionally exempt small quantity generator, is essentially required to obtain an identification number before storing the waste or offering it to a transporter.).

and inspection purposes.[35] Generally, EPA (or the authorized state's) involvement at generator-only sites includes receiving notifications and issuing identification numbers, receiving biennial reports,[36] conducting compliance assurance activities such as inspections, and investigating alleged problems.

EPA has not undertaken a specific assessment of the extent to which oil and gas well sites are generating small amounts of regulated hazardous wastes and consequently are regulated as small quantity generators or conditionally exempt small quantity generators. EPA officials were unaware of the extent to which oil and gas well sites generate nonexempt hazardous waste (e.g., hazardous wastes other than exempt exploration and production wastes) in quantities significant enough to require an EPA ID number. EPA Region 8 officials were unaware of any instances in which a well site requested an EPA ID number. A challenge in understanding the extent to which oil and gas well sites are regulated stems in part from the use of North American Industry Classification System (NAICS) codes. While there is a code at the six-digit level that generally corresponds with oil and gas production,[37] it appears that, for some facilities with this code, the facility entry includes associated downstream facilities such as a compressor station or gas processing plant, making it impossible to use RCRAInfo – a publicly available EPA database that contains information on RCRA generators -- alone to identify well sites triggering the particular requirement of interest. For example, this database shows that some facilities with the oil and gas production NAICS code are listed as conditionally exempt small quantity generators. GAO's review of a small sample of these listings suggests

---

[35]See EPA Form 8700-12.

[36]Biennial reports are only required of large quantity generators. The reports are to include, among other things, a description of the generated hazardous wastes and the quantities shipped off-site to a U.S. treatment, storage, or disposal facility. 40 C.F.R. § 262.41 (2012).

[37]NAICS code 211111, Crude Petroleum and Natural Gas Extraction. A further complication in the context of this report is our scope is focused on unconventional resources produced using land-based wells, where the NAICS code at the six-digit level does not reflect these distinctions and includes other resources and offshore wells.

some may include downstream facilities, while others appear to be well sites.[38]

# Subtitle D – Solid Waste

Oil and gas exploration and production wastes may be RCRA statutory solid wastes even if they are exempt from hazardous waste requirements or are nonhazardous wastes. As compared with hazardous waste, RCRA provided EPA a different and largely nonregulatory role for solid waste.[39] EPA's role in solid waste management is focused on assisting states in developing solid waste management programs. For example, EPA developed guidelines for certain aspects of solid waste management.[40] A key part of EPA's limited regulatory role[41] for solid waste was to establish criteria defining which solid waste disposal facilities and practices are "sanitary landfills" and those which constitute "open dumps,"[42] where RCRA prohibited open dumping of solid waste.[43]

---

[38]EPA officials from one Region believed some well sites may be small quantity generators of hazardous waste.

[39]See, e.g., RCRA §§ 1003(a)(1)-(3), 4001, 42 U.S.C. §§ 6902(a)(1)-(3), 6941 (2012).

[40]See, e.g., RCRA § 1008, 42 U.S.C. § 6907 (2012), 40 C.F.R. pt. 243 (2012) (Guidelines for the Storage and Collection of Residential, Commercial, and Institutional Solid Waste, containing guidelines that are recommended but not required for states).

[41]In addition, for two types of solid waste disposal facilities (those receiving conditionally exempt small quantity generator waste and household hazardous wastes), RCRA provided that states must implement an EPA-approved system to assure the facilities comply with EPA criteria, or the facilities would be subject to EPA hazardous waste enforcement authorities. RCRA § 4005(c)(1)(A)-(B), 42 U.S.C. § 6945(c)(1)(A)-(B) (2012) (providing that each State shall adopt and implement a permit program or other system of prior approval and conditions to assure that each solid waste management facility within such State which may receive hazardous household waste or hazardous waste [from small quantity generators] will comply with," respectively, the applicable initial and revised criteria established by EPA), RCRA § 4005(c)(1)(C), 42 U.S.C. § 6945(c)(1)(C) (2012) (EPA shall determine if each program is adequate); see 40 C.F.R. pts. 239, 257 subpt. B; 258 (2012).

[42]RCRA §§ 1008(a)(3), 4004, 42 U.S.C. §§ 6907(a)(3), 6944, 40 C.F.R. § 257.1, pt. 257, § 258.1(g), pt. 258 (2012). See also 53 Fed. Reg. 25,446 (July 6, 1988) (noting that "[t]he existing Federal standards under Subtitle D of RCRA provide general environmental performance standards for disposal of solid wastes, including oil, gas, and geothermal wastes, but these standards do not fully address the specific concerns posed by oil and gas wastes. Nevertheless, EPA has authority under Subtitle D to promulgate more tailored criteria.").

[43]RCRA § 4005(a), 42 U.S.C. §§ 6945(a) (2012).

Consistent with the scheme established by RCRA Subtitle D, states have primary responsibility for managing disposal of solid waste, including that resulting from oil and gas exploration and production. State solid waste programs regulate treatment (which may include incineration) and land disposal of these wastes, among other things. In addition, states may have specific programs to address oil and gas production wastes, and some states put such wastes in a special category of solid waste, such as industrial wastes, with more stringent requirements than the federal minimum requirements. (See report and app. IX for discussion of selected aspects of state waste management.)

## Enforcement

EPA has certain enforcement authorities to address hazardous wastes. RCRA sections 3007, 3008, and 3013 collectively provide EPA with authorities to monitor compliance, conduct investigations, and enforce Subtitle C (the hazardous waste subtitle) and its implementing regulations.[44] Each of these key authorities depends, among other things, on the existence or presence of a hazardous waste in a given situation. EPA's authority under sections 3007 and 3013 extends beyond waste that is regulated as hazardous under Subtitle C (e.g., wastes meeting the regulatory definition of hazardous waste), and includes waste that meets the statutory definition of hazardous waste in RCRA section 1004(5).[45]

For example, section 3008(a) authorizes EPA to issue administrative compliance orders "whenever on the basis of any information" the EPA Administrator determines that any person has violated or is in violation of any requirement of Subtitle C.[46],[47] These orders may require the person to come into compliance immediately or by a specific time frame and/or

---

[44]RCRA §§ 3007, 3008, 3013, 42 U.S.C. §§ 6927, 6928, 6934 (2012).

[45]Cf. RCRA § 1004(5), 42 U.S.C. § 6903(5) (2012) with 40 C.F.R. §§ 261.3,-4 (2012).

[46]RCRA § 3008, 42 U.S.C. § 6928 (2012).

[47]EPA also has authorities to require corrective action or such other response measure as necessary to protect human health or the environment from past and present contamination, at RCRA permitted or interim status facilities—that is, where the facility is a storage, treatment, or disposal facility and has or should have a Subtitle C hazardous waste permit. EPA can use this corrective action authority only at facilities that are RCRA permitted or interim status facilities, and cannot require a corrective action at a generator-only facility. Interim status facilities are facilities that treat, store, or dispose of hazardous waste and have begun the process of applying for a RCRA permit. See RCRA §§ 3004(u)-(v), 3008(h), 42 U.S.C. §§ 6924(u)-(v), 6928(h) (2012).

pay a civil penalty for any past or current violation and may include suspension or revocation of a facility's RCRA permit. Alternatively, EPA, through the Department of Justice, may file a civil action in federal court for violations of RCRA and its implementing regulations and permits. EPA must give notice to the state, if it has an EPA-authorized hazardous waste program, prior to issuing an order or filing a civil judicial action.

Section 3007(a) gives EPA authority to inspect and copy records and to obtain samples from any person who generates, stores, treats, transports, disposes of, or otherwise handles or has handled hazardous wastes, and to enter sites where hazardous wastes are or have been generated, stored, treated, disposed of, or transported from.[48] Section 3007 also establishes mandatory compliance inspections.[49] EPA has interpreted its section 3007 authority, discussed above, to include the authority to access records and sites related to solid waste "that the Agency reasonably believes may pose a hazard when improperly managed."[50] EPA officials did not provide any examples of EPA using its section 3007 authority at oil or gas well sites.

Section 3013 authorizes EPA to issue an order requiring monitoring, testing, analysis, and reporting if the EPA Administrator determines, upon receipt of any information, that the presence or release of any hazardous waste at a facility or site at which hazardous waste is, or has been, stored, treated, or disposed of may present a substantial hazard to human health or the environment.[51] Furthermore, in certain circumstances, EPA may use its authority under section 3013 to conduct its own investigation into the nature and extent of a potential hazard.[52]

---

[48]RCRA § 3007(a), 42 U.S.C. § 6927(a) (2012).

[49]Id. at § 6927(e) (2012).

[50]See, e.g., 53 Fed. Reg. 25,446, 25,457 (1988) ("EPA believes this [section 3007] authority does not limit information collection to "hazardous" waste under Subtitle C, but also authorizes the collection of information on any solid waste that the Agency reasonably believes may pose a hazard when improperly managed. (EPA may also use this authority in preparing enforcement actions.)").

[51]RCRA § 3013(a), 42 U.S.C. § 6934(a) (2012).

[52]Id. at § 6934(d) (2012).

EPA officials did not provide any examples of EPA using these hazardous waste enforcement provisions for incidents arising at oil or gas well sites.

EPA has fewer enforcement responsibilities and authorities for nonhazardous waste facilities under RCRA Subtitle D, than it does for hazardous waste activities regulated under RCRA Subtitle C. In particular, state solid waste programs are based in state law and generally are not subject to enforcement or overfiling by EPA. RCRA's prohibition on open dumping of solid and hazardous waste is enforceable by citizen suit.[53]

## Imminent and Substantial Endangerment Authority

EPA has imminent and substantial endangerment authority to address both hazardous and solid wastes. Section 7003 authorizes EPA to issue administrative orders and to file suit in federal district court. In addition, "upon receipt of evidence that the past or present handling, storage, treatment, transportation or disposal of any solid waste or hazardous waste may present an imminent and substantial endangerment to health or the environment," EPA has authority to restrain any person who has contributed or who is contributing to such handling, storage, treatment, transportation or disposal, from such activity, to order them to take such other action as may be necessary, or both.[54] Such orders can be issued to a person who contributed in the past or is currently contributing to the imminent and substantial endangerment to health or the environment.[55] Section 7003 orders are enforceable; if a nonfederal recipient fails to comply, EPA can enforce the order, including fines, by requesting that Department of Justice file suit in federal court.[56]

---

[53]RCRA § 7002, 42 U.S.C. § 6972 (2012). RCRA section 7002 authorizes citizen and state suits including against any person who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to RCRA, or who has contributed or is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment. Citizen suits are subject to various conditions, such as a requirement for advance notice to EPA and the state, and that neither EPA nor the state is taking certain actions to address the problem.

[54]RCRA § 7003, 42 U.S.C. § 6973 (2012).

[55]Id. at § 6973(a).

[56]Id. at § 6973(b).

EPA's imminent and substantial endangerment authority is not limited to Subtitle C regulated hazardous wastes but also includes statutory solid wastes and hazardous wastes.[57] EPA has interpreted the authority broadly, to allow a range of actions to be taken, including addressing the threat of endangerment.[58] Nonetheless, EPA officials noted that a section 7003 action is distinct from, for example, the agency's Subtitle C enforcement authorities because the objective of such an action is to abate the imminent and substantial endangerment, rather than to enforce specific RCRA requirements. Whether RCRA section 7003 authority is applicable to a given situation requires a fact-based determination that the facts establish the statutory elements, including the existence of conditions that may present an imminent and substantial endangerment.

EPA has issued section 7003 orders at several facilities handling wastes from oil and gas well sites. For example, as previously discussed, EPA Region 8 participated in an effort with the FWS, states, and tribes, after the FWS expressed concerns about migratory birds landing on open pits that contained oil and water, which killed or harmed the birds.[59] The effort involved aerial surveys to observe pits. Where apparent problems were identified, relevant federal or state agencies were notified and were to give oil and gas operators an opportunity to correct problems. Ground inspections were then conducted where deemed warranted and, if problematic conditions were found, further follow up action was taken by EPA or the relevant state or other federal agency. As a result of this effort, EPA issued nine orders pursuant to RCRA section 7003 authority.[60] According to the report, the orders required operators "to remove oil from pits, install effective exclusionary devices, and/or clean up sites."[61] EPA Region 8 has issued section 7003 orders to several commercial oilfield waste disposal facility operators in Wyoming, finding

---

[57]RCRA § 1004(5), (27), 42 U.S.C. § 6903(5), (27) (2012).

[58]See EPA. Office of Enforcement and Compliance Assurance, Guidance on the Use of Section 7003 of RCRA (October 1997).

[59]EPA Region 8, Oil and Gas Environmental Assessment Effort 1996 – 2002, at v (2003).

[60]Id. at 8.

[61]Id.

each site endangered the environment including having caused bird mortalities due to inadequate pit management.[62]

As another example, in 2005, EPA Region 6 entered into an agreement with an exploration company and property owners at a site in Oklahoma where the contents of a well drilling waste pit had been relocated onto residential property; the agreement required the waste to be removed, among other things.[63]

---

[62]*In the Matter of Jim's Water Service*, Initial Administrative Order, EPA Docket No. RCRA-08-2011-0002 (June 23, 2011); *In the Matter of Pure Petroleum LLC*, Administrative Order, EPA Docket No. RCRA-08-2011-0003 (Sept. 16, 2011). See also Consent Decree, *United States of America v. High Plains Resources, Inc.*, No. 2:09-cv-00087 (Wy. Nov. 3, 2010).

[63]*West Bay Exploration*, Agreement and Remediation Plan, EPA Docket No. RCRA-06-2005-0913 (Sept. 14, 2005).

# Appendix VI: Key Requirements and Authorities under the Comprehensive Environmental Response, Compensation, and Liability Act

In 1980, Congress passed the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), often referred to as "Superfund," to address the cleanup of releases of hazardous substances, pollutants, and contaminants nationwide and, in so doing, protect human health and the environment from their effects.[1] The enactment of CERCLA gave the federal government the authority to respond to actual and threatened releases of hazardous substances, pollutants, and contaminants that may endanger public health or welfare or the environment,[2] as well as requiring reporting of hazardous substances releases above threshold quantities.[3] CERCLA also established a liability scheme, whereby potentially responsible parties such as owners and operators may be liable for cleanup and other costs stemming from the release (or threatened release) of hazardous substances into the environment from a facility.[4] CERCLA is primarily a remedial statute; it is preventive in that it authorizes responses to threatened releases of hazardous substances, pollutants, and contaminants, and to the extent that the liability scheme provides incentives for owners and operators to take care to avoid releases to the environment.

## Relevant Exclusions and Definitions

Under a provision known as the petroleum exclusion, CERCLA's provisions do not apply to releases to the environment that are purely petroleum, including crude oil and natural gas, and fractions of crude oil including the hazardous substances, such as benzene, that are

---

[1]CERCLA, Pub. L. No. 96-510, 94 Stat. 2767 (1980) (codified as amended at 42 U.S.C. §§ 9601- 9675 (2012)). Hereinafter, references to CERCLA sections are as amended.

[2]CERCLA § 104, 42 U.S.C. § 9604 (2012).

[3]CERCLA § 103(a), 42 U.S.C. § 9603(a) (2012).

[4]Parties may also be held liable under CERCLA for damages related to the loss, injury or destruction of natural resources.

**Appendix VI: Key Requirements and Authorities under the Comprehensive Environmental Response, Compensation, and Liability Act**

indigenous in those petroleum substances.[5] EPA can respond to releases of hazardous substances, however, even if there are colocated petroleum releases.[6]

CERCLA's liability and reporting provisions do not apply to federally permitted releases—generally, where a hazardous substance is released in compliance with a permit issued pursuant to certain federal environmental laws.[7] The statutory definition for such federally permitted releases exempt from CERCLA liability and reporting also includes:

> any injection of fluids or other materials authorized under applicable State law (i) for the purpose of stimulating or treating wells for the production of crude oil, natural gas, or water, (ii) for the purpose of secondary, tertiary, or other enhanced recovery of crude oil or natural gas, or (iii) which are brought to the surface in conjunction with the production of crude oil or natural gas and which are reinjected.[8]

However, EPA has explained, "[t]he National Response Center must be notified in any situation involving the use of injection fluids or materials that are not authorized specifically by State law for purposes of the development of crude oil or natural gas supplies and resulting in a release of a hazardous substance" at or above the threshold reporting quantity.[9]

---

[5]CERCLA § 101(14), 42 U.S.C. § 9601(14) (2012) (defining hazardous substance to exclude "petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under [specified provisions of CWA, RCRA, CAA, and 15 U.S.C. § 2606], and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas)."); CERCLA § 101(33), 42 U.S.C. § 9601(33) (with similar language, excluding petroleum from the definition of "pollutant or contaminant"). See also http://www.epa.gov/superfund/policy/release/rq/index.htm#exclude. Such releases may be reportable under provisions of other laws, such as the Oil Pollution Act of 1990 and Clean Water Act; see CWA § 311(b)(3)-(5), 33 U.S.C. § 1321(b)(3)-(5) (2012); 40 C.F.R. § 300.300(b) (2012).

[6]See http://www.epa.gov/superfund/policy/release/rq/index.htm#exclude. Releases of certain waste oils are also regulated under CERCLA. 40 C.F.R. § 302.4 (2012).

[7]CERCLA § 101(10), 42 U.S.C. § 9601(10) (2012). See also exclusions at id. § 9601(22) (2012).

[8]Id. at § 9601(10)(*l*) (2012). This provision was included in CERCLA as enacted in 1980. Pub. L. No. 96-510 § 101, 94 Stat. 2768 (1980). See also 53 Fed. Reg. 27,268 (July 19, 1988).

[9]53 Fed. Reg. at 27,275.

## CERCLA Hazardous Substance Release Reporting

Where there has been a release of a hazardous substance, CERCLA section 103 requires a person in charge of a facility to report such releases above reportable quantities as soon as he/she has knowledge of such release to the National Response Center.[10] EPA regulations establish CERCLA hazardous substances and their reportable quantities.[11] While releases of pure petroleum (e.g., petroleum in which hazardous substances have not increased such as by addition or processing) are excluded, releases of CERCLA hazardous substances that are commingled with petroleum are subject to the reporting requirement.[12] Oil and gas well operators would be required to report any releases to the environment of other hazardous substances, for example, if a stored hazardous substance was accidentally spilled onto the ground, or if hazardous substances above the reportable quantity were injected but not authorized by state law.

The National Response Center—managed by the U.S. Coast Guard—receives release reports and forwards them to EPA Regions. When receiving a report, according to EPA Regional staff will screen the report for such factors as what was spilled and in what quantity and whether the spill threatens surface waters, to determine if EPA needs to respond and, if appropriate, will obtain additional information on the event, and/or send an on-scene coordinator to the site. EPA officials also noted they use the release reports to refer sites to program enforcement offices, such as the Clean Water Act's SPCC program, for follow-up. Although release reports are publicly available, the available search terms do not readily differentiate oil and gas well sites from other types of oil and gas facilities. EPA officials noted that there had been approximately 200 reports of oil spills from oil facilities in the last 5 years. EPA Region 5 officials stated that oil spills are more often related to pipelines, tank sites, or trucking accidents, with few occurring at well sites.

---

[10]CERCLA § 103(a), 42 U.S.C. § 9603(a) (2012). The National Response Center is the sole federal point of contact for reporting all hazardous substances and oil spills that trigger federal notification requirements under several laws. Information reported to the Center is disseminated to other agencies, such as EPA, as well as to states.

[11]40 C.F.R. pt. 302, § 302.4 at table 302.4 (2012).

[12]See http://www.epa.gov/superfund/policy/release/rq/index.htm#exclude. Releases of certain waste oils are also regulated under CERCLA. 40 C.F.R. § 302.4 (2012).

**Appendix VI: Key Requirements and Authorities under the Comprehensive Environmental Response, Compensation, and Liability Act**

## Relevant EPA Authorities

EPA established the Superfund program to carry out its responsibilities and authorities under CERCLA.[13] Under the Superfund program, EPA implements its authorities to compel parties responsible[14] for contaminating sites—via releases of hazardous substances—to clean them up, as well as to enter into agreements with such parties for them to conduct the cleanup. In addition, EPA can itself conduct response actions, which may include investigations and cleanup activities, and then seek reimbursement from the responsible parties.

The Superfund cleanup process involves a series of steps during which specific activities—such as investigations and cleanups—take place or decisions are made. The CERCLA program has two basic types of cleanup: (1) cleanups under the removal process, which generally address short-term threats, and (2) cleanups under the remedial action process, which are generally longer-term cleanup actions.[15] In determining whether to use removal or remedial authority to take a response action, EPA considers the time-sensitivity, complexity, comprehensiveness, and cost of the response action.[16]

Several EPA Superfund authorities are particularly relevant to oil and gas well operations, including the following:

- *Investigations, monitoring, coordination.* Under section 104(b), EPA generally may conduct investigation activities with appropriated program funds whenever a hazardous substance is released or there is a substantial threat of such a release, or there is reason to believe a

---

[13]Through Executive Order 12580, Superfund Implementation (1987), EPA was delegated key regulatory and enforcement authorities CERCLA granted to the President. In addition, CERCLA, as amended, granted certain authorities directly to the EPA Administrator.

[14]Under CERCLA, potentially responsible parties generally include current or former owners and operators of a site or the generators or transporters of the hazardous substances.

[15]40 C.F.R. § 300.5 (2012) (defining removal as including containment and removal of hazardous substances or other actions as may be necessary to minimize or mitigate damage to the public health or welfare of the United States or to the environment, and defining remedial action as including actions consistent with permanent remedy to prevent or minimize the release so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment.) For more information, see 40 C.F.R. § 300.415 (removals), 300.430, 300.435 (remedial actions).

[16]EPA, Memorandum, "Use of Non-Time Critical Removal Authority in Superfund Response Actions" (2000).

Appendix VI: Key Requirements and
Authorities under the Comprehensive
Environmental Response, Compensation, and
Liability Act

release has occurred or is about to occur.[17] These activities may
include monitoring, surveys, testing, and other information gathering,
as well as planning, legal, fiscal, economic, engineering, architectural,
and other studies or investigations, as deemed appropriate.[18]

- *Information gathering and access*. Under section 104(e), EPA has
  authority to obtain information as well as authorities to enter property
  and to conduct inspections and take samples.[19] Specifically, EPA may
  require a person to furnish information about the identification, nature,
  and quantity of materials that have been or are generated, treated,
  stored, or disposed of at a facility or transported thereto, or the nature
  or extent of a release or threatened release of a hazardous substance
  or pollutant or contaminant, or the ability of a person to pay for or to
  perform a cleanup, including related documents and records, among
  other things.[20] Where there is a reasonable basis to believe there may
  be a release or threat of release of a hazardous substance or
  pollutant or contaminant, EPA is authorized to enter a facility or
  property where such release is or may be threatened, among other
  things, and may inspect and obtain samples.[21] EPA may obtain
  access by agreement, warrant, or administrative order.[22] If consent is
  not granted, EPA may issue administrative orders or, through the
  Department of Justice, file civil actions, to compel compliance with
  requests made under these provisions.[23]

- *Removals*. Under section 104(a), EPA generally has authority to act
  whenever there has been a release or substantial threat of release
  into the environment of any hazardous substance. EPA generally may

---

[17]CERCLA § 104(a)(1), (b), 42 U.S.C. § 9604(a)(1), (b) (2012).

[18]Id.

[19]Id. at § 9604(e).

[20]Id. at § 9604(e)(1)-(2).

[21]Id. at § 9604(e)(3)-(4).

[22]Id. at § 9604(e)(4)-(5).

[23]Id. at § 9604(e)(5).

**Appendix VI: Key Requirements and Authorities under the Comprehensive Environmental Response, Compensation, and Liability Act**

conduct removal actions, among other things.[24] Removal actions are broadly defined and include actions to monitor, assess, and evaluate the release; the disposal of removed material; and other actions to prevent, minimize, or mitigate damage to the public health or welfare or to the environment such as provision of alternative drinking water supplies.[25]

- *Imminent and substantial endangerment authority related to releases of a pollutant or contaminant.* Under section 104(a), EPA has authority to act whenever a release or substantial threat of release into the environment of any pollutant or contaminant may present an imminent and substantial danger to the public health or welfare. This provides EPA with authority over releases of substances that are not CERCLA hazardous but that may harm public health or welfare;[26] however, as noted above, releases that are purely petroleum are excluded. Under this authority, EPA may conduct removals, provide for remedial action, or take any other response measure consistent with the National Contingency Plan.[27]

- *Authorities to pursue potentially responsible parties.* In addition, under section 106(a), EPA, through the Department of Justice, can pursue injunctive relief in court, where an actual or threatened release of a hazardous substance from a facility may pose an imminent and substantial endangerment to the public health or welfare or the environment.[28] EPA also can issue an administrative order requiring a potentially responsible party to take response

---

[24]Id. at § 9604(a). In addition to removal actions, EPA may also conduct remedial actions at nonfederal sites which are listed on the National Priorities List, but it is somewhat unlikely an oil and gas well site would be listed on the National Priorities List in light of the petroleum exclusion, among other factors. CERCLA §§ 104(a), (c)(1), 111(e), 42 U.S.C. §§ 9604(a), (c)(1), 9611(e) (2012). The National Priorities List includes sites that EPA determines are among the nation's most seriously contaminated hazardous waste sites to receive attention under the federal Superfund program.

[25]CERCLA § 101(23), 42 U.S.C. § 9601(23) (2012).

[26]See id. at § 9601(33) . EPA cannot, however, recover its response costs associated with these releases.

[27]EPA has promulgated regulations comprising the National Oil and Hazardous Substances Pollution Contingency Plan. 40 C.F.R. pt. 300 (2012). This plan outlines procedures and standards for implementing the Superfund program.

[28]CERCLA § 106(a), 42 U.S.C. § 9606(a) (2012).

GAO-12-874 Unconventional Oil and Gas Development

actions as may be necessary to protect public health and welfare and the environment.[29] CERCLA also provides authorities for EPA to pursue cleanup and related costs from potentially responsible parties, and to enter settlements, as well as providing for liability of potentially responsible parties for damages to federal, state, and tribal natural resources.[30]

EPA has utilized its CERCLA authorities at several locations where it has been alleged that hazardous substance releases from oil and gas well sites have contaminated land or groundwater. In an example at a conventional oil well, in the 1990s, EPA, as represented by the Department of Justice, reached an agreement in which an oil exploration and production company pled guilty to a criminal felony count related to CERCLA violations when operators disposed of waste oil and hazardous substances by injecting them down the annuli (the space between the well casing and the surrounding rock) of the oil wells, over a 2-year period.[31] According to the Department of Justice, the company agreed to spend $22 million to resolve the criminal case and related civil claims, which included claims brought under RCRA, SDWA, and EPCRA, as well as CERCLA.[32]

More recently, EPA has used CERCLA authorities to conduct response activities, investigations, and to obtain records relating to alleged hazardous substance or pollutant or contaminant releases from oil and gas well sites. For example, EPA used CERCLA section 104(a) to undertake emergency removal actions including well sampling and provision of alternate water supplies at a site in Dimock, Pennsylvania.[33] EPA is using CERCLA section 104(b) authority to conduct groundwater

---

[29]Id. at § 9606(a).

[30]See, e.g., CERCLA §§ 107, 122, 42 U.S.C. §§ 9607, 9622 (2012).

[31]See DOJ, news release (Sept. 23, 1999).

[32]See DOJ, news release (Sept. 23, 1999). See also, *United States of America v. BP Exploration (Alaska) Inc.*, Plea Agreement (Sept. 23, 1999), Stipulation of Settlement and Order (Sept. 23, 1999), Docket no. 3:99-cv-00549-JKS (D. Alaska).

[33]See Richard M. Fetzer, On-Scene Coordinator EPA, Action Memorandum to Dennis Carney, Associate Division Director, Hazardous Site Cleanup Division, EPA, re: Request for Funding for a Removal Action at the Dimock Residential Groundwater Site, Jan. 19, 2012.

**Appendix VI: Key Requirements and
Authorities under the Comprehensive
Environmental Response, Compensation, and
Liability Act**

contamination investigations at Pavillion, Wyoming.[34] EPA officials also referenced CERCLA section 104(e) authority in requesting information from operators of wells proximate to the Pavillion site.

EPA has used CERCLA section 104(e) in conjunction with other authorities in several "multimedia" information requests, where EPA seeks information under multiple statutes and for multiple media—air, land, water—that may be affected. In 2011, for example, EPA used CERCLA and other authorities to request information concerning a blowout at a Marcellus shale natural gas well in Bradford, Pennsylvania. In this instance, a well blowout during hydraulic fracturing resulted in the release of flowback fluids to a tributary of the Susquehanna River, as well as combustible gases to the atmosphere.[35]

---

[34]See EPA, Draft Report, *Investigation of Ground Water Contamination near Pavillion, Wyoming*, EPA 600/R-00/000 (December 2011) at xi, 1.

[35]Agency for Toxic Substances and Disease Registry, Health Consultation, Chesapeake ATGAS 2H Well Site, Leroy Hill Road, Leroy Township, Bradford County, PA (2011).

# Appendix VII: Key Requirements and Authorities under the Emergency Planning and Community Right-to-Know Act

The Emergency Planning and Community Right-to-Know Act of 1986 (EPCRA) provides a mechanism to help communities plan for emergencies involving extremely hazardous substances, and to provide individuals and communities with access to information regarding the storage and releases of certain toxic chemicals, extremely hazardous substances, and hazardous chemicals in their communities.[1]

## Generally Applicable Chemical Information, Inventory, and Release Reporting

EPCRA imposes a set of generally applicable requirements to report information on the uses, inventories, and releases into the environment of hazardous and toxic chemicals above threshold quantities.[2] Regarding releases, EPCRA section 304 requires owners or operators of facilities where a chemical is produced, used, or stored to notify state and local emergency planning authorities of certain releases.[3] The releases for which EPCRA requires reporting partially overlap with those for which the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA)[4] requires reporting.[5] Where there is overlap, EPCRA's procedures ensure state and local authorities receive this

---

[1]Pub. L. No. 99–499, Title III, 100 Stat. 1728 (1986) (codified at 42 U.S.C. ch. 116 (2012)). Hereinafter, references to EPCRA sections are as amended.

[2]In addition to EPCRA sections 304, 311, and 312, 42 U.S.C. §§ 11004, 11021, 11022 (2012), provisions discussed herein, section 302, 42 U.S.C. § 11002 (2012) requires the owner or operator of a facility to provide notification to the state and local emergency planning authorities with jurisdiction over the facility within 60 days if any extremely hazardous substances—including ammonia, hydrofluoric acid, and others—are present at or above its threshold planning quantity. See generally 40 C.F.R. pt. 355 (2012).

[3] EPCRA § 304(a), 42 U.S.C. §§ 11004(a) (2012). See also EPA, List of Lists (2011) available at http://www.epa.gov/emergencies/docs/chem/list_of_lists_revised_7_26_2011.pdf The reporting requirement does not apply, however, to releases which results in exposure to persons solely at the site where the facility is located, nor to federally permitted releases under the CERCLA definition. Id. at § 11004(a)(2), (4).

[4]Pub. L. No. 96–510, 94 Stat. 2767 (1980) (codified at 42 U.S.C. ch. 103 (2012)).

[5]See 40 C.F.R. § 355.60 (2012). Three types of releases must be reported: (1) release of extremely hazardous substances for which notification is also required under CERCLA § 103(c), (2) release of extremely hazardous substances for which notification is not required under CERCLA § 103(c), but above reporting thresholds and subject to additional conditions, and (3) release of other hazardous substances for which notification is also required under CERCLA § 103(c), subject to CERCLA reporting thresholds or 1 pound default threshold.

information, and CERCLA's procedures ensure federal authorities receive notification.

Regarding reporting of chemical information and inventories, EPCRA sections 311 and 312 requirements apply only to those facilities storing or using (1) more than 500 pounds or the threshold planning quantity, whichever is lower, of extremely hazardous substances, or (2) more than 10,000 pounds of other hazardous chemicals.[6] These facilities are required to provide chemical information (e.g., Material Safety Data Sheet or other detailed list) and submit an annual inventory report to state and local emergency planning authorities and to the local fire department with jurisdiction over the facilities.[7]

## Requirements under EPCRA That May Be Triggered at Well Sites

Well sites are subject to EPCRA sections 304, 311, and 312, among others, and may be subject to reporting requirements to the extent that the chemicals used, stored, or produced at well sites meet the respective reporting thresholds. Under EPCRA section 304, any facility, such as a well site, that produces, uses, or stores any hazardous chemical and has a release above the reportable quantity of a CERCLA hazardous substance or an extremely hazardous substance, must provide notification to state and local emergency planning authorities, as well as the National Response Center.[8] Under EPCRA sections 311 and 312, any facility, such as a well site, at which an extremely hazardous chemical or any other hazardous chemical is present at the relevant threshold quantity, must meet inventory reporting requirements. For extremely hazardous chemicals, the threshold is 500 pounds or its threshold planning quantity, whichever is less. For all other hazardous chemicals, the reporting threshold is 10,000 pounds.[9] For example, if the

---

[6]EPCRA §§ 302(b)(1), 304(a), 42 U.S.C. §§ 11002(b)(1), 11004(a) (2012); 40 C.F.R. § 370.10(a) (2012). Hazardous chemicals are defined as any chemical which is a physical hazard or a health hazard. EPCRA § 311(e), 42 U.S.C. § 11021(e) (2012), 40 C.F.R. § 355.61, 370.66 (2012), 29 C.F.R. § 1910.1200(c) (2012).

[7]EPCRA § 302(b)(1), 311(a)-(b), 312(a)-(b), 42 U.S.C. §§ 11002(b)(1), 11021, 11022 (2012), and 40 C.F.R. § 370.44 (2012).

[8]The reporting trigger for Section 304—that a facility produce, use, or store any hazardous chemical—does not require that the chemicals be present or stored on the site for any minimum period of time.

[9]40 C.F.R. § 370.10(a)(2)(i) (2012).

aggregate amount of hydrofluoric acid, an extremely hazardous chemical with a threshold planning quantity of 100 pounds, at a well site exceeds that threshold then the facility must report under sections 311 and 312. As another example, if a well stores or uses more than 10,000 pounds of drip gas or natural gas condensate at any one time, then the facility must report under sections 311 and 312.

The extent to which these requirements are triggered at oil and gas well sites depends on the presence and quantities of listed chemicals at such sites, among other things. We did not locate any publicly available data on the quantity of chemicals stored at actual or typical well sites, but FracFocus[10] provides self-reported data on the types of chemicals used in hydraulic fracturing, meaning that these chemicals are present and used at well sites. According to data in FracFocus, some hydraulic fracturing operations may use various hazardous chemicals, including some that are also CERCLA hazardous substances, such as hydrochloric acid, formaldehyde, formic acid, acetaldehyde, ethylene glycol, methanol, acetic acid, sodium hydroxide, potassium hydroxide, acrylamide, and naphthalene; of these, one is also considered "extremely hazardous."[11]

According to EPA, its Regional offices have several cases in development where the facility triggered the reporting requirements under 311 and 312 during all phases of operation, including drilling, hydraulic fracturing, and production.[12] EPA stated that, based on the Regions' experience, section 311 and 312 requirements could be triggered at every well site. EPA provided an example of section 312 information for a well site, which according to EPA officials, indicates that some hazardous chemicals may

---

[10]FracFocus is the national hydraulic fracturing chemical registry managed by the Ground Water Protection Council and Interstate Oil and Gas Compact Commission. The Ground Water Protection Council is a national association of state groundwater and underground injection control agencies whose mission is to promote the protection and conservation of groundwater resources for all beneficial uses, recognizing groundwater as a critical component of the ecosystem. The Interstate Oil and Gas Compact Commission is a multistate government agency that promotes the conservation and efficient recovery of domestic oil and natural gas resources while protecting health, safety, and the environment.

[11]Cf. http://fracfocus.org/chemical-use/what-chemicals-are-used and 40 C.F.R. § 302.4 (2012).

[12]EPCRA sections 311 and 312, 42 U.S.C. §§ 11021, 11022 (2012), require reporting to the state and local emergency planning authorities and to the local fire department with jurisdiction over the facility; EPA does not receive these reports.

be present at the particular well site in quantities that would trigger section 311 and 312 requirements.[13]

The information provided by EPA suggests that the types of chemicals with maximum on-site quantities of 10,000 to 99,999 pounds are the following:

- cement and associated additives;

- silica;

- shale control additives;

- drilling mud and associated additives;

- deflocculants;

- lubricants, drilling mud additives; and

- alkalinity and pH control material.

The information provided by EPA also suggests that the types of chemicals with maximum on-site quantities of 100,000 to 999,999 pounds are the following:

- produced hydrocarbons,

- salt solutions,

- weight materials, and

- fuels.

## Toxic Release Inventory

EPCRA also requires some facilities in listed industries to report to EPA their releases of listed toxic chemicals to the environment;[14] at present, these requirements do not apply to oil and gas well operations.

---

[13]EPA also provided information from an example of a section 312 form from a field service provider for the provider's facility where larger quantities of chemicals are stored and then loaded on trucks to service the wells.

Section 313 of EPCRA generally requires certain facilities that manufacture, process, or otherwise use any of more than 600 listed individual chemicals and chemical categories, to report annually to EPA and their respective state, for those chemicals used above threshold quantities. Facilities need to report the amounts that they released to the environment and whether they were released into the air, water, or soil.[15]

EPCRA further requires EPA to make this information available to the public,[16] which the agency does electronically through the Toxics Release Inventory (TRI) database. The Pollution Prevention Act of 1990 requires covered facilities that report to the TRI to also provide certain information about their waste management practices, including amounts of covered chemicals recycled or treated.[17] The purposes of making this information available include to inform citizens about releases of toxic chemicals to the environment; to assist governmental agencies, researchers, and other persons in the conduct of research and data gathering; and to aid in the development of appropriate regulations, guidelines, and standards, and for other similar purposes.[18]

EPCRA section 313(b)(1) specifies that these requirements shall apply to owners and operators of facilities meeting three conditions: (1) having 10 or more full-time employees;[19] (2) in certain Standard Industrial Classification codes; and (3) that manufactured, processed, or otherwise used a listed toxic chemical in excess of the reporting threshold during the calendar year. The law specified the Standard Industrial Classification codes subject to the reporting requirement. EPA has, from time to time, amended its regulations to reflect industry codes in use; first, providing a crosswalk from Standard Industrial Classification codes to the North

---

[14]The Pollution Prevention Act of 1990, Pub. L. No. 101–508 , Title VI, 104 Stat. 1388–321 (1990) (codified at 42 U.S.C. ch. 133 (2012)) requires facilities subject to EPCRA section 313 to also report annually toxic chemical source reduction and recycling activities. 42 U.S.C. § 13106(a)-(b) (2012).

[15]EPCRA § 313(g)(1)(C), 42 U.S.C. § 11023(g)(1)(C) (2012).

[16]Id. at (i).

[17]Pollution Prevention Act, § 6607, 42 U.S.C. § 13106 (2012).

[18]EPCRA § 313(h), 42 U.S.C. § 11023(h) (2012).

[19]Full-time employee is defined as 2,000 hours per year of full-time equivalent employment. A facility would calculate the number of full-time employees by totaling the hours worked during the calendar year by all employees, including contract employees, and dividing that total by 2,000 hours. 40 C.F.R.§ 372.3 (2012).

American Industry Classification System (NAICS) codes, and subsequently to update as needed to reflect changes to the NAICS codes.[20]

EPCRA section 313(b)(1)(B) provides EPA with authority to add or delete industrial codes.[21] EPA issued initial regulations to implement the TRI in 1988.[22] In the initial regulations, EPA discussed its approach to evaluating additional industrial codes under its discretionary authority but did not add any at that time.[23] Oil and gas extraction industries were not included on the statutory list of Standard Industrial Classification codes and hence were not subject to the rule.

EPA has since expanded the list of covered industries, but it has not included oil and gas extraction.[24] According to EPA's Sector Notebook, the addition of the oil and gas extraction industry to regulation under EPCRA section 313 has been a long-term consideration.[25] In 1997, pursuant to section 313(b)(1)(B), EPA added seven industry groups[26] to the list of industries required to report releases in a rulemaking known as the Industry

---

[20]Community Right-to-Know; Toxic Chemical Release Reporting Using NAICS, 71 Fed. Reg. 32,464, 32,465 (June 6, 2006); see generally http://www.epa.gov/tri/lawsandregs/naic/ncodes.htm

[21]EPCRA § 313(b)(1)(B), 42 U.S.C. § 11023(b)(1)(B) (2012). EPA can also add individual facilities. EPCRA § 313(b)(2), 42 U.S.C. § 11023(b)(2) (2012).

[22]53 Fed. Reg. 4500 (Feb. 16, 1988).

[23]Id. at 4503 (stating "EPA has discretionary authority to modify the coverage of facilities under section 313(b)(1)(B). The report of the congressional conference committee for Title III states that any such modifications are limited "* * * to adding [Standard Industrial Classification] codes for facilities which, like facilities within the manufacturing sectors Standard Industrial Classification codes 20 through 39, manufacture, process or use toxic chemicals in a manner such that reporting by these facilities is relevant to the purposes of this section... The Agency is choosing not to modify the facility coverage of the rule at this time...The Agency must carefully evaluate additional types of facilities that may be manufacturing, processing, or using listed toxic chemicals as well as facilities in [Standard Industrial Classification] codes 20 through 39 that do not handle such chemicals.").

[24]See http://www.epa.gov/tri/lawsandregs/naic/ncodes.htm.

[25]EPA Office of Compliance, Sector Notebook Project: Profile of the Oil and Gas Extraction Industry 114 (October 2000).

[26]These industries included metal mining, coal mining, electrical utilities that combust coal and/or oil for the purpose of generating power for distribution in commerce, certain hazardous waste processing or destruction facilities regulated by EPA, chemical wholesalers, petroleum terminals and bulk stations and solvent recovery services.

Expansion Rule.[27] Oil and gas exploration and production was among nine candidate industries considered in EPA's screening process. The preamble to the proposed Industry Expansion Rule stated in part:

> One industry group, oil and gas extraction classified in [Standard Industrial Classification] code 13, is believed to conduct significant management activities that involve EPCRA section 313 chemicals. EPA is deferring action to add this industry group at this time because of questions regarding how particular facilities should be identified. This industry group is unique in that it may have related activities located over significantly large geographic areas.

> While together these activities may involve the management of significant quantities of EPCRA section 313 chemicals in addition to requiring significant employee involvement, taken at the smallest unit (individual well), neither the employee nor the chemical thresholds are likely to be met. EPA will be addressing these issues in the future.[28]

The preamble of the final rule stated in part, "[a] number of commenters support EPA's decision not to include oil and gas exploration and production in its proposal, and urge EPA not to propose adding this industry in the future. EPA considered the inclusion of this industry group prior to its proposal, and indicated in the proposal that one consideration for not including it was concern over how a 'facility' would be defined for purposes of reporting in EPCRA section 313 ...This issue, in addition to other questions, led EPA to not include this industry group. EPA will continue its dialogue with the oil and gas exploration and production industry and other interested parties, and may consider action on this industry group in the future."[29]

---

[27]Addition of Facilities in Certain Industry Sectors; Revised Interpretation of Otherwise Use; Toxic Release Inventory Reporting; Community Right-to-Know, 62 Fed. Reg. 23,834 (May 1, 1997) (known as the Industry Expansion Rule). In announcing the rule, EPA stated, "EPA believes that [section 313(b)(1)(B)] grants the Agency broad, but not unlimited, discretion to add industry groups to the facilities subject to EPCRA section 313 reporting requirements where EPA finds that reporting by these industries would be relevant to the purposes of EPCRA section 313." See also 71 Fed. Reg. 32,464, 32,465 (June 6, 2006).

[28]61 Fed. Reg. 33,588, 33,592 (June 27,1996).

[29]62 Fed. Reg. 23,834, 23,855 (1997).

In fall 2011, EPA conducted a discussion forum on regulations.gov. The background information provided in the forum stated that EPA was considering a rule to add or expand coverage to the following industry sectors: Iron Ore Mining, Phosphate Mining, Solid Waste Combustors and Incinerators, Large Dry Cleaners, Petroleum Bulk Storage, and Steam Generation from Coal and/or Oil.[30] EPA officials told us that, for the current possible rulemaking, the initial screening process for sectors to consider adding to the TRI included review of those sectors, such as oil and gas production, that were considered but ultimately not added in the 1997 rule. In addition, EPA officials said the initial screening process also included sectors covered by analogous registries of other countries. According to EPA, the oil and gas sector falls into both categories and was considered in the initial screening. As of July 2012, EPA officials stated that EPA does not anticipate adding oil and gas exploration and production sites as part of the possible rule currently under consideration to add industry sectors to the scope of TRI.[31] EPA officials explained that the agency has not changed its assessment of the oil and gas sector as it pertains to TRI reporting since the 1996 proposed rule and stated that adding oil and gas well sites would likely provide a substantially incomplete picture of the chemical uses and releases at these sites, and would therefore be of limited utility in providing information to communities.

EPCRA section 313 also specified the chemicals subject to the reporting requirement and provided a process and criteria for EPA to add or delete chemicals from the list.[32] In the proposal to the 1997 Industry Expansion Rule discussed above, EPA stated that oil and gas extraction activities "may involve the management of significant quantities of EPCRA section 313 chemicals."[33] In response to our request for background data regarding these chemicals and their quantities, EPA officials said they were unable to locate any record of the specific chemicals referred to in the 1996 proposal as being managed in "significant quantities." However,

---

[30]http://exchange.regulations.gov/exchange/topic/trisectorsrule/agencyintro/tri-exchange

[31]In July 2012, EPA officials stated that if the sector is not proposed to be added to the TRI, the agency does not anticipate placing documents related to EPA's consideration of the oil and gas production sector in the docket for any possible TRI rulemaking.

[32]See, e.g., 75 Fed. Reg. 72,727 (Nov. 6, 2010) (EPA's most recent addition to the TRI list of chemicals, adding 16 chemicals reasonably expected to be carcinogenic).

[33]61 Fed. Reg. 33,588, 33,592 (June 27,1996).

Appendix VII: Key Requirements and
Authorities under the Emergency Planning and
Community Right-to-Know Act

EPA officials noted that Canada's National Pollutant Release Inventory (NPRI) has data on Canadian oil and gas wells for some TRI chemicals. Specifically, EPA identified several TRI chemicals that were also reported to the Canadian NPRI by oil and gas facilities as being released, disposed of, and/or transferred in large quantities in reporting year 2010 in Canada including ammonia, arsenic, cadmium, copper, hexavalent chromium, hydrogen sulfide, lead, manganese, mercury, phenanthrene, phosphorus, sulfuric acid aerosols, and zinc compounds.

If oil and gas exploration and production were added to the industries required to report to the TRI, such facilities meeting relevant thresholds would have to report releases of hydrogen sulfide, which is among the chemicals of particular concern some have cited. In October 2011, EPA lifted its administrative stay of the EPCRA section 313 reporting requirements for hydrogen sulfide, which had been in effect since 1994, shortly after the chemical was added to the list of toxic chemicals.[34] EPA conducted a technical evaluation of hydrogen sulfide and found no basis for continuing the administrative stay of the reporting requirements. The first reports under EPCRA section 313 for hydrogen sulfide will be due on July 1, 2013, for reporting year 2012.[35]

## Enforcement

EPCRA provides EPA with various authorities to enforce the act's requirements.[36] For example, for violations of EPCRA section 311 or section 312 requirements, such as provision of annual inventory reports to state and local authorities, EPA may assess administrative penalties, or initiate court actions to assess civil penalties.[37] In cases of violations of section 304 release reporting requirements, EPA may assess administrative penalties, among other things.[38]

---

[34]76 Fed. Reg. 64,022 (Oct. 17, 2011).

[35]Id. at 64,025.

[36]EPCRA § 325, 42 U.S.C. § 11046 (2012).

[37]Id. at § 11046(c)(1), (2), (4).

[38] Id. at § 11046( b).

# Appendix VIII: Key Requirements and Authorities under the Toxic Substances Control Act

To help protect human health and the environment, the Toxic Substances Control Act (TSCA) authorizes EPA to regulate the manufacture, processing, use, distribution in commerce, and disposal of chemical substances and mixtures.[1] EPA has authorities by which it may assess and manage chemical risks, including (1) to collect information about chemical substances and mixtures; (2) upon making certain findings, to require companies to conduct testing on chemical substances and mixtures; and (3) upon making certain findings, to take action to protect adequately against unreasonable risks such as by either prohibiting or limiting manufacture, processing, or distribution in commerce of chemical substances or by placing restrictions on chemical uses.[2] EPA maintains the TSCA Chemical Substance Inventory that currently lists over 84,000 chemicals that are or have been manufactured or processed in the United States; about 62,000 were already in commerce when EPA began reviewing chemicals in 1979.[3] Generally, TSCA's reporting requirements fall on the manufacturers (including importers), processors, and distributors of chemicals, rather than users of the chemicals.[4]

According to EPA, some of the chemicals on the TSCA Chemical Substance Inventory are used in oil and gas exploration and production. For example, in response to our request, EPA identified several

---

[1]Pub. L. No. 94-469, 90 Stat. 2003 (1976) (codified as amended at 15 U.S.C. §§ 2601 - 2692 (2012)). Hereinafter, references to TSCA are as amended. TSCA addresses those chemicals manufactured or imported into the United States, but it generally excludes certain substances, such as pesticides that are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act, and any food, food additive, drug, cosmetic, or device regulated under the Federal Food, Drug, and Cosmetics Act.

[2]For example, prior to requiring testing under section 4, the act requires EPA to either make findings regarding the risk of injury to health or the environment or findings regarding human exposure, as well as findings regarding the sufficiency of existing data and that testing with respect to such effects is necessary to develop needed data.  TSCA § 4(a), 15 U.S.C. § 2603(a) (2012).

[3]See http://www.epa.gov/oppt/existingchemicals/pubs/tscainventory/basic.html#background; GAO, *Chemical Regulation: Options for Enhancing the Effectiveness of the Toxic Substances Control Act,* GAO-09-428T (Feb. 26, 2009).

[4]See, e.g., TSCA § 8(a), (c), (d), 15 U.S.C. § 2607(a), (c), (d) (2012). Regulations also require users to take actions under the hazard communication provisions for certain substances in the workplace. See 40 C.F.R. §§ 721.3, 721.72 (2012).

chemicals on the FracFocus[5] list of "chemicals used most often" which are on the TSCA inventory.[6] These examples, which EPA chose as representative of different product function categories, are as follows:

- Hydrochloric acid – Acid;

- Peroxydisulfuric acid, ammonium salt – Breaker;

- Ethanaminium, 2-hydroxy-N,N,N-trimethyl-, chloride (1:1) – Clay Stabilizer;

- Methanol – Corrosion Inhibitor; and

- 2-Propenamide, homopolymer – Friction Reducer.

As part of EPA's *Study on the Potential Impacts of Hydraulic Fracturing on Drinking Water Resources*, EPA is currently analyzing information provided by nine hydraulic fracturing service companies, including a list of chemicals the companies identify as used in hydraulic fracturing operations. EPA officials said that they expect most of these chemicals disclosed by the service companies to appear on the TSCA inventory list, provided that chemicals are not classified solely as pesticides. EPA does not expect to be able to compare the list of chemicals provided by the nine hydraulic fracturing service companies to the TSCA inventory until the release of a draft report of the *Study on the Potential Impacts of Hydraulic Fracturing on Drinking Water Resources* for peer review, expected in late 2014. For those chemicals that are listed, some hydraulic fracturing service companies may be manufacturers, processors, or distributors, and could be subject to certain TSCA reporting provisions.

---

[5]FracFocus is the national hydraulic fracturing chemical registry managed by the Ground Water Protection Council and Interstate Oil and Gas Compact Commission. The Ground Water Protection Council is a national association of state groundwater and underground injection control agencies whose mission is to promote the protection and conservation of groundwater resources for all beneficial uses, recognizing groundwater as a critical component of the ecosystem. The Interstate Oil and Gas Compact Commission is a multi-state government agency that promotes the conservation and efficient recovery of domestic oil and natural gas resources while protecting health, safety, and the environment. http://www.fracfocus.org

[6]See http://www.epa.gov/oppt/existingchemicals/pubs/tscainventory, http://fracfocus.org/chemical-use/what-chemicals-are-used.

On August 4, 2011, Earthjustice and 114 others filed a petition with EPA asking the agency to exercise TSCA authorities and issue rules to require manufacturers, processors, and distributors of chemicals used in oil and gas exploration or production to develop and/or provide certain information.[7] The petition asserts that more than 10,000 gallons of such chemicals may be used to fracture a single well.[8] EPA denied the portion of the petition requesting that EPA issue a TSCA section 4 rule to require identification and toxicity testing of chemicals used in oil and gas exploration or production, stating that the petition did not set forth facts sufficient to support the findings required for such test rules.[9]

The petition also requested that EPA issue new rule(s) under TSCA section 8 to require, for these chemicals, maintenance and submission of various records, call-in of records of allegations of significant adverse reactions, and submission of all existing not previously reported health and safety studies.[10] EPA granted the section 8(a) and 8(d) portions of the petition in part, stating that the agency believes "there is value in initiating a proposed rulemaking process under TSCA authorities to obtain data on chemical substances and mixtures used in hydraulic fracturing," but denying them so far as they concern other chemical substances used in oil and gas exploration and production but not in hydraulic fracturing.[11]

EPA is drafting an Advance Notice of Proposed Rulemaking for the section 8(a) and (d) rules. As of August 31, 2012, EPA has not released a

---

[7]Earthjustice et al., Letter to Lisa P. Jackson, EPA Administrator, re: Citizen Petition under Toxic Substances Control Act Regarding the Chemical Substances and Mixtures Used in Oil and Gas Exploration or Production, Aug. 4, 2011. See also http://www.epa.gov/oppt/chemtest/pubs/petitions.html#petition10

[8]Earthjustice et al., Letter to Lisa P. Jackson, EPA Administrator, re: Citizen Petition under Toxic Substances Control Act Regarding the Chemical Substances and Mixtures Used in Oil and Gas Exploration or Production, 2, Aug. 4, 2011.

[9]Stephen A. Owens, Assistant Administrator EPA, Letter to Deborah Goldberg, Earthjustice, Re: TSCA Section 21 Petition Concerning Chemical Substances and Mixtures Used in Oil and Gas Exploration or Production, Nov. 2, 2011.

[10]Earthjustice et al., Letter to Lisa P. Jackson, EPA Administrator, re: Citizen Petition under Toxic Substances Control Act Regarding the Chemical Substances and Mixtures Used in Oil and Gas Exploration or Production, Aug. 4, 2011.

[11]Stephen A. Owens, Assistant Administrator EPA, Letter to Deborah Goldberg, Earthjustice, Re: TSCA Section 21 Petition Concerning Chemical Substances and Mixtures Used in Oil and Gas Exploration or Production, Nov. 23, 2011.

publication date for this proposed rulemaking. EPA also intends to convene a stakeholder process to gather additional information for use in developing a proposed rule, and "to develop an overall approach that would minimize reporting burdens and costs, take advantage of existing information, and avoid duplication of efforts." EPA officials said that the agency will consider, among other things, how to address confidential business information as it develops the proposal. A TSCA section 8(a) rule, once issued, may require reporting, insofar as known or reasonably ascertainable, of such chemical information as chemical names, molecular structure, category of use, volume, byproducts, existing environmental and health effects data, disposal practices, and worker exposure.[12] Regulations promulgated under TSCA section 8(d) are to require submission to EPA of reasonably ascertainable health and safety studies.[13]

TSCA provides EPA with certain enforcement authorities. For example, EPA may impose a civil penalty for certain violations of TSCA,[14] such as failing to comply with requirements to notify and provide certain information to EPA before manufacturing a new chemical,[15] or by using for commercial purposes a chemical substance that the user had reason to know was manufactured, processed, or distributed in violation of such requirements, among other things.[16]

---

[12]TSCA § 8(a)(1)-(2), 15 U.S.C. § 2607(a)(1)-(2) (2012).

[13]TSCA § 8(d), 15 U.S.C. § 2607(d) (2012).

[14]TSCA §§ 16(a)(1), 15, 15 U.S.C. §§ 2615(a)(1), 2614 (2012).

[15]TSCA § 5(a)(1), 15 U.S.C. § 2604(a)(1) (2012). See also 40 C.F.R. pt. 720 (2012).

[16]TSCA § 15(2), 15 U.S.C. § 2614(2) (2012).

# Appendix IX: Selected State Requirements

All six states we reviewed have state agencies responsible for implementing and enforcing environmental and public health requirements, which include overseeing oil and gas development (see table 11). In five of the six states we reviewed, this responsibility is split primarily between two different agencies. In general, one of these agencies has primary responsibility for regulating oil and gas development activities such as drilling that occur on the well pad and for managing and disposing of certain wastes generated on-site, while the other agency has a broader mandate for implementing and enforcing environmental or public health requirements, some aspects of which may affect oil and gas development. For example, the Colorado Oil and Gas Conservation Commission regulates activities such as drilling, hydraulic fracturing, and disposal of produced water in Class II UIC wells, while the Colorado Department of Public Health and Environment regulates discharges to surface waters, commercial solid waste facilities, and certain air emissions. In contrast, oil and gas development in Pennsylvania is primarily governed by one agency—the Pennsylvania Department of Environmental Protection.

**Table 11: Primary State Agencies Responsible for Regulating Oil and Gas Development in Six States**

| State | State regulatory agencies |
| --- | --- |
| Colorado | Colorado Oil and Gas Conservation Commission |
| | Colorado Department of Public Health and Environment |
| North Dakota | North Dakota Industrial Commission, Oil and Gas Division |
| | North Dakota Department of Health |
| Ohio | Ohio Department of Natural Resources, Division of Oil and Gas Resource Management |
| | Ohio Environmental Protection Agency |
| Pennsylvania | Pennsylvania Department of Environmental Protection, Office of Oil and Gas Management |
| Texas | Texas Railroad Commission, Oil and Gas Division |
| | Texas Commission on Environmental Quality |
| Wyoming | Wyoming Oil and Gas Conservation Commission |
| | Wyoming Department of Environmental Quality |

Source: GAO analysis of state information.

This appendix presents information about state statutory and regulatory requirements in the areas of siting and site preparation (see table 12); drilling, casing, and cementing (see table 13); hydraulic fracturing (see table 14); well plugging (see table 15); site reclamation (see table 16);

waste management in pits (see table 17); waste management through underground injection (see table 18); and managing air emissions (see table 19). Requirements presented in the following tables have been summarized mainly from state regulations, though references to state statutes are included in certain circumstances.[1,2,3]

**Table 12: Selected State Requirements—Siting and Site Preparation**

**Identification or testing of water wells prior to drilling of production wells**

CO    Testing requirements apply in certain circumstances. Specifically:

- *Coalbed methane wells.* If a conventional or plugged well exists within ¼ mile of a proposed coalbed methane well, the two closest water wells within a ½ mile must be sampled, if accessible. Wells must be tested for all major cations and anions, total dissolved solids, iron, manganese, selenium, nitrates, and nitrites, dissolved methane, field pH, sodium adsorption ration, presence of bacteria (iron related, sulfate reducing, slime, and coliform), specific conductance, and hydrogen sulfide. If there are no conventional or plugged wells within ¼ mile, or if access is denied to such wells, then a water well within ¼ mile, or, failing that, within ½ mile shall be selected. Post-completion sampling must be performed for the same substances within 1 year after completion of the well and repeated 3 and 6 years thereafter, or in accordance with field rules. The state may require further sampling at any time in response to complaints from well owners.

- *Wells in surface water supply areas.*[a] For new operations in surface water supply areas, pre-and post- drilling surface water samples must be taken for a number of substances, including pH, total dissolved solids, benzene, toluene, ethylbenzene, xylenes and metals, from streams immediately downgradient from the location. Different requirements apply to operations at locations that were in existence prior to the Spring of 2009 depending on whether new surface disturbance occurs at the site, and how much. *2 Colo. Code Regs. § 404-1(608, 317B) (2012).*

---

[1]References to state laws are included where no state regulation, or no detailed state regulation, exists; where the law was cross-referenced by a state regulation; or where interviews with state officials drew our attention to requirements in state law. These tables do not include state policy or practice; in some cases, states may address topic areas covered in these tables through processes that are not formally noted or comprehensively described in their regulations, such as the permitting process. The absence of a requirement in a particular state does not reflect any judgment on our part that a state should have such a requirement.

[2]In summarizing state rules, references to specific state officials and forms have been omitted except where those details are crucial for understanding the provision. In many cases, the requirements presented are default requirements that may be varied with state approval. Not all such options are noted in these tables. Unless otherwise noted, requirements are those that apply to new operations.

[3]State regulations on oil and gas development contain a variety of technical terms that are often not defined in the regulations themselves or may be differently defined across states. We have attempted to provide standard definitions for such terms for ease of reading; unless otherwise noted, however, such definitions are dictionary or industry glossary definitions rather than regulatory definitions.

| ND | There is no testing requirement, but if a domestic, livestock, or irrigation water supply with 1 mile of an oil or gas well site is disrupted or diminished in quality or quantity by drilling operations and a certified water quality and quantity test has been performed within 1 year prior to drilling, a person owning an interest in the property supplied by that water is entitled to recover from the operator the costs of repairs, alterations, or construction necessary to deliver water of the original quality and quantity. Prima facie evidence of injury under this section may be established by a showing that the mineral developer's drilling operations penetrated or disrupted an aquifer in such a manner as to cause a diminution in water quality or quantity within the distance limits imposed by this section. *N.D. Cent. Code § 38-11.1-06 (2012).* |
|---|---|
| OH | The well owner must sample all water wells within 300 feet of proposed well locations in urbanized areas, and within 1,500 feet of proposed horizontal wells in any area, prior to drilling under the guidelines provided in the division's best management practices for predrilling water sampling manual.[b] The chief may require modification of this distance if determined necessary to protect water supplies or site conditions may warrant. *Ohio Rev. Code Ann. § 1509.06 (2012).* |
| PA | There is a rebuttable presumption that pollution occurring within 1000 feet and 6 months after completion of drilling or alteration of a conventional well and 2500 feet and 12 months after completion, drilling, stimulation or alteration, whichever is later, of an unconventional well was caused by the operator. Operators can defend against the presumption if they have predrilling tests showing that the problems predated drilling. The state does not specify substances for which wells must be tested. *25 Pa. Code § 78.51(2012); 58 Pa. Cons. Stat. § 3218 (2012).* |
| TX | No requirements identified in regulations or in statutes. |
| WY | An application for a permit to drill or deepen a well must identify all water supply wells permitted by the state within ¼ mile of the land unit within which the well is located, and the depth from which water is being appropriated. Owner/operators must also keep records on all formations penetrated and the content and quality of oil, gas, or water in each formation tested. *055-000-003 Code Wyo. R. §§ 8, 20 (2012).* |

**Required setbacks from water sources**

| CO | Special rules apply to new well sites depending on whether the site is located in one of three buffer zones surrounding surface water supply areas. Operations may not occur within the innermost buffer zone unless a variance is granted, the Department of Health and Environment is consulted, and appropriate conditions are placed on the operation. *2 Colo. Code Regs. § 404-1(317B) (2012).* |
|---|---|
| ND | Well sites and associated production facilities shall not be located in, or hazardously near, bodies of water or block natural drainages. *N.D. Admin. Code 43-02-03-19 (2012).* |
| OH | The location of a new well or a new tank battery of a well shall not be within 50 feet of a stream, river, watercourse, water well, pond, lake, or other body of water. However, the state may authorize a new well or tank battery to be located within 50 feet of such bodies of water if necessary to reduce impacts to the owner of the land or to protect public safety or the environment. *Ohio Rev. Code Ann. § 1509.021 (2012).* |
| PA | Conventional wells may not be drilled within 200 feet, and unconventional wells may not be drilled within 500 feet, of water wells without written owner consent. Unconventional wells may not be drilled within 1,000 feet of certain water supplies used by a water purveyor without written purveyor consent. If consent is not obtained, the operator may receive a variance if it cannot otherwise access its mineral rights and demonstrates that additional protective measures will be utilized. Conventional wells may not be drilled within 100 feet of certain other bodies of water, such as springs.[c] Unconventional wells may not be drilled within 300 feet of the same bodies of water and wetlands and the edge of the disturbed area associated with the well has to be at least 100 feet from the same water bodies and wetlands. *58 Pa. Cons. Stat. § 3215 (2012).* |
| TX | No requirements identified in regulations or in statutes. |
| WY | Generally, pits, wellheads, pumping units, tanks, and treaters shall be no closer than 350 feet from water supplies. *055-000-003 Code Wyo. R. § 22 (2012).* |

**Erosion control, site preparation, surface disturbance minimization, and stormwater management**

| | |
|---|---|
| CO | • *Erosion control, site preparation, surface disturbance minimization.* Operators must separate excavated soil by horizon, store it separately and note locations to facilitate subsequent reclamation. On crop land, segregation must be to the shallower of 6 feet or bedrock. Elsewhere, operators must separate the topsoil horizon or the top 6 inches, whichever is deeper. If soil horizons are too rocky or thin to segregate, the topsoil shall be segregated and stored to the extent possible. Remaining soils on crop land shall be segregated down to the shallower of 3 feet or bedrock. Stockpiled soils shall be protected from contamination, compaction, and, as practicable, erosion. Best management practices to prevent weeds and maintain microbial activity shall be implemented. The drill pad shall minimize total disturbance consistent with safe operation and shall be on the most level location possible. If not avoidable, deep vertical cuts and steep long fill slopes shall be constructed to the least slope practical. Where feasible, directional drilling shall be used to reduce cumulative impacts and adverse impacts on wildlife. Well sites, production facilities, pipelines, and access roads shall be located, adequately sized, constructed, and maintained so as to reasonably control dust and minimize erosion, alteration of natural features, removal of surface materials, and degradation due to contamination. To the extent practicable, operators shall avoid or minimize impacts to wetlands and riparian habitats and shall consolidate facilities to minimize adverse impacts to wildlife resources, including fragmentation of wildlife habitat, as well as cumulative impacts. Existing roads shall be used to the greatest extent practicable to avoid erosion and minimize land disturbance. Roads shall be engineered to avoid or minimize impacts to riparian areas or wetlands. Unavoidable impacts shall be mitigated. Where feasible and practicable, road crossings of streams shall allow fish passage, operators are encouraged to share access roads in developing a field; roads shall be routed to complement other land usage, and vehicles shall not travel off-road.<br><br>• *Stormwater management.* Operators must obtain a construction stormwater permit from the Department of Public Health and Environment and must develop a postconstruction stormwater program upon termination of the permit unless the site has a slope of less than 5% and has low erosion risk. All operators must implement and maintain site-specific best management practices to control stormwater runoff in a manner that minimizes erosion, transport of sediment off-site, and site degradation. Operators must select additional best management practices as part of their postconstruction stormwater program that address potential sources of pollution that may reasonably be expected to affect the quality of discharges associated with the ongoing operation of production facilities during the postconstruction and reclamation operation of the facilities. *2 Colo. Code Regs. § 404-1(1002) (2012).* |
| ND | • *Erosion control, site preparation, surface disturbance minimization.* In the construction of a drill site, access road, and all associated facilities, the topsoil shall be removed, stockpiled, and stabilized or otherwise reserved for use when the area is reclaimed. "Topsoil" means the first 8 inches of suitable plant growth material on the surface. Soil stabilization and materials to be used on-site, as well as access roads or associated facilities must have approval from the director before application. When necessary to prevent pollution of the land surface and freshwaters, the director may require the drill site to be sloped and diked. *N.D. Admin. Code 43-02-03-19 (2012).*<br><br>• *Stormwater management.* Oil and gas construction activity that disturbs 5 or more acres is authorized under the terms of a general permit covering stormwater discharge that requires the development of a stormwater management program and implementation of best management practices. |
| OH | • *Erosion control, site preparation, surface disturbance minimization.* Site construction shall comply with the state's best management practices for oil and gas well site construction manual.[b] Site clearing and surface effects shall be minimized. During any phase of operation in urbanized areas, to minimize off-site sedimentation, erosion and to control the surface flow of water, the well owner or his representative must also follow the best management practices for oil and gas well site construction manual. Best management practices and design standards other than those provided by the state may be used if the alternative minimizes erosion to the same degree as the state procedure. *Ohio Admin. Code Ann. 1501:9-1-02, -07 (2012).* |
| PA | Operators proposing activities that will disturb 5,000 square feet or more or that have the potential to discharge to a high-quality or exceptional value water must develop and implement a written erosion and sedimentation plan. Operators proposing oil and gas activities that involve 5 acres or more of earth disturbance shall obtain an Erosion and Sedimentation permit prior to commencing the earth disturbance activity. During and after earth moving or soil disturbing activities, the operator must design, implement, and maintain best management practices relating to erosion and sediment control and postconstruction stormwater management. An operator may not commence drilling activities until the state has inspected the unconventional well site after the installation of erosion and sediment control measures. *25 Pa. Code §§ 78.53, 102.4, 102.5 (2012); 58 Pa.Cons.Stat. § 3258 (2012).* |

| TX | • | *Stormwater management.* Where required by federal law, discharges of stormwater associated with industrial and construction activities associated with the exploration, development, or production of oil or gas must be authorized by the EPA and the state, as applicable. Under federal law, EPA cannot require a permit for discharges of storm water from "field activities or operations associated with oil and gas exploration, production, processing, or treatment operations, or transmission facilities" unless the discharge is contaminated by contact with any overburden, raw material, intermediate product, finished product, byproduct, or waste product located on the site of the facility. Under state regulations, the Texas Railroad Commission prohibits operators from causing or allowing pollution of surface or subsurface water. Operators are encouraged to implement and maintain best management practices to minimize discharges of pollutants, including sediment, in stormwater to help ensure protection of surface water quality during storm events. *16 Tex. Admin. Code § 3.30 (2012).* |
|----|---|---|
| WY | • | *Erosion control, site preparation, surface disturbance minimization.* Where practical, topsoil must be stockpiled during construction for use in reclamation. |
|    | • | *Stormwater management.* A permit is required for stormwater discharges from all construction activities disturbing 1 or more acres. These permits require the operator to develop a stormwater management program, including best management practices, which can be reviewed by the Wyoming Department of Environmental Quality. *055-000-003 Code Wyo. R. §§ 7, 17; 055-000-004 Code Wyo. R. § 1; 020-080-002 Code Wyo. R. § 6 (2012).* |

Source: GAO analysis of state information.

[a]Surface water supply areas are certain streams that are suitable for or could become sources of drinking water that are within 5 miles upstream of a surface water intake.

[b]Best Management Practices for Pre-drilling Water Sampling Manual, available at http://www.ohiodnr.com/oil/watersampling_bmp/tabid/23361/Default.aspx The manual requires testing for barium, calcium, iron, magnesium, potassium, sodium, chloride, conductivity, pH, sulfate, alkalinity, and total dissolved solids.

[c]Specifically, no well site may be prepared or well drilled within 100 feet from any solid blue lined stream, spring or body of water as identified on the most current 7 and one-half minute topographic quadrangle map of the United States Geological Survey.

**Table 13: Selected State Requirements—Drilling, Casing, and Cementing**

**Requirements relating to cementing/casing plans**

| CO | The casing[a] program adopted for each well must be so planned and maintained as to protect any potential oil or gas bearing horizons penetrated during drilling from infiltration of injurious waters from other sources, and to prevent the migration of oil, gas, or water from one horizon to another, which may result in the degradation of groundwater. *2 Colo. Code Regs. § 404-1(317) (2012).* |
|----|---|
| ND | The proposed casing program, including size and weight of casing, the depth at which each casing string[b] is to be set, the proposed pad layout including cut and fill diagrams, and the proposed amount of cement to be used, including the estimated top of cement, must be submitted with the application for permit to drill. *N.D. Admin. Code 43-02-03-16 (2012).* |
| OH[c] | A casing and cementing plan must be submitted as part of an application for permit to drill. The plan must show how the owner proposes to drill and construct the well with the best available geologic information in the vicinity of the proposed wellbore and with the requirements of state well construction rules. The plan must include, at least, the name and anticipated depth of all zones to be tested or produced; the estimated total depth of the wellbore; the anticipated diameter of each wellbore segment; the proposed casing type, outside diameter, and setting depth for each proposed casing string; proposed cement volumes for each casing string; and whether the owner plans to stimulate any permitted hydrocarbon zone by hydraulic fracturing. The casing and cementing plans in the approved permit are understood to be estimates based upon the best available geologic information prior to drilling. *Ohio Admin. Code Ann. 1501:9-1-02 (2012).* |
| PA | The operator must prepare a casing and cementing plan showing how the well will be drilled and completed. Upon request, the operator must provide a copy of the plan to the state for approval. The plan must include information such as the anticipated depth and thickness of any producing formation; expected pressures; anticipated fresh groundwater zones and the method or information by which the depth of the deepest fresh groundwater was determined; casing type; whether the casing is new or used; depth, diameter, wall thickness and burst pressure rating; cement type, yield, additives and estimated amount; estimated location of centralizers; proposed borehole conditioning procedures; and any alternative methods or |

| | |
|---|---|
| | materials required by DEP as a condition of well permit. *25 Pa. Code § 78.83a (2012).* |
| TX | Texas rules do not require the development or approval of a casing plan unless an operator proposes an alternative method of freshwater protection than those prescribed by rule. *16 Tex. Admin. Code § 3.13 (2012).* |
| WY | An application for permit to drill must include the proposed casing program including size, anticipated setting depths, American Petroleum Institute grade, weight per foot, burst pressure, tensile strength for both body and joint, yield pressure, if new or used casing is planned for the well, and any other information required by the state. *055-000-003 Code Wyo. R. § 8 (2012).* |

**Placement of surface casing relative to groundwater zones**

| | |
|---|---|
| CO | Where pressure and formations are unknown, surface casing[d] shall be run below all known or reasonably estimated utilizable domestic freshwater levels. Where subsurface conditions are known, surface casing shall be run to a depth sufficient to protect all freshwater. Where freshwater aquifers are so deep that it is impractical/uneconomical to set casing to the required depth, intermediate and/or production casing may be stage cemented to isolate the aquifers. *2 Colo. Code Regs. § 404-1(317) (2012).* |
| ND | Casing must be properly cemented at sufficient depths to adequately protect and isolate all formations containing water, oil, or gas or any combination of these. The surface casing shall be set and cemented at a point not less than 50 feet below the base of the Fox Hills formation. *N.D. Admin. Code 43-02-03-21 (2012).* |
| OH | An owner shall set and cement surface casing at least 50 feet below the base of the deepest underground source of drinking water (USDW), or at least 50 feet into competent bedrock, whichever is deeper and as specified by the permit, unless otherwise approved by the state. In areas where bedrock USDWs cannot be mapped and where groundwater resources can be developed in valley-fill aquifers, surface casing shall be set at least 100 feet below the base of the valley-fill aquifer for any well within 1,000 feet of the 100 year floodplain. In other areas where bedrock USDWs cannot be mapped, surface casing shall be set and cemented to at least 300 feet deep or at least 100 feet below the deepest local perennial stream base. As an alternative where bedrock USDWs cannot be mapped, surface casing shall be set to at least 50 feet below the base of the lowest spring or deepest water well within 500 feet or if there are no such springs or water wells, conductor casing shall be set and cemented to at least 100 feet. After conductor casing is set through the deepest useable water zone and cemented to surface, the owner must set and cement to surface a surface casing string through water zones that may include brackish or brine bearing zones. This casing string shall be set and cemented to surface before the owner drills into potential flow zones that can reasonably be expected to contain hydrocarbons in commercial quantities. Other alternative methods of protecting USDWs may be approved upon written application to the state. *Ohio Admin. Code Ann. 1501:9-1-08 (2012).* |
| PA | Surface casing must be set to approximately 50 feet below deepest fresh groundwater or at least 50 feet into consolidated rock, whichever is deeper. Generally, surface casing may not be set more than 200 feet below the deepest fresh groundwater unless necessary to set casing in consolidated rock. Cement placed behind the surface casing must be set to a minimum designed strength of 350 pounds per square inch (psi) at the casing seat. The cement placed at the bottom 300 feet of the surface casing must constitute a zone of critical cement and achieve a 72-hour compressive strength of 1,200 psi, and the free water separation may be no more than 6 milliliters of cement. If the surface casing is less than 300 feet, the entire cemented string constitutes a zone of critical cement. *25 Pa. Code §§ 78.83, .85 (2012).* |
| TX | Surface casing must be set to protect all usable-quality water strata, as defined by the Texas Commission on Environmental Quality (TCEQ). Before drilling any well where no field rules are in effect or in which surface casing requirements are not specified in the applicable field rules, an operator shall obtain a letter from the TCEQ stating the protection depth. In no case, however, is surface casing to be set deeper than 200 feet below the specified depth without prior approval from the Texas Railroad Commission. *16 Tex. Admin. Code § 3.13 (2012).* |
| WY | Surface casing shall be run below all known or reasonably estimated utilizable groundwater. Generally, surface casing shall be set at a minimum of 110 to 120 feet below the depth of any state permitted wells designated for domestic, stock water, irrigation, or municipal use within a minimum of 1/4 mile. A coalbed methane well with a groundwater appropriation permit is exempt from this requirement. *055-000-003 Code Wyo. R. § 22 (2012).* |

| Prescribed cementation techniques for surface casing | |
|---|---|
| CO | Pump and plug, displacement, or other approved method. *2 Colo. Code Regs. § 404-1(317) (2012).* |
| ND | Pump and plug method or other state-approved method. *N.D. Admin. Code 43-02-03-21 (2012).* |
| OH | Sufficient cement shall be used to fill the annular space outside the casing from the seat to the ground surface or to the bottom of the cellar. If cement is not circulated to the ground surface or the bottom of the cellar, and the top of cement cannot be measured from surface, the owner shall notify the state and perform certain tests to determine the nature of the deficiency and shall obtain approval for additional cementing operations. *Ohio Admin. Code Ann. 1501:9-1-08 (2012).* |
| PA | Operator shall permanently cement surface casing by placing cement in casing and displacing it into annular space between wall of hole and outside of casing. *25 Pa. Code § 78.83 (2012).* |
| TX | Surface casing shall be cemented by the pump and plug method. The producing string of casing shall be cemented by the pump and plug method, or other commission-approved method. Alternative surface casing programs may be approved upon written application. *16 Tex. Admin. Code § 3.13 (2012).* |
| WY | Pump and plug, displacement, or other approved method. *055-000-003 Code Wyo. R. § 22 (2012).* |
| **Requirement for cement waiting period and/or integrity tests** | |
| CO | Surface and intermediate casing cement must achieve a minimum compressive strength of 300 psi after 24 hours and 800 psi after 72 hours measured at 95°F and 800 psi. Cement placed behind surface and intermediate casing shall be allowed to set a minimum of 8 hours, or until 300 psi calculated compressive strength is developed, whichever occurs first, prior to commencing drilling operations. Cement placed behind production casing shall achieve a minimum compressive strength of at least 300 psi after 24 hours and 800 psi after 72 hours measured at 95°F and 800 psi. Cement placed behind production casing shall be allowed to set 72 hours, or until 800 psi calculated compressive strength is developed, whichever occurs first, prior to any completion operation. Installed production casing shall be adequately pressure-tested for the conditions anticipated to be encountered during completion and production. *2 Colo. Code Regs. § 404-1(317) (2012).* |
| ND | All strings of surface casing shall stand cemented under pressure for at least 12 hours before drilling the plug or initiating tests. Surface casing strings must be allowed to stand under pressure until the tail cement has reached a compressive strength of at least 500 psi. All filler cements must reach a compressive strength of at least 250 psi within 24 hours and at least 350 psi within 72 hours. Compressive strength on surface casing cement shall be calculated at 80° F. Production or intermediate casing strings must be allowed to stand under pressure until the tail cement has reached a compressive strength of at least 500 psi. All filler cements utilized must reach a compressive strength of at least 250 psi within 24 hours and at least 500 psi within 72 hours, although in any horizontal well performing a single stage cement job from a measured depth of greater than 13,000 feet, the filler cement utilized must reach a compressive strength of at least 250 psi within 48 hours and at least 500 psi within 96 hours. After cementing, casing shall be tested by application of pump pressure of at least 1,500 psi. If, at the end of 30 minutes, this pressure has dropped 150 psi or more, the casing shall be repaired and tested in the same manner again. Further work shall not proceed until a satisfactory test has been obtained. The casing in a horizontal well may be tested by use of a mechanical tool set near the casing shoe[e] after the horizontal section has been drilled. *N.D. Admin. Code 43-02-03-21 (2012).* |
| OH | Cemented conductor, mine, and surface casing strings shall remain static until all cement has reached a compressive strength of at least 500 psi before drilling the plug, or initiating a test. The tail cement for all intermediate and production casing and liners shall remain static until the cement has reached a compressive strength of at least 500 psi before drilling out the plug or initiating a test. Tail cement shall have a 72-hour compressive strength of at least 1,200 psi. Lead cements with volume extenders may be used to seal these strings but in no case shall the cement have a compressive strength of less than 100 psi at the time of drill out nor less than 250 psi 24 hours after being placed. Cement mixtures for which published performance data are not available shall be tested by the owner or service company and approved prior to usage. Tests shall be made on representative samples of the basic mixture of cement and additives used, using distilled water or potable tap water for preparing the slurry. The tests shall be conducted using the equipment and procedures established in the American Petroleum Institute publication "RP 10 B-2 Recommended Practice for Testing Well Cements." Test data showing competency of a proposed cement mixture to meet the above requirements shall be furnished to the inspector prior to the cementing operation. To determine that the minimum compressive strength has been obtained, the owner shall use the typical performance data for the particular cement mixture used in the well at the following temperatures and at atmospheric pressure: for conductor, mine string, and surface casing cement, the test temperature shall be 60°F; for intermediate and production casing cement, the test temperature shall be within 10°F of the formation equilibrium temperature of the cemented interval. *Ohio Admin. Code Ann. 1501:9-1-08 (2012).* |

| PA | After the casing cement is placed behind surface casing, the operator shall permit the cement to set to a minimum designed compressive strength of 350 psi at the casing seat. The cement placed at the bottom 300 feet of the surface casing must constitute a zone of critical cement and achieve a 72-hour compressive strength of 1,200 psi ,and the free water separation may be no more than 6 milliliters per 250 milliliters of cement. After any casing cement is placed and cementing is complete, casing generally may not be disturbed for at least 8 hours by certain activities, such as running drill pipe or other mechanical devices into or out of the wellbore with the exception of certain equipment used to determine the top of the cement. *25 Pa. Code 78.85 (2012).* |
|----|---|
| TX | When cementing any string of casing more than 200 feet long, before drilling the cement plug, the operator shall test the casing at a pump pressure in psi calculated by multiplying the length of the casing string by 0.2. The maximum test pressure required, however, unless otherwise ordered by the commission, need not exceed 1,500 psi. If, at the end of 30 minutes, the pressure shows a drop of 10% or more from the original test pressure, the casing shall be condemned until the leak is corrected. A pressure test demonstrating less than a 10% pressure drop after 30 minutes is proof that the condition has been corrected. Surface casing strings must be allowed to stand under pressure until the cement has reached a compressive strength of at least 500 psi in the zone of critical cement before drilling plug or initiating a test. The cement mixture in the zone of critical cement shall have a 72-hour compressive strength of at least 1,200 psi. Cement mixtures for which published performance data are not available must be tested by the operator or service company in accordance with the current API RP 10B.[f] Test data showing competency of a proposed cement mixture must be furnished to the commission prior to cementing. To determine that the minimum compressive strength has been obtained, operators shall use typical performance data for the cement in the well. *16 Tex. Admin. Code § 3.13 (2012).* |
| WY | Unless otherwise provided by specific order of the Oil and Gas Conservation Commission for a particular well or wells or for a particular pool or parts thereof, cemented casing string shall stand under pressure until the cement at the shoe has reached a compressive strength of 500 psi. In addition, the American Petroleum Institute free-water separation for all cement slurries used shall average no more than 4 mL per 250 mL of cement. All cements used shall achieve a minimum compressive strength of 100 psi in 24 hours measured at 80˚ F. Testing for these properties shall be in accordance with accepted industry standards. *055-000-003 Code Wyo. R. § 22 (2012).* |

**Other measurement, record keeping, notification and/or inspection during cementing/casing process**

| CO | A cement bond log shall be run on all production casing or, in the case of a production liner, the intermediate casing when these strings are run. Open hole logs shall be run at depths that adequately verify the setting depth of surface casing and any aquifer coverage. *2 Colo. Code Regs. § 404-1(317) (2012).* |
|----|---|
| ND | If the annular space behind casing is not adequately filled with cement, the state must be notified immediately. Any well that appears to have defective casing or cementing, the operator shall report the defect to the director. Prior to attempting remedial work on any casing, the operator must obtain approval from the director and proceed with diligence to conduct tests, as approved or required by the director, to properly evaluate the condition of the wellbore and correct the defect. *N.D. Admin. Code 43-02-03-21, -22 (2012).* |
| OH | Generally, the state must receive 48 hours prior notice before the placement of surface casing. A 24 hours or less notification may be approved if prior communications have been initiated with state officials. The state must receive 24 hours notice prior to setting any casing or liner string and before commencing any casing cementing. Within 60 days after drilling to total depth, the owner shall file cement job logs with the state furnishing complete data documenting the cementing of all cemented casing strings. Each job log shall include the date cemented; the name of the cementing contractor; mix water temperature and pH; whether or not the wellbore circulated prior to cementing; certain measurements for the hole, casing, and other equipment; cement types, additives by percent of unit volume, volume of cement in stacks, cement yield per sack, average slurry density, slurry volume, and displacement volume; pumping rates, displacement pressure, and final circulating pressure prior to landing the plug; the time the latch-down or wiper plug landed; casing test pressure and final test pressure; whether or not cement circulated to surface; and volume of cement slurry circulated to the surface. *Ohio Admin. Code Ann. 1501:9-1-02, 1501:9-1-08 (2012).* |
| PA | Operator must notify state if cement used to cement surface casing is not circulated to the surface despite use of at least 120% of expected volume. Casing must undergo pressure testing, and the operator must notify the state at least 24 hours before conducting pressure testing on casing. The operator shall notify the state at least 1 day before cementing of the surface casing begins, unless the cementing operations begins within 72 hours of commencement of drilling. Unconventional well operators shall provide the state 24 hours notice prior to cementing all casing strings, conducting pressure tests of the production casing, stimulation, and abandoning or plugging an unconventional well. *25 Pa. Code §§ 78.83b, .84, .85 (2012); 58 Pa.Cons.Stat. § 3211 (2012).* |

| TX | Upon completion of the well, a cementing report must be filed with the commission furnishing complete data concerning the cementing of surface casing in the well. *16 Tex. Admin. Code § 3.13 (2012)*. |
|----|---|
| WY | The state may require a well owner or operator to provide bond logs if there is a demonstrated reason to believe an inadequate cement job was performed. A cement bond log or cement evaluation tool must be run to verify adequate cement around surface casing and to evaluate cement integrity in each cemented zone for each cemented casing annulus in wells within a geologic area known as the Special Sodium Drilling Area. *055-000-003 Code Wyo. R. § 22 (2012)*. |

**Requirements related to horizontal drilling**

| CO | If an operator intends to drill a horizontal or deviated wellbore utilizing controlled directional drilling methods, other than whipstocking[g] due to hole conditions, the plans shall accompany an application for permit to drill. The plat shall show the surface and bottom hole location. If the surface location is in a different section than the bottom hole location, a plat depicting each section is required. Additionally, the proposed directional survey including two wellbore deviation plots, one depicting the plan view and one depicting the side view, shall accompany the application. Within 30 days of completion, the operator shall submit a drilling completion report, with a copy of the directional survey coordinate listing and the wellbore deviation plots. The survey data shall be provided in a single analysis report with sufficient detail to determine the location of the wellbore from the base of the surface casing to the kick off point and from that point to total depth. Special spacing rules apply to horizontal wells in the Greater Wattenberg Area. *2 Colo. Code Regs.§§ 404-1(321, 318A) (2012)*. |
|----|---|
| ND | A permit is required prior to drilling horizontally in an existing pool. A directional survey shall be made and filed with the director on any well utilizing a whipstock or any method of deviating the wellbore. Special permits may be obtained to drill directionally in a predetermined direction. If a request for a permit to directionally drill is denied, the director shall immediately tell the applicant why. The decision of the director may be appealed to the commission. Filler cement used to set production or intermediate casing in any horizontal well performing a single stage cement job from a measured depth of greater than 13,000 feet must reach a compressive strength of at least 250 psi within 48 hours and at least 500 psi within 96 hours. Casing in a horizontal well may be tested by use of a mechanical tool set near the casing shoe after the horizontal section has been drilled. *N.D. Admin. Code 43-02-03-16, -21, -25 (2012)*. |
| OH | The maximum point at which a well penetrates the producing formation shall not vary unreasonably from the vertical drawn from the center of the hole at the surface, with the exception of approved directional drilling. Such approval must be in writing from the chief. For wells drilled horizontally, in the Marcellus shale, or deeper, intermediate casing shall be set through the Mississippian Berea sandstone or to 1,000 feet, whichever is greater, or as determined by the state. Production casing shall be cemented with sufficient cement to fill the annular space to a point at least 500 true vertical feet above the seat in an open-hole vertical completion or the uppermost perforation in a cemented vertical completion, or 1,000 feet above the kickoff point of a horizontal well. Liners may only be set and cemented as production casing in horizontal shale gas wells if approved by the chief. *Ohio Admin. Code Ann. 1501:9-1-02, -08 (2012)*. |
| PA | No requirements identified in regulations or in statutes.[h] |
| TX | A permit for directionally deviating a well may be granted for a variety of reasons, including where it can be shown to be advantageous from the standpoint of mechanical operation to drill more than one well from the same surface location to reach the productive horizon at essentially the same positions as would be reached if the several wells were drilled from locations prescribed by the well spacing rules. Applications for directional deviation must specify surface and projected bottom hole locations. *16 Tex. Admin. Code § 3.11 (2012)*.[i] |
| WY | For directional wells, an application for permit to drill must include a diagram showing the proposed direction of the deviation and the proposed horizontal distance between hole bottom and surface location. For horizontal wells, an application for permit to drill must include a diagram showing the wellbore path from the surface through the terminus of the lateral. The surface location and the proposed footage locations of both the initial penetration into the productive formation and the terminus of the lateral shall be recorded. For an application to drill a horizontal well, notice shall be given to owners within 1/2 mile of any point on the length of the wellbore. In the absence of any special state order, notice is not required for horizontal wells in federally supervised units or in American Petroleum Institute units provided that no portion of the horizontal interval is closer than 660 feet from a drilling or spacing unit boundary or uncommitted tract. Before beginning controlled directional drilling, other than whipstocking because of hole conditions, notice shall be filed and approval obtained. Such notice shall state: the depth; exact surface location of the wellbore; proposed direction of deviation; and proposed horizontal distance between the bottom of the hole and surface location. A directional survey must be filed within 30 days of completion. *055-000-003 Code Wyo. R. §§ 8, 25 (2012)*. |

**Appendix IX: Selected State Requirements**

---

| **Blowout preventer requirements** | |
|---|---|
| CO | Operators must take all necessary precautions for keeping a well under control while being drilled or deepened. Blowout preventer equipment is not generally required but must be used in high density areas or other areas specified by the state. In addition, the state may designate specific areas, fields or formations as requiring certain blowout prevention equipment. If used, blowout preventer equipment must be identified in the operator's application for permit to drill. The working pressure of any blowout preventer equipment shall exceed the anticipated surface pressure to which it may be subjected. *2 Colo. Code Regs. § 404-1(317, 603) (2012).* |
| ND | In all drilling operations, proper and necessary precautions shall be taken for keeping the well under control, including the use of a blowout preventer and high pressure fittings attached to properly cemented casing strings adequate to withstand anticipated pressures. *N.D. Admin. Code 43-02-03-23 (2012).* |
| OH | Blowout preventer equipment is not generally required, but casing integrity may be verified in conjunction with blowout preventer testing without a test plug. *Ohio Admin. Code Ann. 1501:9-1-08 (2012).* |
| PA | Blowout preventers are required (1) when drilling into an unconventional formation,[i] (2) when drilling out solid core hydraulic fracturing plugs to complete a well, (3) when anticipated well head pressures or natural open flows may result in a loss of well control, (4) where there is no prior knowledge of the pressures or natural open flows, (5) on wells drilled to at least 3,800 feet and penetrating the Onondaga horizon, and (6) when drilling within 200 feet of a building. The operator shall use pipe fittings, valves, and unions placed on or connected to the blowout prevention systems that have a working pressure capability that exceeds the anticipated pressures. All lines, valves, and fittings between the closing unit and the blowout preventer stack must be flame resistant and have a rated working pressure that meets or exceeds the requirements of the blowout preventer system. *25 Pa. Code § 78.72 (2012).* |
| TX | Wellhead assemblies shall be used on wells to maintain surface control of the well. Each component of the wellhead shall have a pressure rating equal to or greater than the anticipated pressure to which that particular component might be exposed during the course of drilling, testing, or producing the well. A blowout preventer or control head and other connections to keep the well under control at all times shall be installed as soon as surface casing is set. The equipment shall be of such construction and capable of such operation as to satisfy any reasonable test that may be required by the commission or its duly accredited agent. *16 Tex. Admin. Code § 3.13 (2012).* |
| WY | Blowout preventers and related equipment shall be installed and maintained during drilling in accordance with state rules unless changed upon hearing before the Oil and Gas Conservation Commission. Among other things, the requirements include that the working pressure rating of all blowout preventers and related equipment shall be based on known or anticipated subsurface pressure, geologic conditions, or accepted engineering practices, and shall equal or exceed the maximum anticipated pressure to be contained at the surface. In the absence of better data, the maximum anticipated surface pressure shall be determined by using a normal pressure gradient of 0.22 psi per foot and assuming a partially evacuated hole. *055-000-003 Code Wyo. R. § 23 (2012).* |

Source: GAO analysis of state information.

[a]Casing is metal pipe used to line a well.

[b]A string is a column made up of connected pipe.

[c]In Ohio, the state may establish alternative well construction standards that are well-specific, field-specific, or play-specific by permit condition, to ensure protection of public health or safety or the environment. *Ohio Admin. Code Ann. 1501:9-1-08(B) (2012).*

[d]Surface casing is cemented into bedrock and serves to shut out shallow water formations and as a foundation for well control during drilling.

[e]A casing shoe is a cylinder or ring of hard steel with a cutting edge attached to the bottom of a string of well casing.

[f]American Petroleum Institute, "API RP 10B-2 (R2010) Recommended Practice for Testing Well Cements." July 2005.

[g]Whipstocking is a long wedge dropped into or placed in a well to deflect the drill to one side of some obstruction.

[h]Pennsylvania requires operators to provide information about the vertical and horizontal paths of unconventional wells through its permitting process.

[i]See also 16 Tex. Admin. Code § 3.86, relating to horizontal drainhole wells.

**Appendix IX: Selected State Requirements**

[j]Pennsylvania law defines an unconventional formation as a geological shale formation existing below the base of the Elk Sandstone or its geologic equivalent stratigraphic interval where natural gas generally cannot be produced at economic flow rates or in economic volumes except by vertical or horizontal well bores stimulated by hydraulic fracture treatments or by using multilateral well bores or other techniques to expose more of the formation to the well bore. 58 Pa.Cons.Stat. § 2301 (2012).

**Table 14: Selected State Requirements—Hydraulic Fracturing**

**Prior authorization/notice/inspection requirements**

| | |
|---|---|
| CO | Operators shall give at least 48 hours advance written notice to the Oil and Gas Conservation Commission of a hydraulic fracturing treatment at any well. The state must provide prompt electronic notice of such intention to the relevant local governmental designee. *2 Colo. Code Regs. § 404-1(316C) (2012).* |
| ND | No requirements identified in regulations or in statutes. |
| OH | The casing and cementing plan that must be submitted with an application for permit to drill must indicate whether the owner plans to stimulate any permitted hydrocarbon zone by hydraulic fracturing. The owner or the owner's representative must notify the state at least 24 hours before commencing the stimulation of a well. *Ohio Admin. Code Ann. 1501:9-1-02(A) (2012). Ohio Rev. Code Ann. § 1509.19 (2012).* |
| PA | Operators must give 24 hours notice prior to well stimulation. *58 Pa. C.S. § 3211 (2012).* |
| TX | No requirements identified in regulations or in statutes. |
| WY | An application for permit to drill must include a description of the anticipated stimulation program. An approved Application for Permit to Drill or Sundry Notice is required prior to the initiation of any well stimulation activity. *055-000-003 Code Wyo. R. §§ 8, 45 (2012).* |

**Requirements to disclose information on fracturing fluids**

| | |
|---|---|
| CO | Certain disclosures are required from vendors of hydraulic fracturing additives, companies that provide hydraulic fracturing services, and operators on whose wells hydraulic fracturing treatments are completed. Vendors and service providers must, with the exception of information claimed to be a trade secret, furnish to operators information on the total volume of water or the type and total volume of any other base fluid used in the hydraulic fracturing treatment; each hydraulic fracturing additive used in the hydraulic fracturing fluid along with its trade name, vendor, and a brief descriptor of its intended use; each chemical intentionally added to the base fluid, its maximum concentration, and its Chemical Abstracts Service (CAS) number, if applicable. Vendors and service providers must also provide any other information needed for operators to comply with operators' own disclosure requirements. Operators must post information to FracFocus, including: information on the makeup of hydraulic fracturing treatments as described above; operator name; date of hydraulic fracturing treatment; location and other identifying information for the well; and the true vertical depth of the well. If the specific identity of a chemical, its concentration, or both is/are claimed as a trade secret, the operator must so indicate on its submission to FracFocus and, as applicable, the vendor, service provider, or operator shall submit to the state a claim of entitlement to have the information withheld as a trade secret. Even if a chemical is claimed to be a trade secret, the operator must include in its submission the chemical family or other similar descriptor associated with such chemical. Information claimed to be a trade secret shall be provided to any health professional who provides a written statement of need for the information and executes a confidentiality agreement. Where a health professional determines that a medical emergency exists and the protected information is necessary for emergency treatment, the information shall be immediately disclosed upon a verbal acknowledgement that such information shall not be used for purposes other than the asserted health needs and shall otherwise be maintained as confidential. A written statement of need and a confidentiality agreement may be requested as soon as circumstances permit. Information so disclosed does not become publicly available. Information claimed to be a trade secret shall be provided to the Oil and Gas Conservation Commission upon written request from the Director of the Commission stating that such information is necessary to respond to a spill or release or a complaint from a person who may have been affected or aggrieved by a spill or release. The Director or designee may disclose the information to additional commission staff if such disclosure is necessary to allow staff to respond to the spill, release, or complaint, provided that such individuals shall not disseminate the information further. In addition, the Director may disclose such information to any commissioner, the relevant county public health director or emergency manager, or to the Colorado Department of Public Health and Environment's director of environmental programs upon request by that individual. The Colorado Department of Public Health and Environment's director of environmental programs, or his or her designee, may disclose such information |

| | to Colorado Department of Public Health and Environment staff members under the same terms and conditions as apply to the director. Information so disclosed does not become publicly available. *2 Colo. Code Regs. § 404-1(100, 205A) (2012).* |
|---|---|
| ND | After performance of a hydraulic fracture stimulation, the owner, operator, or service company must post on FracFocus all elements made viewable by the FracFocus website.[a] *N.D. Admin. Code 43-02-03-27.1 (2012).* |
| OH | Within 60 days after the completion of drilling or after a determination that a well is a dry or lost hole, a well completion record must be filed which designates: the trade name and the total amount of all products, fluids, and substances, and the supplier of each product, fluid, or substance—not including cement and its constituents and lost circulation materials—intentionally added to facilitate the drilling of any portion of the well until the surface casing is set and properly sealed or to stimulate the well. The owner shall identify each additive used and provide a brief description of the purpose for which the additive is used. For stimulated wells, the owner shall also include the maximum concentration of the additive used. In addition, the owner shall include a list of all chemicals, not including any information that is designated as a trade secret, intentionally added to all products, fluids, or substances and include each chemical's corresponding CAS number and the maximum concentration of each chemical. The owner shall obtain the chemical information, not including trade secrets, from the company that drilled or stimulated the well, provided drilling services at the well, or supplied the chemical; and the type and volume of any fluid, not including cement and its constituents or trade secret information, used to stimulate the well, the reservoir breakdown pressure, the method used for the containment of fluids recovered from the fracturing of the well, the methods used for the containment of fluids when pulled from the wellbore from swabbing the well, the average pumping rate of the well, and the name of the person that performed the well stimulation. In addition, the owner shall include a copy of the log from the stimulation of the well, a copy of the invoice for each of certain procedures and methods that were used on a well, and a copy of the pumping pressure and rate graphs. After a well is initially completed and stimulated and until the well is plugged, the owner shall report all materials placed into the formation to refracture, restimulate, or newly complete the well, in addition to the information required above, within 60 days. If there is a material listed in the disclosures for which the state does not have a material safety data sheet, the owner shall provide a copy to the state. Information must be submitted to the state on state prescribed forms, through FracFocus, or by other state-approved means. The state must post information obtained online. If a medical professional, in order to assist in the diagnosis or treatment of an individual who was affected by an incident associated with the production operations of a well, requests the exact chemical composition of each product, fluid, or substance and of each chemical component in a product, fluid, or substance that is designated as a trade secret pursuant, the person claiming the trade secret protection shall provide the information requested. A medical professional who receives such information shall keep it confidential and shall not disclose it for any purpose that is not related to the diagnosis or treatment. This requirement does not preclude a medical professional from making any report required by law or professional ethical standards. Companies may withhold the identity, amount, concentration, or purpose of a product, fluid, or substance or of a chemical component in a product, fluid, or substance as a trade secret. The state may not disclose any trade secret information. Anyone with an interest that is or may be adversely affected by a product, fluid, or substance or by a chemical component in a product, fluid, or substance may challenge a claim of trade secret protection. A well owner shall maintain records of chemicals placed in a well for at least 2 years after placement. The chief of the Oil and Gas Division in the Ohio Department of Natural Resources may inspect the records for non trade secret information at any time concerning any such chemical. For trade secret information, the well owner must disclose records to the state upon request if the information is necessary to respond to a spill, release, or investigation. However, the state shall not disclose the information that is designated as a trade secret. An owner is not required to report chemicals that occur incidentally or in trace amounts. *Ohio Rev. Code Ann. § 1509.10 (2012).* |
| PA | Certain disclosures are required from vendors of hydraulic fracturing additives, companies that provide hydraulic fracturing services, and operators on whose wells hydraulic fracturing treatments are completed.[b] If the vendor, service provider or operator claims that the specific identity of a chemical or the concentration of a chemical, or both, are a trade secret or confidential proprietary information, the operator of the well must indicate that on the form submitted to FracFocus and submit a signed statement that the record contains a trade secret or confidential proprietary information. If a chemical is a trade secret, the operator shall include in its submission to FracFocus the chemical family or similar description associated with the chemical. Unless the information is entitled to protection as a trade secret or confidential proprietary information, information posted to FracFocus is public. A vendor, service company, or operator shall identify the specific identity and amount of any chemicals claimed to be a trade secret or confidential proprietary information to any health professional who executes a confidentiality agreement and provides a written statement of need for the information indicating that the information is needed for diagnosis or treatment of an individual who may have been exposed to a hazardous chemical, and that knowledge of the information will assist in the diagnosis or treatment. If a health professional determines that a medical emergency exists and the information claimed to be a trade secret or confidential proprietary information is necessary for emergency treatment, the vendor, service provider or operator shall immediately disclose the information upon a verbal |

| | |
|---|---|
| | acknowledgment that the information may not be used for purposes other than the health needs asserted and that it will be maintained as confidential. The vendor, service provider, or operator may request, and the health professional shall provide, a written statement of need and a confidentiality agreement as soon as circumstances permit. Trade secret or confidential proprietary information must also be provided to the department, a public health official, an emergency manager, or a responder to a spill, release or a complaint if that information is needed for response. The department must prevent further disclosure of trade secrets or confidential proprietary information in accordance with other applicable state law. *58 Pa.Cons.Stat. §§ 3203, 3222.1 (2012).* |
| TX | Certain disclosures are required from suppliers of hydraulic fracturing additives, companies that provide hydraulic fracturing services, and operators on whose wells hydraulic fracturing treatments are completed. Suppliers and service providers must provide to operators information on each chemical ingredient intentionally added to the hydraulic fracturing fluid, including each additive used, its trade name, supplier, and a brief description of its intended use; each chemical ingredient for which a material safety data sheet would be required under federal regulation;[c] the actual or maximum concentration of each chemical ingredient listed under the last two clauses in percent by mass; all other chemical ingredients that were intentionally included in and used for creating hydraulic fracturing treatment(s) for the well; and the Chemical Abstracts Service (CAS) number for each chemical ingredient, if applicable. Operators must post information to FracFocus, including: information on the makeup of hydraulic fracturing treatments as described above; operator name; date of hydraulic fracturing treatment; location and other identifying information for the well; the true vertical depth of the well; and the total volume of water used in the hydraulic fracturing treatment(s) of the well or the type and total volume of the base fluid used in the hydraulic fracturing treatment(s), if something other than water. If the supplier or service company claims that the specific identity and/or CAS number or amount of any additive or chemical ingredient used in a treatment is entitled to protection as a trade secret under Texas law, it must provide the operator a written statement to that effect and must provide its contact information and the chemical family, unless that is also claimed as a trade secret, in which case only the properties and effects of the ingredient(s) must be disclosed. A claim that any of the same information is a trade secret must be included in the submission to FracFocus, along with the chemical family or other similar description and the contact information of the business claiming the trade secret. Information not protected as a trade secret is public information. A supplier, service company, or operator may not withhold information, including trade secrets, from any health professional or emergency responder who needs the information for diagnostic, treatment or other emergency response purposes. A supplier, service company, or operator must provide directly to a health professional or emergency responder all information in the person's possession that is required whether or not the information may be a trade secret. The person disclosing information must include, as soon as circumstances permit, a statement of the health professional's confidentiality obligation. In an emergency, the supplier, service company, or operator must provide the information immediately.[d] A health professional or emergency responder to whom information is disclosed must hold the information confidential, except that he or she may, for diagnostic or treatment purposes, disclose information to another health professional, emergency responder, or accredited laboratory. Such a person or entity must hold the information confidential, and the disclosing person must include with the disclosure, or in a medical emergency, as soon as circumstances permit, a statement of the recipient's confidentiality obligation. Certain parties may challenge a claim of trade secret protection, including the landowner on whose property the relevant wellhead is located; the landowner who owns real property adjacent to property described above; and a department/agency with jurisdiction over a matter to which the claim is relevant. *16 Tex. Admin. Code § 3.29 (2012).* |
| WY | • The Application for Permit to Drill must include a description of any anticipated stimulation program, including the base stimulation fluid and its source, the chemical additives and proposed concentrations to be mixed, identified by additive type. Specifically, owners or operators must provide information on the stimulation fluid identified by additive type, the chemical compound name and CAS number, and the proposed rate or concentration for each additive. Upon prior request on certain forms and/or by written letter to the state justifying and documenting the nature and extent of the proprietary information, confidentiality protection shall be provided consistent with the Wyoming Public Records Act for trade secrets, privileged information and confidential commercial, financial, geological, or geophysical data furnished by or obtained from any person. Reports must generally be submitted to the state within 30 days of completion of certain activities, including formation fracturing, which present a detailed account of the work done and the manner in which it was performed, including the quantity of sand, crude, chemical, or other materials employed in the operation. |
| | • Following well stimulation, the owner, operator, or service company must provide the actual total well stimulation treatment volume pumped; detail as to each fluid stage pumped, including actual volume, proppant rate or concentration; and actual chemical additive name, type, concentration or rate, and amounts. In lieu of the preceding information, an owner/operator may submit a job log. *055-000-003 Code Wyo. R. §§§ 8, 12, 45 (2012).* |

---

**Pressure monitoring, testing, limitations or other mechanical integrity requirements during well treatment or stimulation**

| | |
|---|---|
| CO | During stimulation, bradenhead[e] annulus pressure shall be continuously monitored and recorded. If at any time during stimulation operations the bradenhead annulus pressure increases more than 200 psi (gauge), the operator shall verbally notify the state as soon as practicable, but no later than 24 hours following the incident. Within 15 days after the occurrence, the operator shall submit a notice giving all details, including corrective actions taken. If intermediate casing has been set on the well being stimulated, the pressure in the annulus between the intermediate casing and the production casing shall also be monitored and recorded. The operator shall keep all well stimulation records and pressure charts on file and available for inspection by the state for at least 5 years. An operator may seek a variance from these bradenhead monitoring, recording, and reporting requirements under appropriate circumstances. *2 Colo. Code Regs. § 404-1(341) (2012).* |
| ND | • The state may prescribe pretreatment casing pressure testing and other operational requirements to protect wellhead and casing strings during treatment operations. If damage results to the casing or the casing seat from fracturing or chemically treating a well, the operator shall immediately notify the state and proceed with diligence to rectify the damage. If perforating, fracturing, or chemical treating results in irreparable damage that threatens the mechanical integrity of the well, the commission may require the operator to plug the well. |
| | • The following mechanical integrity requirements apply to hydraulic fracture stimulations performed through a frac string run inside the intermediate casing string. (1) The frac string must be stung into a liner or run with a packer set at a minimum depth of 100 feet below the top of cement or 100 feet below the top of the Inyan Kara formation, whichever is deeper. (2) The intermediate casing-frac string annulus must be pressurized and monitored during frac operations. (3) An adequately sized, function tested pressure relief valve must be utilized on the treating lines from the pumps to the wellhead, with suitable check valves to limit the volume of flowback fluid should the relief valve open. The relief valve must be set to limit line pressure to no more than 85% of the internal yield pressure of the frac string. (4) An adequately sized, function tested pressure relief valve and an adequately sized diversion line must be utilized to divert flow from the intermediate casing to a pit or containment vessel in case of frac string failure. The relief valve must be set to limit annular pressure to no more than 85% of the lowest internal yield pressure of the intermediate casing string. (5) The surface casing valve must be fully open and connected to a diversion line rigged to a pit or containment vessel. (6) An adequately sized, function tested remote operated frac valve must be utilized between the treating line and the wellhead. |
| | • The following specific mechanical integrity requirements apply to hydraulic fracture stimulations performed through an intermediate casing string: (1) The maximum treating pressure shall be no greater than 85% of the American Petroleum Institute rating of the intermediate casing. (2) Casing evaluation tools to verify adequate wall thickness of the intermediate casing shall be run from the wellhead to a depth as close as practicable to 100 feet above the completion formation and a visual inspection with photographs shall be made of the top joint of the intermediate casing and the wellhead flange. If the casing evaluation tool or visual inspection indicates wall thickness is below the American Petroleum Institute minimum or a lighter weight of intermediate casing than the well design called for, calculations must be made to determine the reduced pressure rating. If the reduced pressure rating is less than the anticipated treating pressure, a frac string shall be run inside the intermediate casing. (3) Cement evaluation tools to verify adequate cementing of the intermediate casing shall be run from the wellhead to a depth as close as practicable to 100 feet above the completion formation. If the cement evaluation tool indicates defective casing or cementing a frac string shall be run inside the intermediate casing. If the cement evaluation tool indicates the top of cement behind the intermediate casing is below the top of the Mowry Formation, a frac string shall be run inside the intermediate casing. (4) The intermediate casing and wellhead must be pressure tested to a minimum depth of 100 feet below the top of the Tyler formation for at least 30 minutes with less than 5% loss to a pressure equal or greater than the maximum frac design pressure. (5) If the pressure rating of the wellhead does not exceed the maximum frac design pressure, a wellhead and blowout preventer protection system must be utilized during the frac. (6) An adequately sized, function tested pressure relief valve must be utilized on the treating lines from the pumps to the wellhead, with suitable check valves to limit the volume of flow back fluid should the relief valve open. The relief valve must be set to limit line pressure to no greater than the test pressure of the intermediate casing, less 100 psi; (7) The surface casing valve must be fully open and connected to a diversion line rigged to a pit or containment vessel. (8) An adequately sized, function tested remote operated frac valve must be utilized between the treating line and the wellhead. |
| | • If during stimulation, the pressure in the intermediate casing-surface casing annulus exceeds 350 psi, the owner or operator shall verbally notify the state as soon as practicable but no later than 24 hours later. *N.D. Admin. Code 43-02-03-27, 27-1 (2012).* |

---

| | |
|---|---|
| OH | All casing installed in a well must have a minimum internal yield pressure rating designed to withstand at least 1.2 times the maximum pressure to which the casing may be subjected during stimulation operations. Reconditioned casing that is permanently set in a well shall be hydrostatically pressure tested with an applied pressure at least 1.2 times the maximum internal pressure to which the casing may be subjected or pressure that may be applied during stimulation, whichever is greater, and assuming no external pressure. Test results shall be provided to the state before casing is installed in the well. Wellhead assemblies shall be used to maintain surface control of the well. Each component of the wellhead shall have a working pressure rating equal to or greater than the highest anticipated operating pressure to which the particular component might be exposed during the course of stimulating the well. During stimulation or workover operations, all annuli shall be pressure-monitored. Stimulation or workover operations shall be immediately suspended for any inexplicable pressure deviation above those anticipated increases caused by pressure or thermal transfer. In the event that stimulation fluids circulate, or annular pressures deviate from anticipated, the owner shall immediately notify the state and acquire approval for remediation of casing or cement. If the chief determines that the stimulation of the well has resulted in irreparable damage to the well, the chief shall order that the well be plugged and abandoned within 30 days of issuance of the order. *Ohio Admin. Code Ann. 1501:9-1-08 (2012).* |
| PA | No requirements identified in regulations or in statutes. |
| TX | No requirements identified in regulations or in statutes. |
| WY | Setting depths of all casing strings shall be determined based on formation fracture gradients and the maximum anticipated pressure to be maintained within the wellbore. *055-000-003 Code Wyo. R. § 22 (2012).* The Owner/Operator shall provide geological names, geological description and depth of the formation into which well stimulation fluids are to be injected and a detailed description of the proposed well stimulation design, which shall include: the anticipated surface treating pressure range; the maximum injection treating pressure; and the estimated or calculated fracture length and fracture height. The state may require, prior to well stimulation, the owner or operator to perform a suitable mechanical integrity test of the casing or of the casing-tubing annulus or other mechanical integrity test methods. During well stimulation, the Owner/Operator shall monitor and record the annulus pressure at the bradenhead. If intermediate casing has been set on the well being stimulated, the pressure in the annulus between the intermediate casing and the production casing shall also be monitored and recorded. A continuous record of the annulus pressure during the well stimulation shall be submitted to the state. If during the stimulation the annulus pressure increases by more than 500 psig, the Owner or Operator shall verbally notify the Supervisor as soon as practicable but no later than 24 hours following the incident. The Owner or Operator shall include a report containing all details pertaining to the incident, including corrective actions taken. *055-000-003 Code Wyo. R. §§ 22, 45 (2012).* |

**Other**

| | |
|---|---|
| CO | An operator making application for approval of an oil and gas location assessment shall provide the surface owner and owners of surface property within 500 feet of the proposed oil and gas location with certain information, including a state information sheet on hydraulic fracturing treatments and must provide notice of subsequent well operations, such as refracturing of a well, at least 7 days in advance of the operations. Placement of all stimulation fluids shall be confined to the objective formations during treatment to the extent practicable. *2 Colo. Code Regs. § 404-1(305, 341) (2012).* |
| ND | No additional requirements identified in regulations or in statutes. |
| OH | • When cementing the production string of a well that will be stimulated by hydraulic fracturing, and the uppermost perforation is less than 500 feet below the base of the deepest underground source of drinking water, sufficient cement shall be used to fill the annular space outside the casing from the seat to the ground surface or to the bottom of the cellar. If it is not so circulated, the owner shall notify the state and perform tests approved by the state. After the top of cement outside the casing is determined, the owner or his/her authorized representative shall contact the state and obtain approval for the procedures to be used to perform any required additional cementing operations.

• Using steel production casing with sufficient cement, an oil and gas reservoir shall be isolated during well stimulation and during the productive life of the well. A well shall not be perforated for purposes of well stimulation in any zone that is located around casing that protects underground sources of drinking water without written authorization from the state.

• An owner who elects to stimulate a well shall do so in a manner that will not endanger underground sources of drinking water. If during the stimulation of a well, damage to the production casing or cement occurs, and results in the circulation of fluids from the annulus of the surface production casing, the owner shall immediately terminate the stimulation of the well and notify the state. If the state determines that the casing and the cement may be remediated in a manner that isolates the oil and gas bearing zones of the well, the state may authorize the completion of the stimulation of the well. If the state determines that the stimulation of a well resulted in irreparable damage to the well, the state shall order that the |

**GAO-12-874  Unconventional Oil and Gas Development**

| | |
|---|---|
| | well be plugged within 30 days. For purposes of determining the integrity of the remediation of the casing or cement of a well that was damaged during the stimulation of the well, the state may require the owner to submit cement evaluation logs, temperature surveys, pressure tests, or a combination of such logs, surveys, and tests. *Ohio Admin. Code Ann. 1501:9-1-08 (2012); Ohio Rev. Code Ann. §§ 1509.17, .19 (2012).* |
| PA | A well permit application must be accompanied by a plat showing the name of all surface landowners and water purveyors whose water supplies are within 3,000 feet. The applicant must notify the aforementioned landowners and purveyors, and each municipality and storage operator within 3,000 feet. A containment plan for unconventional wells is required. Practices under the plan must be sufficiently impervious and able to contain spilled material until it can be removed or treated, and be compatible with the material to be contained. The plan must be submitted to the state. Containment systems must be used for drilling mud, hydraulic oil, diesel fuel, drilling mud additives, hydraulic fracturing additives, and hydraulic fracturing flowback. Areas where any additives, chemicals, oils, or fuels are to be stored must have sufficient containment capacity to hold the volume of the largest container stored in the area plus 10% to allow for precipitation, unless the container is equipped with individual secondary containment. An owner/operator of a facility conducting natural gas operations in unconventional formations shall submit to the department a source report identifying and quantifying actual air contaminant emissions from any air contamination source. *58 Pa.Cons.Stat. §§ 3211, 3218.2, 3227 (2012).* |
| TX | No additional requirements identified. |
| WY | The injection of volatile organic compounds, such as benzene, toluene, ethylbenzene and xylene, (BTEX compounds), or any petroleum distillates into groundwater is prohibited. The proposed use of BTEX compounds or petroleum distillates for well stimulation into hydrocarbon bearing zones is authorized with prior state approval. It is accepted practice to use produced water that may contain small amounts of naturally occurring petroleum distillates, as well stimulation fluid in hydrocarbon bearing zones. |
| | Following well stimulation, the owner, operator, or service company must provide the actual total well stimulation treatment volume pumped; detail as to each fluid stage pumped, including actual volume, proppant rate or concentration; actual chemical additive name, type, concentration or rate, and amounts; the actual surface pressure and rate at the end of each fluid stage and the actual flush volume, rate and final pump pressure; the instantaneous shut-in pressure, and the actual 15-minute and 30-minute shut-in pressures when available. In lieu of the preceding information, an owner/operator may submit a job log. |
| | The owner/operator shall provide information to the state as to the amounts, handling and, if necessary, disposal at an identified appropriate disposal facility, or reuse of the well stimulation fluid load recovered during flowback, swabbing, and/or recovery from production facility vessels. Storage of such fluid shall be protective of groundwater as demonstrated by the use of either tanks or lined pits. If lined pits are utilized to store fluid for use in well stimulation, or for reconditioning, for reuse, or to hold for appropriate disposal, then additional requirements to protect wildlife and migratory birds shall be met. *055-000-003 Code Wyo. R. § 45 (2012).* |

Source: GAO analysis of state information.

[a]Elements that are viewable on the FracFocus website include date of fracturing treatment, identifying information for wells, and information on hydraulic fracturing fluid composition, including trade name of component, supplier, purpose, ingredients, CAS number, and maximum ingredient concentrations in the additive and in the fluid as a whole.

[b]Pennsylvania law does not specify what information must be disclosed.

[c]29 C.F.R. § 1910.1200(g)(2) (2011).

[d]The disclosures required by this subsection must be made in accordance with the procedures in 29 C.F.R. § 1910.1200(i) (2011) with respect to a written statement of need and confidentiality agreements, as applicable.

[e]A bradenhead is a casing head in an oil well having a stuffing box packed to make a gastight connection.

**Table 15: Selected State Requirements—Well Plugging**

| | Requirements for notification, plugging plan or method, witnessing, and reporting |
|---|---|
| CO | The operator must obtain prior approval of the plugging method. A hole must be plugged so that substances are confined to the reservoir from which they originated. Cement plugs shall be at least 50 feet long and extend at least 50 feet above each zone to be protected. Plugging material, whether cement, a mechanical plug, or other equivalent method approved by the state, must permanently prevent migration of oil, gas, water, or other substance from the formation or horizon in which it originally occurred. Where cement is used, the operator may choose among the following methods of placing cement in the hole: by dump bailer, pumping a balanced cement plug through tubing or drill pipe, pump and plug, or equivalent method approved by the state prior to plugging. Unless prior approval is given, all wellbores shall have water, mud, or other approved fluid between all plugs. The operator must provide notice of the estimated time and date of plugging. Reports of plugging and abandonment must be submitted with a job log or cement verification report from the plugging contractor specifying the fluid used to fill the wellbore, type and slurry volume of cement used, date of work, and depth of plugs. *2 Colo. Code Regs. § 404-1(319) (2012).* |
| ND | A notice of intention to plug, including the proposed method of plugging and a detailed statement of proposed work, must be approved by the state prior to plugging. Generally, wells must be plugged so to confine permanently all oil, gas, and water in the separate strata originally containing them. This operation shall be accomplished by the use of mud-laden fluid, cement, and plugs, used singly, or in combination, as may be approved by the state. After the plugging of a well, a plugging record shall be filed with the state. *N.D. Admin. Code 43-02-03-33, -34, -31 (2012).* |
| OH | A permit must be obtained to plug a well. Wells must be plugged so that oil, gas, water, or other fluids shall be confined to the reservoir rock in which it occurs or originates. The owner, or his agent, may have the option of using any method of emplacing the plugging material approved by the state including dump bailer, bullhead, pumping through tubing, casing, or drill pipe. The state may designate an alternate method of plugging in certain areas. Plugging operations must be conducted under the supervision of a state inspector. The owner or his/her agent shall notify the inspector when plugging operations will commence at a dry hole or lost hole in sufficient time to enable the inspector to be present. For all other wells, the owner or agent shall notify the inspector a minimum of 24 hours in advance. The state may grant verbal authorization to commence plugging when the inspector is unable to be present. The state regulations include detail on when plugging must be commenced, when specific types of pipe and casing can be pulled from a well, the materials that can be used for plugging, and how plugging with those materials must proceed. When plugging operations are not witnessed by an inspector, a plugging report on a form provided by the state and signed by the owner or his agent, shall be filed with the state within 30 days after completion of plugging. For all wells plugged with cement, a cementing ticket made by the party cementing the well shall be attached to the plugging report. For all wells plugged with prepared clay, a copy of the prepared clay purchase record shall be attached to the plugging report. When an inspector is present to supervise the plugging operations, a plugging report shall be filed on such form as the chief may prescribe. *Ohio Admin. Code Ann. 1501:9-11-02, -03, -04, -12 (2012).* |
| PA | Notification and witnessing requirements apply only to wells in coal areas. Prior to plugging a well in an area underlain by a workable coal seam, the operator or owners must notify the state, and the coal operator, lessee or owner to permit representatives to be present at the plugging. Detailed plugging requirements differ based on whether the well is in a coal or noncoal area, whether surface casing is present and how it is attached, and whether the well was stimulated with explosives. A plan is only required if operator proposes an alternate plugging method for approval. Reporting requirements also only apply to coal areas. When plugging of a well in an area underlain by a workable coal seam has been completed, a certification shall be prepared and signed by two experienced and qualified people who participated in the work setting forth the time and manner in which the well was plugged. One copy of the certificate shall be mailed to each coal operator, lessee or owner, and another shall be mailed to the state. *25 Pa. Code §§ 78.91-.98 (2012). 58 Pa.C.S. §§ 3220, 3221 (2012).* |
| TX | Generally, the operator must give notice of its intention to plug any well prior to plugging. The notice shall set out the proposed plugging procedure as well as the complete casing record. The proposed plugging procedure must be approved before plugging commences. Generally, wells shall be plugged to insure that all formations bearing usable quality water, oil, or gas are protected. Cement plugs shall be set to isolate each productive horizon and usable quality water strata; cement plugs shall be placed by the circulation or squeeze method through tubing or drill pipe. Cement plugs shall be placed by other methods only upon written request with the written approval of the state. The regulations list different specific requirements for wells with surface, intermediate, and production casing, wells with screens or liners, and wells without production casing and open-hold completions. Plugging cannot commence before the date in the notice unless otherwise authorized, and the operator shall notify the district office at least 4 hours before plugging. Exceptions to the timing requirements may be granted in certain circumstances. The operator shall file a plugging record within 30 days of plugging. *16 Tex. Admin. Code 3.14 (2012).* |

| WY | Before plugging, a notice of intent must be filed with the state. The notice must give a detailed statement of proposed work including kind, location, and length of plugs (by depths), and plans for mudding, cementing, shooting, testing, and removing casing, as well as any other pertinent information. Approval must be obtained prior to commencing plugging operations. The regulations list different specific requirements for wells with and without production casing, coalbed methane wells in the Powder River Basin, and wells within a geologic area known as the Special Sodium Drilling Area. When the well has been plugged, a notarized report accompanied by a job log or cement verification report from the plugging contractor specifying the type of fluid used to fill the wellbore, type of slurry volume of cement used, date of work, and depth of plugs placed must be submitted. *055-000-003 Code Wyo. R. §§ 15, 18 (2012).* |
|---|---|

Source: GAO analysis of state information.

**Table 16: Selected State Requirements—Site Reclamation**

**Backfilling, regrading, recontouring, and compaction alleviation requirements**

| CO | Areas disturbed by drilling and subsequent operations no longer needed for production will be restored to their original condition or their final land use as designated by the surface owner and shall be maintained to control dust and minimize erosion. If subsidence occurs on crop lands, additional topsoil shall be added, and the land shall be releveled as close to its original contour as practicable. Interim reclamation must occur no later than 3 months on crop land or 6 months on noncrop land after operations cease unless that time is extended by the state. Areas needed for subsequent operations within the year shall be stabilized and maintained to minimize dust and erosion. Areas compacted by drilling and subsequent operations no longer needed for production shall be cross-ripped. On crop land, operations shall be undertaken when soil moisture is below 35% of field capacity to a depth of 18 inches unless bedrock is shallower. After well plugging, all access roads to plugged wells shall be closed, graded, and recontoured. Culverts and other obstructions shall be removed. As applicable, compaction alleviation will be performed to the same standards as for interim reclamation. Final reclamation must be completed within 3 months on crop land and 12 months on noncrop land unless that time is extended by the state. Reclamation of the well site and access road shall be considered complete on crop land when, among other things, observation over two growing seasons indicates no significant unrestored subsidence. Stabilization so as to minimize erosion to the extent practicable is a factor in determining completion of final reclamation for all disturbed areas. *2 Colo. Code Regs. § 404-1(1003, 1004) (2012).* |
|---|---|
| ND | The well site, access road, and other associated facilities constructed for the well shall be reclaimed within a year after a well is plugged or a permit expires or is canceled or revoked. Operators must submit and obtain approval of a reclamation plan, including a description of the proposed work, including topsoil redistribution and reclamation plans for the access road and other associated facilities. Gravel and other surfacing material must be removed, stabilized soil must be remediated, and the well site, access road, and other associated facilities shall be reshaped as near as practicable to their original contour. Previously stockpiled topsoil shall be evenly distributed over the disturbed area. *N.D. Admin. Code 43-02-03-34.1 (2012).* |
| OH | Unless the state approves a longer time period, within 3 months after drilling commences in an urbanized area and within 6 months after drilling commences in all other areas, the owner or the owner's agent shall grade or terrace disturbed areas that are not required in production. Within 3 months after a well is plugged in an urbanized area, and within 6 months after a well is plugged in all other areas, or after the plugging of a dry hole, unless the state approves a longer time period, the owner or the owner's agent shall fill remaining excavations. *Ohio Rev. Code Ann. § 1509.072 (2012).* |
| PA | Each oil or gas well owner or operator shall restore the land surface within the area disturbed in siting, drilling, completing, and producing the well. Within 9 months after completion of drilling a well, the owner or operator shall restore the well site, remove or fill all pits used to contain produced fluids or industrial wastes, remove all production and storage facilities, supplies and equipment, and remove all drilling supplies and equipment not needed for production. Drilling supplies and equipment not needed for production may be stored on the well site if express written consent is obtained from the surface landowner. This time frame may be extended to a maximum of 2 years upon request and submission of a plan demonstrating that the extension will result in less earth disturbance or that site restoration cannot be achieved due to adverse weather conditions or a lack of essential fuel, equipment or labor. *58 Pa.C.S. § 3216.* |

| TX | The operator shall fill the rathole, mouse hole, and cellar, and shall empty all tanks, vessels, related piping, and flowlines that will not be actively used in the continuing operation of the lease within 120 days after plugging work is completed. Within the same 120-day period, the operator shall remove all such tanks, vessels, and related piping, remove all loose junk and trash from the location, and contour the location to discourage pooling of surface water at or around the facility site. The operator shall close all pits. The district director or the director's delegate may grant a reasonable extension of time of not more than an additional 120 days for the removal of tanks, vessels and related piping. *16 Tex. Admin. Code 3.14 (2012).* |
|---|---|
| WY | Reclamation must be initiated within 1 year of permanent abandonment of a well or last use of a pit and must be completed in accordance with the landowner's reasonable requests and/or resemble the original contour of adjoining lands. All disturbed areas on state lands will be recontoured unless the state approves otherwise. *055-000-003 Code Wyo. R. §§ 7, 17 (2012).* |

**Revegetation requirements**

| CO | When a well is completed for production, all disturbed areas no longer needed will be revegetated as soon as practicable. For crop lands, all segregated soil horizons shall be replaced to their original relative positions and contour and shall be tilled to establish a proper seedbed. The area shall be treated if necessary and practicable to prevent weeds and erosion. Previously present perennial forage crops shall be reestablished. For noncrop lands, all segregated soil horizons shall be replaced to their original relative positions and contour as near as practicable to achieve erosion control and long-term stability and shall be tilled to establish a proper seed bed. The area shall be reseeded in the first favorable season following rig demobilization. Reseeding consistent with adjacent plant communities is encouraged. Seed mix should be as agreed with surface owner or based on consultation with the local soil conservation district. To be considered complete, reclamation must, among other things, establish uniform vegetative cover reflecting predisturbance or reference area vegetation with total cover of at least 80% of predisturbance levels, excluding weeds. After a well is plugged, revegetation of well sites, associated production facilities, and access roads shall be performed to the same standards. A decision as to whether final reclamation has been completed will take into account permanent physical erosion reduction methods as an alternative to 80% revegetation. *2 Colo. Code Regs. § 404-1(1003, 1004) (2012).* |
|---|---|
| ND | The reclamation plan for the well site, access road, and other associated facilities shall include a reseeding plan, if applicable. Disturbed areas shall be revegetated with native species or according to the reasonable specifications of the government land manager or surface owner. N.D. Admin. Code 43-02-03-34.1 (2012). |
| OH | Unless the state approves a longer time period, within 3 months after the date upon which the surface drilling of a well commenced in an urbanized area, and within 6 months after the date upon which the surface drilling of a well is commenced in all other areas, the owner or the owner's agent shall plant, seed, or sod the area disturbed that is not required in production of the well where necessary to bind the soil and prevent substantial erosion and sedimentation. Within 3 months after a well that has produced oil or gas is plugged in an urbanized area, and within 6 months after a well that has produced oil or gas is plugged in all other areas, or after the plugging of a dry hole, unless the chief approves a longer time period, the owner or the owner's agent shall plant, seed, or sod the area disturbed where necessary to bind the soil and prevent substantial erosion and sedimentation. *Ohio Rev. Code Ann. § 1509.072 (2012).* |
| PA | Upon final completion of an earth disturbance activity or any stage or phase of activity, the site must have topsoil immediately restored, replaced, or amended, seeded, mulched, or otherwise permanently stabilized and protected from accelerated erosion and sedimentation. For the earth disturbance activity or any stage or phase of an activity to be considered permanently stabilized, the disturbed area must be covered with a minimum uniform 70% perennial vegetative cover with a density capable of resisting accelerated erosion and sedimentation or an acceptable best management practice that permanently minimizes accelerated erosion and sedimentation.

See also specific pit closure requirements above. In addition, where residual waste is disposed of by land application, the application area shall be revegetated to stabilize the soil surface. The revegetation shall establish a diverse, effective permanent vegetative cover which is capable of self-regeneration and plant succession. Where vegetation would interfere with the intended use of the surface by the landowner, the surface shall be stabilized against erosion. *25 Pa Code §§ 78.63, 102.22 (2012).* |
| TX | No requirements identified in regulations or in statutes.[a] |
| WY | Reclamation must be initiated within 1 year of permanent abandonment of a well or last use of a pit and must be completed in accordance with the landowner's reasonable requests and/or resemble the original vegetation of adjoining lands. All disturbed areas on state lands will be reseeded unless the state approves otherwise. *055-000-003 Code Wyo. R. §§ 7, 17 (2012).* |

Source: GAO analysis of state information.

[a]According to Texas state officials, however, requirements may be included in permits issued by the Railroad Commission.

**Table 17: Selected State Requirements—Waste Management in Pits**

**Pit siting requirements (with regard to sensitive areas)**

| | |
|---|---|
| CO | Generally, pits shall not be constructed in areas where pathways for communication with groundwater or surface water are likely to exist. Operations at new locations within the intermediate and external buffer zones surrounding a public water system cannot use pits.[a] 2 Colo. Code Regs. § 404-1(317B, 902) (2012). |
| ND | Reserve pits may be used for wells drilled to certain depths providing the pit can be constructed, used, and reclaimed in a manner that will prevent pollution of the land surface and freshwaters. In special circumstances, based on site-specific conditions, the state may prohibit construction of a reserve pit or may impose more stringent pit construction and reclamation requirements. Drilling pits and reserve pits shall not be located in, or hazardously near, bodies of water, nor shall they block natural drainages. No pit shall be wholly or partially constructed in fill dirt unless approved by the state. *N.D. Admin. Code 43-02-03-19.4, 19.5 (2012).* |
| OH | Drilling permits for urbanized areas are conditioned on the state receiving direct notification at least 48 hours prior to pit construction. All pits used for temporary storage of saltwater and oil field wastes shall not be used in an area that is subject to flooding by streams, rivers, lakes, or drainage ditches, unless so constructed that the pits would not normally be affected by flooding. *Ohio Admin. Code Ann. 1501:9-1-02,-3-08 (2012).* |
| PA | Generally, pits for the control, storage, and disposal of production fluids may not be located within 100 feet of a stream, body of water, or wetland. Pits for the disposal of drill cuttings may not be located within 100 feet of a stream, body of water, or wetland unless otherwise permitted, and may not be located within 200 feet of a water supply. Pits for the disposal of residual waste may not be located within 100 feet of a stream, body of water, or wetland or within 200 feet of a water supply. Generally, pit bottoms must be at least 20 inches above the seasonal high groundwater table. *25 Pa. Code § 78.56, 57, .61, .62 (2012).* |
| TX | No commercial oil and gas waste disposal pits may be constructed in any coastal natural resource area[b] and all oil and gas waste disposal pits shall be designed to prevent releases of pollutants that adversely affect coastal waters or critical areas. *16 Tex. Admin. Code § 3.8 (2012).[c]* |
| WY | Owners or operators must obtain state approval for the location of noncommercial centralized pits, reserve pits, and workover and completion and produced water pits proposed for critical areas. Pits in critical areas include those located within ¼ mile of water supplies, areas where groundwater is less than 20 feet from the surface, which are within 500 feet of wetlands, ponds, lakes, perennial drainages or within a floodplain, and areas where pit fluids are greater than 10,000 mg/l total dissolved solids. When a retaining pit is located in an area with a high potential for communication between pit contents and surface water or shallow groundwater, or to protect people, livestock, or wildlife, the state may require changes to plans including running a closed system, lining the pit, or installing monitoring systems and providing additional reporting. In areas where groundwater is less than 20 feet below the surface, a closed system must be utilized. Generally, pits cannot be located closer than 350 feet from water supplies. *055-000-001 Code Wyo. R. § 2; 055-000-003 Code Wyo. R. § 22; 055-000-004 Code Wyo. R. § 1 (2012).* |

**Pit lining requirements**

| | |
|---|---|
| CO | Certain pits, including drilling pits for fluids containing hydrocarbon or chloride concentrations exceeding certain levels; production pits in certain regions unless the quality of the produced water is as good or better than that of the underlying groundwater or seepage will not reach the underlying aquifer or waters of the state at levels in excess of applicable standards; special purpose pits excluding emergency pits and certain flare pits; skim pits; and multiwell pits in certain regions used to contain produced water, drilling fluids, or completion fluids that will be recycled or reused, must be lined if they were constructed after Spring of 2009. Liners shall be synthetic, impervious, have high puncture and tear strength and adequate elongation, and be resistant to ultraviolet light deterioration, weathering, hydrocarbons, acids, alkali, fungi and other substances in produced water. All pit lining systems shall be designed, constructed, installed, and maintained in accordance with the manufacturers' specifications and good engineering practices. Field seams must be installed and tested in accordance with manufacturer specifications and good engineering practices. Unless an operator can demonstrate equivalent protection with an alternative system, liners for on-site pits must also meet the following requirements. Liners shall have a minimum thickness of 24 mils and must cover bottom and insides of pit with enough overhang to be secured in a 12-inch anchor trench. Foundation for the liner shall be constructed with (1) at least 12 inches of soil compacted such that the amount of liquid it can conduct does not exceed 1.0 x 10 [-7] centimeters per second or (2) with other material if two liners of at least 24 mils in thickness are used and the pit bottom and sides are padded and free of material that could puncture the liner. In Sensitive Areas, a leak detection system, increased record-keeping, monitoring, or underlying gravel fill sumps and lateral systems may be required. *2 Colo. Code Regs. § 404-1(904) (2012).* |

| ND | Generally, no saltwater, drilling mud, crude oil, waste oil, or other waste shall be stored in earthen pits or open receptacles except in an emergency and upon state approval. A lined earthen pit or open receptacle may be temporarily used to retain oil, water, cement, solids, or fluids generated in well completion, servicing, or plugging. Such a pit or receptacle must be sufficiently impermeable to provide adequate temporary containment. Pit contents must be removed within 72 hours after operations have ceased and disposed of at an authorized facility. Freshwater pits must also be lined. *N.D. Admin. Code 43-02-03-19.3 (2012).* |
|---|---|
| OH | No requirements identified in regulations or in statutes, though pits used for the temporary storage of saltwater and oil field wastes shall be "liquid tight." *Ohio Admin. Code 1501:9-3-08 (2012).* |
| PA | Pits used for temporary containment, for control, storage, and disposal of production fluids, and for disposal of residual waste must be lined. Liners must meet a specific permeability threshold and be of sufficient strength and thickness to maintain the integrity of the liner. For pits other than those used for temporary containment, the minimum liner strength must be 30 mils. Liners shall be sealed together to prevent leakage in accordance with the manufacturer's directions. The liner shall be designed, constructed, and maintained so that the physical and chemical characteristics of the liner are not adversely affected by the waste and the liner is resistant to physical, chemical, and other failure during transportation, handling, installation, and use. Alternate liners or materials may be approved. Pits must be smooth so they do not tear the liner and must be able to bear the weight of their contents without settling that may affect the liner integrity. If the pit bottom or sides consist of rock, shale, or other materials that may cause the liner to fail, a subbase of at least 6 inches of soil, sand, or smooth gravel, or sufficient amount of an equivalent material, shall be installed over the area as the subbase for the liner. *25 Pa. Code §§ 78.56, .57, .62 (2012).* |
| TX | A permit issued to maintain or use any lined pit for storage or disposal of oil field brines or other mineralized waters will contain requirements relating to liner material, thickness, procedures for installing liners, schedules for inspecting and/or replacing liners. A permit issued to maintain or use a pit for storage of oil field fluids or oil and gas wastes may contain such requirements. *16 Tex. Admin. Code § 3.8 (2012).* |
| WY | Before drilling commences, approval to construct reserve pits must be applied for and received. Special precautions, including an impermeable liner and/or membrane, shall be taken if necessary to prevent water contamination and where drilling is conducted close to water supplies, residences, schools, hospitals, or other structures. Unlined pits shall not be constructed in fill. Lining of pits with reinforced oilfield grade material, compatible with the waste to be received, will be required under certain circumstances including pits proposed to be constructed in critical areas as well as on sites with sandy soils, shallow groundwater, in groundwater recharge areas, or sites immediately adjacent to the Green River or the Colorado River drainage and other sensitive environments or circumstances. Pits constructed in fill or those used to retain oil base drilling muds, high-density brines, and/or completion or treating fluids must be lined. Pits constructed to retain produced water with a total dissolved solids concentration in excess of 10,000 mg/l must be lined. Pits retaining water with a total dissolved solids concentration less than 10,000 mg/l may be required to be lined on a case-by-case basis. Soil mixture liners, recompacted clay liners, and manufactured liners must be compatible with the waste contained. Synthetic liners must meet the following specifications: a 9 to 12 mil thickness, greater than 20% elongation at failure, puncture strength of 60 lbs, tear strength of 50 lbs, and permeability less than 10-7 cm/sec. Joints must be overlapped at least 2 inches and seams sealed per manufacturer recommendation. Blemishes, holes, or scars must be repaired per manufacturer recommendation. Breaches for equipment must be reinforced. Slopes shall not exceed 3:1 for soil mixture or recompacted liners or 1:1 for manufactured liners. Reasonable provisions for protection of liners during filling and emptying activities must be included in the construction plans. Manufactured liners must be installed over smooth fill that is free of pockets or materials which could damage the liner. Sand, sifted dirt ,or bentonite are suggested. At no time will straw or any other organic material except synthetic cushion fabric designed for that purpose be used for a liner cushion. Installation of synthetic or soil mixture liners must be in accordance with accepted engineering practice. Liner edges must be secured by placing in a trench which is deep enough to receive approximately 1' of compacted soil which will anchor the material. *055-000-003 Code Wyo. R. § 22, 055-000-001 Code Wyo. R. § 1 (2012).* |

**Freeboard[d] and secondary containment requirements for pits and tanks**

| CO | • Pits shall be constructed, monitored, and operated to provide for a minimum of 2 feet of freeboard at all times between the top of the pit wall at its point of lowest elevation and the fluid level of the pit. A method of monitoring and maintaining freeboard shall be employed. |
|---|---|
| | • For new operations at new locations within the intermediate buffer zone surrounding a public water system and certain operations that create a new surface disturbance but were otherwise in existence before the spring of 2009 and are in the internal buffer zone surrounding a public water system, flowback and stimulation fluids must be contained within tanks that are either on the well pad or in an area with downgradient perimeter berming. Berms or other containment |

| | devices must be constructed around crude oil, condensate, and produced water storage tanks. Tanks containing oil, condensate, or produced water with greater than 3,500 mg/l total dissolved solids shall have secondary containment sufficient to hold the contents of the largest single tank and enough freeboard for precipitation. *2 Colo. Code Regs. §§ 404-1(317B, 604, 902, 906) (2012).* |
|---|---|
| ND | When necessary to prevent pollution of the land surface and freshwaters, the state may require the drill site to be sloped and diked. Pits containing drill cuttings and other solids must be diked so as to prevent surface water from running into the pit. Dikes must be erected and maintained around oil tanks at any production facility and saltwater tanks at any saltwater handling facility built or rebuilt on or after July 1, 2000, within 30 days after the well has been completed. Dikes must be erected and maintained around tanks and facilities built earlier when deemed necessary by the state. Dikes as well as the base material under the dikes and within the diked area must be constructed of sufficiently impermeable material to provide emergency containment. Dikes must be of sufficient dimension to contain the total capacity of the largest tank plus 1 day's fluid production. The required capacity of the dike may be lowered if need can be demonstrated. Discharged saltwater liquids or brines must be properly removed and may not be allowed to remain standing within or outside of any diked areas. *N.D. Admin. Code 43-02-03-19, -19.4, -49, -53 (2012).* |
| OH | All pits shall have a continuous embankment surrounding them sufficiently above the level of the surface to prevent surface water from entering. In order to protect life, health, and property the state may require where a clear and present hazard exists that any producing equipment at the well-head and related storage tanks be protected by an earthen dike or earthen pit that shall have a capacity sufficient to contain any substances resulting, obtained, or produced in connection with the operation of the related oil or gas well. The dike or pit shall be maintained for the purpose for which it was constructed, and the reservoir within shall be kept reasonably free of water and oil. *Ohio Admin. Code Ann. 1501:9-3-08, 1501:9-9-05 (2012).* |
| PA | • Pits used for temporary containment or the control, storage, and disposal of production fluids must maintain 2 feet of freeboard at all times. If open tanks are used for temporary containment, 2 feet of freeboard must remain at all times unless the tank is provided with an overflow system with sufficient volume. If an open standby tank is used, it shall be maintained with 2 feet of freeboard. If this requirement is violated, the operator immediately shall take the necessary measures to ensure the structural stability of the pit or tank, prevent spills, and restore the 2 feet of freeboard.<br><br>• See above for secondary containment provisions applicable specifically to unconventional wells. In addition, if an owner or operator uses a tank with a capacity of at least 660 gallons or tanks with a combined capacity of at least 1,320 gallons to contain oil produced from a well, the owner or operator shall construct and maintain a dike or other method of secondary containment that satisfies the requirements of certain federal rules[e] around the tank or tanks which will prevent the tank contents from entering waters of this Commonwealth. The containment area shall have capacity sufficient to hold the volume of the largest single tank, plus a reasonable allowance for precipitation based on local weather conditions and facility operation. *25 Pa. Code §§ 78.56, .57, .64 (2012).* |
| TX | A permit to maintain or use a pit for storage of oil field fluids or oil and gas wastes may contain requirements including dike design, overflow warning devices, and leak detection devices. *16 Tex. Admin. Code 3.8 (2012).* |
| WY | Operators are reminded to comply with federal regulations[f] that require facilities to construct appropriate containment or diversionary structures or equipment to prevent discharged oil from reaching waters of the United States. Liquids in pits must be kept at a level that takes into account extreme precipitation events and prevents overtopping and unpermitted discharges. *055-000-004 Code Wyo. R. §§ 1, 4 (2012).* |

**Pit closure requirements**

| CO | All pits unnecessary for further operations, excluding the drilling pit, must be backfilled as soon as possible after the drilling rig is released to conform with surrounding terrain. Drill pits must be closed after drilling and completion activities conclude: no more than 3 months later for crop land, and no more than 6 months for noncrop land. Drilling fluids must be removed from drill pits and soils must meet contaminant concentration levels specified in the rules. Material removed from the pit for drying shall be returned prior to backfilling, and only de minimis amounts may be incorporated into surface material. Dry pits shall be backfilled to return soils to their original relative positions. Subsidence within 2 years must be corrected. On crop land, or within the 100-year floodplain, reclamation shall not form an impermeable barrier in the pit and at least 3 feet of backfill shall be applied over any remaining drilling pit contents. Emergency pits shall be closed and remediated as soon as the initial phase of emergency response operations are complete or process upset conditions are controlled. Upon plugging of a well, all other pits must be backfilled. Pits other than drilling pits must be closed in accordance with a remediation plan approved by the state. General site investigation and remediation requirements include a sensitive area determination, sampling and analysis of soil and groundwater to determine the extent of any contamination, removal and management of exploration and production waste, and remediation of contaminated soil and groundwater. Synthetic liners must be removed and disposed of. Constructed soil liner material may be removed for treatment or disposal, or ripped and mixed with native soils such that it |
|---|---|

| | |
|---|---|
| | continues to meet applicable soil concentration levels. Pits must be backfilled to return the soils to their original relative positions. If there is subsidence, additional topsoil shall be added and the land shall be releveled as close to its original contour as practicable. *2 Colo. Code Regs. § 404-1 (1003, 905, 909, 1004) (2012).* |
| ND | A lined earthen pit or open receptacle may be temporarily used to retain oil, water, cement, solids, or fluids generated in well completion, servicing, or plugging operations. The contents of earthen pits or open receptacles must be removed within 72 hours after operations have ceased and must be disposed of at an authorized facility. Pits must be reclaimed and open receptacles must be removed within 30 days after operations have ceased. Drill cuttings and solids generated during well drilling and completion may be buried in pits provided that the pit can be reclaimed in a way that will prevent pollution of the land surface and freshwaters. Drilling pits must be reclaimed within 30 days after drilling or the expiration of a drilling permit. Reserve pits can be used in certain circumstances to contain certain solids and fluids used and generated during well drilling and completion operations, provided that the pit can be reclaimed in a manner that will prevent pollution of the land surface and freshwaters. Reserve pits must be reclaimed within a year of the completion of a shallow well or prior to drilling below the surface casing shoe on any other well. Prior to reclaiming a pit, approval of a pit reclamation plan must be obtained from the state. Any water or oil accumulated on the pit must be removed prior to reclamation. Drilling waste shall be encapsulated in the pit and covered with at least 4 feet of backfill and topsoil and surface sloped, when practicable, to promote surface drainage away from the reclaimed pit area. In certain circumstances, the state may impose more stringent reclamation requirements for pits. *N.D. Admin. Code 43-02-03-19.3, -19.4, -19.5 (2012).* |
| OH | Each drilling permit issued in an urbanized area will be conditioned on the state receiving direct notification a minimum of 48 hours prior to pit closure. Pits may be used for the temporary storage of saltwater and oil field wastes but no pit may be used for the ultimate disposal of saltwater. Saltwater and oil field wastes must be drained or removed and properly disposed of periodically, at intervals not to exceed 180 days. Pits may be used for the temporary storage of frac-water and other liquid substances produced from the fracturing process, but upon termination of the fracturing process, pits not otherwise permitted shall be emptied, the contents disposed of and the pits filled in, unless this requirement is waived or extended. Within 14 days after the date upon which the drilling of a well is completed to total depth in an urbanized area and within 2 months after the date upon which the drilling is completed in all other areas, the owner or his agent, in accordance with a restoration plan filed with the state, must fill all the pits for containing brine and other waste substances resulting, obtained, or produced in connection with exploration or drilling for oil or gas that are not required by other state or federal law or regulation. *Ohio Admin. Code Ann. 1501:9-1-02, -3-08 (2012); Ohio Rev. Code Ann. § 1509.072 (2012).* |
| PA | Generally, pits used for temporary containment must be removed or filled within 9 months after completion of drilling or within 90 days of construction for pits used during servicing, plugging, and recompleting. Upon abandonment of a well, the operator shall restore pits used to store production fluids by removing and disposing of the contents of the pit, including the liner. The pit shall be backfilled to the ground surface. Dewatered, uncontaminated drill cuttings may be buried at the site where they were generated in structurally sound pits. The pit must be backfilled to the ground surface. Residual waste,[9] including contaminated drill cuttings, may be buried at the site where it was generated in structurally sound, impermeable, lined pits. Free liquid must be removed from the pit prior to waste encapsulation and a liner must cover the contents so that water does not infiltrate. The pit shall be backfilled to at least 18 inches over the top of the liner. Residual waste may not be disposed of at the well site if it exceeds specified concentrations. In all cases, backfilled pits must be graded to promote runoff with no depressions. The stability of backfilled pits must be compatible with the adjacent land. The surface of the backfilled pit must be revegetated or otherwise stabilized against accelerated erosion consistent with land use. *25 Pa. Code §§ 78.56, .57, .61, .62 (2012).* |
| TX | A person who maintains or uses a reserve pit, mud circulation pit, fresh makeup water pit, fresh mining water pit, completion/workover pit, basic sediment pit, flare pit, or water condensate pit shall dewater, backfill, and compact the pit. Reserve pits and mud circulation pits must be closed within a year of the completion of drilling operations; if they contain fluids exceeding a certain chloride concentration, they must be dewatered within 30 days. All completion/workover pits shall be dewatered within 30 days and closed within 120 days of well completion or workover. Basic sediment pits, flare pits, freshwater pits, and water condensate pits shall be dewatered and closed within 120 days of cessation of use. The state may require that pits be backfilled sooner if oil and gas wastes or oil field fluids are likely to escape from the pit or the pit is being used for improper storage or disposal of oil and gas wastes or oil field fluids. Prior to backfilling, all oil and gas wastes which are in the pit must be disposed of. *16 Tex. Admin. Code 3.8 (2012).* |

| WY | If the pit is proposed to be closed through the usual method of on-site natural evaporation and subsequent burial of solids, if pit treatment procedures are going to be applied, or if closure plans have changed from the original proposal, or any time wastes are disposed off-site, a notice must be submitted and approved prior to closure. Oil and Gas Conservation Commission staff must be provided the opportunity to witness closure. Verbal notice of at least 24 hours prior to closure is required. Oil, water, and other fluids must be immediately removed from temporary emergency pits and disposed. Trenching or squeezing pits is expressly prohibited. Burial methods cannot compromise the integrity of manufactured, soil mixture, or recompacted clay liners without written approval. Closure standards and testing requirements for all pits will be determined by the state based on site-specific conditions. Pit solids showing high concentrations of salt must be removed from the location and disposed in a permitted facility, encapsulated, or chemically or mechanically treated. When drilling with oil-based muds, oil-based mud solids must be removed and disposed in a permitted facility; solidified using a commission-approved commercial pit treatment, roadspread, landspread, landfarmed; or, bioremediated. Burial after encapsulation or solidification will be approved if the stabilized mixture contains less than 10 mg/l leachable oil and less than 5,000 mg/l leachable dissolved solids. Reserve pits containing oil, sheens, condensate, other hydrocarbons or chemicals proven to be hazardous shall undergo fluid removal as soon as practical or shall be fenced and netted to avoid loss of animals and birds. The state may require testing of wastes and additional disposal requirements prior to closure of a pit if it has reason to believe exempt exploration and production wastes have been commingled with hazardous wastes. An Operator or Owner wishing to treat pits for closure must submit to the commission a plan outlining the objectives that the treatment is designed to achieve. Production pit areas and reserve pits will be reclaimed after they have dried sufficiently following the removal of any oil, sheens, or other hydrocarbons, or if they contain hazardous chemicals. Pits used solely for water retention in coalbed methane areas in the Powder River Basin may be left open with state approval at the landowner's request. *055-000-004 Code Wyo. R. § 1 (2012).* |

Source: GAO analysis of state information.

[a]Generally, operations may not occur at all within the internal buffer zone surrounding a public water system, so pits may not be located there either.

[b]A coastal natural resource areas include coastal barriers, coastal historic areas, coastal preserves, coastal shore areas, coastal wetlands, critical dune areas, critical erosion areas, gulf beaches, hard substrate reefs, oyster reefs, submerged lands, special hazard areas, submerged aquatic vegetation, tidal sand or mud flats, water in the open Gulf of Mexico, or water under tidal influence, as these terms are defined in Texas law.

[c]In addition, according to Texas state officials, permit applications for waste management are evaluated to determine proximity to sensitive areas and may be denied if the proposed facility is to be located in or near a sensitive area. "Sensitive areas" are "defined by the presence of factors, whether one or more, that make an area vulnerable to pollution from crude oil spills. Factors that are characteristic of sensitive areas include the presence of shallow groundwater or pathways for communication with deeper groundwater; proximity to surface water, including lakes, rivers, streams, dry or flowing creeks, irrigation canals, stock tanks, and wetlands; proximity to natural wildlife refuges or parks; or proximity to commercial or residential areas." 16 Tex. Admin. Code § 3.91 (2012).

[d]Freeboard is the height that is above the recorded highwater mark of a structure associated with a body of water and that is an allowance against overtopping by waves or other transient disturbances.

[e]40 C.F.R. pt. 112 (2011) (relating to oil pollution prevention).

[f]40 C.F.R. pt. 112 (2011) (relating to oil pollution prevention).

[g]"Residual waste" means any garbage, refuse, other discarded material or other waste including solid, liquid, semisolid, or contained gaseous materials resulting from industrial, mining and agricultural operations and any sludge from an industrial, mining or agricultural water supply treatment facility, waste water treatment facility or air pollution control facility, provided that it is not hazardous.

**Table 18: Selected State Requirements—Waste Management through Underground Injection[a]**

**Requirements regarding existing wells**

| | |
|---|---|
| CO | Application for a well shall include (1) plan of the area within 1/4 mile of the proposed disposal well showing the location of all oil and gas wells, domestic and irrigation wells of public record; and (2) the identification of all oil and gas wells currently producing from the proposed injection zone within 1/2 mile of the disposal zone. Remedial action shall be required for any well within one-quarter (1/4) mile of the proposed disposal well in which the injection zone is not adequately confined. The application must identify the need for such remedial action and a plan for the performance of such work. *2 Colo. Code Regs. § 404-1 (325) (2012).* |
| ND | Applications must include a plat of the area of review (1/4-mile radius) and detailing the location, well name, and operator of all wells in the area of review. The plat should include all injection wells, producing wells, plugged wells, abandoned wells, drilling wells, dry holes, and water wells. The application is also to identify the need for corrective action on wells penetrating the injection zone in the area of review. Before injection commences in an underground injection well, the applicant must complete any needed corrective action on wells penetrating the injection zone in the area of review. *N.D. Admin. Code 43-02-05-04 (2012).* |
| OH | Application to include a map showing the geographic location of all wells penetrating the formation proposed for injection, regardless of status, within the area of review (¼ mile to ½ mile from the well depending on its volume). Application must also include a proposed corrective action of wells penetrating the proposed injection formation or zone within the area of review, if required to ensure the injection well will not cause or allow movement of fluid into a source of underground water. *Ohio Admin. Code Ann. 1501:9-3-06, 9-3-12 (2012).[b]* |
| PA[c] | Operator must identify the location of all known wells in the area of review that penetrate the injection zone (or for wells operating over the fracture pressure of the injection formation, all known wells in the area of review penetrating formations affected by the increase in pressure). For such wells that are improperly sealed, completed, or abandoned, the operator shall also submit a plan of actions necessary to prevent movement of fluid into underground sources of drinking water ("corrective action"); status of corrective actions is considered in permit review and a compliance schedule may be a permit condition.[d,e] *40 C.F.R. §§ 144.31, 144.55, 146.7, 146.24 (2012).* |
| TX | Applicants shall, based on review of the public record, identify wells that penetrate the proposed disposal zone within a 1/4 mile radius of the proposed disposal well to determine if all abandoned wells have been plugged in a manner that will prevent the movement of fluids from the disposal zone into freshwater strata, and identify any wells which appear to be unplugged or improperly plugged and any other such wells of which the applicant has actual knowledge; unless a variance is granted. (No specific regulatory provision for corrective action.[f]) *16 Texas Admin. Code § 3.9 (2012).* |
| WY | Application to include plan showing the location of the disposal well or wells, including abandoned and drilling wells and dry holes; and investigation of mechanical conditions of all wells which have penetrated the disposal zone within 1/4 mile radius of the proposed disposal well. *Wyo. Code R. 055-000-004 § 5 (2012).* |

**Casing/cementing**

| | |
|---|---|
| CO | No specific requirements for disposal wells, but applications must include information on casing and cement bond log.[g,h] (See also integrity testing.) *2 Colo. Code Regs. § 404-1 (325) (2012).* |
| ND | All injection wells shall be cased and cemented to prevent movement of fluids into or between underground sources of drinking water or into an unauthorized zone. The casing and cement used in construction of each new injection well shall be designed for the life expectancy of the well. In determining and specifying casing and cementing requirements, all of the following factors shall be considered:<br>• depth to the injection zone,<br>• depth to the bottom of all underground sources of drinking water,<br>• estimated maximum and average injection pressures,<br>• fluid pressure,<br>• estimated fracture pressure, and<br>• physical and chemical characteristics of the injection zone.<br>*N.D. Admin. Code 43-02-05-06 (2012).* |

| OH | Surface casing shall be free of apparent defects and set at least 50 feet below the deepest underground source of water containing less than 10,000 mg/L chlorides, and sealed by circulating cement to the surface under the supervision of the state. Casing to be mechanically centralized and enclosed in cement to a height no less than 300 feet above the top of the injection zone. The cement bond log or cement records are to be submitted, or the state is to verify the number of sacks of cement. State inspector to be notified in advance. *Ohio Admin. Code Ann. 1501:9-3-05 (2012).* |
|---|---|
| PA | Wells shall be cased and cemented to prevent movement of fluids into or between protected aquifers.[i] Surface casing shall be installed and cemented from the surface to at least 50 feet below the base of the lowermost protected aquifer, and for brine disposal wells, install long string casing and tubing extending to the injection zone and cement to a point 50 feet above the injection zone. Design shall consider the depth to injection zone, depth to the bottom of the aquifer, and the estimated injection pressures. *40 C.F.R. §§ 146.22, 147.1955 (2012).* |
| TX | Disposal wells shall be cased and the casing cemented in such a manner that the injected fluids will not endanger oil, gas, geothermal resources, or freshwater resources. Disposal wells must meet casing and cementing requirements for production wells, such as:<br><br>• use of pressure-tested steel casing;<br>• anchoring of casing;<br>• all usable-quality water zones must be isolated and sealed off to effectively prevent contamination or harm;<br>• requirements for surface, intermediate, and production casing;<br>• cementing by the pump and plug method; and<br>• pressure-test standards during cementing.<br><br>*16 Texas Admin. Code §§ 3.9, .13 (2012).* |
| WY | Disposal wells shall be cased and the casing cemented in such a manner that damage will not be caused to oil, gas, or freshwater sources. The disposal application shall include a description of the casing in the disposal well or wells, or the proposed casing program and the proposed method for testing casing before use of the disposal well or wells. *Wyo. Code R. 055-000-004 § 5 (2012).* |

**Operating pressure requirements**

| CO | Operator to indicate operating pressures on application. Maximum injection pressure will be set by the Director upon approval. *2 Colo. Code Regs. § 404-1 (325) (2012).* |
|---|---|
| ND | Injection pressure at the wellhead shall not exceed a maximum that shall be calculated so as to assure that the pressure in the injection zone during injection does not initiate new fracture or propagate existing fractures in the confining zone adjacent to the freshwater resource. In no case shall injection pressure initiate fractures in the confining zone or cause the movement of injection or formation fluids into an underground source of drinking water. *N.D. Admin. Code 43-02-05-09 (2012).* |
| OH | The maximum allowable operating pressure for any injection well shall be determined by a formula or method approved by the state. Under no circumstances shall liquids or waste matter from any source, other than saltwater from oil and gas operations or standard well treatment fluid, be injected into any injection well. *Ohio Admin. Code Ann. 1501:9-3-07, -08 (2012).* |
| PA | Injection pressure shall not exceed maximum calculated to prevent new or propagation of fractures in the confining zone and shall not cause movement of injection or formation fluids into a protected aquifer. *40 C.F.R. §§ 144.51, 146.23 (2012).* |
| TX | Authorized pressure based on pressure test; regulations do not specify limit or formula. *16 Texas Admin. Code § 3.9 (2012).* |
| WY | Regulations do not specify limit or formula.[j] |

**Monitoring/reporting requirements**

| CO | Monthly reports are required, and are to include: types of chemicals used to treat injection water; the date of initial fluid injection for new injection wells; and the type and amount of fluids. Operators must record and report the volume of produced water; the volume of water injected into a Class II dedicated injection well; and the volume of water injected and produced in simultaneous injection wells. *2 Colo. Code Regs. §§ 404-1 (316A, 330) (2012).* |
|---|---|

| ND | The operator of an injection well shall meter or use an approved method to keep records and shall report monthly, including: |
|---|---|

- volume and nature (produced water, makeup water, etc.) of the fluid injected,
- the injection pressure, and
- such other information as may be required.

Reports are required after completion or recompletion, or any remedial work that includes a detailed account of all work done, including the reason for the work; the date; the shots per foot, and size and depth of perforations; the quantity of sand, crude, chemical, or other materials employed in the operation; the size and type of tubing; the type and location of packer; the result of the packer pressure test; and other pertinent information that affects the status of the well. *N.D. Admin. Code 43-02-05-12 (2012).*

| OH | Operator to monitor injection pressures and injection volumes daily, with average and maximum pressures and volumes compiled monthly and filed annually. (See also mechanical integrity testing.) *Ohio Admin. Code Ann. 1501:9-3-07 (2012).*[b] |
|---|---|
| PA | Permits are to specify monitoring requirements, including: |

(1) representative monitoring of the nature of injected fluids;

(2) observation of injection pressure, flow rate, and cumulative volume (at specified frequencies depending on type of well and activity); and

(3) recording of injection pressure, flow rate and cumulative volume at least monthly.

Results are to be summarized in an annual report. *40 C.F.R. §§ 144.54, 146.23 (2012).*

| TX | The operator shall monitor the injection pressure and injection rate of each disposal well monthly and report results annually. The operator shall report within 24 hours any significant pressure changes or other monitoring data indicating the presence of leaks in the well. *16 Texas Admin. Code § 3.9 (2012).* |
|---|---|
| WY | Operators shall report the type and source of the injected substance, the total amount injected, and the injected pressures and casing-tubing annulus pressure during injection. *Wyo. Code R. 055-000-004 § 10 (2012).* |

**Mechanical integrity testing**

| CO | Mechanical integrity tests are required initially and every 5 years to determine if there is:(1) a significant leak in the casing, tubing, or packer of the well, by pressure test, monthly pressure monitoring, or other approved test; and (2) any significant fluid movement into an underground source of drinking water through vertical channels adjacent to the wellbore, by tracer surveys, cement logs, temperature surveys, or other approved test. *2 Colo. Code Regs. § 404-1 (326) (2012).* |
|---|---|
| ND | Operator of a new injection well must demonstrate the mechanical integrity of the well prior to commencing operations, and at least once every 5 years. An injection well has mechanical integrity if: (1) there is no significant leak in the casing, tubing, or packer (demonstrated via a pressure test with liquid or gas, monitoring of positive annulus pressure following a valid pressure test, or a radioactive tracer survey); and (2) there is no significant fluid movement into an underground source of drinking water or an unauthorized zone through vertical channels adjacent to the injection bore (demonstrated via a log from which cement can be determined or well records demonstrating the presence of adequate cement to prevent such migration or a radioactive tracer survey, temperature log, or noise log). *N.D. Admin. Code 43-02-05-07 (2012).* |
| OH | Mechanical integrity to be documented by monitoring the annulus between the casing and tubing during injection of fluids at least monthly at a pressure sufficient to detect leaks, and reported annually. If such monitoring is not feasible, then once every 5 years the operator shall conduct mechanical integrity tests by pressure test, tracer surveys, noise logs; temperature surveys; or other approved test. *Ohio Admin. Code Ann. 1501:9-3-07 (2012).*[b] |
| PA | Mechanical integrity to be established prior to initial injection and tested once every 5 years: |

(1) must demonstrate absence of leaks by either monitoring of annulus pressure or pressure test with liquid or gas; (2) must demonstrate no significant fluid movement by results of a temperature or noise log; or cementing records demonstrating the presence of adequate cement to prevent such migration. *40 C.F.R. §§ 144.51,146.8, 146.23 (2012).*

| TX | The mechanical integrity of a disposal well shall be evaluated by conducting pressure tests to determine whether the well tubing, packer, or casing have sufficient mechanical integrity to meet the prescribed performance standards. Each disposal well shall be tested for mechanical integrity prior to initial use, at least once every 5 years, and after every workover of the well. Mechanical integrity to be demonstrated by pressure test, or an approved alternate method such as tubing-casing annular pressure monitoring. The operator shall notify the Railroad Commission at least 48 hours prior to the testing. A complete record of all tests shall be filed within 30 days after the testing. *16 Texas Admin. Code § 3.9 (2012).* |
|---|---|

**Appendix IX: Selected State Requirements**

| | |
|---|---|
| WY | Mechanical integrity must be established by pressure testing at least once every 5 years to determine whether significant leaks are present in the casing, tubing, or packer. The initial mechanical integrity test for all disposal wells shall include one of the following tests to determine whether there are significant fluid movements in vertical channels adjacent to the wellbore:<br><br>• tracer surveys;<br><br>• cementing records with a cement bond log or other acceptable cement evaluation log;<br><br>• temperature surveys; or,<br><br>• any other test or combination of tests approved by EPA.<br><br>Operators must provide the Oil and Gas Conservation Commission the opportunity to witness all integrity tests. If not witnessed, the Operator is required to provide documentation of the test to the commission. If normal testing, surveys, or monitoring schedules provide inconclusive proof of mechanical reliability, the commission shall require that other appropriate logs or additional well tests be performed. *Wyo. Code R. 055-000-004 § 5 (2012).* |

**Approval prior to operation**

| | |
|---|---|
| CO | Yes. Each injection well must satisfactorily pass a mechanical integrity test prior to application approval and be approved prior to injection. *2 Colo. Code Regs. §§ 404-1 (325, 326) (2012).* |
| ND | Unclear. Prior to commencing operations, the operator of a new injection well must demonstrate the mechanical integrity of the well. Regulations do not specify approval. *N.D. Admin. Code 43-02-05-07 (2012).* |
| OH | Yes. Initial pressure testing of annulus between the tubing and the casing outside the tubing, under supervision of state, required prior to commencing injection. *Ohio Admin. Code Ann. 1501:9-3-05 (2012).* |
| PA | Yes, unless alternative schedule approved by EPA. *40 C.F.R. § 144.51 (2012).* |
| TX | Mechanical integrity of each disposal well shall be demonstrated prior to initial use. *16 Texas Admin. Code § 3.9 (2012).* |
| WY | Unclear. Testing required prior to operation. Regulations do not specify approval. *Wyo. Code R. 055-000-004 § 5 (2012).* |

**Plugging**

| | |
|---|---|
| CO | The operator must obtain approval from the Director of the plugging method prior to plugging and shall notify the Director of the estimated time and date the plugging operation of any well is to commence and identify the depth and thickness of all known sources of groundwater. Abandoned wells must be plugged in such a manner that oil, gas, water, or other substance shall be confined to the reservoir in which it originally occurred. Any cement plug shall be a minimum of 50 feet in length and shall extend a minimum of 50 feet above each zone to be protected. The top of the pipe must be sealed with either a cement plug and a screw cap, or cement plug and a steel plate welded in place or by other approved method, or marked with a permanent monument. All final reports of plugging and abandonment shall be submitted on a Well Abandonment Report and accompanied by a job log or cement verification report from the plugging contractor specifying the type of fluid used to fill the wellbore, type and slurry volume of American Petroleum Institute Class cement used, date of work, and depth the plugs were placed. *2 Colo. Code Regs. § 404-1 (319) (2012).* |
| ND | Well must be plugged with cement or other types of plugs, or both, in a manner that will not allow movement of fluids into an underground source of drinking water. The operator shall file a notice of intention to plug and obtain approval of the plugging method prior to the commencement of plugging operations. *N.D. Admin. Code 43-02-05-08 (2012).* |
| OH | Abandoned wells shall be plugged in such a manner that oil, gas, water, or other fluids shall be confined to the reservoir rock in which it occurs or originates. All Class II saltwater injection, enhanced recovery and Class III solution mining wells must be plugged with cement. Operators may use any method of emplacing the plugging material approved by the state but not limited to dump bailer, bullhead, pumping through tubing, casing, or drill pipe. Regulations specify intervals, including but not limited to:<br><br>• Wells must be plugged from total depth or a minimum of 50 feet below the base of the lowest reservoir rock penetrated to a minimum of 200 feet above the top of the lowest reservoir rock penetrated.<br><br>• From a minimum of 100 feet below to a minimum of 100 above the base of the surface casing.<br><br>• From a minimum of 100 feet below the grade level to 30 inches below grade level.<br><br>Each plugging operation shall be conducted under the supervision of an inspector. When plugging operations are not witnessed by an inspector, a plugging report is required. *Ohio Admin. Code Ann. 1501:9-11-03, -04, -08, -12 (2012).* |

| PA | Operator must submit plugging plan consistent with requirements. Well shall be plugged with cement to not allow the movement of fluids either into or between protected aquifers; allowed methods include (i) the Balance method; (ii) the Dump Bailer method; (iii) the Two-Plug method; or (iv) an approved comparable alternative. Report required within 60 days of plugging, certifying compliance or providing updated plan. *40 C.F.R. §§ 144.32, 144.51, 146.10 (2012).* |
|---|---|
| TX | Disposal wells shall be plugged upon abandonment. Disposal wells must meet plugging requirements for production wells, such as<br><br>• insure that all formations bearing usable quality water, oil, gas, or geothermal resources are protected;<br><br>• cement plugs shall be set as necessary to separate multiple usable quality water strata by placing the required plug at each depth as determined by the Texas Commission on Environmental Quality;<br><br>• cement plugs shall be placed by the circulation or squeeze method through tubing or drill pipe;<br><br>• additional requirements for cement and cementing; and<br><br>• mud-laden fluid of at least 9-1/2 pounds per gallon with a minimum funnel viscosity of 40 seconds shall be placed in all portions of the well not filled with cement.<br><br>The operator shall give the Railroad Commission advance notice of its intention to plug, and shall not commence the work until the proposed procedure has been approved. All cementing operations during plugging shall be performed under the direct supervision of the operator or his authorized representative. *16 Texas Admin. Code § 3.9, 3.14 (2012).* |
| WY | Wells must be plugged in a manner sufficient to properly protect all freshwater bearing formations and possible or probable oil or gas bearing formations. Plugging must be accomplished by the following:<br><br>• All cement and additives shall consist of API class cement and additives;<br><br>• Wells with production casing must be plugged by placing cement plugs of at least 100 foot length at least every 2,500 feet, in the base of the surface casing, and at least 100 feet inside the casing at the surface. If multiple casing strings are present, a minimum 100-foot plug must be placed in the annulus between each casing string at the outside casing shoe, and a minimum 100-foot plug in each annulus at the surface.<br><br>• Regulations include other conditions of plugging, including requirements related to cement volume, perforations, and casing.<br><br>Verbal approval to plug and abandon must be obtained prior to commencing actual plugging operations. When the well has been plugged, a notarized Subsequent Report of Abandonment accompanied by a job log or cement verification report from the plugging contractor specifying the type of fluid used to fill the wellbore, type of slurry volume of API Class cement used, date of work, and depth of plugs placed must be submitted to the Oil and Gas Conservation Commission. *Wyo. Code R. 055-000-003 § 18 (2012).* |

**Seismicity**

| CO | None identified. According to Colorado Oil and Gas Commission documents, its UIC permit review process was expanded in September 2011 to include a review for seismicity by the Colorado Geological Survey, and if historical seismicity is identified in the vicinity, the commission may require an operator to define the seismicity potential and the proximity to faults through geologic and geophysical data prior to any permit approval.[l] |
|---|---|
| ND | The application plan should depict faults, if known or suspected. All new injection wells shall be sited in such a fashion that they inject into a formation which has confining zones that are free of known open faults or fractures within the area of review. *N.D. Admin. Code 43-02-05-04, -05 (2012).* |
| OH | None identified.[b] |
| PA | Wells must be sited to inject into a formation which is separated from any protected aquifer by a confining zone that is free of known open faults or fractures within the area of review, which is either calculated or a minimum area within ¼ mile radius of the well. Applicant must identify faults if known or suspected within the area of review. *40 C.F.R. §§ 146.3, .6, .22, .24 (2012).* |
| TX | None identified. |
| WY | None identified. |

Appendix IX: Selected State Requirements

aRequirements shown generally apply to new wells permitted after the early 1980s. Existing Class II wells, and new wells built in existing fields, were generally authorized by rule for up to five years from the effective date of the initial program, subject to conditions and requirements such as submission of inventory information. In Colorado, existing Class II enhanced recovery or hydrocarbon storage wells may be authorized by rule for the life of the well. Ohio requirements for annular disposal wells, enhanced recovery wells, and hydrocarbon storage wells may differ from those shown in this table.

bOhio Department of Natural Resources identified several reforms to its Class II deep injection well program, and proposed revisions to key regulations (1501:9-3-06, 9-3-07) including changes to application, testing, and monitoring requirements. See Ohio Department of Natural Resources, Preliminary Report on the Northstar 1 Class II Injection Well and the Seismic Events in the Youngstown, Ohio, Area (March 2012). In July 2012, the governor of Ohio signed an executive order determining that an emergency existed requiring the immediate adoption of the proposed rules. Rules filed as emergency rules remain in effect for 90 days, during which time Ohio Department of Natural Resources must go through the regular rule filing procedure. The emergency rules are undergoing public comment through August 31, 2012. Because the emergency rules are still subject to change through these processes, the table shows requirements as of June 2012, and does not reflect the emergency revisions.

cEPA implements the UIC program in Pennsylvania, so the table shows federal requirements applicable in the state of Pennsylvania.

dRequirements shown generally apply to new wells. Existing Class II wells were generally authorized by rule for up to five years from the effective date of the initial program, subject to conditions and requirements such as submission of inventory information. 40 C.F.R. § 144.21 (2011). EPA officials said the expectation was that existing Class II wells authorized by rule for 5 years and allowed to continue operations until permitted would eventually apply for and operate under a permit. In Pennsylvania, the effective date of the federal UIC program was June 25, 1984.

eSee generally 40 C.F.R. §§147.1951-1955, 144.1(f), pts. 144, 146 (2012).

fAccording to Texas state officials, however, every injection well permit includes a condition that states that "should it be determined that such injection fluid is not confined to the approved interval, then the permission given herein is suspended and the disposal operation must be stopped until the fluid migration from such interval is eliminated."

gEnhanced recovery or storage wells (e.g., wells used for injection of fluids into the producing formation) shall be cased with safe and adequate casing or tubing so as to prevent leakage, and shall be so set or cemented that damage will not be caused to oil, gas or freshwater resources. 2 Colo. Code Regs. § 404-1-404.

hSee also 40 C.F.R. § 147.305(d) (providing additional casing and cementing requirements that may be imposed by the EPA Regional Administrator).

iIn this table, "protected aquifer" refers to underground sources of drinking water; however, EPA UIC regulations define underground sources of drinking water as a subset of aquifers, namely an aquifer or its portion: (a)(1) Which supplies any public water system; or (2) which contains a sufficient quantity of groundwater to supply a public water system; and (i) currently supplies drinking water for human consumption; or (ii) contains fewer than 10,000 mg/l total dissolved solids; and (b) which is not an exempted aquifer. 40 C.F.R. § 144.3 (2011). EPA estimates there are approximately 1,000-2,000 exempted portions of aquifers.

jDisposal well permit applicants, are, however, required to submit evidence and data to support a state finding that the proposed disposal well will not initiate fractures through the overlying strata or confining zone which could enable the injection fluid or formation fluid to enter the freshwater strata. Wyo. Code R. 055-000-004 § 5 (2012). According to Wyoming state officials, pressure limits were administratively set on all injection wells existing before Nov. 22, 1982, and were set by orders on all Class II wells permitted after that time.

kOnly the initial tests are required for simultaneous injection wells. A simultaneous injection well is a well in which water produced from oil and gas producing zones is injected into a lower injection zone and such water production is not brought to the surface. 404-1-100.

lSee Colorado Oil and Gas Commission, COGCC Underground Injection Control and Seismicity in Colorado (Jan. 19, 2011).

GAO-12-874  Unconventional Oil and Gas Development

**Table 19: Selected State Requirements—Managing Air Emissions**

**Requirements related to hydrogen sulfide gas (H$_2$S)**

| | |
|---|---|
| CO | When well servicing operations take place in zones known to or reasonably expected to contain at or above 100 parts per million of H$_2$S, the operator shall file a H$_2$S drilling operations plan. Any gas analysis indicating the presence of H$_2$S shall be reported to the state and local government. *2 Colo. Code Regs. § 404-1(607) (2012).* |
| ND | Production facilities that emit sulfur compounds are subject to registration and reporting requirements. Anticipated H$_2$S content in produced gas from a proposed source of supply must be included in the application for permit to drill. The owner or operator of any oil or gas well production facility shall install equipment necessary to ensure that emissions comply with ambient air quality standards, including, but not limited to, H$_2$S. Each gas used for treating gas containing H$_2$S must be equipped and operated with an automatic ignitor or a continuous burning pilot that must be maintained in good working order. This is required even if the flare is used for emergency purposes only. Routine inspections and maintenance of tanks, hatches, compressors, vent lines, pressure relief valves, packing elements, and couplings must be conducted to minimize emissions from equipment used for gas containing H$_2$S. Tank hatches must hold a positive working pressure or must be repaired or replaced. *N.D. Admin. Code 33-15-20-01,-02, -04; 43-02-03-16 (2012).* |
| OH | A well that yields H$_2$S must be plugged with sulfate-resistant cement. In urbanized areas where there is a known occurrence of shallow gas or H$_2$S, drilling on site may not be permitted, fluid drilling shall be required. During drilling, the state inspector shall require converting to fluid drilling where there is an imminent threat to safety of the rig crew and/or the public. *Ohio Admin. Code Ann. 1501:9-11-07, -9-03 (2012).* |
| PA | An operator proposing to drill a well within a 1-mile radius of a well drilled to or through the same formation where H$_2$S has been found while drilling shall install monitoring equipment during drilling at the well site to detect the presence of H$_2$S in accordance with American Petroleum Institute publication API RP49, "Recommended Practices for Safe Drilling of Wells Containing H$_2$S." When H$_2$S is detected in concentrations of 20 parts per million or greater, the well shall be drilled in accordance with API RP49. An operator who operates a well in which H$_2$S is discovered in concentrations of 20 parts per million or greater shall operate the well in a way that presents no danger to human health or to the environment. When an operator discovers H$_2$S in concentrations of 20 parts per million or greater during the drilling of a well, the operator shall notify the state and identify the location of the well and the concentration of H$_2$S detected. The state will maintain a list of all notices that will be available to operators for their reference. *25 Pa. Code § 78.77 (2012).* |
| TX | H$_2$S emissions from source(s) must not exceed a net ground level concentration of 0.08 parts per million averaged over 30 minutes if the downwind concentration affects a residential, business or commercial property.<br><br>Certain storage tanks must be posted with a warning sign on or within 50 feet of the facility; fencing is required when tanks are located inside towns or cities, or where tanks are exposed to the public; tanks are also subject to certain marker and compliance provisions. Operations where the 100 parts per million radius of exposure is greater than 50 feet are subject to warning and marker, security, and materials and equipment provisions. Certain other operations where the radius of exposure includes public areas or is greater than 3,000 feet are also subject to control and equipment safety provisions. Drilling and workover operations where the 100 parts per million radius of exposure is 50 feet or greater are subject to requirements related to protective breathing equipment; wind direction indicators installed; and automatic H$_2$S detection and alarm equipment. Drilling and workover operations where the 100 parts per million radius of exposure includes a public area or is 3,000 feet or greater are subject to additional provisions relating to protective breathing equipment; methods of igniting the gas in the event of an uncontrollable emergency; installation of a choke manifold, mud-gas separator, and flare line and provision of a suitable method for lighting the flare; secondary remote control of blowout prevention and choke equipment; drill stem testing of H$_2$S zones; certificates of compliance; pressure testing of blowout preventers and well control systems; and training. Operators may apply for exceptions. *30 Tex. Admin. Code § 112.31(2012); 16 Tex. Admin. Code § 3.36 (2012).* |
| WY | All flaring operations shall be conducted in a safe and workmanlike manner. If the gas stream is sour or venting would present a safety hazard, a constant flare igniter system or other state approved method to safely manage sour gas may be required. Venting of gas containing H$_2$S content in excess of 50 parts per million is generally not allowed. Venting does not include emissions associated with fugitive losses. State approval is required for venting of gas containing H$_2$S content in excess of 50 parts per million for specific job tasks in controlled environments, such as well repairs, pipeline purging, well failures, decommissioning of facilities, or where necessary as a safety measure where flaring would be dangerous due to the introduction of an ignition source at the work site or when the operation is conducted under the authority and regulations of the Department of Environmental Quality. *055-000-003 Code Wyo. R. § 39 (2012).* |

**Requirements related to venting and flaring**

| | |
|---|---|
| CO | Any gas escaping from the well during drilling operations shall be, so far as practicable, conducted to a safe distance from the well site and burned. The operator shall notify the local emergency dispatch as provided by the local governmental designee of any such flaring. Such notice shall be given prior to the flaring if it can be reasonably anticipated and, in all other cases, as soon as possible but in no more than 2 hours after it occurs. Unnecessary/excessive venting/flaring of natural gas produced from a well is prohibited. Except for gas flared or vented during an upset condition, well maintenance, well stimulation flowback, purging operations, or a productivity test, gas shall be flared or vented only after notice and approval. The notice shall estimate the volume and content of the gas and whether it contains more than 1 parts per million of $H_2S$. If necessary to protect the public health, safety, or welfare, the Director may require the flaring of gas. |

Gas flared, vented, or used on the lease shall be estimated based on a gas-oil ratio test or other approved equivalent test, and reported on Operator's Monthly Production Report. Flared gas shall be directed to a controlled flare or other combustion device operated as efficiently as possible to provide maximum reduction of air contaminants where practicable and without endangering the safety of the well site personnel and the public. Operators shall notify local emergency and government officials prior to flaring when it can be reasonably anticipated, or ASAP, but not more than 2 hours after it occurs.

All salable quality gas shall be directed to the sales line as soon as practicable or shut in and conserved. Temporary flaring or venting shall be permitted as a safety measure during upset conditions and in accordance with all other applicable laws, rules, and regulations. In instances where green completion practices are not technically feasible or are not required, operators shall employ best management practices to reduce emissions. Such best management practices may include measures or actions, considering safety, to minimize the time period during which gases are emitted directly to the atmosphere, or monitoring and recording the volume and time period of such emissions. Such examples could include the flaring or venting of gas. *2 Colo. Code Regs. § 404-1(317, 912, 805) (2012).*

| | |
|---|---|
| ND | Gas produced with crude oil from an oil well may be flared during a 1-year period from the date of first production from the well. Thereafter, flaring of gas from the well must cease and the well must be capped, connected to a gas gathering line, or equipped with an electrical generator that consumes at least 75 percent of the gas from the well. For a well operated in violation of this section, the producer shall pay royalties to royalty owners upon the value of the flared gas and shall also pay gross production tax on the flared gas. A producer may obtain an exemption from this section upon application and a showing that connection of the well to a natural gas gathering line is economically infeasible at the time of the application or in the foreseeable future or that a market for the gas is not available and that equipping the well with an electrical generator to produce electricity from gas is economically infeasible. Pending arrangements for disposition for some useful purpose, all vented casinghead gas shall be burned. Each flare shall be equipped with an automatic igniter or a continuous burning pilot, unless waived by the state for good reason. *N.D. Cent. Code, § 38-08-06.4 (2012); N.D. Admin. Code 43-02-03-45 (2012).* |
| OH | All owners, lessees, or their agents, drilling for or producing crude oil or natural gas, shall use every reasonable precaution in accordance with the most approved methods of operation to stop and prevent waste of oil or gas, or both. Any well productive of natural gas in quantity sufficient to justify utilization shall be utilized or shut in within 10 days after completion. The owner of any well producing both oil and gas may burn such gas in flares when it is necessary to protect the health and safety of the public or when the gas is lawfully produced and there is no economic market at the well for the escaping gas. All gas vented to the atmosphere must be flared, with the exception of gas released by a properly functioning relief device and gas released by controlled venting for testing, blowing down, and cleaning out wells. Flares must be a minimum of 100 feet from the well, a minimum of 100 feet from oil production tanks and all other surface equipment, and 100 feet from existing inhabited structures and in a position so that any escaping oil or condensate cannot drain onto public roads or toward existing inhabited structures or other areas that could cause a safety hazard. In urbanized areas where flaring is expected, permittee shall notify local emergency response officials that such may occur. It is recommended that notice be provided if possible just prior to the expected flaring and/or immediately upon flare ignition. *Ohio Rev.Code Ann. § 1509.20 (2012). Ohio Admin. Code Ann. 1501:9-9-05, -03 (2012).* |
| PA | Excess gas encountered during drilling, completion, or stimulation shall be flared, captured, or diverted away from the drilling rig in a way that does not create a public health or safety hazard. *25 Pa. Code § 78.73 (2012).* |
| TX | Certain gas releases need not be flared, including: releases of gas that are not readily measured such as vapors from crude oil storage tanks; releases of gas from a well that must be unloaded or cleaned-up to atmospheric pressure (limited to 24 continuous hours or 72 hours in 1 month); releases of gas from a facility served by a gas gathering system, compression facility or gas plant (limited to 24 hours unless an exception is granted). Other authorized releases exceeding 24 hours shall be flared unless burning cannot be done safely. Such releases include: gas released for no more than 10 days after initial completion, recompletion in another field, or workover operations in the same field; hydrocarbon gas contained in the waste stream from a membrane unit or molecular sieve used to remove carbon dioxide, $H_2S$, or other contaminants from a gas |

**Appendix IX: Selected State Requirements**

stream, provided that at least 85% of the hydrocarbon gas in the inlet gas stream is recovered and directed to a legal use; low pressure separator gas, not to exceed 15 mcfd of hydrocarbon gas per gas well or 50 mcfd of hydrocarbon gas per commission-designated oil lease or commingling point for commingled operations; releases resulting from cleaning a well of solids or fluids or both for more than 10 producing days following initial completion, recompletion in another field, or workover operations in the same field; releases resulting from unloading excess formation fluid buildup in a wellbore for periods in excess of 24 hours in one continuous event or 72 hours total in 1 calendar month; releases of volumes of low pressure gas that can be measured with devices routinely used in oil and gas exploration, development, and production operations and that are not directed by an operator to a gas gathering system, gas pipeline, or other marketing facility, or other purposes and uses authorized by law due to mechanical, physical, or economic impracticability; for casinghead gas only, releases associated with the unavailability of a gas pipeline or other marketing facility, or other purposes and uses authorized by law; and releases associated with avoiding curtailment of gas production which will result in a reduction of ultimate recovery from a gas well or oil reservoir. *16 Tex. Admin. Code § 3.32 (2012).*

| | |
|---|---|
| WY | Venting or flaring during emergencies or upset conditions; well purging and evaluation tests; or production tests is not waste and is authorized. The state encourages employment of technologies that minimize or prevent venting and flaring during drilling and completion. Unless it is determined that waste is occurring, up to 60 MCF of gas per day is authorized to be vented or flared from individual oil wells. Venting or flaring is authorized either at the well or at a lease facility which serves several wells. An Owner/Operator must apply for retroactive or prospective venting or flaring authorization in other circumstances. Authorization may be granted if the venting or flaring does not constitute waste.*055-000-003 Code Wyo. R. § 39 (2012).* |

Source: GAO analysis of state information.

# Appendix X: Crosswalk between Selected Requirements from EPA, States, and Federal Lands

Table 20 is intended to show representative areas of regulation, focused on substantive requirements specific to oil and gas wells. The table includes EPA's environmental and public health requirements, requirements from the six states included in our review, and additional requirements that apply for the development of federally-owned mineral resources. Other activities at oil and gas well sites may also be subject to federal or state regulation.

**Table 20: Crosswalk between Selected Requirements from EPA, Six States, and Federal Minerals**

| Area of regulation | EPA environmental and public health requirements | Requirements of six states reviewed | Additional requirements for federal minerals |
|---|---|---|---|
| **Siting and site preparation** | | | |
| Comprehensive environmental assessment prior to drilling | No[a] | [b] | Yes |
| Identification or testing of water wells prior to drilling of production wells | No | 1 of 6 (Wyoming) [identification alone]<br><br>2 of 6 (Colorado, Ohio) [identification and testing][c] | Yes – identification<br>No – testing |
| Required setbacks from water sources | No[d] | 5 of 6 (Colorado, North Dakota, Pennsylvania, Ohio, Wyoming) | Yes |
| Erosion control, site preparation, surface disturbance minimization, and stormwater management | Effectively no[e] | 6 of 6 [any]<br><br>4 of 6 (Colorado, North Dakota, Pennsylvania, Wyoming) [stormwater permitting][f] | Yes |
| **Drilling, casing, and cementing** | | | |
| Requirements relating to cementing/casing plans | No[g] | 6 of 6[h] | Yes |
| Prescribed placement of surface casing relative to groundwater zones | No[g] | 6 of 6 | Yes |
| Prescribed cementation techniques for surface casing | No[g] | 6 of 6 | No; instead the Bureau of Land Management (BLM) has performance standards |
| Requirement for cement waiting period and/or integrity tests | No[g] | 6 of 6 | Yes |
| Blowout preventer[i] requirements | No[g] | 5 of 6[j] (Colorado, North Dakota, Pennsylvania, Texas, Wyoming) | Yes |
| **Hydraulic fracturing** | | | |
| Prior authorization/notice/inspection requirements | No | 4 of 6 (Colorado, Ohio, Pennsylvania, Wyoming) | Not currently, but in BLM proposed rule |
| Requirements to disclose information on fracturing fluids | No[k] | 6 of 6 | Not currently, but in BLM proposed rule |

**GAO-12-874  Unconventional Oil and Gas Development**

**Appendix X: Crosswalk between Selected Requirements from EPA, States, and Federal Lands**

| Area of regulation | EPA environmental and public health requirements | Requirements of six states reviewed | Additional requirements for federal minerals |
|---|---|---|---|
| Pressure monitoring, testing, limitations or other mechanical integrity requirements specific to hydraulic fracturing | No | 4 of 6 (Colorado, North Dakota, Ohio, Wyoming) | Not currently, but in BLM proposed rule |
| **Well plugging** | | | |
| Requirements for notification, plugging plan or method, witnessing, and reporting | No[l] | 6 of 6 | Yes |
| Programs to plug wells that are not properly plugged and have been abandoned | No | 6 of 6 | Yes[m] |
| **Site reclamation** | | | |
| Requirements for backfilling, regrading, recontouring, and alleviating compaction of soil | No | 6 of 6 | Yes |
| Revegetation requirements | No | 5 of 6 (Colorado, North Dakota, Ohio, Pennsylvania, Wyoming) | Yes |
| **Waste management** | | | |
| Options for waste disposal: | | | |
|     Underground injection | Yes (Safe Drinking Water Act) | 5 states have their own requirements (Colorado, North Dakota, Ohio, Texas, Wyoming); EPA implements the program in Pennsylvania | In the permit application, operators must describe the final disposal of waste materials. |
|     Direct discharge to surface water | Yes (Clean Water Act— certain discharges prohibited, others subject to conditions and permits) | Surface discharges are allowed in certain cases in 3 western states (Colorado, Texas, Wyoming) | In the permit application, operators must describe the final disposal of waste materials. |
|     Requirements for discharge to publicly-owned treatment works (POTWs) or Centralized Waste Treatment Facilities (CWT) | Pretreatment standards for shale gas wastewater under development (Clean Water Act) | Disposal at POTWs is an option in two states[n] (Ohio, Pennsylvania)<br><br>Disposal at CWT facilities is an option in 3 states (Colorado, Pennsylvania, Wyoming) | In the permit application, operators must describe the final disposal of waste materials. |
|     Recycling or other reuse | Yes (Clean Water Act— certain produced water discharges) | 6 of 6 states allow recycling or other reuse[o] | In the permit application, operators must describe the final disposal of waste materials. |
|     Solid waste disposal | Effectively no[p] | Yes | In the permit application, operators must describe the final disposal of waste materials. |

**Appendix X: Crosswalk between Selected Requirements from EPA, States, and Federal Lands**

| Area of regulation | EPA environmental and public health requirements | Requirements of six states reviewed | Additional requirements for federal minerals |
|---|---|---|---|
| Hazardous waste disposal | Effectively no[q] | No | In the permit application, operators must describe the final disposal of waste materials. |
| Pit siting requirements (with regard to sensitive areas) | No[r] | 6 of 6 | No specific requirements but pits must be approved |
| Pit lining requirements | No | 5 of 6[s] (Colorado, North Dakota, Pennsylvania, Texas, Wyoming) | Not currently, but BLM proposed rule would require liners for pits used to store hydraulic fracturing flowback fluids. |
| Pit closure requirements | No | 6 of 6 | Yes |
| **Managing air emissions** | | | |
| Requirements for criteria pollutants | Certain Clean Air Act provisions apply | 5 of 6 states have permitting or registration programs (Colorado, North Dakota, Ohio, Texas, Wyoming)[t] | No |
| Requirements for hazardous air pollutants | Certain Clean Air Act provisions apply | State permitting or registration programs may address hazardous air pollutants | No |
| Requirements related to hydrogen sulfide gas | No specific requirements[u] | 6 of 6 | Yes |
| Requirements related to flaring | Under new New Source Performance Standards, most hydraulically fractured gas wells must do green completions | 6 of 6 | Yes |

Sources: GAO analysis of federal and state laws and regulations.

[a]Under the National Environmental Policy Act (NEPA), federal agencies must assess the effects of major federal actions—those they propose to carry out or to permit—that significantly affect the environment. Many Environmental Protection Agency (EPA) activities relevant here are exempt from NEPA's procedural requirements by statute or recognition by courts that EPA procedures or environmental reviews under enabling legislation are functionally equivalent to the NEPA process. See 63 Fed. Reg. 58045 (Oct. 29, 1998).

[b]We did not specifically analyze state requirements in this area. However, when asked whether they had a comprehensive environmental assessment process prior to drilling, officials from Ohio, Texas, Pennsylvania, and Wyoming said they did not. Officials in North Dakota said that an environmental assessment is required for drilling on state lands and officials in Colorado said that a location assessment is required, which includes assessing transportation access, future reclamation plans, and determination of whether the proposed location is within a sensitive wildlife habitat.

[c]Testing requirement applies only to certain wells—certain wells near proposed coalbed methane wells in Colorado and wells proposed for urbanized areas or in the vicinity of horizontal wells in Ohio. Pennsylvania does not require operators to identify or test nearby water wells, but state law incentivizes operators to do so by establishing a rebuttable presumption that operators are liable for changes in water quality of certain wells after drilling.

[d]There are no federal requirements regarding setbacks, but under Section 404 of the Clean Water Act, a permit from the U.S. Army Corps of Engineers is required to fill waters of the United States, such as wetlands.

**Appendix X: Crosswalk between Selected
Requirements from EPA, States, and Federal
Lands**

[e]Oil and gas well sites are only required to get permits for stormwater discharges if the facility has had a discharge of contaminated stormwater that includes a reportable quantity of a pollutant or contributes to the violation of a water quality standard, rather than prior to commencing construction or causing discharges.

[f]Ohio and Texas state regulations address stormwater in other ways.

[g]Generally federal environmental laws do not have drilling, cementing, or casing requirements related to drilling production wells. However, according to EPA officials, if the well is to be hydraulically fractured with diesel fuel, it is subject to regulation as a Class II well under the underground injection control (UIC) program authorized by the Safe Drinking Water Act, and be subject to cementing and casing requirements. See 40 C.F.R. §§ 144.52 and 146.22. In May 2012, EPA published draft guidance on how its UIC permit writers should address hydraulic fracturing with diesel in the context of the Class II UIC program. To date, however, EPA officials are unaware of any wells that were regulated in this way.

[h]Colorado, North Dakota, Ohio, Pennsylvania, and Wyoming require cementing/casing plans. Texas requires cementing/casing plans if an operator proposes a method of freshwater protection other than those prescribed by state regulations.

[i]Blowout preventers are devices placed on wells to help maintain control over pressures in the well and prevent the well from spewing oil, gas, or other motion fluids in the case of a blowout.

[j]North Dakota, Texas, and Wyoming require blowout preventers; Colorado and Pennsylvania require blowout preventers in certain circumstances.

[k]Under TSCA, to the extent a hydraulic fracturing fluid is a chemical substance or mixture, manufacturers (including importers), processors, and distributors of such fluids generally would be subject to applicable reporting requirements. Generally, well site operators would not be subject to any such applicable TSCA reporting requirements.

[l]Generally federal environmental laws do not have requirements related to well plugging. However, according to EPA officials, if the well is to be hydraulically fractured with diesel fuel, it is subject to regulation as a Class II UIC well under the SDWA UIC program, as discussed in table note g above.

[m]According to BLM officials, BLM periodically conducts orphan and idle well operations.

[n]Disposal at a POTW is currently available in Pennsylvania and Ohio. Discharges may be authorized from a POTW in Pennsylvania if preceded by treatment at a CWT. The Ohio Environmental Protection Agency recently prohibited disposal at a POTW in the state, but an administrative review commission removed the prohibition as beyond the agency's authority. The Ohio Department of Natural Resources may take separate action to prohibit the practice. We are also aware that the city of Forth Worth, Texas had a pilot program within the last several years under which it accepted flowback for disposal through its POTW, but current information suggests that the city is no longer accepting flowback water.

[o]For example, four states allow operators to reuse certain types of fluid waste for road applications.

[p]The existing federal regulations under RCRA solid waste provisions apply to nonhazardous waste disposal facilities and practices, including those involving oil and gas wastes, and prohibit open dumping of solid waste. However, EPA has a limited role in the enforcement of RCRA solid waste provisions.

[q]Per EPA's 1988 regulatory determination, oil and gas exploration and production wastes—including wastes originating in the well or associated field operations—are not regulated as hazardous. Small amounts of other hazardous waste may be at well sites (such as discarded, unused hydraulic fracturing fluids) but we could not identify any instances where these wastes were available in high enough quantities to trigger RCRA requirements.

[r]Under Section 404 of the Clean Water Act, a permit from the U.S. Army Corps of Engineers is required to fill waters of the United States, such as wetlands.

[s]Colorado, North Dakota, Pennsylvania, and Wyoming have specific pit lining requirements. Texas regulations provide for pit lining requirements to be addressed in permits.

[t]In addition, Pennsylvania is in the process of developing an inventory for oil and gas emissions information.

[u]Although there are no specific requirements, owners and operators are subject to the Clean Air Act general duty clause to take steps to prevent accidental releases of listed and other substances to the air; these include hydrogen sulfide.

# Appendix XI: Comments from the Department of Agriculture

 **United States Department of Agriculture** | **Forest Service** | **Washington Office** | **1400 Independence Avenue, SW Washington, DC 20250**

|                    |          |
|--------------------|----------|
| **File Code:** 1420 |          |
| **Date:**          | AUG 1 5 2012 |

Mr. David Trimble
Director, Natural Resources and Environment
U.S. Government Accountability Office
441 G Street, N.W.
Washington, DC 20548

Dear Mr. Trimble:

Thank you for the opportunity to review and provide comment on the draft U.S. Government Accountability Office (GAO) report on "Unconventional Oil and Gas Development: Key Environmental and Public Health Requirements" (GAO-12-874). The Forest Service has reviewed the report and generally concurs with the information provided in the report and noted that there are no specific recommendations or findings.

Relative to the description of challenges identified by the various agencies, page 70 of the report addresses the Bureau of Land Management challenge of hiring and retaining qualified staff in areas with very active oil and gas development. The Forest Service shares that challenge, especially on the Dakota Prairie Grassland.

We compliment GAO in the use of graphics in the report to facilitate visual display of operations or processes, which are very helpful in understanding quite technical information.

If you have any questions, please contact Thelma Strong, Acting Chief Financial Officer, at 202-205-1321 or tstrong@fs.fed.us.

Sincerely,

THOMAS L. TIDWELL
Chief

**Caring for the Land and Serving People**

Printed on Recycled Paper 

# Appendix XII: Comments from the Department of the Interior



## United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC 20240

AUG 2 0 2012

Mr. David C. Trimble
Director, Natural Resources and Environment
U.S. Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20548

Dear Mr. Trimble:

On July 25, 2012, the Government Accountability Office (GAO) issued a draft report on hydraulic fracturing entitled, *UNCONVENTIONAL OIL AND GAS DEVELOPMENT: Key Environmental and Health Requirements* (GAO-12-874). The GAO made no recommendations to the Department of the Interior (Department). However, the Department offers comments on certain findings and conclusions contained in the report. We believe these additions are necessary to create a fuller public understanding of Departmental initiatives that are otherwise only briefly mentioned in the report.

<u>Proposed Hydraulic Fracturing Rule</u>

The Department appreciates the GAO's recognition of the Bureau of Land Management's (BLM's) proposed rule on hydraulic fracturing, which the report describes briefly (p. 65). This proposed rule is a significant advance toward responsible development of unconventional oil and gas resources on the public lands, with the potential to increase public confidence in its regulation. The BLM's proposed rule focuses on disclosure of chemicals used in the process, well integrity, and management of flowback fluids. We believe that the report would benefit from greater attention to this proposed rule, and therefore request that the GAO address additional information in its discussion of the proposed rule, as detailed below.

*Hydraulic Fracturing Rule Characterization*
Secretary Salazar has placed significant policy and program emphasis on the establishment of a new regulatory framework to assist industry and the BLM in managing hydraulic fracturing on Federal and Tribal lands among the many states in which BLM oversees leasing of the Federal subsurface estate. The BLM currently administers Federal and Indian oil and gas leases across 34 states. BLM regulations on hydraulic fracturing will apply consistently to all leases managed by the BLM, whereas state management of such leases may differ by jurisdiction. Consistent standards governing BLM-managed subsurface will help the Bureau achieve sensible, responsible stewardship of the public estate.

There are three main aspects of the BLM's proposed rule: 1) the requirement for operators to publicly disclose all chemicals used during hydraulic fracturing operations, while protecting trade secrets; 2) the requirement to confirm wellbore integrity before and during the hydraulic fracturing operation; and 3) the requirement to properly manage waters that flow back to the surface from hydraulic fracturing operations. The Department believes this rule will result in

Appendix XII: Comments from the Department
of the Interior

2

significant improvements for the BLM's management of unconventional oil and gas
development on Federal and Indian lands, and increase public confidence in this industry
practice.

*BLM Mission and Framework*
The GAO report should more fully articulate distinctions between BLM and state land
management responsibilities. We suggest adding additional language to the report's description
of the proposed rule on p. 65 to include the following information: Pursuant to the Federal Land
Policy and Management Act (FLPMA) and other applicable laws, the BLM has a mission to
manage the public lands for multiple use and sustained yield, in the national interest. This
imposes stewardship responsibilities that may differ, substantially in many cases, from state
authorities and interests addressed in the report. State lands are often managed solely or
primarily for revenue, and state provisions governing oil and gas activities on state-administered
lands may not address conservation needs and natural resource values, such as air, soil, water,
wildlife, recreation, and cultural and scenic landscapes, in a manner that would satisfy FLPMA's
multiple-use directive. The BLM's multiple-use mission is reflected in the BLM's proposed rule
on hydraulic fracturing, which is intended to improve stewardship and operational efficiency by
establishing a uniform set of standards for hydraulic fracturing practices across the public and
Indian lands.

*Cement Bond Logs and Surface Casing*
The Department also requests that the GAO report more specifically describe the provisions of
the proposed rule relating to well bore integrity and the requirements for cement bond logs and
surface casing. These elements of unconventional gas recovery are of primary importance to
surrounding landowners, stakeholders, and the public, and the Department believes that they
merit further explanation in the report. The BLM's proposed regulations would require that an
operator take the following steps to ensure well bore integrity: 1) run a string of steel pipes
(surface and intermediate casing) across all usable water zones; 2) cement the steel pipes to the
rock formation in a manner that seals all spaces behind the pipe; and 3) use available technology
(e.g., cement bond logs) to verify that there is a secure cement seal between the steel pipes and
the rock formation to avoid fluid migration outside the pipes. Finally, at the conclusion of
drilling and before hydraulic fracturing takes place, the proposed rule would require an operator
to test the steel pipes to ensure that the steel pipe construction is suitable to withstand the force
and pressure to be applied by the hydraulic fracturing activity. The BLM's requirements in the
proposed rule are consistent with the American Petroleum Institute's published guidelines on
industry best practices for mitigating environmental impacts that may be associated with
hydraulic fracturing operations. The BLM will consider public comments on this proposal.

*Aquifer Protection*
The Department also requests that the GAO more specifically articulate the provisions of the
proposed rule relating to the protection of aquifers. The provisions relating to well bore integrity
through casing and cementing isolation, described above, provide important protection for
aquifers. Additionally, the proposed rule includes requirements for operators to submit the
length and height of the hydraulic fractures, both before and after the actual fracturing, so that
the BLM can ensure the safety and zonal isolation integrity of aquifers in the vicinity of the oil

**Appendix XII: Comments from the Department of the Interior**

3

and gas reserves.  Overall, the BLM has taken measures to protect aquifers through the proposed rule's commitment to wellbore integrity, mechanical integrity, and the management of the flowback water (as discussed below).

*Flowback*
The Department also requests that the report include a description of provisions in the proposed rule regarding the collection of information about and management of disposal of flowback water.  Flowback water (fluids recovered after fracturing), if mishandled, can pose a risk to water supply.  The BLM's proposed rule therefore would require that an operator store flowback water in a steel tank and/or a lined pit.  The proposed rule would also mandate that operators estimate the volume of flowback water and report how they will handle it.  The proposed rule would further specify that operators must comply with the BLM's *Onshore Oil and Gas Order Number 7, Disposal of Produced Water*, when managing flowback fluids associated with hydraulic fracturing operations.  The BLM believes that the above steps are necessary to protect water and natural resources at the surface from contamination by hydraulic fracturing.  Further, these steps are consistent with industry practice and guidelines published by the American Petroleum Institute.  Finally, in the proposed rule the BLM reserves the right to place additional restrictions and issue additional guidelines on the handling of flowback water, as appropriate.

Inspection and Enforcement Workforce Strategy Report

The GAO Report also mentions difficulties faced by the BLM in hiring and retaining skilled technical staff (pp.70-71).  A BLM team consisting of field, state, and headquarters staff has reviewed the ongoing issues related to hiring, training, and retaining qualified Petroleum Engineers and Petroleum Engineering Technicians.  The BLM is in the process of developing a report that will provide current information related to these issues and make recommendations for improvements.  We request that the GAO report acknowledge this initiative.

Thank you for the opportunity to comment on this report and its analysis of the important topic of hydraulic fracturing.  In addition to the above comments, we also enclose a number of technical comments.  If you have any questions, please contact Nicholas Douglas, Senior Policy Advisor, at 202-912-7311 or LaVanna Stevenson-Harris, BLM Audit Liaison Officer, at 202-912-7077.

Sincerely,

Ned Farquhar

Ned Farquhar
Deputy Assistant Secretary
Land and Minerals Management

Enclosure

# Appendix XIII: GAO Contact and Staff Acknowledgments

| **GAO Contact** | David C. Trimble, (202) 512-3841 or trimbled@gao.gov |
| --- | --- |
| **Staff Acknowledgments** | In addition to the individual named above, Barbara Patterson, Assistant Director; Elizabeth Beardsley; David Bieler; Antoinette Capaccio; Cindy Gilbert; Armetha Liles; Alison O'Neill; and Janice Poling made key contributions to this report. |

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's website (www.gao.gov). Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to www.gao.gov and select "E-mail Updates." |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, http://www.gao.gov/ordering.htm. <br><br> Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. <br><br> Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **Connect with GAO** | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. Subscribe to our RSS Feeds or E-mail Updates. Listen to our Podcasts. Visit GAO on the web at www.gao.gov. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact: <br><br> Website: www.gao.gov/fraudnet/fraudnet.htm <br> E-mail: fraudnet@gao.gov <br> Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Katherine Siggerud, Managing Director, siggerudk@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |





Natural Gas

# Flowback

HOW THE TEXAS NATURAL
GAS BOOM AFFECTS
HEALTH AND SAFETY

APRIL 2011






# CONTENTS

EXECUTIVE SUMMARY ................................................................................ PAGE 3

INTRODUCTION: An Overview of the Texas Shale Boom ............................................. 4

1. HEALTH AND ENVIRONMENTAL IMPACTS OF DRILLING AND FRACKING ............ 6

2. CASE STUDIES—Poisoned Communities ...................................................... 10

3. CASE STUDIES—Poisoned Families ............................................................. 15

4. CONCLUSIONS AND RECOMMENDATIONS ................................................... 18



This report was prepared by Sharon Wilson, Lisa Sumi, Bill Walker and Jennifer Goldman of Earthworks' Oil & Gas Accountability Project, with technical review by Wilma Subra of Subra Company. We would like to thank the following for their review and comments of the document: Cherelle Blazer, Kathy Chruscielski, Gwen Lachelt, Deborah Rogers, Calvin Tilman, Tammi Vajda, and Don Young. Special acknowledgments go to those personal and community stories told in this document including the Argyle - Bartonville Community Alliance, the Town of Dish, The Parr Family, and Christine and Tim Ruggiero.

Texas Oil & Gas Accountability Project
P.O. Box 470567 Fort Worth, Texas 76147
940-389-1622 • http://texasogap.earthworksaction.org

Texas Oil & Gas Accountability Project is a campaign
of Earthworks • www.earthworksaction.org





## Is the state adequately protecting its citizenry?

### EXECUTIVE SUMMARY

## EXECUTIVE SUMMARY

In the last decade, hydraulic fracturing and other new drilling technologies have turned North Texas into the leading shale gas-producing area in the country. But the drilling boom has brought with it serious concerns over the health and environmental impacts of an industry that uses large volumes of toxic chemicals in close proximity to Texas communities. The search for deposits of shale gas is spreading to other regions of Texas, raising the question of whether the state is adequately protecting its citizens and its resources.

### This investigation by the Earthworks' Texas Oil and Gas Accountability Project concludes that the answer is "No."

We have compiled and collected data on the serious health effects of gas drilling, hydraulic fracturing (e.g., fracking) and production on Texans throughout the Barnett Shale; water contamination and depletion; air pollution and other impacts. We have also documented that the state's present regulations, laws and enforcement policies are far too weak. Not only are the resources for dealing with the health and environmental impacts of gas production insufficient to meet the scale of the boom, but state regulators consistently downplay the risks, take sides with industry against landowners, and respond to complaints feebly, if at all. This report presents case studies of how this denial, complacency and bureaucratic inaction are disrupting the lives of families and communities.

Too often citizen testimonies of health effects or evidence gathered by citizens, as in this report, are dismissed as anecdotal evidence and as long as each case is treated as an isolated incident the larger pattern is ignored. But when so many citizens across almost two dozen counties report similar complaints and symptoms associated with gas drilling, something is wrong. More thorough research is needed to determine if drilling and fracking can be done more safely and under what conditions and locations they should or should not be permitted. At the same time immediate action is warranted to protect public health and the environment.

### We recommend:

The Texas Commission on Environmental Quality must significantly step up its currently inadequate efforts to protect public health by strictly enforcing emission limits from oil and gas exploration and production equipment.

The Texas Railroad Commission, long the oil and gas industry's lapdog, must become a watchdog. The Railroad Commission must adopt rules that provide the public with full public disclosure of oil and gas drilling and fracking fluids. To protect surface and groundwater resources from oil and gas contamination, the Commission must implement rules requiring closed-loop drilling systems and water-based drilling fluids.

The Texas Water Development Board must exercise its authority to evaluate groundwater resources and the impact that hydraulic fracturing withdrawal is having on groundwater resources. The agency must implement rules that require recycling of flowback water.

Authority to regulate air emissions from oil and gas exploration and production equipment should be overseen by the U.S. Environmental Protection Agency. The EPA should oversee permitting of existing and future point sources through a federal advisory commission that includes citizen representation. The agency must also identify the sources of methane contaminants in groundwater.



Reilly Ruggiero plays while a drilling rig operates in her back yard.

Photo by Christine Ruggiero

3

# The Texas shale boom
## INTRODUCTION

## INTRODUCTION — AN OVERVIEW OF THE TEXAS SHALE BOOM

*Over the last decade the rise of natural gas prices has driven an unprecedented expansion in exploration and development of so-called unconventional gas resources, especially gas from deeply buried shale rock formations. The shale gas boom has transformed the landscape of many parts of the United States, but none more dramatically than the Barnett Shale formation in North Central Texas, which is by far the leading shale gas-producing region in the nation.[1]*

According to the Texas Railroad Commission, which regulates the natural gas industry, the Barnett Shale formation underlies approximately 5,000 square miles, producing gas in 23 counties spreading north, west and south from Fort Worth and Tarrant County.[2] The Barnett Shale formation was discovered in 1981. Since drilling began in the 1990s, production has skyrocketed from 11 billion cubic feet in 1993 to 1.76 trillion cubic feet in 2009.[3]

But the boom did not really take off until 2001. Between 2001 and 2005, approximately 1,000 to 1,500 wells were completed annually. In 2006, 2007 and 2008, more than 2,000 wells were completed per year. As of November 2010, Railroad Commission records show 15,574 wells drilled in the region, with drilling permits issued for another 3,000 locations. Industry analysts report that Barnett Shale production has not yet peaked,[4] and that the Barnett Shale may in fact prove to be the largest onshore natural gas field in the United States.[5]

In the past year, concern over the health and environmental impacts of shale gas drilling have led some jurisdictions, including Dallas and Grand Prairie, to issue a temporary moratorium on new wells allowing time to update local ordinances. It is clear, however, that despite restrictions in some locations, Texas' shale gas boom is not going away – in fact, it is spreading from North Central Texas to other parts of the state. The challenge for Texas is not whether to allow shale gas and oil production, but how to protect the communities whose lives and landscapes are being transformed by the boom.

Extracting gas from underground shale deposits is made possible by new horizontal drilling techniques – drilling diagonally under property from an adjacent well – and new well-stimulation processes, chief among them hydraulic fracturing, also known as fracking. Drillers mix hundreds of millions of gallons of water with a cocktail of chemicals and sand and inject the fluid into the wellhead under high pressure. The pressure creates fractures in the shale, allowing gas to be released to the surface. Unfortunately the chemical-laced fracking fluids can also escape from the shale deposit, flowing back to the surface or migrating to groundwater bearing zones. According to Congressional testimony in 2005 by then-Railroad Commission Chairman Vincent Carrillo, 90 percent of all oil and gas wells in the United States are subjected to fracking.[6]

The exact formulas for fracking fluids are closely guarded company secrets, but can include cancer-causing chemicals such as benzene and chromium, heavy metals and dozens of petroleum-derived compounds.[7] An analysis of fracking chemicals known to be used in Colorado found no fewer than 65 substances that are listed as hazardous under federal law.[8] Because the oil and gas industry in 2005 got Congress to exempt fracking fluids from the Safe Drinking Water Act – a loophole opened after lobbying by Houston-based Halliburton – oil and gas is the nation's only industry allowed to inject hazardous substances unchecked directly into, or directly adjacent to, underground drinking water sources.[9]




Left: Barnett Shale counties.  Right: Producing wells as of December 15, 2010.  Oil wells – green; gas wells – red; and drilling permits – blue.
http://www.rrc.state.tx.us/barnettshale/index.php.

## LIVING WITH THE BOOM

This large-scale industrial activity deploying vast amounts of hazardous substances is happening not at hard-hat refineries or isolated oil fields, but in Texans' back yards – sometimes literally, as horizontal drilling and split-estate laws make it possible to locate a drill rig a few feet from a residence without the homeowners' consent. It is occurring in cities, suburbs, small towns and rural communities, within just hundreds of feet of homes, churches, schools, parks, farmland, lakes and rivers. Texans living in the Barnett Shale have experienced rapid and in some cases extreme changes in their daily lives.

Fracking and other gas development brings massive drill rigs, high-pressured drilling and stimulation operations, high volumes of toxic fluids, contaminated wastewater, industrial compressor stations, condensate tanks, noisy and polluting diesel engines, networks of pipelines, increased truck traffic and noise, and concerns about drilling waste disposal and safety. Throughout the Barnett Shale, residents are concerned about air pollution from oil and gas operations and the risks of groundwater and surface water contamination by fracking chemicals. Health problems have become central issues, with many residents complaining of odors, dizziness, nosebleeds, headaches, agitation, and in some cases, more severe symptoms.[10] Livestock have died. Homes have been abandoned on advice of physicians.

The industry denies the risks and state regulators downplay them, saying there are no definitive links between drilling, fracking and production operations and residents' complaints and symptoms. As we will see, that's not true: doctors and investigators have documented contamination of people and property with chemicals used by the industry that could not have come from anywhere else. One thing is clear: Where drilling goes, contamination and health problems follow.

The Barnett Shale region is the first area of Texas to experience on a large scale the problems that come with unconventional gas drilling, but it will not be the last. A boom is already well under way in the Eagle Ford Shale formation, which lies under two dozen counties mostly south and west of San Antonio and Bexar County. From just 33 drilling permits in the Eagle Ford in 2008, the number swelled to more than 1,000 by the end of 2010.[11] The Haynesville Shale, the fourth-largest natural gas field in the U.S., is centered in northwest Louisiana, but extends into adjacent counties in East Texas. And according to recent news reports, gas companies are making "big offers" to landowners in several counties west of Lubbock, with drilling in an as-yet unnamed shale gas formation expected to begin this summer.[12]

## CURRENT REGULATIONS ARE INADEQUATE TO MEET THE PROBLEM

The spread of shale gas drilling to other parts of the state makes it particularly worrisome that Texas' current regulatory and enforcement system is woefully inadequate for protecting citizens from the risks associated with hosting such hazardous activity in their communities. This report by the Texas Oil & Gas Accountability Project (Texas OGAP) tells the stories of entire communities and of families whose concerns have been met with official denial, complacency or bureaucratic inaction. Regulations are weak, outdated or simply don't cover the unique conditions of drilling in the Barnett Shale.

- In 2007, a state auditor's investigation of the Railroad Commission's enforcement capability found that almost half of Texas' oil and gas wells hadn't been inspected in the last five years.[13] In October 2010, a scathing report by the state Sunset Commission recommended restructuring the agency because of conflicts of interest with the oil and gas industry, which makes hefty campaign contributions to the elected commissioners. The Sunset Commission also noted: "The (Railroad) Commission pursues enforcement action in a very small percentage of the thousands of violations its inspectors identify each year."[14]

- In December 2009, the nonprofit investigative news organization ProPublica surveyed the regulatory systems in 32 oil and gas producing states. The survey found that Texas had by far the most wells – almost 275,000 – but the fewest regulators to oversee them. Of 106 Railroad Commission staff at the time, 83 were inspectors, meaning each was responsible for almost 3,300 wells.[15]



Newark, East (Barnett Shale) gas well production 1993 - 2010.

- Through the Texas Public Information Act, Texas OGAP obtained and analyzed records of citizen complaints to the Texas Commission on Environmental Quality (TCEQ) about drilling and fracking operations in Barnett Shale counties. We found that 256 complaints – more than one a day – were filed in the first seven months of 2010, yet only three notices of violations were issued, all for the same site in Wise County.[16]

- In Fort Worth, the biggest city hosting the Barnett Shale boom, the Fort Worth League of Neighborhoods investigated the system of drilling regulation and enforcement and reported in February 2011 that both the city and the state are allowing gas companies to police themselves through the "honor system":

*"Regulation" consists of nothing more than a permit filed [by a drilling company] with the TCEQ stating that [air] emissions will not go above a certain threshold. But no independent routine*

5

*physical verification of these permit claims is currently being done by the State or the City. This is problematic for a variety of reasons, not least of which is that the operators have a clear conflict of interest inherent in their need to maximize profits.[17]*

In the most notorious case of the state's failure to protect citizens, in the summer of 2010 methane and other chemicals were found in the water wells of two Parker County homeowners after two gas wells were drilled nearby. Tests by the U.S. Environmental Protection Agency strongly suggested the methane came from the gas wells, but for months the Railroad Commission took no action. After EPA determined that state and local officials did not plan to do anything, in February 2011 the agency issued an emergency order against the drilling company.

But in March 2011 the Railroad Commission cleared the company of liability because federal officials couldn't point to the specific path the chemicals took from the gas wells to the water wells. As clear evidence of its bias toward industry, the Railroad Commission put the burden of proof on the EPA – and by extension, landowners – rather than holding drillers responsible for making sure their wells are safe.

Texas can – and must – do a better job of protecting Texans from the undeniable hazards posed by the proximity to homes, schools, hospitals and churches of large-scale industry that uses heavy equipment and tons of toxic and volatile chemicals on a daily basis. For public health and the environment, the stakes are too high to ignore.

**In the most notorious case of the state's failure to protect citizens, in the summer of 2010 methane and other chemicals were found in the water wells of two Parker County homeowners after two gas wells were drilled nearby.**

## Health and environmental impacts
# 1

## HEALTH AND ENVIRONMENTAL IMPACTS OF DRILLING AND FRACKING

### Airborne Chemicals

Some of the airborne emissions and odors experienced by citizens in oil and gas communities come from chemicals used when oil and gas wells are drilled or fracked. Other emissions and odors come from chemicals that naturally occur in oil and gas and chemicals that are created when gas is flared or when fuel is burned in engines for compressors, trucks and drilling rigs. Chemicals that have a tendency to become airborne are known as volatile organic compounds or VOCs.

In April 2009, The Endocrine Disruption Exchange (TDEX), an independent research organization based in Paonia, Colorado, analyzed health effects data for 61 chemicals found in products known to be used during oil and gas drilling or hydraulic fracturing in Texas. When drilling wastes or used fracking fluids return to the surface, they often end up in open tanks or pits. VOCs in the fluids may then be emitted to air. Approximately one-fourth of the chemicals examined were volatile, and according to TEDX "can readily become airborne and can be inhaled as well as swallowed, and can reach the skin."[18] More than 90 percent of the chemicals are harmful to the brain, nerves, lungs, and digestive system; 80 or more percent can affect the heart, blood and kidneys; and 67 percent can affect the immune system.



Photo by Sharon Wilson



Health effects related to chemicals used to drill and fracture wells in Texas.

## Air Emissions in Fort Worth

In the past three years, numerous air sampling studies by public agencies, private citizens and even the natural gas industry itself have confirmed that shale gas facilities in Fort Worth – where more than 1,000 gas wells are located inside the limits of a city of more than half a million residents – are emitting concentrations of air pollutants that exceed healthy levels.

Early concerns about air emissions from gas drilling activities in North Texas were raised in 2008[19] by Dr. Alfredo Armendariz of Southern Methodist University, later appointed as the EPA Region 6 administrator. He conducted a study of air pollutants that contribute to the formation of ground-level ozone, commonly known as smog. The study concluded that drilling activities were contributing more to smog than all the cars, trucks and airplanes in the Dallas-Fort Worth region.



In May and June 2009, private air tests were conducted which raised additional questions about emissions coming from gas wells within the city limits of Fort Worth. Tests were conducted on the farm of Deborah Rogers (whose story is told in Part 3) by Wolf Eagle Environmental, an environmental assessment firm from Flower Mound in Tarrant County. These brought to light other toxic compounds apart from the ozone contributors analyzed by Almendariz. The new compounds included benzene, a known carcinogen, together with toluene, ethylbenzene and



**Top:** Aruba Petroleum emissions in Wise County. Photo by Tim Ruggiero

**Bottom:** Red Oak Gas Operating Co. emissions in Denton County. Photo by Robert Massagli

m&p xylenes.[20] In addition, various sulfur compounds, particularly carbon disulfide, a potent neurotoxin, were detected at extremely high levels. Armendariz reviewed the findings and advised the landowner that carbon disulfide was found at levels 300 times the norm for ambient urban air.[21]

Following these alarming findings, the Texas Commission for Environmental Quality ordered its own tests to determine the extent of exposure to these newly detected compounds. These tests confirmed that benzene, tolulene and carbon disulfide, among other chemicals, were indeed being emitted by gas facilities in the Barnett Shale region. In its final report on the tests, issued in January 2010, TCEQ stated that "gas production facilities can, and some cases do, emit contaminants in amounts that could be deemed unsafe."[22] TCEQ found that 21 facilities in 12 locations registered benzene above long-term healthly levels. Carbon disulfide, ethane, 1,2 dibromethane and isopentane were found in concentrations above short-term healthy levels. In all, 35 chemicals were detected at above "appropriate" short term levels.[23]

In August 2010 the City of Fort Worth hired Eastern Research Group, an air monitoring consultant in Austin, to conduct its own air quality study. Preliminary results, released in February 2011, identified benzene and carbon tetrachloride emissions from seven sites. Emissions at two sites exceeded TCEQ's limit of 25 tons of volatile organic compounds a year. Neither the City nor the State had previously been aware of a problem at these sites.[24]

Most recently, the Fort Worth League of Neighborhoods commissioned a study that used emissions data from a June 2011 study commissioned by the Barnett Shale Shale Energy Education Council, a public relations effort funded by gas companies operating in the region.[25] The data, from samples taken at two sites near Lake Arlington, showed elevated levels of carbon disulfide, in one case just below the TCEQ's healthy level and in the other almost 2.5 times higher than the healthy level.

Scientists hired by the League of Neighborhoods then used computer modeling and more than a year's worth of meterological data to determine how far those levels of the chemical would disperse in relation to nearby schools. The results, released in February 2011, found that levels of carbon disulfide could reach the schools that are several times higher than the safe workplace level for adults set by the U.S. Occupational Safety and Health Administration. The League's study concluded that to protect the health of students, drilling sites should be prohibited within one mile of schools.[26]

## Water Depletion

Amid increasing scarcity of water supplies, the immense quantities of water required for hydraulic fracturing are not sustainable. Huge volumes of water are needed to extract shale gas. Estimates range from 1.5 million to five million gallons of water per well, and wells may be refracked several times over the life of each well.[27] Recently, the oil and gas industry announced a new 12-stage completion method that uses over 9 million gallons of water per well.[28]

Of the metered sources in the four-county Upper Trinity Groundwater Conservation District – only a part of the Barnett Shale formation – drillers used more than 1 billion (1,146,598,272) gallons of water in 2009.[29] Water was also taken from unmetered sources. Some areas of the Trinity Aquifer have already dropped hundreds of feet.[30]

The Texas Water Development Board predicts massive increases in water used to frack shale gas, with particularly severe impacts on rural counties. By 2020 from 14% to 76% more water will be needed for gas drilling and production in Bosque, Erath, Hamilton, Hill, Jack, Montague and Palo Pinto

Counties.[31] The Upper Trinity conservation district is fielding complaints from landowners whose wells are drying up. "Their wells might go from seven to eight gallons a minute to half that," said Executive Director Bob Patterson. He thinks fracking could be a factor.[32]

Water consumption has quickly emerged as a concern in the Eagle Ford region, too. Veteran Karnes County oilman John Braudaway says: "They already know they're gonna run this area out of water; there's no ifs, ands, or buts about it." Said Larry Akers, assistant manager of the Evergreen Water Conservation District, the water planning agency for Atascosa, Frio, Karnes, and Wilson counties: "We really have no idea how much water they are pulling from our area, and it's really frustrating."[33]

When the water used for hydraulic fracturing returns to the surface as "flowback" it is contaminated with fracking chemicals and impurities from the formation. This toxic soup requires permanent disposal by injecting it into deep disposal wells "sealed above and below by unbroken, impermeable strata."[34] Dr. Paul F. Hudak of the geography department at the University of North Texas says:



Braden Exploration waste pit just feet from a creek that flows into Denton Creek, Wise County. Photograph by Sharon Wilson.

"Disposing of used water through properly operated and maintained injection well systems, into deep rock formations, essentially removes that water from the active hydrologic cycle. Conceivably, this water could return to the active hydrologic cycle at some very distant point in the future (speaking in geologic terms, well beyond human time frames)."[35]

As technological advances increase the ability to extract more shale gas, treating water used for hydraulic fracture will be critical to its continued use. The technology exists to recycle "flowback" allowing the water to remain in the hydrologic cycle but currently this technology is used on a very limited basis.[36]

## Water Contamination

There are many pathways for water contamination from natural gas drilling, but it is difficult to determine precisely whether a given case of contamination is from spills, leaks, illegal dumping, waste pits or fracking. This is not only because of inadequate or inefficient regulation, but because the industry holds its chemical formulas and processes as closely guarded trade secrets. The Energy Policy Act of 2005 eliminated the U.S. Environmental Protection Agency's ability to monitor or regulate hydraulic fracturing and allows industry to claim chemicals used as trade secrets.[37] When private water wells are contaminated during or after hydraulic fracturing, the burden of proof is placed on individuals who cannot even know exactly what chemicals to test for to prove contamination.

Water contamination was a consequence of Barnett Shale drilling from the beginning. The potential for the Barnett Shale was first realized in the 1980s when Mitchell Energy was experimenting in Wise County with ways to extract gas by using hydraulic fracturing. A landowner named Jim Bartlett sued Mitchell Energy in 1987 because his newly drilled water well was contaminated with natural gas and hydrogen sulfide. As a result of the lawsuit, which did not go to trial until 1996, the Railroad Commission investigated and found that more than 100 wells in the county "didn't have enough surface casing to protect groundwater and that records about the surface casing had been falsified."[38]

But the problem has not gone away. Larry Bisidas has 40 years of water well drilling experience in Wise County. In the past few years, he has witnessed dramatic declines in water quality and an increase in contaminated water wells. He told the Wise County Messenger that he believes contamination occurs because operators are not running the casing pipe (the pipe, secured with cement, that holds the drillhead in place) deep enough: "[It] has to be deep enough or else it's gonna leak up through the strata. I don't know why people can't see that." His 30-year-old water wells now produce water that is too salty to drink. He buys bottled water.[39]

In Grandview, Johnson County, three families lost their drinking water when their private water wells were contaminated soon after Williams Production-Gulf Coast Co. fracked the second of two gas wells a few hundred yards from their homes. The water wells were contaminated with toluene, a solvent that is harmful to fetal and child development and that does not occur naturally. Shortly after Christmas in 2007, several animals died from drinking the water, one landowner asked a worker at the drill site what happened. The worker said a drilling pipe had ruptured 700 feet below the surface. The company claimed they were not responsible.[40]

### Range Resources in Parker County

The most controversial case of water contamination in the Barnett Shale comes from southern Parker County. In 2009, Range Resources of Fort Worth drilled two gas wells, about 120 feet from one private water well and 470 feet from another. In December 2009, four months after gas production started, one water well owner noticed that his water was effervescing, or fizzing. He began raising concerns with the Railroad Commission, in July 2010 discovered he could set the water from his garden hose on fire – a phenomenon that has been found at other fracking sites where methane has contaminated water supplies.[41]

In August 2010, the owners of both water wells commissioned testing which found benzene, toluene, methane and ethane. Soon afterward, both the Railroad Commission and the EPA conducted their own tests. The Railroad Commission found benzene and toluene; the EPA found the same chemicals as in the water well owners' tests, plus propane and hexane. Isotopic testing by the EPA indicated that the methane in the water was likely from the same source as methane found in the natural gas produced by Range's wells.

In November 2010, the EPA concluded that the danger of explosion was so great that it advised the owners of both water wells to stop using the water. EPA later reported:

| Chemical | Private testing, 8/8/10 (ppb) | Railroad Comm., 8/17/10 (ppb) | EPA 10/26/10 (ppb) |
|---|---|---|---|
| Benzene | 3.1 | 6.84 | 4.55 |
| Ethane | No Test | NT | 5.27 |
| Dissolved ethane | 1,580 | NT | NT |
| Hexane | NT | NT | 31.7 |
| Dissolved methane | 7,810 | NT | 20,100 |
| Propane | NT | NT | 2,280 |
| Tolulene | 2.0 | 6.12 | 3.47 |

Results of testing from a water well near Range Resources' gas wells in Parker County, 2010.  http://www.epa.gov/region6/6xa/pdf/range_order.pdf

*EPA has consulted with the appropriate State of Texas and local authorities, including the Railroad Commission of Texas, the Texas Commission on Environmental Quality, and the Parker County fire marshal, regarding the presence of contaminants in the source of drinking water . . . and disclosed the potential endangerment to the health of persons. . . . EPA has determined that the appropriate State and local authorities have not taken sufficient action to address the endangerment described herein and do not intend to take such action at this time.[42]*

On Dec. 6, 2010, EPA issued an emergency order directing Range Resources to provide the water well owners with replacement water supplies, to sample all water wells within 3,000 feet of the two gas wells, to test for gas in the soil and indoor air of the homes of the owners, and to identify and remediate gas leaks into the Trinity Aquifer.

The emergency order set off a bitter public dispute between the Railroad Commission and the EPA over federal authority vs. state authority in regulating fracking and emissions. Range Resources challenged the order, saying that the chemicals more likely came from a much more shallow deposit of gas that had long been identified as a source of methane in well water, not the Barnett Shale formation the company's wells tapped. Range's lawyers made much of the fact that EPA could not identify the exact route the methane took from the gas wells several thousand feet deep to the water wells a few hundred feet deep. The company's hired expert said: "We know that the fractures (caused by process) don't grow more than a few hundred feet."[43] This, however, contradicts industry experts' testimony in a landmark Texas Supreme Court case, Garza v. Coastal, that a fracture planned for 1,000 feet might reach 2,000 feet or just 400 feet.[44] The EPA's position is that it has the legal authority "to ask a company who we believe may have caused or contributed [to water contamination] . . . to collect the data."[45]

On March 7, 2011, Railroad Commission hearing examiners announced a finding that Range was not responsible for methane contamination of the water wells – in other words, the Railroad Commission issued a ruling that supports its own position and its inaction. Two weeks later, the full Railroad Commission affirmed the examiners' initial ruling. Range said it expected the EPA to withdraw the order for lack of evidence, but the Agency said it remains "confident that the natural gas that is now in the drinking water for these two homes is the natural gas that [Range] are producing from a production well nearby which [Range] hydro-fracked during the summer of [2009]."[46] The U.S. Department of Justice has filed a case in federal court to enforce EPA's emergency order under the Safe Drinking Water Act.

## More Water Contamination

Additional cases of water well contamination believed to have been caused by drilling or fracking operations in the Barnett Shale include:

- Doug and Diana Harris, Denton County. Water contaminated with aluminum, arsenic, barium, beryllium, calcium, chromium, cobalt, copper, iron, lead, lithium, magnesium, manganese, nickel, potassium, sodium, strontium, titanium, vanadium, and zinc shortly after Devon Energy fracked a gas well near their home.[47]

- Grace Mitchell, Johnson County. Water contaminated with hydrocarbons shortly after fracking by Chesapeake Energy and Encana. [48]

- Jim and Linda Scoma, Johnson County. Water contaminated with benzene and hydrocarbon by products after fracking of Chesapeake Energy gas well.[49]

- J.D. Johnson, Tarrant County. Water turned gold and sandy immediately following hydraulic fracturing.[50]

- Carol Grosser, Edwards County. Water contaminated and water pressure issues after hydraulic fracturing of well near property. Goats gave birth to deformed kids.[51]

- Amber and Damon Smith, Denton County. Testing found arsenic, chromium, butanone, acetone, carbon disulfide, and strontium in well water after Devon Energy fracked gas well.[52]

- Catherine and Brett Bledsoe, Wise County. Shortly after Aruba Petroleum fracked wells near their property, water stung their eyes and had odor. Animals refused to drink. Testing found benzene and very high levels of MTBE (a diesel fuel additive). [53]

- Steven Brock, Montague County. Flammable water. Tests revealed high chloride levels, arsenic, chromium, barium, mercury and methane.[54]

9



## Case studies: poisoned communities

## 2

**CASE STUDIES: POISONED COMMUNITIES**

### Dish, Texas

Dish is a town of about 200 in southern Denton County. The town is the site of a sprawling complex of oil and gas facilities, pipelines and gas wells. Almost a dozen large natural gas compressor stations are located next to each other, several gas metering stations are just west of the compressor stations and a large battery of condensate tanks is located less than a mile away.[55] These facilities are very close (100 feet or less in some cases) to residences.[56] For years, Dish residents who live near the compressors have experienced headaches, dizziness, and many other health symptoms. A number of surveys and investigations have tried to determine the potential health effects that could be linked to the industrial oil and gas facilities located in Dish.



### Subra Company

In October and November of 2009 environmental chemist Wilma Subra – recipient of a MacArthur "genius" award for her work with communities threatened by toxics – conducted a health survey of the residents of Dish on behalf of Texas OGAP.[57]

In addition to dozens of odor complaints, a total of 165 medical symptoms and diseases were reported by the 31 individuals who responded to the survey. There were 23 conditions frequently reported by the 31 individuals. The most prevalent health conditions included: sinus problems, throat irritation, allergies, weakness and fatigue, eye irritation, nasal irritation, joint pain, muscle aches and pains, breathing difficulties, vision impairment, severe headaches, sleep disturbances,

swollen and painful joints, frequent irritation, skin irritation, wheezing, frequent nausea, ringing in ears, decreased motor skills, loss of sexual drive, bronchitis, easy bruising and difficulty in concentrating.

## Wolf Eagle Environmental

On August 17 and 18, 2009, Wolf Eagle Environmental, an environmental services and consulting company from nearby Flower Mound, sampled the ambient air from seven locations in Dish.[58] The air samples were analyzed for substances classified as volatile organic compounds (VOC), hazardous air pollutants (HAP), tentatively identified compounds (TIC) and nitrogen oxides (NOX). The sampling confirmed the presence of high concentrations of some cancer-causing chemicals (carcinogens) and neurotoxin compounds in air near or on residential properties in Dish.[59]

A number of these compounds exceeded both short and long-term effects screening levels (ESL) established by the TCEQ.[60] For example, benzene, a known human carcinogen, exceeded the short-term at one site and the long-term level at three sites. Fourteen other chemicals that exceeded short- or long-term ESLs included: m,p-xylene, dimethyl disulfide, methyl ethyl disulfide, ethylmethylethyl disulfide, trimethyl benzene, diethyle benzene, methylmethylethyl benzene, tetramethyl benzene, naphthalene, 1,2,4-trimethyl benzene, carbonyl sulfide, carbon disulfide, methyl pyridine and dimethyl pyridine.[61] Sixty-one percent of the health effects experienced by Dish residents who responded to the Subra Company's health survey match the known health effects of the chemical Wolf Eagle detected in Dish's air excess of above state ESL levels.


Glass of water from the Smith's tap in Dish, Texas after Devon Energy completed nearby fracturing operation.
Photo by Sharon Wilson

These air pollutants almost certainly came from natural gas infrastructure located in and around Dish. Hazardous air pollutants can be released from oil and gas well sites, compressor stations, gas dehydrators, oil/condensate tanks, pressure relief values, well drilling, hydraulic fracturing, gas processing plants, pipelines, and vehicle and engine exhaust.[62] According to the Wolf Eagle Environmental report, Dish has virtually no heavy industry other than oil-and-gas related facilities. There are no other industrial activities with the capability to produce the volume of air toxins present within miles of the town.[63]

In October 2009, TCEQ reviewed the Wolf Eagle report and expressed concern that "the monitored concentrations of benzene at several of the sampling locations could pose a long-term health risk to residents if representative of normal and prolonged ambient conditions."[64] TCEQ has since been conducting its own sampling, but has not measured benzene concentrations as high as those found by Wolf Eagle Environmental.

## Texas Department of Health Services

In October 2009, the Texas Department of State Health Services (DHS) was asked by the mayor of Dish to test people in the community for contaminants that had been identified in the community's air.[65] In January 2010, DHS staff collected blood and urine samples from 28 adults, as well as tap water samples from 27 of the residents' homes.[66] To provide a control population, blood and urine samples were also taken from five DHS staff members who collected the samples.

If a volatile organic compound (VOC) is detected in blood or urine, it indicates the person is currently being or has recently been exposed to the chemical. According to DHS, "VOCs only stay in the body for a short time (several hours); therefore these measurements only reflect ongoing or recent exposures, and not historical exposures."[67] A high level does not necessarily mean that a person will experience health effects, nor does a lower concentration indicate that there will be no health effects. Individuals are not equally susceptible to a particular chemical[68] – some are more sensitive, some may be exposed to many chemicals at the same time, and these chemicals may interact or the effects add up to cause an impact to a person's health. DHS compared concentrations of VOCs in

**61%**
Health effects reported by the DISH community were associated with toxics measured in excess of TCEQ screening levels

Abnormal EEG
Brain disorders
Bronchitis
Chronic Eye Irritation
Decreased Motor Skills
Depression
Dizziness
Eyes Burning
Falling, Staggering
Frequent Irritation
Frequent Nausea
Increased Fatigue
Irregular/Rapid Heart Beat
Muscle Aches & Pains
Nasal Irritation
Pre-Cancerous Lesions
Severe Anxiety
Severe Headaches
Sinus Problems
Throat irritation
Tired
Weakness
Allergies
Difficulty in Concentrating
Easy Bruising
Nervous System Impacts

Benzene
Carbon Disulfide
1,2,4-Trimethylbenzene
Xylene
Naphthalene
Carbonyl Sulfide
Trimethyl Benzene
Methyl-Methylethyl Benzene
Tetramethyl Benzene
Methyl Pyridine
Dimethyl Disulfide
Methyl Ethyl Disulfide
Ethyl-Methylethyl Disulfide
Diemethyl Pyridin
Diethyl Benzene

**16**
Chemicals measured in DISH' ambient air above TCEQ screening levels

Over 60 percent of health effects of Dish residents match effects associated with chemicals detected in air.

DISH residents' blood to what is known as a 95% reference value for each chemical – 95% of the U.S. population has concentrations below that level.[69] If a chemical is found at a higher concentration than the reference level, it means the person has recently been exposed to an unusually large amount of the chemical compared to the rest of the population.

Blood from the Dish residents was tested for 33 different VOCs. Some of the chemicals are known to be present in cigarette smoke (2,5-dimethylfuran, styrene and BTEX chemicals – benzene, toluene, ethylbenzene, xylenes), so results were tallied separately for smokers and non-smokers. Major findings:

- A total of 15 VOCs were detected in the residents' blood. Most frequently found were toluene (detected in 18 residents), m-/p-xylene (15 detections) and styrene (13 detections). A total of 14 VOCs were detected in non-smoking residents. The only chemical not found in the blood of at least one non-smoking resident was 2,5-dimethylfuran. This chemical is a biomarker known to be present in cigarette smoke and is generally undetectable in nonsmoking adults.[70] Three VOCs known to be present in cigarette smoke were also found in non-smokers: toluene was found in 13 non-smokers, ethylbenzene in four, o-xylene in three and m-/p-xylenes in 10 non-smokers. If these residents were not exposed to these chemicals from smoking cigarettes, what are other sources of these chemicals? Natural gas, especially gas that has condensate associated with it,[71] contains the BTEX chemicals, and these can be released to the air when gas is vented from compressor stations, pipelines, condensate tanks, well sites or gas processing plants. By comparison, only six VOCs were found in the blood of the DHS staffers who were non-smokers.[72] In other words, approximately twice as many chemicals were detected in non-smokers from Dish than non-smokers from DHS staff.

- Some Dish residents have been exposed to VOCs at higher levels than 95% of the U.S. population. Of the chemicals detected in residents' blood, 15 VOCs were found in at least one resident at a level that is higher than 95% of the U.S. general population. Three of the chemicals found in Dish non-smokers (bromoform, chloroform and dibromochloromethane) might be coming from the town's water supply – they are known to be formed when chlorine is added to public water systems as a disinfectant.[73] But nine other VOCs found at extremely high levels in the blood of non-smoking residents of Dish cannot be linked to chlorinated tap water. Again, DHS staff did not have VOCs in their blood in concentrations as high as residents. Only one chemical – dibromochloromethane, likely from drinking chlorinated water – was found in DHS staff at a level higher than 95% of the general population.

Dish residents also provided urine samples to DHS staff. These samples were analyzed for breakdown products (known as metabolites) of four VOCs: PMA, a metabolite of benzene; DHBM, a metabolite of 1,3-butadiene; BMA, a metabolite of toluene; and AMCA, a metabolite of N,N-dimethylformamide, also known as DMF. All residents and DHS staff had urinary metabolites of 1,3-butadiene, toluene, and DMF. Three residents also had metabolites of benzene (two smokers, one non-smoker). None of the urine samples from DHS staff contained metabolites of benzene. Residents also had higher levels of the metabolite of N,N-dimethylformamide than DHS staff and levels found in published research, but DHS staff could offer no reason for the high levels found in residents.[74] Although there are no recognized standards to determine safe levels in urine, the tests confirmed that residents of Dish are being exposed to benzene, toluene, 1,3-butadiene and N,N-dimethylformamide or other VOC chemicals.[75]

| VOCS FOUND IN AIR, WATER AND RESIDENTS (BLOOD SAMPLES) IN DISH, TX | | | | | |
|---|---|---|---|---|---|
| | Range of levels found in DISH air (ug/m3) | Detected in air (# of sites) | Found in DISH tap water (# of sites) | Range of levels (ug/m3) detected in blood of non-smokers (# of non-smokers) | Range of levels (ug/m3) detected in blood of smokers (# of smokers) |
| **benzene** | 1.91 – 247.88 | 7 | No (0) | ND* – 0.027 (1) | 0.045 – 1.45 (5) |
| **ethylbenzene** | ND – 93.21 | 6 of 7 | Yes (14) | ND – 0.124 (4) | ND – 1.437 (4) |
| **toluene** | 2.76 -523.03 | 7 of 7 | Yes (1) | ND – 0.839 (13) | 0.174 – 3.25 (5) |
| **M/p-xylene** | 3.56 – 366.3 | 7 of 7 | Yes (15) | ND – 0.389 (10) | 0.084 – 1.32 (5) |
| **o-xylene** | ND – 170.8 | 5 of 7 | Yes (17) | ND – 0.118 (3) | ND – 0.186 (4) |
| **styrene** | 1.64 – 5.44 | 3 of 7 | Yes (16) | ND – 0.068 ( 8) | 0.045 – 0.525 (5) |
| **trichloroethene** | ND - 2.16 | 1 of 7 | | ND – 0.013 (1) | ND (S: 0) |

* ND: not detected

Air data from Wolf Eagle Environmental. Sept. 15, 2009. Town of DISH, Texas Ambient Air Monitoring Analysis. Final Report. http://www.bseec.org/ sites/all/pdf/airquality/13.pdf.  Blood and water data from TxDSHS Exposure Investigation. Tables 1 b. and 4.[76]







## Source of the Chemicals

Many of the chemicals found at high concentrations in the blood of Dish residents have previously been found in air samples in and around Dish.  Some of these chemicals were also detected at low levels in tap water samples from the homes of the residents involved in the DHS biomonitoring study.

Since many of the chemicals found in residents' blood were also found in air samples, it seems a reasonable assumption that natural gas drilling and facilities are the source of at least some percentage of the chemicals in blood – especially since Dish has no heavy industry other than oil-and-gas related facilities that could produce the high volumes of air toxins found.[77] But the DHS report concluded that because not all residents had high concentrations of the same VOCs in their blood, the investigation "did not indicate that community-wide exposures from gas wells or compressor stations were occurring in the same population."[78] Instead, the report suggested that other possible sources of high concentrations in residents' blood such as cigarette smoking, the presence of disinfectant by-products in drinking water, and consumer or occupational/hobby related products could explain many of the findings.[79] Perhaps the highest levels of benzenes, ethylbenzene, toluene and xylene found in residents' blood can be attributed to smoking, but there were cases where non-smokers had higher concentrations than smokers. And there were cases where non-smokers had higher concentrations in their blood than 95% of the general population.[80]

There are other possible reasons why not all 28 residents had the same VOCs known to be associated with gas wells and

compressors in their blood. First, the blood collected from the residents represented a snapshot in time. Depending on the wind and atmospheric conditions it is possible that not all residents were being exposed to chemicals from oil and gas facilities on the day when their blood was sampled. Also, some residents may have had higher exposures if they spent more time outside or had windows open when the chemicals were in the air. And if people were being exposed to chemicals through water as well as air, concentrations in blood would vary depending on how much contact they had with these chemicals through inhalation, ingestion or contact with skin.

DHS admitted that its study "was a one-time sample event; thus it could not consider external factors that could have affected results such as season, temperature, wind conditions, and variations in the natural gas operations."[81] DHS staff also acknowledged the presence of odors in the community, and recommended that if sampling from the TCEQ indicated possible environmental exposures, additional sampling should take place in the summer, "when temperatures are higher and when people indicate that odors are the greatest."[82]

## Argyle and Bartonville, Texas

Until 2010, the affluent Denton County communities of Argyle (pop. 3,600) and nearby Bartonville (pop. 1,600) had only a few gas wells. Today, the communities have a major gas processing facility, tank farms, pipelines and multiple wells within one square mile of the homes of approximately 2,000 people. Residents are especially concerned about the approval of two well pads, gathering lines and pipelines under development on either side of the Argyle Intermediate School.[83] The area has had poor air quality for some time, but that only shows how strong the impact of drilling has been: Before the boom, complaints to TCEQ were almost non-existent; more than 100 complaints were issued in 2010.



But prior to the boom, citizens also organized to conduct "baseline" testing to measure the quality of their air before large-scale development took hold. In baseline testing, only seven of the 84 air contaminants typically tested for by TCEQ showed up in Argyle-Bartonville air samples.[84] As tank farms, compressor stations, pipeline and additional oil and gas facilities have moved into the area the Argyle-Bartonville Communities (ABC) Alliance began documenting individual health effects.[85] And TCEQ's most recent testing — on the high school band practice lot — detected up to 65 of the 84 air contaminants usually tested for by the agency.[86]

In October 2010, parents spoke at an Argyle school board meeting voicing their concerns about their children's health. The day of the meeting, the ABC Alliance released a detailed account of students' recent health problems, such as one who complained of unusual chest pains after running around the high school track.[87]

"It's ruining us," Bartonville resident Kelly Gant told *The New York Times* in February 2011. She said her 14-year-old daughter and 11-year-old son have had severe asthma attacks, dizzy spells and headaches since a compressor station and a gas well were set up near her house about two years ago. "I'm not an activist,

an alarmist, a Democrat, environmentalist or anything like that," Ms. Gant said. "I'm just a person who isn't able to manage the health of my family because of all this drilling."[88]

Members of the ABC Alliance began to keep track of the unusual health complaints they were experiencing since the increase in drilling activity. They noticed the timing of health complaints coincided with environmental events at the natural gas facilities in the area. They combined the health log information into a detailed list of incidents and the combined health effects were prepared, which in late 2010 Texas OGAP presented to the U.S. Environmental Protection Agency.[89]

Residents reported a wide range of health effects, including abnormal menstrual bleeding and nosebleeds, rashes, chest pains and difficulty breathing, asthma attacks and an adult onset asthma diagnosis in a 40-year-old non-smoker, difficulty concentrating and overwhelming fatigue. In just one eight-day period – Nov. 13-21, 2010 – ten people in the neighborhood reported symptoms including coughing, sore throat, headache, nosebleed, burning or watering eyes, vomiting and joint pain.

Besides the health impacts, property values in Argyle and Bartonville are plummeting. One residence that was valued at $361,000 on the 2009 tax rolls was valued at $95,000 on the 2010 tax rolls.[90]

The Argyle school district signed leases to allow gas drilling on its property and according to the *Denton Record Chronicle*, has received more than $680,000 from the leases. But Susan Knoll, a Bartonville parent, pointed out that the royalties received would not even cover the cost of treating one child with a case of leukemia.

"You can't put a price on keeping our kids healthy," Knoll said.[91]





Top: Williams Energy Gulf Coast LP's Argyle Central Facility 100 feet from residence. Photo by Susan Knoll

Bottom: Argyle and Bartonville residents protest as Argyle Central Facility is installed.

# Case studies: poisoned families
## 3

## CASE STUDIES: POISONED FAMILIES

### Bob and Lisa Parr, Wise County

Bob and Lisa Parr and their 7-year-old daughter, Emma, live in the Allison community of eastern Wise County. Their 40 acres are graced with immense pecan trees, green pasture, a creek – and are surrounded by 21 gas wells.

Shortly after moving to the area in August 2007, Lisa Parr's previously excellent health began to deteriorate. She began having breathing difficulties, nausea and headaches. She had angry red rashes from the top of her head to the bottoms of her feet that have left her body scarred with pockmarks. She had oozing welts on her scalp and four ping-pong-ball-sized lumps on her neck. Eight doctors treated her over the course of a year. None could find an illness to blame her symptoms on, until a specialist suggested she might be suffering from environmental exposures. [92]

She visited her neighbor, Christine Ruggiero (whose story follows), and compared her medical records with Ruggiero's log of spills, releases and air testing from the gas wells on their property. Her medical episodes coincided with the gas well activity.

On July 25, 2010, she called TCEQ complaining of strong odors of natural gas chemicals around her home causing dizziness and burning nasal passages. TCEQ investigator Damon Armstrong noted in his report that the operator, Aruba Petroleum, was in the process of using nitrogen to clear drilling fluids from the wellhead of a nearby rig. The emissions coming from the frack tank were visible to the naked eye and "were of such concentration and duration to affect the health of the investigator."

According to his report, while on the property Armstrong suffered from dizziness and a sore throat. A toxic vapor analyzer registered an average reading of over 2,500 parts per million. Armstrong collected air samples and detected concentrations of 20 chemicals, including benzene, at concentrations exceeding TCEQ's safe level for long-term health effects. Five were at concentrations exceeding safe levels for short-term health effects. [93]

Four days later, Dr. William Rae of the Environmental Health Center in Dallas tested Lisa Parr's blood and lungs. In her blood and lungs he found more than 20 chemicals, including six that matched the VOCs detected by TCEQ's air sampling of the well site. [94]

Lisa's husband and daughter are also having symptoms that may be related to gas drilling activity. Bob Parr has experienced loss of balance and neurological symptoms. He said he'd rarely had a nosebleed in his life, but in the last year had about three a week. Emma, too, had rashes and frequent nosebleeds: "She'd wake me up at 6 a.m., crying, covered in blood," said her mother. [95] Emma was recently diagnosed with asthma.

The Parrs contracted for private testing of their home and again found numerous chemicals matching the profile of the nearby well. The concentration of methane in her daughter's room, Lisa said, "was at asphyxiation levels." She later told the Wise County Messenger what happened next:

*She showed the results to her doctor, who told her to leave her home within 48 hours.*

*"The doctor told me right then . . . I had to move immediately.*



**Bob, Lisa, and Emma Parr at their home in Wise County.**
Used with permission by Lisa Parr.

| Compound | Concentration (parts per billion) | Over short-term health AMCV | Over long-term health AMCV |
|---|---|---|---|
| 1,2,4-trimethylbenzene | 54 | No | Yes |
| 2,3-dimethylbutane | 100 | No | Yes |
| 2-methylpentane | 1100 | Yes | Yes |
| 2-methylheptane | 260 | No | Yes |
| 2-methylhexane | 500 | No | Yes |
| 3-methylheptane | 230 | No | Yes |
| 3-methylhexane | 420 | No | Yes |
| 3-methylpentane | 730 | No | Yes |
| Benzene | 120 | No | Yes |
| n-butane | 13000 | Yes | Yes |
| cyclohexane | 460 | No | Yes |
| n-heptane | 900 | Yes | Yes |
| n-hexane | 1700 | No | Yes |
| Isobutene | 6800 | Yes | Yes |
| Isopentane | 3700 | Yes | Yes |
| methylcyclohexane | 720 | No | Yes |
| methylcyclopentane | 410 | No | Yes |
| n-octane | 520 | No | Yes |
| n-pentane | 3600 | Yes | Yes |
| m & p-xylene | 200 | No | Yes |

Chemicals found in the air near Aruba Petroleum well near Parr residence, July 25, 2010.

*Because if I did not, we would have to spend more time and money on hospitalization, on chemotherapy and morticians for my whole family."[96]*

*The Parrs are now living at Bob's office in Denton, where there is no drilling nearby. Their health is greatly improved.*

### Tim and Christine Ruggiero, Wise County

On September 16, 2009, with no prior notice, Aruba Petroleum cut the fence around Tim and Christine Ruggiero's horse pasture, drove bulldozers onto their property and began building a pad site to drill two wells on their 10 acres in Allison, Wise County.

Six weeks later, Christine Ruggiero saw black, smoky liquid shooting out from the drilling rig, "across the waste pit and into the neighbor's trees." A week later, Christine and her 10-year-old daughter Reilly walked out of the house and found a "heavy cloud of diesel exhaust" coming from the drilling rig, surrounding their home and stretching out along the horizon for miles. Christine made a complaint to the TCEQ and escaped with her daughter to stay at a hotel that night. The TCEQ inspection report stated: "Continuous operations of three diesel engines greater than 400 horsepower at this site resulted in significant emissions of nitrogen oxides. An estimate of maximum nitrogen oxide concentration over one hour on the complainant's property was predicted to be 380 parts per billion."[97] No enforcement action was taken.

On January 10, 2010, as the Ruggiero family left for church, they saw men shoveling sand onto the drill site from a truck. Later that day, an anonymous caller informed them that Gilbow Oilfield Services had spilled approximately 9,000 gallons of wastewater the day before. Christine reported the spill to the Railroad Commission. The inspection report said the spill covered an area 30 by 60 feet, and orderd Aruba to immediately remove any fluids, excavate the area and "initiate and complete remedial clean-up operations." The Ruggieros never observed that the ordered remediation took place and the regulators did not follow up to enforce it.

After the second spill, the Ruggieros contracted with Wolf Eagle Environmental to test the spilled wastewater, the spilled drilling mud and the air around their property. Fifteen chemicals were found in the wastewater and mud, including benzene and toluene, in concentrations ranging from a trace to 1,500 parts per billion. Of the air samples, Wolf Eagle reported:

*...numerous hydrocarbons indentified as Recognized and Suspected human carcinogens and neurotoxins. ...The compounds identified are known to emanate from processes related to the natural gas industry. The laboratory results confirmed fugitive air emissions exceeding TCEQ Effects-Screening Levels (ESLs) for Benzene (Long-Term), and Propane (Short-Term and Long-Term). In addition, concentrations of Methane were identified in levels that exceed ambient air background concentrations.[98]*

A week after the second spill, Christine Ruggiero noticed "a heavy chemical odor similar to propane" and complained to TCEQ. Two weeks after that, they filed a similar complaint. On both occasions, TCEQ staff took air samples with summa canisters and a GasFindIR infrared camera. They detected more than two dozen VOCs, including benzene, toluene and vinyl chloride. All but one of the compounds were in concentrations exceeding TCEQ's 1-hour safety limit for short-term health effects.[99]



**Christine Ruggiero and her thoroughbred mare, Sweetheart.**
Photograph by Tim Ruggiero

Aruba has vented natural gas at the wells and brought in "workover rigs" numerous times.

There have been at least two more wastewater spills. In the spring of 2010, the Ruggieros observed bubbles rising from a wastewater pit or from puddles in their pasture, and discovered they could set the bubles aflame with a lighter. In March 2010, the Railroad Commission inspected, and in April told the Ruggieros "The bubbles are believed to be a natural occurrence caused by a settling and compaction of the soil due to water saturation." [100]



Ruggiero's home and property. Photo by Tim Ruggiero

In September 2010, the Wise County Appraisal Board devalued their property by 75 percent. Originally on the 2010 tax rolls for $257,330, their home and 10-acre horse property are now worth $75,240.[101] "I wouldn't sell it for $78,000," said Patsy Slimp, a board member and former real estate agent. "I could not sell this house in a clear conscience."[102] The *Denton Record Chronicle* reported:

*After the meeting, Tim and Christine Ruggiero had tears in their eyes.*

*Christine Ruggiero said she knew the day the drilling rig arrived that their property was lost, so the acknowledgement by the appraisal review board was not happy news.*

*They know they need to move in order to protect their daughter's health, Tim Ruggiero said, and that it's possible their credit could be ruined.*

*"The bank could call the note on our home tomorrow," he said, in which case he'd probably hand them the keys to the house.*

### Deborah Rogers, Fort Worth

Deborah Rogers lives in Westworth Village, a tiny municipality inside Fort Worth city limits, where more than 15 gas wells are located in one square mile. When Chesapeake Energy Corp. began drilling near her home, she reported bothersome odors to the TCEQ hotline but the response time was unsatisfactory because the emissions usually subsided by the time an inspector arrived hours later. She found it curious that just as TCEQ called to say they were on their way, the odors disappeared, so the inspector found nothing: "It was as though someone had shut off a valve, simple as that. That's when I knew these odors can be contained at will."[103]

Rogers – a dairy owner, former financial analyst and member of the advisory board for the Federal Reserve Bank of Dallas – was likely the first person to ever conduct air testing around gas wells in North Texas. In May and June 2009, private environmental consultants and labs detected the following toxic air contaminants on her property: benzene, dichlorodifluoromethane, chloroform, m&p xylene, 0 xylene, 1,2,4 tricholorbenzene, toluene, carbon disulfide, dimethyldisulfide, methyly ethyl disulfide, methyl propyl disulfide, diethyl disulfide, ethyly, methylethyl disulfide, dimethyl trisulfide and ethyl n-propyl disulfide.[104] All of the sulfur-based compounds were found at levels above short-term and long-term TCEQ Effects Screening

Levels. The level of carbon disulfide was 300 times higher than U.S. EPA's normal limit for ambient urban air. Further testing confirmed the results, at slightly lower levels.[105]

Rogers has experienced nausea from the strong odors and two massive nose bleeds that began with severe headaches. "The nosebleeds," she said, "are spontaneous and very frightening because the blood flows copiously and within seconds you are covered in blood. I have never had nose bleeds in my life either."

The same evening the first air sampling was conducted on her property, several of Deborah's perfectly healthy baby animals – two baby goats and six baby chicks – died of asphyxiation. After looking at the test results, Dr. E. Murl Baily, Jr., senior veterinary toxicologist at Texas A&M University, wrote a letter of concern to the mayor of Westworth Village concluding that the compounds were problematic to animals and human health as they move up the food chain in milk and meat. [106]

In June 2009, Dr. David Sterling, Chair of Environmental and Occupational Health at UNT Health Science Center reviewed air testing results taken during flaring of a well near Deborah's farm. He wrote:

The compounds found range from those with acute primarily irritation issues, to oxygen deficiency potential (i.e. heavier than air and may accumulate low to the ground and in gulleys, displace oxygen, with potential asphyxiation), to chronic organ toxicity and known or suspect carcinogens. The levels during flaring exceeded in most cases the Texas Commission on Environmental Quality (TCEQ) effects screening levels, both long and short term, which are State levels of exposure to air toxins which can trigger adverse health effects.



Deborah Rogers, owner of Deborah's Farmstead.
Photo by Lee Chastain

# Conclusion and
## RECOMMENDATIONS

The findings of the Texas Oil and Gas Accountability Project's investigation have implications for both state and national oil and gas policies and regulations. Too often citizen testimonies of health effects or evidence gathered by citizens are dismissed as anecdotal evidence; and as long as each case is treated as an isolated incident the larger pattern is ignored. But when so many citizens across almost two dozen counties report similar complaints and symptoms associated with gas drilling, something is wrong. More thorough research is needed if drilling and fracking can be done more safely and under what conditions and locations they should or should not be permitted. At the same time, immediate action is warranted to protect public health and the environment. Texas can, and must, do better.

Several state legislators have offered policy reforms in the 82nd Texas Legislature to protect citizens, the environment and public health. Promising legislation includes:

- SB 1049, by Sen. Wendy Davis, would require disclosure of chemicals used in hydraulic fracturing fluids to property owners and water users.

- SB 772, also by Davis, would require that fracking fluids contain tracer elements that could be used to identify the source of water contamination.

- HB 1226, by Rep. Lon Burnham, would reduce toxic air emissions by requiring vapor recovery units on storage tanks in the Barnett Shale.

- HB 1556, also by Burnham, would prohibit gas wells within 1,200 feet of public schools.

RECOMMENDATIONS:

- The Texas Commission on Environmental Quality must significantly step up its currently inadequate efforts to protect public health by strictly enforcing emission limits from oil and gas exploration and production equipment. TCEQ must require more facilities and units to meet emission limits and issue meaningful penalties for violations.

**Several state legislators have offered policy reforms in the 82nd Texas Legislature to protect citizens, the environment and public health.**



Photo by Kathy Chruscielski

- We heartily endorse the Sunset Commission's recommendation to replace the Texas Railroad Commission with an appointed oil and gas commission – in light of the Railroad Commission's shameful record, it is hard to imagine a single change that would mean greater protection for Texas landowners. In the meantime, the Railroad Commission must also significantly step up its efforts. The Railroad Commission must adopt rules that ban the injection of diesel fuel in drilling operations and provide the public with full public disclosure of oil and gas drilling and stimulation fluids, including chemical constituencies and amounts. The Commission must implement a reporting requirement for hydraulic fracturing operations that documents the volumes of fracturing fluids used and recovered, as well as critical information relating to actual pressures used in fracturing operations, and estimated fracture sizes and extents.

- The Railroad Commission must step up its currently inadequate efforts to protect surface and groundwater resources from oil and gas contaminates. The Commission must implement rules requiring closed-loop drilling systems and water-based drilling fluids.

- The Texas Water Development Board must exercise its authority to evaluate groundwater resources and the impact that hydraulic fracturing withdrawal is having on groundwater resources. The agency must implement rules that require recycling of flowback water.

The EPA must identify the sources of methane contaminants in groundwater.

- Authority to regulate air emissions from oil and gas exploration and production equipment should be overseen by the U.S. Environmental Protection Agency. The EPA should oversee permitting of existing and future point sources through a federal advisory commission that includes citizen representation.

# Endnotes

1   Pickering Energy Partners, Inc. Oct. 2005. *The Barnett Shale – Visitors Guide to the Hottest Gas Play in the US*. Appendix B– Comparison of Organic Shales in the U.S. p. 46. http://www.tudorpickering.com/pdfs/TheBarnettShaleReport.pdf

2   Archer, Bonque, Clay, Cooke, Conianche, Coryell, Dallas, Denton, Eastland, Ellis, Erath, Hamilton, Hill, Hood, Jack, Johnson, Montague, Palo Pinto, Parker, Shackleford, Somerville, Stephens, Tarrant, Wise. http://www.rrc.state.tx.us/barnettshale/index.php

3   http://www.rrc.state.tx.us/barnettshale/index.php

4   The Perryman Group. 2009. *An Enduring Resource: A perspective on the past, present and future contribution of the Barnett Shale to the economy of Fort Worth and surrounding areas.* www.barnettshaleexpo.com/docs/2009_eco_report.pdf

5   http://www.rrc.state.tx.us/barnettshale/index.php

6   http://www.rrc.state.tx.us/commissioners/carrillo/press/energytestimony.html.

7   http://www.ewg.org/node/26651

8   http://www.ewg.org/node/26651

9   Hartman, Todd. 2007. Industry Oversight, *Rocky Mountain News*, December 11, 2007, p. 14.

10  Brown, L. & Tabor, B. Denton Record Chronicle, October 24, 2010. *Parents voice health concerns: gas drilling near Argyle schools making kids ill, residents tell board.*

11  http://www.chron.com/disp/story.mpl/business/energy/746706B.html

12  Slother, B. KCBD-TV, Feb. 16, 2011, *South Plains landowners receiving big offers from oil companies*.

13  http://s3.amazonaws.com/propublica/assets/natural_gas/texas_railroad_commission_auditor_report_aug2007.pdf

14  http://www.sunset.state.tx.us/82ndreports/rct/rct_dec.pdf

15  http://www.propublica.org/article/state-oil-and-gas-regulators-are-spread-too-thin-to-do-their-jobs-1230

16  http://www.dentonrc.com/sharedcontent/dws/drc/spe/alprojects/drilling/stories/DRC_Gas_Health_1015.18f6b27bf.html

17  Fort Worth League of Neighborhoods, *Recommendations For Policy Changes For Gas Drilling Near Schools*. February 2011.

18  The Endocrine Disruption Exchange. April 2009, unpublished. *Chemicals Used in Oil and Natural Gas Operations in Texas.*

19  Armendariz, A., September 30, 2008. For Environmental Defense Fund. *Emissions from Natural Gas Production in the Barnett Shale Area and Opportunities for Cost Effective Improvements.* www.edf.org/documents/9235_Barnett_Shale_Report.pdf

20  May 25, 2009. Wolfe Eagle Environmental. Ambient Air Monitoring Analysis Project, Final Report. http://earthworksaction.org/TXOGAP-CaseStudy-Rogers.cfm

21  August 7, 2009. Letter to Deborah Rogers from Dr. Al Armendariz. http://earthworksaction.org/TXOGAP-CaseStudy-Rogers.cfm

22  Fowler, T., Houston Chronicle, January 28, 2010. *Air tests clear at most Barnett Shale sites.* http://www.chron.com/disp/story.mpl/business/energy/6839196.html

23  http://www.tceq.state.tx.us/assets/public/implementation/barnett_shale/2010.01.27-healthEffects-BarnettShale.pdf

24  http://www.star-telegram.com/2011/02/15/2852226/two-gas-well-pad-sites-in-fort.html

25  http://www.bseec.org/sites/default/files/BSEEC_Final_Report.pdf

26  Fort Worth League of Neighborhoods, *Recommendations For Policy Changes For Gas Drilling Near Schools*, February 2011.

27  Heinkel-Wolfe, P, Denton Record Chronicle, December 9, 2006. *Drilling could sap water supply*

28  ADVANCED RESOURCES INTERNATIONAL, INC, slide 34, Gas Shale Development Workshop, Beijing, China April 2010

29  Records obtained through Texas Public Information Act

30  Evans, B, Wise County Messenger, March 23, 2008, *Aquifer dropping and it could get worse*

31  Adrian, R FOX 4 Investigation, June 12, 2007, *Drilling Boom Brings Water Worries*

32  Smith, J. Star-Telegram, *Barnett Shale search for facts on fracking*, September 4, 2010

33  Crowe, R. San Antonio Current, Jan. 5, 2011. *Sinking feelings: Gas fracking may already be lowering water tables in South Texas*

34  Railroad Commission of Texas, *Saltwater Disposal Wells Frequently Asked Questions* (FAQs)

35  Personal communication, Dr. Paul F. Hudak, Department of Geography, University of North Texas

36  RIGZONE, *Water Treatment Key to Hydraulic Fracturing's Future*. http://www.rigzone.com/news/article.asp?a_id=97222

37  Lustgarten, A, Scientific American, *Drill for Natural Gas, Pollute Water*, November 17, 2008

38  Lee, M, Star-Telegram, Texas Supreme Court ruling discouraged suits against gas drillers, December 28, 2009

39  Evans, B, Wise County Messenger, Unwell water: *Drilling leaves a bad taste for some*, October 3, 2010

40  Gorman, P, FW Weekly, *Water Foul: An aquifer is at risk – along with property values, livestock, and dreams – after gas wells move in,* April 30, 2008

41  Douglas, J, WFAA, *Texas acts on flaming faucets in Montague County.* October 6, 2010.

42  http://www.epa.gov/region6/6xa/pdf/range_order.pdf

43  Loftis, R. Dallas Morning News, January 22, 2011.

44  http://www.supreme.courts.state.tx.us/historical/2008/aug/050466cd.htm

45  http://www.star-telegram.com/2011/02/10/2840390/epa-official-is-grilled-in-range.html#ixzz1DcWiqB1O

46  Loftis, R. Dallas Morning News, *Gas in Parker County home's drinking water puts drilling, EPA in national spotlight,* January 22, 2011

47  Harris vs. Devon Lawsuit http://press.wturley.com/Harris%20v.%20Devon%20Energy.pdf

48  Mitchell vs. Encana and Chesapeake Lawsuit http://press.wturley.com/Mitchell%20vs.%20Encana%20Oil%20&%20Gas%20Land%20Chesapeake.pdf

49  Scoma vs Chesapeake Lawsuit http://press.wturley.com/Scoma%20lawsuit.pdf

50  Smith, J. Star-Telegram, *The Barnett Shale search for facts on fracking*, September 4, 2010

51  *Hydraulic fracturing ruins another water well and dream* http://txsharon.blogspot.com/2010/07/hydraulic-fracturing-ruins-another.html

52  Heinkel-Wolfe, P, Denton Record Chronicle, *Filmy water vexes family,* June 5, 2010

53  Evans, B, Wise County Messenger, Unwell water: *Drilling leaves a bad taste for some*, October 3, 2010

54  Douglas, J, WFAA, Texas acts on flaming faucets in Montague County. October 6, 2010

55  Wolf Eagle Environmental. Sept. 15, 2009. p. 2. Town of DISH, Texas Ambient Air Monitoring Analysis. Final Report. http://townofdish.com/objects/DISH_-_final_report_revised.pdf

56  Subra, W. (Subra Company). December 2009. *Results of Health Survey of Current and Former DISH/Clark, Texas Residents.* Report prepared for Earthworks. p. 10.

57  Subra,W. (Subra Company) December 2009. *Results of Health Survey of Current and Former DISH/Clark, Texas Residence.*

58  Wolf Eagle Environmental. Sept. 15, 2009. Town of DISH, Texas Ambient Air Monitoring Analysis. Final Report. http://townofdish.com/objects/DISH_-_final_report_revised.pdf NOTE: The full report is available at: http://www.bseec.org/sites/all/pdf/airquality/13.pdf

59  Wolf Eagle Environmental. Sept. 15, 2009. Town of DISH, Texas Ambient Air Monitoring Analysis. Final Report. p. 6, and pp 19-30. http://www.bseec.org/sites/all/pdf/airquality/13.pdf

60  Wolf Eagle Environmental. Sept. 15, 2009. Town of DISH, Texas Ambient Air Monitoring Analysis. Final Report. p. 6, and pp 19-30. http://www.bseec.org/sites/all/pdf/airquality/13.pdf

61  Wolf Eagle Environmental. Sept. 15, 2009. Town of DISH, Texas Ambient Air Monitoring Analysis. Final Report. p. 6, and pp 19-30. http://www.bseec.org/sites/all/pdf/airquality/13.pdf

62  Armendariz, A. Jan. 26, 2009. Emissions from Natural Gas Production in the Barnett Shale Area and Opportunities for Cost-Effective Improvements. Report prepared for Environmental Defense Fund. pp. 5-7. http://www.edf.org/documents/9235_Barnett_Shale_Report.pdf

63  Wolf Eagle Environmental. Sept. 15, 2009. *Town of DISH, Texas Ambient Air Monitoring Analysis*. Final Report. p. 6. http://townofdish.com/objects/DISH_-_final_report_revised.pdf

64  Shannon Ethridge, M.S. October 27, 2009. *Health Effects Review of Ambient Air Monitoring Data Collected by Wolf Eagle Environmental Engineers and Consultants for DISH, TX.* Texas Commission on Environmental Quality Inter-Office Memorandum. p. 35. http://www.tceq.state.tx.us/assets/public/implementation/barnett_shale/healthEffectReview.pdf

65  Texas Department of State Health Services. May 12, 2010. DISH, Texas Exposure Investigation - DISH, DENTON COUNTY, TEXAS. p. 1. http://www.dshs.state.tx.us/epitox/consults/dish_ei_2010.pdf

66  Texas Department of State Health Services. May 12, 2010. DISH, Texas Exposure Investigation - DISH, DENTON COUNTY, TEXAS. p. 4. http://www.dshs.state.tx.us/epitox/consults/dish_ei_2010.pdf

67  Texas Department of State Health Services. May 12, 2010. DISH, Texas Exposure Investigation - DISH, DENTON COUNTY, TEXAS. p. 2. http://www.dshs.state.tx.us/epitox/consults/dish_ei_2010.pdf

68  Centers for Disease Control. *Fourth National Report on Human Exposure to Environmental Chemicals.* p. 2. http://www.cdc.gov/exposurereport/index.html

69  Centers for Disease Control. *Fourth National Report on Human Exposure to Environmental Chemicals.* p. 3. http://www.cdc.gov/exposurereport/index.html

70  *Levels of 2,5-dimethylfuran in blood reflect recent exposure and are generally undetectable among nonsmoking adults.* (Source: Centers for Disease Control and Prevention web site: http://www.cdc.gov/exposurereport/data_tables/2,5-Dimethylfuran_ChemicalInformation.html)

71  For example, Armendariz reports that benzene, toluene, ethylbenzene and xylene, as well as trimethylpentane, n-hexane, were identified in a 2006 study that looked at air emissions from condensate tanks in Denton and Parker counties in the Barnett Shale. Concentrations were higher from Barnett Shale condensate tanks than from oil tanks in other parts of Texas. (Source: Armendariz, A. Jan. 26. 2009. Emissions from Natural Gas Production in the Barnett Shale Area and Opportunities for Cost-Effective Improvements. Report prepared for Environmental Defense Fund. pp. 15-16. http://www.edf.org/documents/9235_Barnett_Shale_Report.pdf).

72  Nine VOCs were found in the TxDSHS staff. But the TxDSHS samples were not identified by smoker vs. non-smokers. Looking at the date, one of the TxDSHS staff members was a smoker, because the chemical 2,5-dimethylfuran (a biomarker for smoking according to TxDSHS) was found in that person's blood.

There were two other chemicals, benzene and ethylbenzene that were only detected in the blood of one of the TxDSHS staff. These two chemicals are known to be present in cigarette smoke. So, out of a total of 9 chemicals detected in TxDSHS staff, it's quite likely that only 6 were detected in non-smokers. (See Table 2, p. 28 of the TxDSHS Investigation).

73  Texas Department of State Health Services. May 12, 2010. DISH, Texas Exposure Investigation - DISH, DENTON COUNTY, TEXAS. p. 1. http://www.dshs.state.tx.us/epitox/consults/dish_ei_2010.pdf

74  Texas Department of State Health Services. May 12, 2010. DISH, Texas Exposure Investigation - DISH, DENTON COUNTY, TEXAS. p. 8. http://www.dshs.state.tx.us/epitox/consults/dish_ei_2010.pdf

75  According to TxDSHS, AMCX is a "nonspecific" metabolite, and its presence in urine cold be caused by chemicals other than N,N-directly/formamide. (TxDSHS Exposure Investigation, p. 8).

76  Air data from Wolf Eagle Environmental. Sept. 15, 2009. Town of DISH, Texas Ambient Air Monitoring Analysis. Final Report. http://www.bseec.org/sites/all/pdf/airquality/13.pdf

Blood and water data from TxDSHS Exposure Investigation. Tables 1 b and 4.

77  Wolf Eagle Environmental. Sept. 15, 2009. *Town of DISH, Texas Ambient Air Monitoring Analysis*. Final Report. p. 6. http://townofdish.com/objects/DISH_-_final_report_revised.pdf

78  Texas Department of State Health Services. May 12, 2010. DISH, Texas Exposure Investigation - DISH, DENTON COUNTY, TEXAS. p. 2. http://www.dshs.state.tx.us/epitox/consults/dish_ei_2010.pdf

79  Texas Department of State Health Services. May 12, 2010. DISH, Texas Exposure Investigation - DISH, DENTON COUNTY, TEXAS. p. 2. http://www.dshs.state.tx.us/epitox/consults/dish_ei_2010.pdf

80  E.g., ethylbenzene sine non-smoker was above the reference level, and also had a higher concentration than two smokers; toluene (one non-smoker was above the reference level, and also had a higher concentration than one smoker), o-xylene (one non-smoker was above the reference level and also had higher concentration than one smoker) and m-/p-xylenes (two non-smokers had concentrations higher than the reference level, and concentrations higher than 3 smokers). See Table 1b of the TxDSHS report.

81  Texas Department of State Health Services. May 12, 2010. DISH, Texas Exposure Investigation - DISH, DENTON COUNTY, TEXAS. p. 10. http://www.dshs.state.tx.us/epitox/consults/dish_ei_2010.pdf

82  Texas Department of State Health Services. May 12, 2010. DISH, Texas Exposure Investigation - DISH, DENTON COUNTY, TEXAS. p. 2. http://www.dshs.state.tx.us/epitox/consults/dish_ei_2010.pdf

83  ABC Alliance web site. Followed @ Argyle Intermediate School. http://abcalliance.org/?page_id=548

84  March 16, 2010. Personal communication with Argyle-Bartonville Communities Alliance. http://abcalliance.org/

85  Argyle-Bartonville Communities Alliance web site. http://abcalliance.org

86  October 18, 2010, Texas Commission on Environmental Quality. Laboratory Analysis Results. ACL Number: 101035. http://www.tceq.state.tx.us/assets/public/implementation/tox/barnettshale/healthevaL/acl/101035.pdf

87  http://www.dentonrc.com/sharedcontent/dws/drc/localnews/stories/DRC_Argyle_Drilling_1024.1bd9f97.c2.html

88  Urbina, I. *Regulation Lax as Gas Wells' Tainted Water Hits Rivers*. The New York Times. February 26, 2011

89  Presentation by Sharon Wilson to the Environmental Protection Agency, Office of Air Quality Planning and Standards, October 4, 2010; and Presentation by Sharon Wilson to the Environmental Protection Agency, Office of Air and Radiation, December 10, 2010.

90  Denton Central Appraisal District. Account 65735. http://www.dentoncad.com

91  http://www.dentonrc.com/sharedcontent/dws/drc/localnews/stories/DRC_Argyle_Drilling_1024.1bd9f97.c2.html

92  Evans, B. September 23, 2010. *Flight for survival: Toxic Emissions force family to leave home*. Wise County Messenger. http://www.wcmessenger.com/news/content/EkIVE2EyuV8tnmajzo.php

93  CEQ Investigation #849227, Texas Public Information Request

94  Texas Commission on Environmental Quality. July 28, 2010. Laboratory Analysis Results. ACL Number 100732.

95  Evans, B. September 23, 2010. *Flight for survival: Toxic Emissions force family to leave home*. Wise County Messenger. http://www.wcmessenger.com/news/content/EkIVE2EyuV8tnmajzo.php

96  Evans, B. September 23, 2010. *Flight for survival: Toxic Emissions force family to leave home*. Wise County Messenger. http://www.wcmessenger.com/news/content/EkIVE2EyuV8tnmajzo.php

97  TCEQ complaint #131635

98  Wolf Eagle Environmental, January, 2010. Ruggiero, Mr. & Mrs., Decatur, TX. https://docs.google.com/fileview?id=0Bw-wqxtQkh00nkjbfAZG1242hitOR1wc209tNDA3LTRzOWNTNTmAklmJfmZJg1NWxIhdl=en

99  TCEQ Complaint #134722, TCEQ Complaint #135420

100 April 1, 2010, Railroad Commission of Texas. Ruggiero (Christina) Complaint No. 09-10-9535.

101 Heinkel-Wolfe, P. September 18, 2010. *Drilling can dig into land value.* Denton Record Chronicle. http://www.dentonrc.com/sharedcontent/dws/drc/localnews/stories/DRC_DrillValues_0918.104f6e9a90.html

102 Heinkel-Wolfe, P. September 18, 2010. (See footnote 101)

103 Personal communication. August 2010.

104 May 25, 2009. Wolfe Eagle Environmental. Ambient Air Monitoring Analysis Project, Final Report. http://earthworksaction.org/TXOGAP-CaseStudy-Rogers.cfm

105 May 25, 2009. Wolfe Eagle Environmental. Ambient Air Monitoring Analysis Project, Final Report. http://earthworksaction.org/TXOGAP-CaseStudy-Rogers.cfm

106 July 30, 2009. Letter to Mayor of Wentworth from E. Murl Baily, Jr. Veterinary Toxicologist at Texas A&M. http://earthworksaction.org/TXOGAP-CaseStudy-Rogers.cfm

Case No. 1:20-cv-02484-MSK   Document 92   filed 05/06/21   USDC Colorado   pg 338 of 500








<u>**Healthy Air Questionnaire**</u>
<u>**Final Report**</u>

**Clean Air & Healthy Communities**

## I. Introduction

Sublette County, in the center of the Upper Green River Valley in Western Wyoming, was once known for its exceptionally clean, clear air, with one hundred-mile views that reached to the surrounding Wind River, Wyoming, Gros Ventre and Uinta mountain ranges. Sublette's clean air was primarily due to a very low human population, with the principal economic activities centered on federal agency employment, cattle ranching and tourism.

Today, the Upper Green River Valley is a proposed, U.S. Environmental Protection Agency (EPA) non-attainment area for ozone, and has received the state's first Wyoming Dept. of Environmental Quality (DEQ) "ozone advisories" ever issued.  The main constituents of Sublette's high ozone levels are Volatile Organic Compounds (VOCs) and nitrogen oxides (NOx) which come from natural gas field emissions rapidly developing within the valley.

Ground-level ozone is dangerous not only for healthy residents, but especially for those with existing breathing problems, children, and the elderly.

- Experts writing in the respected *New England Journal of Medicine* conclude that people are at risk of premature death from respiratory causes in association with increases in ozone concentration.[1]

- Sublette County air quality has received an ozone grade of "F" from the American Lung Association.[2]  Of Sublette residents, more than 2,300 people are at greater risk for cardiovascular disease, and 2,255 children, more active when they are outdoors, face greater risk of infection, coughing and bronchitis from air pollution. They may even suffer from lower lung function, putting them at greater risk of lung disease as they age.  Over 770 older residents also face a greater risk of respiratory and cardiovascular problems from breathing ozone.

- DEQ air quality monitors registered 13 days between January and March when ozone levels exceeded the eight-hour health standard of 75 parts per billion (ppb). That includes a March 2 ozone reading of 166 ppb -- higher than the worst ozone levels recorded last year in Los Angeles.

---

[1] Jerrett, Michael, Ph.D., Richard T. Burnett, Ph.D., C. Arden Pope III, Ph.D., et al. Long-Term Ozone Exposure and Mortality. N Engl J Med 2009; 360:1085-95.
[2] American Lung Association: http://www.stateoftheair.org/2011/states/wyoming/sublette-56035.html

## II. Background

The Wyoming Dept. of Environmental Quality (DEQ) maintains air quality monitors at sites around the Upper Green River Valley, and has recorded meteorological information and levels of particulate matter, ozone, and nitrogen dioxide since 2005.[3]

According to the DEQ, ozone is created at ground level generally during the months of Feb. through April in the Upper Green River Basin.[4] Ozone forms when NOx and VOCs from local natural gas field infrastructure is met with snow cover, sunlight, and low winds under the lid of wintertime, valley inversions.  This unusual phenomenon is in contrast to ozone formation that normally occurs during summer months in urban areas.   Not to be confused with atmospheric ozone, excessive amounts of ground-level ozone can increase the risk of premature death from respiratory causes.

Sublette County ozone has become the subject of several research and monitoring projects and intense interest by the scientific community.  However, the studies have focused primarily on the causes and levels of wintertime ozone, with little attention to the direct human impacts and physical symptoms experienced by Sublette County residents.

During early February, 2011 Citizens for Responsible Energy Development (CURED) and the Upper Green River Alliance (UGRA) distributed a *Healthy Air Questionnaire* to Sublette County residents, with relevant questions about the air they breathe as they live, work and recreate in Sublette County.

The *Healthy Air Questionnaire* was designed to serve two main purposes:
1. To educate residents and increase public awareness of the potential health risks associated with local air pollution.
2. To assess whether people are experiencing documented symptoms associated with breathing ozone and Toxic Air Contaminants.

Additionally, a "Sublette County Human Health Risk Assessment Air Toxics Inhalation" project workplan (see Appendix A) conducted by Sublette County, the Wyoming Dept. of Health, and the Wyoming DEQ was intended to examine the broad question of "whether air pollutant emissions from gas extraction activities pose any significant risk of adverse health effects."

The Upper Green River Alliance and Citizens United for Responsible Energy Development were contacted by citizens expressing health concerns about breathing ground-level ozone and Toxic Air Contaminants.  The two organizations

---

[3] http://www.wyvisnet.com/all.aspx
[4] http://deq.state.wy.us/aqd/Ozone/Pinedale%20Public%20Meeting%20on%20January%2021%202010%20EI%20v4.pdf

2

were interested in physical symptoms that concerned citizens may have experienced during ozone events that were not considered in other scientific studies, and so asked randomly-selected Sublette County residents about their reactions during the winter "ozone season."

## III. Procedures

A two-page *Healthy Air Questionnaire* (see Appendix B) was developed by UGRA and CURED, based on health risk information from the American Lung Association and EPA.  Prior to finalizing the survey, two individuals in the medical field were asked to review the survey and make corrections and/or suggestions.

The survey was sent to 105 households in the areas of Boulder, Pinedale, Cora, and Daniel using mailing addresses obtained from the Sublette County GPS system.  The surveys were mailed, along with a cover letter and contact information, during the week of Feb. 7, 2011 and recipients had two weeks to return the survey.  All information was to be kept confidential.  Recipients were given the opportunity to provide their names if they wanted a copy of the survey results.

Data was compiled using Microsoft Excel and analyzed using descriptive statistics.  Comments made by individuals were also recorded (see Appendix C).

## IV. Results

Completed surveys were received from 23 households, constituting a 22% return rate.  The households reported on a total of 43 people (22 females and 21 males).  The age range was one (1) to 83 years of age, with a mean of 56.44 and a standard deviation of 15.93.

None of the 43 individuals reported they were current smokers.  Three males and one female indicated they had been a smoker five or more years ago.

Fifty-one percent (51%) of all individuals in the survey work out-of-doors and 89% recreate out-of-doors.

No established patterns or relationships were detected between where respondents lived, worked or recreated.

Sixty-seven percent (67%) of all respondents reported that they had one or more of the following symptoms:  persistent irritation in throat/nasal passage/chest; persistent cough; watery/itchy eyes; uncomfortable sensation in chest; rapid and shallow breaths while exercising or working out-of-doors; sudden onset of headache; dizziness; and nausea.  Other symptoms experienced by respondents are listed in Table A.  Thirty-eight percent (38%) of these people indicated they had three or more symptoms.

**Table A**
**Health Effects**

|  | Female | Male | Total |
|---|---|---|---|
| Persistent irritation in throat/nasal passage/chest | 6 | 7 | 13 |
| Persistent cough | 4 | 5 | 9 |
| Uncomfortable sensation in chest | 2 | 2 | 4 |
| Breathing in uncomfortable painful | 1 | 1 | 2 |
| Rapid and shallow breaths while exercising or working out-of-doors | 3 | 2 | 5 |
| Watery/Itchy eyes | 10 | 6 | 16 |
| Skin irritation | 4 | 3 | 7 |
| Decreased sense of taste and/or smell | 1 | 1 | 2 |
| Irregular heart rate | 3 | 1 | 3 |
| Sudden onset of headache | 7 | 3 | 10 |
| Dizziness | 6 | 1 | 7 |
| Nausea | 3 | 0 | 3 |
| Depression or mood swings | 4 | 3 | 7 |

The three most-noted symptoms were:
1. Watery/itchy eyes:  37%
2. Persistent irritation in throat/nasal passages/chest:  30%
3. Sudden onset of headache:  23%

Eleven survey respondents reported smelling an uncommon odor, and the most noted description was that of a chemical smell.  Four people felt the odor was coming from the gas fields, and one identified the Pinedale sewer lagoon as a source of odor.

## V. Discussion

The *Questionnaire* was administered during what has become known as Sublette County's "ozone season" to attempt to identify physical effects felt by local residents as they recreate and work outdoors when high ozone levels are present.  However, we acknowledge that the *Healthy Air Questionnaire* is a limited study in both sample size and length of sampling time.

The response rate was approximately 22% of all *Questionnaires* sent.  Had the study extended into March when ozone levels far exceeded health standards, we may have received more responses.  The return rate may also have been influenced by a perception of bias against local natural gas development, or by a general attitude about any survey's usefulness.

Nonetheless, we were able to discern a pattern among respondents, which corresponds with symptoms recognized in the scientific literature that are associated with inhaling either ozone or Toxic Air Contaminants.

Scientific studies on breathing ozone have shown increased hospitalization from respiratory causes.[5]  The *Questionnaire* respondents reported increases in respiratory and eye, nose and throat irritation.

While Sublette County doesn't have a hospital, the local medical clinic reported an increase in visitation for respiratory causes during the high ozone episodes of this past winter.[6]

It should be noted that gas field workers and others who work or recreate outdoors may experience greater exposure to pollutants than those who stay indoors, not only through inhalation, but also through dermal exposure.  However, it is difficult to track health impacts on the oil and gas industry workforce because it is typically transient.

Smokers may be especially at risk due to the synergistic effects of ozone exposure and cigarette smoke.[7]  Individual responses to air pollutants may vary depending on age, gender, and lifestyle.

The "Sublette County Human Health Risk Assessment Air Toxics Inhalation" project, which in the final report was re-named, "Screening Health Risk Assessment, Sublette County, Wyoming,"[8] "did not address a detailed analysis of ozone data collected

---

[5]  Koken PJ, Piver WT, Ye F, Elixhauser A, Olsen LM, Portier CJ. 2003. Temperature, air pollution, and hospitalization for cardiovascular diseases among elderly people in Denver. *Environ Health Perspec*; 111: 1312-1317
[6] Casper Star Tribune: "Sublette ozone spikes continue." http://trib.com/news/local/state-and-regional/article_02afbccc-66cc-5178-84a6-d4644c3ff1c7.html
[7] http://toxsci.oxfordjournals.org/content/65/1/1.full.pdf (Bhalla 2002)
[8] http://www.sublettewyo.com/DocumentView.aspx?DID=438

during the monitoring program," even though the work plan "intended to describe a proposed study of the risks to human health for citizens of Sublette County who are exposed to air toxics and ozone as they live and work in the County." (Appendix A). The "Health Risk Assessment" final report mentions ozone only briefly: "the lack of an exceedance during the air toxics monitoring program discussed herein, and the infrequent wintertime excursions of ozone concentrations above the 75 ppb 8-hour NAAQS observed in the Upper Green Winter Ozone Study, suggests that such health effects are not expected to occur in Sublette County."[7] This conclusion was released just prior to the worst ozone levels ever recorded in the Upper Green River Valley. The "Health Risk Assessment" did not attempt to determine physical impacts or symptoms felt by local residents.

The "Screening Health Risk Assessment" did find low levels of Toxic Air Contaminants which were listed in the final report.[8] For each of the chemicals listed, there are Material Safety Data Sheets available on the internet that indicate physical symptoms associated with exposure. The *Questionnaire* found some correlation between MSDS sheet symptoms and those reported by respondents.

For example, acetaldehyde, which was detected in the "Screening Health Risk Assessment" report[9] at the Bargerville site, "Causes severe eye irritation and is a lachrymator (substance which increases the flow of tears)."[10] "Watery/itchy eyes" was the most-reported physical symptom among survey respondents. Acetaldehyde also causes respiratory tract irritation, and breathing vapors may cause dizziness: a symptom reported by seven survey respondents.

The Material Safety Data Sheet (MSDS) for formaldehyde[11], a chemical also found in the "Screening Health Risk Assessment" report indicates that potential health effects include "irritation and sensitization of the respiratory tract." Persistent irritation in the throat/nasal passages/chest was the second-most reported physical symptom among *Questionnaire* respondents.

Table B assembles the human health symptoms listed in MSDS sheets which are associated with exposure to the Toxic Air Contaminants found in the Bargerville site of the "Screening Health Risk Assessment" study. Many of these human health symptoms were also reported by respondents of the *Questionnaire*.

Ten of 23 households, or 43%, reported both symptoms and uncommon odors. While association between symptoms and odors are difficult to attribute, those who are smelling uncommon odors are likely also inhaling them.

---

[9]  Sublette County Air Toxics Monitoring: http://deq.state.wy.us/aqd/Ozone/Sublette_Final_Report.pdf
[10] Thermo Fisher Scientific Inc.: http://fscimage.fishersci.com/msds/91732.htm
[11] Mallinckrodt Baker, Inc.: http://www.jtbaker.com/msds/englishhtml/f5522.htm

**Table B**
**"Sublette County Human Health Risk Assessment"**
**Chemicals detected in Bargerville and corresponding exposure symptoms**

| Symptom | Chemicals found at Bargerville associated w/symptom |
|---|---|
| Respiratory tract irritant | Formaldehyde, Acetaldehyde, 1,1,1-Trichloroethane, 1,2,4-Trimethylbenzene, 1,2-Dichloroethane, 1,3,5-Trimethylbenzene, 2-Butanone, 2-Propanol, 4-Ethyltoluene, Acetone, Bromomethane, Carbon Disulfide, Ethanol, Ethyl Benzene, Methylene Chloride, Propylbenzene, Toluene |
| Eye irritant | Acetaldehyde, 1,1-Dichloroethene, 2-Propanol, 4-Ethyltoluene, Ethyl Benzene, Freon 12, m,p-Xylene, o-Xylene, Propylbenzene |
| Causes eye, skin, and respiratory tract irritation | 1,1,1-Trichloroethane, 1,2-Dichloroethane, 1,3,5-Trimethylbenzene, 2,2,4-Trimethylpentane, 4-Ethyltoluene, 4-Methyl-2-pentanone, Acetone, Benzene, Cyclohexane, Heptane, Hexane, m,p-Xylene, Propylbenzene, Styrene, Tetrahydrofuran, Toluene, Trichloroethylene |
| May cause sore throat | 1,3,5-Trimethylbenzene, 2-Butanone, Ethyl Benzene |
| May cause shortness of breath | 2-Butanone, Ethyl Benzene, Trichloroethylene |
| Carcinogen (causes cancer) | 1,2-Dichloroethane, Benzene, Bromomethane, Methylene Chloride, Propylbenzene, Trichloroethylene |
| May cause lung damage | m,p-Xylene, o-Xylene |
| May cause respiratory stimulation | Formaldehyde |
| May cause pulmonary edema | Formaldehyde, 1,2,4-Trimethylbenzene, o-Xylene, Styrene, Tetrahydrofuran |
| May cause damage to central nervous system | 1,2-Dichloropropane, 1,3,5-Trimethylbenzene, 2-Butanone, 2-Propanol, Acetone, Benzene, Carbon Disulfide, Chloromethane, Cyclohexane, Ethanol, Ethyl Benzene, Freon 12, m,p-Xylene, Methylene Chloride, o-Xylene, Propylbenzene, Styrene, Toluene, Trichloroethylene |
| May cause allergic reactions | Trichloroethylene |
| May damage cardiovascular system | Freon 12 |
| May cause liver and/or kidney damage | 4-Methyl-2-pentanone, Bromomethane, Chloromethane, o-Xylene, Toluene, Trichloroethylene |
| May cause heart damage/irregular heart beat | Chloromethane, Freon 11, Freon 12, Trichloroethylene |

7

| Harmful by ingestion, inhalation or skin absorption. | 1,1-Dichloroethene, 1,2-Dichloroethane, 1,2-Dichloropropane |
|---|---|
| May cause narcotic effects | 1,1,1-Trichloroethane, 1,2-Dichloroethane, 2,2,4-Trimethylpentane, 2-Propanol, Cyclohexane, Heptane, Hexane |
| May lead to irreversible bone marrow injury | Benzene |
| Decreased sense of taste and/or smell | Formaldehyde |
| Sudden onset of headache | 1,1,1-Trichloroethane, 1,2,4-Trimethylbenzene, 1,2-Dichloroethane, 1,2-Dichloropropane, 1,3,5-Trimethylbenzene, 2-Butanone, 2-Propanol, Acetone, Benzene, Carbon Disulfide, Freon 11, Hexane, Methylene Chloride, o-Xylene, Tetrachloroethene, Tetrahydrofuran, Toluene, Trichloroethylene |
| May cause dizziness/fatigue | 1,1,1-Trichloroethane, 2,2,4-Trimethylpentane, 2-Butanone, 2-Propanol, Acetone, Benzene, Carbon Disulfide, Chloromethane, Ethanol, Freon 11, Heptane, Hexane, Methylene Chloride, o-Xylene, Tetrachloroethene, Tetrahydrofuran, Toluene |
| May cause nausea/vomiting | 1,2,4-Trimethylbenzene, 1,2-Dichloroethane, 1,2-Dichloropropane, 1,3,5-Trimethylbenzene, 2-Butanone, 4-Ethyltoluene, Benzene, Carbon Disulfide, Ethanol, Ethyl Benzene, Heptane, Methylene Chloride, Tetrachloroethene, Tetrahydrofuran, Trichloroethylene |
| May cause depression/mood swings | Acetone, Benzene, Chloromethane, Trichloroethylene |
| Immediately dangerous to life or health | 1,2-Dichloropropane, Heptane, Hexane, Tetrachloroethene, Toluene, Trichloroethylene |
| May cause death | 1,1-Dichloroethene, 1,2-Dichloroethane, Carbon Disulfide, Ethanol, Freon 11, Hexane, m,p-Xylene, Methylene Chloride, Tetrachloroethene, Toluene |

## I. Conclusions

The *Healthy Air Questionnaire* found a pattern of responses which corresponds with symptoms recognized in the scientific literature that are associated with breathing ozone and Toxic Air Contaminants. The relationship between scientific studies, Sublette County ozone monitoring data, and results of the *Healthy Air Questionnaire* suggests that breathing in Sublette County may be hazardous to long-term and short-term human health.

One in three individuals is impacted by breathing ground-level ozone.[12] Not all individuals may be affected in the same manner.  Of all *Healthy Air Questionnaire* respondents, 67% reported one or more of the symptoms associated with breathing ozone that are reported in the scientific literature, and 38% of respondents reporting experiencing at least three symptoms.

Eighty-three percent (83%) of households were supportive of continual assessment of health risks associated with air pollution in Sublette County.  None of the *Questionnaire* respondents have had their health care provider discuss the subject of ozone or other air pollutants when being evaluated for upper respiratory symptoms.

Scientific studies clearly indicate that breathing ground-level ozone, even for short periods, results in numerous and long-lasting human health impacts.  Short-term increases in ozone concentrations increase the risk of hospitalization for COPD and pneumonia, and cause a decline in lung function.

Studies also show that newborns breathing ozone are increasingly admitted to hospitals for respiratory disease, and children with asthma are especially vulnerable.

Short-term increases in ozone are found to increase premature deaths from heart and lung disease.

## VII. Recommendations

Because the vast majority (83%) of responding households supported continual assessment of health risks associated with air pollution; and due to exceedingly high ozone levels recently recorded in Sublette County, we recommend that continual assessment of health risks associated with air pollution be conducted by health care professionals.

Based on *Questionnaire* responses, we also recommend and that health care providers begin to discuss the subject of ozone or other toxic air pollutants when being evaluated for upper respiratory symptoms.

It may be advisable for local schools and day care centers to utilize this *Questionnaire* and be aware that all children should be protected during an ozone alert rather than just those with known respiratory conditions.

Residents may also benefit from knowing *Questionnaire* results that show that area residents have experienced symptoms that are associated with breathing ozone: an awareness that make help them make better decisions to protect their health during future DEQ ozone advisories.

---

[12] http://www.airnow.gov/index.cfm?action=smog.page1

Finally, we note that Upper Green River Alliance and Citizens United for Responsible Energy Development, along with other conservation groups, petitioned the Wyoming Environmental Quality Council (EQC) to lower the Sublette County ozone standard to 65 ppb due to our unique ozone conditions.  While the EQC denied our request, the extreme ozone levels during the winter of 2011 serve to emphasize the importance of an ozone standard that truly protects human health.  We believe a lower ozone standard for Sublette County is justified and appropriate.

**Acknowledgements**

We wish to thank all Sublette County residents who participated in the *Healthy Air Questionnaire,* and members and supporters of the Upper Green River Alliance and Citizens United for Responsible Energy Development.

# References

AIRNow. "AIRNow." *AIRNow.gov*. 2011.
http://www.airnow.gov/index.cfm?action=smog.page1 (accessed 2011).

American Lung Association. *State of the Air 2011*. 2011.
http://www.stateoftheair.org/2011/states/wyoming/sublette-56035.html (accessed May 2011).

Avantor Performance Materials. "Material Safety Data Sheet, FORMALDEHYDE."
*Avantor Performance Materials*. 2011. (accessed May 2011).

Bhalla, Deepak K. "Interactive Effects of Cigarette Smoke and Ozone in the Induction of Lung Injury." *Toxicological Sciences*, 2002: 65, 1-3.

Jerrett, Michael, Ph.D., Richard T. Burnett, Ph.D., C. Arden Pope III, Ph.D. et al. "Long-Term Ozone Exposure and Mortality." *The New England Journal of Medicine*, 2009: 360:1085-95.

Koken, PJ, WT Piver, F Ye, et al. "Temperature, air pollution, and hospitalization for cardiovascular diseases among elderly people in Denver." *Environmental Health Perspectives*, 2003: 111: 1312-1317.

"Material Safety Data Sheet, Acetaldehyde." *Fisher Scientific*. 2011.
http://fscimage.fishersci.com/msds/91732.htm (accessed May 2011).

Sierra Research, Inc. "Screening Health risk Assessment, Sublette County, Wyoming."
*Sublette County, Wyoming*. January 2011.
http://www.sublettewyo.com/DocumentView.aspx?DID=438 (accessed 2011).

Urbigkit, Cat. "Casper Star Tribune." *trib.com*. March 5, 2011.
http://trib.com/news/local/state-and-regional/article_02afbccc-66cc-5178-84a6-d4644c3ff1c7.html (accessed May 2011).

Wyoming Dept. of Environmental Quality - Air Quality Division. January 21, 2010.
http://deq.state.wy.us/aqd/Ozone/Pinedale%20Public%20Meeting%20on%20January%2021%202010%20EI%20v4.pdf (accessed May 2011).

*WYVISNET.com*. 2011. http://www.wyvisnet.com/all.aspx (accessed 2011).

# Further Reading

**1. Brunekreef (1994):** The study examined effects of ozone in amateur bicyclists in the Netherlands. Researchers collected lung function measurements before and

11

after summer training sessions or competitive races. Ozone concentrations were low on most occasions, with an average of 0.043 parts per million. These low ozone concentrations were significantly associated with a decline in lung function and an increase in respiratory symptoms, especially shortness of breath. The effect persisted even after removing all observations with hourly ozone concentrations greater than 0.060 parts per million.[13]

**2. Medina-Ramon (2006):** A very large study of Medicare recipients in 36 U.S. cities evaluated the effect of ozone and particulate matter on respiratory hospital admissions in the elderly over a 13-year period. The analysis found that the risk of daily hospital admissions for chronic obstructive pulmonary disease (COPD) and pneumonia increased with short-term increases in ozone concentrations during the warm season. Eight-hour mean ozone concentrations in the warm season ranged from 0.015 ppm in Honolulu to 0.063 ppm in Los Angeles, with most cities in the 0.040-0.055 ppm range.[14]

**3. Dales (2006):** This research study examined 15 years of data on newborns in 11 large Canadian cities to determine the influence of gaseous air pollutants on daily hospitalizations for respiratory causes. Ozone concentrations were extremely low, ranging from a 24-hour mean of 0.013 parts per million in Vancouver to 0.023 parts per million in Saint John. Although hospital admissions for respiratory disease are relatively uncommon in newborns compared with adults, this study found a strong association with ozone. In fact, the study suggests that air pollution at ambient levels seen in Canada could account for 15 percent of hospital admissions in newborns.[15]

**4. Naeher (1999):** Scientists examined the relationship between air pollution and daily changes in lung function in about 500 nonsmoking women in Roanoke, Virginia over the summers of 1995-1996. A 0.030 parts per million increment in 24-hour average ozone was associated with a decrease in evening peak expiratory flow. Ozone concentrations in this study were well below the current eight-hour ozone standard.  The mean daily maximum 8-hour ozone concentration was 0.054 parts per million, and concentrations never exceeded 0.088 parts per million.[16]

**5. Brauer (1996):** A study of the effect ozone exposure on lung function of outdoor farm workers was undertaken in British Columbia. The mean work shift

---

[13] Brunekreef B, Hoek G, Breugelmans O, Leentvaar M. 1994. Respiratory Effects of Low-level Photochemical Air Pollution in Amateur Cyclists. *Am J Respir Crit Care Med*; 150: 962-966.

[14] Medina-Ramón M, Zanobetti A, Schwartz J. 2006. The Effect of Ozone and PM10 on Hospital Admissions for Pneumonia and Chronic Obstructive Pulmonary Disease: A National Multicity Study. *American Journal of Epidemiology*; 163: 579-588.

[15] Dales RE, Cakmak S, Doiron MS. 2006. Gaseous Air Pollutants and Hospitalization for Respiratory Disease in the Neonatal Period. *Environ Health Perspect*; 114: 1751-1754.

[16] Naeher LP, Holford TR, Beckett WS, Belanger K, Triche EW, Bracken MB, Leaderer BP. 1999. Healthy Women.s PEF Variations with Ambient Summer Concentrations of PM10, PM2.5, SO4 2-, H+, and O3. *Am J Respir Crit Care Med*; 160: 117-125.

concentrations were low, just 0.026 parts per million, with a maximum of 0.054 parts per million. The study found that exposures were associated with decreased lung function over the day, which persisted to the following day. Even after excluding all days when the ozone was greater than 0.040 parts per million, investigators still observed reduced lung function.[17]

**6. Chan (2005):** This study in Taiwan reported acute lung function decline in mail carriers exposed to ozone concentrations below the current air quality standard. The average eight-hour concentration of ozone in this study was 0.036 parts per million, and the maximum concentration was 0.065 parts per million. Each 0.010 parts per million increase in the eight-hour ozone concentration, decreased the night-time peak expiratory flow rate.[18]

**7. Mortimer (2002):** The effect of daily ambient air pollution was examined in a cohort of 864 asthmatic children in eight urban areas of the U.S. in a long-term study. Eight-hour average daytime ozone concentrations were 0.048 parts per million, with a range across cities of 0.034 to 0.058 parts per million. Adverse effects were observed in all cities.  Summertime ozone at levels below the current air quality standards was significantly related to respiratory symptoms and decreased pulmonary function in children with asthma.[19]

**8. Bell (2004):** This is a large 14-year study of residents of 95 U.S. cities, in which short-term increases in ozone were found to increase deaths from heart and lung disease. Even when days exceeding 0.060 parts per million were excluded from the analysis, the mortality effect was evident.[20]

**9. Adams (2002, 2006):** Controlled human exposure studies offer the most compelling evidence of the effects of ozone on lung health. EPA has undertaken a careful re-analysis of the underlying data in the Adams studies to assess the change in lung function following exposure to ozone while exercising. The pre- to post-exposure analysis shows that 6.6 hour exposures to 0.060 parts per million ozone causes a statistically significant decrease in group mean lung function compared to filtered air, in healthy young adults.[21]

---

[17] Brauer M, Blair J, Vedal S. 1996. Effect of Ambient Ozone Exposure on Lung Function in Farm Workers. *Am J Respir Crit Care Med*; 154: 981-987.

[18] Chan C-C, Wu T-H. 2005. Effects of Ambient Ozone Exposure on Mail Carriers. Peak Expiratory Flow Rates. *Environ Health Perspect*; 113: 735-738.

[19] Mortimer, KM, Neas LM, Dockery DW, Redline S, Tager IB. 2002. The effect of air pollution on inner-city children with asthma. *Eur Respir J*; 19: 699-705.

[20] Bell ML, McDermott A, Zeger SL, Samet JM, Dominici F. 2004. Ozone and short-term mortality in 95 US urban communities, 1987-2000. *JAMA*; 292: 2372-2378.

[21] U.S. EPA Memorandum from James S. Brown, EPA, NCEA-RTP Environmental Media Assessment Group, Thru Mary Ross, EPA, NCEA-RTP, EMAG Branch Chief and Ila Cote, EPA, NCEA-RTP, Director, To Ozone NAAQS Review Docket (OAR-2005-0172), The Effects of Ozone on Lung Function at 0.06 ppm in Healthy Adults, June 14, 2007.

**10. Mauderly (2009):** Environmental air polluntants are inhaled as complex mixtures, but the dominant focus on monitoring and research on individual pollutants has provided insight into pollutant interactions that may be important to health.  This study attempted to determine whether synergistic effects from combinations of pollutants on human health have actually been demonstrated. Synergisms involving ozone have been demonstrated by laboratory studies of humans and animals.  Authors conclude that the plausibility of synergisms among environmental pollutants has been established.[22]

---

[22] Mauderly, Joe L., Jonathan M. Samet. 2009."Is There Evidence for Synergy Among Air Pollutants in Causing Health Effects?" *Environmental Health Perspectives*; 117: 1

## Appendix A

**SUBLETTE COUNTY
HUMAN HEALTH RISK ASSESSMENT
AIR TOXICS INHALATION**

**DRAFT WORK PLAN**

**JULY 25, 2008**

### Overall Plan

This work plan, as requested by the Sublette County Commissioners, is intended to describe a proposed study of the risks to human health for citizens of Sublette County who are exposed to air toxics and ozone as they live and work in the County. The work plan is intended to be responsive to a citizen petition submitted in March 22, 2008, to a number of agencies including the office of Governor Dave Freudenthal, the Sublette County Commission, the Wyoming Department of Health, and the Wyoming Department of Environmental Quality.

The process of conducting an air toxics risk assessment will start by selection of chemicals of potential concern to be evaluated. These chemicals will include chemicals known to be produced and emitted during drilling, completion and production of natural gas and from activities ancillary to such industrial processes. Most air samples collected during the study will be analyzed for the identified chemicals of potential concern, and a subset of samples will be analyzed for a broader range of constituents to ensure that the study does not miss a particular air toxic. Samples will also be collected for ozone for evaluation in the risk assessment.

The study will also determine the exposure patterns for residents and sensitive subpopulations, and will then assess the expected human health risk resulting from exposure of those residents to air toxics and ozone measured in the ambient air throughout the County. The risk assessment will be conducted in accord with EPA guidance for how screening level air toxics risk assessments should be performed, and will also consider the risk assessment methods used in a recently completed risk assessment which evaluated residents' risks due to exposure to similar air contaminants in Garfield County, Colorado.

1

15

**Appendix B**

### HEALTHY AIR QUESTIONNAIRE

Please complete this questionnaire as thoroughly as possible.  All information will be kept confidential.  Identity of participants and individual responses will not be revealed in any publication or presentation of questionnaire results.

Please provide the following information for each person in your household. If more space is needed please put information on a separate sheet of paper.

| Person | M / F | age | Smoking History | | Outdoor Employment / work | | Outdoor Recreation / skiing, gardening, etc. | | Comments |
|---|---|---|---|---|---|---|---|---|---|
| | | | current (Y/N) | 5+ yrs ago (Y/N) | avg hrs/wk | Location (map code) | avg hrs/wk | Location (map code) | |
| **A** | | | | | | | | | |
| **B** | | | | | | | | | |
| **C** | | | | | | | | | |
| **D** | | | | | | | | | |
| **E** | | | | | | | | | |

For each individual in your household, please make a √ if they have experienced any of the following symptoms while <u>in Sublette County within the last five years.</u>  Do not include common cold or flu symptoms.

| Symptom* | Person A | Person B | Person C | Person D | Person E | Comments |
|---|---|---|---|---|---|---|
| Persistent irritation in throat/ nasal passages/ chest | | | | | | |
| Persistent Cough | | | | | | |
| Uncomfortable sensation in chest | | | | | | |
| Breathing is uncomfortable/ painful | | | | | | |
| Rapid and shallow breaths while exercising or working out-of-doors | | | | | | |
| Watery/ itchy eyes | | | | | | |
| Skin Irritation (e.g., rash, itchy) | | | | | | |
| Decreased sense of taste and / or smell | | | | | | |
| Irregular Heart Beat | | | | | | |
| Sudden onset of headache | | | | | | |
| Dizziness | | | | | | |

16

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Nausea | | | | | | | |
| Depression / mood swings | | | | | | | |
| Other<br>(specify)_____ | | | | | | | |
| Other<br>(specify)_____ | | | | | | | |

*References:  www.lungusa.org/; www.epa.gov/; http://deq.state.wy.us/aqd/Ozone Air Toxics_Sublette County.asp

Has anyone in your household been diagnosed with cancer in the last 5 years?   Yes  No
Type_____


Has anyone in your household been diagnosed with any of the following conditions?
Please identify by using person A, B, C, D, or E.

| | Asthma | COPD | Chronic Bronchitis |
|---|---|---|---|
| **Person(s)** | | | |
| How Long? | | | |
| Has condition been aggravated in last 5 years?  If so, explain below. | | | |
| Has any person gone to the emergency room because of this condition? | | | |

Explanation and/or Comments_____
_____
_____

Has any health care provider discussed with you the subject of ozone or other air
pollutants when being evaluated for upper respiratory symptoms?    Yes    No

**Odors**

Have individuals in your household experienced uncommon odors in the outside air?
          Yes     No

If yes, please describe timing of the odor events, to the best of your recall
(season, frequency per week or month, duration of odor event, etc.)   _____
_____
_____
_____
_____

Please describe the odor(s) to the best of your ability:_____
_____
_____

Did you experience an uncommon taste(s) when you smelled the odor(s)?  Yes     No
If yes, please describe the taste to the best of your ability:_____
_____
_____

Is the odor stronger with different wind directions?         Yes     No

When/if odors were present, did you note the wind direction, and whether it was weak, moderate, or strong?  Did you note the weather conditions?  Please describe: _____
_____
_____ _____

Please list the suspected / possible source(s) of uncommon odors described above:_____
_____
_____ _____

Would you be in favor of continual assessment of health risks associated with air pollution in our county? Yes No

**Please mail this questionnaire in the enclosed, self-addressed stamped envelope by <mark>Monday, FEBRUARY 28, 2011</mark>.**
If you would like a copy of the compiled results of this questionnaire mailed to you, please fill out the following:

Name (optional)_____P.O. Box # (required) _
_____
Town _____ Zip _____

### ALL INFORMATION WILL BE KEPT CONFIDENTIAL

For questions regarding this questionnaire, please contact the Upper Green River Alliance at 367-3670 or Citizens United for Responsible Energy Development at 367-4309.
**Thank You for taking the time to answer this questionnaire!**

**Appendix C**

**Respondent Comments**
1. Looking at valley air quality from White Pine is very disheartening.  Why not print it in the papers so everyone can see and save you both postage & paper?
2. Having lived in major cities, our air here is wonderful.
3. I have noticed a haziness while walking in Pinedale.
4. Pregnant
5. My granddaughter has had a cough most of this winter.
6. Retired.

STOTEN-13303; No of Pages 9

Science of the Total Environment xxx (2012) xxx–xxx



Contents lists available at SciVerse ScienceDirect

# Science of the Total Environment

journal homepage: www.elsevier.com/locate/scitotenv



# Human health risk assessment of air emissions from development of unconventional natural gas resources ☆,☆☆

Lisa M. McKenzie *, Roxana Z. Witter, Lee S. Newman, John L. Adgate

*Colorado School of Public Health, University of Colorado, Anschutz Medical Campus, Aurora, Colorado, USA*

## A R T I C L E   I N F O

*Article history:*
Received 15 September 2011
Received in revised form 10 February 2012
Accepted 10 February 2012
Available online xxxx

*Keywords:*
Natural gas development
Risk assessment
Air pollution
Hydrocarbon emissions

## A B S T R A C T

*Background:* Technological advances (e.g. directional drilling, hydraulic fracturing), have led to increases in unconventional natural gas development (NGD), raising questions about health impacts.
*Objectives:* We estimated health risks for exposures to air emissions from a NGD project in Garfield County, Colorado with the objective of supporting risk prevention recommendations in a health impact assessment (HIA).
*Methods:* We used EPA guidance to estimate chronic and subchronic non-cancer hazard indices and cancer risks from exposure to hydrocarbons for two populations: (1) residents living >½ mile from wells and (2) residents living ≤½ mile from wells.
*Results:* Residents living ≤½ mile from wells are at greater risk for health effects from NGD than are residents living >½ mile from wells. Subchronic exposures to air pollutants during well completion activities present the greatest potential for health effects. The subchronic non-cancer hazard index (HI) of 5 for residents ≤½ mile from wells was driven primarily by exposure to trimethylbenzenes, xylenes, and aliphatic hydrocarbons. Chronic HIs were 1 and 0.4. for residents ≤½ mile from wells and >½ mile from wells, respectively. Cumulative cancer risks were 10 in a million and 6 in a million for residents living ≤½ mile and >½ mile from wells, respectively, with benzene as the major contributor to the risk.
*Conclusions:* Risk assessment can be used in HIAs to direct health risk prevention strategies. Risk management approaches should focus on reducing exposures to emissions during well completions. These preliminary results indicate that health effects resulting from air emissions during unconventional NGD warrant further study. Prospective studies should focus on health effects associated with air pollution.

© 2012 Elsevier B.V. All rights reserved.

## 1. Introduction

The United States (US) holds large reserves of unconventional natural gas resources in coalbeds, shale, and tight sands. Technological advances, such as directional drilling and hydraulic fracturing, have led to a rapid increase in the development of these resources. For example, shale gas production had an average annual growth rate of 48% over the 2006 to 2010 period and is projected to grow almost fourfold from 2009 to 2035 (US EIA, 2011). The number of

unconventional natural gas wells in the US rose from 18,485 in 2004 to 25,145 in 2007 and is expected to continue increasing through at least 2020 (Vidas and Hugman, 2008). With this expansion, it is becoming increasingly common for unconventional natural gas development (NGD) to occur near where people live, work, and play. People living near these development sites are raising public health concerns, as rapid NGD exposes more people to various potential stressors (COGCC, 2009a).

The process of unconventional NGD is typically divided into two phases: well development and production (US EPA, 2010a; US DOE, 2009). Well development involves pad preparation, well drilling, and well completion. The well completion process has three primary stages: 1) completion transitions (concrete well plugs are installed in wells to separate fracturing stages and then drilled out to release gas for production); 2) hydraulic fracturing ("fracking": the high pressure injection of water, chemicals, and propants into the drilled well to release the natural gas); and 3) flowback, the return of fracking and geologic fluids, liquid hydrocarbons ("condensate") and natural gas to the surface (US EPA, 2010a; US DOE, 2009). Once development is

*Abbreviations:* BTEX, benzene, toluene, ethylbenzene, and xylenes; COGCC, Colorado Oil and Gas Conservation Commission; HAP, hazardous air pollutant; HI, hazard index; HIA, health impact assessment; HQ, hazard quotient; NATA, National Air Toxics Assessment; NGD, natural gas development.
☆ This study was supported by the Garfield County Board of County Commissioners and the Colorado School of Public Health.
☆☆ The authors declare they have no competing financial interests.
* Corresponding author at: Colorado School of Public Health, 13001 East 17th Place, Mail Stop B119, Aurora, CO 80045, USA. Tel.: +1 303 724 5557; fax: +1 303 724 4617.
*E-mail address:* lisa.mckenzie@ucdenver.edu (L.M. McKenzie).

0048-9697/$ – see front matter © 2012 Elsevier B.V. All rights reserved.
doi:10.1016/j.scitotenv.2012.02.018

*L.M. McKenzie et al. / Science of the Total Environment xxx (2012) xxx–xxx*

complete, the "salable" gas is collected, processed, and distributed. While methane is the primary constituent of natural gas, it contains many other chemicals, including alkanes, benzene, and other aromatic hydrocarbons (TERC, 2009).

As shown by ambient air studies in Colorado, Texas, and Wyoming, the NGD process results in direct and fugitive air emissions of a complex mixture of pollutants from the natural gas resource itself as well as diesel engines, tanks containing produced water, and on site materials used in production, such as drilling muds and fracking fluids (CDPHE, 2009; Frazier, 2009; Walther, 2011; Zielinska et al., 2011). The specific contribution of each of these potential NGD sources has yet to be ascertained and pollutants such as petroleum hydrocarbons are likely to be emitted from several of these NGD sources. This complex mixture of chemicals and resultant secondary air pollutants, such as ozone, can be transported to nearby residences and population centers (Walther, 2011; GCPH, 2010).

Multiple studies on inhalation exposure to petroleum hydrocarbons in occupational settings as well as residences near refineries, oil spills and petrol stations indicate an increased risk of eye irritation and headaches, asthma symptoms, acute childhood leukemia, acute myelogenous leukemia, and multiple myeloma (Glass et al., 2003; Kirkeleit et al., 2008; Brosselin et al., 2009; Kim et al., 2009; White et al., 2009). Many of the petroleum hydrocarbons observed in these studies are present in and around NGD sites (TERC, 2009). Some, such as benzene, ethylbenzene, toluene, and xylene (BTEX) have robust exposure and toxicity knowledge bases, while toxicity information for others, such as heptane, octane, and diethylbenzene, is more limited. Assessments in Colorado have concluded that ambient benzene levels demonstrate an increased potential risk of developing cancer as well as chronic and acute noncancer health effects in areas of Garfield County Colorado where NGD is the only major industry other than agriculture (CDPHE, 2007; Coons and Walker, 2008; CDPHE, 2010). Health effects associated with benzene include acute and chronic nonlymphocytic leukemia, acute myeloid leukemia, chronic lymphocytic leukemia, anemia, and other blood disorders and immunological effects. (ATSDR, 2007a, IRIS, 2011). In addition, maternal exposure to ambient levels of benzene recently has been associated with an increase in birth prevalence of neural tube defects (Lupo et al., 2011). Health effects of xylene exposure include eye, nose, and throat irritation, difficulty in breathing, impaired lung function, and nervous system impairment (ATSDR, 2007b). In addition, inhalation of xylenes, benzene, and alkanes can adversely affect the nervous system (Carpenter et al., 1978; Nilsen et al., 1988; Galvin and Marashi, 1999; ATSDR, 2007a; ATSDR, 2007b).

Previous assessments are limited in that they were not able to distinguish between risks from ambient air pollution and specific NGD stages, such as well completions or risks between residents living near wells and residents living further from wells. We were able to isolate risks to residents living near wells during the flowback stage of well completions by using air quality data collected at the perimeter of the wells while flowback was occurring.

Battlement Mesa (population ~5000) located in rural Garfield County, Colorado is one community experiencing the rapid expansion of NGD in an unconventional tight sand resource. A NGD operator has proposed developing 200 gas wells on 9 well pads located as close as 500 ft from residences. Colorado Oil and Gas Commission (COGCC) rules allow natural gas wells to be placed as close as 150 ft from residences (COGCC, 2009b). Because of community concerns, as described elsewhere, we conducted a health impact assessment (HIA) to assess how the project may impact public health (Witter et al., 2011), working with a range of stakeholders to identify the potential public health risks and benefits.

In this article, we illustrate how a risk assessment was used to support elements of the HIA process and inform risk prevention recommendations by estimating chronic and subchronic non-

cancer hazard indices (HIs) and lifetime excess cancer risks due to NGD air emissions.

## 2. Methods

We used standard United States Environmental Protection Agency (EPA) methodology to estimate non-cancer HIs and excess lifetime cancer risks for exposures to hydrocarbons (US EPA, 1989; US EPA, 2004) using residential exposure scenarios developed for the NGD project. We used air toxics data collected in Garfield County from January 2008 to November 2010 as part of a special study of short term exposures as well as on-going ambient air monitoring program data to estimate subchronic and chronic exposures and health risks (Frazier, 2009; GCPH, 2009; GCPH, 2010; GCPH, 2011; Antero, 2010).

### 2.1. Sample collection and analysis

All samples were collected and analyzed according to published EPA methods. Analyses were conducted by EPA certified laboratories. The Garfield County Department of Public Health (GCPH) and Olsson Associates, Inc. (Olsson) collected ambient air samples into evacuated SUMMA® passivated stainless-steel canisters over 24-hour intervals. The GCPH collected the samples from a fixed monitoring station and along the perimeters of four well pads and shipped samples to Eastern Research Group for analysis of 78 hydrocarbons using EPA's compendium method TO-12, Method for the Determination of Non-Methane Organic Compounds in Ambient Air Using Cryogenic Preconcentration and Direct Flame Ionization Detection (US EPA, 1999). Olsson collected samples along the perimeter of one well pad and shipped samples to Atmospheric Analysis and Consulting, Inc. for analysis of 56 hydrocarbons (a subset of the 78 hydrocarbons determined by Eastern Research Group) using method TO-12. Per method TO-12, a fixed volume of sample was cryogenically concentrated and then desorbed onto a gas chromatography column equipped with a flame ionization detector. Chemicals were identified by retention time and reported in a concentration of parts per billion carbon (ppbC). The ppbC values were converted to micrograms per cubic meter ($\mu g/m^3$) at 01.325 kPa and 298.15 K.

Two different sets of samples were collected from rural (population<50,000) areas in western Garfield County over varying time periods. The main economy, aside from the NGD industry, is agricultural. There is no other major industry.

#### 2.1.1. NGD area samples

The GCPH collected ambient air samples every six days between January 2008 and November 2010 (163 samples) from a fixed monitoring station located in the midst of rural home sites and ranches and NGD, during both well development and production. The site is located on top of a small hill and 4 miles upwind of other potential emission sources, such as a major highway (Interstate-70) and the town of Silt, CO (GCPH, 2009; GCPH, 2010; GCPH, 2011).

#### 2.1.2. Well completion samples

The GCPH collected 16 ambient air samples at each cardinal direction along 4 well pad perimeters (130 to 500 ft from the well pad center) in rural Garfield County during well completion activities. The samples were collected on the perimeter of 4 well pads being developed by 4 different natural gas operators in summer 2008 (Frazier, 2009). The GCPH worked closely with the NGD operators to ensure these air samples were collected during the period while at least one well was on uncontrolled (emissions not controlled) flowback into collection tanks vented directly to the air. The number of wells on each pad and other activities occurring on the pad were not documented. Samples were collected over 24 to 27-hour intervals, and samples included emissions from both uncontrolled flowback and

Please cite this article as: McKenzie LM, et al, Human health risk assessment of air emissions from development of unconventional natural gas resources, Sci Total Environ (2012), doi:10.1016/j.scitotenv.2012.02.018

diesel engines (i.e., from trucks and generators supporting completion activities). In addition, the GCPH collected a background sample 0.33 to 1 mile from each well pad (Frazier, 2009). The highest hydrocarbon levels corresponded to samples collected directly downwind of the tanks (Frazier, 2009; Antero, 2010). The lowest hydrocarbon levels corresponded either to background samples or samples collected upwind of the flowback samples (Frazier, 2009; Antero, 2010).

Antero Resources Inc., a natural gas operator, contracted Olsson to collect eight 24-hour integrated ambient air samples at each cardinal direction at 350 and 500 ft from the well pad center during well completion activities conducted on one of their well pads in summer 2010 (Antero, 2010). Of the 12 wells on this pad, 8 were producing salable natural gas; 1 had been drilled but not completed; 2 were being hydraulically fractured during daytime hours, with ensuing uncontrolled flowback during nighttime hours; and 1 was on uncontrolled flowback during nighttime hours.

All five well pads are located in areas with active gas production, approximately 1 mile from Interstate-70.

### 2.2. Data assessment

We evaluated outliers and compared distributions of chemical concentrations from NGD area and well completion samples using Q–Q plots and the Mann–Whitney *U* test, respectively, in EPA's ProUCL version 4.00.05 software (US EPA, 2010b). The Mann–Whitney *U* test was used because the measurement data were not normally distributed. Distributions were considered as significantly different at an alpha of 0.05. Per EPA guidance, we assigned the exposure concentration as either the 95% upper confidence limit (UCL) of the mean concentration for compounds found in 10 or more samples or the maximum detected concentration for compounds found in more than 1 but fewer than 10 samples. This latter category included three compounds: 1,3-butadiene, 2,2,4-trimethylpentane, and styrene in the well completion samples. EPA's ProUCL software was used to select appropriate methods based on sample distributions and detection frequency for computing 95% UCLs of the mean concentration (US EPA, 2010b).

### 2.3. Exposure assessment

Risks were estimated for two populations: (1) residents >½ mile from wells; and (2) residents ≤½ mile from wells. We defined residents ≤½ mile from wells as living near wells, based on residents reporting odor complaints attributed to gas wells in the summer of 2010 (COGCC, 2011).

Exposure scenarios were developed for chronic non-cancer HIs and cancer risks. For both populations, we assumed a 30-year project duration based on an estimated 5-year well development period for all well pads, followed by 20 to 30 years of production. We assumed a resident lives, works, and otherwise remains within the town 24 h/day, 350 days/year, and that lifetime of a resident is 70 years, based on standard EPA reasonable maximum exposure (RME) defaults (US EPA, 1989).

#### 2.3.1. Residents >½ mile from well pads

As illustrated in Fig. 1, data from the NGD area samples were used to estimate chronic and subchronic risks for residents >½ mile from well development and production throughout the project. The exposure concentrations for this population were the 95% UCL on the mean concentration and median concentration from the 163 NGD samples.

#### 2.3.2. Residents ≤½ mile from well pads

To evaluate subchronic non-cancer HIs from well completion emissions, we estimated that a resident lives ≤½ mile from two well pads resulting a 20-month exposure duration based on 2 weeks per well for completion and 20 wells per pad, assuming some overlap in between activities. The subchronic exposure concentrations for this population were the 95% UCL on the mean concentration and the median concentration from the 24 well completion samples. To evaluate chronic risks to residents ≤½ mile from wells throughout the NGD project, we calculated a time-weighted exposure concentration ($C_{s+c}$) to account for exposure to emissions from well completions for 20-months followed by 340 months of exposure to emissions from the NGD area using the following formula:

$$C_{s+c} = (C_c \times ED_c/ED) + (C_s \times ED_s/ED)$$

where:

$C_c$      Chronic exposure point concentration ($\mu g/m^3$) based on the 95% UCL of the mean concentration or median concentration from the 163 NGD area samples



**Fig. 1.** Relationship between completion samples and natural gas development area samples and residents living ≤½ mile and >½ mile from wells. [a]Time weighted average based on 20-month contribution from well completion samples and 340-month contribution from natural gas development samples.

Please cite this article as: McKenzie LM, et al, Human health risk assessment of air emissions from development of unconventional natural gas resources, Sci Total Environ (2012), doi:10.1016/j.scitotenv.2012.02.018

$ED_c$    Chronic exposure duration
$C_S$     Subchronic exposure point concentration ($\mu g/m^3$) based on the 95% UCL of the mean concentration or median concentration from the 24 well completion samples
$ED_S$    Subchronic exposure duration
$ED$      Total exposure duration

### 2.4. Toxicity assessment and risk characterization

For non-carcinogens, we expressed inhalation toxicity measurements as a reference concentration (RfC in units of $\mu g/m^3$ air). We used chronic RfCs to evaluate long-term exposures of 30 years and subchronic RfCs to evaluate subchronic exposures of 20-months. If a subchronic RfC was not available, we used the chronic RfC. We obtained RfCs from (in order of preference) EPA's Integrated Risk Information System (IRIS) (US EPA, 2011), California Environmental Protection Agency (CalEPA) (CalEPA, 2003), EPA's Provisional Peer-Reviewed Toxicity Values (ORNL, 2009), and Health Effects Assessment Summary Tables (US EPA, 1997). We used surrogate RfCs according to EPA guidance for $C_5$ to $C_{18}$ aliphatic and $C_6$ to $C_{18}$ aromatic hydrocarbons which did not have a chemical-specific toxicity value (US EPA, 2009a). We derived semi-quantitative hazards, in terms of the hazard quotient (HQ), defined as the ratio between an estimated exposure concentration and RfC. We summed HQs for individual compounds to estimate the total cumulative HI. We then separated HQs specific to neurological, respiratory, hematological, and developmental effects and calculated a cumulative HI for each of these specific effects.

For carcinogens, we expressed inhalation toxicity measurements as inhalation unit risk (IUR) in units of risk per $\mu g/m^3$. We used IURs from EPA's IRIS (US EPA, 2011) when available or the CalEPA (CalEPA, 2003). The lifetime cancer risk for each compound was derived by multiplying estimated exposure concentration by the IUR. We summed cancer risks for individual compounds to

estimate the cumulative cancer risk. Risks are expressed as excess cancers per 1 million population based on exposure over 30 years.

Toxicity values (i.e., RfCs or IURs) or a surrogate toxicity value were available for 45 out of 78 hydrocarbons measured. We performed a quantitative risk assessment for these hydrocarbons. The remaining 33 hydrocarbons were considered qualitatively in the risk assessment.

## 3. Results

### 3.1. Data assessment

Evaluation of potential outliers revealed no sampling, analytical, or other anomalies were associated with the outliers. In addition, removal of potential outliers from the NGD area samples did not change the final HIs and cancer risks. Potential outliers in the well completion samples were associated with samples collected downwind from flowback tanks and are representative of emissions during flowback. Therefore, no data was removed from either data set.

Descriptive statistics for concentrations of the hydrocarbons used in the quantitative risk assessment are presented in Table 1. A list of the hydrocarbons detected in the samples that were considered qualitatively in the risk assessment because toxicity values were not available is presented in Table 2. Descriptive statistics for all hydrocarbons are available in Supplemental Table 1. Two thirds more hydrocarbons were detected at a frequency of 100% in the well completion samples (38 hydrocarbons) than in the NGD area samples (23 hydrocarbons). Generally, the highest alkane and aromatic hydrocarbon median concentrations were observed in the well completion samples, while the highest median concentrations of several alkenes were observed in the NGD area samples. Median concentrations of benzene, ethylbenzene, toluene, and m-xylene/p-xlyene were 2.7, 4.5, 4.3, and 9 times higher in the well completion samples than in the NGD area samples, respectively. Wilcoxon–Mann–Whitney test results indicate that

**Table 1**
Descriptive statistics for hydrocarbon concentrations with toxicity values in 24-hour integrated samples collected in NGD area and samples collected during well completions.

| Hydrocarbon ($\mu g/m^3$) | NGD area sample results[a] | | | | | | | Well completion sample results[b] | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | No. | % > MDL | Med | SD | 95% UCL[c] | Min | Max | No. | % > MDL | Med | SD | 95% UCL[c] | Min | Max |
| 1,2,3-Trimethylbenzene | 163 | 39 | 0.11 | 0.095 | 0.099 | 0.022 | 0.85 | 24 | 83 | 0.84 | 2.3 | 3.2 | 0.055 | 12 |
| 1,2,4-Trimethylbenzene | 163 | 96 | 0.18 | 0.34 | 0.31 | 0.063 | 3.1 | 24 | 100 | 1.7 | 17 | 21 | 0.44 | 83 |
| 1,3,5-Trimethylbenzene | 163 | 83 | 0.12 | 0.13 | 0.175 | 0.024 | 1.2 | 24 | 100 | 1.3 | 16 | 19.5 | 0.33 | 78 |
| 1,3-Butadiene | 163 | 7 | 0.11 | 0.020 | 0.0465 | 0.025 | 0.15 | 16 | 56 | 0.11 | 0.021 | NC | 0.068 | 0.17 |
| Benzene | 163 | 100 | 0.95 | 1.3 | 1.7 | 0.096 | 14 | 24 | 100 | 2.6 | 14 | 20 | 0.94 | 69 |
| Cyclohexane | 163 | 100 | 2.1 | 8.3 | 6.2 | 0.11 | 105 | 24 | 100 | 5.3 | 43 | 58 | 2.21 | 200 |
| Ethylbenzene | 163 | 95 | 0.17 | 0.73 | 0.415 | 0.056 | 8.1 | 24 | 100 | 0.77 | 47 | 54 | 0.25 | 230 |
| Isopropylbenzene | 163 | 38 | 0.15 | 0.053 | 0.074 | 0.020 | 0.33 | 24 | 67 | 0.33 | 1.0 | 1.0 | 0.0 | 4.8 |
| Methylcyclohexane | 163 | 100 | 3.7 | 4.0 | 6.3 | 0.15 | 24 | 24 | 100 | 14 | 149 | 190 | 3.1 | 720 |
| m-Xylene/p-Xylene | 163 | 100 | 0.87 | 1.2 | 1.3 | 0.16 | 9.9 | 24 | 100 | 7.8 | 194 | 240 | 2.0 | 880 |
| n-Hexane | 163 | 100 | 4.0 | 4.2 | 6.7 | 0.13 | 25 | 24 | 100 | 7.7 | 57 | 80 | 1.7 | 255 |
| n-Nonane | 163 | 99 | 0.44 | 0.49 | 0.66 | 0.064 | 3.1 | 24 | 100 | 3.6 | 61 | 76 | 1.2 | 300 |
| n-Pentane | 163 | 100 | 9.1 | 9.8 | 14 | 0.23 | 62 | 24 | 100 | 11 | 156 | 210 | 3.9 | 550 |
| n-Propylbenzene | 163 | 66 | 0.10 | 0.068 | 0.10 | 0.032 | 0.71 | 24 | 88 | 0.64 | 2.4 | 3.3 | 0.098 | 12 |
| o-Xylene | 163 | 97 | 0.22 | 0.33 | 0.33 | 0.064 | 3.6 | 24 | 100 | 1.2 | 40 | 48.5 | 0.38 | 190 |
| Propylene | 163 | 100 | 0.34 | 0.23 | 0.40 | 0.11 | 2.5 | 24 | 100 | 0.41 | 0.34 | 0.60 | 0.16 | 1.9 |
| Styrene | 163 | 15 | 0.15 | 0.26 | 0.13 | 0.017 | 3.4 | 24 | 21 | 0.13 | 1.2 | NC | 0.23 | 5.9 |
| Toluene | 163 | 100 | 1.8 | 6.2 | 4.8 | 0.11 | 79 | 24 | 100 | 7.8 | 67 | 92 | 2.7 | 320 |
| Aliphatic hydrocarbons $C_5$–$C_8$[d] | 163 | NC | 29 | NA | 44 | 1.7 | 220 | 24 | NC | 56 | NA | 780 | 24 | 2700 |
| Aliphatic hydrocarbons $C_9$–$C_{18}$[e] | 163 | NC | 1.3 | NA | 14 | 0.18 | 400 | 24 | NC | 7.9 | NA | 100 | 1.4 | 390 |
| Aromatic hydrocarbons $C_9$–$C_{18}$[f] | 163 | NC | 0.57 | NA | 0.695 | 0.17 | 5.6 | 24 | NC | 3.7 | NA | 27 | 0.71 | 120 |

Abbreviations: Max, maximum detected concentration; Med, median; Min, minimum detected concentration; NGD, natural gas development; NC, not calculated; No., number of samples; SD, standard deviation; % > MDL, percent greater than method detection limit; $\mu g/m^3$ micrograms per cubic meter; 95% UCL, 95% upper confidence limit on the mean.
[a] Samples collected at one site every 6 six days between 2008 and 2010.
[b] Samples collected at four separate sites in summer 2008 and one site in summer 2010.
[c] Calculated using EPA's ProUCL version 4.00.05 software (US EPA, 2010b).
[d] Sum of 2,2,2-trimethylpentane, 2,2,4-trimethylpentane, 2,2-dimethylbutane, 2,3,4-trimethylpentane, 2,3-dimethylbutane, 2,3-dimethylpentane, 2,4-dimethylpentane, 2-methylhexane, 2-methylhexane, 2-methylpentane, 3-methylheptane, 3-methylhexane, 3-methylpentane, cyclopentane, isopentane, methylcyclopentane, n-heptane, n-octane.
[e] Sum of n-decane, n-dodecane, n-tridecane, n-undecane.
[f] Sum of m-diethylbenzene, m-ethyltoluene, o-ethyltoluene, p-diethylbenzene, p-ethyltoluene.

Please cite this article as: McKenzie LM, et al, Human health risk assessment of air emissions from development of unconventional natural gas resources, Sci Total Environ (2012), doi:10.1016/j.scitotenv.2012.02.018

**Table 2**
Detection frequencies of hydrocarbons without toxicity values detected in NGD area or well completion samples.

| Hydrocarbon | NGD area sample[a] detection frequency (%) | Well completion sample[b] detection frequency (%) |
|---|---|---|
| 1-Dodecene | 36 | 81 |
| 1-Heptene | 94 | 100 |
| 1-Hexene | 63 | 79 |
| 1-Nonene | 52 | 94 |
| 1-Octene | 29 | 75 |
| 1-Pentene | 98 | 79 |
| 1-Tridecene | 7 | 38 |
| 1-Undecene | 28 | 81 |
| 2-Ethyl-1-butene | 1 | 0 |
| 2-Methyl-1-butene | 29 | 44 |
| 2-Methyl-1-pentene | 1 | 6 |
| 2-Methyl-2-butene | 36 | 69 |
| 3-Methyl-1-butene | 6 | 6 |
| 4-Methyl-1-pentene | 16 | 69 |
| Acetylene | 100 | 92 |
| a-Pinene | 63 | 100 |
| b-Pinene | 10 | 44 |
| cis-2-Butene | 58 | 75 |
| cis-2-Hexene | 13 | 81 |
| cis-2-Pentene | 38 | 54 |
| Cyclopentene | 44 | 94 |
| Ethane | 100 | 100 |
| Ethylene | 100 | 100 |
| Isobutane | 100 | 100 |
| Isobutene/1-Butene | 73 | 44 |
| Isoprene | 71 | 96 |
| n-Butane | 98 | 100 |
| Propane | 100 | 100 |
| Propyne | 1 | 0 |
| trans-2-Butene | 80 | 75 |
| trans-2-Hexene | 1 | 6 |
| trans-2-Pentene | 55 | 83 |

Abbreviations: NGD, natural gas development.
[a] Samples collected at one site every 6 six days between 2008 and 2010.
[b] Samples collected at four separate sites in summer 2008 and one site in summer 2010.

concentrations of hydrocarbons from well completion samples were significantly higher than concentrations from NGD area samples ($p<0.05$) with the exception of 1,2,3-trimethylbenzene, n-pentane, 1,3-butadiene, isopropylbenzene, n-propylbenzene, propylene, and styrene (Supplemental Table 2).

### 3.2. Non-cancer hazard indices

Table 3 presents chronic and subchronic RfCs used in calculating non-cancer HIs, as well critical effects and other effects. Chronic non-cancer HQ and HI estimates based on ambient air concentrations are presented in Table 4. The total chronic HIs based on the 95% UCL of the mean concentration were 0.4 for residents >½ mile from wells and 1 for residents ≤½ mile from wells. Most of the chronic non-cancer hazard is attributed to neurological effects with neurological HIs of 0.3 for residents >½ mile from wells and 0.9 for residents ≤½ mile from wells.

Total subchronic non-cancer HQs and HI estimates are presented in Table 5. The total subchronic HIs based on the 95% UCL of the mean concentration were 0.2 for residents >½ mile from wells and 5 for residents ≤½ mile from wells. The subchronic non-cancer hazard for residents >½ mile from wells is attributed mostly to respiratory effects (HI=0.2), while the subchronic hazard for residents ≤½ mile from wells is attributed to neurological (HI=4), respiratory (HI=2), hematologic (HI=3), and developmental (HI=1) effects.

For residents >½ mile from wells, aliphatic hydrocarbons (51%), trimethylbenzenes (22%), and benzene (14%) are primary contributors to the chronic non-cancer HI. For residents ≤½ mile from wells,

trimethylbenzenes (45%), aliphatic hydrocarbons (32%), and xylenes (17%) are primary contributors to the chronic non-cancer HI, and tri-methylbenzenes (46%), aliphatic hydrocarbons (21%) and xylenes (15%) also are primary contributors to the subchronic HI.

### 3.3. Cancer risks

Cancer risk estimates calculated based on measured ambient air concentrations are presented in Table 6. The cumulative cancer risks based on the 95% UCL of the mean concentration were 6 in a million for residents >½ mile from wells and 10 in a million for residents ≤½ mile from wells. Benzene (84%) and 1,3-butadiene (9%) were the primary contributors to cumulative cancer risk for residents >½ mile from wells. Benzene (67%) and ethylbenzene (27%) were the primary contributors to cumulative cancer risk for residents ≤½ mile from wells.

## 4. Discussion

Our results show that the non-cancer HI from air emissions due to natural gas development is greater for residents living closer to wells. Our greatest HI corresponds to the relatively short-term (i.e., sub-chronic), but high emission, well completion period. This HI is driven principally by exposure to trimethylbenzenes, aliphatic hydrocarbons, and xylenes, all of which have neurological and/or respiratory effects. We also calculated higher cancer risks for residents living nearer to wells as compared to residents residing further from wells. Benzene is the major contributor to lifetime excess cancer risk for both scenarios. It also is notable that these increased risk metrics are seen in an air shed that has elevated ambient levels of several measured air toxics, such as benzene (CDPHE, 2009; GCPH, 2010).

### 4.1. Representation of exposures from NGD

It is likely that NGD is the major source of the hydrocarbons observed in the NGD area samples used in this risk assessment. The NGD area monitoring site is located in the midst of multi-acre rural home sites and ranches. Natural gas is the only industry in the area other than agriculture. Furthermore, the site is at least 4 miles upwind from any other major emission source, including Interstate 70 and the town of Silt, Colorado. Interestingly, levels of benzene, m,p-xylene, and 1,3,5-trimethylbenzene measured at this rural monitoring site in 2009 were higher than levels measured at 27 out of 37 EPA air toxics monitoring sites where SNMOCs were measured, including urban sites such as Elizabeth, NJ, Dearborn, MI, and Tulsa, OK (GCPH, 2010; US EPA, 2009b). In addition, the 2007 Garfield County emission inventory attributes the bulk of benzene, xylene, toluene, and ethylbenzene emissions in the county to NGD, with NGD point and non-point sources contributing five times more benzene than any other emission source, including on-road vehicles, wildfires, and wood burning. The emission inventory also indicates that NGD sources (e.g. condensate tanks, drill rigs, venting during completions, fugitive emissions from wells and pipes, and compressor engines) contributed ten times more VOC emissions than any source, other than biogenic sources (e.g. plants, animals, marshes, and the earth) (CDPHE, 2009).

Emissions from flowback operations, which may include emissions from various sources on the pads such as wells and diesel engines, are likely the major source of the hydrocarbons observed in the well completion samples. These samples were collected very near (130 to 500 ft from the center) well pads during uncontrolled flowback into tanks venting directly to the air. As for the NGD area samples, no sources other than those associated with NGD were in the vicinity of the sampling locations.

Subchronic health effects, such as headaches and throat and eye irritation reported by residents during well completion activities

**Table 3**
Chronic and subchronic reference concentrations, critical effects, and major effects for hydrocarbons in quantitative risk assessment.

| Hydrocarbon | Chronic | | Subchronic | | Critical effect/ target organ | Other effects |
|---|---|---|---|---|---|---|
| | RfC (µg/m³) | Source | RfC (µg/m³) | Source | | |
| 1,2,3-Trimethylbenzene | 5.00E+00 | PPTRV | 5.00E+01 | PPTRV | Neurological | Respiratory, hematological |
| 1,3,5-Trimethylbenzene | 6.00E+00 | PPTRV | 1.00E+01 | PPTRV | Neurological | Hematological |
| Isopropylbenzene | 4.00E+02 | IRIS | 9.00E+01 | HEAST | Renal | Neurological, respiratory |
| n-Hexane | 7.00E+02 | IRIS | 2.00E+03 | PPTRV | Neurological | – |
| n-Nonane | 2.00E+02 | PPTRV | 2.00E+03 | PPTRV | Neurological | Respiratory |
| n-Pentane | 1.00E+03 | PPTRV | 1.00E+04 | PPTRV | Neurological | – |
| Styrene | 1.00E+03 | IRIS | 3.00E+03 | HEAST | Neurological | – |
| Toluene | 5.00E+03 | IRIS | 5.00E+03 | PPTRV | Neurological | Developmental, respiratory |
| Xylenes, total | 1.00E+02 | IRIS | 4.00E+02 | PPTRV | Neurological | Developmental, respiratory |
| n-propylbenzene | 1.00E+03 | PPTRV | 1.00E+03 | Chronic RfC PPTRV | Developmental | Neurological |
| 1,2,4-Trimethylbenzene | 7.00E+00 | PPTRV | 7.00E+01 | PPTRV | Decrease in blood clotting time | Neurological, respiratory |
| 1,3-Butadiene | 2.00E+00 | IRIS | 2.00E+00 | Chronic RfC IRIS | Reproductive | Neurological, respiratory |
| Propylene | 3.00E+03 | CalEPA | 1.00E+03 | Chronic RfC CalEPA | Respiratory | – |
| Benzene | 3.00E+01 | ATSDR | 8.00E+01 | PPTRV | Decreased lymphocyte count | Neurological, developmental, reproductive |
| Ethylbenzene | 1.00E+03 | ATSDR | 9.00E+03 | PPTRV | Auditory | Neurological, respiratory, renal |
| Cyclohexane | 6.00E+03 | IRIS | 1.80E+04 | PPTRV | Developmental | Neurological |
| Methylcyclohexane | 3.00E+03 | HEAST | 3.00E+03 | HEAST | Renal | – |
| Aliphatic hydrocarbons C₅–C₈ᵃ | 6E+02 | PPTRV | 2.7E+04 | PPTRV | Neurological | – |
| Aliphatic hydrocarbons C₉–C₁₈ | 1E+02 | PPTRV | 1E+02 | PPTRV | Respiratory | – |
| Aromatic hydrocarbons C₉–C₁₈ᵇ | 1E+02 | PPTRV | 1E+03 | PPRTV | Decreased maternal body weight | Respiratory |

Abbreviations: 95%UCL, 95% upper confidence limit; CalEPA, California Environmental Protection Agency; HEAST, EPA Health Effects Assessment Summary Tables 1997; HQ, hazard quotient; IRIS, Integrated Risk Information System; Max, maximum; PPTRV, EPA Provisional Peer-Reviewed Toxicity Value; RfC, reference concentration; µg/m³, micrograms per cubic meter. Data from CalEPA 2011; IRIS (US EPA, 2011); ORNL 2011.
ᵃ Based on PPTRV for commercial hexane.
ᵇ Based on PPTRV for high flash naphtha.

occurring in Garfield County, are consistent with known health effects of many of the hydrocarbons evaluated in this analysis (COGCC, 2011; Witter et al., 2011). Inhalation of trimethylbenzenes and xylenes can irritate the respiratory system and mucous membranes with effects ranging from eye, nose, and throat irritation to difficulty in breathing and impaired lung function (ATSDR, 2007a;

**Table 4**
Chronic hazard quotients and hazard indices for residents living >½ mile from wells and residents living ≤½ mile from wells.

| Hydrocarbon | >½ mile | | ≤½ mile | |
|---|---|---|---|---|
| | Chronic HQ based on median concentration | Chronic HQ based on 95% UCL of mean concentration | Chronic HQ based on median concentration | Chronic HQ based on 95% UCL of mean concentration |
| 1,2,3-Trimethylbenzene | 2.09E−02 | 1.90E−02 | 2.87E−02 | 5.21E−02 |
| 1,2,4-Trimethylbenzene | 2.51E−02 | 4.22E−02 | 3.64E−02 | 2.01E−01 |
| 1,3,5-Trimethylbenzene | 1.96E−02 | 2.80E−02 | 3.00E−02 | 1.99E−01 |
| 1,3-Butadiene | 5.05E−02 | 2.23E−02 | 5.05E−02 | 2.25E−02 |
| Benzene | 3.03E−02 | 5.40E−02 | 3.32E−02 | 8.70E−02 |
| Cyclohexane | 3.40E−04 | 9.98E−04 | 3.67E−04 | 1.46E−03 |
| Ethylbenzene | 1.63E−04 | 3.98E−04 | 1.95E−04 | 3.23E−03 |
| Isopropylbenzene | 3.68E−04 | 1.78E−04 | 3.90E−04 | 3.05E−04 |
| Methylcyclohexane | 1.18E−03 | 2.00E−03 | 1.36E−03 | 5.32E−03 |
| n-Hexane | 5.49E−03 | 9.23E−03 | 5.76E−03 | 1.47E−02 |
| n-Nonane | 2.11E−03 | 3.14E−03 | 2.95E−03 | 2.31E−02 |
| n-Pentane | 8.71E−03 | 1.32E−02 | 8.79E−03 | 2.39E−02 |
| n-propylbenzene | 9.95E−05 | 9.59E−05 | 1.28E−04 | 2.64E−04 |
| Propylene | 1.09E−04 | 1.27E−04 | 1.10E−04 | 1.30E−04 |
| Styrene | 1.43E−04 | 1.25E−04 | 1.42E−04 | 4.32E−04 |
| Toluene | 3.40E−04 | 9.28E−04 | 4.06E−04 | 1.86E−03 |
| Xylenes, total | 1.16E−02 | 1.57E−02 | 1.54E−02 | 1.71E−01 |
| Aliphatic hydrocarbons C₅–C₈ | 4.63E−02 | 7.02E−02 | 4.87E−02 | 1.36E−01 |
| Aliphatic hydrocarbons C₉–C₁₈ | 1.22E−02 | 1.35E−01 | 1.58E−02 | 1.83E−01 |
| Aromatic hydrocarbons C₉–C₁₈ | 5.44E−03 | 6.67E−03 | 7.12E−03 | 2.04E−02 |
| Total Hazard Index | 2E−01 | 4E−01 | 3E−01 | 1E+00 |
| Neuorological Effects Hazard Indexᵃ | 2E−01 | 3E−01 | 3E−01 | 9E−01 |
| Respiratory Effects Hazard Indexᵇ | 1E−01 | 2E−02 | 2E−02 | 7E−01 |
| Hematogical Effects Hazard Indexᶜ | 1E−01 | 1E−01 | 1E−01 | 5E−01 |
| Developmental Effects Hazard Indexᵈ | 4E−02 | 7E−02 | 5E−02 | 3E−01 |

Abbreviations: 95%UCL, 95% upper confidence limit; HQ, hazard quotient.
ᵃ Sum of HQs for hydrocarbons with neurological effects: 1,2,3-Trimethylbenzene, 1,2,4-Trimethylbenzene, 1,3,5-Trimethylbenzene, 1,3-butadiene, benzene, cyclohexane, ethylbenzene, isopropylbenzene, n-hexane, n-nonane, n-pentane, n-propylbenzene, styrene, toluene, xylenes, aliphatic hydrocarbons C₅–C₈ hydrocarbons.
ᵇ Sum of HQs for hydrocarbons with respiratory effects: 1,2,3-Trimethylbenzene, 1,2,4-Trimethylbenzene, 1,3-butadiene, ethylbenzene, isopropylbenzene, n-nonane, propylene, toluene, xylenes, aliphatic hydrocarbons C₉–C₁₈ hydrocarbons, aromatic C₉–C₁₈ hydrocarbons.
ᶜ Sum of HQs for hydrocarbons with hematological effects: 1,2,3-Trimethylbenzene, 1,2,4-trimethylbenzene, 1,3,5-trimethylbenzene, benzene.
ᵈ Sum of HQs for hydrocarbons with developmental effects: benzene, cyclohexane, toluene, and xylenes.

Please cite this article as: McKenzie LM, et al, Human health risk assessment of air emissions from development of unconventional natural gas resources, Sci Total Environ (2012), doi:10.1016/j.scitotenv.2012.02.018

**Table 5**
Subchronic hazard quotients and hazard indices residents living >½ mile from wells and residents living ≤½ mile from wells.

| Hydrocarbon (µg/m$^3$) | >½ mile | | ≤½ mile | |
|---|---|---|---|---|
| | Subchronic HQ based on median concentration | Subchronic HQ based on 95% UCL of mean concentration | Subchronic HQ based on median concentration | Subchronic HQ based on 95% UCL of mean concentration |
| 1,2,3-Trimethylbenzene | 2.09E−03 | 1.90E−03 | 1.67E−02 | 6.40E−02 |
| 1,2,4-Trimethylbenzene | 2.51E−03 | 4.22E−03 | 2.38E−02 | 3.02E−01 |
| 1,3,5-Trimethylbenzene | 1.18E−02 | 1.68E−02 | 1.29E−01 | 1.95E+00 |
| 1,3-Butadiene | 5.04E−02 | 2.23E−02 | 5.25E−02 | 8.30E−02 |
| Benzene | 1.14E−02 | 2.02E−02 | 3.25E−02 | 2.55E−01 |
| Cyclohexane | 1.13E−04 | 3.33E−04 | 2.93E−04 | 3.24E−03 |
| Ethylbenzene | 1.81E−05 | 4.42E−05 | 8.56E−05 | 5.96E−03 |
| Isopropylbenzene | 1.63E−03 | 7.92E−03 | 3.62E−03 | 1.14E−02 |
| Methylcyclohexane | 1.18E−03 | 2.01E−03 | 4.67E−03 | 6.47E−02 |
| n-Hexane | 1.92E−03 | 3.23E−03 | 3.86E−03 | 3.98E−02 |
| n-Nonane | 2.11E−04 | 3.14E−04 | 1.80E−03 | 3.78E−02 |
| n-Pentane | 8.71E−04 | 1.32E−03 | 1.05E−03 | 2.13E−02 |
| n-propylbenzene | 9.95E−05 | 9.57E−05 | 6.36E−04 | 3.26E−03 |
| Propylene | 1.43E−04 | 3.80E−04 | 4.12E−04 | 6.02E−04 |
| Styrene | 5.68E−04 | 4.16E−05 | 4.00E−06 | 1.97E−03 |
| Toluene | 4.18E−05 | 9.28E−04 | 2.46E−04 | 1.84E−02 |
| Xylenes, total | 2.91E−03 | 3.93E−03 | 2.05E−02 | 7.21E−01 |
| Aliphatic hydrocarbons C$_5$–C$_8$ | 1.07E−03 | 1.63E−03 | 2.07E−03 | 2.89E−02 |
| Aliphatic hydrocarbons C$_9$–C$_{18}$ | 1.3E−02 | 1.41E−01 | 7.9E−02 | 1.03E−00 |
| Aromatic hydrocarbons C$_9$–C$_{18}$ | 6.00E−04 | 6.95E−04 | 3.7E−03 | 2.64E−02 |
| Total Hazard Index | 1E−01 | 2E−01 | 4E−01 | 5E+00 |
| Neurological Effects Hazard Index[a] | 9E−02 | 8E−02 | 3E−01 | 4E+00 |
| Respiratory Effects Hazard Index[b] | 7E−02 | 2E−01 | 3E−01 | 2E+00 |
| Hematological Effects Hazard Index[c] | 3E−02 | 4E−02 | 2E−01 | 3E+00 |
| Developmental Effects Hazard Index[d] | 1E−02 | 3E−02 | 5E−02 | 1E+00 |

Abbreviations: 95%UCL, 95% upper confidence limit; HQ, hazard quotient.
[a]  Sum of HQs for hydrocarbons with neurological effects: 1,2,3-Trimethylbenzene, 1,2,4-Trimethylbenzene, 1,3,5-Trimethylbenzene, 1,3-butadiene, benzene, cyclohexane, ethylbenzene, isopropylbenzene, n-hexane, n-nonane, n-pentane, n-propylbenzene, styrene, toluene, xylenes, aliphatic C$_5$–C$_8$ hydrocarbons.
[b]  Sum of HQs for hydrocarbons with respiratory effects: 1,2,3-Trimethylbenzene, 1,2,4-Trimethylbenzene, 1,3-butadiene, ethylbenzene, isopropylbenzene, n-nonane, propylene, toluene, xylenes, aliphatic C$_9$–C$_{18}$ hydrocarbons, aromatic C$_9$–C$_{18}$ hydrocarbons.
[c]  Sum of HQs for hydrocarbons with hematological effects: 1,2,3-trimethylbenzene, 1,2,4-trimethylbenzene, 1,3,5-trimethylbenzene, benzene.
[d]  Sum of HQs for hydrocarbons with developmental effects: benzene, cyclohexane, toluene, and xylenes.

ATSDR, 2007b; US EPA, 1994). Inhalation of trimethylbenzenes, xylenes, benzene, and alkanes can adversely affect the nervous system with effects ranging from dizziness, headaches, fatigue at lower exposures to numbness in the limbs, incoordination, tremors, temporary limb paralysis, and unconsciousness at higher exposures (Carpenter et al., 1978; Nilsen et al., 1988; US EPA, 1994; Galvin and Marashi, 1999; ATSDR, 2007a; ATSDR, 2007b).

*4.2. Risk assessment as a tool for health impact assessment*

HIA is a policy tool used internationally that is being increasingly used in the United States to assess multiple complex hazards and exposures in communities. Comparison of risks between residents based on proximity to wells illustrates how the risk assessment process can be used to support the HIA process. An important component of the HIA process is to identify where and when public health is most likely to be impacted and to recommend mitigations to reduce or eliminate the potential

impact (Collins and Koplan, 2009). This risk assessment indicates that public health most likely would be impacted by well completion activities, particularly for residents living nearest the wells. Based on this information, suggested risk prevention strategies in the HIA are directed at minimizing exposures for those living closest to the well pads, especially during well completion activities when emissions are the highest. The HIA includes recommendations to (1) control and monitor emissions during completion transitions and flowback; (2) capture and reduce emissions through use of low or no emission flowback tanks; and (3) establish and maintain communications regarding well pad activities with the community (Witter et al., 2011).

*4.3. Comparisons to other risk estimates*

This risk assessment is one of the first studies in the peer-reviewed literature to provide a scientific perspective to the potential health risks associated with development of unconventional natural

**Table 6**
Excess cancer risks for residents living >½ mile from wells and residents living ≤½ mile from wells.

| Hydrocarbon | WOE | | Unit Risk (µg/m$^3$) | Source | >½ mile | | ≤½ mile | |
|---|---|---|---|---|---|---|---|---|
| | IRIS | IARC | | | Cancer risk based on median concentration | Cancer risk based on 95% UCL of mean concentration | Cancer risk based on median concentration | Cancer risk based on 95% UCL of mean concentration |
| 1,3-Butadiene | B2 | 1 | 3.00E−05 | IRIS | 1.30E−06 | 5.73E−07 | 1.30E−06 | 6.54E−07 |
| Benzene | A | 1 | 7.80E−06 | IRIS | 3.03E−06 | 5.40E−06 | 3.33E−06 | 8.74E−06 |
| Ethylbenzene | NC | 2B | 2.50E−06 | CalEPA | 1.75E−07 | 4.26E−07 | 2.09E−07 | 3.48E−06 |
| Styrene | NC | 2B | 5.00E−07 | CEP | 3.10E−08 | 2.70E−08 | 3.00E−08 | 9.30E−08 |
| Cumulative cancer risk | | | | | 5E−06 | 6E−06 | 5E−06 | 1E−05 |

Abbreviations: 95%UCL, 95% upper confidence limit; CalEPA, California Environmental Protection Agency; CEP, (Caldwell et al., 1998); IARC, International Agency for Research on Cancer; IRIS, Integrated Risk Information System; Max, maximum; NC, not calculated; WOE, weight of evidence; µg/m$^3$, micrograms per cubic meter. Data from CalEPA 2011; IRIS (US EPA, 2011).

Please cite this article as: McKenzie LM, et al, Human health risk assessment of air emissions from development of unconventional natural gas resources, Sci Total Environ (2012), doi:10.1016/j.scitotenv.2012.02.018

gas resources. Our results for chronic non-cancer HIs and cancer risks for residents >than ½ mile from wells are similar to those reported for NGD areas in the relatively few previous risk assessments in the non-peer reviewed literature that have addressed this issue (CDPHE, 2010; Coons and Walker, 2008; CDPHE, 2007; Walther, 2011). Our risk assessment differs from these previous risk assessments in that it is the first to separately examine residential populations nearer versus further from wells and to report health impact of emissions resulting from well completions. It also adds information on exposure to air emissions from development of these resources. These data show that it is important to include air pollution in the national dialogue on unconventional NGD that, to date, has largely focused on water exposures to hydraulic fracturing chemicals.

### 4.4. Limitations

As with all risk assessments, scientific limitations may lead to an over- or underestimation of the actual risks. Factors that may lead to overestimation of risk include use of: 1) 95% UCL on the mean exposure concentrations; 2) maximum detected values for 1,3-butadiene, 2,2,4-trimethylpentane, and styrene because of a low number of detectable measurements; 3) default RME exposure assumptions, such as an exposure time of 24 h per day and exposure frequency of 350 days per year; and 4) upper bound cancer risk and non-cancer toxicity values for some of our major risk drivers. The benzene IUR, for example, is based on the high end of a range of maximum likelihood values and includes uncertainty factors to account for limitations in the epidemiological studies for the dose–response and exposure data (US EPA, 2011). Similiarly, the xylene chronic RfC is adjusted by a factor of 300 to account for uncertainties in extrapolating from animal studies, variability of sensitivity in humans, and extrapolating from subchronic studies (US EPA, 2011). Our use of chronic RfCs values when subchronic RfCs were not available may also have overestimated 1,3-butadiene, n-propylbenzene, and propylene subchronic HQs. None of these three chemicals, however, were primary contributors to the subchronic HI, so their overall effect on the HI is relatively small.

Several factors may have lead to an underestimation of risk in our study results. We were not able to completely characterize exposures because several criteria or hazardous air pollutants directly associated with the NGD process via emissions from wells or equipment used to develop wells, including formaldehyde, acetaldehyde, crotonaldehyde, naphthalene, particulate matter, and polycyclic aromatic hydrocarbons, were not measured. No toxicity values appropriate for quantitative risk assessment were available for assessing the risk to several alkenes and low molecular weight alkanes (particularly<$C_5$ aliphatic hydrocarbons). While at low concentrations the toxicity of alkanes and alkenes is generally considered to be minimal (Sandmeyer, 1981), the maximum concentrations of several low molecular weight alkanes measured in the well completion samples exceeded the 200–1000 μg/m$^3$ range of the RfCs for the three alkanes with toxicity values: n-hexane, n-pentane, and n-nonane (US EPA, 2011; ORNL, 2009). We did not consider health effects from acute (i.e., less than 1 h) exposures to peak hydrocarbon emissions because there were no appropriate measurements. Previous risk assessments have estimated an acute HQ of 6 from benzene in grab samples collected when residents noticed odors they attributed to NGD (CDPHE, 2007). We did not include ozone or other potentially relevant exposure pathways such as ingestion of water and inhalation of dust in this risk assessment because of a lack of available data. Elevated concentrations of ozone precursors (specifically, VOCs and nitrogen oxides) have been observed in Garfield County's NGD area and the 8-h average ozone concentration has periodically approached the 75 ppb National Ambient Air Quality Standard (NAAQS) (CDPHE, 2009; GCPH, 2010).

This risk assessment also was limited by the spatial and temporal scope of available monitoring data. For the estimated chronic exposure, we used 3 years of monitoring data to estimate exposures over a 30 year exposure period and a relatively small database of 24 samples collected at varying distances up to 500 ft from a well head (which also were used to estimate shorter-term non-cancer hazard index). Our estimated 20-minute subchronic exposure was limited to samples collected in the summer, which may have not have captured temporal variation in well completion emissions. Our ½ mile cut point for defining the two different exposed populations in our exposure scenarios was based on complaint reports from residents living within ½ mile of existing NGD, which were the only data available. The actual distance at which residents may experience greater exposures from air emissions may be less than or greater than a ½ mile, depending on dispersion and local topography and meteorology. This lack of spatially and temporally appropriate data increases the uncertainty associated with the results.

Lastly, this risk assessment was limited in that appropriate data were not available for apportionment to specific sources within NGD (e.g. diesel emissions, the natural gas resource itself, emissions from tanks, etc.). This increases the uncertainty in the potential effectiveness of risk mitigation options.

These limitations and uncertainties in our risk assessment highlight the preliminary nature of our results. However, there is more certainty in the comparison of the risks between the populations and in the comparison of subchronic to chronic exposures because the limitations and uncertainties similarly affected the risk estimates.

### 4.5. Next steps

Further studies are warranted, in order to reduce the uncertainties in the health effects of exposures to NGD air emissions, to better direct efforts to prevent exposures, and thus address the limitations of this risk assessment. Next steps should include the modeling of short- and longer-term exposures as well as collection of area, residential, and personal exposure data, particularly for peak short-term emissions. Furthermore, studies should examine the toxicity of hydrocarbons, such as alkanes, including health effects of mixtures of HAPs and other air pollutants associated with NGD. Emissions from specific emission sources should be characterized and include development of dispersion profiles of HAPs. This emissions data, when coupled with information on local meteorological conditions and topography, can help provide guidance on minimum distances needed to protect occupant health in nearby homes, schools, and businesses. Studies that incorporate all relevant pathways and exposure scenarios, including occupational exposures, are needed to better understand the impacts of NGD of unconventional resources, such as tight sands and shale, on public health. Prospective medical monitoring and surveillance for potential air pollution-related health effects is needed for populations living in areas near the development of unconventional natural gas resources.

### 5. Conclusions

Risk assessment can be used as a tool in HIAs to identify where and when public health is most likely to be impacted and to inform risk prevention strategies directed towards efficient reduction of negative health impacts. These preliminary results indicate that health effects resulting from air emissions during development of unconventional natural gas resources are most likely to occur in residents living nearest to the well pads and warrant further study. Risk prevention efforts should be directed towards reducing air emission exposures for persons living and working near wells during well completions.

Supplementary materials related to this article can be found online at doi:10.1016/j.scitotenv.2012.02.018.

Please cite this article as: McKenzie LM, et al, Human health risk assessment of air emissions from development of unconventional natural gas resources, Sci Total Environ (2012), doi:10.1016/j.scitotenv.2012.02.018

Case No. 1:20-cv-02484-MSK   Document 92   filed 05/06/21   USDC Colorado   pg 366 of 500
ARTICLE IN PRESS

## Acknowledgements

We extend special thanks to J. Rada, P. Reaser, C. Archuleta, K. Stinson, and K. Scott. We are very grateful to the Garfield County Department of Public Health.

## References

Antero. Air Quality Sampling Summary Report Well Completion and Flowback Development Scenario Watson Ranch Pad Garfield County Colorado December 22, 2010. Denver, CO: Antero Resources; 2010.

ATSDR. Toxicological Profile for Benzene. Atlanta, GA: Agency for Toxic Substances and Disease Registry, US Deparment of Health and Human Services; 2007a.

ATSDR. Toxicological Profile for Xylenes. Atlanta, GA: Agency for Toxic Substances and Disease Registry, US Deparment of Health and Human Services; 2007b.

Brosselin P, Rudant J, Orsi L, Leverger G, Baruchel A, Bertrand Y, et al. Acute Childhood Leukaemia and Residence Next to Petrol Stations and Automotive Repair Garages: the ESCALE study (SFCE). Occup Environ Med 2009;66(9):598–606.

Caldwell JC, Woodruff TJ, Morello-Frosch R, Axelrad DA. Application of health information to hazardous air pollutants modeled in EPA's Cumulative Exposure Project. Toxicol Ind Health 1998;14(3):429–54.

CalEPA. Toxicity Criteria Database. California Environmental Protection Agency, Office of Environmental Health Hazard Assessment; 2003. Available: http://oehha.ca.gov/risk/chemicalDB/index.asp [Accessed May 2011].

Carpenter CP, Geary DL, Myers RC, Nachreiner DJ, Sullivan LJ, King JM. Petroleum Hydrocarbons Toxicity Studies XVII. Animal Responses to n-Nonane Vapor. Toxicol Appl Pharmacol 1978;44:53–61.

CDPHE. Garfield County Air Toxics Inhalation: Screening Level Human Health Risk Assessment: Inhalation of Volatile organic Compounds Measured in Rural, Urban, and Oil &Gas Areas in Ambient Air Study (June 2005–May 2007). Denver, CO: Environmental Epidemiology Division, Colorado Department of Public Health and Environment; 2007. Available: http://www.garfieldcountyaq.net/default_new.aspx.

CDPHE. Garfield County Emissions Inventory. Denver, CO: Air Pollution Control Division, Colorado Department of Public Health and Environment; 2009. Available: http://www.garfieldcountyaq.net/default_new.aspx.

CDPHE. Garfield County Air Toxics Inhalation: Screening Level Human Health Risk Assessment: Inhalation of Volatile Organic Compounds Measured In 2008 Air Quality Monitoring Study. Denver, CO: Environmental Epidemiology Division, Colorado Department of Public Health and Environment; 2010. Available: http://www.garfieldcountyaq.net/default_new.aspx.

COGCC. Statement of Basis, Specific Statutory Authority, and Purpose: New Rules and Amendments to Current Rules of the Colorado Oil and Gas Conservation Commission, 2 CCR 404–1. Colorado Oil and Gas Conservation Commission; 2009a. Available: http://cogcc.state.co.us/.

COGCC. Rules and Regulations, 2 CCR 404–1. Colorado Oil and Gas Conservation Commission; 2009b. Available: http://cogcc.state.co.us/.

COGCC. Inspection/Incident Database. Denver, CO: Colorado Oil and Gas Information System, Colorado Oil and Gas Conservation Commission; 2011. Available: http://cogcc.state.co.us/.

Collins J, Koplan JP. Health impact assessment: a step toward health in all policies. JAMA 2009;302(3):315–7.

Coons T, Walker R. Community Health Risk Analysis of Oil and Gas Industry in Garfield County. Grand Junction, CO: Saccommano Research Institute; 2008. Available: http://www.garfieldcountyaq.net/default_new.aspx.

Frazier A. Analysis of Data Obtained for the Garfield County Air Toxics Study Summer 2008. Rifle Denver, CO: Air Pollution Control Division, Colorado Department of Public Health and Environment; 2009. Available: http://www.garfieldcountyaq.net/default_new.aspx.

Galvin JB, Marashi F. n-Pentane. J Toxicol Environ Health 1999;1(58):35–56.

GCPH. Garfield County 2008 Air Quality Monitoring Summary Report. Rifle CO: Garfield County Public Health Department; 2009. Available: http://www.garfieldcountyaq.net/default_new.aspx.

GCPH. Garfield County 2009 Air Quality Monitoring Summary Report. Rifle CO: Garfield County Public Health Department; 2010. Available: http://www.garfieldcountyaq.net/default_new.aspx.

GCPH. Garfield County Quarterly Monitoring Report. Fourth Quarter October 1 through December 31, 2010. Rifle CO: Garfield County Public Health Department; 2011. Available: http://www.garfieldcountyaq.net/default_new.aspx.

Glass DC, Gray CN, Jolley DJ, Gibbons C, Sim MR, Fritschi L, et al. Leukemia Risk Associated with Low-Level Benzene Exposure. Epidemiology 2003;14(5):569–77.

Kim BM, Park EK, LeeAn SY, Ha M, Kim EJ, Kwon H, et al. BTEX exposure and its health effects in pregnant women following the Hebei spirit oil spill. J Prev Med Public Health Yebang Uihakhoe Chi 2009;42(2):96–103.

Kirkeleit J, Riise T, Brätveit M, Moen B. Increased risk of acute myelogenous leukemia and multiple myeloma in a historical cohort of upstream petroleum workers exposed to crude oil. Cancer Causes Control 2008;19(1):13–23.

Lupo P, Symanski E, Waller D, Chan W, Langlosi P, Canfield M, et al. Maternal Exposure to Ambient Levels of Benzene and Neural Tube Defects among Offspring, Texas 1999–2004. Environ Health Perspect 2011;119(3):397–402.

Nilsen OG, Haugen OA, Zahisen K, Halgunset J, Helseth A, Aarset A, et al. Toxicity of n-C9 to n-C13 alkanes in the rat on short term inhalation. Pharmacol Toxicol 1988;62:259–66.

ORNL. The Risk Assessment Information System. Oak Ridge National Laboratory, TN: US Department of Energy; 2009. Available: http://rais.ornl.gov/ [Accessed May 2011].

Sandmeyer EE. Aliphatic Hydrocarbons. Patty's Industrial Hygeine and Toxicology, Third Edition, Volume IIB. New York: John Wiley; 1981. p. 3175–220.

TERC. VOC Emissions from Oil and Condensate Storage Tanks. Texas Environmental Research Consortium; 2009. p. 1-34. Available online at: http://files.harc.edu/Projects/AirQuality/Projects/H051C/H051CFinalReport.pdf. The Woodlands, TX.

US DOE. "Modern Shale Gas Development in the United States: A Primer," Office of Fossil Energy and National Energy Technology Laboratory, United States Department of Energy; 2009. http://www.netl.doe.gov/technologies/oil-gas/publications/EPreports/Shale_Gas_Primer_2009.pdf (accessed January 2012).

US EIA. Annual Energy Outlook 2011 with Projections to 2035. Washington DC: Energy Information Administration, United States Department of Energy; 2011.

US EPA. Risk Assessment Guidance for Superfund (Part A). Washington, DC: Office of Emergency and Remedial Response, US Environmental Protection Agency; 1989.

US EPA. Chemicals in the Environment: 1,2,4-trimethylbenzene (C.A.S. No. 95-63-6). Washington, DC: Office of Pollution Prevention and Toxics, US Environmental Protection Agency; 1994.

US EPA. Health Effects Assessment Summary Tables. Washington, DC: US Environmental Protection Agency; 1997.

US EPA. Method for the Determination of Non-Methane Organic Compounds (NMOC) in Ambient Air Using Cryogenic Preconcentrations and Direct Flame Ionization Detection (PDFID). Cincinnati OH: Office of Research and Development, US Environmental Protection Agency; 1999.

US EPA. The OAQPS Air Toxic Risk Assessment Library. US Environmental Protection Agency; 2004. Available: http://www.epa.gov/ttn/fera/risk_atra_main.html.

US EPA. Provisional Peer Reviewed Toxicity Values for Complex Mixtures of Aliphatic and Aromatic Hydrocarbons. Cinninati Ohio: Superfund Health Risk Technical Support Center National Center for Environmental Assessment: Office of Reasearch and Development., US Environmental Protection Agency; 2009a.

US EPA. Technology Transfer Network Air Quality System. Washington DC: Office of Air and Radiation, US Environmental Protection Agency; 2009b. Available: http://www.epa.gov/ttn/airs/airsaqs/.

US EPA. Greenhouse Gas Emissions Reporting from the Petroleum and Natural Gas Industry Background Technical Support Document. Washington DC: Climate Change Division, US Environmental Protection Agency; 2010a.

US EPA. ProUCL Version 4.00.05 Technical Guide Statistical Software for Environmental Applications for Data Sets With and Without Nondetect Observations(Draft). Washington DC: Office of Research and Development, US Environmental Protection Agency; 2010b.

US EPA. Integrated Risk Information System (IRIS). Washington DC: US Environmental Protection Agency; 2011. Available: http://www.epa.gov/IRIS/ [Accessed May 2011].

Vidas H, Hugman B. ICF International. Availability, Economics, and Production Potential of North American Unconventional Natural Gas SuppliesPrepared for The INGAA Foundation, Inc. by: ICF International; 2008.

Walther E. Screening Health Risk Assessment Sublette County, Wyoming. Pinedale WY: Sierra Research, Inc.; 2011. Available: http://www.sublettewyo.com/DocumentView.aspx?DID=438.

White N, teWaterNaude J, van der Walt A, Ravenscroft G, Roberts W, Ehrlich R. Meteorologically estimated exposure but not distance predicts asthma symptoms in school children in the environs of a petrochemical refinery: a cross-sectional study. Environ Health 2009;8(1):45.

Witter R, McKenzie L, Towle M, Stinson K, Scott K, Newman L, et al. Draft Health Impact Assessment for Battlement Mesa, Garfield County, Colorado. Colorado School of Public Health; 2011. Available: http://www.garfield-county.com/index.aspx?page=1408.

Zielinska B, Fujita E, Campbell D. Monitoring of Emissions from Barnett Shale Natural Gas Production Facilities for Population Exposure Assessment. Houston TX: Desert Research Institute; 2011. Available: http://www.sph.uth.tmc.edu/mleland/attachments/Barnett%20Shale%20Study%20Final%20Report.pdf.

Please cite this article as: McKenzie LM, et al, Human health risk assessment of air emissions from development of unconventional natural gas resources, Sci Total Environ (2012), doi:10.1016/j.scitotenv.2012.02.018

Dr. Lisa McKenzie, PhD, MPH
Colorado School of Public Health
Department of Environmental and Occupational Health

Testimony on: *"Federal Regulation: Economic, job, and energy security implications of federal hydraulic fracturing regulation"*

May 2, 2012

Mr. Chairman and Members of the subcommittee, I am honored to be asked to testify before you today on the potential health risks from natural gas development air emissions.

I am Lisa McKenzie, a Research Associate in the Department of Environmental and Occupational Health at the Colorado School of Public Health.   In addition to my PhD in Environmental Chemistry and MPH in Epidemiology, I have many years of experience in the private sector as a human health risk assessor and chemist. I am the lead author of the paper "Human Health Risk Assessment of Air Emissions from Development of Unconventional Natural Gas Resources" recently published in Science of the Total Environment, an international journal for scientific research.  Like all papers published in reputable scientific journals, our paper underwent a rigorous peer review process prior to publication.  Today, I will be testifying on the findings and recommendations presented in our paper.

**Potential for health risks**

With the recent expansion of natural gas development, it is becoming increasingly common for natural gas development to occur near where people live, work, and play. The Colorado Oil and Gas Conservation Commission's review of 4956 well locations revealed that 26% of the well locations reviewed are located 150 to 1000 feet from a building intended for human occupancy, including homes, out buildings, businesses, residential living facilities, schools, and hospitals. This illustrates the potential to expose people to various stressors resulting from natural gas development.  One potential stressor is exposure to air pollutants.

As shown by ambient air studies in Colorado, Texas, and Wyoming, natural gas development processes can result in direct and fugitive air emissions of a complex mixture of petroleum hydrocarbons and other pollutants.  The natural gas resource itself contains petroleum hydrocarbons, including alkanes, benzene, and other aromatic hydrocarbons. Petroleum hydrocarbons and other pollutants also may originate from diesel engines, tanks containing produced water, and on site materials used in production, such as drilling muds and fracking fluids.  This complex mixture of chemicals can result in the formation of secondary air pollutants, such as ozone.  The public health concern is the transport of these air pollutants to nearby residences and population centers.

Multiple studies on inhalation exposure to petroleum hydrocarbons in occupational settings as well as homes near refineries, oil spills and gas stations, indicate an increased risk of eye irritation and headaches, asthma symptoms, leukemia, and myeloma.  Many of the petroleum hydrocarbons, such as benzene, observed in these studies are the same as those that have been

observed in and around natural gas development sites.  Previous risk assessments and health consultations performed by the Colorado Department of Public Health and Environment, the ATSDR, and scientists at the Saccomanno Institute concluded that ambient benzene levels observed in the natural gas development area of Garfield County, Colorado demonstrate an increased potential risk of developing cancer as well as chronic and acute non-cancer health effects.

Health effects associated with benzene include leukemia, anemia, and other blood disorders and immunological effects.  In addition, a recent study in Texas has observed a link between maternal exposure to ambient levels of benzene and an increase in prevalence of neural tube birth defects.  Inhalation of trimethylbenzenes and xylenes can irritate the respiratory system and mucous membranes with effects ranging from eye, nose, and throat irritation to difficulty in breathing and impaired lung function.  Inhalation of trimethylbenzenes, xylenes, benzene, and alkanes can adversely affect the nervous system with effects ranging from  dizziness, headaches, fatigue at lower exposures to numbness in the limbs, incoordination, tremors, temporary limb paralysis, and unconsciousness at higher exposures.   Subchronic health effects, such as headaches and throat and eye irritation reported by residents during well completion activities occurring in Garfield County, are consistent with some of these health effects.

In the 2007 Garfield County emission inventory, the Colorado Department of Public Health and Environment attributed the bulk of benzene, xylene, toluene, and ethylbenzene emissions in the county to natural gas development.  Natural gas development point and non-point sources contributed five times more benzene than any other emission source, including on-road vehicles, wildfires, and wood burning.

**How the health risk assessment was conducted**

Previous assessments were limited in that they did not distinguish between risks from ambient air pollution and well completions or risks between people living near wells and people living farther from wells.  My colleagues at the Colorado School of Public Health and I addressed these limitations by conducting a screening level human health risk assessment according to EPA's well established guidance for screening level risk assessments.  This guidance has been in place since 1989, with some amendments and revisions over the years.  It has been the go to guidance for risk assessors over the past four administrations.

We performed our risk assessment for Battlement Mesa, a community of approximately 5,000 people located in rural Garfield County, Colorado where a natural gas operator has proposed developing 200 gas wells on 9 well pads located as close as 500 feet from town residences.  We used petroleum hydrocarbon data from samples collected by Garfield County's Department of Public Health and the natural gas operator to estimate and compare chronic and subchronic non-cancer hazard indices and cancer risks from natural gas air emissions for two residential populations: (1) people living near the well pads and (2) people living farther from well pads.  We defined a distance of $\leq \frac{1}{2}$ mile from wells as living near wells, based odor complaints filed by residents living $\frac{1}{2}$ mile from a well pad in the summer of 2010.

We used 163 samples collected by the Garfield County Department of Public Health every six days between January 2008 and November 2010 and analyzed for hydrocarbons to estimate health risks for people living further from the well pads. These samples were collected from a fixed monitoring station located in the midst of rural home sites and ranches and natural gas development. The site is located on top of a small hill and 4 miles upwind of other potential emission sources, such as Interstate-70 and the town of Silt, Colorado.

We used 24 ambient air samples collected at each cardinal direction along five well pad perimeters in rural Garfield County during well completion activities conducted by four different companies in summer 2008 and summer 2010 to estimate subchronic health risks to nearby residents during well completions. These samples also were analyzed for hydrocarbons. These samples were collected at distances ranging from 130 to 500 feet from the well pad center during uncontrolled flowback of one to three natural gas wells into tanks vented directly to the air. All five well pads are located in areas with active gas production, approximately one mile from Interstate-70. Residents approximately ½ mile of the well pad where the 2010 samples were collected filed odor complaints with the Colorado Oil and Gas Conservation Commission at the time of well completions.

We calculated a time-weighted average using the 163 samples collected at the fixed monitoring station and the 24 samples collected at well pad perimeters to calculate the chronic health risks for people living near well pads.

For the exposure scenarios we assumed a 30-year project duration based on an estimated 5-year well development period for all well pads, followed by 20 to 30 years of production. We assumed a resident lives, works, and otherwise remains within the town 24 hours/day, 350 days/year and that the lifetime of a resident is 70 years, based on standard EPA reasonable maximum exposure defaults. To evaluate subchronic health risks from well completion emissions, we estimated that a resident may live $\leq$ ½ mile from 2 well pads resulting a 20 month exposure duration based on 2 weeks per well for completion and 20 wells per pad, assuming some overlap between activities.

**Health Risk Assessment Findings**

Our screening health risk assessment resulted in three major findings.

**(1) Noncancer health risks**

Our results show that the non-cancer hazard index from air emissions due to natural gas development is greatest for residents living near wells during the relatively short-term, but high emission, well completion period. Furthermore, this hazard index is driven principally by exposure to trimethylbenzenes, alkanes, and xylenes, all of which have neurological and/or respiratory effects.

The total subchronic hazard indices were 5 for residents near wells and 0.2 for residents farther from wells. The total chronic hazard indices were 1 for residents near wells and 0.4 for residents farther wells. Hazard indices are a qualitative tool used to compare health hazards. A hazard

index below one indicates that health effects are unlikely. A hazard index of one and above indicates that health effects may occur as a result of exposure. The chronic hazard index of 1 and the subchronic index of 5 indicate a potential for adverse health effects to residents living near wells pads.

**(2) Cancer health risks**

We estimated higher cancer risks for residents living nearer to wells as compared to residents residing further from wells. Benzene is the major contributor to lifetime excess cancer risk for both scenarios.

The excess lifetime cancer risk estimates were 10 in a million for residents near wells and 6 in a million for residents farther from wells. The level of cancer risk that is of concern is a matter of individual, community, and regulatory judgment. However, the EPA typically considers risks below 1 in a million to be so small as to be negligible. Therefore, the EPA uses a cancer risk of 1 in a million as a regulatory goal. Regulatory programs, such as the Superfund program, are generally designed to try to reduce risk to this level. When it is not feasible to meet this regulatory goal, the EPA may consider cancer risks lower than 100 in a million to be acceptable.

**(3) Samples collected during well completions compared to samples collected at fixed monitoring location**

There is clearly a high potential for exposure to air emissions during the well completion period of natural gas development. Concentrations of petroleum hydrocarbons, including benzene, trimethylbenzenes, most alkanes, and xylenes, were significantly higher in the samples collected from the perimeter of the well pads during the well completions than in the samples collected from the fixed monitoring station. Two thirds more hydrocarbons were detected at a frequency of 100 percent in the samples collected during well completions (38 hydrocarbons) than in the samples collected from the fixed monitoring station (23 hydrocarbons). The highest alkane and aromatic hydrocarbon median concentrations were observed in the samples collected during well completions. Median concentrations of benzene, ethylbenzene, toluene, and m-xylene/p-xylene were 2.7, 4.5, 4.3, and 9 times higher in the well completion samples than in the samples collected at the fixed monitoring location, respectively.

**Recommendations**

Based on our findings, we recommend that air emissions from natural gas development be reduced, particularly during the high emission well completion period, in order to lessen potential health risks for people living near well sites and to improve overall ambient air quality in natural gas development areas. EPA's new rules (4/17/2012) for Source Performance Standards and National Emissions Standards for Hazardous Air Pollutants directed at reducing air pollution for the Oil and Natural Gas Industry have the potential to reduce emissions of air toxics, such as benzene, during well completions.

We recommend further studies to: (1) reduce the uncertainties in the health effects of exposures to natural gas air emissions, (2) to better direct efforts to prevent exposures, and (3) to determine

the effectiveness of new rules and regulations in protecting public health.   Next steps should include the modeling of short- and longer-term exposures as well as collection of area, residential, and personal exposure data, particularly for peak short-term emissions.  Furthermore, studies should examine the toxicity of hydrocarbons, such as alkanes, including health effects of mixtures of hazardous air pollutants and other air pollutants associated with natural gas development.  Emissions from specific emission sources should be characterized and include development of dispersion profiles of hazardous air pollutants.   This emissions data, when coupled with information on local meteorological conditions and topography, can help provide guidance on minimum distances needed to protect occupant health in nearby homes, schools, and businesses.  Studies that incorporate all relevant pathways and exposure scenarios, including occupational exposures, are needed to better understand the impacts of natural gas development of unconventional resources, such as tight sands and shale, on public health.  Prospective medical monitoring and surveillance for potential air pollution-related health effects is needed for populations living in areas near the development of unconventional natural gas resources.

**Limitations of Health Risk Assessment**

As with all risk assessments, scientific limitations may lead to an over- or underestimation of the actual risks.  EPA's methodology is designed to overestimate health risks. However, several factors may have lead to an underestimation of risk in our study results.  We were not able to completely characterize exposures because several criteria of hazardous air pollutants directly associated with the natural gas development process via emissions from wells or equipment used to develop wells, including formaldehyde, acetaldehyde, crotonaldehyde, naphthalene, particulate matter, and polycyclic aromatic hydrocarbons, were not measured.  No toxicity values appropriate for quantitative risk assessment were available for assessing the risk to several alkenes and low molecular weight alkanes (particularly $< C_5$ aliphatic hydrocarbons). We did not consider health effects from acute (i.e., less than one hour) exposures to peak hydrocarbon emissions because there were not appropriate measurements.  We did not include ozone or other potentially relevant exposure pathways such as ingestion of water and inhalation of dust in this risk assessment because of a lack of available data.  Elevated concentrations of ozone precursors (specifically, volatile organic compounds and nitrogen oxides) have been observed in Garfield County's natural gas development area and the 8-hr average ozone concentration has periodically approached the 75 ppb National Ambient Air Quality Standard.

This risk assessment also was limited by the spatial and temporal scope of available monitoring data.  For the estimated chronic exposure, we used 3 years of monitoring data to estimate exposures over a 30 year exposure period and a relatively small database of 24 samples collected at varying distances up to 500 feet from a well head (which also were used to the estimate shorter-term non-cancer hazard index).  Our estimated 20-month subchronic exposure was limited to samples collected in the summer, which may have not have captured temporal variation in well completion emissions.  Our ½ mile cut point for defining the two different exposed populations in our exposure scenarios was based on complaint reports from residents living within ½ mile of existing natural gas development sites, which were the only data available.  The actual distance at which residents may experience exposures from air emissions may be less than or greater than a ½ mile, depending on dispersion and local topography and

meteorology.  This lack of spatially and temporally appropriate data increases the uncertainty associated with the results.

Lastly, this risk assessment was limited in that appropriate data were not available for apportionment to specific sources within natural gas development (e.g diesel emissions, the natural gas resource itself, emissions from tanks, etc.).  This increases the uncertainty in the potential effectiveness of risk mitigation options.

These limitations and uncertainties in our risk assessment highlight the preliminary nature of our results.   However, there is more certainty in the comparison of the risks between the populations and in the comparison of subchronic to chronic exposures because the limitations and uncertainties similarly affected the risk estimates.

The results presented here today indicate that health effects resulting from air emissions during development of unconventional natural gas resources are most likely to occur in residents living nearest to the well pads during the short term well completion period and warrant further study. Risk prevention efforts should be directed towards reducing air emission exposures for persons living and working near wells during well completions.

Thank you again for giving me the opportunity to appear here today.

Respectfully Submitted,

Lisa McKenzie, PhD, MPH
Research Associate
Department of Environmental and Occupational Health
Colorado School of Public Health
University of Colorado
Aurora, CO 80045
(303) 724-5557
lisa.mckenzie@ucdenver.edu



# Gas Patch Roulette

## HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA

OCTOBER 2012





**EARTHWORKS**™
OIL & GAS ACCOUNTABILITY PROJECT



## A WORD OF THANKS

A goal of this research project has been to give voice to the many people in Pennsylvania (and beyond) who directly bear the costs of the nation's dependence on fossil fuels.

This report reflects the tremendous concern, caring, and openness of the project participants. Thank you for giving your time, sharing what are often difficult and personal experiences, and trusting us to write about them.

We are also grateful to the many people from local communities and partner organizations who provided contacts and guidance. Special appreciation goes to the Southwest Pennsylvania Environmental Health Project, which provided advice early on in the research process and reviewed this report.

Finally, many thanks to the Colcom Foundation for its generous support of this project and commitment to protecting the environment and public health.

Photo by: Robert Donnan

# Gas Patch Roulette

## HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA

OCTOBER 2012

y

Nadia Steinzor, Earthworks' Oil & Gas Accountability Project

Wilma Subra, Subra Company

and Lisa Sumi, environmental research and science consultant

For more information on this study go to: http://health.earthworksaction.org

Cover photo: Mark Schmerling; inset photos L-R: Frank Finan, Mark Schmerling
Back cover photo: Nadia Steinzor; inset photos L-R: Roberto M. Esquivel/Herald-Standard, Nadia Steinzor

## Earthworks' Oil & Gas Accountability Project

Offices in New York State, Maryland, New Mexico, Colorado, Texas and California
EARTHWORKS • 1612 K St., NW, Suite 808 Washington, D.C., USA 20006
www.earthworksaction.org • www.ogap.org • 202.887.1872







# Table of Contents

**INTRODUCTION** ...................................................................................................... **5**

**1. BACKGROUND: THE MARCELLUS SHALE BOOM** ................................................ **7**

**2. THE STUDY** ......................................................................................................... **8**

2.1 OVERVIEW ......................................................................................................... 8

2.2 METHODOLOGY ................................................................................................. 8

2.3 FINDINGS ......................................................................................................... 10

    PARTICIPANT OVERVIEW ..................................................................... 10

    HEALTH SYMPTOMS ............................................................................. 11

    ODOR EVENTS ...................................................................................... 20

2.4 ENVIRONMENTAL TESTING ............................................................................. 21

    AIR ......................................................................................................... 21

    WATER ................................................................................................... 25

    SYMPTOM AND TESTING ASSOCIATIONS .......................................... 28

2.5 CONCLUSIONS ................................................................................................. 31

**3. MISSING PIECES** ............................................................................................... **32**

3.1 SCIENCE AND TESTING ................................................................................... 32

3.2 POLICY AND REGULATION .............................................................................. 34

**4. RECOMMENDATIONS** ...................................................................................... **35**

**5. FINAL WORDS** ................................................................................................... **37**

**6. REAL PEOPLE, REAL LIVES** ............................................................................... **39**

# Introduction

Where oil and gas development goes, health problems often follow.

For many people across the United States, this statement has rung painfully true for a long time. As the drilling boom picks up speed and reaches more places, it is now resonating in new communities. From a growing number of stories told by individuals nationwide[1] to conferences held by academics and public agencies,[2] the "dots" between health symptoms and gas facilities are very slowly but surely being connected.

The health survey and environmental testing project described in the following pages is part of this critical process. Between August 2011 and July 2012, Earthworks' Oil & Gas Accountability Project (OGAP) investigated the extent, types, and possible causes of health symptoms experienced by people living in the gas patches of Pennsylvania.

Founded in 1988, Earthworks is dedicated to protecting communities and the environment from the impacts of irresponsible mineral and energy development while seeking sustainable solutions. We reform government policies, improve corporate practices, and work with landowners, organizations, agencies, and elected officials to adopt policies to protect public health and the environment and hold industry accountable for its practices.

The findings of this study stand in strong contrast to statements—often made by industry representatives and policymakers seeking to expand  drilling—dismissing claims of health impacts as "personal anecdotes" and isolated incidents. Directly impacted people are frequently told that what they experience is a random occurrence and that some other source—traffic, lifestyle choices, family disease history, household products—is to blame.

We know that the gas and oil industry uses toxic substances that harm human health. For example, of about 300 compounds identified as being used in hydraulic fracturing to extract gas, 65 are listed as hazardous by the federal government.[3] In turn, this creates a real potential for negative health effects in any area where gas development occurs.[4] While general scientific links regarding the effects of such exposure have been established,[5] research on the direct relationship between health problems and gas and oil activities has been limited and inconsistent.[6]

**Though knowledge of impacts evolves slowly, gas and oil extraction and production continue to accelerate rapidly—allowing industry to put still-emerging technologies to use without first establishing their safety.**



Drilling directly behind the play yard.

Photo by: Nadia Steinzor

Even as knowledge of impacts evolves slowly, gas and oil extraction and production continue to accelerate rapidly—allowing industry to put still-emerging technologies to use without first establishing their safety. State regulations remain too lax and outdated to prevent the impacts of modern-day energy development, and regulatory agencies are often unable to conduct the



EARTHWORKS

GAS PATCH ROULETTE: HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

5

oversight and enforcement needed to protect air and water quality and, in turn, health and communities. Magnifying the consequences of this situation are special exemptions in provisions of the nation's bedrock environmental laws, which allow the industry to stifle key information and pursue risky practices.[7]

The overall result is that the burden of proof remains heaviest for impacted individuals and communities themselves. Companies can continue to avoid responsibility and downplay health-related concerns. Decisionmakers can continue to sidestep the need to recognize the damage and hold companies accountable.

Yet the realities, including those described in this report, can be documented—and when they are, they can no longer be denied. When many people in many places where gas development is occurring have similar health complaints, something is clearly wrong. OGAP believes that when health problems occur, action to solve and prevent them must follow.

GAS PATCH ROULETTE: HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

EARTHWORKS

6

# 1    Background: The Marcellus Shale Boom

The Marcellus Shale spans a distance of approximately 600 miles from central New York through much of Pennsylvania and into the eastern half of Ohio and western parts of West Virginia; small sections are also found in Maryland and Virginia.[8] The formation covers an area of about 54,000 square miles (slightly larger than Florida) and varies greatly in depth, from outcroppings above ground to some areas to 9,000 or more feet below the surface.[9]

For a long time, extracting and producing deep shale gas from formations across the United States was considered economically and technologically unfeasible. But recent advances in hydraulic fracturing methods and its combination with horizontal drilling have made it possible to drill much deeper and further than ever before and, bolstered by political pressure to expand domestic energy production, have spurred a boom in shale gas (and shale oil) production nationwide.

The Marcellus Shale, considered a "gas super giant," has been at the center of this activity, particularly in Pennsylvania, an estimated 60 percent of which is underlain by the formation.[10] As of September 2012, nearly 5,900 unconventional oil and gas wells, primarily in the Marcellus Shale, had been drilled in the state and over 11,500 had been permitted; the pace of expansion has been stunning, with 75 percent of all unconventional wells having been drilled just since 2010.[11]



Rigs in the neighborhood.

Photo by: Mark Schmerling

Gas and oil development is occurring in Pennsylvania and nearby states today more rapidly and with more extensive impacts than in the past. Current development uses a tremendous amount of water, chemicals, and land; requires heavy equipment; and produces large volumes of both wastewater and solid waste. The gas industry has plans for tens of thousands of additional wells across the Marcellus and Utica Shale regions and in other formations nationwide.



Impoundment pits, which often contain contaminated waste, can leak and give off emissions.

Photo by: Robert Donnan

The complexity and intensity of this type of energy development opens up pathways of exposure that impact human health, including air and water pollution, traffic, noise, and soil contamination. Although no industrial process is harm-free, these problems can be particularly severe when operators act irresponsibly and are not required to take measures to prevent, minimize, or mitigate problems such as chemical and waste spills, emission releases, or equipment failure.


EARTHWORKS

GAS PATCH ROULETTE: HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

7

# 2   The Study

## 2.1.  OVERVIEW

This research project had two central components, health surveys and air and water testing, and was undertaken in order to:

- Investigate the extent and types of health symptoms experienced by people living in the gas patches of Pennsylvania.
- Consider links between health symptoms and proximity to gas extraction and production facilities.
- Provide air and water quality testing to households in need of such information.
- Provide useful information to impacted residents, researchers, public officials, and partner organizations.
- Put forth common-sense recommendations for regulatory and policy changes to prevent negative health and environmental impacts.



This project represents a scaling-up (in terms of both the number of participants and geographic area covered) of community-based projects previously conducted by Earthworks' OGAP. We conducted health surveys with local residents and analyzed results in relation to contaminants identified through water quality investigations (Pavillion, Wyoming, 2010) and prior air quality monitoring (DISH, Texas, 2009).[12] In addition, in 2011 OGAP developed case studies of residents who reported health problems while living in close proximity to gas facilities in several counties in Texas.[13]

Separators split off heavy hydrocarbons from gas, and often vent methane and volatile organic compounds into the air.

Photo by: Nadia Steinzor

## 2.2.  METHODOLOGY

The health survey instrument used in this project was designed by Wilma Subra, President of Subra Company, and air and water quality testing was managed by the non-profit organization ShaleTest based in Denton, Texas. Data from the surveys and associations with testing results were obtained by tabulating responses and calculating percentages of both symptom categories and individual symptoms.

The survey focused on a range of exposures, health symptoms, and disease history. Responses were gathered to identify patterns that occur across locations and improve understanding of the experiences of participants. All the symptoms included in the survey could potentially be caused by exposure to substances known to be associated with gas and oil facilities.

It should be noted that this project did not investigate additional factors that can influence health conditions or cause symptoms (e.g., through structured control groups in non-impacted areas and in-depth comparative health history research). Such work, while important and currently lacking, was beyond the scope of this particular project. In addition, we did not seek to link single facilities with particular health problems experienced by specific participants.



The survey was completed by 108 individuals living in 55 households in 14 counties. The largest number of surveys (85 percent) was collected in Bedford, Bradford, Butler, Fayette, and Washington Counties. Taken together, all the counties represent a geographical range across the state (i.e., northeast to southwest) and have had gas development long enough for reports of health impacts and declining air and water quality to surface.

Respondents answered questions on their own or provided them to a relative or friend. In some cases, members of the same household, including spouses and parents, completed surveys for participants, and a few participants chose to provide answers to OGAP staff in person or over the phone. Due to expressed concerns about confidentiality, participants were given the option of completing the surveys anonymously, which some chose to do.[14]



Condensate tanks pull off water from gas and can produce fumes and emissions.

Photo by: Nadia Steinzor

Survey distribution was initiated through existing contacts in the target counties. These individuals then chose to participate in the project themselves and/or recommended other possible participants, who in turn provided additional contacts. The survey was also distributed to individuals who expressed interest in participating directly to OGAP at public events.



Placing an air canister at a test site for collecting emissions data.

Photo by: Nadia Steinzor

Air and water are the primary pathways of exposure to chemicals and other harmful substances, which are inhaled, ingested, and absorbed through the skin. With this in mind, environmental testing was conducted on the properties of a subset of survey participants (70 people in total) in order to identify the presence of pollutants that might be linked to both gas development and health symptoms. Test locations were selected based on household interest, the severity of symptoms reported, and proximity to gas facilities and activities. Because the need for testing in such places far exceeded the resources available, we also considered whether households had already received other environmental testing and been provided with the results.

In total, 34 air tests and 9 water tests were conducted at 35 households in 9 counties. The air tests were conducted using Summa Canisters put out for 24-hours by trained members of ShaleTest. The samples were analyzed by three certified laboratories using U.S. Environmental Protection Agency-approved TO-14 and TO-15 methods, which test for a wide range of Volatile Organic Compounds (VOCs) such as benzene, toluene, ethylbenzene, and xylene (BTEX chemicals). The water tests used samples drawn directly from household sinks or water wells by technicians employed by licensed laboratories and covered the standard Tier 1, Tier 2, and Tier 3 (including VOCs/BTEX) and in one case, Gross Alpha/Beta, Radon, and Radium as well.





EARTHWORKS™

GAS PATCH ROULETTE: HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

9

## 2.3.  FINDINGS

### PARTICIPANT OVERVIEW

Among participants, 45 percent were male from 18 months to 79 years of age and 55 percent were female from 7 to 77 years of age. The closest a participant lived to gas facilities was 350 feet and the furthest away was 5 miles.

Participants had a wide range of occupational backgrounds, including animal breeding and training, beautician, child care, construction, domestic work, farming, management, mechanic, medical professional, office work, painter, retail, teaching, and welding. About 20 percent of participants reported occupational-related chemical exposure (for example, to cleaning products, fertilizers, pesticides, and solvents). At the time of survey completion, 80 percent of participants did not smoke and 20 percent did. While some of the non-smokers had smoked in the past, more than 60 percent never had.

**Table 1: Survey location**

| County surveyed | Number of surveys collected | Percent of surveys |
|---|---|---|
| Washington | 24 | 22 |
| Fayette | 20 | 18 |
| Bedford | 20 | 18 |
| Bradford | 17 | 16 |
| Butler | 12 | 11 |
| Jefferson | 3 | 3 |
| Sullivan | 2 | 2 |
| Greene | 2 | 2 |
| Warren | 2 | 2 |
| Elk | 2 | 2 |
| Clearfield | 1 | 1 |
| Erie | 1 | 1 |
| Susquehanna | 1 | 1 |
| Westmoreland | 1 | 1 |
| TOTAL | 108 | 100% |

GAS PATCH ROULETTE: HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

10

## A COMPARATIVE LOOK:

We established an informal comparison group of 5 individuals in 5 households in and around the city of Sayre in north-central Bradford County and in Waverly, New York, just over the state border from Sayre. This group generally lived further away from gas facilities than the main survey group, between 1.5 - 9 miles from gas wells and (in one case) 8 miles from a compressor station.

None of the participants smoked and all reported being healthy. Taken together, these participants reported a total of 24 health symptoms, including some in the categories of skin, respiratory, digestive, muscles/joints, neurological, ear/nose/mouth, behavioral, and lymphatic. Only one or two participants reported each symptom or smelling odors of any kind—reflecting a lower level of impact than was generally documented among survey participants overall. While much smaller than the main survey group, the comparison group results indicate the possibility that fewer health symptoms exist at longer distances from facilities, an aspect indicated by the project findings overall that warrants further investigation and analysis.

## HEALTH SYMPTOMS

Almost half of the survey participants answered the question of whether they had any health problems prior to shale gas development. About half of those responses indicated no health conditions before the development began and about half reported having had one or just a few, in particular allergies, asthma, arthritis, cancer, high blood pressure, and heart, kidney, pulmonary, and thyroid conditions.

In addition, 5 individuals volunteered (verbally or in writing) that their existing health symptoms became worse after shale gas development started and 15 that their symptoms lessened or disappeared when they were away from home. Members of four households also reported that they'd moved to new locations due to gas drilling and several others told OGAP staff that they would if their finances and jobs allowed it. Also of note is that participants in 22 households reported that pets and livestock began to have unexplained symptoms (such as seizures or losing hair) or suddenly fell ill and died after gas development began nearby.

The specific symptoms reported within each of the top reported categories varied.[15] (To see which specific symptoms were included in all the categories, see the full survey at http://health.earthworksaction.org.) However, the primary categories of health problems reported by participants were quite consistent across counties. For example, sinus/respiratory problems was the top complaint category for all participants, as well as in four of the five main counties and the other counties group; the second top complaint category, behavioral/mood/energy, was the first in one county, second in three and in the other counties group, and third and fourth in one each.

**22 households reported that pets and livestock began to have symptoms (such as seizures or losing hair) or suddenly fell ill and died after gas development began nearby.**



Industrial equipment containing combustible products, very close to home.

Photo by: Nadia Steinzor



EARTHWORKS

GAS PATCH ROULETTE: HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

11

**Table 2: Ranking of top 8 categories of symptoms, by county**

| Symptom Category | All | Bedford | Bradford | Butler | Fayette | Washington | Others* |
|---|---|---|---|---|---|---|---|
| Sinus/respiratory | 1 | 1 | 2 | 1 | 1 | 1 | 1 |
| Behavioral/mood/energy | 2 | 2 | 1 | 3 | 2 | 4 | 2 |
| Neurological | 3 | 5 | 5 | 8 | 7 | 3 | 3 |
| Muscles/joints | 4 | 3 | 3 | 4 | 8 | 5 | 6 |
| Ear/nose/mouth | 5 | 7 | 8 | 7 | 5 | 6 | 5 |
| Digestive/stomach | 6 | 4 | 7 | 5 | 4 | 8 | 7 |
| Skin reactions | 7 | 6 | 4 | 2 | 3 | 7 | 8 |
| Vision/eyes | 8 | 8 | 6 | 6 | 6 | 2 | 4 |

**Table 3: Most prevalent categories of symptoms**

| Symptom category | Percent of individuals reporting conditions in category | | | | | | |
|---|---|---|---|---|---|---|---|
| | All | Bedford | Bradford | Butler | Fayette | Washington | Others* |
| Sinus/respiratory | 88 | 80 | 82 | 75 | 85 | 95 | 87 |
| Behavioral/mood/energy | 80 | 60 | 88 | 67 | 85 | 74 | 67 |
| Neurological | 74 | 45 | 71 | 50 | 70 | 79 | 60 |
| Muscles/joints | 70 | 55 | 82 | 67 | 70 | 74 | 47 |
| Digestive/stomach | 64 | 55 | 65 | 58 | 75 | 63 | 33 |
| Ear/nose/mouth | 66 | 40 | 59 | 50 | 75 | 68 | 47 |
| Skin reactions | 64 | 45 | 70 | 67 | 75 | 63 | 27 |
| Vision/eyes | 63 | 40 | 65 | 50 | 70 | 79 | 53 |

* Includes Clearfield, Elk, Erie, Jefferson, Greene, Sullivan, Susquehanna, Warren, and Westmoreland Counties. The surveys from these counties (15) were analyzed together to create a group comparable in number to each of the counties where more surveys were collected.

The 25 most prevalent symptoms among all participants were increased fatigue (62%), nasal irritation (61%), throat irritation (60%), sinus problems (58%), eyes burning (53%), shortness of breath (52%), joint pain (52%), feeling weak and tired (52%), severe headaches (51%), sleep disturbance (51%), lumbar pain (49%), forgetfulness (48%), muscle aches and pains (44%), difficulty breathing (41%), sleep disorders (41%), frequent irritation (39%), weakness (39%), frequent nausea (39%), skin irritation (38%), skin rashes (37%); depression (37%), memory problems (36%), severe anxiety (35%), tension (35%), and dizziness (34%).

The survey asked questions designed to identify if there might be associations between symptoms and living near particular types of facilities (wells, waste impoundment pits, and compressor stations). However, because it turned out that most survey participants actually live in close proximity to more than one type of facility, it was difficult to determine connections with a specific type of facility. Instead, we examined whether the distance from <u>any</u> type of oil and gas facility had a bearing on the number of types of symptoms reported in the survey.



As seen in Table 4, many symptoms were commonly reported regardless of the distance from the facility (in particular sinus problems, nasal irritation, increased fatigue, feeling weak and tired, joint pain, and shortness of breath).

In general, as the distance from facilities decreases, the percentage of respondents reporting the symptoms increases. For example, when facilities were 1500-4000 feet away, 27 percent reported throat irritation; this increased to 63 percent at 501-1500 feet, and 74 percent at less than 500 feet. For severe headaches, 30 percent reported them at the longer distance, but about 60 percent at the middle and short distances.

However, when facilities were further away than 4001 feet, some percentages jumped back up. The data showed higher percentages of respondents experiencing certain symptoms at the longer than mid-range distances with regard to several other symptoms (e.g., throat irritation, sinus problems, nasal irritation, eye burning, and joint pain). It is possible that the chemicals that bring on these types of symptoms travel over much longer distances than would normally be expected, or that other factors were at play related to the landscape, weather conditions, participant reporting, and type of production.[16]

When the most prevalent symptoms are broken out by age and distance from facility, some differences are notable. In most age groups, symptoms are more prevalent in those living closer to facilities than those living further away. In sum, while the data presented in Figure 1 below do not prove that living closer to an oil and gas facility causes health problems, they do suggest a strong association.

**In general, the closer to gas facilities respondents lived, the higher the rates of symptoms they reported.**



Drilling rig onsite.
Photo by: Frank Finan

GAS PATCH ROULETTE: HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

13

EARTHWORKS™

**Table 4. Differences in symptoms by distance from an oil/gas facility**

| Distance | Number of surveys in this category | Age range | Number of smokers | Average number of symptoms per person | Number of symptoms experienced by 50% or more respondents | Top 15 symptoms (the / means the same percentage of respondents had the symptom – bringing the total to more than 15 symptoms in some cases) |
|---|---|---|---|---|---|---|
| Within 500 feet of any facility | 27 | 1.5 to 76 (1 had no age data) | 2 | 31 | 9 | Throat irritation (74%), sinus problems (70%), nasal irritation/ eye burning/ joint pain/ severe headaches/ sleep disturbances (59%), skin rashes (56%), shortness of breath (52%), loss of sense of smell/ persistent cough/forgetfulness/ sleep disorders/ frequent nosebleeds/ swollen painful joints/ increased fatigue/ feeling weak and tired (44%) |
| 501 - 1500 feet from a facility | 40 | 3 to 79 | 12 | 30 | 11 | Increased fatigue (68%), nasal irritation(65%), throat irritation (63%), eye burning/ severe headaches (60%), shortness of breath (55%), sleep disturbances/ sinus problems/ lumbar pain (53%), feeling weak and tired/ forgetfulness (50%), joint pain/ muscular pain/ memory problems/ weakness (48%) |
| 1501 - 4000 feet from a facility | 30 | 6 to 77 (1 had no age data) | 9 | 27 | 1 | Increased fatigue (57%), feeling weak and tired (47%), joint pain (43%), shortness of breath/ difficulty breathing (40%), sinus problems/ lumbar pain/ forgetfulness/ tension/ weakness of hands (37%), nasal irritation/ frequent nausea/ reduced muscles strength/ persistent skin problems (33%) |
| Greater than 4001 feet from a facility | 11 | 34 to 76 | 2 | 29 | 8 | Throat irritation/ nasal irritation/ feeling weak and tired (64%), sinus problems/ eye burning/ joint pain/ muscle aches or pains/ ringing in ears (55%), increased fatigue/ severe headaches/ shortness of breath/ sleep disturbances/ lumbar pain/ muscular pain/ weakness/ depression/ persistent hoarseness/ blurred vision (45%) |

EARTHWORKS

### Figure 1. Association of symptoms and distance from facilities, by age group



In the youngest age group (1.5-16 years old), the most common symptoms were related to sensitive mucous membranes (throat, eyes, nose) and skin. **Even these youngest respondents had conditions not typically associated with children (e.g., severe headaches, joint pain, lumbar pain, and forgetfulness).**[17] In the subset of this young age group living 1500 feet or closer to a facility, the percentage of respondents with symptoms increased. For example, the number of respondents experiencing throat irritation jumped from 57 to 69 percent, and severe headaches increased from 52 to 69 percent. **Of all age groups, this group had the highest occurrence of frequent nosebleeds within 1500 feet of facilities (56%).**[18]



In the next age group (20-40 years old), there was a high occurrence of symptoms related to the throat, eye, and nose; fatigue, nausea, and severe headaches were also common symptoms. For those living 1500 feet or closer to a facility, the percentage of respondents with symptoms increased for all symptoms except one (headaches). In some cases, the percentage reporting symptoms was considerably higher (e.g., for sinus problems, eye burning, shortness of breath, and sleep disturbances). **44 percent of 20 to 40-year-olds living within 1500 feet of facilities complained of frequent nosebleeds, compared to 29 percent of all participants of this age.**



Approximately 60 percent of participants in the third age group (41-55 years old) reported throat irritation, increased fatigue, nasal irritation, joint pain, and severe headaches. Although the occurrence of some symptoms (e.g., throat irritation, joint pain, and sleep disturbances) increased in the subset of this group living closer to facilities, the increases were not as dramatic as those experienced in other age groups. In some cases, the percentages actually went down in the subgroup of those living closer to facilities.



In the oldest age group (56-79 years old) the symptoms most frequently experienced were increased fatigue, shortness of breath, and feeling weak and tired. For some symptoms (e.g., throat irritation, sinus problems, nasal irritation, eye burning, shortness of breath, severe headaches and skin rashes) **there were large increases in the subset of this age group who lived closest to facilities.**



The survey also asked respondents to indicate whether or not they were smokers. Table 5 shows that while smokers had, on average, more symptoms than non-smokers, and more symptoms in common with each other, the most frequently reported symptoms were very similar to non-smokers (including forgetfulness, increased fatigue, lumbar pain, joint pain, eye burning, nasal irritation, sinus problems, sleep disturbances, severe headaches, throat irritation, shortness of breath, frequent nausea, muscle aches or pains, and weakness).

The fact that the non-smokers reported symptoms that are commonly considered to be side effects of smoking (e.g., persistent hoarseness, throat irritation, sinus problems, nasal irritation, shortness of breath, and sleep disturbances) suggests that there are likely factors other than smoking that contribute to these symptoms.

**Table 5. Comparison of symptoms in smoking and non-smoking subgroups of similar ages 19**

| | Number in this category | Age range | Average number of symptoms per person | Number of symptoms experienced by 50% or more of respondents | Top 15 symptoms (in order of highest percentage reporting symptom) |
|---|---|---|---|---|---|
| Non-smokers | 54 | 23 - 70 | 27 | 6 | Forgetfulness (59%), lumbar pain/ joint pain (57%), increased fatigue (56%), eye burning/ nasal irritation (54%), sinus problems/ sleep disturbances (48%), severe headaches/ throat irritation (44%), shortness of breath (43%), frequent nausea/ muscular pain/ persistent hoarseness (41%), weakness (39%) |
| Smokers | 27 | 24 - 70 | 38 | 13 | Increased fatigue (70%), eye burning/ lumbar pain (59%), sinus problems/ nasal irritation/ joint pain/ forgetfulness/ severe headaches/ sleep disturbances (56%), shortness of breath/ throat irritation/ frequent nausea/ muscular pain (52%), feeling weak and tired/ weakness (48%) |

Breaking down the data further, as shown in Table 6**, it appears that the symptoms most frequently reported by smokers and non-smokers were remarkably similar within each age group.** For example, in the age group 20-40, increased fatigue, sinus problems, throat irritation, frequent nausea, and sleep problems were among the top symptoms for smokers and non-smokers. In the 41-55-year-old group, increased fatigue, throat irritation, eye burning, severe headaches, and feeling weak and tired were among the top symptoms in both groups, and in the over-56 age group, eye burning, sinus problems, increased fatigue, joint pain, and forgetfulness were among the top symptoms of smokers and non-smokers.

Furthermore, the data from smokers did not greatly affect the results in the "all respondents" category. When compared to the non-smoking subgroup, the only notable difference was in the 41-55-year-old age group, where the average number of symptoms in the "all respondents" was 30, versus 22 in the non-smoking subgroup.  The top symptoms, however, were very similar.



**Table 6.  Symptoms by age group, and by smoking or non-smoking status**

| Age category | Sub-category | Number in sub-category | Average number of symptoms per person | Number of symptoms in 50% or more respondents | Top 15 symptoms (in order of highest percentage reporting the symptom) |
|---|---|---|---|---|---|
| 16 and under | All respondents (None were smokers) | 21 | 19 | 2 | Throat irritation (57%), severe headaches (52%), nasal irritation (48%), skin rashes/ abdominal pain/ eye burning/ frequent nose bleeds/ sleep disturbances (43%), sinus problems/ persistent cough (38%), shortness of breath/ frequent nausea (33%), skin irritation/ asthma/ difficulty breathing/ allergies/ diarrhea/ dry eyes/ muscle aches or pains/ forgetfulness/ behavioral changes/ frequent irritation (29%) |
| 20 - 40 | All respondents | 14 | 29 | 12 | Increased fatigue (64%), severe headaches/ sinus problems/ throat irritation/ frequent nausea (57%) abdominal pain/ nasal irritation/ eye burning/ muscular pain/ lumbar pain/ weakness/ sleep disturbances/ depression (50%), dry/cracked red skin/ feeling weak and tired/ sleep disorders/ allergies/ sores or ulcers in mouth/ forgetfulness/ joint pain/ severe anxiety (43%) |
|  | Non-smokers | 10 | 29 | 10 | Increased fatigue/ severe headaches/ abdominal pain, (60%), sinus problems/ throat irritation/ frequent nausea/ nasal irritation/ dry, cracked red skin/ feeling weak and tired/ sleep disorders (50%), eye burning/ muscular pain/ lumbar pain/ sleep disturbances/ depression/ allergies/ sores or ulcers in mouth/ forgetfulness/ skin rashes/ shortness of breath/ diarrhea/ extreme drowsiness/ tension/ persistent skin problems/ loss of sense of smell/ lumps or swelling neck (40%) |
|  | Smokers | 4 | 28 | 28 | Weakness (100%), increased fatigue (75%), sinus problems (75%), throat irritation (75%), frequent nausea (75%), eye burning (75%), muscular pain (75%), lumbar pain (75%), sleep disturbances (75%), depression (75%), joint pain (75%), severe anxiety (75%), frequent irritation (75%), severe headaches/ nasal irritation/ allergies/ sores or ulcers in mouth/ forgetfulness/ swollen painful joints/ muscle aches or pains/ loss of sex drive/ irregular or rapid heart beat/ persistent hoarseness/ reduced muscle strength/ difficulty concentrating/ severe pain in eyes/ compulsive behavior/ weight loss (50%) |

GAS PATCH ROULETTE: HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

18

EARTHWORKS

| | | | | | |
|---|---|---|---|---|---|
| 41 - 55 | All respondents | 33 | 30 | 8 | Severe headaches/ nasal irritation/ increased fatigue (63%), joint pain/ throat irritation (60%), feeling weak and tired (57%), sinus problems/ eye burning (60%), shortness of breath/ sleep disturbances/ depression, muscles aches or pains (49%), lumbar pain/forgetfulness (46%), memory problems (43%) |
| | Non-smokers | 22 | 22 | 8 | Joint pain (68%), nasal irritation (64%), throat irritation (59%), severe headaches/ increased fatigue/ feeling weak and tired (55%), sinus problems/ depression (50%), eye burning/ muscle aches or pains (45%), shortness of breath/ memory problems/ lumbar pain/ skin rashes (41%) |
| | Smokers | 13 | 44 | 18 | Severe headaches/increased fatigue (77%), sleep disturbances (69%), nasal irritation/ throat irritation / feeling weak and tired/ eye burning/ shortness of breath/ forgetfulness/ sleep disorders/ loss of sex drive (62%), sinus problems/ muscle aches or pains/ lumbar pain/ skin irritation/ muscular pain/ persistent hoarseness/ agitation (54%) |
| 56 - 79 | All respondents | 36 | 32 | 11 | Increased fatigue (67%), shortness of breath/ feeling weak and tired (64%), sinus problems/ eye burning, joint pain (56%), forgetfulness (53%), difficulty breathing/ nasal irritation/ lumbar pain/ sleep disturbances (50%), throat irritation (47%), weakness/ reduced muscle strength/ memory problems (44%) |
| | Non-smokers | 28 | 32 | 9 | Feeling weak and tired (68%), increased fatigue/ shortness of breath (64%), sinus problems/ eye burning/ sleep disturbances (54%), joint pain/ forgetfulness/ throat irritation (50%), difficulty breathing/ nasal irritation/ weakness/ memory problems/ sleep disorders/ frequent urination (46%) |
| | Smokers | 8 | 35 | 18 | Increased fatigue/ joint pain/ lumbar pain (75%), shortness of breath/ sinus problems/ eye burning, forgetfulness/ difficulty breathing/ nasal irritation/ tension/ frequent nausea (63%), feeling weak and tired/ reduced muscle strength/ arthritis/ muscular pain/ persistent skin problems/ diarrhea/ skin rashes 50%) |

GAS PATCH ROULETTE: HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA      19
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

EARTHWORKS

## ODOR EVENTS

Bad and unusual odors are an indication of the presence of a substance or chemical, and are a common complaint of people living near gas facilities. Among survey participants, 81 percent reported experiencing bad odors sometimes or constantly. The frequency ranged from 1 to 7 days per week and from several times per day to all day long; 18 percent said they could smell odors every day.

Participants were asked to describe the suspected source of the odors. Nearly all responses related odors to gas facilities and events, including drilling; gas wells; well pads; fracturing; compressor stations; condensate tanks; drinking contaminated water; flaring; waste pits; retention ponds; diesel engines; truck traffic; pipelines and pipeline stations; spills and leaks; subsurface events; seismic testing; and blue-colored particles in air (possibly a sign of catalytic compounds or particulate matter).

When asked in the survey whether health symptoms occurred in conjunction with odor events, participants reported the associations listed below. Most indicated that symptoms would last from a few hours to a few days and, in some cases, a few weeks.

- **Nausea:** ammonia, chlorine, gas, propane, ozone, rotten gas.
- **Dizziness:** chemical burning, chlorine, diesel, ozone, petrochemical smell, rotten/sour gas, sulfur.
- **Headache:** chemical smell, chlorine, diesel, gasoline, ozone, petrochemical smell, propane, rotten/sour gas, sweet smell.
- **Eye/vision problems:** chemical burning, chlorine, exhaust.
- **Respiratory problems:** ammonia, chemical burning, chlorine, diesel, perfume smell, rotten gas, sulfur.
- **Nose/throat problems:** chemical smell, chlorine, exhaust, gas, ozone, petrochemical smell, rotten gas, sulfur, sweet smell.
- **Nosebleeds:** kerosene, petrochemical smell, propane, sour gas.
- **Skin irritation:** chemical smell, chlorine, ozone, sulfur.
- **Decreased energy/alertness:** chemical gas, ozone, rotten/sour gas, sweet smell.
- **Metallic/bad taste in mouth:** chemical burning, chlorine, turpentine.

**81%** reported experiencing **bad odors** sometimes or constantly. The frequency ranged from 1 to 7 days per week and from several times per day to all day long



Centralized compressor stations move large volumes of gas to and through pipelines. Emissions can include volatile organic compounds such as benzene and toluene, nitrogen oxides, and formaldehyde.

Photo by: Nadia Steinzor



## 2.4. ENVIRONMENTAL TESTING

### AIR

As seen in Table 7, the 34 Summa canister air tests, taken together, detected a total of 19 VOCs. In sum, there was considerable consistency in the chemicals present in many of the samples, although concentrations varied. This could in part be due to differences in the reporting limits and suite of chemicals analyzed by the three labs used in this project. It is possible, for example, that more VOCs were present in more locations, but Pace Analytical had much higher reporting limits than Columbia and Con-Test so the Pace results showed "non-detect" for many substances.[20]

**Table 7. VOCs in ambient air, sorted by highest percent detection; concentrations are in micrograms per cubic meter, µg/m³ (n = total number of canister samples that were analyzed for a particular chemical; NA = VOC not included in the analysis)**

| Volatile Organic Compound (VOC) | n | Number of samples detecting VOC | Percent of *n* detecting VOC | Min. | Max. | Mean* | Chemical reporting limits for the three labs used | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Columbia | Con-Test | Pace** |
| **2-Butanone** | 17 | 16 | 94 | 0.95 | 2.9 | 1.52 | 0.85 - 1.3 | NA | NA |
| **Acetone** | 17 | 15 | 88 | 8.0 | 19 | 11.85 | 6.5 - 10 | NA | NA |
| **Chloromethane** | 34 | 27 | 79 | 1.0 | 1.66 | 1.21 | 0.59 - 0.90 | 0.1 | 1.39  1.53 |
| **1,1,2-Trichloro-1,2,2-trifluoroethane** | 34 | 26 | 76 | 0.54 | 0.73 | 0.64 | 0.22 - 0.34 | 0.38 | 5.13 - 5.67 |
| **Carbon tetrachloride** | 34 | 26 | 76 | 0.46 | 0.76 | 0.62 | 0.091 - | 0.31 | 4.21 - 4.65 |
| **Trichlorofluoromethane** | 34 | 26 | 76 | 0.6 | 1.8 | 1.48 | 0.81 -1.2 | 0.28 | 3.32 - 3.66 |
| **Toluene** | 34 | 22 | 65 | 0.68 | 7.9 | 1.83 | 0.53 - 0.82 | 0.19 | 2.52 - 2.79 |
| **Dichlorodifluoromethane** | 17 | 9 | 53 | 1.9 | 2.8 | 2.41 | NA | 0.25 | 3.32 - 3.66 |
| **n-Hexane** | 8 | 3 | 38 | 3.03 | 7.04 | 5.23 | NA | NA | 2.37 - 2.61 |
| **Benzene** | 34 | 11 | 32 | 0.31 | 1.5 | 0.85 | 0.46 - 0.67 | 0.16 | 2.14 - 2.36 |
| **Methylene Chloride** | 34 | 10 | 29 | 1.9 | 32.62 | 7.93 | 0.49 - 0.76 | 1.7 | 2.33 - 2.57 |
| **Total Hydrocarbons (gas) *** | 8 | 2 | 25 | 49.8 | 146 | 97.9 | NA | NA | 46.9 - 52.2 |
| **Tetrachloroethylene** | 34 | 8 | 24 | 0.12 | 10.85 | 1.68 | 0.10 - 0.16 | 0.34 | 4.54 - 5.02 |
| **1,2,4-Trimethylbenzene** | 17 | 4 | 24 | 0.38 | 0.61 | 0.48 | NA | 0.25 | 3.30 - 3.64 |
| **Ethylbenzene** | 34 | 6 | 18 | 0.27 | 1.5 | 0.54 | 1.4 – 1.9 | 0.22 | 2.91 - 3.21 |
| **Trichloroethylene** | 34 | 6 | 18 | 0.17 | 5.37 | 2.71 | 0.08 - 0.12 | 0.27 | 3.60 - 3.98 |
| **Xylene (m&p)** | 34 | 5 | 15 | 0.92 | 5.2 | 1.98 | 2.5 – 3.8 | 0.43 | 2.82 - 3.12 |
| **Xylene (o)** | 34 | 5 | 15 | 0.39 | 1.9 | 0.76 | 1.2 – 1.9 | 0.22 | 2.91 - 3.21 |
| **1,2-Dichloroethane** | 34 | 1 | 3 | 0.64 | 0.64 | 0.64 | 0.59 - 0.90 | 0.2 | 2.71 - 2.99 |

\* Mean of samples detecting chemical.[21]

\*\* Pace reporting limits were in ppbv. We converted to µg/m³.[22]

\*\*\* Total hydrocarbons reported as parts per billion volume (ppbv).



GAS PATCH ROULETTE: HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

21

Breaking out the air data by county, the highest number of VOCs were detected in samples from Washington County (15), Butler County (15), Bradford County (12), and Fayette County (9). Washington County also had the highest measured concentration of five and the second highest concentration of 12 VOCs.[23] Samples from Butler and Bradford Counties had the highest concentrations of five and three VOCs, respectively. Five chemicals were detected in all nine of the samples from Washington County and in the six samples from Butler County: 1,1,2-Trichloro-1,2,2-trifluoroethane; carbon tetrachloride; chloromethane; toluene; and trichlorofluoromethane. (Detailed data for all the counties where air testing occurred are available at http://health.earthworksaction.org.)

In 2010, the Pennsylvania Department of Environmental Protection (DEP) conducted air testing around natural gas wells and facilities in three regions across the state, in part using the same canister sampling methods as in this project.[24] When compared to the DEP's results, OGAP's results showed some similarities in both the chemicals detected and concentrations.

Figure 2 shows benzene, toluene, ethylbenzene, and m&p-xylenes (o-xylenes not included) broken down by county from our project, as well as samples taken by DEP at control sites (rural, forested areas with no nearby gas development), oil and gas sites (including some nearby residences), and an industrial site (the Marcus Hook monitoring site, which is close to two oil refineries in an industrialized area of the state[25]). Also shown in the chart are the number of detections and the number of samples in each category (e.g., benzene was detected in four of six air samples in Butler county).

As seen in these charts, BTEX chemicals measured in our project in Butler and Washington Counties were consistently higher than concentrations found at DEP control sites (ethylbenzene and m&p-xylenes were not detected at any of the control sites). When compared to the sampling done by DEP around oil and gas facilities the concentrations in Butler and Washington Counties were in the same range for benzene, but were considerably higher for toluene, ethylbenzene, and m&p-xylenes. It is also striking that some of the concentrations of ethylbenzene and xylene measured at homes in Butler and Washington Counties were higher than any concentration detected by the DEP at the Marcus Hook industrial site. Again, while factors such as topography, type of gas, and emission control technologies can influence air results, it is highly possible that air quality at the sites where we tested—all in rural and residential areas—was worse overall because of the proximity of gas facilities.

**Concentrations of ethylbenzene and xylene measured at homes in Butler and Washington Counties for this project were higher than in air tests done by the DEP at the Marcus Hook Industrial site.**

According to the DEP, some of the VOCs found in our study are present in ambient air because they were once widely used and persist in the atmosphere.[26] The DEP indicates that acetone and the BTEX chemicals, however, may be attributed to gas development.[27] (In addition, the presence of VOCs clearly influences air quality overall.)

GAS PATCH ROULETTE: HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

EARTHWORKS

22

**Figure 2. The four charts that make up Figure 2 show comparisons of BTEX concentrations where they were detected in project samples (Bradford, Butler, Fayette, and Washington Counties only) and DEP samples (control, oil and gas facility, and an industrial site).**





GAS PATCH ROULETTE: HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

23





To provide some perspective on benzene concentrations found in our results, we examined data on national benzene concentrations in the U.S. (based on annual average concentrations at 22 urban sampling locations). Between 1994 and 2009, benzene in ambient air declined.[28]

In 2009, 80 percent of the urban sites had average annual benzene concentrations between 0.4 and 1.5 micrograms per cubic meter ($\mu g /m^3$), with the average and median concentrations for the 22 sites being less than 1 $\mu g /m^3$. Five of our air canister tests had benzene above the national (urban) average, and two had concentrations equal to the maximum average annual concentration measured by EPA in U.S. urban areas in 2009 (i.e., 1.5 $\mu g /m^3$).[29]



As mentioned previously, the current project's sampling locations were in rural areas of Pennsylvania. While local traffic may have contributed some benzene, the most likely primary sources of benzene in these areas are oil and gas facilities; increased truck traffic associated with these sites could also be a contributing factor.

It is important to note that the concentrations found in our study were <u>one-time</u> samples, while the EPA concentrations represent an average of many samples taken over the course of a year. So there may have been some individual samples in urban areas that were higher than 1.5 µg /m³. It is also possible, however, that benzene concentrations at the sampling locations in our project could have exceeded 1.5 µg /m³ if numerous samples were taken over the course of several months or a year.

Finally, the chemicals sampled in our project were limited to a selection of VOCs. The analytical methods used did not test for some chemicals known to be associated with oil and gas facilities such as formaldehyde, which is commonly emitted from compressor stations. According to the U.S. EPA, the major toxic effects caused by acute formaldehyde exposure via inhalation are eye, nose, and throat irritation and effects on the nasal cavity.[30]  These were symptoms experienced by high percentages of survey respondents. In addition, hydrogen sulfide, a known toxic compound with many of the health effects documented in this project, is often associated with oil and gas development. Testing for such chemicals would have required different types of air sampling methods than applied here.



Operators flare gas that's uneconomical to process or to burn off certain compounds. Flaring emits a host of air pollutants determined by the chemical composition of the gas and the temperature of the flare.

Photo by: Frank Finan

## WATER

The nine water samples taken for this project were sent to laboratories that analyzed for dozens of substances. Table 8 shows the 26 parameters that were detected in at least one sample (including water temperature and pH). Several of the chemicals found in samples are known to be associated with oil and gas drilling operations. For example, barium, bromide, calcium, chloride, iron, manganese, magnesium, potassium, sodium, sulfate, strontium, and Total Dissolved Solids (TDS) have been measured in effluent from a Pennsylvania wastewater plant that only treats oil and gas industry brine and hydraulic fracturing flowback.[31]

**Drinking water standards do not even exist for some contaminants, such as methane, bromide, sodium, strontium, or Total Suspended Solids (TSS).**

GAS PATCH ROULETTE: HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org                    25

EARTHWORKS

**Table 8. Water quality results from nine private water wells in Bradford and Butler Counties, Pennsylvania (Note: not all parameters were analyzed in every sample)**

| Parameter | Units | Number of samples | Number above detection limit | Min.[a] | Max. | Mean[b] | PA DEP MCL[c] | Number of samples above MCL |
|---|---|---|---|---|---|---|---|---|
| Barium | mg/L | 9 | 9 | 0.029 | 0.5 | 0.25 | 2 | 0 |
| Calcium | mg/L | 9 | 9 | 33 | 66.2 | 43.7 | None | |
| Magnesium | mg/L | 9 | 9 | 4.5 | 16.8 | 9.1 | None | |
| Sodium | mg/L | 9 | 9 | 9.2 | 64.1 | 20.9 | None | |
| Strontium | mg/L | 9 | 9 | 0.126 | 1.7 | 0.5 | None | |
| Hardness (Total as CaCO3) | mg/L | 9 | 9 | 120 | 234 | 147 | None | |
| pH | Std Units | 9 | 9 | 6 | 7.9 | 6.5 | 6.5 - 8.5 | 2 below |
| Alkalinity (Total as CaCO3) | mg/L | 9 | 9 | 38 | 285 | 130 | None | |
| Total Dissolved Solids | mg/L | 9 | 9 | 138 | 392 | 218 | 500 | 0 |
| Sulfate | mg/L | 9 | 9 | 6.7 | 231 | 33 | 250 | 0 |
| Manganese | mg/L | 9 | 7 | <0.005 | 6.44 | 1.04 | 0.05 | 7 |
| Chloride | mg/L | 9 | 7 | <5.0 | 84.3 | 24.1 | 250 | 0 |
| Iron | mg/L | 9 | 6 | <0.04 | 153 | 19.5 | 0.3 | 5 |
| Potassium | mg/L | 6 | 6 | 1.14 | 1.57 | 1.1 | None | |
| Specific Conductance | µmhos/cm | 6 | 6 | 287 | 552 | 326 | None | |
| Methane | µg/L | 9 | 5 | 1.06 | 57.4 | 10 | None | |
| Arsenic | mg/L | 9 | 4 | <0.001 | 0.0282 | 0.005 | 0.010 | 1 |
| Lead | mg/L | 9 | 4 | <0.001 | 0.113 | 0.01 | 0.005* | 3 |
| Total Coliform | per 100 mL | 9 | 4 | Absent | Present | | None | |
| Total Suspended Solids | mg/L | 6 | 4 | <5 | 448 | 118 | None | |
| Temp, water | Deg. Celsius | 3 | 3 | 25 | 29 | 28 | None | |
| Turbidity | NTU | 3 | 3 | 0.22 | 5.7 | 2.3 | None | |
| Nitrate | mg/L | 3 | 3 | 0.076 | 0.71 | 0.46 | 10 | 0 |
| E. coli | per 100 mL | 9 | 2 | Absent | Present | | None | |
| Sulfur | µg/L | 1 | 1 | <1,000 | 7,550 | 2,850 | None | |
| Bromide | mg/L | 1 | 1 | 0.26 | 0.26 | 0.26 | None | |

[a] **Minimum values:** If reports included non-detects of a particular chemical, the minimum value in the table was shown as being less than (<) the lowest laboratory detection limit.
[b] **Mean values:** Non-detected chemicals were assigned a concentration equal to half of the detection limit *only if* there were other samples that detected the chemical.
[c] **MCL:** Maximum Contaminant Levels published by the Pennsylvania Department of Environmental Protection Division of Drinking Water Management.



Two of the water samples, both from Butler County, were more acidic than the recommended pH for drinking water. Iron, manganese, arsenic, and lead were detected in water well samples from Bradford and Butler Counties at levels higher than the Maximum Contaminant Levels (MCLs) set by DEP's Division of Drinking Water Management.[32]

It is important to note that while laboratory tests may not show exceeded levels for some of the other substances, drinking water standards on which to base such determinations often do not exist, including for methane, bromide, sodium, strontium, or Total Suspended Solids (TSS).

More than half of the project water samples contained methane. Although some groundwater can contain low concentrations of methane under normal conditions, its presence could also indicate natural gas migration from improperly cased or damaged gas wells. In addition, a recent analysis of U.S. Geological Survey water monitoring data for an aquifer near Pavillion, Wyoming found that thermogenic gas (which likely comes from shale formations), as well as chemicals associated with hydraulic fracturing, are present—evidence that strongly suggests that these substances can seep into water supplies following fracturing.[33]



Drinking water wells have been contaminated with methane, chemicals, and other substances.

Photo by: Nadia Steinzor

Concentrations of some metals such as manganese and iron may be elevated in Pennsylvania surface waters and soils either naturally or due to past industrial activities, and levels can vary regionally and seasonally.[34] In 2012, Pennsylvania State University (PSU) researchers found that some drinking water wells in the state contained elevated concentrations of certain contaminants prior to any drilling in the area.[35] For example, PSU researchers found that 27 percent of pre-drilling water samples had manganese above the DEP drinking water standard.[36] In this project, 7 out of the 9 water supplies sampled (78 percent) had manganese levels above the state MCL; this is a much higher percentage than the PSU study. If there was no impact from drilling, one would expect that fewer than three of our project samples would have had manganese above the MCL.

Even when metals in ground water are naturally occurring or pre-date gas development, drilling and hydraulic fracturing have the potential to mobilize substances in formations such as Marcellus Shale, which is enriched with barium, uranium, chromium, and zinc and other metals.[37] Also, drilling can cause physical and chemical changes to groundwater aquifers that may result in elevated metals and sediment concentrations in drinking water.[38] In the PSU study, there were three cases where wells within within 3,000 feet of the nearest Marcellus gas well experienced changes in manganese, iron and sediment after drilling occurred. For example, each water well had pre-drilling manganese concentrations near or below the drinking water standard (0.05 mg/L) that increased far above the standard following drilling.[39]

GAS PATCH ROULETTE: HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

27

EARTHWORKS

## SYMPTOM AND TESTING ASSOCIATIONS

More research would be required to state "cause and effect" connections between the chemicals present in air and water in specific locations and symptoms reported by particular residents. Nonetheless, associations can be made, as many of the chemicals detected through testing are known to be linked to both oil and gas operations and with the health symptoms reported in the surveys.[40]

The air tests together detected 19 chemicals that may cause sinus, skin, ear/nose/mouth, and neurological symptoms, 17 chemicals that may affect vision/eyes, 16 that may induce behavioral effects, 11 that have been associated with liver damage, 9 with kidney damage, and 8 associated with digestive/stomach problems. In addition, the brain and nervous system may be affected by 5 chemicals that were detected, the cardiological system by 5, muscles by 2, and blood cells by 2.[41]

More specifically, benzene, toluene, ethylbenzene, xylene, chloromethane, trichloroethene, and acetone were detected at project sites where residents reported associated symptoms in health surveys, including in the categories of sinus/respiratory, skin, vision/eyes, ear/nose/mouth, and neurological. Some of these chemicals, as well as others (such as carbon tetrachloride and tetrachloroethylene), were found at sites where survey participants reported associated symptoms in the categories of digestion, kidney and liver damage, and muscles. (For a full list of health symptoms associated with the chemicals detected, see http://health.earthworksaction.org.)

As shown in Table 9, 68 percent of the respondents at households where chemicals were detected reported symptoms known to be associated with those chemicals. Fayette and Washington Counties had the highest rate of association, followed by Greene, Bedford, and Butler. **The total number of symptoms reported by individual participants ranged from 2-111, but more than half of participants reported having over 20 symptoms and nearly one-quarter reported over 50.** The highest number of number of symptoms in households where we conducted air testing were reported by a 26 year-old female in Fayette County (90 symptoms) and a 51 year-old female in Bradford County (94 symptoms).

**Many of the chemicals detected through testing are known to be linked to both oil and gas operations and with the health symptoms reported in the surveys.**





The many stages of gas development create multiple pathways for exposure to air and water pollution, such as emissions, spills, leaks from compressors, impoundments, and other facilities.

Photos by: Nadia Steinzor (top); Frank Finan (bottom)



EARTHWORKS™

GAS PATCH ROULETTE: HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

28

**Table 9. Match between health symptoms reported by individuals at air testing sites and known effects of chemicals detected**

| County | Number of individuals surveyed at homes where testing was conducted | Association between known effects of chemicals detected and symptoms reported | |
|---|---|---|---|
| | | Average | Range |
| Overall | 65 | 68% | 33 - 100% |
| Fayette | 17 | 73% | 33 - 100% |
| Washington | 15 | 73% | 33 - 100% |
| Bradford | 10 | 58% | 16 - 100% |
| Butler | 12 | 63% | 56 - 68% |
| Bedford | 6 | 69% | 63-100% |
| Elk | 2 | 64% | 53 - 74% |
| Clearfield | 1 | None | None |
| Greene | 1 | 70% | 70% |
| Susquehanna | 1 | 50% | 50% |

In addition, as shown in Table 10, the percent of individuals reporting particular types of symptoms that are associated with chemicals detected in the air testing was generally consistent across counties.

**Table 10. Percent of individuals at air testing sites reporting symptoms associated with chemicals detected at those sites, by symptom category**

| Symptom Category | All | Bedford | Bradford | Butler | Fayette | Washington | Others * |
|---|---|---|---|---|---|---|---|
| Sinus/respiratory | 83 | 100 | 88 | 100 | 81 | 73 | 80 |
| Vision/eyes | 73 | -- | 100 | 63 | 69 | 67 | 60 |
| Digestive/stomach | 69 | 50 | 63 | 88 | 75 | 80 | -- |
| Skin reactions | 63 | 50 | 63 | 88 | 69 | 53 | 40 |
| Neurological | 60 | 50 | 88 | 75 | 44 | 53 | 60 |
| Behavioral/mood/energy | 54 | 67 | 50 | 63 | 63 | 47 | 40 |
| Ear/nose/mouth | 33 | 50 | -- | 38 | 44 | 33 | 20 |
| Muscle problems | -- | -- | -- | -- | -- | 40 | -- |

\* This includes air samples from Clearfield, Elk, Greene, and Susquehanna Counties

As mentioned above, iron, manganese, arsenic, and lead were detected in water samples at levels above Pennsylvania drinking water standards. These substances are known to be associated with



GAS PATCH ROULETTE: HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA     29
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

numerous symptoms reported by individuals living in the homes where those tests were conducted, including in the categories of sinus/respiratory, skin reactions, digestive/stomach, vision/eyes, ear/nose/mouth, neurological, muscle/joint, behavioral/mood/energy, and liver and kidney damage. In addition, survey participants in the homes where water test results showed the presence of methane reported health symptoms known to be associated with the gas, including in the categories of sinus/respiratory, digestive/stomach, neurological, and behavioral/mood/energy.

**Where water test results showed the presence of methane, participants reported health symptoms known to be associated with the gas.**

Even though many participants indicated they had concerns with both water and air, the different types of testing conducted at different households provides a way to explore whether there might be particular symptoms more commonly associated with one type of exposure. As indicated in Figure 4, there were notable differences in several of the top symptoms reported at households where water versus air was tested, and among survey participants as a whole. Participants with water tests had a higher occurrence of skin rashes, difficulty breathing, skin irritation, diarrhea, persistent skin problems and sores that wouldn't heal, as well as a lower occurrence of severe headaches, throat irritation, and sleep disturbances, than those with air tests and all respondents.

**Figure 4: Differences in symptoms based on respondents with water and air tests**



## 2.5. CONCLUSIONS

The data gathered through this project point to three central conclusions: (1) contaminants that are associated with oil and gas development are present in air and water in areas where residents are experiencing health symptoms consistent with such exposures; (2) there is a strong likelihood that residents who are experiencing a range of health problems would not be if widespread gas development were not occurring; and (3) by permitting widespread gas development without fully understanding its impacts to public health—and using that lack of knowledge to justify regulatory inaction—Pennsylvania and other states are risking the public's health.

This project documented health symptoms and the presence of air contaminants at longer distances from gas facilities than in other locations where similar projects have been conducted.[42] This could be because the previous air testing was conducted in a limited geographical area very close to facilities, while the surveys and testing in Pennsylvania took place in areas where wells and facilities are more spread out. This could also help to explain why Pennsylvania residents who don't have gas facilities located on their own properties often report health problems and indicates that air contaminants and odors can travel further than might have previously been assumed.

Because of the short-term nature of the air canister testing (24 hours) and the single water tests conducted at households, our results reflect conditions at particular "moments in time." Factors such as the stage of drilling, weather conditions, wind speeds, topography, geology, and whether facilities are in operation or shut down may have an impact on the testing results. In addition, some chemicals may have been present in water or air below detection limits or prior to when the tests were conducted, meaning that other exposures may have also occurred that caused the reported symptoms. Given this, more continuous testing over longer periods of time and at additional locations would likely reveal different chemicals, chemical concentrations, and associations with health impacts.

**More continuous testing over longer periods of time and at additional locations would likely reveal different chemicals, chemical concentrations, and associations with health impacts.**

A related consideration for future research is the wide variation of results, and therefore conclusions about the presence and levels of chemicals, that occur depending on the laboratory used. This project used three laboratories to supply canisters and analyze samples (a step taken to compare the capacity and protocols of labs and to have "back up" should one of the labs have proven inadequate). However, while all the labs tested for the same core suite of chemicals, testing for other chemicals and the reporting limits for detection varied. In addition, the labs did not all analyze the samples for the same VOCs. For example, only Columbia Analytical analyzed for Acetone and 2-Butanone, while only Pace Analytical analyzed for n-Hexane and Total Hydrocarbons as gas.



Photo by: Frank Finan

More research is warranted to establish connections between reported health problems and particular events related to gas operations, such as chemical spills, leaking waste pits, and flaring and venting. This could include, for example, examination of case files compiled by regulatory agencies, interviews with residents near the facilities where problems occurred, and daily odor and symptom logs kept by residents.

GAS PATCH ROULETTE: HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

31

EARTHWORKS

# 3    Missing pieces

*Public health was not brought into discussions about shale gas extraction at earlier stages; in consequence, the health system finds itself lacking critical information about environmental and public health impacts of the technologies and unable to address concerns by regulators at the federal and state levels, communities, and workers...*

–Institute of Medicine at the National Academies of Science[43]

## 3.1.  SCIENCE AND TESTING

Simply put, scientific investigation has not been able to keep pace with the rapid expansion of potential pathways of exposure and associated risks of gas development. Widespread interest by the health, medical, and environmental research community in examining the impacts of oil and gas development is relatively recent, perhaps coincident with the geographic expansion of activities and increased risk of impacts.

In addition, environmental testing and monitoring has long been primarily conducted for a limited number of air contaminants and in areas of high population density,[44] while testing at oil and gas facilities in states like Pennsylvania began only recently.[45] The result is a lack of data on which to base health-related research or for use by agencies charged with protecting health and air and water quality. Further, only a few states require any kind of baseline water testing before drilling begins, and this information is largely not accessible to the general public.[46] This makes it difficult for researchers, regulators, and communities to establish clear connections after gas operations begin.

People living in oil and gas development areas day in and day out—as well as workers at job sites where hazardous substances are continuously used—are subjected to chronic, long-term exposure to multiple toxic substances from a number of facilities. Yet this experience is often not reflected in the standards used to determine the impacts of chemicals and the relative safety or risk of exposure to them through both air and water.[47] In turn, this calls into question reference to these standards (including by the gas industry and regulators) as a basis on which to judge the "risk" and "safety" of operations or to claim that evidence of harm does not exist. As summarized by the Agency for Toxic Substances and Disease Registry, "…most toxicological testing is performed on single chemicals, but human exposure is rarely limited to single chemicals…A particular issue is whether a mixture of components, each of which is present at less than guidance concentrations, may be hazardous due to additivity, interactions, or both."[48]

Similarly, risk assessments for many chemicals use a high dose

**People living in oil and gas development areas and workers are exposed to multiple toxic substances from a number of facilities. Yet this experience is often not reflected in the standards used to determine the safety or risk of exposure.**



Well equipment close to home.

Photo by: Nadia Steinzor



EARTHWORKS

GAS PATCH ROULETTE: HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

32

as the starting point for calculating levels at which negative effects can be observed—potentially minimizing the exposure risks of low doses of many chemicals.[49] A recent paper, for example, showed that endocrine disrupting chemicals can have different but still harmful effects at low doses than at high ones, concluding that fundamental changes in chemical testing and safety protocols are needed to protect human health.[50] In addition, many chemicals have not yet been studied with regard to their health impacts. For example, as stated in a study on air toxics by the University of California-Berkeley School of Public Health, "Of the 188 hazardous air pollutants (HAPs) listed in the Clean Air Act, only a handful have information on human health effects. Lack of consistent monitoring data…makes it difficult to assess the extent of low-level, chronic, ambient exposures to HAPs that could affect human health."[51]

Finally, many areas of the country already have compromised air and water quality from various sources, such as traffic, agriculture, industry, and even previous mining and fossil fuel development. Today's oil and gas operations add even more chemicals and pollutants to the environment. For individuals with underlying conditions (e.g., asthma, heart conditions, or cancer), this can potentially cause a "trigger effect" and result in both new and the worsening of old health problems.

---

## EMERGING KNOWLEDGE

Recent research has begun to establish links between oil and gas operations and health, including:

- A 2011 review of over 600 known chemicals used in natural gas operations concluded that many could have long-term health impacts, including on skin, eyes, and kidneys and respiratory, gastrointestinal, brain/nervous, immune, endocrine, and cardiovascular systems, as well as causing cancer and mutations.[52]

- A 2012 study in Colorado based on air sampling data showed that due to the toxicity of air emissions near natural gas sites, residents living closer to the sites had a greater risk of health-related impacts than those living further away.[53]

- A 2012 paper documented cases in which animals (both livestock and pets) exposed to natural gas operations and related toxic substances suffered negative health impacts and even death.[54]

---


GAS PATCH ROULETTE: HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

33

## 3.2. POLICY AND REGULATION

Public health has not been a priority for policymakers making decisions about gas development. In just the last year, Maryland, Pennsylvania, and the U.S. Secretary of Energy established commissions to study the impacts of shale gas development, but none of the more than 50 members on these official bodies had health expertise.[55] In addition, New York's multi-year review of Marcellus Shale drilling has to date failed to analyze health impacts.[56]

Regulators do not require companies to provide information on potential health impacts in energy proposals and permit applications. Some associated concerns (such as traffic and noise) are often included in federal Environmental Assessments and Environmental Impact Statements, or when laws in 17 states spur similar analyses.[57] But only a few Health Impact Assessments (HIAs) have been conducted in the United States specifically on oil and gas development.[58]

Special exemptions for the oil and gas industry in sections of seven federal environmental laws compound the neglect of public health impacts in decisionmaking. Most notable is the ability of operators to keep secret the chemicals and chemical concentrations used in hydraulic fracturing (Safe Drinking Water Act); to measure air emissions based on single facilities, even if several make up a single operation (Clean Air Act); and to avoid classification (and thereby stringent transport and disposal requirements) of produced solid waste and wastewater as hazardous (Resource Conservation and Recovery Act).[59] These loopholes are replicated on the state level, where regulations developed for limited conventional drilling—in particular with regard to setbacks and waste disposal—are inadequate to address the complexity and intensity of shale gas development.

In addition, a crisis is underway in oil and gas industry monitoring and enforcement, likely adding to the pathways of pollution that are left undocumented and unaddressed. In a comprehensive analysis of programs in six states (Colorado, New Mexico, New York, Ohio, Pennsylvania, and Texas), Earthworks' OGAP found that regulatory agencies have been unable to keep up with oversight of existing wells, let alone the boom in shale gas development.[60] In Pennsylvania specifically, OGAP found that 86 percent of active wells were not inspected in 2011; violations by many operators are getting worse with time; the rate of enforcement has been declining; and penalties are too weak and inconsistent to have a deterrent effect.[61]

**Special exemptions for the oil and gas industry in sections of seven federal environmental laws compound the neglect of public health impacts in decisionmaking.**



Photo by: Frank Finan


EARTHWORKS™

GAS PATCH ROULETTE: HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

34

# 4    Recommendations

The shale gas boom reflects a glaring mismatch in timing: knowledge about health and environmental impacts—and changes in policies and regulations to address them—are evolving slowly, while development is rapid and widespread.

**Because of this, our primary recommendation is that Pennsylvania (and other states) should put public health first and refuse to permit new gas development until they can assure affected communities that they (a) fully understand the associated public health risks and (b) have taken all necessary steps to prevent those health risks.**

To this end, the following measures can help prevent the further degradation of public health and air and water quality.

GIVE PUBLIC HEALTH A CENTRAL ROLE IN GAS DEVELOPMENT DECISIONS. States should conduct HIAs to analyze both problems that could arise over time and existing health and environmental risks that could be exacerbated by industrial activities.[62] Because HIAs help identify measures related to toxic exposure, air and water pollution, emergency response, and other aspects, their conclusions can (if adopted) help prevent problems from occurring in the first place.[63]

INVOLVE STATE AND COUNTY DEPARTMENTS OF HEALTH. These agencies should have the resources necessary to track reports of health problems near gas facilities and to respond to citizen complaints (e.g., through a database and online and telephone systems). Health departments could also train health and medical professionals on exposure pathways and symptoms related to gas operations, so that residents can receive informed advice and appropriate testing and care referrals.[64] The DEP and the Pennsylvania Department of Health (DOH) should establish an agreement to document and respond to spills of chemicals and waste, the underground migration of fracturing fluids, leaks, and other problems that could give rise to health problems. Financial assistance should be available for low-income residents whose health may be affected by gas operations to receive blood and urine tests for chemical exposure.

PLAN AND PACE PERMITS. Regulatory agencies like the DEP should have a long-term, comprehensive plan for the scope and pace of permits issued for wells and other facilities, rather than simply reviewing and approving them on a one-by-one basis. As part of this process, vital information on air and water quality concerns and pollution sources should be considered and, in turn, be factored into decisions on where wells and facilities can be built—particularly in relation to places where health would be most at risk, such as homes, schools, hospitals, and agricultural areas.

STRENGTHEN REGULATIONS. Among the most critical measures for Pennsylvania (as well as other states) to consider are significant increases in setback distances from facilities; requirements for operators to install and use advanced technologies to reduce emissions, odors, and noise; the replacement of open impoundment pits with closed-loop systems to store waste and drilling fluids; and required "green completions" to eliminate flaring and venting of methane gas and other pollutants.

CLOSE THE ENFORCEMENT GAP. Inadequate oversight of gas operations means that risks and damage to air and water quality are frequently not documented and measures not taken to ensure accountability, deter offenders, and prevent problems from occurring. Key steps include binding,



effective inspection protocols, inspection schedules, and wells-to-inspector ratios; significantly higher fines and penalties for violations; and more timely, thorough responses to citizen reports of problems.

REVERSE SPECIAL EXEMPTIONS IN KEY PROVISIONS OF U.S. ENVIRONMENTAL LAWS. These loopholes allow oil and gas operators to avoid rules that every other industry must follow and make it difficult to fully identify and calculate impacts to air and water quality and health. In turn, this skews information on the relative costs and benefits of gas development and slows action to prevent impacts. Closing them would increase the availability and transparency of information on contaminants and exposures and make it possible to resolve remaining questions about health impacts.

CONDUCT BASELINE WATER TESTING AND CONTINUOUS AIR MONITORING. Baselines should be done for both private wells and public drinking water supplies prior to drilling and (for air) at or near facilities during all phases of operations. Tests should cover a full suite of chemicals and results should be available to the public.[65] Air quality testing should be conducted at a range of facilities (e.g., well heads, compressor stations, and impoundment pits) that cause emissions and at distances both close to and further away from homes, schools, and other locations. The DEP or the DOH could jointly oversee the testing using independent laboratories.

DEVELOP NEW TESTING MEASUREMENTS. Federal agencies (in particular the Centers for Disease Control and Prevention, the Environmental Protection Agency, and the Occupational Safety and Health Administration) should develop guidelines for interpreting air and water tests that take into account simultaneous exposure to multiple chemicals. Drinking water and air standards should be developed for those chemicals for which none currently exist. Public agencies should advocate for giving low-level, chronic exposure greater prominence in policy decisions. The public health research community can help improve understanding of current types of exposure and advance data and protocols that better reflect conditions in gas development areas.

PROHIBIT NON-DISCLOSURE AGREEMENTS (NDAS). Often used in legal settlements involving business activities and intellectual property protection, NDAs have in recent years become widespread in oil and gas damages cases as part of negotiations over such aspects as monetary compensation and medical expenses.[66] As a result, documentation, testimony, and information critical to understanding and preventing health and environmental impacts are often not available. A possible solution would be public policies that preclude NDAs from covering factual statements and data in court filings and during discovery, or to require parties to present reasons why facts related to health and safety should be concealed before an NDA can be entered into.


GAS PATCH ROULETTE: HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

36

# 5    Final words

*While we realize that human activities may involve hazards, people must proceed more carefully than has been the case in recent history. Corporations, government entities, organizations, communities, scientists and other individuals must adopt a precautionary approach to all human endeavors…When an activity raises threats of harm to human health or the environment, precautionary measures should be taken even if some cause and effect relationships are not fully established scientifically.*

–Wingspread Consensus Statement on the Precautionary Principle [67]

Across the oil and gas patches of the United States, people experiencing health problems voice the simple wish to be believed. Numerous participants in this project—and others in similar situations nationwide—report that their health has declined since gas development began nearby. Despite frequent statements by policymakers and regulators about the "potential" of "future" impacts, problems are happening right now, in Pennsylvania across the gas patches of the United States. For many people, the situation has grown dire and urgent.

Social, economic, and political pressures often mean that industrial activities are allowed to happen long before their impact on health and safety is fully understood. Without a doubt, more research on the environmental and health dimensions of shale gas development is needed and can play a central role in ongoing decisions about complex and controversial energy issues. Yet an equally valid concern is the need for response even in the face of unanswered questions. To date, reports of health impacts and the situations of individuals—despite continually growing more widespread and serious—have not been defined as evidence or taken seriously enough to spur action and change.

For many proponents of unfettered gas development, the absence of incontrovertible evidence of direct links between gas facilities and specific health impacts amounts to proof that no harm exists. But for the individuals whose lives, families, and homes are at risk—as well as many others who believe health and the environment always deserve protection—what we don't yet know only strengthens the need for caution.

The precautionary principle is warranted when it comes to both current and future gas and oil development. In particular, this means shifting the burden of proof of whether harm is being caused to those proposing the action—the gas industry and promoters of gas development at all levels of policymaking—rather than it continuing to be borne by those directly, and negatively, affected.

**Policymakers and regulators often speak of the "potential" of "future" impacts—but problems are happening right now in Pennsylvania, and across gas patches of the United States. For many people, the situation has grown dire and urgent.**



Photo by: Frank Finan



Earthworks' OGAP believes that corporations should be allowed to extract and process gas and other mineral fuels *only* if they can do so without harming human health or contaminating the air, water, and soil—with an eye to impacts at the local, regional, and global levels.  This means:

1. **No Water Pollution:** protect public health, the environment, and the climate from toxic, hazardous, and carcinogenic chemicals used in the extraction of fossil fuel energy resources.
2. **Low Emissions:** protect public health, the environment, and the global climate from pollutants emitted during drilling and ongoing production of energy resources.
3. **No-Go Zones:** protect sacred areas, fragile ecosystems, neighborhoods, drinking watersheds, and densely populated areas targeted for energy development.
4. **Landowner and Community Consent:** continue to develop and then implement laws and policies making surface and mineral estates co-equal and ensuring that landowners have the right to negotiate and say "no" to energy development, and that communities wishing to restrict or prohibit development have the ability to do so.
5. **Prioritize Renewable Energy:** a comprehensive energy policy should work towards a long-term phase-out of fossil fuels in favor of energy efficiency and renewable sources like solar and wind.

These goals are achievable if decisionmakers are willing to slow the rush to drill, and if industry stops denying the serious problems left in its wake and instead invests the resources and time needed to fix and prevent them. The findings of this health survey and environmental testing project—coupled with similar patterns reported elsewhere and an emerging body of scientific and community-based research—provide a sufficient basis for strong action without further delay. Only then will the residents of Pennsylvania, and every other gas and oil producing state, be reassured that their health is not an acceptable casualty of fossil fuel use, but instead a basic and vital need deserving of protection.


GAS PATCH ROULETTE: HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

38

# 6    Real people, real lives

This section profiles some of the people who participated in this study. There are many similar stories being told in Pennsylvania and other states that have been widely reported elsewhere. Some participants in this project requested anonymity and said they fear reprisals or legal problems if they speak out.

## ANGEL AND WAYNE SMITH, BEDFORD COUNTY

If proof is ever needed that gas development comes in many forms, it can be found on the Smith farm. Old gas wells drilled decades ago into the Oriskany Sandstone are now being used to store more recently produced gas. But the results of this process haven't stayed underground, and a well and compressor station were recently built nearby.



Angel and Wayne Smith at their farmhouse.

Photo by: Nadia Steinzor

By 2007, Angel and Wayne knew something was changing, and very wrong. First their well water turned brown. Then water started bubbling up through their barn floor and an oily sheen and foam appeared on their pond. A strong propane odor laced the air. Headaches, nosebleeds, fatigue, sinus problems, throat and eye irritation, and shortness of breath soon set in. In the space of several months, a horse and three cows died and twelve calves were either miscarried or stillborn—a loss of animals unprecedented in the Smiths' many years of farming. Angel and Wayne's own health problems multiplied and trips to doctors are now routine.

**"It's about operators doing the right thing for people who have been harmed. We just want our lives, our land, and our health back."**

"I'm often told to stop fighting what's happening because we get some royalties from the gas storage, but it hasn't been about the money in a really long time," says Angel. "It's about operators doing the right thing for people who have been harmed. We just want our lives, our land, and our health back."


EARTHWORKS™

GAS PATCH ROULETTE: HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

39

## JANET AND FRED MCINTYRE, BUTLER COUNTY

For several months, the McIntyres hadn't been happy about the heavy traffic, intense odors, and the waste pits and rigs dotting surrounding farmland. But the turning point came when the entire family became sick after a meal that included glasses of tap water. Then the water in the kitchen and bathroom turned soapy and foamy and a dog suddenly died.

For Janet and Fred and many of their neighbors with similar problems, the quest for answers and help has been long, hard, and frustrating—and is far from over. Thanks to a weekly water drive supported by organizations, local residents, and churches, the McIntyres and their neighbors have bottled water to drink, but still have to bathe and do laundry in water that could be contaminated. While some ailments have abated, Janet, Fred, and their young daughter continue to have rashes, breathing problems, fatigue, eye and throat irritation, and headaches. Some previous health conditions have also grown worse.

"I had good water before, but now everyone around here has an issue with their well or health. Something's clearly not right," says Janet. "Can I put my finger on it and prove the precise cause beyond a doubt? No, but the only thing that's changed around here is gas drilling."



Janet helps coordinate the ongoing water drive for families in her community whose drinking water went bad after drilling began.

Photo by: Jason Bell

**"Now everyone around here has an issue with their well or health."**

GAS PATCH ROULETTE: HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

EARTHWORKS

40

## JENNY AND TOM LISAK, JEFFERSON COUNTY

On a warm summer day nearly 30 years ago, Jenny and Tom claimed their slice of heaven, purchasing a historic farmhouse surrounded by fields. Over the years, their hard work and determination paid off and Ladybug Farm, a certified organic produce farm, was born. So were three children, who grew up loving nature.

A few years ago, the Lisaks came face-to-face with an unexpected and unwelcome change to their environment, as Marcellus Shale operations got underway. First there was constant truck traffic, then wells were drilled not far from their house and crops. The Lisaks began to wake up to the strong smell of diesel and would experience frequent headaches, fatigue, sore throats, and eye and nose irritation whenever they were near gas facilities in the area. When a permit was issued for an impoundment pit and gas well on the property adjacent to their farm, stress, irritation, anxiety, and sleeping problems also set in.

"When living in the country, your time is marked by nature and each season comes with its own smells, sounds, and colors. But those colors have faded and our well-being, livelihood, and dreams are now threatened," says Jenny. "I strongly object to being forced to breathe toxic fumes and other unhealthy conditions, and to my family facing the possibility of one day becoming refugees from our own home."



Lisak family on their farm.

Photo by: Jason Bell

**"We are facing the possibility of one day becoming refugees from our own home."**

GAS PATCH ROULETTE: HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

EARTHWORKS™

41

## PAM JUDY, GREENE COUNTY

When Pam Judy and her husband built their dream house in 2006, they truly came home—settling on property that once belonged to her great grandparents and remained part of the family farm. Country life was going great until an unwelcome neighbor moved in just 800 feet away: a large gas compressor station.



Pam at the compressor station near her home.

Photo by: Mark Schmerling

At first, the resulting noise, odors, and emissions took away peace and quiet—and then also the entire family's health. Both parents and children became extremely tired and began to have severe headaches, runny noses, sore throats, and muscle aches. Pam has also experienced dizziness and vomiting. Everyone noticed that they felt better when they were away from home, and started avoiding being outside in their yard or on their porch.

**"By the time the dangers become completely clear, it will be too late for many people."**

Air testing (including by the Pennsylvania Department of Environmental Protection) in the Judy's yard and around the compressor station revealed the presence of a cocktail of chemicals, including known carcinogens like benzene, toluene, and xylene, and several others linked to symptoms the family was experiencing.

"It's bad enough feeling sick so much of the time, but we also have to worry about the serious health problems, like cancer, that prolonged exposure to emissions could cause," says Pam. "State and federal officials must take the complaints of residents seriously and demand that industry change its practices. By the time the dangers become completely clear, it will be too late for many people."

GAS PATCH ROULETTE: HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

42

EARTHWORKS™

## PAT KLOTZ, BRADFORD COUNTY

Fresh air and the outdoors have always been important to Pat Klotz, who for many years had a large garden and kept horses. Even after moving, she's stayed active caring for rescued dogs, renovating her home, and working as a home health aide. Which is why it felt so strange to get bad headaches and feel exhausted much of the time.

Then Pat started keeping track of what happened when—and concluded that her health began to decline soon after a gas well went in upslope behind her house. Every once in awhile, the air would smell like sulfur, and soon after she'd start having trouble breathing, get dizzy, or feel intense burning in her eyes and throat. Sometimes she'd get a strange metallic taste in her mouth or sudden leg cramps.

Relatives who live near gas facilities several miles away told Pat they were having the same symptoms, including sudden dental problems. Both households had dogs that would suddenly become lethargic and have seizures. When they all stopped drinking the tap water—which began to sometimes run fizzy and turn black in 2010—both people and animals felt better.

"Living in the country is supposed to be good for you, but our sense of peace and tranquility ended when drilling started," says Pat. "The doctors don't know what to do, even though more and more people have the same symptoms. Elected officials don't take our complaints seriously. So we're still here waiting for help."

> **"Doctors don't know what to do and elected officials don't take our complaints seriously."**

## JANET AND CHRIS LAUFF, WASHINGTON COUNTY

To Janet and Chris Lauff, the property was perfect, with a rolling meadow ringed by forest and a stream. They bought it, built a house, and raised their young children. But nearly 15 years later, they're thinking about moving—that is, if anyone will buy the place (which isn't leased) with two well pads and a wastewater impoundment next door.

> **"I just want to get my family out of here to a better place."**

This shift has been rather sudden, with quality of life affected in just the last few years, and conditions deteriorating rapidly in the last several months. The Lauffs date the start of their problems to when an access road to the well pads and the impoundment went in upslope behind their house. Now the impoundment is used 24/7 and truck traffic has become constant.

These events have brought bad odors, nose and throat irritation, and headaches. One of the Lauff's sons has asthma, raising concerns of how exposure to chemicals is affecting his health. At times, the odors have been so severe that the family has left home, and in 2010, the water from their well stopped running entirely. They've also found dead raccoons, fox, and deer near their stream. Both Janet and Chris—who holds degrees in biology and chemistry and has worked in the chemical and gas industry for 30 years—know such events can signal deeper health and environmental problems.

"It's impossible to know how much we're affected day-to-day and what that means for the future," says Janet. "Gas development changes your whole life. Your privacy is gone. Your peace of mind and sense of security are gone. I've been pretty calm until now, but after dealing with the odors, noise, dust, water, and air issues for almost three years, I just want to get my family out of here to a better place."



GAS PATCH ROULETTE: HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

43

## LINDA AND DAVID HEADLEY, FAYETTE COUNTY

In rural Fayette County, big changes usually come slowly. After nearly 30 years in the area, Linda and David Headley were accustomed to a quiet, serene way of life, and the farm they bought seven years ago was the perfect place to settle with their two sons.

But just weeks after moving in, the Headleys were hit hard by the reality of not owning the oil and gas rights on their property. First it was the truck traffic and heavy equipment; then came the gas wells, separator tanks, and impoundment pit; and more recently a pipeline cutting across hayfields. Along with all this have been fuel spills, noise, bad odors, and a spring that started bubbling and can be lit on fire.

It wasn't only the Headley's property that was transformed—their health also changed. Linda has constant sore throats and coughing spells. Grant and Adam have bouts of intense stomach pain and nosebleeds. Everyone gets headaches and red, itchy skin after spending time outdoors. Even the Headley's horses have been affected, with brittle hooves and sore feet. And as Linda and David began talking to neighbors about the changes sweeping the community, it became clear that such symptoms were widespread.

"Our once peaceful existence has forever changed. We aren't getting answers about why our land is being damaged and so many people are sick," says Linda. "The industry is a loose cannon and regulators seem to be helpless in the face of all the development. If we could put a man on the moon decades ago, we can surely find a better, safer, healthier way to fuel our future."



Linda and David watch pipeline construction across their hayfields.

Photo by: Roberto M. Esquivel / Herald-Standard

**"If we could put a man on the moon decades ago, we can surely find a better, safer, healthier way to fuel our future."**

GAS PATCH ROULETTE: HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

EARTHWORKS

44

## CAROL FRENCH, BRADFORD COUNTY

As lifelong farmers, Carol French and her significant other Claude Arnold know what it's like to be tired at the end of a hard day's work. So they didn't think twice about how fatigued they were and how their bones ached. But then they began to wonder if it might be connected to the rashes, shortness of breath, and headaches they also were experiencing..

Fortunately, Carol knew what questions to ask and where to look for answers. A co-founder of Pennsylvania Landowner Group for Awareness and Solutions, she was spending every free moment learning about the impacts of gas development and sharing that knowledge with others. She also kept track of problems that arose with leases—including her own—and on properties where drilling was taking place.

Yet nothing could prepare Carol and Claude for when their own water went bad in 2011. Carol started tracking the timing of when it would run white, settle with a mossy substance on top of sand, or become like gelatin, and when nearby drilling activities and the family's health symptoms occurred. Her daughter Lynsey—who has an autoimmune disease that the family doctor said could make her more susceptible to chemical exposure—was hospitalized with a high fever, severe weight loss, and intense abdominal pain, and was found to have an enlarged liver and spleen and fluid retention. Once she recovered, she moved away and hasn't been sick since. In the meantime, several dairy cows have developed rashes and sores, and Carol and Claude continue to have skin and respiratory problems.

"Gas proponents dismiss and deny stories like ours, and some even say that developing the resource is so important that it's worth 'necessary sacrifice,'" says Carol. "But what gives them the right to decide whose health, family, property, and livelihood should be sacrificed?"



Carol French

Photo by: Nadia Steinzor

**"What gives gas proponents the right to decide whose health, family, property, and livelihood should be sacrificed?"**



EARTHWORKS™   GAS PATCH ROULETTE: HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA   45
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

## CAROL JEAN MOTEN AND DEBBIE PEEPLES, WASHINGTON COUNTY

The neighborhood where sisters Carol Jean Moten and Debbie Peeples have lived nearly their whole lives is tight-knit, with modest houses along a few streets where everyone knows and helps each other. Residents also long appreciated the quiet and fresh air that comes from living next to a county park—that is, until much of the park was leased for gas drilling and several well pads went in where trees once stood.



Carol Jean Moten (right) with her mother Edna.

Photo by: Martha Rial

Soon after gas development began, the water in Carol, Debbie, and their mother Edna's homes turned odd colors. A neighbor found sand coming through pipes into the sink. Periodically, often at night, the air would get hazy and gas and chemical smells would blow downhill from the park.

**"Even a toxicology doctor told me that the only thing I can do is leave my home and move away."**

For Carol and Debbie, these episodes meant the onset of symptoms like headaches, shortness of breath, burning eyes and throat, dizziness, and disorientation. Carol, an artist, started having difficulty painting. Over time, both sisters developed skin lesions and often felt weak and tired. And they began to wonder if illnesses among cats and dogs in the neighborhood could be related.

"My family drank the water for a long time and now we're breathing bad air. But the exposure is low-dose and doesn't fit the criteria to gauge harm," says Carol Jean. "Even a toxicology doctor told me that the only thing I can do is leave my home and move away. When it comes to hydrofracturing, there is no justice."

GAS PATCH ROULETTE: HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

46

EARTHWORKS

# 7   Endnotes

1 "List of the Harmed" compiled by the Pennsylvania Alliance for Clean Water and Air, http://pennsylvaniaallianceforcleanwaterandair.wordpress.com/the-list/ (accessed September 25, 2012) and Humes, Edward, "Fractured Lives: Detritus of Pennsylvania's Shale Gas Boom." Sierra Magazine, July/August 2012.

2 "Second Annual Conference on Health Effects of Shale Gas Extraction." Center for Healthy Environments and Communities, University of Pittsburgh. November 2011; presentations at http://shalegas.pitt.edu and "Epidemiologic and Public Health Considerations of Shale Gas Production: The Missing Link." Physicians, Scientists, and Engineers for Healthy Energy. January 2012; presentations at www.psehealthyenergy.org/site/view/971.

3 A. Lustgarten, "Drill for natural gas, pollute water." Scientific American, November 17, 2008.

4 R. Witter et al., Potential Exposure-Related Human Health Effects of Oil and Gas Development: A White Paper, Colorado School of Public Health, University of Colorado, and Colorado State University Department of Psychology, 2008.

5 Colborn, T., Kwiatkowski, C., Schultz, K., and Bachran, M. "Natural gas operations from a public health perspective." 2011. Human & Ecological Risk Assessment 17(5):1039-1056.

6 Witter, R., Stinson K., Sackett H., et al. Potential Exposure-Related Human Health Effects of Oil and Gas Development: A Literature Review (2003-2008). Colorado School of Public Health, 2008.

7 "Loopholes for Polluters: The oil and gas industry's exemptions to major environmental laws." Earthworks, 2011. http://www.earthworksaction.org/library/detail/loopholes_for_polluters

8 Durham, L.S. March, 2008. "Appalachian Basin's Marcellus–the new target." Explorer. American Association of Petroleum Geologists.

9 "Marcellus Shale—Appalachian Basin Natural Gas Play." Geology.com: http://geology.com/articles/marcellus-shale.shtml (accessed June 19, 2012).

10 "Learn about the Marcellus Shale." Pennsylvania Independent Oil and Gas Association. http://www.pioga.org/marcellus-shale/, (accessed June 19, 2012).

11 Based on data from "Oil and Gas Reports." Pennsylvania Department of Environmental Protection. www.portal.state.pa.us/portal/server.pt/community/oil_and_gas_reports/20297#InteractiveReports (accessed September 10, 2012).

12 "Community Health Survey of Current and Former Residents of DISH, Texas." Earthworks OGAP, 2009. http://earthworksaction.org/publications.cfm?pubID=438; and "Community Health Survey Results of Pavillion, Wyoming." Earthworks OGAP, 2010. http://earthworksaction.org/PR_PavillionHealthSurvey.cfm

13 Natural Gas Flowback: How the Texas gas boom affects community health and safety. Earthworks' OGAP, 2011. http://www.earthworksaction.org/library/detail/natural_gas_flowback

14 All survey participants were assured by OGAP that their identifying information (e.g., name and address) would be kept confidential and not used for any other purposes than this project, including to follow up with additional questions, respond to requests for assistance, or to provide additional resources.

15 Specific symptoms within each of the main categories included: SINUS/RESPIRATORY (loss of sense of smell, shortness of breath, hoarseness, asthma, sinus problems, abnormal lung function, difficulty breathing, persistent cough, wheezing, allergies, nasal irritation, throat irritation, coughing up blood/sputum). BEHAVIOR/MOOD/ENERGY (increased fatigue, feeling weak & tired, extreme drowsiness, sleep disorders, sleep disturbances, depression, loss of sexual drive, fainting, judgment problems, behavioral changes, suicidal thoughts, personality changes, severe anxiety, tension, compulsive behavior, agitation, difficulty with activities, appetite disturbances, frequent irritation). NEUROLOGICAL (memory loss, amnesia, forgetfulness, spelling difficulties, decreased motor problems, difficulty drawing, staggering/stumbling, falling nerve damage, tremors, seizures, weakness of hands, trembling of hands, tingling of hands, disorientation, hallucination, dizziness, balance difficulty, slurring of speech, difficulty concentrating). MUSCLES/JOINTS (swollen or painful joints, arthritis, muscular pain, muscle aches, lumbar pain, weakness, reduced strength). EAR/NOSE/MOUTH (deafness, hearing loss, ringing in ears, difficulty hearing, frequent nosebleeds, noises in ears, loss of sense of taste, discoloration of teeth, metallic taste on cough, gingivitis, redness/swelling/discoloration of gums, severe salivation, mouth sores or ulcers). DIGESTIVE/STOMACH (abdominal pain, rectal bleeding, change in bowel habits, black stool, red blood in stool, diarrhea, persistent indigestion, frequent nausea, vomiting, vomiting blood, loss of appetite, weight loss. SKIN (persistent problems; rashes, irritation, hives, boils, changes in color, sores, discolored areas, dry/cracked/red areas, pinpoint dots, burns, contact dermatitis, eczema, peeling hands and arms, thickening, yellowing). VISION/EYES (eyes burning, burns on eyes, conjunctivitis, blurred vision, dry eyes, blindness in either eye, severe eye pain, chronic eye irritation, vision difficulty, vision decrease, frequent tearing of eyes, swelling of eyes, uncontrolled eye movement, loss of ability to see colors, trembling of eyelids, yellowing of eyes).

16 A possible explanation is that, given the topography and forest cover in many parts of rural Pennsylvania, distances to facilities (which were largely reported by survey participants and, where possible using publicly available data, verified by the project coordinator) were not exact because they were not visually apparent. In addition, natural features, wind speed, and other factors can also determine how far chemicals can travel at any given point in time. It is also possible that those living farther away from facilities may have certain symptoms because they are more directly downwind and therefore have more consistent, longer-term exposure to airborne contaminants than those living even closer to facilities. Or, facilities closer to some of the survey respondents may have had better

 GAS PATCH ROULETTE: HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

47

pollution control technologies or were processing different qualities of gas (e.g., wet gas contains higher concentrations of liquid hydrocarbons than dry gas) and therefore were emitting fewer of the chemicals that could cause these symptoms.

[17] Not only the respiratory tract, but other organs as well are affected by air pollution. Thus volatile hydrocarbons and carbon monoxide are transported to the brain and heart via the blood. Symptoms such as headaches, giddiness, nausea and pounding of the heart are the first indications of excessive exposure. In addition, according to the Swiss National Air Pollution Monitoring network, headaches can be an early indicator of excessive exposure to air pollutants such as volatile organic compounds.
http://www.bafu.admin.ch/publikationen/publikation/00652/index.html?lang=en&download=NHzLpZig7t,lnp6I0NTU042l2Z6ln1ad1IZ n4Z2qZpnO2Yuq2Z6gpJCGdn99fGym162dpYbUzd,Gpd6emK2Oz9aGodetmqaN19XI2IdvoaCVZ,s-.pdf

[18] For example, frequent nosebleeds are more common among children because their mucousal membranes are less developed. If there are toxic chemicals in the air, nosebleeds in children may be an early-warning sign of an excessive exposure. This symptom has been experienced by other children in oil and gas producing areas and reported in previous reports by Earthworks OGAP.

[19] Table includes all smokers. There were 27 smokers between the ages of 24 and 70. The table compares the results from the smoking sub-group to the sub-group of non-smokers who were between similar ages (23-70 years old). Not included in this calculation were 22 non-smokers who were either younger or older.

[20] Eight of the samples (23.5%) were analyzed by Pace Analytical Services, nine (26.5%) by Con-Test Analytical Laboratory, and seventeen (50%) by Columbia Laboratories.

[21] Some studies calculate the average/mean by including all samples, and for non-detects a value equal to 1/2 of the minimum reporting limit (MRL)/detection limit is used. (For example, see: Pennsylvania DEP. Southern Delaware County Report.
http://www.dep.state.pa.us/dep/deputate/airwaste/aq/toxics/projects/sdel/sdelrpt3.pdf We did not do that because the one laboratory, Pace Analytical, had MRLs that were often much higher than the values actually detected by the other two laboratories. So the means would have been skewed (i.e., most likely higher than actual ambient concentrations).

[22] Pace Analytical reporting limits were reported in parts per billion volume (ppbv). We converted ppbv to micrograms per cubic meters (μg/m3).  To convert values we used equations from "Air Unit Conversion Table" (Torrent Labs)
http://www.torrentlab.com/torrent/Home/ResourceCenter.html and EnviroGroup
http://www.envirogroup.com/IA%20Unit%20Conversion%20Table.xls.

[23] Even though we found more VOCs and higher concentrations of the chemicals in Washington County than other counties, this does not necessarily mean that Washington County has worse air quality than other counties in this study. More research would be needed to confirm that, especially given that more samples were taken in Washington than in other counties in our study, thus increasing the chances for detection of VOCs. It is also possible that in some places, sampling did not occur when facilities were emitting high concentrations of chemicals or precisely when the wind was blowing contaminants toward canisters.

[24] Ibid.

[25] According to DEP, the Marcus Hook ambient air sampling site was chosen because it is "close to several industrial facilities and near roads with high traffic volumes." PA DEP. 2003. Southern Delaware County Air Monitoring Project. Third Interim Report. p. 4.
www.dep.state.pa.us/dep/deputate/airwaste/aq/toxics/projects/sdel/sdelrpt3.pdf Data are for the 2010 monitoring year and were downloaded from DEP's website: www.dep.state.pa.us/dep/deputate/airwaste/aq/toxics/sites/sdc.htm (both accessed September 20, 2012).

[26] For example, 1,1,2-trichloro-1,2,2-trifluoroethane, dichlorodifluoromethane, trichlorofluoromethane and chloromethane were once used as refrigerants and propellants but have been phased out due to destruction of the ozone layer. Carbon tetrachloride was used to produce these refrigerants but its production declined as use of the other chemicals was banned.

[27] See Pennsylvania Department of Environmental Protection, Northeastern Pennsylvania Marcellus Shale Short-Term Ambient Air Sampling Report; Northcentral Pennsylvania Marcellus Shale Short-Term Ambient Air Sampling Report, 2011; and Southwestern Pennsylvania Marcellus Shale Short-Term Ambient Air Sampling Report, 2010.

[28] U.S. Environmental Protection Agency. Ambient Air Concentrations of Benzene. In the "Metadata" section EPA explains that this does not necessarily represent a national trend because the data come from just 22 urban sites.
http://cfpub.epa.gov/eroe/index.cfm?fuseaction=detail.viewInd&lv=list.listbyalpha&r=231333&subtop=341 (accessed September 20, 2012).

[29] The five highest concentrations from our study were found in Butler:  1.5, 1.0 μg /m3; and Washington: 1.5, 1.4, 1.2 μg/m3.

[30] U.S. Environmental Protection Agency. "Technology Transfer Network Air Toxics Site: Formaldehyde."
http://www.epa.gov/ttn/atw/hlthef/formalde.html  (accessed September 20, 2012).

[31] C.D. Volz et al., Contaminant Characterization of Effluent from Pennsylvania Brine Treatment Inc., Josephine Facility Being Released into Blacklick Creek, Indiana County, Pennsylvania. Department of Environmental and Occupational Health, University of Pittsburgh, 2011.

[32] Pennsylvania Department of Environmental Protection, Division of Drinking Water Management, "Maximum Contaminant Levels,"
www.portal.state.pa.us/portal/server.pt?open=18&objID=437830&mode=2 (accessed July 20, 2012).

[33]  Tom Myers, PhD. "Assessment of Groundwater Sampling Results Completed by the USGS." (Technical memo prepared for Earthworks, Natural Resources Defense Council, and Sierra Club. September, 2012.


GAS PATCH ROULETTE: HOW SHALE GAS DEVELOPMENT RISKS PUBLIC HEALTH IN PENNSYLVANIA
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

48

[34] For example, according to the National Science Foundation, "Pennsylvania's air, water and soils retain the signature of the steel industry and of coal-burning over the last century in their low-level manganese contamination." National Science Foundation. Sidney Draggan, PhD (Topic Editor), "Can Marcellus Shale Development and Healthy Waterways Co-exist?" Last revised August 8, 2012 (accessed October 2, 2012). http://www.eoearth.org/article/Marcellus_Shale_Gas_Development_and_Healthy_Waterways?topic=49463

[35] Boyer, E., Swistock, B., Clark, J., Madden, M. and Rizzo, D. (Pennsylvania State University). 2011. *The Impact of Marcellus Gas Drilling on Rural Drinking Water Supplies.* The Center for Rural Pennsylvania. http://www.rural.palegislature.us/documents/reports/Marcellus_and_drinking_water_2012.pdf

[36] ibid. p. 12.

[37] Banks, T. Jan. 2011. "Fluid Rock Interactions Associated with Hydraulic Fracturing and Natural Gas Development." *Global Water Program Magazine.* ( Johns Hopkins University) http://globalwater.jhu.edu/magazine/article/fluid_rock_interactions_associated_with_hydraulic_fracturing_and_natural_ga/

[38] ProChemTech International, Inc. "Marcellus Gas Well Hydrofracture Wastewater Disposal by Recycle Treatment Process." www.prochemtech.com/Literature/TAB/PDF_TAB_Marcellus_Hydrofracture_Disposal_by_Recycle_1009.pdf (accessed September 20, 2012).

[39] Boyer, E., Swistock, B., Clark, J., Madden, M. and Rizzo, D. (Pennsylvania State University). 2011. The Impact of Marcellus Gas Drilling on Rural Drinking Water Supplies. The Center for Rural Pennsylvania. http://www.rural.palegislature.us/documents/reports/Marcellus_and_drinking_water_2012.pdf

[40] R. Witter et al., *Potential Exposure-Related Human Health Effects of Oil and Gas Development: A Literature Review (2003-2008).* Colorado School of Public Health, 2008; and T. Colborn et al., "Natural gas operations from a public health perspective," *Human & Ecological Risk Assessment* 17(5) (2011): 1039-1056.

[41] Agency for Toxic Substances and Disease Registry (ATSDR), "Toxicological Profiles," http://www.atsdr.cdc.gov/toxprofiles/index.asp (accessed July 30, 2012); and New Jersey Department of Health, "Right to Know Hazardous Substance Fact Sheets," http://web.doh.state.nj.us/rtkhsfs/indexfs.aspx (accessed July 30, 2012).

[42] "Community Health Survey of Current and Former Residents of DISH, Texas." Earthworks OGAP, 2009. http://earthworksaction.org/publications.cfm?pubID=438; and Lisa Sumi, Earthworks' Oil & Gas Accountability Project, "Air Sampling Conducted in Monroe, Conecuh, and Escambia Counties, Alabama," 2007.

[43] "The Health Impact Assessment of New Energy Sources: Shale Gas Extraction." Announcement and summary of meeting at the Institute of Medicine, April 30-May 1, 2012. See www.iom.edu/Activities/Environment/EnvironmentalHealthRT/2012-APR-30.aspx, (accessed June 27, 2012).

[44] U.S. Environmental Protection Agency. "Ambient Air Monitoring Program." http://www.epa.gov/airquality/qa/monprog.html (accessed September 20, 2012).

[45] Clean Air Council. "PA DEP launches long-term air sampling." http://cleanair.org/program/outdoor_air_pollution/marcellus_shale/pa_dep_launches_long_term_air_sampling (accessed September 20, 2012).

[46] Pennsylvania law is unique in establishing a "zone of presumption," by which operators of unconventional (i.e., shale) wells are responsible for pollution of a water supply if it is up to 2,500 feet away and the pollution occurred within 12 months of completion, drilling, stimulation, or alteration of the well. Operators are required to share this baseline information with homeowners. However, they can rebut the presumption under certain conditions. See "Act 13 Frequently Asked Questions," Pennsylvania Department of Environmental Protection: www.portal.state.pa.us/portal/server.pt/community/act_13/20789/act_13_faq/1127392, (accessed July 3, 2012). Colorado requires baseline surface water sampling in particular sensitive areas, downgradient of wells before and three months after drilling, operations, and completion; nearby landowners are provided with the test results: "COGA Baseline Groundwater Quality Sampling Program," www.coga.org/index.php/BaselineWaterSampling/FAQ (accessed August 15, 2012). Ohio requires permit applicants to conduct water sampling prior to drilling, at distances from wells of 300 feet in urban areas and 1,500 feet anywhere if horizontal drilling occurs. See summary of Senate Bill 315 by Ohio Department of Natural Resources: www.ohiodnr.com/tabid/23947/Default.aspx (accessed July 6, 2012).

[47] See, for example, NIOSH Pocket Guide to Chemical Exposures (including recommended exposure limits), Centers for Disease Control and Prevention. www.cdc.gov/niosh/npg/; "National Primary Drinking Water Regulations" (including maximum contaminant levels), U.S. Environmental Protection Agency. http://water.epa.gov/drink/contaminants/index.cfm; "Permissable Exposure Limits," U.S. Occupational Safety and Health Administration. www.osha.gov/SLTC/pel/ (all accessed July 20, 2012).

[48] Assessment of Joint Toxic Action of Chemical Mixtures. Guidance Manual. Agency for Toxic Substances and Disease Registry. 2004. Available at www.atsdr.cdc.gov/interactionprofiles/ipga.html (accessed July 20, 2012).

[49] Birnbaum, L.S. "Environmental Chemicals: Evaluating Low-Dose Effects." *Environmental Health Perspectives,* 120(4)A143-144, 2012.

[50] Vandenberg, L.N., Colborn, T., Hayes, T.B., et al. "Hormones and Endocrine-Disrupting Chemicals: Low-Dose Effects and Nonmonotonic Dose Responses." *Endocrine Reviews* 33: 0000–0000, 2012.

[51] Morello-Frosch, R.A., Woodruff, T.J., Axelrad, D.A., and Caldwell, J.C. "Air toxics and health risks in California: the public health implications of outdoor concentrations." *Risk Analysis,* 20(2):273-91, 2000.



[52] Colborn, T., Kwiatkowski, C., Schultz, K., and Bachran, M. "Natural gas operations from a public health perspective." 2011. *Human & Ecological Risk Assessment* 17(5):1039-1056.

[53] McKenzie, L.M., Witter, R.Z., Newman L.S., Adgate J.L.. "Human Health Risk Assessment of Air Emissions from Development of Unconventional Natural Gas Resources." *Science of the Total Environment.* 2012 May 1;424:79-87.

[54] Bamberger, M. and Oswald, Robert E. "Impacts of Gas Drilling on Human and Animal Health." *New Solutions: A Journal of Environmental and Occupational Health Policy.* Vol 22(1)51-77, 2012.

[55] Goldstein, B., Kriesky, J., Pavliakova, B. "Missing from the Table: Role of the Environmental Public Health Community in Governmental Advisory Commissions Related to Marcellus Shale Drilling." *Environmental Health Perspectives.* Vol 120(4)483-486, 2012.

[55] Comments on New York's draft Supplemental Generic Environmental Impact Statement. Earthworks' OGAP. December 2011. www.earthworksaction.org/library/detail/earthworks_new_york_sgeis_comments

[57] "States with NEPA-like Environmental Planning Requirements." Council on Environmental Quality, National Environmental Policy Act website. http://ceq.hss.doe.gov/state_information/states.html (accessed June 27, 2012).

[58] The most notable examples are the North Slope of Alaska and Garfield County, Colorado. Health Impact Project, "HIA in the United States," www.healthimpactproject.org/hia/us, (accessed June 27, 2012).

59 Earthworks. "Loopholes for Polluters: The oil and gas industry's exemptions to major environmental laws." 2011.  While some states have begun to adopt and strengthen disclosure laws, and industry has a website for limited, voluntary disclosure (see www.FracFocus.org), operators are still largely able to keep secret the types, mixtures, and concentrations of chemicals used and to claim proprietary "trade secret" privileges. See "Disclosure of toxic oil and gas chemicals," www.earthworksaction.org/issues/detail/disclosure_of_oil_and_gas_hazardous_chemicals. On air emissions, see "The BREATHE Act," www.earthworksaction.org/issues/detail/the_breathe_act (accessed July 3, 2012).

[60] Earthworks' Oil & Gas Accountability Project. Breaking All the Rules: the crisis in oil and gas regulatory enforcement. 2012.

[61] Earthworks' Oil & Gas Accountability Project. Enforcement Report: Pennsylvania Department of Environmental Protection. 2012.

[62] A. Wernham, "Health Impact Assessment for Shale Gas Extraction," www.healthimpactproject.org/resources/health-impact-assessment-for-shale-gas-extraction (accessed July 10, 2012).

[63] Garfield County, Colorado, "Battlement Mesa Health Impact Assessment," www.garfield-county.com/environmental-health/battlement-mesa-health-impact-assessment-ehms.aspx (accessed July 10, 2012).

[64] The Southwest Pennsylvania Environmental Health Project has prepared useful materials and presentations in this regard. See "Health concerns in the era of gas drilling—a basic toolkit for health care providers." www.environmentalhealthproject.org/resources/medical-resources (accessed September 15, 2012).

[65] Replacement water supplies should also be provided when changes in the quality and safety of drinking water occur following nearby gas operations—as required by Pennsylvania law but rarely enforced. See Pennsylvania Code, Oil and Gas Wells, Chapter 78, Section 51, "Protection of Water Supplies." http://www.pacode.com/secure/data/025/chapter78/chap78toc.html (accessed July 20, 2012).

[66] Earthjustice, "Fracking Damage Cases and Industry Secrecy," http://earthjustice.org/features/campaigns/fracking-damage-cases-and-industry-secrecy (accessed July 10, 2012).

[67] Science and Environmental Health Network, "Wingspread Consensus Statement on the Precautionary Principle," 1998, www.sehn.org/wing.html (accessed July 18, 2012).










**EARTHWORKS**™
www.earthworksaction.org

ORIGINAL ARTICLE

# Chronic Exposure to Ambient Ozone and Lung Function in Young Adults

*Ira B. Tager,\* John Balmes,†‡ Frederick Lurmann,§ Long Ngo,\* Siana Alcorn,§ and Nino Künzli¶*

**Background:** Tropospheric ozone ($O_3$) is an oxidant, outdoor air pollutant. Chronic exposure has been associated with decreased lung function in children and adolescents. This study investigated the effects of long-term exposure to $O_3$ on lung function in college freshmen.

**Methods:** We recruited University of California, Berkeley students (n = 255) who were lifelong residents of the Los Angeles and San Francisco Bay areas and who never smoked. Lifetime exposure to $O_3$, small particulate matter ($PM_{10}$), and nitrogen dioxide ($NO_2$) were based on spatial interpolation of compliance monitor measurements to all residences at which students lived. Spirometry was performed between February and May, times when students would not have had recent exposure to increased levels of $O_3$.

**Results:** Lifetime exposure to $O_3$ was associated with decreased levels of measures of small airways (<2 mm) function (FEF$_{75}$ and FEF$_{25-75}$). There was an interaction with the FEF$_{25-75}$/FVC ratio, a measure of intrinsic airway size. Subjects with a large ratio were less likely to have decreases in FEF$_{75}$ and FEF$_{25-75}$ for a given estimated lifetime exposure to $O_3$. This association was not altered by history of chronic respiratory disease, allergy, second-hand exposure to environmental tobacco smoke, exposure to $PM_{10}$ and $NO_2$, or measurement errors in exposure assessment.

**Conclusions:** A history of increased level of lifetime exposure to ambient $O_3$ is associated with decreased function of airways in which $O_3$ deposition in the lungs is the greatest. Adolescents with intrinsically smaller airways appear to be at greatest risk. Any environmental or genetic factors that lead to reduced airway size may lead to increased susceptibility to the adverse effects of ambient ozone.

(*Epidemiology* 2005;16: 751–759)

Received for publication 11 November 2004; accepted 24 May 2005.

From the \*Division of Epidemiology School of Public Health, University of California, Berkeley, CA; †Department of Medicine, University of California, San Francisco, CA; ‡Division of Environmental Health Sciences, School of Public Health, University of California, Berkeley, CA; §Sonoma Technology, Inc. Petaluma, CA; and ¶Department of Preventive Medicine; Keck School of Medicine, University of Southern California, Los Angeles, CA.

Supported by grant R01-60689 from the Division of Lung Diseases, National Heart, Lung and Blood Institute. N. Künzli is supported by the Southern California Environmental Health Sciences Center (National Institute of Environmental Health Sciences grant P30 ES07048).

Supplemental material for this article is available with the online version of the journal at www.epidem.com; click on "Article Plus."

Correspondence: Ira B. Tager, 140 Warren Hall, University of California, Berkeley, Berkeley, CA 94720-7360. E-mail: ibt@berkeley.edu.

Copyright © 2005 by Lippincott Williams & Wilkins
ISSN: 1044-3983/05/1606-0751
DOI: 10.1097/01.ede.0000183166.68809.b0

Tropospheric ozone ($O_3$) is an oxidant air pollutant formed from oxides of nitrogen and volatile organic compounds in the presence of sunlight.[1,2] Approximately 115 million Americans live in areas that currently exceed the new 8-hour U.S. $O_3$ standard of 80 ppb (3-year average of 4th highest).[3]

Ozone is largely an outdoor pollutant, and personal exposures are much lower than ambient concentrations.[4] Nonetheless, a variety of health outcomes have been associated with exposure to ambient $O_3$. Associations with short-term exposure have been reported for hospitalizations for respiratory illness,[5] exacerbations of asthma[6] and chronic obstructive pulmonary disease,[7] total daily[8] cardiovascular mortality (summertime levels[9]), decreases in lung function, and increased airway inflammation.[10–14] Chronic exposure to high ambient $O_3$ environments has been associated with the onset of asthma[15,16] and mortality from cardiovascular disease (summertime concentrations).[17]

Chronic exposure to high concentrations of ambient $O_3$ has been associated with decreased levels of 1-second forced expiratory volume (FEV$_1$), maximum midexpiratory flow (FEF$_{25-75}$), and forced expiratory flow after 75% of expired volume (FEF$_{75}$).[18–21] Growth of FEV$_1$ and FEF$_{25-75}$ during a 3-year period in first- and second-grade Austrian children was inversely associated with summertime $O_3$ concentrations. In contrast, a study of children (10–18 years) from 12 Southern California communities did not find an association between lung growth and annual average community-specific $O_3$ concentrations.[22] However, the range of average concentrations across the 12 study communities was relatively small (factor of <2.5).

Previously, we reported that estimated lifetime exposure to ambient $O_3$ concentrations in adolescents reared in the Los Angeles and San Francisco Bay areas of California were

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

*Tager et al*                                                                 *Epidemiology* • Volume 16, Number 6, November 2005

associated with decreased levels of $FEF_{25-75}$ and $FEF_{75}$.[20] Effects were comparable whether exposure was based on an entire lifetime (~18 years) or only on the first 6 years of life.[20] These data were consistent with studies in monkeys[23–25] and human $O_3$ dosimetry[26] that indicate that the impact of $O_3$ on lung structure is at the level of the respiratory bronchioles and that measures that reflect small airway function take longer to recover than $FEV_1$ after controlled human exposure to $O_3$.[27,28] The present study was undertaken to corroborate the previous findings with a larger sample and a more complete assessment of confounding from exposure to other ambient pollutants and second-hand tobacco smoke.

## METHODS

### Design of Study

A convenience sample of freshman undergraduates between the ages of 16–19 years at the University of California, Berkeley (UCB) was recruited in 3 waves that began on 10 April 2000, 12 February 2001, and 6 February 2002. All waves ended in the first week of June. All students were from the Los Angeles area (LA—between latitudes 32° and 35° and longitudes 115.5° and 120.75°) or the San Francisco Bay area (SF—between latitudes 37° and 38.5° and longitudes 121.67° and 123°). (A map that shows locations is available with the online version of this article.) On the basis of sample size calculations, we sought to recruit approximately 200 subjects from LA and 100 from SF.

Students were eligible based on being a lifelong resident of LA or SF before enrollment at UCB, having a history of never smoking, no physical impairment that would hinder performance of spirometry, and no history of chronic respiratory disease. A history of asthma before age 12 years was permitted, provided that student had no symptoms and had not taken any medication at any time after age 12. Six students were in this category. Subjects were studied between February-May, when students from LA would not have been exposed to the high summertime $O_3$ concentrations.

The protocol for this study was approved by the Committee for the Protection of Human Subjects, University of California, Berkeley and the Committee on Human Research, University of California, San Francisco. Written, informed consent was obtained from all subjects, once eligibility was established.

### Residential and Health Histories

Lifetime residential history was reconstructed with a standardized questionnaire. To verify all addresses and time periods, subjects and parents received the same questionnaire. We used a standardized questionnaire for subjects and parents to obtain information on birth history, past history of pneumonia and other lower respiratory tract illnesses, allergy history, history of symptoms related to asthma and physician

diagnosis of asthma, personal smoking history (tobacco and marijuana), second-hand exposure to tobacco smoke, and family history of chronic respiratory diseases. Discrepancies between subject and parental questionnaires were reconciled.

### Testing Protocol

Height was measured with a wall-mounted stadiometer.[29] Weight was measured without shoes with a digital scale. Subjects completed a questionnaire to determine the occurrence of a respiratory illness within the previous 3 weeks and their use of caffeinated beverages within the previous 24 hours. Subjects who had symptoms of a lower respiratory illness at the time of testing were rescheduled after lower respiratory symptoms had abated.

Forced expiratory volume (FEV) measurements were obtained in the sitting position with nose clip, using a Collins Survey rolling seal spirometer. Data were saved directly to a computer (Plus software; Warren E. Collins, Co. Braintree, MA). Two modifications were made to the American Thoracic Society criteria[30]: because of the young age of the subjects, tests that reached a plateau after 2 seconds in the absence of an abrupt termination were considered acceptable, and reproducibility criteria included peak expiratory flow rates (PEFR) within 10% of the maximum. Tracings were reviewed jointly by 2 investigators (J.B., I.T.). Forced vital capacity (FVC), $FEV_1$, $FEF_{25-75}$, $FEF_{75}$ were recorded, and the $FEF_{25-75}/FVC$ ratio was calculated. This ratio estimates the reciprocal of the time constant of the lung[31] and reflects intrinsic airway size.[32]

### Geocoding of Residences and Pollutant Data

A geocoding service, TeleAtlas (TeleAtlas, Menlo Park, CA), was used to assign latitude and longitude coordinates to residence locations. Of 543 residences, 94% were geocoded with the highest-quality match, 3% were geocoded to a zip code centroid, and another 3% were geocoded to lesser-quality matches.

We acquired air quality data from the California Air Resources Board (CD No. PTSD-02-017-CD), the Aerometric Information Retrieval System (AIRS), and from special requests to the Air Resources Board. Monthly mean measures of $O_3$ were derived from ambient air quality data that covered the lifetimes of all subjects. Averages were based on data from zip codes that corresponded to street addresses. We report only monthly 10 AM to 6 PM average ozone. Monthly 24-hour averages were obtained for $NO_2$ and particles with mass median aerodynamic diameter $\leq 10$ $\mu m$ ($PM_{10}$). Measurements for $PM_{10}$ were not widely available before 1988. For these years, a factor of 0.57 was used to scale total suspected particulates (TSP) to estimate $PM_{10}$ concentrations (derived for the years 1988–1992 from collocated $PM_{10}$ and TSP data for California). Particulate matter with a mass median aerodynamic diameter $\leq 2.5 \mu$ ($PM_{2.5}$) data were

© 2005 Lippincott Williams & Wilkins

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

not widely available until 1999; therefore, we did not study $PM_{2.5}$.

Monthly values were interpolated spatially from air quality-monitoring stations to the residence locations with inverse distance weighting and a maximum of 3 monitoring stations for each interpolation (maximum interpolation radius of 50 km). Quality codes were provided for each interpolation.

## Creation of Lifetime Residential Histories and Summary of Activity Data

The time period for each residence was defined by a "from" date and a "to" date. The last "to" date represented the time that the student matriculated at UCB. We used population-based estimates of the age-stratum-specific median values for time typically spent out-of-doors by children and adolescents.[20,33–35]

## Assignment of Individual Exposures

The details and reliability of the exposure assignment method have been published.[20,35,36] Briefly, we fit 2 basic models to estimate life-time pollutant exposure. The "time-outdoors" model included age-specific estimates of time spent outdoors at each residence obtained from a California Air Resources Board study.[33,34] We used an indoor-outdoor $O_3$ ratio of 0.2 in this model. This model was fit only to estimate monthly average lifetime exposure to $O_3$. The "ecological" model omitted estimates of time spent outdoors and used only the residence-specific monthly average, interpolated pollutant concentrations. This model was used to estimate monthly average lifetime exposures to $O_3$, $NO_2$, $PM_{10}$ prior to 1988, and $PM_{10}$ concentrations from 1988 onward.

The "effective exposure" for a given residence was calculated as the average value across all monthly values for that residence.

$$EX_{ij} = (\Sigma\ EX_{ijkl})/D_{ij},$$

where $EX_{ij}$ indicates "effective exposure" for the $i^{th}$ subject at the $j^{th}$ residence[20,35]; $\Sigma\ EX_{ijkl}$ indicates the sum of monthly effective exposures; summation over $l$ months; and $D_{ij}$ indicates the duration that the $i^{th}$ subject lived at the $j^{th}$ residence.

The overall, effective lifetime exposure for the $i^{th}$ subject ($EX_i$) was calculated as a weighted average of the residence specific "effective exposures" ($EX_{ij}$).

$$EX_i = (\Sigma\ EX_{ij}(D_{ij})/(\Sigma\ D_{ij}),$$

summed over $j$ residences.

## Pulmonary Function Data

To generate the "base" lung function model, we fit sex-specific linear regressions of each lung function measure on age, height, and weight. Model fitting was conducted for each measure (mean of 2 or 3 acceptable/reproducible trials)

to determine the optimal model (based on Akaike's Information Criterion). Models included tests of natural log transformations of the function measures and the square of height, as well as evaluation of smooth functions of weight and height. Models with and without smooth functions provided comparable fit; therefore, only models without smoothes were used. In no case did age enter into the models. Model fit was evaluated with residual versus predicted plots and quantile-quantile plots.

Race-ethnicity (White, Asian, other [African-American, Hispanic, and Native American]) was added to each model. There were no consistent effects of this variable. Presence of any respiratory symptoms in the 3 weeks before testing or the use (type and amount) of caffeinated beverages had no association with any measure. There were no associations between any measure of pulmonary function and history of asthma before age 12 years, history of pneumonia, bronchitis, allergic conjunctivitis or rhinitis, or second-hand tobacco smoke exposure. The $FEF_{25–75}/FVC$ ratio was associated with all function measures. It was not retained in the base model as a main effect; rather it was used as a stratification variable (interaction with lifetime exposure to $O_3$) to account for unmeasured differences related to race-ethnicity and to capture the effects of individual variability in intrinsic airway size on any observed effect of lifetime exposure to $O_3$.

## Analysis of Effects of Lifetime Exposure on Lung Function

We first added the lifetime estimates of $O_3$ exposure to the base model along with an interaction term with $FEF_{25–75}/FVC$ ratio as single interaction term or as quartiles of the interaction. Inferences were the same for both; therefore, we present results for the single interaction term. Similar regression analyses were conducted for $PM_{10}$ and $NO_2$.

We added terms for the lifetime exposure to $PM_{10}$ (separate terms for estimates before 1988 and from 1988 onward) and for $NO_2$. We then added a variable that indicated whether subjects were from LA or SF to account for any exposure and other confounders not otherwise measured. In no case did the region variable meaningfully change the coefficients for lifetime exposure to $O_3$ or the interaction with $FEF_{25–75}/FVC$.

We made separate corrections for measurement error due to the estimates of $PM_{10}$ exposure before 1988 based on linear regression with TSP and error in the estimates of lifetime exposure to $O_3$ (Appendix 1, available with the online version of this article). For this latter correction, we used within- and between-subject variance estimates from our published reliability study.[36] We could not estimate the joint effects or these sources of error, because we did not have estimates for the variance of the errors between the $O_3$ and the pre-1988 $PM_{10}$.

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

*Tager et al*                                                                                *Epidemiology* • Volume 16, Number 6, November 2005

**TABLE 1.** Description of Study Subjects

|  | Men (n = 108) | Women (n = 147) |
|---|---|---|
| Age (years); % | | |
|   18 | 52 | 63 |
|   19 | 44 | 36 |
|   ≥20 | 4 | 1 |
| Race/ethnicity; % | | |
|   White | 37 | 27 |
|   Asian | 49 | 54 |
|   Other | 15 | 19 |
| Residence*; % | | |
|   San Francisco area | 39 | 44 |
|   Los Angeles | 61 | 58 |
| Duration of residence (years); mean ± SD | 18.7 ± 2.0 | 18.4 ± 0.7 |
| Respiratory history; % | | |
|   Inactive asthma[†] (n = 102, 145)[‡] | 4 | 1 |
|   Lower respiratory illness before age 2 (n = 79, 124)[‡] | 17 | 15 |
|   History of respiratory disease | | |
|     Bronchitis (n = 102, 138)[‡] | 16 | 12 |
|     Pneumonia ever (n = 103, 138)[‡] | 4 | 7 |
|     Hay Fever ever (n = 101, 136)[‡] | 33 | 25 |
|   Family history of asthma/COPD (n = 100, 144)[‡] | 26 | 35 |
| History of exposure to second-hand exposure to tobacco smoke; % (n = 102, 139)[‡] | 18 | 16 |
| Estimated lifetime exposure to air pollutants[§]; median (interquartile range, range) | | |
|   Ozone | 36 (29–45, 19–64) | 33 (26–44, 18–65) |
|     8-hour average ppb "time outdoors" monthly ppb-hours | 123 (97–169, 42–381) | 112 (86–156, 35–362) |
|   $PM_{10}$ (4-hour average $\mu g/m^3$) | | |
|     Prior to 1987 | 73 (54–93, 34–117) | 71 (53–93, 31–124) |
|     1987 and later | 36 (26–44, 18–68) | 34 (26–44, 20–61) |
|     Lifetime | 48 (34–57, 21–80) | 45 (34–58, 18–71) |
|   $NO_2$ (average ppb) | 30 (22–40, 11–51) | 27 (21–40, 8–50) |
| Pulmonary function measures; median (interquartile range, range) (n = 103, 145)[‡] | | |
|   $FEV_1$ (liters) | 4.31 (3.85–4.83, 2.86–6.00) | 3.22 (2.91–3.48, 2.32–4.72) |
|   $FEF_{25-75}$ (liters/s) | 4.55 (3.77–5.23, 3.14–8.37) | 3.99 (3.10–4.48, 2.10–6.28 |
|   $FEF_{75}$ (liters/s) | 2.23 (1.86–2.81, 1.19–5.67) | 1.94 (1.59–2.35, 0.84–4.65) |
|   $FEV_1/FVC$ | 85.8 (82.7–90.0, 72.3–98.0) | 89.3 (86.0–92.5, 74.8–100.0) |
|   $FEF_{25-75}/FVC$ (s$^{-1}$) | 0.901 (0.783–1.051, 0.572–1.531) | 1.076 (0.929–1.264, 0.578–1.975) |
| Coefficients of variation for pulmonary function; mean ± SD | | |
|   $FEV_1$ | 1.5% ± 0.1% | 1.4 ± 0.1% |
|   $FEF_{25-75}$ | 3.2% ± 1.8% | 3.0 ± 1.8% |
|   $FEF_{75}$ | 5.6 ± 3.7% | 6.0 ± 3.7% |
|   $FEF_{25-75}/FVC$ | 3.3 ± 1.7% | 3.1 ± 1.9% |

*See methods section for exact geographical definition.
[†]Physician diagnosis of asthma in childhood but no symptoms since age 12 years.
[‡]No. subjects (no. of men, no. of women) for whom data are available.
[§]All estimates derived from "ecological" model, except "time outdoors" model. See Methods section for description.
For ozone "time outdoors," values of 591 and 511 ppb-hours are omitted because they are substantial outliers.
COPD, chronic obstructive pulmonary disease; ppb, parts per billion.

                                              © 2005 Lippincott Williams & Wilkins

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

*Epidemiology* • Volume 16, Number 6, November 2005
*Chronic Exposure to Ambient Ozone and Lung Function*

## RESULTS

We enrolled 255 subjects of whom 58% were women. Approximately, 60% were life-long residents of the LA area (Table 1). Coefficients of variation for $FEV_1$, $FEF_{25-75}$, $FEF_{75}$, and $FEF_{25-75}/FVC$ were consistent with our previously published data.[37]

There were no meaningful differences between men and women with regard to the lifetime exposure estimates for any of the pollutants. Subjects who grew up in the LA area had higher median estimated lifetime exposure to $O_3$, $PM_{10}$ and $NO_2$ than did subjects from SF (as presented with the online version of this article). Distributions between these regions were overlapping, which resulted in a continuum of individual exposure terms across a broad range of individual estimated exposures.

We estimated the Spearman correlations between the lifetime exposure to $O_3$ (from the ecological model) and $PM_{10}$ prior to 1988, $PM_{10}$ from 1988 until enrollment at UCB, and $NO_2$; the correlations were 0.68, 0.81, and 0.57, respectively. Correlations between lifetime $O_3$ from ecological and main models and the mean $O_3$ levels 2, 3, 4, and 30 days prior to the time of lung function testing ranged between −0.03 and 0.01 (data not shown).

There were consistent inverse associations between increasing lifetime exposure to $O_3$ and $FEF_{75}$ and $FEF_{25-75}$ for men and women (Table 2). Comparable regressions with lifetime exposure to $PM_{10}$ and $NO_2$ showed similar results (Table 3). The results indicate that the adverse impact of increased lifetime exposure to $O_3$, $PM_{10}$ and $NO_2$ are de-

creased with increasing $FEF_{25-75}/FVC$ ratio. When $PM_{10}$ (alone or with $NO_2$) was added to the $O_3$ ecological model for $FEF_{75}$ (Table 4, columns labeled "none"), there was no

**TABLE 3.** Sex-Specific Effects of Estimated Lifetime Mean 8-Hour Exposure to $PM_{10}$ and $NO_2$, based on Ecological Models

| Lung Function | Parameter Estimates (Standard Error) | |
|---|---|---|
| | Men | Women |
| LnFEF$_{75}$ | | |
| Lifetime total $PM_{10}$ | −0.009 (0.0009) | −0.010 (0.0007) |
| Interaction $PM_{10} \times$ FEF$_{25-75}$/FVC | +0.009 (0.007) | +0.008 (0.0005) |
| Adjusted $R^2$ for model | 0.62 | 0.67 |
| LnFEF$_{75}$ | | |
| Lifetime mean 8-hour $NO_2$ | −0.029 (0.003) | −0.032 (0.002) |
| Interaction $NO_2 \times$ FEF$_{25-75}$/FVC | +0.030 (0.003) | +0.025 (0.002) |
| Adjusted $R^2$ for model | 0.62 | 0.62 |

Units for parameter estimates: for total $PM_{10}$, $\mu g/m^3$ and for interaction, $\mu g/m^3 * s^{-1}$; for $NO_2$, ppb. Each model includes height$^2$ as determined by optimal base models. See footnote to Table 2 for interpretation of parameters on the log scale. Standard error of the estimates given in parentheses.

**TABLE 2.** Sex-Specific Effects of Estimated Lifetime Mean 8-Hour Exposure to Ozone

| Lung Function Measure | Parameter Estimates (Standard Error) | | | |
|---|---|---|---|---|
| | Men | | Women | |
| | Ecological Model | Time Outdoors Model | Ecological Model | Time Outdoors Model |
| FEV$_1$ | | | | |
| Mean 8-hour $O_3$ | −0.011 (0.006) | −0.002 (0.001) | −0.011 (0.004) | −0.003 (0.0009) |
| Interaction $O_3 \times$ FEF$_{25-75}$/FVC | +0.007 (0.007) | +0.003 (0.001) | 0.007 (0.003) | 0.002 (0.0008) |
| Adjusted $R^2$ for model | 0.40 | 0.41 | 0.41 | 0.41 |
| LnFEF$_{75}$ | | | | |
| Mean 8-hour $O_3$ | −0.027 (0.002) | −0.006 (−11.75) | −0.029 (0.002) | −0.006 (0.0005) |
| Interaction $O_3 \times$ FEF$_{25-75}$/FVC | +0.026 (0.002) | +0.006 (12.30) | 0.024 (0.002) | 0.006 (0.0004) |
| Adjusted $R^2$ for model | 0.64 | 0.64 | 0.64 | 0.57 |
| LnFEF$_{25-75}$ | | | | |
| Mean 8-hour $O_3$ | −0.020 (0.002) | −0.004 (−12.48) | −0.23 (0.002) | −0.005 (0.0004) |
| Interaction $O_3 \times$ FEF$_{25-75}$/FVC | +0.020 (0.002) | +0.005 (13.57) | 0.020 (0.001) | 0.005 (0.0003) |
| Adjusted $R^2$ for model | 0.67 | 0.68 | 0.64 | 0.62 |

Units for parameter estimates: for $O_3$, ppb for ecological model and pph-hours for "time outdoors" model; for interaction, ppb (ppb-hours)*sec$^{-1}$. Standard error of the estimates given in parentheses. Each model includes height (or height$^2$) and weight as determined by optimal base models. Parameters on the log scale can be interpreted as percent change per unit change in lifetime mean exposure and unit change in the FEF$_{25-75}$/FVC: $(e^{-\Sigma\beta} - 1)$. For example, the parameter estimate for $O_3$ alone represents a 2.7% decrease $(e^{-0.27} - 1) = (0.972 - 1) = -2.7\%$, per 1 ppb decrease in lifetime mean exposure.

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

Case No. 1:20-cv-02484-MSK   Document 92   filed 05/06/21   USDC Colorado   pg 429 of 500

**TABLE 4.** Effects of Measurement Error on the Estimated Effects of Lifetime Mean Eight-Hour Exposure to Ozone on $FEF_{75}$, based on Ecological Model

| Model for $LnFEF_{75}$ | Men | | | Women | | |
|---|---|---|---|---|---|---|
| | | Measurement Error Correction | | | Measurement Error Correction | |
| | None | $PM_{10}$ Before 1987 | 8-Hour Mean $O_3$ | None | $PM_{10}$ Before 1987 | 8-Hour Mean $O_3$ |
| **Model 1** | | | | | | |
| Mean 8-hour $O_3$ | −0.029 (0.002) | Not applicable | −0.031 (0.002) | −0.026 (0.002) | Not applicable | −0.027 (0.002) |
| Interaction $O_3 \times FEF_{25-75}/FVC$ | +0.029 (0.002) | | +0.031 (0.002) | +0.023 (0.001) | | +0.024 (0.002) |
| **Model 2** | | | | | | |
| Mean 8-hour $O_3$ | −0.031 (0.003) | −0.027 (0.007) | −0.030 (0.003) | −0.024 (0.003) | −0.24 (0.007) | −0.025 (0.003) |
| Interaction $O_3 \times FEF_{25-75}/FVC$ | +0.026 (0.002) | NC | +0.029 (0.003) | +0.025 (0.002) | NC | +0.026 (0.002) |
| $PM_{10}$ before 1988 | $−8.7 \times 10^{-4}$ (0.001) | −0.006 (0.010) | −0.004 (0.002) | $+1.5 \times 10^{-4}$ (0.001) | $+9.7 \times 10^{-4}$ (0.009) | $+1.5 \times 10^{-4}$ (0.001) |
| $PM_{10}$ 1988 and later | +0.006 (0.003) | NC | +0.003 (0.004) | −0.007 (0.003) | NC | −0.007 (0.003) |
| **Model 3** | | | | | | |
| Mean 8-hour $O_3$ | −0.030 (0.003) | Not performed | Not performed | −0.025 (0.003) | Not performed | Not performed |
| Interaction $O_3 \times FEF_{25-75}/FVC$ | +0.026 (0.002) | | | +0.025 (0.002) | | |
| $PM_{10}$ before 1988 | −0.001 (0.002) | | | +0.001 (0.002) | | |
| $PM_{10}$ 1988 and later | +0.005 (0.004) | | | −0.004 (−0.004) | | |
| $NO_2$ | +0.002 (0.003) | | | −0.004 (0.002) | | |

See Table 2 footnote for details.
NC, no correction required to these coefficients.

meaningful change in the regression parameters for either lifetime exposure to $O_3$ or the interaction term. The main effect parameter estimates for $PM_{10}$ and $NO_2$ were reduced substantially. The addition of FVC to the models, to account for difference in lung volumes, increased the magnitude and precision of the coefficients for $O_3$ and the interaction terms, with little impact on the relative associations with $PM_{10}$ and $NO_2$ (data not shown). When models were fit without the interaction term, the $O_3$ coefficients for $FEF_{25-75}$ and $FEF_{75}$ for men were in the negative direct but weak; for women, the coefficient for $FEF_{25-75}$ was weakly positive (data not shown).

Figure 1 illustrates the modification of $O_3$ effect by $FEF_{25-75}/FVC$ ratio. Men whose $FEF_{24-75}/FVC$ ratio was in the upper quartile of the male ratio distribution showed no relation between increasing lifetime exposure for $O_3$ and $FEF_{75}$, whereas those whose ratio was in the lowest quartile showed a progressive percentage decrease in $FEF_{75}$ with increasing lifetime exposure (Fig. 1A). Similar relationships are shown for women (Fig. 1B). For the 17-ppb difference in lifetime exposure to $O_3$ (difference in median lifetime exposure to $O_3$ for students raised in LA vs. SF), the "no-effect" $FEF_{24-75}/FVC$ ratio is 1.17 for men and 1.04 for women (Fig. 1). For a man whose $FEF_{24-75}/FVC$ ratio is at the 25th percentile (0.783), the estimated effect of this 17 ppb difference is a 15% reduction in $FEF_{75}$. For a women at the comparable percentile (0.929), the estimated reduction is 3%. Adjustment for the measurement errors due to estimation of $PM_{10}$ from TSP up to 1988 and those related to the within-subject variation in the estimation of lifetime exposure to ozone did not change the results (Table 4).

There was a suggestion that the estimates based on ages 6 years and older are somewhat larger than those based on ages birth to 6 years; the confidence intervals (CI) for the $O_3$ main effect and interaction terms overlap (eg, among men, the CI for $O_3$ main effect was −0.019 to 0.031 for ages 0–5 and −0.023 to −0.039 for ages 6 and older).

## DISCUSSION

Estimated lifetime exposure to ambient concentrations of ozone in adolescents (ages 18–20 years) is associated with reduced levels of lung function measures that reflect the function of the small airways. We have shown that the ratio of $FEF_{25-75}/FVC$, a measure that reflects airway size,[32] is an important physiological marker for susceptibility to effects of long-term exposure to $O_3$ on lung function in adolescents; failure to include this measure in the analysis resulted in much less consistent results. The observation that $FEF_{25-75}/FVC$ is heritable, and that it is decreased in healthy nonsmoking and smoking first-degree relatives of persons with early-onset chronic obstructive pulmonary disease,[38] supports the importance of this ratio as a marker for susceptibility to oxidant environmental exposures.

© 2005 Lippincott Williams & Wilkins

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

*Epidemiology* • Volume 16, Number 6, November 2005
*Chronic Exposure to Ambient Ozone and Lung Function*



**FIGURE 1.** Effect of level of $FEF_{25-75}$/FVC ratio on the association between estimated lifetime exposure to $O_3$ and predicted $FEF_{75}$ (based on models in last row of Table 4) for men (**A**) and women (**B**). Lower cluster of data points represents predicted values for subjects in the lowest quartile of the $FEF_{25-75}$/FVC ratio distribution. Upper cluster of data points represents predicted values for subjects in the highest quartile of the $FEF_{25-75}$/FVC ratio distribution. Lines are for visualization only and not based on the models in Table 4.

Although the overall results did not suggest a strong difference in the association between men and women, the level of the $FEF_{25-75}$/FVC ratio at which "no effect" would be expected was lower for women than for men (1.04 and 1.17, respectively). This observation suggests that men may be more sensitive to the effects of long-term ozone exposure than women. Compared with those in the highest quartile of $FEF_{25-75}$/FVC, men and women in the lowest quartile had

estimated reductions of 38% and 37%, respectively, in their predicted $FEF_{75}$ (based on medians for each quartile) for comparable estimated lifetime $O_3$ exposures (median 38 ppb/mo). Thus, the results are unclear on this issue.

We have dealt with a number of factors that could have led to spurious associations with lifetime exposures to $O_3$. We restricted the study to subjects who were lifetime never-smokers without history of chronic respiratory diseases. Self-reported race/ethnicity was not associated with measures of lung function, and the use of the $FEF_{25-75}$/FVC ratio and of FVC controlled for potential differences in race that are related to small airways and lung volume. Second-hand exposure to tobacco smoke also was not associated with any measure of lung function. Inclusion of exposure estimates for $PM_{10}$ and $NO_2$ did not change the parameter estimates for $O_3$, nor did the inclusion of an indicator variable to control for unmeasured effects due to residence in LA versus SF. Finally, there was no correlation between estimated lifetime exposure to $O_3$ and average ambient $O_3$ concentrations in the 2, 3, 4 and 30 days prior to spirometry, and most of the subjects performed spirometry after having been in Berkeley for several months, during a time when concentrations of $O_3$, $PM_{10}$ and $NO_2$ are low (average 8-hour maximum ozone = 30 ppb, 24-hour $NO_2$ = 12 ppb, and 24-hour $PM_{10}$ = 17 $\mu g/m^3$ in August–October).

We assessed the potential effect of 2 sources of measurement error (use of questionnaire responses to estimate exposure to $O_3$ and estimation of $PM_{10}$ from TSP prior to 1988). Neither measurement error correction had a meaningful effect on the magnitude of the association with $O_3$ (Table 4). Thus, it seems unlikely that measurement error contributed substantially to the associations that we observed for $O_3$.

We cannot state with certainty that $O_3$ alone is responsible for the associations observed. However, in California, the $O_3$ and $PM_{2.5}$ seasons (the latter a result largely of combustion sources) do not overlap to any great extent,[39,40] in contrast to the considerable overlap on the eastern part of the United States.[41] Associations between $PM_{2.5}$ and lung function have been observed in short-term exposure studies,[10–14] but few data are available for the long-term exposures noted here. In contrast to $PM_{2.5}$, the coarse PM ($PM_{10-2.5}$) does overlap with the end of the $O_3$ season in California.[42] $PM_{10-2.5}$ contains small amounts of material from combustion sources but, more importantly, it is a source of iron, a transition metal that participates in the generation of reactive oxygen species[43] and endotoxin.[44] The latter are potent stimulators of inflammation in the lung.[45] Finally, in California, $NO_2$ levels tend to increase towards the end of the $O_3$ season. Although $NO_2$, has not been associated with changes in lung function, $NO_2$ is an oxidant with pulmonary deposition similar to that of $O_3$.[46] However, controlled exposure studies in humans suggest that $NO_2$ may not be as toxic as $O_3$, as measured by depletion of antioxidant activity and

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

increases in inflammatory markers in respiratory tract lining fluid.[47–49] Thus, our data are best interpreted as an expression of the oxidant environments to which the subjects were exposed over their lifetimes, as well as to effects specific to the oxidant properties of $O_3$ itself.

That our data do reflect, at least in part, some effects that are specific to $O_3$ relates also to the functional abnormalities observed. Primate models of cyclical, chronic exposures to $O_3$[23–25] have established clearly that airway remodeling occurs at the level of the respiratory bronchiole as a consequence of these exposures. Controlled $O_3$-exposure studies in humans suggest that a similar process could be occurring.[28] Based on pathologic correlations with measures of lung function in humans,[50] we expect that measures such as $FEF_{75}$ (and to a lesser extent $FEF_{25-75}$), which primarily reflect the function of small airways ($<2$ mm in diameter),[51] would show the most consistent associations with lifetime exposure, as is the case with our data; this argument is strengthened further by the importance of the interaction between lifetime exposure and the $FEF_{25-75}$/FVC ratio, which is a more direct surrogate for intrinsic airway size.[31,32]

Our observation on the similarity of the estimated exposure associations from birth through age 5 years and after the first 6 years of life suggest that the observed effects may have been driven by exposures very early in life. However, the correlations between exposures during these 2 age periods (range, $0.88-0.92$ for ecological models) limit the certainty around this inference. Evidence does suggest that abnormalities of small airways are associated with early life exposures, such as in utero tobacco smoke exposure;[52] and these abnormalities appear to persist into childhood.[53] Levels of ambient air pollution have been associated with adverse birth outcomes that are similar to those observed for women who smoke, ie, low-birth-weight, small-for-gestational-age infants.[54] Because ambient air pollution, such as cigarette smoke, is a potent inducer of oxidative stress,[55] it is reasonable to expect that events very early in development and infancy could have lasting effect on lung function. The consequent reduction in the size of small airways of such exposures is thought to be related, in part, to increased risk of wheezing in childhood and to the association between second-hand smoke exposure and asthma in children.[56] Thus, reduced small airway size, as reflected by the $FEF_{25-75}$/FVC ratio may also be a marker of sensitivity to oxidant damage early in life and a risk marker for altered lung function during periods of growth and development.

We cannot account fully for the differences between the implications of our study and the failure of several longitudinal studies to observe decreases in lung growth related to $O_3$ exposure.[22,57] The studies differ substantially in design, methods of exposure assignment, and populations studied and, in the case of the Austrian studies,[21,57] in pollutant environments. The failure of these studies to consider the $FEF_{25-75}$/FVC ratio as a marker of susceptibility also could account for some of the differences.

In summary, we have observed an association between long-term exposure to ambient ozone in adolescents who have lived all of their lives in 1 of 2 regions of California and decreased measures of small airways function. The associations are independent of any effects related to PM and $NO_2$. Our data further suggest that the associations observed may have their origins in early life and that underlying abnormality of small airways is a physiological marker for sensitivity to strongly oxidant environments.

## ACKNOWLEDGMENTS

We thank Lucas Carlton, Sarah Deamer, Jessie Murphy, and Dhara Thakar for the recruitment of the subjects and the collection of the data and Huaxia Qin for programming assistance. We thank Lincoln Diagnostics, Decatur, IL for the donation of the skin testing kits.

## REFERENCES

1. Mudway IS, Kelly FJ. Ozone and the lung: a sensitive issue. *Mol Aspects Med*. 2000;21:1–48.
2. Pryor WA, Squadrito GL, Friedman M. The cascade mechanism to explain ozone toxicity: the role of lipid ozonation products. *Free Rad Biol Med*. 1995;19:935–941.
3. U.S. Environmental Protection Agency. EPA Green Book - 8-Hour Ozone Area Standard, Available at: http://www.epa.gov/air/oaqps/greenbk/gnsum.html. Accessed August 26, 2005.
4. Geyh AS, Xue J, Ozkaynak H, et al. The Harvard Southern California Chronic Ozone Exposure Study: assessing ozone exposure of grade-school-age children in two Southern California communities. *Environ Health Perspect*. 2000;108:265–270.
5. Burnett RT, Smith-Doiron M, Stieb D, et al. Association between ozone and hospitalization for acute respiratory diseases in children less than 2 years of age. *Am J Epidemiol*. 2001;153:444–452.
6. Delfino RJ, Coate BD, Zeiger RS, et al. Daily asthma severity in relation to personal ozone exposure and outdoor fungal spores. *Am J Respir Crit Care Med*. 1996;154:633–641.
7. Anderson HR, Spix C, Medina S, et al. Air pollution and daily admissions for chronic obstructive pulmonary disease in 6 European cities: results from the APHEA project. *Eur Respir J*. 1997;10:1064–1071.
8. Kinney PL, Ozkaynak H. Associations of daily mortality and air pollution in Los Angeles County. *Environ Res*. 1991;54:99–120.
9. Pope CA 3rd, Burnett RT, Thun MJ, et al. Lung cancer, cardiopulmonary mortality, and long-term exposure to fine particulate air pollution. *JAMA*. 2002;287:1132–1141.
10. Spektor D, Lippmann M, Lioy P, et al. Effects of ambient ozone on respiratory function in active, normal children. *Am Rev Respir Dis*. 1988;137:313–320.
11. Higgins I, D'Arcy J, Gibbons D, et al. Effect of exposure to ambient ozone on ventilatory lung function in children. *Am Rev Respir Dis*. 1990;141:1136–1146.
12. Kinney P, Ware J, Spengler J, et al. Short-term pulmonary function change in association with ozone levels. *Am Rev Respir Dis*. 1989;139:56–61.
13. Kinney PL, Thurston GD, Raizenne M. The effects of ambient ozone on lung function in children: a reanalysis of six summer camp studies. *Environ Health Perspect*. 1996;104:170–174.
14. Kinney PL, Nilsen DM, Lippmann M, et al. Biomarkers of lung inflammation in recreational joggers exposed to ozone. *Am J Respir Crit Care Med*. 1996;154:1430–1435.
15. McDonnell WF, Abbey DE, Nishino N, et al. Long-term ambient ozone concentration and the incidence of asthma in non-smoking adults: the Ahsmog Study. *Environ Res*. 1999;80:110–121.
16. McConnell R, Berhane K, Gilliland F, et al. Asthma in exercising children exposed to ozone: a cohort study. *Lancet*. 2002;359:386–391.

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

*Epidemiology* • Volume 16, Number 6, November 2005

*Chronic Exposure to Ambient Ozone and Lung Function*

17. Bell ML, McDermott A, Zeger SL, et al. Ozone and short-term mortality in 95 US urban communities, 1987–2000. *JAMA*. 2004;292:2372–2378.

18. Kinney PL, Hayes C, Butler RPulmonary function of military academy freshman from areas of high and low ozone levels: Preliminay results. In: Berglund RL, ed. *Troospheric Ozone and the Environment II. Effects, Modeling and Control.* Atlanta, GA: Air and Waste Management Association; 1992:203–218.

19. Kinney PL, Aggarwal M, Nikiforov SV, et al. Methods development for epidemiologic investigations of the health effects of prolonged ozone exposure. Part III. An approach to retrospective estimation of lifetime ozone exposure using a questionnaire and ambient monitoring data (U.S. sites). *Res Rep Health Eff Inst*. 1998;79–108; discussion 109–21.

20. Kunzli N, Lurmann F, Segal M, et al. Association between lifetime ambient ozone exposure and pulmonary function in college freshman—Results of a pilot study. *Environ Res*. 1997;72:8–23.

21. Frischer T, Studnicka M, Gartner C, et al. Lung function growth and ambient ozone: a three year population study in school children. *Am J Respir Crit Care Med*. 1999;160:390–396.

22. Gauderman WJ, Avol E, Gilliland F, et al. The effect of air pollution on lung development from 10 to 18 years of age. *N Engl J Med*. 2004;351:1057–1067.

23. Fujinaka L, Hyde D, Plopper C, et al. Respiratory bronchiolitis following long-term ozone exposure in bonnet monkeys: a morphometric study. *Exp Lung Res*. 1985;8:167–190.

24. Tyler W, Tyler N, Last J, et al. Comparison of daily and seasonal exposures of young monkeys to ozone. *Toxicology*. 1988;50:131–144.

25. Schelegle ES, Miller LA, Gershwin LJ, et al. Repeated episodes of ozone inhalation amplifies the effects of allergen sensitization and inhalation on airway immune and structural development in Rhesus monkeys. *Toxicol Appl Pharmacol*. 2003;191:74–85.

26. Miller FJ, Overton JH Jr, Jaskot RH, et al. A model of the regional uptake of gaseous pollutants in the lung. I. Sensitivity of the uptake of ozone in the human lung to lower respiratory tract secretions and exercise. *Toxicol Appl Pharmacol*. 1985;79:11–27.

27. Weinmann GG, Liu MC. Proud D, et al. Ozone exposure in humans: inflammatory, small and peripheral airway responses. *Am J Respir Crit Care Med*. 1995;152:1175–1182.

28. Frank R, Liu MC, Spannhake EW, et al. Repetitive ozone exposure of young adults: evidence of persistent small airway dysfunction. *Am J Respir Crit Care Med*. 2001;164:1253–1260.

29. Lohman TG, Roche AF, Martorell R, eds. *Anthropometric Standardization Manual*. Campaign, IL: Human Kinetics; 1988.

30. American Thoracic Society. Standardization of Spirometry-1994 Update. *Am J Respir Crit Care Med*. 1995;152:1107–1136.

31. Tager IB, Weiss ST, Munoz A, et al. Determinants of response to eucapneic hyperventilation with cold air in a population-based study. *Am Rev Respir Dis*. 1986;134:502–508.

32. Mead J. Dysanapsis in normal lungs assessed by the relationship between maximal flow, static recoil, and vital capacity. *Am Rev Respir Dis*. 1980;121:339–342.

33. Wiley JA, Robinson JP, Cheng Y-T, et al. Study of Children's Activity Patterns: Final Report. Sacramento: California Air Resources Board; 1991 A733-149 September, 1991. Report No.: A733-149.

34. Wiley JA, Robinson JP, Piazza T, et al. Activity Patterns of California Residents: Final Report. Sacramento: California Air Resources Board; 1991 A6-177-33 May, 1991. Report No.: A6-177-33.

35. Tager IB, Küenzli N, Ngo L, et al. *A Pilot Study to Assess the Reliability of Estimates of Lifetime Exposure to Ambient Ozone Derived from Questionnaires and Ambient Monitoring Data.* Cambridge, MA: Health Effects Institute; 1998.

36. Kunzli N, Lurmann F, Segal M, et al. Reliability of life-time residential history and activity measures as elments of cumulative ambient ozone exposure assessment. *J Exp Anal Environ Epidemiol*. 1996;6:289–310.

37. Tager IB, Kunzli N, Ngo L, et al. Methods Development for Epidemiologic Investigations of the Health Effects of Prolonged Ozone Exposure Part I:

Variability of Pulmonary Function Measures. Research Report. Cambridge: Health Effects Institute; 1998. Report No.: Research Report 81.

38. DeMeo DL, Carey VJ, Chapman HA, et al. Familial aggregation of FEF(25–75) and FEF(25–75)/FVC in families with severe, early onset COPD. *Thorax*. 2004;59:396–400.

39. Dolislager LJ, Motallebi N. Spatial and temporal variations in ambient PM2.5 and PM10 in California. In: Chow J, Koutrakis P, eds. Air & Waste Management Association's Specialty Conference on PM2.5: a fine particle standard; 1998:108–167.

40. Motallebi N, Taylor CA Jr, Croes BE. Particulate matter in California: part 2—Spatial, temporal, and compositional patterns of PM2.5, PM10-2.5, and PM10. *J Air Waste Manage Assoc*. 2003;53:1517–1530.

41. McMurry P, Shepherd M, Vickery J, et al. *NARSTO: Particulate Matter Assessment for Policy Makers: A NARSTO Assessment*. Cambridge, England: Cambridge University Press; 2004.

42. Chow JC, Watson JG, Lowenthal DH, et al. PM10 and PM2.5 compositions in California's San Joaquin Valley. *Aerosol Sci Tech*. 1993;18:105–128.

43. Ghio AJ, Meng HH, Hatch GE, et al. Luminol-enhanced chemiluminescence after in vitro exposures of rat alveolar macrophages to oil fly ash is metal dependent. *Inhal Toxicol*. 1997;9:255–271.

44. Soukup JM, Becker S. Human alveolar macrophage responses to air pollution particulates are associated with insoluble components of coarse material, including particulate endotoxin. *Toxicol Appl Pharmacol*. 2001;171:20–26.

45. O'Grady NP, Preas HL, Pugin J, et al. Local inflammatory responses following bronchial endotoxin instillation in humans. *Am J Respir Crit Care Med*. 2001;163:1591–1598.

46. U.S. Environmental Protection Agency. Air Quality Criteria for Oxides of Nitrogen Vol I of III, EPA/600/8-91/049aF. Research Triangle Park, NC: Environmental Criteria and Assessment Office; 1993. Report No.: EPA/600/8-91/049aF.

47. Avissar NE, Reed CK, Cox C, et al. Ozone, but not nitrogen dioxide, exposure decreases glutathione peroxidases in epithelial lining fluid of human lung. *Am J Respir Crit Care Med*. 2000;162:1342–1347.

48. Blomberg A, Krishna MT, Bocchino V, et al. The inflammatory effects of 2 ppm NO2 on the airways of healthy subjects (published erratum appears in *Am J Respir Crit Care Med*. 1997;156:2028). *Am J Respir Crit Care Med*. 1997;156:418–424.

49. Solomon C, Christian DL, Chen LL, et al. Effect of serial-day exposure to nitrogen dioxide on airway and blood leukocytes and lymphocyte subsets. *Eur Respir J*. 2000;15:922–928.

50. Cosio M, Ghezzo H, Hogg JC, et al. The relations between structural changes in small airways and pulmonary-function tests. *N Engl J Med*. 1977;298:1277–1281.

51. Hyatt RE. Expiratory flow limitation. *J Appl Physiol*. 1983;55:1–8.

52. Tager IB, Ngo L, Hanrahan JP. Maternal smoking during pregnancy: effects on lung function during the first 18 months of life. *Am J Respir Crit Care Med*. 1995;152:977–983.

53. Li YF, Gilliland FD, Berhane K, et al. Effects of in utero and environmental tobacco smoke exposure on lung function in boys and girls with and without asthma. *Am J Respir Crit Care Med*. 2000;162:2097–2104.

54. Liu S, Krewski D, Shi Y, et al. Association between gaseous ambient air pollutants and adverse pregnancy outcomes in Vancouver, Canada. *Environ Health Perspect*. 2003;111:1773–1778.

55. Li N, Sioutas C, Cho A, et al. Ultrafine particulate pollutants induce oxidative stress and mitochondrial damage. *Environ Health Perspect*. 2003;111:455–460.

56. National Cancer Institute. Health Effects of Environmental Tobacco Smoke: The Report of the California Environmental Protection Agency. Bethesda: National Cancer Institute; NIH 99-4645;1999. Report No.: NIH 99-4645.

57. Ihorst G, Frischer T, Horak F, et al. Long- and medium-term ozone effects on lung growth including a broad spectrum of exposure. *Eur Respir J*. 2004;23:292–299.

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

*The* NEW ENGLAND JOURNAL *of* MEDICINE

---

ORIGINAL ARTICLE

# Long-Term Ozone Exposure and Mortality

Michael Jerrett, Ph.D., Richard T. Burnett, Ph.D., C. Arden Pope III, Ph.D.,
Kazuhiko Ito, Ph.D., George Thurston, Sc.D., Daniel Krewski, Ph.D.,
Yuanli Shi, M.D., Eugenia Calle, Ph.D., and Michael Thun, M.D.

---

## ABSTRACT

### BACKGROUND

Although many studies have linked elevations in tropospheric ozone to adverse health outcomes, the effect of long-term exposure to ozone on air pollution–related mortality remains uncertain. We examined the potential contribution of exposure to ozone to the risk of death from cardiopulmonary causes and specifically to death from respiratory causes.

### METHODS

Data from the study cohort of the American Cancer Society Cancer Prevention Study II were correlated with air-pollution data from 96 metropolitan statistical areas in the United States. Data were analyzed from 448,850 subjects, with 118,777 deaths in an 18-year follow-up period. Data on daily maximum ozone concentrations were obtained from April 1 to September 30 for the years 1977 through 2000. Data on concentrations of fine particulate matter (particles that are $\leq 2.5$ $\mu m$ in aerodynamic diameter [$PM_{2.5}$]) were obtained for the years 1999 and 2000. Associations between ozone concentrations and the risk of death were evaluated with the use of standard and multilevel Cox regression models.

### RESULTS

In single-pollutant models, increased concentrations of either $PM_{2.5}$ or ozone were significantly associated with an increased risk of death from cardiopulmonary causes. In two-pollutant models, $PM_{2.5}$ was associated with the risk of death from cardiovascular causes, whereas ozone was associated with the risk of death from respiratory causes. The estimated relative risk of death from respiratory causes that was associated with an increment in ozone concentration of 10 ppb was 1.040 (95% confidence interval, 1.010 to 1.067). The association of ozone with the risk of death from respiratory causes was insensitive to adjustment for confounders and to the type of statistical model used.

### CONCLUSIONS

In this large study, we were not able to detect an effect of ozone on the risk of death from cardiovascular causes when the concentration of $PM_{2.5}$ was taken into account. We did, however, demonstrate a significant increase in the risk of death from respiratory causes in association with an increase in ozone concentration.

From the University of California, Berkeley (M.J.); Health Canada, Ottawa (R.T.B.); Brigham Young University, Provo, UT (C.A.P.); New York University School of Medicine, New York (K.I., G.T.); the University of Ottawa, Ottawa (D.K., Y.S.); and the American Cancer Society, Atlanta (E.C., M.T.). Address reprint requests to Dr. Jerrett at the Division of Environmental Health Sciences, School of Public Health, University of California, 710 University Hall, Berkeley, CA 94720, or at jerrett@berkeley.edu.

N Engl J Med 2009;360:1085-95.
*Copyright © 2009 Massachusetts Medical Society.*

Downloaded from www.nejm.org by on March 13, 2009 .
Copyright © 2009 Massachusetts Medical Society. All rights reserved.

*The* NEW ENGLAND JOURNAL *of* MEDICINE

S TUDIES CONDUCTED OVER THE PAST 15 years have provided substantial evidence that long-term exposure to air pollution is a risk factor for cardiopulmonary disease and death.[1-5] Recent reviews of this literature suggest that fine particulate matter (particles that are $\leq 2.5$ $\mu m$ in aerodynamic diameter [$PM_{2.5}$]) has a primary role in these adverse health effects.[6,7] The particulate-matter component of air pollution includes complex mixtures of metals, black carbon, sulfates, nitrates, and other direct and indirect byproducts of incomplete combustion and high-temperature industrial processes.

Ozone is a single, well-defined pollutant, yet the effect of exposure to ozone on air pollution–related mortality remains inconclusive. Several studies have evaluated this issue, but they have been short-term studies,[8-10] have failed to show a statistically significant effect,[1,3] or have been based on limited mortality data.[11] Recent reviews by the Environmental Protection Agency (EPA)[12] and the National Research Council[13] have questioned the overall consistency of the available data correlating exposure to ozone and mortality. Similar conclusions about the evidence base for the long-term effects of ozone on mortality were drawn by a panel of experts in the United Kingdom.[14]

Nonetheless, previous studies have suggested that a measurable effect of ozone may exist, particularly with respect to the risk of death from cardiopulmonary causes. In one of the larger studies, ozone was significantly associated with death from cardiopulmonary causes[15] but not with death from ischemic heart disease. However, the estimated effect of ozone on the risk of death from cardiopulmonary causes in this study was attenuated when $PM_{2.5}$ was added to the analysis in copollutant models. On the basis of suggested effects of ozone on the risk of death from cardiopulmonary causes (which includes death from respiratory causes) but an absence of evidence for effects of ozone on the risk of death from ischemic heart disease, we hypothesized that ozone might have a primary effect on the risk of death from respiratory causes.

## METHODS

### HEALTH, MORTALITY, AND CONFOUNDING DATA

Our study used data from the American Cancer Society Cancer Prevention Study II (CPS II) cohort.[16] The CPS II cohort consists of more than

1.2 million participants who were enrolled by American Cancer Society volunteers between September 1982 and February 1983 in all 50 states, the District of Columbia, and Puerto Rico. Enrollment was restricted to persons who were at least 30 years of age living in households with at least one person 45 years of age or older. After providing written informed consent, the participants completed a confidential questionnaire that included questions on demographic characteristics, smoking history, alcohol use, diet, and education.[17] Deaths were ascertained until August 1988 by personal inquiries of family members by the volunteers and thereafter by linkage with the National Death Index. Through 1995, death certificates were obtained and coded for cause of death. Beginning in 1996, codes for cause of death were provided by the National Death Index.[18]

The study population for our analysis included only those participants in CPS II who resided in U.S. metropolitan statistical areas within the 48 contiguous states or the District of Columbia (according to their address at the time of enrollment) and for whom data were available from at least one pollution monitor within their metropolitan area. The study was approved by the Ottawa Hospital Research Ethics Board, Canada.

Data on "ecologic" risk factors at the level of the metropolitan area representing social variables (educational level, percentage of homes with air conditioning, percentage of the population who were nonwhite), economic variables (household income, unemployment, income disparity), access to medical care (number of physicians and hospital beds per capita), and meteorologic variables were obtained from the 1980 U.S. Census and other secondary sources (see the Supplementary Appendix, available with the full text of this article at NEJM.org). These ecologic risk factors, as well as the individual risk factors collected in the CPS II questionnaire, were assessed as potential confounders of the effects of ozone.[3,5,19,20]

### ESTIMATES OF EXPOSURE TO AIR POLLUTION

Ozone data were obtained from 1977 (5 years before the identification of the CPS II cohort) through 2000 for all air-pollution monitors in the study metropolitan areas from the EPA's Aerometric Information Retrieval System. Ozone data at each monitoring site were collected on an hourly basis, and the daily maximum value for the site was determined. All available daily maximum values for the monitoring site were averaged over

Downloaded from www.nejm.org by on March 13, 2009 .
Copyright © 2009 Massachusetts Medical Society. All rights reserved.

each quarter year. The quarterly average values were reported for each monitor only when at least 75% of daily observations for that quarter were available.

The averages of the second (April through June) and third (July through September) quarters were calculated for each monitor if both quarterly averages were available. The period from April through September was selected because ozone concentrations tend to be elevated during the warmer seasons and because fewer data were available for the cooler seasons.

The average of the second and third quarterly averages for each year was then computed for all the monitors within each metropolitan area to form a single annual time series of air-pollution measurements for each metropolitan area for the period from 1977 to 2000. In addition, a summary measure of long-term exposure to ambient warm-season ozone was defined as the average of annual time-series measurements during the entire period from 1977 to 2000. Individual measures of exposure to ozone were then defined by assigning the average for the metropolitan area to each cohort member residing in that area.

Data on exposure to $PM_{2.5}$ were also obtained from the Aerometric Information Retrieval System database for the 2-year period from 1999 to 2000 (data on $PM_{2.5}$ were not available before 1999 for most metropolitan areas).[5] The average concentrations of $PM_{2.5}$ were included in our analyses to distinguish the effect of particulates from that of ozone on outcomes.

STATISTICAL ANALYSIS

Standard and multilevel random-effects Cox proportional-hazard models were used to assess the risk of death in relation to exposures to pollution. The subjects were matched according to age (in years), sex, and race. A total of 20 variables with 44 terms were used to control for individual characteristics that might confound or modify the association between air pollution and death. These variables, which were considered to be of potential importance on the basis of previous studies, included individual risk factors for which data had been collected in the CPS II questionnaire. Seven ecologic covariates obtained from the 1980 U.S. Census (median household income, the proportion of persons living in households with an income below 125% of the poverty line, the percentage of persons over the age of 16 years who were unemployed, the percentage of adults

with less than a high-school [12th-grade] education, the percentage of homes with air conditioning, the Gini coefficient of income inequality [ranging from 0 to 1, with 0 indicating an equal distribution of income and 1 indicating that one person has all the income and everyone else has no income[20]], and the percentage of persons who were white) were also included. These variables were included at two levels: as the average for the metropolitan statistical area and as the difference between the average for the ZIP Code of residence and the average for the metropolitan statistical area. Additional sensitivity analyses were undertaken for ecologic variables that were available for only a subgroup of the 96 metropolitan statistical areas (see the Supplementary Appendix). Models were estimated for either ozone or $PM_{2.5}$. In addition, models with both $PM_{2.5}$ and ozone were estimated.

In additional analyses, our basic Cox models were modified by incorporating an adjustment for community-level random effects, which allowed us to take into account residual variation in mortality among communities.[21] The baseline hazard function was modulated by a community-specific random variable representing the residual risk of death for subjects in that community after individual and ecologic risk factors had been controlled for (see the Supplementary Appendix).

A formal analysis was conducted to assess whether a threshold existed for the association between exposure to ozone and the risk of death (see the Supplementary Appendix). A standard threshold model was postulated in which there was no association between exposure to ozone and the risk of death below a specified threshold concentration and a linear association (on the logarithmic scale of the proportional-hazards model) above the threshold.

The question of whether specific time windows were associated with the health effects was investigated by subdividing the follow-up interval into four periods (1982 to 1988, 1989 to 1992, 1993 to 1996, and 1997 to 2000). Exposures were matched for each of these periods and also tested for a 10-year average on the basis of the 5-year follow-up period and the 5 years before the follow-up period (see the Supplementary Appendix).

RESULTS

The analytic cohort included 448,850 subjects residing in 96 metropolitan statistical areas (Fig. 1).

Downloaded from www.nejm.org by on March 13, 2009 .
Copyright © 2009 Massachusetts Medical Society. All rights reserved.

*The* NEW ENGLAND JOURNAL *of* MEDICINE



**Figure 1.** Ozone Concentrations in the 96 Metropolitan Statistical Areas in Which Members of the American Cancer Society Cohort Resided in 1982.

The average exposures were estimated from 1 to 57 monitoring sites within each metropolitan area from April 1 to September 30 for the years 1977 through 2000.

In 1980, the populations of these 96 areas ranged from 94,436 to 8,295,900. Data were available on the concentration of ambient ozone from all 96 areas and on the concentration of $PM_{2.5}$ from 86 areas. The average number of air-pollution monitors per metropolitan area was 11 (range, 1 to 57), and more than 80% of the areas had 6 or more monitors.

The average ozone concentration for each metropolitan area during the interval from 1977 to 2000 ranged from 33.3 ppb to 104.0 ppb (Fig. 1). The highest regional concentrations were in Southern California and the lowest in the Pacific Northwest and parts of the Great Plains. Moderately elevated concentrations were present in many areas of the East, Midwest, South, and Southwest.

The baseline characteristics of the study population, overall and as a function of exposure to ozone, are presented in Table 1. The mean age

of the cohort was 56.6 years, 43.4% were men, 93.7% were white, 22.4% were current smokers, and 30.5% were former smokers. On the basis of estimates from 1980 Census data, 62.3% of homes had air conditioning at the time of initial data collection.

During the 18-year follow-up period (from initial CPS II data collection in 1982 through the end of follow-up in 2000), there were 118,777 deaths in the study cohort (Table 2). Of these, 58,775 were from cardiopulmonary causes, including 48,884 from cardiovascular causes (of which 27,642 were due to ischemic heart disease) and 9891 from respiratory causes.

In the single-pollutant models, exposure to ozone was not associated with the overall risk of death (relative risk, 1.001; 95% confidence interval [CI], 0.996 to 1.007) (Table 3). However, it was significantly correlated with an increase in the risk of death from cardiopulmonary causes. A

Downloaded from www.nejm.org by on March 13, 2009 .
Copyright © 2009 Massachusetts Medical Society. All rights reserved.

OZONE AND AIR POLLUTION—RELATED MORTALITY

10-ppb increment in exposure to ozone elevated the relative risk of death from the following causes: cardiopulmonary causes (relative risk, 1.014; 95% CI, 1.007 to 1.022), cardiovascular causes (relative risk, 1.011; 95% CI, 1.003 to 1.023), ischemic heart disease (relative risk, 1.015; 95% CI, 1.003 to 1.026), and respiratory causes (relative risk, 1.029; 95% CI, 1.010 to 1.048).

Inclusion of the concentration of $PM_{2.5}$ measured in 1999 and 2000 as a copollutant (Table 3)

attenuated the association with exposure to ozone for all the end points except death from respiratory causes, for which a significant correlation persisted (relative risk, 1.040; 95% CI, 1.013 to 1.067). The concentrations of ozone and $PM_{2.5}$ were positively correlated (r=0.64 at the subject level and r=0.56 at the metropolitan-area level), resulting in unstable risk estimates for both pollutants. The concentration of $PM_{2.5}$ remained significantly associated with death from cardio-

| Variable | Entire Cohort (N = 448,850) | Concentration of Ozone | | | |
|---|---|---|---|---|---|
| | | 33.3–53.1 ppb (N = 126,206) | 53.2–57.4 ppb (N = 95,740) | 57.5–62.4 ppb (N = 106,545) | 62.5–104.0 ppb (N = 120,359) |
| No. of MSAs | 96 | 24 | 24 | 24 | 24 |
| No. of MSAs with data on $PM_{2.5}$ | 86 | 21 | 20 | 23 | 22 |
| Concentration of $PM_{2.5}$ ($\mu g/m^3$) | | 11.9±2.5 | 13.1±2.9 | 14.7±2.1 | 15.4±3.2 |
| **Individual risk factors** | | | | | |
| Age (yr) | 56.6±10.5 | 56.7±10.4 | 56.4±10.7 | 56.3±10.4 | 56.9±10.5 |
| Male sex (%) | 43.4 | 43.5 | 43.1 | 43.5 | 43.2 |
| White race (%) | 93.7 | 94.3 | 95.1 | 93.9 | 91.8 |
| Education (%) | | | | | |
| Less than high school | 12.1 | 11.5 | 13.6 | 12.1 | 11.6 |
| High school | 30.6 | 30.2 | 33.6 | 32.1 | 27.4 |
| Beyond high school | 57.3 | 58.3 | 52.8 | 55.8 | 61.0 |
| Smoking status | | | | | |
| Current smokers | | | | | |
| Percentage of subjects | 22.4 | 22.0 | 23.5 | 22.2 | 21.9 |
| No. of cigarettes/day | 22.0±12.4 | 22.0±12.3 | 22.0±12.5 | 22.2±12.5 | 21.9±12.4 |
| Duration of smoking (yr) | 33.5±11.0 | 33.4±10.8 | 33.4±11.1 | 33.4±11.0 | 33.9±11.2 |
| Started smoking <18 yr of age (%) | 9.6 | 9.3 | 10.5 | 9.4 | 9.3 |
| Started smoking ≥18 yr of age (%) | 13.2 | 13.3 | 13.4 | 13.3 | 13.0 |
| Former smokers | | | | | |
| Percentage of subjects | 30.5 | 31.2 | 30.8 | 29.5 | 30.4 |
| No. of cigarettes/day | 21.6±14.7 | 21.6±14.6 | 22.2±15.1 | 21.6±14.6 | 21.3±14.6 |
| Duration of smoking (yr) | 22.2±12.6 | 22.1±12.5 | 22.6±12.6 | 22.0±12.5 | 22.4±12.7 |
| Started smoking <18 yr of age (%) | 11.9 | 11.8 | 12.7 | 11.5 | 11.8 |
| Started smoking ≥18 yr of age (%) | 18.5 | 19.3 | 17.9 | 17.9 | 18.5 |
| Exposure to smoking (hr/day) | 3.3±4.4 | 3.2±4.4 | 3.4±4.5 | 3.4±4.5 | 3.1±4.4 |
| Pipe or cigar smoker only (%) | 4.1 | 4.0 | 4.2 | 4.3 | 3.8 |
| Marital status (%) | | | | | |
| Married | 83.5 | 84.2 | 83.0 | 83.7 | 83.1 |
| Single | 3.6 | 3.4 | 4.0 | 3.8 | 3.2 |
| Separated, divorced, or widowed | 12.9 | 12.4 | 13.0 | 12.5 | 13.7 |

Table 1. Baseline Characteristics of the Study Population in the Entire Cohort and According to Exposure to Ozone.*

Downloaded from www.nejm.org by on March 13, 2009 .
Copyright © 2009 Massachusetts Medical Society. All rights reserved.

*The* NEW ENGLAND JOURNAL *of* MEDICINE

| Table 1. (Continued.) | | | | | |
|---|---|---|---|---|---|
| Variable | Entire Cohort (N=448,850) | Concentration of Ozone | | | |
| | | 33.3–53.1 ppb (N=126,206) | 53.2–57.4 ppb (N=95,740) | 57.5–62.4 ppb (N=106,545) | 62.5–104.0 ppb (N=120,359) |
| Body-mass index† | 25.1±4.1 | 25.1±4.1 | 25.3±4.2 | 25.1±4.1 | 24.8±4.0 |
| Level of occupational exposure to particulate matter (%)‡ | | | | | |
| 0 | 50.7 | 50.9 | 50.0 | 50.8 | 51.0 |
| 1 | 13.3 | 13.4 | 13.1 | 13.3 | 13.3 |
| 2 | 11.4 | 11.5 | 10.8 | 11.4 | 11.9 |
| 3 | 4.6 | 4.7 | 4.8 | 4.6 | 4.5 |
| 4 | 6.1 | 6.2 | 6.2 | 6.1 | 6.0 |
| 5 | 4.2 | 4.2 | 4.3 | 4.1 | 4.1 |
| 6 | 1.1 | 1.0 | 9.5 | 1.4 | 8.4 |
| Not able to ascertain | 8.6 | 8.2 | 1.2 | 8.4 | 0.9 |
| Self-reported exposure to dust or fumes (%) | 19.5 | 19.5 | 19.8 | 19.7 | 19.1 |
| Level of dietary-fat consumption (%)§ | | | | | |
| 0 | 14.5 | 13.7 | 14.9 | 14.1 | 15.3 |
| 1 | 15.9 | 15.8 | 16.5 | 15.6 | 15.9 |
| 2 | 17.4 | 17.6 | 17.7 | 17.2 | 17.1 |
| 3 | 21.2 | 21.8 | 21.1 | 21.3 | 20.8 |
| 4 | 30.9 | 31.1 | 29.8 | 31.9 | 30.9 |
| Level of dietary-fiber consumption (%)¶ | | | | | |
| 0 | 16.6 | 16.0 | 17.5 | 16.7 | 16.6 |
| 1 | 19.9 | 19.4 | 20.5 | 20.1 | 19.7 |
| 2 | 18.8 | 18.6 | 19.2 | 19.1 | 18.5 |
| 3 | 22.8 | 23.0 | 22.4 | 22.8 | 22.7 |
| 4 | 21.9 | 23.0 | 20.4 | 21.3 | 22.5 |
| Alcohol consumption (%) | | | | | |
| Beer | | | | | |
| Drinks beer | 22.9 | 24.3 | 23.2 | 22.9 | 21.4 |
| Does not drink beer | 9.7 | 9.5 | 9.3 | 9.5 | 10.2 |
| No data | 67.4 | 66.2 | 67.5 | 67.6 | 68.4 |
| Liquor | | | | | |
| Drinks liquor | 28.0 | 30.4 | 27.9 | 25.4 | 27.9 |
| Does not drink liquor | 8.8 | 8.4 | 8.5 | 10.1 | 9.2 |
| No data | 63.2 | 61.2 | 63.6 | 65.5 | 62.9 |
| Wine | | | | | |
| Drinks wine | 23.5 | 25.4 | 22.5 | 21.1 | 24.3 |
| Does not drink wine | 8.9 | 8.7 | 8.8 | 9.3 | 9.1 |
| No data | 67.6 | 65.9 | 68.7 | 69.6 | 66.6 |

Downloaded from www.nejm.org by on March 13, 2009 .
Copyright © 2009 Massachusetts Medical Society. All rights reserved.

OZONE AND AIR POLLUTION—RELATED MORTALITY

| Table 1. (Continued.) | | | | | |
|---|---|---|---|---|---|
| Variable | Entire Cohort (N = 448,850) | Concentration of Ozone | | | |
| | | 33.3–53.1 ppb (N = 126,206) | 53.2–57.4 ppb (N = 95,740) | 57.5–62.4 ppb (N = 106,545) | 62.5–104.0 ppb (N = 120,359) |
| Ecologic risk factors‖ | | | | | |
| Nonwhite race (%) | 11.6±16.8 | 10.5±16.4 | 9.3±15.5 | 10.2±16.0 | 15.9±18.3 |
| Home with air conditioning (%) | 62.3±27.0 | 55.4±31.2 | 59.4±24.0 | 65.3±24.8 | 69.1±24.3 |
| High-school education or greater (%) | 51.7±8.2 | 53.5±7.9 | 52.4±7.5 | 50.8±7.2 | 50.0±9.5 |
| Unemployment rate (%) | 11.7±3.1 | 12.1±3.4 | 11.3±2.6 | 11.3±2.9 | 11.8±3.4 |
| Gini coefficient of income inequality** | 0.37±0.04 | 0.37±0.05 | 0.37±0.04 | 0.37±0.04 | 0.38±0.04 |
| Proportion of population with income <125% of poverty line | 0.12±0.08 | 0.11±0.08 | 0.12±0.08 | 0.11±0.07 | 0.13±0.09 |
| Annual household income (thousands of dollars)†† | 20.7±6.6 | 21.9±7.1 | 19.8±6.0 | 21.2±6.7 | 19.7±6.3 |

* MSA denotes metropolitan statistical area, and $PM_{2.5}$ fine particulate matter consisting of particles that are 2.5 $\mu$m or less in aerodynamic diameter. Plus–minus values are means ±SD. Because of rounding, percentages may not total 100. All baseline characteristics included in the survival model are listed (age, sex, and race were included as stratification factors). The model also includes squared terms for the number of cigarettes smoked per day and the number of years of smoking for both current and former smokers and a squared term for body-mass index.
† The body-mass index is the weight in kilograms divided by the square of the height in meters.
‡ Occupational exposure to particulate matter increases with increasing index number. The index was calculated by assigning a relative level of exposure to $PM_{2.5}$ associated with a cohort member's job and industry. These assignments were performed by industrial hygienists on the basis of their knowledge of typical exposure patterns for each occupation and specific job.[22]
§ Dietary-fat consumption increases with increasing index number. Dietary information from cohort members was used to define the level of fat consumption according to five ordered categories.[20]
¶ Dietary-fiber consumption increases with increasing index number. Dietary information from cohort members was used to define the level of fiber consumption according to five ordered categories.[23]
‖ For the ecologic variables, the model included terms for influences at the level of the average for the metropolitan statistical area and at the level of the difference between the value for the ZIP Code of residence and the average for the metropolitan statistical area to represent between- and within-metropolitan area confounding influence. Some values for ecologic variables and individual variables differ, although they appear to measure the same risk factor. For example, for the entire cohort, the percentage of whites as listed under individual variables is 93.7, whereas the percentage of nonwhites as listed under ecologic variables is 11.6±16.8. This apparent contradiction is explained by the fact that the former is an exact figure based on the individual reports of the study participants in the CPS II questionnaire, whereas the latter is a mean (±SD) for the population based on Census estimates for each metropolitan statistical area.
** The Gini coefficient is a statistical dispersion measure used to calculate income inequality. The coefficient ranges from 0 to 1, with 0 indicating an equal distribution of income and 1 indicating that one person has all the income and everyone else has no income.[20] A coefficient of 0.37 indicates that on average there is a measurable inequality in the distribution of income among the different income groups within the MSAs.
†† Average household incomes for the cohort and for each quartile of ozone concentration were calculated from the median household income for the metropolitan statistical area.

pulmonary causes, cardiovascular causes, and ischemic heart disease when ozone was included in the model. The association of ozone concentrations with death from respiratory causes remained significant after adjustment for $PM_{2.5}$.

Risk estimates for ozone-related death from respiratory causes were insensitive to the use of a random-effects survival model allowing for spatial clustering within the metropolitan area and state of residence (Table 1S in the Supplementary Appendix). The association between increased ozone concentrations and increased risk

of death from respiratory causes was also insensitive to adjustment for several ecologic variables considered individually (Table 2S in the Supplementary Appendix).

Subgroup analyses showed that environmental temperature and region of the country, but not sex, age at enrollment, body-mass index, education, or concentration of $PM_{2.5}$, significantly modified the effects of ozone on the risk of death from respiratory causes (Table 4).

Figure 2 illustrates the shape of the relation between exposure to ozone and death from re-

Downloaded from www.nejm.org by on March 13, 2009 .
Copyright © 2009 Massachusetts Medical Society. All rights reserved.

*The* NEW ENGLAND JOURNAL *of* MEDICINE

| Cause of Death | Entire Cohort (N=448,850) | Concentration of Ozone | | | |
|---|---|---|---|---|---|
| | | 33.3–53.1 ppb (N=126,206) | 53.2–57.4 ppb (N=95,740) | 57.5–62.4 ppb (N=106,545) | 62.5–104.0 ppb (N=120,359) |
| | | *number of deaths* | | | |
| Any cause | 118,777 | 32,957 | 25,642 | 27,782 | 32,396 |
| Cardiopulmonary | 58,775 | 16,328 | 12,621 | 13,544 | 16,282 |
| Cardiovascular | 48,884 | 13,605 | 10,657 | 11,280 | 13,342 |
| Ischemic heart disease | 27,642 | 7,714 | 6,384 | 6,276 | 7,268 |
| Respiratory | 9,891 | 2,723 | 1,964 | 2,264 | 2,940 |

Table 2. Number of Deaths in the Entire Cohort and According to Exposure to Ozone.

| Cause of Death | Single-Pollutant Model† | | | Two-Pollutant Model‡ | |
|---|---|---|---|---|---|
| | Ozone (96 MSAs) | Ozone (86 MSAs) | $PM_{2.5}$ (86 MSAs) | Ozone (86 MSAs) | $PM_{2.5}$ (86 MSAs) |
| | | | *relative risk (95% CI)* | | |
| Any cause | 1.001 (0.996–1.007) | 1.001 (0.996–1.007) | 1.048 (1.024–1.071) | 0.989 (0.981–0.996) | 1.080 (1.048–1.113) |
| Cardiopulmonary | 1.014 (1.007–1.022) | 1.016 (1.008–1.024) | 1.129 (1.094–1.071) | 0.992 (0.982–1.003) | 1.153 (1.104–1.204) |
| Respiratory | 1.029 (1.010–1.048) | 1.027 (1.007–1.046) | 1.031 (0.955–1.113) | 1.040 (1.013–1.067) | 0.927 (0.836–1.029) |
| Cardiovascular | 1.011 (1.003–1.023) | 1.014 (1.005–1.023) | 1.150 (1.111–1.191) | 0.983 (0.971–0.994) | 1.206 (1.150–1.264) |
| Ischemic heart disease | 1.015 (1.003–1.026) | 1.017 (1.006–1.029) | 1.211 (1.156–1.268) | 0.973 (0.958–0.988) | 1.306 (1.226–1.390) |

Table 3. Relative Risk of Death Attributable to a 10-ppb Change in the Ambient Ozone Concentration.*

* MSA denotes metropolitan statistical area, and $PM_{2.5}$ fine particulate matter consisting of particles that are 2.5 μm or less in aerodynamic diameter. Ozone concentrations were measured from April to September during the years from 1977 to 2000, with follow-up from 1982 to 2000; changes in the concentration of $PM_{2.5}$ of 10 μg per cubic meter were recorded for members of the cohort in 1999 and 2000. These models are adjusted for all the individual and ecologic risk factors listed in Table 1. For the ecologic variables, the model included terms for influences at the level of the average for the metropolitan statistical area and at the level of the difference between the value for the ZIP Code of residence and the average for the metropolitan statistical area to represent between- and within-metropolitan area confounding influence. The risk of death was stratified according to age (in years), sex, and race.
† The single-pollutant models were based on 96 metropolitan statistical areas for which information on ozone was available and 86 metropolitan statistical areas for which information on both ozone and fine particulate matter was available.
‡ The two-pollutant models were based on 86 metropolitan statistical areas for which information on both ozone and fine particulate matter was available.

spiratory causes. There was limited evidence that a threshold model specification improved model fit as compared with a nonthreshold linear model (P=0.06) (Table 3S in the Supplementary Appendix).

Because air-pollution data from 1977 to 2000 were averaged, exposure values for persons who died during this period are based partly on data that were obtained after death had occurred. Further investigation by dividing this interval into specific time windows of exposure revealed no significant difference between the effects of earlier and later time windows within the period of follow-up. Allowing for a 10-year period of exposure to ozone (5 years of follow-up and 5 years

before the follow-up period) did not appreciably alter the risk estimates (Table 4S in the Supplementary Appendix). Thus, when exposure values were matched more closely to the follow-up period and when exposure values were based on data obtained before the deaths, there was little change in the results.

## DISCUSSION

Our principal finding is that ozone and $PM_{2.5}$ contributed independently to increased annual mortality rates in this large, U.S. cohort study in analyses that controlled for many individual and ecologic risk factors. In two-pollutant models that

Downloaded from www.nejm.org by on March 13, 2009 .
Copyright © 2009 Massachusetts Medical Society. All rights reserved.

OZONE AND AIR POLLUTION–RELATED MORTALITY

included ozone and $PM_{2.5}$, ozone was significantly associated only with death from respiratory causes.

For every 10-ppb increase in exposure to ozone, we observed an increase in the risk of death from respiratory causes of about 2.9% in single-pollutant models and 4% in two-pollutant models. Although this increase may appear moderate, the risk of dying from a respiratory cause is more than three times as great in the metropolitan areas with the highest ozone concentrations as in those with the lowest ozone concentrations. The effects of ozone on the risk of death from respiratory causes were insensitive to adjustment for individual, neighborhood, and metropolitan-area confounders or to differences in multilevel-model specifications.

There is biologic plausibility for a respiratory effect of ozone. In laboratory studies, ozone can increase airway inflammation[24] and can worsen pulmonary function and gas exchange.[25] In addition, exposure to elevated concentrations of tropospheric ozone has been associated with numerous adverse health effects, including the induction[26] and exacerbation[27,28] of asthma, pulmonary dysfunction,[29,30] and hospitalization for respiratory causes.[31]

Despite these observations, previous studies linking long-term exposure to ozone with death have been inconclusive. One cohort study conducted in the Midwest and eastern United States reported an inverse but nonsignificant association between ozone concentrations and mortality.[1] Subsequent reanalyses of this study replicated these findings but also suggested a positive association with exposure to ozone during warm seasons.[3] A study of approximately 6000 nonsmoking Seventh-Day Adventists living in Southern California showed elevated risks among men after long-term exposure to ozone,[11] but this finding was based on limited mortality data.

Previous studies using the CPS II cohort have also produced mixed results for ozone. An earlier examination based on a large sample of more than 500,000 people from 117 metropolitan areas and 8 years of follow-up indicated nonsignificant results for the relation between ozone and death from any cause and a significant inverse association between ozone and death from lung cancer. A positive association between death from cardiopulmonary causes and summertime exposure to ozone was observed in single-pollutant

**Table 4.** Relative Risk of Death from Respiratory Causes Attributable to a 10-ppb Change in the Ambient Ozone Concentration, Stratified According to Selected Risk Factors.*

| Stratification Variable | % of Subjects in Stratum | Relative Risk (95% CI) | P Value of Effect Modification |
|---|---|---|---|
| Sex | | | 0.11 |
| Male | 43 | 1.01 (0.99–1.04) | |
| Female | 57 | 1.04 (1.03–1.07) | |
| Age at enrollment (yr) | | | 0.74 |
| <50 | 26 | 1.00 (0.90–1.11) | |
| 50–65 | 54 | 1.03 (1.01–1.06) | |
| >65 | 20 | 1.02 (1.00–1.05) | |
| Education | | | 0.48 |
| High school or less | 43 | 1.02 (1.00–1.05) | |
| Beyond high school | 57 | 1.03 (1.01–1.06) | |
| Body-mass index† | | | 0.96 |
| <25.0 | 53 | 1.03 (1.01–1.06) | |
| 25.0–29.9 | 36 | 1.03 (0.99–1.06) | |
| ≥30.0 | 11 | 1.03 (0.96–1.10) | |
| $PM_{2.5}$ (µg/m³)‡ | | | 0.38 |
| <14.3 | 44 | 1.05 (1.01–1.09) | |
| >14.3 | 56 | 1.03 (1.00–1.05) | |
| Region§ | | | 0.05 |
| Northeast | 24.8 | 0.99 (0.92–1.07) | |
| Industrial Midwest | 29.7 | 1.00 (0.91–1.09) | |
| Southeast | 21.0 | 1.12 (1.05–1.19) | |
| Upper Midwest | 5.2 | 1.14 (0.68–1.90) | |
| Northwest | 7.7 | 1.06 (1.00–1.13) | |
| Southwest | 3.9 | 1.21 (1.04–1.40) | |
| Southern California | 7.8 | 1.01 (0.96–1.07) | |
| External temperature (°C)‡¶ | | | 0.01 |
| <23.3 | 24 | 0.96 (0.90–1.01) | |
| >23.3 to <25.4 | 29 | 0.97 (0.87–1.08) | |
| >25.4 to <28.7 | 22 | 1.04 (0.92–1.16) | |
| >28.7 | 25 | 1.05 (1.03–1.08) | |

* $PM_{2.5}$ denotes fine particulate matter consisting of particles that are 2.5 µm or less in aerodynamic diameter. Ozone exposures for the cohort were measured from April to September during the years from 1977 to 2000, with follow-up from 1982 to 2000, with adjustment for individual risk factors, and with baseline hazard function stratified according to age (single-year groupings), sex, and race. These analyses are based on the single-pollutant model for ozone shown in Table 3. Because of rounding, percentages may not total 100.
† The body-mass index is the weight in kilograms divided by the square of the height in meters.
‡ Stratum cutoff is based on the median of the distribution at the metropolitan-area level, not at the subject level.
§ Definitions of regions are those used by the Environmental Protection Agency.[3]
¶ External temperature is calculated as the average daily maximum temperature recorded between April and September from 1977 to 2000.

Downloaded from www.nejm.org by on March 13, 2009 .
Copyright © 2009 Massachusetts Medical Society. All rights reserved.

*The* NEW ENGLAND JOURNAL *of* MEDICINE



**Figure 2. Exposure–Response Curve for the Relation between Exposure to Ozone and the Risk of Death from Respiratory Causes.**

The curve is based on a natural spline with 2 df estimated from the residual relative risk of death within a metropolitan statistical area (MSA) according to a random-effects survival model. The dashed lines indicate the 95% confidence interval of fit, and the hash marks indicate the ozone levels of each of the 96 MSAs.

mine precisely the independent contributions of these copollutants to the risk of death. There was notable collinearity between the concentrations of ozone and $PM_{2.5}$.

Furthermore, measurement at central monitors probably represents population exposure to $PM_{2.5}$ more accurately than it represents exposure to ozone. Ozone concentration tends to vary spatially within cities more than does $PM_{2.5}$ concentration, because of scavenging of ozone by nitrogen oxide near roadways.[36] In the presence of a high density of local traffic, the measurement error is probably higher for exposure to ozone than for exposure to $PM_{2.5}$. The effects of ozone could therefore be confounded by the presence of $PM_{2.5}$ because of collinearity between the measurements of the two pollutants and the higher precision of measurements of $PM_{2.5}$.[37]

Measurements of $PM_{2.5}$ were available only for the end of the study follow-up period (1999 and 2000). Widespread collection of these data began only after the EPA adopted regulatory limits on such particulates in 1997. Since particulate air pollution has probably decreased in most metropolitan areas during the follow-up interval of our study, it is likely that we have underestimated the effect of $PM_{2.5}$ in our analysis.

A limitation of our study is that we were not able to account for the geographic mobility of the population during the follow-up period. We had information on home addresses for the CPS II cohort only at the time of initial enrollment in 1982 and 1983. Census data indicate that during the interval between 1982 and 2000, approximately 2 to 3% of the population moved from one state to another annually (with the highest rates in an age group younger than that of our study population).[38] However, any bias due to a failure to account for geographic mobility is likely to have attenuated, rather than exaggerated, the effects of ozone on mortality.

In summary, we investigated the effect of tropospheric ozone on the risk of death from any cause and cause-specific death in a large cohort, using data from 96 metropolitan statistical areas across the United States and controlling for the effect of particulate air pollutants. We were unable to detect a significant effect of exposure to ozone on the risk of death from cardiovascular causes when particulates were taken into account, but we did demonstrate a significant effect of exposure to ozone on the risk of death from respiratory causes.

models, but the association with ozone was nonsignificant in two-pollutant models.[3] Further analyses based on 16 years of follow-up in 134 cities produced similarly elevated but nonsignificant associations that were suggestive of effects of summertime (July to September) exposure to ozone on death from cardiopulmonary causes.[5]

The increase in deaths from respiratory causes with increasing exposure to ozone may represent a combination of short-term effects of ozone on susceptible subjects who have influenza or pneumonia and long-term effects on the respiratory system caused by airway inflammation,[24] with subsequent loss of lung function in childhood,[32] young adulthood,[33,34] and possibly later life.[35] If exposure to ozone accelerates the natural loss of adult lung function with age, those exposed to higher concentrations of ozone would be at greater risk of dying from a respiratory-related syndrome.

In our two-pollutant models, the adjusted estimates of relative risk for the effect of ozone on the risk of death from cardiovascular causes were significantly less than 1.0, seemingly suggesting a protective effect. Such a beneficial influence of ozone, however, is unlikely from a biologic standpoint. The association of ozone with cardiovascular end points was sensitive to adjustment for exposure to $PM_{2.5}$, making it difficult to deter-

Downloaded from www.nejm.org by on March 13, 2009 .
Copyright © 2009 Massachusetts Medical Society. All rights reserved.

Supported by the Health Effects Institute.

Dr. Krewski reports receiving grant support from the Natural Sciences and Engineering Research Council of Canada as holder of the Industrial Research Chair in Risk Science. This chair is funded by a peer-reviewed university–industry partnership program. No other potential conflict of interest relevant to this article was reported.

We thank the National Institute of Environmental Health Sciences for providing grant support (ES00260) to the New York University School of Medicine.

This article is dedicated to the memory of our coauthor and friend, Dr. Jeanne Calle, who died unexpectedly on February 17, 2009.

## REFERENCES

**1.** Dockery DW, Pope AC, Xu X, et al. An association between air pollution and mortality in six U.S. cities. N Engl J Med 1993;329:1753-9.

**2.** Jerrett M, Burnett RT, Ma RJ, et al. Spatial analysis of air pollution and mortality in Los Angeles. Epidemiology 2005; 16:727-36.

**3.** Krewski D, Burnett RT, Goldberg MS, et al. Reanalysis of the Harvard Six Cities Study and the American Cancer Society Study of Particulate Air Pollution and Mortality: a special report of the institute's Particle Epidemiology Reanalysis Project. Part II. Sensitivity analyses. Cambridge, MA: Health Effects Institute, 2000.

**4.** Miller KA, Siscovick DS, Sheppard L, et al. Long-term exposure to air pollution and incidence of cardiovascular events in women. N Engl J Med 2007;356:447-58.

**5.** Pope CA III, Burnett RT, Thun MJ, et al. Lung cancer, cardiopulmonary mortality, and long-term exposure to fine particulate air pollution. JAMA 2002;287:1132-41.

**6.** Brook RD, Franklin B, Cascio W, et al. Air pollution and cardiovascular disease: a statement for healthcare professionals from the Expert Panel on Population and Prevention Science of the American Heart Association. Circulation 2004;109:2655-71.

**7.** Pope CA III, Dockery DW. Health effects of fine particulate air pollution: lines that connect. J Air Waste Manag Assoc 2006;56:709-42.

**8.** Bell ML, Dominici F, Samet JM. A meta-analysis of time-series studies of ozone and mortality with comparison to the National Morbidity, Mortality, and Air Pollution Study. Epidemiology 2005;16:436-45.

**9.** Ito K, De Leon SF, Lippmann M. Associations between ozone and daily mortality: analysis and meta-analysis. Epidemiology 2005;16:446-57.

**10.** Levy JI, Chemerynski SM, Sarnat JA. Ozone exposure and mortality: an empiric Bayes metaregression analysis. Epidemiology 2005;16:458-68.

**11.** Abbey DE, Nishino N, McDonnell WF, et al. Long-term inhalable particles and other air pollutants related to mortality in nonsmokers. Am J Respir Crit Care Med 1999;159:373-82.

**12.** Review of the national ambient air quality standards for ozone: policy assessment of scientific and technical information. Research Triangle Park, NC: Environmental Protection Agency, 2007. (Report no. EPA-452/R-07-007.)

**13.** Committee on Estimating Mortality Risk Reduction Benefits from Decreasing Tropospheric Ozone Exposure. Estimating mortality risk reduction and economic benefits from controlling ozone air pollu-

tion. Washington, DC: National Academies Press, 2008.

**14.** The Committee on the Medical Effects of Air Pollutants. The effects on health of long-term exposure to ozone. London: Department of Health, 2007. (Accessed February 17, 2009, at http://www.advisorybodies.doh.gov.uk/comeap/statementsreports/chptlongtermexpoozone.pdf.)

**15.** Krewski D, Jerrett M, Burnett RT, et al. Extended follow-up and spatial analysis of the American Cancer Society study linking particulate air pollution and mortality. Boston: Health Effects Institute (in press).

**16.** American Cancer Society. Cancer prevention study overviews. (Accessed February 17, 2009, at http://www.cancer.org/docroot/RES/content/RES_6_2_Study_Overviews.asp?)

**17.** Thun MJ, Calle EE, Namboodiri MM, et al. Risk factors for fatal colon cancer in a large prospective study. J Natl Cancer Inst 1992;84:1491-500.

**18.** Calle EE, Terrell DD. Utility of the National Death Index for ascertainment of mortality among Cancer Prevention Study II participants. Am J Epidemiol 1993;137:235-41.

**19.** Jerrett M, Burnett RT, Willis A, et al. Spatial analysis of the air pollution-mortality relationship in the context of ecologic confounders. J Toxicol Environ Health A 2003;66:1735-77.

**20.** Willis A, Krewski D, Jerrett M, Goldberg MS, Burnett RT. Selection of ecologic covariates in the American Cancer Society study. J Toxicol Environ Health A 2003; 66:1563-89.

**21.** Ma R, Krewski D, Burnett RT. Random effects Cox models: a Poisson modelling approach. Biometrika 2003;90:157-69.

**22.** Siemiatycki J, Krewski D, Shi Y, Goldberg MS, Nadon L, Lakhani R. Controlling for potential confounding by occupational exposures. J Toxicol Environ Health A 2003;66:1591-603.

**23.** Chao A, Thun MJ, Jacobs EJ, Henley SJ, Rodriguez C, Calle EE. Cigarette smoking and colorectal cancer mortality in the Cancer Prevention Study II. J Natl Cancer Inst 2000;92:1888-96.

**24.** Mudway IS, Kelly FJ. An investigation of inhaled ozone dose and the magnitude of airway inflammation in healthy adults. Am J Respir Crit Care Med 2004;169:1089-95.

**25.** Brown JS, Bateson TF, McDonnell WF. Effects of exposure to 0.06 ppm ozone on FEV1 in humans: a secondary analysis of existing data. Environ Health Perspect 2008;116:1023-6.

**26.** McConnell R, Berhane K, Gilliland F, et al. Asthma in exercising children ex-

posed to ozone: a cohort study. Lancet 2002;359:386-91. [Erratum, Lancet 2002; 359:896.]

**27.** Delfino RJ, Quintana PJ, Floro J, et al. Association of FEV1 in asthmatic children with personal and microenvironmental exposure to airborne particulate matter. Environ Health Perspect 2004;112:932-41.

**28.** Thurston GD, Lippmann M, Scott MB, Fine JM. Summertime haze air pollution and children with asthma. Am J Respir Crit Care Med 1997;155:654-60.

**29.** Spektor DM, Lippmann M, Lioy PJ, et al. Effects of ambient ozone on respiratory function in active, normal children. Am Rev Respir Dis 1988;137:313-20.

**30.** Tager IB, Balmes J, Lurmann F, Ngo L, Alcorn S, Künzli N. Chronic exposure to ambient ozone and lung function in young adults. Epidemiology 2005;16:751-9.

**31.** Yang Q, Chen Y, Shi Y, Burnett RT, McGrail KM, Krewski D. Association between ozone and respiratory admissions among children and the elderly in Vancouver, Canada. Inhal Toxicol 2003;15:1297-308.

**32.** Rojas-Martinez R, Perez-Padilla R, Olaiz-Fernandez G, et al. Lung function growth in children with long-term exposure to air pollutants in Mexico City. Am J Respir Crit Care Med 2007;176:377-84.

**33.** Galizia A, Kinney PL. Long-term residence in areas of high ozone: associations with respiratory health in a nationwide sample of nonsmoking young adults. Environ Health Perspect 1999;107:675-9.

**34.** Chen C, Arjomandi M, Balmes J, Tager IB, Holland N. Effects of chronic and acute ozone exposure on lipid peroxidation and antioxidant capacity in healthy young adults. Environ Health Perspect 2007;115:1732-7.

**35.** Ackermann-Liebrich U, Leuenberger P, Schwartz J, et al. Lung function and long term exposure to air pollutants in Switzerland. Am J Respir Crit Care Med 1997;155:122-9.

**36.** McConnell R, Berhane K, Yao L, Lurmann FW, Avol E, Peters JM. Predicting residential ozone deficits from nearby traffic. Sci Total Environ 2006;363:166-74.

**37.** Zidek JV, Wong H, Le ND, Burnett R. Causality: measurement error and multicollinearity in epidemiology. Environmetrics 1996;7:441-51.

**38.** Schachter J. Geographical mobility: population characteristics. March 1999 to March 2000. Current population reports PPL-144. Washington, DC: Census Bureau, May 2001. (Accessed February 17, 2009, at http://www.census.gov/prod/2001pubs/p20-538.pdf.)

*Copyright © 2009 Massachusetts Medical Society.*

Downloaded from www.nejm.org by on March 13, 2009 .
Copyright © 2009 Massachusetts Medical Society. All rights reserved.

Return to this article

# High Country News

For people who care
about the West

# Cracking the ozone code in Utah's gas fields

by Cally Carswell

*Updated 9/4/2012*

On a bright February morning, a curiously adorned cargo van crept down a dirt road in northeastern Utah's Uintah Basin. A steel pole with a jumble of funnels strapped to its tip rose from the roof's rear, and the vehicle moved so slowly that its speed didn't even register -- a good thing, considering that its occupants were less focused on the road than they were on their computer screen's undulating lines.

"We're on the edge of it now," said driver Peter Edwards, an air chemist with the National Oceanic and Atmospheric Administration. "The blue line is the methane -- you'll see that jump right up. And we'll see the nitrogen oxide go up." As we entered a natural-gas well's plume, the funnels inhaled air, and instruments inside the van analyzed it. A decidedly low-tech piece of equipment -- a piece of string tied to the antenna -- stood rigid in the wind, allowing the researchers to eyeball which pieces of well-pad equipment they were downwind of when emissions spiked.

In recent years, frenzied drilling has brought many changes to this sparsely populated patch of the Colorado Plateau. Vernal, population around 9,000, has gained numerous hotels, a handful of Main Street retail stores, a Lowe's and several chain restaurants. Meanwhile, Uintah County's coffers have grown pleasantly plump with mineral royalties.

The boom has also brought some unexpected byproducts: concentrations of ground-level ozone that, on the worst days, rival those of the most polluted cities, where ozone and other airborne wastes combine to create smog. Ozone can cause acute respiratory ailments and aggravate asthma. At times, its concentrations here are almost double what the Environmental Protection Agency considers safe. (How the ozone has affected local health, though, has not been studied.)

It's a puzzling phenomenon that a team of NOAA scientists, including Edwards, spent this year trying to untangle. Unlike urban areas, where ozone events are a hallmark of summer, levels spike here in winter. So far, that is known to occur in only one other place in the world -- Wyoming's Upper Green River Basin, home to the Jonah and Pinedale Anticline gas fields.

Effective strategies for stifling ozone have been slow to take shape, in large part because how it forms in

winter is still only partially understood. Even basic data -- such as the source-by-source emissions inventory the van was collecting -- have been lacking. Many years into a region-wide drilling boom, this points to an uneasy reality: Energy development has significantly outpaced our grasp of its effects on the environment and public health.

"It's important to understand the impacts of our energy economy," says Jim Roberts, a NOAA scientist who headed up the Utah ozone research last winter. "We may need to make choices around that" -- such as how rapidly we punch new wells, and how tightly drillers are required to control certain emissions. It's an issue of national importance, he says. "Why don't you see (wintertime ozone) in eastern Colorado? Why not western Pennsylvania or upstate New York?"

**In 2005,** the Wyoming Department of Environmental Quality began monitoring in the Upper Green River Basin in winter to get a handle on air quality before major oil and gas development occurred. Drilling had revved up the year before, and that first winter, ozone concentrations were nearly 25 percent above what's allowed under federal law.

The data shocked even the most well-versed ozone scientists. It's surprising enough to see this happening so far from the congested highways at the root of urban ozone and smog. But the timing of the episodes, in winter, was even more baffling, because the humidity and intense solar radiation thought necessary to start the chemical reaction that turns certain pollutants into ozone were missing.

By 2009, NOAA researchers had pieced together circumstantial information about Wyoming's worsening winter ozone events. Ozone spiked when temperature inversions trapped and concentrated pollutants near the valley floor. Extensive snow cover made a difference, too: Sunlight reflecting off it created enough radiation, scientists theorized, to set off the reactions that create ozone. In winter 2010, startlingly high ozone levels were documented in Utah's Uintah Basin under similar conditions.

In both places, booming natural gas fields seemed the source of ozone's primary ingredients: nitrogen oxides from diesel trucks and engines that run compressors and other equipment; and volatile organic compounds, present in the gas itself.

Knowing the source of emissions is enough to devise remedies for many pollution problems. Take sulfate particles, another contributor to smog. Power plants emit sulfur dioxide, which creates sulfate. When plants install scrubbers that capture most sulfur dioxide emissions, you get fewer sulfate particles in the air.

Ozone is much more complicated. "It's a weird beast," says Leonard Herr, the Bureau of Land Management's air-quality specialist for Utah. "You can't just control one thing." Nitrogen oxides (NOx) and volatile organic compounds (VOCs) are the basic building blocks, but you also need reactive atoms or molecules called free radicals -- created when sunlight reacts with things like nitrous acid, a byproduct of NOx, or ozone itself -- to jumpstart the process, the way a spark makes fire out of fuel. But there's no universal recipe; which free radicals react with which VOCs and NOx differs from region to region. Moreover, some environments are sensitive to NOx, meaning that if it's reduced, ozone will be too. Others are sensitive to VOCs. It's even possible to reduce NOx in a VOC sensitive environment, and end up slightly increasing ozone.

So managing ozone requires extraordinary prudence, plus a nuanced understanding of the chemistry that creates it in each locale. Neither Utah nor Wyoming has reached that level of understanding.

The NOAA team intended to change that. For six weeks last winter, they worked out of a sort of man camp in the heart of the gas field. A rental RV -- housing for grad students monitoring a balloon measuring pollution above the surface -- sat alongside trailers and what looked like miniature shipping containers,

jammed with instruments measuring pollutants. Wind sensors helped the researchers see how plumes moved. And a team toured the field daily in the van, collecting real-time emissions data from each link of the production chain. If the chemists in the temporary labs could figure out which pollutants were the ozone conspirators, the van could help identify their origins.

Only two things were missing: snow and inversions. The scientists charged with unraveling the ozone riddle and recommending fixes found themselves in the ironic position of wishing for dirty days for the sake of science. But they never materialized. And so, there was no ozone to study.

"We're kind of stuck halfway right now," Roberts says. They did collect some information: They ruled out a nearby coal-fired power plant as a major contributor; although it spews plenty of NOx, its plume travels above the level of inversions. And they believe wintertime ozone has been seen only in the Utah and Wyoming basins because of the way topography restricts air movement during inversions. VOC emissions were found to be especially high from evaporation ponds and during flowback -- the period after a well is hydrofractured when the fracking fluid, gas and other hydrocarbons are regurgitated. The compounds found aren't typically very reactive in small amounts, says Roberts, but their concentrations were very high. NOx levels were sufficient to create ozone, but not particularly high.

"We think there may be some chemistry happening in the snow itself," he says, but it couldn't be studied since there was no snow.

They suspect that this year, with no ozone events, was the anomaly, not the previous two, when snow cover was thick and ozone levels were frequently high. So NOAA, the state and their partners hope to procure funding to study the basin again next year. "The emissions inventory work, gathering fingerprints of sources was successful," says Brock LeBaron, deputy director of air quality for the Utah DEQ, and the state's point person for the study. "Still, the fundamental question is: Should you go after the VOCs, or should you go after NOx?"

Without an answer, it's hard to draft a sure-fire mitigation plan. In the meantime, though, regulators in both Wyoming and Utah are "casting a big net" when it comes to pollution controls, as Wyoming's air quality chief, Steve Dietrich, puts it. "We'd be remiss if we concentrated on VOCs and didn't concentrate on NOx. So we're trying to reduce both of them."

"Green completions," which capture hydrocarbons and VOCs during flowback, are required throughout the Upper Green River Basin, and for new projects in the Uintah Basin, where such projects have been approved only if they install technology such as low-bleed valves to control VOC leaks from well-pad equipment; minimize truck trips; use clean-burning engines at drill rigs; and add any additional controls deemed necessary as regulators' understanding of local ozone chemistry advances. The state and BLM also hope to work with industry to ensure no net increase in emissions, beginning next winter. Wyoming drillers have taken similar steps. Most of these measures aren't legally required, but the industry and states have been trying to avoid becoming 'non-attainment' zones for ozone pollution, an EPA designation that can bring mandatory -- and probably expensive -- regulations, and could limit new energy development.

Since 2009, the industry estimates that it's reduced VOC emissions by 21 percent, and NOx by 17 percent, in the Upper Green River Basin. Yet despite these emissions cuts, the problem persists. The EPA just declared the Upper Green River Basin a non-attainment zone, underscoring the need for better information to shape a strategy. Utah lacks such statistics because it's just begun requiring NOx and VOC controls of big new projects in development.

"The Uintah Basin has a couple years, probably, where we can try some out-of-the-box proactive strategies,"before the EPA enters the fray, says the BLM's Herr. Still, in that short time,  he says, "It's kind of a long shot that we'll be able to solve it."

© High Country News

**American Lung Association ● American Public Health Association
Amercan Thoracic Society ●  Asthma and Allergy Foundation of America
Trust for America's Health**

November 30, 2011

The Honorable Lisa P. Jackson
Administrator
U.S. Environmental Protection Agency
EPA Docket Center
Air and Radiation Docket, Mail Code 28221T
1200 Pennsylvania Avenue, NW
Washington, DC 20460

Re: Oil and Natural Gas Sector: Reviews of New Source Performance Standards and National
Emissions Standards for Hazardous Air Pollutants.  Docket ID No. EPA-HQ-OAR-2010-0505

Dear Administrator Jackson:

On behalf of our nation's medical and public health groups, we urge the U.S. Environmental
Protection Agency to adopt the strongest possible standards to reduce harmful emissions from
the production wells, processing plants, transmission pipelines, and storage units within the oil
and natural gas industry.  As public health groups and medical societies, we are keenly aware of
the harmful health effects of these air pollutants.  Research has shown that these pollutants can
harm the circulatory, respiratory, nervous, and other essential and vital life systems.  These
emissions can even cause cancer, developmental disorders, and premature death.  The cleanup of
air pollution from oil and natural gas wells is necessary for the protection of public health,
appropriate for the EPA to undertake, and of growing importance.  We applaud EPA's efforts to
respond to this growing source of air pollution and appreciate the opportunity to provide
comments.

**Air Pollution from Oil and Natural Gas Sectors**

We agree with the strong evidence the EPA provides to support their decision that action under
Sections 111 and 112 of the Clean Air Act is both appropriate and necessary to protect public
health.  The Clean Air Act requires that EPA review and revise standards to see if they
adequately protect public health from new sources of pollution and from hazardous air
pollutants.  The expanding oil and natural gas production in the United States represents sources
of such emissions that must be addressed under the law.

Emissions can occur during the extraction, production, processing, flaring, transportation and distribution of oil and natural gas. Those emissions can be vented to the atmosphere (intentionally or unintentionally) and impact air quality and must be adequately addressed under the proposed rules. Additionally, the large engines used in drilling and production processes burn fossil fuels and produce emissions. Although those impacts are not covered under these proposed rules, they can particularly add to the air pollution burden affecting local communities.

The rapid development of high volume/horizontal drilling in conjunction with hydraulic fracturing ("fracking") technologies to recover natural gas from shale formations has driven the expansion of new sources, as it rapidly expanded the nation's supply of natural gas resources. As recently as 2001, shale gas made up less than two percent of U.S. production of natural gas. It tripled to six percent in 2006 and doubled again to 12 percent in 2008. As of July 2011, estimates place shale gas at 29 percent of natural gas produced outside of Alaska and Hawaii. (SEAB, 2011). Natural gas production is also expanding into new areas of the country, including highly populated areas, such as western Pennsylvania. In 2009, Pennsylvania had only one percent of natural gas development but now has one of the largest expansions of shale gas production underway with 1,650 wells reportedly producing as of June 30, 2011 (SEAB, 2011; Olson, 2011). EPA's own estimates project shale gas to make up 45 percent of all natural gas production by 2035 (EPA, 2011e).

The expansion of oil and gas production has led to astonishing and unhealthy concentrations of ozone in unexpected areas. In Sublette County, Wyoming, 8-hour ozone concentrations in February 2008 reached as high as 122 ppb (EPA Air Data, 2008). Sublette County currently has a design value of 78 ppb for 2008-2010, well in excess of the 2008 national ambient air quality standards (EPA, 2011d).

## Overall Comments

We recommend EPA include both new and existing sources of air pollution related to oil and natural gas production, not just new ones. EPA should require cleanup of all existing equipment—especially compressors, pneumatic controllers and valves—throughout the process. Stronger limits on emissions are in place in Wyoming, California, and Colorado and should be incorporated into EPA's final rule. For example, Wyoming's current rule requires 98 percent control of volatile organic compounds (VOCs) and hazardous air pollutants from storage vessels, not 95 percent as the EPA rule proposes. Also, some local air quality control districts in California require that well cellars, sumps, and pools of oil be covered to prevent VOC emissions.

We applaud EPA's efforts to bring more modern systems into the measures and monitoring, including the use of better monitoring tools to detect leaks or fugitive emissions. We urge EPA

to incorporate these requirements into the rules for existing facilities, as Colorado is using in ozone nonattainment areas. EPA can help the producers save valuable energy that is being lost and help reduce methane emissions. However, we do urge EPA to target methane reductions specifically and not just including them as a co-benefit of the VOC reductions.

**Malfunctions**. We appreciate EPA's proposal to apply the Section 111 and 112 provisions at all times, including startup and shutdown. However, we urge EPA to review the exposure estimates to recognize that significant air emissions are likely to result from malfunctioning equipment as well. EPA needs to acknowledge that malfunctions are likely events which must be factored into the exposure estimates. EPA's language implies that these are rare events, but such is not the case, as recent reports have shown. For example, the Louisiana Bucket Brigade released a report last week that calculated one accidental release per day in Louisiana for the past six years. (Louisiana Bucket Brigade, 2011) The historical industry evidence should provide more than adequate information on likely malfunctions and exposures.

Unfortunately, the proposed "affirmative defense" option creates a loophole that will not likely reduce the risk of malfunctions, providing facilities with a way to avoid penalties that could provide incentives to reduce malfunctions. The EPA needs to close this loophole as they develop standards under Section 111 and 112 of the Clean Air Act to limit emissions during all phases of operation, including when equipment fails to work properly.

**Major source determination**. We urge that the guidance clearly require that the threshold of a "major source" be based on evaluations of both the emissions in a single source within the facility and in a facility-wide assessment of all similar sources. If more than one source would not meet the individual requirements, then the total emissions from those sources in a facility should be evaluated to determine if they collectively meet the threshold. We are concerned about the possibility that a facility that has multiple "non-major" sources all of which fall just below the threshold for classification as a major source could avoid having to comply with the requirements. While we support looking at the emissions from each source in a facility, we also do not want to have multiple smaller sources ignored because they fit under the threshold.

**Water ponds.** We also support measures to require permits and controls on "produced" water ponds used in the extraction process. These ponds can emit large amounts of volatile organics. A number of air quality districts in California have long required controls on volatile emissions from produced water ponds. For example, the Santa Barbara County, California Air Pollution Control District requires controls for emissions from covered ponds (SBC APCD, 1994).

### Risks to populations likely greater than estimated in proposal

As oil and gas extraction have expanded, emissions from those sectors have increased. Emitted into the air during oil production and natural gas production (both conventional and hydraulically

fractured) are sulfur dioxide and volatile organic compounds (VOCs), which includes gases considered "air toxics" and methane. Using 2005 data, EPA estimates that hydraulically fractured wells are the source of 500,000 tons of VOC emissions each year. EPA also acknowledges that the oil and natural gas sector as a whole emits significant amounts of air pollutants that seriously threaten human health. In EPA's proposed rule, they report that the industry emits 2.2 million tons of VOCs, 130,000 tons of air toxics, and 16 million tons of greenhouse gases (methane) each year (40% of all methane emission in the U.S.). The industry is one of the largest sources of VOCs and sulfur dioxide emissions in the United States (EPA, 2011a; 2011b).

We applaud the EPA's intent to incorporate an "ample margin of safety" approach to determining risk exposure to the air toxics. That approach recognizes that the scientific knowledge can never be exact and the intent of the Clean Air Act is to protect health from such dangerous emissions. However, EPA's tools incorporated in the review have some significant limitations that need addressing in the final rule.

First, the inventory of emissions used to develop this assessment is woefully out of date. The EPA used the 2005 version of the National Emissions Inventory (NEI), a six-year-old inventory which does not cover all toxics that are detected at oil and natural gas wells and does not account for the recent rapid growth in hydraulic fracturing in the industry. In the final rule, EPA should at least use a much more up-to-date estimate of the emissions, as even the 2008 inventory— newer than the one referenced in this rule—misses the current and projected reality. A better choice would be to use actual measured emissions data, since EPA has the authority under Section 114 of the Clean Air Act to request it.

The problems with these data create other limitations in understanding and assessing the potential risk as well, especially risks to children, older adults, and in the environmental justice analysis. EPA has worked hard to assess the potential for disproportionate harm on different demographic groups who may be exposed to these hazardous pollutants. However, EPA had to rely on data drawn from the 2000 Census, now 11 years old, which is missing the significant changes in the composition, distribution, and economic status that have occurred since then. With expanded well production comes expanded exposure to different and changing populations. Because of this, EPA needs to incorporate a wider margin for assessing risk provides a more appropriate basis for evaluating the threats.

The discussion of risk to children needs to include a better assessment of the current evidence about the risk to their health. Children face quite different risks from air pollutants than adults. The lungs and their alveoli are not fully grown until children become adults (Dietert et al., 2000). Biological defenses that help adults fight off infections are still developing in young bodies (WHO, 2005). Furthermore, children don't behave like adults, and their behavior also affects

their vulnerability. They are outside for longer periods and are usually more active when outdoors. Consequently, they inhale more polluted outdoor air than adults typically do (AAP, 2004).

Toxic substances may put children more at risk than adults. For example, the California Environmental Protection Agency explored improved methodologies to determine susceptibility to carcinogens *in utero* and childhood after finding in 2001 that the existing approaches did not adequately reflect the risks to children. Their subsequent research found that the children generally display greater sensitivity to environmental carcinogens than did adults (CEPA, 2009). They recommended a more protective adjustment to risk assessments to reflect that greater risk. We urge EPA to examine and use the most current research on these and other cumulative impacts for children and adults in developing the "ample margin of safety."

Communities of color and poorer people also appear to face higher risk, underscoring the need to properly assess this margin of safety. Research indicates that minorities live in greater concentrations both in areas that do not meet federal air quality standards and in areas with above average numbers of air-polluting facilities (NAS, 1999).  Both African Americans and Hispanics have been found to be more likely than Caucasians to live in areas with high levels of air toxics (Morello-Frosch and Lopez, 2006).

- A study in Maryland found that the risk of cancer related to air toxics was greatest in areas with the largest African American population proportions and lowest among those with the smallest African American population proportions. In addition, the estimated cancer risk decreased for every 10 percent increase in the percentage of Caucasians living in an area. Having a low income also increased the risk among African Americans more so than among Caucasians (Apelberg BJ et al., 2005).

- In Houston, Houston is home to one of the world's largest petrochemical complexes, researchers found that the risk of cancer in an area increased along with the proportion of the population that was Hispanic and as measures of social disadvantage increased (Linder et al., 2008).

- Socioeconomic position has been more consistently associated with greater harm from air pollution. Recent studies show evidence of that link. Low socioeconomic status consistently increased the risk of premature death from fine particle pollution among 13.2 million Medicare recipients studied in the largest examination of mortality associated with particulate matter levels nationwide (Zeger et al., 2008).

**Risks from specific emissions and pollutants**

Not only is there clear evidence of harm directly from emissions of sulfur dioxide, nitrogen oxide and VOCs, but from ozone and fine particulate matter ($PM_{2.5}$) as well. VOCs, nitrogen oxides

and sulfur dioxide are precursors to ozone and fine particulates, also pose a significant threat to human health. These pollutants can cause or increase risk of cardiovascular, respiratory, and other acute and chronic systemic damage, and may increase risk of cancer. The standards will help reduce ozone and fine particulate matter levels in areas where oil and gas production occurs and downwind. The air toxics standards for oil and natural gas wells will also reduce hazardous air pollutants, including the risk of benzene and formaldehyde, both carcinogens, in the oil and gas production process and for transmission and storage. The discussion below summarizes the evidence that these pollutants pose serious threats to health and must be reduced.

### Sulfur Dioxide (SO₂)

Sulfur dioxide ($SO_2$) a gaseous air pollutant composed of sulfur and oxygen. Sulfur dioxide is emitted during the production and processing operations for some sulfur-containing fuels. The sulfur dioxide standard will help reduce this harmful pollutant, long recognized for its harm to health. Sulfur dioxide causes a range of harmful effects on the lungs, including wheezing, coughing, shortness of breath and chest tightness, and other problems, especially during exercise or physical activity. Continued exposure at high levels aggravates asthma, increases respiratory symptoms, and reduces the ability of the lungs to function. Short exposures to peak levels of $SO_2$ in the air can make it difficult for people with asthma to breathe when they are active outdoors. Rapid breathing during exercise helps $SO_2$ reach the lower respiratory tract, as does breathing through the mouth. $SO_2$ pollution increases the risk of hospital admissions or emergency room visits, especially among children, older adults, and people with asthma (EPA, 2009a). In addition, sulfur dioxide poses another threat to human health by reacting in the air to form sulfates ($SO_4$) which exist as aerosolized fine particulate matter ($PM_{2.5}$), another harmful air pollutant discussed below (EPA, 2009b).

### Nitrogen Oxides (NOₓ)

Nitrogen oxides ($NO_x$) are a class of gaseous air pollutants composed of nitrogen and oxygen. NOx is emitted during the combustion of natural gas in engines, turbines, heaters, and boilers during production and processing operations for oil and gas wells. NOx is also emitted during pit flaring of VOC emissions from well completions. The pollutant itself can inflame the airways and reduce lung function, worsened cough and wheezing, increase asthma attacks and hospital visits; and increase risk of respiratory infection (EPA, 2008). EPA's own review of the science found that exposure to NOx can increase the risk of hospitalization by up to 20 percent (EPA, 2008). Nitrogen oxides are also precursors to nitrates ($NO_3$) which also are recognized as aerosolized fine particulate matter ($PM_{2.5}$) and discussed below. (EPA 2009b)

### Fine Particulate Matter (PM₂.₅)

Reductions in sulfur dioxide and nitrogen oxides through the final oil and natural gas wells standards would provide a crucial collateral benefit: reduction in secondary fine particulate matter. Sulfates formed from sulfur dioxide comprise the majority of fine particulate matter in

much of the United States, especially in the summer months.  Nitrates from nitrogen oxides are also a major source of fine particulate matter in the fall, winter and spring (EPA, 2011c).  $PM_{2.5}$ is made up of microscopic particles, including aerosols, that can bypass the body's natural defenses and lodge deep within the lungs (EPA, 2004, 2009b).  Fine particles elevate risk of heart attacks and strokes (Dominici et al., 2002; Hong et al., 2002; Franklin et al., 2007; D'Ippoliti et al., 2003; Miller et al., 2007); stunt lung function and development (Gauderman et al., 2002; Gauderman et al., 2004); inflame and damage lung tissue and airways (Ghio et al., 2000; Churg et al., 2003); increase hospital visits for respiratory and cardiovascular problems (Dominici et al., 2006; Tsai et al., 2003); and aggravate asthma attacks (Lin M et al., 2002; Norris et al., 1999; Tolbert et al., 2000; Slaughter et al., 2003; Lin et al., 2002b).  The evidence shows that $PM_{2.5}$ causes cardiovascular harm and is likely to cause respiratory harm.  More seriously, $PM_{2.5}$ can cause premature death from lung cancer and cardiovascular effects and is likely to cause death from respiratory effects as well (Pope et al., 2002; Pope et al., 2004).

The most vulnerable populations, including children, teens, senior citizens, people with low incomes and people with chronic lung disease, such as asthma, chronic bronchitis, and emphysema, are at risk of being sickened by fine particulate matter.  People with diabetes, heart disease, high blood pressure, coronary artery disease, and congestive heart failure, are also at risk (EPA, 2004, 2009b). The evidence suggests that long-term exposure to $PM_{2.5}$ causes reproductive and developmental effects as well as cancer, mutagenicity and genotoxicity (EPA,  2009b).

### *Volatile Organic Hazardous Air Pollutants*

Volatile organic hazardous air pollutants are specific toxic gases that react easily with other gases and particles. These take in a host of carcinogens and other toxins.  According to the EPA's Regulatory Impact Assessment, six organic hazardous air pollutants dominate the mass from oil and natural gas wells and can most harm human health: benzene, toluene, carbonyl sulfide, ethylbenzene, mixed xylenes, and n-hexane. Other major hazardous air pollutants from wells include formaldehyde, ethylene glycol, methanol, and 2,2,4-trimethylpentane.

Many of these toxic air pollutants can cause cancer, but they can also irritate the eyes, skin, and respiratory tract, impair lung function, and affect vital organs.  Benzene and formaldehyde are recognized as known human carcinogens, while ethylbenzene is considered a probable carcinogen (HHS, 2011).  Long-term exposures to benzene can cause leukemia, a blood cancer, and other blood disorders such as anemia and depressed lymphocyte count in blood.  Exposure to formaldehyde can also cause chronic bronchitis and nasal epithelial lesions. A recent review of the research found evidence that formaldehyde may increase the risk of asthma, particularly in the young (McGwin et al., 2010).  Non-cancer effects associated with exposure to these organics range from irritation of the skin, eyes, nose, throat, and respiratory tract, and dizziness, nausea, and vomiting.  These compounds can also cause difficulty in breathing, impaired lung function and respiratory symptoms, damage to the liver and kidneys, and stomach discomfort.  They may

also cause developmental disorders, adverse effects to the nervous system, impairment of memory and neurological function, and slow response to visual stimuli. These pollutants can also affect hearing, speech, vision, and motor coordination (ATSDR, 1999a, 1999b, 2000, 2007a, 2007b, 2010).

### Volatile Organic Compounds as Precursors to Ozone (O₃)

One of the most crucial aspects of the rule is the limit it sets on the amount of volatile organic compounds (VOCs) that are emitted by oil and natural gas wells. Cleaning up VOCs with these standards is critical to protecting human health. As noted above, many VOCs are hazardous air pollutants. However, VOCs are also precursors to the secondary formation of ozone when they react with nitrogen oxides (NOx) in the presence of sunlight. By limiting emissions of VOCs, the proposed oil and natural gas standard will indirectly reduce the amount of secondary ozone formed in the air, human exposure to ozone, and the incidence of ozone-related health effects.

Ozone is a colorless, odorless gas that reacts chemically ("oxidizes") with internal body tissues, such as those in the lung. Some have described the inflammation that ozone causes in the airways as similar to a "sunburn" on the lungs. It acts as a powerful respiratory irritant at the levels frequently found across the nation during the summer months. Breathing ozone may lead to shortness of breath and chest pain (Horstman et al., 1990; McDonnell et al., 1999), wheezing and coughing (Triche et al., 2006); inflammation of the lung lining (Mudway and Kelly, 2004); increased risk of asthma attacks (Mortimer et al., 2002), increased susceptibility to respiratory infections (Hollingsworth et al., 2007), and need for medical treatment and for hospitalization for people with lung diseases, such as asthma or chronic obstructive pulmonary disease (COPD) (EPA, 2006; Lin et al., 2008); and premature death (Bell et al., 2005; Levy et al., 2005; Ito et al., 2005; NRC, 2008).

The most vulnerable individuals, including children, teens, senior citizens, people who exercise or work outdoors, and people with chronic lung diseases like asthma, COPD, and emphysema, are most in danger of being sickened by ozone (Peters, 1997; Delfino et al., 1998; Gauderman et al., 2002; Lin S et al., 2002; Gent et al., 2003,; Desqueyroux et al., 2003; Lin et al., 2008). So-called "responders," otherwise healthy individuals who experience health effects at lower levels of exposure than the average person, are also susceptible to ozone (Devlin, 1993). Children who grow up in areas of high ozone pollution may never develop their full lung capacity as adults. That can put them at greater risk of lung disease throughout their lives (Kunzli et al., 1997).

### Methane (CH₄)

Although the health effects of methane have been more commonly addressed as a result of methane's role as a precursor to ozone or as a greenhouse gas, methane itself also poses a serious health risk. Methane is also a VOC, but is an odorless gas that can burn or explode at concentrations of 5 percent to 15 percent by volume of air (ATSDR, 2001). At high

concentrations, methane can also displace enough oxygen to cause a deficiency in the air, leading to unconsciousness and even death by suffocation (NIOSH, 1985). Methane is a major concern especially from an occupational safety and health standpoint for workers at natural gas wells who would be exposed to high volumes of the gas during the hydraulic fracturing process.

In addition to its direct health effects, methane poses another risk as a powerful and potent greenhouse gas that is a cause of climate change. Although the standards do not directly reduce methane, the reductions in VOCs will also cut methane. Greenhouse gases pose multiple long-term threats to human health. Warmer temperatures and changing climates can make ozone levels higher than they would be otherwise. Wildfires and dry soil dust resulting from warmer temperatures can increase concentrations of particle pollution, which can be inhaled deep into the lungs. Pollen and allergens may increase (IPCC, 2007; WHO, 2003).

Although the standards do not directly reduce methane, the reductions in VOCs will also cut methane. The EPA has identified the oil and gas industry as the "single largest contributor to United States anthropogenic methane emissions" (EPA, 2011f). As recently recommended by the U.S. Department of Energy's Advisory Board on Shale Gas Production, the EPA should include methane in the oil and gas standards and directly reduce methane emissions on both new and existing pollution sources (SEAB, 2011). The EPA should require the installation of effective and readily available control technologies on both new and existing equipment.

**Preventing the emission of these air pollutants will protect human health**

The proposed standards on the oil and gas industry are a good step towards protecting the health of Americans. The VOCs, air toxics, and sulfur dioxide reductions in the proposed rule are expected to improve outdoor air quality, reduce cancer risk from air toxics emissions, and reduce health effects associated with exposure to ground-level smog and fine particle pollution. People most at risk of harm from breathing these air pollutants who are depending on the EPA to take action to clean up air pollution from the oil and natural gas industry include: infants, children and teenagers; older adults; pregnant women; people with asthma and other lung diseases; people with cardiovascular disease; diabetics; people with low incomes; and healthy adults who work or exercise outdoors.

People with chronic diseases, including cardiovascular diseases, respiratory diseases and diabetes, face higher risk regardless of age. Their diseases make them at much higher risk for harm. Current estimates include these groups:

- Asthma - 24.6 million people, including 7.0 million under age 18 (American Lung Association, 2011)
- Cardiovascular diseases – 82.6 million people (Roger et al., 2011)
- Diabetes – 25.8 million people (CDC, 2011)

- Chronic Obstructive Pulmonary Disease (COPD)—12.1 million adults age 18 and older (American Lung Association, 2010)

As adults age, their body's physiological process decline naturally, placing even healthy older adults at risk from airborne pollutants.  In addition, many older adults also have one or more chronic diseases that increase their susceptibility (EPA, 2009).

Particularly at risk are people with low incomes and some racial and ethnic groups. Scientists have speculated that there are three broad reasons why disparities may exist. First, pollution sources may be located near disadvantaged communities, increasing exposure to harmful pollutants. Second, low social position may make some groups more susceptible to health threats because of factors related to their disadvantage. Lack of access to health care, grocery stores and good jobs, poorer job opportunities, dirtier workplaces or higher traffic exposure are among the factors that could handicap groups and increase the risk of harm. Finally, existing health conditions, behaviors, or traits may predispose some groups to greater risk. For example, diabetics are among the groups most at risk from air pollutants, and the elderly, Blacks/African-Americans, Mexican-Americans and people living near a central city have higher incidence of diabetes (O'Neill et al., 2003).

**Conclusion**

According to the EPA estimates, these new standards will result in the following emissions reductions each year (EPA, 2011a):
- VOCs: an industry-wide reduction of 25 percent (540,000 tons)
- Air toxics, or hazardous air pollutants: a reduction of nearly 30 percent (38,000 tons)
- Methane: a reduction of about 26 percent (3.4 million tons).

We support EPA's efforts to greatly reduce emissions, but more can be done.

We urge EPA to do more to protect public health: update the section 111 emission guidelines for existing sources as well as making final the New Source Performance Standards for new or expanded sources; update and incorporate the 2011 existing and projected emissions inventory; follow the lead of states such as Colorado and Wyoming to ensure more protective limits on emissions and stronger control requirements; improve the detection and control of leaks and fugitive emissions; target methane with specific control requirements; and require planning for responding to the all-too-frequent problem of malfunction.

These emissions not only harm human health, they waste money. Essentially, gas products are escaping into the air, and these standards provide a proven approach to protect health and save money. EPA has calculated that these measures to install cleanup technologies will save the

industry $30 million annually even as they cut emissions of benzene and other air toxics, as well as volatile organic compounds, sulfur dioxide, ozone, and fine particulate matter.

The updated standards will level the playing field by relying on existing, cost-effective technology and will institutionalize best practices that are already in place in some states.  The technologies and best practices allow oil and gas well operators to capture and sell natural gas that currently escapes into the air, threatening public health and wasting a valuable resource.

The adoption of the safeguards against air pollution from oil and natural gas production, as required under the Clean Air Act, will protect the public from life-threatening pollution. Limiting emissions from oil and natural gas production will yield tremendous benefits and significantly reduce adverse health effects.

The nation needs the EPA to strengthen the oil and natural gas standards to effectively protect the health of our patients and our communities.  The standards must be strengthened to keep up with the expansions and the new technology in the oil and gas industry.  The EPA has a historic and momentous opportunity to clean the air of notoriously harmful pollutants that endanger human health.  Our organizations call on the EPA to adopt strong, final oil and natural gas standards by February 28, 2012, and give our patients and communities the clean air they deserve.

Sincerely,


Janice E. Nolen
Assistant Vice President, National Policy
and Advocacy
American Lung Association

Donald P. Hoppert
Director, Government Relations
American Public Health Association


Gary Ewart
Director, Government Relations
American Thoracic Society

Charlotte Collins, J.D.
Vice President of Policy and Programs
Asthma and Allergy Foundation of America

Rebecca  Salay
Director of Government Relations
Trust for America's Health

## References Cited

Agency for Toxic Substances and Disease Registry (ATSDR). 1999a. Toxicological profile for Formaldehyde. Atlanta, GA: U.S. Department of Health and Human Services, Public Health Service.Web link: http://www.atsdr.cdc.gov/toxprofiles/tp111-c2.pdf [Accessed: 17 October 2011].

Agency for Toxic Substances and Disease Registry (ATSDR). 1999b. Toxicological profile for *n*-Hexane. Atlanta, GA: U.S. Department of Health and Human Services, Public Health Service. http://www.atsdr.cdc.gov/toxprofiles/tp113-c2.pdf [Accessed: 17 October 2011].

Agency for Toxic Substances and Disease Registry (ATSDR). 2000. Toxicological profile for Toluene. Atlanta, GA: U.S. Department of Health and Human Services, Public Health Service.  Web link: http://www.atsdr.cdc.gov/ToxProfiles/tp56-c2.pdf [Accessed: 17 October 2011].

Agency for Toxic Substances and Disease Registry (ATSDR). 2001. Landfill Gas Primer – An Overview for Environmental Health Professionals: Chapter 3 – Landfill Gas Safety and Health Issues.  Atlanta, GA: U.S. Department of Health and Human Services, Public Health Service.  Web link: http://www.atsdr.cdc.gov/HAC/landfill/html/ch3.html [Accessed: 17 October 2011].

Agency for Toxic Substances and Disease Registry (ATSDR). 2007a. Toxicological profile for Benzene. Atlanta, GA: U.S. Department of Health and Human Services, Public Health Service.  Web link: http://www.atsdr .cdc.gov/ToxProfiles/tp3-c3.pdf [Accessed: 17 October 2011].

Agency for Toxic Substances and Disease Registry (ATSDR). 2007b. Toxicological profile for Xylenes. Atlanta, GA: U.S. Department of Health and Human Services, Public Health Service.   Web link: http://www.atsdr.cdc.gov/ToxProfiles/tp71-c3.pdf [Accessed: 17 October 2011].

Agency for Toxic Substances and Disease Registry (ATSDR). 2010. Toxicological profile for Ethylbenzene. Atlanta, GA: U.S. Department of Health and Human Services, Public Health Service.  Web link: http://www.atsdr.cdc.gov/ToxProfiles/tp110-c3.pdf [Accessed: 17 October 2011].

American Lung Association. 2010. Trends in COPD (Chronic Bronchitis and Emphysema): Morbidity and Mortality. Web link: http://www.lungusa.org/finding-cures/our-research/trend-reports/copd-trend-report.pdf.

American Lung Association. 2011. Trends in Asthma Morbidity and Mortality. Web link: http://www.lungusa.org/finding-cures/our-research/trend-reports/asthma-trend-report.pdf.

American Academy of Pediatrics (AAP) Committee on Environmental Health. Ambient Air Pollution: Health Hazards to Children. *Pediatrics* 2004; 114: 1699-1707.

Apelberg BJ, Buckley TJ, White RH. Socioeconomic and Racial Disparities in Cancer Risk from Air Toxics in Maryland. *Environmental Health Perspectives*. June 2005;113(6):693-9.

Bell ML, Dominici F, Samet JM. A Meta-Analysis of Time-Series Studies of Ozone and Mortality with Comparison to the National Morbidity, Mortality, and Air Pollution Study. *Epidemiology* 2005; 16:436-445.

Centers for Disease Control and Prevention. (CDC) 2011. National Diabetes Fact Sheet: National Estimates and General Information on Diabetes and Prediabetes in the United States, 2011. Atlanta, GA: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention.

Churg A, Brauer M, Avila-Casado MdC, Fortoul TI, Wright JL. Chronic Exposure to High Levels of Particulate Air Pollution and Small Airway Remodeling. *Environmental Health Perspectives* 2003; 111:714-718.

Delfino RJ, Murphy-Moulton AM, Becklake MR. Emergency room visits for respiratory illnesses among the elderly in Montreal: Association with low level ozone exposure. *Environmental Research* 1998;76:67-77.

Desqueyroux H, Pujet JC, Prosper M, Le Moullec Y, Momas I. Effects of air pollution on adults with chronic obstructive pulmonary disease. *Archives of Environmental Health* 2002;57:554-560

Devlin RB. Identification of subpopulations that are sensitive to ozone exposure: Use of end points currently available and potential use of laboratory-based end points under development. *Environmental Health Perspectives* 1993;101:225-230.

Dietert RR, Etzel RA, Chen D, et al. Workshop to Identify Critical Windows of Exposure for Children's Health: Immune and Respiratory Systems Workgroup Summary. *Environmental Health Perspectives* 2000; 108 (supp 3); 483-490.

D'Ippoliti D, Forastiere F, Ancona C, Agabity N, Fusco D, Michelozzi P, Perucci CA. Air Pollution and Myocardial Infarction in Rome: A Case-Crossover Analysis. *Epidemiology* 2003;14:528-535.

Dominici F, McDermott A, Zeger SL, Samet JM. On the Use of Generalized Additive Models in Time-Series Studies of Air Pollution and Health. *American Journal of Epidemiology* 2002;156:193-203

Dominici F, Peng RD, Bell ML, Pham L, McDermott A, Zeger SL, Samet JM. Fine Particulate Air Pollution and Hospital Admission for Cardiovascular and Respiratory Diseases. *Journal of the American Medical Association* 2006;295:1127-1134.

Franklin M, Zeka A, Schwartz J. Association Between PM2.5 and All-Cause and Specific-Cause Mortality in 27 U.S. Communities. *Journal of Exposure Science and Environmental Epidemiology* 2007;17:279-287.

Gauderman WJ, Gilliland GF, Vora H, Avol E, Stram D, McConnell R, Thomas D, Lurmann F, Margolis HG, Rappaport EB, Berhane K, Peters JM. Association between Air Pollution and Lung Function Growth in Southern California Children: results from a second cohort. *American Journal of Respiratory and Critical Care Medicine* 2002;166:76-84.

Gauderman WJ, Avol E, Gilliland F, Vora H, Thomas D, Berhane K, McConnell R, Kuenzli N, Lurmann F, Rappaport E, Margolis H, Bates D, Peters J. The Effect of Air Pollution on Lung Development from 10 to 18 Years of Age. *New England Journal of Medicine* 2004;351:1057-1067

Gent JF, Triche EW, Holford TR, Belanger K., Bracken MB, Beckett WS, Leaderer BP. Association of low-level ozone and fine particles with respiratory symptoms in children with asthma. *JAMA* 2003;290:1859-1867.

Ghio AJ, Kim C, Devlin RB. Concentrated Ambient Air Particles Induce Mild Pulmonary Inflammation in Healthy Human Volunteers. *American Journal of Respiratory and Critical Care Medicine* 2000;162:981-988.

Hollingsworth JW, Kleeberger SR, Foster WM. Ozone and pulmonary innate immunity. *Proc Am Thorac Soc* 2007;4:240-246.

Hong Y-C, Lee J-T, Kim H, Ha E-H, Schwartz J, Christiani DC. Effects of Air Pollutants on Acute Stroke Mortality. *Environmental Health Perspectives* 2002;110: 187-191.

Horstman DH, Folinsbee LJ, Ives PJ, Abdul-Salaam S, McDonnell WF. Ozone concentration and pulmonary response relationships for 6.6-hour exposures with five hours of moderate exercise to 0.08, 0.10, and 0.12 ppm. *American Review of Respiratory Disease* 1990; 42:1158-1163.

Intergovernmental Panel on Climate Change (IPCC) (Parry, Martin L., Canziani Osvaldo F., Palutikof, Jean P., van der Linden, Paul J., and Hanson, Clair E. (eds.)). 2007. Climate Change 2007: Impacts, Adaptation, and Vulnerability. Contribution of Working Group II to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change., Cambridge University Press, Cambridge, United Kingdom, 1000 pp. Web link: http://www.ipcc-wg2.org/index.html [Accessed 17 October 2011].

Ito K, De Leon SF, Lippmann M. Associations Between Ozone and Daily Mortality: Analysis and Meta-Analysis. *Epidemiology* 2005; 16:446-429.

Kunzli N, Lurmann F, Segal M, Ngo L, Balmes J, Tager IB. Association Between Lifetime Ambient Ozone Exposure and Pulmonary Function in College Freshmen-Results of a Pilot Study. *Environmental Research* 1997; 72: .8-23.

Lin M, Chen Y, Burnett RT, Villeneuve PJ, Krewski D. The Influence of Ambient Coarse Particulate Matter on Asthma Hospitalization in Children: case-crossover and time-series analyses. *Environmental Health Perspectives* 2002;110:575-581.

Lin S, Liu X, Le LH, Hwang S-A. Chronic Exposure to Ambient Ozone and Asthma Hospital Admissions among Children. *Environmental Health Perspectives* 2008;116:1725-1730.

Lin S, Munsie JP, Hwang SA, Fitzgerald E, Cayo MR. Childhood Asthma Hospitalization and Residential Exposure to State Route Traffic. *Environmental Research* 2002b; 88:73-81.

Linder SH, Marko D, Sexton K. Cumulative Cancer Risk from Air Pollution in Houston: Disparities in Risk Burden and Social Disadvantage. *Environmental Science and Technology*. June 2008;42(12)4312-22.

Levy JI, Chermerynski SM, Sarnat JA. Ozone Exposure and Mortality: An Empiric Bayes Metaregression Analysis. *Epidemiology* 2005; 16:458-468.

Louisiana Bucket Brigade. *Common Ground III: Why Cooperation to Reduce Accidents at Louisiana Refineries is Needed Now*. November 2011. Web link: http://labucketbrigade.org/article.php?id=981

McDonnell WF, Stewart PW, Smith MV, Pan WK, Pan J. Ozone-induced respiratory symptoms: exposure-response models and association with lung function. *European Respiratory Journal* 1999;14:845–853.

Miller KA, Siscovick DS, Sheppard L, Shepherd K, Sullivan JH, Anderson GL, Kaufman JD. Long-Term Exposure to Air Pollution and Incidence of Cardiovascular Events in Women. *New England Journal of Medicine* 2007; 56:447-458.

Morello-Frosch R, Lopez R. The Riskscape and the Color Line: Examining the Role of Segregation in Environmental Health Disparities. *Environmental Research*. October 2006; 102(2):181-96.

Mortimer KM, Neas LM, Dockery DW, Redline S, Tager IB. The effect of air pollution on inner-city children with asthma. *European Respiratory Journal* 2002; 19:699-705.

Mudway IS and Kelly FJ. An investigation of inhaled ozone dose and the magnitude of airway inflammation in healthy adults. *American Journal of Respiratory and Critical Care Medicine* 2004;169:1089-1095.

National Academy of Sciences (NAS). Institute of Medicine. *Toward Environmental Justice: Research, Education and Health Policy Needs*. 1999. Web link: http://www.nap.edu/openbook.php?isbn=0309064074 [Accessed: 4 January 2010].

National Institute for Occupational Safety and Health (NIOSH). 1985. International Chemical Safety Cards: Methane. Atlanta, GA: Centers for Disease Control and Prevention (CDC). Web link: http://www.cdc.gov/niosh/ipcsneng/neng0291.html [Accessed: 17 October 2011].

National Research Council (NRC), Committee on Estimating Mortality Risk Reduction and Economic Benefits from Controlling Ozone Air Pollution. *Estimating Mortality Risk Reduction and Economic Benefits from Controlling Ozone Air Pollution.* National Academy Press, 2008.

Norris G, YoungPong SN, Koenig JQ, Larson TV, Sheppard L, Stout JW. An Association Between Fine Particles and Asthma Emergency Department Visits for Children in Seattle. *Environmental Health Perspectives* 1999;107:489-493.

Olson, Laura. "Counties' shale fees could be delayed: Legislation is still being negotiated." *Pittsburgh Post Gazette*, October 13, 2011. Web link: http://www.post-gazette.com/pg/11286/1181796-454.stm

O'Neill MS, Jerrett M, Kawachi I, Levy JI, Cohen AJ, Gouveia N, Wilkinson P, Fletcher T, Cifuentes L, Schwartz J et al. Health, Wealth, and Air Pollution: Advancing Theory and Methods. *Environmental Health Perspectives* 2003: 111: 1861-1870

Pope CA, Burnett RT, Thun MJ, Calle EE, Krewski D, Ito K, Thurston GD. Lung Cancer, Cardiopulmonary Mortality, and Long-Term Exposure to Fine Particulate Air Pollution. *JAMA* 2002; 287:1132-1141.

Pope CA III, Burnett RT, Thurston GD, Thun MJ, Calle EE, Krewski D, Godleski JJ. Cardiovascular Mortality and Year-round Exposure to Particulate Air Pollution: epidemiological evidence of general pathophysiological pathways of disease. *Circulation.* 2004;109:71-77.

Roger VL, Go AS, Lloyd-Jones DM, et al. 2011. Heart Disease and Stroke Statistics: 2011 Update: A Report From the American Heart Association. *Circulation.* 123(4):e18–e209

Secretary of Energy Advisory Board (SEAB), U.S. Department of Energy. Shale Gas Production Subcommittee 90-Day Report. August 18, 2011. Web link: http://www.shalegas.energy.gov/resources/081811_90_day_report_final.pdf.

Slaughter JC, Lumley T, Sheppard L, Koenig JQ, Shapiro GG. Effects of Ambient Air Pollution on Symptom Severity and Medication Use in Children with Asthma. *Annals of Allergy, Asthma, & Immunology* 2003; 91:346-53.

Tolbert PE, Mulholland JA, MacIntosh DD, Xu F, Daniels D, Devine OJ, Carlin BP, Klein M, Dorley J, Butler AJ, Nordenberg DF, Frumkin H, Ryan PB, White MC. Air Quality and Pediatric Emergency Room Visits for Asthma in Atlanta, Georgia. *American Journal of Epidemiology* 2000;151:798-810.

Triche EW, Gent JF, Holford TR, Belanger K, Bracken MB, Beckett WS, Naeher L, McSharry JE, Leaderer BP. Low-level ozone exposure and respiratory symptoms in infants. *Environmental Health Perspectives* 2006;114:911–916.

Tsai SS, Goggins WB, Chiu HF, Yang CY. Evidence for an Association Between Air Pollution and Daily Stroke Admissions in Kaohsiung, Taiwan. *Stroke.* 2003;34:2612-2616.

U.S. Department of Health and Human Services (HHS). National Toxicology Program. 2011. *Report on Carcinogens, Twelfth Edition.* Research Triangle Park, NC: U.S. Department of Health and Human Services.

U.S. Environmental Protection Agency (EPA). Air Quality Criteria for Particulate Matter. 2004. Web link: http://www.epa.gov/ttn/naaqs/standards/pm/s_pm_cr_cd.html.

U.S. Environmental Protection Agency (EPA). Air Quality Criteria for Ozone and Related Photochemical Oxidants (2006 Final). U.S. Environmental Protection Agency, Washington, DC, EPA/600/R-05/004aF-cF, 2006.

U.S. Environmental Protection Agency (EPA). Air Data. Monitor Value Report Criteria Pollutants, Sublette County, Wyoming. Ozone 2008. Web link: http://iaspub.epa.gov/airsdata/adaqs.monvals?geotype=co&geocode=56035&geoinfo=co~56035~Sublette+Co%2C+Wyoming&pol=O3&year=2008&fld=monid&fld=siteid&fld=address&fld=city&fld=county&fld=stabbr&fld=regn&rpp=25. [Accessed 18 October 2011].

U.S. Environmental Protection Agency (EPA). 2008. Integrated Science Assessment for Oxides of Nitrogen -- Health Criteria. EPA/600/R-08/071.

U.S. Environmental Protection Agency (EPA). 2009a. Risk and Exposure Assessment to Support the Review of the SO$_2$ Primary National Ambient Air Quality Standards: Final Report. EPA-452/R-09-007, August 2009.

U.S. Environmental Protection Agency (EPA), 2009b. *Integrated Science Assessment for Particulate Matter*, EPA 600/R-08/139F. Web link: http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm?deid=216546. [Accessed 17 October 2011].

U.S. Environmental Protection Agency (EPA). 2011a. Regulatory Impact Analysis for Proposed New Source Performance Standards and Amendments to the National Emissions Standards for Hazardous Air Pollutants for the Oil and Natural Gas Industry. Office of Air Quality Planning and Standards, Research Triangle Park, NC. Web link: http://www.epa.gov/ttn/ecas/regdata/RIAs/oilnaturalgasfmalria.pdf [Accessed 17 October 2011].

U.S. Environmental Protection Agency (EPA). 2011b. Addressing Air Emissions from the Oil and Natural Gas Industry Overview of EPA's Proposed New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants. Office of Air Quality Planning and Standards, Research Triangle Park, NC. Web link: http://www.epa.gov/airquality/oilandgas/pdfs/20110728presentation.pdf [Accessed 18 October 2011].

U.S. Environmental Protection Agency (EPA). 2011c. Regulatory Impact Analysis for proposed Air Toxics Rule, Office of Air Quality Planning and Standards, Research Triangle Park, NC. Web link: http://www.epa.gov/ttn/ecas/regdata/RIAs/ToxicsRuleRIA.pdf [Accessed 17 October 2011].

U.S. Environmental Protection Agency (EPA). 2011d. Memorandum from Gina McCarthy to Air Division Directors, Regions 1-10. September 22, 2011. Web link: http://www.epa.gov/ozonepollution/pdfs/OzoneMemo9-22-11.pdf

U.S. Environmental Protection Agency (EPA). 2011e.  Plan to Study the Potential Impacts of Hydraulic Fracturing on Drinking Water Resources. November 2011. Web link: http://water.epa.gov/type/groundwater/uic/class2/hydraulicfracturing/upload/FINAL-STUDY-PLAN-HF_Web_2.pdf

U.S. Environmental Protection Agency (EPA).  2011f.  2011 U.S. Greenhouse Gas Inventory Report Executive Summary.  76 Fed. Reg. 52,792.  Web link: http://epa.gov/climatechange/emissions/downloads11/US-GHG-Inventory-2011-Executive-Summary.pdf

World Health Organization (WHO).  2003. Climate change and human health - risks and responses.  Web link: http://www.who.int/globalchange/publications/cchhbook/en/ [Accessed: 17 October 2011].

World Health Organization (WHO). 2005. The Effects of Air Pollution on Children's Health and Development: a review of the evidence. 2005.  Web link: http://www.euro.who.int/document/E86575.pdf

Zeger SL, Dominici F, McDermott A, Samet J. Mortality in the Medicare Population and Chronic Exposure to Fine Particulate Air Pollution in Urban Centers (2000-2005). *Environmental Health Perspectives* 2008: 116:1614-1619.

# Health Consultation

GARFIELD COUNTY

Public Health Implications of Ambient Air Exposures to Volatile Organic Compounds as Measured in Rural, Urban, and Oil & Gas Development Areas

GARFIELD COUNTY, COLORADO

MARCH 13, 2008

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
Public Health Service
Agency for Toxic Substances and Disease Registry
Division of Health Assessment and Consultation
Atlanta, Georgia  30333

**Health Consultation:  A Note of Explanation**

An ATSDR health consultation is a verbal or written response from ATSDR to a specific request for information about health risks related to a specific site, a chemical release, or the presence of hazardous material. In order to prevent or mitigate exposures, a consultation may lead to specific actions, such as restricting use of or replacing water supplies; intensifying environmental sampling; restricting site access; or removing the contaminated material.

In addition, consultations may recommend additional public health actions, such as conducting health surveillance activities to evaluate exposure or trends in adverse health outcomes; conducting biological indicators of exposure studies to assess exposure; and providing health education for health care providers and community members. This concludes the health consultation process for this site, unless additional information is obtained by ATSDR which, in the Agency's opinion, indicates a need to revise or append the conclusions previously issued.

You May Contact ATSDR Toll Free at
1-800-CDC-INFO
or
Visit our Home Page at: http://www.atsdr.cdc.gov

HEALTH CONSULTATION


GARFIELD COUNTY

Public Health Implications of Ambient Air Exposures to Volatile Organic Compounds as
Measured in Rural, Urban, and Oil & Gas Development Areas

GARFIELD COUNTY, COLORADO


Prepared By:

Colorado Department of Public Health and Environment
Under Cooperative Agreement with the
U.S. Department of Health and Human Services
Agency for Toxic Substances and Disease Registry

# Table of Contents

Foreword ................................................................................................................. i

Summary and Statement of Issues ....................................................................... 1

Background ........................................................................................................... 2

    Site Description and History ............................................................................ 2

Demographics ...................................................................................................... 4

Community Health Concerns ............................................................................... 5

Discussion ............................................................................................................ 5

    Environmental Sampling and Data Used for Exposure Evaluation ................. 5

    Exposure Evaluation ....................................................................................... 6

    Conceptual Site Model .................................................................................... 8

Public Health Implications ................................................................................... 8

Child Health Considerations .............................................................................. 12

Conclusions ........................................................................................................ 13

Recommendations .............................................................................................. 13

Public Health Action Plan ................................................................................. 14

Preparers of Report ............................................................................................ 15

References ........................................................................................................... 16

Tables and Figures ............................................................................................. 18

Appendix A. ATSDR Plain Language Glossary of Environmental Health Terms ...................... 28

Appendix B. Photographs and Maps ................................................................. 34

Appendix C. Data Summary and Selection of Contaminants of Potential Concern (COPCs) ..... 42

Appendix D. Exposure Parameters, Estimation of Exposure Dose, Derivation of Risk Based Concentration, and Risk Estimation ................................................................. 57

Appendix E. Toxicological Evaluation ............................................................. 58

Appendix F. ATSDR ToxFAQs for Benzene ................................................... 59

Appendix G. ATSDR Public Health Hazard Categories .................................. 61

Certification ....................................................................................................... 62

# Foreword

The Colorado Department of Public Health and Environment's (CDPHE) Environmental Epidemiology Section has prepared this health consultation in cooperation with the Agency for Toxic Substances and Disease Registry (ATSDR). ATSDR is part of the US Department of Health and Human Services and is the principal federal public health agency responsible for the health issues related to hazardous waste. This health consultation was prepared in accordance with the methodologies and guidelines developed by ATSDR.

The purpose of this health consultation is to identify and prevent harmful health effects resulting from exposure to hazardous substances in the environment. Health consultations focus on health issues associated with specific exposures so that the state or local department of public health can respond quickly to requests from concerned citizens or agencies regarding health information on hazardous substances. The Colorado Cooperative Program for Environmental Health Assessments (CCPEHA) of the Environmental Epidemiology Section (EES) evaluates sampling data collected by our partners, determines whether exposures have occurred or could occur in the future, reports any potential harmful effects, and then recommends actions to protect public health. The findings in this report are relevant to conditions at the site during the time this health consultation was conducted and should not necessarily be relied upon if site conditions or land use changes in the future.

For additional information or questions regarding the contents of this health consultation or the Colorado Cooperative Program for Environmental Health Assessments, please contact the author of this document:

Shannon Rossiter, MPH
Colorado Cooperative Program for Environmental Health Assessments
Disease Control and Environmental Epidemiology Division
Colorado Department of Public Health and Environment
4300 Cherry Creek Drive South
Denver Colorado, 80246-1530
(303) 692-2617
FAX (303) 782-0904
Email: shannon.rossiter@state.co.us

## Summary and Statement of Issues

The purpose of this document is to identify any potential public health implications resulting from inhalation of volatile organic compounds in Garfield County and recommend actions to reduce the exposure, if necessary. The Garfield County Public Health Service requested assistance from the Colorado Cooperative Program for Environmental Health Assessments (CCPEHA) to evaluate the potential public health hazards with respect to air pollution in the county.

Exploration for natural gas is dramatically increasing in Garfield County, the state of Colorado, and throughout the West. The oil and gas industry is a large source of volatile organic compound (VOC) emissions (CDPHE, 2006). Given the rapid development of the oil and gas industry within Garfield County, and the proximity to residential housing, this health consultation seeks to address concerns from local citizens about health effects related to air quality. This health consultation serves as one piece of a multi-pronged approach designed by Garfield County to address air quality concerns via different health assessment methodologies. The resulting assessments include a screening-level risk assessment by the Colorado Department of Public Health and Environment (CDPHE) according to the United States Environmental Protection Agency (EPA) National Air Toxics Program *Risk Assessment Reference Library,* a Community Health Risk Analysis of Oil and Gas Industry Public Health Concerns in Garfield County by the Saccomanno Research Institute, and this ATSDR health consultation by the CCPEHA.

Some Garfield County residents are experiencing health effects that they believe may have environmental causes. Community concerns range from mild complaints such as dizziness, nausea, respiratory problems, and eye and skin irritation to more severe concerns including cancer. Additionally, the community also has environmental concerns related to noise, odors, dust, and "toxic" chemicals in water and air.

Routine monitoring for VOCs was conducted at fourteen fixed sites for a 24-hour period on a once per month or once per quarter basis, and grab samples were collected at a number of locations based on odor complaints. After a thorough review of the available ambient air data across Garfield County, and considering both theoretical cancer risks as well as non-cancer health effects and the uncertainties associated with the available data, it is concluded that the exposures to air pollution in Garfield County pose an indeterminate public health hazard for current exposures. It should be noted, however, that the estimated theoretical cancer risks and noncancer hazards for benzene at Brock, which is within the oil and gas development area, appear to be significantly higher than those in typical urban and rural areas, causing some potential concern. These elevated levels are an indicator of the increased potential for health effects related to benzene exposure at Brock in the oil and gas development area . As with many health consultations, there is uncertainty when discussing future exposures. Here, the uncertainty is twofold; Garfield County is experiencing a period of rapid growth both in terms of population and in terms of the oil and gas industry. Both types of growth are likely to have some impact on the air quality of the county. Therefore, future exposures are also considered an indeterminate public health hazard.



Garfield County                                                                                    Health Consultation

# Background

## Site Description and History

Garfield County is a physically diverse county on Colorado's Western Slope. The far western portion of the County is sparsely populated, arid and contains mostly public lands. The central portion of the County, along the Colorado River Valley, contains five municipalities aligned along I-70 and supports the majority of the county's population and economic activity. The southeastern area of the county, defined by the Roaring Fork and Crystal River Valleys, is economically tied to the nearby resort communities, and has one municipality (Carbondale) (BBC, 2007).

Garfield County's economy is based primarily on tourism, regional services, natural gas development, and jobs in neighboring counties. In combination, tourism and regional services account for approximately half of the Garfield County economic base. Although some workers commute into Garfield County, a greater number of Garfield County residents commute to jobs in neighboring counties. Additionally, Garfield County attracts second homeowners and other "quality of life migrants" who move to the area for the local recreation opportunities, climate, and landscape. The County has generally experienced steady growth over the past three decades and is currently growing rapidly as both the recreation/retirement sector and the natural gas industry have expanded. Home and land values have increased substantially in recent years (BBC, 2007).

### How has the Discovery and Production of Oil and Gas Lead to Changes in Garfield County?

Garfield County is located in the heart of perhaps the most oil and gas rich region of the United States. Although the immense richness of energy reserves in this community has been understood for some time, changes in the value of natural gas, along with technology improvements and federal energy policy changes, has caused the extraction of these resources to become expedited. As of mid-2006, about 4,000 wells had been completed, and well development is expected to continue at a pace of about 1,000 new wells per year. At the same time, it was estimated that 70 drilling rigs were actively working in Garfield County on behalf of a number of exploration and production companies (BBC, 2007).

Colorado, like most western states, recognizes separate ownership of the surface estate and the underground mineral estate. There are distinct property rights associated with each estate. This philosophy can result in different owners of the surface rights and mineral rights. If an oil and gas company has purchased or leased mineral rights, they are entitled to develop the mineral resource below the surface regardless of who may own the surface of the property. Colorado law provides for access to the mineral estate by allowing subsurface owners "reasonable use" of the surface estate (COGCC, 2007)

As such, natural gas wells and associated facilities are frequently within a few hundred feet of local residences.  It has been estimated that 1,179 residential land parcels in Garfield County are within 500 meters of at least one well, and 276 residential land parcels were within 500 meters of at least five wells[1] (NRDC, 2007).  Consequently, an increasing number of issues are arising with regard to environmental pollution and potential human health impacts.

### *Discovery and Production of Oil and Gas*

Oil and natural gas furnish about three-fifths of our energy needs - fueling our homes, workplaces, factories, and transportation systems.  Furthermore, they constitute the raw materials used to make plastics, chemicals, medicines, fertilizers, and synthetic fibers.  Petroleum, otherwise known as oil, is a natural fuel formed from the decay of plants and animals buried beneath the ground, which have been under tremendous heat and pressure for millions of years. Natural gas is formed by a similar process, and is often is found in separate deposits (BLS, 2006).

Using a variety of methods, crews of specialized workers search for geologic formations that are likely to contain oil and gas (BLS, 2006).  In rotary drilling, a rotating bit attached to a length of hollow drill pipe bores a hole in the ground by chipping at and cutting the rock.  A stream of drilling "mud"—a mixture of clay, chemicals, and water—is continuously pumped through the drill pipe and through holes in the drill bit.  When oil or gas is reached, the drill pipe and bit are pulled from the well, and metal pipe (casing) is lowered into the hole and cemented in place. The casing's upper end is fastened to a system of pipes and valves called a wellhead, or "Christmas Tree," through which natural pressure forces the oil or gas into separation and storage tanks (see Figure 1 & Figure 3)(BLS, 2006).  For more information on the production of oil or natural gas, please see: http://www.bls.gov/oco/cg/cgs005.htm.

### *Possible Environmental Impacts During the Discovery and Production of Oil and Gas*

In general, air, soil, and water qualities can be affected by extraction of natural gas that is rich in methane (EPA, 2000).  Sometimes methane must be separated from fluids and other gases in processes that emit volatile organic compounds (VOCs) into the air.  Chemicals containing VOCs may also be used when a well is drilled and also during a process known as hydraulic fracturing ("fracking"), in which chemical mixtures are injected into wells to break up rock formations and release gases.  Compressors and other equipment also emit VOCs (Brown, 2007). In addition, VOCs are released during leaks from tubing, valves, tanks, or when wastes are brought to the surface and evaporated from open pits (EPA, 2000).

"Produced water," groundwater drawn from wells that can contain various salts as well as drilling and fracking chemicals, is usually reinjected underground or placed in evaporation ponds on the surface, from which chemicals including VOCs can be released to the atmosphere (Brown 2007).  Other chemicals found in produced water include VOCs, metals, and radionuclides.  The

---

1 NRDC report cites Garfield County Assessor's Office, "Parcels: Property Boundaries and Surface Land Ownership, Garfield County, Colorado," CD, 2007.



Garfield County                                                                    Health Consultation

American Petroleum Institute estimates that nearly eight barrels of water are produced for every barrel of oil. Natural gas wells typically produce much lower volumes of water than oil wells (EPA, 2000). Methane and fracking chemicals can also migrate into shallow aquifers used for drinking water wells. Benzene, toluene, ethyl benzene, and xylenes are naturally present in many hydrocarbon deposits, and may be present in drilling and fracking chemicals (Brown, 2007).

Overall, VOCs are released to the air at all stages of oil and gas operations, from exploration and drilling to processing, including venting, dehydration, gas processing, compression, leaks from equipment, evaporation of produced water from pond, and evaporation of wastes from open pits. For example, benzene is released during venting and dehydration.


# Demographics


The demographic data listed herein is U.S. Census 2000 data for Garfield County. In 2000, the county had a population of 43,791 – 21,302 (49%) females and 22,489 (51%) males. The median age was 34 years. Twenty-seven percent of the population were under 18 years old and 9% were 65 years and older. In 2000, there were 16,230 households in the census tract. The average household size was 2.65 persons. Within the county, for people reporting one race, 92% were White alone; 0.5% were Black or African American; 0.7% were American Indian and Alaska Native; 0.4% percent were Asian. Two percent reported two or more races. Seventeen percent of the people in the county were Hispanic or Latino. Ten percent of the people living in the county were foreign born. Among people at least five years old, 16% speak a language other than English at home (US Census 2000).

The population of Garfield County is projected to be 72,562 by 2010, 109,763 by 2020, and 147,864 by 2030. This projected increase in population is largely attributable to job increases in Eagle and Pitkin Counties, the need to house large proportions of those workers in Garfield County, and it further considers energy development jobs growth with the predicted number of wells drilled increasing to nearly 20,000 wells by 2025 (WCGSP, 2005).

A significant and growing proportion of the Garfield County population consists of residents with limited capabilities in reading and speaking English. It is estimated that there were about 3,500 County residents in 2005 with limited English proficiency (LEP), compared with approximately 3,200 such residents identified at the time of the 2000 Census. These estimates are based on residents who self-identify themselves as LEP by reporting that they speak English less than "very well" (BBC, 2007).

# Community Health Concerns

Over a period of approximately two years, the Saccomanno Research Institute collected perceptions of individuals about community health and priority health concerns via a process of public meetings, focus groups, structured individual interviews, and unsolicited telephone calls to the Garfield County Health Department.  The views and concerns of about 119 individuals are summarized below with the author's permission.  It is, however, important to note that the following concerns may or may not have been associated with environmental exposures (Coons, Report In Preparation).

- Increase in or exacerbations of allergies and asthma
  - Related concerns:  coughing, wheezing, other respiratory complaints
- Generalized chemical sensitivities
- Fibromyalgia/chronic pain
  - Related concern:  chronic fatigue, lethargy
- Chronic colds
  - Related concerns:  concern about compromised immune systems
- Headaches, dizziness, burning/itching eyes, nausea/vomiting, sinus problems – most often attributed to odors
- Burning/itching skin
- Mental health issues such as stress, depression, anger, inability to sleep
- Cancer (adrenal cancer, brain tumors, unknown/presumed cancers or "fear of developing cancer")
- Loss of voice or speech problems
- Trauma/work-related injuries
- Age-related illnesses
- Diabetes
- Obesity
- Perceptions that pre-existing health conditions have been exacerbated; people "feeling worse" than in the past

Additionally, the community also has environmental concerns related to noise, odors, dust, and "toxic" chemicals in water and air.

# Discussion

## Environmental Sampling and Data Used for Exposure Evaluation

Volatile organic compounds (VOC's) are a class of carbon-based compounds that readily evaporate at room temperatures.  This evaluation used the data collected for an ambient air quality monitoring study conducted by the Garfield County and CDPHE (CDPHE, 2007).  Overall, the data was collected from 14 fixed air monitoring sites.  These 14 sites were divided into three categories; Oil and Gas development (8 sites); Urban (4 sites); and Rural Background



Garfield County                                                                                    Health Consultation

(2 sites). The results of the sampling analysis and summary statistics for the data used in this evaluation are presented in Appendix C and briefly discussed below.

During the 24-month sampling period, 24-hour VOC samples were collected on either a monthly or quarterly basis for a total of 232 samples. All samples were collected by Colorado Mountain College (CMC) under the direction of CDPHE or Garfield County. Monthly and quarterly sampling locations were predetermined by Garfield County and the sampling schedule was made to coincide with the nationwide EPA air sampling schedule. The sampling infrequency was due to the high analytical costs for VOC's. Due to sampling equipment limitations, VOC samples were set out late-morning or early afternoon on the sample day and were recovered at approximately the same time the following day.

Fixed VOC sites were selected based on population exposure, local citizen complaints, or willingness of land-owners. Fixed monitoring sites were chosen to represent urban centers, rural areas (very limited or no oil and gas development) and rural oil and gas areas. The location of fixed monitoring sites in relation to gas wells and residences is shown in Figure 6. There is a varying degree of oil and gas production in the oil and gas development areas depending on the energy companies plans. Yet all oil and gas sampling sites are in some stage of development and are confirmed to be in production.

In addition, 27 grab samples were collected during a number of odor events. All grab samples were taken outdoors. Grab samples collect air over a period of approximately 10 to 15 seconds. Grab samples were collected by Garfield County staff, contractors, and residents in response to odor complaints. Grab sample locations are shown in Figure 7. In comparing the geographic location of the grab samples collected to the location of oil and gas activities and other possible activities, it is likely that the odors were related to oil and gas. In addition, the majority of the grab samples were taken in an area that reports higher condensate production than other areas of the County.

Monitoring was performed using Summa-polished stainless steel canisters with a stainless steel flow control orifice. The canisters are evacuated in the lab prior to sampling, so no power was required for operation. The sampled canisters were analyzed and cleaned by Columbia Analytical for 43 different VOC's following EPA Methods TO-15 and TO-14a.


## Exposure Evaluation


### Selection of Contaminants of Potential Concern (COPCs)

The maximum detected concentration of 15 contaminants was compared with conservative health based environmental guidelines or Comparison Values (CVs) to select COPCs at each of the 14 sites for further evaluation of potential health effects. Exposures to contaminants below the environmental guidelines are not expected to result in adverse or harmful health effects. However, exceeding the CV does not necessarily indicate that the contaminant poses a public

health hazard. The amount of contaminant, duration and exposure route, exposure probability, and the health status and lifestyle of the exposed individual are important factors in determining the potential for adverse health effects.

The health based environmental guideline or screening values utilized as CVs in this evaluation are the Environmental Protection Agency's Region 3 Risk-Based Concentration (RBCs), Massachusetts Allowable Ambient Limits (AALs) for Ambient Air, and ATSDR's Chronic, Intermediate, and Acute duration Minimal Risk Levels (MRLs). EPA Region 3 RBCs for carcinogenic compounds in ambient air are based on an age-adjusted exposure covering 30 years from the time of birth to the age of 30 with an exposure frequency of 350 days per year. The inhalation RBCs for carcinogenic contaminants indicate that no more than one theoretical excess cancer case out of one million would be expected from exposures to this concentration in air. ATSDR's CVs for non-carcinogenic health effects are based upon acute, chronic and intermediate-duration inhalation exposures. When a cancer and non-cancer CV exist for the same chemical, the lower of these values is used as a conservative measure. In addition to exceeding the CV, only those COPCs that were detected in at least 5% of the samples were retained for further analysis.

Benzene, methylene chloride, tetrachloroethene, trichloroethene, and 1,4-dichlorobenzene were retained as COPCs for carcinogenic health effects since the maximum concentrations exceed EPA Region 3 RBCs for carcinogenic health effects (Appendix Tables C4-C17). Of these COPCs, benzene was retained at 12 sites, methylene chloride was retained at 1 site, tetrachloroethene was retained at 2 sites, trichloroethene was retained at 1 site, and 1,4-dichlorobenzene was retained at 8 sites.

In accordance with the CDPHE and EPA Region 8 protocol for the selection of COPCs, if multiple contaminants exist on-site, the CV values are multiplied by 0.1 (EPA, 1994). For non-carcinogenic contaminants, multiplying the CV by 0.1 is thought to account for any additive adverse effects from multiple chemicals. Two COPCs were retained based on the noncarcinogenic health effects (Appendix s C4-C18). Of these, m,p-xylenes was retained at 6 sites, and 2-hexanone was retained at 3 sites.

## The Conceptual Site Model

The conceptual site model describes the primary contaminants of potential concern, contaminated sources, and the potential exposure pathways by which different types of populations (e.g. residents and outdoor workers) might come into contact with contaminated media. Exposure pathways are classified as either complete, potential, or eliminated. Only complete exposure pathways can be fully evaluated and characterized to determine the public health implications. A complete exposure pathway consists of five elements: a source, a contaminated environmental medium and transport mechanism, a point of exposure, a route of exposure, and a receptor population.

The overall conceptual site model for all complete and potential pathways in Garfield County is presented below.



Garfield County                                                        Health Consultation

**Conceptual Site Model**

| Pathway Name | Exposure Pathway Elements | | | | | | |
|---|---|---|---|---|---|---|---|
| | Source | Contaminated Medium | Point of Exposure | Potentially Exposed Population | Route of Exposure | Time Frame | Pathway Complete? |
| Outdoor Air | VOC emissions related to Oil and Gas extraction | Ambient Outdoor Air | Ambient Air | Residents and Workers | Inhalation | Present and Future | Yes |

# Public Health Implications

The purpose of this evaluation is to determine whether exposures to COPCs that exceed the CVs for the outdoor air exposure pathway might be associated with adverse health effects. This requires a calculation of site-specific exposure doses for an estimated duration of exposure on-site and comparison with an appropriate toxicity value (or health guideline).

To calculate theoretical cancer risks for the outdoor air pathway, the inhalation dose of contaminants in the ambient outdoor air samples is multiplied by the cancer slope factor (or health guideline) in accordance with the EPA Region 3 Risk-Based Concentrations methodology. A more detailed description of this methodology is available in Appendix D. The available toxicity values (or health guidelines) utilized here to evaluate the likelihood of possible cancer and noncancer effects are discussed in Appendix E. The results of health risk calculations are presented in Tables 2 – 6.

Overall, only m,p-xylene and 2-hexanone were selected based on the noncarcinogenic health effects. Noncancer adverse health effects are not likely to occur from exposure to the levels of m,p-xylene and 2-hexanone encountered in this evaluation, based on comparison with the ATSDR chronic health guidelines. In addition, methylene chloride is retained as a carcinogenic COPC, but it is not discussed further in this evaluation because it was detected only at one urban site with risk estimates below a cancer risk level of 1E-06 (Table 2). The four major carcinogenic COPCs, tetrachloroethene, trichloroethene, 1,4-dichlorobenzene, and benzene, have risk estimates above the lower-end of EPA's acceptable range of 1E-06 to 1E-04 (1 to 100 excess cancers per million individuals exposed) and are briefly discussed below.

**Trichloroethene**

Trichloroethene was retained as a COPC at only one site, an urban monitoring station (Table 2). At the Parachute site, the estimated theoretical cancer risk is 1.35E-04 (135 cancer cases per million person exposed). This risk estimate does raise concern about significant theoretical cancer risks. However, this risk calculation is based on the maximum value of the eight samples taken at one site. This maximum value is also the only sample of the eight where trichloroethene was detected. As such, there is much uncertainty associated with this risk calculation. Moreover, this risk is conservatively calculated based on the exposure assumption of 24 hrs/day for 350 days/year over 30 years. Overall, noncancer adverse health effects from exposure to trichloroethene are not likely to occur because comparison of the maximum detected value to the ATSDR MRLs for chronic (365 or more days), intermediate (15-364 days), and acute (1-14 days) duration exposures yield HQs that are less than 1.0 (Table 3). In total, trichloroethene in ambient outdoor air is not likely to constitute significant health concerns.

**Tetrachloroethene**

Tetrachloroethene was retained as a COPC at only one site (Table 2). At Haire, the oil and gas development site, the estimated theoretical cancer risk is 3.66E-06 (4 cancer cases per million persons exposed). This risk estimate does not appear to represent a significant theoretical cancer risk. Moreover, this risk is conservatively calculated based on the exposure assumption of 24 hrs/day for 350 days/year over 30 years. Overall, noncancer adverse health effects from exposure to tetrachloroethene are not likely to occur because comparison of the maximum detected value to the ATSDR MRLs for chronic (365 or more days), intermediate (15-364 days), and acute (1-14 days) duration exposures yield HQs that are less than 1.0 for all sites (Table 3).

**1,4-Dichlorobenzene**

1,4-Dichlorobenzene was retained as a COPC at seven sites (Tables 2). At the three oil and gas development sites where it was detected, the estimated theoretical cancer risk ranges from 4.24E-06 (4 cancer cases per million person exposed) to 1.10E-05 (10 cancer cases per million person exposed). At the three urban sites where it was detected, the estimated theoretical cancer risk ranges from 7.58E-06 (7 cancer cases per million person exposed) to 4.14E-05 (41 cancer cases per million persons exposed). At the one rural background site where it was detected, the estimated theoretical cancer risk is 1.59E-05 (16 cancer cases per million person exposed). These risk estimates do not appear to represent a significant theoretical cancer risk at any of the sites, nor does it appear that the theoretical cancer risk is elevated at oil and gas development sites as compared to urban or rural background sites. Moreover, these risks are conservatively calculated based on the exposure assumption of 24 hrs/day for 350 days/year over 30 years. Additional noncancer adverse health effects from exposure to 1,4-dichlorobenzene are not likely to occur because comparison of the maximum detected value to the ATSDR MRLs for chronic (365 or more days), intermediate (15-364 days), and acute (1-14 days) duration exposures yield HQs that are less than 1.0 for all sites (Table 3).



**Benzene**

Benzene was retained as a COPC at 12 sites (Table 2). At the seven oil and gas development sites where it was detected, the estimated theoretical cancer risk ranges from 4.97E-06 (5 cancer cases per million person exposed) to 5.77E-05 (58 cancer cases per million person exposed). At the four urban sites where it was detected, the estimated theoretical cancer risk ranges from 1.52E-05 (15 cancer cases per million person exposed) to 2.22E-05 (22 cancer cases per million person exposed). At the one rural background site where it was detected, the estimated theoretical cancer risk is 8.26E-06 (8 cancer cases per million person exposed).

These risk estimates are within the EPA's acceptable range of 1E-06 to 1E-04 (1 to 100 excess cancers per million individuals exposed). However, the theoretical cancer risk is close to the upper-end of the EPA acceptable range at Brock, an oil and gas development site, where the theoretical cancer risk is 5.77E-05. The theoretical cancer risk at Brock is elevated as compared to other oil and gas development sites, urban sites, and rural background sites (Figure 1). With the exception of the Brock site, these risk estimates do not appear to represent a significant theoretical cancer risk at any of the sites, nor does it appear that the theoretical cancer risk is elevated at oil and gas development sites as compared to urban or rural background sites (Table 2).

The sampling data collected at Brock is critical for several reasons. First, the estimated cancer risks for benzene at the Brock monitoring site are somewhat driven by one very high concentration (49.0 μg/m$^3$) over the 24-hour exposure period. Second, the maximum value detected at Brock is important because it could represent occasional events where peak concentrations of benzene in ambient outdoor air are as high as the levels seen in grab samples during odor complaint events. For example, the maximum detected benzene concentration in grab samples was 180.0 μg/m$^3$ (Table D2). Third, it is unknown why the levels of benzene are elevated at Brock; differences in topography, oil and gas activity, placement of the monitoring station, or sampling conditions could be the cause of the elevated levels. However, the high concentrations detected at Brock cannot be disregarded either. The high values could indicate that some residents are episodically exposed to significantly higher than ambient concentrations of benzene. Since residents may be repeatedly exposed to these peak concentrations of benzene, the concentrations detected via grab samples warrant careful monitoring and exposure evaluation. This high data point at Brock further illustrates the substantial variation between sampling points, due to the limited sampling frequency, and the resulting uncertainty in the data collected.

Garfield County Ambient Air Quality                    Garfield County, CO



Figure 1. Theoretical Cancer Risks for Benzene Across all Monitoring Sites

Additionally, at the Brock oil and gas development site, the estimated chronic noncancer hazards for benzene are in the zone of potential concern based on the comparison of the average detected value of 13.3 μg/m$^3$ with the ATSDR health guideline (MRL) of 10 μg/m$^3$ for the chronic exposure duration (365 days or more) (Table 3). Furthermore, the estimated acute and intermediate noncancer hazards for benzene are in the zone of potential concern, based on the comparison of the maximum detected concentration of 49.0 μg/m$^3$ with the ATSDR MRLs of 20 μg/m$^3$ and 30 μg/m$^3$ for the intermediate (15-364 days) and acute (1-14 days) exposure durations, respectively. The maximum detected concentration at Brock of 49.0 μg/m$^3$ is significantly below the intermediate Lowest-Observed-Adverse-Affect-Level (LOAEL) of 5832 μg/m$^3$ in mice, the acute LOAEL of 8262 μg/m$^3$ in mice, and the chronic NOAEL of 97 μg/m$^3$ in humans (Tables 3 and 5).

Furthermore, it should, be noted that the estimated acute noncancer hazards also enter a range of potential concern based on the comparison of the maximum concentration in grab samples of 180 μg/m$^3$ to the ATSDR acute MRL of 30 μg/m$^3$ (for exposure duration of 1-14 days). Additionally, the maximum benzene concentration is well below the acute LOAEL of 8262 μg/m$^3$ in mice (Table 6). The maximum concentration in grab samples (180 μg/m$^3$) is well below the OEHAA acute health guideline value of 1300 μg/m$^3$ (for 6-hour exposure duration).



Garfield County                                               Health Consultation

In total, benzene exposures are considered to be an indeterminate public health hazard.  Three major sources of uncertainty were factored into this conclusion: (1) the inability to realistically and continuously monitor ambient air at all places of interest and in the breathing zone of the exposed population, (2) the reality that some of the monitoring locations may detect emissions from sources other than the oil and gas development activities; and (3) the inability to adequately capture intermittent peak exposures, as indicated by grab sampling events.

It should be noted that benzene, the major contaminant of potential concern in this investigation, is ubiquitous in the atmosphere.  It has been identified in ambient outdoor and indoor air samples of both rural and urban environments (ATSDR, 2005).  For example, benzene is a component of gasoline vapors or vehicle exhaust, cigarette smoke, wood smoke, paints, adhesives, and particleboard.  Since benzene is a known human carcinogen and the estimated cancer risks are slightly below the upper-end of EPA's acceptable range, no matter what the source, exposure to benzene should be minimized based on prudent public health practice.

Overall, given the uncertainty in the limited available data and uncertainty in the exposure patterns of community, more air monitoring is urged.  More data is needed to further characterize the source of benzene, the acute and chronic noncancer hazards, and the lifetime cancer risks related to benzene at oil and gas sites, especially those either near, or similar to, the Brock monitoring site.

# Child Health Considerations

In communities faced with air, water, or food contamination, the many physical differences between children and adults demand special emphasis.  Children could be at greater risk than are adults from certain kinds of exposure to hazardous substances.  Children play outdoors and sometimes engage in hand-to-mouth behaviors that increase their exposure potential.  Children are shorter than are adults; this means they breathe dust, soil, and vapors close to the ground.  A child's lower body weight and higher intake rate results in a greater dose of hazardous substance per unit of body weight.  If toxic exposure levels are high enough during critical growth stages, the developing body systems of children can sustain permanent damage.  Finally, children are dependent on adults for access to housing, for access to medical care, and for risk identification.  Thus adults need as much information as possible to make informed decisions regarding their children's health.

The health effects of some of the major components of gasoline, benzene, toluene, ethylbenzene, and xylene (BTEX) on young children are generally thought to be similar to the effects on adults.  However, it is not known whether children are more sensitive to the effects of BTEX than adults.  In general, children could have greater exposures than adults because BTEX are heavier than air and occur near the floor and children breathe air that is closer to the ground.  Benzene is the primary contaminant of potential concern at this site.  The unique susceptibility of children to adverse health effects from benzene exposures was considered in this evaluation by utilizing the risk-based concentrations that account for time-weighted early life exposures (0-6 years) through the age of 30.  Children can be affected by benzene exposure in the same way as adults.  It is not known if children are more susceptible to benzene poisoning.  However, benzene can cross the

placenta and can also be excreted in breast milk. Animal studies have shown low birth weights, delayed bone formation, and bone marrow damage when pregnant animals breathed benzene (ATSDR, 2005).

# Conclusions

Data reviewed in this health consultation indicate that the ambient air quality in Garfield County constitutes an indeterminate public health hazard, for all current exposures, based on the estimated theoretical cancer risks as well as noncancer hazards and the uncertainties associated with the available data. It should be noted, however, that the estimated theoretical cancer risks and noncancer hazards for benzene at Brock, in the oil and gas development area, appear to be significantly higher than those in the urban and rural areas, causing some potential concern. These elevated levels are an indicator of the increased potential for health effects related to benzene exposure at Brock and in the oil and gas development area. Furthermore, the future exposures are considered to represent an indeterminate public health hazard, as changes in the oil and gas industry do not allow for use of the current data to predict future exposure scenarios. However, as Garfield County is expected to experience rapid population and industrial growth in the coming years, the air quality will likely be impacted. Should the air quality worsen, the conclusions made here will need to be revisited. Please see Appendix G for a description of ATSDR's public health hazard categories.

# Recommendations

Based upon the data and information reviewed, CDPHE has made the following recommendations:

- In order to facilitate a more thorough health risk evaluation for short-term and long-term exposures, Garfield County should redesign monitoring of ambient air quality by increasing the frequency of sampling and including a complete list of contaminants associated with oil and gas development.
- Garfield County should investigate factors that might be related to higher levels of Benzene detected at the Brock site. Pending the results of this investigation, Garfield County should add monitoring sites that are similar to Brock.
- If feasible, Garfield County should begin groundwater sampling to determine if oil and gas development is impacting water quality.
- Garfield County should continue to work with state regulators to identify major sources of air pollution and implement remedial measures or regulations as appropriate.
- Garfield County should implement appropriate education and outreach efforts to residents and businesses to raise awareness of how their behaviors or practices impact air quality.
- Garfield County should implement appropriate education and outreach efforts to residents and to raise awareness of how air pollution can affect respiratory health.



Garfield County                                                                 Health Consultation

# Public Health Action Plan

The public health action plan describes the actions designed to mitigate or prevent adverse human health effects that might result from exposure to hazardous substances associated with site related contamination.  The CCPEHA at CDPHE and Garfield County Public Health commit to do the following public health actions to reduce exposure to site related contamination:

- By request, CCPEHA will evaluate any additional air and groundwater data that may be collected in the future.
- Upon request, CCPEHA will collaborate with the Garfield County to conduct health education and outreach activities.
- CCPEHA will make this document available to the public through the CCPEHA website and through the information repositories located in the community.
- By request, CCPEHA will facilitate translation of this document into Spanish and will provide a Spanish language version on the website.

## Preparers of Report

Shannon Rossiter, MPH
Colorado Cooperative Program for Environmental Health Assessments
Disease Control and Environmental Epidemiology Division
Colorado Dept. of Public Health and Environment
Phone: 303-692-2617 Fax: 303-782-0904
E-mail: Shannon.rossiter@state.co.us

**CDPHE Designated Reviewer:**

Raj Goyal Ph.D
Principal Investigator
Colorado Cooperative Program for Environmental Health Assessments
Disease Control and Environmental Epidemiology Division
Colorado Dept. of Public Health and Environment
Phone: 303-692-2634 Fax: 303-782-0904
E-mail: raj.goyal@state.co.us

**ATSDR Designated Reviewer:**

Jennifer Freed MPH

Technical Project Officer

Division of Health Assessment and Consultation

Agency for Toxic Substances and Disease Registry

# References

ATSDR (2005). Agency for Toxic Substances and Disease Registry. *Toxicological Profile for Benzene.* Available on the internet at: http://www.atsdr.cdc.gov/toxprofiles/tp3.html, accessed March 2007.

BBC (2007). BBC Research and Consulting. *Garfield County Socio-Economic Impact Study*, January 2007

Brown, V. (2007). *Industry Issues: Putting the Heat on Gas.* Environ Health Perspect. ; 115(2): A76.

BLS (2007). Bureau of Labor Statistics. , U.S. Department of Labor, *Career Guide to Industries, 2006-2007 Edition,* Oil and Gas Extraction. Available on the Internet at: http://www.bls.gov/oco/cg/cgs005.htm, accessed October 2007.

CDPHE (2006). Colorado Department of Public Health and Environment. *State-wide Oil and Gas Controls - Presentation to the Garfield County Energy Advisory Board.* Available on the Internet at: http://www.garfield-county.com/Index.aspx?page=792, accessed October 2007.

CDPHE (2007). Colorado Department of Public Health and Environment. Garfield County Ambient Air Quality Monitoring Study. June 2005-May 2007.

COGCC (2007). Colorado Oil and Gas Conservation Commission. *Typical Questions From the Public About Oil and Gas Development in Colorado.* Available on the Internet at: http://oil-gas.state.co.us/General/typquest.html, accessed January 2008.

Coons, T. (Report In Preparation) *Community Health Risk Analysis of Oil and Gas Industry Public Health Concerns, for Garfield County.*

EPA (1994). Environmental Protection Agency, Region 8 . *Identifying and Evaluating Contaminants of Concern for Human Health.* September 1994. http://www.epa.gov/Region8/r8risk/pdf/r8_ra03-cocs.pdf

Massachusetts Threshold Effects Exposure Limits (TELs) and Allowable Ambient Limits (AALs) for Ambient Air, Available on the Internet at http://www.mass.gov/dep/air/aallist.pdf, accessed October 2007

NRDC (2007). Natural Resources Defense Council. *Protecting Western Communities from the Health and Environmental Effects of Oil and Gas Production.* October 2007.

U. S. Census Bureau (2000). *U.S. 2000 Census.* Available on the Internet at http://www.census.gov/main/www/cen2000.html, accessed October 2007.

U. S. Environmental Protection Agency, Region 3 (EPA 2006a). *Human Health Risk Assessment, Risk-Based Concentration Table;* last update April2007. Available on the Internet at: http://www.epa.gov/reg3hwmd/risk/human/index.htm, Accessed October 2007.

U. S. Environmental Protection Agency (2000).  EPA Office of Compliance Sector Notebook Project Profile of the Oil and Gas Extraction Industry.  Available on the Internet at: http://www.epa.gov/compliance/resources/publications/assistance/sectors/notebooks/oilgas.pdf, Accessed January 2008.

WCGSP (2005). The Watershed Collaborative Growth Scenarios Project, Demographic Forecasts, Eagle, Garfield, and Pitkin Counties 2005-2030, Fall 2005

Garfield County                                                    Health Consultation

# Tables and Figures

**Figure 2. Picture of a Well, California Division of Oil, Gas, and Geothermal Resources**



Picture (http://www.howstuffworks.com/framed.htm?parent=oil-drilling.htm&url=http://www.consrv.ca.gov/DOG/qh_well.htm, June 2007)

**Figure 3.  Photo of Gas Wells In Garfield County**



**EnCana Oil & Gas (USA), Inc**

Garfield County                                                                    Health Consultation

**Figure 4.  Location of 24-hour Monitoring Stations in Garfield County**



| Site Description | Location |
|---|---|
| Oil and Gas Development | Butterfly, Bell, Brock, Isley, West Landfill, Sebold, Haire |
| Urban | Rifle, Parachute, Glenwood Springs, New Castle |
| Rural Background | Cox, Daley |

**Table 1.  Listing of Contaminants Retained for Further Analysis Based on Max Value, by site.**

| Site Description | Location | Contaminant |
|---|---|---|
| | | |
| | | |
| | | Benzene |
| Oil and Gas Development | Butterfly 21 samples | m,p-Xylenes |
| | | 1,4-Dichlorobenzene |
| Oil and Gas Development | Bell 24 samples | Benzene |
| | | m,p-Xylenes |
| Oil and Gas Development | Brock 22 samples | Benzene |
| | | m,p-Xylenes |
| Oil and Gas Development | Isley 20 samples | Benzene |
| | | 1,4-Dichlorobenzene |
| | | Benzene |
| Oil and Gas Development | West Landfill 23 samples | 2-Hexanone |
| | | m,p-Xylenes |
| | | Benzene |
| Oil and Gas Development | Sebold 21 samples | 2-Hexanone |
| | | 1,4-Dichlorobenzene |
| Oil and Gas Development | Haire 22 samples | Benzene |
| | | Tetrachloroethene |
| Urban | Rifle 23 samples | Benzene |
| | | m,p-Xylenes |
| | | Benzene |
| | | 2-Hexanone |
| | | m,p-Xylenes |
| Urban | Parachute 8 samples | Trichloroethene |
| | | 1,4-Dichlorobenzene |
| Urban | Glenwood Springs. 8 samples | Benzene |
| | | 1,4-Dichlorobenzene |
| | | Benzene |
| Urban | New Castle 21 samples | Methylene Chloride |
| | | 1,4-Dichlorobenzene |
| Rural Background | Cox 8 samples | Benzene |
| Rural Background | Daley 8 samples | 1,4-Dichlorobenzene |



Garfield County                                                    Health Consultation

**Table 2.  Theoretical Cancer Risk Estimates for Ambient Air in Garfield County**

| Site Description | Location | Contaminant | EPC | RBC | Cancer Risk | Total Cancer Risk per site |
|---|---|---|---|---|---|---|
| | | | µg/m³ | µg/m³ | | |
| | | | | | | |
| Oil and Gas Development | Butterfly 21 samples | Benzene | 3.739 | 2.3E-01 | 1.63E-05 | |
| | | 1,4-Dichlorobenzene | 3.180 | 2.9E-01 | 1.10E-05 | 2.73E-05 |
| Oil and Gas Development | Bell 24 samples | Benzene | 3.555 | 2.3E-01 | 1.55E-05 | |
| Oil and Gas Development | Brock 22 samples | Benzene | 13.270 | 2.3E-01 | 5.77E-05 | |
| Oil and Gas Development | Isley 20 samples | Benzene | 1.385 | 2.3E-01 | 6.02E-06 | |
| | | 1,4-Dichlorobenzene | 1.639 | 2.9E-01 | 5.65E-06 | 1.17E-05 |
| Oil and Gas Development | West Landfill 23 samples | Benzene | 4.981 | 2.3E-01 | 2.17E-05 | |
| Oil and Gas Development | Sebold 21 samples | Benzene | 1.286 | 2.3E-01 | 5.59E-06 | |
| | | 1,4-Dichlorobenzene | 1.230 | 2.9E-01 | 4.24E-06 | 9.83E-06 |
| Oil and Gas Development | Haire 22 samples | Benzene | 1.143 | 2.3E-01 | 4.97E-06 | |
| | | Tetrachloroethene | 1.135 | 3.1E-01 | 3.66E-06 | 8.63E-06 |
| Urban | Rifle 23 samples | Benzene | 3.658 | 2.3E-01 | 1.59E-05 | |
| Urban | Parachute 8 samples | Benzene | 5.10 | 2.3E-01 | 2.22E-05 | |
| | | Trichloroethene | 2.7 | 2.0E-02 | 1.35E-04 | |
| | | 1,4-Dichlorobenzene | 2.2 | 2.9E-01 | 7.59E-06 | 1.65E-04 |
| Urban | Glenwood Springs. 8 samples | Benzene | 3.50 | 2.3E-01 | 1.52E-05 | |
| | | 1,4-Dichlorobenzene | 12.00 | 2.9E-01 | 4.14E-05 | 5.66E-05 |
| Urban | New Castle 21 samples | Benzene | 4.931 | 2.3E-01 | 2.14E-05 | |
| | | Methylene Chloride | 2.767 | 3.79 | 7.30E-07 | |
| | | 1,4-Dichlorobenzene | 2.888 | 2.9E-01 | 9.96E-06 | 3.21E-05 |
| Rural Background | Cox 8 samples | Benzene | 1.90 | 2.3E-01 | 8.26E-06 | 8.26E-06 |
| Rural Background | Daley 8 samples | 1,4-Dichlorobenzene | 4.60 | 2.9E-01 | 1.59E-05 | 1.59E-05 |

## Table 3.  Chronic Non-Cancer Hazards for Ambient Air in Garfield County, by site

| Site Description | Location | Contaminant | EPC | CV | Non Cancer HQ | ATSDR Chronic MRL | HQ based on ATSDR Chronic MRL | EPA RfC | HQ based on EPA RfC |
|---|---|---|---|---|---|---|---|---|---|
| | | | μg/m³ | μg/m³ | | μg/m³ | | μg/m³ | |
| Oil and Gas Development | Butterfly 21 samples | Benzene | 3.739 | | | 10 | 0.37 | 30 | 0.12 |
| | | m,p-Xylenes | 15.340 | 1.1E+02 | 0.14 | | | | |
| | | 1,4-Dichlorobenzene | 3.180 | | | 60 | 0.05 | 800 | 0.004 |
| Oil and Gas Development | Bell 24 samples | Benzene | 3.555 | | | 10 | 0.36 | 30 | 0.12 |
| | | m,p-Xylenes | 4.329 | 1.1E+02 | 0.04 | | | | |
| Oil and Gas Development | Brock 22 samples | Benzene | 13.270 | | | 10 | **1.33** [a] | 30 | 0.44 |
| | | m,p-Xylenes | 4.425 | 1.1E+02 | 0.04 | | | | |
| Oil and Gas Development | Isley 20 samples | Benzene | 1.385 | | | 10 | 0.14 | 30 | 0.05 |
| | | 1,4-Dichlorobenzene | 1.639 | | | 60 | 0.03 | 800 | 0.002 |
| Oil and Gas Development | West Landfill 23 samples | Benzene | 4.981 | | | 10 | 0.50 | 30 | 0.17 |
| | | 2-Hexanone | 1.330 | 10.880 | 0.12 | | | | |
| | | m,p-Xylenes | 13.420 | 1.1E+02 | 0.12 | | | | |
| Oil and Gas Development | Sebold 21 samples | Benzene | 1.286 | | | 10 | 0.13 | 30 | 0.04 |
| | | 2-Hexanone | 1.104 | 10.880 | 0.10 | | | | |
| | | 1,4-Dichlorobenzene | 1.230 | | | 60 | 0.02 | 800 | 0.002 |
| Oil and Gas Development | Haire 22 samples | Benzene | 1.143 | | | 10 | 0.11 | 30 | 0.04 |
| | | Tetrachloroethene | 1.135 | | | 271.13 | 0.004 | NA | |
| Urban | Rifle 23 samples | Benzene | 3.658 | | | 10 | 0.37 | 30 | 0.12 |
| | | m,p-Xylenes | 6.916 | 1.1E+02 | 0.06 | | | | |
| Urban | Parachute 8 samples | Benzene | 5.10 | | | 10 | 0.51 | 30 | 0.17 |
| | | 2-Hexanone | 2.10 | 10.880 | 0.19 | | | | |
| | | m,p-Xylenes | 11.00 | 1.1E+02 | 0.10 | | | | |
| | | Trichloroethene | 2.7 | | | NA | | NA | |
| | | 1,4-Dichlorobenzene | 2.2 | | | 60 | 0.04 | 800 | 0.003 |
| Urban | Glenwood Springs. 8 samples | Benzene | 3.50 | | | 10 | 0.35 | 30 | 0.127 |
| | | 1,4-Dichlorobenzene | 12.00 | | | 60 | 0.2 | 800 | 0.02 |
| Urban | New Castle 21 samples | Benzene | 4.931 | | | 10 | 0.49 | 30 | 0.16 |
| | | Methylene Chloride | 2.767 | | | 1041 | 0.003 | NA | |
| | | 1,4-Dichlorobenzene | 2.888 | | | 60 | 0.05 | 800 | 0.004 |
| Rural Background | Cox 8 samples | Benzene | 1.9 | | | 10 | 0.19 | 30 | 0.06 |
| Rural Background | Daley 8 samples | 1,4-Dichlorobenzene | 4.60 | | | 60 | 0.08 | 800 | 0.006 |

[a]  The EPC of 13.3 μg/m³ is well below the chronic NOAEL of 97μg/m³ (in humans) of the ATSDR MRL (i.e., HQ $_{NOAEL}$ of 0.14 is well below an acceptable level of 1.0).



Garfield County                                                            Health Consultation

**Table 4.  Acute and Intermediate Noncancer Hazards for Ambient Air in Garfield County at the Brock Site in Oil and Gas Development Area, based on the EPC (95% UCL on the mean)**

| Site Description | Location | Contaminant | EPC | ATSDR acute MRL | HQ based on ATSDR acute MRL | ATSDR Intermediate MRL | HQ based on ATSDR Intermediate MRL |
|---|---|---|---|---|---|---|---|
| | | | µg/m³ | µg/m³ | | µg/m³ | |
| Oil and Gas Development | Brock 22 samples | Benzene | 13.270 | 30 | 0.44 | 20 | **0.66** |

Garfield County Ambient Air Quality                              Garfield County, CO

**Table 5.  Acute and Intermediate Non-Cancer Hazards for Ambient Air in Garfield County Using Maximum Detected Values for Benzene, by site**

| Site Description | Location | Contaminant | Max | ATSDR acute MRL | HQ based on ATSDR acute MRL | ATSDR Intermediate MRL | HQ based on ATSDR Intermediate MRL |
|---|---|---|---|---|---|---|---|
| | | | $\mu g/m^3$ | $\mu g/m^3$ | | $\mu g/m^3$ | |
| | | | | | | | |
| Oil and Gas Development | Butterfly 21 samples | Benzene | 7.7 | 30 | 0.26 | 20 | 0.39 |
| Oil and Gas Development | Bell 24 samples | Benzene | 7.4 | 30 | 0.25 | 20 | 0.37 |
| Oil and Gas Development | Brock 22 samples | Benzene | 49.0 | 30 | **1.63** [a] | 20 | **2.45** [b] |
| Oil and Gas Development | Isley 20 samples | Benzene | 3.0 | 30 | 0.1 | 20 | 0.15 |
| Oil and Gas Development | West Landfill 23 samples | Benzene | 7.5 | 30 | 0.25 | 20 | 0.38 |
| Oil and Gas Development | Sebold 21 samples | Benzene | 2.7 | 30 | 0.09 | 20 | 0.14 |
| Oil and Gas Development | Haire 22 samples | Benzene | 2.3 | 30 | 0.07 | 20 | 0.12 |
| Urban | Rifle 23 samples | Benzene | 6.9 | 30 | 0.23 | 20 | 0.35 |
| Urban | Parachute 8 samples | Benzene | 5.1 | 30 | 0.17 | 20 | 0.26 |
| Urban | Glenwood Springs. 8 samples | Benzene | 3.5 | 30 | 0.12 | 20 | 0.18 |
| Urban | New Castle 21 samples | Benzene | 15.0 | 30 | **0.5** | 20 | **0.75** |
| Rural Background | Cox 8 samples | Benzene | 1.9 | 30 | 0.06 | 20 | 0.09 |

[a] The maximum detected concentration of 49$\mu g/m^3$ is well below the acute LOAEL of 8262 $\mu g/m^3$ for lymphocyte depression (immune system effects) in mice, based on the ATSDR MRLs (ATSDR, 2005).
[b] The maximum detected concentration of 49$\mu g/m^3$ is well the below the intermediate LOAEL of 5832 $\mu g/m^3$ for lymphocyte depression (immune system effects) in mice, based on the ATSDR MRLs (ATSDR, 2005).

**ATSDR**
AGENCY FOR TOXIC SUBSTANCES
AND DISEASE REGISTRY

Garfield County                                                    Health Consultation

**Table 6.  Acute Non-Cancer Hazards based on Max Values from Grab Samples**

| Compound | Result | COPC? | OEHAA acute / Mass. TEL value | ATSDR Acute MRL | HQ based on OEHAA acute / Mass. ALL value | HQ based on ATSDR acute MRL |
|----------|--------|-------|-------------------------------|-----------------|-------------------------------------------|------------------------------|
| | $\mu g/m^3$ | | $\mu g/m^3$ | $\mu g/m^3$ | | |
| **Benzene** | **180.0** | **Y** | **1300** | **30** | **0.14** | **6 [a]** |
| 2-Hexanone | 2.7 | Y | 10.88 | NA | 0.25 | |
| *m,p*-Xylenes | 1500.0 | Y | 22000 | 9000 | 0.07 | 0.17 |

[a] The maximum detected concentration of $180\mu g/m^3$ is well below the acute LOAEL of $8262\ \mu g/m^3$ in mice, based on the ATSDR MRLs (ATSDR, 2005).

# APPENDICES

## Appendix A. ATSDR Plain Language Glossary of Environmental Health Terms

**Absorption**: How a chemical enters a person's blood after the chemical has been swallowed, has come into contact with the skin, or has been breathed in.

**Acute Exposure**: Contact with a chemical that happens once or only for a limited period of time. ATSDR defines acute exposures as those that might last up to 14 days.

**Additive Effect**: A response to a chemical mixture, or combination of substances, that might be expected if the known effects of individual chemicals, seen at specific doses, were added together.

**Adverse Health Effect**: A change in body function or the structures of cells that can lead to disease or health problems.

**Antagonistic Effect**: A response to a mixture of chemicals or combination of substances that is **less** than might be expected if the known effects of individual chemicals, seen at specific doses, were added together.

**ATSDR**: The **A**gency for **T**oxic **S**ubstances and **D**isease **R**egistry. ATSDR is a federal health agency in Atlanta, Georgia that deals with hazardous substance and waste site issues. ATSDR gives people information about harmful chemicals in their environment and tells people how to protect themselves from coming into contact with chemicals.

**Background Level**: An average or expected amount of a chemical in a specific environment. Or, amounts of chemicals that occur naturally in a specific environment.

**Bioavailability**: See **Relative Bioavailability.**

**Biota**: Used in public health, things that humans would eat - including animals, fish and plants.

**Cancer**: A group of diseases, which occur when cells in the body become abnormal and grow, or multiply, out of control

**Carcinogen**: Any substance shown to cause tumors or cancer in experimental studies.

**CDPHE**: The Colorado Department of Public Health and Environment.

**CERCLA**: See **C**omprehensive **E**nvironmental **R**esponse, **C**ompensation, and **L**iability **A**ct.

**Chronic Exposure**: A contact with a substance or chemical that happens over a long period of time. ATSDR considers exposures of more than one year to be *chronic*.

**Completed Exposure Pathway**: See **Exposure Pathway**.

**Comparison Value (CVs)**: Concentrations or the amount of substances in air, water, food, and soil that are unlikely, upon exposure, to cause adverse health effects. Comparison values are used by health assessors to select which substances and environmental media (air, water, food and soil) need additional evaluation while health concerns or effects are investigated.

**Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA)**: CERCLA was put into place in 1980.  It is also known as **Superfund**.  This act concerns releases of hazardous substances into the environment, and the cleanup of these substances and hazardous waste sites.  ATSDR was created by this act and is responsible for looking into the health issues related to hazardous waste sites.

**Concern**: A belief or worry that chemicals in the environment might cause harm to people.

**Concentration**: How much or the amount of a substance present in a certain amount of soil, water, air, or food.

**Contaminant**: See **Environmental Contaminant**.

**Delayed Health Effect**: A disease or injury that happens as a result of exposures that may have occurred far in the past.

**Dermal Contact**: A chemical getting onto your skin.  (See **Route of Exposure**).

**Dose**: The amount of a substance to which a person may be exposed, usually on a daily basis. Dose is often explained as "amount of substance(s) per body weight per day".

**Dose / Response**: The relationship between the amount of exposure (dose) and the change in body function or health that result.

**Duration**: The amount of time (days, months, years) that a person is exposed to a chemical.

**EES**: Environmental Epidemiology Section within the Colorado Department of Public Health and Environment.

**Environmental Contaminant**: A substance (chemical) that gets into a system (person, animal, or the environment) in amounts higher than that found in **Background Level**, or what would be expected.

**Environmental Media**: Usually refers to the air, water, and soil in which chemical of interest are found.  Sometimes refers to the plants and animals that are eaten by humans. **Environmental Media** is the second part of an **Exposure Pathway**.

**U.S. Environmental Protection Agency (EPA)**: The federal agency that develops and enforces environmental laws to protect the environment and the public's health.



Garfield County                                                                    Health Consultation

**Exposure**: Coming into contact with a chemical substance.  (For the three ways people can come in contact with substances, see **Route of Exposure**.)

**Exposure Assessment**: The process of finding the ways people come in contact with chemicals, how often and how long they come in contact with chemicals, and the amounts of chemicals with which they come in contact.

**Exposure Pathway**: A description of the way that a chemical moves from its source (where it began) to where and how people can come into contact with (or get exposed to) the chemical.

ATSDR defines an exposure pathway as having 5 parts:
- o  Source of Contamination,
- o  Environmental Media and Transport Mechanism,
- o  Point of Exposure,
- o  Route of Exposure; and,
- o  Receptor Population.

When all 5 parts of an exposure pathway are present, it is called a **Completed Exposure Pathway**.  Each of these 5 terms is defined in this Glossary.

**Frequency**: How often a person is exposed to a chemical over time; for example, every day, once a week, and twice a month.

**Hazardous Waste**: Substances that have been released or thrown away into the environment and, under certain conditions, could be harmful to people who come into contact with them.

**Health Effect**: ATSDR deals only with **Adverse Health Effects** (see definition in this Glossary).

**Indeterminate Public Health Hazard**: The category is used in Public Health Assessment documents for sites where important information is lacking (missing or has not yet been gathered) about site-related chemical exposures.

**Ingestion**: Swallowing something, as in eating or drinking.  It is a way a chemical can enter your body (See **Route of Exposure**).

**Inhalation**: Breathing.  It is a way a chemical can enter your body (See **Route of Exposure**).

**LOAEL**: **L**owest **O**bserved **A**dverse **E**ffect **L**evel.  The lowest dose of a chemical in a study, or group of studies, that has caused harmful health effects in people or animals.

**MRL**: **M**inimal **R**isk **L**evel.  An estimate of daily human exposure - by a specified route and length of time -- to a dose of chemical that is likely to be without a measurable risk of adverse, noncancerous effects.  An MRL should not be used as a predictor of adverse health effects.