

Map showing projected location of new Marcellus well pads in southern Susquehanna County under the medium development scenario.



Map showing projected location of new Marcellus well pads in southwestern Pennsylvania under the medium development scenario.



Map showing projected location of 6,000 new Marcellus well pads across Pennsylvania (low development scenario).



Map showing projected location of 15,000 new Marcellus well pads across Pennsylvania (high development scenario).

17

## Conservation Impacts of Marcellus Shale Natural Gas Development

What is the overlap of the areas with the highest probability of future Marcellus gas development and those areas known to have high conservation values?   To answer this question, we intersected the projected Marcellus well pads with areas previously identified and mapped as having high conservation values.  We looked at several examples from four categories of conservation value, including:

- Forest habitats
- Freshwater habitats
- Species of conservation concern
- Outdoor recreation

Substantial areas of overlap are indicated between likely future Marcellus development areas and Pennsylvania's most important forest, freshwater, sensitive species habitats, and outdoor recreation sites.

**FORESTS**

Forests are Pennsylvania's most extensive natural habitat type.  Once covering at least 95 percent of the state's land area, forests were whittled away for agriculture, charcoal for iron smelting, and lumber until only a third of the state's forests remained.  Forests have rebounded steadily to cover about 60 percent of the state, though a trend toward increasing net loss of forest has emerged during the past decade.  Pennsylvania is famous worldwide for its outstanding cherry, oak, and maple hardwoods, and forests provide livelihoods for many thousands of Pennsylvanians in the forest products and tourism industries.  They also contribute enormously to the quality of life for all Pennsylvanians by filtering contaminants from water and air, reducing the severity of floods, sequestering carbon dioxide emissions that would otherwise warm the planet, and providing a scenic backdrop to recreational pursuits.

A majority of projected well locations are found in a forest setting for all three scenarios (64% in each case).  The low scenario would see 3,845 well pads in forest areas.  With an average cleared forest average of 8.8 acres per pad (including roads and other infrastructure), the total forest clearing would be approximately 33,800 acres.  Indirect impacts to adjacent forest interior habitats would total an additional 81,500 acres.  Forest impacts from the medium scenario (6,350 projected wells in forest locations) would be 56,000 cleared forest acres and an additional 135,000 acres of adjacent forest interior habitat impacts.  For the high scenario (9,448 forest well pads), approximately 83,000 acres would be cleared and an additional 200,300 acres of forest interior habitats affected by new adjacent clearings.  While the high Marcellus scenario would result in a loss of less than one percent of the state's total forest acreage, areas with intensive Marcellus gas development could see a loss of 2-3 percent of local

forest habitats. Some part of the cleared forest area will become reforested after drilling is completed, but there has not been enough time to establish a trend since the Marcellus development started. Large contiguous forest patches are especially valuable because they us sustain wide-ranging forest species, such as northern goshawk and provide more habitat for forest interior species. They are also more resistant to the spread of invasive species, suffer less tree damage from wind and ice storms, and provide more ecosystem services – from carbon storage to water filtration – than small patches. The Nature Conservancy and the Western Pennsylvania Conservancy's Forest Conservation Analysis mapped nearly 25,000 forest patches in the state greater than 100 acres. Patches at least 1,000 acres in size are about a tenth of the total (2,700) and patches at least 5,000 acres are rare (only 316 patches). In contrast to overall forest loss, projected Marcellus gas development scenarios indicate a more pronounced impact on large forest patches. For example, 40 percent of patches greater than 5,000 acres are projected to have at least one well pad and associated infrastructure located in them in the medium scenario



Map showing number of probable Marcellus well pads in forest patches greater than 1,000 acres across Pennsylvania.

compared to just over 20 percent for patches > 1,000 acres. Most affected large patches have multiple projected well pads (as many as 29). The projections indicate larger patches are likely to be more vulnerable, with over a third projected to have at least one new well pad and road. Many affected large patches have multiple projected well pads (as many as 17 for patches). While one or two well pads and associated infrastructure may not fragment the large patch into smaller patches, each additional well pad increases the likelihood that the large patch will become several smaller patches with a substantially reduced forest interior habitat area.



Map showing projected number of well pads in forest patches greater than 1,000 acres under the medium development scenario in Potter, Cameron, McKean and Forest Counties.

Bird species that nest in close canopy forest environments are often referred to as "forest interior" species. The Carnegie Museum of Natural History, Powdermill Nature Reserve and the Pennsylvania Game Commission recently completed Pennsylvania's Second Breeding Bird Atlas project. As part of the project, trained ornithologists conducted point count using standardized protocols at 39,000 sites between 2004-2009. The result is an incredibly detailed data base that provides the most accurate information on the distribution and density of breeding birds available anywhere in the United States. Density data for several forest interior nesting species were mapped and intersected with the projected Marcellus gas well pad locations. The resulting maps show the estimated reduction in habitat for that species in each Marcellus gas probability pixel (including both cleared forest and adjacent edge effects). Scarlet Tanagers are one of the most widespread forest interior nesting bird in the state. Since they are so widespread, a majority of their range in the state is outside of the most likely Marcellus development areas. In some locations, scarlet tanager populations could decline by as much as 23 percent in the Medium Scenario. Black-throated blue warblers are more narrowly distributed in Pennsylvania favoring mature northern hardwood and coniferous forests with a dense understory, frequently in mountain terrain. Since most of their breeding range in Pennsylvania overlaps with likely Marcellus development areas, a higher proportion of their habitat could be affected.



Scarlet tanager © U.S. Fish and Wildlife Service



Map showing estimated percent loss of habitat for Scarlet Tanagers under medium scenario.



Map showing estimated percent loss of habitat for Black-Throated Blue Warblers under medium scenario.

FRESHWATER

Home to three great river systems and one of the Great Lakes, Pennsylvania's fresh water resources are vital not only to the Commonwealth but to much of the eastern United States. The **Ohio River** basin contains the richest fresh water ecosystems in North America. In Pennsylvania, French Creek and parts of the Upper Allegheny River contain some of the most intact aquatic ecosystems in the entire basin. The **Susquehanna** River is the source of more than half the fresh water that enters the Chesapeake Bay, and most of the water that flows down the Susquehanna River originates in tributary headwaters across a wide swath of central Pennsylvania. Forming Pennsylvania's eastern boundary, the **Delaware River** is the longest undammed river in the eastern United States, one of the last strongholds for Atlantic coast migratory fish, and provides the drinking water source for nearly 20 million Americans living in Pennsylvania, New York, and New Jersey. Because of their importance to human health and livelihoods, the potential of Marcellus gas development to affect water flows and quality have received growing attention from regulatory agencies, natural gas companies, and environmental groups.

The intersection of gas development with sensitive watersheds has received less attention. High Quality and Exceptional Value (EV) watersheds have been designated by the Pennsylvania Department of Environmental



Map showing current number of Marcellus well pads in intact and predicted intact brook trout watersheds. Data source: Eastern Brook Trout Joint Venture.

Protection across the state. Our projections indicate 28 percent of High Quality and 5 percent of Exceptional Values streams have or will have Marcellus gas development during the next two decades presence of well pads in these watersheds may not be a problem as long as spill containment measures and erosion and sedimentation regulations are strictly observed and enforced in these areas.  More specifically, the projections indicate 3,581 well pads could be located within ½ mile of a High Quality or Exceptional Values streams.  Pads within close proximity to High Quality and especially Exceptional Value streams pose more risk than those at greater distances, as there is increased risk for potential spills and uncontained sediments to find their way into streams.



Map showing projected number of Marcellus well pads by 2030 in intact and predicted intact brook trout watersheds under medium scenario. Data source: Eastern Brook Trout Joint Venture.

Native brook trout are one of the most sensitive aquatic species in Pennsylvania watersheds. Brook trout favor cold, highly-oxygenated water and are unusually sensitive to warmer temperatures, sediments, and contaminants. Once widely distributed across Pennsylvania, healthy populations have retreated to a shrinking number of small watersheds.  Many of these watersheds overlap with the Marcellus shale formation.  A large majority (113) of the 138 intact or predicted intact native brook trout watersheds in Pennsylvania are projected to see at least some Marcellus gas development.  Over half (74) are projected to host between 6 – 38 well pads, and the number reaches as high as 64 pads for some intact brook trout watersheds in the high scenario.  Rigorous sediment controls and carefully designed stream crossings will be critical for brook trout survival in watersheds, especially upper watersheds, with intensive Marcellus development.

## RARE SPECIES

Of the approximately 100,000 species believed to occur in Pennsylvania, just over 1 percent (1052) are tracked by The Pennsylvania Natural Heritage Program (PNHP).  Due to low population sizes and immediate threats, these species are rare, declining or otherwise considered to be of conservation concern. PNHP records indicate that 329 tracked species have populations within pixels that have a relatively high modeled probability for Marcellus development.  Nearly 40 percent (132) are considered to be globally rare or critically endangered or imperiled in Pennsylvania. Many are found in riparian areas, streams, and wetlands, while others are clustered in unusually biologically diverse areas such as the Youghiogheny Gorge.  Some of these species may have only one, two or three populations left in the state.  Two examples include the green salamander (*Aniedes aeneus*) with all known populations in relatively high probability Marcellus development pixels and snow trillium (*Trillium nivale*) with 73 percent of known populations in relatively high probability pixels. A well-managed screening system to



Green salamander © Pennsylvania Fish and Boat Commission

identify the presence of these species and their preferred habitats will be critical to their survival as energy development expands across the state.

## RECREATION

Pennsylvania has built one of the largest networks of public recreation lands in the eastern United States, but much of it could see Marcellus and other natural gas development in coming decades.  Of the 4.5 million acres of state and federal lands in the state, we estimate as little as 500,000 acres are permanently protected from surface mineral development, including gas drilling.  State and federal agencies do not own mineral rights under at least 2.2 million acres. Most other areas where the state does own mineral rights can be leased, such as the estimated 700,000 acres previously leased for gas development on state forest lands.  Severe budget pressures will likely to tempt the legislature to lease additional lands in the future.  Our projections excluded state Wild and Natural Areas, National Park lands, and Congressionally-designated Wilderness Areas but otherwise assumed that high probability Marcellus gas pixels on public lands could be developed.  The low scenario projects 897 pad locations on State Forest and State Game Lands which expands to 1,438 well pads in the medium scenario and 2,096 pads in the high scenario.  The focal area below illustrates what the overlap of future gas development and conservation lands could look like in the medium scenario for the southern Laurel Highlands.  It projects 7 well pads in the portion of Forbes State Forest visible in the focal area above, 13 pads on State Game Lands 51, and 3 on State Game Lands 111.



Map showing projected Marcellus well pads under the medium scenario on public and private conservation lands in the Laurel Highlands.

Pennsylvania's state park system, recognized as one of the best in the nation, illustrates the challenge of protecting recreational values in areas of intensive Marcellus development.  While the DCNR has a long standing policy of not extracting natural resources in state parks, it does not own the mineral rights under an estimated 80 percent of the system's 283,000 acres.  Our projections indicate Marcellus well pads could be located in between 9 and 22 state parks.

**AVOIDING FOREST IMPACTS IN THE LAUREL HIGHLANDS**

The projected potential impacts of Marcellus gas energy development assume recent patterns of development will continue.  Given the relatively large areas drained by Marcellus gas pads (depending on the lateral length and number of wells per pad), there is flexibility in how they are placed.  This allows us potentially to optimize between energy production and conservation outcomes.  To look at how conservation impacts could be minimized, we examined how projected Marcellus gas pads could be relocated to

| Projected Well Pads on State Lands (Medium Scenario) | |
| --- | --- |
| DCNR State Forests | 1,002 |
| DCNR State Parks | 41 |
| State Game Lands | 436 |
| **Total State Lands** | **1,479** |

avoid forest patches in the Southern Laurel Highlands in Fayette and Somerset counties. This area is important because it represents a unique ecological region with a large amount of state land as well as private farmland and forest land. The area is also facing great pressure to develop the Marcellus Gas resource. The focus area included approximately 350 square miles and included Chestnut Ridge on its western border and Laurel Ridge on its east. Within the area, there are two state parks (Ohiopyle State Park and Laurel Hill State Park), two State Game Lands (SGL 51, SGL 111), and state forest land (Forbes State Forest).

The Medium Scenario projected 127 well pads in the focus area. Fourteen well pads were projected in agricultural fields, 33 were in edge habitat (within 100 m of the forest edge), 11 fell within existing cleared areas (e.g. strip mines), and 69 were in forest. There were five pads on Ohiopyle State Park, and 13 within a mile of its boundary. Laurel Ridge State Park contained two pads. Forbes State Forest had seven modeled pads. State Game Lands 111 had 3 pads, and SGL 51 had 13. It was not clear if DCNR State Parks Bureau or the Game Commission control the sub-surface mineral rights beneath the 23 modeled pads. Given that 80 percent of mineral rights are severed on State Park and State Game Lands (and close to 100 percent in western parts of the state), we have assumed that drilling could happen at those projected locations.

To assess additional impacts beyond the well pad itself, we placed a new and/or improved road from the projected pad to the nearest existing road (ESRI Roads Layer). We placed new roads along existing trails, paths and openings whenever detectable on aerial photo imagery (used Bing Maps and 2005-2006 PA Map imagery), avoiding wetlands, steep slopes, cliffs, rock outcrops, and buildings, and where possible, rivers, streams, and forest patches. The projected pads and roads required clearing 400 acres of forest.

Can a modest shift in the location of well pads reduce impacts to forest patches and conservation lands? To reduce the impacts to forest habitats, the wells were relocated to nearby existing anthropogenic openings, old fields, or agricultural fields. Attempts were made to maintain the 4,200 foot (1,260 m) distance between modeled wells. If nearby open areas did not exist, the locations of the well pads were moved toward the edges of forest patches to minimize impacts to forest interior habitats. A set of rules was developed and followed to minimize bias, including:

1. Modeled well pads were not relocated if they occurred in old fields or agricultural fields.
2. Modeled well pads that occurred in forest or edge habitat were moved but well pads were placed in the same general areas as the modeled well pad;
3. Attempts were made to avoid placing relocated well pads any closer that the minimum distance between pads, as specified by the medium scenario (1260 m )
4. Agriculture, cleared land (e.g., former strip mines), or otherwise opened land cover was favored over forest or edges for relocating well pads;
5. If the well pad could not be placed in an open area, forest edges were favored over deep interior forest;
6. Residential areas were avoided. Relocated well pads were placed at least 500 feet (150 m) from homes;
7. Wetlands, water, steep slopes, cliffs, rock outcrops, creeks and rivers, buildings and manicured lawns were avoided;
8. Relocated well pads were only placed in areas with similar to those that supported modeled pads.
9. Relocated well pads often were connected to roads using existing trails, paths and openings whenever detectable on aerial photo imagery (used Bing Maps and 2005-2006 PA Map imagery);
10. The same number of relocated well pads were placed on state lands and Western Pennsylvania Conservancy lands as they were in the modeled output;
11. When the modeled well pad occurred within a forest patch with no nearby alternative locations (due to proximity of other wells or environmental constraints), the projected well pad was not relocated.

26

The relocated wells and roads did not eliminate forest impacts in this heavily forested landscape, but there was a significant reduction.  Total forest loss declined almost 40% while impacts to interior forest habitats adjacent to new clearings declined by a third.







Location of 127 projected Marcellus well pads and new roads in the study area in the southern Laurel Highlands.



Relocated well pads (on the right) reduced forest clearing and forest interior habitat impacts by 40 % and 33% respectively compared to the projected well pads (on the left).

## Key Findings

Key findings from the Pennsylvania Energy Impacts Assessment for Marcellus Shale natural gas include:

- About 60,000 new Marcellus wells are projected by 2030 in Pennsylvania with a range of 6,000 to 15,000 well pads, depending on the number of wells per pad;

- Wells are likely to be developed in at least 30 counties, with the greatest number concentrated in 15 southwestern, north central, and northeastern counties;

- Nearly two thirds of well pads are projected to be in forest areas, with forest clearing projected to range between 34,000 and 83,000 acres depending on the number of number of well pads that are developed. An additional range of 80,000 to 200,000 acres of forest interior habitat impacts are projected due to new forest edges created by well pads and associated infrastructure (roads, water impoundments);

- On a statewide basis, the projected forest clearing from well pad development would affect less than one percent of the state's forests, but forest clearing and fragmentation could be much more pronounced in areas with intensive Marcellus development;

- Approximately one third of Pennsylvania's largest forest patches (>5,000 acres) are projected to have a range of between 1 and 17 well pads in the medium scenario;

- Impacts on forest interior breeding bird habitats vary with the range and population densities of the species.  The widely-distributed scarlet tanager would see relatively modest impacts to its statewide population while black-throated blue warblers, with a Pennsylvania range that largely overlaps with Marcellus development area, could see more significant population impacts;

- Watersheds with healthy eastern brook trout populations substantially overlap with projected Marcellus development sites.  The state's watersheds ranked as "intact" by the Eastern Brook Trout Joint Venture are concentrated in north central Pennsylvania, where most of these small watersheds are projected to have between two and three dozen well pads;

-  Nearly a third of the species tracked by the Pennsylvania Natural Heritage Program are found in areas projected to have a high probability of Marcellus well development, with 132 considered to be globally rare or critically endangered or imperiled in Pennsylvania.  Several of these species have all or most of their known populations in Pennsylvania in high probability Marcellus gas development areas.

- Marcellus gas development is projected to be extensive across Pennsylvania's 4.5 million acres of public lands, including State Parks, State Forests, and State Game Lands.  Just over 10 percent of these lands are legally protected from surface development.

- Integration of conservation features into the planning and development of Marcellus gas well fields can significantly reduce impacts.  For example, relocating projected wells to open areas or toward the edge of large forest patches in high probability gas development pixels in the southern Laurel Highlands reduces forest clearing by 40 percent and forest interior impacts by over a third.

## Additional Information

- Geologic information on the Marcellus shale formation in Pennsylvania:
  http://www.dcnr.state.pa.us/topogeo/oilandgas/marcellus_shale.aspx

- Estimates of Marcellus shale formation gas reserves:
  http://geology.com/articles/marcellus-shale.shtml

- Baker-Hughes weekly oil and gas rig count
  http://gis.bakerhughesdirect.com/Reports/StandardReport.aspx

- Pennsylvania Department of Environmental Protection, Permit and Rig Activity Report:
  http://www.dep.state.pa.us/dep/deputate/minres/oilgas/RIG10.htm

- Copeland, H. E., K.E. Doherty, D.E. Naugle, A. Pocewicz, and J. M. Kiesecker.  2009.   Mapping Oil and Gas Development Potential in the US Intermountain West and Estimating Impacts to Species:
  http://www.plosone.org/article/info%3Adoi%2F10.1371%2Fjournal.pone.0007400

- Overview of forest fragmentation impacts on forest interior nesting species:
  http://www.state.nj.us/dep/fgw/neomigr.htm

- Overview of Pennsylvania High Quality and Exceptional Value Streams:
  http://www.dcnr.state.pa.us/wlhabitat/aquatic/streamdist.aspx

- Pennsylvania Department of Environmental Protection, Chapter 93 Water Quality Standards, Exceptional Value and High Quality Streams: data downloaded from Pennsylvania Spatial Data Access:
  http://www.pasda.psu.edu

- Eastern Brook Trout Joint Venture intact brook trout watersheds:
  http://128.118.47.58/EBTJV/ebtjv2.html

- Overview of Carnegie Museum of Natural History, Powdermill Nature Reserve, and the Pennsylvania Game Commission's 2nd Pennsylvania Breeding Bird Atlas Project:
  http://www.carnegiemnh.org/powdermill/atlas/2pbba.html

- Pennsylvania Natural Heritage Program, including lists of globally rare and state endangered and imperiled species: http://www.naturalheritage.state.pa.us/

- U.S. Department of Agriculture, Natural Resources Conservation Service, National Agriculture Imagery Program: http://datagateway.nrcs.usda.gov/GDGOrder.aspx

- DigitalGlobe, GlobeXplorer, ImageConnect Version 3.1: http://www.digitalglobe.com

# Wind

Wind has become one of the country's fastest growing sources of renewable energy.  Pennsylvania is a leader in the industry as host to several wind company manufacturing plants and corporate headquarters.   Wind energy development has been spurred by its potential to reduce carbon emissions, promote new manufacturing jobs, and increase energy independence.   Technological advances have expanded the size and efficiency of wind turbines during the past decade.  This, together with state and federal incentive programs, has facilitated wind development in Pennsylvania, which otherwise ranks relatively low among states for its potential wind generation capacity. The eight turbines installed next to the Pennsylvania Turnpike in Somerset County a decade ago have grown to nearly 500 turbines, with more permitted for construction (AWEA, 2010).  Topography is a key factor in average wind speeds across Pennsylvania, so nearly all turbines have been built on mountain ridgelines or on top of high elevation plateaus.

Wind energy has become the most symbolic icon of the shift toward a low carbon economy.   With no air emissions or water consumption, it is one of the cleanest renewable energy types.  Communities across the state benefit economically as rural landowners lease their properties, skilled jobs are created to manufacture turbines, and workers are hired to install and maintain turbines.  Wind development has faced controversy in some areas from neighboring landowners and those worried about impacts to migrating birds and bats.  The wind industry, government agencies, and independent researchers have invested considerable effort in trying to better understand impacts on birds and bats.  For example, 26 wind development companies have signed a cooperative agreement with the Pennsylvania Game Commission to conduct bird, bat and animal surveys using specified protocols in proposed development areas.  Among other findings have been the discovery of the Pennsylvania's second largest Indiana bat maternal colony and a variety of previously undocumented foraging and roosting locations for the state's two rarest bats (Indiana and eastern small-footed). Less understood are the potential habitat impacts of wind development in the northeastern United States. This assessment, therefore, focuses on impacts to forest and stream habitats and selected species of conservation concern that may be vulnerable to development of ridgetop habitats.

## What is Wind Energy?

Wind mills have powered grain processing and water pumping in agriculture around the world – most famously in the Netherlands – for centuries.  The first modern wind facilities to generate electricity were built in California in the early 1980s.  Rated at less than 0.5 MW capacity per turbine, the towers were only 50 feet tall.  These facilities were poorly designed and generated considerable controversy because they caused significant mortalities to migrating hawks and eagles.  Wind energy development did not expand appreciably until the late 1990s when newer turbine designs and federal energy incentives stimulated the development of new facilities.  These turbines were rated at 1.0 or 1.5 MW capacity and reached about 200 feet high at the tip of their rotor.  Since the power produced by a wind turbine is proportional to the cube of the blade size and how high in the air it is; turbine size, height and power ratings have expanded steadily.  The largest turbines installed in Pennsylvania are now rated at

2.5 MW (the average was 1.8 MW in 2009) and reach over 400 feet to the tip of the rotor at the apex of its rotation.

Location is everything for wind development in the northeastern United States. Unlike the vast windswept plains in the Midwest and the intermountain West, high wind speeds in the Northeast are primarily confined to mountain ridgetops, plateau escarpments, and the Atlantic and Great Lake shorelines. Areas that have a wind power class rating of 3 or more (300 watts per m$^2$) are potentially feasible for wind power development. Wind companies will lease areas that seem to have the most favorable characteristics including wind class, flat pad sites, proximity to transmission lines, and proximity to existing highways. Before development, a wind development company will typically place an anemometer tower on potential development sites to improve knowledge about wind power at the site during a year or longer monitoring period. The turbines are mounted on pads at least 800 feet apart with an access road between towers. The average size of wind facilities has been growing steadily since the first eight were established in 2000. The two largest facilities are now between 75 and 100 turbines.

Several steps have been taken to address potential conflicts between wind development and wildlife in Pennsylvania. The Pennsylvania Game Commission (PGC) has a voluntary agreement in place with most wind companies active in the state to screen proposed facilities for possible impacts to birds and bats and migratory pathways. Participating wind companies carry out pre-construction monitoring for birds and bats. If possible conflicts are identified, PGC works with wind companies to avoid or minimize impacts and to continue monitoring post construction in some cases. Second, the Pennsylvania Wind and Wildlife Collaborative (PWWC) was established in 2005 with a state goal to develop a set of "Pennsylvania-specific principles, policies and best management practices, guidelines and tools to assess risks to habitat and wildlife, and to mitigate for the impact of that development." Several studies on wildlife and habitat issues have been commissioned, though guidelines and Best Management Practices (BMPs) have not been released.

## Current and Projected Wind Energy Development

We documented the spatial foot print of 319 wind turbines at 12 wind facilities across the state by comparing aerial photos taken before and after development. Turbine pads, roads, and other new clearings were digitized for all 12 facilities visible in 2008 images from the



Map showing 12 wind facilities included in the spatial footprint analysis.

National Agriculture Imagery Program.  The ground excavated for turbines, roads, and associated infrastructure

| Average Spatial Disturbance for Wind Energy Development in Forested Context (acres) | | |
|---|---|---|
| Forest cleared for wind turbine | 1.4 | 1.9 |
| Forest cleared for associated infrastructure (roads, other cleared areas) | 0.5 | |
| Indirect forest impact from new edges | 13.4 | |
| TOTAL DIRECT AND INDIRECT IMPACTS | 15.3 | |

(e.g., clearings for construction staging areas or electrical sub-stations) is the most obvious spatial impact. For each turbine site, the area for the turbine pad, new roads, staging areas, and sub-stations were digitized and measured.  Turbine pads occupy 1.4 acres on average while the associated infrastructure (roads, staging areas and substations) takes up 0.5 acres, or a total of 1.9 acres of spatial impact per wind turbine.

As with Marcellus gas development, adjacent lands can also be impacted even if they are not directly cleared (See p. 11 for a description of forest edge impacts on forest "interior" species).    To assess the potential interior forest habitat impact, we created a 330 foot buffer into forest patches from new edges created by wind turbine and associated infrastructure development.  For turbine sites developed in forest areas (about 80% of the 319 turbines), an average area of 13.4 acres of interior forest habitat was lost in addition to the 1.9 acres of directly cleared forest.



Key drivers: Alternative Energy Portfolio Standard (AEPS) and projected contribution of wind to meeting that standard.

We project between 1,250 and 3,400 total wind turbines will be erected in Pennsylvania by 2030.

The number of wind turbines built in Pennsylvania will certainly expand during the next two decades. Various factors will drive exactly how many turbines are ultimately built including electricity prices, state and federal incentives, technological improvements, energy and climate policy, regulatory changes, and social preferences. Our projections assume economic, policy, and social conditions will remain favorable enough to promote steady expansion of wind development in the state since we cannot reasonably forecast energy prices, technological developments, and policy conditions. The key driver in our low scenario is that companies will use wind energy to meet 70 percent of the current Alternative Energy Portfolio Standard (AEPS) Tier 1 standard (8 percent of electric generation). This projection indicates an additional 750 turbines (2 MW average) will be added to the 500 turbines currently operating. The key driver in our medium scenario is that utilities will use wind energy to meet 70 percent of an expanded AEPS 15% Tier 1 standard, as proposed in recent draft legislation. That scenario would add 1,400 new turbines to those already built. The high scenario used in this assessment is based on the 20% wind power electric generation scenario used by the National Renewable Energy Laboratory in the Eastern Wind Integration Study (EWITS). This scenario would require 2,900 additional turbines.

Where are those new turbines in each scenario more and less likely to go? To start, we created a probability surface by looking at a range of variables that might be relevant to a company's decision to develop a wind facility with wind turbines that have already been built. We used the maximum entropy modeling approach used to develop the Marcellus gas probability surface (see p. 13) and built the model using 580 existing and permitted wind turbines. Variables that potentially drive wind energy development were chosen based on data availability and included wind power (W/m$^2$), distance to transmission lines, percent slope, distance to roads, and land cover. An additional 193 existing and permitted wind turbines were used to test the validity of the model's probability surface and the model was found to be 95.8% accurate in predicting existing and permitted turbines from randomly sampled undeveloped areas. The resulting probability map indicates many long, narrow high probability sites along ridge tops, and several wider areas on high plateaus and along the Lake Erie coastline.

To get a better sense of where wind development is more likely, we searched for the highest probability areas where wind turbine pads in each scenario might be located. The probability raster was re-sampled to 60 meter resolution (0.89 acres) to reflect the actual geographic footprint of wind turbines based on aerial photo assessment. We selected the highest available probability pixel for each scenario and then buffered that pixel by a minimum separation distance of 800 feet (240 meters – the site distance between turbines) between existing turbines before selecting the next highest available probability pixel. The highest probable pixels were then selected until the threshold for each impact scenario was reached (low – 700 turbines; medium – 1,200 turbines; high – 2,700 turbines). Areas incompatible for wind energy development (existing wind turbines, Wild and Natural Areas, and water bodies) were excluded from being selected as probable pixels. The highest probable pixels were then converted into points for map display purposes.

The resulting projected turbine locations occur in strings, groups, and widely scattered single or very small clusters (2-5) of turbines, mostly in southwest, north central and northeastern parts of Pennsylvania.

Wind turbines, however, are almost always located in clusters rather than widely separated locations for individual turbines. In order to represent viable wind farms, we selected clusters of pixels with high probability to represent probable farms based on the results of the model. The following steps were applied to standardize the selection process:

- All selected wind facilities had to be anchored by at least 6 projected wind turbine sites selected by the model

- Buffers of equaling four times the minimum turbine separation distance of 787 ft (totaling 3,148 ft) were applied to existing and permitted wind farms were in order to not 'expand' operating and soon to be operating facilities;
- Setbacks of 500 ft from the boundaries of state and federal lands were applied to exclude turbine placement areas adjacent to public land;
- Existing homes Areas (as visible in aerial imagery) were buffered by approximately 1,000 ft;
- Projected clusters (wind farms) were assigned to the low, medium, or high scenario based on the number of the assigned wind turbines to that scenario within the cluster.
- Solitary and very small clusters of wind turbines were relocated to relatively high probability pixels adjacent to projected wind turbine clusters of at least 6 turbines (an 800 feet buffer was applied to each modeled turbine to maintain proper spacing).

The scenarios are cumulative with the high scenario including the wind facilities for both the low and medium scenarios and the additional turbines needed to meet the high scenario quota.



Map showing existing wind turbines with the probability that a given area will be developed indicated by color (dark red is high probability; dark blue is low).



Map showing 1,400 new wind turbines projected by 2030 under the medium development scenario.



Map showing 750 new wind turbines projected by 2030 under the low development scenario.



Map showing 2,900 new wind turbines projected by 2030 under the high development scenario.



Map showing medium wind development scenario within Somerset and Bradford counties.

These geographic projections of future wind energy development are spatial representations of possible scenarios. They are not predictions. We faced several constraints in developing the geographic scenarios:

- We do not have the detailed wind power data that wind companies have developed through anemometer tower monitoring.
- We do not have the detailed location of wind energy leases.

Still, we believe the overall geographic patterns in the projected wind development locations are relatively robust for several reasons. We used over 500 existing or permitted wind turbines to build the model and nearly 200 additional existing and permitted wind turbine sites were used to validate the model. This is typically a sufficient sample size for building predictive models. They are also consistent with Black and Veatch (2010) projected locations for wind facilities under a 15% renewable energy portfolio standard.

## Conservation Impacts of Wind Energy Development

What is the overlap of the areas with the highest probability of future wind energy development and those areas known to have high conservation values? To answer this question, we intersected the projected wind energy facilities with high conservation value areas. We looked at several examples from four categories of conservation value, including:

- Forest habitats
- Freshwater habitats

- Species of conservation concern
- Outdoor recreation

Areas of overlap between likely future wind development areas and priority conservation areas in Pennsylvania are substantially less than the conservation area overlap with likely future Marcellus development areas, largely because the projected foot print will be much smaller.

Forests

A large majority of projected wind turbines are found in forest patches, about 80 percent for each of the scenarios. The low scenario would see 600 new wind turbines in forest areas.  With a cleared forest average of 1.9 acres per turbine (including roads and other infrastructure), the total forest loss would be a modest 1,140 acres.  Indirect impacts to adjacent forest interior habitats would total an additional 7,920 acres.  Forest impacts from the medium scenario (1,120 projected new turbines in forest locations) would be 2,128 cleared forest acres and an additional 15,840 acres of adjacent forest interior habitat impacts. For the high scenario (2,320 new turbines in forest areas) 4,408 acres would be cleared and an additional 30,624 acres of forest interior habitats would be affected by new adjacent clearings.  On a statewide basis, the projected forest losses and accompanying interior forest habitat impacts will be minor given the Pennsylvania's 16 million acres of forest.  Locally, these impacts could be significant for individual large forest patches where wind development takes place.

All forests have conservation value, but large contiguous forest patches are especially valuable because they sustain wide-ranging forest species, such as northern goshawk, than small patches.  They are also more resistant to the spread of invasive species, can better withstand damage from wind and ice storms, and provide more ecosystem services – from carbon sequestration to water filtration – than small patches. The Nature Conservancy and the Western Pennsylvania Conservancy's Forest Conservation Analysis mapped nearly 25,000 forest patches in the state greater than 100 acres.  Patches at least 1,000 acres in size are about a tenth of the total (2,700).  The medium projected wind development scenarios indicate 73 patches (3%) greater than 1,000 acres in size are projected to have at least one wind turbine and associated infrastructure.  Patches at least 5,000 acres in size are relatively rare (only 316 patches).  The medium wind scenario indicates about 21 (7%) of these patches could be affected by future wind turbine development.  Most affected large patches have multiple projected wind turbines (as many as 36).  Typically, a large patch is split by wind development into two or three smaller patches due to the linear pattern of development.   Projected gas well pads, by contrast, are more likely to fragment a large patch into multiple smaller patches.

Forest interior bird species could be affected by the clearing of forest and adjacent edge effects that wind turbine facilities create in a forest context.  We used data from the 2nd Breeding Bird Atlas Project (see p. 20) to assess the potential impact on forest interior species.   The resulting maps show the estimated reduction in habitat for that species in each high wind development gas probability pixel (including both cleared forest and adjacent edge effects).  Scarlet Tanagers are perhaps the most widespread forest interior nesting bird in the state. Since they are so widespread, the vast majority of their range in the state is outside of the most likely wind development areas.  Scarlet Tanager populations could decline by an insignificant amount due to habitat losses projected in the medium scenario.  Black-throated blue warblers are more narrowly distributed in Pennsylvania favoring mature northern hardwood and coniferous forests with a thick understory, frequently in mountain terrain.  Likewise, population declines would also be extremely small for Black-throated blue warblers under the medium scenario.



Map showing estimated percent loss of habitat for Scarlet Tanagers under the medium wind scenario.



Map showing estimated percent loss of habitat for Black-Throated Blue Warblers under the medium wind scenario.

40

**Freshwater**

Wind energy and freshwater habitats are not often thought of in the same context since most wind facilities are generally in high elevation areas away from rivers and streams. The exceptions are small headwater streams, some of which may be classified as Exceptional Value watersheds.  Our medium scenario projection indicates that 9 percent of future turbine development could be located within ½ mile of an Exceptional Value stream.

Native brook trout are one of the most sensitive species in Pennsylvania watersheds. Brook trout favor cold, highly-oxygenated water and are unusually sensitive to warmer temperatures, sediments, and contaminants. Once widely distributed across Pennsylvania, healthy populations have retreated to a shrinking number of small watersheds.  The potential impact on intact brook trout watersheds, however, does increase significantly between the low to high scenarios.  Wind turbines have been built in just five of the intact brook trout watersheds identified by the Eastern Brook Trout Joint Venture.  That number would expand to 13 in the low scenario, 19 in the medium scenario, and 28 in the high scenario.  The presence of wind turbines may pose a limited risk in many of these watersheds, principally from soil disturbance near headwater streams.



Map showing current number of wind turbines in intact and predicted intact brook trout watersheds.



Map showing projected number of wind turbines in intact brook trout watersheds (by 2030) under medium scenario.

Poorly designed or maintained sedimentation measures, especially on road cuts and stream crossings, is the principal risk to these sensitive populations.

**Rare Species**

Of the approximately 100,000 species believed to occur in Pennsylvania, just over 1 percent is tracked by The Pennsylvania Natural Heritage Program (PNHP). These species are rare, declining or otherwise considered to be of conservation concern. PNHP records indicate that 77 tracked species have populations within pixels that have a relatively high modeled probability for wind development. Most of these species are commonly found in rocky outcrops and scrub oak/pitch pine barrens habitats on ridgetops across the state. Only a handful of species, however, have more than a few occurrences overlapping with the relatively high probability wind development pixels. For example, the eastern timber rattlesnake (*Crotalus horridus*) and Allegheny woodrat (*Neotoma magister*) are strongly associated with rocky outcrops and talus slopes along or near ridgetops. Six percent of the rattlesnake's known rattlesnake breeding/denning sites and three percent of Allegheny woodrat den sites are located in relatively high wind probability pixels. The den sites are very small sites and do not include foraging areas. The Pennsylvania Natural Heritage Program has developed core habitat polygons for each Allegheny woodrat occurrence. Much larger than the den locations, these polygons indicate a much broader overlap – 43 percent – with relatively high probability pixels for wind development. The Northern long-eared Myotis bat (*Myotis septentrionalis*) has about eight percent of its known winter hibernation and summer roosting areas overlapping with relatively high probability wind development pixels. Ridgetop barrens communities in northeastern Pennsylvania have some of the state's largest concentrations of rare terrestrial species. The Nature Conservancy has mapped these communities, and some of these habitats overlap with high wind areas. In general, there appears to be relatively little overlap between tracked species occurrences in Pennsylvania and likely wind

42

development sites.  For a handful of species, there is enough overlap to indicate the importance of surveys early in the project planning stage to identify the presence of rare species and their core habitats.

We have not addressed the potential impact of these scenarios on bird migration patterns and bat foraging populations.  For more information on wind development impacts on bird and bat species, please see links to the Pennsylvania Game Commission, U.S. Fish and Wildlife Service, American Wind and Wildlife Institute, and Bat Conservation International.

**Recreation**

Wind development has not occurred on any state or federal lands in Pennsylvania to date.  Since our projections assume there will not be a significant change in state land leasing policies for wind development, we have not projected new wind turbines in State Parks, State Forests or State Game Lands. Our projections, however, do indicate that wind turbines will be located in close proximity (sometimes as close as 500 feet) to many state lands. They are likely to be highly visible in some heavily visited areas, such as Blue Knob State Park in Bedford County, where natural landscape vistas are a prime attraction.

## Key Findings

Key findings from the Pennsylvania Energy Impacts Assessment include:

- Projections of between 750 and 2,900 new wind turbines developed on ridgetops and high plateaus by 2030, depending on the size of the Pennsylvania Alternative Energy Portfolio standard.   There are currently an estimated 500 wind turbines built in the state.

- Wind turbine facilities are likely to be developed in half of the state's counties, especially along the Allegheny front in western Pennsylvania and on high Central Appalachian ridges in central and northeastern parts of the state;

- Nearly eighty percent of turbine locations are projected to be in forest areas, with forest clearing projected to range between 1,140 and 4,400 acres depending on the number of turbines developed.  An additional range of 7,900 to 30,600 acres of forest interior habitat impacts are projected due to new edges created by turbine pads and roads;

- On a statewide basis, the projected forest clearing from turbine development is relatively minor, though some of the state's largest forest patches (>5,000 acres) could be fragmented into smaller patches by projected wind turbine development;

- Impacts on forest interior breeding bird habitats appear to be limited, largely because the overall footprint for the projected wind turbine facilities is small in comparison to the typical breeding range of these species in Pennsylvania.  The study did not assess impacts to migratory pathways for birds or foraging bats.

- Relatively few watersheds ranked as "intact" by the Eastern Brook Trout Joint Venture are affected by projected wind turbine development.  Several intact watersheds, however, could see several dozen wind turbines.  In a number of cases, these small watersheds are projected to see significant Marcellus gas development as well.  Given the cumulative impact of these activities, rigorously designed and monitored sediment control measures will be needed to protect sensitive brook trout populations.

- A relatively small handful of rare species occurrences tracked by the Pennsylvania Natural Heritage Program are found in areas with high probability for wind development.  These species tend to be associated with rocky outcrops and barrens communities typically found on ridge tops, including the Allegheny wood rat, the eastern timber rattlesnake, and the northern long-eared Myotis bat.

- Wind development is not projected to occur on Pennsylvania's public lands.  Existing and projected wind turbines, however, will be close to some of Pennsylvania's most heavily visited outdoor recreation areas where scenic natural vistas are a major attraction.

## Additional Information

- American Wind Energy Association (2010).  U.S. Wind Projects Database.
  http://www.awea.org/la_usprojects.cfm

- Black and Veatch (2010) Study for the Community Foundation for the Alleghenies:  Assessment of a 15 Percent Pennsylvania Alternative Energy Portfolio Standard: http://www.cfalleghenies.org/pdf/aepss.pdf

- Federal Aviation Administration (FAA) permits for wind turbines:
  https://oeaaa.faa.gov/oeaaa/external/public/publicAction.jsp?action=showCaseDownloadForm

- Federal Aviation Administration (FAA), Obstruction Evaluation / Airport Airspace Analysis (OE/AAA):
  https://oeaaa.faa.gov/oeaaa/external/public/publicAction.jsp?action=showCaseDownloadForm

- Pennsylvania Wind Farms and Wildlife Collaborative:  http://www.dcnr.state.pa.us/wind/index.aspx

- PA Game Commission (2007) Wind Energy Voluntary Cooperative Agreement and First Annual Report for the Wind Energy Voluntary Cooperative Agreement:
  http://www.portal.state.pa.us/portal/server.pt?open=514&objID=613068&mode=2

- Pennsylvania Department of Environmental Protection, Chapter 93 Water Quality Standards, Exceptional Value and High Quality Streams: data downloaded from Pennsylvania Spatial Data Access: (www.pasda.psu.edu)

- U.S. Department of Energy TrueWind 80 Meter Wind Resource Maps:
  http://www.windpoweringamerica.gov/wind_maps.asp

- U.S. Fish and Wildlife Service Wind Turbine Advisory Committee:
  http://www.fws.gov/habitatconservation/windpower/wind_turbine_advisory_committee.html

- U.S. Environmental Protection Agency summary of forest fragmentation effects:
  http://cfpub.epa.gov/eroe/index.cfm?fuseaction=detail.viewInd&lv=list.listByAlpha&r=219658&subtop=210

- Overview of forest fragmentation impacts on forest interior nesting species:
  http://www.state.nj.us/dep/fgw/neomigr.htm

- Overview of Pennsylvania High Quality and Exceptional Value Streams:
  http://www.dcnr.state.pa.us/wlhabitat/aquatic/streamdist.aspx

- Eastern Brook Trout Joint Venture intact brook trout watersheds:
  http://128.118.47.58/EBTJV/ebtjv2.html

- Overview of Carnegie Museum of Natural History, Powdermill Nature Reserve, and the Pennsylvania Game Commission's  2nd Pennsylvania Breeding Bird Atlas Project: http://www.carnegiemnh.org/powdermill/atlas/2pbba.html

- Pennsylvania Natural Heritage Program, including lists of globally rare and state endangered and imperiled species: http://www.naturalheritage.state.pa.us/

- U.S. Department of Agriculture, Natural Resources Conservation Service, National Agriculture Imagery Program: http://datagateway.nrcs.usda.gov/GDGOrder.aspx

    

January 11, 2012

Attn: dSGEIS Comments
New York State Department of Environmental Conservation
625 Broadway
Albany, NY 12233-6510

Dear Sir or Madam:

Enclosed please find the comments of Catskill Mountainkeeper, Delaware Riverkeeper Network, Earthjustice, the Natural Resources Defense Council and Riverkeeper on the Revised Draft Supplemental Generic Environmental Impact Statement on the Oil, Gas and Solution Mining Regulatory Program, Well Permit Issuance for Horizontal Drilling and High-Volume Hydraulic Fracturing to Develop the Marcellus Shale and Other Low-Permeability Reservoirs, issued September 7, 2011, and draft regulations (Proposed Express Terms 6 NYCRR Parts 52, 190, 550-556, 560, 750.1, and 750.3), issued September 28, 2011.

Sincerely,

Wes Gillingham
Catskill Mountainkeeper

Maya van Rossum
the Delaware Riverkeeper, Delaware Riverkeeper Network

Deborah Goldberg
Earthjustice

Kate Sinding
Natural Resources Defense Council

Kate Hudson
Riverkeeper



THE **Louis Berger Group**, INC.

48 Wall Street, 16th Floor, New York, NY 10005
Tel 212 612 7900    Fax 212 363 4341
www.louisberger.com

## Memorandum

TO:      Kate Sinding, Natural Resources Defense Council

FROM: Niek Veraart, Louis Berger Group

DATE:  January 11, 2012

RE:     Technical Comments Summary Report: Expert Team Review of the 2011 Revised Draft
        SGEIS on the Oil, Gas and Solution Mining Regulatory Program and Proposed High-Volume
        Hydraulic Fracturing Regulations

# 1.0   Introduction

The Louis Berger Group, Inc. (LBG) is pleased to submit this comment report on the 2011 Revised
Draft Supplemental Generic Environmental Impact Statement (RDSGEIS) on the Oil, Gas and
Solution Mining Regulatory Program and Proposed High Volume Hydraulic Fracturing (HVHF)
Regulations to the Natural Resources Defense Council (NRDC) and its partner organizations,
Earthjustice, Riverkeeper, Delaware Riverkeeper Network and Catskill Mountainkeeper. This
comment report serves two primary purposes: 1) to provide general comments on the RDSGEIS and
proposed regulations that are not limited to specific disciplines, and 2) to summarize the discipline-
specific technical comments from NRDC's expert review team. The expert review team consisted of
Harvey Consulting, LLC, Dr. Tom Myers, Dr. Glenn Miller, Dr. Ralph Seiler, Dr. Susan
Christopherson, Meliora Design LLC, LBG, Kevin Heatley, Dr. Kim Knowlton, Dr. Gina Solomon, and
Briana Mordick.  The detailed technical comments from each author/organization are provided as
attachments to this summary report and referenced as appropriate throughout.[1] Table 1 provides a
complete list of technical comment attachments and summarizes the major topics areas addressed
in each. Resumes for the members of the expert review team are provided in Attachment 12.

# 2.0   General Comments

## 2.1   RDSGEIS Fails to Address "Other Low-Permeability Shales"

The final scope and title of the RDSGEIS included other low-permeability shales, in addition to the
Marcellus shale. The RDSGEIS makes it clear that development of other shales (including the Utica
shale) is not only possible in the future, but is considered likely as evidenced by the inclusion of
development of other shales in the Ecology & Environment. Inc. economic impact assessment.[2]

---

[1] All references cited and relied upon in the attached reports are hereby incorporated by reference into these
comments.  Hard and/or electronic copies of all references are available upon request.
[2] See the 11/23/2011 email from Steven Russo (NYSDEC) to Deborah Goldberg (Earthjustice) explaining the
assumptions used in developing the scenarios for economic impact assessment include the development of
"other shales."

1

**Table 1**
**Technical Attachments to the Summary Comment Report**

| Attachment Number | Preparer | Topics Addressed |
|---|---|---|
| 1 | Harvey Consulting, LLC | Scope of SGEIS - Marcellus Shale Only<br>Liquid Hydrocarbon Impacts<br>Water Protection Threshold<br>Well Casing Requirements<br>Permanent Wellbore Plugging &Abandonment Requirements<br>HVHF Design and Monitoring<br>Hydraulic Fracture Treatment Additive Limitations<br>Drilling Mud Composition and Disposal<br>Reserve Pit Use and Drill Cutting Disposal<br>HVHF Flowback Surface Impoundments at Drillsite<br>HVHF Flowback Centralized Surface Impoundments Off-Drillsite<br>Repeat HVHF Treatment Life Cycle<br>Air Pollution Control and Monitoring<br>Surface Setbacks from Sensitive Receptors<br>Naturally Occurring Radioactive Materials<br>Hydrogen Sulfide<br>Chemical Tank, Waste Tank and Fuel Tank Containment<br>Corrosion and Erosion Mitigation and Integrity Monitoring Programs<br>Well Control and Emergency Response Capability<br>Financial Assurance Amount<br>Seismic Data Collection |
| 2 | Tom Myers, Ph. D. | Hydrogeology and Contaminant Transport<br>Surface Water Hydrology<br>Groundwater Quality Monitoring<br>Setbacks from aquifers and public water supply wells<br>Acid Rock Drainage |
| 3 | Glenn Miller, Ph.D. | Toxicology<br>Hydraulic Fracturing Additives<br>Naturally Occurring Radioactive Materials<br>Contaminants in Flowback water and produced brines<br>Wastewater Treatment issues |
| 4 | Ralph Seiler, Ph.D. | Radon in Marcellus Shale Natural Gas<br>Naturally Occurring Radioactive Materials |
| 5 | Susan Christopherson, Ph.D. | Socioeconomic Impacts<br>Pace and timing of natural gas development |
| 6 | Meliora Design, LLC | Water Quality<br>Stormwater<br>Erosion<br>SPDES General Permit |
| 7 | The Louis Berger Group, Inc. | Noise and Vibration<br>Visual impacts<br>Land use<br>Transportation<br>Community character<br>Cultural resources<br>Aquatic Ecology |
| 8[3] | Kevin Heatley, M.EPC  LEED AP | Ecosystems and Wildlife |
| 9 | Kim Knowlton, DrPH | Climate Change and Public Health |
| 10 | Gina Solomon, M.D., M.P.H | Health Impact Assessment |
| 11 | Briana Mordick | Induced Seismicity |

---

[3] Report prepared for and provided courtesy of the Delaware Riverkeeper Network.

The RDSGEIS adds some additional baseline geologic information on the Utica shale, but the environmental impacts specific to the Utica shale have not been addressed. For example, the Utica shale is almost twice as deep as the Marcellus shale, which means wells in the Utica shale will take longer to drill, would create more noise, would require more water, and would generate more waste and truck trips than wells in the Marcellus shale.

In addition to the incomplete study of deeper depth low permeability gas reservoirs, gas reservoirs at shallower depths than the Marcellus shale were not studied at all in the RDSGEIS. These shallower low-permeability shales pose development risks greater than those associated with the Marcellus shale because they are closer to protected water resources. Furthermore, the combined and/or concurrent exploitation of low-permeability shales at multiple depths may result in cumulative impacts not addressed in the RDSGEIS. The absence of the impact analyses of exploitation of shales at depths other than the Marcellus shale renders the RDSGEIS incomplete.  NYSDEC should either evaluate additional information and analysis on the impacts of exploring and developing the Utica Shale and other unnamed low-permeability gas reservoirs, or acknowledge that there is insufficient information and analysis to study the impacts of this development. In the latter case, the RDSGEIS should conclude that its examination of impacts and mitigation measures is limited to the Marcellus Shale Gas Reservoir, and therefore any Utica Shale or other unnamed low-permeability gas reservoir development will warrant a site-specific supplemental environmental impact statement review or should be covered under another, future SGEIS process.

For additional detailed information supporting this comment, refer to Chapter 2 of the 2011 Harvey Consulting, LLC report (Attachment 1).

## 2.2   RDSGEIS and Regulations Fail to Protect the Environment from Non-HVHF Gas Development

While significant gaps remain as identified throughout these comments, the proposed regulatory framework for HVHF includes a number of improvements to NYSDEC's existing regulations to protect the environment from natural gas development. However, most of these improvements apply only to wells meeting the threshold to be classified as HVHF (defined as hydraulic fracturing using greater than 300,000 gallons of water).[4] NYSDEC is using a patchwork approach to regulating HVHF by adding new requirements on top of outdated requirements. A broader reform of the oil and gas development regulations is needed to address deficiencies in the existing regulations. This will ensure that best practice approaches are required for all natural gas wells in New York, including conventional wells and hydraulic fracturing using less than 300,000 gallons of water. Examples of reforms incorporated into the RDSGEIS and/or proposed regulations for HVHF that should apply to all wells include updated well casing requirements, emergency response plans and plans addressing the mitigation of noise, visual, transportation and ecological impacts.

## 2.3   RDSGEIS Fails to Address Indirect and Cumulative Impacts

The RDSGEIS fails to analyze important indirect and cumulative impacts as required by the State Environmental Quality Review Act (SEQRA). One of the most glaring examples of this is the

---

[4] The RDSGEIS arbitrarily increased the threshold for HVHF to 300,000 gal from 80,000 gal, as evaluated in the 1992 GEIS.  There is no scientific justification given for the increase, and it effectively leaves all fracturing in the range 80,000-300,000 regulated by the existing rules without NYSDEC ever having conducted an environmental review showing that they are adequate for jobs that big.

RDSGEIS's failure to analyze the impacts of the pipelines and compressor stations that would be required to support the development of HVHF.

The RDSGEIS does not analyze any of the important impacts of pipelines and compressor stations (such as additional habitat fragmentation, noise and air pollutant emissions) based on flawed reasoning that such an analysis is not required because the pipelines would be reviewed under the Public Service Commission's Article VII process. The regulatory review process for pipelines is irrelevant—SEQRA requires state and local agencies to consider indirect "growth inducing" impacts. Pipelines and compressor stations are an indirect effect of the approval of HVHF. Without the approval of HVHF, there would be no reason to construct additional pipelines. Therefore, the pipelines/compressor stations and associated impacts cannot be separated from the environmental impact analysis of the HVHF regulatory program. The separate environmental review of the pipelines is, moreover, a form of segmentation, which is not permissible under SEQRA.[5] The additional natural gas pipelines and related infrastructure could also result in cumulative impacts when their impacts are combined with the impacts of HVHF that were analyzed in the RDSGEIS. The result of these deficiencies in the RDSGEIS is that the true impacts of the approval of HVHF have not been disclosed to the public and the requisite "hard look" under SEQRA has not been taken.

Similar to the treatment of pipeline infrastructure, the RDSGEIS also fails to analyze the cumulative impacts of numerous actions related to HVHF moving forward in New York, including the following:

- **Impacts from wastewater disposal and management**. The wastewater produced during the HVHF process is highly contaminated and could impact water resources if released into groundwater or surface water. While recognizing the problems with management of this water, the RDSGEIS fails to clearly state how this water will be either disposed in a manner that protects human health and the environment, or otherwise treated to remove the contaminants. While the RDSGEIS provides a range of alternatives, the RDSGEIS does not analyze the environmental or human health impacts associated with any of these disposal options. There are four possible treatment options for flowback and produced water discussed in the RDSGEIS: (1) reuse, (2) deep well injection, or (3) treatment in municipal or privately owned treatment facilities. None of these options is properly analyzed in the RDSGEIS, and the potential significant adverse impacts of each are therefore not disclosed nor possible mitigation identified. Further, effectively none of these options is likely to be accomplished in state, and the RDSGEIS implies that virtually all of the wastewater generated in New York will be managed out of state where regulations may be less stringent.

- **Impacts from Centralized Flowback Impoundments.** The RDSGEIS fails to analyze the impacts of centralized flowback impoundments based on statements from industry that they will not be "routinely" proposed. While site-specific SEQRA review would be required for any centralized flowback impoundment, NYSDEC should have addressed the potential for significant adverse cumulative impacts (particular air quality and water resources) arising from centralized flowback impoundments in combination with the other impacts of HVHF discussed in the RDSGEIS.

- **Impacts from seismic data collection.** Seismic data collection has the potential to create

---

[5] See 6 § NYCRR (617.2(ag)): "Segmentation means the division of the environmental review of an action such that various activities or stages are addressed under this Part as though they were independent, unrelated activities, needing individual determinations of significance."

habitat fragmentation through the clearing of long linear corridors, among other impacts. Seismic data collection is a reasonably foreseeable part of the development process and should have been considered as an aspect of the cumulative effects assessment in the RDSGEIS.

- **Impacts from liquid petroleum.** The development of the Marcellus shale has the potential to result in wells the encounter liquid hydrocarbons.  If liquid hydrocarbons are found while drilling a shale gas well, additional wells and drill sites may be proposed to develop those oil resources. Liquid hydrocarbons found during natural gas exploration have the potential to contaminate the environment through spills and well blowouts. None of these impacts were considered in the RDSGEIS.

- **Impacts from land use change**. The RDSGEIS contains some information about potential economic benefits, but does not examine how increase population and employment would change land use. Changes in land use would result in greater demands on the transportation system as well as ecological impacts from new residential and commercial development (above and beyond the direct impacts of the well pad sites themselves).

Fundamentally, the RDSGEIS analyzes only certain elements of HVHF and fails to analyze all elements of the process, both individually and collectively.

## 2.4    Unenforceable Mitigation under the HVHF Regulatory Framework

As noted throughout the detailed technical review comments, the RDSGEIS includes numerous mitigation commitments that are not enforceable because they are not included in the proposed regulations or supplemental permit conditions.

To provide a consistent regulatory framework for industry and to protect the environment, mitigation measures that would be applied across all HVHF operations should be incorporated into the proposed regulations. Mitigation measures that are site-specific should be incorporated into the supplemental permit conditions. Mitigation measures that are suggested in the RDSGEIS itself that are unenforceable (i.e., not codified through regulatory or other mechanisms) should be acknowledged as such and reduced efficacy of mitigation due to the lack of enforcement should be analyzed and disclosed.

## 2.5    Setbacks

As a general matter, the setback requirements stipulated by proposed HVHF regulations are inadequate to protect public health and environmental quality. Table 2 provides a summary of the setbacks proposed in the RDSGEIS and/or regulations and the recommended revisions to the setbacks based on the expert reviews conducted for NRDC.

For example, the minimum setback according to the HVHF regulatory framework for a residence is 100-feet. This is inadequate considering the potential for blowouts to eject drilling mud, hydrocarbons, and/or formation water from a well onto adjacent waters and lands. Depending on reservoir pressure, blowout circumstances, and wind speed, these pollutants can be distributed hundreds to thousands of feet away from a well. Other risks to residences and schools within close proximity to HVHF operations include noise levels that damage hearing and, exposure to hazardous gases, chemicals, fuels, and explosive charges.

The potential radius of impact for explosions, fire, and other industrial hazards should be considered in the RDSGEIS and proposed HVHF regulations. For example, Fort Worth Texas uses the International Fire Code as the basis for its minimum 600' setback from shale gas drilling operations. The figure below shows how the HVHF regulations setback distance requirements are significantly shorter and thus less protective than the requirements in other locations.



## 2.6   Insufficient Public Review of HVHF Permit Applications

The RDSGEIS fails to provide a clear and accessible process for public and local government access to site-specific HVHF activity information, while at the same time placing the burden on local government (and not the industry) to provide notice to NYSDEC that a HVHF activity may not be in compliance with local zoning or land use regulations (RDSGEIS pages 8-4 and 8-5). This essentially puts the regulatory burden on local government and at the same time fails to provide local government with access to the necessary information. The burden of demonstrating compliance with local government land use requirements should fall on the industry, not local government and the public. NYSDEC should require public notice of the availability of HVHF permit applications locally through publication of a notice in a newspaper of general circulation and statewide through a centralized website. Permit applicants should be required to provide copies of their application to the affected municipality. The public should have immediate online access to all supporting documentation submitted with each permit application and the public review timeframe should be no less than 30 days. The regulatory framework must incorporate a mechanism for public comments on permit applications to be considered by NYSDEC before the decision to grant or reject a permit application is made.

**Table 2**
**Summary of Setback Recommendations**

| | Minimum Setback under Existing/Proposed HVHF Regulatory Framework | Recommended Minimum Setback | Rationale/Notes |
|---|---|---|---|
| Residences | 100 feet<br><br>6 NYCRR § 553.2 | 1,320 feet | Protects from noise, explosions, fire, and other industrial hazards. |
| Public Buildings (including schools) | 150 feet<br><br>6 NYCRR § 553.2 | | |
| Primary Aquifers | 500 feet<br><br>6 NYCRR § 560.4 | 4,000 feet | The 500 feet setback for primary aquifers should be increased to 4,000 feet (the same setback distance adopted in the RDSGEIS for Filtration Avoidance Determination watersheds), unless a site specific analysis demonstrates there are no fractures connecting the bedrock with the aquifer and there are no obvious surface water pathways. |
| Principal Aquifers | 500 feet in RDSGEIS (page 1-18) but not in the proposed regulations** | 4,000 feet | The only difference between a primary and principal aquifer is the number of people potentially using the aquifer. Principal aquifers are thought to be productive enough to be an important source and contamination with fracking fluid or flowback could render them unusable without substantial remediation. Wells near principal aquifers should be subject to the same setback as well near a primary aquifer. |
| Public Water Supplies | 2,000 feet<br><br>(6 NYCRR § 560.4) | 4,000 feet | The setback for public water supplies should be the same as for principal aquifers (4,000 feet) and the operator should identify the capture zone for flow to the well and identify the five year transport distance contour. |
| Private Drinking Water Wells | 500 feet*<br><br>(6 NYCRR § 560.4) | 4,000 feet | Private and public wells should be protected to the same extent. NYSDEC should not allow the owner to waive the private well setback requirement because health and safety are at risk. More than just the "owner" may use the source, and the owner could sell to someone who does not understand the situation. |
| Stream, Storm Drain, Lake, or Pond | 150 feet** | 660 feet | The regulations currently contain conflicting and unclear requirements with respect to surface water resource setbacks. The regulations should be revised provide consistent setback requirements that are protective of water sources, including rivers, streams (perennial and intermittent), and lakes. |
| Filtration Avoidance Determination Watersheds | 4,000 feet in RDSGEIS (page 7-56) but not in the proposed regulations | 4,000 feet | Incorporate RDSGEIS setback commitment into regulations. In addition, the operator should be required to analyze the local geology to determine whether the groundwater divide would allow transport into the FAD watershed. |
| Floodplains | Wellpads prohibited in the 100-year floodplain<br><br>(6 NYCRR § 560.4) | Wellpads prohibited in the 500-year floodplain | For wells that might operate for 30 years, there is a 26% chance of a 100-year flood occurring during the period the well would be operated. Wells should be prohibited within at least the 500 year return interval floodplain, because the damages from significant flooding could be very substantial. |

*Setback can be waived by the landowner. The proposed regulations do not address setbacks for domestic use springs

** Setback could be waived based on site-specific analysis.

## 2.7   Impacts of Well Refracture Not Addressed

The assessments of environmental impacts in the RDSGEIS are all based on a single hydraulic fracturing treatment of each well.  The RDSGEIS inappropriately relies on informal statements from industry that refracturing will be rare and does not quantify the number of HVHF treatments possible per well. The RDSGEIS under-predicts both the peak and cumulative impacts by not examining the reasonably foreseeable likelihood that Marcellus, Utica, and other low-permeability shale reservoirs will require more than one HVHF treatment, most likely two or three, over a several-decade long lifecycle. The RDSGEIS should quantify how many times a well may be fracture treated over its life, and provide a worst case scenario for water use and waste disposal requirements based on this scenario. Additionally, the RDSGEIS should examine the peak and cumulative impacts of multiple HVHF treatments over a well's life and propose mitigation to offset those reasonably foreseeable impacts. Refer to Chapter 16 of the Harvey Consulting, LLC report (Attachment 1) for more information supporting this comment.

# 3.0   Summary of Technical Comments

## 3.1   Liquid Petroleum Impacts

The RDSGEIS describes natural gas exploration and production, but does not address the potential for shale gas wells to also encounter liquid hydrocarbons. Natural gas exploration can identify oil and condensate development opportunities. If liquid hydrocarbons are found while drilling a shale gas well, additional wells and drill sites may be needed to develop those oil resources. Liquid hydrocarbons found during natural gas exploration have the potential to contaminate the environment through spills and well blowouts. The risk of oil spills during shale gas exploration has not been analyzed in the RDSGEIS. While blowouts are infrequent, they do occur, and are a reasonably foreseeable consequence of exploratory drilling operations. Blowouts can occur from gas and/or oil wells. They can last for days, weeks, or months until well control is achieved. On average, a blowout occurs in 7 out of every 1,000 onshore exploration wells. Two recent gas well blowouts occurred in Pennsylvania due to Marcellus Shale drilling.

The RDSGEIS should examine the potential for shale gas wells to also encounter liquid hydrocarbons. The RDSGEIS should also examine the incremental risks of oil well blowouts and oil spills, as well as the impacts from the additional wells and drill sites that may be required to develop oil resources identified by shale gas exploration and production activities.

The comments summarized in this section are covered in greater detail in Chapter 3 of the Harvey Consulting, LLC report (Attachment 1).

## 3.2   Well Casing Requirements

The comments summarized in this section are covered in greater detail in Chapters 5 through 8 of the Harvey Consulting, LLC report (Attachment 1).

### 3.2.1   Conductor Casing

Conductor casing is the first string of casing in a well and is installed to prevent the top of the well from caving in. The conductor casing requirements listed in the Proposed Supplementary Permit Conditions for HVHF and Existing Fresh Water Supplementary Permit Conditions Required for Wells Drilled in Primary and Principal Aquifers should be codified in the proposed regulations and should

apply to all natural gas wells drilled in NYS, not just HVHF wells. Additionally, NYSDEC should set a conductor casing depth criterion, requiring conductor casing be set to a sufficient depth to provide a solid structural anchorage. Regulations should specify that conductor casing design be based on site-specific engineering and geologic factors.

## 3.2.2  Surface Casing

Surface casing plays a very important role in protecting groundwater aquifers, providing the structure to support blowout prevention equipment, and providing a conduit for drilling fluids while drilling the next section of the well. Stray gas may impact groundwater and surface water from poor well construction practices. Properly constructed and operated gas wells are critical to mitigating stray gas and thereby protecting water supplies and public safety. If a well is not properly cased and cemented, natural gas in subsurface formations may migrate from the wellbore through bedrock and soil. Stray gas may adversely affect water supplies, accumulate in or adjacent to structures such as residences and water wells, and has the potential to cause a fire or explosion. Instances of improperly constructed wellbores leading to the contamination of drinking water with natural gas are well documented in Pennsylvania and other locations.

The RDSGEIS and proposed regulations include important improvements for surface casing that incorporate many of the comments provided by this working group in 2009. Notable improvements include requirements related to cement quality, casing quality, and installation techniques. Unfortunately, there are a number of inconsistencies between the permit conditions and the proposed regulations that create uncertainty about what will be required. The Harvey Consulting, LLC report provides recommendations for correcting these inconsistencies. Finally, there are a number of new surface casing requirements proposed for HVHF wells that are standard industry best practices for all oil and gas wells. These requirements should be included in 6 NYCRR Part 554 (drilling practices for all oil and gas wells), and not just contained in 6 NYCRR Part 560 (drilling practices for HVHF wells).

## 3.2.3  Intermediate Casing

Intermediate casing provides a transition from the surface casing to the production casing. This casing may be required to seal off anomalous pressure zones, lost circulation zones, and other drilling hazards. The RDSGEIS and proposed regulations include important improvements for intermediate casing in comparison to the 2009 DSGEIS. Overall, NYSDEC's intermediate casing requirements for HVHF wells are robust. However, the remaining area for improvement in the proposed regulations is to establish intermediate casing and cementing standards for all wells that will not undergo HVHF treatment, but will require the installation of intermediate casing, on which the proposed regulations are silent. There are also a number of new intermediate casing requirements proposed for HVHF wells that are standard industry best practices for all oil and gas wells. Those requirements should be included in 6 NYCRR Part 554 (drilling practices for all oil and gas wells), and not just covered in the new 6 NYCRR Part 560 (drilling practices for HVHF wells).

## 3.2.4  Production Casing

Production casing is the last string of casing set in the well. It is called "production casing" because it is set across the hydrocarbon-producing zone or, alternatively, it is set just above the hydrocarbon zone. Production casing is used to isolate hydrocarbon zones and to contain formation pressure. Production casing pipe and cement integrity is very important, because it is the piping/cement barrier

that is exposed to fracture pressure, acid stimulation treatments, and other workover/stimulation methods used to increase hydrocarbon production.

The RDSGEIS and proposed regulations include substantial improvements for production casing. NYSDEC's proposed production casing requirements for HVHF wells are robust. The most notable improvement to the proposed regulations is that production casing must be set from the well surface through the production zone. This provides an additional protective layer of casing and cementing in the well during HVHF treatments. The RDSGEIS and proposed regulations require production casing to be fully cemented, if intermediate casing is not set. If intermediate casing is set, it requires production casing be tied into the intermediate casing. The proposed regulations also require the cement placement and bond be verified by well logging tools. These requirements are best practice. The Harvey Consulting, LLC report provides minor additional recommendations to improve consistency of the various requirements for production casing and highlights additional best practices that should be considered.

## 3.3   HVHF Design and Monitoring

Computer modeling is routinely used by industry to design hydraulic fracture treatments. During actual fracture stimulation treatments, data is collected to verify model accuracy, and the model is continually refined to improve its predictive capability. Data collected during drilling, well logging, coring, and other geophysical activities and HVHF implementation can be used to continuously improve the model quality and predictive capability. HVHF modeling is an important way of helping to ensure fracture treatments do not extend outside the target formation.  Fracture treatments that propagate outside the shale zone (fracturing out-of-zone) reduce gas recovery and risk pollutant transport.

The RDSGEIS does not require well operators to develop or maintain a hydraulic fracture model. Instead, the RDSGEIS only requires the operator to abide by a 1000' vertical offset from protected aquifers and collect data during the HVHF job to evaluate whether the job was implemented as planned.  Knowing whether a job was implemented as planned is only helpful if the initial design is protective of human health and environment. If the job is poorly planned, and is implemented as planned, that only proves that a poor job was actually implemented. Instead, NYSDEC needs to first verify that the operator has engineered a HVHF treatment that is protective of human health and the environment, and then, second, verify that the job was implemented to that protective standard. A rigorous engineering analysis is a critical design step. Proper design and monitoring of HVHF jobs is not only best practice from an environmental and human health perspective; it is also good business because it optimizes gas production and reduces hydraulic fracture treatment cost.  Best practices for HVHF design and monitoring should be included as a mitigation measure, and codified in regulations as a minimum standard. These best practices include utilizing hydraulic fracture modeling prior to each fracture treatment to ensure that the fracture is contained in zone.

The comments summarized in this section are covered in greater detail in Chapter 10 of the Harvey Consulting, LLC report (Attachment 1).

## 3.4   Corrosion and Erosion Mitigation and Integrity Monitoring Programs

Downhole tubing and casing, surface pipelines, pressure vessels, and storage tanks used in gas exploration and production can be subject to internal and external corrosion. Corrosion can be caused by water, corrosive soils, oxygen, corrosive fluids used to treat wells, and the carbon dioxide

($CO_2$) and hydrogen sulfide ($H_2S$) present in gas. High velocity gas contaminated with water and sediment can internally erode pipes, fittings, and valves. HVHF treatments, if improperly designed, can accelerate well corrosion. Additionally, acids used to stimulate well production and remove scale can be corrosive. The RDSGEIS includes a discussion on corrosion inhibitors used by industry in fracture treatments, but does not require them as best practice. Furthermore, the RDSGEIS does not require that facilities be designed to resist corrosion (e.g., material selection and coatings), nor does it require corrosion monitoring, or the repair and replacement of corroded equipment. Best corrosion and erosion mitigation practices and long-term well integrity monitoring should be evaluated and codified in regulations. Operators should be required to design equipment to prevent corrosion and erosion. Corrosion and erosion monitoring, repair, and replacement programs should be instituted.

The comments summarized in this section are covered in greater detail in Chapter 23 of the Harvey Consulting, LLC report (Attachment 1).

## 3.5   Well Control & Emergency Response Capability

Industrial fires, explosions, blowouts, and spills require specialized emergency response equipment, which may not be available at local fire and emergency services departments. For example, local fire and emergency services departments typically do not have well capping and control systems. The addition of an Emergency Response Plan (ERP) requirement to the RDSGEIS is a substantial improvement over the 2009 DSGEIS, which failed to address this issue. However, it is recommended that NYSDEC include a review, approval, and audit processes to ensure that quality ERPs are developed.  Objectives of the ERP should include adequately trained and qualified personnel, and the availability of adequate equipment. If local emergency response resources are relied on in the ERP, operators should ensure they are trained, qualified, and equipped to respond to an industrial accident. Additionally, NYSDEC should have a program to audit ERPs via drills, exercises, equipment inspections, and personnel training audits.

The comments summarized in this section are covered in greater detail in Chapter 24 the Harvey Consulting, LLC report (Attachment 1).

## 3.6   Financial Assurance Amount

NYSDEC ignored comments submitted by this working group in 2009 requesting that the SGEIS examine financial assurance requirements to ensure there is funding available to properly plug and abandon wells; remove equipment and contamination; complete surface restoration; and provide adequate insurance to compensate nearby public for adverse impacts (e.g., well contamination). Although changes in financial assurance amounts would require legislative action, the analysis of this issue is necessary to fully disclose the potential adverse environmental impacts that would result in the absence of adequate financial assurances.  Moreover, such an analysis would be an appropriate way of bringing this need for legislation to the attention of elected officials as appropriate mitigation for identified significant adverse impacts.

The importance of reevaluating financial assurance requirements is heightened when the inadequacy of the existing requirements is considered. For wells between 2,500' and 6,000' in depth, NYSDEC requires only $5,000 financial security per well, with the overall total per operator not to exceed $150,000. For wells drilled more than 6,000' deep, NYSDEC is proposing a regulatory revision that requires the operator to provide financial security in an amount based solely on the anticipated cost for plugging and abandoning the well (6 NYCRR § 551.6). These requirements are

far less than those in other locations.  Fort Worth, Texas requires an operator drilling 1-5 wells to provide a blanket bond or letter of credit of at least $150,000, with incremental increases of $50,000 for each additional well. Therefore, under Fort Worth, Texas requirements, an operator drilling 100 wells would be required to hold a bond of $4,900,000, as compared to $150,000 in NYS. In Ohio, an operator is required to obtain liability insurance coverage of at least $1,000,000 and up to $3,000,000 for wells in urban areas.

NYSDEC's financial assurance requirements should not narrowly focus on the costs of plugging and abandoning a well. Instead, NYSDEC's financial assurance requirements should include a combination of bonding and insurance that addresses the costs and risks of long-term monitoring; publicly incurred response and cleanup operations; site remediation and well abandonment; and adequate compensation to the public for adverse impacts (e.g., water well contamination). It is recommended that each operator provide a bond of at least $100,000 per well, with a cap of $5,000,000 for each operator. Additionally, NYSDEC should require Commercial General Liability Insurance, including Excess Insurance, Environmental Pollution Liability Coverage, and a Well Control Policy, of at least $5,000,000. If NYSDEC deviates from these financial assurance requirements, it should be justified with a rigorous economic assessment that is provided to the public for review and comment. Recommendations for financial assurance improvements for Marcellus Shale gas well drilling should be evaluated and included in the proposed regulations.

The comments summarized in this section are covered in greater detail in Chapter 25 of the Harvey Consulting, LLC report (Attachment 1).

## 3.7   Hydrogeology and Contaminant Transport

The RDSGEIS dismisses the potential for groundwater contamination due to HVHF on the basis of faulty science and unsupported assumptions.

1. The characterization of the hydraulic fracturing process and effects in the RDSGEIS is technically incorrect, leading to important impacts being overlooked.

2. The RDSGEIS assumes that the geologic layers above the Marcellus shale will stop contamination of aquifers without providing sufficient information on these layers, and ignoring the potential for existing faults and fractures to expedite contaminant transport. It also ignores studies which show that hydraulic fracturing has fractured formations as much as 1500 feet above the target shale, thereby providing pathways through the rock which the RDSGEIS relies on for stopping contaminant transport.

3. The RDSGEIS impact analyses are incomplete from a spatial perspective. The analyses focus on *local* impacts and fails to address the *regional* impacts of HVHF on the characteristics of the shale and the environmental implications of these changes. Such changes include increased shale permeability to water flow, which increases the risk of aquifer contamination over time.

4. The RDSGEIS analyses are incomplete from a temporal perspective. The analyses do not address the potential long-term aquifer contamination impacts by focusing on a time period of few days, assuming contamination has not occurred in other locations that lack the monitoring that would be necessary to detect contamination, and not considering evidence of the potential vertical movement of fracking fluid to near-surface aquifers as discovered under comparable conditions elsewhere.

Detailed technical supporting information for the deficiencies noted above is provided in the report prepared by Dr. Tom Myers (Attachment 2). The Myers report also provides a number of important recommendations for:

1. Improving and expanding the characterization of the hydraulic fracturing process and impacts in the RDSGEIS; and
2. Implementing measures as part of the review of specific well site proposals to avoid significant adverse aquifer contamination impacts.

The measures should include the following:

1. Mapping groundwater gradients above the Marcellus shale using existing data.
2. Requiring seismic surveys to locate faults prior to drilling.
3. Implementation of a long-term monitoring plan with wells established to monitor for long-term upward contaminant transport.

The groundwater monitoring at domestic wells proposed in the RDSGEIS is a scientifically improper method of monitoring the location of a contaminant plume because domestic wells are not designed for monitoring.  Dedicated monitoring wells are necessary to prevent contamination of water wells by detecting contaminants before they reach the water wells.

## 3.8    Well Plugging and Abandonment

Wells that are not properly plugged can act as a preferential pathway for surface contaminants to impact groundwater resources. There are 2,114 wells that are at least 47 years old and some more than 87 years old that still have not been properly abandoned in NYS, and 2,026 wells where the age and condition is unknown (and must be assumed improperly abandoned). As a result, there is a risk that improperly planned HVHF wells or fractures could intersect abandoned wells and contaminate groundwater.   Key recommendations from Chapter 9 of the Harvey Consulting, LLC report (Attachment 1) related to well plugging and abandonment (P&A) include the following:

- The SGEIS should examine: the number of improperly abandoned or orphaned wells in NYS requiring P&A in close proximity to drinking water sources or in close proximity to areas under consideration for HVHF treatments; whether a procedure needs to be put in place to examine the number, type, and condition of wells requiring P&A in close proximity to  new shale gas development; and whether plugging improperly abandoned and orphaned wells should be required where such wells are in close proximity to new HVHF treatments.

- The SGEIS should include maps showing the location and depths of improperly abandoned, orphaned wells in NYS. These maps should correlate the locations and depths to potential foreseeable shale gas development and examine the need to properly P&A these wells before shale gas development occurs nearby. The SGEIS should assess the risk of a HVHF well intersecting a well that is not accurately documented in NYSDEC's Oil & Gas database and whether this poses and unmitigated significant impact to protected groundwater resources.

- The SGEIS requirements with respect to the plugging of improperly abandoned wells nearby proposed HVHF wells should be strengthened and incorporated in the proposed regulations.

## 3.9    Seismic Data Collection

Seismic surveys are used by industry to target hydrocarbon formations for exploration and appraisal drilling. Typically seismic surveys are conducted using vehicle-mounted vibrator plates that impact the ground or use explosive to create seismic waves which bounce off of subsurface rock strata and geologic formations. The reflected seismic waves are measured at various surface receivers. The rate that seismic energy is transmitted and received through the earth crust provides information on the subsurface geology, because seismic waves reflect at different speeds and intensity off various rock strata and geologic structures. Seismic operations are very labor intensive and require large amounts of equipment, personnel and support systems. Depending on the size of the area under study, and the type of equipment selected, seismic operations can require dozens to hundreds of personnel. In addition to seismic exploration equipment, there is a need for housing, catering, waste management systems, water supplies, medical facilities, equipment maintenance and repair shops, and other logistical support functions.

Significant surface impacts can be caused by extensive tree and vegetation removal to create straight "cutlines" to run seismic equipment (up to 20'-50' wide). Lines need to be cut to run mechanical vibration equipment or set explosives to generate the seismic waves, and other seismic lines are cleared to set geophones to measure the seismic reflection.

The RDSGEIS does not include any analysis of the potential impacts or mitigation needed for two-dimensional (2D) or three-dimensional (3D) seismic surveys. If 2D or 3D seismic surveys are planned, or are possible in the future, the proposed HVHF regulations should codify a permitting process for these activities and institute mitigating measures in the RDSGEIS to minimize surface impacts and disruptions, and require rehabilitation of impacted areas. In addition, the increased industrial activity (e.g., economic impacts, noise, surface disturbance, wildlife impacts, etc.) associated with 2D and 3D seismic surveys should be examined in the RDSGEIS.

The comments summarized in this section are covered in greater detail in Chapter 26 of the Harvey Consulting, LLC report (Attachment 1).

## 3.10   Surface Water Hydrology

The RDSGEIS has addressed many of the deficiencies of the 2009 DSGEIS with respect to the treatment of hydrology issues. As discussed in the Myers report (Attachment 2), NYSDEC proposes to use the natural flow regime method (NFRM) for all regions by means of permit conditions. However, NYSDEC should verify the accuracy for the proposed methods for estimating passby flows at ungauged sites.  Since NFRM is proposed to be applied everywhere (and not just in a specific case which would justify its use as a permit condition), it would be more appropriate for NYSDEC to include the use of the NFRM as a requirement in the regulations themselves. The following changes should be accounted for in the regulatory framework regarding the avoidance or reduction of potential impacts resulting from water withdrawal:

- NYSDEC should coordinate water withdrawals among operators so their withdrawals do not cumulatively cause flows to drop below the required passby flows at any point along the stream.
- The operator should establish a temporary flow/stage relationship with at least a staff gage that should be monitored.
- Passby flows should be maintained with consideration of the measurement error inherent in the technique.  The operator should assume that the measurement method is overestimating

flow and therefore maintain a flow greater than the passby flow by as much as the error estimate.

# 3.11  Stormwater, Sedimentation and Erosion

All of the comments summarized in this section are covered in greater detail in the Meliora Design, LLC report (Attachment 6).

### 3.11.1 Cumulative Water Quality Impacts of Land Disturbance Are Not Addressed

The RDSGEIS provides only a very brief generic discussion of the potential land disturbance and associated stormwater and water quality impacts on surface waters from HVHF (and well drilling in general).  The RDSGEIS makes no attempt to evaluate the cumulative impacts of HVHF activity on water resources, at either the small (headwater stream) scale, or the larger watershed scale.  Even very general cumulative estimates of land disturbance, and its associated water quality impacts, are not provided.  Since the original draft of the GEIS nearly twenty years ago, the use of improved geographic information system (GIS) software and modeling tools has expanded the ability of scientists, engineers, and regulators to quantify the scale and impact of proposed activities on water resources.  Such analysis has become standard industry practice for watershed planning and the development of TMDL (Total Daily Maximum Load) studies to determine the level of pollutant load (and required pollutant load reduction) to meet water quality standards.  The RDSGEIS fails to provide any such analysis, and instead only acknowledges stormwater impacts on water quality in the most general and generic manner, with little industry specific consideration, and no consideration of total or cumulative impacts.  A more detailed and comprehensive evaluation of the amount of anticipated land disturbance and associated water quality impacts is essential to a full environmental impact analysis, and to any determinations by NYSDEC on the appropriate regulatory permitting requirements.

### 3.11.2 Stream Crossing Impacts Are Not Addressed

The RDSGEIS fails to consider the potential surface water impacts of stream crossing activity associated with HVHF well pads, most notably, stream crossings associated with gathering lines and access roads (to both well pads and compressor stations).  Stream crossings and the associated water quality impacts are not fully addressed in the RDSGEIS, and are specifically not included in the Draft State Pollutant Discharge Elimination System (SPDES) General Permit.  It is unclear how many stream crossings may be anticipated, and of these, how many will essentially be unregulated under current NYSDEC regulations.  It is unclear what the anticipated environmental impacts of these stream crossings will be on water quality and aquatic systems.  NYSDEC should provide some estimate of the extent of anticipated stream crossings, potential water quality impacts, and proposed requirements to regulate and mitigate these impacts.

### 3.11.3 Mitigation and SPDES General Permit Do Not Consider Existing Water Quality

With the exception of watersheds that have received Filtration Avoidance Determinations, the RDSGEIS (and associated Draft SPDES HVHF General Permit) do not provide any specific consideration of whether different performance requirements or standards are necessary to protect water quality for higher quality watersheds, impaired streams, or areas of denser well pad development on a watershed basis.  There is no documentation to support the adequacy of the proposed setbacks to protect water quality in all situations (i.e., higher quality streams, percent of land disturbance within a watershed, site specific conditions such as steep slopes), and the setbacks

discussed in the narrative of Chapter 7 are not clearly coordinated with EAF requirements in Appendices 4, 5, 6 and 10 and the Draft HVHF General Permit mapping and documentation requirements (and the Draft SPDES HVHF General Permit is presumably the regulatory mechanism for compliance). NYSDEC should provide some analysis or justification as to why a single set of performance requirements is applicable in all watersheds and all situations, regardless of stream designation or current levels of impairment or high quality.

### 3.11.4 SPDES General Permit Flawed

The Draft SPDES General Permit for HVHF is essentially a compilation of the NYSDEC's general permits for both construction activity and industrial activity. The general permit process is essentially "self-regulating," relying on the regulated industry to adhere to certain compliance requirements. It is not clear from the RDSGEIS's very limited discussion of land disturbance and surface water impacts that a general permit process is sufficient to protect water quality. It is also not clear that an industry that is not subject to local government review and approval, unlike virtually all other land disturbance activities addressed by general permits, can be adequately regulated through a general permit process. This is especially important for a heavy industrial activity that will be occurring in areas not zoned or accustomed to heavy industrial activity at the scale that will occur with HVHF. Finally, the general permit process does not provide a timeframe (or process) for public review, comment, and objection to any or all parts of proposed general permit coverage. Essentially, permit coverage is automatically granted to the industry by providing notice to the NYSDEC and meeting minimum performance requirements. The SPDES HVHF General permit should provide a process for public access to all information associated with HVHF land disturbance and water quality impacts, and that a process and timeline be developed to allow for public comment and appeal of general permit coverage for a specific site before general permit coverage is granted. The permit coverage timeline should be adjusted to provide for public comment and appeal.

## 3.12  Hazardous and Contaminated Materials Management

All of the comments summarized in this section are covered in greater detail in the Harvey Consulting, LLC report (Attachment 1) and the report of Dr. Glenn Miller (Attachment 3).

### 3.12.1 Disposal of Waste and Equipment Containing NORM

Naturally Occurring Radioactive Materials (NORM) can be brought to the surface in a number of ways during drilling, completion, and production operations:

- **Drilling**: Drill cuttings containing NORM are circulated to the surface.
- **Completion**: Wells stimulated using hydraulic fracture treatments inject water; a portion of that water flows back to the surface ("flowback") and can be contaminated by radioactive materials picked up during subsurface transport.
- **Production**: Subsurface water located in natural gas reservoirs, produced as a waste byproduct, may contain radioactive materials picked up by contact with gas or formations containing NORM (this water is called "produced water"). Equipment used in hydrocarbon production and processing can concentrate radioactive materials in the form of scale and sludge.

The RDSGEIS fails to establish clear cradle-to-grave collection, testing, transportation, treatment, and disposal requirements for all waste containing NORM. The RDSGEIS is improved relative to the 2009 DSGEIS in that it establishes radioactive limitations and testing in some cases, but testing is

still not required in all cases (even when data uncertainty exists). Long-term treatment and disposal requirements are not robust for all waste types. Nor is there a process in place to provide the public with information on NORM handling over the project life. For example:

- Radioactivity treatment and disposal threshold levels are established (e.g., for produced water and equipment); however, it is unclear if there is sufficient treatment and disposal capacity in NYS to handle the volume and amount of radioactive waste that may be generated;
- NYSDEC assumes that some waste will not contain significant amounts of radioactivity; yet, this assumption is based on a very limited dataset;
- There is no testing requirement to verify NORM content in drill cuttings before they are sent directly to a landfill; and
- Road spreading of waste is not prohibited; it is deferred to a yet-to-be determined future process outside the SGEIS review.

Detailed collection, testing, transportation, treatment, and disposal methods for each type of drilling and production waste and equipment containing NORM should be included as a mitigation measure and codified in the NYCRR. Where data uncertainty exists, additional testing should be required. The radioactive content of waste should be verified to ensure appropriate transportation, treatment, and disposal methods are selected, and the testing results should be disclosed to the public.

## 3.12.2 Drilling Mud Composition and Disposal

Drilling muds may contain mercury, metals, Naturally Occurring Radioactive Materials (NORM), oils and other contaminates. The NYSDEC appropriately removed the statement that "*drilling muds are not considered to be polluting fluids*" from the proposed regulations in response to this working group's 2009 comments. This positive change is commendable, but there are two problems related to the regulation of drilling muds that remain:

- The RDSGEIS states that the vertical portion of wells would be "typically" drilled using compressed air or freshwater mud as the drilling fluid. There is no regulatory restriction on industry using toxic additives in drilling mud, with corresponding increases in the risks of water resources contamination during drilling, transport and disposal. NYSDEC should stipulate in the regulations the mandatory use of compressed air or freshwater mud and prohibit the use oil-based muds, synthetic-based muds and the use of toxic additives.
- The proposed regulations do not provide criteria for acceptable drilling mud disposal plans to ensure safe handling and disposal. The proposed regulations should require specific best practices for drilling mud handling and disposal.

## 3.12.3 Reserve Pit Use and Drill Cuttings Disposal

The RDSGEIS acknowledges the numerous environmental advantages of a closed loop tank system to manage drilling fluids and cuttings rather than reserve pits, but fails to require a closed loop tank system in all circumstances. The closed loop tank system is only required for wells without an acceptable acid rock drainage mitigation plan for onsite disposal and for cuttings that need to be disposed at a landfill because they contain toxic additives. The proposed regulations should prohibit reserve pits and require a closed loop tank system. Reserve pits should only be allowed where the applicant demonstrates that the closed loop tank system would be technically infeasible. The proposed regulations also should include testing of the shale to determine the extent of potentially acid generating material included in the cutting.

The RDSGEIS states that onsite disposal of water-based muds is permissible, despite the fact that these muds may contain mercury, metals and other contaminates. These contaminated muds would be put in direct contact with soils and groundwater, resulting in the potential for significant adverse environmental impacts not addressed in the RDSGEIS. Some portions of the RDSGEIS and proposed regulations vaguely reference a requirement for consultation with the NYSDEC Division of Materials Management prior to disposal of cuttings from water-based mud drilling, but this "consultation" improperly circumvents the proper public review that would be provided by reaching a decision on the disposal requirements for water-based mud and associated cuttings through the environmental review process.

## 3.12.4 Hydraulic Fracture Additive Limitations

The RDSGEIS and proposed regulations continue to rely solely on the drilling operators to (1) regulate themselves, and (2) select the lowest toxicity chemicals for use in fracture treatment additives.

The proposed regulations require documentation that the additives exhibit "reduced aquatic toxicity" and "lower risk to water resources" compared to alternate additives or documentation that alternatives are not equally effective or feasible. There are no specific criteria for determining what is an acceptable reduction in toxicity or an acceptable reduction in risk. Operators would still be allowed to use harmful chemicals merely by stating to NYSDEC that these are the only chemicals that would be "effective" or by showing that the chemicals they propose are slightly less toxic than the most toxic alternatives.

To address this problem, the RDSGEIS and proposed regulations should identify the type, volume and concentrations of fracture treatment additives that are protective of human health and the environment; include a list of prohibited additives; and require the use of non-toxic materials to the greatest extent possible.
NYSDEC should develop the list of prohibited fracture treatment additives based on the known list of chemicals currently used in hydraulic fracturing. The list of prohibited fracture treatment additives should apply to all hydraulic fracture treatments, not just HVHF treatments. NYSDEC should also develop a process to evaluate newly proposed hydraulic fracturing chemical additives to determine whether they should be added to the prohibited list. No chemical should be used until NYSDEC and/or the New York State Department of Health (NYSDOH) has assessed whether it is protective of human health and the environment, and has determined whether or not it warrants inclusion on the list of prohibited hydraulic fracturing chemical additives for NYS. The burden of proof should be on industry to demonstrate, via scientific and technical data and analysis, and risk assessment work, that the chemical is safe. Fracture treatment additive prohibitions should be included in the RDSGEIS as a mitigation measure and codified in the proposed regulations.

## 3.12.5 Centralized Surface Impoundments for HVHF Flowback Off-Drillsite

The 2009 DSGEIS disclosed significant adverse air quality impacts associated with centralized surface impoundments for HVHF flowback, which were found to emit over 32.5 tons of air toxics per year. However, this important impact information was removed from the RDSGEIS. Instead, NYSDEC improperly declined to analyze centralized surface impoundments based on statements by the industry that they would not "routinely propose" to use centralized flowback impoundments. The proposed regulations do not prohibit centralized surface impoundments, which would be appropriate

mitigation for the significant adverse impact identified in the 2009 DSGEIS, and instead a separate site-specific SEQRA review would be required for them.

### 3.12.6 Chemical and Waste Tank Secondary Containment

NYSDEC appropriately codified a requirement for secondary containment for chemical and waste handling tanks in the proposed regulations. However, the proposed regulations do not specifically address secondary containment for chemical and waste transport, mixing and pumping equipment. The regulations should be revised to address secondary containment for transport, mixing and pumping equipment in order to minimize potential soil and water resource impacts from chemical spills. There are several other minor modifications to the proposed regulations for secondary containment detailed in Chapter 21 of the Harvey Consulting, LLC report (Attachment 1) to eliminate inconsistencies between various regulatory requirements.

### 3.12.7 Fuel Tank Containment

NYSDEC appropriately included a requirement for fuel tank secondary containment in the Proposed Supplementary Permit Conditions. However, this requirement is confused by inconsistent statements in the RDSGEIS that secondary containment is not required for *temporary* fuel tanks (page 7-34). In addition to correcting this inconsistency, the proposed regulatory framework for fuel tank containment should be substantively improved to be more protective of the environment through adoption of the following changes:

- Define clear criteria for adequate containment (e.g., using coated or lined materials that are chemically compatible with the environment and the substances to be contained; providing adequate freeboard; protecting containment from heavy vehicle or equipment traffic; and having a volume of at least 110 percent of the largest storage tank within the containment area).
- Include mandatory minimum setbacks from surface water features, homes and public buildings. The proposed regulations contain a setback for surface water resources, but only "to the extent practical."
- Explain how NYSDEC's requirements for fuel tank containment interface with federal requirements (40 CFR Part 112).
- Require tank inspections, spill prevention and spill alarm systems.
- Clarify whether vaulted, self-diking, and double-walled portable tanks will be allowed in cases where secondary containment is impractical, and codify the requirements for the use of those tanks, including inspections and spill prevention alarm systems.

## 3.13  Toxicology

This section addresses the toxicology-related issues associated with Naturally Occurring Radioactive Materials (NORM), hydraulic fracturing additives and waste disposal. For supporting technical information for these comments, refer to the technical reports of Dr. Glenn Miller (Attachment 3) and Dr. Ralph Seiler (Attachment 4).

### 3.13.1 Naturally Occurring Radioactive Materials

The Marcellus Shale is known to contain NORM concentrations at higher levels than surrounding rock formations. The primary environmental contamination risk associated with NORM is in production brines. Appendix 13 of the RDSGEIS presented some information on radioactivity

characteristics of vertical wells in the Marcellus Shale in New York. However, the data in Appendix 13 identifies only 14-24% of the gross alpha radiation sources in the water samples. The sources of the other 75%+ of alpha radiation are not identified.  The RDSGEIS explicitly acknowledges that the scientific understanding of NORM in production brine is incomplete.[6] NYSDEC should have obtained more information on the radiation sources in production brine as part of the SGEIS process because it is essential to NYSDEC's decision-making process and for NYSDEC to ensure that adequate regulations are in place before widespread HVHF occurs in New York. Even if the information could not have been reasonably obtained (which is not the case here), the proper approach for SEQRA compliance would have been to disclose the unavailable information in accordance with NYCRR §617.9 (b) (6)[7]:

One possible source of the unspecified alpha levels in production brines is polonium. Polonium-210 is 5,000 times more radioactive than radium and is highly toxic.[8] Polonium-210 is difficult and expensive to remove from drinking water and bioaccumulates in the environment. Before completing the SEQRA process, NYSDEC should determine if polonium is a significant component of alpha emission in formation waters and identify appropriate regulations that address polonium-contaminated wastewater to prevent water resource impacts. Specific technical recommendations regarding the analyses that should be conducted to determine the presence of polonium are provided in Attachment 4. Attachment 4 also addresses the potential for Polonium-210 exposure via build-up in natural gas delivery pipes.

### 3.13.2 Radon Exposure via Natural Gas Combustion

Radon is a cancer-causing, radioactive gas. Radon is known to be present in natural gas and will be delivered with the natural gas to consumers. The quantity of radon in natural gas is highly variable and has not been studied by NYSDEC in the Marcellus Shale.  While normal natural gas use in properly ventilated burners are unlikely to contribute to radon concentrations in a closed space, poorly vented areas may well be a problem, and certain scenarios (e.g., high use of natural gas for industrial applications, restaurants that use gas burners) need to be subjected to risk assessment. At the very least, substantially more radon measurements need to be made.   The risk is likely to be greatest in those areas that already have elevated radon in air, and that risk may be enhanced by the natural gas contribution. Any increase in radon exposure in the Southern Tier is of particular concern in terms of cumulative impacts given that the NYSDOH estimates the majority of homes in

---

[6] 2011 RDSGEIS Page 5-142: "The data indicate the need to collect additional samples of production brine to assess the need for mitigation and to require appropriate handling and treatment options...."

[7] *In addition to the analysis of significant adverse impacts required in subparagraph 617.9(b) (5) (iii) of this section, if information about reasonably foreseeable catastrophic impacts to the environment is unavailable because the cost to obtain it is exorbitant, or the means to obtain it are unknown, or there is uncertainty about its validity, and such information is essential to an agency's SEQR findings, the EIS must:*

*(i) identify the nature and relevance of unavailable or uncertain information;*
*(ii) provide a summary of existing credible scientific evidence, if available; and*
*(iii) assess the likelihood of occurrence, even if the probability of occurrence is low, and the consequences of the potential impact, using theoretical approaches or research methods generally accepted in the scientific community.*

*This analysis would likely occur in the review of such actions as an oil supertanker port, a liquid propane gas/liquid natural gas facility, or the siting of a hazardous waste treatment facility. It does not apply in the review of such actions as shopping malls, residential subdivisions or office facilities.*

[8] http://www.who.int/ionizing_radiation/pub_meet/polonium210/en/index.html

the region have existing basement radon levels above the EPA "action level" of 4 pCi/L. Between 20 and 40 percent of homes in the several Marcellus Shale counties have long-term exposure to radon levels above the EPA limit in their living areas.[9]  Before completing the SEQRA process, NYSDEC should analyze the cumulative health risk posed by additional radon exposure from Marcellus Shale natural gas combustion so that appropriate mitigation measures can be identified to address the issue.

### 3.13.3 Hydraulic Fracturing Additives

The RDSGEIS does not present sufficient information to analyze the toxicology risks posed by hydraulic fracturing additives. It does not address the toxicology risks generically or at the site level. The proposed regulations do not require permit applicants to provide sufficient information for the risks of these additives to be considered at the site level. The RDSGEIS provides a long list of potential additives (Tables 5.4 and 5.5), but does not analyze their potential environmental impacts. The list of additives is almost certainly incomplete, specific information on the chemicals is lacking, and the specific rate of usage is not offered.  Thus, not knowing the composition of the specific additives nor the amounts in which they would be used during the HVHF process there is no basis for estimating the risk of these components with regard to their presence in the produced flowback or produced water.

The RDSGEIS misrepresents the presence of hydraulic fracturing additives in flowback. Table 6.1 of the RDSGEIS states that no non-naturally occurring additives were detected. However, most of these additives cannot be detected through standard methods. Table 6.1 should be revised to indicate which additives were actually capable of being detected by the analytical methods selected and the associated detection limits. This is a customary practice and standard. The proposed regulations should require testing of flowback water for acrylonitrile, a non-naturally occurring chemical that if detected provides a clear indication of off-site contamination by hydraulic fracturing.

### 3.13.4 Disposal of Contaminated Wastewater

The water that flows back immediately following hydraulic fracturing is heavily contaminated, primarily with the Marcellus formation contaminants, and represents the most problematic chemical contamination potential, due to the large volumes of contaminated water generated.  The produced brines that are released during production generally have higher concentrations of naturally occurring contaminants than flowback waster (although lower volumes) and similarly represent a serious chemical contamination potential.  Four problematic components of the flowback water and produced brines are present: the radioactive component (NORM); the inorganic salts, metals and metalloids; the organic substances (from the hydrocarbon formation) and the hydraulic fracturing additives. While recognizing the problems with management of this water, the RDSGEIS fails to clearly state how this water will be either disposed in a manner that protects human health and the environment, or otherwise treated to remove the contaminants.  While the RDSGEIS provides a range of alternatives, the RDSGEIS does not analyze the environmental or human health impacts associated with any of these disposal options.  Further, effectively none of these options is likely to be accomplished in state, and the RDSGEIS implies that virtually all of the wastewater generated in New York will be managed out of state where regulations may be less stringent.

There are four possible treatment options for flowback and produced water discussed in the RDSGEIS: (1) reuse, (2) deep well injection, or (3) treatment in municipal or privately owned treatment facilities. None of these options is properly analyzed in the RDSGEIS. Reuse is not a

---

[9] http://www.wadsworth.org/radon/

complete disposal option because residual salts and other contaminants must still be managed. Beyond reuse, the disposal options considered in the RDSGEIS only included injection wells, municipal sewage treatment facilities (of which there are currently none that are permitted to accept flowback and produced water) and private treatment plants (of which none currently exist in New York).  The RDSGEIS did not consider whether there are other, less environmentally harmful, options that exist for flowback and produced water.  More importantly, the RDSGEIS fails to evaluate the potentially significant adverse environmental impacts and human health risks associated with these disposal options.

## 3.14  Air Quality and Odors

For supporting technical information for the comments provided in this section, refer to Chapters 17 and 20 of the Harvey Consulting, LLC report (Attachment 1).

### 3.14.1 Air Quality Modeling Assumptions

The air quality analysis in the RDSGEIS contains some substantial improvements compared to the DSGEIS, but the assumptions used still warrant additional review and justification. For example, the RDSGEIS did not consider the reasonable worst case scenario air impacts resulting from simultaneous operations of spatially proximate well sites. In addition, the mobile source impact assessment under-predicts the number of miles that will be driven by heavy equipment to transport supplies to and haul wastes away from drillsites, especially wastewater that is hauled out of state to treatment and disposal facilities. Modeling for mobile source air impacts resulting from wastewater transport must be consistent with reasonable worst case scenario forecasts of wastewater volume (which impacts the number of truck trips needed per well site) as well as forecasted in and out of state disposal options (which impacts distance traveled per disposal). Limitations used in the modeling assumptions must all be translated into SGEIS mitigation measures and codified in the proposed regulations to ensure that the National Ambient Air Quality Standards will not be exceeded.

### 3.14.2 Air Quality Monitoring Program

The RDSGEIS includes a commitment to develop a regional air quality monitoring program to address the potential for significant adverse air quality impacts. However, more information is needed to understand the scope and duration of NYSDEC's proposed air monitoring program. A more rigorous monitoring program proposal is needed that identifies: the scope of the monitoring program; the location of the monitoring sites; the amount of equipment and personnel needed to run each site; the duration of monitoring proposed at each site; along with the cost. It is anticipated that a program used to assess both regional and local impacts will require long term monitoring stations placed in key locations, not just infrequent and unrepresentative sampling. The SGEIS should require the monitoring program to commence prior to Marcellus Shale gas development to verify background levels and continue until NYSDEC can scientifically justify that data collection is no longer warranted, in consultation with EPA. The obligation to fund the air monitoring program needs to be clearly tied to a permit condition requirement.

### 3.14.3 Greenhouse Gas Emissions Mitigation Plan

The RDSGEIS took a step in the right direction with the inclusion of a requirement for greenhouse gas emissions (GHG) impact mitigation plans. However, this requirement needs to be further defined.  NYSDEC should require a GHG Mitigation Plan that provides for measureable emissions

reductions and includes enforceable requirements. The GHG Impacts Mitigation Plan should list all Natural Gas STAR Program best management technologies and practices that have been determined by EPA to be technically and economically feasible, and operators should select and use the emission control(s) that will achieve the greatest emissions reductions. The GHG Impacts Mitigation Plan should be submitted and approved prior to drillsite construction, GHG controls should be installed at the time of well construction, and NYSDEC should conduct periodic reviews to ensure that GHG Impacts Mitigation Plans include state of the art emission control technologies. Further, the extent of compliance with adopted emission mitigation control plans should be documented throughout the well's potential to emit GHGs. The GHG Impacts Mitigation Plan requirement should be included in the SGEIS as a mitigation measure and codified in the proposed regulations. This requirement should apply to all natural gas operations, not just HVHF operations.

## 3.14.4 Flare and Venting of Gas Emissions

Flares may be used during well drilling, completion, and testing to combust hydrocarbon gases that cannot be collected because gas processing and pipeline systems have not been installed. During production operations, high pressure gas buildup may require gas venting via a pressure release valve, or gas may need to be routed to a flare during an equipment malfunction. Reducing gas flaring and venting is widely considered best practice for reducing air quality impacts of natural gas development.  The RDSGEIS air quality analyses of flaring assumed it would be limited to three days based on statements from industry, even though the actual duration should be longer. Planned flaring should be limited to no more than three days. In all other cases flaring should be limited to safety purposes only. If NYSDEC finds there is an operational necessity to flare an exploration well for more than a three-day period, the SGEIS impact analysis should evaluate the air pollutant impact, particularly the potential for relatively high short-term emission impacts, from longer flaring events, before approving such operations. The SGEIS should provide justification for allowing a maximum of 5 MMscf of vented gas and 120 MMscf of flared gas at a drillsite during any consecutive 12-month period. The RDSGEIS does not contain information to show that these limits are equivalent to the lowest levels of venting and flaring that can be achieved through used of best practices, and it is unclear if these rates were used in the modeling assessment. Flaring and venting restrictions should be included in the SGEIS as a mitigation measure and codified in the proposed regulations. This requirement should apply to all natural gas operations, not just HVHF operations.

## 3.14.5 Reduced Emission Completions

Reduced Emission Completions (RECs, also known as "green completions") control methane and other GHG emissions following HVHF operations. RECs also reduce nitrogen oxide (NOx) pollution, which otherwise would be generated by flaring gas wells, and hazardous air pollutants (HAPs) and volatile organic compounds (VOCs) emissions, which otherwise would be released when gas is vented directly into the atmosphere. The RDSGEIS requires RECs where an existing gathering line is located near the well in question, which allows the gas to be collected and routed for sale. While the addition of this requirement represents a substantial improvement that protects air quality and increases the efficiency and productivity of wellsites, NYSDEC should consider expanding its REC requirements to more categories of wells—i.e., wells that are drilled prior to construction of gathering lines. Under the current proposal, a large number of wells could be exempt from the REC requirement, resulting in the flaring or venting of a significant amount of gas that could, instead, be captured for sale. Furthermore, NYSDEC proposes to postpone making a decision on the number of wells that can be drilled on a pad without the use of RECs until two years after the first HVHF permit is issued. NYSDEC should not defer the decision to implement RECs for two more years. The requirement to use RECs in all practicable situations should be included in the SGEIS as a

mitigation measure and codified in the proposed regulations. This requirement should apply to all natural gas operations, not just HVHF operations.

## 3.14.6 Gas Dehydrators

Dehydrator units remove water moisture from the gas stream. Dehydrator units typically use triethylene glycol (TEG) to remove the water; the TEG absorbs methane, VOCs, and HAPs. Gas dehydration units can emit significant amounts of HAPs and VOCs, and it is best practice to use control devices with gas dehydration units to mitigate HAP and VOC emissions. The 2011 RDSGEIS requires emissions modeling, using the EPA approved and industry standard model GRI-GlyCalc, and the installation of emission controls for dehydrator units emitting more than one ton per year of benzene. This is an important and substantial improvement. In addition to this requirement, natural gas operators should be required to evaluate the technical and economic feasibility of installing methane emission controls on gas dehydrators; installation should be mandatory unless an infeasibility determination is made. This requirement should be included in the SGEIS as a mitigation measure and codified in the proposed regulations. This requirement should apply to all natural gas operations, not just HVHF operations.

## 3.14.7 Diesel Engine Emissions Control

NRDC's 2009 comments recommended limiting diesel engines to Tier 2 or higher.  The RDSGEIS takes a step in the right direction by prohibiting "Tier 0" engines and requiring Tier 2 engines in most cases.  To further strengthen air quality protection from diesel emissions SGEIS should examine whether it is possible to eliminate Tier 1 engine use altogether.

## 3.14.8 Leak Detection and Control

Unmitigated gas leaks pose a risk of fire and explosion, and contribute to GHG, VOC, and HAP emissions, that could otherwise be avoided by routine detection and repair programs. NYSDEC's proposed Leak Detection and Repair Program should be revised to require: a drillsite Leak Detection and Repair inspection at start-up; quarterly testing with an infrared camera with additional follow-up testing and repair if a leak is indicated; testing of all equipment located on the drillsite up to and including the gas meter outlet which is connected to the pipeline inlet. These requirements should be included in the SGEIS as mitigation measures and codified in the proposed regulations, and be required for all natural gas operations, not just HVHF operations.

## 3.14.9 Cleaner Power and Fuel Supply Options

The RDSGEIS did not examine cleaner power and fuel supply options as was requested in NRDC's 2009 comments.  In suburban and urban areas of NYS, where a connection to the electric power grid is available, electric engines should be used in lieu of diesel wherever practicable, eliminating the local diesel exhaust from those engines. In rural areas, where highline power is not readily available, an operator should be required to evaluate whether there is a natural gas supply that could be used as fuel; if so, use of the natural gas supply should be mandatory to the extent practicable. Cleaner power and fuel selection requirements should be included in the SGEIS as a mitigation measure and codified in the proposed regulations. These requirements should apply to all natural gas operations, not just HVHF operations.

### 3.14.10 Hydrogen Sulfide (H$_2$S) ("Sour Gas") Emissions

In addition to air quality risks associated with emissions of criteria pollutants and air toxics resulting from natural gas development, additional air quality risks can occur as a result of the release of hydrogen sulfide (H$_2$S) or sour gas. H$_2$S gas produces a malodorous smell of rotten eggs at low concentrations, can cause very serious health symptoms, and can be deadly at the higher concentrations found in some oil and gas wells.

Therefore, proper handling of H$_2$S is important from both a quality-of-life and human-safety standpoint for workers and nearby public. The RDSGEIS does not analyze H$_2$S impacts based on the argument (supported by limited evidence) that to date H$_2$S has not been detected in high concentrations in HVHF operations in Pennsylvania. However, the early experience in Pennsylvania does not mean that there is no potential for H$_2$S issues to develop over time in New York.

A supplemental permit condition proposed in the RDSGEIS appropriately requires monitoring for H$_2$S during the drilling phase. However, a requirement should be added to the HVHF regulations to ensure that periodic monitoring occurs throughout production as gas fields age and sour. H$_2$S monitoring requirements should apply to all wells and therefore should be addressed through regulations, rather than through permit conditions that can be altered without public review. The regulations should stipulate that when monitoring detects H$_2$S, nearby neighbors, local authorities and public facilities should be notified of the risk of H$_2$S gas. They should be provided information on safety and control measures that the operator will be required to undertake to protect human health and safety. In cases where elevated H$_2$S levels are present, audible alarms should be installed to alert the public when immediate evacuation procedures are warranted.

## 3.15   Socioeconomics

This section addresses the socioeconomic impacts of HVHF. For supporting technical information for these comments, refer to the technical report from Dr. Susan Christopherson (Attachment 5).

### 3.15.1 NYSDEC's Socioeconomic Impact Analysis

Although NYSDEC has included more information on the social and economic impacts of gas development using HVHF in the RDSGEIS than it did in the 2009 draft, the RDSGEIS still does not effectively assess those impacts or provide appropriate mitigation strategies.  There are a number of substantive concerns raised by the discussion of socioeconomic impacts presented in the RDSGEIS and by the Economic Assessment Report (EAR) prepared by NYSDEC's consultant, Environment and Ecology, on which that discussion is based.

1. The assessment of economic benefits (jobs and taxes) relies on questionable assumptions about the amount of gas extractable in the New York portion of the Marcellus Shale.  The range of estimates for extractable gas appears to be skewed to the high end, leading to an overestimation of economic benefits.

2. The model used in the RDSGEIS to assess social and economic impacts presents natural gas development as a gradual, predictable process beginning with a "ramp-up" period and then proceeding through a regular pattern of well development over time.  This model is misleading, and because many of the negative social and economic impacts of HVHF gas extraction (such as housing shortages followed by excess supply) are a consequence of unpredictable development, the model cannot appropriately assess those impacts.

3. The RDSGEIS does not assess public costs associated with natural gas development. A fiscal impact analysis of the base costs to the state and localities that will occur with any amount of HVHF gas development is required, along with an estimate of how costs will increase and accumulate as development expands.

4. The long-term economic consequences of HVHF gas development for the regions where production occurs are not addressed despite a widely recognized literature indicating that such regions have poor economic outcomes when resource extraction ends.

5. Mitigation of enumerated negative social and economic impacts of HVHF gas development is presumed to occur by means of phased development and regulation of the industry, but no evidence or information is provided to indicate whether, and if so how, that would occur.

## 3.15.2 Uncertainty and Volatility of Natural Gas Production and its Socioeconomic Impacts

The EAR's projections concerning population, jobs, housing, and revenue are predicated on the assumption of a regular, predictable roll-out of the exploratory, drilling, and production phases of the natural gas development process, rather than the irregular pattern typically associated with such development.

Natural gas drilling is a speculative venture and the commercially extractable gas from any particular well is uncertain. This central feature of natural gas development has critical implications for the economies of natural gas development regions. As production fluctuates, they may experience short- and medium-term volatility in population, jobs, revenues, and housing vacancies. The model used in the RDSGEIS to project socioeconomic impacts ignores those issues, however, and assumes instead that the HVHF natural gas development in New York will have a different pattern than that historically associated with such development. Rather than occurring in irregularly recurring waves (or "boom-bust cycles"), development in New York is assumed to be steady and predictable. Many of the economic benefits that the RDSGEIS and EAR associate with natural gas development are predicated on this unlikely gradual, regular development scenario, raising doubts about the projection of economic benefits based on that model.

The spatial distribution of impacts is also uneven. Some wells will have long production phases; others will have dramatic declines in productivity after a relatively short period. The uncertainties in the geographic extent of drilling and the potential for intensive development in "hot spots" have implications for social and economic impacts. If drilling is concentrated in particular locations rather than rolled out uniformly across sub-regions of the landscape (as was modeled in the RDSGEIS), wealth effects and tax revenues also will be concentrated in particular localities. The social and economic costs of spatially concentrated drilling, however, will be experienced across a much wider geographic area, because public services will be required in areas without HVHF development (and therefore not receiving tax revenues from drilling), but close enough to serve the transient population associated with the industry.

Contrary to the RDSGEIS' contention that the regularized development model "does not significantly affect the socioeconomic analysis," smoothing out the unpredictability and unevenness of development covers up many of the negative cumulative social and economic impacts that arise from the unpredictability of shale gas development. Finally, the RDSGEIS does not sufficiently model the resource depletion phase of the exploration, drilling, production, and resource depletion cycle and its implications for local and regional economies.

### 3.15.3 Economic Impact Study Fails to Address Costs

The 2011 RDSGEIS analyzes potential *economic benefits* of HVHF, but fails to provide the same level of analysis of the potential *costs* of HVHF.  A central component of the EAR is use of a Regional Industrial Multiplier System (RIMS) model.  This type of model is useful for comparing different types of investments and for examining inter-industry linkages, but it has a significant drawback as the central model for the RDSGEIS analysis of socioeconomic impacts because it can only project economic benefits.  It cannot measure or assess the costs of proposed gas development using HVHF.

The RDSGEIS assumes, based on the RIMS model, that economic benefits from HVHF gas development, presumably including benefits to revenue, will be substantial, but there is no fiscal impact analysis or cost-benefit analysis to substantiate that assumption.  A fiscal impact analysis is required, given that:

(1)  Many purchases by drilling companies are tax exempt.

(2)  Costs to the state that will reduce or offset tax revenues are not calculated.

(3)  Substantial negative fiscal impacts are detailed in the EAR that are not quantified or fully acknowledged in the RDSGEIS, including public costs associated with the increased demand for community social services, police and fire departments, first responders, schools, etc., as well as costs associated with monitoring and inspection and infrastructure maintenance.  Although experience in other shale gas plays demonstrates that these costs are likely, the RDSGEIS makes no attempt to calculate the costs and consider them in the context of a fiscal impact assessment.

(4)  There is no analysis of the expected 2-3 year lag between immediate costs and anticipated revenues, during which communities will be faced with significant public service costs.

Given the inability of the EAR input-output model to address the costs of gas development and the significance of local and state costs to decisions about shale gas drilling in the state, revised EAR findings regarding costs must be prepared and an opportunity for public review and comment on the revised EAR afforded before the SGEIS is finalized.

### 3.15.4  Impacts on Other Industries

HVHF has the potential to have significant adverse effects on the viability of other industries in New York, particularly tourism and agriculture. In contrast with the pages of projected benefits from gas development, the RDSGEIS offers no detailed description and no quantitative analysis of the effects of HVHF development on existing industries and the associated impact on the state of New York's economy.  This omission is particularly important for the counties defined in the EAR as "representative" because industries, including agriculture and tourism, are significant employers in those counties and are important to the overall economy of the State.  There is no analysis of how the "crowding out" of existing industries may impact the regional or statewide economy or of the implications of the loss of industrial diversity to the long-term prospects for regional economic sustainability.

The inadequate assessment of the impacts on existing industries in the region that will be affected by HVHF gas development is problematic not only because the state does not have adequate information to assess costs and benefits of HVHF gas development, but also because negative impacts on industries such as tourism and agriculture, including dairies and wineries, will undermine

state investments intended to support those industries.  Given the importance of these industries in the state and regional economy, the evidence that they will be negatively affected by HVHF gas development should have been analyzed in detail and quantified when possible.

## 3.15.5  Housing and Property Value Impacts

The potential impacts of HVHF on the housing supply, housing costs, and housing financing are inadequately addressed in the EAR.  In addition, the social and economic impacts of unpredictable shortfalls in housing followed by periods in which there is an excess supply are not addressed.

The report assumes that the current housing stock would be used to house any workers who move to the production region on a "permanent" (more than one year) basis. However, given the quality and age of the housing stock in the region, evidence from Pennsylvania indicates that it is likely that there will be a demand for new single-family housing. This new housing stock will create new and additional construction jobs, increasing population pressure, accelerating the "boomtown" phenomenon. This housing may also contribute to sprawl around urban population centers such as Binghamton.  When drilling ceases, either or temporarily or permanently, the value of this new housing is likely to plummet. The social and economic impacts of unpredictable shortfalls in housing followed by periods in which there is an excess supply are not addressed.  These impacts pose environmental justice concerns and require mitigation strategies.

With respect to impacts on property value, the EAR authors found that having a well on a property was associated with a 22% reduction in the value of the property; that having a well within 550 feet of a property increased its value; and that having a well located between 551 feet and 2,600 feet from a property had a negative impact on a property's value.  Thus, "…residential properties located in close proximity to the new gas wells would likely see some downward pressure on price.  This downward pressure would be particularly acute for residential properties that do not own the subsurface mineral rights." (EAR, 4-114).  The EAR's assumption of recovering property values after the completion of HVHF gas development does not take into account the potential for re-fracturing of wells to increase their productivity or the effects of waves of development in which drilling moves in and out of an area.  The prospect of industrial activity is what drives down investment in regions open to boom-bust development and also negatively impacts property values.  A more definitive analysis of impacts of on property values, including mortgage availability, in regions affected by drilling is needed.

## 3.15.6  Effects on Employment

The oil and gas industry is not likely to be a major source of jobs in New York, because of the project-based nature of the drilling phase of natural gas production (rigs and crews move from one place to another and activities are carried out at each well) and because of its capital intensity (labor is a small portion of total production costs). The emerging information on actual employment created in Pennsylvania in conjunction with Marcellus drilling shows much smaller numbers than industry-sponsored input-output models projected.

Although the industry points to years of drilling experience in New York, the oil and gas industry employed only 362 people in New York State in 2009 (0.01% of the state's total employment).  43% of those workers (157) were employed in Region C, the region where vertical natural gas drilling is most significant in New York.  Wages for these workers constituted 0.04% of the wages in the two-county region with almost 4,000 active gas wells.

In contrast, nearly 674,000 New York jobs were sustained by tourism activity last year, representing

7.9% of New York State employment, either directly or indirectly.  New York State tourism generated a total income of $26.5 billion, and $6.5 billion in state and local taxes in 2010.  In the Southern Tier alone, the tourism and travel sector accounted for 3,335 direct jobs and nearly $66 million in labor income in 2008.  When indirect and induced employment is considered, the tourism sector was responsible for 4,691 jobs and $113.5 million in labor income.  In addition, the travel and tourism sector generated nearly $16 million in state taxes and $15 million in local taxes, for a total of almost $31 million in tax revenue.

The RDSGEIS assumes that as the industry "matures" in the region, local residents will be trained and hired for drilling jobs. If, as has been the case with vertical drilling in New York State and in the Western US shale plays, development follows a more irregular pattern, then the higher paid technical jobs are less likely to evolve into stable local employment. In addition, the jobs in ancillary industries (retail and services) are likely to disappear and reappear as rigs leave and re-enter the region at unpredictable intervals.

In addition, many of the highest paid jobs associated with HVHF will not be filled locally. Occupational employment statistics geographical analysis of petroleum engineers, one of the most common occupations in the oil and gas industry, indicates that the states with the highest employment in this occupation are Texas, Oklahoma, and Louisiana.  This data suggests that the rural areas of New York that are likely to experience the most intensive gas development will not see an increase in highly skilled and highly paid jobs in petroleum engineering.

The creation of high-paying jobs as a result of expenditures in industries outside the extraction industry is also likely to occur outside the production region.  This is important because regions where natural resource extraction takes place (and especially rural regions with little economic diversity) have been found to end up with poorer economies at the end of the resource extraction process.  Although the EAR asserts that as the natural gas industry grows, more of the suppliers would locate to the representative regions and less of the indirect and induced economic impacts would leave the regions, no evidence is presented to substantiate this assumption.  The more likely outcome is indicated by a study of the impact of gas drilling on Western State economies, which found that natural gas drilling may have positive fiscal impacts at the state level, but negative fiscal impacts for the regions in which it occurs.

## 3.15.7  Regional Plan of Development Approach to Mitigating Socioeconomic Impacts

The mitigation chapter of the RDSGEIS implies that negative impacts will be mitigated through the permitting process and a secondary level of review triggered by the operator's identification of inconsistencies with comprehensive land use plans. The measures are only advisory.   The RDSGEIS proposes no requirements to mitigate adverse socioeconomic impacts in this process.

Mitigation measures should be developed that would require operating companies to submit plans for exploration and development in a county or counties to county planning offices for review of cumulative impacts and mitigation (for example truck traffic routing), a model used in Western U.S. drilling regions.  Because the RDSGEIS acknowledges that the pace and scale of development are difficult to ascertain until exploration and production begin to proceed, it is critical that a permit and regional Plan of Development (POD) review process be set up that alerts local officials to the need for long term planning for land use, schools, public safety and public health. The POD, outlining the pace, scale, and general location in which development will occur enables local government to anticipate and develop strategies to mitigate cumulative impacts. The near-term projections of development activity should include all secondary facilities (e.g., water extraction, waste disposal,

pipeline construction) in the area to be affected. A POD would allow communities in that region to prepare for the disruption and negotiate the least disruptive and damaging development plan.

To further assist communities in planning for socioeconomic impacts, a series of reporting requirements should be incorporated into the RDSGEIS and regulations. As development activities begin and progress, the information provided in initial projections should be confirmed or revised on a semiannual basis.  This information is critical to forecasting and meeting housing and service demands.

In addition, mitigation strategies need to be developed and described in the RDSGEIS that address long term costs to affected regions and the impacts of the resource depletion phase of the exploration, drilling, and development process, when population and jobs leave the region and tax revenues may be insufficient to pay for the capital investments made to serve the population influx during the drilling and production phases of development.  Finally, mitigation strategies should include policies to prevent negative impacts on existing industries, including agriculture, tourism and manufacturing.

## 3.16  Traffic and Transportation

While the RDSGEIS improves upon the 2009 DSGEIS regarding estimates truck trip generation, the impact of HVHF on roadway congestion and safety has not been adequately addressed in the RDSGEIS.

The impacts of a typical multi-well development on congestion and safety should be analyzed in detail; such analysis should include a cumulative traffic effects analysis using a reasonable worst case development scenario. The reasonable worst case development scenario for regional traffic impacts should include indirect traffic generation associated with increased economic development and population growth attributable to natural gas extraction and related economic activity.

The LBG technical memo (Attachment 7) details the specific analyses that should be undertaken and describes how the transportation mitigation commitments described in the RDSGEIS should be incorporated into regulations or permit conditions to ensure they are enforceable. The transportation plan requirement in the RDSGEIS is a good first step, but additional detail is needed on the transportation plan including required contents, methodologies and impact criteria to make this mitigation measure meaningful.

## 3.17  Noise and Vibration

The construction and operation phase noise impact assessments presented in RDSGEIS are improved over the 2009 DSGEIS, but still contain important flaws that understate the impacts.

For example, the drilling and fracturing impact assessment presented is for one well, ignoring the cumulative impact of multiple wells being developed at the same time. Even using the analysis for a single well, the sound levels associated with the fracturing process are so extreme that hearing damage could result from exposure for 8-hours at a distance of 500 feet from the well pad.

Transportation-related noise impacts are not quantified in the RDSGEIS. Potential noise effects on wildlife are not evaluated, even though the noise of a single well and even more so the combination of noise of multiple wells could affect wildlife (especially sensitive bird species). The cumulative

effects of noise on wildlife habitat and fragmentation effects of almost continual disturbance are not evaluated.

Vibration impacts and low-frequency noise impacts (which are associated with health impacts) are similarly not addressed in the RDSGEIS. The LBG technical memo details the specific analyses that should be undertaken and describes how the noise mitigation commitments described in the RDSGEIS should be incorporated into regulations or permit conditions to ensure they are enforceable.

Similar to the transportation plan requirement mentioned above, the noise mitigation plan requirement lacks specificity regarding the analyses required and the thresholds that trigger the need for mitigation. A best practice template for NYSDEC to consider adopting to specify the requirements for noise impact analysis and mitigation plans is the Alberta Energy Resources Conservation Board (ERCB) Noise Control Directive (#38).

## 3.18  Visual Resources

The RDSGEIS describes in very broad terms the potential direct and cumulative impacts of various phases of natural gas development on NYSDEC-designated visually sensitive resources. This assessment should incorporate best practices for analyzing visual impacts, such as identifying the relevant view groups, landscape zones and photo simulations of well development in various contexts.

The RDSGEIS mitigation section for visual resources suggests that mitigation measures would only be considered when designated significant visual resources (parks, historic resources, scenic rivers, etc.) are present *and* within the viewshed of proposed wells. This approach fails to consider visual impacts on nearby residences or tourists in areas where a significant visual resource is not present. In these situations, no mitigation would be required for individual wells to be consistent with the RDSGEIS. NYSDEC should make basic and low-cost mitigation measures mandatory for all well development sites (such as keeping lighting levels at the minimum level required and directing lights downward to minimize light pollution), regardless of whether or not state designated significant visual resources are present. For more information on the adequacy of the proposed mitigation measures and suggested changes, refer to the LBG technical memorandum (Attachment 7).

## 3.19  Land Use

The RDSGEIS fails to provide any analysis of the reasonably foreseeable cumulative land use impacts that would result if HVHF development goes forward in New York.  This should be corrected by providing information on existing land use patterns and analyzing the impact of the level of development anticipated in the economic impact study on land use change. The RDSGEIS fails to provide any discussion of mitigation measures for land use impacts. Mitigation measures such as buffer distances for incompatible land uses should be described and incorporated into enforceable regulations or supplemental permit conditions, as appropriate. For more information on the adequacy of the proposed mitigation measures and suggested changes, refer to the LBG technical memorandum (Attachment 7).

## 3.20  Community Character

Community character is an amalgam of various elements that give communities their distinct "personality."   These elements include a community's land use, architecture, visual resources,

historic resources, socioeconomics, traffic, and noise.[10]  The community character impact assessment portion of the RDSGEIS lists some of the community character impacts that could be expected (focused on demographic and economic impacts), but does not analyze the significance of these impacts or draw conclusions on how HVHF would affect community character in the short-term and long-term.  The impact assessment does not mention the contribution of visual, land use or historic resource impacts to community character. The discussion of traffic and noise impacts is superficial (two sentences each). A complete community character impact assessment is needed (including regional cumulative impacts) to ensure appropriate mitigation measures are included in the HVHF regulatory framework.

## 3.21  Cultural Resources

In addition to the ecological effects of the massive ground disturbance and industrial development that will occur with HVHF in New York, the integrity of historic architectural resources, archaeological sites and culturally significant areas to Native Americans is also threatened. The RDSGEIS does not address comments provided by New York Archaeological Council during scoping in 2008 on cultural resource issues and does not adequately address this important resource topic. There is no section of the RDSGEIS specifically devoted to the direct, indirect and cumulative impacts of HVHF on cultural resource or any discussion of mitigation measures (except for impacts related to visual resources). The reliance on the 1992 GEIS for protection of cultural resources is not sufficient given the significantly different type and scale of impacts that could occur with HVHF and the length of time that passed since the 1992 GEIS was prepared. The role of the New York State Office of Parks, Recreation and Historic Preservation (OPRHP) in the review of individual permit applications is not clear in the RDSGEIS. In addition, the RDSGEIS does not explained how tribal consultation regarding impacts to cultural resources will be accomplished in a manner consistent with NYSDEC's own 2009 policy *Contact, Cooperation, and Consultation with Indian Nations*.  Cultural resource impacts, mitigation measures and project-level review requirements must be addressed before HVHF is approved. Refer to the LBG technical memorandum for more information supporting these comments (Attachment 7).

## 3.22  Ecosystems and Wildlife

The ecological effects of HVHF and related infrastructure development include direct losses of habitat, fragmentation of existing habitats and indirect "edge effects" such as the spread of invasive species and noise disturbance of wildlife. The RDSGEIS qualitatively acknowledges these impacts and summarizes the findings of studies conducted in other locations, but does not provide build-out analyses that could quantify the range of cumulative habitat loss and fragmentation effects in New York. As evidenced by The Nature Conservancy's build-out analysis of Tioga County, such an analysis is readily achievable with existing GIS tools and datasets available to NYSDEC.[11] The RDSGEIS should include quantitative build-out analysis of habitat fragmentation and edge effects using estimates of development potential consistent with those developed for the RDSGEIS economic impact assessment and include the impacts from reasonably foreseeable infrastructure such as pipelines and compressor stations. Based on the results of the build-out analysis, NYSDEC should also analyze the potential diminution of critical ecosystem services associated with the disruption of forest cover and soils (carbon sequestration and storage, air filtration, watershed flow rates and volume, surface water quality and thermal condition).

---

[10] New York City Mayor's Office of Environmental Coordination. 2010. City Environmental Review Technical Manual.
[11] The Nature Conservancy. 2011 . "An Assessment of the Potential Impacts of High Volume Hydraulic Fracturing on Forest Resources."

The RDSGEIS characterizes the ecological impacts of HVHF as "unavoidable" and fails to consider alternative mitigation approaches that could lessen significant adverse environmental impacts. The site-specific ecological assessments and mitigation measures required by the RDSGEIS for well pads in grasslands greater than 30 acres and forest patches greater than 150 acres is a fragmented approach. It does not address the importance of landscape connectivity between habitat patches, which is essential to the movement and long-term viability of numerous species.   A preferable methodology would be to set limits on deforestation, fragmentation and increases in impervious surface cover based upon ecological planning units such as the sub watershed. The SGEIS process should consider an alternative where rather than the current spacing unit requirements (which are intended to maximize production), land disturbance would be restricted region wide based on ecological carrying capacity. An ecologically oriented planning framework could significantly lessen the adverse impacts of HVHF development on terrestrial and aquatic systems.

In addition, consideration should be given to cumulative changes to land use within each watershed that could lead to detrimental changes in the affected stream to support critical species habitat. Limiting the percent increase in impervious area to less than five percent (inclusive of existing uses) in trout supporting watersheds, including upstream tributaries, would reduce the potential for adverse impacts to sensitive aquatic organisms and the loss of a waters best use designation.

The RDSGEIS fails to provide any meaningful guidance regarding the ultimate restoration of well pads, pipeline right-of-ways and access roads to full ecosystem functionality upon decommissioning. Effective restoration requires a comprehensive, site-level assessment of the existing plant community prior to disturbance and the use of local reference ecosystems as templates for restoration.  Ecological restoration is based upon the concept of rebuilding degraded areas such that they are structurally and functionally similar to pre-disturbance conditions.   Reclamation is not restoration.  Grassy fields neither function in a biologically similar manner as a forest nor supply the ecosystem benefits of a forest system.  The replacement of a decades-old, complex assemblage of woodland species with a simple mix of grasses is not "restoration".  It may retard erosion but it does not replace the original functionality and structure of the displaced ecosystem.

For supporting technical information for these comments and additional comments on ecological impacts and mitigation measures, refer to the technical report from Kevin Heatley (Attachment 8) and LBG (Attachment 7).

## 3.23  Climate Change

The RDSGEIS ignores the real possibility that climate change impacts will undermine the safety of HVHF operations, frustrate mitigation efforts proposed by NYSDEC, and therefore exacerbate adverse impacts to the environment and human health resulting from HVHF operations.  Increases in extreme weather events, such as floods, pose considerable obstacles to the safety of HVHF operations and infrastructure in and around low-lying coastal areas and floodplains.  Precipitation changes coupled with enormous surface and groundwater withdrawals may result in modified groundwater flow patterns, which may cause unexpected groundwater contamination that jeopardizes drinking water supplies.  Increased temperatures can volatilize dangerous chemical compounds at drill sites, exposing workers and nearby residents to airborne carcinogens at a rate greater than would be expected by modeling baseline temperatures without climate change. Remarkably, the effect of climate change on the availability of water resources is ignored in the section on the cumulative impact of water withdrawals, and no provision is made for situations where HVHF operations and public needs may conflict over water usage.  Underscoring these concerns is the notable failure of NYSDEC to conduct a comprehensive Health Impact Assessment, despite the real possibility that climate change impacts confluent with HVHF operations can pose serious human

health problems. Reliable reports on the effect of climate change on New York abound, including some produced within the last year by New York governmental bodies. The RDSGEIS fails to include current information relevant to climate change's potential effects on New York State, which may pose potentially significant adverse environmental and public health threats in conjunction with HVHF operations that should be identified and mitigated to the maximum extent possible.

For supporting technical information regarding these comments, refer to the technical report from Dr. Kim Knowlton (Attachment 9).

## 3.24  Health Impact Assessment

Numerous health concerns have been associated with natural gas development using hydraulic fracturing, and while the RDSGEIS addresses some aspects of a subset of these health issues, it fails to address other important health risks. The RDSGEIS not only omits several issues, but also it only addresses only some aspects of other issues such as air, water quality, and heightened traffic without fully considering health impacts in those areas. Lastly, it doesn't consider health issues as a group in a formal Health Impact Assessment (HIA), including interactive effects on the health of local residents and communities. A full HIA as part of the RDSGEIS is a necessary component, as there are already numerous reports of health complaints including dizziness, sinus disorders, depression, anxiety, difficulty concentrating, and many others, among people who live near natural gas drilling and fracturing operations in other states. Without a full assessment and mitigation of the impacts of the risks, the health of New York State residents and communities is likely to suffer.

For supporting technical information regarding these comments, refer to the technical report from Dr. Gina Solomon (Attachment 10).

## 3.25  Induced Seismicity

The RDSGEIS fails to require operators of HVHF wells to consider the risk of induced seismicity when siting wells and designing hydraulic fracture treatments. The justification provided is that high volume hydraulic fracturing is not expected to cause induced seismicity that will result in adverse impacts. Since the RDSGEIS was written, hydraulic fracturing has been confirmed to have caused induced seismicity strong enough to be felt at the surface. The RDSGEIS assumes that operators will manage seismic risks voluntarily and makes statements regarding the frequency of use of seismic monitoring techniques that are internally contradictory. It also fails to recognize the potential significance of unmapped faults and relies too heavily on the occurrence of natural seismicity as a future predictor of the potential for induced seismicity. Finally, it underestimates the potential adverse consequences of induced seismicity, which include risks to drinking water, well integrity, private and public property, and New York City drinking water supply infrastructure. The RSDGEIS provides insufficient analysis and scientific evidence to support its conclusion that regulations to reduce the risk of induced seismicity from hydraulic fracturing are not necessary. The RSDGEIS must require operators to evaluate and manage the risk of induced seismicity from hydraulic fracturing through proper site characterization and hydraulic fracture treatment design.

For supporting technical information regarding these comments, refer to the technical report from Briana Mordick (Attachment 11).

Attachment 1

Harvey Consulting, LLC.

# 2011 NYS RDSGEIS

**Revised Draft Supplemental Generic
Environmental Impact Statement
On the Oil, Gas & Solution Mining Regulatory Program**

**Well Permit Issuance for Horizontal Drilling
and High-Volume Hydraulic Fracturing to
Develop the Marcellus Shale and Other
Low-Permeability Gas Reservoirs
and**

**Proposed Revisions to the New York Code of Rules and Regulations**

**Best Technology and Practice Recommendations**

Report to:

**Natural Resources Defense Council (NRDC)**

Prepared by:



*Oil & Gas, Environmental, Regulatory Compliance, and Training*

**January 9, 2011**

# Contents

1.    Introduction ............................................................................................................. 3

2.    Scope of SGEIS – Marcellus Only ......................................................................... 4

3.    Liquid Hydrocarbon Impacts (Oil and Condensate) ........................................... 10

4.    Water Protection Threshold .................................................................................. 12

5.    Conductor Casing .................................................................................................. 15

6.    Surface Casing ...................................................................................................... 17

7.    Intermediate Casing .............................................................................................. 31

8.    Production Casing .................................................................................................. 41

9.    Permanent Wellbore Plugging & Abandonment Requirements ........................... 49

10.   HVHF Design and Monitoring .............................................................................. 63

11.   Hydraulic Fracture Treatment Additive Limitations ........................................... 83

12.   Drilling Mud Composition and Disposal .............................................................. 90

13.   Reserve Pit Use & Drill Cuttings Disposal .......................................................... 94

14.   HVHF Flowback Surface Impoundments at Drillsite.......................................... 101

15.   HVHF Flowback Centralized Surface Impoundments Off-Drillsite ................... 102

16.   Repeat HVHF Treatment Life Cycle Impacts ..................................................... 105

17.   Air Pollution Control and Monitoring ................................................................. 108

18.   Surface Setbacks from Sensitive Receptors ........................................................ 130

19.   Disposal of Drilling & Production Waste and Equipment Containing Naturally Occurring Radioactive Material (NORM) ........................................................... 138

20.   Hydrogen Sulfide ................................................................................................. 149

21.   Chemical & Waste Tank Secondary Containment ............................................... 152

22.   Fuel Tank Containment ........................................................................................ 155

23.   Corrosion & Erosion Mitigation & Integrity Monitoring Programs ................... 161

24.   Well Control & Emergency Response Capability ................................................ 167

25.   Financial Assurance Amount ............................................................................... 171

26.   Seismic Data Collection ....................................................................................... 174


Appendix A – Surface Casing Table

Appendix B – Intermediate Casing Table

Appendix C – Production Casing Table

Appendix D – List of Acronyms

# 1.  Introduction

This report responds to the Natural Resources Defense Council's (NRDC), and its partner organizations Earthjustice, Inc., Riverkeeper, Inc., Catksill Mountainkeeper and Delaware Riverkeeper Network, request for a review of the New York State (NYS) 2011 Revised Draft Supplemental Generic Environmental Impact Statement (RDSGEIS) on the Oil, Gas & Solution Mining Regulatory Program Well Permit Issuance for Horizontal Drilling and High-Volume Hydraulic Fracturing to Develop the Marcellus Shale and Other Low-Permeability Gas Reservoirs and proposed revisions to the New York Code of Rules and Regulations (NYCRR).

NRDC, and its partners, requested a technical review of the RDSGEIS and the proposed revisions to the NYCRR to determine if best technology and practices were included. NRDC has also commissioned additional experts; therefore, this list of recommendations is not exhaustive and is complementary to the work assigned to other experts. A complete list of expert recommendations can be found in the summary cover letter submitted by The Louis Berger Group, Inc., on behalf of NRDC, to the New York State Department of Environmental Conservation (NYSDEC) during the RDSGEIS public comment period.

This report makes recommendations for improving the SGEIS and the proposed revisions to the NYCRR. Overall, HCLLC found that NYSDEC made a number of significant improvements in both the RDSGEIS and the proposed revisions to the NYCRR. HCLLC commends NYSDEC for integrating a number of new best practices and technology alternatives into its 2011 RDSGEIS and proposed regulations.

This report highlights the RDSGEIS areas of improvement and reinforces the importance of retaining those improvements in the final SGEIS and the proposed NYCRR revisions. However, there remain significant areas for improvement. This report provides additional technical justification and scientific support for best practices and technology that warrant further NYSDEC consideration. It also recommends area of further study. Recommendations are highlighted in blue text boxes throughout the document.

A systemic problem persists in the 2011 RDSGEIS, where NYSDEC proposes to build on the existing 1992 Generic Environmental Impact Statement (GEIS) for oil and gas drilling in NYS by providing additional information on the Marcellus Shale reservoir and high-volume hydraulic fracturing without addressing the fact that the technology and practices required by the 1992 GEIS are over two decades old.

Since 1992, numerous best technology and best management practice improvements have been made in the oil and gas industry. By relying on 1992-vintage decisions and technology as the foundation for Marcellus Shale development, NYS' RDSGEIS starts with an unstable foundation. This problem is magnified in the proposed revisions to the NYCRR where NYSDEC proposes to retain, with little revision, antiquated technology and practices for all oil and gas development in NYS, while proposing that new technology and practices only apply to HVHF operations. This creates a technically and scientifically unsupported two-tiered system for oil and gas regulation in NYS.

Accordingly, the first and most logical step in the State Environmental Quality Review Act (SEQRA) analysis is to examine the 1992 GEIS foundation and identify new best technology and best practice improvements have been made since 1992 that warrant adoption. Then, and only then, can NYS build a well-supported incremental analysis that examines the impact of new techniques such as horizontal drilling and high-volume fracture treatments.

## 2.   Scope of SGEIS – Marcellus Only

**Background**: In 2009, NYSDEC proposed that the SGEIS cover all horizontal drilling and HVHF in low-permeability gas reservoirs, at all depths. However, only the Marcellus Shale Gas Reservoir was studied in any detail. The DSGEIS was incomplete for all other low-permeability gas reservoirs.

In 2009, HCLLC recommended that NYSDEC either include additional information and analysis on the impacts of exploring and developing other low-permeability gas reservoirs or limit the scope of the SGEIS to the Marcellus Shale Gas Reservoir.

NYSDEC's consultant, Alpha Geoscience, disagreed with HCLLC's recommendation to limit the SGEIS scope to the Marcellus Shale, stating that the time to modify the scope had lapsed.[1] Alpha Geoscience concluded that it would be best for NYSDEC to determine at a future date, once a specific application was before them, whether the SGEIS covered High-Volume Hydraulic Fracturing (HVHF) operations in other low-permeability reservoirs.

HCLLC disagrees with Alpha Geoscience's recommendation, because it lacks technical and scientific basis and misconstrues HCLLC's recommendation. HCLLC did not recommend that other low-permeability gas reservoirs be excluded from the analysis because they should not be studied at all. On the contrary, HCCLC recommended that if low-permeability gas reservoirs were included in the SGEIS, they should be thoroughly studied.  The 2009 DSGEIS should have included a complete assessment of the Marcellus **and** all other low-permeability gas reservoirs in NYS; however, it did not.  Unfortunately, the 2011 RDSGEIS suffers from the same lack of data on other low-permeability gas reservoirs.

Consequently, there is a technical and scientific choice that needs to be made in declaring whether the SGEIS content satisfies its title. Either the SGEIS had to be revised to cover all low-permeability gas formations in NYS, or the SGEIS had to conclude that NYSDEC has insufficient data and/or resources to examine anything more than the Marcellus Shale at this time, and limit the scope of the SGEIS.

HCLLC's 2009 recommendation was made to ensure the SGEIS document title matches its content. The title of the SGEIS purports to provide an environmental impact analysis on all low-permeability gas reservoirs, yet, as explained in HCLLC's 2009 comments, the SGEIS did not provide sufficient analysis of the Utica Shale, and provided no analysis of the other Lower Paleozoic, Devonian (other than Marcellus), and Middle to Upper Paleozoic low-permeability gas reservoirs.[2,3] If NYSDEC has additional information to support a complete SGEIS for the Marcellus **and** all other low-permeability gas reservoirs, it should certainly include that complete assessment.

Unfortunately, the 2011 RDSGEIS suffers from the same narrow focus on the Marcellus shale. There was little additional work completed to advance NYSDEC's understanding of exploration and development impacts from the Utica Shale and other low-permeability gas reservoirs.

---

[1] Alpha Geoscience, Review of the DSGEIS and Identification Best Technology and Best Practices Recommendations Harvey Consulting, LLC, December 28, 2009, prepared for NYSERDA on January 20, 2011, Page 3.

[2] Ryder, R.T., 2008, Assessment of Appalachian Basin Oil and Gas Resources: Utica-Lower Paleozoic Total Petroleum System: U.S. Geological Survey Open-File Report 2008–1287.

[3] Milici, R.C., and Swezey, C.S., 2006, Assessment of Appalachian Basin Oil and Gas Resources: Devonian Shale-Middle and Upper Paleozoic Total Petroleum System: U.S. Geological Survey Open-File Report 2006-1237.

**2011 RDSGEIS:** The 2011 RDSGEIS provides some additional information on the Utica Shale Gas Reservoir, mostly in the form of geologic assessment. However, the RDSGEIS does not examine the peak or cumulative impacts of Utica Shale development.

No additional information is provided in the 2011 RDSGEIS on other low-permeability gas reservoirs in the region. The 2011 RDSGEIS states that industry's main focus in the near term is the Marcellus and Utica Shales; however, NYSDEC wants to cover all other low-permeability formations in the SGEIS because it may receive applications in the future for those formations:

> *The Department of Environmental Conservation (Department) has received applications for permits to drill horizontal wells to evaluate and develop the Marcellus and Utica Shales for natural gas production...* ***Other shale and low-permeability formations in New York may also be targeted for future application of horizontal drilling and high-volume hydraulic fracturing*** *[emphasis added].* [4]

Chapter 4 provides a geologic description of the Marcellus and Utica shale gas reservoirs; however, no other low-permeability gas reservoirs are studied. Yet, it is well known that most unconventional reservoirs vary in mineralogy, permeability, rock mechanics, and natural fracture parameters (length, orthogonal spacing, connectivity, anisotropy) and that there will be differences between formations that could lead to different drilling, stimulation, and development techniques.

Chapters 5 and 6 provide an analysis of drilling, fracturing, and development approaches in the Marcellus Shale Gas Reservoir. Chapters 5 and 6 are essentially silent on how the Utica Shale Gas Reservoir would be developed. No other low-permeability gas reservoirs are examined.

A search of the 1537 page electronic version of the RDSGEIS for the term "low-permeability gas reservoirs" shows that the term is only used a few times in the entire document. This term is used twice in the Executive Summary, where NYSDEC concludes that it has effectively studied "low-permeability gas reservoir" air quality impacts; yet, as further explained in Chapter 17 of this report there is insufficient information in the RDSGEIS to support that conclusion. The next occurrence of the term "low-permeability gas reservoirs" is not found until page 618 in the Air Quality Section, where again, NYSDEC states that it has included the impacts of "low-permeability gas reservoirs" in the air quality analysis; yet, there is insufficient information in the RDSGEIS to support that conclusion. The next occurrence, after the Air Quality Section, is found at page 1008, where NYSDEC defends exclusion of pipeline and compressor stations. A few minor references to this term are found at page 1071 in Chapter 9 (Alternative Actions). More simply put, the RDSGEIS contents do not match the title, and that there is insufficient information contained in the RDGSEIS to support development of all unnamed, unanalyzed low-permeability gas reservoirs in NYS. NYS has not developed a technical or scientific case to justify that the impacts described for the Marcellus Shale are representative of the peak or cumulative impact that would result from development of all unnamed, unanalyzed low-permeability gas reservoirs in NYS.

The 2011 RDSGEIS does not include a complete list of the formation names that it considers fit under the umbrella term of "low-permeability" formations. The only place that the term "low-permeability" formation is defined is in the Glossary at the end of the document:

> *Gas bearing rocks (which may or may not contain natural fractures) which exhibit in-situ gas permeability of less than 0.10 milidarcies.* [5]

---

[4] 2011 NYSDEC, RDSGEIS, Page 1-1.

[5] 2011 NYSDEC, RDSGEIS, Glossary.

Using this definition, a low-permeability formation could include a shale, sandstone, limestone or other formation that is gas bearing with a permeability of less than 0.10 milidarcies. The RDSGEIS does not address the scope of the formations that could be encompassed by this definition.

Figure 4.2 of the RDSGEIS[6] includes a stratigraphic section showing existing known oil and gas intervals above the Marcellus and Utica Shales, including numerous shale and other low-permeability formations that are known to exist, that were not examined in the SGEIS.



On the next page is a table summarizing historical oil and gas production data from 1967 to 2010 in NYS.[7] This table shows that there is numerous gas zones present both above and below the Marcellus Shale that have been producing gas. Some of these reservoirs are low-permeability reservoirs that may be further developed using horizontal drilling and hydraulic fracturing techniques. Additionally, this table shows that there has been no Utica Shale production in NYS from 1967 to 2010; therefore, little is known about its productivity or how it may be developed.

---

[6] 2011 NYSDEC, RDSGEIS, Page 4-7.

[7] NYS Oil & Gas Data Summary 1967-2010, compiled by Briana Mordick, NRDC, December 2011, using NYS data found at http://www.dec.ny.gov/energy/1601.html. 1967-1999 data came from summary production history files. 2000-2010 data came from oil and gas production files.

Harvey Consulting, LLC.                                                      Report to NRDC January 2012

## NYS Oil & Gas Data Summary 1967-2010

| | | Formation | Oil (bbl) | Gas (mcf) | | Oil (bbl) | Gas (mcf) |
|---|---|---|---|---|---|---|---|
| Devonian | Upper | DEVONIAN SHALE | 12,274 | 323,975 | | | |
| | | UPPER DEVONIAN | 364,054 | 881,848 | DEVONIAN SHALE | 376,328 | 1,208,697 |
| | | UPPER DEVONIAN SHALE | - | 2,874 | | | |
| | | Canadaway Undifferentiated | | | | | |
| | | GLADE | 1,392,255 | 449,124 | | | |
| | | BRADFORD | 7,665,427 | 1,639,511 | | | |
| | | BRADFORD 1ST & 2ND | 21 | - | | | |
| | | BRADFORD & CHIPMUNK | 416,357 | 676,506 | | | |
| | | Bradford 1st & Chipmunk | 6,609 | 2,497 | | | |
| | | CHIPMUNK, BRADFORD 1ST & 2ND | 44,943 | 10,217 | | | |
| | | CHIPMUNK | 7,369,293 | 1,012,975 | | | |
| | | CHIPMUNK & BRADFORD 2ND | 2,454,948 | 16,415 | | | |
| | | BRADFORD SECOND | 21,724 | 2,520 | | | |
| | | CHIPMUNK, BRADFORD 2ND & 3RD | 237,195 | 162,809 | CANADAWAY UNDIFFERENTIATED | 23,945,472 | 7,271,139 |
| | | Chipmunk, Bradford 1st,2nd,3rd | 9,719 | 8,321 | | | |
| | | BRADFORD 2ND & 3RD | 37,780 | 9,353 | | | |
| | | CHIPMUNK & BRADFORD 3RD | 33,186 | 34,858 | | | |
| | | Chipmunk & Harrisburg | 2,442 | 1,026 | | | |
| | | Harrisburg | 1,682 | - | | | |
| | | SCIO | 137,258 | 2,520 | | | |
| | | PENNY | 13,232 | 46,567 | | | |
| | | PENNY & FULMER VALLEY | 42,660 | 71,003 | | | |
| | | RICHBURG | 4,057,637 | 3,121,677 | | | |
| | | RICHBURG-WAUGH & PORTER | 1,104 | 3,240 | | | |
| | | Canadaway PERRYSBURG | - | 395 | | | |
| | | BRADFORD THIRD | 228,582 | 112,002 | | | |
| | | CLARKSVILLE | 39,387 | 36,864 | PERRYSBURG | 2,055,287 | 4,746,392 |
| | | WAUGH & PORTER | 42,100 | 247,245 | | | |
| | | FULMER VALLEY | 1,745,218 | 4,349,886 | | | |
| | | Nunda | - | - | | | |
| | | RHINESTREET | - | 3,409 | | | |
| | Middle | TULLY | 1,108 | 275,643 | TULLY | 1,108 | 275,643 |
| | | HAMILTON | - | 20,416 | HAMILTON | - | 20,416 |
| | | MARCELLUS | - | 747,399 | MARCELLUS | - | 747,399 |
| | | ONONDAGA | 647,251 | 25,843,114 | ONONDAGA | 647,251 | 25,843,114 |
| | | ONONDAGA-ORISKANY | - | 223,157 | | | |
| | Lower | ORISKANY | 10,582 | 31,738,725 | ORISKANY | 10,582 | 31,961,882 |
| | | HELDERBERG | - | 10,230,425 | HELDERBERG | - | 10,230,425 |
| | | ONONDAGA-BASS ISLAND | 532,310 | 3,118,389 | | | |
| | | BASS ISLAND | 1,021,802 | 5,739,620 | BASS ISLAND | 1,580,509 | 9,416,091 |
| | | BASS ISLAND/MEDINA | 26,397 | 558,082 | | | |
| Silurian | Upper | AKRON | 1,577 | 1,729,358 | AKRON | 1,577 | 1,729,358 |
| | | SALINA | 1,278 | 5,778 | | | |
| | | CAMILLUS | - | 60 | | | |
| | | SYRACUSE | 570 | 2,338 | | | |
| | | VERNON | - | 358,405 | | | |
| | | CLINTON | - | 87,231 | | | |
| | | LOCKPORT | - | 69,558 | | | |
| | | ROCHESTER SHALE | - | 70,693 | | | |
| | | SAUQUOIT | - | 210 | | | |
| | | SODUS SHALE | - | 164,071 | | | |
| | Lower | MEDINA | 213,688 | 514,545,705 | | | |
| | | GRIMSBY | - | 1,501,854 | MEDINA | 213,688 | 521,205,687 |
| | | WHIRLPOOL | - | 893,326 | | | |
| | | MEDINA-QUEENSTON | - | 4,264,802 | | | |
| | | HERKIMER | - | 5,849,567 | | | |
| | | HERKIMER-ONEIDA | - | 1,178,375 | | | |
| | | ONEIDA | - | 1,024,647 | HERKIMER-ONEIDA-OSWEGO | - | 9,169,025 |
| | | ONEIDA-OSWEGO | - | 1,054,384 | | | |
| Ordovician | Upper | QUEENSTON | - | 56,439,648 | QUEENSTON | - | 56,439,648 |
| | | OSWEGO | - | 22,052 | | | |
| | | UTICA | - | - | | | |
| | Middle | TRENTON | - | 485,477 | TRENTON | - | 485,477 |
| | | BLACK RIVER | - | 318,316,063 | BLACK RIVER | - | 318,316,063 |
| Cambrian | Upper | LITTLE FALLS | - | 501,440 | LITTLE FALLS | - | 501,440 |
| | | THERESA | - | 3,588,222 | THERESA | - | 3,588,222 |
| | | POTSDAM | - | - | | | |

NYS Oil & Gas Data Summary 1967-2010, compiled by Briana Mordick, NRDC, December 2011.

Using the Marcellus Shale impact assessment and proposed mitigation measures as a surrogate for peak and cumulative impact assessment in the Utica and all other unnamed low-permeability formations is an inadequate approach.

For example, the Utica Shale Gas Reservoir is almost twice as deep as the Marcellus Shale Gas Reservoir. The Utica Shale dips to 9,000' deep,[8] while the Marcellus Shale is approximately 5,000' deep.[9] Utica Shale wells will take longer to drill than Marcellus Shale wells, generating more air pollution and drilling waste, HVHF waste and resulting in longer duration surface impacts (e.g. noise, light, fuel and chemical storage periods, etc.). Additionally, waste generated translates into additional transportation and surface use impacts. Utica Shale development will also require more resources and equipment. Deeper shale gas formations will have higher reservoir pressure, and will penetrate more known oil and gas zones before reaching the Utica Shale, meaning increased blowout risk. Higher reservoir pressure will require additional combustion equipment to meet higher pump pressure and energy demands. Deeper wells can have more complex well construction designs. Fully cemented casing strings will be more difficult to complete at deeper depths and higher temperature cement mixtures will be required if subsurface temperatures exceed 200 $^0$F. Therefore, the maximum impact assessment for a Marcellus Shale well is not sufficient to examine the maximum impact of a Utica Shale well.

Additionally, there is little information in Petroleum Engineering technical literature on the Utica Shale, and how it may be effectively developed. The 2011 RDSGEIS assumes that the Utica Shale will be developed using the same exact techniques as the Marcellus Shale; however, this may not be the case. For example, a 2007 a paper prepared by Universal Well Services Inc., CESI Chemical A Flotek Industries Co., in collaboration with the State University of New York noted some significant differences in the Utica Shale, and the likelihood for a unique stimulation method:

> *The primary purpose of stimulating fractured shale reservoirs is the extension of the drainage radius via creation of a long fracture sand pack that interconnects with natural fractures thereby establishing a flow channel network to the wellbore.* ***However, there is limited understanding of a successful method capable of stimulating Utica Shale reservoirs. Indeed most attempts to data have yielded undesirable results.*** *This could be due to several factors, including formation composition, entry pressure, and premature pad fluid leak-off. Furthermore, stimulation of Utica shale reservoirs with acid alone has not been successful. This treatment method leads to a fracture length and drainage radius less than expected resulting in poor well productivity [emphasis added].*[10]

> *...several recently drilled Utica shale wells have not responded well to the normal shale fracturing practices.* ***An understanding of Utica shale mineralogy and rock mechanics is necessary before a stimulation method and fluid are selected*** *[emphasis added].*[11]

Additionally, the authors point out that the Utica, unlike the Marcellus, contains a high percentage of acid soluble carbonate and dolomite that may require chemical treatment (e.g. acids) to treat the carbonates and dolomite to reduce entry pressures. They suggest that an acid stimulation treatment could potentially be the main stimulation method instead of a HVHF, or alternatively be added as an additional pre-

---

[8] 2009 NYSDEC, DSGEIS, Page 4-5.

[9] 2009 NYSDEC, DSGEIS, Page 4-14.

[10] Paktinat, J., Pinkhouse, J.A., and Fontaine, J., (Universal Well Services Inc.), Lash, G. G., State University of New York College at Fredonia, Penny, G.S., CESI Chemical A Flotek Industries Co., Investigation of Methods to Improve Utica Shale Hydraulic Fracturing in the Appalachian Basin, Society of Petroleum Engineers, SPE Paper 111063, 2007, Page 1.

[11] Paktinat, J., Pinkhouse, J.A., and Fontaine, J., (Universal Well Services Inc.), Lash, G. G., State University of New York College at Fredonia, Penny, G.S., CESI Chemical A Flotek Industries Co., Investigation of Methods to Improve Utica Shale Hydraulic Fracturing in the Appalachian Basin, Society of Petroleum Engineers, SPE Paper 111063, 2007, Page 2.

treatment to a HVHF. The Utica also contains a higher percentage of clays than the Marcellus, and has the potential to generate both siliceous and organic fines that may require additional chemical treatment.

Moreover, there are low-permeability gas reservoirs that are present at depths shallower than the Marcellus Shale, which were not studied at all. Those unnamed, unanalyzed low-permeability reservoirs are in closer proximity to protected water resources, and warrant a complete technical and scientific assessment. Most importantly, HVHF modeling and fracture design requirements should be established to ensure that man-made induced fractures in these shallower reservoirs do not propagate in a manner that pollutes protected groundwater resources. Man-made induced fractures in shallower formations will tend to propagate on the horizontal plane; however, the size of that horizontal fracture must be constrained so that it does not intersect with existing improperly constructed or improperly abandoned wells or transmissive faults and fractures that can provide a direct pollution pathway to protected groundwater resources.

Best technology and best practices and cumulative impacts, in many cases, are reservoir specific. Because the RDSGEIS does not contain information on the depth, type, activity, or equipment requirements for the general category called "*other low-permeability gas reservoirs*," it is not possible to determine if the maximum impact assessment for a Marcellus Shale well sufficiently covers the maximum impact from "*other low-permeability gas reservoirs*." Nor is it possible to determine whether best technology and best practices developed for the Marcellus Shale would apply to the Utica Shale since there is very little information and understanding of the optimal Utica Shale stimulation method at this time.

> **Recommendation No. 1**: The SGEIS should either include additional information and analysis on the impacts of exploring and developing the Utica Shale and other unnamed low-permeability gas reservoirs, or acknowledge that there is insufficient information and analysis to study the impacts of this development. In the latter case, the SGEIS should conclude that its examination of impacts and mitigation measures is limited to the Marcellus Shale Gas Reservoir, and therefore any Utica Shale or other unnamed low-permeability gas reservoir development will warrant a site-specific supplemental environmental impact statement review or should be covered under another, future SGEIS process.

## 3.   Liquid Hydrocarbon Impacts (Oil and Condensate)

**Background**: NYS 2009 Annual Oil and Gas Report[12] show that NYS produced 323,536 barrels of oil in 2009, primarily from the western counties of:

| | |
|---|---|
| Cattaraugus | 201,688 barrels |
| Allegany | 47,421 barrels |
| Chautauqua | 40,187 barrels |
| Steuben | 9,992 barrels |

NYSDEC did not separately report the amount of condensate or natural gas liquids production.

Chapter 2 of this report includes a table summarizing oil and gas production from 1967 to 2010 in NYS, showing that oil gas been produced from above the Marcellus and Utica Shale formations, verifying the potential to encounter liquid hydrocarbons while drilling into the Marcellus and Utica formations.

**2011 RDSGEIS:** The 2011 RDSGEIS describes natural gas exploration and production, but does not address the potential for shale gas wells to also encounter liquid hydrocarbons.  Natural gas exploration can identify oil and condensate development opportunities. If liquid hydrocarbons are found while drilling a shale gas well, additional wells and drillsites may be needed to develop those oil resources.

Liquid hydrocarbons found during natural gas exploration have the potential to contaminate the environment through spills and well blowouts. The risk of oil spills during shale gas exploration has not been analyzed in the RDSGEIS. While blowouts are infrequent, they do occur, and are a reasonably foreseeable consequence of exploratory drilling operations.  Blowouts can occur from gas and/or oil wells. They can last for days, weeks, or months until well control is achieved. On average, a blowout occurs in 7 out of every 1,000 onshore exploration wells. [13] Two recent gas well blowouts occurred in Pennsylvania due to Marcellus Shale drilling.[14,15]

The 2011 RDSGEIS provided several useful maps and a stratigraphic section that aid in understanding the overlap of NYS' oil and gas production intervals. Figure 4.2 includes a Stratigraphic Section of Southwestern NYS that shows oil is produced from the Upper Devonian, at shallower depths than the Marcellus Shale, meaning that wells drilled in this region may encounter oil before penetrating the Marcellus. An annotated version of Figure 4.2 is also shown in Chapter 2 of this report. Figures 4.8 and 4.9 indicate that there is an overlap of current oil production with possible Marcellus Shale development in Cattaraugus, Allegany, Chautauqua, and Steuben counties.

Oil is also found below the Marcellus Shale and above the Utica Shale in the Upper Silurian. Therefore wells drilled into the Utica Shale may encounter oil before penetrating the Utica. Figure 4.6 indicates that there is an overlap of current oil production with possible Utica Shale development in Steuben County.

---

[12] New York State Oil, Gas and Mineral Resources, 26th Annual Report for Year 2009 and Appendices, Prepared by NYSDEC, 2009.

[13] Rana, S., Environmental Risks- Oil and Gas Operations Reducing Compliance Cost Using Smarter Technologies, Society of Petroleum Engineering Paper 121595-MS, Asia Pacific Health, Safety, Security and Environment Conference, 4-6 August 2009, Jakarta, Indonesia, 2009.

[14] Blowout Occurs at Pennsylvania Gas Well, Wall Street Journal, June 4, 2010.

[15] Pennsylvania Fracking Spill: Natural Gas Well Blowout Spills Thousands of Gallons of Drilling Fluid, The Huffington Post, April 20, 2011.

There are low-permeability gas reservoirs that are present at depths both shallower and deeper than the Marcellus Shale, which were not studied in detail in the RDSGEIS. Absent geologic maps for these unnamed, unanalyzed low-permeability reservoirs, it is not clear where oil development and shale gas development overlap for these reservoirs may occur.

> **Recommendation No. 2**: The SGEIS should examine the potential for shale gas wells to also encounter liquid hydrocarbons. The SGEIS should also examine the incremental risks of oil well blowouts and oil spills, as well as the impacts from the additional wells and drillsites that may be required to develop oil resources identified by shale gas exploration and production activities.

Harvey Consulting, LLC.                                                        Report to NRDC January 2012

## 4.   Water Protection Threshold

**Background:** The regulations promulgated under the federal Safe Drinking Water Act (SDWA) define an Underground Source of Drinking Water (USDW) as an aquifer or part of an aquifer, which is not exempted (per 40 CFR § 146.4), and: (1) which supplies a public water system; or (2) which contains a sufficient quantity of groundwater to supply a public water system and either supplies drinking water for human consumption or contains fewer than 10,000 milligrams/liter of Total Dissolved Solids (TDS) [10,000 ppm TDS]. 40 CFR § 144.3. An EPA diagram depicting a USDW is shown below.[16]



**The 2011 RDSGEIS:** The 2011 RDSGEIS is based on the protection of potable water as defined as water containing less than 250 ppm of sodium chloride or 1,000 ppm TDS. The RDSGEIS states:

> *For oil and gas regulatory purposes, **potable fresh water is defined as water containing less than 250 ppm of sodium chloride or 1,000 ppm TDS** and salt water is defined as containing more than 250 ppm sodium chloride or 1,000 ppm TDS [emphasis added].[17]*

The RDSGEIS identifies 850' as the depth where 250 ppm of sodium chloride or 1,000 ppm TDS is typically reached, however the RDSGEIS notes that in some cases potable water is found deeper than 850'.

---

[16] USEPA, Karen Johnson, Chief Ground Water & Enforcement Branch, 2010 PowerPoint Presentation, EPA's Underground Injection Control Program, Regulation of Disposal Wells in Pennsylvania.

[17] 2011 NYSDEC, RDSGEIS, Page 2-23.

Review of NYS 2011 RDSGEIS and Proposed Revisions to NYCRR                          Page 12 of 183

*__Groundwater from sources below approximately 850 feet in New York typically is too__*
*__saline for use as a potable water supply; however, there are isolated wells deeper than__*
*__850 feet that produce potable water__* *and wells less than 850 feet that produce salt water.*
*A depth of 850 feet to the base of potable water is commonly used as a practical*
*generalization for the maximum depth of potable water; however, a variety of conditions*
*affect water quality, and the maximum depth of potable water in an area should be*
*determined based on the best available data [emphasis added].[18]*

By comparison, USDWs are based on a TDS cutoff of 10,000 ppm. The RDSGEIS has not explained why
it proposes, and NYS regulations rely on, a 1,000 ppm TDS threshold instead of the federally required
USDW threshold of 10,000 ppm TDS.

Ohio issued updated Oil and Gas Well Construction Rules on October 28, 2011, that require surface
casing and intermediate casing to be set to protect the deepest underground source of drinking water
(USDW); Ohio's rules are based on the 10,000 ppm federal TDS threshold.[19]

> **Recommendation No. 3**: The SGEIS and the NYCRR should require wells to be constructed to
> protect Underground Sources of Drinking Water (USDWs), as defined by the Safe Drinking
> Water Act.

NYS' use of a 1,000 ppm TDS cut-off instead of the USDW threshold of 10,000 ppm TSD is a two-fold
problem: First, the RDSGEIS states that surface casing ("water protection piping") setting depths will be
925' if no other data is available.[20] The 925' surface casing setting depth is based on an 850' base plus
75'[21], where NYSDEC has assumed that TDS will exceed 1,000 ppm at deeper than 850'. The 925'
casing setting depth does not take into account the fact that drinking water, under the SDWA definition of
a USDW, could exist at depths below 850'. Therefore the RDSGEIS has not provided scientific
justification for the default 925' casing setting depth, nor has it explained how such a proposal comports
with federal law.

Second, the entire RDSGEIS is premised on the conclusion that a HVHF well initiated at a depth of
2,000' would be safe, because NYSDEC assumes that NYS does not have any drinking water resources
deeper than 850' deep. However, the RDSGEIS does not indicate that any examination of the depth of
10,000 ppm TDS water or of the availability of drinking water resources below 850' has been or will be
conducted and, therefore, cannot support its 850' assumption.

Additionally, the RDSGEIS states that potable water is found deeper than 850'. Therefore, the 2,000'
threshold depth for initiating a HVHF under this SGEIS requires re-evaluation. And as explained in
Chapter 10 of this report, HCLLC is recommending that initial drilling and completions occur below
4,000', while site-specific data is gathered in NYS to justify safe drilling at shallower depths.

---

[18] 2011 NYSDEC, RDSGEIS, Page 2-23.

[19] Proposed Ohio Oil and Gas Well Construction Rules, October 28, 2011, currently under public review and comment.

[20] 2011 NYSDEC, RDSGEIS, Page 7-50.

[21] See Chapter 6 of this report, where a 100' buffer is recommended, instead of 75'.

> **Recommendation No. 4**: The SGEIS should re-examine the 925' casing default setting and the 2000' HVHF cut-off, and justify how these proposed thresholds will protect USDW sources. Protecting to a 10,000 ppm TDS standard will likely increase both depths.
>
> The SGEIS should include data on the location of Underground Sources of Drinking Water (USDWs), as defined by the Safe Drinking Water Act, across NYS. The SGEIS should include USDW maps for all areas that will be affected by the proposed scope of the SGEIS. This data will be an important tool for industry and the public alike to ensure USDWs are protected.

**NYCRR Proposed Revisions**: Well construction regulations at 6 NYCRR § 550-559 instruct operators to construct oil and gas wells in a manner that protects potable fresh water, i.e., only water containing less than 250 ppm of sodium chloride or less than 1,000 ppm of TDS. 6 NYCRR § 550.3 (ai).

The NYCRR does not protect, under its definition of "potable fresh water," water resources with less than 10,000 ppm TDS but greater than 1,000 ppm TDS, which could qualify as USDWs under the Safe Drinking Water Act. See 40 CFR §§ 144.3, 146.4.

Regulations at 6 NYCRR § 554.1 require operators to prevent pollution to "surface or ground fresh water"; however, this term is not defined by the NYCRR, so it is unclear what additional groundwater beyond "potable fresh water" would be protected or how.

> **Recommendation No. 5**: The NYCRR should be consistent with federal law [Underground Sources of Drinking Water (USDWs)] or NYSDEC should propose more protective standards for NYS if needed to protect NYS' future water supply needs, if the federal threshold is found insufficient.

## 5.  Conductor Casing

**Background:**  In 2009, HCLLC recommended the NYCRR and the SGEIS be revised to include conductor casing construction standards. While a number of changes were made to improve conduct casing requirements in the RDSGEIS, the proposed revisions to the NYCRR do not include conductor casing construction standards. Please refer to HCLLC's September 16, 2009 Report, *New York State (NYS) Casing Regulation Recommendations* for more specific recommendations on conductor casing and the technical basis for HCLCC's recommendations.

Conductor casing construction standards are only partially addressed in the 2011 RDSGEIS, under Appendix 10, Proposed Supplementary Permit Conditions for HVHF, and Appendix 9, Existing Fresh Water Supplementary Permit Conditions Required for Wells Drilled in Primary and Principal Aquifers**.**

**2011 RDSGEIS:**  The 2011 RDSGEIS Appendix 9, Existing Fresh Water Supplementary Permit Conditions Required for Wells Drilled in Primary and Principal Aquifers, includes a conductor casing requirement that limits drilling fluid types. The requirement excludes synthetic muds and oil based muds from being used while drilling shallow sections of the wellbore.

> *Any hole drilled for conductor or surface casing (i.e., "water string") must be drilled on air, fresh water, or fresh water mud. For any holes drilled with mud, techniques for removal of filter cake (e.g., spacers, additional cement, appropriate flow regimes) must be considered when designing any primary cement job on conductor and surface casing.*

Excluding synthetic muds and oil based muds from being used while drilling shallow sections of the wellbore is a best practice.

Appendix 9 also includes procedures for ensuring conductor pipe is cemented from top to bottom, and firmly affixed in a central location in the wellbore, with a continuous, equally thick layer of cement around the pipe.

> *If conductor pipe is used, it must be run in a drilled hole and it must be cemented back to surface by circulation down the inside of the pipe and up the annulus, or installed by another procedure approved by this office. Lost circulation materials must be added to the cement to ensure satisfactory results.*
>
> *Additionally, at least two centralizers must be run with one each at the shoe and at the middle of the string. In the event that cement circulation is not achieved, cement must be grouted (or squeezed) down from the surface to ensure a complete cement bond. In lieu of or in combination with such grouting or squeezing from the surface, this office may require perforation of the conductor casing and squeeze cementing of perforations. This office must be notified _____ hours prior to cementing operations and cementing cannot commence until a state inspector is present.*

The 2011 RDSGEIS Appendix 10, Proposed Supplementary Permit Conditions for HVHF, includes a conductor casing condition that states:

> *When drive pipe (conductor casing) is left in the ground, a pad of cement shall be placed around the well bore to block the downward migration of surface pollutants. The pad shall be three feet square or, if circular, three feet in diameter and shall be crowned up to the drive pipe (conductor casing), unless otherwise approved by the Department.*

**NYCRR Proposed Revisions**: In summary, NYSDEC has included important conductor casing construction guidelines in the 2011 RDSGEIS for wells drilled in primary and principal aquifer areas and HVHF wells, but has not proposed to codify those changes in the NYCRR.

The conductor casing construction guidelines listed in the 2011 RDSGEIS should apply to all wells in NYS, and should not just be limited to wells drilled in primary and principal aquifer areas and HVHF wells. These are best practices for construction of all oil and gas wells.

NYSDEC should set a conductor casing depth criterion, requiring conductor casing be set to a sufficient depth to provide solid structural anchorage. Also, the regulations should specify that conductor casing design be based on site-specific engineering and geologic factors.

> **Recommendation No. 6**: Conductor casing requirements listed in the Proposed Supplementary Permit Conditions for HVHF and Existing Fresh Water Supplementary Permit Conditions Required for Wells Drilled in Primary and Principal Aquifers should be codified in the NYCRR and should apply to all wells drilled in NYS, not just HVHF wells. Additionally, NYSDEC should set a conductor casing depth criterion, requiring conductor casing be set to a sufficient depth to provide a solid structural anchorage. Regulations should specify that conductor casing design be based on site-specific engineering and geologic factors.

## 6.  Surface Casing

**Background:**  In 2009, HCLLC recommended the NYCRR be revised to include additional surface casing construction standards. Please refer to HCLLC's September 16, 2009 Report, *New York State (NYS) Casing Regulation Recommendations* for more specific recommendations on surface casing the technical basis for HCLCC's recommendations.

Surface casing plays a very important role in protecting groundwater aquifers, providing the structure to support blowout prevention equipment, and providing a conduit for drilling fluids while drilling the next section of the well.

The drilling engineer determines the depth of surface casing installation with these key factors in mind: surface casing should stop above any significant pressure or hydrocarbon zone, ensuring the blowout preventer can be installed prior to drilling into a pressure or hydrocarbon zone, and surface casing should provide a protective barrier to prevent hydrocarbons from contaminating aquifers when the well is drilled deeper (below the surface casing) into hydrocarbon bearing zones.

Stray gas may impact ground water and surface water from poor well construction practices.  Properly constructed and operated oil and gas wells are critical to mitigating stray gas and thereby protecting water supplies and public safety.  If a well is not properly cased and cemented, natural gas in subsurface formations may migrate from the wellbore through bedrock and soil.  Stray gas may adversely affect water supplies, accumulate in or adjacent to structures such as residences and water wells, and has the potential to cause a fire or explosion.

Instances of improperly constructed wellbores leading to the contamination of drinking water with natural gas are well documented in Pennsylvania.[22]  Gas well leaks from improperly constructed gas wells have resulted in contamination of the Susquehanna River and adjacent private water supply wells.[23]  A 2011 Duke University study covering Pennsylvania and New York found methane contamination of drinking water associated with shale-gas extraction.  Duke University found that methane concentrations were 17 times higher, on average, in drinking water wells in active drilling and extraction areas than in wells in nonactive areas.[24]

The 2011 RDSGEIS and the proposed revisions to the NYCRR include important improvements for surface casing. Overall, NYS' surface casing requirements are fairly robust when the NYCRR, guidance documents, and standard stipulations are combined. NYSDEC proposed a number of substantial improvements in the surface casing requirements, most notably improved cement quality, casing quality, and installation techniques.

This chapter reviews the proposed changes and supports the improvements that have been made. It also makes suggestions for improved regulatory clarity and adds a few additional recommendations for NYSDEC to consider in completing its surface casing regulatory program revision.

---

[22] *See, e.g.*, DEP Reaches Agreement with Cabot to Prevent Gas Migration, Restore Water Supplies in Dimock Township, Agreement Requires DEP Approval for Well Casing, Cementing, November 4, 2009, available at http://www.portal. state.pa.us/portal/server.pt/community/newsroom/14287?id=2418& typeid=1.

[23] *See, e.g.*, DEP Monitors Stray Gas Remediation in Bradford County Requires Chesapeake to Eliminate Gas Migration, Chesapeake Commits to Evaluate, Remediate All PA Wells to Conform with Improved Casing Regulations, September 17, 2010, available at http://www.portal.state.pa.us/portal/server.pt/ community/newsroom/14287?id=14274&typeid=1.

[24] Osborn, S.G., A. Vengosh, N.R. Warner, R.B. Jackson, 2011 Methane contamination of drinking water accompanying gas- well drilling and hydraulic fracturing, Proceedings of the National Academy of Sciences, U.S.A.; DOI: 10.1073/pnas.1100682108,  Page 2.

The main recommendation in this section is to streamline surface casing regulations by amending the NYCRR to include requirements contained in the 2011 RDSGEIS and standard stipulations. As proposed, NYSDEC has included a number of surface casing requirements in the 2011 RDSGEIS at Appendices 8, 9, and 10 (Proposed Permit Conditions). NYSDEC also included some, but not all, of these requirements in the NYCRR. Unfortunately, there are a number of inconsistencies between the permit conditions and the NYCRR that create uncertainty about what will be required.

Additionally, there are a number of new surface casing requirements proposed for HVHF wells that are standard industry best practices for all oil and gas wells. These requirements should be included in the NYCRR Part 554 (drilling practices for all oil and gas wells), and not just contained in NYCRR Part 560 (drilling practices for HVHF wells).

In 2009, HCLLC recommended that improved casing and cementing practices be codified in the NYCRR, rather than through a combined patchwork of permit conditions and regulations. HCLLC's concern was that the proposed requirements, in a number of cases, were inconsistent with existing regulations, and could be more efficiently consolidated into a single, more concise set of regulations.

NYSDEC's consultant Alpha Geoscience disagreed. Alpha Geoscience concluded that it would be more logical to use a patchwork of regulations, add a long list of conditions to each permit, and forgo regulatory revision.

> *Harvey Consulting suggests that NYSDEC revise the NYS oil and gas regulations to specifically address new casing and cementing practices and fresh water aquifer supplementary permit conditions. The purpose of the SGEIS, however, is not to revise regulations. The purpose of the Proposed Supplementary Permit Conditions for shale gas activities is to customize the existing regulations and guideline framework to fit new and changing industry, relieving the need for frequent regulatory changes. Permit conditions must be met by the party seeking a permit for a proposed action, so whether or not the permit conditions are included in the New York State regulations is irrelevant.[25]*

HCLLC disagrees with Alpha Geoscience's recommendation. It is relevant whether new requirements are found in regulation or a permit condition. Foremost, revising the outdated NYCRR provides simplicity and clarity for industry and the public. It provides a concise set of co-located rules. Conversely, layering a complex patchwork of permit conditions on outdated NYCRR creates confusion, inconsistency, and enforcement challenges. Furthermore, permit conditions can be revised and modified by staff, without public review, and can be applied in a more discretionary manner. Regulations are not discretionary, and are not subject to modification without a formal public review process. Therefore, HCLLC recommends that requirements that apply to all wells be codified in the NYCRR, and permit conditions be reserved for site-specific, project-specific requirements. This will improve clarity and certainty for industry and the public alike, and will afford NYSDEC the opportunity to apply site-specific, project specific requirements to address unique project issues.

NYSDEC evidently agreed with HCLLC's recommendation to revise the NYCRR by proposing revisions for public review; however, the regulations have only been partially updated to include new surface casing best practices. Therefore inconsistency remains, and needs resolution.

> **Recommendation No. 7**: The surface casing and cementing requirements should be consistent throughout the SGEIS text and with the NYCRR.

---

[25] Alpha Geoscience, Review of the DSGEIS and Identification Best Technology and Best Practices Recommendations, Harvey Consulting, LLC, December 28, 2009, prepared for NYSERDA on January 20, 2011, Page 13.

An analysis of the proposed RDSGEIS conditions found in Appendices 8, 9, and 10 is provided below and compared to the proposed NYCRR revisions. Recommendations are made to improve consistency in the documents and highlight additional best practices that should be considered.

**The 2011 RDSGEIS:** It appears that NYSDEC's intent is to require that all wells meet the minimum standards found at Appendix 8 (NYSDEC's Casing and Cementing Practices), and then layer on additional requirements for wells drilled in primary and principal aquifers (Appendix 9 Existing Fresh Water Supplementary Permit Conditions Required for Wells Drilled in Primary and Principal Aquifers). It appears that a third layer of requirements will be applied to wells that undergo HVHF stimulation treatments (Appendix 10 Proposed Supplementary Permit Conditions for HVHF).

Therefore, it is assumed that a shale gas well that is drilled in a primary and principal aquifer, and will undergo a HVHF stimulation treatment must meet all the conditions found in Appendices 8, 9, and 10; however, this would not be possible because the permit conditions are discordant. An evaluation of these layered conditions reveals inconsistencies, as explained in the text and summary table below.

**The 2011 RDSGEIS Appendix 8:** Appendix 8 Casing and Cementing Practices requires: surface casing be set at least 75' below freshwater or at least 75' into bedrock, whichever is deeper; surface casing be set before hydrocarbons are encountered; new pipe be used (or used pipe if tested); and centralizers and cement baskets be used.

> 2. *Surface casing shall extend at least 75 feet beyond the deepest fresh water zone encountered or 75 feet into competent rock (bedrock), whichever is deeper, unless otherwise approved by the Department. However, the surface pipe must be set deeply enough to allow the BOP [blow-out preventer] stack to contain any formation pressures that may be encountered before the next casing is run.*

> 3. *Surface casing shall not extend into zones known to contain measurable quantities of shallow gas. In the event that such a zone is encountered before the fresh water is cased off, the operator shall notify the Department and, with the Department's approval, take whatever actions are necessary to protect the fresh water zone(s).*

> 4. *All surface casing shall be a string of new pipe with a mill test of at least 1,100 pounds per square inch (psi), unless otherwise approved. Used casing may be approved for use, but must be pressure tested before drilling out the casing shoe or, if there is no casing shoe, before drilling out the cement in the bottom joint of casing. If plain end pipe is welded together for use, it too must be pressure tested. The minimum pressure for testing used casing or casing joined together by welding, shall be determined by the Department at the time of permit application. The appropriate Regional Mineral Resources office staff will be notified six hours prior to making the test. The results will be entered on the drilling log.*

> 5. *Centralizers shall be spaced at least one per every 120 feet; a minimum of two centralizers shall be run on surface casing. Cement baskets shall be installed appropriately above major lost circulation zones.[26]*

Appendix 8 requires the use of: 25% excess cement, spacer fluids between the drilling muds and cement, and lost circulation additives. Appendix 8 also requires that gas flows or lost circulation be addressed and

---

[26] 2011 NYSDEC, RDSGEIS, Appendix 8, Page 1.

the hole be conditioned before cementing. NYSDEC reserves the right to require a cement evaluation log if cement does not return to the surface.

> 6. *Prior to cementing any casing strings, all gas flows shall be killed and the operator shall attempt to establish circulation by pumping the calculated volume necessary to circulate. If the hole is dry, the calculated volume would include the pipe volume and 125% of the annular volume. Circulation is deemed to have been established once fluid reaches the surface. A flush, spacer or extra cement shall be used to separate the cement from the bore hole spacer or extra cement shall be used to separate the cement from the bore hole fluids to prevent dilution. If cement returns are not present at the surface, the operator may be required to run a log to determine the top of the cement.*

> 7. *The pump and plug method shall be used to cement surface casing, unless approved otherwise by the Department. The amount of cement will be determined on a site-specific basis and a minimum of 25% excess cement shall be used, with appropriate lost circulation materials, unless other amounts of excesses are approved or specified by the Department.* [27]

Appendix 8 requires: the water used in the cement be tested for pH and temperature; the cement be prepared according to manufacturer specifications; and the cement be allowed to harden to a compressive strength of at least 500 psi before being disturbed.

> 8. *The operator shall test or require the cementing contractor to test the mixing water for pH and temperature prior to mixing the cement and to record the results on the cementing ticket.*

> 9. *The cement slurry shall be prepared according to the manufacturer's or contractor's specifications to minimize free water content in the cement.*

> 10. *After the cement is placed and the cementing equipment is disconnected, the operator shall wait until the cement achieves a calculated compressive strength of 500 psi before the casing is disturbed in any way. The waiting-on-cement (WOC) time shall be recorded on the drilling log.* [28]

**The 2011 RDSGEIS Appendix 9:** Appendix 9, Existing Fresh Water Supplementary Permit Conditions Required for Wells Drilled in Primary and Principal Aquifers, applies to wells drilled in primary and principal aquifer zones. Appendix 9 includes conditions that require: surface casing to be set at least 100' below the deepest freshwater zone and at least 100' into bedrock; the annulus be at least 1-1/4" wide to optimize cement placement and cement sheath width; the entire annulus be cemented, using at least 50% excess cement; the cement design include additives to control lost circulation; centralizers be run at least every 120'; new pipe be used (or reconditioned tested pipe); and NYSDEC be notified and present for cementing operations.

---

[27] 2011 NYSDEC, RDSGEIS, Appendix 8, Pages 1-2.

[28] 2011 NYSDEC, RDSGEIS, Appendix 8, Page 2.

> *A surface casing string must be set at least 100' below the deepest fresh water zone and at least 100' into bedrock. If shallow gas is known to exist or is anticipated in this bedrock interval, the casing setting depth may be adjusted based on site-specific conditions provided it is approved by this office. There must be at least a 2½" difference between the diameters of the hole and the casing (excluding couplings) or the clearance specified in the Department's Casing and Cementing Practices, whichever is greater. Cement must be circulated back to the surface with a minimum calculated 50% excess. Lost circulation materials must be added to the cement to ensure satisfactory results. Additionally, cement baskets and centralizers must be run at appropriate intervals with centralizers run at least every 120'. Pipe must be either new API graded pipe with a minimum internal yield pressure of 1,800 psi or reconditioned pipe that has been tested internally to a minimum of 2,700 psi. If reconditioned pipe is used, an affidavit that the pipe has been tested must be submitted to this office before the pipe is run. This office must be notified _____ hours prior to cementing operations and cementing cannot commence until a state inspector is present.*[29]

Appendix 9 requires the surface hole be drilled using compressed air or Water-Based Muds (WBM), meaning no Synthetic-Based Muds (SBM) or Oil-Based Muds (OBM) may be used.

> *Any hole drilled for conductor or surface casing (i.e., "water string") must be drilled on air, fresh water, or fresh water mud. For any holes drilled with mud, techniques for removal of filter cake (e.g., spacers, additional cement, appropriate flow regimes) must be considered when designing any primary cement job on conductor and surface casing.*[30]

As found in Appendix 9, freshwater zone depths and the potential for shallow gas hazards must be estimated and documented in drilling applications; actual data must be collected during drilling to identify any freshwater zones and shallow gas hazards that require additional NYSDEC review and approval.

> *If multiple fresh water zones are known to exist or are found or if shallow gas is present, this office may require multiple strings of surface casing to prevent gas intrusion and/or preserve the hydraulic characteristics and water quality of each fresh water zone. The permittee must immediately inform this office of the occurrence of any fresh water or shallow gas zones not noted on the permittee's drilling application and prognosis. This office may require changes to the casing and cementing plan in response to unexpected occurrences of fresh water or shallow gas, and may also require the immediate, temporary cessation of operations while such alterations are developed by the permittee and evaluated by the Department for approval.*[31]

Appendix 9 requires cement fill the surface casing annulus, and if cement placement in the annulus is not initially successful, additional cement must be pumped into the annulus until it is filled with cement.

> *In the event that cement circulation is not achieved on any surface casing cement job, cement must be grouted (or squeezed) down from the surface to ensure a complete cement bond. This office must be notified _____ hours prior to cementing operations and cementing cannot commence until a state inspector is present. In lieu of or in*

---

[29] 2011 NYSDEC, RDSGEIS, Appendix 9, Page 1.
[30] 2011 NYSDEC, RDSGEIS, Appendix 9, Page 1.
[31] 2011 NYSDEC, RDSGEIS, Appendix 9, Page 2.

*combination with such grouting or squeezing from the surface, this office may require perforation of the surface casing and squeeze cementing of perforations.* [32]

In Appendix 9, NYSDEC reserves the right to require the operator to run a cement bond log; however, it does not require one to verify the integrity of all surface casing cement jobs.

*This office may also require that a cement bond log and/or other logs be run for evaluation purposes. In addition, drilling out of and below surface casing cannot commence if there is any evidence or indication of flow behind the surface casing until remedial action has occurred. Alternative remedial actions from those described above may be approved by this office on a case-by-case basis provided site-specific conditions form the basis for such proposals.* [33]

**The 2011 RDSGEIS Appendix 10:** Appendix 10 contains Proposed Supplementary Permit Conditions for HVHF operations, including additional surface casing requirements. The 2011 RDSGEIS does not explain why these additional pollution prevention and quality control/quality assurance (QC/QA) requirements do not apply to all oil and gas wells in NYS.

The 2011 RDSGEIS Appendix 10 requires new casing and the use of American Petroleum Institute (API) standards for: casing thread compounds, centralizer placement, and cement composition (including the requirement to use gas-blocking additives).

31) *With respect to all surface, intermediate and production casing run in the well, and in addition to the requirements of the Department's "Casing and Cementing Practices" and any approved centralizer plan for intermediate casing, the following shall apply:*

a) *Casing must be new and conform to American Petroleum Institute (API) Specification 5CT, Specifications for Casing and Tubing (April 2002), and welded connections are prohibited;*

b) *Casing thread compound and its use must conform to API Recommended Practice (RP) 5A3, RP on Thread Compounds for Casing, Tubing, Line Pipe, and Drill Stem Elements (November 2009);*

c) *At least two centralizers (one in the middle and one at the top) must be installed on the first joint of casing (except production casing) and all bow-spring style centralizers must conform to API Specification 10D for Bow-Spring Casing Centralizers (March 2002);*

d) *Cement must conform to API Specification 10A, Specifications for Cement and Material for Well Cementing (April 2002 and January 2005 Addendum). Further, the cement slurry must be prepared to minimize its free water content in accordance with the same API specification and it must contain a gas-block additive ...* [34]

---

[32] 2011 NYSDEC, RDSGEIS, Appendix 9, Page 2.

[33] 2011 NYSDEC, RDSGEIS, Appendix 9, Page 2.

[34] 2011 NYSDEC, RDSGEIS, Appendix 10, Pages 5-6.

Appendix 10 also requires: drilling mud be circulated and conditioned prior to cementing; spacer fluid be used to separate the drilling mud from the cement, to avoid drilling mud contamination; and cement be installed using methods that inhibit voids in the cement.

> *e)   Prior to cementing any casing string, the borehole must be circulated and conditioned to ensure an adequate cement bond… The surface casing must be run and cemented immediately after the hole has been adequately circulated and conditioned.*
>
> *f)   A spacer of adequate volume, makeup and consistency must be pumped ahead of the cement;*
>
> *g)   The cement must be pumped at a rate and in a flow regime that inhibits channeling of the cement in the annulus…[35]*

Appendix 10 establishes a specific period of time for the cement to harden, and a compressive strength standard that the cement must achieve before drilling continues deeper in the hole. This avoids disturbing the cement until it has completely set.

> *h)   After the cement is pumped, the operator must wait on cement (WOC):*
>
> *1. until the cement achieves a calculated (e.g., performance chart) compressive strength of at least 500 psig, and*
>
> *2. a minimum WOC time of 8 hours before the casing is disturbed in any way, including installation of a blow-out preventer (BOP). The operator may request a waiver from the Department from the required WOC time if the operator has bench tested the actual cement batch and blend using mix water from the actual source for the job, and determined that 8 hours is not required to reach a compressive strength of 500 psig.[36]*

Appendix 10 requires records be kept for a period of 5 years and be available to NYSDEC upon request.

> *A copy of the cement job log for any cemented casing in the well must be available to the Department at the wellsite during drilling operations, and thereafter available to the Department upon request. The operator must provide such to the Department upon request at any time during the period up to and including five years after the well is permanently plugged and abandoned under a Department permit. If the well is located on a multi-well pad, all cementing records must be maintained and made available during the period up to and including five years after the last well on the pad is permanently plugged and abandoned under a Department permit.[37]*

---

[35] 2011 NYSDEC, RDSGEIS, Appendix 10, Page 6.
[36] 2011 NYSDEC, RDSGEIS, Appendix 10, Page 6.
[37] 2011 NYSDEC, RDSGEIS, Appendix 10, Page 6.

Appendix 10 reserves the right for NYSDEC to require additional casing strings to be set in the well if the surface casing fails to adequately protect water resources or poses a safety hazard.

> *38) The installation of an additional cemented casing string or strings in the well as deemed necessary by the Department for environmental and/or public safety reasons may be required at any time.[38]*

Appendix 10 requires NYSDEC's Casing and Cementing Practices be followed. NYSDEC's Casing and Cementing Practices are included in the 2011 RDSGEIS as Appendix 8. Yet, a number of the Casing and Cementing Practices found in Appendix 8 conflict with the new requirements in Appendix 10 for wells subject to HVHF.

The RDSGEIS does not provide a rationale or basis for the use of a 75' surface casing setting depth for some wells and a 100' surface casing setting depth for others. NYSDEC determined that a 100' setting depth is best practice for groundwater protection in areas of primary and principal aquifers, but does not explain why a 100' standard would not be best practice for all wells, or at least wells that undergo HVHF.

An analysis of the surface casing permit condition requirements and inconsistencies is provided in table format as Appendix A. Recommendations are listed in the table.

**NYCRR Proposed Revisions**: A number of the requirements listed in the RDSGEIS Appendices 8, 9, and 10 are not codified in the NYCRR, or conflict with the proposed changes to the NYCRR.

Listed below is an analysis of the proposed NYCRR revisions for surface casing and cementing. Specific recommendations for improving surface casing design, installation, and quality control/ quality assurance requirements are also included.

**Surface Casing Setting Depth:** 6 NYCRR § 554.1(d) requires that:

> *Surface casing shall be run in all wells to extend below the deepest potable fresh water level.*

Neither the 75' nor the 100' setting depths below the deepest protected water zone (described in the RDSGEIS) are specified in regulation. Furthermore, this regulation only protects "potable fresh water." As explained in Chapter 4 of this report, NYSDEC should consider its long-term water needs.

> **Recommendation No. 8**: 6 NYCRR § 554.1(d) should be revised to require the surface casing setting depth to be at least 100' below protected groundwater for all wells, or NYSDEC should provide a technical justification for reducing the setting depth to 75' for some wells.

**Surface Casing Definition:** 6 NYCRR § 550.3(au) reads:

> *Surface casing shall mean casing extending from the surface through the potable fresh water zone.*

This definition requires surface casing be set through only the protected water zone, and does not require the casing be set deeper. This definition, as written, does not include the important requirement for the casing to be set at least 100' below protected groundwater and be cemented in place.

---

[38] 2011 NYSDEC, RDSGEIS, Appendix 10, Page 8.

> **Recommendation No. 9**: 6 NYCRR § 550.3(au) should be revised to read: surface casing shall mean casing installed and cemented from the surface, through protected groundwater, to a point at least 100' below the deepest protected groundwater. Protected groundwater should be defined in a way that meets NYS' long-term water needs.

**Rotary Tool Drilling Practices:** 6 NYCRR § 554.4 should be revised to be consistent with the proposed RDSGEIS surface casing conditions, and remove reference errors. 6 NYCRR § 554.4(a) provides the operator with a choice of installing surface casing in accordance with 6 NYCRR § 554.1(b) (which does not provide specific instruction to the operator) or by cementing the production casing from below the deepest potable fresh water level to the surface (which does not provide specific instruction to the operator).

> *§554.4 Rotary tool drilling practices*
>
> *(a) On all wells where rotary tools are employed, and the subsurface formations and pressures to be encountered have been reasonably well established by prior drilling experience, the operator shall have the option of either running surface casing as provided in section 554.1(b) of this Part or of cementing the production casing from below the deepest potable fresh water level to the surface. In areas where the subsurface formations and pressures to be encountered are unknown or uncertain, surface casing shall be run as provided in section 554.1(b) of this Part.*

6 NYCRR § 554.1(b) does not provide any specific direction on the type or amount of surface casing to be installed; it just says:

> *Pollution of the land and/or of surface or ground freshwater resulting from exploration or drilling is prohibited.*

Nor does 6 NYCRR § 554.4(a) provide any specific direction on the type or amount of surface casing to be installed, other than to say that it must be set below *the deepest potable fresh water level,* but the minimum depth that the casing must be set below the deepest freshwater located is not specified.

> **Recommendation No. 10**: 6 NYCRR § 554.1(d) and 6 NYCRR § 554.4(a) should be combined or at least be consistent to require the surface casing setting depth to be at least 100' below protected groundwater.

NYCRR does not provide the operator with instructions on how to determine protected groundwater depth. The RDSGEIS explains that the depth of potable freshwater in NYS is typically 850' deep, but this depth will vary across the state. Using the 850' benchmark may not sufficiently protect all groundwater covered under the Safe Drinking Water Act. NYCRR should be revised to provide instructions to the operator on how to estimate protected water depth in drilling applications and well construction designs. NYCRR should require that depth be confirmed before setting surface casing.

> **Recommendation No. 11**: NYCRR should require the protected groundwater depth be estimated in the drilling application to aid in well construction design. NYCRR should require the protected water depth be verified with a resistivity log or other sampling method during drilling. If the protected water depth is deeper than estimated, an additional string of intermediate casing should be required. Additionally, the NYCRR needs to be clear on whether its purpose is to protect potable freshwater only, or a broader definition of protected groundwater, which would result in surface casing being set deeper.

6 NYCRR § 554.4(b) correctly requires: cement be placed by the pump and plug or displacement methods; cement be placed in the entire annulus; and a wait on cement time before further drilling. However, 6 NYCRR § 554.4(b) does not include the best practices listed in the permit conditions (Appendices 8 and 9). Additionally, many of the best practices included in Appendix 10 for HVHF wells should be included in regulations for all oil and gas wells.

> **Recommendation No. 12**: 6 NYCRR § 554.4(b) should be revised to be consistent with the proposed Appendices 8 and 9 permit conditions. Also, the best practices listed in Appendix 10 for HVHF should apply to all oil and gas wells and be included in 6 NYCRR § 554.4(b).

**Cable Tool Drilling Practices:** 6 NYCRR § 554.3 includes requirements for cable tool drilling.

> **Recommendation No. 13**: NYSDEC should verify whether cable tool drilling is still anticipated in NYS. If cable tool drilling is still allowed, 6 NYCRR § 554.3 should be revised to require these wells be constructed to the same quality standards as wells drilled with rotary drilling equipment.

Newly proposed surface casing regulations for HVHF wells at 6 NYCRR § 560.6(c)(10) require casing be run in accordance with the "department's casing and cementing requirements." Presumably this refers to the requirements set out in the RDSGEIS at Appendix 8, but this needs to be clarified. All surface casing requirements for HVHF operations should be codified in NYCRR.

A number of new requirements proposed at 6 NYCRR § 560.6(c)(10) should be applied to all wells in NYS, not just those that will undergo a HVHF treatment. 6 NYCRR § 560.6(c)(10) proposes to add these requirements only to HVHF wells.

*(10) With respect to all surface, intermediate and production casing run in the well, and in addition to the department's casing and cementing requirements and any approved centralizer plan for intermediate casing, the following shall apply:*

*(i) all casings must be new and conform to industry standards specified in the permit to drill;*

*(ii) welded connections are prohibited;*

*(iii) casing thread compound and its use must conform to industry standards specified in the permit to drill;*

*( iv) in addition to centralizers otherwise required by the department, at least two centralizers, one in the middle and one at the top of the first joint of casing, must be installed (except production casing) and all bow-spring style centralizers must conform to the industry standards specified in the permit to drill;*

*(v) cement must conform to industry standards specified in the permit to drill and the cement slurry must be prepared to minimize its free water content in accordance with the industry standards and specifications, and contain a gas-block additive;*

*(vi) prior to cementing any casing string, the borehole must be circulated and conditioned to ensure an adequate cement bond;*

*(vii) a spacer of adequate volume, makeup and consistency must be pumped ahead of the cement;*

*(viii) the cement must be pumped at a rate and in a flow regime that inhibits channeling of the cement in the annulus;*

*(ix) after the cement is pumped, the operator must wait on cement (WOC) until the cement achieves a calculated (e.g., performance chart) compressive strength of at least 500 psig, and a minimum WOC time of 8 hours before the casing is disturbed in any way, including installation of a blowout preventer. The operator may request a waiver from the department from the required WOC time if the operator has bench tested the actual cement batch and blend using mix water from the actual source for the job, and determined that 8 hours is not required to reach a compressive strength of 500 pounds per square inch gage; and*

*(x) a copy of the cement job log for any cemented casing string in the well must be available to the department at the well site during drilling operations, and thereafter available to the department upon request. The operator must provide such log to the department upon request at any time during the period up to and including five years after the well is permanently plugged and abandoned under a department permit issued pursuant to Part 550 of this Title. If the well is located on a multi-well pad, all cementing job logs must be maintained and made available during the period up to and including five years after the last well on the pad is permanently plugged and abandoned under a department permit issued pursuant to Part 550 of this Title.*

*(11) The surface casing must be run and cemented as soon as practicable after the hole has been adequately circulated and conditioned.*

The zone of critical cement (e.g. cement placed at bottom of surface casing, typically bottom 300-500') should achieve a 72-hour compressive strength standard of 1,200 psi and the free water separation for the cement should be no more than 6 ml per 250 ml of cement. For example, this requirement is found in the Pennsylvania surface casing code (25 PaCode § 78.85 (b))

An analysis of the proposed Appendices 8, 9, and 10 permit condition requirements and inconsistencies, with comparisons to NYCRR, is provided in table format as Appendix A. Recommendations for improving requirements and addressing inconsistencies are listed in the table.

> **Recommendation No. 14**: The recommendations listed in the Surface Casing Analysis Table (Appendix A to this report) should be considered for the SGEIS and the NYCRR, including:
>
> Surface Casing Setting Depth: NYSDEC should consider a 100' protection for all oil and gas wells. Additionally, NYSDEC needs to clarify whether this setting depth is intended to protect potable freshwater only, or include a broader definition of protected groundwater, which would result in deeper surface casing depths. This requirement should apply to all NYS wells.
>
> Protected Water Depth Verification: The freshwater depth should be estimated in the drilling application to aid in well construction design. The actual protected water depth should be verified with a resistivity log or other sampling method. If the actual protected water depth extends beyond the estimated protected water depth, an additional string of intermediate casing should be required. This requirement should apply to all NYS wells.
>
> Cement Sheath Width: A cement sheath of at least 1-1/4" should be installed on all oil and gas wells. Thin cement sheaths are easily cracked and damaged. This requirement should apply to all NYS wells.

Amount of Cement in Annulus: The surface casing annulus should be completely filled with cement; this should be clearly specified. There should be no void space in the annulus. This requirement should apply to all NYS wells.

Shallow Gas Hazards: If a shallow gas hazard is encountered, surface hole drilling must stop, and surface casing must be set and cemented, before drilling deeper into hydrocarbon resources. All oil and gas well designs and applications should plan for shallow gas hazards. Any shallow gas hazards encountered while drilling should be recorded. This requirement should apply to all NYS wells.

Excess Cement Requirements: 25% excess cement is standard practice, unless a caliper log is run to more accurately assess hole shape and required cement volume. This requirement should apply to all NYS wells.

Cement Type: The cement must conform to API Specification 10A, Specifications for Cement and Material for Well Cementing (April 2002 and January 2005 Addendum). Further, the cement slurry must be prepared to minimize its free water content, in accordance with the same API specification, and it must contain a gas-block additive. HVHF cement quality requirements (including API specifications and the use of gas-blocking additives) is best practice. These practices should apply to all wells, not just HVHF wells.

Cement Mix Water Temperature and pH Monitoring: Best practice is for the free water separation to average no more than six milliliters per 250 milliliters of tested cement, in accordance with the current API RP 10B. Best practice is to test for pH to evaluate water chemistry and ensure cement is mixed to manufacturer's recommendations. This requirement should apply to all NYS wells, not just HVHF wells.

Lost Circulation Control: Lost circulation control is best practice.  This requirement should apply to all NYS wells, not just HVHF wells.

Spacer Fluids: The use of spacer fluids to separate mud and cement, to avoid mud contamination of the cement, is best practice. This requirement should apply to all NYS wells, not just HVHF wells.

Hole Conditioning: Hole conditioning before cementing is best practice. This requirement should apply to all NYS wells, not just HVHF wells.

Cement Installation and Pump Rate: The requirement for cement to be pumped at a rate and in a flow regime that inhibits channeling of the cement in the annulus is a good practice; this requirement should apply to all oil and gas wells, not just HVHF wells.

Rotation and Reciprocation: Rotating and reciprocating casing while cementing is a best practice to improve cement placement. This requirement should apply to all NYS wells.

Centralizers: The proposed conditions reference an outdated API casing centralizer standard. Best practice is to use at least two centralizers and follow API RP 10D-2 (July 2010). This requirement should apply to all NYS wells, not just HVHF wells.

<u>Casing Quality</u>: New casing should be used in all wells. Once installed, surface casing remains in the well for the life of the well, and typically remains in place when the well is plugged and abandoned. It is important that the surface casing piping string (known as "the water protection piping string") is of high quality to maximize the corrosion allowance and life-cycle of the piping. The installation of older, used, thinner pipe, with less remaining corrosion allowance, may be a temporary solution, but not a long-term investment in groundwater protection. Used piping may pass an initial pressure test; however, it will not last as long as new piping, and will not be as protective of water resources in the long-term.

<u>Casing Thread Compound</u>: The requirement to use casing thread compound that conforms to API RP 5A3 (November 2009) is a good practice. This requirement should apply to all oil and gas wells, not HVHF wells.

<u>Drilling Mud</u>: The use of compressed air or WBM (with no toxic additives) is best practice when drilling through protected water zones. This should be a requirement for all NYS wells.

<u>Cement Setting Time</u>: Best practice is to have surface casing strings stand under pressure until the cement has reached a compressive strength of at least 500 psi in the zone of critical cement, before drilling out the cement plug or initiating a test. Additionally, the cement mixture in the zone of critical cement should have a 72-hour compressive strength of at least 1,200 psi. This requirement should apply to all NYS wells.

<u>NYS Inspectors</u>: Best practice is to have a state inspector on site during cementing operations, to verify surface casing cement is correctly installed, before attaching the blowout preventer and drilling deeper into the formation. This requirement should apply to all NYS wells.

<u>Cement QA/QC</u>: Circulating cement to the surface is one indication of successfully cemented surface casing, but it is not the only QA/QC check that should be conducted. Cement circulation to surface can be achieved even when there are mud or gas channels, or other voids, in the cement column. Circulating cement to the surface also may not identify poor cement to casing wall bonding. These integrity problems, among others, can be further examined using a cement evaluation tool and temperature survey.

<u>Formation Integrity Test</u>: It is best practice to complete a formation integrity test to verify the integrity of the cement in the surface casing annulus at the surface casing shoe. The test should be conducted after drilling out of the casing shoe, into at least 20 feet, but not more than 50 feet of new formation. The test results should demonstrate that the integrity of the casing shoe is sufficient to contain the anticipated wellbore pressures identified in the application for the Permit to Drill. This requirement should apply to all NYS wells.

<u>BOP Installation</u>: The Appendix 8 requirement is best practice. Additionally, the surface casing should be pressure tested to ensure it can hold the required working pressure of the BOP. This requirement should apply to all NYS wells.

<u>Record Keeping</u>: Best practice is to keep permanent records for each well, even after the well is plugged and abandoned (P&A'd). This information will be needed by NYSDEC and industry during the well's operating life, will be critical for designing the P&A, and may be required if the well leaks post P&A. This requirement should apply to all NYS wells, not just HVHF wells. P&A'd wells do occasionally leak, and well information is may be needed to develop a re-entry, repair, re-P&A plan.

Additional Casing or Repair: NYSDEC should reserve the right to require industry to install additional cemented casing strings in wells, and repair defective casing or cementing, as deemed necessary for environmental and/or public safety reasons. This requirement should apply to all wells, not just HVHF wells.

Pressure Testing: Casing and piping should be pressure tested.[39]

---

[39] Pennsylvania Governor's Marcellus Shale Advisory Commission Report, July 22, 2011, recommends pressure testing each casing to ensure initial integrity of casing design and cement, and pressure testing and logging to verify the mechanical integrity of the casing and cement over the life of the well, p. 109.

## 7.   Intermediate Casing

**Background:** In 2009, HCLLC recommended the NYCRR be revised to include additional intermediate casing construction standards. Please refer to HCLLC's September 16, 2009 Report, *New York State (NYS) Casing Regulation Recommendations* for more specific recommendations on intermediate casing and the technical basis for HCLCC's recommendations.

Intermediate casing provides a transition from the surface casing to the production casing. This casing may be required to seal off anomalous pressure zones, lost circulation zones, and other drilling hazards. A drilling engineer may set hundreds or thousands of feet of intermediate casing to: isolate unstable hole sections (to prevent collapse); isolate high or low pressure zones; isolate geologic "thief" zones prone to robbing mud from the well bore (lost circulation); put gas or saltwater zones behind pipe before drilling into the production zone; or provide additional wellbore structure.

Intermediate casing is set prior to drilling through the hydrocarbon bearing zone, and may be cemented behind the entire casing string from the top of the well to the bottom of the casing shoe, depending on intermediate casing depth. Intermediate casing provides an additional protective barrier across to prevent contamination of protected groundwater zones.

The 2011 RDSGEIS and the proposed revisions to the NYCRR include important improvements for intermediate casing. Overall, NYSDEC's intermediate casing requirements for HVHF wells are robust. NYSDEC proposed a number of substantial improvements in the intermediate casing requirements. The most notable improvement to the RDSGEIS mitigation and the NYCRR is that intermediate casing will be required in wells that undergo HVHF treatments to provide an additional protective layer of casing and cementing in the well. The RDSGEIS and the NYCRR requires intermediate casing be fully cemented, and the cement placement and bond be verified by well logging tools.

However, the remaining area for improvement in the NYCRR is to establish intermediate casing and cementing standards for all wells that will not undergo HVHF treatment, but will require the installation of intermediate casing. The proposed NYCRR is silent on the intermediate casing and cementing standards for wells that will not undergo HVHF treatment. NYS should provide instruction on intermediate casing standards for all wells that require it.

There are a number of new intermediate casing requirements proposed for HVHF wells that are standard industry best practices for all oil and gas wells. Those requirements should be included in the NYCRR Part 554 (drilling practices for all oil and gas wells), and not just covered in the new NYCRR Part 560 (drilling practices for HVHF wells).

> **Recommendation No. 15**: The NYCRR should be revised to establish intermediate casing and cementing standards for all wells at NYCRR Part 554 (drilling practices for all oil and gas wells).

This section reviews the proposed changes to intermediate casing requirements and supports the improvements that have been made. It also makes suggestions for improved regulatory clarity and offers recommendations for regulatory program revisions.

An analysis of the proposed RDSGEIS conditions found in Appendices 8, 9, and 10 is provided below, and compared to the proposed NYCRR. Recommendations are made to improve consistency in the documents and highlight additional best practices that should be considered.

**The 2011 RDSGEIS:** The 2011 RDSGEIS recommends that intermediate casing be required in wells that undergo HVHF treatments, to provide an additional protective layer of casing and cementing in the well. The 2011 RDSGEIS recommends that intermediate casing be fully cemented, and the cement placement and bond be verified by well logging tools. This is an excellent recommendation. The 2011 RDSGEIS states:

> *Current casing and cementing practices attached as conditions to all oil and gas well drilling permits state that intermediate casing string(s) and cementing requirements will be reviewed and approved by the Department on an individual well basis.* ***The Department proposes to require, via permit condition and/or regulation, that for high-volume hydraulic fracturing the installation of intermediate casing in all wells covered under the SGEIS would be required.*** *However, the Department may grant an exception to the intermediate casing requirement when technically justified [emphasis added].[40]*

> *The current dSGEIS proposes to require in most cases fully cemented intermediate casing, with the setting depths of both surface and intermediate casing determined by site-specific conditions[41]*

> *Requirement for fully cemented production casing or intermediate casing (if used), with the cement bond evaluated by use of a cement bond logging tool; and[42]*

> *Fully cemented intermediate casing would be required unless supporting site-specific documentation to waive the requirement is presented. This directly addresses gas migration concerns by providing additional barriers (i.e., steel casing, cement) between aquifers and shallow gas-bearing zones.[43]*

> *Depending on the depth of the well and local geologic conditions, there may be one or more intermediate casing string.[44]*

> *Use of centralizers to ensure that the cement sheath surrounds the casing strings, including the first joint of surface and intermediate casings.[45]*

The 2011 RDSGEIS proposes a waiver process to exclude intermediate casing under some circumstances:

> *A request to waive the intermediate casing requirement would need to be made in writing with supporting documentation showing that environmental protection and public safety would not be compromised by omission of the intermediate string. An example of circumstances that may warrant consideration of the omission of the intermediate string and granting of the waiver could include: 1) deep set surface casing, 2) relatively shallow total depth of well and 3) absence of fluid and gas in the section between the surface casing and target interval. Such intermediate casing waiver request may also be supported by the inclusion of information on the subsurface and geologic conditions from offsetting wells, if available.[46]*

---

[40] 2011 NYSDEC, RDSGEIS, Page 7-52.

[41] 2011 NYSDEC, RDSGEIS, Executive Summary, Page 25.

[42] 2011 NYSDEC, RDSGEIS, Page 1-12.

[43] 2011 NYSDEC, RDSGEIS, Page 1-12.

[44] 2011 NYSDEC, RDSGEIS, Page 5-92.

[45] 2011 NYSDEC, RDSGEIS, Page 7-42.

[46] 2011 NYSDEC, RDSGEIS, Page 7-52.

The proposed waiver process conflicts with the stated intent of requiring intermediate casing for HVHF wells. The RDSGEIS states that the reason intermediate casing is required for a HVHF well is because it:

> ...directly addresses gas migration concerns by providing additional barriers (i.e., steel casing, cement) between aquifers and shallow gas-bearing zones.[47]

As proposed, NYSDEC would consider a wavier if the surface casing is set "deep" or if the well is "shallow"; however, these depths are not defined. The RDSGEIS does not explain how the use of deep-set surface casing or shallow surface casing provides the same protection to aquifers as installing a second string of intermediate casing and cement.

Additionally, as proposed, NYSDEC would consider a wavier if there is an "*absence of fluid and gas in the section between the surface casing and target interval.*[48]" This requirement is incongruous, because there will always be some type of fluid in the formation between the surface casing and target interval; therefore, the conditions for this waiver to occur would never be realized.

> **Recommendation No. 16**: The SGEIS and NYCRR should be revised to remove the waiver provisions for intermediate casing on HVHF wells, or the SGEIS and NYCRR should be revised to include technical justifications, rationale and thresholds for proposed waivers.

The 2011 RDSGEIS requires that intermediate casing be cemented and evaluated for quality as follows:

> *Intermediate casing would be cemented to the surface and cementing would be by the pump and plug method with a minimum of 25% excess cement unless caliper logs are run, in which case 10% excess would suffice.*[49]

> *The operator would run a radial cement bond evaluation log or other evaluation approved by the Department to verify the cement bond on the intermediate casing and the production casing. The quality and effectiveness of the cement job would be evaluated using the above required evaluation in conjunction with appropriate supporting data per Section 6.4 "Other Testing and Information" under the heading of "Well Logging and Other Testing" of API Guidance Document HF1 (First Edition, October 2009). Remedial cementing would be required if the cement bond is not adequate to drill ahead and isolate hydraulic fracturing operations, respectively.*[50]

The requirements for intermediate casing are listed in Appendices 8, 9, and 10 of the RDSGEIS.

**The 2011 RDSGEIS Appendix 8:** Appendix 8 Casing and Cementing Practices requires intermediate casing be set only in certain circumstances.

> *Intermediate casing string(s) and the cementing requirements for that casing string(s) will be reviewed and approved by Regional Mineral Resources office staff on an individual well basis.*[51]

---

[47] 2011 NYSDEC, RDSGEIS, Page 1-12.

[48] 2011 NYSDEC, RDSGEIS, Page 7-52.
[49] 2011 NYSDEC, RDSGEIS, Page 7-53.
[50] 2011 NYSDEC, RDSGEIS, Page 7-54.
[51] 2011 NYSDEC, RDSGEIS, Appendix 8, Page 2.

**The 2011 RDSGEIS Appendix 9:** Appendix 9 Existing Fresh Water Supplementary Permit Conditions Required for Wells Drilled in Primary and Principal Aquifers requires intermediate casing be set:

> *If multiple fresh water zones are known to exist or are found or if shallow gas is present, this office may require multiple strings of surface casing to prevent gas intrusion and/or preserve the hydraulic characteristics and water quality of each fresh water zone. The permittee must immediately inform this office of the occurrence of any fresh water or shallow gas zones not noted on the permittee's drilling application and prognosis. This office may require changes to the casing and cementing plan in response to unexpected occurrences of fresh water or shallow gas, and may also require the immediate, temporary cessation of operations while such alterations are developed by the permittee and evaluated by the Department for approval.[52]*

The main problem with the conditions of Appendices 8 and 9 is that there is no specific guidance for intermediate casing and cementing, if the intermediate casing string is required as part of the well construction design.

> **Recommendation No. 17**: The SGEIS (Appendices 8 and 9) and NYCRR should be revised to provide specific intermediate casing and cementing requirements, as explained further in Appendix B.

**The 2011 RDSGEIS Appendix 10:** Appendix 10 contains Proposed Supplementary Permit Conditions for HVHF operations, including additional intermediate casing requirements.

The 2011 RDSGEIS Appendix 10 requires intermediate casing be set, unless a waiver is granted:

> *Intermediate casing must be installed in the well. The setting depth and design of the casing must consider all applicable drilling, geologic and well control factors. Additionally, the setting depth must consider the cementing requirements for the intermediate casing and the production casing as noted below. Any request to waive the intermediate casing requirement must be made in writing with supporting documentation and is subject to the Department's approval. Information gathered from operations conducted on any single well or the first well drilled on a multi-well pad may serve to form the basis for the Department waiving the intermediate casing requirement on subsequent wells in the vicinity of the single well or subsequent wells on the same multi-well pad.[53]*

The 2011 RDSGEIS Appendix 10 requires intermediate casing be completely cemented and the department be notified of cementing operations:

> *This office must be notified _____ hours prior to intermediate casing cementing operations. Intermediate casing must be fully cemented to surface with excess cement. Cementing must be by the pump and plug method with a minimum of 25% excess cement unless caliper logs are run, in which case 10% excess will suffice. (Blank to be filled in based on well's location and Regional Minerals Manager's direction.)[54]*

The 2011 RDSGEIS Appendix 10 requires a cement bond evaluation log:

---

[52] 2011 NYSDEC, RDSGEIS, Appendix 9, Page 2.

[53] 2011 NYSDEC, RDSGEIS, Appendix 10, Page 7.

[54] 2011 NYSDEC, RDSGEIS, Appendix 10, Page 7.

*The operator must run a radial cement bond evaluation log or other evaluation approved by the Department to verify the cement bond on the intermediate casing. The quality and effectiveness of the cement job shall be evaluated by the operator using the above required evaluation in conjunction with appropriate supporting data per Section 6.4 "Other Testing and Information" under the heading of "Well Logging and Other Testing" of American Petroleum Institute (API) Guidance Document HF1 (First Edition, October 2009). Remedial cementing is required if the cement bond is not adequate for drilling ahead (i.e., diversion or shut-in for well control).[55]*

The 2011 RDSGEIS Appendix 10 requires new casing and the use of American Petroleum Institute (API) standards for: casing thread compounds, centralizer placement, and cement composition (including the requirement to use gas-blocking additives).

*With respect to all surface, intermediate and production casing run in the well, and in addition to the requirements of the Department's "Casing and Cementing Practices" and any approved centralizer plan for intermediate casing, the following shall apply:*

*a) Casing must be new and conform to American Petroleum Institute (API) Specification 5CT, Specifications for Casing and Tubing (April 2002), and welded connections are prohibited;*

*b) casing thread compound and its use must conform to API Recommended Practice (RP) 5A3, RP on Thread Compounds for Casing, Tubing, Line Pipe, and Drill Stem Elements (November 2009);*

*c) at least two centralizers (one in the middle and one at the top) must be installed on the first joint of casing (except production casing) and all bow-spring style centralizers must conform to API Specification 10D for Bow-Spring Casing Centralizers (March 2002);*

*d) cement must conform to API Specification 10A, Specifications for Cement and Material for Well Cementing (April 2002 and January 2005 Addendum). Further, the cement slurry must be prepared to minimize its free water content in accordance with the same API specification and it must contain a gas-block additive...[56]*

Appendix 10 requires: drilling mud be circulated and conditioned prior to cementing; the use of a spacer fluid to separate drilling mud from cement, avoiding drilling mud contamination; and cement installation methods that inhibit voids in the cement.

*e) Prior to cementing any casing string, the borehole must be circulated and conditioned to ensure an adequate cement bond;*

*f) A spacer of adequate volume, makeup and consistency must be pumped ahead of the cement; and*

*g) The cement must be pumped at a rate and in a flow regime that inhibits channeling of the cement in the annulus...[57]*

---

[55] 2011 NYSDEC, RDSGEIS, Appendix 10, Page 7.
[56] 2011 NYSDEC, RDSGEIS, Appendix 10, Pages 5-6.
[57] 2011 NYSDEC, RDSGEIS, Appendix 10, Page 6.

Appendix 10 establishes a specific period of time required for the cement to harden and a compressive strength standard that the cement must achieve before drilling continues deeper in the hole. This avoids disturbing the cement until it has completely set.

> h)  *After the cement is pumped, the operator must wait on cement (WOC):*
>
>> *1. until the cement achieves a calculated (e.g., performance chart) compressive strength of at least 500 psig, and*
>>
>> *2. a minimum WOC time of 8 hours before the casing is disturbed in any way, including installation of a blow-out preventer (BOP). The operator may request a waiver from the Department from the required WOC time if the operator has bench tested the actual cement batch and blend using mix water from the actual source for the job, and determined that 8 hours is not required to reach a compressive strength of 500 psig.*[58]

Appendix 10 requires records be kept as follows:

> i)  *A copy of the cement job log for any cemented casing in the well must be available to the Department at the wellsite during drilling operations, and thereafter available to the Department upon request. The operator must provide such to the Department upon request at any time during the period up to and including five years after the well is permanently plugged and abandoned under a Department permit. If the well is located on a multi-well pad, all cementing records must be maintained and made available during the period up to and including five years after the last well on the pad is permanently plugged and abandoned under a Department permit.* [59]

An analysis of the Appendices 8, 9, and 10 permit conditions requirements is provided in table format in Appendix B. Recommendations are listed in the table for improving the requirements and addressing inconsistencies.

**NYCRR Proposed Revisions:** The existing regulations at 6 NYCRR § 554 do not include specific requirements for intermediate casing, when intermediate casing is part of the well construction design.

A new section of regulations at 6 NYCRR § 560.6(c)(13, 14 and 15) proposes to add intermediate casing requirements for HVHF wells:

> *(13) Intermediate casing must be installed in the well. The setting depth and design of the casing must be determined by taking into account all applicable drilling, geologic and well control factors. Additionally, the setting depth must consider the cementing requirements for the intermediate casing and the production casing as noted below. Any request to waive the intermediate casing requirement must be made in writing with supporting documentation and is subject to the department's approval. Information gathered from operations conducted on any single well or the first well drilled on a multi-well pad may be considered by the department upon a request for a waiver of the intermediate casing requirement on subsequent wells in the vicinity of the single well or subsequent wells on the same multi-well pad.*

---

[58] 2011 NYSDEC, RDSGEIS, Appendix 10, Page 6.
[59] 2011 NYSDEC, RDSGEIS, Appendix 10, Page 6.

*(14) As specified on a permit to drill, deepen, plug back and convert, the department must be notified prior to intermediate casing cementing operations. Intermediate casing must be fully cemented to surface with excess cement. Cementing must be by the pump and plug method with a minimum of 25 percent excess cement unless caliper logs are run, in which case 10 percent excess will suffice.*

*(15) The operator must run a radial cement bond evaluation log or other evaluation approved by the department to verify the cement bond on the intermediate casing. Remedial cementing is required if the cement bond is not adequate for drilling ahead (i.e., diversion or shut-in for well control).*

Additional intermediate casing and cementing standards are included at 6 NYCRR § 560.6(c)(10) for HVHF wells:

*(10) With respect to all surface, intermediate and production casing run in the well, and in addition to the department's casing and cementing requirements and any approved centralizer plan for intermediate casing, the following shall apply:*

*(i) all casings must be new and conform to industry standards specified in the permit to drill;*

*(ii) welded connections are prohibited;*

*(iii) casing thread compound and its use must conform to industry standards specified in the permit to drill;*

*(iv) in addition to centralizers otherwise required by the department, at least two centralizers, one in the middle and one at the top of the first joint of casing, must be installed (except production casing) and all bow-spring style centralizers must conform to the industry standards specified in the permit to drill;*

*(v) cement must conform to industry standards specified in the permit to drill and the cement slurry must be prepared to minimize its free water content in accordance with the industry standards and specifications, and contain a gas-block additive;*

*(vi) prior to cementing any casing string, the borehole must be circulated and conditioned to ensure an adequate cement bond;*

*(vii) a spacer of adequate volume, makeup and consistency must be pumped ahead of the cement;*

*(viii) the cement must be pumped at a rate and in a flow regime that inhibits channeling of the cement in the annulus;*

*(ix) after the cement is pumped, the operator must wait on cement (WOC) until the cement achieves a calculated (e.g., performance chart) compressive strength of at least 500 psig, and a minimum WOC time of 8 hours before the casing is disturbed in any way, including installation of a blowout preventer. The operator may request a waiver from the department from the required WOC time if the operator has bench tested the actual cement batch and blend using mix water from the actual source for the job, and determined that 8 hours is not required to reach a compressive strength of 500 pounds per square inch gage; and*

*(x) a copy of the cement job log for any cemented casing string in the well must be available to the department at the well site during drilling operations, and thereafter available to the department upon request. The operator must provide such log to the department upon request at any time during the period up to and including five years after the well is permanently plugged and abandoned under a department permit issued*

*pursuant to Part 550 of this Title. If the well is located on a multi-well pad, all cementing job logs must be maintained and made available during the period up to and including five years after the last well on the pad is permanently plugged and abandoned under a department permit issued pursuant to Part 550 of this Title.*

An analysis of the proposed Appendices 8, 9, and 10 permit conditions requirements and the proposed changes to NYCRR is provided in table format in Appendix B. Recommendations for improving requirements are listed in the table.

**Recommendation No. 18**: The recommendations listed in the Intermediate Casing Analysis Table (Appendix B to this report) should be considered for the SGEIS and the NYCRR, including:

Waiver Provisions: It is best practice to install intermediate casing on a case-by-case basis for most wells; however, it is best practice to install it on all HVHF wells. The waiver provision proposed in the RDSGEIS to exclude intermediate casing on HVHF wells is not technically justified.

Setting Depth: Best practice is to set intermediate casing at least 100' below the deepest protected groundwater, to seal off anomalous pressure zones, lost circulation zones, and other drilling hazards. Although intermediate casing setting depth is site specific, there should be criteria for determining that depth. This requirement should apply to all NYS wells.

Protected Water Depth Verification: The freshwater depth should be estimated in the drilling application to aid in well construction design. The actual protected water depth should be verified with a resistivity log or other sampling method during drilling, ensuring intermediate casing protects that groundwater. This requirement should apply to all NYS wells where intermediate casing is set.

Cement Sheath Width: A cement sheath of at least 1-1/4" should be installed. Thin cement sheaths are easily cracked and damaged. This requirement should apply to all NYS wells where intermediate casing is set.

Amount of Cement in Annulus: It is best practice to fully cement intermediate casing if technically feasible to isolate protected water zones, and to seal off anomalous pressure zones, lost circulation zones, and other drilling hazards. If the casing cannot be fully cemented, most states require cement to be placed from the casing shoe to a point at least 500-600' above the shoe. This requirement should apply to all wells where intermediate casing is set.

Excess Cement: 25% excess cement is standard practice, unless a caliper log is run to assess the hole shape and required cement volume. This requirement should apply to all wells where intermediate casing is set.

Cement Type: Cement must conform to API Specification 10A, Specifications for Cement and Material for Well Cementing (April 2002 and January 2005 Addendum). The cement slurry must be prepared to minimize its free water content, in accordance with the same API specification, and it must contain a gas-block additive. HVHF cement quality requirements (including API specifications and the use of gas-blocking additives) are best practice. However, these practices should apply to all wells where intermediate casing is installed, not just HVHF wells.

Cement Mix Water Temperature and pH Monitoring: Best practice is for the free water separation to average no more than six milliliters per 250 milliliters of tested cement, in accordance with the

current API RP 10B. Best practice is to test for pH to evaluate water chemistry and ensure cement is mixed to manufacturer's recommendations. These requirements should apply to all NYS wells where intermediate casing is required, not just HVHF wells.

Lost Circulation Control: Lost circulation control is best practice. This requirement should apply to all NYS wells where intermediate casing is required.

Spacer Fluids: The use of spacer fluids to separate mud and cement, to avoid mud contamination of the cement, is best practice. This requirement should apply to all NYS wells where intermediate casing is used, not just HVHF wells.

Hole Conditioning: Hole conditioning before cementing is best practice. This requirement should apply to all NYS wells, not just HVHF wells.

Cement Installation and Pump Rate: The requirement for cement to be pumped at a rate and in a flow regime that inhibits channeling of the cement in the annulus is a good practice. This requirement should apply to all oil and gas wells, not just HVHF wells.

Rotation and Reciprocation: Rotating and reciprocating casing while cementing is a best practice to improve cement placement. This requirement should apply to all NYS wells.

Centralizers: The proposed conditions reference an outdated API casing centralizer standard. Best practice is to use at least two centralizers and follow API Recommended Practice for Centralizer Placement, API RP 10D-2 (July 2010). This requirement should apply to all NYS wells where intermediate casing is installed.

Casing Quality: The use of new pipe conforming to API Specification 5CT is best practice. This requirement should apply to all NYS wells where intermediate casing is set.

Casing Thread Compound: The requirement to use casing thread compound that conforms to API RP 5A3 (November 2009) is a good practice. This requirement should apply to all oil and gas wells, not just HVHF wells.

Drilling Mud: The use of compressed air or WBM (with no toxic additives) is best practice when drilling through protected water zones. This should be a requirement for all wells during the period when drilling occurs through protected water zones.

Cement Setting Time: Best practice is to have casing strings stand under pressure until cement reaches a compressive strength of at least 500 psi in the zone of critical cement, before drilling out the cement plug or initiating a test. Additionally, the cement mixture in the zone of critical cement should have a 72-hour compressive strength of at least 1,200 psi. This requirement should apply to all NYS wells, not just HVHF wells.

NYSDEC Inspector: Best practice is to have a state inspector onsite during cementing operations. This requirement should apply to all NYS wells where intermediate casing is installed.

Cement QA/QC: The use of a cement evaluation logging tool is best practice. This requirement should apply to all wells where intermediate casing is set.

Record Keeping: Best practice is to keep permanent records for each well, even after the well is plugged and abandoned (P&A'd). This information will be needed by NYSDEC and industry during the well's operating life, will be critical for designing the P&A, and may be required if the

well leaks post P&A.  This requirement should apply to all NYS wells, not just HVHF wells. P&A'd wells do occasionally leak, and well information is may be needed to develop a re-entry, repair, re-P&A plan.

Additional Casing or Repair: NYSDEC should reserve the right to require industry to install additional cemented casing strings in wells, and repair defective casing or cementing, as deemed necessary for environmental and/or public safety reasons. This requirement should apply to all wells.

Pressure Testing: Casing and piping should be pressure tested.[60]

---

[60] Pennsylvania Governor's Marcellus Shale Advisory Commission Report, July 22, 2011, recommends pressure testing each casing to ensure initial integrity of casing design and cement, and pressure testing and logging to verify the mechanical integrity of the casing and cement over the life of the well, Page 109.

## 8.   Production Casing

**Background:** In 2009, HCLLC recommended NYCRR be revised to include additional production casing construction standards. Please refer to HCLLC's September 16, 2009 Report, *New York State (NYS) Casing Regulation Recommendations* for more specific recommendations on production casing the technical basis for HCLCC's recommendations.

Production casing is the last string of casing set in the well. It is called "production casing" because it is set across the hydrocarbon-producing zone, or alternatively sets just above the hydrocarbon zone. Production casing can be run all the way from the surface of the well across the hydrocarbon zone (production casing string) or can be hung from the surface or intermediate casing at a point deeper in the well (production liner).

If production casing is set across the hydrocarbon-producing zone, it is called a "cased hole" completion. In this scenario, production casing is lowered into the hole and cemented in place. Explosives are then lowered inside the production casing (perforation guns) to perforate holes through the pipe/cement barrier to allow oil and/or gas to enter the wellbore. In some cases, a drilling engineer may elect not to set production casing. This is called an "open hole" completion.

NYSDEC recommends a full string of production casing be set across the production zone and be run to surface, and that the production casing be cemented in place. This is a best practice for HVHF wells.

Production casing is used to isolate hydrocarbon zones and contain formation pressure. Production casing pipe and cement integrity is very important, because it is the piping/cement barrier that is exposed to fracture pressure, acid stimulation treatments, and other workover/stimulation methods used to increase hydrocarbon production.

The 2011 RDSGEIS and proposed revisions to the NYCRR include substantial improvements for production casing. NYSDEC's proposed production casing requirements for HVHF wells are robust. The most notable improvement to the NYCRR is that production casing must be set from the well surface through the production zone. This provides an additional protective layer of casing and cementing in the well during HVHF treatments. The RDSGEIS and NYCRR requires production casing be fully cemented, if intermediate casing is not set. If intermediate casing is set, it requires production casing be tied into the intermediate casing. NYCRR also requires the cement placement and bond be verified by well logging tools. These requirements are best practice.

NYSDEC's proposed HVHF production casing design prevents pollution of protected groundwater by constraining the HVHF pressurized fluid treatment to the inside of the production casing string as it passes the protected groundwater zone. Additionally, behind the production casing string there are two additional layers of casing and cement installed as a barrier across protected waters (e.g. surface and intermediate casing).

This section reviews the proposed changes to production casing requirements and supports the improvements that have been made. It also makes suggestions for improved regulatory clarity and offers recommendations for regulatory program revisions.

An analysis of the proposed RDSGEIS conditions found in Appendices 8, 9, and 10 is provided below, and compared to the proposed NYCRR. Recommendations are made to improve consistency in the documents and highlight additional best practices that should be considered.

**The 2011 RDSGEIS:** The 2011 RDSGEIS requires that production casing be installed and fully cemented across the production zone in wells that undergo HVHF treatments. The 2011 RDSGEIS states:

> *Requirement for fully cemented production casing or intermediate casing (if used), with the cement bond evaluated by use of a cement bond logging tool.* [61]

> *Anticipated Marcellus Shale fracturing pressures range from 5,000 pounds per square inch (psi) to 10,000 psi, so production casing with a greater internal yield pressure than the anticipated fracturing pressure must be installed.* [62]

**The 2011 RDSGEIS Appendix 8:** Appendix 8 NYSDEC's Casing and Cementing Practices includes the following production casing requirements for all wells.

> *12. The production casing cement shall extend at least 500 feet above the casing shoe or tie into the previous casing string, whichever is less. If any oil or gas shows are encountered or known to be present in the area, as determined by the Department at the time of permit application, or subsequently encountered during drilling, the production casing cement shall extend at least 100 feet above any such shows. The Department may allow the use of a weighted fluid in the annulus to prevent gas migration in specific instances when the weight of the cement column could be a problem.*

> *13. Centralizers shall be placed at the base and at the top of the production interval if casing is run and extends through that interval, with one additional centralizer every 300 feet of the cemented interval. A minimum of 25% excess cement shall be used. When caliper logs are run, a 10% excess will suffice. Additional excesses may be required by the Department in certain areas.*

> *14. The pump and plug method shall be used for all production casing cement jobs deeper than 1500 feet. If the pump and plug technique is not used (less than 1500 feet), the operator shall not displace the cement closer than 35 feet above the bottom of the casing. If plugs are used, the plug catcher shall be placed at the top of the lowest (deepest) full joint of casing.*

> *15. The casing shall be of sufficient strength to contain any expected formation or stimulation pressures.*

> *16. Following cementing and removal of cementing equipment, the operator shall wait until a compressive strength of 500 psi is achieved before the casing is disturbed in any way. The operator shall test or require the cementing contractor to test the mixing water for pH and temperature prior to mixing the cement and to record the results on the cementing tickets and/or the drilling log. WOC time shall be adjusted based on the results of the test.* [63]

**The 2011 RDSGEIS Appendix 9:** Appendix 9 Existing Fresh Water Supplementary Permit Conditions Required for Wells Drilled in Primary and Principal Aquifers does not include any additional requirements for production casing.

---

[61] 2011 NYSDEC, RDSGEIS, Page 1-12.

[62] 2011 NYSDEC, RDSGEIS, Page 5-92.

[63] 2011 NYSDEC, RDSGEIS, Appendix 8, Page 2-3.

**The 2011 RDSGEIS Appendix 10:** Appendix 10 contains Proposed Supplementary Permit Conditions for HVHF operations, including additional production casing requirements.

The 2011 RDSGEIS Appendix 10 requires production casing run the entire length of the wellbore, which is an excellent recommendation. Appendix 10 also requires production casing be tied into intermediate casing with at least 500' of cement:

> *36) Production casing must be run to the surface. This office must be notified _____ hours prior to production casing cementing operations. If installation of the intermediate casing is waived by the Department, then production casing must be fully cemented to surface. If intermediate casing is installed, the production casing cement must be tied into the intermediate casing string with at least 500 feet of cement measured using True Vertical Depth (TVD).[64]*

Appendix 10 requires a cement bond evaluation log, which is another excellent recommendation:

> *The operator must run a radial cement bond evaluation log or other evaluation approved by the Department to verify the cement bond on the production casing. The quality and effectiveness of the cement job shall be evaluated by the operator using the above required evaluation in conjunction with appropriate supporting data per Section 6.4 "Other Testing and Information" under the heading of "Well Logging and Other Testing" of American Petroleum Institute (API) Guidance Document HF1 (First Edition, October 2009). Remedial cementing is required if the cement bond is not adequate to effectively isolate hydraulic fracturing operations.[65]*

However, Appendix 10 includes a waiver provision that would exempt an operator from installing production casing cement as described above. This waiver provision is based solely on whether oil and gas might migrate from one pool or stratum to another. It does not address any of the other reasons why production casing cementing is important and required by NYSDEC in HVHF wells.

> *Any request to waive any of the preceding cementing requirements must be made in writing with supporting documentation and is subject to the Department's approval.*
>
> *The Department will only consider a request for a waiver if the open-hole wireline logs including a narrative analysis of such and all other information collected during drilling from the same well pad or offsetting wells verify that migration of oil, gas or other fluids from one pool or stratum to another will be prevented. (Blank to be filled in based on well's location and Regional Minerals Manager's direction.)[66]*

**Recommendation No. 19:** The production casing cementing waiver should be removed for HVHF wells, or NYSDEC should provide more technical justification and rationale for the waiver. NYSDEC should show how environmental protection and safety objectives can be achieved to the same level with the waiver as without it.

The 2011 RDSGEIS Appendix 10 requires new casing and the use of American Petroleum Institute (API) standards for: casing thread compounds, centralizer placement, and cement composition (including the requirement to use gas-blocking additives).

---

[64] 2011 NYSDEC, RDSGEIS, Appendix 10, Page 7.
[65] 2011 NYSDEC, RDSGEIS, Appendix 10, Page 7.
[66] 2011 NYSDEC, RDSGEIS, Appendix 10, Page 7.

*31) With respect to all surface, intermediate and production casing run in the well, and in addition to the requirements of the Department's "Casing and Cementing Practices" and any approved centralizer plan for intermediate casing, the following shall apply:*

> *e) Casing must be new and conform to American Petroleum Institute (API) Specification 5CT, Specifications for Casing and Tubing (April 2002), and welded connections are prohibited;*

> *f) Casing thread compound and its use must conform to API Recommended Practice (RP) 5A3, RP on Thread Compounds for Casing, Tubing, Line Pipe, and Drill Stem Elements (November 2009);*

> *g) At least two centralizers (one in the middle and one at the top) must be installed on the first joint of casing (except production casing) and all bow-spring style centralizers must conform to API Specification 10D for Bow-Spring Casing Centralizers (March 2002);*

> *h) Cement must conform to API Specification 10A, Specifications for Cement and Material for Well Cementing (April 2002 and January 2005 Addendum). Further, the cement slurry must be prepared to minimize its free water content in accordance with the same API specification and it must contain a gas-block additive...* [67]

Appendix 10 requires: drilling mud be circulated and conditioned prior to cementing; the use of spacer fluid to separate drilling mud from cement, avoiding drilling mud contamination; and cement installation methods that inhibit voids in the cement.

> *e) Prior to cementing any casing string, the borehole must be circulated and conditioned to ensure an adequate cement bond;*

> *f) A spacer of adequate volume, makeup and consistency must be pumped ahead of the cement;*

> *h) The cement must be pumped at a rate and in a flow regime that inhibits channeling of the cement in the annulus...* [68]

Appendix 10 establishes a specific period of time required for the cement to harden and a compressive strength standard that the cement must achieve before drilling continues deeper in the hole. This avoids disturbing the cement until it has completely set.

> *h) After the cement is pumped, the operator must wait on cement (WOC):*

> > *1. until the cement achieves a calculated (e.g., performance chart) compressive strength of at least 500 psig, and*

> > *2. a minimum WOC time of 8 hours before the casing is disturbed in any way, including installation of a blow-out preventer (BOP). The operator may request a waiver from the Department from the required WOC time if the operator has bench tested the actual cement batch and blend using mix water from the actual source for the job, and determined that 8 hours is not required to reach a compressive strength of 500 psig.* [69]

---

[67] 2011 NYSDEC, RDSGEIS, Appendix 10, Pages 5-6.
[68] 2011 NYSDEC, RDSGEIS, Appendix 10, Page 6.
[69] 2011 NYSDEC, RDSGEIS, Appendix 10, Page 6.

NZ

Appendix 10 requires records be kept as follows:

> *A copy of the cement job log for any cemented casing in the well must be available to the Department at the wellsite during drilling operations, and thereafter available to the Department upon request. The operator must provide such to the Department upon request at any time during the period up to and including five years after the well is permanently plugged and abandoned under a Department permit. If the well is located on a multi-well pad, all cementing records must be maintained and made available during the period up to and including five years after the last well on the pad is permanently plugged and abandoned under a Department permit.[70]*

An analysis of the Appendices 8, 9, and 10 permit conditions requirements is provided in table format in Appendix C. Recommendations are listed in the table for improving the requirements and addressing inconsistencies.

**NYCRR Proposed Revision**s: The existing regulations at 6 NYCRR § 554 include requirements for production casing:

> *If it is elected to complete a rotary-drilled well and production casing is run, it shall be cemented by a pump and plug or displacement method with sufficient cement to circulate above the top of the completion zone to a height sufficient to prevent any movement of oil or gas or other fluids around the exterior of the production casing. In such instance, operations shall be suspended until the cement has been permitted to set in accordance with prudent current industry practices.[71]*

A new section of regulations at 6 NYCRR § 560.6(c)(16) proposes to add production casing requirements for HVHF wells.

> *(16) Production casing must be run to the surface. If installation of the intermediate casing is waived by the department, then production casing must be fully cemented to surface. **If intermediate casing is installed, the production casing cement must be tied into the intermediate casing string with at least 300 feet of cement measured using True Vertical Depth**. Any request to waive any of the cementing requirements of this paragraph must be made in writing with supporting documentation and must be approved by the department. The department will only consider a request for a waiver if the open-hole wireline logs including a narrative analysis of such and all other information collected during drilling from the same well pad or offsetting wells verify that migration of oil, gas or other fluids from one pool or stratum to another will otherwise be prevented [emphasis added].*

The proposed regulations at 6 NYCRR § 560.6(c)(16) are inconsistent with the Appendix 10 requirement to cement the production casing with a 500' overlap into the intermediate casing.

> *If intermediate casing is installed, the production casing cement must be tied into the intermediate casing string with at least 500 feet of cement measured using True Vertical Depth (TVD).[72]*

---

[70] 2011 NYSDEC, RDSGEIS, Appendix 10, Page 6.

[71] 6 NYCRR V.B. §554.4(d)

[72] 2011 NYSDEC, RDSGEIS, Appendix 10, Page 7.

> **Recommendation No. 20**: A production casing 500' cement overlap into the intermediate casing is more protective; 6 NYCRR § 560.6(c)(16) should be revised to match Appendix 10.

A new section of regulations at 6 NYCRR § 560.6(c)(17) requires production casing cement be verified for HVHF wells:

> *(17) The operator must run a radial cement bond evaluation log or other evaluation approved by the department to verify the cement bond on the production casing. Remedial cementing is required if the cement bond is not adequate to effectively isolate hydraulic fracturing operations.*

Additional production casing and cementing standards are included at 6 NYCRR § 560.6(c)(10) for HVHF wells.

> *(10) With respect to all surface, intermediate and production casing run in the well, and in addition to the department's casing and cementing requirements and any approved centralizer plan for intermediate casing, the following shall apply:*
>
> *(i) all casings must be new and conform to industry standards specified in the permit to drill;*
>
> *(ii) welded connections are prohibited;*
>
> *(iii) casing thread compound and its use must conform to industry standards specified in the permit to drill;*
>
> *(v) cement must conform to industry standards specified in the permit to drill and the cement slurry must be prepared to minimize its free water content in accordance with the industry standards and specifications, and contain a gas-block additive;*
>
> *(vi) prior to cementing any casing string, the borehole must be circulated and conditioned to ensure an adequate cement bond;*
>
> *(vii) a spacer of adequate volume, makeup and consistency must be pumped ahead of the cement;*
>
> *(viii) the cement must be pumped at a rate and in a flow regime that inhibits channeling of the cement in the annulus;*
>
> *(ix) after the cement is pumped, the operator must wait on cement (WOC) until the cement achieves a calculated (e.g., performance chart) compressive strength of at least 500 psig, and a minimum WOC time of 8 hours before the casing is disturbed in any way, including installation of a blowout preventer. The operator may request a waiver from the department from the required WOC time if the operator has bench tested the actual cement batch and blend using mix water from the actual source for the job, and determined that 8 hours is not required to reach a compressive strength of 500 pounds per square inch gage; and*
>
> *(x) a copy of the cement job log for any cemented casing string in the well must be available to the department at the well site during drilling operations, and thereafter available to the department upon request. The operator must provide such log to the department upon request at any time during the period up to and including five years after the well is permanently plugged and abandoned under a department permit issued pursuant to Part 550 of this Title. If the well is located on a multi-well pad, all cementing job logs must be maintained and made available during the period up to and including five years after the last well on the pad is permanently plugged and abandoned under a department permit issued pursuant to Part 550 of this Title.*

An analysis of the proposed Appendices 8, 9, and 10 permit conditions requirements and the proposed changes to the NYCRR is provided in table format in Appendix C. Recommendations for improving requirements are listed in the table.

> **Recommendation No. 21**: The recommendations listed in the Production Casing Analysis Table (Appendix C to this report) should be considered for the SGEIS and the NYCRR, including:
>
> Casing Design: For all wells, it is best practice for the productive horizon(s) to be determined by coring, electric log, mud-logging, and/or testing to aide in optimizing final production string design and placement.  It is best practice to install production casing on a case-by-case basis for most wells; however, it is best practice to install a full string of production casing on HVHF wells to provide a conduit for the HVHF job and provide an extra layer of casing and cement.
>
> Cement Sheath Width: A cement sheath of at least 1-1/4" should be installed on all oil and gas wells. Thin cement sheaths are easily cracked and damaged. This requirement should apply to all NYS wells.
>
> Amount of Cement in Annulus: Cementing production casing to surface if technically feasible (becomes more difficult with increasing depth), or at least 500' into the intermediate casing string is best practice. This requirement should apply to all NYS wells where production casing is set.
>
> Excess Cement Requirements: 25% excess cement is standard practice, unless a caliper log is run to assess the hole shape and required cement volume. This requirement should apply to all wells where production casing is set.
>
> Cement Type: Cement must conform to API Specification 10A, Specifications for Cement and Material for Well Cementing (April 2002 and January 2005 Addendum). Further, the cement slurry must be prepared to minimize its free water content in accordance with the same API specification and it must contain a gas-block additive. HVHF cement quality requirements (including API specifications and the use of gas-blocking additives) are best practice. However, these practices should apply to all wells where production casing is installed, not just HVHF wells.
>
> Cement Mix Water Temperature and pH Monitoring: Best practice is for the free water separation to average no more than six milliliters per 250 milliliters of tested cement, in accordance with the current API RP 10B. Best practice is to test for pH to evaluate water chemistry and ensure cement is mixed to manufacturer's recommendations. These requirements should apply to all NYS wells where production casing is required, not just HVHF wells.
>
> Lost Circulation Control: Lost circulation control is best practice. This requirement should apply to all NYS wells where production casing is required.
>
> Spacer Fluids: The use of spacer fluids to separate mud and cement, to avoid mud contamination of the cement, is best practice. This requirement should apply to all NYS wells where production casing is used, not just HVHF wells.
>
> Hole Conditioning: Hole conditioning before cementing is best practice. This requirement should apply to all NYS wells, not just HVHF wells.

<u>Cement Installation and Pump Rate</u>: The requirement for cement to be pumped at a rate and in a flow regime that inhibits channeling of the cement in the annulus is a good practice. This requirement should apply to all oil and gas wells, not just HVHF wells.

<u>Rotation and Reciprocation</u>: Rotating and reciprocating casing while cementing is a best practice to improve cement placement. This will become more difficult with a deviated wellbore, but should be attempted if achievable. This requirement should apply to all NYS oil and gas wells, not just HVHF wells.

<u>Centralizers</u>: Best practice is to use at least two centralizers and follow API Recommended Practice for Centralizer Placement, API RP 10D-2 (July 2010). This requirement should apply to all NYS wells where production casing is installed.

<u>Casing Quality</u>: The use of new pipe conforming to API Specification 5CT is best practice. This requirement should apply to all NYS wells where production casing is set.

<u>Casing Thread Compound</u>: The requirement to use casing thread compound that conforms to API RP 5A3 (November 2009) is a good practice. This requirement should apply to all oil and gas wells, not just HVHF wells.

<u>Cement Setting Time</u>: Best practice is to have casing strings stand under pressure until cement reaches a compressive strength of at least 500 psi in the zone of critical cement, before drilling out the cement plug or initiating a test. This requirement should apply to all NYS wells, not just HVHF wells.

<u>NYSDEC Inspector</u>: Best practice is to have a state inspector onsite during cementing operations. This is more typical for surface and intermediate casing, but can be considered for production casing as well.

<u>Cement QA/QC</u>: The use of a cement evaluation logging tool is best practice. This requirement should apply to all wells where production casing is set.

<u>Record Keeping</u>: Best practice is to keep permanent records for each well, even after the well is P&A'd. This information will be needed by NYSDEC and industry during the well's operating life, will be critical for designing the P&A, and may be required if the well leaks post P&A. This requirement should apply to all NYS wells, not just HVHF wells. P&A'd wells do occasionally leak, and well information is may be needed to develop a re-entry, repair, re-P&A plan.

<u>Additional Casing or Repair</u>: NYSDEC should reserve the right to require industry to install additional cemented casing strings in wells, and repair defective casing or cementing, as deemed necessary for environmental and/or public safety reasons. This requirement should apply to all wells, not just HVHF wells.

<u>Pressure Testing</u>: Casing and piping should be pressure tested.[73]

---

[73] Pennsylvania Governor's Marcellus Shale Advisory Commission Report, July 22, 2011, recommends pressure testing each casing to ensure initial integrity of casing design and cement, and pressure testing and logging to verify the mechanical integrity of the casing and cement over the life of the well, p. 109.

## 9.   Permanent Wellbore Plugging & Abandonment Requirements

**Background**: In 2009, HCLLC recommended that NYSDEC establish specific criteria to determine when a well must be permanently plugged and abandoned (P&A'd) and recommended improvements in NYS' well plugging regulations, incorporating best technology and practices.

Several terms are used to describe the condition of oil and gas wells that are not active hydrocarbon producers.

- Temporary Abandonment. This term is used to describe a well that may be temporarily suspended as a production well. The well may be shut-in awaiting repairs, a stimulation treatment, workover (e.g. drilling into a new zone) or a decision to finally P&A the well. A reasonable amount time should be afforded to the operator to complete the well work, or to decide when to P&A the well; however, a well should not be temporarily abandoned for a long period of time, because it poses a risk to the environment, especially if the well is known to have a leak or mechanical malfunction. Leaking or malfunctioning wells should be repaired in a timely manner or the well should be permanently P&A'd.

  In 2003, ICF Consulting produced a report for the New York State Energy Research and Development Authority (NYSERDA) that concluded NYS had 5,900 shut-in or temporarily abandoned wells, 39% of the 15,000 known wells.[74] ICF concluded that more than half the 5,900 wells have been "temporarily" abandoned for more than nine years. ICF concluded that:

  > NYS is one of the few oil and gas producing states that have no specific regulatory provisions for long-term shut-in wells (more than two years). New York's current regulations allow an initial shut in period of one-year and an extension of up to one year, renewable for additional successive periods...[75]

  ICF concluded that while operators are required to contact NYS to justify temporary abandonment extensions beyond one year, NYS' lack of resources to oversee the program has resulted in many wells remaining idle and not properly P&A'd for years:

  > The practical effect is that New York's idle well regulation cannot be adequately enforced due to constraints on manpower and other agency resources, and as a result, New York has a defacto long-term inactive well program. For example New York has approximately 1,379 gas wells and 1440 oil wells with either inactive or unknown status that have no reported production since 1992.[76]

- Permanent Abandonment. A well that is no longer needed to produce hydrocarbons should be plugged (e.g. cement barriers installed, failed casing removed, mechanical plugs set), surface equipment removed (e.g. wellhead and piping), and permanently abandoned. Operators typically do not monitor well condition once a P&A'd job is complete and approved by an agency.

---

[74] ICF Consulting, Well Characterization and Evaluation Program for New York State Oil and Gas Wells, Draft Report, Prepared for the New York State Energy Research and Development Authority, PSA No. 7012, July 2003, Page 1. A final version of this report could not be located on the world-wide web.

[75] ICF Consulting, Well Characterization and Evaluation Program for New York State Oil and Gas Wells, Draft Report, Prepared for the New York State Energy Research and Development Authority, PSA No. 7012, July 2003, Page 5.

[76] ICF Consulting, Well Characterization and Evaluation Program for New York State Oil and Gas Wells, Draft Report, Prepared for the New York State Energy Research and Development Authority, PSA No. 7012, July 2003, Page 36.

- Improperly Abandoned Well. This term describes a well that was P&A'd, but was done so in a manner where the well still poses a risk to the environment (e.g. insufficient barriers or cement used to seal the well). Because operators typically do not monitor the condition of P&A'd wells, improperly abandoned wells often go un-resolved.

  The problem of improperly abandoned wells in NYS may be a significant issue, because NYS' P&A regulations currently only require 15' cement plugs, which NYSDEC now recognizes as deficient. Therefore, most wells in the state were not P&A'd using a quality standard that would be considered best technology and best practice today.

- Orphaned Well. This term describes a well that was orphaned by the well operator (e.g. insolvent, absentee, or non-responsive well owners) and the well was not P&A'd. Because, by definition, an "orphaned well" does not have an operator to monitor its condition, permanent abandonment of these wells typically becomes a government or property owner responsibility. Given limited agency resources, the magnitude of the environmental hazard posed by any particular orphaned well often is unknown. Unless government or property owners make it a priority to fund well monitoring or plug the well, the potential environmental impacts of orphaned wells cannot be ascertained.

In 2003, ICF Consulting, further examined 4,140 of the long-term inactive wells in NYS and concluded that:

- 546 of the 4,140 wells (13%) were drilled and completed before 1924 (over 87 years old now);

- 1,568 of the 4,140 wells (38%) were drilled and completed from 1924-1964 (at least 47 years old now, and possibly up to 87 years old); and

- 2,026 of the 4,140 wells (49%) had no information on the date of complete or condition.[77]

Therefore, there are 2,114 wells that are at least 47 years old and some more than 87 years old that still have not been properly abandoned in NYS, and 2,026 wells where the age and condition is unknown (and must be assumed improperly abandoned).

NYS' 2009 Annual Oil and Gas Report[78] shows improperly abandoned and orphaned wells continue to be a significant problem in NYS. NYSDEC reports:

> ***Abandoned, unreported and inactive wells continued to be a problem. In 2009 a total of 450 operators reported 3,043 wells with zero production. This is in addition to over 4,100 orphaned and inactive wells in the Department's records.*** *Enforcement actions have reduced the number of unreported wells yet some operators refused to file their annual reports. The operators that remained out of compliance have been referred to the Office of General Counsel for additional enforcement actions.[emphasis added]*

> *DEC has at least partial records on 40,000 wells, but estimates that over 75,000 oil and gas wells have been drilled in the State since the 1820s. **Most of the wells date from before New York established a regulatory program. Many of these old wells were never properly plugged or were plugged using older techniques that were less reliable and long-lasting than modern methods.** [emphasis added]*

---

[77] ICF Consulting, Well Characterization and Evaluation Program for New York State Oil and Gas Wells, Draft Report, Prepared for the New York State Energy Research and Development Authority, PSA No. 7012, July 2003, Page 32.

[78] New York State Oil, Gas and Mineral Resources, 26th Annual Report for Year 2009 and Appendices, Prepared by NYSDEC, 2009, pp. 22-23.

> *Every year while conducting scheduled inspections or investigating complaints, DEC staff discover more abandoned wells. Extensive courthouse research is often required to identify a well's previous owners. Many of these cases take several years to resolve as DEC pursues legal action against the responsible parties.*
>
> *New York has an Oil and Gas Account which was created to plug problem abandoned wells. It is funded by a $100 per well permit fee; at the end of 2009 the balance was $208,806. DEC has over 500 wells on its priority plugging list. Since **the funds are insufficient to plug all the priority wells**, DEC continues to pursue other mechanisms to plug abandoned wells [emphasis added].*

Well construction standards, techniques and technology have improved over time, and it is reasonable to assume that most of these long-term idle wells were not constructed to today's standards, have been subject to mechanical wear and corrosion, and warrant proper abandonment to mitigate risk to protected groundwater resources.

To compound problems, many wells that have not been properly abandoned do not have financial security (e.g. bonds) in place to fund P&A work. ICF reported that, in 2003, NYS had more than 3,500 wells that needed to be P&A'd, but there was no financial security in place (e.g. wells that were grandfathered from NYS bonding requirements). Additionally, ICF reported that 675 of the existing oil and gas wells in NYS have operators that do not comply with the current bonding requirements, and numerous operators that might comply with the existing bonding requirements have plugging liability in amounts that exceed NYS' current bonding requirements, which are too low and do not keep pace with the actual costs of P&A'ing wells today.[79]

The number of temporarily abandoned wells, improperly abandoned wells, and orphaned wells in NYS is a significant issue as shale gas resources are developed, because these old wells could provide a vertical conduit for pollutants to reach protected aquifers. Shale gas wells drilled and fracture stimulated nearby a temporarily abandoned, improperly abandoned, or orphaned well pose a risk. For example, a HVHF treatment can propagate a fracture that, depending on geology, HVHF design, and well depths, could pose a risk of intersection with a nearby well (active producer, abandoned or orphaned well).

Temporarily abandoned wells, improperly abandoned wells, and orphaned wells all pose a risk to the environment. Wellbore infrastructure can corrode and erode, failing over time and creating a potential pollutant pathway for hydrocarbons to move vertically through failed casing or cement to groundwater resources. These wells can either leak gas on their own or provide a vertical pollutant pathway to groundwater resources that can be activated by new well activity nearby.

In 2009, HCLLC recommended that temporary abandonment be limited to no longer than a one-year period, with a wellbore integrity monitoring requirement to ensure that the well is not leaking during temporary abandonment, and a requirement to permanently abandon the well after it is idle for more than a year. HCLLC recommended that NYSDEC carefully examine idle wells that have not been properly P&A'd and that are in close proximity to drinking water sources and in areas under consideration for new HVHF treatments, and require those wells to be P&A'd as a high priority and before shale gas drilling operations commence in those areas.

---

[79] ICF Consulting, Well Characterization and Evaluation Program for New York State Oil and Gas Wells, Draft Report, Prepared for the New York State Energy Research and Development Authority, PSA No. 7012, July 2003, Page 35-36.

A report documenting specific cases of well pollution caused by NYS' improperly abandoned wells or orphaned wells could not be located; however, neighboring Pennsylvania has completed an analysis of this problem, and it sheds light on the problems NYS may encounter.

Pollution caused by improperly abandoned wells in Pennsylvania is documented in a 2009 report prepared by Pennsylvania Department of Environmental Protection (PADEP). The PADEP report lists 27 cases where improperly abandoned wells have been the source of groundwater contamination.[80] In some of the 27 cases the wells were abandoned according to the standard practices of the time, but now leak and need to be re-abandoned using improved materials and techniques. Some of the cases cited by PADEP include very old well construction techniques, for example, surface casing made out of wood that has rotted away, and wells with no surface casing or cement installed at all. These wells have provided a conduit for gas and other pollutants to reach groundwater through damaged or worn casing, poorly installed cement, or more directly where casing or cement was not initially installed.

PADEP also identified wells that need to be P&A'd, but have not yet been addressed due to the lack of a responsible party and/or on account of PADEP resource limitations.[81]

There were three cases cited by PADEP where fracture stimulations in an operating well communicated with a nearby abandoned well, causing a gas leak in the abandoned well.[82] PADEP's study highlighted the importance of locating orphaned and improperly abandoned wells near new oil and gas developments, and study shows the importance of properly abandoning wells before new development proceeds.

A 2011 Duke University study covering Pennsylvania and New York found methane contamination of drinking water associated with shale-gas extraction. The study found that methane concentrations were 17 times higher, on average, in drinking water wells in active drilling and extraction areas than in wells in nonactive areas.[83] Clearly, the higher incidence rate of methane contamination in drinking water wells in shale gas extraction areas is not a coincidence, but is an indicator of shale gas drilling and completion operations mobilizing gas from the shale gas reservoir into protected aquifers. One of the most likely pathways for leaking of gas mobilized by HVHF is a nearby existing well that either was improperly constructed or improperly plugged. Given their failed cement, corroded casing, or lack of casing or cement, such improperly abandoned wells present vertical pathways to aquifers and drinking water resources.

Mechanical failure, human error, and engineering design flaws do occur in the construction and operation of wells. Indeed, groundwater contamination has been attributed to operational failures at various Marcellus Shale gas development operations in Pennsylvania, including operations by Cabot Oil & Gas Corporation, Catalyst Energy, Inc., and Chesapeake Energy Corporation.

---

[80] "Stray Natural Gas Migration Associated with Oil and Gas Wells" Draft Report. PADEP, Bureau of Oil and Gas Management. October 28, 2009.

[81] "Stray Natural Gas Migration Associated with Oil and Gas Wells" Draft Report. PADEP, Bureau of Oil and Gas Management. October 28, 2009. Cases include: Independent Valley News Migration, Allegheny County – SWRO – March 2009; Versailles Migration, Versailles, Allegheny County – SWRO – 2007 through 2008; Childers Migration, Washington County – SWRO – June 2005; Groshek Migration, Keating Twp., McKean County – NWRO – 2008; and Skinner Migration, Columbus Twp., Warren County – NWRO.

[82] "Stray Natural Gas Migration Associated with Oil and Gas Wells" Draft Report. PADEP, Bureau of Oil and Gas Management. October 28, 2009.

[83] Osborn, S.G., A. Vengosh, N.R. Warner, R.B. Jackson, 2011 Methane Contamination of Drinking Water Accompanying Gas Well Drilling and Hydraulic Fracturing, Proceedings of the National Academy of Sciences, U.S.A.; DOI: 10.1073/pnas.1100682108, p.2.

For example, on February 27, 2009, the Pennsylvania Department of Environmental Protection (PADEP) issued a Notice of Violation to Cabot Oil & Gas Corporation for unpermitted discharge of polluting substances and failure to prevent gas from entering fresh groundwater, among other deficiencies, in connection with its drilling activities in Dimock Township.[84] PADEP inspectors "…discovered that the well casings on some of Cabot's natural gas wells were cemented improperly or insufficiently, allowing natural gas to migrate to groundwater...DEP ordered Cabot to cease hydro fracking natural gas wells throughout Susquehanna County."[85] In April 2010, under its consent order and agreement with PADEP, Cabot was required to plug three leaking wells that contaminated the groundwater and drinking water supplies of 14 homes in the region.[86]

In 2011, PADEP issued a cease and desist order to Catalyst Energy, Inc. that prohibited the company from conducting drilling and hydraulic fracturing operations, after a PADEP investigation confirmed that private water supplies serving two homes had been contaminated by natural gas and elevated levels of iron and manganese from Catalyst's operations.[87]

In May 2011, PADEP determined that improper well casing and cementing in Chesapeake Energy Corporation's shallower wells allowed migration into groundwater and caused contaminated 16 families' drinking water supplies in Bradford County.[88]

Pennsylvania has found that significant planning and research is needed to identify orphaned and improperly abandoned wells before drilling nearby wells. At a 2009 Stray Gas Workshop in Pennsylvania, Garrett Velosi, from the National Energy Technology Laboratory, pointed out that one of the main problems with stray gas leaks from abandoned wells is verifying the location of improperly abandoned wells. Records on older wells are often limited or non-existent. Mr. Velosi presented methods for locating unmarked abandoned wells. They include the use of historic photos, ground magnetic surveys, and airborne surveys (equipped with magnetometers and methane detectors).[89]

In January 2011, NYS' consultant Alpha Geoscience agreed that timely well plugging and abandonment requirements are important; however, it recommended that establishing "a specific timeline for plugging and abandonment is neither practical nor necessary."[90] Alpha Geoscience did not examine the large backlog of improperly abandoned wells in NYS or the risk of groundwater contamination from improperly abandoned wells located within the radius of influence of new gas wells and HVHF operations. Alpha Geoscience did not recommend any improved P&A procedures, despite NYCRR's outdated requirements. 6 NYCRR § 555.5 requires only 15' cement plugs, as compared to Texas, Alaska, and Pennsylvania regulations that require a series of 50'-200' cement plugs at various locations within the wellbore.

[84] http://www.portal.state.pa.us/portal/server.pt/community/newsroom/14287?id=2418&typeid=1.

[85] http://www.portal.state.pa.us/portal/server.pt/community/newsroom/14287?id=2418&typeid=1.

[86] http://www.portal.state.pa.us/portal/server.pt/community/newsroom/14287?id=10586&typeid=1.

[87] DEP Orders Catalyst Energy to Stop Operations at Gas Wells in Forest County Village, available at
http://www.portal.state.pa.us/portal/server.pt/community/newsroom/14287?id=16894&typeid=1.

[88] DEP Fines Chesapeake Energy More Than $1 Million, available at
http://www.portal.state.pa.us/portal/server.pt/community/newsroom/14287?id=17405&typeid=1.

[89] Veloski, G., National Energy Technology Laboratory, Methods for Locating Wells in Urban Areas – A Summary of Case Studies, Pennsylvania Stray Gas Workshop, November 2009.

[90] Alpha Geoscience, Review of the dSGEIS and Identification Best Technology and Best Practices Recommendations Harvey Consulting, LLC, December 28, 2009, prepared for NYSERDA, January 20, 2011

HCLLC disagrees with Alpha Geoscience's recommendation to NYSDEC. Alpha Geoscience's recommendation also conflicts with prior advice from ICF to NYSERDA. HCLLC finds that it is practical and necessary to properly abandon wells on a reasonable timeline, and recommends that NYCRR be improved to include best practices and techniques for permanent wellbore abandonment.

**2011 RDSGEIS:** The 2011 RDSGEIS document is inconsistent on its recommendations for P&A'ing wells. In Chapter 5, NYSDEC concludes that no improvements are needed in the NYCRR regulations, but proposes changes to improve the regulations at 6 NYCRR § 555.5. In Chapter 6, NYSDEC concludes that it is not possible for HVHF treatments to intersect improperly abandoned wells; yet, in Chapter 7 NYSDEC proposed mitigation to address this very risk. These inconsistencies are further explained below, with recommendations for resolving them.

Chapter 5 of the RDSGEIS concludes that well plugging procedures and requirements in the existing NYCRR (described in the 1992 GEIS) are sufficient to address the risk of improperly abandoned wells. The 2011 RDSGEIS states:

> *As described in the 1992 GEIS, any unsuccessful well or well whose productive life is over must be properly plugged and abandoned, in accordance with Department-issued plugging permits and under the oversight of Department field inspectors. **Proper plugging is critical for the continue protection of groundwater, surface water bodies and soil.** Financial security to ensure funds for well plugging is required before the permit to drill is issued, and must be maintained for the life of the well [emphasis added].[91]*

> *When a well is plugged, downhole equipment is removed from the wellbore, uncemented casing in critical areas must be either pulled or perforated, and cement must be placed across or squeezed at these intervals to ensure seals between hydrocarbon and water-bearing zones. These downhole cement plugs supplement the cement seal that already exists at least behind the surface (i.e., fresh-water protection) casing and above the completion zone behind production casing.*

> *Intervals between plugs must be filled with a heavy mud or other approved fluid. For gas wells, in addition to the downhole cement plugs, a minimum of 50 feet of cement must be placed in the top of the wellbore to prevent any release or escape of hydrocarbons or brine from the wellbore. This plug also serves to prevent wellbore access from the surface, eliminating it as a safety hazard or disposal site. Removal of all surface equipment and full site restoration are required after the well is plugged.*

> *The plugging requirements summarized above are described in detail in Chapter 11 of the 1992 GEIS and are enforced as conditions on plugging permits. Issuance of plugging permits is classified as a Type II action under SEQRA. Proper well plugging is a beneficial action with the sole purpose of environmental protection, and constitutes a routine agency action. **Horizontal drilling and high-volume hydraulic fracturing do not necessitate any new or different methods for well plugging that require further SEQRA review** [emphasis added].[92]*

---

[91] 2011 NYSDEC, RDSGEIS, Page 5-143.

[92] 2011 NYSDEC, RDSGEIS, Page 5-144.

While NYSDEC agrees that proper well P&A is critical to the protection of groundwater, surface water, and soil, it concludes that horizontal drilling and HVHF shale gas wells do not require any new or different P&A methods. However, this conclusion is inconsistent with NYSDEC's proposed revisions to the P&A procedures at 6 NYCRR § 555.5, this proposal suggests that the existing regulations do not represent best practices.

> **Recommendation No. 22**: The SGEIS should be revised to state that the existing P&A procedures at 6 NYCRR § 555.5 were determined to be outdated and not best practice and that NYSDEC has proposed revisions. The basis for NYSDEC's proposed revisions should be justified in the SGEIS, and include a review of other states' best practices for P&A.

Chapter 5 of the RDSGEIS does not address: (1) whether NYS has a backlog of wells requiring P&A in close proximity to drinking water sources; (2) whether NYS has a backlog of wells requiring P&A in close proximity to areas under consideration for HVHF treatments; (3) whether a procedure needs to be put in place to examine the number, type, and condition of wells requiring P&A in close proximity to new shale gas development; and (4) whether plugging improperly abandoned and orphaned wells should be required where such wells are in close proximity to new HVHF treatments.

> **Recommendation No. 23**: The SGEIS should examine: the number of improperly abandoned or orphaned wells in NYS requiring P&A in close proximity to drinking water sources or in close proximity to areas under consideration for HVHF treatments; whether a procedure needs to be put in place to examine the number, type, and condition of wells requiring P&A in close proximity to new shale gas development; and whether plugging improperly abandoned and orphaned wells should be required where such wells are in close proximity to new HVHF treatments.

For example, maps showing the location and depth of NYS' temporarily abandoned, improperly abandoned, or orphaned wells could not be located; however, this data is needed to ensure safe development of shale gas resources. The RDSGEIS proposes that operators identify any existing well listed in NYSDEC's Oil & Gas database within one mile of the proposed HVHF well[93]; however, ICF's 2003 report to NYSERDA points out that there are a large number of old wells in NYS where location or well condition data is not available in NYSDEC's Oil & Gas database. If NYSDEC has improved the Oil & Gas database to accurately document all existing wells this information should be included in the SGEIS and maps of the wells should be made available.

> **Recommendation No. 24**: The SGEIS should include maps showing the location and depths of improperly abandoned, orphaned wells in NYS. These maps should correlate the locations and depths to potential foreseeable shale gas development and examine the need to properly P&A these wells before shale gas development occurs nearby. The SGEIS should assess the risk of a HVHF well intersecting a well that is not accurately documented in NYSDEC's Oil & Gas database and whether this poses and unmitigated significant impact to protected groundwater resources.

In Chapter 6 of the RDSGEIS, NYSDEC discounts the risks of new HVHF shale gas wells communicating with nearby abandoned wells. NYSDEC relies on its consultant's (ICF) analysis that concludes it is not possible for HVHF treatments to intersect with improperly abandoned wells.[94] Yet, in Chapter 7, NYSDEC recommends precautionary measures to be taken by operators to ensure that wells

---

[93] 2011 NYSDEC, RDSGEIS, Page 3-10 and Page 7-72.

[94] 2011 NYSDEC, RDSGEIS, Page 6-52.

near HVHF operations are properly P&A'd to prevent freshwater contamination. The RDSGEIS is internally inconsistent on this point and the two diametrically opposed conclusions need reconciliation.

> **Recommendation No. 25**: Chapter 6 of the SGEIS should be revised to be consistent with and support the Chapter 7 recommendation for HVHF operators to ensure all nearby wells are properly P&A'd before HVHF operations are conducted to mitigate the risk of HVHF treatments intersecting improperly abandoned wells. This requirement should also be codified in NYCRR.

In 2009 HCLLC recommended that preventative measures be taken to identify and properly abandon existing wells before proceeding with nearby shale gas drilling and HVHF operations. NYSDEC responded favorably to this recommendation by proposing that the operator identify any existing well listed in NYSDEC's Oil & Gas database within one mile of the proposed HVHF well[95] and by proposing that any improperly abandoned wells be plugged within that one-mile radius.[96] While NYS' recommendation is a step in the right direction, additional analysis is needed to justify the one-mile radius selected.

The RDSGEIS does not provide data on the maximum horizontal fracture propagation length that could occur at NYS' proposed 2000' depth cut-off. The RDSGEIS assumes the maximum horizontal well length will be 4000'. However, as highlighted in other sections of this report, current horizontal drilling technology allows for wells to be drilled substantially longer than 4000'. Fractures induced along this horizontal wellbore section can propagate several thousand feet from the well, depending on fracture treatment design parameters. Therefore, the wellbore length and the maximum fracture length combined could result in a radius of influence of more than one mile (5,280').

> **Recommendation No. 26**: The SGEIS should provide technical justification for selecting a one-mile wellbore intersection radius and should explain the maximum horizontal drilling length and horizontal fracture length that corresponds with the proposed one-mile radius. This will be especially important for shallower wells where fractures tend to propagate on a horizontal plane, and where there will be a large number of potential shallow well intersection possibilities.
>
> The SGEIS should examine the potential for longer wellbores and large fracture influence zones to occur now or in the future, and a wellbore intersection radius that corresponds to the largest areas of influence that are reasonably foreseeable should be included in the SGEIS as a mitigation measure and be codified in the NYCRR. Alternatively, if NYSDEC selects a one mile radius, the SGEIS should limit drilling length and horizontal fracture length in the SGEIS as a mitigation measure and in the NYCRR to ensure that the radius of influence does not extend beyond the one-mile impact area proposed.

The RDSGEIS proposes, in Table 11.1, that operators identify and plug wells within a one-mile radius, but this requirement is not translated into a permit condition or codified in NYCRR. Table 11.1 proposes:

> *Operators must identify and characterize any existing wells within the spacing unit and within one mile of proposed well and **plug and abandon any well which is open to the target formation or is otherwise and immediate threat to the environment** [emphasis added].*[97]

---

[95] 2011 NYSDEC, RDSGEIS, Page 3-10 and Page 7-72.

[96] 2011 NYSDEC, RDSGEIS, Table 11.1, Page 11-5.

[97] 2011 NYSDEC, RDSGEIS, Table 11.1, Page 11-5.

Appendix 6, **PROPOSED** Environmental Assessment Form Addendum requires the operator to complete the one-mile radius of investigation, yet, there is no requirement in Appendix 10 or in the NYCRR requiring the offset wells to be plugged by the HVHF operator if needed.

In direct contrast to the conclusions reached in Chapter 6, Chapter 7 of the RDSGEIS acknowledges the potential risk of HVHF wells intersecting improperly abandoned wells and proposes a process to address these risks:

> ***To ensure that abandoned wells do not provide a conduit for contamination of fresh water aquifers, the Department proposes to require that the operator consult the Department's Oil and Gas database as well as property owners and tenants in the proposed spacing unit to determine whether any abandoned wells are present. If (1) the operator has property access rights, (2) the well is accessible, and (3) it is reasonable to believe based on available records and history of drilling in the area that the well's total depth may be as deep or deeper than the target formation for high-volume hydraulic fracturing, then the Department would require the operator to enter and evaluate the well, and properly plug it prior to high-volume hydraulic fracturing if the evaluation shows the well is open to the target formation or is otherwise an immediate threat to the environment.*** *If any abandoned well is under the operator's control as owner or lessee of the pertinent mineral rights, then the operator is required to comply with the Department's existing regulations regarding shut-in or temporary abandonment if good cause exists to leave the well unplugged. This would require a demonstration that the well is in satisfactory condition to not pose a threat to the environment, including during nearby high-volume hydraulic fracturing, and a demonstrated intent to complete and/or produce the well within the time frames provided by existing regulations [emphasis added].*[98]

While Chapter 7 correctly acknowledges the need for P&A procedure improvement and review of nearby abandoned wells before HVHF treatments, NYSDEC incongruously proposes to limit P&A due diligence to: 1) wells that are within the HVHF well operator's control and 2) wells that are "accessible." This approach discounts the risks posed by improperly abandoned wells that are owned by another operator, orphaned, or difficult to access.

The inconsistency in P&A improvement recommendations persists in the Appendix 10 HVHF Permit Conditions where the recommended improvements in Chapter 7 are not included. The Chapter 7 recommendations are not included in the revised NYCRR either.

---

[98] 2011 NYSDEC, RDSGEIS, Page 7-58.

> **Recommendation No. 27**: If a well was not properly P&A'd to current standards, the operator should be required to work with the well owner or take the initiative itself to ensure the well is properly P&A'd before new drilling begins and before a nearby HVHF treatment occurs. Approval of a HVHF well application should be conditioned on verification that any necessary P&A work is complete. This requirement should be included in the SGEIS as a mitigation measure and codified in the NYCRR.
>
> NYSDEC should consider requiring operators to use a variety of proven methods to locate unmarked, abandoned wells, including: historic photos, ground magnetic surveys, and airborne surveys (equipped with magnetometers and methane detectors).
>
> The proposed mitigation measure, requiring improperly abandoned or orphaned wells to be plugged prior to a HVHF treatment, should be included in Appendix 10, of the SGEIS and codified in the NYCRR.

Additionally, NYSDEC should request ICF to further examine additional technical and scientific questions that were not addressed in its analysis.

Foremost, ICF's report does not indicate that ICF evaluated the difference in reservoir pressure near a new shale gas wellbore, drilled into an un-depleted higher pressure gas reservoir, as compared to the lower reservoir pressure in the drainage radius around a well that previously served or is currently serving as a production well. The reservoir pressure in the drainage radius around a production well will be substantially lower creating a pressure sink around that well. By the laws of physics, gas and fluid will flow from higher pressure regimes to lower pressure regimes. Therefore, if a HVHF treatment intersects the drainage radius around a nearby pressure-depleted reservoir connected to an improperly abandoned well, the HVHF fluid and associated mobilized gas will continue to move towards the improperly abandoned well, not back to the new shale gas well as ICF suggests.

As explained in Chapter 10 of this report, industry data shows that HVHF treatments are propagating well beyond the shale zone into formations located above and sometimes below the shale, meaning that the HVHF treatment can potentially intersect the depleted well drainage area of a well that has produced from a zone above or below the shale.

However, ICF concludes that, once the HVHF treatment pressure ceases, all HVHF fluid will return to the shale gas well, and there is no possibility that HVHF fluid or associated mobilized gas will travel up an improperly abandoned well conduit. This conclusion is based on the assumption that the lowest pressure pathway for HVHF fluids injected into the formation is back to the shale gas well, but such assumption does not account for the possibility that a lower pressure regime at an abandoned or active well site could influence the flow of HVHF fluids and newly mobilized gas. It also discounts the possibility that other lower pressure intervals could be located above or below the shale zone that would preferentially accept HVHF fluids and gas mobilized during the treatment.

In these cases, HVHF fluids and gas would continue towards the improperly abandoned well and up the well conduit until pressure equilibrium is reached or into adjacent lower pressured reservoirs. This could result in HVHF fluids and associated gas that is mobilized during the HVHF treatment contaminating groundwater if an exposure pathway exists in the improperly abandoned well or from an adjacent lower pressure reservoir to a shallower protected water zone.

While it is true that HVHF fluids will flow back to the new shale gas well if such well presents the lowest pressure regime for fluid to flow to, this will not always be the case, as evidenced by the fact that not all the HVHF fluid returns to the well. The RDSGEIS states that:

> *Flowback water recoveries reported from horizontal Marcellus wells in the northern tier of Pennsylvania range between 9 and 35 percent of the fracturing fluid pumped. Flowback water volume, then, could be 216,000 gallons to 2.7 million gallons per well, based on a pumped fluid estimate of 2.4 million to 7.8 million gallons, as presented in Section 5.9.[99]*

Therefore, several million gallons of HVHF treatment fluid remain in the reservoir and will travel to the lowest pressure formation/regime present, including such lower pressure regimes present around nearby existing wells that have previously produced hydrocarbons. An out-of-zone HVHF, as described in Chapter 10 of this report  could potentially connect with this lower pressure reservoir, if not properly designed and implemented.

Secondly, ICF's analysis did not examine the maximum horizontal distance a HVHF could travel, nor identify minimum safe separation distances between horizontal fractures and abandoned wells. Thus, ICF did not attempt, to compare the maximum HVHF length to the closest distance that an abandoned well may occur.

Instead, ICF's analysis assumes that the HVHF impact radius would always be less than the distance to a nearby well (which may not be true in all cases, and will depend on reservoir characteristics and job design). ICF concludes, without basis, that a fracture created by a HVHF would never intersect a nearby well, but does not establish the well spacing distance required for this to be true nor does it consider the fact that Marcellus Shale fractures (as shown in Chapter 10 of this report) do routinely propagate out of zone.

Additionally, the Chapter 6 conclusion that it is not possible for a HVHF treatment to intersect an improperly abandoned well is discordant with three cases cited in PADEP's 2009 Report that document situations in which fracture stimulations in operating wells communicated with nearby abandoned wells, causing gas leaks in the abandoned wells.[100] PADEP's cases confirm that fracture stimulations, if improperly designed and executed, can intersect improperly abandoned and orphaned wells.

> **Recommendation No. 28**: The SGEIS and NYCRR should require HVHF well operators to identify previously drilled wells that may be located within the hydraulic radius of the new shale gas well that may be affected during a HVHF treatment. The operator should be required to estimate the maximum horizontal and vertical extent of the fracture length that will be propagated and ensure that there are no abandoned or improperly abandoned wells in that intersection radius. An additional safety factor should be applied in this analysis to account for uncertainty in fracture design and implementation, and the potential for the actual fracture length to be longer than estimated (e.g. a conservative analysis is needed).
>
> The HVHF treatment size should be designed to ensure that it does not intersect with any abandoned or improperly abandoned wells, with an additional margin of safety.

---

[99] 2011 NYSDEC, RDSGEIS, Page 5-99.

[100] "Stray Natural Gas Migration Associated with Oil and Gas Wells" Draft Report. PADEP, Bureau of Oil and Gas Management. October 28, 2009.

> Any improperly abandoned wells nearby, and just outside, the intersection radius should be properly abandoned to current standards before new drilling begins and before the HVHF treatment occurs.

**NYCRR Proposed Revisions**: Despite the 2011 RDSGEIS conclusion that no new P&A requirements are needed, and NYSDEC's consultant's (Alpha Geoscience) recommendation that no improvements are necessary, NYSDEC proposed revisions to its existing well P&A requirements at 6 NYCRR § 555.5, Plugging Methods, Procedures and Reports:

*(a) The plugging of a well shall be conducted in accordance with the following sequence of operations[:]* __*. The Division at its discretion may require the tagging of all plugs and require casing and/or cement evaluation logs to be run to determine proper plugging procedures. The following are minimum requirements for plugging and the department may impose additional requirements*__*: [emphasis added]*

   *(1) The well bore, whether to remain cased or uncased, shall be filled with cement from total depth to at least [15] 50 feet above the top of the shallowest formation from which the production of oil or gas has ever been obtained in the vicinity. Alternatively, a bridge topped with at least [15] 50 feet of cement shall be placed immediately above each formation from which the production of oil or gas has ever been obtained in the vicinity.*

   *(2) [ If] For any casing [is to be] left in the ground, a cement plug of at least [15] 100 feet in length shall be placed [at the bottom of such section of casing] 50 feet inside and 50 feet outside of the casing shoe . Uncemented casing must be pulled as deep as practical with a 50-foot plug placed in and above the stub of the casing. If the uncemented casing is unable to be pulled the casing must be ripped or perforated 50 feet below the shoe of the next outer casing and a 100-foot plug placed across that shoe. A [similar] 50 foot plug shall be placed at [the top of such section of casing unless it shall extend to]the surface. [In the latter event, the casing shall be capped in any such manner as will prevent the migration of fluids and not interfere with normal soil cultivation.]*

   *(3) If casing extending below the deepest potable fresh water level shall not remain in the ground, a cement plug of at least [15] 50 feet in length shall be placed in the open hole at a position approximately 50 feet below the deepest potable fresh water level.*

   *(4) If the conductor casing or surface casing is drawn, a cement plug of at least [15] 50 feet in length shall be placed immediately below the point where the lower end of the conductor or surface casing shall previously have rested. The hole thereabove shall be filled with cement, sand or rock sediment or other suitable material in such a manner as well prevent erosion of the well bore area and not interfere with normal soil cultivation.*

   *(5) The interval between all plugs mentioned in paragraphs (1) through (4) of this subdivision shall be filled with [a heavy mud-laden] gelled fluid with a minimum density equal to 8.65 pounds per gallon with a 10 minute gel-shear strength of 15.3 to 23.5 pounds per hundred square feet or other department approved fluid.*

NYSDEC's proposed revisions are a step in the right direction. Overall, NYSDEC proposes to require longer cement plugs, weighted mud, and some additional QA/QC procedures, including tagging the cement plugs and possibly running cement evaluation logs.

NYSDEC's existing P&A regulations require short cement plugs (15'), which are woefully inadequate, compared to current best practices of installing a series of 50'-200' cement plugs within a wellbore, and removing corroded casings to isolate water resources. Unfortunately, this means that most of NYS'

abandoned wells, if plugged to NYCRR's existing standards, are not likely to provide adequate groundwater protection. To address this problem, the P&A procedures used in each previously abandoned well, located near a proposed new HVHF well should be carefully examined for adequacy to determine whether the well should be re-abandoned to current, more robust P&A standards.

> **Recommendation No. 29:** P&A procedures used in each previously abandoned well, located near a proposed new HVHF well should be carefully examined for adequacy to determine whether the well should be re-abandoned to current, more robust P&A standards and this requirement should be included in the SGEIS as a mitigation measure and codified in the NYCRR.

NYSDEC's proposed increase to 50' cement plug length is an improvement; however, best practices used in other states such as Texas, Alaska, and Pennsylvania require longer cement plugs. NYSDEC should consider enhancing the regulations to require longer and additional cement barriers to ensure that hydrocarbons and freshwater are confined to their respective indigenous strata, and are prevented from migrating into other strata or to the surface. For example, while NYSDEC has proposed to revise the NYCRR to require a 50' cement barrier, Alaska requires double that protection at 100'.[101] Pennsylvania recently upgraded its P&A requirements from its previous 50' standard to plugs of 50'-100'.[102] Texas requires cement plugs ranging from 50'-200' at numerous locations in the well, and requires cement QA/QC procedures.[103] For example, Texas requires each cement plug to be a minimum of 200' in length and extend at least 100' below and 100' above the top of each hydrocarbon stratum and the base of the deepest protected water stratum, which is a substantial difference from NYS' current requirement for 15' plugs.

> **Recommendation No. 30:** The SGEIS mitigation measures and NYCRR should be revised to clearly specify that:
>
> Plugging a wellbore should be performed in a manner that ensures all hydrocarbons and freshwater are confined to their respective indigenous strata, and prevented from migrating into other strata or to the surface.
>
> All hydrocarbon-bearing strata should be permanently sealed off by installing a cement barrier at least 100 feet below the base to at least 100 feet above the top of all hydrocarbon-bearing strata (200' plug).
>
> The plugging of a well should include effective segregation of uncased and cased portions of the wellbore to prevent the vertical movement of fluid within the wellbore. A continuous cement plug must be placed from at least 100 feet below to at least 100 feet above the casing shoe (200' plug).
>
> The operator should be required to submit records to NYSDEC to demonstrate that the well is P&A'd in compliance with regulations.

NYSDEC should consider specifying the grade of cement required to plug the well. It should also consider requiring the use of gas blocking agents.

---

[101] 20 AAC 25.

[102] PA Code, § 78.91.

[103] 16 TAC Part 1, § 3.14.

Revisions to the NYCRR include some improved QA/QC procedures, but these revisions are loosely written and do not specify when QA/QC procedures will be mandatory. For example, it is best practice to tag all cement plugs to verify placement depth; this should not be an optional, discretionary procedure. Also, NYSDEC should specify under what circumstances a cement evaluation tool will be required.

> **Recommendation No. 31**: The SGEIS mitigation measures and NYCRR should be revised to require cement quality standards, including the use of gas blocking cement. The SGEIS and NYCRR should require tagging of all cement plugs and provide instructions on when additional cement evaluation tools must be run.

## 10. HVHF Design and Monitoring

**Background:** In 2009, HCLLC recommended that NYSDEC revise its regulations to specify and require best technology and best practices for collecting data, and modeling, designing, implementing, and monitoring a fracture treatment, including:

  (a) Collecting additional geophysical and reservoir data to support a reservoir simulation model;

  (b) Developing a high-quality Marcellus Shale 3D reservoir model(s) to safely design HVHF treatments;

  (c) HVHF modeling prior to each fracture treatment to ensure that the fracture is contained to the Marcellus Shale zone;

  (d) Careful monitoring of the fracture treatment, including shutting the treatment down if data indicates casing leaks or out-of-zone fractures;

  (e) Starting with smaller fracture treatments in the deepest, thickest sections of the Marcellus Shale to gain data and experience (e.g. 4,000' deep and 150' thick);[104]

  (f) Using the experience gained with fracture testing on deeper sections of the Marcellus to design and implement larger treatment volumes over time (potentially allowing increasingly shallower and thinner intervals *only* if technical data supports the safety of this technique); and

  (g) Documenting, reporting, and remediating fracture treatment failures to ensure drinking water protection.

In 2009, HCLLC recommended that fracture treatments be carefully monitored and shut down if pressure data indicates casing leaks. HCLLC noted the American Petroleum Institute recommends continuous and careful monitoring of surface injection pressure, slurry rate, proppant concentration, fluid rate, and sand or proppant rate,[105] and that fracture treatments should be immediately shutdown if abnormal pressures indicate a casing leak. The 2011 RDSGEIS now requires the operator to carefully monitor fracture treatments and shut down the treatment if data indicates casing leaks or out-of-zone fractures. This is an important improvement to the SGEIS.

Experts agree that Marcellus Shale gas production can be maximized by: 1) drilling long horizontal wells to increase the drainage area and 2) conducting hydraulic fracture treatments to improve permeability and access to trapped gas. However, successful, safe development requires hydraulic fracture treatments be properly designed and sized to remain <u>within</u> the shale zone. Fracture treatments that propagate <u>outside</u> the shale zone (fracturing out-of-zone) reduce gas recovery and risk pollutant transport. There is extensive industry literature on the importance of hydraulic fracture design, modeling, and field verification to optimize fracture stimulation. Therefore, in 2009 HCLLC recommended that the DSGEIS be improved to provide additional technical and scientific data and require specific mitigation, ensuring that operators are designing jobs that will not fracture out-of-zone.

---

[104] Smaller, deeper fracture treatments could be used initially in NYS, the performance examined, the predictive model improved based on that data, and then fracture treatment size and proximity to protected waters and other wellbores could be modified, as confidence increases in the predictive ability of the model to ensure a safe and favorable result.

[105] American Petroleum Institute (API) Guidance Document HF1, Hydraulic Fracturing Operations—Well Construction and Integrity Guidelines, October 2009.

Pollutant transport and pollutant toxicity issues are addressed in Dr. Tom Myers' and Dr. Glenn Miller's reports to NRDC on the 2009 DSGEIS and the 2011 RDSGEIS. HCLLC's recommendations center on what type of data, analysis, tools, and methods an engineer/operator should have in place and use to ensure that a fracture treatment can be contained within the Marcellus Shale zone.

In 2009, HCLLC observed that NYSDEC and/or operators had not provided sufficient data to demonstrate that a HVHF treatment can be contained to the Marcellus Shale. HCLLC pointed out that the 2009 DSGEIS did not require the operator to demonstrate that it is equipped with sufficient expertise, training, qualifications, and engineering tools to safely design, implement, and assess the performance of HVHF treatments. HCLLC recommended that NYSDEC consider operator qualifications.

HCLLC's recommendations on the 2009 DSGEIS explained that it is best practice in newly developed formations, such as the NYS Marcellus Shale, to build hydraulic fracture models. Fracture models are used by engineers to safely design fracture treatments. During actual fracture stimulation treatments, data are collected to verify model accuracy, and the model is continually refined to improve its predictive capability.

Because fracture treatments may be executed several thousand feet below the surface of the earth, and can only be indirectly observed, it is important for engineers to have a 3D model to guide design. While 3D modeling is not an exact science, the model provides an engineer with an estimating method for predicting both horizontal and vertical fracture length.

As further explained below, data collected during drilling, well logging, coring, and other geophysical activities and HVHF implementation can be used to continuously improve the model quality and predictive capability.

In newly developed areas it is important to conduct initial HVHF treatments in the lowest risk zones, far below protected aquifers and with large horizontal offsets from existing wells. Until the predictive capability of site-specific models improves from the input of actual field data, larger buffer zones should be used. Absent hydraulic fracture modeling in newly developed areas such the NYS Marcellus Shale, engineers would blindly be making decisions on the size, type, and execution of HVHF treatments.

NYS' consultant, Alpha Geoscience, agreed with HCLLC's 2009 recommendations and in January 2011 reported to NYSDEC that:

> *Harvey Consulting's [HCLLC] assessment of the dSGEIS' discussion of hydraulic fracture design and monitoring is thorough...*

> *Harvey Consulting has thoroughly documented its discussion of hydraulic fracture design and monitoring, citing professional journal articles, professional conference papers, technical guidance documents, and consultant reports.[106]*

Alpha Geoscience recommended to NYSDEC that HCLLC's 2009 recommendations be included in the SGEIS:

> *Harvey Consulting's ideas should be considered for inclusion in the dSGEIS as possible permit conditions, especially for the first wells drilled in an area.[107]*

---

[106] Alpha Geoscience, Review of the dSGEIS and Identification Best Technology and Best Practices Recommendations, Harvey Consulting, LLC, December 28, 2009, prepared for NYSERDA, January 20, 2011, Pages 26-27.

[107] Alpha Geoscience, Review of the dSGEIS and Identification Best Technology and Best Practices Recommendations, Harvey Consulting, LLC, December 28, 2009, prepared for NYSERDA, January 20, 2011, Page 28.

While Alpha Geoscience's report acknowledges the importance of proper HVHF design and monitoring, it includes several misrepresentations about HCLLC's 2009 comments that require correction.

First, Alpha Geoscience incorrectly contends that HCLLC recommended industry and NYS develop separate hydraulic fracture models; this is not correct. HCLLC recommended that industry develop models, **or** that joint model funding be implemented as a more cost-effective approach. Typically, companies build their own proprietary models to seek competitive advantage, especially in newly developed areas where the models are used as part of the competitive bidding process. However, it is possible for one or more companies to pool resources to develop a joint model as a cost savings.

Second, Alpha Geoscience incorrectly contends that HCLLC recommended that every operator perform fracture modeling at every location, **including locations that have been thoroughly modeled and assessed.** Alpha Geoscience concluded that this would be extremely costly compared to the technical value. HCLLC did not recommend HVHF modeling be conducted at locations that have been "thoroughly modeled and assessed." Logically, if this work has already been completed, there is no reason to repeat it.

HCLLC did recommend that NYSDEC require operators to complete modeling prior to each fracture treatment to ensure that the fracture is properly designed and planned to be contained to the Marcellus Shale zone. This is not a significant amount of work per well for experienced operators, with working models. HCLLC also recommended that operators collect data during fracture treatments to further refine hydraulic fracture models. HCLLC pointed out that as NYS shale development is in its infancy, hydraulic fracture model work has not yet been completed, and therefore is needed.

Once a hydraulic fracture model is built and populated with data specific to the NYS Marcellus Shale, running a well-specific HVHF treatment scenario is an efficient process, and an important quality control and quality assurance measure. It does not appear that Alpha Geoscience is familiar with the reservoir simulators used for oil and gas work, because their recommendation to construct a hydraulic fracture model for the Marcellus Shale, and then use it only on the initial wells constructed, is inconsistent with industry practice. Model quality improves over time. As additional data is collected and the model is refined, it becomes an increasingly valuable tool to the operator. High-quality models are an essential tool for designing fracture treatments in challenging circumstances and locations.

In 2009, HCLLC explained that industry agrees there is a high level of uncertainty in NYS Marcellus Shale development; industry recommends engineering and geophysical data work to reduce that uncertainty. HCLLC's recommendations in 2009 stated:

> ***Marcellus Experience Very Limited:*** *Marcellus Shale gas development has a high level of uncertainty. Shales by nature are very heterogeneous.[108] Industry has limited experience exploiting the Marcellus Shale using horizontal wells and slickwater fracs. The first Appalachian Basin Marcellus Shale gas well stimulation using high-volume slickwater fracture treatments was only recently performed in Southwestern Pennsylvania in 2004.[109] Therefore, industry has less than five years of experience developing the Marcellus Shale using the techniques proposed in the dSGEIS.*

[108] Cipolla, C.L., Lolon, E.P., and Mayerhofer, M.J., Reservoir Modeling and Production Evaluation in Shale-Gas Reservoirs, International Petroleum Technology Conference, Paper 13185, December 2009.

[109] Fontaine, J., Johnson, N., and Schoen, D., Design, Execution, and Evaluation of a "Typical" Marcellus Shale Slickwater Stimulation: A Case History, Society of Petroleum Engineers Paper 117772, October 2008.

*Even NYSDEC's consultants acknowledge that industry literature on and experience with the Marcellus Shale is so limited that most of their analysis was based on development of other shale gas reservoirs, such as the Barnett and Fayetteville. NYSDEC's consultant, ICF, states that:*

> "**Drilling operations, and especially multi-horizontal wells, are relatively new in Marcellus Shale**. *While drilling operations are underway in neighboring states as evidenced by over 450 wells in Pennsylvania for example,* **technical studies have yet to be published** *that quantify actual drilling operations in Marcellus Shale.* **For the most part, we have had to make assumptions, where technically appropriate, that drilling operations in other shale formations are representative of expected Marcellus operations** *[emphasis added].*[110]

*Lack of Marcellus Shale experience increases the risk of fracturing out-of-zone, unless a conservative, step-wise approach is taken to better understand the Marcellus Shale before large scale development occurs in NYS.*

***NYS Marcellus Data Set Improvement Needed****: Site-specific data, unique to the Marcellus Shale in NYS, must be collected to: better understand the reservoir heterogeneities; develop sophisticated three dimensional (3D) reservoir models to more accurately design fracture treatments; and examine actual fracture performance in the field. Reservoir simulation models are critical engineering design tools. The dSGEIS provides no indication that a model exists for the NYS Marcellus Shale.*

*Engineers use 3D models to predict fracture height, length, and orientation prior to actually performing the job at the well. The goal is to design a stimulation treatment that optimizes fracture networking and maximizes gas production, while confining fracture growth to within the gas shale target formation.*[111]

*Engineers examine various parameters (e.g., volume, pressure, treatment placement) to optimize a fracture treatment. Without a high-quality 3D reservoir simulation model to design a fracture treatment, operators cannot demonstrate to NYSDEC that the fracture is predicted to stay in zone.*

*Typically an operator would start by collecting core analysis, well logs, and other subsurface data in the area it is interested in developing, to populate a site-specific 3D reservoir model. To collect this data, additional exploration and appraisal wells must be drilled (see recommendation No. 2). The limited amount of special core analysis and core data on the Marcellus Shale, as well as overlying intervals, is described in Chapter 4 of the DSGEIS, showing a need for additional data.*

***Test in Deepest, Thickest Zones First:*** *NYSDEC is proposing to allow high-volume fracture treatments, without requiring the standard of care a petroleum engineer would typically use to collect data, and model, design, and monitor fracture treatments. NYSDEC should require that additional data be collected to support a model, and initially it should only allow a few, small fracture treatments that are conducted with intensive monitoring to verify that they are designed and implemented to stay within the*

---

[110] 2009 NYSDEC, DSGEIS, ICF Task 2 Report, Page 1.

[111] ALL Consulting, Hydraulic Fracturing Considerations for Natural Gas Wells of the Marcellus Shale, Presented at The Ground Water Protection Council 2008 Annual Forum, Cincinnati, Ohio, September 21-24, 2008.

*Marcellus Shale. This data gathering and testing should be conducted in the deepest portions of the Marcellus Shale (below 4,000') and in the thickest section of the shale (over 150') to ensure there are adequate buffer zones to protect the environment during the data gathering and testing process. Operators should start with smaller fracture treatment sizes, collecting field data to better understand fracture performance, and use field data to calibrate that performance in the 3D model.*

*Over time, with careful analysis and a conservative, step-wise approach, larger fracture treatments can be tested and carefully monitored. Over time it may be possible to safely use the treatments on thinner reservoirs and shallower reservoirs, but certainly not as a first step. High-volume fracture treatments should not be conducted until there is a sophisticated data set, model, and monitoring program to verify pre-fracture and post-fracture reservoir properties.*

***Buffer Zones Needed:*** *Vertical fractures that extend above and below the shale zone will decrease gas recovery rates by allowing vertical migration into the overlying strata, or by allowing water influx from aquifers above or below the shale. NYS has a financial incentive to ensure fracture treatments are conducted correctly, because NYS will want to maximize its royalty share and tax revenue.*

*To avoid fracturing out-of-zone, engineers typically design fracture treatments with a buffer zone (an un-fractured zone at the top of the shale layer and at the base of the shale). Buffer zone size should increase with geologic and technical uncertainty. Buffer zone size may decrease as industry gains experience and data quality/quantity improves. The DSGEIS does not contain sufficient information to demonstrate that NYSDEC and/or operators proposing high-volume fracture treatments have developed engineering tools capable of computing a safe buffer zone.*

Third, Alpha Geoscience incorrectly contends that HCLLC recommended that every operator perform a minifracture treatment at every location, including locations that have been thoroughly modeled and assessed. HCLLC did not recommend that a minifracture be conducted at every well. Instead, HCLLC recommended that minifractures be conducted in a few different areas of NYS to further refine hydraulic fracture models. HCLLC's 2009 recommendations stated:

*Technology is available to assess actual fracture growth including: minifracs,[112] microseismic fracture mapping,[113] tilt surveys, well logging (e.g., tracer and temperature surveys[114]), etc.[115] These technologies can be used to provide more accurate assessments of the locations, geometry, and dimensions of a hydraulic fracture system.[116]* ***This data***

---

[112] Minifracs are small fracture treatments conducted in the well to better understand fracture conductivity and flow geometry prior to implementing a large fracture treatment. Minifracs are typically used to optimize the fracture design and calibrate the fracture model. These tests involve periods of intermittent injection followed by intervals of shut-in and/or flowback. Pressure and rate are measured throughout a minifrac and recorded for subsequent analyses.

[113] Microseismic monitoring is a method that measures the seismic wave generated during a fracture treatment to map the fracture extent, and it can be used to make "real-time" changes in the fracture design and implementation program.

[114] After the fracture treatment is completed, an operator can run a temperature log in the well to measure the variation in reservoir temperature resulting from the treatment. The reservoir temperature is hotter than the fracture fluid and proppant. Cooler temperatures will be measured where frac fluid and proppant are placed. Temperature logs will provide insight into fracture location and growth outside the casing.

[115] American Petroleum Institute (API) Guidance Document HF1, Hydraulic Fracturing Operations—Well Construction and Integrity Guidelines, October 2009.

[116] Schlumberger, Microseismic Hydraulic Fracture Monitoring, http://www.slb.com/content/services/stimulation/stimmap.asp.

*__can be obtained in the Marcellus Shale in a few different areas of NYS to further__
__refine the hydraulic fracture model.__ Minifractures are particularly helpful in estimating
fracture dimensions, fracture efficiency, closure pressure, and leakoff prior to
implementing a high-volume, full-scale treatment. NYSDEC should require operators to
conduct minifractures to better understand site-specific reservoir characteristics prior to
conducting a high-volume fracture treatment [emphasis added].*

HCLLC's 2009 recommendations also noted that:

*__While NYSDEC's consultant, ICF[117], documents a number of the engineering__
__methods that can be used to model, monitor, and improve fracture treatments,__
__NYSDEC does not require any of these methods in its existing regulations. Absent a__
__regulatory requirement, there is no assurance these methods will be used__ [emphasis
added]__.__*

*Best practice for hydraulic fracture planning includes a detailed understanding of the
in-situ conditions present in the reservoir (e.g., shale thickness, reservoir pressure, rock
fracture characteristics, and special core analysis). In highly heterogeneous reservoirs,
reservoir simulation is often coupled with stochastic methods (e.g. Monte Carlo analysis
and geostatistical techniques) to improve the quality of the 3D reservoir model.[118]*

*Data collected on previous fracture treatments in the Marcellus Shale and drilling data
will be useful to refine the fracture modeling. Actual fracture treatments must be
carefully monitored and implemented to ensure fractures stay within zone. Data
collected during each fracture treatment should be used to calibrate the 3D reservoir
model to improve future fracture treatment design.*

*Peer-reviewed articles and technical data on Marcellus Shale vertical fracture growth
characteristics are sparse. While fracture growth models exist at an industry level, and
have been tuned for fracture treatments in the Barnett Shales and other gas reservoirs,
considerable technical work is still needed to develop fracture growth models for NYS
Marcellus Shale development.*

*A literature review was completed by the author [HCLLC] in search of a Marcellus Shale
3D reservoir model for NYS; none was found in the petroleum engineering published
literature. It is not clear if the lack of a Marcellus Shale reservoir model for NYS
indicates that one does not exist, or whether industry is holding models proprietary. Yet
in other shale gas developments (e.g., Barnett and Fayetteville) there is extensive
industry literature on: available reservoir simulation model; completion and fracture
design; and performance assessment to compare predicted fracture growth with that
achieved in the field. Lack of industry literature is usually a strong indication that
additional data gathering and technology development is needed.*

*The data void for NYS' Marcellus Shale technical literature reinforces the need for
NYSDEC to use a conservative, step-wise approach, rather than launching into a massive
drilling and fracturing campaign without the data or tools in place to do a safe and
effective job.*

---

[117] ICF International, Technical Assistance to NYS on DSGEIS, August 2009.

[118] Schepers, K.C., Gonzalez, R.J., Koperna, G.J., and Oudinot, A.Y., Reservoir Modeling in Support of Shale Gas Exploration, Society of Petroleum Engineers, June 2009.

*NYSDEC should require additional information be collected by industry to better understand the geological and geophysical properties of the Marcellus Shale zone and the overlying strata between the Marcellus and drinking water aquifers.*

*NYSDEC should require 3D reservoir simulation models be developed to accurately predict hydraulic fracture treatment performance, and to ensure the jobs are well engineered and designed with adequate safety factors to avoid fracturing out-of-zone.*

*The DSGEIS must assure the public that fractures can be contained to the Marcellus Shale zone. The DSGEIS does not provide data sufficient to meet this standard. The DSGEIS does not document the existence of 3D reservoir simulation models for NYS' Marcellus Shale, nor does NYSDEC require engineers to design fracture treatments using 3D models.*

*While Marcellus Shale development in Pennsylvania precedes development in NYS, data collected from the Pennsylvania wells is not applicable to the NYS Marcellus Shale because the depth of burial, thickness, organic content, permeability, and other reservoir properties in NYS differ. Industry experts warn that site-specific data is critical:*

*"__By their nature, shales are extremely variable and regional differences in structure, mineralogy and other characteristics should always be considered in treatment design__...The wide geographic range [of the Marcellus Shale] has led to numerous different completion schemes being utilized as with the geographic variation comes geologic variability within the formation itself. A primary topic of [industry] discussion has been determining the optimal size and type of stimulation treatment for a given area"[119] [emphasis added].*

Marcellus Shale thickness lessens substantially in western NYS to less than 75' for roughly one-third of the total anticipated development area.[120] HVHF treatments in thin shale zones increases the risk of fracturing out-of-zone, unless a very cautious approach is taken by tailoring the design to the geophysical properties of the shale, taking into account shale thickness, local stress conditions, compressibility, and rigidity.

NYSDEC's consultants point out that a gas operator has no incentive to fracture out of the Marcellus Shale zone, because doing so could result in a loss of gas reserves or an increase in produced water volumes. Yet, NYSDEC's consultant, ICF, also recognizes that fracture design is complicated and it is possible to inadvertently fracture out-of-zone. ICF examined the potential for fracture fluids to propagate vertically and contaminate overlying drinking water aquifers. ICF recommended a 1,000' vertical offset be used.

HCLLC agrees that the use of vertical and horizontal offsets (buffer zones) is a prudent approach. The next step is to determine the size of the offsets. Initially, in new areas, offsets should be large, and then may decrease over time, as field data is obtained and predictive capability is refined.

---

[119] Fontaine, J., Johnson, N., and Schoen, D., Design, Execution, and Evaluation of a "Typical" Marcellus Shale Slickwater Stimulation: A Case History, Society of Petroleum Engineers Paper 117772, October 2008.
[120] 2009 NYSDEC, DSGEIS, Figure 4.9.

In 2009, HCLLC pointed out that the 1,000' vertical offset proposed by ICF is not technically supported, and a horizontal buffer zone is also needed. HCLLC recommended that vertical and horizontal offsets be based on actual field data, 3D reservoir simulation modeling, and a peer-reviewed hydrological assessment. HCLLC recommended these steps be taken to ensure aquifers are protected and nearby wellbore intersections are avoided.

The 2011 RDSGEIS still does not provide technical justification for the proposed minimum 1,000' vertical offset, nor does it make a recommendation for a horizontal offset from existing wells.

Instead, the 2011 RDSGEIS provides data that shows HVHF treatments in the Marcellus Shale have propagated vertical fractures up to 1500' in length, and horizontal fractures can extend hundreds to thousands of feet, as further explained below. These data do not support the proposed buffers.

**The 2011 RDSGEIS**: The 2011 RDSGEIS agrees that in new areas hydraulic fracture model development and design is important, citing recommendations from the Ground Water Protection Council and its consultant ICF; yet, incongruously the RDSGEIS concludes it is unnecessary for operators to be required do this work in NYS (as a SGEIS mitigation measure or a NYCRR requirement).

> *Service companies design hydraulic fracturing procedures based on the rock properties of the prospective hydrocarbon reservoir. For any given area and formation, hydraulic fracturing design is an iterative process, i.e., it is continually improved and refined as development progresses and more data is collected. **In a new area, it may begin with computer modeling to simulate various fracturing designs and their effect on the height, length and orientation of the induced fractures. After the procedure is actually performed, the data gathered can be used to optimize future treatments. Data to define the extent and orientation of fracturing may be gathered during fracturing treatments by use of microseismic fracture mapping, tilt measurements, tracers, or proppant tagging. ICF International, under contract to NYSERDA** to provide research assistance for this document, **observed that fracture monitoring by these methods** is not regularly used because of cost, but **is commonly reserved for evaluating new techniques, determining the effectiveness of fracturing in newly developed areas, or calibrating hydraulic fracturing models** [emphasis added].[121]*

NYSDEC's consultants (Alpha Geoscience and ICF), the Ground Water Protection Council, HCLLC, and industry all agree:

- There is a need for computer modeling on new gas shale play areas to simulate various fracturing designs and their effects on the height, length, and orientation of the induced fractures;

- After the HVHF treatment is actually performed, gathered data should be used to optimize future treatments; and

- There is technology available to further refine treatment design, including microseismic fracture mapping, tilt measurements, tracers, and proppant tagging.

However, these points of agreement are not reflected in the RDSGEIS, permit conditions, or NYCRR revisions. Remarkably, the 2011 RDSGEIS only has a few paragraphs in the entire 1,537 page document that discuss the importance of HVHF modeling and post-fracture assessment work (Chapter 5.8), and these recommendations are later disregarded in Chapter 7 proposed mitigation.

---

[121] 2011 NYSDEC, RDSGEIS, Page 5-88.

Case No. 1:20-cv-02484-MSK   Document 93   filed 05/06/21   USDC Colorado   pg 138 of 538

The use of 3D reservoir simulation to more accurately predict vertical and horizontal fracture growth is not new; reservoir simulation models have been used by petroleum engineers for decades. However, computational efficiency and model design have improved considerably, and more sophisticated simulation techniques are now available for shale gas reservoirs.

The basic engineering approach for populating a 3D reservoir simulation model is shown in the simplified flow diagram below, with geophysical data (seismic, well logs, core, samples, etc.) and existing nearby well data serving as the starting point. Once a model is built, it is used to design and optimize a safe and effective HVHF job. Data are gathered while the job is implemented, and those data are used to refine the model and improve future HVHF treatments.



There is abundant industry literature explaining the need for hydraulic fracture modeling and microseismic mapping, especially for new shale play developments, such as in NYS.

NYSDEC should recognize that the use of refined, site-specific models to optimize HVHF jobs is industry best practice. Quality operators with high standards routinely do this work. It should not be considered a burdensome practice, but rather a necessary requirement to protect groundwater and the environment.

Furthermore, it is economically attractive for an operator to use HVHF modeling. Models aid industry in making informed decisions, and prevents fracturing out-of-zone, which maximizes gas recovery rates.

Microseismic mapping has become a key tool for better understanding shale gas heterogeneities, identifying reservoir faults, and measuring actual fracture propagation orientation and length.

A 2010 industry paper[122] written by Rex Energy Corporation and MicroSeismic Inc. explains the importance of microseismic mapping for shale gas engineering:

> By using microseismic source locations and mechanisms in conjunction with other geological and geophysical knowledge of an area, engineering and completion methods can be quickly corrected and enhanced. Induced fracture height, length, and placement influence the location, orientation and spacing of subsequent wells. **_Microseismic monitoring allows for identification and characterization of unknown faults which intersect the wellbore and may significantly affect reservoir production and stimulations_**. Formations with limited exploration with limited exploration data, such as the Marcellus shale, are ideal candidates for microseismic monitoring [emphasis added].

> In this case study, we will show how the **_microseismic monitoring of a hydraulic fracture treatment in the Marcellus Shale identified a pre-existing natural fault which intersected the wellbore_** [emphasis added].

A 2011 industry paper[123] written by Marquette Exploration (a Marcellus Shale operator) and Schlumberger (an industry contractor), titled "Integrating All Available Data to Improve Production in the Marcellus Shale," emphasizes the importance of HVHF design and monitoring:

> The operator featured in this paper is a small independent with Marcellus Shale areas of operation spanning across Belmont and Jefferson counties, eastern Ohio (Fig.2). This paper describes the methodology used by the operator to systematically gather the critical data during a pilot program to enhance the knowledge of their reservoir and develop optimized completion strategies and stimulation designs, thereby maximizing the true economic value of their asset.

> To build realistic property models, input from team members from different disciplines is required; in this study, team members included a geophysicist, geologist, petrophysicist, and reservoir engineer. Once the 3D structural model was completed, individual log measurements and interpreted properties from petrophysical, geomechanical, and image logs were incorporated in the model.

Marquette Exploration's paper concludes:

- Delineating a reservoir early on in the play and gathering as much data as possible can improve the drilling and completion design of the initial horizontal wells in the field to reduce the time and cost for an operator to get up the learning curve.

- Using all available data can greatly enhance the understanding in a field which, in turn, can improve the lateral design. Core data are imperative to calibrate petrophysical and geomechanical logs to further refine log models in other wells in an area.

- Seismic data in conjunction with strategically placed vertical logs can be used to construct a detailed static 3D geological model.

---

[122] Hulsey, B.J., and Cornette, B. (MicroSeismic Inc.), and Pratt, D. (Rex Energy Corporation), Surface Microseismic Mapping Reveals Details of the Marcellus Shale, Society of Petroleum Engineers, SPE Paper 138806, 2010, Page 1.

[123] Ejofodomi, E., Baihly, J., Malpani, R., Altman, R, (Schlumberger), and Huchton, T., Welch, D., and Zieche, J., (Marquette Exploration), Integrating All Available Data to Improve Production in the Marcellus Shale, Society of Petroleum Engineers Paper, SPE 144321, 2011.

- *The thickness, depth, and continuity for shale sub-layers can vary greatly over a small area, so a pilot hole can be imperative to calibrate the geologic model for lateral landing point determination.*

- *The geologic model showed that the reservoir properties varied across the area of interest.*

- *Stochastic modeling can be used to successfully propagate interpreted log properties from a few wells across a large acreage.*

- *A novel reservoir modeling technique, Microseismic Fracture Network (MFN), was developed using microseismic data to properly describe the created complex fracture network.*

A 2010 industry paper[124] written by El Paso Exploration and Production and StrataGen Engineering stresses the importance of HVHF design:

> *...a primary conclusion is that as reservoir permeability decreases, proper well type selection and **effective hydraulic fracture stimulation design become much more crucial** [emphasis added].*
>
> ***Additional modeling with specifics must be performed to evaluate well type, fracture design, and spacing requirement for a specific well or formation** [emphasis added].*

A 2011 industry paper[125] written by Schlumberger also stresses the importance of HVHF design and monitoring:

> *The completion strategy and hydraulic fracture stimulation are the keys to economic success in unconventional reservoirs. **Therefore, reservoir engineering workflows in unconventional reservoirs need to focus on completion and stimulation optimization** as much as they do well placement and spacing. **This well-level focus requires the integration of hydraulic fracture modeling software and the ability to utilize measurements specific to unconventional reservoirs** [emphasis added].*
>
> ***It is very important to properly model hydraulic fracture propagation and hydrocarbon production mechanisms in unconventional reservoirs**, a significant departure from conventional reservoir simulation workflows. **Seismic-to-simulation workflows in unconventional reservoirs require hydraulic fracture models that properly simulate complex fracture propagation** which is common in many unconventional reservoirs, algorithms to automatically develop discrete reservoir simulation grids to rigorously model the hydrocarbon production from complex hydraulic fractures, and the ability to efficiently integrate microseismic measurements with geological and geophysical data. **The introduction of complex hydraulic fracture propagation models now allows these workflows to be implemented** [emphasis added].*

A 2010 industry paper[126] written by StrataGen Engineering and CMG (industry consultants) again highlights the importance of HVHF design and monitoring:

---

[124] Shelley, R.F., Lolon, E., and Dzubin, B. (StrataGen Engineering ), and Vennes, M. (El Paso Exploration and Production), Quantifying the Effects of Well Type and Hydraulic Fracture Selection on Recovery for Various Reservoir Permeability Using a Numerical Reservoir Simulator, Society of Petroleum Engineers Paper, SPE 133985, 2010, Pages 1 and 12.

[125] Cipolla, C.L., Fitzpatrick, T., Williams, M.J., and Ganguly, U.K., (Schlumberger), Seismic-to-Simulation for Unconventional Reservoir Development, Society of Petroleum Engineers Paper, SPE 146876, 2011, Page 1.

Harvey Consulting, LLC.                                                                  Report to NRDC January 2012

> *The widespread application of microseismic mapping has significantly improved our understanding of hydraulic fracture growth in unconventional gas reservoirs (primarily shale) and led to better stimulation designs. However, the overall effectiveness of stimulation treatments is difficult to determine from microseismic mapping, as the location of proppant and distribution of conductivity in the fracture network cannot be measured (and are critical parameters that control well performance). Therefore __it is important to develop reservoir modeling approaches that properly characterize fluid flow in and the properties of a complex fracture network, tight matrix, and primary hydraulic fracture (if present) to evaluate well performance and understand critical parameters that affect gas recovery__ [emphasis added].*

> *Given the complex nature of hydraulic fracture growth and the very low permeability of the matrix rock in many shale-gas reservoirs combined with the predominance of horizontal completions, __reservoir simulation is commonly the preferred method to predict and evaluate well performance__ [emphasis added].*

> *The most rigorous method to model shale-gas reservoirs is to discretely grid the entire reservoir, including the network fractures, hydraulic fracture, matrix blocks, and un-stimulated areas – but this increases computational time. However, with the continual advances in computing power, much more complex numerical models can be efficiently utilized.*

In 2010, Atlas Energy Resources published a Society of Petroleum Engineering Paper that explained the importance of reservoir characterization, modeling, the use of minifracs, and the use of microseismic data. Atlas Energy Resources explained that the use of advanced technology is good business:

> *This paper describes a procedure to enhance production in the Marcellus shale while optimizing economics through integration of minifrac, fracture treatment, microseismic, and production data technologies.*

> *Application of this integrated technology approach will help prodvide the operator with a systematic approach for designing, analyzing, and optimizing multi-stage/multi-cluster transverse hydraulic fractures in horizontal wellbores.[127]*

An engineering analysis and modeling prior to a HVHF treatment provides industry, regulators, and the public with confidence that the treatment has been thoroughly evaluated and designed to protect the environment. It is not sufficient for industry and NYSDEC to say this work is being done, while being unwilling to require it. If this work is being done, then creating a formal requirement in the SGEIS and NYCRR does not impose an incremental burden on the operator. Resistance to a formal requirement should signal to NYSDEC that industry best practice is not always followed.

While industry literature explains the need for hydraulic fracture modeling, this does not guarantee it will actually be implemented by all shale gas operators in NYS. Shale gas drilling has attracted numerous small, less experienced operators. Computational modeling requires personnel with expertise in building models, running them, and refining datasets. If the operator does not have sufficient in-house engineering and geophysical expertise, it should be required to hire experts to provide the necessary expertise.

---

[126] Cipolla, C.L., Lolon, E.P. (StrataGen Engineering), Erdle, J.C., and Rubin, B. (CMG), Reservoir Modeling in Shale-Gas Reservoirs, Society of Petroleum Engineers Paper, SPE 125530, 2009, Pages 1,3, and 4.

[127] Henry Jacot, R. (Atlas Energy Resources), Bazan, L.W. (Bazan Consulting, Inc.), Meyer, B.R. (Meyer & Associates Inc.), Technology Integration – A Methodology to Enhance Production and Maximize Economics in Horizontal Marcellus Shale Wells, Society of Petroleum Engineers Paper, SPE 135262, 2010, Page 1.

> **Recommendation No. 32:** Best practices for HVHF design and monitoring should be included in the SGEIS as a mitigation measure, and codified in NYCRR as a minimum standard.

Additionally, Alpha Geoscience, ICF, Ground Water Protection Council, HCLLC, and industry all agree that additional technical work is needed to develop new shale gas play areas; yet the 2011 RDSGEIS does not require the operator to develop or maintain a hydraulic fracture model. Instead, the 2011 RDSGEIS only requires the operator to abide by a 1000' vertical offset from protected aquifers and collect data during the HVHF job to evaluate whether the job was implemented as planned.[128]

Knowing whether a job was implemented as planned is only helpful if the initial design is protective of human health and environment. If the job is poorly planned, and is implemented as planned, that only proves that a poor job was actually implemented. This approach would not be in NYS' best interest.

Instead, NYS needs to first verify that the operator has engineered a HVHF treatment that is protective of human health and environment, and then, second, verify that the job was implemented to that protective standard. A rigorous engineering analysis is a critical design step. Proper design and monitoring of HVHF jobs is not only best practice from an environmental and human health perspective, it is also good business because it optimizes gas production and reduces hydraulic fracture treatment costs.

The 2011 RDSGEIS does not require a HVHF design plan.[129] The RDSGEIS does not require the operator to:

    (a)  Estimate the vertical and horizontal fracture length;

    (b)  Verify that the proposed HVHF design will not intersect protected groundwater or nearby wells;

    (c)  Use a site-specific hydraulic fracture model, based on NYS specific shale characteristics and the operational design parameters of the planned HVHF job (volume, pressure, rate, etc.).

> **Recommendation No. 33:** The SGEIS and NYCRR should require the operator to:
>
> (a)  Estimate the maximum vertical and horizontal fracture propagation length for each well, and submit technical information (e.g. model output) with its application to support its computations.
>
> (b)  Describe in its post-well completion report whether the predicted vertical and horizontal fracture propagation lengths were accurate, or note discrepancies.
>
> (c)  Certify that the actual HVHF job was implemented safely, and fracture propagations did not intersect protected aquifers or nearby wells.
>
> Additionally, NYS should reserve the right, and provide funding, to periodically review industry's models and computations to assess quality and verify this work is being completed.

---

[128] 2011 NYSDEC, RDSGEIS, Page 5-88.

[129] The operator is only required to verify that the vertical offset of 1000' is achieved and the shale is at least 2000' deep.

The 2011 RDSGEIS assumes that any HVHF job, no matter the volume, no matter the pressure, and no matter the shale thickness, will be safe, as long as it is conducted at a depth below 2,000'. The 2011 RDSGEIS recommends that site-specific SEQRA reviews be limited to wells shallower than 2000' and within 1000' of a protected aquifer.[130] The RDSGEIS lacks technical and scientific data to support the hypothesis that all HVHF treatments, regardless of design, at 2000' or deeper will be safe. Additionally, the RDSGEIS does not address safe horizontal fracture length.

NYSDEC does not provide data on HVHF treatments conducted between 2000' and 5000' deep; yet, NYS proposed to allow shale gas drilling at these depths. Instead, the RDSGEIS relies on limited data collected from Marcellus Shale fractures conducted in other states at depths below 5000'. However, even industry points out that data collected in one part of the Marcellus Shale cannot be applied to the entire shale.

For example, Guardian Exploration and Universal Well Services reports that optimal Marcellus Shale HVHF treatments are still being developed, and that a "one-size-fits-all approach should not be expected. They anticipate that industry will examine the use of higher rates and increased fluid volume and proppant mass in the future resulting in varied fracture lengths from current HVHF jobs:

> ***Much work remains to be done in determining the optimal stimulation treatment for the Marcellus shale. Certainly given the extremely large geographic area encompassed by the Marcellus play, it should not be expected that one size will fit all.*** *While the treatment discussed here has been considered successful,* ***future projects will examine the effects of increased rate, increased volumes in terms of both overall fluid volume and proppant mass, the effects of varying the proppant mesh ratios and concentrations, and optimization of flowback/cleanup rates.*** *The utilization of evaluation tools such as microseismic monitoring of fracture growth and horizontal drilling and completions to enhance reservoir development should also prove to be beneficial [emphasis added].*[131]

As HVHF treatment methods continue to evolve, NYSDEC must either set a limit in the SGEIS and NYCRR for the upper bounds of a safe HVHF job, or it must have a process in place for industry to provide site-specific engineering to support each well application to ensure that new HVHF designs are safe.

NYSDEC assumes that 1000' vertical separation between the bottom of the protected groundwater zone and the top of the shale zone where HVHF will occur is sufficiently protective, regardless of shale thickness, HVHF job size, and other subsurface characteristics. However, this approach is not technically supported. The 2011 RDSGEIS concludes:

> *As explained in Section 6.1.5.2, the conclusion that* ***harm from fracturing fluid migration up from the horizontal wellbore is not reasonably anticipated is contingent upon the presence of certain natural conditions, including 1,000 feet of vertical separation between the bottom of a potential aquifer and the top of the target fracture zone.*** *The presence of 1,000 feet of low-permeability rocks between the fracture zone and a drinking water source serves as a natural or inherent mitigation measure that protects against groundwater contamination from hydraulic fracturing [emphasis added].*[132]

---

[130] 2011 NYSDEC, RDSGEIS, Page 7-59.

[131] Fontaine, J., and Johnson, N. (Universal Well Services), and Schoen, D. (Guardian Exploration), Design, Execution, and Evaluation of a "Typical" Marcellus Shale Slickwater Stimulation: A Case History, Society of Petroleum Engineers Paper, SPE 117772, 2008, Page 11.

[132] 2011 NYSDEC, RDSGEIS, Page 7-59.

Neither the 2009 DSGEIS nor the 2011 RDSGEIS contain site-specific NYS Marcellus Shale hydraulic fracture model data to support NYSDEC's conclusion that a 1,000' vertical separation will be protective in all cases in NYS, especially where thinner, shallower shales are present. Furthermore, the 2011 RDSGEIS lacks data on vertical and horizontal fracture propagation in the Marcellus Shale at depths between 2000' and 5000' (depths that NYS proposes to permit).

The behavior of HVHF propagation in NYS is not currently well understood. HCLLC was unable to locate any NYS site-specific hydraulic fracture models for the Marcellus, Utica, or other low-permeability reservoirs. If these models exist, they should be described in the SGEIS, and NYSDEC should explain how it used the data from these models to inform its SGEIS.

Instead, the RDSGEIS currently relies on Marcellus Shale HVHF data from other states that may not be applicable to NYS. For example, NYSDEC points to data collected on 400 Marcellus hydraulic fractures conducted in Pennsylvania, West Virginia, and Ohio. This data was summarized in a three page article in the American Oil & Gas Reporter in July 2010:

> *Four hundred Marcellus hydraulic fracturing stages in Pennsylvania, West Virginia and Ohio have been mapped with respect to vertical growth and distance to the deepest water wells in the corresponding areas. Although many of the hydraulic fracturing stages occurred at depths greater than the depths at which the Marcellus occurs in New York, the results across all depth ranges showed that induced fractures did not approach the depth of drinking water aquifers. In addition, as previously discussed, at the shallow end of the target depth range in New York, fracture growth orientation would change from vertical to horizontal.[133]*

NYSDEC's conclusions rely heavily on the American Oil & Gas Reporter three-page article (Fisher, 2010); yet NYSDEC does not further investigate the origin of the data contained in this article or its implications for shale development in NYS. Fracture growth is a function of type of formations located above and below the Marcellus Shale. Subsurface geology will vary across states and the RDSGEIS does not explain how this data is applicable to NYS.  For example, this article:

- Does not provide any information on the maximum HVHF job size (volumes, pressures, rates, etc.) to verify whether the fracture treatments conducted and analyzed are equivalent to the maximum HVHF job size anticipated in NYS;

- Does not provide any information on the Marcellus Shale thickness or geophysical properties present during the HVHF treatments;

- Shows that vertical fractures in excess of 1000' were observed (the plot, which is copied from the Fisher 2010 report and provided below, shows a 1500' vertical fracture propagated at 6300');

- Does not show what the vertical fracture growth height would be in the 2000-5000' Marcellus Shale depth interval that NYS proposes to develop; and,

- Does not show the horizontal distance that a fracture will propagate at the shallower shale depths NYS plans to develop.

---

[133] 2011 NYSDEC, RDSGEIS, Page 6-56.

A more in-depth technical paper written by Kevin Fisher (Halliburton) in 2011 appears to be the origin of the data cited in the American Oil & Gas Reporter article.  Fisher's 2011 paper[134] concludes that:

> **_Fracture lengths can sometimes exceed a thousand feet_** when contained with a relatively homogeneous layer [emphasis added].
>
> **_At depths deeper than about 2,000 ft_**, the vertical stress or overburden is generally the largest single stress so **_the principal fracture orientation is expected to be vertical_** on deeper wells [emphasis added].
>
> **_At some point on shallow wells, the overburden stress will decrease to a point where it is less than the maximum horizontal stress and, at this point, one would expect the fracture growth to be horizontal and not vertical._** As wells get shallower, and the overburden stress lessens, mapped fractures are typically observed exhibiting increasingly larger horizontal components. **_All of the fractures do not necessarily turn horizontal; they might have significant vertical and horizontal components with more of a T-shaped geometry,_** but the horizontal components can become significant and could thieve away enough fluid causing a blunting effect, limiting upward fracture-height growth [emphasis added].

The Marcellus fracture height figure shown in the American Oil & Gas Reporter is provided below; HCLLC annotated it to identify additional evaluation that is needed for NYS.



The use of vertical offset limits to separate hydrocarbon recovery operations from protected aquifers is a reasonable approach, but it must be scientifically and technical supported. While it is possible that a 1,000' vertical offset may potentially be sufficiently protective; the 2011 RDSGEIS does not provide sufficient scientific data or technical examination to support this recommended threshold.

---

[134] Fisher, K. and Warpinski, N., Pinnacle- A Halliburton Service, Hydraulic Fracture-Height Growth: Real Data, Society of Petroleum Engineers Paper, SPE 145949, 2011, Pages 1-2 and 5.

In addition to understanding the maximum vertical fracture propagation height, horizontal fracture propagation distance is an important consideration, especially when developing shallower shale zones. Fractures in shallower formations will tend to propagate on the horizontal plane. HVHF treatments should be designed to prevent fractures from intersecting with existing improperly constructed and improperly abandoned wells, and transmissive faults and fractures, which can provide pollutants a direct pathway to protected groundwater resources.

For example, in 2010 the BC Oil & Gas Commission issued a safety advisory on the risks of fracture treatments intersecting adjacent wells. The advisory specifically notified industry that:

> *A large kick was recently taken on a well being horizontally drilled for unconventional gas production in the Montney formation. **The kick was caused by a fracturing operation being conducted on an adjacent horizontal well. Fracture sand was circulated from the drilling wellbore, which was 670m [~2200'] from the wellbore undergoing the fracturing operation.** [emphasis added].[135]*

Additionally, the advisory reported 18 known fracture communication incidents in B.C. and one in Western Alberta: five incidents of fracture stimulation communicating with an adjacent well; three incidents of drilling into a hydraulic fracture formed during a previous stimulation on an adjacent well and containing high pressure fluids; 10 incidents of fracture stimulations communicating into adjacent producing wells, and one incident of fracture stimulations communication into an adjacent leg on the same well for a multi-lateral well. Therefore fracture stimulations communication with adjacent wells is a known and reasonably foreseeable risk.

The 2011 RDSGEIS includes a wellbore schematic used in presentations given by the NYSDEC Commissioner. This wellbore schematic, shown below, depicts an example Marcellus Shale well. In the example the base of freshwater is at 500', the well is drilled to a depth of 4,000', and the horizontal length of the well is 4,000'.

---

[135] BC Oil & Gas Commission, Safety Advisory 2010-03, Communication During Fracture Stimulation, May 20, 2010.

Harvey Consulting, LLC.                                                    Report to NRDC January 2012



Drawing from: Presentation by Commissioner Joe Martens NYS Department of Environmental Conservation, 2011 Supplemental Generic Environmental Impact Statement for High-Volume Hydraulic Fracturing showing a 500' freshwater depth and a 4,000' HVHF well.

The drawing does not represent the highest risk wells proposed in the 2011 RDSGEIS. The highest risk wells allowed under the 2011 RDSGEIS would be drilled into a thin section of the Marcellus Shale at a 2,000' depth, with protected water located above at 1,000'. Below is an annotated version of this wellbore schematic, prepared by HCLLC, showing the higher risk wells proposed under the RDSGEIS.



Drawing from: Presentation by Commissioner Joe Martens NYS Department of Environmental Conservation, 2011 Supplemental Generic Environmental Impact Statement for High-Volume Hydraulic Fracturing was annotated by HCLLC to show a HVHF well constructed at 2,000' depth, the base of freshwater at least at 1,000' and a theoretical uncertainty zone associated with vertical and horizontal fracture propagation at 2,000' depth.

As explained in Chapter 9 of this report , if a HVHF treatment intersects with a nearby improperly abandoned well, the potential exists for the improperly abandoned well to become a vertical conduit, and therefore transfer hydraulic fluid and mobilized gas to protected aquifers. Additionally, the pollution risk posed by possible HVHF intersections is not limited to improperly abandoned wells; existing wells that were poorly designed and constructed could also pose a risk.

Physics dictate that fractures form perpendicular to the direction of the least amount of stress. Vertical fracture height will decrease with depth, and horizontal fracture length will increase.

NYSDEC proposes that operators identify wells within a mile radius around the surface location of a HVHF well, to identify wells that might be at risk of intersection with HVHF treatments.[136] However, NYSDEC does not provide technical data to support a mile radius. The 2011 RDSGEIS does not specify a maximum horizontal drilling length. Although NYSDEC's spacing rules may impose some limitation on this length, limitations are not clearly explained in the RDSGEIS.

The RDSGEIS should identify the maximum horizontal fracture propagation distance that could occur in a shallow well to ensure that HVHF treatments do not intersect existing wellbores. This should be included in the SGEIS. Limits on horizontal drilling section lengths and HVHF job size, including a safety zone around each HVHF well, should also be established.

> **Recommendation No. 34:** The SGEIS should provide a basis for the maximum horizontal well drilling limit. The SGEIS should also explain how the operator will verify that the maximum horizontal well drilling limit, plus the maximum predicted horizontal fracture length, will avoid nearby well intersection.

The most logical way forward is to begin by limiting development to the deepest Marcellus Shale intervals, maximizing the vertical separation from drinking water aquifers. Once accurate, field-calibrated 3D reservoir simulation models are available for NYS, development can then move to shallower intervals, as long as technical data shows that treatments will remain in zone.

> **Recommendation No. 35:** The SGEIS should technically justify vertical and horizontal HVHF treatment offsets. Proposed offsets should be supported by hydraulic fracture modeling. Modeling should reflect the maximum HVHF job designs allowed in NYS and shale reservoir characteristics. NYSDEC should provide public access to the scientific data and hydraulic fracture models it uses to develop vertical and horizontal offsets for the purposes of the SGEIS.

Drilling into the deepest, thickest Marcellus Shale intervals (e.g., below 4000') will maximize data collection, affording access to all overlying intervals. Core samples, well logs, and pressure transient data can be obtained, verifying whether there are continuous permeability barriers hydraulically separating the Marcellus Shale and the overlying drinking water aquifers, and geologic barriers that will limit fracture propagation. Initially, smaller fracture treatments should be used as tests. These treatments can be increased in size over time, if data support the conclusion that large fracture treatments can remain in zone. As data are collected, and 3D reservoir models are developed and refined, it may be possible to safely develop the Marcellus at shallower depths and in thinner intervals.

NYSDEC's recommendation to move forward with shale gas development, absent additional engineering data and hydraulic fracture models, is technically unsupported and in direct conflict with the information cited in its 2009 DSGEIS and 2011 RDSGEIS, as well as its own consultants' recommendations.

---

[136] 2011 NYSDEC, RDSGEIS, Page 6-56.

**Recommendation No. 36:** The SGEIS should include a more thorough examination of hydraulic fracture modeling. The SGEIS and NYCRR should require the operator to:

(a) Collect additional geophysical and reservoir data to support a reservoir simulation model;

(b) Develop a high-quality Marcellus Shale 3D reservoir model(s) to safely design fracture treatments;

(c) Maintain and run hydraulic fracture modeling prior to each fracture treatment to ensure that the fracture is contained in zone;

(d) Collect and carefully analyze data from HVHF treatments to optimize future HVHF treatments;

(e) Initially complete HVHF treatments in the deepest, thickest sections of the Marcellus Shale to gain data and experience before proceeding to shallower zones (e.g. 4000' deep and 150' thick, progressively moving shallower as more NYS site-specific information is collected); and

(f) Conduct post-fracture analysis, and provide that analysis to NYS to demonstrate that the HVHF treatment was safely implemented.

**NYCRR Proposed Revisions**: There are no proposed revisions in the NYCRR. As proposed, the NYCRR do not require operators to:

(a) Submit a HVHF designs to NYS;

(b) Estimate the vertical and horizontal fracture length;

(c) Provide engineering analysis and run HVHF modeling;

(d) Monitor HVHF performance to ensure that HVHF design and actual implementation in the field match; and

(e) Notify NYSDEC if the actual vertical and/or horizontal fracture length greatly exceeds the job design, such that risk may be present to the environment.

## 11. Hydraulic Fracture Treatment Additive Limitations

**Background**: In 2009, HCLLC recommended that NYS regulations identify fracture treatment additives that are protective of human health and the environment. HCLLC also recommended that the NYCRR include a list of prohibited chemical additives.

**2011 RDSGEIS**: The 2011 RDSGEIS includes improvements in the handling and storage of HVHF chemicals by requiring chemicals to be stored in suitable containers placed in secondary containment. Additionally, NYSDEC encourages operators to select the lowest toxicity chemicals. However, neither the 2011 RDSGEIS nor the proposed NYCRR amendments establish a prohibited chemical list, nor do they **require** an operator to use the lowest toxicity chemicals. Instead, the 2011 RDSGEIS requires only that the operator evaluate alternative products. Ultimately, the operator is allowed to select the final chemicals used with no firm evaluation criteria listed in the NYCRR to rule out harmful chemicals.

**NYCRR Proposed Revisions**: Proposed regulations at 6 NYCRR § 560.3(c)(1)(v) require only that the operator provide:

> *Documentation that proposed chemical additives exhibit reduced aquatic toxicity and pose a lower potential risk to water resources and the environment than available alternatives; or documentation that available alternative products are not equally effective or feasible.*

The proposed regulation requires the operator to examine chemicals that "exhibit reduced aquatic toxicity" and a "lower risk to water resources," but the NYCRR does not provide specific criteria for determining what is an acceptable reduction in toxicity or an acceptable reduction in risk.

The 2011 RDSGEIS guides the operator to conduct a five-part analysis:

> *The evaluation criteria should include (1) impact to the environment caused by the additive product if it remains in the environment, (2) the toxicity and mobility of the available alternatives, (3) persistence in the environment, (4) effectiveness of the available alternative to achieve desired results in the engineered fluid system, and (5) feasibility of implementing the alternative.[137]*

However the 2011 RDSGEIS does not instruct the operator on what is required if any part of the five-part analysis has an unacceptable outcome, nor does the NYCRR. For example, if an operator proposes a chemical additive that is known to impact the environment and be persistent if it remains in the environment, but the operator proposes no other alternative, or states that this is the only chemical that will be effective for its planned job, neither the RDSGEIS or the NYCRR prohibit the operator from using this chemical even if it is harmful.

As proposed, the NYCRR would still allow the use of a highly toxic chemical, as long as it was slightly less toxic than the most toxic chemical available. This is not best practice. Best practice would be to use the chemical with the lowest impact and risk, not just a slightly improved risk. Best practice would also be for NYS to develop a list of prohibited chemicals that pose an unacceptable risk to human health and the environment.

---

[137] 2011 NYSDEC, RDSGEIS, Page 8-30.

The 2011 RDSGEIS concludes that it is not possible for hydraulic fracturing to contaminate groundwater, erroneously assuming that all wells will be flawlessly constructed and operated, and that no human error is possible that would put hydraulic fracturing additives in contact with groundwater, with the exception of a potential surface spill. The 2011 RDSGEIS concludes:

> *The regulatory discussion in Section 8.4 concludes that adequate well design prevents contact between fracturing fluids and fresh ground water sources, and text in Chapter 6 along with Appendix 11 on subsurface fluid mobility explain why ground water contamination by migration of fracturing fluid is not a reasonably foreseeable impact.[138]*

The 2011 RDSGEIS should be revised to clarify that groundwater contamination by hydraulic fracturing fluids is a reasonably foreseeable impact that requires mitigation. Well construction failures, engineering design flaws, human error, mechanical malfunctions, and chemical spills all are reasonably foreseeable events, and have occurred at Marcellus Shale operations in Pennsylvania.[139] Additionally, Dr. Myers identifies the potential long-term contaminant transport through conductive faults, natural fractures, and advective transport.[140]

Groundwater contamination has been attributed to operational failures at various Marcellus Shale gas development operations in Pennsylvania, including operations by Cabot Oil & Gas Corporation, Catalyst Energy, Inc., and Chesapeake Energy Corporation.

For example, on February 27, 2009, the Pennsylvania Department of Environmental Protection (PADEP) issued a Notice of Violation to Cabot Oil & Gas Corporation for unpermitted discharge of polluting substances and failure to prevent gas from entering fresh groundwater, among other deficiencies, in connection with its drilling activities in Dimock Township.[141] PADEP inspectors *"...discovered that the well casings on some of Cabot's natural gas wells were cemented improperly or insufficiently, allowing natural gas to migrate to groundwater...DEP ordered Cabot to cease hydro fracking natural gas wells throughout Susquehanna County."[142]* In April 2010, under its consent order and agreement with PADEP, Cabot was required to plug three leaking wells that contaminated the groundwater and drinking water supplies of 14 homes in the region.[143]

In 2011, PADEP issued a cease and desist order to Catalyst Energy, Inc. that prohibited the company from conducting drilling and hydraulic fracturing operations, after a PADEP investigation confirmed that private water supplies serving two homes had been contaminated by natural gas and elevated levels of iron and manganese from Catalyst's operations.[144]

In May 2011, PADEP fined Chesapeake Energy Corporation $1,088,000 for violations related to natural gas drilling activities that contaminated private water supplies in Bradford County. PADEP issued a news release reporting:

---

[138] 2011 NYSDEC, RDSGEIS, Page 8-29.

[139] DEP Investigating Lycoming County Fracking Fluid Spill at XTO Energy Marcellus Well, November 22, 2010, available at http://www.portal. state.pa.us/portal/server.pt/community/newsroom/
14287?id=15315&typeid=1

[140] Dr. Tom Myers, Comments Prepared for NRDC on 2011 RDSGEIS, 2012.

[141] http://www.portal.state.pa.us/portal/server.pt/community/newsroom/14287?id=2418&typeid=1.

[142] http://www.portal.state.pa.us/portal/server.pt/community/newsroom/14287?id=2418&typeid=1.

[143] http://www.portal.state.pa.us/portal/server.pt/community/newsroom/14287?id=10586&typeid=1.

[144] DEP Orders Catalyst Energy to Stop Operations at Gas Wells in Forest County Village, available at http://www.portal.state.pa.us/portal/server.pt/community/newsroom/14287?id=16894&typeid=1.

*DEP determined that because of improper well casing and cementing in shallow zones, natural gas from non-shale shallow gas formations had experienced localized migration into groundwater and contaminated 16 families' drinking water supplies.*[145]

If HVHF treatments are conducted in poorly constructed wells, there exists a potential for groundwater contamination. Therefore, as NYSDEC recommends, well construction must be robust, and the use of safe HVHF treatment additives provides any extra layer of protection in the event that human error or mechanical malfunction create a pathway for such additives to reach groundwater. Reducing the toxicity of hydraulic fracturing additives by listing prohibited additives mitigates the impact of both surface and groundwater pollution if it occurs.

> **Recommendation No. 37**: NYSDEC should develop a list of prohibited fracture treatment additives based on the known list of chemicals currently used in hydraulic fracturing. The list of prohibited fracture treatment additives should apply to all hydraulic fracture treatments, not just HVHF treatments. NYSDEC should also develop a process to evaluate newly proposed hydraulic fracturing chemical additives to determine whether they should be added to the prohibited list. No chemical should be used until NYSDEC and/or the NYSDOH has assessed whether it is protective of human health and the environment, and has determined whether or not it warrants inclusion on the list of prohibited hydraulic fracturing chemical additives for NYS. The burden of proof should be on industry to demonstrate, via scientific and technical data and analysis, and risk assessment work, that the chemical is safe. Fracture treatment additive prohibitions should be included in the SGEIS as a mitigation measure and codified in the NYCRR.

The 2009 DSGEIS Section 5.3[146] stated that NYSDEC collected compositional information from chemical suppliers and service companies on many of the additives proposed for use in shale fracture treatments. NYSDEC reported partial compositional data on 197 products and complete compositional data on 152 products. Tables 5.3-5.7 provided lists of chemicals proposed for use in fracture treatments, and Section 5.4.3.1 described the potential health impacts of categories of chemicals. Yet the 2009 DSGEIS did not arrive at any recommendation or conclusion about which fracture treatment additives are acceptable for use in NYS and which are not. This problem persists in the 2011 RDSGEIS.

Chapter 5 of the 2011 RDSGEIS explains that NYSDOH reviewed information on 322 unique chemicals present in 235 products proposed for hydraulic fracturing of shale formations in New York and categorized them into chemical classes, but did not develop any recommendations for prohibiting specific HF additives. The 2011 RDSGEIS merely concludes that the 322 unique chemicals studied did not identify any potential exposure situations that are qualitatively different from those addressed in the 1992 GEIS.[147] This conclusion has little significance, since the 1992 GEIS did not establish any criteria for limiting or prohibiting HF chemical additives (i.e., for mitigating potential significant adverse impacts from exposure to these additives). For example, Dr. Miller points out that acrylonitrile and acrylamide are listed, and known to be carcinogenic and quite toxic, but fairly short lived in an aqueous environment.[148] As proposed, NYSDEC would allow these carcinogenic, toxic chemicals to be used, unless industry proposes a less-harmful chemical. The appropriate step for NYS would be to add acrylonitrile and acrylamide, among other chemical that pose a risk to human health or the environment, to the list of prohibited chemicals in NYS.

---

[145] DEP Fines Chesapeake Energy More Than $1 Million, available at
http://www.portal.state.pa.us/portal/server.pt/community/newsroom/14287?id=17405&typeid=1.

[146] 2009 NYSDEC, DSGEIS, Page 5-34.

[147] 2011 NYSDEC, RDSGEIS, Page 8-29.

[148] Dr. Glenn Miller, Comments Prepared for NRDC on 2011 RDSGEIS, 2012.

Although the percentage of hydraulic fracturing fluid that is composed of chemicals may be small—typically 0.5 to 2 percent of the total volume required for a Marcellus Shale hydraulic fracture stimulation—the absolute volume of chemicals used is very large. A typical Marcellus Shale well may require the use of more than five million gallons of freshwater for drilling and hydraulic fracturing. A five million gallon hydraulic fracture treatment would require approximately 25,000 to 100,000 gallons of hydraulic fracturing chemicals per well at a chemical additive dosage of 0.5 to 2 percent. Some of these chemicals are toxic, including known or possible human carcinogens, chemicals regulated under the Safe Drinking Water Act due to their risks to human health, and chemicals regulated under the Clean Air Act as hazardous air pollutants.[149]

> **Recommendation No. 38**: The SGEIS should do more than just list chemicals proposed by industry for HVHF operations and describe their toxicity; the SGEIS should identify chemicals that should be prohibited or used with limitations to protect human health and the environment.

Additionally, the 2011 RDSGEIS includes a process for reviewing chemicals proposed by industry that appears to have little value or scientific rigor.

> *For every well permit application the Department would require, as part of the EAF Addendum, identification of additive products, by product name and purpose/type, and proposed percent by weight of water, proppants and each additive. This would allow the Department to determine whether the proposed fracturing fluid is water-based and generally similar to the fluid represented by Figures 5.3, 5.4, and 5.5.*[150]

Figures 5.3, 5.4, and 5.5 in the 2011 RDSGEIS are merely pie charts showing example compositions from previous Fayetteville and Marcellus Shale HVHF jobs. The 2011 RDSGEIS does not include a scientific analysis of the proposed HVHF compositions to verify if these mixtures are optimal. Therefore, there is little scientific value in having NYSDEC staff compare an operator's proposed HVHF composition to these figures, because NYSDEC has not even completed the fundamental scientific analysis to verify whether these proposed treatment compositions are protective of human health and the environment and whether the figures are a suitable yardstick.

The 2011 RDSGEIS proposes to require industry to submit a Material Safety Data Sheet (MSDS) for every new product that is not currently listed by NYSDEC in Chapter 5 of the 2011 RDSGEIS. NYSDEC explains that the MSDS will provide it with more information on the proposed chemical, but does not institute a plan for taking action to limit or prohibit hazardous chemical use based on a review of that MSDS. Instead, the 2011 RDSGEIS appears to propose that NYSDEC will just collect MSDS information and take no action, other than to accept the chemicals selected by the operator and add the MSDS to NYSDEC's file system.

> *The Department would also require the submittal of an MSDS for every additive product proposed for use, unless the MSDS for a particular product is already on file as a result of the disclosure provided during the preparation process of this SGEIS (as discussed in Chapter 5) or during the application process for a previous well permit. Submittal of product MSDSs would provide the Department with the identities, properties and effects of the hazardous chemical constituents within each additive proposed for use.*[151]

---

[149] United States House of Representatives, Committee on Energy and Commerce, Minority Staff, Chemicals Used in Hydraulic Fracturing, April 2011.

[150] 2011 NYSDEC, RDSGEIS, Page 8-30.

[151] 2011 NYSDEC, RDSGEIS, Page 8-30.

The 2011 RDSGEIS goes on to say that NYSDEC staff will verify, by reviewing the well completion form, that the chemicals proposed by industry in a permit application (with no limitations or prohibitions by NYSDEC) were actually the same chemicals used on the HVHF job.

> *In addition to the above requirements for well permit applications, the Department would continue its practice of requiring hydraulic fracturing information, including identification of materials and volumes of materials utilized, on the well completion report which is required, in accordance with 6 NYCRR §554.7, to be submitted to the Department within 30 days after the completion of any well. This requirement can be utilized by Department staff to verify that only those additive products proposed at the time of application, or subsequently proposed and approved prior to use, were utilized in a given high-volume hydraulic fracturing operation.[152]*

The proposed review process holds little scientific or audit value, since NYSDEC is not limiting chemicals in the initial application. It is insufficient to bind industry to use specific chemicals at the tail end of the permitting process, when industry can propose any chemical for use on the front-end.

However, the proposed chemical audit review process would have great value if NYSDEC limited or prohibited chemical use in the initial application. In that case, a post-HVHF review process would be valuable to verify that prohibited chemicals were not used.

There are several international models in place that NYSDEC could consider using to develop a prohibited chemical list, or to develop an approved list of chemical, or both. Below is a short summary of three models that could be considered: (1) the Oslo-Paris Convention (OSPAR) list of environmentally friendly chemicals (chemicals considered to Pose Little Or No Risk (PLONOR) for the oil and gas industry); (2) Canada-Newfoundland and Labrador Offshore Petroleum Board (C-NLOPB) Offshore Chemical Selection Guidelines for Drilling & Production Activities on Frontier Lands; and (3) the Norwegian Pollution Control Authority chemical coding system for the oil and gas industry. These governmental entities prohibit use of chemicals that have harmful characteristics, such as: low biodegradability; high bioaccumulation potential; high acute toxicity; and detrimental mutagenic or reproductive effects.

**OSPAR PLONOR**: Certain European governmental entities have developed a list of environmentally friendly chemicals. Under the Oslo-Paris Convention (OSPAR)[153] a list of chemicals that were considered to Pose Little Or No Risk (PLONOR) to the marine environment was developed for use in drilling and stimulation treatments. The PLONOR list was initially developed in early 2000 and has been amended several times to add and de-list chemicals. The PLONOR list has been very effective in reducing chemical pollution from offshore operations, and use of the PLONOR list has expanded to onshore oil and gas operations and to other industrial sectors. HCLCC is not recommending that NYS adopt the PLONOR list without review; instead, HCLLC is recommending that NYSDEC consider a process similar to OSPAR's system to develop a list of hydraulic fracturing treatment additives that would pose little or no risk to human health or the environment if the chemicals spilled, leaked, or were improperly disposed, or, in the alternative, consider developing a list of chemicals to be prohibited from use in hydraulic fracturing operations.

---

[152] 2011 NYSDEC, RDSGEIS, Page 8-31.

[153] The Convention for the Protection of the Marine Environment of the North-East Atlantic (the "OSPAR Convention") was opened for signature at the Ministerial Meeting of the former Oslo and Paris Commissions in Paris on 22 September 1992. The Convention entered into force on 25 March 1998. It has been ratified by Belgium, Denmark, Finland, France, Germany, Iceland, Ireland, Luxembourg, Netherlands, Norway, Portugal, Sweden, Switzerland and the United Kingdom and approved by the European Community and Spain.

The OSPAR process is straight forward: the establishment of criteria for inclusion of substances on the PLONOR list. Industry has the burden of proof to provide scientific and technical data to support listing of a chemical as PLONOR—i.e., industry must prove the chemical poses little or no risk. The OSPAR Commission reviews the data and makes the final listing determination. The Commission also can remove chemicals from the PLONOR list if new information comes to light warranting a de-listing. A current list of PLONOR chemicals can be found at the OSPAR website.[154]

**C-NLOPB Guidelines:** The Canada-Newfoundland and Labrador Offshore Petroleum Board has developed guidelines that industry must follow to select less harmful chemicals used in their offshore oil and gas operations.[155] Industry operators must demonstrate that they have incorporated a chemical selection process in their management system that conforms to the guidelines, and the Board has the ability to audit industry compliance. The guidelines are reviewed at least once every five years to ensure that gains in scientific and technical knowledge are incorporated, and more frequent reviews may be initiated if significant risks are identified. The C-NLOPB Guidelines rely in part on the PLONOR list, but also establish specific requirements for hazard and risk assessment.

**The Norwegian Pollution Control Authority** has developed a chemical coding system to prohibit use of harmful and toxic chemicals in the Norwegian petroleum industry. The Norwegian Pollution Control Authority system categorizes chemicals by color, using the colors: black, red, yellow and green. Black chemicals are the most hazardous, followed by red, then yellow. Green chemicals are those listed on the PLONOR list.

Black: chemicals on the OSPAR List of Chemicals for Priority Action, chemicals on the Norwegian Pollution Control Authority prioritized list (White Paper No. 21 (2004-2005)), and chemicals in the following categories, characterized by certain ecotoxicological properties:

- Substances that have both a low biodegradability ($BOD_{28}$<20%) and a high bioaccumulation potential (log $P_{OW}$•5);

- Substances that have both a low biodegradability ($BOD_{28}$<20%) and a high acute toxicity ($EC_{50}$ or $LC_{50}$•10 mg/l); and

- Substances that are detrimental in a mutagenic or reproductive way.

Red: chemicals in the following categories, characterized by certain ecotoxicological properties:

- Inorganic substances that are acutely toxic ($EC_{50}$ or $LC_{50}$•1 mg/l);

- Organic substances with a low biodegradability ($BOD_{28}$<20%);

- Substances that meet two of the three following criteria:

    o Biodegradability equivalent to $BOD_{28}$<60%;

    o Bioaccumulation potential equivalent to log $P_{OW}$•3 and molecular weight < 700; or

    o Acute toxicity of $EC_{50}$ or $LC_{50}$•10 mg/l.[156]

---

[154] OSPAR Convention for the Protection of the Marine Environment of the North-East Atlantic, OSPAR List of Substances/Preparations Used and Discharged Offshore Which Are Considered to Pose Little or No Risk to the Environment (PLONOR), Reference Number: 2004-10, 2008 Update, available at: http://www.klif.no/arbeidsomr/petroleum/dokumenter/plonor2008.pdf

[155] The Canada-Newfoundland and Labrador Offshore Petroleum Board, Offshore Chemical Selection Guidelines for Drilling & Production Activities on Frontier Lands, April 2009, available at http://publications.gc.ca/collections/collection_2009/one-neb/NE23-151-2009E.pdf.

[156] Regulations Relating to Conduct of Activities in the Petroleum Activities (The Activities Regulations), § 56b. The latest update of this list can be found on OSPAR's website under the Offshore Oil and Gas Industry, Decisions, Recommendations and other Agreements.

Green: chemicals on the OSPAR PLONOR list (chemicals considered to Pose Little Or No Risk to the marine environment).

Yellow: chemicals that are not categorized as Green, Black or Red.

> **Recommendation No. 39**: The SGEIS and the NYCRR should include a more rigorous technical and scientific review process to examine newly proposed fracture treatment additives to ensure they are protective of human health and the environment. In addition to a list of prohibited chemicals, NYSDEC should develop a list of recommended/approved fracture treatment additives that have been scientifically and technically reviewed by NYSDEC and NYSDOH and confirmed to pose little or no risk to human health or the environment. This list could be provided to industry for immediate use and would provide industry with a simplified list of chemicals that have already been determined to pose the least risk.
>
> Any chemical not found on this list, or on the list of prohibited chemicals, could be proposed by industry for future use, but would be subject to an in-depth scientific and technical justification and risk assessment review process before being added to the approved chemical list for NYS.
>
> No chemical should be used until NYSDEC and/or the NYSDOH has assessed whether it is protective of human health and the environment. Industry should bear the burden of proof of demonstrating to NYSDEC and NYSDOH that the chemical is safe. The technical and scientific review and approval process to examine newly proposed fracture treatment additives should be included in the SGEIS as a mitigation measure and codified in the NYCRR. This more rigorous technical and scientific review process should apply to all hydraulic fracture treatments, not just HVHF treatments.

## 12. Drilling Mud Composition and Disposal

**Background:** In 2009, HCLLC recommended that the NYCRR be revised to: acknowledge and mitigate drilling mud pollution impacts; minimize drilling waste generation; limit heavy metal and NORM content; and establish best practices for the collection, treatment and disposal of drilling waste.

**NYCRR Proposed Revisions:** NYSDEC proactively responded to scientific and technical information provided through the public input process, revising the NYCRR to recognize that drilling muds are polluting fluids. NYSDEC removed the existing sentence at 6 NYCRR § 554.1(c)(1) that says "drilling muds are not considered to be polluting fluids." This is an important and positive change in the regulations.

However, additional work is still needed in the proposed amendments to the NYCRR to define what types of drilling muds should be used at various depths in constructing a well. NYCRR should also be amended to include best practices for how those drilling muds should be properly handled and disposed.

In January 2011, NYS consultant, Alpha Geoscience complimented HCLLC for its recommendations on drilling mud composition and disposal and agreed that additional mitigation was warranted. Alpha Geoscience wrote: [157]

> *Harvey Consulting has commented on the need for regulation revisions to specifically address drilling mud and drilling waste. The report states "New York State regulations should be revised to acknowledge and mitigate drilling mud pollution impacts, minimize drilling waste generation, limit heavy metal and NORM (Naturally Occurring Radioactive Material) content, and establish best practices for collection, treatment and disposal of drilling waste.*

> *Current NYS regulation 6 NYCRR §554.1(c)(1) states that drilling muds are not considered polluting fluids. The 1992 GEIS allows drill cuttings to be buried onsite, and the dSGEIS does not address the potential impact. Drilling muds commonly contain barite which contains mercury (1-10 ppm) (www.fossil.energy.gov) and may also contain cadmium. NYSDEC has not set limits on the heavy metal content of drilling mud, and New York State regulations do not address how to dispose of drill cuttings containing NORM.*

> *Harvey Consulting's recommended best management practice for most applications includes a combination of waste minimization, using low impact additives, collecting waste in a closed-loop system, pumping waste to a cuttings reinjection unit, and disposing the waste into a disposal well by deep well injection. Harvey Consulting suggests NYSDEC should thoroughly analyze each situation and location to develop the best site-specific best management practices.*

> *Harvey Consulting's comments concerning the composition and handling of drilling mud and drilling waste appear to have some merit. Per 6 NYCRR §554.1 (C)(1) drilling muds are not considered polluting fluids, however the presence of mercury and cadmium in barite composed drilling muds may be cause for concern given the quantity of drilling mud that would be required to drill each well.*

---

[157] Alpha Geoscience, Review of the dSGEIS and Identification Best Technology and Best Practices Recommendations Harvey Consulting, LLC; December 28, 2009, prepared for NYSERDA, January 20, 2011, Pages 7-9.

*NYSDEC regulations do not clearly define the treatment or disposal of drilling waste and any best management practices concerning their handling, and/or recycling are not clearly outlined in the dSGEIS as documented by Harvey Consulting. Section 5.13 of the dSGEIS covers waste disposal, however it is general in its scope and does not outline any best management practices concerning the recycling, treatment, or disposal of drilling waste.*

*Harvey Consulting's review recommends that the dSGEIS include best management practices concerning the type and handling of drilling mud and the subsequent waste byproducts. It suggests that NYSDEC should determine which drilling fluid composition and disposal methods are best practices for various scenarios. **Alpha agrees that the proposed measures seem reasonable and would serve to protect the public, environment, and the drilling applicant** [emphasis added].*

**2011 RDSGEIS:** The 2011 RDSGEIS explains that drilling operators propose to drill through protected groundwater zones using compressed air or Water-Based Muds (WBM).

*The vertical portion of each well, including the portion that is drilled through any fresh water aquifers, will typically be drilled using either compressed air or freshwater mud as the drilling fluid.[158]*

The use of compressed air and WBM for drilling though the protected groundwater zones is best practice, as long as NYCRR also sets limits on the type of additives that can be mixed in the WBM formulation. WBM additives used when drilling through the protected groundwater zones should be non-toxic.

The 2011 RDSGEIS' use of the term "typically" indicates that use of compressed air and WBM for drilling though the protected groundwater zones may only occur a portion of the time. This is a best practice that should be implemented each time a well is drilled through protected groundwater zones.

While the 2011 RDSGEIS documents industry's position that it "typically" will use compressed air and WBM for the protection of groundwater, NYSDEC should *require* that practice and ensure that the requirement is codified in NYCRR. The proposed amendments to the NYCRR do not limit the types of drilling muds that can be used while drilling through protected groundwater zones. NYCRR should be revised to clearly prohibit the use of Oil-Based Muds (OBM) and Synthetic-Based Muds (SBM) drilling through protected groundwater zones and to limit additives used in the WBM to those that are non-toxic.

OBM contain diesel fuel or other hydrocarbons. SBM use synthetic oil. SBM are less harmful than OBM, but still contain materials that are toxic, bio-accumulate when discharged into water, and do not bio-degrade. For example, European nations prohibit the discharge of SBM to offshore waters, and prohibit their use when drilling through protected waters.[159] SBM are not approved by USEPA or Department of Energy for discharge offshore because they exceed USEPA's effluent limit guidelines.[160] The 2011 RDSGEIS incorrectly describes SBM as *"food-grade"* and *"environmentally friendly."[161]*

---

[158] 2011 NYSDEC, RDSGEIS, Page 5-32.

[159] Jonathan Wills, M.A., Ph.D., M.Inst.Pet., for Ekologicheskaya Vahkta Sakhalina, Muddied Waters A Survey of Offshore Oilfield Drilling Wastes and Disposal Techniques to Reduce the Ecological Impact of Sea Dumping, May 25, 2000.

[160] http://web.ead.anl.gov/dwm/techdesc/discharge/index.cfm.

[161] 2011 NYSDEC, RDSGEIS, Page 5-32.

> **Recommendation No. 40**: 6 NYCRR § 554.1(c)(1) should be revised to limit the types of drilling muds that can be used while drilling through subsurface formations that contain protected groundwater. Drilling muds should be limited to Water-Based Muds (WBM) or drilling with air. Any additives required for safe drilling through the protected groundwater interval with WBM should be limited to additives that are bio-degradable, are non-toxic, and do not bio-accumulate. The SGEIS should also include this requirement as a mitigating measure.

Neither the 2011 RDSGEIS nor the proposed amendments to the NYCRR instruct the operator on how to properly dispose of drilling fluids. NYCRR requires a disposal plan and that drilling fluids be removed from the drillsite within 45 days; however, 6 NYCRR § 554.1(c)(1) does not provide specific instructions or criteria for acceptable drilling mud disposal plans. This problem was identified by HCLLC in 2009, and is still unresolved.

This problem is magnified in light of new language in the 2011 RDSGEIS that appears to contemplate allowing drilling muds to be spread on non-active agricultural fields and other soils. The 2011 RDSGEIS includes a discussion on proposed Agricultural District requirements. One of the requirements discussed is for "spent drilling muds to be removed from active agricultural fields."[162] The RDSGEIS is silent on provisions for non-active agricultural fields and other soils, and it is unclear what NYSDEC has planned for drilling mud disposal. NYSDEC should clarify its intentions in regards to spreading drilling muds.

The 2011 RDSGEIS correctly notes that drilling mud can be reconditioned and used at more than one well,[163] but it must eventually be disposed. Drilling muds may contain mercury, metals, NORM, oils, and other contaminates. This is especially true for Marcellus Shale operations where naturally occurring radioactive material is present in the shale drill cuttings and mud mixture. Therefore, drilling muds require proper handling and disposal.[164]

Solid waste management regulations at 6 NYCRR Chapter IV, Subchapter B (Solid Waste) provide the authority by which the state (through the Division of Solid and Hazardous Materials) establishes standards and criteria for solid waste management operations, including landfills and land application. However, the RDSGEIS is unclear on what NYSDEC has deemed to be the best management practices for handling drilling waste. A recent U.S. Department of Energy review of NYSDEC's drilling waste disposal regulations concluded:

> *"The [NYS] **DEC has developed no regulations, policies, or guidelines** governing slurry injection, subsurface injection, or annular disposal of drilling wastes and reserve-pit wastes [emphasis added]."[165]*

NYSDEC has not established regulations to minimize the generation of drilling waste (e.g. reuse, recycle), or established limits on the heavy metal content of drilling mud additives.

Regulations at 6 NYCRR § 554.1(c)(1) should be revised to provide specific instructions on drilling fluid handling and disposal. Questions that need to be addressed include: Where will drilling waste be taken for treatment and disposal? What tests will be run to characterize the waste stream for proper handling,

---

[162] 2011 NYSDEC, RDSGEIS, Page 7-145.

[163] 2011 NYSDEC, RDSGEIS, Page 5-32.

[164] As explained in HCLLC's 2009 report, the mercury content in drilling mud for a Marcellus Shale well drilled to a depth of 5,000' could contain 0.5- 5.0 lbs of mercury per well, depending on barite quality, and drilling muds may also contain the heavy metal cadmium.

[165] U.S. Department of Energy, Drilling Waste Management Information System, http://web.ead.anl.gov/dwm/regs/state/newyork/index.cfm.

treatment, and disposal? Does the treatment capacity exist to handle this incremental waste in NYS? If so, where are the treatment facilities located? What types of treatments will be completed? What is the ultimate disposal location for the treatment byproducts?

> **Recommendation No. 41**: 6 NYCRR § 554.1(c)(1) should be revised to provide specific instructions on the best practices for drilling mud handling and disposal. The SGEIS should also provide specific instructions on the best practices for drilling mud handling and disposal as a mitigating measure. See Chapter 13 of this report for additional recommended disposal solutions.

## 13. Reserve Pit Use & Drill Cuttings Disposal

**Background**: In 2009, HCLLC recommended that NYSDEC adopt regulations requiring closed-loop tank systems as best practice, instead of the use of temporary reserve pits to handle and store drill muds and cuttings, unless the operator demonstrates that closed-loop tank systems are not technically feasible. Additionally, HCLLC recommended that if temporary reserve pits are used, NYSDEC should adopt regulations that: require impermeable, chemical resistant liner material; limit the types of chemicals stored to those compatible with the liner material; require wildlife protection design standards; and establish firm removal and restoration requirements when drilling was completed. HCLLC recommended that cuttings not be buried onsite, and that waste be removed from the drilling location and properly disposed at an approved waste disposal facility capable of handling the quantity and type of waste generated.

HCLLC recommended that NYS consider the use of grind-and-inject technology to convert drill cuttings into a slurry that can be injected into a properly designed, approved subsurface disposal well. Additionally, HCLLC recommended that if reserve pits are determined to be the only technically feasible option for temporary waste storage, that storage of drilling waste be limited to un-contaminated drill cuttings, drilled using compressed air or water based-muds with non-toxic additives.

**2011 RDSGEIS:** The 2011 RDSGEIS recommends closed-loop tank systems as best practice in some circumstances, but in other circumstances defaults to the use of reserve pits, without demonstrating that reserve pits are environmentally preferable.

The RDSGEIS requires a closed-loop tank system for horizontal drilling operations in the Marcellus Shale that do not have an acceptable acid rock drainage (ARD) mitigation plan[166] for on-site cuttings burial; and drill cuttings that are coated with Synthetic-Based Muds (SBM) and Oil-Based Muds (OBM). In all other cases, the RDSGEIS proposes the use of reserve pits.

> *The revised draft SGEIS proposes to require, pursuant to permit conditions and/or regulation, that a closed-loop tank system be used instead of a reserve pit to manage drilling fluids and cuttings for:*
>
> - *Horizontal drilling in the Marcellus Shale without an acceptable acid rock drainage (ARD) mitigation plan for on-site cuttings burial; and*
>
> - *cuttings that, because of the drilling fluid composition used must be disposed off-site, including at a landfill.[167]*

Appendix 10, Proposed Supplementary Permit Conditions for HVHF, Condition No. 56 requires the operator to provide NYSDEC with an acid rock drainage mitigation plan if NYSDEC requests the plan. However, there is no specific criteria established to define what constitutes and acceptable acid rock drainage mitigation plan.

---

[166] 2011 NYSDEC, RDSGEIS, Page 7-67.

[167] 2011 NYSDEC, RDSGEIS, Page 1-13.

Yet, the USGS recommends against onsite disposal because of the potential risk posed:

> *Onsite burial of drill cuttings at shale-gas development sites, which is allowable under the dSGEIS if oil-based drilling mud is not used, should be carefully considered. According to Lash and Engelder (2008), pyrite is abundant in the high-TOC basal intervals of the Marcellus Shale. Oxidation and leaching of pyritic shale produces and acidic, metals-rich discharge commonly referred to as AMD (Acid Mine Discharge). A multi-horizontal well site will generate 100 to 500 times the volume of AMD-producing pyritic shale cutting than that generated at a single-vertical well site. **If these pyritic shale drill cuttings are left onsite, the potential for future surface-water and groundwater contamination is significant – removal and disposal of all cuttings at an approved landfill would be the preferred approach** [emphasis added].[168]*

The RDSGEIS proposal to use reserve pits is internally inconsistent with the RDSGEIS' conclusion that closed-loop tank systems are environmentally preferable for the following reasons:

> *Depending on the configuration and design of a closed-loop tank system use of such a system can offer the following advantages:*

> • *Eliminates the time and expense associated with reserve pit construction and reclamation;*

> • *Reduces the surface disturbance associated with the well pad;*

> • *Reduces the amount of water and mud additives required as a result of re-circulation of drilling mud;*

> • *Lowers mud replacement costs by capturing and re-circulating drilling mud;*

> • *Reduces the wastes associated with drilling by separating additional drilling mud from the cuttings; and*

> • *Reduces expenses and truck traffic associated with transporting drilling waste due to the reduced volume of the waste.[169]*

Additionally, the 2011 RDSGEIS explains the environmental risks of reserve pits:

> **Pit leakage or failure could also involve well fluids**. *These issues are discussed in Chapters 8 and 9 of the 1992 GEIS, but are acknowledged here with respect to unique aspects of the proposed multi-well development method. The conclusions regarding pit construction standards and liner specifications presented in the 1992 GEIS were largely based upon the short duration of a pit's use. **The greater intensity and duration of surface activities associated with well pads with multiple wells increases the potential for an accidental spill, pit leak or pit failure if engineering controls and other mitigation measures are not sufficient**. Concerns are heightened if on-site pits for*

---

[168] Testimony of John H. Williams, Ground-Water Specialist, U.S. Geological Survey, The Council of the City of New York Committee on Environmental Protection, Public Hearing, Draft Supplemental Generic Environmental Impact Statement Relating to Drilling for Natural Gas in New York State Using Horizontal Drilling and High-Volume Hydraulic Fracturing, October 23, 2009, Page 2.

[169] 2011 NYSDEC, RDSGEIS, Page 5-39.

*handling drilling fluids are located in primary and principal aquifer areas, or are constructed on the filled portion of a cut-and-filled well pad [emphasis added].*[170]

*As explained in Chapter 5, the total volume of drill cuttings produced from drilling a horizontal well may be about 40% greater than that for a conventional, vertical well to the same target depth. For multi-well pads, cuttings volume would be multiplied by the number of wells on the pad.* ***The potential water resources impact associated with the greater volume of drill cuttings from multiple horizontal well drilling operations would arise from the retention of cuttings during drilling, necessitating a larger reserve pit that may be present for a longer period of time, unless the cuttings are directed into tanks as part of a closed-loop tank system****[emphasis added].*[171]

The use of close-loop drilling waste handling system is a best practice. For example, New Mexico requires the use of closed-loop drilling systems.[172]

> **Recommendation No. 42**: The SGEIS and NYCRR should be revised to prohibit reserve pit use for Marcellus Shale drilling operations, and instead require closed-loop tank systems to collect drill cuttings and transport them to waste disposal facilities. NYCRR should make reserve pit use the exception, allowing it only in cases where closed-loop tank systems are determined to be technically infeasible. If reserve pits are determined to be the only technically feasible option, storage of drilling waste should be limited to un-contaminated drill cuttings from the section of the well drilled using compressed air or water based-muds with non-toxic additives. These best practices for drilling waste management should be included in the SGEIS as a mitigation measure and codified in the NYCRR.

Of even greater concern is the RDSGEIS' proposal to allow drill cuttings to be buried onsite in some cases. Marcellus Shale cuttings contain Naturally Occurring Radioactive Materials (NORM) and are coated with drilling muds, including Water-Based Mud (WBM). The Marcellus Shale is considered a "highly radioactive" shale,[173] and its drill cuttings may require special hazardous waste handling and treatment.  While the RDSGEIS proposes to allow on-site burial only of drill cuttings that were created by air drilling or WBM drilling operations, WBM may contain mercury, metals, and other contaminants.[174]

*The Department has determined that drill cuttings are solid wastes, specifically construction and demolition debris, under the State's regulatory system. Therefore, **the Department would allow disposal of cuttings from drilling processes which utilize only air and/or water on-site**, at construction and demolition (C&D) debris landfills, or at municipal solid waste (MSW) landfills, while cuttings from processes which utilize any oil-based or polymer-based products could only be disposed of at MSW landfills [emphasis added].*[175]

---

[170] 2011 NYSDEC, RDSGEIS, Page 6-16.

[171] 2011 NYSDEC, RDSGEIS, Page 6-65.

[172] New Mexico, Energy, Minerals and Natural Resources Department, Oil Conservation Division, Regulations at Title 19, Chapter 15, Part 17.

[173] Hill, D.G., Lombardi, T.E. and Martin, J.P., Fractured Shale Gas Potential in New York, 2002, p.8.

[174] As explained in HCLLC's 2009 report, the mercury content in drilling mud for a Marcellus Shale well drilled to a depth of 5,000' could contain 0.5- 5.0 lbs of mercury per well, depending on barite quality, and drilling muds may also contain the heavy metal cadmium.

[175] 2011 NYSDEC, RDSGEIS, Page 1-13.

The proposed revisions to NYCRR would require the reserve pit liner to be ripped and perforated as part of the onsite burial process (6 NYCRR § 560.7(c)); therefore, contaminated drill cuttings would be in direct contact with soils and surface waters.

While the RDSGEIS generally takes the position that WBM-coated cuttings can be stored in reserve pits and buried onsite, in some cases it waivers. It is not clear what additional limitations may be applied to WBM-coated drill-cuttings disposal. NYSDEC recognizes that onsite burial of chemical additives included in WBM may not be prudent. However, the RDSGEIS does not spell out criteria for determining what types of WBM-coated cuttings may and may not be stored and buried in reserve pits. The RDSGEIS proposes this decision be left to a later NYSDEC consultation process.

An example of how the RDSGEIS deviates from its general position that WBM-coated cuttings can be stored in reserve pits and buried onsite is as follows:

> *Supplementary permit conditions pertaining to the management of drill cuttings from high-volume hydraulic fracturing **require consultation with the Department's Division of Materials Management for the disposal of any cuttings associated with water-based mud-drilling and any pit liner associated with water-based or brine-based mud-drilling where the water-based or brine-based mud contains chemical additives.** Supplemental permit conditions also dictate that any cuttings required to be disposed of off-site, including at a landfill, be managed on-site within a closed-loop tank system rather than a reserve pit [emphasis added].[176]*

This uncertain position about what to do with WBM-coated drill cuttings is perpetuated in the proposed revisions to NYCRR at 6 NYCRR § 560.7(c):

> *Consultation with the department's Division of Materials Management (DMM) is required prior to disposal of any cuttings associated with water-based mud-drilling and pit liner associated with water-based mud-drilling where the water-based mud contains chemical additives.*

All WBM contains chemical additives. NYCRR must be clear on which chemical additives would trigger the use of closed-loop tanks and prohibit drill cuttings burial onsite.

> **Recommendation No. 43**: The SGEIS and NYCRR should be clear about how WBM-coated drill cuttings will be handled and should not leave this unresolved. The standards for handling WBM-coated drill cuttings should be included in the SGEIS as a mitigation measure and codified in the NYCRR.

Additionally, it is inefficient from a logistics and energy use standpoint to construct a reserve pit for the temporary storage of drill cuttings, and then remove this pit at a later time. It is substantially more efficient to use a closed-loop tank system to collect the drill cuttings, because the cuttings can be directly transported to a waste handling facility. The RDSGEIS agrees with the efficiencies gained through closed-loop tank systems, but incongruously does not recommend them in all cases.

---

[176] 2011 NYSDEC, RDSGEIS, Page 7-67.

> *The 1992 GEIS discusses the use of reserve pits and tanks, either alone or in conjunction with one another, to contain the cuttings and fluids associated with the drilling process. Both systems result in complete capture of the fluids and cuttings; however the use of tanks in* ***closed-loop tank systems facilitates off-site disposal of wastes while more efficiently utilizing drilling fluid and providing additional insurance against environmental releases*** *[emphasis added].[177]*

> *The design and configuration of closed-loop tank systems will vary from operator to operator, but all such systems contain drilling fluids and cuttings in a series of containers, thereby eliminating the need for a reserve pit....the objective is to fully contain the cuttings and fluids in such a manner as to prevent direct contact with the ground surface or the need to construct a lined reserve pit.[178]*

NYSDEC's proposal for onsite burial of contaminated drill cuttings becomes even more paradoxical when the RDSGEIS concludes that operators have not proposed onsite burial of drill cuttings.

> ***Operators have not proposed on-site burial of mud-drilled cuttings****, which would be equivalent to burial or direct ground discharge of the drilling mud itself. Contaminants in the mud or in contact with the liner if buried on-site could adversely impact soil or leach into shallow groundwater [emphasis added].[179]*

A portion of the well drilled will generate cuttings that do not contain NORM. However, as identified in the RDSGEIS, the Marcellus contains NORM and cuttings drilled during this section of the well would require special handling and disposal.

> **Recommendation No. 44**: The SGEIS and NYCRR should prohibit the onsite burial of drill cuttings. If onsite burial is permitted, it should be limited to cuttings that do not have any NORM and are not coated with drill muds containing mercury, heavy metals, and other chemical additives.

Cuttings Reinjection (CRI) Technology, also referred to as "grind-and-inject technology" is commonly used by industry as a best practice to avoid the need for long-term onsite burial of drill cuttings. CRI technology converts drill cuttings into a slurry that can be injected into a subsurface disposal well. CRI also provides a waste disposal method for used drilling mud, because mud can be used in the slurry formulation to reduce supplemental water needs. Currently, NYS does not have sufficient waste disposal wells to handle the anticipated Marcellus Shale drilling waste volume. Either NYS would need to rely on permitted waste handling capacity at wells out of state, or would need to permit and drill wells to meet that need if there are geologically, hydrologically, and otherwise appropriate locations for such wells in NYS.

For example, CRI is commonly used in Alaska as a best practice to avoid use of long-term reserve pit use and surface burial of contaminated drill cuttings. Waste is collected, ground into a slurry, and injected into a subsurface disposal well.[180] If an injection well is not available at a well location, operators have

---

[177] 2011 NYSDEC, RDSGEIS, Page 5-37.

[178] 2011 NYSDEC, RDSGEIS, Page 5-37.

[179] 2011 NYSDEC, RDSGEIS, Page 6-66.

[180] BP Exploration (Alaska), Inc., ARCO Alaska, Inc. and ConocoPhillips, Inc. have published numerous technical papers on grind and injection technology, and the success of disposal wells as a pollution prevention measure in the SPE trade journals, and at industry conferences.

collected wastes and transported them back to an injection well location. Operators that do not have their own waste handling facilities or disposal wells typically negotiate an agreement with another operator or a service provider to use its disposal facilities.  As a result of this best practice implementation in Alaska, DOE reports there are 58 active Class II-D (disposal) wells and six Class I wells in Alaska.[181]

NYS would need to permit construction of a sufficient number of Class I and Class II injection wells to ensure that there was sufficient capacity for the types and amounts of waste generated.

In addition to the environmental mitigation benefit, CRI technology reduces future liability for industry operators, and has been determined to be an environmentally-appropriate method for handling drilling waste containing NORM by both Shell and Chevron.[182]

Halliburton, an industry service provider, agrees that CRI technology makes business and environmental sense as compared to long-term drilling waste burial at the surface.

> *While it is true that new technology comes with a price tag, and much of the technology used in drilling waste management has been introduced in the last 10 years, many technologies now available to operators **are clearly cost effective when the entire well construction cost is evaluated**.*
>
> *The cost of making a mistake and having either an expensive remediation project or a potential liability nearly always significantly outweighs the cost of a good preventative drilling waste management program. Further, compliance with current environmental regulations does not always guarantee immunity in the future …*
>
> *Numerous examples exist of industries having to clean up sites that were fully compliant with all regulations at the time the waste was generated and disposed of….*
>
> *The paper demonstrates that the correct application of these technologies combined with a holistic approach to drilling waste management and drilling fluid operations results in a net reduction in well construction costs and a reduction in the potential for environmental liability …*
>
> *… environmental compliance (whether internally or externally driven) is not the only reason to utilize these types of technologies and services [emphasis added].[183]*

International operators report favorable economics for eliminating exploration and production waste by deep well injection. For example, a 2001 Advantek International Corp. report concludes:

> *Downhole disposal of mud and cuttings waste through hydraulic fracturing provides a zero discharge solution and eliminates future cleanup liabilities … This downhole disposal technology has shown success in both onshore and offshore drilling operations and is*

---

[181] Puder, M.G., Bryson, B., Veil, J.A, Argonne National Laboratory, "Compendium of Regulatory Requirements Governing Underground Injection of Drilling Wastes," Prepared for the U.S. Department of Energy, February 2003, Page 17.

[182] Okorodudu, A., Akinbodunse, A., Linden, L., Chevron Nigeria Ltd, Anwuri, L., Shell Petroleum Development Co. Nigeria Ltd., Irrechukwu, D.O., Zagi, M.M., Nigeria Department of Petroleum Resources, Guerrero, H., M-I Swaco, "Feasibility Study of Cuttings-Injection Operation: A Case Study of the Niger Delta Basin," SPE Paper 98640, presented at the SPE International Conference on Health, Safety and Environment in Oil and Gas Exploration and Production in Abu Dhabi, U.A.E., April 2006,Page 2.

[183] Browing, K., Seaton, S., Halliburton Fluid Systems, "Drilling Waste Management: Case Histories Demonstrate that Effective Drilling Waste Management Can Reduce Overall Well-Construction Costs," SPE Paper 96775, presented at the 2005 SPE Annual Technical Conference and Exhibition in Dallas Texas, October 2005,  Pages 1, 3, & 4

Harvey Consulting, LLC.                                                                          Report to NRDC January 2012

> *becoming a <u>routine</u> disposal option…It also <u>offers favorable economics</u> [emphasis added].[184]*

The U.S. Department of Energy (DOE) also advocates CRI technology:

> *Because wastes are injected deep into the earth below drinking water zones, proper slurry injection operations should pose lower environmental and health risks than more conventional surface disposal methods.[185]*

In 1990, the United States passed the Pollution Prevention Act, establishing a national policy that places priority on pollution prevention and specifies that disposal into the environment should only be allowed as a **last resort**:

> *The Congress hereby declares it to be the national policy of the United States that pollution should be prevented or reduced at the source whenever feasible; pollution that cannot be prevented should be recycled in an environmentally safe manner, whenever feasible; pollution that cannot be prevented or recycled should be treated in an environmentally safe manner whenever feasible; and <u>disposal or other release into the environment should be employed only as a last resort</u> and should be conducted in an environmentally safe manner[emphasis added]."[186]*

Additionally, the amount of drill-cutting waste generated can be significant. If CRI technology is not used to dispose of this waste by deep well injection, than surface waste disposal sites will need to be utilized to handle this waste. The RDSGEIS estimates the amount of waste generated for each well:

> *For example, a vertical well with surface, intermediate and production casing drilled to a total depth of 7,000 feet produces approximately 154 cubic yards of cuttings, while a horizontally drilled well with the same casing program to the same target depth with an example 4,000-foot lateral section produces a total volume of approximately 217 cubic yards of cuttings (i.e., about 40% more). A multi-well site would produce approximately that volume of cuttings from each well.[187]*

> **Recommendation No. 45**: NYS should consider the use of grind-and-inject technology to convert drill cuttings into a slurry that can be injected into a subsurface disposal well, and work with industry to permit a sufficient number of drilling waste disposal wells to safely meet this need. The use of Cuttings Reinjection (CRI) technology for drilling waste management should be included in the SGEIS as a mitigation measure and codified in the NYCRR, as an environmentally preferable option to onsite-disposal of drilling waste.

---

[184] Abou-Sayed, A., SPE, Advantek International, Guo, Q., SPE, Advantek International, "Design Considerations in Drill Cuttings Re-Injection Through Downhole Fracturing," IADC/SPE Paper 72308, Presented at the IADC/SPE Middle East Drilling Technology Meeting in Bahrain, October 2001, Page 1.

[185] Argonne National Laboratory, "An Introduction to Slurry Injection Technology for Disposal of Drilling Wastes," Publication prepared for the U.S. Department of Energy, September 2003, Page 2.

[186] Pollution Prevention Act of 1990, U.S. Code, Title 42, Public Health and Welfare, Chapter 133, Pollution Prevention.

[187] 2011 NYSDEC, RDSGEIS, Page 5-34.

## 14. HVHF Flowback Surface Impoundments at Drillsite

**Background:** In 2009, HCLLC recommended that the NYCRR require fracture fluid flowback be routed to onsite treatment systems for fracture fluid recycling and/or collected in closed-loop tanks for transportation to offsite treatment systems. Surface impoundments should not be used for fracture fluid flowback.

**2011 RDSGEIS:** The 2011 RDSGEIS made excellent revisions that address public concerns and are protective of human health and the environment by clearly prohibiting HVHF flowback waste impoundments at drillsites. The 2011 RDSGEIS recommends the use of closed-loop tank systems at the drillsites for collecting waste before transporting it to a treatment location, or recycling it for use on another well:

> *Flowback water stored on-site must use covered watertight tanks within secondary containment and the fluid contained in the tanks must be removed from the site within certain time periods.*[188]

> *The Department proposes to require that operators storing flowback water on-site would be required to use watertight tanks located within secondary containment, and remove the fluid from the wellpad within specified time frames.*[189]

**NYCRR Proposed Revisions:** Proposed regulations at 6 NYCRR § 560.6(c)(27) specifically prohibit HVHF flowback from being directed to or stored in any on-site pit, and require covered watertight tanks to handle flowback at the drillsite. Furthermore, 6 NYCRR § 750-3.4(b) prohibits the issuance of a State Pollutant Discharge Elimination System (SPDES) permit without prior certification that HVHF flowback fluids will be not be directed to or stored in a pit or impoundment. Proposed regulations at 6 NYCRR § 560.3(a)(10)-(11) also require an operator to provide a description of the closed-loop tank system it will use and the number of receiving tanks it will employ for flowback water.

> **No further recommendations**. The RDSGEIS includes the use of closed-loop tank systems, which is best available technology.

---

[188] 2011 NYSDEC, RDSGEIS, Executive Summary, Page 25.
[189] 2011 NYSDEC, RDSGEIS, Page 1-12.

Harvey Consulting, LLC.                                                                   Report to NRDC January 2012

## 15. HVHF Flowback Centralized Surface Impoundments Off-Drillsite

**Background:** In 2009, HCLLC recommended that the NYCRR prohibit the use of centralized surface impoundments for HVHF flowback. This recommendation was made because it is best technology to eliminate the use of surface impoundments altogether, rather than gathering HVHF flowback into tanks at the drillsite and then moving it by pipeline or truck to be pumped into a larger open impoundment at a centralized location away from drillsites. If flowback is recycled, it should be trucked or piped from tank–to–tank to another drillsite or used at the same drillsite in a different well.

Eliminating use of centralized surface impoundments prevents: large scale surface disturbance that requires multi-year rehabilitation[190]; the potential for leakage to occur through or around the liner, impacting ground water; and the potential to generate substantial amounts of hazardous air pollution.

A centralized surface impoundment photograph in Pennsylvania is shown below.



Bednarski Centralized Waste Impoundment, Pennsylvania, Site Permit PADEP, 798407

The most serious concern with the use of centralized surface impoundments for HVHF flowback is the amount of hazardous air pollution predicted for these centralized surface impoundments. In 2009, NYSDEC estimated that each centralized impoundment would be a major source of hazardous air pollution, emitting more than 32.5 tons of air toxics per year, and it was unclear if NYSDEC's estimate was even a worst-case estimate:

---

[190] Surface disturbance is less for temporary tanks than impoundments. Impoundments require surface soil excavation and multi-year rehabilitation. Temporary tanks used at the drillsite use existing gravel space already in place for drilling operations rather that impacting new and additional surface terrain away from the drillsite.

*Based on an assumed installation of ten wells per wellsite in a given year, an annual methanol air emission [estimate] of 32.5 tons (i.e., "major" quantity of HAP) is theoretically possible at a central impoundment[191] [emphasis added].*

USEPA classifies a major source of hazardous air pollution as a source that emits more than 25 tons per year. These centralized impoundments have been sited nearby residential homes and community facilities in other states, increasing the amount of hazardous air pollution exposure to nearby humans, including increased exposure to benzene, a known human carcinogen.

In January 2011, NYS' consultant, Alpha Geoscience, complimented HCLLC for its recommendations on flowback impoundments, and supported improved mitigation:

*Harvey Consulting has thoroughly documented their discussion of surface flowback impoundments and hazardous air pollutants, citing a professional journal article, technical guidance documents, consultant reports, and NYSDEC documents. [192]*

**2011 RDSGEIS:** The 2011 RDSGEIS states that centralized flowback impoundments are "not contemplated" by industry.[193]

*The Department was informed in September 2010 that operators would not routinely propose to store flowback water either in reserve pits on the wellpad or in centralized impoundments. Therefore, these practices are not addressed in this revised draft SGEIS and such impoundments would not be approved without site-specific environmental review [emphasis added].[194]*

This industry representation is inconsistent with the actual practice of operators in Pennsylvania. Moreover, neither the RDSGEIS nor the proposed NYCRR amendments prohibit the use of centralized flowback impoundments. This leaves the door open for centralized flowback impoundments to be approved if a site-specific environmental review is conducted.

NYSDEC's requirement to use closed-loop HVHF flowback collection tanks at each drillsite is an efficient collection method, because fluid can be easily transferred to a treatment and disposal location, or taken to another well for reuse. It would not be efficient, or environmentally sound, to collect HVHF waste in a closed-loop flowback tank at the drillsite, and then transfer that waste by temporary piping or truck to a large centralized surface impoundment off of the drillsite location.

> **Recommendation No. 46**: The SGEIS and NYCRR should prohibit the use of centralized surface impoundments for HVHF flowback based on the known impacts examined in the SGEIS process. HVHF flowback waste should be collected at the wellhead and recycled or directly routed to disposal. This prohibition should be described in the SGEIS as a mitigation measure and codified in the NYCRR.

---

[191] 2009, NYSDEC, DSGEIS, Page 6-56.

[192] Alpha Geoscience, Review of the dSGEIS and Identification Best Technology and Best Practices Recommendations, Harvey Consulting, LLC; December 28, 2009, prepared for NYSERDA, January 20, 2011, Page 31.

[193] 2011 NYSDEC, RDSGEIS, Executive Summary, Page 15.

[194] 2011 NYSDEC, RDSEGIS, Page 1-2.

If NYSDEC does not prohibit the use of centralized impoundments, the SGEIS should analyze the impacts and propose mitigation to protect public health and the environment. The decision to allow centralized flowback impoundments should not be segmented from the SGEIS just because it is known to create significant impacts. Prohibiting the use of centralized impoundments mitigates that known risk.

## 16. Repeat HVHF Treatment Life Cycle Impacts

**Background**: In 2009, HCLLC recommended that the DSGEIS disclose how many times a well may be fracture treated over its life, and provide a worst case scenario for water use and waste disposal requirements based on this scenario. HCLLC pointed out that the 2009 DSGEIS estimated water use and waste volumes based on a single initial fracture treatment and that this approach does not consider the fact that most shale gas wells require multiple fracture treatments.

**2011 RDSGEIS:** The 2011 RDSGEIS indicates there may be a potential for repeated HVHF treatments over the life of the well.[195] However, the 2011 RDSGEIS does not quantify the number of HVHF treatments possible per well, nor does it estimate the peak or cumulative impact of these HVHF treatments. Therefore the RDSGEIS under-predicts both the peak and cumulative impacts by not examining the reasonably foreseeable likelihood that Marcellus, Utica, and other low-permeability shale reservoirs will require more than one HVHF treatment, most likely two or three, over a several decade long lifecycle.

NYSDEC does acknowledge that, when Marcellus repeat HVHF treatments are conducted, the impact will be equivalent to the initial treatment. However, its impact assessment does not examine the peak or cumulative impacts that may occur:

> *Regardless of how often it occurs, **if the high-volume hydraulic fracturing procedure is repeated it will entail the same type and duration of surface activity at the well pad as the initial procedure** [emphasis added].*[196]

For example, NYSDEC estimates 1,600 or more wells to be drilled and completed per year,[197] estimating a 30 year development life cycle,[198] for a total of 48,000 wells. NYSDEC estimates each HVHF treatment to use an average 4,200,000 gallons per well,[199] and that approximately 9-35% of HVHF treatment returns to the well and is produced as waste that requires handling, treatment and/or disposal.[200] A single HVHF treatment in each well, over a thirty year period, could yield a total waste load of 18-71 billion gallons. That waste volume could double or triple if two or three fracture treatments are conducted on each well over a several decade period. Assuming at least two fracture treatments, and possibly three may be implemented, the waste volumes would increase substantially, possibly exceeding 200 billion gallons.

NYSDEC acknowledges the fact that repeated HVHF treatments have been required in the Barnett shale, typically within 5 years from the initial HVHF.[201] However, NYSDEC notes:

> *Marcellus operators with whom the Department has discussed this question have stated their expectation that refracturing will be a rare event.*[202]

---

[195] 2011 NYSDEC, RDSGEIS, Page 6-275.

[196] 2011 NYSDEC, RDSGEIS, Page 5-99.

[197] 2011 NYSDEC, RDSGEIS, Page 2-1.

[198] 2011 NYSDEC, RDSGEIS, Page 6-6.

[199] 2011 NYSDEC, RDSGEIS, Page 6-10.

[200] 2011 NYSDEC, RDSGEIS, Page 5-99.

[201] 2011 NYSDEC, RDSGEIS, Page 5-98.

[202] 2011 NYSDEC, RDSGEIS, Page 5-98.

The information NYDEC gathered from a few Marcellus operators, that concludes Marcellus shale re-fracturing will be "rare", is inconsistent with industry literature.

For example, in 2010 Range Resource published a Society of Petroleum Engineering technical paper that describes two successful horizontal shale re-fracture re-stimulations and explains that Marcellus re-fracture stimulations will be used:

> *Based on the success of horizontal re-fracs in other shale plays, re-fracture stimulations in the Marcellus will be an excellent option to maximize fracture complexity and increase the total effective fracture network. ...These re-fracs can be utilized to soften overall field decline in future years... "[203]*

In 2006, Schlumberger, an Oil & Gas Service Company, published a Society of Petroleum Engineering technical paper describing the benefits of re-fracture re-stimulations to increase hydrocarbon production in wells that were initially fractured and where hydrocarbon production had declined to a point that it was economically attractive to repeat the fracture stimulation procedure in that same well:

> *A successful refracturing treatment is one that creates a fracture having higher fracture conductivity and/or penetrating an area of higher pore pressure than the previous fracture.[204]*

Schlumberger explains that re-fracture re-stimulations are likely in wells that have the following characteristics: low productivity relative to other wells with comparable pay; remaining reserves in place; need for fracture reorientation to improve hydrocarbon production; poorly placed initial fracture treatment (e.g. proppant crushing, or proppant flowback, use of incompatible fluids); and reservoir complexity leading to poor hydrocarbon recovery.

A 2010 Apache Corporation, Society of Petroleum Engineering paper, agrees that re-fracture re-stimulations will play an important role in shale stimulation for some time to come. Apache Corporation explains that re-fracture re-stimulations are being used in shale wells to increase gas production, and to make good wells even better gas producers:

> *Refracs of even good wells increased the recovery and re-established near initial production rate. Increasing stimulated reservoir volume should increase both the IP[205] and EUR[206]. When new areas of the shale are exposed in a refrac, there should also be a gain in reserves (Warpinski, 2008). Increases in stimulated reservoir volume could be accomplished by opening many of the micro-cracks and laminations within the undisturbed matrix blocks in the initial drainage [area] that were left unstimulated by previous fracturing attempts. Re-opening of natural and hydraulic fractures that had closed due to overburden and confining stress created by depletion would re-establish matrix area contact. [207]*

---

[203] Curry, M., and Maloney, T., Range Resources Corp., Woodroof, R., and Leonard, R. ProTechnics Division of Core Laboratories, Less Sand May Not Be Enough, Society of Petroleum Engineers Technical Paper, SPE 131783, 2010. Page 12.

[204] Moore, L.P., Ramakrishnan, H,, Schlumberger, Restimulation: Candidate Selection Methodologies and Treatment Optimization, Society of Petroleum Engineers Technical Paper, SPE 102681, 2006. Page 1.

[205] IP= Initial Production.

[206] EUR= Expected Ultimate Recovery.

[207] King, G.E., Apache Corporation, Thirty Years of Gas Shale Fracturing: What Have We Learned?, Society of Petroleum Engineers Technical Paper, SPE 133456, 2010. Page 24.

Re-fracture re-stimulation has been used widely in the Barnett Shale. Many technical papers report successful re-fracture re-stimulations in the Barnett Shale where improved HVHF slickwater fractures were used as a second treatment after the initial cross-linked gel fracture treatment. While the Marcellus and Utica Shales in NYS will start with improved HVHF slickwater fracture treatments, these treatment methods will continue to improve over time, and like the Barnett, repeat fracture treatments will be required to improve hydrocarbon performance as new and improved fracture treatment design supplants existing technology. Apache Corporation explains:

> *Fracturing technology for shales is constantly improving and refracs may slowly fade from common use as the frac designs for shale wells are optimized.* **_Until optimal fracs are achieved and production engineering is optimized, however, refracs will have a place in shale stimulation_** *[emphasis added].*[208]

Additionally, NYSDEC acknowledges the benefits of re-fracture treatment:

> *Several other reasons may develop to repeat the fracturing procedure at a given well. Fracture conductivity may decline due to proppant embedment into the fracture walls, proppant crushing, closure of fractures under increased effective stress as the pore pressure declines, clogging from fines migration, and capillary entrapment of liquid at the fracture and formation boundary. Refracturing can restore the original fracture height and length, and can often extend the fracture length beyond the original fracture dimensions.*[209]

**Recommendation No. 47:** The SGEIS should quantify how many times a well may be fracture treated over its life, and provide a worst case scenario for water use and waste disposal requirements based on this scenario. Additionally, the SGEIS should examine the peak and cumulative impacts of multiple HVHF treatments over a well's life and propose mitigation to offset those reasonably foreseeable impacts.

---

[208] King, G.E., Apache Corporation, Thirty Years of Gas Shale Fracturing: What Have We Learned?, Society of Petroleum Engineers Technical Paper, SPE 133456, 2010. Page 24.

[209] 2011 NYSDEC, RDSGEIS, Page 5-98.

## 17. Air Pollution Control and Monitoring

**Air Quality Impact Assessment Modeling Analysis**:

In 2009, AKRF's comments on the 2009 DSGEIS (prepared for NRDC) identified a number of shortcomings in the air quality impact assessment modeling analysis. Notably, that emissions from 10 wells per year and simultaneously operating equipment would produce emission impacts that exceed the NAAQS.

**The 2011 RDSGEIS**: The 2011 RDSGEIS includes a substantial amount of new modeling work and a number of operational restrictions and limitations to ensure that NAAQS are not violated. While the RDSGEIS has been significantly improved in this area, some problems with the analysis persist, and some new problems have developed.

The following assumptions used in the air quality impact assessment modeling analysis warrant further review and justification:

- The modeling analysis assumes that a maximum of four wells per drillsite will be drilled each year.[210] However, NYS ECL § 23-0501 requires development of all infill drilling within three years of the first well drilled, and the RDSGEIS envisions the Marcellus Shale gas reservoir will be developed from a multi-well pad for a 640-acre spacing unit, with 40-acre spacing. At 40-acre spacing density, 16 wells would need to be drilled in three years to fill a 640-acre unit, meaning that a maximum of 5-6 wells could possibly be drilled per year. This conflicts with the 4 wells per year (12 wells for three years) assumption and would generate more significant air quality impacts than contemplated by the RDSGEIS.

- Gas compositional data used in the modeling analysis was based on Marcellus Shale gas only. There was no analysis of Utica Shale gas or gas from any other low-permeability gas reservoir.[211] Modeling should be based on a reasonable worst case scenario that includes analysis of all shale formations with development potential, not just the Marcellus Shale, if the SGEIS proposes to cover more reservoirs.

- The modeling analysis assumed that there will be no emissions of criteria pollutants from venting. However, the RDSGEIS proposes to allow gas venting of up to 5 MMscf during any consecutive 12-month period, including sour gas, as long as it is vented at least 30 feet in the air. This allowance undermines the assumption that no criteria pollutants would be emitted during venting.

- The modeling analysis assumes only three days of gas flaring per well. However, the RDSGEIS states that flaring can occur for up to a month in some cases.[212] Therefore, the modeling understates the potential emissions from flaring.

---

[210] 2011 NYSDEC, RDSGEIS, Page 6-104.

[211] 2011 NYSDEC, RDSGEIS, Page 6-115.

[212] 2011 NYSDEC, RDSGEIS, Table 5.29 on Page 5-136 shows that well cleanup and testing can take 12 hours to 30 days. Modeling on Page 6-192 only assumes 3 days of flaring.

- The supplemental 24-hour $PM_{2.5}$ model impacts analysis did not evaluate simultaneous operation of equipment operating on the pad. However, other short-term impact assessment assumed simultaneous operation of one well drilling, one well completion and one well flaring, along with operation of the on-site line heater and off-site compressor for the gas production phase for previously-completed wells.[213]  Therefore, the 24-hour $PM_{2.5}$ impact modeling is based on inconsistent assumptions.

- To account for the possibility of simultaneous well operations at nearby pads, a simplified sensitivity analysis was performed in the RDSGEIS to determine the potential contribution of an adjacent pad to the modeled impacts.[214] This modeling assumed a single adjacent pad, located one kilometer away (0.62 miles), with identical equipment and emissions as the modeling target pad.

  The RDSGEIS model only examined the potential for two multi-well drillsites, drilling horizontal wells to be located near each other at a distance of 0.62 miles apart. The modeling analysis assumed that only two drillsites would be operating nearby each other, and that drillsite development in an area would occur in a sequential fashion,[215] which is not always the case (especially when there are multiple operators developing an area).

  The modeling analysis did not evaluate the possibility of more than two multi-well drillsite drilling and completion operations adjacent to each other, nor did it evaluate the possibility of multi-well drillsites operating nearby several single well drilling and completion operations drilled on 40 acre spacing. Nor did the analysis examine the possibility that the surface location of multi-well drillsites could be positioned closer than 0.62 miles apart.

  NYS does not require drillsites to be located over the drilling unit, as long as surface siting approval is authorized. Therefore there is a possibility for drillsites to be located closer than 0.62 miles, a possibility of simultaneous operation of more than two drillsites at a time, and a possibility that more significant overlapping ambient air pollution impacts may occur than modeled.  Therefore, the RDSGEIS did not consider the reasonable worst case scenario air impacts resulting from simultaneous operations of spatially proximate well sites. NYSDEC wither needs to examine all possible concurrent operation impacts, or prohibit the possibility.

- Mobile source impact assessment under-predicts the number of miles that will be driven by heavy equipment to transport supplies to and haul wastes away from drillsites, especially wastewater that is hauled out of state to treatment and disposal facilities. Modeling for mobile source air impacts resulting from wastewater transport must be consistent with reasonable worst case scenario forecasts of wastewater volume (which impacts the number of truck trips needed per well site) as well as forecasted in and out of state disposal options (which impacts distance traveled per disposal).

  The RDSGEIS assumes that both light and heavy duty trucks will only travel 20-25 miles[216] one way, yet out-of-state treatment and disposal facilities may be located several hundred miles away. For rural operations, it is unlikely that supplies, equipment, specialty contractors, lodging, and other support equipment and personnel will be located within 20-25 miles of the drillsite.

---

[213] 2011 NYSDEC, RDSGEIS, Page 6-124.

[214] 2011 NYSDEC, RDSGEIS, Page 6-127.

[215] 2011 NYSDEC, RDSGEIS, Page 6-136.

[216] 2011 NYSDEC, RDSGEIS, Page 6-176.

- The modeling analysis assumes that there will be no simultaneous operations of well drilling and completion equipment on a drillsite. There is a permit requirement prohibiting simultaneous operations;[217] however, this requirement is not codified in the proposed revisions to NYCRR.[218]

> **Recommendation No. 48**: The RDSGEIS air quality impact assessment modeling analysis assumptions warrant additional review and justification. Limitations used in the modeling assumption must all be translated into SGEIS as mitigation measures and codified in the NYCRR to ensure the assumed impacts will not be exceeded. This was done in some cases, but not all. In the cases where modeling assumptions used cannot be justified, modeling revisions will be needed to examine impacts and identify required mitigation, or operational limits set.

**Air Quality Monitoring Program**:

In 2009, AKRF recommended improved air dispersion modeling and a region-wide emissions analysis. In response, NYSDEC completed a significant amount of additional work on the air quality section of the RDSGEIS. A major conclusion from this work was that there is insufficient information to understand the consequences of increased regional $NO_x$ and VOC emissions on the resultant levels of ozone and $PM_{2.5}$. As a result of this lack of data, these impacts were not fully quantified by modeling alone. Furthermore, NYSDEC concluded that ambient air quality monitoring program is needed.

While implementation of a ambient air quality monitoring program, is an important improvement in the RDSGEIS, the proposed program needs further definition, a funding commitment, and a formal industry compliance obligation.

**The 2011 RDSGEIS**: The 2011 RDSGEIS includes a commitment to implement local and regional air quality monitoring:[219]

> ___The Department also developed an air monitoring program to fully address potential for adverse air quality impacts beyond those analyzed in the dSGEIS, which are either not fully known at this time or not verifiable by the assessments to date.___ *The air monitoring plan would help determine and distinguish both the background and drilling related concentrations of pertinent pollutants in the ambient air [emphasis added].*[220]
>
> *The dSGEIS identifies additional mitigation measures designed to ensure that emissions associated with high-volume hydraulic fracturing operations do not result in the exceedance of any NAAQS. In addition,* ___the Department has committed to implement local and regional level air quality monitoring at well pads and surrounding areas___ *[emphasis added].*[221]

---

[217] 2011 NYSDEC, RDSGEIS, Appendix 10, Attachment A, Condition 2.

[218] 2011 NYSDEC, RDSGEIS, Page 6-115.

[219] 2011 NYSDEC, RDSGEIS, Executive Summary, Page 23.

[220] 2011 NYSDEC, RDSGEIS, Executive Summary, Page 16.

[221] 2011 NYSDEC, RDSGEIS, Executive Summary, Page 23.

Although Section 6.5.4 of the RDSGEIS proposes alternative methods for implementing air quality monitoring, it does not settle on a recommended solution.[222] The RDSGEIS proposes two alternatives: (1) industry-led monitoring with NYSDEC oversight, or (2) NYSDEC monitoring with industry funding. The RDSGEIS identifies NYSDEC monitoring with industry funding as the preferred alternative without making clear how this goal will actually be funded and implemented.

Table 6.24 proposes to: add a single air monitoring trailer and mobile laboratory to monitor ozone, particulate matter, oxides of nitrogen and air toxics; use infrared cameras to monitor gas leaks; and conduct summa canister sampling for BTEX and other VOCs. However, the RDSGEIS does not explain how the addition of a single mobile trailer and lab along with some other intermittent sampling will provide sufficient information to understand the consequences of increased regional $NO_x$ and VOC emissions on the resultant levels of ozone and $PM_{2.5}$.

The RDSGEIS did not evaluate the possibility of installing permanent monitoring locations at numerous locations in NYS, with priority in existing non-attainment areas, and areas that will be heavily impacted by shale gas development. Instead, the RDSGEIS only proposes to examine "regional level" monitoring by collecting data at two sites in NYS.[223] This proposal is insufficient because monitoring regional ambient air quality is not possible with the limited data provided by a two-site program, proposed for an unspecified time period.

More information is needed to understand the scope and duration of NYSDEC's proposed air monitoring program. A more rigorous monitoring program proposal is needed that identifies: the scope of the monitoring program; the location of the monitoring sites; the amount of equipment and personnel needed to run each site; the duration of monitoring proposed at each site; along with the cost. It is anticipated that a program used to assess both regional and local impacts will require long term monitoring stations placed in key locations, not just infrequent and unrepresentative sampling.

The obligation to fund the air quality monitoring program needs to be clearly tied to a permit condition requirement—for example, the permit to flare or spud a well should require a contribution to an air quality monitoring fund; such a requirement is not set forth in either Appendix 6 or Appendix 10.

> **Recommendation No. 49**: The SGEIS should include a more rigorous air monitoring program to achieve NYSDEC's goal of regional and local air pollutant impact monitoring. The proposed program should identify: the scope of the monitoring program; the location of the monitoring sites; the amount of equipment and personnel needed to run each site; the duration of monitoring proposed at each site; along with the cost. The SGEIS should require the monitoring program to commence prior to Marcellus Shale gas development to verify background levels and continue until NYSDEC can scientifically justify that data collection is no longer warranted, in consultation with EPA. The obligation to fund the air monitoring program needs to be clearly tied to a permit condition requirement.

The RDSGEIS acknowledges that air monitoring may identify peak or cumulative air pollution impacts that warrant additional emission controls. For example, NYSDEC has identified that:

> *...the consequences of the increased regional NOx and VOC emissions on the resultant levels of ozone and PM2.5 cannot be fully addressed by only modeling at this stage due to the lack of detail on the distribution of the wells and compressor stations. In addition, any potential emissions of certain VOCs at the well sites due to fugitive emissions,*

---

[222] 2011 NYSDEC, RDSGEIS, Page 6-180 through 6-184.

[223] 2011 NYSDEC, RDSGEIS, Page 6-181.

*including possible endogenous level, and from the drilling and gas processing equipment at the compressor station (e.g. glycol dehydrators) are not fully quantifiable.[224]*

However, the RDSGEIS does not explain NYSDEC's plan to collect data, identify the potential for air pollutants to exceed the federal, state or local air pollution control standards, or require these additional emission controls in a timely manner before adverse impacts are realized by humans or the surrounding ecosystem.

> **Recommendation No. 50**: The SGEIS should explain NYSDEC's plan to collect data, identify the potential for pollution problems to exceed the federal, state or local air pollution control standards, and the timely installation of additional emission controls, in order to protect against exceedances of pollution control standards, should be required as an SGEIS mitigation measure and codified in the NYCRR.

**GHG Impacts Mitigation Plan**:

In 2009, HCLLC and AKRF recommended further analysis of Greenhouse Gas (GHG) impacts and mitigation. In response, NYSDEC acknowledged the potential for GHG emissions impacts and the need for mitigation. While such acknowledgement represents a substantial improvement from the 2009 draft, the proposed mitigation needs improvement to ensure the requirements are clear, measureable and enforceable.

**The 2011 RDSGEIS**: The 2011 RDSGEIS requires a GHG Impacts Mitigation Plan.[225]

> *The Plan must include: a list of best management practices for GHG emission sources for implementation at the permitted well site; a leak detection and repair program; use of EPA's Natural Gas Star best management practices for any pertinent equipment; use of reduced emission completions that provide for the recovery of methane instead of flaring whenever a gas sales line and interconnecting gathering line are available; and a statement that the operator would provide the Department with a copy of the report filed with EPA to meet the GHG Reporting Rule.[226]*

The GHG Impacts Mitigation Plan requires the operator to implement a Leak Detection and Repair Program,[227] use Reduced Emission Completions,[228] use EPA Natural Gas STAR program recommendations, and identify other best management practices.

The requirement that a GHG Impacts Mitigation Plan be prepared and include the use of best management practices for GHG control is a step in the right direction; however, given the variety of best management practices under EPA's voluntary Natural Gas STAR program, NYSDEC should require that well operators select and install the controls that will achieve the greatest emissions reductions possible. In addition, such emissions reductions should be made enforceable, as permit conditions or in the NYCRR.

---

[224] 2011 NYSDEC, RDSGEIS, Page 6-181.

[225] 2011 NYSDEC, RDSGEIS, Executive Summary, Page 24.

[226] 2011 NYSDEC, RDSGEIS, Executive Summary, Page 24.

[227] See also HCLLC recommendations on LDAR Program in this section of the report.

[228] See also HCLLC recommendations on Reduced Emission Completions in this section of the report.

For example, the Natural Gas STAR Program data shows that it is both technically feasible and economically attractive to use "low-bleed" or "no-bleed" pneumatic controllers and plunger lift systems;[229] however, it is not clear whether an operator would be required under the GHG Impacts Mitigation Plan to use this technology, or how NYSDEC would enforce its use if an operator chose not to select it.

NYSDEC should require operators to use Natural Gas STAR Program best management technologies and practices that will optimize emissions reductions.

The RDSGEIS does not make clear whether or how new technologies or practices would be required (e.g. technologies or practices identified by the Natural Gas STAR Program after drillsite construction has been completed). It is not clear if an operator will be required to implement GHG emission controls only at the time of construction, or if there will be an ongoing obligation to implement additional controls as they are identified by the Natural Gas STAR Program and developed.

The plan should include a list of emission controls that will be installed at the time of construction and best management practices, and a process for periodically reviewing new technologies and installing them as new control solutions are developed over time.

> **Recommendation No. 51**: NYSDEC should require a GHG Mitigation Plan that provides for measureable emissions reductions and includes enforceable requirements. The GHG Impacts Mitigation Plan should list all Natural Gas STAR Program best management technologies and practices that have been determined by EPA to be technically and economically feasible, and operators should select and use the emission control(s) that will achieve the greatest emissions reductions.
>
> The GHG Impacts Mitigation Plan should be submitted and approved prior to drillsite construction, GHG controls should be installed at the time of well construction, and NYSDEC should conduct periodic reviews to ensure that GHG Impacts Mitigation Plans include state of the art emission control technologies.  Further, the extent of compliance with adopted emission mitigation control plans should be documented throughout the well's potential to emit GHGs.
>
> The GHG Impacts Mitigation Plan requirement should be included in the SGEIS as a mitigation measure and codified in the NYCRR. This requirement should apply to all natural gas operations, not just HVHF operations.

**Flare and Venting of Gas Emissions**:

In 2009, HCLLC recommended that flaring and venting be limited to the lowest level technically feasible and safe. Reducing gas flaring and venting is widely considered best practice. Both federal and state governments have taken steps over the past two decades to enact regulations that limit flaring and venting of natural gas.[230] Initially the motive was to conserve hydrocarbon resources to maximize federal and

---

[229] Older gas wells stop flowing when liquids (water and condensate) accumulate inside the wellbore creating backpressure on the hydrocarbon formation. This will be a future problem in NYS, as gas wells age. Methane gas is emitted when companies open wells to vent gas to the atmosphere to unload wellbore liquids (water and condensate that accumulate in the bottom of the well) in order to resume gas flow. The industry typically refers to this process as "blowing down the well" or a "well blowdown." Eventually, even a well's own gas pressure becomes insufficient to flow accumulated liquids to the surface and the well is either shut-in as uneconomic, or some form of artificial lift (e.g. plunger lifts) is installed to transport the liquids to the surface.

[230] Global Gas Flaring Reduction Partnership (GGFR), Guidance on Upstream Flaring and Venting Policy and Regulation, Washington D.C., March 2009.

state revenue and gas supply. More recently, focus on GHG, VOC and HAPs emission reduction has prompted additional innovation to further reduce flaring and venting.

Flares may be used during well drilling, completion, and testing to combust hydrocarbon gases that cannot be collected because gas processing and pipeline systems have not been installed. If gas processing equipment and pipeline systems are in place, gas flaring can be avoided in all cases except in the event of equipment malfunction. During the drilling and completion phase of the first well on a well pad, a gas pipeline might not be installed. Gas pipelines are typically not installed until it is confirmed that an economic gas supply has been found. Therefore, gas from the first well is often flared or vented during drilling and completion activities because there is not a pipeline to which it can be routed. The RDSGEIS proposes to require Reduced Emission Completions for all wells where a pipeline is installed, which will reduce the need to flare or vent gas.

During production operations, high pressure gas buildup may require gas venting via a pressure release valve, or gas may need to be routed to a flare during an equipment malfunction. At natural gas facilities, continuous flaring or venting may be associated with the disposal of waste streams[231] and gaseous by-product streams[232] that are uneconomical to conserve. Venting or flaring may also occur during manual or instrumented depressurization events, compressor engine starts, equipment maintenance and inspection, pipeline tie-ins, pigging, sampling activities, and pipeline repair.[233]

Best practices for planned[234] flaring and venting during gas production should limit flaring and venting to the smallest amount possible and only for purposes of for safety. Gas should be collected for sale, and used as fuel unless it is proven to be technically and economically unfeasible.

**The 2011 RDSGEIS**: The 2011 RDSGEIS limits planned gas flaring to flowback operations for wells where a gas sales line has not been installed which is a significant improvement.[235]

However, when flaring or venting does occur, there is the potential for relatively high short-term VOC and CO emission impacts that need to be considered.[236] The RDSGEIS states that industry only plans to flare for a maximum of three days, and NYSDEC only modeled a 3-day impact; yet, the RDSGEIS states that flaring can occur for up to a month (30 days) in some cases.[237]

> *A flaring period of 3 days was considered for this analysis for the vertical and horizontal wells respectively although the actual period could be either shorter or longer [emphasis added].*[238]

Modeling needs to represent a reasonable worst case scenario. Because only a three day flaring period was considered in the RDSGEIS modeling, planned flaring should be limited to no more than three days.

---

[231] For example, acid gas from the gas sweetening process and still-column overheads from glycol dehydrators.

[232] For example: instrument vent gas; stabilizer overheads and process flash gas.

[233] The Global Gas Flaring Reduction partnership (GGFR) and the World Bank, Guidelines on Flare and Vent Measurement, September 2008.

[234] There is a difference between planned flaring and emergency flaring. Emergency flaring is conducted to safely route combustible and potentially toxic (e.g. hydrogen sulfide gas) and in most cases cannot be avoided. Planned flaring can be avoided in most cases.

[235] 2011 NYSDEC, RDSGEIS, Page 5-135.

[236] 2011 NYSDEC, RDSGEIS, Page 6-103.

[237] 2011 NYSDEC, RDSGEIS, Table 5.29 on Page 5-136 shows that well cleanup and testing can take 12 hours to 30 days. Modeling on Page 6-192 only assumes 3 days of flaring.

[238] 2011 NYSDEC, RDSGEIS, Page 6-197.

Alternatively, modeling analysis should be based on the maximum time period that flaring would be allowed.

**Recommendation No. 52**: Planned flaring should be limited to no more than three days. In all other cases flaring should be limited to safety purposes only. If NYSDEC finds there is an operational necessity to flare an exploration well for more than a three-day period, the SGEIS impact analysis should evaluate the air pollutant impact, particularly the potential for relatively high short-term emission impacts, from longer flaring events, before approving such operations. Flaring restrictions should be included in the SGEIS as a mitigation measure and codified in the NYCRR. This requirement should apply to all natural gas operations, not just HVHF operations.

In 2009, HCLLC recommended that NYSDEC should require operators to flare gas as a preferred method over venting. Gas flaring is environmentally preferable over venting because flaring reduces HAP, VOC, and GHG emissions.[239] Proposed revisions to 6 NYCRR § 560.6(c)(28) would require that gas be flared whenever technically feasible instead of vented,[240] which is a significant improvement.

The RDSGEIS limits the amount of flaring and venting that is allowed at a drillsite during any consecutive 12-month period; however, it is unclear how the venting (5 MMscf) or flaring (120 MMscf) thresholds were developed, and such thresholds are not listed in the proposed revisions to the NYCRR.

- *During the flowback phase, the **venting of gas** from each well pad will be limited to a maximum of **5 MMscf** during any consecutive 12-month period. If "sour" gas is encountered with detected hydrogen sulfide emissions, the height at which the gas will be vented will be a minimum of 30 feet (9.1m);*

- *During the flowback phase, **flaring of gas** at each well pad will be limited to a maximum of **120 MMscf** during any consecutive 12-month period [emphasis added].[241]*

**Recommendation No. 53**: The SGEIS should provide justification for allowing a maximum of 5 MMscf of vented gas and 120 MMscf of flared gas at a drillsite during any consecutive 12-month period. The RDSGEIS does not contain information to show that these limits are equivalent to the lowest levels of venting and flaring that can be achieved through used of best practices, and it is unclear if these rates were used in the modeling assessment. Flaring and venting limits, once justified, should be included in the SGEIS as a mitigation measure, codified in the NYCRR, and should apply to all natural gas operations, not just HVHF operations.

In 2009, HCLLC recommended that NYSDEC require that well operators follow best practices for construction and operation of flares used for safety. The RDSGEIS requires self-igniting flares,[242] which is an improvement; however, the RDSGEIS does not require that:

- Flare pilot blowout risk be minimized by installing a reliable flare system;

- Low/intermittent velocity flare streams have sufficient exit velocity or wind guards;

- A reliable ignition system is used;

---

[239] Fugitive and Vented methane has 21 times the global warming potential as combusted methane gas. Methanetomarkets.org, epa.gov/gasstar.

[240] 2011 NYSDEC, RDSGEIS, Page 7-117.

[241] 2011 NYSDEC, RDSGEIS, Page 7-108.

[242] 2011 NYSDEC, RDSGEIS, Page 7-117.

- Liquid carry over and entrainment in the gas flare stream is minimized by ensuring a suitable liquid separation system is in place; or

- Combustion efficiency is maximized by proper control and optimization of flare fuel/air/steam flow rates.

> **Recommendation No. 54**: The SGEIS should require flare systems to be designed in a manner that optimizes reliability, safety, and combustion efficiency, including requirements to: minimize the risk of flare pilot blowout by installing a reliable flare system; ensure sufficient exit velocity or provide wind guards for low/intermittent velocity flare streams; ensure use of a reliable ignition system; minimize liquid carry over and entrainment in the gas flare stream by ensuring a suitable liquid separation system is in place; and maximize combustion efficiency by proper control and optimization of flare fuel/air/steam flow rates. Flare design requirements should be included in the SGEIS as a mitigation measure and codified in the NYCRR. These requirements should apply to all natural gas operations, not just HVHF operations.

**Reduced Emission Completions**:

In 2009, HCLLC recommended the use of Reduced Emission Completions (RECs, also known as "green completions") to control methane and other greenhouse gas (GHG) emissions following HVHF operations. RECs also reduce nitrogen oxide ($NO_x$) pollution, which otherwise would be generated by flaring gas wells, and hazardous air pollutants (HAPs) and volatile organic compounds (VOCs) emissions, which otherwise would be released when gas is vented directly into the atmosphere.

EPA estimates that, on average, an REC can capture 7,700 Mcf/well workover for an unconventional gas well. If, for example, 2,000 wells are exempted during the first few years of Marcellus Shale gas development in NYS before pipeline infrastructure is more broadly developed, that could result in 15.3 Bcf (6.2 MMTCO$_2$e) of methane gas vented to the atmosphere.

To put the significance of 15.3 Bcf of methane gas (6.2 MMTCO$_2$e) into perspective, it is equivalent to the GHG emissions from:

- Over 1,100,000 passenger vehicles; or

- The electric use of approximately 700,000 homes for one year; or

- 13,000,000 barrels of oil consumed.[243]

The 2011 RDSGEIS requires RECs where an existing gathering line is located near the well in question, which allows the gas to be collected and routed for sale. While the addition of this requirement represents a substantial improvement that protects air quality and increases the efficiency and productivity of well-sites, NYSDEC should consider expanding its REC requirements to more categories of wells—i.e., wells that are drilled prior to construction of gathering lines. Under the current proposal, a large number of wells could be exempt from the REC requirement, resulting in the flaring or venting of a significant amount of gas that could, instead, be captured for sale.

Furthermore, NYSDEC proposes to postpone making a decision on the number of wells that can be drilled on a pad without the use of RECs until two years after the first HVHF permit is issued.

---

[243] EPA Greenhouse Gas Equivalencies Calculator, http://www.epa.gov/cleanenergy/energy-resources/calculator.html#results

*Reduced Emissions Completion (REC) would be required whenever a gathering line is already constructed. In addition, **two years after issuance of the first permit for high volume hydraulic fracturing, the Department would evaluate whether the number of wells that can be drilled on a pad without REC should be limited** [emphasis added].*[244]

NYSDEC should not defer the implementation of this known best practice, because it could result in the exemption of several thousand wells from this control technology requirement, leading to unmitigated air quality impacts from uncontrolled venting. HCLLC agrees that RECs are not an option for single exploration wells with no offset wells or pipeline infrastructure nearby. In addition, RECs may not be possible if well pressure is too low. Regulations should make exceptions only for these situations in which emission control is truly infeasible. However, RECs should be required in all other circumstances.

Once an exploration well is drilled and hydrocarbons are located, additional drilling and well completion operations on that same drillsite should be coordinated with gas line installation, enabling RECs for all subsequent wells. High-volume hydraulic fracturing can be completed at any time after a well is drilled and gas is found. The well can be temporarily suspended, and the HVHF be conducted once a gas line is in place. In a newly explored area, it may be reasonable to drill an exploration well, and conduct a HVHF treatment to test gas productivity before drilling additional production wells. However, once a commercial source of gas is identified and tested with that initial exploration well, there is no reason to vent or flare gas using the HVHF flowback process and test wells prior to a gas line installation.

In natural gas fields, gas from the first well is often flared or vented during drilling and completion activities, because natural gas pipelines are typically not installed until it is confirmed that an economical gas supply has been found. However, once a pipeline is installed, subsequent wells drilled on that same pad would be in a position to implement REC techniques.

Operators often point to the lack of pipeline infrastructure as a primary reason REC may not be possible. However, there are also alternatives to piping methane, such as using it onsite to generate power, re-injecting it to improve well performance, or providing it to local residents as an affordable power supply. Therefore, RECs do not need to rely solely on the installation of a nearby pipeline.

RECs are technically feasible and economically attractive, and are a commercially available emission control option. Appendix 25 of the RDSGEIS, Reduced Emission Completions Executive Summary, summarizes the economic benefits, making a clear case for requiring this technology on all NYS wells, with few exceptions. RECs provide an immediate revenue stream by routing gas (methane and gas condensates) to a gas sales line that would otherwise be vented into the atmosphere or flared.. Alternatively, captured gas can be used for fuel, offsetting operating costs, or re-injected to improve well performance. Industry has demonstrated that RECs are both an environmental best practice and profitable.

In addition to being economically attractive for the operator, there are a number of other benefits of RECs:

- The collection of potentially explosive gas vapors, rather than venting them to the atmosphere. This improves well site safety, reduces worker exposure to harmful vapors, and limits overall corporate liability.

- The reduction in emissions, noises, odors, and citizen complaints associated with venting or flaring.

- The reduction in disposal costs, as a result of gas and condensate capture and sale.

---

[244] 2011 NYSDEC, RDSGEIS, Page 1-116.

- The elimination of the need to secure flare permits and provide flaring notifications.[245]

- The reduction of VOCs and HAPs. Unprocessed natural gas contains VOCs and HAPs, along with methane. Flaring, an alternative control device, can reduce VOCs and HAPs. However, flaring generates $NO_X$ and particulate matter (PM), as well as other combustible byproducts. Many areas with significant oil and gas development have challenges achieving ozone and regional haze standards. Therefore, REC technology is a preferred alternative.

- Wells flow back to portable separation units for longer periods than would be allowed with direct venting into the atmosphere or flaring, providing improved well cleanup and enhanced well productivity.

- Fewer wells are drilled as more methane is kept in the system and sent to market, thereby reducing a range of environmental impacts.

While some operators report the voluntary use of RECs, many wells in the United States are still drilled without REC. And, even for companies that have announced the use of RECs, it is not clear how extensively RECs are implemented. Thus, many states have put REC requirements into effect.

The commercial availability of REC equipment has become so widespread that it is now required in several states. For instance, Colorado requires RECs on all oil and gas wells unless they are not technically and economically feasible.[246] Fort Worth, Texas requires RECs.[247] Wyoming has required RECs in the Jonah-Pinedale Anticline Development Area (JPAD) since 2007, and more recently, Wyoming has expanded this requirement to all Concentrated Development Areas (CDAs) of oil and gas in the state.[248]

In 2005, EPA estimated that an average of 7,000 Mcf of natural gas can be recovered during each REC.[249] In 2011, EPA increased the emission recovery estimate and created two distinct categories of wells that are major contributors to methane emissions: Unconventional Gas Wells (7,700 Mcf/well workover) and Low Pressure Gas Well Cleanup (1,400 Mcf/well/year). For each unconventional gas well completion, there is an opportunity to generate about $31,000 in gross revenue, creating a very short payout period if the operator invests in its own equipment.[250]

Investment in REC equipment is extremely profitable, with a conservative average investment cost of $10,000 per REC.[251] The payout occurs quickly if a contractor is hired and the operator only pays a per well REC equipment rental charge. As long as the gas that is captured and sold exceeds the equipment rental charge, the payout is immediate.

Oil and gas operators that have a sufficient number of wells to amortize the cost of REC equipment are finding it more economically attractive to invest in their own technology. Most of the companies that have gone this route report a one- to two-year payout, and substantial profitability thereafter, depending on the gas and condensate recovery rate.[252] For smaller operators, it is possible, and maybe more

---

[245] Flaring is not always practicable near populated areas or areas of high forest fire risk.

[246] Colorado Oil and Gas Conservation Commission, Rule § 805(b)(3)

[247] Fort Worth Texas, Ordinance No. 18449-02-2009.

[248] Wyoming Oil and Gas Production Facilities, Chapter 6, Section 2, Permitting Guidance, March 2010.

[249] United States Environmental Protection Agency, Cost-Effective Methane Emissions Reductions for Small and Midsize Natural Gas Producers, Journal of Petroleum Technology, June 2005.

[250] (7,700 Mcf)($4/Mcf)= $30,800

[251] EPA's Green Completion PRO FACT Sheet No.703 estimates the cost between $1K and $10K; a $10K per completion cost estimate is conservative.

[252] EPA Natural Gas STAR, Green Completions, PRO Fact Sheet No. 703, September 2004.

financially feasible, to rent REC equipment from a contractor. The profitability math is simple. In 2005, the EPA estimated that, on average, 7,000 Mcf/well of natural gas could be captured, yielding a profit of $14K per well, with a payback of less than one year.[253] However, it is important to note that EPA's 2005 profitability calculations were based on lower gas prices ($3/Mcf) than the current market rate ($4+/Mcf). Using the EPA's new 2011 estimate of 7,700 Mcf/well and a gas price of $4/Mcf, each well, on average, has the potential to generate $31,000 in gross revenue. A portion of that revenue stream must be allocated to purchasing or renting the required REC equipment, but unless that cost is greater than $31,000 per well, a REC is a profitable endeavor. Profitability will vary based on the market price for gas and the cost of carrying out the REC.

The EPA has found that RECs are a major contributor to methane reductions on a national scale. In 2008, 50 percent of the EPA's Natural Gas STAR Program's annual total reductions for the oil and gas production sector was attributed to REC s.[254] Therefore, requiring this technology will be very important to NYS' and EPA's GHG emission reduction goals.

> **Recommendation No. 55**: Drilling and well completion operations should be coordinated with gas line installation, enabling RECs for all wells drilled subsequent to the initial exploration well. Alternatively, methane gas should be used onsite to generate power, re-injected to improve well performance, or provided to local residents as an affordable fuel supply. NYSDEC should not defer the decision to implement RECs for two more years. The requirement to use RECs in all practicable situations should be included in the SGEIS as a mitigation measure and codified in the NYCRR. This requirement should apply to all natural gas operations, not just HVHF operations.

**Wastewater Impoundments**:

In 2009, HCLLC pointed out that centralized wastewater impoundments have the potential to be a major source of HAPs—EPA lists facilities that release 10 tons of a single HAP per year as major sources. The 2009 DSGEIS estimated 32.5 tons of methanol[255] per year—more than three times the HAP major source threshold—could be emitted from centralized wastewater impoundments.[256] This large amount of hazardous air pollution was identified as an unmitigated significant impact.

In 2009, HCLLC recommended the use of closed loop collection and tank systems, rather than wastewater impoundments, as a best practice. The 2011 RDSGEIS prohibits the use of wastewater impoundments at the drillsite, requiring closed loop collection and tank systems. This is a substantial improvement. However, the RDSGEIS does not prohibit centralized flowback impoundments at locations

---

[253] EPA Natural Gas STAR, Cost-Effective Methane Emission Reductions for Small and Mid-Size Natural Gas Producers, Corpus Christi, Texas, November 1, 2005.

[254] 2009 EPA Natural Gas STAR Program Accomplishments, available online at http://www.epa.gov/gasstar/documents/ngstar_accomplishments_2009.pdf. Total sector reductions (2008) = 89.3 Bcf of which 50 percent are the result of RECs (50% of 89.3 Bcf = 45 Bcf).

[255] EPA lists methanol as a hazardous air pollutant, but has not yet classified it with respect to carcinogenicity. The reproductive and developmental effect of methanol on humans is not yet understood. http://www.epa.gov/ttn/atw/hlthef/methanol.html. Testing in rats has yielded skeletal, cardiovascular, urinary system, and central nervous system malformations. American Conference of Governmental Industrial Hygienists (ACGIH), TLVs and BEIs, Threshold Limit Values for Chemical Substances and Physical Agents, Biological Exposure Indices, Cincinnati, OH, 1999. In humans, chronic inhalation or oral exposure may result in headaches, dizziness, giddiness, insomnia, nausea, gastric disturbances, conjunctivitis, blurred vision, and blindness. Neurological damage, specifically permanent motor dysfunction, may also be a result. The Merck Index. An Encyclopedia of Chemicals, Drugs, and Biologicals. 11th ed. Ed. S. Budavari. Merck and Co. Inc., Rahway, NJ. 1989.

[256] 2009 NYSDEC, DSGEIS, Page 6-57.

away from the drillsite and fails to analyze the impacts of such centralization. This represents impermissible segmentation.  It is recommended that centralized flowback impoundments be prohibited, however, if this recommendation is not adopted a new draft should be prepared analyzing the potential impacts posed by the reliance on centralized impoundments to store and treat HVHF wastewater and made available for public comment; such a significant analysis cannot be deferred until future site-specific review.

Despite the RDSGEIS's reliance on representations by industry that centralized flowback impoundments are not contemplated at this time, recent experience in Pennsylvania, and other states, reveals that industry's use of centralized flowback impoundments has become common practice. The RDSGEIS either needs to clearly prohibit the use of centralized flowback impoundments in NYS or analyze the potential environmental impacts, including human health impacts, posed by such use and develop ways to avoid or mitigate such impacts.

While industry may not presently intend to build centralized flowback impoundments in NYS, that could change in the future. Based on the use of centralized flowback impoundments as a common industry practice, this is a reasonably foreseeable impact, and unless prohibited is an unmitigated significant impact.

As proposed, there would be no limitations in place for these types of impoundments:

> ***Since September 2009 industry has provided information that***: *(1) simultaneous drilling and completion operations at a single pad would not occur; (2) the maximum number of wells to be drilled at a pad in a year would be four in a 12-month period; and **(3) centralized flowback impoundments, which are large volume, lined ponds that function as fluid collection points for multiple wells, are not contemplated** [emphasis added].*[257]

---

**Recommendation No. 56**: The use of centralized impoundments to collect waste should be prohibited because these impoundments are a major source of air pollution. This prohibition should be included in the SGEIS as a mitigation measure and codified in the NYCRR.

If centralized flowback impoundments are not prohibited, the potential adverse impacts to human health and the environment must be analyzed fully by NYSDEC. Given that the RDSGEIS includes no analysis whatsoever of the impacts of centralized flowback impoundments, a new draft must be prepared and made available for public comment in order to satisfy the requirements of SEQRA; deferring such analysis for later review would constitute impermissible segmentation. Moreover, mitigation measures to address the potential significant impacts must be included in the SGEIS and codified in the NYCRR.

---

**Gas Dehydrators**:

In 2009, HCLLC pointed out that gas dehydration units can emit significant amounts of HAPs and VOCs, and it is best practice to use control devices with gas dehydration units to mitigate HAP and VOC emissions.

---

[257] 2011 NYSDEC, RDSGEIS, Executive Summary, Page 15-16, and Page 6-111.

Dehydrator units remove water moisture from the gas stream. Dehydrator units typically use triethylene glycol (TEG) to remove the water; the TEG absorbs methane, VOCs, and HAPs. These gases are vented to atmosphere unless pollution controls are installed. Best technology for dehydration units includes the installation of flash-tank separators to recover gas pollutants. Alternatively, pollutants can be routed to a vapor collection/destruction unit, or desiccant dehydrators can be used. Desiccant dehydrators have shown to cost less than flash-tank separators, have lower operating and maintenance costs, and control 99% of HAPs.[258]

The 2011 RDSGEIS requires emissions modeling, using the EPA approved and industry standard model GRI-GlyCalc, and the installation of emission controls for dehydrator units emitting more than one ton per year of benzene. This is an important and substantial improvement.

Appendix 10, Proposed Supplementary Permit Conditions for HVHF, requires:

> The emissions of benzene at any glycol dehydrator to be used at the well pad will be limited to one ton/year as determined by calculations with the GRI-GlyCalc program. If wet gas is encountered, the dehydrator will have a minimum stack height of 30 feet (9.1m) and will be equipped with a control device to limit the benzene emissions to one ton/year; [259]

The 2011 RDSGEIS also requires a GHG impacts mitigation plan[260] that includes an evaluation of EPA Natural Gas STAR Best Practices for methane and other GHG emissions. However, it does not make GHG emission controls for gas dehydrators mandatory.

NYSDEC's requirement to control emissions from all dehydrators emitting more than one ton per year of benzene will result in emission control on a number of NYS dehydration units. However, smaller dehydration units that do not fall under this requirement may still have economical methane emission control opportunities.

In 2011, the EPA estimated that approximately 8 Bcf of methane is emitted from gas dehydration systems annually. Most of this methane is emitted from smaller glycol dehydration units currently fall below federal regulatory thresholds for emission control. That methane could instead be captured for sale or use as fuel.[261] While the EPA requires a number of large glycol dehydrators to install emission controls, under the federal Maximum Achievable Control Technology (MACT) standards at 40 CFR Part 63, Subpart HH, small glycol dehydrators are typically exempt. Many small operating glycol dehydrator units do not have flash tank separators, condensers, electric pumps, or vapor recovery installed.

There are four straightforward solutions readily available to control methane emissions from TEG dehydrator units, including: installing a flash tank separator; optimizing the glycol circulation rate; rerouting the skimmer gas; and installing an electric pump to replace the natural gas driven energy exchange pump.

A typical glycol dehydration system includes the following components:

- **Glycol Contactor**: Wet gas enters the glycol contactor. Glycol removes moisture from the gas by the process of physical absorption. Along with removing moisture, the glycol also absorbs methane,

---

[258] Fernandez, R., Petrusak, R., Robinson, D., Zavadil, D., Cost-Effective Methane Emissions Reductions for Small and Midsize Natural Gas Producers, Journal of Petroleum Technology, June 2005.

[259] 2011 NYSDEC, RDSGEIS, Page 7-108 and 7-109, and Appendix 10, Attachment A.

[260] 2011 NYSDEC, RDSGEIS, Executive Summary, Page 24.

[261] USEPA, Inventory of U.S. Greenhouse Gas Emissions and Sinks; (1990-2009), April 15, 2011.

VOCs, and HAPs. Dry gas exits the glycol contactor absorption column and is either routed to a pipeline or a gas plant.

The glycol contactor unit plays the primary role in dehydrating gas to pipeline specifications; the rest of the glycol dehydration system is required to convert the now moisture rich glycol back into a lean product that can be re-used to dehydrate more incoming gas. Therefore, the next step in the process is to route the moisture rich glycol to "regenerator" and "reboiler" units.

- **Glycol Regenerator & Reboiler:** Glycol loaded with moisture, methane, VOCs, and HAPs ("rich glycol") exits the bottom of the glycol contactor unit and is routed to the glycol regenerator and reboiler units, where the absorbed components are removed and "lean" glycol is created. If emission controls are not installed, methane, VOCs, HAPs, and water are boiled off and vented to atmosphere from the regenerator and reboiler units.

One way to limit the amount of methane, VOCs, and HAPs emitted to the atmosphere from the regenerator and reboiler units is to install a flash tank separator.

- **Flash Tank Separator:** The installation of a flash tank separator between the glycol contactor and the glycol regenerator/reboiler units creates a pressure drop in the system, allowing methane and some VOCs and HAPs to flash out of (separate from) the glycol. The amount of pressure drop that can be created is a function of the fuel gas system pressure or compressor suction pressure, because methane gas flashed-off at the flash tank separator is then sent to be used as fuel in the TEG reboiler or compressor engine. Simply put, the pressure can only be dropped to a pressure that still exceeds the fuel gas pressure, allowing the collected methane gas to flow into the fuel system. Flash tank separators typically recover 90 percent of the total methane and approximately 10 to 40 percent of the total VOCs that would otherwise be vented to atmosphere. Methane emissions can also be controlled by taking the simple step of adjusting the rate that glycol is circulated in the system.

In 2005, the EPA estimated that the installation of a flash tank separator, on average, resulted in 10 Mcfd (3,650 Mcf/yr) of methane gas captured for sale or use as fuel for each TEG dehydrator (typically a 90 percent reduction in methane emissions). And in 2009, the EPA reported that flash tank separators are installed on *only*: 15 percent of the dehydration units processing less than 1 MMcfd; 40 percent of units processing 1 to 5 MMcfd; and between 65 and 70 percent of units processing more than 5 MMcfd.[262] Therefore, an emission control target still exists, especially for small dehydration units.

The installation of a flash tank separator also improves the efficiency of downstream components (e.g. condensers) and reduces fuel costs by providing a fuel source to the TEG reboiler or compressor engine.[263]

- **Glycol Recirculation Pump:** Methane emissions are directly proportional to the glycol circulation rate. Circulating glycol at a rate that exceeds the operational need for removing water content from gas unnecessarily increases methane emissions. Glycol circulation rates are typically set at the maximum to account for peak throughput. Gas pressure and flow rate decline over time, requiring the glycol circulation rate to be adjusted to meet operational need. Optimizing the glycol circulation merely requires an engineering assessment and a field operating adjustment. If the glycol dehydration unit includes a condenser, methane emissions can be collected and used for fuel or destroyed, rather than being vented to atmosphere.

In 2005, the EPA estimated that optimizing the glycol circulation rate could result in a wide range of methane capture from 1 to 100Mcfd (18,250 Mcf/yr using a median estimate of 50 Mcfd).[264]

---

[262] USEPA Natural Gas STAR, Optimize Glycol Circulation and Install Flash Tank Separators in Glycol Dehydrators, 2009.
[263] USEPA Natural Gas STAR, Optimize Glycol Circulation and Install Flash Tank Separators in Glycol Dehydrators, 2009.

- **Condensers**: Some glycol reboilers have condensers to recover natural gas liquids and reduce VOCs and HAPs. However, condensers do not capture methane (because it is a non-condensable gas); therefore, the addition of a condenser does not reduce methane emissions. When condensers are installed, methane gas is typically vented to atmosphere. Alternatively, this methane gas (called "skimmer gas") can be routed to the reboiler firebox or other low-pressure fuel gas systems.[265] In 2005, the EPA estimated that rerouting glycol skimmer gas could result in an average methane capture of 21 Mcfd (7,665 Mcf/yr). [266]

- **Electric Pump vs. Energy-Exchange Pumps:** Historically, gas-assisted glycol pumps have been used. Where there is an electric supply, the gas-assisted glycol pumps can be replaced with an electric pump. Gas-assisted pumps are driven by the expansion of the high-pressure gas entrained in the rich glycol that leaves the contactor, supplemented by the addition of untreated high-pressure wet (methane rich) natural gas. The high-pressure gas drives pneumatic pumps. Much like pneumatically operated valves, pneumatically operated pumps vent methane.

  In 2007, the EPA estimated that between 360 and 36,000 Mcf/yr in methane emission reductions could be achieved by installing an electric pump to replace the natural gas driven glycol energy exchange pump; the wide range in methane emission reductions is a function of the large variation in equipment sizes.[267]

In 2007, EPA estimated the total potential emission reductions at any given glycol dehydration unit is a function of how many emission control solutions are installed. The total may range from 3,700-35,000 Mcf/year ($14.8K-$140K worth of gas leakage). In 2011, EPA estimated 38,000 Mcf/year ($152K).[268] Therefore, controlling methane emissions and other GHG emissions from dehydration units is good business.

However, despite the clear environmental and financial benefits, not all members of the oil and gas industry voluntarily invest in methane control options. Therefore, it is recommended that NYSDEC require operators to evaluate the technical and economic feasibility of installing methane emission controls on gas dehydrators; installation should be mandatory unless an infeasibility determination is made.

> **Recommendation No. 57**: Natural gas operators should be required to evaluate the technical and economic feasibility of installing methane emission controls on gas dehydrators; installation should be mandatory unless an infeasibility determination is made. This requirement should be included in the SGEIS as a mitigation measure and codified in the NYCRR. This requirement should apply to all natural gas operations, not just HVHF operations.

---

[264] The wide range in methane capture opportunity is a function of the dehydrator size, and how efficiently the operator previously optimized the glycol circulation rate.

[265] USEPA Natural Gas STAR, Reroute Glycol Skimmer Gas, PRO Fact Sheet No. 201, 2004.

[266] EPA Natural Gas STAR, Cost-Effective Methane Emission Reductions for Small and Mid-Size Natural Gas Producers, Corpus Christi, Texas, November 1, 2005.

[267] EPA Natural Gas STAR, Natural Gas Dehydration, Producers Technology Transfer Workshop, Durango Colorado, September 13, 2007.

[268] USEPA, Inventory of U.S. Greenhouse Gas Emissions and Sinks; (1990-2009), April 15, 2011.

**Diesel Engine Emission Control**:

In 2009 AKRF recommended that diesel engines should be Tier 2 or higher. AKRF pointed out that "Tier 0" engines could be used, unless NYSDEC limited engines by certification type. Uncertified engines have extremely high emission rates for criteria pollutants such as particulate matter.

Additionally, AKRF recommended that diesel particle filters be installed on diesel engines to reduce particulate matter that has shown to aggravate respiratory systems and is known to be carcinogenic. More specifically AKRF recommended that all engines with a power output of 50 horsepower or greater be equipped with a diesel particle filter, either by the original engine manufacturer or by retrofit.

The 2011 RDSGEIS, Appendix 10 Proposed Supplementary Permit Conditions for HVHF, addressed most of AKRF's recommendations, by prohibiting Tier 0 engines, requiring Tier 2 engines in most cases, and requiring both Tier 1 and Tier 2 engines to install emission controls. NYSDEC proposes that:

- *No uncertified (i.e., EPA Tier 0) drilling or hydraulic fracturing engines will be used for any activity at the well sites;*

- *The drilling engines and drilling air compressors will be limited to EPA Tier 2 or newer equipment. If Tier 1 drilling equipment is to be used, these will be equipped with both particulate traps (CRDPF [Continuously Regenerating Diesel Particulate Filters]) and SCR [Selective Catalytic Reduction] controls. During operations, this equipment will be positioned as close to the center of the well pad as practicable. If industry deviates from the control requirements or proposes alternate mitigation and/or control measures to demonstrate ambient standard compliance, site specific information will be provided to the Department for review and concurrence; and*

- *The completion equipment engines will be limited to EPA Tier 2 or newer equipment. Particulate traps will be required for all Tier 2 engines. SCR control will be required on all completion equipment engines regardless of the emission Tier. During operations, this equipment will be positioned as close to the center of the well pad as practicable. If industry deviates from this requirement or proposes mitigation and/or alternate control measures to demonstrate ambient standard compliance, site specific information will be provided to the Department for review and concurrence [emphasis added].[269]*

NYSDEC estimates that 25% of the engines may be Tier 1 engines, and to ensure compliance with National Ambient Air Quality Standards (NAAQS) it requires the engine to be equipped with both CRDPFs and Selective Catalytic Reduction controls.

While NYSDEC has proposed a number of improvements for diesel engine emission control, the RDSGEIS did not assess whether Tier 1 engines could be eliminated altogether.

> **Recommendation No. 58**: The SGEIS should examine whether it is possible to eliminate Tier 1 engine use. Further examination of AKRF's recommendation to prohibit Tier 1 engine use is warranted.

---

[269] 2011 NYSDEC, RDSGEIS, Page 7-108 and 7-109 and Appendix 10, Attachment A, Condition 9-11.

**Leak Detection & Repair Program**:

In 2009 HCLLC recommended that NYSDEC require Leak Detection and Repair (LDAR) programs including acoustic detectors and infrared technology to detect odorless and colorless leaks. Unmitigated gas leaks pose a risk of fire and explosion, and contribute to GHG, VOC, and HAP emissions, that could otherwise be avoided by routine detection and repair programs.

Methane gas leaks can occur from numerous locations at gas facilities—valves, drains, pumps, threaded and flanged connections, pressure relief devices, open-ended valves and lines, and sample points—as gas moves through equipment under pressure. These leaks are called "fugitive emissions."

Fugitive emissions from equipment leaks are unintentional losses of methane gas that may occur due to normal wear and tear, improper or incomplete assembly of components, inadequate material specifications, manufacturing defects, damage during installation or use, corrosion, or fouling.[270]

Because methane is a colorless, odorless gas, leaks often go unnoticed. Historically, leak checks were only performed on equipment components when they were first installed, using a soap bubble test or hand held sensor, to ensure the installation was leak tight. After installation leaks were not typically monitored or repaired unless they became a significant safety hazard. For example, a significant gas leak would be repaired if area, building, or employee monitors set off alarms or if olfactory, audible, or visual indicators observed by facility employees identified the leak. Under these circumstances, the leaks had usually become an obvious safety concern. As a result, methane leaks at outdoor facilities and unmanned facilities often went undetected for long periods of time.

Fugitive emission control is a two-part process that includes: (1) a monitoring program to identify leaks and (2) a repair program to fix the leak. Monitoring program type and frequency is a function of the type of component, and how the component is put to use. In most cases, monitoring programs can be intermittently scheduled at a certain frequency (e.g. monthly or quarterly) to identify leaking equipment. However, permanent leak sensors may be required to detect chronic leakers.[271]

There are many different monitoring tools that can be used to identify leaks, including electronic gas detectors, acoustic detectors, ultrasound detectors, flame ionization detectors, calibrated bagging, high volume sampler, end-of-pipe flow measurement, and infrared leak detection. Once leaks are identified, the operator can evaluate what is causing the leak and develop a replacement or repair program to mitigate the leak.

For example, a hand held infrared camera can be used as a screening tool to detect emissions that are not visible to the naked eye. An infrared camera produces images of gas leaks in real-time. [272] It is capable of identifying methane leaks, but cannot quantify the amount of the leak. Infrared cameras produce photos that show methane gas leaks.

Once a leak is identified, and a more quantitative leak flow rate determination is needed, other measurement devices such as Hi-Flow Samplers, Vent-Bag Methods, and Anemometers may be used.[273] Hi-Flow Samplers capture the entire leak, measuring the leak rate directly for leaks up to 10 cubic feet per

---

[270] USEPA, Methane's Role in Promoting Sustainable Development in the Oil and Natural Gas Industry, 2009.

[271] Squarek, J. (Canadian Association of Petroleum Producers), Layer, M. (Environment Canada) and Picard, D. (Clearstone Engineering Ltd.), Development of a Best Management Practice in Canada for Controlling Fugitive Emissions at Upstream Oil and Gas Facilities, 2005.

[272] Snider, P., Advanced Well Completion Technology to Reduce Methane Emissions and Use of Infared Cameras for Leak Detection, Global Forum on Flaring and Venting Reduction and Natural Gas Utilisation, 2008.

[273] Heath, M.W., Leak Detection and Quantification of Fugitive Methane Emissions at Natural Gas Facilities, 2009.

minute (cfm), providing leak flow rate and concentration data.[274] Toxic Vapor Analyzers and acoustic leak detection systems are other methods to identify methane leaks.[275]

Fugitive emissions management is an ongoing commitment, not a one-time initiative. The potential for fugitive equipment leaks will increase as facilities age. Successful fugitive emission control plans require trained personnel, emissions testing equipment, and performance tracking systems.

In 2009, the EPA examined the profitability of repairing equipment leaks at oil and gas facilities and found that leak repair is not only an important air pollution control and safety measure, but also is a profitable investment.[276] EPA reports that fugitive emissions control provides numerous benefits including: reduced maintenance costs and downtime, improved process efficiency, a safer work environment, a cleaner environment, and resource conservation.

The 2011 RDSGEIS acknowledges the potential impact of gas leaks, and requires a Leak Detection and Repair Program to be included in the operator's GHG Mitigation Plan.

> *Because the production phase is the greatest contributor of GHGs and in an effort to mitigate VOC and methane leaks during this phase, the* **Department proposes to require, via permit condition and/or regulation, a Leak Detection and Repair Program would include as part of the operator's greenhouse gas emissions impacts mitigation plan which is required for any well subject to permit issuance under the SGEIS** *[emphasis added].[277]*

The 2011 RDSGEIS specifies the minimum requirements for a Leak Detection and Repair Program.

> **The Leak Detection and Repair Program within the greenhouse gas emissions impacts mitigation plan would contain the following minimum requirements.**

- *There would be an ongoing site inspection for readily detected leaks by sight and sound whenever company personnel or other personnel under the direction of the company are on site. Anytime a leak is detected by sight or sound, an attempt at repair should be made. If the leak is associated with mandated worker safety concerns, it should be so noted in follow-up reports;*

- *Within 30 days of a well being placed into production and at least annually thereafter, all wellhead and production equipment, surface lines and metering devices at each well and/or well pad including and from the wellhead leading up to the onsite separator's outlet would be inspected for VOC, methane and other gaseous or liquid leaks. Leak detection would be conducted by visible and audible inspection and through the use of at least one of the following: 1) electronic instrument such as a forward looking infrared camera, 2) toxic vapor analyzer, 3) organic vapor analyzer, or 4) other instrument approved by the department;*

- *All components noted above that are possible sources of leaks would be included in the inspection and repair program. These components include but are not limited to: line heaters, separators, dehydrators, meters, instruments, pressure relief valves,*

---

[274] http://www.heathus.com/_hc/index.cfm/about-us/vision

[275] Methane to Markets, Reducing Methane Emissions through Directed Inspection and Maintenance (DI&M), Oil & Gas Subcommittee Technology Transfer Workshop, 2009.

[276] Methane to Markets, Reducing Methane Emissions Through Directed Inspection and Maintenance (DI&M), Oil & Gas Subcommittee Technology Transfer Workshop, 2009.

[277] 2011 NYSDEC, RDSGEIS, Page 7-114 .

*vents, connectors, flanges, open-ended lines, pumps and valves from and including the wellhead up to the onsite separator's outlet;*

- *For each detected leak, if practical and safe an initial attempt at repair would be made at the time of the inspection, however, any leak that is not able to be repaired during the inspection may be repaired at any time up to 15 days from the date of detection provided it does not pose a threat to on-site personnel or public safety. All leaking components which cannot be repaired at detection would be identified for such repair by tagging. All repaired components would be re-inspected within 15 days from the date of the initial repair and/or re-repair to confirm, using one of the approved leak detection instruments, the adequacy of the repair and to check for leaks. The department may extend the period allowed for the repair(s) based on site-specific circumstances or it may require early well or well pad shutdown to make the repair(s) or other appropriate action based on the number and severity of tagged leaks awaiting repair; and*

- *Site inspection records would be maintained for a minimum period of 5 years. These records would include the date and location of the inspection, identification of each leaking component, the date of the initial attempt at repair, the date(s) and result(s) of any re-inspection and the date of the successful repair if different from initial attempt [emphasis added].[278]*

The RDSGEIS proposal to require an LDAR Program is a substantial improvement; however, a few changes to the proposed program are recommended:

- An LDAR inspection should be conducted at well/drillsite start-up, not 30 days after. It is best practice to construct and install equipment and test for leaks prior to operation. Equipment should not be operated for 30 days without completing this minimum standard of care.

- Quarterly testing with an infrared camera (as a screening method) should be required, instead of annual testing, as a minimum standard. If the infrared camera screening indicates a leak, the leak location, if clearly pin pointed, should be repaired. Or additional testing should be conducted using more sophisticated tools (described above) to pin-point the leak location, followed by a repair.

- Testing should include all equipment located on the drillsite. As proposed, the RSGEIS suggests the LDAR Program end at the separator's outlet. Equipment will be located downstream of the separator outlet, and prior to the connection the gas transit line that could potentially leak gas. Therefore, it is recommended that the LDAR Program be implemented for all equipment on the drillsite up to and including the gas meter outlet which is connected to the pipeline inlet.

> **Recommendation No. 59**: The proposed LDAR Program should be revised to require: a drillsite LDAR inspection at start-up; quarterly testing with an infrared camera with additional follow-up testing and repair if a leak is indicated; testing of all equipment located on the drillsite up to and including the gas meter outlet which is connected to the pipeline inlet. These requirements should be included in the SGEIS as mitigation measures and codified in the NYCRR, and be required for all natural gas operations, not just HVHF operations.

---

[278] 2011 NYSDEC, RDSGEIS, Page 7-115 and 7-116.

**Cleaner Power and Fuel Supply Options**:

In 2009, HCLLC and AKRF recommended that the SGEIS evaluate the use of cleaner engines and fuels.

In suburban and urban areas of NYS, where a connection to the electric power grid is available, electric engines should be used in lieu of diesel wherever practicable, thus eliminating local diesel exhaust. This alternative would be particularly beneficial where operations are planned near sensitive receptors and in areas that already suffer from high air pollutant loading. Electric engines have the added benefit of quieter operation and less noise impact in urban and suburban settings.

In rural areas, where high-line power is not readily available, an operator should be required to evaluate whether there is a natural gas supply that could be used as fuel. Natural gas fired engines produce less air pollution that diesel engines. A natural gas supply should be available for all wells drilled on a multi-well drillsite, except the first well. Once the first well is drilled using diesel, subsequent wells can be drilled using the natural gas produced by that well to generate power. Smaller temporary gas processing units are available to process wellhead gas to the quality required for equipment use. The use of dual fuel engines would enable switching from diesel to natural gas once it is available.

The use of electric and natural gas engines would result in reduced local pollutant emissions and overall GHG emissions (both grid power and natural gas have a lower carbon footprint than diesel) and generally would have associated cost savings given the reduced fuel transportation and storage needs (e.g. double-wall tanks) and the reduced risk of tank leakage and cleanup associated with the use of fuel gas produced on-site or electric power.

**The 2011 RDSGEIS**: The 2011 RDSGEIS did not examine cleaner power and fuel supply options. The RDSGEIS only briefly mentioned that electric engines and cleaner fuel options were recommended[279] but disregarded the recommendations as "unlikely to be practically implemented to any extent" due to the remote nature of the drillsites. This analysis is incomplete and fails to consider viable alternatives for mitigating air pollution.

Foremost, electric power is available in all suburban and urban areas of NYS, and is currently located in many rural areas as well to supply power to homes, farms and businesses.

Secondly, the use of natural gas-fired engines on a multi-well drillsite is a commonly used mitigation measure. While diesel engines are often used as the prime mover of power supply for rotary well drilling, natural gas or dual fuel (diesel/gas) engines are available to take advantage of cleaner fuel supplies.[280] EnCana, a gas producer, reports that natural gas-fired rigs reduce air pollution by 90% compared to diesel fired rigs.[281] Power can also be supplied to the drilling rig by a natural gas-powered reciprocating turbine that can generate electricity on site.

---

[279] 2011 NYSDEC, RDSGEIS, Page 6-144.

[280] www.naturalgas.org.

[281] EnCana 2005 Annual Report.

**Recommendation No. 60**: In suburban and urban areas of NYS, where a connection to the electric power grid is available, electric engines should be used in lieu of diesel wherever practicable, eliminating the local diesel exhaust from those engines. In rural areas, where high-line power is not readily available, an operator should be required to evaluate whether there is a natural gas supply that could be used as fuel; if so, use of the natural gas supply should be mandatory to the extent practicable. Cleaner power and fuel selection requirements should be included in the SGEIS as a mitigation measure and codified in the NYCRR. These requirements should apply to all natural gas operations, not just HVHF operations.

## 18. Surface Setbacks from Sensitive Receptors

**Background:** The 2009 DSGEIS did not propose sufficient safety or quality-of-life surface setbacks from sensitive human and environment resource receptors. This problem persists in the 2011 RDSGEIS. Noise, traffic, odor, air, and water pollution impacts to sensitive receptors will be significant if the small setbacks proposed in the RDSGEIS are adopted.

Surface setbacks should be increased to mitigate significant impacts and to create a safe environment for the affected public. For example:

- Blowouts can eject drilling mud, hydrocarbons, and/or formation water from a well onto adjacent waters and lands. Depending on reservoir pressure, blowout circumstances, and wind speed, these pollutants can be distributed hundreds to thousands of feet away from a well. These pollutants can then be further transported in the subsurface or on the surface, creating a large area of contamination in a very short amount of time.

- Chemicals, fuels, and explosive charges (e.g. perforating guns) may be located at the drillsite and may pose hazards to the public, in addition to the flammable, explosive, and hazardous gases (e.g. hydrogen sulfide gas, benzene) that are produced from the well and associated equipment.

- The potential radius of impact for explosions, fire, and other industrial hazards should be considered. For example, the city of Forth Worth, Texas uses the International Fire Code as the basis for its minimum 600' setback from Barnett shale gas drilling operations.[282] Whereas, NYCRR only provides for a 100' setback from a home. 6 NYCRR § 553.2.

- High pressure hose leaks can spray industrial fluids off the drilling pad and onto surrounding properties or waters. The radius of contamination will depend on system pressure, shut-down reaction timing, wind speed, and other factors.

For example, in September 2009, 1,300 gallons of well chemicals were leaked during a hydraulic fracture treatment at the Cabot Heitsman 4H well located in Susquehanna Country, Pennsylvania, and flowed into the nearby Steven's Creek located more than 100 feet away, despite protections in place under the operator's required Pennsylvania PPC plan.[283]

> **Recommendation No. 61**: The SGEIS should provide scientific and technical justification for each setback distance proposed to demonstrate how that distance is protective of the nearby sensitive receptor. A hazard identification analysis should be completed to assess the safe distance from human and sensitive environmental receptors to proposed shale gas drilling and HVHF operations. The analysis should assess blowout radius, spill trajectory, explosion hazards, other industrial hazards, fire code compliance, human health, agricultural health, and quality-of-life factors. Improved setbacks as a result of this analysis should be included in the SGEIS as a mitigation measure and codified in the NYCRR.

While statewide minimum setbacks to protect human health, provide safe buffers, and protect the environment should be established, both the RDSGEIS and NYCRR should include a provision to allow local communities to establish more protective setbacks than statewide regulations to address unique and site-specific local concerns and community characteristics.

---

[282] Fort Worth Gas Drilling Regulations Presentation, Barnett Shale EXPO, March 11, 2009.

[283] Cabot Oil & Gas Corporation, Engineering Study, for submittal to PADEP, In Response to Order dated September 24, 2009, prepared by URS Corporation for Cabot, October 9, 2009.

> **Recommendation No. 62**: The SGEIS and NYCRR should allow local zoning authorities to establish more protective setbacks than statewide regulations to address unique and site-specific local concerns and community characteristics. The ability to improve local setbacks should be included in the SGEIS as a mitigation measure and codified in the NYCRR.

**The 2011 RDSGEIS**: The 2011 RDSGEIS proposes additional setbacks from aquifers, wells, and water bodies for HVHF operations, but does not establish additional setbacks from homes or public buildings.

NYSDEC does not provide scientific or technical justification in the RDSGEIS for the setback distances it has selected. Setbacks ranging from 150' to 2,000' are included in the RDSGEIS without justification for how or why those particular distances were selected or determined to be adequate to protect water resources.

The 2011 RDSGEIS proposes the following setbacks:

- **500' setback from primary and principal aquifers**. However, for principal aquifers, drilling and HVHF operations can occur within that 500' buffer with additional review, and for both primary and principal aquifers the setback distance will be reconsidered in two years in a yet to be determined process.

  *Well pads for high-volume hydraulic fracturing would be prohibited within 500 feet of primary aquifers (subject to reconsideration 2 years after issuance of the first permit for high-volume hydraulic fracturing).[284]*

  *For at least two years from issuance of the first permit for high-volume hydraulic fracturing, proposals for high-volume hydraulic fracturing at any well pad within 500 feet of principal aquifers, would require (1) site-specific SEQRA determinations of significance and (2) individual State Pollutant Discharge Elimination System (SPDES) permits for stormwater discharges. The Department would re-evaluate the necessity of this approach after two years of experience issuing permits in areas outside of the 500-foot boundary.[285]*

- **2,000' setback from a public water supply**, unless a shale gas well is located within 1000' of a subsurface water supply designated by the New York City Department of Environmental Protection (NYCDEP). However, these setbacks will be reconsidered in three years in a yet to be determined process.

  *The Department will not issue well permits for high-volume hydraulic fracturing at the following locations…any proposed well pad within 2,000 feet of public water supply wells, river or stream intakes and reservoirs (subject to reconsideration 3 years after issuance of the first permit for high-volume hydraulic fracturing).[286]*

  *The Department proposes that site-specific environmental assessments and SEQRA determinations of significance be required for … any proposed well location determined by NYCDEP to be within 1,000 feet of its subsurface water supply infrastructure.[287]*

---

[284] 2011 NYSDEC, RDSGEIS, Page 1-17.

[285] 2011 NYSDEC, RDSGEIS, Page 1-18.

[286] 2011 NYSDEC, RDSGEIS, Page 3-15.

[286] 2011 NYSDEC, RDSGEIS, Page 3-16.

[287] 2011 NYSDEC, RDSGEIS, Page 3-15.

Harvey Consulting, LLC.                                             Report to NRDC January 2012

> **Recommendation No. 63**: The process for revising the 500' setback from primary and principal aquifers and the 2,000' setback from a public water supply in two and three years, respectfully, is unclear. NYSDEC should clarify the review process, including an explanation of its plans for public review and comment. NYSDEC should revise its regulations at 6 NYCRR § 617.4(b) to provide that the siting of any oil or gas well within 500' of a primary aquifer or within 2,000 of a public water supply is a Type I action.

- **500' setback from a private water well**.

   *The Department will not issue well permits for high-volume hydraulic fracturing at the following locations...any proposed well pad within 500 feet of private drinking water wells or domestic uses springs, unless waived by the owner.*[288]

The RDSGEIS provides no rationale as to why a public water supply would be afforded a 2,000' setback, while a private water well would only be afforded at 500' setback.

> **Recommendation No. 64**: The SGEIS should examine whether waivers to the 500' private water well setback comport with federal law and the requirement to protect Underground Sources of Drinking Water (USDWs). The SGEIS should provide technical justification for any reduction in this setback, and should not allow a private water well owner to reduce the setback such that it poses a risk to its water supply, as well as other user in the area. Private land owners should not be allowed to waive setbacks from private water wells and adversely affect the water quality of neighboring wells.

- **150' setback from a stream, storm drain, lake, or pond**.

   *Based on the above information and mitigating factors, the Department proposes that site specific SEQRA review be required for projects involving any proposed well pad where the closest edge is located within 150 feet of a perennial or intermittent stream, storm drain, lake or pond.*[289]

The 150' setback language conflicts with the 2,000' setback language above, because it allows a closer setback from lakes, rivers and streams than from a public water supply. It is not clear which lakes, rivers, and streams would be protected by the 150' setback, and which would be protected by a 2,000' setback.

On October 3, 2011 Pennsylvania Governor Corbett announced plans to implement the Marcellus Shale Advisory Commission recommendation to increase the setback distance for wells near streams, rivers, ponds and other bodies of water to at least 300'.[290] An increased set back to at least 300' should also be considered by NYS.

---

[288] 2011 NYSDEC, RDSGEIS, Page 7-76.

[289] 2011 NYSDEC, RDSGEIS, Page 7-76.

[290] Pennsylvania Office of the Governor, News Release, Governor Corbett Announces Plans to Implement Key Recommendations of Marcellus Shale Advisory Commission, October 3, 2011.

> **Recommendation No. 65**: The conflicting language between the 150' setback requirement and 2,000' setback requirement for lakes, rivers, and streams needs to be resolved in both the SGEIS and the NYCRR. As drafted, neither the RDSGEIS nor the NYCRR are clear which lakes, rivers, and streams would be protected by the 150' setback, and which would be protected by a 2,000' setback. NYSDEC should indicate whether it intends to apply the 150' setback only to surface water resources that are not actual or potential public drinking water supplies. NYSDEC should also explain whether the 150' set back is sufficient to protect those water resources, or whether this setback should be increased. Improved setbacks as a result of this analysis should be included in the SGEIS as a mitigation measure and codified in the NYCRR.

- **4,000' setback from NYC and Syracuse watersheds**.

    *Accordingly, the Department recommends that regulations be adopted to prohibit high-volume hydraulic fracturing in both the NYC and Skaneateles Lake watersheds, as well as in a 4,000 -foot buffer area surrounding these watersheds, to provide an adequate margin of safety from the full range of operations related to high-volume hydraulic fracturing that extend away from the well pad. The Department also is presenting this proposal based on its consistency with the principles of source water protection and the "multi-barrier" approach to systematically assuring drinking water quality.[291]*

> **Recommendation No. 66**: The 4,000' setback from NYC and Syracuse watersheds should be added to the proposed regulatory revisions for operations associated with HVHF at 6 NYCRR § 560.4. The SGEIS and NYCRR should also clarify if activities associated with HVHF drilling and completions will be prohibited underneath the watershed as well as on the surface.

NYSDEC has not provided engineering or scientific justification for the setback distances it has selected, other than a brief assessment of the setbacks that are allowed in other states. NYSDEC ultimately selected setbacks that are not as protective as those identified by the agency's consultants. For example, the RDSGEIS, states:

    *The required setbacks from surface water supplies in other states reviewed by Alpha vary between 100 and 350 feet.[292]*

NYSDEC's consultants collected information that shows a more protective 350' setback is in use in other states; however, NYSDEC concludes that only a 150' setback will be required. This is less than half the distance of the most protective standard found by NYSDEC's consultants, and the 150' setback can be further reduced at NYSDEC's discretion based on a site-specific SEQRA review:

    *Based on the above information and mitigating factors, the Department proposes that site specific SEQRA review be required for projects involving any proposed well pad where the closest edge is located within 150 feet of a perennial or intermittent stream, storm drain, lake or pond.[293]*

---

[291] 2011 NYSDEC, RDSGEIS, Page 7-56.
[292] 2011 NYSDEC, RDSGEIS, Page 7-76.
[293] 2011 NYSDEC, RDSGEIS, Page 7-76.

Of note, the RDSGEIS does not address setbacks from homes or public buildings. The RDSGEIS merely requires the operator to document the distance from the proposed drilling and HVHF operations to "…any residences, occupied structures or places of assembly within 1,320 feet."[294] However, no new setback is established for homes or public buildings, other than required by current regulations.

**NYCRR Proposed Revisions**: The new setbacks proposed in the RDSGEIS are codified in regulation at 6 NYCRR §560.4. These setbacks would apply only to wells that undergo HVHF. NYSDEC does not explain why these setbacks would not apply to all oil and gas well drilling in NYS, despite the fact that 6 NYCRR § 553.2 (Well Surface Restrictions) applies to all NYS oil and gas wells. NYSDEC has not justified its limiting of new setback increases to HVHF wells only.

> **Recommendation No. 67**: The setback increases proposed in the RDSGEIS should apply to all oil and gas drilling in NYS and should be codified at 6 NYCRR § 553.2.

The existing NYCRR allows drilling, HVHF operations, and production equipment to be located within 100' from an inhabited private dwelling and within 150' from a public building or area that may be used as a place of "resort, assembly, education, entertainment, lodging, trade, manufacture, repair, storage, traffic or occupancy by the public." The existing NYCRR also allows drilling, HVHF operations, and production equipment to be located within 50' from a public stream, river, or other body of water. There is no required setback from buildings or structures used for agriculture. 6 NYCRR § 553.2.

The proposed revisions to the NYCRR include 500' setbacks from primary aquifers, 2,000' setbacks from public water supplies, and 500' setbacks from private wells. Proposed 6 NYCRR § 560.4. However, these setbacks apply only to wells that undergo HVHF, and do not apply to all wells that undergo hydraulic fracturing operations in NYS.

NYSDEC's setback analysis does not take into account that directional drilling technology enables wells to be drilled to a bottom-hole location at 3-5 miles[295] away from a wellhead. In directional drilling, it is now common for the horizontal displacement of the bottom hole location to be several times the total vertical depth (TVD) of the well. For example, a well with a vertical depth of 5,000' could have a bottom hole horizontal displacement of 10,000-15,000' from the drill site, or more. A well with a vertical depth of 7,000' could have a bottom hole horizontal displacement of 14,000-21,000' from the drill site, or more. For example, in 1997, BP drilled a well to approximately 5,300' achieving a 33,182' horizontal displacement, meaning the wellhead was located over 6 miles away from the hydrocarbon target.[296] In 1997, a 6-mile horizontal displacement was a great feat; now, extended reach drilling (ERD) is commonplace in the industry, and wells are routinely drilled to hydrocarbon targets miles away from the wellhead.

Given the flexibility afforded by the fact that 640-acre spacing units may vary in shape, from square to rectangular, and that surface drillsites need not be located over the spacing unit, well operators utilizing directional drilling technology have a greater ability to select surface drillsite locations that optimize distance from sensitive public and private resources.

As shown in the figure below, the setbacks currently proposed in the RDSGEIS and in the NYCRR are inadequate. Shale drilling and HVHF operations within 100'-150' of homes and public buildings pose a direct safety risk, not to mention the health and quality of life impacts presented. NYSDEC is proposing

---

[294] 2011 NYSDEC, RDSGEIS, Page 3-10.

[295] Well step-out distance that can be achieved will depend on well depth.

[296] BP, Extended-Reach Drilling: Breaking the 10-km Barrier, 1997.

to allow shale drilling and HVHF operations to run 24 hours a day, 7 days a week, which will result in significant impacts to human health and quality of life—disrupting sleep, work, schooling, and recreational patterns for nearby residents.



By comparison, the local zoning setback requirements for Barnett Shale development implemented in the urban area of Fort Worth, Texas are substantially larger than those proposed for NYS.[297] As shown in the figure below, the required setback from a home is six times larger at 600', as compared to NYS' 100' setback. Additionally, Fort Worth, Texas has implemented setbacks of at least 300' from public buildings and 600' from schools, which is more than double what is proposed by NYSDEC.[298]

At a state level, Wyoming requires a minimum setback of 350' from "water supplies, residences, schools, hospitals, and other structures where people are known to congregate."[299] The below photograph shows the proximity of homes to a well pad in Pennsylvania, where a 200' minimum setback from homes is required.[300]

---

[297] Fort Worth Gas Drilling Regulations Presentation, Barnett Shale EXPO, March 11, 2009; the Code of Ordinances of the City of Forth Worth § 15-36(A).

[298] The Code of Ordinances of the City of Forth Worth § 15-34(N)(7), § 15-36(A).

[299] Wyo. Admin. Code OIL GEN Ch. 3 § 22(b).

[300] Governor's Marcellus Shale Advisory Commission Report, Prepared for Governor Corbett of Pennsylvania, July 22, 2011.



The photo above shows homes within close proximity to shale drilling operations in Hopewell Township, Washington County, PA.



**Recommendation No. 68**: Improved setbacks should be included in the SGEIS as a mitigation measure and codified in the NYCRR. Specifically, the SGEIS and NYCRR should be revised at 6 NYCRR § 553.2 to include the following minimum setbacks: homes, public buildings, and schools (1,320'; ¼ mile); private and public wells, primary aquifers, and other sensitive water resources (4,000'); and other water resources (660'; 1/8 mile). Additionally, NYSDEC should clarify the authority of local zoning authorities to establish minimum setbacks that are more protective than NYS' minimum standards in order for localities to address unique and site-specific local concerns and community characteristics.

In addition to the inadequate minimum setback requirements, the NYCRR allows an operator to move its surface location by 75' without obtaining a permit amendment. 6 NYCRR § 552.3(b). Absent NYSDEC and public review, a 75' adjustment is very significant, especially when setbacks as low as 50' to 150' are used. The regulations at 6 NYCRR § 552.3 explain that a 75' surface location adjustment is allowed, without any permit amendment process, to account for surface obstructions or topography. However, if an operator's due diligence and site planning during the original permit process include an examination of surface obstructions and topography, later adjustments should not be necessary.

> **Recommendation No. 69**: The NYCRR should be revised at 6 NYCRR § 552.3 to allow the well location to be adjusted by 75' without a permit amendment only if all the statewide and local setback requirements are still preserved.

The proposed regulations that govern HVHF SPDES permits also suffer from inadequate minimum setback requirements. The revisions proposed to 6 NYCRR § 750-3.3 include: a 4,000' setback from an unfiltered water supply; a 500' setback from a primary aquifer; no operations within a 100-year floodplain; and a 2,000' setback from a public water supply, including wells, natural lakes, man-made impoundments, rivers and streams. However, neither the existing regulations nor the proposed revisions to 6 NYCRR § 750-3.3 include setbacks from streams, rivers, or other bodies of water that are not specifically designated as public water supplies. Thus, HVHF operations potentially could be as close as 50' to streams, rivers, or other bodies of water, based on 6 NYCRR § 553.2. Also, the proposed regulations do not require a minimum setback of HVHF operations from private wells.

Further inconsistency is introduced in the proposed revisions to 6 NYCRR § 750-3.21, which prohibit HVHF operations within 100' of a wetland. While this setback requirement is recognized in the RDSGEIS,[301] the proposed revisions to 6 NYCRR § 553.2 and 6 NYCRR § 560.4 do not include a parallel requirement. These sections of the regulations should be revised to include a wetland setback.

> **Recommendation No. 70**: The NYCRR should be revised at 6 NYCRR § 553.2 to include a wetland setback of at least 100' as described in the RDSGEIS.

The proposed revisions to 6 NYCRR § 750-3.21(f)(3) do not authorize the issuance of a SPDES permit for HVHF operations within 150' of storm drains, lakes, ponds, and perennial or intermittent streams, which conflicts with the 50' setback established at 6 NYCRR § 553.2. There remains confusion about which setbacks would be applied to lakes, ponds, and perennial or intermittent streams and rivers.

> **Recommendation No. 71**: The NYCRR should be revised at 6 NYCRR § 750-3.3, 6 NYCRR § 750-3.2, 6 NYCRR § 553.2, and 6 NYCRR § 560.4 to provide consistent setback requirements that are protective of water sources, including rivers, streams, lakes, and private water supplies.

NYCRR should be clear that the intent, as stated in the RDSGEIS, is to measure setbacks from the edge of the drillsite, and to attempt to center wells on the drillsite to maximize the distance from the well to the drillsite edge.

> **Recommendation No. 72**: NYCRR and the SGEIS should clarify that setbacks are measured from the edge of the drillsite. Wells should be centered on the well pad and should be set back at least 100' from the pad edge, to maximize well setbacks from sensitive receptors.

---

[301] 2011 NYSDEC, RDSGEIS, Page 2-34.

## 19. Disposal of Drilling & Production Waste and Equipment Containing Naturally Occurring Radioactive Material (NORM)

**Background:** In 2009, HCLLC made recommendations to NYSDEC on best practices for disposal of drilling and production waste and equipment containing Naturally Occurring Radioactive Materials (NORM). NORM includes uranium, thorium, radium, and lead-210 and their decay products.[302] Additionally, radon, a component of natural gas, decays into radioactive polonium.

NORM can be brought to the surface in a number of ways during drilling, completion, and production operations:

- **Drilling**: Drill cuttings containing NORM are circulated to the surface.

- **Completion**: Wells stimulated using hydraulic fracture treatments inject water; a portion of that water flows back to the surface ("flowback") and can be contaminated by radioactive materials picked up during subsurface transport.

- **Production**: Subsurface water located in natural gas reservoirs, produced as a waste byproduct, may contain radioactive materials picked up by contact with gas or formations containing NORM (this water is called "produced water"). Equipment used in hydrocarbon production and processing can concentrate radioactive materials in the form of scale and sludge.

In January 2011, NYSDEC's consultant, Alpha Geoscience, agreed that the disposal of waste containing NORM is an important issue that should be addressed in the SGEIS. Alpha Geoscience's review of HCLLC's recommendations on NORM concluded that:

> *Harvey Consulting's recommendation to analyze practices for NORM testing, NORM treatment, and NORM disposal appears to be complete and well-researched. The review presents a concise analysis of practices involving the testing for and the treatment and disposal of NORM.*

> *Harvey Consulting's review of the dSGEIS's content regarding NORM is supported by a range of reliable sources. References include the EPA's website, USGS fact sheets, Texas Railroad Commission regulations, and a publication by Argonne National Laboratory.*[303]

Alpha Geoscience recommended that the SGEIS include a detailed analysis of NORM testing, treatment, transportation, and disposal methods:

> *Alpha suggests that **it may be useful to operators if the SGEIS includes NYSDEC's detailed analyses of NORM testing, treatment, transportation, and disposal**. This information may prove useful to the operator for developing handling and disposal plans [emphasis added].*[304]

---

[302] USEPA Oil and Gas Production Wastes, NORM, http://www.epa.gov/radiation/tenorm/oilandgas.html.

[303] Alpha Geoscience, Review of the dSGEIS and Identification Best Technology and Best Practices Recommendations, Harvey Consulting, LLC; December 28, 2009, prepared for NYSERDA, January 20, 2011, Pages 9-11.

[304] Alpha Geoscience, Review of the dSGEIS and Identification Best Technology and Best Practices Recommendations, Harvey Consulting, LLC; December 28, 2009, prepared for NYSERDA, January 20, 2011, Page 12.

Yet, Alpha Geoscience recommended against adopting specific regulations to formalize NORM testing, treatment, transportation, and disposal requirements in NYS; instead, Alpha Geoscience recommended that NYSDEC "consider" having "temporary guidelines:"

> *Alpha suggests that NYSDEC consider having temporary guidelines regarding NORM in place, to clarify expectations and requirements for operators prior to the commencement of operations. This also would be helpful to operators for the design of handling and disposal plans [emphasis added].*[305]

HCLLC disagrees with Alpha Geoscience's recommendation for temporary NORM disposal guidelines. The requirements for testing, treatment, transportation, and disposal of NORM should be formalized in NYCRR. The rules should be clear to industry and the public, and enforceable by NYSDEC.

The 2009 DSGEIS acknowledged that drilling and production waste and equipment may contain NORM. NYSDEC reports that the Marcellus Shale contains Uranium-238 and Radium-226, and this NORM may be present in drill cuttings, produced water, and stimulation treatment waste.[306] NYSDEC identified Radium-226 as the most significant NORM of concern, because it is water soluble and has a half-life of 1,600 years.[307] Radiation pathways can include external gamma radiation, ingestion, inhalation of particulates, and radon gas.[308]

In 2009, HCLLC recommended that the SGEIS address the potential for equipment scale and sludge to contain high concentrations of NORM. HCLLC explained that equipment (water lines, flow lines, injection wellheads, vapor recovery units, water storage tanks, heaters/treaters, and separators)[309] used to process natural gas and produced water containing NORM can become coated with radium scale and sludge deposits.[310] Scale precipitates from produced water when it is brought to the surface, cooled to lower temperatures, and subject to lower pressures.[311] The most common form of scale is barium sulfate, which readily incorporates radium in its structure. HCLLC noted that, because E&P waste is exempt from the federal Resource Conservation and Recovery Act (RCRA),[312] it is critical that states establish clear best practice requirements for handling E&P waste, especially for NORM found in equipment scale and sludge. HCLLC pointed out that other oil and gas states, such as Texas and Louisiana, have adopted stringent NORM regulations, including: occupational dose control, surveys; testing and monitoring; record keeping; signs and labeling; and treatment and disposal methods.[313]

---

[305] Alpha Geoscience, Review of the dSGEIS and Identification Best Technology and Best Practices Recommendations, Harvey Consulting, LLC; December 28, 2009, prepared for NYSERDA, January 20, 2011, Page 11.

[306] 2009 NYSDEC, DSGEIS, Page 4-36.

[307] 2009 NYSDEC, DSGEIS, Page 6-129.

[308] US Department of Interior, Naturally Occurring Radioactive Materials (NORM) in Produced Water and Oil-Field Equipment-an Issue for the Energy Industry, USGS Fact Sheet FS-142-99.

[309] Argonne National Laboratory, Radiological Dose Assessment Related to Management of Naturally Occurring Radioactive Materials Generated by the Petroleum Industry, Publication ANL/EAD-2, 1996.

[310] US Department of Interior, Naturally Occurring Radioactive Materials (NORM) in Produced Water and Oil-Field Equipment-an Issue for the Energy Industry, USGS Fact Sheet FS-142-99.

[311] US Department of Interior, Naturally Occurring Radioactive Materials (NORM) in Produced Water and Oil-Field Equipment-an Issue for the Energy Industry, USGS Fact Sheet FS-142-99.

[312] Environmental Protection Agency, Exemption of Oil and Gas Exploration and Production Wastes from Federal Hazardous Waste Regulations, EPA530-K-01-004, October 2002.

[313] 2009 NYSDEC, DSGEIS, Page 7-101.

**The 2011 RDSGEIS**: The 2011 RDSGEIS provided some improved data and acknowledged the risk of significant impacts from improperly disposed waste containing NORM. The RDSGEIS concluded that the NORM dataset is limited and there can be significant variability in NORM content. The 2011 RDSGEIS based its conclusions on data collected in other states; this data examined Marcellus Shale cuttings, produced water, and HVHF flowback.

However, the 2011 RDSGEIS still does not establish clear cradle-to-grave collection, testing, transportation, treatment, and disposal requirements for all waste containing NORM. The RDSGEIS is improved in that it establishes radioactive limitations and testing in some cases, but testing is still not required in all cases (even when data uncertainty exists). Long-term treatment and disposal requirements are not robust for all waste types. Nor is there a process in place to provide the public with information on NORM handling over the project life. For example:

- Radioactivity treatment and disposal threshold levels are established (e.g. for produced water and equipment); however, it is unclear if there is sufficient treatment and disposal capacity in NYS to handle the volume and amount of radioactive waste that may be generated;

- NYSDEC assumes that some waste will not contain significant amounts of radioactivity; yet, this assumption is based on a very limited dataset;

- There is no testing requirement to verify NORM content in drill cuttings before they are sent directly to a landfill; and

- Road spreading of waste is not prohibited; it is deferred to a yet-to-be determined future process outside the SGEIS review.

> **Recommendation No. 73**: Detailed collection, testing, transportation, treatment, and disposal methods for each type of drilling and production waste and equipment containing NORM should be included in the SGEIS as a mitigation measure and codified in the NYCRR. Where data uncertainty exists, additional testing should be required. The radioactive content of waste should be verified to ensure appropriate transportation, treatment, and disposal methods are selected, and the testing results should be disclosed to the public.

**Equipment Containing NORM**: The 2011 RDSGEIS contains substantially improved requirements for equipment containing NORM, including a new radiation testing requirement and a treatment and disposal threshold limit. The RDSGEIS concludes that pipe scale and sludge (NORM buildup in equipment) can result in NORM concentrations that may have a significant adverse impact.

The 2011 RDSGEIS clarifies that NYSDOH will require the well operator to obtain a radioactive materials license for its facility when exposure rate measurements associated with scale accumulation in or on piping, drilling, and brine storage equipment exceeds 50 microR/hr[314] ($\mu$R/hr).[315] The RDSGEIS does not explain the origin of the 50 $\mu$R/hr limit; however, this limit has been used by a number of oil and gas producing states, including Texas[316] and Louisiana.[317]

---

[314] Microroentgens per hour ($\mu$R/hr) is a measurement of exposure from x-ray and gamma ray radiation in air.

[315] 2011 NYSDEC, RDSGEIS, Page 5-142.

[316] Texas Administrative Code, Title 16, Part 1, Chapter 4, Subchapter F, Economic Regulation, Railroad Commission of Texas, Environmental Protection, Oil and Gas NORM.

[317] Louisiana Administrative Code, Title 33 LAC Part XV, Radiation Protection.

Presumably, equipment containing a radioactive concentration of less than 50 μR/hr would be disposed of in a NYS landfill; however, it is unclear if NYS' landfills are designed to accommodate waste containing radioactivity of up to 50 μR/hr.

> **Recommendation No. 74**: NYSDEC should explain the origin of the 50 μR/hr limit, and explain how NYS determined that this threshold is sufficiently protective for NYS. The SGEIS should explain where equipment containing a radioactive concentration of less than 50 μR/hr would be disposed (e.g. a NYS landfill), and whether this waste disposal method was designed for this waste handling purpose.

The RDSGEIS Chapter 7 (Section 7.7.2) proposes NORM testing (radiation survey) requirements:

> ***The Department proposes to require, via permit condition and/or regulation, that radiation surveys be conducted at specified time intervals for Marcellus wells developed by high-volume hydraulic fracturing completion methods on all accessible well piping, tanks, or other equipment that could contain NORM scale buildup.*** *The surveys would be required to be conducted for as long as the facility remains in active use. Once taken out of use no increases in dose rate are to be expected. Therefore, surveys may stop until either the site again becomes active or equipment is planned to be removed from the site. If equipment is to be removed, radiation surveys would be performed to ensure appropriate disposal of the pipes and equipment. All surveys would be conducted in accordance with NYSDOH protocols. The NYSDOH's Radiation Survey Guidelines and a sample Radioactive Materials Handling License are presented in Appendix 27. The Department finds that existing regulations, in conjunction with the proposed requirements for radiation surveys, would fully mitigate any potential significant impacts from NORM [emphasis added].*[318]

NYSDEC's proposal to require NORM testing (radiation surveys) for HVHF wells and equipment is an important improvement. This proposed mitigation measure is effectively translated into a permit condition. Appendix 10, Proposed EAF Addendum Requirements for HVHF, Condition No. 65, requires:

> *65) Periodic **radiation surveys must be conducted at specified time intervals** during the production phase for Marcellus wells developed by high-volume hydraulic fracturing completion methods. Such surveys must be performed on all accessible well piping, tanks, or equipment that could contain NORM scale buildup. The surveys must be conducted for as long as the facility remains in active use. If piping, tanks, or equipment is to be removed, radiation surveys must be performed to ensure their appropriate disposal. All surveys must be conducted in accordance with NYSDOH protocols [emphasis added].*[319]

However, this permit condition is only applied to HVHF wells and equipment. NORM can accumulate in all oil and gas equipment; therefore, this requirement is better suited for the NYCRR and should be applied to all oil and gas operations.

Additionally, it is recommended that the radiation testing frequency and method be specified. As explained in Dr. Glenn Miller's and Dr. Ralph Seiler's comments on the 2011 RDSGEIS, the test method is an important determinant in quantifying total radioactivity.[320] Furthermore, Dr. Glenn Miller and Dr.

---

[318] 2011 NYSDEC, RDSGEIS, Page 7-119.

[319] 2011 NYSDEC, RDSGEIS, Appendix 10, Page 12.

[320] Miller, G. and Seiler, R., Comments Prepared for NRDC on 2011 NYSDEC, DSGEIS, 2012.

Ralph Seiler recommended that radiation testing not be limited to radium. For example, Dr. Ralph Seiler points out in his comments that while NYSDEC has identified Radium (Ra) as a contaminant of concern, NYSDEC has overlooked the potential significant unmitigated impact of Polonium 210 ($^{210}$Po) accumulating in pipe scale as a byproduct of radon decay (natural gas contains radon).[321]

> **Recommendation No. 75**: The requirement for radiation surveys should be codified in the NYCRR and applied to all oil and gas operations, not just HVHF operations. Radiation testing frequency and method should be specified to ensure that all potential radiation impacts are assessed and quantified. The proposed HVHF Permit Condition No. 65 could serve as a starting point for the NYCRR revisions.

**Produced Water and Flowback Wastewater NORM:** In 2009, HCLLC pointed out that water produced from wells can be rich in chloride, which enhances the solubility of other elements, including the radioactive element radium.[322] HCLLC also noted that flowback wastewater can contain NORM.

In 2009, NYSDEC reported that it had insufficient data on NORM in produced water and flowback wastewater, but acknowledged that NORM is present and is known to be found in elevated levels in produced water.

The Department of Energy (DOE) explains the presence of NORM in produced water:

> _**Because the water has been in contact with the hydrocarbon-bearing formation for centuries, it contains some of the chemical characteristics of the formation and the hydrocarbon itself.** It may include water from the reservoir, water injected into the formation, and any chemicals added during the production and treatment processes. Produced water is also called "brine" and "formation water." **The major constituents of concern in produced water are**_:
>
> - _Salt content (salinity, total dissolved solids, electrical conductivity)_
> - _Oil and grease (this is a measure of the organic chemical compounds[323]_
> - _Various natural inorganic and organic compounds or chemical additives used in drilling and operating the well_
> - _**Naturally occurring radioactive material (NORM).**_
>
> _The physical and chemical properties of produced water vary considerably depending on the geographic location of the field, the geological host formation, and the type of hydrocarbon product being produced. Produced water properties and volume can even vary throughout the lifetime of a reservoir [emphasis added]._[324]

---

[321] Seiler, R., Comments Prepared for NRDC on 2011 NYSDEC, DSGEIS, 2012.

[322] US Department of Interior, Naturally Occurring Radioactive Materials (NORM) in Produced Water and Oil-Field Equipment-an Issue for the Energy Industry, USGS Fact Sheet FS-142-99.

[323] In addition to the major constituents of concern listed by DOE for produced water, Dr. Glenn Miller notes that both the gasoline and diesel range hydrocarbon fractions should be monitored, since they are more soluble than heavy hydrocarbons.

[324] United States Department of Energy, Produced Water Management Information System, http://www.netl.doe.gov/technologies/pwmis/intropw/index.html.

Since 2009, NYSDEC gathered additional information and improved the 2011 RDSGEIS to acknowledge and quantify the potential adverse impact of produced water radioactivity. Although NYSDEC's research shows that flowback waste may not contain significant concentrations of radioactive material, NYSDEC acknowledges it has a limited dataset, and proposes radiation surveys for both types of wastewater (flowback and produced water).

NYSDEC's proposal to require NORM testing (radiation surveys) for flowback and production brine is a significant improvement to the 2011 RDSGEIS, and this proposed mitigation measure was effectively translated into a permit condition. Appendix 10, Proposed EAF Addendum Requirements for HVHF, Condition No. 64, requires:

> *64) Flowback water recovered after high-volume hydraulic fracturing operations must be tested for NORM prior to removal from the site. Fluids recovered during the production phase (i.e., production brine) must be tested for NORM prior to removal.[325]*

However, this permit condition is only applied to HVHF wells and equipment. NORM can be present in all flowback wastewater, including hydraulic fracture treatments less than 300,000 gallons, and produced water from wells that are not subject to HVHF treatments. Therefore, this requirement is better suited for the NYCRR and should be applied to all oil and gas operations.

Additionally, it is recommended that the NORM testing method and frequency be specified. As explained in Dr. Glenn Miller's and Dr. Ralph Seiler's comments on the 2011 RDSGEIS, the test method is an important determinant in quantifying total radioactivity.[326]

> **Recommendation No. 76**: The requirement to test produced water (production brine) and flowback wastewater (waste from hydraulic fracturing operations) should by codified in the NYCRR and applied to all oil and gas operations. NORM testing frequency and method should be specified. Proposed HVHF Permit Condition No. 64 could serve as a starting point for NYCRR revisions.

The RDSGEIS proposes to allow flowback wastewater and produced water to be disposed of at a Publically Owned Treatment Works (POTW), as long at the influent concentration of radium-226 (as measured prior to admixture with POTW influent) is limited to 15 pCi/L,[327] or 25% of the 60 pCi/L concentration value listed in 6 NYCRR Part 380-11.7.

> *The Department proposes to require, as a permit condition, that the permittee demonstrate that it has a source to treat or otherwise legally dispose of wastewater associated with flowback and production water prior to the issuance of the drilling permit. **Disposal and treatment options include publicly owned treatment works, privately owned high volume hydraulic fracturing wastewater treatment and/or reuse facilities, deep-well injection, and out of state disposal.***

---

[325] 2011 NYSDEC, RDSGEIS, Appendix 10, Page 12.

[326] Miller, G. and Seiler, R., Comments Prepared for NRDC on 2011 NYSDEC, DSGEIS, 2012.

[327] Picocuries per gram (pCi/g) is a measure of the radioactivity in one gram of a material. One picocurie is that quantity of radionuclide(s) that decays at the rate of $3.7 \times 10^{-2}$ disintegrations per second.

Harvey Consulting, LLC.                                                     Report to NRDC January 2012

> *Flowback water and production water must be fully characterized prior to acceptance by a POTW for treatment. Note in particular Appendix C. IV of TOGS 1.3.8, Maximum Allowable Headworks Loading. The POTW must perform a MAHW analysis to assure that the flowback water and production water will not cause a violation of the POTW's effluent limits or sludge disposal criteria, allow pass through of unpermitted substances or inhibit the POTW's treatment processes. As a result, the SPDES permits for POTWs that accept this source of wastewater will be modified to include influent and effluent limits for Radium and TDS, if not already included in the existing SPDES permit, as well as for other parameters as necessary to ensure that the permit correctly and completely characterizes the discharge. In the case of NORM, anyone proposing to discharge flowback or production water to a POTW must first determine the concentration of NORM present in those waste streams to determine appropriate treatment and disposal options. POTW operators who accept these waste streams are advised to limit the*
>
> *concentrations of NORM in the influent to their systems to prevent its inadvertent concentration in their sludge. For example, due to the potentially large volumes of these waste waters that could be processed through any given POTW, as well as the current lack of data on the level of NORM concentration that may take place, it will be proposed that POTW influent concentrations of radium-226 (as measured prior to admixture with POTW influent) be limited to 15 pCi/L, or 25% of the 60 pCi/L concentration value listed in 6 NYCRR Part 380-11.7. As more data become available on concentrations in influent vs. sludge it is possible that this concentration limit may be revisited [emphasis added].[328]*

EPA data shows that produced water can contain 0.1 to 9,000 pCi/L of radium-226.[329] Therefore, it is reasonably foreseeable that there will be substantial volumes of wastewater that will exceed the 15 pCi/L POTW influent limit. NYSDEC has not proposed a waste treatment or disposal solution for wastewater that exceeds the 15 pCi/L POTW influent limit.

> **Recommendation No. 77**: The SGEIS should examine treatment and disposal options, and capacity within NYS, for wastewater exceeding 15 pCi/L radiation.

Additionally, it is unclear if NYS' POTWs are designed to treat incoming wastewater with 15 pCi/L radiation. The Federal Safe Drinking Water standard is 5 pCi/L[330] (radium-226 and radium -228 combined).[331]   The 5 pCi/L threshold was set because of the increased risk of cancer above this level. Because the RDSGEIS does not examine NYS' POTW's ability to treat incoming wastewater with 15 pCi/L radiation, it does not provide an estimate of the expected radiation level at the POTW effluent. Therefore, it is not clear whether POTW effluent discharge at a level greater than 5 pCi/L could end up in a drinking water supply, or how NYSDEC plans to monitor and ensure that this does not happen.

---

[328] 2011 NYSDEC, RDSGEIS, Page 6-58 and 6-59.

[329] USEPA Oil and Gas Production Wastes, Summary Table of Reported Concentrations of Radiation in TENORM, http://www.epa.gov/radiation/tenorm/sources.html#summary-table

[330] Measured as Radium 226 and Radium 228 combined.

[331] USEPA Federal Safe Water Drinking Water Standards for Radionuclides at http://water.epa.gov/drink/contaminants/index.cfm#List.

> **Recommendation No. 78**: The SGEIS should examine whether NYS' POTWs are designed to treat incoming wastewater with 15 pCi/L radiation, and should predict the maximum effluent radiation level. The SGEIS should explain how NYSDEC will ensure that drinking water sources will not exceed 5 pCi/L radiation.

The 2011 RDSGEIS does not prohibit road spreading of waste; it deferred this decision to a yet-to-be determined future process outside the SGEIS review. Yet, other oil and gas producing states, such as Texas, specifically prohibit road spreading of waste containing NORM.[332] A study conducted by Argonne National Lab for the US Department of Interior (DOI) concluded that land spreading of diluted NORM waste presented the highest potential dose of exposure to the general public of all waste disposal methods studied.[333]

Most states dispose of wastewater using deep well injection or use it to enhance hydrocarbon recovery operations. Land disposal is not common for onshore operations. The Department of Energy reports that more than 98% of oil and gas wastewater from onshore operations is injected into underground disposal wells, which are regulated by EPA, or used for enhanced hydrocarbon recovery.[334] The 2009 DSGEIS explored produced water treatment and disposal options (e.g. injection wells, treatment plants, and road spreading),[335] but did not land on a best practice.

The 2011 RDSGEIS concludes there is not enough information available to allow for road spreading under a Beneficial Use Determination (BUD).[336] However, the RDSGEIS does not explicitly state that road spreading for any purpose is prohibited until NYSDEC and NYSDOH agree on exposure standards that will serve as thresholds for BUD determinations, with the proposed exposure standards undergoing a public review and comment period.

Since the current BUD does not require an operator to test for NORM,[337] it is unclear how NORM testing at the well site will be integrated into the BUD process. The level of NORM, if any, that will be allowed in fluids used for road spreading is also unclear. The 2011 RDSGEIS does not examine the cumulative impact of spreading small amounts of NORM repeatedly over the same area. It is recommended that land and road spreading of produced water and other waste containing NORM be **prohibited**. Produced water containing NORM should be returned to the subsurface formation from which it came, or should be handled at an approved waste treatment plant.

> **Recommendation No. 79**: The SGEIS should explicitly state that land and road spreading for any purpose is prohibited until NYSDEC and NYSDOH agree on exposure standards that will serve as thresholds for BUD determinations, with the proposed exposure standards undergoing a public review and comment period.

---

[332] Texas Railroad Commission (TXRRC), 16 Texas Administrative Code, Title 16, Part 1, Chapter 4, Subchapter F, §4.601 - 4.632. "Disposal of Oil and Gas NORM Waste". The TCEQ has jurisdiction over the disposal of other NORM wastes.

[333] Argonne National Laboratory, Radiological Dose Assessment Related to Management of Naturally Occurring Radioactive Materials Generated by the Petroleum Industry, Publication ANL/EAD-2, 1996.

[334] Argonne National Laboratory, Produced Water Volumes and Management Practices in the United States, Report Prepared for United States Department of Energy, Report No. ANL/EVS/R-09/1, 2009.

[335] 2009 NYSDEC, DSGEIS, Page 5-131.

[336] 2011 NYSDEC, RDSGEIS, Page 7-60.

[337] The example BUD application provided in Appendix 12 requires testing for calcium, sodium, chloride, magnesium, total dissolved solids, pH, iron, barium, lead, sulfate, oil and grease, benzene, ethylbenzene, toluene and xylene, but not NORM.

The Environmental Protection Agency (EPA) identifies produced water pits (brine pits) as an outdated practice in cases where produced water contains NORM. If wastewater pond sediments pose a potential radiological health risk, tank sediments from wastewater stored in tanks also would pose a radiological health risk. EPA reports that:

> Lined and/or earthen pits were previously used for storing produced water and other nonhazardous oil field wastes, hydrocarbon storage brine, or mining wastes. In this case, TENORM[338] in the water will concentrate in the bottom sludges or residual salts of the ponds. **Thus the pond sediments pose a potential radiological health risk**....produced waters are now generally reinjected into deep wells...No added radiological risks appear to be associated with this disposal method as long as the radioactive material carried by the produced water is returned in the same or lower concentration to the formations from which it was derived [emphasis added].[339]

> **Recommendation No. 80**: The SGEIS should address testing of wastewater sediments, and explain the collection, transportation, treatment, and disposal methods for this potential radiological health risk.

**Drill Cutting NORM:** The 2011 RDSGEIS acknowledges the fact that drill cuttings can contain NORM, but makes a blanket assumption that the level of radiation from cuttings will be low. The RDSGEIS does not require site-specific testing to verify this assumption, nor does it preclude cuttings disposal in existing solid waste landfills. Instead, the RDSGEIS only recommends that the well operator consult with the landfill operator prior to drill cuttings disposal.

> In New York State the **NORM in cuttings is not precluded by regulation from disposal in a solid waste landfill, though well operators should consult with the operators** of any landfills they are considering using for disposal regarding the acceptance of Marcellus Shale drill cuttings by that facility [emphasis added].[340]

The 2011 RDSGEIS is unclear about the environmental and human health protections that would be achieved via the landfill consultation process. Appendix 10, Proposed EAF Addendum Requirements for HVHF, requires the operator to specify where it plans to dispose of cuttings, and requires evidence that the cuttings will go to a Part 360 solid waste landfill. However, the RDSGEIS does not provide scientific or engineering data to demonstrate that existing NYS landfills are properly designed and equipped to safely handle and store drill cuttings containing NORM.

NYSDEC acknowledges significant uncertainty about the NORM content of drill cuttings in Chapter 7, and raises questions as to whether there are sufficient data to fully assess NORM impacts at this time. The 2011 RDSGEIS states:

> **Existing data from drilling in the Marcellus Formation** in other States, and from within New York for wells that were not hydraulically fractured, **shows significant variability in NORM content.** This variability appears to occur both between wells in different portions of the formation and at a given well over time. This makes it important that samples from wells in different locations within New York State are used to assess the extent of this variability.

---

[338] TENORM is Technologically Enhanced Natural Occurring Radioactive Material.

[339] http://www.epa.gov/radiation/tenorm/oilandgas.html#disposalpast.

[340] 2011 NYSDEC, RDSGEIS, Page 5-129 and 5-130.

*During the initial Marcellus development efforts, sampling and analysis would be undertaken in order to assess this variability. These data would be used to determine whether additional mitigation is necessary to adequately protect workers, the general public, and environment of the State of New York [emphasis added].[341]*

Yet, the 2011 RDSGEIS does not propose NORM mitigation measures. It does not require drill cuttings testing prior to disposal in the landfill, nor does it establish a maximum allowed NORM disposal threshold for safe long-term cuttings disposal in a landfill.

> **Recommendation No. 81**: Drill cuttings should be tested for NORM prior to disposal in a landfill. A maximum allowed NORM threshold for drill cuttings disposal in the landfill should be clearly established and scientifically justified. Testing and threshold requirements should be included in the SGEIS as a mitigation measure and codified in the NYCRR. Waste exceeding the established NORM threshold should be handled under NYS' radioactive waste handling rules.

Chapter 5.2.4.2 of the 2011 RDSGEIS concludes that NORM content in drill cuttings is equivalent to background levels of radiation occurring naturally in the atmosphere. This conclusion is based on Geiger counter and gamma ray spectroscopy sampling methods.

Yet, Dr. Glenn Miller points out in his comments on the 2011 RDSGEIS[342] that gamma ray spectroscopy is insufficient to assess all radioactive constituents (e.g. polonium is radioactive and only a weak gamma ray emitter), and gamma ray measurements do not provide insight into the potential for drill cuttings containing NORM to later oxidize, leach, and concentrate NORM when disposed. Dr. Miller concludes that NYS likely has underestimated the amount of NORM in drill cuttings, and recommends NYS require additional testing methods to verify total radiation levels and better understand the potential for drill cuttings to later oxidize, leach, and concentrate NORM when disposed. Additional work is needed to verify whether the disposal of drill cuttings containing NORM in existing NYS landfills is a best practice.

> **Recommendation No. 82**: The SGEIS should provide scientific and engineering data to demonstrate that existing NYS landfills are properly designed and equipped to safely handle and store drill cuttings containing NORM, including lower concentrations of NORM that could cumulatively have a significant impact when stored in large volumes over long periods of time. The SGEIS should examine the potential for drill cuttings containing NORM to later oxidize, leach, and concentrate radioactive materials within the landfill. If NYSDEC cannot provide scientific and engineering data to demonstrate that existing NYS landfills are properly designed and equipped to safely handle and store drill cuttings containing NORM, it should identify alternative collection, transportation, treatment, and disposal requirements.

**NYCRR Proposed Revisions**: Proposed Permit Condition No. 53 requires waste fluids be handled in accordance with 6 NYCRR § 554.1(c)(1); yet, this regulation does not specify the best practice for handling hydraulic fracturing fluid and other drilling and completion wastes. Instead, 6 NYCRR § 554.1(c)(1) merely provides a process for the applicant to submit a waste management plan. In 2009, HCLLC recommended revisions to this regulation; yet, none are proposed. The existing regulation states:

*Prior to the issuance of a well-drilling permit for any operation in which the probability exists that brine, salt water or other polluting fluids will be produced or obtained during drilling operations in **sufficient quantities** to be deleterious to the surrounding environment, the operator*

---

[341] 2011 NYSDEC, RDSGEIS, Page 7-119.

[342] Miller, G., Comments Prepared for NRDC on 2011 NYSDEC, DSGEIS, 2012.

*must submit and receive approval for a plan for the environmentally safe and proper ultimate disposal of such fluids. For purposes of this subdivision, drilling muds are not considered to be polluting fluids. Before requesting a plan for disposal of such fluids, the department will take into consideration the known geology of the area, the sensitivity of the surrounding environment to the polluting fluids and the history of any other drilling operations in the area. **<u>Depending on the method of disposal chosen by the applicant</u>**, a permit for discharge and/or disposal may be required by the department in addition to the well-drilling permit. An applicant may also be required to submit an acceptable contingency plan, the use of which shall be required if the primary plan is unsafe or impracticable at the time of disposal [emphasis added].*

Terms such as "sufficient quantities" are ambiguous, providing operators and regulators large latitude in how they interpret the regulation. Regulations should specify technically and scientifically based thresholds and management practices.

Under 6 NYCRR § 554.1(c)(1), the waste disposal method is selected by the applicant, with no instruction on how to determine the best waste management practice. While recycling and the reuse of fracturing fluid are discussed in the RDSGEIS, there is no requirement in the proposed permit conditions to use this best practice. Furthermore, NYSDEC does not explain how it will oversee the recycling and reuse processes.

> **Recommendation No. 83**: Revisions are needed to 6 NYCRR § 554.1(c)(1) to require a more robust waste management planning and oversight process, including detailed instructions on collection, testing, transportation, treatment, and disposal of waste.

## 20. Hydrogen Sulfide

**Background**: In 2009, HCLLC recommended that the NYCRR require operators to follow American Petroleum Institute Recommended Practice 49 (API RP 49) for Drilling and Well Servicing Operations Involving Hydrogen Sulfide, and API RP 55 for Oil and Gas Producing and Gas Processing Plant Operations Involving Hydrogen Sulfide, to protect employees and the public.

**The 2011 RDSGEIS**: The 2011 RDSGEIS reports that Marcellus Shale operations in Pennsylvania have not produced substantial amounts of $H_2S$.[343] However, this conclusion is based on limited information from wells drilled only in Pennsylvania. These data do not confirm that $H_2S$ will not be present initially or over time in NYS wells.

$H_2S$ gas produces a malodorous smell of rotten eggs at low concentrations, can cause serious health symptoms at elevated concentrations, and can be deadly at the higher concentrations found in some oil and gas wells.

The Occupational Safety and Health Administration (OSHA) recommends close monitoring of $H_2S$ for human health and explosion mitigation:

> *Hydrogen Sulfide or sour gas (H2S) is a flammable, colorless gas that is toxic at extremely low concentrations. It is heavier than air, and may accumulate in low-lying areas. It smells like "rotten eggs" at low concentrations and causes you to quickly lose your sense of smell. Many areas where the gas is found have been identified, but pockets of the gas can occur anywhere.*

> *Iron sulfide is a byproduct of many production operations and may spontaneously combust with air.*

> *Flaring operations associated with $H_2S$ production will generate Sulfur Dioxide (S02), another toxic gas.*

> *Active monitoring for hydrogen sulfide gas and good planning and training programs for workers are the best ways to prevent injury and death.[344]*

The American Conference of Governmental Industrial Hygienists recommends a Threshold Limit Value of 10ppm and a short-term exposure (STEL) limit of 15 ppm, averaged over 15 minutes, for the action level indicating the need for respiratory protection.[345] While workers may be afforded respiratory protection, nearby members of the public do not have routine access to respiratory protection and monitoring systems. Routine, standardized testing should also be in place to ensure public health and safety.

A 300 ppm concentration of $H_2S$ is considered by the American Conference of Governmental Industrial Hygienists as Immediately Dangerous to Life and Health.

---

[343] 2011 NYSDEC, RDSGEIS, Page 5-138.

[344] OSHA website at http://www.osha.gov/SLTC/etools/oilandgas/general_safety/h2s_monitoring.html.

[345] OSHA website at http://www.osha.gov/SLTC/etools/oilandgas/general_safety/appendix_a.html.

*In low concentrations, H₂S sometimes can be detectable by its characteristic odor; however, the smell cannot be relied upon to forewarn of dangerous concentrations (greater than 100ppm) of the gas because it rapidly paralyzes the sense of smell due to paralysis of the olfactory nerve. A longer exposure to the lower concentrations has a similar desensitizing effect on the sense of smell.*

*It should be well understood that the sense of smell will be rendered ineffective by hydrogen sulfide, which can result in an individual failing to recognize the presence of dangerously high concentrations. Exposure to hydrogen sulfide causes death by poisoning the respiratory system at the cellular level.* [346]

Therefore, proper handling of H₂S is important from both a quality-of-life and human-safety standpoint for workers and nearby public.

While H₂S may not be initially present at a drillsite, the operator must remain vigilant in monitoring for H₂S over time, because sulfate reducing bacteria and other forms of acid producing bacteria can generate H₂S in the reservoir, such that H₂S concentrations elevate over time. Increasing levels of H₂S is a common problem in waterflooding operations in oil and gas fields. Biocides are typically used to mitigate bacteria growth; however, sometimes biocides are not successful.

Biocide use and close monitoring of H₂S early in field development is an important mitigation measure, because once elevated H₂S is present it is difficult to control. Industry anticipates H₂S will be a future concern in operations requiring large volumes of water for HVHF treatments, especially where treatment fluid is recycled, as planned in NYS. A 2010 Apache Corporation paper summarizes the problem:

> ***One of the most severe threats in recycling waters for fracs is the control of bacteria (Tischler, 2009), including sulfate reducing bacteria (SRBs) and other forms such as acid producing bacteria (APB), iron fixing bacteria and slime formers. SRBs have created souring of some conventional reservoirs from injection of waters, both produced and semi-fresh, which have established a presence in the reservoirs and create H₂S gas and iron sulfide problems.*** *Local well fouling problems are common where SRBs are spiked into the formation from drilling or completion fluids. This type of H₂S occurrence may cause local corrosion… in shale, however, the effect of uncontrolled bacteria is a general unknown, given the extremely large volumes of surface water used for slick water fracturing. For this reason, recycling of the water may seed all waters with bacteria and/or concentrate the bacteria; thus bacterial control is a necessity [emphasis added].* [347]

Due to the potential close proximity of Marcellus Shale operations to the public, a robust initial monitoring program should be instituted to determine H₂S concentrations in Marcellus Shale gas throughout NYS. As described in American Petroleum Institute Recommended Practices 49 and 55, monitoring frequency can be adjusted over time as site-specific information is obtained. Initial sampling should be conducted at each drillsite, with at least monthly sampling thereafter.

---

[346] OSHA website at http://www.osha.gov/SLTC/etools/oilandgas/general_safety/appendix_a.html

[347] King, G.E., Apache Corporation, Thirty Years of Gas Shale Fracturing: What Have We Learned?, Society of Petroleum Engineers Technical Paper, SPE 133456, 2010, Page 30.

Proposed Supplementary Permit Conditions for High-Volume Hydraulic Fracturing, Permit Condition No. 25 includes a requirement to conform with API RP 49; however, there is no requirement for operators to conform with API RP 55, which applies after the well is drilled, during production operations.

**NYCRR Proposed Revisions**: As a control measure, when $H_2S$ is present, the proposed regulations at 6 NYCRR § 560.6(c)(28) require the venting of any gas containing $H_2S$ through a flare stack to combust the dangerous vapors.

> **Recommendation No. 84**: $H_2S$ monitoring and reporting requirements should be included in the RDSGEIS as a mitigation measure and codified in the NYCRR. Operators should be required to follow $H_2S$ detection and handling procedures to protect employees and the public. Initial $H_2S$ testing should be conducted at each drillsite. Subsequent test frequency should be based on the results of initial testing. $H_2S$ levels can increase over time as gas fields age and sour. $H_2S$ requirements should be included in regulation for both drilling and production operations, and should not just be relegated to a drilling permit condition. Additionally, when $H_2S$ is present, nearby neighbors, local authorities, and public facilities should be notified, and provided information on the safety and control measures that the operator will undertake to protect human health and safety. In cases where elevated $H_2S$ levels are present, audible alarms should be installed to alert the public when immediate evacuation procedures are warranted.

## 21. Chemical & Waste Tank Secondary Containment

**Background:** In 2009, HCLLC recommended that NYCRR be revised to include secondary containment for chemicals stored on the well pad or, alternatively, require the use of double-wall tanks. Chemicals, especially corrosive chemicals, can result in storage container leaks and spills to the environment. Best practice for permanent chemical storage is to install secondary containment under the storage container, and ensure the containers are not in contact with soil or standing water.[348] Shale gas drilling and HVHF operations include the use of many chemical tanks and waste handling tanks (e.g. flowback tanks) that warrant secondary containment.

**2011 RDSGEIS:** NYSDEC responded to public comments and made appropriate revisions to the 2011 RDSGEIS with its requirement for 110% secondary containment for all chemical and waste handling tanks. It also requires secondary containment for chemical and waste transport, mixing and pumping equipment. The 2011 RDSGEIS states:

> *Flowback water stored on-site must use covered watertight tanks within secondary containment and the fluid contained in the tanks must be removed from the site within certain time periods.[349]*

> *Secondary containment would be required for all fracturing additive containers and additive staging areas. These requirements would be included in supplementary well permit conditions for high-volume hydraulic fracturing.[350]*

> *Secondary containment measures may include one or a combination of the following; dikes, liners, pads, curbs, sumps, or other structures or equipment capable of containing the substance. Any such secondary containment would be required to be sufficient to contain 110% of the total capacity of the single largest container or tank within a common containment area.[351]*

> *Secondary containment for flowback tanks is required.[352]*

> *The Department proposes to require that operators storing flowback water on-site would be required to use watertight tanks located within secondary containment, and remove the fluid from the wellpad within specified time frames.[353]*

> *Location of additive containers and **transport, mixing and pumping equipment**...within secondary containment... [emphasis added][354]*

---

[348] Bureau of Land Management, Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development, The Gold Book, 2007.

[349] 2011 NYSDEC, RDSGEIS, Executive Summary, Page 25.

[350] 2011 NYSDEC, RDSGEIS, Page 7-38.

[351] 2011 NYSDEC, RDSGEIS, Page 7-38.

[352] 2011 NYSDEC, RDSGEIS, Page 7-40.

[353] 2011 NYSDEC, RDSGEIS, Page 1-12.

[354] 2011 NYSDEC, RDSGEIS, Page 7-29.

> **Recommendation No. 85**: Secondary containment requirements for well site chemicals should be applied as a best practice to all oil and gas development and codified in NYCRR, and should not be limited to shale gas and HVHF operations.

**NYCRR Proposed Revisions:** Proposed regulations codify the requirement for secondary containment for chemical and waste handling tanks, but do not specifically address secondary containment for chemical and waste transport, mixing and pumping equipment.

> **Recommendation No. 86**: Consistent with the proposed RDSGEIS mitigation, 6 NYCRR § 750-3.11 and 6 NYCRR § 560.6 should be revised to require lined secondary containment for chemical and waste transport, mixing, and pumping equipment.

Proposed regulations at 6 NYCRR § 750-3.11 provide very specific instructions on how to construct adequate secondary containment, including the use of coated or lined materials that are chemically compatible with the environment and the substances they may contain. Regulations also state that the containment structures must have adequate freeboard, be protected from damage, and be able to contain at least 110% of the largest tank volume.

> *750-3.11 Applications of standards, limitations and other requirements*
>
> *(e) The HVHF SWPPP must, at a minimum, include the HVHF SWPPP General Requirements listed in subparagraph (1) below, Structural Best Management Practices (BMPs), Non-structural BMPs, and Activity-Specific SWPPP Requirements.*
>
> *(v) Secondary Containment - To prevent the discharge of hazardous substances, the owner or operator shall provide, implement, and operate secondary containment measures.* ***Such secondary containment shall be: (a) designed and constructed in accordance with good engineering practices, (b) constructed, coated or lined with materials that are chemically compatible with the environment and the substances to be contained, (c) provide adequate freeboard, (d) protected from heavy vehicle or equipment traffic; and have a volume of at least 110 percent of the largest storage tank within the containment area*** *[emphasis added].*

In contrast, proposed regulations at 6 NYCRR § 560.6 offer substantially less instruction on how to construct adequate secondary containment. They do not mandate the use of coated or lined materials that are chemically compatible with the environment and the substances they may contain. They do not require the containment structure have adequate freeboard. Nor do they require that the containment be protected from damage.

> *§560.6 Well Construction and Operation.*
>
> *(c) Drilling, Hydraulic Fracturing and Flowback.*
>
> *(26) Hydraulic fracturing operations must be conducted as follows:*
>
> *(i) secondary containment for fracturing additive containers and additive staging areas, and flowback tanks is required.* ***Secondary containment measures may include, as deemed appropriate by the department, one or a combination of the following: dikes, liners, pads, impoundments, curbs, sumps or other structures or equipment capable of containing the substance.*** *Any such secondary containment must be sufficient to contain*

*110 percent of the total capacity of the single largest container or tank within a common containment area. No more than one hour before initiating any hydraulic fracturing stage, all secondary containment must be visually inspected to ensure all structures and equipment are in place and in proper working order [emphasis added].*

**Recommendation No. 87**: 6 NYCRR § 560.6 should be revised to include specific secondary containment construction standards that are consistent with 6 NYCRR § 750-3.11.

**Proposed Supplementary Permit Conditions for High-Volume Hydraulic Fracturing:** Permit conditions have been developed to require secondary containment. However, the permit conditions merely echo proposed regulations at 6 NYCRR § 560.6. They do not provide additional or supplemental requirements to the NYCRR.

**Recommendation No. 88**: Streamline the Proposed Supplementary Permit Conditions for High-Volume Hydraulic Fracturing contained in the RDSGEIS to remove requirements that are redundant with NYCRR, or if retained, ensure that permit language matches the final codified version of NYCRR and cite the NYCRR requirements.

## 22. Fuel Tank Containment

**Background:** In 2009, HCLLC recommended that the NYCRR be revised to require more stringent oil spill prevention measures for temporary fuel tanks associated with drilling and well stimulation activities, and that NYS' regulations be at least as stringent as federal EPA's Spill Prevention Control and Countermeasures (SPCC) Plan. HCLLC recommended that NYSDEC incorporate existing EPA oil spill prevention standards into the NYCRR. EPA standards require secondary containment if a facility stores 1,320 gallons of fuel or more (30 CFR § 112), including portable, temporary fuel tanks.

In 2009, NYSDEC proposed to exempt drilling rig and HVHF fuel tanks (even those as large as 10,000 gallons) from NYS' petroleum bulk storage regulations and tank registration requirements at 6 NYCRR §§ 612-614, citing the fact that the storage tanks are temporary (non-stationary) as the reason for the exemption. This problem persists in the 2011 RDSGEIS.

HCLCC questioned NYSDEC's rationale for exempting drilling rig and HVHF fuel tanks from NYS' spill prevention regulations, as all other tanks 1,100 gallons and larger must register in NYS, install secondary containment, and undergo inspections at 5- and 10-year intervals.

HCLLC pointed out that a _temporary_ fuel tank poses a greater environmental risk than a _stationary_ fuel tank, because temporary fuel tanks are relocated many times during their operating lives, increasing the potential for tank damage during transit and the likelihood of tank appurtenance leakage.

Large temporary fuel tanks should be subject to the same secondary containment requirements as large stationary fuel tanks in NYS, particularly in situations where temporary fuel tanks are installed in one location for a significant period of time (e.g. a multi-well pad where drilling and completion operations could span several years). Alternatively, where secondary containment is not technically feasible, the use of double-walled or vaulted tanks should be considered for portable fuel tanks.

In January 2011, NYS' consultant, Alpha Geoscience, reviewed HCLLC's recommendation and provided NYSDEC with incorrect guidance on EPA's secondary containment requirements for onshore oil drilling workover and mobile equipment and other fuel storage.[355] Alpha Geoscience advised NYSDEC that EPA's SPCC regulations only addressed _stationary_ fuel tanks greater than 1,320 gallons.

Alpha Geoscience's advice was incorrect because EPA's SPCC rules apply to facilities that have an aggregate fuel or hydrocarbon storage of 1,320 gallons or more at a facility, and secondary containment rules are not limited to stationary tanks.[356]

**2011 RDSGEIS:** NYSDEC's 2011 proposal for fuel tank secondary containment is confusing and inconsistent. The RDSGEIS both recommends and requires fuel tank secondary containment as a best practice, yet also exempts large fuel tanks used for drilling and HVHF operations.

For example, the 2011 RDSGEIS states that secondary containment will be required for fuel tanks and areas where fuel transfers occur:

---

[355] Alpha Geoscience, Review of the dSGEIS and Identification Best Technology and Best Practices Recommendations Harvey Consulting, LLC; December 28, 2009, prepared for NYSERDA, January 20, 2011, Page 21.

[356] USEPA, SPCC Guidance for Regional Inspectors Version 1.0, November 28, 2005, Page 2-16.

> ***The Department proposes to require***, *via permit condition and/or new regulation, that **operators provide secondary containment around all** additive staging areas and **fueling tanks, manned fluid/fuel transfers and visible piping and appropriate use of troughs, drip pads or drip pans** [emphasis added].*[357]

NYSDEC supports its recommendation for fuel tank secondary containment by pointing out that its consultant has identified it as a best management practice:

> *In addition to its regulatory survey, Alpha also reviewed and discussed best management practices directly observed in the northern tier of Pennsylvania and noted that "[t]he reclamation approach and regulations being applied in PA may be an effective analogue going forward in New York." **The best management practices referenced by Alpha include…Secondary containment structures around petroleum storage tanks and lined trenches to direct fluids to lined sumps where spills can be recovered without environmental contamination** [emphasis added].*[358]

Yet, the 2011 RDSGEIS exempts large fuel tanks from secondary containment by designating drilling rig and HVHF fuel tanks as "temporary":

> *The diesel tank fueling storage associated with the larger rigs described in Chapter 5 may be larger than 10,000 gallons in capacity and may be in one location on a multi-well pad for the length of time required to drill all of the wells on the pad. However, the tank would be removed along with the rig during any drilling hiatus between wells or after all the wells have been drilled. There are no long-term or permanent operations at a drill pad which require an on-site fueling tank. **Therefore, the tank is considered non-stationary and is exempt from the Department's petroleum bulk storage regulations and tank registration requirements** [emphasis added].*[359]

The 2011 RDSGEIS does not explain why a temporary fuel tank would pose less risk of a spill than a stationary fuel tank.

The 2011 RDSGEIS further confuses the issue by stating that all fuel tanks would be included in secondary containment:

> *The following measures are proposed to be required, via permit condition and/or regulation, to prevent and mitigate spills. **For all wells subject to the SGEIS**, supplementary permit conditions for high-volume hydraulic fracturing **would include the following requirements with respect to fueling tanks and refilling activities**:*

> > *a. **Secondary containment consistent with the objectives of SPOTS 10 for all fueling tanks**.*

> > ***The secondary containment system could include one or a combination of the following: dikes, liners, pads, holding ponds, curbs, ditches, sumps, receiving tanks or other equipment capable of containing spilled fuel**. Soil that is used for secondary containment would be of such character that a spill into the soil will be readily recoverable and would result in a minimal amount of soil contamination and*

---

[357] 2011 NYSDEC, RDSGEIS, Page 1-11.

[358] 2011 NYSDEC, RDSGEIS, Page 8-5.

[359] 2011 NYSDEC, RDSGEIS, Page 7-343.

*infiltration. Draft Department Program Policy DER-1730 may be consulted for permeability criteria for dikes and dike construction standards, including capacity of at least 110% of the tank's volume [emphasis added].* [360]

Ultimately, the 2011 RDSGEIS, includes secondary containment requirements for all fuel tanks, in Appendix 10, Proposed Supplementary Permit Conditions for High-Volume Hydraulic Fracturing.

13) ***Secondary containment*** *consistent with the Department's Spill Prevention Operations Technology Series 10, Secondary Containment Systems for Aboveground Storage Tanks,(SPOTS 10)* ***is required for all fueling tanks*** *[emphasis added];*

14) *To the extent practical, fueling tanks must not be placed within 500 feet of a public or private water well, a domestic-supply spring, a reservoir, a perennial or intermittent stream, a storm drain, a wetland, a lake or a pond;*

15) *Fueling tank filling operations must be manned at the fueling truck and at the tank if the tank is not visible to the fueling operator from the truck, and;*

16) *Troughs, drip pads or drip pans are required beneath the fill port of a fueling tank during filling operations if the fill port is not within the secondary containment.* [361]

While, it is useful that the RDSGEIS finally lands on requiring secondary containment for fuel tanks, there remains a conflict in the text where NYSDEC has proposed to exempt temporary fuel tanks.

> **Recommendation No. 89**: The SGEIS text should be revised to remove the temporary fuel tank exemption from secondary containment described on page 7-34.

Additionally, Appendix 10 permit conditions merely echo proposed regulations at 6 NYCRR § 560.6, and do not provide additional or supplemental requirements to the NYCRR. Therefore, if adopted into regulation, the permit conditions could be streamlined.

> **Recommendation No. 90**: Streamline the Proposed Supplementary Permit Conditions for High-Volume Hydraulic Fracturing to remove requirements that are redundant with the proposed revisions to NYCRR, or if retained, ensure that permit language matches the final codified version of NYCRR and cite the NYCRR requirements.

**NYCRR Proposed Revisions:** The proposed regulations at 6 NYCRR § 560.6 codify the requirement for fuel tank secondary containment, and set no limit on the size or duration of fuel tank use. These proposed regulations are protective of the environment. The RDSGEIS should be revised to be consistent with the proposed regulations, avoiding future confusion about NYSDEC's intent.

### §560.6 Well Construction and Operation.

*(b) Site Maintenance.*

*(1) For any well:*

---

[360] 2011 NYSDEC, RDSGEIS, Page 7-34.

[361] 2011 NYSDEC, RDSGEIS, Appendix 10, Page 3.

*(i) secondary containment is required for all fueling tanks [emphasis added];*

*(ii) to the extent practical, fueling tanks must not be placed within 500 feet of a perennial or intermittent stream, storm drain, wetland, lake or pond;*

*(iii) fueling tank filling operations must be supervised at the fueling truck and at the tank if the tank is not visible to the fueling operator from the truck; and*

*(iv) troughs, drip pads or drip pans are required beneath the fill port of a fueling tank during filling operations if the fill port is not within the secondary containment required by subparagraph (i) of this subdivision.*

> **Recommendation No. 91**: The SGEIS should be revised to be consistent with the proposed regulations, which require secondary containment for all fuel tanks (6 NYCRR § 560.6) used for shale gas drilling and HVHF operations.

While proposed regulations at 6 NYCRR § 560.6 are useful because they make it clear that secondary containment is required for all fuel tanks, the proposed regulations do not provide specific instruction on how to construct adequate containment.

> **Recommendation No. 92**: 6 NYCRR § 560.6 should be revised to clearly state that all fuel tank secondary containment should be designed and constructed in accordance with good engineering practices, incremental to the minimum federal standards. Good engineering practices include: using coated or lined materials that are chemically compatible with the environment and the substances to be contained; providing adequate freeboard; protecting containment from heavy vehicle or equipment traffic; and having a volume of at least 110 percent of the largest storage tank within the containment area.

**NYCRR Proposed Revisions:** The proposed regulations at 6 NYCRR § 560.6 require a 500' setback for fuel tanks from perennial or intermittent streams, storm drains, wetlands, lakes, and ponds, but only to the "extent practical" with no explanation of what that means in real terms, and under what conditions it would be acceptable to place a fuel tank closer. NYCRR does not include any setbacks from homes or public facilities.

### §560.6 Well Construction and Operation.

*(b) Site Maintenance.*

*(1) For any well:*

*(i) secondary containment is required for all fueling tanks;*

*(ii) __to the extent practical__, fueling tanks must not be placed within 500 feet of a perennial or intermittent stream, storm drain, wetland, lake or pond[emphasis added];*

*(iii) fueling tank filling operations must be supervised at the fueling truck and at the tank if the tank is not visible to the fueling operator from the truck; and*

*(iv) troughs, drip pads or drip pans are required beneath the fill port of a fueling tank during filling operations if the fill port is not within the secondary containment required by subparagraph (i) of this subdivision.*

> **Recommendation No. 93**: Proposed regulations at 6 NYCRR § 560.6 (b)(1)(ii) should be revised to delete the term "to the extent practical," and should include minimum setbacks for fuel tanks from homes and public buildings.

Additionally, the RDSGEIS is problematic because it still references a **<u>draft</u>** NYSDEC Program Policy (DER-17) for construction standards and a September 28, 1994 Spill Prevention Operations Technology Series (SPOTS) memo for guidance on secondary containment construction.

> **Recommendation No. 94**: The SGEIS should not rely on a draft[362] NYSDEC Program Policy document (DER-17) for construction standards and an outdated September 28, 1994 Spill Prevention Operations Technology Series (SPOTS) memo for guidance on secondary containment construction. Instead, secondary containment requirements for fuel tanks should be codified in the NYCRR and written in a way that is clear, consistent, and enforceable.

The importance of secondary containment for fuel tanks extends beyond shale gas drilling and HVHF operations to all hydrocarbon drilling and HVHF operations.

> **Recommendation No. 95**: Secondary containment requirements for fuel tanks should extend to all hydrocarbon drilling and HVHF operations in NYS. The requirements should not be limited to shale gas drilling and HVHF operations. Therefore, the recommendations made above should be captured in both 6 NYCRR § 560 and 6 NYCRR § 554.

The RDSGEIS does not cite existing EPA spill prevention requirements at 40 CFR § 112, which apply to all fuel tanks, including drilling tanks, at 40 CFR § 112.7(c) and 40 CFR § 112.10(c). EPA's regulations, which were revised in 2002, require secondary containment for fuel tanks at facilities storing 1,320 gallons and more. EPA allows an operator the opportunity to demonstrate under 40 CFR § 112.7(d) that it is impracticable to install secondary containment; however, EPA requires a formal written "impracticability determination." Under this determination, EPA requires periodic tank integrity testing, leak testing of the valves and associated piping, a Part 109 contingency plan, and a written commitment of manpower, equipment, and materials to respond to a spill.

> **Recommendation No. 96**: The SGEIS should cite federal standards (similar to how NYSDEC cited relevant USEPA standards for air quality) and notify the operator that the federal standards must be met. The SGEIS should also clearly explain what additional requirements will be imposed by NYS.

The RDSGEIS should also include: periodic fuel tank inspections to examine structural conditions and document corrosion or damage; the installation of high-liquid-level alarms that sound and display in an immediately recognizable manner; the installation of high-liquid-level automatic pump shutoff devices, which are designed to stop flow at a predetermined tank content level; and a means of immediately determining the liquid level of tanks.

> **Recommendation No. 97**: In the NYCRR, NYSDEC should require tank inspections and tank alarm systems.

---

[362] If NYSDEC decides to refer to policy and guidance documents, those documents at a minimum should be final documents, and NYSDEC should state within those documents that the contents are enforceable.

NYSDEC does not address whether vaulted, double-walled, or self-diking tanks can be used as alternatives to constructing large temporary containment areas. Other oil and gas producing states allow the use of vaulted, self-diking, or double-walled portable tanks to meet the secondary containment requirement in cases where the operator can demonstrate that it is infeasible to install a containment area meeting EPA's 110% of the largest tank volume requirement. NYSDEC could consider allowing these alternative tanks in places where secondary containment is proven to be infeasible.

Vaulted, self-diking, and double-walled portable tanks are equipped with catchments that hold fuel overflow or divert it into an integral secondary containment area. Industry standards for the construction of vaulted, self-diking, and double-walled portable tanks include:

- Underwriters Laboratories' Steel Aboveground Tanks for Flammable and Combustible Liquids (UL 142);

- Appendix J of the American Petroleum Institute's (API) Welded Steel Tanks for Oil Storage (API 650); and

- API's Specification for Shop Welded Tanks for Storage of Production Liquids (API Spec 12F).

Due to the higher potential for damage during relocation and use at multiple sites, it is recommended that inspections be routinely performed on vaulted, self-diking, and double-walled portable tanks. The inspections should identify damage and corrosion using one of the following standards:

- Steel Tank Institute's (STI) Standard for the Inspection of Aboveground Storage Tanks, Third Edition (STI SP001); or

- API's Tank Inspection, Repair, Alteration, and Reconstruction Standard (API 653).

As an oil spill prevention measure, portable tanks can be equipped with high-liquid-level alarms that sound and display in an immediately recognizable manner; high-liquid-level automatic pump shutoff devices, which are designed to stop flow at a predetermined tank content level; and a means of immediately determining the liquid level of tanks.

> **Recommendation No. 98**: NYSDEC should clarify whether vaulted, self-diking, and double-walled portable tanks will be allowed, and codify in the NYCRR the requirements for the use of those tanks, including inspections and spill prevention alarm systems.

## 23. Corrosion & Erosion Mitigation & Integrity Monitoring Programs

**Background:** In 2009, HCLLC recommended that NYSDEC require corrosion and erosion mitigation programs. More specifically HCLLC recommended that: equipment be designed to prevent corrosion and erosion; monitoring programs be put into place to identify corrosion and erosion over the well and equipment operating lifetime; and repair and replacement of damaged wells and equipment be completed.

Downhole tubing and casing, surface pipelines, pressure vessels, and storage tanks used in oil and gas exploration and production can be subject to internal and external corrosion. Corrosion can be caused by water, corrosive soils, oxygen, corrosive fluids used to treat wells, and the carbon dioxide ($CO_2$) and hydrogen sulfide ($H_2S$) present in gas. High velocity gas contaminated with water and sediment can internally erode pipes, fittings, and valves.

HVHF treatments, if improperly designed, can accelerate well corrosion. Additionally, acids used to stimulate well production and remove scale can be corrosive. The 2011 RDSGEIS includes a discussion on corrosion inhibitors used by industry in fracture treatments, but does not require them as best practice. Furthermore, the RDSGEIS does not require facilities be designed to resist corrosion (e.g. material selection and coatings), nor does it require corrosion monitoring, or the repair and replacement of corroded equipment.[363]

As explained in Chapter 20 of this report, the use of recycled HVHF fluid can result in the inoculation of sulfate reducing bacteria in the reservoir, and increased downhole equipment corrosion. And, while NYSDEC indicates that $H_2S$ levels may be initially low in the Marcellus Shale, this may not be the case during the full life-cycle of the well. Nor does the RDSGEIS examine the $H_2S$ of all other low permeability gas reservoirs to know what the $H_2S$ might be for those formations.

Corroded well casings can provide a pathway for gas and well fluids to leak into protected aquifers. Therefore, it is important to install a robust casing system, and it's equally important to ensure that the casing system's integrity is maintained during the well's life.

Corrosion measured on production casing is an important piece of information, because corrosive fluids are known to also degrade the quality of the cement barrier. Corrosive fluids reduce the cement strength and make it more permeable, potentially providing a pathway for hydrocarbons to migrate from zones of higher pressure to lower pressure freshwater zones.

Additionally, the bond between the casing and cement can be compromised over the well's life, creating a "micro-annulus" (a space between the outer pipe wall and cement sheath) that allows vertical migration of hydrocarbons along the outside of the pipe wall.[364,365] Micro-annulus' can be formed during initial

---

[363] Curran, E., Corrosion Control in Gas Pipelines, Coating Protection Provides a Lifetime of Prevention, Pipeline & Gas Journal, October 2007.

[364] See Ravi, K. (Halliburton), Bosma, M. (Shell) and Gastebled, O. (TNO Building and Construction Research), Safe and Economic Gas Wells through Cement Design for the Life of the Well, Society of Petroleum Engineering Paper No. 75700, 2002. Ravi et. al. concludes: "The extreme operating conditions that occur in gas-storage and gas-producing wells could cause the cement sheath to fail, resulting in fluid migration through the annulus…The sustained casing pressure observed on a number of wells after they have been put on production emphasizes the need to design a cement sheath that will maintain integrity during the life of the well…However, recent experience has shown that after well operations such as completing, pressure testing, injecting, stimulating and producing, the cement sheath could lose its ability to provide zonal isolation. This failure can create a path for formation fluids to enter the annulus, which pressurizes the well and renders the well unsafe to operate…Failure of the cement sheath is most often caused by pressure – or temperature-induced stresses inherent in well operations during the well's economic life."

cementing, or later in the well's life, due to: pipe wall thinning; cement deterioration; the shock of additional well workover activities (perforations, stimulation, drilling); pressure and temperature changes in the well; or by seismic vibrations.

In January 2011, NYS' consultant, Alpha Geoscience, recommended that NYSDEC ignore HCLLC's best practice recommendations for corrosion and erosion, citing Section 6.1.4.2 and 6.1.5.1 of the 2009 DSGEIS. In these sections, another NYS consultant (ICF) estimated the risk of groundwater contamination due to casing failure in a Class II injection well is 1 in 50 million wells.[366] Alpha Geoscience concludes that corrosion and erosion prevention, monitoring, and repair requirements are unnecessary in the NYCRR.

Neither Alpha Geoscience nor ICF provide technical justification for the use of a Class II injection well corrosion risk analysis as a surrogate for a gas well corrosion risk analysis. A Class II injection well risk profile is different than a gas well. Gas wells can continuously produce sources of corrosive gas ($CO_2$ and $H_2S$), water, and sediment, that can corrode and erode well casing and surface piping over time.

Neither Alpha Geoscience nor ICF examined:

- The full life cycle of a gas well, and the fact that there is substantial field evidence that well casings do corrode and erode over time;

- The fact that casing inspection logs, caliper logs, temperature surveys, and other wellbore diagnostics are commonly run to examine the well casing condition due to the known problem of gas well corrosion;

- Information on the amount of money spent annually on corrosion inhibitors, pipe coating, and other preventive measures to mitigate corrosion impacts;

- The fact that well service specialists routinely provide well casing patching, repair, and replacement services,[367] because gas well casing failure is a known problem; and,

- The fact that it is best practice to examine the condition of well casing over the well life to verify its integrity, especially before major well work (e.g. additional drilling, stimulation) is completed on an aging well.[368]

Additionally, Alpha Geoscience criticizes HCLLC for citing industry literature on corrosion best practices, stating that HCLLC's inclusion of this material shows industry bias. HCLLC disagrees with Alpha Geoscience's conclusion. Industry has developed most of the technology to address the problem; therefore, it is logical to cite industry literature on this point.

---

[365] See Stewart, R.B. and Schouten, F.C. (Shell), Gas Invasion and Migration in Cemented Annuli: Causes and Cures, Society of Petroleum Engineering Paper No. 14779, SPE Drilling Engineering, March 1988. Stewart and Schouten conclude: *"Gas migration resulting from casing contraction is a common field problem… Annular gas-migration problems can develop in an old well owing to changes in pressure or thermal conditions in the well."*

[366] Alpha Geoscience, Review of the dSGEIS and Identification of Best Technology and Best Practices Recommendations, Harvey Consulting, LLC; December 28, 2009, prepared for NYSERDA, January 20, 2011, Page 18.

[367] Storaune, A., Winters, W.J. (BP America Inc.), Versatile Expandables Technology for Casing Repair, Society of Petroleum Engineers, SPE Paper No. 92330-MS, SPE/IADC Drilling Conference, 23-25 February 2005, Amsterdam, Netherlands, 2005, p.1.

[368] Brondel, D., Edwards, R., Hayman, A., Hill, D., Shreekant, M., Semerad, T., Corrosion in the Oil Industry, Oilfield Review, April 1994, p. 9-10.

Experienced engineers know the importance of assessing and implementing programs to mitigate corrosion/erosion risk early in the field/well lifecycle. Corrosion of gas production equipment is a fundamental concern for the oil and gas industry that has been identified for decades.

> *Failures of equipment handling or producing natural gas occur only in the absence of an adequate corrosion-control program. A successful program is shown to include (1) anticipation of corrosion in design factors of all equipment, (2) detection of corrosion within the system and measurement of its severity for future reference, (3) use of mitigation measures and (4) continual follow-up and adjustment of control techniques. Design factors to be considered are tubing couplings, packers, tubing grade and size, and the number of tubing strings to be set. Future corrosion problems and mitigation work should be recognized at the time the well completion is made so that the best possible design factors can be realized. Corrosion can be detected by gas analysis, water analysis, coupon exposures and caliper surveys. Quantitative data are needed to determine the severity of the problem and to design a suitable program of alleviation of the corrosion. Use of inhibitors and plastic coatings are popular methods for mitigation of corrosion. Both methods have advantages and disadvantages that must be realized and evaluated. Control limits for a mitigation program should be established so that the operator can be certain that he is receiving the desired protection. Gas gathering and process equipment also often suffer from corrosion….*
>
> *It is suggested that an adequate corrosion-control program must include efforts at various levels of company operations. All engineers and supervisors must participate actively in the corrosion-control effort. As a property is being developed, corrosion control should be considered when the equipment to be used is being selected. When development is complete, the operating people must determine the seriousness of their corrosion problems. They must realize that the corrosion attack may change with changes in production characteristics and that absence of corrosion today does not guarantee absence of corrosion tomorrow. When corrosion is detected within an operation, mitigation is in order* [emphasis added].[369]

Because of the known problem of casing corrosion, the National Association of Corrosion Engineers (NACE) developed Recommended Practice RP0186 to mitigate external casing corrosion; this standard applies to the design of cathodic protection for external surfaces of steel well casings, and would be used when soil/subsurface reservoir conditions present a corrosive environment warranting installation of cathodic protection system installation.[370]

NACE International writes:

> *Oil and gas wells represent a large capital investment. It is imperative that corrosion of well casings be controlled to prevent loss of oil and gas, environmental damage, and personnel hazards, and in order to ensure economical depletion of oil and gas reserves necessary* [emphasis added].[371]

---

[369] Fincher, D.R. (Tidewater Oil Co.), Corrosion in Gas Wells and Gas Gathering Systems, Journal of Petroleum Technology, Volume 13, Number 9, September 1961, Abstract.

[370] NACE International Standard RP0186-2001, Application of Cathodic Protection for External Surfaces of Steel Well Casings.

[371] NACE International, Application of Cathodic Protection for External Surfaces of Steel Well Casings, RP0186-2001, 2001, p.1.

Gas operators stress the importance of corrosion monitoring and control programs. For example, OMV Exploration and Production writes:

> **_Corrosion remains a key issue in petroleum production_**. _Its continued occurrence has consequences on the safety of people and environment and the integrity of facilities and affects the economy of the oil or gas field. Particularly the presence of severe environments containing corrosive components such as carbon dioxide and hydrogen sulphide poses serious problems. **A central element in the design of facilities and the corrosion control is therefore the proper choice of materials which are both economical and provide a satisfactory performance over the entire service life with respect to the given environment. Prior to the production phase reliable corrosion monitoring programmes have to be selected, established, and implemented, as necessary**_ [emphasis added].[372]

The magnitude and complexity of a corrosion/erosion mitigation program will vary depending on site-specific conditions. The important step is to complete the initial evaluation, assess the site-specific circumstances, and develop an adequate corrosion/erosion mitigation plan. Some mitigation programs are started early, some are applied intermittently, and others are instituted later in the gas production process; in all cases, an engineering assessment prior to gas drilling and production must be completed to determine the optimal plan.

The corrosion engineering textbook, Corrosion Control in Oil and Gas Production, explains the importance of developing a site-specific plan:

> **_The many possible alternatives available today for corrosion management for gas and oil well environments, dictates the need for a thorough evaluation and development of long term plans to assure a safe, economical and effective program_**. _History has shown that both corrosion inhibition and corrosion resistant alloys (CRAs) have been used successfully in tough environments. The final decision on which method to use is often made on the basis of available capital versus long term operating costs_ [emphasis added].[373]

**The 2011 RDSGEIS**: The 2011 RDSGEIS includes a substantially improved well casing program, including a three-casing-string design. However, this casing is typically made of carbon steel, and must be protected from corrosion and erosion. Chromium steel and corrosion resistant alloys are commonly installed in corrosive environments; however, these metals are substantially more expensive and are not currently proposed for NYS.

Well casing, once installed and cemented into place, will remain in the well for its entire lifecycle, and is often abandoned in place.[374] Therefore, it is in the operator's best economic interest to ensure that its casing investment is protected from corrosion and erosion.

---

[372] Oberndorfer, M. (OMV Exploration and Production), Corrosion Control in the Oil and Gas Production-5 Successful Case Histories, CORROSION Conference 2007, March 11-15, 2007, Nashville Tennessee, NACE International, 2007, p.1.

[373] Treseder, R.S., Tuttle, R.N., Corrosion Control in Oil and Gas Production, Chapter 14, Corrosion of Steels in Gas Wells, 1998.

[374] In some circumstances corroded casing will be pulled from a well prior to abandonment, although this process can prove difficult, time consuming, and expensive for fully cemented casing strings.

It would be shortsighted for NYS to require a robust well casing program, and not build in a corrosion and erosion control program. Chemicals, metallurgy, monitoring, and repair techniques are available to the operator to manage corrosion and erosion downhole (in the well) and at its surface facilities (e.g. corrosion inhibitors, cathodic protection systems, coatings).

Tools that can be used to monitor well corrosion include caliper tools and casing inspection logs. A caliper tool is run down the inside of the well casing or tubing to measure the internal diameter and assess metal wall loss. Casing inspection logs use ultrasonic and magnetic-flux technology to estimate metal wall loss. Additionally, temperature surveys can be run to look for gas cooling anomalies in the well, which are an indication of casing holes.[375]

NYSDEC has proposed cement evaluation tools to be run when HVHF wells are initially drilled and completed, which is a best practice. Cement integrity should also be monitored periodically over the well's life if casing corrosion occurs. Casing corrosion is an indicator of potential cement deterioration, as explained above.

Without regulations, the decision to invest in corrosion/erosion mitigation and wellbore integrity monitoring is left to the operator. In some cases, operators postpone mitigation to improve early economics. Deferral strategies can produce unfavorable results in the long-term, but may be attractive to small operators that have limited funds, or to large operators that plan to reap the benefits of early production and sell assets soon thereafter. Operators may not implement, unless required, long-term monitoring when faced with declining production, lower profits and when operating cost cuts are sought.

Corrosion and erosion programs that are instituted early can prolong the life of equipment and well casings, and reduce environmental risk. Delayed attention to corrosion and erosion mitigation can result in increased safety, environmental, and human health risks.

Gas well corrosion and erosion can occur in many ways:

- Oxygen contaminated drilling fluids are injected downhole, and can corrode well casing and drilling equipment;

- Water produced along with gas can corrode well casing, tubing, and downhole equipment;

- Acid stimulation treatments, used alone or in conjunction with hydraulic fracturing, readily attack metal;

- Well casing and surface piping can be eroded by high gas production velocities, especially when laden with sediment, sands, or hydraulic fracturing proppants;

- Corrosive soils can cause external corrosion of carbon steel casing;

- Hydrogen sulfide and carbon dioxide, often present in gas production, can corrode carbon steel; and

- Higher wellbore temperatures, increased velocity, and increased salinity accelerate corrosion rates.

**NYCRR Proposed Revisions**: NYSDEC has not proposed any new requirements for corrosion or erosion mitigation for the Marcellus, Utica, or other low-permeability reservoirs. There are no requirements for corrosion or erosion mitigation or long-term well integrity monitoring in the existing NYCRR.

---

[375] Pennsylvania Governor's Marcellus Shale Advisory Commission Report, July 22, 2011, recommends pressure testing each casing to ensure initial integrity of casing design and cement, and pressure testing and logging to verify the mechanical integrity of the casing and cement over the life of the well, p. 109.

**Recommendation No. 99**: Best corrosion and erosion mitigation practices and long-term well integrity monitoring should be included in the SGEIS and codified in the NYCRR. Operators should be required to design equipment to prevent corrosion and erosion. Corrosion and erosion monitoring, repair, and replacement programs should be instituted.

## 24. Well Control & Emergency Response Capability

**Background:** In 2009, HCLLC recommended that NYSDEC require an operator to have an Emergency Response Plan (ERP) and a well blowout control plan. HCLLC recommended that operators be required to demonstrate that they have access to sufficient personnel and resources to respond to a fire, explosion, blowout, or other industrial accident. Best practices include: developing response and well control plans; verifying there are a sufficient number of trained and qualified personnel to carry out the plans; ensuring operators have access to the necessary response equipment; and testing (drills and exercises) the plan prior to drilling.

In 2009, HCLLC also recommended that NYSDEC examine the capacity of local emergency response teams. Oil and gas industry accidents often require highly specialized response capability and equipment. Operators should be required to supplement local emergency response resources to meet this need.

In January 2011, NYS' consultant, Alpha Geoscience, concluded that NYS well control and emergency response planning requirements are narrowly focused on the Bass Island Trend wells. Alpha Geoscience agreed with HCLLC that new regulations are needed for the formations proposed for development under this SGEIS.[376]

**The 2011 RDSGEIS**: The 2011 RDSGEIS includes a new section (Section 7.13) on Emergency Response Plans, which is a substantial improvement. Section 7.13 states:

*7.13 Emergency Response Plan*

*There is always a risk that despite all precautions, non-routine incidents may occur during oil and gas exploration and development activities. **An Emergency Response Plan (ERP) describes how the operator of the site will respond in emergency situations which may occur at the site.** The procedures outlined in the ERP are intended to provide for the protection of lives, property, and natural resources through appropriate advance planning and the use of company and community assets. **The Department proposes to require supplementary permit conditions for high-volume hydraulic fracturing that would include a requirement that the operator provide the Department with an ERP consistent with the SGEIS at least 3 days prior to well spud.** The ERP would also indicate that the operator or operator's designated representative will be on site during drilling and/or completion operations including hydraulic fracturing, and such person or personnel would have a current well control certification from an accredited training program that is acceptable to the Department [emphasis added].*

*The ERP, at a minimum, would also include the following elements:*

- *Identity of a knowledgeable and qualified individual with the authority to respond to emergency situations and implement the ERP;*

- *Site name, type, location (include copy of 7 ½ minute USGS map), and operator information;*

- *Emergency notification and reporting (including a list of emergency contact numbers for the area in which the well site is located; and appropriate Regional*

---

[376] Alpha Geoscience, Review of the dSGEIS and Identification Best Technology and Best Practices Recommendations, Harvey Consulting, LLC; December 28, 2009, prepared for NYSERDA, January 20, 2011, Page 42.

> *Minerals' Office), equipment, key personnel, first responders, hospitals, and evacuation plan;*

- *Identification and evaluation of potential release, fire and explosion hazards;*
- *Description of release, fire, and explosion prevention procedures and equipment;*
- *Implementation plans for shut down, containment and disposal;*
- *Site training, exercises, drills, and meeting logs; and*
- *Security measures, including signage, lighting, fencing and supervision.*[377]

Appendix 6, Proposed Environmental Assessment Form Addendum, requires an Emergency Response Plan be located at the rig, and that the plan be followed.[378]

Appendix 10, Proposed Supplementary Permit Conditions for HVHF, Condition No. 2, requires an ERP be provided 3 days prior to spud and available at the site. Condition No. 2 requires the ERP be developed in a manner consistent with the SGEIS, but it does not reference the Chapter 7.13 minimum requirements.

> *An emergency response plan (ERP) consistent with the SGEIS must be prepared by the well operator and be available on-site during any operation from well spud (i.e., first instance of driving pipe or drilling) through well completion. A list of emergency contact numbers for the area in which the well site is located must be included in the ERP and the list must be prominently displayed at the well site during operations conducted under this permit. Further, a copy of the ERP in electronic form must be provided to this office at least 3 days prior to well spud.*[379]

The addition of an Emergency Response requirement to the SGEIS is a substantial improvement. However, it is recommended that NYSDEC include a review, approval, and audit process to ensure that quality plans are developed. NYSDEC should have a program to audit ERPs via drills, exercises, equipment inspections, and personnel training audits.

As proposed by NYSDEC, the operator is required to submit an ERP three days prior to commencing drilling. This leaves no time for regulators to review and approve the ERP. NYSDEC proposes no process for determining the adequacy of the ERP. There is no assessment of personnel training and qualifications, equipment resources, or local emergency response services.

Industrial fires, explosions, blowouts, and spills require specialized emergency response equipment, which may not be available at local fire and emergency services departments. For example, local fire and emergency services departments typically do not have well capping and control systems.

Larger, paid fire and emergency services departments, located near existing industrial developments, may have some industrial firefighting capability; however, the level of capability should be assessed by the operator and supplemented. If local emergency response services are relied upon in the ERP, operators should ensure emergency response personnel are trained, qualified, and equipped to respond to oil and gas industrial accidents. Small, local, volunteer fire and emergency services departments will typically not be equipped or qualified to meet this need.

---

[377] 2011 NYSDEC, RDSGEIS, Page 7-146.

[378] 2011 NYSDEC, RDSGEIS, Appendix 6, Page A6-7.

[379] 2011 NYSDEC, RDSGEIS, Appendix 10, Page 1 of 17.

> **Recommendation No. 100:** NYSDEC should identify an Emergency Response Plan (ERP) review, approval, and audit process to ensure that quality plans are developed. Objectives of the ERP should include adequately trained and qualified personnel, and the availability of adequate equipment. If local emergency response resources are relied on in the ERP, operators should ensure they are trained, qualified, and equipped to respond to an industrial accident. Additionally, NYSDEC should have a program to audit ERPs via drills, exercises, equipment inspections, and personnel training audits.

On average, a blowout occurs in 7 out of every 1,000 onshore exploration wells.[380] This risk statistic is applicable to Marcellus and other low-permeability gas reservoir drilling that is still in the exploration and appraisal phase in NYS. Blowout rates are less frequent for production wells where more information is known about the reservoir, well control is optimized, and personnel are more experienced in site-specific conditions. For example, a review of production well blowouts in California estimated 1 blowout per 2,500 wells drilled.[381] California's data showed that: 25% of the blowouts affected more than 25 acres; the average blowout lasted 18 hours; and the maximum blowout length was 6 months.

Using the California statistic of 1 blowout per 2,500 production wells drilled (which is more conservative than the exploration well statistic of 7 blowouts per 1,000 exploration wells), and NYS' estimate of 1600 wells per year over 30 years, an incremental likelihood of 19 blowouts is estimated for NYS.[382] Because some of the early wells drilled will be exploration wells, the blowout frequency many be higher in the first few years of shale gas development in NYS and it is plausible that 40[383] or more well blowouts could occur during the next 30 years. Therefore, blowouts are a reasonably foreseeable significant impact, and mitigation is warranted.

Hydrocarbon reservoirs can contain large quantities of gas and formation water, which can be released into the surrounding environment during a well blowout, resulting in significant damage. For example, the Chesapeake Energy 2011 Marcellus well blowout in Bradford County, Pennsylvania spilled thousands of gallons of fracture treatment fluid over "containment walls, through fields, personal property and farms, even where cattle continue[d] to graze."[384]

Methods to control a gas well blowout can require significant water withdrawals – from 500,000 to 6,000,000 gallons per day. Well control experts may also use foam and dry chemicals to respond to a blowout. Controlling a well blowout can create large volumes of waste. Rig-deluge operations create large pools of water that can transport oil, chemicals, fuels, and other materials toward lower elevation drainage areas.

In addition to the Chesapeake Energy 2011 well blowout, another Pennsylvania Marcellus Shale blowout occurred in 2010.[385,386] Also, in 2010, there was a major industrial fire. The 2010 incidents prompted

---

[380] Rana, S., Environmental Risks- Oil and Gas Operations Reducing Compliance Cost Using Smarter Technologies, Society of Petroleum Engineering Paper 121595-MS, Asia Pacific Health, Safety, Security and Environment Conference, 4-6 August 2009, Jakarta, Indonesia, 2009.

[381] Jordan, P.D., and Benson, S. M., Well Blowout Rates in California Oil and Gas District 4- Update and Trends,  Summary of Well Blowout Risks for California Oil and Gas District 4, 1991-2005, Table 1

[382] 19 blowouts= (1,600 wells drilled per year)(30 years)(1 blowout per 2500 wells drilled).

[383] 40 blowouts= 1,600 wells drilled per year)(2 years)(7 blowout per 1000 wells drilled)+(1,600 wells drilled per year)(28 years)(1 blowout per 2500 wells drilled).

[384] Pennsylvania Fracking Spill: Natural Gas Well Blowout Spills Thousands of Gallons of Drilling Fluid, The Huffington Post, April 20, 2011.

[385] Blowout Occurs at Pennsylvania Gas Well, Wall Street Journal, June 4, 2010.

Pennsylvania to realize the need for its own emergency response services, with trained and qualified personnel and adequate equipment available 24 hours per day, 7 days per week. The news reported that it took "16 hours for out-of-state crews to address a June 3 blowout in Clearfield County and 11 hours to extinguish a July 23 fire in Allegheny County. In both cases, well operators had to wait for response crews to fly in from Texas."[387]

In 2010, CUDD Well Control located a new facility in Canton Township, Bradford County, Pennsylvania. Canton Township is located near the southern NYS border. It may be possible for NYS operators to contract with CUDD to provide emergency response services. However, a better alternative may be for NYS to collaborate with a well control specialist to provide more centrally located services dedicated to supporting NYS' proposed drilling activity.

The 2011 RDSGEIS requires operators to develop and implement a blowout preventer (BOP) testing program. However, the SGEIS does not unequivocally require a well control expert be on contract. It is recommended that NYSDEC require operators to have a contract in place for immediate response by a trained and qualified well control contractor. If a contract with a well control expert is not in place when a blowout occurs, contract negotiations can cause detrimental delays.

Well capping is a proven, effective, and rapid method to control a blowout. Well control contractors provide the expertise and equipment for this operation. However, in some limited cases, well capping is not effective, and a relief well may be required. Therefore, it is important for operators to also have prearranged access to a relief well rig, either via a contract with a rig provider or via a memorandum of agreement to provide emergency response assistance with a nearby operator.

> **Recommendation No. 101:** NYSDEC should require a well blowout response plan (either included in the Emergency Response Plan or as a separate plan), a contract retainer with an emergency well control expert, and prearranged access to a relief well rig.

**NYCRR Proposed Revisions**: NYSDEC has proposed a new regulation at 6 NYCRR § 560.5 requiring an ERP for HVHF wells. This is a substantial improvement; however, this plan should be required for all wells in NYS, not just HVHF wells. Additionally, the NYCRR should more clearly specify the ERP content requirements and include the recommendations listed above.

> **Recommendation No. 102:** The requirement for an Emergency Response Plan should be codified in the NYCRR. It should apply to all wells in NYS, not just HVHF wells. The NYCRR should specify ERP content requirements. These requirements should be consistent with NYSDEC's recommendations listed in Chapter 7.13 of the 2011 RDSGEIS.

---

[386] Pennsylvania Fracking Spill: Natural Gas Well Blowout Spills Thousands of Gallons of Drilling Fluid, The Huffington Post, April 20, 2011.

[387] http://pagasdrilling.com/tag/cudd-well-control/

## 25. Financial Assurance Amount

**Background:** In December 15, 2008, scoping comments to NYSDEC, NRDC, and its co-signatories requested the DSGEIS examine whether NYSDEC requires a sufficient financial assurance amount (in the form of a bond or other financial instrument). In its comments on the 2009 DSGEIS, NRDC and its co-signatories, as well as HCLLC, noted that the DSGEIS did not provide an analysis of the current financial assurance requirements, and requested that work be done.

HCLLC recommended that the SGEIS examine financial assurance amounts to ensure there is funding available to properly plug and abandon wells; remove equipment and contamination; complete surface restoration; and provide adequate insurance to compensate nearby public for adverse impacts (e.g., well contamination).

Long horizontal wells are more costly to plug and abandon than vertical wells. Also, surface impacts are increased when high-volume fracture stimulation treatments are employed and multiple wells are drilled from a single well pad. Both of these operations require additional gas treatment and transportation facilities.

In January 2011, NYS' consultant, Alpha Geoscience, advised NYSDEC to ignore financial assurance recommendations, declaring it "out of scope" of the SGEIS, because legislative action would be required at ECL 23-0305(8)(k).[388] HCLCC disagrees. Regardless of whether a legislative change is required, financial assurance improvements for Marcellus Shale gas well drilling should not be disregarded in the RDSGEIS; instead, the SGEIS should recommend to NYS' Legislature the need for legislative action as a mitigating measure.

**The 2011 RDSGEIS:** The 2011 RDSGEIS still does not include recommendations for increasing the financial assurance amounts for HVHF shale gas operations.

**NYCRR Proposed Revisions:** There is no proposed revision to the amount of financial security for wells up to 6,000' deep. 6 NYCRR § 551.5. For wells between 2,500' and 6,000' in depth, NYSDEC requires only $5,000 financial security per well, with the overall total per operator not to exceed $150,000.

For wells drilled more than 6,000' deep, NYSDEC is proposing a regulatory revision that requires the operator to provide financial security in an amount based on the anticipated cost for plugging and abandoning the well (6 NYCRR § 551.6).

In 2003, ICF completed a report for the New York State Energy Research and Development Authority (NYSERDA) on NYS oil and gas wells.[389] ICF's report advised NYS that well plugging and abandonment can range from $5,000 per well to more than $50,000 per well depending on the well depth, well condition, site access, and site condition.[390] ICF's 2003 report recommended that NYS consider increased financial security requirements. NYSDEC's current requirement of only $5,000 financial

---

[388] Alpha Geoscience, Review of the dSGEIS and Identification Best Technology and Best Practices Recommendations Harvey Consulting, LLC; December 28, 2009, prepared for NYSERDA, January 20, 2011, Page 46.

[389] ICF Consulting, Well Characterization and Evaluation Program for New York State Oil and Gas Wells, Draft Report for the New York State Energy Research and Development Authority, PSA No. 7012, July 2003. This report is found at http://esogis.nysm.nysed.gov/esogisdata/downloads/NYSERDA/7012.pdf. The report is listed as a draft, and a final could not be located on the world-wide web.

[390] ICF Consulting, Well Characterization and Evaluation Program for New York State Oil and Gas Wells, Draft Report for the New York State Energy Research and Development Authority, PSA No. 7012, July 2003, Page. ES-1.

security per well is clearly insufficient, if ICF determined in 2003 that the cost could be as much as $50,000 per well. Today's cost would likely be higher, almost a decade later.

In Ohio, an operator is required to obtain liability insurance coverage of at least $1,000,000 and up to $3,000,000 for wells in urban areas. The Ohio Code at Title 15, Chapter 1509 requires:

> *1509.07 Liability insurance coverage. **An owner of any well**, except an exempt Mississippian well or an exempt domestic well, **shall obtain liability insurance coverage** from a company authorized to do business in this state **in an amount of not less than one million dollars bodily injury coverage and property damage coverage to pay damages for injury to persons or damage to property caused by the drilling, operation, or plugging of all the owner's wells in this state.** However, **if any well is located within an urbanized area, the owner shall obtain liability insurance coverage in an amount of not less than three million dollars for bodily injury coverage and property damage coverage to pay damages for injury to persons or damage to property caused by the drilling, operation, or plugging of all of the owner's wells in this state**. The owner shall maintain the coverage until all the owner's wells are plugged and abandoned or are transferred to an owner who has obtained insurance as required under this section and who is not under a notice of material and substantial violation or under a suspension order. The owner shall provide proof of liability insurance coverage to the chief of the division of oil and gas resources management upon request. Upon failure of the owner to provide that proof when requested, the chief may order the suspension of any outstanding permits and operations of the owner until the owner provides proof of the required insurance coverage.[emphasis added]*

> *Except as otherwise provided in this section, an owner of any well, before being issued a permit under section 1509.06 of the Revised Code or before operating or producing from a well, shall execute and file with the division of oil and gas resources management a surety bond conditioned on compliance with the restoration requirements of section 1509.072, the plugging requirements of section 1509.12, the permit provisions of section 1509.13 of the Revised Code, and all rules and orders of the chief relating thereto, in an amount set by rule of the chief.*

> **Recommendation No. 103**: NYSDEC's financial assurance requirements should not narrowly focus on the cost for plugging and abandoning a well. Instead, NYSDEC's financial assurance requirements should include a combination of bonding and insurance that addresses the costs and risks of long-term monitoring; publicly incurred response and cleanup operations; site remediation and well abandonment; and adequate compensation to the public for adverse impacts (e.g., water well contamination). Recommendations for financial assurance improvements for Marcellus Shale gas well drilling should be included in the SGEIS as a mitigating measure, even if legislative action is ultimately required. Additionally, improved financial assurance should be codified in the NYCRR during this revision to the extent possible.

By comparison, Fort Worth, Texas requires an operator drilling 1-5 wells to provide a blanket bond or letter of credit of at least $150,000, with incremental increases of $50,000 for each additional well.[391] Therefore, under Fort Worth, Texas requirements, an operator drilling 100 wells would be required to hold a bond of $4,900,000, as compared to $150,000 in NYS.

---

[391] Fort Worth, Texas Ordinance No. 18449-2-2009, An Ordinance Amending the Code of Ordinances for the City of Fort Worth for Gas Drilling, 2009.

In addition to the bond amount, Fort Worth, Texas also requires the operator to carry multiple insurance policies:

1. *Standard Commercial General Liability Policy of at least $1,000,000 per occurrence. The Standard Commercial General Liability insurance must include: "premises, operations, blowout or explosion, products, completed operations, sudden and accidental pollution, blanket contractual liability, underground resources and equipment hazard damage, broad form property damage, independent contractors' protective liability and personal injury."*

2. *Excess or Umbrella Liability of $5,000,000;*

3. *Environmental Pollution Liability Coverage of at least $5,000,000 "applicable to bodily injury, property damage, including the loss of use of damaged property or of property that has not been physically injured or destroyed; cleanup costs; and defense, including costs and expenses incurred in the investigation, defense or settlement of claims…coverage shall apply to sudden and accidental, as well as gradual pollution conditions resulting from the escape or release of smoke, vapors, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste material or other irritants, contaminants or pollutants."*

4. *Control of Well Policy of at least $5,000,000 per occurrence/combined single limit with a $500,000 sub-limit endorsement for damage to property for which the Operator has care, custody and control; and*

5. *Other insurance required by Texas (e.g. Workers Compensation Insurance, Auto Insurance, and other corporate insurance required to do business in the state of Texas).[392]*

Financial assurance requirements should be increased to address worst-case risk exposure. Risk assessments should include worst-case scenario financial impact models. The risk modeling should be used to set higher financial assurance requirements.

> **Recommendation No. 104**: The financial assurance requirements at 6 NYCRR §§ 551.5 and 551.6 are insufficient to address the risks to NYS and private parties associated with oil and gas development. It is recommended that each operator provide a bond of at least $100,000 per well, with a cap of $5,000,000 for each operator. Additionally, NYSDEC should require Commercial General Liability Insurance, including Excess Insurance, Environmental Pollution Liability Coverage, and a Well Control Policy, of at least $5,000,000. If NYSDEC deviates from these financial assurance requirements, it should be justified with a rigorous economic assessment that is provided to the public for review and comment.

---

[392] Fort Worth, Texas Ordinance No. 18449-2-2009, An Ordinance Amending the Code of Ordinances for the City of Fort Worth for Gas Drilling, 2009.

## 26. Seismic Data Collection

**Background**: In 2009, HCLLC recommended that NYSDEC improve the DSGEIS and establish regulatory requirements for seismic data collection to reduce impacts to the environment and the public. The 2009 DSGEIS addressed naturally occurring seismic events in Chapter 4, but was silent on the impacts from industrial seismic exploration, which is used to locate subsurface gas reservoirs including shale gas targets.

This problem persists in the 2011 RDSGEIS. The 2011 RDSGEIS discusses naturally occurring seismic events, and seismically induced fractures from HVHF operations, but does not include any analysis of the potential impacts or mitigation needed for two-dimensional (2D) or three-dimensional (3D) seismic surveys used to target hydrocarbon formations for exploration and appraisal drilling. These seismic surveys are also useful to identify major fault systems to be used in HVHF design and modeling. Improved understanding of the subsurface stratigraphy and fault systems will improved 3D model simulation predictions and can aid engineers in designing HVHF treatments that do not link induced fractures with existing, conductive, natural fault systems that could move HF fluids into protected groundwater resources or water wells.

In January 2011, NYS' consultant, Alpha Geoscience provided a misguided recommendation to NYSDEC to ignore seismic data collection mitigation in the RDSGEIS, as "irrelevant."[393] Because seismic data collection is typically the first step in unexplored areas, to locate and optimize exploration drilling targets, seismic data collection mitigation when used to target Marcellus Shale wells is hardly "irrelevant."

Therefore, it is unclear whether NYSDEC is not familiar with the use of seismic data collection to target hydrocarbon formations for drilling, and the mitigation measures needed because its consultants advised against study of this important mitigation, or whether shale gas operators have told NYSDEC that they don't intend to collect two-dimensional (2D) or three-dimensional (3D) seismic surveys prior to exploring in the Marcellus Shale.

If operators do not intend to collect additional 2D and 3D data, that representation should be stated in the RDSGEIS, and the 2D and 3D data collection should be precluded in NYS. Otherwise, the impacts of this work should be identified and mitigated. This is an important issue to resolve, because seismic surveys can create significant surface impacts and disruptions.

> **Recommendation No. 105**: If 2D or 3D seismic surveys are planned, or are possible in the future, the NYCRR should codify a permitting process for these activities and institute mitigating measures in the SGEIS to minimize surface impacts and disruptions, and require rehabilitation of impacted areas.

Exploration for oil and natural gas typically begins with a geologic examination of the surface structure of the earth, to identify areas where petroleum or gas deposits might exist. Once a geologist/geophysicist has identified an area of potential interest based on surface geologic maps, seismic data collection is typically obtained to identify possible subsurface hydrocarbon traps and structures.

---

[393] Alpha Geoscience, Review of the dSGEIS and Identification Best Technology and Best Practices Recommendations, Harvey Consulting, LLC; December 28, 2009, prepared for NYSERDA, January 20, 2011.

Seismic exploration equipment is used to send seismic waves into the earth. Seismic waves are generated by a surface positioned source and are measured by a surface positioned receiver. The rate that seismic energy is transmitted and received through the earth crust provides information on the subsurface geology, because seismic waves reflect at different speeds and intensity off various rock strata and geologic structures. Collecting seismic data in this manner is called a Reflection Seismic Survey.[394]





A reflection seismic survey involves generating hundreds to tens of thousands of seismic source events, or shots, at various locations in the survey area. The seismic energy generated by each shot is detected and recorded by sensitive receivers ("geophones" on land and "hydrophones" under water) at a variety of distances from the source location. Geophones and hydrophones are connected by long cables to relay the collected information back to a centralized computer. The photo to the left is a geophone and cable system.[395]

For every source event, each geophone generates a seismogram or trace, which is a time series representing the earth movement at the receiver location. A record of all traces for each shot is transmitted to a computer for storage and conversion into a seamless cross-sectional representation of the subsurface for subsequent study and interpretation by a trained geophysicist.

Onland seismic operations involve generation of seismic vibrations by explosive energy sources or by mechanical sources. One type of energy source for seismic exploration is an explosive charge. Small holes ("shot-holes"), typically 4 inches in diameter are drilled into the earth surface, 10-60' deep depending on surface terrain.[396] Although, some drill holes have been drilled to 200'.[397] The photo to the right shows an example of a shot-hole drill unit.



[394] U.S. Geologic Survey, Seismic Data Acquisition.

[395] Geophone and cable photo from http://www.anr.state.vt.us/dec/geo/newbedu.htm, State of Vermont.

[396] Westlund, D., Thurber, M.W., Best Environmental Practices for Seismic Exploration in Tropical Rainforest, Society of Petroleum Engineers International Conference on Health, Safety and Environment in Oil and Gas Exploration and Production, SPE 10HSE 126844-PP, April 2010.

[397] US Fish and Wildlife Service, 612 FW 2, Oil and Gas, Policy Manual.

The hole must be drilled into a hard layer of soil that is sufficiently dense to carry the seismic wave.[398] Explosive charges (typically 5-50 pounds each)[399] are lowered into the hole and detonated to create a shock wave (vibration). Some states have limits on the size of charges that can be deployed near environmentally sensitive areas, human inhabitation and near roadways.

Historic use of explosives on the ground surface resulted in large craters and extensive surface damage. Explosive charges are no longer deployed at the surface. Instead, a shot-hole must be drilled and the explosive lowered into the shot-hole at a sufficient depth to prevent surface craters. Shot-holes are filled with cuttings, bentonite and rocks to minimize surface impact.

Mechanical vibrators are an alternative to the use of explosives, and are more commonly used. Mechanical vibrators provide more consistent source strength and repeatability, and they are more reliable in the case of repeat data acquisition programs or for time-lapse studies.



Mechanical vibrators can include: a pad that thumps the surface of the earth ("thumper trucks"), driven by gravity or compressed air; a truck that generates vibrations ("Vibroseis™ Truck"); and compressed air guns.[400] The photo to the right shows a Vibroseis Truck. The Vibroseis method involves a truck equipped with vibrator pads that are lowered to the ground and triggered. Depending on the subsurface target depth and the purpose of the seismic survey, two or more seismic Vibroseis Trucks (vibrating in sync) may be needed.

In cold climates, ice road construction and use of Vibroseis Trucks for seismic data acquisition is the norm. Seismic data is typically secured over the winter months along ice road routes, to reduce footprint and stress to sensitive areas of the tundra environment.



The use of thumper trucks is not considered best practice because it involves dropping a steel slab that weighs about three tons to the ground to create a seismic vibration. Thumper trucks are large, requiring extensive tree and vegetation removal, and leave land scars.

In areas where seismic data is collected in water, the energy source is usually compressed air in an airgun submerged underwater, because explosives can cause adverse impacts to aquatic life.

---

[398] The Pembina Institute, Seismic Exploration, www.pembina.org.

[399] US Fish and Wildlife Service, 612 FW 2, Oil and Gas, Policy Manual.

[400] Petroleum Engineering Handbook, Reservoir Engineering and Petrophysics, Volume V(A), Society of Petroleum Engineers, 2007.

Harvey Consulting, LLC.                                              Report to NRDC January 2012

Significant surface impacts can be caused by extensive tree and vegetation removal to create straight "cutlines" to run seismic equipment (as shown in the photo to the left). Lines need to be cut to run mechanical vibration equipment or set explosives to generate the seismic waves, and other seismic lines are cleared to set geophones to measure the seismic reflection. The width of each cutline depends on the seismic survey method used, but can be on the order of 20'-50' wide where large seismic equipment units are required. Best practice is to decrease the width of the cutlines to as small as possible using hand carried equipment. More recently companies have been able to reduce cutline width to 6'-10' in certain circumstances.

The spacing between each cutline is dependent on the type of seismic equipment used and depth of examination into the earth. The distance between each cutline is typically 300' apart (shallow reservoir targets) to 3,000' apart (deeper reservoir targets).[401]

Depending on existing development, infrastructure and access in the area planned for onshore seismic exploration, a seismic operator may need to build access roads, set up temporary camps and establish helicopter landings to bring in personnel and equipment. In areas where there are existing roads, housing and airports, surface disturbance can be minimized.

A basic set of seismic data can be obtained by setting a two dimensional array of seismic sources and receivers (2D seismic). Typically 2D seismic requires seismic lines tens of miles apart. Often 2D data is acquired along existing roads or access routes to minimize surface impacts. Along the 2D seismic cutlines shot-points and receivers are evenly spaced to send and receive a signal. This process produces a 2D slice of the subsurface.



If funding is available, operators generally opt to collect three dimensional seismic (3D seismic) images of the subsurface. 3D seismic data acquisition involves a much more intensive data collection effort, using multiple shot lines arranged perpendicular to multiple receiver lines of geophones, with seismic lines spaced several hundred feet apart, rather than miles apart.[402] An example of a map produced from a 3D seismic survey is shown to the left.

Seismic operations are very labor intensive and require large amounts of equipment, personnel and support systems. Depending on the size of the area under study, and the type of equipment selected, seismic operations can require dozens to hundreds of personnel. In addition to seismic exploration equipment, there is a need for housing, catering, waste management systems, water supplies, medical facilities, equipment maintenance and repair shops, and other logistical support functions. None of these impacts have been analyzed in the NYS RDSGEIS.

There are typically six different crews deployed: (1) access crews, that clear seismic lines, (2) "shooters" that drill the shot-holes and set the explosive charges or run the mechanical vibration equipment to generate seismic waves, (3) "recorders" that set the geophones and measure the seismic reflection, (4) the "pick-up" crews that move the equipment from one location to the next along the seismic lines,

---

[401] The Pembina Institute, Seismic Exploration, www.pembina.org.

[402] Westlund, D., Thurber, M.W., Best Environmental Practices for Seismic Exploration in Tropical Rainforest, Society of Petroleum Engineers International Conference on Health, Safety and Environment in Oil and Gas Exploration and Production, SPE 10HSE 126844-PP, April 2010.

(5) logistical support crews that provide housing, food, medical, maintenance and repair, and transportation; and (6) remediation and plugging crews that restore the area and plug shot-holes (if used).

> **Recommendation No. 106**: The increased industrial activity (e.g. economic impacts, noise, surface disturbance, wildlife impacts, etc.) associated with 2D and 3D seismic surveys should be examined in the SGEIS.

In 2011, HCLLC developed a report for NRDC and Sierra Club describing the types of impacts that occur from 2D and 3D seismic surveys, and made recommendations for best practices and model permit requirements. The recommendations in this report could be considered by NYSDEC in crafting seismic survey requirements for NYCRR.[403]

> **Recommendation No. 107**: Consider the best practices and model permit requirements proposed in Harvey Consulting, LLC., Onshore Seismic Exploration Best Practices & Model Permit Requirements Report to: Sierra Club and Natural Resources Defense Council, January 20, 2011, for inclusion as mitigation measures in the SGEIS and improvements in the NYCRR to regulate seismic survey data collection.

---

[403] Harvey Consulting, LLC., Onshore Seismic Exploration Best Practices & Model Permit Requirements Report to: Sierra Club and Natural Resources Defense Council, January 20, 2011.

# APPENDIX A

## Surface Casing Table

# Appendix A - Surface Casing Table

| Surface Casing Requirement | 2011 RDSGEIS Appendix 8 Casing and Cementing Practices | 2011 RDSGEIS Appendix 9 Existing Fresh Water Conditions Required for Wells Drilled in Primary and Principal Aquifers | 2011 RDSGEIS Appendix 10 Proposed Supplementary Permit Conditions for HVHF | Analysis of Proposed Permit Conditions and Recommendations in 2011 RDSGEIS | NYCRR Requirements for all Wells, NYCRR Part 554 | ADDITIONAL NYCRR Requirements for all HVHF Wells, NYCRR Part 560 | Analysis of Proposed NYCRR Requirements and Recommendations |
|---|---|---|---|---|---|---|---|
| Setting Depth | 75' beyond the deepest fresh water zone encountered or 75' into competent rock (bedrock), whichever is deeper. | 100' below the deepest freshwater zone and at least 100' into bedrock. | No requirement listed; assume it defaults to the Appendix 8 requirement of 75'. | The Appendix 10 HVHF surface casing setting depth requirement is less stringent than the Appendix 9 requirement; both should be 100'. NYSDEC should consider a 100' protection for all oil and gas wells. Additionally, NYSDEC needs to clarify whether the setting depth is intended to protect potable freshwater only, or include a broader definition of protected groundwater, which would result in deeper surface casing depths. | Surface casing must be run in all wells to extend below the deepest potable fresh water level. Neither the 75' nor the 100' setting depth below the deepest protected water zone is specified in the NYCRR. | No additional requirement. | NYSDEC should consider a 100' protection for all oil and gas wells. Additionally, NYSDEC needs to clarify whether this setting depth is intended to protect potable freshwater only, or include a broader definition of protected groundwater, which would result in deeper surface casing depths. This requirement should apply to all NYS wells. |
| Protected water depth estimate and verification | No requirement. | Estimated in drilling application and verified while drilling. | No requirement. | The freshwater depth should be estimated in the drilling application to aid in well construction design. The actual protected water depth should be verified with a resistivity log or other sampling method. If the actual protected water depth extends beyond the estimated protected water depth, an additional string of intermediate casing should be required. | No requirement. | No requirement. | The freshwater depth should be estimated in the drilling application to aid in well construction design. The actual protected water depth should be verified with a resistivity log or other sampling method. If the actual protected water depth extends beyond the estimated protected water depth, an additional string of intermediate casing should be required. This requirement should apply to all NYS wells. |
| Cement Sheath Width | No requirement. | At least 1-1/4". | No requirement. | A cement sheath of at least 1-1/4" should be installed on all oil and gas wells. Thin cement sheaths are easily cracked and damaged. | No requirement. | No requirement. | A cement sheath of at least 1-1/4" should be installed on all oil and gas wells. Thin cement sheaths are easily cracked and damaged. This requirement should apply to all NYS wells. |

# Appendix A - Surface Casing Table

| Surface Casing Requirement | 2011 RDSGEIS Appendix 8 Casing and Cementing Practices | 2011 RDSGEIS Appendix 9 Existing Fresh Water Supplementary Permit Conditions Required for Wells Drilled in Primary and Principal Aquifers | 2011 RDSGEIS Appendix 10 Proposed Supplementary Permit Conditions for HVHF | Analysis of Proposed Permit Conditions and Recommendations in 2011 RDSGEIS | NYCRR Requirements for all Wells, NYCRR Part 554 | ADDITIONAL NYCRR Requirements for all HVHF Wells, NYCRR Part 560 | Analysis of Proposed NYCRR Requirements and Recommendations |
|---|---|---|---|---|---|---|---|
| Amount of Cement in Annulus | Not specified, but it is presumed that the goal is to complete annulus cementing, because the requirements include 25% excess cement; however, the conditions require a reporting of the cement top location, if cement is not returned to the surface, which indicates that NYSDEC could accept a partially cemented annulus. | Entire annulus must be cemented; cement squeeze may be required. | No requirement listed; assume it defaults to Appendix 8 requirement. | The surface casing annulus should be completely filled with cement; this should be clearly specified. There should be no void space in the annulus. | There is a requirement to circulate cement to the top of the hole. | No additional requirement. | The surface casing annulus should be completely filled with cement; this should be clearly specified. There should be no void space in the annulus. This requirement should apply to all NYS wells. |
| Shallow gas hazards | Surface hole drilling must stop and surface casing must be set and cemented before drilling deeper into hydrocarbon resources. | The likelihood of shallow gas hazards must be estimated in the drilling application and verified while drilling. | No requirement listed; assume it defaults to Appendix 8 requirement. | All oil and gas well designs and applications should plan for shallow gas hazards. Any shallow gas hazards encountered while drilling should be recorded. If a shallow gas hazard is encountered, surface casing should be set and cemented to protect water resources, before drilling deeper into hydrocarbon resources. | No requirement. | No requirement. | If a shallow gas hazard is encountered, surface hole drilling must stop, and surface casing must be set and cemented, before drilling deeper into hydrocarbon resources. All oil and gas well designs and applications should plan for shallow gas hazards. Any shallow gas hazards encountered while drilling should be recorded. This requirement should apply to all NYS wells. |
| Excess Cement Requirement | 25% | 50% | No requirement listed; assume it defaults to Appendix 8 requirement of 25%. | 25% excess cement is standard practice, unless a caliper log is run to more accurately assess hole shape and required cement volume. | No requirement. | No requirement. | 25% excess cement is standard practice, unless a caliper log is run to more accurately assess hole shape and required cement volume. This requirement should apply to all NYS wells. |

# Appendix A - Surface Casing Table

| Surface Casing Requirement | 2011 RDSGEIS Appendix 8 Casing and Cementing Practices | 2011 RDSGEIS Appendix 9 Existing Fresh Water Supplementary Permit Conditions Required for Wells Drilled in Primary and Principal Aquifers | 2011 RDSGEIS Appendix 10 Proposed Supplementary Permit Conditions for HVHF | Analysis of Proposed Permit Conditions and Recommendations in 2011 RDSGEIS | NYCRR Requirements for all Wells, NYCRR Part 554 | ADDITIONAL NYCRR Requirements for all HVHF Wells, NYCRR Part 560 | Analysis of Proposed NYCRR Requirements and Recommendations |
|---|---|---|---|---|---|---|---|
| Cement Type | The cement slurry shall be prepared according to the manufacturer's or contractor's specifications to minimize free water content in the cement. | No requirement listed; assume it defaults to Appendix 8 requirement. | The cement must conform to API Specification 10A, Specifications for Cement and Material for Well Cementing (April 2002 and January 2005 Addendum). Further, the cement slurry must be prepared to minimize its free water content, in accordance with the same API specification, and it must contain a gas-block additive. | HVHF cement quality requirements (including API specifications and the use of gas-blocking additives) is best practice. These practices should apply to all wells, not just HVHF wells. | No requirement. | The cement must conform to the industry standards specified in the permit to drill, and the cement slurry must be prepared to minimize its free water content and contain a gas-block additive. | The cement must conform to API Specification 10A, Specifications for Cement and Material for Well Cementing (April 2002 and January 2005 Addendum). Further, the cement slurry must be prepared to minimize its free water content, in accordance with the same API specification, and it must contain a gas-block additive. HVHF cement quality requirements (including API specifications and the use of gas-blocking additives) is best practice. These practices should apply to all wells, not just HVHF wells. |
| Cement Mix Water Temperature and pH Monitoring | Required. | No requirement listed; assume it defaults to Appendix 8 requirement. | No requirement listed; assume it defaults to Appendix 8 requirement. | Best practice is for the free water separation to average no more than six milliliters per 250 milliliters of tested cement, in accordance with the current API RP 10B. Best practice is to test for pH to evaluate water chemistry and ensure cement is mixed to manufacturer's recommendations. | No requirement. | The cement must conform to the industry standards specified in the permit to drill, and the cement slurry must be prepared to minimize its free water content. | Best practice is for the free water separation to average no more than six milliliters per 250 milliliters of tested cement, in accordance with the current API RP 10B. Best practice is to test for pH to evaluate water chemistry and ensure cement is mixed to manufacturer's recommendations. This requirement should apply to all NYS wells, not just HVHF wells. |
| Lost Circulation Control | Required. | Required. | Required. | Lost circulation control is best practice. | No requirement. | No requirement. | Lost circulation control is best practice. This requirement should apply to all NYS wells, not just HVHF wells. |

Harvey Consulting, LLC.

## Appendix A - Surface Casing Table

| Surface Casing Requirement | 2011 RDSGEIS Appendix 8 Casing and Cementing Practices | 2011 RDSGEIS Appendix 9 Existing Fresh Water Supplementary Permit Conditions Required for Wells Drilled in Primary and Principal Aquifers | 2011 RDSGEIS Appendix 10 Proposed Supplementary Permit Conditions for HVHF | Analysis of Proposed Permit Conditions and Recommendations in 2011 RDSGEIS | NYCRR Requirements for all Wells, NYCRR Part 554 | ADDITIONAL NYCRR Requirements for all HVHF Wells, NYCRR Part 560 | Analysis of Proposed NYCRR Requirements and Recommendations |
|---|---|---|---|---|---|---|---|
| Spacer Fluids | Required. | No requirement listed; assume it defaults to Appendix 8 requirement. | Required. | The use of spacer fluids to separate mud and cement, to avoid mud contamination of the cement, is best practice. | No requirement. | A spacer of adequate volume, makeup, and consistency must be pumped ahead of the cement. | The use of spacer fluids to separate mud and cement, to avoid mud contamination of the cement, is best practice. This requirement should apply to all NYS wells, not just HVHF wells. |
| Hole conditioning before cementing | Gas flows must be killed or lost circulation must be controlled and the hole be conditioned before cementing. | No requirement listed; assume it defaults to Appendix 8 requirement. | No requirement listed; assume it defaults to Appendix 8 requirement. | Hole conditioning before cementing is best practice. | No requirement. | Prior to cementing any casing string, the borehole must be circulated and conditioned to ensure an adequate cement bond. | Hole conditioning before cementing is best practice. This requirement should apply to all NYS wells, not just HVHF wells. |
| Cement Installation and Pump Rate | No requirement. | No requirement. | The cement must be pumped at a rate and in a flow regime that inhibits channeling of the cement in the annulus. | The requirement for cement to be pumped at a rate and in a flow regime that inhibits channeling of the cement in the annulus is a good practice; this requirement should apply to all oil and gas wells, not just HVHF wells. | No requirement. | Cement must be pumped at a rate and in a flow regime that inhibits channeling of the cement in the annulus. | The requirement for cement to be pumped at a rate and in a flow regime that inhibits channeling of the cement in the annulus is a good practice; this requirement should apply to all oil and gas wells, not just HVHF wells. |
| Rotating and Reciprocating Casing While Cementing | No requirement. | No requirement. | No requirement. | Rotating and reciprocating casing while cementing is a best practice to improve cement placement. | No requirement. | No additional requirement. | Rotating and reciprocating casing while cementing is a best practice to improve cement placement. This requirement should apply to all NYS wells. |
| Centralizers | At least every 120', with a minimum of two centralizers. A table of centralizer-hole size combinations is included. | At least every 120'. | At least two centralizers (one in the middle and one at the top), and all bow-spring style centralizers must conform to API Specification 10D for Bow-Spring Casing Centralizers (March 2002). | The proposed conditions reference an outdated API casing centralizer standard. Best practice is to use at least two centralizers and follow API RP 10D-2 (July 2010). | No requirement. | In addition to centralizers otherwise required by the department, at least two centralizers, one in the middle and one at the top of the first joint of casing, must be installed, and all bow-spring style centralizers must conform to the industry standards specified in the permit to drill. | The proposed conditions reference an outdated API casing centralizer standard. Best practice is to use at least two centralizers and follow API RP 10D-2 (July 2010). This requirement should apply to all NYS wells, not just HVHF wells. |

# Appendix A - Surface Casing Table

| Surface Casing Requirement | 2011 RDSGEIS Appendix 8 Casing and Cementing Practices | 2011 RDSGEIS Appendix 9 Existing Fresh Water Supplementary Permit Conditions Required for Wells Drilled in Primary and Principal Aquifers | 2011 RDSGEIS Appendix 10 Proposed Supplementary Permit Conditions for HVHF | Analysis of Proposed Permit Conditions and Recommendations in 2011 RDSGEIS | NYCRR Requirements for all Wells, NYCRR Part 554 | ADDITIONAL NYCRR Requirements for all HVHF Wells, NYCRR Part 560 | Analysis of Proposed NYCRR Requirements and Recommendations |
|---|---|---|---|---|---|---|---|
| Casing quality | All surface casing shall be a string of new pipe with a mill test of at least 1,100 pounds per square inch (psi); used casing may be approved for use, but must be pressure tested before drilling out the casing shoe. | New pipe with minimum internal yield pressure (MIYP) of 1,800 psi, or reconditioned pipe that has been tested internally to a minimum of 2,700 psi, must be used. | New pipe is required and must conform to American Petroleum Institute (API) Specification 5CT, Specifications for Casing and Tubing (April 2002). | New casing should be used in all wells. Once installed, surface casing remains in the well for the life of the well, and typically remains in place when the well is plugged and abandoned. It is important that the surface casing piping string (known as "the water protection piping string") is of high quality to maximize the corrosion allowance and life-cycle of the piping. The installation of older, used, thinner pipe, with less remaining corrosion allowance, may be a temporary solution, but not a long-term investment in groundwater protection. Used piping may pass an initial pressure test; however, it will not last as long as new piping, and will not be as protective of water resources in the long-term. | No requirement. | All casing must be new and conform to the industry standards specified in the permit to drill. | New casing should be used in all wells. Once installed, surface casing remains in the well for the life of the well, and typically remains in place when the well is plugged and abandoned. It is important that the surface casing piping string (known as "the water protection piping string") is of high quality to maximize the corrosion allowance and life-cycle of the piping. The installation of older, used, thinner pipe, with less remaining corrosion allowance, may be a temporary solution, but not a long-term investment in groundwater protection. Used piping may pass an initial pressure test; however, it will not last as long as new piping, and will not be as protective of water resources in the long-term. |
| Casing Thread Compound | No requirement. | No requirement. | Casing thread compound and its use must conform to API Recommended Practice (RP) 5A3, RP on Thread Compounds for Casing, Tubing, Line Pipe, and Drill Stem Elements (November 2009). | The requirement to use casing thread compound that conforms to API RP 5A3 (November 2009) is a good practice. This requirement should apply to all oil and gas wells, not HVHF wells. | No requirement. | Casing thread compound and its use must conform to the industry standards specified in the permit to drill. | The requirement to use casing thread compound that conforms to API RP 5A3 (November 2009) is a good practice. This requirement should apply to all oil and gas wells, not HVHF wells. |

Harvey Consulting, LLC.

# Appendix A - Surface Casing Table

Report to NRDC January 2012

| Surface Casing Requirement | 2011 RDSGEIS Appendix 8 Casing and Cementing Practices | 2011 RDSGEIS Appendix 9 Existing Fresh Water Supplementary Permit Conditions Required for Wells Drilled in Primary and Principal Aquifers | 2011 RDSGEIS Appendix 10 Proposed Supplementary Permit Conditions for HVHF | Analysis of Proposed Permit Conditions and Recommendations in 2011 RDSGEIS | NYCRR Requirements for all Wells, NYCRR Part 554 | ADDITIONAL NYCRR Requirements for all HVHF Wells, NYCRR Part 560 | Analysis of Proposed NYCRR Requirements and Recommendations |
|---|---|---|---|---|---|---|---|
| Drilling Mud | No requirement. | Compressed air or WBM, no SMB or OBM. | Not listed in Appendix 10, but the RDSGEIS text includes a section that states compressed air or WBM should be used on HVHF wells. | The use of compressed air or WBM (with no toxic additives) is best practice when drilling through protected water zones. This should be a requirement for all wells, not just those described in Appendix 9. | No requirement. | No requirement. | The use of compressed air or WBM (with no toxic additives) is best practice when drilling through protected water zones. This should be a requirement for all NYS wells. |
| Cement Setting Time | Compressive strength standard of 500 psi. | No requirement listed; assume it defaults to Appendix 8 requirement. | 8 hours Wait on Cement (WOC) and compressive strength standard of 500 psi. | Best practice is to have surface casing strings stand under pressure until the cement has reached a compressive strength of at least 500 psi in the zone of critical cement, before drilling out the cement plug or initiating a test. Additionally, the cement mixture in the zone of critical cement should have a 72-hour compressive strength of at least 1,200 psi. | No requirement. | 8 hours Wait on Cement (WOC) and compressive strength standard of 500 psi. | Best practice is to have surface casing strings stand under pressure until the cement has reached a compressive strength of at least 500 psi in the zone of critical cement, before drilling out the cement plug or initiating a test. Additionally, the cement mixture in the zone of critical cement should have a 72-hour compressive strength of at least 1,200 psi. This requirement should apply to all NYS wells. |
| NYSDEC Inspector | No requirement. | Required to be onsite for cementing operations. | No requirement. | Best practice is to have a state inspector on site during cementing operations, to verify surface casing cement is correctly installed, before attaching the blowout preventer and drilling deeper into the formation. | No requirement. | No additional requirement. | Best practice is to have a state inspector on site during cementing operations, to verify surface casing cement is correctly installed, before attaching the blowout preventer and drilling deeper into the formation. This requirement should apply to all NYS wells. |

## Appendix A - Surface Casing Table

| Surface Casing Requirement | 2011 RDSGEIS Appendix 8 Casing and Cementing Practices | 2011 RDSGEIS Appendix 9 Existing Fresh Water Supplementary Permit Conditions Required for Wells Drilled in Primary and Principal Aquifers | 2011 RDSGEIS Appendix 10 Proposed Supplementary Permit Conditions for HVHF | Analysis of Proposed Permit Conditions and Recommendations in 2011 RDSGEIS | NYCRR Requirements for all Wells, NYCRR Part 554 | ADDITIONAL NYCRR Requirements for all HVHF Wells, NYCRR Part 560 | Analysis of Proposed NYCRR Requirements and Recommendations |
|---|---|---|---|---|---|---|---|
| Cement QA/QC - Cement Evaluation Log | NYSDEC reserves the right to require the operator run a cement bond log, but does not require one on every well. | NYSDEC reserves the right to require the operator run a cement bond log, but does not require one on every well. | No requirement listed; assume it defaults to Appendix 8 requirement. | Circulating cement to the surface is one indication of successfully cemented surface casing, but it is not the only QA/QC check that should be conducted. Cement circulation to surface can be achieved even when there are mud or gas channels, or other voids, in the cement column. Circulating cement to the surface also may not identify poor cement to casing wall bonding. These integrity problems, among others, can be further examined using a cement evaluation tool and temperature survey. | No requirement. | No additional requirement. | Circulating cement to the surface is one indication of successfully cemented surface casing, but it is not the only QA/QC check that should be conducted. Cement circulation to surface can be achieved even when there are mud or gas channels, or other voids, in the cement column. Circulating cement to the surface also may not identify poor cement to casing wall bonding. These integrity problems, among others, can be further examined using a cement evaluation tool and temperature survey. |
| Formation Integrity Test | No requirement. | No requirement. | No requirement. | It is best practice to complete a formation integrity test to verify the integrity of the cement in the surface casing annulus at the surface casing shoe. The test should be conducted after drilling out of the casing shoe, into at least 20 feet, but not more than 50 feet of new formation. The test results should demonstrate that the integrity of the casing shoe is sufficient to contain the anticipated wellbore pressures identified in the application for the Permit to Drill. | No requirement. | No requirement. | It is best practice to complete a formation integrity test to verify the integrity of the cement in the surface casing annulus at the surface casing shoe. The test should be conducted after drilling out of the casing shoe, into at least 20 feet, but not more than 50 feet of new formation. The test results should demonstrate that the integrity of the casing shoe is sufficient to contain the anticipated wellbore pressures identified in the application for the Permit to Drill. This requirement should apply to all NYS wells. |

Harvey Consulting, LLC.

# Appendix A - Surface Casing Table

Report to NRDC January 2012

| Surface Casing Requirement | 2011 RDSGEIS Appendix 8 Casing and Cementing Practices | 2011 RDSGEIS Appendix 9 Existing Fresh Water Supplementary Permit Conditions Required for Wells Drilled in Primary and Principal Aquifers | 2011 RDSGEIS Appendix 10 Proposed Supplementary Permit Conditions for HVHF | Analysis of Proposed Permit Conditions and Recommendations in 2011 RDSGEIS | NYCRR Requirements for all Wells, NYCRR Part 554 | ADDITIONAL NYCRR Requirements for all HVHF Wells, NYCRR Part 560 | Analysis of Proposed NYCRR Requirements and Recommendations |
|---|---|---|---|---|---|---|---|
| BOP Installation | Confirmation that the surface casing is set and cemented into place, such that the BOP can be secured and effective when drilling deeper into the well. | No requirement listed; assume it defaults to Appendix 8 requirement. | No requirement listed; assume it defaults to Appendix 8 requirement. | The Appendix 8 requirement is best practice. Additionally, the surface casing should be pressure tested to ensure it can hold the required working pressure of the BOP. | No requirement. | No requirement. | The Appendix 8 requirement is best practice. Additionally, the surface casing should be pressure tested to ensure it can hold the required working pressure of the BOP. This requirement should apply to all NYS wells. |
| Record keeping | Not specified. | Not specified. | Records must be kept for five years after the well is P&A'd, and be available for review upon NYSDEC's request. | Best practice is to keep permanent records for each well, even after the well is P&A'd. This information will be needed by NYSDEC and industry during the well's operating life, will be critical for designing the P&A, and may be required if the well leaks post P&A. This requirement should apply to all NYS wells, not just HVHF wells. P&A'd wells do occasionally leak, and well information is may be needed to develop a re-entry, repair, re-P&A plan. | No requirement. | Records must be kept for five years after the well is P&A'd, and be available for review upon NYSDEC's request. | Best practice is to keep permanent records for each well, even after the well is P&A'd. This information will be needed by NYSDEC and industry during the well's operating life, will be critical for designing the P&A, and may be required if the well leaks post P&A. This requirement should apply to all NYS wells, not just HVHF wells. P&A'd wells do occasionally leak, and well information is may be needed to develop a re-entry, repair, re-P&A plan. |
| Additional Casing or Repair | Not specified. | Not specified. | The installation of an additional cemented casing string or strings in the well, as deemed necessary by the Department for environmental and/or public safety reasons, may be required at any time. | NYSDEC should reserve the right to require industry to install additional cemented casing strings in wells, and repair defective casing or cementing, as deemed necessary for environmental and/or public safety reasons. This requirement should apply to all wells, not just HVHF wells. | No requirement. | The installation of an additional cemented casing string or strings in the well, as deemed necessary by the department for environmental and/or public safety reasons, may be required at any time. | NYSDEC should reserve the right to require industry to install additional cemented casing strings in wells, and repair defective casing or cementing, as deemed necessary for environmental and/or public safety reasons. This requirement should apply to all wells, not just HVHF wells. |

Harvey Consulting, LLC.                                    Report to NRDC January 2012

## APPENDIX B

Intermediate Casing Table

# Appendix B - Intermediate Casing Table

| Intermediate Casing Requirement | NYS RDSGEIS Appendix 8 Casing and Cementing Practices | NYS RDSGEIS Appendix 9 Existing Fresh Water Supplementary Permit Conditions Required for Wells Drilled in Primary and Principal Aquifers | NYS RDSGEIS Appendix 10 Proposed Supplementary Permit Conditions for HVHF | Analysis of Proposed NYS RDSGEIS, Permit Conditions and Recommendations | NYCRR Requirement for all NYS Wells, NYCRR Part 554 | Additional NYCRR Requirement for HVHF Wells, NYCRR Part 560 | Analysis of Proposed NYCRR Requirements and Recommendations |
|---|---|---|---|---|---|---|---|
| Waiver Provision to Exclude Use of Intermediate Casing | Intermediate casing is required on a case-by-case basis. | Intermediate casing is required on a case-by-case basis. | Intermediate casing is required on all wells unless a waiver is granted. | It is best practice to install intermediate casing on a case-by-case basis for most wells; however, it is best practice to install it on all HVHF wells. The waiver provision proposed in the RDSGEIS to exclude intermediate casing on HVHF wells is not technically justified. | No requirement. | Intermediate casing is required on all wells unless a waiver is granted. | It is best practice to install intermediate casing on a case-by-case basis for most wells; however, it is best practice to install it on all HVHF wells. The waiver provision proposed in the RDSGEIS to exclude intermediate casing on HVHF wells is not technically justified. |
| Setting Depth | No requirement. | No requirement. | The setting depth and design of the casing must consider all applicable drilling, geologic, and well control factors. | Best practice is to set intermediate casing at least 100' below the deepest protected groundwater, to seal off anomalous pressure zones, lost circulation zones, and other drilling hazards. Although intermediate casing setting depth is site specific, there should be criteria for determining that depth. | No requirement. | The setting depth and design of the casing must consider all applicable drilling, geologic, and well control factors. | Best practice is to set intermediate casing at least 100' below the deepest protected groundwater, to seal off anomalous pressure zones, lost circulation zones, and other drilling hazards. Although intermediate casing setting depth is site specific, there should be criteria for determining that depth. This requirement should apply to all NYS wells. |
| Protected Water Depth Estimate and Verification | No requirement. | No requirement. | No requirement. | The freshwater depth should be estimated in the drilling application to aid in well construction design. The actual protected water depth should be verified with a resistivity log or other sampling method during drilling, ensuring intermediate casing protects that groundwater. | No requirement. | No requirement. | The freshwater depth should be estimated in the drilling application to aid in well construction design. The actual protected water depth should be verified with a resistivity log or other sampling method during drilling, ensuring intermediate casing protects that groundwater. This requirement should apply to all NYS wells where intermediate casing is set. |
| Cement Sheath Width | No requirement. | No requirement. | No requirement. | A cement sheath of at least 1-1/4" should be installed. Thin cement sheaths are easily cracked and damaged. | No requirement. | No requirement. | A cement sheath of at least 1-1/4" should be installed. Thin cement sheaths are easily cracked and damaged. This requirement should apply to all NYS wells where intermediate casing is set. |
| Amount of Cement in Annulus | No requirement. | No requirement. | Intermediate casing must be fully cemented to surface with excess cement. | It is best practice to fully cement intermediate casing if technically feasible to isolate protected water zones, and to seal off anomalous pressure zones, lost circulation zones, and other drilling hazards. If the casing can not be fully cemented most states require  cement to be placed from the casing shoe to a point at least 500-600' above the shoe. | No requirement. | Intermediate casing must be fully cemented to surface with excess cement. | It is best practice to fully cement intermediate casing if technically feasible to isolate protected water zones, and to seal off anomalous pressure zones, lost circulation zones, and other drilling hazards. If the casing can not be fully cemented most states require cement to be placed from the casing shoe to a point at least 500-600' above the shoe. This requirement should apply to all wells where intermediate casing is set. |
| Excess Cement Requirement | No requirement. | No requirement. | 25% unless a caliper log is run; if a caliper log is run, the excess cement requirement is 10%. | 25% excess cement is standard practice, unless a caliper log is run to assess the hole shape and required cement volume. | No requirement. | 25% unless a caliper log is run; if a caliper log is run, the excess cement requirement is 10%. | 25% excess cement is standard practice, unless a caliper log is run to assess the hole shape and required cement volume. This requirement should apply to all wells where intermediate casing is set. |

Harvey Consulting, LLC.

# Appendix B - Intermediate Casing Table

Report to NRDC January 2012

| Intermediate Casing Requirement | NYS RDSGEIS Appendix 8 Casing and Cementing Practices | NYS RDSGEIS Appendix 9 Existing Fresh Water Supplementary Permit Conditions Required for Wells Drilled in Primary and Principal Aquifers | NYS RDSGEIS Appendix 10 Proposed Supplementary Permit Conditions for HVHF | Analysis of Proposed NYS RDSGEIS, Permit Conditions and Recommendations | NYCRR Requirement for all NYS Wells, NYCRR Part 554 | Additional NYCRR Requirement for HVHF Wells, NYCRR Part 560 | Analysis of Proposed NYCRR Requirements and Recommendations |
|---|---|---|---|---|---|---|---|
| Cement Type | No requirement. | No requirement. | Cement must conform to API Specification 10A, Specifications for Cement and Material for Well Cementing (April 2002 and January 2005 Addendum). The cement slurry must be prepared to minimize its free water content, in accordance with the same API specification, and it must contain a gas-block additive. | HVHF cement quality requirements (including API specifications and the use of gas-blocking additives) are best practice. However, these practices should apply to all wells where intermediate casing is installed, not just HVHF wells. | No requirement. | Cement must conform to industry standards, specified in the permit to drill, and the cement slurry must be prepared to minimize its free water content, in accordance with the industry standards, and contain a gas-block additive. | Cement must conform to API Specification 10A, Specifications for Cement and Material for Well Cementing (April 2002 and January 2005 Addendum). The cement slurry must be prepared to minimize its free water content, in accordance with the same API specification, and it must contain a gas-block additive. HVHF cement quality requirements (including API specifications and the use of gas-blocking additives) are best practice. However, these practices should apply to all wells where intermediate casing is installed, not just HVHF wells. |
| Cement Mix Water Temperature and pH Monitoring | No requirement. | No requirement. | Cement slurry must be prepared to minimize its free water content, in accordance with industry standards and specifications. | Best practice is for the free water separation to average no more than six milliliters per 250 milliliters of tested cement, in accordance with the current API RP 10B. Best practice is to test for pH to evaluate water chemistry and ensure cement is mixed to manufacturer's recommendations. | No requirement. | Cement must conform to industry standards, specified in the permit to drill, and the cement slurry must be prepared to minimize its free water content, in accordance with the industry standards. | Best practice is for the free water separation to average no more than six milliliters per 250 milliliters of tested cement, in accordance with the current API RP 10B. Best practice is to test for pH to evaluate water chemistry and ensure cement is mixed to manufacturer's recommendations. These requirements should apply to all NYS wells where intermediate casing is required, not just HVHF wells. |
| Lost Circulation Control | No requirement. | No requirement. | No requirement. | Lost circulation control is best practice. | No requirement. | No requirement. | Lost circulation control is best practice. This requirement should apply to all NYS wells where intermediate casing is required. |
| Spacer Fluids | No requirement. | No requirement. | A spacer of adequate volume, makeup, and consistency must be pumped ahead of the cement. | The use of spacer fluids to separate mud and cement, to avoid mud contamination of the cement, is best practice. | No requirement. | A spacer of adequate volume, makeup, and consistency must be pumped ahead of the cement. | The use of spacer fluids to separate mud and cement, to avoid mud contamination of the cement, is best practice. This requirement should apply to all NYS wells where intermediate casing is used, not just HVHF wells. |
| Hole conditioning before cementing | No requirement. | No requirement. | Prior to cementing any casing string, the borehole must be circulated and conditioned to ensure an adequate cement bond. | Hole conditioning before cementing is best practice. | No requirement. | Prior to cementing any casing string, the borehole must be circulated and conditioned to ensure an adequate cement bond. | Hole conditioning before cementing is best practice. This requirement should apply to all NYS wells, not just HVHF wells. |
| Cement Installation and Pump Rate | No requirement. | No requirement. | The cement must be pumped at a rate and in a flow regime that inhibits channeling of the cement in the annulus. | The requirement for cement to be pumped at a rate and in a flow regime that inhibits channeling of the cement in the annulus is a good practice. | No requirement. | The cement must be pumped at a rate and in a flow regime that inhibits channeling of the cement in the annulus. | The requirement for cement to be pumped at a rate and in a flow regime that inhibits channeling of the cement in the annulus is a good practice. This requirement should apply to all oil and gas wells, not just HVHF wells. |

## Appendix B - Intermediate Casing Table

| Intermediate Casing Requirement | NYS RDSGEIS Appendix 8 Casing and Cementing Practices | NYS RDSGEIS Appendix 9 Existing Fresh Water Supplementary Permit Conditions Required for Wells Drilled in Primary and Principal Aquifers | NYS RDSGEIS Appendix 10 Proposed Supplementary Permit Conditions for HVHF | Analysis of Proposed NYS RDSGEIS, Permit Conditions and Recommendations | NYCRR Requirement for all NYS Wells, NYCRR Part 554 | Additional NYCRR Requirement for HVHF Wells, NYCRR Part 560 | Analysis of Proposed NYCRR Requirements and Recommendations |
|---|---|---|---|---|---|---|---|
| Rotating and Reciprocating Casing While Cementing | No requirement. | No requirement. | No requirement. | Rotating and reciprocating casing while cementing is a best practice to improve cement placement. | No requirement. | No requirement. | Rotating and reciprocating casing while cementing is a best practice to improve cement placement. This requirement should apply to all NYS wells. |
| Centralizers | No requirement. | No requirement. | At least two centralizers (one in the middle and one at the top), and all bow-spring style centralizers, must conform to API Specification 10D for Bow-Spring Casing Centralizers (March 2002). | The proposed conditions reference an outdated API casing centralizer standard. Best practice is to use at least two centralizers and follow API Recommended Practice for Centralizer Placement, API RP 10D-2 (July 2010). | No requirement. | In addition to centralizers otherwise required by the Department, at least two centralizers, one in the middle and one at the top of the first joint of casing, must be installed, and all bow-spring style centralizers must conform to the industry standards specified in the permit to drill. | The proposed conditions reference an outdated API casing centralizer standard. Best practice is to use at least two centralizers and follow API Recommended Practice for Centralizer Placement, API RP 10D-2 (July 2010). This requirement should apply to all NYS wells where intermediate casing is installed. |
| Casing quality | No requirement. | No requirement. | New pipe is required and must conform to American Petroleum Institute (API) Specification 5CT, Specifications for Casing and Tubing (April 2002). | The use of new pipe conforming to API Specification 5CT is best practice. | No requirement. | All casings must be new and conform to industry standards specified in the permit to drill. | The use of new pipe conforming to API Specification 5CT is best practice. This requirement should apply to all NYS wells where intermediate casing is set. |
| Casing Thread Compound | No requirement. | No requirement. | Casing thread compound and its use must conform to API Recommended Practice (RP) 5A3, RP on Thread Compounds for Casing, Tubing, Line Pipe, and Drill Stem Elements (November 2009). | The requirement to use casing thread compound that conforms to API RP 5A3 (November 2009) is a good practice. This requirement should apply to all oil and gas wells, not just HVHF wells. | No requirement. | Casing thread compound and its use must conform to industry standards specified in the permit to drill. | The requirement to use casing thread compound that conforms to API RP 5A3 (November 2009) is a good practice. This requirement should apply to all oil and gas wells, not just HVHF wells. |
| Drilling Mud | No requirement. | No requirement. | No requirement. | The use of compressed air or WBM (with no toxic additives) is best practice when drilling through protected water zones. This should be a requirement for all wells during the period when drilling occurs through protected water zones. | No requirement. | No requirement. | The use of compressed air or WBM (with no toxic additives) is best practice when drilling through protected water zones. This should be a requirement for all wells during the period when drilling occurs through protected water zones. |
| Cement Setting Time | No requirement. | No requirement. | 8 hours Wait on Cement (WOC) and compressive strength standard of 500 psi. | Best practice is to have casing strings stand under pressure until cement reaches a compressive strength of at least 500 psi in the zone of critical cement, before drilling out the cement plug or initiating a test. Additionally, the cement mixture in the zone of critical cement should have a 72-hour compressive strength of at least 1,200 psi. | No requirement. | 8 hours Wait on Cement (WOC) and compressive strength standard of 500 psi. | Best practice is to have casing strings stand under pressure until cement reaches a compressive strength of at least 500 psi in the zone of critical cement, before drilling out the cement plug or initiating a test. Additionally, the cement mixture in the zone of critical cement should have a 72-hour compressive strength of at least 1,200 psi. This requirement should apply to all NYS wells, not just HVHF wells. |

Harvey Consulting, LLC.

# Appendix B - Intermediate Casing Table

| Intermediate Casing Requirement | NYS RDSGEIS Appendix 8 Casing and Cementing Practices | NYS RDSGEIS Appendix 9 Existing Fresh Water Supplementary Permit Conditions Required for Wells Drilled in Primary and Principal Aquifers | NYS RDSGEIS Appendix 10 Proposed Supplementary Permit Conditions for HVHF | Analysis of Proposed NYS RDSGEIS, Permit Conditions and Recommendations | NYCRR Requirement for all NYS Wells, NYCRR Part 554 | Additional NYCRR Requirement for HVHF Wells, NYCRR Part 560 | Analysis of Proposed NYCRR Requirements and Recommendations |
|---|---|---|---|---|---|---|---|
| NYSDEC Inspector | No requirement. | No requirement. | Required to be onsite for cementing operations. | Best practice is to have a state inspector onsite during cementing operations. | No requirement. | No requirement. | Best practice is to have a state inspector onsite during cementing operations. This requirement should apply to all NYS wells where intermediate casing is installed. |
| Cement QA/QC - Cement Evaluation Log | No requirement. | No requirement. | The operator must run a radial cement bond evaluation log or other evaluation tool approved by the Department to verify the cement bond on the intermediate casing. | The use of a cement evaluation logging tool is best practice. | No requirement. | The operator must run a radial cement bond evaluation log or other evaluation tool approved by the Department to verify the cement bond on the intermediate casing. | The use of a cement evaluation logging tool is best practice. This requirement should apply to all wells where intermediate casing is set. |
| Record keeping | Not specified. | Not specified. | Records must be kept for five years after the well is P&A'd, and be available for review upon NYSDEC's request. | Best practice is to keep permanent records for each well, even after the well is P&A'd. This information will be needed by NYSDEC and industry during the well's operating life,  will be critical for designing the P&A, and may be required if the well leaks post P&A.  This requirement should apply to all NYS wells, not just HVHF wells. P&A'd wells do occasionally leak, and well information is may be needed to develop a re-entry, repair, re-P&A plan. | No requirement. | Records must be kept for five years after the well is P&A'd, and be available for review upon NYSDEC's request. | Best practice is to keep permanent records for each well, even after the well is P&A'd. This information will be needed by NYSDEC and industry during the well's operating life,  will be critical for designing the P&A, and may be required if the well leaks post P&A. This requirement should apply to all NYS wells, not just HVHF wells. P&A'd wells do occasionally leak, and well information is may be needed to develop a re-entry, repair, re-P&A plan. |
| Additional Casing or Repair | No requirement. | No requirement. | No requirement. | NYSDEC should reserve the right to require industry to install additional cemented casing strings in wells, and repair defective casing or cementing, as deemed necessary for environmental and/or public safety reasons. This requirement should apply to all wells. | The installation of an additional cemented casing string or strings in the well, as deemed necessary by the department for environmental and/or public safety reasons, may be required at any time. | No additional requirement. | NYSDEC should reserve the right to require industry to install additional cemented casing strings in wells, and repair defective casing or cementing, as deemed necessary for environmental and/or public safety reasons. This requirement should apply to all wells. |

Harvey Consulting, LLC.                                    Report to NRDC January 2012

## APPENDIX C

Production Casing Table

Harvey Consulting, LLC.

## Appendix C - Production Casing Table

Report to NRDC January 2012

| Production Casing Requirement | NYS RDSGEIS Appendix 8 Casing and Cementing Practices | NYS RDSGEIS Appendix 9 Existing Fresh Water Supplementary Permit Conditions Required for Wells Drilled in Primary and Principal Aquifers | NYS RDSGEIS Appendix 10 Proposed Supplementary Permit Conditions for HVHF | Analysis of Proposed NYS RDSGEIS, Permit Conditions and Recommendations | NYCRR Requirement for all NYS Wells, NYCRR Part 554 | Additional NYCRR Requirement for HVHF Wells, NYCRR Part 560 | Analysis of Proposed NYCRR Requirements and Recommendations |
|---|---|---|---|---|---|---|---|
| Casing Design | No requirement. | No requirement. | Full string of production casing be set across the production zone and be run to surface, and that the production casing be cemented in place. | For all wells, it is best practice for the productive horizon(s) to be determined by coring, electric log, mud-logging,and/or testing to aide in optimizing final production string design and placement. It is best practice to install production casing on a case-by-case basis for most wells; however, it is best practice to install a full string of production casing on HVHF wells to provide a conduit for the HVHF job and provide an extra layer of casing and cement. | The drilling, casing and completion program adopted for any well shall be such as to prevent the migration of oil, gas or other fluids from one pool or stratum to another. | Full string of production casing be set across the production zone and be run to surface, and that the production casing be cemented in place. | For all wells, it is best practice for the productive horizon(s) to be determined by coring, electric log, mud-logging,and/or testing to aide in optimizing final production string design and placement. It is best practice to install production casing on a case-by-case basis for most wells; however, it is best practice to install a full string of production casing on HVHF wells to provide a conduit for the HVHF job and provide an extra layer of casing and cement. |
| Cement Sheath Width | No requirement. | No requirement. | No requirement. | A cement sheath of at least 1-1/4" should be installed. Thin cement sheaths are easily cracked and damaged. | No requirement. | No additional requirement. | A cement sheath of at least 1-1/4" should be installed. Thin cement sheaths are easily cracked and damaged. This requirement should apply to all NYS wells where production casing is set. |
| Amount of Cement in Annulus | The production casing cement shall extend at least 500 feet above the casing shoe or tie into the previous casing string, whichever is less. If any oil or gas shows are encountered or known to be present in the area, as determined by the Department at the time of permit application, or subsequently encountered during drilling, the production casing cement shall extend at least 100 feet above any such shows. The Department may allow the use of a weighted fluid in the annulus to prevent gas migration in specific instances when the weight of the cement column could be a problem. | No additional requirement. Appendix 8 requirement would apply. | If installation of the intermediate casing is waived by the Department, then production casing must be fully cemented to surface. If intermediate casing is installed, the production casing cement must be tied into the intermediate casing string with at least 500 feet of cement measured using True Vertical Depth (TVD). | Cementing production casing to surface if technically feasible (becomes more difficult with increasing depth), or at least 500' into the intermediate casing string is best practice. | If it is elected to complete a rotary-drilled well and production casing is run, it shall be cemented by a pump and plug or displacement method with sufficient cement to circulate above the top of the completion zone to a height sufficient to prevent any movement of oil or gas or other fluids around the exterior of the production casing. | If installation of the intermediate casing is waived by the Department, then production casing must be fully cemented to surface. If intermediate casing is installed, the production casing cement must be tied into the intermediate casing string with at least 500 feet of cement measured using True Vertical Depth (TVD). | Cementing production casing to surface if technically feasible (becomes more difficult with increasing depth), or at least 500' into the intermediate casing string is best practice. This requirement should apply to all NYS wells where production casing is set. |

Harvey Consulting, LLC.

# Appendix C - Production Casing Table

Report to NRDC January 2012

| Production Casing Requirement | NYS RDSGEIS Appendix 8 Casing and Cementing Practices | NYS RDSGEIS Appendix 9 Existing Fresh Water Supplementary Permit Conditions Required for Wells Drilled in Primary and Principal Aquifers | NYS RDSGEIS Appendix 10 Proposed Supplementary Permit Conditions for HVHF | Analysis of Proposed NYS RDSGEIS, Permit Conditions and Recommendations | NYCRR Requirement for all NYS Wells, NYCRR Part 554 | Additional NYCRR Requirement for HVHF Wells, NYCRR Part 560 | Analysis of Proposed NYCRR Requirements and Recommendations |
|---|---|---|---|---|---|---|---|
| Excess Cement Requirement | A minimum of 25% excess cement shall be used. When caliper logs are run, a 10% excess will suffice. Additional excesses may be required by the Department in certain areas. | No additional requirement. Appendix 8 requirement would apply. | No additional requirement. Appendix 8 requirement would apply. | 25% excess cement is standard practice, unless a caliper log is run to assess the hole shape and required cement volume. | No requirement. | No additional requirement. | 25% excess cement is standard practice, unless a caliper log is run to assess the hole shape and required cement volume. This requirement should apply to all wells where production casing is set. |
| Cement Type | No requirement. | No requirement. | Cement must conform to API Specification 10A, Specifications for Cement and Material for Well Cementing (April 2002 and January 2005 Addendum). Further, the cement slurry must be prepared to minimize its free water content in accordance with the same API specification and it must contain a gas-block additive. | HVHF cement quality requirements (including API specifications and the use of gas-blocking additives) are best practice. However, these practices should apply to all wells where production casing is installed, not just HVHF wells. | No requirement. | Cement must conform to industry standards, specified in the permit to drill, and the cement slurry must be prepared to minimize its free water content, in accordance with the industry standards, and contain a gas-block additive. | Cement must conform to API Specification 10A, Specifications for Cement and Material for Well Cementing (April 2002 and January 2005 Addendum). Further, the cement slurry must be prepared to minimize its free water content in accordance with the same API specification and it must contain a gas-block additive. HVHF cement quality requirements (including API specifications and the use of gas-blocking additives) are best practice. However, these practices should apply to all wells where production casing is installed, not just HVHF wells. |
| Cement Mix Water Temperature and pH Monitoring | The operator shall test or require the cementing contractor to test the mixing water for pH and temperature prior to mixing the cement and to record the results on the cementing tickets and/or the drilling log. WOC time shall be adjusted based on the results of the test. | No additional requirement. Appendix 8 requirement would apply. | No additional requirement. Appendix 8 requirement would apply. | Best practice is for the free water separation to average no more than six milliliters per 250 milliliters of tested cement, in accordance with the current API RP 10B. Best practice is to test for pH to evaluate water chemistry and ensure cement is mixed to manufacturer's recommendations. | No requirement. | No additional requirement. | Best practice is for the free water separation to average no more than six milliliters per 250 milliliters of tested cement, in accordance with the current API RP 10B. Best practice is to test for pH to evaluate water chemistry and ensure cement is mixed to manufacturer's recommendations. These requirements should apply to all NYS wells where production casing is required, not just HVHF wells. |
| Lost Circulation Control | No requirement. | No requirement. | No requirement. | Lost circulation control is best practice. | No requirement. | No additional requirement. | Lost circulation control is best practice. This requirement should apply to all NYS wells where production casing is required. |
| Spacer Fluids | No requirement. | No requirement. | A spacer of adequate volume, makeup and consistency must be pumped ahead of the cement. | The use of spacer fluids to separate mud and cement, to avoid mud contamination of the cement, is best practice. | No requirement. | A spacer of adequate volume, makeup, and consistency must be pumped ahead of the cement. | The use of spacer fluids to separate mud and cement, to avoid mud contamination of the cement, is best practice. This requirement should apply to all NYS wells where production casing is used, not just HVHF wells. |
| Hole conditioning before cementing | No requirement. | No requirement. | Prior to cementing any casing string, the borehole must be circulated and conditioned to ensure an adequate cement bond. | Hole conditioning before cementing is best practice. | No requirement. | Prior to cementing any casing string, the borehole must be circulated and conditioned to ensure an adequate cement bond. | Hole conditioning before cementing is best practice. This requirement should apply to all NYS wells, not just HVHF wells. |

Harvey Consulting, LLC.

# Appendix C - Production Casing Table

Report to NRDC January 2012

| Production Casing Requirement | NYS RDSGEIS Appendix 8 Casing and Cementing Practices | NYS RDSGEIS Appendix 9 Existing Fresh Water Supplementary Permit Conditions Required for Wells Drilled in Primary and Principal Aquifers | NYS RDSGEIS Appendix 10 Proposed Supplementary Permit Conditions for HVHF | Analysis of Proposed NYS RDSGEIS, Permit Conditions and Recommendations | NYCRR Requirement for all NYS Wells, NYCRR Part 554 | Additional NYCRR Requirement for HVHF Wells, NYCRR Part 560 | Analysis of Proposed NYCRR Requirements and Recommendations |
|---|---|---|---|---|---|---|---|
| Cement Installation and Pump Rate | The pump and plug method shall be used for all production casing cement jobs deeper than 1500 feet. If the pump and plug technique is not used (less than 1500 feet), the operator shall not displace the cement closer than 35 feet above the bottom of the casing. If plugs are used, the plug catcher shall be placed at the top of the lowest (deepest) full joint of casing. | No additional requirement. Appendix 8 requirement would apply. | The cement must be pumped at a rate and in a flow regime that inhibits channeling of the cement in the annulus. | The requirement for cement to be pumped at a rate and in a flow regime that inhibits channeling of the cement in the annulus is a good practice. The pump and plug installation method is a best practice. | No requirement. | The cement must be pumped at a rate and in a flow regime that inhibits channeling of the cement in the annulus. | The requirement for cement to be pumped at a rate and in a flow regime that inhibits channeling of the cement in the annulus is a good practice. This requirement should apply to all oil and gas wells, not just HVHF wells. |
| Rotating and Reciprocating Casing While Cementing | No requirement. | No requirement. | No requirement. | Rotating and reciprocating casing while cementing is a best practice to improve cement placement. This will be come more difficult with a deviated wellbore, but should be attempted if achievable. | No requirement. | No additional requirement. | Rotating and reciprocating casing while cementing is a best practice to improve cement placement. This will become more difficult with a deviated wellbore, but should be attempted if achievable. This requirement should apply to all NYS oil and gas wells, not just HVHF wells. |
| Centralizers | Centralizers shall be placed at the base and at the top of the production interval if casing is run and extends through that interval, with one additional centralizer every 300 feet of the cemented interval. | No additional requirement. Appendix 8 requirement would apply. | At least two centralizers (one in the middle and one at the top) must be installed on the first joint of casing (except production casing) and all bow-spring style centralizers must conform to API Specification 10D for Bow-Spring Casing Centralizers (March 2002) | The proposed conditions reference an outdated API casing centralizer standard. Best practice is to use at least two centralizers and follow API Recommended Practice for Centralizer Placement, API RP 10D-2 (July 2010). | No requirement. | In addition to centralizers otherwise required by the Department, at least two centralizers, one in the middle and one at the top of the first joint of casing, must be installed, and all bow-spring style centralizers must conform to the industry standards specified in the permit to drill. | The proposed conditions reference an outdated API casing centralizer standard. Best practice is to use at least two centralizers and follow API Recommended Practice for Centralizer Placement, API RP 10D-2 (July 2010). This requirement should apply to all NYS wells where production casing is installed. |
| Casing quality | The casing shall be of sufficient strength to contain any expected formation or stimulation pressures. | No additional requirement. Appendix 8 requirement would apply. | Casing must be new and conform to American Petroleum Institute (API) Specification 5CT, Specifications for Casing and Tubing (April 2002), and welded connections are prohibited. | The use of new pipe conforming to API Specification 5CT is best practice. | No requirement. | All casings must be new and conform to industry standards specified in the permit to drill. | The use of new pipe conforming to API Specification 5CT is best practice. This requirement should apply to all NYS wells where production casing is set. |

Harvey Consulting, LLC.

**Appendix C - Production Casing Table**

Report to NRDC January 2012

| Production Casing Requirement | NYS RDSGEIS Appendix 8 Casing and Cementing Practices | NYS RDSGEIS Appendix 9 Existing Fresh Water Supplementary Permit Conditions Required for Wells Drilled in Primary and Principal Aquifers | NYS RDSGEIS Appendix 10 Proposed Supplementary Permit Conditions for HVHF | Analysis of Proposed NYS RDSGEIS, Permit Conditions and Recommendations | NYCRR Requirement for all NYS Wells, NYCRR Part 554 | Additional NYCRR Requirement for HVHF Wells, NYCRR Part 560 | Analysis of Proposed NYCRR Requirements and Recommendations |
|---|---|---|---|---|---|---|---|
| Casing Thread Compound | No requirement. | No requirement. | Casing thread compound and its use must conform to API Recommended Practice (RP) 5A3, RP on Thread Compounds for Casing, Tubing, Line Pipe, and Drill Stem Elements (November 2009). | The requirement to use casing thread compound that conforms to API RP 5A3 (November 2009) is a good practice. This requirement should apply to all oil and gas wells, not just HVHF wells. | No requirement. | Casing thread compound and its use must conform to industry standards specified in the permit to drill. | The requirement to use casing thread compound that conforms to API RP 5A3 (November 2009) is a good practice. This requirement should apply to all oil and gas wells, not just HVHF wells. |
| Cement Setting Time | Following cementing and removal of cementing equipment, the operator shall wait until a compressive strength of 500 psi is achieved before the casing is disturbed in any way. | No additional requirement. Appendix 8 requirement would apply. | After the cement is pumped, the operator must wait on cement (WOC): 1. until the cement achieves a calculated (e.g., performance chart) compressive strength of at least 500 psi, and 2. a minimum WOC time of 8 hours before the casing is disturbed in any way, including installation of a blow-out preventer (BOP). The operator may request a waiver from the Department from the required WOC time if the operator has bench tested the actual cement batch and blend using mix water from the actual source for the job, and determined that 8 hours is not required to reach a compressive strength of 500 psi. | Best practice is to have casing strings stand under pressure until cement reaches a compressive strength of at least 500 psi in the zone of critical cement, before drilling out the cement plug or initiating a test. | Operations shall be suspended until the cement has been permitted to set in accordance with prudent current industry practices. | 8 hours Wait on Cement (WOC) and compressive strength standard of 500 psi. | Best practice is to have casing strings stand under pressure until cement reaches a compressive strength of at least 500 psi in the zone of critical cement, before drilling out the cement plug or initiating a test. This requirement should apply to all NYS wells, not just HVHF wells. |
| NYSDEC Inspector | No requirement. | No requirement. | This office must be notified _____ hours prior to production casing cementing operations. | Best practice is to have a state inspector onsite during cementing operations. This is more typical for surface and intermediate casing, but can be considered for production casing as well. | No requirement. | No additional requirement. | Best practice is to have a state inspector onsite during cementing operations. This is more typical for surface and intermediate casing, but can be considered for production casing as well. |

**Appendix C - Production Casing Table**

| Production Casing Requirement | NYS RDSGEIS Appendix 8 Casing and Cementing Practices | NYS RDSGEIS Appendix 9 Existing Fresh Water Supplementary Permit Conditions Required for Wells Drilled in Primary and Principal Aquifers | NYS RDSGEIS Appendix 10 Proposed Supplementary Permit Conditions for HVHF | Analysis of Proposed NYS RDSGEIS, Permit Conditions and Recommendations | NYCRR Requirement for all NYS Wells, NYCRR Part 554 | Additional NYCRR Requirement for HVHF Wells, NYCRR Part 560 | Analysis of Proposed NYCRR Requirements and Recommendations |
|---|---|---|---|---|---|---|---|
| Cement QA/QC – Cement Evaluation Log | No requirement. | No requirement. | The operator must run a radial cement bond evaluation log or other evaluation tool approved by the Department to verify the cement bond on the production casing. The quality and effectiveness of the cement job shall be evaluated by the operator using the above required evaluation in conjunction with appropriate supporting data per Section 6.4 "Other Testing and Information" under the heading of "Well Logging and Other Testing" of American Petroleum Institute (API) Guidance Document HF1 (First Edition, October 2009). | The use of a cement evaluation logging tool is best practice. | No requirement. | The operator must run a radial cement bond evaluation log or other evaluation tool approved by the Department to verify the cement bond on the production casing. | The use of a cement evaluation logging tool is best practice. This requirement should apply to all wells where production casing is set. |
| Record keeping | No requirement. | No requirement. | A copy of the cement job log for any cemented casing in the well must be available to the Department at the wellsite during drilling operations, and thereafter available to the Department upon request. The operator must provide such to the Department upon request at any time during the period up to and including five years after the well is permanently plugged and abandoned under a Department permit. If the well is located on a multi-well pad, all cementing records must be maintained and made available during the period up to and including five years after the last well on the pad is permanently plugged and abandoned under a Department permit. | Best practice is to keep permanent records for each well, even after the well is P&A'd. This information will be needed by NYSDEC and industry during the well's operating life, will be critical for designing the P&A, and may be required if the well leaks post P&A. This requirement should apply to all NYS wells, not just HVHF wells. P&A'd wells do occasionally leak, and well information is may be needed to develop a re-entry, repair, re-P&A plan. | No requirement. | Records must be kept for five years after the well is P&A'd, and be available for review upon NYSDEC's request. | Best practice is to keep permanent records for each well, even after the well is P&A'd. This information will be needed by NYSDEC and industry during the well's operating life, will be critical for designing the P&A, and may be required if the well leaks post P&A. This requirement should apply to all NYS wells, not just HVHF wells. P&A'd wells do occasionally leak, and well information is may be needed to develop a re-entry, repair, re-P&A plan. |

# Appendix C - Production Casing Table

| Production Casing Requirement | NYS RDSGEIS Appendix 8 Casing and Cementing Practices | NYS RDSGEIS Appendix 9 Existing Fresh Water Supplementary Permit Conditions Required for Wells Drilled in Primary and Principal Aquifers | NYS RDSGEIS Appendix 10 Proposed Supplementary Permit Conditions for HVHF | Analysis of Proposed NYS RDSGEIS, Permit Conditions and Recommendations | NYCRR Requirement for all NYS Wells, NYCRR Part 554 | Additional NYCRR Requirement for HVHF Wells, NYCRR Part 560 | Analysis of Proposed NYCRR Requirements and Recommendations |
|---|---|---|---|---|---|---|---|
| Additional Casing or Repair | No requirement. | No requirement. | Remedial cementing is required if the cement bond is not adequate to effectively isolate hydraulic fracturing operations. | NYSDEC should reserve the right to require industry to install additional cemented casing strings in wells, and repair defective casing or cementing, as deemed necessary for environmental and/or public safety reasons. This requirement should apply to all wells. | No requirement. | The installation of an additional cemented casing string or strings in the well, as deemed necessary by the department for environmental and/or public safety reasons, may be required at any time. | NYSDEC should reserve the right to require industry to install additional cemented casing strings in wells, and repair defective casing or cementing, as deemed necessary for environmental and/or public safety reasons. This requirement should apply to all wells. |

## Appendix D: List of Acronyms

$^{210}$Po ................Polonium 210
2D.....................two-dimensional
3D.....................three-dimensional
API...................American Petroleum Institute
API RP ............American Petroleum Institute Recommended Practice
AQ....................Air Quality
AMD ................Acid mine discharge
ARD .................Acid Rock Drainage
Bcf....................billion cubic feet
BOP..................Blow-out preventer
BTEX ..............benzene, toluene, ethylbenzene, and xylenes
BUD .................Beneficial Use Determination
C-NLOPB ........Canada-Newfoundland and Labrador Offshore Petroleum Board
CDA .................Concentrated Development Area
CRI...................Cuttings reinjection technology
CRA .................Corrosion-resistant alloys
CRDPF.............Continuously Regenerating Diesel Particulate Filters
DOI ..................United States Department of the Interior
DMM ...............Division of Materials Management
EAF..................Environmental Assessment Form
EPA..................Environmental Protection Agency
ERP ..................Emergency Response Plan
GHG.................Greenhouse Gases
H2S ..................Hydrogen Sulfide
HAP .................Hazardous Air Pollutants
HVHF...............High Volume Hydraulic Fracturing
JPAD................Jonah-Pinedale Anticline Development Area
LDAR...............Leak Detection and Repair
MACT...............Maximum Achievable Control Technology
MFN.................Microseismic Fracture Network
MMscf..............Million standard cubic feet
MSDS...............Material Safety Data Sheet
MSW................Municipal solid waste
NAAQS............National Ambient Air Quality Standards
NACE...............National Association of Corrosion Engineers
NO$_X$.................Nitrogen Oxide
NORM .............Naturally Occurring Radioactive Material
NRDC ..............Natural Resources Defense Council
NYCRR............New York Code of Rules and Regulations
NYS .................New York State
NYSDEC .........New York State Department of Environmental Conservation
NYSERDA.......New York State Energy Research and Development Authority
NYSDOH.........New York State Department of Health
OBM ................Oil-Based Mud
OSHA...............Occupational Safety and Health Administration
OSPAR.............Oslo-Paris Convention

P&A ................Plug & Abandonment
PA ...................Pennsylvania
PADEP............Pennsylvania Department of Environmental Protection
PLONOR ........Pose Little Or No Risk
$PM_{2.5}$.................Particulate Matter, 2.5 microns or smaller in diameter
POTW .............Publically Owned Treatment Works
ppm .................parts per million
psi....................pounds per square inch
QC/QA ............Quality Control/Quality Assurance
Ra.....................Radium
RDSGEIS........Revised Draft Supplemental Generic Environmental Impact Statement
REC.................Reduced Emission Completions
RP....................Recommended Practice
RCRA..............Resource Conservation and Recovery Act
SBM ................Synthetic-Based Muds
SCR.................Selective Catalytic Reduction
SDWA..............Safe Drinking Water Act
SEQRA ...........State Environmental Quality Review Act
SPDES ............State Pollutant Discharge Elimination System
$SO_2$ ...................Sulfur Dioxide
SPCC...............Spill Prevention Control and Countermeasures
SPOTS ............Spill Prevention Operations Technology Series
SRB.................Sulfate-reducing bacteria
STEL................Short-term exposure limit
STI ..................Steel Tank Institute
SWPPP............Storm Water Pollution Prevention Plan
TDS.................Total Dissolved Solids
TEG.................Triethylene Glycol
TENORM.........Technologically Enhanced Naturally Occurring Radioactive Material
TVD ................True Vertical Depth
USDW..............Underground Sources of Drinking Water
USEPA ............United States Environmental Protection Agency
USGS ..............United States Geological Survey
VOC ................Volatile Organic Compound
WBM ..............Water-based muds
WOC ...............Wait on Concrete

Attachment 2

Tom Myers, Ph. D.

**Technical Memorandum**

**Review and Analysis**

**Revised Draft**

**Supplemental Generic Environmental Impact Statement on the Oil, Gas and Solution Mining Regulatory Program**

**Well Permit Issuance for Horizontal Drilling and High-Volume Hydraulic Fracturing to Develop the Marcellus Shale and Other Low-Permeability Gas Reservoirs**

**September 2011**

January 5, 2011

Prepared for:

Natural Resources Defense Council

New York, New York

Prepared by

Tom Myers, Ph.D.

Hydrologic Consultant

Reno, NV

# Contents

INTRODUCTION ................................................................................................ 1

SUMMARY OF FINDINGS ................................................................................ 2

    General Hydrogeology ................................................................................... 4

    Presence of Fresh and Salt Water ................................................................. 4

    Hydrogeology of the Shale ............................................................................ 6

    Description of Hydraulic Fracturing ............................................................. 8

    Contaminant Transport from the Shale ......................................................... 12

    Other Pathways for Groundwater Contamination ......................................... 14

    Groundwater Quality Monitoring ................................................................. 16

WATER RESOURCES ...................................................................................... 19

PROJECT MITIGATION MEASURES ............................................................ 22

    Acid Rock Drainage ...................................................................................... 26

COMMENTS ON SPECIFIC PROPOSED REGULATIONS ............................ 26

REFERENCES ................................................................................................... 29

# INTRODUCTION

This technical memorandum reviews aspects of the *Revised Draft Supplemental Generic Environmental Impact Statement* (RDSGEIS) on the *Oil, Gas and Solution Mining Regulatory Program regarding Well Permit Issuance for Horizontal Drilling and High-Volume Hydraulic Fracturing to Develop the Marcellus Shale and Other Low-Permeability Gas Reservoir*.  The New York State Department of Environmental Conservation (NYSDEC) is the lead agency.  Throughout this review, I refer to the document as the RDSGEIS.  The document was "revised" since its initial publication in 2009.  I had prepared a review of the 2009 DSGEIS as Myers (2009).

Appendix A to this technical memorandum is my specific review of Appendix 11 in the RDSGEIS, which has been excerpted from the 2009 DSGEIS without change.  Appendix B to this technical memorandum is a paper I wrote which is currently undergoing peer review for a journal; this paper concerns vertical transport of contaminants from the shale to freshwater groundwater.

Since the 2009 DSGEIS, the New York State Energy Research and Development Authority (NYSERDA) contracted with Alpha Geoscience (Alpha) to review the comments I prepared on the 2009 DSGEIS (Myers, 2009).  Alpha produced a report titled: *Review of dSGEIS and Identification of Best Technology and Best Practices Recommendations, Tom Myers: December 28, 2009*, prepared by Alpha.  The RDSGEIS does not reference, or apparently rely, on this Alpha review in any meaningful way; the bibliography includes a list of 2011 reports by Alpha, but the apparent reference to this review (Alpha 2011) does not include my name.  The consultants bibliography includes a subheading with Alpha's report, with "Myers" misspelled, but no apparent use of this reference either.   Alpha's reviews prepared for NYSERDA were not available directly on the RDSGEIS web page other than through an obscure link.  Appendix C to this technical memorandum is my response to Alpha (2011).

This technical memorandum also reviews the water resources/hydrogeology aspects of the revised regulations, published as *Proposed Express Terms 6 NYCRR Parts 550 through 556 and 560, Subchapter B: Mineral Resources*, referred to throughout as the proposed regulations.  This technical memorandum proposes additional regulations throughout the review, and then includes a separate section regarding specific proposed regulations.

The report focuses on three main aspects of the RDSGEIS: (1) hydrogeology, including the hydraulic fracturing (fracking) process, (2) low flow surface water resources, and (3) water-resource-related setbacks.  Hydrogeology includes review of the geology, contaminant transport, shale hydrogeology, groundwater quality, and induced seismicity analyses.  Low flow

surface water resources include an assessment of the analysis required to determine passby flows and the requirements/restrictions on pumping from aquifers.  Consideration of the proposed setbacks includes whether the proposed setback is based on facts or analysis. Specific setbacks considered include those proposed to protect aquifers, wells, springs, and other water-related resources.

The RDSGEIS provides data and analysis almost exclusive to the Marcellus shale, although the regulations purport to govern all low-permeability formations, including the Utica shale (which is mentioned in the RDSGEIS).  Developing different low-permeability formations would have different effects than would development of the Marcellus shale, which is the focus of the RDSGEIS.  Deeper shale, such as the Utica shale, would generate far more cuttings and use more drilling mud, which present different disposal issues.  The amount of water used for fracking could be different, as well.  Development of shallower shales would increase the regional hydrogeology impacts and increase the potential vertical contaminant transport and the prevalence of improperly plugged abandoned wells.  Additionally, the RDSGEIS focused its analysis from the total amount of surface water withdrawals to wastewater disposal on the wells expected in the Marcellus shale.  Additional shale development would vastly increase the impacts beyond those revealed in this RDSGEIS

- *The RDSGEIS and proposed regulations should acknowledge that they apply only to the Marcellus shale.*
- *Additional low-permeability gas plays require additional supplemental GEIS analyses as suggested in RDSGEIS 3.2.1.*

The focus on this review is on development of the Marcellus shale, because except for Chapter 4, the RDSGEIS discussion is limited to the Marcellus shale.

## SUMMARY OF FINDINGS

The RDSGEIS only poorly describes the hydrogeology of the Marcellus shale area and of the shale in particular.  It does not provide a description of what fracking does to the shale or how it affects the regional hydrogeology.  There is no description provided of the geologic formations between the shale and the surface beyond the general stratigraphy and stating that it would be nonconductive to upward flow, a point not supported with data or by the literature. The fault mapping is outdated.

Industry should be required to complete geophysical logging, including conductivity, to determine the lower extent of freshwater (Williams 2010).  The definition of freshwater should

be as protective as federal standards, meaning that surface casing should extend to TDS at 10,000 ppm.

The description of fracking is incomplete and incorrect from a hydrogeologic perspective. The contention that out of formation fracking is rare is incorrect based on industry data which has documented fractures as much as 2000 feet above the top of the shale in other states. Also, the contention that fracking pressure dissipates immediately upon cessation of injection is also incorrect, except right at the well. Model simulations show that pressure in the shale remains elevated for more than three months and that that prevents some of the injected fluid from flowing back to the gas well. The injected fluid displaces substantial amounts of formation fluid from the shale into surrounding formations; existing and new fractures allows that fluid to move much further from the shale than expected due simply to the volume injected.

The RDSGEIS dismisses the concept of contaminant transport from the shale to the near-surface aquifers, but there is overwhelming evidence that it is at least possible. Fracking fluids and methane have been found in water wells from fracking in different areas. Simulations indicate it could occur much more in the future. Fracking displaces large quantities of brine, and fractures provide pathways to the surface; fracking may also widen those existing pathways. Areas of natural artesian pressure would allow advection to move fluids and contaminants vertically upward. Mapping areas of artesian pressure, improved regional fault mapping, and site-specific project by project fault mapping should be employed to avoid areas of enhanced vertical transport potential. Long-term multilevel monitoring is also needed to track the future potential of vertical contaminant movement.

NYSDEC proposes setbacks that are not obviously based on observed data. If the setback from fracking in a protected watershed is 4000 feet, the setback from primary or principal aquifers or from public water supply wells should be no less, unless justified by site-specific analyses. Wells located in a 100-year floodplain have a greater than 1 in 4 chance of being flooded in a 30-year project life, therefore wells should be setback further from streams.

The proposed monitoring plans are paltry and insufficient. Simply monitoring existing water wells only shows when that user is affected, it does not protect the aquifer. Water wells are not designed for monitoring. The industry should establish a dedicated groundwater monitoring system downgradient from every well pad, out to at least the distance that a contaminant would travel in five years. Monitoring should continue for at least five years after the cessation of production.

The required passby flows have improved since 2009, as has the method for determining them. In general requiring the Q60 and Q75 monthly flow avoids diversions at all when flows are in the bottom 40 or 25 percent of their normal monthly flow regime, depending on area and

month.  Q75 only applies to larger streams (> 50 square mile watershed) during the winter months when flow is generally higher.  The RDSGEIS should provide some data to show the estimation methods for ungaged sites is accurate.

HYDROGEOLOGY

This section considers all aspects of the RDSGEIS that concern underground resources, including aspects of geology, shale hydrogeology, contaminant transport, the descriptions of fracking and the potential for fracking-induced seismicity.  The toxicity of fracking fluid additives was considered was considered by Dr. Glenn Miller.

## General Hydrogeology

The distinction between primary and principal aquifers and other sources (RDSGEIS, p. 2-20) ignores the connections between surface and groundwater.  Groundwater from principal aquifers may seep into streams, especially during periods of low flow.  Because those aquifers are also used by New Yorkers for water supply, the assertion in the RDSGEIS that "one quarter of New Yorkers … rely on groundwater as a source of potable water" (Id.) understates the number of people who may be affected by groundwater contamination

RDSGEIS Figure 2.1 shows that the north end of the shale parallels a large principal aquifer north of Syracuse.  This coincidence deserves explanation at some point in the document.

The RDSGEIS mentions that one quarter of New Yorkers rely on groundwater as a source of potable water (RDSGEIS, p. 2-20).  This downplays the connection of groundwater with surface water; many aquifers support stream flow, especially during low flow period, therefore aquifer contamination potentially affects many more people.

Safe yield (RDSGEIS, p. 2-29) is an outdated and flawed concept which should not be repeated in the RDSGEIS.  It is flawed because all pumping depletes the aquifer, which contradicts the definition of the phrase (Id.).  The preferable concept is sustainable yield which is the amount of water that can be pumped without having significant negative effects on the aquifer and on resources connected to that aquifer; what is significant is a societal question related to the values that depend on the aquifer (Alley et al, 1999).

## Presence of Fresh and Salt Water
The federal Safe Drinking Water Act (SDWA) defines an underground source of drinking water (USDW) as "[a]n aquifer or portion of an aquifer that supplies any public water system or that

4

contains a sufficient quantity of ground water to supply a public water system, and currently supplies drinking water for human consumption, or that contains fewer than 10,000 mg/l total dissolved solids and is not an exempted aquifer" (http://water.epa.gov/type/groundwater/uic/glossary.cfm).  However, NYSDEC apparently ignores this federal requirement where it specifies that surface casings be extended to 75 feet below the transition from fresh- to saltwater but also specifies 850 feet below ground surface (bgs) as a "practical generalization for the depth to potable water", the point at which near-surface freshwater transitions to saline water, which corresponds to 1000 ppm total dissolved solids (TDS) and 250 mg/l chlorides (RDSGEIS, p. 2-23, 6NYCRR §550(at)).  The NYSDEC regulations, by only protecting water to a 1000 ppm cutoff for TDS may not provide protections that for some waters that could apparently meet the definition under the SDWA.

The hydrogeology of southern New York over the Marcellus gas play does suggest that there may be very little water with a TDS higher than the threshold that could actually be developed.  Williams (2010) found that freshwater transitions to salt water at about 200 feet bgs in valley areas and about 800 ft bgs in upland areas in three counties in the middle of the Marcellus shale gas play.  There was uncertainty around the depth estimates with some freshwater observations at deeper depths.  Also the distinction between fresh- and saltwater in his survey of both water and gas wells was based on taste tests rather than any scientific measurement.  Williams et al (1998) found similar results in similar geology just across the border in Pennsylvania.  Many electric conductivity logs for bedrock water wells in the north Catskill Mountains (Heisig and Knutson 1997) showed that EC would jump from low values representing freshwater to high values representing salt water in a short transition zone or threshold.  This suggests that many of the bedrock areas over the Marcellus shale gas play have either high-quality, low-TDS water, or very poor-quality high-TDS water; few wells apparently have water quality near the actual cut-off value.  Considering the geology of the area, the zones that have high TDS are also mostly very low hydraulic conductivity zones, so they would not be considered an aquifer because they would not produce sufficient water to support a water supply.

However, the presence of salt water welling up under the alluvial aquifers, which often coincides with fault zones, suggests that salt water does move upward in fractured areas.  Water with TDS up to 10,000 ppm may be developable in these higher conductivity fracture zones.  In these areas, the NYSDEC regulations may be violating the SDWA requirements to protect USDWs, although the regulations regarding development in primary and principal aquifer may limit drilling in the areas underlain by fractured rock which could have developable high TDS water.  Regardless of those aquifer regulations, the threshold for protection should include all areas that qualify as underground sources of water as defined under the Safe Drinking Water Act.  These would include waters with TDS up to 10,000 ppm where they exist in an aquifer, and to 1000 ppm or

250 mg/l Cl- in areas underlain by unconductive bedrock.  See the separate technical review submitted by Harvey Consulting LLC, for further discussion of the requirements on the SDWA.

- The operator should extend the surface casing to below the 10,000 ppm TDS threshold, unless the operator can show that the formation containing groundwater between 1000 and 10,000 ppm could not produce water in usable quantities.  In this case, the operator should extend the surface casing to below the 1000 ppm TDS threshold.

The RDSGEIS does not indicate that the regulations will require the driller to actually locate the transition depth, which would define the depth below which the surface casing would extend a minimum of 75 feet (RDSGEIS, p. 7-50).

- *The regulations should require the operator to complete geophysical logging, including specific conductance logging, prior to casing the well, to determine the actual depth of protected water to which to apply the casing regulations.*

## Hydrogeology of the Shale

RDSGEIS Section 4.0 covers Geology, but leaves out most of the important aspects of the Marcellus shale.  There is no discussion of hydrogeology of the formations between the targeted shales and the surface, including no discussion of the hydrogeology of the shale itself beyond mention of the permeability.  This failure means there is no baseline against which to compare the hydrogeologic changes caused by fracking.  There is no hydrogeologic description of the sedimentary layers between the shale and the surface other than very cursory mentions of how it has low permeability.  The lack of data on the hydrogeology of formations between the target shale and ground surface is important because NYSDEC relies on geology to "limit or avoid the potential for groundwater contamination" (RDSGEIS, p. 6-2).

Formations that lie between the shale and the surface are generally considered a natural control on fracture propagation and contaminant transport vertically from the shale (RDSGEIS, p. 6-54).  RDSGEIS Figure 4-2 does not support the statement that overlying formations will prevent vertical movement of contaminants (RDSGEIS, p. 6-54) because it shows that layers above the Marcellus are primarily sand, limestone, and shale, with no indication of the proportion of each, which controls their conductivity and their propensity to propagate fractures.  Most important from the perspective of contaminant transport from the shale to the surface is the prevalence of fractures, both due to faults and otherwise.  Faults could be a pathway for vertical contaminant transport (Osborn et al 2011; Myers in review) and could also allow fractures to propagate further from the shale.  The RDSGEIS discusses faults only with regard to present day seismicity and the potential for induced seismicity and presents an outdated map (Isachsen and McKendree 1977).  A more detailed an integrated analysis of faults and fractures revealed there are many more faults in New York's Appalachian Basin than

previously suspected (Jacobi 2002).  The RDSGEIS should include up-to-date information and acknowledge that more faults are probably yet to be found.

There is little information provided in the geology or hydrogeology sections about the make-up of the shale, beyond the amount of organic carbon.  The geology chapter does not even mention the presence of pyrite in the Marcellus shale, although there is a brief reference to it for the Utica shale.  The sections on "Solids Disposal" mentions pyrite and acid rock drainage of cuttings derived from the Marcellus shale.  "As the basal portion of the Marcellus has been reported to contain abundant pyrite (an iron sulfide mineral), there exists the potential that cuttings derived from this interval and placed in reserve pit may oxidize and leach, resulting in an acidic discharge to groundwater, commonly referred to as acid rock drainage (ARD)" (RDSGEIS, p 7-67).  ARD will be discussed more below in the Regulations section.

Most industry references state the Marcellus shale is "low-permeability" (RDSGEIS, p. 2), and the proposed regulations apparently rely on this categorization, although not all sources agree with it.  Soeder (1988) described Marcellus shale as "surprisingly permeable" and presented data showing the permeability ranges up to 60 microdarcies, as compared to the Huron shale with permeability two orders of magnitude lower.  Most reported permeability values are estimated from core samples, but, in a hydrogeologic sense, these estimates do not represent the formation-wide conductivity; point estimates due to scaling effects can be several orders of magnitude less conductive than the formation as a whole due to preferential flow through fractures (Schulze-Makuch et al, 1999), which are prevalent in this area.  RDSGEIS Figure 4-2 also does not show the fractures in the overlying formations which prevail throughout New York including in the Marcellus shale zone (Myers in review).

The assertion that the shale requires fracturing "to produce fluids" (Id.) does not prove that the shale above the Marcellus is equally poorly transmissive.  Shales above the Marcellus have not apparently trapped gas or fluids for significant time periods, a fact which undercuts the claim they are not transmissive or there is a lack of vertical flow.  Fractures that go out-of-formation above the shale connect the shale with the much more transmissive formations above the shale.

The Geology section should also discuss general groundwater flow paths in the formations above the shale; this should include vertical gradients and recharge zones.

- *The RDSGEIS should discuss the hydrogeology of the formations between the targeted shale and ground surface, including data on the hydraulic conductivity of the formations.*

- *The RDSGEIS should also map the groundwater gradients for the formations just above the targeted shale using water level data obtained from geothermal applications and previous deep wells.*
- *The NYSDEC should require the industry to do a seismic survey to locate faults near proposed drilling, within half a mile of the center of the well pad or 1000 feet beyond the projected end of the horizontal wells, whichever is further from the well pad.*
- *The RDSGEIS should include up-to-date fault mapping.*
- *Industry should be required to complete and provide to the NYSDEC geophysical logging of the formations above the targeted shale showing fractures, lithology, and groundwater characteristics.*

## Description of Hydraulic Fracturing

RDSGEIS Chapter 5 describes the fracking process, but it does not describe what actually happens to the shale – what does it look like after fracking and what are its properties. It is much more permeable to gas flow, perhaps substantially so, therefore it must also be much more transmissive to water flow. With up to an expected 40,000 horizontal wells over the next 30 years in New York (RDSGEIS, p. 6-6), the properties of the shale, which currently is an aquitard, will change substantially. The RDSGEIS completely fails to address these changes.

Industry designs fracking jobs to keep the fractures in the shale, but data show that the results of the fracking do not always or even often verify the design. The industry rarely monitors or measures the actual extent of fractures (RDSGEIS, p. 5-88), beyond monitoring pressure and injected fluid during fracking. The RDSGEIS references Fisher (2010) as being proof that fractures do not extend into the aquifer zone, but his data actually show that fractures commonly go out of formation (Figure 1). His data show many instances of the top of the fracture zone being more than 1000 feet above the centerline of the shale. As the depth to the centerline of the shale decreases from 8000 to 5000 feet, the vertical fracture growth also appears to decrease from 2000 feet above to 500 feet above the centerline of the shale. The apparent trend to fracture growth above the formation decreasing with decreasing depth may relate to the pressure on the rock or its hardness. The data were not sorted according to formation type and there is no data concerning shale thickness, therefore it is unknown whether fractures extend further in some types of rock or whether out-of-formation fractures are more common with thinner shales.

- *The RDSGEIS should not rely on industry's alleged intent to avoid out-of-formation fracking as a means of preventing the consequences of out-of-formation fracking.*

8

- *The RDSGEIS and regulations should require geophysical logging and microseismic tests to map how far fractures extend out of formation, and the density of the fractures in different formation.  This information should be publically available so that all companies can benefit from experience and so that the public can better understand the process.*

FIGURE 2



Figure 1:  Figure 2 from Fisher (2010) showing the well centerline and a depth to the top of the fracture zone.

It is common practice to compare pressure and flow rate monitoring results from fracking operations to expected values from pre-fracking modeling as a method for evaluating the results of a fracking procedure (RDSGEIS, p. 5-88).  Considering that many things affect the pumping flow rate, including pores between the well and the leading extent of the fluid moving away from the well, hydraulically it is difficult to imagine that a significant pressure drop would accompany the leading edge of the fluid reaching surrounding formations.  Fracturing into surrounding formations would not bring additional water into the shale, as suggested (Id.), because of the pressures as described elsewhere (Myers in review).  The increased porosity in the shale would release substantial brine bound in the shale.

Fracking injects up to 7.2 million gallons of frack fluid into the shale over a well bore up to 4000 ft long – the RDSGEIS suggests these are general upper limits based on fracking in the Marcellus shale in other states.  Fractures form or widen as the injection pressure exceeds the normal stress in the shale (RDSGEIS, p. 5-95).  The injection would slowly displace any water and gas

9

that exists in the (extremely small) pore spaces near the well; it would push the natural fluid away from the well bore. Because less than 35% of the injected fluid returns to the well as flowback, a significant proportion of the injected fluid remains underground, presumably occupying pores extending out from the well bore. Assuming a job injects 5 million gallons and there is 20% flowback, approximate average values, and 10% effective porosity resulting from the fracking, the fluid could occupy all pore spaces in a 21-ft diameter cylinder centered on the well. Assuming a more realistic resulting effective porosity of 1%, the fluid could fully occupy the pores out to 62 feet in all directions from the well. Fluids that existed there prior to fracking would be pushed further from the wellbore, likely into surrounding formations. Thus, simple consideration of the volume of fracking fluid injected shows that fluid would move far from the well bore and displace formation fluids even further The calculation does not account for pre-existing preferential flow paths or heterogeneities in the direction that fractures develop, so the fluid would likely move further from the well bore in some directions. The fluid would also follow pathways created by the fractures above the shale, thus fluids could end up much further from the well bore than simple considerations would indicate. .

Shale NG development will affect a large proportion of the shale in New York with fracking fluid, as can be shown by comparing expected fracking fluid volumes with shale volume. The RDSGEIS does not indicate the total area of Marcellus shale within New York. However, Figure 2 in Myers (in review) shows the extent of shale within New York to be 18,680 sq miles. Assuming an average thickness of 100 ft, the total volume is $5.2 \times 10^{13}$ ft$^3$. If the expected 40,000 wells are all developed in the Marcellus shale, the injected water volume will approximate $2.1 \times 10^{10}$ ft$^3$, which at porosity of 0.01 means that fracking fluid would occupy all of the pores in about 4% of the total Marcellus shale volume[1]. This assumes that none of the fluid reaches surrounding formations, which as shown above is unlikely. It is also unlikely that development will be evenly spaced over the shale as supposed in this calculation, therefore the effect in areas of concentrated development could be underestimated.

Fracking efficiency does not improve if the well spacing is significantly less than 300 m, or about 1000 ft (Krissane and Weisset 2011). It is therefore appropriate to assume that fracking changes the shale over the entire spacing unit, or an area of 660 by 4000 ft. The total area affected by 40,000 wells would be about 3800 square miles, which is about 20% of the total shale area in New York. Based on the extent that injected fluid reaches from the well and the frequency of out-of-formation fracturing (Fisher 2010), it is reasonable to conclude that most fracking affects the shale to its edge. Fracking, based on these assumptions, will significantly change the hydrogeology over at least 20 % of a shale aquitard that extends over 18,680 square miles of New York. Because not all of the total area will be developed, it is a good assumption

---

[1] This calculation assumes 5,000,000 gallons injected per well and 20% flowback for each of 40,000 wells.

that where development actually occurs, fracking will substantially change the shale hydrogeology.

The statement, that "the volume of fluid used to fracture a well could only fill a small percentage of the void space between the shale and the aquifer" (RDSGEIS, p. 6-53), is also misleading.  The total proportion of pores actually filled by injected fluid may be relatively small, but combined with displaced existing brines the injection will affect groundwater over a much larger proportion of the pores.  The boundary between salt and freshwater may be displaced or disrupted by advection and dispersion of and by fluids associated with fracking. Additionally the changed properties of the shale over a large area will affect the upward movement of the natural brines.  Simple consideration of advection and dispersion shows that the current balance between fresh and salt water could be substantially upset by fracking.

The RDSGEIS also erroneously claims that the pressure applied for injection will dissipate immediately upon cessation of pumping; in the well bore that may be correct, but the fact that pressure exists to push fluid back into the well bore proves that residual pressure remains in the shale and possibly beyond.  The statement that "the amount of time that fluids are pumped under pressure into the target formation is orders of magnitude less than the time that would be required for fluids to travel through 1,000 feet of low-permeability rock" (RDSGEIS, p. 5-94, p. 6-53) is technically correct but highly misleading because pressures and conditions for transport from the shale to the near surface will exist long after fracking has finished.  Fluids can move away from the well bore at distances from the well bore after the injection ends until the pressure has dissipated; the contrary statement (RDSGEIS, p. 5-94) is wrong in that respect. Myers (in review) describes the modeling of injection and its effect on the pressure distribution in detail.  The following is a simpler and more accurate description that should be what appears in the RDSGEIS:

> Hydraulic fracturing involves high pressure injection of fracking fluid into the shale from a horizontal well.  This injection fractures the shale and increases the size and connectivity of existing pores.  The high pressure creates a pressure gradient from the well to a point in the shale just beyond the expanding volume of injecting fluid where the pressure remains equal to background.  If the fluid disperses from the well evenly, the volume will be a cylinder.  As injection continues, the radius of the cylinder increases and pressure gradient is from the well to the edge of the cylinder.  Offsetting the decreased pressure gradient is an increased effective cross-sectional area for the fluid to cross.  The flow away from the well fractures the shale, creating new fractures and increasing the size of the existing fractures.  When injection ceases the pressure in the well drops immediately to atmospheric pressure coincident with the well-bottom depth. However, the pressure in the shale begins to drop more slowly, initially equals that caused by injection.  Flow away from the well continues as the pressure in the reservoir

created by the HVHF treatment moves fluids towards the well and away from the well both but since there is no more pressure being applied at the well the pressure in the shale near the well begins to drop.

Descriptions in the RDSGEIS (p 5-94) are therefore wrong.  Fracking is a transient situation wherein a pressure divide, where the pressure is higher between the well and the end of the fluid, sets up with some fluid movement toward the well and some away from the bore continues.  The modeling (Myers in review) shows that this requires about 90 days to effectively dissipate.  This counters several statements in the RDSGEIS implying that all fracturing and flow from the well bore ceases at the end of fracking, in about five days.

The claim that the flow direction away from the wellbore would be reversed during flowback (RDSGEIS, p. 6-54) also cannot be correct if only 10 to 30% of the injected fluid actually returns to the well.  Some must continue to flow away from, or at least not toward, the well.

NYSDEC makes an unreasonable assumption regarding the flow around the shale after fracking, regarding a discussion of the period between fracking operations if refracking would occur.  "It is important to note, however, that between fracturing operations, while the well is producing, flow direction is towards the fracture zone and the wellbore" (RDSGEIS, p. 5-99).  Because the goal is to attract gas from the shale, any such low pressure would likely affect just the fracked shale, not formations away from the shale in which fluids would flow according to the background hydraulic gradient.  That a small amount of formation water may be produced with time indicates that water from only a small portion of the shale near the well flows toward the well.  If the natural gradient in formations above the shale has a vertical component, there will be upward advection of water and contaminants away from the shale.

- *Measurements of the water pressure profile should be made in each well prior to fracking, as it is drilled and before it is cased.  This could be a part of the geophysical logging process.*

NYSDEC assumes that it will be rare for a well to be refracked, that is, to repeat the fracking operation years after initially completing it, inappropriately relying on "Marcellus operators'" assurances without reference to a source (RDSGEIS, p. 5-98).

## Contaminant Transport from the Shale
The RDSGEIS completely dismisses the concept of vertical contaminant migration from the shale to fresh-water aquifers.  Statements suggesting that the only way for the public to be exposed to fracking fluid would be through an accident or spill (RDSGEIS, 5-74) reflect the

dismissal of the potential long-term transport from the shale.  This section reviews the evidence and potential for contaminant transport from the shale.

Claiming that regulatory officials from 15 states have "testified that groundwater contamination as a result of the hydraulic fracturing process … has not occurred" (RDSGEIS, p. 6-41 & 6-52) is misleading because they have simply never looked for contamination beyond reports from water well owners.  There are no monitoring well networks designed to monitor contaminant transport upward from the fracked shale.  The upward transport could also take years, decades, or centuries, not just the few days considered in the RDSGEIS.  They are wrong to suggest there is no evidence for such transport.

Two reports have documented or suggested the movement of fracking fluid from the target formation to water wells (EPA 1987; Thyne 2008) linked to fracking in wells.  Thyne (2008) had found bromide in wells 100s of feet above the fracked zone.  The EPA (1987) documented fracking fluid moving into a 416-foot deep water well in West Virginia; the gas well was less than 1000 feet horizontally from the water well, but the report does not indicate the gas-bearing formation.  There is also recent evidence of fracking fluid reaching several domestic drinking water wells near Pavillon, WY from a deep source in a sedimentary sandstone and shale formation Diquilio et al 2011).  Deep monitoring wells (depth not specified) have detected synthetic organic compounds including glycols, alcohols, and 2-butoxyethanol, BTEX (including benzene at 50 times the MCL), phenols, trimethylbenzenes, and DRO.  Dissolved methane was found at near-saturation levels with an isotopic signature similar to production gas.  The EPA identified three pathways for fluid movement.  One was nearby wellbores.   The second was fluid movement from low permeability sandstone into more conductive sandstone nearby.  Third was out-of-formation fractures forcing fracking fluid into overlying formations.  NYSDEC should consider this example as a cautionary tale of the potential for vertical movement of fracking fluid to near-surface aquifers.

Methane contamination has been observed to occur in many areas near fracking operations.  The RDSGEIS acknowledges that gas migration occurs (RDSGEIS, p. 6-42), but suggests it is limited to well construction problems.  This assumption ignores the studies which link the source to much deeper formations (Osborn et al 2011, Thyne 2008).  Myers (in review) and Osborn et al (2011) indicate that gas transport could indicate pathways which could also be longer-term fluid pathways; if there is a pathway for gas, there is also a pathway for water.

The RDSGEIS dismisses diffusion of chemicals from the shale to the surface because this would dilute their concentrations; this is correct, but diffusion is only a minor process in the movement of chemicals to the surface and is the wrong process to analyze for consideration of

whether vertical transport could occur.  Contaminants move by advection, dispersion, and diffusion, with the later being a minor component.  Advection would be the most likely transport process (Myers in review).  Upward movement of chemicals could occur by advection wherever there is an upward vertical component to the hydraulic gradient; fractures and faults would enhance that flow. Myers (in review) simulated transport through the bulk media as requiring from 100s to 1000s of years, depending on hydraulic properties and gradient; fractures substantially decreased that simulated time.

The RDSGEIS relies on an analysis by ICF (2009), included in the RDSGEIS as Appendix 11, for its dismissal of potential vertical contaminant transport.  Dismissing the potential for such transport based on the gradient occurring just for the time of fracking simply illustrates a lack of understanding of the process and associated groundwater and contaminant flow.  ICF (2009) had been part of the 2009 version of the DSGEIS.  Appendix A of this technical memorandum reviews ICF (2009) again in detail and Appendix B presents a copy of a journal article (Myers in review), which analyzes in detail the potential for transport from the shale to the surface.

The RDSGEIS should reconsider some of its assumptions and implement several regulatory changes, as specified here:

- *ICF (2009) should be removed in its entirety and substituted with an analysis that at least acknowledges the potential risk for long-term contaminant transport from the shale to the surface.  All citations to and conclusions based on ICF (2009) should also be removed from the RDSGEIS.*
- *The RDSGEIS should include the foregoing recommendations concerning hydrogeology, and regulations should be promulgated specifically requiring the delineation of properties of the geologic formations above the shale, the locations of fractures, and mapping of the hydraulic gradients near the proposed drillsites.*
- *The RDSGEIS and regulations should require driller to implement a long-term monitoring plan with wells established to monitor for long-term upward contaminant transport, as described below in the section concerning groundwater monitoring.*

## Other Pathways for Groundwater Contamination

Section 2.4.5 incorrectly claims that "[i]mproperly constructed water wells can allow for easy transport of contaminants to the well…" (RDSGEIS, p. 2-22).  Transport "to the well" depends on flowpaths and gradients near the well which would only marginally be affected by well construction.  Improper water well construction does allow transport of contaminants along the casing which could allow contaminants to move among aquifers, once the contaminants reach

the well.  Improperly constructed wells can allow contaminants from aquifer layers which were not intended to be screened to transport to the producing layers.

Flowback and produced water are important potential contaminants, primarily in the potential for blowouts or spills just after fracking and in the potential for leaks from the well bore. Estimates are that from 9 to 35% of the injected fracking fluid, expected to vary from 2.4 to 7.8 million gallons per well, would return as flowback (RDSGEIS, p. 5-99).  This is a total flowback of 216,000 to 2.7 million gallons per well (Id.).  Estimates also indicate that up 60 percent of the flowback would return within the first four days after fracking ceases (RDSGEIS, p. 5-100).  The upper estimate based on these ranges is that 60 percent of 2.7 million gallons, or 1.62 million gallons of flowback will occur within four days of the cessation of fracking.  Modeling in Myers (in review) confirms both the relative proportion of injected fluid that becomes flowback and the rapid rate.

Flowback is a mixture of returning fracking fluid and formation fluid, but the limited chemistry data presented in the RDSGEIS suffers from being a single sample per well (RDSGEIS, p. 5-105). The RDSGEIS states that some of the data was provided by the Marcellus Shale Coalition, an industry group, but without reference or actually providing the data; it is not possible for the reader to assess or draw independent conclusions that might differ from the statements in the RDSGEIS.  The available data does not apparently allow an assessment of the proportion of shale to injected water.  For example, samples with very high salt content probably consist more of shale brine than fracking fluid.  RDSGEIS Table 5.10 demonstrates, by its illustration of poor water quality, that the water must be contained.  The minimum, median, and maximum for TDS, at 1530, 63,800, and 337,000 mg/l, respectively, suggests the proportions vary widely but that more than half of them are saltier than ocean water.  The range in chemicals such as benzene, at 15.7, 479.5, and 1950 ug/l, shows that some flowback could be extremely toxic; the NY MCL for benzene is 5 ug/l, thus most of the samples above detect exceed the standard for this contaminant.  Because of the toxic chemistry of flowback water, much more data is necessary, as specified here:
- *The RDSGEIS should present temporal flowback data from specific wells, in tabular or graphical form.*
- *The RDSGEIS should present an appendix with raw data provided by the Marcellus Shale Coalition or link to the data on the internet.*
- *Table 5.10 could be made more understandable by including the detect and MCL levels.*

The RDSGEIS promises that flowback would be contained in "water-tight tanks" for onsite handling (Id.), but the document does not discuss the sizing of the tanks.  The proposed regulations address flowback and requirements for capturing it at many points (6 NYCRR §560),

but also fails to specify a size.  For example, the operator must include " the number and total capacity of receiving tanks for flowback water" (6 NYCRR § 560.3(a)(12)), and must have secondary containment, "as deemed appropriate by the department"…"sufficient to contain 110 percent of the total capacity of the single largest container or tank within a common containment area" (6 NYCRR § 560.6(x)(26)(i)).  Because there are no specifications for the size of the "single largest container", the required secondary containment sizing is not useful.

- *The RDSGEIS and proposed regulations must specify the necessary total capacity for tanks to contain flowback.  The required capacity must reasonably exceed the expected flowback as discussed above.  It must be able to capture within four days, 60 percent of the 35 percent of the maximum amount of fluid to be injected for fracking.*

RDSGEIS Chapter 5 lists many chemicals that could be used in fracking fluid, but does not list any properties of these chemicals which could affect their flow through soils or through groundwater.  The RDSGEIS does not provide data regarding whether and how much they will be attenuated.  However, the RDSGEIS inappropriately relies on attenuation (p. 6-53) to mitigate against the potential for long-distance transport.

- *The RDSGEIS should either provide data concerning the transport properties of the various chemicals or not rely on attenuation as a means of mitigating the transport which could results from spills and leaks.*

## Groundwater Quality Monitoring

The previous sections of this report have highlighted the poor water quality of fluids associated with fracking operations – the fracking fluid itself and the produced shale-bed water – and the various pathways for aquifers to be contaminated.  Small quantities of either of these fluids can significantly pollute groundwater and surface water.  The RDSGEIS provides some setbacks in an attempt to protect various receptors – wells, aquifers, or streams – and the adequacy of these is discussed below.  With the potential for spills and leaks from multiple sources associated with these operations, the requirements for groundwater quality monitoring in the RDSGEIS and the regulations is paltry and insufficient, as described here.

The proposed monitoring consists only of testing existing private water wells within 1000 ft of the drill site, or to 2000 ft if none are located within 1000 ft (RDSGEIS, p. 1-10, 7-44).  While this is necessary for the protection of the well owner, it is insufficient for the long-term protection of the aquifer.  Domestic wells have not been designed to function as water quality monitoring wells which causes many problems in sampling and interpreting the data.  Thyne explains clearly why domestic wells are poor monitoring wells:

16

First, the number of domestic well sample points is far exceeded by the potential point sources (gas wells). Domestic wells are much less than ideal for sampling purposes. Domestic wells are not placed to determine sources of contamination in groundwater. They are not evenly spaced around gas wells or within close enough proximity to determine the presence of chemicals associated with methane that degrade rapidly. Domestic wells are generally screened over large intervals making vertical spatial resolution for samples difficult nor are the wells are not constructed to facilitate measurement of water table elevation or downhole sampling. This forces sampling to occur at the surface after pumping raising the possibility of sampling artifacts. In addition, since domestic wells are the sole source of drinking water for individual properties, it is difficult to arrange access to take samples due to privacy issues, and the County may bear potential liability for damage during sampling and interruption of water supply. (Thyne 2008, p 10-11)

A monitoring well system should be designed so that a contaminant plume will neither pass horizontally between the monitoring wells nor above or below the screened interval.  The best way to be certain of intercepting a contaminant passing a point in an aquifer is to span the entire aquifer with well screen.  A long screen may increase the chances of detecting the presence of a potential contaminant which may indicate the site being monitored has developed a leak, but will dilute the concentration by mixing contaminated water with cleaner water.  A sample extracted from such a well will be a conglomerate of the chemistry of the entire screen thickness; if the screen spans multiple lithologies, the water within the well bore will not be representative of any lithology (Shosky, 1987).  It can only be effective only for substances which do NOT naturally exist in the region of the aquifer.  Monitoring with long screens is good only for presence/absence determinations.

Concentrations vary throughout an aquifer, both vertically and horizontally.  The concentration determined from any well will represent an average over the entire screen length.  Therefore, to monitor trends in concentration, screens should span representative vertical sections

The spatial layout of the monitoring well system should be based on the conceptual flow and transport model for flow from the gas well through the aquifer, which includes flow pathways and possible contaminant dispersion.  Monitoring wells should be placed as close to the expected flow path as possible, where the concentration will be highest.  However, because of uncertainty in the prediction of the flow path, monitoring wells should also be spaced laterally away from the expected flow path.  These lateral wells should detect lower concentrations than the one in the predicted flow path.  If the lateral wells actually have higher concentration, the predicted flow path may be incorrect and monitoring wells should be added further from the predicted flow path to improve the understanding of the flow and movement of the contaminant plume.

17

Monitoring wells or piezometers should be placed close to the potential source for early detection, but also at a distance from the source to increase the chances that they will intercept the contaminant and to assess the rate of contaminant movement. If many wells detect the contaminant, the concentration variation would indicate the degree of dispersion. Denser well networks will have a better chance of detecting the contaminant and providing accurate description of it dispersal.

Considering the above fundamentals of a monitoring system, the following recommendations, in addition to sampling the existing private wells, should be added to the RDSGEIS and partly replace proposed regulations in 6 NYCCR §560.5(d)

- *The operator should prepare a conceptual flow path model for groundwater and contaminant transport from the drill pad to and through nearby aquifers.*
- *As part of the conceptual model, the operator should estimate the distance that a contaminant would travel from the well pad in various time periods, including one month, six months, one year, and five years.*
- *Dedicated groundwater monitoring wells should be reasonably located along and perpendicular to the projected flow path out to the five-year travel distance. At a minimum, there should be a transect of monitoring wells/piezometers at the one-month travel distance from the well and halfway between the well and important receptors, meaning wells or discharge points such as springs or streams.*
- *Monitor wells should span the surface aquifer and piezometers should have multiport sampling capabilities for twenty foot intervals at the top of the saturated zone and every 100 feet to the bottom of the freshwater zone. This will help establish vertical concentration and hydraulic gradients.*
- *The monitoring system should be established to establish baseline data including seasonal variability for at least one year prior to drilling and fracking.*

Monitoring transport from the deep shale is more difficult because a substantial flux of contaminants could be released from most anywhere in the fractured shale as a result of oil and gas development. Time intervals for transport could be more than 100 years, but fractures could decrease the time frame to as short a time as a few years. Fracture zones therefore could be monitored, but if they are known the industry should avoid fracking near them, both to avoid vertical transport and induced seismicity. It is therefore reasonable to require a dedicated monitoring well in the middle of each well pad wherever there is an upward flow gradient.

- *Industry should establish a multiport piezometer system from the shale to the bottom of the freshwater zone in the center of all well pads.*

18

- *The industry should provide the funding to maintain the piezometers system for at least 100 years beyond the end of gas production, to account for the long potential travel times.*

## WATER RESOURCES

This section concerns primarily the controls on making water withdrawals for fracking.  The section focuses on surface water diversions but also considers diversions from aquifers.

The RDSGEIS notes correctly that without proper controls, the withdrawals of water from streams and aquifers to use in fracking could have significant ecologic and hydrologic impacts (RDSGEIS, p. 6-2).   The "natural flow paradigm" is a good description of the interdependencies of the stream ecology with all of the hydrologic regimes (RDSGEIS, p. 6-4).   The description of the depletion to an aquifer and the interconnection of aquifers with surface water (RDSGEIS, p. 6-5) is also good.  Treating the withdrawals as consumptively lost to the system (RDSGEIS, p. 6-9) is appropriate because in essence, with recycling of flowback, the water will not return to the system.  These are acknowledgements which should lead to good regulation of withdrawals, if properly considered in the rulemaking.

The discussion and comparison of the withdrawals for fracking with statewide water uses (Withdrawals for High-Volume Hydraulic Fracturing, RDSGEIS, p 6-9 thru 6-13) are scientifically unsupported and irrelevant;.  The potential impacts of withdrawals are a matter of scale and depend on their size, the size of the stream, and antecedent moisture conditions.

Much of the regulation of withdrawals from streams focuses on passby flows.  The RDSGEIS defines a passby flow as "a prescribed quantity of flow that must be allowed to pass an intake when withdrawal is occurring" (RDSGEIS, p 2-30) which also specifies a low flow condition "during which no water can be withdrawn" (Id.).  Specific definitions will be discussed below, but in reality the lower specified values can allow significant damage to occur to streams, especially smaller ones.  If the required passby flow is small compared to the average, meaning it has a long return interval, it will only rarely restrict water withdrawals.  If flows on the river can be reduced to a low passby flow, then diversions can reduce the flow to low, long return interval rates much more frequently; this is tantamount to imposing low-frequency, high-damaging, drought on the streams much more frequently.

The Delaware River Basin Commission (DRBC) does not have a specific passby flow requirement and usually uses the 7Q10 flow, the seven-day low flow with a ten-year return interval, for water resources evaluation (RDSGEIS, p. 7-13).  The RDSGEIS indicates this is not protective (Id.) and as described in the previous paragraph, it would allow the 10-year low flow to manifest

19

much more frequently.  The Susquehanna River Basin Commission (SRBC) regulations are more complicated, but generally use the 7Q10 or from 15 to 25 percent of the average daily flow (RDSGEIS, p 7-15, 16).  Neither is protective and the NYSDEC proposes to use the natural flow regime method (NFRM) method for all regions (RDSGEIS, p 7-16).

The RDSGEIS expresses the intent to use the NFRM only in permit conditions, however, as the document acknowledges that guidance has not yet been completed (RDSGEIS, p. 7-3).  As authority, the RDSGEIS cites 6 NYCRR § 703.2, which states that "[n]o alteration that will impair the waters for their best usages" will be allowed.  "For the purpose of this revised draft SGEIS only, the Department proposes to employ the NFRM via permit conditions as a protection measure pending completion of guidance." (Id.).  NYSDEC also indicates that the requirement could be "imposed via permit condition and/or regulation" (RDSGEIS, p. 7-22).

- *NYSDEC must include the requirement for using the NFRM in the regulations if it is to be consistently enforceable; the proposed regulations do not currently  require use of the NFRM to establish the requisite passby flow in a stream.*

The NFRM attempts to protect the distinctive flow patterns for each stream, including the "variable magnitude, duration, timing, and rate of change of flow rates and water levels" (RDSGEIS, p 7-18).  The RDSGEIS proposes to use the "Q75 and/or Q60 monthly exceedence values for establishing passby flows" (Id.).  An Qx exceedence value is the flow rate which is exceeded x percent of the time.  Another way of considering the Q75 and Q60 exceedance values is that the passby flow would be greater than the flow which the stream exceeds 25 or 40 percent of the time.  This is much higher than a 7Q10 flow.  However, in a small stream, diversions could change a flow regime from wet (higher than average) to significantly below average.

NYSDEC appears to intend that if the watershed exceeds 50 square miles, the passby flow will be Q75 for the winter/spring months of October through June and Q60 for the summer months of July through September, whereas for smaller watersheds (Area<50 sq miles), the Q60 value applies all year (RDSGEIS, p 7-19).  NYSDEC at least recognizes that small streams need more protection and that low flows can be more critical during the summer when temperatures are higher.  This means that at least 40 percent of the time, withdrawals will not be allowed.  For another short time period (up to the time for which the actual streamflow and the required passby flow is less than the preferred withdrawal rate), withdrawals will be limited to prevent the streamflow from being reduced to below the passby flow.

The RDSGEIS does not discuss how the recommended passby flows were chosen, in terms of habitat protected.  There is an implication that Q60 and/or Q75 mean the same amount of

habitat would be protected; this may simply be incorrect because streams are not created equal.  The NYSDEC should apply a second filter and actually require a determination of the habitat at Q60 and limit the change in habitat.  This is one advantage of the Susquehanna River Basin Commission method (RDSGEIS, p 7-15, -16).

The flow estimation method assumes a linear relation between baseflow and drainage area (RDSGEIS, p 7-19).  The assumption is that streamflow increases consistently in a downstream direction in proportion to the contributing drainage area.  Because it is essential to the method, the RDSGEIS should present data to justify their assumptions.  Analyzing streams with two or more gages, the Qx flow at one would be calculated according to the area proportionality relationship with the other gage; the RDSGEIS should present this type of verification to prove the method is suitable.

On streams without gages, the RDSGEIS indicates that NYSDEC will use factors developed from regression equations based on their location in New York (RDSGEIS, Fig 7.1, Table 7.2).  The table provides coefficients in cfs/sq mi for the passby flow for the different geographic zone by month.  Presumably, they are based on basin areas as discussed above, with different requirements for greater than and less than 50 sq miles.  The RDSGEIS should compare values determined with Table 7.2 with the actual value determined for gaged streams to verify the table.  Statements such as "[t]he passby flow requirement … would fully mitigate any significant adverse impact from water withdrawals" (RDSGEIS, p 7-22) are unsubstantiated and unjustified.

The passby flow requirements effectively ignore the potential cumulative impacts, irrespective of the following sentence:  "The application of the NFRM to all water withdrawals to support the subject hydraulic fracturing operations would comprehensively address cumulative impacts on stream flows because it will ensure a specified minimum passby flow, regardless of the number of water withdrawals taking place at one time" (RDSGEIS, p. 7-25).  The RDSGEIS continues by indicating that "significant adverse cumulative impacts would be addressed by the NFRM … because each operator … would be required, via permit condition and/or regulation, to estimate or report the maximum withdrawal rate and measure the actual passby flow for any period of withdrawal" (RDSGEIS, p. 7-25, -26).  The RDSGEIS analysis of the prevention of cumulative flow impacts appears limited to these statements.  Clearly, several concurrent withdrawals along a stream reach could cumulatively decrease the flow at the more downstream sites to less than the passby flow, if the timing of withdrawals is not controlled and if there are not adequate measurements ongoing at the site which compare the actual flow to the required passby flow.  Short of establishing a gaging station with flow/stage relationship, it is difficult to measure flows frequently enough to monitor short-term flow changes, therefore it is unlikely that an operator would be able to react sufficiently to preserve the passby flow.

The following are recommendations for improving the passby flow requirement to be used by NYSDEC

- *The program must be codified into regulations.*
- *The methods for estimating passby flows at ungaged sites must be verified as to their accuracy.*
- *NYSDEC should coordinate operators so their withdrawals do not cumulatively cause flows to drop below the required passby flows at any point along the stream.*
- *The operator should establish a temporary flow/stage relationship with at least a staff gage that should be monitored.*
- *Passby flows should be maintained with consideration to the measurement error inherent in the technique. The operator should assume that the measurement method is overestimating flow and therefore maintain a flow greater than the passby flow by as much as the error estimate.*

NYSDEC recognizes that groundwater pumping could deplete streams and also recognizes that pumping effects on the aquifers must be limited (RDSGEIS, pp 6-5, -6). Regarding groundwater pumping, the "Department proposes to impose requirements regarding passby flows as stated in this document" (RDSGEIS, p 7-25). The RDSGEIS does not discuss how the potential impacts to a stream will be estimated or how passby flows will be maintained, especially considering the lag time between groundwater pumping and the time for effects to manifest in the streams.

- *NYSDEC should prohibit groundwater pumping in tributary watersheds when analysis indicates that the time for a pumping effect to reach the stream is less than 30 days.*
- *NYSDEC should require a suitable groundwater analysis to estimate the effect on groundwater discharge to streams.*

The RDSGEIS indicates that industry has begun recycling more of its wastewater (RDSGEIS, p. 1-2). Recycling flowback water is good for reducing the amount of water to be disposed of, but it will not significantly decrease the water volume needed for fracking because the amount recovered as flowback is just 10 to 30 percent of the amount originally injected. Tracking the flowback to be recycled should be part of the new "Drilling and Production Waste Tracking" process (RDSGEIS, p. 1-13).

## PROJECT MITIGATION MEASURES

The primary mitigation schemes proposed in the RDSGEIS are setbacks, which the RDSGEIS treats as additional precautionary measures (RDSGEIS, p. 1-11). This section considers whether

22

the setbacks are sufficient or arbitrary.  A list in section 1.8 introduces additional precautionary measures; they are repeated in section 3.2.4.  The following lists the proposed mitigation setbacks from the RDSGEIS and provides brief comment:

> "Well pads for high-volume hydraulic fracturing would be prohibited in the NYC and Syracuse watersheds, and within a 4,000-foot buffer around those watersheds."

The primary pathway if wells are prohibited within 4000 feet of the watershed boundary would be underground, since topography would cause contaminants to flow away from the watershed boundary, assuming this coincides with a topographic divide.  In general, 4000 feet is probably sufficient, but a site specific consideration of the geology should be included to ascertain that the groundwater divide would not place the well within the watershed and that geologic formations are not dipping in the direction of the watershed.

- *This setback is not specified in the regulations, but should be.*
- *The operator should be required to analyze the local geology to determine whether the groundwater divide would allow transport into the prohibited watershed.*

> "Well pads for high-volume hydraulic fracturing would be prohibited within 500 feet of primary aquifers (6 NYCCR §560.4(a)(2),(subject to reconsideration 2 years after issuance of the first permit for high-volume hydraulic fracturing)"

The implication of only a 500 –ft setback is that there is no groundwater connection, but if groundwater in the bedrock connects with the aquifer, there is a potential for a rapid transport of contaminants from a spill through fractures to the aquifer.  Contamination will easily spread through the highly conductive aquifer (RDSGEIS, p. 6-37).  The risk to the aquifer would be the same as to the prohibited watersheds, so there is no reason the distance should be different.  If the ground surface slopes from the well to the primary aquifer, there is a significant risk of a spill reaching the aquifer through surface channels.

- *The prohibition in 6 NYCCR §560.4(a)(2) should be increased to 4000 feet, unless a site specific analysis demonstrates there are no fractures connecting the bedrock with the aquifer and there are no obvious surface water pathways.*
- *Additionally, the RDSGEIS should publish the area the Marcellus shale zone overlapped by primary aquifers and the area that would be included as buffer; this would help the public to understand how much land the prohibition affects.*

> "Well pads for high-volume hydraulic fracturing would be prohibited within 2,000 feet of public water supply wells, river or stream intakes and reservoirs (6 NYCCR

§560.4(a)(4)) (subject to reconsideration 3 years after issuance of the first permit for high-volume hydraulic fracturing)"

Essentially, there is no reason for this offset to be less than the offset from a primary aquifer. Considering a public water supply well, the operator should be required to perform a capture zone analysis for the well, and if the well could draw contaminants from a spill to the well, the gas well should not be permitted in that location.

- *The setback for public water supply wells should also be 4000 feet.*
- *Additionally, the operator should identify the capture zone for flow to the well and identify the five year transport distance contour.*

"The Department would not issue permits for proposed high-volume hydraulic fracturing at any well pad in 100-year floodplains". (6 NYCCR §560.4(a)(4))

For wells that might operate for 30 years, there is a 26% chance[2] of a 100-year flood occurring during the period the well would be operated.

- *Wells should be prohibited within at least the 500 year return interval floodplain, because the damages from significant flooding could be very substantial.*

"The Department would not issue permits for proposed high-volume hydraulic fracturing at any proposed well pad within 500 feet of a private water well or domestic use spring, *unless waived by the owner*." (6 NYCCR §560.4(a)(4)), emphasis added.)

NYSDEC should not allow the owner to waive this requirement because health and safety are at risk. More than just the "owner" may use the source, and the owner could sell to someone who does not understand the situation.

- *6 NYCCR §560.4(a)(1) should be changed to remove the waiver from the water well owner unless the owner is required to disclose the waiver to a future buyer in perpetuity.*

In general, some of the points discussed above mention that NYSDEC will revisit the need for the setback in the future. These reconsiderations are not part of the regulations. If so, the NYSDEC should specify in detail the performance standards that must be met in order for the setback requirement to be relaxed, and should acknowledge that a supplemental EIS would be completed to consider those changes.

---

[2] The probability that a event with a p probability will occur during n observations (years) may be determined with a binomial distribution.

The RDSGEIS also specified the following factors which would require site-specific SEQRA analysis.

1) Any proposed high-volume hydraulic fracturing where the top of the target fracture zone is shallower than 2,000 feet along any part of the proposed length of the wellbore.
2) Any proposed high-volume hydraulic fracturing where the top of the target fracture zone at any point along any part of the proposed length of the wellbore is less than 1,000 feet below the base of a known fresh water supply.
*These requirements should be considered together – if the top of the shale is less than 2000 feet bgs or 1000 feet below the bottom of the aquifer, a site-specific SEQRA review will be required. The depths seem arbitrary, and must be based on a perceived potential for vertical transport from the shale to the receptor.*

3)  Any proposed well pad within 500 feet of a principal aquifer:
*The only difference between a primary and principal aquifer is the number of people potentially using the aquifer.  Principal aquifers are thought to be productive enough to be an important source and contamination with fracking fluid or flowback could render them unusable without substantial remediation.  Wells near principal aquifers should be subject to the same setback as well near a primary aquifer.*

4) Any proposed well pad within 150 feet of a perennial or intermittent stream, storm drain, lake or pond:
*Again, rather than allowing development subject toa site-specific study, development within 150 feet of these streams should be prohibited.  It is difficult to imagine how study will prevent a spill which is, by its nature, unexpected.*


5) A proposed surface water withdrawal that is found not to be consistent with the Department's preferred passby flow methodology as described in Chapter 7;
Revised Draft SGEIS 2011, Page 3-16
6) Any proposed water withdrawal from a pond or lake;
7) Any proposed ground water withdrawal within 500 feet of a private well;
8) Any proposed ground water withdrawal within 500 feet of a wetland that pump test data shows would have an influence on the wetland:
*Requirements 5 through 8 are acceptable limits for requiring site-specific study.*

9)  Any proposed well location determined by NYCDEP to be within 1,000 feet of its subsurface water supply infrastructure

*This applies to areas outside the NYC watershed that contain NYC infrastructure (RDSGEIS, p 6-1). It is unclear whether there is any infrastructure that would actually be affected by fracking outside of the watershed. Fracking should not be allowed within 1000 feet of any NYC water supply infrastructure to prevent damage.*

## Acid Rock Drainage

The RDSGEIS refers in several locations to an acid rock drainage (ARD) mitigation plan which would be required for the on-site burial of Marcellus Shale cuttings (RDSGEIS, p 7-67). In general, our recommendation is that on-site burial not be allowed (see the report by Harvey Consulting, LLC). NYSDEC does not describe an adequate mitigation plan to prevent the leaching of ARD into groundwater. It does not specify testing which is essential to know how much neutralizing rock must be supplied.

For each well, prior to disposal of the cuttings, an adequate set of samples should be collected from the cuttings to test for acid generation. Adequate sampling would be representatively spaced along the horizontal well bore; initially, many samples would be needed to determine the variability among samples; samples every 100 feet would be desirable until sufficient data is collected from New York shales to characterize the variability along the horizontal well bore.

At least three types of testing should be completed:
- Acid base accounting – Modified Sobek procedure
- Net acid/alkaline production
- Meteoric water mobility testing – ASTM E-2242-02

These tests should provide adequate information to determine the amount of neutralizing rock which should be added to the cuttings to prevent ARD from leaching through the waste. Ideally, if the rock is potentially acid generating (PAG), kinetic tests should be completed to better assess the PAG potential, but this may not be possible in a timely fashion. The regulations should reflect these testing requirements. Final disposal must include adequate encapsulation to assure neutralization in perpetuity. It must also include adequate monitoring to assure that ARD does not leach into the underlying groundwater. A mitigation plan must be in place to remediate any disposal sites that do leak ARD.

## COMMENTS ON SPECIFIC PROPOSED REGULATIONS

The proposed regulations increase the overlap lengths for cement plugs in abandoned O&G wells from 15 to 50 feet at several locations (6 NYCRR§ 555.5(a)). This increase in plug length is an improvement but not sufficient or well planned in all locations. Rather than filling "with

cement from total depth to at least 50 feet above the top of the shallowest formation from which the production of oil or gas has ever been obtained in the vicinity" (6 NYCRR§ 555.5(a)(1)), the regulation requiring cementing to 50 feet above the top of the shallowest formation in which gas has been observed; not all gas pockets have actually produced gas but could cause methane contamination if they are not already sealed off by casing. The regulations should specify that the cement plug "below the deepest potable fresh water level" should overlap the transition than be just below it because even a short section of uncased well bore open to the salt water could mix into the well and to above the fresh water line (6 NYCRR§ 555.5(a)(3)).

The definition of "public water supply" (6NYCRR§ 560.2(19)) appears to include only groundwater by referring to "a…well system which provides piped water". However, the definition of "reservoir" (6NYCRR§ 560.2(20)) includes "waterbody designated for use as a dedicated public water supply". The regulations must clear up this inconsistency by making clear that a "public water supply" includes ground- and surface water.

Operators must include in their applications various items (6NYCRR§ 560.3). The following address some of these requirements by number (the setback requirements were addressed above in the section concerning setbacks).

(2):  The estimated maximum depth and elevation of bottom of potential freshwater: The operator should also be required to complete geophysical logging including conductivity measurements to verify the depth, unless it had been based on "previous drilling on the well pad".

(3):  The "proposed volume of water to be used in hydraulic fracturing": The operator should also be required to discuss and specify how the estimated volume was determined.

(5), (6):  The two parts specify that the application will provide the distance to various features but only if they are within a given specific distance. With current geographic information systems technology, there is no difficulty in obtaining these distances. The application should provide the distance to the water supply features in (5) and the aquifer and stream features in (6) if they are within two miles.

Mapping requirements for the application are specified in 6 NYCCR § 560.3(b). The topographic map requirements (6 NYCCR § 560.3(b)(2) require essentially a site map within 2640 feet of the proposed surface location (RDSGEIS, p. 3-9). This should be increased to 1 mile from the site, so that the map would be two by two miles centered on the proposed well pad. The map should include locations of all aquifers, water wells, stream channels, and other water features. The map should also include surface geology including faults. If fractures dominate the surface bedrock, contaminants can move quickly to wells. Contaminant pathways for transport from

27

the pad should be identified on the map.  Contaminants would not move far upgradient, so the NYSDEC should focus downgradient.  The following recommendations should be included in regulations regarding the requirements of well drillers to take steps to protect nearby wells.

- *The operator should complete site specific geology/hydrogeology studies to map the potential flow paths for contaminants released from the well pad or the well bore.*
- *All wells within a five-year transport zone should be located and included in sampling plans discussed below.  Additionally, dedicated monitoring wells should be established within this zone, also as described below.*

The regulations require the operator to record and report the depths and flow rates where "freshwater, brine, oil and/or gas were encountered or circulation was lost during drilling operations" (6 NYCCR 560.6(c)(22)).  The operator should identify these areas with specific conductivity logging.  The regulations do not specify any limits or actions that the operator should take if certain flow or losses were recorded; they do not specify what the department will do with this information.

The required treatment plan "must include a profile showing anticipated pressures and volumes of fluid for pumping the first stage" (6 NYCCR 560.6(c)(22)).  The operator also "must make and maintain a complete record of it hydraulic fracturing operation including the flowback phase" (6 NYCCR 560.6(c)(26)viii).  The operator should compare the "anticipated pressures and volumes" with the actual values.

The operator must suspend operations immediately "if any anomalous pressure and/or flow conditions is indicated or occurring which is a significant deviation from either the treatment plan" (6 NYCCR 560.6(c)(26)vii).  This is good, but the regulations do not define anomalous or what a significant deviation from the treatment plan would be, or what the follow-up action would be to assess and remedy damages.

Also, the required record of the fracking operation, 6 NYCCR 560.6(c)(26)viii, includes rates, volumes, and pressures of all injected and flowback fluids to the well.  The department only requires a synopsis be provided to the department.  There is no description what a synopsis should include.  Instead, the department should require the full record be provided to the department, and this record should be made publically available online.

The regulations allow a well owner to waive setback requirements (6NYCRR§ 560.4(a)(1)).  This should not be allowed unless there is also a requirement to inform potential purchasers of the well in the future of the waiver.

# REFERENCES

Alley, W. M., T. E. Reilly, and. O. E. Franke. (1999). Sustainability of groundwater resources. U.S. Geological Survey Circular 1186, Denver, Colorado, 79 p.

(EPA) Environmental Protection Agency. 1987. *Report to Congress, Management of Wastes from the Exploration, Development, and Production of Crude Oil, Natural Gas, and Geothermal Energy, Volume 1 of 3, Oil and Gas.* Washington, D.C.

Fisher, K., 2010, Data confirm safety of well fracturing: The American Oil and Gas Reporter, July 2010, http://www.fidelityepco.com/Documents/OilGasRept_072010.pdf.

Heisig, P.M., and K.D. Knutson. 1997. Borehole Geophysical Data from Bedrock Wells at Windham, New York. U.S. Geological Survey Open – File Report 97-42. Troy, N.Y.

Isachsen, Y.W., McKendree, W., 1977, Preliminary brittle structure map of New York, 1:250,000 and 1:500,000 and generalized map of recorded joint systems in New York, 1: 1,000,000: New York State Museum and Science Service Map and Chart Series No. 31.

Jacobi, R.D., 2002, Basement faults and seismicity in the Appalachian Basin of New York State: Tectonophysics, v. 353, Issues 1-4, 23 August 2002, p. 75-113.

Krisanne, E.L., and S. Weisset. 2011. Marcellus shale hydraulic fracturing and optimal well spacing to maximize recovery and control costs. *SPE Hydraulic Fracturing Technology Conference*, 24-26 January 2011, The Woodlands, TX.

Myers, T., in review. Potential contaminant pathways from hydraulically fractured shale to aquifers.

Schulze-Makuch, D., D.A. Carlson, D.S. Cherkauer, and P. Malik. 1999. Scale dependence of hydraulic conductivity in heterogeneous media. *Ground Water* 37, no. 6: 904-919

Soeder, D.J.. 1988. Porosity and permeability of eastern Devonian gas shale. SPE Formation Evaluation (March) 116-125.

Thyne, G., 2008. Review of Phase II Hydrogeologic Study. Prepared for Garfield County.

Williams, J.H., 2010, Evaluation of well logs for determining the presence of freshwater, saltwater, and gas above the Marcellus Shale in Chemung, Tioga, and Broome Counties, New York: U.S. Geological Survey Scientific Investigations Report 2010–5224, 27 p., at http://pubs.usgs.gov/sir/2010/5224/.

Williams, J.H., Taylor, L.E., and Low, D.J. 1998, Hydrogeology and groundwater quality of the glaciated valleys of Bradford, Tioga, and Potter Counties, Pennsylvania: Pennsylvania Topographic and Geologic Survey Water Resources Report 68, 89 p.

APPENDIX A

Review of Appendix 11, Excerpt from ICF Report, Task 1, 2009

Analysis of Subsurface Mobility of Fracturing Fluids

Agreement No. 9679

Reviewed by

Tom Myers, Ph.D.

Hydrologic Consultant

Reno, NV

December 7, 2009

Revised:  November 14, 2011

Introduction

The New York State Energy and Development Authority (NYSERDA) contracted with ICF International to prepare a review of the hydraulic fracturing process as it will likely be applied to the Marcellus Shale in New York; this review was published as a supporting document for the 2009 RDSGEIS prepared by the New York State Department of Environmental Conservation.  For the 2011 RDSGEIS, Appendix 11 presents excerpts from that report regarding the subsurface mobility of fracturing fluids.  This is a review of Appendix 11, revised from a review completed by this author of the ICF International report contained in the 2009 RDSGEIS.

In summary, ICF completed an analysis of the potential for contamination to flow from the shale to freshwater aquifers, but misrepresented the actual situation in many ways.  The basic problem was they conceptualized the flow potential incorrectly.  They considered the gradient incorrectly and assumed that if the transport did not occur within the time period of fracturing, it would not occur.  They assumed that the fluids leaving the shale would completely disperse, and be diluted, by occupying and being retained in every pore between the shale and the aquifers.  They did not consider preexisting fractures.  They ignored any potential pre-existing vertical gradient which would drive contaminants leaving the shale to the aquifers.  Although they presented a geochemical analysis which could explain why some attenuation could occur, they provided no site specific or fluid specific data to indicate that it would occur.

30

Exposure Pathways

ICF analyzes the potential for fracturing fluid to flow from the shale to the freshwater aquifers anywhere from 1000 to 5000 feet above.  The first problem is that the potential contaminants are both fracturing fluid and connate (formation) water existing in the shale before fracturing, which could contain extremely high concentrations of TDS, benzene, or radioactive materials.  Therefore, ICF should have considered the potential for flow of both fracturing fluid and connate water.  Ambient water could both be pushed from the shale by the injection of fracturing fluid and just by the opening of the pore spaces which would increase the permeability and allow more of a natural connection.

ICF calculates the gradient between the fracture zone and the bottom of the freshwater zone, which they set at 1000 feet bgs to be conservative in because much of the groundwater below this level in southern New York is not an underground source of drinking water either because it is too salty or the formation is not sufficiently productive to be considered an aquifer.  However, their calculation applied only during the period of injection.  Myers (in review) demonstrated through modeling that the fracking pressure would dissipate over a period of months, not immediately after fracking ended, because of the fluid that has been pushed away from the well.  The effective gradient is from the well to just beyond the migrating fluid where pressures would not yet have been affected by the current fracking.

ICF also ignores the potential for a natural upward gradient, which could be due to natural artesian pressure.  Myers (in review) also discusses the potential for this in detail.

ICF properly calculated the pressure that would occur in the shale during fracturing based on the effective stress in the formation and the amount of pressure required to overcome the in-situ horizontal stress (ICF, pages 25-26); accepting the assumptions in the following quote, equation 12, and equations 7 through 11 used to derive it, is an accurate description of the head applied to the shale during fracturing.

> Since the horizontal stress is typically in the range of 0.5 to 1.0 times the vertical stress, the fracturing pressure will equal the depth to the fracture zone times, say, 0.75 times the density of the geologic materials (estimated at 150 pcf average), times the depth.  To allow for some loss of pressure from the wellbore to the fracture tip, the calculations assume a fracturing pressure 10% higher than the horizontal stress… (ICF, pages 25-26)

ICF uses that equation with the gradient equation 6 to estimate the gradient between the shale and freshwater aquifer, "during hydraulic fracturing", for a variety of depths of the aquifer and the shale.  The numbers are correct, for an aquifer depth of 1000 feet and shale depth of 2000 feet, they show the gradient to be about 3.6, but the concept applied in the derivation is wrong as described above.  During hydraulic fracturing, variously estimated through the RDSGEIS

documents as occurring for up to 5 days, there is no hydraulic connection between the shale and the bottom of the freshwater aquifer and it is therefore inappropriate to consider the gradient across that thickness. The correct conceptualization is described in the following paragraph.

Upon applying a pressure in the shale, as occurs during the injection for fracturing, a very high pressure head is developed at the well and nearby shale. This pressure causes the gradient that drives the fluid away from the well into the shale, where it causes the shale to fracture. Fluid may continue to flow into surrounding formations. During the process, the pressure begins to increase away from the well which establishes a steep gradient near the well. Away from the well at any given time during injection, the pressure is less than at the well. The pressure drop from the well to any point in the shale away from the well is a function of the friction incurred by the fluid flowing away from the well. At some distance from the well, the pressure is only at background. The distance at which the pressure is only background is the point at which the injection fluid has not yet reached. Beyond the point to which the injection fluid flows, there is NO hydraulic connection. For this reason, ICF's calculation for gradient between the injection pressure in the shale and the bottom of the freshwater aquifer is hydrogeologically incorrect. ICF is effectively analyzing a steady state situation that would occur if the injection pressure continued until the pressure stabilized between the shale and the freshwater aquifer.

ICF acknowledges the reality that transient or non-steady conditions will prevail and that the actual pressure gradient will be higher closer to the shale. "In an actual fracturing situation, non-steady state conditions will prevail during the limited time of application of the fracturing pressures, and the gradients will be higher than the average closer to the fracture zone and lower than the average closer to the aquifer." (ICF, pages 26-27)

However, they do not carry the analysis any further and seem to argue that immediately after injection ceases, all upward gradient will cease: "It is important to note that these gradients only apply while fracturing pressures are being applied. Once fracturing pressures are removed, the total head in the reservoir will fall to near its original value, which may be higher or lower than the total head in the aquifer" (ICF, page 27). The implication from this statement is that ending injection will cause the pressure in the reservoir to drop back to background, immediately. This is not possible, any more than it is possible for the drawdown in a pumping well in an aquifer to return to pre-pumping conditions immediately upon cessation of pumping.

For example, consider that during a five-day injection period, the pressure propagated outward from the well as described in Myers (in review). When injection ends, the pressure within the well may almost immediately return to background, but the pressure in the surrounding formation will still be very high. This is the pressure which will drive the flowback to the well, as described throughout the RDSGEIS. The initial flowback is fluid right next to the well – the

32

fluid that had just been injected.  The pressure field created in the formation away from the well is the pressure that causes a gradient to push the fluid back into the well.

As long as there is flowback, there is a gradient toward the well, and residual pressure in the shale or surrounding formations.  With distance from the well, the pressure increases (as required for there to be a gradient back to the well).  At any given time, there will be a point of maximum pressure beyond which the pressure becomes lower; in other words, a cross-section through the formation away from the well showing the pressure head would show the pressure rising from the well to the peak and falling from the peak to the point the pressure reaches background.  (This is similar to the concept in hydrogeology that during pumping, the maximum drawdown caused by a well is at the well; when the well ceases to pump, the water level will initially rise quickly, but the drawdown away from the well will continue to expand for a period of time.)

ICF considers that local drawdown caused by production from the well will further prevent flow away from the well: "During production, the pressure in the shale would decrease as gas is extracted, further reducing any potential for upward flow" (ICF, page 27).  This is probably correct, but the process described in the preceding paragraph likely causes some of the fluid to have moved beyond this propagating drawdown.  The fact that only 35% of the injected fluid returns as flowback (RDSGEIS, Gaudlip et al, 2008) would seem to confirm that much of the injected fluid gets beyond the point where the reversing gradient would pull the fluid back to the well.

ICF also relies on there being no connection between the shale and surrounding formations, as indicated by the high TDS content of water in the shale.  This may reflect the pre-fractured conditions, but the fracturing process could open a connection between formations.  As noted in the main body of this review, out-of-zone fracking is not uncommon, therefore it is reasonable to assume that connections between the shale and surrounding formations do occasionally occur.

The analysis provided by ICF in section 1.2.4.3, Seepage Velocity, is irrelevant because it considers the velocity between the shale and the freshwater aquifer, using a gradient established in the previous section that only applies for as long as the injection.  Their calculation of 10 ft/day (ICF, page 28) relies on that average gradient.  They seem to acknowledge the fallacy of their assumptions by stating: "The actual gradients and seepage velocities will be influenced by non-steady state conditions and by variations in the hydraulic conductivities of the various strata" (ICF, page 28, emphasis added).  ICF carries the error into section 1.2.4.4, Required Travel Time, by calculating how long it would take for flow at the seepage velocity calculated in the previous section to reach the freshwater aquifers.

ICF's fourth argument is that even if all of the injected fluid moves vertically out of the shale towards the freshwater aquifer, it would have to disperse among all of the pores between the shale and the aquifer – a truly nonsensical idea. The calculation requires that 4,000,000 gallons of fluid would be evenly dispersed throughout a 40-acre well spacing. In other words, they assume that about 4,000,000 gallons of injected fluid would evenly disperse through all of the void, assuming porosity of 0.1, over a 1000-foot thickness 40 acres in area, or about 1.3 billion gallons of void space, would cause a dilution factor of 300 (ICF, pages 30-31). This is wrong for the following reasons.

- An injected fluid would move as a slug along the gradient. In this case, with a natural upward gradient, any fluid that escapes the well bore (does not flowback) would disperse upward. It would not diffuse through every pore space between the shale and aquifer. Advective forces would move it upward as a slug with dispersion spreading it out both vertically and horizontally. It will dilute, but far less than postulated by ICF's analysis.
- The vertical flow would follow preferential flow paths rather than advecting upwards uniformly across 40 acres. The image painted by ICF is that the fluid would flow upward to the aquifer with the leading edge moving at exactly the same rate over the entire area. Even if there are no fractures, faults, or improperly plugged wells, simple finger flow, caused by heterogeneities in the material properties, would cause an uneven distribution of the contaminant.

ICF also rejects the concept of fractures, faults, or unplugged wells by claiming it is "extremely unlikely that a flow path such as a network of open fractures, an open fault, or an undetected and unplugged wellbore could exist that directly connects the hydraulically fractured zone to an aquifer" (ICF, page 31). They provide no data or references to assess the probability that such a network is "extremely unlikely" or to justify their conclusion. More importantly, for fractures to facilitate a connection between the shale and the aquifers, it is not necessary for the fracture to exist over the entire thickness. As ICF (page 5) mentions, the Marcellus Shale has substantial natural fractures, and therefore it is possible that the surrounding formations, sandstone or shale, also have fractures. It is not necessary for the flow to follow a fracture all the way to the aquifers, but it could enhance the velocity of movement. Fractures could also further disperse the flow vertically, as discussed in Myers (in review).

ICF also mentions geochemistry as a reason that transport of contaminants from the shale to the aquifers will not occur. While it is possible for attenuation to occur as contaminants move through a formation, without site specific and chemical specific data, they should not make such an argument.

34

Reference

Gaudlip, A.W., L.O. Paugh,  and T.D. Hayes, 2008.  Marcellus shale water management
    challenges in Pennsylvania.  Society of Petroleum Engineers Paper No. 119898.

**APPENDIX B**

Prepublication Copy

**Myers, T., in review.  POTENTIAL CONTAMINANT PATHWAYS FROM HYDRAULICALLY FRACTURED SHALE TO AQUIFERS**

# POTENTIAL CONTAMINANT PATHWAYS FROM HYDRAULICALLY FRACTURED SHALE TO AQUIFERS

Tom Myers

Hydrologic Consultant

Reno NV

Tom_myers@charter.net

## ABSTRACT

Hydraulic fracturing (fracking) of deep shale beds to develop natural gas has caused concern regarding the potential for various forms of water pollution.  Two potential pathways – diffuse transport through bulk media and preferential flow through fractures – could allow the transport of contaminants from the fractured shale to aquifers.  There is substantial geologic evidence that natural vertical flow drives contaminants, mostly brine, to near the surface from deep evaporite sources.  Interpretative numerical modeling shows that diffuse transport could require up to tens of thousands of years to move contaminants to the surface, but also that fracking the shale could reduce that transport time to tens or hundreds of years.  Conductive faults or fracture zones, as found throughout the Marcellus shale region, could reduce the travel time further.  Injection of up to 15,000,000 liters of fluid into the shale generates high pressure at the well which decreases with distance from the well and with time after injection as the fluid advects through the shale.  The advection displaces native fluids, mostly brine, and fractures the bulk media and widens existing fractures.  Simulated pressure returns to pre-injection levels in about 90 days.  The overall system requires from three to six years to reach a new equilibrium reflecting the significant changes caused by fracking the shale.  The rapid expansion of hydraulic fracturing requires that monitoring systems be employed to track the movement of contaminants and that gas wells have a reasonable offset from faults.

37

## Introduction

The use of natural gas (NG) in the United States has been increasing, with 53 percent of new electricity generating capacity between 2007 and 2030 projected to be with NG-fired plants (EIA 2009). Unconventional sources account for a significant proportion of the new NG available to the plants.  A specific unconventional source has been deep shale-bed NG, including the Marcellus shale primarily in New York, Pennsylvania, Ohio, and West Virginia (Soeder 2010), which has seen over 4000 wells developed between 2009 and 2010 in Pennsylvania (Figure 1).Unconventional shale-bed NG differs from conventional sources in that the permeability is so low that gas does not naturally flow in timeframes suitable for development.  Hydraulic fracturing (fracking, the industry term for the operation (Kramer 2011)) loosens the formation to release the gas and provide pathways for it to move to a well.

Fracking injects 13 to 19 million liters of fluid consisting of water and additives, including benzene at concentrations up to 560 ppm (Jehn 2010), at pressures up to 69,000 kPa (PADEP 2011) into low permeability shale to force open and connect the fractures.  This is often done using horizontal drilling through the middle of the shale.  Horizontal wells may be more than a kilometer (km) long.  The amount of injected fluid that returns to the ground surface after fracking ranges from 9 to 34 percent of the injected fluid (Alleman 2011; NYSDEC 2009), although some would be formation water.

Many agency violation reports and legal citations (ODNR 2008; PADEP 2009) and peer-reviewed articles (DiGuilio et al. 2011; Osborn et al. 2011; Breen et al. 2007; White and Mathes 2006) have found more gas in water wells near areas being developed for unconventional NG, documenting the source can be difficult.  One reason for the difficulty is the different sources – thermogenic for gas formed by compression and heat at depth in shale and bacteriogenic for gas formed by bacteria breaking down organic material (Schoell 1980).  The source can be distinguished based on both C and H isotopes and the ratio of methane to higher chain gases (Osborn and McIntosh 2010; Breen et al 2007).  Thermogenic

38

gas can reach aquifers only by leaking from the well bore or by seeping vertically from the source.  In either case, the gas must flow through potentially very thick sequences of sedimentary rock to reach the aquifers.  Many studies which have found thermogenic gas in water wells found there to be more gas near fracture zones (DiGuilio et al. 2011; Osborn et al. 2011; Thyne 2008; Breen et al. 2007), suggesting that fractures are pathways for gas to move from shale or other deep formations to aquifers.

A pathway for gas would also be a pathway for fluids and contaminants to advect from the fractured shale to the surface, although the time for transport would likely be longer.  Two reports (DiGuilio et al. 2011; EPA, 1987) have documented the presence of fracking fluid in aquifers and another found elevated chloride (Thyne 2008), linked to fracking, in wells, although the exact source and pathways had not been determined.

There is sufficient documented gas movement and circumstantial evidence regarding fluids movement to suggest that there is a potential for fracking fluid or shale-bed formation fluid to reach aquifers.  With the vastly increasing development of unconventional NG sources, the risk to aquifers could seemingly be increasing.  However, there is almost no data concerning the movement of contaminants along pathways from depth, either from wellbores or from deep formations, to aquifers.  The only way in the short term to explore the risk is with conceptual analyses.

To consider the potential transport from depth to aquifers, I have considered first the potential pathways for contaminant transport through bedrock between deep shale and surface aquifers, and the necessary conditions for such transport to occur.  Second, I have estimated contaminant travel times through the potential pathways, with a bound on these estimates based on formation hydrologic parameters, using interpretative MODFLOW-2000 computations.   The modeling does not, and cannot, account for all of the complexities of the geology, which could either increase or decrease the travel

times compared to those considered herein.  The intent of this study is to characterize the risk factors, so the modeling is used, similar to that by Hsieh (2011), to consider the possibilities.

 The Marcellus shale area of northern Pennsylvania and southern New York is the study area (Figure 1), although the concepts should apply anywhere there is a deep unconventional NG source separated from the surface by sedimentary rock.



Figure 2:  Location of Marcellus shale in northeastern United States.  Location of Marcellus wells (dots)  drilled July 2009 to June 2010 and total Marcellus shale wells in New York and West Virginia.  There are 4064 wells shown in Pennsylvania, 48 wells in New York, and 1421 wells in West Virginia.  Faulting in the area may be found in PBTGS (2001), Isachsen and McKendree (1977), and WVGES (2011, 2010a and 2010b).

## Method of Analysis

I consider several potential scenarios of transport from shale, 1500 m below ground surface to the surface, beginning with pre-development steady state conditions to establish a baseline and then scenarios considering transport after fracking has potentially caused contaminants to reach the overlying formations.  To develop the conceptual models and MODFLOW-2000 simulations, it is necessary first to consider the hydrogeology of the shale and the details of hydraulic fracturing, including details of how fracking changes the shale hydrogeologic properties.

### *Hydrogeology of Marcellus Shale*

Shale is a mudstone, a sedimentary rock consisting primarily of clay- and silt-sized particles, which tend to break in one direction (Nichols 2009).  It forms through the deposition of fine particles in a low energy environment, such as a lake- or seabed.  The Marcellus shale formed in very deep offshore conditions during Devonian time (Harper 1999) where only the finest particles had remained suspended.   Because sufficient organic matter settled with the clay and silt, anaerobic decomposition caused the formation of methane.  The depth to the Marcellus shale varies to as much as 3000 m in parts of Pennsylvania, and averages about 1500 m in southern New York.  Between the shale and the ground surface are layers of sedimentary rock, including sandstone, siltstone, and shale (NYSDEC 2011).

Marcellus shale has very low natural intrinsic permeability, on the order of $10^{-16}$ Darcies (Kwon et al. 2004a and 2004b; Neuzil 1994 and 1986), which makes it an extremely efficient seal, or capstone, for keeping natural gas in underlying sandstone.  At a gradient equal to 1 with an intrinsic permeability equal to $100x10^{-9}$ darcies, water would flow only 0.000025 m in a year.

Schulze-Makuch et al. (1999) described Devonian Shale of the Appalachian Basin, of which the Marcellus is a major part, as containing "coaly organic material and appear either gray or black" and being "composed mainly of tiny quartz grains < 0.005 mm diameter with sheets of thin clay flakes".  Median

particle size is 0.0069±0.00141 mm with a grain size distribution of <2% sand, 73% silt, and 25% clay. Primary pores are typically 5 x $10^{-5}$ mm in diameter, matrix porosity is typically 1% to 4.5% and fracture porosity is typically 0.078 to 0.09% (Schulze-Makuch et al. 1999 and references therein).

The Marcellus shale is fractured by faulting and contains synclines and anticlines which cause tension cracks (Engelder et al. 2009; Nickelsen 1986).  It is sufficiently fractured in some places to support water wells just six to ten km from where it is being developed for NG at 2000 m below ground surface (bgs) in eastern Lycoming County, Pennsylvania (Lloyd and Carswell 1981) (Figure 2).

Porous flow in unfractured shale is negligible due to the low bulk media permeability, but at larger scales the fractures control and may allow significant flow.  Conductivity scale dependency (Schulze-Makuch et al.1999) may be described as follows:

$$K = Cv^m$$

K is hydraulic conductivity (m/s), C is the intercept of a log-log plot of observed K to scale (the K at a sample volume of 1 $m^3$), V is sample volume ($m^3$), and m is a scaling exponent determined with log-log regression; for Devonian shale, C equals -14.3 and m equals 1.08 (Schulze-Makuch et al. 1999).  Most of their samples were small because the deep shale is not easily tested at a field-scale and no groundwater models have calibrated for flow through the Marcellus shale, therefore field scale K estimates are uncertain.  Considering a 1 km square area with 30 m thickness, the Kh would equal 5.96x$10^{-7}$ m/s (0.0515 m/d).  This effective K is low and the shale would be an aquitard, but a leaky one.

### Contaminant Pathways from Shale to the Surface

Three studies (Osborn et al. 2011; Thyne 2008; Breen et al. 2007) have found gas in near-surface water wells and suggested that the most likely cause was vertical transport of gas from depth, possibly linked to the presence of faults through which the gas could flow.  Osborn et al. (2011) found systematic

circumstantial evidence for higher methane concentrations in wells within 1 km of Marcellus shale gas wells that had been fracked.  Gas moves through fractures depending their width (Etiope and Martinelli 2001) and is a primary concern for many projects, including carbon sequestration (Annunziatellis et al. 2008) and natural gas storage projects (Breen et al. 2007).

Pathways for gas suggest pathways for fluids and contaminants, if there is a gradient.  Vertical hydraulic gradients of a up to a few percent, or about 30 m over 1500 m, exist throughout the Marcellus shale region as may be seen in various geothermal developments in New York (TAL 1981).  Brine more than a thousand meters above their evaporite source (Dresel and Rose 2010) is evidence of upward movement of contaminants from depth to the surface. The Marcellus shale, with salinity as high as 350,000 mg/l (Soeder 2010; NYDEC 2009), may be a primary brine source.  Relatively uniform brine concentrations over large areas (Williams et al. 1998) suggest widespread diffuse transport, which would occur if there is a sufficient concentration gradient.   The transition from briny to freshwater suggests a long-term equilibrium between the upward movement of brine and downward movement of freshwater.

Faults, which occur throughout the Marcellus shale region (Gold 1999), could provide pathways (Caine et al. 1996; Konikow 2011) for more concentrated advective and dispersive transport.  Brine concentrating in faults or anticline zones reflects potential preferential pathways (Wunsch 2011; Dresel and Rose 2010; Williams 2010; Williams et al. 1998).



Figure 3:  Marcellus shale wells and the Marcellus outcrop in Lycoming County, Pennsylvania.  The grey shading is the area of Marcellus shale, which outcrops along its boundary along an area about 1 km wide (Lloyd and Carswell 1981).  Faults from PBTGS (2001).

### Effect of Hydraulic Fracturing on Shale

Fracking increases the permeability of the targeted shale to make extraction of natural gas economically efficient (Engelder et al. 2009; Arthur et al. 2008).  Fracking creates fracture pathways with up to 9.2 million square meters of surface area in the shale accessible to a horizontal well (King 2010; King et al. 2008) and connects natural fractures (Engelder et al. 2009; King et al. 2008).  No post-fracking studies that documented hydrologic properties such as conductivity were found while researching this article (there is a lack of information about pre- and post-fracking properties (Schweitzer and Bilgesu 2009)), but it is reasonable to assume the K increases significantly because of the newly created and widened fractures.

Fully developed shale typically has wells spaced at about 300-m intervals (Krissane and Weissert 2011; Soeder 2010).  Up to eight wells may be drilled from a single well pad (NYDEC 2009; Arthur et al. 2008), although not in a perfect spoke pattern.  Reducing by half the effective spacing did not enhance overall productivity (Krissane and Weissert 2011) which indicates that 300–m spacing creates sufficient overlap among fractured zones to assure adequate gas drainage.  The properties controlling groundwater flow

45

would therefore be affected over a large area, not just at a single horizontal well or set of wells emanating from a single well pad.

Fracking is not intended to affect surrounding formations, but shale properties vary over short ranges (King 2010; Boyer et al. 2006) and out of formation fracking is not uncommon.  Fluids could reach surrounding formations just because of the volume injected into the shale, which must displace natural fluid, such as the existing brine in the shale.  For example, if 15 million liters is injected into shale over a 1000 m long horizontal well, the fluid could occupy all of the pore spaces within 7 to 16 m from the well for effective porosity ranging from 0.1 to 0.02.  Even with 20% of the fluid returning to the well, a significant amount of existing pore space would be occupied by the injected fluid, displacing the existing brine and gas.

**Analysis of Potential Transport along Pathways**

Fracking could cause contaminant to reach overlying formations either by fracking out of formation, connecting fractures in the shale to overlying bedrock, or by simple displacement of fluids from the shale into the overburden.  Advective transport will manifest if there is a significant vertical component to the regional hydraulic gradient.  Advective transport can be considered with the simple particle velocity determined with Darcy velocity and effective porosity.

Numerical modeling provides flexibility to consider potential conceptual flow scenarios, but should be considered interpretative (Hill and Tiedeman, 2007).  Numerical simulation presented herein was completed with the MODFLOW-2000 code (Harbaugh et al. 2000).  The simulation considers the rate of vertical transport of contaminants to near the surface for the different conceptual models, based on an expected, simplified, realistic range of hydrogeologic aquifer parameters.

MODFLOW-2000 is a versatile numerical modeling code, but it is not perfect for all of the factors required for this simulation.  The native water at depth near the shale is brine, much saltier than seawater, therefore the injected fluid would be lighter so buoyancy factors may speed the upward flux beyond the simple consideration of hydraulic gradient.  As more data becomes available, it may be useful to consider the added upward force caused by the brine by using the SEAWAT-2000 module (Langevin et al. 2003).

Vertical flow would be perpendicular to the general tendency for sedimentary layers to have higher horizontal than vertical conductivity.  Fractures and improperly abandoned wells would provide pathways for much quicker vertical transport than general advective transport.  This paper considers the fractures as vertical columns with cells having much higher conductivity than the surrounding bedrock. The cell discretization is fine, so the simulated width of the fracture zones is realistic.  Dual porosity modeling would not be useful because high velocity vertical flow through the fractures is unlikely. MODFLOW-2000 has a module, MNW (Halford and Hansen 2002), that could simulate flow through open bore holes.  Open boreholes would clearly provide rapid transport if the head deep in the borehole exceeds that near the surface or if fractures containing fracking fluid intersect or come close to the borehole.  Because it is possible to simply plug open boreholes, I have limited consideration here to fractures; however, models of well fields should include known boreholes.

The thickness of the formations and fault would affect the simulation, but much less than the several-order-of-magnitude variation possible in the shale properties.  The overburden and shale thickness were set equal to 1500 and 30 m, respectively, similar to that observed in southern New York.  The estimated travel times are proportional for thicker or thinner sections.  The overburden could be predominantly sandstone, sections of shale, mudstone, and limestone could exert local control.  The vertical fault is assumed to be 6 m thick.

There are five conceptual models of flow and transport of natural and post-fracking transport from the level of the Marcellus shale to the near-surface to consider with an interpretative numerical model.

1. The natural upward diffuse flow due to a head drop of 30 m from below the Marcellus shale to the ground surface, considering the variability in both shale and overburden K. This is a steady state solution for upward advection through a 30-m thick shale zone and 1500-m overburden and is a baseline condition for upward flow through unfractured sedimentary rock.

2. Same as number 1, but with a fracture zone connecting level of the shale with the surface. This emulates the conceptual model postulated for flow into the alluvial aquifers near stream channels, the location  of which may be controlled by faults (Williams et al 1998). The fault K varies from 10 to 1000 times the surrounding bulk sandstone K.

3. This scenario tests the effect of extensive fracturing in the Marcellus shale by increasing the shale K from 10 to 1000 times its native value over an extensive area. This transient solution starts with initial conditions being a steady state solution from scenario 1. The K in the shale layers increases from 10 to 1000 times at the beginning of the simulation, to represent the relatively instantaneous change on the regional shale hydrogeology imposed by the fracking. This scenario estimates both the changes in flux and the time for the system to come to equilibrium after fracking.

4. As number 3, considering the effect of the same changes in shale properties but with a fault as in number 2.

5. This scenario simulates the actual injection of 13 to 17 million liters of fluid in five days into fractured shale from a horizontal well with and without a fault.

*Model Setup*

The model domain was 150 rows and columns spaced at 3 m to form a 450 m square (Figure 3) with 50 layers bounded with no flow boundaries.  The 30-m thick shale was divided into 10 equal thickness layers from layer 40 to 49.  The overburden layer  thickness varied from 3 m just above the shale to layer 34, 6 m layer 29, 9 m to layer 26, 18 m in layer 25, 30 m to layer 17, 60 m to layer 6, 90 m to layer 3, and 100 m in layers 2 and 1

The model simulated vertical flow between constant head boundaries in layers 50 and 1, as a source and sink, so that the overburden and shale properties control the flow.  The head in layers 50 and 1 was 1580 and 1550 m, respectively, to create an upward gradient of 0.019 over the profile.  Varying the gradient would have much less effect on transport than changing K over several orders of magnitude and was therefore not done.

This simulation considers particle travel times between the top of the shale and the top of the model domain based on an effective porosity of 0.1.  A 6-m wide fault is added for some scenarios in the center two rows from just above the shale, layer 39 to the surface.  The fault is an attempt at considering fracture flow, but the simulation treats the six meter wide fault zone as homogeneous, which could underestimate the real transport rate in fracture-controlled systems.  The simulation also ignores diffusion between the fracture and the adjacent shale matrix (Konikow, 2011).

Scenario 5 simulates injection using a WELL boundary in layer 44, essentially the middle of the shale, from columns 25 to 125 (Figure 3).  It injects 15 million liters over one 5-day stress period, or 3030 m$^3$/d into 101 model cells at the WELL.  The modeled shale K was changed to its assumed fracked value at the beginning of the simulation.  Simulating high rate injection generates very high heads in the model domain, similar to that found simulating oil discharging from the well in the Deepwater Horizon crisis (Hsieh, 2011) and water quality changes caused by underground coal gasification (Contractor and El-

49

Didy 1989).  DRAIN boundaries on both sides of the WELL simulated return flow for sixty days after the completion of (Figure 3), after which the DRAIN was deactivated.  The sixty days were broken into four stress periods, 1, 3, 6, and 50 days long, to simulate the changing heads and flow rates.  DRAIN conductance was calibrated so that 20% of the injected volume returned within 60 days to emulate standard industry practice (Alleman 2008; NYSDEC 2009).  Recovery, continuing relaxation of the head at the well and the adjustment of the head distribution around the domain, occurred during the sixth period which lasted for 36,500 days, a length of time that simulation of scenarios 3 and 4 indicated would suffice.



Figure 4: Model grid through layer 44 showing the horizontal injection WELL (red) and DRAIN cells (yellow) used to simulate flowback.  The figure also shows the monitoring well.

There is no literature guidance to a preferred value for fractured shale storage coefficient, so I estimated S with a sensitivity analysis using scenario 3.  With fractured shale K equal to 0.001m/d, two orders of magnitude higher than the in-situ value, the time to equilibrium resulting from simulation tests of three fractured shale storage coefficients, $10^{-3}$, $10^{-5}$, and $10^{-7}$ m$^{-1}$, varied twofold (Figure 4).  The slowest time to equilibrium was for S=$10^{-3}$ m$^{-1}$ (Figure 4), which was chosen for the transient simulations because more water would be stored in the shale and flow above the shale would change the least.



Figure 5: Sensitivity of the modeled head response to the storage coefficient used in the fractured shale for model layer 39 just above the shale.

**Results**

***Scenario 1***

The travel time for a particle to transport through 1500 m of sandstone and shale equilibrates with one of the formations controlling advection (Figure 5).  For example, when the shale K equals 1x$10^{-5}$ m/d, transport time does not vary with sandstone K.  For sandstone K at 0.1 m/d, transport time for varying

shale K ranges from 40,000 years to 160 years.  The lower travel time estimate is for shale K similar to

that found by Schulze-Makuch et al. (1999). The shortest simulated transport time of about 20 years

results from both the sandstone and shale K equaling 1 m/d.  Other sensitivity scenarios emphasize the

control exhibited by one of the media (Figure 5).  If shale K is low, travel time is very long and not

sensitive to sandstone K.



Figure 6:  Sensitivity of particle transport time over 1500 m for varying shale and sandstone vertical K.  Effective porosity equals 0.1.  (1) – varying Kss, Ksh=10-5 m/d, (2) – varying Ksh, Kss= 0.1 m/d, (3) – varying Kss, Ksh = 0.1 m/d, (4): varying Kss, Ksh = 0.01 m/d, and (5): varying Ksh, Kss= 1.0 m/d.

### Scenario 2

Vertical transport time through a system including  a high-K fault zone was limited primarily by the shale

K, presumably because the fault K was one to two orders of magnitude more conductive than that of the

surrounding sandstone (Figure 6).  Including a fault increased the particle travel rate by about 10 times

(compare Figure 8 with Figure 6).  The fault K controlled the transport rate for shale K less than 0.01

m/d.  A highly conductive fault could transport fluids to the surface in as little as a year for shale K equal

to 0.01 m/d (Figure 6).



Figure 7:  Variability of transport through various scenarios of changing the K for the fault or shale.  Effective porosity equals 0.1.  (1): Vary Ksh, Kss=0.01 m/d; (2): Varying Ksh, Kss=0.1 m/d; (3), no fault; (4): Varying K fault, Kss=0.1 m/d, Ksh=0.01 m/d.  Unless specified, the vertical fault has K=1 m/d for variable shale K.

**Scenarios 3 and 4**

Scenarios 3 and 4 estimate the time to establish a new equilibrium for scenarios 1 and 2.  Equilibrium times would vary by model layer as the changes propagate through the domain, and flux rate for the simulated changes imposed on natural background conditions.  The fracking-induced changes cause a significant decrease in the head drop across the shale and the ultimate adjustment of the potentiometric surface to steady state depends on the new shale properties.

The time to equilibrium for one scenario 3 simulation, shale K changing from $10^{-5}$ to $10^{-2}$ m/d with sandstone K equal to 0.1 m/d, varied from 5.5 to 6.5 years, depending on model layer (Figure 7).  Near the shale (layers 39 and 40), the potentiometric surface increased from 23 to 25 m reflecting the decreased head drop across the shale.  One hundred meters higher in layer 20, the head increased about 20 m.  These changes reflect the decrease in K across the shale.  Simulation of scenario 4, with a fault with K=1 m/d, decreased the time to equilibrium to from 3 to 6 years within the fault zone,

53

depending on model layer (Figure 7).  Faster transport occurred only in areas near the fault.  Highly fractured sandstone would allow more vertical transport, but diffused advective flow would also increase so that the base sandstone K would control the overall rate.

The flux across the upper boundary changed within 100 years for scenario 3 from 1.7 to 345 m$^3$/d, or 0.000008 m/d to 0.0017 m/d.  There is little difference in the equilibrium fluxes between scenario 3 and 4 indicating that the fault primarily affects the time to equilibrium rather than the long-term flow rate.



Figure 8: Monitoring well water levels for specified model layers due to fracking of the shale; monitor well in the center of the domain, including in the fault, K of the shale changes from 0.00001 to 0.01 m/d at the beginning of the simulation.

### Scenario 5: Simulation of Injection

The injection scenarios simulate 15 million liters entering the domain at the horizontal well and the subsequent potentiometric surface and flux changes throughout.  The highest potentiometric surface

increases (highest injection pressure) occurred at the end of injection (Figure 8), with a 2400 m mound at the horizontal well.  The peak pressure simulated both decreased but occurred longer after the cessation of injection with distance from the well (Figure 8).  The pressure at the well returned to within a meter of pre-injection levels in about 95 days (Figure 8).  After injection ceases, the peak pressure simulated further from the well occurs longer from the time of cessation, which indicates there is a pressure divide beyond which fluid continues to flow away from the well bore while within which the fluid flows toward the well bore.  The simulated head returned to near pre-injection levels slower with distance from the well (Figure 9), with levels at the edge of the shale (layer 40) and in the near-shale sandstone (layer 39) requiring several hundred days to recover.  After recovering from injection, the potentiometric surface above the shale increased in response to flux through the shale adjusting to the change in shale properties (Figure 9), as simulated in scenario three.  The scenario required about 6000 days (16 years) for the potentiometric surface to stabilize at new, higher, levels (Figure 9).  Removing the fault from the simulation had little effect on the time to stabilization, and is not shown.



Figure 9:  Simulated potentiometric surface changes by layer for specified injection and media properties: Kss=0.01 m/d, Ksh = 0.001 m/d, Kfault = 1 m/d.  S(fractured shale) = 0.001 m$^{-1}$, S(ss) = 0.0001 m$^{-1}$

55



Figure 10: Simulated potentiometric surface changes for layers within the shale and sandstone. CW is center monitoring well and EW is east monitoring well, about 120 m from the centerline. Fault is included. The line for Layer 2, CW plots beneath the line for Layer 2, EW. Kss = 0.01 m/d, Kshale = 0.001 m/d, Kfault=1m/d, S(fractured shale) = 0.001 m$^{-1}$, S(ss) = 0.0001 m$^{-1}$

Prior to injection, the steady flow for in-situ shale (K=10$^{-5}$ m/d) was generally less than 2 m$^3$/d and varied little with sandstone K (Figure 5). Once the shale was fractured, the sandstone controlled the flux which ranges from 38 to 135 m$^3$/d as sandstone K ranges from 0.01 to 0.1 m/d (Figure 10), resulting in particle travel times of 2390 and 616 years, respectively. More conductive shale would allow faster transport (Figure 8). Adding a fault to the scenario with sandstone K equal to 0.01 m/d increased the flux to about 63 m$^3$/d with 36 m$^3$/d through the fault (Figure 10) and decreased the particle travel time to 31 from 2390 years. The fault properties control the particle travel time, especially if the fault K is two or more orders of magnitude higher than the sandstone.



Figure 11: Various fluxes for three separate scenarios. Flowback is the same for all scenarios. (1): Kss=0.01 m/d, Kshale = 0.001 m/d, Fault K = 1 m/d; (2): Kss = 0.01 m/d, Kshale = 0.001 m/d, no fault; (3) Kss= 0.1 m/d, Kshale = 0.001 m/d, no fault.

Simulated flowback varied little with shale K because it had been calibrated to be 20 percent of the injection volume. A lower storage coefficient or higher K would allow the injected fluid to move further from the well, which would lead to less flowback. Lower K would also lead to higher injection pressure which in turn would fracture the shale more.

Vertical flux through the overall section with a fault varies significantly with time, due to the adjustments in potentiometric surface. One day after injection, vertical flux exceeds significantly the pre-injection flux about 200 m above the shale (Figure 11). After 600 days, the vertical flux near the shale is about 68 $m^3$/d and in layer 2 about 58 $m^3$/d; it approaches steady state through all sections after 100 years with flux equaling about 62.6 $m^3$/d. The 100-year steady flux is about 61.5 $m^3$/d higher than the pre-injection flux because of the changed shale properties.



Figure 12: Upward flux across the domain section as a function of distance above the top of the shale layer.  Cross section is 202,500 m$^2$.

**Discussion**

The interpretative modeling completed herein has revealed several facts about fracking.  First, MODFLOW can be coded to adequately simulate fracking.  Simulated pressures are high, but velocities even near the well do not violate the assumptions for Darcian flow.  Second, injection for five days causes extremely high pressure within the shale that decreases with distance from the well.  The time to maximum pressure away from the well lags the time of maximum pressure at the well.  The pressure drops back to close to its pre-injection level at the well within 90 days, indicating the injection affects the flow for significantly longer periods than just during the fracking operation.  Although the times may vary based on media properties, the difference would be at most a month or so, based on the various combinations of properties simulated. The system transitions within six years due to changes in the shale properties.  The same order of magnitude would apply to changes in shale properties from less to more conductive.  The equilibrium transport rate would transition from a system requiring thousands of years to one requiring hundreds of years or less within less than ten years.

Third, most of the injected water in the simulation flows vertically rather than horizontally through the shale.  This reflects the higher sandstone K 20 m above the well and the no flow boundary within 225 m laterally from the well, which emulates in-situ shale properties that would manifest at some distance in the shale.

Fourth, the interpretative model accurately and realistically simulates long-term steady state flow conditions, with an upward flow that would advect whatever conservative constituents exist at depth.  Using low, unfractured K values, the transport simulation may correspond with advective transport over geologic time although there are conditions for which it would occur much more quickly (Figure 5).  If the shale K is 0.01 m/d, transport could occur on the order of a few hundreds of years.  Faults through the overburden could speed the transport time considerably.  Reasonable scenarios presented herein suggest the travel time could be decreased further by an order of magnitude.

Fifth, fracking increases the shale K by several orders of magnitude.  The regional hydrogeology changes due to the increased K.  Vertical flow could change over broad areas if the expected density of wells in the Marcellus shale region (NYSDEC 2011) actually occurs.

Sixth, fault fracture zones coming close to contacting the newly-fractured shale could allow contaminants to reach surface areas in tens of years.  Faults can decrease the simulated particle travel time several orders of magnitude.

**Conclusion**

Fracking can release fluids and contaminants from the shale either by changing the shale hydrogeology or simply by the injected fluid forcing other fluids out of the shale.  The complexities of contaminant transport from hydraulically fractured shale to near-surface aquifers render estimates uncertain, but a range of interpretative simulations suggest that transport times could be decreased from geologic time

scales to as few as tens of years.  Preferential flow through fractures could further decrease the travel times to as little as just a few years.

There is no data to verify either the pre- or post-fracking properties of the shale.  The evidence for potential vertical contaminant flow is strong, but there are also almost no monitoring systems that would detect contaminant transport as considered herein.  Several improvements could be made.

- Prior to hydraulic fracturing operations, the subsurface should be mapped for the presence of faults and measurement of their properties
- A reasonable setback distance from the fracking to the faults should be established.  The setback distance should be based on a reasonable risk analysis of fracking increasing the pressures within the fault.
- The properties of the shale should be verified, post-fracking, to assess how the hydrogeology will change.
- A system of deep and shallow monitoring wells and piezometers should be established in areas expecting significant development, before that development begins (Williams 2010).

**Acknowledgements**

This research was funded by the Park Foundation and Catskill Mountainkeepers.  The author thanks Anthony Ingraffea, Paul Rubin, and Evan Hansen for helpful comments on the paper.

# References

Alleman, D. 2011.  Water Used for Hydraulic Fracturing: Amounts, Sources, Reuse, and Disposal, in *Hydraulic Fracturing of the Marcellus Shale*. National Groundwater Association, in Baltimore, MD.

Annunziatellis, A., S.E. Beaubien, S. Bigi, G. Ciotoli, M. Coltella, and S. Lombardi. 2008.  Gas migration along fault systems and through the vadose zone in the Latera calder (central Italy): Implications for CO2 geological storage.  *International Journal of Greenhouse Gas Control* 2, 353-372. Doi:10.1016/j.ijggc.2008.02.003.

Arthur, J.D., B.Bohm, and M. Layne. 2008.  *Hydraulic fracturing consideration for natural gas wells of the Marcellus Shale*.  Ground Water Protection Council, Cincinnati, September 21-24, 2008.

Boyer, C., J. Kieschnick, R. Suarez-Rivera, R.E. Lewis, and G. Waters. 2006.  Producing gas from its source. *Oilfields Review*, Autumn 2006.

Breen, K.J., K. Revesz, F.J. Baldassare, and S.D. McAuley. 2007.  *Natural Gases in Ground Water near Tioga Junction, Tioga County, North-Central Pennsylvania – Occurrence and Use of Isotopes to Determine Origins, 2005*.  U.S. Geological Survey, Scientific Investigations Report Series 2007-5085.  Reston, VA.

Caine, J.S., J.P. Evans, C.B. Forster. 1996.  Fault zone architecture and permeability structure.  *Geology* 24, n. 11: 1025-1028.

Contractor, D.N. and S. M.A. El-Didy. 1989.  Field application of a finite-element water-quality model to a coal seam with UCG burns.  *Journal of Hydrology* 109, 57-64

DiGiulio, D.C., R.T. Wilkin, C. Miller, and G. Oberly. 2011.  DRAFT:  Investigation of Ground Water Contamination near Pavillion, Wyoming.   U.S. Environmental Protection Agency, Office of Research and Development, Ada, OK.

Dresel, P. E., and Rose, A. W., 2010. *Chemistry and origin of oil and gas well brines in western Pennsylvania: Pennsylvania Geological Survey, 4th ser*., Open-File Report OFOG 10–01.0, 48 p. Pennsylvania Geological Survey, Harrisburg.

 (EIA) Energy Information Administration. 2009. *Annual Energy Outlook with Projections to 2030.* U.S. Dept of Energy. http://www.eia.doe.gov/oiaf/aeo/ (accessed May 23, 2011).

Engelder, T. G.G. Lash, and R.S. Uzcategui. 2009. Joint sets that enhance production from Middle and Upper Devonian gas shales of the Appalachian Basin. *AAPG Bulletin* 93, no. 7: 857-889.

(EPA) Environmental Protection Agency. 1987. *Report to Congress, Management of Wastes from the Exploration, Development, and Production of Crude Oil, Natural Gas, and Geothermal Energy, Volume 1 of 3, Oil and Gas*. Washington, D.C.

Etiope, G., and G. Martinelli. 2002. Migration of carrier and trace gases in the geosphere: an overview. *Physics of the Earth and Planetary Interiors* 129, no. 3-4: 185-204.

Fisher, K, and N. Warpinski. 2011. Hydraulic fracture-height growth: real data. Paper SPE 145949 presented at the Annual Technical Conference and Exhibition held in Denver, CO, October 30 – November 2, 2011. Doi: 10.2118/145949-MS

Gold, D. 1999. Lineaments and their interregional relationships. Chapter 22 in: Schultz, C.H. (ed.). *The Geology of Pennsylvania*. Pennsylvania Department of Conservation and Natural Resources, Harrisburg.

Halford, K.J., and R.T. Hanson. 2002. User Guide for the Drawdown-Limited, Multi-Node Well (MNW) Package for the U.S. Geological Survey's Modular Three-Dimensional Finite-Difference Ground-Water Flow Model, Versions MODFLOW-96 and MODFLOW-2000. U.S. Geological Survey Open-File Report 02-293. Sacramento, CA. 33 p.

Harbaugh, A W., E. R. Banta, M.C. Hill, and M.G. McDonald. 2000. *Modflow-2000, The U.S. Geological Survey Modular Ground-Water Model—User Guide to Modularization, Concepts and the Ground-Water Flow Process.* U.S. GEOLOGICAL SURVEY, Open-File Report 00-92. Reston, VA.

Harper, J.A. 1999. Devonian. Chapter 7 in: Schultz, C.H. (ed.). *The Geology of Pennsylvania*. Pennsylvania Department of Conservation and Natural Resources, Harrisburg.

Hill, M.C., and C.R. Tiedeman. 2007. *Effective Groundwater Model Calibration: With Analysis of Data, Sensitivities, Predictions, and Uncertainty.* John Wiley and Son, Inc.

Hsieh, P.A. 2011. Application of MODFLOW for oil reservoir simulation during the Deepwater Horizon crisis. *Ground Water* 49, no. 3: 319-323. doi: 10.1111/j.1745-6584.2011.00813.x

Isachsen, Y.W., and W. McKendree. 1977. *Preliminary Brittle Structure Map of New York, Map and Chart Series No. 31.* New York State Museum.

Jehn, P. 2011. Well and Water Testing – What to Look for and When to Look for It. In: *Groundwater and Hydraulic Fracturing of the Marcellus Shale.* National Groundwater Association, Baltimore MD, May 5, 2011.

King, G. 2010. Thirty Years of Gas Shale Fracturing: What Have We Learned? *SPE Annual Technical Conference and Exhibition*, 19-22 September 2010, Florence, Italy

King, G.E., L. Haile, J. Shuss, and T.A. Dobkins. 2008. Increasing fracture path complexity and controlling downward fracture growth in the Barnett shale. *SPE Shale Gas Production Conference*, 16-18 November 2008, Fort Worth, Texas, USA

Konikow, L.F. 2011. The secret to successful solute-transport modeling. *Ground Water* 49, no. 2:144-159.

Kramer, D. 2011.  Shale-gas extraction faces growing public and regulatory challenges.  *Physics Today* 64, no. 7: 23-25.

Krisanne, E.L., and S. Weisset. 2011.  Marcellus shale hydraulic fracturing and optimal well spacing to maximize recovery and control costs.  *SPE Hydraulic Fracturing Technology Conference*, 24-26 January 2011, The Woodlands, TX.

Kwon, O., A.K.Kronenberg, A.F. Gangi, B. Johnson, and B.E. Herbert. 2004a. Permeability of illite-bearing shale: 1. Anisotropy and effects of clay content and loading.  *Journal of Geophysical Research* 109:B10205, doi:10.1029/2004/JB003052.

Kwon, O., B.E. Herbert, and A.K. Kronenberg. 2004b. Permeability of illite-bearing shale: 2. Influence of fluid chemistry on flow and functionally connected pores.  *Journal of Geophysical Research* 109, B10206. Doi:10.1029/2004JB003055.

Langevin, C.D., W.B. Shoemaker, and W. Guo. 2003.  MODFLOW-2000, the U.S. Geological Survey Modular Ground-Water Model – Documentation of the SEAWAT-2000 Version with the Variable-Density Flow Process (VDF) and the Integrated MT3DMS Transport Process (IMT).  U.S. Geological Survey Open-File Report 03-426.  Tallahassee FL.  43 p.

Loyd, O.B., and L.D. Carswell. 1981. *Groundwater resources of the Williamsport region, Lycoming County, Pennsylvania*, Water Resources Report 51.  Pennsylvania Dept. of Environmental Resources.

Neuzil, C.E. 1994.  How permeable are clays and shales?  *Water Resources Research* 30, no. 2: 145-150.

Neuzil, C.E. 1986. Groundwater flow in low-permeability environments.  *Water Resources Research* 22, no. 8: 1163-1195.

Nickelsen, R.P. 1986. Cleavage duplexes in the Marcellus Shale of the Appalachian foreland. *Journal of Structural Geology* 8, no. ¾: 361-371.

Nichols, G. 2009. *Sedimentology and Stratigraphy, 2nd edition.* Wiley-Blackwell.

(NYDEC) New York State Department of Environmental Conservation. 2009. *Draft Supplemental Generic Environmental Impact Statement on the Oil, Gas and Solution Mining Regulatory Program—Well Permit Issuance for Horizontal Drilling and High-Volume Hydraulic Fracturing to Develop the Marcellus Shale and Other Low-Permeability Gas Reservoirs.* Albany, NY, New York State Department of Environmental Conservation.

(NYDEC) New York State Department of Environmental Conservation. 1992. *Final Generic Environmental Impact Statement on the Oil, Gas and Solution Mining Regulatory Program.* Albany, NY, New York State Department of Environmental Conservation.

(ODNR) Ohio Department of Natural Resources. 2008. *Report on the Investigation of the Natural Gas Invasion of Aquifers in Bainbridge Township of Geauga County, Ohio.* ODNR, Division of Mineral Resources Management.

Osborn, S.G., A. Vengosh, N.R. Warner, and R.B. Jackson. 2011. Methane contamination of drinking water accompanying gas-well drilling and hydraulic fracturing. *Proceedings of the National Academy of Sciences* pnas.1100682108.

Osborn, S.G., and J.C. McIntosh. 2010. Chemical and isotopic tracers of the contribution of microbial gas in Devonian organic-rich shales and reservoir sandstones, northern Appalachian Basin. Applied Geochemistry 25(3): 456-471.

(PADEP) Pennsylvania Department of Environmental Protection. 2011. *Marcellus Shale,* http://www.dep.state.pa.us/dep/deputate/minres/oilgas/new_forms/marcellus/marcellus.htm.

(PADEP) Pennsylvania Department of Environmental Protection. 2009.  Notice of Violation, Re: Gas Migration Investigation, Dimock Township, Susquehanna County, Letter from  S. C. Lobins, Regional Manager, Oil and Gas Management, to Mr. Thomas Liberatore, Cabot Oil and Gas Corporation.  February 27,2009.

(PBTGS) Pennsylvania Bureau of Topographic and Geologic Survey. 2001.  *Bedrock Geology of Pennsylvania (digital files)*.  PA Department of Conservation and Natural Resources.

Schoell, M. 1980.  The hydrogen and carbon isotopic composition of methane from  natural gases of various origins.  Geochemica et Cosmochiica Act. 44(5): 649-661.

Schulze-Makuch, D., D.A. Carlson, D.S. Cherkauer, and P. Malik.  1999.  Scale dependence of hydraulic conductivity in heterogeneous media.  *Ground Water* 37, no. 6: 904-919

Schweitzer, R. and H.I. Bilgesu.  2009. The Role of Economics on Well and Fracture Design Completions of Marcellus Shale Wells.  *Society of Petroleum Engineers Eastern Regional Meeting*, September 23-25, 2009.  Charleston WV.

Soeder, D.J. 2010.  The Marcellus Shale: Resources and Reservations.  *EOS* 91, no. 32: 277-278.

(TAL) T.A.L. Research and Development. 1981.  *Geology, Drill Holes, and Geothermal Energy Potential of the Basal Cambrian Rock Units of the Appalachian Basin of New York State*.  Prepared for New York State Energy Research and Development Authority.  54 p.

Thyne, G. 2008.  *Review of Phase II Hydrogeologic Study*.  Prepared for Garfield County, Colorado. 26 p.

White, J.S., and M.V. Mathes. 2006.  Dissolved-gas concentration in ground water in West Virginia.  U.S. Geological Survey Data Series 156, 8 p.

(WVGES) West Virginia Geological and Economic Survey. 2011. *Completed Wells – Marcellus Shale, West Virginia*. Morgantown, WV.

(WVGES) West Virginia Geological and Economic Survey. 2010a. *Structural Geologic Map (Faults) – Topo of the Onondaga Limestone or Equivalent, West Virginia*. Morgantown, WV.

(WVGES) West Virginia Geological and Economic Survey. 2010b. *Structural Geologic Map (Folds) – Topo of the Onondaga Limestone or Equivalent, West Virginia*. Morgantown, WV.

Williams, J.H. 2010. *Evaluation of well logs for determining the presence of freshwater, saltwater, and gas above the Marcellus Shale in Chemung, Tioga, and Broome Counties, New York*: U.S. Geological Survey Scientific Investigations Report 2010–5224, 27 p. Reston, VA.

Williams, J.H., L.E. Taylor, and D.J. Low. 1998. *Hydrogeology and Groundwater Quality of the Glaciated Valleys of Bradford, Tioga, and Potter Counties, Pennsylvania*, Water Resource Report 68. Pennsylvania Dept of Conservation and Natural Resources and U.S. Geological Survey.

Wunsch, D. 2011. Hydrogeology and Hydrogeochemistry of Aquifers Overlying the Marcellus Shale. In: *Groundwater and Hydraulic Fracturing of the Marcellus Shale*, National Groundwater Association. Baltimore MD, May 5, 2011.

**Appendix C**

**Review of NYSERDA Commissioned Review of Myers Comments on the 2009 DSGEIS**

Prepared by:  Tom Myers

11/30/11


**Introduction**

The New York State Energy and Resource Development Agency (NYSERDA) commission Alpha Geosciences (Alpha) to complete a review of the comments I had prepared for the 2009 Draft Supplemental Generic Environmental Impact State (DSGEIS).  This report replies to some of those review comments.  Throughout, I refer to the review as "Alpha".

**General Points**

Alpha divided my comments into various subsets for their response, but they rely very much on several points throughout their response.  One is their perception of there being no hydraulic connection between groundwater at depth, in the Marcellus shale, and the near-surface aquifers; they also dismiss the analysis from ICF (2009) on the same basis, even though they have no data with which to dismiss the argument.  Their second line of reasoning is the results or conclusions from the 2004 EPA study of coal bed methane fracking.

Alpha rejects the suggestion that a water balance for the project area or subareas "would not serve the purpose of the SGEIS" (Alpha, at 4).  They provide no reason for this conclusion, but also state that a "water balance clearly is site-specific" (Id.).  A water balance can be useful for any size study area or portion of the study area.  A water balance for the overall study area would help to understand the total volume of water involved in fracking; a similar argument can be made for a watershed – a water balance for the groundwater would help to understand whether the water amounts used for fracking is a substantial portion of the local water balance.

Alpha partially rejects my suggestion that a better description of the area's hydrogeology is needed by quoting my statement that "the Marcellus Shale is 'notoriously heterogeneous'" (Alpha, at 4).  The request for a better description pertains to the overall area, not specifically the Marcellus shale.  Additionally, the statement supports the concept that reported permeability values for the shale may not be representative and that broader scale description are required.

**Hydraulic Connection between Shale and Surface**

Alpha argues that the "target shales exist as an isolated system from the overlying fresh water-bearing units" (Alpha, at 4).  "Isolated" overstates the case even for natural conditions, although the connection may be limited, as I accepted in 2009.  Alpha claims that the "shales … are not part of, and are not connected to, the regional hydrogeological systems.  Their baseline geologic evidence that fluid

68

migration to overlying fresh water aquifers is improbable includes studies that show the Marcellus shale has remained isolated from overlying formations for millions of years" (Alpha, at 5). Alpha does not directly provide citations for these "studies", but in the next sentence references the "facts that these units are 'overpressured' and that natural gas and saline water has remained trapped ... for millions of years" (Id.) to two industry studies and the GEIS. This all ignores the science, cited in Myers (in review) of the upward movement and artesian pressure, observed during geothermal exploration, in formations above the shale. The salt in the shale may be the source of the salt in overlying formations, with the upward movement of salt balanced by the downward movement of freshwater recharge. This balance could be substantially upset by the changes wrought by fracking on the shale.

The "overpressuring" of the shale does not prove that the shale itself is isolated. Overpressuring is due to the gas being contained in the low permeability, very small pore spaces of the shale. Once fracked, the overpressuring may provide an initial source for water to flow into the formations above the shale.

The isolation argument is invoked again, by Alpha, at 11&12, 20, and 33.

My discussion relied and continues to rely for the 2011 rDSGEIS on the fact that fracking will change those conditions, changing the shale from an almost impervious aquitard into a low-conductivity formation; the previously isolated formation water will no longer be "isolated" because fracking fluid injection will push some into surrounding formations. The "overpressuring" in the shale may suggest that the shale itself is isolated at least in places. Myers' (2009 and in review) argument relies on the connection in the formation above the shale. Once fracked, the shale will have a much higher permeability so that fluids in the shale can move into surrounding formations within which the general groundwater flow will control.

Alpha refers to the fact that shallow water wells may be hydrofractured as "additional evidence that natural fractures and structures are not necessarily transmissive" (Alpha, at 4 and 37). This is a comparison of "apples and oranges". Hydrofracturing water wells may be done to increase their yield when screened in low-transmissivity formations; fracking water wells is done to increase the well yield from a few gallons per minute. The transmissivity of unfracked shale is orders of magnitude less than that in the formations in which a water well may have been screened. The cause for fracking in water wells differs from the cause for fracking a gas well; the comparison is irrelevant and proves nothing about the isolated nature of shale.

A further reliance on "overpressuring" is demonstrated (Alpha, at 5) where Alpha notes that eight research wells in the Marcellus shale had pressure gradients of 0.46 to 0.51 psia/ft when hydrostatic pressure is 0.433 psia/ft. That waters remain contained in the shale even with this overpressuring demonstrates their isolation. Once fracking hydraulically connects the shale with the overlying formations, the overpressuring is a source of pressure that would cause an upward gradient. The pressure would likely dissipate with time, but it would also cause an upward gradient after fracking.

Alpha indicates that my "hypothetical pathway ... to ground water is along faults and fractures that intersect the Marcellus or induced fractures that extend beyond the target formation" (Alpha, at 5). This mischaracterizes the argument in two ways.  First, it ignores the potential flow through the bulk media, through the primary porosity of the formations; this pathway would be slower, but flow is possible if there is a connection (Myers, in review) with the newly fractured shale.  Myers (in review) found this flow to require from 100s to 1000s of years for contaminant transport.  Second, natural faults and fractures do not have to "intersect" the shale, just reach its edge.  Fluids within the shale would access the natural fractures above the shale, once fracked; the overpressuring would provide an added gradient for flow from the shale to surrounding formations, once fracking releases the fluids.

Alpha's second point is correct; out-of-formation fractures would provide an additional pathway. Although Alpha continues to suggest that out-of-formation fracking is rare, in their view, more current evidence is that it occurs frequently and extends as much as 2000 feet above the target formation (Fischer 2010); Alpha even references a personal communication from Fisher (Alpha, at 24) to recommend that the "SGEIS acknowledge that hydrofracturing has been shown to induce fractures beyond the target formation" (Id.).  It appears that Alpha is not familiar with up to date literature or science.

Alpha rejects the "suggestion of 'head level maps'" that I had suggested in 2009 based on their rejection of the concept of saturated conditions from the "top of the target zone to the land surface" (Alpha, at 20).  If there is no connection, groundwater levels will show nothing.  They also note the isolation argument (at 20, 21) to reject the need for head level maps.  Head level maps as recommended by Myers (2009) would confirm or deny the presence of upward head gradients in the formations above the shale.  Once released by fracking, contaminants could advect along the flow paths which would be delineated by the hydraulic gradient.  Although the fracking itself will change the gradient and potentially increase the potential upward flow, mapping the groundwater levels would assist the NYSDEC in determining where transport is possible.  Alpha's recommendation is to basically ignore science and ignore the possibility of upward flow. Alpha replied to my comment suggesting that the rDSGEIS discuss properties resulting from fracking by discussing the direction that fractures would take in the shale (Alpha, at 15).  My comments indicated that the rDSGEIS should include hydrogeologic properties, therefore Alphas reply was not responsive to the comment.  Alpha's response that my "argument that the fractures will extend to and connect overlying fractures or paleofractures contradicts rock mechanics principles and field observations" is countered by the recent data in Fisher (2010) showing out-of-formation fracking.  Alpha is unclear and provides no references as to how the comments contradict "rock mechanics principles".

I had also recommended that the NYSDEC require the industry to monitor post fracking shale properties. Alpha states that "[f]racture monitoring is required by the Proposed Supplementary Permit Conditions ... (#33 and #34)" (Alpha at 16).   That is incorrect; those permit conditions require the driller report on recorded operations during fracking, including pressure and the amount of injected, but that is not the same thing as doing post-frack monitoring, which could include microseismic surveys or core sampling. They also suggest that "[f]racture monitoring also can be evaluated on a well-specific basis using the

70

same criteria as the requirement to collect core samples and well logs" (Alpha, at 16).  Those requirements are for pre-fracking conditions, not post-fracking.

**Myers' Groundwater Modeling and ICF Analytical Modeling**

I prepared (Myers 2009) an interpretative numerical groundwater model to consider whether and over what time frame flow could occur from the shale to freshwater aquifers.  The "theory supporting Myers' model" is NOT from Hill and Tiedeman (2007) (Alpha, at 23).  The reference is to the concept of "interpretative" modeling as opposed to a calibrated, predictive model.  "Myers acknowledges that his model is not calibrated and cannot be used for predictive purposes" (Alpha, at 12).  An interpretative model is not used for prediction, so Alpha's attack on the model is an attack here is irrelevant.  The model does assume that the interburden between the ground surface and top of the shale is saturated, but not through the "isolated shale gas formations" (Id.).  Again, the modeling is of the interburden and the shale, once it is fracked to its edge or beyond, is a boundary or a source of both fluids and contaminants.  Or, flow through the shale is estimated based on its extremely low in-situ conductivity.

The numerical model I used in 2009 was not "to support [my] opinion" (Id.) but to test my conceptualization as to whether the flow was possible and under what conditions. Alpha criticizes the fact the model "oversimplifies ground water flow and transport".  All groundwater models simplify flow; simple applications of Darcy's law are the most oversimplified analyses.  The addition of secondary permeability, or fracture flow, to a contaminant transport analysis usually increases the rate that contaminants move, thus my estimated times should be low.

Alpha asserts that my "offered alternate model is not technically defensible" apparently based on their perceived lack of a hydraulic connection.  They state that an assumption of a hydraulic connection "contradicts decades of hydrofracturing data and experience in the U.S." (Alpha, at 11) without referencing or outlining the data in support of their contention. They also claim that my analysis is based on "the entire bedrock stratigraphic column [being] highly fractured" (Alpha, at 12).  This statement does not reflect the analysis in Myers (2009), for reasons noted above - the conductivity values used for the formations between the shale and surface were based on observed primary conductivity values (Anderson Woessner 1992), not fractured values.

ICF's flow equations are correct (Alpha at 11), but the problem is how they were parameterized and time frame they were applied over.  As Myers (2009) discussed, the relevant gradient is not from the well to the aquifers, but from the well to just beyond the influence of the spreading injected fracking fluid, the point at which the background pressure has not changed.  Also, the conductivity parameters for the formations between the shale and the aquifers do not reflect fractures, unless specifically parameterized as such.  The parameters reflect standard textbook bulk conductivity values for sandstone.

**Vertical Contaminant Transport**

I had argued that "natural gradients" would allow vertical contaminant transport of frack fluid through advection.  Alpha claims that "Engelder refutes that injected frac water would migrate vertically upward

71

in his slide-presentation review of others" (Alpha, at 24). Aside from the confusing phrase, "slide-presentation review of others", this line of reasoning cannot be correct because frack fluid is lighter than the high-TDS brine found in the shale; buoyancy due to frack fluid being lighter than brine would enhance its upward movement. The movement of high-TDS formation water could be inhibited by its denser nature, but the point is that upward hydraulic gradients cause the flow. The overpressuring discussed above is proof of these upward gradients and suggestive that fracking would release some of this pressure into the formations lying above.

Engelder's "principle of viscosity" (Id.) may apply "to ground water as well as gases", but the fact that low viscosity gases have been contained from vertical migration for millions of years does not mean that fracking will not release contaminants that could migrate upward much quicker. The relevant "containment" is provided in the shale and has nothing to do with the properties of overlying formations. Shale has contained gas for millions of years; fracking will cause that gas to be released in 30 to 50 years (the length of time most wells will produce). This can only occur if the properties that contain the gas will vastly change.

### Leaks from Well Bores

The DSGEIS had implied that leaks do not occur from properly-constructed wells, but did not specify how often wells are found to not be properly constructed, and I requested (Myers 2009) that they provide an estimate of the times the wells are not properly constructed. Alpha responded with a quote from an industry source that estimated risk from failures to properly constructed wells is less than one in 50 million (Alpha, at 32). Alpha should have included the entire paragraph from which they selectively chose their quote, because it indicates the wells considered are class II injection wells and are properly constructed. Fracking wells experience a much higher, although much shorter, pressure during operations. They also should realize that the comment had to do with wells that are improperly constructed, because most failures, those that have allowed gas into groundwater, have resulted from improperly constructed wells.

Alpha also protests too much when they discuss my examples of gas in water wells (Alpha, at 33, 34). Incidents not related specifically to fracking are relevant because they show that the gas does move long distances through the groundwater, regardless of the source. Coal bed methane development relies on the gas moving through the groundwater, in coal seams, to the production wells; those production wells commonly pump as much water as do water wells, so, if gas is present to move to the water wells, the conceptual model for flow to water wells is similar. The point has to do with gas moving through aquifers due to any source – direct from the shale or a leak from the well bore.

### Comparison to CBM Wells

Alpha used the conclusion to the EPA's 2004 CBM study, that fracking in coal seams poses little or no threat to underground sources of drinking water (Alpha, at 20) to support their conclusion that I had ignored relevant data (EPA's study) and that my arguments were fallacious because CBM wells are a much higher risk. They also state that "[c]oalbed hydrofracturing events approximate conditions where shale hydrofracturing is performed closest to ground water resources" (Id.). This is simply not true, and

it directly contradicts the conditions that the EPA put on their conclusion.  EPA relied on the nature of CBM wells for their conclusion. "Although potentially hazardous chemicals may be introduced into USDWs when fracturing fluids are injected into coal seams that lie within USDWs, the risk posed to USDWs by introduction of these chemicals is **reduced significantly by groundwater production and injected fluid recovery**, combined with the mitigating effects of dilution and dispersion, adsorption, and potentially biodegradation" (EPA, 2004, at 7-5, emphasis added).

In fracked shale, there is no intentional "injected fluid recovery" brought about by pumping the injection wells, as in CBM wells.  CBM wells pump water toward the gas well; this pumping decreases the hydrostatic pressure which releases the gas from the coal.  Water and contaminants in the coal seam flows toward the CBM well.  If there were contaminants in the coal, they would be drawn toward the CBM well.

Fracking in a coal seam would require much less pressure as well which would cause less out-of-formation fractures, which would limit the chance for out-of-formation fractures to occur.  Additionally, EPA relies on the "high stress contrast between adjacent geologic strata" as a barrier to fracture propagation.  The fact the coal is softer and the seams are much shallower and require much less fracking pressure helps to limit the fractures to the coal, much in contrast to shale seams (Fisher, 2010).

Finally, although the EPA's reasoning is reasonable, their methodology for concluding there has been no contamination is suspect; they only considered reported cases of contamination rather than relying on monitoring data.  Fracking fluids in water wells near coal seams would be reported only if someone detects a problem.  There have been cases of methane reaching water wells in the coal seams, but methane is obvious as it bubbles coming from the faucet.

Alpha claims that "Myers fails to address the historical data presented by ICF (2009, p. 22)" (Alpha at 19).  ICF (2009, p 22) does not actually present data, contrary to Alpha's allegation.  GWPC (1998), the source of ICF's "data", presents the results of a survey to which officials from states with over 10,000 coal-bed methane wells had responded they had never found groundwater contamination.  However, contrary to Alpha's allegation, GWPC did not analyze 10,000 wells' worth of data.  GWPC does not present monitoring data as proof, they present survey data from agency personnel claiming there has been no reported contamination.  There is no indication whether the agencies ever looked for contamination beyond the claims of well owners.  ICF also notes that coal seams may be used as aquifers, but did not indicate how many of the coal seams being developed by the CBM wells in the states replied to by the agency personnel were also aquifers.

Alpha truly mixes apples and oranges by using studies of CBM development, including fracking, to conclude that shale-gas development poses no threat to groundwater.

**General Hydrogeology**

Alpha's response to comments regarding aquifer depletion is a stretch to show how they actually disagree with my comments.  Specifically, my comments about failures to regulate are replied to by stating the various commissions must permit the withdrawal – the problem is that there are really no

specifics provided about how the decision to permit would be granted.  The DSGEIS did not specify what standard had to be met, beyond simple reporting, to be granted a permit.

**Mitigating Surface Water Impacts**

Alpha goes out of its way to find something to criticize in its review of my general surface water comments (Alpha, at 44, 45).  My comments were generally qualitative and Alpha's responses are generally not substantial enough to require a reply here.

In Alpha section 4.2, regarding the use of the natural flow regime method, Alpha states that I was incorrect in claiming the NYSDEC would not require its use (Alpha, at 48).  The 2011 rDSGEIS states clearly that it is NYSDEC's intent to require use of the NFRM, but the 2009 DSGEIS only states that it is "preferred", not required (2009 DSGEIS, at 7-3).

Alpha responds in detail to my comments regarding the Delaware and Susquehanna River Basin Commissions' methods (Alpha at 46, 47), even though they acknowledge the dSGEIS would require the NFRM.  Because the rDSGEIS states the NFRM will be used throughout the project area, there is little reason to reply further to Alpha's comments at this point.

Ultimately, Alpha adapts many of my recommendations regarding surface water flow (Alpha, at 50, 51).  They do not specifically endorse the recommendation to minimize the effect on aquatic habitats (outlined at Alpha, p. 47), the RDSGEIS does adapt a recommendation for using the Q60 or Q75 flow by month, which by month is better than my original recommendation.

**Setbacks**

Alpha discusses vertical setbacks along with my comments on monitoring and the need for water level mapping (Alpha, section 3.1).  Much of their response relies on their perceived lack of hydraulic connection among formations, which has been discussed above.

Regarding horizontal setbacks, I had suggested that the recommended values are not based on any data or analysis of their effectiveness.  Alpha simply rejects this without providing any reference, data, or results.  "Myers assumes the setbacks proposed in the dSGEIS are not based on analysis; however, the setbacks are supported by practical application, experience, and historical analyses" (Alpha, at 43).  Alpha repeats this sentence twice, verbatim, on the same page.  When stating something as being based on analyses, it is customary scientific practice to cite the references to these analyses, something Alpha has failed to do.  Alpha also suggests the "dSGEIS reference SEQRA, NYSDOH, NYC Watershed Rules and Regulations, the Clean Water Protection Act, and public water protection rules from other states" (Id.).  Alpha does not indicate where in the dSGEIS these references are made, not indicates that the references include any analysis.  Referencing others' rules without analyzing their effectiveness is not a scientific justification for specifying a setback.  My statements are not that the setbacks are wrong, but that it is unknown whether they are effective.  My recommendations may be larger than those in the dSGEIS, but they are designed to be protective to encourage a site specific analsis.

## References

(Alpha) Alpha Geoscience, Inc. 2011.  Review of dSGEIS and Identification of Best Technology and Best Practices Recommendations, Tom Myers; December 28, 2009.  Prepared for NYSERDA, Albany NY.

Anderson, M.P., and W.W. Woessner, 1992.  Applied Groundwater Modeling: Simulation of Flow and Advective Transport.  Academic Press.

Hill, M.C., and C.R. Tiedeman, 2007.  Effective Groundwater Model Calibration: With Analysis of Data, Sensitivities, Predictions, and Uncertainty.  John Wiley and Son, Inc.

ICF International, 2009. Technical Assistance for the Draft Supplemental Generic EIS: Oil, Gas and Solution Mining Regulatory Program Well Permit issuance for Horizontal Drilling and High-Volume Hydraulic Fracturing to Develop the Marcellus Shale and Other Low Permeability Gas Reservoirs. Agreement No. 9679, NYSERDA, Albany NY. August 7, 2009.

Perry, R., and Henry, B., July 1, 2010. Letter and attachment from Interstate Oil & Gas Compact Commission to Jeff Bingaman and Henry A. Waxman.

USEPA, 2004. *Evaluation of Impacts to Underground Sources of Drinking Water by Hydraulic Fracturing of Coalbed Methane Reservoirs,* EPA 816-R-04_003, June 2004. http://water.epa.gov/type/groundwater/uic/class2/hydraulicfracturing/wells_coalbedmethanestudy.cfm.

Attachment 3

Glenn Miller, Ph.D.

**Review of the**

**Revised Draft**
**Supplemental Generic Environmental Impact Statement on The Oil,**
**Gas and Solution Mining Regulatory Program**
**Well Permit Issuance for Horizontal Drilling and High-Volume**
**Hydraulic Fracturing to Develop the Marcellus Shale and Other**
**Low-Permeability Gas Reservoirs**

Prepared for:
Natural Resources Defense Council
New York, New York

Prepared by
Glenn C. Miller, Ph.D.
Reno, NV

January 6, 2012

This document represents a review of the Revised Draft Supplemental Generic Environmental Impact Statement (RDSGEIS) regarding proposals to develop natural gas wells using high-volume hydraulic fracturing in New York.  I have specifically examined some of the chemical and toxicological issues, particularly related to the fracturing additives used, and the management of the severely contaminated flowback/produced brines.  The RDSGEIS, in general, is an improved document compared to the previous draft of the potential environmental impact of the very large number of gas wells being proposed in much of New York.  However, several key potentially significant adverse impacts remain inadequately addressed.

The following comments should be considered.

**A. The water that flows back immediately following hydraulic fracturing is heavily contaminated (flowback), primarily with the Marcellus formation contaminants, and represents the most problematic chemical contamination potential, due to the large volumes of contaminated water generated.  The brines that will be produced during gas production[1] will have higher concentrations of naturally occurring contaminants than flowback water (although lower volumes) and similarly represent a serious chemical contamination potential.**

The RDSGEIS recognizes these problems and goes a long way towards evaluation and management of the contaminants; however, it still does not present a comprehensive wastewater management and disposal plan that will handle the anticipated large volumes of heavily contaminated wastewater.  Further efforts are required to properly understand the contaminants in the flowback water, and develop management and disposal solutions.

Four problematic components of the flowback water and produced brines are present, including: (1) salts, other inorganic constituents, and metals and metalloids; (2) the radioactive component (NORM); (3) organic substances (from the hydrocarbon formation) and (4) hydraulic fracturing chemical additives.

***1. Salts, other inorganic constituents, metals and metalloids in the formation water that are brought to the surface both as flowback and as production brines***:  The largest mass component of the formation water is salts and other inorganic constituents.  The concentration of these constituents varies widely, as does their toxicity.  Because the flowback is proposed to be collected and temporarily stored in closed systems, disposal of these large volumes of water is the largest problem with its management.  The RDSGEIS discusses the problems with management of this water, and in

---

[1] The terms produced brine, production brine, produced water, and produced water brine are used interchangeably throughout these comments for formation water that is produced up the well.

particular the discharge of high total dissolved solids (TDS) water into receiving waters (see, for example pages 7-63), and stipulates that flowback produced water and brines will need to be regulated as industrial wastewater.

Table 5-10 of the RDSGEIS shows that produced waters (from Pennsylvania and West Virginia) containing the formation water are variable in chemical composition, but include not only simple salts (e.g., sodium, potassium, chloride, bromide, sulfate, fluoride, etc.) but also a variety of metals with varying frequency (cadmium, mercury, cobalt, nickel) and metalloids (arsenic, selenium, boron).  Some of the constituent concentrations are very high, particularly sodium chloride, which has a mean concentration of over 10% by weight.  Some samples had over 30% by weight simple salts plus other contaminants.  The extreme contamination of these wastewaters and the high variability of contaminant levels make these waters complicated for treatment and potential reuse, as well as for tracking and disposal.  If improperly managed and released to surface or groundwater, severe contamination is a reasonably foreseeable outcome.  In particular, if this contaminated water intercepts domestic groundwater sources, the potential exists to permanently damage aquifers as current and future domestic water supplies.

While recognizing the problems with management of this water, the RDSGEIS fails to clearly state how this water will be either disposed in a manner that protects human health and the environment, or otherwise treated to remove the contaminants.  While the RDSGEIS provides a range of treatment and disposal alternatives, the RDSGEIS does not sufficiently analyze the environmental or human health impacts associated with any of these treatment and disposal options.  Further, the RDSGEIS implies that virtually all of the wastewater generated in New York will be managed out of state, where regulations may be less stringent, due to the lack of treatment capacity for these contaminated waters in New York.

2. ***Radioactive Substances (NORM):***  The RDSGEIS also recognizes the issues associated with management of NORM that comes to the surface either in the flowback or the production brines.  However, similar to the salt problem discussed above, it does not explicitly indicate how wastes contaminated with NORM will be regulated and disposed.

Examples of NORM concentrations in flowback are presented in Table 5-24, and in produced brines in Appendix 13.  As expected, the NORM present in the flowback is somewhat lower than in the brines, due to dilutions when fresh water is used for the primary fracturing fluids.  Less dilution would be expected if the flowback is reused as a portion of the fracturing fluid for another well.

3

Only three produced brine samples are shown in Appendix 14, but the level of radioactivity as gross alpha is very high, from about 18,000 pCi /L to 123,000 pCi/L.  The standard for safe drinking water is 15 pCi/L (gross alpha).

The RDSGEIS does not propose a disposal solution for residual NORM, if it is separated from the produced water and the flowback water.  Dilution of the brines to a drinking standard of 15 pCi/L (gross alpha) will require 1000x to 10,000x dilutions, and is unlikely to be acceptable in any jurisdiction, particularly when the components that are causing the radioactivity are not specified.  While some mention of regulatory oversight is made in the RDSGEIS, there are no explicit indications of how these waters will be regulated or managed.  The RDSGEIS does not propose a technically sound or viable solution for disposing of these radioactive materials. The RDSGEIS has not examined options such as evaporation-crystallization treatment or chemical precipitation. These processes will produce a very large tonnage of salts containing radioactive and metal waste.  The lack of a thorough treatment and disposal analysis presents a serious problem when assessing the risk and potentially significant adverse impacts of these substances.  There is effectively no analysis of how these materials will be disposed, other than a general (potential) suggestion that new licensing may be required.

For an adequate environmental analysis, it is also critical to identify the sources of the gross alpha radiation.  Gross alpha radiation is defined by the U.S. EPA (40 CFR Parts 9, 141, and 142 [National Primary Drinking Water Regulations; Radionuclides; Final Rule]) as the total amount of alpha radiation minus the alpha radiation coming from uranium and radon.   Table 2.3 of the RDSGEIS, which specifies the primary drinking water standards, is unclear as to how New York regulates radioactivity, other than to indicate that it will limit "alpha particles" to 15 pCi/L in drinking water, but does not indicate if that includes uranium.  For the three samples of groundwater indicated in Appendix 13, only a small fraction of the components of the gross alpha have been identified, with the largest component being $^{226}$Ra. For the three samples provided in Appendix 13, the individual gross alpha contributors can be summed to provide only 14-24% of the gross alpha in the water samples.  The RDSGEIS does not identify the source of the remaining 76%+ alpha radiation; this omission constitutes a major flaw in the radioactive waste treatment and disposal analysis.

While it may be difficult to get an exact mass balance, accounting for less than 25% of the alpha radioactivity is insufficient.

It is unclear whether the data in Appendix 13 were based on the EPA gross alpha radiation definition, but the implications are substantial.  If the EPA gross alpha radiation definition is used (which is probably the case), some other source of the alpha radiation will be present (e.g., polonium) as was

4

observed in the Florida phosphate industry (Burnett, et al., 1988).  Verifying radioactive waste constituents is particularly important when assessing radioactive waste risk and to develop viable treatment and disposal options. Radioactive materials will also precipitate as scale in equipment; therefore, verifying radioactive waste constituents is also important for determining the radioactive risk as pipes are disassembled when cleaning is needed, or when the wells are disassembled when gas production ceases.  If the source of the excess alpha radiation is polonium, the residual radioactivity from water treatment or scale management will potentially be more expensive to manage safely. The RDSGEIS has not analyzed the polonium risk, or treatment and disposal options for radioactive waste containing polonium.

While the U.S. does not have a polonium 210 standard, both Canada and the European Union do (see accompanying comments of Dr. Ralph Seiler), and it is lower or similar to the U.S. radium standard (5 pCi/L).  Polonium is soluble in water under reducing conditions, and should be assumed to contribute to the alpha emission from the formation water, unless NYSDEC can rule out the risk.  Polonium's risk contribution, however, is not currently analyzed in the RDSGEIS, and is a critical data gap in the NORM analysis. Polonium is a strong alpha emitter, but most importantly, treatment/management of these waters for disposal should require knowledge of the composition of the alpha emitting NORM component.  Only then can appropriate methods for treatment and disposal be developed.

An additional component of the naturally occurring radioactivity is radon, a gaseous odorless radioactive element that is responsible for approximately 21,000 deaths from lung cancer each year (ATSDR, 2012), and is second only to cigarette smoking for causing this disease.  Southern New York is already recognized as a region where elevated radon (>4 pCi/L) is common.  Adding radon to households either from improperly vented gas utilizing appliances or through water systems that have been contaminated with natural gas leaks in groundwater supplies presents an additional risk factor for radon.

Data on radon in natural gas from the Marcellus Shale formation is very scant, and the RDSGEIS does not contain a sufficient amount of data to verify the maximum concentrations of radon expected in Marcellus Shale gas, or any other natural gas that may be developed under the proposed scope of the SGEIS.  The amount of radon in natural gas is a critical measurement that should be made, to examine the incremental risk of radon exposure in homes and places of business that use natural gas or well water that could experience higher radon content as Marcellus and other shale gases are produced in NYS.  While normal natural gas use in properly ventilated burners is unlikely to contribute to radon concentrations in closed spaces (see accompanying Seiler report), poorly vented areas may result in increased radon concentrations, and certain scenarios (e.g., high use of natural gas for industrial applications, restaurants that use gas burners)

should be subject to risk assessment.  The risk of radon exposure from burning natural gas in poorly ventilated areas is likely to be greatest in indoor areas that already have elevated radon exposure levels.

An additional risk is when natural gas from a well leaks into an aquifer used as a well water source.  Depending on concentrations of radon in the water, and the use of that water, radon levels can potentially be elevated in homes.  This is a separate risk than from burning natural gas, but it is reasonable to develop scenarios where highly radon-contaminated gas moves through the soil profile and into homes.  However, there are only scant radon data that can provide a basis for estimating those risks.

**Recommendation 1.**  The SGEIS should clearly identify treatment and disposal options for flowback and wastewater, analyze the range of treatment and disposal alternatives, and propose the best technology and best practices for handling this waste.  These technologies and practices should be included in the SGEIS as a mitigation measure, and codified in the NYCRR.  The SGEIS treatment and disposal options for flowback and wastewater analysis should include a detailed examination of the waste constituents including, at a minimum:  salts and inorganic constituents; NORM; metals and metalloids; organic substances (from the hydrocarbon formation); and fracture treatment additives.

**Recommendation 2.**  The SGEIS should examine the existing wastewater treatment capacity in NYS, compared to the potential volume and composition of wastewater that will be generated by the proposed development, and make specific recommendations to ensure sufficient waste handling capacity exists before authorizing the proposed development.  If waste will be transported to other states, the SGEIS should examine the impacts of that waste handling option as well.

**Recommendation 3.**  The components of the gross alpha radioactivity should be identified in the RDSGEIS, and mitigation measures should be proposed to address radioactivity risk. The RDSGEIS does not identify 76%+ of the gross alpha radioactivity.   The specific definition of gross alpha radioactivity should also be stated, or the EPA definition should be used.

**Recommendation 4.**  The RDSGEIS should determine whether polonium is a significant component of alpha emission in formation waters, and polonium-contaminated wastewater should be regulated/managed appropriately to limit its discharge to surface or groundwater, as should all of the individual components of NORM.

**Recommendation 5.**  Specific treatment methods to remove radioactive constituents from flowback and produced water need to be identified.   If the radioactive constituents are removed from wastewater, management methods and disposal sites for the residual radioactive wastes should be identified. (See further discussion below.)

6

**Recommendation 6.** Additional radon measurements are needed to determine the range of concentrations of radon expected in Marcellus Shale gas or any other gas that may be developed under the proposed scope of the SGEIS. Gas measurement should be made at the wellhead, where natural gas is being used, including homes, businesses that use large amounts of natural gas, and in areas where natural gas leaks have been found. The SGEIS should include radon testing requirements as a mitigation measure, and this requirement should also be codified in the NYCRR.

3. ***Hydrocarbons present in the formation water:*** Hydrocarbons present in the flowback and produced water are characteristic of fuel hydrocarbons, and are represented by (a) compounds that, in some cases, are carcinogenic (e.g., benzene, benzo(a)pyrene); (b) common solvents (e.g., toluene, ethylbenze); and (c) the primary fuel components of natural gas, particularly methane. Common solvents and primary gas components, although generally of lower solubility in water, represent a toxic contribution that can be a serious risk, if they are released either into surface water or as a vapor that may subject persons living in the area to exposure.

4. ***Hydraulic fracturing additives:*** The range of hydraulic additives is very large, and difficult to assess from a risk perspective since the list is almost certainly incomplete, specific information on the chemicals is lacking, and the specific rate of usage is not offered. Thus, not knowing the composition of the specific additives and the amounts provides effectively no basis for estimating the risk of these components of the flowback or produced water, and the RDSGEIS falls seriously short in this regard. A mere laundry list of these components does not meet requirements for analysis of their potential impacts. The list is so long, and the data on each component so incomplete, that it falls far short of the data that would normally be contained in a professional scientific risk analysis. Additionally, Tables 5.4 and 5.5 use trade names, and while the New York regulators may have information on the constituents in those products, that information was not available for this review. Additionally, the public does not have access to this information, and thus the public cannot legitimately understand or evaluate the risk of these products to their health or the environment that they live in.

Table 6.1 reports the constituents found in flowback, and effectively none of the additive compounds used in fracturing were reported in the flowback, except for the hydrocarbons that occur naturally in the hydrocarbon formations (benzene, toluene, xylene, naphthalene, etc.). In fact, the only non-fuel compound found in flowback that is also mentioned as a hydraulic fracturing additive is propylene glycol. This analysis demonstrates a significant problem in examining flowback chemical composition. Either NYSDEC is concluding that chemicals injected into the formation do not return in the flowback (improbable), or NYSDEC has not employed the correct analytical methods to evaluate flowback waste constituents.

7

It is not clear from the RDSGEIS how many of the additives were actually subjected to analysis in the flowback samples. Most of the chemicals listed in Table 6.1 that are used as additives will not be detected/measured by the standard methods used to determine hydrocarbons and metals. Therefore, the absence chemical additives in the flowback samples shown in the RDSGEIS is likely a function of incomplete laboratory analysis. For example, it is not clear that any attempt was made to actually measure the following three compounds in the flowback water: (1) 1-propanesulfonic acid; (2) 2-propenoic acid, homopolymer, ammonium salt; (3) acetic acid, hydroxyl-, reaction products with triethanolamine. None of the methods used by the Marcellus Shale Coalition (see Chapter 5-109) would, in this reviewer's estimation, be suitable for measuring these compounds. In fact, many, if not most of the additives, require very specialized methods for analysis; some are multiple chemicals (e.g., polymers), and some are relatively unstable (e.g., acrylamide).

There is, however, an implication that since the compounds were not subject to analysis, and thus not observed in the flowback water, they do not exist in the flowback water, which is a scientifically unjustified conclusion and almost certainly not the case.

Table 6.1 should be re-created with an additional column that indicates whether the compounds would have been measured with the analytical scheme utilized (e.g., gc-ms, icp-ms, ion chromatography for anions, etc.). Additionally, the RDSGEIS should list the analytical method required to detect each compound in the flowback. The detection limit for each method should be specified.

A full analysis for all of the additives utilized in hydraulic fracturing is indeed a challenge, but the SGEIS should clearly indicate which compounds could be measured by the protocol utilized, which could not, and what method would be required. It is likely that most if not all of the additives used that are not found in the formation water were not actually measured/determined. Thus, Table 6.1 has very limited value, and provides a distorted view of what is actually being measured.

**Recommendation 7**. The analytical tables for hydraulic fracturing additives should be revised to clearly show the analytical methods utilized and whether the analytical methods used, and detection limits provided by those methods, are sufficient to protect human health and the environment. The tables should verify if the additives were actually measured in the flowback water.

**Recommendation 8**. The RDSGEIS should include as a mitigation measure a list of analytically testing methods required to test flowback prior to disposal; these testing requirements should also be codified in the NYCRR.

A detailed risk assessment of each of the potentially toxic additives is a reasonable request.  Leakage of flowback water to domestic water has been demonstrated recently in Wyoming by the U.S. EPA (2011) and represents a potential threat to ground water in New York.  It is not sufficient to simply argue that gas wells will not leak, since leaks are now apparent in certain well fields (e.g., most recently in Wyoming (US EPA, 2011a)), as well as in Pennsylvania (Pennsylvania DEC, 2011).  When leaks occur, it is probable that the greatest risk will be from the naturally occurring substances, but the additives also pose a non-trivial risk.

Practically speaking, it is more efficient and cost-effective to limit the additives used, rather than test for every possible additive in the flowback.  Other governments and agencies have developed simplified methods and lists for prohibiting toxic additives, and assessing their risk (e.g., OSPAR PLONOR, C-NLOPB Guidelines, The Norwegian Pollution Control Authority; see accompanying report of Susan Harvey regarding additives).  NYS could develop a similar list of prohibited additives, and a process for approving additives for use that will offer a method for reducing risks to both the public and workers.

Some of the additives being used are serious carcinogens, and may be difficult to measure.  Two examples of these are acrylamide and acrylonitrile.  Both are carcinogenic and, while not long lived in the environment, can create serious exposure concerns to workers and the public.

Acrylonitrile has been found in Pennsylvania and/or West Virginia in water samples taken near hydraulic fracturing operations (data received from individuals who had samples analyzed).  It was also observed in flowback water from the Marcellus Shale Coalition (page 5-115 of the RDSGEIS).  Acrylonitrile is a carcinogenic (US EPA, 2011b) and exclusively anthropogenic compound.  It can be measured in a standard purge and trap gc-ms method, and has been used in Pennsylvania, and is indicated in a patent issued to Halliburton (Halliburton Energy Services, U.S. Patent 7799744).  This compound is one of the more toxic compounds used as additives, yet is not even mentioned in the RDSGEIS (Table 5.9).  Failure to include a chemical additive that is commonly used and known to be carcinogenic and toxic to humans is a serious deficiency in the RDSGEIS.

Failure to include Acrylonitrile in Table 5.9 raises uncertainty in what other harmful chemical were not listed or examined in the RDSGEIS.  Additionally, the RDGSEIS lacks of information on additives use rates.  Therefore, the RDSGEIS analysis of the potential significant adverse impact of additive use is, at the least, incomplete.

Acrylonitrile, butadiene and styrene (ABS polymer) are mixed "on the fly" with the uncoated propping agent to create a polymer covering on the propping agent.   From the Halliburton patent:

> Some suitable polymers include, but are not limited to, acrylic polymers such as acrylonitrile polymers, acrylonitrile copolymers, and mixtures thereof. Some preferred polymers include homopolymers and copolymers of polyacrylonitrile (including copolymers of acrylonitrile and methyl acrylate, methyl methacrylate, vinyl chloride, styrene and butadiene), polyacylates, polymethacrylates, poly(vinyl alcohol) and its derivatives, and mixtures thereof. As used herein the term "acrylic" polymers refers to any synthetic polymer composed of at least 85% by weight of acrylonitrile units (the Federal Trade Commission definition). Thus, the definition of the term may include homopolymers of polyacrylonitrile and copolymers containing polyacrylonitrile. Usually they are copolymers of acrylonitrile and one or more of the following: methyl acrylate, methyl methacrylate, vinyl chloride, styrene, butadiene. However, polymers that do not meet the definition of an acrylic polymer (such as those having less than 85% acrylonitrile) may also be suitable. For instance, Example 3 uses poly(acrylonitrile-co-butadiene-co-styrene) that contains approximately 25 wt % acrylonitrile.

Further down the patent, the "on-the-fly" process is described.

> In particular embodiments of the present invention, the particulates may be coated with the polymer solution and introduced into the treatment fluid, which acts as the aqueous medium, directly prior to being introduced into a subterranean formation in an on-the-fly treatment.

This process is likely to be inefficient and likely to release substantial amounts of acrylonitrile and styrene into the water used in the fracturing process.  Acrylonitrile has been found in flowback water (page 5-115 of the RDSGEIS), and reports are available that show that it has been detected in surface and ground water in Pennsylvania, and is perhaps one of the most unambiguous anthropogenic indicators that off-site contaminated water has been in communication with the water used in the fracturing process. NYSDEC should determine if this polymer and application method is appropriate for use in New York, and require acrylonitrile and styrene as two of the suite of compounds to be analyzed in flowback before it leaves the wellsite.

**Recommendation 8.**   The NYSDEC should re-examine the additives used in hydraulic fracturing and conduct a much more detailed analysis of the risk of these compounds.  Specifically , acrylamide and acrylonitrile, a carcinogenic and exclusively anthropogenic compound used in hydraulic fracturing, should be measured in flowback water, and an assessment made as to whether and/or how use of this compound should be permitted.  The conclusions of such analysis should be included in the SGEIS as a mitigation measure and codified in the NYCRR.

**B.  The analytical data presented in Tables 5.10, 5.23, 5.24 and 6.1 all indicate a lack of detailed understanding of the quality of the flowback, and indicate**

**an inadequate understanding of the methods necessary to fully characterize the wastewater.**

The errors in Tables 5.10, 5.23, 5.24 and 6.1 are sufficiently glaring that they need a much more detailed review. For example, in Table 5.10, the dissolved metal concentrations in some cases are higher than total metals. Iron, for example, has a median concentration 29.2 mg/L, but the dissolved median concentration is 63.25 mg/L. Similarly, the mean manganese concentration is 1.89 mg/L, while the dissolved manganese concentration is 2.975 mg/L. There cannot be higher amounts of dissolved iron and manganese than total iron and manganese.

The data from the Marcellus Shale Coalition was not displayed, other than as a table of compound detections. These samples were collected from 19 gas well sites in Pennsylvania and West Virginia. All samples were collected by a single contractor and the analyses performed by a single laboratory, which should reduce the variability. This would appear to be a very valuable data set, but surprisingly, no data were presented regarding concentrations of the analytes. Some comments were provided on the types of compounds detected, although it was not clear which types of water contained these constituents. Additionally, chlorinated hydrocarbon insecticides were detected, which is very surprising, since these compounds could not have been found in the formation water, and have not been used in the U.S. since the 1970's. They are likely false positives, although it is not possible to make that determination, based on the discussion in the RDSGEIS. Data obtained from the Marcellus Shale Coalition should be presented, which compares, for example, flowback water from different wells under similar conditions (e.g., immediate flowback versus flowback in subsequent days).

Finally, the data in Table 6.1, which focuses on the additives used in hydraulic fracturing, is problematic. As discussed above, it is highly unlikely that attempts to determine the concentrations of the fracturing additives were actually conducted, since many of these compounds are difficult to determine. The implication remains, however from Table 6.1, that these compounds were actually considered in some appropriate analytical scheme. This is almost certainly not the case, and Table 6.1 should be clarified.

**Recommendation 9.** Each of the SGEIS tables of analytical data should be reviewed by an analytical chemist, and the data be presented in a scientifically accurate and quality controlled manner. The data in Table 6.1 should be clarified and the compounds which were not subjected to specific analyses should be identified.

C. **Permissible treatment of the flowback and the produced water is not well defined. It is unclear how the post-treatment residual salts and radioactivity will be managed. There does not appear to be any complete treatment of these waters that will be permitted in New York.**

There are four possible treatment options for flowback and produced water discussed in the RDSGEIS: (1) reuse, (2) deep well injection, (3) treatment in municipal facilities, or (4) treatment in privately owned facilities. None of these options is properly analyzed in the RDSGEIS, and the potential significant adverse impacts of each are therefore not disclosed nor possible mitigation identified.

"Treatment" of flowback for *reuse* is discussed in Section 5.12.  Reuse of the flowback conserves fresh water and allows contaminated water to be used instead during fracturing.  However, the RDSGEIS only considered treatments for removal of salts that would allow for reuse in other hydraulic fracturing operations, and evaluated how specific requirements for reuse could be met by various treatment processes (e.g., membrane, ion exchange or evaporative processes). It did not analyze the residual contaminants removed by evaporative or membrane processes and thus concentrated, or how those contaminants would be managed, other than to indicate that the residual salts, or concentrated brine will require "further treatment or disposal."  The SGEIS must address how this highly concentrated and toxic residue will be regulated and managed.

Three hundred tons of salt will exist in one million gallons of flowback or produced water brine, if you assume a 7% (70,000 mg/L) salt solution.  The source of the alpha emitters also must be identified, as is discussed above.  If, as is suspected, polonium is present in the flowback water, it represents an additional management burden of the flowback and produced water that must be evaluated.

Beyond reuse, the disposal options considered in the RDSGEIS only included injection wells (although there are currently no industrial waste injection wells capable of handling this wastewater in NYS), municipal sewage treatment facilities (of which there are currently none that are permitted to accept flowback and produced water), and private treatment plants (of which none currently exist in New York)  Therefore the RDSGEIS examines options that do not exist, and does an incomplete job of that examination.

The RDSGEIS did not consider whether there are other, less environmentally harmful, options that exist for treatment and disposal of flowback and produced water.  More importantly, the RDSGEIS fails to evaluate the potentially significant adverse environmental impacts and human health risks associated with each treatment and disposal option.

Section 6.1.8.1 indicates that "[f]lowback water may be sent to POTW's", but then describes the limitations that may preclude disposal of these waters in POTWs.  The RDSGEIS requires that a "facility must first evaluate the pollutants present in that source of wastewater against an analysis of the capabilities of the individual treatment units and the treatment system as a whole to treat these

pollutants" (page 6-57); however, before such an evaluation can be conducted, the well operator must obtain a complete analysis of the flowback water (which as explained above, has not been done).

Additionally, the diversity of the flowback water quality is such that a POTW would need to conduct an extensive and expensive analysis of each water type that was delivered to the POTW under those guidelines.  Since most of the additives are clearly not subject to routine analyses, it appears doubtful that a POTW could ever accept this type of waste.  Also, if the limitation of 15 pCi/L of radium in the influent is enforced, a large portion (as yet not determined) of the flowback water could not even be accepted.  Finally, the requirement of a complete description of the contaminants in the water is likely to add an additional burden to using POTW's for disposal, that this option may be precluded for most of the flowback water.  Therefore, the proposal to use POTWs as a potential treatment and disposal method is scientifically and technically unsupported.

One serious problem with the proposed discharge (dilution) of fracture treatment wastewater via a municipal or privately owned treatment plant is the observed increases in trihalomethane (THM) concentrations in drinking water reported in the public media (Frazier and Murray, 2011), due to the presence of increased bromide concentrations.  Bromide is more reactive than chloride in formation of trihalomethanes, and even though bromide concentrations are generally lower than chloride concentrations, the increased reactivity of bromide generates increased amounts of bromodichloromethane and dibromochloromethane (Chowdhury, et al., 2010).  Continued violations of an 80microgram/L THM standard may ultimately require a drinking water treatment plant to convert from a standard and cost effective chlorination disinfection treatment to a more expensive chloramines process for water treatment.  Although there are many factors affecting THM production in aspecific water, simple (and cheap) dilution of fracture treatment water in a stream can result in a more expensive treatment for disinfection of drinking water.  This transfer of costs to the public should not be permitted.

NORM, the inorganic substances, and the organic compounds from the formation also represent serious contamination potential and require an appropriate level of treatment.  The exact method of treatment that NYSDEC expects to require for any municipal or private treatment facilities that may be permitted is unclear.  The RDSGEIS suggests that there will be some level of wastewater dilution through discharge into a receiving stream, at least in some cases.  The analysis should be much more explicit about how wastewaters will be treated, both in-state and out-of-state.  New drilling operations should not be permitted until adequate management/disposal of these waters is evaluated, with public comment required on the proposed methods, an analysis of the impacts associated with each, as well as mitigation measures as required by SEQRA.

Injection of the waste fluids into fully permitted underground injection control (UIC) wells is an option also, although this method is problematic due to the lack of permitted wells in New York, and the distance the contaminated water would need to be trucked in order to dispose of it in other states where permitted wells exist (e.g., Ohio). The recent seismic activity in Ohio from disposal of fracturing fluids also raises serious concerns whether this option is safe. Given the difficulties of wastewater treatment, UIC is likely the popular choice for wastewater disposal from the Marcellus region. However, NYS' increase wastewater load, along with increased wastewater generated from the increased drilling in Ohio and surrounding states, will likely pose an injection capacity problem for Ohio UIC wells. The RDSGEIS has not examined whether it is possible, or safe to install disposal wells in NYS' or whether a nearby state has sufficient capacity to inject NYS' incremental waste load, or whether this is the best technical solution. These are all potential significant adverse impacts that should be, but are not, addressed in the RDSGEIS.

Out-of-state management of waste is contemplated in Section 5.13.3.3., but is identified as not being within the regulatory purview of New York. However, simply stating that wastewater will likely be managed "out-of-state" is insufficient. Wastewater handling is an unmitigated significant impact in the RDSGEIS as currently proposed. The proposal to export NYS' wastewater and not examine this significant impact is not justified.

NYSDEC should instead evaluate the impacts of, clear cradle-to-grave oversight and management, identify the best solutions for waste handling, and include those requirements as mitigation measures in the RDSGEIS.

Furthermore, even if some export of wastewater is permitted, SEQRA requires analysis of the impacts of any potential waste management options, even if they are to occur outside of New York.

Finally, road spreading for dust control and de-icing would apparently (and appropriately) not be allowed for flowback water, but could be used under certain conditions for the produced brines. A rationale for this distinction is not provided, and permitting road spreading of produced water is not recommended, since the brines will have higher concentrations of NORM than the flowback water, and may include polonium. Some rationale should be provided for this distinction, particularly since it is apparently unknown if any of the hydraulic fracturing additives are even detected in the flowback water (see Table 6.1). It is clear, however, that the NYSDEC is concerned about using the brines for roads and will require a specific permit for this application. Whether a permit will be granted presumably will depend on the amount of radioactivity present in the water. Under no circumstances should brine solution that has a gross alpha concentration of greater than 15 pCi/L be applied to roads. Ultimately, this practice should not be allowed – there are simply too many questions about the identity and amount of contaminants in these fluids.

**Recommendation 10:**  The RDSGEIS should identify and evaluate the impacts of the various options that are proposed to be permitted for management of wastewater, and identify any proposed mitigation for identified significant adverse impacts, which should be set forth in the proposed regulations.

**Recommendation 11.** Specific influent contaminant load restrictions need to be explicitly identified including those for: fracking additives, NORM (including gross alpha), TDS and other relevant contaminants in this management description.

**D. Cuttings disposal:** Disposal of cuttings is considered in the RDSGEIS, although the treatment is incomplete.  Cuttings from the shales of marine origin such as the Marcellus Shale (particularly the horizontal cuttings) will require further examination to determine if they contain large amounts of salts, similar to the produced brines, or if they contain excessive alpha emitters.  While the measurements of radioactivity, based on a gamma detector, do not indicate high levels of radioactivity, further analysis is required to determine the leachability of these cuttings.  Polonium is only a very weak gamma emitter, and thus it would not be observed by simple gamma counting.  The organic (reducing) components of the shales chemically trap uranium and potentially other radionuclides, and when they are subject to oxidizing conditions, increases in the solubility/mobility of some of the radionuclides (particularly uranium) is likely. The leachability of these cuttings under oxidizing conditions thus requires further analysis, as discussed at the bottom of page 6-65.  However, these determinations need to be made, and the risks and potential mitigation identified, *prior* to permitting the wells.

**Recommendation 12.** The RDSGEIS must fully evaluate the potential significant adverse impacts of cuttings disposal and identify any necessary mitigation to address such impacts, which should be set forth in the proposed regulations.

**E.  Odors are a continuing concern from gas wells:** A variety of chemicals are present in hydrocarbon formations that can present a serious odor problem, which can be both a serious human health problem and affect the quality of life of persons living near these sites.  A very common, but toxic, constituent is hydrogen sulfide, characterized by a rotten egg smell.  Other organic sulfides can also be present, including a variety of alkyl sulfides.  Odors are very difficult to regulate, due to the vagaries associated with odor detection, acclimation, and differential effects on different persons.  The severity of an odor is in the nose of the beholder.  Thus, each well should be assessed to determine the potential of migration of volatile substances from the well operation to surrounding residents.  Odor complaints should be taken seriously, and the presumption should be that an odor complaint is valid, and an investigation of the source required.

15

Hydrogen sulfide is, however, probably the most acutely toxic component present in a potential natural gas leak, and it can pose a serious health risk to surrounding residents, in addition to causing odor complaints.   Sulfide monitors should be required at least two points, corresponding to most probable downwind locations at the fenceline.  When hydrogen sulfide is detected above the odor thresholds, the source of the odor should be identified and eliminated.

Setbacks from an operating well will help to minimize the impact of odors on the surrounding residents.   (Setbacks are discussed in further detail in the accompanying reports being submitted under cover of the Louis Berger Group.)

**Recommendation 13.** The RDSGEIS must fully evaluate the potential significant adverse impacts associated with odors and hydrogen sulfide emissions, and identify any necessary mitigation to address such impacts, which should be set forth in the proposed regulations.

F. **Monitoring of nearby domestic wells for contamination from gas drilling operations should be conducted at regular intervals during and following hydraulic fracturing.**  While the drilling company would be required to test domestic wells for contamination prior to gas development operations, these same wells should be tested during production, and subsequent to discontinuing production to determine if hydraulic fracturing has resulted in contamination (See the accompanying report of Dr. Tom Myers).  At present, the documents are silent on this requirement and effectively transfer this responsibility to the well owner.  The analytes that should be determined should include, at a minimum, the components of natural gas (methane, ethane, etc.) and also toxic volatiles from the formation water (benzene, toluene, xylenes), salts and relevant inorganic contaminants, and the additives used during the hydraulic fracturing. This list should be developed based on those specific additives used.

**Recommendation 14.** The RDSGEIS and proposed regulations should require that monitoring of domestic wells situated in close proximity to gas drilling operations to be required at regular intervals during and following hydraulic fracturing.  Because of the slow movement of groundwater, routine analysis of those domestic wells should be continued at least 20 years.

## References

ATSDR (2012). Agency for Toxic Substances and Disease Registry web site. Toxicological Profile for Radon
http://www.atsdr.cdc.gov/substances/toxsubstance.asp?toxid

Burnett, W.C., P.Chin, S. Deetae and P. Panik, (1988) "Release of Radium and Other Decay-Series Isotopes from Florida Phosphate Rock" A Final Report sumbtted to the Florida Institute of Phosphate Research, Publication No. 05-016-059.

Chowdhury, S., P. Champagne, and J. McLellen, (2010) "Investigating effects of bromide ions on trihalomethanes and developing model for predicting bromodichlormethane in drinking water" **Water Research,** 44:2349-59)

Pennsylvania DEP, 2011. "DEP Gives Cabot Oil & Gas 60 Days to Implement Permanent Fix to Impacted Water Supplies in Susquehanna County Township" A press release related to regulatory actions on potential contamination from a hydraulic fracturing operation. Available on the web at:
http://www.portal.state.pa.us/portal/server.pt/community/newsroom/14287?id= 12985&typeid=1

Frazier, R. and Murray, A. (2011) "Salts From Drilling, a Drinking Water Danger, Still Showing Up in Rivers" A news report from Essential Public Radio. Available on the web at: http://www.essentialpublicradio.org/story/2011-12-01/salts-drilling-drinking-water-danger-still-showing-rivers-9616.

Halliburton Energy Services, U.S. Patent 7799744, available on the web at
http://www.docstoc.com/docs/58860687/Polymer-Coated-Particulates---Patent-7799744)

U.S. EPA, 2011a, "Draft Report on an Investigation of Ground Water contamination near Pavillion, Wyoming" Office of Research and Development
National Risk Management Research Laboratory, Ada, Oklahoma 74820

U.S. EPA, 2011b," Integrated Risk Information Series: Acrylonitrile" available on the web at http://www.epa.gov/ncea/iris/subst/0206.htm

Attachment 4

Ralph Seiler, Ph.D.

**Review of the**

**Revised Draft**
**Supplemental Generic Environmental Impact Statement On The**
**Oil, Gas and Solution Mining Regulatory Program**
**Well Permit Issuance for Horizontal Drilling and High-Volume**
**Hydraulic Fracturing to Develop the Marcellus Shale and Other**
**Low-Permeability Gas Reservoirs**

Prepared for:
Natural Resources Defense Council
New York, New York

Prepared by
Ralph Seiler, PhD
(rlseiler@juno.com)
Carson City, NV

1/11/12

This document represents a review of the Revised Draft Supplementary Generic Environmental Impact Statement (RDSGEIS) regarding the hydraulic fracturing proposals to develop natural gas wells in New York.  I have specifically examined issues related to NORM in the flowback/produced brine, as well as of radon in the gas itself.  My comments supplement those of Glenn C. Miller, Ph.D.

**Issue 1**.

<u>Unidentified sources of gross alpha and beta radioactivity in flowback water and production brine.</u>

Gross alpha radioactivity in the brines (Appendix 13) and flowback water (Table 5-24) can be very high.  In the brines, gross alpha is usually from 8,000 to 20,000 pCi/L, with a maximum of 120,000 pCi/L (Well Webster T1).   In the brine samples with high gross alpha, the sum of uranium (U) , thorium (Th) , radium-226 ($^{226}$Ra) and radium-228 ($^{228}$Ra  activities is much less than the measured gross alpha. Individual analyses of flowback water are not given, but the aggregated data similarly suggest that the sum of U, Th, and $^{226}$Ra and $^{228}$Ra activities is also much less than the measured gross alpha.  These results indicate one of two things:

1.    There are analytical problems with the gross alpha measurements, probably caused by the high salinity of the water.

2.    There is an unidentified alpha emitter present in the water.

High salinity can cause the measured gross alpha to significantly overestimate the actual alpha activity of a sample (Arndt and West, 2007).  The recommended mass placed on a planchet for gross alpha is only 100 mg, so given a brine Total Dissolved Solids (TDS) of 350,000 mg/L (p. 6-61), only ~0.4 ml of sample should be placed on a planchet.  The high TDS means it is easy for too much mass to be placed on the planchet, or the small volume means the mass may be unevenly distributed. Both of these factors can contribute to reduced precision and accuracy in the gross alpha analysis.

2

Appendix 13 indicates all of the relatively long-lived, naturally occurring alpha emitters in the brines were measured except polonium-210 ($^{210}$Po). Radon itself would not contribute at all to the measured gross alpha because it is a gas. In the gross alpha measurement, an aliquot of sample water is placed in a planchet and evaporated to dryness. After drying, the planchet is commonly flamed until it glows red to drive off hygroscopic water from the salts. Because of this, alpha radioactivity from radon does not contribute to gross alpha radioactivity.

$^{210}$Po normally binds strongly to sediment particles and concentrations in fresh groundwater are typically <1 pCi/L. In some geochemical settings $^{210}$Po activities have exceeded 500 pCi/L in drinking-water wells in the US (Seiler et al., 2011), however this is extremely rare and fewer than 100 US wells have been reported with >15 pCi/L. $^{210}$Po is known to be present in oil-field brines (Parfenov, 1974), however, the reported $^{210}$Po activities in the brines were relatively low, about 100 pCi/L.

On p. 6-205 the RDSGEIS states radium is the primary radionuclide of concern, but this may not be the case if the excess alpha radioactivity is caused by the presence of $^{210}$Po. If $^{210}$Po is present in high levels, it may be much harder and more expensive to treat the contaminated water and manage the waste. Ra can be removed from water with relatively simple technology such as water softeners. On the other hand, Charles County in Maryland found the best way to remove Po from a contaminated public-supply well was with reverse osmosis. Treating millions of gallons of brine with reverse osmosis would be expensive and difficult, and could increase the cost to the public if treated at a public treatment facility. It could cause the gas to be more expensive to the consumer if the operator is made to bear the cost of treatment at an on-site or privately-owned treatment facility.

Gross beta radioactivity in many of the wells in some of the wells is several thousand pCi/L. To evaluate the significance of this, you need to know the potassium concentrations because $^{40}$K is the source of almost all natural beta. If gross beta minus a correction factor for K were to exceed 50 pCi/L in a municipal well, the operator would have to identify the major contributors to gross beta. One

3

potential contributor to gross beta is lead-210 ($^{210}$Pb), which was not measured. This is potentially important because $^{210}$Pb decays to $^{210}$Po and could support it in the water.

<u>Issue 1 Recommendations</u>

The cause of the excess alpha radioactivity in the brine and flowback samples needs to be determined. $^{210}$Po may be present at high concentrations and could pose a significant risk to health and the environment if oil-field brines are inadequately disposed of because it bioaccumulates. Samples from some of the more contaminated wells should be reanalyzed for the same suite of analytes as before, except this time include $^{210}$Po. Redoing the complete suite will provide an idea on how adequately the less expensive gross alpha analysis identifies the presence of $^{210}$Po. All samples analyzed for NORM (e.g. p. 6-61) as part of the regulatory process should include $^{210}$Po, at least until it has been demonstrated that $^{210}$Po is not an important source of alpha radioactivity.

NYSDEC should identify what the important contributors to gross alpha are (probably radium and $^{210}$Po) and identify how, if at all, the brine and flowback water will be treated, taking economic considerations into account. Failure to do so constitutes a potentially significant adverse impact that would not have been disclosed or mitigated.

The principal contributer to the gross beta radioactivity is probably potassium-40 ($^{40}$K), but this should be confirmed because $^{210}$Pb can also contribute to gross beta, and if present $^{210}$Pb can support aqueous $^{210}$Po. An estimated $^{40}$K activity, based on the potassium (K) concentrations for the brines, should be added to Appendix 13 so the gross beta measurements can be evaluated. It is presumed that K was measured, even though no major ion analyses for the brines were found in the RDSGEIS. A theoretical activity ratio of 0.818 pCi/mg was reported by Friedlander et al. (1981) and can be used to convert concentrations to activities.

4

**Issue 2**.

<u>Documentation of analytical methods</u>

It is important that all analytical methods that will be used to analyze pollutant levels are well documented, but the RDSGEIS does not indicate what they would be.

<u>Issue 2 Recommendations</u>

It is presumed the alpha emitters were analyzed by alpha spectrometry, but the RDSGEIS should confirm this. The RDSGEIS also needs to provide reporting limits for the other analytes, not just provide a list of the analytes to be measured. An analysis for arsenic is useless if the reporting limit is 50 ppb when the drinking water standard is 10 ppb.

Documentation of the method is particularly important for the gross alpha analysis. EPA Method 900.0 for gross alpha allows samples to be composited quarterly and allowed to sit for up to a year before analysis. Unfortunately, the EPA approved analytical method can allow more than 60% of the $^{210}$Po in a sample to be lost due to decay during that year (Seiler et al., 2011). A simple statement that Method 900.0 will be followed is inadequate. The RDSGEIS should explicitly state that samples for gross alpha will not be composited and must be analyzed within 3 days of sample collection. Analysis within 3 days is SOP for many agencies and finding labs that can meet that requirement should not be a problem.

**Issue 3**.

<u>Radon in Natural Gas</u>

Radon is known to be present in natural gas and will be delivered with the natural gas to consumers. Burning of natural gas in stoves, water heaters, and furnaces does not affect the radioactivity of radon and consumers will be potentially exposed to increased levels of atmospheric radon.

The RDSGEIS does not include measurements of radon concentrations in the natural gas, nor does it indicate plans to monitor it. Radon concentrations in natural gas are extremely variable and can be very high. Natural gas from Texas and Kansas had radon concentrations ranging between about 5 and 1500 pCi/L (Dixon 2001,

Table 2). This raises the possibility that radon concentrations in gas from the Marcellus Shale could be much higher values than are in the gas currently being used. In addition, the hydraulic fracturing process would be designed to maximize extraction of natural gas from the formation, and as a consequence may also maximize extraction of radon from the formation.

The pipeline from well heads tapping the Marcellus Shale will be much shorter than the existing 1500 mile pipeline delivering gas from Texas/Louisiana. Assuming the gas moves through the pipeline at 10 mph, it would take 6.25 days for gas from the wellhead to the consumer, and during this time ~68 percent of the radon will decay. If wellheads in the Marcellus Shale are only 100 miles from the consumer then only 7 percent of the radon would have decayed. Because of this, even if the wellhead radon concentrations in gas from the Marcellus Shale were identical to those of the currently used natural gas, consumers would be exposed to greater radon concentrations because the wellheads are closer.

Dixon (2001) provided a risk assessment for the radon in natural gas in the UK. The average radon in natural gas from the UK wells was 5.4 pCi/L, and, as a worst-case scenario, Dixon (2001) assumed that there was instantaneous delivery of the gas so that no radon decay occurred between the wellhead and the consumer. Dixon (2001) concluded there was negligible risk to the public from release of radon in combustion gasses, and that the average dose to the public using 100 cubic meters of gas would be only 4 microSieverts per year (µSv/yr). The greatest risk was to workers in large commercial kitchens who would receive a dose of 19 µSv/yr.

<u>Issue 3 Recommendations</u>

The risk to the public from radon in the natural gas probably is small. Measurements of radon in the gas are needed, however, to confirm that radon levels in the gas are within the expected range. A new risk assessment should be made using actual measurements of radon in gas from the Marcellus Shale and other factors specific to New York, such as the background radon concentration for the area. For

a worst-case scenario the assumption should be made that there is instantaneous delivery of gas from the wellhead to the consumer.

**Issue 4**.

### $^{210}$Po Buildup in Delivery Pipes

On page 6-205 of the RDSGEIS there is a discussion of scale buildup in pipes and equipment, but the discussion seems to indicate Ra is the principle radionuclide of concern.  If radon, $^{210}$Pb or $^{210}$Po are present at high concentrations in the water or gas, a more significant health risk for workers could be $^{210}$Po in the scale.  Summer-lin and Prichard (1985) evaluated this and concluded that workers cleaning impellers could be exposed to high levels of atmospheric $^{210}$Po.

Consumers and State and Local workers may also be exposed to $^{210}$Po, which will form in scale on all pipes carrying natural gas with radon in it.  The amount of $^{210}$Po buildup will depend on the amount of radon in the gas.  Plumbers and City/State employees working on the pipes may not know what precautions need to be taken, and thus could be exposed to $^{210}$Po in the scale.

Another issue is the volatility of $^{210}$Po, which is completely volatile at temperatures above 500°C (Radford and Hunt, 1964).  Because of this, $^{210}$Po that accumulates near burners that have been turned off may be vaporized when burners are turned on.  This could potentially expose consumers to health risks from inhaling $^{210}$Po.  In cases of accidents or fires involving gas lines, first responders and the public near the incident could also be exposed to $^{210}$Po through inhalation.  This risk is not specific to gas from the Marcellus Shale.  The health risks, however, would be related to the amount of radon in the gas and thus the amount of $^{210}$Po that would build up, and this is not known for gas from the Marcellus Shale.

### Issue 4 Recommendations

Measurements of radon in natural gas from the Marcellus Shale need to be made.  A risk assessment should be made for inhalation of $^{210}$Po resulting from scale buildup in delivery pipes.

**Issue 5**.

<u>$^{210}$Po drinking-water standards</u>

Table 2-3 presents drinking water standards for radionuclides.  The US does not have a standard specifically for $^{210}$Po largely because $^{210}$Po is extraordinarily rare in drinking water. The US standard for $^{210}$Po is exceeded if the gross alpha minus the U activity exceeds 15 pCi/L.  Canada and the European Union have set drinking-water standards specific for $^{210}$Po at 5.4 and 2.7 pCi/L, respectively (Health Canada, 2007; Commission of the European Communities, 2001).  The regulatory use of the gross alpha standard assumes it will adequately identify samples with $^{210}$Po levels that exceed health safety standards.  For several reasons related to Po chemistry and the gross alpha analytical method, this may not be the case (e.g. Seiler, 2011).

<u>Item 5 Recommendations</u>

For any analysis where there may be actual human exposure, the RSDGEIS should analyze $^{210}$Po analyses using alpha spectrometry rather than using gross-alpha analyses as an inexpensive but inadequate surrogate.

REFERENCES

Arndt, Michael F.; West, Lynn E., 2007. An Experimental Analysis Of Some Of The Factors Affecting Gross Alpha-Particle Activity With An Emphasis On [226]Ra And Its Progeny. Health Physics 92(2):148-156.

Commission of the European Communities, 2001. Commission recommendation of 20 December 2001 on the protection of the public against exposure to radon in drinking water supplies. Official Journal of the European Communities (2001/928/Euratom). <http://www.ec.europa.eu/energy/nuclear/radioprotection/doc/legislation/01928_en.pdf> (accessed 18.03.09).

Dixon, DW, 2001. Radon exposures from the use of natural gas in buildings. Radiation Protection Dosimetry 97(3):259-264.

Friedlander, G., Kennedy, H.W., Macias, E.S., and Miller, J.M., 1981. Nuclear and Radiochemistry. New York: John Wiley & sons.

Health Canada, 2007. Guidelines for Canadian Drinking Water Quality Summary Table. <http://www.r-can.com/download.php?file_id=525> (accessed 06.04.09).

Parfenov YD. 1974. Polonium-210 in the environment and in the human organism. Atomic Energy Review 12(1):75-143

Radford, EP and Hunt, VR. 1964. Polonium-210: A volatile radionuclide in cigarettes. Science143:247-249.

Seiler, RL, 2011. 210Po in Nevada groundwater and its relation to gross alpha radioactivity. Groundwater 49(2):160-171.

Seiler RL, Stillings LL, Cutler N, Salonen L, and Outola I. 2011. Factors affecting the presence of polonium-210 in groundwater. Applied Geochemistry 26:526-539.

Summerlin, J., and Prichard, H.M., 1985. Radiological health implications of lead-210 and polonium-210 accumulations in LPG refineries. American Industrial Hygienist Association Journal 46(4):202-205.

Attachment 5

Susan Christopherson, Ph.D.

**Memorandum**

To:     Kate Sinding, Natural Resources Defense Council

From:   Susan Christopherson, Ph.D.

Date:   January 11, 2012

This memorandum comments on issues in the sections of the 2011 Revised Draft Supplemental Generic Environmental Impact Statement (RDSGEIS) and accompanying documents that address the social and economic impacts of natural gas development using high volume hydraulic fracturing (HVHF) proposed for New York, and evaluates the sufficiency of the impact analysis presented and the mitigation measures identified. HVHF describes a stage in the gas extraction process whereby large amounts of water, toxic chemicals, and sand are injected at high pressure to create fissures in low-permeability formations and thereby allow the release of gas. The process is capital intensive, and throughout its duration, poses significant environmental risks. The New York State Department of Environmental Conservation (NYSDEC or the Department) is charged with identifying and evaluating the impacts of gas development using HVHF, including both the benefits and the costs that will be borne by the communities and counties where drilling will occur.

In preparing these comments, the key documents reviewed include:

- The 2009 scope of work for the SGEIS.
- Comments prepared by AKRF and other technical experts on the 2009 draft SGEIS.
- A report prepared by Sammons, Dutton and Blankenship (2010) in response to comments on the 2009 draft SGEIS analysis of socio-economic impacts.
- The RDSGEIS released in September 2011 and particularly sections addressing socioeconomic and community impacts (6.8 and 6.12) and mitigation (7.0).
- The Economic Assessment Report (EAR) prepared by Environment and Ecology LLC to accompany the RDSGEIS.

These comments also draw on my own research on input/output models and community impacts and on research that has been conducted on the social and economic impacts of natural gas drilling in shale gas plays across the United States. Other documents cited in these comments are included in the reference list.

Although NYSDEC has included more information on the social and economic impacts of gas development using HVHF in the RDSGEIS than it did in the 2009 draft, the RDSGEIS still does not effectively assess those impacts or provide appropriate mitigation strategies. These comments identify areas of social and economic impact that require additional or revised research or analysis in the SGEIS. Overall, the discussion of social and economic impacts in the RDSGEIS is poorly organized. Social and economic topics are discussed in several sections of the RDSGEIS and statements are made in some sections that are contradicted by evidence in others. The differences between the social and economic impacts of vertical and horizontal drilling are not addressed in a systematic way. Critical assumptions underlying the socioeconomic

impact analysis were accepted from industry sources (the Independent Oil and Gas Association of New York or IOGA NY) without independent verification.

Substantive concerns include the following:

1. The assessment of economic benefits (jobs and taxes) relies on questionable assumptions about the amount of gas extractable in the New York portion of the Marcellus Shale.  The range of estimates for extractable gas appears to be skewed to the high end, leading to an overestimation of economic benefits.

2. The model used to assess social and economic impacts presents natural gas development as a gradual, predictable process beginning with a "ramp-up" period and then proceeding through a regular pattern of well development over time.  Experience from shale plays in the Western United States demonstrates that volatility and unpredictability are intrinsic to natural gas extraction, as operating companies assess their commercial options from one shale play to another or within one shale play and allocate rigs to respond to those options.  The model used in the RDSGEIS is misleading, giving the impression that communities in the drilling regions will experience economic disruption only once, during a ramp-up phase, rather than periodically, as operating companies repeatedly enter and leave the region.  The problems with the model are then compounded, as projected impacts on population, jobs, and housing are predicated on one-time ramp-up and adjustment phases rather than on a process in which rigs may move in, move out, and move in again, in an unpredictable sequence.  Because many of the negative social and economic impacts of HVHF gas extraction (such as housing shortages followed by excess supply) are a consequence of unpredictable development, the model used in the RDSGEIS cannot appropriately assess those impacts.  The limitations of the model should have been explained with reference to the literature that describes the irregular, unpredictable course of natural gas development, including rig movement among shale plays and the frequency of re-fracturing wells.

3. The RDSGEIS does not assess public costs associated with natural gas development.  A fiscal impact analysis of the base costs to the state and localities that will occur with any amount of HVHF gas development is required along with an estimate of how costs will increase and accumulate as development expands.  Although some of the potential community character and economic costs associated with the projected drilling scenarios are mentioned in the RDSGEIS, there is no attempt to quantify those costs to the state or localities either as part of the modeling process or separately.

4. The long-term economic consequences of HVHF gas development for the regions where production occurs are not addressed despite a widely recognized literature indicating that such regions have poor economic outcomes when resource extraction ends.

5. Mitigation of enumerated negative social and economic impacts of HVHF gas development is presumed to occur by means of phased development and regulation of the industry, but no evidence or information is provided to indicate whether, and if so how, that would occur.  For example, NYSDEC proposes to ask operators to identify inconsistencies with local zoning and other comprehensive land use planning, but there is no explanation of how the inconsistencies will be addressed in the permitting process or regulatory system.  All mechanisms that will be relied on to address adverse social

and economic impacts need to be defined and incorporated into enforceable mitigation measures.

Part I of these comments focuses on the socioeconomic impact analysis in section 6.8 of the RDSGEIS. Section 6.8 adopts the assumptions utilized in the EAR and summarizes its more detailed description of anticipated impacts from HVHF gas development. Part I.A pays particular attention to the model employed in the EAR and its assumptions about how the exploratory, drilling, production, and resource depletion phases of development will occur. These assumptions do not adequately consider the uncertainties and risks associated with HVHF gas development. Part I.B comments on particular issues and areas of impact addressed in the RDSGEIS. Part II discusses issues pertaining to the distribution of economic benefits that are raised by the EAR but not addressed in the RDSGEIS. Part III comments on the mitigation proposed for potentially significant social and economic impacts.

## I.      NYSDEC's Socioeconomic Impact Analysis

### A.      The Unpredictability of Natural Gas Production and How It Is Treated in the RDSGEIS

The EAR's projections concerning population, jobs, housing, and revenue are predicated on the assumption of a regular, predictable roll-out of the exploratory, drilling, and production phases of the natural gas development process, rather than the irregular pattern typically associated with such development.

Natural gas drilling is a speculative venture and the amount of commercially extractable gas from any particular well is uncertain. Because of the speculative nature of the industry, there are significant economic risks associated with natural gas production. These risks are magnified by the costs involved in natural gas development, which uses capital-intensive technologies such as those engaged in hydraulic fracturing.

The industry is organized in such a way that these risks can be lessened. For example, a limited number of rigs is available nationally, and they are deployed among and within natural gas plays based on calculations of well productivity and commercial return. The drilling labor force is not fixed to a place, but moves with the rigs based on operator company strategies. Work is carried out by contractors on a project-by-project basis to maximize flexibility and efficient deployment of the specialized skills needed.

Because of the speculative character of commercial development of natural gas plays, there are uncertainties in how any shale gas play or portion of a play will be developed. What this means in practical terms is that the regions where shale gas development occurs can experience considerable volatility in the timing of well development and in the scale of well development (in the total number of wells). This central feature of natural gas development has critical implications for the economies of natural gas development regions. As production fluctuates, regions may experience short- and medium-term volatility in population, jobs, revenues, and housing vacancies (Best, 2009; Headwaters Economics, 2011; Jacquet, 2009; Sammons, Dutton and Blankenship, 2010).

The EAR does recognize both production volatility and price volatility in the gas industry. In describing national drilling activity, the authors report: "The number of active gas

drilling rigs fluctuated substantially over the decade, with the number of rigs in the most active quarter being 2.35 times the number in the least active quarter."  (EAR, 2-2).  In New York, "the average wellhead price for natural gas remained at relatively low levels in the 1990s, generally increased thereafter, reaching a peak in 2008, and then fell sharply in 2009."  (EAR, 3-12).

The EAR also briefly mentions the difficulties that the unpredictability and volatility of natural gas development presents for predicting social and economic impacts (e.g., EAR, 4-59, 4-111).  The model used to project socioeconomic impacts ignores those issues, however, and assumes instead that the HVHF natural gas development in New York will have a different pattern than that historically associated with such development.  Rather than occurring in irregularly recurring waves (or "boom-bust cycles"), development in New York is assumed to be steady and predictable.

The RDSGEIS mentions the uncertainty and variation in well productivity in sections not addressing socioeconomic impacts (RDSGEIS, 2-5, 2-62, 2-74, 4-17).  However, the section of the RDSGEIS that specifically addresses socioeconomic impacts (Section 6.8) ignores the evidence of unpredictability in the pace and scale (timing and total well development) of natural gas development from New York counties with vertical well development and from other shale plays.  Instead, it reports results from the model used in the EAR to project social and economic impacts from HVHF gas development that assume a regular, incremental, and predictable pattern of well development and production over a 60-year period, both on a statewide basis in three defined regions and under two development scenarios (low and average).  Like the EAR, the RDSGEIS neglects the implications of variable well productivity and commercial viability -- critical considerations that will affect the pace and scale of drilling as well as its geographic distribution.

### A1.    Uncertainties Regarding Well Productivity

The RDSGEIS and accompanying EAR do not meaningfully recognize a central category of uncertainties that will affect the pace and scale of drilling – the uncertainties surrounding well productivity.  Instead, NYSDEC states with respect to the low and average development scenarios analyzed:

> Both development scenarios assume a consistent timeline for development and production.  Development is assumed to occur for a period of 30 years, starting with a 10-year ramp-up period.  The number of new wells constructed each year is assumed to reach the maximum in Year 10 and to continue at this level until Year 30, when all new well construction is assumed to end.

(RDSGEIS, 6-209).

This approach is one of the major weaknesses of the RDSGEIS because the assumptions of a 30-year well production cycle and a sub-regionally consistent roll-out of wells that will move through the drilling and production phases over 60 years are not supported by evidence from other shale plays.  In fact, there is sufficient evidence of precipitous declines in well productivity and the costs of HVHF gas development relative to ultimate recovery to raise questions about why the 30-year development/60-year productivity profile was adopted (Berman, 2010; Berman and Pittinger, 2011; Hughes,

2011; Urbina, 2011).  In an analysis of shale gas wells across shale plays, Berman and Pittinger (2011) found thousands of wells that dropped below commercially viable production between 5 and 12 years after initial drilling.  The average commercial life of these wells was 8 years.  NYSDEC should not have used data provided only by IOGA to construct the roll-out model; rather, it should have obtained evidence and data from independent sources who do not stand to benefit from the projection of long-term, predictable resource development.

Another example of questionable assumptions that likely over-estimate potential gas extraction from the New York portion of the Marcellus Shale is the well productivity projections used in the EAR.  These are presented in Tables 4-3, 4-4 and 4-5 of the EAR. Although ultimate recovery figures are not presented in the EAR, they can be calculated based on the yearly production projections presented in 4.1.3 and the number of wells projected in 4.1.2.

These productivity projections are considerably higher than the well productivity results from existing shale plays found by Berman and Pittinger (2011).  In addition, calculations of well productivity over the 60 year period produce ultimate recovery figures for the New York portion of the shale play that, in the medium and high scenarios, exceed most scientific estimates of ultimate recovery (Coleman et al, 2011).  Although the 29 Tcf low scenario (for 60 years) does not exceed geologist Terry Engelder's estimate for New York's portion of the Marcellus shale, the productivity projections seem particularly questionable considering that, "The Marcellus fairway in New York is expected to have less formation thickness, and because there has not been horizontal Marcellus drilling to date in New York the reservoir characteristics and production performance are unknown. IOGA-NY expects lower average production rates in New York than in Pennsylvania." (RDSGEIS, 5-139).

Moreover, as pointed out by a group of economists commenting on the EAR assumptions and methods (Barth, Kokkelenberg and Mount, 2011), the range of estimates of productivity is so large as to be meaningless.  For example, estimates for well productivity during the 23rd year of production range from 600 billion to 3.6 trillion cubic feet, a variation on the order of 600%.  Accuracy in these estimates is critical to derive estimates of tax and employment effects.  As it stands, the estimates used in the EAR are no better than bloated "guesstimates."

The use of IOGA's estimates as the sole source of well productivity projections undermines the credibility and accuracy of the EAR and the RDSGEIS.  The estimates of well productivity must be revised to more accurately reflect expert opinion on anticipated well productivity in the New York portion of the Marcellus shale.  In addition, the RDSGEIS must be updated to reflect the Energy Information Administration's revised estimates of natural gas in the Marcellus shale based on the USGS analysis (Coleman et al, 2011).

The uncertainties associated with the productivity of extraction from the Utica shale must also be addressed, if Utica shale wells are to be included in the SGEIS analysis.  In the EAR, the projections for the number of wells to be drilled include those for the Utica shale.  There are significant uncertainties about the productivity of that play, the geographic variation in liquid content across that play, whether the well spacing and fracture treatment would resemble those for the Marcellus, and what technologies would be used in Utica shale development (Yost, 2011).  These unknowns are significant and

indicate that Utica shale development may proceed differently than Marcellus shale development and utilize different technologies.

The unspecified inclusion of well numbers and productivity figures from the Utica shale also raises questions about the extrapolated employment, housing and tax implications that are attributed to Marcellus shale development.

The issues surrounding productivity are further complicated by the common practice of re-fracturing wells to increase pressure and productivity.  If re-fracturing is practiced in New York Marcellus wells, communities will be repeatedly subjected to the environmental disruptions associated with heavy industry.

The uncertainties around and questions raised about long-term well productivity argue for modeling a shorter-term development and production cycle.  At the very least, the competing evidence concerning well productivity and the cost of recovery should have been discussed in the RDSGEIS to qualify assumptions concerning the production cycle and estimated ultimate recovery.

### A2.  Impacts of the Uncertainties Associated with HVHF Gas Development

<u>Evidence from Western shale plays indicates that the volatile pace and scale of natural gas development drives many environmental and social and economic impacts</u> (Best, 2009; Jacquet, 2009; Headwaters Economics, 2010).  Impacts directly affected by the pace and scale of drilling include:

1) Labor force needs and behavior. (How much of the workforce remains transient rather than becoming local? A local labor supply cannot develop if gas development is unpredictable.)
2) Demands placed on public services, including health facilities, public safety, and schools. (Can communities adapt over time or are there unpredictable rises and falls in demand?)
3) Community character impacts from increases in traffic, noise, construction disruption, and the transient population. (Do these increases roll out in a regular fashion with the expectation that disruptive "ramp-up" will end or are they unpredictable over a long period of time?)
4) Impacts on rural industries, such as tourism. (Can the scale of noise and traffic be predicted to occur only for a short period or are disruptive activities likely to recur over a longer period of time, for example, with re-fracturing of wells?)
5) Housing demand and cost. (Will there be periodic housing shortages with homelessness and lack of affordable housing for people on fixed incomes, potentially followed by excess housing supply and falling home values?)

To illustrate:  As well pad construction begins in an area, jobs increase along with housing construction and business development.  A transient population (in addition to transient industry workers) migrates to the area because of the prospect of jobs, increasing the demand for housing and services, including education and health.  For a variety of reasons (price of natural gas, availability of higher value opportunities elsewhere, rig availability), natural gas development may drop off in the area within five-ten years of this initial "ramp-up."  Evidence from gas plays in Western states indicates that this drop-off may be sudden.  In the wake of this drop in production and the number

of drilling rigs in the area, the transient population leaves and resident communities are left without jobs and revenue.  Local governments may still be paying the public costs of ramping up to respond to the initial "boom."  If conditions change (rigs become available, prices rise), the rigs may return to the area, causing another production "boom" with all of its attendant costs.

This pattern is described by Spelman (2009) and is associated with a reluctance of business (other than the gas industry) to invest in regions characterized by boom-bust economies.  A contemporary example of such reluctance is contributing to the housing crisis in the Williston North Dakota Bakken Shale development.  According to interviews conducted there: "Developers have been slow to build more apartments, largely because they got stung by the region's last oil boom that went bust in the 1980s." (MacPherson, 2011).

This volatile pattern is dramatically different from the scenario presented in the EAR and RDSGEIS.  In both documents, communities are assumed to be impacted by a boom only once (during "ramp-up") and are gradually able to adjust to natural gas drilling.  <u>Many of the economic benefits that the RDSGEIS and EAR associate with natural gas development are predicated on this gradual, regular development scenario.</u>  For example, the RDSGEIS assumes that as the industry "matures" in the region, local residents will be trained and hired for drilling jobs.  If, as has been the case with vertical drilling in New York State and in the Western US shale plays, development follows a more irregular pattern, then the higher paid technical jobs are less likely to evolve into stable local employment.  In addition, the jobs in ancillary industries (retail and services) are likely to disappear and reappear as rigs leave and re-enter the region at unpredictable intervals.  The RDSGEIS's use of a model built around regular, predictable development of the shale gas resource raises doubts about the projection of economic benefits based on that model.

### A3.    Hot Spots, Socioeconomic Impacts, and Public Costs

<u>Contrary to the contention that the regularized development model "does not significantly affect the socioeconomic analysis" (RDSGEIS, 6-209), smoothing out the unpredictability and unevenness of development covers up many of the negative cumulative social and economic impacts that arise from the unpredictability of shale gas development.</u>  The RDSGEIS admits that steady, constant well construction is "unlikely" (RDSGEIS, 6-209), but it fails to analyze the implications of this admission and offers no description or evaluation of the adverse impacts of temporally and spatially uneven development.

In contrast with the model used in the RDSGEIS, natural gas development does not resemble a "manufacturing" process. Some wells will have long production phases; others will have dramatic declines in productivity after a relatively short period.  Well productivity may be uniformly low across a region, or there may be long-term well productivity in particular "hot-spots."  The question of how many wells will exhibit long-term productivity and where they will be located is unknown before exploratory drilling takes place and, even then, well productivity will be unpredictable.

The RDSGEIS admits that its socioeconomic analysis is based on average well productivity (RDSGEIS, 6-210), but the production process in natural gas (pace and scale) is not effectively captured using averages.  The uncertainties in the geographic extent of drilling and the potential for intensive development in "hot spots" have

implications for social and economic impacts. For example, if drilling is concentrated in particular locations rather than rolled out uniformly across sub-regions of the landscape for 60 years (as is modeled in the RDSGEIS and EAR), wealth effects and tax revenues also will be concentrated in particular localities. The social and economic <u>costs</u> of spatially concentrated drilling, however, will be experienced across a much wider geographic area, because public services will be required in areas without HVHF development (and therefore not receiving tax revenues from drilling), but close enough to serve the transient population associated with the industry. There is no attempt to address this likely unbalanced distribution of positive and negative impacts in the RDSGEIS.

Finally, the RDSGEIS does not sufficiently model the resource depletion phase of the exploration, drilling, production, and resource depletion cycle and its implications for local and regional economies. Figure 6.13 (RDSGEIS, 6-215) shows the drop in direct and indirect employment following resource depletion. This depiction needs to be accompanied by analyses of how the resource depletion phase will be reflected in royalty payments and tax revenues.

### A4. Socioeconomic Impact Analysis Can Accommodate the Uncertain Pace and Scale of Gas Development

<u>If the impacts of volatility are to be mitigated, their prevalence in natural gas extraction regions needs to be acknowledged in the SGEIS.</u> It is difficult to model the unpredictable pace and scale of natural gas production, but that difficulty is no excuse for ignoring adverse social and economic impacts arising from volatile and unpredictable development. Those impacts have been documented in relation to the phases of exploration, construction and drilling, production, and resource depletion, recognizing the company strategies that produce economic volatility in resource extraction regions (Jacquet, 2009; Kelsey, 2009; Sammons, Dutton and Blankenship, 2010).[1]

In cases where it is not possible to model specific <u>cause-effect</u> relationships (such as the relationship between well development and public costs), but where there is evidence of potential adverse impacts, those impacts should be recognized and documented. Sammons, Dutton and Blankenship (2010) take this approach in their report

---

[1] From Sammons, Dutton and Blankenship (2010):

> Several recent studies address (social and economic) aspects of natural gas development in the western U.S. They include the *Northwest Colorado Socioeconomic Analysis and Forecasts* prepared for the Associated Governments of Northwest Colorado and the *Sublette County Socioeconomic Impact Study: Phase I Final Report* and *Phase II Final Report,* prepared for the Sublette County, Wyoming Board of County Commissioners. A third report, the *ExxonMobil Piceance Development Project Environmental Assessment - Socioeconomic Technical Report,* prepared by the authors for the U.S. Bureau of Land Management White River Field Office, assesses potential effects of a specific natural gas project in the context of ongoing large scale natural gas development in northeastern Colorado. A more recent journal article, *Energy Boomtowns & Natural Gas: Implications for Marcellus Shale Local Governments & Rural Communities,* published by the Northeast Regional Center for Rural Development, describes a model for impact assessment, presents a case study describing Sublette County's experience with large scale natural gas development and discusses some possible implications for Marcellus Shale development.

commissioned by the New York State Energy Research and Development Authority (NYSERDA) to describe socioeconomic impacts that can be anticipated with HVHF gas development.  In addition, NYSDEC needs to quantify known social and economic costs even if their occurrence cannot be synchronized with their scenario model of development.  This quantification can be accomplished through examination of comparable cases of impact, a standard method used in fiscal impact analysis (Kotval and Mullin, 2006).

**B.**      **NYSDEC's Analysis of Specific Socioeconomic Impacts: Model Assumptions and the Use of Representative Regions**

The RDSGEIS presents only a fraction of the material contained in the EAR and acknowledges: "A more detailed discussion of the potential impacts, as well as the assumptions used to estimate the impacts, is provided in the Economic Assessment Report, which is available as an addendum to this RDSGEIS." (RDSGEIS, 6-207).  This section identifies questions and concerns regarding the assumptions underlying the model used to predict impacts of HVHF development in New York State.  These comments focus particularly on the use of representative regions to project impacts throughout New York State, including those for Utica shale gas drilling.

**B1.     The Use of Representative Regions**

NYSDEC's use of a set of Southern Tier counties to represent all counties in New York that may experience HVHF shale gas drilling (EAR, 6-217) raises concerns about the representativeness of these counties.  The EAR and RDSGEIS define three representative regions for the socioeconomic analysis, with Region A representing counties accounting for a high percentage of overall well development, Region B representing counties with about half the development of Region A, and Region C representing counties not expected to have much production but with a history of drilling. In the RDSGEIS, characteristics from a representative region are used to make assumptions about socioeconomic impacts in other New York State regions where drilling may occur.  For example, tourism impacts are assumed to be minimal for all regions based on the continued presence of a tourism industry in Region C.  The EAR and NYSDEC need to provide evidence (in industrial composition, growth rates, and population composition) to support the assumption that these counties are "representative" of all the counties that may experience drilling.

In addition, the EAR indicates that it addresses "local" impacts, but there is no analysis below the county scale.  Analysis of differential economic impacts in urban and rural areas, for example, is critical to understanding the total economic impact picture.  For example, counties in Region A in the EAR scenario analysis include both urban areas such as the Binghamton Metropolitan Statistical Area and rural areas where tourism and agriculture are the primary industries.  Urban areas will garner more expenditures from natural gas drilling in the region, but are also likely to have negative impacts in the form of increased crime and demand for health services (because of their location in the urban areas).  Rural areas will experience intense impacts on their small rural communities, including demand for housing and increases in road damage, as well as potential negative effects on agriculture and tourism.  These local impacts, and how the costs and benefits will be distributed, need to be assessed separately.

B2.    The Use of a RIMS Input-Output Model to Assess Social and Economic Impacts

A central component of the EAR is use of a Regional Industrial Multiplier System (RIMS) model developed by The Bureau of Economic Analysis.  This type of model is useful for comparing different types of investments and for examining inter-industry linkages, but it has a significant drawback as the central model for the RDSGEIS analysis of socioeconomic impacts because it can only project economic benefits.  It cannot measure or assess the costs of proposed gas development using HVHF or tell us anything about fiscal impacts.

The purpose of the model is to deduce direct and indirect economic impacts of new expenditures in a region.  This type of model is very limited in the types of impacts it can assess.  It is typically used to estimate some economic impacts, but is not useful to assess the wide range of social impacts that have been identified as occurring with HVHF shale gas drilling.  So, for example, the model can be used to derive population increases and then, to crudely extrapolate potential housing demand.  It cannot tell policy makers anything about the impact of housing demand on different population segments or on community character.

The results of this kind of model will always be positive because the model begins with the inflow of expenditures in the region.  If the modelers had examined new expenditures flowing into the region's tourism or agricultural sectors those, too, would be positive.  The model provided in the RDSGEIS does not allow us to assess opportunity costs, that is, to compare the economic impacts of shale gas drilling with those that might occur with increased investments and expenditures in other industries.  This is important not only because shale gas drilling impacts are being considered in "isolation," but because investments in industries such as tourism and agriculture might decrease because of "crowding out" by HVHF activity (Christopherson and Rightor, 2011)

A model of this type is completely dependent on assumptions about the source of expenditures in the region.  For example, in the case of HVHF gas development, the model is based on assumptions such as those about where the labor force hired in the drilling phase will spend the money they earn -- in the drilling region or in their home states?  These assumptions are critical to the model results and should have been made available so that the accuracy of the model could be analyzed.

The presentation of the model results in the EAR is neither useful nor informative.  Much of the text is devoted to tables that present mechanical calculations.  These tables should have been relegated to an appendix and the body of the report used to lay out and support the assumptions that underlie the calculations.

In December 2011, the consulting firm that developed the EAR was asked to evaluate costs associated with gas development using HVHF in New York State.  Because the RIMS input-output model and the associated scenario approach cannot address the costs of such development, the use of this approach rather than one that addresses costs as well as benefits needs to be justified and re-visited.  In addition, because of its inability to address costs, the model does not provide information on impacts that require mitigation.  Given the inadequacies of the EAR model and the significance of local and state costs to decisions about shale gas drilling in the state, revised EAR findings

regarding costs must be prepared and an opportunity for public review and comment on the revised EAR afforded before the SGEIS is finalized.

**C.    NYSDEC Analysis of Selected Social and Economic Impacts**

This section comments on section 6.8 of the RDSGEIS, which assesses a selective subset of the many social and economic impacts anticipated with HVHF natural gas drilling.  These include: (1) economy and employment, (2) population, (3) housing, (4) government revenue and expenditure, and (5) environmental justice.  This section concludes with comments on material presented in the EAR that is not discussed in section 6.8, but which is relevant to the RDSGEIS findings regarding social and economic impacts.

**C1.    Economy and Employment**

Employment.  The oil and gas industry is not likely to be a major source of jobs in New York, because of the project-based nature of the drilling phase of natural gas production (rigs and crews move from one place to another and activities are carried out at each well) and because of its capital intensity (labor is a small portion of total production costs) (Jacquet, 2009).  The emerging information on actual employment created in Pennsylvania in conjunction with Marcellus drilling shows much smaller numbers than industry-sponsored input-output models projected.

Although the industry points to years of drilling experience in New York, the oil and gas industry employed only 362 people in New York State in 2009 (0.01% of the state's total employment) (EAR, 3-7).  43% of those workers (157) were employed in Region C, the region where vertical natural gas drilling is most significant in New York.  Wages for these workers constituted 0.04% of the wages in the two-county region with almost 4,000 active gas wells (EAR, 3-31).

The employment multiplier projected for New York State (2.1766) (derived from the model used in the EAR) is exceptionally high, especially for investment from a capital-intensive industry.  (A 2.0 multiplier is considered generous by most regional economic analysts.)  This underscores the importance of making the assumptions underlying the model transparent.  For example, is the basis for the multiplier used an assumption that expenditures on real estate development resulting from the HVHF gas development will accrue disproportionately to New York state firms?  If so, why?  Because unrealistic and overly optimistic assumptions made in constructing the models may overstate economic benefits, assumptions underlying this RIMS model need to be available for scrutiny.

Finally, the employment figures presented in Table 4-8 are "full–time-equivalent" (FTE) jobs.  These jobs do not correspond with what the ordinary person thinks of as a job – a person employed full-time to carry out certain tasks.  They are a composite of part-time and full-time jobs that might be developed from the 410 job activities associated with constructing and drilling a well and from the subsequent production phase.  These may not be new jobs, but existing jobs required to sustain industry activity.  Finally, the EAR does not provide sufficient context for evaluating the employment impact of gas development using HVHF in the state.  Projected employment in HVHF development should be compared with that in other New York industries, including tourism, to place the numbers in perspective.  Projected increases in employment in these other

industries should be provided to enable comparison and to estimate costs and benefits of permitting HVHF gas development.

Impacts on other regional Industries.  Having described in detail the modeled economic and employment growth from the gas industry, the RDSGEIS then mentions the potential adverse impacts on existing industries in the regions where natural gas development will occur.  In a bare two paragraphs, the RDSGEIS admits:

> Conversely, some industries in the regional economies may contract as a result of the proposed natural gas development.  Negative externalities associated with the [sic] natural gas drilling and production could have a negative impact on some industries such as tourism and agriculture. Negative changes to the amenities and aesthetics in an area could have some effect on the number of tourists that visit a region, and thereby impact the tourism industry.  However, as shown by the tourism statistics provided for Region C, Cattaraugus and Chautauqua Counties still have healthy tourism sectors despite having more than 3,900 active natural gas wells in the region.

> Similarly, agricultural production in the heavily developed regions may experience some decline as productive agricultural land is taken out of use and is developed by the natural gas industry.

(RDSGEIS, 6-230).

In contrast with the pages of projected benefits from gas development, the RDSGEIS offers no detailed description and no quantitative analysis of the effects of HVHF development on existing industries and the associated impact on the state of New York's economy.  This omission is particularly important for the counties defined in the EAR as "representative" because industries, including agriculture and tourism, are significant employers in those counties and are important to the overall economy of the State. There is no analysis of how the "crowding out" of existing industries may impact the regional or statewide economy or of the implications of the loss of industrial diversity to the long-term prospects for regional economic sustainability.

The inadequate assessment of the impacts on existing industries in the region that will be affected by HVHF gas development is problematic not only because the state does not have adequate information to assess costs and benefits of HVHF gas development, but also because negative impacts on industries such as tourism and agriculture, including dairies and wineries, will undermine state investments intended to support those industries.  As discussed in detail below, given the importance of these industries in the state and regional economy, the evidence that they will be negatively affected by HVHF gas development should have been analyzed in detail and quantified when possible.

Tourism.  The RDSGEIS makes no effort to quantify the value of tourist activities that may be adversely affected by gas development but rather dismisses any impacts as insignificant.

Nearly 674,000 New York jobs were sustained by tourism activity last year, representing 7.9% of New York State employment, either directly or indirectly.  New York State

tourism generated a total income of $26.5 billion, and $6.5 billion in state and local taxes in 2010.

Tourism in the Southern Tier counties includes a wide range of activities, from visits to the Corning Glass Museum to hiking, hunting, and fishing in the rural areas.  The Southern Tier Central (STC) Planning District, which includes Chemung, one "fairway" county (where significant natural gas drilling is anticipated because of the geologic formation) located in Region A in the RDSGEIS analysis, has published a study indicating that:

> In 2008, visitors spent more than $239 million in the STC region across a diverse range of sectors.  The tourism and travel sector accounted for 3,335 direct jobs and nearly $66 million in labor income in the STC region that year.  When indirect and induced employment is considered, the tourism sector was responsible for 4,691 jobs and $113.5 million in labor income.  In addition, the travel and tourism sector generated nearly $16 million in state taxes and $15 million in local taxes, for a total of almost $31 million in tax revenue -- a tax benefit of $1,181 per household.

 (Rumbach, 2011, page 1).

Tourism is thus a significant contributor to the counties in New York potentially impacted by HVHF gas development.  The tourist opportunities and activities also contribute to the quality of life of local residents and attract companies in other sectors, such as manufacturing.

NYSDEC's use of Chautauqua and Cattaraugus Counties as the basis for contending that tourism will not be significantly impacted in New York is not persuasive.  First, the evidence offered for the judgment that those counties have "healthy tourism sectors" (RDSGEIS, 6-231) consists of nothing more than the statement that: "In 2009 wages earned by persons employed in the travel and tourism sector in Chautauqua and Cattaraugus counties (Region C) were approximately $77.5 million, or about 3.0% of all wages earned in Region C" (NYSDOL 2009b) (see Table 3-37)" (EAR, 3-27).  Without comparing Chautauqua and Cattaraugus over time with similar counties where natural gas development has not taken place, it is impossible to determine whether the tourism sector of the Region C counties has been negatively impacted by shale gas drilling.

The contention that those counties represent a tourism success story is contradicted by data presented in the EAR, which shows that from 2007 to 2009, Region C tourism employment declined 17%, and wages declined 13% (EAR, 3-28).  While a portion of this decline might be attributable to the recession, there is no justification for describing waning tourism in the region as "healthy."

In addition, there is growing evidence regarding the negative effects of shale gas drilling on tourism in the counties where shale gas drilling takes place (Rumbach, 2011).

> Evidence from other shale plays in the Western U.S. indicates that natural habitat tourism (whether hunting, fishing, birding or hiking) may be disrupted for long periods of time and in some cases where infrastructure, such as compressor plants and pipelines, disrupts habitats, may be permanently altered.

(Sammons, Dutton and Blankenship, 2010). Negative impacts derive not only from the loss of habitat for outdoor sports, but also from the "crowding out" of tourism activities (because of increasing prices in the drilling region and the loss of hotel spaces to gas industry workers) and from the impact of regional industrialization on the tourism brand. For example, tourism centers in Upstate New York, such as the Finger Lakes wineries, may experience losses when tourists looking for a rural retreat find themselves driving through an industrial region with heavy truck traffic and shift their allegiance to quieter and more accessible vacation spots. In addition, the RDSGEIS does not assess the impacts on tourism from degradation of historical and cultural assets.

The EAR also conflates access to private recreational land for purposes of hiking, hunting, and fishing with the success of commercial tourism businesses. The relationship between personal recreational opportunities and natural gas development is presented as one of personal trade-offs in terms of land use. The negative impacts on the options of non-land owning recreationists are mentioned but not addressed (EAR, 4.58).

Rumbach's assessment of HVHF gas development on tourism is that:

> ….individual impacts are unlikely to have serious and long-term consequences, but without mitigation, cumulatively they could do substantial damage to the tourism sector. Examples of such impacts include strains on the available supply and pricing of hotel/motel rooms, shortfalls in the collection of room (occupancy) taxes, visual impacts (including wells, drilling pads, compressor stations, equipment depots, etc.), vastly increased truck and vehicle traffic, potential degradation of waterways, forests and open space, and strains on the labor supply that the tourism sector draws from. All told, the region's ability to attract tourists could be damaged in the long-term if the perception of the region as an industrial landscape outlasts the employment and monetary benefits of gas drilling.

(Rumbach, 2011, page 2).

The RDSGEIS fails to address the long-term costs associated with displacing business in existing industries, such as tourism, that provide economic diversity in the regional economy and thus increase its prospects for sustainability.

<u>Agriculture.</u> <u>Potential negative impacts on agricultural production and land use are noted, but their impact is not assessed nor are any mitigation measures proposed (RDSGEIS, 6-231). There is no analysis of whether and how HVHF gas development will affect sub-sectors of agriculture, such as dairy farming, which are of key importance in the New York economy.</u>

Milk and other dairy products account for more than half the total value of agricultural products sold in New York State, accounting for $2.2 billion in receipts in 2010. According to the US Department of Agriculture, New York ranks third in the US in production and sale of dairy products. Certainly the size and importance of this industry to the New York economy warrants a full analysis of how production and producers will be impacted by HVHF gas development. Instead, the RDSGEIS lacks an economic

assessment of how temporary and long-term agricultural costs and productivity will be affected by HVHF development.

Recent evidence from Pennsylvania indicates that agriculture and particularly dairy farming may be significantly affected by drilling activity.  For example: "(Bradford) county's dairy herd has decreased over the last decade from 30,000 head in 2002 to just under 20,000 head today.  Another 15 dairies have been sold since the beginning of the year (2011)" (Tomes, 2011).  Although evidence from Pennsylvania is anecdotal, there is sufficient information to indicate that one of New York's major industries will be negatively affected by HVHF gas drilling.

Dairy farms are decreasing in areas with natural gas development both because some farmers have another source of income and because costs for dairy farmers are going up as a consequence of the impact of the drilling economy in the county.  For example, competition for truck drivers is raising the cost for dairy farmers to transport their milk to processors.  In addition to the impacts on the dairy farms themselves, the infrastructure that supports dairy farming in Bradford County is being affected.  For example, an agricultural equipment dealer in the County has gone out of business because of an inability to hire and retain a workforce (Tomes, 2011).

There are also land use impacts that affect farmers, including impacts not only from the well pads, but also from the ancillary industrial facilities, such as "laydown yards" (operations and storage sites), pipelines, and compressor stations (Tomes, 2011).

The American Farmland Trust (2011) has submitted comments on the RDSGEIS that summarize its expert assessment of the impact on agricultural production in New York State:

> …the DEC's analysis of the impacts of drilling and hydraulic fracturing to agricultural land is inadequate and encourages specific analysis of the likely impacts of such activities to agricultural land resources.  The SGEIS analysis should consider the scale of farmland likely to be converted by both direct drilling activities and the off-site drilling support services and other types of residential and commercial development that is anticipated as a result of natural gas drilling.  In addition, it should consider the impacts of such activities to agricultural land values and on the ability of New York farmers to maintain their competitiveness in a global economy.

Upstate New York is currently experiencing a resurgence in its food processing industry, and the State Agricultural and Markets Program has a stated policy of encouraging more dairy production in the state.  In July 2011, the State of New York provided $16 million in incentives to a dairy processing company in Chenango County in Central New York.  According to a statement by Governor Cuomo: "Agro Farma's expansion in Chenango County will create hundreds of new jobs and increase the demand for milk from New York dairy farms," (press release available at: http://www.governor.ny.gov/press/07212011DairyProductsCompany).

The support from New York's Empire State Development Corporation reflects the significance of this industry to the regional and state economy.  A full economic assessment of potential impacts to this industry is warranted.  This assessment should include labor costs (from competition for truckers, for example) and impacts on specialty

agricultural producers, such as organic farmers. New York State has the fourth largest number of organic farms in the U.S.

The Finger Lakes wineries, combining agriculture and tourism, are another important subset of New York industries that may also be affected by HVHF gas development in Upstate New York.  New York State ranks third nationally in grape production.  Tourists visiting the wineries may not want to drive through industrial development and its associated truck traffic in order the reach the wineries, even if the wineries are not locally impacted by the drilling process.  Given the importance of this and other sectors of New York's agricultural industry to the Upstate New York "brand" and the investment of State resources to build the industry, the SGEIS needs to separately assess the impacts on this industry and develop mitigation policies to address the negative impacts identified.

Manufacturing.  Finally, the RDSGEIS and the EAR focus exclusively on impacts to agriculture and tourism because the use of land by those industries potentially competes with use of land for gas development.  Focusing on that competition may make sense for the largely rural representative regions defined in the EAR, but it does not make sense for representative regions with more diversified economies, including substantial manufacturing.  A report by the New York State Comptroller's office in 2010 shows that the Southern Tier has 14% of Upstate manufacturing.  Manufacturing should be included in the assessment of impacts on existing industries, because of its significance in Region A and because gas development will affect the labor supply and industry wage rates in counties where manufacturing plays a significant role in the economy.

## C2.    Population

The RDSGEIS and EAR do not address population impacts on community services, such as schools and health, but only population as it relates to employment and the labor market.  There was no attempt to look at actual population trends in counties with significant gas drilling and whether they reflect a decline in economic diversity that makes population levels less sustainable.  An analysis of the long-term population trends in shale gas drilling counties in the US is necessary to determine the impact of HVHF gas development on New York counties.  A projection based on labor demand is not sufficient.

The EAR assumes that, for the first 30 years, the population increases in counties that "host" natural gas drilling will be modest.  It notes, for example:

> [A]ctual population impacts may also be less than what is described in the following section because currently unemployed or underemployed local workers could be hired to fill some of the construction and production positions, thereby, reducing the total in-migration to the region.

(EAR, 4-59).

By focusing only on population changes directly related to gas industry employment, the RDSGEIS avoids addressing the potential for long-term population decline beyond the loss of industry workers.  Many areas with significant natural gas drilling lose population over time.  That has been the case with Chautauqua and Cattaraugus counties (Region C) in New York.

In addition, the RDSGEIS assumes a gradual (rather than disruptive) integration of the unemployed population in the region and of transient workers into the labor force required by the industry.  Experience from other states, however, contradicts the assumption of easy integration of the resident workforce and of newcomers to the regional labor force: "In areas of Pennsylvania where Marcellus shale drilling activity is occurring, it has been difficult at times to accommodate the influx of new workers" (Kelsey, 2011).  The potential for a low-skilled, transient workforce to migrate into the area is not considered, although there is evidence from Western shale plays that this occurs, and is particularly likely with high national unemployment rates.

> [B]ecause labor markets are imperfect, [and] the availability of a relatively large number of jobs may result in an influx of job seekers, some of whom lack necessary skills and qualifications and may be relatively indigent.  To the extent that indigent job seekers are unable to find jobs or do not have resources to secure housing and transportation to work; they can become a burden for local human service agencies.  This situation can be exacerbated by weak economic conditions in other parts of the state or country.

(Sammons, Dutton and Blankenship, 2010, page 13).

The RDSGEIS fails to address this evidence of adverse economic impacts.

### C3.    Housing and Property Values

<u>The potential impacts on the housing supply, housing costs, and housing financing are inadequately assessed in the EAR.  In addition, the social and economic impacts of unpredictable shortfalls in housing followed by periods in which there is an excess supply are not addressed.</u>

The report assumes that the current housing stock would be used to house any workers who move to the production region on a "permanent" (more than one year) basis (EAR, 4-107 (concluding "the impact on the supply of permanent housing units would be negligible at the statewide level during the production phase")).  Given the quality and age of the housing stock in the region, evidence from Pennsylvania indicates that it is likely that there will be a demand for new single-family housing (Kolb and Williamson, 2011).  This new housing stock will create new and additional construction jobs, increasing population pressure, accelerating the "boomtown" phenomenon. This housing may also contribute to sprawl around urban population centers such as Binghamton. When drilling ceases, either temporarily or permanently, the value of this new housing is likely to plummet (Best, 2009).

With respect to temporary housing, the EAR (EAR, 4-111) admits:

> In areas of Pennsylvania where Marcellus shale drilling activity is occurring, it has been difficult at times to accommodate the influx of new workers (Kelsey 2011).  There have been reports of large increases in rent in Bradford County, Pennsylvania, as a result of the influx of out-of-area workers (Lowenstein 2010).  There have also been "frequent reports" of landlords not renewing leases with existing tenants in anticipation of leasing at higher rates to incoming workers, and reports of

an increased demand for motel and hotel rooms, increased demand at RV camp sites, and increases in home sales (Kelsey 2011). Such localized increases in the demand for housing have raised concerns about the difficulties caused for existing local, low-income residents to afford housing (Kelsey 2011).

If communities add substantial temporary, short-term housing or single-family housing to accommodate development-phase workers, surplus capacity may exist in all these types of units after development is completed. Based on evidence from other shale gas plays, all of these adverse impacts (initial housing shortage, surplus supply if rigs leave temporarily and depressed value in some areas) may occur (Best, 2009; Sammons, Dutton and Blankenship, 2010).

The EAR (EAR, 4-111) also acknowledges the potential impact of the volatility of the production cycle on the housing market and property values:

> The demand for housing, both temporary and permanent, would be expected to change over time. The demand for housing would be the greatest in the period during which the wells in an areas are being developed, and demand would decline thereafter. This would create the possibility of an excess supply of such housing after the well development period (Kelsey 2011). If well development in a region occurs in some areas earlier than in others, then housing shortages and surpluses may occur at the same time in different areas within the same region.

> The natural gas market can be volatile, with large swings in well development activity. Downswings may cause periods of temporary housing surplus, while up-swings may exacerbate housing shortages within the regions.

A recent study of the impact of HVHF gas development in Pennsylvania indicates that impacts on the housing supply are significant, especially for people at the economic margins (Williamson and Kolb, 2011). These impacts pose environmental justice concerns and require mitigation strategies.

With respect to impacts on property value, the EAR authors found that having a well on a property was associated with a 22% reduction in the value of the property; that having a well within 550 feet of a property increased its value; and that having a well located between 551 feet and 2,600 feet from a property had a negative impact on a property's value. Thus,

> …not all properties in the region would increase in value, as residential properties located in close proximity to the new gas wells would likely see some downward pressure on price. This downward pressure would be particularly acute for residential properties that do not own the subsurface mineral rights (EAR, 4-114).

The EAR authors attributed the positive impact on property values of having a well located within 550 feet of a property to the prevention of further gas well development in that area due to a spacing order and setback conditions that prevented well drilling close to existing wells.

<u>The assertion in the EAR that property owners in the drilling region would see an overall increase in property values is based on increased demand and economic activity. Evidence from Pennsylvania and from Western Shale plays indicates that this demand may not occur in the county or locality where the drilling is occurring (Patton et al, 2010).</u>

The EAR's assumption of recovering property values after the completion of HVHF gas development does not take into account the potential for re-fracturing of wells to increase their productivity or the effects of waves of development in which drilling moves in and out of an area. The prospect of industrial activity is what drives down investment in regions open to boom-bust development and also negatively impacts property values (Spelman, 2009). A more definitive analysis of impacts of on property values, including mortgage availability, in regions affected by drilling is needed.

## C4.    Government Revenues and Expenditures

<u>The RDSGEIS assumes, based on the RIMS model, that economic benefits from HVHF gas development, presumably including benefits to revenue, will be substantial, but there is no fiscal impact analysis or cost-benefit analysis to substantiate that assumption.</u>  A fiscal impact analysis is required, given that:

(1)  Many purchases by drilling companies are tax exempt (EAR, 4-116).

(2)  Costs to the state that will reduce or offset tax revenues are not calculated.  For an example of this problem, see the discussion of rail infrastructure in the RDSGEIS section on transportation impacts.  The provision of tax rebates to railroad companies and to industry facilities represent lost revenue to the State and the locality.  The EAR admits that in addition to tax benefits, "such as expensing, depletion, and depreciation deductions," which reduce taxable income, "New York State offers an investment tax credit (ITC) that could substantially reduce most, if not all, of the net income generated by these energy development companies" (EAR, 4-115 to 4-116).

(3)  Substantial negative fiscal impacts are detailed in the EAR that are not quantified or fully acknowledged in the SGEIS:

> High-volume hydraulic fracturing operations would also result in some significant negative fiscal impacts on the state.  The increased truck traffic required to deliver equipment, supplies, and water and sand to the well sites would increase the rate of deterioration of the state's road system. Additional capital outlays would be required to maintain the same level of service on these roads for their projected useful life.  Depending on the exact location of well pads, the state may also be required to upgrade roads and interchanges under its jurisdiction in order to handle the additional truck traffic.  The potential increase in accidents and potential additional hazardous materials spills resulting from the increased truck traffic also would require additional expenditures.  Finally, approval of transportation plans/permits would place additional administrative costs on the New York State Department of Transportation (EAR 4-116).

There are now numerous studies available to calculate road damage, and the counties in the "fairway" in New York State have undertaken baseline studies that would enable

accurate calculation of the costs of road damage (Randall 2011). There is plenty of expertise available in the state to draw on, including Cornell Local Roads program, which has completed a thorough analysis of the kind of damage and what it would cost to repair.

The EAR also recognizes additional public costs associated with Marcellus shale gas development:

> Additional environmental monitoring, oversight, and permitting costs would also accrue to the state.  In order to protect human health and the environment, New York State would be required to spend substantial funds to review permit applications; to ensure that permit requirements were met, safe drilling techniques were used, and the best available management plans were followed; and to provide enforcement against violations.  In addition, the state would experience administrative costs associated with the review of well permit applications and leasing requirements and enforcement of regulations and permit restrictions.  All of these factors could result in significant added costs for the New York State government.

> The New York State Department of Health would also incur additional costs due to the need to provide additional technical support and oversight services to local governments that would monitor water quality in local drinking water wells (EAR, 4-116).

> In addition to the positive fiscal impacts discussed above, local governments would also experience some significant negative fiscal impacts as a result of the development of natural gas reserves in the low-permeability shale.  As described in previous sections, the use of high-volume hydraulic-fracturing drilling techniques would increase the demand for governmental services and thus increase the total expenditures of local government entities.  Additional road construction, improvement, and repair expenditures would be required as a result of the increased truck traffic that would occur.  Additional expenditures on emergency services such as fire, police, and first aid would be expected as a result of the increased traffic and construction and production activities.  Also, additional expenditures on public water supply systems may be required.  Finally, if substantial immigration occurs in the region as a result of high-volume hydraulic fracturing operations, local governments would be required to increase expenditures on other services, such as education, housing, health and welfare, recreation, and solid waste management to serve the additional population (EAR, 4-138).

The RDSGEIS mentions public costs associated with the increased demand for community social services, police and fire departments, first responders, schools, etc., but makes no attempt to calculate the costs and consider them in the context of a fiscal impact assessment.  Experience in other shale gas plays demonstrates that these costs are likely:

> Natural gas development and production-related activities and the incremental population associated with those activities will generate

demand for the full range of local government facilities and services and for some state government services. For example, during exploration and moderate stages of development, demand is usually limited to law enforcement, emergency response, emergency medical and road and highway maintenance and traffic control. Traffic, vehicle and industrial accidents and issues associated with a single-status, predominately working-age male workforce are the primary drivers associated with emergency response and law enforcement increases. Because many workers are temporary, and do not have local general purpose health care providers, they commonly use hospital emergency rooms for what would be otherwise be routine health care visits.

(Sammons, Dutton and Blankenship, 2010, page 19).

This knowledge regarding public costs and fiscal impacts should have been reflected in the RDSGEIS.  These costs may occur even if the amount of commercially extractable natural gas does not reach projected levels.  They need to be calculated both in terms of the baseline costs that are likely to occur with <u>any</u> drilling activity and in relation to varying levels of drilling activity.

Addressing the variability is important because there are distinct community character impacts attributable to large-scale development that have been identified and documented in other shale plays.[2]  For example:

> …some areas that experience large scale development have reported substantial increases in a variety of crime and social problems including alcohol and drug-related offenses, traffic offenses, disturbances, assaults and domestic conflicts.  Although some increases in crime and social problems would be anticipated to accompany any increase in population, some researchers have also attributed the increased levels of crime and social problems to the temporary and transient nature of the workforce and their living conditions.  There has been some debate in the social impact assessment literature about whether or not crime and other adverse social indicators increase at higher rates in communities experiencing large-scale development than average rates for all communities.  But the implications are clear that increases in crime and social problems are likely with large-scale development, even if they are proportionate to the increase in the numbers of people working and living in affected communities.

(Sammons, Dutton, and Blankenship, 2010).

Given the scale of development being projected, the thresholds for community costs and

---

[2] *See* Sublette County Socioeconomic Impact Study Phase I Final Report. Ecosystem Research Group. , January 2008.  Pages 54 – 58 and Index Crimes, Arrests, and Incidents in Sublette County 1995 to 2004: Trends and Forecasts, Prepared by J. Jacquet. Sublette County, Wyoming, April 2005, *available at:* http://www.sublettewyo.com/DocumentView.aspx?DID=351;  Local Social Disruption and Western Energy Development: A Critical Review, Wilkinson et.al. Pacific Sociological Review Volume 25. July 1982. *available at:* http://www.sublettewyo.com/archives/42/Local_Social_Disruption__Critical_Review_Response_and_Comm entary [1]. pdf.

adaptation to the impacts related to population increase or demand for services (administrative, school, health, public safety) must be addressed by the SGEIS. Evidence from Pennsylvania indicates that ability to adapt to these community social and economic impacts is critical to short-term and long-term community well-being (Kolb and Williamson, 2011; Kelsey, 2010, 2011).

(4)  Costs will vary with the nature of population increases driven by the permitting of HVHF gas development.  For example, indigent job seekers unable to find jobs and without resources to secure housing or transportation to work can become a burden for local human service agencies.  This situation may be exacerbated by weak economic conditions in other parts of the state or country.

An example of this phenomenon is documented in a study carried out by Guthrie Hospital/Troy Community Hospital in Bradford County, Pennsylvania, where impacts from HVHF gas development in the county have significantly increased demand for health services (Covey 2010).  The hospital is treating a new non-English speaking clientele and has had to hire translators.   They have also had to purchase new equipment and have experienced a significantly increased demand on their emergency room services.  The new demand affects not only the bottom line of providers, but also the availability of and access to health care for residents of the region in which drilling is occurring.

(5)  There is no analysis of the expected lag between immediate costs and anticipated revenues.  This lag may be 2-3 years, during which communities will be faced with significant public service costs.

(6)   A tax profile needs to be presented over time, not one for a single year, in order to understand how natural gas drilling has fiscally impacted Region C, where most wells are currently located and where wells have increased.

### C5.    Environmental Justice Impacts

A section on Environmental Justice, included at the end section 6.8 of the RDSGEIS, notes that well permits are currently exempt from screening under NYSDEC Commissioner Policy 29, Environmental Justice and Permitting (CP-29) (RDSGEIS, 6-263).  NYSDEC suggests that a drilling permit applicant could, "when necessary," conduct a GIS analysis to identify potential environmental justice areas.  The RDSGEIS should set forth criteria to determine when such an analysis would be "necessary" and should include the requirement in standard permit conditions or regulations.  Moreover, given the known housing impacts of gas development on low-income populations, efforts to mitigate significant adverse environmental justice impacts must include not only the "additional community outreach activities" required in the RDSGEIS, but also substantive measures to prevent dislocation and homelessness.

## II.     Additional Economic Impacts Identified in the EAR But Not Addressed in the RDSGEIS

The RDSGEIS presents only a fraction of the material contained in the EAR and acknowledges: "A more detailed discussion of the potential impacts, as well as the

assumptions used to estimate the impacts, is provided in the Economic Assessment Report, which is available as an addendum to this SGEIS" (RDSGEIS, 6-207).  This section comments on material presented in the EAR that is not discussed in section 6.8, but which is relevant to the RDSGEIS findings regarding social and economic impacts.

A.      <u>The Distribution of Impacts of HVHF Gas Development in New York State</u>

<u>The socioeconomic impact analysis should systematically describe the geographic distribution of impacts.</u>  In New York, as is explained below, the creation of high-paying jobs as a result of expenditures in industries outside the extraction industry is likely to occur <u>outside</u> the production region.  This is important because regions where natural resource extraction takes place (and especially rural regions with little economic diversity) have been found to end up with poorer economies at the end of the resource extraction process (Best, 2009; Sammons, Dutton and Balnkenship, 2010).  Mitigation measures need to be identified to address long-term costs to the rural counties where extraction will be concentrated.

The EAR calculates the impact of a $1 million increase in the final demand in the output of the oil and gas extraction industry on the value of the output of other industries in New York State (EAR, 3-6).  The EAR then makes a series of statements concerning where the economic benefits of HVHF development are expected to occur.  For example:

> The proposed use of high-volume hydraulic fracturing would have a significant, positive impact on employment in New York State as a whole and in the affected communities.  However, the distribution of these positive employment impacts would not be evenly distributed throughout the state or even throughout the areas where low-permeability shale is located.  Many geological and economic factors would interact to determine the exact locations where wells would be drilled. <u>The location of productive wells would determine the distribution of impacts</u>.

(EAR, 4-46; emphasis added).

<u>The location of wells is, however, only one factor affecting the distribution of economic impacts in New York State.</u> Many wells are drilled in rural areas with no or very limited commercial services near-by.  If that is the case, then the economic impacts (in the form of expenditures by drillers and companies) will not occur close to the drilling site.  Some will occur in centers – perhaps across a municipal or county line – where there are stores and restaurants that the drilling company employees use for meals and supplies.  Some economic impacts will occur in far away places, such as New York City, where the drilling company can buy specialized services, such as tax accounting and legal services, to meet their business needs.

This potentially broad distribution of economic impacts is reflected in the multipliers reported in the EAR as follows:

> As anticipated, the direct effect employment multiplier for the State of New York (2.1766) was substantially larger than the multipliers for the individual regions, which had direct-effect employment multipliers of 1.4977 in Region A, 1.3272 in Region B, and 1.4357 in Region C (USBEA

23

2011a, 2011b, 2011c, 2011d).  (EAR, 4-19).

These multipliers are affected by purchases by the gas drillers from other industries in the economy.  In this case, the RIMS model used in the EAR indicates that three largest industries in which purchases will be made (and additional employment created) are: (1) real estate and rental; (2) professional, scientific, and technical services; and (3) management of companies).  We can anticipate that purchases from these industries would have a strong effect in New York State as a whole because these industries have a strong presence in New York State.

What the multipliers also tell us, however, is that the jobs indirectly created by purchases of goods and services by the natural gas developers are not likely to be located in the counties where HVHF gas development occurs.  Multipliers tell us how strong the industry is in a region or state.  Higher multipliers indicate that those businesses that the oil and gas industry is likely to purchase goods and services from are present.  Lower multipliers indicate a small industry presence and thus a lower likelihood of purchases in that geographic area.  So, for example, a natural gas development company would employ professional services as a consequence of expanding drilling in Chautauqua County, but is likely to go to New York City to purchase those services because they are more likely to be available in New York City.  Companies providing professional services in New York City are more likely to stay there rather than move to the Southern Tier because they have more opportunities to attract diverse industries to their specialized services in New York City than in Elmira or Jamestown.

If the EAR seeks to project the impact of expenditures on the regions in the state likely to be affected by HVHF gas development, it needs to disaggregate these impacts to show what proportion of the impacts in the three largest sectors (real estate and rental; professional, scientific, and technical services; and management of companies) is actually likely to occur in the representative regions.  Although the authors assert that as the natural gas industry grows, more of the suppliers would locate to the representative regions and less of the indirect and induced economic impacts would leave the regions, no evidence is presented to substantiate this assumption.  This assumption contravenes economic knowledge about agglomeration economies and company location behavior, which indicates that specialized services will remain in higher order centers (like New York City) and not re-locate to counties, especially rural counties, where drilling is occurring.  The more likely outcome is indicated by a study of the impact of gas drilling on Western State economies, which found that natural gas drilling may have positive fiscal impacts at the state level, but negative fiscal impacts for the regions in which it occurs (Headwaters Economics, 2011).

### B.    The Distribution of Economic Impacts in New York Versus Those in Other States

Nationally, Texas and Oklahoma are the major beneficiaries of natural gas development, wherever production takes place in the United States. According to *Mine K. Yücel and Jackson Thies of* the Dallas Federal Reserve (2011): "An increase in oil and gas production **anywhere** benefits the state (of Texas) and its energy sector, which provides oilfield machinery and energy services to the rest of the world."  See also subsection C, below.  Nevertheless, because of its capital intensity, natural gas drilling does not have a large employment impact, even in Texas.  Gas development thus plays a minor role in the economies of even these resource extraction states.

### C.     The Distribution of Highly-Skilled Jobs

Petroleum engineers are listed as one of the most common occupations in the oil and gas industry (EAR, 3-8, Table 3-10).  The geographical analysis of this occupation by occupational employment statistics indicates that the states with the highest employment in this occupation are Texas, Oklahoma, and Louisiana.  In 2010, the total U.S. employment of petroleum engineers was 28,210, of which 15,510 were employed in Texas, and 10,380 of those worked in the Houston metropolitan area.  Thus, even in Texas, the employment in this occupation is concentrated in the Houston metropolitan area, not in the drilling areas.

The likely distribution of highly paid occupations is demonstrated by the Bureau of Labor Statistics (BLS) Occupational Employment Statistics Data on one of the most numerically significant skilled occupations, that of petroleum engineer.  According to the BLS, only a fraction of petroleum engineers (in the hundreds) are employed in non-metropolitan areas in the U.S. (BLS, 2010).  This data, too, suggests that the rural areas of New York that are likely to experience the most intensive gas development will not see an increase in highly skilled and highly paid jobs related to the oil and gas industry.

## III.    Inadequacy of Proposed Mitigation Measures

### A.     Mitigation Measures That Address Potential Impacts Related to Volatility in the Pace and Scale of Drilling Should Be Required

The mitigation chapter of the RDSGEIS implies that negative impacts will be mitigated through the permitting process and a secondary level of review triggered by the operator's identification of inconsistencies with comprehensive land use plans.  The measures identified are only advisory.  The RDSGEIS proposes no requirements to mitigate adverse socioeconomic impacts in this process.

Mitigation measures should be developed that would require operating companies to submit plans for exploration and development in a county or counties to county planning offices for review of cumulative impacts and mitigation (for example truck traffic routing), a model used in Western U.S. drilling regions (Headwaters Economics, 2011).  This assessment is also completed for National Environmental Policy Act compliance when development proceeds on public lands.

Because the RDSGEIS acknowledges that the pace and scale of development are difficult to ascertain until exploration and production begin to proceed, it is critical that a permit and regional Plan of Development (POD) review process be set up that alerts local officials to the need for long term planning for land use, schools, public safety and public health.  The POD, outlining the pace, scale, and general location in which development will occur, enables local government to anticipate and develop strategies to mitigate cumulative impacts (Sammons, Dutton and Blankenship, 2010).  The near-term projections of development activity should include all secondary facilities (e.g., water extraction, waste disposal, pipeline construction) in the area to be affected.
A POD would allow communities in that region to prepare for the disruption and negotiate the least disruptive and damaging development plan.

Another mechanism for reducing the unpredictability and uncertainty of natural gas production at the regional scale is being developed by the Nature Conservancy with pilot projects in the Western States and planned in Pennsylvania (see Kiesecker et al, 2010). Their objective is a science-based, landscape-scale approach to Marcellus gas development that will secure measurable conservation outcomes, while enhancing industry's ability to operate in an environmentally sensitive and cost-efficient manner.  To be enforceable, this cooperative approach, based on a partnership between the operating company and local public officials, needs to be codified in a binding agreement.  Partnerships of this sort may be useful, but they cannot serve as mitigation for significant adverse socioeconomic impacts unless they are mandatory.

**B.      Mitigation Should Address Housing and Urban Development Impacts, Including Sprawl and Excess Substandard Housing**

Evidence from Pennsylvania and Western shale plays indicates the likelihood of negative impacts on the quality of the temporary and permanent housing stock, a high rate of homelessness for extensive periods, and displacement of low income people from affordable housing.  Given the presence of small cities in the region, mitigation measures should include required assistance to cities in the affected region to encourage new housing development in already-developed urban areas and the development of temporary housing that could be transformed to other uses once the influx of transient workers resides.  Mitigation measures should also address the impacts of the loss of affordable housing units in the region.

**C.      Mitigation Should Address Long-Term Social and Economic Impacts**

The RDSGEIS and the EAR describe significant adverse social and economic impacts, such as those produced by the volatility of natural gas development on the housing market of regions where development occurs.  No mitigation strategies are recommended to alleviate long-term costs that are reasonably assumed to be associated with natural resource development, including HVHF development.  Mitigation strategies directed at these long-term costs to the affected regions need to be developed and described in the SGEIS.  Mitigation strategies also need to be developed to address the resource depletion phase of the exploration, drilling, development and resource depletion process. In this phase, population and jobs leave the region and tax revenues may be insufficient to pay for the capital investments made to serve the population influx during the drilling and production phases of development.  Mitigation strategies should include policies to prevent negative impacts on existing industries, including agriculture, tourism and manufacturing.

**D.      Mitigation Should Require That Monitoring Reports Projecting Industry Development Plans Be Prepared by the State in Cooperation with Industry and Filed Semiannually**

As development activities begin and progress, the information provided in initial projections should be required to be confirmed or revised on a semiannual basis. Information provided in the semiannual assessment and projection should include: (1) employment for each activity; (2) identification and location of contractors; (3) demographic characteristics and residence of employees who will be working in the region.  This information is critical to forecasting and meeting housing and service demands.

## References

American Farmland Trust. 2011. Comments on the RDSGEIS submitted to NYSDEC.

Barth, J., J. Kokkelenberg, and T. Mount, 2011. Comments on the RDSGEIS submitted to NYSDEC.

Berman, A. 2010.Shale Gas – Abundance or Mirage?  Why the Marcellus Shale Will Disappoint Expectations.
http://www.theoildrum.com/node/7075

Berman and Lynn F. Pittinger (August 5, 2011), "U.S. Shale Gas: Lower Abundance, Higher Cost". The Oil Drum. http: / /www.theoildrum.com /node/8212 2

Best, Allen. 2009. "Bad Gas or Natural Gas, The Compromises Involved in Energy Extraction," *Planning Magazine*.

Brown, D. and P. Zaepfel. 1996. The "Implications of Scientific Uncertainty for Environmental Law", in John Lemons. Scientific Uncertainty and Environmental Problem Solving Oxford/New York: Blackwell Science.

Bureau of Labor Statistics. 2010. Occupational Employment Statistics Data. Available at:
http://www.bls.gov/oes/current/oes172171.htm#st

Christopherson, S and N. Rightor. 2011. "How Shale Gas Extraction Affects Drilling Localities: Lessons for Regional and City Policy Makers." *International Journal of Town and City Management* (forthcoming, March 2012).

Coleman, J.L., Milici, R.C., Cook, T.A., Charpentier, R.R., Kirschbaum, Mark, Klett, T.R., Pollastro, R.M., and Schenk, C.J., 2011, Assessment of undiscovered oil and gas resources of the Devonian Marcellus Shale of the Appalachian Basin Province, 2011: U.S. Geological Survey Fact Sheet 2011–3092, 2 p., available at
http://pubs.usgs.gov/fs/2011/3092/.

Covey, S. 2010. Local Experiences Related to the Marcellus Shale Industry. PPT presentation. Available from the author at Troy Community Hospital.

Ecology and Environment LLC. 2011. Economic Assessment Report for the Supplemental Generic Environmental Impact Statement on New York State's Oil, Gas, and Solution Mining Regulatory Program.  Report prepared for The New York State Department of Environmental Conservation. Albany New York.

Engelder, T & G. Lash (May 2008) Marcellus Shale Play's Vast Resource Potential.

Erickcek, G. "Preparing a Local Fiscal Benefit–Cost Analysis," ICMA IQ Report 37, no. 3 (2005).

Gas Well Drilling Noise Impacts and Mitigation Study. Behiens and Associates, Inc. (April 2006).

Headwaters Economics. 2011. *Fossil Fuel Extraction and Western Economies* Bozeman Montana: Headwaters Economics, Available at: http://headwaterseconomics.org/energy/western/maximizing-benefits

Hughes, J.D. 2011. Will Natural Gas Fuel America in the 21st Century? Santa Rosa, California: Post Carbon Institute.

IHS Global Insight. 2009. The Contributions of the Natural Gas Industry to The US National and State Economies.

Jacquet, J. 2009. Rural Development Paper No. 43 – Energy Boomtowns & Natural Gas. NERCRD

Kay, D. 2011. Comments on 2011 Revised SGEIS posted on: http://cce.cornell.edu/EnergyClimateChange/NaturalGasDev/Documents/PDFs/Cornell%20SGEIS%20Comments.pdf

Kiesecker, J.M., H. Copeland, A. Pocewicz, and B. McKenney. 2010. "Development by Design: Blending Landscape Level Planning with the Mitigation Hierarchy". Frontiers in Ecology and the Environment. (.pdf, 891KB)

Kelsey, T. 2010. Natural Gas and Local Governments. Pennsylvania State Cooperative Extension

Kelsey, T. 2011. Potential Economic Impacts of Marcellus Shale in Pennsylvania. Pennsylvania State University Cooperative Extension.

Kotval, Z and J. Mullin. 2006. "Fiscal Impact Analysis: Methods, Cases, and Intellectual Debate," Working Paper. Boston: Lincoln Institute of Land Policy.

MacPherson, J. (2011) "North Dakota Oil Boom Ignites Rise in Rents", Seattle Times, November 14, 2011 Available at: http://seattletimes.nwsource.com/html/nationworld/2016769083_dakotarents15.html

Mine K. Yücel and Jackson Thies Oil and Gas Rises Again in a Diversified Texas-Southwest Economy, First quarter 2011 The Dallas Federal Reserve Bank. Available at: http://dallasfed.org/research/swe/2011/swe1101g.cfm

Morgan, J. 2010. Available at: http://sogpubs.unc.edu/electronicversions/pdfs/cedb7.pdf

Office of the State Comptroller. New York. 2010. The Changing Manufacturing Sector in Upstate New York: Opportunities for Growth. Available at: http://www.osc.state.ny.us/localgov/pubs/research/manufacturingreport.pdf

NTC Consultants. 2009. *Impacts On Community Character Of Horizontal Drilling and High Volume Hydraulic Fracturing in Marcellus Shale and Other Low-Permeability Gas Reservoirs.* Final Report to The New York State Energy Research and Development Authority. (NYSERDA Contract #: 11170 & 1955) Available from NTC Consultants, Saratoga, New York

Patton, Z., C. Leigh Lencsak, and S. Lepori. 2010. "The Impacts of Natural Gas

Development on the Cost, Availability, and Quality of Housing" Working Paper. Available at: http://cce.cornell.edu/EnergyClimateChange/NaturalGasDev/Documents/

Rumbach, Andrew (2011) *Natural Gas Drilling in the Marcellus Shale: Potential Impacts on the Tourism Economy of the Southern Tier.* Available online: http://www.stcplanning.org/usr/Program_Areas/Energy/Naturalgas_Resources/STC_RumbachMarcellusTourismFinal.pdf

Sammons/Dutton LLC and Blankenship Consulting LLC. 2010. Socioeconomic Effects of Natural Gas Development, A Report Prepared to Support NTC Consultants. Available from NTC Consultants, Saratoga New York.

Spelman, W.. 2009. "Boom, Bust, and Regional Growth Rates" *Urban Affairs Review* March 2009 vol. 44 no. 4 588-604.

Tomes, C. 2011. "Gas Drilling's Impact on Farming Evolves, To Varying Degrees" Lancaster Farming (November 26). Available at: http://lancasterfarming.com/news/-Gas-Drilling-s-Impact-on-Farming-Evolves--To-Varying-Degrees-

Urbina, I. 2011. "Insiders Sound an Alarm Amid a Natural Gas Rush" New York Times, June 25, page 1. Available at http://www.nytimes.com/2011/06/26/us/26gas.html?pagewanted=all

Yost, A. 2011. Research Plan for Utica Shale Characterization and Development. PPT presentation. National Energy Technology Laboratory. Washington: US Department of Energy.

Attachment 6

Meliora Design, LLC.

**Technical Memorandum**

**Review and Analysis of the**

**Revised Draft Supplemental Generic Environmental Impact Statement on the Oil, Gas, and Solution Mining Regulatory Program Well Permit Issuance for Horizontal Drilling and High-Volume Hydraulic Fracturing to Develop the Marcellus Shale and Other Low-Permeability Gas Reservoirs**

**and the**

**Draft New York State Department of Environmental Conservation SPDES General Permit for Stormwater Discharges from High-Volume Hydraulic Fracturing**

**January 10, 2012**

**Prepared for:**

**Natural Resources Defense Council**

**New York, New York**

**Prepared by:**

**Michele C. Adams, P.E. Water Resources Engineer**
**and**
**Ruth Ayn Sitler, P.E. Water Resources Engineer**
**Meliora Design, LLC**
**100 North Bank Street**
**Phoenixville, PA  19460**

## Table of Contents

Introduction ................................................................................................................. 4

Summary of Key Findings ............................................................................................ 5

Comments on the RDSGEIS ......................................................................................... 9

Comments on the Draft SPDES HVHF GP .................................................................. 31

Attachment A .............................................................................................................. 60

References ................................................................................................................... 63

## Introduction

This memorandum reviews both the *Revised Draft Supplemental Generic Environmental Impact Statement* (RDSGEIS) *on the Oil, Gas and Solution Mining Regulatory Program Well Permit Issuance for Horizontal Drilling and High-Volume Hydraulic Fracturing to Develop the Marcellus Shale and Other Low-Permeability Gas Reservoirs* and the Draft *New York State Department of Environmental Conservation SPDES General Permit for Stormwater Discharges from High-Volume Hydraulic Fracturing* (SPDES HVHF GP).  The focus of this memorandum is the potential impacts on surface water resources that result from land disturbance and alteration, including impacts related to increased erosion and sedimentation, as well as impacts that result from increased and altered stormwater discharges.  The review of both the RDSGEIS and the Draft SPDES HVHF GP are co-dependent, as the Department has indicated that  general or (substantially similar) individual SPDES permit coverage will be the primary means of regulatory oversight for HVHF operations (and presumably for other low-volume hydraulic fracturing activities, although this is not explicitly stated).

The land disturbance associated with HVHF construction activity has the potential to negatively impact surface water quality in the same manner as other land disturbance activities, as discussed in Attachment A, and the lack of a local government land development review process increases the potential for greater water quality impacts through the increased disturbance of steep slopes, sensitive areas, proximity to unmapped headwater streams, etc.  Furthermore, the land disturbance nature of HVHF operations results in a dispersed industry across a wide area, with a large (and unknown) number of stream crossings and an increase in road traffic and gravel road construction.  The documented water quality impacts of roads (including gravel roads) are also discussed in Attachment A.

**Summary of Key Findings:**

The RDSGEIS provides only a very brief generic discussion on the potential land disturbance and associated stormwater and water quality impacts on surface waters from HVHF (and well drilling in general).  While the RDSGEIS acknowledges that this land disturbance has potential for water quality impacts, and the Department has made a positive determination that a SPDES permit is required, the RDSGEIS provides little specific discussion or consideration of the land disturbance and surface water quality impacts.   Specifically:

- The RDSGEIS makes no attempt to evaluate the <u>cumulative</u> impacts of HVHF activity on water resources, at either the small (headwater stream) scale, or the larger watershed scale.  Even very general cumulative estimates of land disturbance, and its associated water quality impacts, are not provided.  Since the 1992 GEIS, the use of improved geographic information system (GIS) software and modeling tools has expanded the ability of scientists, engineers, and regulators to quantify the scale and impact of proposed activities on water resources.  Such analysis has become standard industry practice for watershed planning and the development of TMDL (Total Daily Maximum Load) studies to determine the level of pollutant load (and required pollutant load reduction) to meet water quality standards.  The RDSGEIS fails to provide any such analysis, and instead only acknowledges stormwater impacts with little industry-specific consideration, and no consideration of total or cumulative impacts.  **A more detailed and comprehensive evaluation of the amount of anticipated land disturbance and associated water quality impacts is essential for a full environmental impact analysis, and to inform any determinations by the Department on the appropriate regulatory permitting requirements.**
- The RDSGEIS fails to consider the potential surface water impacts of stream crossing activity associated with HVHF well pads, most notably, stream

crossings associated with gathering lines and access roads (to both well pads and compressor stations).  Stream crossings and the associated water quality impacts are not fully addressed in the RDSGEIS, and are specifically <u>not</u> included in the Draft SPDES HVHF GP.  It is unclear how many stream crossings may be anticipated, and of these, how many will essentially be unregulated under current Department regulations.  It is unclear what the anticipated environmental impacts of these stream crossings will be on water quality and aquatic systems.  **The RDSGEIS should provide some estimate of the extent of anticipated stream crossings, potential water quality impacts, and proposed Department requirements to regulate and mitigate these impacts.**

- The RDSGEIS does not adequately address private well setbacks, road spreading of brine, gather lines, fueling areas, on-site disposal of drill cuttings, and acid rock drainage.  Each of these has the potential to significantly impact and impair water quality.  **The RDSGEIS should provide additional information regarding each of these impacts, specifically with regard to landowner notification of well setbacks, cumulative impacts of road spreading of brine, minimizing stream crossings with gather lines, addressing the non-stationary status of fueling areas, and consideration of ARD impacts from disposal of drill cuttings.**

- With the exception of watersheds that serve as unfiltered drinking water supplies and receive Filtration Avoidance Determination (FAD) status, the RDSGEIS and SPDES HVHF GP do not provide any specific consideration of whether different performance requirements or standards are necessary to protect water quality for higher quality watersheds, impaired streams, or areas of denser well pad development on a watershed basis.  There is no documentation to support that proposed setbacks are adequate to protect water quality in all situations (i.e., higher quality streams, percent of land disturbance within a watershed, site specific conditions such as steep

slopes). **The RDSGEIS should provide some analysis or justification as to why a single set of performance requirements is applicable in all watersheds and all situations, regardless of stream designation or current levels of impairment or high quality.**

- Even if the proposed setbacks discussed in Chapter 7 were adequate, they are not clearly coordinated with the EAF requirements in Appendices 4, 5, 6 and 10 and the Draft SPDES HVHF GP mapping and documentation requirements (and the SPDES HVHF GP is presumably the regulatory mechanism for compliance). **The Draft SPDES HVHF GP mapping requirements must be at a scale and level of site-specific detail to accurately reflect the required information, and SPDES mapping requirements must be consistent with those identified in the RDSGEIS.**

- The RDSGEIS fails to provide a clear and accessible process for public and local government access to site specific HVHF activity information.  At the same time, DEC expects local governments to provide notice to the Department if a proposed HVHF activity is not in compliance with local zoning or land use regulations.  This approach puts the regulatory burden on a local government that wishes to challenge a proposed permit application while simultaneously failing to provide local government with access to the necessary information.  **The burden of demonstrating compliance with local government land use requirements should fall on the industry, not local government and the public,** with supporting public access to all information regarding proposed land disturbance activity, and reasonable timeframes and processes for comments and addressing of concerns.

- The Draft SPDES HVHF GP is essentially a compilation of the Department's general permits for both construction activity and industrial activity.  The general permit process is essentially "self-regulating," relying on the regulated industry to adhere to certain compliance requirements.  Based on the very limited discussion of land disturbance and surface water impacts in the RDSGEIS, it is uncertain whether a general permit process will be

sufficient to protect water quality.  It is also not clear that an industry that is NOT subject to local government review and approval, unlike virtually all other land disturbance activities addressed by general permits, can be adequately regulated through a general permit process.  This is especially important for a heavy industrial activity that will be occurring in areas not zoned or accustomed to heavy industrial activity at the scale that will occur with HVHF operations.

- The general permit process does not provide a timeframe (and process) for public review, comment, and objection to any or all parts of a general permit coverage.  Essentially, permit coverage is automatically granted to the industry by providing notice to the Department and meeting minimum performance requirements.  There is no opportunity for public access to information or appeal of permit coverage.  **It is essential that the SPDES HVHF GP provide a process for public access to all information associated with HVHF land disturbance and water quality impacts, and that a process and timeline be developed to allow for public comment and appeal of general permit coverage for a specific site *before* general permit coverage is granted.  It is essential that the permit coverage timeline be adjusted to provide for public comment and appeal.**

## Comments on the RDSGEIS

As previously indicated, the discussion in the RDSGEIS on the total land use impacts and associated water quality impacts as a result of both land disturbance during construction and post-construction stormwater management is extremely limited.

### Comment 1:

**Chapter 5, Natural Gas Development & High-Volume Hydraulic Fracturing.** Section 5.1 of the RDSGEIS discusses the impacts of Land Disturbance, including Access Roads, Well Pads, Utility Corridors, and Well Pad Density.  See pages 5-6 through 5-31.  Estimates of land disturbance associated with each of these well drilling activities are provided but total or cumulative land disturbance is not addressed.


### Comment 2:

**Section 5.1** *Land Disturbance* identifies a number of types of land disturbance activities associated with HVHF including utility corridors (including gathering lines), compressor facilities, and access roads associated with compressor facilities. The Draft HVHF SPDES permit (Part III.A.3) does NOT address construction of gathering lines, compressor facilities, or the access roads associated with compressor facilities.

**Recommendation**:  The RDSGEIS must provide a process for regulation and mitigation of the land disturbance impacts associated with gathering lines, compressor facilities, and the access roads associated with compressor facilities. The RDSGEIS cannot identify the SWPPP as "*the principal control mechanism to mitigate potential significant adverse impacts from stormwater runoff*" (Section 7.1.2 SGEIS) without providing for adequate management requirements for all HVHF activities in the Draft SPDES HVHF GP.

Further discussion in Section 5.1 provides some analysis of disturbance areas associated with gathering lines, compressor stations, and access roads to

compressor stations, but specific consideration of the impacts of these activities is not discussed in Chapter 6, and specific recommendations to reduce the impacts of these components (such as co-locating gathering lines along well pad access roads) is not provided in Section 7 or the Draft HVHF SPDES permit.

**Comment 3:**

**Section 5.1.1** *Access Roads* indicates that roads may be placed across ditches, but does not discuss the construction or widening of access roads that cross streams or wetlands.  The potential impacts of such crossings are not discussed in Section 6.1.2, *Stormwater Runoff* or other portions of Section 6, nor are the mitigation measures for road crossings of streams and wetlands addressed in Section 7.1.2 *Stormwater.* Setbacks for roads from streams and wetlands are not specifically addressed in either Chapter 7 or the Draft HVHF SPDES permit, nor are requirements for stream and wetland crossings provided.  It is not clear as to whether an Article 15 Stream Disturbance Permit from the DEC will be required for HVHF projects and what compliance might entail.   It is noted that Photos 5.1 and 5.2 of the RDSGEIS portray access road stream crossings, but the impacts of the stream crossing are not addressed.

Road crossings of streams and wetlands will be unavoidable during the development of HVHF sites.  Section 5.1.1 acknowledges that the length of road may be influenced by selecting a route to avoid environmentally sensitive areas, but mitigation measures recommending such route selection are not specifically addressed in either Chapter 7 or the Draft HVHF SPDES Permit.  Estimates of the number and extent of anticipated stream and wetland crossings are not provided in Section 5.1.1.

**Recommendation**:  The proximity of roads to streams and wetlands, and the unavoidable need to cross streams and wetlands, increases the risk that erosion and sedimentation will cause measurable impacts on water quality.  Poorly constructed stream crossings can directly impact aquatic communities.[3, 7]   Excessive sediment

levels are one of the primary threats to US surface waters[10] and have multiple effects on stream health.  The RDSGEIS should provide estimates of the anticipated extent of road crossings of streams and wetlands, as well as an evaluation of the potential environmental impacts of these crossings.  Furthermore, avoidance and mitigation measures should be addressed in the RDSGEIS and incorporated into the regulatory process.  Specific requirements and guidelines to mitigate the impacts of stream and wetland crossings should be provided.

**Recommendation**:  If the SPDES HVHF GP is to be the primary mechanism for regulation, then the permit should include a defined documentation process to require the applicant to reduce the number and extent of stream crossings.  This section should be incorporated into Part IV, *Contents of the Construction SWPPP*, as a requirement of Section A.1 and include both mapping requirements and narrative that documents the need for each stream crossing and explanation as to why any individual stream crossings cannot be reduced or combined.   Road crossings on areas specifically in conflict with local government land use regulations should be identified, as well as road crossings on steep slopes erodible soils, or intact woodlands.


**Comment 4:**

**Section 5.1.2** *Well Pads* notes that well pad size is determined by site topography, but no estimates are provided regarding the impact of slope on well pad size and disturbance footprint, and the increased impacts on erosion and sediment discharge.  The area of disturbance can be increased by up to 50% on slopes exceeding 15 degrees[8] (the Draft HVHF SPDES permit allows disturbance on slopes up to 25% in AA or AA-s watersheds.  It is not clear that there is a limit on slope construction in other watersheds).   The stormwater and erosive impacts of well pads on steep slopes continues through the life of the well pad.   At a minimum, the Draft SPDES HVHF GP should preclude well pad construction on slopes over 25%.

**Recommendation:** Section 5.1.2 should provide some evaluation of the anticipated increase in well pad disturbance as a function of slope (and required cut and fill) as a result of the impacted terrain conditions specific to New York.  Section 7 of the RDSGEIS should provide discussion of specific mitigation measures to reduce the impacts of well pad construction on slopes.  The HVHF SPDES permit should include specific requirements to reduce construction of well pads on steep slopes, limits on steep slope construction in all watersheds, and provide discussion and requirement of implementation measures to reduce the long-term water quality impact of well pads on slopes when such systems are constructed.   Additional measures to prevent sediment discharge from construction on steep slopes should be defined and required as part of the facility SWPPP.   It is not clear that the general requirements of either the 2005 New York State Standards and Specifications for Erosion Control or the 2010 New York State Stormwater Management Design Manual provide sufficient specific guidance to address the additional impacts associated with well pad construction on slopes.  Both erosion control measures and stormwater measures must be adjusted in their design to account for the greater water quality impacts of well pad location on slopes.

**Comment 5:**

**Section 5.1.2** *Well Pads* and **Section 5.1.4** *Well Pad Density* do not provide any specific information or estimates of well pad or HVHF facility location or density with regards to watershed drainage areas, or analysis of the anticipated density of well pads within intermittent or perennial headwater stream drainage areas. Section 6 does not discuss the impacts on water quality of well pad density within the drainage area of an intermittent or perennial stream.  Headwater and intermittent perennial streams originate with a drainage area of 5.5- to 37-acres[5], increasing the likelihood of a HVHF well pad being within several hundred feet of an intermittent or perennial stream, and the likelihood that the disturbance will represent a sizable portion of the total drainage area to a headwater stream (i.e. 7.4 acres of total disturbance for a multi-well pad during the drilling phase, and 1.5

12

acres of disturbance during the drilling phase could represent a very large percentage of the drainage area of a headwater or small stream).

**Recommendation:** Current research[2] indicates a positive relationship between stream water turbidity and well density within a drainage area or watershed.  The RDSGEIS does not provide any analysis or consideration of potential levels of watershed disturbance as a result of HVHF activities, and the resulting potential impacts on water quality, although such an analysis is well within current mapping and GIS capabilities and should be included in the RDSGEIS.

**Comment 6:**

While some mention of gathering lines is included in **Section 5.1.3** *Utility Corridors*, including an estimate of 1.66 acres per well pad, no discussion is made of the anticipated extent of stream crossings, or the cumulative levels of land disturbance associated with gathering lines on a watershed or other basis.  No further discussion is provided in Chapters 6 and 7 specific to gathering lines.  It is unclear exactly how the current DEC permit process for pipeline stream crossing is adequate to protect water quality from either a land disturbance or stream crossing impact from gathering lines, or how gathering line construction will be addressed and/or coordinated with the Draft HVHF SPDES permit process (which does not currently address gathering lines).

**Recommendation:** This issue requires additional consideration in the RDSGEIS, and the specific permitting requirements for gathering line stream crossings should either be identified in the Draft HVHF SPDES permit or coordinated with this permit so that impacts are reduced.  Specifically, measures to reduce the impact of gathering line stream crossings (and general construction) by coordination of this construction with other well site needs should be required.

**Comment 7:**

**Chapter 6, Potential Environmental Impacts.  Section 6.1.2** *Stormwater Runoff,* discusses both stormwater impacts and erosion and sedimentation construction issues.  However, this discussion is very general in nature, comprising only 1-1/4 pages within Chapter 6 for both of these topics.  No discussion is provided regarding the specific magnitude and issues of concern associated with stormwater and erosion impacts from the various HVHF activities (i.e. well pad construction, and variations on well pad construction such as disturbance footprint from construction on steep slopes).   Rather, it is simply noted that the potential for water resource impacts exists, and that these impacts may cause increased runoff volumes, greater erosive forces, heightened sediment loads, etc.

**Recommendation:** Research data and engineering methodologies are available to quantify the potential adverse water quality impacts, either on a "typical" facility basis or an anticipated watershed basis (using the estimates of acreage developed in Section 5).   Such analysis would provide at least some basis for determining whether the requirements of the Draft HVHF SPDES GP are adequate for the industry.  These estimates would also provide information on the cumulative impacts of HVHF on water quality and stream health and should be included in the RDSGEIS.

**Comment 8:**

**Chapter 7, Mitigation Measures.  Section 7.1.2** *Stormwater,* discusses stormwater management in general terms, with a non-specific discussion of the particular issues associated with HVHF stormwater and erosion.  Much of the generic discussion focuses on pollution prevention from exposed industrial activities.  Less than one page addresses stormwater management mitigation measures related to land use changes, and one-half page addresses mitigation associated with stormwater and erosion issues from construction activities.   Section 7.1.3 discusses spills and

containment, which is also addressed in the SPDES HVHF GP.  However, much of this discussion is focused on industrial spill control, not stormwater impacts.

Chapter 7 indicates that the Department intends to issue a single SPDES General Permit that will encompass all issues of construction stormwater and erosion control, post-construction stormwater management, industrial stormwater management, and pollution prevention/spill control.  Specifically, page 7-26 states: *The Department has determined that natural gas well development using high-volume hydraulic fracturing would require a SPDES permit to address stormwater runoff, erosion, and sedimentation.  The SPDES permit will address the construction of well pads and access roads and any associated soil disturbance, as well as provisions to address surface activities associated with high-volume hydraulic fracturing for natural gas development.  Additionally, during production of the natural gas, the Department will require coverage under the SPDES permit to remain in effect and/or compliance with regulations.  The Department proposes to require SPDES permit conditions, a Comprehensive SWPPP (stormwater pollution prevention plan), and both structural and non-structural Best Management Practices (BMPs) to minimize or eliminate pollutants in stormwater.  The Department is proposing the use of a SPDES general permit for high-volume hydraulic fracturing (HVHF GP), but the Department proposes to use the same requirements in other SPDES permits should the HVHF GP not be issued.*

**Recommendation:** The HVHF SPDES permit should be specific to this industry and impose requirements that reflect the lack of local government review and approval of the land development activities associated with the industry.  The RDSGEIS should specifically identify the areas where additional permit requirements specific to the industry are necessary to protect water resources.

**Comment 9:**

Section 5.1.1 *Access Roads* notes that roads may be constructed by placing crushed stone or gravel, but Section 6 does not specifically address the water quality issues

associated with the long-term use of gravel roads (after construction), nor does Section 6 provide any estimate of potential pollutant loadings associated with gravel roads, specifically estimates of sediment generation.  Research data[4] indicates that gravel roads can be a significant source of sediment pollution, and data to support sediment pollutant load estimates is available but requires an estimate of the anticipated extent and area of gravel access roads to be constructed, which is not provided in Section 5.1.1.  Gravel access roads serving HVHF will be subject to undefined levels of truck traffic, which has a greater impact on road condition and erosion than regular vehicle traffic.  Section 6.1.2 *Stormwater Runoff* discusses the impacts of sediment on streams and notes that "*steep access roads...pose particular challenges.*"  **Section 7.1.2** *Stormwater* indicates that the construction of access roads will be addressed by the SPDES permit, but neither Section 7.1.2 nor the Draft HVHF SPDES permit provide specific recommendations to reduce the length and width of gravel access roads, to reduce construction access roads on steep slopes, or to reduce the specific impacts of gravel road and sediment generation once the construction period has ended.  General reference to the State stormwater manual is not sufficient for this issue as it relates to HVHF.  There is no requirement in the Draft HVHF SPDES mapping requirements to indicate or accurately depict the length, width, or slope of gravel access roads.  Since these areas will generate sediment pollutants through the life of the project, specific guidelines to mitigate pollution from access roads are warranted.

**Recommendation**:  The RDSGIES should provide more detailed information on the specific impacts of gravel access roads with regards to sediment generation, and the estimated extent of potential pollutant loads.  Section 7 of the RDSGEIS should provide discussion of specific mitigation measures to reduce the impacts of access road construction. The HVHF SPDES permit should indicate specific requirements for the documentation of access road lengths and widths, and requirements to reduce construction on steep slopes, reduce road width, and implement other measures to reduce the water quality impact of access roads.   Measures to maintain

gravel access roads in a manner that prevents sediment discharge (over the life of the project) should be defined and required as part of the facility SWPPP.

**Comment 10:**

**Section 7.1.11.1** *Setback from private well*, Section 7.1.11.1 states that "The Department proposes that it will not issue permits for high-volume hydraulic fracturing within 500 feet of a private water well or domestic supply spring unless waived by the landowner." However, the Draft SPDES permit does not require the applicant to map the location of private water wells or springs that may be within 500 feet, or to notify the landowner. Coverage under the GP is granted within 30 calendar days of the Department receiving the NOI (and meeting the requirements of Part II.B.2). How will the Department or the applicant be aware of the existence of private water wells within 500 feet? This is also not included in Section 5 of the Environmental Assessment Form, but IS included in the Proposed EAF Addendum Requirements for HVHF. It is not clear how 500 feet was determined as sufficient distance to support a private well from HVHF activities as no supportive reasoning is provided.

**Recommendation:** Require that all private water wells and domestic supply springs within 2,640 feet and 500 feet, respectively, to be located on the Site Map (prepared under Part IV.C.1.b and as a requirement to the Site Map in the SWPPP). The NOI form should require that the applicant confirm that there are no such wells within 500 feet, and provide proof to the Department of landowner waiver receipt (by certified mail or similar means).

**Recommendation:** The SWPPP should identify the private water well or spring in the narrative (Part XI.3) and identify measures undertaken to protect the private well and to address emergency spill situations.

**Comment 11:**

**Section 7.1.11.2** *Setbacks from Other Surface Water Resources* states "Existing regulations prohibit the surface location of an oil or gas well within 50 feet of any 'public stream, river or other body of water.'" The 1992 GEIS proposed that this distance be increased to 150 feet and apply to the <u>entire well site</u> instead of just the well itself". The Draft HVHF SPDES permit (Section I.D.4) requires a setback of 150 feet from the <u>well pad</u> and perennial or intermittent streams, but does not address setbacks from other HVHF site components.

**Recommendation:** As discussed later in specific recommendations associated with the Draft HVHF SPDES permit, required setbacks of any length are meaningless unless the water features are accurately identified and located. A USGS 7-1/2 minute topographic map, at a scale of 1" = 2000' is inadequate for this purpose. It is essential that the Draft HVHF SPDES permit require mapping at a scale that can accurately depict both existing natural features (such as steep slopes and headwater streams) as well as proposed HVHF components.

**Comment 12:**

There are benefits associated with a single SPDES GP (or a single individual SPDES permit) that addresses construction, post-construction stormwater, and industrial stormwater and spill containment for each project in one permit. These benefits include a comprehensive evaluation of each project, potential continuity in responsible facility personnel, and consistency of management practices through both construction and operation.

However, the Department is largely drawing on the current requirements in the existing SPDES general permit for construction (New York State Department of Environmental Conservation SPDES General Permit For Stormwater Discharges From Construction Activity Permit No. GP-0-10-001) and the existing SPDES general permit for industry (New York State Department of Environmental Conservation SPDES Multi-Sector General Permit For Stormwater Discharges Associated With

Industrial Activity Permit No. GP-0-06-002).   The Department is combining many (but not all) requirements of these two GPs into one HVHF GP and, in doing so, does not include provisions that would otherwise be required of permittees seeking either of the existing permits alone..

For the issues of site disturbance, stormwater management, setbacks, disturbance of sensitive features, erosion, and other impacts associated with many <u>non-HVHF</u> land development projects and industrial activities, there is an additional level of professional review and regulation in the form of local laws, regulations, plans or policies implemented by the local planning board or authorized board.   In other words, for non-HVHF projects, such as land development projects, there is often a local project review of proposed plans by a professional reviewer knowledgeable in local conditions, supported by the review of an authorized board whose members possess local knowledge.  Local regulations are likely to impose more rigorous mapping requirements, stormwater calculations, and design detail than those imposed in a Department general permit, and furthermore, project submissions receive local, professional review.  In these circumstances, successful design and compliance (with the requirements of Department general permit) is more likely when supported by a secondary level of performance requirements and review at the local level.

The issuance of a single GP for HVHF (that encompasses many requirements of both existing Department GPs) will not have the benefit of local review and specific local performance requirements.   The potential impacts of HVHF projects on land disturbance, stormwater, erosion, sensitive sites, etc. is at least as significant (if not more significant) than other, locally regulated land disturbance and industrial activities.  HVHF is also a "heavy" industry that will be located in many areas unaccustomed to heavy industry.

**Recommendation:** The Department should provide the opportunity for local review by revising the SPDES HVHF GP to address compliance with applicable local ordinances.  For instance, those activities which would typically require issuance of

19

GP-0-10-001 should be required to comply with all local ordinance requirements as they apply to HVHF activities.  Additionally, the Department should require SPDES HVHF GP permittees to provide written notification to the Department from the affected local governments that the conditions of local ordinances are met to the satisfaction of the local governing authority prior to issuance of the permit. Comment 14 below discusses this further.

**Comment 13:**

HVHF compliance with the requirements of the GP are largely self-reviewing and self-monitoring, as facilities are required to develop and implement a SWPPP, but there is generally no review of the SWPPP unless the Department elects to request and review the SWPPP for a specific facility.  Absent this specific request by DEC, the SWPPP is simply maintained on-site.  In addition, DEC does not propose any mechanism that would enable it to effectively evaluate successful implantation of a SWPPP.

**Recommendation:** The SPDES HVHF GP should be revised to make public all documents, specifically including the SWPPP, available for review by the Department and the public.  In all instances, the Department should establish a mechanism to routinely review whether applicants have successfully implemented their SWPPPs.  Dated digital photos that support inspection and compliance per permit and SWPP requirements should be a requirement for permit coverage.

**Comment 14:**

**Chapter 8 , Permit Process and Regulatory Coordination; Section 8.1.1.5** *Local Planning Documents* of the SGEIS states:

> *However, in order to consider potential significant adverse impacts on land use and zoning as required by SEQRA, the EAF Addendum would require the applicant to identify whether the proposed location of the well pad, or any*

> *other activity under the jurisdiction of the Department, conflicts with local land*
> *use laws or regulations, plans or policies. The applicant would also be required*
> *to identify whether the well pad is located in an area where the affected*
> *community has adopted a comprehensive plan or other local land use plan and*
> *whether the proposed action is inconsistent with such plan(s). For actions*
> *where the applicant indicates to the Department that the location of the well*
> *pad, or any other activity under the jurisdiction of the Department, is either*
> *consistent with local land use laws, regulations, plans or policies, or is not*
> *covered by such local land use laws, regulations, plans or policies, the*
> *Department would proceed to permit issuance unless it receives notice of an*
> *asserted conflict by the potentially impacted local government.*

This approach is problematic.  While it is the responsibility of the applicant to determine whether or not there are any conflicts, it is up to the potentially impacted local government to provide notice to the Department of an asserted conflict that has not been identified by the applicant.  Although the RDSGEIS states that the Department would notify local governments of all applications for high-volume hydraulic fracturing in the locality, through the use of an electronic notification system to local government officials (see DSGEIS at 8-4), DEC offers no guarantee that this system will be in place prior to the issuance of permits and does not specifically describe when in the permitting process such notification to local governments will occur.  These are critical issues that should be addressed. Further, it is unclear how the Department will determine *"whether significant adverse environmental impacts would result from the proposed project that have not been addressed in the SGEIS and whether additional mitigation or other action should be taken in light of such significant adverse impacts." RDSGEIS at 8-5.*  It is also not clear as to whether this determination process applies to all HVHF GP applicants, or only those subject to SEQRA determination.

**Recommendation:**  In consideration of the Department's decision to regulate HVHF under a single SPDES general permit **without** the important supplemental benefit of local review and local laws, regulations, plans or policies (that virtually all other

land development and industrial construction projects are subject to when obtaining SPDES permit coverage), obtaining General or Individual Permit coverage (for all HVHF projects) should also require the applicant to notify the local government (as well as the Department) that there are no conflicts with local laws, regulations, plans or policies, <u>and</u> to provide supporting documentation of the evaluation to the local government and Department.  This will allow local governments to receive the necessary information to "assert" a potential conflict that may not have been identified by the applicant.  Without this critical information, local governments cannot be expected to "assert" a potential conflict to the Department.

## **Comment 15:**

As discussed above, Section 5.1 of the RDSGEIS provides estimates of land disturbance for well pads and associated construction activities (roads, utility corridors, compressors, etc.), including total estimated disturbance per pad for multi- and single-well pads.   The RDSGEIS notes that most wells will be multi-pad wells with a net disturbance of 7.4 acres per pad (reducing to 1.5 acres per pad during production).  A spacing of 640 acres per multi-well pad is presented in Table 5.1 of the RDSGEIS.  However, no consideration is provided of the anticipated disturbance and well pad density on a watershed basis, or proximity to streams and anticipated stream crossings, and no consideration is provided on the potential individual and cumulative effects on stream health.

A recently published study of natural gas development in the Fayetteville and Marcellus formations in Arkansas and Pennsylvania[2] used current topographic data, well development data, and readily available land use analysis computer modeling tools (ArcHydro Version 1.3) to evaluate both the overall well pad density per drainage area and well proximity to streams in these formations in Arkansas and Pennsylvania.   This desktop analysis was further supported by in-stream turbidity measurements in seven different drainage areas with different well densities.

This report had several significant findings, most notably it "identified a positive relationship between stream water turbidity and well density.  Turbidity was not positively correlated to other land use cover variables." (Entrekin, et al, "Rapid Expansion of Natural Gas Development Poses a Threat to Surface Waters, pg 507). The report further concluded that "preliminary data suggest that the cumulative effects from gas well and associated infrastructure development are detectable at the landscape scale."

This study also determined that approximately 17% of the active Pennsylvania wells were within 100 meters (328 feet) of a stream, and all wells were within 300 meters (984 feet) of a stream.  Gas wells "were located, on average, 15 km (9.3 miles) from public surface-water drinking supplies and 37 km (23 miles) from public well water supplies."  The report noted that "although wells are generally constructed far from public drinking-water sources, there is potential for wastewater to travel long distances given that many of the components, such as brines, will not settle out or be assimilated into biomass."  In other words, due to the nature of material from HVHF wells, discharges that reach streams (due to inadequate stream setbacks) may travel to public drinking supplies, even if the surface water supplies are distant to the well.

Chapter 6 of the RDSGEIS broadly identifies potential environmental impacts on water resources (Section 6.1), including polluted stormwater runoff and spills.  The RDSGEIS does not specifically discuss the cumulative impacts of land disturbance on surface water quality (i.e. whether turbidity or other measures of stream impact increase with well density).   The RDSGEIS makes no attempt to estimate well density and land disturbance on a drainage area basis with regards to water quality impacts or consideration of specific watersheds and designated uses.   No specific consideration is given to the topography and stream density of New York State with regards to land disturbance and proximity to surface waters.

Such an analysis would provide a far better estimate of potential surface water impacts and the extent of anticipated land disturbance on a watershed or drainage area basis.  This information would inform the state as to the watershed impacts

from HVHF activities, and provide some additional basis for well density in different watersheds. It would also better inform the decisions regarding setback distances discussed in Sections 7.1.5 and 7.1.11.2.

As discussed previously, most headwater and small perennial streams are not indicated on USGS 7-1/2 minute topographic quadrangles, and hence will not necessarily be identified under the current mapping requirements in the Draft HVHF SPDES permit. Headwater streams generally originate with a surface drainage area of 5 to 37 acres.[5] The study discussed above had a stream threshold of 12.4 acres. With a disturbance footprint of 7.4 acres per multi-well pad, drilling activities could potentially impact as much as 60% of the land area in a headwater stream drainage area (assuming 12.4 acres per drainage area). The extent and impact of land disturbance in headwater streams is not addressed in any manner in the RDSGEIS.

**<u>Recommendation</u>**: The RDSGEIS should provide some technically supported evaluation of the anticipated well density on a drainage area basis, with consideration of water quality impacts. The analytical land use tools, data, and models available today are <u>significantly</u> more robust than the environmental tools available during the development of the 1992 GEIS (and such tools are often used to support TMDL determinations). In other words, the density of anticipated land disturbance and proximity to streams and wetlands could easily be mapped and evaluated using anticipated development rates and relevant information from states such as Pennsylvania. At a minimum, representative watersheds could be evaluated in detail to represent anticipated conditions, and using topographic data and average proximity to streams could be estimated. Relevant well drilling data is also available from other states such as Pennsylvania. High-volume hydraulic fracturing is "distinct from other types of well completion" as noted in the RDSGEIS, and warrants additional consideration.

This type of land use and density evaluation will allow the Department to better assess the potential impacts of high-volume hydraulic fracturing on both watershed

land use and proximity to streams, and can provide a technical basis for HVHF well density and setback decisions.  It can also inform decisions regarding well density and setbacks in waters with TMDLs.   But at this time there is no watershed impact consideration of HVHF well location and density.  It is unclear whether the various setbacks discussed in the RDSGEIS are adequate to protect water resources during HVHF activity, or whether these setbacks merely represent an arbitrarily selected value.

**Recommendation:** To facilitate Department identification of wells that may have an impact on small headwater streams, the Draft SPDES HVHF GP could require that each well pad application document the total amount of anticipated land disturbance, and the percent of land disturbance within the drainage area of the well pad location.  This is not a difficult estimate for the permit applicant to develop using current mapping tools, and will provide some indication that adjacent streams may be small and especially vulnerable to land use impacts.

**Comment 16:**

**Section 7.1.3.1** indicates that fueling tanks are considered "non-stationary" at well pads, and therefore exempt from Department storage and registration requirements.  Section 7.1.3.1 does state that secondary containment is required for all fueling tanks, and that fueling tanks would not be positioned within 500 feet of perennial or intermittent stream, storm drain, wetland, lake or pond.

It is unclear how this requirement will be met or maintained, especially in light of the fueling tanks being "non-stationary."  Specific requirements are not reflected in the Draft HVHF SPDES permit, either in the general SWPPP requirements or the Fueling Area requirements.  It is unclear how this setback will be identified and maintained, and how the Department intends to ensure compliance.   The requirements for fueling areas in the Draft HVHF SPDES permit are the same general requirements applied to all industrial facilities and do not have any specific consideration of the nature and conditions of HVHF sites and fueling needs.

**Recommendation:** The RDSGEIS and Draft HVHF SPDES permit must address the issue of containment for "non-stationary" fueling tanks, and all other non-stationary tanks.


**Comment 17:**

The RDSGEIS **Section 7.1.7.2 Road Spreading** indicates that NORM concentration data in brines is insufficient to allow road spreading under a BUD, and that as more data becomes available the Department will evaluate the BUD petitions.  However, the RDSGEIS is inadequate in that no consideration has been made of the total potential increase in chlorides on roads as a result of the HVHF industry disposing of brines in this manner, and the anticipated levels of chlorides and other compounds in the brine.  Again, the RDSGEIS has not considered the cumulative impacts of the generation of this material and the potential volume of material application on roadways.  No estimate is made of the volume of production brine that may be disposed of on roadways.  No consideration is provided regarding what might be "safe" levels of chlorides (or other compounds) in different situations, or what other additional compounds that may be found in production brine that would preclude the use of the material for roadway application.   The requirements in the current BUD have no basis as being sufficient for protecting water quality, and are generally self-monitored by the industry.

Unless the use of production brine is demonstrated as being a beneficial use for the public in roadway safety, application to roadways should not be seen as a viable disposal method.  Much more research on the effects of the material on plant and aquatic systems is required.

**Recommendation:** The RDSGEIS should provide better information regarding anticipated brine production levels and disposal needs as a result of HVHF activity.  Future authorization of the application of brines under a BUD should not be allowed until this information has been developed and provided for public review and comment.

**Comment 18:**

**Section 7.1.9** Solids Disposal indicates that the generation of acid rock drainage (ARD) may occur as the result of material from certain portions of the Marcellus shale.  The RDSGEIS indicates that an ARD mitigation plan would be required for in-site burial, but is not required for off-site disposal.

No estimate is provided within the RDSGEIS of the potential amount or magnitude of the generation of this material, and whether or not the amount of ARD material is of concern, or within which watersheds such material may be anticipated.   The generation of ARD is of significant concern and impact on watershed health, and warrants more detailed analysis of the anticipated locations and extent where ARD may be an issue.   It is not clear if this is expected to be an extensive concern, and no consideration is made of the amount and extent of the ARD material encountered in other states such as Pennsylvania, and how much this material has created additional acid discharge problems in other states.    This issue is not addressed in the HVHF SPDES draft permit.

**Recommendation:** Estimates of the anticipated extent of such material should be included in Chapter 6.1.9.2, and coordinated requirements for ARD treatment (as discussed in Section 7) incorporated into the Draft HVHF SPDES permit.   This material has significant potential impact to water quality.

**Comment 19:**

The EAF addendum should clearly define the process and timeline for notification of local government, and for the Department's process for determination of permit applicability when notice is received from the applicant or local governments that a conflict with local laws, regulations, plans or policies exists.   Furthermore, the EAF addendum should address the issue of HVHF GP coverage upon NOI submission when such local conflicts exist.

**Recommendation:** Coverage should NOT begin until proof of notification to local governments has been received by the Department, local governments have been provided sufficient information and time to "assert" any unidentified potential conflicts, and the Department has made project specific determinations regarding the impact of identified or asserted conflicts.   A timeline and process must be defined.


**Comment 20:**

**EAF Appendix 12 Beneficial Use Determination (BUD) Notification Regarding Road Spreading** states that "Any person, including any government entity, applying for a Part 364 permit or permit modification to use production brine from oil or gas wells or brine from LPG well storage operations for road spreading purposes (i.e. road deicing, dust suppression, or road stabilization) must submit a petition for a beneficial use determination (BUD)."  This petition must include sampling data (although the sampling parameters are limited), a map indicating roads where brine is to be spread, and a general narrative of practices to be implemented, including avoiding applying brines within 50 feet of a stream or waterbody, avoiding application during rainfall periods or on slopes greater than 10 percent.

Chlorides are toxic to many plants and freshwater aquatic plants and invertebrates[14] with levels as low as 30 mg/L toxic to plants, and at 1000 mg/L toxic to aquatic plants and invertebrates.  Chlorides also impact the use of surface water for potable water sources.

While chlorides are applied to roads during snow and ice conditions for safety reasons, many state Departments of Transportation have begun programs to significantly reduce the use of chlorides and implement alternative de-icing practices to reduce the impacts of chloride on both vegetation and stream system health.

**Recommendation:** Additional analysis of potential impacts must be done to evaluate potential impacts from road spreading, including analysis to support that the proposed setback criteria are sufficient to protect water quality, as well as to define required sampling requirements for BUD petitions.

**Comment 21:**

In addition to defining the processes and timelines for review and notification requirements, coordinating permit approvals and public participation activities would ensure compliance with all applicable statutes and eliminate any conflicts that may arise. Regulatory permit tracking, municipal coordination and public outreach and participation should be integrated and automated to the fullest extent possible to ensure satisfactory oversight of gas development operations. This includes the use of internet and GIS technologies for geovisualization, database management, and compliance with all regulatory requirements.

One example of internet-based GIS information sharing is the Pennsylvania Department of Environmental Protection's (PA DEP) eMapPA website. PA DEP uses this online application that is updated on a regular schedule and tied to a multitude of databases which track publicly available information (air quality, water quality, mining/reclamation, natural resources, etc.) on a publicly accessible GIS website. (See http://www.emappa.dep.state.pa.us/emappa/viewer.htm).

**Recommendation:** With regard to regulatory permit tracking, PA DEP has developed an additional tool called Environment, Facility, Application, Compliance Tracking System (eFACTS). PA DEP staff, as necessary, has internal agency access to this database system, cross-referenced by regulatory program, in which permits and permittees may be tracked and updated with regard to permits issued, violations, etc. This information is also available to the public, in a limited format, via the internet at http://www.dep.state.pa.us/dep/efacts/efacts.html. If not already available through the NYS Department Application Review Tracking (DART) system, the development of such a system would be very beneficial for tracking SPDES

HVHF GPs, as well as other state issued permits associated with gas development projects, including dirt/gravel roads, stream crossings, etc.  This information should be linked to any web-based GIS application.

**Recommendation:** Population of a geodatabase may occur through the submission of GIS data by permittees.  Permit application packages could and should be front loaded for digital information by requiring permittees to submit GIS data (i.e., shapefiles in an accepted Metadata format) about their project sites.  At a minimum, a project boundary on georeferenced state plane coordinate system should be required.  This website should also link each project boundary to any online permit tracking system, including the email address of appropriate personnel to whom comments may be submitted.

**Recommendation:** In addition to sharing GIS data with local governments, NYSDEC should, if it has not already, implement a requirement for municipal notification similar to those commonly referred to in Pennsylvania as Act 14 notices.  Pennsylvania permitting processes include requirements for written notifications to be sent to each municipality and county government in which the permitted facility is or will be located under an amendment to the Commonwealth's Administrative Code.  These notifications allow 30 days for specific municipal and county comments.

**Recommendation:** Additional public participation may be solicited by the publication of notices of pending permits in NYSDEC's Environmental Notice Bulletin (ENB).  Certain SPDES permitting actions are already included in the monthly ENB; however, it may be beneficial to provide a section specific to those SPDES permits issued for HVHF gas development on the ENB website and linked to the DART system.

## Comments on the Draft SPDES HVHF GP

Impacts to surface water quality from gas exploration and extraction activities can occur during the construction of the facility, the operation of the facility, and as a result of inadequate restoration of the facility after operations have ceased. Applying specific performance standards and consistent regulatory oversight through a thorough permitting process is essential to ensuring the prevention of water quality impacts. A comprehensive permitting process should include, but not be limited to, the following considerations:

- Clearly defined permitting process and timelines;
- Sound technical guidelines specific to the activities being permitted;
- Compliance with both State and local regulations prior to final permit approvals;
- Opportunities for public participation, outreach, and comment.

These considerations, as well as a comprehensive evaluation of all potential environmental impacts, are essential to the development of permitting procedures that are adequately protective of environmental resources.

The RDSGEIS notes that certain water resources, such as the New York City and Syracuse drinking water supplies, have been the subject of extensive comment and warrant different regulatory requirements (i.e. a prohibition on drilling). Specifically, the "Department finds that standard stormwater control and other mitigation measures would not fully mitigate the risk of potential significant adverse impacts on water resources from high-volume hydraulic fracturing." RDSGEIS at 7-55.

In a paper prepared by Patrick O'Dell, a professional engineer with the National Park Service Geologic Resources Division, Mr. O'Dell noted that "If the public

depends on operators in general to voluntarily use measures such as 'best management practices' to meet an agency's standards of resource protection, the public will be disappointed.  This is because operators are sometimes willing to assume more environmental risk in exchange for a reduction in expense or acceleration of project completion."[8]

Given these comments, and that the Department recognizes that "*standard stormwater control and other mitigation measures would not fully mitigate the risk of potential significant adverse impacts on water resources from high-volume hydraulic fracturing,*" and the Department's decision to preclude HVHF in FAD watersheds (Section 7.1.5), the validity and effectiveness of a self-monitoring GP process for other watersheds cannot be assumed to be protective of water resources, and the SPDES permit and associated regulatory activities must be developed to address these concerns.

In comments provided to the Pennsylvania DEP, Dr. James Schmid[14] PhD made the following recommendations that are directly applicable to NYSDEC regarding the HVHF SPDES permitting process in New York:

a.  Place all gas-related permit applications, issued permits, and enforcement actions online in an electronic database accessible by public.
b.  Include stream encroachment for pipelines *(in the SPDES permit).*
c.  Select a significant number of permit applications for file and on-site audit, to ascertain trends in adequacy of permitting process.
d.  Disallow general permits in Exceptional Value and High Quality waters (or in New York, require individual permits for AA or A drinking water streams and T or TS trout streams).
e.  Require an inventory for all EV or HQ streams within 500 ft of well pads.

f.  Make an attained use determination at every stream proposed for impact that has not been studied.

g.  Require disclosure of ALL related facilities in each project application, require disclosure of all land and water disturbances for each well or well pad so that projects do not incorrectly fall below thresholds.

h.  Require construction of impermeable holding areas sufficient to contain spills and prevent release outside pad.

i.  Require accounting of tree clearing.  Provide plans and timetable for reforestation.

j.  Gathering lines and water pipelines should follow existing roads rather than new ROWs.   New ROWs should be demonstrated to reduce stream/wetland crossings.

k.  Distinguish between new stream crossings and those made atop existing culverts.

**With these and other previously discussed recommendations in consideration, the following comments are provided with regards to the current Draft HVHF SPDES General Permit:**

**Comment 1:** The Draft HVHF SPDES permit is primarily a compilation of the existing Construction SPDES GP (001) and the Industrial Stormwater GP (002).  It has not been significantly modified to address the issues specific to HVHF. Additionally, the Draft HVHF SPDES permit should encompass ALL components of a well project (well pads, access roads, water lines, gathering lines, compressor stations, water withdrawals, transportation of materials, waste management) with considerations specific to HVHF, or clearly provided coordination with other permitting requirements specific to these issues.

**Comment2:** Given the lack of local land use review, the mapping and data requirements for the SWPPP should be coordinated with the mapping/data

requirements of the Environmental Assessment Form, and <u>all</u> information should be available digitally for access by local government, property owners, and the general public.  The RDSGEIS Appendix 5 *Environmental Assessment Form Attachment to Drilling Permit Application* does NOT reflect all site data requirements described in Appendix 6 *Proposed EAF Addendum Requirements for High-Volume Hydraulic Fracturing.*

**Comment3:**  The SPDES HVHF GP should be modified to include construction and stormwater discharges related to gathering lines, compressor stations and compressor station access roads, or to clarify how these activities will be addressed under another permit.

**Comment 4:** In the absence of more explicit requirements, such as the submission of supporting calculations for BMP design, owners/operators are likely to use a generic narrative for multiple wells, with exception of mapping requirements.  It is important that the SPDES HVHF GP requirements for mapping be site specific, comprehensive, at a scale that provides info needed.  Generic SWPPPs tend to be ignored.

**The following comments are in regard to specific sections of the Draft SPDES HVHF GP as noted.**

**Part I GENERAL PERMIT COVERAGE AND LIMITATIONS**

**Comment 5:**

**Section B.2 Maintaining Water Quality** – This section places the burden of identifying a violation of a water quality standard on the Department, as opposed to the permittee.  In the Industrial Stormwater GP, the burden of identifying such stormwater discharges is placed on the permittee: "*If there is evidence indicating*

*that the stormwater discharges authorized by this permit are causing, have the reasonable potential to cause, or are contributing to an excursion above an applicable water quality standard, the permittee must take appropriate corrective action and notify DEC of corrective actions taken.*"  Similar responsibility should be placed on the permittee for HVHF activities.

**Comment 6:**

**Section C.3 Non-Stormwater Discharges** – This section authorizes non-stormwater discharges and adds "uncontaminated discharges from well site dewatering operations" to the list of allowable non-storm discharges. Is this section referring to only de-watering of erosion and sediment control measures in site development or to well drilling material?  This should be clarified.

**Comment 7:**

**Section D.2 Activities Which are Ineligible for Coverage under this General Permit** – This section precludes the construction of HVHF only on locations where the stream designation is AA or AA-s, **and** there is no impervious cover **and** the slopes are greater than 25% or E / F slope designation.   Does this mean that if there is some impervious cover on such a site that HVHF is allowed?  Does this mean that all other sites have no limits on slope (unless identified by the applicant as addressed in local land use regulations **and** identified as an objection by local government)?   Is disturbance of steep slopes allowed in T streams?  Should steep slope disturbance be precluded in proximity to water bodies and wells and identified in setbacks?  The RDSGEIS notes in Section 6.1.2 that "*Steep access roads, well pads on hill slopes, and well pads constructed by cut-and-fill operations pose particular challenges, especially if an on-site drilling pad is proposed.*"  This section should be substantially re-evaluated to preclude or define limits on coverage for steep slopes, etc. in all watersheds.  Additionally, the Department should develop specific performance parameters/requirements for coverage of such activities on steep slopes under an Individual Permit for sites not addressed under the GP, rather

than issuing an Individual Permit that is substantially similar to the GP. Additionally, this section should clarify that local land use regulations regarding steep slopes and other environmental constraints apply unless waived by local government.

**Comment 8:**

**Section D.4 Setbacks for Well Pad** – These setbacks should reflect further consideration in the RDSGEIS, and include all setbacks discussed and identified in the RDSGEIS and appendices – such as setbacks from private water supply wells and springs, public water supply wells, residences, etc. This section should also clarify where ALL HVHF activities are prohibited (i.e. within 100-year floodplain, within 4,000 feet of unfiltered water supply watersheds, within 2,000 feet of public water supply, etc.).

All setback dimensions should be indicated on the GP mapping requirements.

Additionally, this section should clarify that local land use regulation setbacks also apply unless waived by local government. The permittee should prepare documentation that such land use regulations have been evaluated, and the local government notified if local land use requirements have not been met.

**Part II Obtaining General Permit Coverage**

**Comment 9:**

**A. Notice of Intent (NOI) Submittal** – The applicant is required to submit an NOI form to the Department, and prepare a SWPPP. The SWPPP must be available to the Department (if requested) and maintained on site. This process does not provide for public access and notification (other than the publication in a newspaper, which is easily overlooked by the public).

The public, including immediately adjacent property owners, should have opportunity for notification when such notification is submitted to the Department.

Many local governments have adjacent property owner notification requirements as part of the local zoning and land development process.  Since this process does not apply to HVHF, a process of notification to adjacent and potentially impacted property owners should be included in Section II.A.   Clarification of the definition of "potentially impacted property owners" requires further consideration in the RDSGEIS.  Potentially, notice should be provided to water suppliers, etc.

If coverage under the GP is dependent upon development and implementation of the SWPPP, then the SWPPP must be available for public review upon request. It is likely that most members of the general public would not necessarily know how to request or obtain a copy of the SWPPP.  As previously suggested, an on-line database would allow public and Department access to the SWPPP.  It is unreasonable to allow the industry to obtain GP coverage without an opportunity for public comment.

**Comment 10:**

**B.2.3.b  General Permit Authorization** – Given the unique nature of HVHF construction, and the lack of local government review regarding land use disturbance and stormwater management, the permit should impose a time period between preparation and submission of any and all required materials and actual permit coverage.  All material should be digitally submitted and all information regarding land disturbance activities should be available and accessible for public review and comment, with a minimum 30-day period for public comment before permit coverage.  HVHF practices are different from other industrial practices and coverage under a general permit must provide some process for public review and comment on permit coverage.

**Comment 11:**

**C. Impaired Waters and TMDLs** – The RDSGEIS has not provided any
documentation or consideration as to whether a general permit is sufficient to
prevent further water quality impacts in impaired waters and especially watersheds
with TMDLs. A requirement should be imposed for the permit applicant to identify
to the Department when the discharge will occur in impaired waters, and what
specific additional measures are being implemented to provide protection for the
specific pollutants of concern. The Department should maintain specific records
and documentation of HVHF activities in impaired waters. Additional monitoring
and reporting requirements are warranted in impaired waters, and should be
submitted to the Department, not just maintained on site.

**Part III – DEVELOPMENT AND ADMINISTRATION OF THE CONSTRUCTION
SWPPP**

**Comment 12:**

**A.3. Development of the Construction SWPPP** – Section 5.1 of the RDSGEIS
identifies a number of types of land disturbance activities associated with HVHF
including utility corridors (including gathering lines), compressor facilities, and
access roads associated with compressor facilities. However, the construction of
gathering lines, compressor facilities and the access roads associated therewith is
not required to be addressed in the SWPPP. The GP and the required SWPPP
contents should be revised to include construction and stormwater discharges
related to gathering lines, compressor stations and associated access roads, as well
as those facilities currently listed under this section.

**Comment 13:**

**C.1. Disturbance of more than five (5) acres** – If phased construction is planned,

with a maximum of five acres disturbed in any phase, the permitting of greater disturbance may be permissible under the SPDES HVHF GP as it is currently written.

**Recommendation:** The SPDES HVHF GP should be revised to require approval when the soil disturbance activities will result in more than five acres of disturbance at any one time, or more than five acres of disturbance over the life of the project.

**Recommendation:** The SPDES HVHF GP should be revised to effectively cover all areas not in AA, AA-Special, or FAD areas.


**Part IV CONTENTS OF SWPPP**

**Comment 14:**

**A. What the Construction SWPPP Must Achieve** –The SPDES HVHF GP requires well sites to be *designed to minimize environmental impacts* through the minimization of clearing and grading; and avoidance of sensitive areas such as erodible soils, steep areas, and critical habitats.  However, the SPDES HVHF GP does not indicate how the permittee will achieve this.

**Recommendation:** The SPDES HVHF GP should be revised to clearly indicate how sensitive areas will be identified in permittee submission packages and require the identification to be done so at a mapping scale adequate to clearly identify all potential sensitive areas to ensure clearing and grading will be minimized accordingly.  This requirement also applies to setback requirements around waterbodies.  (See additional comments under Part IV.C.1. and Part IV.A.)


**Comment 15:**

**B.1.b. and e. Effluent Limitation Requirements** – The SPDES HVHF GP requires compliance with erosion and sediment controls to *minimize the discharge of pollutants,* specifically the control of stormwater and sediment discharges, but does not require supporting calculations to be submitted.

**Recommendation:** The SPDES HVHF GP should be revised to require permittees to submit calculations supporting any claim of compliance with mandatory control of stormwater, sediment, or other pollutant discharges.


**Comment 16:**

**C.1.b. Erosion and sediment control components** -  The SPDES HVHF GP requires a site map/construction drawing(s) that include information vital to erosion and sediment control considerations, including wetlands, potentially affected surface waters, existing and final slopes, and location(s) of stormwater discharges. However, there is no maximum scale identified for this requirement.  It is possible that sensitive features may be overlooked and steep slopes unidentified if mapping is at too large a scale.

**Recommendation:** The SPDES HVHF GP should be revised to require mapping at a maximum scale no greater than 1" = 100' to ensure adequate identification of features to be avoided or protected during construction.


**Comment 17:**

**C.1.i. Erosion and sediment control components** – The inspection schedule, as well as the corresponding inspection reports should be made available with the SWPPP for Department access.  At a minimum, the inspection schedule should be made available to the public and include a Department contact where concerns may be reported.


**Comment 18:**

**D.1.b. Post-construction stormwater management practice component** - The SPDES HVHF GP requires a well site map/construction drawing(s) that include information vital to post-construction stormwater management practice evaluation,

including the specific location and size of each post-construction stormwater management practice.  However, there is no maximum scale identified for this requirement.  It is possible that the regulatory review of post-construction stormwater management practices may be inadequate if mapping is at too large a scale.

**Recommendation:** The SPDES HVHF GP should be revised to require mapping at a maximum scale no greater than 1" = 100' to ensure adequate identification and evaluation of proposed post-construction stormwater management practices.

## Comment 19:

**D.1.e. Post-construction stormwater management practice component** - The SPDES HVHF GP requires a hydrologic and hydraulic analysis for all structural components of the stormwater management control system.  However, the SPDES HVHF GP does not require supporting calculations to be submitted in support of these analyses.  Without supporting calculations, regulators will be limited in the ability to effectively review the appropriateness of the proposed system.

**Recommendation:** The SPDES HVHF GP should be revised to require permittees to submit calculations supporting the hydrologic and hydraulic analysis of all structural components of the proposed stormwater management control system. All calculations and information should be available to the public upon request.

## Comment 20:

**D.1.f. Post-construction stormwater management practice component** – The SPDES HVHF GP requires a detailed summary of the sizing criteria that were used to design all post-construction stormwater management practices *including calculations* to be submitted with the SWPPP.  The SPDES HVHF GP requires the summary to address, at a minimum, the required design criteria from applicable chapters of the 2010 New York State Stormwater Management Design Manual.

However, the SPDES HVHF GP does not indicate that the calculations are site specific.  Given the variability of site conditions throughout any given project, it is essential that the post-construction stormwater management practices be designed to address the unique considerations of both the site conditions and the functional practicality of any proposed post-stormwater management practice.

**Recommendation:** The SPDES HVHF GP should be revised to require permittees to submit site-specific calculations supporting the design of all proposed stormwater management practices to ensure they are appropriate for site-specific conditions.

## Comment 21:

**E. Enhanced Phosphorous Removal Standards** – The SPDES HVHF GP requires post-construction stormwater management practices to be designed in conformance with the Enhanced Phosphorous Removal Standards included in the 2010 New York State Stormwater Design Manual.  However, the SPDES HVHF GP does not require permittees to submit documented implementation of this requirement.

**Recommendation:** The SPDES HVHF GP should be revised to require permittees to document the implementation of the Enhanced Phosphorous Removal Standards within the SWPPP as part of their permit application package.

## Part V-CONSTRUCTION OF WELL SITE – INSPECTION, MAINTENANCE, AND RECORDKEEPING REQUIREMENTS

## Comment 22:

**D. Recordkeeping** – The SPDES HVHF GP requires all inspection reports to be maintained on the *well site* with the *Construction SWPPP*.  Without a requirement to submit inspection reports or, at a minimum, a list of violations and corrective actions required, to the Department, the inspection reports may not serve their

intended purpose.  Regardless of limitations to staff and funding, the Department should maintain responsibility for ensuring compliance with applicable regulations. The utilization of *qualified inspectors* is only one part of ensuring compliance and should be supplemented with quality control checks by the Department, which may be done by performing random reviews of documents submitted electronically to a Department database similar to that mentioned in previous comments.

**Recommendation:** The SPDES HVHF GP should require electronic submission of inspection reports or, at a minimum, a list of violations and correctives actions required, to the Department.  These submissions should be managed in a Department database similar to that mentioned in previous comments.  The Department database should also be accessible to the public in a manner described in previous comments.  Additionally, the Department should conduct quality control reviews of inspection documents to ensure compliance is being achieved.

**Part VI CONSTRUCTION PHASE COMPLETION**

<u>**Comment 23:**</u>
**B. Inspections** – The SPDES HVHF GP requires from qualified inspectors, by signature, a statement certifying achievement of final site stabilization.  However, the SPDES HVHF GP does not require any documentation supporting this certification.

**Recommendation:** The SPDES HVHF GP should be revised to require documentation, specifically time/date-stamped digital photographs, to support certification of final stabilization.

**Part VII HVHF SWPP**

<u>**Comment 24:**</u>
**Part VII General comment** – Would an applicant be permitted to submit one

generic document to be applied at multiple sites?  If so, it is unlikely that all relevant issues will be adequately addressed.

**Recommendation:** The SPDES HVHF should be revised to require a site-specific SWPPP as described in previous comments to ensure adequate protection and mitigation measures are proposed.


**Comment 25:**

**A.5. Development of the HVHF SWPPP** – The SPDES HVHF GP requires the HVHF SWPPP to be developed by someone knowledgeable in the principles and practices of stormwater management and groundwater protection associated with the HVHF Phase and the Production Phase.  The SPDES HVHF GP specifically mentions a Professional Engineer.  However, the principles and practices of groundwater protection are often best performed by a Professional Hydrogeologist.

**Recommendation:** The SPDES HVHF GP should be revised to reference the appropriate professional disciplines necessary to adequately address both stormwater management (Professional Engineer) and groundwater protection (Professional Hydrogeologist).


**Comment 26:**

**A.11 Development of the HVHF SWPPP** – The SPDES HVHF GP allows the Department to issue an immediate stop work order upon a finding of significant non-compliance of the HVHF SWPPP or violation of the GP.

**Recommendation:** The ability to issue a stop-work order is a great option for the Department and should be supplemented by random quality control reviews performed as described in previous comments.

**Part VIII HVHF OPERATION REQUIREMENTS**

**Comment 27:**

**A.1. and 2. General Requirements** – The SPDES HVHF GP requires owners and operators to develop and evaluate alternatives for HVHF Phase fluid additives and to maintain a list of all HVHF Phase fluid additives on-site.  The Department must make clear that propriety information must not be excluded from this list.

**Comment 28:**

**A.4. General Requirements** – The SPDES HVHF GP requires qualified inspectors to sign a statement certifying achievement of final site stabilization prior to initiating the HVHF Phase.  However, the SPDES HVHF GP does not require any documentation supporting this certification.

**Recommendation:** The SPDES HVHF GP should be revised to require documentation, specifically time/date-stamped digital photographs, to support certification of final stabilization.

**Comment 29:**

**A.6. General Requirements** – The SPDES HVHF GP requires Department inspector verification of partial site reclamation.  However, the SPDES HVHF GP does not address the procedures necessary if partial site reclamation is not sufficient.

**Recommendation:** The SPDES HVHF GP should be revised to detail the process for addressing sites where the requirements for partial site reclamation are insufficient.

**Part IX CONTENTS OF THE HVHF SWPPP**

**Comment 30:**

**A.2. HVHF General SWPPP Requirements** – The SPDES HVHF GP requires a site map that includes information critical to adequately review and evaluate the HVHF

SWPPP.  Specifically, the SPDES HVHF GP cites a *USGS quadrangle or other map.* While a USGS quadrangle map may be adequate for showing general site location, it is not appropriate for showing detailed information.  It is possible that the regulatory review of the HVHF SWPPP may be inadequate if mapping is at too large a scale.

**Recommendation:** The SPDES HVHF GP should be revised to require mapping at a maximum scale no greater than 1" = 100' to ensure adequate identification and evaluation of proposed post-construction stormwater management practices. Specifically, this section of the SPDES HVHF GP should be revised as follows:

**b.** Directions of stormwater flow should be shown on a contoured map with contours shown at minimum 5-ft intervals.

**e.** The scale for maps showing the locations of items listed in this section should be mapped at an appropriate <u>defined</u> scale (e.g. 1"=50' maximum). This section should also include the location of gathering lines.

**g.** Drainage area maps and stormwater outfall locations should be submitted on a separate stormwater map, attached to the site map, to ensure correct documentation.

**i.** The procedure for determining areas with significant potential for causing erosion should be defined or, if already defined in other documents, referenced.


**Comment 31:**

**A.4. HVHF General SWPPP Requirements** – This section requires the name, classification, and distance from the nearest edge of the well pad to the nearest receiving water(s).  Submission of this information in narrative form may be sufficient, but an appropriately scaled map with labeled features would also provide an easily-verifiable document.

**Recommendation:** The SPDES HVHF GP should be revised to require a map showing the name, classification, and distance from the nearest edge of a well pad to the nearest receiving water(s) at a legible scale.

**Comment 32:**

**A.7. HVHF General SWPPP Requirements** – The inclusion of gravel is important when considering the total imperviousness of the well site.  The compaction of subsoils and clogging with fine sediment within gravel areas has been shown to function as an impervious surface with regard to stormwater runoff.

**Comment 33:**

**A.7. HVHF General SWPPP Requirements** – This section includes an equation for estimating the total imperviousness of a well site as:

> Area of Roofs + Area of Paved and Other *Impervious* Surfaces, including gravel and roads = Total Area of *Well site.*

This equation should be revised as follows:

> Area of Roofs + Area of Paved and Other *Impervious* Surfaces, including gravel and roads = Total <u>Impervious Surface</u> Area of *Well site.*

**Comment 34:**

**A.11. HVHF General SWPPP Requirements** – The SPDES HVHF GP requires a summary of discharge sampling data to be maintained on the well site.  Without a requirement to submit sampling data to the Department, it is possible that discharges in violation of the SPDES HVHF GP may be overlooked.  Regardless of limitations to staff and funding, the Department should maintain responsibility for compliance and enforcement through quality control checks.

**Recommendation:** Quality control checks should be performed by the Department and facilitated by the submission of sampling data to the Department electronically. Checks should then be verified through cross-checking submitted sampling data

against Department-collected sample data.  These submissions should be managed in a Department database similar to that mentioned in previous comments.  The Department database should also be accessible to the public in a manner described in previous comments.

## Comment 35:

**A.13. HVHF General SWPPP Requirements** – In addition to identifying the proposed sources or any water to be used at the well site, an estimate of proposed volume to be withdrawn from each source will assist in tracking any pollutants found in that water.

**Recommendation:** The SPDES HVHF GP should be revised to require permittees to submit estimated volumes to be withdrawn from each identified water source.

## Comment 36:

**A.16. HVHF General SWPPP Requirements** – The SPDES HVHF GP requires the HVHF SWPPP to include a description of stormwater management controls appropriate for the *well site*.  However, the SPDES HVHF GP does not indicate that this description will include site specific sizing calculations.  Given the variability of site conditions throughout any given project, it is essential that stormwater management controls be designed to address the unique considerations of both the site conditions and the functional practicality thereof.

**Recommendation:** The SPDES HVHF GP should be revised to require permittees to submit site specific sizing calculations supporting the design of all proposed stormwater management controls to ensure they are appropriate for site-specific conditions.  Site-specific stormwater management controls should be evaluated for design and performance through inspection reporting and quality control as described in previous comments.

**Comment 37:**

**A.18.k. HVHF General SWPPP Requirements** – The SPDES HVHF GP requires the HVHF SWPPP to include information about partial site reclamation, including a requirement that reclaimed areas be seeded and mulched after topsoil replacement and reestablishment of vegetative cover.  Standards for acceptable seeding, maintenance of seeded areas, and soil restoration should be defined in order to ensure reclamation, revegetation, and continued stabilization are achieved.

**Recommendation:** The SPDES HVHF GP should be revised to include by definition or reference standards for acceptable seeding, maintenance of seeded areas, and soil restoration.

**Comment 38:**

**B.1.p. Required Non-Structural BMPs**  - The SPDES HVHF GP requires the owner or operator to use absorbents for dry cleanup whenever possible.  However, the SPDES HVHF GP does not address the disposal of used absorbents.

**Recommendation:** The SPDES HVHF GP should be revised to address the disposal of used absorbents in accordance with NYS and EPA guidelines.

**Comment 39:**

**C. Required Structural BMPs** – The SPDES HVHF GP requires the HVHF SWPPP to "describe the traditional stormwater management practices…that currently exist or that are planned."  However, the SPDES HVHF GP does not require calculations supporting the capacity of existing stormwater management practices to manage additional stormwater from newly constructed well sties, nor does the SPDES HVHF GP require supporting calculations for design of proposed stormwater management practices.  Without a thorough review prior to issuance of the GP, it is possible that stormwater management practices will be inadequate to effectively address stormwater runoff from well sites.

**Recommendation: -** The SPDES HVHF GP should be revised to require the submission of calculations supporting the capacity of existing stormwater management practices and the design of proposed stormwater management practices to effectively manage stormwater runoff resulting from the construction and operation of a well site.

## Part X ACTIVITIY-SPECIFIC STRUCTURAL AND NON-STRUCTURAL BMPs AND BENCHMARK MONITORING REQUIREMENTS

**Comment 40:**

**A.5. General** – The SPDES HVHF GP states that "if the [HVHF] activities are conducted for less than one (1) calendar year, all stormwater monitoring requirements must be satisfied during the period of activity. If no qualifying storm event occurs during the period of activity, or no qualifying storm event results in a *discharge*, monitoring requirements must be completed during the first qualifying storm that results in a *discharge*."  However, the SPDES HVHF GP does not define the term "qualifying storm event."  To ensure adequate monitoring of stormwater resulting from HVHF activities, the monitoring and sampling requirements must be clearly defined in order for permittees to satisfy the conditions of the permit.

**Recommendation:** The SPDES HVHF GP should be revised to include a clear definition of the term "qualifying storm event."

**Comment 41:**

**D. Vehicle and equipment cleaning areas** – The SPDES HVHF GP states that "discharge of vehicle and equipment wash waters … are not authorized by the SPDES HVHF GP and must be covered under a separate SPDES permit or discharged to a sanitary sewer in accordance with applicable industrial pretreatment requirements or transported off-site for proper disposal."  The intent of the SPDES HVHF GP was to streamline and condense the permitting process for HVHF

activities.  Requiring a separate permit for the discharge of vehicle and equipment wash waters seems redundant in light of the ability of the SPDES HVHF GP to cover all other HVHF activities.

**Recommendation:** The SPDES HVHF GP should be revised to incorporate all the provisions necessary to meet New York State permitting requirements within a single permit, including the provisions necessary to authorize discharges from vehicle and equipment wash waters or require off-site transportation for disposal.

**Comment 42:**

**J. Piping/conveyances** – The SPDES HVHF GP requires the HVHF SWPPP to include and describe measures that prevent or minimize the contamination of surface runoff from spills and leaks from piping/conveyance systems used for transferring "fresh water, *flowback* water, *production brine*, well *stimulation* water, sanitary, and other wastewaters."  However, the SPDES HVHF GP does not address this requirement for piping/conveyance systems used for transferring the gas produced by each well site. Failure to address the piping/conveyance systems used for gas transmission may result in inadequate protection of surface waters in the event of a leak or spill of gas.

**Recommendation:** The SPDES HVHF GP should be revised to address all piping/conveyances, including gas transmission systems.

**Comment 43:**

**J.2.p. Piping/conveyances** – The SPDES HVHF GP states, "pipelines buried under stream crossings shall be buried below the scouring depth and may require other permits."  The SPDES HVHF GP does not require the submission of supporting calculations for determination of scour depth, nor does it clearly define the conditions under which "other permits" may be required.  Furthermore, it seems that NYSDEC does not require stream crossing permits for activities other than silviculture.  This lack of oversight may result in significant impacts to surface

waters due to the potential thousands of crossings at headwater streams to facilitate HVHF activities.

**Recommendation:** The SPDES HVHF GP should be revised to require submission of calculations supporting the determination of scour depth for the placement of buried pipeline stream crossings.

**Recommendation:** The SPDES HVHF GP should be revised to clearly define which "other permits" may be required and the conditions under which those "other permits" are applicable.

**Recommendation:** NYSDEC should examine current stream crossing requirements and develop more robust regulations to ensure proposed crossings are constructed and maintained appropriately and do not impact water quality.


**Comment 44:**

**M. Freshwater Surface Impoundments and Reserve Pits** – The SPDES HVHF GP states, "a closed-loop tank system must be used instead of a reserve pit to manage drilling fluids and cuttings for any of the following: a) horizontal drilling in the Marcellus Shale unless an <u>acid rock drainage mitigation plan</u> for onsite burial of such cuttings is approved by the Department; and; b) any drilling requiring cuttings to be disposed of off-site, as provided in <u>Part 360 of this Title</u>, including at a landfill." However, the SPDES HVHF GP does not define an "acid rock drainage mitigation plan." The SPDES HVHF GP also does not clearly identify the reference to Part 360 in section (b), above.

**Recommendation:** The SPDES HVHF GP should be revised to include a section defining an "acid rock drainage mitigation plan" which includes the conditions under which the plan must be developed, the issues which the plan must address (including any necessary supporting calculations), and the contents which must be included in the plan.

**Recommendation:** The SPDES HVHF GP should be revised to clearly identify the statute included in part (b) of this section which references the off-site disposal of cuttings.

**Part XII HVHF PHASE MONITORING**

**Comment 45:**

**A. Schedule for Monitoring** – The SPDES HVHF GP requires a schedule for visual monitoring and examination of stormwater discharges at each outfall after each qualifying storm that must document observed color, odor, clarity, floating solids, settled solids, suspended solids, foam, and oil sheen.  However, the SPDES HVHF GP does not require sampling, even if the visual observations indicate the presence of pollutants.

**Recommendation:** The SPDES HVHF GP should be revised to clearly define sampling requirements.  At a minimum, sampling and laboratory testing should be required if a visual examination indicates the presence of pollutants.

**Comment 46:**

**A. Schedule for Monitoring** – The SPDES HVHF GP requires visual examination documents to be maintained on the well site.  Also, the SPDES HVHF GP does not require photographic documentation to support visual examination reports.  The Department should perform quality control checks, which may be done by performing random reviews of documents submitted electronically to a Department database similar to that mentioned in previous comments.

**Recommendation:** The SPDES HVHF GP should require electronic submission of visual examination reports, including photos, to the Department.  These submissions should be managed in a Department database similar to that mentioned in previous comments.  The Department database should also be

accessible to the public in a manner described in previous comments.  Additionally, the Department should conduct quality control reviews of visual examination documents to ensure compliance is being achieved.

**Comment 47:**

**A. Schedule for Monitoring** – The SPDES HVHF GP states, "all samples (except snowmelt samples) must be collected from the *discharge* resulting from a storm event that is greater than 0.1 inches in magnitude and that occurs at least seventy-two (72) hours from the previously measurable (greater than 0.1 inch rainfall) storm event. The 72-hour storm interval is waived if the preceding measurable storm did not result in a stormwater *discharge* (e.g., a storm event in excess of 0.1 inches may not result in a stormwater *discharge* at some facilities)."  Is this the intended definition of "qualifying storm event?"


**Comment 48:**

**A. Schedule for Monitoring** – The SPDES HVHF GP states, "if a visual examination was performed and the storm event was later determined not to be a measurable (greater than 0.1 inch rainfall) storm event, the visual examination should still be included in the *HVHF SWPPP* records."  The inclusion of all visual examination reports in the HVHF SWPPP record should be required.

**Recommendation:** The SPDES HVHF GP should be revised to state, "if a visual examination was performed and the storm event was later determined not to be a measurable (greater than 0.1 inch rainfall) storm event, the visual examination <u>must</u> still be included in the *HVHF SWPPP* records."


**Comment 49:**

**A.3.c. Schedule for Monitoring** – This section of the SPDES HVHF GP requires samples to be analyzed within ten calendar days after they have been collected.

This information may be more logically located in section A.10.b. which discusses collection and analysis of samples.

**Recommendation:** The SPDES HVHF GP should be revised to move the above referenced requirement for analysis of samples from Part XII.A.3.c. to Part XII.A.10.b.

**Comment 50:**

**A.3.d. Schedule for Monitoring** – This section of the SPDES HVHF GP states, "the benchmark concentrations do not constitute direct numeric effluent limitations and, therefore, an exceedance is not a general permit violation." What is the purpose of benchmark monitoring if exceedance of the benchmark concentrations listed in Part X of the SPDES HVHF GP do not result in a general permit violation?

**Recommendation:** The SPDES HVHF GP should be revised to omit this sentence from the document. Exceeding benchmark concentrations should immediately result in a violation of the GP to ensure proper corrective action is taken to protect water quality.

**Comment 51:**

**A.3.f. Schedule for Monitoring** – The SPDES HVHF GP requires benchmark monitoring results to be documented and maintained on the well site. The Department should perform quality control checks, which may be done by performing random reviews of documents submitted electronically to a Department database similar to that mentioned in previous comments.

**Recommendation:** The SPDES HVHF GP should require electronic submission of benchmark monitoring results, including corrective actions needed, to the Department. These submissions should be managed in a Department database similar to that mentioned in previous comments. The Department database should

also be accessible to the public in a manner described in previous comments. Additionally, the Department should conduct quality control reviews of benchmark monitoring documents to ensure compliance is being achieved.

**Comment 52:**

**A.10.b. Schedule for Monitoring** – The SPDES HVHF GP states that "sampling requirements must be assessed on an outfall-by-outfall basis." However, there are no criteria upon which sampling requirements are to be assessed. The SPDES HVHF GP also fails to identify the party responsible for directing sampling requirements at each outfall. Sampling requirements should be directed by NYSDEC guidance criteria, to include frequency of collection and analysis requirements.

**Recommendation:** The SPDES HVHF GP should be revised to clearly identify the Department as the party responsible for directing sampling requirements at each outfall.

**Recommendation:** The NYSDEC should develop guidance criteria for sampling requirements for HVHF activities. This guidance criteria should address the conditions under which sample collection is required (i.e., when a visual examination indicates the presence of pollution), location of sample collection, frequency of sample collection, and laboratory analysis requirements for collected samples.

**Recommendation:** The SPDES HVHF GP should be revised to require sampling in accordance with NYSDEC guidance criteria, to include frequency of collection and analysis requirements.

**Comment 53:**

**A.10.b. Schedule for Monitoring** – This section of the SPDES HVHF GP does not reference the ten-day time limit for analysis of collected samples.

**Recommendation:** This section of the SPDES HVHF GP should be revised to include reference to the ten-day time limit for analysis of collected samples included in Part XII.A.3.c.

## Comment 54:

**A.10.c. Schedule for Monitoring** – This section of the SPDES HVHF GP requires owners/operators to provide the date and duration of sampled storm events, <u>rainfall measurements or estimates (in inches) of the storm event that generated the sampled runoff</u>, time between storm events greater than 0.1 inch, and an estimate of volume sampled.  A rain gauge/weather station should be required to ensure rainfall greater than 0.1 inch is accurately recorded.  This will also ensure visual examination and sampling is completed for events greater than 0.1 inch.

**Recommendation:** The SPDES HVHF GP should be revised to require rainfall measurements and remove references to rainfall estimates to ensure monitoring and sampling in compliance with the conditions of the permit.

## Part XIII HVHF PHASE REPORTING

## Comment 55:

**A. Discharge Monitoring Reports (DMR)** – The SPDES HVHF GP requires the results of laboratory analysis of samples to be submitted to the Department on preprinted DMRs within ten days of their receipt.  The required formatting of DMRs lends itself very easily to standardization for electronic submission to the Department, which would allow for faster submission and reduce the costs incurred by both the Department and permittees by eliminating unnecessary paper and paperwork.  Furthermore, the Department should perform quality control checks, which may be done by performing random reviews of documents submitted electronically to a Department database similar to that mentioned in previous comments.

**Recommendation:** The SPDES HVHF GP should require electronic submission of DMRs, in approved format via online forms, to the Department.  These submissions should be managed in a Department database similar to that mentioned in previous comments.  The Department database should also be accessible to the public in a manner described in previous comments.  Additionally, the Department should conduct quality control reviews of benchmark monitoring documents to ensure compliance is being achieved.

## Part XIV MONITORING FOR THE PRODUCTION PHASE AND TEMPORARY SUSPENSION OF THE HVHF PHASE

<u>**Comment 56:**</u>

**A. Schedule for Monitoring** – Please see comments 45, 46, 49, 50, 51, 52, 53, and 54, and the corresponding recommendations as they apply to this section of the SPDES HVHF GP.

## Part XVI PRODUCTION PHASE REPORTING

<u>**Comment 57:**</u>

**A. Discharge Monitoring Reports (DMR)** – Please see comment 55 and the corresponding recommendation as it applies to this section of the SPDES HVHF GP.

## Part XXI. STANDARD GENERAL PERMIT CONDITIONS

<u>**Comment 58:**</u>

**F. Duty to Provide Information** – The SPDES HVHF GP states, "the NOI, SWPPP and inspection reports required by this general permit are public documents that the *owner or operator* must make available for review and copying by any person within five (5) business of the *owner or operator* receiving a written request by any such

person to review the NOI, SWPPP or inspection reports. Copying of documents will be done at the requester's expense." Many HVHF well sites prohibit access by the general public, and all of the public documents indicated are required by the SPDES HVHF GP to be kept on the well site.  In order to expedite requests and eliminate man-hours necessary to escort individuals through restricted areas, as well as provide for the recommendations above, the Department should require the electronic submission of all public documents.  These documents should be managed in a Department database similar to that mentioned in previous comments.  The Department database should also be accessible to the public in a manner described in previous comments.

**Recommendation:** The SPDES HVHF GP should be revised to allow for the electronic submission of all public documents.  These documents should be managed in a Department database similar to that mentioned in previous comments.  The Department database should also be accessible to the public in a manner described in previous comments.

**Attachment A**

**Technical Information in support of comments:**

1. Sediment Loads from Gravel Roads

   The Pennsylvania Center for Dirt and Gravel Road Studies provides information on measures to maintain gravel roads in a manner to reduce the discharge of pollutants and protect water quality.  Penn State's Center for Dirt and Gravel Road Studies (Center) recently completed a research project for the Chesapeake Bay Commission (Scheetz, Summary Statement) that begins to quantify sediment production from gravel roads and sediment reductions from several commonly used practices. This study found that:

   > **Runoff Rates from Existing Roads:**
   > *"The five "existing condition" tests done for this study found sediment production rates ranging from 0.7-12.2 pounds of sediment runoff in a single 30 minute, 0.55 inches simulated rainfall. The 0.7 pound event was generated from a flat narrow farm lane with grass growing between the wheel tracks. The 12.2 pound event was generated from a wider, mixed limestone/clay road at a 4-5% slope. This highlights the great variability in erosion rates based on specific site conditions. Using the average sediment runoff rate of 5.6 pounds per event, a single 30 minute 0.55  inch rain event moving across Pennsylvania can be conservatively expected to generate over 3,000 tons\* of sediment  form the State's 20,000+ miles of public unpaved roads".*

   This research supports that gravel roads can be a significant source of pollutants such as sediment.  As discussed in several comments, there is a need for the RDSGEIS to estimate the cumulative impact of gravel road development as a result of HVHF activity.

2. **Water Quality Impacts from Gas Drilling Activities**

   In 2005, the U.S. Environmental Protection Agency (U.S. EPA) awarded a grant to the City of Denton, Texas, to monitor and assess the impact of gas well drilling on stormwater runoff.  The results of this effort were published in December 2007

in a report titled "Demonstrating the Impacts of Oil and Gas Exploration on Water Quality and How to Minimize These Impacts Through Targeted Monitoring Activities and Local Ordinances."  With regards to the discharge of sediment during construction, this study determined that:

> *"Gas well sites have the potential to produce sediment loads comparable to traditional construction sites.*
>
> - *Total suspended solids (TSS) and turbidity event mean concentrations (EMC = pollutant mass / runoff volume) at gas sites were significantly greater than at reference sites (the median TSS EMC at gas sites was 136 times greater than reference sites).*
>
> - *Compared to the median EMCs of storms sampled by Denton near one of their outfalls, the gas well site median EMC was 36 times greater.*
>
> - *Gas site TSS EMCs ranged from 394 to 9898 mg/l and annual sediment loadings ranged from 21.4 to 40.0 tonnes/hectare/year (tonne = 1000 Kg; hectare = 10,000 square meters), and were comparable to previous studies of construction site sedimentation".*

This study concludes that "Gas well sites have the potential to negatively impact surface waters due to increased sedimentation rates."  (US EPA ID No. CP-83207101-1, page 2).

In addition to the well pad site, roads that are constructed, widened, or altered for vehicle access to and from the well pad site can be a source of sediment and pollutants during both construction and operation.  The U.S. EPA Publication "Erosion, Sediment and Runoff Control for Roads and Highways" (EPA-841-F-95-008d) states that:

> Runoff controls are essential to preventing polluted runoff from roads, highways, and bridges from reaching surface waters. Erosion during and after construction of roads, highways, and bridges can contribute large amounts of sediment and silt to runoff waters, which can deteriorate water quality and lead to fish kills and other ecological problems.
>
> Heavy metals, oils, other toxic substances, and debris from construction traffic and spillage can be absorbed by soil at construction sites and carried with runoff water to lakes, rivers,

and bays. Runoff control measures can be installed at the time of road, highway, and bridge construction to reduce runoff pollution both during and after construction. Such measures can effectively limit the entry of pollutants into surface waters and ground waters and protect their quality, fish habitats, and public health.

This publication (EPA-841-F-95-008d) identifies a number of pollutant types and sources related to Roads and Highways, as identified in Table 1.

**Table 1. Typical pollutants found in runoff from roads and highways.**

Erosion, Sediment and Runoff Control for Roads and Highways | Polluted Runoff | US EPA

| | **Pollutant** | **Source** |
|---|---|---|
| **Sedimentation** | Particulates | Pavement wear, vehicles, the atmosphere and maintenance activities |
| **Nutrients** | Nitrogen & Phosphorus | Atmosphere and fertilizer application |
| **Heavy Metals** | Lead | Leaded gasoline from auto exhausts and tire wear |
| | Zinc | Tire wear, motor oil and grease |
| | Iron | Auto body rust, steel highway structures such as bridges and guardrails, and moving engine parts |
| | Copper | Metal plating, bearing and brushing wear, moving engine parts, brake lining wear, fungicides & insecticides |
| | Cadmium | Tire wear and insecticide application |
| | Chromium | Metal plating, moving engine parts and brake lining wear |
| | Nickel | Diesel fuel and gasoline, lubricating oil, metal plating, bushing wear, brake lining wear and asphalt paving |
| | Manganese | Moving engine parts |
| | Cyanide | Anti-caking compounds used to keep deicing salt granular |
| | Sodium, calcium & chloride | Deicing salts |
| | Sulphates | Roadway beds, fuel and deicing salts |
| **Hydrocarbons** | Petroleum | Spills, leaks, antifreeze and hydraulic fluids and asphalt surface leachate |

# References

1. Center for Rural Pennsylvania "the Impact of Marcellus Gas drilling on Rural Drinking Water Supplies", October 2011.

2. Entrekin, Sally, et al, "Rapid Expansion of Natural Gas Development Poses a Threat to Surface Waters", From Frontiers in Ecology 2011; 9(9): 503-511, Oct 2011.

3. Etowah Aquatic Habitat Conservation Plan "Utility Stream Crossings Policy", July 13, 2006.

4. Handlerof, Stephanie; League of Women Voters of Indiana "Marcellus Shale Natural Gas Extraction Study 2009-2010 Study Guide V: Regulation and Permitting of Marcellus Shale Drilling", League of Women Voters of Pennsylvania, 2010.

5. Kaplan, Louis, et al "Protecting Headwaters: The Scientific Basis For Safeguarding Stream And River Ecosystems, A Research Synthesis from the Stroud Water Research Center " 2008.

6. Leopold, Luna B.; "A View of the River", Harvard University Press, Cambridge, MA, 1994.

7. NYDEC "Stream Crossings Protecting and Restoring Stream Continuity" web page at http://www.dec.ny.gov/permits/49060.html.

8. O'Dell, Patrick M., Professional Engineer in Petroleum Engineering, National Park Service Geologic Resources Division, "Potential for Development of Natural Gas Exploratory Wells to Adversely Affect Water Resources of the Delaware River Basin", Nov 23, 2010.

9. Reid, Scott M. and Paul G. Anderson "Effects of Sediment released During Open-cut Pipeline Water Crossings, Canadian water Resources Journal Vol. 24, No 3, 1999.

10. Scheetz, Dr. Barry E. and Steven M. Bloser; Center for Dirt and Gravel Road Studies, The Pennsylvania State University, University Park, PA 16802; "Environmentally Sensitive Maintenance Practices for Unpaved Roads: Sediment Reduction Study" Prepared for Chesapeake Bay Commission c/o Senate of Pennsylvania G-05 North Office Building Harrisburg, PA 1712, FINAL REPORT June 30, 2008, Revised August 29, 2008 and Summary Statement

11. United States Environmental Protection Agency "Erosion, Sediment and Runoff Control for Roads and Highways", Office of Water (4503F) EPA-841-F-95-008d, December 1995

12. United States Environmental Protection Agency, Final Report for Catalog of Federal Domestic Assistance Grant Number 66.463 Water Quality Cooperative Agreement for Project Entitled "Demonstrating the Impacts of Oil and Gas Exploration on Water Quality and How to Minimize these Impacts Through Targeted Monitoring Activities and Local Ordinances" and "Summary of the Results of the Investigation Regarding Gas Well Site Surface Water Impacts", ID No. CP-83207101-1, Kenneth E. Banks, Ph.D. Manager, Division of Environmental Quality and David J. Wachal, M.S. Water Utilities Coordinator

13. United States Environmental Protection Agency, Wadable stream assessment: a collaborative survey of the nation's streams, 2006.  EPA 841-B-06-002.

14. Letter from James A. Schmid, PhD, Schmid & Company Consulting Ecologists to Scott E. Walters, Chief General Permits Bureau of Waste Management PaDEP, 8 November 2011.

Attachment 7

The Louis Berger Group, Inc.



THE **Louis Berger Group**, INC.

48 Wall Street, 16th Floor, New York, NY 10005
Tel 212 612 7900    Fax 212 363 4341
www.louisberger.com

## Memorandum

TO:      Kate Sinding, Natural Resources Defense Council

FROM: Niek Veraart, Louis Berger Group

DATE:  January 11, 2012

RE:      Technical Review Comments on the 2011 Revised Draft SGEIS on the Oil, Gas and Solution Mining Regulatory Program and Proposed High-Volume Hydraulic Fracturing Regulations (Proposed Express Terms 6 NYCRR Parts 550 through 556 and 560)

# 1.0   Introduction

The Louis Berger Group Inc. (LBG) reviewed the 2011 Revised Draft Supplemental Generic Environmental Impact Statement (RDSGEIS), the proposed Environmental Assessment Form (EAF) and EAF Addendum (RDSGEIS Appendices 5 and 6), the proposed Supplemental Permit Conditions (RDSGEIS Appendix 10) and the proposed High-Volume Hydraulic Fracturing (HVHF) regulations (Proposed Express Terms 6 NYCRR Parts 550 through 556 and 560) for the following topics:

- Noise (RDSGEIS Sections 2.4.13 and 6.10)
- Ground-borne noise and vibration (impacts not addressed in the RDSGEIS)
- Visual impacts (RDSGEIS Sections 2.4.12 and 6.9)
- Land use (impacts not addressed in the RDSGEIS)
- Transportation (RDSGEIS Sections 2.4.14 and 6.11)
- Community character (RDSGEIS Sections 2.4.15 and 6.11)
- Cultural resources (impacts not addressed in the RDSGEIS).
- Aquatic Ecology (RDSGEIS Sections 6.1.1.2, 6.1.1.3 and 6.1.1.4).

For each topic, the following sections address the sufficiency of the RDSGEIS impact analyses and proposed mitigation measures in meeting State Environmental Quality Review Act (SEQRA--6 NYCRR Part 617) requirements. The comments also identify specific improvements and best practice approaches that the New York State Department of Environmental Conservation (NYSDEC) could use to resolve the deficiencies identified and minimize the environmental impacts of High-Volume Hydraulic Fracturing (HVHF) and related development in New York.

# 2.0   Noise

## 2.1   Construction Impacts

The 2011 RDSGEIS quantitative construction noise assessment uses information from the Federal Highway Administration's Road Construction Noise Model to estimate noise

levels at various distances from the construction site and represents a substantial improvement over the qualitative analysis in the 2009 Draft Supplemental Generic Environmental Impact Statement (DSGEIS). For quiet rural areas, the results show that construction activities would result in significant adverse impacts under NYSDEC criteria (increase of 6 dBA (A-weighted decibels) or more over existing conditions) at distances exceeding 2,000 feet.

The RDSGEIS provides the requisite construction noise analysis, but fails to appropriately evaluate and discuss the significance of the model results. Instead, a one sentence conclusion is provided: "Such levels would not generally be considered acceptable on a permanent basis, but as a temporary, daytime occurrence, construction noise of this magnitude and duration is not likely to result in many complaints in the project area."

Contrary to this statement, there is no regulatory requirement that access road construction and site preparation be limited to daytime hours. To mitigate this significant adverse impact, a prohibition on nighttime construction should be included in the HVHF regulations or supplemental permit conditions to avoid annoyance and sleep disturbance of nearby residences, along with other construction noise control best practices (See Section 2.6 infra).

Further, the assertion in the RDSGEIS that construction noise impacts are "temporary" ignores the likelihood of large number of wells and pads being concentrated in certain areas, as well as construction noise from related infrastructure development (pipelines, compressors, etc.). The cumulative construction noise impact has not been addressed.

In addition, noise-related complaints are not the appropriate basis for drawing conclusions about the significance of noise impacts under SEQRA because people (and wildlife) can be adversely affected by noise, but choose not to report it. NYSDEC should evaluate the significance of the construction noise impacts in relation to the duration, quality (tonal purity), time of day and year, background noise present, distance to the source, familiarity with the noise and other factors such as the setting. Studies have shown that each listener's subjective perception of appropriateness of a noise in a particular setting can be just as important to annoyance as the objective sound level.[1] Given the rural context of the majority of the areas where natural gas development is expected to occur, many residents and visitors to these areas would find heavy construction activity noise to be out of place and annoying. Construction noise adjacent to parks and other sensitive land areas where natural quiet is expected would be especially problematic and would contribute to adverse economic impacts not accounted

---

[1]See: Blauert, J. 1986. "Cognitive and Aesthetic Aspects of Noise Engineering." In *Proceedings of Inter-Noise 86, Cambridge, Massachusetts, July 21–23*, volume 1, 5–13.

Kuwano, S., S. Namba, and H. Miura 1989 "Advantages and Disadvantages of A-weighted Sound Pressure Level in Relation to Subjective Impression of Environmental Noises."*Noise Control Engineering Journal* 33:107–115.

Carles, J.L., I. Lopez Barrio, J.V. de Lucio 1999 "Sound Influence on Landscape Values."*Landscape and Urban Planning* 43:191–200.
Ozawa, K., S. Ohtake, Y. Suzuki, and T. Sone 2003 "Effects of Visual Information on Auditory Presence," Acoustical Letter to Acoustical Science and Technology, 24(2), 97-99.

for in the 2011 RDSGEIS by making areas where gas development is occurring less attractive to visitors.[2]

## 2.2 Drilling and Fracturing Impacts

### 2.2.1 Failure to Analyze Multi-Well Pad Impacts

The general approach used in the RDSGEIS quantitative noise impact assessment is reasonable and consistent with the methodology recommended in NRDC's comments on the 2009 DSGEIS for evaluation of the impacts of drilling and fracturing of one horizontal well. However, it fails to analyze the impacts of multi-well pads, which is the primary form of development anticipated. Table 6-59 in the RDSGEIS presents the duration of various construction and operational phases for one well. Each well is estimated to take 28-35 days to drill, while fracturing is assumed to take up to five days. Since drilling or fracking of multiple wells is likely to occur simultaneously, the combined noise levels would be higher than those reported for a single well in the RDSGEIS.

The failure of the RDSGEIS to provide a noise impact assessment for the simultaneous drilling and fracturing of multiple wells is especially problematic because it is inconsistent with the scenario developed for the analysis of transportation impacts (page 6-305). The result of this inconsistency is that the noise impacts of drilling and fracturing are underestimated and do not reflect a reasonably foreseeable worst-case development scenario. The multi-pad horizontal well development scenario in the transportation section of the RDSGEIS assumed three rigs would be operated simultaneously over a 120 day period and that each rig would drill four wells (for a total of 12 wells at the site). With three rigs in operation at the same time, the combined noise level at a distance of 50 feet would be approximately 84 dBA, not 79 dBA as reported for one rig in the RDSGEIS (Table 6.56- Rotary Air Well Drilling).[3]

With respect to the fracturing phase, the RDSGEIS wording is unclear, but appears to suggest sequential fracturing (one well being fractured at a time for a total of 60 days of fracturing noise impacts). The RDSGEIS states "fracturing and completion of the four wells occurs sequentially and tanks are brought in once for all four wells" (page 6-305). This statement is confusing because the scenario being described involves a total of 12 wells, not four wells. If fracturing of multiple wells occurs simultaneously, then the duration of fracturing impacts would be less, but the combined noise level would be higher. For example, fracturing two wells at once would create a combined noise level 3 dBA higher than the fracturing of one well.  When drilling and fracturing are occurring at the same time, the total noise level would be entirely driven by the much louder fracturing process (no increase in the total sound level because the difference between the two sound levels is greater than 10 dBA).

At a minimum, NYSDEC should analyze the noise impact from the same multi-pad well development scenario as used in the analysis of transportation impacts. NYSDEC should address the expected number of wells per multi-well site, the timing of drilling and fracturing at each well and the reasonable worst case noise levels that could result from the various combinations of drilling and fracturing at multiple wells on the same site.

---

[2] Refer to Susan Christopherson's socioeconomics technical memorandum for more information on impacts to the tourism industry.

[3] Decibels are expressed on a logarithmic scale and thus cannot be added together directly.

**2.2.2   Lack of Reasonable Noise Impact Significance Criteria**

Similar to the construction impact assessment discussed in Section 2.1, the RDSGEIS presents the model results for the drilling and fracturing noise impacts without a SEQRA-compliant assessment of the significance of the results in various contexts where natural gas development is anticipated. The RDSGEIS does not include noise impact criteria against which the significance of the impacts can be assessed generically or at the site specific review level, which is contrary to the purposes of a GEIS. For information on a recommended framework for developing noise impact criteria, refer to Section 2.8.

The RDSGEIS references NYSDEC's noise policy ("Assessing and Mitigating Noise Impacts,"2001)[4], but this document has a number of significant problems that limit its usefulness in regulating noise. It discusses a 6 dBA increase as potentially significant, but does not define what averaging time period should be used in calculating the increase, does not account for increased sensitivity to noise occurring at night, and does not take into account the total level at the affected receptor. The policy also does not provide a standard for specific highly sensitive land uses, such as passive recreation parks and wilderness areas. The NYSDEC noise policy leaves too much discretion to individual analysts to ensure consistent application of noise control for an activity expected to have widespread and significant impacts across New York.  Accordingly, an assessment as to the significance of the potential adverse noise impacts should be made independent of the 2001 policy.

The RDSGEIS acknowledges that drilling and fracturing would take place 24hours per day. People are much more sensitive to noise that occurs at night and interferes with sleep than to noise that occurs only during daytime activities. For this reason, community noise impact assessment metrics such as day-night sound levels (Ldn) apply a 10 dB penalty to sounds occurring at night in determining a 24-hour average energy sound level that better reflects human preferences.  Background noise levels are also lower at night, further emphasizing the significance of the increase in sound levels attributable to drilling and fracturing. As noted above in the discussion of construction impacts, non-residential land uses in rural areas vital to the economic health of upstate New York such as parks, recreation areas and campgrounds would be especially sensitive to increases in sound levels.

**2.2.3   Fracturing Noise Impacts Exceed Hearing Damage Thresholds**

The noise levels associated with the fracturing process are of a relatively short duration on a per well basis (2-5 days), but are of an extremely large magnitude that could adversely affect human health:

- At a distance of 2,000 feet, the fracturing pump truck noise level of up to 72 dBA would be intrusive and interfere with normal conversation.
- At a distance of 500 feet, the fracturing pump truck noise level of up to 84 dBA approaches the level where hearing damage occurs (85 dBA for eight hours).

---

[4] http://www.dec.ny.gov/docs/permits_ej_operations_pdf/noise2000.pdf

- At a distance of 250 feet, the fracturing pump truck noise level of up to 90 dBA is in the range of noise levels where no more than 15 minutes of unprotected exposure is recommended to prevent damage to hearing.[5]
- At a distance of 50 feet, the fracturing pump truck noise level of up to 104 dBA is of a similar magnitude to a jet flyover at a distance of 1,000 feet and at a level where unprotected exposure over one minute poses a risk of permanent hearing loss.

For context in understanding the sound levels discussed above, Table 1 provides a summary of the decibel level of common sounds sources and the associated effects.

**Table 1**
**Decibel Levels of Common Sound Sources**

| Sound | Noise Level (dB) | Effect |
|---|---|---|
| Jet Engines (near) | 140 | |
| Shotgun Firing Jet Takeoff (100-200 ft.) | 130 | |
| Rock Concerts (varies) | 110–140 | Threshold of pain begins around 125 dB |
| Oxygen Torch | 121 | |
| Discotheque/Boom Box Thunderclap (near) | 120 | Threshold of sensation begins around 120 dB |
| Stereos (over 100 watts) | 110–125 | |
| Symphony Orchestra Power Saw (chainsaw) Pneumatic Drill/Jackhammer | 110 | Regular exposure to sound over 100 dB of more than one minute risks permanent hearing loss. |
| Snowmobile | 105 | |
| Jet Flyover (1000 ft.) | 103 | |
| Electric Furnace Area Garbage Truck/Cement Mixer | 100 | No more than 15 minutes of unprotected exposure recommended for sounds between 90–100 dB. |
| Farm Tractor | 98 | |
| Newspaper Press | 97 | |
| Subway, Motorcycle (25 ft.) | 88 | Very annoying |
| Lawnmower, Food Blender Recreational Vehicles, TV | 85–90 70–90 | 85 dB is the level at which hearing damage (8 hrs.) begins |
| Diesel Truck (40 mph, 50 ft.) | 84 | |
| Average City Traffic Garbage Disposal | 80 | Annoying; interferes with conversation; constant exposure may cause damage |
| Washing Machine | 78 | |
| Dishwasher | 75 | |
| Vacuum Cleaner, Hair Dryer | 70 | Intrusive; interferes with telephone conversation |
| Normal Conversation | 50–65 | |
| Quiet Office | 50–60 | Comfortable hearing levels are under 60 dB. |
| Refrigerator Humming | 40 | |
| Whisper | 30 | Very quiet |
| Broadcasting Studio | 30 | |
| Rustling Leaves | 20 | Just audible |
| Normal Breathing | 10 | |

Source: http://www.nidcd.nih.gov/health/education/teachers/pages/common_sounds.aspx

The minimum setbacks in the proposed regulations (currently 100 feet from a residence) must be revised to protect the health and well-being of nearby residents during fracking. Landowners should not have the power to waive the minimum setback requirement. The

[5]http://www.nidcd.nih.gov/health/education/teachers/pages/common_sounds.aspx

landowners should not be presented with the temptation to trade their family's health for financial gain. An additional problem with granting landowners the ability to waive setback requirements is that tenants of a landowner's property would not have any say in the landowner's decision to waive setback requirements essential for health.

The drilling phase sound levels are substantially lower than the fracturing noise levels, but their duration is much longer (approximately one month of 24-hour drilling per well). Drilling sound levels would drop to below 70 dBA at a distance of 250 feet from the well pad. However, 70 dBA is still 40 dBA greater than the nighttime background sound level in rural areas of 30 dBA, further supporting the need for noise impact criteria and mitigation requirements to protect the soundscapes of rural areas

### 2.2.4   Other Comments

Tables 6.56, 6.57 and 6.58 are all incorrectly labeled as showing "estimated construction noise levels."

The equipment assumed in the analysis and sound levels associated with each piece of equipment are based on "confidential industry sources." NYSDEC should disclose the basis for the equipment assumptions and sound levels so that these important inputs can be independently validated.

Table 6.57 has footnote "2" for the rig drive motor and generator sound levels, but the explanation for footnote 2 is missing. In addition, it appears that footnote #1 on Table 6.57 should be associated with the "Distance in Feet/SPL (dBA)" portion of the table and not the sound levels associated with the top drive, draw works and triple shaker.

## 2.3   Transportation Noise Impacts

The RDSGEIS discusses the potential for noise impacts related to truck traffic, but fails to conduct a meaningful analysis of typical transportation noise impacts for various phases of well pad development. This failure is particularly problematic given that the detailed truck trip generation information necessary for conducting a traffic noise assessment was developed for the transportation section of the RDSGEIS.

NYSDEC should use the Federal Highway Administration's (FHWA) Traffic Noise Model (TNM) version 2.5 and the truck trip generation information to fully consider truck traffic noise impacts. While site-specific impacts cannot be assessed, NYSDEC could easily examine a hypothetical, yet realistic development scenario for one well. The analysis could look at one single public road segment from which the well site would be accessed. Receptors at various distances (50 feet to 1,000 feet) would help show the potential extent of the area where impacts could occur. A range of non-natural gas related background traffic on the modeled road could be considered to show how the increase in sound levels would be much higher for local roads with low traffic volumes than for roads with high volumes under existing conditions. Traffic noise impacts for the various receptor distances could be assessed using well established New York State Department of Transportation (NYSDOT) and FHWA criteria.[6]

---

[6]FHWA's noise impact assessment and mitigation procedures are defined under 23 CFR 772. NYSDOT's latest noise policy (revised April 2011) for implementing the FHWA requirements is

For the purposes of the SGEIS level of analysis, a number of simplifying, conservative assumptions could be employed in the TNM analysis (assuming flat terrain, no existing barriers, analyze one worst-case peak hour and one worst-case off-peak hour etc.). These assumptions would allow NYSDEC to complete a meaningful traffic noise analysis without extensive cost or delay to the review process.

## 2.4   Effects on Wildlife

Animals rely on sounds for communication, navigation, avoiding danger and finding food. Industrial and transportation noises associated with natural gas development create noise levels that can interfere with the sounds used by animals, which in turn can affect wildlife behavior and populations. The RDSGEIS acknowledges that noise could contribute to impacts on wildlife (page 6-68), but does not provide any analysis of this issue. NYSDEC should review the available scientific literature on this topic, qualitatively assess impacts and ensure appropriate mitigation measures are implemented. Key references to assist NYSDEC in this aspect of the environmental review are provided below:[7]

FHWA. Synthesis of Noise Effects on Wildlife Populations. http://www.fhwa.dot.gov/environment/noise/noise_effect_on_wildlife/effects/

Barber, J.R., K.R. Crooks, and K. Fristrup. 2010. The costs of chronic noise exposure for terrestrial organisms. Trends Ecology and Evolution 25(3): 180–189. Available at: http://www.sciencedirect.com/

Bayne, E.M., L. Habib and S. Boutin. 2008. Impacts of Chronic Anthropogenic Noise from Energy-Sector Activity on Abundance of Songbirds in the Boreal Forest. Conservation Biology 22(5) 1186-1193. Available at: http://oz.biology.ualberta.ca/faculty/stan_boutin/uploads/pdfs/Bayne%20etal%202008 %20ConBio.pdf

Dooling R. J., and A. N. Popper. 2007. The effects of highway noise on birds. Report to the California. Department of Transportation, contract 43AO139. California Department of Transportation, Division of Environmental Analysis, Sacramento, California, USA. Available at: http://www.dot.ca.gov/hq/env/bio/files/caltrans_birds_10-7-2007b.pdf

Francis, C.D., C.P. Ortega and A. Cruz. 2009. Noise Pollution Changes Avian Communities and Species Interactions. Current Biology, Aug 25;19(16):1415-9 10.1016/j.cub.2009.06.052. Available at: http://www.sciencedirect.com/science/article/pii/S0960982209013281

Habib, L, E.M. Bayne and S. Boutin. 2007. Chronic industrial noise affects pairing success and age structure of ovenbirds Seiurus aurocapilla. Journal of Applied Ecology 44: 176-184. Available at: http://oz.biology.ualberta.ca/faculty/stan_boutin/ilm/uploads/pdfs/Habib%20etal%202

---

available at https://www.dot.ny.gov/divisions/engineering/environmental-analysis/manuals-and-guidance/epm/repository/4_4_18Noise.pdf
[7] The suggested list of references is adapted from the USFWS paper entitled "The Effects of Noise on Wildlife." Available at: http://www.fws.gov/windenergy/docs/Noise.pdf

007%20JAE.pdf

Schaub, A, J. Ostwald and B.M. Siemers. 2008.  Foraging bats avoid noise. The Journal of Experimental Biology 211: 3174-3180. Available at: http://jeb.biologists.org/cgi/content/full/211/19/3174

Swaddle, J.P. and L.C. Page.   2007. High levels of environmental noise erode pair preferences in zebra finches: implications for noise pollution.  Animal Behavior 74: 363-368.

## 2.5    Cumulative Impacts

The RDSGEIS does not address the cumulative noise impacts of the anticipated natural gas development. Key considerations in developing a cumulative impact analysis for noise include the following:

- Analyze the cumulative noise impact of multi-well pads. The RDSGEIS analysis only addresses a single well.
- Analyze the cumulative noise impact from well site construction, drilling and fracturing in combination with the construction of pipelines and the operation of compressor stations. Pipelines and compressor stations are a reasonably foreseeable form of "induced growth" that needs to be considered.
- Examining the Ldn sound levels that would result at residences that are exposed to drilling, fracturing and truck traffic noise. The combination of these sources could result in impacts more significant than any individual source examined separately.
- Discuss regional-scale traffic noise impacts that would result from wide spread natural gas development and related economic development and temporary population growth.
- Discuss regional-scale noise impacts on human beings and wildlife, including the potential for disturbance of noise-sensitive species, such as the ovenbird (*Seiurus aurocapilla*).[8]

## 2.6    Mitigation

### 2.6.1  Mitigation for Construction Impacts

Construction noise impact mitigation is not addressed in Section 7.10 of the RDSGEIS. NYSDEC should require the use of construction noise mitigation best practices, such as those outlined in FHWA's Construction Noise Handbook. At a minimum, these measures should include:

- Requiring the use of construction noise control measures in construction contract documents. Specific noise levels can be established to ensure the protection of sensitive receptors.

---

[8] http://oz.biology.ualberta.ca/faculty/stan_boutin/ilm/uploads/pdfs/Habib%20etal%202007%20JAE.pdf

- Limitations on the time periods when construction could occur (e.g., prohibiting nighttime construction).
- Requiring the use of less noisy equipment and mufflers.
- Requiring temporary noise barriers when significant impacts cannot be addressed through other means.

## 2.6.2  Mitigation for Drilling, Fracturing and Transportation Impacts

The general types of noise mitigation measures for drilling, fracturing and trucking suggested in the RDSGEIS are reasonable, but there is no guarantee which measures, if any, will actually be required in specific circumstances. Therefore, it is likely that significant impacts will not be mitigated at the site level. In addition, the RDSGEIS states that detailed noise modeling and consideration of mitigation measures will only be required for receptors within 1,000 feet of the well pad. This requirement is illogical given the impact analysis results that show impacts extending beyond 2,000 feet. Under NYSDEC's proposed 1,000 feet distance for noise modeling, well operators could avoid assessing site specific impacts and mitigation by locating wells just beyond the 1,000 feet threshold. This could result in unmitigated significant adverse impacts for residences between 1,000 and 2,000+ feet from the well pad.

Table 2 summarizes the noise mitigation commitments in the RDSGEIS and shows that many of these commitments were not carried through to the EAF, EAF Addendum or the proposed regulations. The mitigation measures not included in the EAF or regulations are not enforceable.

The proposed supplemental permit conditions (Appendix 10) state that NYSDEC can require noise mitigation "deemed necessary," but this is meaningless without a clear basis for determining when noise impacts that warrant mitigation occur. The proposed supplemental permit conditions do not contain any of the mitigation measures in Table 2 that were not addressed by the EAF or the regulations. The proposed supplemental permit conditions do contain specific requirements to mitigate air quality impacts (Appendix 10, Attachment A), therefore it would be reasonable and consistent to also include many of the site-specific noise mitigation measures in Table 2 as supplemental permit conditions. A few of the mitigation measures in Table 2 are general enough that they should be incorporated in the proposed regulations, rather than as supplemental permit conditions. These are indicated in the "notes" column of Table 2.

Finally, NYSDEC should develop an adaptive management framework for monitoring the effectiveness of measures implemented to avoid, minimize, or mitigate noise impacts at HVHF sites, and use this information to refine the noise mitigation requirements for future permit applications.

**Table 2**
**Noise Mitigation Matrix**

| RDSGEIS Mitigation Commitment | Incorporated in EAF or EAF Addendum | Incorporated in Proposed Regulations | Incorporated into Supplemental Permit Conditions | Notes |
|---|---|---|---|---|
| Compliance with regulatory spacing and siting restrictions. (7-128) | No | Yes (553.1) | No | |
| Unless otherwise required by private lease agreement, the access road must be located as far as practicable from occupied structures, places of assembly, and occupied but unleased property. (7-135) | Yes (A6-6) | Yes (560.6(a)) | No | Regulation adds an additional qualifier where this provision potentially does not apply- to avoid bisecting agricultural land. |
| The well operator must operate the site in accordance with a noise impacts mitigation plan consistent with the SGEIS. (7-135) | Yes (A6-6) | No | No | Applies to all wells, should be in regulations |
| The operator's noise impacts mitigation plan shall be provided to the Department along with the permit application. (7-135) | Yes (A6-5) | No | No | Applies to all wells, should be in regulations |
| Additional site-specific noise mitigation measures will be added to individual permits if a well pad is located within 1,000 feet of occupied structures or places of assembly. (7-135) | Partial(A6-5) | No | No | Permit applicants are required to identify mitigation measures in the noise mitigation plan, but there is no regulatory requirement that mitigation is included in permit conditions.<br><br>Applies to all wells, should be in regulations |
| Modifying speed limits or restricting truck traffic on certain roads. (7-130) | No | No | No | |
| Noise modeling for any site within 1,000 feet of a noise receptor. (7-130) | No (noise mitigation plan is required, modeling is not mentioned) | No | No | The 1,000 feet distance is arbitrary and inconsistent with the 2011 RDSGEIS analysis results which show significant impacts out to 2,000+ feet from the well pad.<br><br>Applies to all wells, should be in regulations |

| RDSGEIS Mitigation Commitment | Incorporated in EAF or EAF Addendum | Incorporated in Proposed Regulations | Incorporated into Supplemental Permit Conditions | Notes |
|---|---|---|---|---|
| *Potential site-specific permit condition*: Requiring the measurement of ambient noise levels prior to beginning operations. (7-130) | No | No | No | All of the following site specific measures are required "as practicable," but no procedure or criteria for determining practicability is specified. |
| *Potential site-specific permit condition*: Specifying daytime and nighttime noise level limits as a permit condition and periodic monitoring thereof. (7-130) | No | No | No | Daytime and nighttime noise limits should be established as part of the SGEIS and regulatory process, not on a permit by permit basis that does not allow for public review. The noise limits should be consistent and included in regulations. |
| *Potential site-specific permit condition*: Placing tanks, trailers, topsoil stockpiles, or hay bales between the noise sources and receptors. (7-131) | No | No | No | |
| *Potential site-specific permit condition*: Using noise-reduction equipment such as hospital-grade mufflers, exhaust manifolds, or other high-grade baffling. (7-131) | No | No | No | |
| *Potential site-specific permit condition*: Limiting drill pipe cleaning ("hammering") to certain hours .(7-131) | No | No | No | |
| *Potential site-specific permit condition*: Running of casing during certain hours to minimize noise from elevator operation. (7-131) | No | No | No | |
| *Potential site-specific permit condition*: Placing air relief lines and installing baffles or mufflers on lines. (7-131) | No | No | No | |
| *Potential site-specific permit condition*: Limiting cementing operations to certain hours (i.e., perform noisier activities, when practicable, after 7 A.M. and before 7 P.M.). (7-131) | No | No | No | |
| *Potential site-specific permit condition*: Using higher or larger-diameter stacks for flare testing operations. (7-131) | No | No | No | |

| RDSGEIS Mitigation Commitment | Incorporated in EAF or EAF Addendum | Incorporated in Proposed Regulations | Incorporated into Supplemental Permit Conditions | Notes |
|---|---|---|---|---|
| *Potential site-specific permit condition*: Placing redundant permanent ignition devices at the terminus of the flow line to minimize noise events of flare re-ignition. (7-131) | No | No | No | |
| *Potential site-specific permit condition*: Providing advance notification of the drilling schedule to nearby receptors. (7-131) | No | No | No | |
| *Potential site-specific permit condition*: Placing conditions on air rotary drilling discharge pipe noise, including: <br> -orienting high-pressure discharge pipes away from noise receptors; <br> - having the air connection blowdown manifolded into the flow line. This would provide the air with a larger-diameter aperture at the discharge point; <br> - having a 2-inch connection air blowdown line connected to a larger-diameter line near the discharge point or manifolded into multiple 2-inch discharges; <br> - shrouding the discharge point by sliding open-ended pieces of larger-diameter pipe over them; or <br> -rerouting piping so that unusually large compressed air releases (such as connection blowdown on air drilling) would be routed into the larger-diameter pit flow line to muffle the noise of any release. (7-131) | No | No | No | |
| *Potential site-specific permit condition*: using rubber hammer covers on the sledges when clearing drill pipe. (7-131) | No | No | No | |
| *Potential site-specific permit condition*: Laying down pipe during daylight hours. (7-131) | No | No | No | |
| *Potential site-specific permit condition*: Scheduling drilling operations to avoid simultaneous effects of multiple rigs on common receptors. (7-131) | No | No | No | |
| *Potential site-specific permit condition*: Limiting hydraulic fracturing operations to a single well at a time. (7-131) | No | No | No | |
| *Potential site-specific permit condition*: Employing electric pumps. (7-131) | No | No | No | |

12

| RDSGEIS Mitigation Commitment | Incorporated in EAF or EAF Addendum | Incorporated in Proposed Regulations | Incorporated into Supplemental Permit Conditions | Notes |
|---|---|---|---|---|
| *Potential site-specific permit condition*: Installing temporary sound barriers (see Photo 7.2, Photo 7.3, and Photo 7.4) of appropriate heights, based on noise modeling, around the edge of the drilling location between a noise generating source and any sensitive surroundings. Sound control barriers should be tested by a third-party accredited laboratory to rate Sound Transmission Coefficient (STC) values for comparison to the lower-frequency drilling noise signature. (7-131) | No | No | No | |

## 2.7    EAF and EAF Addendum

The EAF requires land use information for a distance of one-quarter (1/4) mile around the well pad. This distance is insufficient, as many impacts (including noise and visual) extend far beyond this distance. The EAF should require the identification and mapping of land uses within one mile of the well pad, as well as additional land use mapping along local roads that would be affected by heavy truck traffic (as identified in the required transportation plan) outside the one mile area. The EAF Addendum should specifically require the identification of land uses that are especially sensitive to noise, including protected open space, recreational areas, places of worship, campgrounds, hotels, schools, and healthcare facilities.

The details of the noise mitigation plan required by the EAF Addendum are not sufficiently defined to ensure impacts are mitigated. There is a need for a standardized noise impact assessment procedure and criteria for determining the reasonableness of various levels of mitigation expenditure (e.g., the cost per benefited receptor approach used by DOTs). Without standardized requirements for assessing and mitigating noise impacts, residents in areas affected by gas development will not receive fair or consistent treatment. The NYSDEC noise guidance document does not provide sufficient detail and criteria to ensure appropriate noise analyses conducted at the site level.  At a minimum, NYSDEC should provide the detailed requirements of the noise mitigation plan, addressing the following components:

- Scope of study area for the mitigation plan (recommend one-half (1/2) mile around well pad plus sensitive areas adjacent to the local roads that would experience the largest percent increase in truck traffic).
- Methodology for establishing existing noise levels (recommend requiring 24-hour measurements at a few representative receptors).
- Required protocol for assessing noise impacts: what noise metrics should be used (Ldn, Lmax, peak hour Leq, percent time audible etc.); what sources need to be considered (transportation, drilling and fracking); acceptable software modeling packages; and sources of information on appropriate sound emission levels to assume for various types of the equipment.
- Required criteria for determining which impacts are significant and require mitigation and which do not.
- Required criteria for determining how much expenditure on mitigation is reasonable to address significant adverse impacts.

One template for NYSDEC to consider adopting to specify the requirements of noise impact analysis and mitigation plans is the Alberta Energy Resources Conservation Board (ERCB) Noise Control Directive (#38), which is described below in Section 2.8.

## 2.8    Best Practice Recommendation for Noise Standards and Site-Specific Impact Assessment Protocol

The Alberta ERCB Noise Control Directive was developed through an extensive scientific review process and is recognized as one of the most stringent in the world. The Noise Control directive is based on the calculation of a permissible sound level (PSL) at

14

the worst case receptor in terms of equivalent energy sound level (Leq)[9] for the daytime period and the nighttime period. The PSL calculation takes into account all the important factors that influence human annoyance due to noise:

- Daytime noise is allowed to be higher than nighttime noise, reflecting the greater sensitivity to noise occurring at night.
- Existing noise levels are taken into account based on dwelling unit densities and transportation infrastructure or through ambient monitoring.
- A sliding scale of adjustment factors based on the duration of the noise accounts for the fact that people are more tolerant of a brief period of noisy activity than a noise source that continues for months or years.

As a simple example, the PSL in a low density rural area not near a major transportation corridor would be calculated as follows for the drilling of one well (35 days):

Nighttime Drilling PSL= 40 dBA basic sound level + 5 dBA adjustment due to the duration
Nighttime Drilling PSL= 45 dBA

The daytime PSL for drilling in this simple example would be 10 dBA higher, or 55 dBA.

For five days of fracking, the PSL in a low density rural area not near a major transportation corridor would be calculated as follows:

Nighttime Fracking PSL= 40 dBA basic sound level + 10 dBA adjustment due to the duration
Nighttime Fracking PSL= 50 dBA

The daytime fracking PSL would be 10 dBA higher or 60 dBA. This daytime limit would be exceeded even at a distance of 2,000 feet from the well pad based on the RDSGEIS analysis without mitigation, which estimated 72 dBA at this distance, or approximately twice as loud as the standard.

The Alberta ERCB Noise Control Directive also outlines detailed requirements to standardize the modeling of noise impacts and the preparation and documentation of noise studies that would be appropriate for NYSDEC to consider in regulating noise from HVHF in New York.

# 3.0   Ground-Borne Vibration and Noise

Page 6-251 of the RDSGEIS acknowledges the potential for ground-borne vibration impacts in the discussion of potential effects on property values: "Gas well development could impact local environmental resources and cause noise and vibration impacts, and trucks servicing the well development could also impact the surrounding areas." Despite this statement, no vibration impact analysis (or an explanation of why an analysis was not conducted) is presented in the 2011 RDSGEIS. NYSDEC should analyze vibration impacts addressing the following issues:

---

[9] Leq refers to the constant sound level that conveys the same energy as the variable sound levels during the analysis period.

- Construction-period vibration impacts for access road and well pad development. Recommended procedures are provided in Section 12.2 of the Federal Transit Administration's *Transit Noise and Vibration Impact Assessment* guidebook. A simple qualitative assessment may be appropriate in this case. While construction activities do not typically create vibration levels capable of damaging most buildings, fragile historic buildings are more sensitive and should be avoided in the siting of access roads and well pads. Ground vibration from construction can also be an annoyance to adjacent land uses.

- Operation vibration impacts associated with drilling and fracking. This assessment should include information on drilling vibration levels from existing natural gas development in New York and other locations. While it is difficult to generalize vibration effects from one area to another due to the effects of local soils and geologic conditions, this information would provide a rational basis for identifying a screening distance for determining when a more detailed vibration impact assessment should be required at the site level. If no receptors are within the screening distance at which perceptible vibration levels could occur, then no vibration assessment would be required in the site level review.

- Operation low-frequency ground-borne noise impacts. Ground vibration can create a phenomenon known as ground-borne noise, a rumble associated with the movement of the interior surfaces of a room.[10] Special considerations apply when assessing low-frequency noise because of the non-linearity of human hearing which causes sounds dominated by low-frequency components to seem louder than broadband sounds that have the same A-weighted level. As a result, even low levels of low-frequency noise (generally defined as the frequency range below 200 Hz) can be perceived as highly annoying and contribute to sleep problems and other health problems caused by sleep disruption. In addition to sleep disturbance and physiological stress, there is strong evidence that noise exposure can contribute to cardiovascular diseases.[11] NYSDEC should assess the potential for the various phases of well development and production to generate ground-borne noise, including any on-site equipment such as condensers that have been anecdotally reported generating high vibration levels in Pennsylvania.

Based on the ground-borne noise and vibration impact assessment conclusions, the NYSDEC should identify ground-borne noise and vibration impact mitigation measures and ensure that information necessary to identify and mitigate ground-borne noise and vibration impacts at the site level is required as part of the EAF Addendum, supplemental permit conditions and/or regulations.

---

[10] Both ground-borne noise and vibration are issues associated with the inside of buildings and are generally not annoying outdoors.

[11] See Cardiovascular effects of noise. Noise Health. Vol. 15 Issue 52. http://www.noiseandhealth.org/showBackIssue.asp?issn=1463-1741;year=2011;volume=13;issue=52;month=May-June

# 4.0   Visual

## 4.1   Impact Assessment

The RDSGEIS describes in very broad terms the potential direct and cumulative impacts of various phases of natural gas development on NYSDEC-designated visually sensitive resources. The RDSGEIS considers and incorporates information from two studies by others that addressed the visual impact of high-volume hydraulic fracturing.[12] The public disclosure of significant adverse visual resource impacts should be improved by providing the following:

- Discussion of the various viewer groups (local residents, through travelers, tourists, etc.) that would experience changed views as a result of natural gas development and their relative sensitivity. For example, local residents are familiar with local views and may be very sensitive to changes in views they consider important. Tourists visiting an area in part to experience high visual environment quality would also be much more sensitive than general through travelers that would have passing views of natural gas development from roadways while commuting. NYSDEC should describe how natural gas development at the scale anticipated in the socioeconomic impact study would affect viewer perceptions.

- To aid in the identification and understanding of impacts, landscape similarity zones (rural open areas, rural wooded areas, villages, cities, etc.) should be identified statewide and computer modeling conducted to create three dimensional photo simulations of various phases of the well development process at various distances for each zone. NYSDEC would not need to develop this analysis from scratch—significant consultant costs could be saved by using the New York State Office For Technology's "Generic Visual Impact Assessment" prepared for the 2004 Statewide Wireless Network (SWN) DGEIS as a starting point.[13]  The SWN Generic Visual Impact Assessment is an excellent example for NYSDEC to follow in comprehensively addressing visual impacts at the GEIS stage. The landscape similarity zones and representative photos selected for photo simulations used in the SWN analysis could likely be used with no to little modification. The main additional work required would be to define the components of a typical well pad development at various phases in sufficient detail and re-run the simulation model.

---

[12]Upadhyay and Bu. 2010. Visual Impacts of Natural Gas Drilling in the Marcellus Shale Region. Cornell University, Dept. of City and Regional Planning: CRP 3072 Land Use,  Environmental Planning, and Urban Design Workshop

Rumbach, Andrew. 2011. Natural Gas Drilling in the Marcellus Shale: Potential Impacts on the Tourism Economy of the Southern Tier

[13]New York State Office for Technology. 2004. *Draft Generic Environmental Impact Statement for the New York State Statewide Wireless Network*. Cultural Resources Appendix B.  Prepared by Environmental Design & Research, P.C. (now EDR Companies)

- Analysis of light pollution impacts of nighttime lighting and flaring. The RDSGEIS analysis focuses on daytime visual impacts and downplays nighttime light impacts as a "temporary impact" that most of the viewing public would not be exposed to (see page 6-281).  Light pollution impacts would not be temporary when the duration of drilling, fracturing and production activities is considered for multi-well pads and cumulatively as numerous well pads are added throughout the region over the 60 year development timeframe contemplated in the RDSGEIS. The RDSGEIS ignores the visual impact to local residences that comes with the loss of pristine dark nighttime skies in rural areas. Residences are not even mentioned in the impact assessment. In many cases the nighttime impact will be more significant than the daytime visual impact because the lighting will make the well site a pronounced focal point.  In addition to evaluating the visual impact of light pollution on humans, NYSDEC also needs to evaluate the impact of nighttime lighting and flaring on migratory birds.[14]

The photographs of a PA well site below illustrate the dramatic visual impact of natural gas development in a rural residential setting during the day and night.

---

[14] Poot, H., B. J. Ens, H. de Vries, M. A. H. Donners, M. R. Wernand, and J. M. Marquenie. 2008. Green light for nocturnally migrating birds. *Ecology and Society* **13**(2): 47. http://www.ecologyandsociety.org/vol13/iss2/art47/
For background information on light pollution impacts on wildlife see:
http://www.darksky.org/index.php?option=com_content&view=article&id=719



Day and Night Views of Chappel Unit 1H-10H in Hopewell Township, Washington County PA. Source: http://www.marcellus-shale.us/Chappel-Unit.htm

## 4.2    Mitigation

The RDSGEIS mitigation section for visual resources suggests that mitigation measures would only be considered when designated significant visual resources (parks, historic resources, scenic rivers, etc.) are present and within the viewshed of proposed wells. This approach fails to consider visual impacts on nearby residences or tourists in areas where a significant visual resource is not present. In these situations, no mitigation would be required for individual wells to be consistent with the RDSGEIS. NYSDEC should make basic and low-cost mitigation measures mandatory for all well development sites (such as keeping lighting levels at the minimum level required and directing lights downward to minimize light pollution), regardless of whether or not significant visual resources are present. In addition, a broader menu of more sophisticated and costly mitigation measures should be provided for those development sites that do have the potential to impact designated visual resources.

Table 3 summarizes the visual impact mitigation commitments in the RDSGEIS and shows that many of these commitments were not carried through to the EAF, EAF Addendum, regulations or supplemental permit conditions. The mitigation measures not included in the EAF, regulations or permit conditions are not enforceable. The proposed supplemental permit conditions do contain specific requirements to mitigate air quality impacts (Appendix 10, Attachment A); therefore it would be reasonable and consistent to also include many of the visual impact mitigation measures in Table 3 as supplemental permit conditions. A few of the visual impact mitigation measures that are general enough and are applicable to all well sites should be incorporated into the proposed regulations. These mitigation measures are identified in the notes column of Table 3.

**Table 3**
**Visual Impacts Mitigation Matrix**

| RDSGEIS Mitigation Commitment | Incorporated in EAF or EAF Addendum | Incorporated in Proposed Regulations | Incorporated in Supplemental Permit Conditions | Notes |
|---|---|---|---|---|
| Prepare visual impacts mitigation plan (A6-6 and Supplemental Permit Conditions). | **Yes** | No | **Yes** | Applies to all wells, should be in regulations |
| Flaring would only occur during initial flowback at some wells, and the potential for flaring would be limited to the extent practicable by permit conditions, such that the duration of nighttime impacts from flaring typically would not occur for longer than three days. (6-281) | No | No | No | Applies to all wells, should be in regulations |
| The development of measures to reduce impacts on visual resources or visually sensitive areas would follow the procedures identified in NYSDEC DEP-00-2, "Assessing and Mitigating Visual Impacts." (7-121) | No | No | No | Applies to all wells, should be in regulations |
| Design and siting measures, as described in NYSDEC DEP-00-2, would typically consist of screening, relocation, camouflage or disguise, maintaining low facility profiles, downsizing the scale of a project, using alternative technologies, using non-reflective materials, and controlling off-site migration of lighting (NYSDEC 2000). (7-122) | No | No | No | Design and siting mitigation measures would be primarily site specific, but some measures could be incorporated in regulations (see the mitigation measure below regarding avoiding ridgelines and minimizing light pollution). |
| Relocating well sites to avoid ridgelines or other areas where aboveground equipment and facilities breaks (sic) the skyline; and minimizing off-site light migration by using night lighting only when necessary and using the minimum amount of nighttime lighting necessary, directing lighting downward instead of horizontally, and using light fixtures that control light to minimize glare, light trespass (off-site light migration), and light pollution (sky glow). (7-125) | No | No | No | Applies to all wells, should be in regulations |

| RDSGEIS Mitigation Commitment | Incorporated in EAF or EAF Addendum | Incorporated in Proposed Regulations | Incorporated in Supplemental Permit Conditions | Notes |
|---|---|---|---|---|
| The study also recommends the development of a best practices manual for Department staff and the industry, which would provide information on what is expected by the Department in terms of well siting and visual mitigation, and the identification of instances where visual mitigation may be necessary. (7-126) | No | No | No | |
| Develop a feedback mechanism in the project review process to confirm the success of measures to avoid, minimize, or mitigate visual impacts, based on the analysis of results for prior projects. (7-126) | No | No | No | |
| The maintenance activities described in NYSDEC DEP-00-2 should be implemented to prevent project facilities from becoming "eyesores." Such measures would typically consist of appropriate mowing or other measures to control undesirable vegetation growth; erosion control measures to prevent migration of dust and/or water runoff from a site; measures to control the off-site migration of refuse; and measures to maintain facilities in good repair and as organized and clean as possible according to the type of project. (7-126) | No | Partial- mostly related to stormwater and erosion control | Partial- SWPPP required | Applies to all wells, should be in regulations |

| RDSGEIS Mitigation Commitment | Incorporated in EAF or EAF Addendum | Incorporated in Proposed Regulations | Incorporated in Supplemental Permit Conditions | Notes |
|---|---|---|---|---|
| The decommissioning activities described in NYSDEC DEP-00-2 should be implemented when the useful life of the project facilities is over; these activities would typically occur during the reclamation phase for well sites. Such activities would typically consist of, at a minimum, the removal of aboveground structures at well sites. Additional decommissioning activities that may also be required include: the total removal of all facility components at a well site (aboveground and underground) and restoration of a well site to an acceptable condition, usually with attendant vegetation and possibly including recontouring to reestablish the original topographic contours; the partial removal of facility components, such as the removal or other elimination of structures or features that produce visual impacts (such as the restoration of water impoundment sites to original conditions); and the implementation of actions to maintain an abandoned facility and site in acceptable condition to prevent the well site from developing into an eyesore, or prevent site and structural deterioration. (7-127) | Partial- site reclamation plans required, but no specific measures are required. | Partial (560.7 Reclamation) | Partial (reclamation plans required) | |
| The offsetting mitigation described in NYSDEC DEP-00-2 should be implemented when the impacts of well sites on visual resources or visually sensitive areas are significant and when such impacts cannot be avoided by locating the well pad in an alternate location. Per guidance in NYSDEC DEP-00-2, offsetting mitigation would consist of the correction of an existing aesthetic problem identified within the viewshed of a proposed well project. (7-128) | No | No | No | |

23

## 4.3   EAF and EAF Addendum

There are a number of problems with the EAF and EAF Addendum requirements as currently drafted that will result in significant unmitigated adverse visual impacts if not corrected.

The EAF does not require sufficient information to properly identify receptors that would experience views of proposed wells. The EAF requirement is to identify the distance to the closest occupied building or outdoor facility.   The EAF Addendum requires identification of "[a]ll residences, occupied structures or places of assembly within 1,320 feet." This is not a sufficient distance for assessing visual impacts and does not take into account the fact that the closest structures may not be the most impacted depending on local vegetation and topography patterns.[15] A more reasonable distance for identifying sensitive resources and receptors in most instances would be one mile.[16] The EAF addendum should require a visibility analysis to determine where the well site facilities would be visible from public roadways, parks, residences and other sensitive receptors. The number of viewers exposed and the activities viewers would typically be engaged in during exposure needs to be evaluated to determine the extent of visual impacts and the need for mitigation at the site level.   NYSDEC has developed excellent guidance on this topic ("Assessing and Mitigating Visual Impacts") and a useful visual EAF addendum. These best practice approaches to visual impact assessment and mitigation should be required as part of the EAF for proposed well development sites.

Unlike the noise and traffic mitigation plans, a visual impacts mitigation plan is not a required component of the submittals to NYSDEC with the permit application, EAF and EAF Addendum. The visual impacts mitigation plan does not even have to be prepared prior to issuance of the well drilling permit and is not subject to prior approval by NYSDEC. The only apparent requirement is that the visual resource mitigation plan is prepared by the applicant in conformity with the SGEIS and made available to the NYSDEC on request. This procedure offers no opportunity for public review or even notice to affected local residents. A visual resources mitigation plan that is not subject to public review and that does not require NYSDEC approval is not an adequate mitigation measure.

---

[15]The RDSGEIS acknowledges that on-site equipment would be a prominent landscape feature at distances of up to double 1,320 feet used in the EAF Addendum.  Page 6-274: "On-site equipment would be the most visible sign of fracturing activity and, when viewed from relatively short distances (i.e., from 1,000 feet to 0.5 miles) are relatively prominent landscape features."

[16] Although drilling activity during the daytime would be most prominent within ½ mile, a one mile distance is reasonable to account for areas with topography that could make well sites prominent features for more distant views and to address nighttime lighting impacts (which could be prominent at greater distances than the physical appearance of the well site equipment during the day.

# 5.0   Land Use

## 5.1   Impact Assessment

The RDSGEIS fails to provide any analysis of the reasonable foreseeable cumulative land use impacts that would result if high-volume hydraulic fracturing was permitted in New York. To comply with SEQRA, NYSDEC should provide the following information:

- An overview of statewide existing land uses patterns and land use planning framework. Much of this information and mapping could be adopted directly from Section 3.3.2.2 of the 2004 Statewide Wireless Network DGEIS and associated appendices. This would provide an appropriate baseline to use in assessing potential land use impacts.

- A quantitative analysis of potential land cover change at the county level. This analysis could use readily available GIS land cover data for existing conditions and assume that well development would impact land cover proportionate to the existing percentage of land cover types in each county (excluding water and developed land). Impacts could be assessed using the average 7.4 acres of disturbance per multi-well pad used in the RDSGEIS (page 5-6) and an estimate of the number of well pads by county consistent with the economic impact study county-level estimates. Cumulative impacts associated with existing trends and known major development proposals should be evaluated, taking into account the lack of capacity of rigorous land use regulation throughout most rural areas of the Southern Tier.

- A qualitative assessment of the compatibility of natural gas development with various adjacent land uses, taking into consideration impacts associated with truck traffic, noise and visual impacts.   Appropriate buffer zones should be recommended between natural gas development and incompatible land uses such as residences, parks and schools to minimize impacts.

- A qualitative assessment of the consistency of natural gas development with local and regional plans. Specific land use plans and zoning regulations could not be analyzed in detail in a GEIS, but generalized planning areas common to many areas of the Marcellus shale region could be considered (e.g., rural residential, agricultural, commercial, etc.). Natural gas development should not be permitted to undermine local land use laws, especially planning in rural areas that emphasizes resource protection, open space, and scenic quality. Potential inconsistencies with plans prepared pursuant to New York's Local Waterfront Revitalization Program should be specifically considered in this assessment.

The failure of the RDSGEIS to analyze land use impacts is inconsistent with the scope for the SGEIS, which included a commitment to conduct an "[e]valuation of whether any aspect of multi-well site development or high-volume hydraulic fracturing of shale wells could be expected to change the GEIS's conclusion that major long-term changes to land use patterns, traffic and the need for public services are not anticipated as the result of gas well development. This will include review of the compatibility of shale gas development with other land uses such as agriculture, tourism, and alternative energy

development."[17] The RDSGEIS is deficient because it does not contain a land use impact assessment addressing compatibility with agriculture, tourism, and alternative energy development.

## 5.2    Mitigation

The RDSGEIS fails to provide any discussion of mitigation measures for land use impacts. Based on the additional analyses of land use impacts recommended above, mitigation measures such as buffer distances for incompatible land uses should be described and incorporated into enforceable regulations or supplemental permit conditions, as appropriate.   The RDSGEIS should make it clear that such mitigation measures are intended to supplement any local zoning or other land use planning addressing the location of industrial uses, including gas development.

Finally, NYSDEC should develop an adaptive management framework for monitoring the effectiveness of measures implemented to avoid, minimize, or mitigate land use impacts at HVHF sites, and use this information to refine the land use mitigation requirements for future permit applications.

## 5.3    EAF and EAF Addendum

The topic of consistency with local plans was not addressed in the EAF and EAF Addendum in the 2009 DSGEIS.  The addition of a requirement related to the review of local plans and assessment of consistency as part of the EAF Addendum in the RDSGEIS is an improvement.  The term "land use plan" should be broadly defined in the EAF Addendum to ensure it encompasses comprehensive plans, zoning ordinances, subdivision regulations, site plan review requirements, hazard mitigation plans,   open space plans, agricultural/farmland protection plans, Local Waterfront Revitalization Program plans, historic districts/historic resource protection plans, economic revitalization and tourism plans, ecological and water resource protection/restoration plans etc.

With respect to the avoidance of land use compatibility impacts, the requirements of the EAF Addendum in the RDSGEIS remain extremely vague.   Permit applicants are required to attest that "[u]nless otherwise required by private lease agreement, the access road will be located as far as practical from occupied structures, places of assembly and unleased property." There are no definitional or other criteria for determining what is "as far as practical" concerning location of the access road in relation to occupied structures, places of assembly and unleased property. Nor is there any required explanation by the applicant to support its affirmation or submission of a map showing such structures and uses in relation to the access road. Nor is there any required hierarchy in determining which uses of land require greatest distance from the access road in the event that movement of the access road away from one use would bring it closer to another. All that is required of the applicant is a bare affirmation that it has located the access road.

---

[17] NYSDEC. 2009. *Scope for the 2009 Draft Supplemental Generic Environmental Impact Statement on the Oil, Gas and Solution Mining Regulatory Program.* Page 41

The EAF Addendum requires the identification of "[a]ll residences, occupied structures or places of assembly within 1,320 feet." However, as noted previously, there is evidence that significant impacts (such as noise) extend beyond 1,320 feet. In order to comply with SEQRA, NYSDEC must require that the applicant identify all land uses within one mile of a proposed well.  These land uses should include, but not be limited to hospitals, senior citizen residences, schools, places of worship, and residential uses.

# 6.0   Transportation

## 6.1   Impact Assessment

Additional analysis is provided in the RDSGEIS regarding truck trip generation (e.g., the number of truck trips to and from the well site at varies stages), but the impact on roadway congestion and safety has not been adequately addressed. The impacts of a typical multi-well development on congestion and safety should be analyzed in detail, as well as a cumulative traffic effects analysis using a reasonable worst case development scenario. The reasonable worst case development scenario for regional traffic impacts should include indirect traffic generation associated with increased economic development and population growth attributable to natural gas extraction and related industries. Finally, the statewide impact on vehicle miles traveled (VMT) should be reported, taking into account the long distance truck trips that would be required to haul produced water and brine waste out of state for disposal.

### 6.1.1   Traffic Congestion and Safety Impacts of a Typical Multi-Well Pad

The detailed analysis of the traffic congestion and safety impacts of one typical multi-well pad development serves an important purpose in terms of disclosing the general types of impacts that could occur in many similar locations, but also in terms of creating an analysis template for permit applicants to follow in developing their transportation plans for specific development proposals. A hypothetical well site could be identified in the area where the greatest drilling is expected (Region A) or an actual well site in an area of Pennsylvania representative of similar areas in New York could be analyzed. Once the hypothetical or actual well site is located, the following tasks should be undertaken:

- Identification of the project area where transportation impacts would be most likely based on actual or hypothetical information on trip origins and routes for workers, equipment and water deliveries to the site.
- Characterization of existing conditions in the project area using NYSDOT traffic counts, local data and additional traffic counts as needed. Topics to be addressed should include traffic volumes, intersection level of service, crash rates, etc.
- Analysis of impacts on traffic volumes, intersection congestion and safety consistent with the 2010 Highway Capacity Manual, NYSDOT procedures for traffic impact assessment and good transportation engineering practice.
- Development of mitigation measures to address significant impacts, such as changes in signal timing, temporary traffic signals, limitations on the routes used by water trucks, etc.

### 6.1.2   Regional Traffic Congestion and Safety Impacts

In addition to analyzing one well site in detail, it is important for NYSDEC to analyze regional cumulative impacts because these types of impacts will not likely be considered at the site level in the review of individual permits. The regional analysis would consider changes in traffic volumes on major roadways and the resulting potential for increased congestion and crashes from the combined effects of truck traffic to individual wells, as well as traffic related to additional employment and population growth. One methodology for conducting a meaningful regional analysis would be to use an existing travel demand model within the Marcellus and Utica shale regions. Unfortunately, neither New York State nor the Metropolitan Planning Organizations (MPOs) in Region A have a statewide or regional travel demand model. However, there are still several possible options for NYSDEC to conduct a meaningful regional scale transportation modeling analysis.

One option would be to use an analysis of Tompkins County as a surrogate for similar regional scale impacts that could occur in other places. There are several advantages to this approach:

- The Ithaca-Tompkins County Transportation Council (ITCTC) has an existing travel demand model that covers all of Tompkins County.

- The Tompkins County Council of Governments Task Force on Gas Drilling has identified realistic scenario of potential well locations for Tompkins County based on a GIS analysis and information from the 2009 DSGEIS.[18] An example map output from this analysis is provided in the figure below.



---

[18] http://www.tompkins-co.org/tccog/Gas_Drilling/Focus_Groups/Mapping.html

Example of Well Pad Placement Assessment for the northern portion of the Town of Caroline, Tompkins County.  Source: http://www.tompkins-co.org/tccog/Gas_Drilling/Focus_Groups/Mapping%20Minutes/Section%203%20-%20TC%20Mapping%20Analysis.pdf

The travel demand model could be run for multiple scenarios but, at a minimum, future no action and action (peak year of traffic generation) scenarios should be run. Key considerations in setting up the model should include identifying the traffic analysis zones that would experience increased population and employment and appropriately defining the trips attracted to well sites and other important destinations, such as hypothetical water source areas and waste disposal areas. These parameters could easily be established by a team composed of a travel demand modeling expert and a person familiar with hydraulic fracturing well site development stages and trucking needs (making the assumptions available for public review). A cooperative study in partnership with the ITCTC could be particularly beneficial to take advantage of their familiarity with local conditions and the existing model.

Once the model runs are complete, the results should be post-processed and used to develop an informative impact analysis and mapping (e.g., link volume change maps, volume/capacity ratio maps, etc.). This type of regional analysis is routinely conducted by MPOs as part of the long-range transportation planning process. There are numerous examples and guidance sources available to NYSDEC on how to conduct regional transportation analyses for planning that are equally applicable to generic regional traffic impact analysis.[19]

## 6.1.3  Statewide Vehicle Miles Traveled Impact

Vehicle miles traveled (VMT) is a key indicator used in transportation planning to compare various future scenarios and investment decisions. Increases in heavy truck VMT provide a basis for drawing general conclusions about the effects of HVHF on the transportation system, as well as effects on air pollutant emissions from mobile sources. While information on the number of trips is discussed in the transportation impacts section of the RDSGEIS, VMT impacts are not addressed. The failure of the transportation section to address VMT impacts is especially problematic because statewide VMT estimates were developed for the air quality analyses in the RDSGEIS (see page 6-176). As discussed in further detail below, the RDSGEIS VMT estimates for air quality should be revised to take into account out-of-state waste disposal and incorporated into the transportation impact assessment section, as well as the air quality section.

As discussed in Glenn Miller's accompanying technical memorandum, the waste disposal requirements for produced water and brines cannot be met at any existing disposal facilities in New York. This means that a significant number of long-distance heavy truck trips would be needed to move wastes out of state for disposal. VMT information for the RDSGEIS air quality analyses was generated using average truck trip

---

[19]See:  NCHRP Report 546: Incorporating Safety into Long-Range Transportation Planning.

FHWA. 2003.  "Tools for Assessing Safety Impacts of Long-Range Transportation Plans in Urban Areas."

length information provided by the industry.[20] The industry data was from Bradford County, PA. The data collection methodology and the number of well sites upon which the industry average truck trip length estimates were developed were not disclosed in the RDSGEIS or the industry memo providing the estimates to NYSDEC. Industry estimated 100 truck trips for produced water disposal from each horizontal well, with each waste disposal truck traveling an average distance of 24 miles (one-way).[21] While supporting calculations are not provided to ascertain how the distance of 24 miles was computed, it would appear that the industry's data set was weighted heavily towards well sites where produced brine was reused at other nearby wells. This does not take into account the final disposal transportation impacts. A review of Pennsylvania Department of Environmental Protection (PADEP) waste reports[22] for Bradford County show two primary final disposal sites for brines from wells in the county:

- Pennsylvania Brine and Treatment, Inc. in Franklin, PA (approximately 200 miles from Bradford County municipalities such as Troy).
- Waste-Treatment Corporation in Warren, PA (approximately 140 miles from Bradford County municipalities such as Troy).

The 24-mile trip average distance for waste disposal provided by industry does not reflect the long distance waste hauling that occurs in Bradford County and would be expected to occur in New York. To correct this deficiency, NYSDEC should independently reevaluate the average trip length information provided by industry and develop revised truck trip length estimates that take into account final waste disposal transportation impacts. The assumptions used in generating the average truck trip length estimates should be disclosed for public review. This will allow for a more realistic assessment of the potential transportation and air quality impacts that will result from the statewide increase in VMT.

## 6.2   Mitigation

The majority of the transportation mitigation discussion in the RDSGEIS is focused on damage to roadways and road use agreements. While this remains an important issue, the RDSGEIS does not give sufficient attention to traffic impact mitigation measures. A list of generic mitigation measures for traffic impacts is provided (Section 7.11.3), but it is not clear when specific mitigation measures would be required because no impact criteria have been defined. For example, at what level of predicted intersection level of service would mitigation have to be considered?  NYSDEC should make clear what traffic impact criteria would trigger the need for mitigation measures and include a process for local government and public review of the transportation plans for proposed well sites before NYSDEC issues a permit.

---

[20] March 16, 2011 Letter from ALL Consulting to IOGA New York, obtained through a FOIL request. The footnote referencing this letter (footnote #100) was missing from the RDSGEIS.

[21] See Exhibit 19A in the March 16, 2011 ALL Consulting letter
.
[22] Pennsylvania Oil and Gas Well Statewide Waste Report by  Reporting Period. Jan - Jun 2011 (Marcellus Only, 6 months)
https://www.paoilandgasreporting.state.pa.us/publicreports/Modules/DataExports/DataExports.aspx

Table 4 summarizes the transportation mitigation commitments in the RDSGEIS and shows that many of these commitments were not carried through to the EAF, EAF Addendum, regulations or supplemental permit conditions. The mitigation measures not included in the EAF, regulations or permit conditions are not enforceable. The proposed supplemental permit conditions do contain specific requirements to mitigate air quality impacts (Appendix 10, Attachment A); therefore it would be reasonable and consistent to also include many of the transportation mitigation measures in Table 4 as supplemental permit conditions. Other mitigation measures are general enough to apply to all well sites and should be incorporated into regulations as described in the "notes" column of Table 4.

Finally, NYSDEC should develop an adaptive management framework for monitoring the effectiveness of measures implemented to avoid, minimize, or mitigate transportation impacts of HVHF, and use this information to refine the transportation mitigation requirements for future permit applications.

**Table 4**
**Transportation Impacts Mitigation Matrix**

| RDSGEIS Mitigation Commitment | Incorporated in EAF or EAF Addendum | Incorporated in Proposed Regulations | Incorporated in Supplemental Permit Conditions | Notes |
|---|---|---|---|---|
| Development of Transportation Plans, Baseline Surveys, and Traffic Studies. (7-136) | Yes | Yes (560.3) | Yes- transportation plan must be approved by NYSDEC and is "incorporated by reference" into the permit | The details of the transportation plan related-requirements should be described in greater detail in the EAF Addendum, along with an example transportation plan to provide clear guidance to industry on the level of data collection and analysis NYSDEC and NYSDOT expect. |
| Municipal Control over Local Road Systems. (7-137) | N/A | N/A | N/A | This is a mitigation measure that cannot be implemented by NYSDEC- it relies on municipalities with very limited planning resources to be proactive in protecting their roads. |
| The owner or operator should attempt to obtain a road use agreement with the appropriate local municipality; if such an agreement cannot be reached, the reason(s) for not obtaining one must be documented in the Transportation Plan. The owner or operator would also have to demonstrate that, despite the absence of such agreement, the traffic associated with the activity can be conducted safely and that the owner or operator would reduce the impacts from truck traffic on local road systems to the maximum extent feasible. (7-138) | Partial- copy of road use plan must be submitted if there is one. | No | Partial- copy of road use plan must be submitted if there is one. | Applies to all wells, should be in regulations |
| Route selection to maximize efficient driving and public safety, pursuant to city or town laws or ordinances as may have been enacted under Vehicle and Traffic Law §1640(a)(10). (7-138) | No | No | No | Applies to all wells, should be in regulations |
| Avoidance of peak traffic hours, school bus hours, community events, and overnight quiet periods, as established by Vehicle and Traffic Law §1640(a)(20). (7-139) | No | No | No | Applies to all wells, should be in regulations |

| RDSGEIS Mitigation Commitment | Incorporated in EAF or EAF Addendum | incorporated in Proposed Regulations | Incorporated in Supplemental Permit Conditions | Notes |
|---|---|---|---|---|
| Coordination with local emergency management agencies and highway departments. (7-139) | No | No | No | Applies to all wells, should be in regulations |
| Upgrades and improvements to roads that will be traveled frequently for water transport to and from many different well sites, as may be reimbursable pursuant to ECL §23-0303(3). (7-139) | No | No | No | Refers to provision of ECL that allows municipalities to request from NYSDEC "funds from the oil and gas fund to reimburse the municipality for costs incurred in repairing damages to municipal land or property. Such requests shall include such explanatory material and documentation as the commissioner may require." |
| Advance public notice of any necessary detours or road/lane closures. (7-139) | No | No | No | Applies to all wells, should be in regulations |
| Adequate off-road parking and delivery areas at the site to avoid lane/road blockage.(7-139) | No | No | No | Provision of large parking and delivery areas may increase the footprint of the well development sites, increasing ecological and water quality impacts. |
| Use of rail or temporary pipelines where feasible to move water to and from well sites. (7-139) | No | No | No | |
| Prior to site disturbance, the operator shall submit to the Department and provide a copy to the NYSDOT of any road use agreement between the operator and local municipality. (7-139) | Yes | No | Yes | Applies to all wells, should be in regulations |
| The operator shall file a transportation plan, which shall be incorporated by reference into the permit; the plan will be developed by a NYS-licensed Professional Engineer in consultation with the Department and will verify the existing condition and adequacy of roads, culverts, and bridges to be used locally. (7-139) | Yes | Yes | Yes | |

| RDSGEIS Mitigation Commitment | Incorporated in EAF or EAF Addendum | incorporated in Proposed Regulations | Incorporated in Supplemental Permit Conditions | Notes |
|---|---|---|---|---|
| Mitigating Incremental Damage to the State System of Roads. (7-141) | N/A | N/A | N/A | Damage to the state road system is identified in the RDSGEIS as an unmitigated impact. The Final SGEIS and HVHF regulations should include a transportation fee on permit applications to compensate for the costs of repairing HVHF-related damage to the state road system. |
| Limiting truck weight, axle loading, and weight during seasons when roads are most sensitive to damage from trucking (e.g., during periods of frost heaving and high runoff). (7-141) | No | No | No | |
| Requiring the operator to pay for the addition of traffic control devices or trained traffic control agents at peak times at identified problem intersections or road segments. (7-141) | No | No | No | |
| Providing industry-specific training to first responders to prepare for potential accidents. (7-141) | No | No | No | |
| Road use agreements limiting heavy truck traffic to off-hour periods, to the extent feasible, to minimize congestion. (7-141) | No | No | No | |
| Providing a safety and operational review of the proposed routes, which may include commitments to providing changes to geometry, signage, and signaling to mitigate safety risks or operational delays. (7-141) | No | No | No | |
| Avoiding hours and routes used by school buses. (7-141) | No | No | No | |

| RDSGEIS Mitigation Commitment | Incorporated in EAF or EAF Addendum | incorporated in Proposed Regulations | Incorporated in Supplemental Permit Conditions | Notes |
|---|---|---|---|---|
| 1.0  Where appropriate the Department would impose specific construction windows within well construction permits in order to ensure that drilling activity and its cumulative adverse socioeconomic effects are not unduly concentrated in a specific geographic area. Those <br><br> 2.0  measures, designed to mitigate socioeconomic impacts and impacts on community character, can also be employed to minimize operational and safety impacts where such impacts are identified. (7-142) | No | No | No | The effectiveness of this measure is difficult to assess because the RDSGEIS does not explain what criteria would trigger a limitation on well permits within a specific area. Applying an adaptive management approach is logical, but it requires substantial resources and planning to monitor well development pressures at the local level. NYSDEC has not explained how such a monitoring system would be implemented, and thus this mitigation measure is likely to be ignored or forgotten once NYSDEC starts issuing permits. |
| Reducing trucking through different technology, such as on-site treatment. (7-142) | No | No | No | |
| The operator will provide specific information on the types and quantities of hazardous materials expected to be transported through the jurisdictions that they will be operating in and brought on site as part of the permitting process. (7-142) | Yes | Yes (560.3) | Yes | |
| All fracturing fluids and additives are transported in "DOT-approved" trucks or containers.  (7-142) | N/A | N/A | N/A | This measure cannot be enforced by NYSDEC- depending on federal or NYSDOT oversight of hazardous material movement. |
| First responders and emergency personnel would need to be aware of hazardous materials being transported in their jurisdiction and also be properly trained in case of an emergency involving these materials. Permit conditions may require the operator to provide first responder emergency response training specific to the hazardous materials to be used in the drilling process if a review of existing resources indicates such a need. (7-143) | No | No | No | Applies to all wells, should be in regulations |

| RDSGEIS Mitigation Commitment | Incorporated in EAF or EAF Addendum | incorporated in Proposed Regulations | Incorporated in Supplemental Permit Conditions | Notes |
|---|---|---|---|---|
| Transportation plans may provide that sensitive locations be avoided for trucks carrying hazardous materials. (7-143) | No | No | No | To make this mitigation measure meaningful, it would be helpful for NYSDEC to identify the specific categories of sensitive facilities that permit applicants must identify and avoid in developing trucking routes (bridges over drinking water supply reservoirs for example). |

## 6.3   EAF and EAF Addendum

A transportation plan is a required component of the EAF Addendum.  The scope of the transportation plan is discussed in RDSGEIS Section 7.11.1.1 and includes "the number of anticipated truck trips to be generated by the proposed activity; the times of day when trucks are proposed to be operating; the proposed routes for such truck trips; the locations of, and access to and from, appropriate parking/staging areas; and the ability of the roadways located on such routes to accommodate such truck traffic." NYSDEC should provide details on the scope of the specific analyses that should be performed for the transportation plan to ensure a uniform approach is used.

# 7.0   Community Character

## 7.1   Impact Assessment

Community character is an amalgam of various elements that give communities their distinct "personality." These elements include a community's land use, architecture, visual resources, historic resources, socioeconomics, traffic, and noise (CEQR Tech. Manual).  The community character impact assessment portion of the RDSGEIS lists some of the community character impacts that could be expected (focused on demographic and economic impacts), but does not analyze the significance of these impacts or draw conclusions on how proposed new natural gas development in the Marcellus and Utica shales would affect community character in the short-term and long-term.  The impact assessment does not mention the contribution of visual, land use or historic resource impacts to community character. The discussion of traffic and noise impacts is superficial (two sentences each).

The community character impact assessment in the RDSGEIS appears to be based on the *Impacts on Community Character of Horizontal Drilling and High Volume Hydraulic Fracturing in Marcellus Shale and Other Low-Permeability Gas Reservoirs* report prepared by NTC Consultants for NYSERDA. To the extent the analysis in the RDSGEIS derives from or relies upon this report, it is significantly flawed in that for the most part it considers a few of the elements of community character individually (visual, noise, traffic), without drawing conclusions on the cumulative impact of all the changes associated with the expected level of new development. Much of the cumulative impact discussion in the report focuses on attempting to explain why a regional cumulative impact assessment based on a reasonable worst case development scenario is not necessary or helpful. The report also states:

> "The approach for addressing regional cumulative impacts is to focus on the proactive siting of well pads as discussed in previous sections of this report. If the location and construction of each well pad is based on 'Best Practices' (See Appendix A) then the potential impacts will be lessened and/or eliminated. **When applications are reviewed, it is recommended that DEC examine any negative issues that have occurred on adjacent well pads to determine if there is a potential problem in the area that needs further scrutiny.**" Page 38. Emphasis added.

The suggested approach is to let the impacts occur and then do something about those impacts if there is a problem. NYSDEC adopted this approach in the form of the vague mitigation commitment to monitor the pace of well development and respond through limits on permits in specific areas to minimize cumulative socioeconomic impacts (see page 7-120). This is contrary to SEQRA, the intent and spirit of which is to consider impacts *before* making a decision to approve the proposed action. NYSDEC must address regional cumulative community character impacts and not defer the issue to the future after the impacts have occurred. An adaptive management framework to addressing HVHF impacts is useful (as discussed further below), but this does not excuse the omission of a complete community character impact assessment in the RDSGEIS.

## 7.2   Mitigation

The community character mitigation section of the RDSGEIS focuses on the EAF Addendum requirement related to consistency with local plans. There is also a mitigation commitment requiring site-specific review and additional mitigation measures of disturbance of 2.5 acres or more within an agricultural district. However, the agricultural district mitigation commitment is not enforceable because it is not included in the EAF Addendum, regulations or supplemental permit conditions.

The community character mitigation section also references the visual, noise, transportation and socioeconomic mitigation commitments in Chapter 7. However, as noted in the other sections of this review, enforceable mitigation has not been provided for those topics, which means that the unmitigated impacts in those subject areas will contribute to unmitigated community character impacts.

Finally, NYSDEC should develop an adaptive management framework for monitoring the effectiveness of measures implemented to avoid, minimize, or mitigate community impacts of HVHF, and use this information to refine the community impacts mitigation requirements for future permit applications. NYSDEC contemplates such a similar approach in the discussion of mitigation for socioeconomic impacts (page 7-120), but the details of how this monitoring system would work need to be defined and circulated for public review and comment.

## 7.3   EAF and EAF Addendum

Community character impacts are not addressed as a distinct topic in the EAF or EAF Addendum.

# 8.0   Cultural Resources

## 8.1   Impact Assessment

Cultural resources, also referred to as historic properties, link a community with its past. These are finite resources and are provided protections through local, state, and federal authorities. In the 1992 GEIS, cultural resources were addressed as one of the major environmental issues. In GEIS Chapter 6, a background of these environmental resources and a review of the then-existing authorities (in addition to SEQRA) was

provided, noting "the revised, shortened and simplified EAF should still remain as an attachment to the drilling permit application form (FGEIS page 31)." The simplified EAF includes cultural resources and offers the New York State Office of Parks, Recreation, and Historic Preservation (OPRHP, the State Historic Preservation Office) as a source for information along with the DEC Division of Construction Management-Cultural Resources Section and the DEC Division of Regulatory Affairs-Regional Office. There was limited discussion of the potential cultural resource issues beyond that identified on pages 6-16, 7-7, and 16-11 through 16-12. Further, although the 1992 GEIS highlighted the need for consultation between NYSDEC and the OPRHP, there was no formal process for consideration of cultural resources outlined.

Despite the length of time since the 1992 GEIS was issued, the 2009 DSGEIS and the RDSGEIS provide no update or reaffirmation of the authority-driven procedures for taking potential impacts to cultural resources into account beyond referring back to the 1992 GEIS. For example, how will tribal consultation be addressed given the 2009 DEC policy, *Contact, Cooperation, and Consultation with Indian Nations*:

> "'Affecting Indian Nation interests' means a proposed action or activity, whether undertaken directly by the Department or by a third party requiring a Department approval or permit, which may have a direct foreseeable, or ascertainable effect on environmental or cultural resources of significance to one or more Indian Nations, whether such resources are located on or outside of Indian Nation Territory."

In the RDSGEIS there is limited new discussion of cultural resource issues despite comments provided during the scoping process by the New York Archaeological Council (NYAC) dated December 11, 2008, outlining the potential loss of valuable scientific information should no consideration be given to these finite resources. NYAC reinforces the direct impacts to archaeological deposits that can result from any ground disturbing activity and offers comments on potential indirect impacts, such as vibration from drilling and increased vehicular traffic that could impact fragile archaeological deposits, or the potential for loss or degradation of the information that could be gleaned from specialized analyses of archaeological features that may result from changes to the soil matrix with the introduction of chemical additives as well as the potential for indirect (visual, vibration) impacts to historic architectural resources. Despite the availability of these comments, the additions to the RDSGEIS focus solely on the potential for visual impacts but disregard NYAC's other recommendations, a notable deficiency in the 1992 document.

In \RDSGEIS Chapter 3, there is no mention of cultural resources relative to SEQRA beyond the reference back to the 1992 findings. In Chapter 6, there is no discussion of cultural resources; while the 1992 document and its findings are incorporated by reference and this chapter is intended to address new issues, this is a missed opportunity to consider potential impact to cultural resources. Consider the potential situation where a cultural resource, such as the remnants of an old water-powered mill complex that once was the economic hub for a small community or what remains of an historic vessel scuttled during a military skirmish, is submerged or partially submerged in an anaerobic environment. With a reduction in stream flow there is the potential to degrade the resource, rendering it subject to deterioration and potential loss. Without consideration of a broadly defined area of potential effect at the outset when the siting application and all its associated contingencies (e.g., well pads, gathering lines,

distributions lines, access roads, resource or water needs, etc.) is reviewed, there is the potential to impact cultural resources.

The RDSGEIS does note in Chapter 8, Table 8.1, that OPRHP has a role in "well siting" and in "new in-state industrial treatment plants" but these are shown with an asterisk, with the caveat "role pertains in certain circumstances." On page 8-6, it is noted that "[i]n addition to continued review of well and access road locations in areas of potential historic and archeological significance, OPRHP will also review locations of related facilities such as surface impoundments and treatment plants." On page 8-37, the State Historic Preservation Act (SHPA) is brought into play with respect to dam safety permitting criteria and thresholds for resource consideration. And in Appendix 14 (Department of Public Service Environmental Management & Construction Standards and Practices –Pipelines), cultural resources are listed under the portion of the checklist for "Procedures for the Identification and Protection of Sensitive Resources."

Thus, the big issue that has not been adequately outlined and addressed is how cultural resources will be handled in the overall permitting process; in particular, what is the procedural means and proposed agency coordination for cultural resources identification, and impact evaluation, minimization, avoidance, mitigation?

## 8.2   Mitigation

The RDSGEIS mitigation section for visual resources suggests that mitigation measures would be considered when designated significant visual resources associated with historic resources are present and within the view shed of proposed wells. However, in order to determine whether there is a view shed impact on a historic resource the resource itself must be identified, and evaluated before a determination of impact can be made. Because the RDSGEIS does not, as noted, indicate how this will be done, it is impossible to evaluate whether the process for impact identification and mitigation pursuant to SEQRA will be adequate.

The same can be said for *all* potential cultural resource impacts, such as those to archaeological sites which are rarely visible on the surface – mitigation measures would be considered once any resources have been identified, evaluated for significance, and a determination made that the impact cannot be avoided or minimized. It is expected that this process is to be undertaken during consideration of well siting applications (which should take into account gathering and distribution lines, access roads, all potential ground-disturbing impacts as well as potential indirect impacts [i.e., vibration, chemical, visual, etc.]).  Unfortunately, this approach does not allow the public adequate review of possible mitigation efforts.

Finally, NYSDEC should develop an adaptive management framework for monitoring the effectiveness of measures implemented to avoid, minimize, or mitigate cultural resource impacts of HVHF, and use this information to refine the cultural resource mitigation requirements for future permit applications.

## 8.3   EAF and EAF Addendum

As noted above, the process for addressing potential cultural resource impacts is not fully developed beyond the EAF checkboxes and DEC review of the application.

# 9.0   Aquatic Ecology

The assessment of aquatic ecology issues focused on the following items:

- Potential for impairment of the "best use" classifications of the State's surface waters due to cumulative impacts.
- Potential for the alteration or degradation of critical aquatic habitat for aquatic species with limited distributions and sensitivity to water quality, such as trout and salamanders (e.g., the common mudpuppy (*Necturus maculosus*).
- Potential for aquatic habitat fragmentation (i.e., the isolation of existing populations).

LBG's review of Sections 6.1.1.2, 6.1.1.3 and 6.1.1.4 of the RDSGEIS indicates that the document does not fully characterize the potential environmental impacts leading to the potential degradation of a stream's best use classification, and the alteration of aquatic habitats and ecosystems due to direct and cumulative impacts. The RDSGEIS inadequately addresses the potential for the regulated development of high-volume hydraulic fracturing to alter critical aquatic habitat for sensitive species, specifically trout and salamanders, and no provisions are made in sections 7.1 and 7.4 to require standard mitigation measures to ensure degradation is avoided.

Pursuant to NY State Environmental Conservation Law regulations, Chapter X - Division of Water, Article 2, Part 701, all fresh surface water classes have a general condition that does not allow the discharge of wastes to impair the best usage of the receiving water, and all surface water use classifications "shall be suitable for fish, shellfish, and wildlife propagation and survival." The regulations provide for further discharge restrictions to surface waters that occur within the RDSGEIS study area, including:

- Part 701.20: c.2 – waters that contain "critical aquatic habitat for fishes, amphibians, or aquatic invertebrates listed as endangered, threatened, or of special concern in Part 182 of this Title"; d.3 "small trout spawning streams;"
- Part 701.25 a. – waters that are labeled with the symbol (T) are "classified waters in that specific item are trout waters. Any water quality standard, guidance value, or thermal criterion that specifically refers to trout or trout waters applies;" and,
- Part 701.25 b. – waters that are labeled with the symbol (TS) are "classified waters in that specific Item are trout spawning waters. Any water quality standard, guidance value, or thermal criterion that specifically refers to trout, trout spawning, trout waters, or trout spawning waters applies."

The purpose of the discharge designations is to provide further protection to these waters by defining their best use as the maintenance of aquatic species diversity and populations of sensitive or diminishing species that are sensitive to the degradation of water and habitat quality.  The combined land use changes caused by well pad development, roadway network improvements and expansion, and supporting

infrastructure should be described within the RDSGEIS at a watershed scale that is practical to the management of aquatic resources.

To assist in defining a potential scale, LBG prepared maps that depict the frequency, spatial distribution and arrangement of discharge restricted sensitive aquatic environments (trout streams) at two watershed scales (See Figures 1 and 2). Figure 1 shows the distribution of streams with NYSDEC discharge designations for trout within the Unadilla river watershed, a large tributary to the Susquehanna River with a 520 square mile watershed. Figure 1 shows the number of and connectivity between patches of existing stream habitat and populations of trout, and presumably other sensitive aquatic species.  Figure 2 shows the Lower Butternut Creek watershed at the Hydrologic Unit Code (HUC) 12 level, with a 52.16 square mile watershed. Lower Butternut Creek is a tributary of the Unadilla River. At this scale, Figure 2 can be used as a planning level tool to depict aquatic habitat cores, islands, and corridors for a single or multiple populations of aquatic species. The scale is also practical for relating well pad and ancillary features with potential impacts and mitigation considerations.  In the RDSGEIS, NYSDEC should use similar planning tools to evaluate more thoroughly potential impacts to aquatic habitat.

Table 5 below summarizes the watershed features of size, length of trout supporting (T) and trout spawning (TS) designated waters, and length of existing roads for both figures.

**Table 5**
**Watershed Statistics**

| Watershed | Watershed Size (sq. miles) | Non-Trout Waters (miles) | Trout Supporting/ Trout Spawning Waters (miles) | Existing Roads (miles) |
|---|---|---|---|---|
| Unadilla River | 520 | 587.63 | 461.85 | 1488 |
| Lower Butternut Creek | 52.16 | 88.26 | 49 | 134 |

Construction of well pads, access roads and supporting infrastructure may impact two major watershed processes which could have multiple cumulative effects on surface waters.

The first process is the increase in concentrated runoff from construction sites due to precipitation or snow melt through the re-routing and concentrating of diffuse overland sheet flow into roadside ditch networks, and the reduction in soil infiltration and permeability due to land development (or changes in water supply distribution) (Rosgen 2006, Forman et al. 2003, Leopold and Langbein 1960).

Second, the increase in sediment from the introduction of miles of new access roads with a gravel base, unpaved shoulders, and/or unconsolidated drainage conveyances/ditches, and stream crossings is a process that can lead to changes in sediment supply. Gravel roads, even when properly constructed and maintained, provide a source of sediment, especially during high traffic periods (Rosgen 2006, Forman et al. 2003, Reid and Dunne 1984).  Each of these items is discussed below.

## 9.1.1  Land Use

Sections 5.1.1, 5.1.2 and 5.1.3 of the RDSGEIS describe the extent of land disturbance during the drilling and fracturing stage for a well pad and ancillary features (access

roads, utility corridors, compressor stations, etc.). The average total disturbance was estimated at 7.4 acres for a multi-well pad and 4.6 acres for a single well pad.

Section 5.1.4.2 of the RDSGEIS states that the spacing of disturbances from horizontal wells with multiple wells drilled from common pads is "up to 640 acres," which is approximately one well pad per square mile. An "on average" spacing estimate is not provided; therefore, a typical disturbance footprint spacing has not been quantified. Analyses of cumulative impacts at a watershed scale require a practical spacing or range of spacing to better evaluate the need for regulatory limitations on well pad densities. If truly representative of the affected acreage, a single 7.4 acre multi-well pad represents approximately 1.5 percent of the area within a square mile.

A common component of construction is the clearing, grading and compaction of land within the disturbance footprint. These actions impact the naturally occurring drainage patterns outside of the disturbance footprint by re-routing and concentrating diffuse overland sheet flow produced by precipitation or snow melt (Leopold and Langbien, 1960; Leopold, 1994), re-directing this water through surface conveyances such as a ditch network (Foreman et al. 2003), which can change the timing and path of water supplied to surface waters within the watershed (Rosgen, 2006) or the hydrologic regime (Poff et al., 1997). The RDSGEIS does not specifically address these processes or address potential mitigation measures for inclusion as permit conditions within the regulatory program.

In reference to partial reclamation of the well pad, Section 5.16.1 states that "[s]ubsequent to drilling and fracturing operations, associated equipment is removed. Any pits used for those operations must be reclaimed and the site must be re-graded and seeded to the extent feasible to match it to the adjacent terrain. Department inspectors visit the site to confirm full restoration of areas not needed for production."
The intention of partial reclamation of a pad during the production phase is to further reduce the footprint of the disturbance. However, this section does not describe details about how long each phase lasts, does not provide a reclamation time table, or performance standards. Therefore, it is difficult to classify the disturbance as a temporary or permanent impact. The section provides insufficient elaboration or methods and does not define the industry standards or success criteria for reclamation activities and the environmental benefits they may provide; therefore, the value of reclamation as mitigation is also unclear.

Land use restrictions using impervious area thresholds are used to maintain brown trout populations in suburban watersheds in Delaware, Maryland and Pennsylvania (Kauffman and Brant, 2000) which is based on limiting impervious surfaces to less than 10% coverage of a watershed. Brook trout populations, the very species associated with T and TS stream designations in NY have become extirpated in watersheds with impervious land uses above 4% coverage, and stress upon brook trout populations was inversely related to impervious watershed coverage (Stranko et al., 2008). Brook trout population presence is shown to have a positive relationship with forested watershed coverage above 68% (Hudy et al. 2008). Collectively, this information demonstrates that cumulative watershed land use changes induced by HVHF that impact forested land and increase impervious cover is likely to cumulatively impact NY State designated trout and trout spawning waters which could well lead to the loss of the waters' best use designations. NYSDEC should address these issues in the RDSGEIS. In addition, related impacts to tourism are not discussed here but should be as these impacts are an

indirect effect of natural habitat degradation and natural habitat is an established State tourism asset.

## 9.1.2  Access Roads

Section 5.1.1 of the RDSGEIS states "industry estimates an average access road size of 0.27 acre, which would imply an average length of about 400 feet for a 30-foot wide road. Permit applications for horizontal Marcellus wells received by the Department prior to publication of the 2009 DSGEIS indicated road lengths ranging from 130 feet to approximately 3,000 feet." The Executive Summary, Chapter 2 summary of the RDSGEIS states "the Department has determined, based on industry projections, that it may receive applications to drill approximately 1,700 - 2,500 horizontal and vertical wells for development of the Marcellus Shale by high-volume hydraulic fracturing during a 'peak development' year. An average year may see 1,600 or more applications. Development of the Marcellus Shale in New York may occur over a 30-year period. Those peak and average levels of development are the assumptions upon which the analyses contained in this RDSGEIS are based." Based only on the averages considered in the RDSGEIS, an average of 1,600 wells annually, each requiring 400 feet of new road, according to the RDSGEIS would result in over 121 miles of new, likely gravel, roads annually. This would be over 3,600 miles of new roads over 30 years. The RDSGEIS does not address the potential impact of the additional roads on aquatic resources, especially streams with sensitive species.

Stream drainage density relative to road density across a watershed is indicative of the interconnectivity of the roadway drainage system with the stream ecosystem (Foreman et al. 2003). In a regional study of the distribution of brook trout in their native range, average road densities of  3.2 km/sq. km was shown to be a predictor of watersheds that are not likely to support intact brook trout habitat (Hudy et al. 2008). Road density within the lower Butternut Creek watershed is 2.57 miles/sq. mile and the stream density is 2.63 miles/sq. mile. Within the lower Butternut Creek watershed, the stream network is less likely to be designated as Trout or Trout Spawning in areas where roads cross the stream more frequently. For instance, the stream network is designated as Trout or Trout Spawning stream segments are crossed by roads 38 times, and non-trout where stream segments are crossed by roads 54 times or more (Figure 2). While other land use factors can be at play here, road density within a watershed is positively correlated with stream habitat condition. The RDSGEIS should exam available literature on this topic to aid in the assessment of potential long term impacts to trout populations within affected watersheds due to watershed level changes. It is likely that some watersheds currently supporting trout populations are at or near the tipping point of trout sustainability. The RSDGEIS does not address how future HVHF development may affect native trout populations and other sensitive aquatic species.

Road crossings have been identified as a source of habitat fragmentation within linear aquatic systems by forming barriers to fish passage and altering the continuity of fluvial processes (e.g. sediment transport and disconnecting a stream from its floodplain) (Foreman, 2003). Road crossing structures can also change the transport of Large Woody Debris (LWD) (Foreman et al. 2003). LWD is important as an indicator of trout habitat quality (Flebbe and Dolloff, 1995) and in routing, storing and sorting sediment in fluvial landforms (Fisher et al. 2010, Lassettre and Harris 2001, Gomi et al. 2001 and Montgomery et al. 1995).

The alteration of fluvial processes caused by watershed development includes increased peak flows and mobilization of sediment from watershed and stream channel sources (Leopold 1994). Gravel roads, particularly construction and repair of gravel roads, have been shown to be a source of sediment in watersheds (Rosgen 2006) and contribute to habitat degradation (Logan, 2003). Heavy vehicle traffic on gravel roads, up to four heavy vehicles per day, has been shown to contribute up to 130 times more sediment to streams than paved roads (Reid and Dunne, 1984). The drilling and fracturing process can require tens to hundreds of trips by heavy vehicles each time a new well is constructed, thus increasing the likelihood of new sediment loadings to the local stream. Currently New York State provides no regulatory guidance for stream crossing design which maintains Aquatic Organism Passage (AOP). Vermont Department of Environmental Conservation, Watershed Management Program has developed stream crossing design guidance and stream crossing assessment tools which support AOP and natural channel morphology (The Vermont Culvert Geomorphic Compatibility Screening Tool, 2008 and The Vermont Culvert Aquatic Organism Passage Screening Tool, 2009). These tools can be used to design habitat sensitive crossings at new roads and find mitigation through retrofit or replacement of existing non-habitat sensitive crossings. The Massachusetts Department of Environmental Protection has developed guidance for maintaining gravel roads, ditch networks and stabilizing cut slopes to prevent erosions and reduce sediment inputs to the watershed (The Massachusetts Unpaved Roads BMP Manual, 2001). The adoption or incorporation of these practices as standard BMP measures within the regulatory program should be addressed within the RDSGEIS as a means to minimize potential impacts.

Section 6.4.3 of the RDSGEIS provides an incomplete characterization of potential environmental impacts to endangered and threatened species. While Chapter X, Part 701.20: c.2 states "critical aquatic habitat for fishes, amphibians, or aquatic invertebrates listed as endangered, threatened, or of special concern in Part 182 of this Title" includes discharge designations for waters with species of special concern, the RDSGEIS does not adequately recognize critical habitats for aquatic species of special concern, nor does it provide a complete list of species of special concern that are dependent on aquatic habitats as part of their natural life cycle. There is insufficient evaluation of species of special concern and potential cumulative impacts to threatened, endangered or special concern species within the RDSGEIS.

### 9.1.3  Recommendations

Based on the review of the RDSGEIS, LBG has found that the document does not adequately address the potential direct and cumulative impacts of HVHF on aquatic resources, New York State designated trout and trout spawning waters, and the potential for the loss of the waters' best use designations. Recommendations to address the deficiencies of the RDSGEIS are provided below.

1. The RDSGEIS should provide a technically supported evaluation method to assess the anticipated changes to land use and road networks at a watershed level and the potential impact to aquatic habitat and sensitive aquatic species.

2. The RDSGEIS should define the restoration standards and success criteria for well pads, access roads and other short term and long term disturbances,

and timelines so that the temporal impacts of these activities and the environmental benefits of site reclamation are clearly defined.

3. Currently New York State does not provide regulatory guidance for stream crossing design which maintains Aquatic Organism Passage (AOP).The adoption or incorporation of these practices as standard BMP measures within the regulatory program should be addressed within the RDSGEIS as a means to minimize potential impacts.

## 9.1.4 Aquatic Ecology References

P.A. Flebbe and A. Dolloff. 1995. Trout Use of Woody Debris and Habitat in Appalachian Wilderness Streams of North Carolina. North American Journal of Fisheries Management. Vol. 15:  579-590.

G.B. Fisher, F.J. Magilligan, J.M. Kaste and K.H. Nislow. 2010. Constraining the timescales of sediment sequestration associated with large woody debris using cosmogenic Be. Journal of Geophysical Research, Vol. 115, FO1013, 19 PP.

D.R. Montgomery, J.M. Buffington, R.D. Smith, K.M. Schmidt and G. Pess. 1995. Pool Spacing in Forest Channels. Water Resources Research, Vol. 31, pg. 1097-1105.

Berkshire Regional Planning Commission. 2001. The Massachusetts Unpaved Roads BMP Manual. Available On-line at:
http://www.mass.gov/dep/water/resources/dirtroad.pdf

Vermont Agency of Natural Resources. 2009. The Vermont Culvert Aquatic Organism Passage Screening Tool. Available On-line at:
http://www.anr.state.vt.us/dec/waterq/rivers/docs/rv_VTAOPScreeningTool.pdf

Vermont Agency of Natural Resources. 2009. The Vermont Culvert Geomorphic Compatibility Screening Tool. Available On-line at:
http://www.anr.state.vt.us/dec/waterq/rivers/docs/rv_VTCulvertGCScreenTool.pdf

Leopold, Luna B., and Langbein, W.B, 1960, A Primer on Water, U.S. Geological Survey Miscellaneous Reports, Special Publication, 50p.

L.B. Leopold. 1968. Hydrology for Urban Land Planning – A Guide Book on the Effects of Urban Land Use. U.S. Geologic Survey Circular 554, 18p.

Leopold, Luna B. 1994. A View of the River. Harvard University Press

M. Hudy, T.M. Thieling, N. Gillespie and E.P. Smith. 2008. Distribution, Status, and Land Use Characteristics of Subwatersheds within the Native Range of Brook Trout in the Eastern United States. North American Journal of Fisheries Management. Vol. 28: 1069-1085.

M.N. Logan. 2003. Brook Trout (Salvelinus fontinalis) Movement and Habitat Use in Headwater Stream of the Central Appalachian Mountains of West Virginia. University of West Virginia, Masters Thesis. Available On-line at:

http://wvuscholar.wvu.edu:8881/exlibris/dtl/d3_1/apache_media/L2V4bGlicmlzL2R0bC9k
M18xL2FwYWNoZV9tZWRpYS82ODg3.pdf

S.A. Stranko, R.H. Hilderbrand, R.P. Morgan, M.W. Staley, A.J. Becker, A. Roseberry-
Lincoln, E.S. Perry and P.T. Jacobson. 2008. North American Journal of Fisheries
Management. Vol. 28: 1223-1232.

L.M. Ried and T. Dunne. 1984. Sediment Production from Forest Road Surfaces. Water
Resources Research. Vol. 20: 1753-1761.

G.J. Kauffman and T. Brant. 2000. The Role of Impervious Cover as a Watershed-Based
Planning Tool to Protect Water Quality in the Christiana River Basin of Delaware,
Pennsylvania,  and Maryland. Conference Proceedings: Watershed Management. Water
Environment Federation.

D. Rosgen. 2006. Watershed Assessment of River Stability and Sediment Supply.
Wildland Hydrology. Fort Collins, CO.

R.T.T. Foreman, D. Sperling, J.A. Bisonette, A.P. Clevenger, C.D. Cutshall, V.H Dale, L.
Farhig, R. France, C.R. Goldman, K. Heanue, J.A. Jones, F. J. Swanson, T. Turrentine
and T. Winter. 2003. Road Ecology Science and Solutions. Island Press.

Lassettre, N.S. and R.R. Harris. 2001. The Geomorphic and Ecological influence of large
woody debris in streams and rivers. University of California, Berkeley.

Gomi, T., Sidle, R.C., Bryant, M.D., Woodsmith, R.D., 2001. The characteristics of
woody debris and sediment distribution in headwater streams, southeastern Alaska.
Canadian Journal of Forest Research 31, 1386–1399.



Lower Butternut Creek
Sub-Watershed

**Legend**
- NY County Boundaries
- Extent of Marcellus Shale
- Extent of Utica Shale
- Unadilla River Watershed Boundary
- Streams
- Trout Streams
- Trout Spawning Streams
- Main Roads
- Secondary Roads

0   2.5   5        10
Miles

Source:
Roads - NYS Roads - New York State Office of Cyber Security, 2011
Watersheds - 12 Digit Watershed Boundary - U.S. Geological Survey New York Water Science Center and U.S Department of Agriculture, New York State Natural Resources Conservation Service, 2009
Streams - Water Quality Classifications - NYS Department of Enviromental Conservation, Division of Water, Bureau of Flood Protection and Dam Safety, 2010.

Natural Resources
Defense Council

**UNADILLA RIVER WATERSHED MAP**
NEW YORK

The Louis Berger Group, Inc.
412 Mt. Kemble Ave
Morristown, NJ

FIGURE 1



**Legend**

- NY County Boundaries
- Lower Butternut Creek Sub-Watershed Boundary
- Streams
- Trout Streams
- Trout Spawning Streams
- Roads

Chenango

Otsego

0   1   2        4
Miles

Source:
Base Map - US Dept. of Ag. Farm Service Agency, National Agriculture Imagery Program, New York, 2011.
Roads - NYS Roads - New York State Office of Cyber Security, 2011
Watersheds - 12 Digit Watershed Boundary - U.S. Geological Survey New York Water Science Center and U.S Department of Agriculture, New York State Natural Resources Conservation Service, 2009
Streams - Water Quality Classifications - NYS Department of Enviromental Conservation, Division of Water, Bureau of Flood Protection and Dam Safety, 2010.

Natural Resources
Defense Council

**LOWER BUTTERNUT CREEK SUB-WATERSHED MAP**
NEW YORK

The Louis Berger Group, Inc.
412 Mt. Kemble Ave
Morristown, NJ

**FIGURE 2**

Attachment 8

Kevin Heatley, M.EPC  LEED AP

# Professional Review & Comment

## on

# Revised Draft Supplemental Generic Environmental Impact Statement on the Oil, Gas and Solution Mining Regulatory Program (Revised September 7, 2011)

**January 5, 2012**

**Prepared for:**

**Delaware Riverkeeper Network**

**Prepared By:**

**Kevin Heatley,  M.EPC  LEED AP**

**Restoration Ecologist**

1

# EXECUTIVE SUMMARY

This review of the New York State Department of Environmental Conservation (NYDEC) revised draft Supplemental Generic Environmental Impact Statement (RDSGEIS) on the Oil, Gas and Solution Mining Regulatory Program (issued September 7, 2011) was prepared in response to a request by the Delaware Riverkeeper Network to provide expert opinion on issues of terrestrial and restoration ecology.  The ecological health and integrity of the forested landscapes located within watersheds has a direct bearing on both the water quality and the biotic composition of the streams and aquatic resources of the Delaware River and other major drainages of the Marcellus and Utica region.  Mitigation of land disturbance impacts, such as those associated with unconventional fossil fuel extraction, is critical to ecological sustainability.

The NYDEC recognizes in section 1.2 of the RDSGEIS that it is required by NY state law to "conserve, improve and protect its natural resources and environment . . ."  However, the agency openly, and correctly, acknowledges that this mandate cannot be achieved for terrestrial habitats and wildlife resources in the state under the proposed RDSGEIS mitigation recommendations.  According to section 7.4.1, "Significant adverse impacts to habitats, wildlife, and biodiversity from site disturbance associated with high-volume hydraulic fracturing in the area underlain by the Marcellus Shale in New York will be unavoidable."  The agency presents no mitigation option, such as aggressive region-wide restrictions on the spatial and/or temporal scale of this land disturbance sufficient to negate the undesirable ecological impacts of shale gas development.

The RDSGEIS identified four major areas of concern with respect to ecosystems and wildlife:

1. Fragmentation of habitat
2. Potential transfer of invasive species
3. Potential impacts on endangered and threatened species
4. Use of certain state-owned lands

While the RDSGEIS correctly emphasizes the importance of habitat fragmentation on terrestrial vertebrate species (in particular avian organisms) it fails to document the long term ecological consequences of fragmentation, deforestation, increasing forest edge and reduced surface permeability on desirable forest regeneration, surface water quality, soil chemistry, biodiversity, and sustainable ecosystem services.

Unfortunately, the mitigation measures proposed fail to fully address fragmentation and landscape connectivity issues for the majority of the affected ecosystems. In addition, the proposed invasive species best management practices lack the following key components:

- Quantifiable control metrics
- Latent seed bank management
- Forest edge management

The RDSGEIS also fails to provide any effective regulatory guidance and/or mandates regarding the final ecological restoration of ecosystem structure and function to well pads, pipelines, access road sites, and other related infrastructure upon cessation of natural gas extraction activities.

3

As written, the revised draft RDSGEIS presented by the NYDEC assures that widespread, dramatic changes in both the current integrity, and the future successional trajectory, of the watersheds and forests in the Marcellus and Utica regions will occur should the anticipated level of landscape industrialization occur.  Changes in the successional trajectory (the type of tree species regenerating in the forest understory and that will ultimately comprise the forest canopy) will cause cascading ecological consequences. These changes are likely to result in an undesirable diminution of the ecosystem benefits and services currently provided by these biotic communities.  Cascading ecological effects and consequences are probable and will require costly management interventions of significant spatial and temporal scale in order to achieve system restoration.

## DISCUSSION

A careful review and analysis of the draft NYDEC RDSGEIS reveals a number of areas of concern with respect to the maintenance of the ecological integrity of terrestrial ecosystems and the corresponding impacts upon aquatic resources.  In particular the RDSGEIS does not adequately provide for the protection and sustainable regeneration of critical headwater forests within the Delaware River drainage.  Forested ecosystems are the dominant land cover type (57%) within the areas of potential shale gas extraction in the State of New York.  This canopy cover is of extreme importance to both the quality and quantity of water that flows within the Delaware River drainage.

4

Forests filter contaminants, moderate stream temperatures and buffer flow volumes associated with precipitation events.  They are the structural foundation upon which the ecological integrity and health of the basin's biological resources are built.  The link between percent forest cover and water quality is clearly established in the scientific literature.  As an example, reductions in forest cover are directly correlated with negative changes in water chemistry, such as increases in nitrogen, phosphorus, sodium, chlorides, and sulfates, and with reductions in stream macroinvertebrate diversity (Jackson and Sweeny 2010).

A healthy, viable forest canopy creates tangible economic value that accrues directly to local and regional communities. This value comes both from forest-dependent industries and from the ecosystem services (air filtration, climate regulation, water purification, etc.) that the forest provides. For instance, a 2002 survey of 27 water suppliers found that for every 10% increase in forest cover within a municipal watershed, the costs of water treatment and purification decreased by approximately 20% (Ernst, Caryn, Gullick and Nixon 2004). In New York State, forest-dependent industries are estimated to generate nine billion dollars of economic activity on an annual basis (North East State Foresters Association 2001).

Forest fragmentation as a result of anthropogenic landscape modification is well recognized within biogeographic theory and conservation biology as a leading cause of local species extinctions (extirpation).  It can also cause dramatic shifts in the floral and faunal composition of woodland communities.  Sub-lethal impacts to floral and faunal

5

populations (population isolation, reduced genetic fitness and diversity) have also been associated with disruptions to forest connectivity (Clark, et.al. 2010).

Species dependent upon large, intact areas of interior, or "core" forest and those with limited dispersal abilities are at particular risk from forest fragmentation. A large body of scientific literature associated with neotropical migratory birds clearly links the survival of many of these species to the preservation and restoration of core forest habitat. The Cerulean warbler *(Dendroica cerulean)*, a species of special concern in New York State, is a prime example. These populations are already in decline due to massive reductions in the amount of intact core forest. Even if the remaining interior forest habitat is preserved, the extensive fragmentation of the rest of the forested landscape will effectively preclude these areas from reconnection and restoration as interior forest habitat.

As pointed out by Semlitsch and Bodie (2003), the long-term persistence of many amphibian populations depends on the availability of vernal (seasonal) woodland pools and the surrounding, connective forest habitat. The ability of local populations to safely disperse is critical for the survival of these species. For instance, while many species of salamanders return to where they hatched to breed and lay eggs, it has been shown that they will use other vernal pools for breeding if their vernal pool of origin has been disturbed (if it is within their migration distance capacity). Linear disturbance corridors such as roadways and pipeline right-of-ways can create impermeable barriers to movement and effectively isolate populations of these organisms from alternative breeding sites. Isolated populations are at greater risk for extirpation (local extinction). The Jefferson salamander (*Ambystoma jeffersonianum*), another species of special concern in

New York, is an example of an amphibian that will be at risk should significant forest alterations occur.

The development of shale gas infrastructure in the New York and Pennsylvania region will have profound forest fragmentation impacts. Recent modeling work performed by the Pennsylvania Chapter of The Nature Conservancy indicates that approximately 2/3rds of the Marcellus well pads to be built in Pennsylvania will be located in what is currently forested habitat (TNC 2010).  Coupled with the associated connective infrastructure of access roads and pipeline right-of-ways (ROWs), disruption of vital ecological processes is assured.

Fragmentation creates an increase in the amount of forest edge (the interface between forest and non-forest).  This transitional zone or "ecotone" is fundamentally different in structure and functionality from an interior forest system.  Edge habitat is characterized by increased light levels on the forest floor, reduced soil moisture, and a high degree of biological invasion from non-native invasive organisms.  Dramatic changes can occur in the soil chemistry and associated micro biota.  The top layer of the soil profile, the rich organic duff, begins to dry out and the primary decomposition community begins to shift from fungal to bacterial. Changes in the soil micro biota will result in shifts in the macro biotic community structure.  The regeneration of desirable tree species (the successional trajectory) will be affected, potentially impacting the level of valuable ecosystem benefits supplied by the forest.  These changes have direct economic implications to both landowners and society.  Invasive species, for instance, have been estimated to cost the U.S. economy approximately $120 billion dollars per year (Pimintel et al. 2004).

Invasive organisms within terrestrial forest environments tend to be early successional species that respond favorably to site disturbance. Disruption of native plant cover and the exposure of the forest floor to sunlight provide an opportunity for these organisms to establish satellite populations. These populations eventually radiate out into the adjacent forest, displacing native species and retarding desirable tree regeneration (Bennet et al. 2011). Dispersal (vectoring) mechanisms and/or corridors are required in order for these non-native species to colonize new locations and the access roads, pipelines, and vehicular traffic associated with natural gas extraction are ideally configured to serve this function. Long beyond the point when wells are decommissioned, the landscape legacy of forest edge spreading outward from pipeline corridors, access roads, well pads, and related infrastructure will continue to disrupt ecosystem functioning as non-native organisms repeatedly colonize exposed areas and impede desirable tree regeneration.

Invasive species suppression and the eventual restoration of these disturbed sites to forested systems will require resources of a significant financial and temporal scale. While published information is scarce, it is in the professional experience of restoration practitioners in this region that the reasonable reconstruction of forest canopy and understory diversity can cost between $4,000 and $10,000 per acre. The suppression of invasive plant species is also a major, recurring expense with the initial years' treatment often costing between $1,000 and $2,500 per acre. Invasive treatment in subsequent years typically drops in cost by approximately 50% per year during the first three years of suppression. Treatment and monitoring will need to continue on an annual basis until forest canopy closure is re-established and the resulting changes in light penetration and soil conditions begin to favor native species.

8

As the effects of forest fragmentation may not immediately manifest themselves following the disturbance, monitoring is often suggested as a methodology to balance and modify the level of fragmenting activity in accordance with the conservation of forest-related ecosystem services.  Unfortunately, these effects may not be linear in nature and thus are not always amenable to an adaptive management approach.  Biological systems may possess thresholds that provide little indication of impending adverse impacts until sudden system collapse.

It is from within this conceptual framework that a review of the NYDEC Revised Draft RDSGEIS was undertaken and the following concerns identified:

**Infrastructure Density-related Ecological Impacts -**

- While mandatory unitization of production areas is in effect in New York, this spacing regime is geared toward maximization of gas extraction and not natural resource protection.  Preliminary research results already point towards pad density as a significant indicator of potential landscape level impacts to water quality (Academy of Natural Sciences 2011).  The RDSGEIS makes no mention of utilizing ecological planning units (such as the sub watershed) or ecological carrying capacity models.  This is necessary to assure the industrial development pattern is consistent with the maintenance of ecological integrity.

- Density of infrastructure is also directly correlated to percent impermeable surface within subwatersheds.  Increased impermeable surface area will disrupt both surface and subsurface hydrologic regimes within currently forested systems

resulting in shifts in species composition and functional benefits. For instance, it is widely accepted among watershed managers that negative changes in water quality and quantity become clearly evident when impermeable surface begins to exceed 10% of a given watershed area. The RDSGEIS-proposed mitigation strategies do not address allowable levels of impermeable surface within ecological planning units such as the subwatershed.

**Forest Fragmentation**

- While the requirement for ecological assessments and site-specific mitigation measures on well pads placed in grasslands of greater than 30 acres (in grassland focus areas) and for forest patches of greater than 150 acres (in forest focus areas), is helpful this approach is, in essence, ironically fragmented. It completely fails to address the importance of landscape connectivity between patches. As such, it will not protect the landscape-level ecological processes that maintain regional forest integrity. It will also fail to protect connective corridors vital to the movement of plant and animal populations in response to climate change. A preferable methodology would be to set maximum allowable levels of deforestation and fragmentation based upon ecological planning units such as the subwatershed.

- It is strongly recommended that a comprehensive, ecosystem-based plan guide the decision-making and permitting process in place of the piecemeal approach to land use planning and the protection of watershed resources set forth in the RDSGEIS. Setting maximum thresholds and spatial parameters for percent forest cover loss

and forest connectivity would assure that density levels and cumulative impacts of natural gas extraction do not exceed the ability of the regional ecosystem to absorb these activities.

- The RDSGEIS correctly emphasizes the importance of minimum patch sizes and landscape connectivity in protecting terrestrial wildlife habitat and/or the human recreation associated with such wildlife.  However, no discussion or analysis is present regarding the impact that fragmentation and increasing edge habitat will have upon long term forest successional trajectory and associated biodiversity.

- No analysis has been presented in the RDSGEIS regarding the potential diminution of critical ecosystem services associated with the disruption of forest cover and soils (carbon sequestration and storage, air filtration, watershed flow rates and volume, surface water quality and thermal condition).

- Section 6.4.1.2 estimates that a mere 7% of the forest cover underlain by the Marcellus Shale in NY occurs on State-owned land.  However, section 7.4.4 proposes a ban on surface disturbance within state forests and state wildlife management areas only.  It is important to understand that this prohibition is not based upon any substantive ecological differences between forests under different ownership.

- Section 7.4.4 gives several reasons for prohibiting surface disturbance on State-owned land including: "Increased light and noise levels would be likely to have significant impacts on local wildlife populations, including impacts on breeding, feeding and migration" and "The local wildlife populations could take years or even

11

decades to recover." These concerns are equally applicable to privately-owned forests, yet full mitigation of these identified impacts to wildlife is not addressed for the remaining 93% of the forest cover in the state. In particular, noise reduction strategies are entirely omitted from section 7.4.1.1 (BMPs for Reducing Direct Impacts at Individual Well Sites).

- Section 7.4.1.1 requires full cutoff (downward) lighting only during bird migration periods. As the ecological impacts of artificial night lighting across a range of species are well documented in the scientific literature, this requirement should be extended year-round.

- Section 7.4.1.1 fails to address BMPs for placement and maintenance of gathering pipelines. As this infrastructure is fundamental to well pad development, and has the potential to disrupt a greater net acreage than the actual pad, BMP recommendations should be developed.

- Section 7.4.1.1 fails to address BMPs for placement and mitigation of compressor station impacts.

- Section 7.4.1.2 indicates that for forest patches of 150 acres or more (within Forest Focus Areas) where the DEC issues a disturbance permit after reviewing the required Ecological Assessment, "enhanced monitoring of forest interior birds during the construction phase of the project and for a minimum period of two years

12

following the end of high-volume hydraulic fracturing activities (i.e., following date of well completion) would be required." While this is an important recommendation, such enhanced monitoring should be extended to less mobile species sensitive to the radical changes in forest floor light and moisture levels that forest fragmentation will cause. Forest-dwelling amphibian species are at a particular risk of extirpation (local extinction) following the loss of interior forest conditions given their limited ability to traverse across linear landscape barriers such as roadways and pipeline ROWs.

- As connectivity between forest patches is critical to allowing for species migration, dispersal, and the continued genetic fitness of terrestrial species, mitigation strategies protective of this landscape level feature should be required. The RDSGEIS does not presently address protection of landscape connectivity and mitigation of disruptions to connective corridors.

- Definition of a disturbed area – clarification should be made as to the minimum size that defines a disturbed area.

- Section 7.4.1.3, *Monitoring Changes in Habitat* recommends, on parcels meeting the threshold criteria in grassland and forest focus areas, that monitoring of disturbance effects should occur during the drilling process and for a minimum of two years following well completion. While monitoring is indeed a valuable tool, effective implementation of operational changes (adaptive management) following and in

response to ecosystem disruption is not always possible.  Ecosystem response to disturbance may not follow a linear pattern as previously unknown tolerance thresholds may be crossed.  Sudden system collapse and the loss of valuable structural and functional features of an ecosystem may occur even in the absence of discernible advance indicators of stress.  A more appropriate response would be to apply the precautionary principle and study the likely impacts <u>prior</u> to widespread, and potentially irreversible, landscape modification.

**Invasive Species Introduction & Management**

- It is recommended that section 6.4 be expanded to include an analysis of the threat potential to forest health from the inadvertent introduction and facilitation of the spread of invasive terrestrial invertebrates and pathogens.  The current analysis only considers invasive plants and aquatic organisms.

- The construction of infrastructure necessary to develop the Marcellus and Utica shales will entail the movement of large fleets of vehicles and equipment from various sections of North America.  It will also entail the movement of large numbers of transient laborers and technical personnel from across the United States.  This activity carries an inherent risk of acting as a vectoring mechanism for a number of threats to forest health.  The RDSGEIS should review this potential mechanism of invasive threat and propose mitigation strategies.

- Section 6.4 should also be expanded to include an analysis of the impact that massive increases in forest edge habitat will have upon the incursion and establishment of invasive plant species.  Edge habitat is inherently attractive to the type of plant species that display invasive characteristics.  Invasive plants tend to be early successional species adapted to disturbed sites.  The ecotone between forest and grassland is an area generated by recent disturbance and thus presents ideal conditions for these opportunistic, rapidly-reproducing species.  Periodic re-infestation of edge habitat by invasive plant species is also highly probable given the high light levels and frequent deposition of wind-borne and bird-deposited seeds in such areas.  The creation of edge habitat on the scale anticipated by natural gas infrastructure is likely to result in chronic, regional infestations of undesirable species that will require regular, and expensive, control interventions.  The creation of forest edge is, in and of itself, an important precursor to biological invasion.

- Section 7.4.2.1 fails to include compressor stations and pipeline ROWs in the requirements for invasive species best management practices.

- Section 7.4.2.1 indicates that an invasive species survey "should be conducted by an environmental consultant familiar with the invasive species in New York."  It is recommended that the word "should" be replaced by "must".

- It is recommended that the invasive species survey required under section 7.4.2.1 stipulate that percent aerial cover be classified <u>for each</u> identified invasive plant

species on the site.  Identification of baseline infestation levels is critical to determining target levels of cover reduction and control.

- Section 7.4.2.1 fails to provide any measurable metric, such as percent cover reduction from pre-disturbance levels, for quantifying levels of invasive control. The recommendation strategy that, "Any new invasive species occurrences found at the project location should be removed and disposed of appropriately" should be qualified to include the latent seed bank in the soil.

- Section 7.4.2.1 fails to define the temporal timeframe of responsibility for invasive suppression.  The seeds of many invasive plant species can lie dormant in the soil for years.  This latent seed bank creates a reservoir for future outbreaks following soil disturbance.  It is critical that a long term monitoring and treatment program be implemented for all sites and associated infrastructure.  Monitoring and suppression treatments should continue until final site reforestation and effective closure of the tree canopy.

- Section 7.4.2.1 fails to provide a spatial framework for the area of invasive species control responsibility.  Invasive species are highly mobile and akin to a wildfire in their dispersal from initial point of infestation.  At a minimum, site developers should be required to manage invasive infestations within all forest edge environments surrounding new pads, pipeline ROWs, and newly constructed access roads.  Failure to do so will result in migration of these species off-site and the transfer of the financial burden of control onto adjacent property owners.

- As prevention is more cost effective than control, requirements should be adopted mandating independent site inspections by a qualified ecologist on no less than a semiannual basis until final reforestation and canopy closure occurs. Failing to provide for frequent site inspections assures compliance will be minimal.

**Site Restoration**

- The RDSGEIS fails to provide any meaningful guidance regarding the ultimate restoration of well pads, pipeline ROWs and access roads to full ecosystem functionality upon decommissioning. Effective restoration requires a comprehensive, site-level assessment of the existing plant community prior to disturbance and the use of local reference ecosystems as templates for restoration. Ecological restoration is based upon the concept of rebuilding degraded areas such that they are structurally and functionally similar to pre-disturbance conditions. Reclamation is NOT restoration. Grassy fields neither function in a biologically similar manner as a forest nor supply the ecosystem benefits of a forest system. The replacement of a decades-old, complex assemblage of woodland species with a simple mix of grasses is not "restoration". It may retard erosion but it does not replace the original functionality and structure of the displaced ecosystem.

- Restoration objectives and planning should be integrated into best management practices and developed based upon a landscape-level analysis. Re-establishing forest connectivity should be a primary goal.

17

- As the service life of gas extraction infrastructure such as transmission pipelines may extend for decades, mitigation banks and sites where restoration of previously degraded systems might off-set the disturbance for the interim period should be utilized.  This will help assure that no net loss of ecosystem benefits occurs within the region.

- Requirements for an independent, qualified restoration ecologist to oversee and inspect site restoration should be developed in order to assure effective compliance.

**Summary**

As currently proposed, the NYDEC RDSGEIS does not provide an adequate assessment of likely impacts associated with the rapid conversion of forested and rural ecosystems to industrial sites.  It also fails to recommend potential mitigation strategies and options that would offset and reduce the "significant" impacts anticipated for native terrestrial ecosystems.  Protection of these terrestrial ecosystems is critical to the continued health of the regions' aquatic resources.  Inadequate attention has been given to the following vital considerations: density related impacts of infrastructure, forest fragmentation, invasive species, and site restoration.  Should the RDSGEIS be adopted in its current form, widespread disruption to forest ecosystems within the upper Delaware River Basin and other watersheds underlain by the Marcellus and Utica formations will occur.  Restoration of these systems following the eventual cessation of natural gas extraction will be a monumental cost incurred by both the taxpaying public and adjacent private property owners.  It is strongly recommended that the NYDEC