# Past and Ongoing Studies in Western US Oil and Gas Fields



Green River Basin, WY: high winter time ozone in natural gas field (Schnell et al., Nature, 2009)

Uinta Basin, UT: Jan/Feb 2012 winter-time study of surface ozone and its precursors

CO Northern Front Range ozone non attainment area: Hydrocarbon emissions from oil and gas operations in 2008 in Weld County (Pétron et al., 2012)

10

# Potential Health Impacts of Natural Gas development



Oil and gas well pads in Garfield County

McKenzie et al.,
Human health risk assessment of air emissions from development
of unconventional natural gas resources, Sci Total Environ (2012)

Ambient air samples every 6 days 2008-2010.
64 samples near new wells being completed

- Residents living ≤1/2 mile from wells are at greater risk for health effects from NGD than are residents living >1/2 mile from wells. Subchronic exposures to air pollutants during well completion activities present the greatest potential for health effects.
- The subchronic non-cancer hazard index (HI) of 5 for residents ≤1/2 mile from wells was driven primarily by exposure to trimethylbenzenes, xylenes, and aliphatic hydrocarbons.
- Cumulative cancer risks were 10 in a million and 6 in a million for residents living ≤1/2 mile and >1/2 mile from wells, respectively, with benzene as the major contributor to the risk. "



Multi-well pad in Garfield County







# How inventories are built?

Regulatory or research bottom-up emissions inventories

- Sector specific/process specific
- Time specific
- Not always speciated (total VOCs)
- Regional or global scales
- Uncertainty estimates usually non-existent or low
- Rarely up-to-date

Relies on high quality activity data (routine and non routine), emissions factors, estimates of control effectiveness …

French: "La cerise sur le gateau"

English: "Icing on the cake"

Example of data used to build inventory
Number of wells drilled
Number of compressor stations
Miles of pipelines
Types/number of pneumatic devices
Production data



▶ Emissions factors
Gas composition

# Can we evaluate $CH_4$ emission inventories at the global, regional and local scales?

Research atmospheric measurements and modeling
- Sector specific (multi-species)
- Time specific
- Speciated (VOCs)
- Regional or global scales
- Wide range of uncertainties



Relies on high quality atmospheric measurements of trace gas enhancements and measurements or modeling of the atmosphere mixing and wind characteristics



Balancing the atmosphere's budget

$\Sigma$ ?

*Emissions*

# Top-down: From mixing ratios to emissions



Atmospheric
concentrations

Atmospheric
Transport

Chemistry

Emissions

**Top-down evaluation methods**

1. Atmospheric enhancement ratios versus emissions ratios
   - *Tall Tower and Mobile Lab sampling and multiple species analysis*
2. Mass-balance "box" calculation
   - *Aircraft plume sampling with wind and mixing height measurements*
3. Inverse modeling (not covered in this talk)
   - *NOAA CarbonTracker-$CH_4$*



# Top-down Emissions Evaluation # 1

### *2008-2009*
Tall tower measurements
&
Surface measurement intensive in:
- Denver Julesburg Basin

### *Winter/Spring 2012*
Airborne and surface measurement intensive in:
- Uintah Basin
- Denver Julesburg Basin





# Colorado Northern Front Range

~20,000 oil and gas wells



Denver Metropolitan Area/ Northern Front Range ozone non attainment area (designated 2007): Adams, Arapahoe, Boulder, Broomfield, Denver, Douglas, Jefferson, Larimer, Weld Counties.

Colorado Front Range Ozone NAA Regulation 7:
Control of Ozone via Ozone Precursors
Oil and Gas VOC emissions
- Condensate Tanks controls:
  - 47.5% summer 2006
  - 75% summer 2007 and 2008
  - 81% summer 2009
  - 85% summer 2010
  - 90% summer 2011, 2012
  - 70% rest of the time
- Most high-bleed pneumatic

Most oil and gas E&P operations have been regulated so far at the state level.
New EPA rule into effect by 2015.

http://www.epa.gov/airquality/oilandgas/

# Boulder Atmospheric Observatory



o 300 meter tall tower
o located in Erie, Weld County
o Instrumented with LICOR ($CO_2$) and TECO (CO) in April 2007: sampling from 3 intake heights (22m, 100m, 300m)
o 30 sec- Met Data at three levels
o Equipped to collect discrete air samples from 300 meter level in August 2007. Analyses performed in NOAA Boulder lab.







http://www.esrl.noaa.gov/gmd/ccgg/towers/index.html

# BAO: Distinct Alkane Signature



NOAA Tall Tower Measurement and Sampling Network (PI Arlyn Andrews)



Air samples collected at the BAO and SGP* have a strong alkane signature.

\* SGP is a NOAA aircraft site in Northern Oklahoma. Samples collected below 650 meters were used for this analysis.



# BAO: Filtering Data By Wind Sector



## North and East

Weld County
Oil and Gas operations
Farming + Cattle Feedlots
I-25
Small towns

## South

Denver Metropolitan Area

## West

"Cleaner" Air Sector
Boulder



# BAO: Data Filtered By Wind Sector

Strongest alkane signature in North & East wind sector





Midday Data from the BAO (August 2007-April 2010).
Wind sector designation based on 30-min average (prior to sample collection) wind direction and wind speed (data retained if |w.speed|> 2.5 m/s).



# Field study to investigate methane sources chemical signatures in the Front Range

- ▸ Mobile Platform to sample close to sources
- ▸ High-frequency stable analyzers to detect plumes and target flask sampling
- ▸ Discrete air sampling for multi-species chemical analyses in the NOAA lab

Toyota Prius equipped with:
○ Fast response $CO_2$ and $CH_4$ analyzer (Picarro)
○ Real Time Display of Measurements
○ GPS
○ Programmable Flask Package (PFP with 12 sampling glass flasks) and Programmable Compressor Package (PCP) with GPS









# Regional Scale enhancement of CH$_4$



Example of Hybrid Lab Survey (July 9, 2008)

The size of the symbols along the survey track are proportional to the measured CH$_4$ mixing ratio.

The CH$_4$ mixing ratio increased suddenly when the wind direction shifted and we started sampling air coming from the NE.

# Strong Correlations between Alkanes



BAO N&E wind sector





Mobile Lab





- Methane is strongly correlated with propane.

- Samples collected close to feedlots, a landfill, a waste water treatment plant have enhanced methane compared to the other samples.

- Propane, n-butane, i-pentane and n-pentane are strongly correlated ($r^2 > 0.9$) in samples collected at BAO and with the Mobile Lab.



# Denver Julesburg Basin Study of VOC and NOx emissions from oil and gas upstream and mid stream operations

## Western Regional Air Partnership Phase III inventory

▸ *"The result from Phase III will include all criteria pollutant emissions for all point and area sources associated with the exploration, production, and gathering operations of oil and gas in the major basins throughout the six-state (CO, MT, NM, ND, UT, and WY) study region for year 2006 as well as future projection years."*

▸ Emission inventories for VOC and NOx from oil and gas exploration, production and midstream gathering and processing operations.

> DEVELOPMENT OF BASELINE 2006 EMISSIONS FROM OIL AND GAS ACTIVITY IN THE DENVER-JULESBURG BASIN
> Prepared for Colorado Department of Public Health and Environment Air Pollution Control Division
>
> Prepared by Amnon Bar-Ilan, John Grant, Ron Friesen, Alison K. Pollack ENVIRON International Corporation
>
> Doug Henderer, Daniel Pring Buys & Associates
>
> Kathleen Sgamma Western Energy Alliance (formerly IPAMS)
>
> April 30, 2008

▸ http://www.wrapair.org/forums/ogwg/PhaseIII_Inventory.html

# WRAP VOC emissions inventory for NAA



Venting (raw gas leak) and flashing (condensate tanks) emissions cover 95% of total VOC source in Front Range NAA [Bar-Ilan et al., 2008].



# Bottom-up Emissions by Species

2008 taken as average of 2006 and 2010

Hypotheses:

1. Flashing emissions by species were computed for the 16 flash tanks modeled, and the average (green color bar) and min and max (error bars) are shown.

2. Volume of gas vented calculated based on WRAP venting total VOC emissions and WRAP venting composition profile. WRAP mean raw gas composition and GWA raw gas data from 77 wells were used to derive emissions estimates.



WRAP estimate of gas vented:
2006: volume of gas vented=1.68% of total NG production



# Top-down Estimates vs Inventory

The bottom-up propane source estimate is used to derive top-down emissions for all other species based on observed atmospheric ratios



The largest discrepancies between bottom-up and top-down estimates are for methane and benzene.
Fugitive emissions of raw natural gas are underestimated in the inventory.
Very little information is available on the benzene content of the raw natural gas



# Top-down Emissions Evaluation #2



**NOAA Global Monitoring Division**

Anna Karion, Colm Sweeney, Steve Conley et al.

**Aircraft Measurements of $CH_4$, Uintah Basin, Utah**

**February 3 , 2012**

*Mass-Balance "Box" Calculation*



- The airplane samples upwind and downwind of the area source
- The airplane also documents the boundary layer height and how well mixed the plume is.

# Downwind Plume Integration



$$\dot{m}_{CH_4} = \iint\limits_{CS} \rho_{CH_4} V_n dA_{out} - \iint\limits_{CS} \rho_{CH_4} V_n dA_{in}$$



# Boundary Layer Height



# Wind direction and Speed




- CH$_4$ in basin has been flushed out by high winds previous to the flight.



# Feb 7 2012: Uinta Basin
# Flight over gas field - Low Wind Conditions



# Airplane flask samples show that several hydrocarbons correlate well with $CH_4$



Uinta Basin, February 2012

Anna Karion, Colm Sweeney, Steve Conley, Ben Miller, Steve Montzka

# Concluding remarks

❑ Atmospheric measurements can be used to quantitatively assess methane emissions from oil and gas upstream activities
  ➢ Our top-down emission estimates are
    ➢ for a specific location and time
    ➢ integrated fluxes from various O&G operations
❑ This type of study provides an objective evaluation of bottom-up inventories
  ➢ Specifically it can be used to assess at the regional scale
    ➢ new inventory methodologies
    ➢ impact of new regulation/practices
❑ VOC emission reduction strategies most likely also reduce $CH_4$ emissions
  ❑ Example of co-benefit: Air quality/Climate
❑ Results from on-going experiments should be available later this year.

   

▶ Pictures from Uinta Basin February 2012

# Special Thanks to



### NOAA Earth System Research Laboratory
### University of Colorado Boulder
#### Cooperative Institute for Research
in Environmental Sciences
Institute for Arctic and Alpine Research



*View from Fantasy Canyon, UT*

Jonathan Kofler
Ben Miller
Steve Montzka
Pat Lang
Ed Dlugokencky
Colm Sweeney
Anna Karion
Sonja Wolter
Tim Newberger
Jack Higgs
Jonathan Williams
Doug Guenther
Brad Hall
Tom Conway
Ken Masarie
Dan Chao
Molly Heller
Chris Carparelli
Andy Crotwell
Pieter Tans

Russ Schnell
Laura Patrick
Bryan Johnson
Patrick Cullis
Emrys Hall
Jim Wendell
Robert Albee
Peter Edwards
William Dubé
Steve Brown
Felix Geiger
Carsten Warneke
Greg Frost
Michael Trainer
Ken Aikin

Detlev Helmig
Jacques Hueber
Jason Winokur

Steve Conley,
Scientific Aviation

Extra Slides

# World Natural Gas Production



USA and Russia combined represent 35% of world natural gas production.

# Principle of Hydraulic Fracturing



Source:
Total

Hydraulic fracturing or "fracking" is a stimulation technique used to increase the amount of natural gas or oil that can be extracted from compact formations.





Fracking consists in injecting millions of gallons of water mixed with sand (9.5%) and chemical additives (0.5%) down the hole. The high pressure mixture causes the rock layer to crack. The natural gas present in very fine pores can flow to the well head via the fissures which are held open by the sand particles.

# NAA Natural Gas production ~ 15% of the State's



County level natural gas production data: http://cogcc.state.co.us/

# Emission Profiles Used



Columns show the average molar compositions of:

➢ raw natural gas (WRAP venting profile and Great Wattenberg Area study, COOGC, mean raw gas profile) &

➢ flashing emissions profiles modeled by CDPHE with EPA TANK2.0 and condensate composition data from 16 tanks in Weld County (2002).

The black error bars show the minimum and maximum for each profile – when available.

▶ Note notation convention in later plots for alkanes: methane=C1,… pentane=C5

# Observations vs Flashing+Venting emissions



The observed atmospheric ratios reflects a mix of sources with different emission profiles.

# Comparison with signatures of urban air samples collected by Mobile Lab (July) and Aircraft (April)





The prevalent alkane signature observed in the Northern Front Range is different from the urban air signature.

BLM



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT



# GUNNISON SAGE-GROUSE

# RANGEWIDE

## Draft Resource Management Plan Amendment
## Draft Environmental Impact Statement



# AUGUST 2016

**BLM COLORADO STATE OFFICE**
**Lakewood, Colorado**
**Ruth Welch, State Director**

**BLM UTAH STATE OFFICE**
**Salt Lake City, Utah**
**Jenna Whitlock, Acting State Director**

**BLM MISSION**

It is the mission of the Bureau of Land Management to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations.

BLM/CO/PL-16/008

**BUREAU OF LAND MANAGEMENT**

# Gunnison Sage-Grouse Rangewide
## *Draft Resource Management Plan Amendment and Draft Environmental Impact Statement*

U.S. Department of the Interior
Bureau of Land Management

Ruth Welch, State Director
Bureau of Land Management
Colorado State Office
2850 Youngfield Street
Lakewood, Colorado 80215

Jenna Whitlock, Acting State Director
Bureau of Land Management
Utah State Office
440 West 200 South
Salt Lake City, Utah 84101

**Access the Draft Resource Management Plan
and Draft Environmental Impact Statement
online through the project website at:
http://1.usa.gov/1Uusw8C**

**Cover Photos (left to right) by:**
Top Row: Bob Gress; Cameron Aldridge
Middle Row: Brad Wilson
Bottom Row: Bob Gress; John Furka; Helen Richardson

This page intentionally left blank.

# ABSTRACT

**Gunnison Sage-Grouse Rangewide Draft Resource Management Plan Amendment/**
**Draft Environmental Impact Statement**

Responsible Agency: United States Department of the Interior, Bureau of Land Management
Type of Action: Administrative
Document Status:  Draft

This draft resource management plan amendment and environmental impact statement has been prepared by the Bureau of Land Management (BLM) with assistance from 21 cooperating agencies.  It describes and analyzes four alternatives for managing approximately 741,700 acres of BLM-administered land and nearly 1.35 million acres of BLM-administered subsurface federal estate that may lie beneath other surface ownership.  Surface estate and federal mineral estate is managed by seven BLM field offices (Grand Junction, Gunnison, San Luis Valley, Tres Rios and Uncompahgre in Colorado and Moab and Monticello in Utah), three national conservation areas (Dominguez-Escalante, Gunnison Gorge and McInnis Canyons) and Canyons of the Ancients National Monument.  The analysis area spans portions of 12 counties: Chaffee, Delta, Dolores, Gunnison, Hinsdale Mesa, Montrose, Ouray, Saguache, and San Miguel in Colorado and Grand and San Juan in Utah.

The alternatives present a range of management actions to achieve the goal of Gunnison Sage-Grouse conservation for BLM Colorado and Utah.  Major planning issues addressed include land and realty actions, energy and minerals, recreation and travel management and livestock grazing.  Alternative A is a continuation of current management (No Action Alternative); use of public lands and resources would continue to be managed under the current BLM RMPs, as amended.  Alternative B manages land primarily for the benefit of GUSG and its habitat.  Alternative C minimizes or compensates for impacts from resource uses and other actions to varying degrees.  Alternative D represents the agency's preliminary preference for a combination of decisions to effectively achieve BLM goals and policies, meet the purpose and need, address the key planning issues, and respond to the recommendations of cooperating agencies and BLM specialists.

Review Period: Comments on the Gunnison Sage-Grouse Rangewide Draft Resource Management Plan Amendment/Environmental Impact Statement will be accepted for 90 calendar days following publication of the United States Environmental Protection Agency's Notice of Availability in the Federal Register.

For further information, contact:
> Bridget Clayton, BLM Colorado Sage Grouse Coordinator
> 2815 H Road, Grand Junction, CO 81506
> (970) 244-3045
> Project Website:  http://1.usa.gov/1Uusw8C

This page intentionally left blank.

DEAR READER LETTER



# United States Department of the Interior
## BUREAU OF LAND MANAGEMENT
Colorado State Office
2850 Youngfield Street
Lakewood, CO 80215-7210
www.co.blm.gov



In Reply Refer To:
1610 (CO-910)

**JUL 26 2016**

Dear Reader:

Enclosed for your review and comment is the Gunnison Sage-Grouse (GUSG) Rangewide Draft Resource Management Plan (RMP) Amendment/Draft Environmental Impact Statement (EIS). The Bureau of Land Management (BLM) prepared this Draft RMP Amendment/Draft EIS in consultation with 21 cooperating agencies and in accordance with the National Environmental Policy Act of 1969 (as amended), Federal Land Policy and Management Act of 1976 (as amended), BLM Land Use Planning Handbook (H-1601-1), and other applicable laws, policies, and implementing regulations.

The planning area for the Draft RMP Amendment/Draft EIS consists of approximately 2.1 million acres of federal, state, city, county and private lands in Colorado and Utah (including just over 740,000 acres of BLM-administered lands), along with an estimated 1.3 million acres of BLM-administered federal mineral estate. BLM lands and federal mineral estate in the planning area are managed by seven BLM field offices (Grand Junction, Gunnison, San Luis Valley, Tres Rios and Uncompahgre in Colorado; Moab and Monticello in Utah) spanning portions of 10 Colorado counties (Chaffee, Delta, Dolores, Hinsdale, Gunnison, Mesa, Montrose, Ouray, Saguache and San Miguel) and two Utah counties (Grand and San Juan). If approved, the plan could amend up to 11 existing BLM RMPs (including one national monument RMP and three national conservation area RMPs) in order to provide current guidance for managing and conserving GUSG habitat on BLM-administered lands and federal mineral estate.

The BLM encourages the public to provide information and comments pertaining to the analysis presented in the Draft RMP Amendment/Draft EIS. We are particularly interested in feedback concerning the adequacy and accuracy of the proposed alternatives, the analysis of their respective management decisions, and any new information that would help the BLM as we develop the plan. As a member of the public, your timely comments will help us formulate the Proposed RMP Amendment/Final EIS. Comments will be accepted for ninety (90) calendar days following the Environmental Protection Agency's (EPA) publication of its Notice of Availability in the Federal Register. The BLM can best utilize your comments and resource information submissions if received within the review period.

Your review and comments on the content of this document are critical to the success of this planning effort. If you wish to submit comments on the Draft RMP Amendment/Draft EIS, we request that you make your comments as specific as possible. Comments will be more helpful if they include suggested changes, sources, or methodologies, and reference a section or page

2

number. Comments containing only opinion or preferences will be considered and included as part of the decision making process, but they will not receive a formal response from the BLM.

Comments may be submitted electronically through the project website: http://1.usa.gov/1Uusw8C. Submissions will also be accepted by email to: GUSG_amend@blm.gov; facsimile to: (303) 239-3699; or mail to: Gunnison Sage-Grouse EIS, BLM Colorado State Office, 2850 Youngfield Street, Lakewood, CO 80215. Please avoid duplicate comments by submitting them only once and in one format.

Before including your address, phone number, email address or other personally identifiable information, be advised that your entire comment—including personally identifiable information—may be made publicly available at any time. While you can request to have your personally identifiable information withheld from public review, the BLM cannot guarantee that we will be able to do so.

Public meetings to provide an overview of the document, respond to questions, and take public comments will be announced by local media, website, and/or public mailings at least 15 days in advance.

Copies of the Draft RMP/Draft EIS have been sent to affected Federal, state and local government agencies. Interested parties can view the Draft RMP Amendment/Draft EIS electronically through the project website, http://1.usa.gov/1Uusw8C. The BLM has printed a limited number of paper copies as well. Paper copies are available for public review at the following BLM locations:

- Colorado State Office, 2850 Youngfield Street, Lakewood, CO 80215
- Colorado Southwest District Office, 2465 South Townsend Avenue, Montrose, CO 81401
- Grand Junction Field Office, 2815 H Road, Grand Junction, CO 81506
- Gunnison Field Office, 210 West Spencer Avenue, Gunnison, CO 81230
- San Luis Valley Field Office, 1313 E. Highway 160, Monte Vista, CO 81144
- Tres Rios Field Office, 29211 Highway 184, Dolores, CO 81323
- Utah State Office, 440 West 200 South, Suite 500, Salt Lake City, UT 84101
- Utah Canyon County District Office, 82 East Dogwood, Moab, UT 84532
- Monticello Field Office, 365 North Main, Monticello, UT 84535

Thank you for your continued interest in and contributions to this important planning effort. For additional information or clarification regarding this document or the planning process, please contact BLM Colorado Sage Grouse Coordinator Bridget Clayton at (970) 244-3045.

Sincerely,

Ruth Welch
State Director

# EXECUTIVE SUMMARY

## INTRODUCTION

The Gunnison Sage-Grouse (GUSG) *(Centrocercus minimus)* is a ground-dwelling bird species with a current range limited to seven scattered populations in southwest Colorado and southeast Utah—approximately 7% (FWS 2010a) of its recognized historical range in southwest Colorado, southeast Utah, northeast Arizona, and northern New Mexico (RCP 2005 and FWS 2014b, c). The GUSG is designated as a sensitive species by the State of Utah and labeled as a species of special concern by the State of Colorado.

In January 2013, the U.S. Fish and Wildlife Service (FWS) proposed to list the GUSG as endangered under the Endangered Species Act (ESA) (FWS 2013a) and to designate critical habitat for the species (FWS 2013b). On November 20, 2014, the FWS published a final rule in the Federal Register listing the GUSG as a threatened species (FWS 2014b) and designating critical habitat (FWS 2014c). The BLM manages approximately 40 percent of GUSG habitat across twelve counties in southwestern Colorado and southeastern Utah. The inadequacy of regulatory mechanisms in land use plans was identified as a major threat in the FWS listing decision. In response to the listing decision, the United States (U.S.) Department of the Interior, Bureau of Land Management (BLM) has prepared this Draft Resource Management Plan (RMP) Amendment to analyze the addition of GUSG conservation measures to their existing RMPs.

The Federal Land Policy and Management Act of 1976 (FLPMA) directs the BLM to develop and periodically revise or amend its RMPs, which guide management of BLM-administered lands. The FWS has identified conservation measures in land use plans as the principal regulatory mechanism for protecting GUSG on BLM-administered lands. Based on the FWS-identified threats to the GUSG, the BLM needs to incorporate objectives and adequate conservation measures into RMPs to contribute to the conservation and assist with the recovery of the GUSG. The conservation measures could include restrictions on resource uses and programs that affect GUSG, as well as measures to reduce the impacts resulting from BLM programs and authorized uses.

An Environmental Impact Statement (EIS) has been prepared in association with the RMP Amendment. An EIS is a document required by the National Environmental Policy Act (NEPA) for federal government agency actions "significantly affecting the quality of the human environment." A tool for decision-making, an EIS discloses the environmental effects of a proposed agency action and evaluates a range of alternative actions.

EXECUTIVE SUMMARY

Management direction and actions outlined in this RMP Amendment apply only to BLM-administered lands within the planning area, as well as to the federal mineral estate beneath other surface-owned lands—this constitutes the decision area. These areas are located in Chaffee, Delta, Dolores, Gunnison, Hinsdale, Mesa, Montrose, Ouray, Saguache, and San Miguel counties in southwestern Colorado and Grand and San Juan counties in Southeastern Utah.

The decision area includes approximately 620,000 acres of BLM-administered public land, as well as approximately 1,000,000 acres of subsurface federal mineral estate (as shown in Figure 1.1 and described in Table 1.1 and Table 1.2).

The decision area is defined as BLM-administered lands and federal mineral estate within three categories of GUSG habitat:

**Occupied Habitat**

Occupied critical habitat, as designated by the FWS under the ESA, forms the core, but not the entirety of what is defined as Occupied Habitat in this Draft RMP Amendment. Occupied Habitat supplements occupied critical habitat as necessary to meet the purpose and need of this action and comply with the multiple use and sustained yield mandate of the BLM. Occupied Habitat supplements occupied critical habitat as follows:

- Occupied Habitat includes an area of vacant/unknown and a small area of occupied, as defined and delineated by the CPW, not included in FWS-designated critical occupied habitat.
- Occupied Habitat includes the Poncha Pass area. The FWS did not include the Poncha Pass area in their final occupied critical habitat designation because they concluded that the "Poncha Pass area, for reasons unknown, is not a landscape capable of supporting a population of Gunnison sage-grouse and therefore does not meet primary constituent element (PCE) 1." However, the Poncha Pass area does currently support GUSG and the BLM will treat it as such unless and until it no longer meets the criteria.
- Occupied Habitat includes specific properties coinciding with BLM-administered federal minerals that the FWS excluded from the critical habitat designation. While the removal of surface lands with these properties from critical habitat is appropriate, the removal of subsurface public lands from Occupied Habitat is not. Removing these properties from Occupied Habitat would exclude the subsurface mineral estate from the management actions contained in this RMP Amendment.

**Unoccupied Habitat**

Unoccupied critical habitat, as designated by the FWS under the ESA, forms the extent of Unoccupied Habitat. Unoccupied critical habitat consists of specific areas

outside of those occupied by GUSG at the time of the listing that are determined to be essential for the conservation of the species (16 USC § 1532 (5), (A), (ii)).

**Non-Habitat Areas within Four Miles of a Lek**
Disruptive activities outside of Occupied or Unoccupied Habitat can affect GUSG and GUSG habitat. As a result, disruptive activities occurring within four miles of a lek in Non-Habitat Areas adjacent to Occupied and/or Unoccupied Habitat will be considered.

# PURPOSE AND NEED FOR THE RESOURCE MANAGEMENT PLAN AMENDMENT

## PURPOSE

This RMP Amendment provides a framework for conserving and assisting with the recovery of the GUSG and for conserving and restoring habitat upon which the species depends on BLM-administered public lands across the range of the bird. The ESA requires agencies to ensure that their actions are not likely to jeopardize the continued existence of a listed species or result in the adverse modification or destruction of critical habitat for a listed species. In meeting this requirement, the BLM will strive to integrate management objectives and actions that promote recovery of the GUSG with the agency's responsibility to allow for appropriate public land uses that enhance the economic stability of local communities in accordance with the multiple use and sustained yield direction set forth in the FLPMA.

## NEED

ESA Section 7(a)(1) requires the BLM to use its authority to further the purposes of the ESA by implementing programs for the conservation of federally listed species and the ecosystems upon which they depend. The BLM conducted land use plan evaluations in accordance with its planning regulations, which require that RMPs "shall be revised as necessary based on …, new data, new or revised policy …" (43 Code of Federal Regulations [CFR] 1610.5-6). These evaluations concluded that a RMP Amendment is necessary in order to address the changed circumstances and new information resulting from the 2014 FWS listing of the GUSG as "threatened" under the ESA.

# THE SCOPING PROCESS

Scoping is an early and open process for determining the scope, or range, of issues to be addressed and for identifying the significant issues to consider in the planning

process.  Scoping is designed to meet the public involvement requirements of FLPMA and NEPA.  Scoping helps the BLM to identify the concerns of the agency and affected public and define the relevant issues and alternatives that will be examined in detail in the RMP Amendment.  A planning issue is defined as a major controversy or dispute regarding management or uses on BLM-administered lands that can be addressed through a range of alternatives.

A 60-day public scoping period began on July 18, 2014, with the publication in the Federal Register of a Notice of Intent to begin planning and ended on August 18, 2014.

This cooperative process included soliciting input from interested state and local governments, tribal governments, other federal agencies and organizations, and individuals to identify the scope of issues to be addressed in the RMP Amendment and to assist in formulating reasonable alternatives.  The scoping process is a method for opening dialogue between the BLM and the public about managing for the GUSG and GUSG habitat on BLM-administered lands.  The process also identifies the concerns of those who have an interest in this subject.  As part of the scoping process, the BLM requested that the public submit nominations for potential areas of critical environmental concern (ACECs) for the GUSG and its habitat.

Scoping included four open-house meetings in Golden, Gunnison, Montrose, and Dove Creek Colorado in early August 2014.  In addition, news releases notified the public of the scoping period and invited them to provide written comments.  Public comments were used to define the relevant issues that would be addressed by a reasonable range of alternatives in the RMP Amendment and associated EIS.

The Gunnison Sage-Grouse Rangewide Resource Management Plan Amendment/EIS Scoping Summary Report (BLM 2014) is available on the project website.  The discussion below provides an overview of the scoping results.

## ISSUES

During the scoping process, the public and agencies identified issues to be addressed in the GUSG RMP Amendment/EIS.  Issues outlined in the Scoping Summary Report, as well as resource and use issues from the BLM Land Use Planning Handbook and Manual (H-1610-1; BLM 2005), were considered in developing the alternatives brought forward for analysis.  The scope of issues included GUSG habitat, energy and mineral development, livestock grazing, vegetation and riparian management, lands and realty and recreation and travel management.

## MANAGEMENT ALTERNATIVES

Alternatives development is guided by established planning criteria (as outlined in 43 CFR Section 1610). The basic goal of alternative development is to produce distinct potential management scenarios that:

- Address the identified major planning issues
- Explore opportunities to enhance management of resources and resource uses
- Meet the purpose and need for the RMP Amendment
- Are feasible

Between September 2014 and March 2016, the BLM project team met to develop management goals and identify objectives and actions. Various groups, along with cooperating agencies, met a number of times to refine their work. Through this process, the planning team developed one no action alternative (A), required by CEQ, and three action alternatives (B, C, and D). The action alternatives were designed to address the planning issues, to fulfill the purpose of and need for the RMP Amendment, and to meet the multiple use mandates of FLPMA (43 US Code, Section 1716).

The three resulting action alternatives offer a range of possible management approaches. Their purpose is to respond to planning issues and concerns identified through public scoping, to maintain or increase GUSG abundance and distribution in the planning area, and to provide adequate regulatory mechanisms for GUSG.

While the goal is the same across alternatives, each alternative contains a discrete set of objectives, allowable uses, and management actions constituting a separate RMP Amendment. The goal is through varying approaches, with the potential for different long-range outcomes and conditions. Land use allocations and conservation measures in the alternatives are focused on mapped GUSG habitat (Occupied, Unoccupied and Non-Habitat), depending on the alternative's objective.

The relative emphasis given to particular resources and resource uses differs as well, including allowable uses, restoration measures, and specific direction pertaining to individual resource programs. When resources or resource uses are mandated by law or are not tied to planning issues, there are typically few or no distinctions between alternatives.

The alternatives are also directed toward responding to FWS-identified issues and threats to GUSG and their habitat. All of the action alternatives were developed to employ resource programs to address the FWS-identified threats. A complete description of all decisions proposed for each alternative is in Chapter 2, Alternatives. A summary of each of the alternatives is presented below.

## NO ACTION ALTERNATIVE A

Alternative A meets the CEQ requirement that a no action alternative be considered. This alternative would continue current management direction and prevailing conditions derived from the existing planning documents of each field office. Goals and objectives for resources and resource uses are based on the most recent RMP decisions, along with associated amendments, activity and implementation level plans, and other management decision documents. Laws, regulations, and BLM policies that supersede RMP decisions would apply.

Goals and objectives for BLM-administered lands and mineral estate would not change. Appropriate and allowable uses and restrictions pertaining to activities such as mineral leasing and development, recreation, construction of utility corridors, and livestock grazing would also remain the same. The BLM would not modify existing or establish additional criteria to guide the identification of site-specific use levels for implementation activities.

## ALTERNATIVE B

GUSG conservation measures and threats outlined in the FWS listing decision published in the Federal Register in November 2014 and conservation measures identified in the Gunnison Sage-grouse Rangewide Conservation Plan (RCP) (2005) were used to formulate BLM management direction under Alternative B. Management actions implemented by the BLM, in concert with local, state and other federal agencies and private landowners, play a critical role in the future trends of GUSG populations. Alternative B would achieve the purpose of and need for the RMP Amendment by avoiding negative impacts from resource uses and other actions in Occupied Habitat and Unoccupied Habitat and enhancing recovery opportunities.

## ALTERNATIVE C

Alternative C would achieve the purpose of and need for the RMP Amendment by minimizing or compensating for impacts from resource uses and other actions to varying degrees in Occupied Habitat and Unoccupied Habitat. Resource uses and other actions would be allowed if their impacts could be avoided, minimized, rectified, reduced/eliminated over time, or through compensatory mitigation. Impacts that occur would be rectified by repairing, rehabilitating, or restoring the affected environment and/or by reducing or eliminating the impact over time through preservation and maintenance operations during the life of the action. Negative impacts that cannot be minimized would be compensated for by replacing or providing substitute resources or environments, often off-site.

## ALTERNATIVE D (AGENCY PREFERRED)

Alternative D (consisting of sub-alternatives D1 and D2) is the agency-preferred alternative and seeks to allocate resources among land uses and conserve natural resource values, while sustaining and enhancing ecological integrity across the landscape, including plant, wildlife, and fish habitat.  Public scoping efforts and language included in the FWS decision to list the species as threatened under the ESA enabled the BLM to identify and shape significant issues pertaining to GUSG Habitat, energy development, livestock grazing, potential ACECs, public land access, and other program areas to provide a balanced level of protection, restoration, enhancement, and use of resources and services to meet ongoing programs and land uses.  Conservation measures under Alternative D are focused on both Occupied and Unoccupied Habitat.

As Alternative D was being developed, it became apparent that, while some management actions should be consistent rangewide, there were more that should be specific to the Gunnison Basin Population or to the satellite (non-Gunnison Basin) populations due to distinct differences in bird numbers, amount of contiguous habitat (BLM and non-BLM), extent, scale, and intensity of threats, and other considerations among and between the populations.  For this reason, the preferred alternative was divided into two sub-alternatives labeled $D_1$ and $D_2$.

### Sub-Alternative $D_1$

Sub-Alternative $D_1$ is the agency-preferred alternative for the Gunnison Basin Population of GUSG.  The Gunnison Basin Population contains the largest numbers of birds and habitat across the range of the species.  The extent, scale, and nature of the threats to this population are generally different than those affecting the satellite populations.  While critical to the long-term success and recovery of the species, the management actions necessary for this population are different from those necessary for the satellite populations.  Resource uses and other actions would be allowed if their impacts could be avoided, minimized, rectified, reduced/eliminated over time, or through compensatory mitigation.

### Sub-Alternative $D_2$

Sub-Alternative $D_2$ is the BLM preferred alternative for the satellite (non-Gunnison Basin) populations of GUSG.  The low numbers of birds, and range of habitat threats separate from those present in the Gunnison Basin, were identified as critical factors in the FWS decision to list the GUSG as threatened under the ESA.  As a result, these population areas are key to species recovery and require different combinations of protection than needed within the Gunnison Basin.  Sub-Alternative $D_2$ would achieve the purpose of and need for the RMP Amendment by balancing resources and resource use among competing human interests, land uses, and the

conservation of natural and cultural resource values, while sustaining and enhancing ecological integrity across the population, including plant and wildlife habitat.

## ENVIRONMENTAL CONSEQUENCES

The purpose of the environmental consequences analysis in this RMP Amendment/EIS is to determine the potential for significant impacts of the federal action on the human environment. CEQ regulations for implementing NEPA state that the human environment is interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment (40 CFR, Part 1508.14). The federal action is the BLM's selection of an RMP Amendment that will provide a consistent framework for its management of the GUSG and its habitat on BLM-administered lands. This would be in concert with its allocation of resources, in accordance with the multiple-use and sustained yield mandates of FLPMA.

Management actions proposed in Chapter 2, Alternatives are primarily planning-level decisions and typically would not result in direct on-the-ground changes. However, by planning for uses on BLM-administered surface estate and federal mineral estate during the planning horizon, this impact analysis focuses on impacts that could eventually result in on-the-ground changes. Impacts for some resources or resource uses, such as livestock grazing and off-highway vehicle use, could be confined to the BLM-administered surface estate.

Other impacts, such as energy and minerals and requirements to protect GUSG from such activity, could apply to all BLM-administered federal mineral estate (including split-estate). Some BLM management actions may affect only certain resources under certain alternatives. This impact analysis in Chapter 4, Environmental Consequences, identifies impacts that may enhance or improve a resource as a result of management actions, as well as those impacts that have the potential to impair a resource.

# TABLE OF CONTENTS

ABSTRACT
DEAR READER LETTER
EXECUTIVE SUMMARY                                                      i
FIGURES                                                             xvii
TABLES                                                               xix
ABBREVIATIONS AND ACRONYMS                                         xxiii

## 1. INTRODUCTION                                                 1-1

1.1.    BACKGROUND                                                 1-2
1.1.1.  Gunnison Sage-Grouse                                       1-2
1.1.2.  BLM Land Use Planning Requirement                          1-2
        Plan Amendments                                            1-2
1.1.3.  Purpose and Need                                           1-3
        Purpose                                                    1-3
        Need                                                       1-3
1.2.    THE PLANNING AREA                                          1-5
1.2.1.  GUSG RMP Amendment Planning Area                           1-5
1.2.2.  GUSG RMP Amendment Decision Areas                          1-6
        Occupied Habitat                                           1-6
        Unoccupied Habitat                                         1-7
        Non-Habitat Areas within Four Miles of a Lek               1-7
1.2.3.  Planning Area by GUSG Population                           1-8
1.2.4.  BLM RMPs Potentially Amended by this Action                1-12
        BLM Colorado Plans                                         1-12
        BLM Utah Plans                                             1-14
1.2.5.  Issues and Resources Identified and Considered but Not Carried Forward   1-15
1.3.    PLANNING CRITERIA                                          1-22
1.3.1.  About BLM Planning Criteria                                1-22
1.3.2.  Criteria for the GUSG RMP Amendment                        1-22
1.4.    THE PLANNING PROCESS                                       1-25
1.4.1.  BLM Land Use Planning Process                              1-25
        Plan Maintenance                                           1-26
        Relationship To Other Policies and Plans                   1-26

## 2. ALTERNATIVES                                                 2-1

TABLE OF CONTENTS

2.1.    INTRODUCTION TO ALTERNATIVES                                          2-2
2.1.1.  Components of Alternatives                                            2-2
2.1.2.  Purpose of Alternatives Development                                   2-3
2.1.3.  Developing Alternatives                                              2-3
        Alternatives Development Process                                     2-3
        Developing a Reasonable Range of Alternatives                        2-4
2.1.4.  Resulting Range of Alternatives                                      2-5
        Alternatives Considered but Not Analyzed in Detail                   2-8
        Area of Critical Environmental Concern Proposals                     2-9

2.2.    ALTERNATIVES                                                        2-11
2.2.1.  Summary of Alternatives                                             2-11
        Alternative A - No Action                                           2-13
        Alternative B                                                       2-13
        Alternative C                                                       2-13
        Alternative D - Agency Preferred                                    2-14
        *Sub-Alternative D₁ - Gunnison Basin Preferred*                     *2-15*
        *Sub-Alternative D₂ - Satellite Populations Preferred*              *2-15*
        Management Common to All Alternatives                               2-15
        Agency-Preferred Alternative                                        2-16
2.2.2.  Tables of Alternatives                                              2-17
        How to Read Tables 2.6 and 2.7                                      2-17
        Table 2.6 - No Action Alternative A                                 2-18
        Table 2.7 - Action Alternatives: B, C, and Sub-Alternatives D₁/D₂   2-137
        Table 2.8 - Summary Comparison of Environmental Consequences        2-191

2.3.    MONITORING, EVALUATION, ADAPTIVE MANAGEMENT, & MITIGATION  2-205
2.3.1.  Evaluation                                                          2-205
2.3.2.  Monitoring                                                          2-205
2.3.3.  Adaptive Management                                                 2-206
        Adaptive Management                                                 2-206
        Adaptive Management and Monitoring                                  2-207
        Adaptive Management Plan                                            2-207
        Adaptive Management Triggers                                        2-207
        GUSG Habitat                                                        2-208
        Poncha Pass Management Absent GUSG                                  2-208
        Incorporation of a FWS Recovery Plan or an Updated RCP              2-209
        Incorporation of a Change to the ESA Status of the GUSG            2-209
2.3.4.  Mitigation                                                          2-209

TABLE OF CONTENTS

Mitigation Plan                                                                          2-210

## 3. AFFECTED ENVIRONMENT                                                  3-1

3.1.    SPECIAL STATUS SPECIES                                                   3-2

3.1.1.  Gunnison Sage-Grouse (Centrocercus minimus) and Habitat         3-2

3.2.    FISH & WILDLIFE                                                           3-34

3.2.1.  Elk (Cervus canadensis)                                                  3-35
        Colorado Elk Units                                                       3-36
        Utah Elk Units                                                           3-48
3.2.2.  Mule Deer (Odocoileus hemionus)                                          3-50
        Colorado Data Analysis Units                                             3-50
        Utah Mule Deer Units                                                     3-62
3.2.3.  Common Raven (Corvus corax)                                             3-64

3.3.    SOIL RESOURCES                                                           3-66

3.3.1.  Conditions within Occupied and Unoccupied Habitat                       3-66

3.4.    TERRESTRIAL VEGETATION (INCLUDING WOODLANDS)               3-70

3.4.1.  Conditions within Occupied and Unoccupied Habitat                       3-70

3.5.    RIPARIAN AREAS & WETLANDS                                               3-79

3.5.1.  Conditions within Occupied and Unoccupied Habitat                       3-79

3.6.    NOXIOUS WEEDS & INVASIVE SPECIES                                        3-85

3.6.1.  Conditions within Occupied and Unoccupied Habitat                       3-85

3.7.    WILDLAND FIRE ECOLOGY & MANAGEMENT                                      3-91

3.7.1.  Conditions within Occupied and Unoccupied Habitat                       3-91

3.8.    LIVESTOCK GRAZING                                                        3-95

3.8.1.  Conditions within Occupied and Unoccupied Habitat                       3-95

3.9.    RECREATION                                                               3-102

3.9.1.  Conditions within the Planning Area                                      3-102
3.9.2.  Conditions on BLM-Administered Lands                                     3-103
        Recreation Policy                                                        3-103
        Recreation Participation                                                 3-104
        Recreation Priorities                                                    3-105
        Recreation Management Areas                                              3-105
        Special Recreation Permits                                              3-114
        Tourism                                                                  3-116
        Developed Recreation Facilities                                          3-116

TABLE OF CONTENTS

*Community-Based Recreation*                                          *3-119*
*Recreation Participation*                                            *3-119*
*Recreation Priorities*                                               *3-121*

3.10.   TRAVEL & TRANSPORTATION MANAGEMENT                            3-123

3.10.1.  Conditions within the Decision Area                         3-123

3.10.2.  Conditions on BLM-Administered Lands                         3-138
         OHV Designations                                            3-138
         Travel Management Planning                                 3-142

3.11.   MINERALS                                                      3-144

3.11.1.  Leasable Minerals                                            3-154
         Oil & Gas                                                   3-154
         Split Estate                                                3-159
         Geothermal Resources                                       3-164
         DOE Uranium Lease Tracts                                   3-167
         Other Solid Leasable Minerals                              3-169
3.11.2.  Locatable Minerals                                           3-173
3.11.3.  Salable Minerals                                            3-188

3.12.   LANDS & REALTY                                                3-195

3.12.1.  Land Use Authorizations & Utility Corridors                 3-195
3.12.2.  Withdrawals                                                 3-208

3.13.   AREAS OF CRITICAL ENVIRONMENTAL CONCERN                       3-210

3.13.1.  Conditions within Occupied and Unoccupied Habitat           3-210

3.14.   SOCIAL & ECONOMIC CONDITIONS                                  3-212

3.14.1.  Demographic and Economic Conditions                         3-213
3.14.2.  Environmental Justice                                       3-223
3.14.3.  Economic Contribution Analysis                             3-225

4.  ENVIRONMENTAL CONSEQUENCES                                        4-1

4.1.    INTRODUCTION                                                  4-1

4.1.1.  Purpose and Format                                           4-1
4.1.2.  Analytical Assumptions                                       4-3
4.1.3.  General Methodology for Analyzing Impacts                    4-4
4.1.4.  Cumulative Analysis Methodology                              4-5
4.1.5.  Incomplete or Unavailable Information                        4-8

4.2.    SPECIAL STATUS SPECIES                                        4-10

TABLE OF CONTENTS

|  | Gunnison Sage-Grouse & Habitat | 4-10 |
|---|---|---|
| 4.2.1. | Methodology | 4-10 |
| 4.2.2. | Impacts Common to All Alternatives | 4-10 |
| 4.2.3. | Impacts by Alternative | 4-19 |
| 4.2.4. | Cumulative Effects | 4-40 |
| 4.3. | FISH & WILDLIFE | 4-46 |
|  | Big Game | 4-46 |
| 4.3.1. | Methodology | 4-46 |
| 4.3.2. | Impacts Common to All Alternatives | 4-46 |
| 4.3.3. | Impacts by Alternative | 4-49 |
| 4.3.4. | Cumulative Impacts | 4-54 |
|  | Common Raven | 4-54 |
| 4.3.5. | Methodology | 4-54 |
| 4.3.6. | Impacts Common to All Alternatives | 4-55 |
| 4.3.7. | Impacts by Alternative | 4-56 |
| 4.3.8. | Cumulative Effects | 4-59 |
| 4.4. | SOIL RESOURCES | 4-60 |
| 4.4.1. | Methodology | 4-60 |
| 4.4.2. | Impacts Common to All Alternatives | 4-62 |
| 4.4.3. | Impacts by Alternative | 4-62 |
| 4.4.4. | Cumulative Impacts | 4-66 |
| 4.5. | TERRESTRIAL VEGETATION (INCLUDING WOODLANDS) | 4-68 |
| 4.5.1. | Methodology | 4-68 |
| 4.5.2. | Impacts Common to All Alternatives | 4-72 |
| 4.5.3. | Impacts by Alternative | 4-73 |
| 4.5.4. | Cumulative Impacts | 4-79 |
| 4.6. | RIPARIAN AREAS & WETLANDS | 4-81 |
| 4.6.1. | Methodology | 4-81 |
| 4.6.2. | Impacts Common to All Alternatives | 4-84 |
| 4.6.3. | Impacts by Alternative | 4-84 |
| 4.6.4. | Cumulative Impacts | 4-91 |
| 4.7. | INVASIVE SPECIES | 4-93 |
| 4.7.1. | Methodology | 4-93 |
| 4.7.2. | Impacts Common to All Alternatives | 4-94 |
| 4.7.3. | Impacts by Alternative | 4-95 |

| | | |
|---|---|---|
| 4.7.4. | Cumulative Impacts | 4-99 |
| **4.8.** | **WILDLAND FIRE ECOLOGY & MANAGEMENT** | **4-100** |
| 4.8.1. | Methodology | 4-100 |
| 4.8.2. | Impacts Common to All Alternatives | 4-103 |
| 4.8.3. | Impacts by Alternative | 4-103 |
| 4.8.4. | Cumulative Impacts | 4-109 |
| **4.9.** | **LIVESTOCK GRAZING** | **4-111** |
| 4.9.1. | Methodology | 4-111 |
| 4.9.2. | Impacts Common to All Alternatives | 4-115 |
| 4.9.3. | Impacts by Alternative | 4-115 |
| 4.9.4. | Cumulative Impacts | 4-124 |
| **4.10.** | **RECREATION** | **4-126** |
| 4.10.1. | Methodology | 4-126 |
| 4.10.2. | Impacts Common to All Alternatives | 4-128 |
| 4.10.3. | Impacts by Alternative | 4-129 |
| 4.10.4. | Cumulative Impacts | 4-135 |
| **4.11.** | **TRAVEL MANAGEMENT** | **4-137** |
| 4.11.1. | Methodology | 4-137 |
| 4.11.2. | Impacts Common to All Alternatives | 4-139 |
| 4.11.3. | Impacts by Alternative | 4-139 |
| 4.11.4. | Cumulative Impacts | 4-144 |
| **4.12.** | **LEASABLE FLUID MINERALS** | **4-146** |
| | Oil and Gas | 4-146 |
| 4.12.1. | Methodology | 4-146 |
| 4.12.2. | General Impacts | 4-147 |
| 4.12.3. | Impacts by Alternative | 4-148 |
| | Geothermal | 4-152 |
| **4.13.** | **LEASABLE SOLID MINERALS** | **4-153** |
| 4.13.1. | Methodology | 4-153 |
| 4.13.2. | General Impacts | 4-154 |
| 4.13.3. | Impacts by Alternative | 4-155 |
| **4.14.** | **LOCATABLE MINERALS** | **4-158** |
| 4.14.1. | Methodology | 4-158 |
| 4.14.2. | Impacts by Alternative | 4-159 |

4.15.    SALABLE MINERALS                                                           4-162
4.15.1.  Methodology                                                                4-162
4.15.2.  General Impacts                                                            4-163
4.15.3.  Impacts by Alternative                                                     4-163
4.15.4.  Cumulative Impacts                                                         4-165

4.16.    LANDS & REALTY                                                             4-168
         Land Use Authorizations and Utility Corridors                             4-168
4.16.1.  Methodology                                                                4-168
4.16.2.  Impacts by Alternative                                                     4-169
4.16.3.  Cumulative Impacts                                                         4-173

4.17.    AREAS OF CRITICAL ENVIRONMENTAL CONCERN                                    4-174
4.17.1.  Methodology                                                                4-174
4.17.2.  Impacts by Alternative                                                     4-175

4.18.    SOCIO-ECONOMICS                                                            4-177
4.18.1.  Methodology                                                                4-177
4.18.2.  Socio-Economic Impacts                                                     4-181
         Grazing Allotments                                                         4-181
         Recreation                                                                 4-185
         Oil, Natural Gas, and $CO_2$ Leases                                        4-186
         Other Minerals                                                             4-189
         Lands & Realty                                                             4-192
         Non-Market Values                                                          4-193
         Environmental Justice                                                      4-194
4.18.3.  Cumulative Impacts                                                         4-197

5.  CONSULTATION & COORDINATION                                                     5-1

5.1.     COLLABORATION                                                              5-1
5.1.1.   Native American Tribal Consultation                                        5-2
5.1.2.   Colorado State and Utah State Historic Preservation Officers Consultation 5-3
5.1.3.   U.S. Fish and Wildlife Service Consultation                                5-3
5.1.4.   Cooperating Agencies                                                       5-3
5.1.5.   Resource Advisory Councils                                                 5-6

5.2.     COORDINATION & CONSISTENCY                                                 5-7
5.2.1.   Rangewide and Local Working Group Plans                                    5-7
5.2.2.   County Plans and Policies                                                  5-8

TABLE OF CONTENTS

5.2.3.  State Policies and Plans                                                          5-8
5.2.4.  BLM Policies and Plans                                                            5-9
5.2.5.  Other Federal Agency Policies and Plans                                          5-9
5.2.6.  Memoranda of Understanding                                                       5-10
5.2.7.  Public Involvement                                                               5-10

5.3.    SCOPING & ISSUES                                                                 5-12
5.3.1.  Public Scoping                                                                   5-12
        Scoping Meetings                                                                 5-12
        Other Outreach Methods                                                           5-13
5.3.2.  Scoping Comments                                                                 5-14
5.3.3.  Key Issues Identified through Scoping                                            5-15
        Future Public Involvement                                                        5-15

5.4.    LIST OF PREPARERS                                                                5-17

**6.  APPENDICES**                                                                       **6-1**

        APPENDIX A:  GUSG Population Maps                                                 6-2
        APPENDIX B:  BLM Washington Office IM 2014-100                                    6-18
        APPENDIX C:  GUSG Candidate Conservation Agreement, Gunnison Basin Population     6-30
        APPENDIX D:  GUSG Rangewide Conservation Plan Structural Habitat Guidelines      6-144
        APPENDIX E:  BLM Standards for Public Land Health and Guidelines for Livestock Grazing
        Management in Colorado and Utah                                                  6-151
        APPENDIX F:  GUSG Draft Socio-Economic Data                                      6-160
        APPENDIX G:  Areas of Critical Environmental Concern - Relevance and Importance
        Analysis and Determination Rationale                                            6-171
        APPENDIX H:  Draft Stipulations Applicable to Fluid Mineral Leasing and Land Use
        Authorizations                                                                  6-181
        APPENDIX I:  Draft GUSG Best Management Practices                                6-198
        APPENDIX J:  GUSG Rangewide Mitigation Strategy                                  6-210

**7.  GLOSSARY**                                                                         **7-1**

**8.  REFERENCES**                                                                       **8-1**

FIGURES AND TABLES

## FIGURES

Figure 1.1 - Decision Area for the GUSG Rangewide RMP Amendment/EIS..................................................1-4
Figure 3.2 - Gunnison Basin GUSG Population, 1996–2014....................................................................3-8
Figure 3.3 - Surface Disturbance in the Gunnison Basin Population Area..................................................3-10
Figure 3.4 - Cerro Summit-Cimarron-Sims Mesa GUSG Population, 1998–2014......................................3-11
Figure 3.5 - Surface Disturbance in the Cerro Summit-Cimarron-Sims Mesa Population Area.............3-13
Figure 3.6 - Crawford GUSG Population, 1996–2014.........................................................................3-14
Figure 3.7 - Surface Disturbance in the Crawford Population Area........................................................3-16
Figure 3.8 - Monticello GUSG Sub-Population, 1996–2014................................................................3-18
Figure 3.9 - Dove Creek GUSG Sub-Population, 1996–2014..............................................................3-19
Figure 3.10 - Surface Disturbance in the Monticello-Dove Creek Population Area................................3-21
Figure 3.11 - Piñon Mesa GUSG Population, 1996–2014...................................................................3-22
Figure 3.12 - Surface Disturbance in the Piñon Mesa Population Area..................................................3-24
Figure 3.13  - Poncha Pass GUSG Population, 1998–2014.................................................................3-26
Figure 3.14 - Surface Disturbance in the Poncha Pass Population Area.................................................3-28
Figure 3.15 - San Miguel Basin GUSG Population, 1996–2014...........................................................3-30
Figure 3.16 - Surface Disturbance in the San Miguel Basin Population Area...........................................3-32
Figure 3.17 - Sand Dunes Elk Unit (E-11) Post-Hunt Population Estimate, 1988–2014.........................3-37
Figure 3.18 - Piñon Mesa Elk Unit (E-19) Post-Hunt Population Estimate.............................................3-38
Figure 3.19 - Uncompahgre Elk Unit (E-20) Post-Hunt Population Estimate, 1980–2014.......................3-39
Figure 3.20 - Disappointment Elk Unit (E-24) Post-Hunt Population Estimate, 1987–2013.....................3-40
Figure 3.21 - Powderhorn Elk Unit (E-25) Post-Hunt Population Estimate, 1980–2014 ..........................3-41
Figure 3.22 - Saguache Elk Unit (E-26) Post-Hunt Population Estimate, 1987–2013...............................3-43
Figure 3.23 - Cimarron Elk Unit (E-35) Post-Hunt Population Estimate, 1980–2014...............................3-44
Figure 3.24 - Sapinero Elk Unit (E-41) Post-Hunt Population Estimate..................................................3-45
Figure 3.25 - Fossil Ridge Elk Unit (E-43) Post-Hunt Population Estimate, 1980–2014...........................3-47
Figure 3.26 - Coal Creek/Fruitland Mesa Elk Unit (E-52) Post-Hunt Population Estimate, 1980–2014.3-48
Figure 3.27 - Utah La Sal Elk Unit Population Estimate, 2003–2013......................................................3-49
Figure 3.28 - Utah San Juan Elk Unit Population Estimate, 2003–2013.................................................3-49
Figure 3.29 - Piñon Mesa Mule Deer Unit (D-18) Post-Hunt Population Estimate....................................3-51
Figure 3.30 - Uncompahgre Mule Deer Unit (D-19) Post-Hunt Population Estimate, 1980–2014.........3-52
Figure 3.31 - West Elk Mule Deer Unit (D-21) Post-Hunt Population Estimate, 1980–2014...................3-54
Figure 3.32 - Taylor Park Mule Deer Unit (D-22) Post-Hunt Population Estimate, 1980–2014...............3-55
Figure 3.33 - Groundhog Mule Deer Unit (D-24) Post-Hunt Population Estimate, 1982–2014...............3-56
Figure 3.34 - Powderhorn Mule Deer Unit (D-25) Post-Hunt Population Estimate, 1980–2014............3-57
Figure 3.35 - Saguache Mule Deer Unit Post-Hunt Population Estimate, 1988–2014..............................3-58
Figure 3.36 - Mesa Verde Mule Deer Unit (D-29) Post-Hunt Population Estimate, 1987–2016............3-59
Figure 3.37 - Villa Grove Mule Deer Unit (D-37) Post-Hunt Population Estimate, 1986–2014..............3-60
Figure 3.38 - Fruitland Mesa Mule Deer Unit (D-39) Post-Hunt Population Estimate, 1980–2014........3-61
Figure 3.39 - Cimarron Mule Deer Unit (D-40) Post-Hunt Population Estimate, 1980–2014.................3-62
Figure 3.40 - Utah La Sal Mule Deer Unit Population Estimate .............................................................3-63
Figure 3.41 - Utah San Juan Mule Deer Unit Population Estimate..........................................................3-64

Figure 3.42 - BLM Special Recreation Management Areas in the Decision Area.......................................3-108
Figure 3.43 - BLM Extensive Recreation Management Areas in the Decision Area................................3-111
Figure 3.44 - BLM Lands with GUSG Habitat Not Designated as Recreation Management Areas.......3-113
Figure 3.45 - BLM Recreation Sites in or Adjacent to the Planning Area............................................3-118
Figure 3.46 - Roads within GUSG Habitat: Cerro Summit-Cimarron-Sims Mesa Population...............3-129
Figure 3.47 - Roads within GUSG Habitat: Crawford Population ........................................................3-130
Figure 3.48 - Roads within GUSG Habitat: Gunnison Basin Population.................................................3-131
Figure 3.49 - Roads within GUSG Habitat: Monticello-Dove Creek Population ..................................3-132
Figure 3.50 - Roads within GUSG Habitat: Piñon Mesa Population......................................................3-133
Figure 3.51 - Roads within GUSG Habitat: Poncha Pass Population.....................................................3-134
Figure 3.52 - Roads within GUSG Habitat: San Miguel Basin Population...............................................3-135
Figure 3.53 - Off-Highway Vehicle Designations within the Decision Area ..........................................3-141
Figure 3.54 - Mineral Ownership in Cerro Summit-Cimarron-Sims Mesa Population Area..................3-147
Figure 3.55 - Mineral Ownership in the Crawford Population Area ....................................................3-148
Figure 3.56 - Mineral Ownership in the Gunnison Basin Population Area.............................................3-149
Figure 3.57 - Mineral Ownership in the Monticello-Dove Creek Population Area ..............................3-150
Figure 3.58 - Mineral Ownership in the Piñon Mesa Population Area ..................................................3-151
Figure 3.59 - Mineral Ownership in the Poncha Pass Population Area .................................................3-152
Figure 3.60 - Mineral Ownership in the San Miguel Basin Population Area ..........................................3-153
Figure 3.61 - DOE Uranium Lease Tracts within the Decision Area ....................................................3-168
Figure 3.62 - Withdrawals and Active Claims in Cerro Summit-Cimarron-Sims Mesa Population Area...3-177
Figure 3.63 - Withdrawals and Active Mining Claims in the Crawford Population Area .......................3-178
Figure 3.64 - Withdrawals and Active Mining Claims in the Gunnison Basin Population Area..............3-179
Figure 3.65 - Withdrawals and Active Mining Claims in Monticello-Dove Creek Population Area......3-180
Figure 3.66 - Withdrawals and Active Mining Claims in the Piñon Mesa Population Area ...................3-181
Figure 3.67 - Withdrawals and Active Mining Claims in the Poncha Pass Population Area ..................3-182
Figure 3.68 - Withdrawals and Active Mining Claims in the San Miguel Basin Population Area...........3-183
Figure 3.69 - ROWs and ROW Corridors in Cerro Summit-Cimarron-Sims Mesa Population Area.3-200
Figure 3.70 - ROWs and ROW Corridors in the Crawford Population Area........................................3-201
Figure 3.71 - ROWs and ROW Corridors in the Gunnison Basin Population Area ..............................3-202
Figure 3.72 - ROWs and ROW Corridors in the Monticello-Dove Creek Population Area................3-203
Figure 3.73 - ROWs and ROW Corridors in the Piñon Mesa Population Area.....................................3-204
Figure 3.74 - ROWs and ROW Corridors in the Poncha Pass Population Area ..................................3-205
Figure 3.75 - ROWs and ROW Corridors in the San Miguel Basin Population Area ...........................3-206
Figure 3.76 - Unemployment Trends, Area 1....................................................................................3-217
Figure 3.77 - Unemployment Trends, Area 2....................................................................................3-219
Figure 3.78 - Unemployment Trends, Area 3....................................................................................3-223
Figure 4.79 - Potential of Leks in the Decision Area to Be Impacted by Roads .................................4-28
Figure A.80 - Decision Area for the Cerro Summit-Cimarron-Sims Mesa Population...........................6-4
Figure A.81 - Decision Area for the Crawford Population ..................................................................6-5
Figure A.82 - Decision Area for the Gunnison Basin Population..........................................................6-6
Figure A.83 - Decision Area for the Monticello-Dove Creek Population .............................................6-7
Figure A.84 - Decision Area for the Piñon Mesa Population................................................................6-8

FIGURES AND TABLES

Figure A.85 - Decision Area for the Poncha Pass Population.................................................................. 6-9
Figure A.86 - Decision Area for the San Miguel Basin Population.........................................................6-10
Figure A.87 - Sub-Surface Decision Area for the Cerro Summit-Cimarron-Sims Mesa Population.......6-11
Figure A.88 - Sub-Surface Decision Area for the Crawford Population ...............................................6-12
Figure A.89 - Sub-Surface Decision Area for the Gunnison Basin Population.......................................6-13
Figure A.90 - Sub-Surface Decision Area for the Monticello-Dove Creek Population..........................6-14
Figure A.91 - Sub-Surface Decision Area for the Piñon Mesa Population ............................................6-15
Figure A.92 - Sub-Surface Decision Area for the Poncha Pass Population............................................6-16
Figure A.93 - Sub-Surface Decision Area for the San Miguel Basin Population.....................................6-17

## TABLES

Table 1.1 - Surface Ownership/Administration by GUSG Population Area............................................ 1-9
Table 1.2 - Acres of Federal Subsurface Minerals by Population Area................................................. 1-11
Table 1.3 - Acreage of GUSG Habitat on BLM Lands by Affected RMP............................................ 1-14
Table 2.4 - Applicable BLM Programs and Decisions to Address Issues and FWS Threats...................... 2-6
Table 2.5 - Summary of Impacted Acres by Resource Use for Each Alternative....................................2-12
Table 2.6 - Alternative A: No Action .................................................................................................2-18
Table 2.7 - Action Alternatives B, C, and D (consisting of Sub-Alternatives $D_1$ and $D_2$) ......................2-137
Table 2.8 - Summary Comparison of Environmental Consequences..................................................2-191
Table 3.9 - GUSG Population, Three-year Average 1998–2005 (CPW 2014)...................................... 3-3
Table 3.10 - GUSG Population, Three-year Average 2006–2014 (CPW 2014)............................................ 3-3
Table 3.11 - Surface Disturbance within GUSG Habitat by Land Status............................................... 3-4
Table 3.12 - LANDFIRE Habitat Types in the Planning Area Capable of Supporting GUSG................... 3-5
Table 3.13 - Surface Ownership in the Satellite Population Areas........................................................ 3-5
Table 3.14 - Surface Ownership within the Four-Mile Non-Habitat Areas ......................................... 3-6
Table 3.15 - Gunnison Basin GUSG Habitat based on LANDFIRE Data............................................ 3-8
Table 3.16 - Land Status for the Gunnison Basin Population Area ...................................................... 3-9
Table 3.17 - Surface Disturbance in the Gunnison Basin Population Area............................................ 3-9
Table 3.18 - Cerro Summit-Cimarron-Sims Mesa GUSG Habitat based on LANDFIRE Data...............3-12
Table 3.19 - Land Status for the Cerro Summit-Cimarron-Sims Mesa Population Area..........................3-12
Table 3.20 - Surface Disturbance in the Cerro Summit-Cimarron-Sims Mesa Population Area ...........3-12
Table 3.21 - Crawford GUSG Habitat based on LANDFIRE Data.....................................................3-15
Table 3.22 - Land Status for the Crawford Population Area ..............................................................3-15
Table 3.23 - Surface Disturbance in the Crawford Population Area ...................................................3-16
Table 3.24 - Monticello-Dove Creek GUSG Habitat based on LANDFIRE Data................................3-19
Table 3.25 - Surface Ownership in the Monticello-Dove Creek Population Area................................3-20
Table 3.26 - Surface Disturbance in the Monticello-Dove Creek Population Area..............................3-20
Table 3.27 - Piñon Mesa GUSG Habitat based on LANDFIRE Data.................................................3-23
Table 3.28 - Surface Ownership in the Piñon Mesa Population Area .................................................3-23
Table 3.29 - Surface Disturbance in the Piñon Mesa Population Area ................................................3-24
Table 3.30 - Poncha Pass Sage-Grouse Habitat based on LANDFIRE Data.......................................3-26

FIGURES AND TABLES

Table 3.31 - Surface Ownership in the Poncha Pass Population Area.............................................3-27
Table 3.32 - Surface Disturbance in the Poncha Pass Population Area..........................................3-28
Table 3.33 - San Miguel Basin GUSG Habitat based on LANDFIRE Data .....................................3-31
Table 3.34 - Surface Ownership in the San Miguel Population Area ..............................................3-31
Table 3.35 - Surface Disturbance in the San Miguel Population Area.............................................3-31
Table 3.36 - Fish and Wildlife Species of Primary Interest in the Decision Area .....................3-34
Table 3.37 - Soil Indicators on BLM Lands across GUSG Habitat....................................................3-68
Table 3.38 - Soil Indicators on BLM Lands within Non-Habitat Areas...........................................3-68
Table 3.39 - Vegetation Types on BLM Lands in Occupied and Unoccupied Habitat ...................3-73
Table 3.40 - Vegetation Types on BLM Lands within Non-Habitat Areas........................................3-74
Table 3.41 - Vegetation Conditions on BLM Lands in Occupied and Unoccupied Habitat.................3-75
Table 3.42 - Vegetation Conditions on BLM Lands within Non-Habitat Areas ..............................3-76
Table 3.43 - Riparian and Wetland Areas on BLM Lands in Occupied and Unoccupied Habitat...........3-80
Table 3.44 - Riparian and Wetland Areas on BLM Lands within Non-Habitat Areas......................3-81
Table 3.45 - Riparian Conditions on BLM Lands in Occupied and Unoccupied Habitat..........................3-82
Table 3.46 - Riparian Conditions on BLM Lands within Non-Habitat Areas .................................3-83
Table 3.47 - Noxious and Invasive Species Indicators on BLM Lands within GUSG Habitat.................3-89
Table 3.48 - Noxious and Invasive Species Indicators on BLM Lands within Non-Habitat Areas...........3-90
Table 3.49 - Wildland Fire Management Indicators on BLM Lands in GUSG Habitat...........................3-93
Table 3.50 - Wildland Fire Management Indicators on BLM Lands within Non-Habitat Areas ..............3-94
Table 3.51 - Livestock Grazing Allotments, AUMs and Concerns within BLM GUSG Habitat...............3-98
Table 3.52 - Livestock Grazing Allotments, AUMs, and Concerns in BLM Non-Habitat Areas.............3-99
Table 3.53 - Livestock Grazing Management Indicators on BLM Lands in GUSG Habitat.....................3-100
Table 3.54 - Acreage of BLM Special Recreation Management Areas by Population .............................3-107
Table 3.55 - BLM Extensive Recreation Management Areas by Population.........................................3-109
Table 3.56 - BLM Lands with GUSG Habitat Not Designated as Recreation Management Areas........3-112
Table 3.57 - Special Recreation Permits in the Decision Area .........................................................3-115
Table 3.58 - BLM Recreation Sites in the Decision Area.................................................................3-117
Table 3.59 - Miles of Road on BLM-Administered Lands within GUSG Habitat by Population.............3-125
Table 3.60 - Acres of Road on BLM-Administered Lands within GUSG Habitat by Population.............3-127
Table 3.61 - Miles of Trail on BLM-Administered Lands by GUSG Population Area .............................3-136
Table 3.62 - Acres of Trail on BLM-Administered Lands by GUSG Population Area ...........................3-137
Table 3.63 - OHV Travel Designations in the Decision Area by GUSG Population...............................3-139
Table 3.64 - Mineral Estate in GUSG Habitat and Non-Habitat by Population Area ...........................3-145
Table 3.65 - Oil and Gas Development Potential in the Decision Area .............................................3-155
Table 3.66 - Federal Fluid Mineral Acreage Closed, Open, and Leased for Oil and Gas........................3-157
Table 3.67 - Oil and Gas Leasing Allocation Decisions and Current Leases by GUSG Population ......3-160
Table 3.68 - Federal Mineral Estate Closed and Open to Leasing and Leased for Solid Minerals.........3-170
Table 3.69 - Status of Locatable Minerals in the Decision Area ......................................................3-175
Table 3.70 - Salable Minerals Status in the Decision Area...............................................................3-190
Table 3.71 - ROWs and Other Land Use Authorizations in the Decision Area ...................................3-197
Table 3.72 - ROW Exclusion and Avoidance Areas in the Decision Area.........................................3-198
Table 3.73 - Land Use Authorizations in the Decision Area ............................................................3-207
Table 3.74 - Area 1 Population Change, 2000–2012 .......................................................................3-214

FIGURES AND TABLES

Table 3.75 - Area 1 Land Ownership ..................................................................................................3-214

Table 3.76 - Area 1 Median Household Income .............................................................................3-216

Table 3.77 - Population Change in Area 2, 2000–2012..................................................................3-218

Table 3.78 - Area 2 Land Ownership ..................................................................................................3-218

Table 3.79 - Area 2 Median Household Income .............................................................................3-219

Table 3.80 - Population Change in Area 3, 2000–2012..................................................................3-220

Table 3.81 - Area 3 Land Ownership ..................................................................................................3-221

Table 3.82 - Area 3 Median Household Income .............................................................................3-222

Table 3.83 - Race and Ethnicity in the Planning Area by County...............................................3-224

Table 3.84 - Percentage of People with Income below the Poverty Level................................3-225

Table 3.85 - Area 1 Federal Mineral Production, Fiscal Year 2013.............................................3-227

Table 3.86 - Countywide Oil and Gas Production, Area 1, 2012–2014......................................3-227

Table 3.87 - Area 2 Federal Mineral Production, Fiscal Year 2013.............................................3-228

Table 3.88 - Countywide Oil and Gas Production, Area 2, 2012–2014......................................3-228

Table 3.89 - Area 3 Federal Mineral Production, Fiscal Year 2013.............................................3-228

Table 3.90 - Countywide Oil and Gas Production, Area 3 ............................................................3-229

Table 3.91 - Average Number of Billed AUMs within GUSG Habitat in Area 1, 2012–2014 ...............3-231

Table 3.92 - Average Number of Billed AUMs within GUSG Habitat in Area 2, 2012–2014 ...............3-231

Table 3.93  - Average Number of Billed AUMs within GUSG Habitat in Area 3, 2012–2014................3-232

Table 3.94 - Area 1 Recreation Visits .................................................................................................3-233

Table 3.95 - Area 2 Recreation Visits .................................................................................................3-233

Table 3.96 - Area 3 Recreation Visits .................................................................................................3-234

Table 4.97 - Reasonably Foreseeable Actions ..................................................................................... 4-7

Table 4.98 - FWS Listing Factors and Threat Potential on BLM Lands in the Decision Area ................. 4-11

Table 4.99 - Acres of BLM Surface by BLM Unit ............................................................................. 4-20

Table 4.100 - Sagebrush Decline from 1958 to 1993 ...................................................................... 4-21

Table 4.101 - GUSG Habitat Characteristics in Non-Habitat ....................................................... 4-26

Table 4.102 - Supportable Deer Density Estimates ........................................................................ 4-48

Table 4.103 - Supportable Elk Density Estimates ............................................................................ 4-48

Table 4.104 - Oil and Gas Leasing by Population Area ................................................................. 4-149

Table 4.105 - Solid Mineral Leasing on Federal Mineral Estate in Decision Area....................4-155

Table 4.106 - Status of Locatable Minerals in the Decision Area ..............................................4-160

Table 4.107 - Mineral Estate in GUSG Occupied and Unoccupied Habitat.............................4-164

Table 5.108 - Agencies and Tribes Invited to Participate as Cooperating Agencies .................. 5-4

Table 5.109 - Public Scoping Meetings ..............................................................................................5-12

Table 5.110 - Comments by Resource or Planning Issue ..............................................................5-15

Table 5.111 - Contributors to the Draft RMP Amendment/Draft EIS .......................................5-17

Table A.112 - Data Sources for the Draft RMP Amendment/Draft EIS ...................................... 6-2

Table F.113 - Delta County, Colorado Employment by Industry................................................6-160

Table F.114 - Dolores County, Colorado Employment by Industry ..........................................6-161

Table F.115 - Gunnison County, Colorado Employment by Industry .......................................6-162

Table F.116 - Hinsdale County, Colorado Employment by Industry..........................................6-163

Table F.117 - Mesa County, Colorado Employment by Industry ...............................................6-164

Table F.118 - Montrose County, Colorado Employment by Industry.......................................6-165

FIGURES AND TABLES

Table F.119 - Ouray County, Colorado Employment by Industry ................................................. 6-166
Table F.120 - Saguache County, Colorado Employment by Industry .......................................... 6-167
Table F.121 - San Miguel County, Colorado Employment by Industry ....................................... 6-168
Table F.122 - Grand County, Utah Employment by Industry ...................................................... 6-169
Table F.123 - San Juan County, Utah Employment by Industry .................................................. 6-170

# ABBREVIATIONS AND ACRONYMS

The following abbreviations and acronyms are used throughout this document.

| COMMON ABBREVIATIONS/ ACRONYMS | COMPLETE PHRASE |
| --- | --- |
| ACEC | Area of Critical Environmental Concern |
| AMP | Allotment Management Plan |
| APD | Application for Permit to Drill |
| ATV | all-terrain vehicle |
| AUM | animal unit month |
| BA | Biological Assessment |
| BLM | Bureau of Land Management |
| BMP | best management practice |
| BO | Biological Opinion |
| BOR | Bureau of Reclamation |
| BRCW | Black Ridge Canyons Wilderness (designated Wilderness within McInnis Canyons NCA) |
| CCA | Candidate Conservation Agreement |
| CCAA | Candidate Conservation Agreement with Assurances |
| CCNCA | Colorado Canyons NCA (former title for McInnis Canyons NCA) |
| CCR | Colorado Code of Regulations |
| CEQ | Council on Environmental Quality |
| CFR | Code of Federal Regulations |
| COA | Conditions of Approval |
| CPW | Colorado Parks and Wildlife (previously Colorado Division of Wildlife) |
| CSU | Controlled Surface Use |
| dBA | A-Weighted Decibel |
| DEIS | Draft Environmental Impact Statement |
| DOE | U.S. Department of Energy |
| DOI | U.S. Department of the Interior |
| DRMP Amendment | Draft Resource Management Plan Amendment |

ABBREVIATIONS AND ACRONYMS

| COMMON ABBREVIATIONS/ ACRONYMS | COMPLETE PHRASE |
|---|---|
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EPA | U.S. Environmental Protection Agency |
| ERMA | Extensive Recreation Management Area |
| ESA | Endangered Species Act of 1973 |
| FAR | Functional at Risk |
| FLPMA | Federal Land Policy and Management Act of 1976 |
| FO | Field Office |
| FRCC | Fire Regime Condition Class |
| FRN | Federal Register Notice |
| FWS | U.S. Fish and Wildlife Service |
| GIS | Geographic Information Systems |
| GUSG | Gunnison Sage-Grouse |
| IM | Instruction Memorandum |
| LN | Lease Notice |
| LUP | land use plan |
| MOU | Memorandum of Understanding |
| MS | BLM Manual Section |
| NCA | National Conservation Area |
| NEPA | National Environmental Policy Act of 1969 |
| NF | Non Functional |
| NM | National Monument |
| NPS | U.S. National Park Service |
| NRCS | National Resources Conservation Service |
| NSO | No Surface Occupancy |
| OHV | Off-Highway Vehicle |
| PCE | Primary Constituent Element |
| PFC | proper functioning condition |
| RAC | Resource Advisory Council |
| RCP | Rangewide Conservation Plan |

ABBREVIATIONS AND ACRONYMS

| COMMON ABBREVIATIONS/ ACRONYMS | COMPLETE PHRASE |
|---|---|
| RMP | Resource Management Plan |
| RMP Amendment | Resource Management Plan Amendment |
| ROD | Record of Decision |
| ROW | right-of-way |
| SRMA | Special Recreation Management Area |
| SRP | Special Recreation Permit |
| SSR | Site-Specific Relocation |
| SSS | Special Status Species |
| TL | timing limitation |
| TMP | travel management plan |
| UDWR | Utah Division of Wildlife Resources |
| U.S. | United States |
| USC | United States Code |
| USFS | U.S. Forest Service |
| VCC | vegetation condition class |
| WEM | waiver, exception, or modification |
| WO | Washington Office |
| WSA | Wilderness Study Area |
| WSR | Wild and Scenic Rivers |

# 1. INTRODUCTION

The United States (U.S.) Department of the Interior (DOI) Bureau of Land Management (BLM) has prepared this Draft Resource Management Plan (RMP) Amendment and Draft Environmental Impact Statement (EIS) in order to analyze alternative approaches to contribute to the conservation of, and implement actions to assist with the recovery of, the Gunnison Sage-Grouse (GUSG) *(Centrocercus minimus)* and its habitat. The BLM proposes to incorporate goals, objectives, and management actions for the benefit of the GUSG and its habitat into approved resource management plans (RMPs) across the range of the species. This amendment will govern the allocation and administration (including use, protection, and enhancement) of resources, resource uses, and special management areas relevant to the GUSG and GUSG habitat, potentially amending land use plan decisions in up to eleven BLM RMPs currently in use.

A Draft EIS has been prepared in association with the Draft RMP Amendment and incorporated into this document. The EIS is a tool for decision-making required for any federal agency action significantly affecting the quality of the human environment. The EIS analyzes and describes the positive and negative environmental effects of the alternative approaches to conservation of the GUSG.

Draft decisions in this document apply only to BLM-administered public surface lands and subsurface mineral estate. Lands within the planning area administered by other Federal agencies (including the U.S. Forest Service [USFS], U.S. Fish and Wildlife Service [FWS], and National Park Service [NPS]) and state agencies (such as the Colorado and Utah state land boards), along with actions that are the administrative responsibility of other agencies (such as county roads), are not the subject of this planning effort. In addition, planning decisions in this RMP Amendment do not pertain to private lands, with the exception of federal minerals that lie beneath private surface (known as split estate).

# 1.1. BACKGROUND

## 1.1.1. GUNNISON SAGE-GROUSE

The GUSG *(Centrocercus minimus)* is a ground-dwelling bird species with a current range limited to seven scattered populations in southwest Colorado and southeast Utah—approximately 7% (FWS 2010a) of its recognized historical range in southwest Colorado, southeast Utah, northeast Arizona, and northern New Mexico (RCP 2005 and FWS 2014b, c). The GUSG is designated as a sensitive species by the State of Utah and labeled as a species of special concern by the State of Colorado.

In January 2013, the U.S. Fish and Wildlife Service (FWS) proposed to list the GUSG as endangered under the Endangered Species Act (ESA) (FWS 2013a) and to designate critical habitat for the species (FWS 2013b). On November 20, 2014, the FWS published a final rule in the Federal Register listing the GUSG as a threatened species (FWS 2014b), as well as a final rule designating critical habitat for the bird (FWS 2014c). The FWS determined that the most substantial threats to the GUSG currently and in the future include habitat decline due to human disturbance, small population size and structure, drought, climate change, and disease.

## 1.1.2. BLM LAND USE PLANNING REQUIREMENT

### PLAN AMENDMENTS

The Federal Land Policy and Management Act of 1976 (FLPMA) directs the BLM to develop and periodically revise or amend its RMPs to ensure that goals and actions reflect current policies and conditions. Per 43 Code of Federal Regulations (CFR) 1610.5-5, RMP amendments change one or more of the terms, conditions, or decisions of an approved land use plan, including decisions related to desired outcomes and measures to achieve desired outcomes. RMP amendments are most often prompted by the need to:

- Consider a proposal or action that does not conform to the plan;
- Implement new or revised policy that changes land use plan decisions, such as an approved conservation agreement between the BLM and the FWS;
- Respond to new, intensified, or changed uses on public land; or
- Consider significant new information from resource assessments, monitoring, or scientific studies that change land use plan decisions.

BLM regulations in 43 CFR 1600 and CEQ NEPA regulations in 40 CFR 1500 guide the preparation of plan amendments. RMPs requiring amendment may be grouped geographically or by type of decision in the same amendment process. Similarly, one amendment process may amend the same or related decisions in more than one land use plan. When preparing an associated EIS, the amending process follows the same procedure required for the preparation and approval of the plan, but consideration shall be limited to that portion of the plan being considered for amendment. If several plans are being amended simultaneously, a single EIS may be prepared to cover all amendments.

## 1.1.3. PURPOSE AND NEED

### PURPOSE

This land use plan amendment provides a framework for conserving and assisting with the recovery of the Gunnison Sage-Grouse and for conserving and restoring habitat upon which the species depends on BLM-administered public lands across the range of the bird. The Endangered Species Act requires agencies to ensure that their actions are not likely to jeopardize the continued existence of a listed species or result in the adverse modification or destruction of critical habitat for a listed species. In meeting this requirement, the BLM will strive to integrate management objectives and actions that promote recovery of the Gunnison Sage-Grouse with the agency's responsibility to allow for appropriate public land uses that enhance the economic stability of local communities in accordance with the multiple use and sustained yield direction set forth in the Federal Land Policy and Management Act of 1976.

### NEED

ESA Section 7(a)(1) requires the BLM to use its authorities to further the purposes of the ESA by implementing programs for the conservation of federally listed species and the ecosystems upon which they depend. The BLM conducted plan evaluations in accordance with its planning regulations, which require that RMPs "shall be revised as necessary based on …, new data, new or revised policy …" (43 CFR 1610.5-6). These evaluations concluded that a plan amendment is necessary to address the changed circumstances and new information resulting from the 2014 FWS listing of the GUSG as "threatened" under the Endangered Species Act.



Figure 1.1 - Decision Area for the GUSG Rangewide RMP Amendment/EIS

CHAPTER 1 - INTRODUCTION

# 1.2.   THE PLANNING AREA

## 1.2.1.   GUSG RMP AMENDMENT PLANNING AREA

As stated in the BLM Land Use Planning Handbook H-1601-1 (2010), the planning area is the geographic boundary within which the BLM makes decisions during a planning effort.  When appropriate, BLM State Directors may establish regional planning areas that encompass several field offices and/or states.  A planning area boundary includes all lands regardless of jurisdiction.  However, the BLM will only make decisions on lands that fall under the BLM's jurisdiction (as detailed in the description of decision areas below).  Lands within the planning area administered by other state and federal agencies or under private ownership are not the subject of this planning effort, with the exception of federal minerals beneath public and private surface lands.

The planning area for the GUSG Rangewide Draft RMP Amendment/Draft EIS consists of lands within the boundaries of the following BLM Colorado and Utah field offices, national monuments, and national conservation areas, and the decisions made through this RMP Amendment/EIS have the potential to affect the associated RMPs for these units:

**BLM Colorado**

- Canyons of the Ancients NM (Canyons of the Ancients NM RMP)
- Dominguez-Escalante NCA (Dominguez-Escalante NCA RMP)
- Grand Junction FO (Grand Junction FO RMP)
- Gunnison Gorge NCA (Gunnison Gorge NCA RMP)
- Gunnison FO (Gunnison Resource Area RMP)
- McInnis Canyons NCA (McInnis Canyons NCA RMP)
- San Luis Valley FO (San Luis Resource Area RMP)
- Tres Rios FO (Tres Rios FO RMP)
- Uncompahgre FO (San Juan/San Miguel RMP and Uncompahgre Basin RMP)

**BLM Utah**

- Moab FO (Moab FO RMP)
- Monticello FO (Monticello FO RMP).

The planning area includes BLM-administered lands not allocated as GUSG habitat. This RMP Amendment does not establish any additional management for these lands, and each would continue to be managed in accordance with the existing underlying BLM land use plan for that area.

## 1.2.2.   GUSG RMP AMENDMENT DECISION AREAS

The decision area is the geographic boundary within which a BLM planning decision will apply, and the specific lands within that boundary to which the decision applies. Decisions in this amendment apply only to lands for which the BLM has authority (jurisdiction) to make land use and management decisions (shown in Figure 1.1). As a general rule, the BLM has jurisdiction over public lands, including federal surface lands and subsurface mineral estate, administered by the BLM for the Secretary of the Interior (see the glossary definition of Public Lands). In split estate situations (where the surface land is owned by a non-federal entity, such as a state trust or private owner, and the federal subsurface mineral estate is administered by the BLM), jurisdiction pertains only to the federal subsurface mineral estate. Decision areas are limited in geographic scope to encompass only the area relevant to the analysis and do not extend beyond the planning area.

The decision areas in this amendment consist of specified GUSG Occupied Habitat, GUSG Unoccupied Habitat, and Non-Habitat Areas. A decision may apply to more than one decision area. Surface and subsurface maps depicting Occupied Habitat, Unoccupied Habitat, and Non-Habitat Areas for each GUSG population are included in the map section in Appendix A.

## OCCUPIED HABITAT

Occupied Habitat, as defined in this Draft RMP Amendment, consists primarily, but not exclusively, of occupied critical habitat designated by the FWS under the ESA. Occupied Habitat supplements occupied critical habitat as necessary to meet the purpose and need of this action and comply with the multiple use and sustained yield mandate of the BLM. In the Draft RMP Amendment, BLM Occupied Habitat supplements FWS-designated occupied critical habitat as follows:

- Occupied Habitat includes a small area of occupied habitat (as defined and delineated by Colorado Parks and Wildlife [CPW]) and an area of vacant/unknown habitat on BLM lands supporting the Crawford Population of GUSG that are not included in FWS-designated critical occupied habitat.
- The Poncha Pass population area is included as Occupied Habitat in the Draft RMP Amendment. Although included in their proposed designation of occupied critical habitat and identified as containing "the physical and biological features essential to the conservation of the Gunnison sagegrouse" (FWS 2013a), the FWS did not include the Poncha Pass Unit in their final designation, as they concluded that the "Poncha Pass area, for reasons unknown, is not a landscape capable of supporting a population of Gunnison sage-grouse and therefore does not meet primary constituent element (PCE)

CHAPTER 1 - INTRODUCTION

1."  However, the Poncha Pass area is currently occupied by GUSG and the BLM will treat it as Occupied Habitat until a recovery plan identifying FWS goals for the Poncha Pass Population have been completed.

- Occupied Habitat includes specific properties coinciding with BLM-administered federal minerals that the FWS excluded from the critical habitat designation.  While private lands with conservation easements were removed from critical habitat, conservation easements do not apply to the federal mineral estate.  These areas are included in the RMP Amendment in order to identify and prescribe management for the federal mineral estate.

For purposes of this Draft RMP Amendment, Occupied Habitat includes only BLM-administered surface lands and subsurface minerals.  Lands occupied by GUSG but not administered by the BLM are not included within the definition of Occupied Habitat and are not subject to the decisions adopted in this Draft RMP Amendment, but are considered in the analysis of alternatives, as appropriate.

## UNOCCUPIED HABITAT

Unoccupied critical habitat, as designated by the FWS under the ESA, forms the extent of Unoccupied Habitat.  Unoccupied critical habitat consists of specific areas outside of those occupied by GUSG at the time of the listing that are determined to be essential for the conservation of the species (16 USC § 1532 (5), (A), (ii)).

For purposes of this Draft RMP Amendment, Unoccupied Habitat includes only BLM-administered surface lands and subsurface minerals.  BLM decisions do not apply to Unoccupied Habitat on private land or on lands managed by other government organizations.  When conducting an analysis, all Unoccupied Habitat is included.

## NON-HABITAT AREAS WITHIN FOUR MILES OF A LEK

Disruptive activities occurring outside of Occupied or Unoccupied Habitat have the potential to affect GUSG or GUSG habitat.  As outlined in Table 2.7, Alternative B identifies management prescriptions to address potential disruptive activities occurring within four miles of a lek in Non-Habitat Areas adjacent to Occupied and/or Unoccupied Habitat.

Physical (natural) and human-constructed features and vegetative characteristics on the landscape can prevent otherwise disruptive activities from affecting GUSG or its habitat.  In order to assess these situations, a matrix would be developed at the implementation level by the FWS in cooperation with the BLM, state fish and game agencies, and other cooperating agencies to assist the BLM in determining whether a

proposed action could disrupt GUSG or GUSG habitat or if potential disruptive activities could be prevented due to site-specific conditions. If project analysis establishes that an activity would be disruptive or does not determine with certainty whether disruption could be effectively prevented, then the appropriate management prescriptions (outlined in Table 2.7) would apply. If it is clearly established that no disruption would result, then the specific management prescriptions would not be applicable. When a clear determination cannot be made, the parties would revise the matrix as necessary to provide greater clarity.

The management prescriptions for Non-Habitat Areas would pertain only to disruptive activities on BLM-administered surface lands and sub-surface minerals within four miles of a lek and adjacent to Occupied and/or Unoccupied Habitat.

## 1.2.3. PLANNING AREA BY GUSG POPULATION

GUSG habitat is predominantly non-contiguous—separated by natural geographic barriers and human development. Because of the disconnected nature of the habitat, the GUSG is described as occurring within seven distinct populations (with five of these primarily located within Colorado and two extending into Utah):

- Cerro Summit-Cimarron-Sims Mesa
- Crawford
- Gunnison Basin
- Monticello-Dove Creek
- Piñon Mesa
- Poncha Pass
- San Miguel Basin

Delineating the GUSG by population enables the BLM to better analyze variations in habitat, threats, and impacts throughout the decision area, and identify appropriate responses to these different populations and habitat issues. The population approach also provides a natural starting point from which to evaluate issues related to habitat fragmentation.

Table 1.1 provides acreages and percentages of BLM, state, local, private, and other federal lands within each of the seven GUSG population areas, while Table 1.2 provides the acreages of federal subsurface minerals within each of the population areas.

CHAPTER I - INTRODUCTION

**Table 1.1 - Surface Ownership/Administration by GUSG Population Area**

| GUSG POPULATION AREA | BLM Acres | BLM % | LOCAL Acres | LOCAL % | NPS Acres | NPS % | OTHER Acres | OTHER % | PRIVATE Acres | PRIVATE % | STATE Acres | STATE % | USFS Acres | USFS % | TOTAL Acres |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cerro Summit-Cimarron-Sims Mesa** | **20,815** | **16%** | **7,032** | **5%** | **4,500** | **4%** | **0** | **0%** | **95,750** | **75%** | **0** | **0%** | **369** | **0%** | **128,466** |
| Occupied | 4,380 | 12% | 4,336 | 12% | 362 | 1% | 0 | 0% | 28,064 | 76% | 0 | 0% | 0 | 0% | 37,142 |
| Unoccupied | 5,011 | 26% | | 0% | 6 | 0% | 0 | 0% | 14,353 | 74% | 0 | 0% | 0 | 0% | 19,370 |
| Non-Habitat | 11,425 | 16% | 2,696 | 4% | 4,132 | 6% | 0 | 0% | 53,333 | 74% | 0 | 0% | 369 | 1% | 71,955 |
| **Crawford** | **33,955** | **28%** | **0** | **0%** | **17,331** | **14%** | **0** | **0%** | **69,562** | **57%** | **0** | **0%** | **2,190** | **2%** | **123,039** |
| Occupied | 22,150 | 63% | 0 | 0% | 4,402 | 13% | 0 | 0% | 8,444 | 24% | 0 | 0% | 0 | 0% | 34,996 |
| Unoccupied | 10,324 | 13% | 0 | 0% | 7,023 | 9% | 0 | 0% | 60,738 | 76% | 0 | 0% | 2,190 | 3% | 80,274 |
| Non-Habitat | 1,481 | 19% | 0 | 0% | 5,907 | 76% | 0 | 0% | 380 | 5% | 0 | 0% | 0 | 0% | 7,768 |
| **Gunnison Basin** | **378,003** | **46%** | **12,524** | **2%** | **20,509** | **2%** | **0** | **0%** | **264,048** | **32%** | **4,366** | **1%** | **143,491** | **17%** | **822,942** |
| Occupied | 302,024 | 50% | 9,880 | 2% | 9,430 | 2% | 0 | 0% | 187,761 | 31% | 3,205 | 1% | 92,724 | 15% | 605,026 |
| Unoccupied | 63,972 | 47% | 0 | 0% | 7,407 | 5% | 0 | 0% | 53,034 | 39% | 414 | 0% | 12,181 | 9% | 137,009 |
| Non-Habitat | 12,007 | 15% | 2,643 | 3% | 3,671 | 5% | 0 | 0% | 23,252 | 29% | 747 | 1% | 38,586 | 48% | 80,907 |
| **Monticello-Dove Creek** | **69,788** | **17%** | **5** | **0%** | **0** | **0%** | **4** | **0%** | **335,021** | **82%** | **1,156** | **0%** | **944** | **0%** | **406,919** |
| Occupied | 8,483 | 8% | 0 | 0% | 0 | 0% | 0 | 0% | 102,864 | 92% | 922 | 0% | 0 | 0% | 112,269 |
| Unoccupied | 35,904 | 15% | 5 | 0% | 0 | 0% | 0 | 0% | 199,918 | 85% | 0 | 0% | 48 | 0% | 235,877 |
| Non-Habitat | 25,400 | 43% | 0 | 0% | 0 | 0% | 4 | 0% | 32,239 | 55% | 235 | 0% | 896 | 2% | 58,774 |
| **Piñon Mesa** | **137,111** | **45%** | **0** | **0%** | **0** | **0%** | **25** | **0%** | **111,526** | **37%** | **916** | **0%** | **55,021** | **18%** | **304,598** |
| Occupied | 12,686 | 29% | 0 | 0% | 0 | 0% | 0 | 0% | 30,689 | 70% | 0 | 0% | 729 | 2% | 44,104 |
| Unoccupied | 97,795 | 49% | 0 | 0% | 0 | 0% | 25 | 0% | 60,845 | 30% | 0 | 0% | 42,698 | 21% | 201,363 |

CHAPTER 1 - INTRODUCTION

| GUSG POPULATION AREA | BLM | | LOCAL | | NPS | | OTHER | | PRIVATE | | STATE | | USFS | | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Non-Habitat | 26,629 | 45% | 0 | 0% | 0 | 0% | 0 | 0% | 19,992 | 34% | 916 | 2% | 11,594 | 20% | 59,131 |
| **Poncha Pass** | **25,500** | **39%** | **0** | **0%** | **0** | **0%** | **0** | **0%** | **16,642** | **26%** | **2,083** | **3%** | **20,347** | **32%** | **64,571** |
| Occupied | 9,860 | 48% | 0 | 0% | 0 | 0% | 0 | 0% | 4,875 | 24% | 478 | 2% | 5,214 | 26% | 20,428 |
| Unoccupied | 14,877 | 53% | 0 | 0% | 0 | 0% | 0 | 0% | 11,225 | 40% | 1,605 | 6% | 187 | 1% | 27,894 |
| Non-Habitat | 763 | 5% | 0 | 0% | 0 | 0% | 0 | 0% | 541 | 3% | 0 | 0% | 14,945 | 92% | 16,249 |
| **San Miguel Basin** | **76,568** | **29%** | **8,686** | **3%** | **0** | **0%** | **0** | **0%** | **140,304** | **52%** | **6,956** | **3%** | **35,328** | **13%** | **267,842** |
| Occupied | 35,879 | 35% | 8,357 | 8% | 0 | 0% | 0 | 0% | 52,458 | 52% | 3,437 | 3% | 1,466 | 1% | 101,597 |
| Unoccupied | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 29,094 | 70% | 0 | 0% | 12,393 | 30% | 41,488 |
| Non-Habitat | 40,689 | 33% | 329 | 0% | 0 | 0% | 0 | 0% | 58,752 | 47% | 3,519 | 3% | 21,469 | 17% | 124,757 |
| **Total Acres** | **741,740** | **35%** | **28,247** | **1%** | **42,340** | **2%** | **29** | **0%** | **1,032,853** | **49%** | **15,477** | **1%** | **257,691** | **12%** | **2,118,377** |

CHAPTER 1 - INTRODUCTION

## Table 1.2 - Acres of Federal Subsurface Minerals by Population Area

| GUSG POPULATION AREA | ALL MINERALS | COAL ONLY | OIL AND GAS ONLY | OIL, GAS AND COAL ONLY | OTHER | TOTAL |
|---|---|---|---|---|---|---|
| **Cerro Summit-Cimarron-Sims Mesa** | **59,277** | **11,264** | **643** | **177** | **0** | **71,361** |
| Occupied | 15,110 | 3,136 | 171 | 137 | 0 | 18,554 |
| Unoccupied | 11,261 | 0 | 127 | 0 | 0 | 11,388 |
| Non-Habitat | 32,906 | 8,128 | 346 | 39 | 0 | 41,419 |
| **Crawford** | **72,657** | **0** | **128** | **36** | **167** | **72,989** |
| Occupied | 31,781 | 0 | 0 | 0 | 0 | 31,781 |
| Unoccupied | 33,277 | 0 | 128 | 36 | 0 | 33,442 |
| Non-Habitat | 7,598 | 0 | 0 | 0 | 167 | 7,765 |
| **Gunnison Basin** | **633,509** | **894** | **684** | **0** | **6,287** | **641,375** |
| Occupied | 454,701 | 569 | 684 | 0 | 4,103 | 460,057 |
| Unoccupied | 110,485 | 0 | 0 | 0 | 2,127 | 112,612 |
| Non-Habitat | 68,323 | 326 | 0 | 0 | 56 | 68,705 |
| **Monticello-Dove Creek** | **76,922** | **509** | **33,548** | **0** | **8,286** | **119,265** |
| Occupied | 8,782 | 309 | 10,175 | 0 | 4,217 | 23,174 |
| Unoccupied | 40,015 | 0 | 20,916 | 0 | 2,509 | 63,741 |
| Non-Habitat | 28,125 | 200 | 2,457 | 0 | 1,569 | 32,350 |
| **Piñon Mesa** | **230,301** | **0** | **445** | **0** | **44** | **230,790** |
| Occupied | 25,769 | 0 | 41 | 0 | 0 | 25,810 |
| Unoccupied | 158,442 | 0 | 143 | 0 | 44 | 158,629 |
| Non-Habitat | 46,090 | 0 | 261 | 0 | 0 | 46,351 |
| **Poncha Pass** | **47,660** | **0** | **0** | **0** | **306** | **47,966** |
| Occupied | 16,382 | 0 | 0 | 0 | 85 | 16,468 |
| Unoccupied | 15,800 | 0 | 0 | 0 | 0 | 15,800 |
| Non-Habitat | 15,478 | 0 | 0 | 0 | 220 | 15,698 |
| **San Miguel Basin** | **156,394** | **0** | **2,386** | **0** | **6,511** | **165,290** |
| Occupied | 65,082 | 0 | 1,325 | 0 | 364 | 66,771 |
| Unoccupied | 8,320 | 0 | 0 | 0 | 5,297 | 13,617 |
| Non-Habitat | 82,991 | 0 | 1,061 | 0 | 850 | 84,902 |
| **Total Acreage** | **1,276,720** | **12,667** | **37,835** | **213** | **21,600** | **1,349,036** |

CHAPTER 1 - INTRODUCTION

## 1.2.4.  BLM RMPs POTENTIALLY AMENDED BY THIS ACTION

The following BLM RMPs currently in use within the planning area have the potential to be amended by this RMP Amendment:

## BLM COLORADO PLANS

### Canyons of the Ancients NM RMP

The Canyons of the Ancients NM RMP was issued in June 2010.  Canyons of the Ancients NM operates under this plan and contains Unoccupied Habitat supporting the Monticello-Dove Creek GUSG Population.

### Dominguez-Escalante NCA RMP

The draft Dominguez-Escalante NCA RMP was released in April 2013 and the final plan is expected to be issued in 2016.  Dominguez-Escalante NCA is co-administered by the Grand Junction FO under the Grand Junction FO RMP and the Uncompahgre FO under the Uncompahgre Basin RMP and contains Unoccupied Habitat in the Piñon Mesa GUSG Population.

### Grand Junction FO RMP

The approved Grand Junction RMP revision was signed in August of 2015. The Grand Junction FO operates under this plan and it contains habitat supporting the Piñon Mesa GUSG Population.

### Gunnison Gorge NCA RMP

The Gunnison Gorge NCA Approved RMP and ROD was issued in November 2004.  Gunnison Gorge NCA is administered by the Uncompahgre FO under this plan and contains habitat supporting the Crawford GUSG Population.

### Gunnison Resource Area RMP

The Gunnison Resource Area RMP was issued in February 1993.  The Gunnison FO operates under this plan and provides habitat for two GUSG populations: the Cerro Summit-Cimarron-Sims Mesa Population and the Gunnison Basin Population.

### McInnis Canyons NCA RMP

The McInnis Canyons (formerly Colorado Canyons) NCA and Black Ridge Canyons Wilderness RMP and ROD was issued in September 2004.  McInnis Canyons NCA is administered by the Grand Junction FO under this plan and contains habitat supporting the Piñon Mesa GUSG Population.

CHAPTER 1 - INTRODUCTION

### San Juan/San Miguel RMP

The San Juan/San Miguel RMP was issued in 1985.  A portion of the Uncompahgre FO operates under this plan and contains habitat supporting the San Miguel Basin GUSG Population.  This portion of BLM-administered land is included in the planning area for the Uncompahgre RMP, and the approved RMP is expected to be issued in late 2017.

### San Luis Resource Area RMP

The San Luis Resource Area ROD and Approved RMP was issued in December 1991.  The San Luis Valley FO contains habitat supporting the Poncha Pass GUSG Population.  In addition, the FO manages habitat supporting the Poncha Pass Population within the Royal Gorge FO.

### Tres Rios FO RMP

The Tres Rios FO RMP was issued in February 2015.  The Tres Rios FO provides habitat for two GUSG populations:  the Monticello-Dove Creek Population (with the Dove Creek sub-population predominantly within the Tres Rios FO) and the San Miguel Basin Population.

### Tres Rios FO Areas of Critical Environmental Concern (ACEC) RMP Amendment

The BLM is preparing an RMP Amendment and associated Environmental Assessment (EA) for the Tres Rios FO (DOI-BLM-CO-S010-2016-0018-EA).  The EA will evaluate and consider management prescriptions for eighteen potential ACECs.  Two of the proposed ACECs (Dry Creek Basin and Northdale) meet the relevance and importance criteria for GUSG conservation.

The proposed range of alternatives and management prescriptions prepared for the Tres Rios FO RMP ACEC Amendment would be consistent with the GUSG planning effort. Protection of identified relevance and importance values will be considered during project-level analysis of any management actions or project proposals.

Additionally, Alternative B in this document analyzes an ACEC for all GUSG Occupied and Unoccupied Habitat, which overlaps the Dry Creek Basin and Northdale ACECs proposed in the Tres Rios FO RMP ACEC Amendment.

### Uncompahgre Basin RMP

The Uncompahgre Basin RMP and ROD was issued in July 1989.  A significant portion of the Uncompahgre FO operates under this plan and provides habitat for four GUSG populations:  the Cerro Summit-Cimarron-Sims Mesa Population (with the Sims Mesa sub-population entirely within the Uncompahgre FO), the Crawford Population, the Gunnison Basin Population, and the Piñon Mesa Population.  This

CHAPTER 1 - INTRODUCTION

portion of the field office is included in the planning area for the Uncompahgre RMP. The Draft Uncompahgre RMP was issued in May 2016, and the approved RMP is expected to be issued in late 2017.

If the GUSG RMP Amendment is issued prior to the revised Uncompahgre RMP, then it would amend the existing Uncompahgre Basin RMP (as well as the San Juan/San Miguel RMP) for lands in the Uncompahgre RMP planning area. Analysis from the GUSG EIS would be incorporated by reference into the Uncompahgre Proposed RMP/Final EIS, and decisions made in the GUSG Approved RMP Amendment/ROD would be carried forward to the Uncompahgre Approved RMP/Record of Decision. However, if the revised Uncompahgre RMP is issued first, then the GUSG RMP Amendment could require amendment of the Uncompahgre RMP.

## BLM UTAH PLANS

### Moab FO RMP

The Moab FO ROD and Approved RMP was issued in October 2008. The Moab FO operates under this plan and contains habitat supporting the Piñon Mesa GUSG Population.

### Monticello FO RMP

The Monticello FO ROD and Approved RMP was issued in November 2008. The Monticello FO operates under this plan and contains habitat supporting the Monticello-Dove Creek GUSG Population (with the Monticello sub-population predominantly within the Monticello FO).

Table 1.3 provides the acreages of Occupied Habitat, Unoccupied Habitat, and Non-Habitat Areas within Four Miles of a Lek for each of the potentially affected RMPs.

**Table 1.3 - Acreage of GUSG Habitat on BLM Lands by Affected RMP**

| AFFECTED RMP | SURFACE ACRES | | | SUB-SURFACE ACRES | | |
|---|---|---|---|---|---|---|
| | Occupied Habitat | Unoccupied Habitat | Non-Habitat Areas | Occupied Habitat | Unoccupied Habitat | Non-Habitat Areas |
| Canyons of the Ancients NM RMP | – | 4,042 | – | – | 4,079 | – |
| Dominguez-Escalante NCA RMP | – | – | – | – | – | – |
| Grand Junction FO RMP | 12,335 | 71,889 | 12,676 | 25,460 | 128,339 | 32,892 |
| Gunnison Gorge NCA RMP | 22,148 | 5,491 | 1,481 | 27,383 | 12,263 | 1,861 |
| Gunnison Resource Area RMP | 302,349 | 65,000 | 13,391 | 461,052 | 108,748 | 73,983 |
| McInnis Canyons NCA RMP | 351 | 21,575 | 181 | 350 | 20,475 | 181 |
| Moab FO RMP | – | 4,338 | 13,772 | – | 4,265 | 13,277 |

CHAPTER 1 - INTRODUCTION

| AFFECTED RMP | SURFACE ACRES | | | SUB-SURFACE ACRES | | |
|---|---|---|---|---|---|---|
| | Occupied Habitat | Unoccupied Habitat | Non-Habitat Areas | Occupied Habitat | Unoccupied Habitat | Non-Habitat Areas |
| Monticello FO RMP | 3,234 | 1,745 | 13,540 | 10,619 | 8,238 | 20,006 |
| San Juan/San Miguel RMP | 825 | – | 20,280 | 11,745 | 12,550 | 46,511 |
| San Luis Resource Area RMP | 9,742 | 14,877 | 763 | 15,750 | 15,800 | 14,970 |
| Tres Rios FO RMP | 40,308 | 30,106 | 32,269 | 67,270 | 51,416 | 44,868 |
| Uncompahgre Basin RMP | 4,057 | 8,816 | 10,041 | 21,958 | 28,957 | 41,532 |

## 1.2.5. ISSUES AND RESOURCES IDENTIFIED AND CONSIDERED BUT NOT CARRIED FORWARD

The following issues identified during public scoping are not being carried forward in this RMP Amendment/EIS for reasons that include lack of significant impacts and topics beyond the scope of the RMP Amendment:

Air Quality - Management of air quality was not identified as a key issue driving the formulation of alternatives for this RMP Amendment. While no significant changes in air quality are anticipated as a result of efforts to conserve and restore GUSG, management actions with the potential to impact air quality are addressed in this EIS.

Coal - As part of BLM land use planning, RMPs identify lands with potentially developable coal resources. There are four specific land use screening steps that are unique to developing land use planning decisions for federal coal lands. These are:

- Identification of coal with potential for development
- Determination if the lands are unsuitable for coal development
- Consideration of multiple use conflicts
- Surface owner consultation

The purpose of the coal screening portion of the land use planning process (43 CFR 3420.1-4) is to identify those federal lands that are acceptable for further consideration for coal leasing and development. Only those areas that have development potential may be identified as acceptable for further consideration for leasing. The suitability of those lands for coal leasing is then determined based upon twenty criteria listed in Section 522 of the Surface Mining Control and Reclamation Act and in 43 CFR 3461.5. Lands found suitable for coal leasing are evaluated in relation to potential multiple-use conflicts and protective measures identified in the RMP to determine whether or not coal leasing would be acceptable. No federal minerals subject to BLM administration have been identified as suitable for further consideration for coal leasing within the analysis area in the Grand Junction, draft

Uncompahgre, and Tres Rios RMPs.  Coal leasing is not mentioned in the Gunnison or San Luis RMPs.

In the Moab and Monticello FOs and their respective RMPs, no expressions of interest for coal leasing have been received and the development potential for coal resources is low.  If an interest in coal leasing were expressed, the respective RMP would be amended as appropriate and mining unsuitability criteria (43 CFR 3461) would be applied by the field office, as applicable, before any coal leases would be issued.  If issued, a coal lease would be subject to special conditions developed in the RMP and unsuitability assessment that could restrict all or certain types of mining techniques.  Before any coal could be removed, the field office would have to approve the mining permit application package, incorporating stipulations developed in the RMP.  McInnis Canyons, Dominguez-Escalante, and Gunnison Gorge NCAs and Canyon of the Ancients NM are withdrawn from coal leasing as stipulated in the enabling legislation for each area.

Cultural Resources - Management of cultural resources was not identified as a key issue driving the formulation of alternatives for this RMP Amendment.  Additionally, no significant changes to cultural resources are anticipated as a result of management actions and alternatives.  Many beneficial effects potentially accrue to cultural resources from the conservation of GUSG habitat.  There is also potential for negative impacts resulting from habitat improvement activity, vegetation management, restrictions on mitigation options (e.g. fence exclosures for protection), and the movement of development into other areas of cultural resource sensitivity (e.g. pinyon juniper vegetation zone).

Quantification of potential impacts requires knowledge of the extent of cultural resources, or at least a reasonable predictive capability.  Such knowledge or reasonable prediction capability is unavailable beyond the basic premise that cultural resources are more likely to be found in pinyon juniper vegetation (Haas, Personal Communication, 2015).  Quantification also requires the ability to estimate the proposed extent of potentially impactful management actions in quantifiable terms such as acres or percent.  The management actions and objectives relevant to cultural resources do not contain such quantitative metrics.  The combination of this lack of quantification of both the resource and the potential impacts renders quantitative analysis, and therefore estimation of significance of effects, inappropriate for this RMP Amendment.  Finally, cultural resources are protected from significant impacts as a general matter by the laws and regulations that govern impacts to them.

ESA Listing Decisions - Decisions directly associated with the listing of the GUSG under the ESA are the purview of the FWS and are not addressed in this RMP Amendment.

CHAPTER 1 - INTRODUCTION

<u>Fish and Wildlife</u> - While the GUSG is addressed in the *Special Status Species* resource sections of this EIS and three wildlife species are addressed in the *Fish and Wildlife* sections, general fish and wildlife management was not identified as a key issue to be addressed through this RMP Amendment.

<u>Hunting of GUSG</u> - The hunting of GUSG is not allowed in either Colorado or Utah. Comments related to state-regulated actions are outside the scope of this RMP Amendment.

<u>Land Tenure</u> - Land tenure is an action that has been addressed in the existing RMPs, in accordance with FLPMA. Land tenure refers to public land ownership, both disposal and acquisition. Changes in land tenure can be accomplished through direct sales, land exchanges, land purchases, and/or land donations. The existing RMPs identify specific parcels or criteria for parcels that are available for disposal. Public lands within Wilderness Areas, Wilderness Study Areas, the Canyons of the Ancients NM, and the Dominguez-Escalante, McInnis Canyons, and Gunnison Gorge NCAs are withdrawn from disposal under the public land laws.

Any land tenure actions, including disposals identified in an RMP, are subject to site-specific environmental analysis under NEPA. Land tenure adjustments must be determined to be in the public interest (FLPMA sec. 102(a)(1), 203(a), 205(b), and 206(a)) and to be in conformance with relevant laws, regulations, and policies. These include the policy as stated in BLM Manual 6840, Special Status Species Management: "the BLM shall retain in Federal ownership those habitats essential for the conservation of any listed species, particularly those that are part of a broader, logical public land ownership management unit. The BLM may dispose of lands providing habitat for listed species, including critical habitat, only following consultation with the FWS and upon a determination that such action is consistent with relevant law."

<u>Lands with Wilderness Characteristics</u> - Section 201 of FLPMA requires the BLM to maintain an inventory of all public lands and their resources and other values, including wilderness characteristics. FLPMA further provides that the preparation and maintenance of the inventory shall not, in and of itself, change or prevent change of the management or use of public lands. BLM lands identified as possessing wilderness characteristics must possess sufficient size, naturalness, and outstanding opportunities for either solitude or primitive and unconfined recreation, and may also possess supplemental values. The purpose of and need for this RMP Amendment is limited to making land use planning decisions specific to the conservation of GUSG habitat. As no decisions related to the management of lands with wilderness characteristics will be made as part of this planning effort, any discussion of lands with wilderness characteristics will be limited to the analysis of potential impacts from the management action alternatives.

CHAPTER 1 - INTRODUCTION

The BLM will conduct wilderness characteristics inventories as a part of the NEPA analysis for any site-specific projects, such as vegetation treatments, that have the potential to impact this resource. At that time, alternatives will be considered to avoid or minimize the impacts to wilderness characteristics where possible, while still meeting the purpose and need for the project.

National Heritage Areas - No National Heritage Areas are located within the planning area.

National Historic Landmarks - No National Historic Landmarks are located on BLM-managed lands within the planning area.

National Historic Trails - National Historic Trails (NHTs) closely follow historic trails or routes of travel of national significance. Branches of the Old Spanish NHT occur throughout the planning area in both Colorado and Utah. The Old Spanish NHT was an important pack trail (and a later emigration route) connecting Santa Fe and Los Angeles from 1829 to 1848. Because the trail consisted of a multitude of general corridors on which the pack strings were driven, evidence of the actual routes that define the trail are extremely rare. Management actions for the conservation of the GUSG are not expected to impact the values of the Old Spanish NHT.

National Recreation Areas (NRA) - No NRAs occur on BLM-managed lands within the planning area. Curecanti NRA, located on the Gunnison River within the planning area, is managed by the National Park Service.

National Scenic Trails - National Scenic Trails (NST) are only authorized and designated through an Act of Congress. NSTs provide maximum outdoor recreation potential and for the conservation and enjoyment of the various qualities—scenic, historical, natural, and cultural—of the areas through which they pass. In the Gunnison Basin, the BLM manages approximately one mile of the Continental Divide NST within the planning area. On BLM lands, the Continental Divide NST is located on the extreme southern edge of GUSG habitat, and management actions taken for the conservation of the GUSG are not expected to impact its values.

Oil Shale and Tar Sands - The BLM completed the Approved Land Use Plan Amendments/ROD for Allocation of Oil Shale and Tar Sands Resources on Lands Administered by the BLM in Colorado, Utah, and Wyoming and Final EIS in 2013. The Oil Shale/Tar Sands EIS analyzed the most geologically prospective oil shale areas in Colorado, Utah, and Wyoming. The ROD amended three RMPs in Colorado and four in Utah, only two of which—the 1988 Grand Junction RMP (as amended by the 2006 Roan Plateau RMP Amendment) and the 2008 Monticello

CHAPTER 1 - INTRODUCTION

RMP—overlap with the planning area. No federal oil shale or tar sands resources were made available for application for leasing in the planning area.

Paleontological Resources - The management of paleontological resources was not identified as a key issue driving the development of alternatives for this RMP Amendment. While no significant changes to paleontological resources in the planning area are anticipated as a result of efforts to conserve and restore GUSG, management actions with the potential to impact paleontological resources are addressed in this EIS.

Prime and Unique Farmlands - None of the actions proposed in this RMP Amendment were determined to have the potential to impact prime and unique farmlands (as defined by the CEQ and mapped by the Natural Resources Conservation Service) or farmlands of statewide or local importance (as mapped by state or local agencies). Irrigation is necessary for land to be classified as Prime and Unique Farmlands and BLM lands are not irrigated.

Renewable Energy Land Use Authorizations - Renewable energy includes geothermal, solar power, wind, and hydropower resources. Geothermal resources are managed as a leasable fluid mineral and are discussed in the Leasable Minerals sections of this EIS. Solar, wind, and hydropower resources are managed by the lands and realty program. The BLM completed programmatic environmental analyses and subsequent decisions for both wind energy and solar energy development. In the Programmatic EIS on Wind Energy Development (BLM 2005), none of the decision area was identified as having potential for future wind energy development. There are currently no wind energy development proposals in the planning area.

In the Approved Resource Management Plan Amendments/ROD for Solar Energy Development in Six Southwestern States (BLM 2012), the entire planning area is excluded from utility-scale solar development (projects generating 20 megawatts or greater), either through designation as an exclusion area or by being subject to exclusion criteria. There are currently no utility-scale solar energy development proposals or authorizations on public lands in the planning area.

Small-scale wind, solar, and hydropower projects would be managed by the lands and realty programs and are discussed in the Lands and Realty sections of this EIS.

Scenic, Historic, and Backcountry Byways - Several national and state scenic and/or historic byways exist within the planning area. The West Elk Loop Scenic Byway crosses three population areas: Crawford, Cerro Summit-Cimarron-Sims Mesa, and Gunnison Basin. The San Juan Skyway touches the outer southwest edge of the San Miguel Basin Population, while the Unaweep/Tabeguache Scenic Byway brushes the edges of two sub-units on the east side of the Piñon Mesa Population. The Silver Thread Scenic Byway also intersects GUSG Habitat., but is located on state

CHAPTER 1 - INTRODUCTION

highways.  Conservation of the GUSG is not expected to alter the experience of America's or Colorado/Utah designated byways and designation of additional byways is beyond the scope of this planning effort; therefore, byways are not analyzed in detail in this planning effort.

Special Status Plants - The Draft RMP Amendment does not propose the removal of any protections for listed or sensitive plant species.  BLM Manual 6840 on Special Status Species Management provides instruction on survey and protection of sensitive and listed plants.  In accordance with this manual, surveys and avoidance of special status plants would be required where GUSG conservation measures such as habitat improvements have the potential to affect them.  This standard practice, in combination with the conservation nature of this RMP Amendment, precludes the need to analyze listed and sensitive plants further in this document.

In no scenario under the Draft RMP Amendment would disturbance to a special status plant species increase; the opposite will be the case.  Under the RMP Amendment, special status plant species would receive additional protection where their range overlaps with GUSG.  Requiring no surface disturbance in order to protect GUSG and their habitat would also benefit other special status species.  Habitat treatments would focus on pinyon and juniper encroachment into sagebrush and on sagebrush restoration.  Stand type conversion of pinyon-juniper stands are not included in this amendment.

Taylor Grazing Act/National Grazing Policy - Both elimination and reduction of livestock (i.e., permitted grazing use) within GUSG habitat in the planning area are considered in different alternatives.  This is consistent with Instruction Memorandum (IM) 2012-169, RMP Alternative Development for Livestock Grazing.

Visual Resources - The management of visual resources was not identified as a key issue driving the development of alternatives for this RMP Amendment.  While no significant changes to visual resources are anticipated as a result of efforts to conserve and restore GUSG, management actions with the potential to impact visual resources are addressed in this EIS.

Water Quality - The management of water quality was not identified as a key issue driving alternatives design for this RMP Amendment.  Additionally, consideration and initial analysis of water quality did not identify reasonably foreseeable significant impacts occurring due to any of the alternatives.  Therefore, water quality was not analyzed in detail.

Wild Horse and Burro Management - No wild horses and burros or wild horse and burro herd management areas occur within the decision area.

Wild and Scenic Rivers - While no stream segments within the planning area have been designated as Wild and Scenic Rivers (WSR), both the Tres Rios and

CHAPTER 1 - INTRODUCTION

Uncompahgre FOs contain stream segments partially intersecting the planning area that have been identified as eligible or suitable for WSR designation. The RMPs for the respective offices include land use prescriptions that provide for interim protective management of river-related values. All of the alternatives under consideration in this planning effort contain land use restrictions that would be as restrictive as or more restrictive than land use prescriptions presently in effect for the stream segments. Because of the additional protections provided for river-related values along eligible and suitable stream segments under any of the alternatives and the small amount of intersection between the planning area and eligible and suitable stream segments, WSR issues are not analyzed in detail in this planning effort.

The BLM will not consider any management actions or allocations through this planning effort that would prevent the agency from managing eligible and suitable WSRs in a manner that would protect river values and ensure a decision on suitability could be made for eligible rivers, and in the case of suitable rivers, until Congress designates the segment or releases it for other uses.

<u>Wilderness/Wilderness Study Areas</u> - Four of the GUSG populations—Crawford, Gunnison Basin, Monticello-Dove Creek, and Piñon Mesa—either intersect or abut wilderness areas or wilderness study areas. Management for the conservation of GUSG in designated wilderness areas or wilderness study areas is not expected to result in measurable impacts or impair existing wilderness character. It is beyond the current authority of the BLM and the scope of this planning effort to designate new wilderness areas or wilderness study areas. The BLM will not consider any management actions or allocations through this planning effort that would prevent the agency from managing recommended wilderness areas in a manner that would preserve and protect wilderness characteristics or preclude Congress from designating wilderness areas in the future.

CHAPTER 1 - INTRODUCTION

# 1.3. PLANNING CRITERIA

## 1.3.1. ABOUT BLM PLANNING CRITERIA

Planning criteria are standards and rules used as a framework to resolve issues and develop alternatives and to ensure that decision making is tailored to the issues and the BLM avoids unnecessary data collection and analysis. Planning criteria are based on appropriate laws, regulations, and BLM manuals, handbooks, and policy directives, as well as on public participation and coordination with cooperating agencies (consisting of state, local, and other federal agencies and government entities) and Native American tribes.

## 1.3.2. CRITERIA FOR THE GUSG RMP AMENDMENT

Preliminary planning criteria were established at the start of public scoping in order to guide initial input, and have been modified as a result of feedback and new information.

The current planning criteria state that:

- The planning effort will be limited to making land use planning decisions specific to the conservation of the GUSG and its habitat. For the purposes of this planning effort, GUSG habitat may include areas in addition to those designated as critical habitat by the FWS in the final listing decision.
- Lands addressed in the RMP Amendment will consist of GUSG Occupied and Unoccupied Habitat and Non-Habitat Areas administered by the BLM. Decisions in the RMP Amendment will apply only to federal public lands and minerals administered by the BLM.
- The BLM will consider land use allocations and/or prescriptive standards to conserve GUSG habitat, as well as objectives and management actions to restore, enhance, and improve GUSG habitat.
- The BLM will use a collaborative and multi-jurisdictional approach, where appropriate, to determine the goals and objectives of public lands for the conservation of the GUSG and its habitat.
- As described by law and policy, the BLM will strive to ensure that conservation measures are as consistent as possible with other planning jurisdictions within the planning area boundary.
- The BLM will consider a reasonable range of alternatives, including appropriate management prescriptions that focus on the relative values of

resources while contributing to the conservation of the GUSG and its habitat.

- The BLM will consider GUSG conservation measures developed by or in conjunction with cooperating agencies, including county and state governments and the FWS, among others.
- The RMP Amendment will consider management actions that have been previously demonstrated as successful for GUSG conservation on private, local, state, other federal, or BLM-administered lands.
- The BLM will use the Gunnison Sage-Grouse Rangewide Conservation Plan (Rangewide Steering Committee 2005) and other appropriate resources to identify GUSG habitat requirements and best management practices (BMPs).
- The planning effort will comply with FLPMA, NEPA, CEQ regulations at 40 CFR parts 1500–1508, DOI regulations at 43 CFR part 46 and 43 CFR part 1600, BLM H-1601 Land Use Planning Handbook Appendix C: Program-Specific and Resource-Specific Decision Guidance Requirements for affected resource programs; BLM NEPA Handbook H-1790-1 (2008); and all other applicable BLM policies and guidance.
- The planning effort will recognize valid existing rights.
- The BLM will address socioeconomic impacts of the alternatives developed. Socioeconomic analyses will use an accepted input/output quantitative model such as the Impact Analysis for Planning or the Regional Input-Output Modeling System.
- The BLM will use current scientific information, research, technologies, and results of inventory, monitoring, and coordination to determine appropriate local and regional management strategies that will enhance or restore GUSG habitat.
- All activities and uses for BLM-administered lands within GUSG habitat will follow existing land health standards.  Standards and guidelines for livestock grazing and other applicable programs will be applicable to all alternatives for BLM lands.
- Resources and resource programs that do not contain specific management direction for GUSG and that may be indirectly affected by the proposed management actions will be identified and discussed only to the degree required to fully understand the range of effects of the proposed management actions.
- The BLM will consult with Native American tribes to identify sites, areas, and objectives important to their cultural and religious heritage within GUSG habitat.
- The BLM will coordinate and communicate with state, local, and tribal governments to ensure that the BLM considers provisions of pertinent plans, will seek to resolve inconsistencies between state, local, and tribal plans, and

CHAPTER 1 - INTRODUCTION

will provide ample opportunities for state, local and tribal governments to comment during development of the RMP Amendment.

- The planning effort will be based on adaptive management principles.
- The BLM will use the most current approved BLM corporate spatial data supported by current metadata to ascertain the extent and quality of GUSG habitat.  Data will be consistent with the principles of the Information Quality Act of 2001.
- The BLM will make use of data and expertise pertaining to the GUSG provided by the FWS and state wildlife agencies to the fullest extent practicable in making management determinations on federal lands.  The BLM recognizes the jurisdiction of state wildlife agencies as the primary management agencies for species not managed under the Endangered Species Act.
- The BLM will adhere to the principles of multiple use and sustained yield.
- The BLM will use a systematic interdisciplinary approach to integrate physical, biological, economic, and other sciences.

CHAPTER 1 - INTRODUCTION

# 1.4. THE PLANNING PROCESS

## 1.4.1. BLM LAND USE PLANNING PROCESS

FLPMA requires that the BLM develop and maintain RMPs as management tools by which "present and future use is projected" (43 United States Code [USC] 1701[a][2]). The implementing regulations of FLPMA for planning (43 CFR Part 1600) state that RMPs are a preliminary step in the overall process of managing BLM-administered lands and are "designed to guide and control future management actions and the development of subsequent, more detailed and limited scope plans for resources and uses" (43 CFR Part 1601.0-2). Public participation and input are important components of land use planning.

Under BLM regulations, approval of an EIS-level RMP revision or amendment is considered a major federal action that could significantly affect the quality of the human environment and therefore requires disclosure and documentation of environmental effects as described in NEPA. Thus, this EIS accompanies the amendment of the existing RMPs.

The EIS follows the format outlined in the BLM Land Use Planning Handbook H-1601-1, planning regulations at 43 CFR 1610, NEPA Handbook H-1790-1, CEQ regulations at 40 CFR 1500–1508, and DOI NEPA regulations at 43 CFR 46. The RMP Amendment and EIS are being developed in full compliance with NEPA and the planning process is being conducted in compliance with legal and policy requirements regarding public notices, required elements, distribution of draft and final documents, and specific laws.

The BLM uses a nine-step planning process to develop or revise RMPs outlined in 43 CFR Part 1600 and the BLM Land Use Planning Handbook H-1601-1 (BLM 2005d). This EIS analyzes the impacts of four alternatives for the GUSG Rangewide RMP Amendment/EIS, including a No Action Alternative. In accordance with the BLM planning handbook, portions of separate alternatives analyzed in the Draft RMP Amendment may be combined in order to formulate a comprehensive alternative for the final RMP Amendment.

Through a rangewide plan amendment effort the BLM will incorporate objectives and management actions into approved RMPs. The BLM will evaluate and adapt a suite of conservation measures based on the RCP, local GUSG conservation initiatives, current peer-reviewed research, and conservation summaries developed in conjunction with FWS and state fish and wildlife agencies.

CHAPTER I - INTRODUCTION

This planning effort is limited to actions that support conservation or recovery of the GUSG and its habitat and will be structured to incorporate adaptive management practices where appropriate in order to achieve habitat conservation, restoration, and enhancement goals.

A Scoping Report was completed prior to formulating the alternatives and preparing the Draft RMP Amendment/EIS. Public comments on the Draft RMP Amendment/EIS will be analyzed following a 90-day review period. The BLM will consider all comments prior to publishing a Proposed RMP Amendment/Final EIS. Prior to issuing a Record of Decision (ROD), the public will have an opportunity to protest the Proposed RMP Amendment and the states of Colorado and Utah will conduct Governor's Consistency Reviews.

## PLAN MAINTENANCE

Over the life of a plan, the BLM expects that new information gathered from field inventories and assessments, other agency studies, and other sources will update geographic information system (GIS) and other data (to include best management practices). To the extent that new information or actions address issues covered in the RMP Amendment, the BLM will integrate the data through plan maintenance. BLM regulations in 43 CFR 1610.5-4 provide that plan decisions and supporting actions can be maintained to reflect minor changes in data. Maintenance is limited to further refining, documenting, or clarifying a previously approved decision incorporated in the RMP Amendment. Maintenance must not expand the scope of resource uses or restrictions or change the terms, conditions, and decisions of the approved RMP Amendment.

## RELATIONSHIP TO OTHER POLICIES AND PLANS

This planning effort recognizes the many ongoing efforts to conserve the GUSG through policies and plans implemented throughout the planning area by other land managers and government agencies. The BLM will seek to be consistent with or complement other management actions in accordance with FLPMA and regulations.

# 2. ALTERNATIVES

Chapter Two details alternatives A through D (including sub-alternatives $D_1$ and $D_2$) for the GUSG Rangewide RMP Amendment/EIS, identifying management actions and where those actions would be applicable.  The draft alternatives were formulated in response to issues and concerns identified through public scoping and threats to the GUSG identified in the FWS final listing decision and in an effort to maintain or increase GUSG abundance and distribution by conserving, enhancing, or restoring the sagebrush ecosystem upon which the species depends, as well as implement actions that will lead to recovery of the species.  Decisions resulting from this RMP Amendment would apply to federal surface lands and federal subsurface mineral estate administered by the BLM in the decision area (described in Section 1.2.2).

# 2.1. INTRODUCTION TO ALTERNATIVES

The GUSG RMP Amendment/EIS was drafted in compliance with NEPA, which directs the BLM to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal that involves unresolved conflicts concerning alternative uses of available resources..." (NEPA Section 102[2][e]). At the heart of the alternative development process is the requirement that the range of alternatives is reasonable. The purpose of and need for the action provide the parameters for determining the reasonableness of the range of alternatives.

The BLM recognizes that social, economic, and environmental issues extend across land ownership boundaries and that extensive cooperation is necessary in order to actively address issues of mutual concern. To the extent possible, these alternatives reflect input provided during public scoping and from cooperating agencies.

RMP decisions consist of identifying and clearly defining goals and objectives (desired outcomes) for resources and resource uses. After establishing desired outcomes, the BLM identifies allowable uses (land use allocations) and management actions for different alternatives that are anticipated to achieve the goals and objectives.

## 2.1.1. COMPONENTS OF ALTERNATIVES

Goals are broad statements of desired outcomes that usually are not quantifiable. Objectives identify specific desired outcomes for resources. Goals typically pertain to all of the alternatives, while objectives may be consistent across alternatives or vary by alternative. An RMP can include some objectives that vary by alternative and other objectives that are consistent across alternatives. And while goals typically apply to the entire decision area, objectives, allowable uses, and management actions may apply to the decision area as a whole or to a specific geographic area(s).

RMPs identify resource uses or allocations that are allowable, restricted, or prohibited on public lands and federal mineral estate. These allocations identify surface lands and/or subsurface mineral interests where uses are allowed, including restrictions necessary to meet goals and objectives. Land use plans also identify lands where specific uses are excluded in order to protect resource values. At the land use plan level, it is important to identify reasonable development scenarios for allowable uses to enable the orderly implementation of future actions. These scenarios provide a context for RMP decisions and an analytical base for NEPA analysis. The BLM may also establish criteria in a land use plan to guide the identification of site-specific use levels for activities during plan implementation.

Land use plans must identify the management actions anticipated to achieve outcomes, including actions to maintain, restore, or improve land health. These actions include proactive measures (such as measures to enhance function and condition), as well as measures or criteria guiding day-to-day activities occurring on public lands.

## 2.1.2.   PURPOSE OF ALTERNATIVES DEVELOPMENT

Land use planning and NEPA regulations require the BLM to formulate a reasonable range of alternatives. Alternative development is guided by established planning criteria (as outlined in 43 CFR Section 1610).

The basic goal of alternative development is to produce distinct potential management scenarios that:

- Address the identified major planning issues
- Explore opportunities to enhance management of resources and resource uses
- Meet the purpose and need for the RMP Amendment
- Are feasible.

Pursuit of this goal provides the BLM and the public with an appreciation for the diverse ways in which conflicts regarding resources and resource uses might be resolved, and offers the BLM State Director(s) a reasonable range of alternatives from which to make an informed decision. The components and broad aim of each alternative considered for the GUSG Range-wide RMP Amendment/EIS are discussed below.

## 2.1.3.   DEVELOPING ALTERNATIVES

## ALTERNATIVES DEVELOPMENT PROCESS

The planning team adhered to the BLM planning process in developing a reasonable range of alternatives for the RMP Amendment/EIS. Planning was conducted in compliance with NEPA and White House Council on Environmental Quality (CEQ) regulations for implementing the procedural provisions of NEPA (40 CFR 1500), including seeking public input and analyzing a reasonable range of alternatives. In order to meet the planning criteria and respond to scoping issues and FWS-identified threats, the alternatives include management options that could modify or amend decisions in field office, national conservation area, and national monument RMPs across the planning area. Because the RMP Amendment/EIS is specific to

CHAPTER 2 - ALTERNATIVES

GUSG conservation, numerous decisions in existing RMPs remain valid. In these instances, no alternative management prescriptions were required.

Public input received during the scoping process was considered to ensure that all issues and concerns would be addressed, as appropriate, when developing the alternatives. The planning team identified the issues to be addressed in the RMP Amendment/EIS based on broad concerns or controversies related to conditions, trends, needs, and existing and potential uses of planning area lands and resources.

## DEVELOPING A REASONABLE RANGE OF ALTERNATIVES

The BLM project team identified planning issues, developed management goals, and drafted objectives and actions to address the goals based on scoping and collaboration efforts. Cooperating agencies reviewed, discussed, and provided comments on the drafts. Reasonable alternatives meet the purpose and need of the project and can be feasibly carried out based on estimated cost, logistics, technology, and social and environmental factors.

Using a two-step process, the planning team:

- Developed preliminary action alternatives B and C. The action alternatives were designed to:
  o Address the planning issues by offering a range of management responses;
  o Fulfill the purpose and need for the RMP Amendment (outlined in Chapter 1, Section 1.1, Purpose and Need);
  o Meet the multiple use mandates of FLPMA (43 USC 1716).
- Blended goals, objectives, and actions from the action alternatives to formulate a third action alternative (Alternative D) that strives for balance among competing interests and has the greatest potential to effectively address the purpose and need in the Gunnison Basin and each of the satellite populations. This quest for balance was further refined by splitting Alternative D into two sub-alternatives. Sub-alternative $D_1$ focuses on issues associated with the more stable Gunnison Basin Population, while $D_2$ focuses on issues associated with the smaller satellite populations.

The action alternatives (B and C and sub-alternatives $D_1/D_2$) respond to issues and concerns raised during the public scoping period, as well as planning criteria and guidance applicable to management of resources and resource uses with the potential to affect GUSG or GUSG Habitat.

CHAPTER 2 - ALTERNATIVES

## 2.1.4.   RESULTING RANGE OF ALTERNATIVES

The No Action Alternative (A) outlines existing management direction, including current decisions set forth in field office RMPs and reasonable, foreseeable, management scenarios.  CEQ requires a No Action Alternative in order to provide a baseline for comparison of the other alternatives (CEQ 1981).  While reflecting current management, management actions from Alternative A can also be selected for the final RMP Amendment/EIS.

The action alternatives (B and C and sub-alternatives $D_1$ and $D_2$) offer a range of possible management approaches for responding to planning issues and concerns to conserve and restore GUSG and habitat in the decision area.  While the goal is the same across alternatives, objectives can differ by alternative, and each of the alternatives contains a discrete set of management actions with the potential for different long-range outcomes and conditions to meet the purpose and need for the amendments.

The relative emphasis given to particular resources and resource uses differs as well, including allowable uses, restoration measures, and specific direction pertaining to individual resource programs.  When resources or resource uses are mandated by law or are not tied to planning issues, there are typically few or no distinctions between alternatives.

Differences among the alternatives are described in Table 2.5 - Summary of Impacted Acres by Resource Use.  Table 2.7 details the proposed goals, objectives, management actions, and allowable uses by resource for each of the action alternatives B and C and sub-alternatives $D_1$ and $D_2$.  No Action Alternative A is outlined in a separate table (Table 2.6) that precedes the action alternatives table.

A complete description of the stipulations developed for implementation of the management actions can be found in Appendix H, Stipulations Applicable to Fluid Mineral Leasing and Land Use Authorizations.  A complete description of the Best Management Practices (BMPs) for implementation of the management actions described in the alternatives is available in Appendix I, Best Management Practices.

Geographic information system (GIS) data has been used in developing acreage calculations and for generating many of the figures.  Calculations in this EIS are rounded and are dependent upon the quality and availability of data.  Data were collected from a variety of sources, including the BLM, collaborative partners, stakeholders, and cooperating agencies, among others.  Given the scale of the analysis, the compatibility constraints between datasets, and the lack of data for some resources, all calculations are approximate and serve for comparison and analytic purposes only.  Because the BLM may receive additional GIS data, the acreages are likely to be recalculated and revised.

CHAPTER 2 - ALTERNATIVES

The action alternatives (B and C and sub-alternatives $D_1$/$D_2$) may modify planning decisions in the three NCAs and or the National Monument, but only as consistent with their designations.

The action alternatives were designed to respond to threats to the GUSG and GUSG habitat identified by the FWS, as well as issues identified by the public and cooperating agencies during scoping. Table 2.4 identifies these threats and issues, as well as the applicable BLM resource programs and management decisions being analyzed in this EIS to address the threats and issues.

**Table 2.4 - Applicable BLM Programs and Decisions to Address Issues and FWS Threats**

| FWS THREAT* | SCOPING ISSUE | APPLICABLE BLM RESOURCE PROGRAM FOR ADDRESSING THREAT | |
|---|---|---|---|
| RANGEWIDE - MOST SUBSTANTIAL THREAT | | | |
| Habitat Decline Due to Human Disturbance | Energy and Minerals | Program: | Minerals |
| | | Decisions: | Identify areas open and closed to fluid mineral leasing. |
| | | | Identify No Surface Occupancy (NSO), Controlled Surface Use (CSU), and/or Timing Limitation (TL) stipulations for open areas. |
| | | | Identify areas to petition for withdrawal from mineral development. |
| | | | Establish terms, conditions, or special considerations. |
| | | | Identify areas open and closed to mineral materials disposal. |
| | | | Establish BMPs. |
| | Lands and Realty | Program: | Lands and Realty |
| | | Decision: | Identify stipulations for ROW grants and utility corridors. |
| | | | Identify ROW avoidance or exclusion areas. |
| | Recreation | Program: | Recreation |
| | | Decision: | Identify terms, conditions and stipulations for SRPs. |
| | Range Management | Program: | Range Management |
| | | Decision: | Identify appropriate grazing management practices and suitability for range facilities/improvements. |
| | Travel Management | Program: | Travel and Transportation Management - Roads |
| | | Decision: | Identify areas open, limited, or closed to travel and modes of access and travel. |
| Small Population Size and Structure | Lands and Realty | Program: | Lands and Realty |
| | | Decision: | Identify criteria for areas for retention, disposal, or acquisition. |
| Climate Change | Climate Change | Although no individual resource program addresses this threat to the GUSG or GUSG Habitat, the threat has been considered as part of individual resource concerns and monitored trends. | |
| Disease | No similar issue identified. | Program: | Range Management, Special Status Species |
| | | Decision: | Identify actions to minimize potential of spread of West Nile Virus. |
| Drought | Drought | Although no individual resource program addresses this threat to the GUSG or GUSG Habitat, the threat has been considered as part of individual resource concerns and monitored trends. | |
| LOCALIZED - LESS SUBSTANTIAL THREAT | | | |

CHAPTER 2 - ALTERNATIVES

| FWS THREAT* | SCOPING ISSUE | APPLICABLE BLM RESOURCE PROGRAM FOR ADDRESSING THREAT | |
|---|---|---|---|
| Grazing Practices Inconsistent with Local Ecological Conditions | Livestock Grazing Vegetation Management | Program: | Range Management |
| | | Decisions: | Identify areas open and closed to grazing. Establish animal unit months (AUMs). Identify appropriate grazing management practices and suitability for range facilities/improvements. |
| | | Program: | Wildlife |
| | | Decisions: | Identify habitat management. |
| | | Program: | Special Status Species |
| | | Decision: | Identify habitat management. |
| Fences | Range Improvements | Program: | Range Management |
| | | Decision: | Identify appropriate grazing management practices and suitability for fences. |
| Invasive Species | Weeds | Program: | Vegetation Management, Range Management, Wildland Fire Management, and Recreation |
| | | Decisions: | Control, suppress, or eradicate weeds. Identify BMPs for allowable uses. Actively manage or treat weeds. |
| Fire | Fire Management Vegetation Management | Program: | Wildfire Management |
| | | Decisions: | Consider changes to fire management strategies. Identify areas suitable/unsuitable for managing wildfire to meet resource objectives. Identify priority areas for suppression. |
| Mineral Development | Energy and Mineral Development | Program: | Fluid Minerals |
| | | Decisions: | Identify areas open and closed to fluid mineral leasing. Identify NSO, CSU, and TL stipulations for open areas. |
| | | Program: | Lands and Realty |
| | | Decisions: | Identify stipulations for ROW grants and utility corridors. Identify ROW avoidance or exclusion areas. |
| | | Program: | Locatable Minerals |
| | | Decisions: | Identify areas to petition for withdrawal from mineral development. Establish terms, conditions, or special considerations. |
| | | Program: | Salable Mineral Materials |
| | | Decisions: | Identify areas open and closed to mineral materials disposal. Establish terms, conditions, or special considerations. |
| | | Program: | Non-energy Leasable Minerals |
| | | Decisions: | Identify areas open and closed to non-energy leasable minerals. Establish terms, conditions, or special considerations. |
| Conifer Invasion (including pinyon and juniper) | Vegetation Management | Program: | Vegetation |
| | | Decisions: | Identify habitat management. |
| | | Program: | Wildfire Management |
| | | Decisions: | Consider changes to fire management strategies. Identify areas suitable/unsuitable for managing wildfire to meet resource objectives. Identify priority areas for suppression. |

CHAPTER 2 - ALTERNATIVES

| FWS THREAT* | SCOPING ISSUE | APPLICABLE BLM RESOURCE PROGRAM FOR ADDRESSING THREAT | |
|---|---|---|---|
| Large-Scale Water Development | No similar issue identified. | Program:<br>Decision: | Lands and Realty<br>Identify stipulations for development. |
| Predation | Predation | Program:<br>Decision: | Lands and Realty, Minerals, Recreation, Range Management<br>Establish design features and BMPs. |
| Recreation | Recreation and Travel Management | Program:<br>Decision: | Recreation<br>Establish design features and BMPs to apply to SRPs. |
| | | Program:<br>Decision: | Travel and Transportation Management<br>Identify areas open, limited, or closed to travel and modes of access and travel. |
| No similar threat identified. | Special Management Areas | Program:<br>Decisions: | Special Designations<br>Identify special management areas. |
| No similar threat identified. | Social, Economic, and Environmental Justice | Although no individual resource program addresses this threat to the GUSG or GUSG Habitat, the threat has been considered as part of individual resource concerns and monitored trends. | |

*As identified in the FWS final listing decision (FR Vol. 79, No. 224)

## ALTERNATIVES CONSIDERED BUT NOT ANALYZED IN DETAIL

### Alternative Focused on Management Actions for Occupied Habitat

As part of internal scoping, a recommendation was made for an alternative focused solely on Occupied Habitat. As the majority of acres included under the umbrella of "Unoccupied Habitat" includes lands designated as critical habitat by the FWS, this alternative would not meet the purpose and need of this effort or meet BLM's responsibilities under Section 7(a)(2) of the Endangered Species Act, and therefore, was not carried forward for analysis. Specifically, nearly one third of GUSG critical habitat on BLM surface lands is classified as Unoccupied Habitat. Although currently not in use by GUSG, the lands are designated as critical habitat and considered to be essential for conservation of the species.

### Alternative Emphasizing Full Resource Development

This alternative would not meet the purpose and need of this effort to address threats to the species or meet BLM responsibilities under Section 7(a)(2) of the Endangered Species Act, as the majority of acreage in the planning area includes land designated as critical habitat by the FWS. The No Action Alternative represents the fullest development scenario within the range of alternatives analyzed. As stated in the Purpose and Need, the "Endangered Species Act requires agencies to ensure that their actions are not likely to jeopardize the continued existence of a listed species or result in the adverse modification or destruction of critical habitat for a

listed species." Full development of resources and infrastructure on lands designated as critical habitat would likely result in habitat degradation and fragmentation, which would hinder conservation of the GUSG. Therefore, this alternative was not carried forward for analysis.

## Alternative Closing Areas to Entry or Activities to Protect Populations

A recommendation was made to provide increased protection of Gunnison sage-grouse, particularly for the satellite populations. Among the protections would be to provide the ability of BLM to exclude or prohibit all human entry or activities that may conflict with the conservation of Gunnison sage-grouse. Such an alternative would be counter to 43 CFR 2310.3-4, which states that "All orders withdrawing 5,000 or more acres shall be subject to the Congressional Review Provision of section 204(c) of the Act (43 U.S.C. 1714(c)." Moreover, the potential to implement such withdrawals would not be considered to be within a reasonable range of alternatives. Alternative B, other protections considered in this document, and the adaptive management provisions will help protect the species. Therefore, this suggested alternative was not carried forward for analysis.

## AREA OF CRITICAL ENVIRONMENTAL CONCERN PROPOSALS

Areas of Critical Environmental Concern (ACECs) differ from other special designations, such as Wilderness Study Areas, in that designation by itself does not automatically prohibit or restrict other uses in the area.

Multiple public proposals recommending designation of new ACECs were submitted to the BLM during the public scoping period, including the following:

- Establish a system of conservation areas to anchor restoration efforts by conserving the highest quality habitats:
  - o Areas of high ecological value for GUSG and other sagebrush dependent species
  - o Designate sagebrush reserves that encompass centers of GUSG abundance large enough to achieve the goals of biological representation and ecological redundancy and resiliency.
- Consider all GUSG Habitat on BLM lands, including both Occupied Habitat and critical habitat as delineated by the FWS, for ACEC designation in at least one alternative.
- Consider designation of all proposed critical habitat on public lands in a conservation alternative.
- Consider the following specific areas for designation as ACECs:

CHAPTER 2 - ALTERNATIVES

- o All habitat on BLM land currently occupied by populations of GUSG outside of the Gunnison Basin, with a buffer large enough to ensure that activities authorized adjacent to the ACEC will not result in functional loss or fragmentation of currently Occupied Habitat
- o Priority habitat on BLM lands in the Gunnison Basin, as identified by the CCA, with improvements
- o Areas outside of priority habitat in the Gunnison Basin with high potential for restoration and re-establishment of populations
- o Any ACECs or special management designations in GUSG Habitat that have been included in current public or internal draft BLM RMPs (e.g. Tres Rios, Uncompahgre, etc.)
- Designate all GUSG Habitat on federal lands.
- Designate priority habitat.
- Designate large blocks of core habitat.
- Manage potential critical habitat as ACECs for vegetation composition and structure consistent with ecological site potential and within the reference state to achieve GUSG seasonal habitat objectives.

In consideration of these public proposals, the BLM proposes to designate all Occupied and Unoccupied habitat as an ACEC under Alternative B.  Occupied Habitat and Unoccupied Habitat were separately evaluated by a team of BLM biologists and determined to meet the relevance and importance criteria.  See Appendix G, Areas of Critical Environmental Concern, Relevance and Importance Rationale, for details of the analysis."

## 2.2. ALTERNATIVES

### 2.2.1. SUMMARY OF ALTERNATIVES

This section summarizes and compares the four alternatives (A through D) considered in the EIS. To reduce the length and avoid confusion, only select meaningful differences among alternatives (with the most potential to affect resources) are summarized in this section. Combined with the appendices and Table 2.4 - Applicable BLM Resource Programs and Management Decisions for Addressing Scoping Issues and FWS-identified Threats, Table 2.6 - Alternative A: No Action, and Table 2.7 - Draft Action Alternatives B and C and Sub-Alternatives $D_1/D_2$ highlight meaningful differences among the alternatives regarding what they establish and where they occur.

Table 2.5 summarizes the acreage that would be allocated or restricted for each resource or resource use, based on the management actions for each of the alternatives. Please note that there is overlap between acreages of resources and resource uses as currently managed (under No Action Alternative A) and as potentially managed (under the action alternatives B and C and sub-alternatives $D_1/D_2$).

Decisions made through this RMP Amendment are anticipated to be subsequently implemented. Restrictions on resource uses (such as closures to leasing) made through this amendment apply for the life of an RMP unless otherwise amended or revised.

CHAPTER 2 - ALTERNATIVES

### Table 2.5 - Summary of Impacted Acres by Resource Use for Each Alternative

| RESOURCE USE | NO ACTION ALTERNATIVE A | ALTERNATIVE B | ALTERNATIVE C | SUB-ALTERNATIVE D₁ | SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| COMPREHENSIVE TRAVEL & TRANSPORTATION MANAGEMENT | | | | | |
| Open to Cross-Country Motorized Travel | 56,072 | 0 | 0 | 2 | 0 |
| Closed to Motorized Travel | 34,550 | 623,346 | 34,550 | 4,541 | 30,009 |
| LANDS & REALTY | | | | | |
| ROW Exclusion Areas - Occupied Habitat | 3,786 | 395,463 | 3,786 | 3,277 | BLM lands within 0.6 mile of a lek |
| ROW Avoidance Areas - Occupied Habitat | 24,425 | 0 | 391,677 | 298,747 | BLM lands outside 0.6 mile of a lek |
| ROW Exclusion Areas - Unoccupied Habitat | 10,843 | 227,883 | 10,843 | 4,614 | 6,229 |
| ROW Avoidance Areas - Unoccupied Habitat | 89,141 | 0 | 217,000 | 59,358 | 157,681 |
| Recommended for Withdrawal from Federal Mineral Development | N/A | 855,766 | TBD | TBD | TBD |
| FLUID MINERAL LEASING (also applies to Geothermal Leasing) | | | | | |
| Closed to Fluid Mineral Leasing | 206,950 | 851,752 | 126,133 | 9,148 | 197,802 |
| Open to Leasing Subject to NSO | 370,466 | N/A | 498,584 | 381,330 | 276,926 |
| LOCATABLE MINERALS, MINERAL MATERIALS, & NON-ENERGY SOLID LEASABLE MINERALS | | | | | |
| Closed to Mineral Material Sales | 65,946 | 611,710 - plus 169 riparian miles in Unoccupied Habitat | 65,946 | 8,446 | 57,500 |
| Closed to Non-Energy Mineral Leasing | 206,950 | 851,752 | 126,133 | 9,148 | 197,802 |
| LIVESTOCK GRAZING | | | | | |
| Not Permitted for Livestock Grazing | 46,147 | 623,346 | 46,147 | 26,375 | 19,772 |

CHAPTER 2 - ALTERNATIVES

## ALTERNATIVE A - NO ACTION

The No Action Alternative A would continue current management direction and prevailing conditions derived from the existing planning documents of each field office. Goals and objectives for resources and resource uses are based on the most recent RMP decisions, along with associated amendments, activity and implementation level plans, and other management decision documents. Laws, regulations, and BLM policies that supersede RMP decisions would apply.

Goals and objectives for BLM-administered lands and mineral estate would not change. Appropriate and allowable uses and restrictions pertaining to activities such as mineral leasing and development, recreation, construction of utility corridors, and livestock grazing would also remain the same. The BLM would not modify existing or establish additional criteria to guide the identification of site-specific use levels for implementation activities.

## ALTERNATIVE B

Alternative B would manage lands in the decision area predominately for GUSG and its habitat. GUSG conservation measures and threats outlined in the FWS listing decision published in the *Federal Register* in November 2014 and conservation measures identified in the RCP (2005) were used to formulate BLM management direction under Alternative B. Management actions implemented by the BLM, in concert with local, state and other federal agencies and private landowners, play a critical role in the future trends of GUSG populations. Alternative B would achieve the purpose of and need for the RMP Amendment by avoiding negative impacts from resource uses and other actions in Occupied Habitat and Unoccupied Habitat and enhancing recovery opportunities.

## ALTERNATIVE C

Alternative C would achieve the purpose of and need for the RMP Amendment by minimizing or compensating for impacts from resource uses and other actions to varying degrees in Occupied Habitat and Unoccupied Habitat. Resource uses and other actions would be allowed if their impacts could be avoided, minimized, rectified, reduced/eliminated over time, or mitigated through compensatory mitigation. Impacts that occur would be rectified by repairing, rehabilitating, or restoring the affected environment and/or by reducing or eliminating the impact over time through preservation and maintenance operations during the life of the action. Residual impacts are impacts to the resource that remain after avoidance and minimization measures have been implemented. Residual impacts would be

compensated for by replacing or providing substitute resources or environments, as identified in the GUSG Mitigation Plan.

## ALTERNATIVE D - AGENCY PREFERRED

Alternative D (consisting of sub-alternatives $D_1$ and $D_2$) is the agency-preferred alternative and seeks to allocate resources among land uses and conserve natural resource values, while sustaining and enhancing ecological integrity across the landscape, including plant, wildlife, and fish habitat. Public scoping efforts and language included in the FWS decision to list the species as threatened under the ESA enabled the BLM to identify and shape significant issues pertaining to GUSG Habitat, energy development, livestock grazing, public land access, and other program areas to provide a balanced level of protection, restoration, enhancement, and use of resources and services to meet ongoing programs and land uses. Conservation measures under Alternative D are focused on both Occupied and Unoccupied Habitat.

As Alternative D was being developed, it became apparent that, while some management actions should be consistent rangewide, there were more that should be specific to either the Gunnison Basin Population or the satellite (non-Gunnison Basin) populations, due to distinct differences in bird numbers, amount of contiguous habitat (BLM and non-BLM), extent, scale, and intensity of threats, and other considerations among and between the populations. The Gunnison Basin Population is the only population large enough to have a very high probability of surviving random demographic stochastic events over a 50-year timeframe (RCP, pg. 202) and has been relatively stable based on the last 19 years of lek counts (as discussed in the FWS 2014 listing decision). It is also the only population large enough in and of itself to maintain a reasonably large degree of genetic variation over time (RCP, p. 202). Additionally, the Gunnison Basin is not currently undergoing significant pinyon-juniper encroachment (Boyle and Reeder 2005).

Declining trends in the abundance of GUSG outside of the Gunnison Basin indicate that currently Occupied Habitat for the satellite populations may be less than the minimum amount of habitat necessary for their long-term viability (FWS 2014 listing decision) and has some degree of documented pinyon-juniper encroachment. Limits on available habitat in the satellite populations suggest local extinctions may occur without intervention. The satellite populations are likely small enough to induce inbreeding depression, and could be losing adaptive potential (FWS 2014 listing decision). For this reason, the preferred alternative was divided into two sub-alternatives labeled $D_1$ and $D_2$.

CHAPTER 2 - ALTERNATIVES

## SUB-ALTERNATIVE D$_1$ - GUNNISON BASIN PREFERRED

Sub-Alternative D$_1$ is the agency-preferred alternative for the Gunnison Basin Population of GUSG. The Gunnison Basin Population contains the largest numbers of birds and habitat across the range of the species. The extent, scale, and nature of the threats to this population are generally different than those affecting the satellite populations. While critical to the long-term success and recovery of the species, the management actions necessary for this population are different from those necessary for the satellite populations. Resource uses and other actions would be allowed if their impacts could be avoided, minimized, rectified, reduced/eliminated over time, or through compensatory mitigation.

## SUB-ALTERNATIVE D$_2$ - SATELLITE POPULATIONS PREFERRED

Sub-Alternative D$_2$ is the BLM preferred alternative for the satellite (non-Gunnison Basin) populations of GUSG. The low numbers of birds, and range of habitat threats separate from those present in the Gunnison Basin, were identified as critical factors in the FWS decision to list the GUSG as threatened under the ESA. As a result, these population areas are key to species recovery and require different combinations of protection than needed within the Gunnison Basin. Sub-alternative D$_2$ would achieve the purpose of and need for the RMP Amendment by balancing resources and resource use among competing human interests, land uses, and the conservation of natural and cultural resource values, while sustaining and enhancing ecological integrity across the population, including plant and wildlife habitat.

## MANAGEMENT COMMON TO ALL ALTERNATIVES

Allowable uses and management actions from existing RMPs that remain valid and do not require revision have been carried forward to all of the proposed alternatives. Other decisions are common only to the action alternatives (B, C, and D$_1$/D$_2$).

Although each alternative emphasizes a slightly different mix of resources and resource uses, all alternatives contain the following:

- Conserve, enhance and restore the sagebrush ecosystem upon which GUSG populations depend in cooperation with other conservation partners.
- Comply with state and federal laws, regulations, policies, and standards, including FLPMA multiple use mandates.
- Implement actions originating from laws, regulations, and policies and conform to day-to-day management, monitoring, and administrative functions not specifically addressed.

- Preserve valid existing rights, which include any leases, claims, or other use authorizations established before a new or modified authorization, change in land designation, or new or modified regulation is approved. Existing fluid mineral leases are managed through the stipulations attached to the existing lease and, where supported by site specific analysis, conditions of approval (COAs) to an approved permit.
- Collaborate with adjacent landowners, federal and state agencies, local governments, tribes, communities, other agencies, and other individuals and organizations, as needed to monitor and implement decisions to achieve desired resource conditions.
- Provide protection for human safety and property from wildfire.

## AGENCY-PREFERRED ALTERNATIVE

The proposed alternatives offer a range of discrete strategies for resolving potential deficiencies in existing management, exploring opportunities for enhanced management, and addressing issues identified through internal assessment and public scoping related to maintaining or increasing GUSG abundance and distribution on BLM-administered lands.

Comments submitted by other government agencies, public organizations, state and tribal entities, and interested individuals were given careful consideration. Public scoping efforts enabled the BLM to identify and shape significant issues pertaining to GUSG Habitat, energy development, livestock grazing, potential ACECs, public land access, recreation, rights of way, and other program areas. Cooperating agencies participated, reviewed, and provided comments at critical intervals during the alternative development process, as well as the EIS process in general.

The BLM NEPA handbook (H-1790-1) and BLM Planning handbook (H-1610-4.7) require the BLM to identify a preferred alternative in the Draft RMP Amendment/EIS. Formulated by the planning team, the preferred alternative represents those goals, objectives, and actions determined to be most effective at resolving planning issues and balancing resource use at this stage of the process. While collaboration is critical in developing and evaluating alternatives, the final designation of a preferred alternative remains the exclusive responsibility of the BLM.

Alternative D (consisting of sub-alternatives $D_1$ and $D_2$) represents the BLM preferred alternative.

CHAPTER 2 - ALTERNATIVES

## 2.2.2. TABLES OF ALTERNATIVES

### HOW TO READ TABLES 2.6 AND 2.7

Table 2.6 details the No Action Alternative A. Management actions outlined in Alternative A were extracted from planning documents currently in use by the BLM administrative units across the planning area (including RMPs, travel management plans (TMP), and programmatic EISs), and reflect current management direction.

Table 2.7 details the action alternatives B and C and sub-alternatives $D_1$ (Gunnison Basin Preferred) and $D_2$ (Satellite Populations Preferred).

When multiple alternatives include the same management action for a resource or resource use, the action is described in the first column, followed by a notation in the subsequent column(s) (i.e., "Same as Alternative B.").

Both alternatives tables are arranged in the same order by resource or resource use, followed by applicable RMP Amendment goals, objectives, and management actions.

## TABLE 2.6 - NO ACTION ALTERNATIVE A

**Table 2.6 - Alternative A: No Action**

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| **TRAVEL AND TRANSPORTATION** | | |
| **Travel Management Planning** | | |
| 1 | Travel | **GRAND JUNCTION RMP 2015**<br>SSS-SGR-MA-03:  Reduce routes through currently suitable or potentially suitable Gunnison and Greater Sage-Grouse habitat by reducing routes through sagebrush parks, with an emphasis on routes that bisect sagebrush parks.<br>SSS-SGR-MA-06:  To reduce disturbance to Gunnison or Greater Sage-grouse, close duplicative or redundant routes within Sage-grouse habitat and/within 4 miles of a lek.<br><br>**MCINNIS CANYONS NCA 2004**<br>Special emphasis will be given to proper placement of roads and trails, along with rehabilitation and stabilization of existing roads and trails.<br><br>**MOAB FO RMP 2008**<br>Travel Management Decision 3 (TRV-3):  Identification of specific designated routes will be initially established through the chosen Travel Plan accompanying this RMP (see Appendix N) and may be modified through subsequent implementation planning and project planning on a case-by-case basis (p. 126).<br>Travel Management Decision 10 (TRV-10):  OHV Designations:<br>• About 339,298 acres will be closed to OHV travel.<br>• About 1,481,334 acres will be limited to designated routes.<br>• Approximately 2,000 acres (White Wash Sand Dunes) will be open to cross country travel (see Map 30) (p. 127)<br>Travel Management Decision 10 (TRV-10):  Designated Routes – Motorized:<br>• Designate 3,693 miles of motorized routes.<br>• Designate 313 miles for motorcycles (163 miles on inventoried routes and 150 miles on inventoried single-track).<br>• Designate a dirt bike route from Colorado State Line to Thompson (see Map 3), utilizing 9.0 miles of single-track designated above and 22.0 miles of inventoried Grand County roads (p. 127). |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | **MONTICELLO FO RMP 2008**<br>TM-2:  Through future implementation level planning, designated routes will be categorized as mechanized only (bicycles), single-track motorized (dirt bikes), or two-track motorized (four-wheelers, jeeps), or available to all vehicles, or any combination of these categories.  Adjustments of these categories will be made based on recreational demand and potential conflict.  All non-motorized travel is allowed on designated routes unless otherwise prohibited (page 141).<br>TM-6:  Appendix O outlines the processes and procedures for making modifications to the travel plan designated route network (page 141).<br><br>**TRES RIOS FO RMP 2015**<br>No cross country motorized travel allowed in sage grouse habitat (limited to existing, in process to limited to designated). |
| 2 | Travel | **GRAND JUNCTION RMP 2015**<br>SSS-SGR-MA-03:  Reduce routes through currently suitable or potentially suitable Gunnison and Greater Sage-Grouse habitat by reducing routes through sagebrush parks, with an emphasis on routes that bisect sagebrush parks.<br>SSS-SGR-MA-06:  To reduce disturbance to Gunnison or Greater Sage-grouse, close duplicative or redundant routes within Sage-grouse habitat and/within 4 miles of a lek.<br><br>**MCINNIS CANYONS NCA 2004**<br>Special emphasis will be given to proper placement of roads and trails, along with rehabilitation and stabilization of existing roads and trails.<br><br>**MOAB FO RMP 2008**<br>Travel Management Decision 3 (TRV-3):  Identification of specific designated routes will be initially established through the chosen Travel Plan accompanying this RMP (see Appendix N) and may be modified through subsequent implementation planning and project planning on a case-by-case basis (p. 126).<br>Travel Management Decision 10 (TRV-10):  OHV Designations:<br>• About 339,298 acres will be closed to OHV travel.<br>• About 1,481,334 acres will be limited to designated routes.<br>• Approximately 2,000 acres (White Wash Sand Dunes) will be open to cross country travel (see Map 30) (p. 127)<br>• Travel Management Decision 10 (TRV-10):  Designated Routes – Motorized:<br>• Designate 3,693 miles of motorized routes. |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | • Designate 313 miles for motorcycles (163 miles on inventoried routes and 150 miles on inventoried single-track). <br> • Designate a dirt bike route from Colorado State Line to Thompson (see Map 3), utilizing 9.0 miles of single-track designated above and 22.0 miles of inventoried Grand County roads (p. 127). <br><br> **MONTICELLO FO RMP 2008** <br> TM-2:  Through future implementation level planning, designated routes will be categorized as mechanized only (bicycles), single-track motorized (dirt bikes), or two-track motorized (four-wheelers, jeeps), or available to all vehicles, or any combination of these categories.  Adjustments of these categories will be made based on recreational demand and potential conflict.  All non-motorized travel is allowed on designated routes unless otherwise prohibited (page 141). <br> TM-6:  Appendix O outlines the processes and procedures for making modifications to the travel plan designated route network (page 141). <br><br> **TRES RIOS FO RMP 2015** <br> No cross country motorized travel allowed in sage grouse habitat (limited to existing, in process to limited to designated). |
| 3 | Travel | **GRAND JUNCTION RMP 2015** <br> SSS-SGR-MA-03:  Reduce routes through currently suitable or potentially suitable Gunnison and Greater Sage-Grouse habitat by reducing routes through sagebrush parks, with an emphasis on routes that bisect sagebrush parks. <br> SSS-SGR-MA-06:  To reduce disturbance to Gunnison or Greater Sage-grouse, close duplicative or redundant routes within Sage-grouse habitat and/within 4 miles of a lek. <br><br> **MCINNIS CANYONS NCA 2004** <br> Special emphasis will be given to proper placement of roads and trails, along with rehabilitation and stabilization of existing roads and trails. <br><br> **MOAB FO RMP 2008** <br> Travel Management Decision 3 (TRV-3):  Identification of specific designated routes will be initially established through the chosen Travel Plan accompanying this RMP (see Appendix N) and may be modified through subsequent implementation planning and project planning on a case-by-case basis (p. 126). <br> Travel Management Decision 10 (TRV-10):  OHV Designations: <br> • About 339,298 acres will be closed to OHV travel. <br> • About 1,481,334 acres will be limited to designated routes. |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | • Approximately 2,000 acres (White Wash Sand Dunes) will be open to cross country travel (see Map 30) (p. 127) Travel Management Decision 10 (TRV-10):  Designated Routes – Motorized: <br>• Designate 3,693 miles of motorized routes. <br>• Designate 313 miles for motorcycles (163 miles on inventoried routes and 150 miles on inventoried single-track. <br>• Designate a dirt bike route from Colorado State Line to Thompson (see Map 3), utilizing 9.0 miles of single-track designated above and 22.0 miles of inventoried Grand County roads (p. 127). <br> <br>**MONTICELLO FO RMP 2008** <br>TM-2:  Through future implementation level planning, designated routes will be categorized as mechanized only (bicycles), single-track motorized (dirt bikes), or two-track motorized (four-wheelers, jeeps), or available to all vehicles, or any combination of these categories.  Adjustments of these categories will be made based on recreational demand and potential conflict.  All non-motorized travel is allowed on designated routes unless otherwise prohibited (page 141). <br>TM-6:  Appendix O outlines the processes and procedures for making modifications to the travel plan designated route network (page 141). <br> <br>**TRES RIOS FO RMP 2015** <br>No cross country motorized travel allowed in sage grouse habitat (limited to existing, in process to limited to designated). |
| 4 | Travel | **CANYONS OF THE ANCIENTS NM RMP 2010** <br>Prohibit cross-country motorized and mechanized (such as mountain bike) travel.  Limit motorized and mechanized vehicle use to designated routes. <br> <br>**GRAND JUNCTION FO RMP 2015** <br>Manage 126,400 acres as closed to mechanized travel: <br>• WSAs <br>• ACECs: Atwell Gulch, Juanita Arch, Mt. Garfield, Pyramid Rock, A portion of Rough Canyon (600 acres), and Unaweep Seep <br>• Wildlife Emphasis Areas:  Timber Ridge (deer/elk/sagegrouse), A portion of Rapid Creek (1,700 acres), and Bangs (RMZ 3 and 4). <br>• Lands managed for wilderness characteristics:  Bangs, A portion of Maverick (1,600 acres), and Unaweep. <br> <br>**GUNNISON RMP 1993** |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | Gunnison Field Office Existing Conditions:  222 Miles of Road 0.6 Mile from Leks; 539 Miles of Road 2 Miles from Leks 719 Miles of Road 4.0 Miles from Leks<br><br>**GUNNISON GORGE NCA RMP 2004**<br>REC-C-3:  The OHV designations in the planning area will include 2,579 acres in the open category, where cross-country, off-route motorized and non-motorized, mechanical vehicular travel will be permitted; 51,727 acres of lands where motorized and non-motorized mechanized use will be limited to designated routes year round; 22,200 acres of public lands where motorized and non-motorized mechanized travel will generally be limited to designated routes from May 1 to November 14 annually, and for the remainder of the year, these lands will be closed to these uses; and 19,274 acres of public lands closed to motorized and mechanized use yearlong, including the Gunnison Gorge Wilderness.<br><br>**MOAB FO RMP 2008**<br>Travel Management Decision 4 (TRV-4):  Limit travel by motorized vehicle on all lands administered by the Moab Field Office to designated routes, except for Managed Open Areas, and for areas that are closed to motorized travel (see Map 30; see Appendix N for Travel Plan development) (p. 126)<br>Motorized travel is limited to designated routes within Occupied Habitat.  There are no Managed Open Areas within GUSG Occupied Habitat, not areas closed to motorized travel.<br><br>**MONTICELLO FO RMP 2008**<br>MCA-2:  OHV use is either limited to designated routes or closed to cross-country travel.  All ACECs will have travel limited to designated routes unless otherwise noted. (p. 55).  There are no exceptions that allow for cross-country travel for game retrieval or antler gathering in areas designated as limited or closed.  OHV use for game retrieval will adhere to all OHV classifications.<br><br>**SAN JUAN/SAN MIGUEL RMP 1985**<br>Provide administrative access to public land to enhance management of the range resource.  Provide maintenance of roads in the BLM transportation plan to minimum standards for user safety.<br><br>**SAN LUIS VALLEY TMP 2009/2014**<br>Evaluate and manage snowmobile trails/use areas.<br>Eliminate 'OSV open play area' on east side of U.S. Highway 285 from Saguache County Road LL57 (Hayden Pass Rd.), north to Raspberry Creek for the protection of the GUSG.  Proposed by GUSG Working Group.  Not yet officially part of the SLVFO TMP (SLVFO TMP, as amended - 2014 (NOT FINAL)). |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| 5 | Travel | **MOAB FO RMP** 2008<br>SSS-3:  As required by the Endangered Species Act, no management action will be permitted on public lands that will jeopardize the continued existence of plant or animal species that are listed or are officially proposed or are candidates for listing as T&E (pg. 117).<br><br>**MONTICELLO FO RMP 2008**<br>• Prohibit construction of roads year-round.<br>• Prohibit construction of wind power turbines year-round.<br>• Avoid all permitted activities from March 20 to May 15.  If impractical to avoid all permitted activities, then no activity from sunset the evening before to 2 hours after sunrise the next morning.  Prohibit construction of roads year-round.<br>SSP-6: No management action will be permitted on BLM lands that will jeopardize the continued existence of species that are listed, proposed for listing, or candidates for listing under the Endangered Species Act (pg. 137).<br><br>**SAN LUIS RMP 1991**<br>Limited OHV designations in riparian zones. |
| 6 | Travel | **MOAB FO RMP** 2008<br>Travel Management Decision 3 (TRV-3):  Specific designated routes initially established through the Travel Plan accompanying this RMP (see Appendix N) may be modified through subsequent implementation planning and project planning on a case-by-case basis.  These identified routes will be available regardless of other management actions.  These adjustments will occur only in areas with limited route designations and will be analyzed at the implementation planning level.  These adjustments will be done through a collaborative process with local government and will include public review of proposed route changes.  Site-specific NEPA documentation will be required for changes to the route designation system. (p. 126)<br><br>**MONTICELLO FO RMP 2008**<br>Year-round habitat (within 4.0 miles of active strutting ground):<br>Avoid the construction of power lines, wind power turbines, or other aboveground structures |
| 7 | Travel | No similar action. |
| 8 | Travel | **DOMINGUEZ-ESCALANTE NCA DRAFT RMP** 2013<br>Prohibit the construction of new routes in existing, un-fragmented sagebrush shrublands 60 acres or larger.  Allow for the construction of new routes in patches smaller than 60 acres only if one of the following conditions is met: |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | • Any additional fragmentation of sagebrush shrublands is offset by projects that reduce fragmentation of sagebrush parks elsewhere.<br>• New routes are placed on the edge of existing sagebrush shrublands to reduce fragmentation. Reroutes would be placed to avoid encompassing more than half of the perimeter of the patch. Reduce fragmentation in existing sagebrush shrublands by closing routes to public use or by rerouting routes to the edge of sagebrush parks. Prioritize the largest patches in sage-grouse critical habitat. Minimize travel routes in and crossing riparian and wetland areas.<br>When routes are contributing to continued decline, do one or more of the following:<br>• Close and rehabilitate<br>• Relocate the routes<br>• Re-engineer these routes. Conduct work with partners (e.g., local governments, trail organizations, user groups, etc.). Locate new routes outside of riparian and wetland areas. Minimize the number of crossings and work with partners (e.g., local governments, trail organizations, user groups, etc.) to build bridges or properly armor or protect crossings at necessary crossing locations.<br><br>**GRAND JUNCTION FO RMP 2015**<br>Maintain and/or create connections between key sagebrush habitats by encouraging placement of new utility developments (power lines, pipelines, etc.) and transportation routes (roads, trails etc.) in existing utility or transportation corridors to minimize fragmentation of sagebrush vegetation. Where feasible, consistent with user safety, locate/relocate developed travel routes away from riparian wetland areas.<br><br>**GUNNISON BASIN TMP 2010**<br>Possible New Routes, It is my decision that before a new route can be approved to be built (ground disturbance), further environmental analysis and public involvement, pursuant to NEPA must be completed prior to a decision to authorize the action. The analysis would also address compliance with other laws and regulations relating to endangered species and cultural resources. Future possible routes not listed in the FEIS may be considered for addition to the BLM Travel Management System if these routes are consistent with criteria identified in the FEIS.<br><br>**MOAB FO RMP 2008**<br>SSS -24: All surface-disturbing activities will be prohibited within 0.6 mile of a lek. Implement GUSG RCP (2005) pp. 122: Minimize negative impacts of roads.<br>SSS- 12: As required by the Endangered Species Act, avoid construction of new roads within listed and non-listed special status plant and animal species habitats. (p. 119). |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | Travel Management decision 3 (TRV-3):  See also specific designated routes initially established through the Travel Plan accompanying this RMP (see Appendix N) may be modified through subsequent implementation planning and project planning on a case-by-case basis.  These identified routes will be available regardless of other management actions.  These adjustments will occur only in areas with limited route designations and will be analyzed at the implementation planning level.  These adjustments will be done through a collaborative process with local government and will include public review of proposed route changes.  Site-specific NEPA documentation will be required for changes to the route designation system (p. 126). **MONTICELLO FO RMP 2008** SSP-23:  Lek habitat (within 0.6 mile of active strutting ground): Prohibit construction of roads year-round (p. 139). SSP-6:  No management action will be permitted on BLM lands that will jeopardize the continued existence of species that are listed, proposed for listing, or candidates for listing under the Endangered Species Act (pg. 136). **SAN LUIS VALLEY TMP 2009** Reduce route density. |
| 9 | Travel | **DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013** Prohibit the construction of new routes in existing, un-fragmented sagebrush shrublands 60 acres or larger.  Allow for the construction of new routes in patches smaller than 60 acres only if one of the following conditions is met: <br>• Any additional fragmentation of sagebrush shrublands is offset by projects that reduce fragmentation of sagebrush parks elsewhere. <br>• New routes are placed on the edge of existing sagebrush shrublands to reduce fragmentation.  Reroutes would be placed to avoid encompassing more than half of the perimeter of the patch.  Reduce fragmentation in existing sagebrush shrublands by closing routes to public use or by rerouting routes to the edge of sagebrush parks.  Prioritize the largest patches in sage-grouse critical habitat.  Minimize travel routes in and crossing riparian and wetland areas. <br>When routes are contributing to continued decline, do one or more of the following: <br>• Close and rehabilitate <br>• Relocate the routes <br>• Re-engineer these routes.  Conduct work with partners (e.g., local governments, trail organizations, user groups, etc.).  Locate new routes outside of riparian and wetland areas.  Minimize the number of crossings and work with partners (e.g., local governments, trail organizations, user groups, etc.) to build bridges or properly armor or |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | protect crossings at necessary crossing locations. |
| | | **GRAND JUNCTION FO RMP 2015**<br>Maintain and/or create connections between key sagebrush habitats by encouraging placement of new utility developments (power lines, pipelines, etc.) and transportation routes (roads, trails etc.) in existing utility or transportation corridors to minimize fragmentation of sagebrush vegetation.  Where feasible, consistent with user safety, locate/relocate developed travel routes away from riparian wetland areas. |
| | | **GUNNISON BASIN TMP 2010**<br>Possible New Routes, It is my decision that before a new route can be approved to be built (ground disturbance), further environmental analysis and public involvement, pursuant to NEPA must be completed prior to a decision to authorize the action.  The analysis would also address compliance with other laws and regulations relating to endangered species and cultural resources.  Future possible routes not listed in the FEIS may be considered for addition to the BLM Travel Management System if these routes are consistent with criteria identified in the FEIS. |
| | | **MOAB FO RMP 2008**<br>SSS-24:  All surface-disturbing activities will be prohibited within 0.6 mile of a lek.  Implement GUSG RCP (2005) pp. 122:  Minimize negative impacts of roads.<br>SSS-12:  As required by the Endangered Species Act, avoid construction of new roads within listed and non-listed special status plant and animal species habitats (p. 119).<br>Travel Management decision 3 (TRV-3):  See also specific designated routes initially established through the Travel Plan accompanying this RMP (see Appendix N) may be modified through subsequent implementation planning and project planning on a case-by-case basis.  These identified routes will be available regardless of other management actions.  These adjustments will occur only in areas with limited route designations and will be analyzed at the implementation planning level.  These adjustments will be done through a collaborative process with local government and will include public review of proposed route changes.  Site-specific NEPA documentation will be required for changes to the route designation system (p. 126). |
| | | **MONTICELLO FO RMP 2008**<br>SSP-23:  Lek habitat (within 0.6 mile of active strutting ground):<br>Prohibit construction of roads year-round (p. 139).<br>SSP-6:  No management action will be permitted on BLM lands that will jeopardize the continued existence of species that are listed, proposed for listing, or candidates for listing under the Endangered Species Act. (p. 136) |
| | | **SAN LUIS VALLEY TMP 2009** |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | Reduce route density. |
| 10 | Travel | **DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**<br>Prohibit the construction of new routes in existing, un-fragmented sagebrush shrublands 60 acres or larger. Allow for the construction of new routes in patches smaller than 60 acres only if one of the following conditions is met:<br>• Any additional fragmentation of sagebrush shrublands is offset by projects that reduce fragmentation of sagebrush parks elsewhere.<br>• New routes are placed on the edge of existing sagebrush shrublands to reduce fragmentation. Reroutes would be placed to avoid encompassing more than half of the perimeter of the patch. Reduce fragmentation in existing sagebrush shrublands by closing routes to public use or by rerouting routes to the edge of sagebrush parks. Prioritize the largest patches in sage-grouse critical habitat. Minimize travel routes in and crossing riparian and wetland areas.<br>When routes are contributing to continued decline, do one or more of the following:<br>• Close and rehabilitate<br>• Relocate the routes<br>• Re-engineer these routes. Conduct work with partners (e.g., local governments, trail organizations, user groups, etc.). Locate new routes outside of riparian and wetland areas. Minimize the number of crossings and work with partners (e.g., local governments, trail organizations, user groups, etc.) to build bridges or properly armor or protect crossings at necessary crossing locations.<br><br>**GRAND JUNCTION FO RMP 2015**<br>Maintain and/or create connections between key sagebrush habitats by encouraging placement of new utility developments (power lines, pipelines, etc.) and transportation routes (roads, trails etc.) in existing utility or transportation corridors to minimize fragmentation of sagebrush vegetation. Where feasible, consistent with user safety, locate/relocate developed travel routes away from riparian wetland areas.<br><br>**GUNNISON BASIN TMP 2010**<br>Possible New Routes, It is my decision that before a new route can be approved to be built (ground disturbance), further environmental analysis and public involvement, pursuant to NEPA must be completed prior to a decision to authorize the action. The analysis would also address compliance with other laws and regulations relating to endangered species and cultural resources. Future possible routes not listed in the FEIS may be considered for addition to the BLM Travel Management System if these routes are consistent with criteria identified in the FEIS.<br><br>**MOAB FO RMP 2008** |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
|  |  | SSS -24:  All surface-disturbing activities will be prohibited within 0.6 mile of a lek.  Implement GUSG RCP (2005) p. 122:  Minimize negative impacts of roads.<br>Travel Management decision 3 (TRV-3):  See also specific designated routes initially established through the Travel Plan accompanying this RMP (see Appendix N) may be modified through subsequent implementation planning and project planning on a case-by-case basis.  These identified routes will be available regardless of other management actions.  These adjustments will occur only in areas with limited route designations and will be analyzed at the implementation planning level.  These adjustments will be done through a collaborative process with local government and will include public review of proposed route changes.  Site-specific NEPA documentation will be required for changes to the route designation system (p. 126). |
| 11 | Travel | No Similar Action. |
| 12 | Travel | **DOMINGUEZ-ESCALANTE DRAFT RMP 2013**<br>TRV-MA-66:  Reduce routes through currently suitable or potentially suitable Gunnison and Greater Sage-Grouse habitat by reducing routes through sagebrush parks, with an emphasis on routes that bisect sagebrush parks.<br>TRV-MA-68:  To reduce disturbance to Gunnison or Greater Sage-Grouse, close duplicative or redundant routes within Sage-Grouse habitat and within 4 miles of a lek.<br><br>**GRAND JUNCTION FO**<br>TRV-MA-62:  Reduce redundancies in routes to minimize habitat fragmentation, and minimize direct impacts from motorized and mechanized users of roads, routes, and trails on listed species and in designated critical habitat for threatened and endangered plants.  Identify mitigation where open routes are negatively effecting listed species and/or designated critical habitat, and ensure that Land Health Standard 4 is being achieved or progress is being made towards meeting this Standard.<br>TRV-MA-66:  Reduce routes through currently suitable or potentially suitable Gunnison and Greater Sage-Grouse habitat by reducing routes through sagebrush parks, with an emphasis on routes that bisect sagebrush parks.<br>TRV-MA-68:  To reduce disturbance to Gunnison or Greater Sage-Grouse, close duplicative or redundant routes within Sage-Grouse habitat and within 4 miles of a lek.<br><br>**MOAB FO RMP 2008**<br>SSS-24:  Implement RCP 2005 pp. 226 -228:  Minimize negative impacts of roads.<br>(Travel Management Decision 9 (TRV-9):  Any routes that are not baseline routes will be signed "Closed" on the ground.  Such routes will be considered as impacts to the area's natural character, and use of such routes will be considered cross country use and not allowed.  Non-inventoried routes should be rehabilitated (p. 127). |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | TRV-8:  Where the authorized officer determines that off-road vehicles are causing or will cause considerable adverse impacts, the authorized officer shall close or restrict such areas.  The public will be notified as to these closures and restrictions (p. 127).<br><br>**MONTICELLO FO RMP 2008**<br>TM-8:  Where the authorized officer determines that OHVs are causing or will cause considerable adverse impacts, the authorized officer shall close or restrict such areas.  The public will be notified.  The BLM could impose limitations on types of vehicles allowed on specific designated routes if monitoring indicates that a particular type of vehicle is causing disturbance to the soil, wildlife habitat, cultural or vegetative resources, especially by off-road travel in an area that is limited to designated routes.<br>SSP-18:  Any nonessential routes developed for a project located in special status species habitat will be closed and rehabilitated when the project is complete.<br><br>**TRES RIOS FO RMP 2015**<br>ACTION:  Conduct restoration of roads, primitive roads, and trails not designated in travel management plans.  This also includes primitive route/roads that were not designated in wilderness study areas and within lands managed for wilderness characteristics that have been selected for protection. |
| 13 | Travel | **DOMINGUEZ-ESCALANTE DRAFT RMP 2013**<br>TRV-MA-66:  Reduce routes through currently suitable or potentially suitable Gunnison and Greater Sage-Grouse habitat by reducing routes through sagebrush parks, with an emphasis on routes that bisect sagebrush parks.<br>TRV-MA-68:  To reduce disturbance to Gunnison or Greater Sage-Grouse, close duplicative or redundant routes within Sage-Grouse habitat and within 4 miles of a lek.<br><br>**GRAND JUNCTION FO**<br>TRV-MA-62:  Reduce redundancies in routes to minimize habitat fragmentation, and minimize direct impacts from motorized and mechanized users of roads, routes, and trails on listed species and in designated critical habitat for threatened and endangered plants.  Identify mitigation where open routes are negatively effecting listed species and/or designated critical habitat, and ensure that Land Health Standard 4 is being achieved or progress is being made towards meeting this Standard.<br>TRV-MA-66:  Reduce routes through currently suitable or potentially suitable Gunnison and Greater Sage-Grouse habitat by reducing routes through sagebrush parks, with an emphasis on routes that bisect sagebrush parks.<br>TRV-MA-68:  To reduce disturbance to Gunnison or Greater Sage-Grouse, close duplicative or redundant routes within Sage-Grouse habitat and within 4 miles of a lek. |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | **MOAB FO RMP 2008**<br>SSS-24: Implement RCP 2005 pp. 226 -228: Minimize negative impacts of roads.<br>(Travel Management Decision 9 (TRV-9): Any routes that are not baseline routes will be signed "Closed" on the ground. Such routes will be considered as impacts to the area's natural character, and use of such routes will be considered cross country use and not allowed. Non-inventoried routes should be rehabilitated (p. 127).<br>TRV-8: Where the authorized officer determines that off-road vehicles are causing or will cause considerable adverse impacts, the authorized officer shall close or restrict such areas. The public will be notified as to these closures and restrictions (p. 127).<br>**MONTICELLO FO RMP 2008**<br>TM-8: Where the authorized officer determines that OHVs are causing or will cause considerable adverse impacts, the authorized officer shall close or restrict such areas. The public will be notified. The BLM could impose limitations on types of vehicles allowed on specific designated routes if monitoring indicates that a particular type of vehicle is causing disturbance to the soil, wildlife habitat, cultural or vegetative resources, especially by off-road travel in an area that is limited to designated routes.<br>SSP-18: Any nonessential routes developed for a project located in special status species habitat will be closed and rehabilitated when the project is complete.<br>**TRES RIOS FO RMP 2015**<br>ACTION: Conduct restoration of roads, primitive roads, and trails not designated in travel management plans. This also includes primitive route/roads that were not designated in wilderness study areas and within lands managed for wilderness characteristics that have been selected for protection. |
| 14 | Travel | **GUNNISON GORGE NCA RMP 2004**<br>ACTION: From May 1 to November 14, motorized and non-motorized, mechanical vehicular travel and use on public lands in the unit will be limited to the designated routes shown on Figure 2-4 (see end of this chapter) to prevent disturbance to sage grouse leks or potential leks. The routes shown are preliminary and may not be all inclusive.<br>ACTION: Roads managed by BLM will be closed seasonally or otherwise under the appropriate regulations or laws for protection of resources, for prevention of vandalism or trespass, or for other reasons that warrant such restrictions in order to better manage resources or values on public lands. These options will be implemented as a result of findings during monitoring of resources and programs as part of adaptive management.<br>ACTION: The management unit will be closed to motorized and mechanical vehicular use and travel from |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | November 15 through April 30 annually to prevent disturbance to wintering big game or breeding/strutting sage-grouse. Closure could be extended an additional 30 days if warranted by circumstances.<br>ACTION: Motorized and mechanical vehicle travel on public lands in this management unit will be limited to the designated routes as shown on Figure 2-4 from May 1 through November 14, unless necessary to extend closure another 30 days.<br><br>**GRAND JUNCTION FO RMP 2015**<br>Additional closures or seasonal restrictions on areas or routes may be implemented to reduce resource conflicts, public health and safety concerns, or road and trail damage as necessary.<br><br>**GUNNISON BASIN TMP 2010**<br>ACTION: I have decided to apply seasonal closures to motorized travel, for sage-grouse habitat conservation, to specific areas of key sage-grouse habitat rather than simply closing specific routes. This proposed area closure is expected to help protect sage-grouse breeding and early nesting habitat and encompasses about 191,000 acres around Gunnison. This area would be closed to all motorized travel, except to access private in-holdings with proper authorization and some administrative access, from March 15 to May 15 each year.<br><br>**HARTMAN ROCKS RAMP 2014**<br>ACTION: Roads and trails south of the power line road would be closed to motorized and mechanized vehicles from March 15 to May 15 each year for GUSG conservation.<br>ACTION: The 2006 RAMP designated system roads and trails. It also designated types of use on those trails. It instituted seasonal closures to help with GUSG conservation. Off route travel with motorized and mechanized vehicles is not allowed under this alternative.<br>ACTION: No cross country travel. Currently, the Public Lands managed by BLM within the planning area are open to over-snow winter travel. The proposed action alternative would amend the RMP to limit over-snow travel by tracked vehicles (e.g. snowmobiles) to specific designated routes within the planning area. Tracked vehicles would be allowed to travel over snow on system roads that are groomed for cross-country skiing. Using tracked vehicles on ungroomed routes would not be allowed at Hartman Rocks Recreation Area.<br><br>**MOAB FO RMP 2008**<br>SSS -24: Implement RCP 2005 p. 246: Minimize negative impacts of recreational activities.<br>TRV-5: BLM could impose limitation to types of vehicles if monitoring indicates a type of vehicle is causing disturbances to the soil, wildlife, wildlife habitat, cultural and vegetative resources...<br>TRV-8: Where the authorized officer determines ORV are causing or will cause considerable adverse impacts, the |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | AO shall close or restrict such areas. |
| | | **MONTICELLO FO RMP 2008** |
| | | TM-8:  Where the authorized Officer determines that OHVs are causing or will cause adverse impacts, the authorized officer shall close or restrict such areas.  The public will be notified.  The BLM could impose limitations on types of vehicles allowed on specific designated routes if monitoring indicates that a particular type of vehicle is causing disturbance to the soil, wildlife habitat, cultural or vegetative resources, especially by off-road travel in an area that is limited to designated routes (p. 142). |
| | | **SAN LUIS VALLEY TMP 2013** |
| | | Apply seasonal road closures to all motorized routes from Poncha Pass (east side of U.S. Highway 285) to Saguache County Road LL57 (Hayden Pass), with the exception of the Glider Road (BLM Road 5342) from March 1st to May 15th for the protection of the GUSG. |
| 15 | Travel | **GUNNISON GORGE NCA RMP 2004** |
| | | ACTION:  From May 1 to November 14, motorized and non-motorized, mechanical vehicular travel and use on public lands in the unit will be limited to the designated routes shown on Figure 2-4 (see end of this chapter) to prevent disturbance to sage grouse leks or potential leks.  The routes shown are preliminary and may not be all inclusive. |
| | | ACTION:  Roads managed by BLM will be closed seasonally or otherwise under the appropriate regulations or laws for protection of resources, for prevention of vandalism or trespass, or for other reasons that warrant such restrictions in order to better manage resources or values on public lands.  These options will be implemented as a result of findings during monitoring of resources and programs as part of adaptive management. |
| | | ACTION:  The management unit will be closed to motorized and mechanical vehicular use and travel from November 15 through April 30 annually to prevent disturbance to wintering big game or breeding/strutting sage-grouse.  Closure could be extended an additional 30 days if warranted by circumstances. |
| | | ACTION:  Motorized and mechanical vehicle travel on public lands in this management unit will be limited to the designated routes as shown on Figure 2-4 from May 1 through November 14, unless necessary to extend closure another 30 days. |
| | | **GRAND JUNCTION FO RMP 2015** |
| | | Additional closures or seasonal restrictions on areas or routes may be implemented to reduce resource conflicts, public health and safety concerns, or road and trail damage as necessary. |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | **GUNNISON BASIN TMP 2010**<br>ACTION: I have decided to apply seasonal closures to motorized travel, for sage-grouse habitat conservation, to specific areas of key sage-grouse habitat rather than simply closing specific routes. This proposed area closure is expected to help protect sage-grouse breeding and early nesting habitat and encompasses about 191,000 acres around Gunnison. This area would be closed to all motorized travel, except to access private in-holdings with proper authorization and some administrative access, from March 15 to May 15 each year.<br><br>**HARTMAN ROCKS RAMP 2014**<br>ACTION: Roads and trails south of the power line road would be closed to motorized and mechanized vehicles from March 15 to May 15 each year for GUSG conservation.<br>ACTION: The 2006 RAMP designated system roads and trails. It also designated types of use on those trails. It instituted seasonal closures to help with GUSG conservation. Off route travel with motorized and mechanized vehicles is not allowed under this alternative.<br><br>**MOAB FO RMP 2008**<br>SSS -24 - Implement RCP 2005 p. 246: Minimize negative impacts of recreational activities.<br>TRV-5: BLM could impose limitations on types of vehicle allowed on specific designated routes if monitoring indicates that a particular type of vehicle is causing disturbance to the soil, wildlife, wildlife habitat, cultural or vegetative resources, especially by off-road travel in an area that is limited to designated roads (p. 126).<br><br>**SAN LUIS RMP 1991**<br>Seasonal road closures will be applied to the GUSG lek and nesting habitat area, and includes all motorized routes from Poncha Pass (east of U.S. Highway 285) to the Hayden Pass Road (Saguache County Road LL57), with the exception of the Glider Road (BLM Road 5342 accessed through CR-LL57), which is outside of GUSG Habitat. Dates for seasonal road closures are from March 1st to May 15th. |
| 16 | Travel | **GUNNISON GORGE NCA RMP 2004**<br>ACTION: From May 1 to November 14, motorized and non-motorized, mechanical vehicular travel and use on public lands in the unit will be limited to the designated routes shown on Figure 2-4 (see end of this chapter) to prevent disturbance to sage grouse leks or potential leks. The routes shown are preliminary and may not be all inclusive.<br><br>**GRAND JUNCTION FO RMP 2015**<br>Additional closures or seasonal restrictions on areas or routes may be implemented to reduce resource conflicts, |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | public health and safety concerns, or road and trail damage as necessary.<br><br>**MOAB FO RMP 2008**<br>SSS -24:  Implement 2005 GUSG RCP p. 246:  Minimize negative impacts of recreational activities.<br><br>**MONTICELLO RMP 2008**<br>SSP-6:  No management action will be permitted on BLM lands that will jeopardize the continued existence of species that are listed, proposed for listing, or candidates for listing under the Endangered Species Act (p. 137). |
| **RECREATION** | | |
| 17 | Recreation | **MONTICELLO FO RMP 2008**<br>REC-2:  Consider and, where appropriate, implement management methods to protect natural and cultural resources and while giving consideration to community and economic impacts, implement management methods to maintain or enhance recreation opportunities.  Management methods may include limitation of visitor numbers, camping and travel controls, implementation of fees, alteration of when use takes place, and other similar actions as they are approved through normal BLM procedures (p. 88).<br>REC-141:  ERMA lands are managed to provide an undeveloped setting where visitors can disperse and recreate in a generally unregulated manner, as long as the use is consistent with other resource values (p. 111).<br>REC-143:  Any portions of an ERMA subject to other management prescriptions (i.e., ACEC, WSA, etc.) will be managed according to those prescriptions (p. 111).<br>REC-144:  Monitor the ERMA to determine if more intensive recreational management is required to protect resource values and preserve the recreational experience (p. 111).<br>REC-145:  Encourage "Leave No Trace" and "Tread Lightly" principles throughout the ERMA (p. 111).<br>REC-149:  Within the ERMA, dispersed vehicle camping is allowed only in previously disturbed areas within 150 feet of designated routes (on each side of a centerline).  If use is such that undue environmental impacts are taking place, BLM will close and rehabilitate damaged areas.  This use will not include areas within WSAs (389,444 acres) or non-WSA areas with wilderness characteristics (88,871 acres), WSR corridors, ACECs, or T&E/special status species habitats.  Where monitoring identifies resource impacts, future implementation level plans could consider designation of specific camp sites (p. 112). |
| 18 | Recreation | **CANYONS OF THE ANCIENTS NM RMP 2010**<br>Mitigate (vegetation damage) by restoration and reclamation for disturbance on a project-level basis. |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | **GUNNISON GORGE NCA RMP 2004**<br>Implement additional management actions if needed to ensure recreation use, including motorized and non-motorized, mechanical vehicular use, within Gunnison Sage-Grouse ACEC/IBA is consistent with ACEC objectives. Actions could include: special stipulations for commercial, competitive (outside NCA), and organized groups permits; seasonal restrictions on camping and/or other recreational activities in lek areas to protect strutting birds; and allow camping, firewood gathering, etc., only in designated areas in critical habitat areas.<br><br>**MOAB FO RMP 2008**<br>If GUSG leks are discovered within sage-grouse habitat, no surface-disturbing activities will be allowed within 0.6 mile of a lek.<br>Purpose:  To protect occupied lek sites within GUSG Habitat.<br>Exception:  An exception may be granted by the Field Manager if the operator submits a plan which demonstrates that impacts from the proposed action can be adequately mitigated.<br>Modification:  The Field Manager may modify the boundaries of the stipulation area if:<br>(1) portions of the area do not include lek sites, or (2) the lek site(s) have been completely abandoned or destroyed, or (3) occupied lek site(s) occur outside the current defined area, as determined by the BLM.<br>Waiver:  A waiver may be granted if there are no active lek site(s) in the leasehold and it is determined the site(s) have been completely abandoned or destroyed or occur outside current defined area, as determined by the BLM. |
| 19 | Recreation | **CANYONS OF THE ANCIENTS NM RMP 2010**<br>Mitigate (vegetation damage) by restoration and reclamation for disturbance on a project-level basis.<br><br>**GUNNISON GORGE NCA RMP 2004**<br>Implement additional management actions if needed to ensure recreation use, including motorized and non-motorized, mechanical vehicular use, within Gunnison Sage-Grouse ACEC/IBA is consistent with ACEC objectives. Actions could include: special stipulations for commercial, competitive (outside NCA), and organized groups permits; seasonal restrictions on camping and/or other recreational activities in lek areas to protect strutting birds; and allow camping, firewood gathering, etc., only in designated areas in critical habitat areas.<br><br>**MOAB FO RMP 2008**<br>If GUSG leks are discovered within sage-grouse habitat, no surface-disturbing activities will be allowed within 0.6 mile of a lek.<br>Purpose:  To protect occupied lek sites within GUSG Habitat. |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | Exception:  An exception may be granted by the Field Manager if the operator submits a plan which demonstrates that impacts from the proposed action can be adequately mitigated. Modification:  The Field Manager may modify the boundaries of the stipulation area if: (1) portions of the area do not include lek sites, or (2) the lek site(s) have been completely abandoned or destroyed, or (3) occupied lek site(s) occur outside the current defined area, as determined by the BLM. Waiver:  A waiver may be granted if there are no active lek site(s) in the leasehold and it is determined the site(s) have been completely abandoned or destroyed or occur outside current defined area, as determined by the BLM. **TRES RIOS FO RMP 2015** Structures in sage grouse habitat should be constructed to limit risk of collision and predation. |
| **Special Recreation Permits (SRPs)** | | |
| 20 | Recreation | **GRAND JUNCTION FO RMP 2015** ACTION:  Issue SRPs as a discretionary action as a means to: help meet management objectives, provide opportunities for economic activity, facilitate recreational use of the public lands, control visitor use, protect recreational and natural resources, and provide for the health and safety of visitors.  Cost recovery procedures for issuing SRPs would be applied where appropriate.  All new SRP proposals would be reviewed using the Special Recreation Permit Evaluation as outlined in Appendix L, Special Recreation Permits. ACTION:  All SRPs would contain standard stipulations appropriate for the type of activity and may include additional stipulations necessary to protect lands or resources, reduce conflicting user interactions, or minimize health and safety concerns. **GUNNISON GORGE NCA RMP 2004** Implement additional management actions if needed to ensure recreation use, including motorized and non-motorized, mechanical vehicular use, within Gunnison Sage-Grouse ACEC/IBA is consistent with ACEC objectives. Actions could include: special stipulations for commercial, competitive (outside NCA), and organized groups permits; seasonal restrictions on camping and/or other recreational activities in lek areas to protect strutting birds; and allow camping, firewood gathering, etc., only in designated areas in critical habitat areas. **MCINNIS CANYONS NCA RMP 2004** Special Recreation Permits are issued at the discretion of the Field Manager, who may at any time and without prior notice, choose not to issue permits for certain activities or use areas. Such decisions could be based on a variety of factors such as planning decisions, potential resource impacts, existing outfitters in the same area, overcrowding, |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | past poor performance, and other concerns. All SRPs will be evaluated using Permit Evaluation Factors and Permit Classification System (see Appendix I). Monitoring will identify effectiveness of permit classification system and adjustments would be made if determined that goals and objectives are not being met. **MOAB FO RMP 2008** REC-46:  Special Recreation Permits (SRPs):  SRPs are issued as a discretionary action as a means to: help meet management objectives, provide opportunities for economic activity, facilitate recreational use of the public lands, control visitor use, protect recreational and natural resources, and provide for the health and safety of visitors. Cost recovery procedures for issuing SRPs will be applied where appropriate (p. 97). REC-48:  All SRPs will contain standard stipulations appropriate for the type of activity and may include additional stipulations necessary to protect lands or resources, reduce user conflicts, or minimize health and safety concerns (p. 98). REC-50:  Issue and manage special recreation permits for a wide variety of uses to enhance outdoor recreational opportunities, provide opportunities for private enterprise, manage user-group interaction, and limit the impacts of such uses upon natural and cultural resources.  Organized group permits required for groups with 25 or more vehicles (one driver/vehicle) (p. 98). SSS-3:  As required by the Endangered Species Act, no management action will be permitted on public lands that will jeopardize the continued existence of plant or animal species that are listed or are officially proposed or are candidates for listing as T&E (p. 117). **MONTICELLO FO RMP 2008** REC-17:  SRPs will be issued as a discretionary action as a means to help meet management objectives, control visitor use, protect recreational and natural resources, and provide for the health and safety of visitors (p. 91). REC-18:  All SRPs will contain standard stipulations appropriate for the type of activity and may include additional stipulations (Appendix K of RMP) necessary to protect lands or resources, reduce user conflicts, or minimize health and safety concerns (p. 91). SSP-6:  No management action will be permitted on BLM lands that will jeopardize the continued existence of species that are listed, proposed for listing, or candidates for listing under the Endangered Species Act (p. 137). **TRES RIOS FO RMP 2015** Only allow special recreation permits that have neutral or beneficial effects to priority habitat areas. |
| 21 | Recreation | **GRAND JUNCTION FO RMP 2015** |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | ACTION:  Issue SRPs as a discretionary action as a means to: help meet management objectives, provide opportunities for economic activity, facilitate recreational use of the public lands, control visitor use, protect recreational and natural resources, and provide for the health and safety of visitors.  Cost recovery procedures for issuing SRPs would be applied where appropriate.  All new SRP proposals would be reviewed using the Special Recreation Permit Evaluation as outlined in Appendix L, Special Recreation Permits. ACTION:  All SRPs would contain standard stipulations appropriate for the type of activity and may include additional stipulations necessary to protect lands or resources, reduce conflicting user interactions, or minimize health and safety concerns. |
| | | **GUNNISON GORGE NCA RMP 2004** Implement additional management actions if needed to ensure recreation use, including motorized and non-motorized, mechanical vehicular use, within Gunnison Sage-Grouse ACEC/IBA is consistent with ACEC objectives. Actions could include: special stipulations for commercial, competitive (outside NCA), and organized groups permits; seasonal restrictions on camping and/or other recreational activities in lek areas to protect strutting birds; and allow camping, firewood gathering, etc., only in designated areas in critical habitat areas. |
| | | **MCINNIS CANYONS NCA RMP 2004** Special Recreation Permits are issued at the discretion of the Field Manager, who may at any time and without prior notice, choose not to issue permits for certain activities or use areas.  Such decisions could be based on a variety of factors such as planning decisions, potential resource impacts, existing outfitters in the same area, overcrowding, past poor performance, and other concerns. All SRPs will be evaluated using Permit Evaluation Factors and Permit Classification System (see Appendix I). Monitoring will identify effectiveness of permit classification system and adjustments would be made if determined that goals and objectives are not being met. |
| | | **MOAB FO RMP 2008** REC-46:  Special Recreation Permits (SRPs):  SRPs are issued as a discretionary action as a means to: help meet management objectives, provide opportunities for economic activity, facilitate recreational use of the public lands, control visitor use, protect recreational and natural resources, and provide for the health and safety of visitors. Cost recovery procedures for issuing SRPs will be applied where appropriate (p. 97). REC-48:  All SRPs will contain standard stipulations appropriate for the type of activity and may include additional stipulations necessary to protect lands or resources, reduce user conflicts, or minimize health and safety concerns (p. 98). REC-50:  Issue and manage special recreation permits for a wide variety of uses to enhance outdoor recreational |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | opportunities, provide opportunities for private enterprise, manage user-group interaction, and limit the impacts of such uses upon natural and cultural resources. Organized group permits required for groups with 25 or more vehicles (one driver/vehicle) (p. 98). SSS-3: As required by the Endangered Species Act, no management action will be permitted on public lands that will jeopardize the continued existence of plant or animal species that are listed or are officially proposed or are candidates for listing as T&E (p. 117). **MONTICELLO FO RMP 2008** REC-17: SRPs will be issued as a discretionary action as a means to help meet management objectives, control visitor use, protect recreational and natural resources, and provide for the health and safety of visitors (p. 91). REC-18: All SRPs will contain standard stipulations appropriate for the type of activity and may include additional stipulations (Appendix K of RMP) necessary to protect lands or resources, reduce user conflicts, or minimize health and safety concerns (p. 91). SSP-6: No management action will be permitted on BLM lands that will jeopardize the continued existence of species that are listed, proposed for listing, or candidates for listing under the Endangered Species Act (p. 137). **TRES RIOS FO RMP 2015** Only allow special recreation permits that have neutral or beneficial effects to priority habitat areas. |
| 22 | Recreation | **GRAND JUNCTION FO RMP 2015** ACTION: Issue SRPs as a discretionary action as a means to: help meet management objectives, provide opportunities for economic activity, facilitate recreational use of the public lands, control visitor use, protect recreational and natural resources, and provide for the health and safety of visitors. Cost recovery procedures for issuing SRPs would be applied where appropriate. All new SRP proposals would be reviewed using the Special Recreation Permit Evaluation as outlined in Appendix L, Special Recreation Permits. ACTION: All SRPs would contain standard stipulations appropriate for the type of activity and may include additional stipulations necessary to protect lands or resources, reduce conflicting user interactions, or minimize health and safety concerns. **GUNNISON GORGE NCA RMP 2004** Implement additional management actions if needed to ensure recreation use, including motorized and non-motorized, mechanical vehicular use, within Gunnison Sage-Grouse ACEC/IBA is consistent with ACEC objectives. Actions could include: special stipulations for commercial, competitive (outside NCA), and organized groups permits; seasonal restrictions on camping and/or other recreational activities in lek areas to protect strutting birds; and allow |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | camping, firewood gathering, etc., only in designated areas in critical habitat areas. |

**MCINNIS CANYONS NCA RMP 2004**

Special Recreation Permits are issued at the discretion of the Field Manager, who may at any time and without prior notice, choose not to issue permits for certain activities or use areas.  Such decisions could be based on a variety of factors such as planning decisions, potential resource impacts, existing outfitters in the same area, overcrowding, past poor performance, and other concerns.

All SRPs will be evaluated using Permit Evaluation Factors and Permit Classification System (see Appendix I). Monitoring will identify effectiveness of permit classification system and adjustments would be made if determined that goals and objectives are not being met.

**MOAB FO RMP 2008**

REC-46:  Special Recreation Permits (SRPs):  SRPs are issued as a discretionary action as a means to: help meet management objectives, provide opportunities for economic activity, facilitate recreational use of the public lands, control visitor use, protect recreational and natural resources, and provide for the health and safety of visitors. Cost recovery procedures for issuing SRPs will be applied where appropriate (p. 97).

REC-48:  All SRPs will contain standard stipulations appropriate for the type of activity and may include additional stipulations necessary to protect lands or resources, reduce user conflicts, or minimize health and safety concerns (p. 98).

REC-50:  Issue and manage special recreation permits for a wide variety of uses to enhance outdoor recreational opportunities, provide opportunities for private enterprise, manage user-group interaction, and limit the impacts of such uses upon natural and cultural resources.  Organized group permits required for groups with 25 or more vehicles (one driver/vehicle) (p. 98).

SSS-3:  As required by the Endangered Species Act, no management action will be permitted on public lands that will jeopardize the continued existence of plant or animal species that are listed or are officially proposed or are candidates for listing as T&E (p. 117).

**MONTICELLO FO RMP 2008**

REC-17:  SRPs will be issued as a discretionary action as a means to help meet management objectives, control visitor use, protect recreational and natural resources, and provide for the health and safety of visitors (p. 91).

REC-18:  All SRPs will contain standard stipulations appropriate for the type of activity and may include additional stipulations (Appendix K of RMP) necessary to protect lands or resources, reduce user conflicts, or minimize health and safety concerns (p. 91).

SSP-6:  No management action will be permitted on BLM lands that will jeopardize the continued existence of

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | species that are listed, proposed for listing, or candidates for listing under the Endangered Species Act (p. 137). **TRES RIOS FO RMP 2015** Only allow special recreation permits that have neutral or beneficial effects to priority habitat areas. |
| 23 | Recreation | No similar action. |

## LANDS AND REALTY MANAGEMENT

### Rights-of-Way (ROWs)

| 24 | Lands & Realty– Exclusion and Avoidance Areas | **CANYONS OF THE ANCIENTS NM RMP 2010** <br>• Allow no new ROWs to be permitted in Squaw/Cross Canyon SRMA, except for access to private land. <br>• Allow land actions to occur only when they will result in minimal adverse impact(s), when they will be beneficial to cultural resource management, or when there is a clear and significant public need. <br>• Limit ROWs for development of resources to a 16-foot running surface (road) width. <br><br>**DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013** <br>Manage 208,990 acres of the D-E NCA as a ROW exclusion area (Map 2–14d), except to allow for: <br>• Reasonable access and utilities to non-federal property and existing ROW facilities. <br>• Upgrades or modifications to existing facilities <br>• Allow for the construction of research and monitoring sites in ROW exclusion areas as long as these facilities further understanding and management of the purposes of the D-E NCA. <br><br>**GUNNISON RMP 1993** <br>ROW Exclusion Areas: <br>• MU 3 (Cochetopa Canyon SRMA):  ROWs.  Public land in the unit will be classified an exclusion area for above-ground utility ROWs. Underground utility ROWs and development will be limited to previously disturbed areas associated with existing roads. <br>• MU 9 (Dillon Pinnacles ACEC):  ROWs. Public lands in the unit will be classified an exclusion area for ROWs. <br>• ROW Avoidance Areas: <br>• MU 1 (Part of Alpine Triangle SRMA):  ROWs. Public lands north of the south line of Sections 16 and 17, T.47N.R.3W. NMPM, approximately 2,560 acres, and about 76,880 acres south and west of Lake City will be classified an avoidance area for all other ROWs. |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | • MU 1 (Part of Alpine Triangle SRMA):  ROWs.  With the exception of public lands in the ROWs corridor, the entire unit will be closed to the development of above-ground utilities (91,510 acres).<br><br>**GUNNISON GORGE NCA RMP 2004**<br>• MU 4 (GUSG ACEC/IBA):  Construction of all ROWs in the management unit will be restricted from November 15 through April 30 during crucial periods for wintering mule deer, elk, and GUSG.<br>• MU 4 (GUSG ACEC/IBA):  Except as described below for the relict tree stand on Black Ridge, this management unit will be open to ROWs with appropriate conditions where the ROW will not adversely affect the values for which the management unit was designated.  Mitigation will be required in all applications to meet the objectives of this management unit.  Public lands in the relict tree stand on Black Ridge will not be available for surface linear ROWs of any kind, nor aerial ROWs or special use permits occupying more than 100 square feet and needing vehicular access constructed, or needing existing vehicular access maintained for distances greater than 200 feet.  Buried ROWs will be authorized on a case-by-case basis along previously disturbed areas along existing travel routes.  Mitigation will be required in all applications to meet the objectives of this management unit.  Exceptions will be made on a case-by-case basis if the proposal supports meeting management unit objectives.<br><br>**GRAND JUNCTION FO RMP 2015**<br>Allowable Use (LR-AU1):  ROW Exclusion Areas (including renewable energy sites such as solar, wind, hydroelectric, and biomass development):  Manage 210,000 acres as ROW exclusion areas that are not available for the location of ROWs or other realty authorizations under any conditions, to include the following (Figure 2-27, Appendix A):<br>Within a 0.4-mile radius of Sage-Grouse leks<br>WSAs (allow for ROWs to existing leases without an NSO stipulation issued under the 1987 RMP)<br>Allowable Use (LR-AU2):  ROW Avoidance Areas:  Manage 779,400 acres as ROW avoidance areas (Figure 2-27, Appendix A) (see Appendix B):<br>Sage-Grouse:  Occupied Habitat<br>Sage-Grouse:  Within a 4.0-mile radius of leks<br>Streams/springs possessing lotic/lentic riparian characteristics<br>Wetlands, springs, seeps, and riparian areas...<br>Allowable Use (LR-AU9):  Leases, permits, and easements authorized under 43 CFR 2920 may be subject to additional protective measures in areas identified as ROW avoidance areas and restrict activities in areas identified as ROW exclusion areas, except for low impact temporary permits, such as filming by foot and horseback. |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | **MCINNIS CANYONS NCA RMP 2004**<br>All roads administered by the BLM will be maintained in their current condition, and no improvement will be permitted through ROW authorizations.  Any new roads that could be authorized will be constructed to minimal widths and standards similar to nearby existing "jeep roads."  Any such new roads could also be gated to prevent, or limit, public vehicle access.<br><br>**MOAB FO RMP 2008**<br>Implement the most current UDWR Strategic Management Plan for Sage-Grouse (UDWR, 2002 and its future revisions), the Gunnison Sage-grouse Range-wide Conservation Plan (2005, as amended) and recommendations from local sage-grouse working groups to protect, maintain, enhance, and restore Gunnison sage-grouse populations and habitat.  There is no GUSG occupation at this time.  However, if occupation is identified, through cooperation with UDWR, the following decisions will apply:<br>• All surface-disturbing activities will be prohibited within 0.6 mile of GUSG leks on a year-round basis.  Within the 0.6 mile buffer, allow no permanent aboveground facilities or powerlines; prohibit or limit year-round construction of fences and where opportunity exists, remove existing fences.<br>• Within four miles of a lek, avoid fence construction, overhead powerline construction, and aboveground structures that provide raptor hunting perches.  Where fences are necessary, increase their visibility.  Modify or remove fences to minimize sage-grouse mortality.<br>• As required by the Endangered Species Act, avoid construction of new roads within listed and non-listed special status plant and animal species habitats.<br>• ROW avoidance and exclusion areas will be consistent with the stipulations identified in Appendix A for oil and gas leasing and other surface-disturbing activities.  These stipulations have been developed to protect important resource values.<br>ROW Avoidance Areas:  riparian areas and springs.<br><br>**MONTICELLO FO RMP 2008**<br>ROW avoidance and exclusion areas will generally be consistent with the stipulations identified in Appendix B for oil and gas leasing and other surface-disturbing activities.  These stipulations have been developed to protect important resource values.<br>Areas identified as NSO are open to oil and gas leasing but surface-disturbing activities cannot be conducted on the surface of the land.  Access to oil and gas deposits will require directional drilling from outside the boundaries of the NSO areas.  NSO areas are avoidance areas for ROWs; no ROW will be granted in NSO areas unless there are no |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | feasible alternatives. |

**SAN LUIS RMP 1991**

Protection measures (for riparian/wetland areas) will include, but are not limited to, 1) mitigation of impacts from ROWs and utility corridors adjacent to or that cross riparian areas.

San Luis Area #1; 1-16:  Any impacts from ROWs adjacent to or that cross riparian areas will be mitigated.

Amended the San Luis RMP:  Programmatic policies and BMPs in the Wind Energy Development Program will be adopted.

Policy:  The BLM will incorporate management goals and objectives specific to habitat conservation for species of concern (e.g., sage-grouse), as appropriate, into the POD for proposed wind energy projects.

POD BMPs:  Site Monitoring and Testing.  Meteorological towers shall not be located in sensitive habitats or in areas where ecological resources known to be sensitive to human activities (e.g., prairie grouse) are present.  Installation of towers shall be scheduled to avoid disruption of wildlife reproductive activities or other important behaviors.

**SOLAR PEIS 2012**

Solar Energy Program ROW Exclusion Areas:

1.  All designated and proposed critical habitat areas for species protected under the ESA of 1973 (as amended), or if critical habitat is not yet proposed, then as identified in respective recovery plans or the final listing rule http://ecos.fws.gov/tess_public/TESSWebpageRecovery?sort=1

2.  Sage-grouse core areas, nesting habitat, and winter habitat;

3.  All ROW exclusion areas identified in applicable land use plans.

4.  All ROW avoidance areas identified in applicable land use plans. (p. 38)

Grand Junction FO:  All lands would be excluded.

Gunnison FO:  Approximately 3,162 acres in variance areas.

Gunnison Gorge NCA:  All lands would be excluded.

McInnis Canyons NCA:  All lands would be excluded.

Moab FO:  Approximately 587 acres in variance areas.

Monticello FO:  Approximately 4,120 acres in variance areas.

San Juan/San Miguel:  Approximately 12,105 acres in variance areas.

San Luis Valley FO:  Approximately 50,384 acres in variance areas.  Four Solar Energy Zones designated (total of 16,308 acres) [none of which are within or adjacent to GUSG Occupied Habitat].

Uncompahgre Basin:  All lands would be excluded.

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| 25 | Lands & Realty- Road ROWs | **CANYONS OF THE ANCIENTS NM RMP 2010**<br>Make every reasonable effort to provide primary access to private landowners when such access will not result in significant adverse impacts to other resources.<br>Allow no new ROWs to be permitted in Squaw/Cross Canyon SRMA, except for access to private land.<br><br>**DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**<br>Allow for reasonable access to non-Federal property with the following limitations:<br>• All ROWs on existing roads administered by the BLM will be maintained in their current condition unless an upgrade in condition would better protect natural and cultural resources<br>• Any new roads would be authorized and constructed in a way that minimizes impacts to natural and cultural resources<br>• Any new roads will be gated as needed to prevent or limit public vehicle access<br>• Utilities to non-Federal property must be co-located within a 50 foot buffer of the access road to the property, unless an exception would reduce impacts to natural and cultural resources.<br>Grant no additional ROWs when reasonable access already exists, unless there is a compelling public need.<br>Authorize only 1 access route to private parcels, unless public safety or local ordinances warrant additional routes. (NOTE: Additional routes will be considered at the discretion of the Monument Manager. The ROW width will be commensurate with the development needs of the individual private parcel.) Work with private landowners to coordinate development of access routes across public lands in order to prevent proliferation of routes (see Appendix L).<br><br>**GUNNISON GORGE NCA RMP 2004**<br>On public lands in the planning area outside the Wilderness, the BLM will cooperate with the US Department of the Interior, Bureau of Reclamation (BOR) to acknowledge and document the agency's existing facilities and access needs for maintenance and operation of these facilities under the appropriate authority, e.g., withdrawals and ROWs.  BLM will request adequate information to process for the appropriate documentation, analysis, and authorizations for the facilities.  See decisions in Management Unit 6 regarding public lands withdrawn to BOR and OHV uses.<br>On public lands in the planning area outside the Wilderness, the BLM will acknowledge and document the Uncompahgre Valley Water Users Association and BOR's existing facilities and access needs for maintenance and operation of these facilities on public lands, under the appropriate authority, such as withdrawals and ROWs, when the BLM receives adequate mapping and other information to process the appropriate authorizations for the facilities. |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | **MCINNIS CANYONS NCA RMP 2004**<br>In response to potential development on private inholdings, the BLM may request Mesa County consideration of land use permitting restrictions on private inholdings for protecting the overall landscape and land use character. Requested restrictions could include limiting land uses or subdivision of property, limiting any development to a portion of the private land, locating and designing developments to minimize adverse impacts to the landscape, limiting use of exterior lights, or providing for limited public access.<br><br>**TRES RIOS FO RMP 2015**<br>Road access to private land is granted only where no other reasonable alternative exists and where it meets the appropriate road design and maintenance standards necessary for resource protection and public safety. |
| 26 | Lands & Realty-Power and Phone Lines | **GRAND JUNCTION FO RMP 2015**<br>Maintain and/or create connections between key sagebrush habitats by encouraging placement of new utility developments (power lines, pipelines, etc.) and transportation routes (roads, trails etc.) in existing utility or transportation corridors to minimize fragmentation of sagebrush vegetation.<br><br>**GUNNISON GORGE NCA RMP 2004**<br>MU 4 (GUSG ACEC/IBA):  Approximately one mile of the public lands in the management unit parallel to Red Canyon Creek will be located within a recommended ROW utility corridor for future growth in the North Fork Valley area.  Part of this corridor is also located in Management Unit 6.  See Figure 2-2 (at the end of this chapter) for the location and Table 2-3 (see end of this chapter) for information on all recommended corridors in the planning area.<br>Measures to prevent damage and injury to sage-grouse during the crucial seasonal use periods (strutting, nesting, and potentially winter), such as raptor-proofing utility poles, placing power lines in a horizontal array, will be required.<br>MU 6:  Corridors (cont'd) Map Key 4, Table 2-3 (at end of this chapter)   Along the south side of Red Canyon Creek.  Measures to prevent damage and injury to sage-grouse during the crucial seasonal use periods (strutting, nesting, and potentially winter), such as raptor-proofing utility poles, or placing power lines in a horizontal array, will be required.  Construction of ROWs in the Unit will be restricted during crucial periods for wintering deer and elk.  Part of this corridor will be located in Management Unit 4.<br>MU 6:  Corridors (cont'd) Map Key 5, Table 2-3 (at end of this chapter)   Along the northeast boundary of the planning area and NCA, and parallel to Smith Fork Creek and canyon.  Measures to prevent damage and injury to sage-grouse during the crucial seasonal use periods (strutting, nesting, and potentially winter), such as raptor-proofing utility poles, placing power lines in a horizontal array, will be required.  Construction of ROWs in the Unit |

| ROW | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | will be restricted during crucial periods for wintering deer and elk.  This corridor will be located adjacent to Unit 4. **MONTICELLO FO RMP 2008** This RMP will adopt the existing designated ROW corridors from the 1991 San Juan RMP including the Western Utility Group (WUG) updates to the Western Regional Corridor Study (Map 5), Section 368 Energy Policy Act of 2005, Westwide Energy Corridor PEIS.  Designate additional corridors as needed subject to physical barriers and sensitive resource values.  Designated transportation and utility corridors include existing groupings of ROWs for electric transmission facilities, pipelines 16 inches and larger, communication lines, federal and state highways, and major county road systems. **TRES RIOS FO RMP 2015** Energy transmission facilities should be consolidated within existing corridors and along existing linear energy transmission facilities in order to reduce habitat loss, degradation, and fragmentation resulting from new construction. **ENERGY CORRIDOR DESIGNATION PEIS 2009** • Grand Junction RMP Amendment:  Corridors 132-133, 132-276 • Gunnison RMP Amendment:  Corridor 87-277 • San Juan/San Miguel RMP Amendment:  Corridors 130-131, 130-274 • Uncompahgre Basin RMP Amendment:  Corridors 132-136, 134-136, 134-139, 136-139, 139-277, 136-277. The following corridors were identified as "corridors of concern" in the Settlement Agreement, with additional Sage-Grouse habitat concerns to be addressed in the event of ROW pre-application discussion and/or ROW applications: 82-277, 130-274, 130-274 (E). • San Luis Valley FO RMP Amendment:  San Luis Area #1; I-15:  Utility corridor routes, identified by the Western   Utility Group and included in the Rio Grande Forest Plan, are adopted with three exceptions: No utility corridor from the Poncha Pass corridor west to Middle Creek (near Saguache) to Del Norte.  This area has many acres of crucial winter wildlife habitat, is highly scenic, and is an important dispersed recreation area. Any expansion of utility use in the Poncha Pass corridor will be analyzed thoroughly under the NEPA process. |
| 27 | Lands & Realty-Communication Sites | **GRAND JUNCTION FO RMP 2015** Allowable Use (LR-AU6):  Encourage the placement of new facilities or upgrades to existing facilities in delineated corridors or in other areas with previous disturbance and existing facilities, as consistent with other resource values. **GUNNISON RMP 1993** |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | ROW Corridors: Public lands within one-half mile on each side of the centerline of Western Area Power Administrations' (WAPA) Curecanti to Salida 230 Kv electrical transmission line, and Tri-State Generation and Transmission Association's Blue Mesa to Lake City 115 Kv electrical transmission line will be designated as ROWs corridors. The WAPA line crosses Management Units 8, 11, 12, 13, 14, and 16. A ROW window 1,000 feet in width, or 500 feet either side of the centerline, will be designated where the WAPA line crosses Management Unit 8. The Tri-State corridor crosses Management Units 1, 13, and 16. **GUNNISON GORGE NCA RMP 2004** <br>• MU 4 (GUSG ACEC/IBA): Approximately one mile of the public lands in the management unit parallel to Red Canyon Creek will be located within a recommended ROW utility corridor for future growth in the North Fork Valley area. Part of this corridor is also located in Management Unit 6. See Figure 2-2 (at the end of this chapter) for the location and Table 2-3 (see end of this chapter) for information on all recommended corridors in the planning area. Measures to prevent damage and injury to sage-grouse during the crucial seasonal use periods (strutting, nesting, and potentially winter), such as raptor-proofing utility poles, placing power lines in a horizontal array, will be required. <br>• MU 6: Corridors (cont'd) Map Key 4, Table 2-3 (at end of this chapter). Along the south side of Red Canyon Creek. Measures to prevent damage and injury to sage-grouse during the crucial seasonal use periods (strutting, nesting, and potentially winter), such as raptor-proofing utility poles, or placing power lines in a horizontal array, will be required. Construction of ROWs in the Unit will be restricted during crucial periods for wintering deer and elk. Part of this corridor will be located in Management Unit 4. <br>• MU 6: Corridors (cont'd) Map Key 5, Table 2-3 (at end of this chapter). Along the northeast boundary of the planning area and NCA, and parallel to Smith Fork Creek and canyon. Measures to prevent damage and injury to sage-grouse during the crucial seasonal use periods (strutting, nesting, and potentially winter), such as raptor-proofing utility poles, placing power lines in a horizontal array, will be required. Construction of ROWs in the Unit will be restricted during crucial periods for wintering deer and elk. This corridor will be located adjacent to Unit 4. **MONTICELLO FO RMP 2008** <br>This RMP will adopt the existing designated ROW corridors from the 1991 San Juan RMP including the Western Utility Group (WUG) updates to the Western Regional Corridor Study (Map 5), Section 368 Energy Policy Act of 2005, Westwide Energy Corridor PEIS. Designate additional corridors as needed subject to physical barriers and sensitive resource values. Designated transportation and utility corridors include existing groupings of ROWs for electric transmission facilities, pipelines 16 inches and larger, communication lines, federal and state highways, and |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | major county road systems. |
| | | **TRES RIOS FO RMP 2015** <br> Energy transmission facilities should be consolidated within existing corridors and along existing linear energy transmission facilities in order to reduce habitat loss, degradation, and fragmentation resulting from new construction. |
| | | **ENERGY CORRIDOR DESIGNATION PEIS 2009** <br> • Grand Junction RMP Amendment:  Corridors 132-133, 132-276 <br> • Gunnison RMP Amendment:  Corridor 87-277 <br> • San Juan/San Miguel RMP Amendment:  Corridors 130-131, 130-274 <br> • Uncompahgre Basin RMP Amendment:  Corridors 132-136, 134-136, 134-139, 136-139, 139-277, 136-277. <br> The following corridors were identified as "corridors of concern" in the Settlement Agreement, with additional Sage-Grouse habitat concerns to be addressed in the event of ROW pre-application discussion and/or ROW applications: 82-277, 130-274, 130-274 (E). <br> • San Luis Valley FO RMP Amendment:  San Luis Area #1; I-15:  Utility corridor routes, identified by the Western Utility Group and included in the Rio Grande Forest Plan, are adopted with three exceptions: <br>    o No utility corridor from the Poncha Pass corridor west to Middle Creek (near Saguache) to Del Norte.  This area has many acres of crucial winter wildlife habitat, is highly scenic, and is an important dispersed recreation area. Any expansion of utility use in the Poncha Pass corridor will be analyzed thoroughly under the NEPA process. |
| 28 | Lands & Realty | **DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013** <br> Utilities to non-Federal property must be co-located within a 50 foot buffer of the access road to the property, unless an exception would reduce impacts to natural and cultural resources. |
| | | **GUNNISON GORGE NCA RMP 2004** <br> • MU 4 (GUSG ACEC/IBA):  Construction of all ROWs in the management unit will be restricted from November 15 through April 30 during crucial periods for wintering mule deer, elk, and GUSG. <br> • MU 4 (GUSG ACEC/IBA):  Except as described below for the relict tree stand on Black Ridge, this management unit will be open to ROWs with appropriate conditions where the ROW will not adversely affect the values for which the management unit was designated.  Mitigation will be required in all applications to meet the objectives of this management unit.  Public lands in the relict tree stand on Black Ridge will not be available for surface linear |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | ROWs of any kind, nor aerial ROWs or special use permits occupying more than 100 square feet and needing vehicular access constructed, or needing existing vehicular access maintained for distances greater than 200 feet. Buried ROWs will be authorized on a case-by-case basis along previously disturbed areas along existing travel routes. Mitigation will be required in all applications to meet the objectives of this management unit. Exceptions will be made on a case-by-case basis if the proposal supports meeting management unit objectives. |
| 29 | Lands & Realty- Exclusion and Avoidance Areas | **CANYONS OF THE ANCIENTS NM RMP 2010**<br>• Allow no new ROWs to be permitted in Squaw/Cross Canyon SRMA, except for access to private land.<br>• Allow land actions to occur only when they will result in minimal adverse impact(s), when they will be beneficial to cultural resource management, or when there is a clear and significant public need.<br>• Include all surface-use stipulations (including NGD/NSO, TL, and protective considerations for cultural resources) on new ROWs.<br>• Limit ROWs for development of resources to a 16-foot running surface (road) width.<br><br>**DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**<br>Manage 208,990 acres of the D-E NCA as a ROW exclusion area (Map 2–14d), except to allow for:<br>• Reasonable access and utilities to non-federal property and existing ROW facilities.<br>• Upgrades or modifications to existing facilities<br>• Allow for the construction of research and monitoring sites in ROW exclusion areas as long as these facilities further understanding and management of the purposes of the D-E NCA.<br><br>**GUNNISON RMP 1993**<br>ROW Exclusion Areas:<br>• MU 3 (Cochetopa Canyon SRMA): ROWs. Public land in the unit will be classified an exclusion area for above-ground utility ROWs. Underground utility ROWs and development will be limited to previously disturbed areas associated with existing roads.<br>• MU 9 (Dillon Pinnacles ACEC): ROWs. Public lands in the unit will be classified an exclusion area for ROWs.<br>ROW Avoidance Areas:<br>• MU 1 (Part of Alpine Triangle SRMA): ROWs. Public lands north of the south line of Sections 16 and 17, T.47N.R.3W. NMPM, approximately 2,560 acres, and about 76,880 acres south and west of Lake City will be classified an avoidance area for all other ROWs.<br>• MU 1 (Part of Alpine Triangle SRMA): ROWs. With the exception of public lands in the ROWs corridor, the entire unit will be closed to the development of above-ground utilities (91,510 acres). |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | **GUNNISON GORGE NCA RMP 2004**<br>• MU 4 (GUSG ACEC/IBA):  Construction of all ROWs in the management unit will be restricted from November 15 through April 30 during crucial periods for wintering mule deer, elk, and GUSG.<br>• MU 4 (GUSG ACEC/IBA):  Except as described below for the relict tree stand on Black Ridge, this management unit will be open to ROWs with appropriate conditions where the ROW will not adversely affect the values for which the management unit was designated.  Mitigation will be required in all applications to meet the objectives of this management unit.  Public lands in the relict tree stand on Black Ridge will not be available for surface linear ROWs of any kind, nor aerial ROWs or special use permits occupying more than 100 square feet and needing vehicular access constructed, or needing existing vehicular access maintained for distances greater than 200 feet.  Buried ROWs will be authorized on a case-by-case basis along previously disturbed areas along existing travel routes.  Mitigation will be required in all applications to meet the objectives of this management unit.  Exceptions will be made on a case-by-case basis if the proposal supports meeting management unit objectives.<br><br>**GRAND JUNCTION FO RMP 2015**<br>Allowable Use (LR-AU1):  ROW Exclusion Areas (including renewable energy sites such as solar, wind, hydroelectric, and biomass development):  Manage 221,600 acres as ROW exclusion areas that are not available for the location of ROWs or other realty authorizations under any conditions, to include the following (Figure 2-27, Appendix A):<br>• Within a 0.4-mile radius of Sage-Grouse leks.<br>Allowable Use (LR-AU2):  ROW Avoidance Areas:  Manage 779,800 acres as ROW avoidance areas (Figure 2-27, Appendix A) (see Appendix B):<br>• Sage-Grouse:  Occupied Habitat<br>• Sage-Grouse:  Within a 4.0-mile radius of leks<br>• Streams/springs possessing lotic/lentic riparian characteristics<br>• Wetlands, springs, seeps, and riparian areas.<br>Allowable Use (LR-AU9):  Leases, permits, and easements authorized under 43 CFR 2920 may be subject to additional protective measures in areas identified as ROW avoidance areas and restrict activities in areas identified as ROW exclusion areas, except for low impact temporary permits, such as filming by foot and horseback.<br>ACTION:  Identify the following as ROW exclusion areas:<br>Within a 0.6-mile radius of Sage-Grouse leks<br>Allowable Use (LR-AU6):  Encourage the placement of new facilities or upgrades to existing facilities in delineated corridors or in other areas with previous disturbance and existing facilities, as consistent with other resource values. |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | **MCINNIS CANYONS NCA RMP 2004**<br>All roads administered by the BLM will be maintained in their current condition, and no improvement will be permitted through ROW authorizations.  Any new roads that could be authorized will be constructed to minimal widths and standards similar to nearby existing "jeep roads."  Any such new roads could also be gated to prevent, or limit, public vehicle access.<br><br>**MOAB FO RMP 2008**<br>Implement the most current UDWR Strategic Management Plan for Sage-Grouse (UDWR, 2002 and its future revisions), the Gunnison Sage-grouse Range-wide Conservation Plan (2005, as amended) and recommendations from local sage-grouse working groups to protect, maintain, enhance, and restore Gunnison sage-grouse populations and habitat. There is no GUSG occupation at this time.  However, if occupation is identified, through cooperation with UDWR, the following decisions will apply:<br>• All surface-disturbing activities will be prohibited within 0.6 mile of GUSG leks on a year-round basis. Within the 0.6 mile buffer, allow no permanent aboveground facilities or powerlines; prohibit or limit year-round construction of fences and where opportunity exists, remove existing fences.<br>• Within four miles of a lek, avoid fence construction, overhead powerline construction, and aboveground structures that provide raptor hunting perches. Where fences are necessary, increase their visibility. Modify or remove fences to minimize sage-grouse mortality.<br>As required by the Endangered Species Act, avoid construction of new roads within listed and non-listed special status plant and animal species habitats.<br>ROW avoidance and exclusion areas will be consistent with the stipulations identified in Appendix A for oil and gas leasing and other surface-disturbing activities.  These stipulations have been developed to protect important resource values.<br>ROW Avoidance Areas:  riparian areas and springs.<br><br>**MONTICELLO FO RMP 2008**<br>ROW avoidance and exclusion areas will generally be consistent with the stipulations identified in Appendix B for oil and gas leasing and other surface-disturbing activities.  These stipulations have been developed to protect important resource values.<br>Areas identified as NSO are open to oil and gas leasing but surface-disturbing activities cannot be conducted on the surface of the land.  Access to oil and gas deposits will require directional drilling from outside the boundaries of the NSO areas.  NSO areas are avoidance areas for ROWs; no ROW will be granted in NSO areas unless there are no |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | feasible alternatives. |

**SAN LUIS RMP 1991**
Protection measures (for riparian/wetland areas) will include, but are not limited to, 1) mitigation of impacts from ROWs and utility corridors adjacent to or that cross riparian areas.
San Luis Area #1; 1-16: Any impacts from ROWs adjacent to or that cross riparian areas will be mitigated.
Amended the San Luis RMP: Programmatic policies and BMPs in the Wind Energy Development Program will be adopted.
Policy: The BLM will incorporate management goals and objectives specific to habitat conservation for species of concern (e.g., sage-grouse), as appropriate, into the POD for proposed wind energy projects.
POD BMPs: Site Monitoring and Testing. Meteorological towers shall not be located in sensitive habitats or in areas where ecological resources known to be sensitive to human activities (e.g., prairie grouse) are present. Installation of towers shall be scheduled to avoid disruption of wildlife reproductive activities or other important behaviors.

**SOLAR PEIS 2012**
Solar Energy Program ROW Exclusion Areas:
1. All designated and proposed critical habitat areas for species protected under the ESA of 1973 (as amended), or if critical habitat is not yet proposed, then as identified in respective recovery plans or the final listing rule http://ecos.fws.gov/tess_public/TESSWebpageRecovery?sort=1
2. Sage-grouse core areas, nesting habitat, and winter habitat;
3. Greater sage-grouse habitat (currently occupied, brooding, and winter habitat) as identified by the BLM in California, Nevada, and Utah, and GUSG Habitat (currently occupied, brooding, and winter habitat) as identified by the BLM in Utah.
4. All areas designated as NSO in applicable land use plans.
5. All ROW exclusion areas identified in applicable land use plans.
6. All ROW avoidance areas identified in applicable land use plans (p. 38).
Grand Junction FO: All lands would be excluded.
Gunnison FO: Approximately 3,162 acres in variance areas.
Gunnison Gorge NCA: All lands would be excluded.
McInnis Canyons NCA: All lands would be excluded.
Moab FO: Approximately 587 acres in variance areas.
Monticello FO: Approximately 4,120 acres in variance areas.
San Juan/San Miguel: Approximately 12,105 acres in variance areas.

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | San Luis Valley FO:  Approximately 50,384 acres in variance areas.  Four Solar Energy Zones designated (total of 16,308 acres) [none of which are within or adjacent to GUSG Occupied Habitat]. Uncompahgre Basin:  All lands would be excluded. |
| 30 | Lands & Realty | **CANYONS OF THE ANCIENTS NM RMP** 2010<br>• Allow no new ROWs to be permitted in Squaw/Cross Canyon SRMA, except for access to private land.<br>• Allow land actions to occur only when they will result in minimal adverse impact(s), when they will be beneficial to cultural resource management, or when there is a clear and significant public need.<br>• Include all surface-use stipulations (including NGD/NSO, TL, and protective considerations for cultural resources) on new ROWs.<br>• Limit ROWs for development of resources to a 16-foot running surface (road) width.<br><br>**DOMINGUEZ-ESCALANTE NCA DRAFT RMP** 2013<br>Manage 208,990 acres of the D-E NCA as a ROW exclusion area (Map 2–14d), except to allow for:<br>• Reasonable access and utilities to non-federal property and existing ROW facilities.<br>• Upgrades or modifications to existing facilities.<br>Allow for the construction of research and monitoring sites in ROW exclusion areas as long as these facilities further understanding and management of the purposes of the D-E NCA.<br><br>**GUNNISON RMP** 1993<br>ROW Exclusion Areas:<br>• MU 3 (Cochetopa Canyon SRMA):  ROWs.  Public land in the unit will be classified an exclusion area for above-ground utility ROWs.  Underground utility ROWs and development will be limited to previously disturbed areas associated with existing roads.<br>• MU 9 (Dillon Pinnacles ACEC):  ROWs.  Public lands in the unit will be classified an exclusion area for ROWs.<br>ROW Avoidance Areas:<br>• MU 1 (Part of Alpine Triangle SRMA):  ROWs.  Public lands north of the south line of Sections 16 and 17, T.47N.R.3W. NMPM, approximately 2,560 acres, and about 76,880 acres south and west of Lake City will be classified an avoidance area for all other ROWs.<br>• MU 1 (Part of Alpine Triangle SRMA):  ROWs.  With the exception of public lands in the ROWs corridor, the entire unit will be closed to the development of above-ground utilities (91,510 acres).<br><br>**GUNNISON GORGE NCA RMP** 2004 |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | • MU 4 (GUSG ACEC/IBA):  Construction of all ROWs in the management unit will be restricted from November 15 through April 30 during crucial periods for wintering mule deer, elk, and GUSG.<br>• MU 4 (GUSG ACEC/IBA):  Except as described below for the relict tree stand on Black Ridge, this management unit will be open to ROWs with appropriate conditions where the ROW will not adversely affect the values for which the management unit was designated.  Mitigation will be required in all applications to meet the objectives of this management unit.  Public lands in the relict tree stand on Black Ridge will not be available for surface linear ROWs of any kind, nor aerial ROWs or special use permits occupying more than 100 square feet and needing vehicular access constructed, or needing existing vehicular access maintained for distances greater than 200 feet.  Buried ROWs will be authorized on a case-by-case basis along previously disturbed areas along existing travel routes.  Mitigation will be required in all applications to meet the objectives of this management unit.  Exceptions will be made on a case-by-case basis if the proposal supports meeting management unit objectives.<br><br>**GRAND JUNCTION FO RMP 2015**<br>Allowable Use (LR-AU1):  ROW Exclusion Areas (including renewable energy sites such as solar, wind, hydroelectric, and biomass development):  Manage 221,600 acres as ROW exclusion areas that are not available for the location of ROWs or other realty authorizations under any conditions, to include the following (Figure 2-27, Appendix A):<br>• Within a 0.4-mile radius of Sage-Grouse leks.<br>Allowable Use (LR-AU2):  ROW Avoidance Areas:  Manage 779,800 acres as ROW avoidance areas (Figure 2-27, Appendix A) (see Appendix B):<br>• Sage-Grouse:  Occupied Habitat<br>• Sage-Grouse:  Within a 4.0-mile radius of leks<br>• Streams/springs possessing lotic/lentic riparian characteristics<br>• Wetlands, springs, seeps, and riparian areas…<br>Allowable Use (LR-AU9):  Leases, permits, and easements authorized under 43 CFR 2920 may be subject to additional protective measures in areas identified as ROW avoidance areas and restrict activities in areas identified as ROW exclusion areas, except for low impact temporary permits, such as filming by foot and horseback.<br>ACTION:  Identify the following as ROW exclusion areas:<br>Within a 0.6-mile radius of Sage-Grouse leks<br>Allowable Use (LR-AU6):  Encourage the placement of new facilities or upgrades to existing facilities in delineated corridors or in other areas with previous disturbance and existing facilities, as consistent with other resource values.<br><br>**MCINNIS CANYONS NCA RMP 2004** |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | All roads administered by the BLM will be maintained in their current condition, and no improvement will be permitted through ROW authorizations.  Any new roads that could be authorized will be constructed to minimal widths and standards similar to nearby existing "jeep roads."  Any such new roads could also be gated to prevent, or limit, public vehicle access.<br><br>**MOAB FO RMP 2008**<br>Implement the most current UDWR Strategic Management Plan for Sage-Grouse (UDWR, 2002 and its future revisions), the Gunnison Sage-grouse Range-wide Conservation Plan (2005, as amended) and recommendations from local sage-grouse working groups to protect, maintain, enhance, and restore Gunnison sage-grouse populations and habitat. There is no GUSG occupation at this time.  However, if occupation is identified, through cooperation with UDWR, the following decisions will apply:<br>• All surface-disturbing activities will be prohibited within 0.6 mile of GUSG leks on a year-round basis.  Within the 0.6 mile buffer, allow no permanent aboveground facilities or powerlines; prohibit or limit year-round construction of fences and where opportunity exists, remove existing fences.<br>• Within four miles of a lek, avoid fence construction, overhead powerline construction, and aboveground structures that provide raptor hunting perches. Where fences are necessary, increase their visibility. Modify or remove fences to minimize sage-grouse mortality.<br>As required by the Endangered Species Act, avoid construction of new roads within listed and non-listed special status plant and animal species habitats.<br>ROW avoidance and exclusion areas will be consistent with the stipulations identified in Appendix A for oil and gas leasing and other surface-disturbing activities.  These stipulations have been developed to protect important resource values.<br>ROW Avoidance Areas:  riparian areas and springs.<br><br>**MONTICELLO FO RMP 2008**<br>ROW avoidance and exclusion areas will generally be consistent with the stipulations identified in Appendix B for oil and gas leasing and other surface-disturbing activities.  These stipulations have been developed to protect important resource values.<br>Areas identified as NSO are open to oil and gas leasing but surface-disturbing activities cannot be conducted on the surface of the land.  Access to oil and gas deposits will require directional drilling from outside the boundaries of the NSO areas.  NSO areas are avoidance areas for ROWs; no ROW will be granted in NSO areas unless there are no feasible alternatives. |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | **SAN LUIS RMP 1991**<br>Protection measures (for riparian/wetland areas) will include, but are not limited to, 1) mitigation of impacts from ROWs and utility corridors adjacent to or that cross riparian areas.<br>San Luis Area #1; 1-16: Any impacts from ROWs adjacent to or that cross riparian areas will be mitigated.<br>Amended the San Luis RMP: Programmatic policies and BMPs in the Wind Energy Development Program will be adopted.<br>Policy: The BLM will incorporate management goals and objectives specific to habitat conservation for species of concern (e.g., sage-grouse), as appropriate, into the POD for proposed wind energy projects.<br>POD BMPs: Site Monitoring and Testing. Meteorological towers shall not be located in sensitive habitats or in areas where ecological resources known to be sensitive to human activities (e.g., prairie grouse) are present. Installation of towers shall be scheduled to avoid disruption of wildlife reproductive activities or other important behaviors.<br><br>**SOLAR PEIS 2012**<br>Solar Energy Program ROW Exclusion Areas:<br>1. All designated and proposed critical habitat areas for species protected under the ESA of 1973 (as amended), or if critical habitat is not yet proposed, then as identified in respective recovery plans or the final listing rule http://ecos.fws.gov/tess_public/TESSWebpageRecovery?sort=1<br>2. Sage-grouse core areas, nesting habitat, and winter habitat.<br>3. Greater sage-grouse habitat (currently occupied, brooding, and winter habitat) as identified by the BLM in California, Nevada, and Utah, and GUSG Habitat (currently occupied, brooding, and winter habitat) as identified by the BLM in Utah.<br>4. All areas designated as NSO in applicable land use plans.<br>5. All ROW exclusion areas identified in applicable land use plans.<br>6. All ROW avoidance areas identified in applicable land use plans (p. 38).<br>• Grand Junction FO: All lands would be excluded.<br>• Gunnison FO: Approximately 3,162 acres in variance areas.<br>• Gunnison Gorge NCA: All lands would be excluded.<br>• McInnis Canyons NCA: All lands would be excluded.<br>• Moab FO: Approximately 587 acres in variance areas.<br>• Monticello FO: Approximately 4,120 acres in variance areas.<br>• San Juan/San Miguel: Approximately 12,105 acres in variance areas. |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | • San Luis Valley FO:  Approximately 50,384 acres in variance areas.  Four Solar Energy Zones designated (total of 16,308 acres) [none of which are within or adjacent to GUSG Occupied Habitat]. <br>• Uncompahgre Basin:  All lands would be excluded. |
| 31 | Lands & Realty | No similar action. |
| 32 | Lands & Realty | No similar action. |
| 33 | Lands & Realty | **GRAND JUNCTION FO RMP 2015** <br>Allowable Use (LR-AU6):  Encourage the placement of new facilities or upgrades to existing facilities in delineated corridors or in other areas with previous disturbance and existing facilities, as consistent with other resource values. <br><br>**TRES RIOS FO RMP 2015** <br>Energy transmission facilities should be consolidated within existing corridors and along existing linear energy transmission facilities in order to reduce habitat loss, degradation, and fragmentation resulting from new construction. |
| 34 | Lands & Realty | **GRAND JUNCTION FO RMP 2015** <br>Allowable Use (LR-AU6):  Encourage the placement of new facilities or upgrades to existing facilities in delineated corridors or in other areas with previous disturbance and existing facilities, as consistent with other resource values. <br><br>**TRES RIOS FO RMP 2015** <br>Energy transmission facilities should be consolidated within existing corridors and along existing linear energy transmission facilities in order to reduce habitat loss, degradation, and fragmentation resulting from new construction. |
| 35 | Lands & Realty | **GUNNISON RMP 1993** <br>MU 14 (riparian areas containing important sage grouse brood-rearing areas):  ROWs.  Mitigating measures will be included in ROW authorizations to prevent disturbance within this unit to brooding sage grouse from June 15 through July 31 and from December 1 through April 30 on crucial big game winter range to prevent disturbance to wintering deer and elk. <br>MU 15 (important fishery streams):  ROWs.  No surface-disturbing activities will be permitted along Alder, Willow (west of Gunnison), and Razor Creeks, and along the lower one-mile of South Beaver Creek in the unit from July 1 through July 31 in order to prevent disturbance to sage grouse during the brood rearing period.  Mitigating measures will be included in ROW authorizations in these areas of this unit to prevent disturbance to brooding sage grouse. |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| 36 | Lands & Realty | **GUNNISON GORGE NCA RMP 2004**<br>Measures to prevent damage and injury to sage-grouse during the crucial seasonal use periods (strutting, nesting, and potentially winter), such as raptor-proofing utility poles, placing power lines in a horizontal array, will be required.<br>• MU 6: Corridors (cont'd) Map Key 4, Table 2-3 (at end of this chapter)   Along the south side of Red Canyon Creek.  Measures to prevent damage and injury to sage-grouse during the crucial seasonal use periods (strutting, nesting, and potentially winter), such as raptor-proofing utility poles, or placing power lines in a horizontal array, will be required.  Construction of ROWs in the Unit will be restricted during crucial periods for wintering deer and elk.  Part of this corridor will be located in Management Unit 4.<br>• MU 6: Corridors (cont'd) Map Key 5, Table 2-3 (at end of this chapter)   Along the northeast boundary of the planning area and NCA, and parallel to Smith Fork Creek and canyon.  Measures to prevent damage and injury to sage-grouse during the crucial seasonal use periods (strutting, nesting, and potentially winter), such as raptor-proofing utility poles, placing power lines in a horizontal array, will be required.  Construction of ROWs in the Unit will be restricted during crucial periods for wintering deer and elk.  This corridor will be located adjacent to Unit 4. |
| 37 | Lands & Realty | **GUNNISON RMP 1993**<br>• MU 14 (riparian areas containing important sage grouse brood-rearing areas):  ROWs.  Mitigating measures will be included in ROW authorizations to prevent disturbance within this unit to brooding sage grouse from June 15 through July 31 and from December 1 through April 30 on crucial big game winter range to prevent disturbance to wintering deer and elk.<br>• MU 15 (important fishery streams):  ROWs.  No surface-disturbing activities will be permitted along Alder, Willow (west of Gunnison), and Razor Creeks, and along the lower one-mile of South Beaver Creek in the unit from July 1 through July 31 in order to prevent disturbance to sage grouse during the brood rearing period.  Mitigating measures will be included in ROW authorizations in these areas of this unit to prevent disturbance to brooding sage grouse. |
| **RANGELAND MANAGEMENT** | | |
| 38 | Range Management | **TRES RIOS FO RMP 2015**<br>Guideline 2.4.65:  Within occupied Gunnison sage-grouse critical habitat the RCP grazing guidelines should be incorporated when appropriate. |
| 39 | Range | **DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013** |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | Management | Livestock grazing permits will include seasonal utilization limits for palatable forage that reflect best management practices and are consistent with meeting land health standards or other biological objectives.  Lower limits will be established for grazing allotments with land health problems where grazing is contributing to those problems. **GRAND JUNCTION FO RMP 2015** ACTION (A10):  Identify appropriate utilization levels based on allotment or site-specific management practices, such as season-of-use, grazing intensity and duration, and utilization patterns, as well as vegetative conditions, riparian conditions, the presence or absence of range improvements, and resource issues or concerns. ACTION (A11):  Implement changes in livestock use through allotment management plans, grazing use agreements, and terms and conditions on grazing permits for priority allotments based on the current prioritization process and/or land health issues. **TRES RIOS FO RMP 2015** Guideline 2.4.65:  Within occupied Gunnison sage-grouse critical habitat the RCP grazing guidelines should be incorporated when appropriate. Guideline 2.4.66:  Within Occupied Habitat, grazing in treatment areas should be deferred for 2 growing season after treatment, unless needed for seedbed preparation or desired understory and over-story are established. |
| 40 | Range Management | **CANYONS OF THE ANCIENTS NM RMP 2010** Administer 23 allotments.  Remove 5 grazing allotments from Availability: the East and West Sand Canyon, Rock Creek, Goodman Gulch, and Trail Canyon allotments.  Remove the Rock Creek allotment at the time the current grazing.  Permittee is no longer able to run a livestock operation.  Pursue establishing common reserve allotments, as allotments become available, in order to allow for periodic rest and deferment in other allotments.  Make one of the following determinations in the event a grazing permit is relinquished or cancelled: 1. Reissue a term grazing permit. 2. Close, either temporarily or permanently, the allotment to grazing where any of the following exists and is attributable to livestock grazing: ○ damage to cultural resources; ○ fragile soil/biological crusts essential for soil and water resource protection; ○ low forage production (less than 200 pounds/acre); inadequate facilities to manage livestock grazing (such as fencing, water, or forage availability); and/or ○ degraded riparian and/or upland conditions. 3. Create, temporarily or permanently, a reserve forage allotment. (NOTE: Permits for reserve forage allotments |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | will not be held by specific grazing operators.)  Require grazing to meet the goals described for the area in the RMP and, if applicable, in an allotment management plan.  Grant temporary, nonrenewable use to Federal permit holders when there is a demonstrated need to rest a permittee's allotment.  [NOTE: "Need" for rest will include, but not be limited to, the following reasons: to improve resource condition of other allotments prior to prescribed burns or necessary fence construction; and during/after rehabilitation projects (such as wildland fire, drought, flood, insect damage, and/or disease).]<br><br>**DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**<br>Close the following areas to livestock use (361 acres, Map 2–4p): ● Bean Allotment (361 acres, due to conflicts with adjoining private lands).  Unallocated areas would be managed according to the following (Map 2–4p): Area open to livestock grazing (acreage also included in line 506 as available to grazing): 994 acres Area where active movement would be the only livestock use allowed: 572 acres Area closed to livestock use: 3,489 acres New (un-allotted) land acquisitions would be evaluated and closed or allotted to neighboring permittees on a case-by-case basis considering topography and resource objectives.<br>Based on biological resource objectives, evaluate and allocate vacated or relinquished allotments, or un-allotted areas for:<br>• combining with active allotments to provide for additional management options.<br>• establishing grass banks<br>• closure to grazing.<br>Changes (increases or decreases) in forage allocation for livestock grazing could be made where such changes would allow for progress toward the achievement of biological objectives.<br><br>**GRAND JUNCTION FO RMP 2015**<br>Offer temporary use on a case-by-case basis in allotments where grazing preference has been relinquished, or non-use warrants to rest other allotments that include important Sage-Grouse habitat.<br>Action (A4):  Make 66,600 acres unavailable for livestock grazing, which includes allotments, portions of allotments, and unallotted land.  The purpose includes steep slopes, conflict with BLM recreation sites, or avoidance of sensitive resources such as those described in the Areas of Critical Environmental Concern section.  Refer to Appendix J, Livestock Grazing Allotments.<br>Action (A5):  Close the following allotments to livestock use (see Appendix J):<br>• Same as Alternative A plus the following: o Baldridge Mesa; o Bevan;  o Boulder Canyon; o Browns Place; o Brush Creek; o Charlesworth; o Clifton; o Clover Gulch; o Coon Creek; o Dead Horse; o Dry Kimball; o Eby Point;  o Erven; o Etcheverry; o Fetters; o Heely; o Hight; o Horizon; o Hunter; o Logan Wash; o Parkes Place; o Plateau |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | Creek; o Red Mountain; Webber;  o Webb Isolated Tracts; and o Whitewater Hill. |

**Action (A6):**  In open allotments, close the following areas to livestock use: • Ant Research Area; • Badger Wash un-grazed paired plots or designated no grazing areas as defined in the study objectives; • Miracle Rock picnic area; • Mud Springs picnic area; • North Fruita Desert developed campground; • Pyramid Rock ACEC; • Study area exclosures; and • West Creek picnic area. • Palisade municipal watershed.

**Action (A8):**  Periodically evaluate whether to close other allotments or portions of allotments to livestock grazing, and implement with project level  analysis, based on the following criteria:

- Areas identified as BLM disposal tracts;
- Lack of administrative access to public land;
- Small percentage of forage in allotment is contributed by BLM lands in allotment (less than 15 percent);
- Areas not accessible to livestock grazing (e.g., steep slopes);
- "C" category allotments that are relinquished and determined to be impractical for the administration of livestock grazing by the Authorized Officer;
- Major impact to sensitive resources such as wildlife or threatened and endangered species (e.g., competition for forage, winter range, Sage- Grouse habitat), or sensitive fish habitat, as determined by data analysis;
- Public health and safety;
- High intensity recreation areas/facilities;
- Resource objectives for municipal watersheds;
- Impacts to cultural resources; and
- Conflicts with adjoining private lands (development).

**Action (A23):**  Offer temporary use on a case-by-case basis in allotments where grazing preference has been relinquished, or non-use warrants to rest other allotments that include important Sage-Grouse habitat.

**Action (A24):**  Pursue the opportunity to establish grass banks from un-allotted grazing allotments to provide management options on other allotments (e.g., fire, drought, vegetation treatments, and allotments not meeting land health).

**GUNNISON GORGE NCA RMP 2004**
Forage for livestock will not be permanently allocated on newly acquired lands.  Cattle will not be permitted to use forage on these newly acquired lands.  On newly acquired lands in the planning area BLM will prepare, with input from permittees, a grazing allotment and grazing strategy that will permit the lands to be used by any existing sheep grazing permittee when permittee's allotment(s) are not usable, such as if grazing is restricted on allotments because of drought/fire, a vegetation treatment (e.g., vegetation manipulation and follow-up seeding) is being conducted on an

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | allotment that requires a deferment from grazing, or if their allotment requires a deferment from grazing to allow plants to recover from previous grazing (There are concerns within the planning area regarding potential disease transfer to bighorn sheep from domestic sheep that occupy the same, or immediately adjacent, lands.  Not authorizing new permanent allocations of forage for domestic sheep grazing within occupied bighorn sheep habitat or associated nine mile buffer zones, will move bighorn sheep management in the NCA slightly closer to the guidelines contained in BLM's Revised Guidelines for Management of Domestic Sheep and Goats in Native Wild Sheep Habitats ([BLM 1998f]).  Suitable public lands will be available for livestock grazing use.  Grazing allotments that become unallocated will be considered for: 1) using occasionally as a grazing bank to alleviate grazing pressure on other allotments in the region; or 2) adding to an existing, contiguous allotment to increase grazing flexibility. **MCINNIS CANYONS NCA RMP 2004** Any grazing permit that is relinquished or canceled will be evaluated for future allocation and level of use. **SAN JUAN/SAN MIGUEL RMP 1985** Un-allotted tracts generally will remain available for future livestock grazing, as provided for in the BLM grazing regulations (43 CFR 4110 and 43 CFR 4130).  However, certain tracts not currently authorized for grazing use will remain un-allotted. **SAN LUIS RMP 1991** 1-7:  Consider allocating 1,500 AUMs for livestock grazing in the presently un-allotted acres (approximately 30,000 acres) that are suitable for grazing. **TRES RIOS FO RMP 2015** If grazing privileges are relinquished or cancelled on Tres Rios FO lands where fragile soils, low forage production, low livestock water availability, and/or conflicts with other resources make livestock grazing undesirable, the privileges should not be re-allocated.  Prior to allocating grazing privileges for a new grazing permittee on unallocated grazing allotments, the needs of existing rangeland management, as well as ecological diversity and species viability, should be considered.  The designation of grazing allotments to be used as forage reserves should be considered when grazing privileges terminate, if such designations would improve land management as well as livestock management opportunities.  The BLM should consider closing custodial allotments when term grazing permits expire where public lands cannot be properly managed due to the subdividing of surrounding base property, or due to insufficient or livestock water availability, access, management flexibility, and/or lack of capable rangeland. |
| 41 | Range | **CANYONS OF THE ANCIENTS NM RMP 2010** |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | Management | Administer 23 allotments.  Remove 5 grazing allotments from Availability: the East and West Sand Canyon, Rock Creek, Goodman Gulch, and Trail Canyon allotments. Remove the Rock Creek allotment at the time the current grazing. Permittee is no longer able to run a livestock operation.  Pursue establishing common reserve allotments, as allotments become available, in order to allow for periodic rest and deferment in other allotments.  Make one of the following determinations in the event a grazing permit is relinquished or cancelled: |

3. Reissue a term grazing permit.
4. Close, either temporarily or permanently, the allotment to grazing where any of the following exists and is attributable to livestock grazing:
   o damage to cultural resources;
   o fragile soil/biological crusts essential for soil and water resource protection;
   o low forage production (less than 200 pounds/acre); inadequate facilities to manage livestock grazing (such as fencing, water, or forage availability); and/or
   o degraded riparian and/or upland conditions.
5. Create, temporarily or permanently, a reserve forage allotment. (NOTE: Permits for reserve forage allotments will not be held by specific grazing operators.)  Require grazing to meet the goals described for the area in the RMP and, if applicable, in an allotment management plan.  Grant temporary, nonrenewable use to Federal permit holders when there is a demonstrated need to rest a permittee's allotment.  [NOTE: "Need" for rest will include, but not be limited to, the following reasons: to improve resource condition of other allotments prior to prescribed burns or necessary fence construction; and during/after rehabilitation projects (such as wildland fire, drought, flood, insect damage, and/or disease).]

**DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**
Close the following areas to livestock use (361 acres, Map 2–4p): ● Bean Allotment (361 acres, due to conflicts with adjoining private lands). Unallocated areas would be managed according to the following (Map 2–4p): Area open to livestock grazing (acreage also included in line 506 as available to grazing): 994 acres Area where active movement would be the only livestock use allowed: 572 acres Area closed to livestock use: 3,489 acres New (un-allotted) land acquisitions would be evaluated and closed or allotted to neighboring permittees on a case-by-case basis considering topography and resource objectives.  Based on biological resource objectives, evaluate and allocate vacated or relinquished allotments, or un-allotted areas for: ● combining with active allotments to provide for additional management options. ● establishing grass banks ● closure to grazing.

**GRAND JUNCTION FO RMP 2015**
Offer temporary use on a case-by-case basis in allotments where grazing preference has been relinquished, or non-

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | use warrants to rest other allotments that include important Sage-Grouse habitat. Action (A4):  Make 66,600 acres unavailable for livestock grazing, which includes allotments, portions of allotments, and unallotted land.  The purpose includes steep slopes, conflict with BLM recreation sites, or avoidance of sensitive resources such as those described in the Areas of Critical Environmental Concern section.  Refer to Appendix J, Livestock Grazing Allotments. Action (A5):  Close the following allotments to livestock use (see Appendix J): <ul><li>Same as Alternative A plus the following: o Baldridge Mesa; o Bevan;  o Boulder Canyon; o Browns Place; o Brush Creek; o Charlesworth; o Clifton; o Clover Gulch; o Coon Creek; o Dead Horse; o Dry Kimball; o Eby Point;  o Erven; o Etcheverry; o Fetters; o Heely; o Hight; o Horizon; o Hunter; o Logan Wash; o Parkes Place; o Plateau Creek; o Red Mountain; Webber;  o Webb Isolated Tracts; and o Whitewater Hill.</li></ul> Action (A6):  In open allotments, close the following areas to livestock use: • Ant Research Area; • Badger Wash un-grazed paired plots or designated no grazing areas as defined in the study objectives; • Miracle Rock picnic area; • Mud Springs picnic area; • North Fruita Desert developed campground; • Pyramid Rock ACEC; • Study area exclosures; and • West Creek picnic area. • Palisade municipal watershed. Action (A8):  Periodically evaluate whether to close other allotments or portions of allotments to livestock grazing, and implement with project level  analysis, based on the following criteria: <ul><li>Areas identified as BLM disposal tracts;</li><li>Lack of administrative access to public land;</li><li>Small percentage of forage in allotment is contributed by BLM lands in allotment (less than 15 percent);</li><li>Areas not accessible to livestock grazing (e.g., steep slopes);</li><li>"C" category allotments that are relinquished and determined to be impractical for the administration of livestock grazing by the Authorized Officer;</li><li>Major impact to sensitive resources such as wildlife or threatened and endangered species (e.g., competition for forage, winter range, Sage-Grouse habitat), or sensitive fish habitat, as determined by data analysis;</li><li>Public health and safety;</li><li>High intensity recreation areas/facilities;</li><li>Resource objectives for municipal watersheds;</li><li>Impacts to cultural resources; and</li><li>Conflicts with adjoining private lands (development).</li></ul> Action (A23):  Offer temporary use on a case-by-case basis in allotments where grazing preference has been relinquished, or non-use warrants to rest other allotments that include important Sage-Grouse habitat. |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | Action (A24):  Pursue the opportunity to establish grass banks from un-allotted grazing allotments to provide management options on other allotments (e.g., fire, drought, vegetation treatments, and allotments not meeting land health).<br><br>**GUNNISON GORGE NCA RMP 2004**<br>Forage for livestock will not be permanently allocated on newly acquired lands.  Cattle will not be permitted to use forage on these newly acquired lands.  On newly acquired lands in the planning area BLM will prepare, with input from permittees, a grazing allotment and grazing strategy that will permit the lands to be used by any existing sheep grazing permittee when permittee's allotment(s) are not usable, such as if grazing is restricted on allotments because of drought/fire, a vegetation treatment (e.g., vegetation manipulation and follow-up seeding) is being conducted on an allotment that requires a deferment from grazing, or if their allotment requires a deferment from grazing to allow plants to recover from previous grazing (There are concerns within the planning area regarding potential disease transfer to bighorn sheep from domestic sheep that occupy the same, or immediately adjacent, lands.  Not authorizing new permanent allocations of forage for domestic sheep grazing within occupied bighorn sheep habitat or associated nine mile buffer zones, will move bighorn sheep management in the NCA slightly closer to the guidelines contained in BLM's Revised Guidelines for Management of Domestic Sheep and Goats in Native Wild Sheep Habitats ([BLM 1998f]).  Suitable public lands will be available for livestock grazing use.  Grazing allotments that become unallocated will be considered for: 1) using occasionally as a grazing bank to alleviate grazing pressure on other allotments in the region; or 2) adding to an existing, contiguous allotment to increase grazing flexibility.<br><br>**MCINNIS CANYONS NCA RMP 2004**<br>Any grazing permit that is relinquished or canceled will be evaluated for future allocation and level of use.<br><br>**SAN JUAN/SAN MIGUEL RMP 1985**<br>Un-allotted tracts generally will remain available for future livestock grazing, as provided for in the BLM grazing regulations (43 CFR 4110 and 43 CFR 4130).  However, certain tracts not currently authorized for grazing use will remain un-allotted.<br><br>**SAN LUIS RMP 1991**<br>1-7:  Consider allocating 1,500 AUMs for livestock grazing in the presently un-allotted acres (approximately 30,000 acres) that are suitable for grazing.<br><br>**TRES RIOS FO RMP 2015**<br>If grazing privileges are relinquished or cancelled on Tres Rios FO lands where fragile soils, low forage production, low livestock water availability, and/or conflicts with other resources make livestock grazing undesirable, the |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | privileges should not be re-allocated.  Prior to allocating grazing privileges for a new grazing permittee on unallocated grazing allotments, the needs of existing rangeland management, as well as ecological diversity and species viability, should be considered.  The designation of grazing allotments to be used as forage reserves should be considered when grazing privileges terminate, if such designations would improve land management as well as livestock management opportunities.  The BLM should consider closing custodial allotments when term grazing permits expire where public lands cannot be properly managed due to the subdividing of surrounding base property, or due to insufficient or livestock water availability, access, management flexibility, and/or lack of capable rangeland. |
| 42 | Range Management | No similar action. |
| **Range Improvements** | | |
| 43 | Range Management | **CANYONS OF THE ANCIENTS NM RMP 2010** Implement specific projects (such as cross-fencing of riparian areas, development of water sources outside of riparian areas, and use of seedlings) in a manner that facilitates effective management and promotes recovery and maintenance of riparian/alluvial habitat.  Consider allowing temporary range improvement structures, on a case-by-case basis, where risk of damage to other resource values is low. **DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013** Construct new livestock facilities (e.g., water developments, fences, corrals) as needed to achieve biological resources objectives. **GRAND JUNCTION FO RMP 2015** Design any new structural range improvements to conserve, enhance, or restore Sage-Grouse habitat through an improved grazing management system relative to Sage-Grouse objectives.  Structural range improvements, in this context, include but are not limited to: cattle guards, fences, enclosures, corrals or other livestock handling structures; pipelines, troughs, storage tanks (including moveable tanks used in livestock water hauling), windmills, ponds/reservoirs, solar panels and spring developments. Action (VR-A4):  Consider the following management actions for improvement or protection of riparian values: riparian grazing pastures, exclosures, land acquisitions, adjustments to grazing management, stream structures, and plantings. Action (A13):  Construct range improvement projects on allotments to implement changes in grazing management to improve vegetative conditions, riparian conditions, or reduce conflicts with other resources or public land users. |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | Action (A20):  Design any new structural range improvements to conserve, enhance, or restore Sage-Grouse habitat through an improved grazing management system relative to Sage-Grouse objectives.  Structural range improvements, in this context, include but are not limited to: cattle guards, fences, enclosures, corrals or other livestock handling structures; pipelines, troughs, storage tanks (including moveable tanks structures used in livestock water hauling), windmills, ponds/reservoirs, solar panels and spring developments. Action (A22):  When conducting NEPA analysis for water developments or other rangeland improvements, address the direct and indirect effects to Sage-Grouse populations and habitat. <br><br> **GUNNISON RMP 1993** <br> Structural and non-structural range improvements such as fences, water developments, bums, spray treatments, and others will continue to be identified and prescribed in activity plans or agreements.  This will facilitate livestock management to achieve specific management and resource objectives defined in activity plans or agreements. However, any range improvements identified in the Management Framework Plan ROD that were not implemented, and will enhance or facilitate resource management objectives will be considered for development.  Existing range improvements will continue to be maintained as assigned in cooperative agreements and range improvement permits. Cooperative agreements will be the preferred method to authorize range improvements.  These agreements will be used to authorize all structural and nonstructural, multiple-use range improvements (removable and non-removable).  Range improvement permits will be used to authorize single use, removable range improvements required for livestock operations.  These range improvements will be paid for and constructed by the permittee, or other non-federal entities.  Maintenance will be assigned and contributions defined in both cooperative agreements and range improvement permits.  All range improvement permits and cooperative agreements will comply with 43 CFR 4120.3-2. <br><br> **MCINNIS CANYONS NCA RMP 2004** <br> Additional range improvements will be utilized to improve grazing management in accordance with grazing management plans. <br><br> **SAN LUIS RMP 1991** <br> New range improvements will be constructed if needed to achieve allotment management plan objectives and/or implement the grazing management programs prescribed in the allotment management plans.  Manipulation of vegetation can be used if needed to meet management objectives. <br> San Luis I-7:  Construct new range improvements, if needed, to achieve allotment management plan objectives and/or implement the grazing programs prescribed in the allotment management plans.  Manipulation of vegetation will be used, if needed, to meet management objectives. |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | **TRES RIOS FO RMP 2015**<br>Wildlife needs should be considered in the design of structural and non-structural range improvements. |
| 44 | Range Management | No similar action. |
| 45 | Range Management | No similar action. |
| 46 | Range Management | **CANYONS OF THE ANCIENTS NM RMP 2010**<br>Encourage range, fuels and fire, and vegetation management activities that will protect and/or enhance riparian/aquatic resource conditions.  Manage riparian areas in a manner that moves them toward achieving Proper Functioning Condition. (NOTE:  Projects designed for enhancement or improvement of riparian and alluvial sites will not be allowed within 100 feet of active channel edges without appropriate mitigation.)  Design spring developments that maintain water flow in riparian channels and that, at the same time, provide livestock water outside of the channel and spring source area.  Fence springs (and associated cultural resource sites) in livestock use areas. Fence streams and riparian areas where reduced livestock numbers, or season of use adjustments, do not result in achieving PFC and/or in meeting Public Land Health Standards and Guidelines.<br><br>**DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**<br>Apply SSR (see Appendix B, Map 2-2e) within a minimum distance of 100 meters (328 feet) from the edge of the riparian zone of naturally occurring seeps and springs (lentic riparian areas).  Also apply SSR to the spring/seep recharge zone where it is determined to extend more than 100 meters from the riparian zone.  For all new water developments, inspect and characterize all springs and seeps located inside the affected watershed, down gradient and within one mile of proposed development.<br>Allow for new water developments when: a. Surface disturbing actions would not directly impact the source area, and; b. characterization of the spring/seep, indicates recharge potential would not be significantly altered, and; c. Development would be limited to instances where needed to achieve biological resources objectives.<br>Apply SSR within a minimum distance of 30 meters (98 feet) from the edge of the ordinary high-water mark (bank–full stage) of ephemeral streams (see Appendix B, Maps 2-2d and 2-2e).<br><br>**GRAND JUNCTION FO RMP 2015**<br>Allowable Use (VR-AU3): STIPULATION NSO-4: Lentic Riparian Areas (including springs, seeps, and fens).<br>(Alternative B: All Programs Except Fluid Minerals.  Alternative C: All Surface-disturbing Activities) Prohibit surface |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | occupancy and surface-disturbing activities within a minimum distance of 100 meters (328 feet) from the edge of the riparian zone. (Refer to Appendix B.) See Figures 2-43 (Alternative B) and 2-44 (Alternative C) in Appendix A. Standard exceptions apply; see Appendix B.<br>NSO-2 (ROWA) Streams/Springs Possessing Lotic Riparian Characteristics (except oil and gas).<br>NSO-4 (ROWA) Lentic Riparian Areas (including springs, seeps, and fens) (except oil and gas).<br>ACTION (A13):  Construct range improvement projects on allotments to implement changes in grazing management to improve vegetative conditions, riparian conditions, or reduce conflicts with other resources or public land users.<br>ACTION (A19):  Authorize new water developments for diversions from spring or seep source only when priority Sage-Grouse habitat would benefit on both upland and riparian habitat from the development or there are no negative impacts to sage grouse. This includes developing new water sources for livestock as part of an allotment management plan/ conservation plan to improve sage-grouse habitat.<br>ACTION (A22):  When conducting NEPA analysis for water developments or other rangeland improvements, address the direct and indirect effects to Sage-Grouse populations and habitat.<br><br>**GUNNISON RMP 1993**<br>New water sources will be developed with concern for the protection of riparian areas.  Structural and non-structural range improvements such as fences, water developments, bums, spray treatments, and others will continue to be identified and prescribed in activity plans or agreements.  This will facilitate livestock management to achieve specific management and resource objectives defined in activity plans or agreements.  However, any range improvements identified in the Management Framework Plan ROD that were not implemented, and will enhance or facilitate resource management objectives will be considered for development.  Existing range improvements will continue to be maintained as assigned in cooperative agreements and range improvement permits. Federally funded livestock watering developments such as reservoirs (ponds), spring developments, wells, water pipelines etc. will be developed and be  safe for livestock and wildlife needs.  Federally funded livestock watering developments such as reservoirs (ponds), spring developments, wells, water pipelines etc. will be developed and be safe for livestock and wildlife needs.<br>Existing water source developments within riparian areas will be modified, or relocated, if inventories and studies indicate the hydrologic condition is being negatively impacted from use of the development.  Water developments that are range improvements will be modified or relocated in accordance with 43 CFR 4120.<br><br>**MOAB FO RMP 2008**<br>GRA-20 Grazing in Riparian Areas:  Evaluate non-functioning and functioning-at-risk riparian areas using Standards for Rangeland Health and Guidelines for Livestock Grazing Management to determine if restriction from grazing will |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | improve riparian functioning condition. |
| 47 | Range Management | **CANYONS OF THE ANCIENTS NM RMP** 2010<br>Encourage range, fuels and fire, and vegetation management activities that will protect and/or enhance riparian/aquatic resource conditions.  Manage riparian areas in a manner that moves them toward achieving Proper Functioning Condition. (NOTE:  Projects designed for enhancement or improvement of riparian and alluvial sites will not be allowed within 100 feet of active channel edges without appropriate mitigation.)  Design spring developments that maintain water flow in riparian channels and that, at the same time, provide livestock water outside of the channel and spring source area.  Fence springs (and associated cultural resource sites) in livestock use areas. Fence streams and riparian areas where reduced livestock numbers, or season of use adjustments, do not result in achieving PFC and/or in meeting Public Land Health Standards and Guidelines.<br><br>**DOMINGUEZ-ESCALANTE NCA DRAFT RMP** 2013<br>Apply SSR (see Appendix B, Map 2-2e) within a minimum distance of 100 meters (328 feet) from the edge of the riparian zone of naturally occurring seeps and springs (lentic riparian areas).  Also apply SSR to the spring/seep recharge zone where it is determined to extend more than 100 meters from the riparian zone.  For all new water developments, inspect and characterize all springs and seeps located inside the affected watershed, down gradient and within one mile of proposed development.<br>Allow for new water developments when: a. Surface disturbing actions would not directly impact the source area, and; b. characterization of the spring/seep, indicates recharge potential would not be significantly altered, and; c. Development would be limited to instances where needed to achieve biological resources objectives.<br>Apply SSR within a minimum distance of 30 meters (98 feet) from the edge of the ordinary high-water mark (bank–full stage) of ephemeral streams (see Appendix B, Maps 2-2d and 2-2e).<br><br>**GRAND JUNCTION FO RMP** 2015<br>Allowable Use (VR-AU3): STIPULATION NSO-4: Lentic Riparian Areas (including springs, seeps, and fens). (Alternative B: All Programs Except Fluid Minerals.  Alternative C: All Surface-disturbing Activities) Prohibit surface occupancy and surface-disturbing activities within a minimum distance of 100 meters (328 feet) from the edge of the riparian zone. (Refer to Appendix B.) See Figures 2-43 (Alternative B) and 2-44 (Alternative C) in Appendix A. Standard exceptions apply; see Appendix B.<br>NSO-2 (ROWA) Streams/Springs Possessing Lotic Riparian Characteristics (except oil and gas).<br>NSO-4 (ROWA) Lentic Riparian Areas (including springs, seeps, and fens) (except oil and gas).<br>ACTION (A13):  Construct range improvement projects on allotments to implement changes in grazing management |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | to improve vegetative conditions, riparian conditions, or reduce conflicts with other resources or public land users. ACTION (A19):  Authorize new water developments for diversions from spring or seep source only when priority Sage-Grouse habitat would benefit on both upland and riparian habitat from the development or there are no negative impacts to sage grouse. This includes developing new water sources for livestock as part of an allotment management plan/ conservation plan to improve sage-grouse habitat. ACTION (A22):  When conducting NEPA analysis for water developments or other rangeland improvements, address the direct and indirect effects to Sage-Grouse populations and habitat.<br><br>**GUNNISON RMP 1993**<br>New water sources will be developed with concern for the protection of riparian areas.  Structural and non-structural range improvements such as fences, water developments, bums, spray treatments, and others will continue to be identified and prescribed in activity plans or agreements.  This will facilitate livestock management to achieve specific management and resource objectives defined in activity plans or agreements.  However, any range improvements identified in the Management Framework Plan ROD that were not implemented, and will enhance or facilitate resource management objectives will be considered for development.  Existing range improvements will continue to be maintained as assigned in cooperative agreements and range improvement permits. Federally funded livestock watering developments such as reservoirs (ponds), spring developments, wells, water pipelines etc. will be developed and be  safe for livestock and wildlife needs.  Federally funded livestock watering developments such as reservoirs (ponds), spring developments, wells, water pipelines etc. will be developed and be safe for livestock and wildlife needs. Existing water source developments within riparian areas will be modified, or relocated, if inventories and studies indicate the hydrologic condition is being negatively impacted from use of the development.  Water developments that are range improvements will be modified or relocated in accordance with 43 CFR 4120.<br><br>**MOAB FO RMP 2008**<br>GRA-20 Grazing in Riparian Areas:  Evaluate non-functioning and functioning-at-risk riparian areas using Standards for Rangeland Health and Guidelines for Livestock Grazing Management to determine if restriction from grazing will improve riparian functioning condition. |
| 48 | Range Management | No similar action. |
| 49 | Range Management | **GRAND JUNCTION FO RMP 2015**<br>SSS-SGR-MA-10:  To reduce Sage-Grouse strikes and mortality, remove, modify, or mark fences in high risk areas. |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | When fences are necessary, require a Sage- Grouse-safe design. |
| | | SSS-SGR-MA-04: Improve brood-rearing habitat by implementing the following action: restore old ponds or construct new ponds in areas lacking water, while minimizing potential for promoting mosquito breeding habitat at elevations below 8,000 feet. |
| | | SSS-SGR-MA-09: Design any new structural range improvements to conserve, enhance, or restore Sage-Grouse habitat through an improved grazing management system relative to sage-grouse objectives. Structural range improvements , in this context, include but are not limited to: cattleguards, fences, enclosures, corrals, or other livestock handling structures; pipelines troughs, storage tanks (including moveable tanks used in livestock water hauling), windmills, ponds/reservoirs, solar panels and spring developments. |
| | | **GUNNISON RMP 1993** |
| | | Fences will be installed according to spacing, height, and other specifications described in the BLM Manual, Section 1740 and Handbook H-1741-1, for the control of livestock as well as the protection of wildlife.  An example will be spacing the bottom wire of a 3-wire fence at 16 inches above the ground in pronghorn antelope ranges.  Variances from these standards require approval of the authorized officer after consultation with affected parties. |
| | | **MOAB FO RMP 2008** |
| | | SSS-24: Implement the most current UDWR Strategic Management Plan for Sage-Grouse (UDWR, 2002 and its future revisions), the GUSG RCP (2005 as amended) and recommendations from local sage-grouse working groups to protect, maintain, enhance, and restore GUSG populations and habitat.  About 175,727 acres of potential habitat has been identified within the Moab planning area.  There is no GUSG occupation at this time.  However, if occupation is identified, through cooperation with UDWR, the following decisions will apply: |
| | | • All surface-disturbing activities will be prohibited within 0.6 miles of GUSG leks on a year-round basis. Within the 0.6 mile buffer, allow no permanent aboveground facilities or power-lines; prohibit or limit year-round construction of fences and where opportunity exists, remove existing fences. |
| | | • Within 4.0 miles of a lek, avoid fence construction, overhead power-line construction, and aboveground structures that provide raptor hunting perches. Where fences are necessary, increase their visibility.  Modify or remove fences to minimize sage-grouse mortality. |
| | | SSS-3: As required by the Endangered Species Act, no management action will be permitted on public lands that will jeopardize the continued existence of plant or animal species that are listed or are officially proposed or are candidates for listing as T&E. |
| | | **MONTICELLO FO RMP 2008** |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | SSP-6: No management action will be permitted on BLM lands that will jeopardize the continued existence of species that are listed, proposed for listing, or candidates for listing under the Endangered Species Act. SSP-23: Lek habitat (within 0.6 miles of active strutting ground): Prohibit year-round construction of fences. Retrofit visual devices on existing fences to prevent collisions. Where opportunity exists, remove existing fences and Avoid all permitted activities from March 20 to May 15. If impractical to avoid all permitted activities, then no activity from sunset the evening before to 2 hours after sunrise the next morning. SSP-24 Year-round habitat (within 4 miles of active strutting ground): Avoid construction of new fences. If impracticable, increase the visibility of the fences (flagging, white-tipped T-posts, etc.) and monitor effectiveness of visual devices and modify or remove fences if necessary to minimize sage-grouse mortality. RIP-4:The BLM will follow Utah's Standards for Rangeland Health and Guidelines for Grazing and Recreation Management (BLM 1997) to achieve riparian PFC. RIP-16 Develop seasonal restrictions, closures, and/or forage utilization limits on grazing in riparian areas considered Functioning at Risk. SSP-6: No management action will be permitted on BLM lands that will jeopardize the continued existence of species that are listed, proposed for listing, or candidates for listing under the Endangered Species Act. Within 4.0 miles of a lek, avoid fence construction, overhead power-line construction and aboveground structures that provide raptor hunting perches.  Where fences are necessary, increase their visibility.  Modify or remove fences to minimize sage-grouse mortality.  All surface-disturbing activities will be prohibited within 0.6 miles of GUSG leks on a year-round basis.  Within the 0.6 mile buffer, allow not permanent aboveground facilities; prohibit or limit year-round construction of fences and where there is opportunity to remove them. **TRES RIOS FO RMP 2015** Objective 2.4.20:  Gunnison Sage-Grouse (Centrocercus minimus): improve habitat for Gunnison sage-grouse when conducting resource management actions within Occupied Habitat. Guideline 2.4.59:  Structures in sage-grouse habitat should be constructed to limit risk of collision and predation. 2.3.70 Structures in sage-grouse habitat should be constructed to limit risk of collision and predation. |
| 50 | Range Management | **GRAND JUNCTION FO RMP 2015** SSS-SGR-MA-04:  Improve brood-rearing habitats by implementing the following action: • Restore old ponds or construct new ponds in areas lacking water, while minimizing potential for promoting mosquito breeding habitat at elevations below 8,000 feet. **MONTICELLO FO RMP 2008** |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | MCA-4:  The BLM will coordinate actions with affected parties where natural resources may be impacted by fire, drought, insects and diseases, or natural disasters. **TRES RIOS FO RMP 2015** Guideline 2.4.67:  When developing or modifying water developments, BMPs (Appendix N) should be used to mitigate potential impacts from West Nile virus on sage-grouse within Occupied Habitat. |
| 51 | Range Management | **GRAND JUNCTION FO RMP 2015** SSS-SGR-MA-04:  Improve brood-rearing habitats by implementing the following action: • Restore old ponds or construct new ponds in areas lacking water, while minimizing potential for promoting   mosquito breeding habitat at elevations below 8,000 feet. **MONTICELLO FO RMP 2008** MCA-4:  The BLM will coordinate actions with affected parties where natural resources may be impacted by fire, drought, insects and diseases, or natural disasters. **TRES RIOS FO RMP 2015** Guideline 2.4.67:  When developing or modifying water developments, BMPs (Appendix N) should be used to mitigate potential impacts from West Nile virus on sage-grouse within Occupied Habitat. |

## FLUID MINERALS

### Unleased Fluid Minerals

| 52 | Fluid Minerals | No similar action. |
|---|---|---|
| 53 | Fluid Minerals | **DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013** As specified in the enabling legislation (P.L. 111-11), subject to valid existing rights, all Federal land within the Conservation Area and the Wilderness, and all land and interests in land acquired for the Conservation Area or the Wilderness by the United States are withdrawn from: 1) all forms of entry, appropriation, or disposal under the public land laws; 2) location, entry, and patent under the mining laws; and 3) the operation of the mineral leasing, mineral materials, and geothermal leasing laws. **GUNNISON GORGE NCA RMP 2004** |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | Oil and gas stipulation:  Gunnison Gorge NCA-1 (Colorado BLM Exhibit CO-02) NSO stipulation.  To protect grouse strutting/dancing grounds (including sage and mountain sharp-tailed grouse and lesser and greater prairie chickens) within a two-mile (three-kilometer) radius from the site (potentially affects MU 4). Oil and gas stipulation:  Gunnison Gorge NCA-12 NSO stipulation.  To protect GUSG brood rearing habitat in certain riparian areas (potentially affects MU 3, 4, 6). Oil and gas stipulation:  Gunnison Gorge NCA-14 CSUS:  Activities associated with oil and gas exploration and development including roads, transmission lines, storage facilities, are restricted to an area beyond 500 feet of the riparian vegetation zone on the lands described below (for clarification, the 500-foot restriction starts at the point between riparian vegetation and upland vegetation).  To protect perennial water impoundments and streams, and/or riparian/wetland vegetation zone, important GUSG brood-rearing habitat, and fish use, water quality, and other related resource values. **GRAND JUNCTION FO RMP 2015** Allowable Use (FM-AU2):  No Leasing: BLM surface/federal minerals.  Manage 295,600 acres of the federal mineral estate underlying BLM surface as closed to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.) See Figure 2-38 in Appendix A: [includes] GUSG Critical Habitat; Allowable Use (FM-AU3):  No Leasing: Split-estate.  Manage 25,400 acres of Private and State surface/federal fluid mineral estate as closed to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.) See Figure 2-39 in Appendix A: [includes] GUSG Critical Habitat (16,500 acres) **GUNNISON RMP 1993** CO-2, Sage Grouse Lek/Courtship sites; CO-2: No surface occupancy or use is allowed within a one-quarter mile radius of sage grouse lek sites/courtship sites. NOTE:  The 1993 Gunnison RMP specifies a NSO buffer for sage-grouse leks within a 0.25-mile radius of leks.  The 2005 Gunnison Sage Grouse RCP specifies a NSO buffer within a 0.6-mile radius of active leks.  Per BLM policy to implement the RCP, the 1997 Public Land Health Standards Amendment to the RMP, and BLM policy regarding sage-grouse management, the 0.6-mile sage-grouse active lek buffer would be implemented. GUSG lek sites NSO stipulation (G-10) (within a 0.6 mile radius of GUSG leks of inactive, historic, and unknown status). (Geothermal Amendment) CSU, CO-28, Riparian/Wetland vegetation in Sage Grouse Brood Rearing Habitat -- Lease STIPULATION CSU GUSG mapped summer-fall habitat CSU stipulation (G-25) |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | **MCINNIS CANYONS NCA PROCLAMATION 2000**<br>As specified in the enabling legislation (P.L. 106-353), subject to valid existing rights, all federal land within the McInnis Canyons NCA and the BRCW, and all land and interests in land acquired for the Conservation Area or the Wilderness by the United States are withdrawn from:<br>1.  all forms of entry, appropriation, or disposal under the public land laws;<br>2.  location, entry, and patent under the mining laws; and<br>3.  the operation of the mineral leasing, mineral materials, and geothermal leasing laws, and all amendments thereto.<br><br>**MOAB FO RMP 2008**<br>If GUSG leks are discovered within sage-grouse habitat, no surface-disturbing activities will be allowed within 0.6 mile of a lek.<br>Purpose:  To protect occupied lek sites within GUSG Habitat.<br>Exception:  An exception may be granted by the Field Manager if the operator submits a plan which demonstrates that impacts from the proposed action can be adequately mitigated.<br>Modification:  The Field Manager may modify the boundaries of the stipulation area if (1) portions of the area do not include lek sites, or (2) the lek site(s) have been completely abandoned or destroyed, or (3) occupied lek site(s) occur outside the current defined area, as determined by the BLM.<br>Waiver:  A waiver may be granted if there are no active lek site(s) in the leasehold and it is determined the site(s) have been completely abandoned or destroyed or occur outside current defined area, as determined by the BLM.<br><br>**MONTICELLO FO RMP 2008**<br>CSU STIPULATION:  Avoid surface-disturbing activities within year round habitat (between 0.6 and 4.0 miles of active [GUSG lek].  If activities cannot be avoided, then an operating plan which incorporates the applicable conservation measures outlined in the GUSG RCP (2005 as amended) must be approved by the BLM prior to surface-disturbing activities.<br>Conservation measures from this plan include, but are not limited to: Fences would be fitted with visual devices to minimize grouse collisions; Road length and width would be minimized and vehicles not exceed 35 mph; Bury power lines or place raptor perching deterrents on power poles; Any necessary equipment would produce minimal noise, including compressors, vehicles, and other sources of noise by using mufflers or noise suppression devices.<br>Exception:  The Field Manager may grant an exception after an analysis the authorized officer determines that the animals are not present in the project area.<br>Modification:  The Field Manager may modify the boundaries of the stipulation area if a portion of the area is not being used as sage-grouse habitat. |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | Waiver:  A waiver may be granted if the habitat is determined as unsuitable for sage-grouse. CSU STIPULATION:  No surface-disturbing activities are allowed within 0.6 miles of an active GUSG strutting ground [lek]. No surface-disturbing activities are allowed within 0.6 mile of an active strutting ground. Exception:  The Field Manager may grant an exception if, after an analysis, the authorized officer determines that the animals are not present in the project area or the activity can be completed so as to not adversely affect the animals. Modification:  The Field Manager may modify the boundaries of the stipulation area if a portion of the area is not being used as sage-grouse habitat. Waiver:  A waiver may be granted if the habitat is determined as unsuitable for sage-grouse. Purpose:  To protect and conserve GUSG and their habitat.<br><br>**SAN JUAN/SAN MIGUEL RMP 1985** NSO: [Stip. Code: CO-2] Grouse (includes sage grouse, mountain sharp-tailed, lesser and greater prairie chickens). NSO within one-quarter mile radius of a lek site (courtship area). (p. 17)<br><br>**SAN LUIS GEOTHERMAL RMP AMENDMENT 2013** NSO on all Occupied Habitat within 4.0 miles of lek sites and extending to include the top of Poncha Pass on all BLM-managed mineral estate north of the 4.0-mile buffer on both sides of Highway 285.<br><br>**TRES RIOS FO RMP 2015** NSO:  No surface occupancy is allowed on the lands described below: as mapped for occupied Gunnison sage-grouse habitat.  For the purpose of: Protecting priority habitat such as lek sites and nesting habitat for Gunnison sage-grouse. (3.4.2) Applicable BMPs should be applied to all mineral proposals as Conditions of Approval within occupied sage-grouse habitat to provide for adequate effective habitat and breeding, nesting, and wintering habitat. (2.4.61) |
| 54 | Fluid Minerals | **GUNNISON GEOTHERMAL LEASING RMP AMENDMENT 2011** GUSG mapped summer-fall habitat CSU stipulation (G-25).<br><br>**MONTICELLO FO RMP 2008** Leasing will be available with CSU stipulations for oil and gas development.  Follow Suggested Management Practices, where applicable, for oil and gas development listed in the GUSG RCP (2005 as amended). CSU Stipulation:  No surface-disturbing activities allowed within 0.6 miles of an active Gunnison Sage-grouse strutting ground [lek]. |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
|  |  | CSU Stipulation:  Avoid surface-disturbing activities within year round habitat (between 0.6 and 4.0 miles of active [GUSG lek].  If activities cannot be avoided, then an operating plan that incorporates the applicable conservation measures outlined in the RCP must be approved by the BLM prior to surface-disturbing activities.<br><br>**TRES RIOS FO RMP 2015**<br>CSU - Unoccupied Habitat:  In unoccupied Gunnison sage-grouse habitat, NSO would be allowed within a 0.6-mile radius of a newly identified lek site.  A TL may be applied to lease activities if surface occupancy is allowed. A TL may apply to construction, drilling, and workovers within 4.0 miles of an identified lek site from March 1 through June 30, dependent on the distribution of suitable nesting habitat and line of sight from the activity to the lek (potential habitat as identified in the Gunnison Sage Grouse Rangewide Plan, 2005). (3.4.3) |
| 55 | Fluid Minerals | **CANYONS OF THE ANCIENTS NM RMP 2010**<br>No WEMs. |
| 56 | Fluid Minerals | No similar action. |
| 57 | Fluid Minerals | **CANYONS OF THE ANCIENTS NM RMP 2010**<br>Permit off-lease seismic activities only for the purpose of defining the limits of common reservoirs now being produced.<br>Limit geophysical operations to BLM-authorized routes.  Prohibit vehicle traffic along receiver lines.  Require that all vehicles associated with geophysical operations travel only on BLM-authorized routes if water is visible in the channel at washes, alluvial valleys, or perennial water features, and/or where riparian vegetation is present.<br>Prohibit seismic operation-related work by bulldozers and/or by other earthmoving equipment.<br>Require that any ground disturbance along source or receiver lines be reclaimed in a manner that protects cultural and natural resources.  Conduct reclamation of these routes using methods appropriate to the area (including, but not limited to, the use of natural barriers, such as boulders or dead-and-down wood, and/or ripping, reseeding, and signing).<br><br>**GRAND JUNCTION FO RMP 2015**<br>Allowable Use (FM-AU2):  No Leasing:  BLM surface/federal minerals.  Manage 239,400 acres of the federal mineral estate underlying BLM surface as closed to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.)<br>See Figure 2-38 in Appendix A: [includes]<br>Occupied GUSG Habitat<br>Allowable Use (FM-AU3):  No Leasing:  Split-estate.  Manage 25,400 acres of Private and State surface/federal fluid |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | mineral estate as closed to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.)  See Figure 2-39 in Appendix A: [includes] Occupied GUSG Habitat (12,700 acres). |
| 58 | Fluid Minerals | **CANYONS OF THE ANCIENTS NM RMP 2010** Permit off-lease seismic activities only for the purpose of defining the limits of common reservoirs now being produced. Limit geophysical operations to BLM-authorized routes.  Prohibit vehicle traffic along receiver lines.  Require that all vehicles associated with geophysical operations travel only on BLM-authorized routes if water is visible in the channel at washes, alluvial valleys, or perennial water features, and/or where riparian vegetation is present. Prohibit seismic operation-related work by bulldozers and/or by other earthmoving equipment. Require that any ground disturbance along source or receiver lines be reclaimed in a manner that protects cultural and natural resources.  Conduct reclamation of these routes using methods appropriate to the area (including, but not limited to, the use of natural barriers, such as boulders or dead-and-down wood, and/or ripping, reseeding, and signing). <br><br>**GRAND JUNCTION FO RMP 2015** Allowable Use (FM-AU2):  No Leasing:  BLM surface/federal minerals.  Manage 239,400 acres of the federal mineral estate underlying BLM surface as closed to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.) See Figure 2-38 in Appendix A: [includes] Occupied GUSG Habitat Allowable Use (FM-AU3):  No Leasing:  Split-estate.  Manage 25,400 acres of Private and State surface/federal fluid mineral estate as closed to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.)  See Figure 2-39 in Appendix A: [includes] Occupied GUSG Habitat (12,700 acres). |
| 59 | Fluid Minerals | **CANYONS OF THE ANCIENTS NM RMP 2010** Permit off-lease seismic activities only for the purpose of defining the limits of common reservoirs now being produced. Limit geophysical operations to BLM-authorized routes.  Prohibit vehicle traffic along receiver lines.  Require that all vehicles associated with geophysical operations travel only on BLM-authorized routes if water is visible in the channel at washes, alluvial valleys, or perennial water features, and/or where riparian vegetation is present. Prohibit seismic operation-related work by bulldozers and/or by other earthmoving equipment. |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | Require that any ground disturbance along source or receiver lines be reclaimed in a manner that protects cultural and natural resources.  Conduct reclamation of these routes using methods appropriate to the area (including, but not limited to, the use of natural barriers, such as boulders or dead-and-down wood, and/or ripping, reseeding, and signing). **GRAND JUNCTION FO RMP 2015** Allowable Use (FM-AU2):  No Leasing:  BLM surface/federal minerals.  Manage 239,400 acres of the federal mineral estate underlying BLM surface as closed to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.)  See Figure 2-38 in Appendix A: [includes] Occupied GUSG Habitat Allowable Use (FM-AU3):  No Leasing:  Split-estate.  Manage 25,400 acres of Private and State surface/federal fluid mineral estate as closed to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.)  See Figure 2-39 in Appendix A: [includes] Occupied GUSG Habitat (12,700 acres). |
| 60 | Fluid Minerals | **GRAND JUNCTION FO RMP 2015** Action (FM-A5):  In areas being actively developed, the operator would be encouraged to submit a Master Development Plan (formerly known as Geographic Area Proposal) that describes a minimum of two to three years activity for operator-controlled federal leases within a reasonable geographic area (to be determined jointly with BLM).  Use the Master Development Plan to plan development of federal leases within the area to account for well locations, roads, and pipelines, and to identify cumulative environmental effects and appropriate mitigation.  The extent of the analysis would be dependent on the extent of surface ownership, extent of lease holdings, topography, access, and resource concerns. **SAN LUIS GEOTHERMAL RMP AMENDMENT 2013** In areas being actively developed, the operator must submit a Master Development Plan that describes a minimum of two to three years activity for operator-controlled federal leases within a reasonable geographic area (to be determined jointly with BLM).  Use the Master Development Plan to plan development of federal leases within the area to account for well locations, roads, and pipelines, and to identify cumulative environmental effects and appropriate mitigation.  The extent of the analysis would be dependent on the extent of surface ownership, extent of lease holdings, topography, access, and resource concerns.  This requirement for a Master Development Plan may be waived for individual or small groups of exploratory wells, for directional wells drilled on previously developed well pads. |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| 61 | Fluid Minerals | **GRAND JUNCTION FO RMP 2015**<br>Action (FM-A5):  In areas being actively developed, the operator would be encouraged to submit a Master Development Plan (formerly known as Geographic Area Proposal) that describes a minimum of two to three years activity for operator-controlled federal leases within a reasonable geographic area (to be determined jointly with BLM).  Use the Master Development Plan to plan development of federal leases within the area to account for well locations, roads, and pipelines, and to identify cumulative environmental effects and appropriate mitigation.  The extent of the analysis would be dependent on the extent of surface ownership, extent of lease holdings, topography, access, and resource concerns.<br><br>**SAN LUIS GEOTHERMAL RMP AMENDMENT 2013**<br>In areas being actively developed, the operator must submit a Master Development Plan that describes a minimum of two to three years activity for operator-controlled federal leases within a reasonable geographic area (to be determined jointly with BLM).  Use the Master Development Plan to plan development of federal leases within the area to account for well locations, roads, and pipelines, and to identify cumulative environmental effects and appropriate mitigation.  The extent of the analysis would be dependent on the extent of surface ownership, extent of lease holdings, topography, access, and resource concerns.  This requirement for a Master Development Plan may be waived for individual or small groups of exploratory wells, for directional wells drilled on previously developed well pads. |
| 62 | Fluid Minerals | **GUNNISON GORGE NCA RMP 2004**<br>Federal oil, gas, and geothermal estate on both federal surface and split-estate lands outside the NCA and Wilderness boundaries will be open to leasing with standard lease terms, except as noted in management unit prescriptions... Other special stipulations and conditions for leasing of federal mineral estate, such as NSO stipulation and timing limitation stipulation (TLS), will be recommended in some management unit prescriptions; these special stipulations and conditions will also apply to federal surface and split-estate lands adjacent to the management unit in which the stipulations in Appendix E will apply.<br><br>**GUNNISON RMP 1993**<br>Federal oil, gas, and geothermal estate on both federal surface and split-estate lands, that is, private or other non-federal surface estate overlying federal mineral estate, will be open to leasing with standard lease terms.  Other special stipulations and conditions for leasing such as no surface occupancy and seasonal restrictions are assigned or specified in each management unit prescription and as deemed necessary; these special stipulations and conditions will also apply to federal surface and split-estate lands. |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | **MOAB FO RMP 2008**<br>On 20,061 acres of split-estate lands, the BLM will apply the same lease stipulations as those applied to surrounding lands with Federal surface. BLM will close or impose a no surface occupancy stipulation on 9,617 acres of split-estate lands (see Appendix A).  Mitigation measures to protect other resource values will be developed during the appropriate site-specific environmental analysis and will be attached as conditions of approval to permits in consultation with the surface owner or SMA.<br><br>**MONTICELLO FO RMP 2008**<br>On split-estate lands, lease stipulations will consist of those necessary to comply with non-discretionary federal laws, such as the Endangered Species Act.  The one exception to this will be the stipulations developed for GUSG as identified in Appendix B.  Mitigation measures will also be applied to protect other resource values such as VRM class, recreation, and non-federally protected fish and wildlife species consistent with Section 6 of the standard lease terms.  These mitigation measures will be developed during site-specific environmental analysis and will be attached as COAs in consultation with the surface owner or surface management agency.<br><br>**UNCOMPAHGRE BASIN**<br>Federal oil, gas, and geothermal estate on both federal surface and split-estate lands will be open to leasing with standard lease terms:  Other conditions for leasing such as no surface occupancy and seasonal stipulations (see Appendix A) are assigned in each management unit prescription; special stipulations and conditions also apply to federal surface and split-estate lands.  Any special stipulations (i.e., seasonal closures) prescribed for a management unit will also apply to seismic and drilling activities. |
| 63 | Fluid Minerals | **TRES RIOS FO RMP 2015**<br>Guideline 2.4.61: Applicable BMPs should be applied to all mineral proposals as Conditions of Approval within occupied sage-grouse habitat to provide for adequate effective habitat and breeding, nesting, and wintering habitat. |
| 64 | Fluid Minerals | No similar action. |
| **Leased Fluid Minerals** | | |
| 65 | Fluid Minerals | **DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**<br>As specified in the enabling legislation (P.L. 111-11), subject to valid existing rights, all Federal land within the Conservation Area and the Wilderness, and all land and interests in land acquired for the Conservation Area or the Wilderness by the United States are withdrawn from: |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | 1) all forms of entry, appropriation, or disposal under the public land laws;<br>2) location, entry, and patent under the mining laws; and<br>3) the operation of the mineral leasing, mineral materials, and geothermal leasing laws.<br><br>**GUNNISON GORGE NCA RMP 2004**<br>Oil and gas stipulation:  Gunnison Gorge NCA-1 (Colorado BLM Exhibit CO-02) NSO stipulation.  To protect grouse strutting/dancing grounds (including sage and mountain sharp-tailed grouse and lesser and greater prairie chickens) within a two-mile (three-kilometer) radius from the site (potentially affects MU 4).<br>Oil and gas stipulation:  Gunnison Gorge NCA-12 NSO stipulation.  To protect GUSG brood rearing habitat in certain riparian areas (potentially affects MU 3, 4, 6).<br>Oil and gas stipulation:  Gunnison Gorge NCA-14 CSUS:  Activities associated with oil and gas exploration and development including roads, transmission lines, storage facilities, are restricted to an area beyond 500 feet of the riparian vegetation zone on the lands described below (for clarification, the 500-foot restriction starts at the point between riparian vegetation and upland vegetation).  To protect perennial water impoundments and streams, and/or riparian/wetland vegetation zone, important GUSG brood-rearing habitat, and fish use, water quality, and other related resource values.<br><br>**GRAND JUNCTION FO RMP 2015**<br>Allowable Use (FM-AU2):  No Leasing: BLM surface/federal minerals.  Manage 239,400 acres of the federal mineral estate underlying BLM surface as closed to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.) See Figure 2-38 in Appendix A: [includes]<br>Occupied GUSG Habitat;<br>Allowable Use (FM-AU3):  No Leasing: Split-estate.  Manage 25,400 acres of Private and State surface/federal fluid mineral estate as closed to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.) See Figure 2-39 in Appendix A: [includes]<br>Occupied GUSG Habitat (12,700 acres)<br><br>**GUNNISON RMP 1993**<br>CO-2, Sage Grouse Lek/Courtship sites; CO-2: No surface occupancy or use is allowed within a one-quarter mile radius of sage grouse lek sites/courtship sites.<br>NOTE:  The 1993 Gunnison RMP specifies a NSO buffer for sage-grouse leks within a 0.25-mile radius of leks.  The 2005 Gunnison Sage Grouse RCP specifies a NSO buffer within a 0.6-mile radius of active leks.  Per BLM policy to implement the RCP, the 1997 Public Land Health Standards Amendment to the RMP, and BLM policy regarding sage-grouse management, the 0.6-mile sage-grouse active lek buffer would be implemented. |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | GUSG lek sites NSO stipulation (G-10) (within a 0.6 mile radius of GUSG leks of inactive, historic, and unknown status). (Geothermal Amendment) CSU, CO-28, Riparian/Wetland vegetation in Sage Grouse Brood Rearing Habitat -- Lease STIPULATION CSU GUSG mapped summer-fall habitat CSU stipulation (G-25) **MCINNIS CANYONS NCA PROCLAMATION 2000** As specified in the enabling legislation (P.L. 106-353), subject to valid existing rights, all federal land within the McInnis Canyons NCA and the BRCW, and all land and interests in land acquired for the Conservation Area or the Wilderness by the United States are withdrawn from: 1. all forms of entry, appropriation, or disposal under the public land laws; 2. location, entry, and patent under the mining laws; and 3. the operation of the mineral leasing, mineral materials, and geothermal leasing laws, and all amendments thereto. **MOAB FO RMP 2008** If GUSG leks are discovered within sage-grouse habitat, no surface-disturbing activities will be allowed within 0.6 mile of a lek. Purpose:  To protect occupied lek sites within GUSG Habitat. Exception:  An exception may be granted by the Field Manager if the operator submits a plan which demonstrates that impacts from the proposed action can be adequately mitigated. Modification:  The Field Manager may modify the boundaries of the stipulation area if (1) portions of the area do not include lek sites, or (2) the lek site(s) have been completely abandoned or destroyed, or (3) occupied lek site(s) occur outside the current defined area, as determined by the BLM. Waiver:  A waiver may be granted if there are no active lek site(s) in the leasehold and it is determined the site(s) have been completely abandoned or destroyed or occur outside current defined area, as determined by the BLM. **MONTICELLO FO RMP 2008** CSU STIPULATION:  Avoid surface-disturbing activities within year round habitat (between 0.6 and 4.0 miles of active [GUSG lek].  If activities cannot be avoided, then an operating plan which incorporates the applicable conservation measures outlined in the GUSG RCP (2005 as amended) must be approved by the BLM prior to surface-disturbing activities. Conservation measures from this plan include, but are not limited to: Fences would be fitted with visual devices to minimize grouse collisions; Road length and width would be minimized and vehicles not exceed 35 mph; Bury power lines or place raptor perching deterrents on power poles; Any necessary equipment would produce minimal noise, including compressors, vehicles, and other sources of noise by using mufflers or noise suppression devices. |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | Exception:  The Field Manager may grant an exception after an analysis the authorized officer determines that the animals are not present in the project area. Modification:  The Field Manager may modify the boundaries of the stipulation area if a portion of the area is not being used as sage-grouse habitat. Waiver:  A waiver may be granted if the habitat is determined as unsuitable for sage-grouse. CSU STIPULATION:  No surface-disturbing activities are allowed within 0.6 miles of an active GUSG strutting ground [lek]. No surface-disturbing activities are allowed within 0.6 mile of an active strutting ground. Exception:  The Field Manager may grant an exception if, after an analysis, the authorized officer determines that the animals are not present in the project area or the activity can be completed so as to not adversely affect the animals. Modification:  The Field Manager may modify the boundaries of the stipulation area if a portion of the area is not being used as sage-grouse habitat. Waiver:  A waiver may be granted if the habitat is determined as unsuitable for sage-grouse. Purpose:  To protect and conserve GUSG and their habitat.<br><br>**SAN JUAN/SAN MIGUEL RMP 1985** NSO: [Stip. Code: CO-2] Grouse (includes sage grouse, mountain sharp-tailed, lesser and greater prairie chickens). NSO within one-quarter mile radius of a lek site (courtship area). (p. 17)<br><br>**SAN LUIS GEOTHERMAL RMP AMENDMENT 2013** NSO on all Occupied Habitat within 4.0 miles of lek sites and extending to include the top of Poncha Pass on all BLM-managed mineral estate north of the 4.0-mile buffer on both sides of Highway 285.<br><br>**TRES RIOS FO RMP 2015** NSO:  No surface occupancy is allowed on the lands described below: as mapped for occupied Gunnison sage-grouse habitat.  For the purpose of: Protecting priority habitat such as lek sites and nesting habitat for Gunnison sage-grouse. (3.4.2) Applicable BMPs should be applied to all mineral proposals as Conditions of Approval within occupied sage-grouse habitat to provide for adequate effective habitat and breeding, nesting, and wintering habitat. (2.4.61) |
| 66 | Fluid Minerals | **CANYONS OF THE ANCIENTS NM RMP 2010** Permit off-lease seismic activities only for the purpose of defining the limits of common reservoirs now being produced. Limit geophysical operations to BLM-authorized routes.  Prohibit vehicle traffic along receiver lines.  Require that all |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | vehicles associated with geophysical operations travel only on BLM-authorized routes if water is visible in the channel at washes, alluvial valleys, or perennial water features, and/or where riparian vegetation is present. Prohibit seismic operation-related work by bulldozers and/or by other earthmoving equipment. Require that any ground disturbance along source or receiver lines be reclaimed in a manner that protects cultural and natural resources.  Conduct reclamation of these routes using methods appropriate to the area (including, but not limited to, the use of natural barriers, such as boulders or dead-and-down wood, and/or ripping, reseeding, and signing). **GRAND JUNCTION FO RMP 2015** Allowable Use (FM-AU2):  No Leasing:  BLM surface/federal minerals.  Manage 239,400 acres of the federal mineral estate underlying BLM surface as closed to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.)  See Figure 2-38 in Appendix A: [includes] Occupied GUSG Habitat Allowable Use (FM-AU3):  No Leasing:  Split-estate.  Manage 25,400 acres of Private and State surface/federal fluid mineral estate as closed to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.)  See Figure 2-39 in Appendix A: [includes] Occupied GUSG Habitat (12,700 acres). |
| 67 | Fluid Minerals | **CANYONS OF THE ANCIENTS NM RMP 2010** Permit off-lease seismic activities only for the purpose of defining the limits of common reservoirs now being produced. Limit geophysical operations to BLM-authorized routes.  Prohibit vehicle traffic along receiver lines.  Require that all vehicles associated with geophysical operations travel only on BLM-authorized routes if water is visible in the channel at washes, alluvial valleys, or perennial water features, and/or where riparian vegetation is present. Prohibit seismic operation-related work by bulldozers and/or by other earthmoving equipment. Require that any ground disturbance along source or receiver lines be reclaimed in a manner that protects cultural and natural resources.  Conduct reclamation of these routes using methods appropriate to the area (including, but not limited to, the use of natural barriers, such as boulders or dead-and-down wood, and/or ripping, reseeding, and signing). **GRAND JUNCTION FO RMP 2015** Allowable Use (FM-AU2):  No Leasing:  BLM surface/federal minerals.  Manage 239,400 acres of the federal mineral estate underlying BLM surface as closed to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.) |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | See Figure 2-38 in Appendix A: [includes] Occupied GUSG Habitat Allowable Use (FM-AU3):  No Leasing:  Split-estate.  Manage 25,400 acres of Private and State surface/federal fluid mineral estate as closed to fluid mineral leasing and geophysical exploration. (Refer to Appendix B.)  See Figure 2-39 in Appendix A: [includes] Occupied GUSG Habitat (12,700 acres). |
| 68 | Fluid Minerals | No similar action. |
| 69 | Fluid Minerals | **GRAND JUNCTION FO RMP 2015** Action (FM-A5):  In areas being actively developed, the operator would be encouraged to submit a Master Development Plan (formerly known as Geographic Area Proposal) that describes a minimum of two to three years activity for operator-controlled federal leases within a reasonable geographic area (to be determined jointly with BLM).  Use the Master Development Plan to plan development of federal leases within the area to account for well locations, roads, and pipelines, and to identify cumulative environmental effects and appropriate mitigation.  The extent of the analysis would be dependent on the extent of surface ownership, extent of lease holdings, topography, access, and resource concerns. **SAN LUIS GEOTHERMAL RMP AMENDMENT 2013** In areas being actively developed, the operator must submit a Master Development Plan that describes a minimum of two to three years activity for operator-controlled federal leases within a reasonable geographic area (to be determined jointly with BLM).  Use the Master Development Plan to plan development of federal leases within the area to account for well locations, roads, and pipelines, and to identify cumulative environmental effects and appropriate mitigation.  The extent of the analysis would be dependent on the extent of surface ownership, extent of lease holdings, topography, access, and resource concerns.  This requirement for a Master Development Plan may be waived for individual or small groups of exploratory wells, for directional wells drilled on previously developed well pads. |
| 70 | Fluid Minerals | **GRAND JUNCTION FO RMP 2015** Action (FM-A5):  In areas being actively developed, the operator would be encouraged to submit a Master Development Plan (formerly known as Geographic Area Proposal) that describes a minimum of two to three years activity for operator-controlled federal leases within a reasonable geographic area (to be determined jointly with BLM).  Use the Master Development Plan to plan development of federal leases within the area to account for well locations, roads, and pipelines, and to identify cumulative environmental effects and appropriate mitigation.  The |

| ROW | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | extent of the analysis would be dependent on the extent of surface ownership, extent of lease holdings, topography, access, and resource concerns. **SAN LUIS GEOTHERMAL RMP AMENDMENT 2013** In areas being actively developed, the operator must submit a Master Development Plan that describes a minimum of two to three years activity for operator-controlled federal leases within a reasonable geographic area (to be determined jointly with BLM). Use the Master Development Plan to plan development of federal leases within the area to account for well locations, roads, and pipelines, and to identify cumulative environmental effects and appropriate mitigation. The extent of the analysis would be dependent on the extent of surface ownership, extent of lease holdings, topography, access, and resource concerns. This requirement for a Master Development Plan may be waived for individual or small groups of exploratory wells, for directional wells drilled on previously developed well pads. |
| 71 | Fluid Minerals | **GUNNISON GORGE NCA RMP 2004** Federal oil, gas, and geothermal estate on both federal surface and split-estate lands outside the NCA and Wilderness boundaries will be open to leasing with standard lease terms, except as noted in management unit prescriptions... Other special stipulations and conditions for leasing of federal mineral estate, such as NSO stipulation and timing limitation stipulation (TLS), will be recommended in some management unit prescriptions; these special stipulations and conditions will also apply to federal surface and split-estate lands adjacent to the management unit in which the stipulations in Appendix E will apply. **GUNNISON RMP 1993** Federal oil, gas, and geothermal estate on both federal surface and split-estate lands, that is, private or other non-federal surface estate overlying federal mineral estate, will be open to leasing with standard lease terms. Other special stipulations and conditions for leasing such as no surface occupancy and seasonal restrictions are assigned or specified in each management unit prescription and as deemed necessary; these special stipulations and conditions will also apply to federal surface and split-estate lands. **MOAB FO RMP 2008** On 20,061 acres of split-estate lands, the BLM will apply the same lease stipulations as those applied to surrounding lands with Federal surface. BLM will close or impose a no surface occupancy stipulation on 9,617 acres of split-estate lands (see Appendix A). Mitigation measures to protect other resource values will be developed during the appropriate site-specific environmental analysis and will be attached as conditions of approval to permits in consultation with the surface owner or SMA. |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | **MONTICELLO FO RMP 2008** <br> On split-estate lands, lease stipulations will consist of those necessary to comply with non-discretionary federal laws, such as the Endangered Species Act.  The one exception to this will be the stipulations developed for GUSG as identified in Appendix B.  Mitigation measures will also be applied to protect other resource values such as VRM class, recreation, and non-federally protected fish and wildlife species consistent with Section 6 of the standard lease terms.  These mitigation measures will be developed during site-specific environmental analysis and will be attached as COAs in consultation with the surface owner or surface management agency. <br><br> **UNCOMPAHGRE BASIN** <br> Federal oil, gas, and geothermal estate on both federal surface and split-estate lands will be open to leasing with standard lease terms:  Other conditions for leasing such as no surface occupancy and seasonal stipulations (see Appendix A) are assigned in each management unit prescription; special stipulations and conditions also apply to federal surface and split-estate lands.  Any special stipulations (i.e., seasonal closures) prescribed for a management unit will also apply to seismic and drilling activities. |
| 72 | Fluid Minerals | No similar action. |
| 73 | Fluid Minerals | **GUNNISON GORGE NCA RMP 2004** <br> Oil and gas stipulation:  Gunnison Gorge NCA-15 (Colorado BLM Exhibit CO-30) Information Notice or Lease Notice:  A potential closure period from March 1 through June 30, and special mitigation measures to protect nesting GUSG from surface-disturbing activities. Information Notice or Lease Notice:  The lessee is hereby notified of potential closure period (March 1 through June 30) and special mitigation to protect nesting GUSG from surface-disturbing activities.  GUSG nesting habitat is described as sagebrush stands with plants between 30 and 100 centimeters in height and 15 to 40 percent mean canopy cover. <br> Oil and gas stipulation:  Gunnison Gorge NCA-8 TLS:  No surface use is allowed December 16 through March 15 [Nov.15 – March 30 specified in RMP]. Protecting crucial GUSG wintering range (potentially affects MU 4, 6). <br> **GUNNISON GEOTHERMAL LEASING RMP AMENDMENT 2011** <br> GUSG Timing Limitation stipulations (G-20):  Construction or drilling activities will not be allowed in Occupied Habitat between March 15 and May 15. <br> GUSG Timing Limitation stipulations (G-21):   Routine operations, maintenance, and other activities in Occupied Habitat will be allowed between 9:00 a.m. and 4:00 p.m. during the period between March 15 and May 15.  This restriction applies to human activity, and not to continuing operation of equipment and facilities, such as well pumps, power plant, and cooling equipment. |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | **SAN LUIS GEOTHERMAL RMP AMENDMENT 2013**<br>BRCW (applicable on BLM-managed and split-estate lands) No human encroachment in mapped Occupied Habitat March 1 – August 15.<br><br>**SAN JUAN/SAN MIGUEL RMP 1985**<br>Stipulation Code CO-30:  In order to protect nesting grouse species, surface-disturbing activities proposed during the period between March 1 and June 30 will be relocated, consistent with lease rights granted and section 6 of standard lease terms, out of grouse nesting habitat.  Sage-grouse nesting habitat is described as sage stands with sagebrush plants between 30 and 1000 centimeters in height and a mean canopy cover between 15 and 40 percent.<br>TL:  To protect important seasonal wildlife habitat, exploration, drilling, and other developmental activity will be allowed only from May 16 to March 14 on sage grouse strutting grounds. This limitation does not apply to maintenance and operation of producing wells. Exceptions to this limitation in any year may be specifically authorized in writing by BLM's Authorized Officer.<br>Stipulation Code CO-15:  Grouse (includes sage-grouse, mountain sharp-tailed, and lesser and greater prairie chickens) Sage-grouse crucial winter habitat -- December 16 to March 15.<br><br>**TRES RIOS FO RMP 2015**<br>2.3.71:  New noise sources resulting from management activities should not contribute to noise levels that negatively impact sage-grouse leks during the active lek season (March 1 to June 30) based on best available science.<br>3.4.5 Controlled Surface Use – Noise Restriction Occupied and Unoccupied Habitat<br>Surface occupancy or use is subject to the following special operating constraints:  New noise sources resulting from management activities must not contribute to noise levels exceeding 34 A-weighted decibels (dBA) (10 dBA above ambient measures, typically 20 to 24 dBA) from 6 p.m. until 9 a.m. at the perimeter of a lek during active lek season. In Occupied Habitat the BLM would not authorize vehicular traffic between the hours of 6 p.m. and 9 a.m. within 1.9 miles of a lek from March 15 through May 15 annually.  This stipulation applies to vehicles that may create noise levels that exceed recommended guidance.<br>2.3.70:  Structures in sage-grouse habitat should be constructed to limit risk of collision and predation. (See Structure Design in General Management.)<br>Guideline 2.4.62:  Remote methodologies for monitoring, transporting fluids to centralized collection tanks, etc., should be utilized to minimize human disturbance in Gunnison sage-grouse habitat. |
| **SOLID MINERALS** | | |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| **Locatable Minerals** | | |
| 74 | Solid Minerals | No similar action. |
| **Locatable Minerals** | | |
| 75 | Locatable Minerals | **CANYONS OF THE ANCIENTS NM PROCLAMATION 2000**<br>From the Proclamation:  All Federal lands and interests in lands within the boundaries of this monument are hereby appropriated and withdrawn from all forms of entry, location, selection, sale, or other disposition under the public land laws, including but not limited to withdrawal from location, entry, and patent under the mining laws, and from disposition under all laws relating to mineral leasing, other than by exchange that furthers the protective purposes of the monument, and except for oil and gas leasing as prescribed herein. ... The establishment of this monument is subject to valid existing rights.<br><br>**DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**<br>As specified in the enabling legislation (P.L. 111-11), subject to valid existing rights, all federal land within the Conservation Area and the Wilderness, and all land and interests in land acquired for the Conservation Area or the Wilderness by the United States are withdrawn from:<br>1) all forms of entry, appropriation, or disposal under the public land laws;<br>2) location, entry, and patent under the mining laws; and<br>3) the operation of the mineral leasing, mineral materials, and geothermal leasing laws.<br><br>**MCINNIS CANYONS NCA PROCLAMATION 2000**<br>As specified in the CCNCA enabling legislation (P.L. 106-353), subject to valid existing rights, all federal land within the CCNCA and the BRCW, and all land and interests in land acquired for the Conservation Area or the Wilderness by the United States are withdrawn from:<br>1) all forms of entry, appropriation, or disposal under the public land laws;<br>2) location, entry, and patent under the mining laws; and<br>3) the operation of the mineral leasing, mineral materials, and geothermal leasing laws, and all amendments thereto.<br><br>**MOAB FO RMP 2008**<br>Where public lands are sold or exchanged under 43 U.S.C. 682(B) (Small Tracts Act), 43 U.S.C. 869 (Recreation and Public Purposes Act), 43 U.S.C. 1718 (Sales) or 43 U.S.C. 1716 (Exchanges), the minerals reserved to the United States will continue to be removed from the operation of the mining laws unless a subsequent land-use planning |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | decision expressly recommends restoring the land to mineral entry. |
| 76 | Locatable Minerals | **CANYONS OF THE ANCIENTS NM PROCLAMATION 2000**<br>From the Proclamation:  All Federal lands and interests in lands within the boundaries of this monument are hereby appropriated and withdrawn from all forms of entry, location, selection, sale, or other disposition under the public land laws, including but not limited to withdrawal from location, entry, and patent under the mining laws, and from disposition under all laws relating to mineral leasing, other than by exchange that furthers the protective purposes of the monument, and except for oil and gas leasing as prescribed herein. ... The establishment of this monument is subject to valid existing rights.<br><br>**DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**<br>As specified in the enabling legislation (P.L. 111-11), subject to valid existing rights, all federal land within the Conservation Area and the Wilderness, and all land and interests in land acquired for the Conservation Area or the Wilderness by the United States are withdrawn from:<br>1) all forms of entry, appropriation, or disposal under the public land laws;<br>2) location, entry, and patent under the mining laws; and<br>3) the operation of the mineral leasing, mineral materials, and geothermal leasing laws.<br><br>**MCINNIS CANYONS NCA PROCLAMATION 2000**<br>As specified in the CCNCA enabling legislation (P.L. 106-353), subject to valid existing rights, all federal land within the CCNCA and the BRCW, and all land and interests in land acquired for the Conservation Area or the Wilderness by the United States are withdrawn from:<br>1) all forms of entry, appropriation, or disposal under the public land laws;<br>2) location, entry, and patent under the mining laws; and<br>3) the operation of the mineral leasing, mineral materials, and geothermal leasing laws, and all amendments thereto.<br><br>**MOAB FO RMP 2008**<br>Where public lands are sold or exchanged under 43 U.S.C. 682(B) (Small Tracts Act), 43 U.S.C. 869 (Recreation and Public Purposes Act), 43 U.S.C. 1718 (Sales) or 43 U.S.C. 1716 (Exchanges), the minerals reserved to the United States will continue to be removed from the operation of the mining laws unless a subsequent land-use planning decision expressly recommends restoring the land to mineral entry. |
| 77 | Locatable Minerals | **CANYONS OF THE ANCIENTS NM RMP 2010**<br>Locate no new mining claims and undertake no new prospecting or exploration activities designed to identify new |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | locatable hardrock minerals or to establish the discovery of valuable mineral deposits.  Approve no operating plans for mining operations, unless the USDOI has made a final determination regarding the validity of the mining claims and mill sites covered by the plan.  **GUNNISON GORGE NCA RMP 2004**  BLM will conduct validity examinations on all mining claims located within the NCA or on any lands withdrawn from mineral entry. |
| 78 | Locatable Minerals | **GUNNISON GORGE NCA RMP 2004**  Plans of operation will be required for proposed locatable mineral activity authorized by BLM's surface management regulations on the following lands: 1) lands closed to OHV travel and 2) lands within designated ACECs.  MU 4 (GUSG ACEC/IBA):  A plan of operation will be required in this ACEC, for locatable mineral activities that will result in surface disturbance.  **MOAB FO RMP 2008**  To the extent possible, the stipulations developed for oil and gas leasing are applicable to all mineral activities (leasable, locatable, and salable).  These stipulations are found in Appendix A.  Locatable minerals include gold, copper, and uranium.  **TRES RIOS FO RMP 2015**  See Timing Limitations and No Ground Disturbance in General Management section.  2.3.73 Applicable BMPs should be applied to all mineral proposals as COAs within occupied sage-grouse habitat to provide for adequate effective habitat and breeding, nesting, and wintering habitat. |
| 79 | Locatable Minerals | **TRES RIOS FO RMP 2015**  See Timing Limitations and No Ground Disturbance in General Management section.  2.3.73 Applicable BMPs should be applied to all mineral proposals as COAs within occupied sage-grouse habitat to provide for adequate effective habitat and breeding, nesting, and wintering habitat. |
| **Salable Minerals** | | |
| 80 | Salable Minerals | **CANYONS OF THE ANCIENTS NM RMP 2010**  See 43 CFR 3600 which prohibits mineral materials disposal in National Monuments.  **DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013** |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | As specified in the enabling legislation (P.L. 111-11), subject to valid existing rights, all federal land within the Conservation Area and the Wilderness, and all land and interests in land acquired for the Conservation Area or the Wilderness by the United States are withdrawn from: <br> 1. all forms of entry, appropriation, or disposal under the public land laws; <br> 2. location, entry, and patent under the mining laws; and <br> 3. the operation of the mineral leasing, mineral materials, and geothermal leasing laws. <br><br> **GUNNISON GORGE NCA RMP 2004** <br> Disposal of saleable mineral material on federal mineral estate will not be permitted in the NCA and Wilderness. Disposal of mineral materials from specific areas outside the NCA and Wilderness will be permitted unless prohibited in a management unit prescription. Disposal of mineral materials where not prohibited will be discretionary with the authorizing official and will be determined on a case-by-case basis. Disposal of mineral materials within power site reserves or within other agency withdrawn lands will require approval of the agency reserving the withdrawal. <br><br> **GUNNISON RMP 1993** <br> Disposal of mineral material on federal mineral estate will be permitted. Disposal of mineral materials from specific areas is discretionary with the authorizing official and will be determined on a case-by-basis. Disposal of mineral materials within power site reserves or within other agency withdrawn lands will require approval of the agency reserving the withdrawal. <br> **MCINNIS CANYONS NCA PROCLAMATION 2000** <br> As specified in the CCNCA enabling legislation (P.L. 106-353), subject to valid existing rights, all federal land within the CCNCA and the BRCW, and all land and interests in land acquired for the Conservation Area or the Wilderness by the United States are withdrawn from: <br> 1. all forms of entry, appropriation, or disposal under the public land laws; <br> 2. location, entry, and patent under the mining laws; and <br> 3. the operation of the mineral leasing, mineral materials, and geothermal leasing laws, and all amendments thereto. <br><br> **MOAB FO RMP 2008** <br> To the extent possible, the stipulations developed for oil and gas leasing are applicable to all mineral activities (leasable, locatable, and salable). These stipulations are found in Appendix A. Salable minerals include sand and gravel, clay, and building stone. <br><br> **MONTICELLO FO RMP 2008** |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | Management conditions for disposal of mineral materials under each category correspond respectively to the oil and gas leasing stipulations developed in the RMP, as follows: <br> Standard lease terms <br> TL and CSU <br> NSO and closed. <br> **SAN LUIS RMP 1991** <br> San Luis Area #1; I-4:  Federal mineral estate will be open on 486,240 acres (99 percent) and will be available for disposal of mineral materials except in riparian zones. <br> **TRES RIOS FO RMP 2015** <br> See Timing Limitations and No Ground Disturbance in General Management section. <br> 2.3.73:  Applicable BMPs should be applied to all mineral proposals as Conditions of Approval within occupied sage-grouse habitat to provide for adequate effective habitat and breeding, nesting, and wintering habitat. |
| 81 | Salable Minerals | **GUNNISON RMP 1993** <br> MU 7 (West Antelope Creek ACEC) <br> MU 11 (grouse high production areas) <br> MU 12 (elk and deer crucial winter range) <br> MU 14 (riparian areas containing important sage grouse brood-rearing areas) <br> MU 16 (general resource lands): <br> Disposal of mineral materials will not be permitted on federal mineral estate within 1/4 mile of all leks in the unit from April 1 through May 31 in order to prevent disturbance to strutting sage grouse. |
| 82 | Salable Minerals | **GUNNISON RMP 1993** <br> MU 7 (West Antelope Creek ACEC) <br> MU 11 (grouse high production areas) <br> MU 12 (elk and deer crucial winter range) <br> MU 14 (riparian areas containing important sage grouse brood-rearing areas) <br> MU 16 (general resource lands): <br> Disposal of mineral materials will not be permitted on federal mineral estate within 1/4 mile of all leks in the unit from April 1 through May 31 in order to prevent disturbance to strutting sage grouse. <br><br> **MOAB FO RMP 2008** |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | To the extent possible, the stipulations developed for oil and gas leasing are applicable to all mineral activities (leasable, locatable, and salable).  These stipulations are found in Appendix A.  Salable minerals include sand and gravel, clay, and building stone. <br><br>**MONTICELLO FO RMP 2008** <br>Management conditions for disposal of mineral materials under each category correspond respectively to the oil and gas leasing stipulations developed in the RMP, as follows: <br>Standard lease terms <br>TL and CSU <br>NSO and closed. <br><br>**TRES RIOS FO RMP 2015** <br>See Timing Limitations and No Ground Disturbance in General Management section. <br>2.3.73:  Applicable BMPs should be applied to all mineral proposals as Conditions of Approval within occupied sage-grouse habitat to provide for adequate effective habitat and breeding, nesting, and wintering habitat. |
| 83 | Salable Minerals | No similar action. |
| **LEASABLE MINERALS** | | |
| **Non-Energy Leasable Minerals** | | |
| 84 | Non-Energy Leasable Minerals | **CANYONS OF THE ANCIENTS NM PROCLAMATION 2000** <br>From the Proclamation:  All Federal lands and interests in lands within the boundaries of this monument are hereby appropriated and withdrawn from all forms of entry, location, selection, sale, or other disposition under the public land laws, including but not limited to withdrawal from location, entry, and patent under the mining laws, and from disposition under all laws relating to mineral leasing, other than by exchange that furthers the protective purposes of the monument, and except for oil and gas leasing as prescribed herein.... The establishment of this monument is subject to valid existing rights. <br><br>**DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013** <br>As specified in the enabling legislation (P.L. 111-1106-353), subject to valid existing rights, all federal land within the Conservation Area and the Wilderness, and all land and interests in land acquired for the Conservation Area or the Wilderness by the United States are withdrawn from: <br>4.   all forms of entry, appropriation, or disposal under the public land laws; |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | 5.   location, entry, and patent under the mining laws; and the operation of the mineral leasing, mineral materials, and geothermal leasing laws.<br><br>**GRAND JUNCTION FO RMP 2015**<br>Allowable Use (AU2):  Close 561,700 acres in the following areas to non-energy leasable mineral exploration and/or development (Figure 2-62, Appendix A):  Occupied GUSG Habitat.<br><br>**MCINNIS CANYONS NCA PROCLAMATION 2000**<br>As specified in the enabling legislation (P.L. 106-353), subject to valid existing rights, all federal land within the McInnis Canyons NCA and the BRCW, and all land and interests in land acquired for the Conservation Area or the Wilderness by the United States are withdrawn from:<br>1) all forms of entry, appropriation, or disposal under the public land laws;<br>2) location, entry, and patent under the mining laws; and<br>3) the operation of the mineral leasing, mineral materials, and geothermal leasing laws, and all amendments thereto. |
| 85 | Non-Energy Leasable Minerals | **CANYONS OF THE ANCIENTS NM PROCLAMATION 2000**<br>From the Proclamation:  All Federal lands and interests in lands within the boundaries of this monument are hereby appropriated and withdrawn from all forms of entry, location, selection, sale, or other disposition under the public land laws, including but not limited to withdrawal from location, entry, and patent under the mining laws, and from disposition under all laws relating to mineral leasing, other than by exchange that furthers the protective purposes of the monument, and except for oil and gas leasing as prescribed herein…. The establishment of this monument is subject to valid existing rights.<br><br>**DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**<br>As specified in the enabling legislation (P.L. 111-1106-353), subject to valid existing rights, all federal land within the Conservation Area and the Wilderness, and all land and interests in land acquired for the Conservation Area or the Wilderness by the United States are withdrawn from:<br>6.  all forms of entry, appropriation, or disposal under the public land laws;<br>7.  location, entry, and patent under the mining laws; and<br>8.  the operation of the mineral leasing, mineral materials, and geothermal leasing laws.<br><br>**GRAND JUNCTION FO RMP 2015**<br>Allowable Use (AU2):  Close 561,700 acres in the following areas to non-energy leasable mineral exploration and/or development (Figure 2-62, Appendix A):  Occupied GUSG Habitat. |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | **MCINNIS CANYONS NCA PROCLAMATION 2000**<br>As specified in the enabling legislation (P.L. 106-353), subject to valid existing rights, all federal land within the McInnis Canyons NCA and the BRCW, and all land and interests in land acquired for the Conservation Area or the Wilderness by the United States are withdrawn from:<br>1) all forms of entry, appropriation, or disposal under the public land laws;<br>2) location, entry, and patent under the mining laws; and<br>3) the operation of the mineral leasing, mineral materials, and geothermal leasing laws, and all amendments thereto. |
| 86 | Non-Energy Leasable Minerals | **MOAB FO RMP 2008**<br>To the extent possible, the stipulations developed for oil and gas leasing are applicable to all mineral activities (leasable, locatable, and salable).  These stipulations are found in Appendix A.  Leasable minerals include oil and gas, coal, and potash.<br><br>**TRES RIOS FO RMP 2015**<br>See Timing Limitations and No Ground Disturbance in General Management section.<br>2.3.73:  Applicable BMPs should be applied to all mineral proposals as Conditions of Approval within occupied sage-grouse habitat to provide for adequate effective habitat and breeding, nesting, and wintering habitat. |
| 87 | Non-Energy Leasable Minerals | **MOAB FO RMP 2008**<br>To the extent possible, the stipulations developed for oil and gas leasing are applicable to all mineral activities (leasable, locatable, and salable).  These stipulations are found in Appendix A.  Leasable minerals include oil and gas, coal, and potash.<br><br>**TRES RIOS FO RMP 2015**<br>See Timing Limitations and No Ground Disturbance in General Management section.<br>2.3.73:  Applicable BMPs should be applied to all mineral proposals as Conditions of Approval within occupied sage-grouse habitat to provide for adequate effective habitat and breeding, nesting, and wintering habitat. |
| **Split-Estate** | | |
| 88 | Split Estate | **GUNNISON GORGE NCA RMP 2004**<br>Federal oil, gas, and geothermal estate on both federal surface and split-estate lands outside the NCA and Wilderness boundaries will be open to leasing with standard lease terms, except as noted in management unit prescriptions... Other special stipulations and conditions for leasing of federal mineral estate, such as NSO stipulation |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | and timing limitation stipulation (TLS), will be recommended in some management unit prescriptions; these special stipulations and conditions will also apply to federal surface and split-estate lands adjacent to the management unit in which the stipulations in Appendix E will apply. |

**GUNNISON RMP 1993**
Federal oil, gas, and geothermal estate on both federal surface and split-estate lands, that is, private or other non-federal surface estate overlying federal mineral estate, will be open to leasing with standard lease terms. Other special stipulations and conditions for leasing such as no surface occupancy and seasonal restrictions are assigned or specified in each management unit prescription and as deemed necessary; these special stipulations and conditions will also apply to federal surface and split-estate lands.

**MOAB FO RMP 2008**
On 20,061 acres of split-estate lands, the BLM will apply the same lease stipulations as those applied to surrounding lands with Federal surface. BLM will close or impose a no surface occupancy stipulation on 9,617 acres of split-estate lands (see Appendix A). Mitigation measures to protect other resource values will be developed during the appropriate site-specific environmental analysis and will be attached as conditions of approval to permits in consultation with the surface owner or SMA.

**MONTICELLO FO RMP 2008**
On split-estate lands, lease stipulations will consist of those necessary to comply with non-discretionary federal laws, such as the Endangered Species Act. The one exception to this will be the stipulations developed for GUSG as identified in Appendix B. Mitigation measures will also be applied to protect other resource values such as VRM class, recreation, and non-federally protected fish and wildlife species consistent with Section 6 of the standard lease terms. These mitigation measures will be developed during site-specific environmental analysis and will be attached as COAs in consultation with the surface owner or surface management agency.

**UNCOMPAHGRE BASIN**
Federal oil, gas, and geothermal estate on both federal surface and split-estate lands will be open to leasing with standard lease terms. Other conditions for leasing such as no surface occupancy and seasonal stipulations (see Appendix A) are assigned in each management unit prescription; special stipulations and conditions also apply to federal surface and split-estate lands. Any special stipulations (i.e., seasonal closures) prescribed for a management unit will also apply to seismic and drilling activities.

## WILDLAND FIRE ECOLOGY AND MANAGEMENT

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| **Fuels Management** | | |
| 89 | Fire, Fuels, Rehabilitation | **CANYONS OF THE ANCIENTS NM RMP 2010**<br>Encourage range, fuels and fire, and vegetation management activities that include the protection and/or enhancement of the health and productivity of native and other desirable plant and animal communities.<br>Encourage range, fuels and fire, and vegetation management activities that will protect and/or enhance riparian/aquatic resource conditions.<br>Approve, within 1-3 years following the signing of the ROD, a list of areas requiring fuels management and vegetation management treatments (as determined by the Monument Manager).<br>Prioritize this list based upon such criteria as pending threats to life and property; potential threats to Monument objects (such as cultural resources); vegetation management goals and objectives; consideration of areas where fire suppression has disrupted natural fire regimes, and consideration of areas where similar efforts are being pursued by adjacent landowners.<br>Update this list annually in order to address changing threats, conditions, and opportunities.<br>Allow all forms of fuels or vegetation management treatments (including mechanical, biological, chemical, and/or prescribed burns) on the Monument where they promote vegetation and cultural resource management goals and objectives.<br>Authorize no mechanical fuels or vegetation management treatment in RMZ 4 (Squaw-Cross Canyon).<br>Determine a treatment's location, size, specific layout, and project design features, as well as any measures needed in order to protect sensitive resources, through the environmental review process.<br><br>**DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**<br>Use mechanical, chemical and biological treatments and prescribed fire to improve FRCC and to meet biological and cultural resource objectives.  Manage fire and fuels to protect private property, infrastructure, cultural and biological resources, and watersheds.<br><br>**GRAND JUNCTION FO RMP 2015**<br>Design vegetation treatments in Sage-Grouse habitats to strategically reduce wildfire threats in the greatest area. This may involve spatially arranging new vegetation treatments with past treatments, vegetation with fire-resistant seral stages, natural barriers, and roads in order to constrain fire spread and growth.  This may require vegetation treatments to be implemented in a more linear versus block design.<br>Action (A3):  Implement fuels treatments actions that may include, but are not limited to:<br>Mechanical treatments, including mowing, weed-whacking, chopping (roller chopper), chipping, grinding (hydro-ax), |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | chaining, tilling, and cutting.<br>Manual treatments, including hand cutting (chainsaw/handsaw) and hand-piling.<br>Prescribed fire, including pile and broadcast burning.<br>Chemical spraying or biological treatments, such as insects or goats.<br>Seeding, including aerial or ground application.<br><br>**MOAB RMP 2008**<br>FIRE-4:  Hazardous fuels reduction treatments will be used to restore ecosystems; protect human, natural and cultural resources; and reduce the threat of wildfire to communities.<br>FIRE-11:  Criteria for Establishing Fire Management Priorities: Protection of human life is the primary fire management priority.  Establishing a priority among protecting human communities and community infrastructure, other property and improvements, and natural and cultural resources is based on human health and safety, the values to be protected, and the costs of protection.  When firefighters and other personnel have been committed to an incident, these human resources become the highest values to be protected.  Priorities for all aspects of fire management decisions and actions are based on the following:<br>Protecting the Wildland-Urban Interface (WUI; including At-risk Communities and At-risk Watersheds).<br>Maintaining existing healthy ecosystems.<br>High priority sub-basins (HUC-4) or watersheds (HUC-5).<br>Threatened, endangered, or special species.<br>Cultural resources and/or cultural landscapes.<br>FIRE-14:  Fuels Treatment:  Fuels management activities outlined in the FMP will be consistent with the resource goals and objectives contained in the RMP.  To reduce hazards and to restore ecosystems, authorized fuels management actions include wildland fire use, prescribed fire, and mechanical, manual, chemical, biological, and seeding treatments.  The FMP describes fuels management goals and objectives and the full range of fuels management strategies and actions authorized for fuels reduction.  Fuels treatments are focused on the DWFC of restoring historic fire regimes to ecosystems when feasible, so that future wildland fire use actions can be more easily implemented.<br>SSS-3:  As required by the Endangered Species Act, no management action will be permitted on public lands that will jeopardize the continued existence of plant or animal species that are listed or are officially proposed or are candidates for listing as T&E.<br><br>**MONTICELLO FO RMP 2008**<br>FIRE-7:  Wildland fire is authorized as a tool, when appropriate, to allow naturally ignited wildland fire to accomplish |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | specific resource management objectives. Due to existing resource conditions and proximity to values at risk, fire cannot be allowed to resume its natural role on all BLM lands in the FO. Consideration of ongoing management decisions and other natural changes will direct periodical reassessment of DWFC and determination of potential areas for wildland fire use. Operational management of wildland fire use is described in the Wildland Fire Implementation Plan (WFIP). The FMP identifies FMUs that may have the potential for wildland fire use. Wildland fire use may be authorized for all areas, except when the following resources and values may be negatively impacted and there are no reasonable Resource Protection Measures to protect such resources and values: WUI areas; Areas known to be highly susceptible to post-fire cheatgrass or invasive weed invasion; Important terrestrial and aquatic habitats; Non–fire-adapted vegetation communities; Sensitive cultural resources; Areas of soil with high or very high erosion hazard; Class I areas and PM10 nonattainment areas; Administrative sites; Developed recreation sites; Communication sites; Oil, gas, and mining facilities; Aboveground utility corridors; High-use travel corridors, such as interstates, railroads, and/or highways.
FIRE-8: Fuels management activities outlined in the FMP will be consistent with the resource goals and objectives contained in the RMP. To reduce hazards and to restore ecosystems, authorized fuels management decisions include wildland fire use, prescribed fire, and mechanical, manual, chemical, biological, and seeding treatments. The FMP describes fuels management goals and objectives, and the full range of fuels management strategies and actions authorized for fuels reduction. Fuels treatments are focused on the DWFC of restoring historic fire regimes to ecosystems when feasible, so that future wildland fire use actions can be more easily implemented.
SSP-6: No management action will be permitted on BLM lands that will jeopardize the continued existence of species that are listed, proposed for listing, or candidates for listing under the Endangered Species Act.

**TRES RIOS FO RMP 2015**
GUSG: In Occupied Habitat fuels treatments must be designed and implemented with an emphasis on protecting and enhancing existing sagebrush ecosystems.
ACTION: Fuels treatments should be designed to meet strategic protection of identified occupied sage-grouse habitat.
Guideline 2.4.63: Fuels treatments should be designed to meet strategic protection of identified occupied sage-grouse habitat. |
| 90 | Fire, Fuels, Rehabilitation | **CANYONS OF THE ANCIENTS NM RMP 2010**
Require a plan for reclamation, with a reclamation budget, for all proposed vegetation management treatment projects (including mechanical, biological, and chemical treatments, and prescribed burns). Consider prescribed burns as a treatment option for ecosystems that are identified as fire-dependent or fire-adaptive. Assess fuel loads |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | within the treatment area(s) for expected fire behavior.  Mitigate for heavy concentrations (hazardous fuels) prior to prescribed burn ignition.  (NOTE:  Under these circumstances, prescribed burns will be used, and will attempt to simulate natural fire intensity and timing.)  Use prescribed burns on a limited basis in order to achieve management objectives or for the safety of firefighters. **DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013** Use mechanical, chemical and biological treatments and prescribed fire to improve FRCC and to meet biological and cultural resource objectives. **GUNNISON GORGE NCA RMP 2004** In all management units in the planning area, prescribed and planned ignitions will continue to be allowed as a management tool to meet management objectives, such as to increase forage for wildlife and livestock grazing. Prior to any ignitions, an environmental analysis, burn plan, and burning permit will be prepared or obtained. **GRAND JUNCTION FO RMP 2015** Avoid natural and prescribed fire in low-elevation sagebrush communities infested with or susceptible to cheatgrass. Ground disturbing mechanical treatments completed in low-elevation sagebrush may require seeding. **GUNNISON RMP 1993** Prescribed fires for resource enhancement or fuel hazard reduction could occur throughout the Planning Area in accordance with approved prescribed burn plans.  A site-specific bum plan and Environmental Analysis (EA) will be prepared prior to authorizing any prescribed bums. **SAN LUIS RMP 1991** San Luis Area #1 1-5:  Allow vegetative manipulation such as mechanical, chemical, or fire practices to aid in accomplishing the overall objective and the desired plant communities described in activity plans.  Prescribed burn plans and necessary NEPA documentation will be written for areas requiring visual landscape or vegetation manipulation; however, no specific areas are identified at this time. **TRES RIOS FO RMP 2015** Planned and unplanned fire ignitions are used to increase resiliency and diversity across all forest and rangeland vegetation types.  Unplanned ignitions, wildland fire tactical options, and planned ignitions on Tres Rios FO lands will be determined on a case-by-case basis. |
| **Wildfire** | | |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| 91 | Fire, Fuels, Rehabilitation | **CANYONS OF THE ANCIENTS NM RMP 2010**<br>Designate the entire Monument as FMZ B (area where natural fire is generally not desired under current conditions and suppression is emphasized.)  Use Appropriate Management Response for all fires within the Monument.<br><br>**DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**<br>Allow natural unplanned ignitions to be managed for multiple objectives (including resource benefit) within 208,565 acres of the D-E NCA to meet biological resource objectives.  Manage fire and fuels to protect private property, infrastructure, cultural and biological resources, and watersheds.<br><br>**GUNNISON GORGE NCA RMP 2004**<br>Any fire that occurs in a fire use category area before a prescribed burn plan is approved, that is not within the limits of the prescription, or that threatens life or property will be suppressed as a conditional suppression area fire.<br><br>**GRAND JUNCTION FO RMP 2015**<br>Use new fire starts and prescribed fire where suitable to meet resource objectives as deemed appropriate by Land Health Assessments, Ecological Site Inventories, Emergency Stabilization & Rehabilitation monitoring, and prescribed fire monitoring.  Avoid natural and prescribed fire in low-elevation sagebrush communities infested with or susceptible to cheatgrass.<br>Action (A1):  Allow unplanned fire on 857,400 acres for resource benefit to manage diversity in desired plant communities in those areas identified in Figure 2-76 in Appendix A.<br>Action (A4):  Use a combination of planned and unplanned fire along with fuels treatments including mechanical, manual, chemical, and seeding to meet resource objectives.  The priority would be using any of the above treatments based on strategic goals for site-specific projects.<br><br>**GUNNISON RMP 1993**<br>Wildfires on about 508,388 acres of public land will be suppressed according to a "conditional suppression" policy and about 76,624 acres of public land will be suppressed according to a "full suppression" policy.<br><br>**MOAB FO RMP 2008**<br>Suppression:  An "Appropriate Management Response" (AMR) procedure is required for every wildland fire that is not a prescribed fire.  In all fire management decisions, strategies and actions, firefighter and public safety are the highest priority followed by consideration of benefits and values to be protected as well as suppression costs.  The AMR can range from full suppression to managing fire for resource benefit (wildland fire use).  Resource goals and objectives outlined in the RMP guide the development and implementation of AMR fire management activities in regard to the accomplishment of those objectives.  The FMP establishes fire suppression objectives with minimum |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | and maximum suppression targets for each Fire Management Unit (FMU) within the MPA. While firefighter and public safety are the first priority, considerations for suppression activities also include fire intensity, acreage, and spread potential, threats to life and property, potential to impact high-value resources such as critical habitat for threatened, endangered and sensitive species, crucial wildlife habitat, cultural resources and/or riparian areas, historic fire regimes, and other special considerations such as wilderness and/or adjacent agency lands.<br><br>**MONTICELLO RMP 2008**<br>FIRE-6-Suppression:  An Appropriate Management Response (AMR) procedure is required for every wildland fire that is not a prescribed fire. In all fire management decisions, strategies, and actions, firefighter and public safety are the highest priority followed by consideration of benefits and values to be protected as well as suppression costs. The AMR can range from full suppression to managing fire for resource benefit (wildland fire use).  Resource goals and objectives outlined in the RMP guide the development and implementation of AMR fire management activities in regard to the accomplishment of those objectives.  The FMP establishes fire suppression objectives with minimum and maximum suppression targets for each Fire Management Unit (FMU) within the PA.  While firefighter and public safety are the first priority, considerations for suppression activities also include fire intensity, acreage, and spread potential; threats to life and property; potential to impact high-value resources such as critical habitat for threatened, endangered, and sensitive species; crucial wildlife habitat; cultural resources and/or riparian areas; historic fire regimes; and other special considerations such as wilderness and/or adjacent agency lands.<br><br>**SAN LUIS RMP 1991**<br>Any fire, including wildfires, occurring in the resource area will be suppressed.<br><br>**TRES RIOS FO RMP 2015**<br>Planned and unplanned fire ignitions are used to increase resiliency and diversity across all forest and rangeland vegetation types.  Unplanned ignitions, wildland fire tactical options, and planned ignitions on Tres Rios FO lands will be determined on a case-by-case basis.<br><br>**UNCOMPAHGRE BASIN RMP 1989**<br>Consider fire as a management tool for the entire planning area, subject to site specific environmental analysis and approved bum plans. |
| 92 | Fire, Fuels, Rehabilitation | **CANYONS OF THE ANCIENTS NM RMP 2010**<br>Designate the entire Monument as FMZ B (area where natural fire is generally not desired under current conditions and suppression is emphasized.)  Use Appropriate Management Response for all fires within the Monument. |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | **DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013** Allow natural unplanned ignitions to be managed for multiple objectives (including resource benefit) within 208,565 acres of the D-E NCA to meet biological resource objectives. Manage fire and fuels to protect private property, infrastructure, cultural and biological resources, and watersheds. **GUNNISON GORGE NCA RMP 2004** Any fire that occurs in a fire use category area before a prescribed burn plan is approved, that is not within the limits of the prescription, or that threatens life or property will be suppressed as a conditional suppression area fire. **GRAND JUNCTION FO RMP 2015** Use new fire starts and prescribed fire where suitable to meet resource objectives as deemed appropriate by Land Health Assessments, Ecological Site Inventories, Emergency Stabilization & Rehabilitation monitoring, and prescribed fire monitoring. Avoid natural and prescribed fire in low-elevation sagebrush communities infested with or susceptible to cheatgrass. Action (A1): Allow unplanned fire on 857,400 acres for resource benefit to manage diversity in desired plant communities in those areas identified in Figure 2-76 in Appendix A. Action (A4): Use a combination of planned and unplanned fire along with fuels treatments including mechanical, manual, chemical, and seeding to meet resource objectives. The priority would be using any of the above treatments based on strategic goals for site-specific projects. **GUNNISON RMP 1993** Wildfires on about 508,388 acres of public land will be suppressed according to a "conditional suppression" policy and about 76,624 acres of public land will be suppressed according to a "full suppression" policy. **MOAB FO RMP 2008** Suppression: An "Appropriate Management Response" (AMR) procedure is required for every wildland fire that is not a prescribed fire. In all fire management decisions, strategies and actions, firefighter and public safety are the highest priority followed by consideration of benefits and values to be protected as well as suppression costs. The AMR can range from full suppression to managing fire for resource benefit (wildland fire use). Resource goals and objectives outlined in the RMP guide the development and implementation of AMR fire management activities in regard to the accomplishment of those objectives. The FMP establishes fire suppression objectives with minimum and maximum suppression targets for each Fire Management Unit (FMU) within the MPA. While firefighter and public safety are the first priority, considerations for suppression activities also include fire intensity, acreage, and spread potential, threats to life and property, potential to impact high-value resources such as critical habitat for |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | threatened, endangered and sensitive species, crucial wildlife habitat, cultural resources and/or riparian areas, historic fire regimes, and other special considerations such as wilderness and/or adjacent agency lands. |
| | | **MONTICELLO RMP 2008**<br>FIRE-6-Suppression:  An Appropriate Management Response (AMR) procedure is required for every wildland fire that is not a prescribed fire. In all fire management decisions, strategies, and actions, firefighter and public safety are the highest priority followed by consideration of benefits and values to be protected as well as suppression costs. The AMR can range from full suppression to managing fire for resource benefit (wildland fire use).  Resource goals and objectives outlined in the RMP guide the development and implementation of AMR fire management activities in regard to the accomplishment of those objectives.  The FMP establishes fire suppression objectives with minimum and maximum suppression targets for each Fire Management Unit (FMU) within the PA.  While firefighter and public safety are the first priority, considerations for suppression activities also include fire intensity, acreage, and spread potential; threats to life and property; potential to impact high-value resources such as critical habitat for threatened, endangered, and sensitive species; crucial wildlife habitat; cultural resources and/or riparian areas; historic fire regimes; and other special considerations such as wilderness and/or adjacent agency lands. |
| | | **SAN LUIS RMP 1991**<br>Any fire, including wildfires, occurring in the resource area will be suppressed. |
| | | **TRES RIOS FO RMP 2015**<br>Planned and unplanned fire ignitions are used to increase resiliency and diversity across all forest and rangeland vegetation types.  Unplanned ignitions, wildland fire tactical options, and planned ignitions on Tres Rios FO lands will be determined on a case-by-case basis. |
| | | **UNCOMPAHGRE BASIN RMP 1989**<br>Consider fire as a management tool for the entire planning area, subject to site specific environmental analysis and approved bum plans. |
| **Emergency Stabilization and Rehabilitation** | | |
| 93 | Fire, Fuels, Rehabilitation | **CANYONS OF THE ANCIENTS NM RMP 2010**<br>Evaluate all burned areas in order to determine whether or not fire rehabilitation is required.  This evaluation will include the following considerations:<br>• Would life or private property be threatened if rehabilitation practices are not implemented? |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | • Would naturally reestablished vegetation be unacceptable (such as exotic annual grasses or noxious weeds) or not meet vegetation resource management goals and objectives?<br>• Would adequate desirable vegetation recover sufficiently in order to stabilize soil and prevent on or off- site soil erosion problems?<br>• Would immediate or long-term damage (such as erosion) to cultural resources occur?<br>Prepare an Emergency Fire Rehabilitation Plan (EFRP) for all escaped wildland fires if one or more of the above criteria are not met.  (NOTE:  EFRPs will be in accordance with the Emergency Fire Rehabilitation Handbook and the Monument RMP ROD.)  Address all critical resources (including cultural, air, water, vegetation, and soils) in EFRPs, and specifically identify how these resources will be addressed in area rehabilitation.<br><br>**DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**<br>Implement emergency stabilization and rehabilitation as needed to meet biological, recreation and cultural resource objectives.<br><br>**GRAND JUNCTION FO RMP 2015**<br>Action (A6): Design Burned Area Rehabilitation (BAR) and ES treatment actions based on the severity of the wildfire impacts. BAR and ES priorities include, but are not limited to, areas where:<br>• Life, safety, or property requires protection.<br>• Unique or sensitive cultural resources are at risk.<br>• Soils are highly susceptible to accelerated erosion or water quality protection is required.<br>• Perennial grasses and forbs are not expected to provide soil and watershed protection within two years.<br>• Unacceptable vegetation, such as noxious weeds, may invade and become established.<br>• It is necessary to quickly restore threatened, endangered, or special species habitat populations to prevent adverse impacts.<br>• Stabilization and rehabilitation are necessary to meet RMP resource objectives.<br>Action (A7):  Design BAR treatment actions based on the severity of wildfire impacts.  BAR priorities include, but are not limited to:<br>• Repairing or improving lands unlikely to recover naturally.<br>• Implementing weed treatments to remove invasive weeds and planting native or non-natives to restore or establish healthy ecosystems.<br>• Planting to reestablish native trees.<br>• Repairing or replacing minor facilities (e.g., fences, campgrounds, interpretive signs, shelters, wildlife guzzlers, etc.) |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | **MOAB FO RMP 2008**<br>Rehabilitation Plan (NFRP) is in place to meet emergency stabilization and rehabilitation (ESR) needs and to comply with up-to-date ESR policy and guidance.  The NFRP is a programmatic implementation plan authorizing treatment options specific to vegetative communities and dependent upon post-wildland fire conditions and other site-specific considerations.  Treatment actions are designed according to the type and severity of wildfire impacts and priorities include, but are not limited to, areas where the following criteria apply:<br>• It is necessary to protect human life and safety as well as property.<br>• Unique or critical cultural and/or historical resources are at risk.<br>• It is determined soils are highly susceptible to accelerated erosion.<br>• Perennial grasses and forbs (fire-tolerant plants) are not expected to provide soil and watershed protection within two years.<br>• There is a need to establish a vegetative fuel break of less flammable species (greenstrips). Unacceptable vegetation, such as noxious weeds, may readily invade and become established.<br>• Shrubs and forbs are a crucial habitat component for wintering mule deer, pronghorn, sage grouse, or other special status species.<br>• Stabilization and rehabilitation are necessary to meet RMP resource objectives, including rangeland seedings.<br>• It is necessary to protect water quality.<br>• It is necessary to quickly restore threatened, endangered, or special species habitat populations to prevent adverse impacts.<br>SSS-3:  As required by the Endangered Species Act, no management action will be permitted on public lands that will jeopardize the continued existence of plant or animal species that are listed or are officially proposed or are candidates for listing as T&E.<br><br>**MONTICELLO RMP 2008**<br>FIRE-14:  A Normal Year Fire Stabilization and Rehabilitation Plan (NFRP) is in place to meet ES&R needs and to comply with up-to-date ES&R policy and guidance.  The NFRP is a programmatic implementation plan authorizing treatment options specific to vegetative communities and dependent upon post-wildland fire conditions and other site-specific considerations.  Treatment actions that are designed according to the type and severity of wildfire impacts and priorities include but are not limited to areas where the following criteria apply:<br>• It is necessary to protect human life and safety as well as property.<br>• Unique or critical cultural and/or historical resources are at risk. |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | • It is determined soils are highly susceptible to accelerated erosion.<br>• Perennial grasses and forbs (fire-tolerant plants) are not expected to provide soil and watershed protection within two years.<br>• There is a need to establish a vegetative fuel break of less flammable species (greenstrips).<br>• Unacceptable vegetation, such as noxious weeds, may readily invade and become established.<br>• Shrubs and forbs are a crucial habitat component for wintering mule deer, antelope, sage-grouse, or other special status species.<br>• Stabilization and rehabilitation are necessary to meet RMP resource objectives, including rangeland seedings.<br>• It is necessary to protect water quality.<br>• It is necessary to quickly restore threatened, endangered, or special status species habitat populations to prevent negative impacts.<br>SSP-6:  No management action will be permitted on BLM lands that will jeopardize the continued existence of species that are listed, proposed for listing, or candidates for listing under the Endangered Species Act.<br><br>**TRES RIOS FO RMP 2015**<br>Seeding and other site rehabilitation practices should be provided, as necessary, on wildland fire and managed wildland fire areas.  Fire suppression support activities and facilities (including constructed fire lines, fuel breaks and safety areas, fire camps, staging areas, heli-bases, and heli-spots), as well as mechanical and prescribed fire treatment areas, should follow the same site rehabilitation practices. |
| 94 | Fire, Fuels, Rehabilitation | **CANYONS OF THE ANCIENTS NM RMP 2010**<br>Prepare an Emergency Fire Rehabilitation Plan (EFRP) for all escaped wildland fires if one or more of the above criteria are not met.  (NOTE:  EFRPs will be in accordance with the Emergency Fire Rehabilitation Handbook and the Monument RMP ROD.)  Address all critical resources (including cultural, air, water, vegetation, and soils) in EFRPs, and specifically identify how these resources will be addressed in area rehabilitation.<br><br>**GRAND JUNCTION FO RMP 2015**<br>Apply integrated control methods (physical, cultural, biological, chemical, fire) to noxious and invasive pest populations.<br>Use vegetative treatments to improve diversity, reduce noxious and invasive species, and restore native plant communities to support wildlife and livestock.<br>Implement treatments designed to replenish the native seed bank and control noxious and invasive species.<br>Restore the species composition and diversity of successional stages of sagebrush communities. |

| ROW | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | Implement treatments designed to reduce pinyon-juniper and conifer encroachment, replenish diminished native seed banks, control noxious and invasive species, and provide periods of grazing rest or reduced usage during drought. **MOAB FO RMP 2008** Rehabilitation Plan (NFRP) is in place to meet emergency stabilization and rehabilitation (ESR) needs and to comply with up-to-date ESR policy and guidance.  The NFRP is a programmatic implementation plan authorizing treatment options specific to vegetative communities and dependent upon post-wildland fire conditions and other site-specific considerations. **MONTICELLO RMP 2008** FIRE-14:  A Normal Year Fire Stabilization and Rehabilitation Plan (NFRP) is in place to meet ES&R needs and to comply with up-to-date ES&R policy and guidance.  The NFRP is a programmatic implementation plan authorizing treatment options specific to vegetative communities and dependent upon post-wildland fire conditions and other site-specific considerations. **TRES RIOS FO RMP 2015** Projects in Occupied Habitat should be designed to mitigate or avoid the direct or indirect loss of habitat necessary for maintenance of the local population or reduce to acceptable levels the direct or indirect loss of important habitat necessary for sustainable local populations.  Projects will incorporate special reclamation measures or design features that accelerate recovery and/or re-establishment of affected sage-grouse habitat as much as possible. In order to determine site occupation, pre-implementation surveys may be required for projects occurring in habitats that may support populations of sensitive species and species listed or proposed under the ESA, as determined by an agency biologist. Objective 2.4.20:  Gunnison Sage-Grouse (Centrocercus minimus): improve habitat for Gunnison sage-grouse when conducting resource management actions within Occupied Habitat. Standard 2.4.37:  Gunnison Sage-Grouse: invasive vegetation must be monitored and controlled post-treatment. |
| 95 | Fire, Fuels, Rehabilitation | **TRES RIOS FO RMP 2015** Guideline 2.4.66:  Within Occupied Habitat, grazing in treatment areas should be deferred for 2 growing season after treatment, unless needed for seedbed preparation or desired understory and over-story are established. |
| 96 | Fire, Fuels, Rehabilitation | **TRES RIOS FO RMP 2015** Guideline 2.4.64:  Use of native seeds should be used for revegetation following fuels management treatment based |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | on availability, adaptation (site potential), and probability of success (Richards et al. 1998). Where probability of success or native seed availability is low, non-native seeds may be used as long as they meet sage-grouse habitat objectives. |

**SPECIAL STATUS SPECIES**

| 97 | Special Status Species | **MONTICELLO FO RMP 2008**<br>Avoid all permitted activities from March 20 to May 15. If impractical to avoid all permitted activities, then no activity from sunset the evening before to 2 hours after sunrise the next morning. Prohibit construction of roads year-round.<br>GRA-24: Sage Flat, Upper East Canyon, Sage-grouse and Dry Farm allotments will not be grazed from March 20 to May 15 (Gunnison Sage-grouse nesting season) (pg. 78). SSP-23 Lek habitat (within 0.6 miles of active strutting ground): Avoid all permitted activities from March 20 to May 15. If impractical to avoid all permitted activities, then no activity from sunset the evening before to 2 hours after sunrise the next morning  SSP-24 Year-round habitat (within 4 miles of active strutting ground): Limit grazing use levels as necessary to maintain and/or improve sage-grouse habitat.<br><br>**TRES RIOS FO RMP 2015**<br>Projects in Occupied Habitat should be designed to mitigate or avoid the direct or indirect loss of habitat necessary for maintenance of the local population or reduce to acceptable levels the direct or indirect loss of important habitat necessary for sustainable local populations. Projects will incorporate special reclamation measures or design features that accelerate recovery and/or re-establishment of affected sage-grouse habitat as much as possible.<br>In order to determine site occupation, pre-implementation surveys may be required for projects occurring in habitats that may support populations of sensitive species and species listed or proposed under the ESA, as determined by an agency biologist.<br>Objective 2.4.20: Gunnison Sage-Grouse (Centrocercus minimus): improve habitat for Gunnison sage-grouse when conducting resource management actions within Occupied Habitat.<br>Standard 2.4.34: Gunnison Sage-Grouse: Management activities must not occur from March 1 to June 30 within Occupied Habitat suitable for nesting to allow for breeding and December 1 to March 15 for known winter habitat.<br>Guideline 2.4.61: Applicable BMPs should be applied to all mineral proposals as Conditions of Approval within occupied sage-grouse habitat to provide for adequate effective habitat and breeding, nesting, and wintering habitat. |
| 98 | Special Status | **GUNNISON RMP 1993** |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | Species | MU 10 (yearlong bighorn sheep and other wildlife habitat.):  ROWs.  Public lands will be open to the location of ROWs with appropriate mitigation to insure compatibility with the management of bighorn sheep. ROW construction or maintenance that will result in disturbance to lambing bighorn sheep will not be permitted from April 15 through June 15.<br>MU 15 (important fishery streams):  ROWs.  No surface-disturbing activities will be permitted along Alder, Willow (west of Gunnison), and Razor Creeks, and along the lower one-mile of South Beaver Creek in the unit from July 1 through July 31 in order to prevent disturbance to sage grouse during the brood rearing period.  Mitigating measures will be included in ROW authorizations in these areas of this unit to prevent disturbance to brooding sage grouse.<br><br>**TRES RIOS FO RMP 2015**<br>Projects in Occupied Habitat should be designed to mitigate or avoid the direct or indirect loss of habitat necessary for maintenance of the local population or reduce to acceptable levels the direct or indirect loss of important habitat necessary for sustainable local populations.  Projects will incorporate special reclamation features or design features that accelerate recovery and/or re-establishment of affected sage-grouse habitat as much as possible.<br>In order to determine site occupation, pre-implementation surveys may be required for projects occurring in habitats that may support populations of sensitive species and species listed or proposed under the ESA, as determined by an agency biologist.<br>Objective 2.4.20:  Gunnison Sage-Grouse (Centrocercus minimus): improve habitat for Gunnison sage-grouse when conducting resource management actions within Occupied Habitat.<br>Standard 2.4.34: Gunnison Sage-Grouse: Management activities must not occur from March 1 to June 30 within Occupied Habitat suitable for nesting to allow for breeding and December 1 to March 15 for known winter habitat.<br>Guideline 2.4.61:  Applicable BMPs should be applied to all mineral proposals as Conditions of Approval within occupied sage-grouse habitat to provide for adequate effective habitat and breeding, nesting, and wintering habitat. |
| 99 | Special Status Species | **GUNNISON RMP 1993**<br>MU 7 (West Antelope Creek ACEC):  ROWs.  ROW-related construction activities will not be permitted on crucial big game winter range from December 1 through April 30 to prevent disturbance to wintering elk and deer.<br>MU 14 (riparian areas containing important sage grouse brood-rearing areas):  ROWs.  Mitigating measures will be included in ROW authorizations to prevent disturbance within this unit to brooding sage grouse from June 15 through July 31 and from December 1 through April 30 on crucial big game winter range to prevent disturbance to wintering deer and elk.<br><br>**GUNNISON GORGE NCA RMP 2004** |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | MU 4 (GUSG ACEC/IBA):  Construction of all ROWs in the management unit will be restricted from November 15 through April 30 during crucial periods for wintering mule deer, elk, and GUSG. **TRES RIOS FO RMP 2015** Projects in Occupied Habitat should be designed to mitigate or avoid the direct or indirect loss of habitat necessary for maintenance of the local population or reduce to acceptable levels the direct or indirect loss of important habitat necessary for sustainable local populations.  Projects will incorporate special reclamation measures or design features that accelerate recovery and/or re-establishment of affected sage-grouse habitat as much as possible. In order to determine site occupation, pre-implementation surveys may be required for projects occurring in habitats that may support populations of sensitive species and species listed or proposed under the ESA, as determined by an agency biologist. Objective 2.4.20:  Gunnison Sage-Grouse (Centrocercus minimus): improve habitat for Gunnison sage-grouse when conducting resource management actions within Occupied Habitat. Standard 2.4.34:  Gunnison Sage-Grouse: Management activities must not occur from March 1 to June 30 within Occupied Habitat suitable for nesting to allow for breeding and December 1 to March 15 for known winter habitat. Guideline 2.4.61:  Applicable BMPs should be applied to all mineral proposals as Conditions of Approval within occupied sage-grouse habitat to provide for adequate effective habitat and breeding, nesting, and wintering habitat. **UNCOMPAHGRE BASIN RMP 1989** Management Unit 2 will be open to major utility development with possible restrictions, on construction activities from December 1 through April 30 within crucial deer and elk winter range to protect crucial deer and elk winter range from disturbance. |
| 100 | Special Status Species | **TRES RIOS FO RMP 2015** Projects in Occupied Habitat should be designed to mitigate or avoid the direct or indirect loss of habitat necessary for maintenance of the local population or reduce to acceptable levels the direct or indirect loss of important habitat necessary for sustainable local populations.  Projects will incorporate special reclamation measures or design features that accelerate recovery and/or re-establishment of affected sage-grouse habitat as much as possible. In order to determine site occupation, pre-implementation surveys may be required for projects occurring in habitats that may support populations of sensitive species and species listed or proposed under the ESA, as determined by an agency biologist. Objective 2.4.20:  Gunnison Sage-Grouse (Centrocercus minimus): improve habitat for Gunnison sage-grouse when conducting resource management actions within Occupied Habitat. |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | Standard 2.4.35:  Gunnison Sage-Grouse: New structural improvements or surface disturbance must not occur within known winter concentration areas or within 0.6 mile radius  of known Gunnison Sage-Grouse leks. Guideline 2.4.61:  Applicable BMPs should be applied to all mineral proposals as Conditions of Approval within occupied sage-grouse habitat to provide for adequate effective habitat and breeding, nesting, and wintering habitat. |
| 101 | Special Status Species | **TRES RIOS FO RMP 2015** Projects in Occupied Habitat should be designed to mitigate or avoid the direct or indirect loss of habitat necessary for maintenance of the local population or reduce to acceptable levels the direct or indirect loss of important habitat necessary for sustainable local populations.  Projects will incorporate special reclamation measures or design features that accelerate recovery and/or re-establishment of affected sage-grouse habitat as much as possible. In order to determine site occupation, pre-implementation surveys may be required for projects occurring in habitats that may support populations of sensitive species and species listed or proposed under the ESA, as determined by an agency biologist. Objective 2.4.20:  Gunnison Sage-Grouse (Centrocercus minimus): improve habitat for Gunnison sage-grouse when conducting resource management actions within Occupied Habitat. Standard 2.4.38:  Gunnison Sage-Grouse: New noise sources resulting from management activities should not contribute to noise levels that negatively impact sage-grouse leks during the active lek season (March 1 to May 15) based on best available science. |
| 102 | Special Status Species | **MOAB FO RMP 2008** If GUSG leks are discovered within sage-grouse habitat, no surface-disturbing activities will be allowed within 0.6 mile of a lek. Purpose: To protect occupied lek sites within GUSG Habitat. Exception:  An exception may be granted by the Field Manager if the operator submits a plan which demonstrates that impacts from the proposed action can be adequately mitigated. Modification:  The Field Manager may modify the boundaries of the stipulation area if: (1) portions of the area do not include lek sites, or (2) the lek site(s) have been completely abandoned or destroyed, or (3) occupied lek site(s) occur outside the current defined area, as determined by the BLM. Waiver:  A waiver may be granted if there are no active lek site(s) in the leasehold and it is determined the site(s) have been completely abandoned or destroyed or occur outside current defined area, as determined by the BLM. |
| 103 | Special Status Species | No similar action. |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| 104 | Special Status Species | **DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**<br>On sites where the Ecological Site Description potential is for sagebrush shrublands, prevent expansion of pinyon-juniper vegetation into these areas using mechanical and/or manual treatments, and planned or unplanned wildfire. (From Proposed RMP 2015)<br>Use vegetation treatments (e.g., mechanical treatments, chemical treatments, planned and unplanned wildfire, reseeding, targeted grazing) to move towards meeting structural habitat guidelines found within the Gunnison sage-grouse Rangewide Conservation Plan (Gunnison Sage-grouse Rangewide Steering Committee, 2005), or comparable, best available scientific guidance.<br>Apply vegetation treatments to reintroduce and/or increase cover of sagebrush in old vegetation treatments where it was removed.<br>Apply vegetation treatments to reintroduce native grass, forb and shrub species in old vegetation treatments where crested wheatgrass is now a dominant species.  Prior to completing vegetation treatments: establish research or pilot plots in D-E NCA to determine successful treatment prescriptions (exemption: noxious weed treatments); or ensure that likely outcomes are known on the basis of other tests conducted in the region.  Use existing research or pilot plots from the D-E NCA or surrounding region to inform vegetation treatment prescriptions in this vegetation type.<br><br>**GRAND JUNCTION FO RMP 2015**<br>Maintain present composition of late- to mid-seral plant communities providing suitable habitat for wildlife.  Minimize activities that would result in a persistent early-seral stage in the lower elevations.  Maintain or improve high-quality sagebrush habitats consistent with the natural range of variability for sagebrush communities.  Restore the species composition and diversity of seral stages of sagebrush communities.  Implement treatments designed to reduce pinyon-juniper and conifer encroachment, replenish diminished native seed banks, control noxious and invasive species, and provide periods of grazing rest or reduced usage during drought.  Reduce the encroachment of juniper (Juniperus spp.) and other woody tree species in sagebrush habitat.  Sites should have evidence of past sagebrush plant communities as evidenced by residual native plants or soils that support a rangeland not a woodland ecological site.<br><br>**GUNNISON RMP 1993**<br>Specific, desired plant communities will be identified in activity plans.  Exceptions to a late seral ecological status needed to meet objectives will be identified in activity plans.<br><br>**MOAB FO RMP 2008**<br>Vegetation Treatments:  Maintain the existing vegetation treatments (46,307 acres) to increase available forage |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | within the following allotments.  These areas have been treated over the past 50 years and consist primarily of pinyon-juniper woodlands.  These areas will be treated by prescribed fire, chemical or mechanical or other means in accordance with BLM sagebrush conservation guidance and other applicable resource goals.  The improved forage will benefit multiple use objectives including livestock and wildlife use.  Allotments:  Adobe Mesa, Big Triangle, Black Ridge, Buckhorn.<br><br>**MONTICELLO FO RMP 2008**<br>Maintain an estimated 1,500 acres/year of existing land treatments and implement new vegetation treatments to restore ecosystem health, functioning condition, etc. in the following vegetation cover types (Map 15):<br>sagebrush 1,500 acres/year<br>weed treatments 3,000 acres/year<br>pinyon-juniper 3,000 acres/year<br>riparian 100 acres/year<br>greasewood 200 acres/year |
| 105 | Special Status Species | **DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**<br>On sites where the Ecological Site Description potential is for sagebrush shrublands, prevent expansion of pinyon-juniper vegetation into these areas using mechanical and/or manual treatments, and planned or unplanned wildfire. (From Proposed RMP 2015)<br>Use vegetation treatments (e.g., mechanical treatments, chemical treatments, planned and unplanned wildfire, reseeding, targeted grazing) to move towards meeting structural habitat guidelines found within the Gunnison sage-grouse Rangewide Conservation Plan (Gunnison Sage-grouse Rangewide Steering Committee, 2005), or comparable, best available scientific guidance.<br>Apply vegetation treatments to reintroduce and/or increase cover of sagebrush in old vegetation treatments where it was removed.<br>Apply vegetation treatments to reintroduce native grass, forb and shrub species in old vegetation treatments where crested wheatgrass is now a dominant species.  Prior to completing vegetation treatments: establish research or pilot plots in D-E NCA to determine successful treatment prescriptions (exemption: noxious weed treatments); or ensure that likely outcomes are known on the basis of other tests conducted in the region.  Use existing research or pilot plots from the D-E NCA or surrounding region to inform vegetation treatment prescriptions in this vegetation type.<br><br>**GRAND JUNCTION FO RMP 2015** |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | Maintain present composition of late- to mid-seral plant communities providing suitable habitat for wildlife. Minimize activities that would result in a persistent early-seral stage in the lower elevations. Maintain or improve high-quality sagebrush habitats consistent with the natural range of variability for sagebrush communities. Restore the species composition and diversity of seral stages of sagebrush communities. Implement treatments designed to reduce pinyon-juniper and conifer encroachment, replenish diminished native seed banks, control noxious and invasive species, and provide periods of grazing rest or reduced usage during drought. Reduce the encroachment of juniper (Juniperus spp.) and other woody tree species in sagebrush habitat. Sites should have evidence of past sagebrush plant communities as evidenced by residual native plants or soils that support a rangeland not a woodland ecological site.

**GUNNISON RMP 1993**
Specific, desired plant communities will be identified in activity plans. Exceptions to a late seral ecological status needed to meet objectives will be identified in activity plans.

**MOAB FO RMP 2008**
Vegetation Treatments: Maintain the existing vegetation treatments (46,307 acres) to increase available forage within the following allotments. These areas have been treated over the past 50 years and consist primarily of pinyon-juniper woodlands. These areas will be treated by prescribed fire, chemical or mechanical or other means in accordance with BLM sagebrush conservation guidance and other applicable resource goals. The improved forage will benefit multiple use objectives including livestock and wildlife use. Allotments: Adobe Mesa, Big Triangle, Black Ridge, Buckhorn.

**MONTICELLO FO RMP 2008**
Maintain an estimated 1,500 acres/year of existing land treatments and implement new vegetation treatments to restore ecosystem health, functioning condition, etc. in the following vegetation cover types (Map 15):
• sagebrush 1,500 acres/year
• weed treatments 3,000 acres/year
• pinyon-juniper 3,000 acres/year
• riparian 100 acres/year
• greasewood 200 acres/year |
| 106 | Special Status Species | **CANYONS OF THE ANCIENTS NM RMP 2010**
Encourage range, fuels and fire, and vegetation management activities that will protect and/or enhance riparian/aquatic resource conditions. Evaluate all proposed projects in order to ensure their compliance with BLM |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
|  |  | policies on riparian habitat management.  Manage riparian areas in a manner that moves them toward achieving Proper Functioning Condition (PFC).  (NOTE:  Projects designed for enhancement or improvement of riparian and alluvial sites will not be allowed within 100 feet of active channel edges without appropriate mitigation.)<br><br>**DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**<br>Use vegetation treatments and/or restrictions on allowable uses to meet priority species and vegetation objectives.  Restore native riparian species in degraded areas by planting, seeding and by relying on natural regeneration associated with flooding and successional processes.  Apply SSR (see Appendix B, Map 2-2e) within a minimum distance of 100 meters (328 feet) from the edge of the riparian zone of naturally occurring seeps and springs (lentic riparian areas).  Also apply SSR to the spring/seep recharge zone where it is determined to extend more than 100 meters from the riparian zone.  Reintroduce appropriate native, wetland obligate plant species to seeps and springs that have been degraded.  Emphasize reintroductions in springs and seeps that lack rare species and communities.<br><br>**GUNNISON GORGE NCA RMP 2004**<br>Vegetation planting and weed control will take place on all areas identified in the Gunnison Gorge Land Health Assessment (BLM 2001a) as needing restoration, and restoration will occur until an acceptable native plant community occupies the site.<br><br>**GRAND JUNCTION FO RMP 2015**<br>Restore natural disturbance regimes such as fire, and use vegetative treatments to accomplish biodiversity objectives in resilient plant communities.<br>Allowable Use (VR-AU3):  STIPULATION NSO-4:  Lentic Riparian Areas (including springs, seeps, and fens).  (Alternative B:  All Programs Except Fluid Minerals.  Alternative C:  All Surface-disturbing Activities) Prohibit surface occupancy and surface-disturbing activities within a minimum distance of 100 meters (328 feet) from the edge of the riparian zone.  (Refer to Appendix B.) See Figures 2-43 (Alternative B) and 2-44 (Alternative C) in Appendix A.  Standard exceptions apply; see Appendix B.<br>ACTION (VR-A2):  Give priority for riparian management to areas identified as special status species habitat and those riparian areas not meeting Proper Functioning Condition (e.g., Roan, Carr, Hawxhurst, Coon Creek, and Plateau Creeks; the Gunnison, Colorado, and Dolores Rivers; and Unaweep Seep).<br>ACTION (VR-A4):  Consider the following management actions for improvement or protection of riparian values:  riparian grazing pastures, exclosures, land acquisition, adjustments to grazing management, stream structures, and plantings.<br>NSO-2 (ROWA):  Streams/Springs Possessing Lotic Riparian Characteristics (except oil and gas).<br>NSO-4 (ROWA):  Lentic Riparian Areas (including springs, seeps, and fens) (except oil and gas). |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | **GUNNISON RMP 1993**<br>Resources and values in riparian areas will be maintained, restored, or improved, including the diversity, vigor, and quantity of herbaceous and woody plants necessary for the 1) proper hydrological functioning of riparian systems, 2) control of accelerated soil erosion, and 3) sustained high quality livestock forage and wildlife habitat.  During the preparation of all plans for surface-disturbing activities on public lands, affected wetlands will be inventoried, classified, and considered.<br><br>**SAN JUAN/SAN MIGUEL RMP 1985**<br>Management actions within floodplains and wetlands will include measures to preserve, protect, and, if necessary, restore their natural functions (as required by Executive Orders 11988 and 11990).<br><br>**TRES RIOS FO RMP 2015**<br>Management actions must not cause long-term change away from desired conditions in riparian or wetland vegetation communities.  Agency actions should avoid or otherwise mitigate long-term adverse impacts to riparian areas and wetlands.  Agency actions should avoid or otherwise mitigate damage to the long-term soil productivity of riparian area and wetland ecosystems.  Woody riparian vegetation along low-gradient ephemeral and permanent stream channels should be maintained or restored to ensure terrestrial food sources for invertebrates, fish, birds, and mammals, and to minimize water temperature changes.<br><br>**UNCOMPAHGRE BASIN RMP 1989**<br>Measures designed to minimize site-specific riparian and aquatic deterioration will be required in site specific plans for surface-disturbing land use activities.  Vegetation conditions and streambank cover will be maintained or improved. |
| 107 | Special Status Species | **CANYONS OF THE ANCIENTS NM RMP 2010**<br>Treat over-mature or overly dense sagebrush-steppe habitat in a manner that provides for a diversity of age classes and for a better shrub-grass mosaic.  Plant desirable native grasses and forbs.<br><br>**DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**<br>Use vegetation treatments and/or restrictions on allowable uses to meet priority species and vegetation objectives. (In sagebrush communities) Use vegetation treatments (e.g., mechanical treatments, chemical treatments, planned and unplanned wildfire, reseeding, targeted grazing) to move towards meeting structural habitat guidelines found within the GUSG RCP (2005) or comparable, best available scientific guidance.  (In sagebrush communities) Apply vegetation treatments to reintroduce and/or increase cover of sagebrush in old vegetation treatments where it was |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | removed. (In sagebrush communities) Apply vegetation treatments to reintroduce native grass, forb and shrub species in old vegetation treatments where crested wheatgrass is now a dominant species. Prior to completing vegetation treatments: establish research or pilot plots in D-E NCA to determine successful treatment prescriptions (exemption: noxious weed treatments); or ensure that likely outcomes are known on the basis of other tests conducted in the region. Use existing research or pilot plots from the D-E NCA or surrounding region to inform vegetation treatment prescriptions in this vegetation type.<br><br>**GUNNISON GORGE NCA RMP 2004**<br>Vegetation planting and weed control will take place on all areas identified in the Gunnison Gorge Land Health Assessment (BLM 2001a) as needing restoration, and restoration will occur until an acceptable native plant community occupies the site. Plant community improvement projects will take place to restore native perennial grasses and forbs to communities where these have been depleted far below average levels.<br>Unit 4 grouse area:<br>• In the Black Ridge area of the unit, the size, number, and types of vegetation (see Figure 3-8 in Chapter 3 of the DRMP [BLM 2003c]) will be tailored first to GUSG needs, and second to big game winter range needs.<br>• Vegetation treatments will be managed to ensure that appropriate plant communities are present for all life functions for the GUSG.<br>• In areas of severely degraded vegetation, restoration treatments will be undertaken.<br><br>**GRAND JUNCTION FO RMP 2015**<br>ACTION: Consistent with current guidance for sagebrush-dependent species, improve areas of poor quality nesting habitat by implementing the following actions, including but not limited to:<br>• In areas where species diversity is low seed area with grasses and forbs, with an emphasis on forbs if brood-rearing occurs in the area, accompanied by light disking and inter-seeding, or drill seeding.<br>• Where sage is decadent and does not meet habitat objectives, conduct thinning by roller-chopping, light disking, Dixie Harrow, Lawson Aerator or other methods.<br>• Conduct vegetation treatments to retain residual cover through fall and winter into nesting season.<br>ACTION: Prioritize the following greater Sage-Grouse and GUSG winter areas for treatment and restoration:<br>• winter habitat areas in need of enhancement<br>• areas that pose a fire risk to key winter habitats; and<br>• areas to meet habitat condition objectives (e.g., Sunny Side and Wagon Track Ridge).<br>ACTION: Inventory upper-elevation sagebrush to identify non-functioning habitat and develop restoration plans |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | within priority management units to increase patch size and connectivity through vegetation treatments and consolidation of disturbance to support sagebrush obligate species.  Prioritize management of upper-elevation sagebrush in the following order: 1. Greater and GUSG important habitat, including but not limited to Glade Park, Brush Mountain, and 4A Mountain. Action (A14):  Implement vegetation treatments, including mechanical, chemical, and fire, on priority allotments to improve rangeland health or reduce conflicts with other resources or public land users.<br><br>**GUNNISON RMP 1993**<br>Specific, desired plant communities will be identified in activity plans.  Exceptions to a late seral ecological status needed to meet objectives will be identified in activity plans.  Structural and non-structural range improvements such as fences, water developments, burns, spray treatments, and others will continue to be identified and prescribed in activity plans or agreements.  This will facilitate livestock management to achieve specific management and resource objectives defined in activity plans or agreements.  However, any range improvements identified in the MFP ROD that were not implemented, and will enhance or facilitate resource management objectives will be considered for development.  Existing range improvements will continue to be maintained as assigned in cooperative agreements and range improvement permits.<br><br>**MCINNIS CANYONS NCA RMP 2004**<br>Vegetation restoration and reclamation projects will be implemented on those areas currently not meeting land health standards, in concert with other programs that will improve the land health on all priority areas, including the River Corridor, Rabbit Valley, Black Ridge, as well as on other sites that will benefit from treatment for various resources such as sage grouse, desert bighorn, and prairie dogs.  Emphasis will also be placed on improving plant diversity, particularly in those areas dominated by cheatgrass or crested wheatgrass, and in other priority areas. Rehabilitation efforts appropriate for the area will be applied.<br><br>**SAN JUAN/SAN MIGUEL RMP 1985**<br>Development of habitat management plans for key species and their related habitat will occur over the term of the plan.  Completion of these plans will be dependent upon need, availability of funding, and manpower.  Several key habitats in which plans might be developed include: big game winter ranges; winter raptor concentration areas; aquatic riparian habitats; bighorn sheep habitat; pronghorn antelope habitat; and threatened and endangered (T&E) species habitat.  Priority will generally be given to the development of a habitat management plan for T&E species.<br><br>**SAN LUIS RMP 1991**<br>San Luis Area #1 1-5:  Allow vegetative manipulation such as mechanical, chemical, or fire practices to aid in |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | accomplishing the overall objective and the desired plant communities described in activity plans.<br>San Luis Area #1 1-7:  Provide 40 percent of increased forage production to livestock grazing and 60 percent, if needed, to non-livestock uses and needs (e. g., wildlife, riparian, watershed, soils, etc.).<br><br>**TRES RIOS FO RMP 2015**<br>Vegetation management planning should emphasize restoration needs in the sagebrush ecosystem type. |
| 108 | Special Status Species | **TRES RIOS FO RMP 2015**<br>Use of native seeds should be used for re-vegetation following fuels management treatment based on availability, adaptation (site potential), and probability of success (Richards et al. 1998).  Where probability of success or native seed availability is low, non-native seeds may be used as long as they meet sage-grouse habitat objectives. |
| 109 | Special Status Species | **CANYONS OF THE ANCIENTS NM RMP 2010**<br>• Consider vegetation treatments on a case-by-case basis with weighted consideration of cultural resource values.  Prioritize areas for restoration and reclamation where management changes alone will not improve resource conditions.<br>• Implement and monitor new restoration projects, as needed.<br><br>**GRAND JUNCTION FO RMP 2015**<br>• Restore natural disturbance regimes such as fire, and use vegetative treatments to accomplish biodiversity objectives in resilient plant communities.<br>• Maintain or restore vegetative communities to provide soil stability and resistance to erosion.<br>• Use vegetative treatments to improve diversity, reduce noxious and invasive species, and restore native plant communities to support wildlife and livestock.<br>• Ensure that managed activities (grazing, recreation, energy development, etc.) are not leading to degraded conditions.  Maintain present composition of late- to mid-seral plant communities providing suitable habitat for wildlife.<br>• Minimize activities that would result in a persistent early-seral stage in the lower elevations.<br>• Maintain or improve high-quality sagebrush habitats consistent with the natural range of variability for sagebrush communities.<br>• Restore the species composition and diversity of seral stages of sagebrush communities.<br>• Implement treatments designed to replenish the native seed bank and control noxious and invasive species.  Inventory lower-elevation sagebrush to identify non-functioning habitat and develop restoration plans within |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | priority management units to increase patch size and connectivity through vegetation treatments and consolidation of disturbance to support sagebrush obligate species. <br> • Prioritize management of lower-elevation sagebrush in the following order: 1. Greater Sage-Grouse (Centrocercus urophasianus) and GUSG important winter habitat. 2. Critical and severe big-game winter range. 3. Areas not meeting land health. <br> • Inventory low-elevation sagebrush to identify non-functioning habitat. <br> • Develop restoration plans that prioritize efforts to achieve specific species and habitat goals.  Habitat goals include but are not limited to increased patch size and connectivity through vegetation treatments and consolidation of disturbance to support sagebrush obligate species. <br> • Prioritize the following greater Sage-Grouse and GUSG winter areas for treatment and restoration: <br> ○ winter habitat areas in need of enhancement <br> ○ areas that pose a fire risk to key winter habitats <br> ○ areas to meet habitat condition objectives (e.g., Sunny Side and Wagon Track Ridge). <br> • Maintain or improve high-quality sagebrush habitats consistent with the natural range of variability for sagebrush communities. <br> • Restore the species composition and diversity of successional stages of sagebrush communities. <br> • Implement treatments designed to reduce pinyon-juniper and conifer encroachment, replenish diminished native seed banks, control noxious and invasive species, and provide periods of grazing rest or reduced usage during drought. <br> • Inventory upper-elevation sagebrush to identify non-functioning habitat and develop restoration plans within priority management units to increase patch size and connectivity through vegetation treatments and consolidation of disturbance to support sagebrush obligate species. <br> • Prioritize management of upper-elevation sagebrush in the following order: 1.Greater and GUSG important habitat, including but not limited to Glade Park, Brush Mountain, and 4A Mountain. 2. Critical and severe big-game winter range. 3. Areas not meeting land health. 4. Areas that pose a fire risk to key habitats. <br> • Remove sagebrush to create small openings in continuous or dense sagebrush to create a mosaic of multiple age classes and associated understory diversity across the landscape to benefit many sagebrush-dependent species. Factors that help determine the mosaic are soil types, topography, aspect, climate and local weather patterns, and current and potential plant communities. <br> Action (A14):  Implement vegetation treatments, including mechanical, chemical, and fire, on priority allotments to improve rangeland health or reduce conflicts with other resources or public land users. |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | **MOAB FO RMP 2008**<br>Reclaim and restore up to 257,809 acres of sagebrush habitat and shrub-steppe ecosystems where appropriate in accordance with the BLM sagebrush conservation guidance.  Reclamation/restoration will be undertaken in cooperation with the Utah Partners for Conservation and Development and may include removing surface material, re-contouring, spreading topsoil, seeding or planting seedlings, and/or changing livestock grazing strategies, such as, changing season of use, type of use, removing or reducing spring grazing, reducing livestock numbers, reducing grazing intensity, improving distribution, requiring rest rotation practices, or exclusion.  Work in coordination with UDWR to reduce wildlife numbers, as necessary, to restore sagebrush habitat.<br><br>**TRES RIOS FO RMP 2015**<br>ACTION:  When re-seeding roads, primitive roads, and trails, use appropriate seed mixes and consider the use of transplanted sagebrush. |
| 110 | Special Status Species | **CANYONS OF THE ANCIENTS NM RMP 2010**<br>Consider vegetation treatments on a case-by-case basis with weighted consideration of cultural resource values. Prioritize areas for restoration and reclamation where management changes alone will not improve resource conditions.<br>Implement and monitor new restoration projects, as needed.<br><br>**GRAND JUNCTION FO RMP 2015**<br>• Restore natural disturbance regimes such as fire, and use vegetative treatments to accomplish biodiversity objectives in resilient plant communities.<br>• Maintain or restore vegetative communities to provide soil stability and resistance to erosion.<br>• Use vegetative treatments to improve diversity, reduce noxious and invasive species, and restore native plant communities to support wildlife and livestock.<br>• Ensure that managed activities (grazing, recreation, energy development, etc.) are not leading to degraded conditions.  Maintain present composition of late- to mid-seral plant communities providing suitable habitat for wildlife.<br>• Minimize activities that would result in a persistent early-seral stage in the lower elevations.<br>• Maintain or improve high-quality sagebrush habitats consistent with the natural range of variability for sagebrush communities.<br>• Restore the species composition and diversity of seral stages of sagebrush communities. |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | • Implement treatments designed to replenish the native seed bank and control noxious and invasive species. Inventory lower-elevation sagebrush to identify non-functioning habitat and develop restoration plans within priority management units to increase patch size and connectivity through vegetation treatments and consolidation of disturbance to support sagebrush obligate species.<br>• Prioritize management of lower-elevation sagebrush in the following order: 1. Greater Sage-Grouse (Centrocercus urophasianus) and GUSG important winter habitat. 2. Critical and severe big-game winter range. 3. Areas not meeting land health.<br>• Inventory low-elevation sagebrush to identify non-functioning habitat.<br>• Develop restoration plans that prioritize efforts to achieve specific species and habitat goals. Habitat goals include but are not limited to increased patch size and connectivity through vegetation treatments and consolidation of disturbance to support sagebrush obligate species.<br>• Prioritize the following greater Sage-Grouse and GUSG winter areas for treatment and restoration:<br>   ○ winter habitat areas in need of enhancement<br>   ○ areas that pose a fire risk to key winter habitats<br>   ○ areas to meet habitat condition objectives (e.g., Sunny Side and Wagon Track Ridge).<br>• Maintain or improve high-quality sagebrush habitats consistent with the natural range of variability for sagebrush communities.<br>• Restore the species composition and diversity of successional stages of sagebrush communities.<br>• Implement treatments designed to reduce pinyon-juniper and conifer encroachment, replenish diminished native seed banks, control noxious and invasive species, and provide periods of grazing rest or reduced usage during drought.<br>• Inventory upper-elevation sagebrush to identify non-functioning habitat and develop restoration plans within priority management units to increase patch size and connectivity through vegetation treatments and consolidation of disturbance to support sagebrush obligate species.<br>• Prioritize management of upper-elevation sagebrush in the following order: 1.Greater and GUSG important habitat, including but not limited to Glade Park, Brush Mountain, and 4A Mountain. 2. Critical and severe big-game winter range. 3. Areas not meeting land health. 4. Areas that pose a fire risk to key habitats.<br>• Remove sagebrush to create small openings in continuous or dense sagebrush to create a mosaic of multiple age classes and associated understory diversity across the landscape to benefit many sagebrush-dependent species. Factors that help determine the mosaic are soil types, topography, aspect, climate and local weather patterns, and current and potential plant communities. |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | Action (A14):  Implement vegetation treatments, including mechanical, chemical, and fire, on priority allotments to improve rangeland health or reduce conflicts with other resources or public land users. **MOAB FO RMP 2008** Reclaim and restore up to 257,809 acres of sagebrush habitat and shrub-steppe ecosystems where appropriate in accordance with the BLM sagebrush conservation guidance.  Reclamation/restoration will be undertaken in cooperation with the Utah Partners for Conservation and Development and may include removing surface material, re-contouring, spreading topsoil, seeding or planting seedlings, and/or changing livestock grazing strategies, such as, changing season of use, type of use, removing or reducing spring grazing, reducing livestock numbers, reducing grazing intensity, improving distribution, requiring rest rotation practices, or exclusion.  Work in coordination with UDWR to reduce wildlife numbers, as necessary, to restore sagebrush habitat. **TRES RIOS FO RMP 2015** ACTION:  When re-seeding roads, primitive roads, and trails, use appropriate seed mixes and consider the use of transplanted sagebrush. |
| 111 | Special Status Species | **DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013** In coordination with the counties, use early detection/rapid response to contain and (where possible) eradicate all State listed species and selected BLM species of concern (see Appendix F for list of State weeds.  Treat tamarisk, Russian olive and elm (and other woody non-native plants) with a phased approach.  Remove patches of woody non-natives to 1) allow for the establishment of native species in treated patches prior to treating adjacent patches and 2) minimize disruption to habitat connectivity.  Conduct active restoration in disturbed patches. **GRAND JUNCTION FO RMP 2015** Apply integrated control methods (physical, cultural, biological, chemical, fire) to noxious and invasive pest populations. Use vegetative treatments to improve diversity, reduce noxious and invasive species, and restore native plant communities to support wildlife and livestock. Implement treatments designed to replenish the native seed bank and control noxious and invasive species. Restore the species composition and diversity of successional stages of sagebrush communities. Implement treatments designed to reduce pinyon-juniper and conifer encroachment, replenish diminished native seed banks, control noxious and invasive species, and provide periods of grazing rest or reduced usage during drought. |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | **GUNNISON RMP 1993**<br>A noxious weed program, and control of noxious weeds, will be initiated in cooperation with the local county weed district, county governments, and other affected interests.<br><br>**GUNNISON GORGE NCA RMP 2004**<br>Vegetation planting and weed control will take place on all areas identified in the Gunnison Gorge Land Health Assessment (BLM 2001a) as needing restoration, and restoration will occur until an acceptable native plant community occupies the site.  Pursuant to BLM's Partners in Weeds strategy, BLM will conduct integrated weed management with counties, private landowners, and other agencies to meet land health standards.<br><br>**MCINNIS CANYONS NCA RMP 2004**<br>The BLM will manage noxious weeds using an Integrated Weed Management (IWM) approach, while incorporating weed education information into CCNCA literature, web sites, and key entry points into the CCNCA.  The BLM's Partners Against Weeds (PAWs) action plan is a comprehensive strategy providing guidance for preventing and controlling the spread of noxious weeds.  Goals of the PAWs plan are prevention and detection, education and awareness, inventory, planning, Integrated Weed Management, monitoring and evaluation, and research and technology transfer.  PAWs and additional guidance such as the Certified Weed-Free Forage Program are integral to the CCNCA weed management program.<br><br>**MOAB FO RMP 2008**<br>Make consistent with LUA and maybe minerals.  Consider making General or applying to Control invasive and non-native weed species and prevent the introduction of new invasive species by implementing a comprehensive weed program (as per national guidance and local weed management plans in cooperation with state, federal affected counties), including: coordination with partners; prevention and early detection; education; inventory and monitoring; and using principles of integrated weed management.<br>Control invasive and non-native weed species and prevent the introduction of new invasive species by implementing a comprehensive weed program (as per national guidance and local weed management plans in cooperation with state, federal affected counties), including: coordination with partners; prevention and early detection; education; inventory and monitoring; and using principles of integrated weed management.  Manage for vegetation restoration, including control of weed infestations and control of invasive and undesirable non-native species.  Maintain, protect and enhance special status plant and animal habitats in such manner that the potential need to consider any of these species for listing as threatened or endangered under the Endangered Species Act does not arise.  Maintain or enhance the integrity of current sagebrush and sage steppe communities and identify areas in need of restoration. |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | Initiate restoration and/or rehabilitation efforts to ensure sustainable populations of sage-grouse, mule deer and other sagebrush obligate species. |
| 112 | Special Status Species | **CANYONS OF THE ANCIENTS NM RMP 2010**<br>Inventory and prioritize areas for noxious weed treatment (such as routes, riparian areas, stock ponds, and areas of ground disturbance) within 3 years of the signing of the ROD. Monitor, annually, at least 20 percent of treatment areas.<br><br>**DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**<br>Within SRMAs: Prioritize non-native plant treatments to most efficiently achieve both biological and recreation objectives. In all other areas: Prioritize non-native plant treatments to most efficiently achieve biological resources objectives. Focus weed inventory surveys and treatments on high use areas (roads, trails, ponds, river, etc.), federally listed species habitat, and in stream segments suitable for inclusion in the National Wild and Scenic Rivers system.<br><br>**GRAND JUNCTION FO RMP 2015**<br>Prioritize treatment areas for priority noxious and invasive species based on the following criteria: • Current state, county, and BLM priority weed lists; • Appropriate time of year for the most effective treatment; and • River restoration projects. |
| 113 | Special Status Species | **CANYONS OF THE ANCIENTS NM RMP 2010**<br>Apply all weed prevention BMPs (see Appendix D) to ground-disturbing activities.<br><br>**DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**<br>Ensure noxious weed preventive measures are applied to Special Recreation Permit activities, construction activities, road maintenance and mechanical vegetation treatment activities as outlined in contracts, permits, and cooperative agreements.<br><br>**GRAND JUNCTION FO RMP 2015**<br>Implement preventative measures for activities associated with oil and gas operations; ROWs; range developments; special recreation permits (SRP); and construction and mechanical vegetation treatment activities as authorized in contracts and permits.<br><br>**MOAB FO RMP 2008**<br>Control invasive and non-native weed species and prevent the introduction of new invasive species by implementing |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | a comprehensive weed program (as per national guidance and local weed management plans in cooperation with state, federal affected counties), including: coordination with partners; prevention and early detection; education; inventory and monitoring; and using principles of integrated weed management.<br><br>**TRES RIOS FO RMP 2015**<br>For all proposed projects or activities, the risk of invasive aquatic and plant species introduction or spread should be determined and appropriate prevention and mitigation measures implemented.<br>ACTION:  GUSG:  Invasive vegetation must be monitored and controlled post-treatment. |
| 114 | Special Status Species | **CANYONS OF THE ANCIENTS NM RMP 2010**<br>Permit no personal fuelwood cutting.  Authorize, by permit, commercial fuelwood cutting.  Use both dead-and-down wood and live trees for commercial fuelwood harvesting.  Require a Class III Cultural Resource Inventory in areas permitted for commercial fuelwood harvesting.  Authorize, on a case-by-case basis, the removal of products not aforementioned for research and/or for traditional purposes. Allow the commercial removal of special forest products following the completion of a Class III Cultural Resource Inventory, and a determination by the Monument Manager that the use (such as fuelwood harvesting, post cutting, or Christmas tree cutting) will not result in any new impacts that will interfere with the proper care and/or management of the objects (cultural, biological, and/or geological resources).  Designate areas for commercial special forest product removal in order to meet vegetation management objectives.<br><br>**DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**<br>Allow for the authorized collection of plant materials (including firewood) within the D-E NCA, where doing so helps achieve biological and/or cultural resource objectives.  Evaluate yearly and designate as-needed firewood collection areas in order to conserve, protect or enhance biological and/or cultural resources, while maintaining the recreational value of this traditional use.  Designate Christmas tree cutting areas where doing so helps meet goals and objectives established for biological resources in the D-E NCA, and evaluate such areas on yearly basis.<br><br>**GUNNISON GORGE NCA RMP 2004**<br>All public lands in the planning area will be closed to commercial forestry activities.  Fuelwood collection or cutting will be allowed only if all other management unit objectives will continue to be met and, upon completion of fuelwood collection, existing ground conditions will not hinder proposed treatments.  In areas on the east side of the Gorge that receive vegetation treatments, prescribed burns, or other techniques, fuelwood collection could be allowed as a means to accomplish a resource objective, priority, cleanup, or to remove fuel from the ground and to facilitate the purposes of the treatment, if appropriate. (Unit 4 grouse area)  In areas that receive vegetation |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | treatments, prescribed burns, or other techniques, fuelwood collection could be allowed as a means to accomplish a resource objective, priority, cleanup, or to remove fuel from the ground and to facilitate the purposes of the treatment, if appropriate.  Fuelwood collection or cutting, where authorized, will be allowed only if all other management unit objectives will continue to be met and, upon completion of fuelwood collection, existing ground conditions will not hinder proposed treatments. |
| | | **GRAND JUNCTION FO RMP 2015** |
| | | Make 830,500 acres available for wilding permits. Issue commercial seed permits on a case-by-case basis.  Close the following areas to wilding permits: • WSAs; • ACECs; • SRMAs: o Bangs and o North Fruita Desert; • Lands managed for wilderness characteristics; • Occupied threatened and endangered plant habitat; and • Occupied special status plant species habitat. Prohibit firewood harvest (in riparian areas), except where appropriate to allow for removal of undesirable invasive species. |
| | | Action (A1):  Allow harvest of forest and woodland products in portions of the following forestry zones that are determined suitable for harvest in activity-level plans or site-specific analyses: • Pinyon-juniper: o Bangs Canyon (59,100 acres) o Glade Park (67,100 acres); o Gateway (194,300 acres); o Book Cliffs (214,300); o Plateau Valley (66,800 acres); o Grand Mesa Slopes (60,700 acres); and o Roan Creek (243,300 acres). |
| | | Action (A2):  Close the following areas (approximately 231,200 acres) to wood product sales and/or harvest (not including Christmas tree harvest). (Figure 2-79, Appendix A).  Additional areas may be found as unsuitable for harvest in the site specific forest/woodland management plans:• The Palisade municipal watershed; • Known lynx habitat; • VRM Class I areas;• WSAs; • Lands managed for wilderness characteristics; and • ACECs. |
| | | Exception:  Allow wood product sales and/or harvest to meet desired resource conditions. |
| | | Action (A3):  Allow Christmas tree cutting in annually delineated tree cutting areas.  Close the following areas to Christmas tree cutting, except when tree removal supports the objectives of the following areas: • Areas identified as being over harvested; • ACECs; • Lands managed for wilderness characteristics; and • WSAs. |
| | | Action (A7): Discourage clear cuts in small, isolated, and tall conifer stands and/or mature pinyon-juniper woodlands under 160 acres, unless such practices meet other resource objectives. |
| | | Implementation Action (A9):  Based upon tribal and public demand, allow collection of unconventional forest products.  Limit permitted use of vegetal  collection of commonly available renewable resources (e.g., seeds, cones, wildlings, berries, mushrooms, nuts) for non-commercial use to the following amounts consistent with other resource goals/objectives: • Boughs, All Coniferous Species: 50 pounds per person per year • Cones – Ornamental: two bushels per person per year (one bushel is equal to 9 gallons or 35 liters) • Cones – Nuts: one bushel per person per year • Medicinal: one bushel per person per year (collection prohibited within WSAs and ACECs) • |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | Mushrooms: five gallons per species per person per year • Wildings: 15 meters (50 feet) per species per person per year (collection prohibited within WSAs and ACECs) • Traditional, religious, or ceremonial plants that are not widely available may be harvested for personal use by Native American tribal members and would not be offered as wilding plants for the general public.<br><br>Implementation Action (A9):  Based upon tribal and public demand, allow collection of unconventional forest products.  Limit permitted use of vegetal  collection of commonly available renewable resources (e.g., seeds, cones, wildlings, berries, mushrooms, nuts) for non-commercial use to the following amounts consistent with other resource goals/objectives: • Boughs, All Coniferous Species: 50 pounds per person per year • Cones – Ornamental: two bushels per person per year (one bushel is equal to 9 gallons or 35 liters) • Cones – Nuts: one bushel per person per year • Medicinal: one bushel per person per year (collection prohibited within WSAs and ACECs) • Mushrooms: five gallons per species per person per year • Wildings: 15 meters (50 feet) per species per person per year (collection prohibited within WSAs and ACECs) • Traditional, religious, or ceremonial plants that are not widely available may be harvested for personal use by Native American tribal members and would not be offered as wilding plants for the general public.<br><br>**GUNNISON RMP 1993**<br>Suitable commercial forest lands and woodlands will be managed for sustained yield production within the allowable cut restrictions and guidelines determined by the Timber Production Capability Classification (TPCC).  Special emphasis will be placed on the harvest of over-mature and pest-killed trees.  Approximately 41,347 acres of suitable commercial forest lands, and 23,615 acres of suitable woodlands in several Management Units will be available for harvest.  Approximately 1,200 MBF of commercial timber, 490 cords of fuelwood, 400 wildings and, on average, 300 Christmas trees could be considered for harvest annually on a sustained yield basis.  No commercial timber harvesting will occur in riparian areas, or in a 30-foot area either side of riparian areas, unless riparian or wildlife values will be improved.<br><br>**MCINNIS CANYONS NCA RMP 2004**<br>The practice of taking woodland products within the CCNCA will be discontinued.  The option of allowing some cutting to facilitate clearing trees for trails, recreation projects, land health initiatives, and wildlife projects will be considered.<br><br>**SAN JUAN/SAN MIGUEL RMP 1985**<br>Forested areas within other emphasis areas will also be available for a full range of forest management activities; plans will be modified to be compatible with the management emphasis areas.  Firewood harvesting will be permitted on most accessible forest land available for harvesting forest products.  Provide intensive timber management on |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | approximately 10,960 acres.  Estimated allowable harvest would be 6.5 MMBF per decade.  An additional 42,130 acres would be managed to provide woodland products (firewood, posts, poles, etc.).<br><br>**SAN LUIS RMP 1991**<br>San Luis Area #1: 1-15:  Meet crucial thermal and cover requirements for wildlife during harvest of productive forest lands and operable woodlands.<br>San Luis Area #1: 1-16:  Allow small timber operations (i.e., 80 acres or less) during the winter months provided there will be only minimal impacts to wintering big game herds.<br>San Luis Area #1:1-17:  Harvest 477 cords of fuelwood (11,992 acres of productive operable woodlands) during the life of the plan or 53 acres annually. San Luis Area #1: 1-9:  Allow harvesting in any area consistent with activity plans and RMP decisions.<br><br>**UNCOMPAHGRE BASIN RMP 1989**<br>Suitable commercial forest lands and pinyon-juniper woodlands will be managed for sustained yield production within the allowable cut restrictions determined by the Timber Production Capabilities Classification (TPCC) inventory.  In Management Unit 2 (Southern Uncompahgre Plateau):  The management unit will be available for woodland product harvests.  On 37,007 acres of crucial deer and elk winter range, seasonal restrictions on harvest may be necessary from December 1 through April 30 to reduce stress on wintering deer and elk.  Woodland harvest will be designed to increase forage production and will be compatible with wildlife habitat management objectives. |
| 115 | Special Status Species | **CANYONS OF THE ANCIENTS NM RMP 2010**<br>Authorize, without permit, the gathering of up to 22.5 pounds of pinyon pine nuts for personal and/or traditional use.  Prohibit the gathering of pinyon nuts for commercial purposes.  Authorize, on a case-by-case basis, the removal of products not aforementioned for research and/or for traditional purposes.<br><br>**DOMINGUEZ-ESCALANTE NCA DRAFT RMP 2013**<br>Allow for the authorized collection of plant materials (including firewood) within the D-E NCA, where doing so helps achieve biological and/or cultural resource objectives.  Evaluate yearly and designate as-needed firewood collection areas in order to conserve, protect or enhance biological and/or cultural resources, while maintaining the recreational value of this traditional use.  Designate Christmas tree cutting areas where doing so helps meet goals and objectives established for biological resources in the D-E NCA, and evaluate such areas on yearly basis.<br><br>**GRAND JUNCTION FO RMP 2015**<br>Make 830,500 acres available for wilding permits. Issue commercial seed permits on a case-by-case basis.  Close the |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | following areas to wilding permits: • WSAs; • ACECs; • SRMAs: o Bangs and o North Fruita Desert; • Lands managed for wilderness characteristics; • Occupied threatened and endangered plant habitat; and • Occupied special status plant species habitat. Prohibit firewood harvest (in riparian areas), except where appropriate to allow for removal of undesirable invasive species. |
| | | Action (A1):  Allow harvest of forest and woodland products in portions of the following forestry zones that are determined suitable for harvest in activity-level plans or site-specific analyses: • Pinyon-juniper: o Bangs Canyon (59,100 acres) o Glade Park (67,100 acres); o Gateway (194,300 acres); o Book Cliffs (214,300); o Plateau Valley (66,800 acres); o Grand Mesa Slopes (60,700 acres); and o Roan Creek (243,300 acres). |
| | | Implementation Action (A9):  Based upon tribal and public demand, allow collection of unconventional forest products.  Limit permitted use of vegetal  collection of commonly available renewable resources (e.g., seeds, cones, wildlings, berries, mushrooms, nuts) for non-commercial use to the following amounts consistent with other resource goals/objectives: • Boughs, All Coniferous Species: 50 pounds per person per year • Cones – Ornamental: two bushels per person per year (one bushel is equal to 9 gallons or 35 liters) • Cones – Nuts: one bushel per person per year • Medicinal: one bushel per person per year (collection prohibited within WSAs and ACECs) • Mushrooms: five gallons per species per person per year • Wildings: 15 meters (50 feet) per species per person per year (collection prohibited within WSAs and ACECs) • Traditional, religious, or ceremonial plants that are not widely available may be harvested for personal use by Native American tribal members and would not be offered as wilding plants for the general public. |
| | | Implementation Action (A9):  Based upon tribal and public demand, allow collection of unconventional forest products.  Limit permitted use of vegetal  collection of commonly available renewable resources (e.g., seeds, cones, wildlings, berries, mushrooms, nuts) for non-commercial use to the following amounts consistent with other resource goals/objectives: • Boughs, All Coniferous Species: 50 pounds per person per year • Cones – Ornamental: two bushels per person per year (one bushel is equal to 9 gallons or 35 liters) • Cones – Nuts: one bushel per person per year • Medicinal: one bushel per person per year (collection prohibited within WSAs and ACECs) • Mushrooms: five gallons per species per person per year • Wildings: 15 meters (50 feet) per species per person per year (collection prohibited within WSAs and ACECs) • Traditional, religious, or ceremonial plants that are not widely available may be harvested for personal use by Native American tribal members and would not be offered as wilding plants for the general public. |
| | | **MCINNIS CANYONS NCA RMP 2004** |
| | | The practice of taking woodland products within the CCNCA will be discontinued.  The option of allowing some cutting to facilitate clearing trees for trails, recreation projects, land health initiatives, and wildlife projects will be |

| R O W | PROGRAM AREA | NO ACTION ALTERNATIVE A |
|---|---|---|
| | | considered. **SAN JUAN/SAN MIGUEL RMP 1985** Forested areas within other emphasis areas will also be available for a full range of forest management activities; plans will be modified to be compatible with the management emphasis areas. Firewood harvesting will be permitted on most accessible forest land available for harvesting forest products. Provide intensive timber management on approximately 10,960 acres. Estimated allowable harvest would be 6.5 MMBF per decade. An additional 42,130 acres would be managed to provide woodland products (firewood, posts, poles, etc.). |
| **WILDLIFE** | | |
| 116 | Wildlife | No similar action. |
| 117 | Wildlife | No similar action. |
| 118 | Wildlife | No similar action. |
| 119 | Wildlife | No similar action. |
| 120 | Wildlife | No similar action. |
| **AREAS OF CRITICAL ENVIRONMENTAL CONCERN** | | |
| 121 | ACECs | **GUNNISON GORGE NCA RMP 2004** Public lands in the Management Unit 4 (22,200 acres) will be designated and managed as the GUSG ACEC/IBA. Management and protection of the GUSG and its habitat will be emphasized in this management unit. |

## TABLE 2.7 - ACTION ALTERNATIVES: B, C, AND SUB-ALTERNATIVES D₁/D₂

**Table 2.7 - Action Alternatives B, C, and D (consisting of Sub-Alternatives D₁ and D₂)**

| ROW | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| **TRAVEL AND TRANSPORTATION** | | | | | |
| **GOAL:** Travel and transportation are managed to avoid, minimize, or compensate for activities that 1) disrupt **GUSG** or 2) fragment **GUSG Habitat.** | | | | | |
| OBJECTIVE: Travel and transportation are managed to: 1) reduce mortality from vehicle collisions, 2) avoid, minimize, and compensate for habitat fragmentation, 3) limit the spread of invasive species, and 4) limit disruptive activity associated with human access. | | | | | |
| OBJECTIVE: A travel management plan (TMP) is completed or amended to address management of GUSG Habitat for each BLM field office in the planning area. | | | | | |
| 1 | Travel | When conducting travel management planning, reduce route densities to improve Occupied Habitat. | In Occupied Habitat, evaluate for potential reductions in route density in order to improve habitat conditions and adjust, as applicable, through the travel management planning process. | No Action. | Same as Alternative C. |
| 2 | Travel | In Unoccupied Habitat, evaluate for potential reductions in route density in order to improve habitat conditions and adjust, as applicable, through the travel management planning process. | Same as Alternative B. | No Action. | Same as Alternative B. |
| 3 | Travel | Evaluate routes in Non- | No similar action. | No similar action. | No similar action. |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | Habitat Areas for potential reductions in route density in order to enhance connectivity and eliminate activities disruptive to GUSG and adjust, as applicable, through the travel management planning process. | | | |
| 4 | Travel | Designate Occupied Habitat as closed to motorized travel, except for access required by law or for emergency services or administrative or permitted activities. | Designate Occupied Habitat as limited.  Where designation through a TMP does not yet exist, limit to existing routes.  Where routes have been designated through a TMP, limit to designated routes. Areas currently designated as closed to motorized travel will remain so and not be changed by this RMP Amendment. | Same as Alternative C. | Same as Alternative C. |
| 5 | Travel | Prohibit upgrades to existing routes in Occupied Habitat. | Prohibit upgrades to existing routes in Occupied Habitat unless necessary for motorist safety or to eliminate the need for construction of a new road.  Require mitigation of impacts using methods demonstrated | Allow for upgrades to existing routes after documenting that the upgrade would not adversely affect GUSG populations due to habitat loss or disruptive activities in Occupied Habitat. | Same as Sub-Alternative D₁. |

| ROW | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | | to be effective in offsetting the loss of GUSG Habitat. | Require mitigation in accordance with the Mitigation Plan (in Appendix J). | |
| 6 | Travel | Subject to valid existing rights, prohibit any upgrade to an existing route in Unoccupied Habitat that would change the route category (from a trail to a primitive road or road or from a primitive road to a road) or increase capacity, unless the upgrade is necessary for motorist safety or to eliminate the need to construct a new road and determined through quantitative analysis to have minimal impact on GUSG Habitat. | Allow for upgrades to existing routes in Unoccupied Habitat after documenting that the upgrade would not adversely affect the recovery of GUSG populations due to habitat loss or disruptive activities. Require mitigation in accordance with the Mitigation Plan (in Appendix J). | Allow for upgrades to existing routes after documenting that the upgrade would not adversely affect the recovery of GUSG populations due to habitat loss or disruptive activities in Unoccupied Habitat. Require mitigation in accordance with the Mitigation Plan (in Appendix J). | Same as Sub-Alternative D₁. |
| 7 | Travel | Do not allow upgrades to existing routes in Non-Habitat Areas if the upgrade would be disruptive to GUSG or act as an impermeable barrier to connectivity between populations or sub-populations. | No similar action. | No similar action. | No similar action. |
| 8 | Travel | Prohibit new routes in | Limit route construction in | Allow for realignments in | Allow for realignments in |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D$_1$ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D$_2$ |
|---|---|---|---|---|---|
| | | Occupied Habitat. | Occupied Habitat to the realignment of existing designated routes necessary for safety or to eliminate the need to construct a new route if realignment is determined to have a minimal impact on GUSG Habitat.<br><br>Require mitigation in accordance with the Mitigation Plan (in Appendix J). | CCA-designated Tier 1 habitat for agency purposes requiring new road or trail construction and/or re-openings and allow for new roads and trails in CCA-designated Tier 2 habitat, as outlined in Section 4.3.2 of the CCA.<br><br>A separate minimum set of GUSG conservation measures is proposed for three geographic areas identified as Highly Managed Urban Interface Recreation Areas to meet current and future recreation needs. (Refer to CCA Appendix B.) | Occupied Habitat for agency purposes requiring new road or motorized trail construction and/or re-openings and non-motorized trail realignments if:<br>• The realignment or reopening would conserve or enhance GUSG Habitat; and<br>• The resulting decommissioned road/trail segments would be reclaimed; and<br>• Standard minimization measures would be applied.<br>Allow for new routes if:<br>• The new routes would consolidate existing designated and user-created routes; and<br>• Consolidation would be accomplished by decommissioning and reclaiming the replaced routes per the mitigation plan; and<br>• Standard minimization measures would be applied. |

CHAPTER 2 - ALTERNATIVES

| ROW | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D$_1$ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D$_2$ |
|---|---|---|---|---|---|
| 9 | Travel | Limit route construction in Unoccupied Habitat to the realignment of existing designated routes necessary for safety or to eliminate the need to construct a new route if realignment is determined to have a minimal impact on GUSG Habitat.<br><br>Require mitigation in accordance with the Mitigation Plan (in Appendix J). | Prior to completion of a TMP, limit route construction to routes that will not adversely affect GUSG populations due to habitat loss or disruptive activities in Unoccupied Habitat.<br><br>Require mitigation in accordance with the Mitigation Plan (in Appendix J). | Same as Alternative C. | Same as Alternative C. |
| 10 | Travel | Prior to completion of a TMP, limit route construction in Non-Habitat Areas if routes have the potential to be disruptive to GUSG or act as an impermeable barrier to connectivity between populations and sub-populations. | No similar action. | No similar action. | No similar action. |
| 11 | Travel | Use existing roads or realignments as described above to access valid existing rights that are not yet developed in Occupied Habitat.<br><br>If valid existing rights cannot be accessed via existing | Same as Alternative B. | Same as Alternative B. | Same as Alternative B. |

CHAPTER 2 - ALTERNATIVES

| ROW | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | roads, then allow for a new road constructed to the absolute minimum standard necessary and apply effective mitigation necessary to offset the resulting loss of GUSG Habitat. | | | |
| 12 | Travel | No similar action. | Prioritize and conduct the restoration of closed routes in Occupied Habitat identified as most critical for GUSG success. | When implementing route closures in Occupied Habitat in the Gunnison Basin in accordance with the 2010 Gunnison Basin TMP: <br>• Prioritize CCA-designated Tier 1 habitat for reclamation work to the extent feasible. <br>• Use the Habitat Prioritization Tool and/or a route density map to compare reclamation options for optimizing the size of intact unfragmented CCA-designated Tier 1 habitat patches (CCA Section 5.2.1). | Same as Alternative C. |
| 13 | Travel | Actively conduct restoration of all closed routes in Unoccupied Habitat. | Prioritize and conduct the restoration of closed routes in Unoccupied Habitat as time and resources allow. | Same as Alternative C. | Same as Alternative C. |
| 14 | Travel | Timing Limitation: | Timing Limitation: | Timing Limitation: | Same as Alternative C. |

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE $D_1$ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE $D_2$ |
|---|---|---|---|---|---|
| | | During the lek season from March 15 through May 15, implement seasonal closures for motorized routes in Occupied Habitat. | During the lek season from March 15 through May 15, implement seasonal closures for motorized routes in Occupied Habitat where a conflict has been identified. | During the lek season from March 15 through May 15, implement seasonal closures to motorized travel in Occupied Habitat in the Gunnison Basin, in accordance with the 2010 Gunnison Basin TMP and as outlined in Section 5.2.2 of the CCA. From December 1 through March 31, implement closures when necessitated by severe winter conditions, in accordance with guidance in Section 5.2.2.B of the CCA. | |
| 15 | Travel | Timing Limitation: During the lek season from March 15 through May 15, implement seasonal closures for mechanized routes in Occupied Habitat. | Timing Limitation: During the lek season from March 15 through May 15, implement seasonal closures for mechanized routes in Occupied Habitat in any area where a conflict has been identified and within 1.0 mile of a lek. | No similar action. | Same as Alternative C. |
| 16 | Travel | Timing Limitation: From March 1 through May 15, implement seasonal closures to human entry in | Timing Limitation: From March 15 through May 15, implement seasonal closures to uses in Occupied | Same as Alternative C. | Same as Alternative C. |

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | Occupied Habitat. | Habitat where a conflict has been identified. | | |

**RECREATION**

**GOAL:  Recreation is managed to avoid, minimize, or mitigate activities that 1) disrupt GUSG, 2) fragment GUSG Habitat, or 3) spread invasive species.**

OBJECTIVE:  Disruptive recreational activities are reduced in GUSG Habitat.

OBJECTIVE:  Fragmentation of GUSG Habitat due to recreational activities is reduced based upon site potential, current scientific research, and RCP guidelines.

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| 17 | Recreation | Do not designate new RMAs (SRMAs or ERMAs) in Occupied Habitat.  While not emphasizing recreation, allow for recreation uses and activities not in conflict with GUSG or GUSG Habitat. | Do not designate new RMAs (SRMAs or ERMAs) in Occupied Habitat where a conflict with GUSG or GUSG Habitat can be identified.  While not emphasizing recreation, allow for recreation uses and activities not in conflict with GUSG or GUSG Habitat. | For three areas (Hartman Rocks, Signal Peak, and Van Tuyl Ranch) that sustain the majority of recreational use within GUSG Habitat in the Gunnison Basin, implement actions as outlined in Appendix B of the CCA.  In order to compensate for new route and facility development in these areas, observe GUSG conservation measures (such as seasonal closures to minimize disturbance to leks), but do not require compliance with the off-site mitigation standards outlined in sections 4.3, 4.4, 5.2, and 5.3 of the CCA. | Same as Alternative C. |

CHAPTER 2 - ALTERNATIVES

| ROW | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D$_1$ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D$_2$ |
|---|---|---|---|---|---|
| 18 | Recreation | In Occupied Habitat, prohibit new developed recreational infrastructure and remove all existing recreational infrastructure. | In Occupied Habitat, allow for new developed recreational infrastructure only when it functions to minimize the effects of recreation on GUSG and Occupied Habitat. Remove existing infrastructure that does not serve this function.<br><br>Require mitigation in accordance with the Mitigation Plan (in Appendix J). | In Occupied Habitat in the Gunnison Basin, permit additional small-scale infrastructure (such as signs, kiosks, vault toilets, vehicle barriers, concentrated parking areas, culverts, gates, cattle guards, exclosures, and water developments) in CCA-designated Tier 1 and Tier 2 habitat, as outlined in CCA Section 4.4.4 and Section 4.2.<br><br>For activities outside of CCA guidelines, follow Alternative C. | Same as Alternative C. |
| 19 | Recreation | In Unoccupied Habitat, prohibit new developed recreational infrastructure and remove all existing recreational infrastructure. | In Unoccupied Habitat, authorize developed recreational infrastructure only if it serves to minimize the effects of recreation in Occupied Habitat and any portion of Unoccupied Habitat that currently exhibits or has the potential to exhibit the Primary Constituent Elements (PCEs) of GUSG Habitat. Remove existing infrastructure that does not serve this function. Require mitigation of | Same as Alternative C. | Same as Alternative C |

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | | recreational impacts in accordance with the Mitigation Plan (in Appendix J). | | |

**Special Recreation Permits (SRPs)**

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| 20 | Recreation | Do not authorize new SRPs or renew expiring SRPs in Occupied Habitat. | Authorize only those SRPs that have neutral or beneficial effects to Occupied Habitat. Where possible, transfer currently permitted uses to areas outside of Occupied Habitat. | In Occupied Habitat in the Gunnison Basin, authorize SRPs for recreation events, guides, and outfitters as outlined in CCA Section 5.2.3. Identify and provide limited opportunities for specific activities not locatable outside of sagebrush habitat. (CCA) | Do not allow SRPs with the potential to adversely affect GUSG or GUSG Occupied Habitat. Where possible, transfer currently permitted uses to areas outside of Occupied Habitat. |
| 21 | Recreation | Authorize only those SRPs that have neutral or beneficial effects to Unoccupied Habitat. | Do not allow SRPs with the potential to adversely affect Unoccupied Habitat. | Same as Alternative B. | Same as Alternative B. |
| 22 | Recreation | In Non-Habitat Areas, do not allow SRPs with the potential to cause activity disruptive to GUSG or that acts as an impermeable barrier to connectivity between populations and sub-populations. | No similar action. | No similar action. | No similar action. |

| ROW | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| 23 | Recreation | Do not identify any lek viewing areas. | Work with state agencies to identify lek viewing sites as necessary and appropriate. | Same as Alternative C. | Same as Alternative C. |

## LANDS AND REALTY MANAGEMENT

**GOAL: The Lands and Realty program is managed to avoid, minimize, and compensate the loss of habitat and habitat connectivity through the authorizations of ROWs (including other land use authorizations), land tenure adjustments, proposed land withdrawals, agreements with partners, and incentive programs.**

OBJECTIVE: Impacts to habitat from ROWs are reduced.

**Rights-of-Way (ROWs) including Wind and Solar Energy Development**

| ROW | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| 24 | Lands & Realty– Exclusion and Avoidance Areas | Designate Occupied Habitat as ROW exclusion areas, with the following exceptions:<br>• Designated West-wide Energy Corridors (per Section 368 of the Energy Policy Act of 2005)<br>• Designated utility corridors<br>• The 100-foot buffer from the center line (or up to 100 feet from the edge of the ROW if not feasible) of county roads and highways (which would be managed as ROW avoidance areas). | Designate Occupied Habitat as ROW avoidance areas.<br><br>When authorizing new ROWs, require that the following guidelines are met:<br>• In all cases, timing limitations, ground disturbance limitations, and applicable BMPs will be applied.<br>• Authorizations are mitigated in accordance with the mitigation plan. | Designate Occupied Habitat as ROW avoidance areas.<br><br>When authorizing new ROWs, the CCA guidelines (in Section 4.4.1) would apply to ROWs for new roads, power lines, phone lines, and pipelines only if the following conditions are met:<br>• Permitted area would be less than 5.0 acres;<br>• Permitted area width for a utility ROW would be less than 25 feet; and<br>• Aboveground infrastructure (not including buried utilities and pipelines) would be | Designate Occupied Habitat within 0.6 mile of a lek as a ROW exclusion area, with the following exceptions:<br>• Designated West-wide Energy Corridors (section 368 corridors)<br>• Designated utility corridors<br>• 100-foot buffer from the center line (or up to 100 feet from the edge of the ROW if not feasible) of county roads and highways (which would be managed as ROW avoidance areas).<br><br>Designate Occupied Habitat more than 0.6 mile from a lek |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D$_1$ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D$_2$ |
|---|---|---|---|---|---|
| | | | | less than 0.5 mile. For any ROW authorization outside of the guidelines for the CCA, follow Alternative D$_2$. | as a ROW avoidance area using the guidelines for avoidance in Alternative C. |
| 25 | Lands & Realty– Road ROWs | When evaluating applications for road ROWs or reopenings to access valid existing rights and/or non-federal inholdings in Occupied Habitat:<br>• Do not authorize a new ROW if other reasonable access is available.<br>• If a new ROW is determined to be necessary, then require that the ROW be built to the absolute minimum standard necessary and mitigation be performed.<br>• Prohibit upgrades to existing routes.<br>• Locate utilities within a 50-foot buffer of access roads, unless an exception would reduce impacts to GUSG habitat.  Require mitigation.<br>• Limit public access whenever possible. | When evaluating applications for road ROWs or reopenings to access valid existing rights and/or non-federal inholdings in Occupied Habitat:<br>• Do not authorize a new ROW if other reasonable access is available.<br>• Prior to authorizing, document that the ROW would not adversely impact GUSG due to habitat loss or disruptive activities, except when such a restriction would make accessing valid existing rights and/or non-federal inholdings impracticable.<br>• Require that ROWs on existing roads administered by the BLM be maintained in their current condition, unless an upgrade:<br>o Would better protect | When evaluating applications for new road ROWs or reopenings to access valid existing rights and/or non-federal inholdings in Occupied Habitat:<br>• Only authorize a new ROW after determining that the proposed access route is the only feasible option and no reasonable alternative access route is available.<br>• Require offsite compensatory mitigation at a ratio of greater than 1.0 acre reclaimed for every 1.0 acre disturbed.<br>• Require that standard minimization measures be applied (in accordance with Section 4.2 of the CCA). | Same as Alternative C. |

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | | GUSG habitat<br>o Is necessary for motorist safety, or<br>o Would eliminate the need to construct a new road.<br>• Require that impacts are mitigated using methods demonstrated to be effective in offsetting the loss of GUSG habitat.<br>• Allow for route maintenance unless it would change the route category upward or increase the route capacity.<br>• Locate utilities within a 50-foot buffer of access roads, unless an exception would reduce impacts to GUSG habitat.<br>• Limit public access wherever possible. | | |
| 26 | Lands & Realty– Power and Phone Lines | No similar action. | When authorizing a power or phone line in Occupied Habitat:<br>• Avoid Occupied Habitat to the maximum extent feasible and demonstrate full consideration of this | When authorizing a ROW for a power or phone line through CCA-designated Tier 1 or Tier 2 habitat, require that the CCA standards in Section 4.4.1 A and B are met. | Same as Alternative C. |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | | alternative.<br>• If unable to avoid, then co-locate new utility line on existing overhead lines to the maximum extent feasible.<br>• If unable to co-locate on existing overhead lines, then:<br>• Bury line (vertical structure avoided) and,<br>• Co-locate within existing comparable development footprints (i.e. roads) to the maximum extent feasible.<br>• If unable to bury utility line, then install the most effective perch deterrents available on all poles for the proposed segment. | Apply standard minimization measures (CCA Section 4.2). | |
| 27 | Lands & Realty– Communication Sites | No similar action. | When authorizing communication sites, meteorological towers, and comparable infrastructure in Occupied Habitat, require the proponent to:<br>• Co-locate new equipment on an existing communication tower or other comparable | When authorizing communication sites, meteorological towers, and comparable infrastructure in Occupied Habitat in the Gunnison Basin, require the proponent to:<br>• Co-locate new equipment on an existing communication tower or | Same as Alternative C. |

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | | structure, and/or visually conceal structure in a forested area;<br>• If unable to co-locate on comparable structure, then co-locate within existing comparable development footprint (proximal to other vertical infrastructure) and/or forested area; and<br>• Incorporate the mitigation measures outlined in the FWS Interim Guidelines on the Siting, Construction, Operation and Decommissioning of Communication Towers (or other updated guidance).<br><br>When authorizing associated access routes and utilities to communication sites, meteorological towers, and comparable infrastructure in Occupied Habitat, require proponent to:<br>• Use impacted areas to the maximum extent feasible: utilize system roads and non-system roads; | other comparable structure, and/or visually conceal structure in a forested area;<br>• If unable to co-locate new equipment on a comparable structure, then co-locate within an existing comparable development footprint (proximal to other vertical infrastructure) and/or forested area; and<br>• Incorporate the mitigation measures outlined in the FWS Interim Guidelines on the Siting, Construction, Operation and Decommissioning of Communication Towers (or other updated guidance).<br><br>When authorizing associated access routes to communication sites, meteorological towers, or comparable infrastructure, require proponent to:<br>• Use impacted areas (including system and non-system roads) to the | |

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | | • If no existing access is available, demonstrate that the proposed access route is the only reasonable, feasible option, and no sufficient alternative access is available.<br>• Mitigate in accordance with the Mitigation Plan (outlined in Appendix J). | maximum extent feasible.<br><br>When a new access route is proposed, require the proponent to:<br>• demonstrate that the proposed access route is the only reasonable, feasible option, and no sufficient alternative access is available; and<br>• Apply offsite mitigation standards for new access routes consistent with CCA Section 4.3.1, Motorized Roads; and<br>• Apply standard minimization measures (CCA Section 4.2). | |
| 28 | Lands & Realty | When authorizing new ROWs or amending existing ROWs for new disturbance areas in Occupied Habitat, require that the following guidelines are met:<br>• In all cases, timing limitations, ground disturbance limitations, and applicable BMPs will be applied.<br>• Authorizations are mitigated in accordance | Same as Alternative B. | When authorizing new ROWs or renewing or amending existing ROWs in Occupied Habitat, require that the grant holder follow CCA guidelines and apply standard minimization measures (CCA Section 4.2).<br><br>If the action is outside of CCA guidelines, then follow Alternative B. | Same as Alternative B. |

| ROW | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | with the mitigation plan.<br>• Co-locate new ROWs within existing ROWs or where best minimizes GUSG impacts.<br>When amending or renewing existing ROWs in Occupied Habitat, timing limitations, ground disturbance limitations, and applicable BMPs will be applied. | | | |
| 29 | Lands & Realty– Exclusion and Avoidance Areas | Designate Unoccupied Habitat as ROW exclusion areas, with the following exceptions:<br>• Designated West-Wide Energy Corridors (per Section 368 of the Energy Policy Act of 2005)<br>• Designated utility corridors<br>• A 100-foot buffer from the center line (or up to 100 feet from the edge of the ROW if not feasible) of county roads and highways (to be managed as a ROW avoidance area). | Designate Unoccupied Habitat as ROW avoidance areas with guidelines as shown for Occupied Habitat. | Same as Alternative C. | Same as Alternative C. |
| 30 | Lands & Realty | For ROWs within Non-Habitat Areas, include | No similar action. | No similar action. | No similar action. |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | stipulations or conditions to avoid disruptive activities. | | | |
| 31 | Lands & Realty | Prohibit the RMP designation of new ROW corridors in Occupied Habitat. | Same as Alternative B. | Same as Alternative B. | Same as Alternative B. |
| 32 | Lands & Realty | In Occupied and Unoccupied Habitat, un-designate existing RMP-designated ROW corridors that do not contain an authorized ROW. | Within Occupied Habitat, un-designate existing RMP-designated ROW corridors that do not contain an authorized ROW. | No similar action. | Same as Alternative B. |
| 33 | Lands & Realty | No similar action. | When feasible, require the placement of new facilities and upgrades to existing facilities within designated corridors or areas with previous disturbance and existing facilities and ensure compatibility with other resource values. | Same as Alternative C. | Same as Alternative C. |
| 34 | Lands & Realty | Require the placement of new facilities and upgrades to existing facilities within designated corridors or areas with existing facilities if present, if there is the potential to be disruptive to GUSG, and ensure compatibility with other resource values. | No similar action. | No similar action. | No similar action. |

CHAPTER 2 - ALTERNATIVES

| ROW | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| 35 | Lands & Realty | When granting new or amending/renewing existing ROWs, require compliance with applicable timing and ground disturbance limitations and mitigation standards. [Timing limitations would not apply to snow plowing and/or emergency maintenance of U.S. and state highways.] | Same as Alternative B. | Same as Alternative B. | Same as Alternative B. |
| 36 | Lands & Realty | Require that power lines be maintained in compliance with standards identified by the Avian Power Line Interaction Committee (following current GUSG guidelines and best available science determined in coordination with the FWS). | Same as Alternative B. | Same as Alternative B. | Same as Alternative B. |
| 37 | Lands & Realty | When permitting ROWs in Occupied Habitat, implement breeding seasonal closures for motorized and non-motorized routes from March 15 through May 15, except for access to private property and for emergencies. | Same as Alternative B. | In seasonally Occupied Habitat in the Gunnison Basin, implement seasonal restrictions on construction, maintenance, and access (including by the public), except for emergency maintenance. (See Figure 2 in the CCA.)

Currently implemented | Same as Alternative B. |

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | | | closure: Lekking period (observed from approximately March 15 through May 15). Closed to motorized travel, with the following exceptions:<br>• Permittees<br>• Access to private property<br>• Hartman Rocks Recreation Area, north of powerline<br>• Emergency maintenance. Excepted travel is encouraged after 9 a.m. where possible.<br><br>If research indicates that additional restrictions are necessary to sustain GUSG populations, then seasonal restrictions may be applied in identified seasonal habitat in order to minimize disturbance during the following critical biological periods for GUSG: nesting, brood-rearing, and winter use. (CCA) | |

### RANGE MANAGEMENT

**GOAL: Manage the range program to avoid and minimize adverse impacts to GUSG Habitat to the extent practical under the law and BLM jurisdiction.**

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | OBJECTIVE: Grazing practices are compatible with GUSG RCP guidelines and relevant science | | | | |
| | OBJECTIVE: Sagebrush habitat and riparian areas with suitable ecological site potential meet RCP guidelines. | | | | |
| | OBJECTIVE: Range improvements result in no net increase in habitat fragmentation. Measurable impacts to habitat from existing range improvements are reduced and structures modified to minimize habitat avoidance by GUSG. | | | | |
| | OBJECTIVE: Important grazing management adjustments to accommodate GUSG are prioritized and expedited through the NEPA process, and are based on upland and riparian-wetland land health data that includes GUSG RCP habitat indicators. | | | | |
| 38 | Range Management | Close all GUSG Habitat to livestock grazing. | In all GUSG Habitat, incorporate measures to meet RCP Habitat Guidelines into allotment management plans, livestock grazing permits, and the management of grazing allotments.<br><br>When suitable sagebrush and riparian ecological sites do not meet RCP habitat guidelines or livestock disrupt GUSG, then manage allotments to:<br>• Minimize livestock presence in GUSG seasonal use areas during important GUSG use periods<br>• Allocate forage at levels appropriate for the Ecological Site and at stocking rates that result in less than 35% use of | In all GUSG Habitat in the Gunnison Basin, follow CCA Section 5.4 management guidelines for grazing permit renewals, monitoring, and conservation measures:<br>• Continue to incorporate RCP/CCA grazing management guidelines (CCA Appendix D) into all permits and associated allotment management plans and/or coordinated management plans.<br>• Manage allotments and/or pastures containing GUSG Habitat for both breeding and summer/fall herbaceous heights per RCP habitat guidelines.<br>• For each grazing permit wholly/partially within GUSG Habitat, use the Habitat Condition | In all GUSG Habitat, incorporate measures to meet RCP Habitat Guidelines into allotment management plans, livestock grazing permits, and the management of grazing allotments.<br><br>When suitable sagebrush and riparian ecological sites do not meet RCP habitat guidelines or livestock disrupt GUSG, then manage allotments to:<br>• Minimize livestock presence in GUSG seasonal use areas during important GUSG use periods<br>• Allocate forage at levels appropriate for the Ecological Site and at stocking rates that result in less than 35% use of |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | | palatable forage species<br>• Improve productivity of cool season perennial grasses and forbs where needed to achieve RCP habitat guidelines. | Assessment (CCA, Section 7.2) to incorporate habitat guidelines for herbaceous heights as a term and condition of the permit.<br>• For riparian areas, incorporate CCA guidelines for herbaceous heights as a term and condition of the permit.<br>• For non-riparian and all other habitat types, incorporate RCP guidelines for herbaceous heights as a term and condition of the permit.<br>• Manage grazing in riparian areas, swales, and wet meadows to improve habitat conditions.<br><br>Develop management strategies to benefit GUSG that are as seamless as possible with respect to actions on public and private lands within BLM grazing allotments, but are not unduly restrictive of private land actions. | palatable forage species<br>• Improve productivity of cool season perennial grasses and forbs<br>• Manage grazing in riparian areas, swales, and wet meadows to improve habitat conditions. |
| 39 | Range Management | No similar action. | Require that all permits issued for livestock grazing in | Require that all permits issued for livestock grazing in | Same as Alternative C. |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | | GUSG Habitat contain terms and conditions that specify measures to meet or exceed RCP guidelines, addressing the following points where applicable:<br>• Placement of salt, minerals, and supplements to protect riparian-wetland areas and lekking GUSG<br>• Livestock turnout and trailing practices<br>• Allowable stubble heights<br>• Protecting sagebrush height and cover<br>• Adequately resting treatment and burned areas<br>• Changing grazing practices to reduce impacts to GUSG Habitat from drought, flooding or other disruptive environmental events<br>• Requirements for moving livestock between pastures<br>• Criteria for using controlled grazing as a tool for habitat improvement<br>• Sheep bedding practices that avoid damage to | GUSG Habitat contain terms and conditions that specify measures to meet RCP guidelines, including:<br>• RCP guidelines for herbaceous heights in riparian areas<br>• RCP guidelines for herbaceous heights in all other habitat<br>• Adequate rest for treatment and burned areas. | |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE $D_1$ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE $D_2$ |
|---|---|---|---|---|---|
| | | | GUSG Habitat. | | |
| 40 | Range Management | No similar action. | When a permittee or lessee voluntarily relinquishes grazing preference on an allotment in Occupied Habitat, reduce overall grazing pressure through one of the following measures:<br>• Retire the AUMs and merge with an existing allotment in Occupied Habitat, or<br>• Close the allotment. | When a permittee or lessee voluntarily relinquishes grazing preference on an allotment in Occupied Habitat in the Gunnison Basin, look for opportunities to alleviate grazing and GUSG conflicts across a broader landscape through one of the following measures:<br>• Reissue a permit on the allotment that is consistent with meeting RCP habitat guidelines<br>• Convert the allotment to a reserve allotment that will remain available for occasional use by permittees on other allotments in the Occupied Habitat on a temporary, non-renewable basis to benefit GUSG Habitat;<br>• Close the allotment; or<br>• Merge with an existing allotment and retire the AUMs. | When a permittee or lessee voluntarily relinquishes grazing preference on an allotment in Occupied Habitat in a satellite population area, look for opportunities to alleviate grazing and GUSG conflicts across a broader landscape through one of the following measures:<br>• Reissue a permit on the allotment that is consistent with meeting RCP habitat guidelines<br>• Convert the allotment to a reserve allotment that will remain available for occasional use by permittees on other allotments in the Occupied Habitat on a temporary, non-renewable basis to benefit GUSG Habitat;<br>• Close the allotment; or<br>• Merge with an existing allotment and retire the AUMs. |
| 41 | Range | No similar action. | When a permittee or lessee | When a permittee or lessee | Same as Sub-Alternative $D_1$. |

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D$_1$ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D$_2$ |
|---|---|---|---|---|---|
| | Management | | voluntarily relinquishes grazing preference on an allotment in Unoccupied Habitat, reduce overall grazing pressure through one of the following measures:<br>• Retire the AUMs and merge with an existing allotment in Occupied or Unoccupied Habitat; or<br>• Exchange with an existing allotment in Occupied Habitat., or<br>• Close the allotment. | voluntarily relinquishes grazing preference on an allotment in Unoccupied Habitat, look for opportunities to alleviate grazing pressure and GUSG conflicts across a broader landscape through one of the following measures:<br>• Reissue a permit on the allotment that is consistent with meeting RCP habitat guidelines<br>• Convert the allotment to a reserve allotment that will remain available for occasional use by permittees on other allotments in the Occupied Habitat on a temporary, non-renewable basis to benefit GUSG Habitat;<br>• Close the allotment;<br>• Merge with an existing allotment and retire the AUMs. | |
| 42 | Range Management | No similar action. | Develop drought contingency plans at the appropriate landscape unit level that provide for a consistent and appropriate grazing | Same as Alternative C. | Same as Alternative C. |

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | | management response. Plans should establish policy for addressing ongoing drought and post-drought recovery for GUSG Habitat objectives. | | |

**Range Improvements**

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| 43 | Range Management | Prohibit new structural range improvements in all GUSG Habitat. | Require that new structural range improvements in all GUSG Habitat conserve, enhance, or restore the habitat. | For new large-scale structural range improvements in all GUSG Habitat, same as Alternative C.<br><br>Allow for additional small-scale infrastructure, such as gates, cattle guards, exclosures, and water developments as outlined in CCA Section 4.4.4.<br><br>Apply standard minimization measures (CCA Section 4.2). | Same as Alternative C. |
| 44 | Range Management | Remove structural range improvements from Occupied Habitat. | In Occupied Habitat, evaluate existing structural range improvements and access to improvements to determine whether modifications are necessary to maintain GUSG populations or reverse a downward population trend caused by habitat loss.<br><br>Modify, relocate, or remove | Require that access to and maintenance or removal of structural range improvements follow the standards outlined in General Management Section 4.2 of the CCA. | Same as Alternative C. |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | | projects and access for these as necessary. Utilize BMPs for GUSG when accessing, removing, reconstructing, or performing maintenance on structural range improvements. | | |
| 45 | Range Management | Remove structural range improvements from Unoccupied Habitat. | In Unoccupied Habitat, evaluate existing structural range improvements and access for these to determine if modifications are necessary to improve habitat for or remove barriers to GUSG occupation. Modify, relocate, or remove projects and access for these as necessary. Utilize BMPs for GUSG when accessing, removing, reconstructing, or performing maintenance on structural range improvements. | In Unoccupied Habitat, require that access to and maintenance, removal, or new construction of structural range improvements follow the standards outlined in General Management Section 4.2 of the CCA. | Same as Alternative C. |
| 46 | Range Management | Prohibit new water developments for diversion from spring or seep sources in Occupied Habitat. | In Occupied Habitat, allow for new water developments for diverting spring or seep sources only when GUSG Habitat would benefit from the development. | Same as Alternative C. | Same as Alternative C. |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | | Require that new spring developments be designed to minimize changes to in-channel water flow. | | |
| 47 | Range Management | In Unoccupied Habitat, prohibit new developments for diverting water from spring or seep sources. | In Unoccupied Habitat, allow for the development of new water diversions from spring or seep sources that would not have an adverse impact on GUSG or GUSG Habitat. Design new spring developments to minimize changes to in-channel water flow. | Same as Alternative C. | Same as Alternative C. |
| 48 | Range Management | In all GUSG Habitat, remove water developments damaging to riparian and wetland areas and restore natural flow patterns to seeps and springs. | In all GUSG Habitat, analyze seeps, springs, riparian areas, and associated water developments to determine if modifications are necessary to improve GUSG habitat and modify projects as necessary to restore applicable habitat. | In all GUSG Habitat in the Gunnison Basin, allow for access to maintain water developments. Require standard minimization measures (consistent with CCA Section 4.2) as terms and conditions of the permit, including: • Timing restrictions for access and construction consistent with spring seasonal closures for the general public (with an exception for emergency | Same as Alternative C. |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | | | maintenance); and<br>• Integrated weed prevention practices are used for all construction and maintenance activity. (See CCA Appendix A.) | |
| 49 | Range Management | In Occupied Habitat:<br>• Prohibit the construction of new fences.<br>• Remove existing fences within 0.6 mile of active leks.<br>• Remove existing fences beyond 0.6 mile of a lek if risk of collision exists.<br>• Mark remaining fences. | In Occupied Habitat, require that new fences are:<br>• Located in areas demonstrated to have low collision risk<br>• Marked for visibility<br>• Constructed to general wildlife standards.<br><br>Evaluate existing fences for collision risk and prioritize fences in high and moderate risk areas for marking, relocation, or removal. | In Occupied Habitat, allow for the construction of new fences when necessary to improve habitat conditions for GUSG and built to general wildlife standards recommended by CPW.<br><br>Require standard minimization measures consistent with CCA Section 4.2. | Same as Alternative C. |
| 50 | Range Management | In GUSG Habitat, remove existing water developments identified as contributing to the spread of West Nile Virus.<br><br>Prohibit new water developments with the potential to contribute to the spread of West Nile Virus. | When developing, modifying, or maintaining water developments in GUSG Habitat, follow BMPs and current science for minimizing potential impacts from West Nile Virus. | When developing, modifying, or maintaining water developments in GUSG Habitat, adhere to CCA Section 5.3.2. | Same as Alternative C. |
| 51 | Range | When developing, modifying, | No similar action. | No similar action. | No similar action. |

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | Management | or maintaining water developments in Non-Habitat Areas, follow BMPs and current science for minimizing potential impacts from West Nile virus. | | | |

## FLUID MINERALS

**GOAL: Manage fluid minerals to avoid, minimize, and compensate: 1) direct disturbance, displacement or mortality of GUSG, 2) direct loss of habitat, and 3) cumulative landscape-level impacts.**

OBJECTIVE: Energy and mineral development activities identified as disruptive to GUSG life cycles or limiting GUSG populations have been decreased.

OBJECTIVE: Impacts from fragmentation from energy and mineral development have been reduced.

OBJECTIVE: Where fluid mineral development projects on an existing lease could adversely affect GUSG populations or habitat, the BLM will work with the lessees, operators, or other project proponents to avoid, reduce, or mitigate adverse impacts to the extent compatible with valid existing rights.

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| 52 | | Existing withdrawals, including those for NMs and NCAs, would remain in effect. | Same as Alternative B. | Same as Alternative B. | Same as Alternative B. |

**Unleased Fluid Minerals**

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| 53 | Fluid Minerals | Close Occupied Habitat to fluid mineral leasing. Prohibit the issuance of new leases upon expiration or termination of existing leases. | Apply NSO stipulation to Occupied Habitat. | Same as Alternative C. | Same as Alternative C. In addition, maintain Occupied Habitat in the Piñon Mesa population area as closed to fluid mineral |

CHAPTER 2 - ALTERNATIVES

| ROW | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | | | | leasing. |
| 54 | Fluid Minerals | Close Unoccupied Habitat to fluid mineral leasing. Prohibit the issuance of new leases upon expiration or termination of existing leases. | Apply CSU to protect sagebrush and riparian habitat quality and connectivity in Unoccupied Habitat. | Same as Alternative C. | Same as Alternative C. |
| 55 | Fluid Minerals | No similar action. | Allow for Exceptions, Waivers, and Modifications. | Allow for Exceptions, Waivers, and Modifications with concurrence from the BLM State Director. | Same as Alternative D₁. |
| 56 | Fluid Minerals | No similar action. | If an Exception, Waiver, or Modification is granted on a lease stipulation, then apply appropriate ground disturbance and mitigation standards and timing limitations. | Same as Alternative C. | Same as Alternative C. |
| 57 | Fluid Minerals | Prohibit geophysical exploration within Occupied Habitat. | Allow for geophysical exploration within Occupied Habitat. Require the use of low impact methods (helicopter-portable drilling, wheeled or tracked vehicles on existing roads, or other approved methods) and adherence to applicable timing limitation, ground disturbance, noise, and mitigation standards. | Same as Alternative C. | Same as Alternative C. |

CHAPTER 2 - ALTERNATIVES

| ROW | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| 58 | Fluid Minerals | Prohibit geophysical exploration within Unoccupied Habitat. | Allow for geophysical exploration within Unoccupied Habitat:<br>• Require low impact methods (helicopter-portable drilling, wheeled or tracked vehicles on existing roads, or other approved methods).<br>• Apply applicable timing limitation, ground disturbance, and mitigation standards.<br>• Apply CSU to protect sagebrush and riparian habitat quality and connectivity. | Same as Alternative C. | Same as Alternative C. |
| 59 | Fluid Minerals | When geophysical exploration activities in Non-Habitat Areas have the potential to be disruptive to GUSG, apply management prescriptions similar to those identified for Unoccupied Habitat. | No similar action. | No similar action. | No similar action. |
| 60 | Fluid Minerals | No similar action. | Require a Master Development Plan in lieu of Applications for Permit to Drill (APD)-by-APD processing for all but wildcat wells. | Same as Alternative C. | Same as Alternative C. |

CHAPTER 2 - ALTERNATIVES

| ROW | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D$_1$ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D$_2$ |
|---|---|---|---|---|---|
| 61 | Fluid Minerals | In Non-Habitat Areas, require a Master Development Plan in lieu of APD-by-APD processing for all but wildcat wells where activities have the potential to be disruptive to GUSG. | No similar action. | No similar action. | No similar action. |
| 62 | Fluid Minerals | Require the same COAs, stipulations, and conservation measures for developing fluid minerals on split estate lands (where the Federal Government owns the mineral estate and surface ownership is non-federal) that are applicable to the development of federal mineral estate under BLM-administered surface lands within that management area, to the maximum extent permissible under existing authorities and in coordination with the landowner. | Same as Alternative B. | Same as Alternative B. | Same as Alternative B. |
| 63 | Fluid Minerals | Prohibit the siting of pipeline compressors in GUSG Habitat. | Same as Alternative B. | Same as Alternative B. | Same as Alternative B. |
| 64 | Fluid Minerals | In Non-Habitat Areas, prohibit the siting of pipeline | No similar action. | No similar action. | No similar action. |

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | compressors when there is a potential for activity disruptive to GUSG. | | | |
| **Leased Fluid Minerals** | | | | | |
| 65 | Fluid Minerals | Upon expiration or termination of existing leases, prohibit issuance of new leases in GUSG Habitat. | Upon expiration or termination of existing leases, consider issuance of new leases in GUSG Habitat. | Same as Alternative C. | Same as Alternative C. |
| 66 | Fluid Minerals | Prohibit geophysical exploration within Occupied Habitat. | Allow for geophysical exploration within Occupied Habitat and require:<br>• The use of low impact methods (including helicopter-portable drilling, wheeled or tracked vehicles on existing roads, and other approved methods)<br>• Adherence to applicable timing limitations and ground disturbance and mitigation standards. | Same as Alternative C. | Same as Alternative C. |
| 67 | Fluid Minerals | Prohibit geophysical exploration within Unoccupied Habitat. | Allow for geophysical exploration within Unoccupied Habitat and require:<br>• The use of low impact methods (including helicopter-portable drilling, | Same as Alternative C. | Same as Alternative C. |

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | | wheeled or tracked vehicles on existing roads, and other approved methods) • Adherence to applicable timing limitations and ground disturbance and mitigation standards. | | |
| 68 | Fluid Minerals | Allow for the use of conservation measures not identified in this document following analysis in a site-specific NEPA document consistent with language in Interior Board of Land Appeals Yates Petroleum Corp., 176 IBLA 144 (2008) and William P. Maycock, 177 IBLA 1 (2009) cases. | Same as Alternative B. | Same as Alternative B. | Same as Alternative B. |
| 69 | Fluid Minerals | Require a Master Development Plan in lieu of APD-by-APD processing for all but wildcat wells on existing leases. | Same as Alternative B. | Same as Alternative B. | Same as Alternative B. |
| 70 | Fluid Minerals | In Non-Habitat Areas, require a Master Development Plan in lieu of APD-by-APD processing for all but wildcat wells on existing leases where | No similar action. | No similar action. | No similar action. |

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | activities have the potential to be disruptive to GUSG. | | | |
| 71 | Fluid Minerals | Require the same COAs, stipulations, and conservation measures for developing fluid minerals on split estate lands (where the Federal Government owns the mineral estate and surface ownership is non-federal) that are applicable to the development of federal mineral estate under BLM-administered surface lands within that management area, to the maximum extent permissible under existing authorities and in coordination with the landowner. | Same as Alternative B. | Same as Alternative B. | Same as Alternative B. |
| 72 | Fluid Minerals | For authorization of development actions for individual APDs or Master Development Plan proposals, coordinate with the FWS (consistent with requirements under ESA), CPW (consistent with the Colorado Oil & Gas Conservation Commission MOU), UDWR, local | Same as Alternative B. | Same as Alternative B. | Same as Alternative B. |

| ROW | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | governments as appropriate, and industry experts regarding management actions designed to minimize impacts to GUSG and their habitat, including COAs applicable to future APDs (as described in WO IM 2014-100). | | | |
| 73 | Fluid Minerals | Apply appropriate timing limitations and ground disturbance and mitigation standards. | Same as Alternative B. | Same as Alternative B. | Same as Alternative B. |

### SOLID MINERALS

**GOAL: Manage the Solid Minerals Program to avoid, minimize, and compensate adverse impacts to GUSG Habitat to the extent practical under the law and BLM jurisdiction.**

OBJECTIVE: Mineral development activities identified as disruptive to GUSG life cycles or limiting GUSG populations are decreased.

OBJECTIVE: Impacts from fragmentation from mineral development are reduced.

OBJECTIVE: Where development projects with valid existing rights could adversely affect GUSG populations or habitat, the BLM works with the lessees, operators, or other project proponents to avoid, reduce, and mitigate adverse impacts to the extent compatible.

| ROW | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| 74 | Solid Minerals | Existing withdrawals, including those for NMs and NCAs, would remain in effect. | Same as Alternative B. | Same as Alternative B. | Same as Alternative B. |

**Locatable Minerals**

| ROW | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| 75 | Locatable | Recommend lands in | Consider petitioning for | Same as Alternative C. | Same as Alternative C. |

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | Minerals | Occupied Habitat for withdrawal from mineral location and entry. | withdrawal from mineral location and entry lands in Occupied Habitat based on risk to GUSG and GUSG Habitat from locatable mineral potential and development.<br><br>Recommend lands for withdrawal from mineral location and entry where it is the only method available to minimize or mitigate adverse impacts to GUSG Habitat. | | |
| 76 | Locatable Minerals | Recommend lands in Unoccupied Habitat for withdrawal from mineral location and entry. | Consider petitioning for withdrawal from mineral location and entry lands in Unoccupied Habitat based on risk to GUSG and GUSG Habitat from locatable mineral potential and development.<br><br>Recommend lands for withdrawal from mineral location and entry where it is the only method available to minimize or mitigate adverse impacts to GUSG Habitat. | No Action. | No Action. |
| 77 | Locatable Minerals | Initiate validity exams in areas withdrawn or segregated from mineral location and | Same as Alternative B. | Same as Alternative B. | Same as Alternative B. |

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | entry when appropriate under 43 CFR 3809.100 and BLM Surface Management Handbook H-3809-1. | | | |
| 78 | Locatable Minerals | On lands segregated pending review of a withdrawal petition, and until such time as the recommended withdrawal is approved, or in the absence of such segregation or approval:<br>• In plans of operations required prior to any proposed surface-disturbing activity, include where appropriate effective mitigation for conservation in accordance with existing policy (BLM Washington Office Instruction Memorandum 2008-204, or as updated) per regulations at 43 CFR 3809.<br>• Apply seasonal restrictions if deemed necessary to prevent unnecessary or undue degradation.<br>• Require mitigation in accordance with the Mitigation Plan (in | On lands segregated pending review of a withdrawal petition, and until such time as the recommended withdrawal is approved, or in the absence of such segregation or approval:<br>• In plans of operations required prior to any proposed surface-disturbing activity, include where appropriate effective mitigation in accordance with existing policy (BLM Washington Office Instruction Memorandum 2008-204, or as updated) per regulations at 43 CFR 3809.<br>• Apply seasonal restrictions if deemed necessary to prevent unnecessary or undue degradation.<br>• Require mitigation in accordance with the Mitigation Plan (in | Same as Alternative C. | Same as Alternative C. |

| ROW | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D$_1$ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D$_2$ |
|---|---|---|---|---|---|
| | | Appendix J). | Appendix J). | | |
| 79 | Locatable Minerals | Apply appropriate timing limitations and ground disturbance and mitigation standards. | Same as Alternative B. | Same as Alternative B. | Same as Alternative B. |
| **Salable Minerals** | | | | | |
| 80 | Salable Minerals | Close Occupied Habitat to mineral material sales. | Allow for mineral material sales in Occupied Habitat subject to provisions set forth in the mitigation framework. | Same as Alternative C. | Same as Alternative C. |
| 81 | Salable Minerals | Close sagebrush and riparian Unoccupied Habitat to mineral material sales. | Allow for mineral material sales in Unoccupied Habitat subject to provisions set forth in the mitigation framework. | Same as Alternative C. | Same as Alternative C. |
| 82 | Salable Minerals | Apply appropriate timing limitation, ground disturbance, and mitigation standards. | Same as Alternative B. | Same as Alternative B. | Same as Alternative B. |
| 83 | Salable Minerals | Restore salable mineral pits no longer in use to meet GUSG Habitat conservation objectives.<br><br>Require the reclamation or restoration of GUSG Habitat as a viable long-term goal for | Same as Alternative B. | Same as Alternative B. | Same as Alternative B. |

| ROW | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | improving habitat conditions. | | | |
| **Non-Energy Leasable Minerals** | | | | | |
| 84 | Non-Energy Leasable Minerals | In Occupied Habitat, grant no new solid mineral leases (including for expansion of an existing mine), prospecting permits, or exploration licenses.<br><br>Upon expiration or termination of existing leases, close Occupied Habitat to new leases. | Apply NSO to Occupied Habitat, including for new leases to expand an existing mine. | Same as Alternative C. | Same as Alternative C. |
| 85 | Non-Energy Leasable Minerals | In Unoccupied Habitat, grant no new solid mineral leases, prospecting permits, or exploration licenses.<br><br>Upon expiration or termination of existing leases, do not accept nominations or expressions of interest for parcels within Unoccupied Habitat. | In Unoccupied Habitat, apply CSU to protect sagebrush and riparian habitat quality and connectivity.<br><br>Require mitigation in accordance with the Mitigation Plan (in Appendix J). | Same as Alternative C. | Same as Alternative C. |
| 86 | Non-Energy Leasable Minerals | No similar action. | Apply appropriate timing limitations and ground disturbance and mitigation standards. | Same as Alternative C. | Same as Alternative C. |
| 87 | Non-Energy Leasable | Where applicable in Non-Habitat Areas, apply the same | No similar action. | No similar action. | No similar action. |

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | Minerals | stipulations to the leasing of non-energy leasable minerals as for fluid minerals when an activity disruptive to GUSG is identified. | | | |
| **Split Estate** | | | | | |
| 88 | Split Estate | No Similar Action. | For APDs on split estate (where the Federal Government owns the mineral estate and surface ownership is non-federal), require the same COAs, stipulations, and conservation measures applicable to the development of federal mineral estate under BLM-administered surface lands within that management area, to the maximum extent permissible under existing authorities and in coordination with the landowner. | Same as Alternative C. | Same as Alternative C. |

## WILDLAND FIRE, FUELS MANAGEMENT, AND FIRE REHABILITATION

**GOAL:** Manage the wildland fire, fuels, and fire rehabilitation program to avoid GUSG Habitat loss, enhance contiguous sagebrush habitat, restore damaged habitats, and address post-wildfire threats to GUSG Habitat.

| ROW | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| OBJECTIVE: Reduce loss of habitat to wildfire. | | | | | |
| OBJECTIVE: Rehabilitate damaged lands to prevent weed infestation. | | | | | |
| OBJECTIVE: Implement fire as a management tool to increase suitable habitat and create corridors. | | | | | |
| **Fuels Management** | | | | | |
| 89 | Fire, Fuels, Rehabilitation | Prohibit non-fire fuels treatments in GUSG Habitat. Treat fuels in Non-Habitat Areas adjacent to Occupied Habitat to reduce the risk of wildfire spreading into Occupied Habitat. | Allow for non-fire fuels treatments in GUSG Habitat. Design and implement treatments in accordance with RCP guidelines to: • Reduce the risk of wildfires spreading to and within Occupied Habitat; and • Minimize degradation of existing sagebrush or riparian habitat. | Same as Alternative C. | Same as Alternative C. |
| 90 | Fire, Fuels, Rehabilitation | Prohibit prescribed fire in GUSG Habitat. | Allow for prescribed fire in GUSG Habitat when: • The prescription, including any necessary post-fire revegetation, is designed to restore sagebrush habitat; • The potential for GUSG Habitat loss or degradation is minimized. | Same as Alternative C. | Prohibit prescribed fire in Occupied Habitat, except for the burning of slash piles. Same as Alternative C for Unoccupied Habitat. |
| **Wildfire** | | | | | |
| 91 | Fire, Fuels, Rehabilitation | In Occupied Habitat, prioritize fire suppression to | In Occupied Habitat, manage wildfires to promote | Same as Alternative B. | Same as Alternative B. |

CHAPTER 2 - ALTERNATIVES

| ROW | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | prevent damage to or loss of GUSG Habitat immediately after protection of life and property, recognizing that protection of human life is the single, overriding priority. | conversion of other non-forested habitat types to sagebrush where the potential exists, while conserving existing sagebrush and riparian habitat as much as possible, immediately after protection of life and property, recognizing that protection of human life is the overriding priority. | | |
| 92 | Fire, Fuels, Rehabilitation | In Unoccupied Habitat, prioritize fire suppression to prevent damage to or loss of GUSG Habitat immediately after protection of life and property, recognizing that protection of human life is the overriding priority. | In Unoccupied Habitat, manage wildfires to help meet the connectivity needs of GUSG through conversion of other non-forested habitat types to sagebrush where the potential exists, while also minimizing damage to existing sagebrush and riparian areas, recognizing that protection of human life is the overriding priority. | Same as Alternative C. | Same as Alternative C. |
| **Emergency Stabilization and Rehabilitation** | | | | | |
| 93 | Fire, Fuels, Rehabilitation | In GUSG Habitat, limit Emergency Stabilization and Rehabilitation activities to the restoration of GUSG Habitat. | In GUSG  Habitat, replace sagebrush, grasses, forbs, and riparian components as quickly as possible where such techniques are demonstrated to be effective. | Same as Alternative C. | Same as Alternative C. |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE $D_1$ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE $D_2$ |
|---|---|---|---|---|---|
| | | | Implement the following post-wildfire activities:<br>• Wildfire management activity damage repair (suppression repair)<br>• Emergency Stabilization<br>• Burned Area Rehabilitation. | | |
| 94 | Fire, Fuels, Rehabilitation | Monitor and control invasive vegetation following fire, stabilization and rehabilitation. | Same as Alternative B. | Same as Alternative B. | Same as Alternative B. |
| 95 | Fire, Fuels, Rehabilitation | No similar action. | Rest burned or treated areas from grazing for two full growing seasons unless vegetation recovery dictates otherwise. | Same as Alternative C. | Same as Alternative C. |
| 96 | Fire, Fuels, Rehabilitation | Require the use of native plant seeds for vegetation treatments based on availability, adaptation (site potential), probability for success, and vegetation management objectives for the area covered by the treatment.  Where probability of success or native seed availability is low, use species that meet soil | Same as Alternative B. | Same as Alternative B. | Same as Alternative B. |

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | stability and hydrologic function objectives as well as vegetation and GUSG habitat objectives. | | | |

## SPECIAL STATUS SPECIES

**GOAL: GUSG Habitat exhibits the desired mix of vegetative types, structural states, and landscape and riparian functions.**

OBJECTIVE: Landscapes are created and maintained to benefit GUSG.

OBJECTIVE: Vegetation management is conducted in accordance with RCP guidelines.

OBJECTIVE: Vegetation management, including Integrated Vegetation Management (BLM Handbook H-1740-2), is used as a tool to restore, improve, create, and/or maintain landscapes that benefit GUSG.

OBJECTIVE: The BLM *Sage-grouse Habitat Assessment Framework* (HAF), *Assessment, Inventory, and Monitoring Strategy* (AIM) or Gunnison Basin CCA is used to evaluate GUSG Habitat per RCP habitat guidelines (appendix H). Adjustments to RCP habitat guidelines or known suitability are accomplished through plan maintenance based on best available science.

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| 97 | Special Status Species– GUSG Lek/Breeding Habitat | Timing Limitation: From March 1 through May 15, prohibit activities disruptive to GUSG in Lek/Breeding Habitat. | Timing Limitation: From March 15 through May 15, avoid activities disruptive to GUSG in Lek/Breeding Habitat. | Same as Alternative C. | Same as Alternative C. |
| 98 | Special Status Species– GUSG Nesting/Early Brood-Rearing Habitat | Timing Limitation: From March 15 through July 15, prohibit activities disruptive to GUSG in Nesting/Early Brood-Rearing Habitat. | Timing Limitation: From April 15 through June 30, avoid activities disruptive to GUSG in Nesting/Early Brood-Rearing Habitat. | Same as Alternative C. | Same as Alternative C. |
| 99 | Special Status Species– GUSG Winter | Timing Limitation: From October 1 through February 28, prohibit | Timing Limitation: In Winter Habitat, avoid activities disruptive to GUSG | Same as Alternative C. | Same as Alternative C. |

CHAPTER 2 - ALTERNATIVES

| ROW | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | Habitat | activities disruptive to GUSG in Winter Habitat. | from December 1 through March 14. | | |
| 100 | Special Status Species– GUSG Occupied and Unoccupied Habitat | Prohibit surface disturbance within 4.0 miles of a lek. | Prohibit surface disturbance within 1.0 mile of a lek. Avoid occupancy: • Restrict energy development to a maximum of one well pad within 1.2 miles of a lek. • Construct tall structures at least 1.4 miles from leks. | Prohibit surface disturbance within 0.6 mile of a lek. Avoid occupancy: • Restrict energy development to a maximum of one well pad within 1.2 miles of a lek. • Construct tall structures at least 1.4 miles from leks. • Site linear features at least 1.0 mile from leks. | Same as Sub-Alternative D₁. |
| 101 | Special Status Species | During the breeding season, prohibit activities that would produce noise levels 10 dBA above the ambient noise level measured at the perimeter of a lek at sunrise. | During the breeding season, prohibit new noise sources with the potential to negatively impact GUSG leks. | Same as Alternative C. | Same as Alternative C. |
| 102 | Special Status Species | Do not allow Exceptions, Waivers, or Modifications. | Allow for Exceptions, Waivers, and Modifications. | Allow for Exceptions, Waivers, and Modifications with concurrence from the BLM State Director. | Same as Alternative D₁. |
| 103 | Special Status Species | Require compliance with the mitigation hierarchy of first avoiding impacts to the degree possible, second minimizing impacts, and third providing compensatory | Same as Alternative B. | Same as Alternative B. | Same as Alternative B. |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | mitigation to offset residual impacts. Require mitigation in accordance with the Mitigation Plan (in Appendix J). In compensatory mitigation sites, require site-specific relocation of any activity not compatible with GUSG mitigation goals. | | | |
| 104 | Special Status Species | In Occupied Habitat, do not treat pinyon-juniper encroachment onto sagebrush ecological sites. | In Occupied Habitat, treat pinyon-juniper encroachment onto sagebrush ecological sites through the use of hand cutting, mechanical mulching/removal, or chemical treatments. Prioritize treatment of areas in the early stages of tree encroachment over sites with later stages of encroachment. | Same as Alternative C. | Same as Alternative C. |
| 105 | Special Status Species | In Unoccupied Habitat, do not treat pinyon-juniper encroachment onto sagebrush ecological sites. | In Unoccupied Habitat, treat pinyon-juniper encroachment onto sagebrush ecological sites through the use of hand cutting, mechanical or chemical treatments, prescribed fire, and managed | Same as Alternative C. | Same as Alternative C. |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | | wildfires to meet resource objectives. Prioritize treatment of areas in the early stages of tree encroachment over sites with later stages of encroachment, where appropriate. | | |
| 106 | Special Status Species | In GUSG Habitat, prohibit active habitat treatment of seeps, springs, and riparian zones in order to prevent potential negative impacts. | In GUSG Habitat, implement active treatments and techniques to restore seeps and springs, increase riparian zones, and raise the water table in order to reestablish native riparian grasses and shrubs for brood-rearing. | Same as Alternative C. | Same as Alternative C. |
| 107 | Special Status Species | In GUSG Habitat, prohibit habitat treatments in sagebrush stands in order to prevent potential negative impacts. | In GUSG Habitat, treat sagebrush stands not meeting objectives for GUSG seasonal habitat: <br> • Treat only those sites with the ecological potential to meet RCP habitat guidelines; <br> • Follow RCP treatment standards; <br> • Utilize treatment approaches (including mechanical, chemical, grazing, or prescribed fire where authorized) most | Same as Alternative C. | Same as Alternative C. |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | | likely to trigger new sagebrush growth and improve sagebrush quality and age diversity, as well as the understory. | | |
| 108 | | No similar action. | Require the use of native plant seeds for vegetation treatments based on availability, adaptation (site potential), probability for success (Richards et al 1998), and vegetation management objectives for the area covered by the treatment. Where probability of success or native seed availability is low, use species that meet soil stability and hydrologic function objectives as well as vegetation and GRSG habitat objectives (Pyke 2011). | Same as Alternative C. | Same as Alternative C. |
| 109 | Special Status Species | No similar action. | In Occupied Habitat, make the reestablishment of sagebrush and desirable understory plant cover (relative to site potential) the highest priority for upland restoration efforts, but consider GUSG habitat requirements in conjunction with all resource values. | In Occupied Habitat, make the reestablishment of sagebrush and desirable understory plant cover (relative to site potential) the highest priority for upland restoration efforts. | Same as Alternative D₁. |

CHAPTER 2 - ALTERNATIVES

| ROW | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| 110 | Special Status Species | No similar action. | In Unoccupied Habitat, make the reestablishment of sagebrush and desirable understory plant cover (relative to site potential) the highest priority for upland restoration efforts, but consider GUSG habitat requirements in conjunction with all resource values. | In Unoccupied Habitat, make the reestablishment of sagebrush and desirable understory plant cover (relative to site potential) the highest priority for upland restoration efforts. | Same as Alternative D₁. |
| 111 | Special Status Species | Actively treat all invasive weeds that threaten sagebrush and riparian habitat quality in GUSG Habitat through the use of integrated weed management practices with minimal ground disturbance. | Actively treat state-listed noxious weeds that threaten sagebrush and riparian habitat quality in GUSG Habitat through the use of integrated weed management practices with minimal ground disturbance. | Same as Alternative B. | Same as Alternative B. |
| 112 | Special Status Species | Prioritize weed treatments in Occupied Habitat before Unoccupied Habitat. | Same as Alternative B. | Same as Alternative B. | Same as Alternative B. |
| 113 | Special Status Species | Require weed management BMPs for all projects and management activities in all GUSG Habitat. | Same as Alternative B. | Same as Alternative B. | Same as Alternative B. |
| 114 | Special Status Species | In Occupied Habitat, prohibit the commercial or public collection or harvest of vegetative materials in sagebrush or riparian/wetland | In Occupied Habitat, allow for the commercial and public collection and harvesting of vegetative materials. | Same as Alternative C. | Same as Alternative C. |

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D$_1$ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D$_2$ |
|---|---|---|---|---|---|
| | | habitat. | | | |
| 115 | Special Status Species | In Unoccupied Habitat, prohibit commercial or public collection or harvest of vegetative materials in sagebrush or riparian/wetland habitat. | In Unoccupied Habitat, prohibit commercial or public collection or harvest of vegetative materials in sagebrush or riparian/wetland habitat. | Same as Alternative C. | Same as Alternative C. |

## WILDLIFE

**GOAL:  Threats and disturbances to GUSG are reduced.**

OBJECTIVE:  Areas where wild ungulate use is limiting the ability of a site to meet GUSG Habitat guidelines are identified and corrective prescriptions are implemented in coordination with state wildlife agencies.

OBJECTIVE:  In coordination with state wildlife agencies, management prescriptions are identified, strategies and actions are developed, and an interagency MOU is signed to address wild ungulate conflicts in Occupied Habitat.

| | | | | | |
|---|---|---|---|---|---|
| 116 | Wildlife | In Occupied Habitat, support the control of predators. Consider options for predator control with APHIS during annual MOU reviews. Cooperate in predation research in collaboration with other partners. | Same as Alternative B. | Same as Alternative B. | Same as Alternative B. |
| 117 | Wildlife | Collaborate with state wildlife agencies to mitigate wild ungulate impacts to Occupied Habitat.  Where Occupied Habitat overlaps with mapped elk winter range | Same as Alternative B. | Same as Alternative B. | Same as Alternative B. |

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D₁ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | and when sagebrush or riparian zones within Occupied Habitat do not meet, at a minimum, RCP Habitat Guidelines (as determined by monitoring that follows from RCP and/or AIM based methodologies, or most recent direction by the BLM) and if the failure to meet RCP Habitat Guidelines is determined to be caused by elk, then the BLM will notify and work with the appropriate state wildlife agency to mitigate impacts. | | | |
| 118 | Wildlife | Participate in state of Colorado and Utah elk and mule deer management reevaluation of Data Analysis Unit (DAU) plans for managing specific populations of wild ungulates and in Utah statewide elk and deer management plans:<br>• In Colorado, DAU reevaluation will occur consistent with state and federal laws and regulations and established protocols, including | Same as Alternative B. | Same as Alternative B. | Same as Alternative B. |

CHAPTER 2 - ALTERNATIVES

| R O W | PROGRAM AREA | ALTERNATIVE B | ALTERNATIVE C | GUNNISON BASIN PREFERRED SUB-ALTERNATIVE D$_1$ | SATELLITE POPULATIONS PREFERRED SUB-ALTERNATIVE D$_2$ |
|---|---|---|---|---|---|
| | | Wildlife Commission review. <br> • In Utah, continue BLM participation in statewide elk and deer management planning, following existing protocols. | | | |
| 119 | Wildlife | Implement strategies and prescriptions to draw ungulates away from conflict and treatment areas to allow proper habitat recovery. | Same as Alternative B. | Same as Alternative B. | Same as Alternative B. |
| 120 | Wildlife | Implement strategies and prescriptions to enhance the capability of habitats to meet the needs of GUSG and wild ungulates. | Same as Alternative B. | Same as Alternative B. | Same as Alternative B. |

## AREAS OF CRITICAL ENVIRONMENTAL CONCERN

**GOAL: Potential ACECs for conserving, enhancing, and restoring GUSG Habitat are identified, evaluated, and considered for designation.**

OBJECTIVE: ACEC prescriptions include management practices that conserve, enhance, and restore GUSG Habitat.

| 121 | ACECs | Designate all BLM-administered surface lands within GUSG Habitat as an ACEC. | No similar action. <br><br> Existing ACECs shall remain in force. | Same as Alternative C. | Same as Alternative C. |

CHAPTER 2 - ALTERNATIVES

## TABLE 2.8 - SUMMARY COMPARISON OF ENVIRONMENTAL CONSEQUENCES

**Table 2.8 - Summary Comparison of Environmental Consequences**

| AFFECTED RESOURCE OR USE | No Action ALTERNATIVE A | ALTERNATIVE B | ALTERNATIVE C | Gunnison Basin Preferred SUB-ALTERNATIVE $D_1$ | Satellite Populations Preferred SUB-ALTERNATIVE $D_2$ |
|---|---|---|---|---|---|
| **SPECIAL STATUS SPECIES** | | | | | |
| **Surface Disturbance Activities in Occupied and Unoccupied Habitat** | Restrictions vary by RMP: Five RMPs restrict surface disturbance within 0.6 mile of a lek, while Grand Junction RMP has a 4.0-mile NSO. | Would prohibit surface disturbance within 4.0 miles of a lek, the most restrictive of the alternatives. | Would prohibit surface disturbance within 1.0 mile of a lek, more restrictive than Alternative A and sub-alternatives $D_1$ and $D_2$. | Would prohibit surface disturbance within 0.6 mile of a lek. | Impacts would be the same as under Alternative C. |
| **Comparison of Surface Area Protections** | Across the decision area, approximately 42,127 acres would continue to be covered by a prohibition on surface-disturbing activities. | Would provide the highest level of surface protection, with approximately 8 times more protected acreage than under Alternative A. | Would provide surface protection for nearly 2.4 times more acreage than Alternative A. | Impacts would be the same as under Alternative C, with the exception of a 0.6-mile lek buffer within which surface-disturbing activities would be prohibited. Protections would be about 1.8 times greater than under Alternative A. | Impacts would be the same as under Alternative C. |
| **FISH AND WILDLIFE** | | | | | |
| **Big Game and Common Raven** | Direct disturbance impacts from road traffic, recreation, | The most protective alternative for wildlife, with prohibitions on | The level of disturbance and activity would be less than under | Impacts to wildlife would be similar to those under Alternative | Impacts to wildlife would be similar to those under Alternative |

CHAPTER 2 - ALTERNATIVES

| AFFECTED RESOURCE OR USE | No Action ALTERNATIVE A | ALTERNATIVE B | ALTERNATIVE C | Gunnison Basin Preferred SUB-ALTERNATIVE D₁ | Satellite Populations Preferred SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | lands and reality, range management, and mineral development would be mitigated by a number of protections from the array of RMPs across the decision area. | surface disturbance and timing restrictions that would benefit elk and deer during critical seasons by reducing human disturbance. | Alternative A, but greater than under Alternative B. | C. | C. |
| **SOIL RESOURCES** | | | | | |
| **Soil Stability** | Soil disturbance from human development and activity occurs on about 1% of BLM lands in the region, but as RMP revisions are completed, restrictions would protect soil stability. Other impacts include those resulting from livestock grazing and wildfire. | Would provide the highest level of protection to soil stability of all the alternatives, with surface restrictions in Occupied and Unoccupied Habitat and Non-Habitat areas safeguarding soil from development and construction disturbances. | In Occupied and Unoccupied Habitat, a greater proportion of BLM surface lands would be under surface disturbance restrictions than Alternative A, but less than Alternative B. | Would provide higher level of protections to soil stability than under Alternative A, but less than alternatives B and C. | Within the satellite populations, would protect soil stability from surface disturbances across a similar area as Alternative C, but with a higher level of protection than C. |
| **TERRESTRIAL VEGETATION** | | | | | |
| **Vegetation Types** | The extent of unvegetated areas, sagebrush, and pinyon-juniper would increase slightly, while grass-forb and mountain | Impacts would be similar to those under Alternative A. | In Occupied and Unoccupied Habitat, increases in grass-forb and sagebrush and reductions in pinyon-juniper vegetation types | Vegetative impacts would be similar to those under alternatives A, B, and C, although small differences could occur | Impacts would be similar to those under Alternative C in satellite population areas and similar to those under the other |

CHAPTER 2 - ALTERNATIVES

| AFFECTED RESOURCE OR USE | No Action ALTERNATIVE A | ALTERNATIVE B | ALTERNATIVE C | Gunnison Basin Preferred SUB-ALTERNATIVE D₁ | Satellite Populations Preferred SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | shrub communities would decrease. | | would be greater than under alternatives A and B. Impacts to four-mile Non-Habitat Areas would be about the same as under alternatives A and B. | that would not be readily detectable. | alternatives overall. |
| **Vegetation Condition** | About 60% of Occupied and Unoccupied Habitat and 42% of the Non-Habitat Areas would be protected from surface disturbance. | The extent and rate of improvement in vegetative conditions would be higher than under Alternative A, with the elimination of livestock grazing in Occupied and Unoccupied Habitat. | Surface and vegetative disturbances would be less than under Alternative A, but more than Alternative B. Grazing management would be maintained, but monitored and managed to achieve long-term ecological standards. | Restrictions on surface disturbance in the Gunnison Basin population area would provide increased protection compared to Alternative A, but less than alternatives B and C. | Similar to Alternative C in the satellite population areas. |
| **RIPARIAN AREAS AND WETLANDS** | | | | | |
| **Riparian and Wetland Area Presence and Distribution** | Continuation of current management, which requires low utilization levels to maintain riparian and watershed cover and function in greater than 70% of BLM surface in Occupied and Unoccupied | Domestic grazing impacts in riparian areas in Occupied and Unoccupied Habitats would be eliminated. Habitat treatments and damaging water development projects would be prohibited. This is the most | Grazing impacts would be limited and essentially the same as under Alternative B. Adverse impacts from habitat treatments and water developments would be less than Alternative A, but greater than Alternative | Grazing impact levels would be similar to alternatives B and C, and less than Alternative A. Adverse impacts from habitat treatments and water developments would be similar to Alternative C. | Similar impact levels as Alternative C. |

CHAPTER 2 - ALTERNATIVES

| AFFECTED RESOURCE OR USE | No Action ALTERNATIVE A | ALTERNATIVE B | ALTERNATIVE C | Gunnison Basin Preferred SUB-ALTERNATIVE D₁ | Satellite Populations Preferred SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | Habitat. | protective alternative. | B. | | |
| **Stream and Riparian Condition** | Existing RMPs have been amended to include Public Land Health Standards and Guidelines for Livestock Grazing. Current conditions along riparian areas would continue in Occupied and Unoccupied Habitats, but may decline in other areas outside of these protections. | Would eliminate most surface disturbance along riparian areas in Occupied and Unoccupied Habitat. | Surface disturbance in Occupied and Unoccupied habitats would be less than that under Alternative A, but more than Alternative B. Reclamation on closed routes would be greater than Alternative A but less than Alternative B. | Surface disturbance impacts would be between that under alternatives A and B or C.  Impacts from grazing and habitat improvements in Occupied and Unoccupied habitats would be similar to Alternative C. | Similar impact levels as Alternative C. |
| **INVASIVE SPECIES** | | | | | |
| **Vegetation Treatments** | Vegetation treatments would be allowed on most BLM lands. | Weeds that threaten sagebrush and riparian habitats could be treated, but in general vegetation treatments on BLM lands in Occupied and Unoccupied habitats would not be allowed. | Higher levels of vegetation treatments than alternatives A and B. | Would provide the same level of protection as Alternative C. | Impacts would be similar to those under Alternative C. |
| **Risk of Weed Introduction and Spread** | Some protections occur in Occupied and Unoccupied Habitat and the 4-mile Non- | Greater extent of surface protection, thus the risk of weed introduction and spread | More surface protections than Alternative A, but less than Alternative B. | Similar risks as alternatives A and C. | Similar to Alternative C. |

| AFFECTED RESOURCE OR USE | No Action ALTERNATIVE A | ALTERNATIVE B | ALTERNATIVE C | Gunnison Basin Preferred SUB-ALTERNATIVE D₁ | Satellite Populations Preferred SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | Habitat Areas. These lands are at lower risk from disturbance and weed invasion. | would be decreased compared to Alternative A. | | | |
| **WILDLAND FIRE** | | | | | |
| **Amount Burned and Fire Frequency** | About 4% of Occupied and Unoccupied Habitat and 8% of four-mile Non-Habitat areas have burned in the past 30 years. There are some surface disturbance restrictions in GUSG habitat through current RMPs. | Fire frequency would decrease but acreage by wildfire could increase compared to Alternative A. | Would limit fire frequency in Occupied and Unoccupied Habitat, and the impacts would be less than Alternative A, but more than Alternative B. | Fire frequency would be reduced in comparison to Alternative A, but total acreage could increase. Would allow for greater levels of surface disturbance (including fire protection) than alternatives A, B, and C. | Impacts would be similar to those under Alternative C. |
| **Fuels Condition** | VCC 2 is the dominant fire class, with VCC 1 and 3 about equally distributed. These conditions would be continued under Alternative A. | Would employ aggressive fire suppression, and more acres would be in VCC2 and VCC3 classification than Alternative A. | Fuel treatments and prescribed fire would reduce VCC class compared to alternatives A and B. More acres would be VCC 1 and fewer in VCC 2 and 3 compared to alternatives A and B. | Would have similar management to Alternative C, but there would be fire suppression in Unoccupied Habitat. VCC would be reduced compared to Alternative A, but more than Alternative B. | Would be similar to Alternative C, although prescribed burning would be limited to slash piles in Occupied Habitat. VCC would be reduced less than Alternative A, but more than Alternative B. |
| **LIVESTOCK GRAZING** | | | | | |
| **Permitted** | Permitted forage | All GUSG habitat | Would allow for | Impacts would be | Impacts would be |

CHAPTER 2 - ALTERNATIVES

| AFFECTED RESOURCE OR USE | No Action ALTERNATIVE A | ALTERNATIVE B | ALTERNATIVE C | Gunnison Basin Preferred SUB-ALTERNATIVE D₁ | Satellite Populations Preferred SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| **Forage** | allocations are >36,000 AUMs but this could decrease over the long term. | would be closed to livestock grazing in Occupied and Unoccupied Habitat. | livestock grazing in Occupied and Unoccupied Habitat, although AUMs could be reduced where RCP guidelines are not met. | similar to those under Alternative C. | similar to those under Alternative C. |
| **Acres with Active Grazing Allocations** | Almost 580,000 acres are grazed within Occupied and Unoccupied Habitat, and 86,000 acres are within the 4 mile Non Habitat area. These acreages would decrease over time. | There would be no active grazing allotments in Occupied and Unoccupied Habitats. | The acreage of allotments used for grazing would be less than under Alternative A because some allotments may be voluntarily closed. | Impacts would be similar to those under Alternative C. | Would be the same as Alternative C. |
| **Land Health** | Livestock grazing would continue over 90% of BLM Occupied and Unoccupied Habitat. Conditions would improve on portions of Occupied and Unoccupied Habitat (up to 41%) and within the 4-mile Non-Habitat Areas (up to 26%). | Improvements to Land Health Ecological Fundamental Status would occur more rapidly than under Alternative A, although the Occupied and Unoccupied Habitat proportions would remain about the same. | Would constrain surface-disturbing activities in Occupied and Unoccupied Habitat, with more rapid improvements in Land Health than under Alternative A. | Would constrain surface disturbance more than Alternative A, but less than alternatives B and C. | Same as Alternative C. |
| **Constraints on Range** | The extent and scope of constraints on | Range improvements would not be allowed. | New developments would be required to | Constraints on range improvements | Impacts would be similar to Alternative C. |

CHAPTER 2 - ALTERNATIVES

| AFFECTED RESOURCE OR USE | No Action ALTERNATIVE A | ALTERNATIVE B | ALTERNATIVE C | Gunnison Basin Preferred SUB-ALTERNATIVE D₁ | Satellite Populations Preferred SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| Improvements | development of range infrastructure would increase over time. | | conserve, enhance, or restore Occupied Habitat and would not be allowed to degrade Unoccupied Habitat. | infrastructure would be less than Alternative C, but more than Alternative A in the Gunnison Basin population area. | |
| **RECREATION** | | | | | |
| **Targeted Beneficial Outcomes** | Would have the least impact to RMAs in the decision area. | Would be the most restrictive, with no new RMAs and a loss of new recreational services. | Would be less restrictive than Alternative B, if recreation is compatible with GUSG and GUSG Habitat. | Management would default to the interagency Candidate Conservation Agreement (CCA), which is designed to protect and enhance the recovery of GUSG. | Same as Alternative C. |
| **Unstructured Recreational Opportunities** | Would have the least impact to unstructured recreational opportunities. | Would be the most restrictive on unstructured recreational activities. | Would allow for some development if mitigations (such as seasonal road closures and spatial restrictions) were imposed. Would be less restrictive than Alternative B, but more than Alternative A. | Management in Occupied Habitat would default to the CCA, and small-scale infrastructure could be developed. | Restrictions in Unoccupied Habitat would be similar to alternatives B, C, and D₁. |
| **Special Recreation Permits** | Would have the least impact to recreation and visitor services related to SRPs. | Would avoid issuance of new SRPs and eliminate SRPs in GUSG Habitat. | Would only allow for issuance of new SRPs that minimize impacts to GUSG and GUSG | Would follow CCA guidelines in Occupied Habitat, otherwise management would be | Would allow for issuance of new SRPs on a case-by-case basis that minimize impacts |

CHAPTER 2 - ALTERNATIVES

| AFFECTED RESOURCE OR USE | No Action ALTERNATIVE A | ALTERNATIVE B | ALTERNATIVE C | Gunnison Basin Preferred SUB-ALTERNATIVE D$_1$ | Satellite Populations Preferred SUB-ALTERNATIVE D$_2$ |
|---|---|---|---|---|---|
| | | | Habitat. | similar to Alternative A. | to Occupied and Unoccupied Habitat. |
| **TRAVEL MANAGEMENT** | | | | | |
| **Allowable Uses** | Would allow for the greatest diversity of uses on existing or designated travel routes. | Would be the most restrictive for allowable uses. | Would be less restrictive than Alternative B, as long as designations are compatible with GUSG and GUSG Habitat. | Designations would comply with the Gunnison Basin Federal TMP and the interagency CCA. | If transportation uses in a field office TMP are compatible with GUSG conservation, then the No Action Alternative would apply; if not, then the TMP would be amended. |
| **Travel Management Designations** | 38,114 acres of Occupied and Unoccupied Habitat would continue to be closed to motorized travel. | Would be the most restrictive, including closing Occupied Habitat (totaling 597,006 acres) to motorized travel. | Same as Alternative A, closing 38,114 acres of Occupied and Unoccupied Habitat to motorized travel. | Same as Alternative A, closing 38,114 acres of Occupied and Unoccupied Habitat to motorized travel. | If transportation uses in a field office TMP are compatible with GUSG conservation, then the No Action Alternative would apply; if not, then measures would be the same as under Alternative A. |
| **New Route Development** | Would have the least impact to new route development. | Route densities would be reduced and there would be no new development in GUSG Habitat. | Would be less restrictive than Alternative B if travel routes are compatible with GUSG and GUSG Habitat. | Management actions in Occupied Habitat would comply with the Gunnison Basin Federal TMP and the interagency CCA. | Same as Alternative C. |

CHAPTER 2 - ALTERNATIVES

| AFFECTED RESOURCE OR USE | No Action ALTERNATIVE A | ALTERNATIVE B | ALTERNATIVE C | Gunnison Basin Preferred SUB-ALTERNATIVE D₁ | Satellite Populations Preferred SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| **LEASABLE FLUID MINERALS** | | | | | |
| **Areas Open or Closed for Leasing** | 96,600 acres would continue to be closed and 899,600 acres open to fluid mineral leasing. | The entire decision area would be closed to fluid mineral leasing. | Occupied Habitat would be open to leasing with NSO stipulation and Unoccupied Habitat would be subject to a CSU leasing, with 25,460 acres more open than under Alternative A. Existing withdrawals, including those for NMs and NCAs, would remain in effect. | Same as Alternative C, except that the Piñon Mesa population area in the Grand Junction FO would be closed. | Same as Alternative C, except that the Piñon Mesa population area in the Grand Junction FO would be closed. |
| **LEASABLE SOLID MINERALS** | | | | | |
| **Areas Open or Closed for Leasing** | 96,600 acres would continue to be closed and 899,600 acres open to solid mineral leasing. | The entire decision area would be closed to solid mineral leasing. | Occupied Habitat would be open to leasing with NSO stipulation and Unoccupied Habitat would be subject to a CSU leasing, with 25,460 acres more open than under Alternative A. Existing withdrawals, including those for NMs and NCAs, would | Same as Alternative C. | Same as Alternative C. |

| AFFECTED RESOURCE OR USE | No Action ALTERNATIVE A | ALTERNATIVE B | ALTERNATIVE C | Gunnison Basin Preferred SUB-ALTERNATIVE D₁ | Satellite Populations Preferred SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | | remain in effect. | | |
| **LOCATABLE MINERALS** | | | | | |
| **Areas Open or Closed for Leasing** | The Canyon of the Ancients NM, Gunnison Gorge NCA, Dominguez Escalante NCA, and McInnis Canyons NCA and wilderness areas, plus approximately 61,000 additional acres would be withdrawn. About 952,600 acres would remain open to staking. | The entire decision area would be recommended for withdrawal from mineral location and entry. | Withdrawals would be assessed based on risk of conflict between mineral development and GUSG and GUSG Habitat. Impacts to locatable minerals would be greater than under Alternative A, but less than Alternative B. Existing withdrawals, including those for NMs and NCAs, would remain in effect. | Same as Alternative C, except that no withdrawals would be recommended in Unoccupied Habitat. Impacts would be greater than under Alternative A, but less than alternatives B and C. | Same as Alternative C, except that no withdrawals would be recommended in Unoccupied Habitat. Impacts would be greater than under Alternative A, but less than alternatives B and C. |
| **SALABLE MINERALS** | | | | | |
| | The Canyon of the Ancients NM, Gunnison Gorge NCA, Dominguez Escalante NCA, and McInnis Canyons NCA and wilderness areas, plus approximately 106,700 additional acres would be withdrawn. | All Occupied Habitat and sagebrush and riparian habitat in Unoccupied Habitat would be closed to mineral sales. | Mineral material sales would be allowed throughout the area, subject to mitigation. Impacts would be greater than under Alternative A, but less than Alternative B. Existing withdrawals, including those for NMs and NCAs, would | Same as Alternative C. | Same as Alternative C. |

CHAPTER 2 - ALTERNATIVES

| AFFECTED RESOURCE OR USE | No Action ALTERNATIVE A | ALTERNATIVE B | ALTERNATIVE C | Gunnison Basin Preferred SUB-ALTERNATIVE D₁ | Satellite Populations Preferred SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | About 899,300 acres would remain open to staking. | | remain in effect. | | |
| **LANDS AND REALTY** | | | | | |
| **Rights-of-Way** | Approximately 305,306 acres would be ROW exclusion areas and 89,028 acres would be designated as ROW avoidance areas, with the remaining area open to ROWs that could include stipulations. | The entire area would be designated as a ROW exclusion area, with some exceptions. | The entire area would be designated as a ROW avoidance area, with guidelines for protection if a ROW could not be avoided. Impacts to ROWs would be more than under Alternative A, but less than Alternative B. | Would implement the CCA for actions in Occupied Habitat, same as D₂ in Unoccupied Habitat, and minerals development would be like Alternative C. Impacts would be similar to Alternative C, although costs might be higher due to mitigation. | Similar to Alternative C, but with a 0.6-mile ROW exclusion area around leks. |
| **SOCIOECONOMICS** | | | | | |
| **Grazing** | In the decision area, the grazing industry supports approximately 81 jobs, $1.26 million in labor, and $6.0 million in output. | Impacts could include the loss of 33 jobs, $493,000 in labor, and over $3 million in output. | Employment, labor income, and output would be midpoint between alternatives A and B. | Economic impacts to grazing would be similar to Alternative C. | Economic impacts to grazing would be similar to Alternative C. |
| **Recreation** | In the decision area, the recreation industry supports approximately 164 | Would limit recreational use, route construction, and SRPs. While overall economic | Would implement some restrictions, but not as extensive as under Alternative B. | Would implement some restrictions, but not as extensive as under Alternative B. | Economic impacts to recreation would be similar to alternatives C and D₁. |

| AFFECTED RESOURCE OR USE | No Action ALTERNATIVE A | ALTERNATIVE B | ALTERNATIVE C | Gunnison Basin Preferred SUB-ALTERNATIVE D₁ | Satellite Populations Preferred SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | jobs, $5.5 million in labor, and $12.1 million in output. | activity would not change, compensatory uses in less restrictive areas would increase. | Activities and values would not decrease overall, but would be displaced. | Activities and values would not decrease overall, but would be displaced. | |
| Oil and Gas Leases | Would continue current oil and gas production levels in the decision area, with about 68 wells generating approximately 2,800 barrels per year. | Would be expected to reduce employment, labor income, and output-related development and extraction. | If operators are able to access oil reserves, then impacts would be similar to those under Alternative A and if unable to access reserves, then impacts would be similar to those under Alternative B. | Same as Alternative C. | Same as Alternative C. |
| Other Minerals | Would continue current designation of approximately 95,564 acres closed to mineral leasing and 899,645 acres open and support the highest employment, income, and economic output levels of the alternatives. | The entire decision area would be closed to solid minerals leasing. | All Occupied Habitat would be open to leasing with a NSO stipulation. All Unoccupied Habitat would be open to leasing with a CSU stipulation to protect sagebrush and riparian habitat. Would generate lower employment and economic income and value levels than under Alternative A, but more than Alternative B. | Same as Alternative C. | Same as Alternative C. |

CHAPTER 2 - ALTERNATIVES

| AFFECTED RESOURCE OR USE | No Action ALTERNATIVE A | ALTERNATIVE B | ALTERNATIVE C | Gunnison Basin Preferred SUB-ALTERNATIVE D$_1$ | Satellite Populations Preferred SUB-ALTERNATIVE D$_2$ |
|---|---|---|---|---|---|
| **Land and Realty** | Approximately 305,306 acres are designated as ROW exclusion areas, and 89,028 acres as ROW avoidance areas. | The entire decision area would be designated as a ROW exclusion area, with some exceptions. BLM lands in Non-Habitat Areas would be designated as ROW avoidance areas, and would require additional management such as timing limitations and reclamation requirements. | The entire decision area would be designated as a ROW avoidance area, and would require additional management such as timing limitations and reclamation requirements. Similar to Alternative A, but infrastructure development would be lower and costs would be higher. | Similar to Alternative C, but some infrastructure development under Alternative D$_1$ would require additional offsite mitigation, thus adding to the cost. | Similar to Alternative C |
| **Non-Market Values** | Would be less likely to support non-market values related to protection of wildlife and quality of water and soil, but would provide more opportunities for livestock grazing and recreation. | Would decrease soil erosion and improve stream and wetland habitat. Wildfire fighting would be more expensive and difficult due to limited access. | Would allow for ecosystem restoration, but continued grazing would impact soil erosion and riparian health. Wildfire risk would be reduced. | Similar to Alternative C. | Similar to Alternative C. |
| **ENVIRONMENTAL JUSTICE** | | | | | |
| **Impacts to Environmental Justice Populations** | Would not adversely affect environmental justice populations. | Would reduce livestock grazing opportunities by 85% in Saguache County, CO and by | Grazing would be allowed, but costs would be higher than under Alternative A. | Similar to Alternative C. | Similar to Alternative C. |

CHAPTER 2 - ALTERNATIVES

| AFFECTED RESOURCE OR USE | No Action ALTERNATIVE A | ALTERNATIVE B | ALTERNATIVE C | Gunnison Basin Preferred SUB-ALTERNATIVE D₁ | Satellite Populations Preferred SUB-ALTERNATIVE D₂ |
|---|---|---|---|---|---|
| | | about 26% in San Juan County, UT, as well as oil and gas and mining, resulting in potential adverse economic impacts. | NSO and CSU stipulations would increase costs and there could be subsequent economic impacts to segments of the environmental justice population. | | |

## 2.3. MONITORING, EVALUATION, ADAPTIVE MANAGEMENT, & MITIGATION

BLM planning regulations (including 43 CFR 1610.4-9) require that land use plans establish intervals and standards for monitoring and evaluation, based on the sensitivity of the resource decisions involved.

### 2.3.1. EVALUATION

Evaluation is the process of reviewing the RMP and determining whether decisions and NEPA analysis are still valid and whether the RMP is being adequately implemented. The BLM Land Use Planning Handbook (H-1601-1; BLM 2005a) directs that RMPs should be evaluated at a minimum period of every five years.

Specifically, RMPs are evaluated to determine whether:

- Decisions remain relevant to current issues;
- Decisions are effective in achieving (or making progress toward achieving) desired outcomes;
- Any decisions should be revised;
- Any decisions should be dropped from further consideration; and
- Any areas require new decisions.

Data collected during RMP implementation helps to inform the RMP evaluation.

### 2.3.2. MONITORING

Land use plan monitoring is the process of tracking the implementation of land use plan decisions (implementation monitoring) and collecting data/information necessary to evaluate the effectiveness of land use plan decisions (effectiveness monitoring) in meeting the purpose and need of the plan, or in this case the plan amendment.

Monitoring strategies for GUSG Habitat and populations must be collaborative, as habitat occurs across jurisdictional boundaries. Therefore, efforts will continue to be conducted in partnership with federal and state fish and wildlife agencies. The BLM and other partners will use the resulting information to guide implementation of conservation activities.

In accordance with BLM's Land Use Planning Handbook, BLM, with their partners, will develop a monitoring plan as a part of the implementation plan. The monitoring

CHAPTER 2 - ALTERNATIVES

plan will describe the process BLM will use to monitor implementation and effectiveness. The monitoring plan will include methods, data standards, and intervals of monitoring; analysis and reporting methods; and the incorporation of monitoring results into future management actions.

More specifically, the plan will discuss how the BLM will monitor and track implementation and effectiveness of planning decisions. To monitor habitats, the BLM will measure and track attributes of Occupied Habitat and Unoccupied Habitat and attributes of habitat availability.

During implementation of this RMP Amendment, population trends will be monitored by BLM, FWS, CPW, and UDWR biologists. This monitoring would evaluate the effects to GUSG Habitat and populations due to BLM permitted activities and make recommendations for changes in management. Monitoring would also evaluate the effectiveness of restoration activities and mitigation (to include compensatory mitigation) associated with permitted activities.

## 2.3.3. ADAPTIVE MANAGEMENT

### ADAPTIVE MANAGEMENT

Adaptive Management is a decision process that promotes flexible resource management decision making that can be adjusted in the face of uncertainties as outcomes from management actions and other events become better understood. Careful monitoring of these outcomes advances scientific understanding and helps with adjusting resource management directions as part of an iterative learning process. Adaptive management also recognizes the importance of natural variability in contributing to ecological resilience and productivity. It is not a 'trial and error' process, but rather emphasizes learning while doing. Adaptive management does not represent an end in itself, but rather a means to more effective decisions and enhanced benefits. On February 1, 2008, the DOI published its Adaptive Management Implementation Policy (522 DM 1). The adaptive management strategy presented within this EIS complies with this policy.

In relation to the BLM GUSG Planning Strategy, adaptive management will help identify whether GUSG conservation measures presented in this EIS contain the needed level of certainty for effectiveness. If principles of adaptive management are incorporated into the conservation measures in the plan (to ameliorate threats to or respond to recovery of a species), then there is a greater likelihood that a conservation measure or plan will be effective.

## ADAPTIVE MANAGEMENT AND MONITORING

As part of plan implementation, a monitoring framework that includes an effectiveness monitoring component will be developed in accordance with Section 2.3.2. The BLM intends to use the data collected through effectiveness monitoring to identify any changes in habitat conditions related to the goals and objectives of the plan and other rangewide conservation strategies. When available, information about population trends will be considered along with effectiveness monitoring data (taking into consideration the lag effect response of populations to habitat changes). The information collected through the monitoring framework will be used by the BLM to determine when adaptive management triggers (discussed below) are met.

## ADAPTIVE MANAGEMENT PLAN

The BLM will develop an adaptive management plan to provide certainty that unintended negative impacts to GUSG would be addressed before consequences become severe or irreversible and to provide regulatory certainty to the FWS that appropriate action would be taken by the BLM. Additionally, the adaptive management plan would provide flexibility for BLM resource management decisions when positive improvements achieving recovery objectives occur.

This adaptive management plan will:

- Identify science-based adaptive management triggers within the planning area
- Address how the multiple scale data from the Monitoring Framework will be used to gauge when adaptive management triggers are met, and charter an adaptive management working group to assist with responding to adaptive management triggers.

## ADAPTIVE MANAGEMENT TRIGGERS

Adaptive management triggers are essential for identifying when potential management changes are needed or warranted in order to continue meeting GUSG conservation objectives or in response to achieving recovery objectives. The BLM will use a continuum of trigger points, which will enhance the agency's ability to effectively manage GUSG habitat. At a minimum, triggers delineated in the adaptive management plan will:

- Be based upon the best available science
- Take into account the importance of various seasonal habitat types
- Not be limited to a single point in time.

CHAPTER 2 - ALTERNATIVES

Adaptive management should include multiple triggers. Triggers indicate when the BLM will consider adjustments to resource/resource use management. An adaptive management working group will help identify the causal factors as to what prompted the adaptive management trigger. The group will also provide recommendations to the appropriate BLM authorizing official (decision maker) regarding the applicable management response to address this trigger (e.g. effective mitigation, restoration, reclamation, and in some instances, a land use plan amendment or revision). When organizing the adaptive management working group, the BLM will invite participation from the BLM, FWS, local governments, and applicable state fish and game agencies.

Furthermore, triggers indicate when the BLM will take management action to stop the continued deviation from conservation objectives or respond to recovery of GUSG. These triggers should be linked to specific management actions that address the causal factors and could include, but are not limited to, one or more of the following:

- Coordination with cooperating agencies
- Temporary closures
- Immediate implementation of interim management policies and procedures through the BLM directives system, and
- Initiation of a new LUP Amendment to consider changes to the existing LUP decisions.

## GUSG HABITAT

Adjustments to lek locations and boundaries, Occupied or Unoccupied Habitat boundaries, and seasonal habitat will be made as necessary if the BLM determines that conditions warrant such changes to more accurately depict existing or potential GUSG Habitat. Analysis and recommendations regarding such determinations will be prepared and produced by BLM biologists in coordination with Colorado and/or Utah state wildlife agency biologists, FWS biologists, and county/local government biologists. The appropriate planning process (i.e., plan maintenance or plan amendment) would be used to make any necessary changes to RMPs.

## PONCHA PASS MANAGEMENT ABSENT GUSG

The Poncha Pass Population has no designated critical GUSG habitat. The BLM's decision to manage the Poncha Pass area for the conservation of GUSG arises from the presence of GUSG, though the population exists solely due to transplantation of birds. The BLM will continue to manage for GUSG in Poncha Pass so long as birds are present. If GUSG are determined to no longer be present in Poncha Pass, then

CHAPTER 2 - ALTERNATIVES

the BLM will no longer be able to justify the need to manage that area as habitat for GUSG.

The criterion for determining that GUSG are no longer present consists of documenting that the entire population area (Occupied and Unoccupied Habitat and areas within four miles of a lek regardless of habitat) has had no GUSG presence in the past ten years. Documentation of GUSG presence includes telemetry locations, sightings of GUSG or sage-grouse sign, local biological expertise, GIS analysis, or other data sources. The BLM may make a determination to no longer manage the Poncha Pass area as habitat for GUSG if this criterion is met. Analysis and recommendations regarding such determinations will be prepared and produced by BLM biologists in coordination with Colorado and/or Utah state wildlife agency biologists, FWS biologists, and county/local government biologists. The appropriate planning process (i.e., plan maintenance or plan amendment) would be used to make any necessary changes to a RMP(s).

## INCORPORATION OF A FWS RECOVERY PLAN OR AN UPDATED RCP

The BLM may make a determination to incorporate all or part of a FWS-published GUSG recovery plan and/or an updated and signed RCP, if either where to become available. Analysis and recommendations regarding such determinations would be prepared and produced by BLM interdisciplinary staff in coordination with Colorado and/or Utah state wildlife agencies, the FWS and other federal agencies, and county/local governments. The appropriate planning process (i.e., plan maintenance or plan amendment) would be used to make any necessary changes to a RMP(s).

## INCORPORATION OF A CHANGE TO THE ESA STATUS OF THE GUSG

The BLM may make a determination to incorporate changes necessitated or flowing from a change to the ESA status of GUSG (delisting, designation as endangered, or some other status change). Analysis and recommendations regarding such determinations would be prepared and produced by BLM interdisciplinary staff in coordination with Colorado and/or Utah state wildlife agencies, the FWS and other federal agencies, and county/local governments. The appropriate planning process (i.e., plan maintenance or plan amendment) would be used to make any necessary changes to a RMP(s).

## 2.3.4.   MITIGATION

The mitigation hierarchy for the BLM states that the BLM will first try to avoid impacts. The GUSG RMP Amendment focuses on avoidance of impacts followed by

minimization techniques.  The intent of the Draft GUSG Rangewide Mitigation Plan is to achieve a net conservation gain for the GUSG.  To do so, in undertaking BLM management actions, and, consistent with valid existing rights and applicable law, in authorizing third party actions that result in habitat loss and/or degradation, the BLM will require and ensure mitigation that provides a net conservation gain to the species including accounting for any uncertainty associated with the effectiveness of such mitigation.  This will be achieved by avoiding, minimizing, and compensating for impacts by applying beneficial mitigation actions.  Actions that result in habitat loss and/or degradation include those identified as threats that contribute to GUSG disturbance as identified by the FWS in its listing decision (FWS 2014).

## MITIGATION PLAN

Consistent with valid existing rights and applicable law, in undertaking BLM management actions or authorizing third party actions within GUSG habitat that result in habitat loss and/or degradation, the BLM will require and ensure mitigation that provides a net conservation gain to the GUSG, including accounting for any uncertainty associated with the effectiveness of such mitigation.  Mitigation would be required under every alternative and would be achieved by avoiding, minimizing, and compensating for impacts.  Mitigation would adhere to CEQ regulations (40 CFR 1508.20; e.g., avoid, minimize, and compensate).  If impacts from BLM management actions or authorized third-party actions that result in habitat loss and/or degradation remain following the application of avoidance and minimization measures (i.e., residual impacts), then compensatory mitigation would be used to provide a net conservation gain to the species actions as identified in the Draft GUSG Rangewide Mitigation Plan (in Appendix J).  Any compensatory mitigation would be durable, timely, and in addition to that which would have resulted without the compensatory mitigation.

# 3. AFFECTED ENVIRONMENT

This chapter documents the existing conditions of and trends for biological, physical, cultural, and human resources in the planning area that could be affected by implementing any of the proposed alternatives described in Chapter Two, *Alternatives*. The affected environment provides the context for assessing the potential impacts described in Chapter Four, *Environmental Consequences*.

The affected environment of planning area resources is described in relation to the following components:

## ❧ INDICATORS

Indicators are factors selected in order to assess resource conditions, such as ambient pollutant level, visibility, and vegetation. Whenever possible, indicators are quantitative. Indicators can be derived from many potential sources, such as the Standards for Rangeland Health.

## ❧ EXISTING CONDITIONS

Existing Conditions describe the location, extent, and current condition of resources within the planning area in general and on BLM-administered lands. Conditions can be determined by comparing the value of indicators to an established standard (such as a current plan goal or objective) and/or benchmark.

## ❧ TRENDS

Trends describe the degree and direction of change in a resource between the present and some point in the past. If change is noted, then the degree and direction of resource change is characterized as moving toward or away from the current desired condition based on specific indicators, and reasons for the change are identified. Trends can be described in quantitative or qualitative terms. Identification of trends is necessary in order to provide an understanding of how BLM management practices influence desired resource conditions over time. Trends for certain resources can be difficult to analyze, as changes to the resource often occur due to factors beyond BLM control.

# 3.1. SPECIAL STATUS SPECIES

Only species for which the proposed action might substantially change conditions to an extent that analysis in an EIS is necessary are addressed in this document. Due to the conservation-focused nature of the RMP Amendment, special status species in the planning area would receive residual protection and benefit from any alternative analyzed outside of the No Action Alternative.

No increase in surface-disturbing activities would be authorized under any of the action alternatives above what is permitted in existing land use plans. In no scenario under the Draft RMP Amendment would disturbance to a plant or animal species increase. Under the RMP Amendment, special status plant and animal species would receive additional protections in areas where their range overlaps with GUSG.

Management actions to protect GUSG and their habitat would benefit other special status species as well. The RMP Amendment would not remove any protections for a species that are identified in an existing land use plan. Current management actions that require the survey and avoidance of special status plant and animal species would remain in place.

## 3.1.1. GUNNISON SAGE-GROUSE (CENTROCERCUS MINIMUS) AND HABITAT

### INDICATORS

Special Status Species within Occupied and Unoccupied Habitat are described in terms of:

- Acres of sagebrush habitat
- Direct and Indirect disturbance to GUSG.

### EXISTING CONDITIONS

Based on population trends since 1996, five of the seven GUSG populations are in decline. The Gunnison Basin Population has been stable to increasing throughout the same period, with variation evident over the years (CPW 2014). GUSG populations have been identified as cycling over many years. The general trend over multiple years—including population peaks and valleys—is necessary to determine the trend for any population.

CHAPTER 3 - AFFECTED ENVIRONMENT

**Table 3.9 - GUSG Population, Three-year Average 1998–2005 (CPW 2014)**

| POPULATION | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|
| Cerro Summit-Cimarron-Sims Mesa | no data | no data | 28 | 39 | 43 | 43 | 36 | 31 |
| Crawford | 232 | 245 | 260 | 216 | 196 | 154 | 150 | 146 |
| Gunnison Basin | 3,135 | 3,357 | 3,346 | 3,390 | 3,216 | 2,991 | 2,641 | 3,220 |
| Monticello-Dove Creek | 283 | 344 | 429 | 453 | 381 | 273 | 206 | 182 |
| Piñon Mesa | 119 | 128 | 144 | 152 | 149 | 136 | 132 | 144 |
| Poncha Pass | no data | no data | no data | 15 | 21 | 31 | 39 | 39 |
| San Miguel | 307 | 316 | 319 | 301 | 352 | 342 | 296 | 280 |
| **Total** | — | — | — | 4,566 | 4,358 | 3,969 | 3,501 | 4,041 |

**Table 3.10 - GUSG Population, Three-year Average 2006–2014 (CPW 2014)**

| POPULATION | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|
| Cerro Summit-Cimarron-Sims Mesa | 38 | 36 | 31 | 28 | 18 | 25 | 29 | 43 | 57 |
| Crawford | 173 | 168 | 137 | 96 | 65 | 47 | 54 | 83 | 121 |
| Gunnison Basin | 4,137 | 4,862 | 4,497 | 4,034 | 3,714 | 3,738 | 3,826 | 3,995 | 4,073 |
| Monticello-Dove Creek | 183 | 211 | 227 | 227 | 190 | 162 | 147 | 144 | 122 |
| Piñon Mesa | 154 | 147 | 128 | 101 | 83 | 69 | 62 | 90 | 128 |
| Poncha Pass | 43 | 38 | 31 | 23 | 20 | 18 | 16 | 11 | 10 |
| San Miguel | 322 | 345 | 306 | 234 | 167 | 126 | 129 | 150 | 188 |
| **Total** | 5,050 | 5,807 | 5,360 | 4,749 | 4,263 | 4,188 | 4,266 | 4,516 | 4,701 |

Surface disturbances were mapped across the range of GUSG using National Agriculture Imagery Program (NAIP) imagery.  For the purpose of this analysis, surface disturbances have been categorized as either impacting sagebrush availability or causing habitat degradation.  Actions that impact sagebrush availability include agricultural conversion, urbanization, wildfire, conifer encroachment, sagebrush treatments, and invasive species.  Sagebrush availability can be impacted by anthropogenic surface-disturbing  activities (such as agricultural conversion or urbanization) or through natural processes that do not result in surface disturbance (such as pinyon-juniper encroachment or fire).

According to a 2015 BLM greater sage-grouse monitoring strategy, features on the landscape related to habitat degradation include, but are not limited to, energy development (oil and gas wells and development facilities), geothermal, mining, roads, power lines, communication towers, other vertical structures, and other

developed ROWs.  Habitat degradation is always associated with surface-disturbing activities resulting from anthropogenic development of an area.

Rangewide, surface disturbance has impacted approximately 12% (114,478 acres) of Occupied Habitat and 22% (161,356 acres) of Unoccupied Habitat.

**Table 3.11 - Surface Disturbance within GUSG Habitat by Land Status**

| HABITAT TYPE/ LAND STATUS | ACRES OF SURFACE DISTURBANCE | % OF ALL DISTURBANCES | % HABITAT DISTURBED |
|---|---|---|---|
| ALL OCCUPIED HABITAT | 114,478 | — | 12% |
| BLM | 4,014 | 4% | 0% |
| Local | 1,272 | 1% | 0% |
| NPS | 182 | 0% | 0% |
| Private | 107,887 | 94% | 11% |
| State | 446 | 0% | 0% |
| USFS | 676 | 1% | 0% |
| ALL UNOCCUPIED HABITAT | 161,356 | — | 22% |
| BLM | 2,230 | 1% | 0% |
| NPS | 141 | 0% | 0% |
| Private | 158,245 | 98% | 21% |
| State | 371 | 0% | 0% |
| USFS | 369 | 0% | 0% |

GUSG habitat was mapped using LANDFIRE Existing Vegetation Type data (2010).  GUSG habitat includes those areas identified as capable of supporting GUSG life functions.  Rangewide in the decision area, 63% of Occupied Habitat is classified as capable of supporting GUSG, 28% as non-habitat (does not include agriculture), and 9% as agricultural development.  Rangewide in the decision area, 35% of Unoccupied Habitat is mapped as habitat capable of supporting GUSG, 49% as non-habitat, and 16% as agricultural development.  The following habitat types capable of supporting GUSG were identified in the decision area.

CHAPTER 3 - AFFECTED ENVIRONMENT

**Table 3.12 - LANDFIRE Habitat Types in the Planning Area Capable of Supporting GUSG**

| GUSG HABITAT |
| --- |
| Artemisia tridentata ssp. vaseyana Shrubland Alliance |
| Colorado Plateau Mixed Low Sagebrush Shrubland |
| Inter-Mountain Basins Big Sagebrush Shrubland |
| Inter-Mountain Basins Big Sagebrush Steppe |
| Inter-Mountain Basins Montane Sagebrush Steppe |
| Inter-Mountain Basins Semi-Desert Shrub Steppe |
| Quercus gambelii Shrubland Alliance |
| Rocky Mountain Gambel Oak-Mixed Montane Shrubland |
| Rocky Mountain Lower Montane-Foothill Shrubland |

Of the leks in Occupied Habitat rangewide, 99 are active, 18 are inactive, 5 are unknown, and 36 are historic (CPW 2015 data request).  Four known historic leks have been identified in Unoccupied Habitat.  A historic lek is defined in the RCP as a formerly active lek that has not been utilized for display or breeding within the last 10 years.  The unoccupied habitat classification was developed by the FWS in order to distinguish types of critical habitat and is largely based on RCP habitat categories (occupied, vacant/unknown, and potentially suitable).

Surface ownership within Occupied Habitat rangewide is comprised of 43% private surface and 41% BLM-administered public lands.  Surface ownership within Unoccupied Habitat is 58% private surface and 31% BLM-administered lands.  As shown in Table 3.13, Occupied Habitat for the satellite populations is 65% private surface and 27% BLM-administered lands.

**Table 3.13 - Surface Ownership in the Satellite Population Areas**

| LAND STATUS | OCCUPIED HABITAT | | UNOCCUPIED HABITAT | |
| --- | --- | --- | --- | --- |
| | ACRES | % OF HABITAT | ACRES | % OF HABITAT |
| Total Acres | 350,536 | — | 606,266 | — |
| BLM | 93,439 | 27% | 163,910 | 27% |
| Local | 12,693 | 4% | 5 | 0% |
| Private | 227,394 | 65% | 376,174 | 62% |
| NPS | 4,764 | 1% | 7,029 | 1% |
| USFS | 7,409 | 2% | 57,517 | 9% |

CHAPTER 3 - AFFECTED ENVIRONMENT

| LAND STATUS | OCCUPIED HABITAT | | UNOCCUPIED HABITAT | |
|---|---|---|---|---|
| | ACRES | % OF HABITAT | ACRES | % OF HABITAT |
| State | 4,837 | 1% | 1,605 | 0% |
| Other | — | 0% | 25 | 0% |

Outside of mapped Occupied Habitat and Unoccupied Habitat, lands within four miles of all active, inactive, unknown, and historic GUSG leks were also identified in order to analyze potential impacts to the leks.  Labeled as Non-Habitat Areas within Four Miles of a Lek (Non-Habitat Areas), these areas extend outside of current mapping for GUSG by 419,541 acres.  Surface ownership of lands within the Non-Habitat Areas is identified in Table 3.14.  Public lands managed by the BLM comprise approximately 30% of this area.

**Table 3.14 - Surface Ownership within the Four-Mile Non-Habitat Areas**

| POPULATION | OWNER/MANAGER | ACRES |
|---|---|---|
| Cerro Summit-Cimarron-Sims Mesa | BLM | 11,425 |
| | Local | 2,696 |
| | NPS | 4,132 |
| | Private | 53,333 |
| | USFS | 369 |
| Crawford | BLM | 1,481 |
| | NPS | 5,907 |
| | Private | 380 |
| Gunnison Basin | BLM | 12,007 |
| | Local | 2,643 |
| | NPS | 3,671 |
| | Private | 23,252 |
| | State | 747 |
| | USFS | 38,586 |
| Monticello-Dove Creek | BLM | 25,400 |
| | Other | 4 |
| | Private | 32,239 |
| | State | 235 |
| | USFS | 896 |
| Piñon Mesa | BLM | 26,629 |

CHAPTER 3 - AFFECTED ENVIRONMENT

| POPULATION | OWNER/MANAGER | ACRES |
|---|---|---|
| | Private | 19,992 |
| | State | 916 |
| | USFS | 11,594 |
| Poncha Pass | BLM | 763 |
| | Private | 541 |
| | USFS | 14,945 |
| San Miguel Basin | BLM | 40,689 |
| | Local | 329 |
| | Private | 58,752 |
| | State | 3,519 |
| | USFS | 21,469 |
| **Total BLM Non-Habitat Acreage** | | **118,394** |
| **TOTAL NON-HABITAT ACREAGE** | | **419,541** |

Using LANDFIRE data, vegetation was classified as either capable of supporting GUSG, non-habitat, or agricultural. Within four miles of a lek outside of Occupied Habitat or Unoccupied Habitat, 93,484 acres (22%) are capable of supporting GUSG, 304,654 acres (73%) are non-habitat, and 21,362 acres (5%) are classified as agricultural development.

## Gunnison Basin Population

The Gunnison Basin GUSG Population is located in Gunnison and Saguache counties across 605,026 acres of Occupied Habitat. Of this area, 50% is BLM-administered public land totaling approximately 302,024 acres. The majority of GUSG habitat within the Basin receives less than 12 inches of precipitation a year. The main vegetation types in the Gunnison Basin include mountain big sagebrush, Wyoming big sagebrush, and black sage. Mountain big sagebrush occurs at higher elevations and at lower elevations containing moist sites. Wyoming big sagebrush is typically found at lower elevations and on drier sites. A hybrid of Wyoming and mountain big sagebrush occurs in transition areas between the two. Black sage is also found on dry gravel soils at lower elevations. Figure 3.2 provides GUSG population estimates for the Gunnison Basin Population from 1996 to 2014 (CPW 2015 data request). The population has been exceeding objectives set in the RCP since 2005.

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.2 - Gunnison Basin GUSG Population, 1996–2014**



There are 95 known leks in the Gunnison Basin, of which 68 are classified as active, 8 as inactive, 4 as unknown, and 15 as historic (CPW 2015 lek data request). The high lek count in 2015 was 974 birds, with a 2015 population estimate of 4,306. Over a ten-year period, the population averaged 4,169 birds, which is 1,169 over the 3,000 population goal identified in the RCP (2014 Gunnison Basin lek report). 387 birds have been removed from the Gunnison Basin to augment sub-populations (CPW 2015 data request).

Based on LANDFIRE data, 411,843 acres of habitat are capable of supporting GUSG in Occupied Habitat in the Gunnison Basin. Cultivated cropland occurs on 5% or 30,441 acres of Occupied Habitat. The rest of Occupied Habitat in the Gunnison Basin falls into other habitat types totaling approximately 162,742 acres.

**Table 3.15 - Gunnison Basin GUSG Habitat based on LANDFIRE Data**

| GUNNISON BASIN | OCCUPIED HABITAT | | UNOCCUPIED HABITAT | |
|---|---|---|---|---|
| | Acres | Percent | Acres | Percent |
| Habitat | 411,843 | 68% | 51,876 | 38% |
| Non-habitat | 162,742 | 27% | 83,477 | 61% |
| Agricultural | 30,441 | 5% | 1,656 | 1% |

CHAPTER 3 - AFFECTED ENVIRONMENT

**Table 3.16 - Land Status for the Gunnison Basin Population Area**

| STATUS | OWNERSHIP | ACRES | % OF HABITAT |
|---|---|---|---|
| Occupied Habitat (605,026 acres) | BLM | 302,024 | 50% |
| | Private | 187,761 | 31% |
| | USFS | 92,724 | 15% |
| | Local | 9,880 | 2% |
| | NPS | 9,430 | 2% |
| | State | 3,205 | 1% |
| Unoccupied Habitat (137,009 acres) | BLM | 63,972 | 47% |
| | Private | 53,034 | 39% |
| | USFS | 12,181 | 9% |
| | NPS | 7,407 | 5% |
| | State | 414 | 0% |

Overall surface disturbance in the Gunnison Basin does not exceed 10% of Occupied Habitat and approximately 4% of Unoccupied Habitat. Most surface disturbance impacts sagebrush availability and is primarily attributed to agricultural development and urbanization. Roads, energy development, and other infrastructure in Occupied Habitat cover 5,297 acres and includes less than 1% of Occupied Habitat.

**Table 3.17 - Surface Disturbance in the Gunnison Basin Population Area**

| | GUNNISON BASIN | | |
|---|---|---|---|
| LAND OWNERSHIP | ACRES OF SURFACE DISTURBANCE | % OF ALL DISTURBANCES | % HABITAT DISTURBED |
| OCCUPIED HABITAT | | | |
| **Total Occupied Habitat** | **59,132** | – | **10%** |
| BLM | 3,222 | 5% | 0.53% |
| Local | 1,035 | 2% | 0.17% |
| Private | 53,896 | 91% | 8.91% |
| State | 351 | 1% | 0.06% |
| USFS | 629 | 1% | 0.10% |
| UNOCCUPIED HABITAT | | | |
| **Total Unoccupied Habitat** | **6,221** | – | **4%** |
| BLM | 879 | 14% | 0.64% |
| NPS | 15 | 0% | 0.01% |
| Private | 5,006 | 80% | 3.65% |
| State | 180 | 3% | 0.13% |
| USFS | 141 | 2% | 0.10% |

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.3 - Surface Disturbance in the Gunnison Basin Population Area**



For the purpose of this EIS, surface disturbance was mapped using NAIP imagery and classified by disturbance type.  Disturbances were grouped based on relationships identified in the Greater Sage-Grouse Monitoring Framework.  Disturbances mapped as agriculture, urbanization, or wildfire were classified as disturbances that impact sagebrush availability.  Disturbances such as energy development, mining, roads and other infrastructure were classified as habitat degradation.

In the Gunnison Basin population area, there are 80,907 acres outside of Occupied or Unoccupied Habitat within 4 miles of a lek.  75% of leks in the Gunnison Basin are within 4 miles of Occupied Habitat, including 46 active leks.  Surface ownership within 4 miles of a lek outside of Occupied and Unoccupied Habitat is identified in Table 3.14.  Public lands managed by the BLM make up 19% of the area.

Within this area, 15% (12,506 acres) of the area provides habitat capable of supporting GUSG, while 83% (67,408 acres) is non-habitat, and less than 1% (993 acres) is classified as agricultural development.

CHAPTER 3 - AFFECTED ENVIRONMENT

## *Cerro Summit-Cimarron-Sims Mesa Population*

The Cerro Summit and Cimarron GUSG sub-populations are located 15 miles east, and the Sims Mesa sub-population is 7 miles south, of Montrose, Colorado.  The entire population covers approximately 37,142 acres of Occupied Habitat and 19,370 acres of Unoccupied Habitat.  Predominant uses of BLM lands in the area include livestock grazing, recreation, and hunting.  This population is heavily fragmented by pinyon-juniper stands and cultivated cropland.  No population augmentation has been done in the Cerro Summit-Cimarron-Sims Mesa Population.  There are six known leks in the area, of which two are active and four are historic (CPW 2015 Lek Data Request).  Peak male attendance was 11 birds in 2015, 15 birds in 2014, and 9 in 2013.  In 2015, the estimated population was 54 birds.

**Figure 3.4 - Cerro Summit-Cimarron-Sims Mesa GUSG Population, 1998–2014**



CPW 2014 unpublished data

Occupied Habitat covers 37,142 acres.  Occupied Habitat is 76% private surface (28,064 acres).  BLM-administered public lands make up about 12% of the area or 4,380 acres.  Local and state government lands include 12% of Occupied Habitat or 4,336 acres.  Agricultural land makes up 5% of Occupied Habitat covering 2,039 acres.  Habitat able to support GUSG is 64% of Occupied Habitat and other habitat—mostly pinyon-juniper—is 31% or 11,381 acres (LANDFIRE 2010).

CHAPTER 3 - AFFECTED ENVIRONMENT

**Table 3.18 - Cerro Summit-Cimarron-Sims Mesa GUSG Habitat based on LANDFIRE Data**

| CERRO SUMMIT-CIMARRON-SIMS MESA | OCCUPIED HABITAT | | UNOCCUPIED HABITAT | |
|---|---|---|---|---|
| | Acres | Percent | Acres | Percent |
| Habitat | 23,722 | 64% | 10,045 | 52% |
| Non-Habitat | 11,381 | 31% | 9,192 | 47% |
| Agricultural | 2,039 | 5% | 132 | 1% |

Unoccupied Habitat for the Cerro Summit-Cimarron-Sims Mesa population area encompasses 19,370 acres. Unoccupied Habitat is 74% private surface (14,353 acres) and 26% BLM-administered public lands (5,011 acres). Agricultural land makes up 132 acres of Unoccupied Habitat. Habitat capable of supporting GUSG makes up 52% (10,045 acres) and other habitats—mostly pinyon-juniper woodlands—make up the remaining 47% (9,192 acres).

**Table 3.19 - Land Status for the Cerro Summit-Cimarron-Sims Mesa Population Area**

| STATUS | OWNERSHIP | ACRES | % OF HABITAT |
|---|---|---|---|
| Occupied Habitat (37,142 acres) | Private | 28,030 | 75% |
| | BLM | 4,776 | 13% |
| | Local | 4,336 | 12% |
| Unoccupied Habitat (19,370 acres) | Private | 14,353 | 74% |
| | BLM | 5,016 | 26% |

Overall surface disturbance in the Cerro Summit-Cimarron-Sims Mesa population area is present on approximately 12% of Occupied Habitat and 1% of Unoccupied Habitat. Most surface disturbance impacts sagebrush availability and is primarily agricultural development. Roads, energy development, and other infrastructure in Occupied Habitat covers less than 1% (286 acres) of Occupied Habitat.

**Table 3.20 - Surface Disturbance in the Cerro Summit-Cimarron-Sims Mesa Population Area**

| LAND STATUS | ACRES OF SURFACE DISTURBANCE | % OF ALL DISTURBANCE | % OF HABITAT DISTURBED |
|---|---|---|---|
| OCCUPIED HABITAT | | | |
| **Total Occupied Habitat** | **4,428** | – | **12.3%** |
| BLM | 63 | 1.0% | 0.2% |
| Local | 42 | 1.0% | 0.1% |
| Private | 4,323 | 98.0% | 12.0% |

CHAPTER 3 - AFFECTED ENVIRONMENT

| LAND STATUS | ACRES OF SURFACE DISTURBANCE | % OF ALL DISTURBANCE | % OF HABITAT DISTURBED |
|---|---|---|---|
| UNOCCUPIED HABITAT | | | |
| Total Unoccupied Habitat | 215 | — | 1.2% |
| BLM | 50 | 23.0% | 0.3% |
| Private | 165 | 77.0% | 0.9% |

**Figure 3.5 - Surface Disturbance in the Cerro Summit-Cimarron-Sims Mesa Population Area**



In the Cerro Summit-Cimarron-Sims Mesa population area, 71,955 acres is outside mapped Occupied and Unoccupied Habitat and within four miles of a lek. The population area is just over four miles wide at its widest point, meaning that no location is more than two miles from the edge of Occupied Habitat. Surface ownership for the area outside Occupied and Unoccupied Habitat is identified in Table 3.6. Public lands managed by the BLM make up 21% of the area.

CHAPTER 3 - AFFECTED ENVIRONMENT

Within four miles of a lek and outside of Occupied and Unoccupied Habitat, 31% of the area (22, 474 acres) provides habitat capable of supporting GUSG, 57% (40,780 acres) is non-habitat, and 12% (8,700 acres) is classified as agricultural development.

## Crawford Population

The Crawford Population of GUSG is located eight miles southwest of the town of Crawford, Colorado. The area consists of rocky drainages, pinyon-juniper woodlands, and uplands dominated by big and mountain sagebrush. Predominant uses of BLM-managed lands in the area include livestock grazing, recreation, and hunting. The area contains ten known leks, of which five are active, one is inactive, and four are historic (CPW 2015 Lek Data Request). Peak male attendance was 31 in 2015, 32 in 2014, 22 in 2013, and 11 in 2012. GUSG population trends in the area were declining from 2000 through 2012, with increases in 2013, 2014, and 2015. In 2011, the population was augmented by 27 birds from the Gunnison Basin. In the springs of 2011, 2012, and 2013, 72 birds were translocated from the Gunnison Basin to Crawford to help stabilize the population (from personal communication with CPW regarding comments on wild ungulate analysis 2015). The 2015 population estimate was 152 birds.

**Figure 3.6 - Crawford GUSG Population, 1996–2014**



CPW 2014 unpublished data

CHAPTER 3 - AFFECTED ENVIRONMENT

Occupied Habitat supporting the Crawford Population encompasses approximately 34,996 acres. Of this, roughly 63% is comprised of BLM-administered public lands totaling 22,150 acres, 24% (8,444 acres) is private surface, 3% (4,402 acres) is NPS-administered land. In Occupied Habitat, 3% (1,211 acres) is agricultural land. The vast majority (67%) 23,280 acres of Occupied Habitat is habitat that supports GUSG. Other habitat types make up the remaining 30% or 10,505 acres.

**Table 3.21 - Crawford GUSG Habitat based on LANDFIRE Data**

| CRAWFORD POPULATION AREA | OCCUPIED HABITAT | | UNOCCUPIED HABITAT | |
|---|---|---|---|---|
| | Acres | Percent | Acres | Percent |
| Habitat | 23,280 | 67% | 32,815 | 41% |
| Non-Habitat | 10,505 | 30% | 32,592 | 41% |
| Agricultural | 1,211 | 3% | 14,867 | 19% |

Unoccupied Habitat in the Crawford population area covers 80,274 acres. Of this, approximately 76% (60,738 acres) of the surface land is private, while 13% (10,324 acres) is administered by the BLM, 9% (7,023 acres) by the NPS, and 3% (2,190 acres) by the USFS. Agricultural lands cover 19% (14,867 acres) of Unoccupied Habitat. There are 32,815 acres of habitat capable of supporting GUSG or 41% of Unoccupied Habitat. Other habitat types make up the remaining 41% (32,592 acres) of Unoccupied Habitat in the Crawford population area.

**Table 3.22 - Land Status for the Crawford Population Area**

| STATUS | OWNERSHIP | ACRES | % OF HABITAT |
|---|---|---|---|
| Occupied Habitat (34,996 acres) | BLM | 22,150 | 63% |
| | Private | 8,444 | 24% |
| | NPS | 4,402 | 13% |
| Unoccupied Habitat (80,274 acres) | Private | 60,738 | 76% |
| | BLM | 10,324 | 13% |
| | NPS | 7,023 | 9% |
| | USFS | 2,190 | 3% |

Overall surface disturbance in the Crawford population area includes approximately 2% of Occupied Habitat and 23% of Unoccupied Habitat. Most surface disturbance impacts sagebrush availability and consists primarily of agricultural development. Roads in Occupied Habitat cover 324 acres totaling less than 1% of Occupied Habitat.

CHAPTER 3 - AFFECTED ENVIRONMENT

**Table 3.23 - Surface Disturbance in the Crawford Population Area**

| LAND STATUS | ACRES OF SURFACE DISTURBANCE | % OF ALL DISTURBANCE | % OF HABITAT DISTURBED |
|---|---|---|---|
| OCCUPIED HABITAT | | | |
| **Total Occupied Habitat** | **850** | **–** | **2.0%** |
| BLM | 238 | 28.0% | 0.7% |
| NPS | 31 | 4.0% | 0.1% |
| Private | 580 | 68.0% | 1.7% |
| UNOCCUPIED HABITAT | | | |
| **Total Unoccupied Habitat** | **18,158** | **–** | **22.7%** |
| BLM | 145 | 1.0% | 0.2% |
| NPS | 37 | – | 0.1% |
| Private | 17,963 | 99.0% | 22.4% |
| USFS | 13 | – | <0.1% |

**Figure 3.7 - Surface Disturbance in the Crawford Population Area**



CHAPTER 3 - AFFECTED ENVIRONMENT

In the Crawford population area, 5,842 acres are outside of mapped Occupied Habitat and Unoccupied Habitat and within 4 miles of a lek. At its widest point, the population area is just over 5 miles, meaning that no place within Occupied Habitat is further than 2.5 miles from the edge of Occupied Habitat. Surface ownership for the area outside of Occupied Habitat and Unoccupied Habitat is identified in Table 3.6. Public lands managed by the BLM make up 19% of the additional area.

Within four miles of a lek and outside of Occupied Habitat and Unoccupied Habitat, 75% (5,842acres) of the area contains habitat capable of supporting GUSG, while 25% (1,926 acres) is classified as non-habitat.

## Monticello-Dove Creek Population

The Monticello-Dove Creek Population of GUSG is divided into two distinct sub-populations (79 CFR 69192). This split is largely due to political boundaries and management by state agencies. UDWR is responsible for population and habitat monitoring in Utah.

### Monticello Sub-Population

Located near the town of Monticello in the southeastern corner of Utah in San Juan County, the Monticello sub-population is the larger of the two sub-populations. According to the RCP, "Gunnison sage-grouse in the area occupy a broad, relatively flat plateau on the northeast side of the Abajo Mountains. This area is characterized by large grass pastures, and agricultural fields interspersed with fragmented patches of Wyoming sagebrush and black sagebrush" (RCP 2005). There are eight known leks in the Monticello sub-population area. Based on RCP lek definitions for small populations, two leks are active, two are inactive, and four are historic (UDWR 2015 lek data request). The high male lek count in 2015 was 12 and in 2014 was 11. One inactive lek is located on BLM lands, while the other leks are on private surface. The population estimate in 2015 was 59 birds.

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.8 - Monticello GUSG Sub-Population, 1996–2014**



CPW 2014 unpublished data

The Dove Creek sub-population is located in western Dolores County, north and west of Dove Creek, Colorado (79 FR 69192). Habitat north of Dove Creek is characterized as mountain shrub habitat, dominated by oakbrush interspersed with sagebrush, while habitat to the west is largely sagebrush steppe.

There are ten known leks in the Dove Creek sub-population area, of which four are classified as active, two as inactive, and four as historic (CPW 2015 Lek Data Request). Peak male attendance at any lek has not been above 10 birds in the last ten years, which was only for one lek. The Wheatfield Lek had the most consistent attendance, with peak male attendance at 10 in 2006. The high male lek count in 2014 was 5. The high male count in 2015 was 1. In 2015, the population estimate for Dove Creek was 5 birds. In an effort to stabilize the GUSG population, population augmentation was conducted in the Monticello-Dove Creek population area. Since 2000, 42 birds have been introduced to the Dove Creek Population.

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.9 - Dove Creek GUSG Sub-Population, 1996–2014**



CPW 2014 unpublished data

In the Monticello-Dove Creek population area, 92% (102,864 acres) of Occupied Habitat is private surface.  Occupied Habitat encompasses 11,269 acres.  BLM surface ownership in Occupied Habitat is 8% (8,483 acres).  BLM lands are not contiguous in these populations.  The area is heavily fragmented by agricultural development.  In Occupied Habitat, 27% (30,738 acres) is cultivated cropland.  Habitat capable of supporting GUSG makes up 49% (55,397 acres) of Occupied Habitat.  The configuration of the habitat is heavily fragmented.  Other habitats—primarily pinyon-juniper woodlands—make up 23% (26,133 acres).

**Table 3.24 - Monticello-Dove Creek GUSG Habitat based on LANDFIRE Data**

| MONTICELLO-DOVE CREEK | OCCUPIED HABITAT | | UNOCCUPIED HABITAT | |
|---|---|---|---|---|
| | Acres | Percent | Acres | Percent |
| Habitat | 55,397 | 49% | 60,529 | 26% |
| Non-Habitat | 26,133 | 23% | 85,904 | 36% |
| Agricultural | 30,738 | 27% | 89,444 | 38% |

Unoccupied Habitat in the Monticello-Dove Creek population area covers approximately 236,877 acres.  Private surface accounts for 85% (199,918 acres) of

Unoccupied Habitat. Public lands managed by the BLM make up the remaining 15% (35,904 acres) of Unoccupied Habitat. Unoccupied Habitat is 38% (89,444 acres) cultivated cropland. Habitat capable of supporting GUSG makes up 26% (60,529 acres) of Unoccupied Habitat and the remaining 36% (85,904 acres) is largely pinyon-juniper woodlands (53,907 acres).

**Table 3.25 - Surface Ownership in the Monticello-Dove Creek Population Area**

| STATUS | OWNERSHIP | ACRES | % OF HABITAT |
|---|---|---|---|
| Occupied Habitat (112,269 acres) | Private | 102,864 | 92% |
| | BLM | 8,483 | 8% |
| | State | 922 | 1% |
| Unoccupied Habitat (236,877 acres) | Private | 199,918 | 85% |
| | BLM | 35,904 | 15% |
| | USFS | 48 | 0% |
| | Local | 5 | 0% |

Overall surface disturbance in the Monticello-Dove Creek population area is approximately 41% of Occupied Habitat and 56% of Unoccupied Habitat. Most surface disturbance is from agricultural development. Roads, energy development, and other infrastructure in Occupied Habitat cover 966 acres totaling less than 1% of Occupied Habitat.

**Table 3.26 - Surface Disturbance in the Monticello-Dove Creek Population Area**

| LAND STATUS | ACRES OF SURFACE DISTURBANCE | % OF ALL DISTURBANCE | % OF HABITAT DISTURBED |
|---|---|---|---|
| OCCUPIED HABITAT | | | |
| **Total Occupied Habitat** | **45,745** | **–** | **41%** |
| BLM | 118 | 0% | 0% |
| Private | 45,617 | 100% | 41% |
| State | 10 | 0% | 0% |
| UNOCCUPIED HABITAT | | | |
| **Total Unoccupied Habitat** | **131,592** | **–** | **56%** |
| BLM | 815 | 1% | 0% |
| Private | 130,776 | 99% | 55% |
| USFS | 1 | 0% | 0% |

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.10 - Surface Disturbance in the Monticello-Dove Creek Population Area**



In the Monticello-Dove Creek population area, 58,774 acres are outside of mapped occupied or unoccupied habitat and within 4 miles of a lek.  Surface ownership for the area outside of Occupied Habitat and Unoccupied Habitat is identified in Table 3.6.  Public lands managed by the BLM make up 43% of the additional area.  Within four miles of a lek and outside of Occupied Habitat and Unoccupied Habitat, 24% (13,967 acres) is capable of supporting GUSG, 63% (36,785 acres) is non-habitat, and 14% (7,971 acres) is classified as agricultural development.

## Piñon Mesa Population

The Piñon Mesa Population of GUSG is located about 22 miles southwest of Grand Junction, Colorado.  While almost entirely within Colorado, the population area does include approximately 6,000 acres of Unoccupied Habitat in southeast Utah.  The interior portions of the area are composed of mesas and canyons.  At lower elevations, saltbush, sagebrush, and greasewood are common.  Higher elevations are dominated by oakbrush, with sagebrush and snowberry in openings (RCP 2005).

CHAPTER 3 - AFFECTED ENVIRONMENT

Predominant uses of BLM lands in the area include livestock grazing, recreation, and hunting.  There are 21 known leks, of which 11 are active, 2 inactive, and 8 historic (CPW 2015 lek data request).  Peak male attendance was 35 in 2015 and 36 in 2014. Between 2000 and 2013, the Piñon Mesa Population was augmented with 92 birds from the Gunnison Basin, 44 of which were introduced in 2010–2011 (CPW 2015 data request).  The 2015 population estimate was 172 birds.

**Figure 3.11 - Piñon Mesa GUSG Population, 1996–2014**



CPW 2014 unpublished data

Occupied Habitat in the Piñon Mesa area covers approximately 44,104 acres. Occupied Habitat is 70% (30,689 acres) private surface.  Public lands managed by the BLM make up approximately 29% (12,686 acres) of Occupied Habitat.  1,391 acres of Occupied Habitat is agricultural land.  About 74% (32,710 acres) of Occupied Habitat on Piñon Mesa is capable of supporting GUSG, while the remaining 23% (10,004 acres) consists of aspen stands, pinyon-juniper, and other habitat types.

CHAPTER 3 - AFFECTED ENVIRONMENT

**Table 3.27 - Piñon Mesa GUSG Habitat based on LANDFIRE Data**

| PIÑON MESA | OCCUPIED HABITAT | | UNOCCUPIED HABITAT | |
|---|---|---|---|---|
| | Acres | Percent | Acres | Percent |
| HABITAT | 32,710 | 74% | 71,171 | 35% |
| NON-HABITAT | 10,004 | 23% | 122,203 | 61% |
| AGRICULTURAL | 1,391 | 3% | 7,990 | 4% |

Unoccupied Habitat on Piñon Mesa encompasses 201,363 acres. BLM-administered lands cover 49% (97,795 acres) of Unoccupied Habitat, with 6,023 acres located in Utah. Private surface makes up 30% (63,845 acres) of Unoccupied Habitat, while USFS-managed lands make up 21% (42,698 acres). Agricultural land makes up 4% (7,990 acres) of Unoccupied Habitat. Approximately 35% (71,171 acres) of Unoccupied Habitat is capable of supporting GUSG, while 122,203 acres or 61% is non-habitat consisting mostly of woodlands, including pinyon-juniper and ponderosa pine.

**Table 3.28 - Surface Ownership in the Piñon Mesa Population Area**

| STATUS | OWNER/MANAGER | ACRES | % OF HABITAT |
|---|---|---|---|
| Occupied Habitat (44,104 acres) | Private | 30,689 | 70% |
| | BLM | 12,686 | 29% |
| | USFS | 729 | 2% |
| Unoccupied Habitat (201,364 acres) | BLM | 97,795 | 49% |
| | Private | 60,845 | 30% |
| | USFS | 42,698 | 21% |
| | Other | 25 | 0% |

Overall surface disturbance in the Piñon Mesa population area is almost non-existent in Occupied Habitat and affects approximately 1% of Unoccupied Habitat. Surface disturbance consists primarily of roads. Roads and other infrastructure cover less than 0.1% (40 acres) of Occupied Habitat.

CHAPTER 3 - AFFECTED ENVIRONMENT

**Table 3.29 - Surface Disturbance in the Piñon Mesa Population Area**

| LAND STATUS | ACRES OF SURFACE DISTURBANCE | % OF ALL DISTURBANCE | % OF HABITAT DISTURBED |
|---|---|---|---|
| **All Occupied Habitat** | **92** | — | **< 1.0%** |
| BLM | 3 | 4% | <0.1% |
| Private | 88 | 96% | 0.2% |
| **All Unoccupied Habitat** | **2,110** | — | **1.0%** |
| BLM | 225 | 11% | 0.1% |
| Private | 1,765 | 84% | 0.9% |
| USFS | 120 | 6% | <0.1% |

**Figure 3.12 - Surface Disturbance in the Piñon Mesa Population Area**



In the Piñon Mesa population area, 59,131 acres are outside of mapped Occupied Habitat and Unoccupied Habitat and within 4 miles of a lek. At its widest point, Occupied Habitat in the area is just over 4 miles wide, meaning that no point is further than 2 miles from the edge of Occupied Habitat. Surface ownership for the area outside of Occupied Habitat and Unoccupied Habitat is identified in Table 3.6. Public lands managed by the BLM make up 45% of the area.

Within four miles of a lek and outside of Occupied Habitat and Unoccupied Habitat, 32% of the land (18,753 acres) provides habitat capable of supporting GUSG, 67% (39,873 acres) is non-habitat, and less than 1% (504 acres) is classified as agricultural development.

## Poncha Pass Population

The Poncha Pass Population of GUSG is located about 10 miles northwest of Villa Grove in Saguache County, Colorado. Occupied Habitat extends over approximately 20,428 acres. Proposed critical habitat for the Poncha Pass Population was not designated by the FWS in its final determination of November 2014. Sagebrush in the area is contiguous, with little fragmentation (RCP 2005).

There are four known leks in in the area, of which three are active and one is inactive. Peak male attendance was 10 in 2014 (CPW 2015 Lek Data Request). The 10 individuals were translocated from the Gunnison Basin. While 3 males were seen on leks in 2011, none were observed in 2013. Due to the absence of birds in 2013, no population estimate was provided for the Poncha Pass Population in 2014. The population number for 2014 consisted of the translocated birds. In 2015, the high lek count was 6 birds. Between 2000 and 2013, the Poncha Pass Population was augmented with 41 birds from the Gunnison Basin. In the fall of 2013, 17 birds were released, with 10 more in the spring of 2014. The 2015 population estimate was 29 birds.

**Figure 3.13  - Poncha Pass GUSG Population, 1998–2014**



CPW 2014 unpublished data

Occupied Habitat in the Poncha Pass area covers roughly 20,428 acres, with **48%** (9,860 acres) consisting of public lands managed by the BLM.  USFS-managed lands make up 26% (5,214 acres) of Occupied Habitat, followed by 24% private surface (4,875 acres) and 2% State of Colorado lands (478 acres).  Only 123 acres of Occupied Habitat is agricultural land.  Habitat capable of supporting GUSG makes up 53% (10,839 acres) of Occupied Habitat, while other habitat types make up 46% (9,466 acres).  Other habitats include grasslands, lodgepole forests, and aspen forests.

**Table 3.30 - Poncha Pass Sage-Grouse Habitat based on LANDFIRE Data**

| PONCHA PASS | OCCUPIED HABITAT | | UNOCCUPIED HABITAT | |
|---|---|---|---|---|
| | Acres | Percent | Acres | Percent |
| HABITAT | 10,839 | 53% | 15,253 | 55% |
| NON-HABITAT | 9,466 | 46% | 11,690 | 42% |
| AGRICULTURAL | 123 | 1% | 952 | 3% |

CHAPTER 3 - AFFECTED ENVIRONMENT

Unoccupied Habitat on Poncha Pass encompasses approximately 27,894 acres. BLM-managed lands cover 53% of Unoccupied Habitat totaling 14,877 acres. Private surface makes up 40% of Unoccupied Habitat totaling 11,225 acres. State of Colorado and USFS lands make up the remaining 6% and 1% respectively. Agricultural land makes up 3% or 741 acres of Unoccupied Habitat. About 55% (15,253 acres) of Unoccupied Habitat in the area is capable of supporting GUSG. The remaining 42% (11,690 acres) consists of other habitat types, predominated by subalpine grasslands.

**Table 3.31 - Surface Ownership in the Poncha Pass Population Area**

| HABITAT TYPE | OWNER/MANAGER | ACRES | % OF HABITAT |
|---|---|---|---|
| Occupied Habitat (20,428 acres) | BLM | 9,860 | 48% |
| | USFS | 5,214 | 26% |
| | Private | 4,875 | 24% |
| | State | 478 | 2% |
| Unoccupied Habitat (27,894 acres) | BLM | 14,877 | 53% |
| | Private | 11,225 | 40% |
| | State | 1,605 | 6% |
| | USFS | 187 | 1% |

Overall surface disturbance in the Poncha Pass population area is roughly 5% in Occupied Habitat and approximately 7% of Unoccupied Habitat. Most surface disturbance is categorized as agricultural development. Roads and other infrastructure cover approximately 1% (211 acres) of Occupied Habitat.

CHAPTER 3 - AFFECTED ENVIRONMENT

**Table 3.32 - Surface Disturbance in the Poncha Pass Population Area**

| LAND STATUS | ACRES OF SURFACE DISTURBANCE | % OF ALL DISTURBANCE | % OF HABITAT DISTURBED |
|---|---|---|---|
| OCCUPIED HABITAT | | | |
| **Total Occupied Habitat** | **973** | – | **4.8%** |
| BLM | 134 | 14% | 0.7% |
| Private | 751 | 77% | 3.7% |
| State | 60 | 6% | 0.3% |
| USFS | 27 | 3% | 0.1% |
| UNOCCUPIED HABITAT | | | |
| **Total Unoccupied Habitat** | **2,029** | – | **7.3%** |
| BLM | 171 | 8% | 0.6% |
| Private | 1,666 | 82% | 6.0% |
| State | 190 | 9% | 0.7% |
| USFS | 1 | – | – |

**Figure 3.14 - Surface Disturbance in the Poncha Pass Population Area**



**BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS**

**AUGUST 2016**

CHAPTER 3 - AFFECTED ENVIRONMENT

In the Poncha Pass population area, 16,249 acres is outside of mapped Occupied Habitat and Unoccupied Habitat and within 4 miles of a lek. Occupied Habitat in the Poncha Pass population area is just over 5 miles wide at its widest point. This means that no point within Occupied Habitat is more than 2.5 miles from the edge of Occupied Habitat. Surface ownership for the area outside of Occupied and Unoccupied Habitat is identified in Table 3.31. Public lands managed by the BLM make up 5% of the additional area.

Within four miles of a lek and outside of Occupied and Unoccupied Habitat, 21% (3,484 acres) of the land surface is capable of supporting GUSG, with 78% (12,725 acres) classified as non-habitat.

## San Miguel Basin Population

The San Miguel Basin Population of GUSG is located in Montrose and San Miguel counties, Colorado and is made up of six small sub-populations (Dry Creek Basin, Hamilton Mesa, Miramonte Reservoir, Gurley Reservoir, Beaver Mesa, and Iron Springs) (RCP 2005). GUSG in the San Miguel Basin are thought to have once moved widely between populations and it is believed that the basin was once a migratory corridor between the Cerro Summit-Cimarron-Sims Mesa Population and the Monticello-Dove Creek Population (79 FR 69192).

The San Miguel Population supports thirteen leks, of which six are active, five are inactive, and two are historic. Four of these leks are found in Dry Creek Basin, none in Hamilton Mesa, two in Miramonte Reservoir, two in Gurley Reservoir, three in Beaver Mesa, and two in Iron Springs (CPW 2015 Lek Data Request). The high male lek count was 59 in 2015 and 42 in 2014. The 2015 population was estimated at 289 individuals. Between 2000 and 2013, 51 birds were transplanted into the San Miguel Basin Population. Overall, 112 birds have been translocated from the Gunnison Basin to the San Miguel Population.

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.15 - San Miguel Basin GUSG Population, 1996–2014**



The majority of habitat (64%) for the San Miguel Population is in the Dry Creek Basin. The proposed rule for GUSG cites the San Miguel Basin Sage-grouse Working Group as stating that the Dry Creek Basin has some of the poorest habitat and smallest individual GUSG populations (79 FR 69192). Dry Creek Basin consists of 57% (35,252 acres) BLM, 30% (18,474 acres) private, 12% (7,544 acres) local government, and 1% (734 acres) State of Colorado lands.

Hamilton Mesa is mostly private surface (85%, 4,081 acres). The State of Colorado is the next largest surface management agency (11%, 527 acres), followed by the BLM with 4% of the area (177 acres). Miramonte Reservoir is mostly private (73%, 8,544 acres) and State of Colorado (14%, 1,672 acres). Gurley Reservoir and Beaver Mesa are mostly private surface with 91% and 99% private surface respectively. Gurley reservoir has 152 (2%) acres of State of Colorado and 185 acres (3%) of BLM surface. Surface ownership in Iron Springs is 73% private surface (34,824 acres) followed by USFS with 27% of the surface (12,752 acres) and the remaining 1% is State of Colorado.

In Occupied Habitat in the San Miguel Basin population area, 47,482 acres or 47% is capable of supporting GUSG. Agricultural lands make up 16% of habitat and lands

**BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS**
                                    **AUGUST 2016**

CHAPTER 3 - AFFECTED ENVIRONMENT

classified as not GUSG habitat make up 37% (37,997 acres) of lands in Occupied Habitat.

**Table 3.33 - San Miguel Basin GUSG Habitat based on LANDFIRE Data**

| SAN MIGUEL BASIN | OCCUPIED HABITAT | | UNOCCUPIED HABITAT | |
|---|---|---|---|---|
| | Acres | Percent | Acres | Percent |
| Habitat | 47,482 | 47% | 19,607 | 47% |
| Non-Habitat | 37,997 | 37% | 21,710 | 52% |
| Agricultural | 16,119 | 16% | 171 | 0% |

Unoccupied Habitat in the San Miguel population area is mostly (52%, 21,720 acres) habitat that does not support GUSG.  Habitat capable of supporting GUSG makes up 47% or 19,607 acres.  Agricultural lands make up 171 acres of Unoccupied Habitat.

**Table 3.34 - Surface Ownership in the San Miguel Population Area**

| STATUS | OWNERSHIP | ACRES | % OF HABITAT |
|---|---|---|---|
| Occupied Habitat (101,597 acres) | Private | 52,458 | 52% |
| | BLM | 35,879 | 35% |
| | Local | 8,357 | 8% |
| | State | 3,437 | 3% |
| | USFS | 1,466 | 1% |
| Unoccupied Habitat (41,488 acres) | Private | 29,094 | 70% |
| | USFS | 12,393 | 30% |

Overall surface disturbance in the San Miguel Basin population area is roughly 3% of Occupied Habitat and approximately 2% of Unoccupied Habitat.  Most surface disturbance is categorized as agricultural development.  Roads, energy development, and other infrastructure in Occupied Habitat covers 1,081 acres and is approximately 0.11% of Occupied Habitat.

**Table 3.35 - Surface Disturbance in the San Miguel Population Area**

| LAND STATUS | ACRES OF SURFACE DISTURBANCE | % OF ALL DISTURBANCE | % OF HABITAT DISTURBED |
|---|---|---|---|
| OCCUPIED HABITAT | | | |
| Occupied Habitat | 3,258 | – | 3.0% |
| BLM | 386 | 12% | 0.4% |

CHAPTER 3 - AFFECTED ENVIRONMENT

| LAND STATUS | ACRES OF SURFACE DISTURBANCE | % OF ALL DISTURBANCE | % OF HABITAT DISTURBED |
|---|---|---|---|
| Local | 194 | 6% | 0.2% |
| Private | 2,632 | 81% | 2.6% |
| State | 26 | 1% | <0.1% |
| USFS | 20 | 1% | <0.1% |
| UNOCCUPIED HABITAT | | | |
| **Unoccupied Habitat** | **1,031** | — | **2.0%** |
| Private | 903 | 88% | 2.2% |
| USFS | 128 | 12% | 0.3% |

**Figure 3.16 - Surface Disturbance in the San Miguel Basin Population Area**



In the San Miguel Basin population area, 124,757 acres is outside of mapped Occupied Habitat and Unoccupied Habitat and within four miles of a lek.  At its widest point, the Occupied Habitat is just over 6 miles wide, meaning that no point in Occupied Habitat is further than 2.5 miles from the edge of Occupied Habitat.

Surface ownership for the area outside Occupied Habitat and Unoccupied Habitat is identified in Table 3.6. Public lands managed by the BLM make up 33% of the additional area.

Within four miles of a lek and outside Occupied Habitat and Unoccupied Habitat, 18% (22,971 acres) is capable of supporting GUSG, 79% (96,643 acres) is non-habitat, and less than 3% (3,142 acres) is agricultural development.

## TRENDS

Trend data for the Gunnison Basin indicates that the Gunnison Basin Population is stable to increasing. Trend data for the satellite populations must be interpreted with caution. Population augmentation could substantially confound population estimates in the satellite populations. In addition, once a population is below the minimum viable population, the rate of decrease in the population will slowly increase, leading to a steady downward trend, regardless of management in the area.

Sagebrush loss appears to have stopped in 1993. As more sagebrush is being planted through various U.S. Department of Agriculture programs, this trend could be changing direction. Mapping of surface disturbance for the RMP Amendment identified a 16% loss of habitat through loss of sagebrush availability or habitat degradation (Table 4.3). This corresponds with the loss estimated by Oyler-McCance. Based on the Oyler-McCance data from 1993 and data from the GUSG disturbance mapping, little or no habitat has been lost since 1993.

## 3.2. FISH & WILDLIFE

### INTRODUCTION

This section describes the existing conditions for wildlife resources within the decision area, including terrestrial animal species and their habitats. The Utah Department of Wildlife Resources (UDWR) and Colorado Parks and Wildlife (CPW) have primary authority for the management of fish and wildlife species, while the BLM is responsible for managing habitat on public lands.

Two big game species are carried forward for analysis primarily due to concerns about potential impacts to GUSG habitat and the potential for overlapping benefits and restrictions from mineral leasing and development in the alternatives. The common raven is carried forward primarily due to recent concerns related to the predation of GUSG. We recognize that there are multiple predators of sage-grouse, however ravens have been identified as the primary predator where they occur (Coates et al 2008, Lockyer et al 2013). Ravens have also been identified as actively seeking (targeting) sage-grouse nests (Howe and Coates 2015). Most all other predators of sage-grouse are opportunistic and have not been identified to have near the impact of ravens.

Only species that could impact GUSG or their habitat to the extent of influencing conservation measures and alternative development to conserve GUSG are addressed in this document. Due to the conservation-focused nature of the plan amendment, wildlife in the decision area would receive residual protection and may have additional benefits from any alternative analyzed outside of the No Action Alternative. Under the No Action Alternative, there would be no change outside of what has already been analyzed in existing land use plans. No issues were identified for any other species during internal or external scoping. Issues point to environmental effects and as such, can help shape the proposal and alternatives.

**Table 3.36 - Fish and Wildlife Species of Primary Interest in the Decision Area**

| SPECIES | RATIONALE FOR PRIORITY DESIGNATION |
|---|---|
| MAMMALS | |
| Elk *(Cervus Canadensis)* | Big game species; potential for habitat alteration; high economic and recreational value |
| Mule Deer *(Odocoileus hemionus)* | Big game species; potential for habitat alteration; high economic and recreational value |
| BIRDS | |
| Common Raven *(Corvus corax)* | Predator; high interest associated with concern for decrease in GUSG nest success; protected by law |

## 3.2.1.   ELK (CERVUS CANADENSIS)

Elk winter range overlaps with almost all Occupied and Unoccupied Habitat.  Elk are primarily grazers and in high concentrations may have substantial impacts on the habitat components identified for GUSG in the Rangewide Conservation Plan.

## INDICATORS

Wildlife status in Occupied and Unoccupied Habitat is described in terms of:

- Elk population estimates
- Number of elk per square mile
- Mule deer population estimates
- Number of mule deer per square mile
- Surface disruptive activities on the landscape

## EXISTING CONDITIONS

Biomass production is extremely variable throughout the decision area both spatially and annually.  Deer and elk are typically migratory, largely overlapping with GUSG habitat in the winter months (November through March).  Even during that period, deer and elk spend only a portion of time in specific areas important to GUSG.  Where big game concentrates in the winter in GUSG habitat, big game could impact the habitat, including the ability of the site to meet RCP habitat guidelines.

Sagebrush is frequently cited as one of the most important shrub resources for mule deer out of a list of over 17 species, though shrub consumption varies seasonally from approximately 20% of mule deer diet in the spring-early summer up to 80% during the fall months.  Most sagebrush species are identified as moderately valuable to elk during the fall and winter seasons, and low value in spring and summer months.

For this document, critical winter range is the combination of CPW Elk Winter Concentration Areas and UDWR Elk Crucial Winter Range data.  This term is used in an effort to reflect a common analysis approach for the two different states.

Within the decision area, there are ten elk Data Analysis Units (DAUs) in Colorado and two elk management units in Utah.  The combined elk units in both states cover approximately 11,174,736 acres and the 2014 population estimate for elk throughout all units was 68,648.  In 1988, CPW estimated the elk population to be around 70,843.  The elk population increased to an estimated 82,000 in 1999-2000, and has since declined to fewer than 65,000.  In Utah, the population is estimated to be around 3,550 elk.

The twelve elk units contain approximately 1,314,734 acres of critical winter range for elk.  Critical winter range was determined using a combination of CPW Elk Winter Concentration Areas and UDWR Elk Crucial Winter Range data.  Approximately 276,457 acres of critical winter range is identified as GUSG Occupied Habitat and 97,603 acres as Unoccupied Habitat.  Roughly 20% of elk critical winter range occurs in Occupied Habitat.

CPW defines winter range as that part of the overall range where 90% of the elk use is located during a mild winter.  Winter concentration areas are that part of the winter range where densities are at least 200% greater than the surrounding winter range density in the average five winters out of ten.  Based on CPW mapped winter ranges, winter concentration areas and winter range definitions, elk densities for each game unit in the decision area are identified in the write-up for each game unit.

## COLORADO ELK UNITS

### E-11 (GMU 82) - Sand Dunes

Sand Dunes elk have been modeled since 1988.  The population increased in the 1990s, to a high of 5,500 elk.  The population declined with the 2002 drought, but has increased since then and leveled off.  The elk population is currently estimated at 4,500.  The population objectives were set in 2010 at 3,000-4,000 elk.  Elk Unit E11 is 1,088 square miles in size and is bordered by the crest of the Sangre de Cristo Mountains to the east, the Alamosa/Costilla county line and U.S. Highway 160 to the south, Colorado Highway 17 and U.S. Highway 285 to the west, and the divide between the Arkansas drainage and the San Luis Valley to the north.

The overall range of elk encompasses the range of GUSG at Poncha Pass.  Elk summer and winter range overlap most of the Poncha Pass GUSG range.  An elk summer concentration area is on the east side of Poncha Pass GUSG range, with an elk production area adjacent to the eastern edge of this GUSG range.  An elk highway corridor transects part of the north side of the Poncha Pass GUSG range.  No winter concentration areas or severe winter range for elk intersects GUSG range at Poncha in E11.

Winter range can be limiting for the elk population.  Elk tend to concentrate on winter range and disperse to higher elevations during summer.  The relatively low overlap of elk and GUSG during critical winter months likely reduces any significant impacts of elk herbivory on GUSG habitat.  These species have coexisted for many centuries and face similar challenges.  Building development on private land can fragment habitat for elk.  This type of land development also can affect GUSG.  Focus on conservation of sustainable and diverse sagebrush habitat will benefit multiple species, including GUSG and elk.

CHAPTER 3 - AFFECTED ENVIRONMENT

Elk densities based on CPW winter range definitions and population estimates could be as high as 31 elk per square mile in winter concentration areas. There is no winter concentration area for this unit in Occupied Habitat.

**Figure 3.17 - Sand Dunes Elk Unit (E-11) Post-Hunt Population Estimate, 1988–2014**



CPW

## E-19 (GMU 40) - Piñon Mesa

The Piñon Mesa elk herd, known as DAU E-19, grew dramatically through the 1980s and 1990s. Since the early 2000s, the population size has leveled off at approximately 3,500 elk as a result of a significantly increased and targeted harvest. The herd management plan was approved in 2009 and designates a post-hunt population size of 2,800–3,800 elk, so the population is currently within the objective range.

GUSG on Piñon Mesa have two relatively distinct use areas; a northern, lower elevation area including Fish Park and Glade Park, and a southern, higher elevation area including Luster Basin, Snyder Flats, Timber Ridge, and Payne Mesa.

Elk and GUSG occur together across much of both the high and low elevation sage-grouse ranges on Piñon Mesa, but they are seasonally distinct as elk migrate in response to forage and snow conditions. Elk summer range, summer concentration areas, and production areas overlap with the upper elevation sage-grouse overall range and production areas. Elk winter range overlaps all of the lower elevation sage-grouse areas and portions of the high elevation areas. The winter ranges are almost entirely on BLM lands. Fish Park is used by sage-grouse in winter and is also an elk winter concentration area. Elk densities based on CPW winter range definitions and population estimates could be as high as 23 elk per square mile in

CHAPTER 3 - AFFECTED ENVIRONMENT

winter concentration areas.   Approximately 4% (1,536 acres) of winter concentration area for this unit is in Occupied Habitat.

**Figure 3.18 - Piñon Mesa Elk Unit (E-19) Post-Hunt Population Estimate**



CPW

## E-20 (GMUs 61 & 62) - Uncompahgre

The elk population on the Uncompahgre has increased from the early 1980's, yet has decreased from its highest estimate in the early 2000's towards the objective of 9,500 (Figure 3).  The herd management plan was approved in 2006.  Elk distribution has been a concern for this population, due to the split harvest management between game management units and emphasized recreation on the east side of the Uncompahgre pushing elk to winter at high densities on the west side of the Uncompahgre.  In addition to the distribution issue, declining cow-calf ratios are a big concern for the population as well as other elk populations across southwest Colorado.

The Uncompahgre elk DAU overlaps the San Miguel GUSG Population on Iron Springs Mesa, which lies on the southwest corner of the Uncompahgre Plateau.  Elk use on Iron Springs Mesa is year round, yet most use occurs during migration, calving, and summer.  Winter use is mostly bulls, but on mild winters some cow/calf herds remain on Iron Springs as well.  The Uncompahgre DAU also overlaps historic leks/vacant habitat in the Sims Mesa area, southwest of Montrose, as well as in the Ridgway and Nucla areas.  These historic grouse use areas would have been primarily used by elk as winter range and severe winter range, when snow pushed elk off the upper elevations of the Uncompahgre Plateau.  Recently, GUSG use has also been documented on the north end of the Uncompahgre in the upper end of the Big Dominguez drainage which had been classified as vacant habitat.  Active leks

CHAPTER 3 - AFFECTED ENVIRONMENT

have not been identified in the area, but collared and non-collared grouse have been observed in the area during the winter months.  This area is primarily transition range, calving, and summer range for elk, however, during mild winters elk reside in the area as well.

Elk densities based on CPW winter range definitions and population estimates could be as high as 15 elk per square mile in winter concentration areas.  Approximately 2% (6,263 acres) of winter concentration area for this unit is in Occupied Habitat.

**Figure 3.19 - Uncompahgre Elk Unit (E-20) Post-Hunt Population Estimate, 1980–2014**



CPW

### E-24 (GMUs 70, 71, 72, 73 & 711) - Disappointment

The Disappointment elk herd increased in size from 14,900 in 1987 (the first year captured in the model) and peaked at 23,000 in 2003.  Since that time the population has decreased to the current estimate of 19,200 due to increased hunting pressure.  The population objective is 17,000 to 19,000 established in the 2006 DAU plan.

The entire DAU is considered overall range for elk.  There is overlap between elk winter range and most of the GUSG overall range.  The exception is the GUSG range west of Dove Creek.  Elk winter concentration areas are found on approximately 1/3 of the GUSG overall range and severe winter range on approximately half of the GUSG overall range.  There is less than 20% of the GUSG overall range shared with elk summer range and no commonality with elk summer concentration areas and GUSG overall range.

Elk DAU E-24 includes Game Management Unit 70.  GMU 70 overlaps the majority of the San Miguel Basin population area.  The upper elevation leks around

CHAPTER 3 - AFFECTED ENVIRONMENT

Miramonte, Cone Reservoir, and Beaver Mesa are used by elk in the winter and summer months, as well as during transition.  The Dry Creek Basin area is used by elk as winter range, winter concentration, and severe winter range.  Minimal summer use occurs in Dry Creek by elk.  Elk densities based on CPW winter range definitions and population estimates could be as high as 24 elk per square mile in winter concentration areas.  Approximately 10% (30,633 acres) of winter concentration area for this unit is in Occupied Habitat.

**Figure 3.20 - Disappointment Elk Unit (E-24) Post-Hunt Population Estimate, 1987–2013**



CPW

## E-25 (GMUs 66 & 67) - Powderhorn

The DAU Plan for E25 was written in 2001 and contained a population objective of 3500-4500 elk.  At that time, the population estimate was about 7800.  The result was the public and federal land management agencies felt a significant herd reduction was acceptable, or even necessary. In 2006, population models were significantly changed, in many cases adding about 10-20% more elk to the current estimate, though the objectives were not concurrently changed. Based on the updated model, the estimate in 2001 would have been about 8500. For a few more years, the herd was reduced another 20%, and since has been managed for a stable herd size 6000-6500 elk. A new herd management plan is in preparation now.

Like many places in the Rocky Mountain west, spring and summer ranges in E-21 (as well as E41 and E43 also in the Gunnison Basin, following) are much more expansive than the limited winter range. Summer ranges for elk are mostly discrete from GUSG occupied ranges. Most winter range, where overlap with grouse does exists, occurs many miles from summer range and can only be reached following lengthy migrations.  Public land managers have expressed concerns about the condition of

big game winter ranges (CPW 2001c). According to Colorado Parks and Wildlife (CPW 2001c) overall habitat condition in E-25 may have declined over the last several decades. Sagebrush stands are tending to become more decadent and forbs are being lost in the understory. Long-term soil erosion has caused productivity to decline, and some riparian systems may be deteriorating. The combined effects of these are bound to be having some effect on big game.

Winters may be severe in the Gunnison Basin and the quantity and quality of winter habitat is arguably the primary limitation for herd productivity and sustainability in this region. In E25, E41, and E43, elk typically begin arriving on winter ranges during late November where they remain until the following April. Winter habitats in the Gunnison Basin consist of sagebrush dominated systems interspersed with other key forage species such as aspen, serviceberry, mountain mahogany, bitterbrush, chokecherry, snowberry, rabbitbrush, and occasionally scrub oak. Winter ranges generally receive lower annual precipitation than higher elevation sites and contain less productive soil types. These conditions result in systems that are slow to recover from excessive herbivory and/or climatic stress. A reduction in the quantity and quality of winter range forage across the landscape will ultimately result in declining productivity for local mule deer herds. Degradation of sagebrush systems is also of concern to wildlife managers with regard to GUSG, and other sage obligate species. Elk densities based on CPW winter range definitions and population estimates could be as high as 32 elk per square mile in winter concentration areas. Approximately 77% (67,728 acres) of winter concentration area for this unit is in Occupied Habitat.

**Figure 3.21 - Powderhorn Elk Unit (E-25) Post-Hunt Population Estimate, 1980–2014**



CPW

### E-26 (GMUs 68 & 681) - Saguache

DAU E-26 is 1,047 square miles in size and is bounded on the north and west by the continental divide, on the south by Saguache Creek\Rio Grande divide and County Road G, and on the east by Colorado Highway 285.

Saguache elk have been modeled since 1987. The population increased in the late 1980s and early 1990s to a high of 6,700 elk in the mid-1990s. The population declined in response to the 2002 drought, but has leveled off and increased since then. The population is currently estimated at 4,300. In 2010, population objectives were set at 3,500-4,500 elk.

The overall range for elk encompasses the overall range for GUSG at Poncha Pass. Elk summer and winter ranges overlap most of the Poncha Pass GUSG range. An elk highway corridor transects part of the north side of the Poncha Pass GUSG range. An elk winter concentration site is on a minor southwest side of Poncha Pass GUSG range. No elk summer concentration areas, production areas, or severe winter range intersect GUSG range in E-26.

Winter range can be limiting for the elk population. Elk tend to concentrate on winter range and disperse to higher elevations during summer months. Relatively low overlap of elk and GUSG during critical winter months likely reduces any significant impacts of elk herbivory on GUSG habitat. Winter range, particularly severe winter range, is the limiting factor for elk populations in this DAU (CPW 2008a). The two species have coexisted for many centuries and face similar challenges. Building development on private land can fragment habitat for elk and can also affect GUSG. A focus on conservation of sustainable and diverse sagebrush habitat will benefit multiple species, including GUSG and elk. There is no mapped winter concentration area for this unit in Occupied Habitat.

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.22 - Saguache Elk Unit (E-26) Post-Hunt Population Estimate, 1987–2013**



CPW

### E-35 (GMUs 64 & 65) - Cimarron

The Cimarron elk herd experienced growth beginning in the early 1980s and, like the Uncompahgre elk herd, reached its peak in the early 2000s. Figure 3.23 illustrates the increase through the 1980s and the subsequent decrease during the early 2000s to a more stable to slightly increasing trend in recent years. After the population was pushed toward objective, wildlife specialists and the public concurred that the objective was set too low. Private landowners and hunters have been primarily satisfied with current population levels. While the Cimarron population has experienced a declining cow-calf ratio, it has not been to the extent of the Uncompahgre and other southwest elk herds.

The Cimarron elk DAU overlaps the Cerro Summit-Cimarron-Sims Mesa GUSG Population. Two active leks (Hairpin and Cimarron) occur within the population area. Both leks are within elk summer and winter range, with most elk use occurring during winter months. The lek areas are within elk winter concentration areas and severe winter range. The Hairpin lek area experiences significant elk use during transition and calving periods as well. Historic habitat in Bostwick Park falls within elk winter concentration areas and severe winter ranges. In addition, unoccupied (historic vacant/unknown) habitat in the Waterdog area would include elk winter range, concentration areas, and severe winter range. Based on CPW winter range definitions and population estimates, elk densities could be as high as 23 elk per square mile in winter concentration areas. Approximately 14% (13,757) of the winter concentration area for this unit is within Occupied Habitat.

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.23 - Cimarron Elk Unit (E-35) Post-Hunt Population Estimate, 1980–2014**



CPW

## E-41(GMU 54)- Sapinero

The DAU Plan for E41 was written in 2001 and contained a population objective of 3000-3500 elk. At that time, the population estimate was about 4500, indicating the public and agencies felt a significant herd reduction was acceptable, or even necessary. In 2006, population models were significantly changed, in many cases adding about 10-20% more elk to the current estimate, though the objectives were not concurrently changed. Based on the updated model, the estimate in 2001 would have been about 5600. Since 2005, aggressive cow harvest has reduced the herd to just over 3000 elk and is now being stabilized. A new herd management plan is in preparation now.

The Sapinero elk DAU overlaps GUSG range. While elk summer range lies well above GUSG range, elk winter range and especially elk winter concentration ranges overlap with sage-grouse. The concern about condition of wildlife seasonal ranges, especially winter ranges is significant and has been mentioned by several individuals (CPW 2001b). Dr. Roy Roth with the range science department at Colorado State University offers the following observations. The wildlife winter range is unable to support the current numbers of wildlife without substantial risk to the populations. The shrub component clearly indicates that transitional and winter ranges are being over-browsed. Damage to resources can result in long-term loss of the habitat's ability to support grazing animals (CPW 2001b).

BLM personnel offered the following comments. Numbers of big game in excess of herd objectives from 1987 to 1996 have contributed to the degraded vegetation conditions on critical winter range. The intensity and frequency of big game use has

**BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS**
                                              **AUGUST 2016**

CHAPTER 3 - AFFECTED ENVIRONMENT

resulted in plant communities which cannot support current populations without continued degradation.  Because of this the carrying capacity has been greatly reduced.  The capacity of the winter range to support herd objective no longer exists.  Both elk and deer need to be reduced to improve winter range and transition range (CPW 2001b).

Winter range in the study area is not in good shape.  The vegetation is dominated by over-used and decadent sage plants that have stunted growth and low production.  This condition has resulted from a long time of over use from grazing herbivores.  The key long-term risk, as we see it, is continued and/or accelerated damage to range resources (CPW 2001b).

Sagebrush stands are tending to become more decadent and forbs area being lost in the understory.  Long-term soil erosion has caused productivity to decline, and some riparian systems may be deteriorating.  The combined effects of these are bound to be having some effect on big game (CPW 2001b).

Elk densities based on CPW winter range definitions and population estimates could be as high as 12 elk per square mile in winter concentration areas.  Approximately 71% (61,735 acres) of winter concentration area for this unit is in Occupied Habitat.

**Figure 3.24 - Sapinero Elk Unit (E-41) Post-Hunt Population Estimate**



CPW

## E-43 (GMUs 55 & 551) - Fossil Ridge

The DAU Plan for E43 was written in 2001 and contained a population objective of 3000-3500 elk. At that time, the population estimate was about 4600, indicating the public and agencies felt a significant herd reduction was acceptable, or even necessary. In 2006, population models were significantly changed, in many cases

adding about 10-20% more elk to the current estimate, though the objectives were not concurrently changed. Based on the updated model, the estimate in 2001 would have been about 6,400. Since the early 1990s, cow harvest has reduced the herd to just over 4,000 elk and is now being stabilized. A new herd management plan is in preparation now.

The Fossil Ridge elk herd overlaps GUSG range during the winter months. Elk winter range and especially winter concentration areas overlap grouse range. Elk migrate out of sage-grouse range in late spring and move to summer ranges at higher elevations. According to the CPW (2001a):

> Elk densities on winter range are 8 to 10 times greater than densities found on summer range. Public land managers believe the habitat, especially winter range, has been degraded by big game over-use. They recommend reduction in population size from present levels to allow vegetation to recover. A Colorado State University range scientist says 'the wildlife winter range is unable to support the numbers of wildlife without substantial risk to the populations.'

> The concern about condition of wildlife seasonal ranges, especially winter ranges is significant and has been mentioned by several individuals. Dr. Roy Roth with the range science department at Colorado State University offers the following general comments. The wildlife winter range is unable to support the current numbers of wildlife without substantial risk to the populations. The shrub component clearly indicated that transitional winter ranges are being over browsed. Damage to resources can result in long-term loss of the habitat's ability to support grazing animals.

> BLM personnel offered the following comments. Numbers of big game in excess of herd objectives from 1987 to 1996 have contributed to the degraded vegetation conditions on critical winter range. The intensity and frequency of big game use has resulted in plant communities which cannot support current populations without continued degradation. Because of this the carrying capacity has been greatly reduced. The capacity of the winter range to support herd objective no longer exists. Both elk and deer need to be reduced to improve winter range and transition range.

CHAPTER 3 - AFFECTED ENVIRONMENT

The Gunnison Basin Habitat Assessment Project reported on habitat conditions in portions of DAU E-43.  A report released in January 1999 concluded: "Winter range in the study area is not in good shape.  The vegetation is dominated by over-used and decadent big sage plants that have stunted growth and low production.  This condition has resulted from a long time of over use from grazing herbivores.  The key long-term risk, as we see it, is continued and/or accelerated damage to range resources.

Elk densities based on CPW winter range definitions and population estimates could be as high as 19 elk per square mile in winter concentration areas.  Approximately 89% (77,179 acres) of winter concentration area for this unit is in Occupied Habitat.

**Figure 3.25 - Fossil Ridge Elk Unit (E-43) Post-Hunt Population Estimate, 1980–2014**



CPW

## E-52 (GMUs 53 & 63) - Coal Creek/Fruitland Mesa

The DAU Plan for E52 was written in 2005 and contained a population objective of 2,200-2,400 elk.  At that time, the population estimate was about 2,700, indicating the public and agencies felt a herd reduction was acceptable, or even necessary.  In 2006, population models were significantly changed, in many cases adding about 10-20% more elk to the current estimate, though the objectives were not concurrently changed.  Based on the updated model, the estimate in 2001 would have been about 4,700.  Since the early 1990s, cow harvest has reduced the herd to just below 4,000 elk and is now being stabilized.  A new herd management plan will be prepared in the next few years.

CHAPTER 3 - AFFECTED ENVIRONMENT

Only the southern portion of this DAU overlaps with GUSG. The public land portion of the DAU (generally eastern side) is very popular with hunters, creating a high density of hunters and roads, and it is generally accepted elk migrate westerly onto private and BLM lands earlier than might be caused by weather alone to avoid hunters and road traffic. This has created distribution issues of elk concentrating for longer periods of time on private and NPS lands, while also using the intermixed BLM lands used by GUSG. These issues are being addressed with special private land only seasons. Wildlife/livestock conflict areas are discussed in the Gunnison Basin Big Game Distribution Management Plan (DMP) (November 1992). Public land managers have expressed concerns about the condition of big game winter ranges (CPW 2005).

Elk densities based on CPW winter range definitions and population estimates could be as high as 25 elk per square mile in winter concentration areas. Approximately 32% (17,626 acres) of winter concentration area for this unit is in Occupied Habitat.

**Figure 3.26 - Coal Creek/Fruitland Mesa Elk Unit (E-52) Post-Hunt Population Estimate, 1980–2014**



CPW

## UTAH ELK UNITS

### E-13 La Sal

The population objective for the La Sal Unit is 2,500 elk. The La Sal Unit covers approximately 116,126 acres and contains 70,222 acres of critical winter range. There are no crucial winter ranges for this unit in Occupied Habitat.

**Figure 3.27 - Utah La Sal Elk Unit Population Estimate, 2003–2013**



### E-14 San Juan

The population objective for the San Juan Unit is 1,300 elk.  The San Juan Unit covers approximately 1,338,227 acres and contains 118,028 acres of critical winter range.  There are no crucial winter ranges for this unit in Occupied Habitat.

**Figure 3.28 - Utah San Juan Elk Unit Population Estimate, 2003–2013**



## 3.2.2.   MULE DEER (ODOCOILEUS HEMIONUS)

Across the decision area, there are eleven mule deer units in Colorado and two in Utah.  In 1988, CPW estimated the population to be around 149,533 deer. The mule deer population has been in decline since.  The current Colorado population of mule deer within the decision area is estimated to be just over 81,000 deer.  Mule deer have declined almost 45% in Colorado in the range of GUSG since 1988.  In Utah, the population is estimated to be around 332,900 statewide, with approximately 20,350 mule deer in the decision area.

The mule deer units contain approximately 1,782,980 acres of mule deer critical winter range.  Mule deer critical winter range was determined using a combination of CPW Mule Deer Critical Winter Range and UDWR Mule Deer Crucial Winter Range.  There are 312,712 acres of critical winter range in Occupied Habitat and 139,825 acres in Unoccupied Habitat.  Roughly 18% of critical winter range for all units is in Occupied Habitat.

CPW defines winter range as that part of the overall range where 90% of the deer use is located during a mild winter.  Winter concentration areas are that part of the winter range where densities are at least 200% greater than the surrounding winter range density in the average five winters out of ten.  Based on CPW mapped winter ranges, winter concentration areas, and winter range definitions, mule deer densities for each game unit in the decision area are identified throughout this section.

## COLORADO DATA ANALYSIS UNITS

### D-18 (GMU 40) - Piñon Mesa

The Piñon Mesa mule deer herd, known as DAU D-18, declined dramatically through the 1980s and early 1990s.  Since the mid-1990s, the population size has leveled off at approximately 5,100 deer.  The herd management plan was approved in 2009 and designates a post-hunt population size of 6,500–8,500 mule deer, so the population is currently well below the objective range.

GUSG on Piñon Mesa have two relatively distinct use areas; a northern, lower elevation area including Fish Park and Glade Park, and a southern, higher elevation area including Luster Basin, Snyder Flats, Timber Ridge, and Payne Mesa.

Mule deer and GUSG use the same area across both the high and low elevation GUSG ranges on Piñon Mesa, but they are seasonally distinct as deer migrate in response to forage and snow conditions.  Mule deer summer range overlaps with the upper elevation sage-grouse overall range and production areas.  Mule deer winter range overlaps all of the lower elevation GUSG areas and portions of the high elevation areas.  Fish Park, the Reservation Country, and Snyder Flats are used

CHAPTER 3 - AFFECTED ENVIRONMENT

by GUSG in winter and are also mule deer winter concentration areas.   Fish Park and the Reservation Country also provide sever winter range to mule deer.  "There is some concern, primarily within the CDOW [now CPW], that doe-fawn ratios are not as high as would be expected.  It is possible this is due to density-dependence related to winter range declines." (CPW 2010b).  "A significant impact to habitat condition in DAU D-18 is the fragmentation and destruction of habitat as a result of residential development, causing direct habitat loss" (CPW 2010b).  Direct removal of winter range will result in higher densities of mule deer in habitat that remains undeveloped.  Mule deer densities based on CPW winter range definitions and population estimates could be as high as 27.9 mule deer per square mile in winter concentration areas.  Approximately 10% (8,302 acres) of winter concentration area for this unit is in Occupied Habitat.

**Figure 3.29 - Piñon Mesa Mule Deer Unit (D-18) Post-Hunt Population Estimate**



CPW

## D-19 (GMUs 61 & 62) - Uncompahgre

The Uncompahgre mule deer herd is estimated to be considerably smaller now at 19,170 than in the early 1980s when the population was estimated to exceed 50,000 (as shown in Figure 3.30).  A herd management plan (also known as a Data Analysis Unit plan) was approved in 2006 with a set population objective of 36-38,000 mule deer.  The current population is well below that objective, based on changes in population models and prolonged effects from the winters of 2007-2009 with poor fawn to doe ratios.  The population appears to have hit bottom and is now rebounding based on better fawn to doe ratios, high over-winter fawn survival (74.8% in 2013-14, 94% to date this winter) and high annual doe survival (90.7% in 2013-14, 97.8% to date this winter).  A new herd management plan is being

developed.  Revised population objectives will probably be somewhere between 20,000-28,000, pending public and internal input.

The Uncompahgre DAU overlaps the San Miguel GUSG Population on Iron Springs Mesa, which lies on the southwest corner of the Uncompahgre Plateau.  Mule deer use is limited to fawning, summer, and early fall, as mule deer migrate to lower elevations north and west in the winter.  The Uncompahgre DAU also overlaps historic leks and vacant habitat in the Sims Mesa area, southwest of Montrose, as well as in the Ridgway and Nucla areas.  These historic GUSG use areas would have been primarily used by mule deer during winter months, as concentration areas, when snow pushed deer off the upper elevations of the Uncompahgre Plateau.

Recently, GUSG use has also been documented on the north end of the Uncompahgre in the upper end of the Big Dominguez drainage which had been classified as vacant habitat.  Active leks have not been identified in the area, but collared and non-collared GUSG have been observed in the area during the winter months.  This area is primarily summer and transition range for mule deer, however, during mild winters mule deer reside in the area as well.  Mule deer densities based on CPW winter range definitions and population estimates could be as high as 30.2 mule deer per square mile in winter concentration areas.  Approximately 2% (5,227 acres) of winter concentration area for this unit is in Occupied Habitat.

**Figure 3.30 - Uncompahgre Mule Deer Unit (D-19) Post-Hunt Population Estimate, 1980–2014**



CPW

CHAPTER 3 - AFFECTED ENVIRONMENT

### D-21(GMU 54) - West Elk

The current model estimates suggest that there was a larger deer population in D-21 during the early 1980s, which declined as a result of the severe winter of 1983-84. Although not as high as pre-1983–1984 levels, the mule deer population in D-21 increased to over 8,000 estimated animals during the late 1980s before experiencing a gradual decline during the first half of the 1990s.  Following statewide license limitation in 1999 and a series of exceptionally mild winters, the mule deer herd in D-21 increased substantially.  More recently, the population in D-21 declined considerably as a result of the severe winter of 2007–2008 and lingering effects since.  Prior to that winter, the population had hit a recent high and was actively being reduced through sustained antlered and antlerless harvest.  Since 2008, the allocation of hunting licenses has remained extremely conservative, with no antlerless hunting occurring.  The 2013 post-hunt population estimate for D-21 was approximately 5,200 mule deer on a moderately increasing trend, within the objective range established in 2013 of 5,000–5,500 mule deer.

Like many places in the Rocky Mountain West, spring and summer ranges in D-21 (as well as D22 and D25, following) are much more expansive than the limited winter range.  Summer ranges for mule deer are mostly discrete from GUSG occupied ranges.  Most winter range, where overlap with GUSG does exists, occurs many miles from summer range and can only be reached following lengthy migrations.  Winters can be severe in the Gunnison Basin and the quantity and quality of winter habitat is arguably the primary limiting factor for herd productivity and sustainability in this region.

In D-21, D-22, and D-25, mule deer typically begin arriving on winter ranges during late October or early November, where they remain until the following May.  Winter ranges generally receive lower annual precipitation than higher elevation sites and contain less productive soil types.  These conditions result in systems that are slow to recover from excessive herbivory and/or climatic stress.  A reduction in the quantity and quality of winter range forage across the landscape will ultimately result in declining productivity for local mule deer herds.  Degradation of sagebrush systems is also of concern to wildlife managers with regard to GUSG, and other sage obligate species.  Mule deer densities based on CPW winter range definitions and population estimates could be as high as 38.7 mule deer per square mile in winter concentration areas.  Approximately 81% (40,000 acres) of winter concentration area for this unit is in Occupied Habitat.

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.31 - West Elk Mule Deer Unit (D-21) Post-Hunt Population Estimate, 1980–2014**



CPW

### D-22 (GMUs 55 & 551) - Taylor Park

Current model estimates suggest that this population has experienced several population peaks; one during the late 1980's, and one more recently during the early 2000s. Several significant population declines are evident; one following the severe winter of 1983–84, and one following the winter of 2007–08. Following statewide license limitation in 1999 and a series of exceptionally mild winters, the mule deer herd in D-22 increased substantially. More recently, the population in D-22 declined as a result of the severe winter of 2007–2008. Prior to that winter, the population was actively being reduced through sustained antlered and antlerless harvest. Since 2008, hunting license allocation has remained extremely conservative, with no antlerless hunting occurring. The 2013 post-hunt population estimate for D-22 was approximately 6,400 animals on a moderately increasing trend, exceeding the objective range established in 2013 of 5,000-5,500 mule deer. Antlerless hunting was implemented for the 2015 seasons to manage the population toward objective.

In D-22, mule deer overlap the GUSG range year-round. While a low density of mule deer does overlap GUSG range in the summer months, the majority of mule deer summer at elevations above the GUSG range. The majority of overlap occurs during the winter months. All of the winter range classifications for D-22 overlap GUSG range. Concern for browsing pressure on sagebrush occurs during the winter. The concern is greatest when snow is deep and temperatures are cold during severe winters, which is when the heaviest browsing pressure occurs. Mule deer densities based on CPW winter range definitions and population estimates could be as high as 41.1 mule deer per square mile in winter concentration areas.

**BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS
AUGUST 2016**

CHAPTER 3 - AFFECTED ENVIRONMENT

Approximately 97% (56,349 acres) of winter concentration area for this unit is in Occupied Habitat.

**Figure 3.32 - Taylor Park Mule Deer Unit (D-22) Post-Hunt Population Estimate, 1980–2014**



CPW

## D-24 (GMUs 70, 71 & 711) - Groundhog

The post hunt population estimate for D-24 in 2013 was 14,800. For the past four years, the population has been around 14,600 to 14,800, which are the lowest estimates dating back to 1982, the first year in the model. The high in the population was 46,000 in 1982, three times the current population, and the population has been on a decline since that time. For the past few years, the population has been stable at its current size. The D-24 management plan was updated in 2014 with a population objective of 15,000 to 19,000. The objective was 34,000 prior to that.

All of the DAU is considered overall range for mule deer, so there is overlap between mule deer and GUSG. This overlap is limited. In the Dove Creek area as well as in Disappointment Creek, there is some overlap between mule deer winter range and overall GUSG range. Of the areas of overlap, perhaps half of that is considered winter concentration areas or severe winter range for mule deer. The overall range of GUSG near the Utah border is outside of any wintering mule deer activity as well as a portion of GUSG range on the western extent of their range in Disappointment Creek. There is not any overlap between mule deer concentration areas and GUSG range. Less than half of GUSG overall range falls within mule deer summer range.

CHAPTER 3 - AFFECTED ENVIRONMENT

Deer DAU D-24 includes GMU 70.  GMU 70 overlaps the majority of the San Miguel Basin population area.  Mule deer use is limited in the winter, but gets used by mule deer more as transition range and summer range.  The Dry Creek Basin area is used by mule deer as winter range, winter concentration, and severe winter range.  Minimal summer use occurs in Dry Creek by mule deer.  Mule deer densities based on CPW winter range definitions and population estimates could be as high as 19.2 mule deer per square mile in winter concentration areas.  Approximately 13% (38,887 acres) of winter concentration area for this unit is in Occupied Habitat.

**Figure 3.33 - Groundhog Mule Deer Unit (D-24) Post-Hunt Population Estimate, 1982–2014**



CPW

## D-25 (GMUs 66 & 67) - Powderhorn

Similar to other deer herds in the Gunnison area, the D-25 population declined following the severe winter of 1983-84, increased during the late 1980s, and then remained stable or increasing during much of the 1990s.  Following statewide license limitation in 1999 and a series of exceptionally mild winters, the mule deer herd in D-25 increased substantially, and current model estimates suggest the population peaked during the early 2000s.  The population in D-25 declined as a result of the severe winter of 2007-2008.  Prior to that winter, the population was actively being reduced through sustained antlered and antlerless harvest.  Since 2008, hunting license allocation has remained extremely conservative, with no antlerless hunting occurring.  The 2013 post-hunt population estimate for D-25 was approximately 5,800 animals on a moderately increasing trend, within the objective range established in 2013 of 5,400-5,900 deer; antlerless hunting was established in 2014.

The Powderhorn mule deer do overlap GUSG year-round, yet similar to most mule deer populations, the majority of deer migrate to higher elevations outside of

sagebrush habitat during the summer months.  Most overlap of deer and grouse range occurs during the winter months when mule deer are concentrated in the lower elevation sagebrush winter ranges in the northern portions D-25.  Mule deer densities based on CPW winter range definitions and population estimates could be as high as 44 mule deer per square mile in winter concentration areas.  Approximately 84% (41,529 acres) of winter concentration area for this unit is in Occupied Habitat.

**Figure 3.34 - Powderhorn Mule Deer Unit (D-25) Post-Hunt Population Estimate, 1980–2014**



CPW

## D-26 (GMUs 68, 681 & 682) - Saguache

Mule deer in Saguache have been modeled since 1988.  The population declined in the early 1990s.  Once deer licenses were limited in 1999, the population increased.  The population declined during a drought in 2002, then increased again until a harsh winter in 2007–2008 and periods of drought.  The mule deer population fluctuated from increasing to decreasing in numbers during the mid-1990s and 2000s.  In the past few years, the population has become more stable.  The most recent population estimate is 4,400 mule deer.  In 2008, the population objective was set at 4,000-5,000 deer.  D-26 is 1,047 square miles in size and is bounded on the north and west by the Continental Divide, on the south by the Saguache Creek\Rio Grande Divide and County Road G, and on the east by Colorado Highway 285.

Mule deer overall range encompasses Gunnison sage grouse overall range at Poncha Pass.  Mule deer summer range overlaps most of the Poncha Pass GUSG range except a relatively small piece in the south.  Mule deer winter range includes a small piece on the south side of Poncha Pass GUSG range.  Mule deer migration patterns are observed on the edge of Poncha Pass GUSG range.  No known overlap occurs

CHAPTER 3 - AFFECTED ENVIRONMENT

between mule deer concentration area, winter concentration, or severe winter range and GUSG range at Poncha Pass in D26. Winter range can be limiting for this mule deer population. Relatively low overlap of mule deer and GUSG during critical winter months likely reduces any significant impacts of mule deer herbivory on GUSG habitat. These species have coexisted for many centuries and face similar challenges. Building development on private land can fragment habitat for mule deer. This type of land development also can affect GUSG. Focus on conservation of sustainable and diverse sagebrush habitat will benefit multiple species including GUSG and mule deer. There are no winter concentration areas for this unit in Occupied Habitat.

**Figure 3.35 - Saguache Mule Deer Unit Post-Hunt Population Estimate, 1988–2014**



CPW

## D-29 (GMUs 72 & 73) - Mesa Verde

The D-29 population is at its lowest point since 1987, the first year of the model. The 2013 post hunt population estimate is 5,800. The highest population estimate for the same time period was in 1987 at 13,900. The population has been on a decreasing trend over this time period. The D-29 management plan was revised in 2014 and a new population objective was set with a range of 5,500 to 7,000. The prior plan had a population objective of 11,000.

There is only a small portion of mapped overall range for GUSG in the northwest corner of the DAU, west of Dove Creek. This falls within mule deer overall range which is found in the entire unit. Within the GUSG overall range there is only a sliver of mule deer severe winter range and winter concentration area. No other mapped mule deer use in Species Activity Mapping overlaps the GUSG overall range in this DAU. Mule deer densities based on CPW winter range definitions and

CHAPTER 3 - AFFECTED ENVIRONMENT

population estimates could be as high as 25.2 mule deer per square mile in winter concentration areas.  Approximately 1% (733 acres) of winter concentration area for this unit is in Occupied Habitat.

**Figure 3.36 - Mesa Verde Mule Deer Unit (D-29) Post-Hunt Population Estimate, 1987–2016**



CPW

## D-37 (GMU 82) - Villa Grove

Deer in the Villa Grove area have been modeled since 1986.  The population increased until the early 1990s, and then it declined.  When deer licenses were limited in 1999, the population stabilized.  This population grew some, but the heavy winter of 2007-2008 brought some decline.  Since the drought of 2012 passed, the population increased.  The population is currently estimated at 2,200.  The population objectives were set in 2010 at 1,500-2,000 deer.  D-37 is 1,088 square miles in size and is bordered by the crest of the Sangre de Cristo Mountains to the east, the Alamosa/Costilla county line and U.S. Highway 160 to the south, Colorado Highway 17 and U.S. Highway 285 to the west and the divide between the Arkansas drainage and the San Luis Valley to the north.

Mule deer overall range encompasses Gunnison sage grouse overall range at Poncha Pass.  Mule deer summer range overlaps most of the Poncha Pass GUSG range except a relatively small piece in the south.  Mule deer winter range includes a small piece on the south side of Poncha Pass GUSG range.  Mule deer migration patterns are observed on the edge of Poncha Pass GUSG range.  No known overlap occurs between mule deer concentration area, winter concentration, or severe winter range and GUSG range at Poncha Pass in D-37.  Winter range can be limiting for this mule deer population.  Relatively low overlap of mule deer and GUSG during critical winter months likely reduces any significant impacts of mule herbivory on

CHAPTER 3 - AFFECTED ENVIRONMENT

GUSG habitat.  These species have coexisted for many centuries and face similar challenges.  Building development on private land can fragment habitat for mule deer.  This type of land development also can affect GUSG.  Focus on conservation of sustainable and diverse sagebrush habitat will benefit multiple species including GUSG and mule deer.  There are no winter concentration areas for this unit in Occupied Habitat.

**Figure 3.37 - Villa Grove Mule Deer Unit (D-37) Post-Hunt Population Estimate, 1986–2014**



CPW

## D-39 (GMU 63) - Fruitland Mesa

The DAU Plan for D-39 was written in 2007 and contained a population objective of 7000-8000 deer.  At that time, the population estimate was about 8,400, indicating the public and agencies felt a herd slight reduction was acceptable.  Since then, population models were significantly changed, in many cases subtracting about 10-20% deer from the estimate, though the objectives were not concurrently changed.  Based on the updated model, the estimate in 2007 would have been about 6,500.  From 1980 through 2007, the herd fluctuated between 6,000 and 7,000 mule deer and has since declined to about 5,000.

Mule deer in the Fruitland Mesa DAU overlap GUSG during all seasons.  However, the majority of overlap occurs during the winter months when deer migrate to the lower elevation sagebrush winter ranges where the Crawford Population of GUSG resides.  Mule deer densities based on CPW winter range definitions and population estimates could be as high as 35.3 mule deer per square mile in winter concentration areas.  Approximately 14% (11,623 acres) of winter concentration area for this unit is in Occupied Habitat.

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.38 - Fruitland Mesa Mule Deer Unit (D-39) Post-Hunt Population Estimate, 1980–2014**



CPW

## D-40 (GMUs 64, 65) - Cimarron

The Cimarron mule deer population has experienced similar declines to most of the deer populations in southwest Colorado.  In 1980, the Cimarron population was estimated at approximately 18,800, however, now the population is estimated at about 8,100.  The population is currently below objective based on changes to population model and prolonged effects from the winter of 2007-08 with poor fawn to doe ratios.  However, the population appears to have stabilized and is now slightly growing.

The Cimarron DAU overlaps the Cerro Summit-Cimarron-Sims Mesa GUSG Population.  Two active leks occur within this population, the Hairpin Lek and the Cimarron Lek.  Both leks are within mule deer summer and winter range, but most mule deer use occurs during the winter.  The lek areas are within mule deer concentration areas and at least partly within mapped severe winter ranges.  The historic habitat in Bostwick Park falls within mule winter concentration areas and severe winter ranges.  In addition, historic vacant and unknown habitat in the waterdog area would include year round use by deer with most use occurring during the winter.  The Waterdog Lake area includes general winter range, winter concentration, and severe winter ranges.  Mule deer densities based on CPW winter range definitions and population estimates could be as high as 39.8 mule deer per square mile in winter concentration areas.  Approximately 12% (13,421 acres) of winter concentration area for this unit is in Occupied Habitat.

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.39 - Cimarron Mule Deer Unit (D-40) Post-Hunt Population Estimate, 1980–2014**



CPW

## UTAH MULE DEER UNITS

In 2013, the mule deer population in Utah was estimated to be 332,900.  The long-term population objective for Utah is 425,000 deer (Utah Mule Deer Statewide Management Plan).  The mule deer population in Utah has had an annual growth rate of 1.6% for the last 20 years.  Portions of two of Utah's deer units are in GUSG habitat.

### E-13 - La Sal

The population objective for the La Sal unit is 19,400 deer.  The La Sal Unit covers approximately 116,126 acres and contains 100,803 acres of critical winter range.  The La Sal unit is divided into two areas the La Sal Mountains and the Dolores Triangle.  There is no crucial winter range for this population in Occupied Habitat.

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.40 - Utah La Sal Mule Deer Unit Population Estimate**



CPW

No change has been recommended for the La Sal Mountains mule deer herd as habitat monitoring indicates that range trend monitoring conditions are on the upper end of fair. A 20% reduction is recommended for the Dolores Triangle due to poor range conditions in 2006.

## E-14 - San Juan

The population objective for the San Juan Unit is 20,500 mule deer. The San Juan Unit covers approximately 1,338,227 acres and contains 549,466 acres of critical winter range. UDWR monitors range trend conditions. Based on UDWR monitoring, mountain big sagebrush was the most common species sampled in browse studies and increased in density and cover from 1999 to 2004 (UDWR 2012). According to the UDWR deer management plan, the proportion of summer range to winter range appears to be the limiting factor, high quality summer range representing only a small percentage of the Elk Ridge sub-unit. Mule deer densities based on CPW winter range definitions and population estimates could be as high as 7.4 mule deer per square mile in winter concentration areas. Approximately 19% (102,381 acres) of winter concentration area for this unit is in Occupied Habitat.

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.41 - Utah San Juan Mule Deer Unit Population Estimate**



## 3.2.3.   COMMON RAVEN (CORVUS CORAX)

The common raven is found throughout the planning area.  Common ravens are protected under the Migratory Bird Treaty Act.  Raven numbers have quadrupled in the U.S. over the last 40 years (Sauer et al 2011).  Christmas Bird Count data for Colorado identified 179 common ravens in 1971 and 3,362 in 2013, a 1,778% increase (National Audubon Society 2010).  In some areas, common raven populations are expected to increase as a result of the presence of anthropogenic resources (Webb et al 2004).

Common ravens nest opportunistically and will take advantage of isolated trees and anthropogenic structures (Dunk et al 1997, Howe et al 2014, Webb et al 2009, Coates et al 2014a, Bui 2009).  Ravens exhibit strong site fidelity and breeding pairs are territorial (Roth et al 2004).  Non-breeding pairs are typically nomadic and follow the food supply, with many juveniles congregating at a communal point subsidy (Webb et al 2009, Roth et al 2004).  Ravens are omnivores and their diets have been described as consisting of "anything edible, alive or dead, that it can catch kill, disable, or pick up" (Knight and Call 1980).

Multiple studies have identified common ravens as preying upon sage-grouse nests (Bui et al 2010, Coates and Delehanty 2010, Coates et al 2008, Lockyer et al 2013, Schroeder and Baydack 2001) and broods (Bui et al 2009, ).  Mammals have been identified as the main food supply for common ravens, with eggs being second, and avian parts third (Knight and Call 1980).  Common ravens differ from other sage-

grouse predators due to their adaptability and learned food-gathering strategies (Knight and Call 1980). Other predators of sage-grouse, nests, and broods are typically opportunistic in nature. Ravens have been documented to be the most common predator of sage-grouse nests (Coates et al 2008, Lockyer et al 2013). Ravens have learned to search for sage-grouse nests and cache eggs from multiple nests (Howe and Coates 2014). Multiple studies have documented common ravens responding to the presence of sage-grouse nests and broods (Bui et al 2010, Bui et al 2009).

## 3.3. SOIL RESOURCES

### INDICATORS

Existing and potential for surface and vegetation disturbance, expressed in terms of:

- Areas of disturbance
- Areas of vegetation manipulation including vegetation treatments, prescribed burns, and wildfire
- Areas open to surface disturbing activities
- Areas with active livestock grazing allotments.

### EXISTING CONDITIONS

### 3.3.1. CONDITIONS WITHIN OCCUPIED AND UNOCCUPIED HABITAT

Across the region, soils are largely undeveloped, dominated by Aridisol and Entisol soil orders, and formed from sedimentary rocks for areas falling in the Colorado Plateau ecoregion, and from igneous rocks for areas in the Southern Rocky Mountain ecoregion (Bryce 20120, USDA 1975). While there are a number of exceptions such as on some of the deeper soils in the Gunnison Basin population area, many of these soils are generally shallow, with low organic content and variable vegetation cover. In addition, many of the soils are on slopes with high to very high runoff classifications. All of these factors increase soil vulnerability to erosion. Erosion results from both natural processes and human activities which disturb the soil surface, reduce protective vegetation cover and biological soil crusts, and thereby expose soil to the erosive forces of wind and water.

Soil types, characteristics, and conditions vary widely across BLM surface in Occupied and Unoccupied Habitat. Some soil characteristics such as soil erodibility, salinity and accelerated erosion are of special concern to land managers across the region, however they are not affected by, nor do they affect GUSG. Because of its relationship to vegetation cover and productivity, soil stability is one soil characteristic that is relevant to GUSG and can also be affected by land management practices associated with GUSG conservation. Soil stability reflects the resistance of soils to wind and water erosion, and is considered a terrestrial function of high ecological value across the GUSG range (BLM 1991b, Bryce 2012). Much of this stability is due to biological soil crusts (Chaudhary 2009). Land uses which disturb

the soil surface, biological soil crust and the protective plant cover reduce soil stability (Bryce 2012, BLM 1991b).

Several different indicators are used to address soil stability on BLM surface in Occupied and Unoccupied Habitat.  These include past disturbance, present sources of disturbance, and protections from future disturbances for activities where data sets are relatively complete (as shown in Table 3.37).  Vegetation treatments have been mapped over the past several decades and most of these included scraping, turning or disking the soil surface to varying degrees.  Agriculture, mining, and other types of development have been mapped using satellite imagery, which captures the larger soil and vegetation disturbances across BLM surface in Occupied and Unoccupied Habitat (LANDFIRE 2015).  Soils on over 10% of the land area in Occupied Habitat and Unoccupied Habitat have been affected by mechanical vegetation treatments, but less than 1% of the land area is classified by satellite imagery as modified by agriculture, mining and other types of development. Within non-habitat areas, these impacts have occurred on 2% and 1% of the land area respectively.

Active livestock grazing allotments are included as an indicator for current vegetation removal and small-scale soil disruption through trampling (Anderson 1982, Neff 2005).  Although elk, deer and other wildlife can cause similar effects to soil stability as livestock, their distribution across the landscape is not controlled, so they are not considered an indicator for soil stability.  Protections from future surface disturbances are indicated by RMP or other planning level designations which greatly restrict surface disturbance, surface occupancy, and associated vegetation removal.  These include Wilderness Areas, Wilderness Study Areas, and areas with Right of Way Exclusion or No Surface Occupancy (NSO) stipulations, and areas withdrawn from mineral leasing or development.

Most of the BLM land in Occupied and Unoccupied Habitat falls into active livestock grazing allotments (as shown in Table 3.37 and Table 3.38).  While many allotments contain areas that are inaccessible to livestock or are not grazed for other reasons, as a whole they are subject to more vegetation removal and trampling—with associated implications for soil stability—than areas outside of the allotments.  The distribution of livestock grazing is similar across BLM surface in Occupied and Unoccupied Habitat, with over 70% of each population area in an active grazing allotment. Somewhat less BLM land in Non-Habitat Areas is within active grazing allotments, at 56% of the area (as shown in Table 3.38).

Soil stability across most of the BLM lands in the planning area is currently protected by RMP-level surface disturbance restrictions (shown in Table 3.37).  However, 39% is not under this level of surface protection, and surface protections vary across BLM surface in Occupied and Unoccupied Habitat.  The Crawford, Piñon Mesa, and San Miguel Basin population areas are most protected by surface use restrictions,

CHAPTER 3 - AFFECTED ENVIRONMENT

while the Poncha Pass and Cerro Summit-Cimarron-Sims Mesa population areas have the least amount protected.  Within Non-Habitat Areas, 61% of BLM land lacks RMP-level surface disturbance restrictions.

**Table 3.37 - Soil Indicators on BLM Lands across GUSG Habitat**

| GUSG POPULATION AREA | VEGETATION TREATMENTS | | LARGE-SCALE SURFACE DISTURBANCE | | AREAS WITHOUT SURFACE DISTURBANCE RESTRICTIONS | | ACTIVE LIVESTOCK GRAZING ALLOTMENTS | |
|---|---|---|---|---|---|---|---|---|
| | ACRES | PERCENT | ACRES | PERCENT | ACRES | PERCENT | ACRES | PERCENT |
| Rangewide | 63,369 | 10% | 3,098 | <1% | 240,467 | 39% | 577,198 | 93% |
| Cerro Summit-Cimarron-Sims Mesa | 1,032 | 11% | 113 | 1% | 8,126 | 87% | 8,433 | 90% |
| Crawford | 7,328 | 23% | 176 | 1% | 11,669 | 36% | 31,772 | 98% |
| Gunnison Basin | 12,198 | 3% | 1,210 | 0% | 160,233 | 44% | 339,621 | 93% |
| Monticello-Dove Creek | 10,362 | 23% | 859 | 2% | 30,745 | 69% | 32,812 | 74% |
| Piñon Mesa | 21,947 | 20% | 127 | 1% | 5,482 | 5% | 105,085 | 95% |
| Poncha Pass | 30 | 0% | 533 | 2% | 23,379 | 95% | 24,099 | 97% |
| San Miguel Basin | 10,471 | 29% | 79 | 0% | 832 | 2% | 35,375 | 99% |

Percentages are calculated against the total BLM surface in Occupied and Unoccupied Habitat.

**Table 3.38 - Soil Indicators on BLM Lands within Non-Habitat Areas**

| GUSG POPULATION  AREA | VEGETATION TREATMENTS | | LARGE-SCALE SURFACE DISTURBANCE | | AREAS WITHOUT SURFACE DISTURBANCE RESTRICTIONS | | ACTIVE LIVESTOCK GRAZING ALLOTMENTS | |
|---|---|---|---|---|---|---|---|---|
| | ACRES | PERCENT | ACRES | PERCENT | ACRES | PERCENT | ACRES | PERCENT |
| Rangewide | 2,580 | 2% | 1,096 | 1% | 71.955 | 61% | 66,797 | 56% |
| Cerro Summit-Cimarron-Sims Mesa | 92 | 1% | 126 | 1% | 11,406 | 100% | 7,201 | 63% |
| Crawford | 3 | 0% | 0 | 0% | 2 | 0% | 1,481 | 100% |
| Gunnison Basin | 74 | 1% | 0 | 0% | 8,763 | 73% | 7,514 | 63% |
| Monticello-Dove Creek | 1,115 | 4% | 603 | 2% | 18,183 | 72% | 12,186 | 48% |
| Piñon Mesa | 563 | 2% | 32 | 0% | 6,236 | 23% | 20,285 | 76% |
| Poncha Pass | 0 | 0% | 0 | 0% | 763 | 100% | 556 | 73% |
| San Miguel Basin | 734 | 2% | 335 | 1% | 26,603 | 65% | 17,573 | 43% |

Percentages are calculated against the total BLM surface in the Non-Habitat Area outside of Occupied and Unoccupied Habitat.

CHAPTER 3 - AFFECTED ENVIRONMENT

## TRENDS

Where information is available from management units across BLM surface in Occupied and Unoccupied Habitat, additional surface disturbance is anticipated to accrue at current rates and increase in some areas (BLM 2005a, 2005e, 2006, 2009b, 2010a, 2011g). Growing levels of recreation use and requests to develop ROWs and energy projects, along with increasing rates of wildfire, are all cited as factors decreasing soil stability. This appears to be a pattern across the GUSG range despite the mitigating effects anticipated with travel management, route closure and rehabilitation.

Expected increases in frequency and severity of drought associated with climate change are also likely to reduce protective soil cover and complicate soil recovery from surface disturbance. This is anticipated to occur as hotter, drier conditions and more erratic weather make seed germination and establishment more difficult and reduce overall plant vigor.

# 3.4. TERRESTRIAL VEGETATION (INCLUDING WOODLANDS)

## INDICATORS

Vegetation status across BLM surface in Occupied and Unoccupied Habitat is described in terms of:

- Vegetation types expressed as acreage of each major plant community on BLM surface
- Vegetation conditions expressed in terms of acreage achieving or not achieving the Land Health Ecological Fundamental.

## EXISTING CONDITIONS

### 3.4.1. CONDITIONS WITHIN OCCUPIED AND UNOCCUPIED HABITAT

Vegetation throughout the two ecological regions, which support the GUSG, is affected by both natural drivers and human land uses. Montane shrubland, sagebrush, and pinyon-juniper woodland make up the primary vegetation types of the mid-elevations. Forested communities are generally at higher elevations and are not considered GUSG habitat in this plan. Natural drivers include drought, wet periods, insect and animal herbivory, and fire (Bryce 2012). These drivers influence the distribution and prevalence of vegetation communities across the landscape, and the relative dominance of the different plant species within each community.

Past and current human impacts in these mid-elevations include conversion of native communities to agriculture, urban or residential use. Most native plant communities across the region have been altered to some degree by livestock grazing which has been widespread at substantial levels since the late 1800s (Grahme 2002). Aggressive fire suppression over the last 70 years has affected fire frequency and contributed to the expansion of woody vegetation, through impacting vegetation structure, composition, and vegetation successional patterns (Bryce 2012). Human-caused fragmentation of native vegetation communities has taken place with the development of energy resources and infrastructure, recreation and range management infrastructure, and habitat and range improvement projects (Bryce 2012). It has also been fueled by growing OHV use, road construction and rural home development. These activities have broken formerly large patches of native

plant communities into smaller, often damaged fragments with reduced functionality and resilience.

A variety of upland vegetation communities occur on BLM lands in Occupied and Unoccupied Habitat (as shown in Table 3.39 and Table 3.40). For the purposes of this discussion, discrete vegetation assemblages from LANDFIRE Existing Vegetation Types data have been grouped into broader vegetation groups. This data was derived from satellite imagery, predictive models, and ground truthing (LANDFIRE 2015). As with most remotely sensed data, the maps are likely to contain some imprecision pertaining to vegetation classification and the amount of acreage covered by each vegetation type. However, the data are sufficiently accurate to provide an overview of vegetation types across BLM surface in Occupied and Unoccupied Habitat.

Although sagebrush communities are the most frequently referenced GUSG habitat components, grass and forb dominated vegetation, montane shrubland, and pinyon-juniper woodland are also prominent vegetation types in and around GUSG habitat. While forested lands with aspen, pine, spruce, and fir also occur within BLM surface in Occupied and Unoccupied Habitat, these vegetation types are not considered to be potential habitat and are not evaluated in depth.

Within Occupied Habitat, montane shrubland is the most common vegetation type—making up nearly half of the area—while sagebrush shrubland constitutes a third, forested lands nearly 10%, and pinyon-juniper woodland and grass-forb vegetation make up just over 5% each (as shown in Table 3.39). Unoccupied Habitat generally has a different composition on BLM lands, with pinyon-juniper woodlands making up nearly 40% of the area, sagebrush shrublands over 20%, forested lands at nearly 20%, and small components of montane shrubland and grassland. Vegetation on BLM lands in Non-Habitat Areas is dominated by pinyon-juniper woodland, followed by forested types, sagebrush, grass-forb vegetation, and finally, montane shrubland.

Vegetation composition also varies across the GUSG population areas. Within Occupied Habitat, sagebrush constitutes anywhere between a low of 31% of the total vegetation in the Gunnison Basin population area, to a high of 52% for the San Miguel population area. Montane shrubland ranges from being nearly absent in areas supporting the San Miguel Population to a high of 51% for the Gunnison Basin Population. Pinyon-juniper vegetation is lowest in the Gunnison Basin population area at 1% and highest in the Monticello-Dove Creek and Crawford population areas at 27%. The variability of vegetation composition across the GUSG range indicates not only the unique distribution of vegetation in each region, but also the range of vegetation types within which GUSG are found.

The primary sagebrush communities within GUSG habitat are dominated by the drier Inter-mountain Basins Big Sagebrush Shrubland, with Wyoming big sagebrush (*Artemisia tridentata ssp. wyomingensis*) and the wetter Inter-Mountain Basins Montane Sagebrush Steppe, characterized by mountain big sagebrush (*Artemisia tridentata ssp. vaseyana*). Three other sagebrush communities are smaller constituents: Artemisia tridentata ssp. vaseyana Shrubland Alliance, Colorado Plateau Mixed Low Sagebrush Shrubland, and Inter-Mountain Basins Big Sagebrush Steppe. These and the following communities are more completely described in the Colorado Plateau Rapid Ecoregional Assessment (Bryce 2012), the NatureServe database (NatureServe 2014), and BLM planning documents (BLM 1989, 1991, 2003, 2005e, 2006, 2009a, 2011g, 2013c).

Montane shrublands on BLM surface in Occupied and Unoccupied Habitat are mostly Rocky Mountain Lower Montane-Foothill Shrubland. This shrubland is characterized by mountain mahogany and usually associated with rocky substrates, and dry conditions which limit trees and Gambel oak. Both Wyoming and mountain big sagebrush can occur in this shrubland as co-dominants. The other important montane shrubland type across Occupied and Unoccupied Habitat is the Gambel Oak Shrubland Alliance. This shrubland contains many associations dominated by Gambel oak, some with sagebrush as a co-dominant.

The pinyon-juniper woodland falls into the broad category of Colorado Plateau Pinyon-Juniper Woodland, which includes numerous pinyon-juniper associations. Of particular relevance for GUSG habitat are those associations that occur on flat to gentle slopes and contain a shrub understory dominated by mountain or Wyoming big sagebrush.

The grass-forb vegetation is primarily made up of two vegetation subcategories. The Introduced Upland Vegetation-Annual Grassland—most often dominated by cheatgrass—makes up 3% of Occupied and Unoccupied Habitat on BLM surface. The Cerro Summit-Cimarron-Sims Mesa, San Miguel, and Piñon Mesa population areas have the highest levels of cheatgrass, although all population areas with the exception of Poncha Pass have over 500 acres of the cheatgrass vegetation type. The Southern Rocky Mountain Montane-Subalpine Grassland is the other most common subcategory. It is dominated by a variety of associations containing upland montane perennial grass species, and is most widespread in the Gunnison Basin population.

CHAPTER 3 - AFFECTED ENVIRONMENT

### Table 3.39 - Vegetation Types on BLM Lands in Occupied and Unoccupied Habitat

| GUSG POPULATION | SAGEBRUSH | | MONTANE SHRUBLAND | | PINYON-JUNIPER | | GRASS-FORB | | FORESTED | |
|---|---|---|---|---|---|---|---|---|---|---|
| | ACRES | % | ACRES | % | ACRES | % | ACRES | % | ACRES | % |
| OCCUPIED HABITAT | | | | | | | | | | |
| Rangewide Occupied Habitat | 134,431 | 34% | 169,778 | 43% | 23,294 | 6% | 23,599 | 6% | 32,160 | 8% |
| Cerro Summit-Cimarron-Sims Mesa | 2,066 | 47% | 361 | 8% | 912 | 21% | 572 | 13% | 39 | 1% |
| Crawford | 8,096 | 37% | 5,516 | 25% | 6,071 | 27% | 1,649 | 7% | 390 | 2% |
| Gunnison Basin | 94,123 | 31% | 155,222 | 51% | 3,050 | 1% | 12,723 | 4% | 28,942 | 10% |
| Monticello-Dove Creek | 4,213 | 50% | 808 | 10% | 2,255 | 27% | 529 | 6% | 135 | 2% |
| Piñon Mesa | 4,241 | 33% | 4,247 | 33% | 2,630 | 21% | 966 | 8% | 441 | 3% |
| Poncha Pass | 3,087 | 31% | 3,463 | 35% | 176 | 2% | 63 | 1% | 1,976 | 20% |
| San Miguel Basin | 18,604 | 52% | 161 | 0% | 8,200 | 23% | 7,096 | 20% | 237 | 1% |
| UNOCCUPIED HABITAT | | | | | | | | | | |
| Rangewide Unoccupied Habitat | 44,509 | 20% | 18,437 | 8% | 88,182 | 39% | 9,778 | 4% | 37,230 | 16% |
| Cerro Summit-Cimarron-Sims Mesa | 1,765 | 35% | 343 | 7% | 2,376 | 47% | 73 | 1% | 49 | 1% |
| Crawford | 2,145 | 21% | 1,692 | 16% | 3,778 | 37% | 592 | 6% | 404 | 4% |
| Gunnison Basin | 7,587 | 12% | 10,725 | 17% | 4,208 | 7% | 1,190 | 2% | 32,608 | 51% |
| Monticello-Dove Creek | 6,943 | 19% | 896 | 2% | 22,458 | 63% | 3,372 | 9% | 867 | 2% |
| Piñon Mesa | 20,493 | 21% | 3,560 | 4% | 55,190 | 56% | 4,429 | 5% | 3,106 | 3% |
| Poncha Pass | 5,577 | 37% | 1,221 | 8% | 171 | 1% | 122 | 1% | 195 | 1% |
| San Miguel Basin | NA | | NA | | NA | | NA | | NA | |

**Other vegetation types occupy a minor fraction of the area and are not included in this table. Percentages are calculated against the total BLM surface in Occupied and Unoccupied Habitat.**

CHAPTER 3 - AFFECTED ENVIRONMENT

**Table 3.40 - Vegetation Types on BLM Lands within Non-Habitat Areas**

| GUSG POPULATION | SAGEBRUSH | | MONTANE SHRUBLAND | | PINYON-JUNIPER | | GRASS-FORB | | FORESTED | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Acres | % | Acres | % | Acres | % | Acres | % | Acres | % |
| Rangewide Habitat | 14,264 | 12% | 7,267 | 6% | 59,652 | 50% | 3,721 | 9% | 19,105 | 16% |
| Cerro Summit-Cimarron-Sims Mesa | 2,071 | 18% | 502 | 4% | 6,006 | 53% | 325 | 3% | 848 | 7% |
| Crawford | 78 | 5% | 26 | 2% | 1,105 | 75% | 0 | 0% | 198 | 13% |
| Gunnison Basin | 872 | 7% | 2,081 | 17% | 194 | 2% | 769 | 6% | 6,175 | 51% |
| Monticello-Dove Creek | 2,629 | 10% | 1,151 | 5% | 15,877 | 63% | 140 | 1% | 2,548 | 10% |
| Piñon Mesa | 3,948 | 15% | 2,356 | 9% | 14,627 | 55% | 367 | 1% | 1,062 | 4% |
| Poncha Pass | 50 | 7% | 181 | 24% | 3 | 0% | 12 | 2% | 323 | 42% |
| San Miguel Basin | 4,616 | 11% | 970 | 2% | 21,840 | 54% | 2,108 | 5% | 7,952 | 20% |

Other vegetation types occupy a minor fraction of the area and are not included in this table. Percentages are calculated against the total BLM surface in the Non-Habitat areas outside of Occupied and Unoccupied Habitat.

Conditions can vary within a given vegetation community. BLM uses the Land Health Ecological Fundamental (BLM 2008, 2011b) to address plant community ecological intactness, functionality, and degradation. Indicators, including plant species diversity, presence of noxious plants, and spatial distribution of native species, are used to assess plant community intactness and functionality. Lands that do not achieve this fundamental are determined to have lost a substantial amount of their capacity to support ecological processes and are unlikely to recover naturally from disturbance (Pellant 2005).

Table 3.41 and Table 3.42 show the current determinations for the Land Health Ecological Fundamental across BLM surface in Occupied and Unoccupied Habitat. While this information reflects some inconsistencies in how data was collected, extrapolated, and interpreted and tends to be more representative of the accessible grazable lands, it does provide an indication of how the BLM management units within the planning area view their vegetation status.

Of the BLM surface lands in Occupied and Unoccupied Habitat, slightly more acreage has been identified as not meeting the Ecological Fundamental. The majority of vegetation in Occupied Habitat is rated as not achieving this fundamental. The largest acreages of degraded vegetation are in the Gunnison and San Miguel population areas, while the majority of vegetation in the other populations is rated as achieving the fundamental, within both Occupied Habitat and Unoccupied Habitat. These figures are influenced by variations in data collection and interpretation.

CHAPTER 3 - AFFECTED ENVIRONMENT

Within BLM surface in Occupied and Unoccupied Habitat, each management unit
has been responsible for assessing land health for the lands it manages, and has been
allowed flexibility in the data collection and interpretation methodologies.  Some
management units have extrapolated data from accessible grazed areas to entire
allotments, while others have broken out the inaccessible areas.  In addition, some
determinations were based on comparison of indicators to what would be found in
potential natural communities rather than what would be required for basic
ecological health (Clements 2015, Austin 2015, West 2015).  Given the variability in
data collection and interpretation, much of the vegetation across BLM surface in
Occupied and Unoccupied Habitat is not in a pristine state, but is probably
sustaining basic ecologic functionality.  While data is less complete for BLM lands
within Non-Habitat Areas, a greater proportion of lands are achieving the Ecological
Fundamental than occurs in Occupied Habitat (as shown in Table 3.41).

**Table 3.41 - Vegetation Conditions on BLM Lands in Occupied and Unoccupied Habitat**

| GUSG POPULATION | ACHIEVING ECOLOGICAL FUNDAMENTAL | | NOT ACHIEVING ECOLOGICAL FUNDAMENTAL | |
|---|---|---|---|---|
| | Acreage | Percentage | Acreage | Percentage |
| OCCUPIED HABITAT | | | | |
| Rangewide Occupied Habitat | 73,626 | 19% | 240,654 | 61% |
| Cerro Summit-Cimarron-Sims Mesa | 3,048 | 70% | 0 | 0% |
| Crawford | 18,353 | 83% | 2,293 | 10% |
| Gunnison Basin | 26,700 | 9% | 203,400 | 67% |
| Monticello-Dove Creek | 3,007 | 35% | 0 | 0% |
| Piñon Mesa | 11,922 | 94% | 311 | 2% |
| Poncha Pass | 9,806 | 99% | 0 | 0% |
| San Miguel Basin | 790 | 2% | 34,649 | 97% |
| UNOCCUPIED HABITAT | | | | |
| Rangewide Unoccupied Habitat | 158,001 | 69% | 17,990 | 8% |
| Cerro Summit-Cimarron-Sims Mesa | 2,881 | 57% | 1,837 | 37% |
| Crawford | 7,287 | 71% | 1,786 | 17% |
| Gunnison Basin | 34,743 | 54% | 8,637 | 14% |
| Monticello-Dove Creek | 12,503 | 35% | 2,841 | 8% |
| Piñon Mesa | 85,768 | 88% | 2,889 | 3% |
| Poncha Pass | 14,821 | 100% | 0 | 0% |
| San Miguel Basin | NA | NA | NA | NA |

Percentages are calculated against the total BLM surface in Occupied and Unoccupied
Habitat.  BLM lands that have not yet been evaluated for this fundamental are not reported
in this table, but account for the remaining percentages.

CHAPTER 3 - AFFECTED ENVIRONMENT

**Table 3.42 - Vegetation Conditions on BLM Lands within Non-Habitat Areas**

| GUSG POPULATION | LANDS ACHIEVING ECOLOGICAL FUNDAMENTAL | | LANDS NOT ACHIEVING ECOLOGICAL FUNDAMENTAL | |
|---|---|---|---|---|
| | Acres | Percentage | Acres | Percentage |
| Rangewide | 46,574 | 39% | 23,171 | 20% |
| Cerro Summit-Cimarron-Sims Mesa | 8,558 | 75% | 1,307 | 11% |
| Crawford | 1,352 | 91% | 0 | 0% |
| Gunnison Basin | 1,141 | 10% | 7,935 | 66% |
| Monticello-Dove Creek | 2,492 | 10% | 0 | 0% |
| Piñon Mesa | 12,716 | 48% | 0 | 0% |
| Poncha Pass | 762 | 100% | 0 | 0% |
| San Miguel Basin | 19,553 | 48% | 13,929 | 34% |

Percentages are calculated against the total BLM surface in Non-Habitat Areas outside of Occupied and Unoccupied Habitat. BLM lands that have not been evaluated for this fundamental are not reported in this table, but account for the remaining percentages.

Vegetation management includes collection and harvest of vegetation products. Within the pinyon-juniper woodland, products have included fuelwood, fence posts, Christmas trees, pine boughs and cones, wildlings and pinyon nuts. These have historically been harvested at low levels over the decades, with supply far exceeding demand, and little impact on woodland structure or age class. Collection of plants and seed for landscaping or restoration purposes has been a very small component of the vegetation product harvest. The BLM has only recently provided national direction for collection of wildland seed resources, indicating the low levels of this type activity across the BLM lands (BLM 2013e).

Commercial sales of firewood and timber are infrequent within BLM surface in Occupied and Unoccupied Habitat, and typically do not occur in GUSG habitat as they require forested or heavily wooded areas (BLM 1991b). Non-commercial woodland harvests on BLM-administered lands primarily consist of Christmas trees, fuelwood, and posts (BLM 1989, 2005e, 2009b, 2011g). Harvest is at low levels across the management units, and annual sales within a given management unit typically do not exceed more than 500 cords of firewood, 2,000 Christmas trees, and far fewer posts (BLM 1989, 2009b, 2010a).

The collection of other plant materials (including transplants, pinyon nuts, and native plant seed) is allowed in some management units. Demand for collection of such resources is at a much lower level than for fuelwood or Christmas trees (BLM 2006, 2010a, 2013c). The Dominguez-Escalante NCA and Canyons of the Ancients NM RMPs allow for collection permits only when the collection would benefit other vegetation or habitat goals (BLM 2005a, 2011g). Limitations on plant material collections are not identified in any of the other BLM RMPs in the planning area.

CHAPTER 3 - AFFECTED ENVIRONMENT

## TRENDS

For those areas across the GUSG range where information is available, the extent of most native vegetation types has been reduced across the landscape (Bryce 2012). Throughout the Colorado Plateau Ecoregion, an estimated 16-30% of the total area identified as suitable for sagebrush has been converted to agriculture, urban areas, roads, invasive species, and tree encroachment (Bryce 2012, Oyler-McCance 2001). Similar losses have taken place across 28% of montane shrubland, and 16-40% of pinyon-juniper woodland and shrublands (Bryce 2012).

Within the sagebrush types, invasive species followed by pinyon and juniper invasion converted slightly more acreage than did urban and road development and agriculture. Tree invasion was the primary cause of conversion within montane shrubland. Within pinyon-juniper woodland, conversion to uncharacteristic native vegetation (increased stand densities) was identified as resulting from fire exclusion. However, this might not apply broadly to Occupied and Unoccupied Habitat areas, since evidence for frequent low-severity fire in pinyon-juniper vegetation is lacking for southwest Colorado. The rates of pinyon-juniper invasion into shrub communities averaged less than 0.2% per year, providing one estimate of the rate of succession in these communities.

On BLM land within Occupied and Unoccupied Habitat loss of native vegetation including sagebrush is attributed to a variety of factors such as drought, fire, increased recreation and surface- disturbing activities, and pinyon-juniper encroachment. Meanwhile, associated increases in developed or barren areas, and annual-dominated herbaceous communities are occurring (Bryce 2012, BLM 2005e, 2006, 2010a). The Colorado Plateau Rapid Ecoregional Assessment reports more recent trends over the past 20 years. These indicate continued likely losses with fire, mechanical vegetation treatment or other types of disturbances affecting 5–6% of sagebrush types, 5% of montane shrubland, and 2–4% of pinyon-juniper vegetation, recognizing that a portion of the treatments may actually improve or restore natural conditions within these vegetation types (Bryce 2012).

Trends in land health status and condition of sagebrush communities are varied, with a mix of upward, stable and downward trends (BLM 2009b, 2010a). Planning documents reported a predominantly downward trend for perennial cool season grass and increasing weeds in Canyons of the Ancients National Monument declining sagebrush stands in Monticello FO, and increasing noxious and invasive weeds in Grand Junction and Uncompahgre FOs (BLM 2005a, 2005e, 2009b, 2010a).

Demand for fuelwood, posts, and Christmas trees has remained stable in some areas and increased in others (BLM 2005a, 2006, 2010a, 2013c). Demand for collection of other materials such as transplants and native seed has increased in some

management units as interest in xeriscaping grows, along with an increased need for native seed to restore degraded habitat following wildfires (BLM 2006, 2010a).

CHAPTER 3 - AFFECTED ENVIRONMENT

# 3.5. RIPARIAN AREAS & WETLANDS

## INDICATORS

Riparian and wetland status throughout BLM surface in Occupied and Unoccupied Habitat is indicated by:

- Mileage of riparian areas on BLM surface
- Acreage of wetlands on BLM surface
- Mileage of streams and riparian habitat on BLM surface in riparian Proper Functioning Condition, Functioning at Risk, and Not Functional categories

## EXISTING CONDITIONS

### 3.5.1. CONDITIONS WITHIN OCCUPIED AND UNOCCUPIED HABITAT

**Analysis Area**

Past and current land uses have altered the nature of streams and wetlands on BLM surface in Occupied and Unoccupied Habitat.  The semiarid conditions within the region naturally lead to highly variable stream flow, affecting the duration or extent of water in many streams (Hughes 2011).  Human land uses and impacts including development or dewatering of streams and alteration of watersheds through land use changes, development and road construction have compounded this natural variability such that the majority of streams in the Western US once mapped as permanent now are considered temporary, or have experienced reduced base and flood flows relative to historic levels (Stoddard 2005, Carlisle 2011).  Because BLM surface in Occupied and Unoccupied Habitat has been subject to these same types of uses, a similar situation is likely to have occurred.

Activities with the potential to degrade riparian areas, such as altered flow regimes and areas of heavy grazing, have been present throughout the analysis area since the time of European settlement (Belsky 1999, Bryce 2012).  While dewatering and degradation has occurred in many areas, humans have created new wetlands and riparian areas where they did not previously exist.  This has taken place through irrigation of croplands and hayfields, irrigation return flow, construction of canals and development of livestock ponds.  More recently, wet areas have been created by the installation of small rock structures along 10 miles of drainages in the Gunnison population area by the Gunnison Climate Working Group (The Nature Conservancy 2015).

CHAPTER 3 - AFFECTED ENVIRONMENT

Wet meadow communities are considered an important component of GUSG summer and fall habitats (Gunnison Sage-grouse Rangewide Steering Committee 2005). In GUSG habitat, wet meadows are primarily associated with riparian areas, irrigated hayfields, and the occasional isolated lentic wetland. These wet areas typically have the potential to support a variety of wetland obligate and facultative woody and herbaceous species including cottonwood, alder, willow, and sedge-rush communities (Carsey 2003). They are also considered to be vulnerable to climate change (The Nature Conservancy 2011).

The data in Table 3.43 and Table 3.44 shows the extent and distribution of riparian and wetland habitat on BLM surface throughout Occupied and Unoccupied Habitat. Nearly all of the wetland acreage is found along streams or in drainages and swales. Riverine riparian vegetation, freshwater emergent wetland composed of herbaceous marsh, fen, swale and wet meadows, and freshwater forested/shrub wetlands each comprise nearly one third of the wetland types, and the remainder is categorized as freshwater pond. These wetlands are distributed along nearly 400 miles of perennial or intermittent stream. While streams and wetlands occur in both Occupied Habitat and Unoccupied Habitat for all the populations, they make up a very small proportion of habitat occupying around 0.4% of the land area overall. The Gunnison Basin and Cerro Summit-Cimarron-Sims Mesa population areas have the highest amount of wetland in Occupied habitat, while the lowest amounts occur in Crawford, Monticello-Dove Creek and Piñon Mesa population areas at around 0.2% of the landscape. Wetlands make up around 0.4% of BLM lands within Non-Habitat Areas, and are primarily distributed along 130 miles of streams.

Although some limitations and inaccuracies may exist, these national-level datasets are adequate to provide a large-scale picture of stream and wetland presence on BLM surface in Occupied and Unoccupied Habitat. Data inaccuracies could include miscategorization of some ephemeral channels as intermittent streams (that would increase estimates of riparian habitat), gaps along mapped stream courses (that would shorten stream distance estimates), and inclusion of artificial stock ponds as wetlands (that would inflate lentic wetland acreage estimates).

**Table 3.43 - Riparian and Wetland Areas on BLM Lands in Occupied and Unoccupied Habitat**

|  | OCCUPIED HABITAT | | | UNOCCUPIED HABITAT | | |
|---|---|---|---|---|---|---|
| **GUSG POPULATION** | **Riparian Miles** | **Wetland Acres** | **%** | **Riparian Miles** | **Wetland Acres** | **%** |
| Rangewide | 204 | 1,595 | 0.4% | 169 | 894 | 0.4% |
| Cerro Summit-Cimarron-Sims Mesa | 4 | 19 | 0.4% | 3 | 16 | 0.3% |
| Crawford | 3 | 37 | 0.2% | 3 | 70 | 0.7% |
| Gunnison Basin | 143 | 1,347 | 0.4% | 51 | 490 | 0.8% |
| Monticello-Dove Creek | 9 | 11 | 0.1% | 7 | 32 | 0.1% |

CHAPTER 3 - AFFECTED ENVIRONMENT

| GUSG POPULATION | OCCUPIED HABITAT | | | UNOCCUPIED HABITAT | | |
|---|---|---|---|---|---|---|
| | Riparian Miles | Wetland Acres | % | Riparian Miles | Wetland Acres | % |
| Piñon Mesa | 8 | 26 | 0.2% | 96 | 259 | 0.3% |
| Poncha Pass | 19 | 33 | 0.3% | 8 | 28 | 0.2% |
| San Miguel Basin | 19 | 122 | 0.3% | NA | NA | NA |

**Wetland data is derived from the National Wetlands Inventory for Riverine, Freshwater Emergent, Freshwater Forested/Shrub Wetlands and Freshwater Pond categories. Stream data is based on the National Hydrologic Dataset showing only named streams or those categorized as general or perennial streams. Percentages are calculated against the total BLM surface in Occupied and Unoccupied Habitat.**

**Table 3.44 - Riparian and Wetland Areas on BLM Lands within Non-Habitat Areas**

| GUSG POPULATION | NON-HABITAT AREAS | | |
|---|---|---|---|
| | Riparian Miles | Wetland Acres | % |
| Rangewide | 130 | 523 | 0.4% |
| Cerro Summit-Cimarron-Sims Mesa | 9 | 43 | 0.4% |
| Crawford | 0 | 2 | 0.1% |
| Gunnison Basin | 8 | 51 | 0.4% |
| Monticello-Dove Creek | 30 | 155 | 0.6% |
| Piñon Mesa | 35 | 32 | 0.1% |
| Poncha Pass | 0 | 0 | 0% |
| San Miguel Basin | 49 | 239 | 0.6% |

**Wetland data is derived from the National Wetlands Inventory for Riverine, Freshwater Emergent, Freshwater Forested/Shrub Wetlands and Freshwater Pond categories. Stream data is based on the National Hydrologic Dataset showing only named streams or those categorized as general or perennial streams. Percentages are calculated against the total BLM surface in Non-Habitat Areas outside of Occupied and Unoccupied Habitat.**

While GUSG habitat quality guidelines for riparian-wetland areas have not been described in the RCP, the plan does state that current BLM guidelines for managing streams are consistent with GUSG needs and that BLM managers should strive to meet the full potential of any given site. Currently, the BLM manages streams and wetlands for Proper Functioning Condition (PFC), which encompasses the riparian-wetland indicators described under the Standards for Public Land Health (BLM 2008, 2011b).

The PFC classification procedure describes Proper Functioning Condition as a riparian area that possesses adequate vegetation and stream channel characteristics to protect against erosion during floods, and to maintain other important riparian and hydrologic processes. When these processes are in place but vegetation or streambank and channel characteristics are no longer adequate to ensure their

protection, the riparian area becomes vulnerable and is considered to be Functional at Risk.  Once a streambank has become degraded and the processes are compromised, the riparian area is classified as Non-functional. While the PFC data is incomplete or missing for some management units within BLM surface in Occupied and Unoccupied Habitat and incorporates some ephemeral reaches in others-- incorrectly increasing mileage of nonfunctional streams--it still provides a general picture of regional riparian and wetland condition.

The current riparian PFC dataset is mostly complete across BLM surface in Occupied and Unoccupied Habitat (as shown in Table 3.45 and Table 3.46).  The data indicates that portions of riparian areas within Occupied Habitat have either become Nonfunctional (NF, 20%) or are Functioning At Risk (FAR, 38%), with the remaining 42% in Proper Functioning Condition (PFC).  There are fewer stream miles in Unoccupied Habitat, and the streams are in better condition, with 63% classified as PFC, 27% as FAR, and 9% as NF.  Reported stream condition in the different population areas varies with some areas having the majority of streams showing problems with stream processes while other population areas report few or no problems.  While some of the disparities between population areas may be due to differences between different management units' interpretation of the riparian indicators, the PFC evaluations follow a standard protocol and systematically consider the same indicators.  A greater percentage of stream miles on BLM land in Non-Habitat Areas are in PFC, although less data is available for streams in these areas.

**Table 3.45 - Riparian Conditions on BLM Lands in Occupied and Unoccupied Habitat**

| GUSG POPULATION | PROPER FUNCTIONING CONDITION | | FUNCTIONING AT RISK[1] | | NON-FUNCTIONAL | |
|---|---|---|---|---|---|---|
| | Stream Miles | % in Population Area | Stream Miles | % in Population Area | Stream Miles | % in Population Area |
| OCCUPIED HABITAT | | | | | | |
| Rangewide Occupied Habitat | 78 | 42% | 70 | 38% | 37 | 20% |
| Cerro Summit-Cimarron-Sims Mesa | 0 | 0% | 0 | 0% | 1 | 100% |
| Crawford | 0 | 0% | 0 | 0% | 0 | 0% |
| Gunnison Basin | 44 | 43% | 34 | 33% | 25 | 24% |
| Monticello-Dove Creek[2] | 5 | 100% | 0 | 0% | 0 | 0% |
| Piñon Mesa | 0 | 100% | 0 | 0% | 0 | 0% |
| Poncha Pass | 20 | 75% | 6 | 23% | 1 | 3% |
| San Miguel Basin | 9 | 18% | 30 | 60% | 11 | 22% |
| UNOCCUPIED HABITAT | | | | | | |

CHAPTER 3 - AFFECTED ENVIRONMENT

| GUSG POPULATION | PROPER FUNCTIONING CONDITION | | FUNCTIONING AT RISK[1] | | NON-FUNCTIONAL | |
|---|---|---|---|---|---|---|
| | Stream Miles | % in Population Area | Stream Miles | % in Population Area | Stream Miles | % in Population Area |
| Rangewide Unoccupied Habitat | 35 | 63% | 15 | 27% | 5 | 9% |
| Cerro Summit-Cimarron-Sims Mesa | 0 | 0% | 0 | 0% | 2 | 100% |
| Crawford | 1 | 34% | 1 | 48% | 0 | 0% |
| Gunnison Basin | 10 | 84% | 1 | 11% | 1 | 5% |
| Monticello-Dove Creek[2] | 3 | 51% | 1 | 16% | 2 | 33% |
| Piñon Mesa | 13 | 65% | 7 | 35% | 0 | 0% |
| Poncha Pass | 9 | 57% | 5 | 34% | 1 | 9% |
| San Miguel Basin | NA | NA | NA | NA | NA | NA |

Note: Percentages are calculated from total BLM stream miles in the BLM PFC data set in Occupied and Unoccupied Habitat; streams not yet evaluated for PFC are classified as "unknown."
Mileages and percentages of streams classified as "unknown" are not included in this table.
[1]Includes all streams in the Functioning at Risk category irrespective of trend.
[2]Data not available for the Utah portion of the Monticello Population area.

## Table 3.46 - Riparian Conditions on BLM Lands within Non-Habitat Areas

| GUSG POPULATION | PROPER FUNCTIONING CONDITION | | FUNCTIONING AT RISK[1] | | NON-FUNCTIONAL | |
|---|---|---|---|---|---|---|
| | Stream Miles | % in Population Area | Stream Miles | % in Population Area | Stream Miles | % in Population Area |
| Rangewide | 58 | 77% | 15 | 19% | 2 | 3% |
| Cerro Summit-Cimarron-Sims Mesa | 4 | 54% | 1 | 12% | 2 | 31% |
| Crawford | 0 | 0% | 0 | 0% | 0 | 0% |
| Gunnison Basin | 0 | 0% | 0 | 0% | 0 | 0% |
| Monticello-Dove Creek[2] | 11 | 100% | 0 | 0% | 0 | 0% |
| Piñon Mesa | 17 | 87% | 2 | 13% | 0 | 0% |
| Poncha Pass | 1 | 68% | <1 | 24% | <1 | 8% |
| San Miguel Basin | 26 | 70% | 11 | 30% | 0 | 0% |

Note: Percentages are calculated from total BLM stream miles in the BLM PFC data set in Non-Habitat Areas; streams not yet evaluated for PFC are classified as "unknown."
Mileages and percentages of streams classified as "unknown" are not included in this table.
[1]Includes all streams in the Functioning at Risk category irrespective of trend.
[2]Data not available for the Utah portion of the Monticello population area.

## TRENDS

BLM field offices across Occupied and Unoccupied Habitat have described different trends for riparian-wetland areas over the past twenty years (BLM 2005a, 2005e, 2009b, 2010a, 2013c).  Some areas note increasing levels of weeds—most commonly tamarisk, Russian olive, and Russian knapweed—lowering water tables, and reduced riparian plant vigor associated with drought.  Several other offices report general improvements in riparian vegetation and wetland species.

# 3.6. NOXIOUS WEEDS & INVASIVE SPECIES

## INDICATORS

The status of weeds and the level of weed management across BLM surface in Occupied and Unoccupied Habitat is described as follows:

- Vegetation treatment acreage as an indicator of large scale surface disturbance and seeding, since these are often tied with weed introduction and spread
- Risk of invasive species introduction and spread due to presence or absence of surface disturbance restrictions
- Risk of invasive species introduction and spread due to presence or absence of permitted livestock grazing.

## EXISTING CONDITIONS

### 3.6.1. CONDITIONS WITHIN OCCUPIED AND UNOCCUPIED HABITAT

State-designated noxious weeds and other invasive plant species have affected plant communities across the region.  According to the Colorado Weed Management Association website (2012), these weeds have been deliberately or unintentionally transported from other continents and spread by animals, humans, water, wind, and soil disturbance.  Without the diseases and insects that would normally control them, these non-native plants have been able to thrive in this region.  Within the Colorado Plateau—the underlying ecoregion for about half of Occupied and Unoccupied Habitat—about 7% of the total area is estimated to have been significantly altered by the presence of invasive plants (Bryce 2012).  Cheatgrass and similar annual invasive grasses make up the majority of large-scale infestations across this area.  These invasive grasses are of particular concern because once dominant, they increase fire frequency, which leads to the loss of native vegetation from these areas.  According to the Colorado Weed Management Association (2012), other noxious weeds and invasive species pose different threats to vegetation, habitat, range condition, and other natural values and uses in the region.  Both Colorado and Utah have noxious weed acts, which identify and categorize weed species, and require their eradication, containment or control.  Each county, as well as every BLM management unit, also has a weed management program to implement weed regulations.

CHAPTER 3 - AFFECTED ENVIRONMENT

A number of invasive species, including Colorado and Utah state-listed noxious weeds, occur across BLM surface in Occupied and Unoccupied Habitat. Invasive species—which are often tied to disturbance, but have the ability to infest and dominate undisturbed native vegetation—are considered to be such a great threat on the Colorado Plateau that they have been identified as a "change agent" along with human development and wildfire (Bryce 2012). As these species expand in distribution and dominance on the landscape, native species and communities become increasingly marginalized, which over time can largely degrade the function of these ecosystems.

Noxious weeds that have been documented in upland areas within BLM surface in Occupied and Unoccupied Habitat include musk thistle, Russian knapweed, spotted knapweed, redstem filaree, cheatgrass, chicory, common mullein, field bindweed, common burdock, jointed goatgrass, hoary cress and halogeton. Weeds associated with riparian areas in BLM surface in Occupied and Unoccupied Habitat include saltcedar, Russian olive, Canada thistle, common burdock and quackgrass (BLM 2005a, 2006, 2009b, 2011g). Management units usually have weed control programs and staff. Because the scope of existing infestations is so great, most units have a strategy that prioritizes how their limited resources will be used. Most units follow a strategy that focuses on early detection and control of new weed invasions, especially for the highest priority state-listed noxious weeds.

While wildlife, wind, and water and many land uses and human activities spread weed seed, this discussion will center on those activities most likely to be affected by the different plan alternatives, and for which there are complete spatial data sets. Table 3.47 and

Table 3.48 cover activities for which there are relatively complete data sets that relate to past and present risk of weed introduction and spread.  These are widespread and large-scale conditions and land uses that reflect an increased level of risk.  They include past vegetation treatments, areas unprotected by RMP-level surface disturbance constraints, and active grazing allotments.

Ten percent of GUSG habitat has received some type of vegetation treatment.  The percentage ranges from higher than 30% for some population areas to less than 1% in others.  It is important to recognize that treatment type and location influence the risk and degree of weed introduction and spread (Chambers 2007, Dodson 2006).  However, it is reasonable to assume that the treated acres are more likely to contain invasive species at higher levels than the untreated acreage due to soil disturbance, reduced competition from native species, increased resource availability, and introduction of weed seed from equipment and as contaminants in seed mixes (Harrod 2001, Hobbs 1992).  Only 2% of BLM lands within Non-Habitat Areas have received any vegetation treatment.

Soil and vegetation disturbance are a common source of weed introduction and spread (Harrod 2001).  Many activities that occur on BLM lands incidentally disturb soils and potentially introduce weeds, such as a car parking next to the road, or a horse travelling across open country.  The BLM has varying levels of control over sources such as these, but typically more control over larger disturbances that have greater potential for weed introduction and spread.  Planning-level decisions that limit surface disturbance include Wilderness and Wilderness Study Area designations, ROW exclusions, mining withdrawals, and NSO stipulations.  These reduce the risk of weed introduction and spread as compared to areas that do not have one of these designations.

Currently, 36% of Occupied Habitat and 43% of Unoccupied Habitat are not protected by RMP-level surface disturbance restrictions (as shown in Table 3.47).  Occupied Habitat in the Piñon Mesa and San Miguel population areas has nearly complete protection.  On the other hand, the Cerro Summit-Cimarron-Sims Mesa and Poncha Pass population areas only have a fraction of land under these protections, increasing vulnerability to weed introduction and spread.

Livestock grazing is another source of weed introduction, movement, and spread, as weed seeds can pass through the digestive tracts and adhere to the coats of livestock (Harrod 2001).  Wildlife dispersed throughout Occupied and Unoccupied Habitat also contribute to the spread of weeds, with the BLM having little control over their movements and activity.

The acreage of BLM land within active grazing allotments is a general measure of the presence of livestock across the landscape, although some portions of an allotment might receive little if any livestock use due to topography or other factors.  Over

CHAPTER 3 - AFFECTED ENVIRONMENT

90% of BLM surface in Occupied and Unoccupied Habitat currently is situated within active grazing allotments, and this percentage was likely higher in the past.  These numbers indicate that livestock grazing and management has been and continues to be a source of weed seed introduction and spread in most regions of BLM surface within Occupied and Unoccupied Habitat.  Over 50% of the BLM land in Non-Habitat Areas currently falls within active livestock grazing allotments.

CHAPTER 3 - AFFECTED ENVIRONMENT

**Table 3.47 - Noxious and Invasive Species Indicators on BLM Lands within GUSG Habitat**

| GUSG POPULATION | VEGETATION TREATMENTS | | AREAS OPEN TO SURFACE-DISTURBING ACTIVITIES | | ACTIVE LIVESTOCK GRAZING ALLOTMENTS | |
|---|---|---|---|---|---|---|
| | Acres | % of Area | Acres | % of Area | Acres | % of Area |
| Rangewide Occupied Habitat | 30,471 | 8% | 142,074 | 36% | 367,948 | 93% |
| Rangewide Unoccupied Habitat | 32,898 | 14% | 98,394 | 43% | 209,250 | 92% |
| Cerro Summit-Cimarron-Sims Mesa Occupied Habitat | 847 | 19% | 4,057 | 93% | 3,759 | 86% |
| Cerro Summit-Cimarron-Sims Mesa Unoccupied Habitat | 185 | 4% | 4,068 | 81% | 4,674 | 93% |
| Crawford Occupied Habitat | 6,913 | 31% | 4,616 | 21% | 22,150 | 100% |
| Crawford Unoccupied Habitat | 416 | 4% | 7,053 | 68% | 9,622 | 93% |
| Gunnison Basin Occupied Habitat | 7,851 | 3% | 119,255 | 39% | 279,731 | 93% |
| Gunnison Basin Unoccupied Habitat | 4,348 | 7% | 40,978 | 64% | 59,890 | 94% |
| Monticello-Dove Creek Occupied Habitat | 488 | 6% | 3,683 | 43% | 4,949 | 58% |
| Monticello-Dove Creek Unoccupied Habitat | 9,875 | 28% | 27,062 | 75% | 27,864 | 78% |
| Piñon Mesa Occupied Habitat | 3,885 | 31% | 111 | 1% | 12,301 | 97% |
| Piñon Mesa Unoccupied Habitat | 18,062 | 18% | 5,371 | 5% | 92,784 | 95% |
| Poncha Pass Occupied Habitat | 16 | 0% | 9,519 | 97% | 9,683 | 98% |
| Poncha Pass Unoccupied Habitat | 13 | 0% | 13,860 | 93% | 14,416 | 97% |
| San Miguel Basin Occupied Habitat | 10,471 | 29% | 832 | 2% | 35,375 | 99% |
| San Miguel Basin Unoccupied Habitat | NA | NA | NA | NA | NA | NA |

**Percentages are calculated against the total BLM surface in Occupied and Unoccupied Habitat.**

CHAPTER 3 - AFFECTED ENVIRONMENT

**Table 3.48 - Noxious and Invasive Species Indicators on BLM Lands within Non-Habitat Areas**

| GUSG POPULATION | VEGETATION TREATMENTS | | AREAS OPEN TO SURFACE-DISTURBING ACTIVITIES | | ACTIVE LIVESTOCK GRAZING ALLOTMENTS | |
|---|---|---|---|---|---|---|
| | Acres | % of Area | Acres | % of Area | Acres | % of Area |
| Rangewide | 2,580 | 2% | 71,955 | 61% | 66,797 | 56% |
| Cerro Summit-Cimarron-Sims Mesa | 92 | 1% | 11,406 | 100% | 7,201 | 63% |
| Crawford | 3 | 0% | 2 | 0% | 1,481 | 100% |
| Gunnison Basin | 74 | 0% | 8,763 | 73% | 7,514 | 63% |
| Monticello-Dove Creek | 1,115 | 4% | 18,183 | 72% | 12,186 | 48% |
| Piñon Mesa | 563 | 2% | 6,236 | 23% | 20,285 | 76% |
| Poncha Pass | 0 | 0% | 763 | 100% | 556 | 73% |
| San Miguel Basin | 734 | 2% | 26,603 | 65% | 17,573 | 43% |

Percentages are calculated against the total BLM surface in Non-Habitat areas outside Occupied and Unoccupied Habitat.

## TRENDS

Invasive species appear to be increasing across much of the BLM surface in Occupied and Unoccupied Habitat. Several BLM management units cite data or provide anecdotal evidence describing an increase in invasive, non-native species such as knapweed, cheatgrass, and annual invasive forbs in upland areas, although some areas are still free of invasive species (BLM 2005a, 2006, 2010a). Some field offices attribute this increase to introduction and spread by livestock, fuels treatments, development, and roads. Aggressive weed control has been effective at reducing or eliminating Russian knapweed and hoary cress in some areas (BLM 2011g).

Across the broader Colorado Plateau Ecoregion, invasive plants have altered an estimated 3%–10% of sagebrush, 1% of montane shrubland, and 4%–22% of pinyon-juniper vegetation types (Bryce 2012). Similar trends are expected to continue within these vegetation types in Occupied and Unoccupied Habitat.

# 3.7. WILDLAND FIRE ECOLOGY & MANAGEMENT

## INDICATORS

Wildland fire ecology and management across BLM surface in Occupied and Unoccupied Habitat is expressed in terms of:

- Amount of land burned by wildfires (acres burned)
- Frequency of wildfire occurrence
- Fuels condition as indicated by Vegetation Condition Class.

## EXISTING CONDITIONS

### 3.7.1.  CONDITIONS WITHIN OCCUPIED AND UNOCCUPIED HABITAT

Wildfire frequency and acreage burned vary substantially across the GUSG range. While fire data was not collected in a consistent manner until the 1980s, data since that time is sufficient to indicate patterns and provide an estimate of wildfire numbers and fire size (as shown in Table 3.49 and Table 3.50).  Fire has burned in roughly 1% of Occupied Habitat and 7% of Unoccupied Habitat over the past 30 years.  Fire frequency across BLM surface in Occupied and Unoccupied Habitat is low, and averages from six fires a year in Occupied Habitat to ten a year in Unoccupied Habitat.

A few wildfires in excess of 1,000 acres have occurred in the Piñon Mesa population area and these account for most of the burned acreage on BLM surface in Occupied and Unoccupied Habitat.  Burned area acreage and fire frequency are similar to figures for Unoccupied Habitat on BLM lands in Non-Habitat Areas. (See Table 3.50.) Based on fire occurrence within the management units, a clear pattern of more frequent fire is evident in the western portion of Occupied and Unoccupied Habitat (BLM 1989, 2005e).  Lightning is the primary cause of most fires, although human caused fires make up as much as 40% of all fires in some management units (BLM 1989, 1991b, 2003, 2009b, 2011g).

According to BLM management documents, fire is considered important in shaping the natural vegetation in the westernmost management units in Occupied and Unoccupied Habitat including Monticello FO and Canyons of the Ancients National Monument (BLM 2005a, 2005e)  Fire is not considered as important for maintaining natural vegetation composition and successional class proportions in eastern

management units such as the San Luis Valley FO, in part due to low incidence of natural ignitions (BLM 1989).

Alternatively, a slightly different picture is presented by remote sensing data, which has been classified into Vegetation Condition Classes (VCC) across BLM surface in Occupied and Unoccupied Habitat (Jones 2013, LANDFIRE 2010). VCC indicates the amount that current vegetation has departed from the simulated historical vegetation reference conditions. VCC is calculated based on changes to species composition, structural stage, and canopy closure. Three condition classes describe low departure (VCC 1), moderate departure (VCC 2), and high departure (VCC 3). This information is interpreted here as an indicator of potential areas where vegetation communities have not burned at their natural rates or severities. However, it only represents an approximate picture of fuel conditions and imbalances.

Currently, 52% of Occupied Habitat is categorized in VCC 2, where vegetation has been moderately altered from historic conditions, and 32% in VCC 3, with significant alteration from the historical range (as shown in Table 3.49 and Table 3.50). VCC 2 also dominates Unoccupied Habitat and BLM lands in Non-Habitat Areas. This data suggests that vegetation and fuels have been altered from historic conditions across most of the landscape, and this situation is mirrored throughout the different population areas as well. If the assumptions behind LANDFIRE and VCC are correct, the data implies that most of the vegetation and therefore the fuels condition on BLM surface in Occupied and Unoccupied Habitat is being affected by altered natural disturbance regimes, which may affect future fire behavior.

Existing RMPs state that management units focus on suppression of wildfires with emphasis on protecting human safety and property first, and resource values as a secondary goal. Cost is also an important factor in fire suppression. Additional fire program components include prescribed fire, fuel reduction, and managed fire for habitat or ecological benefit. Fire management is guided by RMPs and activity-level Fire Management Plans. These plans may include desired future condition objectives for both fuels and fire. Fuels management is a priority in areas of wildland-urban interface (BLM 2010a, 2011g, 2013c). Several existing fire management plans already contain measures to protect or enhance GUSG habitat.

CHAPTER 3 - AFFECTED ENVIRONMENT

**Table 3.49 - Wildland Fire Management Indicators on BLM Lands in GUSG Habitat**

| GUSG POPULATION AREA | AVERAGE FIRE FREQUENCY PER YEAR | LAND BURNED BY WILDFIRES | VCC CLASS 1 OR NOT APPLICABLE | VCC CLASS 2 | VCC CLASS 3 |
|---|---|---|---|---|---|
| | NUMBER | ACRES (%) | ACRES (%) | ACRES (%) | ACRES (%) |
| OCCUPIED HABITAT | | | | | |
| Rangewide Occupied Habitat | 6 | 5,093 (1%) | 63,588 (16%) | 205,025 (52%) | 126,849 (32%) |
| Cerro Summit-Cimarron-Sims Mesa | <1 | 0 (0%) | 351 (8%) | 3,634 (83%) | 394 (9%) |
| Crawford | <1 | 71 (0%) | 5,035 (23%) | 16,927 (76%) | 188 (1%) |
| Gunnison Basin | 3 | 983 (0%) | 53,476 (18%) | 133,450 (44%) | 115,098 (38%) |
| Monticello-Dove Creek | <1 | 0 (0%) | 631 (7%) | 3,963 (47%) | 3,890 (46%) |
| Piñon Mesa | <1 | 3,648 (29%) | 1,245 (10%) | 8,996 (71%) | 2,445 (19%) |
| Poncha Pass | <1 | 0 (0%) | 795 (8%) | 6,165 (63%) | 2,900 (29%) |
| San Miguel Basin | <1 | 390 (1%) | 2,055 (6%) | 31,899 (89%) | 1,934 (5%) |
| UNOCCUPIED HABITAT | | | | | |
| Rangewide Unoccupied Habitat | 10 | 15,552 (7%) | 67,431 (30%) | 135,916 (60%) | 24,535 (11%) |
| Cerro Summit-Cimarron-Sims Mesa | <1 | 7 (0%) | 559 (11%) | 4,158 (83%) | 293 (6%) |
| Crawford | <1 | <1 (0%) | 3,542 (34%) | 4,775 (46%) | 2,007 (19%) |
| Gunnison Basin | 1 | 4 (0%) | 11,342 (18%) | 50,711 (79%) | 1,919 (3%) |
| Monticello-Dove Creek | 1 | 495 (1%) | 11,013 (31%) | 17,477 (49%) | 7,443 (21%) |
| Piñon Mesa | 7 | 15,045 (15%) | 40,844 (42%) | 46,533 (48%) | 10,419 (11%) |
| Poncha Pass | <1 | 0 (0%) | 131 (1%) | 12,293 (83%) | 2,453 (16%) |
| San Miguel Basin | NA | NA | NA | NA | NA |

Percentages are calculated against the total BLM surface in Occupied and Unoccupied Habitat.

CHAPTER 3 - AFFECTED ENVIRONMENT

**Table 3.50 - Wildland Fire Management Indicators on BLM Lands within Non-Habitat Areas**

| GUSG POPULATION AREA | FIRE FREQUENCY PER YEAR | LAND BURNED BY WILDFIRES | VCC CLASS 1 OR NOT APPLICABLE | VCC CLASS 2 | VCC CLASS 3 |
|---|---|---|---|---|---|
| | AVERAGE | ACRES (%) | ACRES (%) | ACRES (%) | ACRES (%) |
| Rangewide Occupied Habitat | 8 | 10,715 (9%) | 46,246 (39%) | 64,127 (54%) | 8,021 (7%) |
| Cerro Summit-Cimarron-Sims Mesa | 1 | 0 (0%) | 1,075 (9%) | 9,140 (80%) | 1,210 (11%) |
| Crawford | <1 | 0 (0%) | 1,088 (73%) | 206 (14%) | 188 (13%) |
| Gunnison Basin | <1 | 164 (1%) | 3,308 (28%) | 8,179 (68%) | 520 (4%) |
| Monticello-Dove Creek | 2 | 0 (0%) | 8,566 (34%) | 13,773 (54%) | 3,061 (12%) |
| Piñon Mesa | 2 | 6,454 (24%) | 14,296 (54%) | 11,031 (41%) | 1,302 (5%) |
| Poncha Pass | 0 | 0 (0%) | 63 (8%) | 488 (64%) | 212 (28%) |
| San Miguel Basin | 2 | 4,097 (10%) | 17,850 (44%) | 21,310 (52%) | 1,529 (4%) |

## TRENDS

On BLM surface within Occupied Habitat and Unoccupied Habitat, drought and insect-killed trees have altered fuels and fuel loading, and increased the likelihood of fire over the short term but reduced it over the longer term (BLM 2005a, 2006). Increasing development adjacent to BLM-administered lands has added to the wildland-urban interface and makes fire and fuels management more challenging (BLM 2010a, 2011g, 2013c). Increased fuels and increased fuel continuity have resulted from weed invasion in some portions of BLM surface in Occupied Habitat and Unoccupied Habitat. Cheatgrass is of particular concern because it can increase fire frequency and size. Fire behavior has also changed with tree invasion into sagebrush sites (BLM 2010a, 2011g, 2013c). Fire suppression has led to increases in fuels (BLM 2006, 2009b). Grazing has altered fine-fuel distribution and amounts and is thought to have affected the natural fire regime where cheatgrass is not prevalent by reducing fire frequency and size (BLM 2006).

CHAPTER 3 - AFFECTED ENVIRONMENT

# 3.8. LIVESTOCK GRAZING

## INDICATORS

Current livestock grazing on BLM land throughout Occupied Habitat and Unoccupied Habitat is described in terms of:

- Active permitted forage (expressed as Animal Unit Months or AUMs)
- Acres within active livestock grazing allotments
- Acres of BLM lands achieving Land Health Ecological Fundamental, and acres not achieving this fundamental with livestock grazing a significant factor
- Acres of area where there are prohibitions on or limitations to the construction or maintenance of structural and nonstructural range improvements
- Acreage of existing grazing systems on BLM lands.

## EXISTING CONDITIONS

### 3.8.1.  CONDITIONS WITHIN OCCUPIED AND UNOCCUPIED HABITAT

Livestock grazing has been present at substantial levels across the region that includes Occupied Habitat and Unoccupied Habitat since development of the railroads in the late 1800s (Grahame 2002).  It has been the primary use of much of the non-timbered land since that time, with cattle, horses and sheep being grazed. The intensity of livestock grazing has varied with very heavy, unregulated use that degraded rangelands until the 1930s (BLM 2011a).

Passage of the Taylor Grazing Act in 1934 and Federal Land Policy and Management Act (FLPMA) in 1976 resulted in gradually increased regulation of grazing and reduced grazing pressure by instituting grazing allotments and grazing permits.  Over time, grazing permit terms and conditions have generally become more specific and less flexible, with a lower profit margin for permittees (BLM 2011d).  This shift has resulted from an increase in conflicting land uses, mandates for environmental protection, and expectations from the public that the BLM minimize livestock impacts on public lands (BLM 2011a).

Livestock grazing is permitted on the majority of BLM lands across Occupied Habitat and Unoccupied Habitat (see tables 3.51 and 3.52).  Most of the allotments are grazed by cattle, although a few are grazed by sheep or horses.  There are 219

grazing allotments on BLM surface in Occupied Habitat and Unoccupied Habitat that receive regular or periodic livestock use. Over 90% of BLM surface in Occupied Habitat and Unoccupied Habitat falls within these actively grazed allotments, with little difference between Occupied Habitat and Unoccupied Habitat, but greater variability between population areas. A lesser amount—56% of BLM lands in Non-Habitat Areas—is within a grazing allotment.

The BLM manages forage in units known as animal unit months (AUM), whereby one unit is the amount of dry forage required to feed a cow and calf for one month—generally referred to as one AUM. Within most management units, the majority of permitted AUMs are in active status, with additional AUMs held in some type of suspension due to a variety of factors (as shown in Table 3.51) (BLM 2006, 2009b, 2010a, 2011g, 2013c) The active AUMs represent the current grazing levels on BLM range, although the suspended AUMs may be available for use in the future, once analysis and documentation has been made that sufficient forage has become available.

On BLM surface, over 24,000 AUMs of forage are actively permitted each year for livestock grazing in Occupied Habitat and over 12,000 AUMs in Unoccupied Habitat. This represents an average stocking rate of around 15 acres per AUM. In Occupied Habitat, the Gunnison Basin population area produces the majority—75%—the total AUMs, with the other population areas each contributing no more than 6% of the total AUMs. Within Unoccupied Habitat, the Piñon Mesa population area, which is very large at nearly 100,000 acres, produces over 6,000 AUMs, which is the most of all the population areas. Permitted carrying capacities vary across allotments and GUSG populations. The lowest permitted carrying capacity occurs in the San Miguel Basin population area, with a rate of 34 acres per AUM, while the highest is in the Poncha Pass population area, with a rate of 6 acres per AUM on Occupied Habitat.

Grazing systems and seasons of use vary across the allotments. (See Table 3.53.) (BLM 1989, 1991b, 2003, 2005a, 2005e, 2010a, 2011g, 2013c) Higher management grazing systems require more management in the form of planning and involvement by both the BLM and the livestock grazers than lower management systems. Higher management systems can also require more inputs such as fences and water developments. Lower management grazing systems include spring grazing, spring and fall grazing, and season-long grazing. Higher management systems include short duration growing season grazing, deferred grazing, and deferred/rest rotational grazing systems. In Occupied Habitat rangewide, 157 allotments are currently under a type of higher management grazing system. These allotments cover 85% of the active allotment area. The situation in Unoccupied Habitat is similar. Lower management grazing systems are most common on lands supporting the Monticello-Dove Creek and Gunnison Basin populations, but they still represent only a small percentage of the total area at 30% and 14% respectively.

Public land grazing in the Gunnison Basin has recently been addressed by the GUSG Candidate Conservation Agreement (CPW 2013). The agreement lays out a process that provides for continued grazing of public lands in a manner consistent with meeting GUSG habitat requirements. This process is based on the premise that viable ranching operations on private lands are important for GUSG survival, and that public land grazing is an integral part of these ranching operations. The process describes how changes to grazing permits will occur once systematic monitoring for GUSG habitat parameters indicates changes are needed.

A general picture of range conditions within BLM surface in Occupied and Unoccupied Habitat can be gained from looking at the lands achieving or not achieving the Land Health Ecological Fundamental. (See Table 3.41 and Table 3.42.) The Ecological Fundamental requires BLM lands to support and maintain healthy, productive plant and animal communities of native and other desirable species (BLM 2008, 2011b). Lands that do not achieve this fundamental are generally not supporting adequate or appropriate vegetation for sustaining current livestock grazing levels. (See Table 3.51 and Table 3.52) While 61% of the acreage in Occupied Habitat and 8% in Unoccupied Habitat is reported as not achieving the Ecological Fundamental, some of this acreage likely reflects inconsistencies in data interpretation , or includes nonnative seedings and other vegetation treatments which do not function similarly to native communities, but may still be in good range condition. The data does indicate how the different management units view vegetation status on lands under their management, particularly those lands that are accessible for grazing. Within Non-Habitat Areas, 20% of BLM land is reported as not achieving this fundamental.

The land health data is incomplete for some offices and significant factors behind land health conditions have not been identified for Grand Junction, Gunnison, and Moab FOs. Where data has been reported, there are some cases where poor conditions are at least partially due to livestock grazing. (See Table 3.51 and Table 3.52.) The existing land health reporting data for grazing allotments on BLM surface in Occupied and Unoccupied Habitat identifies relatively few acres of land as not achieving the Ecological Fundamental with livestock grazing as a Significant Factor. Only Occupied Habitat for the San Miguel Population has any acreage in this category, and changes to grazing management have recently been made within this population area. Just 2% of Unoccupied Habitat has so far been identified as not achieving the Ecological Fundamental with livestock grazing as a significant factor. On BLM lands in Non-Habitat Areas, 11% of the land has been identified as not achieving the Ecological Fundamental, with livestock grazing as a significant factor.

CHAPTER 3 - AFFECTED ENVIRONMENT

**Table 3.51 - Livestock Grazing Allotments, AUMs and Concerns within BLM GUSG Habitat**

| GUSG POPULATION | ACTIVE LIVESTOCK GRAZING ALLOTMENTS | PERMITTED ACTIVE AUMS AND CARRYING CAPACITY | ECOLOGICAL FUNDAMENTAL RATING NOT ACHIEVING WITH LIVESTOCK GRAZING A SIGNIFICANT FACTOR |
|---|---|---|---|
| | Acres (% of Total Area) | (Acres per AUM) | Acres (% of Total Area) |
| OCCUPIED HABITAT | | | |
| Rangewide Occupied Habitat | 367,948  (93%) | 24,204 (15 ac/AUM) | 33,345 / 8% |
| Cerro Summit-Cimarron-Sims Mesa | 3,759   (86%) | 157 (24 ac/AUM) | 0 / 0% |
| Crawford | 22,150 (100%) | 1,496 (15 ac/AUM) | 0 / 0% |
| Gunnison Basin | 279,731  (93%) | 18,699 (15 ac/AUM) | 0 / 0% |
| Monticello-Dove Creek | 4,949  (58%) | 325 (15 ac/AUM) | 0 / 0% |
| Piñon Mesa | 12,301  (97%) | 920 (13 ac/AUM) | 0 / 0% |
| Poncha Pass | 9,683  (98%) | 1,555 (6 ac/AUM) | 0 / 0% |
| San Miguel Basin | 35,375  (99%) | 1,053 (34 ac/AUM) | 33,345 / 93% |
| UNOCCUPIED HABITAT | | | |
| Rangewide Unoccupied Habitat | 209,250  (92%) | 12,743 (16 ac/AUM) | 4,257 / 2% |
| Cerro Summit-Cimarron-Sims Mesa | 4,674  (93%) | 198 (24 ac/AUM) | 0 / 0% |
| Crawford | 9,622  (93%) | 509 (19 ac/AUM) | 1,416 / 14% |
| Gunnison Basin | 59,890  (94%) | 2,555 (23 ac/AUM) | 0 / 0% |
| Monticello-Dove Creek | 27,864  (78%) | 1,547 (18 ac/AUM) | 2,841 / 8% |
| Piñon Mesa | 92,784  (95%) | 6,038 (15 ac/AUM) | 0 / 0% |
| Poncha Pass | 14,416  (97%) | 1,897 (8 ac/AUM) | 0 / 0% |
| San Miguel Basin | NA | NA | NA |

**Percentages are calculated against the total BLM surface in Occupied Habitat and Unoccupied Habitat.**

CHAPTER 3 - AFFECTED ENVIRONMENT

**Table 3.52 - Livestock Grazing Allotments, AUMs, and Concerns in BLM Non-Habitat Areas**

| GUSG POPULATION | ACTIVE LIVESTOCK GRAZING ALLOTMENTS<br>Acres and % of Total Area | LAND HEALTH ECOLOGICAL FUNDAMENTAL RATING OF NOT ACHIEVING WITH LIVESTOCK GRAZING AS A SIGNIFICANT FACTOR<br>Acres and % of Total Area |
|---|---|---|
| Rangewide | 66,797 / 56% | 13,380 / 11% |
| Cerro Summit-Cimarron-Sims Mesa | 7,201 / 63% | 0 / 0% |
| Crawford | 1,481 / 100% | 0 / 0% |
| Gunnison Basin | 7,514 / 63% | 0 / 0% |
| Monticello-Dove Creek | 12,186 / 48% | 0 / 0% |
| Piñon Mesa | 20,285 / 76% | 0 / 0% |
| Poncha Pass | 556 / 73% | 0 / 0% |
| San Miguel Basin | 17,573 / 43% | 13,380 / 33% |

Percentages are calculated against the total BLM surface within Non-Habitat areas outside of Occupied Habitat and Unoccupied Habitat.

The infrastructure needed to support grazing systems is an important component of range management. Typically, developed infrastructure and higher management systems of livestock management require more resources, maintenance, and effort from both the grazing permittees and the BLM rangeland management staff in comparison to lower management systems. However, grazing systems are often used to improve livestock distribution, avoid overgrazing, and improve rangeland health (BLM 2011a).

Presently, the majority of active allotment acreage has few if any constraints at the land use plan level on development of range management infrastructure. However, the NEPA process and activity-level plans such as the Candidate Conservation Agreement (CPW 2013) can add additional constraints to infrastructure development (as shown in Table 3.53). Development of range infrastructure is generally more feasible in the unconstrained areas. Only the Occupied Habitat portion of the Crawford Population is substantially affected by construction constraints at the land use plan level.

CHAPTER 3 - AFFECTED ENVIRONMENT

**Table 3.53 - Livestock Grazing Management Indicators on BLM Lands in GUSG Habitat**

| GUSG POPULATION | ALLOTMENTS WITH MINIMAL CONSTRAINTS ON RANGE INFRASTRUCTURE ACRES/% OF ACTIVELY GRAZED AREA | | LOWER MANAGEMENT ALLOTMENTS* NUMBER OF ALLOTMENTS/ % OF ACTIVELY GRAZED AREA) | | DEFERRED GRAZING NUMBER OF ALLOTMENTS/ % OF ACTIVELY GRAZED AREA | ROTATION GRAZING NUMBER OF ALLOTMENTS/ % OF ACTIVELY GRAZED AREA | SHORT DURATION GROWING SEASON GRAZING NUMBER OF ALLOTMENTS/ % OF ACTIVELY GRAZED AREA |
|---|---|---|---|---|---|---|---|
| OCCUPIED HABITAT | | | | | | | |
| Rangewide Occupied Habitat | 348,036 | 88% | 58 | 12% | 38 / 5% | 90 / 49% | 29 / 31% |
| Cerro Summit-Cimarron-Sims Mesa | 3,579 | 86% | 465 | 5% | 0 / 0% | 7 / 76% | 0 / 0% |
| Crawford | 5,338 | 24% | 0 | 0% | 2 / 23% | 6 / 77% | 0 / 0% |
| Gunnison Basin | 279,731 | 93% | 26 | 14 % | 10 / 3% | 30 / 39% | 25 / 40% |
| Monticello-Dove Creek | 4,949 | 58% | 7 | 30% | 13 / 30% | 4 / 28% | 0 / 0% |
| Piñon Mesa | 9,201 | 73% | 13 | 5% | 3 / 5% | 16 / 76% | 3 / 11% |
| Poncha Pass | 9,683 | 98% | 1 | 5% | 4 / 3% | 7 / 95% | 0 / 0% |
| San Miguel Basin | 35,375 | 99% | 6 | <1% | 6 / 4% | 20 / 94% | 1 / 0% |
| UNOCCUPIED HABITAT | | | | | | | |
| Rangewide Unoccupied Habitat | 150,287 | 66% | 80 | 15% | 39 / 5% | 108 / 71% | 17 / 4% |
| Cerro Summit-Cimarron-Sims Mesa | 4,674 | 93% | 6 | 35% | 0 / 0% | 6 / 53% | 1 / 12% |
| Crawford | 6,544 | 63% | 3 | 8% | 6 / 9% | 17 / 68% | 9 / 11% |
| Gunnison Basin | 47,443 | 74% | 9 | 15% | 3 / 2% | 7 / 76% | 1 / 0% |
| Monticello-Dove Creek | 27,623 | 77% | 23 | 25% | 16 / 8% | 20 / 62% | 0 / 0% |
| Piñon Mesa | 49,588 | 51% | 39 | 14% | 13 / 7% | 53 / 69% | 6 / 6% |
| Poncha Pass | 14,416 | 97% | 0 | 0% | 1 / 0% | 5 / 97% | 0 / 0% |
| San Miguel Basin | NA | NA | NA | | NA | NA | NA |

*Includes allotments with season-long grazing, allotments with little BLM land used in conjunction with larger private land portions, and other undefined grazing systems.

Percentages are calculated against the total BLM surface in Occupied Habitat and Unoccupied Habitat.

## TRENDS

Livestock use on BLM lands has generally been stable or declining as a result of market forces, reduced agricultural activity in the surrounding area, drought impacts, and AUM reductions or changes in grazing necessary to meet land health standards (BLM 2003, 2005a, 2013c). In some management units, demand for available permits remains strong with new applicants for every available permit (BLM 2010a). Other uses that compete with or make livestock grazing more difficult have been increasing in some parts of BLM surface in Occupied Habitat and Unoccupied Habitat (BLM 2009b, 2011g). Examples include increased trail-based recreation and elk use of forage. Range condition trends in some management units indicate that range

conditions cannot be sustained under current total AUM allocations unless higher management grazing systems and more inputs and infrastructure are put into place (BLM 2005e, 2006, 2013c).

Within the Gunnison Basin, the Candidate Conservation Agreement has established a process to make grazing consistent with meeting GUSG RCP habitat guidelines (CPW 2013). As a result, there are likely to be more constraints placed on grazers, and more resources required to monitor grazing levels and vegetation conditions. However, the CCA should bring some predictability and assurance to the public land grazers that they can continue to graze on public lands within GUSG habitat.

# 3.9.  RECREATION

## INDICATORS

The following indicators are used to describe the existing condition related to recreation. These indicators will also be used to analyze the impacts of the preferred alternative and other alternatives on recreation resources:

- Changes in the number of acres where recreationists are unable to achieve targeted beneficial outcomes (specific to SRMAs), and for BLM to achieve and maintain supporting setting characteristics (specific to SRMAs and ERMAs).
- Changes in the number of acres where unstructured recreational opportunities and experiences are reduced or eliminated.
- Changes to the number or types of Special Recreation Permits (SRPs) allowed in GUSG habitat.

## EXISTING CONDITIONS

### 3.9.1.  CONDITIONS WITHIN THE PLANNING AREA

Typical recreational activities within the planning area include hiking, camping, horseback riding, mountain biking, off-highway vehicle (OHV) use, and cross-country skiing. Migrating and resident wildlife provide plentiful opportunities for hunting, photography, and observation. Renowned local rivers, streams, and lakes offer boating and cold-water fishing opportunities.

Recreation visitors to the planning area come from national and international locations, the Denver and Salt Lake City metropolitan areas, Colorado's Front Range and Utah's Wasatch Front, and other local communities. For both Colorado and Utah visitors, the region is an easily accessible weekend getaway with a diversity of outdoor activity offerings and recreation settings. Increased visitation to small towns and destination resorts contribute to the increased use of public lands within the decision area.

## 3.9.2.   CONDITIONS ON BLM-ADMINISTERED LANDS

### RECREATION POLICY

#### Recreation Planning and Outcomes-Focused Management

Some form of recreation use and associated recreation resources are typically present on the lands and waters managed by Bureau of Land Management (BLM) field offices, and are consequently allocated through the land use planning process. BLM recreation management focuses on three basic components of recreation opportunities on public lands: 1) types of recreation opportunities and experiences that are provided, 2) the character of recreation setting within which they occur and retaining that character, and 3) services that can be provided by the BLM and its collaborating partners.  In the last several decades, there has been a growing recognition of how much recreation contributes to the quality of life, economy, society, and environment.

Changing public values and expectations of land management agencies to meet the demand for diverse recreation uses has created the need for changes in managing Recreation and Visitor Services.  These changes and resulting advances in recreation management knowledge and practices have been responsible for the evolution from activity-based management to experience-based management and, recently, benefits-based management. Each transition built on the management framework of the previous.  Within the BLM, benefits-based management has further transitioned to outcomes-focused management.

Outcomes-focused management is defined as an approach to recreation management that focuses on the positive outcomes gained from engaging in recreational experiences.  Positive recreation outcomes consist of experiences and benefits and are defined by the BLM as:

- Experiences - Immediate states of mind resulting from participation in recreation activities that result in benefits.
- Benefits - The results of a satisfying recreation experience that improve or maintain a desired condition.  These accrue from recreation participation, are both short and long term, and are realized onsite and offsite.  Benefits are identified in one of four categories and are described as: Personal/Individual Benefits, Social/Community Benefits, Economic Benefits, and Environmental Benefits.  The fundamental concept of outcomes-focused management is that benefits endure beyond the onsite recreation experience attained by individuals.  Those experiences and onsite benefits stay with the individual when they leave the recreation area and cumulatively lead to offsite beneficial outcomes to communities, economies, and the environment.  This linkage

between experiences and outcomes can be viewed as a chain (BLM H-8320-1 2014).

## Connecting with Communities Strategy

BLM public lands—once described as "the lands nobody wanted"—are now recognized as America's Great Outdoors, a "Backyard to Backcountry" treasure. They are uniquely accessible, and their close proximity to varied stakeholders creates many opportunities for the BLM and communities to collaborate, set mutual objectives for proposed recreation opportunities, and pool resources toward shared goals and to better enable communities to achieve their own desired social, economic, and environmental outcomes.

As part of a serious effort to reposition the Recreation and Visitor Services Program to focus on producing community social and economic benefits in support of community values while optimizing benefits for the public, BLM released a national "Connecting With Communities" strategy in 2014.

## RECREATION PARTICIPATION

BLM lands constitute nearly 13% of all lands in Colorado at 8,382,959 acres, and about 42% of all lands in Utah at just under 23 million acres (CO and UT SCORP's 2014/2013).  In FY 13, BLM reported a total of 61 million visits, 7,218,735 in Colorado and 6,843,098 in Utah (RMIS 2015).  Since a low in 2007–2008, which can be attributed to rising gas prices and a declining economy, visitation to BLM lands in both Colorado and Utah steadily recovered through 2012 to just above pre-recession numbers.

Much of the recreation participation within the decision area reflects the predominantly open and undeveloped character (also referred to as the 'dispersed' recreation setting character) of the majority of BLM lands in both states.  As reflected by the 2014 Colorado Statewide Comprehensive Outdoor Recreation Plan, 26 of the top 38 outdoor recreation activities are strongly associated with public lands, such as BLM-administered lands. Motorized and non-motorized trail use, water-based activities, and winter-based activities are all well-represented within the planning area.  On BLM lands within the decision area, the most popular activities based on number of participants include: OHV riding, Hiking/Walking/Running, Mountain Biking, Driving for Pleasure, Camping, Row/Float/Raft Boating, Photography, Viewing Cultural Sites, Big Game Hunting, and Picnicking (RMIS 2015).

## RECREATION PRIORITIES

Recreation priorities on BLM lands will be determined within the decision area through a variety of means. State SCORPs will continue to inform BLM of citizen desires and unmet needs in both states; state-specific strategies of BLM's Connecting with Communities strategy will continue to identify BLM's recreation niche and most important recreation-tourism products, which will vary from place to place. Customer assessments for recreation management areas will provide specific focus for recreation management for those unique allocations of BLM lands. Changing recreation patterns, interests and technologies, and BLM's ability to adapt to them will also determine priorities. Other factors over time, such as population growth or climate change will also, undoubtedly, determine priorities for recreation and other resources on BLM-managed lands in the decision area.

## RECREATION MANAGEMENT AREAS

To help effectively manage Recreation and Visitor Services (R&VS), the BLM designates RMAs. Areas are classified as either a special recreation management area (SRMA) or an extensive recreation management area (ERMA). Both types of areas are recognized as producing high quality recreation opportunities and offering beneficial outcomes for recreation participants, recreation-tourism partners, visitor service providers, and communities. R&VS objectives in RMAs are recognized as a primary resource management consideration, and specific management is required to protect the recreation opportunities. The RMA designation is based on recreation demands and issues, Recreation Setting Characteristics (RSCs), resolving use/user conflicts, compatibility with other resource uses, and resource protection needs. RMAs identify where the BLM generally prioritizes the expenditure of funding. There is no requirement to designate all lands as RMAs. However, in public lands not designated as RMAs ('undesignated lands'), addressing visitor health and safety, resource protection, and use and user conflicts may be of equal or greater importance (H-8320-1 2014).

Designating lands as an RMA is not an either/or determination between managing for recreation resources or any other resource, such as for the conservation of GUSG and its habitat. Among several other considerations, management objectives and actions in RMAs are required to consider resource protection issues as they relate to the recreation resource (H-8320-1 2014).

### Special Recreation Management Areas

An SRMA is an administrative unit where existing or proposed recreation opportunities and Recreation Setting Characteristics (RSCs) are recognized for their unique value, importance, and/or distinctiveness, especially as compared to other areas used for recreation. RSCs are derived from the recreation opportunity

spectrum, and are categorized as physical, social, and operational components and are further subdivided into specific characteristics (attributes). These characteristics are categorized across a spectrum of classes that describe a range of qualities and conditions of a recreation setting, for example primitive to urban.

An SRMA is managed to protect and enhance a targeted set of activities, experiences, benefits, and desired RSCs. Within an RMP, an SRMA may be subdivided into recreation management zones (RMZs) to further delineate specific recreation opportunities. Within an SRMA, R&VS management is recognized as the predominant RMP focus, where specific recreation opportunities and RSCs are managed and protected on a long-term basis (H-8320-1 2014).

There are ten SRMAs in the decision area that overlap portions of GUSG habitat (as shown in Table 3.54 and Figure 3.42), including:

- Alpine Triangle: provides sightseeing and motorized recreation along the Alpine Loop Scenic and Historic Byway.
- Bangs Canyon: provides motorized and non-motorized trail systems in a setting of high desert canyons and plateaus.
- Cochetopa: provides a scenic canyon with great fishing and watchable wildlife opportunities.
- Dolores River: provides water-based recreation and hiking in one of southwest Colorado's most scenic canyons.
- Gateway: provides motorized and non-motorized recreation in unparalleled geologic formations, and associated with the Gateway Canyons Resort.
- Hartman Rocks: provides community-based recreation in Gunnison, CO and features a non-motorized and motorized singletrack trail system, rock climbing/bouldering, and cross-country skiing.
- Gunnison and North Fork Rivers: provides an ideal location for non-technical boating within the Gunnison Gorge NCA.
- San Miguel River: provides world-class boating and fishing opportunities in Southwest Colorado.
- Two Rivers: provides boating and camping in the popular Westwater Canyon of the Colorado River.
- Squaw-Cross Canyons: provides remote backpacking, camping, and exploring in the Canyons of the Ancients NM.

CHAPTER 3 - AFFECTED ENVIRONMENT

**Table 3.54 - Acreage of BLM Special Recreation Management Areas by Population**

| POPULATION/HABITAT TYPE | ACRES |
|---|---|
| Crawford Population | 43 |
| Unoccupied Habitat | 43 |
| Gunnison Gorge NCA | 43 |
| Uncompahgre FO | 0 |
| Gunnison Basin Population | 30,593 |
| Occupied Habitat | 17,304 |
| Gunnison FO | 17,304 |
| Unoccupied Habitat | 13,288 |
| Gunnison FO | 13,288 |
| Monticello-Dove Creek Population | 11,557 |
| Non-Habitat | 7,298 |
| Tres Rios FO | 7,298 |
| Occupied Habitat | 35 |
| Tres Rios FO | 35 |
| Unoccupied Habitat | 4,223 |
| Canyons of the Ancients NM | 4,031 |
| Tres Rios FO | 192 |
| Piñon Mesa Population | 9,124 |
| Non-Habitat | 8,700 |
| Grand Junction FO | 344 |
| Moab FO | 8,356 |
| Unoccupied Habitat | 424 |
| Grand Junction FO | 270 |
| Moab FO | 154 |
| San Miguel Basin Population | 14,693 |
| Non-Habitat | 14,494 |
| Uncompahgre FO | 14,494 |
| Occupied Habitat | 199 |
| Uncompahgre FO | 199 |
| **Total Acreage** | **66,010** |



**Figure 3.42 - BLM Special Recreation Management Areas in the Decision Area**

CHAPTER 3 - AFFECTED ENVIRONMENT

CHAPTER 3 - AFFECTED ENVIRONMENT

## Extensive Recreation Management Areas

An ERMA is an administrative unit that requires specific management consideration in order to address recreation use, demand, or R&VS program investments.  An ERMA is managed to support and sustain principal recreation activities and associated qualities and conditions. Management of ERMAs is commensurate with the management of other resources and resource uses. While generally unnecessary, ERMAs may be subdivided into RMZs to ensure R&VS are managed commensurate with other resources and resource uses (H-8320-1 2014).  The decision area includes six ERMAs containing GUSG habitat (as shown in Table 3.55 and Figure 3.43):

**Table 3.55 - BLM Extensive Recreation Management Areas by Population**

| POPULATION | ACRES |
|---|---|
| **Cerro Summit-Cimarron-Sims Mesa** | **11,099** |
| Non-Habitat | 1,384 |
| Gunnison FO | 1,394 |
| Occupied Habitat | 4,704 |
| Gunnison FO | 649 |
| Uncompahgre FO | 4,055 |
| Unoccupied Habitat | 5,010 |
| Gunnison FO | 1,073 |
| Uncompahgre FO | 3,937 |
| **Crawford** | **25,789** |
| Occupied Habitat | 16,761 |
| Gunnison Gorge NCA | 16,760 |
| Uncompahgre FO | 1 |
| Unoccupied Habitat | 9,028 |
| Gunnison Gorge NCA | 4,196 |
| Uncompahgre FO | 4,831 |
| **Gunnison Basin** | **343,269** |
| Non-Habitat | 12,007 |
| Gunnison FO | 12,007 |
| Occupied Habitat | 285,127 |
| Gunnison FO | 285,127 |
| Unoccupied Habitat | 46,136 |
| Gunnison FO | 46,090 |
| Uncompahgre FO | 46 |
| **Monticello-Dove Creek** | **40,118** |
| Occupied Habitat | 8,477 |
| Monticello FO | 3,233 |

CHAPTER 3 - AFFECTED ENVIRONMENT

| POPULATION | ACRES |
|---|---|
| Tres Rios FO | 5,244 |
| Unoccupied Habitat | 31,641 |
| Canyons of the Ancients NM | 0 |
| Moab FO | 7 |
| Monticello FO | 1,744 |
| Tres Rios FO | 29,890 |
| **Piñon Mesa** | **9,267** |
| Non-Habitat | 5,168 |
| Moab FO | 5,168 |
| Unoccupied Habitat | 4,099 |
| Moab FO | 4,099 |
| **Poncha Pass** | **24,619** |
| Occupied Habitat | 9,742 |
| San Luis Valley FO | 9,742 |
| Unoccupied Habitat | 14,877 |
| San Luis Valley FO | 14,877 |
| **San Miguel Basin** | **35,679** |
| Occupied Habitat | 35,679 |
| Uncompahgre FO | 625 |
| Tres Rios FO | 35,054 |
| **Total Acreage** | **489,840** |

CHAPTER 3 - AFFECTED ENVIRONMENT



**Figure 3.43 - BLM Extensive Recreation Management Areas in the Decision Area**

CHAPTER 3 - AFFECTED ENVIRONMENT

## Public Lands Not Designated as Recreation Management Areas

BLM field offices with land use plans older than 2011 previously designated all acres of the field office not allocated as an SRMA as one or more ERMAs. Current policy now allows for a third consideration relative to Recreation and Visitor Services allocations, "Public Lands Not Designated as Recreation Management Areas." Public lands that are not designated as RMAs (undesignated lands) are managed to meet basic Recreation and Visitor Services (R&VS) and resource stewardship needs. Recreation is not emphasized on these lands; however, recreation activities may occur, except on those lands closed to public use. The R&VS are managed to allow recreation uses that are not in conflict with the primary uses of these lands.

While there are currently only 63,298 acres of undesignated lands in the decision area, future RMPs associated with the decision area would likely increase that number. Table 3.56 and Figure 3.44 illustrate the current undesignated lands in the Moab FO (which are located within a Wilderness area) and undesignated lands in the Grand Junction FO.

**Table 3.56 - BLM Lands with GUSG Habitat Not Designated as Recreation Management Areas**

| BLM UNIT | ACRES TOTAL |
|---|---|
| GRAND JUNCTION FO | 62,190 |
| Occupied Habitat | 10,521 |
| Unoccupied Habitat | 51,669 |
| MOAB FO | 1,108 |
| Unoccupied Habitat | 1,108 |
| **Total** | **63,298** |

Note: Acres are rounded to the nearest whole number.
Source: BLM 2015

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.44 - BLM Lands with GUSG Habitat Not Designated as Recreation Management Areas**



## SPECIAL RECREATION PERMITS

Special Recreation Permits (SRPs) are authorizations that allow specific recreational uses of the public lands and related waters.  SRPs are issued under the authority of the Federal Lands Recreation Enhancement Act.  They are issued as a means to:

- Support recreation planning goals to provide experience and beneficial outcomes to the public.
- Manage visitor use and reduce user conflicts.
- Protect natural and cultural resources.
- Provide for public health and safety.
- Educate and communicate with the public.
- Provide a mechanism to accommodate commercial recreation uses, and
- Obtain a fair value and return for the commercial use of public land.

The objective of the BLM recreation permitting system is to satisfy recreational demand within allowable use levels in an equitable, safe, and enjoyable manner while minimizing adverse resource impacts and user conflicts.  By issuing SRPs, BLM authorizes permittees the use of public lands and/or related waters for specific recreational purposes; a privilege that is subject to the terms and conditions of the permit.  Recreation permits are administered in a manner that is consistent with management objectives determined in RMPs, Recreation Area Management Plans, or in their absence, through recreation management objectives resulting from analysis of resources and visitor use in each area (H-2930-1, 2014).

SRPs are issued for various commercial, competitive, and organized non-commercial activities on BLM-administered lands.  Within the decision area, SRPs are issued for such things as guided hunting and fishing, off-road vehicle tours, mountain bike tours, horseback rides, races, vendors, river outfitting, and numerous other activities. (See Table 3.57.)  The greatest number and variety of SRPs in GUSG habitat are in the Gunnison FO.  Within the satellite populations, the most common type of SRP issued in GUSG habitat is for Big Game hunting.  No SRPs have been issued on BLM-administered lands related to GUSG viewing.

### Table 3.57 - Special Recreation Permits in the Decision Area

| | SPECIAL RECREATION PERMIT TYPES | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Decision Area BLM Unit | Big Game Hunting | Mountain Lion Hunting | Mountain Biking | Horse-back Riding | Hiking/ Foot Racing | Rock Climbing | Fishing | Education | OHV Touring | Photography | Row/ Float/ Raft |
| Gunnison FO | 10 | 4 | 9 | 6 | 8 | 10 | 6 | | 2 | 1 | 2 |
| Grand Junction FO | 3 | 5 | N/A | N/A | N/A | 4 | N/A | 1 | N/A | N/A | N/A |
| San Luis Valley FO | 1 | 2 | 1 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Uncompahgre FO | 8* | 6* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Tres Rios FO | 6 | 7 | 1 | 2 | N/A | N/A | N/A | 1 | 1 | N/A | N/A |
| Monticello FO | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Moab FO | 19 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Canyons of the Ancients NM | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Dominguez-Escalante NCA | 2 | 4 | 1 | N/A | N/A | 1 | N/A | 2 | 1 | N/A | N/A |
| McInnis Canyons NCA | 2 | 5 | N/A | N/A | N/A | N/A | N/A | 2 | N/A | N/A | N/A |
| Gunnison Gorge NCA | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

Source BLM
**13 SRPs in Uncompahgre FO are for both big game and mountain lion hunting.

# TOURISM

Some of the fastest-growing segments of the travel and tourism industry—outdoor recreation, nature, adventure, and heritage tourism—are also key components of BLM-managed public lands.  Recreation and tourism are significant economic drivers, and are identified together as one of the top three industries in the twelve western states where the vast majority of BLM public lands are located.

The BLM works with the tourism industry and gateway communities to:

- Encourage development of sustainable travel and tourism within gateway communities and support community-based conservation;
- Emphasize BLM outdoor recreation, National Conservation Lands, and heritage tourism attractions that influence the social, economic, and environmental interests of gateway communities;
- Improve BLM relationships with community, state, and individual travel and tourism partners to stimulate public involvement with the public lands; and
- Sustain social, economic, and environmental viability of rural communities, including communicating a sustainable stewardship message to those communities and their visitors.

BLM involvement with the tourism industry is important to enhancing the quality of life within communities, where there is interest in expanding outdoor recreation-based tourism, nature-based tourism, and heritage-based tourism. Working with tourism partners, in turn, can help protect natural and heritage resources on public lands, as well as provide critical economic opportunities in local communities.

Home to the principal GUSG population, the Gunnison Basin annually hosts tourists associated with a GUSG festival, which attracts birders and other enthusiasts for wildlife watching (especially the GUSG's unique lek display behavior), as well as educational forums and other activities (Sisk-a-dee website 2015).

## DEVELOPED RECREATION FACILITIES

Within the decision area and GUSG habitat, developed recreation sites and facilities have been constructed in order to enhance recreational opportunities, protect resources, manage activities, and reduce user conflicts.  These developments range from campgrounds, to trailheads with simple bulletin boards, to developed river access sites.  Many of these developments are located within SRMAs, where the BLM has made a commitment to the unique values, importance, and distinctiveness of the recreational opportunities in those areas.

There are 15 developed recreation sites located in GUSG habitat on BLM-managed lands (as shown in Table 3.58 and Figure 3.45).

CHAPTER 3 - AFFECTED ENVIRONMENT

**Table 3.58 - BLM Recreation Sites in the Decision Area**

| POPULATION AREA/ HABITAT TYPE/SITE | NUMBER OF SITES |
|---|---|
| GUNNISON BASIN — 7 | |
| **Occupied Habitat** | **3** |
| Recreation Areas | 2 |
| • Cochetopa Canyon Recreation Area | |
| • Hartman Rocks Recreation Area | |
| Trailheads | 1 |
| • Mill Creek Trailhead (North) | |
| **Unoccupied Habitat** | **4** |
| Campgrounds/Camping | 2 |
| • Cebolla Creek Campground | |
| • Red Bridge Campground | |
| Recreation Sites | 2 |
| • Gateview Recreation Site | |
| • The Gate Recreation Site | |
| PIÑON MESA — 7 | |
| **Unoccupied Habitat** | **7** |
| Recreation Sites | 4 |
| • Cactus Park Recreation Site | |
| • Miracle Rock Recreation Site | |
| • Mud Springs Recreation Site | |
| • Pot Holes Recreation Site | |
| Trailheads | 3 |
| • Cactus Park Wilderness Trailhead | |
| • Jones Canyon Trailhead | |
| • Knowles Canyon Trailhead | |
| PONCHA PASS — 1 | |
| **Occupied Habitat** | **1** |
| Campgrounds/Camping | 1 |
| • Dorsey Creek Parking & Camping | |
| **Total Recreation Sites** | **15** |



Figure 3-45 - BLM Recreation Sites in or Adjacent to the Planning Area

CHAPTER 3 - AFFECTED ENVIRONMENT

CHAPTER 3 - AFFECTED ENVIRONMENT

## TRENDS

Nationally, people enjoy all the benefits available from our federal public lands, but the way that society recreates is changing. Across the country, fewer and fewer two week vacations are being taken. Instead, people are opting for closer and shorter "weekend" getaways that offer opportunities to experience these natural wonderlands (FICOR website 2015).

One of the top reasons people choose to live in Colorado and Utah are both states' clean environment, access to public lands and outdoor recreation opportunities, and residents' ability to maintain a healthy, outdoor lifestyle. Considering population growth projections, and the likelihood of new residents sharing these same outdoor-focused priorities, land managers will face trade-offs between promoting recreational opportunities while managing natural resources to maintain their integrity (CO SCORP 2014).

## COMMUNITY-BASED RECREATION

An increasing number of people are living near, or seeking out, BLM-administered lands for a diversity of recreational opportunities characterized by the "mountain resort or outdoor lifestyle." Because the planning area is a year-round place to live and work, BLM-administered lands are experiencing an increase in demand for recreational use.

Visitation and use near local communities is expected to continue to grow. Many local communities in the planning area are bordered by public lands, which are used as "backyard" recreation areas by local residents. As urbanization increases, so too does expansion into the Wildland Urban Interface, which may pose increased threats for GUSG conservation efforts from increased outdoor recreation use and other resource concerns characteristic of the Wildland Urban Interface, such as loss of habitat and habitat fragmentation.

## RECREATION PARTICIPATION

The decision area consists primarily of the central Colorado mountain region. According to the 2014 Colorado SCORP, most Colorado residents stay within their region of residence to recreate, however, there is an increasing willingness of Coloradans to travel. Most overnight visits within the state come from residents in the major cities of the Front Range. This region is expected to see the largest population growth in the decades ahead, which will also affect the public lands within the decision area (CO SCORP 2014).

Participation in outdoor recreation on public lands within the planning and decision areas will likely increase at a greater rate than national averages, due partially to

higher-than-average population growth in the mountain west, combined with the increasingly popular outdoor lifestyle that the planning area is renowned for. In Colorado, for example, a majority of residents expect to greatly increase their outdoor recreation participation over the next five years (CO SCORP 2014). On BLM-managed lands in the planning area, recreational use has steadily increased in recent years and that trend is expected to continue. Local residents, and visitors alike, will continue to seek easy access to public lands for shorter use periods (such as after-work trail runs or bike rides and weekend getaways, etc.), combined with increasing interest in lower-elevation, community-based recreation on public lands. Trends can also be seen for some of the more common recreational pursuits on BLM lands in the planning area, including:

## OHV Riding

The most popular recreational activity on BLM-managed lands in the planning area is Off-Highway Vehicle riding, with over 26 million participants in Colorado alone over the last 15 years (RMIS 2015). OHV use has steadily increased, especially for All-Terrain Vehicles (ATV'S) and Off-Highway Motorcycles. The one exception to an increase in OHV use is for snowmobiling, which continues a decade-long decline in participation (CO SCORP2014). The Colorado Off-Highway Vehicle Coalition (COHVCO) reported that OHV registrations increased 145% between 2001 and 2008. In 2008, they reported that over 184,000 resident households likely participated in some sort of motorized recreation in the 2007-08 season in Colorado and nearly 30,000 non-resident households also traveled to Colorado to participate in motorized recreation. (COHVCO 2009).

## Hiking/Walking/Running

The second most popular activity on BLM-managed lands in the planning area is non-motorized/mechanical trail use (RMIS 2015). Trails in the planning area are a stated necessity, especially in Colorado, and seeking greater connectivity between communities and associated public lands will continue for the foreseeable future.

## Mountain Biking

The mountain west is the epicenter of mountain biking popularity. Nationally, there are more than 40 million participants in this region alone (IMBA website 2015). Mountain biking ranks as the 17th most common pursuit of adults in Colorado, and biking of all types is the #1 recreational activity of youth in Colorado aged 6-18 (CO SCORP). On BLM-managed lands in the planning area, mountain biking ranks as the 3rd most common activity in Colorado. Mountain biking has the 17th largest amount of outdoor recreation participation (which also includes water-based recreation), according to the 2014 CO SCORP.

CHAPTER 3 - AFFECTED ENVIRONMENT

According to Singletracks.com (2015), as of 2012, Colorado had more miles (over 5 thousand) of mountain bike trail, more than any other state in the nation. Other places in the planning area, such as Moab, Utah are international destinations for mountain biking opportunities.

## Big Game Hunting

Though still very popular on BLM lands within the planning area, big game hunting has generally declined since a high in 1998 for license holders in Colorado. That decline can be attributed to a couple of reasons; one being a reduction in available licenses themselves, which recognizes that there is more demand than supply available for that use. The second reason is that a majority of hunters are between the ages of 47 and 57 years old, and as hunters age and stop hunting, there continues to be less recruitment of younger hunters to replace them. That said, the majority of big game hunting in Colorado takes place within the planning area, where 53 percent of the state's big game hunting activity takes place on the western slope, and another 24 percent occurs in the South Central region. A similar trend is seen with wildlife viewing. (CPW strategic plan 2015).

## Other Outdoor Recreation Pursuits in the Planning Area

Nationally, horseback riding remains steady in the number of user days, but has fallen slightly with actual numbers of participants nationwide. Wildlife watching, viewing scenery, and experiencing the heritage/history/culture of lands associated with the planning area are expected to increase, especially with the aging of the population.

# RECREATION PRIORITIES

According to the 2014 Utah and Colorado SCORPs, in southeastern Utah citizens reported the greatest need for more OHV riding areas. In Colorado, dirt trails were identified as extremely important and a primitive setting with basic amenities was preferred over highly developed recreation areas. It is expected that priorities will be responsive to population changes over time, the needs of communities and the associated network of service providers, and evolving outdoor recreation pursuits and technologies.

## Changing Technologies

The current revolution in outdoor recreation-related innovation is unlikely to stop any time soon, if ever. Emerging technologies in recent years are challenging land managers to characterize new uses and technologies through traditional definitions, such as 'motorized', 'non-motorized', 'mechanized', 'quiet use' 'solitude', etc. So-called 'typical' or 'traditional' recreation uses of BLM lands are rapidly expanding to include such things as all-terrain Segway's, electric motorcycles that make essentially

CHAPTER 3 - AFFECTED ENVIRONMENT

no sound, hikers with robotic-assisted exoskeletons, electric-motor bicycles, extreme jeeps, fat-tire bicycles that can travel on all types of terrain (including snow), zorbing (rolling down a mountainside in a giant transparent plastic ball), miniature airplanes, squirrel suits, jet packs, and the list continuously grows.

# 3.10. TRAVEL & TRANSPORTATION MANAGEMENT

## INDICATORS

The following indicators are used to describe the existing condition related to travel and transportation management. These indicators will also be used to analyze the impacts of the preferred alternative and other alternatives on the travel and transportation management systems:

- Change in the types of allowable uses occurring on transportation routes in GUSG habitat.
- Change in the number of acres designated as open, limited, or closed to motorized travel.
- Change in the number of acres where new route development would be allowed.

## EXISTING CONDITIONS

### 3.10.1. CONDITIONS WITHIN THE DECISION AREA

Travel management is integral to many activities taking place on public lands. Consideration of a comprehensive travel and transportation network involves all aspects of road and trail system planning and management; taking into account road and trail locations, system users, and other natural resource management objectives. The transportation system in the decision area consists of federal and state highways, paved and unpaved local roads, as well as unpaved primitive roads and trails. As a side-effect of travel management planning, and because they still represent some level of impact, closed routes are also identified in the decision area. Many, if not most, primitive roads are inherited, user-created routes (versus engineered or designed and constructed routes). These routes may be sustainable or not and maintenance actions and frequency of maintenance likely contribute to that sustainability. There are no railroads or backcountry airstrips located on BLM-administered lands within the decision area.

The largest contiguous concentration of GUSG habitat is located in the Gunnison Basin. GUSG habitat areas in the remainder of the decision area are generally smaller and less contiguous. Transportation routes are mainly concentrated around communities, recreation areas, or where surface activities (such as energy development or other extractive uses) require access. Parts of the decision area are

remote and rugged, with limited opportunity for travel on roads and trails in those areas.

Table 3.59 through Table 3.62 display data compiled by the BLM that provides a relatively coarse estimate of road and trail mileage and acreage on BLM-managed lands within the decision area by population both within GUSG Occupied Habitat and Unoccupied Habitat and Non-Habitat Areas outside of GUSG habitat.

Figure 3.46 through Figure 3.52 graphically illustrate roads on BLM-managed lands within the decision area.  'Closed' roads and trails are those that have been inventoried in a Travel Management Plan and have been determined to not be necessary for the transportation system.  Roads and trails categorized as 'unauthorized' are non-system routes (either missed in a previous inventory, or more likely recently created) that have been identified outside of a Travel Management Planning process.  Roads and trails categorized as 'unknown' are linear features that exist on the ground, however the data collector (BLM or typically some other local, state, or other federal agency) did not characterize the road or trail by type or jurisdiction in GIS.  Unknown roads are assumed to be open to the public.

CHAPTER 3 - AFFECTED ENVIRONMENT

**Table 3.59 - Miles of Road on BLM-Administered Lands within GUSG Habitat by Population**

| POPULATION/HABITAT TYPE/ ROAD TYPE | MILES OF ROAD |
|---|---|
| **Cerro Summit-Cimarron-Sims Mesa** | **110** |
| Non-Habitat Area | 26 |
| Open | 26 |
| Occupied Habitat | 37 |
| Closed | 2 |
| Open | 34 |
| Unoccupied Habitat | 48 |
| Administrative Use Only | 0 |
| Closed | 9 |
| Limit-Type | 3 |
| Open | 36 |
| **Crawford** | **159** |
| Occupied Habitat | 111 |
| Open | 111 |
| Unoccupied Habitat | 49 |
| Open | 49 |
| **Gunnison Basin** | **2,329** |
| Non-Habitat Area | 16 |
| Closed | 0 |
| Open | 16 |
| Occupied Habitat | 1,994 |
| Administrative Use Only | 29 |
| Closed | 1,102 |
| Open | 862 |
| Unoccupied Habitat | 320 |
| Administrative Use Only | 7 |
| Closed | 168 |
| Open | 144 |
| **Monticello-Dove Creek** | **524** |
| Non-Habitat Area | 40 |
| Open | 40 |
| Occupied Habitat | 26 |
| Open | 26 |
| Unauthorized | 0 |

CHAPTER 3 - AFFECTED ENVIRONMENT

| POPULATION/HABITAT TYPE/ ROAD TYPE | MILES OF ROAD |
|---|---|
| Unoccupied Habitat | 459 |
| Open | 459 |
| **Piñon Mesa** | **289** |
| Non-Habitat Area | 27 |
| Open | 9 |
| Unknown | 18 |
| Occupied Habitat | 29 |
| Open | 0 |
| Unknown | 29 |
| Unoccupied Habitat | 232 |
| Open | 127 |
| Unknown | 106 |
| **Poncha Pass** | **131** |
| Non-Habitat Area | 3 |
| Closed | 0 |
| Open | 3 |
| Occupied Habitat | 60 |
| Closed | 21 |
| Limit-Type | 2 |
| Open | 33 |
| Unauthorized | 4 |
| Unoccupied Habitat | 69 |
| Closed | 9 |
| Open | 46 |
| Unauthorized | 13 |
| **San Miguel Basin** | **464** |
| Non-Habitat Area | 88 |
| Open | 88 |
| Occupied Habitat | 377 |
| Open | 377 |
| **Total Miles** | **4,008** |

Note: Miles are rounded to the nearest whole number.
Source: BLM 2015

CHAPTER 3 - AFFECTED ENVIRONMENT

**Table 3.60 - Acres of Road on BLM-Administered Lands within GUSG Habitat by Population**

| POPULATION/HABITAT TYPE/ ROAD STATUS | ACRES[1] OF ROAD |
|---|---|
| Cerro Summit-Cimarron-Sims Mesa | 424 |
| OCCUPIED HABITAT | 244 |
| Closed | 4 |
| Open | 240 |
| UNOCCUPIED HABITAT | 180 |
| Administrative Use Only | 0 |
| Closed | 14 |
| Limit-Type | 4 |
| Open | 162 |
| Crawford | 905 |
| OCCUPIED HABITAT | 211 |
| Open | 211 |
| UNOCCUPIED HABITAT | 694 |
| Open | 694 |
| Gunnison Basin | 9,283 |
| OCCUPIED HABITAT | 7,537 |
| Administrative Use Only | 54 |
| Closed | 2,135 |
| Open | 5,348 |
| UNOCCUPIED HABITAT | 1,745 |
| Administrative Use Only | 12 |
| Closed | 305 |
| Open | 1,429 |
| Monticello-Dove Creek | 3,285 |
| OCCUPIED HABITAT | 1,099 |
| Open | 1,098 |
| Unauthorized | 1 |
| UNOCCUPIED HABITAT | 2,186 |
| Open | 2,186 |
| Piñon Mesa | 1,159 |
| OCCUPIED HABITAT | 190 |
| Open | 190 |
| UNOCCUPIED | 969 |
| Open | 969 |
| Poncha Pass | 384 |
| OCCUPIED HABITAT | 169 |
| Closed | 39 |

CHAPTER 3 - AFFECTED ENVIRONMENT

| POPULATION/HABITAT TYPE/ ROAD STATUS | ACRES[1] OF ROAD |
|---|---|
| Limit-Type | 4 |
| Open | 112 |
| Unauthorized | 14 |
| UNOCCUPIED HABITAT | 216 |
| Closed | 16 |
| Open | 176 |
| Unauthorized | 23 |
| San Miguel Basin | 1,503 |
| OCCUPIED HABITAT | 1,261 |
| Open | 1,261 |
| UNOCCUPIED HABITAT | 242 |
| Open | 242 |
| **Grand Total** | **16,943** |

[1]Assumes an approximate footprint of 240 feet for interstate highways, 80 feet for primary and secondary highways, 40 feet for county roads, and 12 feet for BLM roads.
Note:  Miles are rounded to the nearest whole number.
Source: BLM 2015



Figure 3.46 - Roads within GUSG Habitat: Cerro Summit-Cimarron-Sims Mesa Population

CHAPTER 3 - AFFECTED ENVIRONMENT



Figure 3.47 - Roads within GUSG Habitat: Crawford Population

CHAPTER 3 - AFFECTED ENVIRONMENT



Figure 3.48 - Roads within GUSG Habitat: Gunnison Basin Population

CHAPTER 3 - AFFECTED ENVIRONMENT

BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS
AUGUST 2016

3-131

**Roads Within GUSG Habitat (Map 3.3.4)**
**Monticello-Dove Creek Population**

Figure 3.49 - Roads within GUSG Habitat: Monticello-Dove Creek Population

Figure 3.50 - Roads within GUSG Habitat: Piñon Mesa Population

CHAPTER 3 - AFFECTED ENVIRONMENT



Roads Within GUSG Habitat (Map 3.3.5)
Piñon Mesa Population



**Roads Within GUSG Habitat (Map 3.3.6)**
**Poncha Pass Population**

Figure 3.51 - Roads within GUSG Habitat: Poncha Pass Population