CHAPTER 3 - AFFECTED ENVIRONMENT

Figure 3.52 - Roads within GUSG Habitat: San Miguel Basin Population

Roads Within GUSG Habitat (Map 3.3.7)
San Miguel Basin Population
MONTROSE
Norwood
OURAY
SAN MIGUEL
UNCOMPAHGRE FIELD OFFICE
TRES RIOS FIELD OFFICE
Dolores River
DOLORES
0 2 4 8 Miles
Utah
Colorado
Sources: Esri, USGS, NOAA
Secondary Highway
County Road
BLM Road
BLM Unknown
4WD Road
FS Road
Other
Bureau of Land Management
Private
State
State, County, City; Areas
US Forest Service
Planning Area Habitat Status
Occupied
Unoccupied
N
NOTE TO MAP USER
NO WARRANTY IS MADE BY THE BUREAU OF LAND MANAGEMENT AS TO THE ACCURACY, RELIABILITY, OR COMPLETENESS OF THESE DATA FOR INDIVIDUAL USE OR AGGREGATION USE WITH OTHER DATA.

BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS
AUGUST 2016
3-135

## Table 3.61 - Miles of Trail on BLM-Administered Lands by GUSG Population Area

| POPULATION/HABITAT TYPE/TRAIL TYPE | TRAIL MILES |
|---|---|
| Cerro Summit-Cimarron-Sims Mesa | 2 |
| Unoccupied Habitat | 2 |
| Bicycle | 2 |
| Gunnison Basin | 53 |
| Occupied Habitat | 50 |
| Bicycle | 9 |
| Foot Only | 2 |
| Motorcycle | 39 |
| Trail-Unknown Use | 1 |
| Unoccupied Habitat | 2 |
| Foot Only | 2 |
| Horseback/Foot | 1 |
| Piñon Mesa | 72 |
| Occupied Habitat | 2 |
| Trail-Unknown Use | 2 |
| Unoccupied Habitat | 70 |
| ATV | 6 |
| Bicycle | 7 |
| Foot Only | 21 |
| Horseback/Foot | 10 |
| Motorcycle | 3 |
| Trail-Unknown Use | 22 |
| Poncha Pass | 2 |
| Occupied Habitat | 2 |
| ATV | 1 |
| Trail-Unknown Use | 1 |
| San Miguel Basin | 0 |
| Unoccupied Habitat | 0 |
| Horseback/Foot | 0 |
| **TOTAL MILES** | **128** |

Note: Miles are rounded to the nearest whole number.
Source: BLM 2015

### Table 3.62 - Acres of Trail on BLM-Administered Lands by GUSG Population Area

| GUSG POPULATION/HABITAT/TRAIL USE | ACRES[1] OF TRAIL |
|---|---|
| Cerro Summit-Cimarron-Sims Mesa | 0 |
| UNOCCUPIED HABITAT | 0 |
| Bicycle | 0 |
| Gunnison Basin | 13 |
| OCCUPIED HABITAT | 12 |
| Bicycle | 2 |
| Foot Only | 0 |
| Motorcycle | 9 |
| Trail-Unknown Use | 0 |
| UNOCCUPIED HABITAT | 1 |
| Foot Only | 0 |
| Horseback/Foot | 0 |
| Piñon Mesa | 19 |
| OCCUPIED HABITAT | 0 |
| Trail-Unknown Use | 0 |
| UNOCCUPIED HABITAT | 18 |
| ATV | 3 |
| Bicycle | 2 |
| Foot Only | 5 |
| Horseback/Foot | 3 |
| Motorcycle | 1 |
| Trail-Unknown Use | 5 |
| Poncha Pass | 1 |
| OCCUPIED HABITAT | 1 |
| ATV | 0 |
| Trail-Unknown Use | 0 |
| San Miguel Basin | 0 |
| UNOCCUPIED HABITAT | 0 |
| Horseback/Foot | 0 |
| **TOTAL ACREAGE** | **32** |

[1] Assumes an approximate footprint of 2 feet for singletrack trails and 4 feet for ATV trails.
Note: Miles are rounded to the nearest whole number.
Source: BLM 2015

## 3.10.2. Conditions on BLM-Administered Lands

GUSG Habitat and Non-Habitat Areas within four miles of a lek are generally accessible on BLM-administered lands via an extensive network of roads and trails. Travel surfaces range from paved roads, to primitive dirt roads only accessible by high clearance four-wheel drive vehicles and Off-Highway Vehicles (OHVs), to single-track trails accessible by foot, bike, horseback, and motorcycles.

### OHV DESIGNATIONS

Executive Order 11644 and CFR (43 CFR Part 8340) both require the BLM to designate all BLM lands nationally as open, closed, or limited for OHV use. Per the BLM's regulations for OHV management, all BLM lands must be designated in one of three OHV categories; open, limited or closed.

**Open areas** are those where cross-country travel by OHV is allowed.

**Limited areas** are those where the BLM imposes certain restrictions on motorized use, such as to existing roads and trails, designated roads and trails, particular types of vehicles, or specific seasons of use.

**Closed areas** are those where OHV use is prohibited.

With the exception of three BLM units currently in the final stages of land use plan revisions (Grand Junction FO, Uncompahgre FO, and Dominguez-Escalante NCA), all of the units within the planning area have completed the task of designating travel areas.

Table 3.63 summarizes the acreage of open, limited, and closed OHV areas in GUSG habitat by population for each of the eleven BLM units, including the National Landscape Conservation System (NLCS) areas within the units. As shown in this table, the vast majority of BLM-administered lands with GUSG habitat in the decision area are available for OHV use under the 'limited' designation. Only a small portion of BLM-administered lands within GUSG habitat are available as 'open' or 'closed' to OHV use.

### Table 3.63 - OHV Travel Designations in the Decision Area by GUSG Population

| POPULATION/HABITAT TYPE/ AREA DESIGNATION | OHV DESIGNATION IN ACRES | PERCENT OF POPULATION TOTAL |
|---|---|---|
| **Cerro Summit-Cimarron-Sims Mesa** | **20,700** | **3%** |
| Non-Habitat | 11,373 | 55% |
| Closed | 23 | 0% |
| Limited | 11,349 | 100% |
| Occupied Habitat | 4,376 | 21% |
| Limited | 4,376 | 100% |
| Unoccupied Habitat | 4,951 | 24% |
| Limited | 4,951 | 100% |
| **Crawford** | **25,608** | **4%** |
| Non-Habitat | 5 | 0% |
| Limited | 5 | 100% |
| Occupied Habitat | 16,761 | 65% |
| Closed | 0 | 0% |
| Limited | 16,761 | 100% |
| Unoccupied Habitat | 8,842 | 35% |
| Limited | 8,842 | 100% |
| **Gunnison Basin** | **378,003** | **55%** |
| Non-Habitat | 12,007 | 3% |
| Closed | 272 | 2% |
| Limited | 11,735 | 98% |
| Occupied Habitat | 302,024 | 80% |
| Closed | 747 | 0% |
| Limited | 301,277 | 100% |
| Unoccupied Habitat | 63,972 | 17% |
| Closed | 5,023 | 8% |
| Limited | 58,949 | 92% |
| **Monticello-Dove Creek** | **64,736** | **9%** |
| Non-Habitat | 25,087 | 39% |
| Closed | 2,120 | 8% |
| Limited | 22,967 | 92% |
| Occupied Habitat | 8,059 | 13% |
| Limited | 8,059 | 100% |
| Unoccupied Habitat | 31,590 | 48% |
| Closed | 12 | 0% |

| POPULATION/HABITAT TYPE/ AREA DESIGNATION | OHV DESIGNATION IN ACRES | PERCENT OF POPULATION TOTAL |
|---|---|---|
| Limited | 31,590 | 100% |
| **Piñon Mesa** | **94,547** | **14%** |
| Non-Habitat | 24,579 | 26% |
| Closed | 13,734 | 56% |
| Limited | 10,846 | 44% |
| Open | 0 | 0% |
| Occupied Habitat | 12,240 | 13% |
| Closed | 146 | 1% |
| Limited | 12,093 | 99% |
| Unoccupied Habitat | 57,728 | 61% |
| Closed | 13,635 | 24% |
| Limited | 44,093 | 76% |
| Open | 0 | 0% |
| **Poncha Pass** | **25,143** | **4%** |
| Non-Habitat | 736 | 3% |
| Limited | 487 | 66% |
| Open | 248 | 34% |
| Occupied Habitat | 9,617 | 38% |
| Limited | 6,915 | 72% |
| Open | 2,678 | 28% |
| Unknown | 24 | 0% |
| Unoccupied Habitat | 14,790 | 59% |
| Limited | 14,768 | 100% |
| Unknown | 21 | 0% |
| **San Miguel Basin** | **76,442** | **11%** |
| Non-Habitat | 40,629 | 53% |
| Closed | 6,821 | 17% |
| Limited | 33,809 | 83% |
| Occupied Habitat | 35,812 | 47% |
| Closed | 205 | 1% |
| Limited | 35,607 | 99% |
| **Total Acreage** | 685,178 | **100%** |



CHAPTER 3 - AFFECTED ENVIRONMENT

Off-Highway Vehicle Designations within the GUSG Decision Area
Date: 1/6/2016
BLM Field Office Boundary
USA State Boundaries
Counties
Rivers
Non-Habitat
Occupied Habitat
Unoccupied Habitat
OHV Designation
Closed
Limited
Open
Bureau of Land Management
Bureau of Reclamation
Indian Reservation
Military Reservation
National Park Service
Other Federal
Private
State
State, County, City; Areas
US Fish and Wildlife Service
US Forest Service
Utah
Colorado
0 5 10 20 Miles
N
Pinon Mesa
Crawford
Cerro Summit-Cimarron-Sims Mesa
Gunnison Basin
Poncha Pass
San Miguel Basin
Monticello-Dove Creek
Moab Field Office
Grand Junction Field Office
Colorado River Valley Field Office
Uncompahgre Field Office
Gunnison Field Office
Royal Gorge Field Office
San Luis Valley Field Office
Tres Rios Field Office
Monticello Field Office
Utah
Colorado
Arizona
New Mexico
NOTE TO MAP USER
NO WARRANTY IS MADE BY THE BUREAU OF LAND MANAGEMENT AS TO THE ACCURACY, RELIABILITY, OR COMPLETENESS OF THESE DATA FOR INDIVIDUAL USE OR AGGREGATION USE WITH OTHER DATA.

Figure 3.53 - Off-Highway Vehicle Designations within the Decision Area

BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS
AUGUST 2016

3-141

## TRAVEL MANAGEMENT PLANNING

Within the BLM, travel management planning can be considered to take place in three phases: inventory, designation, and implementation. During the inventory phase, the BLM completes an inventory of all routes within a planning area. During the designation phase, the BLM designates a route system within a planning area through a NEPA process. The implementation phase includes route rehabilitation (including restoration of closed or unauthorized routes), signing, and enforcement. Within the planning area, one of the eleven BLM units is solely engaged in inventory (Tres Rios FO), one is solely engaged in designation (Dominguez-Escalante NCA), two units are engaged in a combination of designation and implementation (Uncompahgre and Grand Junction FOs), and seven units are in the implementation phase (McInnis Canyons and Gunnison Gorge NCAs, Canyons of the Ancients NM, and Gunnison, San Luis Valley, Moab, and Monticello FOs).

### TRENDS

The BLM is currently in the process of moving away from an 'open-system' of travel management in favor of a Comprehensive Travel and Transportation Management system (CTTM). CTTM planning has become a major priority for the BLM, since extensive cross-country travel can impact natural and cultural resources, and can fragment habitat. CTTM is the proactive management of public access, natural resources, and regulatory needs to ensure that all aspects of road and trail system planning and management are considered. This includes resource management, road and trail design, rehabilitation, and recreation and non-recreation uses of the roads and trails. CTTM will address all resource aspects and accompanying modes and conditions of travel on the public lands. One implication of CTTM is the potential reduction in current access to public lands by mere volume of routes. Through the CTTM planning process, the relative significance of that change in public access will be determined by a number of factors, including: duplication of routes, route density, and natural and cultural resource concerns (BLM 2015).

Consistent with statewide trends, the overall trend for travel and transportation management on BLM-administered lands includes an increase in general visitation, OHV riding, hiking, and mountain biking use as populations increase within the planning area, and within the region.

Construction of new routes for development (energy and ROWs, etc.) is also expected to increase. Previously constructed roads could also require upgrading, relative to ROWs. Recreationists will likely use these routes, even though they are not designed to optimize recreation experiences.

Private property adjacent to BLM-administered lands will likely continue to be subdivided. Subdivision of private property has dramatically increased the number of adjacent property owners, and increased the number of new access routes to public lands within the planning area. The result is expected to be continued unauthorized creation of unmanaged user-created routes that impact other resources. However, because of the remoteness of many areas within GUSG habitat on BLM-administered lands, these areas have not yet experienced significant changes in travel routes and are not expected to in the near future.

# 3.11. MINERALS

The BLM manages all federally-owned minerals that lie beneath both BLM, other federal, and non-federal lands (with the exception of Department of Energy uranium leases, discussed below). There are over one million acres of federal minerals within the decision area. However, under this RMP Amendment, the BLM is not making decisions on federal minerals beneath surfaces managed by other federal agencies (USFS and NPS), which includes 17% (175,890 acres) of the federal minerals in the decision area. The decisions and/or recommendations for mineral development under lands managed by the USFS are analyzed and made by that agency. The NPS units within the planning area are withdrawn from mineral exploration and development. In addition, there are approximately 646,060 acres of non-federal minerals within the decision area. Non-federal minerals in the planning area are typically owned by private entities and/or by the State of Colorado. Only federal minerals beneath BLM, private, and other non-federal surface are discussed in Chapters 3 and 4 as being subject to decisions from this analysis.

Federal mineral resources are managed under three categories with differing sets of laws and regulations for leasable, locatable, and salable minerals. In all cases, any activities related to the exploration or development of any kind of mineral on public lands must comply with other federal and state laws where applicable. These include laws such as the Clean Water Act, the Clean Air Act, the National Historic Preservation Act, and the Endangered Species Act. Where open to the public, the rights to access, explore, and develop locatable minerals are guaranteed by the Mining Law of 1872. Rights to leasable and salable minerals are granted through a process of leases, permits, and contracts.

As shown in Table 3.64, the amount of federal minerals compared to non-federal minerals varies within each GUSG population.

## Table 3.64 - Mineral Estate in GUSG Habitat and Non-Habitat by Population Area

| SURFACE OWNERSHIP/ MANAGEMENT | MINERAL OWNERSHIP | TOTAL ACRES | ACRES IN OCCUPIED HABITAT | ACRES IN UNOCCUPIED HABITAT | ACRES IN NON-HABITAT AREAS |
|---|---|---|---|---|---|
| **Cerro Summit-Cimarron-Sims Mesa Population Area** | | | | | |
| Total Minerals | | 128,500 | 37,142 | 19,400 | 72,000 |
| Total Federal Minerals[1] (56%) | | 71,400 | 18,554 | 11,400 | 41,400 |
| BLM | federal | 20,700 | 4,400 | 5,000 | 11,400 |
| Split Estate (non-federal surface) | federal | 45,800 | 13,800 | 6,400 | 25,600 |
| Other Federal (USFS, NPS) | federal | 4,900 | 400 | 10 | 4,500 |
| Total Non-federal Minerals (44%) | | 57,100 | 18,600 | 8,000 | 30,500 |
| BLM | non-federal | 100 | 0 | 100 | 100 |
| Non-BLM | non-federal | 26,500 | 18,600 | 7,900 | 30,500 |
| [1]Includes 3,100 acres of coal only, 300 acres of oil and gas only, and 100 acres of oil, gas, and coal only. | | | | | |
| **Crawford Population Area** | | | | | |
| Total Minerals | | 123,000 | 35,000 | 80,300 | 7,800 |
| Total Federal Minerals[2] (59%) | | 73,000 | 31,800 | 33,400 | 7,800 |
| BLM | federal | 33,900 | 22,100 | 10,300 | 1,500 |
| Split Estate (non-federal surface) | federal | 22,700 | 8,400 | 13,900 | 400 |
| Other Federal (USFS, NPS) | federal | 19,500 | 4,400 | 9,200 | 5,900 |
| Total Non-federal Minerals (41%) | | 50,000 | 3,200 | 46,800 | 10 |
| BLM | non-federal | 10 | 0 | 10 | 0 |
| Non-BLM | non-federal | 50,000 | 3,200 | 46,800 | 10 |
| [2]Includes 0 acres of coal only, 100 acres of oil and gas only, 50 acres of oil, gas, and coal only. | | | | | |
| **Gunnison Basin Population Area** | | | | | |
| Total Minerals | | 822,900 | 605,000 | 137,000 | 80,900 |
| Total Federal Minerals[3] (78%) | | 641,400 | 460,100 | 112,600 | 68,700 |
| BLM | federal | 364,000 | 288,400 | 63,600 | 12,000 |
| Split Estate (non-federal surface) | federal | 116,100 | 71,500 | 29,700 | 15,000 |
| Other Federal (USFS, NPS) | federal | 161,300 | 100,200 | 19,300 | 41,700 |
| Total Non-federal Minerals (22%) | | 181,600 | 145,000 | 24,400 | 12,200 |
| BLM | non-federal | 14,000 | 13,600 | 300 | 10 |
| Non-BLM | non-federal | 167,600 | 131,400 | 24,100 | 12,200 |
| [3]Includes 600 acres of coal only, 700 acres of oil and gas only, and 0 acres of oil, gas, and coal only. | | | | | |
| **Monticello-Dove Creek Population Area** | | | | | |
| Total Minerals | | 406,900 | 112,300 | 235,900 | 58,800 |
| Total Federal Minerals[4] (29%) | | 119,300 | 23,200 | 63,800 | 32,400 |
| BLM | federal | 67,700 | 6,900 | 35,600 | 25,200 |
| Split Estate (non-federal surface) | federal | 50,600 | 16,300 | 28,100 | 6,300 |
| Other Federal (USFS, NPS) | federal | 900 | 0 | 50 | 900 |

Case No. 1:20-cv-02484-MSK Document 94-2 filed 05/06/21 USDC Colorado pg 12 of 425

| SURFACE OWNERSHIP/ MANAGEMENT | MINERAL OWNERSHIP | TOTAL ACRES | ACRES IN OCCUPIED HABITAT | ACRES IN UNOCCUPIED HABITAT | ACRES IN NON-HABITAT AREAS |
|---|---|---|---|---|---|
| Total Non-federal Minerals (71%) | | 287,700 | 89,100 | 172,100 | 26,400 |
| BLM | non-federal | 2,100 | 1,600 | 300 | 200 |
| Non-BLM | non-federal | 285,500 | 87,500 | 171,800 | 26,200 |
| [4]Includes 300 acres of coal only, 31,100 acres of oil and gas only, and 0 acres of oil, gas, and coal only. | | | | | |
| **Piñon Mesa Population Area** | | | | | |
| Total Minerals | | 304,600 | 44,100 | 201,400 | 59,100 |
| Total Federal Minerals[5] (76%) | | 230,800 | 25,800 | 158,600 | 46,400 |
| BLM | federal | 133,400 | 11,900 | 95,500 | 25,900 |
| Split Estate (non-federal surface) | federal | 42,500 | 13,200 | 20,500 | 8,900 |
| Other Federal (USFS, NPS) | federal | 54,900 | 700 | 42,600 | 11,500 |
| Total Non-federal Minerals (24%) | | 73,800 | 18,300 | 42,700 | 12,800 |
| BLM | non-federal | 3,700 | 800 | 2,300 | 700 |
| Non-BLM | non-federal | 70,100 | 17,500 | 40,500 | 12,100 |
| [5]Includes 0 acres of coal only, 200 acres of oil and gas only, and 0 acres of oil, gas, and coal only. | | | | | |
| **Poncha Pass Population Area** | | | | | |
| Total Minerals | | 65,600 | 20,400 | 27,900 | 16,200 |
| Total Federal Minerals[6] (73%) | | 48,000 | 15,800 | 15,800 | 15,700 |
| BLM | federal | 24,900 | 9,300 | 14,900 | 800 |
| Split Estate (non-federal surface) | federal | 2,700 | 2,000 | 800 | 0 |
| Other Federal (USFS, NPS) | federal | 20,300 | 5,200 | 200 | 14,900 |
| Total Non-federal Minerals (27%) | | 16,600 | 4,000 | 12,100 | 600 |
| BLM | non-federal | 600 | 600 | 20 | 0 |
| Non-BLM | non-federal | 16,000 | 3,400 | 12,100 | 600 |
| [6]Includes 0 acres of coal only, 0 acres of oil and gas only, and 0 acres of oil, gas, and coal only. | | | | | |
| **San Miguel Basin Population Area** | | | | | |
| Total Minerals | | 267,800 | 101,600 | 41,500 | 124,800 |
| Total Federal Minerals[7] (62%) | | 165,300 | 66,700 | 13,600 | 84,900 |
| BLM | federal | 76,300 | 35,800 | 0 | 40,500 |
| Split Estate (non-federal surface) | federal | 55,400 | 29,500 | 1,200 | 24,600 |
| Other Federal (USFS, NPS) | federal | 33,600 | 1,400 | 12,400 | 19,900 |
| Total Non-federal Minerals (38%) | | 102,600 | 34,800 | 33,700 | 39,900 |
| BLM | non-federal | 300 | 40 | 0 | 200 |
| Non-BLM | non-federal | 102,300 | 34,800 | 27,900 | 39,600 |
| [7]Includes 0 acres of coal only, 1,300 acres of oil and gas only, and 0 acres of oil, gas, and coal only. | | | | | |

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.54 - Mineral Ownership in Cerro Summit-Cimarron-Sims Mesa Population Area**

Mineral Ownership in the Cimarron/Cerro/Sims Mesa GUSG Population Area
Federal Mineral estate
All Minerals
Coal Only
No Minerals
Oil and Gas Only
Oil, Gas and Coal Only
Other
Unknown
Planning Area
Occupied Habitat
Unoccupied Habitat
Land Ownership
Bureau of Land Management
Bureau of Reclamation
Indian Reservation
Military Reservation
National Grasslands
National Park Service
Other Federal
Private
State
State, County, City Areas
Bankhead-Jones Land Use Lands
US Fish and Wildlife Service
US Forest Service
Miles
GUNNISON
Gunnison Field Office
MONTROSE
Uncompahgre Field Office
OURAY

BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS 3-147
AUGUST 2016



CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.55 - Mineral Ownership in the Crawford Population Area**

Mineral Ownership in the Crawford GUSG Population Area
Federal Mineral estate
All Minerals
Coal Only
No Minerals
Oil and Gas Only
Oil, Gas and Coal Only
Other
Unknown
Planning Area
Occupied Habitat
Unoccupied Habitat
Land Ownership
Bureau of Land Management
Bureau of Reclamation
Indian Reservation
Military Reservation
National Grasslands
National Park Service
Other Federal
Private
State
State, County, City; Areas
Bankhead-Jones Land Use Lands
US Fish and Wildlife Service
US Forest Service
NOTE TO MAP USER
NO WARRANTY IS MADE BY THE BUREAU OF LAND MANAGEMENT AS TO THE ACCURACY, RELIABILITY, OR COMPLETENESS OF THESE DATA FOR INDIVIDUAL USE OR AGGREGATION USE WITH OTHER DATA.
N
0 1 2 3 Miles
GUNNISON
Uncompahgre Field Office
DELTA
MONTROSE
92
347

3-148 BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS
AUGUST 2016



CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.56 - Mineral Ownership in the Gunnison Basin Population Area**

Mineral Ownership in the Gunnison GUSG Population Area
Federal Mineral estate
All Minerals
Coal Only
No Minerals
Oil and Gas Only
Oil, Gas and Coal Only
Other
Unknown
Planning Area
Occupied Habitat
Unoccupied Habitat
Land Ownership
Bureau of Land Management
Bureau of Reclamation
Indian Reservation
Military Reservation
National Grasslands
National Park Service
Other Federal
Private
State
State, County, City Areas
Bankhead-Jones Land Use Lands
US Fish and Wildlife Service
US Forest Service
Miles
Gunnison Field Office
San Luis Valley Field Office
Uncompahgre Field Office
CHAFFEE
SAGUACHE
GUNNISON
MINERAL
HINSDALE
MONTROSE
DELTA
OURAY
SAN JUAN

BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS 3-149
AUGUST 2016



CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.57 - Mineral Ownership in the Monticello-Dove Creek Population Area**

3-150 BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS
AUGUST 2016

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.58 - Mineral Ownership in the Piñon Mesa Population Area**

BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS 3-151
AUGUST 2016



CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.59 - Mineral Ownership in the Poncha Pass Population Area**

Mineral Ownership in the Poncha Pass GUSG Population Area
Federal Mineral estate
All Minerals
Coal Only
No Minerals
Oil and Gas Only
Oil, Gas and Coal Only
Other
Unknown
Planning Area
Occupied Habitat
Unoccupied Habitat
Land Ownership
Bureau of Land Management
Bureau of Reclamation
Indian Reservation
Military Reservation
National Grasslands
National Park Service
Other Federal
Private
State
State, County, City; Areas
Bankhead-Jones Land Use Lands
US Fish and Wildlife Service
US Forest Service
NOTE TO MAP USER: NO WARRANTY IS MADE BY THE BUREAU OF LAND MANAGEMENT AS TO THE ACCURACY, RELIABILITY, OR COMPLETENESS OF THESE DATA FOR INDIVIDUAL USE OR AGGREGATION USE WITH OTHER DATA.
N
0 1 2 3 Miles
50
FREMONT
Royal Gorge Field Office
285
San Luis Valley Field Office
SAGUACHE
CHAFFEE
285

3-152 BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS AUGUST 2016



Case No. 1:20-cv-02484-MSK Document 94-2 filed 05/06/21 USDC Colorado pg 19 of 425

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.60 - Mineral Ownership in the San Miguel Basin Population Area**

Mineral Ownership in the San Miguel Basin GUSG Population Area
Federal Mineral estate
All Minerals
Coal Only
No Minerals
Oil and Gas Only
Oil, Gas and Coal Only
Other
Unknown
Planning Area
Occupied Habitat
Unoccupied Habitat
Land Ownership
Bureau of Land Management
Bureau of Reclamation
Indian Reservation
Military Reservation
National Grasslands
National Park Service
Other Federal
Private
State
State, County, City, Areas
Bankhead-Jones Land Use Lands
US Fish and Wildlife Service
US Forest Service
Miles
OURAY
SAN MIGUEL
SAN JUAN
Uncompahgre Field Office
MONTROSE
Tres Rios Field Office
DOLORES

BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS 3-153
AUGUST 2016



### 3.11.1. Leasable Minerals

Leasable minerals consist of leasable fluid and solid minerals, as defined by the Mineral Leasing Act of 1920 as amended, and 43 CFR 3000-3599. Leasable fluid minerals include oil, natural gas (including methane, coalbed natural gas, and carbon dioxide), and geothermal resources. Geothermal leasing is authorized in accordance with the Geothermal Steam Act of 1970. Leasable solid minerals include coal, oil shale, and tar sands. Leasable solid minerals also include non-energy minerals, such as phosphate, potash, and sodium. Hard rock minerals—minerals that would otherwise be locatable (such as gold, silver, copper, etc.) on acquired lands (lands acquired by the federal government, rather than typical public domain lands) could also be subject to leasing depending on the authority by which lands were acquired. Uranium is not a leasable mineral as defined by the Mineral Leasing Act, but can be leased under the authority of the Department of Energy (DOE) Uranium Lease Program in specific areas on public land (see discussion later in this section).

## OIL & GAS

### INDICATORS

The following indicators are used to describe the existing condition related to oil and gas leasing. These indicators will also be used to analyze the impacts of the preferred alternative and other alternatives on the availability of, and access to, federal oil and gas resources:

- Acres of federal minerals leased for oil and gas
- Acres of federal minerals closed to oil and gas leasing
- Acres of federal minerals open to oil and gas leasing
- Acres subject to NSO stipulation
- Acres subject to Controlled Surface Use (CSU), Timing Limitations (TL), and/or standard stipulations
- Acres of ROW exclusion and avoidance areas (described in Section 3.13, Lands and Realty)

### EXISTING CONDITIONS

The existing conditions for oil and gas leasing across the decision area are summarized in the following tables. The conditions related to oil and gas leasing vary between BLM field offices and between GUSG populations, and are described in detail later in this section.

Two GUSG population areas (San Miguel Basin and Monticello-Dove Creek) have moderate to high oil and gas development potential. About 17% (148,000 acres) of the decision area has moderate to high potential. The remaining populations are classified as low or none (BLM 2015a).

**Table 3.65 - Oil and Gas Development Potential in the Decision Area**

| HABITAT TYPE | OIL AND GAS DEVELOPMENT POTENTIAL (ACRES) | | | | |
|---|---|---|---|---|---|
| | High | Moderate | Low | None | Total[1] |
| Total Decision Area - All Minerals | 352,900 | 241,300 | 471,700 | 29,700 | 2,118,300 |
| Occupied Habitat | 137,200 | 61,900 | 72,900 | 400 | 965,600 |
| Unoccupied Habitat | 136,900 | 56,500 | 277,400 | 22,800 | 743,300 |
| Non-Habitat | 78,800 | 95,900 | 121,400 | 6,500 | 1,336,300 |
| Total Decision Area - Federal Minerals | 78,800 | 150,200 | 278,900 | 27,600 | 1,336,300 |
| Occupied Habitat | 66,200 | 22,700 | 39,900 | 400 | 638,900 |
| Unoccupied Habitat | 40,200 | 19,800 | 169,300 | 21,100 | 408,900 |
| Non-Habitat | 53,000 | 62,600 | 69,700 | 6,100 | 288,500 |

[1]Includes areas identified as "not recorded"; 927,800 acre total includes 663,200 acres of federal minerals.
BLM 2015

The areas where potential was "not recorded" are primarily within the Gunnison and San Luis Valley FOs, the NCAs, and the National Monument. The San Luis Valley and Gunnison FOs have not had recent evaluations of oil and gas development potential, as the RMPs for those area were completed in the early 1990s. The portions of those field offices within the decision area have not had any leasing or exploration activity in the past twenty years or more.

In addition, there are approximately 288,500 acres of federal minerals located within 4 miles of GUSG leks, but outside the Occupied Habitat and Unoccupied Habitat of the decision area. Similar to the decision area, most of these Non-Habitat Areas have been identified as having low to no potential for oil and gas development. Only the Non-Habitat in proximity to the Monticello-Dove Creek and San Miguel Basin populations (less than 40%) include federal minerals within areas that have been identified as having moderate to high potential.

The BLM has decisions in place in current RMPs that allocate which areas are closed and open to leasing, and if open, under what conditions.

Table 3.66 provides a summary of federal mineral acres open and closed to leasing, acres currently leased within the open areas, and how much of the leased acreage is held by production (meaning currently being developed and/or producing).

**Table 3.66 - Federal Fluid Mineral Acreage Closed, Open, and Leased for Oil and Gas**

| HABITAT TYPE | ACRES CLOSED TO LEASING[1] | ACRES OPEN TO LEASING | ACRES LEASED | LEASED ACRES HELD BY PRODUCTION |
|---|---|---|---|---|
| Total Decision Area - Federal Minerals | 238,500 | 802,400 | 69,700 | 30,300 |
| Occupied Habitat | 81,900 | 444,700 | 11,900 | 5,000 |
| Unoccupied Habitat | 125,100 | 200,000 | 24,400 | 15,600 |
| Non-Habitat | 31,500 | 157,700 | 33,500 | 9,700 |

[1]Includes areas administratively unavailable for leasing, such as Wilderness Areas, Wilderness Study Areas, and certain withdrawn lands.

Oil and gas leases are issued for a ten-year period and continue for as long thereafter as oil or gas is produced in paying quantities. Leases expire at the end of their primary term—the tenth year—unless they are held by production, meaning that one of the following conditions exists:

- diligent drilling operations are in progress on or for the benefit of the lease
- the lease contains a well capable of producing oil or gas in paying quantities
- the lease is receiving or is entitled to receive an allocation of production under the terms of an approved communitization agreement or unit agreement.

Currently there are oil and gas leases on federal minerals in the Monticello-Dove Creek and San Miguel Basin population areas, one lease in the Crawford population area, and no leases in the other population areas.

In 2014, San Miguel County (which includes parts of the Monticello-Dove Creek and San Miguel Basin population areas) ranked 12th out of 38 Colorado counties in natural gas production and 28th out of 39 in oil production (COGCC 2015). Dolores County (which includes parts of the Monticello-Dove Creek population area) ranked 24th out of 38 Colorado counties in natural gas production and 23rd out of 34 in oil production (COGCC 2015). San Juan County (which includes part of the Monticello-Dove Creek population area) ranked 4th out of 9 Utah counties in natural gas production and 3rd of 10 in oil production (State of Utah 2015). Colorado ranks 6th in the nation for natural gas production and 7th for crude oil production, while Utah ranks 10th for natural gas and 11th for crude oil (US EIA 2015).

Areas designated as open to leasing in an RMP may be leased under standard lease terms on the lease sale contract, which set general parameters for development of a lease. If additional restrictions are required to protect certain resources, lease stipulations may be added to the standard lease terms. Lease stipulations include

No Surface Occupancy (NSO), timing limitations (TL), and controlled surface use (CSU), defined as follows:

**NSO** - Prohibits any occupancy or other use of the surface that results in ground-disturbing activities.

**TL** - Prohibits occupancy or other use of the surface during a specified season or other period. For oil and gas, this applies to construction, drilling, and completion activities, but does not apply to production and maintenance activities.

**CSU** - Allows the BLM to apply special requirements, such as those related to location, design, reclamation, and monitoring of proposed facilities.

Lease stipulations are applied at the time of lease issuance. New stipulations required under a planning decision would apply only to new leases. Existing leases are subject to the lease stipulations attached to them at the time of lease issuance. Together, the written stipulations in the RMPs and any mapped geographic information system (GIS) layers describe the lands where stipulations apply. These mapped areas can change based on the most current information at the time of the leasing analysis. More than one stipulation can apply to a particular land area. For example, an area might have a CSU stipulation applied for one particular purpose and a TL applied to address another resource purpose. Some resources are not mapped or are only partially mapped. Resources not mapped or partially mapped would be applied on a case by case basis where applicable.

Most stipulations have circumstances, described in the RMP, for granting a waiver, exception, or modification to the stipulation. A waiver is a permanent exemption from a lease stipulation. An exception is a one-time exemption for a particular site within a lease. A modification is a change to the provisions of a stipulation, either temporarily or for the term of the lease.

The BLM has the authority and is required by law to review a request from an operator and to grant, if warranted, waivers, exceptions, or modifications to oil and gas lease stipulations and associated permitting activities. Based on a site-specific analysis—which includes consideration of any new information or changed circumstances—protections may be increased or decreased to address resource concerns.

Waivers, exceptions, and modifications are rarely authorized. For example, in the last ten years in BLM Colorado, no modifications or waivers have been authorized. Exceptions have been granted on approximately 7% of APDs (B. Sterling, personal communication, May 29, 2015). Exceptions have been approved primarily for big game winter range TL stipulations.

## SPLIT ESTATE

In split estate situations, the surface rights and subsurface mineral rights for a piece of land are owned by different parties. For this analysis, the discussion of split estate applies to federal minerals managed by the BLM that underlie non-federal land surfaces. The BLM works to encourage coordination and cooperation among all parties that have rights and responsibilities in split estate situations.

The mineral owner and lessee must show due regard for the interests of the surface estate owner and occupy only those portions of the surface that are reasonably necessary to develop the mineral estate. For example, if intending to conduct operations on private land, a lessee/operator is encouraged to contact the surface owner as early as possible when operations are contemplated. The lessee is required to certify that a good faith effort has been made to negotiate a surface use agreement with the surface owner. If a good faith effort by the lessee/operator cannot be reached, the lessee/operator still has the right to enter upon the lands to perform these activities. The lessee/operator can post a Surface Owner Damages Bond to protect the surface owner against reasonable and foreseeable losses or damages.

During permit review, the surface owner is entitled to the same level of resource protection provided on federally owned estate. The BLM is responsible for ensuring that authorized mineral development meets all statutory and regulatory requirements. Activities and use of the surface are not subject to FLPMA planning requirements, and the BLM does not have authority under FLPMA over use of the surface by the surface owner. BLM management authority on split estate lands is limited to activities (both surface and subsurface) related to exploration and development of the minerals. However, the BLM is required to analyze in land use planning and NEPA documents the impacts to surface resources, uses, and users from any BLM-authorized mineral development. Stipulations for surface protection will be applied where regulatory lease terms and conditions are not adequate to protect those resources. To accommodate development preferences identified at the onsite meeting with the surface owner, exceptions, modifications, and waivers may be granted if appropriate.

An operator or lessee must also follow Colorado Oil and Gas Conservation Commission (COGCC), Utah Division of Oil, Gas, and Mining, and applicable county regulations.

### Table 3.67 - Oil and Gas Leasing Allocation Decisions and Current Leases by GUSG Population

| BLM RMP | ALLOCATIONS (ACRES) | | | | | LEASE STIPULATIONS (ACRES)[1] | | |
|---|---|---|---|---|---|---|---|---|
| | CLOSED TO LEASING | CLOSED TO LEASING TO PROTECT GUSG | OPEN TO LEASING | CURRENTLY LEASED | UNLEASED | NSO | CSU | TL |
| GUNNISON BASIN POPULATION | | | | | | | | |
| Gunnison RMP | 9,100 | 0 | 556,000 | 0 | 556,000 | 302,000 | 107,400 | 30,700 |
| Uncompahgre Basin RMP | 0 | 0 | 7,000 | 0 | 7,000 | 300 | 0 | 100 |
| CERRO SUMMIT-CIMARRON-SIMS MESA POPULATION | | | | | | | | |
| Uncompahgre Basin RMP | 0 | 0 | 22,700 | 0 | 22,700 | 0 | 0 | 45,100 |
| Gunnison RMP | 0 | 0 | 4,100 | 0 | 4,100 | 300 | 200 | 30 |
| CRAWFORD POPULATION | | | | | | | | |
| Uncompahgre Basin RMP | 0 | 0 | 31,800 | 20 | 31,800 | 0 | 0 | 0 |
| Gunnison Gorge NCA RMP | 8,400 | 0 | 33,100 | 0 | 33,100 | 17,700 | 6,900 | 59,000 |
| MONTICELLO-DOVE CREEK POPULATION | | | | | | | | |
| Tres Rios RMP | 53 | 0 | 63,919 | 26,135 | 37,784 | 14,884 | 257,656 | 95,606 |
| Canyons of the Ancients NM RMP | 0 | 0 | 4,079 | 2,320 | 1,759 | 4,079 | 0 | 0 |
| Monticello RMP | 0 | 0 | 18,545 | 1,254 | 17,291 | 0 | 4,124 | 0 |
| PIÑON MESA POPULATION | | | | | | | | |
| Grand Junction RMP | 25,500 | 25,500 | 110,700 | 0 | 110,700 | 52,700 | 43,300 | 12,300 |
| McInnis Canyons NCA RMP | 20,900 | 0 | 0 | 0 | 0 | N/A | N/A | N/A |
| Dominguez-Escalante NCA RMP | 17,700 | 0 | 0 | 0 | 0 | N/A | N/A | N/A |
| Uncompahgre Basin RMP | 0 | 0 | 5,600 | 0 | 5,600 | 200 | 0 | 100 |
| Moab RMP | 2,500 | 0 | 5,300 | 0 | 5,300 | 40 | 0 | 0 |
| SAN MIGUEL BASIN POPULATION | | | | | | | | |
| Tres Rios RMP | 0 | 0 | 53,300 | 6,530 | 0 | 64,300 | 322,300 | 179,600 |
| San Juan/San Miguel RMP | 0 | 0 | 11,400 | 0 | 0 | 1,600 | 0 | UTD[2] |
| Uncompahgre Basin RMP | 0 | 0 | 1,067 | 0 | 0 | 0 | 0 | 0 |
| PONCHA PASS POPULATION | | | | | | | | |
| San Luis RMP | 500 | 0 | 31,700 | 0 | 15,600 | 900 | 0 | 57,900 |

[1] There are overlapping stipulations, so acres may be accounted for in NSO, CSU, and/or TL.
[2] Unable to Determine: Stipulation applies to resource not currently mapped (e.g. GUSG winter habitat).

### *Gunnison Basin Population*

Lands supporting the Gunnison Basin Population are identified as not recorded or as having low oil and gas development potential (BLM 2015a). The Final EIS for the Gunnison RMP (1992) noted that the likelihood for occurrence was low to nominal, and the development potential was also low to nominal. According to the Gunnison RMP, the most reasonably foreseeable level of oil, gas, and geothermal development is a maximum of one or two APDs during the life of the RMP, with an estimated total of ten acres of surface disturbance (BLM 1993). The last lease in the population area was on split-estate lands and expired in 1994. No wells have been drilled on federal leases in the population area (BLM 1991b). Currently there are no leases for oil and gas development on lands supporting the Gunnison Basin Population (BLM 2015a).

Within the Gunnison Basin population area, the Gunnison FO administers approximately 560,700 acres (76%) of minerals and the Uncompahgre FO administers approximately 7,000 acres (1%) of minerals.

The 1993 Gunnison RMP provides for NSO within 0.6 mile of a GUSG lek and CSU for other habitat. The Uncompahgre Basin RMP does not include any lease stipulations specifically prescribed to protect GUSG or GUSG habitat.

### *Cerro Summit-Cimarron-Sims Mesa Population*

The Cerro Summit-Cimarron-Sims Mesa Population is within an area with low oil and gas potential (BLM 2015a). Currently no federal lands are leased in the population area (BLM 2015a).

The Uncompahgre FO administers approximately 25,793 acres (46%) of minerals on lands supporting the Cerro Summit-Cimarron-Sims Mesa Population. The Gunnison FO administers approximately 4,149 acres (7%). RMP guidance for the area is the same as that for the Gunnison Basin Population (discussed in the previous section).

### *Crawford Population*

Lands supporting the Crawford Population are in an area with low potential for oil and gas development (BLM 2015a). The most reasonably foreseeable level of oil, gas, and geothermal development in the decision area, from the 2004 Gunnison Gorge NCA RMP, would involve a maximum of one to ten APDs during the life of the RMP, with an estimated total of from 10 to 30 acres of surface disturbance. There is one authorized federal lease (BLM 2015a) that includes 24 acres (<0.1 %) of the Crawford population area.

The 2004 Gunnison Gorge NCA RMP provides for NSO within 2.0 miles of GUSG leks and TLs for winter range and nesting. The Gunnison Gorge Wilderness and the Gunnison Gorge NCA are closed to mineral leasing. The existing Uncompahgre Basin RMP does not include any lease stipulations specifically prescribed for protection of GUSG or GUSG habitat.

### *Monticello-Dove Creek Population*

The Monticello-Dove Creek Population is in an area of moderate to high oil and gas development potential (BLM 2015a). There are 112 federal leases that include 29,700 acres (8.5 %) of the population area (BLM 2015a).

Canyons of the Ancients NM administers approximately 4,100 acres (1%) of minerals on lands supporting the Monticello-Dove Creek GUSG Population, the Tres Rios FO administers approximately 63,400 acres (18%), and the Monticello FO administers approximately 18,855 acres (5 %).

Currently approximately 80 percent (about 131,000 acres and 125 wells) of the entire Monument is leased for fluid mineral development, including oil and gas and carbon dioxide ($CO_2$). Most of these leases are unitized and held by production. Production of $CO_2$ is a major economic driver in Montezuma County, which borders Dolores County and the population area to the south, and is expected to continue for up to 50 years. However, oil and natural gas production is declining. It is anticipated that there will be up to 150 wells (81oil and natural gas wells and 69 $CO_2$ wells) on up to 121 new locations over the life of the Canyons of the Ancients NM RMP. New oil and gas leases will be allowed up to 880 acres for drainage purposes only. Based upon the reasonably foreseeable development scenario, up to 2 new well pads in 20 years may be permitted on new leases.

In the Colorado portion of the population area, NSO is applied to all Occupied Habitat. Within the Tres Rios FO, CSU stipulations may also be applied to Unoccupied Habitat, as well as to address noise impacts. A lease notice may also be applied to notify lessees of the need to protect GUSG populations and habitat quality. In the Utah portion of the population area, no surface-disturbing activities are allowed within 0.6 mile of an active GUSG lek and a CSU Stipulation would be applied to protect other GUSG habitat.

### *Piñon Mesa Population*

The potential for oil or gas development in this area is none to low (BLM 2015a). No oil and gas wells or authorized federal leases occur on lands supporting the Piñon Mesa Population (BLM 2015a).

The Dominguez-Escalante NCA administers approximately 17,700 acres (7 %) of minerals on lands supporting the Piñon Mesa GUSG Population and the McInnis Canyons NCA administers approximately 20,800 acres (8 %). Both NCAs are closed to mineral leasing.

The Grand Junction FO administers approximately 135,900 acres (55 %) of minerals on lands supporting the Piñon Mesa GUSG Population. All GUSG critical habitat is closed to leasing.

The Uncompahgre FO administers approximately 5,600 acres (2%) and the Moab 3057 FO administers approximately 5,300 acres (2%). The current San Juan/San Miguel Oil and Gas RMP Amendment (1991) provides for NSO within 0.6 mile of a GUSG lek, CSU for other GUSG habitat, and a TL for winter and breeding habitat. The Moab RMP also provides for no surface-disturbing activities within 0.6 mile of a GUSG lek. The existing Uncompahgre Basin RMP does not include any lease stipulations specifically prescribed for protection of GUSG or GUSG habitat.

### *Poncha Pass Population*

The San Luis RMP Draft EIS (1989) identified the field office planning area as having low and nominal potential. The entire Poncha Pass population area is within the San Luis Valley FO. The San Luis Valley FO manages 31,550 acres (66%) of minerals in the Poncha Pass population. Under the current San Luis RMP (1991), there are no lease stipulations prescribed for protection of GUSG or GUSG habitat. The RMP described that based on past exploration and future projections concerning fluid mineral activity, the reasonably foreseeable level of development within the planning area would involve a maximum of ten APDs and seven geophysical notices of intent (NOIs) per year. That level of activity would result in an estimated 40 acres of surface disturbance per year (BLM 1989). Since 1991, there have been no leases sold within the Poncha Pass population area.

### *San Miguel Basin Population*

The oil and gas development potential ranges from low to high across the population area (BLM 2015a). Most of the Occupied Habitat is rated as moderate to high development potential, and the Unoccupied Habitat as low to moderate. Within Occupied Habitat, there are currently 29 leases, 18 of which are held by production. The leases include 6,528 acres, (4.6 %) of the Occupied Habitat, 4,994 acres of which are under production. Currently 25 gas wells are active within Occupied Habitat of the San Miguel Basin, and an additional 18 active wells occur immediately adjacent to Occupied Habitat (BLM 2015a). All of these wells are in or near the Dry Creek sub-population.

The Tres Rios FO administers approximately 54,544 acres (38%) of minerals in the San Miguel Basin population area. The Uncompahgre FO administers approximately 25,675 acres (18 %) of minerals.

In the Tres Rios FO, NSO is applied to all Occupied Habitat. CSU stipulations may also be applied to Unoccupied Habitat and to address noise impacts. A lease notice may also be applied to notify lessees of the need to protect GUSG populations and habitat quality.

The current San Juan/San Miguel Oil and Gas RMP Amendment (1991) provides for NSO within 0.6 mile of a GUSG lek, CSU for other GUSG habitat, and a TL for winter and breeding habitat. Under the current Uncompahgre Basin RMP (1989), there are no lease stipulations prescribed for protection of GUSG or GUSG habitat.

### TRENDS

The U.S. Energy Information Administration estimates that over the next 25 years both demand and prices for oil and gas will increase (USEIA 2015c). These circumstances would likely result in continued industry emphasis on increasing production of known reservoirs and searching for additional reservoirs. The NSO stipulation for Occupied Habitat in the Tres Rios FO, which has been implemented for new leases since February 2015, will limit potential exploration and development in the Monticello-Dove Creek and San Juan Basin populations. The rest of the population areas within the decision area have low to no development potential for oil and gas.

## GEOTHERMAL RESOURCES

### INDICATORS

The following indicators are used to describe the existing condition related to geothermal leasing. These indicators will also be used to analyze the impacts of the preferred alternative and other alternatives on the availability of, and access to, federal geothermal resources:

- Acres of federal minerals leased for geothermal
- Acres of federal minerals closed to geothermal leasing
- Acres of federal minerals open to geothermal leasing
- Acres subject to NSO stipulation
- Acres subject to CSU, TL, and/or standard stipulations
- Acres of ROW exclusion and avoidance areas (described in Section 3.12, Lands and Realty)

The decision area does not include areas with high potential for geothermal development. As described below, all RMPs in the planning area contain the same allocations and stipulations for geothermal leasing and oil and gas leasing except for the Gunnison and San Luis RMPs, both of which identify separate allocation decisions specific to geothermal leasing.

## EXISTING CONDITIONS

In 2008, the BLM and the USFS completed an EIS for geothermal leasing in the western United States. The BLM issued its Record of Decision (ROD) and Approved RMP Amendments for Geothermal Leasing in the Western United States in December 2008. Although specific to geothermal leasing, the RMP Amendments were consistent with existing fluid mineral leasing allocation decisions and/or with proposed fluid mineral leasing allocation decisions in RMPs being revised at that time. The ROD amended all of the existing RMPs within the GUSG RMP Amendment planning area in Colorado, with the exception of the San Luis RMP. The San Luis RMP was subsequently amended for geothermal leasing decisions in 2013. In Utah, the Moab and Monticello RMPs were not amended for geothermal leasing, as the RMPs had been developed concurrently with the Geothermal EIS and incorporated geothermal direction in the RMPs. In 2010, the Gunnison RMP was also amended for consistency with the geothermal leasing amendments for a specific area within the field office.

The planning area does not include areas with high potential for geothermal development. The 2008 Geothermal EIS included a Reasonably Foreseeable Development Scenario analysis of geothermal development in the western United States. Within the decision area, there is no potential for geothermal development in the Moab or Monticello FOs. Colorado was identified as one of four western states with the lowest development potential for geothermal electrical generation. However, projected development for federal geothermal resources in the state was 20 megawatts by 2015, and 50 megawatts by 2025. Ten areas with the highest potential for geothermal electrical generation in Colorado were identified, two of which are in the decision area: Waunita and Poncha (BLM 2008). The Waunita area is in the Gunnison FO and the Poncha area is in the San Luis Valley FO.

In the decision area, there is one geothermal lease located in the Gunnison FO. This lease was sold in 2010 and has not yet had any applications for exploration or development activities.

## *Gunnison Basin Population*

### Gunnison FO

The Gunnison FO administers approximately 560,669 acres (76%) of minerals in the Gunnison Basin Population area. The Waunita area identified in the 2008 Geothermal EIS was the subject of a 2010 geothermal leasing analysis and subsequent Gunnison RMP Amendment. In the Reasonably Foreseeable Development Scenario, it is anticipated that the area has the potential for development of one geothermal resource project that could culminate in a working commercial binary-cycle geothermal power plant likely sized to 5-10 megawatts. Once operational, the project as a whole would likely be limited to an area no larger than two sections, with approximately 100 dispersed acres of surface disturbance (BLM 2010). In addition to allocation decisions in the existing Gunnison RMP, the following stipulations for the Waunita area were amended:

- NSO - within a 0.6-mile radius of GUSG leks of active, inactive, historic, and unknown status.
- TL - Construction or drilling activities will not be allowed in Occupied Habitat between March 15 and May 15.
- TL - Routine operations, maintenance, and other activities in Occupied Habitat will be allowed between 9:00 a.m. and 4:00 p.m. during the period between March 15 and May 15.
- CSU - GUSG mapped summer-fall habitat CSU stipulation (G-25)

## *Poncha Pass Population*

### San Luis Valley FO

The 2013 San Luis Valley Geothermal Leasing RMP Amendment provided additional stipulations for the protection of GUSG and habitat. There have not yet been any nominations of lease parcels in this area.

- NSO - GUSG leks and Occupied Habitat
- TL - GUSG
- Sensitive Species Stipulation - For agency-designated sensitive species (e.g., GUSG), a lease stipulation (NSO, CSU, or TL) would be imposed for those portions of high value/key/crucial species habitat where other existing measures are inadequate to meet agency management objectives.

## TRENDS

The U.S. Energy Information Administration estimates that over the next 25 years production and consumption of electricity from geothermal development will

increase (USEIA 2015c).  In the decision area, only one geothermal lease has been sold in over 30 years.  Although there has been more interest in geothermal development nationally, there have been no exploration activities in the decision area.  Other areas within the western U.S. have higher potential and are being actively developed.

## DOE URANIUM LEASE TRACTS

After World War II, the Atomic Energy Commission was given the authority to withdraw federal lands for uranium leasing and development through a variety of Congressional Acts and secretarial orders.  Ultimately, this became what today is known as the Department of Energy (DOE) Uranium Leasing Program.  Those lands have been withdrawn from locatable mineral entry, but may be leased by the DOE for uranium and vanadium development.  Surface resources continue to be managed by the BLM, and the lands remain open to mineral leasing and mineral material sales, so long as they do not interfere substantially with uranium leases and/or development.  DOE is the authorized agency responsible for uranium leasing, with the BLM acting as a cooperating agency.

The Uranium Leasing Program administers 31 tracts of land covering an aggregate of approximately 25,000 acres in Mesa, Montrose, and San Miguel Counties in western Colorado for exploration, mine development and operations, and reclamation of uranium mines.  There are currently 29 existing leases; two of the lease tracts are not leased (DOE 2014).  Several lease tracts (Lease Tracts 10, 11, 11A, 12, 15A, 16, and 16A) are partly or wholly within the decision area.  A total of 1,855 acres of these leases are in the decision area, all in Unoccupied Habitat within the Monticello-Dove Creek population area.

As plans for exploration, mine development and operation, or reclamation are submitted by the lessees to the DOE for approval, further NEPA analyses will be prepared for each plan and tiered to the analysis contained in the DOE 2014 Final Uranium Leasing Program Programmatic Environmental Impact Statement.  Because it is not a leasable mineral as defined by the Mineral Leasing Act of 1920, and the BLM does not have final authority over how it is leased and developed (BLM 2013c), uranium is not discussed as a leasable mineral in this EIS.  For public lands in the planning area not withdrawn under the DOE Uranium Leasing Program and for which the BLM has authority to administer exploration and development, uranium is addressed as a locatable mineral within the Locatable Minerals section of this chapter.

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.61 - DOE Uranium Lease Tracts within the Decision Area**

DOE Uranium Lease Tracts within GUSG Decision Area
Uranium Lease Tracts
BLM Field Office Boundary
Occupied Habitat
Unoccupied Habitat
Counties
Streams/Rivers
Bureau of Land Management
Bureau of Reclamation
Indian Reservation
Military Reservation
National Grasslands
National Park Service
Other Federal
Private
State
State, County, City; Areas
Bankhead-Jones Land Use Lands
US Fish and Wildlife Service
US Forest Service
Utah
Colorado
Pinon Mesa
San Miguel Basin
0 1.75 3.5 7 Miles
N
San Miguel Basin
Tres Rios Field Office
Monticello-Dove Creek
Moab Field Office
Monticello Field Office
Monticello
Utah
Colorado
MONTEZUMA
SAN JUAN
DOLORES

3-168 BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS
AUGUST 2016



## OTHER SOLID LEASABLE MINERALS

Other solid leasable minerals include most chlorides, sulfates, carbonates, borates, silicates, or nitrates of sodium or potassium (potash) and related products, phosphate and related minerals, and gilsonite (including all vein-type solid hydrocarbons). Rarely, hard rock minerals that would otherwise be locatable (such as gold, silver, copper, and uranium, etc.) may also be subject to leasing on certain lands acquired by the federal government (rather than typical public domain lands). These typically locatable minerals are discussed in the Locatable Minerals section. Solid leasable minerals are extracted by a broad array of methods, including surface, underground, and solution mining methods.

While classified as solid leasable minerals, coal and oil shale and tar sands are not discussed here as they are considered beyond the scope of this RMP Amendment. (See Section 1.2.5.)

### INDICATORS

The following indicators are used to describe the existing condition related to solid minerals leasing and to analyze the impacts of the preferred alternative and other alternatives on the availability of and access to federal solid mineral resources:

- Acres of federal minerals leased for solid minerals
- Acres of federal minerals closed to solid minerals leasing
- Acres of federal minerals open to solid minerals leasing
- Acres subject to NSO stipulation
- Acres subject to CSU, TL, and/or standard stipulations
- Acres of ROW exclusion and avoidance areas (described in 3.12 Lands and Realty).

### EXISTING CONDITIONS

There are solid leasable minerals activities authorized in the Monticello-Dove Creek population area. The other population areas have no current activity and no identified potential for solid minerals.

**Table 3.68 - Federal Mineral Estate Closed and Open to Leasing and Leased for Solid Minerals**

| HABITAT TYPE | ACRES CLOSED TO LEASING[1] | ACRES OPEN TO LEASING | ACRES UNDER PROSPECTING PERMITS | ACRES LEASED |
|---|---|---|---|---|
| Total Decision Area - Federal Minerals | 238,500 | 764,400 | 19,000 | 0 |
| Occupied Habitat | 81,900 | 432,200 | 6,000 | 0 |
| Unoccupied Habitat | 125,100 | 178,700 | 13,000 | 0 |
| Non-Habitat | 31,500 | 153,500 | 0 | 0 |

[1]Includes areas administratively unavailable for leasing, such as Wilderness Areas, Wilderness Study Areas, and certain withdrawn lands.

In addition, there are approximately 281,500 acres of federal minerals located within four miles of GUSG leks, but outside of Occupied and Unoccupied Habitat in the decision area. Similar to the decision area, there are eight pending potash prospecting permits that overlap a portion of the Non-Habitat in proximity to the Monticello-Dove Creek Population. There is no current activity and no identified potential for solid minerals in proximity to the other population areas. Approximately 10% of the Non-Habitat Areas are located in areas closed to leasing, primarily within Wilderness, WSAs, NCAs, or the Canyons of the Ancients NM.

## *Gunnison Basin Population*

### Gunnison FO

No areas within the Gunnison FO have been identified as having development potential for leasable solid minerals and there is no mention of leasable solid minerals in the Gunnison RMP. Solid minerals leases would be managed under the same stipulations as those applicable to fluid mineral leases. Those stipulations are discussed in the Fluid Minerals section of this chapter.

### Uncompahgre FO

No areas in the Uncompahgre FO portion of the Gunnison Basin population area have been identified as having development potential for leasable solid minerals.

Under the current Uncompahgre Basin RMP (1989), there are no lease stipulations prescribed for protection of GUSG or GUSG habitat.

## *Cerro Summit-Cimarron-Sims Mesa Population*

### Uncompahgre and Gunnison FOs

The mineral potential and RMP guidance for BLM lands supporting the Cerro Summit-Cimarron-Sims Mesa GUSG Population are the same as that for the Gunnison Basin Population.

## *Crawford Population*

### Gunnison Gorge NCA

The Gunnison Gorge NCA and the Gunnison Gorge Wilderness are withdrawn from mineral leasing. While there is no specific mention of leasable solid minerals management in the Gunnison Gorge RMP, solid mineral leases outside of the NCA and Wilderness would be managed under the same stipulations as those applicable to fluid mineral leases. Those stipulations are discussed in the Fluid Minerals section of this chapter.

### Uncompahgre FO

No areas in the Uncompahgre FO portion of the Gunnison Basin population area have been identified as having potential for leasable solid minerals.

Under the current Uncompahgre Basin RMP (1989), there are no special stipulations prescribed for protection of GUSG or GUSG habitat.

## *Monticello-Dove Creek Population*

### Canyons of the Ancients NM

All federal lands and interests in lands are withdrawn from solid mineral leasing.

### Tres Rios FO

There is high potential for the occurrence of a variety of solid leasable minerals, primarily sodium and potash (BLM 2013c). In 2013, the Tres Rios FO prepared an EA in which six of 19 potash prospecting permit applications were analyzed. Five of the applications were authorized, four of which were in Unoccupied Habitat. The sixth application, located in Occupied Habitat, was deferred. There are 13 additional prospecting permit applications, which include 2,579 acres in Occupied Habitat and 10,298 acres in Unoccupied Habitat.

Under the Tres Rios RMP, the same or similar surface use restrictions may be applied to solid leasable minerals as those applied to fluid leasable minerals (BLM 2015b). Those stipulations are discussed in the Fluid Minerals section of this chapter.

### Monticello FO

Within the Monticello FO, no areas with solid mineral potential have been identified in the decision area. Neither of the two Known Potash Leasing Areas are within GUSG habitat. The Moab and Monticello FOs are developing a Master Leasing Plan for oil and gas and potash leasing. The analysis area for the Master Leasing Plan is generally west of the GUSG decision area and does not include any GUSG habitat.

There are six pending prospecting permit applications, which include 2,513 acres in Occupied Habitat.

## *Piñon Mesa Population*

### Dominguez-Escalante NCA and McInnis Canyons NCA

As specified in the enabling legislation, both NCAs are withdrawn from mineral leasing.

### Grand Junction FO

Under the Grand Junction RMP (2015), Occupied Habitat and Unoccupied Habitat are closed to leasing. Although there is moderate occurrence potential for potash within the population area, no interest in exploration activities has been expressed (BLM 2015c).

### Uncompahgre FO

Within the Uncompahgre FO, no lands supporting the Piñon Mesa Population have been identified as having potential for leasable solid minerals (BLM 2010a).

Under the existing Uncompahgre Basin RMP, no lease stipulations are prescribed for protection of GUSG or GUSG habitat.

### Moab FO

Under the Moab RMP, the stipulations developed for oil and gas leasing are applicable to all mineral activities (leasable, locatable, and salable) to the extent possible. Leasable solid minerals include coal and potash (BLM 2008e). Although three areas within the Moab FO fall within known potash leasing areas, none of the areas overlap with GUSG habitat.

## *San Miguel Basin Population*

### Tres Rios FO

The decision area holds potential for a variety of solid leasable minerals subject to lease under the Mineral Leasing Act of 1920, as amended. The same or similar surface use restrictions would apply to solid leasable minerals as those for fluid leasable minerals (BLM 2015b).

### Uncompahgre FO

Within the Uncompahgre FO, no lands supporting the San Miguel Basin Population have been identified as having potential for leasable solid minerals.

Under the current Uncompahgre Basin RMP (1989), there are no special stipulations prescribed for protection of GUSG or GUSG habitat.

### *Poncha Pass Population*

#### San Luis Valley FO

There is no mention of leasable solid minerals in the San Luis RMP. As with direction in the other RMPs, any leases for solid minerals would be managed under the same stipulations as those applicable to fluid mineral leases.

## TRENDS

Along with other natural resources, potash and soda ash have experienced a rise in commodity prices to historic levels. With high demand for sodium and potassium deposits expected to continue, soda ash and potash exploration activity in the planning area is projected to increase over the next ten to fifteen years (BLM 2008c).

The U.S. is the largest consumer of potash and imports about 80 percent of the potash used mainly from Canada. About 85 percent of U.S. potash sales are to the fertilizer industry and the principal use of potash worldwide is as an agricultural fertilizer. A growing world population and corresponding increased need for food will require continued growth in both potash production and consumption (BLM 2014f).

Growing demand for potash in association with the sharp rise in potash prices in 2008 ($900 per ton) and continuing high prices through 2012 ($470 per ton) have sparked a renewed interest in the potash resources of the Paradox Basin in both Colorado and Utah. Though the price of potash dropped to $470 per ton in 2012 and has slowly declined and hovered near $387 per ton, the interest in potash resources within the Paradox Basin has remained high. The Paradox Basin contains over 25 percent of the known potash resources in the United States (BLM 2014f). Presently only exploration and prospecting has been proposed for potash. However, if viable deposits are proved up by exploration, leasing and development could occur in the future.

## 3.11.2. Locatable Minerals

The right to explore or develop locatable minerals on federal lands is established by the location (or staking) of lode, placer, tunnel, or millsite mining claims and is authorized under the General Mining Law of 1872, as amended. Locatable minerals include metallic minerals such as gold, silver, copper, lead, zinc, molybdenum,

uranium, and non-metallic minerals such as fluorspar, asbestos, talc, and mica. Within a mining claim, the surface lands remain open to the public for other uses.

The BLM may recommend closures to mineral entry (a land use planning decision) by petitioning the Secretary of the Interior to withdraw areas from further location of mining claims or sites. BLM lands subject to existing mineral withdrawals are summarized in Table 3.69.

Areas not withdrawn are open to location and are subject to surface management regulations (43 CFR 3809). The regulations are nondiscretionary and require the claimant to prevent unnecessary or undue degradation of the land. For operations other than casual use, the claimant is required to submit a notice or a plan of operations. Casual use means activities ordinarily resulting in no or negligible disturbance of the public lands or resources. BLM surface management regulations at 43 CFR 3809.11(c)(6) require that in GUSG habitat (areas with federally listed threatened species or their designated critical habitat), an operator must submit a plan of operations regardless of whether the proposed activities would otherwise be subject to a notice.

The plan would be reviewed, including an environmental analysis under NEPA, to be sure that the required performance standards (43 CFR 3809.420) would be met. Performance standards include such things as land use plan compliance, actions to protect public lands, (such as, to prevent adverse impacts to threatened or endangered species and their habitat which may be affected by operations), concurrent reclamation, and full reclamation requirements. In addition, the BLM would require a bond or financial guarantee that would cover the estimated costs of reclamation.

## INDICATORS

The following indicators are used to describe the existing condition related to the exploration and development of locatable minerals. These indicators will also be used to analyze the impacts of the preferred alternative and other alternatives on the availability of, and access to, federal locatable mineral resources, particularly in the context of the potential for such mineral resources:

- Acres of current mining claims
- Acres of federal minerals withdrawn from mineral entry
- Acres of federal minerals proposed for withdrawal from mineral entry.

## EXISTING CONDITIONS

Within the decision area, there are some areas with moderate to high locatable mineral potential (primarily for uranium and vanadium). These areas are in the Monticello-Dove Creek population area. The existing conditions for locatable mineral claims and withdrawals across the decision area are summarized in Table 3.69 and are depicted in Figures 3.62–3.68. Note that the acres of active claims in Table 3.69 are actual acres reported in BLM Land & Mineral Legacy Rehost 2000 System (LR2000) records. However, the active claims shown on the maps are mapped to the nearest quarter-section (usually about 160 acres) and so illustrate the distribution of active claims rather than actual acres. The conditions related to locatable mineral claims vary between BLM field offices and between GUSG populations, and are described in detail later in this section.

In addition, there are approximately 284,400 acres of federal minerals located within four miles of GUSG leks, but outside of Occupied Habitat and Unoccupied Habitat in the decision area. Similar to the decision area, only the Non-Habitat Areas in proximity to the Monticello-Dove Creek Population (less than 10% of Non-Habitat) have been identified as having moderate to high potential for uranium and vanadium. There are about 22 active mining claims within Non-Habitat Areas in proximity to the San Miguel Basin Population, 1 in proximity to the Piñon Mesa Population, and 5 in proximity to the Monticello-Dove Creek Population.

**Table 3.69 - Status of Locatable Minerals in the Decision Area**

| POPULATION | HABITAT TYPE | ACRES WITHDRAWN[1] | ACRES OPEN TO LOCATION | ACTIVE CLAIMS (AC) |
|---|---|---|---|---|
| Gunnison Basin | Occupied | 17,750 | 449,100 | 3,190 |
| | Unoccupied | 9,420 | 100,200 | 7,830 |
| | Non-Habitat | 0 | 68,380 | 230 |
| Cimarron/Cerro/Sims Mesa | Occupied | 70 | 14,700 | 0 |
| | Unoccupied | 940 | 10,300 | 0 |
| Crawford | Occupied | 6,860 | 26,100 | 0 |
| | Unoccupied | 1,540 | 31,700 | 0 |
| | Non-Habitat | 1,310 | 0 | 0 |
| Monticello-Dove Creek | Occupied | 0 | 23,170 | 0 |
| | Unoccupied | 5,930 | 57,770 | 2,090 |
| | Non-Habitat | 0 | 32,550 | 60 |
| Piñon Mesa | Occupied | 380 | 25,800 | 0 |
| | Unoccupied | 36,800 | 133,500 | 21 |
| | Non-Habitat | 310 | 45,780 | 0 |
| San Miguel Basin | Occupied | 380 | 65,500 | 520 |

Case No. 1:20-cv-02484-MSK Document 94-2 filed 05/06/21 USDC Colorado pg 42 of 425

| POPULATION | HABITAT TYPE | ACRES WITHDRAWN[1] | ACRES OPEN TO LOCATION | ACTIVE CLAIMS (AC) |
|---|---|---|---|---|
| | Unoccupied | 0 | 13,600 | 0 |
| | Non-Habitat | 0 | 83,800 | 770 |
| Poncha Pass | Occupied | 220 | 16,500 | 0 |
| | Unoccupied | 130 | 15,800 | 0 |
| | Non-Habitat | 310 | 45,780 | 0 |
| TOTAL | Occupied | 25,640 | 614,900 | 3,710 |
| | Unoccupied | 54,820 | 337,700 | 9,940 |
| | Non-Habitat | 1,620 | 282,800 | 1,060 |

[1] Includes Wilderness Canyons of the Ancients NM, NCAs, and other withdrawn lands.
BLM 2015, queried July 16, 2015.

Case No. 1:20-cv-02484-MSK Document 94-2 filed 05/06/21 USDC Colorado pg 43 of 425

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.62 - Withdrawals and Active Claims in Cerro Summit-Cimarron-Sims Mesa Population Area**

Withdrawals and Active Mining Claims in the Cimarron/Cerro/Sims Mesa GUSG Population Area
Active Mining Claims within GUSG Planning Area
Federal Mineral Withdrawals within GUS Planning Area
GUSG Planning Area
Occupied Habitat
Unoccupied Habitat
Land Ownership
Bureau of Land Management
Bureau of Reclamation
Indian Reservation
Military Reservation
National Grasslands
National Park Service
Other Federal
Private
State
State, County, City; Areas
Bankhead-Jones Land Use Lands
US Fish and Wildlife Service
US Forest Service
0
1
2
3
Miles
Gunnison Field Office
GUNNISON
MONTROSE
Uncompahgre Field Office
OURAY
50
92
347
550
90

BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS 3-177
AUGUST 2016



CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.63 - Withdrawals and Active Mining Claims in the Crawford Population Area**

Withdrawals and Active Mining Claims in the Crawford GUSG Population Area
Active Mining Claims within GUSG Planning Area
Federal Mineral Withdrawals within GUS Planning Area
GUSG Planning Area
Occupied Habitat
Unoccupied Habitat
Land Ownership
Bureau of Land Management
Bureau of Reclamation
Indian Reservation
Military Reservation
National Grasslands
National Park Service
Other Federal
Private
State
State, County, City, Areas
Bankhead-Jones Land Use Lands
US Fish and Wildlife Service
US Forest Service
N
0
1
2
3
Miles
GUNNISON
DELTA
Uncompahgre Field Office
92
347
MONTROSE

3-178 BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS
AUGUST 2016



Case No. 1:20-cv-02484-MSK Document 94-2 filed 05/06/21 USDC Colorado pg 45 of 425

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.64 - Withdrawals and Active Mining Claims in the Gunnison Basin Population Area**

Withdrawals and Active Mining Claims in the Gunnison GUSG Population Area
Active Mining Claims within GUSG Planning Area
Federal Mineral Withdrawals within GUS Planning Area
GUSG Planning Area
Occupied Habitat
Unoccupied Habitat
Land Ownership
Bureau of Land Management
Bureau of Reclamation
Indian Reservation
Military Reservation
National Grasslands
National Park Service
Other Federal
Private
State
State, County, City; Areas
Bankhead-Jones Land Use Lands
US Fish and Wildlife Service
US Forest Service
0
3
6
9
Miles
CHAFFEE
Royal Gorge Field Office
Gunnison Field Office
San Luis Valley Field Office
SAGUACHE
GUNNISON
Uncompahgre Field Office
DELTA
MONTROSE
HINSDALE
OURAY
MINERAL
SAN JUAN
50
114
135
149
92
133
187

BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS 3-179
AUGUST 2016



CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.65 - Withdrawals and Active Mining Claims in Monticello-Dove Creek Population Area**

Withdrawals and Active Mining Claims in the Monticello-Dove Creek GUSG Decision Area
Active Mining Claims within GUSG Planning Area
Federal Mineral Withdrawals within GUS Planning Area
GUSG Decision Area
Occupied Habitat
Unoccupied Habitat
Land Ownership
Bureau of Land Management
Bureau of Reclamation
Indian Reservation
Military Reservation
National Grasslands
National Park Service
Other Federal
Private
State
State, County, City; Areas
Bankhead-Jones Land Use Lands
US Fish and Wildlife Service
US Forest Service
Miles
Pinon Mesa
Gunnison Basin
Uncompahgre Field Office
MONTROSE
San Miguel Basin
SAN MIGUEL
Monticello-Dove Creek
Tres Rios Field Office
DOLORES
MONTEZUMA
Colorado
Utah
Moab Field Office
SAN JUAN
Monticello Field Office

3-180 BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS
AUGUST 2016



Case No. 1:20-cv-02484-MSK Document 94-2 filed 05/06/21 USDC Colorado pg 47 of 425

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.66 - Withdrawals and Active Mining Claims in the Piñon Mesa Population Area**

Withdrawals and Active Mining Claims in the Pinon Mesa GUSG Population Area
Active Mining Claims within GUSG Planning Area
Federal Mineral Withdrawals within GUS Planning Area
GUSG Planning Area
Occupied Habitat
Unoccupied Habitat
Land Ownership
Bureau of Land Management
Bureau of Reclamation
Indian Reservation
Military Reservation
National Grasslands
National Park Service
Other Federal
Private
State
State, County, City, Areas
Bankhead-Jones Land Use Lands
US Fish and Wildlife Service
US Forest Service
Miles
Grand Junction Field Office
Uncompahgre Field Office
Moab Field Office
MESA
DELTA
MONTROSE
GRAND
Colorado
Utah

BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS 3-181
AUGUST 2016



Case No. 1:20-cv-02484-MSK Document 94-2 filed 05/06/21 USDC Colorado pg 48 of 425

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.67 - Withdrawals and Active Mining Claims in the Poncha Pass Population Area**

Withdrawals and Active Mining Claims in the Poncha Pass GUSG Population Area
Active Mining Claims within GUSG Planning Area
Federal Mineral Withdrawals within GUS Planning Area
GUSG Planning Area
Occupied Habitat
Unoccupied Habitat
Land Ownership
Bureau of Land Management
Bureau of Reclamation
Indian Reservation
Military Reservation
National Grasslands
National Park Service
Other Federal
Private
State
State, County, City; Areas
Bankhead-Jones Land Use Lands
US Fish and Wildlife Service
US Forest Service
0 1 2 3 Miles
50
FREMONT
Royal Gorge Field Office
285
San Luis Valley Field Office
SAGUACHE
CHAFFEE
285

3-182 BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS
AUGUST 2016



CHAPTER 3 - AFFECTED ENVIRONMENT

Withdrawals and Active Mining Claims in the San Miguel Basin GUSG Population Area
Active Mining Claims within GUSG Planning Area
Federal Mineral Withdrawals within GUS Planning Area
GUSG Planning Area
Occupied Habitat
Unoccupied Habitat
Land Ownership
Bureau of Land Management
Bureau of Reclamation
Indian Reservation
Military Reservation
National Grasslands
National Park Service
Other Federal
Private
State
State, County, City, Areas
Bankhead-Jones Land Use Lands
US Fish and Wildlife Service
US Forest Service
NOTE TO MAP USER
NO WARRANTY IS MADE BY THE BUREAU OF LAND MANAGEMENT AS TO THE ACCURACY, RELIABILITY, OR COMPLETENESS OF THESE DATA FOR INDIVIDUAL USE OR AGGREGATION USE WITH OTHER DATA
N
0
3
6
9
Miles
MONTROSE
OURAY
SAN MIGUEL
DOLORES
SAN JUAN
Uncompahgre Field Office
Tres Rios Field Office
550
90
97
145
62
141
491

Figure 3.68 - Withdrawals and Active Mining Claims in the San Miguel Basin Population Area

BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS
AUGUST 2016
3-183

## *Gunnison Basin Population*

Within the Gunnison Basin population area, 27,200 acres are withdrawn from location of mining claims, along with an additional 19,610 acres withdrawn from location of claims for nonmetallic minerals only. The remainder of the area is open to locating claims. There are 540 mining claims in this population area, which account for 11,027 acres (1.9 % of the area) (BLM 2015a). An additional 358 claims not fully within the decision area includes up to 7,373 acres.

Of the active claims in the decision area, only 309 acres are under a pending plan of operations, meaning that a plan has been submitted to, but has not yet been approved by, the BLM.

### Gunnison FO

Historically within the Gunnison FO, metallic mineral resources have been produced from the Gunnison Gold Belt, which lies within the Colorado Mineral Belt. The Iron Hill area near Powderhorn contains mineral deposits with a good potential for production of rare earth metals, such as titanium (BLM 1991b). The White Earth Mining District of the Iron Hill Carbonatite Complex near Powderhorn contains a massive carbonatite stock that forms the core of the Iron Hill carbonatite complex. The carbonatite stock is enriched in rare earth elements, niobium, and thorium, while the adjacent pyroxenite unit is enriched in these same elements, as well as substantial amounts of titanium (Long et al 2010).

### Uncompahgre FO

No potential for locatable minerals has been identified in the portion of the Uncompahgre FO supporting the Gunnison Basin Population (BLM 2010a).

## *Cerro Summit-Cimarron-Sims Mesa Population*

### Uncompahgre FO and Gunnison FO

There are 1,020 acres withdrawn from location of mining claims in the Cerro Summit-Cimarron-Sims Mesa population area, including 40 acres withdrawn from location of claims for nonmetallic minerals only. The rest of the area is open to locating claims.

No potential for locatable minerals has been identified (BLM 1991b, BLM 2010a) and no mining claims occur within the population area (BLM 2015a).

## *Crawford Population*

Within the Crawford population area, 7,240 acres are withdrawn from location of mining claims, while an additional 1,310 acres are withdrawn in Non-Habitat areas.

The rest of the area is open to locating claims. There are no mining claims in this population area (BLM 2015a).

### Gunnison Gorge NCA

There is little development related to locatable minerals in the NCA area. Federal mineral estate in areas outside of the NCA and Wilderness and not under withdrawal is open to entry and location under the general mining laws, including recreational panning. Plans of operation will be required for proposed locatable mineral activity authorized by the BLM's surface management regulations on the following lands: 1) lands closed to OHV travel and 2) lands within designated ACECs. Within the Gunnison Sage-Grouse ACEC (MU 4), a plan of operation will be required for locatable mineral activities that would result in surface disturbance.

### Uncompahgre FO

No potential for locatable minerals has been identified in this part of the Uncompahgre FO (BLM 2010a).

## *Monticello-Dove Creek Population*

Within the Monticello-Dove Creek population area, 5,970 acres are withdrawn from location of mining claims, including about 1,710 acres withdrawn as lease tracts to the Department of Energy Uranium Leasing Program. (See Figure 3.70.) An additional 280 acres are withdrawn from location of claims for nonmetallic minerals only. The rest of the area is open to locating claims. There are 101 mining claims totaling 2,087 acres (3.8 % of the population area) (BLM 2015a). An additional 258 claims that includes up to 5,351 acres are not fully within the decision area.

### Tres Rios FO

There is a high potential for the occurrence of uranium and vanadium, as well as some potential for copper, along the Colorado-Utah border in the Uravan Mineral Belt (BLM 2013c).

### Monticello FO

The primary locatable minerals with potential for development are uranium and vanadium, often located along with copper. There is a high potential for the occurrence of uranium and vanadium deposits in historic mining areas. Where the Chinle and Morrison formations are present outside of these areas, there is a moderate potential for occurrence and a low to moderate potential for occurrence of copper. The copper deposits throughout the Monticello FO are low-grade and sparse, making development unlikely (BLM 2005d).

### Canyons of the Ancients NM

When Canyons of the Ancients NM was established, the law specified that all federal lands and interests in lands within the boundaries of the monument were appropriated and withdrawn from all forms of entry, location, selection, sale, or other disposition under the public land laws, including but not limited to withdrawal from location, entry, and patent under the mining laws. The establishment of the Monument, and concurrent withdrawal, were subject to valid existing rights. There are two existing unpatented uranium mining claims located in the Monument (BLM 2009).

## *Piñon Mesa Population*

There is moderate potential for the occurrence of uranium and vanadium in the Piñon Mesa population area (BLM 2015a). There are 37,200 acres withdrawn from location of mining claims in this population area, including 6,180 acres withdrawn from location of claims for nonmetallic minerals only. An additional 310 acres are withdrawn in Non-Habitat areas. The rest of the population area is open to locating claims. There is one mining claim within the area that accounts for 21 acres (less than 0.1% of the area) (BLM 2015a). Another two claims consisting of up to 41 acres are not fully within the decision area.

### McInnis Canyons NCA

As specified in the McInnis Canyons NCA enabling legislation (Public Law 106-353), subject to valid existing rights, all federal land within the McInnis Canyons NCA, and all land and interests in land acquired for the NCA or associated Wilderness Area by the U.S. are withdrawn from location, entry, and patent under the mining laws.

### Grand Junction FO

There are no approved mining operations in this area, but the public has been collecting gemstones from a few abandoned underground mines along Highway 141 southwest of Whitewater. There is no other discussion of any potential for locatable minerals in the Piñon Mesa population area in the Grand Junction FO (BLM 2015c).

### Uncompahgre FO

There is no discussion of any potential for locatable minerals in the Piñon Mesa population area in the Uncompahgre FO (BLM 2010a).

### Dominguez-Escalante NCA

As specified in the Dominguez-Escalante NCA enabling legislation (Omnibus Public Lands Management Act of 2009), subject to valid existing rights, all federal land within the NCA and associated Wilderness Area and all land and interests in land

acquired by the U.S. within the NCA or associated Wilderness Area are withdrawn from location, entry, and patent under the mining laws.

#### Moab FO

The primary locatable minerals in the decision area include copper, uranium and vanadium. While no mining activity has occurred within GUSG habitat in the Moab FO, most of the lands are open for location. To the extent possible, the stipulations developed for oil and gas leasing are applicable to all mineral activities (leasable, locatable, and salable).

### *Poncha Pass Population*

#### San Luis Valley FO

The portion of the decision area in the San Luis Valley FO was identified as having low to moderate potential for locatable minerals.

In the Poncha Pass population area, 350 acres are withdrawn from location of claims for nonmetallic minerals only. The rest of the area is open to locating claims. There are currently no mining claims in this population area (BLM 2015a).

### *San Miguel Basin Population*

#### Tres Rios FO and Uncompahgre FO

There is a high potential for the occurrence of uranium and vanadium in the Uravan Mineral Belt along the Colorado-Utah border, as well as some potential for copper (BLM 2013c).

In the San Miguel population area, 360 acres are withdrawn from location of claims for nonmetallic minerals only, while the rest of the area is open to locating claims. There are currently 25 mining claims totaling 517 acres (0.6 % of the population area) (BLM 2015a). There are another 119 claims totaling up to 2,413 acres that are not fully within the decision area.

Of the active claims, only 41 acres in the Uncompahgre FO are under an authorized plan of operations (for uranium mining).

## TRENDS

The demand for mineral resources is driven by price, which, in turn, is governed by improvements in technology of exploration, production, refining, transportation, manufacture, and use; changes in lifestyle; changes in regulation and availability of land and access; changes in patterns of supply and demand (both domestically and

internationally); and changes in national policy areas (including military conflict, security, and strategic reserves). The planning area has reserves of precious metals used for industrial, cosmetic, and investment purposes, as well as base metals (copper, lead, zinc, molybdenum, tin, tungsten, bismuth, and tellurium) used for a variety of industrial purposes. Exploration drilling of these deposits is a distinct possibility.

The planning area contains uranium resources used for domestic power generation, medicine, and weapons, as well as vanadium used in steel production and batteries. Currently, important locatable mineral interests within the decision area are limited to uranium and vanadium (in the Monticello-Dove Creek area). The increasing interest in nuclear power generation, as well as the need for vanadium (a byproduct of uranium development), for modern energy, air, space, power, and weapons technology could rapidly increase the demand for uranium exploration, development, and processing.

Although higher gold prices have increased the number of mining claims in the area, no substantial gold mining or exploration projects on public lands have come to fruition in the recent past, but continued high prices would likely translate into increased exploration and development in the near future. Demand for limestone for use as a chemical scrubber for coal-fired power plants could also increase.

### 3.11.3. Salable Minerals

Salable minerals (also referred to as mineral materials) include common varieties of construction materials and aggregates, such as, sand, gravel, limestone aggregate, building stone, cinders (clinker), moss-covered rock (moss rock), roadbed, decorative rock, clay, and ballast material. Mineral materials are sold or permitted under the Mineral Materials Sale Act of 1947, as amended and regulated under 43 CFR 3600. The sale of mineral materials is discretionary.

Sand and gravel, as construction aggregate, is an extremely important resource. The extraction of the resource varies directly with the amount of development nearby—road building and maintenance, and urban development—as sand and gravel is necessary for that infrastructure development. The proximity of both transportation and markets are key elements in the development of a deposit.

Mineral materials are sold at a fair market value or made available through free use permits to governmental agencies. Local government agencies and nonprofit organizations may obtain these materials free of cost for community purposes. The BLM can make mineral materials available to the public through small sales contracts and may designate areas called "community pits" or "common use areas" for these small sales.

## INDICATORS

The following indicators are used to describe the existing condition related to the development of salable minerals. These indicators will also be used to analyze the impacts of the preferred alternative and other alternatives on the availability of, and access to, federal salable mineral resources:

- Acres of currently permitted salable mineral sites
- Acres of federal minerals open to salable mineral development
- Acres of federal minerals closed to salable mineral development
- Acres of federal minerals proposed for withdrawal from mineral disposal.

## EXISTING CONDITIONS

Unlike most locatable minerals, deposits of common variety mineral materials occur everywhere, by default. Common sites for natural concentrations of small to large amounts of such materials are canyon walls, stream channels, talus slopes, landslides, ancient river terraces, glacial moraines, and floodplains. Road cuts, quarries, and pits increase the amount of material available for extraction. Areas with known resources, or areas that are favorable for resources of sand and gravel, may contain materials that are ready for use or that are suitable for screening, washing, or crushing in order to meet size or fine-material requirements.

The existing conditions for salable minerals across the decision area are summarized in the following tables. The conditions related to salable minerals vary between BLM field offices and between GUSG populations, and are described in detail later in this section.

Approximately 281,500 acres of federal minerals are located within four miles of GUSG leks, but are outside of Occupied or Unoccupied Habitat in the decision area. No mineral material sites within the Non-Habitat Areas overlap with the decision area. Approximately 10% of the Non-Habitat Areas are in locations closed to mineral material sales, primarily within wilderness areas, WSAs, NCAs, or Canyons of the Ancients NM.

Case No. 1:20-cv-02484-MSK Document 94-2 filed 05/06/21 USDC Colorado pg 56 of 425

**Table 3.70 - Salable Minerals Status in the Decision Area**

| POPULATION AREA | ACRES CLOSED TO MINERAL MATERIAL SALES | ACTIVE AND PENDING MINERAL MATERIAL SALES/FREE USE PERMITS[1] (ACRES) | |
|---|---|---|---|
| | | Sand and Gravel | Stone |
| Gunnison Basin | 13,300 | 134 | 173 |
| Cerro Summit-Cimarron-Sims Mesa | 0 | 0 | 0 |
| Crawford | 13,620 | 10 | 0 |
| Monticello-Dove Creek | 4,080 | 0 | 0 |
| Piñon Mesa | 41,080 | 0 | 0 |
| Poncha Pass | 520 | 0 | 0 |
| San Miguel Basin | 0 | 0 | 33 |
| **TOTAL ACRES** | **72,600** | **144** | **206** |

[1] Free Use Permits are issued for federal, state, and local government uses.

## *Gunnison Basin Population*

There are 5,100 acres currently authorized for free use permits and/or mineral material sales in this population area. Of that, 5,030 acres are in Occupied Habitat. Within Non-Habitat Areas, 110 acres are closed to mineral material sales.

### Gunnison FO

Mineral materials disposal is subject to the following additional restrictions:

- No surface-disturbing activities will be permitted within 0.6 mile of all sage grouse leks during the strutting season to prevent disturbance to mating sage grouse.
- MU 8 (South Beaver Creek ACEC): Disposal of mineral materials on 4,540 acres of federal mineral estate within the unit will not be authorized in order to protect populations of skiff milkvetch.
- MU 9 (Dillon Pinnacles ACEC): Disposal of mineral materials on 530 acres of the federal mineral estate in the unit will not be permitted in order to prevent potential deterioration of scenic, recreation, and other natural values.
- MU 14 (riparian areas containing important sage grouse brood-rearing areas): Disposal of mineral materials on about 2,440 acres of federal mineral estate in the unit will not be authorized, from June 15 through July 31 to prevent disturbance to sage grouse during the brooding period.

#### Uncompahgre FO

Under the current Uncompahgre Basin RMP (1989), the field office is open to mineral material disposal.

### *Cerro Summit-Cimarron-Sims Mesa Population*

#### Uncompahgre FO and Gunnison FO

There are currently no authorized free use permits and/or mineral material sales in this population area. The management situation for salable minerals in this population area is the same as for the Gunnison Basin population area, with the exception that Gunnison RMP management guidance related to MU 8 and 9 do not apply in this population area.

### *Crawford Population*

There are 41 acres currently authorized for a free use permit in Occupied Habitat in the Crawford population area. Within Non-Habitat Areas, 6,700 acres are closed to mineral material sales.

#### Gunnison Gorge NCA

Public lands in Flat Top-Peach Valley OHV Recreation Area (MU2) and in the Gunnison and North Fork Rivers SRMA (MU3) outside of the NCA are not available for mineral material sales.

#### Uncompahgre FO

Under the current Uncompahgre Basin RMP (1989), the field office is open to mineral material disposal.

### *Monticello-Dove Creek Population*

No free use permits and/or mineral material sales are currently authorized in the Monticello-Dove Creek population area.

#### Tres Rios FO

The following standards specific to protection of GUSG and GUSG habitat apply to mineral material disposals in the decision area:

- Management activities must not occur from March 1 to June 30 within Occupied Habitat suitable for nesting to allow for breeding and December 1 to March 15 for known winter habitat.

- New structural improvements or surface disturbance must not occur within known winter concentration area or within a 0.6-mile radius of known GUSG leks.

The following guidelines specific to protection of GUSG and GUSG habitat apply to mineral material disposals:

- New noise sources resulting from management activities should not contribute to noise levels that negatively impact sage-grouse leks during the active lek season (March 1 to June 30) based on best available science.
- Projects in Occupied Habitat should be designed to mitigate or avoid the direct or indirect loss of habitat necessary for maintenance of the local population or reduce to acceptable levels the direct or indirect loss of important habitat necessary for sustainable local populations. Projects will incorporate special reclamation measures or design features that accelerate recovery and/or re-establishment of affected sage-grouse habitat as much as possible.

Applicable BMPs should be applied to all mineral proposals as Conditions of Approval within Occupied Habitat to provide for adequate effective habitat and breeding, nesting, and wintering habitat.

#### Monticello FO

Management conditions for disposal of mineral materials correspond respectively to the oil and gas leasing stipulations developed in the Monticello RMP. Areas with standard lease terms are available for disposal of mineral materials subject to standard conditions. Areas with a TL and/or CSU stipulation are available subject to special conditions. Areas designated as NSO are unavailable for disposal of mineral material, but there are no such areas in the decision area.

#### Canyon of the Ancients NM

Mineral materials disposal is prohibited in national monuments.

### *Piñon Mesa Population*

No free use permits and/or mineral material sales are currently authorized in the Piñon Mesa population area. In Non-Habitat Areas, 14,870 acres are closed to mineral material sales.

#### Dominguez-Escalante and McInnis Canyons NCAs

Both NCAs are closed to mineral material disposal.

#### Grand Junction FO

Public lands not otherwise closed are open for consideration for mineral material disposal on a case-by-case basis (BLM 2015c).

#### Uncompahgre FO

Under the current Uncompahgre Basin RMP (1989), the Uncompahgre FO is open to mineral material disposal.

#### Moab FO

To the extent possible, the stipulations developed for oil and gas leasing are applicable to all mineral activities (leasable, locatable, and salable) in the Moab FO.

### *Poncha Pass Population*

#### San Luis Valley FO

There are currently no authorized free use permits and/or mineral material sales in this population area. In Non-Habitat Areas, 4,840 acres are closed to mineral material sales.

Federal minerals in the entire planning area are open to mineral materials disposal, except for within riparian areas. The area was identified as having low to moderate potential for sand and gravel (BLM 1989).

### *San Miguel Basin Population*

There are 160 acres currently authorized for free use permits and/or mineral material sales in this population area.

#### Tres Rios FO

The management situation for mineral material disposal in this population area is the same as that for the Monticello-Dove Creek Population.

#### Uncompahgre FO

Under the current Uncompahgre Basin RMP (1989), the field office is open to mineral material disposal.

## TRENDS

With the continued increase in the human population in the planning area, the need for additional sand and gravel resources for road improvements and other construction related activities will likely increase. Increasing construction in all area communities will likely create a growing demand for aggregate and fill materials, as

well as for decorative and landscaping stone. The building of new roads and the maintenance and improvement of existing roads may create increasing demand for aggregate for asphalt and cement and gravel for road surfaces.  The competition for gravel and aggregate, may likely result in more development of quarries and pits within the decision area, on public lands as well as on adjacent private lands.

# 3.12. LANDS & REALTY

## 3.12.1. LAND USE AUTHORIZATIONS & UTILITY CORRIDORS

Land use authorizations include granting right-of-ways (ROWs), permits, and leases. A ROW grant is an authorization to use a specific piece of public land for a certain project, such as roads, pipelines, transmission lines, and communication sites. A ROW grant authorizes rights and privileges for a specific use of the land for a specific period of time. Generally, a BLM ROW is granted for a term appropriate for the life of the project and typically for a maximum of a 30-year term.

Broad policy concerning the granting of ROWs for roads and trails across public land is to provide access to applicants who do not have access to their private property, cannot gain access across nonfederal land, and cannot exercise existing rights of access across nonfederal land. ROW grants are authorized for uses such as oil and gas development, water pipelines, electric transmission and distribution lines, roads, and communication lines such as telephone or cable. An ROW authorizes the holder to construct, operate, maintain, and/or terminate a new or existing facility over, under, upon, or through public lands. The majority of ROWs granted are authorized under Title V of the FLPMA and under the Mineral Leasing Act.

Leases and permits are issued for purposes such as commercial filming, advertising displays, apiaries, livestock holding or feeding areas not related to grazing permits and leases, temporary or permanent facilities for commercial purposes (does not include mining claims), residential occupancy, ski resorts, construction equipment storage sites, assembly yards, or oil rig stacking sites. The regulations for the processing of leases and permits are found at 43 CFR 2920. Permits are short term (generally not to exceed three years) revocable authorizations to use the lands for specified purposes. Leases are usually long-term authorizations requiring a significant capital investment.

In RMPs, areas identified as unsuitable for surface disturbance or occupancy are generally identified as avoidance or exclusion areas for ROWs. Restrictions and mitigation measures could be modified on a case-by-case basis for avoidance areas, depending on impacts on resources, while exclusion areas are strictly prohibited from ROW development.

Utility corridors, developed to concentrate the effects of utility lines in manageable locations on public lands, often provide suitable locations for utility transmission lines. The corridors may contain power lines, transcontinental fiber-optic

communication cables, and trans-state gas pipelines. Identifying corridors does not necessarily mandate that transportation and transmission facilities would be located within the corridor, especially if they are not compatible with other resource uses, values, and objectives in and near the corridors, or if the corridors are already at maximum capacity with existing structures.

## INDICATORS

The following indicators are used to describe the existing condition related to land use authorizations, as well as to analyze the impacts of the preferred alternative and other alternatives on the availability of BLM-administered lands for ROWs. The term "ROW" is generally used to refer to all land use authorizations, including ROWs, land use permits, leases, and communication use leases, unless otherwise specified in the discussion. This includes authorizations for solar and wind energy developments:

- Acres of ROW exclusion areas
- Acres of ROW avoidance areas
- Acres of designated utility corridors
- Acres of BLM ROWs
- Powerlines/Phone Lines
    - Overhead
    - Buried
- Roads
- Pipelines
- Acres of communication site leases/ROWs
- Acres of other leases and permits

## EXISTING CONDITIONS

In current RMPs, the BLM has allocation decisions in place designating which areas are:

- ROW exclusion areas not available for location of ROWs under any condition
- ROW avoidance areas to be avoided but potentially available for location of ROWs with additional stipulations
- Areas open to ROWs and under what conditions.

In addition, the current RMPs indicate designated ROW corridors, which are specific areas identified as preferred locations for existing and future ROW facilities.

Table 3.71 provides acreages of ROW exclusion areas, avoidance areas, and open areas, ROW corridors, and currently authorized ROWs (including ROWs, leases, permits, and communication sites) in the decision area.

### Table 3.71 - ROWs and Other Land Use Authorizations in the Decision Area

| HABITAT TYPE | ROW EXCLUSION AREAS (ACRES) | ROW AVOIDANCE AREAS (ACRES) | OPEN TO ROWS (ACRES) | ROW CORRIDORS (ACRES) | AUTHORIZED ROWS (ACRES[1]) |
|---|---|---|---|---|---|
| **Total Decision Area** | | | | | |
| **Occupied Habitat** | **5,800** | **15,900** | **389,700** | **93,100** | **15,400** |
| **Unoccupied Habitat** | **44,900** | **28,700** | **183,000** | **31,000** | **6,400** |
| **Non-Habitat** | **32,200** | **8,400** | **86,200** | **0** | **0** |
| Gunnison Basin Population Area | | | | | |
| Occupied Habitat | 3,300 | 300 | 298,700 | 54,000 | 11,900 |
| Unoccupied Habitat | 4,600 | 2,400 | 59,400 | 5,600 | 3,100 |
| Cerro Summit-Cimarron-Sims Mesa Population Area | | | | | |
| Occupied Habitat | 0 | 0 | 4,400 | 6,000 | 700 |
| Unoccupied Habitat | 0 | 0 | 5,000 | 7,000 | 400 |
| Crawford Population Area | | | | | |
| Occupied Habitat | 200 | 0 | 22,000 | 1,000 | 700 |
| Unoccupied Habitat | 200 | 40 | 10,200 | 7,500 | 700 |
| Non-Habitat | 1,300 | 0 | 0 | 0 | 0 |
| Monticello-Dove Creek Population Area | | | | | |
| Occupied Habitat | 0 | 0 | 10,200 | 22,500 | 200 |
| Unoccupied Habitat | 2,000 | 0 | 32,200 | 100 | 900 |
| Piñon Mesa Population Area | | | | | |
| Occupied Habitat | 100 | 24,100 | 12,600 | 0 | 0 |
| Unoccupied Habitat | 4,000 | 86,700 | 93,800 | 100 | 700 |
| Non-Habitat | 18,500 | 5,900 | 8,100 | 0 | 0 |
| Poncha Pass Population Area | | | | | |
| Occupied Habitat | 0 | 0 | 9,900 | 7,100 | 300 |
| Unoccupied Habitat | 0 | 0 | 14,900 | 10,500 | 600 |
| San Miguel Basin Population Area | | | | | |
| Occupied Habitat | 200 | 0 | 35,700 | 2,500 | 1,600 |
| Unoccupied Habitat | 0 | 0 | 0 | 200 | 0 |
| Non-Habitat | 13,000 | 0 | 27,700 | 0 | 0 |

[1]Includes total acres encumbered by one or more ROWs; there may be overlapping ROWs, e.g. a phone line within a road ROW.

Table 3.72 provides a summary of the designated ROW exclusion and avoidance areas within the decision area. Timing limitations that apply to all ground disturbances, apply in areas otherwise open to ROWs and other land use authorizations.

There are about 118,400 acres of BLM lands in Non-Habitat Areas, of which approximately 28% are within ROW exclusion areas and 5% within ROW avoidance areas.

Wilderness Areas are administered to preserve wilderness character and so are generally ROW exclusion areas with some specific allowances for access to inholdings and for valid existing rights, as described in BLM Manual 6340. Wilderness Study Areas are managed so as not to impair the suitability of such areas for preservation as wilderness, and so are also generally ROW exclusion areas, with some specific allowances as described in BLM Manual 6330.

### Table 3.72 - ROW Exclusion and Avoidance Areas in the Decision Area

| RMP | ROW EXCLUSION[1] | ROW AVOIDANCE |
|---|---|---|
| Canyons of the Ancients NM | Allow no new ROWs to be permitted in Squaw/Cross Canyon SRMA, except for access to private land. | Include all surface-use stipulations (including NGD/NSO, TL, and protective considerations for cultural resources) on new ROWs. |
| Draft Dominguez-Escalante NCA | ROW exclusion area, except to allow for:<br>• Reasonable access and utilities to non-federal property and existing ROW facilities.<br>• Upgrades or modifications to existing facilities. | N/A |
| Grand Junction | Within 0.6-mile of a lek. | Occupied Habitat; areas within 4-mile radius of a lek. |
| Gunnison | MU9 (Dillon Pinnacles ACEC) | No above-ground utilities in MU1 (Alpine Triangle SRMA) and MU3 (Cochetopa Canyon SRMA).<br>In MU1, public lands north of the south line of Sections 16 and 17, T47N, R3W, NMPM, avoidance area for all other ROWs. |
| Gunnison Gorge NCA | N/A | MU3 (Gunnison and North Fork Rivers SRMA) |
| McInnis Canyons NCA | N/A | N/A |
| Moab | N/A | NSO areas: within 0.6-mile of a lek |
| Monticello | N/A | NSO areas: within 0.6-mile of a lek |
| San Luis | N/A | N/A |
| Tres Rios | N/A | N/A |
| Uncompahgre Basin | N/A | N/A |

| RMP | ROW EXCLUSION[1] | ROW AVOIDANCE |
|---|---|---|

[1]In addition to wilderness areas and wilderness study areas.

It is a BLM objective to grant ROWs to any qualified individual, business, or government entity and to control and direct the use of ROWs on public land so as to:

- Protect the natural resources associated with public lands and adjacent lands;
- Prevent unnecessary or undue environmental damage to the lands and resources;
- Promote the use of rights-of-way in common considering engineering and technological compatibility, national security, and land use plans; and,
- Coordinate, to the fullest extent possible, with state and local governments and interested parties (43 CFR 2801.2 and 2881.2).

ROW corridors are designated in accordance with FLPMA, which requires that the use of ROWs in common shall be required to the extent practical in order to minimize adverse environmental impacts and the proliferation of separate ROWs. Corridors may be suitable to accommodate more than one type of ROW use or facility. Designated corridors are often already occupied by at least one existing facility.

In addition to field office-specific corridors, the BLM in January 2009 issued the Approved RMP Amendment/ROD for Designation of Energy Corridors on Bureau of Land Management Administered Land in the 11 Western States (West Wide Energy Corridors) in accordance with the Energy Policy Act of 2005. The ROD amended four RMPs in the GUSG planning area to designate ROW corridors specific to energy, such as pipelines and transmission lines. As a result of subsequent litigation and a settlement agreement, 36 of the 119 corridors were designated as Corridors of Concern, with additional review requirements. Applications for a new ROW in a utility corridor must still undergo site-specific NEPA analysis before a ROW can be granted.

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.69 - ROWs and ROW Corridors in Cerro Summit-Cimarron-Sims Mesa Population Area**

Rights-of-Way and ROW Corridors within GUSG Planning Area Cimarron/Cerro/Sims Mesa Population
Rights-of-Way
ROW Corridors
GUSG Planning Area
Occupied Habitat
Unoccupied Habitat
BLM Field Office Boundary
Counties
Rivers
Bureau of Land Management
Bureau of Reclamation
Indian Reservation
Military Reservation
National Grasslands
National Park Service
Other Federal
Private
State
State, County, City, Areas
Bankhead-Jones Land Use Lands
US Fish and Wildlife Service
US Forest Service
Utah
Colorado
0 1.25 2.5 5 Miles
N
Gunnison Field Office
GUNNISON
Uncompahgre Field Office
MONTROSE
OURAY
Montrose
50
550

3-200 BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS
AUGUST 2016

CHAPTER 3 - AFFECTED ENVIRONMENT

## Figure 3.70 - ROWs and ROW Corridors in the Crawford Population Area

Rights-of-Way and ROW Corridors within GUSG Planning Area Crawford Population
Rights-of-Way
ROW Corridors
GUSG Planning Area
Occupied Habitat
Unoccupied Habitat
BLM Field Office Boundary
Counties
Rivers
Bureau of Land Management
Bureau of Reclamation
Indian Reservation
Military Reservation
National Grasslands
National Park Service
Other Federal
Private
State
State, County, City, Areas
Bankhead-Jones Land Use Lands
US Fish and Wildlife Service
US Forest Service
Utah
Colorado
0 0.75 1.5 3 Miles
N
Uncompahgre Field Office
GUNNISON
DELTA
MONTROSE
50

BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS 3-201
AUGUST 2016



CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.71 - ROWs and ROW Corridors in the Gunnison Basin Population Area**

Rights-of-Way and ROW Corridors within GUSG Planning Area Gunnison Population
Rights-of-Way
ROW Corridors
GUSG Planning Area
Occupied Habitat
Unoccupied Habitat
BLM Field Office Boundary
Counties
Rivers
Bureau of Land Management
Bureau of Reclamation
Indian Reservation
Military Reservation
National Grasslands
National Park Service
Other Federal
Private
State
State, County, City, Areas
Bankhead-Jones Land Use Lands
US Fish and Wildlife Service
US Forest Service
Utah
Colorado
0 3 6 12 Miles
N
Royal Gorge Field Office
San Luis Valley Field Office
Gunnison Field Office
Uncompahgre Field Office
Gunnison
Ouray

3-202 BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS
AUGUST 2016

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.72 - ROWs and ROW Corridors in the Monticello-Dove Creek Population Area**

Rights-of-Way and ROW Corridors within GUSG Decision Area Monticello-Dove Creek Population
January 7th, 2016
BLM Field Office Boundary
Counties
Rivers
Occupied Habitat
Unoccupied Habitat
Rights-of-Way
ROW Corridors
Bureau of Land Management
Bureau of Reclamation
Indian Reservation
Military Reservation
National Grasslands
National Park Service
Other Federal
Private
State
State, County, City, Areas
Bankhead-Jones Land Use Lands
US Fish and Wildlife Service
US Forest Service
Utah
Colorado
0 2.25 4.5 9 Miles
N
Uncompahgre Field Office
Tres Rios Field Office
Moab Field Office
Monticello Field Office
SAN MIGUEL
DOLORES
MONTROSE
MONTEZUMA
SAN JUAN
491
191
Utah
Colorado

BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS 3-203
AUGUST 2016



CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.73 - ROWs and ROW Corridors in the Piñon Mesa Population Area**

Rights-of-Way and ROW Corridors within GUSG Planning Area Pinon Mesa Population
Rights-of-Way
ROW Corridors
GUSG Planning Area
Occupied Habitat
Unoccupied Habitat
BLM Field Office Boundary
Counties
Rivers
Bureau of Land Management
Bureau of Reclamation
Indian Reservation
Military Reservation
National Grasslands
National Park Service
Other Federal
Private
State
State, County, City; Areas
Bankhead-Jones Land Use Lands
US Fish and Wildlife Service
US Forest Service
Utah
Colorado
0 1.75 3.5 7 Miles
N
Grand Junction
Grand Junction Field Office
Uncompahgre Field Office
Moab Field Office
MESA
MONTROSE
DELTA
GRAND

3-204 BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS
AUGUST 2016

CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.74 - ROWs and ROW Corridors in the Poncha Pass Population Area**

Rights-of-Way and ROW Corridors within GUSG Planning Area Poncha Pass Population
Rights-of-Way
ROW Corridors
GUSG Planning Area
Occupied Habitat
Unoccupied Habitat
BLM Field Office Boundary
Counties
Rivers
Bureau of Land Management
Bureau of Reclamation
Indian Reservation
Military Reservation
National Grasslands
National Park Service
Other Federal
Private
State
State, County, City, Areas
Bankhead-Jones Land Use Lands
US Fish and Wildlife Service
US Forest Service
Utah
Colorado
0 0.75 1.5 3 Miles
N
Royal Gorge Field Office
San Luis Valley Field Office
FREMONT
SAGUACHE
50
285

BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS 3-205
AUGUST 2016



CHAPTER 3 - AFFECTED ENVIRONMENT

**Figure 3.75 - ROWs and ROW Corridors in the San Miguel Basin Population Area**

Rights-of-Way and ROW Corridors within GUSG Planning Area San Miguel Basin Population
Rights-of-Way
ROW Corridors
GUSG Planning Area
Occupied Habitat
Unoccupied Habitat
BLM Field Office Boundary
Counties
Rivers
Bureau of Land Management
Bureau of Reclamation
Indian Reservation
Military Reservation
National Grasslands
National Park Service
Other Federal
Private
State
State, County, City, Areas
Bankhead-Jones Land Use Lands
US Fish and Wildlife Service
US Forest Service
Utah
Colorado
0 2.25 4.5 9 Miles
N
Montrose
Telluride
OURAY
SAN MIGUEL
MONTROSE
Uncompahgre Field Office
Tres Rios Field Office
DOLORES
50
550
491

3-206 BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS AUGUST 2016



The BLM authorizes a wide range of uses and facilities through ROWs, leases, and permits, from interstate electric transmission lines to local electric distribution lines; from major highways to two-track dirt roads accessing private property parcels and/or energy facilities; and various facilities related to energy development that are not authorized as part of mineral lease development. Table 3.73 summarizes the current land use authorizations in the decision area.

### Table 3.73 - Land Use Authorizations in the Decision Area

| HABITAT TYPE | POWER AND PHONE LINES | | | ROADS AND HIGHWAYS | PIPELINES | COMMUNI-CATION SITES | WATER-RELATED AND OTHER[1] |
|---|---|---|---|---|---|---|---|
| | Overhead | Buried | Unknown | | | | |
| Occupied Habitat | 6,900 | 260 | 1,800 | 6,200 | 1,500 | 800 | 1,300 |
| Unoccupied Habitat | 2,000 | 100 | 600 | 3,600 | 600 | 100 | 640 |
| **Total Decision Area** | **8,900** | **400** | **2,400** | **9,700** | **2,000** | **900** | **2,000** |
| GUNNISON BASIN POPULATION AREA | | | | | | | |
| Occupied Habitat | 6,700 | 200 | 1,300 | 5,100 | 20 | 500 | 300 |
| Unoccupied Habitat | 600 | 10 | 200 | 2,400 | 0 | 10 | 50 |
| CERRO SUMMIT-CIMARRON-SIMS MESA POPULATION AREA | | | | | | | |
| Occupied Habitat | 0 | 0 | 200 | 800 | 100 | 0 | 180 |
| Unoccupied Habitat | 400 | 0 | 30 | 40 | 0 | 0 | 40 |
| CRAWFORD POPULATION AREA | | | | | | | |
| Occupied Habitat | 0 | 0 | 100 | 0 | 0 | 300 | 600 |
| Unoccupied Habitat | 0 | 0 | 200 | 300 | 100 | 100 | 400 |
| MONTICELLO-DOVE CREEK POPULATION AREA | | | | | | | |
| Occupied Habitat | 10 | 20 | 0 | 200 | 40 | 0 | 10 |
| Unoccupied Habitat | 100 | 0 | 0 | 400 | 500 | 0 | 100 |
| PIÑON MESA POPULATION AREA | | | | | | | |
| Occupied Habitat | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Unoccupied Habitat | 400 | 30 | 0 | 300 | 0 | 0 | 100 |
| PONCHA PASS POPULATION AREA | | | | | | | |
| Occupied Habitat | 200 | 40 | 0 | 20 | 0 | 0 | 0 |
| Unoccupied Habitat | 500 | 100 | 0 | 20 | 0 | 0 | 0 |
| SAN MIGUEL BASIN POPULATION AREA | | | | | | | |
| Occupied Habitat | 10 | 0 | 200 | 200 | 1,300 | 10 | 200 |
| Unoccupied Habitat | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[1] "Water-Related and Other" includes ditches, irrigation facilities, water facilities, water plants, and other

#### TRENDS

Within the planning area, the demand for ROWs will continue to increase. About 10% of the existing acres occupied by ROWs are for ROWs that were granted in the past ten years. Recent demand has included all types of ROWs, including access roads, electric and phone lines, pipelines, and communication sites. The rate of the increased demand is tied to the rate of population growth and associated private land development, access needs, and utilities development. Demand for ROWs is also tied to minerals development and associated infrastructure development and access needs.

### 3.12.2. Withdrawals

#### EXISTING CONDITIONS

Withdrawals are formal lands actions that set aside, withhold, or reserve federal land by statute or administrative public land order for public purposes. Withdrawn lands are specific areas of federal land reserved and set aside from disposal, location, or entry under some or all of the general land laws. These lands are established for the purpose of limiting activities under the laws in order to maintain other public values or to reserve the area for a particular public purpose or program. The segregative effects of withdrawals can vary depending upon the particular resource being protected, and a withdrawal can be modified or eliminated through revocation.

Withdrawals are established for a wide variety of purposes such as Federal Energy Regulatory Commission power site reserves; Department of Defense military reservations; administrative sites; recreation sites; national parks; national forests; Bureau of Reclamation projects such as reservoirs; wild and scenic rivers; and wilderness areas. Withdrawals are most often used to preserve sensitive environmental values and major federal investments in facilities or other improvements, to support national security, or to provide for public health and safety. Withdrawals can be designated by Congress through a public land order or statute, or be processed administratively by the BLM through FLPMA and 43 CFR 2300.

In the decision area, 82,060 acres (including 1,610 acres in Non-Habitat) are currently withdrawn from mineral entry and there are no pending withdrawals. The existing withdrawals include wilderness areas, WSAs, NCAs, Canyons of the Ancients NM, various water power and storage withdrawals, and various administrative withdrawals. Refer to the Locatable Minerals section for a further

CHAPTER 3 - AFFECTED ENVIRONMENT

discussion of withdrawals and to Table 3.69 in that section, which summarizes the current withdrawals in the decision area.

**BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS** **3-209**
**AUGUST 2016**

# 3.13. AREAS OF CRITICAL ENVIRONMENTAL CONCERN

Areas of Critical Environmental Concern (ACEC) are the only special designation category brought forward for analysis in this amendment. (See Section 1.2.5 for a complete list of issues identified and considered but not further analyzed.)  The BLM uses the ACEC designation to highlight areas where special management attention is necessary to protect and prevent irreparable damage to important historic, cultural, and scenic values; fish or wildlife resources; or other natural systems or processes [43 CFR 1610.7-2(b)].  ACEC designation may also be used to protect human life and safety from natural hazards.

## INDICATORS

- The presence or absence of an ACEC is indicated by a designation within a BLM RMP.

## EXISTING CONDITIONS

### 3.13.1.  CONDITIONS WITHIN OCCUPIED AND UNOCCUPIED HABITAT

One ACEC in the decision area has been designated expressly for the purpose of protecting GUSG habitat.  The 22,000-acre Gunnison Sage Grouse ACEC/Important Bird Area is located within the Gunnison Gorge NCA decision area.  These lands contain a population of GUSG that is managed under the Gunnison Sage-Grouse Conservation Plan, Crawford Area, Colorado (Crawford Sage-Grouse Partnership 1998).  At the time of designation, the ACEC was believed to include 100 percent of the Occupied Habitat in the NCA planning area.

The Gunnison Gorge NCA RMP (2004) sets forth management of the ACEC as follows:

Public lands in the Management Unit 4 (22,200 acres) are designated and managed as the Gunnison Sage Grouse ACEC/Important Bird Area.  Management and protection of the GUSG and its habitat will be emphasized in this management unit.

For 22,000 acres within the Gunnison Sage-Grouse ACEC, the following lease stipulations for GUSG and GUSG habitat protection apply:

- NSO within 2 miles of GUSG leks
- NSO stipulation within riparian areas
- TL within GUSG winter range, November 15 through April 30
- CSU stipulation for other GUSG habitat.

A lease notice could be attached to oil and gas leases containing GUSG nest sites that would prohibit surface-disturbing activities or require other special mitigation on leases from March 1 through June 30 to prevent disturbance to nesting GUSG.

## TRENDS

ACECs are an administrative designation analyzed solely through the RMP process. ACEC designation is determined by the planning schedule and does not exhibit an identifiable future trend beyond that.

# 3.14. SOCIAL & ECONOMIC CONDITIONS

This section evaluates existing demographic and economic conditions in and around GUSG Habitat and assesses the economic role of activities that rely on BLM-managed resources in the region.  Additional species conservation measures may affect these activities and, therefore, socioeconomic conditions.  These consequences are addressed in Chapter 4.

The GUSG populations are spread across nine Colorado counties and two Utah counties:  Delta, Dolores, Gunnison, Hinsdale, Mesa, Montrose, Ouray, Saguache, and San Miguel counties in Colorado and Grand and San Juan counties in Utah. Most of the demographic and economic data are presented at the county level, with reference to statewide conditions and trends for context.  While county-level data often masks variation within counties, community-level data, particularly in rural areas, is scarce and typically contains large margins of error. Therefore, county-level data is considered the best available for analysis.

The economic contribution analysis relies on functional economic areas—defined by labor market linkages—rather than the political boundaries of a county.  The economic analysis groups the 11 counties into three areas.  Area One includes Delta, Gunnison, Hinsdale, Montrose, Ouray, and Saguache counties in Colorado, Area Two includes Mesa County, Colorado, and Area Three includes Dolores, and San Miguel counties in Colorado and Grand and San Juan counties in Utah. Although Mesa County, Colorado and Grand County, Utah share one of the critical habitat units, the economic linkages between these counties are weak.  Therefore, these counties are addressed separately in the socioeconomic analysis.

## INDICATORS

The following are indicators of socioeconomic effects resulting from management actions related to the protection of Gunnison Sage-Grouse within the decision area:

- Employment, labor income, and output associated with economic activities affected by management alternatives
- Number of jobs
- Dollar value of output and labor income
- Qualitative assessment of additional costs to the use of public lands and resources
- Grazing allotment infrastructure and management costs

- Restrictions on mineral development and extraction, including fluid mineral leasing stipulations (e.g., NSO) and ROW exclusion and avoidance designations
- Recreation site access
- Interest groups and communities of place
- Qualitative assessment of effects to quality of life
- Qualitative assessment of non-market values
- Environmental Justice
- Qualitative assessment of disproportionately high and adverse human health and environmental impacts

## 3.14.1. Demographic and Economic Conditions

### Area 1

The Gunnison Basin contains the largest population of GUSG (approximately 4,000 birds or 80% of the total population). The occupied portions of this Gunnison Basin area extend across portions of Gunnison and Saguache counties. Other habitat areas include the Cerro Summit-Cimarron-Sims Mesa area (mostly in Montrose County), the Crawford area (Delta, Gunnison, and Montrose counties) and the Poncha Pass area (mostly in Saguache County).

As indicated in Table 3.74, most of the counties in Area 1 grew more slowly than the State of Colorado between 2000 and 2012. Montrose County, which is also the most populous county, and Ouray County slightly exceeded Colorado's population growth rate over this period. All other counties in this area experienced population growth rates that were substantially slower than statewide population growth.

### Table 3.74 - Area I Population Change, 2000–2012

| COLORADO COUNTY | 2000 POPULATION | 2012 POPULATION | POPULATION GROWTH 2000-2012 |
|---|---|---|---|
| Delta County | 27,824 | 30,432 | 9.4% |
| Gunnison County | 14,000 | 15,475 | 10.5% |
| Hinsdale County | 792 | 810 | 2.3% |
| Montrose County | 33,438 | 40,725 | 21.8% |
| Ouray County | 3,747 | 4,530 | 20.9% |
| Saguache County | 5,904 | 6,304 | 6.8% |
| State of Colorado | 4,302,086 | 5,187,582 | 20.6% |

**Source: U.S. Census Bureau 2000 and 2012b**

Population growth can put pressure on existing housing stock and drive new residential development when vacancy rates are low. New residential development in these counties may result in habitat loss and fragmentation (IEc 2013). However, the counties with the largest shares of habitat (Gunnison and Saguache counties) have some of the lowest population growth rates in the area. This decreases the likelihood of conflict between population growth and GUSG habitat.

In all counties except Ouray, a minority of land is privately owned. Public land provides natural amenities, open space, recreation opportunities, and other benefits to nearby residents. High levels of public land ownership can also constrain development. Throughout the West, high shares of public lands increase the potential for land management actions to influence local economic conditions. Table 3.75 shows the large share of BLM-managed public lands in Delta, Gunnison, Hinsdale, Montrose, and Saguache counties. The high percentage of BLM lands underscores the potential for changes in BLM GUSG conservation measures to affect social and economic activity.

### Table 3.75 - Area I Land Ownership

| COLORADO COUNTY | PRIVATE LAND | BLM |
|---|---|---|
| Delta County | 43.2% | 30.1% |
| Gunnison County | 18.5% | 17.3% |
| Hinsdale County | 4.5% | 17.5% |
| Montrose County | 31.0% | 42.7% |
| Ouray County | 52.9% | 7.5% |
| Saguache County | 26.0% | 16.9% |

| COLORADO COUNTY | PRIVATE LAND | BLM |
|---|---|---|
| State of Colorado | 56.7% | 12.6% |
| Source: USGS 2012 | | |

Industry composition may influence the relationship between habitat conservation and regional economic activity. Several counties in this area have large shares of employment in the agricultural sector (see Appendix E). Livestock grazing in critical habitat areas may require modification to prevent conflict with the GUSG. In Delta County, cattle ranching and farming is the largest agricultural sector in the county, with 464 jobs (approximately 3 percent of all employment in the county). Montrose County also has a large share of employment in cattle ranching and farming, with 483 jobs (2 percent of total employment in the county). More than one-third of employment in Saguache County is in the agricultural sector. Seventy jobs in the county are in cattle ranching and farming subsector, which is approximately 3 percent of all employment in the county (IMPLAN 2012). While BLM allotments often provide a small portion permittees' forage, public land forage complements ranching operations that also occur on adjacent National Forest System lands and private lands.

Mineral and energy development activities may be affected by GUSG conservation measures. Delta, Gunnison, and Montrose counties have large shares of employment in the mining sector (7.9%, 7.4%, and 4.7%, respectively; see Appendix E). Restrictions on surface occupancy and disturbance, for example, could affect the prevalence of mining activity in the region.

Habitat conservation measures may also affect outdoor recreation opportunities on public lands. More than twenty percent of employment in Gunnison County is in tourism-related sectors (arts, entertainment, and recreation and accommodation and food services), which reflects the importance of outdoor recreation to local economic activity in the county (IMPLAN 2012). Appendix E provides details on sector-level employment for all counties in the planning area. The economic analysis discusses the economic role of grazing, recreation, mineral extraction, and energy development on BLM-managed public lands in the area.

Table 3.76 displays median household income for each of the Area 1 counties.

Case No. 1:20-cv-02484-MSK Document 94-2 filed 05/06/21 USDC Colorado pg 82 of 425

**Table 3.76 - Area I Median Household Income**

| COLORADO COUNTY | MEDIAN HOUSEHOLD INCOME |
|---|---|
| Chaffee County | $45,713 |
| Delta County | $42,786 |
| Gunnison County | $50,091 |
| Hinsdale County | $54,844 |
| Montrose County | $47,139 |
| Ouray County | $66,474 |
| Saguache County | $32,429 |
| State of Colorado | $58,244 |
| **Source: U.S. Census Bureau 2012a** | |

Most counties in the area are less affluent than the state as a whole. Only Ouray County has higher median household income than the state. Saguache County has the lowest median household income in the area. Low household income can increase vulnerability to social and economic change, as people have access to fewer resources. In addition to having the lowest household income in the area, Saguache County also has the highest unemployment rate.

Figure 3.76 displays the 10-year trend for unemployment in Area I. While unemployment spiked throughout the area during the recession, only Saguache County continues to experience unemployment above 10 percent. Montrose County also has a high unemployment rate compared to the state. Montrose County experienced the most severe unemployment during the recession. All other counties in the area have unemployment rates similar to, or below, the unemployment rate in the state.

**Figure 3.76 - Unemployment Trends, Area 1**

Source: BLS 2014

Discussions with county officials in this area indicated that residents value open space, outdoor recreation opportunities, and recognition of their historical – and in some cases continued – reliance on resource-based industries for employment. Communities in this area offer a wealth of natural amenities, which make communities appealing places to live that positively contribute to quality of life. In some communities in this area, natural amenities also drive second-home ownership (Gunnison County 2014). Out-of-county property owners bring outside money into counties, which can create jobs and improve local services. Second-home ownership can also increase housing costs, which make it more difficult for low-wage workers to live near their place of work (Gunnison County 2014). County officials also noted the importance of multiple use management on public lands in the area to local economic activity.

### Area 2

The majority of the Piñon Mesa GUSG Population inhabits areas to the southwest of Grand Junction and Fruita in Mesa County, Colorado. Grand Junction is the largest city in Mesa County and the largest city between Denver and Salt Lake City. As a regional economic center, the county is economically diverse. Other communities in the county rely on agriculture and oil and gas extraction for local employment and income. Public land amenities, including recreational opportunities and open space, attract residents to the area. Mesa County has grown substantially over the past 50 years, but has also experienced a number of boom and bust cycles. BLM-managed

public lands in the county contribute to local employment and income through energy development, recreation, and livestock grazing (BLM 2012).

As shown in Table 3.77, Mesa County added more than 30,000 residents between 2000 and 2012. The population growth rate in the county exceeds the statewide population growth rate. Population growth can strain infrastructure, housing supply, and community relations. New residential development may lead to habitat loss and fragmentation (IEc 2013). Therefore, population growth may also complicate the conservation of GUSG critical habitat.

**Table 3.77 - Population Change in Area 2, 2000–2012**

| COLORADO COUNTY | 2000 POPULATION | 2012 POPULATION | POPULATION GROWTH, 2000-2012 |
|---|---|---|---|
| Mesa County | 116,939 | 147,848 | 26.4% |
| State of Colorado | 4,302,086 | 5,187,582 | 20.6% |
| Source: U.S. Census Bureau 2000 and 2012b | | | |

As shown in Table 3.78, nearly half of the land in Mesa County is managed by the BLM. As a result, BLM management actions have the potential to meaningfully influence social and economic conditions in the county. Federal land management decisions may affect water quality, recreation opportunities, and resource extraction. The social and economic influence of public land management decisions increases where the majority of land is publicly owned.

**Table 3.78 - Area 2 Land Ownership**

| COLORADO COUNTY | PRIVATE LAND | BLM LANDS |
|---|---|---|
| Mesa County | 25.9% | 46.6% |
| State of Colorado | 56.7% | 12.6% |
| Source: USGS 2012 | | |

Habitat conservation measures may affect livestock grazing, outdoor recreation opportunities, and mineral activities on public lands. Mesa County has a large share of employment (5.1%) in the mining sector compared to Colorado overall (1.8%). The relative economic specialization in the mining sector suggests that GUSG conservation measures could affect economic activity on BLM-managed lands in the county. Appendix E provides further details on sector-level employment for the county.

Table 3.79 displays median household income in Mesa County and the State of Colorado.

**Table 3.79 - Area 2 Median Household Income**

| COLORADO COUNTY | MEDIAN HOUSEHOLD INCOME |
|---|---|
| Mesa County | $51,029 |
| State of Colorado | $58,244 |
| Source: U.S. Census Bureau 2012a | |

Household income in Mesa County is lower than median household income in the state, although it is higher than many counties in Area 1. Additionally, Figure 3.86 shows that the unemployment rate in Mesa County has exceeded the statewide unemployment rate since 2009. While the unemployment rates have tracked closely over much of the past decade, the unemployment rate in the county is currently about 1 percentage point higher than Colorado's unemployment rate.

**Figure 3.77 - Unemployment Trends, Area 2**

Source: BLS 2014

## Area 3

Most of the GUSG habitat in this area is near the communities of Dove Creek in Dolores County, Colorado and Monticello in San Juan County, Utah. This habitat area also covers a large portion of San Miguel County, Colorado.

Discussions with county officials in the area indicate that much of the area in proximity to the critical habitat remains reliant on agriculture, mineral extraction, and other natural resource-based economic activities. In Dolores County, for instance, 64% of tax revenue was generated from oil and gas activities (Julie Kibel, personal communication, September 25, 2014). The counties in this area also attract many recreation visitors and other tourists. Natural amenities in the area encourage public land recreation and contribute to residents' quality of life. Balancing economic development with the preservation of natural amenities is a key interest of county officials (Dolores County 2014).

As shown in Table 3.80, all of the counties in Area 3 grew more slowly than other counties in each state between 2000 and 2012. Relatively slow population growth suggests that these counties are not attracting significant numbers of new residents from other states and counties. The counties are also predominantly rural. The most densely populated county in the area—San Miguel (CO)—has fewer than 6 people per square mile, compared to approximately 50 people per square mile in the State of Colorado (U.S. Census Bureau 2012b). Slower population growth may reduce incentives for new residential development, which may limit potential conflict between private land development and GUSG habitat.

**Table 3.80 - Population Change in Area 3, 2000–2012**

| COUNTY/STATE | 2000 POPULATION | 2012 POPULATION | POPULATION GROWTH 2000-2012 |
|---|---|---|---|
| Dolores County, CO | 1,844 | 1,994 | 8.1% |
| San Miguel County, CO | 6,593 | 7,580 | 15.0% |
| Grand County, UT | 8,407 | 9,328 | 11.0% |
| San Juan County, UT | 14,389 | 14,965 | 4.0% |
| State of Colorado | 4,302,086 | 5,187,582 | 20.6% |
| State of Utah | 2,233,183 | 2,855,287 | 27.9% |

Source: U.S. Census Bureau 2000 and 2012b

In all counties, a minority of land is in private ownership. As indicated in Table 3.81, all of the Area 3 counties have lower rates of private land ownership than their respective states. The BLM manages a particularly large share of lands in San Miguel (CO), Grand (UT), and San Juan (UT) counties. Due to large shares of public land ownership, BLM management actions related to habitat conservation may affect social and economic conditions in these counties.

**Table 3.81 - Area 3 Land Ownership**

| COUNTY/STATE | PRIVATE LAND | BLM LANDS |
|---|---|---|
| Dolores County, CO | 33.6% | 14.8% |
| San Miguel County, CO | 35.9% | 38.9% |
| Grand County, UT | 4.3% | 66.0% |
| San Juan County, UT | 8.2% | 41.3% |
| State of Colorado | 56.7% | 12.6% |
| State of Utah | 23.5 | 42.2% |

Source: USGS 2012

Habitat conservation measures may affect livestock grazing, outdoor recreation, and mineral activities on BLM-managed lands. Dolores County, Colorado and San Juan County, Utah have relatively large shares of employment in the agricultural sector. Appendix E provides details on sector-level employment for all counties in the planning area. In Dolores County, cattle ranching and farming is the largest agricultural sector in the county, with 64 jobs (approximately 6 percent of all employment in the county). San Juan County also has a large share of employment in cattle ranching and farming, with 155 jobs (2.5 percent of all employment in the county) (IMPLAN 2012).

In comparison, just 0.5% of jobs in Colorado and 0.1% of jobs in Utah are in the cattle ranching and farming sector (IMPLAN 2012). Therefore, a resident of San Juan County, Utah is 25 times more likely to work in cattle ranching and farming than a resident of their state overall. A resident of Dolores County, Colorado is 12 times more likely to work in this sector. This indicates that Area 3 is specialized in cattle ranching and farming relative to the regional economy.

San Juan County also has a large mining sector, accounting for 7.8% of jobs in the county. Mining-related employment only accounts for 1% of employment statewide in Utah; therefore, San Juan County is also specialized in mining relative to the broader economy (IMPLAN 2012).

Tourism-related sectors (arts, entertainment, and recreation and accommodation and food services) are among the largest sectors in San Miguel County, Colorado and Grand County, Utah. More than one-third of employment in San Miguel County and approximately 30% of employment in Grand County is in tourism-related sectors (IMPLAN 2012). In Colorado, tourism-related sectors account for about 10% of employment. In Utah, those sectors account for 9% of employment (IMPLAN 2012). Therefore, San Miguel (CO) and Grand (UT) counties are specialized in tourism-related sectors relative to the regional economy. However, Telluride in eastern San Miguel County (CO) is responsible for driving much of the

tourism-related employment in the county. Telluride is physically separate from the decision area and will not be affected by proposed habitat conservation measures.

Table 3.82 displays the median household income in the area. All counties except San Miguel County, Colorado have lower household incomes than their respective states. Low household income can indicate socioeconomic vulnerability. Vulnerable individuals and communities may be less resilient to social and economic change.

**Table 3.82 - Area 3 Median Household Income**

| COUNTY/STATE | MEDIAN HOUSEHOLD INCOME |
|---|---|
| Dolores County, Colorado | $43,098 |
| San Miguel County, Colorado | $63,766 |
| Grand County, Utah | $42,208 |
| San Juan County, Utah | $40,186 |
| State of Colorado | $58,244 |
| State of Utah | $58,164 |

Source: U.S. Census Bureau 2012a

In addition to having lower median household incomes, most counties in this area have higher unemployment rates than Colorado and Utah overall. Unemployment in Dolores County, Colorado spiked during the recession, but is again in line with other counties in the region. San Juan (UT), Dolores (CO), and Grand (UT) counties have higher unemployment rates than Colorado and Utah.

**Figure 3.78 - Unemployment Trends, Area 3**

Source: BLS 2014

## 3.14.2. Environmental Justice

In 1994, President Clinton issued Executive Order 12898 mandating that all federal agencies analyze the potential for their actions to affect minority and low-income populations disproportionately. The Council on Environmental Quality (CEQ) issued supplemental guidance to assist agencies' compliance (CEQ 1997). The CEQ suggests the following criteria for identifying potential environmental justice populations:

- "Minority population: Minority populations should be identified where either: (a) the minority population of the affected area exceeds 50 percent or (b) the minority population percentage of the affected area is meaningfully greater than the minority population percentage in the general population or other appropriate unit of geographic analysis..."
- "Low-income population: Low-income populations in an affected area should be identified with the annual statistical poverty thresholds from the Bureau of the Census' Current Population Reports, Series P-60 on Income and Poverty. In identifying low-income populations, agencies may consider as a community either a group of individuals living in geographic proximity to one another, or a set of individuals (such as migrant workers or Native Americans), where either type of group experiences common conditions of environmental exposure or effect."

The emphasis of environmental justice is on health effects and the benefits of a healthy environment. The CEQ has interpreted health effects with a broad definition: "*Such effects may include ecological, cultural, human health, economic or social impacts on minority communities, low-income communities or Indian Tribes . . . when those impacts are interrelated to impacts on the natural or physical environment*" (CEQ 1997).

Table 3.83 displays the share of minority populations in each planning area county and their respective states. Table 3.84 lists the poverty rate in the counties and states. These conditions are used to evaluate the presence of environmental justice populations in the decision area.

**Table 3.83 - Race and Ethnicity in the Planning Area by County**

| COUNTY/STATE | WHITE ALONE | BLACK OR AFRICAN AMERICAN ALONE | AMERICAN INDIAN OR ALASKA NATIVE ALONE | ASIAN ALONE | NATIVE HAWAIIAN OR OTHER PACIFIC ISLANDER ALONE | SOME OTHER RACE | TWO OR MORE RACES | HISPANIC OR LATINO* |
|---|---|---|---|---|---|---|---|---|
| **State of Colorado** | **84.2%** | **4.0%** | **1.0%** | **2.7%** | **0.1%** | **4.7%** | **3.3%** | **20.6%** |
| Delta County | 94.4% | 1.0% | 0.6% | 0.6% | 0.0% | 2.1% | 1.3% | 14.0% |
| Dolores County | 96.6% | 0.0% | 1.1% | 0.2% | 0.1% | 0.0% | 2.0% | 3.8% |
| Gunnison County | 95.3% | 0.8% | 0.4% | 0.7% | 0.0% | 1.5% | 1.3% | 8.3% |
| Hinsdale County | 99.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.9% | 2.4% |
| Mesa County | 90.2% | 0.7% | 1.1% | 0.7% | 0.1% | 4.6% | 2.7% | 13.3% |
| Montrose County | 91.0% | 0.6% | 0.8% | 0.6% | 0.1% | 3.8% | 3.1% | 19.6% |
| Ouray County | 97.7% | 0.0% | 0.3% | 0.6% | 0.0% | 0.0% | 1.4% | 2.0% |
| Saguache County | 81.0% | 0.5% | 1.5% | 0.2% | 0.1% | 10.4% | 6.4% | 41.3% |
| San Miguel County | 96.6% | 0.2% | 0.4% | 1.6% | 0.0% | 0.2% | 1.0% | 8.9% |
| **State of Utah** | **89.1%** | **1.1%** | **1.1%** | **2.0%** | **0.9%** | **3.4%** | **2.3%** | **12.9%** |
| Grand County | 93.2% | 0.4% | 4.7% | 0.5% | 0.2% | 0.2% | 0.8% | 9.4% |
| San Juan County | 48.2% | 0.1% | 48.7% | 0.5% | 0.4% | 0.4% | 1.7% | 4.9% |

*Hispanic or Latino is an ethnicity and Hispanic/Latino individuals can be of any race.
Source: U.S. Census Bureau 2012a

San Juan County, Utah has a large share of Native American residents. Nearly half of county residents identify as Native American. Saguache County (CO) also has a large share of minority residents, with more than 40 percent of people reporting Hispanic or Latino heritage. Saguache County is the only county that has a larger share of Hispanic/Latino residents than the state overall.

**Table 3.84 - Percentage of People with Income below the Poverty Level**

| COUNTY/STATE | POVERTY RATE |
|---|---|
| **State of Colorado** | **12.9%** |
| Delta County, Colorado | 14.9% |
| Dolores County, Colorado | 13.9% |
| Gunnison County, Colorado | 16.3% |
| Hinsdale County, Colorado | 5.1% |
| Mesa County, Colorado | 13.4% |
| Montrose County, Colorado | 13.8% |
| Ouray County, Colorado | 6.0% |
| Saguache County, Colorado | 24.8% |
| San Miguel County, Colorado | 7.3% |
| **State of Utah** | **12.1%** |
| Grand County, Utah | 13.6% |
| San Juan County, Utah | 27.9% |
| **Source: U.S. Census Bureau 2012a** | |

Delta, Dolores, Gunnison, Mesa, Montrose, and Saguache counties in Colorado and Grand and San Juan counties in Utah have poverty rates above the rates in their respective states. Saguache and San Juan counties have the highest poverty rates in the decision area, with approximately one-quarter of residents living in poverty.

San Juan and Saguache counties have large shares of minority residents. These counties also have the highest poverty rates in the decision area. These conditions increase the likelihood that individuals in these counties may experience disproportionately adverse consequences from economic changes. The environmental consequences analysis will evaluate if GUSG conservation measures disproportionately affect the environmental justice populations identified here.

## 3.14.3. Economic Contribution Analysis

Public land uses, including recreation, energy and mineral development, and livestock grazing contribute to economic activity across the twelve counties. The economic contribution analysis estimates the number of jobs and amount of labor income attributable to activities on BLM-managed lands in the study area. GUSG conservation measures are expected to affect energy and mineral development, recreation, and livestock grazing on BLM-managed lands in the decision area. While

public land management contributes to economic activity in other ways—e.g., through payments-in-lieu-of-taxes—other contributions are not expected to be measurably affected by GUSG conservation measures.

The economic contribution analysis uses IMPLAN Professional version 3.0, with 2012 data. IMPLAN is an input-output model that estimates the economic consequences of changes in an industry, event, or policy. IMPLAN captures direct, indirect, and induced economic contributions. Direct contributions occur in the immediately affected industry. For example, public land forage directly contributes to employment, income, and output in the cattle ranching sector. Indirect contributions result from directly affected individuals and firms buying goods and services to support their business. Ranchers buying hardware to repair a fence is an example of an indirect contribution. Induced contributions result from employees of the directly and indirectly affected sectors spending household income in the regional economy (e.g., on housing).

Appendix F details the assumptions and methodology used in the economic contribution analysis.

### Oil and Gas

While federal oil and gas production occurs in all three socioeconomic areas, there is limited overlap with GUSG habitat. BLM-managed oil and gas wells exist in the Crawford (Area 1), Monticello-Dove Creek (Area 3), and San Miguel Basin (Area 3) population areas. Because the only producing wells that overlap with GUSG habitat are in the Monticello-Dove Creek and San Miguel Basin population areas, the economic contribution of BLM-managed oil and gas is analyzed only for Area 3. For context, countywide oil and gas production from all ownership is disclosed for the three socioeconomic areas.

Energy price volatility complicates the economic contribution analysis. The latest IMPLAN data available for this analysis is from 2012, a year when a barrel of crude oil sold for approximately $100. As of this writing (August 2015), a barrel of crude oil is approximately $45 (USEIA 2015). The dramatic reduction in oil prices likely means that the employment, income, and output data contained in IMPLAN likely differ from current conditions. Natural gas prices have not followed the same downward trend. In 2012, the wellhead price for a Mcf of natural gas was $2.66, which is similar to current prices (EIA 2014).

Area 1 has the lowest levels of oil and gas production among the three socioeconomic areas. Table 3.85 and Table 3.86 display production of federal minerals and production of oil and gas from all ownerships, respectively. Only Delta and Gunnison counties produced oil and gas in 2012 and 2013. Federal minerals accounted for approximately half of natural gas production and 5% of oil production in Area 1.

**Table 3.85 - Area 1 Federal Mineral Production, Fiscal Year 2013**

| COLORADO COUNTY | OIL (BBL[1]) | GAS (MCF[2]) |
|---|---|---|
| Chaffee County | – | – |
| Delta County | 70 | – |
| Gunnison County | 65 | 1,041,628 |
| Hinsdale County | – | – |
| Montrose County | – | – |
| Ouray County | – | – |
| Saguache County | – | – |

[1] bbl = barrels of oil [2] Mcf = thousand cubic feet

Source: ONRR 2014

**Table 3.86 - Countywide Oil and Gas Production, Area 1, 2012–2014**

| COLORADO COUNTY | 2012 PRODUCTION | | 2013 PRODUCTION | | 2014 PRODUCTION | |
|---|---|---|---|---|---|---|
| | Oil (bbl) | Gas (Mcf) | Oil (bbl) | Gas (Mcf) | Oil (bbl) | Gas (Mcf) |
| Delta County | 113 | 61,468 | 3,044 | 152,834 | 1,149 | 300,803 |
| Gunnison County | 986 | 1,974,284 | 231 | 1,476,566 | 1,608 | 3,610,345 |
| Hinsdale County | – | – | – | – | – | – |
| Montrose County | – | – | – | – | – | – |
| Ouray County | – | – | – | – | – | – |
| Saguache County | – | – | – | – | – | – |

Source: COGCC 2014

Between 2012 and 2014, Area 1 counties produced an average of 2,377 barrels of oil and 2.5 million Mcf of natural gas annually. No oil and gas was produced from BLM-managed wells in GUSG habitat zones in Area 1. Therefore, an oil and gas economic contribution analysis is not conducted for Area 1.

Area 2 has higher oil and gas production than Area 1, with approximately $1.9 million worth of oil and $58.2 million worth of natural gas extracted from federal sources in fiscal year 2013. Between 2012 and 2014, Area 2 produced an average of 64,180 barrels of oil and 40 million Mcf of natural gas annually. However, like Area 1, Area 2 has no BLM-managed wells in GUSG habitat zones. Therefore, an oil and gas economic contribution analysis is not conducted for Area 2.

**Table 3.87 - Area 2 Federal Mineral Production, Fiscal Year 2013**

| COLORADO COUNTY | OIL (BBL) | GAS (MCF) |
|---|---|---|
| Mesa County | 20,528 | 21,890,286 |
| [1] bbl = barrels of oil | | [2] Mcf = thousand cubic feet |
| Source: ONRR 2014 | | |

Table 3.88 shows annual production of oil and gas across all mineral ownerships in Mesa County. This data reveals that approximately one-third of oil production and one-half of natural gas production in Mesa County comes from federal minerals.

**Table 3.88 - Countywide Oil and Gas Production, Area 2, 2012–2014**

| COLORADO COUNTY | 2012 PRODUCTION | | 2013 PRODUCTION | | 2014 PRODUCTION | |
|---|---|---|---|---|---|---|
| | Oil (bbl) | Gas (Mcf) | Oil (bbl) | Gas (Mcf) | Oil (bbl) | Gas (Mcf) |
| Mesa County | 72,330 | 46,587,232 | 54,399 | 37,111,263 | 65,811 | 36,311,889 |
| Source: COGCC 2014 | | | | | | |

Area 3 has the highest production of oil and gas in the decision area. Each county in the area reported production of oil and gas. Total federal production in Area 3 accounts for $113.5 million in oil output and $18.7 million in natural gas output. Between 2012 and 2014, Area 3 produced an average of 5.5 million barrels of oil and 51 million Mcf of natural gas annually. Area 3 is the only socioeconomic area in the decision area that has BLM-managed oil and gas producing wells in GUSG habitat zones.

**Table 3.89 - Area 3 Federal Mineral Production, Fiscal Year 2013**

| COUNTY | OIL (BBL) | GAS (MCF) |
|---|---|---|
| Dolores County, Colorado | 18,810 | 264,816 |
| San Miguel County, Colorado | 5,498 | 2,331,571 |
| Grand County, Utah | 768,057 | 2,807,041 |
| San Juan County, Utah | 414,861 | 1,612,013 |
| [1] bbl = barrels of oil | | [2] Mcf = thousand cubic feet |
| Source: ONRR 2014 | | |

**Table 3.90 - Countywide Oil and Gas Production, Area 3**

| COUNTY | 2012 PRODUCTION | | 2013 PRODUCTION | | 2014 PRODUCTION | |
|---|---|---|---|---|---|---|
| | Oil (bbl) | Gas (Mcf) | Oil (bbl) | Gas (Mcf) | Oil (bbl) | Gas (Mcf) |
| Dolores County, CO | 26,193 | 23,272,905 | 17,472 | 24,114,726 | 14,572 | 48,461,693 |
| San Miguel County, CO | 15,272 | 5,776,642 | 5,917 | 4,382,700 | 2,374 | 4,437,271 |
| Grand County, UT | 363,559 | 4,148,601 | 1,094,061 | 4,341,425 | 1,341,440 | 4,469,215 |
| San Juan County, UT | 4,403,628 | 9,491,182 | 4,571,904 | 9,781,535 | 4,575,257 | 10,650,457 |
| Source: COGCC 2014 and UTDNR 2014 | | | | | | |

Federal minerals account for a relatively small share of total production in Area 3. Table 3.90 displays the annual production of oil and gas across all mineral ownerships in each county. San Juan County, Utah has the highest levels of oil production and Dolores County, Colorado has the highest levels of natural gas production. These are also the counties with the largest share of GUSG Habitat in Area 3. Extraction of BLM-managed oil and gas in the Monticello-Dove Creek population area averaged 6,177 barrels of oil and 275,588 Mcf of gas during the same period. In the San Miguel Basin population area, these figures were 2,166 barrels of oil and 643,693 Mcf of gas. Therefore, BLM-managed resources within GUSG Habitat account for 0.15% of countywide oil production and 1.8% of countywide gas production.

Extraction of BLM-managed oil and gas in the Monticello-Dove Creek and San Miguel Basin population areas support approximately two jobs, $95,000 of labor income, and $630,000 of output on an average annual basis. The economic contribution of oil and gas production may be affected by changes in market conditions. Appendix F describes the assumptions and methodology used to estimate oil and gas economic contributions.

Federal data sources report a varying range of employment in the oil and gas extraction sector. IMPLAN employment estimates, which are derived from several federal sources, exceed the employment numbers reported by the U.S. Census Bureau's County Business Patterns (CBP). In Area 1, IMPLAN reports 859.0 jobs in the extraction of oil and gas, while CBP reports only 4 jobs in 2012. In Area 2, IMPLAN reports 549.7 jobs and CBP reports 99 jobs in 2012. In Area 3, IMPLAN reports 242.7 jobs and CBP reports 90 jobs in 2012 (IMPLAN 2012 and U.S. Census Bureau 2014).

These divergent and conflicting data sets make precise and accurate economic contribution analysis impossible. To reconcile the difference between data sets, the BLM consulted the Colorado State Demography Office and researched the U.S. Census Bureau's County Business Patterns' methodology documents. From this

research, it is likely that CBP data underreports employment due to a number of factors, including under representation of sole proprietors, privacy precautions, and CBP's March acquisition of employment data that occurs when a number oil and gas operations are not active. Accordingly, the BLM utilized IMPLAN employment data, which is aggregated from numerous federal economic and demographic data sources.

### Potash

Approximately 19,000 acres of Occupied and Unoccupied Habitat overlap with existing or pending potash prospecting permits. Prior BLM mineral reports have indicated thicknesses of three specific potash seams within this acreage ranging from 14 feet up to 28 feet. Potential potash tonnages within this acreage could be substantial. However, prospecting is needed to determine whether a valuable deposit of potash exists within the lands covered by the prospecting permit applications, and whether these lands are chiefly valuable for potash. Therefore, an estimate of potential production is not possible as of the publication of this document.

In 2014, the market price of potash has been stable near $300 per metric ton, which is near the five-year low (World Bank 2014). Over the past five years, the market price has fluctuated between $287 and $500. Since no potash production is occurring, economic contribution analysis cannot be conducted. However, GUSG conservation measures may affect the potential for future potash mining.

### Carbon Dioxide

Enhanced oil recovery may increase the quantity of oil extracted from a reservoir. Enhanced oil recovery injects carbon dioxide (CO2) to push residual oil to a production well. CO2 injection has the potential to increase production relative to conventional extraction techniques. The price of CO2 is tied to oil prices (Cook 2012). In late 2015, the price of a barrel of oil was approximately $36, which is low relative to recent price trends. Between 2012 and 2014, a barrel of oil was approximately $100 (EIA 2015). The price of third-party supplied CO2 is approximately 2.5 percent of the oil price plus $0.50 per Mcf for transportation costs (van 't Veld and Phillips 2009). At current (late 2015) oil prices, that implies a CO2 price of $1.40 per Mcf.

In periods of low oil prices, private investment in CO2 infrastructure and activities is less likely. There are no current CO2 developments within Gunnison Sage-Grouse habitat. Although seismic testing for CO2 has been completed in the Doe Canyon area, which is within GUSG habitat, no proposals have been received for drilling. Since no CO2 development is occurring, economic contribution analysis cannot be conducted. However, GUSG conservation measures may affect the potential for future CO2 development in the planning area.

## Livestock Grazing

A number of county representatives indicated that livestock grazing is both economically and culturally important to area residents. BLM-managed public lands in the decision area provide forage for livestock. The following analysis describes the economic contribution of livestock grazing in GUSG habitat. GUSG conservation measures may affect livestock grazing in these areas. The analysis is broken out by GUSG population for each of the three socioeconomic areas.

Table 3.91 shows the number of billed animal unit months (AUMs) that overlap with GUSG Habitat in Area 1, including Poncha Pass.

**Table 3.91 - Average Number of Billed AUMs within GUSG Habitat in Area 1, 2012–2014**

| AUM BILLED | CERRO SUMMIT-CIMARRON-SIMS MESA | CRAWFORD | GUNNISON BASIN | PONCHA PASS |
|---|---|---|---|---|
| Billed Cattle AUMs | 368 | 1,213 | 11,701 | 1,319 |
| Billed Horse AUMs | 0 | 0 | 7 | 0 |
| Billed Sheep AUMs | 710 | 1,098 | 1,573 | 0 |
| Billed Yearling Cattle AUMs | 0 | 0 | 2,275 | 0 |
| Source: BLM 2015 | | | | |

Livestock grazing in Occupied Habitat in Area 1 supports approximately 41 jobs and $744,000 in labor income annually. Livestock grazing in both Occupied and Unoccupied Habitat supports approximately 50 jobs and $924,000 in labor income annually.

Table 3.92 shows the number of billed AUMs that overlap with GUSG Habitat in Area 2.

**Table 3.92 - Average Number of Billed AUMs within GUSG Habitat in Area 2, 2012–2014**

| AUM BILLED | PIÑON MESA |
|---|---|
| Billed Cattle AUMs | 6,916 |
| Billed Horse AUMs | 26 |
| Billed Sheep AUMs | 0 |
| Billed Yearling Cattle AUMs | 248 |
| Source: BLM 2015 | |

Livestock grazing in Occupied Habitat in Area 2 supports approximately 2 jobs and $38,000 in labor income annually. Livestock grazing in both Occupied and

Unoccupied Habitat supports approximately 15 jobs and $270,000 in labor income annually.

Table 3.93 shows the number of billed AUMs that overlap with GUSG Habitat in Area 3. Livestock grazing within GUSG Habitat in Area 3 supports approximately 21 jobs, $270,000 of labor income, and $1.7 million of output annually.

**Table 3.93 - Average Number of Billed AUMs within GUSG Habitat in Area 3, 2012–2014**

| AUM BILLED | MONTICELLO-DOVE CREEK | SAN MIGUEL BASIN |
|---|---|---|
| Billed Cattle AUMs | 5,728 | 3,719 |
| Billed Horse AUMs | 5 | 3 |
| Billed Sheep AUMs | 0 | 0 |
| Billed Yearling Cattle AUMs | 128 | 0 |
| Source: BLM 2015 | | |

## Recreation

Public lands in the decision area are valued for a variety of recreational opportunities. Public land recreation opportunities improve quality of life and make communities attractive places to live. Additionally, recreation on BLM-managed public lands attracts visitors from outside the local area. When recreation users spend money in the local economy—on food and lodging, for example—they contribute to employment and income in the area. GUSG conservation measures may affect the quantity and distribution of recreation visits across the decision area. This section assesses the economic contribution of recreation on BLM-managed public lands. Recreation visit estimates are only available by BLM field office and not by county.

Table 3.94, Table 3.95, and Table 3.96 display the number of annual recreation visits in fiscal years (FY) 2013 and 2014 for each field office in the decision area. They also show the share of each field office within Occupied Habitat and Unoccupied Habitat. A detailed description of recreation data and economic contribution methods is available in Appendix F.

The Gunnison FO, San Luis Valley FO, and Gunnison Gorge NCA are primarily within Area 1. Recreation opportunities are most likely to be affected in Area 1 due to the large share of the Gunnison FO and Gunnison Gorge NCA with GUSG Habitat.

### Table 3.94 - Area 1 Recreation Visits

| BLM UNIT | VISITS (FY13) | VISITS (FY14) | % OF UNIT WITHIN OCCUPIED HABITAT | % OF UNIT WITHIN UNOCCUPIED HABITAT |
|---|---|---|---|---|
| Gunnison FO | 510,028 | 501,926 | 50.8% | 11.5% |
| San Luis Valley FO | 461,471 | 475,972 | 2.0% | 3.0% |
| Gunnison Gorge NCA | 172,688 | 182,575 | 23.0% | 5.7% |
| Source: BLM 2014 | | | | |

The average number of visits in FY13 and FY14 are multiplied by the share of each BLM unit within GUSG Habitat in order to estimate the number of visits that could be affected by GUSG conservation measures. The economic contribution analysis relies on this number to estimate the employment and labor income supported by public land recreation in habitat zones.

Table 3.94 shows Area 1 recreation visits for FY13 and FY14. Non-local recreation visits within GUSG Habitat in Area 1 are estimated to support approximately 90 jobs, $2.4 million of labor income, and $6.5 million of output annually. Local recreation visits support an additional 31 jobs, $890,000 of labor income, and $2.3 million of output annually, equivalent to approximately 0.22% of total employment, 0.17% of labor income, and 0.13% of total output in Area 1.

The Grand Junction FO, Moab FO, and McInnis Canyons NCA are primarily within Area 2. Because only a small share of these BLM units is within GUSG Habitat, GUSG conservation measures will be less likely to affect the quantity and distribution of public land recreation in Area 2.

### Table 3.95 - Area 2 Recreation Visits

| BLM UNIT | VISITS (FY13) | VISITS (FY14) | % OF UNIT WITHIN OCCUPIED HABITAT | % OF UNIT WITHIN UNOCCUPIED HABITAT |
|---|---|---|---|---|
| Moab FO | 1,996,520 | 1,951,315 | 0.0% | 0.2% |
| Grand Junction FO | 817,869 | 812,896 | 1.2% | 5.1% |
| McInnis Canyons NCA | 295,491 | 283,063 | 0.3% | 17.5% |
| Source: BLM 2014 | | | | |

Table 3.95 shows the percentage of recreation visits occurring within GUSG habit in Area 2 in fiscal years 2013 and 2014. In Area 2, non-local recreation visits in GUSG Habitat are estimated to support approximately 34 jobs, $992,000 in labor income,

and $2.7 million in output annually. Local recreation visits support an additional 11 jobs, $376,000 of labor income, and $1 million of output annually, equivalent to approximately 0.05% of total employment, 0.04% of total labor income, and 0.03% of output in Area 2.

The Monticello FO, Uncompahgre FO, Tres Rios FO, Canyons of the Ancients NM, and Dominguez-Escalante NCA are primarily within Area 3. Similar to Area 2, a relatively small share of each BLM unit is within GUSG Habitat.

**Table 3.96 - Area 3 Recreation Visits**

| BLM UNIT | VISITS (FY13) | VISITS (FY14) | % OF UNIT WITHIN OCCUPIED HABITAT | % OF UNIT WITHIN UNOCCUPIED HABITAT |
|---|---|---|---|---|
| Monticello FO | 245,094 | 255,807 | 0.3% | 0.0% |
| Uncompahgre FO | 467,803 | 524,639 | 0.8% | 1.4% |
| Tres Rios FO | 760,569 | 853,919 | 8.0% | 6.0% |
| Dominguez-Escalante NCA | 98,705 | 92,567 | 0.0% | 8.5% |
| Canyons of the Ancients NM | 76,252 | 68,497 | 0.0% | 2.4% |
| Source: BLM 2014 | | | | |

Table 3.96 shows the percentage of recreation visits occurring within GUSG Habitat in Area 3 in fiscal years 2013 and 2014. Non-local recreation visits within GUSG Habitat are estimated to support approximately 40 jobs, $1.1 million of labor income, and $2.9 million of output annually. Local recreation visits support an additional 13 jobs, $400,000 of labor income, and $1 million of output annually. This is equivalent to approximately 0.24% of total employment, 0.2% of total labor income, and 0.17% of output in Area 3.

## Nonmarket Values

The economic analysis above captures the contributions of public land uses to local economic activity. An economic contribution analysis considers how the money spent on public land uses cycles through an economy to support local employment and labor income. This type of analysis informs our understanding of the role of BLM management actions in supporting economic activity and contributing to local employment and income. However, an economic contribution analysis does not provide complete information relevant to understanding the economic importance of public lands.

Public land has both market and non-market values. Market values include commodity uses of public land resources, such as mineral extraction. The discussion of oil and gas, above, describes the market value and oil and natural gas

extracted from each county in the decision area. Oil and natural gas are traded in markets and their prices are known. However, not all public land resources are traded in markets. These types of values are called non-market. Non-market values may arise from direct use of the resources (e.g., hunting for personal use and subsistence gathering) or from passive use (sometimes called non-use). Passive use captures the value of knowing that the resource(s) exist, whether or not future direct use is intended. Public lands provide numerous values that are often of direct use to humans, even if they are not recognized in economic analyses. Drinking water, clean air, and the research and educational opportunities that unique ecosystems afford are a few of the many ecosystem goods and services whose values are not addressed in many economic analyses.

Many individuals—in the planning area and throughout the nation—value wildlife. More than half of visitors to national forests participate in a wildlife-related activity, with the majority of these visitors engaged in wildlife viewing (White et al 2013). Comparable statistics are not available for the BLM, but it is reasonable to assume that visitor characteristics and preferences are similar across agencies. Furthermore, individuals may value the protection of wildlife even if they have no intention to visit public lands to view wildlife or participate in other wildlife-related activities (such as hunting and fishing). Approximately 15 million Americans are members of environmental and wildlife conservation non-profit organizations, which is one measure of the population holding wildlife-related values (Straughan and Pollak 2008, World Values Survey 2014). The protection of GUSG in the planning area may advance non-market values related to wildlife.

GUSG conservation measures could entail tradeoffs with other non-market values. Many recreation users value the opportunities on public land beyond what they pay traveling to sites. The difference between what recreation users pay (in travel costs and site fees) and what they are willing to pay is called consumer surplus. Motorized recreation use on public lands may conflict with GUSG conservation measures. Deisenroth et al (2009) find that motorized recreation users have a mean consumer surplus of approximately $89 per person per day (converted from 2007 USD to 2014 USD using BLS 2014a). A reduction in motorized recreation use, therefore, would have both market (loss of economic activity) and non-market (consumer surplus) implications.

Consistent with direction provided in BLM IM 2013-131, the subsequent analysis of environmental consequences will consider non-market goods and services primarily in qualitative terms (BLM 2013). Where appropriate, discussion of how the alternatives may affect non-market values will be presented. However, due to the qualitative nature of these discussions, direct comparisons between changes in market and non-market values are generally not possible. Furthermore, the

CHAPTER 3 - AFFECTED ENVIRONMENT

economic impact of each alternative should not be conflated with the economic value of that alternative. These are two distinct economic measures.

3-236 BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS
AUGUST 2016

# 4. ENVIRONMENTAL CONSEQUENCES

## 4.1. INTRODUCTION

### 4.1.1. PURPOSE AND FORMAT

This chapter presents the direct, indirect, and cumulative impacts on the human and natural environment anticipated to occur from implementing the alternatives presented in Chapter 2, Alternatives. The purpose of this chapter is to describe to the decision maker and the public how the environment could change if any of the alternatives in Chapter 2 were to be implemented. It is meant to aid in the decision of which Resource Management Plan Amendment (RMP Amendment) alternative, if any, to adopt.

This chapter is organized by topic, similar to Chapter 3, Affected Environment. Each topic area includes the following:

- A method of analysis section that identifies indicators and assumptions
- An analysis of impacts for each of the four alternatives (in some sections, the analysis has been broken down by alternative; in other sections, if the impacts are expected to be similar, the analyses have been combined)
- A summary comparison of the alternatives.

This impact analysis identifies impacts that may benefit, enhance, or improve a resource or resource use as a result of management actions, as well as those impacts that have the potential to impair a resource or resource use. Some BLM management actions may affect only certain resources, uses, and alternatives. If an activity or action is not addressed in a given section, either no impacts are expected or the impact is expected to be negligible.

Many management actions proposed in Chapter 2 are planning-level decisions that do not result in direct on-the-ground changes. However, by planning for land use on surface estate and federal mineral estate administered by the BLM over the life of the plan, the analysis focuses on the reasonably foreseeable impacts that may result or impacts that could eventually result in-on-the ground changes.

Some BLM and management actions may affect only certain resources and alternatives. This impact analysis identifies impacts that may benefit, enhance, or improve a resource as a result of management actions, as well as negative impacts. If an activity or action is not addressed in a given section, either no impacts are expected or the impact is negligible, based on BLM analysis.

The BLM manages public lands for multiple use and sustained yield in accordance with the Federal Land Policy and Management Act (FLPMA). FLPMA states:

> …the public lands must be managed in a manner that protects the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; that will provide for outdoor recreation and human occupancy and use; and that recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands by encouraging collaboration and public participation throughout the planning process.

These decisions can result in trade-offs which are disclosed in this chapter. The projected impacts on land use activities and the associated environmental impacts of land uses are characterized and evaluated for each of the alternatives.

Impact analysis is a cause-and-effect process. The detailed impact analyses and conclusions are based on science and professional applied scientific knowledge and natural resource management knowledge from sources including the following:

- The BLM planning team's professional scientific and resource management knowledge of resources and the project area
- Reviews of existing scientific and resource management and planning literature
- Science and professional resource management and planning information provided by experts in the BLM, other agencies, cooperating agencies, interest groups, and concerned citizens.

The baseline used for the impact analysis is the current condition or situation, as described in Chapter 3. Impacts on resources and resource uses are analyzed and discussed in detail, commensurate with resource issues and concerns identified through the process. At times, impacts are described using ranges of potential impacts or in qualitative terms.

Analysis is based on the Uncompahgre Basin RMP, San Juan/San Miguel RMP, and Draft Dominguez-Escalante NCA RMP for the Uncompahgre FO, and on approved RMPs for the rest of the units: Canyons of the Ancients NM RMP, Dominguez-Escalante NCA RMP, Grand Junction FO RMP, Gunnison Gorge NCA RMP, Gunnison Resource Area RMP, McInnis Canyons NCA RMP, San Luis Resource Area RMP, San Juan/San Miguel RMP, Tres Rios FO RMP, Uncompahgre Basin RMP, and Moab FO RMP and Monticello FO RMP for the Moab FO.

## 4.1.2. Analytical Assumptions

Several overarching assumptions have been made in order to facilitate the analysis of the project impacts. These assumptions set guidelines and provide reasonably foreseeable projected levels of development that would occur in the decision area during the planning period. These assumptions should not be interpreted as constraining or redefining the management objectives and actions proposed for each alternative, as described in Chapter 2.

The following general assumptions apply to all resource categories. Specific resource assumptions are provided in the methods of analysis section for that resource.

- Sufficient funding and personnel would be available for implementing the final decision.
- Implementing actions from any of the RMP Amendment alternatives would be in compliance with all federal regulations, bureau policies, and other requirements and would respect valid existing rights unless otherwise stated.
- Implementation-level actions necessary to execute land use plan-level decisions in this RMP Amendment would be subject to further environmental review, including that under NEPA, Section 7 of the ESA, Section 106 of the NHPA, and others as appropriate.
- The discussion of impacts is based on best available data. Knowledge of the planning area and decision area and professional judgment, based on observation and analysis of conditions and responses in similar areas, are used for environmental impacts where data are limited.
- Restrictions (such as siting, design, and mitigation measures) would apply, where appropriate, to surface-disturbing activities associated with land use authorizations and permits issued on BLM-administered lands and federal mineral estate. There are approximately 638,000 acres of BLM-administered lands and approximately one million acres of federal mineral estate in the decision area.
- Data from GIS has been used in developing acreage calculations and to generate the figures. Calculations depend on the quality and availability of

data. Acreage figures and other numbers are approximate projections for comparison and analytic purposes only. Readers should not infer that they reflect exact measurements or precise calculations. Where quantitative data was unavailable, the BLM relied on its resource specialists' judgment to provide qualitative analyses. Impacts were sometimes described using ranges of potential impacts or qualitatively, when appropriate.

### 4.1.3. General Methodology for Analyzing Impacts

Potential impacts are described in terms of type, context, duration and intensity, which are generally defined below.

- Types of Impact - Impacts are characterized using the indicators described at the beginning of each resource impact section. The presentation of impacts for key planning issues is intended to provide the BLM decision maker and reader with an understanding of the multiple use trade-offs associated with each alternative.
- Context - This describes the area or location (site-specific, local, planning area-wide, or regional) in which the impact would occur. Site-specific impacts would occur at the location of the action; local impacts would occur within the general vicinity of the action area; planning area-wide impacts would affect a greater portion of decision area lands in Colorado and Utah; and regional impacts would extend beyond the planning area boundary.
- Duration - This describes the duration of an effect, either short term or long term. Unless otherwise noted, short term is defined as anticipated to begin and end within the first five years after the action is implemented; long term is defined as lasting beyond five years to the end of or beyond the life of this RMP Amendment.
- Intensity - This analysis discusses impacts using quantitative data wherever possible, but to add context, or when quantitative information is lacking, the analysis will use qualitative inferences or comparisons among alternatives.
- Direct and Indirect Impacts - Direct impacts are caused by an action or implementation of an alternative and occur at the same time and place; indirect impacts result from implementing an action or alternative, but typically occur later in time or are removed in distance and are reasonably certain to occur.
- Cumulative Impacts - Cumulative impacts result from the incremental direct and indirect impacts of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal or non-federal) or person undertakes such other actions. Cumulative impacts

can result from individually minor but collectively significant actions taking place over a period of time. Cumulative impacts are effects on the environment that result from the impact of implementing any one of the alternatives (Chapter 2) in combination with other actions outside the scope of this plan, either within the planning area or adjacent to it. Cumulative impact analysis is required by Council on Environmental Quality (CEQ) regulations because environmental conditions result from many different factors that act together. The total effect of any single action cannot be determined by considering it in isolation, but must be determined by considering the likely result of that action in conjunction with many other factors. Evaluation of potential impacts considers incremental impacts that could occur from the proposed project, as well as impacts from past, present, and reasonably foreseeable future actions. Management actions could be influenced by activities and conditions on adjacent public and nonpublic lands beyond the planning area boundary; therefore, assessment data and information could span multiple scales, land ownerships, and jurisdictions. These assessments involve determinations that often are complex and, to some degree, subjective.

For ease of reading, the impacts of the management actions for a particular alternative on a specific resource are generally described in comparison to the status quo or baseline for that resource. In order to properly and meaningfully evaluate the impacts under each alternative, the impacts expected under that alternative should be measured against the impacts projected to occur under Alternative A. Because it represents what would be anticipated to occur should no RMP Amendment be implemented, Alternative A serves as a reasonable baseline for comparison of the alternatives.

Irreversible commitments of resources result from actions in which resources are considered permanently changed; irretrievable commitments of resources result from actions in which resources are considered permanently lost.

### 4.1.4. Cumulative Analysis Methodology

The cumulative impacts discussions that follow consider the alternatives in the context of the broader human environment. Because of the programmatic nature of the RMP Amendment and cumulative assessment, the analysis tends to be broad and generalized to address potential impacts that could occur from a reasonably foreseeable management scenario combined with other reasonably foreseeable activities or projects. Consequently, this assessment is primarily qualitative for most resources because of lack of detailed information that would result from project-level decisions and other activities or projects. Quantitative information is used

whenever available and as appropriate to portray the magnitude of an impact. The analysis assesses the magnitude of cumulative impacts by comparing the environment in its baseline condition with the expected impacts of the alternatives and other actions in the same geographic area. The magnitude of an impact is determined through a comparison of anticipated conditions against the naturally occurring baseline as depicted in the affected environment (see Chapter 3, Affected Environment) or the long-term sustainability of a resource or social system.

The following factors were considered in this cumulative impact assessment:

- Federal, nonfederal, and private actions
- Potential for synergistic impacts or synergistic interaction among or between impacts
- Potential for impacts across political and administrative boundaries
- Other spatial and temporal characteristics of each affected resource
- Comparative scale of cumulative impacts across alternatives.

The geographic scope for the cumulative impact analysis varies by resource and is described within each resource section. Each resource specific cumulative effects analysis is conducted over an analysis area (geographic scope) that allows for analysis of past, present, and reasonably foreseeable future actions relevant to that resource and its interactions with other resources. These analysis areas may be larger or smaller than the planning area, and sometimes smaller than the decision area. This targeted analysis approach meets the NEPA goal of efficiency and avoids the dilution which could occur if a single cumulative effects analysis area where employed.

### Past, Present, and Reasonably Foreseeable Future Actions

Past, present, and reasonably foreseeable future actions are considered in the analysis to identify whether and to what extent the environment has been degraded or enhanced, whether ongoing activities are causing impacts, and trends for activities in and impacts on the area. Projects and activities are evaluated on the basis of proximity, connection to the same environmental systems, potential for subsequent impacts or activity, similar impacts, the likelihood a project will occur, and whether the project is reasonably foreseeable.

Impacts of past actions and activities are manifested in the current condition of the resources, as described in the affected environment (see Chapter 3, Affected Environment). Reasonably foreseeable future actions are actions that have been committed to or known proposals that would take place within a 10-year planning period.

Reasonably foreseeable future action scenarios are projections made to predict future impacts – they are not actual planning decisions or resource commitments. Projections, which have been developed for analytical purposes only, are based on

current conditions and trends and represent a best professional estimate. Unforeseen changes in factors such as economics, demand, and federal, state, and local laws and policies could result in different outcomes than those projected in this analysis.

Other potential future actions have been considered and eliminated from further analysis because there is a small likelihood these actions would be pursued and implemented within the life of the plan or because so little is known about the potential action that formulating an analysis of impacts is premature. These potential future actions may have greater capacity to affect resource uses within the planning area; however, until more information is developed, no reasonable estimation of impacts could be developed.

Data on the precise locations and overall extent of resources within the planning area are considerable, although the information varies according to resource type and locale. Furthermore, understanding of the impacts on and the interplay among these resources is evolving. As knowledge improves, management measures (adaptive or otherwise) would be considered to reduce potential cumulative impacts in accordance with law, regulations, and the existing RMPs for the areas included in the analysis.

### Relevant Cumulative Actions

This cumulative effects analysis considers the incremental impact of the GUSG Proposed RMP Amendment and alternatives in combination with other past, present, and reasonably foreseeable future federal and nonfederal actions on all lands in the decision area. Where these actions occur within with GUSG habitat, they would cumulatively add to the impacts of BLM authorized activities set forth in the GUSG Proposed RMP Amendment. Relevant cumulative actions occurring in the decision area may occur on federal, state, private, or mixed land ownership.

Table 4.97 identifies reasonably foreseeable future actions within the range of GUSG that, when added to the Proposed RMP Amendment and alternatives, could cumulatively affect GUSG. These actions (including CXs, DNAs, EAs, and EISs) were retrieved from BLM field office online NEPA logs and identified as actions within the decision area with the potential to affect the GUSG or its habitat.

**Table 4.97 - Reasonably Foreseeable Actions**

| TYPE OF ACTION | ADMINISTRATIVE UNIT | POPULATION |
|---|---|---|
| Grazing Permit Renewal | Grand Junction FO<br>Monticello FO<br>Uncompahgre FO<br>Gunnison FO | Piñon Mesa<br>Monticello-Dove Creek Crawford and Cerro Summit-Cimarron-Sims Mesa<br>Gunnison Basin |

| TYPE OF ACTION | ADMINISTRATIVE UNIT | POPULATION |
|---|---|---|
| Trailing Permits | Uncompahgre FO<br>San Luis Valley FO<br>Moab FO | Crawford Poncha Pass Piñon Mesa |
| Fuels Treatment | Grand Junction FO | Piñon Mesa |
| Habitat Treatment | Grand Junction FO/Moab FO<br>Uncompahgre FO<br>Tres Rios FO | Piñon Mesa Crawford San Miguel |
| Oil/Gas Development | Tres Rios FO | San Miguel<br>Monticello-Dove Creek |
| Powerline ROW Construction/ Reconstruction | Uncompahgre FO<br>Gunnison FO<br>San Luis Valley FO | Cimarron-Cerro Summit-Sims Mesa and San Miguel Gunnison Basin Poncha Pass |
| Travel and Trails | San Luis Valley FO | Poncha Pass |
| Lands/ROWs | Gunnison FO | Gunnison Basin |
| Recreation | Gunnison FO<br>San Luis Valley | Gunnison Basin Poncha Pass |
| Abandoned Minelands | Gunnison FO<br>Tres Rios | Gunnison Basin<br>San Miguel |
| Weed Control | Moab | Piñon Mesa |
| Fire Management Plan | NPS - Black Canyon National Park/ Curecanti National Recreation Area | |

### 4.1.5. Incomplete or Unavailable Information

The CEQ established implementing regulations for NEPA, requiring that a federal agency identify relevant information that may be incomplete or unavailable for evaluating reasonably foreseeable significant adverse impacts in an EIS (40 CFR, Part 1502.22). If the information is essential to a reasoned choice among alternatives, it must be included or addressed in an EIS, unless the cost of obtaining such information is exorbitant. Knowledge and information is, and would always be, incomplete, particularly with infinitely complex ecosystems considered at various scales.

The best available information pertinent to the decisions to be made was used in developing the RMP Amendment. The BLM made a considerable effort to acquire and convert resource data into digital format for use in the RMP Amendment, both from the BLM and from outside sources.

Under FLPMA, the inventory of public land resources is ongoing and continuously updated. However, certain information was unavailable for use in developing the

RMP Amendment because inventories were not available or complete. Some of the major types of data that are incomplete or unavailable are the following:

- Comprehensive planning area-wide inventory of wildlife and special status species occurrence and condition
- Site-specific surveys of cultural and paleontological resources.

For these resources, estimates were made concerning the number, type, and significance of these resources based on previous surveys and existing knowledge. In addition, some impacts cannot be quantified, given the proposed management actions. Where this gap occurs, impacts are projected in qualitative terms or, in some instances, are described as unknown. Subsequent site-specific project-level analysis for particular implementation decisions will provide site-specific data and analyses to ensure the implementation decision is consistent with this RMP Amendment. In addition, the BLM and other agencies in the planning area continue to update and refine information used to implement this plan.

# 4.2. SPECIAL STATUS SPECIES

## GUNNISON SAGE-GROUSE & HABITAT

### 4.2.1. METHODOLOGY

#### ATTRIBUTES AND INDICATORS

- Acres of sagebrush habitat
- Direct and indirect disturbance to GUSG

### 4.2.2. IMPACTS COMMON TO ALL ALTERNATIVES

Of the 135 GUSG leks identified within the decision area, 82 are categorized as active, 17 as inactive, 5 as of unknown status, and 31 as historic. Although for purposes of this Draft RMP Amendment, Unoccupied Habitat is defined as including all FWS critical habitat that is not Occupied Habitat, LANDFIRE vegetation identifies only 35% of Unoccupied Habitat as containing characteristics of GUSG habitat, with the balance consisting of 16% agricultural land and 49% other habitat types. Assessment and analysis of all Unoccupied Habitat would be required in order to determine its potential for restoration to suitable GUSG habitat.

In its final rule published in the Federal Register on November 20, 2014, the FWS identifies 24 threats to the GUSG (listed in Table 4.98). Of these, 17 threats are identified as occurring on public lands managed by the BLM or for which the BLM has regulatory influence. For 7 of the threats (invasive plants, pinyon-juniper encroachment, lek viewing, disease, recreation, pesticides and herbicides, and contaminants), there is no data indicating that their occurrence on BLM-administered lands is widespread. Where they do occur, the impacts are likely to be localized.

Five FWS-identified threats are known to occur on BLM-administered lands: power lines, domestic grazing and wild ungulate herbivory, predation, renewable energy development, and non-renewable energy development. The extent of each of these threats can vary substantially across the decision area.

Roads, fences, and fire are identified as threats with the potential to be widespread on public lands managed by the BLM. No data is currently available on traffic volumes for BLM roads across the decision area. Existing scientific data suggests that impacts from roads are likely to be localized and related to traffic volume.

While fences are a documented source of mortality for Greater Sage-grouse (Stevens et al 2012), current data suggests that fence collisions are a much less significant threat to GUSG. Current data does not indicate a significant impact to GUSG habitat from fire. The few fires occurring on BLM land in the decision area have burned approximately 1.7% of Occupied and Unoccupied Habitat.

Climate change and drought are identified in the FWS ruling as substantial threats to GUSG. Although neither is managed as a separate resource program area, the BLM is given regulatory authority to manage resources and activities with potential influence on and from both climate change and drought. In particular, 43 CFR 4100 authorizes the BLM to manage grazing allotments during times of drought, as well as to address changing climate conditions.

**Table 4.98 - FWS Listing Factors and Threat Potential on BLM Lands in the Decision Area**

| Listing Factor | Threat | Present on BLM Lands or BLM has Regulatory Authority | Threat Classification on BLM Lands |
|---|---|---|---|
| Present or threatened destruction, modification, or curtailment of its habitat or range | Residential Development | N/A | – |
| | Roads | present | potential |
| | Power lines | present | yes |
| | Domestic Grazing and Wild Ungulate Herbivory | present | yes |
| | Fences | present | potential |
| | Invasive Plants | present | DSNWT |
| | Fire | present | potential |
| | Climate Change | present | RMIP |
| | Renewable Energy Development | present | localized |
| | Nonrenewable Energy Development | present | localized |
| | Pinyon-juniper encroachment | present | DSNWT |
| | Conversion to agriculture | N/A | – |
| | Water development—mainly reservoirs | N/A | – |
| Overutilization for commercial, recreational, scientific, or educational purposes | Hunting | N/A | – |
| | Lek Viewing | present | DSNWT |
| | Scientific research | N/A | – |
| Disease and Predation | Disease | present | DSNWT |
| | Predation | N/A | Yes |
| Inadequacy of existing regulatory mechanisms | Local laws and regulations | N/A | – |
| | State laws and regulations | N/A | – |
| | Federal laws and regulations | present | RMIP |

| Listing Factor | Threat | Present on BLM Lands or BLM has Regulatory Authority | Threat Classification on BLM Lands |
|---|---|---|---|
| | Conservation easements | N/A | – |
| Other natural or manmade factors affecting its continued existence | Genetics and small population size | N/A | – |
| | Drought | present | RMIP |
| | Recreation | present | DSNWT |
| | Pesticides and herbicides | present | DSNWT |
| | Contaminants | present | DSNWT |

**DSNWT = Data Suggest No Widespread Threat; RMIP = Regulatory Mechanisms In Place**

### Roads

Sage-grouse exhibit a clear avoidance of paved high volume traffic roads (Carpenter et al 2010; Aldridge et al 2012) and avoid unpaved roads with high traffic levels (Holloran 2005; Tack 2009; Walker 2007). Road use might be a better predictor of sage-grouse occurrence than road density (Tack 2009). Walker et al (2007) found that roads not associated with oil and gas development received little or no support for their sage-grouse models and hypothesized that it might have been due to limited amounts of traffic.

### Recreation

Impacts from recreation vary depending on the activity. Impacts from OHVs are analyzed in the travel management section.

### Lands & Realty

Transmission lines fragment the habitat and can attract avian predators. Sage-grouse have been documented to avoid anthropogenic features and select habitat to avoid avian predators (Dinkins et al 2012). Lesser and greater prairie-chickens have been documented to avoid transmission lines by over 3,330 feet for nesting (Pruett et al 2009). While not in the same genus as sage-grouse, lesser and greater prairie-chickens share similar life histories with respect to lekking behavior and predator-prey interactions, and select similar habitat types.

Dinkins et al (2014) found that Greater Sage-Grouse hen survival was negatively associated with power line density. Pruett et al (2009) studied the impacts of power lines and roads on lesser and greater prairie-chickens. Prairie-chickens were found to cross roads more frequently than power lines. While no set avoidance distance was identified for prairie-chickens, 85% of nests were more than 6,600 feet from transmission lines. The closest nest was 663 feet from a power line. Pitman et al (2005) seldom found lesser prairie-chickens within 1,320 feet of transmission lines. The mean nesting distance from transmission lines in Pitman's study was 4,353 feet.

Greater Sage-Grouse have been documented to avoid areas with high levels of avian predator activity (Dinkins et al 2012). Breeding season survival of Greater Sage-Grouse has been shown to be negatively associated with power line density (Dinkins et al 2014).

Common ravens are a common nest predator of Greater Sage-Grouse. Coates and Delehanty (2010) found an increase in common raven density of one raven per 3.86 square miles increased the odds of nest predation by 26%. In a study by Manzer and Hannon (2005) on sharp-tailed grouse in Canada, they found that the odds of a hen having a successful nest was eight times greater in landscapes with less than three corvids per 0.386 square miles when compared with areas with greater than three corvids per 0.386 square miles. Increasing the density of ravens increases the risk of nest predation.

Common ravens have been documented to seek out anthropogenic features for nesting (Coates et al 2014; Howe et al 2014; Bui 2009). Howe found that the odds of raven nesting decreased with every 3,330-foot increase in distance from a transmission line. Increased edge was also found to increase the odds for raven nesting. Breeding ravens hunt live prey an average of 2,333 feet from their nests. Home range sizes vary from 297 acres to 2,323 acres. AS common ravens seek out power lines for nesting and hunting then the risk of predation to sage-grouse nests and broods will be higher the closer they are to power lines.

### Range Management

The Taylor Grazing Act of 1934 (named after Representative Edward Taylor of Colorado) led to the creation of grazing districts in which grazing use was apportioned and regulated (BLM 2015). Grazing management was initially designed to increase productivity and reduce soil erosion by controlling grazing through both fencing and water projects and by conducting forage surveys to balance forage demands with the land's productivity ("carrying capacity"). But by the 1960s and 1970s, appreciation for public lands and expectations for their management rose to a new level, as made clear by congressional passage of such laws as the National Environmental Policy Act of 1969, the Endangered Species Act of 1973, and the Federal Land Policy and Management Act of 1976. Consequently, the BLM moved from managing grazing in general to better management or protection of specific rangeland resources, such as riparian areas, threatened and endangered species, sensitive plant species, and cultural or historical objects (BLM 2015f).

Over time, there has been a gradual decrease in the amount of grazing that takes place on BLM-managed land, and that trend continues today. Grazing use on public lands has declined from 18.2 million AUMs in 1954 to 8.5 million AUMs in 2013 (BLM 2015f). While not pristine, range conditions on public lands managed by the BLM have shown steady improvement since the 1950s, mostly as a result of

improved range management practices. Improper grazing may be detrimental to habitat condition where it occurs. As areas of improper livestock grazing are identified through LHA, site visits or compliance checks and it is determined that land health standards are not being met, the BLM is required by regulation to make appropriate changes in grazing management by the next grazing season.

Sage-grouse nest success is correlated with grass height and percentage of cover (Holloran et al 2005), primarily due to loss of nests through predation. Livestock grazing can be a tool to achieve a desired result. Grazing can be used to meet ecological requirements for species such as GUSG that require variability in habitat types (Budd and Thorpe 2009). With respect to nesting habitat quality, indirect impacts include a temporary reduction of herbaceous understory, which could affect food availability and hiding cover. Without sufficient hiding cover, nest success may be compromised. Sage-grouse exhibit high nest site fidelity, with hens often returning to nest in the same general area each year. With reductions in herbaceous cover that fall below RCP habitat guidelines for nesting habitat, nest sites lose concealment and could be more susceptible to predation.

Wild ungulates, particularly elk, have the potential to impact sage-grouse habitat to the point where habitat conditions do not meet RCP guidelines. In areas where elk concentrate in the winter, or areas where large numbers of elk migrate, elk grazing could remove residual cover that sage-grouse use when selecting nest locations. This may limit the ability of the site to meet RCP guidelines for sage-grouse nesting cover.

Properly managed grazing should not reduce the capability of critical habitat to satisfy requirements essential to GUSG. There could be localized, temporary reductions of herbaceous cover that result in isolated areas (such as water and salt locations) falling below the minimum coverage recommended in the RCP. However, sage-grouse have been documented to select for sheep bedding locations and salt locations for establishment of new lek sites (Beck & Mitchell 2000). It is a common misconception that all areas within sage-grouse home ranges must be managed for nesting habitat. Habitat management must be responsive to all stages of GUSG life history.

Sage-grouse require a variety of habitat conditions throughout their home ranges to meet critical life functions. Habitat needs for late brood-rearing habitat would not meet habitat guidelines for nesting GUSG. In late brood-rearing habitat, sage-grouse selected for grazed meadows rather than long-term ungrazed exclosures (Cagney et al 2010). Sage-grouse use of grazed meadows was significantly greater than use of ungrazed meadows in late July and throughout August (Evans 1986). When considering the impacts of grazing on habitat, a management approach that focuses

on the availability of all habitat components is more critical than one that focuses on a single life cycle.

Residual tall grass cover and sagebrush cover are components selected by nesting sage-grouse that have been shown to influence nest success. Incorporating RCP habitat guidelines for herbaceous heights as permit terms and conditions would minimize the extent and occurrence of herbaceous cover being grazed below RCP guidelines to isolated livestock concentration areas. With the implementation of habitat guidelines at the landscape scale, grazed Occupied Habitat would be more likely to meet seasonal habitat guidelines described in the RCP over the long term. Monitoring would serve to ensure compliance with permit terms and conditions.

Grazing can also impact habitat quality via compacted soil, erosion, and the increased probability of the presence and spread of exotic plant species. Each of these impacts would be expected to continue, while not exceeding the current conditions. Positive influences of controlled grazing by domestic animals on rangelands include: loosening of the soil surface during dry periods, incorporation of mulch into the soil profile, recycling of nutrients, trampling of seeds into the ground, maintenance of an optimal leaf area index of plant tissue, and reduction in excessive accumulations of standing dead vegetation and mulch that could chemically and physical inhibit new growth (Holechek 1981).

While some available data identifies nest trampling by livestock, no study has documented the percentage of sage-grouse nests that might be lost due to livestock trampling. In a study of the trampling of nesting grassland passerines in low, moderate, and high stocking rates, Johnson et al (2012) found a daily probability of nest trampling of 0.001 for savannah sparrows and 0.003 for horned larks at moderate livestock grazing rates.. The nesting density of passerines in native grassland is significantly higher than for GUSG. Based on data from Johnson et al (2012) nesting densities for Savannah Sparrows and Horned Larks combined was 0.04348 nests per acre. The Gunnison Basin CCA estimates nesting densities of GUSG as 0.00602 grouse per acre for the Gunnison Basin. Based on trampling probabilities for nesting passerines and density estimates for GUSG, four to twelve of every one-thousand GUSG nests could be trampled over a 28-day incubation period. This most likely overestimates the probability of nest trampling due to the differences in the nesting substrate. As GUSG nesting typically occurs under sagebrush rather than in open grasslands, nests are less likely to be trampled.

Fences have the potential to impact GUSG directly through collisions and indirectly by serving as perches for predators. The collision probability for sage-grouse is influenced by terrain and fence density on the broad scale and by fence construction and distance to leks at the site scale (Stevens et al 2012). This data should be

interpreted with caution as Greater Sage-Grouse habitat is generally flatter and current research on fence collisions suggests that terrain is a factor.

## Minerals

### *Fluid Minerals*

Surface-disturbing and disruptive activities could have negative impacts on GUSG and GUSG habitat. Multiple studies have identified the avoidance of oil and gas fields by sage-grouse (Aldridge and Boyce 2007, Carpenter et al 2010, Doherty et al 2006, Dzialak et al 2012, Holloran et al 2010, Holloran and Kaiser 2007) and other studies have identified declines in sage-grouse lek attendance as a result of energy development (Gregory and Beck 2014, Harju et al 2010, Hess and Beck 2012, Holloran 2005, Walker et al 2007).

Wells and other infrastructure located within sagebrush communities result in direct habitat loss. Sage-grouse avoidance of these facilities produces even greater indirect habitat loss. Development exceeding one oil and gas well pad for every 699 acres appeared to negatively influence male lek attendance. Similarly, development within 1.86 to 3.0 miles of a Greater Sage-Grouse lek led to declines in peak male attendance, as well as lek inactivity within three to five years (Holloran 2005). Fluid mineral development is most likely to occur in the Dry Creek Basin of the San Miguel population and in the eastern portion of the Monticello-Dove Creek population area.

Adult female sage-grouse will continue to nest in the same nest areas regardless of the level of development in those areas (Holloran 2005). However, nesting yearling greater sage-grouse were documented to avoid oil and gas development by 0.59 miles (Holloran et al 2010), meaning that one well pad could result in the functional loss of 699 acres of nesting habitat. In addition to the loss of nesting habitat, sage-grouse experience decreased survival, increased predation, and lower fecundity. These factors all lead to observed lek abandonment in natural gas fields (Holloran et al 2007). Walker et al found that leks within coalbed natural gas field development declined 35% per year, as opposed to leks outside of development, which declined at a rate of 3% per year. The time lag between development around a lek and lek disappearance was approximately four years. Walker's overall conclusion was that "…development appeared to have substantial negative effects on sage-grouse breeding populations."

Holloran (2005) noted that as development increased within 3.1 miles of a lek, declines in lek attendance approached 100%. Hess and Beck (2012) observed that the odds of lek abandonment increased by 34% with each additional well pad in a 3,330-foot radius. In the Big Horn Basin of Wyoming, greater sage-grouse lek persistence dropped below 50% when oil and gas well densities in a 3,330-foot radius were greater than two wells per 0.386 $mi^2$ (Hess and Beck 2012). Holloran

(2005) determined that drilling had no impact on leks at a distance of 3.9 miles and producing wells had no influence on lek attendance at a distance of 2.9 miles. Gregory and Beck (2014) found that, to avoid measurable impacts, no more than one well pad should occur within 1.2 miles of a lek, and that, to avoid delayed impacts, fewer than six well pads should be located within 6.2 miles.

Because GUSG are a sagebrush-obligate species, development occurring in winter habitat could be detrimental to populations. Doherty et al (2006) found that the sage-grouse in their study selected winter habitat based on sagebrush cover and coalbed natural gas development. Sage-grouse use increased in areas with a higher percentage of sagebrush cover, unless coalbed natural gas development was present. Sage-grouse were 1.3 times more likely to use suitable habitat if coalbed natural gas development was not present. In Alberta, Canada, sage-grouse were documented to avoid all anthropogenic edges and had no selection within 3,960 feet of a well and limited use between 3,960 feet and 6,270 feet (Carpenter et al 2010). Because suitable nesting habitat is typically associated with suitable winter habitat, the loss of winter habitat would be expected to be similar to the potential loss of nesting habitat.

#### *Solid Leasable and Salable Minerals*

Although no studies were found that analyze the effects of geothermal, uranium, potash, or salable mineral development (gravel pits) on sage-grouse, impacts from development of these minerals would be expected to be similar to impacts from oil and gas development and largely based on disturbance footprint, activities on the landscape, and human activity levels. With the exception of geothermal and salable mineral development, the only moderate and high potential for leasable mineral development is in the Tres Rios FO.

All existing RMPs in the planning area contain a NSO stipulation for oil and gas development within 0.6 mile of a lek.

### Wildlife and Sensitive Species

GUSG would benefit from management of public lands by the BLM under all alternatives. All plans in the no action have management actions designed to protect sage-grouse from development and disruptive activities. The BLM's management of anthropogenic features would continue under all alternatives.

Predation by common ravens could be one of the greatest limiting factors for GUSG. Multiple studies have documented common ravens as the most common nest predator of sage-grouse nests (Lockyer et al 2013, Bui et al 2010, Bui 2009, Coates and Delehanty 2010, Coates et al 2008) and sage-grouse broods are highly susceptible to predation(Bui et al 2010). Ravens use anthropogenic features for nesting and can use increased fragmentation to move into areas not previously

occupied (Coates et al 2014, Howe et al 2014, Bui 2009, Bui et al 2010). Raven densities are highest near population centers, but ravens can move into fragmented landscapes and establish territories (Bui et al 2010). Even in areas where raven densities are not high, territorial ravens may have a substantial impact on nest and brood success (Bui et al 2010), predating multiple nests per nest pair (Howe et al 2015).

Although sage-grouse habitat in the 1950s was in worse condition than today, based on existing information it is possible that sage-grouse populations were some of the highest estimated. Sage-grouse populations increased in the 1940s and 1950s and started to decline in the 1960s and 1970s, in part, due to the loss of sagebrush (Connelly and Braun 1997). In the range of GUSG, sagebrush was reduced by 20% between 1958 and 1993 (Oyler-McCance et al 2001), with the majority of loss in the Monticello-Dove Creek population area (Table 3.24 and Figure 3.10).

Sage-grouse populations may have experienced artificially high numbers in the 1950s due to extensive predator control throughout the west, as well as the impact of DDT on raptor populations. This could help explain high grouse population numbers at a time when habitat conditions were relatively poor. There is evidence that GUSG populations not experiencing impacts from anthropogenic activities could be declining as a result of a developing equilibrium between predator and prey populations.

Common raven numbers in the United States have quadrupled over the last four decades (Sauer et al 2011). Batterson and Morse (1948) found a 3% sage-grouse nest success rate in an area with common ravens and a 35% nest success rate in an area where common ravens were removed (reference to Batterson and Morse in Schroeder and Baydack 2001). This idea is supported by work conducted by Manzer and Hannon (2005) on work with Sharp-tailed Grouse in Canada, in which they found that the odds of nest success increased by eight times in landscapes with less than three corvids per square kilometer. Coates and Delehanty (2010) determined that an increase in density of one raven per ten square kilometers increased the odds of nest predation by 7.4%. Howe et al (2014) suggests that common ravens can impact small sage-grouse populations in fragmented habitats, leading to hyper-predation even under the best habitat conditions.

None of the alternatives address the direct control of common ravens as a management action. Objective B in BLM Manual 6830, Animal Damage Control (ADC) seeks to ensure that ADC is carried out in a systematic manner which responds to resource protection, human health, and livestock protection needs while protecting public safety, domestic animals, and non-target wildlife.

Schroeder and Baydack (2001) identified predator management as a consistent theme in European management plans for grouse. Schroeder and Baydack (2001)

cite four studies in which predator controls have been shown to increase nest success, juvenile survival, and population size. Management actions that address predation could reduce fragmentation, limit anthropogenic features on the landscape and improve habitat conditions. While not a long-term solution to GUSG recovery, predator control could provide the relief necessary to establish robust populations capable of absorbing the loss of individuals to predation.

#### Wildland Fire, Fuels Management, and Fire Rehabilitation

Sagebrush recovery from wildland fire varies by sagebrush species. In mountain big sagebrush ecosystems, recovery is estimated to take 35–100 years, while Wyoming big sagebrush recovery is estimated to take 50–120 years (Baker 2006). Fire in sagebrush habitat has the potential for increasing perennial grasses, along with an initial increase in forbs (Beck et al 2009). Undesirable shrubs could increase under wild and prescribed fires, while forbs might have no long-term benefits (Beck et al 2009).

## 4.2.3. Impacts by Alternative

### Alternative A - No Action

#### General

Five RMPs restrict surface-disturbing activities within 0.6 mile or more of a lek. The Grand Junction RMP places a No Surface Occupancy (NSO) restriction within 4.0 miles of a lek. The Gunnison Gorge NCA places surface disturbance restrictions in GUSG habitat, Moab has a 0.6-mile NSO, and the Tres Rios RMP uses a 0.6-mile buffer around leks to prohibit surface occupancy and disturbance and identifies all winter concentration areas as NSO. The Gunnison FO currently uses the CCA.

Canyons of the Ancients NM RMP does not have restrictions for GUSG leks, other than for oil and gas development. While there are only limited restrictions within Canyons of the Ancients NM, there is no Occupied Habitat and the majority of Unoccupied Habitat does not contain primary constituent elements as identified by the FWS.

### Table 4.99 - Acres of BLM Surface by BLM Unit

| BLM UNIT | ACRES WITHIN 0.6 MILE OF A LEK | PROHIBITS SURFACE OCCUPANCY FOR ALL ACTIVITIES IN NON-HABITAT |
|---|---|---|
| Grand Junction FO | 851 | – |
| Gunnison Gorge NCA | 4,276 | – |
| Moab FO | 0 | 0.6 mile |
| Monticello FO | 362 | – |
| San Luis Valley FO | 687 | – |
| Canyons of the Ancients NM | 0 | – |
| Gunnison FO | 44,343 | 0.6 mile |
| Tres Rios FO | 1,714 | 0.6 mile |
| Uncompahgre FO | 0 | 0.6 mile |
| San Juan FO | 21 | – |
| Dominguez-Escalante NCA | 0 | – |
| McInnis Canyons NCA | 0 | – |
| **Data based on CPW 0.6-mile lek buffer available from COGCC website and UDWR lek data.** | | |

Despite the absence of management direction pertaining to GUSG and GUSG habitat in some RMPs, the present extent of development is extremely low across the range of GUSG. Energy and mining density has impacted 0.07% of Occupied Habitat in the Gunnison Basin, 0.01% of Occupied Habitat in the Cerro Summit-Cimarron-Sims Mesa, 0.03% of Occupied Habitat in Monticello-Dove Creek, and 0.15% of Occupied Habitat in the San Miguel Basin. No energy or mining development has occurred in Occupied Habitat for any of the other populations. (See surface disturbance levels in Table 3.11.) Similarly, the threat of large-scale sagebrush conversion has also appeared to slow, if not stop altogether. Across the GUSG range, sagebrush was reduced by 20% between 1958 and 1993 (Oyler-McCance et al 2001), with most of the loss occurring in the Monticello-Dove Creek population area. (See Table 3.26 and Figure 3.10.)

**Table 4.100 - Sagebrush Decline from 1958 to 1993**

| STRATUM | SAGEBRUSH AVAILABLE IN 1958 (ACRES) | SAGEBRUSH AVAILABLE IN 1993 (ACRES) | SAGEBRUSH LOST (ACRES / PERCENT CHANGE) |
|---|---|---|---|
| Gunnison Basin | 947,951 | 843,179 | 104,414 / ¯11% |
| All Others | 994,481 | 714,714 | 279,752 / ¯28% |
| Overall | 1,942,435 | 1,557,891 | 384,512 / ¯20% |

**Table adapted from Oyler-McCance 2001**

Oyler-McCance et al (2001) did not attempt to map sagebrush or surface disturbance, but developed a stratified random sample to estimate habitat loss in the range of GUSG. In order to quantify surface disturbances in the decision area surface disturbances were mapped for the RMP Amendment. Surface disturbance mapping identified a 16% loss of habitat through loss of sagebrush availability or habitat degradation (as shown in Table 4.100). This corresponds with the loss estimated by Oyler-McCance. Based on the Oyler-McCance data from 1993 and data from the GUSG disturbance mapping, little or no habitat has been lost since 1993.

Management actions that limit surface disturbances around leks vary across the decision area. Some plans require a 0.6-mile no surface-disturbing activity buffer around lek locations, while others extend out from two to four miles. A 0.6-mile buffer encompasses 723.5 acres, whereas a two-mile buffer covers 8,038 acres. Across the decision area, 42,127 acres totaling approximately 7% of BLM-administered public lands are covered by a prohibition on surface-disturbing activities. Timing limitations for disruptive activities during the lek/nesting seasons could be applied on 317,676 acres across the decision area in Occupied and Unoccupied Habitat. This represents 50% of public lands managed by the BLM in the decision area. Winter timing restrictions under No Action Alternative A cover 26,502 acres of BLM-administered public land totaling 4% of the decision area.

### Roads

Under all of the action alternatives, motorized vehicles are limited to designated or existing routes. During the lek season, the Gunnison Basin has closures to motorized vehicles for certain areas on BLM and county roads. The Gunnison Gorge NCA and the San Luis Valley have area closures during the lekking season. The Gunnison Gorge NCA has a winter closure for big game that also acts as a winter closure to protect GUSG. The Grand Junction RMP and Moab RMP provide direction to close redundant or duplicative routes.

Avoidance of roads by GUSG is likely to relate to the level of use. Areas with higher levels of use likely have more of an impact on sage-grouse avoidance than roads that see lower levels. No Action Alternative A leaves 53,565 acres open to unrestricted cross country travel, or 9% of Occupied and Unoccupied Habitat on public lands managed by the BLM. 17% of areas open to cross-country travel are in Occupied Habitat. Unrestricted cross-country motorized travel has the potential to cause direct loss of nests if the activity was to occur during the nesting season. Under No Action Alternative A, direct disturbance to GUSG could occur on 9% of public lands managed by the BLM. Indirect disturbances could occur on these lands where high volume roads decrease habitat effectiveness through avoidance.

Impacts from cross country travel are likely to differ from road closures. In areas where cross country travel is open direct take of a nest could occur if a nest were to be run over by an off-road vehicle. This is highly unlikely since sage-grouse nest under taller sagebrush and these areas are not typically preferred areas for off road vehicle use.

In the decision area, 85% of public lands are designated as limited to existing routes. Any road through a lek is likely to result in direct disturbance to GUSG during the lek season. Direct disturbance would be proportional to the level of traffic.

### Recreation

Under No Action Alternative A, recreation would occur in the same manner as currently being authorized or managed. Special Recreation Permits would continue to be issued. BLM authority to place conditions of approval on a special recreation permit is not limited to decisions made in land use plans. Special Recreation Permits issued in Occupied Habitat or Unoccupied Habitat would be required to conform to the Endangered Species Act and comply with Section 7 of the Act.

### Lands & Realty

Under No Action Alternative A, five RMPs contain management actions that encourage the placement of new ROWs in existing corridors. Only the Grand Junction RMP designates the area within 0.6 mile of a lek as a ROW exclusion area. However, other plans have general management actions that prohibit surface disturbance and occupancy within 0.6 mile of an active lek. The Grand Junction RMP places all lands within 4.0 miles of a lek as an avoidance area for ROWs. Management direction in the Monticello and Moab RMPs require avoidance of power lines within 4.0 miles of a lek.

In the Gunnison Basin, lands in Occupied Habitat are included in the Candidate Conservation Agreement (CCA 2013). The CCA does not make land use plan allocation decisions or direct management actions, but provides a tool to screen

project activities in Tier 1 and Tier 2 Habitat (as defined in the CCA) on federal lands for coverage under streamlined consultation.

Under No Action Alternative A, 5,783 acres of public lands managed by the BLM are exclusion areas for ROWs, or roughly 1% of Occupied Habitat. In Unoccupied Habitat 44,921 acres or 19% of public lands managed by the BLM are exclusion areas for ROWs. Under this alternative, 73,182 acres are designated as utility corridors, approximately 11% of public lands managed by the BLM.

### Range Management

Grazing is managed by the BLM and the BLM has the authority to make changes to permits if range conditions are not meeting rangeland health standards. Terms and conditions do not need to be specifically identified in land use plans in order to be applied to grazing permits and leases. In the Gunnison Basin, range management in Occupied Habitat would continue to follow the CCA and resulting FWS biological opinions.

Under No Action Alternative A, impacts to GUSG would be the same as described in the impacts common to all alternatives. Grazing in the decision area would continue on 90% of BLM-administered public lands.

### Minerals

Under No Action Alternative A, levels of oil and gas development would remain relatively constant and surface-disturbing activities related to oil and gas development would only occur on existing leases and in Unoccupied Habitat, except in the Monticello portion of the Monticello-Dove Creek Population. There are four existing leases in the Monticello area, none of which is held by production. In the Monticello decision area, 9.4% of the area is federal fluid mineral estate. Within the Grand Junction RMP decision area, Piñon Mesa would remain closed to leasing under No Action Alternative A. In the Moab RMP decision area, most of Piñon Mesa is open for leasing, although development potential is very low.

Minerals have been withdrawn from leasing in the Dominguez-Escalante and McInnis Canyons RMP decision areas, and the Gunnison Gorge NCA. The Tres Rios FO RMP leases with an NSO restriction in Occupied Habitat. In Tres Rios FO, leasing would be open with stipulations if Unoccupied Habitat were to become occupied.

Leasing in the Monticello RMP decision area would remain open, with a 0.6-mile NSO around leks and a timing restriction for nesting habitat within 4 miles of a lek. The impacts from closing to leasing and leasing with NSO would be essentially the same, since under each action no development would occur on the lease. Waivers, exceptions, and modifications may be granted consistent with the requirements of 43 CFR 3101.1-4. However, this is extremely rare. In the last ten years, no

modifications or waivers have been authorized. Exceptions have been granted on approximately 7% of APDs, primarily for big game winter range restrictions. (See the minerals analysis in Chapter 3.) There is potential for development to occur from outside of Occupied and Unoccupied Habitat as technology advances and allows drilling from greater distances.

Under No Action Alternative A, 9% of the federal oil and gas mineral estate would continue to be closed to fluid mineral leasing. In the decision area, 44% of the federal oil and gas mineral estate could be leased with NSO restrictions. In the decision area, 4% of the federal mineral estate would remain closed to mineral material sales and 9% to non-energy mineral leasing. Under this alternative, almost half of Occupied and Unoccupied Habitat could not be developed for fluid minerals due to NSO restrictions.

### Fuels Management

Under No Action Alternative A, fuels management would continue to occur in Occupied and Unoccupied Habitat. All fuels treatments would be required to comply with Section 7 of the ESA. Prescribed fire would continue to be allowed in all Occupied and Unoccupied Habitat following consultation with the FWS. The impacts to GUSG habitat from prescribed fire would be the same as identified in the impacts common to all alternatives.

### Wildfire

BLM policy is to immediately suppress wildland fires in sage-grouse habitat. The Grand Junction, Moab, Monticello, and Dominguez-Escalante NCA RMPs have provisions to use wildland fire to enhance or protect resources.

### Emergency Stabilization & Rehabilitation

Under No Action Alternative A, emergency stabilization and rehabilitation would continue to be handled following the normal emergency stabilization and rehabilitation process. Under the emergency stabilization and rehabilitation program, priority is given to restoration of fires in habitat for listed species and critical habitat.

### Wildlife and Sensitive Species

Management actions for sensitive species focus on treating pinyon and juniper that encroach on rangelands. Almost all RMPs provide some direction to use vegetation management treatments to meet sagebrush or resource objectives. Under No Action Alternative A, vegetation treatments would continue to be prioritized by each field office.

### Forest and Woodland Products

Under all planning area RMPs, the collection of forest and woodland products is allowed. The BLM has the regulatory mechanisms to control the timing of collection if the collection requires a permit. Issuing firewood and Christmas tree permits could occur in forest and woodland habitats. Seed collection could occur in Occupied Habitat; however, collection for most species would occur outside of the nesting season once seed has set.

### Weeds

Under No Action Alternative A, weeds would continue to be treated on public lands managed by the BLM. Currently the BLM prioritizes the treatment of noxious weeds and invasive species. Treatments focus on roadways, other disturbances, and identified infestations. In areas where treatment could occur in nesting habitat, GUSG could be temporarily disturbed by the activity of spraying during the nesting season. Some weed treatments must occur during the spring. Under the ESA, consultation would be required for any treatments in GUSG habitat.

## ALTERNATIVE B

### General

General guidance for surface-disturbing and disruptive activities under this alternative would prohibit surface-disturbing activities within 4 miles of a lek. This area encompasses approximately 58% (372,117 acres) of BLM surface. Alternative B would place a timing limitation for disruptive activities during the lek/nesting season on 56% (361,482 acres) of BLM-administered lands, while winter timing restrictions would occur on 39% (252,012 acres) of BLM-administered lands.

Under Alternative B, there would be a 14% increase in BLM surface with nesting timing restrictions over Alternative A. Alternative B would increase winter timing restrictions by 851% over Alternative A. Prohibitions on surface-disturbing activities would increase by 690% over Alternative A.

In Occupied Habitat, there are 87 active/unknown, 17 inactive, and 31 historic leks within 4 miles of the edge of Occupied Habitat. The Non-Habitat Areas that extend four miles beyond Occupied and Unoccupied Habitat largely do not contain habitat characteristics for GUSG. Extending management actions beyond the mapped Occupied and Unoccupied Habitat would not benefit GUSG, except to provide protection from potential impacts resulting from projects on the edge of Occupied Habitat of large enough scale to impact GUSG behavior, or in areas where there is habitat to support GUSG and grouse use the areas.

While numerous studies have identified the impacts of development extending miles from a sage-grouse lek (Walker et al 2007, Carpenter et al 2010, Holloran 2005, Dzialak et al 2013, Gregory and Beck 2014, Harju et al 2010, Hess and Beck 2012, Holloran et al 2010, Holloran et al 2007, Johnson et al 2011), these developments occurred within sage-grouse habitat and in areas likely to have been used by individual grouse from an impacted lek; otherwise there would be no impacts to leks miles away. Only 22% of the Non-Habitat Areas are capable of supporting GUSG, and those areas are spread throughout the Gunnison Basin and satellite population areas.

**Table 4.101 - GUSG Habitat Characteristics in Non-Habitat**

| POPULATION | Acres of Habitat Capable of Supporting GUSG (% of Non-Habitat) | | |
|---|---|---|---|
| | YES | NO | AGRICULTURAL |
| Cerro-Summit-Cimarron-Sims Mesa | 22,508 (31%) | 41,190 (57%) | 8,257 (11%) |
| Crawford | 1,937 (25%) | 5,831 (75%) | – (0%) |
| Gunnison Basin | 12,526 (15%) | 68,236 (84%) | 145 (0%) |
| Monticello-Dove Creek | 13,935 (24%) | 36,822 (63%) | 7,976 (14%) |
| Piñon Mesa | 18,743 (32%) | 40,279 (68%) | 109 (0%) |
| Poncha Pass | 860 (6%) | 14,683 (94%) | – (0%) |
| San Miguel Basin | 23,034 (18%) | 101,482 (81%) | – (0%) |
| Total | 93,542 (22%) | 308,523 (74%) | 16,728 (4%) |

Public lands managed by the BLM remain largely undeveloped. Management through the use of a no surface disturbance within four miles of a lek in GUSG habitat would prohibit activity on 62% of the decision area. Alternative B would place more protections on GUSG habitat than Alternative C or sub-alternatives $D_1/D_2$. Under Alternative B, direct disturbance to GUSG and loss of sagebrush from development would not occur on 62% of the decision area.

### Roads

Under Alternative B, routes would be closed in Occupied Habitat. Route closures would be limited to BLM routes in the decision area. County roads and state highways would remain open. The primary use time for BLM routes is during hunting season from September through November. Upgrades to existing BLM routes would not be allowed in Occupied Habitat. A seasonal closure of motorized and mechanized routes would be implemented from March 15 through May 15 in Occupied Habitat.

As all motorized routes would be closed under this alternative, a timing restriction on motorized routes would provide no additional benefit to GUSG. While the closure of mechanized routes would reduce disturbance to GUSG nesting along the route, such a closure would not be likely to have a measurable effect on GUSG. New disruptive activities that could influence the use of an area by GUSG would not be permitted during the lek season.

As a result of the decrease in human activity, it can be expected that elk and mule deer would concentrate in the closure areas to a higher level than under current conditions. This may increase the stress on habitat conditions and result in further habitat degradation due to the loss of vegetation.

Outside of Occupied and Unoccupied Habitat, upgrades to any roads would not be allowed if the upgrade would create an impermeable barrier between populations or sub-populations. Outside of Occupied and Unoccupied Habitat, new route construction would only be allowed if the proposed upgrade would not create an impermeable barrier between populations or sub-populations.

Construction or upgrades of new routes in Non-Habitat Areas would most likely have no effect on GUSG or their habitat based on best available science and the lack of documented use by GUSG outside of Occupied and Unoccupied Habitat. The vast majority of the Non-Habitat Areas outside of Occupied and Unoccupied Habitat do not contain GUSG habitat characteristics.

In order for motor vehicles to impact leks, the noise would have to travel from the road to the lek and be of sufficient decibels to impact the lek location. Not factoring in the effects of vegetation and topography on noise attenuation, a project that produces 80 decibels at 50 feet would attenuate to 39 decibels within 1 mile (www.sengpielaudio.com). To determine the potential impact on GUSG leks, areas within 0.6 miles of a lek and within 1 mile of the edge of Occupied Habitat were identified and mapped (as shown in Figure 4.79).

Case No. 1:20-cv-02484-MSK Document 94-2 filed 05/06/21 USDC Colorado pg 130 of 425

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

**Figure 4.79 - Potential of Leks in the Decision Area to Be Impacted by Roads**

GUSG AMEND
Impact Evaluation
Population
Potentially Impacted
Not Impacted
Decision Area
Habitat Status
Occupied
Unoccupied
N
0 9.5 19 Miles
Sources: Esri, DeLorme, USGS, NPS, Sources: Esri, USGS, NOAA
White River National Forest
Gunnison National Forest
Grand Mesa National Forest
Uncompahgre National Forest
Rio Grande National Forest
San Juan National Forest
Clifton
Dolores River
San Juan River
50
285

4-28 BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS
AUGUST 2016



There are approximately 19,611 acres of a 0.6-mile lek buffer within 1 mile of the edge of Occupied or Unoccupied Habitat. These areas could potentially be impacted by noise from projects if noise were to reach the edge of the lek (see figure above). This does not take into account to noise impacts already occurring on those leks. Leks within 1 mile of a project that produces 80 dba at 50 feet (i.e., a busy highway) would already be impacted and since noise is not additive, these leks would only experience additional impact if the decibel level from the project was to exceed the existing decibel levels.

Alternative B protects 23,287 acres more than Alternative A of habitat capable of supporting sage-grouse on public lands managed by the BLM outside of Occupied and Unoccupied Habitat. Under Alternative B, project management outside the Occupied and Unoccupied Habitat would focus on projects that are disruptive to GUSG. Under Alternative B, activities disruptive to GUSG from projects outside Occupied and Unoccupied Habitat would not occur. While Alternative B provides more protection, under Alternative A it is extremely unlikely those impacts would occur based on current development and the lack of use of the area by GUSG.

Alternative B implements a 1,563% increase in acres closed to motorized traffic compared to Alternative A. County roads and highways that cross public lands managed by the BLM would remain open and access would to BLM lands would occur in those areas. Under Alternative B, there would be a 100% decrease in areas open to cross country travel. No GUSG or nests would be disturbed by cross country motorized travel.

### Recreation

Four developed recreation sites would be removed in Occupied Habitat and eleven developed recreation sites would be removed in Unoccupied Habitat. (See Table 3.58 - BLM Recreation Sites in the Decision Area.) The impact to GUSG of closing the recreation sites would largely depend on access to the sites. Under Alternative B, access to public lands managed by the BLM would be limited to county roads and highways, and would also vary on the type of recreation site. The benefit to GUSG would depend on the habitat at the recreation site, recreation use levels, and the type of use. In general, sites with more recreational activity would have a larger impact than sites will less activity.

No SRPs would be renewed in Occupied Habitat. SRPs make up a small fraction of recreation use on public lands managed by the BLM. Under this alternative all roads would be closed in Occupied Habitat and recreational use would be limited to foot traffic or horseback.

Outside of Occupied and Unoccupied Habitat but in Non-Habitat no SRPs with the potential to adversely affect GUSG or that act as an impermeable barrier between

populations or sub-populations would be allowed. GUSG movements would only be impacted in those areas where habitat is suitable for sage-grouse, mostly in sagebrush patches large enough to support migrating GUSG, and the project development is such that it acts as a barrier to migration. Based on existing SRPs in the decision area, there are no SRPs that would act as a barrier to migration. Disruptive impacts from recreational activities would be limited to areas where GUSG occur, there is no science to suggest recreational impacts reach beyond where the activity occurs. If areas outside of Occupied and Unoccupied Habitat were to be used by GUSG, then Alternative B would limit those recreation permits on 23,287 acres of public lands managed by the BLM or 18% of BLM lands in Non-Habitat. Alternative B protects 23,287 more acres outside of Occupied and Unoccupied Habitat than Alternative A.

Under Alternative B, disturbances to GUSG from permitted recreational activities would not occur in the decision area. Under this alternative, there would be more protection than in Alternative A.

### Lands & Realty

Under Alternative B, all Occupied and Unoccupied Habitat would be managed as a ROW exclusion area. Existing RMP designated corridors would be undesignated. Undesignating a corridor does not imply that existing infrastructure would be relocated, just that the area designation would be removed, and any future utilities would be less likely to be placed within Occupied Habitat. While ROWs would be allowed within 100 feet of a county road or highway, if the area is within the 4 mile no surface disturbance buffer, then the project would not be allowed.

ROWs in Non-Habitat Areas would be avoided if the project were to be disruptive to GUSG. If GUSG were found to be using the area, the impacts from ROWs would be the same as those described in impacts common to all alternatives. Based on best available science, GUSG are not using the areas outside of Occupied and Unoccupied Habitat.

Under Alternative B, activities that would be disruptive to GUSG would be avoided on 23,287 acres habitat capable of supporting sage-grouse on public lands managed by the BLM in Non-Habitat. Development would be avoided in habitat not capable of supporting GUSG on 100,300 acres if those impacts would be disruptive. It is highly unlikely that any ROW project would be disruptive to GUSG if the activity occurred in habitat that does not support GUSG, such as forests or woodlands. Only projects in habitat that does not support GUSG (i.e., woodlands and forests) that are immediately adjacent to habitat being used by GUSG has the potential to be disruptive to GUSG. In rare instances, noise from permitted ROW activities could be disruptive to GUSG on lek sites. (See roads analysis for Non-Habitat Areas.)

There is no research that has documented noise impacts to GUSG other than impacts on leks.

This is more that Alternative A that does not require restrictions outside of Occupied and Unoccupied Habitat. Under Alternative B, project management outside the Occupied and Unoccupied Habitat would focus on projects that are disruptive to GUSG. Under Alternative B, ROW activities disruptive to GUSG from projects outside Occupied and Unoccupied Habitat would not occur. Under Alternative A, it is extremely unlikely those impacts would occur based on current development.

Under Alternative B, ROW exclusion areas increase by 6,938% in Occupied Habitat and increase by 417% in Unoccupied Habitat. No new ROWs would be allowed and further fragmentation of GUSG habitat would not occur.

### Range Management

Under Alternative B, livestock grazing would not be permitted. Under this alternative, allotments not meeting range land health standards with livestock grazing determined to be a causal factor would likely improve over time. This action could result in improvement of between 37,000 and 258,000 acres (see analysis in CH 4 Livestock Grazing), representing between 6% and 40% of BLM-administered lands in the planning area. The amount of improvement and the time it would take to improve would be dependent upon the current state of the range in a particular area. In some instances, removing grazing might not improve if habitat has transitioned to a state where introducing some form of disturbance is required to reset the system. Other factors, such as increased grazing by wild ungulates, could delay or even offset recovery from the removal of livestock grazing.

Under Alternative B, all BLM-administered public lands would be closed to grazing, a 100% increase over Alternative A. No nests would be trampled as a result of livestock grazing. Modeling created to estimate nest trampling estimated nest trampling under moderate stocking densities at 1.16 nests out of 100.

### Minerals

Under Alternative B, Occupied Habitat and Unoccupied Habitat would be closed to fluid mineral leasing. Piñon Mesa is closed to leasing under the No Action Alternative. In the Tres Rios FO RMP, Occupied Habitat is open to leasing with NSO restrictions, while Unoccupied Habitat is open to leasing. However, as there are currently no GUSG in Unoccupied Habitat, impacts to GUSG from closing to leasing and leasing with a NSO restriction would be essentially the same. Tres Rios and Monticello are the only field offices with moderate to high fluid mineral development potential. Closing to leasing would have no measurable impacts, since

Occupied Habitat in the Tres Rios FO is designated as NSO, and under Alternative B, no exceptions, waivers, or modifications would be allowed.

Under Alternative B, Unoccupied Habitat would be closed to leasing and no oil and gas development would be permitted. Unoccupied Habitat with the highest mineral potential is primarily in the Monticello-Dove Creek population area. Habitat in this area is largely agricultural or pinyon-juniper woodlands, with little sagebrush. Precluding development would protect GUSG in sagebrush habitats. In Unoccupied Habitat under Alternative B, no development would occur.

Exploration for and potential development of potash would not continue since the area would be closed to leasing. Uranium lease tracts are present in the decision area would continue to have the potential for development. Current mining of uranium is underground and mining could occur under Occupied Habitat. New ancillary facilities would have to be placed outside of Occupied Habitat.

Under Alternative B, 1,051,846 acres would not be available for leasing, this is a 1,001% increase from Alternative A. However, protections are not proportional to development potential. Across the decision area there are 91,684 acres in Occupied Habitat of federal fluid mineral estate with moderate to high oil and gas potential, and 47,478 acres in Unoccupied Habitat with moderate to high oil and gas development potential. This represents 13% of the federal mineral estate in the decision area. Under Alternative A, 44% (461,614 acres) of the decision area have NSO stipulations. Factoring in NSO stipulations under Alternative A, then Alternative B increases protection by 89% over Alternative A, however under Alternative A, exceptions, waivers, and modifications to lease stipulations are allowed when supported by site-specific NEPA. The 89% increase does not factor in development potential. The vast majority of Occupied Habitat with high or moderate development potential already has NSO stipulations for the entire lease. In Unoccupied Habitat in the Tres Rios FO, a CSU is applied to all leases in Unoccupied Habitat that prohibits development within 0.6 mile of leks and requires timing restrictions for drilling and construction.

In Non-Habitat, a CSU stipulation would be applied to unleased lands for fluid minerals and non-energy leasable minerals to protect sagebrush and riparian areas. In Non-Habitat 71% is oil and gas mineral estate. Approximately 11% of the federal fluid mineral estate is currently leased for oil and gas development. There are only two populations where there are any existing leases in Non-Habitat. In the Monticello-Dove Creek Population 44% of the federal oil and gas estate is currently leased making up approximately 23% of the Non-Habitat. In the San Miguel Basin 22% of the federal oil and gas estate is currently leased making up approximately 15% of the Non-Habitat. Impacts to GUSG from oil and gas development would be the same as described in the section impacts common to all alternatives if

development were to occur in habitat capable of supporting sage-grouse and sage-grouse are using the area. Best available science does not indicate that GUSG are currently using areas outside of Occupied and Unoccupied Habitat. Noise from oil and gas activities could impact GUSG if the noise were to reach lek locations during the lek season. Management actions for salable and locatable mineral development would be limited in Non-Habitat. Management actions that address noise would be implemented for salable and locatable minerals. Noise impacts to GUSG would be the same as those already analyzed.

Management actions would be applied to geophysical exploration and all other mineral activity in Non-Habitat Areas if activities were identified to be disruptive to GUSG. This would apply to 23,287 acres of habitat capable of supporting GUSG on public lands managed by the BLM. Restrictions would only apply if activities were to disrupt GUSG, which would require that sage-grouse be using habitat in the area or if noise from the project were to impact leks during the lek season. Alternative B would protect 23,287 acres of habitat capable of supporting GUSG outside of Occupied and Unoccupied Habitat. Alternative A does not implement any project restrictions outside of Occupied and Unoccupied Habitat. However the BLM is required to comply with the Endangered Species Act and evaluate all projects for impacts to listed species.

The prohibition on siting of line compressors in Non-Habitat is not likely to provide any measurable benefit to GUSG since best available science does not document any use by sage-grouse. The only benefit would be if a proposed compressor is on the edge in continuous sage-grouse habitat. However, this situation is not likely to occur since only 18% of the Non-Habitat could contains GUSG habitat characteristics in the San Miguel Population and only 24% in the Monticello-Dove creek Population. Any compressors placed in the Non-Habitat would have vegetative screening that would substantially buffer any noise. Noise is subject to a restriction to limit noise levels to no more than 10 decibels above ambient at the edge of a lek under Alternative B.

For impacts from compressors to impact leks the noise would have to travel from the compressor to the lek and be of sufficient volume to impact the lek location. Not factoring in the effects of vegetation and topography on noise attenuation, a compressor station that produces 89 decibels at 50 feet would attenuate to 48 decibels within 1 mile (http://www.sengpielaudio.com/calculator-distance.htm).

There are approximately 19,611 acres of the 0.6 mile lek that is within 1 mile of the edge of Occupied or Unoccupied Habitat. These areas could potentially be impacted by noise if projects were to reach the edge of the lek. (See Figure 4.79.) This does not take into account to noise impacts already occurring on those leks.

Leks already impacted by noise would only experience additional impact of the decibel level from the project was to exceed the existing levels.

### Fuels Management

Under Alternative B, no fuels treatments or mechanical or prescribed fire would occur in GUSG habitat. Fuels would be treated adjacent to Occupied Habitat and Unoccupied Habitat. Pinyon-juniper encroachment would continue in Occupied and Unoccupied Habitat. Impacts to GUSG would vary depending on funding and treatment costs. Although Alternative B would close 100% of the decision area to fuels treatments, the actual impact would occur on no more than 2% of public lands managed by the BLM.

Within Non-Habitat areas, fuels treatments would be designed to meet RCP guidelines. Prescribed fire would be allowed if the proposed treatments are designed to restore habitat to meet RCP guidelines.

### Wildfire

Under Alternative B, impacts would be the same as other alternatives and as described in impacts common to all alternatives. Within Non-Habitat areas, wildland fires would be managed to help meet connectivity of GUSG habitat.

### Emergency Stabilization and Rehabilitation

Under Alternative B, impacts would be the same as those under other alternatives and as described in impacts common to all alternatives.

### Wildlife and Sensitive Species

Under Alternative B, there would potentially be fewer opportunities for ravens to expand their range through the use of anthropogenic features. Alternative B would increase areas closed to surface disturbances by 690% and increase ROW exclusion areas in Occupied Habitat by 6,938% over No Action Alternative A. Limiting the increase in anthropogenic features would benefit GUSG in areas where new anthropogenic features contribute to the expansion of sage-grouse predators, especially common ravens. BLM management actions would be limited to horse and foot traffic. Common ravens could take advantage of pinyon-juniper encroachment for nesting. Under this alternative, treatments for pinyon-juniper encroachment would not be allowed on 639,079 acres of BLM-administered lands. Impacts to GUSG would vary depending on funding and treatment costs. Although Alternative B would close 100% of the decision area to fuels treatments, the actual impact would occur on no more than 2% of BLM-administered lands.

### Forest and Woodland Products

Under Alternative B, no vegetative materials would be collected. Native seeds adapted for the area would not be collected and grown, and would therefore not be available for habitat restoration. Alternative B closes 639,079 acres of public lands managed by the BLM to the collection of vegetative materials, which is 639,079 acres more than Alternative A. Disruptions to GUSG from the collection of forest and woodland products would not occur under this alternative. It is not likely that there would be any measurable benefit to sage-grouse due to the limited amount of vegetative materials being collected.

### Weeds

Under Alternative B, impacts would be the same as other alternatives and as described in impacts common to all alternatives.

## ALTERNATIVE C

### General

Under Alternative C, surface-disturbing activity would be prohibited for 1 mile around GUSG leks. Under Alternative C, surface-disturbing activities would be prohibited on 100,034 acres of public lands managed by the BLM. This is a 112% increase over No Action Alternative A.

Under Alternative C, a timing limitation for disruptive activities during the lek/nesting season would be placed on 361,482 acres (56%) of BLM-administered public lands. Winter timing restrictions would occur on 252,012 acres (39%) of BLM lands.

Under Alternative C, there would be a 14% increase in BLM surface with timing restrictions during nesting periods over No Action Alternative A. Alternative B would increase winter timing restrictions by 851% over No Action Alternative A.

Alternative C would provide additional direction for avoidance areas around lek locations. Under Alternative C, oil and gas well development direction would require avoidance of well pads within 1.2 miles of a lek over approximately 180,725 acres (17% of the federal mineral estate). Under No Action Alternative A, no direction for limiting well pad development around leks is provided. However, because lands would be leased with a NSO stipulation under Alternative C, this management direction would apply only to existing leases, subject to valid existing rights. Existing leases within 1.2 miles of a lek cover about 4,415 acres (0.4% of the federal mineral estate).

Under Alternative C, linear features would be avoided within 1 mile of a lek over approximately 100,034 acres (16%) of BLM-administered land. This would be a

112% increase over No Action Alternative A, which prohibits surface disturbance on 47,127 acres around leks.

Under Alternative C, tall structures would be avoided within 1.4 miles of a lek. This covers 153,796 acres of public lands managed by the BLM or 24% of BLM surface. This is a 226% increase over No Action Alternative A, which prohibits surface disturbance on 47,127 acres around leks.

Impacts from noise would be managed under this alternative through direct restrictions on noise levels and indirectly through other management actions. Only the Tres Rios RMP (shown in No Action Alternative A) has management direction for noise to address impacts from noise on GUSG. Timing restrictions in GUSG nesting and winter habitat eliminate noise during the nesting and lekking season.

For long term noise associated with maintenance and operations, noise levels would be required to not have any negative impacts to GUSG. For construction activities and other permitted activities noise is mitigated with timing restrictions.

It should be noted that very little development has occurred on public lands managed by the BLM and little would be expected in the future. In the absence of development, impacts to GUSG under Alternative C would not be measurably different from those under No Action Alternative A.

### Roads

Under Alternative C, motorized vehicles would be limited to existing routes where travel management has not been completed and limited to designated routes where travel management planning has been completed. No upgrades would be allowed in Occupied Habitat, except where needed to address safety concerns. Mitigation of impacts in accordance with the mitigation plan would be required for any upgrades. Reclamation of routes would be prioritized. In the sub-population areas, seasonal closures would be implemented where a conflict has been identified and where the BLM has regulatory authority, as recommended by an interagency team of biologists.

Alternative C retains the same closures to motorized traffic as No Action Alternative A. Under Alternative C, there would be a 100% decrease in areas open to cross-country travel. No GUSG or nests would be disturbed by cross-country motorized travel. Under Alternative C, motorized travel on 639,079 acres would be limited to existing roads and trails, which represents an 18% increase over No Action Alternative A.

### Recreation

Under Alternative C, new developed recreational sites would be allowed if it minimizes impacts to GUSG from recreation and are mitigated in accordance with the mitigation plan. Special recreation permits would be required to contain criteria

that minimize impacts to GUSG. Minimization techniques could include, but are not limited to, timing restrictions, avoidance of certain areas, limits on the size or duration of an activity, and vehicle washing to prevent the spread of weeds.

### Lands & Realty

Under Alternative C, ROWs would be limited due to the designation of Occupied Habitat and Unoccupied Habitat as avoidance areas. Habitat would not be further fragmented by ROWs and any ROWs would be collocated with existing disturbances and mitigated under the mitigation plan.

Under Alternative C, ROW exclusion areas would not increase over No Action Alternative A. Alternative C would designate Occupied and Unoccupied Habitat as avoidance areas. Under Alternative C, 360,882 acres of public lands managed by the BLM in Occupied Habitat would be designated as avoidance areas, which represent a 2,272% increase over No Action Alternative A. In Unoccupied Habitat, 232,044 acres of public lands managed by the BLM would be designated as avoidance areas for ROWs, a 710% increase over No Action Alternative A. GUSG would benefit from the limitation of new anthropogenic features on the landscape.

### Range Management

Direct and indirect impacts to sage-grouse from range management activities are described in the impacts common to all alternatives. Under Alternative C, in the sub-populations and Unoccupied Habitat rangewide, the BLM would manage grazing to meet RCP guidelines. Specific grazing permit terms and conditions for managing grazing leases and permits are identified under this alternative. Management would be consistent rangewide for grazing administration. High priority would be given to evaluating range improvements and making modifications based on risks to GUSG. The increased attention to improved range management would be expected to result in improved habitat conditions for GUSG under Alternative C. Improving habitat conditions—specifically grass cover—in areas not meeting requirements for GUSG could increase nest and brood success in those areas.

### Minerals

Because of limited mineral development potential and existing protections, impacts under Alternative C would be primarily the same as those under No Action Alternative A, except that mitigation would be required for any activity in Occupied Habitat or Unoccupied Habitat.

Under Alternative C, 95,564 acres would not be available for leasing, which is the same as under No Action Alternative A. Within Occupied Habitat, Alternative C would place NSO restrictions on 650,854 acres of federal fluid mineral estate and increase NSO stipulations for oil and gas development by 41% over No Action

Alternative A. However, the protections are not proportional to development potential. Within Occupied Habitat across the decision area, there are 91,684 acres of federal fluid mineral estate with moderate to high oil and gas potential, totaling approximately 14% of federal mineral estate in Occupied Habitat. However, the only areas with high to moderate oil and gas development potential are within the Monticello FO and Tres Rios FO. All Occupied Habitat not already leased in the Tres Rios FO has a NSO restriction. In the Monticello FO, there is a 0.6-mile NSO for existing leks. The majority of mineral estate in the Monticello decision area is private. The vast majority of Occupied Habitat with high or moderate development potential already has NSO stipulations for the entire lease.

A one-mile NSO stipulation would be applied to all historic leks in Unoccupied Habitat and wherever a lek buffer overlaps from Occupied Habitat. No part of a one-mile lek buffer intersects Unoccupied Habitat within the San Miguel Basin population area, while approximately 2 acres overlap within the Monticello-Dove Creek population area. A one-mile NSO encompasses 1,286 more acres than a 0.6-mile buffer, an increase of 177% per lek over No Action Alternative A. Alternative C would require a CSU stipulation for sagebrush in Unoccupied Habitat.

In Unoccupied Habitat in the Tres Rios FO, a CSU prohibiting development within 0.6 mile of a lek and requiring timing restrictions for drilling and construction would be applied to all leases within Unoccupied Habitat.

### Fuels Management

Under Alternative C, fuels treatments would be designed to benefit GUSG, which is not currently required under No Action Alternative A.

### Wildfire

Wildfires would be managed to minimize damage to sagebrush.

### Wildlife and Sensitive Species

Impacts to Wildlife and Sensitive Species under Alternative C would be the same as those analyzed under impacts common to all alternatives. Under Alternative C, sagebrush treatments would be limited to treating those stands not meeting RCP guidelines. As BLM sagebrush management no longer focuses solely on increasing forage production for livestock, there would likely be no benefit to GUSG. It is highly unlikely that under No Action Alternative A, sagebrush treatments would occur in sagebrush stands meeting RCP guidelines.

### Forest and Woodland Products

Impacts under Alternative C would be the same as under the No Action Alternative and as described in impacts common to all alternatives.

## SUB-ALTERNATIVE $D_1$ - GUNNISON BASIN PREFERRED

### General

Impact from general management actions are the same for Sub-Alternative $D_1$ as described in Alternative C with the exception of the buffer for the prohibition on surface disturbing activities. Under Sub-Alternative $D_1$, a 0.6 mile surface disturbance prohibition covers 78,691 acres. This is no change from Alternative A. Under Alternative C, 148,717 acres are covered by a 1 mile surface disturbance prohibition around sage-grouse leks. This is an 88% increase over Alternative A and Sub-Alternative $D_1$.

### Travel and Transportation Management

Under Sub-Alternative $D_1$, upgrades to existing roads would only be allowed if the upgrade would not have an adverse effect on GUSG populations or habitat. This alternative provides more protection than under the No Action Alternative. Under the no action alternative, any upgrade would be allowed if it is covered by the CCA. Upgrades not covered by the CCA would still be allowed after completion of NEPA and Section 7 consultation under the ESA. The CCA requires mitigation for any road at a rate greater than a 1:1 ratio. This requirement would remain in place for any projects that fall under the CCA. Projects outside the CCA would require greater than a 1:1 ratio.

### Range Management

Actions under Sub-Alternative $D_1$ would be the same as those described for Alternative C.

### Minerals

Impacts under Sub-Alternative $D_1$ would be the same as those described in Alternative C.

### Wildland Fire, Fuels Management, and Fire Rehabilitation

Impacts under Sub-Alternative $D_1$ would be the same as those described in Alternative C.

### Special Status Species

Impacts under Sub-Alternative $D_1$ would be the same as those described in Alternative C.

### Wildlife

Impacts under Sub-Alternative $D_1$ would be the same as those described in Alternative C.

#### ACECs

Impacts under Sub-Alternative $D_1$ would be the same as those described in Alternative C.

### SUB-ALTERNATIVE $D_2$ - SATELLITE PREFERRED

Impacts under Sub-Alternative $D_2$ would be the same as under Alternative C, with the exception of special status species, roads, lands & realty, and fuels management.

#### Special Status Species

Under Sub-Alternative $D_2$, no surface disturbance would be permitted within 0.6 mile of a lek on BLM-administered lands supporting the satellite populations of GUSG. A 0.6-mile buffer would encompass approximately 7,292 acres within Occupied Habitat and 941 acres within Unoccupied Habitat.

#### Roads

Under Sub-Alternative $D_2$, road upgrades would be allowed if there would be no adverse effect to GUSG and if impacts were mitigated in accordance with the mitigation plan.

#### Lands & Realty

Under Sub-Alternative $D_2$, all lands within 0.6 mile of a lek would become a ROW exclusion area, a 100% increase over No Action Alternative A.

#### Fuels

Under Sub-Alternative $D_2$, prescribed fire would not be allowed on BLM lands supporting the GUSG satellite populations, with the exception of pile burning. The requirement for fuels treatments to meet GUSG habitat objectives would have no impact on the risk of wildland fire. Fuels treatments have focused on pinyon-juniper encroachment and other woodland habitats within the range of GUSG. Sagebrush has not been treated in order to reduce the risk of wildland fire.

## 4.2.4. Cumulative Effects

Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely to continue to affect GUSG are mineral exploration and development, residential and industrial development (including power lines and other ROWs), grazing, recreation, road construction, weed invasion and spread, prescribed and wildland fires, predation, land planning efforts, vegetation treatments, habitat improvement projects, insects and disease, and drought.

Many of the activities described above can change habitat conditions, which then cause or favor other habitat changes. For example, wildland fire removes habitat, and affected areas are more susceptible to weed invasion, soil erosion, and sedimentation of waterways, all of which degrade habitats. In general, resource use activities have cumulatively caused habitat removal, fragmentation, noise, increased human presence, and weed spread. Land planning efforts and vegetation, habitat, and weed treatments have offset some of these effects by improving habitat connectivity, productivity, diversity, and health.

Climate change could cause an increase or decrease in temperatures and precipitation, which would affect soil conditions, vegetative health, and water flows and temperature. Such changes would alter habitat conditions, potentially creating conditions that could favor certain species or communities, weeds, or pests.

Under all of the action alternatives, impacts to GUSG would be lessened through restrictions, stipulations, closures to mineral exploration and development, recreation, and motorized travel, conditions of approval, and by concentrating development in previously disturbed areas.

This cumulative effects analysis discloses the long-term effects on GUSG from implementing each RMP/EIS alternative in conjunction with other past, present, and reasonably foreseeable future actions. In accordance with Council of Environmental Quality guidance, cumulative effects need to be analyzed in terms of the specific resource and ecosystem being affected (Council of Environmental Quality 1997). As discussed in Chapter 1, the purpose for the proposed federal action is to identify and incorporate appropriate conservation measures to conserve, enhance, and restore GUSG habitat by reducing, eliminating, or minimizing threats to GUSG habitat. The RCP delineates six GUSG sub-populations. Therefore, the cumulative effects analysis study area for the GUSG is Occupied and Unoccupied Habitat in the planning area.

This analysis includes past, present and reasonably foreseeable future actions in the range of GUSG, and evaluates the impacts of the GUSG RMP Amendment, by alternative, when added to those actions.

## METHODS

The cumulative effects analysis uses the following methods:

- FWS final rule Threatened Status for the GUSG was reviewed to identify the primary threats facing GUSG in each population.
- Predation was included as a threat due to concerns identified in the final listing. The FWS states that "…effects [of predation] may be more

substantial and of greater concern for smaller, declining populations, such as the six satellite populations of Gunnison sage-grouse."

- The numbers in this cumulative analysis display the number of acres across the entire range and the percentage of those acres are located within the decision area.

## ASSUMPTIONS

The cumulative analysis uses the same assumptions and indicators as those established for the analysis of direct and indirect effects on GUSG as discussed in Chapter 4.  In addition, the following assumptions have been made:

- The timeframe for this analysis is 20 years.
- The cumulative effects analysis area extends beyond public lands managed by the BLM and the federal mineral estate and encompasses the range of GUSG.
- The magnitude of each threat would vary geographically and may have more or less impact on GUSG in some parts for the range, depending on such factors as climate, land use patterns, and topography.
- A management action or alternative would result in a net conservation gain to GUSG if there is an actual benefit or gain above baseline conditions. Baseline conditions are defined as the pre-existing conditions of a defined area and/or resources that can be quantified by an appropriate metric(s).  For purposes of a NEPA analysis, the baseline is considered the affected environment that exists at the time NEPA analysis is initiated, and is used to compare predictions of the effects of the proposed action or a reasonable range of alternatives.
- The cumulative effects analysis quantitatively analyzes impacts on GUSG and their habitat in the range.  Impacts on habitat are likely to correspond to impacts on populations, because reductions or alterations in habitat could affect reproductive success through reductions in available forage or nest sites.  Human activity could cause disturbance to the birds preventing them from mating or successfully rearing offspring.  Human activities also could increase opportunities for predation, disease, or other stressors.

### Regional Efforts to Manage Threats to GUSG

Regional Efforts include past, present, and reasonably foreseeable actions conducted by or in cooperation with agencies, organizations, landowners, or other groups in the range of GUSG.  The Range of GUSG encompasses portions of Colorado and Utah.

### Colorado Statewide Efforts

- Gunnison Sage-Grouse Candidate Conservation Agreement with Assurances - Gunnison Basin
- Candidate Conservation Agreement - Gunnison Sage-Grouse Conservation Plan: Dove Creek, Colorado
- Gunnison Sage-Grouse Rangewide Conservation Plan 2005
- Gunnison Sage-grouse Rangewide Steering Committee.
- San Miguel Basin Local Working Group
- Gunnison Basin Sage-grouse Strategic Committee
- Crawford Area Local Working Group
- Dove Creek Local Working Group
- Piñon Mesa Gunnison Sage-grouse Partnership
- Poncha Pass Gunnison Sage-grouse Working Group

### Utah Statewide Efforts

- Gunnison Sage-Grouse Rangewide Conservation Plan 2005
- Strategic Management Plan for Sage-Grouse 2002
- San Juan County Gunnison Sage-Grouse Working Group Conservation Plan
- Monticello-Dove Creek Local Working Group
- San Juan County Local Working Group

### Natural Resource Conservation Service Sage-Grouse Initiative

With 844,330 acres of GUSG habitat in private ownership in the decision area, a unique opportunity exists for the Natural Resources Conservation Service to benefit GUSG and to ensure the persistence of large and intact rangelands by implementing long-term contracts and conservation easements.

While participation in the Sage-Grouse Initiative (SGI) program is voluntary, willing participants enter into binding contracts to ensure that conservation practices that enhance GUSG habitat, such as fence marking, protecting riparian areas, and maintaining vegetation in nesting areas, are implemented. Participating landowners are bound by a contract (usually 3 to 5 years) to implement, in consultation with Natural Resources Conservation Service staff, conservation practices if they wish to receive the financial incentives offered by the SGI. These financial incentives generally take the form of payments to offset costs of implementing conservation practices and easements or rental payments for long-term conservation.

While potentially effective at conserving GUSG populations and habitat on private lands, incentive-based conservation programs that fund the SGI generally require reauthorization from Congress under subsequent farm bills, meaning future funding is not guaranteed.

## ANALYSIS

The cumulative impact analysis area used to analyze cumulative impacts includes the entire decision area. The cumulative effects analysis focuses on the most substantial threats to GUSG habitats rangewide; conversion of sagebrush (agricultural and urban development), mineral development, ROWs, and predation. The analysis presents an overview of populations susceptible to these threats throughout the range of GUSG.

Rangewide, 47% of Occupied Habitat is privately owned and 39% is public lands managed by the BLM. Unoccupied Habitat is 53% private surface and 35% public lands managed by the BLM. In the satellite populations, private surface will play a more substantial role in the conservation and recovery of GUSG, 71% of Occupied Habitat is private surface compared to 22% public lands managed by the BLM. In Unoccupied Habitat, private surface is 57% of the area and public lands managed by the BLM make up 31%.

Conversion of sagebrush to agricultural lands or for urban development may continue, however at a lower rate than has been seen historically. Agriculture makes up 90% of all disturbances in Occupied Habitat rangewide and 91% of all disturbances in Unoccupied Habitat.

The conversion of sagebrush from urban development will largely be managed by the counties. In 2013, eleven counties within the range of GUSG and the governors of Colorado and Utah entered into a Memorandum of Understanding for the management of GUSG and their habitat with the goal of increasing the current abundance, viability and vitality of GUSG and their habitats.

Agricultural conversion from sagebrush to cropland is likely to decline relative to previous rates of development. Rangewide, agricultural conversion accounts for approximately 90% of all surface disturbances. Subsidies from the USDA NRCS Sage-grouse Initiative provide incentives for maintaining and restoring sage-grouse habitat. Areas that were highly desirable for cultivation were most likely converted many decades ago. No sagebrush conversion or urban development would occur on public lands managed by the BLM in in the decision area for the duration of the life of the RMP Amendment.

In Occupied Habitat, 96% of all surface disturbances are on private surface.

While mineral development will continue, due to listing and designation of critical habitat, development will most likely occur at a much slower rate. Fluid mineral development will be limited to existing leases and fee/fee mineral estates in Occupied Habitat. Due to the lack of fluid mineral development activity in the last ten years, it is not likely that any measurable impacts from fluid mineral development

will occur in Occupied Habitat under any of the alternatives. Cumulative impacts from new mineral development should not have any measurable variation among the alternatives. Primarily due to existing management in Occupied Habitat that places NSO leasing restrictions in the Tres Rios FO, where the most potential for oil and gas development to occur. There is one existing proposal for a gas well outside of GUSG habitat with access through Occupied Habitat in Dry Creek Basin. The project proponent proposes to connect oil and gas roads in the southwest portion of Dry Creek Basin. This action would remove oil and gas traffic from the middle of Dry Creek Basin and route all traffic to the far edge in the pinyon-juniper/sagebrush interface. Rerouting traffic would substantially reduce impacts to sage-grouse from oil and gas production activities. Salable minerals operations are present throughout the range of GUSG and existing authorizations would be expected to continue.

ROWs will continue to be processed under all alternatives. Occupied Habitat is an avoidance area and could limit the number of ROW approvals. Upgrading of a Tri-State transmission line is being processed and one alternative is to co-locate the power line along the highway in Dry Creek Basin. This action would decrease impacts from the ROW and improve habitat for GUSG in the Basin. The Poncha Pass Electric Transmission Line could impact GUSG in the Poncha Pass and increase habitat fragmentation.

Predation is a natural process and will continue under all alternatives. It is likely that predation rates could decrease on public lands managed by the BLM, through the management of anthropogenic features under all of the action alternatives. Under the No Action Alternative, facility and infrastructure management would not focus on removing nesting and perching opportunities for avian predators. Objective B in the BLM Manual 6830 Animal Damage Control (ADC) is to "Ensure that ADC is carried out in a systematic manner which responds to resource protection, human health, and livestock protection needs while protecting public safety, domestic animals, and non-target wildlife." While no alternative addresses the direct control of predators, the BLM annually addresses predator control through a MOU with APHIS.

# 4.3. FISH & WILDLIFE

## BIG GAME

### 4.3.1. METHODOLOGY

#### ATTRIBUTES AND INDICATORS

- Elk population estimates
- Number of elk per square mile
- Mule deer population estimates
- Number of mule deer per square mile
- Surface disruptive activities on the landscape

#### ASSUMPTIONS

- Assume an even distribution of big game across the landscape in the planning area.

#### METHODS AND DATA

- BLM surface acreage within the decision area within big game critical winter range
- BLM surface acreage that is not restricted under an ROW exclusion, fluid and solid mineral NSO stipulations, or closed to such leases, or protected within Wilderness or Wilderness Study Areas.
- UDWR and CPW 2014 Elk and Deer Population Estimates.

### 4.3.2. IMPACTS COMMON TO ALL ALTERNATIVES

**Elk and Mule Deer**

Under all alternatives, big game would continue to react to surface disturbing and disruptive activities in a similar fashion. Direct response of mule deer to development is generally through avoidance of habitat and decreased use of an area. Indirect impacts to mule deer could occur on the population level. Studies have documented declines in mule deer numbers as a result of full field oil and gas development. Population declines associated with large-scale oil and gas development are largely thought to be a result of big game being displaced to

suboptimal habitats. No study has documented a complete abandonment of a developed area. Mule deer would still use lands within and around oil and gas development; however the amount of use would change. Mule deer have been documented to alter their behavior as a response to disturbance; generally this is a non-linear response in habitat use. Reducing traffic from seven or eight vehicles passing per day to three was sufficient for mule deer to perceive less risk and alter their behavior (Sawyer et al 2009).

Deer use areas around development less frequently than areas with no development. Therefore the further an area is from development, the more use it will receive by big game. Sawyer et al (2009) identified that mule deer were not only responding to the loss of habitat through development of well pads, but behavior was influenced by the amount of activity. Mule deer avoided areas with the highest traffic levels by the greatest distance. Mule deer were found closer to areas with the lowest traffic levels (Sawyer 2009). Van Dyke and Klein (1996) found similar results with looking at the response of elk to well drilling and production. Elk avoided human activity twice the distance compared to when there was no activity at the well site. In the winter, elk were selecting landscapes with moderate slopes and away from human activity (Sawyer et al 2007). The impacts of human activity in non-forested environments may be larger than in non-forested environments due the lack of security cover (Sawyer et al 2007).

Human activity levels may have substantial influence on elk distribution in the decision area. Removing or decreasing human activity levels in the decision area could result in an increase in the number of elk winter on public lands managed by the BLM in the decision area. Reducing human activity levels could increase big game use of critical winter range in the decision area based on the decrease in human activity.

There are three potential threats of deer and elk overlapping with GUSG. The first is that they consume herbaceous material that grouse would use as nesting cover, potentially reducing the hiding cover necessary for successful grouse nesting. The second is direct competition for sagebrush, a critical component of grouse diets in the winter. The third is disturbance to nests and nesting hens; since deer and elk have largely migrated away from grouse habitat in May and June, this threat is probably extremely rare. In order to evaluate the first potential threat, the time deer and elk spend in nesting area must be estimated, as well as the biomass of grasses, forbs, and shrubs consumed. These may vary annually, temporally, and by location. The second threat can be addressed by examining food habits of deer and elk and consumption rates within the larger area of deer or elk range overlap with Occupied Habitat.

Multiple studies have estimated elk and mule deer forage requirements. CPW estimates forage requirements for one elk as 0.667 AUMs or 533.6 pounds of forage per month. CPW estimates mule deer monthly forage requirements as 0.2 AUMs or 160 pounds of forage per month (CPW 2015 personal communication).

Based on ecological site descriptions for sagebrush in the decision area, sagebrush habitats can produce a wide range of forage per acre annually. Estimates (provided in Table 4.102 and Table 4.103) of the number of deer and elk that sagebrush can support are based on utilization levels, rangeland productivity, and forage consumption. Estimates were calculated based on a big game winter date range of December 1 through April 30, which corresponds to CPW winter timing restrictions for big game winter concentration areas.

### Table 4.102 - Supportable Deer Density Estimates

| UTILIZATION | RANGE PRODUCTIVITY 250 POUNDS/ACRE | RANGE PRODUCTIVITY 500 POUNDS/ACRE | RANGE PRODUCTIVITY 750 POUNDS/ACRE |
|---|---|---|---|
| 15% | 30.42 | 60.83 | 91.25 |
| 20% | 40.56 | 81.11 | 121.67 |
| 25% | 50.69 | 101.39 | 152.08 |
| 30% | 60.83 | 121.67 | 182.5 |
| 40% | 81.11 | 162.22 | 243.33 |
| 50% | 101.39 | 202.78 | 304.17 |

Above table based on mule deer forage requirement of 160 pounds per month and average weight of 200 pounds. Density is reported as deer per square mile.

### Table 4.103 - Supportable Elk Density Estimates

| UTILIZATION | RANGE PRODUCTIVITY 250 POUNDS/ACRE | RANGE PRODUCTIVITY 500 POUNDS/ACRE | RANGE PRODUCTIVITY 750 POUNDS/ACRE |
|---|---|---|---|
| 15% | 9.13 | 18.26 | 27.39 |
| 20% | 12.17 | 24.35 | 36.52 |
| 25% | 15.22 | 30.44 | 45.65 |
| 30% | 18.26 | 36.52 | 54.78 |
| 40% | 24.35 | 48.7 | 73.05 |
| 50% | 30.44 | 60.87 | 91.31 |

Above table based on elk monthly forage requirement of 533 lbs. and average weight of 450 lbs. Density is reported as elk per square mile.

Depending on forage production levels sagebrush communities in the decision area can support densities of winter concentrations of elk ranging from 9 to 27 elk per square mile December 1 through April 30 at 15% utilization.

Depending on forage production levels sagebrush in the decision area can support densities of winter concentrations of deer ranging from 30 to 91 deer per square mile December 1 through April 30 at 15% utilization.

Holechek (1988) recommends that utilization levels within sagebrush communities not exceed 30% in order to maintain rangeland productivity. Many herbivores share the range with GUSG. Utilization needs to account for all herbivores, domestic, state managed wild ungulates, and other wildlife. Rabbits can have a substantial impact on vegetation as shown by Ranglack (2015).

All big game management actions in all plans will remain in place for all alternatives. If a particular plan has a timing limitation for big game critical habitat that timing restriction would remain. The impacts to big game are primarily through the level of activity that will be authorized by BLM management actions. Big game will also benefit by sage-grouse timing restrictions that may extend beyond big game restrictions already in place in existing plans. The BLM will collaborate with state Wildlife Agencies to mitigate wild ungulate impact to GUSG Occupied Habitat.

## 4.3.3. Impacts by Alternative

General management actions impose various restrictions across the landscape. These restrictions vary by alternative and may range from area management direction to timing limitations.

## ALTERNATIVE A - NO ACTION

### Roads

Under No Action Alternative A, there would be no change in impacts to big game from roads. Within Occupied and Unoccupied Habitat, 53,565 acres (9%) of BLM-administered public lands would be open to unrestricted cross-country travel with the potential to result in direct disturbance to big game.

Motorized vehicles would continue to be limited to existing roads and trails on 85% of public lands managed by the BLM in the decision area.

### Recreation

Under No Action Alternative A, recreation sites could continue to be developed anywhere in Occupied Habitat or Unoccupied Habitat, provided that no

development occur within 0.6 mile of an active GUSG lek. Outfitter and guide permits would continue to be issued for big game and trophy game animals. Special recreation permits issued by the BLM would be required to enter into Section 7 ESA consultation if the activity would have any effect on GUSG or GUSG habitat.

### Lands & Realty

Under No Action Alternative A, anthropogenic features on the landscape would increase at the same rate as predicted in existing land use plans EISs, primarily resulting from a potential increase in ROWs. Under this alternative, no areas are designated as ROW exclusion areas with the exception of a few RMPs that identify areas within 0.6 mile of a lek as an exclusion area. Because they are not biologically tied to GUSG lek locations, this mitigation measure would have no beneficial effects to big game.

The Grand Junction RMP identifies any area within 4 miles of a lek as a ROW avoidance area. In this plan, the impact to big game would be similar to that under the preferred alternative. The Monticello RMP requires avoidance of the construction of new power lines, wind power turbines, or other aboveground structures within 4 miles of a lek. In all other land use plans, big game habitat could be further fragmented by ROWs, more so than under the preferred alternative. Under No Action Alternative A, 5,783 acres in Occupied Habitat and 44,921 acres in Unoccupied Habitat would be a ROW exclusion area on BLM -administered lands. ROWs would be avoided on 15,855 acres in Occupied Habitat and on 28,651 acres of Unoccupied Habitat. Big game would benefit overall all by the co-location of utilities and reduction in habitat fragmentation on the landscape.

### Range Management

Under No Action Alternative A, the BLM would continue to make changes to grazing permits if range conditions are not meeting rangeland health standards. Terms and conditions do not need to be specifically identified in a land use plan in order to be applied to grazing permits and leases. BLM 4180 regulations provide the regulatory authority to make changes to grazing permits and leases based on monitoring or rangeland health data. In the Gunnison Basin, range management in Occupied Habitat would continue to follow the CCA and resulting biological opinions from the FWS.

### Minerals

Fluid mineral development under No Action Alternative A would not vary from what has already been analyzed under the no action when factoring in development potential. Since 1985, no federal oil or gas wells have been drilled in Occupied Habitat or Unoccupied Habitat outside of the Tres Rios FO. Current management

direction in Occupied Habitat in the Tres Rios RMP is to lease with a NSO restriction.

Under No Action Alternative A, 9% of the federal oil and gas mineral estate would continue to be closed to fluid mineral leasing. In the decision area, 44% of the federal oil and gas mineral estate could be leased with NSO restrictions, 4% of the federal mineral estate is closed to mineral material sales, and 9% is closed to non-energy mineral leasing. Under this alternative, fluid mineral development could not occur within almost one-half of Occupied and Unoccupied Habitat due to NSO restrictions. Big game would respond to mineral development as described in the section on impacts common to all alternatives.

## ALTERNATIVE B

Under Alternative B, general guidance for surface-disturbing activities would prohibit surface-disturbing activities within 4 miles of a lek, which is approximately 372,117 acres (58%) of BLM surface in the decision area. Alternative B would place a timing limitation for disruptive activities during the lek/nesting season on 361,482 acres (56%) of BLM-administered lands. Winter timing restrictions for GUSG would occur on 252,012 acres (39%) of public lands managed by the BLM.

These restrictions would benefit big game in the decision area by limiting disruptive activities during critical life functions. GUSG nesting and brood-rearing timing restrictions could benefit elk and mule deer when calving/fawning. Winter timing restrictions for GUSG would benefit big game by removing stresses associated with anthropomorphic activity.

Under Alternative B, there would be a 14% increase in BLM surface with nesting timing restrictions over Alterative A. Winter timing restrictions would increase by 851% and prohibitions on surface-disturbing activities would increase by 690% over No Action Alternative A.

### Roads

The effects of roads on big game would be the same as those described for GUSG under Alternative B in Section 4.3.3. Under this alternative, 633,942 acres would be closed to motorized travel—a 1,563% increase over No Action Alternative A, which closes 6% of the decision area to motorized travel. Alternative B would result in an area free from vehicle disturbances to big game. Most of the decision area is winter habitat for elk and mule deer. Removing disturbances, especially during hard winters when animals are physically stressed, could increase overwinter survival and possibly lead to increased populations.

### Recreation

Under Alternative B, no outfitter and guide permits would be issued in Occupied Habitat or Unoccupied Habitat. Although hunting would continue to be allowed, the number of hunters could decrease due to a potential lack of access from the closing of BLM roads. Guiding services would no longer be available for hunting in remote areas where pack animals might be necessary. In the absence of activity, big game could concentrate in Occupied Habitat and Unoccupied Habitat at greater densities. Under Alternative B,633,942 acres in the decision area would be closed to motorized travel, limiting hunter access to BLM-administered lands and reducing disruptive activity in the area. The removal of developed recreation sites could result in increased use by big game. As elk and mule deer concentrate in these areas, more stress could be placed on GUSG habitat.

### Lands & Realty

Under Alternative B, Occupied Habitat and Unoccupied Habitat would be designated as exclusion areas for new ROWs. Under this alternative, ROW exclusion areas would increase by 6,938% in Occupied Habitat and by 417% in Unoccupied Habitat. No new ROWs would be allowed and further fragmentation of big game habitat would not occur. Benefits to big game in the form of increased population numbers is not expected to be proportional to the increase in protections from ROWs. In many areas, ROW exclusions might not result in any benefit if the potential for ROW development is low. Big game numbers could increase in areas where ROW development is high, including winter range and winter concentration areas.

### Range Management

Under Alternative B, all BLM-administered lands would be closed to domestic livestock grazing, in sharp contrast to No Action Alternative where no lands are closed to grazing. Forage formerly used by livestock would be available to wild ungulates. Big game would no longer compete with livestock for resources. If competition for resources had been a limiting factor on big game in an area, then herd numbers in that area would be expected to increase. In areas where big game concentrate and degrade habitat conditions, continued degradation would be expected, especially if animal concentrations increase due to the lack of human activity in an area.

### Minerals

Under Alternative B, no anthropogenic features would be approved, with the exception of valid and existing rights. Occupied Habitat and Unoccupied Habitat would be closed to fluid mineral leasing under this alternative. Tres Rios and Monticello are the only field offices with moderate to high mineral development

potential, primarily for oil and gas, as well as for sodium and potash. Closing Occupied Habitat to leasing under Alternative B would have no measurable impacts over No Action Alternative A since unleased Occupied Habitat in the Tres Rios FO would already have a NSO stipulation.

Under this alternative, Unoccupied Habitat would be closed to leasing and no oil and gas development would occur in Unoccupied Habitat. Unoccupied Habitat with the highest mineral potential is primarily located in the Monticello-Dove Creek population area. Alternative B would close 1,001% more federal mineral estate to leasing than No Action Alternative A, although this does not factor in development potential. In Monticello and Tres Rios FOs, big game could benefit if areas where development might have occurred was critical range or if development would have occurred on a landscape scale.

### Fences

Under Alternative B, no new fences would be constructed and fences within 0.6 mile of a lek would be removed. Big game could benefit from the removal of fences in areas where they had been barriers to migratory and other normal movements.

## ALTERNATIVE C

Under Alternative C, surface-disturbing activity is prohibited on 100,034 acres of public lands managed by the BLM, a 112% increase over No Action Alternative A. Winter timing restrictions cover 252,012 acres from December 1 through March 14 and breeding/nesting timing restrictions on 361,482 acres from March 15 through June 30. Big game using these habitats would benefit from timing restrictions for disruptive activities, as well as from winter timing restrictions for GUSG. Winter protections under Alternative C would increase by 52,928 acres over No Action Alternative A.

Under Alternative C, linear surface disturbances would be prohibited on 100,034 acres (16%) of BLM-administered lands, a 112% increase over No Action Alternative A. Impacts to big game by surface-disturbing activities are described under impacts common to all alternatives.

Under Alternative C, Occupied Habitat would be designated as a ROW avoidance area. New anthropogenic features would be co-located with existing disturbance.

Land use planning decisions would limit anthropogenic activities and benefit big game. Areas outside big game critical winter range will have GUSG winter timing restrictions. These areas comprise approximately 13% of public lands managed by the BLM in Occupied Habitat and could offer additional protection for big game in the winter on 52,928 acres.

### SUB-ALTERNATIVE $D_1$ - GUNNISON BASIN PREFERRED

Impacts to big game under Sub-Alternative $D_1$ would be the same as those analyzed in Alternative C.

### SUB-ALTERNATIVE $D_2$ - SATELLITE PREFERRED

Impacts to big game under Sub-Alternative $D_2$ would be the same as those analyzed in Alternative C.

## 4.3.4. CUMULATIVE IMPACTS

The cumulative impact analysis area used to analyze cumulative impacts includes the entire decision area. Wild ungulate populations are managed by state wildlife agencies and the BLM manages habitat for all species that occur on public lands managed by the BLM. Under all action alternatives, the BLM will work in coordination with state wildlife agencies to identify areas where wild ungulates may be limiting the habitat's potential to meet RCP guidelines. Under No Action Alternative A, no formal management action would guide the agencies development of an MOU with state wildlife agencies, however BLM Manual 6521 State Agencies, provides basic procedures for cooperative programs with state fish and wildlife agencies. The objective is to obtain maximum cooperation with state agencies whose activities affect fish and wildlife habitat management either directly or indirectly on public lands and waters administered by the BLM. Section12 Inventories, Studies, Surveys, and Plans states that "where both wildlife and livestock use the same areas, conflicts on vegetation allocations may occur. BLM is responsible for reconciling such conflicts."

# COMMON RAVEN

## 4.3.5. METHODOLOGY

### ATTRIBUTES AND INDICATORS

- Anthropogenic features on the landscape.

### ASSUMPTIONS

- Juvenile raven densities are highest within 3.0 kilometers of a population center.

- Increased anthropogenic features on the landscape increase nesting opportunities.

## METHODS AND DATA

- BLM surface acreage that is not restricted under Right of Way Exclusion, fluid and solid mineral NSO stipulations, or closed to such leases, or protected within Wilderness or Wilderness Study Areas.

### 4.3.6. Impacts Common to All Alternatives

Common raven populations have more than quadrupled in the United States in the last 40 years (Sauer et al 2014). Anthropogenic resources have contributed to increased raven abundance and juvenile survival (Webb et al 2009). Raven densities have been documented to be highest in cities and decrease sharply beyond 1.86 miles (Bui et al 2010). In the decision area 44,744 acres are within 1.86 miles of a population center. Webb et al (2009) found that 69% of dispersal locations for juveniles occurred at a communal point source subsidy, such as a landfill; and anthropogenic food and water sources correspond with juvenile raven movements.

Breeding or territorial ravens use man-made features for nesting (Coates et al 2014, Howe et al 2014, Bui 2009, Slater & Smith 2010, Prather and Messmer 2009) and may act as a conduit for raven movement. Howe et al (2014) noted that the odds of raven nesting decreased the further away one was from a transmission line and the increased edge (fragmentation) in vegetation types increased the odds of raven nesting. Ravens also tend to avoid dense pinyon-juniper habitat, and use more edge habitat (Howe et al 2014, Dunk et al 1997).

New anthropogenic features are the most influential predictor of common raven occurrence on public lands managed by the BLM. Anthropogenic features in the decision area would primarily occur in the form of Rights-of-Way authorizations, mineral development, or recreational sites.

Portions of highways can contribute to raven population growth when acting as a point source subsidy due to the availability of road kill animals. Landfills are a substantial point source subsidy for common ravens, however no landfills are anticipated on public lands managed by the BLM in any of the alternatives. No new highways are anticipated and therefore no new point source subsidies would be created for common ravens.

Fluid mineral development would be the same under all alternatives. Currently the Monticello/ Dove Creek Population has potential for oil and gas development.

Future development in Occupied Habitat would be limited to existing leases in all alternatives. Under all alternatives, areas within Occupied Habitat not leased are either closed to leasing or leased with a NSO stipulation.

## 4.3.7. Impacts by Alternative

### ALTERNATIVE A - NO ACTION

#### General

Management actions that limit surface disturbances vary across the decision area. Under Alternative A surface disturbances are prohibited on 47,127 acres or 7% of public lands managed by the BLM. Timing limitations for sage-grouse should not impact common ravens since ravens are highly tolerable to disturbances.

#### Roads

Under No Action Alternative A, 53,565 acres within the decision area would remain open to unrestricted cross country travel, while 85% of BLM lands would continue to be designated as limited to existing routes.

#### Recreation

Under this alternative, recreation sites could be developed anywhere in Occupied Habitat or Unoccupied Habitat, provided that no development occurs within 0.6 mile of an active GUSG lek. Developed recreation sites could attract common ravens due to waste generated at these sites acting as a food subsidy.

#### Lands and Realty

Under No Action Alternative A, 5,783 acres of public lands managed by the BLM in Occupied Habitat are exclusion areas for ROW, or roughly 1% of Occupied Habitat. In Unoccupied Habitat 44,921 acres or 19% of public lands managed by the BLM are exclusion areas for ROWs. Under Alternative A, 73,182 acres are designated as utility corridors and cover approximately 11% of public lands managed by the BLM. As discussed in impacts common to all alternatives, common ravens can use anthropogenic features to expand their range, particularly linear ROWs.

Under this alternative, anthropogenic features on the landscape would increase at the same rate as stated in current BLM RMPs, primarily through a potential for increases in ROWs. No areas are designated as ROW exclusion areas. The primary driver for raven occupation on BLM-administered lands would be through the approval of new overhead power lines.

#### Minerals

Under No Action Alternative A, 9% of the federal oil and gas mineral estate is closed to fluid mineral leasing. In the decision area, 44% of the federal oil and gas mineral estate could be leased with NSO restrictions, while 4% of the federal mineral estate is closed to mineral material sales, and 9% is closed to non-energy mineral leasing. Under this alternative, almost half of Occupied Habitat and Unoccupied Habitat could not be developed due to NSO restrictions. The expansion of common ravens could be limited or slowed in areas where development is not allowed or is heavily restricted. Bui et al (2010) found that common raven densities in oil and gas fields were higher than in sagebrush.

### ALTERNATIVE B

#### General

Under Alternative B, surface disturbance would be prohibited on 372,117 acres (58%) of BLM surface, a 690% increase over No Action Alternative A. The prohibition of surface-disturbing activities would help to ensure that anthropogenic activities permitted by the BLM would not contribute to the expansion of common ravens on BLM-administered lands.

#### Roads

Under Alternative B, roads within Occupied and Unoccupied Habitat would be closed. Road closures would be limited to BLM roads in the decision areas. Alternative B would increase areas closed to motorized traffic by 1,563%, decreasing the potential for road-killed animals to act as a subsidy for common ravens.

#### Recreation

Four developed recreation sites in Occupied Habitat and eleven developed recreation sites in Unoccupied Habitat would be removed under Alternative B. In contrast, no sites would be closed under No Action Alternative A. Sites that might serve as a subsidy for common ravens would be eliminated, causing ravens in the area to seek out other sources of prey or new territories.

#### Lands and Realty

Under Alternative B, Occupied and Unoccupied Habitat would be managed as a ROW exclusion area. ROWs would be allowed if within 100 feet of a county road or highway, and outside the four-mile no surface disturbance buffer. Under Alternative B, ROW exclusion areas would increase by 6,938% in Occupied Habitat and 417% in Unoccupied Habitat. The potential for ravens to use new ROWs to expand their range would be extremely limited.

#### Minerals

Under Alternative B, Occupied and Unoccupied Habitat would be closed to fluid mineral leasing. Under Alternative B, 1,051,846 acres would not be available for leasing, a 1,001% increase over No Action Alternative A. However, only 13% of the federal fluid mineral estate has moderate or high development potential. The potential for mineral development to contribute to the expansion of common ravens is only slightly larger than under No Action Alternative A. (See the Minerals analysis under Alternative B for GUSG and Habitat in Section 4.2.3.)

With the exception of valid and existing rights, no anthropogenic features would be approved under Alternative B. Occupied and Unoccupied Habitat would be designated as an exclusion area for new ROWs and would be closed to mineral leasing. The potential for common raven expansion through the use of anthropogenic features would be lower than under No Action Alternative A.

### ALTERNATIVE C

#### General

Under Alternative C, surface disturbance would be prohibited on 100,034 acres of BLM-administered lands, a 112% increase over No Action Alternative A. Alternative C would provide additional direction regarding avoidance areas for tall structures. Tall structures would be avoided on 153,796 acres (24%) of BLM-administered land in the decision area, a 226% increase over No Action Alternative A.

#### Roads

Under Alternative C, areas closed to motorized traffic would be the same as under No Action Alternative A. Motorized travel would be limited to existing roads and trails on 639,079 acres, an 18% increase over No Action Alternative A.

#### Recreation

Recreation impacts would be the same as those under No Action Alternative A.

#### Minerals

Under Alternative C, 95,564 acres would not be available for leasing, a continuation of current management under No Action Alternative A. Alternative C would place NSO restrictions on 650,854 acres of federal fluid mineral estate in Occupied Habitat and would increase NSO stipulations for oil and gas development in Occupied Habitat by 41% over No Action Alternative A. However, these protections would not be proportional to development potential. While across the decision area, 91,684 acres (14%) of federal fluid mineral estate in Occupied Habitat is identified as having moderate to high oil and gas potential, these areas are located

entirely within the Monticello and Tres Rios FOs. The potential for mineral development to contribute to the expansion of common ravens would be only slightly greater than under No Action Alternative A. (See the Minerals analysis under Alternative C for GUSG and Habitat in Section 4.2.3.)

Under Alternative C, Occupied Habitat would be designated as a ROW avoidance area. New anthropogenic features would be co-located with existing disturbance and the potential for raven expansion would be only along existing anthropogenic features.

#### SUB-ALTERNATIVES $D_1$/$D_2$ - GUNNISON BASIN AND SATELLITE PREFERRED

Impacts under sub-alternatives $D_1$ and $D_2$ would be the same as those identified for Alternative C.

### 4.3.8. Cumulative Effects

The cumulative impact analysis area used to analyze cumulative impacts includes the entire decision area. Cumulative effects to common raven would primarily be changes in available nesting and perching sites. Under No Action Alternative A, facility and infrastructure management would continue to provide nesting and perching opportunities for avian predators. All action alternatives focus on the management of infrastructure to remove and minimize perching and nesting opportunities for common ravens. Common raven populations will likely continue to increase in GUSG habitat regardless of alternative, primarily due to the incredible adaptability of this species to changing environments.

# 4.4.  SOIL RESOURCES

## 4.4.1.  METHODOLOGY

### ATTRIBUTES AND INDICATORS

Soil stability expressed in terms of:

- Areas of disturbance
- Areas of mechanical vegetation treatments
- Areas open to surface disturbing activities
- Active livestock grazing allotments.

### ASSUMPTIONS

The erosion potential associated with any one disturbance or series of disturbances would be influenced by several factors, including soil fragility, location in the watershed, the type, time, and degree of disturbance, existing vegetation, precipitation, and mitigating actions applied to the disturbance.

Implementation and effectiveness of management actions on soils are directly related to funding, political constraints, workloads, enforcement, compliance, staffing levels, litigation, conflicting priorities and regulations, climate change, and other factors.

Hotter and drier conditions associated with climate change would increase fire frequency (Gordon 2015).

Short-term effects on upland soils would occur over a timeframe of up to ten years and long-term effects could occur from anywhere over 10 years and possibly exceeding several decades.

Soil resources would be managed to meet the Land Health Upland Fundamental (Land Health Upland Fundamental (BLM 2008, 2011e).

### METHODS AND DATA

In sagebrush and other plant communities of semi-arid environments, vegetation cover, biological soil crust, and a network of filamentous fungi maintain soil stability and resistance to erosion.  Vegetation removal can lead to decreased soil stability and erosion resulting from exposure to raindrop impact, wind, and loss of plant crowns (Weltz 1998).  Research indicates that biological soil crust could play an

even larger role in soil stability than vegetation and fungi (Chaudhary 2009). When crust is disturbed or eliminated, underlying soils are exposed to wind and water erosion, causing the soil to lose much of its ability to fix nitrogen, store carbon, capture dust and airborne nutrients, and retain moisture (Bryce 2012, Miller et al 2011). Soil crust populations are damaged or reduced when surface disturbances (such as vehicular traffic, vegetation clearing, or trampling) disturb the soil surface (Belnap 2001).

The potential for soil disturbance is used as an indicator and analyzed between alternatives due to its relationship to soil stability. The analysis contrasts the levels of protection from surface-disturbing activities, which are defined as those activities which modify the soil surface, with the exception of very small scale soil surface modifications such as trampling. Surface-disturbing activities include the development and construction of roads and trails, recreational facilities, minerals, pipelines, and many types of ROWs, as well as the development and maintenance of some types of range improvements. In addition, many types of habitat or vegetation treatments disturb the soil surface. While revegetation of a disturbed site begins the reestablishment of soil stability over the short term, the redevelopment of soil crusts—potentially the greatest source of soil stability—may not occur for decades (Belnap 1993). In this analysis, surface disturbance is considered to reduce short and long term soil stability, and alternatives that prohibit or limit surface disturbing activities are expected to protect soil stability more than alternatives that do not limit these activities.

Vegetation treatments utilize a variety of techniques which range from no disturbance of the soil surface through scraping, breaking up or imprinting the topsoil. However, the levels of revegetation and litter following a vegetation treatment—particularly those that minimize soil surface disturbance—can exceed levels prior to treatment. As a result, the overall short and long-term impacts to groundcover, infiltration rates, runoff and soil erosion after the initial disturbance can be neutral or even beneficial (Brockway 2002, Stednick 2010). Based on this information, the analysis will consider vegetation treatments as neutral to soil stability over both the short and long term.

Since vegetation cover is one factor that influences soil stability, activities that reduce or remove it are also compared between alternatives. Both wildlife and livestock grazing influence the amount and arrangement of vegetation cover (Gifford 1978, Weltz 1998). Livestock trampling has also been shown to degrade Biological Soil Crusts, although some of the studies which report this incorporate data from historic high stocking rates which are no longer the practice on BLM lands. (Anderson 1982, Neff 2005, Warren 2001). Based on the availability of data and the evidence that livestock can impact these important components of soil stability, the acreage of actively grazed allotments is used as another indicator for potentially

decreased soil stability. However, it is important to recognize that this indicator overestimates impacted acres because many allotments contain areas that are not accessible or used by livestock, or are only used very lightly. Alternatives that reduce the amount of land being grazed by domestic livestock would reduce this source of vegetation removal and disruption to Biological Soil Crust along with the associated soil stability impacts.

Wildfires and prescribed fires remove vegetation and surface litter, thereby affecting soil stability (Stednick 2010). They can also reduce biological soil crusts to varying degrees. While recovery can begin within 2-5 years, complete recovery can take as long as 200 years (Callison 1985, Hilty 2004, Johansen 2001). Therefore, alternatives which result in more acreage burned are considered to reduce soil stability more than alternatives with fewer burned acres over the short term, and be neutral to soil stability over the long term as revegetation progresses.

### 4.4.2. Impacts Common to All Alternatives

Wildlife would graze and trample soils throughout the BLM surface in Occupied and Unoccupied Habitat and reduce vegetation cover, thereby reducing soil stability. Wildfires would continue to ignite and burn across this same area—decreasing soil stability within the burned patch for both the short and long term. As the climate warms and successional vegetation changes continue to build up fuels, more acreage is likely to burn and remain in an unvegetated state for a longer duration, reducing overall soil stability across the BLM surface in Occupied and Unoccupied Habitat over the long term.

### 4.4.3. Impacts by Alternative

## ALTERNATIVE A - NO ACTION

#### Soil Stability

Alternative A is expected to result in short and long term soil stability conditions similar to those described in Chapter 3. Large-scale surface disturbance would be expected to remain about 1% of BLM surface across the BLM surface in Occupied and Unoccupied Habitat as well as on BLM lands in the four-mile Non-Habitat Areas. These figures are based on past levels of development and current levels of surface disturbance restrictions. These surface disturbance restrictions would remain in place affecting about 60% of the BLM surface in Occupied and Unoccupied Habitat, and 39% of the Non-Habitat. These levels could increase as RMP revisions are completed. If this occurs, soil stability would be protected across more acreage.

Livestock grazing would be expected to continue at roughly the current level of activity across 93% of the BLM surface in Occupied and Unoccupied Habitat and 56% of the four-mile Non-Habitat Areas, over the short term, resulting in little change to soil stability. Over the long term, urbanization of private agricultural lands and associated changes to the livestock industry may reduce the amount of actively grazed lands in this area, which could contribute to increased soil stability on the ungrazed lands.

Wildfires documented over the past several decades have burned 1% of Occupied Habitat on BLM and 7% of Unoccupied Habitat on the BLM surface in Occupied and Unoccupied Habitat, while burning 9% of the Non-Habitat Areas. Only small additions are expected over the short term, but these would accelerate over the long term with anticipated rising temperatures. The additional wildfires and burns would reduce short term soil stability across a growing proportion of these areas. However, data from past burns suggests that only a small proportion of the areas would be impacted, even over the long term.

About 10% of the BLM surface in Occupied and Unoccupied Habitat and 2% of the Non-Habitat Areas has been affected by vegetation treatments. This amount will increase as new treatments are carried out, but with projected neutral impacts to soil stability.

## ALTERNATIVE B

### Soil Stability

Alternative B places large portions of the BLM surface in Occupied and Unoccupied Habitat and Non-Habitat Areas under surface disturbance restrictions, which would protect soil stability from development and construction disturbance. This represents an increase in protected area as compared to Alternative A. Furthermore, as vegetation reestablishes in past disturbances, and closed routes are actively reclaimed, soil stability is expected to increase over current levels in these protected areas. This would occur across the BLM surface in Occupied and Unoccupied Habitat, as well as in the Non-Habitat Areas.

Alternative B also eliminates livestock grazing from the BLM surface in Occupied and Unoccupied Habitat, although wildlife grazing would continue. This represents an increase in acreage protected from livestock grazing and associated vegetation removal and trampling impacts to soil stability as compared with Alternative A.

Vegetation treatments would not be allowed under Alternative B within the BLM surface in Occupied and Unoccupied Habitat, but could occur in Non-Habitat Areas. This would result in similar impacts to soil stability as Alternative A because of their neutral short and long term direct effects. However, over the long term, an indirect

outcome is anticipated in the form of increased acreage burned by wildfire on BLM surface in Occupied and Unoccupied Habitat in comparison to Alternative A. This increase is anticipated as fuels build up without any mitigating fuels treatments, climate change increases fire frequency, and travel management restrictions reduce access and efficacy of firefighting. An increase in acreage burned by wildfire would reduce short and long term soil stability in the burned areas as compared to Alternative A.

Based on past wildfire size and frequency, the acreage where soil stability is reduced by wildfire would probably be less than the acreage where soil stability is improved through the elimination of livestock grazing and authorized surface disturbances. The resulting outcome would be a net gain in soil stability across the BLM surface in Occupied and Unoccupied Habitat and Non-Habitat Areas as compared to Alternative A. This benefit to soil stability would extend through both the short and long terms.

## ALTERNATIVE C

### Soil Stability

Alternative C places a portion of the BLM surface in Occupied and Unoccupied Habitat under surface disturbance restrictions, which is more than Alternative A, but less than Alternative B. This alternative would result in similar types of impacts to soil stability as listed under Alternative B, but to a lesser extent. Impacts in the Non-Habitat Areas would be the same as Alternative A.

Alternative C maintains livestock grazing across the BLM surface in Occupied and Unoccupied Habitat using appropriate grazing practices to meet GUSG RCP habitat requirements. This would likely result in similar short term impacts to soil stability as Alternative A. Over the long term, this alternative may result in more allotments being closed to livestock grazing because of voluntary relinquishment of grazing preference. In closed allotments, the types of impacts to soil stability would be similar to those under Alternative B; however closed allotments would occupy a smaller proportion of the area.

Vegetation treatments on BLM surface in Occupied and Unoccupied Habitat would be emphasized under Alternative C, with generally similar direct impacts to soil stability as Alternatives A and B. However, increased use of prescribed fire would decrease short term soil stability in the burned area footprint. The vegetation treatments are expected to indirectly increase long term soil stability in contrast to Alternatives A and B because of the anticipated reduction in acreage burned by wildfire. This outcome is anticipated due to reduced fuels from vegetation treatments, and adequate access for effective firefighting.

Over the short and long term, soil stability on BLM surface in Occupied and Unoccupied Habitat is expected to be improved under this alternative relative to Alternative A, but to a lesser degree than under Alternative B. While levels of burned and treated acreage are difficult to predict under this alternative, the scale of past treatments and burns suggests that less acres would be affected by fuels mitigation and wildfire under this alternative than the scale of surface use restrictions and closures to grazing proposed in Alternative B.

## SUB-ALTERNATIVE $D_1$ - GUNNISON BASIN PREFERRED

### Soil Stability

Sub-Alternative $D_1$ places restrictions on some types of surface-disturbing activities, but allows others to occur with mitigation to protect GUSG and their habitat. A portion of the BLM surface in Occupied and Unoccupied Habitat within the Gunnison Basin Population is covered by these partial restrictions. This portion would be greater than in Alternative A, but less than Alternatives B and C.

Livestock grazing under this alternative is comparable to Alternative C and would have similar soil stability outcomes.

Sub-Alternative $D_1$ has the same types of vegetation treatment measures as Alternative C, resulting in comparable direct short and long term impacts, as well as similar indirect impacts on acres burned by wildfire.

Under Sub-Alternative $D_1$, overall soil stability is anticipated to be greater than under Alternative A, but less than Alternatives B and C due to the fewer protections from soil disturbances. Soil stability in the four-mile Non-Habitat Areas is expected to be the same as under Alternative A.

## SUB-ALTERNATIVE $D_2$ - SATELLITE PREFERRED

### Soil Stability

Sub-Alternative $D_2$ protects soil stability from surface disturbances across a similar area within the satellite populations as Alternative C, but it includes a greater level of protection than C. For example, fewer Rights of Way and recreation infrastructure developments would be allowed

This alternative also contains range management measures identical to Alternative C, with similar impacts to soil stability.

Although Sub-Alternative $D_2$ includes similar vegetation treatment measures as Alternative C, it prevents the use of prescribed fire in GUSG Occupied Habitat. This would reduce the direct soil stability impacts from the prescribed fire footprint

along with the risk of escaped fire as compared with Alternative C, resulting in higher soil stability.

Under this alternative, overall soil stability is expected to be greater than Alternative A, but less than Alternative B for the satellite population portion of BLM surface in Occupied and Unoccupied Habitat. It is also expected to be greater than under Alternative C. This would result because of the increased protections to soil stability from more stringent surface disturbance restrictions and reduced risk of wildfire. Soil stability in Non-Habitat Areas would be similar to Alternative A for the satellite population area.

### 4.4.4. Cumulative Impacts

Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect soil and water resources are mineral development, livestock grazing, infrastructure development, vegetation treatments, wildfires, recreation, and travel and transportation activities.

The cumulative impact analysis area used to analyze cumulative impacts on soils includes the entire Occupied and Unoccupied Habitat together with the Non-Habitat Areas. Combined with the proposed management actions, cumulative impacts on soil resources could present challenges to meeting the BLM Land Health Upland Fundamental. Impacts on soil resources would not be as substantial under alternatives B, C, $D_1$, or $D_2$ when compared with Alternative A. Management under Alternative B would provide the greatest protection of soil resources, followed by Sub-Alternative $D_2$, Alternative C, and Sub-Alternative $D_1$.

Mineral development, including oil and gas, coal, and other minerals, could cause localized impacts on soils. Intensive mechanical vegetation treatments likely have and would continue to impact soil resources locally, but they could increase vegetation cover and thus soil health, over the long term. Past livestock grazing has impacted soil resources. Improved management of grazing allotments has led to improvements in soil health over time in the cumulative impacts analysis area.

An important trend in the region is rapidly increasing recreational use. This growth in recreation on public lands is due to local population growth, as well as the area's reputation as a national and international recreation destination. All forms of recreational activities can increase potential for erosion, sedimentation, gully creation, biologic soil crust damage, and riparian and upland vegetation damage. However, the significance of such impacts varies with the nature and degree of disturbance as well as site specific environmental conditions. Typically larger disturbances represent greater potential to damage soils and vegetation, degrade

CHAPTER 4 - ENVIRONMENTAL CONSEQUENCES

water quality, and impair overall watershed function and condition than smaller disturbances.

BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS 4-67
AUGUST 2016

# 4.5. TERRESTRIAL VEGETATION (INCLUDING WOODLANDS)

## 4.5.1. METHODOLOGY

### ATTRIBUTES AND INDICATORS

- Vegetation types and distribution
- Vegetation conditions

### ASSUMPTIONS

Vegetation would be managed to achieve the Land Health Ecological Fundamental, with implementation rates dependent on available budgets and resources.

Methods and projects that help restore watersheds, desirable vegetation communities, or wildlife habitats (including surface disturbance associated with these efforts) would be neutral to or benefit upland vegetation resources over the long term, with the exception of increasing disturbance-related species, including invasive exotic plants.

Increased levels of roads, ROWs, and other development would negatively affect vegetation condition.

The degree of impact attributed to any one disturbance or series of disturbances would be influenced by several factors, including location in the watershed, the type, time, and degree of disturbance, existing vegetation, precipitation, and mitigating actions applied to the disturbance.

Noxious and invasive weeds would continue to be introduced and spread by vehicle traffic, recreation, wildlife and livestock movements, and activities which disturb the soil surface.

Hotter and drier conditions predicted from climate change models are projected to cause plant stress, and associated plant death, changes in plant species to more drought-tolerant species, and trigger plant community changes (Bryce 2012).

Short-term effects on upland vegetation would occur over a timeframe of up to ten years and long-term effects would occur over longer than ten years.

Fire suppression activities will be effective and keep burned acreage to a minimum level.

## METHODS AND DATA

### Vegetation Types

Vegetation types are indicated by acreages of the major plant communities on BLM surface in Occupied and Unoccupied Habitat. Anticipated increases or decreases of different vegetation types are described under each alternative. The analysis uses LANDFIRE Existing Vegetation Type data (LANDFIRE 2015).

The analysis of direct impacts is based on those activities which affect vegetation types through damage or removal of some or all of the plant species. Vegetation damage or removal often changes the vegetation type on the disturbed area after an initial unvegetated stage. Within sagebrush or pinyon-juniper vegetation types, recovery of the sagebrush, pinyon and juniper can take many years and result in different vegetation types before the original community returns (Barney 1974, Boyd 2011, Romme 2009). For example, in one study Wyoming big sagebrush shrubs required more than ten years to reestablish and reach preceding canopy cover levels following vegetation clearing (Watts 1996). Prior to recovery, grass-forb vegetation typically dominates once the disturbance has stopped (Barney 1974, Bryce 2012, FEIS 2005). On the other hand, the main species in the mountain shrub vegetation type—Gambel's oakbrush, birchleaf mountain mahogany and Utah serviceberry—have the ability to resprout after top removal, and often quickly regain dominance following disturbance (FEIS 2005).

Surface disturbing activities damage or remove vegetation. These include development and construction of roads and trails, recreational facilities, minerals, pipelines, and many types of ROWs, as well as the development and maintenance of some types of range improvements. Although not considered surface-disturbing, wildfire usually removes most or all of the above-ground vegetation. As a result, surface-disturbing activities and many wildfires—particularly the hot fires—directly reduce existing vegetation types and increase unvegetated ground for the short term. Vegetation treatments such as habitat improvements, some prescribed fires or mechanical fuels reduction—which only remove a portion of the vegetation—directly reduce the levels of woodland types and create shrubland or grass-forb vegetation types from them (Brockway 2002, Stevens 2004). In some cases, they convert shrubland to grass-forb vegetation.

The analysis of indirect impacts considers how management activities influence vegetation drivers. The natural drivers for mid-elevation vegetation communities on the Colorado Plateau include climatic factors, herbivory, and infrequent to very rare mixed severity and stand-replacement fires (Bryce 2012, FEIS 2005). Additional drivers are the successional processes whereby slower-growing, usually woody species establish and out-compete shorter-lived species. This analysis extends these drivers to the remainder of the GUSG range, but with the understanding that rates

and outcomes of the processes are probably modified by the ecoregion and individual ecological sites (Fowler 1986). This analysis focuses on alteration of the natural fire regime and the ongoing process of succession as key factors which create indirect impacts to the amounts and distribution of vegetation types.

The process of succession interacts with management actions to cause indirect impacts to vegetation types by shifting one type to another over time. Actions which directly create unvegetated ground, grass-forb vegetation, or shrub-dominated types could indirectly create more grass-forb, shrub and woodland types respectively over time as succession proceeds, depending on the ecological site potential. Rates of succession-driven transition from one vegetation type to another have been estimated for the purposes of this analysis. Estimation parameters used in this analysis are derived from studies on sagebrush, pinyon-juniper and mountain shrub recovery following disturbance (Boyd 2011, Bryce 2012, Erdman 1970, Wambolt 2001, Watts 1996).

Fire suppression influences the fire regime, indirectly affecting vegetation types. In the absence of fire or other disturbance, succession can proceed within the limits of the ecological site. On some ecological sites, pinyon and juniper trees are able to eventually dominate sagebrush and mountain shrub communities, while on other sites sagebrush or mountain shrubs maintain dominance over the long term (Bryce 2012, Burkhardt 1976, FEIS 2005, Koniak 1985).

Vegetation treatments and the spread of invasive annuals also affect the fire regime and indirectly affect the vegetation type. Vegetation and fuels treatments can reduce fire size and occurrence, particularly over the short term through enhancing fire suppression effectiveness. This would reduce the acres burned and indirectly decrease the amount of grass-forb vegetation. However, vegetation and fuels treatments may not affect burned acreage a detectable amount over the long term, since most acres burned across the West occur during extreme weather events which influence fire behavior more so than fuels (Reinhart 2008).

The spread of invasive annuals including cheat grass has been linked with increased fire frequency in the Great Basin, with a resulting conversion of shrub and tree vegetation to grass dominance (Bryce 2012, Knapp 1996). Close to 3% of the vegetation on BLM surface in Occupied and Unoccupied Habitat has undergone a vegetation type-change to dominance by invasive species (Bryce 2012). The indirect effects of this are likely to be continued dominance by these species over the short and long term, in part due to their influence on the fire regime.

Based on the preceding discussion, alternatives which allow for surface disturbing activities, or encourage the use of wildfire to accomplish habitat goals, or which result in more wildfire across the landscape will be considered to directly increase unvegetated area. This increase will accompany a reduction in grass-forb, sagebrush,

mountain shrub and pinyon-juniper vegetation types. Short and long-term indirect impacts would be increased amounts of grass-forb and mountain shrub types, along with decreased amounts of sagebrush and pinyon-juniper vegetation. Alternatives that restrict surface disturbance and reduce wildfire on BLM surface in Occupied and Unoccupied Habitat would produce the opposite effects for unvegetated, mountain shrub, grass-forb, sagebrush and pinyon-juniper vegetation types.

Alternatives which encourage vegetation treatments including prescribed fire will be expected to directly increase the acreage of grass-forb, sagebrush and mountain shrub vegetation types within the treatment footprint over the short and long term. A reduction in pinyon-juniper vegetation would also result. Short-term reductions in grass-forb types along with increases in pinyon-juniper and sagebrush vegetation would be expected outside of the treatment footprint due to reduced fire size, but these effects would not be expected to continue through the long term.

### Vegetation Condition

Analysis of vegetation conditions is based on lands achieving or not achieving the Land Health Ecological Fundamental. This analysis uses Land Health data generated by the BLM management units. It contrasts how management activities under the different alternatives are expected to improve or deteriorate conditions and cause changes to the Ecological Fundamental's rating. Condition indicators include diversity and composition of native species and plant functional groups, amounts of invasive species, plant productivity and plant vigor (BLM 2008, BLM 2011e). The difference between achieving and not achieving the Land Health Ecological Fundamental can be substantial, and it may take many years to move from one category to another. To address this, the BLM has developed subcategories to describe transitional stages, current management, cause of Land Health problems, and trends of the indicators (BLM 2012b).

Surface disturbance directly removes vegetation which can change native species and functional group composition, plant vigor and productivity. Surface disturbance also creates gaps in the existing vegetation and increases available nutrient, moisture and light levels. Invasive plants are able to exploit these resources, and then produce seed to infest the adjacent areas (Huenneke 1990, Burke 1996, Theoharides 2007). On BLM surface, most disturbances associated with construction and development occur on a small footprint, but many small disturbances across a larger area can affect land health indicators within that larger area and alter the land health rating.

Vegetation treatments, prescribed burns and wildfire also affect vegetation condition. While they all tend to increase levels of invasive species, they can also improve some components of vegetation composition and vigor over the long term (Stevens 2004, Barney 1974, Roundy 2014). Rehabilitation of burned areas can

either increase or reduce the likelihood of invasive plant dominance (Getz 2008, Peppin 2010).

Many types of vegetation are adapted to some level of grazing. However, intense or prolonged grazing by livestock and wildlife can lead to changes in functional group composition, plant vigor and production (Holechek 1989, FWS 2010). This can cause a decline of palatable plants and plant groups within a vegetation type along with increases in unpalatable species, affecting several of the Ecological Fundamental indicators (BLM 2008, 2011e). As a result, the presence or absence of livestock grazing and its management can lead to improvements or declines for the indicators and the Land Health rating.

The relationships between vegetation condition and management activities will shape how the alternatives are analyzed. Alternatives that eliminate, limit, or otherwise constrain surface disturbance are projected to maintain the existing Land Health status. Similarly, alternatives with minimal constraints on surface disturbance at the RMP level are expected to maintain present status over the short term, but increase lands not meeting the Ecological Fundamental over the long term as small areas of degraded vegetation accumulate. Because treatments, wildfire, and wildfire rehabilitation have mixed results with respect to the land health indicators, they are expected to be neutral to the land health rating and not affect current status.

Land Health Standards include livestock grazing management guidelines which outline basic criteria to achieve Land Health. Standards and Guidelines have been incorporated into existing RMPs for more than 15 years. Therefore, current management is expected to maintain existing Land Health condition for the short term, and improve it over the long term where the Ecological Fundamental is not being achieved and livestock grazing is a significant factor. Alternatives that remove livestock grazing are projected to improve short and long term Land Health status on these lands, with more rapid improvement resulting from removal of the significant factor. Alternatives which prescribe best management practices for grazing where GUSG habitat requirements are not being met are also projected to improve short and long term Land Health status. Impacts to wildlife grazing from BLM management activities, would be very difficult to predict, so will not be contrasted between the alternatives.

## 4.5.2. Impacts Common to All Alternatives

### Vegetation Types

Successional processes would continue within vegetation communities, leading to increasing dominance by woody species over the long term across more of the

landscape. The amount of forested vegetation type would continue at current levels unless reduced by warming temperatures.

### Vegetation Condition

Wildlife herbivory would continue and cause declines in some areas for the Land Health Ecological Fundamental indicators. Wildlife use and movement through BLM surface in Occupied and Unoccupied Habitat would also continue to introduce and spread invasive plants.

## 4.5.3. Impacts by Alternative

## Alternative A - No Action

### Vegetation Types

The anticipated consequences of the No Action Alternative are small increases in unvegetated area as well as sagebrush and pinyon-juniper vegetation types. The pinyon-juniper type is expected to increase in all but the Gunnison Basin and Poncha Pass population areas based on patterns observed in the Colorado Plateau ecoregion. These increases would be associated with decreases in grass-forb, and mountain shrub vegetation types.

Surface disturbance protections are already in place across 61% of the BLM surface in Occupied and Unoccupied Habitat, leaving only 39% of this area subject to impacts from localized vegetation removal or damage, and 61% of the four-mile Non-Habitat Areas subject to these impacts. On the unprotected lands, surface disturbance is projected to increase unvegetated area and decrease sagebrush and pinyon-juniper vegetation. Associated indirect impacts could be increases in grass-forb and mountain shrub vegetation as a result of successional processes. Since existing large-scale surface disturbance is estimated to be around 1% of BLM surface in Occupied and Unoccupied Habitat and Non-Habitat Areas, it is likely that additional vegetation type changes due to surface disturbance would continue to around 1% of these areas.

Vegetation successional rates, vegetation treatments and wildfires are expected to continue at rates similar to the past 30 years. BLM fire and treatment records indicate that past rates have averaged roughly 0.7% of the BLM surface in Occupied and Unoccupied Habitat per year, with treatments and prescribed fires responsible for 75% and wildfires making up 25% of the total. Over a ten-year period, the combined effects of treatments, wildfire, and natural succession are projected by this analysis to reduce grass-forb vegetation from 7 to 48% of existing levels. Sagebrush vegetation could stay at current levels or increase by up to 9% over this same time

period, while mountain shrub could decrease from between 1 and 5%. Pinyon-juniper vegetation is projected to increase anywhere between 1 and 10% of existing levels, mainly in the western GUSG population areas. Long term impacts to vegetation are projected to continue along these same trajectories. Similar impacts are expected to occur in the Non-Habitat Areas.

### Vegetation Condition

Alternative A constrains surface disturbance on 61% of the BLM surface in Occupied and Unoccupied Habitat and 39% of the four-mile Non-Habitat Areas, so no impacts to the current Land Health status would be expected in the protected areas from surface-disturbing activities. On the remaining 39% of unprotected BLM surface in Occupied and Unoccupied Habitat and 61% in the Non-Habitat Areas, existing Land Health status is expected to be maintained over the short term. Over the long term, lands not achieving the Ecological Fundamental are projected to increase within the unconstrained area.

Livestock grazing is anticipated to continue on over 90% of the BLM surface in Occupied and Unoccupied Habitat, and over 55% of Non-Habitat Areas. It is not expected to influence existing Land Health status for the short term. Over the long term, ratings are expected to improve on acreages currently not achieving the Ecological Fundamental where livestock grazing is a significant factor, and in some areas where significant factors have not been identified yet. Conditions are expected to improve on between 37,000 and 258,000 acres within the BLM surface in Occupied and Unoccupied Habitat and between 13,000 and 23,000 acres within the Non-Habitat Areas.

## ALTERNATIVE B

### Vegetation Types

Alternative B is likely to result in generally similar impacts to vegetation types as Alternative A. Alternative B would nearly eliminate surface disturbance across the BLM surface in Occupied and Unoccupied Habitat, and reduce it across the four-mile Non-Habitat Areas. This represents an increase in lands protected from surface disturbance as compared with Alternative A. As a result, surface disturbance would not influence vegetation types on these lands. However, at the large scale little change from Alternative A would be detectable, as less than 1% of BLM in Occupied and Unoccupied Habitat or Non-Habitat Areas would be affected under either alternative.

Treatments that manipulate the vegetation type would not be allowed under this alternative, and wildfires would be suppressed, with the exception of those within the Non-Habitat Areas. As a result, succession would be the main influence on the

acreages of each vegetation type on BLM surface in Occupied and Unoccupied Habitat, depending on the ecological site potential. Estimation parameters for successional rates used in this analysis are derived from studies on sagebrush, pinyon-juniper and mountain shrub recovery following disturbance (Boyd 2011, Bryce 2012, Erdman 1970, Wambolt 2001, Watts 1996). While estimates of vegetation shifts include losses of between 17 and 53% of the existing grass-forb vegetation and gains to pinyon-juniper of 6 to 12%, these ranges largely overlap the projected ranges under Alternative A. The projected ranges for sagebrush and mountain shrub vegetation are nearly identical between alternatives A and B. Within the Non-Habitat Areas, greater fire use would probably occur than under Alternative A, resulting in more grass-forb and, mountain shrub vegetation and less pinyon-juniper woodland in this area.

### Vegetation Condition

Alternative B is expected to more rapidly improve vegetation conditions relative to Alternative A, and prevent long term degradation across a broader area.

Alternative B would reduce the presence of localized damage to the vegetation indicators and invasive plants by eliminating nearly all surface-disturbing activities across the BLM surface in Occupied and Unoccupied Habitat, which represents an increase as compared with Alternative A. This would occur across Occupied and Unoccupied Habitat, and to a lesser degree in Non-Habitat Areas. Over the short term, no change to land health status would be expected. However, over the long term, this alternative would prevent degradation of Land Health status from development and construction activities.

Livestock grazing would be eliminated on BLM surface in Occupied and Unoccupied Habitat, an increase relative to Alternative A. As a result, the status of lands not achieving the Ecological Fundamental where livestock grazing is a significant factor is expected to improve within ten years. This acreage is anticipated to be between 37,000 and 258,000 acres. The improvement in Land Health status would be sustained into the future as well. Alternative B achieves the same results as Alternative A, but more quickly. Alternative B would have the same vegetation condition impacts from livestock grazing in the Non-Habitat Areas as Alternative A.

## ALTERNATIVE C

### Vegetation Types

Alternative C would result in more grass-forb, sagebrush, and mountain shrub vegetation, and less pinyon-juniper vegetation than alternatives A and B on BLM surface in Occupied and Unoccupied Habitat over both the short and long term.

Impacts to vegetation types in the four-mile Non-Habitat Areas would be the same as under Alternative A.

Alternative C places more area under surface disturbance restrictions than Alternative A, but less area than Alternative B. This would limit the creation of localized unvegetated patches and associated herbaceous vegetation. At the landscape scale, there would be similar impacts to vegetation types as Alternative A because less than 1% of BLM in the planning would be affected under either alternative.

Vegetation treatments and use of fire to improve GUSG habitat are emphasized under this alternative. However, it is not possible to predict the amount of increase that would occur. Nevertheless the expected declines in grass-forb vegetation resulting from succession could drop below 7%, and sagebrush vegetation could increase beyond the possible 9% level in Alternative A. These changes would be associated with declines in pinyon-juniper that could result in a net reduction of this type across the BLM surface in Occupied and Unoccupied Habitat, despite ongoing vegetation succession. Under this alternative, a net gain in mountain shrub across this same area could take place in contrast with the anticipated losses under alternatives A and B.

### Vegetation Condition

Alternative C would constrain surface disturbing activities on a portion of the BLM surface in Occupied and Unoccupied Habitat—an increase in comparison to Alternative A, but a decrease as compared with Alternative B. Over the short term, land health conditions across this area would probably not change as a result of surface disturbance, similar to alternatives A and B. However, long term conditions under Alternative C would be subject to decline from accumulating surface disturbance across less of the area than Alternative A, but more than Alternative B.

Alternative C maintains livestock grazing across the BLM surface in Occupied and Unoccupied Habitat using appropriate grazing practices to meet GUSG RCP habitat requirements. As a result, the status of lands not achieving the Ecological Fundamental where livestock grazing is a significant factor is projected to improve within ten years, similar to Alternative B. This acreage is expected to be between 37,000 and 258,000 acres. Because this alternative institutes specific conservation grazing measures for suitable habitats not meeting RCP guidelines—which is a stricter requirement than Alternative A's requirement to change grazing management on lands not meeting standards—the improvement in Land Health status is projected to occur more rapidly than under Alternative A, and be sustained into the future as well. Impacts to vegetation condition in the four-mile Non-Habitat Areas would be the same as under Alternative A, due to similar surface protections and grazing practices.

## SUB-ALTERNATIVE $D_1$ - GUNNISON BASIN PREFERRED

### Vegetation Types

Sub-Alternative $D_1$ would be expected to result in little overall change to vegetation types as a result of surface-disturbing activities in comparison to alternatives A, B, and C. This alternative places restrictions on some types of surface-disturbing activities, but allows others to occur with mitigation to protect GUSG and their habitat. A portion of BLM surface in Occupied and Unoccupied Habitat within the Gunnison Basin population area is covered by these partial restrictions. This is more area than Alternative A, but less than alternatives B and C. Over the long term, the acreage of small patches of herbaceous vegetation following development-related disturbance is expected to be less than under Alternative A, but greater than alternatives B and C, though probably not detectable at the plan area scale.

Sub-Alternative $D_1$ contains vegetation treatment, fuels management, and prescribed burn measures comparable to Alternative C, but wildfire in Occupied Habitat would be managed similar to Alternative B and prioritized for suppression. While it is not possible to accurately predict the acreage affected by future treatments and fire management, a range of possible changes in vegetation types can be projected. In the Gunnison Basin population area, this alternative would reduce the loss of grassland below the 27-91% range of loss that is projected under Alternative A. Under Sub-Alternative $D_1$, sagebrush would be expected to increase beyond the 3-12% increase under Alternative A, Mountain shrub would be expected to increase beyond the less than 1% increase under Alternative A, while pinyon-juniper woodland would be expected to decline below the 1-3% loss under Alternative A.

Impacts to vegetation types in Non-Habitat Areas would be the same as under Alternative A.

### Vegetation Condition

Sub-Alternative $D_1$ would constrain surface-disturbing activities in a portion of the Gunnison Basin population area—an increase in comparison to Alternative A, but a decrease compared with alternatives B and C. Over the short term, land health conditions would probably not change as a result of surface disturbance, similar to alternatives A, B, and C. However, over the long term, conditions under Sub-Alternative $D_1$ would be subject to decline from accumulating surface disturbance across a portion of the Gunnison Basin population area.

Sub-Alternative $D_1$ would maintain livestock grazing across the Gunnison Basin population area using a strategy designed to achieve RCP guidelines. As a result, the status of lands not achieving the Ecological Fundamental where livestock grazing is a significant factor is projected to improve within ten years, similar to Alternative B. Because all causal determinations for land health status are not currently available

within the Gunnison Basin, this acreage could be anywhere between 0 and 211,000 acres. Similar to alternatives B and C, this improvement in land health status would occur more rapidly than under Alternative A, and would be sustained into the future.

Impacts to vegetation condition in the Non-Habitat Areas would be the same as under Alternative A, due to similar surface protections and grazing practices.

## SUB-ALTERNATIVE $D_2$ - SATELLITE PREFERRED

### Vegetation Types

Sub-Alternative $D_2$ would place similar constraints on satellite population areas as Alternative C, with identical effects to vegetation types. At the scale of the plan area, little overall difference in vegetation types would occur between alternatives A, B, C, and $D_1$ as a result of surface-disturbing activities.

This alternative contains vegetation treatment and fuels management measures comparable to Alternative C for the satellite populations, but wildfire and prescribed burning in Occupied Habitat would be managed similar to Alternative B. While it is not possible to accurately predict the acreage affected by future treatments and fire management, general percentage changes in vegetation types can be projected. In the satellite populations area, this alternative could increase the loss of grassland below the 7% maximum loss that is projected under Alternative A. Changes in sagebrush are expected to be similar to Alternative A, with between a 2% loss and a 7% gain projected over a ten-year timeframe. In addition, changes in mountain shrub acreage are anticipated to be similar to Alternative A, with between a 2% loss and a 6% gain predicted within the satellite population area. Pinyon-juniper woodland is also expected to experience little change from Alternative A, with a predicted 2-8% decline from current levels.

Impacts to vegetation types in Non-Habitat Areas would be the same as under Alternative A.

### Vegetation Condition

Alternative $D_2$ shares the same constraints as Alternative C across the satellite populations. Over the short term, land health conditions across this area would probably not change as a result of surface disturbance, similar to Alternatives A, B, and C. Over the long term, conditions under Alternative $D_2$ would be subject to decline from accumulating surface disturbance across a portion of the satellite populations.

Alternative $D_2$ maintains livestock grazing across the satellite population areas using a strategy designed to achieve RCP guidelines. Similar results for the land health

Ecological Fundamental are expected for this area as described under Alternative C. Because not all causal determinations for land health status are readily available for some of the satellite population areas, this acreage could be anywhere between 37,000 and 46,000 acres. Similar to alternatives B and C, the improvement in land health status would occur more rapidly than under Alternative A, and would be sustained into the future.

Impacts to vegetation condition in Non-Habitat Areas would be the same as under Alternative A, due to similar surface protections and grazing practices.

## 4.5.4. Cumulative Impacts

Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect vegetation are mineral exploration and development, livestock grazing, recreation, road construction, ROWs (including large transmission lines or pipelines), weed invasion and spread, prescribed fire and wildfires, land planning efforts, vegetation treatments, habitat improvement projects, insects and disease, and drought. Many of these create conditions that cause or favor other vegetation changes. For example, wildfire causes vegetation removal, which makes affected areas more susceptible to weed invasion and soil erosion, and also triggers changes in vegetation type.

Drought conditions reduce vegetative health, which makes vegetation prone to insect infestation or disease. In general, resource use activities have cumulatively caused vegetation removal, fragmentation, weed spread, soil compaction, and erosion, whereas land planning efforts and vegetation and weed treatments have countered these effects by improving vegetative connectivity, productivity, diversity, and health.

Climate change within the cumulative impact analysis area is predicted to cause an increase in temperatures contributing to drier conditions, which would affect, vegetative health, and water availability (Bryce 2012). Such changes would alter the conditions to which vegetative communities are adapted, potentially creating conditions that could favor certain species or communities, weeds, or pests.

Under the alternatives, impacts on vegetation would be minimized to the extent practical and feasible through restrictions; stipulations; closures to mineral exploration and development, recreation, and motorized travel; and by concentrating development in previously disturbed areas. Vegetative conditions would be improved through restrictions on development, treatments, weed prevention and control, habitat improvements, use of prescribed and wildfire, and grazing practices ranging from no grazing to appropriately managed grazing.

In general, management under each alternative would work toward achieving land health but would differ in the time and methods used to reach that goal. Since Alternative A generally includes more resource use and development, impacts on vegetation are more likely to occur under this alternative. As a result, management under Alternative A could significantly contribute to cumulative impacts on vegetation. In contrast, under alternatives B and C and sub-alternatives $D_1/D_2$, BLM management actions are expected to contribute to positive cumulative impacts on vegetation by placing restrictions on development and implementing restoration and other management actions to improve GUSG habitat quality.

# 4.6. RIPARIAN AREAS & WETLANDS

## 4.6.1. METHODOLOGY

### ATTRIBUTES AND INDICATORS

- Mileage of riparian areas on BLM surface
- Acreage of wetlands on BLM surface
- Mileage of streams and riparian habitat on BLM surface in riparian Proper Functioning Condition, Functioning at Risk, and Not Functional categories.

### ASSUMPTIONS

Riparian and wetland resources would be managed to meet BLM Land health Riparian Fundamental.

Methods and projects that help restore watersheds, desirable vegetation communities, or wildlife habitats (including surface disturbance associated with these efforts) would benefit riparian vegetation resources over the long term, with the exception of increasing disturbance-related species, including invasive plants.

The degree of impact attributed to any one disturbance or series of disturbances would be influenced by several factors: proximity to drainages and wetlands, location within the watershed, time and degree of disturbance, reclamation potential of the affected area, existing vegetation, precipitation, and mitigating actions applied to the disturbance.

Noxious and invasive weeds would continue to be introduced and spread by vehicle traffic, recreation, wildlife and livestock movements, and vegetation and surface-disturbing activities.

The analysis was conducted assuming hotter and generally drier conditions, greater evaporation earlier snowmelt and earlier spring runoff. This would lead to more plant stress and shorter duration stream flows (Bryce 2012, Cayan 2001, Seager 2007.)

Short-term effects on riparian and wetland vegetation would occur over a timeframe of two years or less and long-term effects would occur over longer than two years.

## METHODS AND DATA

### Riparian and Wetland Presence and Distribution

Impacts to riparian area presence and distribution are evaluated in terms of stream and riparian mileage on BLM surface in Occupied and Unoccupied Habitat. Anticipated increases or decreases in stream mileages are described under the different alternatives. This analysis uses the U.S. Geological Survey National Hydrologic Dataset, version 2.2.

Impacts to lentic wetland presence and distribution are evaluated using acreage of lentic wetlands across the BLM surface in Occupied and Unoccupied Habitat. Expected increases or decreases in wetland size or abundance are described across the different alternatives. The USFWS National Wetland Inventory is used for this analysis.

Within the Colorado Plateau Ecoregion, drivers that shape riparian and wetland systems have been identified which likely apply across the entire GUSG Habitat and four-mile Non-Habitat Areas. Those that are directly impacted by land management include: groundwater, channel geomorphology, stream hydrology, and animal herbivory (Bryce 2012). Groundwater, channel geomorphology, and stream hydrology can be affected by human activities such as water management, diversion, development of facilities and roads. When these actions alter the amount of water or change the timing and intensity of flows, the degradation and even loss of riparian and wetland systems can result (Bryce 2012, Poff 2011). Even activities, such as development or road construction, that modify hydrology in the uplands can have an influence on the stream hydrology (Poff 2011). Heavy animal herbivory in the form of livestock and native wildlife grazing can also result in streambank alteration, compaction, and degraded riparian vegetation through trampling and consumption. (Belsky 1999, Kauffman 1988, Poff 2011). In some cases, damage can lead to vegetation shifts from wetland to upland species and streambank alteration, reducing the extent and riparian characteristics of the site.

This analysis evaluates the management activities that could cause the reduction or addition of miles of stream and associated riparian habitat, along with acres of wetlands not associated with streams. Activities that improve watershed cover, increase water infiltration, reduce erosion and concentrated flow, and restore spring and stream hydrology would be compatible with increasing the mileage of riparian areas and acreage of wetlands (DeBano 1989).

Grazing and wildlife management practices that avoid overgrazing within a watershed leave abundant stubble and groundcover on the range. Such practices result in higher watershed cover compared with grazing practices that remove too much vegetation or trample and compact sensitive areas (Kauffman 1988, Poff 2011).

Removal of grazing has been shown to result in recovery of streambanks and riparian vegetation (Batchelor 2015), while managed grazing can be a compatible use in riparian areas (Kinch 1989). Alternatives that manage grazing to maintain low utilization levels in uplands and riparian areas or that remove grazing from riparian areas and wetlands altogether will be considered compatible with increasing stream and wetland areas.

Vegetation and watershed treatments—both in uplands and along the riparian zone and with appropriate follow up grazing management—can capture sediment and slow runoff, potentially contributing to improved and expanded riparian and wetland areas (DeBano 1989, Zeedyk 2014). The rehabilitation of closed routes that restores the natural hydrology could also contribute to increases in riparian and wetland areas (Trombulak 2000). Therefore, alternatives that encourage route reclamation and habitat treatments with constraints on post-treatment grazing will be considered compatible with increasing stream and wetland areas.

Manipulation of streams and springs for water developments can alter the hydrology and lead to loss of riparian habitat (Husby 2007). Such damage could be mitigated with appropriate design constraints to minimize the loss of wetland area. It is also likely that reestablishing the original hydrology could restore the lost riparian or wetland habitat, although little literature is available on the subject. Alternatives that remove damaging water developments and restore original hydrology will be considered compatible with increasing stream and wetland areas, while alternatives that allow water developments but require that flow be maintained in-channel would be consistent with maintaining current levels of streams and wetlands. Alternatives without such constraints could reduce riparian and wetland area.

### Stream and Riparian Condition

Impacts to stream and riparian conditions are analyzed using BLM stream Proper Functioning Condition data. Because information on wetland condition is largely incomplete, wetlands are not included in this discussion, but parallels exist between stream and wetland condition and management impacts. Anticipated changes in stream mileage in the Proper Functioning (PFC), Functional at Risk (FAR) and Nonfunctioning (NF) categories are described for each of the alternatives.

As previously discussed, riparian condition can be degraded by activities such as development and road building within a watershed, particularly on side slopes above streams (Bryce 2012, Poff 2011). Heavy animal herbivory can also result in reduced riparian condition through streambank alteration, soil compaction, increased sedimentation, and diminished riparian vegetation (Belsky 1999, Kauffman 1988). Habitat improvements and road closure and rehabilitation practices that capture sediment and slow runoff can improve riparian conditions (DeBano 1989, Zeedyk 2014).

Analysis of management activities that affect stream hydrology, streambank soils, and riparian vegetation are used to contrast impacts between the different alternatives. Alternatives that place restrictions on new surface disturbance such as mineral development, ROWs, and routes near streams will be considered consistent with sustaining current stream and riparian conditions. Alternatives that do not restrict such developments could contribute to declines in conditions over the long term. Alternatives that eliminate or reduce livestock congregating in riparian areas such that streambank trampling is minimized and low utilization levels are achieved will be considered as maintaining good riparian conditions, and consistent with improving degraded conditions. Alternatives that encourage habitat improvements or road closures and rehabilitation with appropriate follow-up grazing management are expected to improve riparian conditions over the short and long term.

## 4.6.2. Impacts Common to All Alternatives

### Riparian and Wetland Area Presence and Distribution

Over the long term, expected warmer and drier climate patterns with earlier snowmelt are likely to reduce stream flows and associated water tables along some channels, reducing the total riparian mileage (Bryce 2012). This is also likely to happen to some wetlands, with associated loss of wetland acreage.

### Stream and Riparian Condition

Warming climate conditions (Bryce 2012) are expected to cause declines in riparian plant vigor and abundance, reducing mileage of streams rated as PFC, while increasing mileage of streams in NF and FAR status. Heavy wildlife herbivory would continue in some areas with its associated impacts to riparian plant productivity, vigor and composition. Wildlife use would also continue to introduce, and spread invasive plants. This would be consistent with maintaining NF or FAR condition ratings in these areas.

## 4.6.3. Impacts by Alternative

### ALTERNATIVE A - NO ACTION

### Riparian and Wetland Area Presence and Distribution

Alternative A would continue current management, which in some areas requires low utilization levels that maintain riparian and watershed cover and function. The following land use plans, which cover over 70% of the BLM surface in Occupied and Unoccupied Habitat, already contain such measures: Canyons of the Ancients NM RMP, Tres Rios RMP, Dominguez-Escalante NCA RMP, and Gunnison RMP.

Livestock grazing practices would be consistent with maintaining existing stream mileage and wetland acreage in this area and the four-mile Non-Habitat Areas over the short and long term.  Current land use plans from the other management units on the remaining BLM surface in Occupied and Unoccupied Habitat do not contain such direction, and livestock grazing could contribute to reductions from the existing 373 miles of riparian area and 2,489 acres of wetlands in these areas over the long term.  Reductions from the current 130 miles and 523 acres of wetlands in the Non-Habitat Areas are also projected to occur.

All current management plans under this alternative allow for vegetation treatment.  However, the Dominguez-Escalante NCA, Grand Junction, Gunnison, and Tres Rios RMPs, which cover over 80% of the BLM surface in Occupied and Unoccupied Habitat, specify follow-up grazing practices consistent with maintaining the associated watershed improvements.  Treatments in these areas could contribute to improving and expanding riparian and wetland areas over the long term.  Treatments in the remaining areas are not projected to contribute to increases.  Most existing plans under this alternative do not specify measures to close and rehabilitate routes.  As a result, no changes to current stream and wetland areas are anticipated for BLM surface in Occupied and Unoccupied Habitat or the Non-Habitat Areas.

While the development of springs is currently allowed across all of the management units, only Canyons of the Ancients NM—representing a fraction of BLM surface in Occupied and Unoccupied Habitat—requires that water flow be maintained in riparian channels.  Within this fraction, spring development practices are expected to sustain current riparian and wetland areas.  In the remaining BLM surface in Occupied and Unoccupied Habitat and Non-Habitat Areas, spring development could contribute to long-term reductions in riparian and wetland areas.

### Stream and Riparian Condition

Several land use plans already contain some surface disturbance protections on lands buffering riparian areas.  These include RMPs for the Gunnison FO, Grand Junction FO, Moab FO, Monticello FO, San Luis Valley FO, Gunnison Gorge NCA, and Canyons of the Ancients NM, which represent a portion of the BLM surface in Occupied and Unoccupied Habitat.  Activities on these lands are more likely to be consistent with maintaining current riparian conditions for the long term, while surface-disturbing activities are more likely to contribute to declining riparian conditions in the remainder of habitat and Non-Habitat Areas.

Current land use plan direction on a portion of the BLM surface in Occupied and Unoccupied Habitat prescribes specific grazing management to protect riparian condition.  Each existing RMP has also been amended to include Public Land Health Standards and Guidelines for Livestock Grazing, with suggested grazing measures to

attain riparian PFC.  These measures have been in place for more than 15 years, and resulted in current riparian conditions, with 47% of stream miles in Proper Functioning Condition, 36% Functioning at Risk, and 17% Non-Functional on BLM surface in Occupied and Unoccupied Habitat.  Current conditions in the Non-Habitat Areas include 77% of miles in Proper Functioning Condition, 19% Functioning at Risk, and 3% Non-Functional.  Alternative A is projected to sustain these current riparian conditions over the short term, but contribute to improved conditions over the long term as the required grazing changes take effect.  These changes are expected to occur on lands where livestock grazing has been identified as a significant factor.  These effects are expected to occur on BLM surface in Occupied and Unoccupied Habitat and the Non-Habitat Areas.

As discussed above, a portion of the BLM surface in Occupied and Unoccupied Habitat and the Non-Habitat Areas is currently covered by land use plans that specify follow-up grazing practices to protect vegetation treatment effectiveness.  Across this area, these practices are expected to contribute to improved riparian conditions.  Outside of these areas, the lack of consistent land use plan direction for follow-up grazing management could lead to riparian conditions that do not benefit from vegetation treatments and road and route management.

## ALTERNATIVE B

### Riparian and Wetland Area Presence and Distribution

Alternative B would eliminate the streambank and vegetation removal impacts associated with domestic livestock grazing on a portion of the BLM surface in Occupied and Unoccupied Habitat, which would contribute to increasing stream and wetland area.  This represents an increase over similarly affected lands in Alternative A.

Habitat treatments and their associated contributions to riparian and wetland area would not be allowed on the BLM surface in Occupied and Unoccupied Habitat under this alternative, but could occur in the four-mile Non-Habitat Areas.  Additionally, all closed routes would be actively reclaimed across the BLM surface in Occupied and Unoccupied Habitat.  In contrast to Alternative A, this would be a reduction in areas where vegetation treatments with appropriate follow up management could benefit riparian and wetland area.  However, active reclamation of all closed routes across the BLM surface in Occupied and Unoccupied Habitat would contribute to increased riparian and wetland area under Alternative B, but these activities would not take place under Alternative A.

This alternative also prohibits new water developments and restores natural hydrology where existing water developments have damaged the stream or wetland.  This would contribute to increased riparian and wetland area across the entire BLM

surface in Occupied and Unoccupied Habitat in contrast to Alternative A in which water developments could decrease riparian and wetland area across a portion of the BLM surface in Occupied and Unoccupied Habitat. Impacts to riparian miles and wetland acreage in Non-Habitat Areas would be similar to Alternative A.

### Stream and Riparian Condition

Alternative B largely eliminates surface disturbance and associated erosion and altered hydrology across the BLM surface in Occupied and Unoccupied Habitat and Non-Habitat Areas. While Alternative A would perpetuate the current level of surface disturbance restrictions around streams, Alternative B includes more comprehensive restrictions across a larger area. As a result these restrictions would help sustain the current riparian and wetland conditions across more of the BLM surface in Occupied and Unoccupied Habitat than Alternative A. Similar results would be expected in Non-Habitat Areas, but to a lesser degree because the surface protections are less comprehensive.

Alternative B would eliminate livestock grazing across the BLM surface in Occupied and Unoccupied Habitat. This would contribute to sustaining PFC conditions, and improving stream conditions that are currently in FAR or NF status where livestock grazing is a significant factor. Removal of the significant factor—livestock—would likely bring about condition improvements in both the short and long term. While the amount of land affected would not differ from Alternative A, improvements would probably occur more rapidly. Alternative B would result in similar grazing impacts as Alternative A in Non-Habitat Areas.

Alternative B prohibits vegetation treatments but requires active reclamation of all closed routes. Similar results are expected as discussed under the preceding section, whereby active reclamation of all closed routes across the BLM surface in Occupied and Unoccupied Habitat would contribute to improved riparian and wetland condition. In this area however, as compared with Alternative A there would be a reduction in areas where vegetation treatments with appropriate follow up management could benefit riparian and wetland conditions. In the four-mile Non-Habitat Areas, a similar outcome as Alternative A is predicted.

## ALTERNATIVE C

### Riparian and Wetland Area Presence and Distribution

Alternative C requires grazing practices which are consistent with meeting GUSG RCP habitat requirements. These practices would limit the streambank and vegetation removal impacts associated with domestic livestock grazing across the BLM surface in Occupied and Unoccupied Habitat, which could contribute to

increasing stream and wetland area. This represents an increase over similarly affected lands in Alternative A, and would have the same results as Alternative B.

Habitat treatments and their associated contributions to riparian and wetland area would be encouraged under this alternative, and appropriate follow-up livestock management required. Some closed routes would be actively reclaimed throughout the BLM surface in Occupied and Unoccupied Habitat, depending on GUSG needs. In contrast to Alternative A, this would be an increase in land where vegetation treatments with appropriate follow up management could benefit riparian and wetland area. In addition, active reclamation of some closed routes across this area would contribute to increased riparian and wetland area, an increase over Alternative A which does not require these activities, but reclamation would occur on fewer roads than Alternative B.

This alternative allows new water developments when GUSG habitat would benefit, or would not be damaged, but would minimize changes to in-channel water flow. The alternative also provides for removal or redesign of existing water developments that are exhibiting seep, spring or riparian area damage due to livestock use. These measures would contribute to sustaining and potentially increasing current area of wetlands and riparian habitat throughout the BLM surface in Occupied and Unoccupied Habitat. This approach represents an improvement over the amount of land similarly protected under Alternative A, and management of water developments would result in lesser gains to riparian and wetland area than Alternative B, which requires removal of all water developments which are damaging to riparian and wetland areas.

In Non-Habitat Areas, similar impacts to Alternative A are predicted for riparian miles and wetland acreage.

### Stream and Riparian Condition

Alternative C limits surface disturbance, and associated impacts to riparian condition on a portion of the BLM surface in Occupied and Unoccupied Habitat. This represents an increase over Alternative A. In contrast to Alternative B, this alternative would protect stream conditions from surface disturbance impacts on less of the BLM surface in Occupied and Unoccupied Habitat.

Alternative C requires grazing practices which are consistent with meeting GUSG RCP habitat requirements. These practices would contribute toward improving riparian conditions on FAR and NF streams where livestock are a significant factor, and maintaining conditions on PFC streams. While the amount of land affected would not differ from Alternative A, improvements would probably occur more rapidly, but probably not as rapidly, as under Alternative B. More rapid improvement for NF and FAR streams where livestock grazing is a significant factor

would be expected because of the prompt removal of livestock under Alternative B. Alternative C encourages vegetation treatments, requires follow-up grazing management and specifies active reclamation of closed routes where it is important for GUSG. In contrast to Alternative A, this would be an increase in land where vegetation treatments with appropriate follow up management could benefit riparian conditions. In addition, active reclamation of some closed routes across the BLM surface in Occupied and Unoccupied Habitat would contribute to improved riparian conditions, an increase over Alternative A which does not require these activities. However, reclamation would occur on fewer roads than Alternative B, reducing associated improvements to riparian condition.

In the four-mile Non-Habitat Areas, impacts similar to Alternative A are predicted for stream and riparian condition.

## SUB-ALTERNATIVE $D_I$ - GUNNISON BASIN PREFERRED

### Riparian and Wetland Area Presence and Distribution

This alternative requires grazing practices which are consistent with meeting GUSG RCP habitat requirements. These practices would limit the streambank and vegetation removal impacts associated with domestic livestock grazing across the Gunnison Basin population area, which could contribute to increasing stream and wetland area. Within the Gunnison Basin population area, this represents an increase over similarly affected lands in Alternative A, and would have the same results as alternatives B and C.

Alternative $D_I$ proposes the same habitat treatments with follow-up livestock management for the Gunnison Basin Population as Alternative C. It also proposes similar measures for reclamation of closed routes where needed to improve priority GUSG habitat. These actions would have the same impacts to riparian and wetland area presence and distribution as Alternative C.

This alternative contains the same measures as Alternative C for new water developments within the Gunnison Basin population area, but does not contain similar requirements to minimize livestock impacts from existing water developments. Sub-Alternative $D_I$ would be less compatible with sustaining current area of wetlands and riparian habitat throughout the BLM surface in Occupied and Unoccupied Habitat than Alternative C. This alternative represents an improvement over the amount of land similarly protected under Alternative A. However, management of water developments would not contribute to increasing riparian and wetland area as would occur under alternatives B and C within the Gunnison Basin population area.

In the four-mile Non-Habitat Areas, impacts similar to Alternative A are predicted for riparian miles and wetland acreage.

### Stream and Riparian Condition

Sub-Alternative $D_1$ allows for surface disturbance under 0.25 acre within the Gunnison Basin population area, with associated hydrologic and erosion impacts to riparian condition. This represents an increase in areas with surface disturbance limitations for the Gunnison Basin population area over Alternative A. Within the Gunnison Basin population area, this alternative would provide lower levels of surface protection across less area than alternatives B and C.

This alternative requires grazing practices which are consistent with meeting GUSG RCP habitat requirements in the Gunnison Basin population area. These practices would result in the same impacts as Alternative C. While the amount of land affected would not differ from Alternative A, improvements would probably occur more rapidly, but not as rapidly as, under Alternative B which would remove the significant factor for NF and FAR streams.

Sub-Alternative $D_1$ proposes the same habitat treatments with follow-up livestock management for the Gunnison Basin Population as Alternative C. It also proposes similar measures for reclamation of closed routes where needed to improve priority GUSG habitat. These actions would have the same impacts to riparian condition as Alternative C.

In Non-Habitat Areas, impacts similar to Alternative A are predicted for stream and riparian condition.

## SUB-ALTERNATIVE $D_2$ - SATELLITE PREFERRED

### Riparian and Wetland Area Presence and Distribution

Sub-Alternative $D_2$ contains similar grazing measures across the satellite populations as Alternative C with similar scope and type of effects to riparian and wetland area.

This alternative has the same measures for vegetation treatments, follow-up livestock grazing management, and route reclamation as Alternative C. The same impacts to riparian and wetlands are anticipated for the satellite populations are as with Alternative C.

Sub-Alternative $D_2$ has nearly identical measures for water developments as Alternative C. Within the satellite populations the same impacts to riparian and wetlands are anticipated.

In the Non-Habitat Areas, impacts similar to Alternative A are predicted for riparian miles and wetland acreage.

### Stream and Riparian Condition

Sub-Alternative $D_2$ places similar surface disturbance constraints on satellite population areas as Alternative C, with identical impacts to riparian condition.

Sub-Alternative $D_2$ contains similar grazing measures across the satellite populations as Alternative C with similar scope and type of effects to riparian condition.

This alternative contains the same measures for vegetation treatments, follow-up livestock grazing management, and route reclamation as Alternative C. The same impacts to riparian and wetlands are projected for the satellite populations as with Alternative C.

In Non-Habitat Areas, impacts similar to Alternative A are predicted for stream and riparian condition.

## 4.6.4. Cumulative Impacts

Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area include further water diversion and development, surface-disturbing actions, improper grazing practices, conversion of native rangelands to irrigated agricultural lands or residential development, improper maintenance of transportation facilities, and recreational use. These activities either reduce the amount of water for riparian areas and wetlands, or cause surface disturbance by removing vegetation cover, displacing and compacting soils, and altering soil structure. The result is exposed surfaces that increase the potential for runoff and erosion, and that could have negative effects on stream or wetland function.

Ex-urban growth and development in the region is anticipated to have impacts to riparian and wetland areas. The demand for water is anticipated to increase with development and population growth. Additionally, demand and use of water flowing to BLM lands is expected to continue to rise. Impacts on water quantity would affect riparian areas and wetlands.

Unavoidable water quantity impacts would include water withdrawals for livestock use, oil and gas and other mineral resource exploration, development and production, and watering of roads for dust mitigation. Dust on snow resulting from fugitive dust production outside of the region would continue to impact the timing of melt out and the quantity of water available for downstream users.

Under all alternatives, water resources would be protected due to management in accordance with the Clean Water Act, the Fundamentals of Rangeland Health and Standards and Guidelines for Grazing Administration, and other applicable state and

federal water quality standards. Site-specific mitigation would further reduce impacts on water resources. Adherence to these standards would reduce many of the impacts from future actions.

Alternative actions that allow the least amount of soil disturbance, loss of vegetation, energy and minerals development, recreational use, and roadway and transportation facilities development would be the least impactful on water resources. Alternative B would cause the fewest cumulative impacts on riparian areas and wetlands, followed by Sub-Alternative $D_2$, Alternative C, Sub-Alternative $D_1$, and Alternative A. Management under Alternative A allows the most surface disturbance, least restrictions on livestock grazing and is expected to contribute the most cumulative effects on soil and water resources.

# 4.7. INVASIVE SPECIES

## 4.7.1. METHODOLOGY

### ATTRIBUTES AND INDICATORS

- Vegetation treatment acreage as an indicator of large scale surface disturbance and seeding, since these are often tied with weed introduction and spread
- Risk of invasive species introduction and spread due to presence or absence of surface disturbance restrictions
- Risk of invasive species introduction and spread due to presence or absence of permitted livestock grazing.

### ASSUMPTIONS

Noxious and invasive weeds would continue to be introduced and spread by vehicle traffic, recreational activities, wildland fire, wildlife and livestock movements, and vegetation and surface-disturbing activities.

Weeds and pests would be controlled in coordination with the appropriate county weed and pest control districts and with owners of adjacent property in an effort to comply with state plans for weed eradication and control.

Short-term effects on invasive species and their management would occur over a timeframe of ten years or less and long-term effects would occur over longer than ten years.

### METHODS AND DATA

#### Vegetation Treatments

Vegetation treatment acreage is used to indicate the most widespread and best documented source of large scale surface disturbance across the BLM surface in Occupied and Unoccupied Habitat. As discussed in Chapter 3, it is reasonable to assume that the treated acres are more likely to contain invasive species at higher levels than the untreated areas. This is due to soil disturbance, reduced competition from native species, increased resource availability for weed growth, and introduction of weed seed from equipment and as contaminants in seed mixes (Davies 2011, Davis 1990, Dodson 2006, Harrod 2001, Hobbs 1992).

This analysis considers vegetation treatment to increase the opportunities for weed introduction, establishment and spread across large treated areas. Alternatives which encourage vegetation treatment are projected to increase treatment-associated weed invasion. Alternatives which prohibit vegetation treatment are projected to maintain current levels of treatment-associated weed invasion, while alternatives which restrict treatment would result in intermediate levels of invasion.

Weed treatments are also considered under this indicator. Alternatives which specify greater range of target species will be considered to reduce weeds more than alternatives with fewer target species. Alternatives which do not provide weed management direction or targeted species will be considered to result in the least weed reduction.

### Risk of Weed Introduction and Spread

The risk of weed introduction or spread is also associated with smaller scale disturbances which disrupt soils and vegetation (Hobbs 1992, Huenneke 1990, Burke 1996, Theoharides 2007).) Alternatives which restrict surface disturbance will be considered to reduce the risk for weed invasion. Alternatives which do not restrict surface disturbance are anticipated to increase the risk of weed invasion.

As discussed in Chapter 3, livestock and wildlife grazing is another source of weed introduction, movement and spread (Harrod 2001.) While grazing can also reduce expression of weeds in a plant community by consuming weed seed and biomass or reducing litter production, the introduction and spread risks for weed species that are new to an area remains. Because the alternatives do not present wildlife management actions, this part of the analysis will be based on livestock grazing management. Alternatives which eliminate livestock grazing will be considered to have reduced risk of weed invasion with the removal of this source of weed introduction and transport, compared with alternatives which allow livestock grazing.

## 4.7.2. Impacts Common to All Alternatives

### Vegetation Treatments

Areas that have already been treated are predicted to maintain higher levels of weeds than areas that have not received vegetation treatment, over both the short and long term. Weed management would continue to be directed by strategic plans that direct limited resources for maximum benefit, and rely heavily on treating new species and infestations as directed by the Early Detection Rapid Response approach.

#### Risk of Weed Introduction and Spread

Wildlife will continue to introduce, spread, and favor expansion of invasive plants. Casual uses that occur on BLM lands will incidentally disturb soils and potentially introduce weeds. As public land uses increase, weed introductions and invasions will as well.

## 4.7.3. Impacts by Alternative

### Alternative A - No Action

#### Vegetation Treatments

This alternative places few restrictions on vegetation treatments. The following Land Use Plans encourage vegetation treatments to meet habitat objectives: Dominguez-Escalante, Grand Junction, Monticello, Moab, Canyons of the Ancients, Gunnison Gorge, Gunnison, McInnis Canyons, San Luis, and Tres Rios. No land use plans explicitly prevent vegetation treatments. Treated areas are anticipated to continue to accumulate at current rates approximating 1-3% of the BLM surface in Occupied and Unoccupied Habitat and Non-Habitat Areas per decade over the short and long term. Total treated area is projected to be nearly 14% of the BLM surface in Occupied and Unoccupied Habitat and over 2% of Non-Habitat Areas in 10 years. These acreages are more likely to have higher levels of weeds as compared with untreated areas.

Most of the current RMPs call for coordinated weed management. The Canyons of the Ancients NM, Dominguez-Escalante NCA, Grand Junction, Moab, McInnis Canyons NCA, Gunnison, and Gunnison Gorge NCA RMPs specify weed control or prevention as a management action. However, all units are engaged in weed management. Under Alternative A, the existing level of weed control would continue across the BLM surface in Occupied and Unoccupied Habitat and Non-Habitat Areas.

#### Risk of Weed Introduction and Spread

Most land use plans already contain some surface disturbance protections for BLM surface in Occupied and Unoccupied Habitat and Non-Habitat Areas, associated with wilderness area or wilderness study area status or tied to realty or mineral development. The restrictions cover 61% of the BLM surface in Occupied and Unoccupied Habitat and 39% of the Non-Habitat Areas under Alternative A. Lands under these restrictions are projected to be at lower risk from vegetation and soil disturbance than lands not under these protections.

Livestock grazing is anticipated to continue on over 90% of BLM surface in Occupied and Unoccupied Habitat, and over 55% of the Non-Habitat Areas.  The risk for weed invasion from livestock grazing is projected to stay at current levels in grazing allotments, both over the short and long term.

## ALTERNATIVE B

### Vegetation Treatments

Under Alternative B, vegetation treatments would not be allowed on BLM surface in Occupied and Unoccupied Habitat.  This would cap the total acreage of treatments that could be associated with weed invasions at 10% of BLM surface in Occupied and Unoccupied Habitat.  While weeds would continue to be introduced from other sources, within ten years, this would represent a 23% reduction in areas subject to treatment-associated weed invasion compared to Alternative A.  In Non-Habitat Areas, there would be little difference in treatment-associated weeds between the two alternatives.

Under Alternative B, all weeds that threaten sagebrush and riparian habitat quality could be treated.  This direction is more specific than under Alternative A, and would likely result in more intensive weed control and lower levels of invasive plants across BLM surface in Occupied and Unoccupied Habitat compared to Alternative A.  There would be little difference in weed management in the Non-Habitat Areas between the two alternatives.

### Risk of Weed Introduction and Spread

Alternative B places substantial restrictions on new surface-disturbing activities, which are an important source of weed introduction and spread.  These include No Leasing and NSO and ROW exclusion stipulations.  As a result, the risk of weed introduction and spread would be reduced in the protected areas.  These restrictions would cover a larger portion of the BLM surface in Occupied and Unoccupied Habitat than Alternative A, and also extend into Non-Habitat Areas.  As a result, weed infestations associated with surface disturbance are predicted to be lower than under Alternative A.

Alternative B would not allow grazing of domestic livestock on BLM surface in Occupied and Unoccupied Habitat, reflecting a reduction in area compared to Alternative A.  With the exception of trespass livestock, the risk of weed introduction and spread associated with livestock grazing would be eliminated.  In the Non-Habitat Areas, Alternative B is expected to have the same results for grazing-associated weeds as Alternative A.

## ALTERNATIVE C

### Vegetation Treatments

Under Alternative C, vegetation treatments would be emphasized. While difficult to accurately predict, it is projected that over 14% of BLM surface in Occupied and Unoccupied Habitat would be subject to treatment-associated weed invasion after 10 years, an increase over alternatives A and B.

Alternative C would require a greater level of weed control than Alternative A. This alternative would likely reduce the level of weeds on BLM surface in Occupied and Unoccupied Habitat over the short and long term in comparison to Alternative A. However, Alternative C would only require management of state-listed noxious weeds that threaten GUSG habitat, which is fewer species than would be controlled under Alternative B. As a result, there could be more weed invasions associated with Alternative C than Alternative B across this area.

Weeds associated with vegetation treatments are expected to be similar to Alternative A for the Non-Habitat Areas.

### Risk of Weed Introduction and Spread

Alternative C places more area under surface disturbance restrictions than Alternative A, but less area than Alternative B. These restrictions would limit some of the primary sources of new weed introductions, infestations, and spread in contrast to Alternative A, but would expand them in comparison to Alternative B.

Alternative C would maintain livestock grazing across BLM surface in Occupied and Unoccupied Habitat, using appropriate grazing practices to meet GUSG RCP habitat requirements. This would produce results similar to Alternative A, with similar acreages affected and at risk of weed introduction from livestock grazing.

The risk of weed introduction and spread in Non-Habitat Areas is projected to be similar to Alternative A.

## SUB-ALTERNATIVE $D_1$ - GUNNISON BASIN PREFERRED

### Vegetation Treatment

Sub-Alternative $D_1$ would provide the same habitat treatments with follow-up livestock management as Alternative C. Within the Gunnison Basin population area, this would result in the same amount of land subject to treatment-associated weed invasion. This alternative proposes the same weed treatment measures as Alternative B. Therefore, the same impacts as under Alternative B are anticipated within the Gunnison Basin population area. Weeds associated with vegetation treatments are expected to be similar to Alternative A for the Non-Habitat Areas.

### Risk of Weed Introduction and Spread

Sub-Alternative $D_1$ would allow for surface disturbance under 0.25 acre, with an associated risk of weed introduction and spread. Within the Gunnison Basin population area, this would result in a decrease in areas at higher risk of weeds resulting from surface disturbance in comparison to Alternative A. Sub-Alternative $D_1$ would leave more area vulnerable to weeds resulting from surface disturbance than alternatives B or C.

This alternative requires grazing practices that are consistent with meeting GUSG RCP habitat requirements. These practices would result in a similar level of risk of weed introduction and spread from livestock grazing as alternatives A and C.

The risk of weed introduction and spread in Non-Habitat Areas is projected to be similar to Alternative A.

## SUB-ALTERNATIVE $D_2$ - SATELLITE PREFERRED

### Vegetation Treatment

Sub-Alternative $D_2$ has the same measures for vegetation treatments and follow-up livestock grazing management as Alternative C. Within the satellite populations, the land area subject to treatment-associated weed invasion would be the same as under Alternative C. Sub-Alternative $D_2$ would provide the same weed treatment measures and would result in the same impacts within the satellite population areas as Alternative B. Weeds associated with vegetation treatments would be expected to be similar to Alternative A for the Non-Habitat Areas.

### Risk of Weed Introduction and Spread

Sub-Alternative $D_2$ would place similar constraints over surface disturbance as Alternative C, with identical levels of risk for weed introduction and spread in satellite population areas.

This alternative requires grazing practices that are consistent with meeting GUSG RCP habitat requirements. Within the satellite population areas, these practices would result in the same level of risk for weed introduction and spread as alternatives A and C.

The risk of weed introduction and spread in Non-Habitat Areas is projected to be similar to Alternative A.

## 4.7.4. Cumulative Impacts

Within the cumulative impact analysis area, past, present, and reasonably foreseeable future actions and conditions that have affected and will likely continue to affect noxious and invasive weeds are mineral exploration and development, livestock grazing, recreation, road construction, ROWs (including large transmission lines or pipelines), prescribed and wild fires, land use planning efforts, vegetation treatments, habitat improvement projects, insects and disease, and drought. Many of these create conditions that cause or favor weed invasion.

In general, resource use activities have cumulatively caused vegetation removal and fragmentation, and resulting weed spread. Climate change within the cumulative impact analysis area could cause an increase in temperatures and variations in precipitation that could affect soil conditions, vegetative health, and water availability. Such changes would alter the conditions to which vegetative communities are adapted, potentially creating conditions that favor weeds.

In general, management under each alternative would work toward achieving land health, but would differ in the time and methods used to reach that goal. Since existing management under Alternative A emphasizes greater resource use and development, increases in weeds are more likely to occur under this alternative. As a result, management under Alternative A could significantly contribute to cumulative impacts on vegetation. In contrast, BLM management actions under alternatives B and C and sub-alternatives $D_1$ and $D_2$ (such as placing restrictions on development and prioritizing weed treatments) would be expected to contribute to positive cumulative impacts on weeds.

# 4.8. WILDLAND FIRE ECOLOGY & MANAGEMENT

## 4.8.1. METHODOLOGY

### ATTRIBUTES AND INDICATORS

- Amount of land burned by wildfires
- Frequency of wildfire occurrence
- Fuels condition as indicated by Vegetation Condition Class (VCC).

### ASSUMPTIONS

Some VCCs will increase in departure if vegetation treatment actions are not taken and wildfires continue to be aggressively suppressed.

Some types of vegetation treatments would reduce the VCC or maintain it at the desired level.

There will be a growing demand on suppression resources for managing wildfires in the region.

Fire is an important natural disturbance in many of the ecological systems found in the region.

A direct relationship exists between fuel characteristics and potential fire intensity and severity and size in some cases.

Barriers to wildland fire management (such as limited access) will decrease suppression effectiveness, potentially increasing fire size.

Climate change is expected to bring hotter, drier conditions, leading to a longer fire season and more frequent and intense fire over the long term (Archer 2008).

Short-term effects on upland vegetation, fuels and fire would occur over a timeframe of up to ten years and long-term effects would occur over longer than ten years.

### METHODS AND DATA

#### Amount of Land Burned by Wildfires and Fire Frequency

The amount of land burned by wildfire is assessed in terms of acreages and percentages of burned BLM surface in Occupied and Unoccupied Habitat.

Frequency of wildfire is evaluated based on the average annual numbers of wildfires with their points of origin on BLM surface across this area. This analysis is based on how each alternative is projected to affect opportunities for ignition, vegetation and fuel distribution as well as fire management.

Management actions which increase opportunities for ignition are expected to result in increased fire frequency and burned acreage. Literature suggests that fire size and numbers are positively correlated with increasing human access and activity (Cardille 2001, Main 1974, Harrington 1978). This analysis assumes that management actions which increase the numbers and distribution of developments and people across the landscape will increase the opportunities for ignition. Consistent with this assumption, alternatives that close routes and restrict surface disturbance will be considered to reduce opportunities for ignition. Prescribed fire defined as any fire intentionally ignited by management actions in accordance with applicable laws, policies, and regulations to meet specific objectives is another source of human-caused fire across the landscape. Approximately 1% of the prescribed fires before 2005 in the U.S. resulted in near misses or escapes (Dether 2005), so while it is rare, prescribed fire can lead to increased acres burned through wildfire. Consequently, alternatives that restrict prescribed fire will be expected to reduce opportunities for ignition, and the associated burned acreage, although to a small degree.

Vegetation and fuel distribution influences burned acreage. Fuel breaks and vegetation treatments which thin or change the type of vegetation are used to modify fire behavior and help reinforce defensible locations. These treatments are used to facilitate indirect firefighting tactics such as backfiring, and ultimately reduce fire size (Finney 2001). Accordingly, alternatives that encourage fuel treatments will be considered to reduce burned acreage over the short term. However, because most acres across the West have burned during extreme weather events (which influences fire behavior more so than fuel distribution), fuels treatments might not affect burned acreage over the long term (Reinhart 2008).

Extensive reviews of plant species, fire, and flammability show that some types of vegetation are more likely to ignite and carry a wildfire than other types (FEIS 2015). Flammable annual vegetation—particularly cheatgrass—can increase fire frequency and acreage burned (Zouhar, Bryce 2012; Knapp 1996). While just 3% of the vegetation on BLM surface in Occupied and Unoccupied Habitat is currently mapped as dominated by cheatgrass, activities that contribute to the introduction and spread of cheatgrass in other vegetation types will be considered to indirectly contribute to increased burned acreage, particularly over the long term. As discussed in the Invasive Plants section, alternatives that restrict surface disturbance will be considered to reduce the risk for weed invasion and long-term burned acreage, while alternatives that do not restrict surface disturbance are anticipated to result in

the opposite outcome. Because rehabilitation of burned areas can either increase or reduce the likelihood of invasive plant dominance (Getz 2008; Peppin 2010), rehabilitation actions will not be factored into the analysis of burned acreage or fire frequency.

The amount of land burned by wildfires is further influenced by the BLM fire management capability and strategy. Acreage burned is directly linked to fire management strategy, and a policy of suppressing all fires results in fewer acres burned than a policy aimed at managing fires to achieve habitat objectives, particularly over the short term. While long-term impacts associated with suppression leading to increased fuel loading resulting in an increase in the acreage burned by wildfire, when this would occur cannot be predicted. Firefighter access to fire starts and the presence of fire breaks assist with fire suppression and management. The tie between acreage burned and difficulty of access is supported by at least one study showing an increase in fire size in inaccessible areas (Cardille 2001). Based on this information, alternatives which close and rehabilitate routes, and those which restrict fuels projects are considered to contribute to increased burned acreage. Alternatives that manage to suppress all fires are considered to result in fewer burned acres than alternatives that manage fires to achieve resource objectives over the short term.

### Fuels Condition

Fuel loading throughout the BLM surface in Occupied and Unoccupied Habitat will be evaluated based on acreage of BLM surface in Vegetation Condition Classes (VCC) 2 and 3. VCC indicates the amount that current vegetation has departed from the simulated historical vegetation reference conditions. VCC is calculated based on changes to species composition, structural stage, and canopy closure. Three condition classes describe low departure (VCC 1), moderate departure (VCC 2), and high departure (VCC 3). This information is interpreted here as an indicator of potential areas where vegetation communities have not burned at their natural rates or severities. However, it only represents an approximate picture of fuel conditions and imbalances because some vegetation types included in VCC2 and VCC3 do not have excessive fuel loading Altered VCCs typically indicate increased likelihood of more intense or frequent fires, with associated impacts to BLM fire management resources (LANDFIRE 2009). Vegetation management actions have been recommended by some researchers to reduce VCCs toward baseline conditions (Hood 2007, Hann 2003). These could include fuels treatments, the use of prescribed fire, and some habitat treatments. Fire—both prescribed and wildfire—has the effect of reducing fuels and lowering the VCC as a result. Based on this information, alternatives which encourage fuels treatments, and allow the use of prescribed fire will be interpreted as reducing the VCC over the short and long term. Alternatives that restrict these activities would have the opposite effect.

Alternatives that manage wildfires for resource benefit will be considered to reduce the VCC, while those that call for full suppression will be considered to maintain current VCC in the short term but contribute toward advancing VCC over the long term.

## 4.8.2. Impacts Common to All Alternatives

### Amount of Land Burned by Wildfires and Fire Frequency

Over the long term, as climate warms and vegetation successional changes continue to build up fuels, more acreage is likely to burn. Fire frequency is also expected to increase over current conditions.

### Fuels Condition

Fuels would be decreased in areas that burn. Vegetation would continue along successional trajectories, increasing in age, woody species dominance and fuel loading until old growth status or a disturbance occurs. The successional process would continue to advance Vegetation Condition Class.

## 4.8.3. Impacts by Alternative

### ALTERNATIVE A - NO ACTION

Alternative A would continue a similar pattern of fire frequency and acreage burned by wildfire as has occurred over the past several decades. Wildland fire suppression cost would continue at current levels adjusting for inflation.

### Amount of Land Burned by Wildfires and Fire Frequency

Approximately 4% of the BLM surface in Occupied and Unoccupied Habitat has burned over the past 30 years, and 9% of the four-mile Non-Habitat Areas. This acreage has occurred under management prescribed by existing and past RMPs. Current plans contain some surface disturbance protections which limit human activity and associated opportunities for ignition. These restrictions cover 61% of the BLM surface in Occupied and Unoccupied Habitat, and 39% of the Non-Habitat Areas. On the other hand, most existing plans do not specify measures to reduce route density, which would limit human access and ignition opportunity. This management setting has resulted in a level of human activity on the landscape such that human caused ignitions have increased the number of fire starts on the landscape. It has also contributed to the current levels of burned area and fire frequency. These levels are anticipated to continue over the short and long term.

The use of prescribed fire is specifically permitted in the following management plans: Canyons of the Ancients, Dominguez-Escalante NCA, Grand Junction, Gunnison Gorge NCA, Gunnison, San Luis Valley, Tres Rios, Moab, Monticello and Uncompahgre. Prescribed fire contributed to a higher likelihood of human caused ignitions in these areas. While the prescribed fire data has not been fully analyzed for the area, if there were any past escapes over the past 30 years, they would have been included as a component of the current burned area acreage. This contributing factor to burned acreage is expected to continue in a similar pattern over the short and long term.

Fuels management activities are encouraged in the following RMP: Canyons of the Ancients NM, Dominguez-Escalante NCA, Grand Junction, Moab, Monticello, and Tres Rios. However, other management units have been carrying out fuels treatment projects without specific management plan direction. These actions have contributed to the current distribution of fuels across the BLM surface in Occupied and Unoccupied Habitat and in Non-Habitat Areas, which has factored into the amount of acres burned. This pattern is projected to continue over the short and long term.

Current fire management direction varies across the management units. Canyons of the Ancients NM, Gunnison Gorge NCA, Gunnison, San Luis, and Uncompahgre Basin RMPs place substantial constraints upon or emphasize suppression of natural fire, at least in portions of the area covered under each plan. Grand Junction, Dominguez-Escalante NCA, Moab, Monticello, and Tres Rios RMPs allow for management of natural fire to achieve resource benefits. Fire management plans have added further detail to this direction, and provided for more use of naturally occurring fire for resource benefit. Firefighter access to implement suppression or other fire management has been facilitated by the current route network. This complex of management approaches and firefighter access has also contributed to current burned area acreage. Little change is anticipated in the future under this alternative within the BLM surface in Occupied and Unoccupied Habitat and in Non-Habitat Areas.

### Fuels Condition

VCC 2 is the dominant class across the BLM surface in Occupied and Unoccupied Habitat and in Non-Habitat Areas, with the remainder approximately evenly split between classes 1 and 3. Fuels treatments, as discussed in the preceding section, have contributed to the current VCC distribution. Prescribed fire also discussed above, has been used to reduce fuels in many of the management units. Finally, fire management as outlined above has been a factor in the current VCC status.

As discussed in the vegetation section, successional rates appear to be proceeding more quickly than the rate of wildfire, prescribed fire, fuels and other vegetation

treatments. While it is likely that the distribution of VCCs would remain static over the short term, over the long term, a decrease in VCC I and increases in VCC 2 and VCC 3 would be expected, as percent departure from historic reference conditions increases on BLM surface in both Occupied and Unoccupied Habitat and Non-Habitat Areas.

## ALTERNATIVE B

Alternative B would reduce fire frequency but could increase acreage burned by wildfire in comparison to Alternative A on both the BLM surface in Occupied and Unoccupied Habitat and the four-mile Non-Habitat Areas. Wildfire suppression cost would probably be greater than Alternative A because of access difficulties, and the greater cost associated with suppressing large fires.

### Amount of Land Burned by Wildfires and Fire Frequency

Alternative B places substantial restrictions on new surface disturbing activities which would limit human activity. These restrictions would cover more of the BLM surface in Occupied and Unoccupied Habitat and the four-mile Non-Habitat Areas than Alternative A. This alternative also requires route density reductions during travel management planning which would further limit human access and activity. In addition, prescribed fire would be prohibited under this alternative in this area. Together, these restrictions would reduce the opportunities for human ignition across the BLM surface in Occupied and Unoccupied Habitat, as well as Non-Habitat Areas, in comparison with Alternative A. Associated reductions to fire frequency and burned acreage from these factors are anticipated.

Alternative B prohibits fuels treatments in the BLM surface in Occupied and Unoccupied Habitat with the exception of areas not exhibiting the characteristics of GUSG habitat. It also prioritizes suppression of all fire on BLM surface in Occupied and Unoccupied Habitat to protect GUSG habitat, immediately after protection of life and property. However, firefighter access to implement fire suppression would be more difficult under a reduced route network with reclaimed routes—also mandated under Alternative B. The outcome of this combination of management actions is most likely longer Initial Attack times, and more situations where fires become difficult to control. This would result in increased acreage burned by wildfire in this area—particularly from natural ignitions—as compared with Alternative A. Within Non-Habitat Areas, management of fire to increase connectivity would also increase the area burned by wildfire as compared with Alternative A.

### Fuels Condition

Under Alternative B, fuel treatments on BLM surface in Occupied and Unoccupied Habitat would be prohibited and prescribed fire would not be allowed.  In addition, aggressive fire suppression would be pursued, although other management actions would reduce its effectiveness.  These factors would combine across this area to increase the percent departure from historic reference conditions in comparison to Alternative A, resulting in more acres in VCC 2 and VCC 3.  Within Non-Habitat Areas, management of fire to increase connectivity would reduce acreage in VCC 2 and VCC 3 as compared with Alternative A.

## ALTERNATIVE C

Alternative C would reduce fire frequency in comparison with Alternative A, but could increase acreage burned by wildfire in comparison to Alternative A.  Wildfire suppression cost would probably be greater than Alternative A because of more access difficulties, and the greater cost associated with managing more wildfires for resource benefit.  However costs are projected to be less than Alternative B which would have substantially less access, no fuels reduction projects, and more opportunities for wildfire to reach large and costly sizes.

### Amount of Land Burned by Wildfires and Fire Frequency

Alternative C limits surface disturbance, and associated human activities on more of the BLM surface in Occupied and Unoccupied Habitat than Alternative A, but less than Alternative B.  Alternative C also specifies consideration of route density reductions during travel management planning.  These actions could result in reduced human access and associated opportunities for accidental ignition in comparison with Alternative A, resulting in associated reductions in burned area acreage and fire frequency.  However, surface disturbance restrictions and route density reduction would be to a lesser extent than Alternative B, resulting in greater ignition opportunities, and more associated fire.  This alternative places more restrictions on the use of prescribed fire than Alternative A, with reduced likelihood of escape and a lesser increase in burned area and fire frequency.

Alternative C allows fuels treatments with some design restriction to benefit GUSG across the BLM surface in Occupied and Unoccupied Habitat. It also encourages wildfire management for benefit of GUSG.  However, firefighter access to implement fire management activities would be more difficult under a reduced route network with reclaimed routes, which is also included as part of Alternative C.  The outcome of this combination of management actions could be longer fire size-up and planning times than Alternative A, and more acreage burned by wildfire.  More acreage is projected to be burned under this alternative than under Alternative B as well.  The increase in acreage would primarily result from more fuels treatments

which would increase wildfire manageability, and allow for more wildfire incidents to be used to achieve GUSG benefits.

Impacts to acreage burned and fire frequency within Non-Habitat Areas would be similar to Alternative A.

### Fuels Condition

Under Alternative C, fuel treatments would be allowed with some restrictions across the BLM surface in Occupied and Unoccupied Habitat, and prescribed fire would also be allowed. In addition, wildfire would be used to achieve GUSG habitat objectives in some vegetation types. These factors would combine to reduce VCC class over both the short and long term as compared with Alternative A and B. More acres would fall into VCC 1 and fewer acres would be in VCC2 and VCC 3 as a result.

Impacts to fuel loading within Non-Habitat Areas would be similar to Alternative A.

## SUB-ALTERNATIVE $D_1$ - GUNNISON BASIN PREFERRED

Sub-Alternative $D_1$ would reduce fire frequency in comparison with Alternative A but could increase acreage burned by wildfire in comparison to Alternative A. Wildfire suppression cost would probably be greater than Alternative A because of more access difficulties, and the greater cost associated with managing more wildfires for resource benefit. Costs are projected to be generally similar but less than Alternative C because of similar access, fuels treatment, and wildfire use for resource benefit with the exception of wildfire management in Occupied Habitat.

### Amount of Land Burned by Wildfires and Fire Frequency

Sub-Alternative $D_1$ allows for surface disturbance under 0.25 acre within the Gunnison Basin population area. This represents a decrease in areas at higher risk of ignition and associated increase in fire due to human activities, as compared with Alternative A. Sub-Alternative $D_1$ would leave more area than alternatives B and C open to surface disturbance, human activities, and associated impacts to fire. Sub-Alternative $D_1$ proposes no route reduction measures with similar impacts as Alternative A to human access and associated fire. This alternative treats prescribed fire the same as Alternative C with the same expected results to acreage burned by wildfire and fire frequency.

Sub-Alternative $D_1$ provides the same management actions as Alternative C for fuels treatment and wildfire management within Unoccupied Habitat for the Gunnison Basin population area, with the same anticipated impacts to acreage burned by wildfire. However, it treats wildfire management in Occupied Habitat similar to Alternative B. Higher route densities, fewer reclaimed routes and the presence of

fuels treatments under this alternative would improve firefighter access and fire manageability for more effective suppression than Alternative B, resulting in less acres of Occupied Habitat burned by wildfire.  Because wildfire would not be used to achieve resource objectives in Occupied Habitat, Sub-Alternative $D_1$ would most likely result in fewer acres burned by wildfire than Alternative A within Occupied Habitat.

Impacts to acreage burned and fire frequency within Non-Habitat Areas would be similar to Alternative A.

### Fuels Condition

Sub-Alternative $D_1$ contains the same fuels treatment and prescribed fire measures as Alternative C.  While it also has similar measures for use of wildland fire to achieve GUSG habitat objectives in Unoccupied Habitat, it calls for fire suppression within Occupied Habitat.  These factors would combine to produce similar results as Alternative C for VCC status in Unoccupied Habitat, but would result in less reduction of VCC in Occupied Habitat.  Because of the additional restrictions placed on prescribed fire use and fuels treatments, VCC would be reduced less than under Alternative A.  However, it would be reduced more than under Alternative B which prohibits prescribed fire and fuels treatments in habitat areas.

Impacts to fuel loading within the Non-Habitat Areas would be similar to Alternative A.

## SUB-ALTERNATIVE $D_2$ - SATELLITE PREFERRED

Sub-Alternative $D_2$ would reduce fire frequency in comparison with Alternative A but could increase acreage burned by wildfire.  Wildfire suppression cost would probably be greater than Alternative A because of more access difficulties, and the greater cost associated with managing more wildfires for resource benefit. Costs are projected to be generally similar but less than Alternative C because of similar access, fuels treatment, and wildfire use for resource benefit with the exception of wildfire management in Occupied Habitat.

### Amount of Land Burned by Wildfires and Fire Frequency

Sub-Alternative $D_2$ places similar surface disturbance constraints and route reduction actions on satellite population areas as Alternative C, and similar measures for prescribed burns in Unoccupied Habitat.  The identical impacts to human access and activity, acreage burned by wildfire and fire frequency would be expected in Unoccupied Habitat. Limitations on prescribed fire within Occupied Habitat under Sub-Alternative $D_2$ are not expected to change the escape fire

possibility at a detectable level, so acreage burned by wildfire and fire frequency in this alternative would also be similar to Alternative C.

Sub-Alternative $D_2$ provides the same management actions as Alternative C for fuels treatment and wildfire management within Unoccupied Habitat for the satellite population areas, with the same anticipated impacts to acreage burned by wildfire. However it treats wildfire management in Occupied Habitat similar to Alternative B. Higher route densities, fewer reclaimed routes and the presence of fuels treatments under this alternative would improve firefighter access and fire manageability for more effective suppression than Alternative B, resulting in less acres of Occupied Habitat burned by wildfire. Because wildfire would not be used to achieve resource objectives in Occupied Habitat, Sub-Alternative $D_2$ would most likely result in fewer acres burned by wildfire than Alternative A within Occupied Habitat.

Impacts to acreage burned and fire frequency within the Non-Habitat Areas would be similar to Alternative A.

### Fuels Condition

Sub-Alternative $D_2$ contains the same fuels treatment, fire management and prescribed burning measures as Alternative C in Unoccupied Habitat, but restricts the use of wildfire for resource benefit and prescribed fire is limited to the burning of slash piles in Occupied Habitat. These factors would combine to produce similar results for VCC status as Alternative C in the satellite population area in Unoccupied Habitat. However in Occupied Habitat the management actions would result in less reduction of VCC. Because of the additional restrictions placed on prescribed fire use and fuels treatments, VCC would be reduced less than under Alternative A. However, it would be reduced more than under Alternative B, which prohibits prescribed fire and fuels treatments in habitat areas.

Impacts to fuel loading within Non-Habitat Areas would be similar to Alternative A.

## 4.8.4. Cumulative Impacts

Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely to continue to affect wildland fire ecology and management are the creation of wildland-urban interface areas, creation of recreation areas, fuels treatments, habitat treatments, and livestock grazing.

Past and present management actions and natural events within the cumulative impact analysis area have altered the condition of vegetation and natural fire regimes across the landscape. These include fire suppression, vegetation treatments, grazing,

noxious and invasive weed spread, drought, and insect and disease outbreaks. In some cases, areas have become more prone to large intense fires.

Urban development and recreational activities in the cumulative impact analysis area are expected to increase over the life of the plan amendment, creating additional potential ignition sources and the probability of wildfire occurrence. Of these two factors, urbanization, especially the expansion of residential areas, is expected to be the larger contributor on cumulative wildland fire impacts. Additional wildland-urban interface would increase the need for hazardous fuels projects to reduce the risk of wildfires burning from BLM-administered land into residential areas. Increased wildland-urban interface can also increase costs associated with suppression and is more dangerous to firefighters and the public. Additional fire suppression resources could be needed, including federal, state, and local agency resources.

Changing land use patterns and increased recreation and visitation would also result in the modification of vegetation communities; both trends present new vectors for the introduction of noxious weeds and nonnative vegetation species lacking adequate vegetative cover. These introduced species could eventually alter the fire regime of certain areas and potentially increase the frequency, size, and intensity of wildfires.

Prioritization of fuels treatments and suppression in GUSG Habitat could cumulatively affect areas inside and outside of the cumulative impacts analysis area by placing a lower priority on non-GUSG habitat areas. This prioritization could cause more fires in areas outside of Occupied Habitat and Unoccupied Habitat due to fewer fuels treatments and suppression efforts.

Cumulative impacts on wildland fire ecology and management are expected to be the greatest under Alternative B, because the BLM would place the most restrictions on fire management in the most areas. Management under Alternative A would result in the fewest cumulative impacts on fire management because it would place the fewest restrictions on that program in the fewest areas. Under Alternative C and sub-alternatives $D_1$ and $D_2$, the BLM would place more restrictions on fire management across a larger area than Alternative A, but fewer than under Alternative B.

# 4.9. LIVESTOCK GRAZING

## 4.9.1. METHODOLOGY

### ATTRIBUTES AND INDICATORS

- Active permitted forage (expressed as Animal Unit Months or AUMs)
- Acres within active livestock grazing allotments
- Acres of BLM lands achieving Land Health Ecological Fundamental, and acres not achieving this fundamental with livestock grazing a significant factor
- Acres of area where there are prohibitions on or limitations to the construction or maintenance of structural and nonstructural range improvements.

### ASSUMPTIONS

The BLM will continue to bring grazing allotments and their management into compliance with BLM Colorado and Utah Public Land Health Standards.

Many range improvements (e.g., water wells, troughs, catchments, and reservoirs) result in a localized loss of vegetation cover due to livestock concentrating around them.

Range improvements generally lead to improved livestock distribution and vegetation management, which in turn could support long-term vegetation objectives without changes to permitted AUMs or season of use. Loss of the ability to develop, maintain, and use range improvements would result in loss of livestock distribution capabilities, which could decrease the ability to manage the rangelands

Implementation of particular livestock grazing management actions may affect permittees by increasing their operational cost through more intensive livestock management, season-of-use changes, class of livestock changes, modified grazing systems, or decreased AUMs.

All classes of livestock depend on the herbaceous component of a shrub/grass plant community. Some livestock also utilize shrubs, which can be an important forage component during some seasons.

Increases in shrubs or pinyon and juniper are generally adverse to forage production; increases in perennial grasses and forbs are generally beneficial to forage production.

Vegetation treatments, such as prescribed burns or weed control, can enhance the plant community composition and forage availability.

Overutilization can adversely affect plant composition and ground cover.

Water can improve livestock distribution, and areas without available water will have less use than areas with water.  Areas very close to water will often have over use.

Fences are an important tool used to control areas, timing, and intensity of livestock use, and are generally needed to confine grazing to within allotments, particularly where cattle and horses are grazed.

Rates of suburban and rural development will continue, reducing private ranchland and BLM grazing allotments in some cases.

## METHODS AND DATA

### Permitted Forage

Active permitted Animal Unit Months (AUMs) are estimated for BLM surface in Occupied and Unoccupied Habitat.  These estimates are based on the BLM's Range Administration Database and an updated GIS layer of allotment boundaries, supplemented with information from the range staff of BLM field offices in the planning area.

This analysis compares permitted AUM availability between the different alternatives because of its importance to livestock grazers.  Management actions closing areas to grazing would directly eliminate AUMs.  Actions reducing AUMs or constraining their availability through permit terms and conditions would directly reduce permitted AUMs.

Other management actions also influence forage availability, but with indirect impacts to permitted AUMs.  Alternatives encouraging vegetation treatments or providing for the use of wildfire in shrub or tree-dominated vegetation, including follow-up grazing management, are projected to improve range condition and increase forage production and available AUMs (DeBano 1989).  Alternatives preventing treatments or suppressing wildfire will be considered to reduce forage availability.  Because range improvements can improve livestock distribution and result in better forage utilization, alternatives which prohibit or limit their construction will be considered to indirectly reduce AUMs over both the short and long term.

Designation or development of BLM surface for other land uses could reduce forage availability and permitted AUMs.  Management actions designating Special Recreation

Management Areas or allowing for surface occupancy for mineral development are projected to reduce permitted AUMs.

### Acres within Active Livestock Grazing Allotments

The alternatives are also analyzed for impacts to the total area permitted for livestock grazing. Management actions with impacts to this indicator are limited to those which close allotments, remove entire allotments or remove portions of allotments from grazing use.

### Land Health Ecological Fundamental Status

The Land Health Ecological Fundamental is used here as an indicator of native range condition. Lands not achieving the Ecological Fundamental are considered to be in poor native range condition. This indicator is less effective for indicating condition on ranges with nonnative seedings, but these make up less than 12% of the decision area.

This analysis also considers areas that are not achieving the Ecological Fundamental with livestock grazing a significant factor. BLM requires that grazing management be adjusted within a year to improve conditions on lands in this category. To this end, the BLM has developed livestock grazing guidelines that are consistent with achieving the Land Health Fundamentals (BLM 2008, 2011e). These include generalized guidelines for appropriate utilization levels, rest, recovery, and completion of lifecycle stages for palatable plants. While current management is subject to this requirement, not all grazing permits and allotment management plans have incorporated these guidelines yet. Therefore, in this analysis, current management is projected to maintain poor range condition where livestock grazing is a significant factor over the short term, and improve it over the long term. Alternatives that incorporate the livestock grazing guidelines or similar range management guidance into grazing permits and grazing management plans will be considered consistent with improving range condition where livestock grazing is a significant factor. This would apply over both the short and long term. Alternatives that remove or close lands in this category to grazing are projected to have the same effect on range condition.

Livestock operators who graze on BLM typically have private land pastures or hayfields as well. In many cases, these private lands also provide GUSG habitat. Over the course of a year, they must balance their livestock forage needs across these different sources. If forage from one source is reduced, other sources must make up the difference in order to maintain their herd. This could be done through increasing stocking rates on non-BLM pastures, which could reduce range condition in these pastures in some cases (Holechek 1989). Based on this, alternatives which reduce or eliminate permitted AUMs from BLM land will be interpreted as

potentially indirectly reducing range condition on non-BLM pastures. Alternatives which do not reduce AUMs will be considered neutral to non-BLM pasture condition.

### Constraints on Range Improvements

This analysis is based on acres of area where there are land use plan-level prohibitions on or limitations to the construction or maintenance of structural range improvements. The indicator is used to address cost and complexity of range management. This information is based on the existing land use plans supplemented by a survey of BLM field offices range staff.

Uneven livestock distribution—which is a major challenge in the mountain and desert west—can reduce range condition in some areas, and fail to utilize forage in other areas of an allotment. Well-distributed water sources and fences are important tools to achieve more uniform livestock distribution (Holechek 1989). Therefore, limitations on construction of fences, water sources, and other structural range improvements can increase the cost and complexity of achieving full use of the allotment and its permitted AUMs. Alternatives which prohibit or limit construction of range improvements will be considered to reduce livestock management options more than alternatives which place lesser constraints on their construction. Furthermore, because infrastructure and its maintenance can be costly, alternatives which require redesign, increased maintenance or upgrading of range improvements will be considered to increase the cost and complexity of range management more than alternatives that do not include such constraints.

### Grazing Systems

This indicator is also used to evaluate impacts to the cost and complexity of range management, and is based on the acreage of different types of grazing systems on BLM lands. This information has been provided by BLM field offices range staff.

Grazing systems are used to improve livestock distribution and the condition of important forage species (Holechek 1989). As discussed in Chapter 3 and in the Range Improvements section above, higher management systems are likely to be more costly and complex to administer than lower management systems. As a result, alternatives which require implementation of higher management grazing systems will be considered to make range management more costly and complex than alternatives that do not have similar requirements.

## 4.9.2. Impacts Common to All Alternatives

### Permitted Forage

Wildlife would continue to graze and browse, reducing the available AUMs across the BLM surface in Occupied and Unoccupied Habitat. Fires, drought, insect outbreaks and similar natural phenomena would also affect the availability of AUMs. Natural vegetation succession would move the vegetation in many areas toward dominance by woody species and reduced forage production. This would reduce AUMs, particularly over the long term.

### Land Health Ecological Fundamental Status

Wildlife impacts, fires, drought, insect outbreaks and similar natural phenomena would affect land health indicators and could impact the Ecological Fundamental Status.

## 4.9.3. Impacts by Alternative

## ALTERNATIVE A - NO ACTION

### Permitted Forage

Permitted forage currently exceeds 36,000 AUMs across the BLM surface in Occupied and Unoccupied Habitat and is expected to continue near these levels over the short term. Over the long term, permitted AUMs are likely to decline as management units reduce stocking rates on some allotments to bring them into compliance with Land Health Standards, both on Occupied and Unoccupied Habitat and in the Non-Habitat Areas.

This alternative would place few restrictions on vegetation treatments. The following RMPs encourage vegetation treatments in order to meet habitat objectives: Canyons of the Ancients NM, Dominguez-Escalante NCA, Grand Junction, Gunnison Gorge NCA, Gunnison, McInnis Canyons NCA, Monticello, Moab, San Luis, and Tres Rios. None of the land use plans explicitly prevent vegetation treatments. Treated areas are anticipated to continue to accumulate at current rates approximating 1-3% of the BLM surface in Occupied and Unoccupied Habitat per decade and at a slower rate in Non-Habitat Areas over the short and long term. Forage availability is projected to increase across these areas as a result.

About 12% of BLM surface in Occupied Habitat and 34% in Unoccupied Habitat is currently under some type of planning-level constraint that prevents or complicates development of range infrastructure. This acreage is expected to remain unchanged under Alternative A. The remainder of BLM surface in Occupied and Unoccupied

Habitat currently has fewer restrictions. In these areas, it would be easier to achieve improved livestock distribution and more uniform forage utilization, and therefore indirectly increase forage availability.

Special recreation management areas are expected to increase in number as land use plans are issued or revised. Available forage in these areas is projected to decrease as a result of conflicts between livestock and recreation. Surface protection stipulations currently prevent large-scale development of energy projects across 61% of BLM surface in Occupied and Unoccupied Habitat. If substantial mineral or energy project development were to occur on the remaining 39% open to surface development, then forage availability would be reduced. The amount of land protected from surface disturbance is expected to increase with new and revised land use plans for BLM surface in Occupied and Unoccupied Habitat and the Non-Habitat Areas.

### Acres within Active Livestock Grazing Allotments

Nearly 580,000 acres of BLM surface in Occupied and Unoccupied Habitat and 67,000 acres within the Non-Habitat Areas fall within active livestock grazing allotments. This acreage is expected to decline over the short term as new and revised RMPs eliminate some allotments. Similar long-term declines are anticipated as continued population growth and development cause additional allotments to become impractical to graze.

### Land Health Ecological Fundamental Status

As previously discussed in the vegetation section, Alternative A constrains surface disturbance on 61% of BLM surface in Occupied and Unoccupied Habitat and 42% within the Non-Habitat Areas, with no anticipated impacts to the current Ecological Fundamental status in these areas. On the remaining 41% of unprotected surface and 60% of the Non-Habitat Areas, existing status is expected to be maintained over the short term. But over the long term, lands not achieving the Ecological Fundamental are projected to increase within the unconstrained area.

Livestock grazing is anticipated to continue on over 90% of BLM surface in Occupied and Unoccupied Habitat and within 56% of the Non-Habitat Areas. It is not expected to influence existing Land Health status for the short term. Over the long term, ratings are expected to improve on acreages currently not achieving the Ecological Fundamental where livestock grazing is a significant factor, and in some areas where significant factors have not been identified yet. Conditions are expected to improve on between 37,000 and 258,000 acres on BLM surface in Occupied and Unoccupied Habitat and between 13,000 and 23,000 acres within the Non-Habitat Areas.

Current conditions on non-BLM pastures would be expected to continue over the short term. Over the long term, conditions could decline if ranchers were to increase stocking rates to adjust for stocking rate reductions on BLM lands. Such reductions are projected to occur in some allotments not achieving the Ecological Fundamental with livestock grazing a significant factor.

### Constraints on Range Improvements

About 12% of BLM surface in Occupied Habitat and 34% of Unoccupied Habitat is currently under some type of planning-level constraint which prevents or complicates development of range infrastructure, increasing the cost and complexity of range management. This acreage would be expected to remain unchanged under Alternative A. The remaining BLM surface in Occupied and Unoccupied Habitat currently has fewer restrictions.

Maintenance of existing range developments is subject to general timing constraints to protect wildlife or soils in most land use plans. The extent and scope of these constraints would be expected to increase over the short term as new land use plans and RMP revisions are issued. These constraints would add to the cost and complexity of range management for BLM surface in Occupied and Unoccupied Habitat and in Non-Habitat Areas.

### Grazing Systems

Grazing systems would be expected to continue approximately as they are currently—with the majority of allotments and acreage on BLM surface in Occupied and Unoccupied Habitat in some type of higher level management system. This higher level of management is associated with greater cost and complexity than lower levels of management. The cost and complexity would be amplified as range project maintenance is increasingly constrained.

## ALTERNATIVE B

### Permitted Forage

Under Alternative B, all BLM surface in GUSG habitat would be closed to livestock grazing. In contrast to Alternative A, there would be no permitted AUMs over the short or long term as a result. Indirect impacts to forage availability from vegetation treatments, development of range infrastructure, and conflicts with recreation or mineral development would be irrelevant for livestock grazing. Forage reductions from surface-disturbing activities in the Non-Habitat Areas would be less than under Alternative A.

### Acres within Active Livestock Grazing Allotments

With the closure of BLM surface in Occupied and Unoccupied Habitat to livestock grazing, there would no longer be any active allotments, as compared with Alternative A. Impacts to allotted acreage in Non-Habitat Areas would be similar to Alternative A.

### Land Health Ecological Fundamental Status

With the elimination of livestock grazing, the status of lands not achieving the Ecological Fundamental where livestock grazing is a significant factor would improve over the short and long term. This acreage would be expected to be between 37,000 and 258,000 acres. Alternative B would achieve the same results more quickly than Alternative A.

Range conditions on non-BLM pastures would be expected to decline over the short and long term as a result of ranchers either increasing stocking rates to adjust for loss of grazing on BLM lands, or converting private lands to more impactful land uses that result in reduced range conditions.

Impacts to land health in Non-Habitat Areas would be similar to those under Alternative A.

### Constraints on Range Improvements

Under Alternative B, range improvements would not be needed or allowed in Occupied and Unoccupied Habitat. Within the Non-Habitat Areas, requirements for water developments to comply with West Nile virus minimization measures would add additional costs and complexity to livestock management on BLM lands compared with Alternative A.

### Grazing Systems

With closure to livestock, systems for managing grazing would no longer be needed on BLM lands in Occupied and Unoccupied Habitat. Within the Non-Habitat Areas, impacts to grazing systems would be similar to those under Alternative A.

## ALTERNATIVE C

### Permitted Forage

Alternative C would maintain livestock grazing across much of BLM surface in Occupied and Unoccupied Habitat, but could reduce AUMs in allotments not meeting RCP guidelines or where livestock disrupt GUSG. In addition, the alternative includes an objective that would prioritize expedient action to improve these areas, requiring a short-term reduction of AUMs in contrast to Alternative A. The objective specifies the inclusion of RCP habitat indicators into grazing

management adjustments that would likely result in more of a reduction over the long term than Alternative A. Under Alternative C, grazing permits would be subject to consistent, specific evaluation for GUSG habitat indicators, which is not the case under Alternative A. Forage reductions would be less than under Alternative B.

Vegetation treatments would be emphasized under Alternative C. While not possible to predict the amount of increase over current levels, over 3% of BLM surface in Occupied and Unoccupied Habitat per decade would have more available forage, an increase over forage levels under alternatives A or B.

Alternative C would place constraints on development of new range infrastructure in Occupied and Unoccupied Habitat. New developments would be required to conserve, enhance, or restore Occupied Habitat, and would not be allowed to degrade Unoccupied Habitat. Available forage could increase where such developments are constructed. Because of the constraints, fewer developments and a greater increase in forage availability would be expected in comparison to Alternative A.

Under this alternative, special recreation management areas not in conflict with GUSG would be allowed within Occupied Habitat and would be allowed without restriction within Unoccupied Habitat. Forage availability could be reduced as a result of recreation and livestock conflicts, though the reduction would be less than under Alternative A.

Because of proposed ROW avoidance and mineral leasing NSO stipulations, Alternative C would place a portion of BLM surface in Occupied and Unoccupied Habitat under surface disturbance restrictions, more than under Alternative A, but less than under Alternative B. This alternative would prevent loss of forage to large-scale mining or energy development across more area than Alternative A over both the short and long term.

Within the Non-Habitat Areas, impacts to permitted forage would be similar to those under Alternative A.

### Acres within Active Livestock Grazing Allotments

Because Alternative C allows for the potential closure of voluntarily relinquished allotments, the acreage of allotments is projected to be less than under Alternative A, but greater than under Alternative B. Within Non-Habitat Areas, the impacts to allotted acreage would be similar to Alternative A.

### Land Health Ecological Fundamental Status

Because of proposed ROW avoidance and mineral leasing NSO stipulations, Alternative C would constrain surface-disturbing activities on a portion of BLM

surface in Occupied and Unoccupied Habitat to a greater extent than Alternative A, but less than Alternative B. Similar to alternatives A and B, conditions over the short term would probably not change as a result of surface disturbance. However, over the long term, conditions under Alternative C would be subject to decline from accumulating surface disturbance across portions of BLM surface in Occupied and Unoccupied Habitat.

Alternative C maintains livestock grazing across BLM surface in Occupied and Unoccupied Habitat using appropriate grazing practices to meet GUSG RCP habitat requirements. As a result, the status of lands not achieving the Ecological Fundamental where livestock grazing is a significant factor is projected to improve within ten years, similar to Alternative B. This acreage is expected to be between 37,000 and 258,000 acres. The improvement in Land Health status would occur more rapidly than under Alternative A, and would be sustained into the future.

Under Alternative C, conditions on non-BLM pastures could decline over the short and long term if ranchers were to increase stocking rates on private pastures to adjust for stocking rate reductions on BLM lands. Such reductions could occur in BLM allotments not achieving the Ecological Fundamental with livestock grazing as a significant factor. The decline would be greater than under Alternative A, but less than under Alternative B.

Within Non-Habitat Areas, impacts to range conditions and land health would be similar to those under Alternative A.

### Constraints on Range Improvements

Alternative C would place constraints on the development of new range infrastructure in Occupied and Unoccupied Habitat. New developments would be required to conserve, enhance, or restore Occupied Habitat, and would not be allowed to degrade Unoccupied Habitat, increasing the cost and complexity of range management. Furthermore, Alternative C includes maintenance requirements that would add additional cost over both the short and long term. These constraints are greater than under Alternative A, but less than under Alternative B (which prevents grazing altogether). Within Non-Habitat Areas, constraints on range project development and maintenance would be similar to those under Alternative A.

### Grazing Systems

Alternative C requires managing allotments through livestock distribution, stocking rates, and seasonal use considerations when RCP habitat guidelines are not being met or when livestock disrupt GUSG. This would likely require switching to higher management level grazing systems in some instances. Such a switch would represent an increase over Alternative A. Because range project development and maintenance is more heavily constrained under Alternative C, the overall cost and

complexity of implementing higher management level grazing systems would exceed alternatives A and B. Within Non-Habitat Areas, grazing systems would be managed similar to Alternative A, with the same level of associated cost and complexity.

## SUB-ALTERNATIVE $D_I$ - GUNNISON BASIN PREFERRED

### Permitted Forage

Sub-Alternative $D_I$ is similar to Alternative C in that it maintains livestock grazing across much of the Gunnison Basin population area, and could reduce AUMs in allotments which do not meet RCP guidelines. While slightly less strict than Alternative C in terms of timing and approach, the short and long term outcomes to permitted AUMs would be similar.

Sub-Alternative $D_I$ proposes the same vegetation treatment approach as Alternative C, with the same outcome to forage availability. This alternative places constraints on development of new range infrastructure across the BLM surface in the Gunnison Basin population area, but to a lesser degree than Alternative C, with associated increases in available forage

Special Recreation Management Areas have been identified for future development under this alternative, which is more than would likely occur under Alternative C. These SRMAs could reduce forage availability as a result of recreation and livestock conflicts. This reduction in available forage would be less than under Alternative A, but more than Alternative C.

Sub-Alternative $D_I$ places restrictions on some types of surface-disturbing activities, but allows others to occur with mitigation to protect GUSG and their habitat. A portion of the BLM surface within the Gunnison Basin Population is covered by these partial restrictions. This portion would be greater than in Alternative A, but less than Alternatives B and C. As a result, this alternative would prevent loss of forage to large scale mining or energy development across more area than Alternative A, but less than Alternative C.

Within Non-Habitat Areas, impacts to permitted forage would be similar to Alternative A.

### Acres within Active Livestock Grazing Allotments

Sub-Alternative $D_I$ is similar to Alternative C and would have the same impacts to acreage of active grazing allotments. Within Non-Habitat Areas, impacts to allotted acreage would be similar to Alternative A.

### Land Health Ecological Fundamental Status

Sub-Alternative $D_1$ constrains surface disturbing activities on a portion of the Gunnison Basin Population, an increase in comparison to Alternative A, but a decrease compared with alternatives B and C. Over the short term, land health and conditions would probably not change as a result of surface disturbance, similar to alternatives A, B, and C. However, over the long term, conditions under Sub-Alternative $D_1$ would be subject to decline from accumulating surface disturbance across a portion of the Gunnison Basin population area.

Sub-Alternative $D_1$ maintains livestock grazing across the Gunnison Basin population area using a strategy designed to achieve RCP guidelines. As a result, the status of lands not achieving the Ecological Fundamental where livestock grazing is a significant factor is projected to improve within ten years, similar to alternatives B and C. Because causal determinations for land health status have not yet been documented within the Gunnison Basin, this acreage could be anywhere between 0 and 211,000 acres. Similar to alternatives B and C, this improvement in Land Health status would occur more rapidly than under Alternative A and would be sustained into the future.

Conditions on non-BLM pastures would be expected to be similar to those under Alternative C, since both alternatives could reduce stocking rates in some allotments on BLM lands.

Within the Non-Habitat Areas, impacts to range condition and land health would be similar to those under Alternative A.

### Constraints on Range Improvements

Sub-Alternative $D_1$ places constraints on development of new range infrastructure across the BLM land in the Gunnison Basin population area, but to a lesser degree than Alternative C. While the cost and complexity of range management is expected to be greater than under Alternative A, it would not rise as much as under Alternative C. Within the Non-Habitat Areas, constraints on range project development and maintenance would be similar to Alternative A.

### Grazing Systems

This alternative requires similar grazing management measures as Alternative C, but to a lesser extent. As a result, fewer allotments would require switching to higher management level grazing systems. While this switch represents an increase in range management cost and complexity over Alternative A, it is less than Alternative C. Similarly, this alternative contains constraints on range project development and maintenance that are more restrictive than Alternative A, but less than Alternative C. While this would further increase the cost and complexity of implementing higher management level grazing systems in comparison to Alternative A, the

increases would be less than under Alternative C. Within Non-Habitat Areas, grazing systems would be managed similar to Alternative A, with the same level of associated cost and complexity.

## SUB-ALTERNATIVE $D_2$ - SATELLITE PREFERRED

### Permitted Forage

Sub-Alternative $D_2$ is similar to Alternative C and would result in the same level of AUM reduction as Alternative C. This alternative proposes the same vegetation treatment approach as Alternative C, with the same outcome to forage availability. Sub-Alternative $D_2$ places the same constraints on development of new range as Alternative C, with associated increases in available forage. Alternative C also contains the same SRMA and surface disturbance restrictions, with the same outcomes for forage availability.

Within the Non-Habitat Areas, impacts to permitted forage would be similar to Alternative A.

### Acres within Active Livestock Grazing Allotments

This alternative is identical to Alternative C and would have the same impacts to acreage of active grazing allotments. Within the Non-Habitat Areas, impacts to allotted acreage would be similar to Alternative A.

### Land Health Ecological Fundamental Status

Sub-Alternative $D_2$ shares the same constraints as Alternative C across the satellite populations. Over the short term, land health conditions across this area would probably not change as a result of surface disturbance, similar to alternatives A, B and C. Over the long term, conditions under Sub-Alternative $D_2$ would be subject to decline from accumulating surface disturbance across a portion of the satellite populations.

Sub-Alternative $D_2$ maintains livestock grazing across the satellite populations area using a strategy designed to achieve RCP guidelines. Similar results for the land health Ecological Fundamental are expected for this area as described under Alternative C. Because causal determinations for land health status have not yet been documented within some of the satellite population areas, this acreage could be anywhere between 37,000 and 46,000 acres. Similar to alternatives B and C, the improvement in Land Health status would occur more rapidly than under Alternative A and would also be sustained into the future.

Conditions on non-BLM pastures are expected to be the same as under Alternative C.

Within the Non-Habitat Areas, impacts to range condition and land health would be similar to Alternative A.

### Constraints on Range Improvements

Sub-Alternative $D_2$ places the same constraints on development of new range infrastructure and on range project maintenance as Alternative C with the same impacts to the cost and complexity of range management. Within the Non-Habitat Areas, constraints on range project development and maintenance would be similar to Alternative A.

### Grazing Systems

Sub-Alternative $D_2$ requires the same grazing management, range development and maintenance measures as Alternative C, and would have the same impacts to grazing systems and the cost and complexity of range management. Within the Non-Habitat Areas, grazing systems would be managed similar to Alternative A, with the same level of associated cost and complexity.

## 4.9.4.  CUMULATIVE IMPACTS

Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect range management are wildfires, surface-disturbing activities, the presence and abundance of grazing wildlife, increased recreational demands, and protections for sensitive resources.

Past actions that have affected livestock grazing include human-caused surface disturbances (mineral development, recreation, prescribed burning, mechanical vegetation treatments, WSAs and historic grazing practices) and wildland fires that have contributed to current ecological conditions.

Cumulative projects that increase human disturbance in grazing areas could also indirectly impact grazing by increasing weeds and invasive species. Weed invasion can reduce preferred livestock and wildlife forage and increase the chance of weeds being dispersed by roaming livestock. Cumulative projects that increase human disturbance in grazing areas could directly impact grazing by displacing, injuring, or killing animals.

Present actions affecting livestock grazing are mainly those that reduce available grazing acreage, restrict management actions or the level of forage production in those areas. Key examples include wildland fires, motorized vehicle use, recreation, habitat restoration, fuels reduction, and special designations that restrict grazing. Future actions affecting livestock grazing would be similar to present actions, except

under Alternative B, under which the BLM would close BLM surface across the BLM surface in Occupied and Unoccupied Habitat to livestock grazing.

The cumulative impacts under each alternative would parallel the impacts of the alternatives in the general impact analysis, above. In general, management actions in every alternative would result in short- and/or long-term changes in availability of forage due to treatment activities, other surface-disturbing and disruptive activities, human disturbance, special designations, and the presence of grazing wildlife, threatened, or endangered species. Although forage would increase over the long term under Alternative B if grazing were removed, Alternative B would also have the greatest impact on livestock grazing. Under alternatives A and C and sub-alternatives $D_1$ and $D_2$, forage would be utilized annually at various levels relative to the protections provided in the four alternatives. Management under Alternative A would contribute the most cumulative effects to range management by allowing the most surface disturbance, which would cumulatively decrease forage availability.

# 4.10. RECREATION

## 4.10.1. Methodology

### ATTRIBUTES AND INDICATORS

Indicators of impacts to recreation are as follows:

- Changes in the number of acres where recreationists are unable to achieve targeted beneficial outcomes (specific to SRMAs), and for the BLM to achieve and maintain supporting setting characteristics (specific to SRMAs and some ERMAs).
- Changes in the number of acres where unstructured recreational opportunities and experiences are reduced or eliminated.
- Changes to the number or types of SRPs allowed in GUSG habitat.

### ASSUMPTIONS

The analysis uses the following assumptions:

- Recreation would be managed to achieve the objectives of individual Field Offices.
- Recreation objectives would vary based on the age of a Field Office's Land Use Plan.
- Traditional recreation uses within the decision area would continue, and are anticipated to increase as local populations grow.
- Improved facilities, especially recreation trails, are expected to result in increased use.
- Outside of areas where recreation is the management focus, BLM will mostly manage for dispersed recreation activities, where users participate in activities individually or in small groups.
- Conflicts between motorized users and non-motorized recreationists would increase with increasing use, especially in areas that area open to both.
- Outdoor recreation will continue to be an increasingly important component of local economies.
- Demand for recreation permits will remain steady or gradually increase, but will continue to be issued on a discretionary basis.
- Management actions to preserve GUSG habitat would affect a variety of resources and uses, which would improve some recreation opportunities and

experiences, and potentially degrade other recreation opportunities and experiences.

Impacts on recreation can be direct, indirect, or cumulative. Management actions that alter or prohibit a user's opportunities to access recreation areas or participate in recreation activities would result in a direct impact. Indirect impacts are those that change the physical, social, or administrative settings within which recreation activities take place. In areas where management prescriptions are in place to achieve or maintain desired settings, a change to the setting or availability of recreation opportunities would result in an impact.

Physical, social, and administrative settings are not specifically managed for in areas not identified as recreation management areas, although these areas do still provide intrinsic recreation values and opportunities. The indicator typically used to describe the impact on these areas is the availability of opportunities as described by either acreage restrictions or specific activity prohibitions.

For areas managed as Special Recreation Management Areas (SRMAs), both availability of recreation opportunities (activities and desired outcomes) and changes to physical, social, and administrative settings are used as indicators of impacts. This discussion analyzes the impacts that proposed management decisions would have on managing recreation settings and the targeted outcomes. For areas managed as Extensive Recreation Management Areas (ERMAs), both availability of activity opportunities and changes to the qualities and conditions (settings) are used as indicators of impacts. This discussion also analyzes the impacts that proposed management decisions would have on managing recreation and the prescribed setting character. Since visitor use patterns are difficult to estimate and depend on many factors beyond the scope of management (e.g., recreation trends and economy), qualitative language (such as "increase" or "decrease") is generally used unless quantitative visitor use data is available to describe anticipated impacts.

## METHODS AND DATA

Literature reviews were conducted relative to individual resource areas, to include studies from a variety of sources and a review of relevant BLM laws, regulations, and policies. Interviews with local field office subject matter experts were also conducted relative to land status, recreation management area classification, permitted uses, etc. for both Occupied Habitat and Unoccupied Habitat. Finally, geospatial data from the BLM and other authorities was used to help analyze conditions and land use allocations within the decision area, including the presence of SRMAs, ERMAs, and non-RMAs.

## 4.10.2. Impacts Common to All Alternatives

### Number of acres where recreationists are unable to achieve targeted beneficial outcomes (specific to SRMAs), and for BLM to achieve and maintain supporting setting characteristics (specific to SRMAs and some ERMAs)

All alternatives involve controlling major ground disturbances and disruption to GUSG and their habitat. For RMAs in GUSG habitat, this could result in a loss of recreational opportunities for people desiring more robust infrastructure and management to achieve their recreational pursuits. However, RMAs (or their Recreation Management Zones (RMZs)) that have objectives related to 'solitude' or 'backcountry' that are essentially undeveloped, would continue to be compatible with GUSG conservation measures.

### Number of acres where unstructured recreational opportunities and experiences are reduced or eliminated

Recreation would continue to occur in the unstructured (or dispersed) environment. All alternatives involve controlling human disruption, new ground disturbances, and reclamation of existing ground disturbance for the benefit of GUSG and their habitat. Timing limitations, seasonal closures, and other management actions implemented to protect GUSG and their habitat are not expected to result in significant impacts to recreational opportunities in the unstructured environment.

### Number or Types of SRPs Allowed in GUSG Habitat

Recreation permits, where allowed, are administered in a manner that is consistent with management objectives determined in RMPs, Recreation Area Management Plans, or in their absence, through recreation management objectives resulting from analysis of resources and visitor use in each area. SRPs will continue to be issued only at the discretion of local offices and will remain subject to the terms, conditions, and stipulations of the permit, which can be changed at any time to meet resource objectives. SRPs under all alternatives would be managed to reduce or eliminate conflicts from SRP activities to GUSG or their habitat.

This could potentially result in a long-term shift in the way that SRPs are managed in the decision area. SRPs most likely to be affected are those that depend on a primitive or backcountry setting, such as for hunting, outdoor education, equestrian-related activities, wilderness therapy, organized motor vehicle events, etc. It also includes other activities that occur during spring and summer, when they would need to avoid GUSG lekking, nesting and brood-rearing periods. Fall Big Game Hunting outfitters may be less affected because there are fewer sensitive concerns

for GUSG during the fall hunting season than for other types of hunting seasons, such as Mountain Lion, Turkey, and Small Game.

## 4.10.3. Impacts by Alternative

### ALTERNATIVE A - NO ACTION

#### Number of Acres with Targeted Beneficial Outcomes for Recreationists and Supporting Setting Characteristics

Alternative A would have the least impact to structured, outcomes-focused recreation management related to RMAs within the decision area. Under Alternative A, the BLM would continue to manage recreation uses in RMAs as identified in the existing RMPs. The BLM would not be restricted in establishing new RMAs under appropriate conditions, and current recreational opportunities in the decision area would continue. There would be no new impacts on recreation under Alternative A.

#### Number of Acres with Unstructured Recreational Opportunities and Experiences

Alternative A would have the least impact to unstructured recreational opportunities and experiences, with no change in current management. Under Alternative A, the BLM would continue to manage recreation uses as identified in the existing RMPs. Current recreational opportunities in the decision area would continue over the long term, and there would be no new impacts on recreation under Alternative A.

#### Number or Type of SRPs Allowed within GUSG Habitat

Alternative A would have the least impact to recreation and visitor services related to SRPs, with no change in current management. Under Alternative A, the BLM would continue to manage recreation uses as identified in the existing RMPs. The BLM would continue to review and approve recreation permits on a case-by-case basis. Current recreational opportunities in the decision area would continue, and there would be no new impacts on recreation under Alternative A.

### ALTERNATIVE B

#### Number of Acres with Targeted Beneficial Outcomes for Recreationists and Supporting Setting Characteristics

Alternative B, the most restrictive alternative, would have the greatest impact to structured recreation and visitor services. Under Alternative B, the BLM would not

allow new Recreation Management Areas (RMAs) in either Occupied Habitat or Unoccupied Habitat, but would allow recreation uses and activities to occur in both Occupied Habitat and Unoccupied Habitat that do not conflict with the protection and recovery of GUSG and GUSG habitat.

In addition to denying future RMAs, Alternative B would result in a loss of new opportunities for structured, outcomes-focused recreation management (and the benefits associated with targeted recreation opportunities, settings and experiences), and would potentially degrade beneficial outcomes in existing RMAs currently located within GUSG habitat if restrictions were applied to recreation for the benefit of GUSG recovery. There are 66,010 acres of SRMAs in the decision area that could potentially be eliminated under Alternative B, if they were determined to be in conflict with GUSG conservation.

### Number of Acres with Unstructured Recreational Opportunities and Experiences

BLM management under Alternative B would contain the most restrictions on unstructured recreational activities, such as for timing and season of use, ground disturbance limitations, and requires the most reclamation of existing disturbance. Alternative B would not allow for new recreation site development and could potentially require the removal of existing recreation sites and infrastructure, if it was determined to negatively impact GUSG and their habitat. There are currently 14 recreation sites in GUSG habitat from trailheads to campgrounds and other recreation sites. Under Alternative B, BLM would seasonally prohibit motorized and non-motorized recreation from March 15 to May 15 in Occupied Habitat, or in Non-Habitat. This would result in temporary reductions in recreational opportunities and would decrease the area available for recreational opportunities such as camping, mountain biking, hiking, and antler shed hunting. Big Game hunting would largely be unaffected because the restrictions (especially seasonal and timing) would not overlap with big game hunting seasons, however some hunting seasons that do overlap with seasonal closures under Alternative B, such as for Mountain Lion and Wild Turkey, would be impacted in some locations. Specific to GUSG, lek viewing sites would not be established and lek viewing would not be promoted.

In addition to restrictions for recreation resources, Alternative B contains the greatest restrictions on all other resource uses as well, such as lands and realty actions, energy development, livestock grazing, etc. Restrictions on these other resource uses could have a beneficial impact to unstructured recreation by reducing the potential for conflict with recreational access and degradation of physical setting characteristics. On the other hand, human entry closures and other area restrictions would deny recreation access and opportunities for part of the year.

#### Number or Types of SRPs Allowed within GUSG Habitat

Alternative B, would have the greatest and longest-lasting impact to recreation and visitor services related to SRPs, with an emphasis on avoiding new SRPs and eliminating current SRPs in GUSG habitat over time. Under Alternative B, the BLM would not allow new SRPs in either Occupied Habitat or Unoccupied Habitat, and would also deny existing permits from being renewed in both Occupied Habitat and Unoccupied Habitat. In addition to denying future recreational activities and events that are required to be permitted, Alternative B would result in a loss of new opportunities, and also existing opportunities to continue engaging in current permitted activities and events, which would be eliminated in GUSG habitat over time. There are currently 126 SRPs in the decision area, of which 13 are Mountain Lion hunters that could overlap with critical life function periods of GUSG in March, and 9 other permittees in the Gunnison Field Office and 3 other permittees in the Tres Rios Field Office that could potentially overlap critical time periods of GUSG from March to May, based on their permits being year-round (see Table 4.6).

#### Non-Habitat

Alternative B also provides management actions for Non-Habitat that would further restrict surface-disturbing activities outside of GUSG habitat, and would affect the types of recreational activities and opportunities available within the Non-Habitat Areas. Impacts to SRPs within the Non-Habitat would be similar to those in Occupied and Unoccupied Habitat, with an emphasis on avoiding or eliminating permitted uses that do not have neutral or beneficial effects to GUSG or their habitat.

### ALTERNATIVE C

#### Number of Acres with Targeted Beneficial Outcomes for Recreationists and Supporting Setting Characteristics

BLM management under Alternative C would contain less restriction than Alternative B on structured recreation and visitor services associated with SRMAs and ERMAs, if recreation is compatible with GUSG and their habitat. Recreation in GUSG habitat would not be emphasized if it was determined to be incompatible with GUSG management objectives, and new RMAs would not be designated in either Occupied Habitat or Unoccupied Habitat where a conflict between recreation and GUSG has been identified.

In addition to the possibility of denying future RMAs, Alternative C would result in a loss of new opportunities for structured, outcomes-focused recreation management (and the benefits associated with targeted recreation opportunities, settings and experiences), and would potentially degrade beneficial outcomes in existing RMAs

currently located within GUSG habitat if restrictions were applied to benefit GUSG recovery that would change the fundamental character of an RMA.

### Number of Acres with Unstructured Recreational Opportunities and Experiences

BLM management under Alternative C would contain less restriction on unstructured recreational activities than Alternative B, allowing for some development if mitigations can be applied and the development is located in areas outside of habitat that possesses the Primary Constituent Elements of effective GUSG habitat. Seasonal restrictions, such as road closures from March 15 through May 15, would apply if a conflict between recreational activities and GUSG was identified. Spatial restrictions within 0.6 mile of an active lek would also apply to prevent disturbance to GUSG during critical times of the year for them. Restrictions designed to mitigate disturbance to GUSG and their habitat would be predictable and temporary, resulting in minimal impacts to unstructured recreation opportunities throughout the decision area. Specific to GUSG, lek viewing and lek viewing sites would be coordinated with state agencies as needed.

### Number or Types of SRPs Allowed in GUSG Habitat

Impacts on recreation and visitor services under Alternative C would only allow for new or renewed SRPs in Occupied Habitat that could adhere to the criteria for minimizing impacts to GUSG. New or renewed SRPs would only be allowed in Unoccupied Habitat that would have minimal effects on that portion of habitat that currently exhibits, or has the potential to exhibit the Primary Constituent Elements (PCEs) of GUSG habitat. Under Alternative C, for both Occupied Habitat and Unoccupied Habitat, BLM would attempt to transfer currently permitted uses to other areas outside of GUSG habitat, where possible and when and where it would benefit GUSG conservation most. Similar to Alternative B, restrictions on future recreational activities and events that are required to be permitted, under Alternative C would result in a loss of opportunities to continue engaging in current activities and events if they are found to have adverse effects on GUSG habitat.

Implementing conservation measures, establishing seasonal restrictions, and relocating activities subject to SRPs, and other measures designed to reduce seasonal disturbances to GUSG and their habitat, would likely result in limited impacts on recreation because activities would not be prohibited, due in large part to the type and season of current SRPs in the decision area. However, if mitigations aimed at protecting GUSG and their habitat were ineffective, the BLM may implement seasonal closures of roads and areas, which would limit recreation opportunities in a more general way.

## SUB-ALTERNATIVE D₁ - GUNNISON BASIN PREFERRED

### Number of Acres with Targeted Beneficial Outcomes for Recreationists and Supporting Setting Characteristics

Under Sub-Alternative $D_1$, the Preferred Alternative for Gunnison Basin Occupied Habitat, management actions related to GUSG habitat would default to the interagency Candidate Conservation Agreement (CCA) to protect and enhance the recovery of the GUSG in its core range and habitat. Numerous considerations related to the goal of protecting and enhancing GUSG and their habitat have already been extensively analyzed for the Gunnison Basin, including the protocol for managing existing RMAs or establishing new RMAs.

In Occupied Habitat in the Gunnison Basin, three Urban Interface Recreation Areas have been identified in the CCA, Appendix B (Hartman Rocks, Signal Peak, and Van Tuyl Ranch). The intent of that section is to outline the preferred locations for current, concentrated recreation at the urban interface, and to outline long-term planning for recreation expansion to balance the needs of a growing population and the need to maintain GUSG habitat. A guiding strategy of the CCA Recreation Team has been to balance GUSG and recreation via the concentration of use in preferred areas.

The three areas are generally in close proximity to the City of Gunnison and, especially in the case of Hartman Rocks, capture the vast majority of recreationists in GUSG habitat in the Basin. Although GUSG conservation measures will still be observed in each of these areas, such as seasonal closures to minimize disturbance to leks, the off-site mitigation standards outlined in sections 4.3, 4.4, 5.2, and 5.3 of the CCA would not be required in these areas to compensate for new route and facility development. For efficiency, route reclamation efforts would be best-suited to areas at a greater distance from the urban interface. For each of the areas, a minimum set of GUSG conservation measures is outlined.

### Number of Acres with Unstructured Recreational Opportunities and Experiences

Under Sub-Alternative $D_1$, management actions related to Occupied Habitat would default to the CCA regarding the conditions under which small-scale recreational infrastructure may be developed, and whether or not lek-viewing sites may need to be established through coordination with state agencies, and other factors. (See Chapter 2, Recreation, Alternative D, for specifics pertaining to the CCA.) Similar to aspects of alternatives A through C, in the Gunnison Basin, current recreational opportunities in the decision area would continue, and there would be no new or significant impacts on recreation under Sub-Alternative $D_1$.

#### Number or Types of SRPs Allowed within GUSG Habitat

Under Sub-Alternative $D_1$, management actions related to GUSG Occupied Habitat would default to the CCA's protocol for issuing, denying, or modifying SRPs for the benefit of the GUSG (reflected in Chapter 2, Recreation, Alternative D). Similar to Alternative A, in the Gunnison Basin, current recreational opportunities in the decision area would continue, and there would be no new or significant impacts on recreation under Sub-Alternative $D_1$.

### SUB-ALTERNATIVE $D_2$ - SATELLITE PREFERRED

#### Number of Acres with Targeted Beneficial Outcomes for Recreationists and Supporting Setting Characteristics

Same as Alternative C.

#### Number of Acres with Unstructured Recreational Opportunities and Experiences

Under Sub-Alternative $D_2$, the Preferred Alternative for the GUSG satellite populations and the Gunnison Basin Unoccupied Habitat, BLM management would contain similar restrictions on unstructured recreational activities as elements of alternatives B and C and Sub-Alternative $D_1$, such as for: timing and season of use, ground disturbance limitations, and reclamation of existing disturbance. Sub-Alternative $D_2$ acknowledges that decisions related to GUSG and their habitat in satellite populations are potentially more impacting because of their smaller populations, smaller areas of habitat, and decreased linkage to the main Gunnison Basin Population.

#### Number or Types of SRPs Allowed within GUSG Habitat

Under Sub-Alternative $D_2$, BLM would only allow SRPs that have minimal effects in Occupied Habitat and Unoccupied Habitat. Similar to Alternative C, BLM would continue to review and approve recreation permits on a case-by-case basis accepting only those uses determined to be neutral or beneficial to GUSG and their habitat, (and when and where it would benefit GUSG conservation most), transferring permits that may cause adverse impacts to the recovery of the GUSG to other areas outside of GUSG habitat. Sub-Alternative $D_2$ could potentially result in a loss of opportunities to continue engaging in current permitted activities and events, however, that impact to SRPs is expected to be minor.

## 4.10.4. Cumulative Impacts

The area used to analyze cumulative impacts on recreation resources is the planning area. Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected, and will likely continue to affect, recreation are increased visitation (especially from residents within the planning area and those from the surrounding region), urbanization of communities in the planning area, advances in outdoor recreation equipment, management in existing Recreation Management Areas, and energy development.

At the broadest level, the physical, social, and operational recreation setting character of BLM-administered lands are quickly changing from natural to more developed, from less crowded to more contacts with others, and from less restrictive to more rules and regulations. These changes are expected to impact the activity opportunities that can be offered and the recreation experience and benefit opportunities that can be produced.

There is a strong correlation between population growth, visitation, and recreation, in large part because many new residents have moved to the area specifically because of easy access to recreation opportunities on BLM and other public lands. The expanding suburban development footprint has also placed many new neighborhoods directly adjacent to BLM boundaries, resulting in increased trespass onto private property and resource impacts from private property owners accessing public lands from adjoining private land (e.g., social trailing, etc.). Advances in technology are at least partly responsible for increased recreation across the planning area, as motorized and mechanized vehicles are more capable of accessing previously remote areas.

Reasonably foreseeable trends that would result in cumulative impacts on recreation include continued growth patterns in demand for all recreation experiences, increased demand for close-to-home recreation opportunities for local residents, continued and increased visitation from a growing regional population, and increased popularity of adjacent public lands. However, restrictions on development of public lands to protect GUSG and their habitat could cumulatively result in a benefit for GUSG from managed recreation.

Management of recreation-focused areas (SRMAs and ERMAs), unstructured or dispersed recreational opportunities, and the issuance of SRPs would continue as they are currently managed under Alternative A. Under Alternative B, the BLM would place the most restrictions on recreation, resulting in the greatest number of cumulative impacts, such as the potential elimination of RMAs or elimination of new or reissued SRPs. Under Alternative C, BLM would have more flexibility to provide for continued or new recreational opportunities if it could be demonstrated that

GUSG and their habitat would not be negatively impacted. However, the BLM would place some restrictions on recreation, which could cumulatively add to a decrease in this resource use. Under Sub-Alternative $D_1$, the BLM would manage recreation resources in accordance with the CCA developed for the protection and recovery of the GUSG within its core range and habitat. Under Sub-Alternative $D_2$, the BLM would manage recreation in the smaller, more vulnerable GUSG satellite populations, using the full suite of management actions available for the protection and recovery of GUSG. Sub-Alternative $D_2$ would not be less restrictive than Alternative C, but could be more restrictive, if necessary. Under Sub-Alternative $D_2$, the BLM could place some restrictions on recreation that would result in a cumulative decrease in this resource use.

# 4.11. TRAVEL MANAGEMENT

## 4.11.1. Methodology

### ATTRIBUTES AND INDICATORS

Indicators of impacts to travel management are as follows:

- Change in the types of allowable uses occurring on transportation routes in GUSG habitat.
- Change in the number of motorized acres designated as Open (to cross-country motorized travel), Limited (to existing or designated routes for motorized travel), or Closed (to motorized travel altogether).
- Change in the number of acres where new route development would be allowed.

### ASSUMPTIONS

The analysis uses the following assumptions:

- Travel management would be managed to achieve the objectives of individual Field Offices and would vary based on the age of a BLM unit's RMP.
- Travel systems are dynamic and will be changed through subsequent implementation level planning efforts in order to respond to the needs of the BLM multiple-use mission. The designation of individual routes as open, closed, or limited for motorized use is an implementation-level process and not considered as part of a RMP (planning-level) process.
- The demand for access to travel routes would continue to increase over the life of the RMPs.
- Traditional travel management uses within the decision area would continue, and are anticipated to increase as local populations grow. Motorized and non-motorized use will continue to increase. The potential for resource and user conflict increases as OHV use increases and becomes more concentrated.
- Implementation of a travel management plan includes: increased public education, notification by use of signs, enforcement, resource monitoring in regard to travel management, and the designation of transportation routes (linear features - roads and trails of varying allowable uses).
- Improved facilities, especially trails, are expected to result in increased use.

- Travel Management will continue to be an increasingly important component of local economies.

## METHODS AND DATA

This section discusses impacts on travel and transportation management from proposed BLM management actions. Existing conditions concerning travel and transportation management are described in the Comprehensive Travel and Transportation Management (CTTM) section in Chapter 3. Travel and transportation management supports and helps achieve the objectives of other resource programs. Consequently, travel designations would adhere to the management prescriptions included under each alternative, while following the theme of each alternative.

At the resource management planning level, impacts on CTTM are those that restrict travel, such as managing areas as closed or limited to motorized travel and limiting seasonal travel. New travel and transportation management actions in response to GUSG habitat protection strategies would impact the number of acres where motorized and some non-motorized travel is allowed.

Travel management decisions impact other resources and uses, such as closing routes or limiting travel to protect sensitive resources. As such, impacts of travel management actions on other resources and uses are discussed in the respective resource sections of this chapter. Impacts on CTTM from other program areas do occur and are considered a part of implementation level transportation management planning.

Literature reviews were conducted relative to individual resource areas, to include: studies from a variety of sources (see References for Travel Management-related studies), and a review of BLM's relevant laws, regulations, and policies. Interviews with local field office subject matter experts were also conducted relative to land status, Travel Management Area classification, permitted uses, etc. for both Occupied Habitat and Unoccupied Habitat. Finally, geo-spatial data from BLM and other authorities was used to help analyze conditions and land-use allocations within the decision area, including: the presence of open, limited, and closed Travel Management Areas and the location of roads and trails within GUSG habitat.

## 4.11.2. Impacts Common to All Alternatives

### Types of Allowable Uses on Transportation Routes in GUSG Habitat

Applying restrictions to allowable uses for transportation routes in the decision area to protect GUSG, especially during time periods associated with critical life functions, in most cases would only seasonally limit access in certain parts of the decision area. Because the restrictions would mostly be localized and temporary, long-term impacts on allowable uses of the transportation system within the decision area are not expected to be significant.

### Number of Acres Open, Limited, or Closed to Motorized Travel

A shift in OHV designations in GUSG habitat under all alternatives would reduce cross-country motorized travel opportunities in the decision area. Nationally, however, BLM is currently in the process of moving away from an 'open system' of travel management in favor of a Comprehensive Travel and Transportation Management (CTTM) system. While some short-term impacts can be expected, long-term impacts for cross-country transportation use are not expected.

### Number of Acres Where New Route Development Would Be Allowed

Under all alternatives, travel would be limited to designated routes. Under the action Alternatives B through E, an emphasis would be placed on reducing route densities, especially in Occupied Habitat. Timing limitations and seasonal closures from March 15 to May15 would also be applied to GUSG habitat.

## 4.11.3. Impacts by Alternative

### ALTERNATIVE A - NO ACTION

### Types of Allowable Uses on Transportation Routes in GUSG Habitat

Compared to the action alternatives, Alternative A would provide for the greatest diversity of allowable uses on existing or designated transportation routes within the decision area, and field office TMPs and RMPs would provide the basis for allowable uses on roads and trails. Under Alternative A, the BLM would continue to manage allowable uses on roads and trails as identified in the existing RMPs, and current Travel Management designations for individual routes would continue over the long term. There would be no new impacts on Travel Management under Alternative A.

### Number of Acres Open, Limited, or Closed to Motorized Travel

Compared to the action alternatives, Alternative A would have the least impact to current Travel Management designations.  The BLM would continue to manage Travel Management designations as identified in the existing RMPs, and current travel opportunities in the decision area would be maintained over the long term.

Under Alternative A, approximately 53,565 acres (9,317 in Occupied Habitat and 44,248 acres in Unoccupied Habitat) in the decision area would remain open to unrestricted cross-country motorized travel; approximately 543,422 acres (386,025 in Occupied Habitat and 157,397 acres in Unoccupied Habitat) would remain limited to existing routes; and approximately 38,114 acres (10,266 in Occupied Habitat and 27,848 acres in Unoccupied Habitat) would remain closed to motorized use.  There would be no new impacts on Travel Management.

### Number of Acres Where New Route Development Would Be Allowed

Compared to the action alternatives, Alternative A would have the least impact to potential new route development within the decision area.  The BLM would continue to evaluate the need for additional routes, including ROW applications, proposals for new trails, etc.  BLM field office TMPs and RMPs would inform the conditions under which new routes may be authorized, and NEPA analysis would be conducted to evaluate the effects of implementation-level decisions on resources, such as GUSG.

## ALTERNATIVE B

### Types of Allowable Uses on Transportation Routes in GUSG Habitat

Under Alternative B, greater restrictions on the allowable uses of transportation routes would be applied through a range of management actions for the protection and recovery of the GUSG and its habitat.  Some uses, such as motorized or mechanized travel could be eliminated from roads or trails that negatively impact GUSG.  Timing limitations, seasons of use, and temporary closures could also be used to protect GUSG, especially during critical times of the year, such as for breeding, nesting, and brood-rearing.  Under Alternative B, upgrades to routes in both Occupied Habitat and Unoccupied Habitat would also not be allowed.

Alternative B would also provide for a 4-mile buffer distance from leks outside of habitat, which would further restrict the transportation system within the Non-Habitat Areas, including those routes not in GUSG habitat.  Impacts to the transportation system within the Non-Habitat Areas would be similar to those in

Occupied and Unoccupied Habitat, with an emphasis on avoiding or eliminating allowable uses that have negative effects to GUSG or their habitat.

Impacts to the transportation system as a whole are not expected to be significant, however, more significant impacts to transportation and access within GUSG habitat would be expected under Alternative B, with the likely side-effect that transportation use would transfer to other, less restrictive places in the decision area causing greater impacts and user conflict in localized areas within the overall transportation system. Prior to closing routes or access in GUSG habitat, the BLM could elect to employ Section 106 of the National Historic Preservation Act in order to consider new impacts to cultural resources as a result of displaced or increased transportation use to other areas.

### Number of Acres Open, Limited, or Closed to Motorized Travel

Under Alternative B, the designation of acres open, closed, or limited to motorized travel would be the most restrictive of any alternative, and would have the greatest impact to public access and CTTM. Under Alternative B, the BLM would conduct travel management planning as part of this RMP Amendment analysis and completely close Occupied Habitat to motorized travel.

Under such a scenario, access would be more restrictive than No Action Alternative A due to the closure of 597,006 acres to motorized travel. Additionally, there would be no opportunities for cross-country travel in the decision area.

### Number of Acres Where New Route Development Would Be Allowed

Under Alternative B, the BLM would reduce route densities and would not allow new route development within GUSG habitat. Within Non-Habitat Areas, the BLM would only allow new routes or upgrades to existing routes that are determined to not adversely impact GUSG or their habitat. Seasonal closures in Occupied Habitat would occur from March 15 through May 15 in order to protect GUSG during critical life function time periods. General Management Standards would also apply for timing limitations, ground disturbance and vegetation removal, predation control, climate change, invasive species and disease control, and reclamation procedures.

## ALTERNATIVE C

### Types of Allowable Uses on Transportation Routes in GUSG Habitat

BLM management under Alternative C would be less restrictive on allowable use designations for roads or trails than Alternative B, provided that the designations are determined to be compatible with GUSG and their habitat. Under Alternative

C, the BLM would have the flexibility to adapt allowable uses on a transportation route to specific conditions or changes over time, if the route is designated as Limited in a current Travel Management Plan. If necessary, restrictions such as timing limitations, season of use, stipulations or limitations for permitted users, and reduction in route densities could be applied for the benefit of GUSG and their habitat. In Occupied Habitat, seasonal closures could be implemented from March 15 through May 15 for all travel management or specific uses if a conflict is identified, either in general or from a particular mode of travel.

In both Occupied Habitat and Unoccupied Habitat, routes would not be upgraded to change the route category or capacity unless that upgrade was necessary for public safety or prevented the construction of a new route. Impacts to the transportation system as a whole would not be significant, but might transfer increased use to other areas causing greater impacts and user conflict in localized areas within the overall transportation system, if restrictions were applied. Most impacts would be beneficial for GUSG and their habitat, and only minor or temporary negative impacts to users of the transportation system.

### Number of Acres Open, Limited, or Closed to Motorized Travel

Under Alternative C, BLM management would contain fewer restrictions on travel management designations than Alternative B, if those designations are determined to be compatible with GUSG and GUSG habitat. In both Occupied Habitat and Unoccupied Habitat, areas currently designated as closed to motorized travel would remain so, and generally motorized travel would be limited to existing or designated routes. New cross-country motorized and mechanized travel would be discouraged. Motorized cross-country travel would be allowed to continue in areas previously open to such travel where it has been demonstrated not to have a negative impact to GUSG or their habitat. Travel management planning would be deferred to a later date and conducted by local subject-matter experts, with implementation completed as quickly as time, personnel, and resources allow.

Under Alternative C, there would be no change from No Action Alternative A in the number of acres closed to motorized travel or limited to existing or designated routes for field offices that have conducted travel management planning. Field offices that have not conducted travel management planning would have reduced acreage for cross-country motorized travel when routes in Occupied Habitat are limited to existing routes under Alternative C.

### Number of Acres Where New Route Development Would Be Allowed

Alternative C would contain fewer restrictions on new routes determined to be compatible with GUSG and GUSG habitat than Alternative B. For both Occupied

Habitat and Unoccupied Habitat, new routes would primarily be limited to realignments of existing designated routes, especially if the realignments eliminate the need to construct a new route, or are necessary for public safety. Any new route would require mitigation in accordance with the mitigation strategy in order to decrease fragmentation of GUSG habitat. Under Alternative C, there would generally be no significant change to public access and CTTM within the decision area, and localized impacts to transportation routes would likely be beneficial to all resource areas.

## SUB-ALTERNATIVE $D_1$ - GUNNISON BASIN PREFERRED

### Types of Allowable Uses on Transportation Routes in GUSG Habitat

Under Sub-Alternative $D_1$, management actions related to allowable uses of transportation routes in Occupied Habitat would default to the 2010 Gunnison Basin Federal Land TMP. No new impacts to the Gunnison Basin transportation system are anticipated.

### Number of Acres Open, Limited, or Closed to Motorized Travel

Same as Alternative A.

### Number of Acres Where New Route Development Would Be Allowed

Under Sub-Alternative $D_1$, management actions related to Occupied Habitat would default to the 2010 Gunnison Basin TMP. Numerous considerations related to the goal of protecting and enhancing GUSG and GUSG habitat in the Gunnison Basin have already been explored, including conditions under which new routes (roads and trails) could occur. Current travel management opportunities in the Gunnison Basin would continue, with no new or significant impacts expected under Sub-Alternative $D_1$.

## SUB-ALTERNATIVE $D_2$ - SATELLITE PREFERRED

### Types of Allowable Uses on Transportation Routes in GUSG Habitat

Under Sub-Alternative $D_2$, BLM management would vary based on current field office TMPs. If existing allowable uses for transportation routes in a particular field office are compatible with GUSG conservation measures as determined by that field office, then No Action Alternative A would apply. If not, then those TMPs would be amended to agree with the standards defined above in Alternative C.

### Number of Acres Open, Limited, or Closed to Motorized Travel

Under Sub-Alternative $D_2$, BLM management would vary based on current field office TMPs. If existing travel management for a particular field office is compatible with GUSG conservation measures, as determined by the field office, then No Action Alternative A would apply. If not, then those TMPs would be amended to agree with the standards defined above in Alternative C.

### Number of Acres Where New Route Development Would Be Allowed

Same as Alternative C.

## 4.11.4. Cumulative Impacts

The area used to analyze cumulative impacts on travel management is the planning area and extends along major roads and trails where management inside the decision area could impact use outside it. Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected, and will likely continue to affect travel management are increased use of the travel system and any new actions that introduce additional traffic or reduce or expand the travel system.

RMPs for BLM-administered lands have areas and routes closed to motorized recreation, causing users to move to other BLM-administered lands (and other public lands) in the planning area. Increasing urban and suburban populations proximate to, and within the planning area, have greatly increased the level of recreational and route use on BLM-administered lands. The combination of the region's growing population and the bounty of desirable recreation settings have combined to greatly increase transportation use in the planning area.

For all alternatives, cumulative impacts on travel management would occur primarily from actions that facilitate, limit, or preclude motorized access, including the closure of areas to certain types of travel or through the designation of routes as part of a future travel management planning process. Cumulative impacts on travel management as a result of these reductions could include congestion on the existing travel route network within, and adjacent to, the decision area, particularly where routes provide access to multiple resource uses. Congestion would impact access and require more active management (including enforcement, signage, and education) by the BLM. Overall, these actions are not expected to influence cumulative impacts because of the large remote character in much of the cumulative impact analysis area. Impacts would be localized, occurring in the vicinity of these new actions and near population centers.

Management of travel management designations for open, limited, and closed OHV areas; allowable uses for existing or designated routes; and the presence of existing seasonal closures, timing limitations, or other current restrictions would be maintained, and the existing travel network would continue as it is currently managed under No Action Alternative A.

Under Alternative B, the BLM would place the most restrictions on travel management, resulting in the greatest number of cumulative impacts. Eliminating all motorized travel in Occupied Habitat would result in a cumulative loss of travel opportunities. Some users would go elsewhere, but other travel systems might be less capable of accommodating extensive new use; the multijurisdictional travel system encompassing the analysis area might be unable to accommodate demand and would likely mean increased impacts from travel and transportation to GUSG habitat outside of BLM lands.

Under Alternative C, the BLM would have greater flexibility to provide for continued or new travel management opportunities, if it could be demonstrated that GUSG and their habitat would not be negatively impacted. However, the BLM would place some restrictions on the transportation system, which could cumulatively add to a decrease in this resource use and public access.

Under Sub-Alternative $D_1$, the BLM would manage travel and transportation resources in accordance with the 2010 Gunnison Basin Federal Land Travel Management Plan (TMP) and the CCA, developed for the protection and recovery of the GUSG within its core range and habitat. Under Sub-Alternative $D_2$, the BLM would manage travel management in the smaller, more vulnerable, GUSG satellite populations, using the full suite of management actions available for the protection and recovery of GUSG. Sub-Alternative $D_2$ would not be less restrictive than Alternative C, but could be more restrictive, if necessary. Since the BLM could place some restrictions on travel management under Sub-Alternative $D_2$, there could be a cumulative decrease in this resource use and public access.

# 4.12. LEASABLE FLUID MINERALS

## OIL AND GAS

### 4.12.1. METHODOLOGY

#### ATTRIBUTES AND INDICATORS

The following indicators are used to describe the impacts of the preferred alternative and other alternatives on the availability of, and access to, federal oil and gas resources:

- Acres of federal minerals leased for oil and gas
- Acres of federal minerals closed to oil and gas leasing
- Acres of federal minerals open to oil and gas leasing
    - Acres subject to NSO stipulation
    - Acres subject to CSU and/or TL stipulations
- Acres of ROW exclusion and avoidance areas

#### ASSUMPTIONS

The analysis of impacts on oil and gas exploration and development is based on the following assumptions:

- New stipulations proposed under this RMP Amendment would apply only to new leases.
- Existing stipulations in the RMPs within the planning area would continue to apply. Those stipulations provide for other resource protections, such as riparian areas, that are not specific just to GUSG and habitat.
- Existing fluid mineral leases would be managed to protect valid existing rights and would not be affected by any closures proposed under the preferred alternative or other alternatives.
- Valid existing leases would be managed under the stipulations in effect when the leases were issued. However, new development on existing leases must also comply with the current RMP management direction. This direction is consistent with Interior Board of Land Appeals decisions (*Yates Petroleum Corp.*, 176 IBLA 144 (2008) and *William P. Maycock*, 180 IBLA 1 (2010)) findings that BLM has discretion to modify surface operations to add specific mitigation measures supported by site-specific NEPA analysis undertaken during the development phase on existing leases. Any additional mitigation

measures would need to be justifiable, still provide for lease development and would be incorporated in a site-specific document.

- Fluid mineral operations on existing federal leases, regardless of surface ownership, would be subject to COAs by the BLM Authorized Officer at the time of APD approval. The BLM can deny surface occupancy on portions of leases with COAs to avoid or minimize resource conflicts if this action does not eliminate reasonable opportunities to develop the lease. Existing leases would be developed consistent with applicable laws and valid existing rights, using as many of the surface use limitations and conservation measures as possible while still allowing reasonable access.
- Under all alternatives, reclamation bonds are required, pursuant to 43 CFR 3104, in an amount sufficient to ensure full restoration of lands to the condition in which they were found. In addition, APDs, including drilling plans and surface use plans of operations, would be required under all alternatives in accordance with 43 CFR 3162.
- If an area is leased, it could be developed; however, not all leases would be developed within the life of this plan amendment.
- As the demand for energy increases, so will the demand for extracting energy resources in areas with potential. However, oil and gas operations are sensitive to costs, especially when prices are depressed.
- Technological advancements, such as directional drilling, could lead to changes in levels of fluid mineral development potential throughout the decision area as additional resources become more easily accessible.
- Stipulations apply to fluid mineral leasing on all surface lands overlying federal mineral estate, which includes federal mineral estate underlying BLM-administered and non-BLM-administered surface.

### METHODS AND DATA

Where possible, BLM spatial data (GIS) and other data, such as LR2000, were used to describe the impacts quantitatively. All data sets depend on the quality and availability of data, and so acreages and other numbers are approximations for comparison and analytic purposes only. When quantitative data was not available, the impacts are described qualitatively.

## 4.12.2. General Impacts

The primary planning decisions that could impact the availability of oil and gas resources include: fluid mineral leasing allocations; required fluid mineral leasing stipulations (NSO, TL, and CSU); and, ROW exclusion and avoidance designations.

Allocations of areas open or closed to fluid minerals leasing directly impacts the availability of federal minerals for lease. For areas designated as open to leasing, NSO leasing stipulations would also impact the availability of federal minerals for lease, particularly if lands where wells could be located are too far away to reach the oil and gas resource. Required TL and CSU leasing stipulations could also reduce APDs due to increased costs and decreased efficiency of development from required limitations, such as seasonal restrictions on drilling and other surface-disturbing activities. Indirect impacts include reduced production of oil and gas for the public use and for the generation of lease sale revenues, federal royalties from production, and tax revenues.

Designations of ROW exclusion and avoidance areas could impact the ability to site off-lease ROWs on public land and could increase costs and decrease efficiency of development due to required additional mitigation and project criteria.

It is not possible to state with certainty the degree to which the potential impacts described above would occur.

Until specific lease sales are analyzed, offered, and sold and the BLM receives and adjudicates APDs or other authorizations that includes specific information about a particular project, impacts of actual development that might follow lease issuance are speculative. The location, scope, scale, and timing of potential development, the location of existing roads and utility corridors, proximity to GUSG Occupied and/or Unoccupied Habitat, and proximity to other resources and other seasonally critical habitats that facilities would be required to avoid, and the particular downhole geology of a specific lease (which is important in relation to the potential number of wells reachable from a single well pad) are all factors that would determine the magnitude of impacts.

Refer to Section 4.18 for information regarding expected socioeconomic effects from management actions within each alternative.

### 4.12.3. Impacts by Alternative

#### Alternative A - No Action

No Action Alternative A would provide the largest amount of federal minerals available for fluid mineral leasing in GUSG habitat. Approximately 206,950 acres are designated as closed to leasing, and 644,800 acres are designated as open to leasing. Of the areas open to leasing, 1,589,722 acres are open to leasing with additional stipulations (NSO, CSU, and/or TL), which includes 370,500 acres leased with a NSO stipulation. Due to overlapping stipulations (meaning that acres could be

accounted for in NSO, CSU, and/or TL), there are more acres with stipulations than there are acres to be leased.

The Gunnison Gorge NCA, Dominguez-Escalante NCA, and McInnis Canyons NCA, as well as all Wilderness and Wilderness Study Areas, are withdrawn from mineral leasing. Mineral development throughout much of the decision area is limited for GUSG protections. All Occupied Habitat is closed to mineral leasing under the Grand Junction RMP, and is open to mineral leasing with a NSO stipulation under the Canyons of the Ancients NM and Tres Rios RMPs. The NSO stipulation is applied to areas within 2.0 miles of a lek for the Gunnison Gorge NCA RMP area (outside of the proclaimed NCA), while the rest of the decision area that is open to leasing is subject to a NSO stipulation for areas within 0.6 mile of a lek.

Currently, there are 36,260 acres of federal minerals leased in the decision area. Approximately 20,630 acres of those leases are held by production. The existing leases are located primarily within the Monticello-Dove Creek and San Miguel Basin population areas. The leases held by production are primarily within the Tres Rios FO and Canyons of the Ancients NM. The undeveloped leases are located primarily with the Tres Rios FO (with 92% of the lease acres), followed by the Monticello FO (with 8%), and the Uncompahgre FO and Canyons of the Ancients NM (together totaling less than 1%).

**Table 4.104 - Oil and Gas Leasing by Population Area**

| POPULATION AREA | FEDERAL MINERAL ACRES | | | |
|---|---|---|---|---|
| | CLOSED TO LEASING | OPEN TO LEASING | LEASED | HELD BY PRODUCTION |
| Gunnison Basin | 9,100 | 556,800 | 0 | 0 |
| Cerro Summit-Cimarron-Sims Mesa | 0 | 11,100 | 0 | 0 |
| Crawford | 41,800 | 23,400 | 20 | 0 |
| Monticello-Dove Creek | 4,300 | 75,600 | 29,700 | 15,600 |
| Piñon Mesa | 123,000 | 61,400 | 0 | 0 |
| San Miguel Basin | 13,000 | 61,700 | 6,500 | 5,000 |
| Poncha Pass | 0 | 32,200 | 0 | 0 |

Within the Monticello-Dove Creek and San Miguel Basin population areas, there are few acres subject to ROW exclusion (2,000 acres in Monticello-Dove Creek and 200 in San Miguel Basin) and none designated as ROW avoidance. Therefore, there are few limitations on siting off-lease ROWs for access roads and utilities.

## ALTERNATIVE B

Under Alternative B, Occupied and Unoccupied Habitat in the decision area would
be closed to fluid minerals leasing. Existing leases would be allowed to expire. No
new leases would be issued and unleased federal minerals would no longer be
available for oil and gas leasing.

There are currently 36,260 acres of federal minerals leased for oil and gas resources
in the decision area. Approximately 20,630 acres of those leases are held by
production. As leases expire, any potential future production from those leases
would not be realized. Leases expire at the end of the primary term, which is
usually 10 years. However, leases may continue if: 1) qualifying drilling operations
are in progress; 2) the lease contains a well capable of producing in paying quantities;
or, 3) the lease is entitled to receive an allocation of production from an off-lease
well. If a lease does not have a producible well, or a producible well attributed to it,
it will automatically terminate if annual rental is not paid in full and on time. Leases
may also be given up, in part or in total, if the lessee files a written relinquishment.

There would be little to no impact to oil and gas development in the Gunnison
Basin, Cerro Summit-Cimarron-Sims Mesa, Piñon Mesa, and Poncha Pass population
areas. There is low to no development potential for oil and gas in those areas and
no authorized leases.

In the Crawford population area, federal minerals account for approximately 57% of
the mineral estate. The projected development of one to ten APDs, with an
estimated total of from 10 to 30 acres of surface disturbance, would not occur.
Currently, there is one authorized federal lease which includes 24 acres (<0.1 % of
the population area) (BLM 2015a).

The Monticello-Dove Creek population area has a moderate to high development
potential. Federal minerals account for approximately 25% of the mineral estate in
the population area. There are 112 authorized federal leases (BLM 2015a) which
include 29,700 acres (8.5 % of the population area). The remaining 57,200 acres of
unleased federal minerals would no longer be available for leasing. However,
approximately 41,350 unleased acres (72% of the unleased federal minerals and 48%
of the total federal minerals) are already subject to leasing with a NSO stipulation.

Federal minerals within the Monticello-Dove Creek Population decision area
account for about 2% of the mineral estate in the larger Monticello-Dove Creek
Population planning area with high development potential (BLM 2015a). In the high
development potential areas, it is projected that within the Monticello FO,
approximately 1 to 6 wells per year would be drilled within the entire Paradox Fold
and Fault Belt (BLM 2008b). Within the Tres Rios FO, it is projected that about 25

wells per year would be drilled, primarily within the Gothic Shale Gas Play in the Paradox Basin (BLM 2013).

The San Miguel Basin population area has a low to high development potential, with most of the Occupied Habitat rated as moderate to high development potential, and the Unoccupied Habitat as low to moderate.  Federal minerals account for approximately 56% of the mineral estate in the population area.  There are 29 authorized federal leases (BLM 2015a) which includes 6,500 acres (4.6 % of the population area).  The remaining 73,900 acres of unleased federal minerals would no longer be available for leasing.  However, approximately 60,250 unleased acres (68% of the federal minerals) are already subject to leasing with a NSO stipulation (BLM 2015b).

Under Alternative B, a total of approximately 78,100 acres of federal minerals in moderate to high development potential areas would be closed to leasing.  Under the No Action Alternative, none of the federal minerals in moderate to high development potential areas are closed to leasing, but 54,550 acres are only open to leasing with a NSO stipulation.

Under this alternative, the entire decision area would be designated as a ROW exclusion area with some exceptions.  The exceptions would be designated ROW corridors and areas within 100 feet of the centerline (or if not feasible, within 100 feet of the edge of the ROW) of county roads and highways.  Therefore, siting of off-lease ROWs for access roads and utilities would be limited to those exceptions.  This would result in increased costs and/or decreased ability to locate such ROWs, which would in turn, potentially further decrease oil and gas leasing.

The Non-Habitat Areas would be open to leasing with a CSU stipulation to protect sagebrush and riparian habitat.  Timing limitations would be applied as COAs, where applicable.  Non-Habitat Areas would be designated as ROW avoidance areas with guidance on how and where ROWs could be granted.  Master Development Plans would be required for any new leases and for any undeveloped leases, rather than APD-by-APD analyses.  These lease and ROW restrictions would result in increased costs and potentially decreased oil and gas leasing.  Less than 40% of the Non-Habitat Areas are within areas with moderate to high development potential.  Approximately 10% of the Non-Habitat Areas are located in areas closed to leasing, primarily within Wilderness, WSAs, NCAs, or the Canyons of the Ancients NM.

## ALTERNATIVE C

Under Alternative C, all Occupied Habitat would be open to leasing with a NSO stipulation and all Unoccupied Habitat would be open to leasing with a CSU stipulation to protect sagebrush and riparian habitat.  Wilderness areas, Wilderness

Study Areas, and existing mineral withdrawals would still be closed to leasing. There would be 80,820 more acres of federal minerals available for leasing than under No Action Alternative A. However, the additional acres are all in the Piñon Mesa population area, which has no to low development potential. Approximately 128,120 more acres of the federal minerals open to leasing would be subject to NSO stipulation than under No Action Alternative A. Under this alternative, a total of approximately 139,160 acres of federal minerals in moderate to high development potential areas would be open to leasing, of which 87,530 acres would have a NSO stipulation, while the remaining acreage would have a CSU stipulation.

Under Alternative C, the entire decision area would be designated as a ROW avoidance area with guidance on where and how ROWs would be granted. The guidance includes not granting ROWs when there is other reasonable access, requiring timing limitations and applicable BMPs, as well as requiring mitigation measures. Therefore, siting of off-lease ROWs for preferred locations of access roads and utilities would be somewhat limited. In addition, minimization and mitigation measures result in increased costs and/or decreased ability to locate such ROWs, which would in turn, potentially further decrease oil and gas leasing.

### SUB-ALTERNATIVES $D_1/D_2$ - GUNNISON BASIN AND SATELLITE PREFERRED

Sub-alternatives $D_1$ and $D_2$ include the same management actions, so the impacts would be the same across the Gunnison Basin and satellite population areas. The actions are the same as those under Alternative C, except that the Piñon Mesa population area would be closed to leasing within the Grand Junction FO, as it is in the No Action Alternative. The impacts are essentially the same as under Alternative C.

## GEOTHERMAL

The analysis of effects of the various alternatives on geothermal leasing is the same as that under oil and gas, except for portions of the No Action Alternative.

Under the No Action Alternative, within the San Luis Valley FO, which includes all of the Poncha Pass population area, Occupied Habitat is open to geothermal leasing with a NSO stipulation.

The Waunita/Tomichi Dome area of the Gunnison FO, within the Gunnison Basin population area, is subject to the Gunnison Geothermal RMP Amendment. The amendment provides that the area is open to geothermal leasing with a CSU stipulation to protect summer-fall habitat, in addition to the existing NSO stipulation within 0.6-mile of a lek and TL stipulations for lekking season (March 15–May 15).

# 4.13. LEASABLE SOLID MINERALS

## 4.13.1. METHODOLOGY

### ATTRIBUTES AND INDICATORS

The following indicators are used to describe the impacts of the preferred alternative and other alternatives on the availability of, and access to, federal solid mineral resources (other than coal):

- Acres of federal minerals leased for solid minerals
- Acres of federal minerals closed to solid minerals leasing
- Acres of federal minerals open to solid minerals leasing
    - Acres subject to NSO surface use limitation
    - Acres subject to CSU and/or TL surface use limitations
- Acres of ROW exclusion and avoidance areas.

### ASSUMPTIONS

The analysis of impacts on solid minerals exploration and development is based on the following assumptions:

- Existing solid mineral leases would be managed to protect valid existing rights and would not be affected by any closures proposed under the preferred alternative or other alternatives.
- Valid existing leases would be managed under the special stipulations in effect when the leases were issued; new mitigations proposed under this RMP Amendment would apply on new leases and any readjusted leases.
- In addition, prospecting permits or exploration licenses, including exploration plans, would be required under all alternatives in accordance with 43 CFR 3505 and 43 CFR 3506.
- Under all alternatives, reclamation bonds are required, pursuant to 43 CFR 3404.50, in an amount sufficient to ensure full restoration of lands to the condition in which they were found.
- Surface disturbing activities will be mitigated with special stipulations applied to site specific proposals in accordance with 43 CFR 3501.16.
- Surface use limitations apply to solid mineral leasing on all surface operations overlying federal mineral estate, which includes federal mineral estate underlying BLM-administered and non-BLM-administered surface.

METHODS AND DATA

Where possible, BLM spatial (GIS) and other data, such as LR2000, were used to describe the impacts quantitatively. All data sets depend on the quality and availability of data, and so acreages and other numbers are approximations for comparison and analytic purposes only. When quantitative data was not available, the impacts are described qualitatively.

## 4.13.2. General Impacts

The primary planning decisions that could impact the availability of solid minerals include: solid mineral leasing allocations; solid mineral leasing surface use limitations (NSO, TL, and CSU); and, ROW exclusion and avoidance designations. The management actions under each action alternative are essentially the same as those for fluid minerals leasing. However, surface use limitations are applied as stipulations to fluid mineral leases and as terms, conditions, and/or special stipulations to site-specific solid mineral authorizations, including permit, licenses, and leases.

Allocations of areas open or closed to solid minerals leasing directly impacts the availability of federal minerals for lease. For areas designated as open to leasing, NSO surface use limitations would also impact the availability of federal minerals for lease. Required TL and CSU leasing surface use limitations could also increase costs and decrease efficiency of development from required limitations, such as seasonal restrictions on surface-disturbing activities. Indirect impacts include reduced production of minerals for the public use and for the generation of lease sale revenues, federal royalties from production, and tax revenues.

Designations of ROW exclusion and avoidance areas could impact the ability to site off-lease ROWs on public land and could increase costs and decrease efficiency of development due to required additional mitigation and project criteria.

It is not possible to state with certainty the degree to which the potential impacts described above would occur. The magnitude of those impacts cannot be assessed without project-specific information on where an affected lease is located, its size, and its spatial relationship to other leases.

Until specific permits and leases are analyzed based on information about a particular project, impacts of actual development that might follow lease issuance are speculative. The location, scope, scale, and timing of potential development and the location of existing utility corridors are factors that would determine the magnitude of impacts.

## 4.13.3. Impacts by Alternative

### ALTERNATIVE A - NO ACTION

Under No Action Alternative A, approximately 206,950 acres would continue to be designated as closed to leasing and 610,920 acres open to leasing. Of the areas open to leasing, 1,470,750 acres are open to leasing with additional surface use limitations, including 362,450 acres leased with a NSO surface use limitation. Due to overlapping limitations, there are more acres with surface use limitations than there are to be leased (meaning that acres may be accounted for in NSO, CSU, and/or TL).

The Canyons of the Ancients NM, Gunnison Gorge NCA, Dominguez-Escalante NCA, and McInnis Canyons NCA, as well as all Wilderness and Wilderness Study Areas, are withdrawn from mineral leasing. Mineral development throughout much of the decision area is limited for GUSG protections. All Occupied and Unoccupied Habitat is closed to mineral leasing under the Grand Junction RMP. The rest of the decision area that is open to leasing is subject to a NSO surface use limitation for areas within 0.6 mile of a lek. The Gunnison RMP, Uncompahgre Basin RMP, San Juan/San Miguel RMP, and San Luis RMP do not specifically address solid minerals leasing as there is no known development potential for solid minerals. However, the same surface use limitations that apply to fluid mineral leasing would apply to any solid mineral leases.

Currently, there are no federal minerals leased in the decision area. However, there are five approved potash prospecting permits in the Monticello-Dove Creek population area. There are 13 pending potash prospecting permit applications.

**Table 4.105 - Solid Mineral Leasing on Federal Mineral Estate in Decision Area**

| HABITAT TYPE | ACRES CLOSED TO LEASING[1] | ACRES OPEN TO LEASING | ACRES UNDER PROSPECTING PERMITS | ACRES LEASED |
|---|---|---|---|---|
| Total Decision Area – Federal Minerals | 206,950 | 610,920 | 2,600 | 0 |
| Occupied Habitat | 81,900 | 432,200 | 0 | 0 |
| Unoccupied Habitat | 125,100 | 178,700 | 2,600 | 0 |
| Non-Habitat | 31,500 | 153,500 | 0 | 0 |

[1]Includes areas administratively unavailable for leasing, such as Wilderness Areas, Wilderness Study Areas, and certain withdrawn lands.

## ALTERNATIVE B

Under Alternative B, Occupied and Unoccupied Habitat in the decision area would be closed to solid minerals leasing.  Existing leases would be allowed to expire.  No new leases, prospecting permits, or exploration licenses would be issued.

There are currently no federal minerals leased for solid mineral resources in the decision area.

There would be little to no impact to solid minerals development in the Gunnison Basin, Cerro Summit-Cimarron-Sims Mesa, Crawford, Piñon Mesa, and Poncha Pass population areas.  There is low to no development potential for solid minerals in those areas and no authorized leases.

The Monticello-Dove Creek population area has some development potential. Federal minerals account for approximately 25% of the mineral estate in the population area.  There are no authorized federal leases (BLM 2015a).  The five authorized potash prospecting permits, which include 2,631 acres, would continue as valid existing rights.  The remaining 48,600 acres of unleased federal minerals would no longer be available for leasing.

The San Miguel Basin population area also has some development potential.  Federal minerals account for approximately 56% of the mineral estate in the population area. There are no authorized federal leases and no prospecting permits (BLM 2015a). The 73,400 acres of unleased federal minerals in Occupied and Unoccupied Habitat would no longer be available for leasing.  However, approximately 65,100 acres (89% of the federal minerals) are already subject to leasing with a NSO surface use limitation (BLM 2015b).

Currently, the potential for development of leasable solid minerals is identified as none to low or is unknown.  Under this alternative, no further exploration or prospecting would be allowed, so the development potential would remain unknown.  Given the overall lack of potential, this alternative would likely have minimal impact on production of leasable solid minerals compared to the No Action Alternative.

Non-Habitat Areas would be open to leasing with a determination of whether or not disturbance to GUSG and/or habitat would require management restrictions. Increased costs and/or reduced development of solid minerals would be minimal due to the overall lack of potential in the area.  There are eight pending potash prospecting permits that overlap some of the Non-Habitat Areas in proximity to the Monticello-Dove Creek Population, and no authorized permits or leases.

## ALTERNATIVE C

Under Alternative C, all Occupied Habitat would be open to leasing with a NSO surface use limitation. All Unoccupied Habitat would be open to leasing with a CSU surface use limitation to protect sagebrush and riparian habitat. Wilderness areas, Wilderness Study Areas, and existing mineral withdrawals would still be closed to leasing.

There would be 80,820 more acres of federal minerals available for leasing than under No Action Alternative A. However, the additional acres are all in the Piñon Mesa population area, which has no to low development potential. Approximately 128,120 more acres of the federal minerals open to leasing would be subject to NSO surface use limitation than under No Action Alternative A.

Under this alternative, a total of approximately 84,300 acres of federal minerals in the Monticello-Dove Creek population area (the only area with identified solid leasable mineral development potential) would be open to leasing, of which 13,000 acres of the surface would have a NSO limitation and the remaining acreage would have a CSU limitation.

## SUB-ALTERNATIVES $D_1/D_2$ - GUNNISON BASIN AND SATELLITE PREFERRED

Because sub-alternatives $D_1$ and $D_2$ include the same management actions, the impacts would be the same across the Gunnison Basin and satellite population areas. The actions are the same as those under Alternative C. The impacts would be essentially the same as those under Alternative C.

# 4.14. LOCATABLE MINERALS

## 4.14.1. METHODOLOGY

### ATTRIBUTES AND INDICATORS

The following indicators are used to describe the impacts of the preferred alternative and other alternatives on the availability of, and access to, federal locatable mineral resources:

- Acres of current mining claims
- Acres of federal minerals withdrawn from mineral entry
- Acres of federal minerals proposed for withdrawal from mineral entry
- Restrictions, such as surface use limitations and conservation measures, that can be placed on locatable mineral development activities to prevent unnecessary or undue degradation in GUSG habitat as the law allows
- Acres of ROW exclusion and avoidance areas.

### ASSUMPTIONS

The analysis of impacts on locatable minerals exploration and development is based on the following assumptions:

- Existing claims would be managed to protect valid existing rights and would not be affected by any withdrawal recommendations proposed under the preferred alternative or other alternatives.
- Valid existing claims and existing approved surface management operations would be managed under the conditions in effect when the Plan of Operations was approved; new restrictions proposed under this RMP Amendment would apply only to new Plans of Operation.
- A plan of operations would be required for new proposed operations, greater than casual use, unless currently under an approved notice, in the decision area in accordance with 43 CFR 3809. Existing active notices would not be extended and a Plan of Operations would be required.

### METHODS AND DATA

Where possible, BLM spatial data (GIS) and other data, such as LR2000, were used to describe the impacts quantitatively. All data sets depend on the quality and availability of data, and so acreages and other numbers are approximations for

comparison and analytic purposes only. When quantitative data was not available, the impacts are described qualitatively.

## GENERAL IMPACTS

The primary planning decisions that could impact the availability of locatable minerals include: withdrawals and withdrawal recommendations; and, required conservation measures, such as surface disturbing restrictions and timing limitations.

Areas withdrawn from locating mining claims have an obvious direct impact on the availability of locatable minerals. Areas recommended for withdrawal may eventually have the same direct impact if approved by the Secretary or by Congress. Required surface use limitations, such as timing limitations, could result in increased costs and decreased efficiency of development. Indirect impacts include reduced production of minerals for the public use.

Although access and utilities are typically included in a plan of operations, designations of ROW exclusion and avoidance areas could impact the ability to site access and utility ROWs in locations preferred by a claimant. This in turn, could increase costs and decrease efficiency of mining operations due to required additional mitigation and project criteria.

It is not possible to state with certainty the degree to which the potential impacts described above would occur. The magnitude of those impacts cannot be assessed without project-specific information on where mining claims are staked and any details of associated plans of operations.

### 4.14.2. Impacts by Alternative

## ALTERNATIVE A - NO ACTION

The Canyons of the Ancients NM, Gunnison Gorge NCA, Dominguez-Escalante NCA, and McInnis Canyons NCA, as well as all Wilderness Areas, are withdrawn from mineral entry. There are additional acres withdrawn from mineral entry throughout the analysis area, as shown below.

**Table 4.106 - Status of Locatable Minerals in the Decision Area**

| POPULATION AREA | FEDERAL MINERAL ACREAGE IN OCCUPIED HABITAT AND UNOCCUPIED HABITAT | | |
|---|---|---|---|
| | ACRES WITHDRAWN[1] | ACRES OPEN TO STAKING | ACRES IN ACTIVE MINING CLAIMS |
| Gunnison Basin | 22,100 | 549,300 | 11,000 |
| Cerro Summit-Cimarron-Sims Mesa | 1,400 | 25,000 | 0 |
| Crawford | 7,200 | 57,800 | 0 |
| Monticello-Dove Creek | 5,700 | 49,800 | 2,100 |
| Piñon Mesa | 25,000 | 159,300 | 20 |
| San Miguel Basin | 0 | 79,100 | 500 |
| Poncha Pass | 0 | 32,300 | 0 |

[1] **Does not include acres withdrawn for nonmetallic locatables.**

## ALTERNATIVE B

Under Alternative B, all Occupied and Unoccupied Habitat would be recommended for withdrawal from location and entry under the Mining Law of 1872. This recommendation could result in the publication of a notice of proposed withdrawal in the Federal Register. Once such a notice is published, under 43 U.S.C. 1714(b)(1) the lands would be temporarily segregated from location and entry for up to two years while the Secretary considers the proposed withdrawal.

If the lands are ultimately withdrawn, then no new mining claims could be located for the duration of the withdrawal. During the segregation and withdrawal periods, mining-related activities would be governed by 43 CFR 3809.100. Existing claims could be subject to validity exams, and possible contest. Existing claims could potentially be validated, invalidated, or cancelled. Any claims determined to be valid would be managed according to 43 CFR 3809. Pursuant to FLPMA, the Secretary must notify Congress of any withdrawal exceeding 5,000 acres. Approximately 13,650 acres within the decision area are covered by existing mining claims.

In the absence of segregation or an approved withdrawal, the following would apply:

- All mining operations, beyond casual use activities, would require an authorized plan of operations. The plan would be reviewed, including an environmental analysis under NEPA, to be sure that the required performance standards (43 CFR 3809.420) would be met. Performance standards include such things as land use plan compliance, actions to protect public lands, (such as, to prevent adverse impacts to threatened or endangered species and their habitat which may be affected by operations), concurrent reclamation, and full reclamation requirements. In addition, BLM

would require a bond or financial guarantee that would cover the estimated costs of reclamation.

- Apply seasonal restrictions if deemed necessary to prevent unnecessary or undue degradation.

In the Non-Habitat Areas, noise disturbance limitations would be applied, as appropriate, in authorized plans of operation. Approximately 182,400 acres of federal minerals are in Non-Habitat Areas.

These actions would result in impacts on the locatable minerals program through reduced access and increased costs due to requirements for mitigation. Alternative B would have greater impacts on locatable minerals than Alternative A.

## ALTERNATIVE C

Under Alternative C, withdrawals would be considered for recommendation based on an analysis of: 1) risk to GUSG and its habitat from conflicting locatable mineral potential and development in Occupied and Unoccupied Habitat; and, 2) on development risk and subsequent risk to the sage-grouse from conflicting locatable mineral potential and development. Any such recommendation(s) would be subject to the procedures described under Alternative B.

These actions would result in impacts on the locatable minerals program through increased costs due to requirements for mitigation. Alternative C would have greater impacts on locatable minerals than Alternative A, but less than under Alternative B.

## SUB-ALTERNATIVES $D_1$/$D_2$ - GUNNISON BASIN AND SATELLITE PREFERRED

Because sub-alternatives $D_1$ and $D_2$ include the same management actions, the impacts would be the same across the Gunnison Basin and satellite population areas. The actions are the same as those under Alternative C, except that no withdrawals would be recommended in Unoccupied Habitat. The impacts would be essentially the same as those under Alternative C.

Sub-alternatives $D_1$ and $D_2$ would have greater impacts on locatable minerals in the Gunnison Basin than Alternative A, but less than under alternatives B or C.

# 4.15. SALABLE MINERALS

## 4.15.1. METHODOLOGY

### ATTRIBUTES AND INDICATORS

The following indicators are used to describe the impacts of the preferred alternative and other alternatives on the availability of, and access to, federal salable mineral resources:

- Acres of currently permitted salable mineral sites
- Acres of federal minerals open to salable mineral development
- Acres of federal minerals closed to salable mineral development
- Acres of federal minerals proposed for withdrawal from mineral disposal
- Acres of ROW exclusion and avoidance areas.

### ASSUMPTIONS

The analysis of impacts on salable minerals development is based on the following assumptions:

- Existing mineral material operations on federal mineral estate, regardless of surface ownership, could be subject to additional mitigation measures by the BLM Authorized Officer. Under these circumstances, permit and contract modifications would be developed consistent with applicable laws and valid existing rights, using as many of the BMPs and conservation measures as possible while still allowing reasonable access.
- Management actions apply to mineral material activity on surface lands overlying federal mineral estate, which includes all federal mineral estate underlying BLM-administered and non-BLM-administered surface.
- Future demand for mineral materials will vary depending upon market conditions, which differ according to economic conditions and construction activity. Construction projects within approximately 50 miles of mineral materials deposits may lead to development of these deposits. It is expected that mineral materials activity and demand will continue to increase for the life of the RMP Amendment.

### METHODS AND DATA

Where possible, BLM spatial data (GIS) and other data, such as LR2000, were used to describe the impacts quantitatively. All data sets depend on the quality and availability of data, and so acreages and other numbers are approximations for comparison and analytic purposes only. When quantitative data was not available, the impacts are described qualitatively.

## 4.15.2. General Impacts

The primary planning decisions that could impact the availability of salable minerals include: closure of areas to mineral sales; required conservation measures, such as surface disturbing restrictions and timing limitations; and ROW exclusion and avoidance designations.

Areas closed to mineral sales have an obvious direct impact on the availability of mineral materials. Required surface use limitations, such as timing limitations, could result in increased costs and decreased efficiency of development. Indirect impacts include reduced production of minerals for the public use and for the generation of mineral sales revenues.

Designations of ROW exclusion and avoidance areas could impact the ability to site access and utility ROWs on public land and could increase costs and decrease efficiency of development due to required additional mitigation and project criteria.

It is not possible to state with certainty the degree to which the potential impacts described above would occur. The magnitude of those impacts cannot be assessed without project-specific information on where mineral material sites would be located and any details of associated plans of operation.

## 4.15.3. Impacts by Alternative

### ALTERNATIVE A - NO ACTION

The Canyons of the Ancients NM, Gunnison Gorge NCA, Dominguez-Escalante NCA, and McInnis Canyons NCA, as well as all Wilderness and Wilderness Study Areas, are closed to mineral material sales. There are additional acres closed to mineral entry throughout the analysis area, as shown in Table 4.107.

**Table 4.107 - Mineral Estate in GUSG Occupied and Unoccupied Habitat**

| SURFACE OWNERSHIP/ MANAGEMENT | TOTAL ACRES | ACRES IN OCCUPIED HABITAT | ACRES IN UNOCCUPIED HABITAT | ACRES IN NON-HABITAT AREAS |
|---|---|---|---|---|
| FEDERAL MINERALS[1] | | | | |
| BLM | 720,900 | 378,800 | 224,900 | 117,200 |
| Private | 264,300 | 116,500 | 78,900 | 63,000 |
| State and Local Governments | 17,700 | 12,900 | 0 | 4,800 |
| Other Federal (USFS, NPS) | 295,500 | 112,300 | 83,800 | 99,400 |
| Total Federal Minerals (64%) | 1,298,300 | 626,400 | 387,600 | 284,400 |
| NON-FEDERAL MINERALS | | | | |
| BLM | 20,800 | 16,600 | 3,000 | 1,200 |
| Non-BLM | 748,500 | 296,300 | 331,100 | 121,100 |
| Total Non-Federal Minerals (36%) | 769,300 | 312,900 | 334,000 | 122,400 |
| TOTAL MINERALS | 2,118,400 | 955,600 | 743,300 | 419,600 |

[1]May not include all minerals; occasionally only oil and gas and/or coal are reserved as federal minerals.

## ALTERNATIVE B

Under Alternative B, all Occupied Habitat and sagebrush and riparian habitat in Unoccupied Habitat would be closed to mineral material disposals. Applicable timing limitation and vegetative removal standards in General Management Section would be applied to mineral material disposals allowed in Unoccupied Habitat.

In Non-Habitat Areas, noise disturbance limitations would be applied as appropriate.

These actions would result in impacts on the salable minerals program through reduced access and increased costs due to requirements for mitigation. Indirect impacts include potentially pushing development of salable minerals to non-federal lands. In addition, costs for salable minerals could potentially increase as distances to markets and transportation costs increase. Alternative B would have greater impacts on salable minerals than Alternative A.

## ALTERNATIVE C

Under Alternative C, mineral material sales would be allowed in the entire analysis area, subject to the provisions of the mitigation framework. Applicable timing limitation, surface disturbance limitation, noise, and mitigation standards in the General Management Section would be applied to mineral material sales.

These actions would result in impacts on the salable minerals program through reduced access and increased costs due to requirements for mitigation. Alternative C would have greater impacts on locatable minerals than Alternative A, but less than under Alternative B.

#### SUB-ALTERNATIVES $D_1/D_2$ - GUNNISON BASIN AND SATELLITE PREFERRED

Under sub-alternatives $D_1$ and $D_2$, impacts in the Gunnison Basin and satellite population areas would be the same as under Alternative C.

### 4.15.4. Cumulative Impacts

Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect leasable, locatable, salable, and non-energy leasable minerals are: market fluctuations, pipeline capacity, available markets for distribution, regulatory constraints, new technologies, and reservoir/reserve depletion.

The cumulative impact analysis area for leasable, locatable, salable, and non-energy leasable minerals is the planning area, regardless of land ownership. Impacts on the ability to develop and extract mineral resources could cumulatively reduce exploration and production of commodities from BLM-administered lands.

Impacts on mineral resources that are individually minor may cumulatively reduce exploration and production of commodities from BLM-administered lands. The BLM has no control over many of the factors that affect mineral extraction and prospecting. These factors include regulatory policy, public perception and concerns, transportation costs and availability, well spacing, low commodity prices, taxes, and housing and other necessities for workers.

Levels of domestic oil and gas exploration and development follow the swings in oil and gas prices. As price increases, the development of existing leases and the demand for new leases increases, even in areas with less development potential. Restrictions on oil and gas leasing would have a cumulative effect on the ability to develop these resources. Under Alternative A, oil and gas exploration and development is expected to continue as correlated with mineral commodity prices. Under all of the action alternatives (alternatives B and C and sub-alternatives $D_1$ and $D_2$), oil and gas production would decrease due to restrictions placed on development. Decreases in production would be greatest under Alternative B, under which the BLM would close all GUSG habitat to fluid mineral leasing.

There is a relatively small amount of moderate to high development potential in the decision area (about 17% or 148,218 acres of federal minerals). Much of that area is

already subject to a NSO stipulation (about 48% of federal minerals in the Monticello-Dove Creek population area and 68% of federal minerals in the San Miguel Basin population area). In comparison to the rest of Colorado and Utah, oil and gas production in counties overlapping the planning area is relatively small. Given those factors, the cumulative impacts of reduced oil and gas production in the planning area would be relatively minor on a statewide or national scale.

Non-energy leasable mineral development is also an ongoing activity in the cumulative impact analysis area and is expected to continue as such under Alternative A. Under all of the action alternatives (alternatives B and C and sub-alternatives $D_1$ and $D_2$), non-energy leasable mineral development would decrease due to restrictions placed on development. Decreases in production would be greatest under Alternative B, under which the BLM would close all GUSG habitat to non-energy leasable mineral development. There are currently no authorized leases in the decision area. However, there is demonstrated interest in prospecting for potash resources, with four BLM-authorized potash prospecting permits in the analysis area, one BLM-authorized potash prospecting permit adjacent to the decision area, and at least another 13 pending applications in the decision area.

Locatable mineral development is an ongoing activity in the cumulative impact analysis area and is expected to continue under Alternative A. The level of exploration and development of locatable minerals, particularly gold and uranium, follow the swings in mineral commodity prices. Under all of the action alternatives (alternatives B and C and sub-alternatives $D_1$ and $D_2$), locatable mineral development may decrease due to restrictions placed on development. Decreases in production would be greatest under Alternative B, under which the BLM would recommend that all GUSG habitat be withdrawn from mineral entry.

Salable mineral extraction and use is expected to increase, in conjunction with increasing private property and commercial development. As the amount of BLM-administered land available for disposition of salable materials is reduced, it is expected that demand for salable minerals would increase in other areas adjacent to the cumulative impact analysis area. The demand for salable minerals includes the demand for relatively short transportation distances. A reduction of availability on BLM-administered lands would likely push development of salable minerals to nearby non-federal lands. Due to their proximity to the decision area, these lands would likely be within or adjacent to GUSG habitat.

Mineral exploration and development would continue to occur under all alternatives. However, acreages open to exploration and development would vary by alternative. Overall, management under Alternative B would be the most restrictive to mineral development and could result in the greatest amount of cumulative impacts on mineral exploration and development in the cumulative

impact analysis area. A reduction of availability of mineral resources on BLM-administered lands would likely push development of minerals to nearby non-federal lands with development potential. Due to the proximity to the decision area, these lands would likely be within or adjacent to GUSG habitat.

# 4.16. LANDS & REALTY

## LAND USE AUTHORIZATIONS AND UTILITY CORRIDORS

### 4.16.1. Methodology

#### ATTRIBUTES AND INDICATORS

The following indicators are used to describe the impacts of the preferred alternative and other alternatives on the availability of BLM lands for land use authorizations, including ROWs, permits, leases, and communication site leases:

- Acres of ROW exclusion areas
- Acres of ROW avoidance areas
- Acres of designated utility corridors
- Acres of BLM ROWs
- Powerlines/Phone Lines
  - Overhead
  - Buried
- Roads
- Pipelines
- Acres of communication site leases/ROWs
- Acres of other leases and permits.

#### ASSUMPTIONS

The analysis of impacts on lands and realty is based on the following assumptions:

- Existing ROWs would be managed to protect valid existing rights.
- Upon renewal, assignment, or amendment of existing ROWs, additional stipulations could be included.
- The demand for ROWs, communication facilities, and other land uses would increase over the life of the plan.
- Maintaining and upgrading existing ROWs and communication facilities is preferred before constructing new facilities.

#### METHODS AND DATA

The term "ROW" is generally used to refer to all land use authorizations, including ROWs, land use permits, leases, and communications use leases, unless otherwise

specified in the discussion. This includes authorizations for small-scale solar energy developments and wind energy developments. As discussed in Chapter 3, the decision area is excluded from utility scale (20 megawatt or greater) development proposals. Any proposals for small-scale development would be subject to the same limitations as other ROW proposals.

Where possible, BLM spatial data (GIS) and other data (such as LR2000) were used to describe the impacts quantitatively. All data sets depend on the quality and availability of data, and so acreages and other numbers are approximations for comparison and analytic purposes only. When quantitative data was not available, the impacts are described qualitatively.

The primary planning decisions that could impact the lands and realty program include: ROW exclusion and avoidance designations; timing limitation and other surface use limitation standards and guidelines; travel management limitations; utility corridor designations; withdrawal recommendations; and, allowable mineral development.

Designations of ROW exclusion and avoidance areas could impact the ability to site ROWs on public land and could require additional mitigation and project criteria. Seasonal restrictions on travel, construction, and surface-disturbing maintenance could impact site accessibility, the ability to construct and maintain ROWs, and project costs. Limits on upgrades to existing routes, new route construction, and realignments of existing routes could impact the ability to site ROWs in an applicant's preferred location. Designations of utility corridors could direct future ROWs to preferred locations, while undesignating corridors could impact the ability to site future ROWs. Limitations on mineral development could reduce demand for ROWs for new infrastructure, such as roads and utilities.

### 4.16.2. Impacts by Alternative

#### ALTERNATIVE A - NO ACTION

Under No Action Alternative A, approximately 47,400 acres are designated as ROW exclusion areas and 119,500 acres as ROW avoidance areas, including 32,800 acres of exclusion and 5,900 acres of avoidance in Non-Habitat Areas. The remainder of the analysis area is open to ROWs with various resource protections applied as stipulations.

The more recently adopted plans (Grand Junction, Moab, Monticello, and Tres Rios RMPs) provide for NSO, no surface disturbance, and/or ROW exclusion within 0.6 mile of a lek. All of the plans (except for the McInnis Canyons NCA RMP, in which

the entire NCA is a ROW exclusion area) include timing limitations to protect GUSG during breeding and/or nesting. The Gunnison Gorge NCA RMP, Tres Rios RMP, and Draft Dominguez-Escalante NCA RMP also include timing limitations for wintering GUSG protection.

There are 248,110 acres in the analysis area designated as utility corridors.

There are no approved or recommended withdrawals specific to protection of GUSG in the analysis area. The Gunnison Gorge NCA, Dominguez-Escalante NCA, and McInnis Canyons NCA, as well as all Wilderness Areas, are withdrawn from mineral entry and mineral leasing. Wilderness Study Areas are withdrawn from mineral leasing.

Mineral development throughout much of the decision area is limited for GUSG protections. All Occupied Habitat is closed to mineral leasing under the Grand Junction RMP, and is open to mineral leasing with a NSO stipulation under the Canyons of the Ancients NM and Tres Rios RMPs, and the San Luis Valley Geothermal RMP Amendment. The rest of the decision area that is open to leasing is subject to a NSO stipulation for areas within 0.6 mile of a lek, with NSO within 2 miles of a lek for the Gunnison Gorge NCA RMP decision area outside of the proclaimed NCA. There are similar protections for mineral sales throughout the decision area. New mineral development in open areas would continue to require new ROWs for related infrastructure.

## ALTERNATIVE B

Under Alternative B, Occupied and Unoccupied Habitat in the decision area would be designated as a ROW exclusion area, with some exceptions allowed. Areas subject to the specified exceptions would be managed as ROW avoidance areas. The exceptions would limit any new ROWs to being located within designated utility corridors or within 100 feet of the centerline of highways and county roads (or up to 100 feet from the edge of the ROW if not feasible), or to providing access and utilities to valid existing rights.

Timing limitations, ground disturbance limitations, and mitigation requirements would apply to any new, amended, or renewed authorizations.

Non-Habitat Areas where activities could be disruptive to GUSG would be designated as ROW avoidance areas, and the same guidelines for resource protection would be applied as those described under Alternative C. Noise disturbance limitations would be applied, as appropriate. In addition, whenever feasible new facilities and/or upgrades to existing facilities would be located within designated corridors or other areas with existing facilities.

In Occupied and Unoccupied Habitat, designated utility corridors not containing an authorized ROW would be undesignated. No new corridors would be designated in the decision area.

Withdrawal of the decision area would be recommended. This would require preparation of withdrawal packages to be submitted to the Secretary of Interior.

Occupied and Unoccupied Habitat would be closed to mineral leasing and mineral sales. No new leases would be issued when existing leases expire or terminate and so demand for ROWs would decrease.

All of the actions under Alternative B would lead to a decrease in the demand for and the number of new ROWs granted. It would be more difficult for BLM to accommodate new ROWs, and they would be subject to timing, disturbance, and siting limitations and mitigation requirements that could increase construction costs. New ROWs that could not be accommodated within the exception criteria would likely be diverted to adjacent nonfederal lands or prevented entirely.

## ALTERNATIVE C

Under Alternative C, Occupied and Unoccupied Habitat would be designated as a ROW avoidance area, and guidelines for resource protection would be applied if locating a new ROW in Occupied and Unoccupied Habitat could not be avoided. Generally, existing routes subject to a ROW would be required to be maintained in their current condition (width, surface, etc.). Electric and phone lines would be required to be buried, if possible, or if not, then collocated with existing infrastructure where feasible. Perch deterrents would be required for any overhead lines. New communication infrastructure would be collocated with existing infrastructure where possible.

Timing limitations, ground disturbance limitations, and mitigation requirements would apply to any new, amended, or renewed authorization.

No new corridors would be designated in Occupied Habitat. Designated utility corridors in Occupied Habitat that do not contain an authorized ROW would be undesignated.

Withdrawals would be considered for recommendation based on risk to GUSG and its habitat from conflicting locatable mineral potential and development. For areas not withdrawn, seasonal restrictions and other mitigation measures would be applied to mining plans of operation.

Occupied Habitat in the decision area would be open to mineral leasing with a NSO stipulation. Unoccupied Habitat in the decision area would be open to mineral

leasing with a CSU stipulation to protect sagebrush and riparian habitat quality and connectivity. Mineral material sales would be allowed in accordance with the general management action limitations.

The actions under Alternative C would lead to a decrease in the number of new ROWs, but to a lesser degree than under Alternative B. Limitations to mineral development would reduce the demand for new ROWs. It would be more difficult for BLM to accommodate new ROWs, and ROWs would be subject to timing, disturbance, and siting limitations and mitigation requirements that could increase construction costs. There would be fewer new overhead electric and phone lines than would be authorized under the No Action Alternative, due to the requirements to collocate and/or bury new lines where feasible.

## SUB-ALTERNATIVE $D_1$ - GUNNISON BASIN PREFERRED

Sub-Alternative $D_1$ would: 1) implement the CCA for specific actions in Occupied Habitat; 2) would include the same actions as Sub-Alternative $D_2$ for Unoccupied Habitat and for activities not covered by the CCA and not related to minerals; and, 3) would include the same actions related to minerals development as under Alternative C.

ROWs for new facilities that would not be covered by the CCA guidance include proposals for more than 5.0 acres of permitted area, or more than 25 feet of utility ROW permitted area width, or more than 0.5 mile of aboveground infrastructure (not including buried utilities and pipelines). The CCA generally would apply more limitations on development within Tier 1 habitat than within Tier 2 habitat. The additional limitations include offsite mitigation requirements and a prohibition on new infrastructure, outside of existing development footprints, within 0.6 mile of a lek.

The impacts under Sub-Alternative $D_1$ are similar to those described for Alternative C. However, actions that would require additional offsite mitigation would further increase project costs for proposed ROWs.

## SUB-ALTERNATIVE $D_2$ - SATELLITE PREFERRED

The actions under Sub-Alternative $D_2$ would be similar to those under Alternative C, with the following differences:

The bulk of the decision area would be designated as a ROW avoidance area. However, areas within 0.6 mile of a lek would be designated as ROW exclusion areas. The same exceptions to ROW exclusion area as allowed under Alternative B

would be applied. Areas subject to the specified exceptions would then be managed as ROW avoidance areas.

The impacts under Sub-Alternative $D_2$ would be similar to those under Alternative C.

## 4.16.3. Cumulative Impacts

Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect the lands and realty program include the demand for new and existing ROWs for projects such as access roads, pipelines, electric and phone lines, and communication sites, related to minerals and renewable energy developments and to development of private lands.

The cumulative impact analysis area used to analyze cumulative impacts on the uses administered by the lands and realty program is composed of the planning area.

Population growth, and the associated increased private land development, access needs, and utilities development, as well as increased minerals development and associated infrastructure development and access needs, is expected to continue placing a greater demand on lands and realty actions. Restrictions on ROWs outlined in the alternatives, combined with restrictions from other management plans in the area, would have a cumulative effect by reducing routing options and possibly increasing project construction or implementation costs.

No additional restrictions were placed on utility-scale wind and solar energy development in the alternatives. None of the decision area has been identified as having potential for future wind energy development. However, there are some proposals for wind farms on private lands in the planning area in San Juan County, Utah. The decision area is already excluded from utility scale solar development. There are currently no wind energy or solar energy ROWs authorized on public lands in the decision area.

Cumulative impacts on lands and realty are expected to be the greatest under Alternative B, since it would place the most restrictions on development. In contrast, management under Alternative A would place the fewest restrictions on the lands and realty program and would therefore be expected to contribute the fewest cumulative impacts on lands and realty. Management under Alternative C and sub-alternatives $D_1$ and $D_2$ would also place restrictions on development, but to a lesser extent than under Alternative B.

# 4.17. AREAS OF CRITICAL ENVIRONMENTAL CONCERN

## 4.17.1. METHODOLOGY

### INDICATORS

- The presence of absence of an ACEC is indicated by a designation within a BLM RMP.

### ASSUMPTIONS

- The relevant and important values for which an ACEC is designated are not necessarily uniformly distributed across the entire ACEC.
- Management actions designed to protect GUSG habitat by reducing surface disturbance would benefit those relevant and important values that also occur within sagebrush communities.
- Not all relevant and important values within an ACEC have the same level of protection due to variation in specific management decisions. Management actions designed to protect GUSG habitat by reducing surface disturbance may result in impacts on relevant and important values that occur outside sagebrush communities.
- The designation of an ACEC does not prevent appropriate land uses so long as they are not detrimental to the relevant and important values.
- Proposed management decisions would not replace existing decisions that are more restrictive.
- Designation of an ACEC would not replace existing ACEC designations; GUSG habitat would be added to existing ACECs as another reason for designation and special management attention.

### METHODS AND DATA

The analysis of impacts on ACECs is necessarily an analysis of impacts on the relevant and important values that are given special management attention through the designation of ACECs. A complete evaluation of impacts on these values is incorporated into the appropriate impact analysis sections addressing Fish and Wildlife, Special Status Species, Vegetation Management, Soil and Water Resources, Visual Resources, Cultural Resources, and Paleontological Resources. This analysis

will not duplicate those sections. Instead, this analysis will center on a comparison of alternatives based on the inclusion of an ACEC in Alternative B and any additional protections provided as a consequence.

### 4.17.2. Impacts by Alternative

#### ALTERNATIVE A

All currently designated ACECs would continue without modification. The assumption is that proposed management decisions would not replace existing decisions that are more restrictive. No new ACECs would be designated.

#### ALTERNATIVE B

Under Alternative B, all Occupied and Unoccupied Habitat would be designated as an ACEC. The special area designation would serve as a reminder to public land users and the BLM that GUSG habitat, both Occupied and Unoccupied, has significant values and resources requiring management with greater restrictions than public lands outside the boundaries of the ACEC.

##### Recreation and Travel Management

Management actions resulting from ACEC designation would limit travel to existing roads and trails, prohibit designation of new RMAs (SRMAs or ERMAs) and only allow Special Recreation Permits that have neutral or beneficial effects to GUSG and their habitat.

##### Minerals and Land Use Authorizations

The ACEC would be designated a ROW exclusion area, with exceptions for designated ROW corridors. The ACEC would be closed to fluid mineral leasing and recommended for withdrawal from locatable mineral entry. Designation could trigger additional requirements for avoidance of unnecessary and undue degradation under the general mining laws (43 CFR 3809). Potential solid mineral operators would be required to submit a plan of operations and obtain BLM approval prior to beginning operations that could cause surface disturbance greater than casual use.

#### ALTERNATIVE C

No new ACECs would be designated. Impacts would be the same as under Alternative A.

## SUB-ALTERNATIVES $D_1/D_2$ - GUNNISON BASIN AND SATELLITE PREFERRED

No new ACECs would be designated. Impacts would be the same as under Alternative A.

# 4.18. SOCIO-ECONOMICS

## 4.18.1. METHODOLOGY

### ATTRIBUTES AND INDICATORS

The following are indicators of socioeconomic effects resulting from management actions related to the protection of GUSG within the decision area:

- Employment, labor income, and output associated with economic activities affected by management alternatives
  - Number of jobs
  - Dollar value of output and labor income
- Qualitative assessment of additional costs to the use of public lands and resources
  - Grazing allotment infrastructure and management costs
  - Restrictions on mineral development and extraction, including fluid mineral leasing stipulations (e.g., NSO) and right-of-way exclusion and avoidance designations
  - Recreation site access
- Interest groups and communities of place
  - Qualitative assessment of effects to quality of life
  - Qualitative assessment of non-market values
- Environmental Justice
  - Qualitative assessment of disproportionately high and adverse human health and environmental impacts.

### ASSUMPTIONS

Following are the basic assumptions related to social and economic impact assessment of the alternatives:

- The analysis of economic impacts of management alternatives on grazing assumes billed AUMs represent actual use based on the latest available data. Billed AUMs measure the amount of forage the BLM bills for annually. Billed AUMs may fluctuate year-to-year, but future changes cannot be predicted.
- Recreational expenditures incurred by local visitors to federal lands for recreational purposes are expected to continue to be spent locally if recreational resources on federal lands are no longer available. Expenditures by non-local visitors to federal lands are assumed to no longer be spent in

the planning area if federal lands are no longer available for recreation. Economic impacts are assumed to derive from recreation from non-local visitors.

- The analysis of impacts of management alternatives affecting oil and gas development on federal lands assumes that operators who are unable to drill on federal lands would not access the same oil and gas from nearby private or state lands. To the degree that a shift to private or state lands would occur, the impact estimates would be lower for restrictions on drilling and production on federal lands.
- The economic analysis of fluid mineral leasing for action alternatives B and C and sub-alternatives $D_1$ and $D_2$) relies on a qualitative description of added costs due to lease stipulations and access restrictions.

As a landscape level planning effort, none of the alternatives prescribe project-level or site-specific activities on BLM-managed public lands. Furthermore, the agency's selection of an alternative does not authorize funding to any specific project or activity nor does it directly tie into agency budgets as appropriated annually through the federal budget process. As a consequence, agency costs and differences in program costs across alternatives have not been quantified. Information has been presented in several resource impact sections on the types of costs that might be associated with various GUSG conservation measures.

## METHODS AND DATA

For the analysis of economic consequences, quantitative estimates are provided where sufficient data or estimates are available on the potential changes in authorized uses of federal lands under each alternative. When quantitative estimates of economic consequences are not possible, a qualitative discussion of the potential economic effects of management actions associated with specific authorized uses is presented. Therefore, the overall economic consequences are a combination of quantitative estimates and qualitative discussion.

The economic contribution analysis uses IMPLAN Professional Version 3.0 with 2012 data. IMPLAN is an input-output model that uses linkages in a regional economy to estimate the economic impact of projects, programs, policies, and economic changes on a region. The economic contribution analysis also uses FEAST, a USFS tool that serves as an interface with IMPLAN. FEAST translates resource inputs (such as AUMs and recreation visits) into economically-meaningful units for use in IMPLAN.

For quantitative estimates, IMPLAN was used to estimate impacts on employment, labor income, and output in the decision area. Direct economic impacts are generated by the activity itself, such as livestock grazing on public lands. Indirect

impacts occur when the directly affected sector purchases supplies and services from other industries. Induced impacts are generated as a result of spending new household income generated by direct and indirect employment. The employment estimated is defined as any part-time, seasonal, or full-time job. In the economic impact tables, direct, indirect and induced contributions are included in the estimated impacts.

The IMPLAN database describes the economy in 440 sectors using federal data from 2012. However, the IMPLAN model is a static model, and it does not capture changes in the industrial composition of a region over time, nor does it capture dynamic effects that may be associated with processes of growth or decline, such as changes in technology or labor productivity. There is, therefore, a degree of uncertainty in the estimates of impacts obtained through the IMPLAN model.

The social analysis considers how proposed management actions may affect quality of life. This analysis incorporates non-market values—goods and services not traded in markets that contribute to human well-being. Due to data limitations, the assessment of non-market values is primarily qualitative. Additionally, the social analysis evaluates the potential for disproportionate effects to minority and low-income populations (Environmental Justice).

### Grazing

Economic contributions of public land grazing follow the methodology developed and used by the BLM as part of the annual Department of the Interior economic report. See DOI (2014) for additional information.

### Recreation

The recreation section of the economic contribution analysis uses visit estimates from the Recreation Management Information System (RMIS). RMIS is the BLM's official repository for data relating to the recreational use of public lands and waters. Annually, state and field office outdoor recreation planners enter and verify data on the number of recreation visits to each field office. The data contained in RMIS are the best available information on recreational use of BLM-managed public lands. The economic contribution analysis uses the average number of visits to each field office in FY13 and FY14. The average number of visits is multiplied by the share of the field office within GUSG habitat. The resulting number is used as a proxy for the number of visits that occur within the habitat.

The BLM does not collect information on the distribution of recreation visits among local and non-local users and day and overnight use. Therefore, this analysis uses the national recreation visitor segment shares from the Forest Service's National Visitor Use Monitoring (NVUM) program (White et al 2013). Local visitors are

defined as people residing within 50 miles of the recreation site. The NVUM visitor distribution is:

- Local day visitors: 49%
- Local overnight visitors, lodging on public land: 4%
- Local overnight visitors, lodging off public land: 1%
- Non-local day visitors: 10%
- Non-local overnight visitors, lodging on public land: 9%
- Non-local overnight visitors, lodging off public: 14%
- Non-primary visitors: 13%

Non-primary visitors are individuals whose trip purpose is something other than recreation on the public land. In the economic contribution analysis these visits are added to the local day visits category, since this market segment has the lowest expenditures. Therefore, non-primary visits are captured without assuming substantial visitor spending.

These segment shares are applied to the BLM visitation numbers to estimate the distribution of visitor types for each field office. The segment shares are necessary for the economic contribution analysis because visitor spending varies between local and non-local visitors as well as between day and overnight use. Since BLM does not collect national visitor expenditure data, the average Forest Service visitor expenditure estimates are applied to the BLM data (White et al 2013).

Average visitor spending (per trip) in 2014 dollars is:

- Local day visitors: $36.54
- Local overnight visitors, lodging on public land: $179.82
- Local overnight visitors, lodging off public land: $235.72
- Non-local day visitors: $69.34
- Non-local overnight visitors, lodging on public land: $258.35
- Non-local overnight visitors, lodging off public: $569.08

Dollar values were converted from their original 2009 dollars to 2014 dollars using the Bureau of Labor Statistics' consumer price index calculator (BLS 2014a).

### Minerals

Federal data sources report a wide range of employment in the extraction of oil and gas sector. IMPLAN employment estimates, which are derived from several federal sources, exceed the employment reported by the U.S. Census Bureau's County Business Patterns (CBP). In Area 1, IMPLAN reports 859.0 jobs in the extraction of oil and gas, while CBP reports only 4 jobs in 2012. In Area 2, IMPLAN reports 549.7 jobs and CBP reports 99 jobs in 2012. In Area 3, IMPLAN reports 242.7 jobs and CBP reports 90 jobs in 2012 (IMPLAN 2012 and U.S. Census Bureau 2014).

Discussions with state officials, BLM minerals specialists, and BLM economists suggest that the IMPLAN data is the most accurate available information. Therefore, IMPLAN is used for this analysis.

Since only Area 3 has production from BLM-managed wells in GUSG habitat, the economic contribution analysis is conducted only for this area. The following calculations were made to estimate direct jobs associated with production from BLM-managed wells within habitat:

1) Multiply countywide barrels of oil produced by the 2012 price (5,477,216*94.05)
2) Multiply countywide Mcf of natural gas produced by the 2012 price (51,109,451*2.66)
3) Divide the total number of jobs in the extraction of oil and gas sector by the sum of (1) and (2), which yields 242.7/(515,132,164.8+135,951,139.66) = 242.7/651,083,304.46 = 0.000000373
4) Multiply barrels of oil produced from BLM-managed wells within GUSG habitat by the 2012 price (8,283*94.05) = 779,016.15
5) Multiply Mcf of natural gas produced from BLM-managed wells within GUSG habitat by the 2012 price (919,281*2.66) = 2,445,287.46
6) Multiply the sum of (4) and (5) by the result of (3), which yields 3,224,303.61 * 0.000000373 = **1.2 direct jobs**

The number of direct jobs are then entered into the IMPLAN model to estimate the indirect and induced effects of oil and gas production from BLM-managed wells within GUSG habitat. IMPLAN modeling reveals that in addition to the 1.2 direct jobs, extraction of oil and gas from BLM-managed wells within GUSG habitat supports an additional 0.7 indirect jobs and 0.3 induced jobs. The total labor income associated with the direct, indirect, and induced jobs is $95,000 and total output is $630,000 (IMPLAN 2012).

## 4.18.2. Socio-Economic Impacts

### GRAZING ALLOTMENTS

The potential impacts of management alternatives affecting grazing closures on overall employment, earnings, and output were estimated quantitatively only for alternatives A and B. Alternative C and sub-alternatives $D_1$ and $D_2$ would maintain GUSG habitat open for grazing, but these alternatives would impose restrictions on livestock grazing in GUSG habitat. The extent to which management actions under these alternatives would actually reduce the amount of billed AUMs is unclear. For purposes of the quantitative comparison of alternatives, the mid-point between Alternatives A and B is presented as an estimate of the economic impact of

Alternative C and sub-alternatives $D_1$ and $D_2$. This estimate is presented to allow addition to the impacts of other resource areas on output, employment, and labor income for comparison of alternatives, but should be understood as representing the range of potential impacts.

In addition to economic impacts linked to closing federal lands to livestock grazing, the estimates are intended to illustrate other costs on livestock operators, mainly under Alternative C and sub-alternatives $D_1$ and $D_2$. These include, among others:

- Various measures could affect the efficiency of livestock operations such as restrictions in GUSG habitat on vegetation treatments, structural improvements, movement of cattle, or on supplemental winter feeding.
- To the extent determined necessary in land health assessments, some allotments may be required to change livestock rotation or season of grazing, which could also affect the efficiency of ranch operations.
- For Alternative C and sub-alternatives $D_1$ and $D_2$ in areas where disturbance caps are exceeded, there is potential for restrictions on new disturbance (such as roads) that could increase operation costs for livestock operators.

Details about impacts under each alternative are provided below.

## ALTERNATIVE A - NO ACTION

Under No Action Alternative A, federal lands with GUSG habitat would remain open for grazing.

### Area 1

Area 1 contains approximately 14,600 billed AUMs for cattle, 7 billed AUMs for horses, 3,381 AUMs for sheep, and 2,275 AUMs for yearling cattle. The majority of AUMs are within GUSG habitat. Livestock grazing in Area 1 supports 45 jobs, $720,000 in labor income, and $4.5 million in output. None of these are expected to change as a result of management actions under No Action Alternative A.

### Area 2

Area 2 contains approximately 6,916 billed AUMs for cattle, 26 billed AUMs for horses, and 248 AUMs for yearling cattle. Livestock grazing in Area 2 supports 15 jobs, $275,000 in labor income, and $1.8 million in output. None of these are expected to change as a result of management actions under No Action Alternative A.

### Area 3

Area 3 contains approximately 9,446 billed AUMs for cattle, 8 billed AUMs for horses, and 128 AUMs for yearling cattle. Livestock grazing in Area 3 supports 21

jobs, $270,000 in labor income, and $1.7 million in output. None of these are expected to change as a result of management actions under No Action Alternative A.

## ALTERNATIVE B

Under Alternative B, GUSG habitat would be closed to livestock grazing. Livestock grazing on federal lands in the decision area would be restricted to those with no GUSG habitat. Alternative B would also implement management actions in Non-Habitat Areas. Range management actions in the Non-Habitat Areas would apply only to BLM managed-lands. However, grazing would continue to be authorized.

### Area 1

In Area 1, the impact of Alternative B is reflected in the estimated loss of approximately $783,000 of the output, 9 jobs, and $132,000 labor income compared to current conditions. The impact of Alternative B may also be greater than estimated, if the closure of federal lands makes some grazing operations no longer viable. In addition, permittees may incur fencing costs to prevent livestock from entering public lands in GUSG habitat. Compliance with water development best management practices may increase costs to permittees with allotments in Non-Habitat Areas.

### Area 2

In Area 2, the impact of Alternative B is reflected in the estimated loss of approximately $1 million of the output, 8 jobs, and $153,000 labor income compared to current conditions. The impact of Alternative B may also be greater than estimated, if the closure of federal lands makes some grazing operations no longer viable. In addition, permittees may incur fencing costs to prevent livestock from entering public lands in GUSG habitat. Compliance with water development best management practices may increase costs to permittees with allotments in Non-Habitat Areas.

### Area 3

In Area 3, the impact of Alternative B is reflected in the estimated loss of approximately $1.3 million of the output, 16 jobs, and $208,000 labor income compared to current conditions. The impact of Alternative B may also be greater than estimated, if the closure of federal lands makes some grazing operations no longer viable. In addition, permittees may incur fencing costs to prevent livestock from entering public lands in GUSG habitat. Compliance with water development best management practices may increase costs to permittees with allotments in Non-Habitat Areas.

## ALTERNATIVE C

Under Alternative C, grazing on federal lands with GUSG habitat is likely to be similar to Alternative A because all GUSG habitat would be kept open for grazing. However, under Alternative C, decisions on livestock movement, range improvements, and vegetation treatments may be subject to the conservation, enhancement, or restoration of GUSG habitat, potentially reducing forage available because permittees would be required to move livestock off-range if necessary to protect GUSG. Seasonal restrictions could also be imposed, requiring that permittees move their livestock elsewhere, with added costs to their operations.

### Area 1

The estimated employment, labor income, and output consequences of Alternative C are presented as the mid-point between alternatives A and B. In Area 1, this translates to 41 jobs, $652,000 of labor income, and $4.1 million of output. This estimate is provided to allow addition to the impacts of other resource areas on output, employment, and earnings for comparison of alternatives, but should be understood as representing the range of potential impacts (between those of A and B).

### Area 2

The estimated employment, labor income, and output consequences of Alternative C are presented as the mid-point between alternatives A and B. In Area 2, this translates to 11 jobs, $199,000 of labor income, and $1.3 million in output. This estimate is provided to allow addition to the impacts of other resource areas on output, employment, and earnings for comparison of alternatives, but should be understood as representing the range of potential impacts (between those of A and B).

### Area 3

The estimated employment, labor income, and output consequences of Alternative C are presented as the mid-point between alternatives A and B. In Area 3, this translates to 13 jobs, $166,000 of labor income, and $1.1 million of output. This estimate is provided to allow addition to the impacts of other resource areas on output, employment, and earnings for comparison of alternatives, but should be understood as representing the range of potential impacts (between those of A and B).

## SUB-ALTERNATIVE $D_1$ - GUNNISON BASIN PREFERRED

The economic consequences of management under Sub-Alternative $D_1$ are expected to be similar to the economic consequences described under Alternative C.

## SUB-ALTERNATIVE $D_2$ - SATELLITE PREFERRED

The economic consequences of management under Sub-Alternative $D_2$ are expected to be similar to the economic consequences described under Alternative C and Sub-Alternative $D_1$.

# RECREATION

## ALTERNATIVE A - NO ACTION

No Action Alternative A would be the least likely to affect recreational opportunities in the decision area. Total recreation visits, activity participation, and the location of visits would not change as a result of management under this alternative.

### Area 1

Non-local recreation visits in Area 1 support 90 jobs, $2.4 million in labor income, and $6.5 million in output. None of these are expected to change as a result of management actions under Alternative A.

### Area 2

Non-local recreation visits in Area 2 support 34 jobs, $992,000 in labor income, and $2.7 million in output. None of these are expected to change as a result of management actions under Alternative A.

### Area 3

Non-local recreation visits in Area 3 support 40 jobs, $1.1 million in labor income, and $2.9 million in output. None of these are expected to change as a result of management actions under Alternative A.

## ALTERNATIVE B

Alternative B would adopt the most restrictive management of recreation use among the considered alternatives, including limiting route construction and the issuance of SRPs in Non-Habitat Areas. Total recreation visits are not expected to change, however, some users may be displaced to other sites in the affected counties. As a result, economic activity associated with BLM-managed public land recreation would not change. However, social values related to recreation may be affected as activities are displaced to less preferred sites. Data on site-specific management actions is unavailable; therefore, estimating differentiated effects among the three socioeconomic areas is not possible.

### ALTERNATIVE C

Alternative C would implement some recreation restrictions to avoid adverse effects to GUSG and their habitat. Similar to Alternative B, total recreation visits and their associated economic activity are not expected to change. However, some recreation users may be displaced to other sites. The amount of displacement would be lower under Alternative C compared to Alternative B. Data on site-specific management actions is unavailable; therefore, estimating differentiated effects among the three socioeconomic areas is not possible.

### SUB-ALTERNATIVE $D_1$ - GUNNISON BASIN PREFERRED

Sub-Alternative $D_1$ would implement recreation restrictions for consistency with the CCA to protect and enhance the recovery of GUSG. Similar to alternatives B and C, total recreation visits and their associated economic activity are not expected to change. However, some recreation users may be displaced to other sites. The amount of displacement would be lower under Sub-Alternative $D_1$ compared to Alternative B. Data on site-specific management actions is unavailable; therefore, estimating differentiated effects among the three socioeconomic areas is not possible.

### SUB-ALTERNATIVE $D_2$ - SATELLITE PREFERRED

Sub-Alternative $D_2$ would implement some recreation restrictions to avoid adverse effects to GUSG and their habitat. Similar to alternatives B and C and Sub-Alternative $D_1$, total recreation visits and their associated economic activity are not expected to change. However, some recreation users may be displaced to other sites. The amount of displacement would be lower under Sub-Alternative $D_2$ compared to Alternative B. Data on site-specific management actions is unavailable; therefore, estimating differentiated effects among the three socioeconomic areas is not possible.

## OIL, NATURAL GAS, AND $CO_2$ LEASES

### ALTERNATIVE A - NO ACTION

Alternative A would continue current management of oil, natural gas, and carbon dioxide ($CO_2$) leases in the planning area. The existing resource management plans incorporate restrictions on oil, natural gas, and $CO_2$ activity to protect GUSG habitat. The selection of Alternative A would not affect employment, labor income, or output relative to existing conditions. Oil, natural gas, and $CO_2$ lessees are not

expected to face additional costs to their operations as a result of management actions under this alternative.

Future fluid mineral leasing would have the greatest potential under Alternative A. Within the planning area, 96,564 acres would be designated as closed to leasing and 941,991 acres would be designated as open to leasing. The potential for future economic activity related to oil, natural gas, and $CO_2$ development in the planning area would be highest under this alternative.

### Area 1

There are no federal wells with oil or gas production in Area 1.

### Area 2

There are no federal wells with oil or gas production in Area 2.

### Area 3

All existing oil and gas leases are located within the Monticello-Dove Creek and San Miguel Basin population areas. There are 31 wells with production in the Monticello-Dove Creek population area and 37 wells with production in the San Miguel Basin population area. All of the Monticello-Dove Creek wells with production are in Unoccupied Habitat. In the San Miguel Basin population area, all of the wells with production are in Occupied Habitat.

Annual federal oil production in the Monticello-Dove Creek population area averaged approximately 6,200 barrels (bbl) between 2012 and 2014. Over the same period, federal oil production in the San Miguel Basin population area was approximately 2,200 bbl. Annual federal natural gas production in the Monticello-Dove Creek population area averaged approximately 276,000 Mcf between 2012 and 2014. Over the same period, annual federal oil production in the San Miguel Basin Population Area was approximately 644,000 Mcf. Chapter 3 displays the countywide oil and gas production in the Monticello-Dove Creek and San Miguel Basin population areas. Federal oil and gas production in both Occupied and Unoccupied Habitat accounts for a small share of total oil and gas production in the counties (approximately 0.2 percent of oil production and 2 percent of gas production).

Federal mineral production within GUSG habitat in Area 3 would be expected to continue to support 2 jobs, $95,000 in labor income, and $630,000 in output.

## ALTERNATIVE B

Under Alternative B, the entire planning area would be closed to fluid minerals leasing. Existing leases would be allowed to expire. No expressions of interest

would be accepted for new or expired leases and unleased federal minerals would no longer be available for oil, natural gas, and $CO_2$ leasing. Alternative B would be expected to reduce employment, labor income, and output related to the development and extraction of oil, natural gas, and $CO_2$ in the planning area. The economic impact of closing the planning area to fluid mineral leasing would vary across the planning area; effects by socioeconomic area are described in more detail below.

Some operators might be able to obtain leases on private land, which could offset some of the economic consequences of this alternative. However, the extent to which these opportunities would exist is uncertain. Specific impacts on leasing and development of currently unleased minerals cannot be estimated without project-specific information on the size and configuration of such leases in relation to adjacent federal or private lands and existing or feasible new access routes. Data on site-specific management actions would not be available until specific lease sales are proposed.

Alternative B would also implement a controlled surface use (CSU) stipulation on BLM-managed lands and federal mineral resources in the Non-Habitat Areas. The CSU stipulation may increase the costs of fluid mineral development and extraction in Non-Habitat, which could deter fluid mineral activities in those areas. Because on site-specific management actions is unavailable, estimating differentiated effects of the CSU stipulation in Non-Habitat among the three socioeconomic areas is not possible.

The economic impact of closing the decision area to fluid mineral leasing would vary across the decision area.

### Area 1

In most of Area 1 (Gunnison Basin, Cerro Summit-Cimarron-Sims Mesa, and Poncha Pass population areas), there is low to no development potential for oil, natural gas, and $CO_2$. In the Crawford population area, between one and ten applications for permit to drill (APDs) are projected, which would not occur under Alternative B. Therefore, Alternative B could affect future employment, labor income, and output related to oil and gas development in the Crawford population area.

### Area 2

There is low to no development potential for oil, natural gas, and $CO_2$ in Area 2 (Piñon Mesa). Therefore, fluid mineral leasing restrictions under Alternative B based on current resource knowledge and technologies is not expected to affect future economic activity in Area 2.

#### Area 3

Area 3 has both existing fluid mineral leases and the potential for future development. Therefore, Alternative B may affect both current and future economic activity related to oil and gas production in Area 3. The designation of the decision area as a ROW exclusion area (with some exceptions) would increase costs for access roads and utilities, which may further affect the financial feasibility of oil, natural gas, and $CO_2$ operations in the area.

### ALTERNATIVE C

Under Alternative C, all Occupied Habitat would be open to leasing with a NSO stipulation. All Unoccupied Habitat would be open to leasing with a CSU stipulation to protect sagebrush and riparian habitat. The impact of management under this alternative would depend on the extent to which horizontal drilling could be used to reach the same oil reserves. If operators are able to access oil reserves using horizontal drilling, impacts would resemble those from Alternative A. If operators are unable to reach oil reserves using horizontal drilling, the economic impacts of Alternative C would resemble those of Alternative B.

To assess the extent to which federal minerals would remain accessible in the decision area under an NSO stipulation would require project-specific knowledge, including the location and size of leases and their spatial relationship to other leases, intersection of any new utility and road corridors with existing ones and the location of GUSG leks and habitats that facilities would be required to avoid, as well as the potential downhole geology of a specific lease in relation to the potential number of wells reachable from a single well pad. Even if accessible, development of federal minerals may be no longer viable depending on the extent to which the NSO stipulation adds costs to their development. Because data on site-specific management actions is unavailable, estimating differentiated effects among the three socioeconomic areas is not possible.

### SUB-ALTERNATIVES $D_1$/$D_2$ - GUNNISON BASIN AND SATELLITE PREFERRED

Under sub-alternatives $D_1$ and $D_2$, the impacts are essentially the same as under Alternative C.

## OTHER MINERALS

As described in Chapter 3, approximately 19,000 acres of GUSG habitat (Occupied and Unoccupied) overlaps with existing or pending potash prospecting permits. GUSG habitat conservation measures may restrict the development of potash in the decision area. These restrictions could affect the economic feasibility of mineral

extraction and, as a result, the employment, income, and output associated with mineral development.  There is not enough information on the potential for mineral production throughout the primary study area to quantify the potential economic impacts of restrictions imposed by management alternatives.

## ALTERNATIVE A - NO ACTION

Under No Action Alternative A, approximately 95,564 acres are designated as closed to leasing and 899,645 acres are designated as open to leasing.

### Area 1

As there is no known development potential for solid minerals in Area 1, no economic effects are anticipated.

### Area 2

As there is no known development potential for solid minerals in Area 2, no economic effects are anticipated.

### Area 3

Although there are no solid minerals currently leased in the decision area, there are five approved potash prospecting permits in the Monticello-Dove Creek Population Area.  Because No Action Alternative A has the highest potential to enable solid mineral development in the decision area, this alternative is the most likely among the alternatives to support employment, income, and output related to solid mineral development in the decision area.

## ALTERNATIVE B

Under Alternative B, the entire decision area would be closed to solid minerals leasing.  Existing leases would be allowed to expire.  No new leases, prospecting permits, or exploration licenses would be issued.

Alternative B would also implement a controlled surface use (CSU) stipulation on BLM-managed lands and federal mineral resources in Non-Habitat. The CSU stipulation could increase costs associated with potash prospecting and development in Non-Habitat Areas, which could make those activities economically infeasible.

### Area 1

There is no known development potential for solid minerals in Area 1.  Therefore, no economic effects are anticipated.

#### Area 2

There is no known development potential for solid minerals in Area 2. Therefore, no economic effects are anticipated.

#### Area 3

Five authorized potash prospecting permits in the Monticello-Dove Creek population area would continue as valid existing rights. The San Miguel Basin population area also has potash development potential. However, since there are no authorized federal leases or prospecting permits, there would be no production in the San Miguel Basin population area. Therefore, Alternative B may reduce the potential for potash prospecting and development to contribute to employment, income, and output in Area 3.

### ALTERNATIVE C

Under Alternative C, all Occupied Habitat would be open to leasing with a NSO stipulation. All Unoccupied Habitat would be open to leasing with a CSU stipulation to protect sagebrush and riparian habitat.

#### Area 1

There is no known development potential for solid minerals in Area 1. Therefore, no economic effects are anticipated.

#### Area 2

There is no known development potential for solid minerals in Area 2. Therefore, no economic effects are anticipated.

#### Area 3

The consequences of Alternative C are expected to be similar to No Action Alternative A. However, the NSO and CSU stipulations may increase the cost of mining operations. In particular, NSO stipulations are expected to make potash prospecting and development economically infeasible. CSU stipulations would increase the costs of mining operations and may also make potash prospecting and development economically infeasible. Therefore, Alternative C could support lower levels of potash-related employment, income, and output than No Action Alternative A.

### SUB-ALTERNATIVES $D_1/D_2$ - GUNNISON BASIN AND SATELLITE PREFERRED

The impacts under sub-alternatives $D_1$ and $D_2$ are essentially the same as under Alternative C.

## LANDS & REALTY

ROWs on BLM-managed lands are used for roads, pipelines, utility corridors, communication sites, and other infrastructure. Management actions that restrict development of infrastructure could increase the cost of new investments or make them no longer economically viable.

### ALTERNATIVE A - NO ACTION

No Action Alternative A places the fewest restrictions on ROW development and route construction and has the largest area open to travel. Under Alternative A, approximately 305,306 acres are designated as ROW exclusion areas and 89,028 acres are designated as ROW avoidance areas. The remainder of the analysis area is open to ROWs. Site-specific management actions and the need for future ROWs is uncertain. Therefore, the effects cannot be differentiated among the socioeconomic analysis areas.

### ALTERNATIVE B

Under Alternative B, the entire decision area would be designated as a ROW exclusion area, with some exceptions allowed. General management requirements, including timing limitations and reclamation requirements, would apply to any new, amended, or renewed authorization. Alternative B would impose greater limitations and added costs to future economic investments in the decision area compared to No Action Alternative A.

Alternative B would also implement management actions in the Non-Habitat Areas. BLM-managed lands in Non-Habitat Areas would be designated as ROW avoidance areas. General management requirements, including timing limitations and reclamation requirements, would apply to any new, amended, or renewed authorization. The proposed ROW restrictions in Non-Habitat could increase the costs of infrastructure development adjacent to the decision area. ROW avoidance area designation could affect the economically viability of infrastructure development in Non-Habitat Areas.

### ALTERNATIVE C

Under Alternative C, the entire decision area would be designated as a ROW avoidance area, and guidelines for resource protection would be applied if locating a new ROW in the decision area could not be avoided. General management requirements, including timing limitations and reclamation requirements, would apply to any new, amended, or renewed authorization. Alternative C would have

similar economic consequences to Alternative B. However, the added costs to infrastructure development under Alternative C are expected to be lower. Therefore, some projects may be more economically viable under Alternative C compared to Alternative B.

### SUB-ALTERNATIVES $D_1/D_2$ - GUNNISON BASIN AND SATELLITE PREFERRED

The impacts under sub-alternatives $D_1/D_2$ are similar to those described for Alternative C. However, some infrastructure development under Sub-Alternative $D_1$ would require additional offsite mitigation, which would further increase project costs for proposed ROWs. The added costs could result in some projects no longer being economically viable.

## NON-MARKET VALUES

As described in Chapter 3, non-market values are goods and services that are not traded in markets. Many individuals hold wildlife-related values and the protection of GUSG in the decision area may advance those values. However, other non-market values, particularly recreation-related consumer surplus and livestock grazing heritage values may entail tradeoffs with habitat conservation measures.

### ALTERNATIVE A - NO ACTION

The continuation of surface-disturbing activities under No Action Alternative A would be less likely to support non-market values related to wildlife protection, water and soil quality. However, Alternative A would offer the most access and opportunities for people who value livestock grazing and recreation.

### ALTERNATIVE B

Alternative B is expected to decrease soil erosion and restore damaged streams and wetlands, which will benefit people who value healthy ecosystems. However, Alternative B is also expected to increase the number of acres affected by wildfire and make firefighting more difficult due to limited access. These consequences could adversely affect nearby residents due to smoke emissions and the risk of wildfire in the wildland-urban interface.

Although Alternative B would reduce human surface-disturbing activities in the decision area, the effect on GUSG habitat is not straightforwardly positive. As described in the wildlife section, reduced human activities may cause elk and mule deer to concentrate in closure areas, which may degrade GUSG habitat. The removal of domestic livestock grazing may be offset by increased grazing of wild

ungulates. While these effects may still support wildlife-related non-market values, they may not support the values of those who are particularly interested in the protection of GUSG.

### ALTERNATIVE C

Alternative C would allow for ecosystem restoration activities, which may benefit people who value healthy ecosystems. However, continued livestock grazing would affect soil erosion and riparian health.

Alternative C would reduce wildfire risk in the future due to habitat and fuel treatments. Reduced wildfire risk would benefit nearby residents, who may be affected by smoke emissions and the spread of fire in the wildland-urban interface.

Like No Action Alternative A, Alternative C would continue to support heritage-related livestock grazing values and recreation-related consumer surplus.

### SUB-ALTERNATIVES $D_1/D_2$ - GUNNISON BASIN AND SATELLITE PREFERRED

Effects to non-market values under sub-alternatives $D_1$ and $D_2$ would be similar to those under Alternative C.

## ENVIRONMENTAL JUSTICE

Chapter 3 finds that San Juan, Utah and Saguache, Colorado counties have large shares of minority residents. These counties also have the highest poverty rates in the decision area. These conditions increase the likelihood that individuals in these counties may experience disproportionately adverse consequences from economic changes. Saguache County is in socioeconomic Area 1, while San Juan County is in socioeconomic Area 3. Therefore, environmental justice consequences are assessed for these two areas.

Saguache County is dominated by agriculture, which accounts for more than one-third (34%) of jobs in the county. This makes agriculture the largest economic sector, by a large margin, in the county. Therefore, GUSG habitat conservation measures that affect livestock grazing could disproportionately and adversely affect residents of Saguache County.

San Juan County has a large share of employment in both agriculture (11.4%) and mining (7.8%) relative to the size of these sectors in Utah overall. The potential for GUSG habitat conservation measures to reduce opportunities for livestock grazing and mineral development could, therefore, disproportionately and adversely affect residents of San Juan County, Utah.

## ALTERNATIVE A - NO ACTION

### Area 1 (Saguache County, Colorado)

No Action Alternative A would not affect forage availability or allotment management costs of public land grazing permittees. Therefore, management under Alternative A would not disproportionately and adversely affect environmental justice populations in Area 1.

### Area 3 (San Juan County, Utah)

No Action Alternative A would not affect forage availability or allotment management costs of public land grazing permittees. Additionally, Alternative A would not affect the economic feasibility of mining operations in Area 3. Therefore, management under Alternative A would not affect the quality of life or livelihoods of residents in Area 3.

## ALTERNATIVE B

### Area 1 (Saguache County, Colorado)

Under Alternative B, livestock grazing would be eliminated within Occupied and Unoccupied Habitat. Saguache County includes portions of the Gunnison Basin and Poncha Pass GUSG populations. In both the Gunnison Basin and Poncha Pass populations, approximately 85% of AUMs overlap with GUSG habitat. Therefore, the expected effect of Alternative B in Saguache County is to reduce public land livestock grazing opportunities by 85%. The overlap of agriculture-sector dependence, high poverty rates, and large minority populations indicates that changes to livestock grazing management under Alternative B could adversely and disproportionately affect the environmental justice population in Area 1.

### Area 3 (San Juan County, Utah)

Alternative B would eliminate livestock grazing within GUSG habitat. San Juan County includes a portion of the Monticello-Dove Creek Population. Approximately one-quarter (26%) of AUMs overlap with GUSG habitat. The effects of livestock grazing management under Alternative B would be lower in Area 3 than in Area 1; however, the effect would still be expected to have environmental justice consequences, given the economic specialization in agriculture, high poverty rates, and large minority populations in Area 3.

Alternative B would close the decision area to mineral leasing. Federal oil and gas is extracted from wells in the Monticello-Dove Creek population area, although its contribution to countywide production of oil and gas is small (approximately 0.2% of oil and 2% of gas, as described in chapter 3). In addition to fluid mineral leasing, the Monticello-Dove Creek population area contains the only authorized potash

prospecting permits in the decision area.  Although these five authorized prospecting permits would continue as valid existing rights under Alternative B, the potential for future economic activity related to potash would be curtailed.  These management actions could adversely affect livelihoods in San Juan County.

## ALTERNATIVE C

### Area 1 (Saguache County, Colorado)

Alternative C would continue to authorize public land grazing in GUSG habitat, however, increased measures to protect GUSG relative to Alternative A could increase some costs to the permittee.  Although the potential environmental justice consequences would be muted relative to Alternative B, increased livestock operating costs would be more difficult to bear in the area due to high poverty rates.

### Area 3 (San Juan County, Utah)

Alternative C would continue to authorize public land grazing in GUSG habitat, however, increased measures to protect GUSG relative to Alternative A could increase some costs to the permittee.  Although the potential environmental justice consequences would be muted relative to Alternative B, increased livestock operating costs would be more difficult to bear in the area due to high poverty rates.

Under Alternative C, all Occupied Habitat would be open to leasing with a NSO stipulation.  All Unoccupied Habitat would be open to leasing with a CSU stipulation to protect sagebrush and riparian habitat.  The effect of these management actions on livelihoods in Area 3 is uncertain, but they are expected to increase operating costs.  If increased costs cause some mining operations to cease activities, employment and income in Area 3 could decline.

## SUB-ALTERNATIVES $D_1/D_2$ - GUNNISON BASIN AND SATELLITE PREFERRED

### Area 1 (Saguache County, Colorado)

Environmental justice impacts in Saguache County under sub-alternative $D_1$ and $D_2$ would be essentially the same as under Alternative C.

### Area 3 (San Juan County, Utah)

Environmental justice impacts in San Juan County under sub-alternatives $D_1$ and $D_2$ would be essentially the same as under Alternative C.

### 4.18.3. Cumulative Impacts

The cumulative effects analysis addresses how past, present, and reasonably foreseeable future actions contribute to the socioeconomic consequences of GUSG conservation measures. Cumulative effects analysis considers activities on both federal and non-federal lands in the decision area and vicinity. Because five BLM RMPs (Grand Junction, Gunnison Gorge NCA, Moab, Uncompahgre, and Tres Rios) already restrict surface-disturbing activities within 0.6 mile of a lek or more, GUSG conservation measures are already integrated into BLM management in much of the decision area.

Activities on state, private, and other federal lands (such as USFS lands) in the 11-county socioeconomic analysis area could interact with proposed BLM management actions to either amplify or attenuate the socioeconomic effects described above.

The socioeconomic consequences related to minerals could be affected by both private and public forces. Market fluctuations, such as the recent decline in oil prices, could affect private interest in developing federal mineral resources. Regulatory constraints, including decisions related to pipelines and other infrastructure that depends on public lands, could affect the feasibility of developing both federal and private mineral resources. Actions and events that cause mineral prices to fall would decrease the interest in mineral exploration and development in the decision area, while actions and events that cause mineral prices to rise would increase the interest in mineral exploration and development in the decision area.

Mineral price changes could interact with management actions to produce cumulative effects. Under No Action Alternative A, a rise in prices would increase mineral exploration and development relative to existing conditions. A decline in mineral prices would reduce activity under Alternative A, despite relatively permissive management. Under Alternatives B, firms would have fewer opportunities to react to price changes due to management restrictions. Therefore, a rise in prices would increase the cost of foregone economic opportunities. A decline in prices would decrease the cost of foregone mining-related economic opportunities. Under Alternative C and sub-alternatives $D_1$ and $D_2$, a rise in mineral prices could improve the economic feasibility of exploration and development activities in areas subject to NSO and CSU stipulations, while a decline in mineral prices would result in fewer economically feasible exploration and development opportunities.

The socioeconomic consequences related to public land grazing could be affected by the price of private forage, the conversion of ranch land to residential land, and management actions on adjacent public lands (such as USFS lands).

The socioeconomic consequences related to recreation could be affected by changes in motorized and non-motorized opportunities on adjacent lands and decisions by adjacent landowners regarding access.

# 5. CONSULTATION & COORDINATION

This chapter describes the public outreach and participation opportunities made available through the development of this RMP Amendment/EIS, and consultation and coordination efforts with tribes, government agencies, and other stakeholders.

BLM land use planning activities are conducted in accordance with requirements of NEPA, as well as CEQ regulations and BLM policies and procedures implementing NEPA. NEPA and associated laws, regulations, and policies require the BLM to seek public involvement early in and throughout the planning process to develop a reasonable range of alternatives to proposed actions and to prepare environmental documents that disclose the potential impacts of proposed actions and alternatives. Public involvement and agency consultation and coordination, which have been at the heart of the planning process leading to this Draft RMP Amendment/EIS, were achieved through Federal Register notices, public and informal meetings, individual contacts, media releases, and the GUSG planning project website: http://1.usa.gov/1Uusw8C (formerly www.bit.ly/gunnison_sage-grouse).

## 5.1. COLLABORATION

Federal laws require that the BLM consult with certain federal and state agencies and entities and Native American tribes (40 CFR 1502.25) during the NEPA decision-making process. The BLM is also directed to integrate NEPA requirements with other environmental review and consultation requirements to reduce paperwork and delays (40 CFR 1500.4-5).

In addition to formal scoping (outlined in Chapter 5, Section 5.3), as summarized below, the BLM has implemented an extensive collaborative outreach and public involvement process that has included coordinating with cooperating agencies and holding public scoping meetings. The BLM will continue to meet with interested agencies and organizations throughout the planning process, as appropriate, and will continue coordinating closely with cooperating partners.

### 5.1.1. Native American Tribal Consultation

The BLM began tribal consultation for cultural resources for the planning process through a consultation initiation letter that was sent to the following tribes on July 9, 2014:

- The Hopi Tribe
- Jicarilla Apache Nation
- Kewa Pueblo (formerly the Pueblo of Santo Domingo)
- Navajo Nation
- Ohkay Owingeh (Pueblo of San Juan)
- Pueblo of Acoma
- Pueblo de Cochiti
- Pueblo of Isleta
- Pueblo of Jemez
- Pueblo of Laguna
- Pueblo of Nambe
- Pueblo of Picuris
- Pueblo of Pojoaque
- Pueblo of San Felipe
- Pueblo of San Ildefonso
- Pueblo of Sandia
- Pueblo of Santa Ana
- Pueblo of Santa Clara
- Pueblo of Taos
- Pueblo of Tesuque
- Pueblo of Zia
- Southern Ute Indian Tribe
- The Paiute Tribe
- Ute Indian Tribe (Uintah & Ouray Reservation)
- Ute Mountain Ute Tribe
- White Mesa Ute Council
- Ysleta del Sur Pueblo
- Zuni Tribe of the Zuni Reservation

None of the 27 tribes contacted expressed an interest in participating in a formal capacity throughout the planning process. While the BLM received three letters from tribal agencies (Navajo Nation, The Hopi Tribe, and the Pueblo of San Felipe) in response to the consultation notice and scoping period notice, none identified immediate concerns beyond encouraging the BLM to follow the Section 106 consultation process. Government-to-government consultation will continue

throughout the RMP Amendment process to ensure that the concerns of tribal groups are considered. The Draft RMP Amendment/Draft EIS will be provided to the tribes concurrently with its release to the public.

### 5.1.2. Colorado State and Utah State Historic Preservation Officers Consultation

The Draft RMP Amendment/Draft EIS will be provided to the Colorado State Historic Preservation Office and Utah State Historic Preservation Office concurrently with its release to the public.

### 5.1.3. U.S. Fish and Wildlife Service Consultation

To comply with Section 7(c) of the Endangered Species Act, the BLM consulted with the FWS early in the planning process. The FWS provided input on planning issues, data collection and review, and alternatives development in their role as a cooperating agency. The BLM will consult with the FWS as appropriate.

### 5.1.4. Cooperating Agencies

A cooperating agency is any federal, state, or local government agency or Native American tribe that enters into a formal agreement with the lead federal agency to help develop an environmental analysis. More specifically, cooperating agencies "work with the BLM, sharing knowledge and resources, to achieve desired outcomes for public lands and communities within statutory and regulatory frameworks" (BLM Land Use Planning Handbook H-1601-1).

On July 9, 2014, the BLM wrote to numerous local, state, federal, and tribal representatives (as shown in Table 5.108), inviting them to participate as cooperating agencies for the Gunnison Sage-Grouse Rangewide RMP Amendment/EIS. Twenty-one agencies signed MOUs with the BLM to participate as cooperating agencies in the preparation of the EIS.

**Table 5.108 - Agencies and Tribes Invited to Participate as Cooperating Agencies**

| AGENCIES AND TRIBAL GOVERNMENTS |
|---|
| PARTICIPATING AGENCIES |
| **Counties** |
| Delta County, Colorado |
| Dolores County, Colorado |
| Grand County, Utah |
| Gunnison County, Colorado |
| Mesa County, Colorado |
| Montrose County, Colorado |
| Ouray County, Colorado |
| Saguache County, Colorado |
| San Juan County, Utah |
| San Miguel County, Colorado |
| **State Agencies** |
| Colorado Department of Natural Resources |
| Colorado Department of Transportation |
| Colorado Parks and Wildlife |
| State of Utah Public Lands Policy Coordination Office |
| **Federal Agencies** |
| Bureau of Reclamation, Upper Colorado Region |
| National Park Service, Intermountain Region |
| Natural Resources Conservation Service, Colorado State Office |
| Office of Surface Mining Reclamation and Enforcement, Western Region |
| U.S. Department of Energy, Western Area Power Administration |
| U.S. Fish and Wildlife Service, Mountain-Prairie Region |
| U.S. Forest Service - Region 2 |
| OTHERS CONTACTED |
| **Counties** |
| Chaffee County, Colorado |
| Hinsdale County, Colorado |
| **State Agencies** |
| Colorado State Historic Preservation Officer |

| AGENCIES AND TRIBAL GOVERNMENTS |
|---|
| Colorado Public Utilities Commission |
| Colorado Department of Public Health and Environment |
| Colorado Division of Agriculture |
| Shavano Conservation District |
| Mesa Conservation District |
| San Miguel Basin Conservation District |
| Gunnison Conservation District |
| Delta Conservation District |
| Dove Creek Conservation District |
| Center Conservation District |
| **Federal Agencies** |
| Environmental Protection Agency - Region 8 |
| Natural Resources Conservation Service - Utah State Office |
| U.S. Geological Survey Science Center |
| U.S. Fish and Wildlife Service - Utah Field Office |
| U.S. Army Corps of Engineers - Sacramento District |
| **Tribal Governments** |
| The Hopi Tribe |
| Jicarilla Apache Nation |
| Kewa Pueblo (formerly the Pueblo of Santo Domingo) |
| Navajo Nation |
| Ohkay Owingeh (Pueblo of San Juan) |
| Pueblo of Acoma |
| Pueblo de Cochiti |
| Pueblo of Isleta |
| Pueblo of Jemez |
| Pueblo of Laguna |
| Pueblo of Nambe |
| Pueblo of Picuris |
| Pueblo of Pojoaque |
| Pueblo of San Felipe |
| Pueblo of San Ildefonso |

| AGENCIES AND TRIBAL GOVERNMENTS |
|---|
| Pueblo of Sandia |
| Pueblo of Santa Ana |
| Pueblo of Santa Clara |
| Pueblo of Taos |
| Pueblo of Tesuque |
| Pueblo of Zia |
| Southern Ute Indian Tribe |
| Ute Indian Tribe (Uintah & Ouray Reservation) |
| Ute Mountain Ute Tribe |
| White Mesa Ute Council |
| Ysleta del Sur Pueblo |
| Zuni Tribe of the Zuni Reservation |

Since the planning process began in August, 2014, the BLM has typically conducted two meetings/conference calls a month with cooperating agencies. Potential cooperating agencies were also encouraged to attend the scoping public meetings and provide comments during the scoping period (discussed in Chapter 5, Section 5.3.1).

### 5.1.5. Resource Advisory Councils

Resource Advisory Councils (RACs) are composed of ten to fifteen members appointed by the Secretary of the Interior to represent a variety of interests across their state. The RACs meet two to four times annually to develop recommendations for the BLM regarding the preparation, amendment, and implementation of land use plans for public lands and resources and to provide representative citizen counsel and advice to the Secretary of the Interior concerning the planning and management of public land resources.

A coordinated effort to involve the RACs early on and throughout a planning effort ensures that the BLM will obtain and incorporate local input and advice at every stage. The three Colorado RACs (Front Range, Northwest, and Southwest) and the Utah RAC have been engaged throughout the Draft RMP Amendment/Draft EIS process as available and appropriate.

# 5.2. COORDINATION & CONSISTENCY

BLM planning regulations (43 CFR 1610) require that BLM RMPs be consistent with officially approved or adopted resource-related plans of other federal, state, local, and tribal governments, to the extent that those plans are consistent with federal laws and regulations applicable to public lands.  Plans formulated by federal, state, local, and tribal governments that relate to federal lands and resources have been reviewed and considered as the RMP Amendment/EIS has been developed.  These plans are listed in Chapter 5, Sections 5.2.1 through 5.2.6.

The BLM is aware that there are specific state laws and local plans relevant to aspects of public land management that are discrete from, and independent of, federal law.  However, the BLM is bound by federal law.  As such, there may be inconsistencies that cannot be reconciled.  FLPMA and its implementing regulations require that the BLM's land use plans be consistent with officially approved state and local plans only if those plans are consistent with the purposes, policies, and programs of federal laws and regulations applicable to public lands.

Where officially approved state and local plans or policies and programs conflict with the purposes, policies and programs of federal law applicable to public lands, there will be an inconsistency that cannot be resolved.  With respect to officially approved state and local policies and programs (as opposed to plans), this consistency provision only applies to the maximum extent practical.  While county and state planning processes, under FLPMA, are required to be as integrated and consistent as practical, the federal agency planning process is not bound by or subject to state or county plans, planning processes, policies, or planning stipulations.

Related policies and plans to be considered during the GUSG RMP Amendment planning effort include:

## 5.2.1.  RANGEWIDE AND LOCAL WORKING GROUP PLANS

- Gunnison Sage-Grouse Rangewide Conservation Plan (2005)
- Crawford Area Gunnison Sage-Grouse Conservation Plan (2011)
- Gunnison Sage-Grouse Conservation Plan Crawford Area, Colorado (1998)
- Gunnison Sage-Grouse Conservation Plan Dove Creek, Colorado (1998)
- Gunnison Sage-Grouse Conservation Plan Gunnison Basin, Colorado (1997)
- Gunnison Sage-Grouse Conservation Plan Piñon Mesa, Colorado (2000)

- Gunnison Sage Grouse Conservation Plan San Juan County, Utah
- Gunnison Sage-grouse Conservation Plan Update San Juan County, Utah (2003)
- Gunnison Sage-Grouse Conservation Plan San Miguel Basin Colorado (1998)
- Poncha Pass Gunnison Sage-Grouse Conservation Plan (2000)

## 5.2.2. County Plans and Policies

- Delta County Master Plan (1996)
- Dolores County Planning Process and Master Plan
- Grand County Non-Motorized Trails Master Plan (2011)
- Gunnison County Sage-Grouse Conservation Action Plan (2009)
- Mesa County Master Plan (2000)
- Montrose County Master Plan as amended (2010)
- Ouray County Master Plan (1999)
- Saguache County Master Plan (2010)
- San Juan County Master Plan (2008)
- San Miguel County Master Plan (as amended) (1978)
- Dolores County Development and Land Use Regulations (as amended 2012)
- Gunnison County Resolution No. 2007-09 – Temporary Closure of Certain Roads for Protection of Gunnison Sage Grouse (2007)
- Gunnison County Resolution No. 2007-17 – Amends Gunnison County Land Use Resolution Section 11-106: Protection of Wildlife Habitat Areas (amended 2013)
- Montrose County Resolution No. 39-2013 – Adoption of 1041 Regulations for the Protection of Gunnison Sage Grouse Occupied Habitat

## 5.2.3. State Policies and Plans

- Candidate Conservation Agreement with Assurances for Gunnison Sage-grouse (*Centrocercus minimus*) between the Colorado Division of Wildlife and the U.S. Fish and Wildlife Service (2006)
- Utah Code, Title 23 – Wildlife Resources

### 5.2.4. BLM Policies and Plans

#### PROGRAMMATIC REGIONAL & NATIONAL-LEVEL PLAN AMENDMENTS/EIS

- Vegetation Treatment on BLM Lands in Thirteen Western States (BLM 1991) (common to the proposed plan and draft alternatives)
- Final Vegetation Treatments on BLM Lands in 17 Western States Programmatic EIS and Associated Record of Decision (ROD) (FES 07-21) (BLM 2007)
- Approved RMP Amendments/ROD for Designation of Energy Corridors on BLM-administered Lands in the 11 Western States (U.S. Department of Energy, USFS, and BLM 2009)

#### ACTIVITY-LEVEL PLANS

- Candidate Conservation Agreement for the Gunnison sage-grouse, *Centrocercus minimus* Gunnison Basin Population (2013) (See Appendix C.)
- Bangs Canyon Travel Management Plan (2005)
- Billings Canyon Jeep Trails Plan (2003)
- Burn Canyon Travel Management Plan, Uncompahgre FO (2014)
- Dry Creek Travel Management Plan, Uncompahgre FO (2011)
- Gunnison Field Office Travel Management Plan (2010)
- Ridgway Comprehensive Travel Management Plan, Uncompahgre FO (2013)
- San Luis Valley Public Lands Center Travel Management Plan (2009)
- BLM Grand Junction Field Office [and] NPS Colorado National Monument Fire Management Plan (2008)
- Gunnison Field Office Fire Management Plan (2004)
- Canyon Country Fire Zone Fire Management Plan (2013 maintenance update)
- North Fruita Desert Travel Management Plan (2004)
- San Juan Public Lands Center Fire Management Plan (2014)
- San Luis Valley Bureau of Land Management Fire Management Plan (2004)
- Uncompahgre Field Office Fire Management Plan (2008)
- Utah Land Use Plan Amendment for Fire and Fuels Management (2005)

### 5.2.5. Other Federal Agency Policies and Plans

- Black Canyon of the Gunnison National Monument and Curecanti National Recreational Area General Management Plan (1997, as amended)
- Endangered Species Act of 1973, as amended (16 USC 1531 et sequens)

- Grand Mesa, Uncompahgre and Gunnison National Forests Land and Resource Management Plan (1983, as amended)
- Pike and San Isabel National Forests and Comanche and Cimarron National Grasslands Land and Resource Management Plan (1984)
- Rio Grande National Forest Revised Land and Resource Management Plan (1996)
- San Juan National Forest Revised Land and Resource Management Plan (2013)

### 5.2.6. Memoranda of Understanding

- MOU between the BLM and the DOE to identify the individual and shared roles and responsibilities of the DOE and BLM with respect to the DOE Uranium Leasing Program. (April 2010)

### 5.2.7. Public Involvement

Public Involvement is a vital and legal component of both the RMP Amendment and EIS processes. Public involvement vests the public in the decision-making process and allows for full environmental disclosure. Guidance for implementing public involvement under NEPA is codified in 40 CFR Section 1506.6, thereby ensuring that federal agencies make a diligent effort to involve the public in the NEPA process. FLPMA Section 202 directs the Secretary of the Interior to establish procedures for public involvement during land use planning actions on public lands. These procedures can be found in the BLM Land Use Planning Handbook (H-1601-1). Public involvement for the GUSG RMP Amendment/EIS involves the following four phases:

- Public scoping before NEPA analysis begins to determine the scope of issues and alternatives to be addressed in the RMP Amendment/EIS
- Public outreach via news releases
- Collaboration with federal, state, local, and tribal governments and cooperating agencies
- Public review of and comment on the Draft RMP Amendment/EIS, which analyzes likely environmental effects and identifies the BLMs preferred alternative.

While the public scoping phase of the process has been completed, public outreach and collaboration are ongoing throughout the RMP Amendment/EIS process. Information about the process can be obtained by the public at any time on the BLM GUSG project website (http://1.usa.gov/1Uusw8C). This website contains

background information about the project, a public involvement timeline and calendar, maps, and photos of the planning area, and copies of public information documents released throughout the RMP Amendment/EIS process.

# 5.3. SCOPING & ISSUES

When developing or amending an RMP, the BLM follows a process outlined in the BLM Land Use Planning Handbook H-1601-1 (BLM 2005), beginning with the identification of issues. Planning issues are concerns or controversies about existing and potential land and resource allocations, levels of resource use, production, and related management practices that can be addressed through a range of alternatives. These issues can stem from new information or changed circumstances that cause federal land managers to reassess current situations on federal lands. Issues can be identified either internally by resource specialists and other agency staff or externally by public stakeholders during a public scoping period.

## 5.3.1. PUBLIC SCOPING

The public scoping period for this planning effort was initiated on July 18, 2014 with the publication of a Notice of Intent (79 2014-16819) in the *Federal Register* and ran through August 22, 2014. The process included soliciting input from interested individuals and organizations, state, local, and tribal governments, and other federal agencies in an effort to identify the scope of issues to be addressed in the RMP Amendment and assist in formulating reasonable alternatives.

### SCOPING MEETINGS

The BLM hosted four public scoping meetings in Golden, Gunnison, Montrose, and Dove Creek, Colorado to provide the public with opportunities to learn more about the project and interact with and ask questions of BLM resource specialists and other staff. In addition, scoping comment forms were available for the public to fill out and hand deliver at the meetings. A combined total of 170–200 individuals attended one or more of the public scoping meetings.

**Table 5.109 - Public Scoping Meetings**

| VENUE | LOCATION | DATE | TIME |
|---|---|---|---|
| Marriott - Denver West | Golden, CO | August 4, 2014 | 6-8 pm |
| Western Complex | Gunnison, CO | August 5, 2014 | 6-8 pm |
| Holiday Inn Express | Montrose, CO | August 6, 2014 | 6-8 pm |
| Dove Creek High School | Dove Creek, CO | August 7, 2014 | 6-8 pm |
| **Total Attendees** | | | **170-200** |

The scoping meetings were divided into three segments: (1) an open house, (2) a PowerPoint presentation, and (3) a question and answer session.

### Open House

During the open house portion, the public was able to review poster-sized maps depicting various land designations (including surface, split estate, oil and gas leases, grazing allotments, travel routes, and specially designated land status) across the range of the GUSG. BLM resource specialists stationed near the maps provided the public with opportunities for face-to-face interaction.

### PowerPoint Presentation

Following the open house, the GUSG Project Manager delivered a PowerPoint presentation on the BLM GUSG planning effort, which included an overview of FWS proposals to list and designate critical habitat for the GUSG, the goals of public scoping, the BLM planning process, background information on the GUSG and its range, a summary of existing agreements and policies to protect the GUSG, potentially affected RMPs and resource and program areas, a draft project schedule, and acceptable methods for submitting comments.

### Question and Answer Session

A contract employee facilitated a question and answer session that enabled the public to ask questions of the GUSG Project Manager and other BLM staff. The public was reminded that the verbal questions posed did not constitute a formal public scoping comment and that they would still need to submit their comments and issues in writing.

## OTHER OUTREACH METHODS

In addition, the BLM issued a news release announcing the planning effort and meetings, mailed notifications to an initial list of potentially interested organizations and individuals, established a project website, and made presentations to each of the active BLM resource advisory councils (RAC) within the range of the species. All of these methods were used to notify the public regarding the scoping period and planning process and to invite the public to provide written comments. Comments obtained from the public during the scoping period were used to help identify the relevant issues to be addressed through a reasonable range of alternatives.

Public scoping provided the public with an opportunity to identify considerations for managing GUSG habitat. As part of the scoping process, the BLM also requested that the public consider and submit nominations for potential Areas of Critical Environmental Concern (ACECs) for GUSG and GUSG habitat to be designated in

order to protect the significant wildlife resources, natural processes, or systems within.

### Project Website

The BLM developed a project website at www.bit.ly/gunnison_sage-grouse to provide the public with current information about the RMP Amendment/EIS process (including background information, a public involvement timeline and calendar, maps of the planning area, copies of public information documents such as the Notice of Intent and press releases, a list of cooperating agencies, and project updates).

In addition, project information, documents, and public comment opportunities are posted to the BLM ePlanning site at http://1.usa.gov/1Uusw8C.

### Mailing List

The BLM compiled a mailing list of several hundred individuals, agencies, and organizations that had participated in past BLM projects in southwest Colorado and or southeast Utah. Attendees at the scoping public meetings were added to the mailing list if they chose to receive or continue to receive project information. In addition, all individuals or organizations who submitted scoping comments were added to the mailing list. Requests to be added to or to remain on the official RMP Amendment distribution list will continue to be accepted throughout the planning process.

## 5.3.2. Scoping Comments

All written public comments received on or before August 22, 2014 were evaluated and documented in the Scoping Report (available online at www.bit.ly/gunnison_sage-grouse and through BLM ePlanning at http://1.usa.gov/1Uusw8C).

A total of 63 unique written submissions were received. A number of the submissions contained multiple comments, which resulted in a total of 526 unique comments. These comments were assigned to one of four response categories:

- An issue to be resolved in the RMP Amendment.
- An issue to be resolved through policy or administrative action.
- An issue beyond the scope of the RMP Amendment.
- An issue that has already been addressed but should be better communicated to the issue holder.

Of the 526 comments received, 500 were identified as issues for resolution through the RMP Amendment, 5 were determined to be issues to be resolved through policy or administrative action, and 21 comments were determined to be beyond the

scope of the plan amendment effort to resolve. No comments were categorized as issues that had already been addressed but required improved communications between the BLM and the commenter.

### 5.3.3. KEY ISSUES IDENTIFIED THROUGH SCOPING

**Table 5.110 - Comments by Resource or Planning Issue**

| RESOURCE OR PLANNING ISSUE | NUMBER OF INDIVIDUAL COMMENTS |
|---|---|
| Planning Process and Alternatives | 114 |
| Data/Best Available Science | 54 |
| Energy and Mineral Development | 50 |
| Livestock Grazing | 47 |
| Fish and Wildlife | 42 |
| Recreation and Travel Management | 40 |
| Partnerships/Collaboration | 37 |
| Social, Economic, and Environmental Justice | 30 |
| Lands, Realty, and Rights-of-Way | 28 |
| Special Management Areas | 20 |
| Vegetation Management | 15 |
| Drought Management and Climate Change | 10 |
| Water, Soil, and Riparian Areas | 8 |
| Invasive Species | 5 |
| **TOTAL** | **500** |

## FUTURE PUBLIC INVOLVEMENT

Public participation opportunities will continue to be offered throughout the GUSG RMP Amendment planning process. A substantial contribution to this effort is the opportunity for members of the public to review and comment on this Draft RMP Amendment/Draft EIS during a 90-day comment period. The BLM will consider and address substantive comments within the Proposed RMP Amendment/Final EIS. The release of the Proposed RMP Amendment/Final EIS will be followed by a 30-day protest period, as well as consistency reviews by the governors of Colorado and Utah. The resolution of legitimate protests and issues raised through the

Case No. 1:20-cv-02484-MSK Document 94-2 filed 05/06/21 USDC Colorado pg 316 of 425

consistency reviews will culminate in the issuance of a Record of Decision (ROD) and Approved RMP Amendment by the BLM.

## 5.4. LIST OF PREPARERS

BLM resource specialists and staff members from across Colorado and Utah served on an interdisciplinary team in the preparation of this Draft RMP Amendment/Draft EIS.  In addition, a USFS Enterprise team contributed the socio-economic analysis, while numerous BLM employees provided valuable input and assistance to the project team members and reviewed and commented on draft documents.  Core team members and key contributors are identified in Table 5.111.

**Table 5.111 - Contributors to the Draft RMP Amendment/Draft EIS**

| MEMBER | OFFICE | RESPONSIBILITY |
|---|---|---|
| **CORE TEAM** | | |
| Bridget Clayton | BLM Grand Junction Field Office | Sage Grouse Coordinator (July 2016 – present) |
| Lori A. Armstrong | BLM Colorado Southwest District | Project Manager (July 2015 – June 2016) |
| Leigh D. Espy | BLM Colorado State Office | Project Manager (Project Initiation – July 2015) |
| Roger Sayre | BLM Colorado State Office | NEPA; Planning (December 2015 – present) |
| Travis Haby | BLM National Operations Center | NEPA; Planning (June 2014 – December 2015) |
| Russ Japuntich | BLM Gunnison Field Office | Wildlife Biology - Gunnison Basin Population |
| Nathaniel West | BLM Tres Rios Field Office | Wildlife Biology - Satellite Populations |
| Amanda Clements | BLM Uncompahgre Field Office | Vegetation Management; Grazing; Fire |
| Sean Noonan | BLM San Luis Valley Field Office | Recreation; Travel; Special Designation Areas |
| Marnie Medina | BLM Gunnison Field Office | Minerals; Land Tenure; Contracting Officer's Representative |
| D. Maggie Magee | BLM Colorado Southwest District | Technical Writer-Editor; Web and ePlanning |
| Natalie Dovgan | BLM Colorado State Office | GIS Coordination and Data Analysis |
| **KEY CONTRIBUTORS** | | |
| Ruth Welch | BLM Colorado State Office | State Director |
| Brian St. George | BLM Colorado State Office | Deputy State Director |
| Rebecca Doolittle | BLM Utah Canyon Country District | BLM Utah Point of Contact |
| Leah Baker | BLM Washington Office | Planning Point of Contact |
| Courtney Whiteman | BLM Colorado State Office | Communications Specialist |
| Shannon Borders | BLM Colorado Southwest District | Public Affairs Officer |
| Martin Hensley | BLM Colorado State Office | Socio-Economics Point of Contact |
| Delilah Jaworski | USFS Enterprise Team | Socio-Economics Analysis |
| Kymm Gresset | BLM Colorado State Office | Administrative Record |
| Sara Lura Matthews | BLM Colorado State Office | Facilitation; Administration (pre-draft) |
| David Baker | BLM National Operations Center | Recreation; Travel Management (pre-draft) |
| Sean Hudak, GIS Intern | Colorado Youth Core Association | GIS Analysis |
| Cara Arpino, GIS Intern | Colorado Youth Core Association | GIS Data Digitization |
| Bradley Porter, GIS Intern | Colorado Youth Core Association | GIS Data Digitization |
| Caroline Mardock | Colorado Youth Core Association | GIS Data Digitization |
| Josh Ryan | Colorado Youth Core Association | GIS Data Digitization |

# 6.  APPENDICES

- APPENDIX A:  GUSG Population Maps

- APPENDIX B:  BLM Washington Office IM 2014-100

- APPENDIX C:  GUSG Candidate Conservation Agreement, Gunnison Basin Population

- APPENDIX D:  GUSG Rangewide Conservation Plan Structural Habitat Guidelines

- APPENDIX E:  BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado and Utah

- APPENDIX F:  GUSG Draft Socio-Economic Data

- APPENDIX G:  Areas of Critical Environmental Concern - Relevance and Importance Analysis and Determination Rationale

- APPENDIX H:  Draft Stipulations Applicable to Fluid Mineral Leasing and Land Use Authorizations

- APPENDIX I:  Draft GUSG Best Management Practices

- APPENDIX J:  GUSG Rangewide Mitigation Strategy

## APPENDIX A: GUSG POPULATION MAPS

Spatial data for the GUSG Draft RMP Amendment/Draft EIS was primarily generated internally by combining feature classes from BLM field offices covered within the planning area. Several feature classes were created by pulling legal land descriptions from the BLM LR2000 database, based on pertinent case types. The remaining feature classes were gathered from external sources such as FWS, USGS, and state and local government data. Each feature class is listed below by name and general data source for that feature class.

**Table A.112 - Data Sources for the Draft RMP Amendment/Draft EIS**

| DATA SET NAME | DATA SOURCE |
|---|---|
| Existing Vegetation Type | LANDFIRE LF1.2.0 |
| Vegetation Condition Class | LANDFIRE LF1.1.0 |
| Streams | USGS NHD v220 |
| Oil and Gas Wells | Colorado Oil and Gas Commission, Utah Department of Natural Resources |
| Roads | ESRI ArcGIS Online Major Roads, Delta County Roads, Gunnison County Roads, Mesa County Roads, Montrose County Roads, San Miguel County Roads, Grand County Roads, BLM GTLF |
| Uranium Lease Tracts | DOE Uranium Lease Tracts file Y0010500-02 |
| Fire Occurrence History Points | USGS Federal Fire Occurrence |
| GUSG Habitat | USFWS Final GUSG Critical Habitat |
| Lek Buffers | Colorado Parks and Wildlife |
| Wetlands | USFWS Wetlands Inventory |
| Fire Perimeters | Internal combined BLM Colorado and Utah Field office data |
| Land Use Planning Units | Internal combined BLM Colorado and Utah Field office data |
| Surface Restrictions | Internal combined BLM Colorado and Utah Field office data |
| Rights-of-Way (Lines) | Digitized from internal BLM case files and LR2000 attributes |
| Rights-of-Way (Polygon) | Buffered internal digitized ROW lines |
| Rights-of-Way (Polygon) | Generated from internal LR2000 database |
| Rights-of-Way Restrictions | Internal combined BLM Colorado and Utah Field office data |
| Utility Corridors | Internal combined BLM Colorado and Utah Field office data |
| Surface Management Agency | Internal combined BLM Colorado and Utah State office data |
| Coal Occurrence | Internal combined BLM Colorado and Utah Mineral Potential Reports where available |
| Oil and Gas Development Potential | Internal combined BLM Colorado and Utah State office data |
| Uranium Vanadium Occurrence Development Potential | Internal combined BLM Colorado and Utah Mineral Potential Reports where available |
| Mineral Materials Sites | Internal BLM data generated from LR2000 |
| Notice of Surface Management Exploration Operations | Internal BLM data generated from LR2000 |

| DATA SET NAME | DATA SOURCE |
|---|---|
| Solid Non-energy Leasables | Internal BLM data generated from LR2000 |
| Federal Subsurface Estate | Internal combined BLM Colorado and Utah State office data |
| ACEC | Internal combined BLM Colorado and Utah Field office data |
| Lands with Wilderness Characteristics | Internal combined BLM Colorado and Utah Field office data |
| NLCS National Monument and National Conservation Areas | Internal combined BLM Colorado and Utah State office data |
| NLCS National Scenic and Historic Trails | Internal combined BLM Colorado and Utah State office data |
| NLCS Wild and Scenic Rivers | Internal combined BLM Colorado and Utah State office data |
| NLCS Wilderness Areas | Internal combined BLM Colorado and Utah State office data |
| NLCS Wilderness Study Areas | Internal combined BLM Colorado and Utah State office data |
| Oil and Gas Leases | Internal BLM data generated from LR2000 |
| Oil and Gas Stipulations | Internal combined BLM Colorado and Utah State office data |
| Closed to Oil and Gas Lease | Internal combined BLM Colorado and Utah State office data |
| Closed to Solid Minerals | Internal combined BLM Colorado and Utah State office data |
| OHV Areas | Internal combined BLM Colorado and Utah Field office data |
| Proper Functioning Condition | Internal combined BLM Colorado and Utah Field office data |
| Extensive Recreation Management Areas | Internal combined BLM Colorado and Utah Field office data |
| Special Recreation Management Areas | Internal combined BLM Colorado and Utah Field office data |
| Land Health Reporting | Internal combined BLM Colorado and Utah Field office data |
| Vegetation Materials Restrictions | Internal combined BLM Colorado and Utah Field office data |
| Vegetation Treatments | Internal combined BLM Colorado and Utah Field office data |
| Weed Priority Areas | Internal combined BLM Colorado and Utah Field office data |
| Withdrawals | Digitized from internal BLM master title plats and LR2000 generated polygons and attributes |
| Allotments | Internal combined BLM Colorado and Utah Field office data with added attributes from RIPS and field offices |
| Recreation Sites | Internal BLM FAMS database data |
| GUSG Decision Area | USFWS Critical Habitat combined with CPW habitat polygons and lek buffers |

**Figure A.80 - Decision Area for the Cerro Summit-Cimarron-Sims Mesa Population**



CHAPTER 6 - APPENDIX A
Population Maps & Data Sources

Figure A.81 - Decision Area for the Crawford Population

Gunnison Sage-Grouse Decision Area
Crawford Population
Date: 11/10/2015
Non-Habitat
Occupied Habitat
Unoccupied Habitat
BLM Field Office Boundary
BLM National Monuments and National Conservation Areas
Bureau of Land Management
National Park Service
Other Federal
Private
State, County, City; Areas
US Forest Service
Utah
Colorado
Arizona
New Mexico
0 0.75 1.5 3 Miles
N
NOTE TO MAP USER
NO WARRANTY IS MADE BY THE BUREAU OF LAND MANAGEMENT AS TO THE ACCURACY, RELIABILITY, OR COMPLETENESS OF THESE DATA FOR INDIVIDUAL USE OR AGGREGATION USE WITH OTHER DATA.
UNCOMPAHGRE FIELD OFFICE
Crawford
Gunnison Gorge National Conservation Area
92
133
347
50
E Miami Rd

BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS
AUGUST 2016
6-5

CHAPTER 6 - APPENDIX A
Population Maps & Data Sources

**Figure A.82 - Decision Area for the Gunnison Basin Population**

Gunnison Sage-Grouse Decision Area Gunnison Basin Population
Date: 11/10/2015
Non-Habitat
Occupied Habitat
Unoccupied Habitat
BLM Field Office Boundary
Bureau of Land Management
National Park Service
Private
State
State, County, City; Areas
US Forest Service
Gunnison Basin
ROYAL GORGE FIELD OFFICE
GUNNISON FIELD OFFICE
SAN LUIS VALLEY FIELD OFFICE
UNCOMPAHGRE FIELD OFFICE
0 2.5 5 10 Miles

6-6 BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS
AUGUST 2016

CHAPTER 6 - APPENDIX A
Population Maps & Data Sources

**Figure A.83 - Decision Area for the Monticello-Dove Creek Population**

Gunnison Sage-Grouse Decision Area Monticello-Dove Creek Population
Date: 12/3/2015
Decision Area
Non-Habitat
Occupied Habitat
Unoccupied Habitat
BLM National Monuments and National Conservation Areas
BLM Field Office Boundary
Bureau of Land Management
Bureau of Reclamation
Indian Reservation
National Park Service
Other Federal
Private
State
State, County, City; Areas
US Forest Service
Colorado
Utah
Arizona
New Mexico
0 2 4 8 Miles
Monticello-Dove Creek
UNCOMPAHGRE FIELD OFFICE
TRES RIOS FIELD OFFICE
Moab Field Office
Monticello Field Office
Canyon of the Ancients National Monument

BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS 6-7
AUGUST 2016





CHAPTER 6 - APPENDIX A
Population Maps & Data Sources

Gunnison Sage-Grouse Decision Area
Pinon Mesa Population
Date: 11/10/2015
Non-Habitat
Occupied Habitat
Unoccupied Habitat
BLM Field Office Boundary
BLM National Monuments and National Conservation Areas
Bureau of Land Management
Bureau of Reclamation
National Park Service
Other Federal
Private
State
State, County, City; Areas
US Forest Service
Utah
Colorado
Arizona
New Mexico
0 1.5 3 6 Miles
N
NOTE TO MAP USER
NO WARRANTY IS MADE BY THE BUREAU OF LAND MANAGEMENT AS TO THE ACCURACY, RELIABILITY, OR COMPLETENESS OF THESE DATA FOR INDIVIDUAL USE OR AGGREGATION USE WITH OTHER DATA.
McInnis Canyon National Conservation Area
Pinon Mesa
GRAND JUNCTION FIELD OFFICE
Moab Field Office
Dominguez-Escalante National Conservation Area
UNCOMPAHGRE FIELD OFFICE
70
6
340
141
50
F Rd
C Rd
B 1/2 Rd
D S Rd
S 16 1/2 Rd

Figure A.84 - Decision Area for the Piñon Mesa Population

6-8
BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS
AUGUST 2016

CHAPTER 6 - APPENDIX A
Population Maps & Data Sources

**Figure A.85 - Decision Area for the Poncha Pass Population**

Gunnison Sage-Grouse
Decision Area
Poncha Pass
Population
Date: 11/10/2015
Non-Habitat
Occupied Habitat
Unoccupied Habitat
BLM Field Office Boundary
Bureau of Land Management
Private
State
US Forest Service
Utah
Colorado
Arizona
New Mexico
0 0.5 1 2 Miles
N
Poncha Pass
ROYAL GORGE FIELD OFFICE
SAN LUIS VALLEY FIELD OFFICE
50
285

BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS 6-9
AUGUST 2016



Case No. 1:20-cv-02484-MSK Document 94-2 filed 05/06/21 USDC Colorado pg 328 of 425

CHAPTER 6 - APPENDIX A
Population Maps & Data Sources

**Figure A.86 - Decision Area for the San Miguel Basin Population**

Gunnison Sage-Grouse Decision Area
San Miguel Basin Population
Date: 11/10/2015
Non-Habitat
Occupied Habitat
Unoccupied Habitat
BLM Field Office Boundary
BLM National Monuments and National Conservation Areas
Bureau of Land Management
Bureau of Reclamation
National Park Service
Other Federal
Private
State
State, County, City, Areas
US Forest Service
Utah
Colorado
Arizona
New Mexico
0 2 4 8 Miles
San Miguel Basin
UNCOMPAHGRE FIELD OFFICE
TRES RIOS FIELD OFFICE
Divide Rd
Nucla-Delta Rd
550
62
145
90
97
141
491

6-10 BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS
AUGUST 2016

Case No. 1:20-cv-02484-MSK Document 94-2 filed 05/06/21 USDC Colorado pg 329 of 425

**Figure A.87 - Sub-Surface Decision Area for the Cerro Summit-Cimarron-Sims Mesa Population**



CHAPTER 6 - APPENDIX A
Population Maps & Data Sources

**Figure A.88 - Sub-Surface Decision Area for the Crawford Population**

Gunnison Sage-Grouse Decision Area Crawford Population
Date: 11/10/2015
Non-Habitat
Occupied Habitat
Unoccupied Habitat
BLM Field Office Boundary
BLM National Monuments and National Conservation Areas
All Minerals
Coal Only
No Minerals
Oil and Gas Only
Oil, Gas and Coal Only
Other
Utah
Colorado
Arizona
New Mexico
0 0.75 1.5 3 Miles
N
Crawford
UNCOMPAHGRE FIELD OFFICE
Gunnison Gorge National Conservation Area
92
133
347
50
E Miami Rd

6-12 BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS
AUGUST 2016

CHAPTER 6 - APPENDIX A
Population Maps & Data Sources

**Figure A.89 - Sub-Surface Decision Area for the Gunnison Basin Population**

Gunnison Sage-Grouse Decision Area
Gunnison Basin Population
Date: 11/10/2015
Non-Habitat
Occupied Habitat
Unoccupied Habitat
BLM Field Office Boundary
All Minerals
Coal Only
No Minerals
Oil and Gas Only
Oil, Gas and Coal Only
Other
Utah
Colorado
Arizona
New Mexico
0 2.5 5 10 Miles
ROYAL GORGE FIELD OFFICE
SAN LUIS VALLEY FIELD OFFICE
GUNNISON FIELD OFFICE
UNCOMPAHGRE FIELD OFFICE
Gunnison Basin
50
114
135
149
133
187
92
550

BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS 6-13
AUGUST 2016



**Figure A.90 - Sub-Surface Decision Area for the Monticello-Dove Creek Population**



CHAPTER 6 - APPENDIX A
Population Maps & Data Sources

**Figure A.91 - Sub-Surface Decision Area for the Piñon Mesa Population**

Gunnison Sage-Grouse Decision Area Pinon Mesa Population
Date: 11/10/2015
Non-Habitat
Occupied Habitat
Unoccupied Habitat
BLM Field Office Boundary
BLM National Monuments and National Conservation Areas
All Minerals
Coal Only
No Minerals
Oil and Gas Only
Oil, Gas and Coal Only
Other
Utah
Colorado
Arizona
New Mexico
0 1.5 3 6 Miles
Dominguez-Escalante National Conservation Area
UNCOMPAHGRE FIELD OFFICE
GRAND JUNCTION FIELD OFFICE
Pinon Mesa
McInnis Canyon National Conservation Area
Moab Field Office

BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS 6-15
AUGUST 2016



**Figure A.92 - Sub-Surface Decision Area for the Poncha Pass Population**



CHAPTER 6 - APPENDIX A
Population Maps & Data Sources

**Figure A.93 - Sub-Surface Decision Area for the San Miguel Basin Population**

Gunnison Sage-Grouse Decision Area San Miguel Basin Population
Date: 11/10/2015
Non-Habitat
Occupied Habitat
Unoccupied Habitat
BLM Field Office Boundary
BLM National Monuments and National Conservation Areas
All Minerals
Coal Only
No Minerals
Oil and Gas Only
Oil, Gas and Coal Only
Other
Utah
Colorado
Arizona
New Mexico
0 2 4 8 Miles
NOTE TO MAP USER: NO WARRANTY IS MADE BY THE BUREAU OF LAND MANAGEMENT AS TO THE ACCURACY, RELIABILITY, OR COMPLETENESS OF THESE DATA FOR INDIVIDUAL USE OR AGGREGATION USE WITH OTHER DATA.
San Miguel Basin
UNCOMPAHGRE FIELD OFFICE
TRES RIOS FIELD OFFICE
550
62
145
90
97
141
491


## APPENDIX B: BLM WASHINGTON OFFICE IM 2014-100

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
WASHINGTON, D.C. 20240

May 30, 2014

In Reply Refer To:
6500 (170/200/300/400) P

EMS TRANSMISSION 06/16/2014
Instruction Memorandum No. 2014-100
Expires: 09/30/2015

To: State Directors, Colorado and Utah

From: Assistant Director, Resources and Planning

Subject: Gunnison Sage-grouse Habitat Management Policy on Bureau of Land Management-Administered Lands in Colorado and Utah

**Program Area**: All Programs.

**Purpose**: The intent of this Instruction Memorandum (IM) is to provide interim guidance for protecting important habitat across the range of the Gunnison Sage-Grouse (GUSG). The Bureau of Land Management (BLM) will continue to apply conservation measures to manage and conserve GUSG and their habitat and consider the U.S. Fish and Wildlife Service (FWS) advisory recommendations for minimizing or avoiding adverse effects to GUSG or their proposed critical habitat. Habitat protection is crucial for the conservation and protection of this species. The BLM will focus any type of development in non-habitat areas. Disturbance will be focused outside of a 4-mile buffer around leks. The BLM intends that little or no disturbance occur within the 4-mile buffer, except for valid existing rights, and except where benefits to the GUSG are greater compared to other available alternatives. This guidance:

- Recognizes the FWS Proposed Listing of the GUSG as endangered (78 FR 2486) under the Endangered Species Act (ESA) (January 11, 2013) posted at http://www.fws.gov/policy/library/2013/2012-31667.pdf
- Provides updated direction regarding management and ongoing planning actions in GUSG occupied habitat.
- Recognizes that the BLM proposes to incorporate objectives and conservation measures for the protection of GUSG and its habitat into relevant Resource Management Plans (RMP) through a GUSG range-wide plan amendment process.
- Ensures continued coordination with the FWS, State fish and wildlife agencies, and other partners regarding implementation, updates and project prioritization for GUSG conservation and strategies identified in the Range-wide GUSG Conservation Plan (RCP) and local GUSG population conservation plans posted at: http://wildlife.state.co.us/WildlifeSpecies/RecoveryConservationPlans/Pages/RecoveryConservationPlans.aspx

- Does not preclude developing or using additional conservation measures or strategies deemed necessary to maintain or enhance local GUSG habitat and populations.

Should the final FWS determination be to list GUSG under the ESA, the BLM will review the implementation of this policy in accordance with any Recovery Planning schedules to determine the effectiveness of the guidance and make changes as necessary.

**Policy/Action:** The BLM will continue to apply conservation measures to manage and conserve GUSG and its habitat and consider the FWS advisory recommendations for minimizing or avoiding adverse effects to GUSG or its proposed critical habitat. The BLM's policy is to manage GUSG seasonal habitats and maintain habitat connectivity to support sustainable GUSG populations and/or GUSG population objectives as determined in coordination with the FWS and State fish and wildlife agencies. This policy is consistent with strategies outlined in the GUSG RCP. This policy is consistent with the BLM National Sage-grouse Habitat Conservation Strategy (USDI BLM 2004a), CO IM 2010-028 (GUSG & Greater Sage-grouse [GRSG] habitat management), WO IM 2010-071 (energy), WO IM 2010-022 (structures), WO IM 2013-128 (fire), WO IM 2010-117 (oil and gas leasing reform), CO IM 2005-038 (GUSG RCP), and CO IM 2013-033 (GUSG habitat management). This policy is structured to incorporate adaptive management processes to achieve habitat conservation, restoration and enhancement goals. This policy will be reviewed and updated, as necessary, following the final FWS listing decision.

Unless otherwise stated, BLM management actions and conservation measures in this IM apply to occupied habitat. Occupied habitat is defined in this IM as the FWS "proposed occupied critical habitat" (hereafter referred to as occupied) for GUSG in Colorado and Utah. Within the Gunnison Basin, occupied habitat is further delineated as Tier 1 or Tier 2 habitats using a habitat prioritization tool, developed locally in conjunction with Gunnison County, FWS, Colorado Parks and Wildlife (CPW), and other agencies. This policy applies to all activities and programs authorized and/or occurring on BLM-administered lands, including federal mineral estate. The direction in this IM is time-limited: the conservation policies and procedures described in this IM will be applied until the BLM makes GUSG conservation and resource management decisions through the land use planning process.

The BLM will work with FWS, and the State fish and wildlife agencies in identifying the best available science for implementation of this IM.

**GUSG Habitat Mapping**

As part of the proposed listing decision, the FWS proposed critical habitat for GUSG (78 FR 2540) posted at http://www.fws.gov/policy/library/2013/2012-31666.pdf. The proposed critical habitat map includes occupied GUSG habitat (as previously mapped by CPW and the Utah Division of Wildlife Resources (UDWR), 2004, as updated), and proposed unoccupied habitat. The FWS compiled proposed unoccupied critical habitat using mapping from the RCP (*potentially suitable habitat* – defined as in need of restoration, but capable of supporting sagebrush communities, and *vacant/unknown habitat* – defined as suitable habitat with no documentation of occupancy) and additional areas thought necessary for GUSG conservation based on 1) proximity to occupied habitat, 2) ability to provide connectivity, and 3) size of area, where sagebrush is a primary plant community (78 FR 2552). The final decision on whether to designate critical habitat for GUSG is expected around the same time as the final listing decision (anticipated November 12, 2014).

The BLM will continue to work with State fish and wildlife agencies and other partners to collect site-specific GUSG habitat data. GUSG habitat data includes seasonal habitat mapping (nesting, brood rearing and winter), and/or GUSG habitat condition assessments as documented in Land

Health Assessments (LHA). Habitat condition assessments reflect progress towards meeting GUSG habitat objectives set forth in the RCP or local conservation plans, as determined through the Habitat Assessment Framework (HAF) indicators or other BLM-approved habitat monitoring methods. [1]

If the species is listed and the FWS develops a range-wide Recovery Plan, the BLM will cooperate in the development and implementation of the Recovery Plan on public lands consistent with the policies in BLM's Special Status Species Management Manual 6840. This participation includes, but is not limited to, representation on the Range-wide Steering Committee (RSC) and local GUSG population working groups.

**Land Use Planning**

The BLM proposes to incorporate objectives and conservation measures for the protection of GUSG and its habitat into approved Resource Management Plans (RMP) through a GUSG range-wide plan amendment process.

As part of this GUSG range-wide planning process, the BLM will consider alternative(s) that:

- Close fluid mineral (oil and gas or geothermal) leasing, and consider land allocations following expiration of oil and gas and geothermal leases with a full range of alternatives, including a scenario where the lands will not be re-offered for lease in occupied GUSG areas;
- Exclude new energy development and rights-of-way (ROW);
- Reduce or make lands unavailable to livestock grazing (consistent with WO-IM-2012-169) in GUSG occupied habitat;
- Include consideration of regional mitigation strategies and appropriate mitigation measures (avoid, minimize, and/or compensate) to reduce or eliminate impacts to GUSG populations;
- Address other factors that may pose a threat to GUSG populations, including recreation management, vegetation treatments, and invasive plant management; and
- Consider citizen-based alternatives, as appropriate.

Through this range-wide plan amendment process, BLM Colorado and Utah FOs should consider and evaluate GUSG habitat conservation measures related to timing restrictions, buffer distances, percentages of allowable surface-disturbing activities, noise and desired density levels or other development constraints consistent with the GUSG RCP (including subsequent updates), current peer reviewed sage-grouse research, conservation summaries based on research or as developed in conjunction with State fish and wildlife agencies and the FWS to meet local population objectives. At a minimum, FOs will analyze and implement conservation measures that prohibit or limit energy and discretionary mineral development within four miles of active leks, and minimize surface disturbance and disruptive activities in all occupied habitat, where appropriate.

**Gunnison Basin Candidate Conservation Agreement**

The Gunnison FO, in conjunction with the FWS, CPW, National Park Service (NPS), U.S. Forest Service (USFS), Natural Resources Conservation Service (NRCS) and multiple stakeholders, developed a Candidate Conservation Agreement (CCA) to guide management of GUSG on public lands in the Gunnison Basin. The CCA focuses on managing key threats on federal lands identified by FWS for this population: grazing, recreation, roads, and transmission lines. Actions that fall under the purview of the CCA will follow CCA direction in the Basin. The range-wide planning effort will incorporate measures found in the CCA. All other actions will consider conservation measures identified in the RCP and this IM as the primary guidance for management.

**All Program Areas**

BLM FOs will:

- Work within multiple programs including recreation, hazardous fuels, fire management, Public Domain forestry, range management, and wildlife to accomplish GUSG habitat conservation. When permitting or authorizing activities, FOs will consider, analyze and incorporate appropriate GUSG management strategies, best management practices (BMPs), and mitigation actions (avoid, minimize, and compensate) through NEPA analysis or other regulatory processes. FOs will continue to implement appropriate BMPs through the permitting process in all program areas. BMPs could include those identified at the local, state or national level for oil and gas development in GUSG habitat (see also RCP (Appendix L), fire (WO-IM 2013-128), and grazing guidelines (RCP 2005)).

- Continue coordination with the FWS and State fish and wildlife agencies on appropriate site-specific habitat or population-level management strategies (RCP 2005). This will include, but is not limited to, considering, prioritizing and implementing management prescriptions and strategies outlined in the RCP and local GUSG conservation plans, as well as all subsequent updates as appropriate. The BLM will work with FWS and State fish and wildlife agencies to determine the best available science for implementation of this IM and, if appropriate, will revise the IM accordingly.

- Implement a 0.6-mile no surface disturbance/no surface occupancy buffer radius (RCP 2005) around all active leks for project-level implementation such as fences or sagebrush habitat treatments. Any sagebrush removal or treatment should be prohibited within this buffer, unless implemented to maintain or enhance the lek (RCP, Appendix I).

- Per the RCP (Appendix I), the BLM should manage all sagebrush habitat within a 4-mile radius of an active lek as GUSG breeding habitat (lekking, nesting, early brood rearing). To complement protections within the 0.6-mile buffer (described above), breeding habitat should be managed to minimize disturbance to GUSG during critical seasonal time periods and minimize the footprint of any project, habitat fragmentation across the landscape, and

cumulative effects on the associated population (see RCP, Appendix L).  The following specific disturbance guidelines (see RCP, Appendix I) should be analyzed and applied to all ongoing program authorizations where appropriate:

o   Prohibit surface disturbing activities and disruptive activities within four miles of active leks from March 1 through June 30 (RCP 2005), subject to valid existing rights and emergency repairs of ROWs.
o   Avoid surface disturbance within mapped winter habitat for GUSG (if not mapped, within four miles of active leks); if surface disturbance cannot be avoided, prohibit said activity from December 1 through March 15 (RCP 2005).

- Include requirements to new Special Recreation Permits (SRP) to avoid disturbing leks during the breeding season. SRPs for hunting (other wildlife species), bird watching, and other activities should include appropriate timing restrictions to minimize disturbance to GUSG during critical seasonal periods such as the breeding, late brood rearing and winter-use periods.

- Evaluate the need, and implement where appropriate, seasonal or permanent road or trail closures in occupied habitat through travel management planning and associated NEPA analysis for BLM authorized routes.  Avoid construction of new roads or ROWs within four miles of active leks.

- Analyze the impacts to GUSG when renewable energy (e.g., wind, solar, biomass) development and associated infrastructure (e.g., transmission lines) is proposed in or adjacent to sagebrush habitat, and avoid occupied habitat where warranted.  Manage areas within four miles of active leks as ROW avoidance areas.

- Avoid routing above-ground transmission or distribution lines within occupied habitat.

- In response to a Plan of Operations, evaluate the impacts of non-discretionary activities managed under 43 CFR 3809 (those actions authorized under the 1872 mining law) on local GUSG populations, and clearly describe those effects that cannot be mitigated through the regulatory process.  Through the NEPA process, analyze potential impacts of discretionary mining activities and mitigation approved under 43 CFR 3400 (such as coal management), 43 CFR 3500 (non-energy leasable materials), and exploration or extraction of other solid minerals wherever possible.

- Incorporate adequate reclamation standards designed to re-establish suitable GUSG seasonal habitats (RCP 2005, Appendix H) for all surface-disturbing activities within occupied GUSG habitat.  Incorporate native seed mixtures in restoration efforts.  Wherever possible, native seed mixtures should include a minimum of three native grasses, two native forbs and one native sagebrush species.  Use desired non-persistent, non-native vegetation in rehabilitation only where other options have been proven unsuccessful.

- Monitor all restoration activities for success in meeting short- and long-term vegetation objectives and reclamation standards, including potential weed infestations following the principles outlined in the BLM Assessment, Inventory and Monitoring Strategy.  Conduct follow-up treatments to eliminate weeds as identified through monitoring.  If vegetation objectives are not being met, adjust restoration actions accordingly to improve success of achieving desired GUSG habitat objectives.

**Proper Livestock Grazing**

Continue to evaluate and implement livestock grazing management practices consistent with achieving GUSG seasonal habitat objectives during allotment permit renewals and associated NEPA analysis, or as identified through LHAs. Consistent with the best available science compiled in accordance with the Policy section above, GUSG habitat objectives identified in the RCP (Appendix H) should be considered the range-wide standards for managing GUSG seasonal habitats. Habitat objectives may be adjusted if more localized habitat structural data are available in coordination with State fish and wildlife agencies and the FWS on a population-by-population basis. GUSG habitat objectives should always be managed with consideration to ecological site potential.

Use the BLM-approved monitoring techniques described in the HAF to assess and monitor long-term GUSG habitat conditions and trend in conjunction with authorized grazing management.

Where current livestock grazing management has been identified as a causal factor in not meeting Land Health Standards (43 CFR 4180), use the process in WO-IM-2009-007, Process for Evaluating Status of Land Health and Making Determinations of Causal Factors When Land Health Standards Are Not Achieved, to identify appropriate actions. Evaluate progress towards meeting standards that may affect GUSG or its habitat prior to authorizing grazing on an allotment that was not achieving land health standards in the last renewal cycle, and livestock was a significant causal factor. Where available, use current monitoring data to identify any trends (e.g., progress) toward meeting the standards. Where monitoring data are not available or inadequate to determine whether progress is being made toward achieving Land Health Standards, an interdisciplinary team should be deployed as practicable to conduct a new land health assessment. The NEPA analysis for the permit/lease renewal must address a range of reasonable alternatives including alternatives that improve GUSG habitat.

**Wildland Fire and Fuels Management**

While GUSG protection and habitat enhancement is a high priority for the fire management program, firefighter and public safety is the first priority on every fire and takes precedence over natural resource protection. Local agency administrators and resource advisors will convey resource protection priorities to incident commanders. Incident Commanders will then develop and establish incident objectives, strategies, and operational tactics that ensure firefighter and public safety.[2]

The strategy for all unplanned ignitions in GUSG habitat will be “fire suppression.” Fire suppression strategies and tactics used on an incident will comply with RMP and Fire Management Plan (FMP) direction. Unplanned ignitions in GUSG occupied habitat will not be managed to meet resource objectives until a final FWS listing decision is made and a programmatic consultation can be completed, if warranted.

Discretionary actions under the fire and fuels management program include: unplanned ignitions managed to meet resource objectives; planned ignitions (i.e., prescribed fires); and mechanical, biological and chemical vegetation treatments to reduce hazardous fuels. When these discretionary actions are expected to occur in occupied or unoccupied critical habitat, they must occur under conditions analyzed to be acceptable to meet GUSG resource objectives. The NEPA analysis for FMPs and project plans for these discretionary actions address achieving GUSG habitat objectives and must undergo appropriate consultation with the FWS following the final GUSG listing decision under ESA should the FWS make a final determination to list GUSG. These decisions must be documented in the Wildland Fire Decision Support System.

**Climate Change/Rapid Eco-regional Assessments (REA)**

The proposed GUSG listing package acknowledges the potential for climate change to alter the distribution of native vegetation, increase the potential for invasive species introduction and increase fire frequencies and intensities, all of which may have long-term impacts to key GUSG seasonal habitats across the landscape.

- The BLM Colorado State Office (COSO) will continue to develop a statewide Climate Change Adaptation Strategy, which will include a vulnerability assessment of GUSG.
- FOs in Colorado will implement climate change adaptation strategies developed through the statewide effort. The strategies will be informed by data provided by REAs or other assessment documents, as appropriate.
- BLM Colorado and Utah will incorporate landscape-level data and adaptive management strategies using information identified through the REAs or other assessments to conserve and restore sagebrush habitats.

**Processing Fluid Mineral Leases in GUSG Habitat**

***New Nominated Leases***

In accordance with WO IM 2010-117, Change 1, "the State Directors have discretion to temporarily defer leasing on specific tracts of land based on information under review during planning." Since the RCP (2005) was signed, the BLM Colorado's policy has been to defer leasing of occupied GUSG habitat until new FO land use planning has been completed, as these documents detail significant new information on GUSG not addressed in current plans. The BLM will continue to defer leasing in occupied habitat to avoid affecting decisions related to future management decisions.

***Existing Leases***

For authorization of any development actions (for individual APDs or where an operator proposes a Master Development Plan) where there are valid existing rights, FOs must coordinate with the FWS (consistent with requirements under ESA), CPW (consistent with COGCC MOU – Attachment 1), UDWR, and industry on management actions designed to minimize impacts to GUSG or their habitat, including Conditions of Approval (COA) that will be applied to future APDs. The BLM must ensure that any proposed COAs or mitigation measures are consistent with the RMP, are adequately supported by site-specific NEPA analysis and do not violate any lease rights (see Yates Petroleum Corp., 176 IBLA 144 [2008]).

In accordance with standard lease terms and conditions, existing leases are subject to applicable laws, including ESA, and therefore, may be required to adopt conditions of approval that would reduce adverse impacts to the species consistent with site-specific environmental analysis and ESA conference or consultation.

BLM offices are encouraged to work with the FWS, State fish and wildlife agencies, and industry in advance of planning to develop potential strategies in a particular geographic area. This pre-planning may include conservation strategies such as siting a project in lower quality habitat, clustering activities to minimize fragmentation of existing habitat patches, or noise mitigation.

This policy does not preclude developing and immediately implementing new mitigation or conservation measures necessary to reduce activity/project impacts to GUSG or their habitats, provided this mitigation is in accordance with existing RMPs and lease rights granted. Any new measures applied for GUSG will be coordinated with the FWS and State fish and wildlife agencies. FOs will work with project proponents, the State, the FWS, and private landowners when

appropriate to implement direct avoidance and minimization measures (e.g. relocating disturbance, timing restrictions, etc.) and use COAs.  FOs must ensure any recommended COAs or operator-negotiated stipulations are supported by appropriate analysis through NEPA during the APD, plan of development, or use-authorization approval process.  Biologists are encouraged to reference existing analyses or accepted recommendations from national, range-wide, or local conservation plans; existing or new peer reviewed research studies; or other scientific reports within the NEPA analysis, rather than restate those analyses.

In accordance with Fluid Mineral Resources Handbook (H-1624-1, 2013), the federal government retains certain rights when issuing an oil and gas lease. While the BLM may not unilaterally add a new stipulation to an existing lease that it has already issued, the BLM can subject development of existing leases to reasonable conditions, as necessary, through the application of COAs at the time of permitting. The new constraints must be consistent with the applicable land use plan and not in conflict with rights granted to the holder under the lease.

If the existing lease is in occupied GUSG habitat, and the land use plan does not contain mitigation, FOs should request the operator to modify existing stipulations or add an additional stipulation to mitigate the impacts to GUSG habitat.  When applicable under 43 CFR 3101.1-4, if, after the lease is issued, the authorized officer determines that a modification of a lease term or stipulations involve an issue of major concern for the public, the modification shall be subject to public review for at least 30 days.  43 CFR 3101.1-4. If the operator refuses to sign a stipulation modification or to add a new stipulation, the BLM will need to carefully evaluate whether the project can proceed based on the level of impacts identified in the site-specific NEPA analysis and the BLM's obligation to prevent unnecessary or undue degradation [43 USC 1732(b).]. Any development pursuant to valid existing rights will be approved in the location and in a manner that best minimizes impacts to GUSG.

Where authorized in the applicable RMP, exceptions to lease stipulations or COAs in sagebrush habitats will be considered on a case-by-case basis and coordinated with the FWS and State fish and wildlife agencies before approval.  Any exception authorized in occupied habitat will require District Manager review.

The BLM will defer fluid mineral lease nominations in GUSG occupied habitat until management prescriptions and strategies outlined in the RCP, local GUSG population conservation plans, and/or potential impacts to local GUSG populations as summarized in recent/existing research studies or conservation summaries, have been considered and evaluated
through the range-wide plan amendment effort and associated NEPA analysis. Such analyses must consider the cumulative impact of decisions and mitigation measures.

Development constraints may vary by FO when those constraints are based on locally-collected scientific data or local habitat conditions and are supported with clear rationale in the range-wide amendment NEPA analysis. Prescriptive measures carried forward through the selection of the preferred alternative in the range-wide plan amendment will be incorporated into all new leases within occupied or other GUSG habitats, as outlined in the planning document.

Lands determined to be available for lease and development within occupied GUSG habitat, and under what constraints, will be described in the proposed range-wide plan amendment. The BLM will ensure that the GUSG range-wide plan amendment contains language consistent with recent Interior Board of Land Appeals (IBLA) decisions (Yates Petroleum Corp., 176 IBLA 144 [2008] and William P. Maycock, 177 IBLA 1 [2009]).[3] These decisions allow the BLM discretion to modify surface operations to add specific mitigation measures supported by site-specific National Environmental Policy Act of 1969 (NEPA) analysis undertaken during the development phase on existing leases. The IBLA has made it clear when making a decision regarding discrete surface-

disturbing oil and gas development activities following site-specific environmental review, the BLM has the authority to impose reasonable protective measures not otherwise provided for in lease stipulations to minimize adverse impacts on other resource values.

***Drainage***
It is the responsibility of the BLM to protect the interests of the United States where it is determined that the oil and gas resource is subject to drainage. The BLM has many tools at its disposal to do so, such as forced pooling, communization agreements, issuing leases, and drilling protective wells. Where it is determined that drainage is occurring, the BLM will analyze and employ the least disruptive method necessary to protect the interests of the United States. If disturbance is necessary, the BLM protect GUSG habitat by applying the conservation concepts outlined in this IM, as well as other best management practices, as appropriate.

**Processing Proposed Solid Mineral Leases (Coal) in GUSG Habitat** (i.e., a lease has not been issued and, therefore, no valid existing rights have been established)

The BLM will defer leasing in occupied habitat to avoid affecting decisions related to future management until new FO land use planning has been completed.

**Sagebrush Habitat Improvement/Restoration Projects**

All GUSG habitat improvement projects should clearly articulate and document the need for the project to achieve desired habitat objectives (RCP 2005, Appendix H).  Documentation should include current habitat condition assessments and specific treatment objectives as they relate to GUSG habitat.

All vegetation treatments in sagebrush habitat should consider and incorporate seasonal GUSG habitat needs into project design, analysis and approval when those projects are completed to meet other program area objectives.  Recommendations for sagebrush removal or treatment projects within seasonal habitats are located in the RCP, Appendix I (pg. 6-7). (See guidance under "All Program Areas" for more information.)

All habitat treatments and management prescriptions in GUSG habitat should incorporate appropriate effectiveness monitoring to determine whether one or more of the following goals are being achieved:

1) Meeting site-specific GUSG habitat objectives consistent with best available science compiled in accordance with the Policy section above;
2) Enhancing the long-term sustainability of local GUSG populations;
3) Promoting the maintenance of large intact sagebrush communities;
4) Limiting the expansion or dominance of invasive species;
5) Maintaining or improving soil site stability, hydrologic function, and biological integrity;
6) Enhancing the native plant community, including the native shrub reference state in the *State and Transition Model*, with appropriate shrub, grass, and forb composition identified in the applicable ESD where available; and
7) Meeting specific project or management objectives as they relate to GUSG or their habitat.

Monitoring objectives will be coordinated and/or conducted in conjunction with State fish and wildlife agencies, and will use BLM-approved inventory or monitoring methods.

Livestock grazing will be deferred for all GUSG habitat improvement or restoration treatments for a minimum of two growing seasons to ensure establishment and persistence of desired vegetation, unless analysis or management objectives recommend otherwise.

The BLM will prioritize all GUSG restoration efforts in Proposed Unoccupied Critical Habitat in conjunction with the FWS and State fish and wildlife agencies. Priorities will reflect ground-truthing of site capability, likelihood of success, planning and design, monitoring needs, and prioritization by population status and need.

BLM Colorado and Utah will continue to support, coordinate with, and participate in GUSG conservation activities that are led or initiated by the FWS, State fish and wildlife agencies, and local workgroups or other partnerships.  Such activities may include, but are not limited to, ongoing GUSG research studies, habitat mapping and modeling efforts, conservation planning and project implementation, and population monitoring.

**Conference and Consultation with FWS**

The ESA requires the BLM to conference on all management actions that may result in a Jeopardy determination of a proposed species. Since the BLM is generally not in a position to determine Jeopardy, BLM policy (Manual Section 6840) is to conference on all discretionary actions that May Affect, or are Likely to Adversely Affect (LAA). Per the FWS Guidance for Conferencing (Attachment 2), the FWS has agreed to continue ongoing discussions and/or conferencing for all land use planning efforts and for the Gunnison Basin CCA. The BLM has shared a list of ongoing planning efforts with FWS to help plan their interim workload with the BLM.

The FWS will not be conferencing on individual projects that may have adverse effects to the species or proposed critical habitat, but are not likely to reach the level of Jeopardy to the species. Assessment of project-level impacts should be documented in the associated NEPA analysis.

Individual projects with an LAA determination will be coordinated through the appropriate state office to support continuing ongoing actions. This will include providing feedback to the field on appropriate conservation measures and levels of impacts.

FOs will work with the appropriate state office to prioritize and streamline future consultation needs if the species is listed and help develop a schedule for submitting priority projects/activities/programmatic Biological Assessments (BA) to the FWS for consultation to manage reasonable workloads for both agencies. This will include assisting the FOs in identifying and grouping similar actions (existing and future) that may be assembled and analyzed in programmatic consultation documents or covered by project screens for one or more GUSG populations.

**Adaptive Management**

For purposes of this IM, adaptive management is used in two broad contexts:
1.  Incorporating applicable new research or guidance into GUSG management.

2.  Adjusting management to achieve specific GUSG resource objectives as determined through monitoring (DOI Technical Guide for Adaptive Management, Williams et.al 2007).[4]

As new research, national or state management guidance, population or habitat data, or other pertinent GUSG information becomes available, recommended management of GUSG should be adjusted accordingly. All recommended management applications will continue to be implemented via NEPA analysis. The success in implementation and effectiveness of this management direction will be reviewed to determine if GUSG resource objectives are being met. This review will be in coordination with the FWS, State fish and wildlife agencies, and other agencies through the GUSG RSC. As RMPs are amended or revised in the future with sufficient local population guidance, those conservation measures and management constraints will be reviewed for effectiveness as described above.

Alternatively, where specific GUSG population or habitat objectives have been set, the BLM will use monitoring data to determine the effectiveness of existing management actions in meeting those objectives. If not deemed effective, management prescriptions should be adjusted to meet identified resource objectives.

**Timeframe**: This IM is effective immediately.

**Budget Impact**: This IM will result in additional operational costs for coordination, NEPA review and monitoring of all activities in GUSG habitats in Colorado and Utah. In addition, full implementation of this IM including initiating a GUSG range-wide Plan Amendment, restoration efforts, response to climate change indicators, and adaptive management may require significant funding.

**Background:** Since 1999, the GUSG has been petitioned and reviewed for listing under ESA several times. The FWS issued a 12-month finding on September 27, 2010, (75 FR 59804), and determined that GUSG warranted protection under the ESA, but that proposing the species for protection would be delayed while the FWS addressed the needs of other higher priority species. On January 11, 2013, the FWS proposed GUSG as endangered, and concurrently proposed the designation of approximately 1.7 million acres of critical habitat, under ESA, as amended (78 FR 2486; 78 FR 2540).

GUSG occur in seven isolated populations, one of which is connected to a GUSG population in Utah. It is important to maintain existing populations and/or current distribution throughout both Colorado and Utah, where more than 90 percent of the estimated range-wide population of GUSG occurs within Colorado. Local GUSG workgroups have been established for six of the seven populations and are engaged in management of the species to varying degrees depending on land ownership and local involvement. Threats to these species vary by population in both Colorado and Utah, and are articulated in their respective Conservation Plans (RCP 2005).
As a land manager of GUSG habitat, it is imperative that the BLM conserve sagebrush communities to support sustainable GUSG populations and maintain or improve connectivity of habitat within and between existing populations, where appropriate. However, successful management of GUSG will require cooperation from private, state and federal land owners and managers to address the wide range of land uses that intersect with GUSG habitat. For instance, while the BLM is a primary land manager of GUSG habitat in Colorado, between 80-90 percent of all oil and gas drilling activity statewide occurs on private, county, or state lands, with no federal nexus. Only by finding ways to work across landscapes that transcend ownership boundaries will federal, state, and private land owners and managers achieve substantial and measurable conservation of sagebrush communities and sustainable GUSG populations.

**Directives Affected**: A BLM Colorado/Utah Handbook Supplement will incorporate the new policy and guidance.

**Coordination:** This IM was coordinated with BLM Utah State Office; Colorado State Office; the Washington Office (WO) Resources and Planning Directorate; WO Energy, Minerals, and Realty Management Directorate; and the WO National Landscape Conservation System and Community Programs Directorate.

**Contact:** Robin Sell, Conservation Biologist, at (303) 239-3723, or Leigh Espy, Project Manager, at (303) 239-3801.

Signed by:
Edwin L. Roberson
Assistant Director
Resources and Planning

Authenticated by:
Robert M. Williams
Division of IRM Governance,WO-860

2 Attachments
1 - COGCC MOU (9 pp)
2 - FWS Guidance for Endangered Species Act Conferencing for GUSG (1 p)

---

[1] The HAF is available at http://sagemap.wr.usgs.gov/docs/rs/SG%20HABITAT%20ASESSMENT%202010.pdf
[2] More information available at: https://www.nifc.gov/policies/policies_documents/GIFWFMP.pdf
[3] Available at: http://www.oha.doi.gov:8080/index.html
[4] Available at: http://www.doi.gov/initiatives/AdaptiveManagement/TechGuide/openingpgs.pdf

APPENDIX C: GUSG CANDIDATE CONSERVATION AGREEMENT, GUNNISON BASIN POPULATION

# Candidate Conservation Agreement

## For the Gunnison sage-grouse, *Centrocercus minimus*
## Gunnison Basin Population

Developed cooperatively between:
Colorado Parks & Wildlife
Gunnison County
Saguache County
U.S. Bureau of Land Management
U.S. Fish and Wildlife Service
U.S. Forest Service
U.S. National Park Service
U.S. Natural Resources Conservation Service

# EXECUTIVE SUMMARY

Beginning in January 2010, federal land management agencies and the Gunnison Basin Sage-Grouse Strategic Committee developed the following Candidate Conservation Agreement (CCA) to promote conservation of the Gunnison Basin population of Gunnison sage-grouse. The CCA addresses three categories of threats to sage-grouse habitat on federal public lands in the Gunnison Basin, as identified in the 2010 FWS status review: development, recreation, and grazing. The CCA will apply to such actions on the approximately 395,000 federal acres of occupied habitat, or roughly two-thirds of the total 590,000 acres of occupied Gunnison sage-grouse habitat in the Basin. As noted in the USFWS 2010 status review, the Gunnison Basin population constitutes 87% of the overall population of Gunnison sage-grouse.

Federal signatories will seek a conference opinion from the U.S. Fish and Wildlife Service (USFWS) in accordance with section 7 of the Endangered Species Act (ESA) regarding the CCA and its covered actions, and this process is expected to be completed by mid – 2013. With the conference opinion, so long as the federal agencies design and manage these specified activities to meet the conservation criteria outlined in the CCA, the federal agencies will have met their ESA conference requirements for those activities. If the Gunnison sage-grouse is subsequently listed under the ESA, the federal signatories will request that the USFWS confirm the conference opinion as the biological opinion, such that the federal agencies will have met their ESA consultation requirements for those covered activities.

Because the nonfederal signatories manage activities and uses on and through federal lands, such as road maintenance and big game, they too serve a role in implementing the CCA. Fortunately, the Gunnison Basin has a long history of government-to-government cooperation to conserve the species and habitat. Nonfederal actions or actions without a federal nexus are not intended to be included in the conference opinion, however.

Although the CCA delineates overarching habitat conservation objectives on federal lands, conservation measures in the CCA are not intended to address all threats to the species and habitat. Rather, the CCA and associated conference opinion covers a wide range of activities on federal lands including development, recreation, and grazing.

Further, neither the CCA nor the conference opinion is a land-use plan, nor is it intended to supersede federal or nonfederal land use planning authority. Section 7 coverage does not absolve federal agencies of NEPA obligations, nor does it absolve nonfederal permittees of compliance with permit terms and conditions. For federal agencies, the CCA is a tool to screen activities on federal lands for coverage under the streamlined, programmatic conference opinion. For nonfederal signatories, this document is intended to be a statement by the federal agencies that, so long as the nonfederal signatories implement the identified conservation measures for an action with a federal nexus , then no further consultation is necessary, and such covered actions are "screened out" of any further consultation requirements. For nonfederal nonsignatories who obtain permits and authorizations for activities on federal lands, including such broad stakeholder groups as right-of way/easement permit holders, recreationists, and Stockgrowers, so long as the federal agency administering such permits implements the identified, associated conservation measures, then no further consultation on the permit is necessary.

The Strategic Committee is the Gunnison and Saguache County-appointed local working group comprised of agency officials, elected officials, commercial stakeholders, conservation organizations and members of the public. The CCA effort was facilitated by the Bureau of Land Management (BLM), coordinated with the USFWS, and included approximately 35 individuals representing federal and state agencies, two counties, and stakeholder groups.

Signatories include *(See Section 0, Responsibilities of Signatories)*:

- USDA Forest Service: Gunnison Ranger District of the Grand Mesa, Uncompahgre and Gunnison National Forest
- USDI National Park Service: Black Canyon of the Gunnison National Park and Curecanti National Recreation Area
- USDI Bureau of Land Management: Gunnison Field Office
- USDI Fish & Wildlife Service: Western Colorado Field Office
- USDA Natural Resources Conservation Service, Colorado
- State of Colorado – Department of Natural Resources, Colorado Parks & Wildlife: Gunnison Service Center.
- Board of County Commissioners of Gunnison County
- Board of County Commissioners of Saguache County

## ACKNOWLEDGMENTS

The Gunnison Basin Gunnison sage-grouse Candidate Conservation Agreement is the result of the collective effort of many, many agency staff and public partners and the persistent dedication of a few. Although singular signatures may represent partners' commitment to implement the CCA, success depends upon a host of staff and public partners to fulfill and evolve the agreement in the years to come. Many thanks to those past and future contributors.

# INTRODUCTION & FRAMEWORK

## 1.1.   Background

For almost two decades, Gunnison sage-grouse conservation in the Gunnison Basin has been driven by local stakeholders, local government, and state and federal Authorized Officers and staff located in the Gunnison Basin, periodically spurred by U.S. Fish & Wildlife Service (USFWS) decisions regarding the species' status. The Gunnison Basin sage-grouse working group completed the first local conservation plan for Gunnison sage-grouse in June 1997, and Basin-wide sage-grouse conservation continues in large part via the Gunnison County and Saguache County-appointed Gunnison Basin Sage-grouse Strategic Committee. Formed in 2005, the Strategic Committee is comprised of agency officials, elected officials, commercial stakeholders, conservation organizations and members of the public.  Meanwhile, the USFWS first designated the grouse as a candidate species in 2000, identifying it as warranted for listing as endangered or threatened under the Endangered Species Act (ESA). The candidate designation means that immediate proposed listing of the species is precluded by higher priority listing actions; the species was again designated as warranted but precluded in 2010. Most recently, in September 2011 the U.S. District Court for the District of Columbia, in *WildEarth Guardians v. Salazar,* approved a settlement agreement between USFWS and Wild Earth Guardians addressing the status of candidate species, including the Gunnison sage-grouse. Under this agreement and a subsequently court-revised timeline,, the USFWS proposed the species as endangered in December 2012, and simultaneously proposed critical habitat.

Because of long-standing local commitment to the identification and implementation of sage-grouse conservation measures, and in anticipation of eventual listing under the ESA, agencies and stakeholders began to seek more formalized recognition of their efforts. Colorado Parks & Wildlife (CPW; then Colorado Division of Wildlife) completed a Candidate Conservation Agreement with Assurances (CCAA) with USFWS in 2006. Via voluntary participation in the CCAA, private landowners throughout the range of the Gunnison sage-grouse (GUSG) have enrolled their properties and obtained assurances that no further conservation measures would be required in the event that the sage-grouse is listed, provided they carry out the conservation measures and land management activities as identified in their Certificates of Inclusion.

Given the popularity of the CCAAs and the emerging regional awareness of these types of voluntary but formalized conservation mechanisms, in 2010 the Gunnison Basin Sage-grouse Strategic Committee took on the task of preparing a Candidate Conservation Agreement (CCA) with the USFWS to both a) address threats to sage-grouse from activities on federal lands, and b) participate in laying the foundation for how such activities could continue subsequent to a listing decision for the grouse.

## 1.2.   CCAs: Policy, Practice

By policy, a Candidate Conservation Agreement is "an agreement signed by [the USFWS] and other Federal or State agencies, local governments, Tribes, businesses, organizations, or non-federal citizens,

that identifies specific conservation measures that the participants will voluntarily undertake to conserve the covered species" (64 FR 32705 1999). Although the USFWS issued a final policy for Candidate Conservation Agreements with Assurances in 1999, no comparable policy exists for CCAs. USFWS issued an informal memo to describe how a CCA/CCAAs could be jointly applied, and the memo detailed recommended components to include in such joint agreements (USFWSa). Yet for stand-alone CCAs, "the degree of detail …can vary widely, and there are no specific permits or assurances associated with them" (USFWS 2011).

By practice, most stand-alone CCAs to-date generally describe the known and anticipated threats to the species and its habitat, coupled with the specific conservation measures that signatories will implement to address the identified threats. For the Gunnison sage-grouse, just such a plan was developed in 2005 via an extensive, multi-agency effort that produced the Gunnison sage-grouse Rangewide Conservation Plan (RCP; GSRSC 2005). The RCP was the first up-to-date and rigorous assessment of rangewide population and habitat data for Gunnison sage-grouse, and still serves as a blueprint for GUSG management across the range. Nonetheless, five years subsequent to varying levels of implementation of the conservation strategies outlined in the Rangewide Conservation Plan, the 2010 status review confirmed that the present and future threats to the species were such that the species continues to be warranted for listing, with an increased priority ranking.

### 1.3. Goals & Objectives of this CCA

With a wide degree of latitude to develop a CCA, and the impetus to define the next step in management post-Rangewide Conservation Plan, the GUSG CCA participants outlined overarching process- and outcome-oriented goals:

- ***Engage key stakeholders in the Gunnison Basin community in a collaborative planning and review process to support sage-grouse conservation***

  Building on the trajectory of collaborative, bottom-up grouse management by the Strategic Committee and larger Gunnison Basin community, the CCA process was designed such that public partners worked alongside Authorized Officers to build the key components and conservation measures.

- ***Ease the transition to living and working with a species that may be federally listed in the near future***

  By outlining clear design criteria in the CCA for any proposed or renewed activities on federal lands in grouse habitat, signatories and partners plan ahead to identify and implement necessary conservation measures.

  By then conducting a formal, programmatic conference with USFWS for those activities prior to a final listing determination, federal agencies frontload compliance with their ESA Section 7 obligations in the event of listing. In sum, the GUSG CCA was designed to primarily function as a

project screening tool to streamline future consultation with USFWS under Section 7.[1] This regulatory framework is further elaborated in Section 2.

- ***Build upon the Rangewide Conservation Plan to make conservation measures actionable***

  Participating federal agencies and public partners have a clear and direct incentive to incorporate delineated conservation measures as design criteria for project proposals and renewed activities in grouse habitat due to a) efficiency gains from streamlined consultation under ESA Section 7 and

  b) greater upfront certainty over the conservation measures required.

  The GUSG CCA advances several of the conservation objectives outlined in the RCP by breaking objectives into specific, implementable steps that can reasonably be achieved by the implementing agencies.

- ***Stratify occupied habitat to prioritize conservation measures***

  With approximately 395,000 acres of federally managed occupied Gunnison sage-grouse habitat in the Gunnison Basin, land managers and planners sought a way to stratify the landscape and prioritize conservation measures.[2] The development of the Habitat Prioritization Tool, and the subsequent delineation of tiered habitat, is outlined in Section 3.3 and Appendix F.

  **Tier 1 Habitat:** Roughly 60% of occupied grouse habitat is proposed to be managed as Tier 1 habitat. These areas are identified by the Habitat Prioritization Tool, and they are generally characterized by two or more overlapping seasonal habitats and minimal existing permanent development.

[1] For comparable example, see *Programmatic Consultation Agreement between Bureau of Land Management and US Fish and Wildlife Service for Canada Lynx in Colorado*. USFWS & BLM. 2010.

[2] The Habitat Prioritization Tool was developed for the entirety of occupied habitat in the Gunnison Basin, irrespective of land ownership. The CCA applies the stratification to federal acres only.

**Tier 2 Habitat:** Roughly 40% of occupied grouse habitat is proposed to be managed as Tier 2 habitat. These areas are identified by the Habitat Prioritization Tool, and they generally represent the more fragmented areas on the landscape.

### *Account for cumulative impacts of habitat fragmentation*

Fragmentation as used throughout the CCA is defined as the reduction of continuity and/or quality of habitat, including both direct habitat conversion and indirect/functional impacts.[3] A fundamental goal of the CCA is to account for the cumulative impacts of habitat fragmentation, which is identified as the overriding threat to the species. As such, two habitat objectives frame the conservation measures to address both existing impacts and impacts from future, additional development and activities in occupied habitat on federal lands:

*Tier 1 habitat objective: Reduce existing net fragmentation.*

Section 5, Conservation Measures to Address Existing Development & Activities, outlines measures the agencies and their partners will take to reduce the scope and extent of existing fragmentation over the lifetime of the CCA. For example, Tier 1 habitat will be prioritized for route reclamation.

Section 4, Conservation Measures to Address Future Development & Activities, sets up a framework to reduce net fragmentation – while enabling participating agencies to fulfill mission-priority work and uses – via the use of offsite mitigation[4] for specified types of future infrastructure. For example, new trails can be constructed, but they will have to be offset by a *greater* amount of reclaimed trails. To the extent possible, offsite mitigation should lead to an increase in the size of intact, unfragmented Tier 1 habitat patches.

*Tier 2 habitat objective: Avoid additional net fragmentation.*

Section 4, Conservation Measures to Address Future Development & Activities, sets up a framework to avoid additional net fragmentation – while enabling participating agencies to fulfill mission-priority work and uses — via the use of offsite mitigation for specified types of future infrastructure. For example, new trails that meet the design criteria to minimize impacts to sage-grouse habitat may be constructed, but they will have to be offset at a minimum by an *equal* amount of reclaimed roads and trails.

[3] The use of the term fragmentation throughout the CCA is not intended to imply that sage-grouse within the Gunnison Basin population are genetically isolated as a result of habitat fragmentation, and no data exist to indicate genetic isolation is occurring within the Basin.

[4] Offsite mitigation consists of compensating for resource impacts by replacing or providing substitute resources or habitat at a different location than the project area.

*Disturbance Caps*

In the future, new research, agency policy, or signatories to the CCA may identify caps or thresholds of allowable disturbance in occupied grouse habitat in the Basin. At that time, parties to this CCA would consider modifying Tier 1 and Tier 2 habitat objectives to be consistent with identified disturbance caps, thereby ensuring the GUSG CCA remains a viable and relevant instrument *(See Section 9)*.

## 1.4. Scope

From the onset, CCA participants focused the scope of the agreement on three threats in the Gunnison Basin that contributed to the candidate status of the species: development, grazing, and recreation. While other threats to the species exist, the CCA is a targeted conservation agreement that covers development, recreation, and grazing actions that are:

- discretionary actions occurring on and through federal lands that are likely to have insignificant or discountable effects to the species or habitat
- discretionary actions occurring on and through federal lands that can be closely managed to avoid, minimize, and/or mitigate negative effects to the species or habitat

***Actions covered by this CCA are further defined as:***

- ***Development***: New roads, power lines, phone lines, communication sites and meteorological towers, pipelines, fences, culverts, gates, cattle guards, exclosures, rights-of-way and easements that result in small-scale development projects on federal lands. The maintenance and reconstruction of such existing infrastructure is also covered in the CCA, as is the access and maintenance to existing water developments.

- ***Recreation***: New recreation roads and trails, modification and reclamation of existing recreation roads and trails, recreation infrastructure (signs, kiosks, vault toilets, vehicle barriers, concentrated parking areas), seasonal restrictions, and special recreation permits, including events and outfitters on federal lands.

- ***Grazing:*** With respect to grazing, the CCA primarily concerns livestock grazing permits on federal lands. Yet because of the landscape scale of grazing and grouse habitat, additional grazing conservation measures are identified in this CCA to share the conservation responsibility amongst key partners. These measures – including coordinated allotment management planning across private, state, and federal boundaries, upkeep of data analysis unit plans for big game—will not be addressed in the conference opinion, but are necessary components of a range management system that ensures sage-grouse conservation. Other activities relative to livestock management, such as fences, small-scale water developments, are included in the development category.

Case No. 1:20-cv-02484-MSK Document 94-2 filed 05/06/21 USDC Colorado pg 357 of 425

Certain activities on federal lands have impacts of such a scale, magnitude, and project-specific nature as to warrant additional consideration and may thus require additional consultation with USFWS under ESA Section 7, outside of what will occur in connection with the CCA. Such activities and actions on federal lands within the Gunnison Basin are **not** covered by the CCA, including but not limited to:

- Energy and minerals development
- ROWs and easements > 5 acres permitted area
- Utility ROWs and easements > 25 feet permitted area width
- ROWs and easements >.5 mile aboveground infrastructure (not including buried utilities, buried pipelines) OR
- Agency-implemented actions > 1 acre permanent ground disturbance

# 2 REGULATORY FRAMEWORK

## 2.1. CCA Relationship to Section 7 of the ESA

Other species-specific CCAs have been developed and implemented with sufficient time for the USFWS to evaluate their effectiveness at reducing or eliminating threats to candidate species, with the result that some CCAs have contributed to making listing unnecessary for the covered species. Due to the anticipated proposed listing determination by December 31, 2012, beneficial effects of this CCA on the GUSG and GUSG habitat will postdate any such proposal.

***Federal Signatories***
Any federal agency has the option of conducting an ESA Section 7(a)(4) conference for candidate species and species proposed for listing to ensure that the actions they authorize, fund, permit, or carry out are not likely to jeopardize the existence of those species. Because the GUSG CCA is intended in part to serve as a programmatic agreement to streamline the ESA Section 7 consultation process, the participating federal agencies will prepare a Programmatic Biological Assessment of the effects of the CCA's covered actions and their associated conservation measures. Subsequently, the federal agencies will request that USFWS conduct a Section 7 conference, resulting in a conference opinion, pursuant to section 7(a)(4) of the ESA and 50 C.F.R. § 402.10(d).

Should the USFWS list the GUSG as threatened or endangered, the federal agencies will request, pursuant to 50 C.F.R. § 402.10(d), that the USFWS review the CCA conference opinion and adopt it as a biological opinion issued through formal consultation for the actions covered by the CCA that are in compliance with its conservation measures. If the USFWS determines as a result of this review that there have been no significant changes in the information used during the conference or in the CCA, the USFWS would confirm the original Conference Opinion as the Biological Opinion and no further section 7 consultation will be necessary with respect to these actions. Ultimately, this CCA and accompanying Biological Assessment are intended to demonstrate that adequate conservation measures, sufficient adaptive management, and monitoring obligations to allow the conference opinion to be converted into a biological opinion on the effective date of any decision to list GUSG.

***Nonfederal Signatories***

The Section 7 process does not apply to non-federal actions or actions that are not authorized, funded, or carried out, in whole or in part, by a federal agency in the United States. Therefore, for non-federal signatories – such as Colorado Parks & Wildlife and Gunnison and Saguache counties – the Biological Assessment and subsequent conference opinion will only address actions with a federal nexus.

### 2.2. CCA Relationship to CCAAs

Many private landowners in the Gunnison Basin are enrolled in or have made application to be included in a Candidate Conservation Agreement with Assurances (CCAA) between the USFWS and CPW. Unanticipated conflicts may arise during the course of implementing both agreements. For example, one of the strategies in this CCA encourages cross-boundary flexibility for livestock management. Adjusted grazing prescriptions on the federal portion of an allotment may result in adjusted grazing on the private portion of an allotment, which could conflict with a private landowner's Certificate of Inclusion under his existing CCAA. Any unforeseen conflict between the GUSG CCA and any Certificate of Inclusion issued pursuant to the CCAA will be addressed by the participating agencies and enrolled landowners with close coordination to maximize benefit to grouse habitat. Ultimately, however, nothing in the CCA will alter, impair or negate any obligation or benefit provided to a private landowner under his Certificate of Inclusion in the GUSG CCAA.

### 2.3. CCA Relationship to Land-Use Plans

***Federal Signatories***

- The GUSG CCA is consistent with the 1992 BLM Gunnison Field Office Resource Management Plan; USFS Land and Resource Management Plan for the Grand Mesa, Uncompahgre and Gunnison National Forests; and 1997 General Management Plan, Black Canyon of the Gunnison National Monument and Curecanti National Recreation Area (*see Section 11, Authorities).*
- The GUSG CCA is not a decision document, and as such, does not replace any need for site-specific NEPA analysis for new and ongoing land-use authorizations.

***Nonfederal Signatories***

- Nothing in the CCA shall, or shall be construed to, limit applicable local government land-use or environmental regulatory authority.

## 3 SPECIES BACKGROUND, HABITAT & THREATS

### 3.1. Species Background

Currently there are 7 separate populations of Gunnison sage-grouse located in Colorado and Utah with the vast majority of the birds being in the Gunnison Basin. Loss of sagebrush habitat along with fragmentation has altered much of the historic range of the species. With limited population size and

existing threats to the bird, there are currently no strongholds for population persistence, including the Gunnison Basin (Wisdom et al. 2011). The Gunnison population has remained relatively stable over the last decade, and the RCP Population Viability Analysis indicated that the population has less than 1% chance of extinction next 50 years, modeled on a population target of 3000 individuals (GSRSC 2005). The 2012 population estimate is 3,327, and the three-year average is 3,119 (CPW 2012). However, several primary threats still exist, including landscape fragmentation, habitat loss, and the potential for increased habitat disturbance in the future.

As noted in Section 1.1, the USFWS first determined Gunnison sage-grouse to be a candidate species under the ESA in 2000. On April 11, 2006, USFWS determined that listing under the ESA was not warranted. In late 2006, a lawsuit was filed alleging the 12-month finding of "not warranted" violated the ESA. A settlement agreement was reached in 2009 for the USFWS to reissue a 12-month finding. On September 28, 2010, the USFWS published the 12-month finding which determined that listing under the ESA was warranted, but precluded by higher priority actions. Most recently, in the fall of 2011 the USFWS and Wild Earth Guardians reached a settlement agreement addressing the status of many candidate species, including the Gunnison sage-grouse. Under that court-approved settlement agreement as recently amended, the USFWS is required to issue a proposed rule to list the species, or a not-warranted determination, no later than December 30, 2012. If the USFWS proposes to list the species, the settlement agreement requires FWS to finalize its listing determination on or before September 30, 2013.

## 3.2.   Habitat

There are approximately 593,000 total acres of occupied sage-grouse habitat in the Gunnison Basin. Elevation within occupied habitat ranges from 7,500 to over 9,500 feet. Precipitation levels range from 7 to 16 inches depending on geographic area and elevation. The majority of sage-grouse habitat within the Basin receives less than 12 inches of precipitation a year. Typical sagebrush types include mountain big sagebrush, Wyoming big sagebrush, and black sage. Mountain big sagebrush occurs at higher elevations and at lower elevations containing moist sites. Wyoming big sagebrush is typically found at lower elevations and on drier sites. There is a hybrid of Wyoming and mountain in transition areas between the two. Black sage is also found on the dry gravel soils in lower elevations. Aspect is also an important factor influencing soil moisture content and the distribution of big sagebrush, with mountain big sagebrush often occurring on more northerly slopes and Wyoming big sagebrush occurring on more southerly slopes. There are many perennial and ephemeral streams within the sagebrush-steppe habitat that provide important brood rearing habitat throughout the Basin. Many of these streams have sagebrush encroachment as a result of downcutting and entrenchment of the stream channel, leading to contraction of the riparian zone.

### *Habitat Stratification*

As noted in Section 1.3, a fundamental purpose of the CCA is to stratify the approximately 395,000 federal acres of grouse habitat in the Gunnison Basin and to prioritize conservation measures accordingly. Via a year-long, collaborative, multi-agency process, members of the Strategic Committee developed a Habitat Prioritization Tool *(HPT; See Appendix F)*. In January 2012, the Strategic Committee completed the Habitat Prioritization Tool, and the Committee defined the threshold for what

constitutes high-priority grouse management areas for the purposes of the CCA. For now and throughout this document, the highest-value habitat is referred to as Tier 1 habitat, and the remainder of occupied grouse habitat is referred to as Tier 2 habitat. *(See Figure 1)*

### *Adaptive Element:*

The Strategic Committee will continue to refine and update the HPT, including but not limited to annual CPW updates regarding the status and high male counts of leks. The HPT will be updated when new, spatially explicit sage-grouse habitat models are created and validated for the Gunnison Basin.

Although thorough review of data inputs to the HPT was conducted, the accuracy of inputs is no doubt limited, with the effect that some existing permanent infrastructure may have been omitted in the current HPT and HPT-derived maps of Tier 1 and Tier 2 habitat. In the course of CCA implementation, future land use authorizations will be ground-truthed to determine presence/absence of existing permanent infrastructure. Subsequent design criteria and conservation measures should be consistent with the actual habitat status as Tier 1 or Tier 2.

CHAPTER 6 - APPENDIX C
GUSG Candidate Conservation Agreement, Gunnison Basin Population

## Affected Area

The CCA applies to approximately 395,000 acres, the entirety of occupied sage-grouse habitat on federal lands in the Gunnison Basin. Table 1 details acreage breakdown per agency.

Sage Grouse Priority Habitat
Created By: Amanda Moore on 6/21/2012
Tier 1
Tier 2
Almont
Gunnison
Pitkin
Ohio
Garfield
Sargents
Powderhorn
0
10
20
Miles

Figure 94. Tier 1 & Tier 2 habitat on federal lands.

Table 114. Federal Gunnison sage-grouse occupied habitat acreage.

| | Tier 1 | Tier 2 | Tier 1 & Tier 2 |
|---|---|---|---|
| BLM | 212,554 | 89,300 | 301,854 |
| USFS | 33,033 | 50,993 | 84,026 |
| NPS | 4,959 | 4,619 | 9,578 |
| Totals (acres) | 250,546 | 144,912 | 395,458 |

BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS 43
AUGUST 2016

### 3.3. Threats

Section 4 of the Endangered Species Act sets forth procedures for adding species to the Threatened or Endangered list based on information for five listing factors. The five listing factors are:

A. The present or threatened destruction, modification, or curtailment of the species' habitat or range;
B. Overutilization for commercial, recreational, scientific, or educational purposes
C. Disease or predation
D. Inadequacy of existing regulatory mechanisms
E. Other natural or man-made factors affecting the species' continued existence

The USFWS looks at not only the species' exposure to each of these factors, but also to whether the species may respond to a factor in a way that causes actual, negative impacts to the species. If there is exposure to a factor and resulting negative effects, then the factor may be a threat to the species. If the threat drives or contributes to the risk of extinction of the species, leading to the need for protection under the ESA, the USFWS considers the threat to be significant.

In the 2010 Status Review and 12-month Finding, 75 Fed. Reg. 59,804 (Sept. 28, 2010), USFWS identified several threats to the grouse within the Gunnison Basin. As identified in Section 1.4, the CCA focuses on the threats to federal occupied habitat in the following categories: development, recreation, and grazing. The following is a summary of USFWS 2010 findings relating to these threats:

#### *Factor A: The present or threatened destruction, modification, or curtailment of its habitat or range*

- ***Historic Modification of Habitat***

  Current occupied habitat in the Gunnison Basin totals 593,000 acres (GSRSC, 2005). Although USFWS notes that approximately 7% of the species potential historic range is currently occupied throughout the range of the species, they cite Boyle and Reeder to note that the rate of loss of sagebrush in the Basin was lower than other areas of sagebrush distribution in Colorado (75 FR 187, 59813). It appears that 60-70% of potential historic habitat remains occupied in the Gunnison Basin, considerably more the USFWS' estimated 7% of potential historic habitat currently occupied rangewide (59813).

#### *Roads*

Currently there are 1,274 miles of roads within 4 miles of grouse leks in the Gunnison Basin. One USFWS analysis finds that all occupied habitat in the basin is indirectly

affected by roads, with the conclusion that "increased road use and increased road construction associated with residential development will continue at least through 2050, and likely longer. The resulting habitat loss, degradation, and fragmentation from roads are a significant threat to Gunnison sage-grouse now and in the foreseeable future" (75 FR 187, 59817-8).

*Overall threat: High*

### Powerlines

USFWS analysis indicates that "68 percent of the Gunnison Basin population area is within 4.3 miles of an electrical transmission line and is potentially influenced by avian predators utilizing the additional perches…These results suggest that potential increased predation resulting from transmission lines have the potential to affect a substantial portion of the Gunnison Basin population" (75 FR 187, p. 59819). Citing current demographic and economic trends, USFWS expects that impacts from existing powerlines and distribution of new powerlines associated with residential development will continue at least through 2050, and likely longer (59819).

*Overall threat: Moderate +*

### Invasive Plants

USFWS anticipates cheatgrass and other noxious/invasive weeds will increase in the Gunnison Basin in the future because of potential exacerbation from climate change and the limited success of broad-scale control efforts. Impacts will likely be in the form of habitat degradation via loss of native plants and an altered fire regime (75 FR 187, 59821-2).

*Overall threat: Moderate +*

### Fences

Approximately 960 miles of fence are located on BLM lands alone within the Gunnison Basin, and are thus widely distributed throughout GUSG habitat. Fence posts create perches for avian predators; USFWS anticipates the effect on sage-grouse populations by such facilitated predation is comparable to the effect of powerlines (75 FR 187, 59816-7). Although fences pose a collision hazard that has resulted in a notable level of direct strike mortality rates in the Greater sage-grouse population, mortality risk is dependent in part upon topography. In more rugged terrain, researchers have documented a markedly lesser risk, hypothesized to be a product of consequent higher flying patterns by the grouse (Stevens 2011). The varied terrain of the Gunnison Basin, and anecdotally reported

higher-flying patterns of Gunnison sage-grouse, may limit population-level effects of any direct collisions.

*Overall threat: Moderate +*

### *Domestic Grazing & Wild Ungulate Herbivory*

Domestic livestock grazing occurs throughout most of the occupied habitat in the Gunnison Basin and is expected to continue in the future. USFWS acknowledges that not all livestock grazing results in habitat degradation, and noted that "no studies have documented (positively or negatively) the actual impacts of grazing at the population level" (75 FR 187, 59823). They conclude that "habitat degradation that can result from improper grazing is a significant threat to GUSG now and in the foreseeable future" (59827).

*Overall threat: Moderate (when considered with Wild Ungulate Herbivory)*

### *Wild Ungulate Herbivory*

Any negative effects of livestock grazing are furthermore "likely being exacerbated by intense browsing of woody species by wild ungulates in portions of the Gunnison Basin" (75 FR 187, 59826-7).

*Overall threat: Moderate (when considered with Wild Ungulate Herbivory)*

## *Factor E: Other natural or manmade factors affecting its continued existence*

### *Recreation*

USFWS notes that recreational activities, a significant use on federal lands, can result in direct and indirect effects on sage-grouse and habitat. Citing the RCP, the USFWS notes that direct disturbance during critical biological periods, including lekking, nesting, and early brood-rearing grouse, "can result in abandonment of lekking activities and nest sites, energy expenditure reducing survival, and greater exposure to predators" (75 FR 187, 59846). Early studies of the indirect effects of widespread motorized recreational access on wildlife habitat indicates that high-frequency human activity along established corridors can affect wildlife through habitat loss and fragmentation, including facilitating the spread of predators and invasive plants (Knick et al 2011). Furthermore, domestic dogs on recreation trails are anticipated to be an additional stressor when within vicinity of sage-grouse, although dogs alone are not currently identified as a population-level threat. In general, USFWS notes that recreational activities do not pose a singular threat

to GUSG now or in the foreseeable future, although localized impacts may occur (59846-7).

*Overall threat: Low*

# 4 NEW CONSERVATION MEASURES: FUTURE DEVELOPMENT & ACTIVITIES

## 4.1. Goal, Scope & Function

***GOAL:***

In order to reduce existing net fragmentation in Tier 1 habitat and avoid additional net fragmentation in Tier 2 habitat, impacts from specified new human infrastructure are avoided, minimized, and mitigated via off-site mitigation.

***SCOPE:***

New roads, routes, trails, power lines, phone lines, communication sites and meteorological towers, pipelines, fences, culverts, gates, cattle guards, exclosures, recreation infrastructure, and rights-of-way and easements that result in such types of small-scale development projects on federal lands.

Certain activities on federal lands have impacts of such a scale, magnitude, and project-specific nature as to warrant additional consideration and may thus require additional consultation with USFWS under ESA Section 7, outside of what will occur in connection with the CCA. Such activities and actions on federal lands within the Gunnison Basin are not covered by the CCA, including but not limited to:

- Energy and minerals development
- ROWs and easements > 5 acres permitted area
- Utility ROWs and easements > 25 feet permitted area width
- ROWs and easements >.5 mile aboveground infrastructure (not including buried utilities, buried pipelines) OR
- Agency-implemented actions > 1 acre permanent ground disturbance

***FUNCTION:***

Sections 4 & 5 are designed to function as a screening tool. Identified conservation measures are included as design criteria for projects to be covered under the conference opinion from USFWS. In the event that a project cannot be managed or designed to meet these criteria, additional consultation with USFWS—outside that provided by the conference opinion and any subsequent

adoption of the conference opinion as the biological opinion— may be required if the project may affect the species or its critical habitat.

As noted in Section 2.3, the GUSG CCA is not a decision document, and as such, does not replace any need for site-specific NEPA analysis for new and ongoing land-use authorizations.

## 4.2. Standard/General Minimization Measures

*Note:* ***Each*** *of the bulleted measures below applies, unless otherwise indicated.*

### *Timing Restrictions & Seasonal Closures*

- Seasonal restrictions on construction, maintenance, and access in seasonal grouse habitat (excepting emergency maintenance), including public access (*See Figure*.)
  - Currently implemented: Lekking period, currently observed from approximately March 15 – May 15[5]
    - Closed to motorized travel, with the following exceptions. Excepted travel is encouraged after 9am where possible.
      - Permittees
      - Access to private property
      - Hartman Rocks Recreation Area, north of powerline
      - Emergency maintenance
  - If research indicates additional restrictions are necessary to sustain the sage-grouse population, seasonal restrictions in identified seasonal grouse habitat may be applied to minimize disturbance during the following critical biological periods: nesting, brood-rearing, or winter periods of use by grouse.

[5] Spring closures to minimize disturbance to lekking grouse may be adjusted by the implementing agencies to accommodate changing environmental conditions, i.e., trend toward earlier lekking periods, etc.

CHAPTER 6 - APPENDIX C
GUSG Candidate Conservation Agreement, Gunnison Basin Population

**Figure 2. BLM & Gunnison County road and area closures, March 15-May 15**

Sage Grouse Seasonal Closures
Seasonal Closures
Land Ownership
BLM
NPS
Private
State
County/City
USFS
50
149
114
N

BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS 6-49
AUGUST 2016



### *Siting & Construction*

- Co-locate new construction or infrastructure within existing development footprints to the maximum extent feasible, unless implementing agency biologists have identified such existing infrastructure as detrimental to grouse; and
- Siting options analyzed with habitat prioritization tool (HPT) to determine least-fragmenting general location; and
  - For infrastructure that requires temporary or permanent access routes (i.e., utility lines, communication sites), siting options should be considered in conjunction with proposed access routes to determine least-fragmenting general location; and
- Consistent with the 1992 BLM RMP, locate any new construction outside of the lek boundary; and
- Field-verify all HPT designations to ground-truth final siting decisions[6]; and
- Site using topography to conceal or minimize noise and visual[7] impacts to sage-grouse; and
- Site and construct new infrastructure to minimize hydrological modification and riparian disturbance;[8] and
- Integrated weed prevention practices used for all construction and maintenance activity (*See Appendix A*); and
- Close coordination between right-of-way/easement-permitting agency and the respective county for new and amended ROW grants, easements and permits in grouse habitat on federal lands at the earliest possible stage of development.

### *Follow-up/Reclamation Standards*

- Habitat reclamation employed for any ground disturbance, in order to minimize establishment of invasive weeds and to accelerate restoration of habitat function. (*See Appendix A*).

***Adaptive element:***

- Although these measures are intended to be thorough and sufficient to minimize impacts to sage-grouse and sage-grouse habitat from new human infrastructure, additional or more stringent minimization measures may be developed and recommended by the

[6] Standards for Tier 1 Habitat and Tier 2 Habitat will be applied based upon the most current version of the Habitat Prioritization Tool base maps. Nonetheless, within contiguous blocks of Tier 1 or Tier 2 Habitat, habitat quality is likely to vary. A site visit is critical to locate new ground disturbance in the location with the least impact to grouse habitat.

[7] Visual concealment of vertical infrastructure can minimize the documented behavioral avoidance of such structures by sage-grouse and other grouse species, avoidance likely due to the association between vertical features and predator perches (Braun 1998, Pruett et al 2009).

[8] The BLM will site and construct new infrastructure such that PFC condition is maintained or improved.

Strategic Committee, RCP Steering Committee, agency policy, and/or full agreement by the implementing agencies for inclusion as Standard Minimization Measures. At a minimum, meetings between the implementing agencies and the USFWS will be used to update the CCA *(See Sections 9 & 10)*.
  - New or updated science will be incorporated into management direction via these committees, the policy of the implementing agency, and/or by full agreement by the implementing agencies.

- In order to accommodate this adaptive element, the permitting agency will reserve the right to require additional modifications to all permitted structures, should they be necessary to minimize impacts to Gunnison sage-grouse.
  - Such modifications may be developed and recommended by the Strategic Committee, RCP Steering Committee, agency policy, and/or full agreement by the implementing agencies.
  - At such time that modifications are required, the permit holder may elect to develop a phased implementation schedule in cooperation with the permitting agency.

## 4.3. Travel Management & Access

With respect to recreational and/or public access, new roads and trails will be considered in the context of comprehensive travel management and/or land-use plans. A trail or road proposal may meet sage-grouse standards set forth in the CCA, and therefore be covered under the USFWS conference opinion, but a trail or road proposal will also need to meet other established, specified objectives and standards not specific to sage-grouse. The same planning principles would apply to new recreation infrastructure/facilities.

The following standards generally apply to new routes proposed for recreation in occupied habitat, but a separate minimum set of grouse conservation measures are proposed for three geographic areas identified as Highly Managed, Urban Interface Recreation Areas to meet current and future recreation needs: *(See Appendix B)*. For the purposes of the CCA, "new" routes are those for which construction begins on or after the date that the CCA is signed; therefore, areas and routes identified in the 2010 USFS/BLM Travel Management Plan for possible construction would not be considered as the baseline habitat condition, but *additional* to the baseline.

### *4.3.1 Motorized Roads & Trails*

***A. Tier 1 Habitat:***

- Realignments for agency purposes that require new road or motorized trail construction and/or reopenings will be covered by the CCA if:
  - Realignment or reopening conserves or enhances sage-grouse habitat[9]; and

[9] An example of a realignment that may conserve or enhance sage-grouse habitat is the realignment of existing routes out of brood-rearing habitat into other seasonal habitat types, given the relative scarcity of brood-rearing

- Decommissioned road/trail segments that result from realignment or reopening will be reclaimed[10]; and
  - Standard minimization measures are applied (*Section 4.2*).

- ROW/easement access for private applicants that requires road construction and/or reopenings will be covered by the CCA if :
  - Demonstration that the proposed access route is the only reasonable, feasible option, and no sufficient alternative access is available; and
  - Accompanied by offsite/compensatory mitigation at a ratio >1 acre reclaimed: 1 acre disturbed; and
  - Standard minimization measures are applied (*Section 4.2*).

***B. Tier 2 Habitat:***

- New roads and motorized trails and reopenings will be covered by the CCA if:
  - Accompanied by offsite mitigation at ratio of 1 acre reclaimed: 1 acre disturbed; and
  - Standard minimization measures are applied (*Section 4.2*).

### *4.3.1 Nonmotorized Trails*

***A. Tier 1 Habitat:***

- Realignments will be covered by the CCA if:
  - Realignment conserves or enhances sage-grouse habitat or other important natural resource (riparian areas); and
  - Decommissioned trail segments that result from realignments will be reclaimed; and
  - Standard minimization measures are applied (*Section 4.2*).

- New routes will be covered by the CCA if:
  - These routes would consolidate existing designated and user-created routes[11]; and
  - "Consolidation" is accomplished via decommissioning and reclaiming the replaced routes at a ratio > 1 acre reclaimed: 1 acre disturbed; and

---

habitat in the Basin. Such net benefit to grouse habitat should be documented in the NEPA planning process and reported to USFWS in the annual CCA reports.

[10] The reclamation standard will be determined and documented in site-specific NEPA. Detailed further in Section 6.3.

[11] For USFS and BLM, existing designated/system routes and user-created/nonsystem routes are defined by the 2010 Travel Management Plan (TMP) and subsequent Travel Management Implementation NEPA documents. For NPS, these are defined in the Curecanti National Recreation Area Motorized Vehicle Access Plan/Environmental Assessment, the NPS asset management system, and in the NPS GIS database.

- Signs are installed to ensure pets are leashed on the route during identified critical biological periods, with the exception of permitted outfitting activities; and
- Standard minimization measures are applied (*Section 4.2*).

***B. Tier 2 Habitat:***

- New routes will be covered by the CCA if:
  - Accompanied by offsite mitigation at ratio of 1 acre reclaimed: 1 acre disturbed; and
  - Standard minimization measures are applied (*Section 4.2*).

## 4.4. Miscellaneous Infrastructure

### *4.4.1 Utility Lines & Pipelines*

*Note: Includes amendments on existing ROWs/easements for construction* ***beyond*** *the footprint of the original ROW authorization/easement permit. Routine maintenance and reconstruction within the footprint of the original ROW authorization/easement permit are covered in Section 5.4.*

If proposal is for a major project, such as major transmission line construction, then it would fall outside the scope of the CCA and not be covered under the USFWS conference opinion. A major project would entail one or more of the following:

- > 5 acres permitted area OR
- > 25 feet utility ROW permitted area OR
- >.5 mile aboveground infrastructure (not including buried utilities, buried pipelines).

***A. Tier 1 Habitat:***

1. *For a line proposed through Tier 1 only or Tier 1 and Tier 2 habitat, each of the following standards apply in order to be covered under the CCA:*
   - Avoid Tier 1 to the maximum extent feasible, and demonstrate full consideration of this alternative.

2. *If unable to avoid,*
   - Co-locate new utility line on existing overhead lines, to the maximum extent feasible; and
   - Apply standard minimization measures (*Section 4.2*).

3. *If unable to co-locate on existing overhead lines,*
   - Bury line (vertical structure avoided); and

    - Co-locate buried line within existing comparable development footprints (roads, other pipelines) to the maximum extent feasible;[12] and
- Apply standard minimization measures (*Section 4.2*).

***B. Tier 2 Habitat:***

*1. For a line proposed only in Tier 2 habitat, each of the following standards applies in order to be covered under the CCA:*

- Co-locate new utility line on existing overhead lines, to the maximum extent feasible; and
- Apply standard minimization measures (*Section 4.2*).

*2. If unable to co-locate,*

- Bury line (vertical structure avoided) to the maximum extent feasible, and demonstrate full consideration of this alternative; and
- Co-locate buried line within existing comparable development footprints (roads, other pipelines) to the maximum extent feasible; and
- Apply standard minimization measures (*Section 4.2*).

*3. If unable to bury,*

- Offsite/compensatory mitigation required at a ratio of 1:1, mitigated area: impacted area; and
- Install the most effective perch deterrents available on all power poles for the proposed segment; and
- Apply standard minimization measures (*Section 4.2*).

### 4.4.2 Communication Sites, MET Towers[13], & Comparable Infrastructure

***A. Tier 1 Habitat:***

*For communication sites, MET towers, and comparable infrastructure, each of the following standards apply in order to be covered under the CCA:*

- Co-locate new equipment on existing communication tower, other comparable structure, and/or visually conceal[14] structure in a forested area; and

[12] Design criteria largely consistent with BLM WO IM 2010 – 071, which advises that proposed transmission lines be routed outside of priority sage-grouse habitat. Enabling the transmission line to be buried in Tier 1 habitat provides some flexibility to achieve the desired conservation outcome: avoiding additional vertical infrastructure in Tier 1 sage-grouse habitat.

[13] Meteorological towers. BLM IM 2010-22 advises that the siting of new temporary MET towers be avoided within 2 miles of active sage-grouse leks, unless they are located out of the direct line of sight of the active lek. The design criteria detailed above should achieve a comparable and higher standard by requiring co-location of MET towers and comparable equipment with existing infrastructure in all occupied habitat.

- Apply standard minimization measures (*Section 4.2*).

*For associated access routes:*

- Use impacted areas to the maximum extent feasible: utilize system roads and nonsystem roads; and
- Apply standard minimization measures (*Section 4.2*).

*If there is no existing access,*

- Demonstrate that the proposed access route is the only reasonable, feasible option, and no sufficient alternative access is available; and
- Apply offsite mitigation standards for new access routes, consistent with *Section 4.3.1, Motorized Roads;* and
- Apply standard minimization measures (*Section 4.2*).

***B. Tier 2 Habitat:***

*For communication sites, MET towers, and comparable infrastructure, each of the following standards apply in order to be covered under the CCA:*

- Co-locate new equipment on existing communication tower or other comparable structure, to the maximum extent feasible;
- Apply standard minimization measures (*Section 4.2*).

*If unable to co-locate on comparable structures,*

- Co-locate within existing comparable development footprints (proximal to other vertical infrastructure) and/or forested areas; and
- Incorporate each of the mitigation measures in the USFWS Interim Guidelines on the Siting, Construction, Operation and Decommissioning of Communication Towers *(See Appendix C);* and
- Apply standard minimization measures (*Section 4.2*).

*For associated access routes:*

- Use impacted areas to the maximum extent feasible: utilize system roads and nonsystem roads; and
- Apply standard minimization measures (*Section 4.2*).

*If there is no existing access,*

- Demonstrate that the proposed access route is the only reasonable, feasible option, and no sufficient alternative access is available; and
- Apply offsite mitigation standards for new access routes, consistent with *Section 4.3, Motorized Roads*; and

[14] Visual concealment of vertical infrastructure can minimize the documented behavioral avoidance of such structures by sage-grouse, avoidance likely due to the association between vertical features and predator perches (Braun 1998, Pruett et al 2009).

- Apply standard minimization measures (*Section 4.2*).

### Fences

**A. *Tier 1 and 2 Habitat:***

*New fences will be covered by the CCA if:*

- Fence is necessary to improve habitat conditions for sage-grouse; and
- Built to general wildlife standards, as recommended by CPW (Hanophy 2009):
  - Posts at minimum 16' intervals; and
  - Gates, drop-downs, removable fence sections or other passages where animals concentrate and cross; and
  - If area is identified as high-risk for grouse collision based upon topography, use flagging to mark the fence[15];
    - Otherwise, use a high-visibility wire, flagging or other visual markers for the top; and
  - Fencing wire placed on the side of the fence posts where the domestic animals are located; and
  - Smooth wire on the bottom; and
  - Height of top rail or wire should be 42" or less; and
  - At least 12" between the top two wires; and
  - At least 16" between the bottom wire or rail and the ground; and
- Standard minimization measures are applied (*Section 4.2*).

### 4.4.4 Additional Small-Scale Infrastructure

Examples: signs, kiosks, vault toilets, vehicle barriers, concentrated parking areas, culverts, gates, cattle guards, exclosures, and water developments not otherwise detailed above. Does not include ground disturbance and infrastructure associated with minerals and energy development; such projects are not within the scope of this CCA and any associated Section 7 conference or consultation.

**A. *Tier 1 Habitat:***

- New infrastructure will be covered under the CCA if:
  - Total acres of new ground disturbance is < ¼ acre; and
  - Infrastructure is sited at least .6 miles from active leks, with the exception of signs and culverts along existing development footprints; and
  - Standard minimization measures are applied (*Section 4.2*).

**B. *Tier 2 Habitat:***

---

[15] Consistent with: BLM IM 2010-22, Managing Structures for the Safety of sage-grouse, Sharp-tailed grouse, and Lesser Prairie-chicken, or as updated; USFS R2 SUPPLEMENT 2600-2004-1 2011, Section 2631.1, sage-grouse and Sagebrush Habitats.

- New infrastructure will be covered under the CCA if:
    - Total acres of new ground disturbance is ≤ 1 acre; and
    - Standard minimization measures are applied (*Section 4.2*).

# 5 NEW CONSERVATION MEASURES: EXISTING DEVELOPMENT & ACTIVITIES

## 5.1. Goal, Scope & Function

***GOAL:***

In order to reduce existing net fragmentation in Tier 1 habitat and avoid additional net fragmentation in Tier 2 habitat:

- Specified impacts from existing human infrastructure and activities are avoided and minimized.
- Livestock grazing is managed to maintain and improve habitat conditions for sage-grouse.

***SCOPE:***

- Existing roads, trails, utility lines, including the maintenance and reconstruction of such infrastructure, access to and maintenance of existing water developments.
- Special recreation permits, including events and outfitters on federal lands. Seasonal closures to dispersed recreation are included, as such closures effect the management and permitting of events and outfitters.
- Grazing permits. Because of the landscape scale of grazing and grouse habitat, additional grazing conservation measures are identified to share the conservation responsibility amongst key partners. These measures – including coordinated allotment management planning across private, state, and federal boundaries, upkeep of data analysis unit plans for big game—will not be addressed in the Biological Assessment or conference opinion, but are necessary components of a range management system that ensures sage-grouse conservation.

***FUNCTION:***

Sections 4 & 5 are designed to function as a screening tool. Because Section 5 concerns existing land-use authorizations, such as ROW and easement reauthorizations and grazing and recreation permits, implementation of the identified conservation measures will ensure that continued authorizations receive coverage under the USFWS conference opinion. In the event that an authorization cannot meet these criteria, additional consultation with USFWS—outside that provided by the conference opinion and any subsequent adoption of the conference opinion as

the biological opinion— may be required if the authorized activity may affect the species or its critical habitat.

As noted in Section 2.3, the GUSG CCA is not a decision document, and as such, does not replace any need for site-specific NEPA analysis for new and ongoing land-use authorizations.

## 5.2. Travel Management

### 5.2.1 Closure Implementation

When implementing route closures under the 2010 Travel Management Plan (TMP) and the NPS Motorized Vehicle Access Plan (MVAP):

- Tier 1 habitat will be prioritized for reclamation work, to the extent feasible.[16]
- Using the Habitat Prioritization Tool and/or a route density map, reclamation options will be compared to optimize the size of intact, unfragmented Tier 1 habitat patches.[17]

### 5.2.2 Seasonal Closures

***Tier 1 & Tier 2 Habitat***

**A. Lek Season**

- **Motorized** travel is restricted during the lek season each year, and signatories to this CCA agree to continue implementing such closures (BLM, USFS, NPS, and Gunnison County. *See Figure*). Currently observed from approximately March 15 – May 15.[18] The closures apply uniformly to construction, maintenance, and access, including motorized public access, with the following exceptions:
  - Permittees
  - Access to private property
  - Hartman Rocks Recreation Area, north of powerline
  - Emergency maintenance
- Define approximate geographic boundary.

[16] sage-grouse habitat improvement is one of multiple resource concerns that will be taken into account to plan and prioritize closure implementation. When closed routes travel through Tier I and Tier 2 habitat, reclamation of Tier I segments alone may not be practical or desired from a management or habitat perspective. In such instances, reclamation of the entire closed segment may be preferred and implemented.

[17] See Section 6, Offsite Mitigation. Routes reclaimed after the date of the signed CCA and accompanying conference opinion may be "banked" as credits for future offsite mitigation, so long as monitoring demonstrates such reclamation to be successful.

[18] Spring closures to minimize disturbance to lekking grouse may be adjusted by the implementing agencies to accommodate changing environmental conditions, i.e., trend toward earlier lekking periods, etc.

- CCA signatories will install signs at major shooting areas within Tier 1 habitat or within .6 miles of active leks to encourage shooting only after 9am during the lek season, March 15-May 15.

## B. Severe Winters

The agencies recognize that winter is a critical biological period for sage-grouse, and that even moderate-frequency travel through grouse concentration areas during severe winters would result in physiological stress that likely reduce the overall fitness of individuals and flocks (Hupp and Braun 1989; GSRSC 2005).

Management Trigger:

- Severe winters would trigger a collaborative, interagency management decision to implement area closures to protect identified grouse concentration areas. Closure decisions will be made in the context of managing for multiple resources, including big-game concentrations, public recreation, range condition, etc.
- Severe winters would be identified via a collaborative, interagency management discussion using the following criteria:
  - Snow depth
  - Temperature
  - Snow condition/consistency
  - Prior year's range condition
- Though frequency of severe winters cannot be predicted, on average, severe winters occur every 10 years.
- All other winter conditions:
  - Unless research indicates further consideration, no additional winter timing restrictions would be implemented during non-severe winters.
  - General messaging to recreation community will encourage cross-country winter travel in Urban Interface Recreation Areas, higher elevations and forested areas.

Management Tools:

- Over-snow travel:
  - Agency may implement area closures through all or a portion of identified grouse concentration areas, restricting travel to existing roads.
  - Agency would implement closures to motorized cross-country travel at a minimum, and to all human use at a maximum.
    - If open roads lead to cross-country travel in closed areas, agency will consider closing specified roads as well.
- Timeframe:
  - In identified severe winters, closures would occur anytime between approximately December 1 and March 31.

- Emergency Closures:
  - The above grouse management tools are not intended to substitute for existing agency guidelines/policies regarding emergency seasonal closures. Emergency seasonal closures are implemented to protect a variety of natural resources.
  - Existing management tools for emergency seasonal closures:
    - CPW can implement temporary, emergency area closures during hunting seasons (Colorado Wildlife Commission Regulation 020-E-6).
    - The BLM, NPS, and USFS can implement temporary, emergency seasonal closures to identified federal lands pursuant to their regulatory authorities.

**C. Additional Seasonal Closures:**

- If research indicates additional restrictions are necessary to sustain the sage-grouse population, seasonal restrictions in identified seasonal grouse habitat may be applied to minimize disturbance during the following critical biological periods: nesting, brood-rearing, or winter.
- If and when additional seasonal restrictions are implemented, restrictions will be uniformly applied to construction, maintenance, and access, with the standard exceptions.

### 5.2.3 Recreation Events and Outfitters

***Tier 1 & Tier 2 Habitat***

- *Special use permits for recreation events, guides, and outfitters will be covered by the CCA if:*

  - Applicants comply with any existing public seasonal closures; and
  - Events and guides utilize designated open routes (vs. cross-country travel) as identified in the TMP (BLM, USFS) or MVAP (NPS); and
  - Recreation permits, including those for outfitters, are modified at renewal and issuance to allow for management flexibility in event of a severe winter;
    - I.e., *"When severe winter conditions are identified by permitting agency, in order to preserve natural resources, including sensitive species, the permitting agency reserves the right to restrict permittee's travel from identified areas and/or routes, consistent with restrictions that would be placed on general public access....approx. December 1 to March 31 ....;* and
  - The permitting agency demonstrates reasonable attempt to focus events and outfitters on/through areas outside of sage-grouse habitat, or to identified high-use, urban interface recreation areas. Nonetheless, certain activities require a specific resource, and implementing agencies recognize that not all activities can be located outside of sagebrush habitat.

## 5.3. Miscellaneous Existing Infrastructure

### 5.3.1 Overhead Utility Lines

***Tier 1 & Tier 2 Habitat***

- *Prior to ROW/easement renewal/amendment:*

  Routine maintenance and reconstruction that does not require ROW/easement amendments are covered under the terms and conditions of the original ROW/easement authorization. Nonetheless, participating permit holders may adopt the following voluntary measures:

  - During the course of routine maintenance within the footprint of the existing ROW/easement, install the most effective perch deterrents available on all power poles for that segment.
    - Agency biologists will identify recommended perch deterrents and cooperate with utilities to ensure such mechanisms meet any applicable code requirements.
  - Apply standard minimization measures, (*Section 4.2*), including:
    - Limit access and construction during the lek season, consistent with spring seasonal closures for general public. Emergency maintenance excepted from this provision.
    - Use integrated weed prevention practices for all construction and maintenance activity *(See Appendix A)*.

- *At ROW/easement permit renewal/amendment:*

  Construction within the footprint of the original authorization[19] will be covered by the CCA if:

  - As a condition of renewal or amendment approval, during the course of routine maintenance and upgrades that include pole/line replacement within the footprint of the existing right-of-way/easement, permit holders will install the most effective perch deterrents available on all power poles for that segment; and
  - The permitting agency reserves the right to require additional modifications to all powerline structures placed on rights-of-way/easements, should they be necessary to minimize impacts to Gunnison sage-grouse, consistent with *Section 4.2, Standard Minimization Measures*; and
  - Standard minimization measures are applied as terms and conditions of the permit (*Section 4.2*), including:
    - Timing restrictions for access and construction, consistent with spring seasonal closures for general public. Emergency maintenance excepted from this provision; and

[19] See Section 4.4 for construction *beyond* the footprint of the original ROW/easement authorization.

- Integrated weed prevention practices used for all construction and maintenance activity *(See Appendix A)*.

### *5.3.2 Water Developments*

***Tier 1 & Tier 2 Habitat***

- *Right-of-way/easement authorizations and renewals through occupied habitat on federal lands to access and maintain existing water developments will be covered by the CCA if:*
  - Standard minimization measures are applied as terms and conditions of the permit (*Section 4.2*), including:
    - Timing restrictions for access and construction, consistent with spring seasonal closures for general public. Emergency maintenance excepted from this provision; and
    - Integrated weed prevention practices are used for all construction and maintenance activity *(See Appendix A)*.

## 5.4. Livestock Grazing

Parties to this agreement recognize the following:

- Continuation of working ranches in the Gunnison Basin is important to sage-grouse conservation.
- Public land grazing allotments are critical to continuation of these ranches.
- All Gunnison sage-grouse habitat is important, irrespective of land ownership.
- Both wild ungulate and domestic livestock grazing occur on the landscape, and management of one must recognize the impacts of the other.

***Tier 1 & Tier 2 Habitat***

*Grazing permit renewals in occupied habitat on federal lands will be covered under the CCA if each of the following five measures is implemented:*

1. RCP/CCA grazing management guidelines[20] *(See Appendix D)* continue to be incorporated into all permits and any associated allotment management plans and/or coordinated management plans in occupied sage-grouse habitat (BLM, USFS, NRCS, NPS). *RCP Grazing Objective 1-1, p. 211*

[20] RCP **grazing management** guidelines—a list of Best Management Practices (pgs. 212-213 of RCP) are distinct/different from the RCP **(structural) habitat** guidelines – on-the-ground vegetation parameters necessary for maintenance of sage-grouse habitat (Appendix H of RCP).

Allotments and/or pastures containing occupied habitat will be managed for both breeding and summer/fall herbaceous heights RCP habitat guidelines.

**2.** At permit renewal or in annual operating instructions for each grazing permit containing occupied sage-grouse habitat, if not earlier, an agency IDT, in cooperation with the permittee, will use the Habitat Condition Assessment (*See Section 7.2*) to incorporate habitat guidelines for herbaceous heights as a term and condition of the permit.[21]

a. For riparian areas, Gunnison Basin GUSG Conservation Plan guidelines for herbaceous heights will be incorporated as a term and condition of the permit.

b. For non-riparian habitat, RCP guidelines for herbaceous heights will be incorporated as a term and condition of the permit.

c. Short-term/annual monitoring points will be selected by an IDT, including permittees, to monitor compliance with herbaceous height standards. (*See Section 7.2., which prescribes indicators and monitoring methodology.)*

d. For permittees participating in cooperative monitoring, implementing agencies will conduct on-the-ground review of the monitoring protocol.

**3.** At permit renewal or in annual operating instructions for each grazing permit containing occupied sage-grouse habitat, incorporate into all applicable permits, allotment management plans, and coordinated management plans the following framework of actions that will take effect if herbaceous heights are not met by the following timelines:

[21] For the purposes of the CCA, herbaceous heights will only become a "standard" if and when they are incorporated into a grazing permit through this process. Otherwise, the habitat indicators will be used as long-term objectives to move toward via management of relevant factors.

a. If monitoring shows that herbaceous heights are not meeting the terms and conditions of the permit and changes in grazing are needed, changes will be coordinated with a team approach that involves the permittee.[22]
b. If the sagebrush habitat structure is a limiting factor to achieving the guidelines, habitat treatments will be considered as funding and opportunities become available.[23]
c. If permitted or dispersed recreation is identified as a causal factor for the failure to meet the guidelines, agencies will address as practicable.
d. If other land use authorizations and factors are limiting factors to achieving the guidelines, address as appropriate.

***After year 1:***

If the Authorized Officer determines via compliance monitoring that an allotment is not meeting habitat guidelines for herbaceous heights and due in part or whole to current livestock grazing:

- Adjust intensity, timing, distribution and/or duration of livestock grazing for year 2. Employ grazing BMPs *(See Appendix D)*.
- Address any other contributing factors, as appropriate.

If the Authorized Officer determines via compliance monitoring that an allotment is not meeting habitat guidelines for herbaceous heights and not due to current livestock grazing:

- Record adequate monitoring data to determine cause.
- Address any other contributing factors, as appropriate.

If the Authorized Officer determines via compliance monitoring that an allotment is not meeting habitat guidelines for herbaceous heights and the cause is unclear:

- Conduct more monitoring in year 2, including key areas of livestock use and important habitat areas for grouse, pre-season, and during the grazing season as needed to determine the cause.
- Adjust intensity, timing, distribution and/or duration of livestock grazing for year 2. Employ grazing BMPs *(See Appendix D)*.

***After year 2:***

[22] Consistent with grazing regulation 4130.3-3, which requires the authorized officer to provide affected permittees "an opportunity to review, comment and give input during the preparation of reports that evaluate monitoring and other data that are used as a basis for making decisions to increase or decrease grazing use, or to change the terms and conditions of a permit or lease."

[23] Habitat treatments are not covered by the CCA and associated conference opinion; they may require separate conference or consultation with USFWS.

If the Authorized Officer determines via compliance monitoring that an allotment is not meeting habitat guidelines for herbaceous heights for 2nd consecutive year due in part or whole to current livestock grazing:

- Adjust intensity, timing, distribution, and/or duration of livestock grazing for year 3. Employ grazing BMPs *(See Appendix D)*.
- Address any other contributing factors, as appropriate.

If the Authorized Officer determines via compliance monitoring that an allotment is not meeting habitat guidelines for herbaceous heights for 2nd consecutive year and not due to current livestock grazing:

- Record adequate monitoring data to determine cause.
- Address any contributing factors, as appropriate.

If the Authorized Officer determines via compliance monitoring that an allotment is not meeting habitat guidelines for herbaceous heights for 2nd consecutive year and the cause is unclear:

- Employ additional adjustments to livestock grazing and to other contributing factors for year 3.
- Continue additional monitoring in year 3, key areas of livestock use and important habitat areas for grouse, etc.

***After years 3-5***:

If the Authorized Officer determines via compliance monitoring that an allotment is not meeting habitat guidelines for herbaceous heights for 3rd-5th consecutive year due in part or whole to current livestock grazing:

- Employ longer-term adjustments to grazing, including changing grazing system, reducing stocking/season of use, rest, etc.
- If appropriate, treat/restore structural habitat[24].
- Address any other contributing factors, as appropriate.

[24]Habitat treatments may require additional conference or consultation with USFWS.

If the Authorized Officer determines via compliance monitoring that an allotment is not meeting habitat guidelines for herbaceous heights for 3rd-5th consecutive year and not due to current livestock grazing:

- Continue to manage other factors and monitor progress.

For undetermined causes, continue to implement applicable BMPs to move towards sage-grouse habitat guidelines. Continue to monitor progress towards meeting relevant guidelines.

**4.** Conduct adequate monitoring of herbaceous heights on active grazing allotments in occupied sage-grouse habitat in accordance with the monitoring protocols outlined in the CCA (BLM, USFS). *RCP Grazing Objective 2-1, p. 212. (See Section 7.2).*

a. Short-term monitoring[25] will be conducted during season of grouse use (nesting, brood-rearing, etc.) for early-season grazing, and following livestock use for late-season grazing (*See Section 7.2)*.

b. Prioritize limited funding to ensure adequate monitoring is accomplished in Tier 1 habitat.

**5.** Manage grazing in riparian areas, swales, and wet meadows to improve habitat conditions.

*Note: These are included in Appendix D, Grazing Management Guidelines, but are also included here to emphasize the importance of maintaining and improving riparian and other brood-rearing habitat.*

a. Encourage continued use of irrigation water rights for existing hay meadows, particularly those that maintain riparian areas on allotments in sage-grouse habitat. *CCA Team*

*b.* Manage grazing in riparian areas to maintain or move towards the desired riparian vegetation condition. *CCA Team*

c. New spring developments and spring reconstructions will be designed to minimize changes to the natural flow of the water. *CO GrSG Conservation Plan – Grazing Management Options, p E-3*

- Develop any new alternative livestock water sources outside of naturally occurring riparian areas (develop wells, install pipelines, etc.). *CCA Team; RCP Grazing Management Guidelines for GUSG, #9, p.213*
- Where possible (when sufficient water is present to support riparian habitat and supply livestock water), redesign existing water developments that are in naturally occurring riparian areas to protect riparian habitat and pipe a portion of the water to troughs that are well away from naturally occurring riparian habitat. *CCA Team; RCP Grazing Management Guidelines for GUSG, #9, p.213*

---

[25] Minimum short-term monitoring information will include grass and forb stubble height along transects, in addition to_photo points (See Section 7.2 and Appendix E).

   d. Salt at least 1/4 mile away from riparian areas, to the extent feasible within existing pasture boundaries.
e. Move 95% of all livestock from one pasture to the next within 3 days of scheduled move, with 100% moved within one week from scheduled move.
f. Maintain at least 4" of stubble height (residual material) on hydrophytic plant species (wide-leaved sedges such as beaked sedge, water sedge, rushes, tufted hairgrass, and spikerush) in riparian areas throughout the growing season.[26] *Gunnison Basin GUSG Conservation Plan*

*Furthermore, the following grazing conservation measures are identified to share the conservation responsibility amongst key partners:*

**1.** Seek opportunities to achieve greater flexibility in the distribution of current AUMs across the landscape in order to improve GUSG habitat.[27]

a. Inventory inactive grazing allotments on state and federal lands. Identify vacant allotments that may enable short and long-term flexibility in the grazing system. *(Initial inventory complete.)*
b. If climate events delay the turnout date on federal lands, short-term options for flexibility include, subject to NEPA adequacy requirements:
  - The agencies will work with the permittees to limit the length of delay and allow the days delayed to be added to extend the season, as long as grouse standards can be met.
  - BLM and Forest grazing seasons may be changed to aid important grouse habitat on private land from being grazed beyond the standards.
  - If the permittee is able to find alternative grazing capacity at the start of the season, then an equivalent amount of time may be added to the end of the grazing season on federal lands.
c. Long-term options for flexibility:
  - As opportunities arise, create coordinated Allotment Management Plans to improve GUSG habitat across private and federal lands (NRCS, BLM, USFS, NPS, CPW, private landowners/stockgrowers).

### 5.5. Wild Ungulate Grazing

[26] This will help these deep-rooted plants hold onto sediment, sustain streambanks, and support water table levels (Clary & Leininger 2000, Wyamn et al 2006).

[27] Because of the landscape scale of grazing and grouse habitat, additional grazing conservation measures are identified to share the conservation responsibility amongst key partners. These measures – including coordinated allotment management planning across private, state, and federal boundaries, upkeep of data analysis unit plans for big game—will not be addressed in the Biological Assessment or conference opinion, but are necessary components of a range management system that ensures sage-grouse conservation.

*The following RCP strategies, pertinent to big game management, are continued in the GUSG CCA:*

- Participate in reevaluation of Data Analysis Unit (DAU) plans for managing specific populations of big game, particularly for maintaining elk populations at management objectives (CPW, BLM, USFS, and private landowners). DAU reevaluation will occur consistent with state laws and regulations and consistent with established protocols, including Wildlife Commission review.
- Develop wild ungulate winter habitat objectives to meet seasonal GUSG requirements (CPW, BLM, USFS, and private landowners).
- Develop strategies to draw ungulates away from treatment areas to allow proper recovery (CPW, BLM, USFS, and private landowners).

*Furthermore*,

- Implementing agencies commit to share and use pertinent short and long-term sage-grouse habitat monitoring data to inform DAU planning (CPW, BLM, and USFS).
- Implementing agencies recognize that both wild ungulate and domestic livestock grazing occur on the landscape, and management of one must recognize the impacts of the other.

## 5.6. Integrated Weed Management

***Tier 1 & Tier 2 Habitat***

*Ground disturbance associated with the CCA actions and general road maintenance:*

In order for signatories to receive coverage under the CCA and programmatic conference opinion for ground disturbance associated with the CCA action plan general road maintenance on federal lands, signatories will:

- Implement integrated weed prevention BMPs for road maintenance and ground disturbance operations, consistent with *Appendix A, Section I*.
- Incorporate integrated weed prevention terms and conditions for road maintenance and ground disturbance operations, consistent with *Appendix A, Section II*. These terms and conditions shall apply to the signatory as well as any signatory-contracted operators that maintain and construct infrastructure within Gunnison sage-grouse habitat on federal lands.

# 6 OFFSITE MITIGATION

In the fields of land management and conservation biology, the mitigation hierarchy typically includes three steps prior to offsite mitigation: avoid, minimize, restore. Although the CCA applies such steps for new infrastructure in sage-grouse habitat, the CCA also takes a precautionary and conservation-oriented approach to include off-site mitigation as a design criterion for specific infrastructure projects. Whereas biodiversity offsets are frequently used in situations where development is sought despite detrimental environmental impacts (McKenney 2005Gibbons and Lindenmayer 2007), such as during the development of interstate transmission lines and oilfields, it is less commonly employed for small-scale projects such as those covered in the CCA. Generally, on-site mitigation and minimization measures are applied during the environmental review and permitting processes for small-scale projects such that off-site mitigation is not required. Yet such a project-by-project approach does not account for the cumulative impacts of even small-scale development.

Triggers for offsite mitigation in the GUSG CCA include[28]:

1. *Project impacts cannot be mitigated to an acceptable level onsite.*

   In the GUSG CCA, design criteria have been developed such that the maximum feasible level of on-site mitigation is applied. Yet with respect to the concrete objectives—avoid net Tier 2 habitat loss and achieve a net gain in Tier 1 habitat—permitting certain permanent land-use authorizations in sage-grouse habitat cannot be fully mitigated on-site. These actions, as identified above, include:

   - New road construction and reopenings
   - New motorized trail construction and reopenings
   - New nonmotorized trail construction and reopenings
   - Aboveground utility lines

2. *It is expected that the proposed land use authorization as submitted would not be in compliance with important resource objectives.*

   To accomplish the CCA's habitat objectives, yet to allow continued, unavoidable, and viable land-use authorizations in the affected area that are consistent with the mission of the authorizing agency, offsite mitigation is included as a design criterion in order for specified new, ground-disturbing infrastructure to be covered under the CCA.

[28] Offsite mitigation in the GUSG CCA is consistent with BLM WO IM 2008-204.

## 6.1. Geographic Parameters

At a maximum, the service area for offsite mitigation implementation is limited to the defined affected area of the CCA: federal lands in occupied sage-grouse habitat in the Gunnison Basin. At a minimum, distance between the action area and the offset area is a project-specific discretionary determination, and should be made during project planning and authorization processes. By definition, offsite mitigation consists of compensating for resource impacts by replacing or providing substitute resources or habitat at a different location than the project area. For the purposes of the CCA, the offset action should not be located within the action's direct impact area, i.e., permitted area. Further, the functional value of the offset may be overshadowed if located within the action's functional impact area. Ultimately, the offset should be located to maximize the net benefit to GUSG habitat in the Gunnison Basin.

## 6.2. Accounting

While replacement ratios are specified in the CCA to account for the relative habitat value of Tier 1 versus Tier 2 habitat, there are admittedly more complex accounting systems to determine the size of offsets based upon on-the-ground assessments of habitat quality and function. Habitat assessments of impact and offset sites can provide thorough information to compare their relative values, but such efforts are time-consuming and costly, and are generally inefficient for small-scale projects. Another recent method involves identifying a biologically-based offset currency, based upon anticipated population declines from the project impact (Doherty e al 2010), but existing sage-grouse science limits applicability to development with established density-dependent effects on lek counts and bird distribution, such as oilfield development; paved, high-frequency roads; residential development (Aldridge et al 2011). No such impacts are covered in the CCA.

Instead, the CCA relies on the landscape-level delineation of relative habitat value in the Habitat Prioritization Tool to arrive at more simple, acre-for-acre replacement ratios to meet the stated habitat objectives: >1:1 in Tier 1 habitat; 1:1 in Tier 2 habitat.

If the impact occurs in Tier 1, yet the replacement or offset action is identified in Tier 2, then the standard >1:1 ratio would apply, on the condition that the offset action is calculated to bump the offset area from Tier 2 to Tier 1 classification.[29] If the offset action would not result in reclassifying the offset area as Tier 1 habitat, then a 3:1 replacement ratio would be necessary.

Yet while many offset policies identify replacement ratios and calculate acreage accordingly, i.e., a 2:1 replacement ratio for a 10-acre project would simply require 20 offset acres, critics of such an approach argue that time lags and success probability hinder their reliability in achieving no net loss objectives (Kiesecker et al 2010). Although preservation actions deliver value from the outset, restoration actions may take years to reach expected potential and provide full

[29] The effect of an offset action on the categorization of that area can be assessed with the Habitat Prioritization Tool.

conservation benefit, thus rendering a time lag component that is not accounted for in simple replacement ratios. With respect to success probability, or the likelihood of a particular type of restoration to reach full conservation potential, a simple replacement ratio assumes that all restoration approaches are guaranteed equal results, irrespective of ecological site characteristics and methods. Although most restoration actions completed as offsite mitigation in the CCA will likely be road and trail decommissioning, other restoration actions may surface as viable currency. Methods may vary, as well as the potential of a site to be successfully reclaimed. A high-medium-low probability of success can be estimated case-by-case from experience and professional judgment.

By accounting for both factors (See Table 6.1), offsite mitigation accounting in the CCA will include a back-calculation of the total offset acreage required in order to meet the identified habitat objectives and corresponding replacement ratios.

### *Time lags*

- The time to maturity of a restoration action can be estimated to apply a discount rate.
- Over time, the accounting sheet for offset actions will be adjusted to reflect actual time lag, pending conservation maturity.
    - *Example:* .5 mile trail is reclaimed, estimated to take 5 years to reach maturity, which starts out at .49 miles of credit. Yet monitoring data may indicate restored habitat function within 3 years; in this case, the credits would be adjusted to ~.5 miles. "Credits" may increase or decrease, depending upon the actual time lag to conservation maturity.
- In the event that an offset action constitutes fee title acquisition or assurances via a conservation easement on private land in grouse habitat, time lag is estimated at 0 years (Kiesecker et al 2010).

### *Success probability*

- The probability of the conservation action's success can be roughly estimated, based upon past restoration actions in the same vegetation communities/ecological types.
- Over time, the accounting sheet for offset actions will be adjusted to reflect actual performance, pending conservation maturity.
    - *Example:* .5 mile trail is reclaimed, estimated to be 90% successful, based upon past success with the chosen methods and in the particular ecological types, which equals .45 miles of credit. Yet after the expected number of years to reach maturity, only 25% of the segment appears in a trend toward meeting the sage-grouse habitat guidelines, the credits would be adjusted to .125 miles... At that point, the implementing agency may decide to reinvest effort on this site to make up the difference, or it may make up the missing credits elsewhere on the landscape. "Credits" may increase or decrease, depending upon the actual performance of the offset action.

- In the event that an offset action constitutes fee title acquisition or assurances via a conservation easement on private land in grouse habitat, success likelihood is estimated at 100% (Kiesecker et al 2010).

**Table 2. Calculating total conservation benefit from different offset actions.**

| Impact Size multiplied by replacement ratio = Offset Goal | | |
|---|---|---|
| 1/2 acre of Tier 1 habitat impacted; 2:1 replacement ratio requires minimum 1 acre restored | | |
| ***Offset portfolio*** | ***Site A, Tier 1*** | ***Site B, Tier 1*** |
| Acres at offset site suitable for conservation | 1/2 acre restoration | 1/3 acre restoration |
| Proposed conservation action | Decommissioning a closed road | Redesigning a water source to relocate livestock out of riparian |
| Probability of success of conservation action | 90% | 100% |
| Time lag to conservation maturity | 5 yrs | 0 yrs |
| Effective discount rate | 0.5% | 0% |
| Offset credits | .44 acres | .33 acres |
| Minimum offset credits required | 1 acre | 1 acre |
| Implicit ratio, | *(may be >2:1)* | |
| Total offset acres : impact acres | 2:5 | 1:3 |
| Minimum replacement ratio, | | |
| Offset credit acres : impact acres | 2:1 | 2:1 |
| Additional acres needed to meet ratio? | .56 acres | .67 acres |
| Cost/acre for offset | $500/acre | n/a |
| Total cost | $250 | $1000 fixed cost |
| Cost/offset acre credit delivered | $568/acre | $3030/acre |

(Table modified from Kiesecker et al 2010, p. 178)

## 6.3. Currency: Offset Actions

### *6.3.1 Roads & Trails*

*For public and recreational road and trail construction and reopenings, offsets actions will include:*

- Decommissioning old routes to Level 3 or higher and monitoring to ensure public compliance with the route closure. While Level 3 or higher is generally preferred, there may be circumstances in which ground disturbance of a portion of a route should be minimized due to a) use of site openness for lekking grouse, and/or b) risk of spread of invasives. Such exceptions will be documented on a case-by-case basis in the annual reports submitted by the agency biologists.

A. Level of Decommissioning done by hand, passenger vehicle, or ATV/UTV[30]

[30] BLM terms and framework.

Level 1 – Allow the closed road to naturally revegetate.
Level 2 – Install sign with a hand crew
Level 3 –These activities will be done by a hand crew.

a) Install/Remove worm fence/barricade, buck and pole fence/barricade, rock barriers, or gate.
b) Place slash on the road surface, drop trees, dead plant vegetation, plant live vegetation, transplant live vegetation from nearby areas, and install erosion products such as coir logs (i.e. wattles) , mulch, and erosion control blankets.
c) Install and remove cross ditches/drains; check dams; and water bars.
d) Hand crews rototill or scarify the ground.

B. Levels of Decommissioning done with heavy equipment (excavator, dozer, track hoe).

Level 4 – Physical Barricades. Install gates, rock blockades or trees with mechanized equipment, such as a tracked excavator or dozer.
Level 5 – With mechanized equipment, rip the road; sub-soil the road; or construct water bars or ditches within and outside of the road prism.
Level 6 – With mechanized equipment, re-contour the road prism by pulling back all cut and fill slopes in addition to inboard ditches.
Level 7 –With mechanized equipment, remove all drainage structures including cross drains (culverts, rolling dips, and water bars); stream crossings structures (culverts); and unstable fills.

*For private ROW access that necessitates road construction or reopenings, offset actions will include:*

- An in-lieu fee that will be calculated and charged to the project applicant, based upon the average cost of decommissioning and reclaiming a comparable area of road to Level 3 or higher. Timeline for completion of the on-the-ground offset action by the authorizing agency will be identified in any NEPA planning documents and the annual reports to USFWS; or
- Additional offset actions may be identified by the project applicant. The suitability of the action to meet net habitat objectives will be determined on a case-by-case basis by the implementing agency biologists, in cooperation with USFWS.

### 6.3.2 Utility Lines

Offset actions may include:

- Additional buried utility lines on public lands;[31] or
- An in-lieu fee will be calculated and charged to the project applicant, based upon the average cost of reclaiming an area of habitat comparable to the permitted area of impact.

[31] Action is additional vs. redundant, i.e., the action is not otherwise required.

Timeline for completion of the on-the-ground offset action by the authorizing agency will be identified in any NEPA planning documents and the annual reports to USFWS; or

- Additional offset actions may be identified by the project applicant. The suitability of the action to meet net habitat objectives will be determined on a case-by-case basis by the implementing agency biologists, in cooperation with USFWS.

## 6.4. Banking

- Subsequent to the date of the signed CCA and conference opinion, utility companies may "bank" miles of utility lines they bury on public lands to serve as future credit toward mitigation requirements, so long as the action is not otherwise required.
- Subsequent to the date of the signed CCA and conference opinion, agencies and their recreation partners may "bank" acres of routes they reclaim in sage-grouse habitat to serve as future credit toward mitigation requirements.

## 6.5. Timeline

Required timelines for completing offset actions will be identified in the NEPA planning documents and/or reported to USFWS in the annual reports. If a "banked" credit is used to meet the offset requirements of a particular project, that will likewise be identified in the annual reports to USFWS.

- In the case of a) realignments and b) recreation trails that will consolidate existing dispersed recreation, new open routes may be necessary in order to effectively close the old segments or routes.
- Otherwise, offset actions should be completed concurrent with or prior to new construction activities.

# 7 MONITORING PLAN

*"The vegetation structure guidelines we present… should be interpreted as minimum standards, and managers should strive to meet the full potential of any given site. These habitat guidelines should be considered adaptive, and interim in nature. The guidelines were developed from actual grouse use sites, but should be considered as guidance until further and more specific and quantified data are available from grouse research, or until the development of a rigorous mapping protocol. These guidelines are intended to represent a variety of landscape situations. Landscapes are diverse; some areas on the landscape will not meet these guidelines, some areas will meet the guidelines, and some areas will exceed the guidelines. As new information is collected, these guidelines, as well as the plan are meant to be adaptable."*

RCP App H: GUSG Structural Habitat Guidelines, H-5.

To this end, grouse habitat monitoring will be used to:

- characterize the variability across the landscape with "further and more specific and quantified data";
- better enable managers "to meet the full potential of any given site" to provide sage-grouse habitat via livestock management and habitat reclamation, as outlined in the CCA;
- track the habitat quality and conservation maturity of offsite mitigation in the form of restoration.

## 7.1. Habitat Condition Assessment & Long-term Habitat Monitoring

**NOTE: This section is not specific to grazing, but is a component of an integrated vegetation monitoring plan that is relevant to multiple program areas and uses.*

Objective:

- Monitor and assess sage-grouse habitat conditions relative to RCP sage-grouse Structural Habitat Guidelines for nesting and brood-rearing sagebrush habitat at the landscape scale.
- Use RCP/GUSG Rangewide Steering Committee 2007 habitat monitoring protocol
- Habitat data will be used ***in conjunction with*** other monitoring data (grouse and non-grouse) to inform Land Health Assessments and Determinations (BLM) and relevant long-term management actions.
    - Participants recognize in order to describe grouse habitat conditions at the ***allotment*** level, additional information may be necessary, including annual stubble height measurements and additional transects read with the RCP habitat monitoring protocol.

1. ***Compile and analyze existing baseline data.***
    a. Agencies will examine existing data that can be compared to the Rangewide Conservation Plan, Appendix H, GUSG Structural Habitat Guidelines. Potential data sets include the Habitat Partnership Program inventory, CPW baseline data[32], trend studies, and sagebrush treatment monitoring transects.
    b. Using existing quantitative transect data, agencies may describe ecological site potential of vegetation communities as meeting or not meeting any or all of the GUSG structural habitat guidelines.

2. ***Select transect locations.***
    a. An agency ID team, in coordination with CPW, livestock permittees, and other interested entities, would select a subset of existing transect locations to maintain permanent, long-term monitoring. This subset should include vegetation communities/ecological sites capable of meeting any/all habitat indicators.
    b. Additionally, new transects may be established to ensure coverage of all pertinent vegetation communities/ecological sites.

[32] Williams 2012. *Characteristics of Gunnison sage-grouse Habitat in Dry Mountain Loam and Mountain Loam Ecological Sites of the Gunnison Basin.* CPW.

c. Selected transects will be comprised of a random sample across federal lands in occupied habitat in the Basin.
d. Agencies will monitor transects with the methods outlined in the RCP vegetation monitoring protocol (see Appendix E.II).

***3. Collect Data.***

At a minimum, participating agencies will complete the following:

a. *For areas that are meeting most/all of the structural habitat guidelines:*
   - Re-read transects every 8-9 years, and/or when short-term monitoring indicates habitat conditions have changed. Read more frequently if a significant change occurs in management or vegetation condition (fire, large-scale weed invasion, die-off event, multiple-year drought, etc.)

b. *For areas that are not meeting the minimum value of most/all of the structural habitat guidelines:*
   - Collect monitoring data at established study transect sites every 3-5 years.

***4. Land Health Measures (BLM)***

a. Incorporate GUSG RCP structural habitat guidelines into Land Health Standards Determinations[33] on BLM, Gunnison Field Office-administered lands. *RCP Grazing Objective 1-2, p. 211*
   - Assessment will include data collected with the RCP monitoring protocol (long-term transects) and with the modified stubble height protocol (short-term, see Appendix E).

b. Complete Land Health Determinations (revised, including RCP structural habitat guidelines) on all occupied sage-grouse habitat.
   - Priorities may include: grazing allotments in Tier 1 GUSG habitat, areas previously determined *Not Meeting - Moving towards*, etc.
   - Encourage interested parties to work with the BLM to complete Land Health Assessments.

[33] Land Health assessments and determinations are utilized by the BLM to inform management. Decisions specific to recreation, grazing, and development may follow from Land Health determinations.

## 7.2. Short-term Monitoring for Grazing Management

Objective:

- Monitor herbaceous heights in occupied sage-grouse habitat in order to inform grazing management and management of other contributing factors in the short-term.
- Integrate grouse habitat monitoring for grazing-relevant RCP habitat guidelines with range monitoring.

***1. Select monitoring locations.***

a. An ID team, including participating permittees and range and wildlife Authorized Officer, will choose a subset of the baseline CCA plots for short-term monitoring locations that best represent the habitat conditions AND livestock/big game use in the pasture/use area. To the extent possible, short-term monitoring locations will include the long-term fixed point monitoring locations, but more locations may be necessary.

b. Locations should be established in areas that can support GUSG habitat objectives *(use information from Section 7.2, sage-grouse Habitat Condition Assessment, to locate appropriate ecological sites/vegetation communities.)*

c. The ID team will aim to establish fixed monitoring points for efficiency and consistency, but changing conditions may warrant that the ID team add locations over time to best represent grouse habitat and livestock use. Need at least one per pasture.

***2. Collect & Interpret Data.***

At a minimum, implementing agencies will complete the following:

*Determine whether an allotment is meeting/not meeting the minimum value of the RCP habitat guidelines for herbaceous heights:*

a. **"Meeting" RCP Guidelines:** In a given year, if 70 % of the grass height measurements within a given allotment—in plant communities that have site potential to meet the RCP grass height guidelines in normal precipitation years—have met the RCP guidelines, the allotment will be determined to be "meeting".

b. **"Not meeting" RCP Guidelines:** In a given year, if more than 30% of the grass height measurements within a given allotment –in plant communities that have site potential to meet the RCP grass height guidelines in normal precipitation years—the allotment will be determined to be "not meeting".

c. Consideration of site potential is warranted in the process of determining "meeting" vs "not meeting", because as the RCP notes, "landscapes are diverse; some areas on the landscape will not meet these guidelines, some areas will meet the guidelines, and some areas will exceed the guidelines" (GSRSC 2005, App. H).

*When data indicate an area is meeting/exceeding the minimum value of the RCP habitat guidelines for herbaceous heights:*

a. Collect herbaceous heights and photo points once every *three years* – prior to livestock, immediately following livestock use, and at the end of the growing season.

*When data indicate an area is not meeting the minimum value of the RCP habitat guidelines for herbaceous heights, consistent with Section 5.5, Livestock Grazing:*

a. Conduct trigger monitoring:
   - Conduct utilization monitoring (Grazing Response Index, Key Forage Plant, Pellet Counts, etc.) as soon as practical.
   - Using the same sampling and monitoring methods, monitor herbaceous heights in exclosures/rested pastures with comparable ecological sites, in order to establish control data.
   - All causes for not meeting RCP herbaceous heights guidelines will be documented.
   - If *livestock* grazing is found to be a significant contributing cause to not meet the heights guidelines, conduct utilization monitoring the following year during the grazing season.
   - Use utilization data to assess stocking rates and to trigger pasture/allotment moves, within the terms and conditions of the current permit.

b. Collect herbaceous heights and photo points *annually*, immediately following livestock use. Every third year, collect this information prior to livestock use and at the end of the growing season.

***3. Cooperative Monitoring***

a. To provide a more complete short-term monitoring record in allotments containing sage-grouse habitat, permittees will be encouraged to enter into cooperative monitoring programs with the respective agency/ies to collect short-term monitoring information on the two years that the agency does not (including prior to livestock, immediately following livestock use, and at the end of the growing season).

b. For participating permittees who manage allotments where annual short-term monitoring indicates RCP herbaceous height guidelines are consistently being met, these permittees would receive more consideration for increased flexibility in their grazing management systems.

c. If a coordinated monitoring program is in place or a new one is developed for reasons outside of the CCA, participating agencies will work to incorporate these sampling methods into the monitoring program.

## 7.3. Monitoring Offsite Mitigation Actions: Reclaimed Routes

Objective:

- Monitor reclaimed routes in occupied sage-grouse habitat that are accounted for in the off-site mitigation accounting system, in order to:
  - Track the habitat quality and conservation maturity of this form of off-site mitigation, including:
    - Revegetation over time; and
    - Public compliance with closures.
  - Adjust reclamation methods used in order to speed and enhance revegetation.

***1. Select monitoring locations and collect data.***

A random set of reclaimed routes in the off-site mitigation accounting system will be monitored by the implementing agency at periodic intervals (one year after reclamation

activity, three – five years, etc.). At minimum, a photo point will be taken from the entrance/start of the route; modified vegetation transects may be appropriate in some cases.

# 8 REPORTING

## 8.1. Annual Meeting

At the end of one full year of implementation, dated from the signed CCA and conference opinion, CCA participants and the USFWS will meet to review progress toward CCA habitat objectives, identify problems encountered, and make updates to the CCA, as needed. Meeting would include review of each implementing agency's annual report. At that time, signatories will cooperatively establish subsequent meeting review periods, i.e., five year-intervals, to perform basic maintenance on the CCA. Yet consistent with the principles of adaptive management, changing conditions may warrant more frequent dialogue and adjustment to the CCA.

## 8.2. Annual Report Components

### *8.2.1 Ground-disturbing Development (not including trail/road closure implementation)*

New, amended*, and reauthorized* right of ways/easements and other activities involving short term or permanent habitat fragmentation will be reported, including the following information: *(*Include only reauthorizations and amendments for ground-disturbing activity beyond footprint of original authorization)*

1. Map/shapefile clearly identifying amount, if any, of new ground disturbance, construction, and new activity in Tier 1 and Tier 2 Habitat, in the following categories:
    a. Buried pipeline or utility line
    b. Aboveground pipeline
    c. Overhead utility line
    d. Reopened nonsystem[34] roads and trails
    e. Roads, including realignments
    f. Motorized trails, including realignments
    g. Nonmotorized trails, including realignments
    h. Fences
    i. Communication sites
    j. Miscellaneous infrastructure

[34] A nonsystem road or trail is one that is not formally approved; in this case, formerly officially closed roads and trails that are officially reopened should be reported.

2. Associated spreadsheet, including the following information for each category:
    a. Individual action/project
    b. Mileage/acres of each ground disturbance/infrastructure
    c. Location in Tier 1 or Tier 2 habitat
    d. CCA process used vs. individual/additional consultation process (yes/no)
        i. If no, why
    e. Accompanied by offsite mitigation (N/A/yes/no)
    f. Accompanied by additional conservation measures not outlined in the CCA (yes/no)
        i. If yes, what
    g. Accompanied by monitoring?
    h. Weed management and revegetation on ROWs- Compliance inspection
    i. Fences – Compliance with marking, wildlife-friendly fencing standards

### 8.2.2 *Reauthorized and Amended Rights-of-way/Easements*

Unless amendment of existing right-of-way/easement involves ground disturbance or additions to the permitted area *beyond the original permitted area*, include amendments and reauthorizations in a spreadsheet detailing the following:

1. Individual reauthorization/amendment
2. Type of associated infrastructure
3. Relevant minimization measures incorporated into permit language (yes/no)
    a. If no, why
4. Accompanied by additional conservation measures not outlined in the CCA (yes/no)
    a. If yes, what
5. Accompanied by monitoring?/Compliance inspection?

### 8.2.3 *Travel Management: Trail/Road Closures (not including seasonal closures)*

1. Map/shapefile clearly identifying amount, if any, of trail/road closures and realignments in Tier 1 and Tier 2 Habitat, in the following categories:
    a. Designated open/system or closed/nonsystem in 2010 TMP (USFS, BLM) and MVAP (NPS)
    b. Class
    c. Closures accompanied by a realignment (new ground disturbance)

2. Associated attribute table, including the following information:
    a. Individual road/trail section
    b. Designated open/system or closed/nonsystem in 2010 TMP (USFS, BLM) and MVAP (NPS)
    c. Closures accompanied by a realignment (new ground disturbance) (yes/no)
        i. If yes, Length/class of open realignment (or ID corresponding segment in G.1.a)

d. Class[35]
e. Length of each section
f. Level of closure
g. Location in Tier 1 or Tier 2 habitat
h. Any monitoring? Closure compliance?

### 8.2.4 *Offsite Mitigation*

For the first year of implementation, the agencies/partners will develop an accounting system to illustrate how offsite mitigation is used by agency recreation planners to develop and implement new roads and trails. Until otherwise agreed, report the following minimum information:

1. Baseline habitat map/shapefile, including all permanent infrastructure and linear features, including fences, closed roads and trails
2. Tier 1/Tier 2 habitat map:
   **a.** new roads/trails, if any, and associated mitigation actions
3. Spreadsheet detailing:
   **a.** Triggering action: new road/trail
      - Type
      - Size
      - Location in Tier 1 or Tier 2 habitat
   
   **b.** Corresponding mitigation action
      - Type
      - Size
      - Location in Tier 1 or Tier 2 habitat
      - Photo point/any other monitoring information

### 8.2.5 *Grazing*

The following information will be reported:

1. Number of permits renewed.
   a. For each permit, an assessment of the habitat condition relative to RCP standards, using existing data.

2. Short-term monitoring:
   a. Location of monitoring (transect number/approximate location)
      - Herbaceous height data
      - Photo point data
      - Any additional environmental data
      - For permits that have been modified to incorporate sage-grouse habitat guidelines or standards, identify whether or not area is meeting incorporated standard for grass/forb height (yes/no)
        
        2.a..1. If no, corresponding action and assessment (additional monitoring)

[35] See Section 14, Glossary.

- Year recorded
- Next anticipated (staff) monitoring season/year

### 8.2.6 *Overall Progress*

1. Quantify overall progress toward CCA habitat objectives in Tier 1 (net reduction of fragmentation) and Tier 2 habitat (no net increase in fragmentation).

2. Long-term monitoring:

3. Location of monitoring (transect number/approximate location)

4. Data for RCP habitat guidelines/vegetation variables
   **a.** Photo point data, if any
   **b.** Any additional environmental data
   **c.** Meeting RCP Habitat Guidelines
   - Sagebrush Canopy (%) (yes/no). If no, corresponding action/assessment
   - Non–sagebrush Canopy (%) (yes/no). If no, corresponding action/assessment
   - Total Shrub Canopy (yes/no). If no, corresponding action/assessment
   - Sagebrush Height (yes/no). If no, corresponding action/assessment
   - Grass Cover (%) (yes/no). If no, corresponding action/assessment
   - Forb Cover (%) (yes/no). If no, corresponding action/assessment
   - Grass Height (yes/no). If no, corresponding action/assessment
   - Forb Height (yes/no). If no, corresponding action/assessment
   - Overall habitat condition for grouse (unsuitable/marginal/suitable)
   - Year recorded
   - Next anticipated monitoring season/year.

4. Report trends in habitat quality.

# 9 ADAPTIVE MANAGEMENT

Signatories to the GUSG CCA agree that implementing conservation measures is most effective when accomplished within an adaptive management framework. Adaptive management involves the scientific method of hypothesizing how conservation measures will affect a population or other conservation target, monitoring results, comparing them to pre-defined expectations, and modifying actions to better achieve stated goals and objectives (Walters and Holling 1990; Lyons et al 2008).

Accurate and credible monitoring is a necessary component of adaptive management to ensure that conservation measures described herein are successfully implemented and objectives met. However, it is not sufficient to simply monitor a population without having pre-defined population targets and thresholds that trigger additional actions.

As noted in the RCP, "if a series of population estimates for a given population continually declines toward a threshold, managers should increase efforts to evaluate the decline and potential conservation actions before the population passes the threshold" (GSRSC 2005, p. 198). The RCP identified a conservative threshold of 30% below the RCP population target of 3000 as such a trigger[36]. Therefore, during the lifetime of the CCA, if the 3-year moving average of the Gunnison Basin population declines toward a population estimate of 2000 a) over two consecutive years or b) over a 5-year period, CCA signatories will revisit the conservation measures and management actions outlined in the CCA.

As with most land management decisions, signatories to the CCA must rely on the best available scientific information as to the efficacy of the included conservation measures, especially when such information is not locally available or readily ascertained through monitoring. If the signatories were to commit to monitoring the efficacy of weed BMPs or perch deterrents, and to correlate such measures to population-level effects, we would quickly consume all available biology staff time with such endeavors.

Nonetheless, the federal land management agencies are charged with managing the habitat, and therefore the overarching objectives of the CCA are to reduce net fragmentation (Tier 1 habitat) and avoid further net fragmentation (Tier 2 habitat), described in Section 1.3. Compliance monitoring to account for these objectives will be conducted and submitted in the annual report, as detailed in Section 8. As referenced in Section 1.3, future research or agency policy may identify cumulative levels of disturbance that Gunnison sage-grouse can tolerate. At that time, parties to this CCA would consider modifying Tier 1 and Tier 2 habitat objectives to be consistent with identified disturbance caps, thereby ensuring the GUSG CCA remains a viable and relevant instrument.

Annual compliance monitoring for livestock grazing is required, as is long-term habitat monitoring to document effectiveness of management actions and conservation measures in maintaining and improving sage-grouse habitat quality (*see Section* ***Error! Reference source not ound.***).

Furthermore, as the off-site mitigation plan is developed and implemented, effectiveness monitoring will be necessary to ensure that if functional habitat is disturbed, functional habitat is created or improved. With respect to trail decommissioning, randomized sampling of the vegetative condition will serve to both a) document compliance with overall habitat objectives in the CCA, and b) enable managers to improve habitat reclamation methods *(See Section 7.3)*.

Additionally, adaptive management to ensure maintenance and improvement of land health (BLM) and compliance with Forest Plan standards (USFS) is an integral part of federal land

[36]Future updates to the Gunnison Basin population targets via new population viability analyses will be incorporated to the CCA via a revised trigger threshold, i.e., a continual decline toward 70% of the revised population target would necessitate revisiting the conservation measures and management actions outlined in the CCA.

management and is well-integrated into livestock grazing management programs. For the GUSG CCA, prescribed short-term monitoring results will be used in conjunction with additional data to ensure maintenance and improvement of habitat conditions for Gunnison sage-grouse *(See Section 5.5 and Appendix E)*.

## 10 DURATION of AGREEMENT

Any party may withdraw from the agreement by providing the other parties with a written notice of intent to withdraw no later than 90 days prior to the proposed termination date. If a signatory other than USFWS withdraws, the agreement would be maintained between remaining signatories. The terminating party shall also include a written explanation of the reasons for withdrawal.

All parties will meet at least one year subsequent to the plan execution to review the CCA, its effectiveness, and to determine whether revision is necessary; at such time, signatories will determine subsequent minimum meeting intervals, i.e., every five years, to review annual reports and perform basic maintenance on the CCA. Any signatory may propose changes to this agreement between review meetings, as referenced in Section 9. Such changes will be in the form of an amendment and may be considered at any time after a 30-day notice to all parties. No amendment shall be valid unless approved by all parties to this agreement, and some amendments may trigger the need for additional biological assessment and conferencing with USFWS.

## 11 AUTHORITIES

### *USDI - United States Fish and Wildlife Service*

Sections 2 and 7 of the ESA allow the USFWS to enter into this CCA with other cooperating partners. Section 2 of the ESA states that encouraging interested parties, through Federal financial assistance and a system of incentives, to develop and maintain conservation programs is a key to safeguarding the Nation's heritage in fish, wildlife, and plants. Section 7 of the ESA requires the USFWS to review programs it administers and utilize such programs in furtherance of the purposes of the ESA. By entering into this CCA, the USFWS is utilizing its authority to enter into this type of agreement to further the conservation of the Nation's fish and wildlife resources.

### *USDI - Bureau of Land Management*

The United States Department of Interior (USDI) BLM has authority for conservation of GUSG through: (1) the Federal Land Policy Management Act (FLPMA) of 1976 FLPMA, (Section 307, 43 USC 1737; 90 stat. 2743; PL 94-579); (2) the Sikes Act, Title II (16 U.S.C. 670 et seq.), as amended; and (3) the BLM Manual 6840, Special Status Species Management. Specifically, the

FLPMA guidance on sensitive species authorizes that "the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air, and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals…"(43 USC 1701 Sec. 102 (a) (8)).

The BLM's 2004 National Sage-Grouse Habitat Conservation Strategy states "Approximately half of the remaining sage-grouse habitat is under BLM jurisdiction and management; therefore, BLM land plays a significant role in the consideration of sage-grouse and other sagebrush-dependent wildlife species." Specific strategies pertaining to this CCA include *Strategy 3.1: Maintain, develop, and expand partnerships to promote cooperation and support for all activities associated with sage-grouse and sagebrush conservation; and Action 3.1.3: Maintain and expand state and local partnerships to implement the task outlined in the cooperatively developed state-level strategies and/or plans.*

Finally, the BLM's "Guide to Agreements" notes that "Cooperative Management Agreements" are typically long-term agreements with other parties interested in joint management of wildlife habitats or other areas.

Section 06 (C) of the 6840 Manual gives the following guidance on candidate species: "Consistent with existing laws, the BLM shall implement management plans that conserve candidate species and their habitats and shall ensure that actions authorized, funded, or carried out by the BLM do not contribute to the need for the species to become listed." Specific BLM guidance is outlined in the 6840 Manual. Section .12 of the 6840 Manual states: "Actions authorized by BLM shall further the conservation of federally listed and other special status species and shall not contribute to the need to list any special status species under provisions of the ESA, or designate additional sensitive species under provisions of this policy." The Department of Interior Fish and Wildlife Policy: State-Federal Relationships (43CFR Part 24.4 (c)) states in part that "…the Secretary of Interior is charged with the responsibility to manage non-wilderness BLM lands for multiple uses, including fish and wildlife conservation.

BLM Colorado's Instruction Memorandum No. 2005-038, Statement of Interim Policy, Implementation of the Gunnison sage-grouse Rangewide Conservation Plan, instructs BLM Colorado "to utilize the RCP as the basis for managing the multiple uses of the public lands in identified GSUG habitat. Effective immediately, RCP guidance and strategies will be applied through site-specific analysis, consistent with the National Environmental Policy Act (NEPA), to all proposed projects or actions in identified GUSG habitat; " the CCA formalizes specific standards and implementation practices founded in the RCP.

### *USDI - National Park Service*

The USDI NPS has authority for conservation of the GUSG through the 1916 NPS Organic Act (16 USC 1) which charges the NPS with management of parks to "... conserve the scenery and the natural and historic objects and the wildlife therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of

future generations." Additional authorities that guide the NPS are found in the General Authorities Act of 1970 (16 USC 1c(a)) and the Redwood Act of 1978 (16 USC 1a-1). Furthermore, the Presidential Proclamation establishing Black Canyon of the Gunnison National Monument (Proclamation No. 2033; March 2, 1933; 17 Stat. 2558), and the Memorandum of Agreement between the NPS and Bureau of Reclamation dated February 11, 1965, provide authorities for protection of the GUSG at Black Canyon of the Gunnison National Park and Curecanti National Recreation Area.

NPS Management Policies and the NPS-77 Natural Resources Management Guideline state that the NPS will seek to perpetuate the native animal life as part of the natural ecosystem of parks. They further define Species of Concern as all native animal species within a park that face an immediate danger of losing their natural role in an ecosystem because of human-induced change, which would include the GUSG. Regarding Species of Concern, NPS-77 states that the NPS should also look for opportunities to enter into cooperative and interagency agreements and memoranda of understanding with other federal and state agencies on research, monitoring, and management of the Species of Concern, and, where appropriate, promulgate regulations. The NPS must strive to protect the natural conditions and processes and the ecosystem integrity to the greatest extent possible for Species of Concern.

NPS-77 further states, "Management of Candidate species should, to the greatest extent possible, parallel the management of federally listed species." The NPS Management Policies identifies the management of threatened or endangered plants and animals as follows: "The Service will survey for, protect, and strive to recover all species native to national park system units that are listed under the ESA because of human-caused change." This could include the Gunnison sage-grouse. "The Service will fully meet its obligations under the NPS Organic Act and the ESA to both proactively conserve listed species and prevent detrimental effects on these species."

### *USDA - United States Forest Service*

The United States Department of Agriculture (USDA) Forest Service (USFS) has authority for conservation of the GUSG through: 1) the Multiple Use-Sustained Yield Act (MUSY) of 1960 (P.L. 86-517, 74 Stat. 215, 16 U.S.C 528(note), 528-531); 2) the Sikes Act of 1960 (P.L. 86-797, 74 Stat. 1052, 16 U.S.C. 670 et seq., as amended); 3) the Forest and Rangeland Renewable Resources Planning Act (RPA) of 1974 (P.L. 93-378, 88 Stat. 476, as amended; 16 U.S.C. 1600(note), 1600-1614); 4) the National Forest Management Act (NFMA) of 1976 (P.L. 94-588, 90 Stat. 2949, 16 U.S.C. 472 et seq.) and its implementing regulations (36 CFR 219); 5) Public Rangelands Improvement Act of 1978 (P.L. 95-514, 92 Stat. 1806, 43 U.S.C. 1901-1908); and 6) USDA Regulation 9500-4 and the Forest Service Manual (FSM) Chapter 2600. MUSY directs the USFS to administer the National Forests for outdoor recreation (including wilderness), range, timber, watershed, and wildlife and fish purposes, in cooperation with interested State and local governmental agencies and others. "Multiple use" means the harmonious and coordinated management of the various surface renewable resources so that they are utilized in the combination that will best meet the needs of the American people. The Sikes Act provides authority for cooperative planning, habitat improvement, and providing adequate protection for threatened or endangered species under the Endangered Species Act of 1973 or species

considered to be threatened, rare, or endangered by the State agency. RPA and NFMA provide for comprehensive, integrated planning that will provide for the diversity of plant and animal communities to meet overall multiple-use objectives. USDA Regulation 9500-4 directs the USFS to manage "habitats for all existing native and desired nonnative plants, fish and wildlife species in order to maintain at least viable populations of such species." USFS policy states: "To preclude trends toward endangerment that would result in the need for federal listing, units must develop conservation strategies for those sensitive species whose continued existence may be negatively affected by the forest plan or a proposed project." (FSM 2621.2)

Furthermore, the USFS Manual Update for Region 2, supplement number 2600-2011-2, dated September 30, 2011, "encourages [the Forest] to develop a Candidate Conservation Agreement for sage-grouse with the U.S. Fish and Wildlife Service"; "collaborate with the State, BLM, and other agencies and landowners to promote consistent management of sagebrush and sage-grouse habitats on adjoining lands"; and "support and participate in State-wide and local sage-grouse working groups for the conservation of sage-grouse and sagebrush habitats."

### *USDA - Natural Resources Conservation Service*

The USDA NRCS has authority for conservation of GUSG through: (1) the Soil Conservation and Domestic Allotment Act of 1936, as amended (PL 74-46; (2) the Department of Agriculture Reorganization Act of 1994 (PL 103-354; 7 U.S.C. 6962); and (3) the Farm Security and Rural Investment Act (Farm Bill) of 2002 (PL 107-171).

### *State of Colorado – Department of Natural Resources, Colorado Parks & Wildlife*

The CPW, a branch of the Colorado Department of Natural Resources, has responsibility for the management and conservation of wildlife resources within state borders, including the conservation and management of threatened and endangered species, as defined and directed by state laws (i.e. Colorado Revised Statutes, Title 33 Article 1). Title 33 Article 1-101, Legislative Declaration states: "It is the policy of the State of Colorado that the wildlife and their environment are to be protected, preserved, enhanced and managed for the use, benefit, and enjoyment of the people of this state and its visitors. It is further declared to be the policy of this state that there shall be provided a comprehensive program designed to offer the greatest possible variety of wildlife-related recreational opportunity to the people of this state and its visitors and that, to carry out such program and policy, there shall be a continuous operation of planning, acquisition, and development of wildlife habitats and facilities for wildlife-related opportunities."

In addition, the 10-year Strategic Plan for CPW, adopted by the Colorado Wildlife Commission in 2010, emphasizes the importance of wildlife conservation. The plan lists 10 management principles that guide the agency in fulfilling its mission; these beliefs underscore the importance of wildlife conservation and maintenance of healthy, diverse and abundant wildlife. Principles applicable to this CCA include "... A primary consideration in wildlife management decisions is to maintain healthy, diverse and abundant wildlife…The quality, quantity and conservation of

wildlife habitat are essential to maintaining the state's diverse wildlife populations and wildlife-related uses…Partnerships and the involvement of private property owners, other agencies, local governments, public and private groups, citizens and volunteers are critical to the protection and management of Colorado's wildlife and wildlife habitat…"

The Strategic Plan's Fish, Wildlife, and Habitat Program Area include the following desired outcome, objectives, and actions:

*Desired Outcome:* Colorado's fish and wildlife is managed such that the need for federal listings under the Endangered Species Act are minimized, and the state retains primary management authority.

- *Objective:* Protect, restore and enhance habitat for fish and wildlife.
    - Provide analysis and recommendations to improve fish and wildlife habitats and reduce impacts from threats to those habitats (including, but not limited to, those impacts associated with energy development, climate change, urban and exurban development and invasive species)
- *Objective:* Ensure the long-term viability of native fish and wildlife and strive to maintain the broadest representation of the diversity of native wildlife in suitable habitats across the state.
    - Collaborate with interested and affected parties to develop and implement plans to recover threatened and endangered species and conserve native fish and wildlife
    - Assist public and private landowners in the conservation, restoration and enhancement of native fish and wildlife

### *Gunnison County*

Gunnison County is a Colorado statutory county with the authority to protect and promote the health, welfare and safety of the people of Gunnison County, and the authority to regulate land use planning and quality and protection of the environment in Gunnison County.
Gunnison County has duly adopted regulations to exercise such authorities including the review, approval or denial of proposed activities and uses of land and natural resources.

### *Saguache County*

Saguache County is a Colorado statutory county with the authority to protect and promote the health, welfare and safety of the people of Saguache County, and the authority to regulate land use planning and quality and protection of the environment in Saguache County. Saguache County has duly adopted regulations to exercise such authorities including the review, approval or denial of proposed activities and uses of land and natural resources.

# 12 RESPONSIBILITIES OF SIGNATORIES

### *BLM, NPS, USFS*

- In order to be covered under the programmatic conference opinion for the CCA, the federal agencies will design, authorize, implement, and manage the specified land-use authorizations to be consistent with the conservation measures outlined in the CCA, at a minimum. Agencies may go above and beyond the minimum standards as conditions warrant and/or new federal land use plans and policies are developed.
- The agencies will notify and coordinate with USFWS on land-use authorizations that fall outside the scope of those covered in the CCA and/or fail to meet the established design criteria, consistent with ESA Section 7 requirements.
- As identified in the Reporting Section, submit annual compliance reports to USFWS.
    - Maintain the CCA by providing ongoing technical assistance and feedback to the implementing agencies via formal and informal channels, including continued and active participation in the Gunnison Basin Gunnison sage-grouse Strategic Committee and Technical Subcommittee.

### *USFWS*

- Provide ongoing technical assistance and feedback to the signatory agencies regarding implementation of the CCA via formal and informal channels, including continued and active participation in the Gunnison Basin Gunnison sage-grouse Strategic Committee and Technical Subcommittee.

### *Colorado Parks & Wildlife*

*Colorado Parks & Wildlife commits to the following CCA objectives and conservation strategies so long as they are consistent with state law, regulation and budget authority.*

- Support general objectives of GUSG CCA.
    - Provide ongoing technical assistance and feedback to the signatory agencies regarding implementation of the CCA via formal and informal channels, including continued and active participation in the Gunnison Basin Gunnison sage-grouse Strategic Committee and Technical Subcommittee.
    - Commit to Grazing measure 5, p. 24: *Seek opportunities to achieve greater flexibility in the distribution of current AUMs across the landscape in order to improve GUSG habitat.*
        - *Inventory inactive grazing allotments on state and federal lands. Identify vacant allotments that may enable short and long-term flexibility in the grazing system.*
        - *Seek opportunities to create coordinated Allotment Management Plans to improve GUSG habitat across private, state, and federal lands.*

- During severe winters, coordinate with the federal agencies to identify grouse concentration areas and need for area closures, as well as cooperate to communicate closures to public and hunters, consistent with Section 5.2.B.
- Commit to Section 5.6, Strategies to Manage Wild Ungulate Grazing.
    - *DAU reevaluation will occur consistent with established protocols, including Wildlife Commission review.*

### Gunnison County

- Support general objectives of GUSG CCA.
- Provide ongoing technical assistance and feedback to the signatory agencies regarding implementation of the CCA via formal and informal channels, including continued and active participation in the Gunnison Basin Gunnison sage-grouse Strategic Committee and Technical Subcommittee.
- In order for Gunnison County to receive coverage under the CCA and programmatic conference opinion for the following specified land-use authorizations, Gunnison County will:
    - In partnership with the implementing agencies, and subject to relevant County policies and procedures, continue to coordinate the annual spring season road closures to motorized use, until such time the CCA signatories may determine the closures are no longer warranted.
    - Implement integrated weed prevention BMPs for road maintenance and ground disturbance operations through Gunnison sage-grouse habitat on federal lands, consistent with Appendix A, Section I.
    - Incorporate integrated weed prevention terms and conditions for road maintenance and ground disturbance operations in Gunnison sage-grouse habitat on federal lands, consistent with Appendix A, Section II. These terms and conditions shall apply to Gunnison County as well as any County-contracted operators that maintain and construct infrastructure within Gunnison sage-grouse habitat on federal lands.
    - As identified in the Reporting Section, contribute to annual compliance reports submitted to USFWS regarding use of integrated weed prevention practices within Gunnison sage-grouse habitat on federal lands.

### Saguache County

- Support general objectives of GUSG CCA.
- Provide ongoing technical assistance and feedback to the signatory agencies regarding implementation of the CCA via formal and informal channels, including continued and active participation in the Gunnison Basin Gunnison sage-grouse Strategic Committee and Technical Subcommittee.

- In order for Saguache County to receive coverage under the CCA and programmatic conference opinion for the following specified land-use authorizations, Saguache County[37] will:
  - Implement integrated weed prevention BMPs for road maintenance and ground disturbance operations through Gunnison sage-grouse habitat on federal lands, consistent with Appendix A, Section I.
  - Incorporate integrated weed prevention terms and conditions for road maintenance and ground disturbance operations in Gunnison sage-grouse habitat on federal lands, consistent with Appendix A, Section II. These terms and conditions shall apply to Saguache County as well as any County-contracted operators that maintain and construct infrastructure within Gunnison sage-grouse habitat on federal lands.
  - As identified in the Reporting Section, contribute to annual compliance reports submitted to USFWS regarding use of integrated weed prevention practices within Gunnison sage-grouse habitat on federal lands.

### *Natural Resources Conservation Service*

- Support general objectives of GUSG CCA.
- Provide ongoing technical assistance and feedback to the signatory agencies regarding implementation of the CCA via formal and informal channels, including continued and active participation in the Gunnison Basin Gunnison sage-grouse Strategic Committee and Technical Subcommittee.
- Commit to Grazing measure 5, p. 24: *Seek opportunities to create coordinated Allotment Management Plans to improve GUSG habitat across private, state, and federal lands.*

[37] Saguache County has proposed a 5-year phase-in of the integrated weed prevention measures for road maintenance and ground disturbance operations in Gunnison sage-grouse habitat on federal lands, consistent with Appendix A, Section II. Until such time that these measures are incorporated, Saguache County road maintenance and ground disturbance operations in Gunnison sage-grouse habitat on federal lands will not receive coverage under the programmatic conference opinion.

CHAPTER 6 - APPENDIX C
GUSG Candidate Conservation Agreement, Gunnison Basin Population

## SIGNATURES

8/1/2013

Patty Gelatt
Regional Director/Western Colorado Supervisor
U.S. Fish and Wildlife Service, Rocky Mountain Region

Brian St. George
Field Manager
U.S. Bureau of Land Management, Gunnison Field Office

Sherry Hazelhurst
Acting Forest Supervisor
Grand Mesa, Uncompahgre and Gunnison National Forests

Connie Rudd
Superintendent
National Park Service, Black Canyon of the Gunnison National Park and Curecanti National Recreation Area

6-92 BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS
AUGUST 2016

CHAPTER 6 - APPENDIX C
GUSG Candidate Conservation Agreement, Gunnison Basin Population

Gunnison County Commissioners

Saguache County Commissioners

Anthony L. Gurzick
Acting Southwest Regional Manager
Colorado Parks & Wildlife

Phyllis A. Phillips
State Conservationist
Natural Resources Conservation Service

**BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS** **6-93**
**AUGUST 2016**

# 14 GLOSSARY

**Authorized officer:** Any employee of the federal agency with delegated authority to perform the describe duties.

**Consolidate:** Multiple system and nonsystem routes in one area are replaced by one system trail or trails that better meets user needs and resource objectives.

**Decommission:** Install physical barriers to harden a trail or road closure.

**Fragmentation:** Fragmentation as used throughout the CCA is defined as the reduction of continuity and/or quality of habitat, including both direct habitat conversion and indirect/functional impacts. It is not intended to imply that sage-grouse within the Gunnison Basin population are genetically isolated as a result of habitat fragmentation, and no data exist to indicate genetic isolation is occurring within the Basin.

**Ground disturbance:** The development footprint; area of direct habitat conversion and impacts.

**Nonsystem roads and trails:** All roads, primitive roads, and trails that are not formally recognized, designated, or approved by the respective land management agency. User-created or officially closed roads and trails.

**Offsite mitigation:** Offsite mitigation consists of compensating for resource impacts by replacing or providing substitute resources or habitat at a different location than the project area. Per BLM policy[38], offsite mitigation may include, as appropriate:

A. In-kind: Replacement or substitution of resources that are of the same type and kind as those being impacted.

*Example:* For every acre of new, long-term surface disturbance in important sage-grouse nesting/early brood-rearing habitat in Area (A), (X) acres of unsuitable habitat in Area (B) is reclaimed, treated, or planted to create new or suitable nesting/early brood-rearing sage-grouse habitat.

B. Out-of-kind: Replacement or substitute resources that, while related, are of equal or greater overall value to public lands.

*Example:* For every acre of new, long-term surface disturbance in important sage-grouse nesting/early brood-rearing habitat in Area (A), the project proponent agrees to bury (Y) miles of existing power lines and remove the power poles used as hunting perches by raptors in Area (B).

[38] BLM WO 2008 –204.

C. In-lieu-fee: Payment of funds to the BLM or a natural resource management agency, foundation, or other appropriate organization for performance of mitigation that addresses impacts of a project.

*Example:* The applicant may make payment to the BLM or a conservation group based on the amount of acres that will be disturbed in exchange for commitment from the recipient to apply the funds toward local sage-grouse core habitat protection/restoration projects.

**Reclaim:** Minimize visibility and improve the habitat function of closed routes via a variety of techniques. For the purposes of the CCA, "reclaimed" routes will generally be treated to Level 3 (BLM definition) or higher. Levels detailed here:

C. Level of Decommissioning done by hand, passenger vehicle, or ATV/UTV (*BLM terms and framework)*

Level 1 – Allow the closed road to naturally revegetate.
Level 2 – Install sign with a hand crew
Level 3 –These activities will be done by a hand crew.

e) Install/Remove worm fence/barricade, buck and pole fence/barricade, rock barriers, or gate.
f) Place slash on the road surface, drop trees, dead plant vegetation, plant live vegetation, transplant live vegetation from nearby areas, and install erosion products such as coir logs (i.e. wattles) , mulch, and erosion control blankets.
g) Install and remove cross ditches/drains; check dams; and water bars.
h) Hand crews rototill or scarify the ground.

D. Levels of Decommissioning done with heavy equipment (excavator, dozer, track hoe).

Level 4 – Physical Barricades. Install gates, rock blockades or trees with mechanized equipment, such as a tracked excavator or dozer.
Level 5 – With mechanized equipment, rip the road; sub-soil the road; or construct water bars or ditches within and outside of the road prism.
Level 6 – With mechanized equipment, re-contour the road prism by pulling back all cut and fill slopes in addition to inboard ditches.
Level 7 –With mechanized equipment, remove all drainage structures including cross drains (culverts, rolling dips, and water bars); stream crossings structures (culverts); and unstable fills.

**Realignment:** Rerouting sections of existing roads, trails to avoid sensitive resource areas, i.e., rerouting a trail out of riparian zone.

**Riparian:** an area of land directly influenced by perennial water (streams, rivers, lakes and wetlands). A riparian area is distinctly different vegetation and soils with characteristics that are strongly influenced by free or unbound water in the soil. Swales, washes, and ephemeral drainages without perennial water and a dominant water-loving (hydrophytic) plant community

are not included. During drought years, riparian areas would still be considered riparian, even though water tables would have dropped and perennial water was deep below the soil surface.

**System roads and trails:** All linear features (roads, primitive roads, and trails) formally recognized, designated, and approved by the respective land management agency.

**Tier 1 Habitat:** Roughly 60% of occupied grouse habitat is proposed to be managed as Tier 1 habitat. These areas are identified by the Habitat Prioritization Tool, and are generally characterized by two or more overlapping seasonal habitats and minimal existing development (roads and homes).

**Tier 2 Habitat:** Roughly 40% of occupied grouse habitat is proposed to be managed as Tier 2 habitat. These areas are identified by the Habitat Prioritization Tool, and generally represent the more fragmented areas on the landscape. The standards for grouse conservation in Tier 2 habitat should be consistent with the Range-wide Conservation Plan, to the extent practicable. The RCP is a baseline for grouse management in the Basin.

## 15 LITERATURE CITED

Aldridge et al. 2011. Crucial nesting habitat for Gunnison sage-grouse: a spatially explicit hierarchical approach. Journal of Wildlife Management. 72(2): 391-406.

BLMa, Interagency Technical Team. 1996. Interagency Technical Reference for Utilization Studies and Residual Measurements. Technical Reference 1734-3. National Science and Technology Center, Denver, CO.

BLMb, Interagency Technical Team. 1996. Sampling vegetation attributes. Technical Reference 1734-4. National Science and Technology Center, Denver, CO, 172 pp.

BLM CO IM. IM-No. CO-2005-038.Statement of Interim Policy, Implementation of the Gunnison sage-grouse Rangewide Conservation Plan.

BLM WO IM. IM-No. WO-2008-024.. Offsite mitigation.

BLM WO IM. IM-No. WO-2010-022.. Managing Structures for the Safety of sage-grouse, Sharp-tailed grouse, and Lesser Prairie-chicken.

BLM WO IM. IM-No. WO-2010-071.. Gunnison and Greater sage-grouse Management Considerations for Energy Development.

Boyle, S. A. and D. R. Reeder. 2005. Colorado sagebrush: a conservation assessment and strategy. Grand Junction: Colorado Division of Wildlife.

Braun, C.E. 1998. sage-grouse declines in western North America: What are the problems? Proceedings of the Western Association of State Fish and Wildlife Agencies 78:139–56.

Canfield, R.H. 1941. Application of the line interception method in sampling range vegetation. Journal of Forestry. 39:388-394.

Clary, W.P and W.C. Leininger. 2000.Stubble height as a tool for management of riparian areas. Journal of Range Management. 53:562–573.

Colorado Parks & Wildlife. 2012. 2012 Gunnison Basin Gunnison sage-grouse Lek Count Summary and Population Estimate. Colorado Parks & Wildlife, Gunnison Basin, Colorado, USA.

Colorado Rangeland Monitoring Guide. 2011.

Connelly, J.W., K.P. Reese, and M.A. Schroeder. 2003. Monitoring of greater sage-grouse habitats and populations. Station Bulletin 80, University of Idaho, Moscow, USA.

Daubenmire, Rexford. 1959. A canopy-coverage method of vegetation analysis. Northwest Science 33:43-64.

Doherty, K.E., D.E. Naugle, and J.S. Evans. 2010. A currency for offsetting energy development impacts: horse-trading sage-grouse on the open market. PLoS ONE 5(4): e10339. doi:10.1371/journal.pone.0010339

Endangered and Threatened Wildlife and Plants; Determination for the Gunnison sage-grouse as a Threatened or Endangered Species; Notice of the results of the status review. 75 Federal Register 187 (28 September 2010) pp. 59804-59863.

Gibbons P, and D.B. Lindenmayer 2007. Offsets for land clearing: no net loss or the tail wagging the dog? Ecological Management and Restoration 8: 26–31.

Gunnison sage-grouse Rangewide Steering Committee. 2005. Gunnison sage-grouse rangewide conservation plan. Colorado Division of Wildlife, Denver, Colorado, USA.

Hanophy, W. 2009. Fencing with wildlife in mind. Colorado Division of Wildlife, Denver, CO. 36 pp.

Kiesecker et al. 2010. Energy by design: making mitigation work for conservation and development. pp. 159-181. In D.E. Naugle, ed. Energy development and wildlife conservation in western North America. Island Press, Washington, DC.

Knick, S.T., and J.W. Connelly, editors. 2011. Greater sage-grouse: ecology and conservation of a landscape species and its habitats. Studies in Avian Biology 38. University of California Press, Berkeley, CA.

Lyons, J. E., et al. 2008. Monitoring in the Context of Structured Decision-Making and Adaptive Management. Journal of Wildlife Management 72(8):1683-1692.

McKenney B. 2005. Environmental Offset Policies, Principles, and Methods: A Review of Selected Legislative Frameworks. Amherst (NH): Biodiversity Neutral Initiative.

Phillips, M. Personal communication – CCA review comments. 15 June 2012.

Pruett, C.L., Patten, M.A., and D.H. Wolfe. 2009. Avoidance behavior by prairie grouse: implications for development of wind energy. Conservation Biology. 23(5):1253-1259.

Safe Harbor Agreements and Candidate Conservation Agreements with Assurances; Final Policy. 64 Federal Register 116 (17 June 1999) pp. 32705-32716.

Stevens, B. S., Connelly, J. W. and Reese, K. P. (2012), Multi-scale assessment of greater sage-grouse fence collision as a function of site and broad scale factors. Journal of Wildlife Management 76 (7):1370-1380.

Stevens, B. S. 2011. Impacts of fences on Greater sage-grouse in Idaho: collision, mitigation, and spatial ecology. M.S. Thesis, University of Idaho, Moscow, Idaho, USA.

USFS R2 Supplement 2600-2004-1 2011, Section 2631.1, sage-grouse and Sagebrush Habitats.

USFWSa. N.d. Using Existing Tools to Expand Cooperative Conservation for Candidate Species across Federal and on Federal Lands.

USFWSb. N.d. CCA Fact Sheet, 2011.

USFWS. 2000. Service Interim Guidelines for Recommendations on Communications Tower Siting, Construction, Operation, and Decommissioning. US Fish and Wildlife Service Migratory Bird Program.

USFWS & BLM. 2010. Programmatic Consultation Agreement between Bureau of Land Management and US Fish and Wildlife Service for Canada Lynx in Colorado.

Walters, C. J., and S. Holling. 1990. Large-scale management experiments and learning by doing. Ecology 71:53-74.

Williams, M.I. and A.L. Hild. 2012. Characteristics of Gunnison sage-grouse Habitat in Dry Mountain Loam and Mountain Loam Ecological Sites of the Gunnison Basin. CPW. Report to the Colorado Division of Parks and Wildlife. University of Wyoming, Department of Ecosystem Science and Management, Laramie, WY.

Wisdom et al. 2011. Factors associated with extirpation of sage-grouse**.** In Knick, S. T., and J. W. Connelly, editors. 2011. Greater Sage-Grouse: ecology and conservation of a landscape species and its habitats. Studies in Avian Biology 38. University of California Press, Berkeley, CA.

Wyman, S. et al. 2006. Riparian area management: grazing management processes and strategies for riparian-wetland areas. Technical Reference 1737-20. BLM/ST/ST-06/002+1737. U.S. Department of the Interior, Bureau of Land Management, National Science and Technology Center, Denver, CO. 105 pp.

# APPENDIX A. Integrated Weed Management: Preventing the Spread of Invasive Plants

## A. Background

Weeds are identified as a "moderate+" threat to GUSG by the USFWS, with the likelihood of "indefinite increases due to increased human presence and climate change." And much research indicates that ground disturbance caused by construction and maintenance activities, as well as unclean equipment, contributes heavily to the spread of invasives.

Recognizing that many weed prevention and management efforts are underway in the region, and many BMPs are already incorporated into standard operating procedures, nonetheless, the participants to early discussion – listed above – identified room for improvement across the agencies and counties.

Participants recognize that integrated weed prevention and management measures not only contribute to grouse habitat conservation, but contribute to better resource management in general.

## B. Best Management Practices: Road Maintenance & Ground Disturbance Operations

In order for a signatory to receive coverage under the CCA and conference opinion, the signatory will apply these best management practices to the extent feasible for work within Gunnison sage-grouse habitat on and through federal lands, including signatories' contractors and right-of-way, easement, and permit holders.

Including but not limited to crown or slope reconstruction; clearing ditches, culverts and catchments; replacement of road surface, roadside mowing operations, and dust abatement.

### *SCHEDULE & TIMING*

1. Plan work from non-infested areas to infested areas, as practicable. Plan work with Basin Weed Coordinator or Agency Weed Specialist, using existing weed inventories along planned route.
2. If heavily infested areas are known along planned routes for grading or mowing, work with Basin Weed Coordinator/Agency Weed Specialist to identify sections where it may be appropriate and practical to lift grader's blade or mower deck.
3. Minimize operations of equipment during conditions when mud can accumulate on equipment. Generally, these types of conditions exist when damage to the road resource can occur.
4. When scheduling allows, schedule activity when seeds or propagules are least likely to be viable and to be spread or when grading/blading/mowing could reduce the vigor of the weed infestation.
    - Contact Basin Weed Coordinator or Agency Weed Specialist and refer to Gunnison Basin Weed Inventory GIS database (to be developed).

- Generally grade roads early in the spring before grasses develop seed heads or late in the season after grasses have set seed and become dormant.

### MOBILIZING EQUIPMENT: EQUIPMENT CLEANING

1. Clean all heavy equipment and mobilizing equipment[39] before entering Gunnison County and West Saguache County.
2. Power-washing is the most effective method of cleaning.
3. Equipment shall be considered free of soil, seeds, vegetation, and other such debris when a visual inspection by operator or staff does not disclose such material on the undercarriage, cross members, frame, skid plates, belly pans, wheels, treads, tracks, suspension, bumpers, wheel wells, radiator grills, and the ledges on the inside of rear and front bumpers. *Disassembly of equipment components or specialized inspection tools is not required.*

### BETWEEN-SITE OPERATIONS: EQUIPMENT CLEANING

1. Clean all heavy equipment before entering each project area if:
   - Equipment is covered with mud, plants, or other foreign materials and/or
   - Previous operation site was infested with invasive plant species.
2. Power-washing is the most effective method of cleaning, when available. Mechanical removal via "brooming" may be appropriate when in the field.
   - *Ideally, equipment should be washed between each route within Gunnison sage-grouse habitat and/or in between infested areas and non-infested areas.*
   - *Yet the infrastructure – portable power-washing stations—is not yet available in the region.*
   - *Cleaning equipment arriving from outside of the Basin is a good step but not sufficient.*
   - *A practical compromise is that equipment should be cleaned via following methods:*
     - *Commercially washed whenever movement between sites takes operators through towns with commercial facilities;*
     - *Hose-washing in staging area/area with drain may suffice;*
     - *In the field: mechanical removal may be appropriate in the field.*

3. Equipment shall be considered free of soil, seeds, vegetation, and other such debris when a visual inspection by operator or staff does not disclose such material on the undercarriage, cross members, frame, skid plates, belly pans, wheels, treads, tracks, suspension, bumpers, wheel wells, radiator grills, and the ledges on the inside of rear and front bumpers. *Disassembly of equipment components or specialized inspection tools is not required.*

[39] earth-moving equipment; does not include pickup trucks and personal vehicles.

## *ON-SITE OPERATIONS & OPERATOR EDUCATION*

1. Locate and use weed-free project staging areas.
2. Avoid acquiring water for road dust abatement where access to the water is through weed-infested sites.
3. Only use gravel, chip seal, soil, sand or other types of imported road/fill materials from sites that have no weed infestations.
   - For agency/County work, these sites should be identified or inspected by the Gunnison Basin Weed Coordinator or Agency Weed Specialist prior to mobilization.
   - For contracted work, a list of agency or County-recommended sources will be provided and recommended to contractor.
   - In the future, should a state or local weed-free certification program for road/fill materials be initiated, participating entities in the CCA will adopt the certification standards and require use of certified weed-free road/fill materials for their own and contracted work.
4. Only grade the road or mow the shoulder when necessary for resource protection, safety, or function.
5. As practicable, keep the grader's blade 1 to 2 inches above the road surface when the primary goal is to remove rocks that have fallen onto the road.
6. Annually, train operations and maintenance staff in the identification of invasive plant species and relevant weed BMPs.

## *RESEEDING & RECLAMATION*

1. During the same growing season that the ground disturbance takes place/within 30 days following completion of construction, revegetated the newly disturbed sites with approved seed mixes.
   - Identify party responsible for revegetation work if work is contracted.
   - If ground disturbance occurs after late August/average date of first frost, generally delay reseeding until October 1/average date of consistent frost to ensure seedlings remain dormant and viable until following growing season (NRCS guidance, Scott pers comm). *Date may vary depending upon elevation.*
   - Consult Agency Weed Specialist, Botanist, or Ecologist for approved seed mixes. The agencies and/or the Weed Commission will work together to provide suitable seed mixes.
   - For surfaces that are annually graded and cleaned, including the road prism[40] and water bars, revegetation would not be appropriate.
   - Culvert installation and lead-out ditch construction should be revegetated.
   - Seeding shall be repeated if a satisfactory stand is not obtained as determined by the agency representative upon evaluation after the second growing season.

[40] Road prism is area from the top of the cut to the bottom of the fill.

2. Use only weed-free (certified when available) erosion control devices, such as coir logs, erosion control blankets, straw, topsoil, and soil amendments. Wattles, jute mats, and rice straw are examples of weed- free products.

3. Following ground-disturbing activities, treat infested areas with herbicides, hand pulling, or biological controls as deemed necessary by Basin Weed Coordinator or Agency Weed Specialist.
   - Unless otherwise agreed, surfaces that are annually graded and cleaned, including the road prism and water bars, do not require treatments.
   - Culvert installation and lead-out ditch construction areas should be treated.

### *INVENTORY & MONITOR*

1. Agencies and Counties should inventory areas for invasive plants prior to their own/contracted road maintenance activities and ground-disturbing construction and flag these areas for avoidance or post-project treatment *(see Treatments section, above)*. Inventories should include the following information:
   - Road number and mile markers
   - UTM's
   - Infestation type, i.e. existing infestations
   - Infestation size
   - Cover class
   - Type(s) of species observed
2. Update Gunnison Basin Weed Inventory GIS database at minimum once a year.
   - Gunnison Basin Weed Coordinator will annually coordinate with agencies to collect, compile, and make available most updated weed inventory information.
3. Monitor sites between two and three years following all treatments, as practicable. Prioritize monitoring in priority grouse habitat.
   - Unless the Weed Commission can absorb the work load, the agency will be responsible for monitoring.

## C. Terms and Conditions for Contractors, Rights-of-Way & Easement Holders

In order for a federal signatory to receive coverage under the CCA and conference opinion, federal signatories will incorporate these terms and conditions into new and renewed individual right-of-way authorizations, easements and permits on federal lands within GUSG habitat.
In order for non-federal and federal signatories to receive coverage under the CCA and conference opinion, signatories will apply these terms and conditions to both internal and contracted work to maintain and construct infrastructure within Gunnison sage-grouse habitat on federal lands.
Unless otherwise agreed, to prevent the introduction of the seeds of noxious and invasive weeds onto lands within occupied Gunnison sage-grouse habitat on federal lands:

### *CLEANING*

Contractor, utility, or individual operator shall ensure all heavy equipment moved onto lands is free of soil, seeds, vegetative matter, or other debris that could contain or hold seeds.

1. Equipment shall be considered free of soil, seeds, vegetation, and other such debris when a visual inspection by operator or staff does not disclose any such material on the undercarriage, cross members, frame, skid plates, belly pans, wheels, treads, tracks, suspension, bumpers, wheel wells, radiator grills, and the ledges on the inside of rear and front bumpers.
2. For equipment arriving from outside Gunnison County and West Saguache County, operator shall clean all heavy equipment and mobilizing equipment[41] before entering Gunnison County and West Saguache County.
3. Although power-washing is the most effective method, prior to moving between sites *in the field*, operator shall employ **whatever cleaning methods necessary** to ensure compliance with the terms of this provision.
4. Movement between field sites that *requires travel through or return to Gunnison/urban center* shall be accompanied by power-washing at a commercial washing station, **if one is available**.
5. Disassembly of equipment components or specialized inspection tools is not required.

### *NOTIFICATION*

Contractor, utility, or individual operator shall notify agency representative prior to moving each piece of heavy equipment onto such agency-administered lands, unless otherwise agreed.

1. If the agency representative requests an inspection, arrangements will be made to inspect equipment prior to it being moved onto agency lands.
2. Use of contractors by individual private ROW/easement holder would require agency notification, with the following exceptions:
    - Private land access ROWs/easement holders operating own equipment are excepted from this measure, unless otherwise agreed.
    - Does not apply to snow removal equipment.

### *SOURCING/STAGING*

When the agency/County specifically provides the necessary information, contractor/utility/individual operator shall:

1. Use identified/mapped weed-free project staging areas.
2. Use identified/mapped access routes and water sources for road dust abatement.
3. Use only gravel, chip seal, soil, or other types of imported road materials from agency-approved or inspected sources.

[41] earth-moving equipment; does not include pickup trucks and personal vehicles.

4. Use identified/mapped turn-around locations.

### *APPLICABLE ONLY TO RIGHT-OF-WAY/EASEMENT HOLDERS*

1. The holder shall be responsible for weed control within the limits of the right-of-way. The holder shall be responsible for consultation with the appropriate agency representative for acceptable weed control methods.

1. The holder shall revegetate all disturbed areas using a seed mixture specified by the agency representative within 30 days following completion of any construction.

- If ground disturbance occurs after late August/average date of first frost, generally delay reseeding until October 1/average date of consistent frost to ensure seedlings remain dormant and viable until following growing season (NRCS guidance, Scott pers comm). Reseeding shall be completed prior to the following growing season.
- Consult Agency Weed Specialist, Botanist, or Ecologist for approved seed mixes.
- Seed shall be **certified** weed-free seed; exceptions to this requirement must be approved in writing by the agency representative.
- The seed mixture container shall be tagged in accordance with State law(s) and the tag(s) submitted for inspection by the agency representative at least 14 days before the date of proposed seeding.
- The seed mixture shall be planted in the amounts specified in pounds of pure live seed (PLS)/acre.
- For surfaces that are annually graded and cleaned, including the road prism[42] and water bars, revegetation would not be appropriate.
- Culvert installation and lead-out ditch construction areas shall be revegetated.
- Seeding shall be repeated if a satisfactory stand is not obtained, as determined by the agency representative upon evaluation after the second growing season.

[42] Road prism is area from the top of the cut to the bottom of the fill.

# APPENDIX B. Urban Interface Recreation Areas

*The intent of this section is to outline the preferred locations for current, concentrated recreation at the urban interface, and to outline long-term planning for recreation expansion to balance the needs of a growing population and the need to maintain sage-grouse habitat. A guiding strategy of the CCA Recreation Team has been to balance sage-grouse and recreation via the concentration of use in preferred areas. The following three areas are generally in close proximity to Gunnison[43] and especially in the case of Hartman Rocks, capture the vast majority of recreationists in grouse habitat in the Basin. Although sage-grouse conservation measures should still be observed in each of these areas, such as seasonal closures to minimize disturbance to leks the off-site mitigation standards outlined in sections 4.3, 4.4, 5.2, and 5.3 of the CCA would not be required in these areas to compensate for new route and facility development. For efficiency, route reclamation efforts will be best- suited to areas at a greater distance from the urban interface. For each of the following areas, a minimum set of grouse conservation measures is proposed below.*

## A. Hartman Rocks

**Current Condition:**
Hartman Rocks Recreation Area is a popular urban interface recreation area about 2 to 6 miles southwest of Gunnison (*Se Figure 3 & Figure 4*). Its proximity to Gunnison makes it easy for local residents to access for a quick recreation experience. It is becoming a destination location for mountain biking, rock climbing and single track motorized enthusiasts. It is estimated that it receives approximately 40,000 visits each year. Visitors practice a variety of recreation activities including mountain biking, motorcycling, ATV riding, 4 wheeling, rock climbing, bouldering, camping, trail running, horseback riding, cross country skiing, snowmobiling, dog sledding, hill parties, target shooting, hunting and more.

**Long-Term Planning – Future Need and Development:**
The use of Hartman Rocks will continue to grow as population increases in Gunnison and the region, as accounted in the Hartman Rocks Area Management Plan (2012). In compliance with the Management Plan, facility development would be allowed in the Front Country (1814 acres) and Middle Country Zones (4205 acres.) Facility development could include but is not limited to trails, restrooms, a motorcycle track, open play areas, or shooting ranges.

**Total Acreage:** Tier 1 habitat = 2617; Tier 2 habitat = 3402.

**Proposed sage-grouse Conservation Measures in this Recreation Area:**

- Open north of the Power Line Road March 15 – May 15, when a large number of roads are closed to motorized travel. *Note: This is not a conservation measure for sage-grouse*

[43] These areas also capture recreation use in sage-grouse habitat from the outlying subdivisions, including Tomichi Heights, Cranor Hill, Upper and Lower Castle Mountain, Antelope Hills, and outlying neighborhoods adjacent to Hartman Rocks.

*in Hartman Rocks, but the open area does concentrate recreation use here and limit noncompliance with closures elsewhere in the Basin.*

- Human uses discouraged prior to 9 AM. March 15 to May 15.
    - Human uses in future facilities, i.e. shooting ranges, motorcycle tracks, would be discouraged prior to 9 AM during this time period.
- Closed south of the Power Line Road to motorized and mechanized use from March 15 to May 15.
- Any facility development in the Back Country Zone would follow the planning process and design criteria outlined in the relevant sections of the CCA. If the proposed facility development were to fall outside the scope of the CCA, then the default conference or consultation process would begin with USFWS.